# EXHIBIT A

Gurbir S. Grewal
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, NJ 08625-0093
Tel.: (609) 376-2761
By:  Gwen Farley, Deputy Attorney General
Bar No. 000081999
*Attorneys for Plaintiffs*

Leonard Z. Kaufmann
  Atty. ID #045731994
  lzk@njlawfirm.com
COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
*Special Counsel to the Attorney General*

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>        Plaintiffs,<br><br>v.<br><br>E.I. DUPONT DE NEMOURS & COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; AND "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),<br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION<br><br>SALEM COUNTY<br><br>DOCKET NO. L-000057-19<br><br>        CIVIL ACTION<br><br>**FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs, the New Jersey Department of Environmental Protection (the "Department" or "NJDEP"), the Commissioner of the Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively "Plaintiffs" or the "State"), file this First Amended Complaint against the above-named defendants (the "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1. Plaintiffs bring this civil action against Defendants pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 (the "Spill Act"); the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20 (the "WPCA"); the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 to -13.1 ("ISRA"); the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to 58:10B-31 (the "Brownfields Act"); the Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq. ("SWMA"); the Air Pollution Control Act, N.J.S.A. 26:2C-1, et seq.; the Department's enabling statute, N.J.S.A. 13:1D-1, et seq.; the Uniform Fraudulent Transfer Act, Del. Code. tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to 25:2-34; and the common law of New Jersey for cleanup and removal costs, damages, and other relief as a result of the discharges of hazardous substances and pollutants by E.I. du Pont de Nemours & Company ("DuPont"), The Chemours Company ("Chemours"), and The Chemours Company FC, LLC ("Chemours FC") at and from the Chambers

Works facility, located at 67 Canal Road and Route 130, in Pennsville and Carneys Point Townships, Salem County ("Chambers Works" or "Site").

2.    Throughout its 125 years of operations at Chambers Works, DuPont has produced, utilized, and discharged into the environment approximately 1,200 chemicals, pollutants, and other hazardous substances.   As a result of DuPont's processes, emissions, and waste disposal practices, Chambers Works is one of the most contaminated sites in New Jersey.  It is saturated with a wide variety of pollutants and hazardous substances, including semi-volatile organic compounds ("SVOCs"), volatile organic compounds ("VOCs"), metals, pesticides, and polychlorinated biphenyls ("PCBs"), as well as per- and polyfluoroalkyl substances ("PFAS").

3.    For decades, the Department has worked to allow DuPont to investigate and remediate Chambers Works without the need for enforcement or litigation.  However, it has recently become clear that DuPont has not been working in good faith to address the contamination it released into New Jersey's environment.  Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its "performance chemicals" businesses (including its PFAS-related product lines), the Site itself, and the associated liabilities to Chemours and Chemours FC and away

from DuPont (and tens of billions of dollars of its assets). DuPont also concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused.

4.    For example, for over 50 years, DuPont emitted vast quantities of PFAS chemicals—including perfluorooctanoic acid ("PFOA") and perfluorononanoic acid ("PFNA")—from Chambers Works. For most of that time, DuPont had clear and unequivocal knowledge that: PFOA, PFNA and other PFAS compounds are extremely resistant to degradation, they persist indefinitely in the environment, they bioaccumulate in blood, and they pose a substantial threat to human health and the environment. Yet, DuPont actively concealed the true nature of PFAS compounds, while it utilized, discharged, emitted, released, and dumped vast quantities of these compounds into New Jersey's air, waters, and natural resources. DuPont knowingly undertook this course of conduct for one reason: to maximize its profits from Teflon® and myriad other consumer products and industrial uses for PFAS-containing compounds. Both DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey.

5.    Although DuPont and 3M, which supplied PFOA to DuPont for use at its facilities, knew of these dangers for decades, regulatory agencies around the world are only now coming to understand the true nature and dangers of these global

contaminants.   Today, the State is expending substantial public resources to investigate PFAS compounds, including replacement compounds such as "GenX", their toxicity and impacts to human health and the environment, and to locate, remediate, treat, and/or restore New Jersey's natural resources that are impacted with these "forever chemicals."

6.   Not only is there significant PFAS contamination at Chambers Works, but PFAS compounds also dispersed through the Site's air emissions to locations miles away.  For example, testing of private drinking water wells miles from Chambers Works have recently revealed PFOA at levels that exceed both the interim and proposed applicable criteria for the compound.  Likewise, PFAS compounds have been located in drinking water, groundwater, surface waters, sediments, soils, air, fish, plants, and other natural resources emanating from Chambers Works and in other sites across New Jersey.

7.   Accordingly, the State is bringing this action to require Defendants to pay all of the costs necessary to fully investigate and delineate all of the PFAS compounds and other pollutants and hazardous substances that were discharged, released, and/or emitted from Chambers Works, wherever they may have come to rest.  Likewise, the State is seeking that Defendants pay all costs necessary to investigate, remediate, assess, and restore the Site itself and all of the off-site areas and natural

resources of New Jersey that have been contaminated from Chambers Works, except that the State is explicitly reserving its claims to remediate and restore the Delaware River until such time as the investigation work is more fully complete. Additionally, in this litigation, the State is not asserting claims, costs, or damages associated with aqueous film-forming foam ("AFFF"), which is a particular product that contains PFAS compounds, as that is the subject of a separate action.

8.   Finally, the State is also seeking from Defendants all damages to which the State is entitled to recover, including damages for injuries to all natural resources, property damages, economic damages, restitution and disgorgement of DuPont's and 3M's ill-gotten profits, punitive damages, and all other damages, costs, and equitable relief to which it may be entitled.

## **THE PARTIES**

9.   The Department is a principal department within the Executive Branch of the State government. Under the leadership of the Commissioner, it is vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety. N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

10.  The State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction. The Department is vested with the authority to protect this public

trust and to seek compensation for any injury to the natural resources of this State. N.J.S.A. 58:10-23.11a. In addition, the State may act in its parens patriae capacity to protect the State's "quasi-sovereign" interests, including its interest in the health and well-being of its residents and the integrity of its natural resources. The Department brings this case in its trustee, parens patriae, and regulatory (police power) capacities, as well as in its capacity as an owner of real property directly impacted by contamination originating from the Site.

11. Plaintiff Commissioner is the Commissioner of the Department. N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3; and N.J.S.A. 13:1B-2. In this capacity, the Commissioner is vested by law with various powers and authority, including those conferred by the Department's enabling legislation. N.J.S.A. 13:1D-1 to -19; N.J.S.A.13:1B-3.

12. Plaintiff Administrator is the Chief Executive Officer of the New Jersey Spill Compensation Fund ("the Spill Fund"). N.J.S.A. 58:10-23.11j. As Chief Executive Officer of the Spill Fund, Plaintiff Administrator is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10-23.11f(c) and (d), and to certify the amount of any claim to be paid from the Spill Fund. N.J.S.A. 58:10-23.11j(d).

13.  Defendant DuPont is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

14.  Defendant Chemours is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  In 2015, DuPont spun off its performance chemicals business to Chemours, along with certain environmental liabilities.

15.  Defendant Chemours FC is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours FC is a subsidiary of Chemours that was formed in April 2014.  Chemours FC has owned the Site since February 2015.

16.  Defendant 3M is a corporation duly organized under the laws of the State of Minnesota, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

17. Defendants "ABC Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified defendants in this matter, or which are otherwise liable for the causes of action set forth herein.

## AFFECTED NATURAL RESOURCES

18.   The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust or otherwise controlled by the State. N.J.S.A. 58:10-23.11b.

19.   The natural resources of this State include the "waters of the State," which are the ocean and its estuaries, all springs, streams and bodies of surface or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction.  N.J.S.A. 58:10A-3(t).

20.   New Jersey's habitats and ecosystems—forests, lakes, rivers, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands—are some of the most threatened in the nation.  They are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.

21.   Hazardous substances and pollutants have been found in the groundwater, surface water, sediments, soils, wetlands, air, and other natural resources at and around Chambers Works.

22.   These natural resources have intrinsic (i.e., inherent existence) values.  The current and future residents of New Jersey have a substantial interest in a clean environment.

## Groundwater

23.  Groundwater—that is, water that exists beneath the Earth's surface—is an extremely important natural resource for the people of New Jersey.  More than half of New Jersey's population obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

24.  Private wells, which provide access to groundwater, are widely used in the residential communities around the Site.  Wells are used for drinking water, irrigation, and filling swimming pools, among other things.

25.  Not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

26.  Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

27.  Groundwater and the other natural resources of the State are unique resources that help sustain the State's economy.

28.  Groundwater at the Site is heavily contaminated with hazardous substances and pollutants, including SVOCs, VOCs,

metals, polycyclic aromatic hydrocarbons ("PAHs"), PCBs, pesticides, and PFAS. Contaminated groundwater has also migrated off-site, including to the Salem Canal and the Delaware River. Discharges and releases of PFAS have further resulted in contamination of groundwater in the surrounding area, miles from Chambers Works.

### Surface Water

29. Surface waters are a critical ecological resource of New Jersey. New Jersey's surface water—which includes all water in the State's lakes, streams, and wetlands—is a primary source of drinking water in the State. Nearly half of New Jersey's population obtains its drinking water from surface water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

30. Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of goods and services.

31. The tourism and recreation industries, which are vital to the State's economy, are dependent on clean water and beaches.

32. Surface waters also provide commercial, recreational, aesthetic, and ecological value, including by supporting aquatic ecosystems, nearby communities, and the citizens of the State.

33.  The surface waters located at the Site include the Delaware River, the Salem Canal, Whooping John Creek, Boutons Creek, Hanby Creek, and on-site wetlands and ponds.

34.  Hazardous substances and pollutants, discharged at the Site, including SVOCs and metals, have reached and adversely affected surface waters on and off-site.

### Sediments and Soils

35.  New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

36.  Sediments and soils are critical components of New Jersey ecological resources.

37.  Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem.  They provide a living substrate for submerged and emergent flora and that support diverse invertebrate species, wading birds, and fish and shellfish populations.

38.  Hazardous substances and pollutants, discharged from the Site, including SVOCs, VOCs, PAHs, metals, total PCBs, pesticides and PFAS, have reached and adversely affected sediments and soils on and off-site.

### Wetlands

39.  Wetlands are a critical component of New Jersey's ecological resources, which include land and aquatic resources comprised of unique and complex ecosystems.

40. New Jersey has approximately 730,000 acres of freshwater wetlands and 250,000 acres of coastal wetlands.

41. Wetlands can sustain a wide diversity of plants and animals that are essential in a healthy food chain.

42. Wetlands perform many additional functions, which include the improvement of water quality, sediment trapping, groundwater recharge, shoreline protections, and protecting land from flooding and erosion.

43. Hazardous substances and pollutants, discharged at Chambers Works, have reached and adversely impacted wetlands on and off-site.

## Air

44. Air resources are vital to life. Pollution of air resources can injure human health and welfare, flora and fauna, and property, and can unreasonably interfere with the enjoyment of life and property in areas affected by such pollution. Air deposition (i.e., deposits of air contaminants on the Earth's surface) can also be a source of contamination to other types of natural resources, including surface water, groundwater, sediments and soils, wetlands, forests, and biota.

45. Air pollution from activities at Chambers Works has contaminated surrounding natural resources with PFAS, including but not limited to groundwater, up to five miles away from the Site.

13

46.  When subsurface air is contaminated with VOCs, the subsurface air (i.e., soil gas) can become a source of contaminated air to the structures above, causing vapor intrusion.

**Biota**

47.  Biota, including the flora and fauna of the State, are critical ecological resources.  New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora that cannot be found anywhere else in the world.  Approximately 15 percent of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant species listed as endangered and an additional 32 that have already been extirpated.

48.  New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds. Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers in the State each year.

49.  At least 17 percent of New Jersey's native vertebrate species and 24 percent of its native invertebrate species are at risk of extinction.  Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

50.  New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an

14

integral part of the ecological infrastructure for all cultural and economic activity in the State.

51.   Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

52.   Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

53.   Hazardous substances and pollutants discharged at Chambers Works have reached and adversely impacted biota on and off-site.

## FACTUAL ALLEGATIONS

54.   Chambers Works spans approximately 1,455 acres of real property located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships in Salem County, designated as Block 22, Lots 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10, and Block 301, Lots 1, 2, 3, 4 and 5 in Pennsville Township, and Block 185, Lot 1 in Carneys Point Township.

55.   Chambers Works is located along the eastern shore of the Delaware River.  The Site extends approximately 2.7 miles between Helms Cove to the north, and the Salem Canal to the south.

56.   The Site is comprised of the former Carneys Point Works in the northern area, and the Chambers Works manufacturing area in

the southern area.   Whooping John Creek generally separates the two areas.

57.  To the north and the east of the Site are residential neighborhoods.

*Site Ownership*

58.  In 1891, the DuPont Powder Company purchased farm land and built Carneys Point Works.   Over the next 20 years, DuPont expanded its footprint by purchasing adjacent parcels.   By 1914, DuPont's gunpowder operations had expanded southward, into the Chambers Works manufacturing area.

59.  DuPont owned or operated the contiguous property at Chambers Works from 1927 until 2015.

60.  On or around January 23, 2015, DuPont transferred the Chambers Works real property by deed to Chemours FC.  Chemours FC took the property with full knowledge that it was contaminated.

61.  In 2015, DuPont leased a portion of Chambers Works from Chemours FC to continue its operations of its non-performance chemical businesses at the Site.  As recently as 2018, DuPont was using that portion of the property to manufacture fluoroelastomers.

62.  Chemours FC currently owns the Site, and has been the owner since February 2015.

*Site Operations*

63.   Operations at the facility first began in or about 1892, when Carneys Point Works began manufacturing smokeless gunpowder, nitrocellulose, and other products.  DuPont used various materials to produce these chemicals, including ether, amines, plasticizers, nitroglycerin salts, nitric acid and sulfuric acid.  Carneys Point Works operated until 1979.

64.   DuPont began manufacturing and producing dye and specialty chemicals at the Dye Works part of the Site in or about 1917 and gradually expanded as other product lines were added.  In or about 1944, the Dye Works was renamed as Chambers Works.  DuPont produced approximately 700 different dyes at Chambers Works from 1917 through 1979.  These operations used numerous chemicals including organic mercury, amino compounds, benzene, nitrobenzene, chlorobenzene, phenols, acids, aniline, toluene, nitrotoluene, toluidine, sulfur, naphthalene, sodium hydroxide, sodium hydrosulfide, aluminum chloride, aromatic hydrocarbons, chlorinated aromatics, polymers, elastomers, methlyamines, and ethyl chloride.

65.   In the 1920s, DuPont began manufacturing refrigerants including Freon®, and tetraethyl lead ("TEL").  TEL production involved the use of hydrofluoric acid, sulfuric acid, hydrochloric acid, carbon tetrachloride, fluorospar, and antimony.

66.   In the 1940s, DuPont added aromatic chemical manufacturing to its operations at the Site, which involved

17

petroleum hydrocarbons, acids, solvents, inorganics, and aromatic hydrocarbons.

67. As further described below, DuPont began using PFOA in manufacturing processes at Chambers Works in the late 1950s.

68. In or around the 1960s, DuPont began to produce elastomers at Chambers Works, which production involved organic isocyanates, phosgene, dinitrotoluene, and hydrochloric acid.

69. By the late 1970s and early 1980s, DuPont discontinued its explosive and dye manufacturing divisions, leaving only chemical manufacturing at the Site.

70. Chemours continues to manufacture a variety of fluorochemicals and finished products at Chambers Works. Among other things, Chemours uses a PFAS replacement chemical, GenX, to manufacture Krytox™ greases and lubricating oils.

## HISTORY OF INVESTIGATION, REGULATION AND REMEDIATION

71. Historical manufacturing processes and waste disposal practices at Chambers Works caused significant soil, sediment, and groundwater contamination at the Site, which continues to plague the Site today.

72. From 1917 through the 1980s, process waste generated at Chambers Works was disposed of through a series of open ditches, some of which were unlined.

73. Production buildings had trenches and/or sumps that collected wastewater. Wastewater then flowed into a drainage ditch

adjacent to the buildings, where it would be combined with wastewater from other buildings.

74. Most wastewater then continued through a network of ditches into a settling basin, which ultimately discharged to the Delaware River. Some buildings at the exterior of the Site, however, discharged directly to the Delaware River and the Salem Canal. There were up to 15 historical outfalls along the Delaware River and Salem Canal that may have conveyed process wastewater directly off-site. This practice largely remained unchanged until 1958.

75. Improvements were made to this system incrementally over time, including the construction of a wastewater treatment plant ("WWTP") and the eventual addition of an overhead sewer system in 1991. Once the overhead sewer system was in place, all process wastewater was conveyed to the WWTP.

76. DuPont's historical practices have caused contamination. Sludge samples collected from ditches between the late 1980s and early 1990s contained high concentrations of chlorobenzene (up to 30,000 parts per million ("ppm")), 1,2-dichlorobenzene (up to 65,000 ppm), and lead (up to 176,000 ppm).

77. Groundwater contamination was first identified at the site in the 1960s. In 1967, DuPont installed and sampled groundwater monitoring wells, which samples indicated that contamination had occurred in the shallow glacial aquifer

underlying and adjacent to the Site, and that two unlined landfills were contributors to the contamination.

78. As a result of the identification of groundwater contamination, in 1971, DuPont installed an interceptor well system ("IWS") along the north and east boundaries of the Site.

79. Additionally, in 1975, DuPont constructed the WWTP, which would begin operating two years later.

80. In 1984, DuPont and the Department reached an agreement on terms for an Administrative Consent Order ("ACO"). The ACO recited that "DuPont has been and is discharging pollutants into unlined ditches and lagoons, from which pollutants may flow into the groundwaters of the State, in violation of the Water Pollution Control Act." The ACO required DuPont to line or eliminate all unlined ditches at the Site, and to close its unlined basins. The ACO further required DuPont to continue pumping, through the IWS, 1.5 million gallons of groundwater.

81. In 1988, permit No. NJD002385730 was issued for the Site pursuant to the  Hazardous and Solid Waste Amendments ("HSWA") of 1984.

82. As a result of the issuance of the HSWA permit, in February 1988, the ACO was amended to make the remediation timeframes consistent with the HSWA permit, and also to require closure of an additional basin.

83.  In November 1988, the Department issued a New Jersey Pollutant Discharge Elimination System ("NJPDES") Discharge to Groundwater ("NJPDES-DGW") permit for Chambers Works (NJPDES-DGW permit no. NJ0083429).  The permit required implementation of a groundwater quality monitoring program, and continuation of the IWS as well as other groundwater recovery programs.

84.  There have been four phases of the Resources Conservation and Recovery Act ("RCRA") Facility Investigation ("RFI") at the Site.  Initially, 55 Solid Waste Management Units ("SWMUs") were identified, and eventually that number was increased to 96 SWMUs.

85.  DuPont has identified Areas of Concern ("AOCs") at the Site.  In a 2006 Preliminary Assessment Report, DuPont identified 11 AOCs based on the potential for process-related contaminants to have entered the environment, including the fluoroproducts area, the TEL area, and the aramids area.

86.  Chemours, in a 2017 Preliminary Assessment/Site Investigation, added 11 more AOCs, raising the total to 22. Additional AOCs include the Delaware River AOC, Salem Canal AOC, Carneys Pont AOC, and C Landfill (SWMU 13) AOC.

87.  As a result of multiple years of investigation at the Site, the injury to natural resources, including soil, groundwater, surface water, and sediments is well-documented.

Results of those investigations include, but are not limited to, the below.

## Soils Contamination

88. Over 75 contaminants were detected in soil samples collected between September 2001 and October 2004. At least 60 different contaminants were detected in samples collected in the former Carneys Point Works area and evaluated in a Baseline Ecological Evaluation ("BEE") by DuPont in 2006. Of the contaminants detected, 16 were identified as Contaminants of Potential Ecological Concern ("COPECs"). Investigations associated with the RFI process identified 13 Contaminants of Potential Concern ("COPCs") in soil at the Carneys Point Works and Chambers Works manufacturing areas. Samples collected as part of the investigations exceeded applicable New Jersey soil remediation standards at 54, 173, 129, and 19 locations for VOCs, SVOCs, metals, and pesticides, respectively. Between the BEE and RCRA Facility Investigation, 22 contaminants were identified as either COPECs or COPCs: 1,2 dichlorobenzene, 2,4-DNT, 2,6-DNT, aniline, antimony, arsenic, benzene, bis(2-ethylhexyl)phthalate, butyl benzyl phthalate, chlorobenzene, chromium, copper, hexachlorobenzene, lead, mercury, nickel, nitrocellulose, N-nitrosodiphenylamine, PAHs, selenium, silver, and zinc.

## Groundwater Contamination

89.  Groundwater samples collected between 1999 and 2016 contained approximately 125 different contaminants.  Approximately 100 VOCs and SVOCs have been identified as exceeding New Jersey Groundwater Quality Standards for Class II-A Waters in the Chambers Works manufacturing area and the exceedances are widespread.  In addition, exceedances of groundwater quality standards for metals, including aluminum, antimony, arsenic, beryllium, chromium, iron, lead, manganese, and mercury, were widespread across the manufacturing area, and there were also exceedances of pesticides and total PCBs.

90.  Some contaminants exceeded groundwater quality standards by many orders of magnitude.  In the B Aquifer, some VOC and SVOC exceedances were more than 100,000 times the groundwater quality standard.

91.  In the former Carneys Point Works area, the primary impacts to groundwater are from metals, including arsenic and lead, and PAHs.  In total, the RFI report identified 47 contaminants as COPCs.

92.  After the discovery of a magenta-colored seep in Salem Canal in 2002, investigations identified a groundwater plume originating where azo dyes were once made.  Groundwater characterizations identified the width of that plume along the canal to be approximately 900 feet.  The plume, in the B Aquifer, extends 300 feet south beyond the Salem Canal.  Investigations

23

leading up to the DuPont interim remedial action work plan identified 12 different chemicals as COPCs in the groundwater including: chlorobenzene, dichlorobenzenes, aniline, 4-chloroaniline, n-nitrosodiphenylamine, benzene, o-toluidine, chloroform, tetrachloroethene, trichloroethene, benzidrine, and nitrobenzene.

93. Groundwater under the entire Site has been designated as a classification exception area ("CEA") due to the contamination exceeding groundwater quality standards and the need for remediation to protect human health and the environment. The CEA suspends the designated uses of the groundwater (potable Class IIA Quaternary Aquifer and Potomac-Raritan-Magothy Aquifer System beneath the Site).

## Surface Water and Sediment Contamination

94. As reported in the BEE with respect to surface waters and sediments in the former Carneys Point Works area, in 34 sediment samples there were detections of 30 SVOCs, 23 metals, and total petroleum hydrocarbons ("TPH"). Of those, 16 SVOCs and nine metals exceeded ecological benchmarks. DuPont identified 16 COPECs in sediment including 2,4-DNT, 2,6-DNT, acenaphthene, arsenic, benzo(b)fluoranthene, cadmium, chromium, chrysene, copper, lead, mercury, naphthalene, n-dioctyl phthalate, nickel, N-nitrosodiphenylamine, phenanthrene, pyrene, silver, zinc. In the eight surface water samples considered, one SVOC, bis(2-

ethylhexyl)phthalate, and 17 metals were detected. Of the contaminants detected, bis(2-ethylhexyl)phthalate, lead, and mercury exceeded ecological or surface water benchmarks.

95.   Following the appearance of the magenta-colored seep in Salem Canal in 2002, sampling of the discolored water from the seep was collected and contained six SVOC compounds exceeding ecological benchmarks for aquatic life (1,2-dichlorobenzene, 1,4-dichlorobenzene, aniline, 4-chloroaniline, diphenylamine, and naphthalene) and two VOC compounds that exceeded ecological benchmarks for aquatic life (chlorobenzene and xylene). Further investigations after discovery of the seep identified 11 COPCs in surface water and sediment in the Salem Canal. These include chlorobenzene, dichlorobenzenes, aniline, 4-chloroaniline, n-nitrosodiphenylamine, benzene, o-toluidine, trichlorobenzene, PAHs, 1-naphthylamine, and diphenylamine. In total, at least 38 contaminants have been detected in Salem Canal above either ecological or other sediment quality benchmarks.

96.   The limited sampling conducted in the Delaware River has resulted in detection of numerous VOCs, SVOCs, PAHs, metals, and total PCBs exceeding ecological benchmarks. The following contaminants exceeded refined sediment quality standards intended to provide a representative assessment of potential impacts (equivalent to COPCs): benzene, chlorobenzene, 1,2,4-trichlorobenzene, and vinyl chloride. Twelve VOCs and 13 metals

were detected in 35 Delaware River surface water samples collected near the Chambers Works manufacturing area. Concentrations of 1,4-dichlorobenzene, total aluminum, dissolved beryllium, total iron, dissolved lead, and total manganese exceeded surface water quality criteria. Eight metals were detected in surface water samples collected near Carneys Point. Total aluminum and total iron exceeded surface water quality criteria.

<u>**PFAS COMPOUNDS & GENX**</u>

97. PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals is entirely manmade and does not occur in nature. PFOA and perfluorooctanesulfonic acid ("PFOS") are the most widely studied PFAS chemicals, and have been shown to be toxic at very low concentrations.

98. PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are mobile and persistent. They are mobile in that they are soluble and do not adsorb (stick) to soil particles, and they are readily transported through the soil and into groundwater where they can migrate long distances. And they are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking

water.  In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into the air or water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

99.  PFOA and PFOS bioaccumulate, biopersist, and biomagnify in people and other organisms.

100. Exposure to PFAS in both humans and animals has been linked to several diseases, including kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, pregnancy-induced hypertension, and low birth weight.

101. PFOA and PFOS contamination presents a serious threat to public health through drinking water.  Humans can also be exposed through contaminated food, inhalation, and dermal contact.

102. PFOA and PFOS enter the environment from industrial facilities that manufacture PFOA or PFOS, or that use PFOA or PFOS, or products that degrade to PFOA or PFOS in the manufacture or production of other products.  Releases to land, air, and water from a multitude of industrial sites are known pathways to the environment.  PFOA and PFOS may also enter the environment when released from PFOA- or PFOS-containing consumer and commercial products during their use and disposal.

103. Beginning in 2013, DuPont replaced its production and use of PFOA with GenX chemicals.  GenX is the tradename for the chemicals, including hexafluoropropylene oxide dimer acid (HFPO-

DA), that allow for the creation of fluoropolymers without PFOA. While DuPont in a 2010 marketing brochure touted GenX as having "a favorable toxicological profile," studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure. Further, like PFOA and other PFAS compounds, GenX is persistent in the environment, not readily biodegradable, and mobile in the presence of water. DuPont acknowledged in the same brochure referenced above that GenX "is chemically stable and, if released, would be environmentally persistent." EPA is currently in the process of publishing a toxicity assessment for GenX.

104. In 2017, NJDEP accepted the New Jersey Drinking Water Institute's recommended health-based maximum contaminant level ("MCL") for drinking water of 14 ng/L or parts per trillion ("ppt") of PFOA, and updated its drinking water guidance value for PFOA to this level. The previous preliminary drinking water guidance level for PFOA issued by NJDEP in 2007 was 40 ppt. In September 2018, NJDEP also established an MCL of 13 ppt for PFNA. On March 13, 2019, the Department established interim specific groundwater quality criteria for PFOA of 10 ppt. In addition, the Department has proposed rules establishing MCLs for PFOA of 14 ppt and for PFOS of 13 ppt; establishing groundwater quality criteria

standards for PFOA of 14 ppt and PFOS of 13 ppt; and adding PFOA

and PFOS to the Spill Act's List of Hazardous Substances.

### DUPONT'S USE AND MANUFACTURE OF PFAS

105. Beginning in 1951, DuPont began purchasing PFOA from 3M

for use in the manufacturing process for its name-brand product

Teflon®, commonly known for its use as a coating for non-stick

cookware. DuPont has also used PFAS in other name-brand products

such as Stainmaster®.

106. 3M phased out production of PFOA in 2002. As explained

below, although DuPont was fully aware that PFOA was a dangerous

and toxic chemical, it began producing its own PFOA for use in its

manufacturing processes, including those at Chambers Works.

### 3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS

107. Though the PFAS family of chemicals was first

accidentally discovered by a DuPont scientist in 1938, for most of

the past several decades, 3M has been the primary manufacturer of

PFOA and PFOS.

108. 3M began producing PFOA and PFOS as raw materials that

they used to produce other products, or that they sold to third

parties for use in other products. 3M produced PFOA and PFOS by

electrochemical fluorination in the 1940s. This process results

in a product that contains and/or breaks down into compounds

containing PFOA and/or PFOS. 3M went on to market PFAS and products

containing PFAS, and it shipped PFOA and PFOS to manufacturers all

over the country, including to DuPont, which used PFOA and discharged it from Chambers Works and other facilities.

### DUPONT AND 3M's KNOWLEDGE OF THE DANGERS OF PFAS

109. By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

110. 3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

111. DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

112. As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

113. By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

114. By at least 1970, 3M was aware that its PFAS products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

115. In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

116. As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS' health effects.

117. Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. DuPont was aware of 3M's findings no later than 1981.

118. Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess

whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine. (As noted above, PFAS contain carbon and fluorine, and human exposure to these chemicals therefore has been linked to elevated organic fluorine levels.)

119. In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

120. According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

121. By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. DuPont did not report this data or the results of its worker health analysis to any government agency or community at this time.

122. The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

123. Not only did DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25 percent—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

124. In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of the study of its own plant workers.

125. While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

126. By late 1981, DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries.

127. Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

128. Similarly, in 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment." That same year, 3M worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

129. DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials. DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

130. During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already

liable for the past 32 years of operation." They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

131. Also in 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

132. Despite its understanding of the hazards associated with its PFOA and PFOS products, 3M actively sought to suppress scientific research on the hazards associated with them, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and ecological risks of its PFOA and PFOS products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

133. In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals

are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

134. DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

135. In 2004, EPA filed an action against DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the Toxic Substances Control Act and RCRA. DuPont eventually settled the action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

136. DuPont and 3M knew or should have known that in their intended and/or common use, products containing PFAS would very

likely injure and/or threaten public health and the environment. This knowledge was accessible to DuPont and 3M, but not fully to Plaintiffs.

*DuPont's Use and Discharge of PFOA from Chambers Works*

137. Beginning in the late 1950s, DuPont used PFOA in its manufacturing processes at Chambers Works, created PFOA as a by-product in other processes, and discharged PFOA from its wastewater treatment plant. As a result of all these and other activities, massive amounts of PFOA have been discharged at Chambers Works.

138. DuPont used PFOA to manufacture fluoroelastomers at Chambers Works starting in the late 1950s. Production included standard fluoroelastomers, perfluoroelastomers, and specialty fluoroelastomers. DuPont used PFOA to make standard fluoroelastomers until 2001, and perfluoroelastomers and specialty fluoroelastomers until 2013.

139. PFOA is also a by-product of DuPont's fluorotelomer manufacturing process at Chambers Works. Fluorotelomer manufacture at Chambers Works started in the early 1960s, and chemicals that could break down into PFOA were used until 2014.

140. The WWTP also received on-site process wastewater streams, landfill leachate and groundwater from the IWS, all of which contained PFOA.

141. Additionally, the WWTP received wastewater streams from other DuPont facilities as well as other commercial wastewater streams, which contained PFOA streams in the parts per million.

142. Significantly, DuPont transferred PFOA-containing waste generated at Washington Works to Chambers Works, which was discharged through the WWTP or landfilled on-site.

143. DuPont did not install a carbon treatment system, which could assist with treatment of PFAS, at its WWTP until 2004.

144. DuPont accepted commercial waste streams that contained PFOA and other PFAS until 2012.

145. As a result of the above activities, PFOA was discharged into surface water from the WWTP and emitted into air from stacks and vents, and leached to groundwater from PFOA-contaminated soils and/or onsite landfills with contaminated waste.

146. The scope of DuPont's PFOA-related activities at Chambers Works is demonstrated by its own estimates for the year 1999. For that year alone, DuPont estimates it transferred 13,400 pounds of PFOA-containing waste from Washington Works to Chambers Works; released at least 25,500 pounds of PFOA into water; dumped at least 8,000 pounds of PFOA-containing waste into landfills on-site; and emitted 300 pounds of PFOA-related chemicals into air.

*DuPont's Efforts to Conceal and Downplay PFOA Contamination at and around Chambers Works*

147. DuPont engaged in a long-running campaign in New Jersey to conceal and downplay PFOA contamination at and around Chambers Works, and the effects that this contamination would have on human health and the environment.  Among other things, DuPont compared sampling results to inflated screening levels, attacked New Jersey's efforts to establish more protective levels, and refused to acknowledge there was a contamination problem until it was forced to concede the issue.

148. In 2003, DuPont made one of its first meaningful disclosures about its PFOA-related activities at Chambers Works, in a report titled *DuPont Telomer Manufacturing Sites: Environmental Assessment of PFOA Levels in Air and Water*.  In the report, DuPont was supposed to give its assessment of the impact of its telomer manufacturing operations at Chambers Works.

149. Critically, DuPont sought to compare the results of the assessment to screening levels recently released by the "C-8 [PFOA] Assessment of Toxicity Team" ("CATT").  These levels were inflated by DuPont's own design.  CATT was created through DuPont's Consent Order with West Virginia.  The team, which included a DuPont representative, was tasked with assessing the health risks associated with releases of PFOA from Washington Works.

150. In 1991, DuPont had established an internal Community Exposure Guideline ("CEG") of 1 part per billion ("ppb") (1,000 ppt) for PFOA in community drinking water. DuPont sought to influence CATT to set screening levels significantly higher than its own CEG, which it could then present as proof that its releases posed no health risks. In 2002, CATT issued an "aquatic life advisory concentration" of 1,360 ppb (1,360,000 ppt). CATT also issued a "human health protective screening criteria" of 150 ppb (150,000 ppt), which was 150 times higher than DuPont's prior, internal standard.

151. In DuPont's 2003 report on Chambers Works, it disclosed that PFOA was present in groundwater throughout the Site and at the perimeter, up to 46.6 ppb (46,000 ppt). DuPont characterized these results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system." DuPont also dismissed the significance of the results, asserting that because "[g]roundwater in the vicinity of Chambers Works is not removed from the ground for drinking water or other use," the 1,360 ppb (1,360,000 ppt) screening level should be applied.

152. DuPont further reported that it was discharging PFOA into the Delaware River at an average concentration of 133 ppb (133,000 ppt). Samples from the Delaware River (downstream of the facility) were as high as 0.556 ppb (556 ppt), and from the Salem Canal were 0.089 ppb (89 ppt). According to DuPont, however, these

results were not concerning because they were "well below" CATT-established levels.

153. DuPont concluded its report by saying its operations at Chambers Works were "not a significant source of PFOA to the environment."

154. Following submission of the *Telomer Manufacturing Sites* report, DuPont continued to urge use of CATT screening levels in New Jersey. In or about January 2004, DuPont made a presentation to Department personnel about the CATT levels. It reiterated that "[a]ll" of its Chambers Works environmental assessment results were "[w]ell [b]elow [s]creening [c]riteria."

155. In March 2005, the Department directed DuPont to assess areas of Chambers Works where PFOA was used and may have caused contamination, and, in October 2005, DuPont provided its preliminary assessment and proposal for sampling ("2005 PAR").

156. DuPont sought in the 2005 PAR to sample limited areas. DuPont further stated that "[a]ir emissions from [PFOA-related] manufacturing processes were minimal," and that "contribution from air emissions to soil or groundwater impact would be insignificant."

157. Results of sampling done pursuant to the 2005 PAR were provided to the Department in October 2006 in a Site Investigation Report ("SIR"). PFOA was present in the areas investigated on the site in soil up to 0.990 ppm (990,000 ppt), and in groundwater up

to 1,050 ppb (1,050,000 ppt).  Nevertheless, DuPont concluded there was "limited potential for [PFOA] exposure to soil and groundwater."

158. DuPont did not propose remedial action.  In fact, it prefaced the SIR's results by stating "[t]o date, there are no human health effects known to be caused by PFOA," and that it believed "the weight of scientific evidence indicates that PFOA exposure does not pose a health risk to the general public." DuPont knew from its own internal studies and environmental assessments that this was false.

159. Also during this time, PFOA was detected in public water supplies near Chambers Works.  In February 2006, DuPont took samples from the Pennsgrove Water Supply Company's wells, which supply drinking water to households in Penns Grove and Carneys Point.  DuPont provided these results in a letter to the Department in May 2006.  PFOA was detected in the wells up to 190 ppt.

160. In its letter, DuPont stated that "[t]he results reflect PFOA levels far below any established regulatory guidance for drinking water," and that the water must, "therefore," be considered "safe for human consumption."

161. DuPont, in its letter, dismissed the relevance of litigations seeking treatment for drinking water exceeding 50 ppt. DuPont stated "that number is neither a public health standard nor a threshold for obtaining compensation."  Despite these

statements, mere months later, in November 2006, EPA would issue a Consent Order relating to the Washington Works facility determining PFOA may present an imminent and substantial endangerment to human health at or above 50 ppt, and memorializing DuPont's obligation to provide sufficient treatment to the drinking water of residents of West Virginia and Ohio living around Washington Works to ensure that this 50 ppt level is met.

162. In 2007, the Department issued its drinking water guidance level for PFOA of 40 ppt.

163. DuPont made every effort to see that New Jersey would not issue guidance at this level.

164. As stated above, DuPont had previously dismissed any level of 50 ppt. Now sensing that New Jersey would be issuing an advisory with a lower level, DuPont sought to use 50 ppt, from its prior Consent Order with EPA.

165. However, the Department's drinking water guidance level was being developed for lifetime exposure, while the Consent Order's 50 ppt level was put in place for less-than-lifetime, subchronic exposure.

166. In January 2007, DuPont submitted a memo from one of its scientists, Dr. Robert Rickard, to the Department for the purpose of attacking the advisory to be issued regarding drinking water guidance. Among other things, Dr. Rickard's memo stated the Department's issuance of an advisory below 50 ppt would be

"confusing" to the public.  He wrote:  "If a level lower than [50 ppt] is set in New Jersey it could cause undue concern among the communities at or above that level in New Jersey and elsewhere and the [Department] . . . will have difficulty explaining this variation."

167. Dr.  Rickard  further  charged  that  "it  would  be irresponsible for New Jersey to set a lower level," and that doing so "would undermine public expectations that government agencies charged with protecting health do so in a deliberate and scientifically sound manner."

168. Dr. Rickard, on DuPont's behalf, went even further.  With respect to setting a level below 50 ppt, which he characterized as "totally  unjustified,"  he  seemed  to  threaten  the  Department: "Based on the extensive scientific studies done by the government, research institutions and industry suggesting no human health effects at background levels, DuPont could not let a scientifically unsupported level go unchallenged."

169. DuPont's efforts, and its thinly veiled threat, failed, but it would resist taking remedial action based on the drinking water advisory.

170. In February 2007, the Department directed DuPont to undertake further groundwater sampling on and off-site, and to delineate its results at the drinking water guidance value.

171. DuPont, in a cover letter to its groundwater investigation work plan of May 2007, objected to delineation based on the guidance value, contending it was "inconsistent with other established health based standards," did "not incorporate the most recent available science," and did not "necessitate or warrant a remedial investigation."

172. Groundwater investigations conducted shortly thereafter revealed off-site contamination. In 2008, DuPont submitted a report showing that PFOA was detected in eight of nine monitoring wells that were sampled, at a distance of up to 2,000 feet from the Site's border. PFOA was detected at 2.2 ppb (2,200 ppt) in a well at the border, and up to 1.4 ppb (1,400 ppt) in an off-site monitoring well.

173. Even presented with data showing significant contamination of residential drinking water wells around Chambers Works, DuPont still clung to the highest advisory levels possible. In 2009, DuPont sampled wells within a two-mile radius of Chambers Works for PFOA. However, DuPont refused to use the Department's drinking water guidance value as the threshold for providing treatment. It would only compare the results to EPA's 2009 provisional advisory, which was 400 ppt. Use of this higher criterion resulted in only a single well qualifying for treatment.

174. Today, however, DuPont is no longer in a position to deny that PFOA and other PFAS contamination poses a risk to the surrounding environment and human population.

*PFOA and PFAS Contamination at and around Chambers Works*

175. PFOA and other PFAS contaminate Chambers Works and the surrounding area, though the full extent of this contamination remains to be determined.

176. With respect to the Site itself and the immediate surrounding area, sampling and monitoring have shown severe contamination of groundwater and soil, as well as surface waters and sediment.  Still, the effect of PFAS on the wetlands area, in the northern part of the Site, has not been as thoroughly analyzed for PFAS.

177. As to off-site contamination, between 2016 and 2017, Chemours re-sampled residential drinking water wells within the two-mile radius of Chambers Works.  This time, Chemours sampled for 14 PFAS including PFOA, PFNA and PFOS. Other PFAS including PFNA are also released from Chambers Works as a result of operations there.

178. For purposes of this re-sampling, PFOA was compared to the Department's drinking water guidance level of 40 ppt; PFNA to the Department's specific groundwater quality standard of 10 ppt; and PFOA and PFOS combined to EPA's 2016 lifetime health advisory for the sum of the chemicals of 70 ppt.  Use of these levels (as

opposed to that insisted by DuPont in its 2009 sampling program),
resulted in almost half of the wells sampled (43 wells) exceeding
the screening criteria.  And these criteria are substantially less
stringent than the MCLs New Jersey has proposed, 14 ppt for PFOA
and 13 ppt for PFOS, and the interim specific groundwater quality
criteria of 10 ppt for PFOA and PFOS.

179. Also, as part of the 2016-2017 program, additional
sampling was done outside the two-mile radius, up to 2.75 miles.
Of those 64 wells sampled in these further areas, 21 wells exceeded
the screening levels.

180. Since the initial 2016-2017 program, sampling has
continued to expanded areas, largely to the northeast of Chambers
Works, up to five miles away.

181. In total, 341 individual drinking water wells have been
sampled; there are 168 (approximately half) that exceeded the
following criteria:  14 ppt for PFOA, 13 ppt for PFNA, and 70 ppt
for PFOA and PFOS combined together.

182. The results of the sampling program, to date, do not
provide a full understanding of the off-site contamination that
operations at Chambers Works has caused.  For example, there has
been less sampling of wells to the southeast of Chambers Works.
Further still, there has been limited-to-no sampling, outside of
drinking water wells, of natural resources in the area, including
soil, surface water, wetlands, sediments, and biota.  In addition

47

to the natural resources the State holds in trust, the State owns real property, within the five-mile radius of the Site, including the New Jersey Natural Land Trust Game Branch Preserve to the northeast of the Site, and the New Jersey Fish & Wildlife Salem River Wildlife Management Area to the southeast.

### *DuPont's and 3M's Actual Malice / Wanton and Willful Disregard*

183. DuPont and 3M, as detailed above, committed acts and omissions with respect to PFOA and other PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their products, or to reduce or eliminate expenses they would otherwise have incurred to remove PFAS from their waste streams, despite the impacts on the Site, the State, and its citizens relating to contamination of groundwater, surface water, and other natural resources.

184. Therefore, Plaintiffs are requesting an award of punitive damages for DuPont's and 3M's especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

*The Fraudulent Spinoff of DuPont's Specialty Chemicals Business*

185.  DuPont and Chemours have substantial liabilities due to their polluting activities.  DuPont's and Chemours' liabilities for PFOA and other PFAS contamination account for a substantial portion of their environmental liabilities nationwide, and therefore affect their overall ability to satisfy their environmental liabilities for Chambers Works.

186. DuPont sought to insulate itself from billions of dollars of legacy pollution liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country.

187. Upon information and belief, DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the persistence, mobility, bio-accumulative properties, and toxicity of these "forever" compounds, as well as DuPont's decades-long attempt to hide the dangers of PFAS from the public.

188. For more than five decades, DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina.  As alleged above, throughout this time, DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment.  DuPont also knew that it had emitted and discharged

PFOA and other PFAS in large quantities into the environment, and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which DuPont had contaminated. Thus, DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

189. For example, in 1999, members of the Tennant family, who owned property impacted by PFOA contamination adjacent to DuPont's Washington Works plant in Parkersburg, West Virginia, sued DuPont in West Virginia federal court.

190. DuPont's in-house counsel was very concerned about DuPont's exposure related to PFOA. In November 2000, one of DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

191. In 2005, after confidentially settling the Tennant case, DuPont agreed to pay $10.25 million to resolve eight counts brought by EPA alleging violations of the Toxic Substances Control Act and

the Resource Conservation and Recovery Act. DuPont also was required to commit an additional $6.25 million to supplemental environmental projects. See https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental.

192. Also, in 2005, DuPont agreed to settle a class action lawsuit, which had been filed on behalf of 70,000 residents of Ohio and West Virginia who had been exposed to PFOA that DuPont had discharged from Washington Works for $343 million. Under the terms of the settlement, DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community. The settlement also provided that any class members who developed the linked diseases would be entitled to sue for personal injury, and DuPont agreed not to contest the fact that exposure to PFOA could cause those diseases.

193. After eight years, the Science Panel found several human diseases with "probable links" to PFOA exposure, including: high cholesterol; ulcerative colitis; pregnancy-induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

194. More than 3,500 personal injury claims were filed against DuPont in Ohio and West Virginia as part of the 2005

settlement.   These  claims  were  consolidated  in  the  federal multidistrict litigation styled <u>In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation</u> (MDL No. 2433) in the United States District Court for the Southern District of Ohio.   Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

195. DuPont knew that it faced substantial exposure at these trials,  as  well  as  liability  related  to  PFOA  and  other  PFAS contamination  at  other  sites  throughout  the  country,  including Chambers Works, among others, and that its liability was likely billions of dollars.

196. In  addition  to  its  PFOA  and  other  PFAS  liabilities, DuPont was facing very substantial environmental liabilities for its historic manufacturing and research operations throughout the country.

197. DuPont sought to limit its environmental liability and protect  its  assets  by  engaging  in  a  series  of  restructuring transactions, including a "spinoff" of its performance chemical business which included Teflon, <u>i.e.</u>, one of the primary products that DuPont manufactured using PFOA and which led to widespread contamination throughout the country.

198. Chemours was incorporated on February 18, 2014 under the name "Performance Operations, LLC." On April 10, 2014, the company was renamed "The Chemours Company, LLC." On April 30, 2015, the company  was  converted  from  a  limited  liability  company  to  a

corporation with the name "The Chemours Company." Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of DuPont.

199. On July 1, 2015, DuPont completed the spinoff of its performance chemicals business (the "Spinoff") through the creation of Chemours, which became a separate, publicly-traded entity.

200. DuPont and Chemours entered into a June 26, 2015 Separation Agreement to effectuate the Spinoff (the "Separation Agreement"). At the time of the Spinoff, the performance chemicals business consisted of DuPont's Titanium Technologies Chemical Solutions and Flourochemicals segment (collectively, the "Performance Chemicals Business").

201. Pursuant to the Separation Agreement, DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants. Upon information and belief, Chambers Works was one of the 37 sites referenced in the Separation Agreement and one or more schedules to that Agreement.

202. Prior to the Spinoff, DuPont completed a significant internal reorganization so that all the assets and liabilities (held by DuPont or its subsidiaries) that DuPont deemed to be part of the Performance Chemicals Business would be held by Chemours, as a wholly owned subsidiary of DuPont.

203. In addition to the assets transferred to Chemours, DuPont caused Chemours to assume DuPont's massive historical liabilities relating to DuPont's Performance Chemicals Business, including those arising from its discharge of contaminants, such as PFOA and other PFAS, into the environment. While specific details about the liabilities are set forth in non-public schedules that are not available to Plaintiffs, the Separation Agreement required Chemours to assume what the agreement defines as "Chemours Liabilities," which include DuPont's historic liabilities regardless of (i) when or where such liabilities arose, (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Spinoff, (iii) where or against whom such liabilities are asserted or determined, (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, misrepresentation by DuPont or Chemours, or (v) which entity is named in any action associated with any liability.

204. The Separation Agreement defines Chemours Liabilities broadly, to include "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities. . . .," which include DuPont's historic liabilities relating to and

arising from its decades of emitting PFOA and PFAS along with other contaminants into the environment in New Jersey and elsewhere.

205. Chemours also agreed to indemnify DuPont in connection with those liabilities that it assumed. The indemnification has no cap or temporal limitation.

206. Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

207. Upon information and belief, there was no meaningful negotiation of the Separation Agreement, and DuPont largely dictated its terms. Indeed, when the Separation Agreement was signed, Chemours was a wholly-owned subsidiary of DuPont, and a majority of the Chemours board consisted of DuPont employees.

208. In connection with the Spinoff, Chemours paid DuPont approximately $3.9 billion, consisting of approximately $3.4 billion in cash, plus approximately $507 million in promissory notes. Chemours also transferred all of its stock to DuPont, which was ultimately delivered to DuPont's shareholders.

209. Chemours was thinly capitalized following the Spinoff. Indeed, shortly after the Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

210. In order to fund the $3.9 billion payment to DuPont, Chemours issued unsecured senior notes and entered into a credit agreement with a syndicate of banks to provide two senior secured credit facilities, incurring a total of $4 billion in indebtedness. Upon information and belief, the terms of the financing were dictated by DuPont, in its sole discretion, and not Chemours.

211. According to Chemours' unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion. Following the Spinoff, Chemours issued a 10-K stating that, as of December 31, 2015, Chemours had assets totaling $6.3 billion and total liabilities of $6.2 billion.

212. The 10-K stated that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation.  The 10-K also stated Chemours had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

213. However, Chemours significantly underestimated its liabilities, especially the liabilities that it had assumed from DuPont with respect to PFOA and other PFAS contamination, which DuPont and Chemours should have known would be billions of dollars

in addition to other environmental liabilities for other contaminants discharged at DuPont and Chemours facilities.

214. For example, in 2017, Chemours and DuPont amended the Separation Agreement in connection with the settlement of the personal injury multi-district litigation brought by thousands of residents who had been exposed to PFOA from DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and DuPont paid an additional $320.35 million on September 1, 2017. For all future PFOA costs incurred from July 6, 2017 through July 6, 2022, Chemours agreed to cover the first $25 million per 12-month period, DuPont agreed to cover the next $25 million per 12-month period, and Chemours agreed to cover any additional amounts. Chemours is a named defendant in numerous lawsuits relating to DuPont's historical use of PFAS and other contaminants.

215. Had Chemours taken the full extent of these liabilities into account, as it should have done, it would have negative equity (that is, liabilities that are greater than assets), and would be balance sheet insolvent.

<u>**SCOPE OF ACTION**</u>

216. Through this action, Plaintiffs are not seeking damages, remediation or restoration with respect to any contamination related to AFFF, which is a product that contains PFAS compounds, and not within the scope of this litigation.

217. Likewise, and notwithstanding anything to the contrary herein, Plaintiffs are not asserting claims or seeking costs or damages regarding the remediation or restoration of the Delaware River at this time.  While the State is seeking that Defendants pay all costs necessary to investigate, locate, and assess hazardous substances, pollution, and contamination that has emanated, released, or discharged from Chambers Works, the State is explicitly reserving its claims to remediate and restore the Delaware River of Defendants' hazardous substances, pollutants, and contaminants until such time as the investigation work is more fully complete.

218. In 2005, the Department, the Administrator and DuPont entered into a Compensatory Restoration Administrative Consent Order ("CRACO").  The CRACO is not a bar to the claims asserted in this Complaint for reasons including, but not limited to, the following:  DuPont has failed to comply with the CRACO, concealed the nature and extent of contamination at its facilities, has attempted to provide contaminated property to fulfill its obligations, additional injuries have been incurred, additional discharges have occurred since the CRACO became effective, and injuries to natural resources, including groundwater, have resulted from remedial action implementation.

## First Count
### (Spill Act – As Against All Defendants)

219. Plaintiffs repeat each allegation of Paragraphs 1 through 218 above as though fully set forth in its entirety herein.

220. Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

221. The discharge of hazardous substances is prohibited. N.J.S.A. 58:10-23.11c.

222. Many of the contaminants of concern at the Site are hazardous substances as defined in N.J.S.A. 58:10-23.11b.

223. The Department has submitted a notice of rule proposal to add PFOA to the Department's List of Hazardous Substances at N.J.A.C. 7:1E-Appendix A, which upon adoption will result in PFOA becoming a hazardous substance.

224. Except as otherwise provided in N.J.S.A. 58:10-23.11g(12), which is not applicable here, any person who discharges a hazardous substance, or is in any way responsible for any hazardous substance, shall be liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. 58:10-23.11g(c)

225. The Department and the Administrator have incurred, and will continue to incur, costs and damages, including lost use and value, costs of restoration and replacement for natural resources

of this State that have been, or may be, injured as a result of discharges at Chambers Works, and assessment costs.

226. The costs and damages the Department and the Administrator have incurred, and will incur, associated with discharges at Chambers Works, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

227. DuPont, Chemours, and Chemours FC, as dischargers of hazardous substances at Chambers Works, are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works. N.J.S.A. 58:10-23.11g(c)(1).

228. DuPont, Chemours, and Chemours FC, as owners and/or operators of Chambers Works at the time hazardous substances were discharged there, also are persons in any way responsible, and are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace

any natural resource of this State that has been, or may be,
injured as a result of the discharge of hazardous substances at
Chambers Works. N.J.S.A. 58:10-23.11g(c)(1).

229. Chemours FC, as the knowing purchaser of contaminated
property, Chambers Works, at which hazardous substances were
previously discharged, is also a person in any way responsible,
and is liable, without regard to fault, for all cleanup and removal
costs and direct and indirect damages, including lost use and
value, costs of restoration and replacement, and assessment costs,
that the Department and the Administrator have incurred, and will
incur, to assess, mitigate, restore or replace, any natural
resource of this State that has been, or may be, injured as a
result of the discharge of hazardous substances at Chambers Works.
N.J.S.A. 58:10-23.11g(c)(3).

230. 3M, as the manufacturer, distributor, and/or seller of
a proposed hazardous substance discharged at Chambers Works, will
be a person in any way responsible, and will be liable, without
regard to fault, for all cleanup and removal costs and direct and
indirect damages, including lost use and value, costs of
restoration and replacement, assessment costs, that the Department
and the Administrator have incurred, and will incur, to assess,
mitigate, restore or replace, any natural resource of this State
that has been, or may be, injured as a result of the discharge of

the hazardous substance at Chambers Works.  N.J.S.A. 58:10-23.11g(c)(3).

231. Pursuant to N.J.S.A. 58:10-23.11u(a)(1)(a) and N.J.S.A. 58:10-23.11u(b), the Department may bring an action in the Superior Court for, _inter alia_, injunctive relief, N.J.S.A. 58:10-23.11u(b)(1); for its unreimbursed investigation, cleanup and removal costs, including the reasonable costs of preparing and successfully litigating the action, N.J.S.A. 58:10-23.11u(b)(2); for natural resource restoration and replacement costs, N.J.S.A. 58:10-23.11u(b)(4); and for any other unreimbursed costs or damages the Department incurs under the Spill Act, N.J.S.A. 58:10-23.11u(b)(5).

232. Pursuant to N.J.S.A. 58:10-23.11g(a) and (b), DuPont, Chemours, Chemours FC, and 3M are also liable for lost income due to damage to natural resources destroyed or damaged by a discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge.

233. As a direct or indirect result of such violations, the Department and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

   a.   the investigation, cleanup, and removal of discharged hazardous substances;

b.  the restoration of natural resources contaminated by discharges of hazardous substances at the Site;

c.  the compensation of the citizens of New Jersey for the lost interim value and benefits of natural resources contaminated by discharges of hazardous substances the Site; and

d.  the institution of corrective measures including monitoring of all impacted and potentially impacted public and private drinking water supplies for the presence of hazardous substances, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage.

234. The costs the Department and the Administrator have incurred, and will incur, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

235. Pursuant to N.J.S.A. 58:10-23.11q, the Administrator is authorized to bring an action in the Superior Court for any unreimbursed costs or damages paid from the Spill Fund.

### PRAYER FOR RELIEF

**WHEREFORE,** the Department and the Administrator request that this Court enter judgment against Defendants as follows:

a.  Ordering each Defendant to reimburse the Department and Administrator, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages they have incurred, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at Chambers Works, with applicable interest, and assessment costs;

b.  Finding each Defendant liable, jointly and severally, without regard to fault, for all future cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at Chambers Works, with applicable interest, and assessment costs;

c.  Compelling each Defendant, jointly and severally, without regard to fault, to perform any further cleanup of the Site and contaminated areas off-site in conformance with the Site Remediation Reform Act,

N.J.S.A. 58:10C-1 to -29, and all other applicable laws and regulations;

d.  Compelling each Defendant, jointly and severally, without regard to fault, to fund the Department's performance of an assessment of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works, and compelling each Defendant to compensate the citizens of New Jersey, for the costs of restoration and replacement, including lost use and value of any injured natural resource;

e.  Ordering Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

f.  Finding each Defendant liable, jointly and severally, without regard to fault, for lost income due to damage to natural resources destroyed or damaged by a discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge;

g.  Awarding the Department and the Administrator their costs and fees in this action pursuant to N.J.S.A. 58:10-23.11u(b)(2); and

h.   Awarding the Department and the Administrator interest and such other relief as this Court deems appropriate.

## Second Count
### (Water Pollution Control Act – As Against DuPont, Chemours, Chemours FC)

236. Plaintiffs repeat each allegation of Paragraphs 1 through 235 above as though fully set forth in its entirety herein.

237. DuPont, Chemours, and Chemours FC are each a "person" within the meaning of N.J.S.A. 58:10A-3.

238. Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6(d) and (p), which are not applicable here, it is unlawful for any person to discharge any pollutant except to the extent the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by the Commissioner pursuant to the WPCA, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to -1387. N.J.S.A. 58:10A-6(a).

239. The unauthorized discharge of pollutants is a violation of the WPCA for which any person who is the discharger is strictly liable, without regard to fault. N.J.S.A. 58:10A-6(a).

240. The Department has incurred, and will continue to incur, costs as a result of the discharge of pollutants at Chambers Works.

241. The Department also has incurred, and will continue to incur, costs and damages, including the costs of investigation to

establish a violation at Chambers Works, costs in removing, correcting or terminating the adverse effects upon water quality or public health due to violations at Chambers Works, and compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at Chambers Works.

242. The costs and damages the Department has incurred, and will incur, for Chambers Works are recoverable by the Commissioner within the meaning of N.J.S.A. 58:10A-10(c)(2)-(4).

243. DuPont, Chemours, and Chemours FC discharged pollutants at Chambers Works, which discharges were neither permitted pursuant to N.J.S.A. 58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-6(d) or N.J.S.A. 58:10A-6(p), and are liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at Chambers Works.

244. Pursuant to N.J.S.A. 58:10A-10(c), the Commissioner may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10(c)(1); for the costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the costs of preparing and litigating the case, N.J.S.A. 58:10A-10(c)(2); any cost incurred by the State in removing, correcting, or terminating the adverse effects upon

water quality resulting from any unauthorized discharge of
pollutants for which action under this subsection may have been
brought, N.J.S.A. 58:10A-10(c)(3); compensatory damages and any
other actual damages for any natural resource of this State that
has been, or may be, lost or destroyed as a result of the
unauthorized discharge of pollutants, N.J.S.A. 58:10A-10(c)(4);
and the actual amount of any economic benefits accruing to the
violator from any violation, including savings realized from
avoided capital or noncapital costs resulting from the violation,
the return earned or that may be earned on the amount of avoided
costs, any benefits accruing as a result of a competitive market
advantage enjoyed by reason of the violation, or any other benefit
resulting from the violation, N.J.S.A. 58:10A-10(c)(5).

### **PRAYER FOR RELIEF**

**WHEREFORE,** the Commissioner requests that this Court enter
judgment against DuPont, Chemours, and Chemours FC as follows:

a.   Permanently enjoining DuPont, Chemours, and Chemours FC,
     requiring them to remove, correct, or terminate the
     adverse effects on water quality resulting from any
     unauthorized discharge of pollutants at or from Chambers
     Works;

b.   Assessing DuPont, Chemours, and Chemours FC, without
     regard to fault, for the costs for any investigation,

inspection, or monitoring survey, leading to establishment of the violation, including the costs of preparing and litigating the case;

c.    Finding DuPont, Chemours, and Chemours FC liable, without regard to fault, for all costs for removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants at Chambers Works;

d.    Finding DuPont, Chemours, and Chemours FC liable, without regard to fault, for all compensatory damages and other actual damages for any natural resource of the State that has been, or may be, injured, lost, or destroyed as a result of the unauthorized discharge of pollutants at Chambers Works;

e.    Finding DuPont, Chemours, and Chemours FC liable, without regard to fault, for the amount of any economic benefits they have accrued, including any savings realized from avoided capital or noncapital costs, the return they have earned of the amount of avoided costs, and benefits each Defendant has enjoyed as a result of a competitive market advantage, or any other benefit they have received as a result of having violated the WPCA;

    f.    Awarding the Commissioner her costs and fees in this action pursuant to N.J.S.A. 58:10A-49.1(c)(2); and

    g.    Awarding the Commissioner interest and such other relief as the Court deems appropriate.

## Third Count
### (Industrial Site Recovery Act – As Against DuPont)

245. Plaintiffs repeat each allegation of Paragraphs 1 through 244 above as though fully set forth in its entirety herein.

246. The purpose of ISRA is to ensure that any property meeting the definition of an "industrial establishment" will be investigated for potential environmental impacts and, if warranted, remediated in accordance with Department regulatory requirements if and when the establishment, or the entity that owns or operates an establishment, either closes the operations of the establishment or transfers the establishment's ownership or operations. N.J.S.A. 13:1K-7. A principal goal of ISRA is to ensure that "funding for the cleanup [of industrial establishments] is set aside at the time it is available from a transfer or closing" such that "contaminated property is not abandoned to the State for cleanup." Id.

247. An "industrial establishment" is defined by Department regulation as "any place of business or real property at which such business is conducted" that falls within a range of North

American Industry Classification System ("NAICS") codes listed in Appendix C to N.J.A.C. 7:26B-1.1, whereon operations were conducted on or after December 31, 1983, involving the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances and wastes on-site, above or below ground, unless otherwise provided at N.J.A.C. 7:26B-2.1.  N.J.A.C. 7:26B-1.4.

248. For any ISRA-applicable transfer of ownership or operations of an industrial establishment, the owner or operator of the industrial establishment that is the subject of the transfer is required to file a General Information Notice with the Department within five days after (1) the execution of an agreement to transfer ownership or operations or (2) closing operations of or its public release of its decision to close operations, whichever occurs first.  N.J.S.A. 13:1K-9(a).

249. For any ISRA-applicable transfer of ownership or operations of an industrial establishment, except in limited circumstances not relevant here, the owner or operator of the industrial establishment that is the subject of the transfer also is required, prior to the transfer, to establish ISRA compliance either by obtaining Department approval of one of several forms as set forth at N.J.A.C. Sections 7:26B-5.3 through 5.9 or by filing a completed Remediation Certification as defined pursuant to N.J.A.C. 7:26B-3.3 (collectively, "ISRA Compliance").

250. If the form of ISRA Compliance is a Remediation Certification, the transferring party must also establish a Remediation Funding Source ("RFS") prior to the transfer in accordance with applicable requirements in NJDEP's Administrative Requirements for the Remediation of Contaminated Sites ("ARRCS") at N.J.A.C. 7:26C-5.1 to -5.13.

251. Chambers Works is a chemical manufacturing facility and, as such, falls within either or both NAICS Codes 325 and 326, both of which are within the range of ISRA-applicable NAICS codes. Id.

252. By special warranty deed dated January 23, 2015, DuPont transferred the ownership of Chambers Works to Chemours FC (the "Deed Transfer"), which transfer constituted a "change in ownership" and a "transfer of ownership or operations" as defined in ISRA, thereby triggering ISRA's requirements.

253. DuPont failed to file a General Information Notice with the Department within five days of the Deed Transfer, thereby violating ISRA, which violation has continued each day thereafter that DuPont failed to file such General Information Notice.

254. DuPont's January 23, 2015 transfer of a deed to Chemours FC for Chambers Works without previously obtaining ISRA Compliance and establishing an RFS constitutes a separate and individual violation of ISRA, which DuPont has failed to cure to this day.

255. On or about June 26, 2015, DuPont entered into a Separation Agreement (the "Separation Agreement") with Chemours to

spin off DuPont's Performance Chemicals Business via a transfer of stock and assets into a new public company, Chemours (the "Chemours Spinoff").

256. The Separation Agreement constituted an agreement to "transfer ownership or operations" of Chambers Works, an industrial establishment, within the meaning of ISRA, that would result in the transfer of more than 10 percent of DuPont's assets available for remediation of Chambers Works. See N.J.S.A. 13:1K-8. As such, DuPont's execution of the Separation Agreement triggered an obligation for DuPont to file a General Information Notice with the Department notifying it of the transaction.

257. DuPont failed to file a General Information Notice with the Department notifying it of the pending transfer of ownership or operations of Chambers Works to Chemours within five days of DuPont's execution of the Separation Agreement, thereby violating ISRA, which violation has continued each day thereafter that DuPont failed to file such General Information Notice.

258. The Chemours Spinoff constituted a "change of ownership" and a "transferring of ownership or operations" of Chambers Works, an industrial establishment, within the meaning of ISRA, that would result in the transfer of more than 10 percent of DuPont's assets available for remediation of Chambers Works. N.J.S.A. 13:1K-8.

259. By its actions initiating and completing the Chemours Spinoff, including its execution of the Separation Agreement,

without having obtained the Department's approval pursuant to N.J.A.C. Sections 7:26B-5.3 through 5.9 or without having first filed a Remediation Certification and establishing an RFS, DuPont violated ISRA and has continued to violate ISRA each day that it has failed to do so.

260. As a direct or indirect result of the foregoing violations, Plaintiffs have incurred, are incurring, and will continue to incur substantial costs, including costs relating to the investigation, cleanup, and removal of discharged hazardous substances and pollutants, and New Jersey has been thwarted in its right pursuant to ISRA to obtain the financial assurance necessary to ensure that all hazardous substances and pollutants at and emanating from Chambers Work will be remediated in accordance with ISRA and the Department's regulatory requirements.

261. Pursuant to N.J.S.A. 13:1K-13.1, the Commissioner is authorized to bring an action in the Superior Court for relief for each day of each violation of ISRA to enforce the provisions of ISRA and to prohibit or to prevent the violation of ISRA or of any rule or regulation adopted pursuant ISRA. As further provided pursuant to N.J.S.A. 13:1K-13.1, such relief may include assessment of the violator for the reasonable costs of any inspection that led to the establishment of the violation, and for the reasonable costs of preparing and litigating a claim seeking the enforcement of its ISRA obligations.

### PRAYER FOR RELIEF

**WHEREFORE,** the Commissioner requests that this Court enter judgment against DuPont as follows:

a.  Ordering DuPont to fully comply with ISRA by, <u>inter alia</u>, the submission of a Remediation Certification and establishment of a Remediation Funding Source for Chambers Works in conformance with N.J.A.C. 7:26C-5.1 to -5.13;

b.  Ordering DuPont to reimburse the Commissioner for the reasonable costs of preparing and litigating her claim seeking the enforcement of DuPont's ISRA obligations; and

c.  Awarding the Commissioner such other relief as this Court deems appropriate.

### Fourth Count
### (Brownfield and Contaminated Site Remediation Act As Against DuPont, Chemours, and Chemours FC

262. Plaintiffs repeat each allegation of Paragraphs 1 through 261 above as though fully set forth in its entirety herein.

263. DuPont, Chemours, and Chemours FC are each a "person" within the meaning of N.J.S.A. 58:10-23.11b and N.J.S.A 58:10B-1.

264. Many of the contaminants of concern at the Site are hazardous substances as defined in N.J.S.A. 58:10-23.11b.

265. DuPont, Chemours, and Chemours FC are "dischargers" of hazardous substances at the Site and/or are each a "person in any way responsible," pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, for any hazardous substance that was discharged at the Site, as either an "owner of the real property where the discharge occurred at the time of the discharge" or a "subsequent owner of the real property where the discharge occurred prior to the filing of a final remediation document with the Department." N.J.A.C. 7:26C-1.4.

266. Pursuant to Section 58:10B-1.3 of the Brownfields Act, as the discharger of hazardous substances at the Site or a person in any way responsible for a hazardous substance pursuant to N.J.S.A. 58:10-23.11g, DuPont, Chemours, and Chemours FC are affirmatively obligated to remediate the discharged hazardous substances at the Site.

267. Pursuant to Section 58:10B-1.3 of the Brownfields Act, as the discharger of hazardous substances at the Site or a person in any way responsible for a hazardous substance, DuPont, Chemours, and Chemours FC are required to establish a RFS in an amount necessary to pay the cost to remediate.

268. Pursuant to N.J.A.C. 7:26C-1.4, DuPont, Chemours, and Chemours FC, each a "person in any way responsible," pursuant to the Spill Act, are required to comply with the Department's ARRCS rules.

269. Pursuant to the Department's Technical Requirements for Site Remediation, N.J.A.C. 7:26E-1.3 and 7:26E-1.5(a) (the "Technical Requirements"), as persons subject to the requirements of the ARRCS rules, DuPont, Chemours, and Chemours FC are required to conduct a remediation of contaminants discharged at the Site in accordance with the Technical Requirements.

270. Pursuant to N.J.A.C. 7:26E-4.3(a)(4), 7:26E-5.1(b) and 7:26E-5.1(d)(1) and (4) of the Technical Requirements, DuPont, Chemours, and Chemours FC are required to, inter alia, (1) delineate the horizontal and vertical extent of all groundwater contamination to the groundwater remediation standard, and (2) remediate such contaminants in a manner that is "protective of public safety, health and the environment" and "complies with all applicable remediation standards."

271. On March 13, 2019, the Department established interim specific groundwater quality standards for PFOA and PFOS of 0.01 ug/L (10 ng/L). The interim specific groundwater quality standards for PFOA and PFOS thereafter became effective upon posting to the "Table of Interim Specific Groundwater Quality Criteria (ISGWQC), Interim PQLs (IPQLs), and Interim Specific Groundwater Quality Standards (ISGWQS) for Constituents in Class II-A Groundwater" on the NJDEP website at https://www.nj.gov/dep/wms/bears/gwqs.htm. DuPont, Chemours, and Chemours FC are therefore required to

investigate and remediate PFOA and PFOS to the foregoing standards and to post an RFS in connection with the same.

272. As a direct or indirect result of the foregoing violations, the Department and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to the investigation, cleanup, and removal of discharged constituents and other materials, and NJDEP has been thwarted in its right pursuant to the Brownfields Act to obtain the financial assurance necessary to ensure that all hazardous substances at and emanating from the Site will be cleaned up in accordance with the Brownfields Act and NJDEP's regulatory requirements.

## PRAYER FOR RELIEF

**WHEREFORE,** the Department and the Administrator request that this Court enter judgment against DuPont, Chemours, and Chemours FC as follows:

a.   Ordering DuPont, Chemours and Chemours FC to, jointly and severally, fully comply with the Brownfields Act by, *inter alia,* the submission of a remedial investigation workplan and remedial investigation report pertaining to all off-site locations at which pollutants, contaminants and/or hazardous substances originating from the Site have come to be located, and

the establishment of a RFS for Chambers Works in conformance with N.J.A.C. 7:26C-5.1 to -5.13;

b.   Ordering DuPont, Chemours, and Chemours FC, jointly and severally, to reimburse the Department and Administrator for the reasonable costs of preparing and litigating their claim seeking the enforcement of DuPont's, Chemours' and Chemours FCs' obligations pursuant to the Brownfields Act; and

c.   Awarding the Department and the Administrator such other relief as this Court deems appropriate.

**Fifth Count**
**(Solid Waste Management Act**
**As Against DuPont, Chemours, and Chemours FC**

273. Plaintiffs repeat each allegation of Paragraphs 1 through 272 above as though fully set forth in its entirety herein.

274. DuPont, Chemours, and Chemours FC are each a "person" within the meaning of N.J.S.A. 13:1E-3.

275. The Solid Waste Management Act ("SWMA" or the "Act") defines "[s]olid waste" as, inter alia, "discarded materials resulting from industrial, commercial and agricultural operations" and "all other waste materials." N.J.S.A. 13:1E-3. N.J.A.C. 7:26-1.6(b) defines "other waste material," in pertinent part, as "any solid, liquid, semi-solid or contained gaseous material, including, but not limited to spent material, sludge, by-product, discarded commercial chemical products, or scrap metal resulting

from industrial, commercial, mining or agricultural operations, from community activities, or any other material which has served or can no longer serve its original intended use, which . . . [i]s discarded or intended to be discarded . . . [i]s applied to the land or placed on the land or contained in a product that is applied to or placed on the land in a manner constituting disposal." N.J.A.C. 7:26-1.6(b) provides that "a material is also a solid waste if it is 'disposed of' by being discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or surface waters."

276. N.J.S.A. 13:1E-3 of the SWMA and N.J.A.C. 7:26-1.4 define "disposal" as "the storage, treatment, utilization, processing, resource recovery of, or the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or hazardous waste into or on any land or water, so that the solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

277. Various constituents present in soils, groundwater and surface water in and around the Site, including PFAS-related chemicals, are discarded materials and are "solid waste" as defined under N.J.S.A. 13:1E-3 and N.J.A.C. 7:26-1.6.

278. DuPont, Chemours, and Chemours FC have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and around the Site in the form of various constituents, including PFAS-related chemicals, without first having filed a completed application for and received approval of a solid waste facility ("SWF") permit for such activities, resulting in the widespread presence of such solid wastes in soils, groundwater, and surface water in and around the Site, all in violation of N.J.A.C. 7:26-2.8(e).

279. DuPont, Chemours, and Chemours FC have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and/or around the Site in the form of hazardous constituents, including PFAS-related chemicals, in excess of 0.148 cubic yards of solids and/or 30 gallons of liquids, at locations other than a permitted SWF, resulting in the widespread presence of such solid wastes in soils, groundwater, and surface water in and around the Site, in violation of N.J.S.A. 13:1E-9.3.

280. Pursuant to N.J.S.A. 13:1E-9(b) and (d), when the Commissioner finds that a person has violated any provision of the SWMA or any regulations adopted pursuant to the SWMA, the Commissioner is authorized to bring a civil action in Superior Court seeking temporary or permanent injunctive and other relief, as well as assessment of the violator for the costs of any investigation leading to the establishment of the violation, costs

incurred by the State in removing, correcting or terminating the adverse effects to water and air quality resulting from the violation, and assessment against the violator of compensatory damages for any loss or destruction of wildlife, fish or aquatic life, and for any other actual damages, all of which relief may be awarded in a summary manner.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Commissioner requests that this Court enter judgment against DuPont, Chemours, and Chemours FC as follows:

a. Ordering DuPont, Chemours, and Chemours FC to, jointly and severally, fully comply with the SWMA by, _inter alia_, removing all unlawfully disposed of solid waste, including PFAS-related chemicals, from all locations in and around the Site at which the same have come to be located and for which DuPont, Chemours, and Chemours FC did not obtain a SWF permit;

b. Ordering DuPont, Chemours, and Chemours FC, jointly and severally, to reimburse the Commissioner for the reasonable costs of preparing and litigating her claim seeking the enforcement of DuPont's, Chemours', and Chemours FC's obligations pursuant to the SWMA;

c. Ordering DuPont, Chemours, and Chemours FC, jointly and severally, to reimburse the Commissioner for the cost incurred by the Department in removing, correcting or

terminating the adverse effects upon water and air quality resulting from their violations of the SWMA;

d. Ordering DuPont, Chemours, and Chemours FC, jointly and severally, to compensate the State for the loss or destruction of wildlife, fish or aquatic life, and other actual damages caused by their violations of the SWMA; and

e. Awarding the Commissioner such other relief as this Court deems appropriate.

### Sixth Count
**(Air Pollution Control Act**
**As Against DuPont, Chemours, and Chemours FC**

281. Plaintiffs repeat each allegation of Paragraphs 1 through 280 above as though fully set forth in its entirety herein.

282. DuPont, Chemours, and Chemours FC are each a "person" within the meaning of N.J.S.A. 26:2C-2 and N.J.A.C. 7:27-1.4.

283. It is unlawful for any person to "cause, suffer, allow or permit to be emitted into the outdoor atmosphere substances in quantities which shall result in air pollution." N.J.A.C. 7:27-5.2.

284. "'Air pollution' means the presence in the outdoor atmosphere of one or more air contaminants in such quantities and duration as are, or tend to be, injurious to human health or welfare, animal or plant life or property, or would unreasonably interfere with the enjoyment of life or property throughout the State and in such territories of the State as shall be affected

thereby and excludes all aspects of employer-employee relationship as to health and safety hazards." N.J.A.C. 7:27-5.1.

285. "'Air contaminant' means any substance, other than water or distillates of air, present in the atmosphere as solid particles, liquid particles, vapors, or gases." N.J.S.A. 26:2C-2.

286. PFAS compounds, including PFOA and GenX, emitted from Chambers Works are air contaminants that have, upon information and belief, caused air pollution by contaminating drinking water wells as far as five miles away (and possibly farther) from Chambers Works with concentrations of PFOA exceeding the proposed maximum contaminant level of 14 ppt. These emissions of air contaminants are injurious to human health or welfare, animal or plant life or property, and unreasonably interfere with the enjoyment of life or property within the State, thereby violating N.J.A.C. 7:27-5.2.

287. Pursuant to N.J.S.A. 26:2C-19(a), and 13:1D-9(e) and (n), the Department may bring an action for injunctive relief and any other appropriate relief to prohibit and prevent the violations.

288. DuPont, Chemours, and Chemours FC are not entitled to any affirmative defense because their emissions of PFAS contaminants from Chambers Works threatened and continue to pose a potential threat to public health, welfare, or the environment. N.J.S.A. 26:2C-19.3.

## PRAYER FOR RELIEF

**WHEREFORE**, the Department requests that this Court enter judgment against Defendants as follows:

a.  Permanently enjoining DuPont, Chemours, and Chemours FC, from emitting PFAS air contaminants from Chambers Works;

b.  Ordering DuPont, Chemours, and Chemours FC to remediate all soils and waters contaminated by their PFAS emissions in order to mitigate the injuries to human health and welfare, animal and plant life and property, and the unreasonable interference with the enjoyment of life and property; and

b.  Awarding the Commissioner her costs and fees in this action and any other relief the Court deems appropriate pursuant to N.J.S.A. 26:2C-19(a).

### Seventh Count
**(Public Nuisance – As Against DuPont, Chemours, and Chemours FC)**

289. Plaintiffs repeat each allegation of Paragraphs 1 through 288 above as though fully set forth in its entirety herein.

290. Groundwater, surface water, sediment, wetlands, and biota are natural resources of the State held in trust by the State.

291. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

292. The contamination of the groundwater, surface water, sediment, wetlands, and biota at and around Chambers Works constitutes a physical invasion of the State's natural resources, and upon information and belief, the State's real property in the vicinity of the Site, and an unreasonable and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the Department, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

293. As the owner of the New Jersey Natural Land Trust Game Branch Preserve and the New Jersey Fish & Wildlife Salem River Wildlife Management Area, which upon information and belief has become contaminated by Chambers Works, the Department has suffered a special injury different from that common to the general public.

294. As long as these natural resources at and around Chambers Works remain contaminated due to DuPont, Chemours, and Chemours FC's conduct, the public nuisance continues.

295. Until these natural resources are restored to their pre-injury quality, DuPont, Chemours, and Chemours FC are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

296. DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont, Chemours, and Chemours FC as follows:

a. Ordering DuPont, Chemours, and Chemours FC to reimburse the Department and Administrator for their costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition;

b. Compelling DuPont, Chemours, and Chemours FC to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination in the State's natural resources so that

such natural resources are restored to their original condition;

c. Compelling DuPont, Chemours, and Chemours FC to pay special damages to Plaintiffs, funding the Department's performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances and pollutants at Chambers Works, and compelling DuPont, Chemours, and Chemours FC to compensate the citizens of New Jersey, for the costs of restoration and replacement, including lost use and value of any injured natural resource;

d. Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

e. Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

f. Awarding Plaintiffs such other relief as this Court deems proper.

## Eighth Count
### (Trespass – As Against DuPont, Chemours, and Chemours FC)

297. Plaintiffs repeat each allegation of Paragraphs 1 through 296 as if fully set forth in their entirety herein.

298. Groundwater, surface water, sediment, wetlands, and biota are natural resources of the State held in trust by the State for the benefit of the public. Water resources are owned by the State for the benefit of its citizens.

299. The State brings this claim in both its public trustee and parens patriae capacities.

300. As the trustee over the State's natural resources, the State has a duty to protect and restore all natural resources of the State and protect the health and comfort of its inhabitants.

301. In its parens patriae capacity, the State may protect its "quasi-sovereign" interests, including the State's interest in the well-being of its populace, as well as the populace's interest in the integrity of the State's natural resources. Accordingly, the State is bringing this action for the invasion of a substantial number of its residents' possessory interests in the State's natural resources. Waters, sediments, and biota that have been affected by DuPont, Chemours, and Chemours FC's contamination are mobile, moving to and inhabiting areas far from the immediate area of the initial contamination.

302. Additionally, the State is the owner of lands, including the New Jersey Natural Land Trust Game Branch Preserve and the New Jersey Fish & Wildlife Salem River Wildlife Management Area, in the vicinity of Chambers Works.

303. The hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around Chambers Works, including, upon information and belief, on State-owned lands, constitute a physical invasion of property without permission or license.

304. DuPont, Chemours, and Chemours FC are liable for trespass, and continued trespass, because the hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around Chambers Works, as well as contamination previously removed from Chambers Works, resulted from discharges of hazardous substances and pollutants at the Site.

305. As long as the natural resources remain contaminated due to DuPont's, Chemours', and Chemours FC's conduct, the trespass continues.

306. DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court enter judgment against DuPont, Chemours, and Chemours FC as follows:

a.  Finding DuPont, Chemours, and Chemours FC liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond

to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

    1) Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

    2) Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

    3) Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b. Ordering DuPont, Chemours, and Chemours FC to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c.   Ordering DuPont, Chemours, and Chemours FC to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d.   Ordering DuPont, Chemours, and Chemours FC to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.   Ordering DuPont, Chemours, and Chemours FC to pay for all other damages sustained by Plaintiffs in their public trustee, _parens patriae_, and regulatory capacities as a direct and proximate result of DuPont's, Chemours', and Chemours FC's acts and omissions alleged herein;

f.   Entering an order against DuPont, Chemours, and Chemours FC for all appropriate injunctive relief to abate or mitigate the contamination that DuPont, Chemours, and Chemours FC caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

### Ninth Count
### (Negligence – As Against All Defendants)

307. Plaintiffs repeat each allegation of Paragraphs 1 through 306 above as though fully set forth in its entirety herein.

308. DuPont, Chemours, and Chemours FC had a duty to Plaintiffs to ensure that hazardous substances and pollutants were not discharged at Chambers Works and did not injure groundwater, surface water, sediment, wetlands, and biota at and around the Site.

309. 3M had a duty to Plaintiffs to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of PFAS and/or products containing PFAS, and other pollutants and hazardous substances.

310. Defendants breached these duties.

311. As a direct and proximate result of DuPont's, Chemours', and Chemours FC's discharge of hazardous substances and pollutants at Chambers Works, groundwater, surface water, sediment, wetlands, soils, biota, and other natural resources at and around the Site have been injured. DuPont, Chemours, and Chemours FC are jointly and severally liable for such injuries and the consequential damages.

312. As a direct and proximate result of 3M's negligence in designing PFAS and in failing to warn PFAS purchasers, the State, and others that it was reasonably foreseeable would be harmed by PFAS of the dangers of 3M's products, groundwater, surface water, and other natural resources at and around Chambers Works became contaminated with PFAS in varying amounts over time, causing the State and its citizens significant injury and damage.

313. As a further direct and proximate result of DuPont's, Chemours', and Chemours FC's discharge of hazardous substances and pollutants at Chambers Works, the Department and the Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, treatment, monitoring and restoration costs, and expenses for which DuPont, Chemours, and Chemours FC are jointly and severally liable.

314. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants as follows:

a.   Finding Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the

State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

2) Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

3) Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b. Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c.   Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d.   Ordering Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.   Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, <u>parens patriae</u>, and regulatory capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

f.   Entering an order against Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

**Tenth Count**
**(Abnormally Dangerous Activity – As Against DuPont, Chemours,
and Chemours FC)**

315. Plaintiffs repeat each allegation of Paragraphs 1 through 314 above as though fully set forth in its entirety herein.

316. During the relevant period, DuPont, Chemours, and Chemours FC, utilized, disposed of, discharged, and emitted their PFAS at Chambers Works. These activities occurred in the immediate vicinity of the State's natural resources, including groundwater, air, surface water, sediments and soils, wetlands, and biota.

317. As a result of DuPont's, Chemours', and Chemours FC's use of PFAS at Chambers Works, the State's natural resources were contaminated by PFAS.

318. The use of PFAS in the manufacture of other products and their disposal, discharge, and emission constitute ultra-hazardous activities that introduce an unusual danger into the community. These activities presented and continue to present a high degree of risk of harm to the State's natural resources. These activities have presented a high likelihood that the harm they would cause would be great. Neither Plaintiffs nor the broader community were able to eliminate this risk by the exercise of reasonable care, particularly in light of DuPont's, Chemours', and Chemours FC's failure to provide an adequate warning about the dangers involved.

319. The use, disposal, discharge, and emission of PFAS is not a matter of common usage in the areas in which DuPont,

Chemours, and Chemours FC carried out these activities, and these activities were inappropriate to carry out in these locations.

320. At all relevant times, the risks of DuPont's, Chemours', and Chemours FC's abnormally dangerous activities outweighed the value to the community.

321. DuPont's, Chemours', and Chemours FC's acts and omissions in using, disposing, discharging, and emitting PFAS in the areas in which they did proximately caused the contamination of the State's natural resources. DuPont, Chemours, and Chemours FC are thus strictly liable for the harm these ultra-hazardous activities caused.

322. DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs request that this Court enter judgment against DuPont, Chemours, and Chemours FC as follows:

a. Finding DuPont, Chemours, and Chemours FC liable, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination in the State's groundwater, surface waters, and other natural resources so that such natural resources are restored to their

original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by PFAS products, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of groundwater, surface waters, and natural resources likely to have been contaminated for the presence of PFAS;

2) Past and future treatment of all groundwater, surface waters, and other natural resources containing detectable levels of PFAS until restored to non-detectable levels; and

3) Past and future monitoring of the State's groundwater, surface waters, and other natural resources to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b. Ordering DuPont, Chemours, and Chemours FC to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's groundwater, surface waters, and other natural resources caused by PFAS;

c.   Ordering DuPont, Chemours, and Chemours FC to pay for all damages in an amount at least equal to the full cost of restoring the State's groundwater, surface waters, and other natural resources to their original condition prior to the contamination of such waters by PFAS;

d.   Ordering DuPont, Chemours, and Chemours FC to pay for all compensatory damages for the lost value (including lost use) of the State's groundwater, surface waters, and other natural resources as a result of the contamination of such natural resources with PFAS;

e.   Ordering DuPont, Chemours, and Chemours FC to pay for all other damages sustained by Plaintiffs as a direct and proximate result of their acts and omissions alleged herein, including remedial, administrative, oversight, and legal fees and expenses;

f.   Entering an order against DuPont, Chemours, and Chemours FC for all appropriate injunctive relief to abate or mitigate the PFAS contamination that they caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.    Awarding Plaintiffs such other relief as this Court deems appropriate.

**Eleventh Count**
**(Strict Products Liability – Defective Design as Against 3M)**

323. Plaintiffs repeat each allegation of Paragraphs 1 through 322 above as though fully set forth in its entirety herein.

324. 3M designed, manufactured, and sold PFAS that were used at Chambers Works during the relevant period.

325. As a manufacturer and seller of PFAS, 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.  3M owed that duty both to reasonably foreseeable users of its products and also to any person who or property that might reasonably be expected to come into contact with those products.

326. 3M's PFAS were used in a reasonably foreseeable manner and without substantial change in the condition of such products. These products were defective and unfit for their reasonable use. 3M's PFAS foreseeably contaminated groundwater, surface water, and other natural resources at and around the Site.  3M knew or reasonably should have known that its manufacture, transportation, and/or sale, as well as its customers' use of 3M's PFAS in an intended or reasonably foreseeable manner, would result in the spillage, discharge, disposal, or release of PFAS onto land or into water, including at Chambers Works.

327. PFAS used at Chambers Works have injured and are continuing to injure groundwater, surface water, and other natural resources at and/or around the Site. These PFAS were defective in design and unreasonably dangerous because, among other things:

    a.   PFAS cause extensive and persistent contamination when they, or products containing them, are used in a reasonably foreseeable or intended manner;

    b.   PFAS contamination in groundwater and surface water that are the sources of drinking water poses significant threats to public health and welfare; and

    c.   3M failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFAS.

328. At all times relevant to this action, the PFAS that 3M designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

329. At all times relevant to this action, the foreseeable risk to public health and welfare posed by 3M's PFAS outweighed the cost to 3M of reducing or eliminating such risk.

330. At all times relevant to this action, 3M knew or should have known about reasonably safer feasible alternatives to PFAS, and the omission of such alternative designs rendered 3M's PFAS not reasonably safe.

331. As a direct and proximate result of the defects in the 3M's design, manufacture, and sale of PFAS, groundwater, surface water, and other natural resources at and/or near the Site became contaminated with PFAS in varying amounts over time, causing the State and its citizens significant injury and damage.

332. As a direct and proximate result of 3M's acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages in an amount to be proved at trial related to PFAS contamination of groundwater, surface water, and other natural resources at and/or near the Site.

333. As a further direct and proximate result of 3M's acts and omissions alleged in this Complaint, Plaintiffs have incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface waters, and other natural resources at and/or near the Site with PFAS, for which Defendants are strictly, jointly, and severally liable.

334. 3M knew it was substantially certain that its acts and omissions described above would cause the contamination and harms described herein.

335. Plaintiffs seek redress for exposure to toxic chemicals and/or substances at the Site, an industrial site, caused by the use of PFAS.  Thus, this suit is an "environmental tort action" as

defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

336. 3M committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

337. 3M is strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment against 3M as follows:

a.   Finding 3M liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination at and around the Site so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFAS, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of natural resources at and around the Site likely to have been contaminated by PFAS;

2) Past and future treatment of all natural resources at and around the Site containing detectable levels of PFAS until restored to non-detectable levels; and

3) Past and future monitoring of the State's natural resources at and around the Site to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b. Ordering 3M to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination of the State's natural resources;

c. Ordering 3M to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination;

d. Ordering 3M to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the PFAS contamination of such natural resources;

e.   Ordering 3M to pay for all other damages sustained by Plaintiffs in their public trustee, _parens patriae_, and regulatory capacities as a direct and proximate result of 3M's acts and omissions alleged herein;

f.   Entering an order against 3M to abate or mitigate the PFAS contamination that it caused at and around the Site;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.   Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## Twelfth Count
### (Strict Products Liability – Failure to Warn as Against 3M)

338. Plaintiffs repeat each allegation of Paragraphs 1 through 337 above as though fully set forth in its entirety herein.

339. As a designer, manufacturer, and seller of PFAS, 3M had a strict duty to Plaintiffs and to those who were at risk of being harmed by PFAS to warn users of those products and the State of the foreseeable harms associated with them.  3M had a duty to warn the State about the dangers of PFAS because, among other things, the State is the trustee, for the benefit of its citizens, of all

natural resources within its jurisdiction; because the Department and the Commissioner are charged with enforcing the State's environmental laws and regulations; and because the State maintains a "quasi-sovereign" interest in the well-being of its residents.

340. 3M inadequately warned users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS of the likelihood that 3M's products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.  To the extent 3M provided any warnings about its products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by PFAS, and the warnings did not convey adequate information on the dangers of PFAS to the mind of a reasonably foreseeable or ordinary user or bystander.

341. Plaintiffs seek redress for exposure to toxic chemicals and/or substances at Chambers Works, an industrial site, caused by the use of PFAS.  Thus, this suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

342. Despite the fact that 3M knew or should have known about the risks of PFAS, 3M withheld such knowledge from Plaintiffs, other regulators, and the public.  Moreover, 3M affirmatively

distorted and/or suppressed its knowledge and the scientific evidence linking its products to the unreasonable dangers they pose, and 3M instructed users to release its products directly to the ground where PFAS would infiltrate drinking water supplies.

343. At no time relevant to this action did 3M warn users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS that PFAS would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

344. 3M's PFAS were in the same condition when they were purchased and/or used as they were when they left 3M's control. 3M's customers used 3M's PFAS in a reasonably foreseeable manner and without any substantial change in the condition of the products.

345. Had 3M provided adequate warnings about the hazards associated with its PFAS, users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS would have heeded those warnings.

346. As a direct and proximate result of 3M's failure to warn of the hazards of PFAS, groundwater, surface water, and other natural resources at and around Chambers Works were contaminated with PFAS.

347. As a direct and proximate result of 3M's acts and omissions, Plaintiffs have incurred, are incurring, and will

continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

348. 3M knew it was substantially certain that its acts and omissions described above would cause Plaintiffs' injury and damage.

349. 3M committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

350. 3M is strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment against 3M as follows:

a. Finding 3M liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination at and around the Site so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFAS, and for such orders as may be necessary

to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of natural resources at and around the Site likely to have been contaminated by PFAS;

2) Past and future treatment of all natural resources at and around the Site containing detectable levels of PFAS until restored to non-detectable levels; and

3) Past and future monitoring of the State's natural resources at and around the Site to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b. Ordering 3M to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination of the State's natural resources;

c. Ordering 3M to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination;

d. Ordering 3M to pay for all compensatory damages for the lost value (including lost use) of the State's natural

resources as a result of the PFAS contamination of such natural resources;

e.  Ordering 3M to pay for all other damages sustained by Plaintiffs in their public trustee, parens patriae, and regulatory capacities as a direct and proximate result of 3M's acts and omissions alleged herein;

f.  Entering an order against 3M to abate or mitigate the PFAS contamination that it caused at and around the Site;

g.  Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.  Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.  Awarding Plaintiffs such other relief as this Court deems appropriate.

## Thirteenth Count
### (Actual Fraudulent Transfer – As Against DuPont and Chemours)

351. Plaintiffs repeat each allegation of Paragraphs 1 through 350 above as though fully set forth in its entirety herein.

352. Plaintiffs are and were creditors of Chemours at all relevant times.

353. Through its participation in the Spinoff, as detailed above, Chemours transferred valuable assets to DuPont, including

the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

354. The Transfers and Assumed Liabilities were made for the benefit of DuPont.

355. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours.

356. Chemours made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours.

357. Plaintiffs have been harmed as a result of the Transfers.

358. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Transfers and to recover property or value transferred to DuPont.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours as follows:

a.   Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.   Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c.  Awarding Plaintiffs such other relief as this Court deems appropriate.

## Fourteenth Count
### (Constructive Fraudulent Transfer – As Against DuPont and Chemours)

359. Plaintiffs repeat each allegation of Paragraphs 1 through 358 above as though fully set forth in its entirety herein.

360. Plaintiffs are and were creditors of Chemours at all relevant times.

361. Chemours did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

362. Each of the Transfers and Chemours' assumption of the Assumed Liabilities was made to or for the benefit of DuPont.

363. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours.

364. Chemours made the Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

365. Chemours was insolvent at the time or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

366. At the time that the Transfers were made and Chemours assumed the Assumed Liabilities, DuPont and Chemours intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

367. Plaintiffs have been harmed as a result of the Transfers.

368. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Transfers and to recover property or value transferred to DuPont.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours as follows:

a.   Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.   Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

## <u>RULE 4:5-1 CERTIFICATION</u>

I hereby certify that, to the best of my knowledge and belief, the matter in controversy is not the subject of any action pending in any other court or of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, except the following pending actions: <u>Carneys Point Township v. E.I. du Pont de Nemours & Company, et al.</u>, SLM-L-251-16; and <u>Carneys Point Township v. NJDEP</u>, SLM-C-7-18, <u>NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al.</u>, GLO-L-000388-19 (relating to the DuPont/Chemours "Repauno site"); <u>NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al.</u>, MID-L-002448-19 (relating to the DuPont/Chemours "Parlin site"); and <u>NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al.</u>, PAS-L-00936-19 (relating to the "Pompton Lakes site"). I know of no other parties other than the parties set forth in this pleading who should be joined in the above action. I recognize the continuing obligation of each party to file with the Court and serve on all parties an amended Certification if there is a change in the facts stated in the original Certification.

## <u>DESIGNATION OF TRIAL COUNSEL</u>

Pursuant to <u>Rule</u> 4:25-4, Plaintiffs designate Leonard Z. Kaufmann, Esq., as trial counsel in this matter.

Dated:  May 31, 2019

**Gurbir S. Grewal**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorneys for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
  (Atty. ID #000081999)
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 376-2761

**COHN LIFLAND PEARLMAN**
  **HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

By: */s/ Leonard Z. Kaufmann*
Leonard Z. Kaufmann
  (Atty. ID #045731994)
A Member of the Firm
Also by:  Joseph A. Maurice
          Christina N. Stripp
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General
By:    William J. Jackson
       John Gilmour
       David Reap
       Melissa E. Byroade
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General
By:    John K. Dema
       Scott E. Kauff
       John T. Dema
       James Crooks
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Tel.: (340) 773-6142