**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs*

By:    Gwen Farley
       Deputy Attorney General
       Attorney ID No. 000081999
       Ph. (609) 376-2740
       Gwen.Farley@law.njoag.gov

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General
By:    Geoffrey W. Castello, Esq.
       Atty ID No. 021091995
       One Jefferson Road
       Parsippany, New Jersey 07054
       Tel.: (973) 503-5900
       GCastello@KelleyDrye.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, <br><br>                    Plaintiffs, <br>        v. <br><br> E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS), <br><br>                    Defendants. | Case No.:  1:19-cv-14766-RMB-JBC <br><br> Civil Action <br><br><br> **THIRD AMENDED COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs, the New Jersey Department of Environmental Protection (the "Department" or "NJDEP"), the Commissioner of the New Jersey Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively "Plaintiffs" or the "State"), file this Third Amended Complaint against the above-named defendants (the "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1.     Plaintiffs bring this civil action against Defendants pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 (the "Spill Act"); the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20 (the "WPCA"); the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 to -13.1 ("ISRA"); the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to 58:10B-31 (the "Brownfield Act"); the Solid Waste Management Act, N.J.S.A. 13:1E-1, *et seq.* ("SWMA"); the Air Pollution Control Act, N.J.S.A. 26:2C-1, *et seq.*; the Department's enabling statute, N.J.S.A. 13:1D-1, *et seq.*; the Uniform Fraudulent Transfer Act, Del. Code. tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to 25:2-34; the New Jersey Safe Drinking Water Act, N.J.S.A. 58:12A-1 et seq. ("NJSDWA"); and the common law of New Jersey for cleanup and removal costs, damages, and other relief as a result of the discharges of hazardous substances and pollutants by E.I. du Pont de Nemours and Company ("Old DuPont"), The Chemours Company ("Chemours"), and The Chemours Company FC, LLC ("Chemours FC") at and from the Chambers Works facility, located at 67 Canal Road and Route 130, in Pennsville and Carneys Point Townships, Salem County, New Jersey ("Chambers Works" or "Site").

2.     Throughout its 125 years of operations at Chambers Works, Old DuPont has produced, utilized, and discharged into the environment approximately 1,200 chemicals, pollutants, and other hazardous substances.  As a result of Old DuPont's processes, emissions, and waste disposal practices, Chambers Works is one of the most contaminated sites in New Jersey.  It

is saturated with a wide variety of pollutants and hazardous substances, including semi-volatile organic compounds ("SVOCs"), volatile organic compounds ("VOCs"), metals, pesticides, and polychlorinated biphenyls ("PCBs"), as well as per- and polyfluoroalkyl substances ("PFAS").

3.     For decades, the Department has worked to allow Old DuPont to investigate and remediate Chambers Works without the need for enforcement or litigation.  However, it has recently become clear that Old DuPont has not been working in good faith to address the contamination it released into New Jersey's environment.  Instead, Old DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its Titanium Technologies, Chemical Solutions, and Flourochemicals segments (the "Performance Chemicals Business") (including its PFAS-related product lines), the Site itself, and the associated liabilities to Chemours and Chemours FC and away from Old DuPont (and tens of billions of dollars of its assets).  Old DuPont also concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused.

4.     For example, for over 50 years, Old DuPont emitted vast quantities of PFAS chemicals—including perfluorooctanoic acid ("PFOA") and perfluorononanoic acid ("PFNA")—from Chambers Works.  For most of that time, Old DuPont had clear and unequivocal knowledge that:  PFOA, PFNA and other PFAS compounds are extremely resistant to degradation, they persist indefinitely in the environment, they bioaccumulate in blood, and they pose a substantial threat to human health and the environment.  Yet, Old DuPont actively concealed the true nature of PFAS compounds, while it utilized, discharged, emitted, released, and dumped vast quantities of these compounds into New Jersey's air, waters, and natural resources.  Old DuPont knowingly undertook this course of conduct for one reason:  to maximize its profits from Teflon® and myriad

other consumer products and industrial uses for PFAS-containing compounds. Both Old DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey.

5. Although Old DuPont and 3M, which supplied and transported PFOA to Old DuPont for use at Chambers Works among other DuPont facilities, knew of these dangers for decades, regulatory agencies around the world are only now coming to understand the true nature and dangers of these global contaminants. Today, the State is expending substantial public resources to investigate PFAS compounds, including replacement compounds such as "GenX," their toxicity and impacts to human health and the environment, and to locate, remediate, treat, and/or restore New Jersey's natural resources that are impacted with these "forever chemicals."

6. Not only is there significant PFAS contamination at Chambers Works, but PFAS compounds also dispersed through the Site's air emissions to locations miles away. For example, testing of private drinking water wells miles from Chambers Works have recently revealed PFOA at levels that exceed the applicable criteria for the compound. Likewise, PFAS compounds have been located in drinking water, groundwater, surface waters, sediments, soils, air, fish, plants, and other natural resources emanating from Chambers Works and in other sites across New Jersey.

7. Accordingly, the State is bringing this action to require Defendants to pay all of the costs necessary to fully investigate and delineate all of the PFAS compounds and other pollutants and hazardous substances that were discharged, released, and/or emitted from Chambers Works, wherever they may have come to rest. Likewise, the State is seeking that Defendants pay all costs necessary to investigate, remediate, assess, and restore the Site itself and all of the off-site areas and natural resources of New Jersey that have been contaminated from Chambers Works, except that the State is explicitly reserving its claims to remediate and restore the Delaware River until

such time as the investigation work is more fully complete. Additionally, in this litigation, the State is not asserting claims, costs, or damages associated with aqueous film-forming foam ("AFFF"), which is a particular product that contains PFAS compounds, as that is the subject of a separate action.

8. The State is also seeking from Defendants all damages to which the State is entitled to recover, including damages for injuries to all natural resources, property damages, economic damages, restitution and disgorgement of Old DuPont's and 3M's ill-gotten profits, punitive damages, and all other damages, costs, and equitable relief to which it may be entitled.

9. In addition, the State asserts claims under the Uniform Fraudulent Transfer Act based on a web of transactions that Old DuPont orchestrated over the past decade, all designed to shield significant assets from the State and other creditors.

10. Old DuPont has known for decades that it faces unprecedented environmental and tort liabilities for the PFAS that it released into the environment in numerous parts of the country in combination with its massive environmental liabilities unrelated to PFAS. For years, it has, at every step, sought to hinder the State of New Jersey, and many other states facing massive harm to the well-being of their citizens and their natural resources, from being able to recover on their eventual judgments by attempting to put assets outside of the reach of creditors.

11. Old DuPont has sought to limit its PFAS and environmental liabilities by engaging in a series of complex restructuring transactions, including (i) the "spinoff" of its Performance Chemicals Business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into defendant Chemours; (ii) a purported merger with The Dow Chemical Company; (iii) the transfer of Old DuPont's historic assets to other entities, including defendant DuPont de Nemours Inc. ("New DuPont"); and, ultimately, (iv) the spin-off

of Old DuPont to a new parent company named Corteva, Inc. ("Corteva"). These transactions were all designed to shield billions of dollars in assets from the PFAS and environmental liabilities that DuPont tried to isolate in Chemours.

12.     Old DuPont also sought to hide critical details of these transactions by burying them in non-public schedules to agreements in an attempt to keep the State and other creditors in the dark. What is clear, however, is that Old DuPont shed more than $20 billion in tangible assets as a result of its restructuring efforts and attempted to put those assets outside of the State's reach. This is the exact type of scheme that the Uniform Fraudulent Transfer Act is designed to prevent.

## THE PARTIES

13.     The Department is a principal department within the Executive Branch of the State government.  Under the leadership of the Commissioner, it is vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety.  N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

14.     The State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction.  The Department is vested with the authority to protect this public trust and to seek compensation for any injury to the natural resources of this State.  N.J.S.A. 58:10-23.11a.  In addition, the State may act in its *parens patriae* capacity to protect the State's "quasi-sovereign" interests, including its interest in the health and well-being of its residents and the integrity of its natural resources.  The Department brings this case in its trustee, *parens patriae*, and regulatory (police power) capacities, as well as in its capacity as an owner of real property directly impacted by contamination originating from the Site.   The State asserts its fraudulent transfer claims in its capacity as a creditor of Chemours and Old DuPont.

15.     Plaintiff Commissioner is the Commissioner of the Department.  N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3; and N.J.S.A. 13:1B-2.  In this capacity, the Commissioner is vested

by law with various powers and authority, including those conferred by the Department's enabling legislation. N.J.S.A. 13:1D-1 to -19; N.J.S.A.13:1B-3.

16. Plaintiff Administrator is the Chief Executive Officer of the New Jersey Spill Compensation Fund ("the Spill Fund"). N.J.S.A. 58:10-23.11j. As Chief Executive Officer of the Spill Fund, Plaintiff Administrator is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10-23.11f(c) and (d), and to certify the amount of any claim to be paid from the Spill Fund. N.J.S.A. 58:10-23.11j(d).

17. Defendant Old DuPont is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

18. Defendant Chemours is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly owned subsidiary of Old DuPont until July 2015, when Old DuPont spun-off Chemours as a separate public entity.

19. In connection with the spin-off, Chemours assumed direct liability for Old DuPont's decades—long history of causing environmental pollution and widespread PFAS contamination in the State and elsewhere.

20. Defendant Chemours FC is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC is a subsidiary of Chemours that was formed in April 2014. Chemours FC has owned the Site since January 2015.

21.     Defendant 3M is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

22.     Defendant New DuPont, formerly known as DowDuPont Inc., is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

23.     Defendant Corteva is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805.

24.     Defendant DuPont Specialty Products USA, LLC is a limited liability company duly organized under the laws of the State of Delaware, with its main place of business located at 974 Centre Road, Wilmington, DE 19805.

25.     Defendants "ABC Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Third Amended Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified Defendants in this matter, or which are otherwise liable for the causes of action set forth herein.

**<u>AFFECTED NATURAL RESOURCES</u>**

26.     The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust or otherwise controlled by the State. N.J.S.A. 58:10-23.11b.

27.     The natural resources of this State include the "waters of the State," which are the ocean and its estuaries, all springs, streams and bodies of surface or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction.  N.J.S.A. 58:10A-3(t).

28.     New Jersey's habitats and ecosystems—forests, lakes, rivers, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands—are some of the most threatened in the nation. They are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.

29.     Hazardous substances and pollutants have been found in the groundwater, surface water, sediments, soils, wetlands, air, and other natural resources at and around Chambers Works.

30.     These natural resources have intrinsic (*i.e.*, inherent existence) values. The current and future residents of New Jersey have a substantial interest in a clean environment.

## **Groundwater**

31.     Groundwater—that is, water that exists beneath the Earth's surface—is an extremely important natural resource for the people of New Jersey. More than half of New Jersey's population obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

32.     Private wells, which provide access to groundwater, are widely used in the residential communities around the Site. Wells are used for drinking water, irrigation, and filling swimming pools, among other things.

33.     Not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

34.     Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

35.     Groundwater and the other natural resources of the State are unique resources that help sustain the State's economy.

36.     Groundwater at the Site is heavily contaminated with hazardous substances and pollutants, including SVOCs, VOCs, metals, polycyclic aromatic hydrocarbons ("PAHs"), PCBs, pesticides, and PFAS. Contaminated groundwater has also migrated off-site, including to the Salem Canal and the Delaware River. Discharges and releases of PFAS have further resulted in contamination of groundwater in the surrounding area, miles from Chambers Works.

### Surface Water

37.     Surface waters are a critical ecological resource of New Jersey. New Jersey's surface water—which includes all water in the State's lakes, streams, and wetlands—is a primary source of drinking water in the State. Nearly half of New Jersey's population obtains its drinking water from surface water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

38.     Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of goods and services.

39.     The tourism and recreation industries, which are vital to the State's economy, are dependent on clean water and beaches.

40.     Surface waters also provide commercial, recreational, aesthetic, and ecological value, including by supporting aquatic ecosystems, nearby communities, and the citizens of the State.

41.     The surface waters located at the Site include the Delaware River, the Salem Canal, Whooping John Creek, Boutons Creek, Hanby Creek, and on-site wetlands and ponds.

42.     Hazardous substances and pollutants, discharged at the Site, including SVOCs and metals, have reached and adversely affected surface waters on and off-site.

## Sediments and Soils

43.     New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

44.     Sediments and soils are critical components of New Jersey ecological resources.

45.     Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy ecosystem.  They provide a living substrate for submerged and emergent flora, which in turn support diverse invertebrate species, wading birds, and fish and shellfish populations.

46.     Hazardous substances and pollutants, discharged from the Site, including SVOCs, VOCs, PAHs, metals, total PCBs, pesticides and PFAS, have reached and adversely affected sediments and soils on and off-site.

## Wetlands

47.     Wetlands are a critical component of New Jersey's ecological resources, which include land and aquatic resources comprised of unique and complex ecosystems.

48.     New Jersey has approximately 730,000 acres of freshwater wetlands and 250,000 acres of coastal wetlands.

49.     Wetlands can sustain a wide diversity of plants and animals that are essential in a healthy food chain.

50.     Wetlands perform many additional functions, which include the improvement of water quality, sediment trapping, groundwater recharge, shoreline protections, and protecting land from flooding and erosion.

51.     Hazardous substances and pollutants, discharged at Chambers Works, have reached and adversely impacted wetlands on and off-site.

**Air**

52.     Air resources are vital to life.  Pollution of air resources can injure human health and welfare, flora and fauna, and property, and can unreasonably interfere with the enjoyment of life and property in areas affected by such pollution.  Air deposition (*i.e.*, deposits of air contaminants on the Earth's surface) can also be a source of contamination to other types of natural resources, including surface water, groundwater, sediments and soils, wetlands, forests, and biota.

53.     Air pollution from activities at Chambers Works has contaminated surrounding natural resources with PFAS, including but not limited to groundwater, up to five miles away from the Site.

54.     When subsurface air is contaminated with VOCs, the subsurface air (*i.e.*, soil gas) can become a source of contaminated air to the structures above, causing vapor intrusion.

**Biota**

55.     Biota, including the flora and fauna of the State, are critical ecological resources. New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora that cannot be found anywhere else in the world.  Approximately 15 percent of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant species listed as endangered and an additional 32 that have already been extirpated.

56.     New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds. Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers in the State each year.

57.     At least 17 percent of New Jersey's native vertebrate species and 24 percent of its native invertebrate species are at risk of extinction.  Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

58.     New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for all cultural and economic activity in the State.

59.     Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

60.     Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

61.     Hazardous substances and pollutants discharged at Chambers Works have reached and adversely impacted biota on and off-site.

## FACTUAL ALLEGATIONS

62.     Chambers Works spans approximately 1,455 acres of real property located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships in Salem County, designated as Block 22, Lots 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10, and Block 301, Lots 1, 2, 3, 4 and 5 in Pennsville Township, and Block 185, Lot 1 in Carneys Point Township.

63.     Chambers Works is located along the eastern shore of the Delaware River.  The Site extends approximately 2.7 miles between Helms Cove to the north, and the Salem Canal to the south.

64.     The Site is comprised of the former Carneys Point Works in the northern area, and the Chambers Works manufacturing area in the southern area.  Whooping John Creek generally separates the two areas.

65.     To the north and the east of the Site are residential neighborhoods.

66.     In 1891, the DuPont Powder Company purchased farm land and built Carneys Point Works.  Over the next 20 years, DuPont expanded its footprint by purchasing adjacent parcels.  By 1914, Old DuPont's gunpowder operations had expanded southward, into the Chambers Works manufacturing area.

67.     Old DuPont owned or operated the contiguous property at Chambers Works from 1927 until 2015.

68.     On or around January 23, 2015, Old DuPont transferred the Chambers Works real property by deed to Chemours FC.  Chemours FC took the property with full knowledge that it was contaminated.

69.     In 2015, Old DuPont leased a portion of Chambers Works from Chemours FC to continue its operations of its non-performance chemical businesses at the Site.  As recently as 2018, Old DuPont was using that portion of the property to manufacture fluoroelastomers and/or products containing them.

70.     Chemours FC currently owns the Site, and has been the owner since January 2015.

71.     On or about January 29, 2019, Old DuPont transferred a leasehold to certain portions of the Site associated with the manufacture of fluoroelastomers and/or products containing them to its subsidiary, DuPont Specialty Products USA, LLC ("Specialty Products").

72.     On or about June 1, 2019, Old DuPont transferred ownership of Specialty Products to New DuPont.

*Site Operations*

73.     Operations at the facility first began in or about 1892, when Carneys Point Works began manufacturing smokeless gunpowder, nitrocellulose, and other products.  Old DuPont used

14

various materials to produce these chemicals, including ether, amines, plasticizers, nitroglycerin salts, nitric acid and sulfuric acid. Carneys Point Works operated until 1979.

74. Old DuPont began manufacturing and producing dye and specialty chemicals at the Dye Works part of the Site in or about 1917 and gradually expanded as other product lines were added. In or about 1944, the Dye Works was renamed as Chambers Works. Old DuPont produced approximately 700 different dyes at Chambers Works from 1917 through 1979. These operations used numerous chemicals including organic mercury, amino compounds, benzene, nitrobenzene, chlorobenzene, phenols, acids, aniline, toluene, nitrotoluene, toluidine, sulfur, naphthalene, sodium hydroxide, sodium hydrosulfide, aluminum chloride, aromatic hydrocarbons, chlorinated aromatics, polymers, elastomers, methlyamines, and ethyl chloride.

75. In the 1920s, Old DuPont began manufacturing refrigerants including Freon®, and tetraethyl lead ("TEL"). TEL production involved the use of hydrofluoric acid, sulfuric acid, hydrochloric acid, carbon tetrachloride, fluorospar, and antimony.

76. In the 1940s, Old DuPont added aromatic chemical manufacturing to its operations at the Site, which involved petroleum hydrocarbons, acids, solvents, inorganics, and aromatic hydrocarbons.

77. As further described below, Old DuPont began using PFOA in manufacturing processes at Chambers Works in the late 1950s.

78. In or around the 1960s, Old DuPont began to produce elastomers at Chambers Works, which production involved organic isocyanates, phosgene, dinitrotoluene, and hydrochloric acid.

79. By the late 1970s and early 1980s, Old DuPont discontinued its explosive and dye manufacturing divisions, leaving only chemical manufacturing at the Site.

80.     Chemours continues to manufacture a variety of fluorochemicals and finished products at Chambers Works.  Among other things, Chemours uses a PFAS replacement chemical, GenX, to manufacture Krytox™ greases and lubricating oils.

### HISTORY OF INVESTIGATION, REGULATION AND REMEDIATION

81.     Historical manufacturing processes and waste disposal practices at Chambers Works caused significant soil, sediment, and groundwater contamination at the Site, which continues to plague the Site today.

82.     From 1917 through the 1980s, process waste generated at Chambers Works was disposed of through a series of open ditches, some of which were unlined.

83.     Production buildings had trenches and/or sumps that collected wastewater. Wastewater then flowed into a drainage ditch adjacent to the buildings, where it would be combined with wastewater from other buildings.

84.     Most wastewater then continued through a network of ditches into a settling basin, which ultimately discharged to the Delaware River.  Some buildings at the exterior of the Site, however, discharged directly to the Delaware River and the Salem Canal.  There were up to 15 historical outfalls along the Delaware River and Salem Canal that may have conveyed process wastewater directly off-site.  This practice largely remained unchanged until 1958.

85.     Improvements were made to this system incrementally over time, including the construction of a wastewater treatment plant ("WWTP") and the eventual addition of an overhead sewer system in 1991.  Once the overhead sewer system was in place, all process wastewater was conveyed to the WWTP.

86.     Old DuPont's historical practices have caused contamination.  Sludge samples collected from ditches between the late 1980s and early 1990s contained high concentrations of

chlorobenzene (up to 30,000 parts per million ("ppm")), 1,2-dichlorobenzene (up to 65,000 ppm), and lead (up to 176,000 ppm).

87.    Groundwater contamination was first identified at the site in the 1960s. In 1967, Old DuPont installed and sampled groundwater monitoring wells, which samples indicated that contamination had occurred in the shallow glacial aquifer underlying and adjacent to the Site, and that two unlined landfills were contributors to the contamination.

88.    As a result of the identification of groundwater contamination, in 1971, Old DuPont installed an interceptor well system ("IWS") along the north and east boundaries of the Site.

89.    Additionally, in 1975, Old DuPont constructed the WWTP, which would begin operating two years later.

90.    In 1984, Old DuPont and the Department reached an agreement on terms for an Administrative Consent Order ("ACO"). The ACO recited that "[Old] DuPont has been and is discharging pollutants into unlined ditches and lagoons, from which pollutants may flow into the groundwaters of the State, in violation of the Water Pollution Control Act." The ACO required Old DuPont to line or eliminate all unlined ditches at the Site, and to close its unlined basins. The ACO further required Old DuPont to continue pumping, through the IWS, 1.5 million gallons of groundwater per day.

91.    In 1988, permit No. NJD002385730 was issued for the Site pursuant to the Hazardous and Solid Waste Amendments ("HSWA") of 1984.

92.    As a result of the issuance of the HSWA permit, in February 1988, the ACO was amended to make the remediation timeframes consistent with the HSWA permit, and also to require closure of an additional basin.

93.     In November 1988, the Department issued a New Jersey Pollutant Discharge Elimination System ("NJPDES") Discharge to Groundwater ("NJPDES-DGW") permit for Chambers Works (NJPDES-DGW permit no. NJ0083429).  The permit required implementation of a groundwater quality monitoring program, and continuation of the IWS as well as other groundwater recovery programs.

94.     There have been four phases of the Resources Conservation and Recovery Act ("RCRA") Facility Investigation ("RFI") at the Site.  Initially, 55 Solid Waste Management Units ("SWMUs") were identified, and eventually that number was increased to 96 SWMUs.

95.     Old DuPont has identified Areas of Concern ("AOCs") at the Site.  In a 2006 Preliminary Assessment Report, Old DuPont identified 11 AOCs based on the potential for process-related contaminants to have entered the environment, including the fluoroproducts area, the TEL area, and the aramids area.

96.     Chemours, in a 2017 Preliminary Assessment/Site Investigation, added 11 more AOCs, raising the total to 22.  Additional AOCs include the Delaware River AOC, Salem Canal AOC, Carneys Pont AOC, and C Landfill (SWMU 13) AOC.

97.     As a result of multiple years of investigation at the Site, the injury to natural resources, including soil, groundwater, surface water, and sediments is well-documented.  Results of those investigations include, but are not limited to, the below.

### Soils Contamination

98.     Over 75 contaminants were detected in soil samples collected between September 2001 and October 2004.  At least 60 different contaminants were detected in samples collected in the former Carneys Point Works area and evaluated in a Baseline Ecological Evaluation ("BEE") by Old DuPont in 2006.  Of the contaminants detected, 16 were identified as Contaminants of

Potential Ecological Concern ("COPECs").  Investigations associated with the RFI process identified 13 Contaminants of Potential Concern ("COPCs") in soil at the Carneys Point Works and Chambers Works manufacturing areas.  Samples collected as part of the investigations exceeded applicable New Jersey soil remediation standards at 54, 173, 129, and 19 locations for VOCs, SVOCs, metals, and pesticides, respectively.  Between the BEE and RCRA Facility Investigation, 22 contaminants were identified as either COPECs or COPCs: 1,2 dichlorobenzene, 2,4-DNT, 2,6-DNT, aniline, antimony, arsenic, benzene, bis(2-ethylhexyl)phthalate, butyl benzyl phthalate, chlorobenzene, chromium, copper, hexachlorobenzene, lead, mercury, nickel, nitrocellulose, N-nitrosodiphenylamine, PAHs, selenium, silver, and zinc.

### Groundwater Contamination

99.    Groundwater samples collected between 1999 and 2016 contained approximately 125 different contaminants.  Approximately 100 VOCs and SVOCs have been identified as exceeding New Jersey Groundwater Quality Standards for Class II-A Waters in the Chambers Works manufacturing area and the exceedances are widespread.  In addition, exceedances of groundwater quality standards for metals, including aluminum, antimony, arsenic, beryllium, chromium, iron, lead, manganese, and mercury, were widespread across the manufacturing area, and there were also exceedances of pesticides and total PCBs.

100.    Some contaminants exceeded groundwater quality standards by many orders of magnitude.  In the B Aquifer, some VOC and SVOC exceedances were more than 100,000 times the groundwater quality standard.

101.    In the former Carneys Point Works area, the primary impacts to groundwater are from metals, including arsenic and lead, and PAHs.  In total, the RFI report identified 47 contaminants as COPCs.

102.    After the discovery of a magenta-colored seep in the Salem Canal in 2002, investigations identified a groundwater plume originating where azo dyes were once made. Groundwater characterizations identified the width of that plume along the canal to be approximately 900 feet.  The plume, in the B Aquifer, extends 300 feet south beyond the Salem Canal.  Investigations leading up to the Old DuPont interim remedial action work plan identified 12 different chemicals as COPCs in the groundwater including: chlorobenzene, dichlorobenzenes, aniline, 4-chloroaniline, n-nitrosodiphenylamine, benzene, o-toluidine, chloroform, tetrachloroethene, trichloroethene, benzidrine, and nitrobenzene.

103.    Groundwater under the entire Site is currently designated as a classification exception area ("CEA") due to the contamination exceeding groundwater quality standards and the need for remediation to protect human health and the environment.  The CEA suspends the designated uses of the groundwater (potable Class IIA Quaternary Aquifer and Potomac-Raritan-Magothy Aquifer System beneath the Site).

### Surface Water and Sediment Contamination

104.    As reported in the BEE with respect to surface waters and sediments in the former Carneys Point Works area, in 34 sediment samples there were detections of 30 SVOCs, 23 metals, and total petroleum hydrocarbons ("TPH").  Of those, 16 SVOCs and nine metals exceeded ecological benchmarks.  Old DuPont identified 16 COPECs in sediment including 2,4-DNT, 2,6-DNT, acenaphthene, arsenic, benzo(b)fluoranthene, cadmium, chromium, chrysene, copper, lead, mercury, naphthalene, n-dioctyl phthalate, nickel, N-nitrosodiphenylamine, phenanthrene, pyrene, silver, zinc.  In the eight surface water samples considered, one SVOC, bis(2-ethylhexyl)phthalate, and 17 metals were detected.  Of the contaminants detected, bis(2-ethylhexyl)phthalate, lead, and mercury exceeded ecological or surface water benchmarks.

105. Following the appearance of the magenta-colored seep in Salem Canal in 2002, sampling of the discolored water from the seep was collected and found to contain six SVOC compounds exceeding ecological benchmarks for aquatic life (1,2-dichlorobenzene, 1,4-dichlorobenzene, aniline, 4-chloroaniline, diphenylamine, and naphthalene) and two VOC compounds that exceeded ecological benchmarks for aquatic life (chlorobenzene and xylene). Further investigations after discovery of the seep identified 11 COPCs in surface water and sediment in the Salem Canal. These include chlorobenzene, dichlorobenzenes, aniline, 4-chloroaniline, n-nitrosodiphenylamine, benzene, o-toluidine, trichlorobenzene, PAHs, 1-naphthylamine, and diphenylamine. In total, at least 38 contaminants have been detected in the Salem Canal above either ecological or other sediment quality benchmarks.

106. The limited sampling conducted in the Delaware River has resulted in detection of numerous VOCs, SVOCs, PAHs, metals, and total PCBs exceeding ecological benchmarks. The following contaminants exceeded refined sediment quality standards intended to provide a representative assessment of potential impacts (equivalent to COPCs): benzene, chlorobenzene, 1,2,4-trichlorobenzene, and vinyl chloride. Twelve VOCs and 13 metals were detected in 35 Delaware River surface water samples collected near the Chambers Works manufacturing area. Concentrations of 1,4-dichlorobenzene, total aluminum, dissolved beryllium, total iron, dissolved lead, and total manganese exceeded surface water quality criteria. Eight metals were detected in surface water samples collected near Carneys Point. Total aluminum and total iron exceeded surface water quality criteria.

## PFAS COMPOUNDS & GENX

107. PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat

resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals is entirely manmade and does not occur in nature. PFOA and perfluorooctanesulfonic acid ("PFOS") are the most widely studied PFAS chemicals and have been shown to be toxic at very low concentrations.

108. PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are mobile and persistent. They are mobile in that they are soluble and do not adsorb (stick) to soil particles, and they are readily transported through the soil and into groundwater where they can migrate long distances. And they are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into the air or water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

109. PFOA and PFOS bioaccumulate, biopersist, and biomagnify in people and other organisms.

110. Exposure to PFAS in both humans and animals has been linked to several diseases, including kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, pregnancy-induced hypertension, and low birth weight.

111. PFOA and PFOS contamination presents a serious threat to public health through drinking water. Humans can also be exposed through contaminated food, inhalation, and dermal contact.

112. PFOA and PFOS enter the environment from industrial facilities that manufacture PFOA or PFOS, or that use PFOA or PFOS, or products that degrade to PFOA or PFOS in the

manufacture or production of other products. Releases to land, air, and water from a multitude of industrial sites are known pathways to the environment. PFOA and PFOS may also enter the environment when released from PFOA- or PFOS-containing consumer and commercial products during their use and disposal.

113. Beginning in 2013, Old DuPont replaced its production and use of PFOA with GenX chemicals. GenX is the tradename for the chemicals, including hexafluoropropylene oxide dimer acid (HFPO-DA), that allow for the creation of fluoropolymers without PFOA. While Old DuPont in a 2010 marketing brochure touted GenX as having "a favorable toxicological profile," studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure. Further, like PFOA and other PFAS compounds, GenX is persistent in the environment, not readily biodegradable, and mobile in the presence of water. Old DuPont acknowledged in the same brochure referenced above that GenX "is chemically stable and, if released, would be environmentally persistent." EPA is currently in the process of publishing a toxicity assessment for GenX.

114. Because of the threat posed by PFAS chemicals, NJDEP adopted regulations establishing maximum contaminant levels ("MCLs," which are drinking water standards) and specific groundwater criteria for PFOA (14 parts per trillion ("ppt"), PFOS (13 ppt), and PFNA (13 ppt). NJDEP also added PFOA, PFOS, and PFNA to the Spill Act's list of Hazardous Substances.

## OLD DUPONT'S USE AND MANUFACTURE OF PFAS

115. Beginning in 1951, Old DuPont began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a

coating for non-stick cookware. Old DuPont has also used PFAS in other name-brand products such as Stainmaster®.

116. 3M phased out production of PFOA in 2002. As explained below, although Old DuPont was fully aware that PFOA was a dangerous and toxic chemical, it began producing its own PFOA for use in its manufacturing processes, including those at Chambers Works.

## 3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS

117. Though the PFAS family of chemicals was first accidentally discovered by an Old DuPont scientist in 1938, for most of the past several decades, 3M has been the primary manufacturer of PFOA and PFOS.

118. 3M began producing PFOA and PFOS as raw materials that they used to produce other products, or that they sold to third parties for use in other products. 3M produced PFOA and PFOS by electrochemical fluorination in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS. 3M entered into contracts with DuPont to supply it with PFOA for DuPont's manufacturing processes at various facilities. Specifically, 3M supplied and transported PFOA to DuPont for use at Chambers Works, which DuPont used and discharged from Chambers Works.

## OLD DUPONT AND 3M's KNOWLEDGE OF THE DANGERS OF PFAS

119. Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities, including in West Virginia, North Carolina, and New Jersey.

120. Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the

environment, and that tens of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

121.    By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

122.    3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment.  An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

123.    Old DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs.  Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

124.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

125.    By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

126.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.  One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

127.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.  Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.  This finding

also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA from 3M's products in human blood.

128.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

129.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.  Old DuPont was aware of 3M's findings no later than 1981.

130.    Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.  This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.  (As noted above, PFAS contain carbon and fluorine, and human exposure to these chemicals therefore has been linked to elevated organic fluorine levels.)

131.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.  A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

132.    According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.  At the time of the specialist's resignation in 1999, that resistance had not ceased.

133.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.  Old DuPont did not report this data or the results of its worker health analysis to any government agency or community at this time.

134.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

135.    Not only did Old DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.  In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25 percent—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

136.    In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of the study of its own plant workers.

137.    While Old DuPont knew about this toxicity danger as early as the 1960s, Old DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

138.    By late 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries.

139.    Further, no later than 1984, Old DuPont was aware that PFOA is biopersistent.

140.    Similarly, in 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."  That same year, 3M worked to change the wording in studies

by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

141.    Old DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.  After obtaining data on these releases and the consequent contamination near Old DuPont's plant in West Virginia, Old DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").  Old DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.  Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

142.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."  They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

143.    Also in 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

144.    Despite its understanding of the hazards associated with its PFOA and PFOS products, 3M actively sought to suppress scientific research on the hazards associated with them, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and ecological risks of its PFOA and PFOS products.  At least one scientist funded

by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

145.    In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000.  On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.  On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."  The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

146.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.  For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

147.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the Toxic Substances Control Act and RCRA.  Old DuPont eventually settled the action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects.  EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

148.    Old DuPont and 3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment. This knowledge was accessible to and shared between Old DuPont and 3M, but not fully accessible to or shared with Plaintiffs. For decades, 3M and DuPont worked together to minimize, conceal, and misrepresent the risks of their PFAS chemistry from federal regulators, New Jersey, and the public, throughout which time 3M continued to supply DuPont with PFOA products for use in New Jersey.

*Old DuPont's Use and Discharge of PFOA from Chambers Works*

149.    Beginning in the late 1950s, Old DuPont used PFOA, supplied by 3M, in its manufacturing processes at Chambers Works, created PFOA as a by-product in other processes, and discharged PFOA from its wastewater treatment plant. As a result of all these and other activities, massive amounts of PFOA have been discharged at Chambers Works.

150.    Old DuPont used PFOA to manufacture fluoroelastomers at Chambers Works starting in the late 1950s. Production included standard fluoroelastomers, perfluoroelastomers, and specialty fluoroelastomers. Old DuPont used PFOA to make standard fluoroelastomers until 2001, and perfluoroelastomers and specialty fluoroelastomers until 2013.

151.    PFOA is also a by-product of Old DuPont's fluorotelomer manufacturing process at Chambers Works. Fluorotelomer manufacture at Chambers Works started in the early 1960s, and chemicals that could break down into PFOA were used until 2014.

152.    The WWTP also received on-site process wastewater streams, landfill leachate and groundwater from the IWS, all of which contained PFOA.

153.     Additionally, the WWTP received wastewater streams from other Old DuPont facilities as well as other commercial wastewater streams, which contained PFOA streams in the parts per million.

154.     Significantly, Old DuPont used PFOA supplied by 3M at Washington Works, located in West Virginia, and transferred PFOA-containing waste generated at Washington Works to Chambers Works, which was discharged through the WWTP or landfilled on-site.

155.     Old DuPont did not install a carbon treatment system, which could assist with treatment of PFAS, at its WWTP until 2004.

156.     Old DuPont accepted commercial waste streams that contained PFOA and other PFAS until 2012.

157.     As a result of the above activities, PFOA was discharged into surface water from the WWTP and emitted into air from stacks and vents, and leached to groundwater from PFOA-contaminated soils and/or onsite landfills with contaminated waste.

158.     The scope of Old DuPont's PFOA-related activities at Chambers Works is demonstrated by its own estimates for the year 1999.  For that year alone, Old DuPont estimates it transferred 13,400 pounds of PFOA-containing waste from Washington Works to Chambers Works; released at least 25,500 pounds of PFOA into water; dumped at least 8,000 pounds of PFOA-containing waste into landfills on-site; and emitted 300 pounds of PFOA-related chemicals into air.

*Old DuPont's Efforts to Conceal and Downplay PFOA Contamination at and around Chambers Works*

159.     Old DuPont engaged in a long-running campaign in New Jersey to conceal and downplay PFOA contamination at and around Chambers Works, and the effects that this contamination would have on human health and the environment.  Among other things, Old

31

DuPont compared sampling results to inflated screening levels, attacked New Jersey's efforts to establish more protective levels, and refused to acknowledge there was a contamination problem until it was forced to concede the issue.

160. In 2003, Old DuPont made one of its first meaningful disclosures about its PFOA-related activities at Chambers Works, in a report titled *Old DuPont Telomer Manufacturing Sites: Environmental Assessment of PFOA Levels in Air and Water*. In the report, Old DuPont was supposed to give its assessment of the impact of its telomer manufacturing operations at Chambers Works.

161. Critically, Old DuPont sought to compare the results of the assessment to screening levels recently released by the "C-8 [PFOA] Assessment of Toxicity Team" ("CATT"). These levels were inflated by Old DuPont's own design. CATT was created through Old DuPont's Consent Order with West Virginia. The team, which included an Old DuPont representative, was tasked with assessing the health risks associated with releases of PFOA from Washington Works.

162. In 1991, Old DuPont had established an internal Community Exposure Guideline ("CEG") of 1 part per billion ("ppb") (1,000 ppt) for PFOA in community drinking water. Old DuPont sought to influence CATT to set screening levels significantly higher than its own CEG, which it could then present as proof that its releases posed no health risks. In 2002, CATT issued an "aquatic life advisory concentration" of 1,360 ppb (1,360,000 ppt). CATT also issued a "human health protective screening criteria" of 150 ppb (150,000 ppt), which was 150 times higher than Old DuPont's prior, internal standard.

163. In Old DuPont's 2003 report on Chambers Works, it disclosed that PFOA was present in groundwater throughout the Site and at the perimeter, up to 46.6 ppb (46,000 ppt). Old DuPont characterized these results as showing "very low levels" and that "PFOA is being

contained on-site by the site groundwater containment system." Old DuPont also dismissed the significance of the results, asserting that because "[g]roundwater in the vicinity of Chambers Works is not removed from the ground for drinking water or other use," the 1,360 ppb (1,360,000 ppt) screening level should be applied.

164. Old DuPont further reported that it was discharging PFOA into the Delaware River at an average concentration of 133 ppb (133,000 ppt). Samples from the Delaware River (downstream of the facility) were as high as 0.556 ppb (556 ppt), and from the Salem Canal were 0.089 ppb (89 ppt). According to Old DuPont, however, these results were not concerning because they were "well below" CATT-established levels.

165. Old DuPont concluded its report by saying its operations at Chambers Works were "not a significant source of PFOA to the environment."

166. Following submission of the *Telomer Manufacturing Sites* report, Old DuPont continued to urge use of CATT screening levels in New Jersey. In or about January 2004, Old DuPont made a presentation to Department personnel about the CATT levels. It reiterated that "[a]ll" of its Chambers Works environmental assessment results were "[w]ell [b]elow [s]creening [c]riteria."

167. In March 2005, the Department directed Old DuPont to assess areas of Chambers Works where PFOA was used and may have caused contamination, and, in October 2005, Old DuPont provided its preliminary assessment and proposal for sampling ("2005 PAR").

168. Old DuPont sought in the 2005 PAR to sample limited areas. Old DuPont further stated that "[a]ir emissions from [PFOA-related] manufacturing processes were minimal," and that "contribution from air emissions to soil or groundwater impact would be insignificant."

169.	Results of sampling done pursuant to the 2005 PAR were provided to the Department in October 2006 in a Site Investigation Report ("SIR").  PFOA was present in the areas investigated on the site in soil up to 0.990 ppm (990,000 ppt), and in groundwater up to 1,050 ppb (1,050,000 ppt).  Nevertheless, Old DuPont concluded there was "limited potential for [PFOA] exposure to soil and groundwater."

170.	Old DuPont did not propose remedial action.  In fact, it prefaced the SIR's results by stating "[t]o date, there are no human health effects known to be caused by PFOA," and that it believed "the weight of scientific evidence indicates that PFOA exposure does not pose a health risk to the general public."  Old DuPont knew from its own internal studies and environmental assessments that this was false.

171.	Also during this time, PFOA was detected in public water supplies near Chambers Works.  In February 2006, Old DuPont took samples from the Pennsgrove Water Supply Company's wells, which supply drinking water to households in Penns Grove and Carneys Point. Old DuPont provided these results in a letter to the Department in May 2006.  PFOA was detected in the wells up to 190 ppt.

172.	In its letter, Old DuPont stated that "[t]he results reflect PFOA levels far below any established regulatory guidance for drinking water," and that the water must, "therefore," be considered "safe for human consumption."

173.	Old DuPont, in its letter, dismissed the relevance of litigations seeking treatment for drinking water exceeding 50 ppt.  Old DuPont stated "that number is neither a public health standard nor a threshold for obtaining compensation."  Despite these statements, mere months later, in November 2006, EPA would issue a Consent Order relating to the Washington Works facility determining PFOA may present an imminent and substantial endangerment to human

health at or above 50 ppt, and memorializing Old DuPont's obligation to provide sufficient treatment to the drinking water of residents of West Virginia and Ohio living around Washington Works to ensure that this 50 ppt level is met.

174. In 2007, the Department issued its drinking water guidance level for PFOA of 40 ppt.

175. Old DuPont made every effort to see that New Jersey would not issue guidance at this level.

176. As stated above, Old DuPont had previously dismissed any level of 50 ppt. Now sensing that New Jersey would be issuing an advisory with a lower level, Old DuPont sought to use 50 ppt, from its prior Consent Order with EPA.

177. However, the Department's drinking water guidance level was being developed for lifetime exposure, while the Consent Order's 50 ppt level was put in place for less-than-lifetime, subchronic exposure.

178. In January 2007, Old DuPont submitted a memo from one of its scientists, Dr. Robert Rickard, to the Department for the purpose of attacking the advisory to be issued regarding drinking water guidance. Among other things, Dr. Rickard's memo stated the Department's issuance of an advisory below 50 ppt would be "confusing" to the public. He wrote: "If a level lower than [50 ppt] is set in New Jersey it could cause undue concern among the communities at or above that level in New Jersey and elsewhere and the [Department] . . . will have difficulty explaining this variation."

179. Dr. Rickard further charged that "it would be irresponsible for New Jersey to set a lower level," and that doing so "would undermine public expectations that government agencies charged with protecting health do so in a deliberate and scientifically sound manner."

180.     Dr. Rickard, on Old DuPont's behalf, went even further.  With respect to setting a level below 50 ppt, which he characterized as "totally unjustified," he seemed to threaten the Department:  "Based on the extensive scientific studies done by the government, research institutions and industry suggesting no human health effects at background levels, Old DuPont could not let a scientifically unsupported level go unchallenged."

181.     Old DuPont's efforts, and its thinly veiled threat, failed, but it would resist taking remedial action based on the drinking water advisory.

182.     In February 2007, the Department directed Old DuPont to undertake further groundwater sampling on and off-site, and to delineate its results at the drinking water guidance value.

183.     Old DuPont, in a cover letter to its groundwater investigation work plan of May 2007, objected to delineation based on the guidance value, contending it was "inconsistent with other established health based standards," did "not incorporate the most recent available science," and did not "necessitate or warrant a remedial investigation."

184.     Groundwater investigations conducted shortly thereafter revealed off-site contamination.  In 2008, Old DuPont submitted a report showing that PFOA was detected in eight of nine monitoring wells that were sampled, at a distance of up to 2,000 feet from the Site's border.  PFOA was detected at 2.2 ppb (2,200 ppt) in a well at the border, and up to 1.4 ppb (1,400 ppt) in an off-site monitoring well.

185.     Even presented with data showing significant contamination of residential drinking water wells around Chambers Works, Old DuPont still clung to the highest advisory levels possible.  In 2009, Old DuPont sampled wells within a two-mile radius of Chambers Works for PFOA.  However, Old DuPont refused to use the Department's drinking water guidance value as

the threshold for providing treatment. It would only compare the results to EPA's 2009 provisional advisory, which was 400 ppt. Use of this higher criterion resulted in only a single well qualifying for treatment.

186. Today, however, Old DuPont is no longer in a position to deny that PFOA and other PFAS contamination poses a risk to the surrounding environment and human population.

*PFOA and PFAS Contamination at and around Chambers Works*

187. PFOA and other PFAS contaminate Chambers Works and the surrounding area, though the full extent of this contamination remains to be determined.

188. With respect to the Site itself and the immediate surrounding area, sampling and monitoring have shown severe contamination of groundwater and soil, as well as surface waters and sediment. Still, the effect of PFAS on the wetlands area, in the northern part of the Site, has not been as thoroughly analyzed.

189. As to off-site contamination, between 2016 and 2017, Chemours re-sampled residential drinking water wells within the two-mile radius of Chambers Works. This time, Chemours sampled for 14 PFAS including PFOA, PFNA and PFOS. Other PFAS including PFNA are also released from Chambers Works as a result of operations there.

190. For purposes of this re-sampling, PFOA was compared to the Department's then-existing drinking water guidance level of 40 ppt; PFNA was compared to the Department's then-existing specific groundwater quality standard of 10 ppt; and PFOA and PFOS were combined and compared to EPA's 2016 lifetime health advisory for the sum of the chemicals of 70 ppt. Use of these levels (as opposed to that insisted by Old DuPont in its 2009 sampling program), resulted in almost half of the wells sampled (43 wells) exceeding the screening criteria. These criteria were

substantially less stringent than the MCLs and the specific groundwater quality criteria New Jersey more recently adopted for PFOA (14 ppt) and PFOS (13 ppt).

191.   Also, as part of the 2016-2017 program, additional sampling was done outside the two-mile radius, up to 2.75 miles. Of those 64 wells sampled in these further areas, 21 wells exceeded the screening levels.

192.   Since the initial 2016-2017 program, sampling has continued to expanded areas, largely to the northeast of Chambers Works, up to five miles away.

193.   In total, 341 individual drinking water wells have been sampled; there are 168 (approximately half) that exceeded the following criteria: 14 ppt for PFOA, 13 ppt for PFNA, and 70 ppt for PFOA and PFOS combined together.

194.   The results of the sampling program, to date, do not provide a full understanding of the off-site contamination that operations at Chambers Works has caused. For example, there has been less sampling of wells to the southeast of Chambers Works. Further still, there has been limited-to-no sampling, outside of drinking water wells, of natural resources in the area, including soil, surface water, wetlands, sediments, and biota. In addition to the natural resources the State holds in trust, the State owns real property, within the five-mile radius of the Site, including the New Jersey Natural Land Trust Game Branch Preserve to the northeast of the Site, and the New Jersey Fish & Wildlife Salem River Wildlife Management Area to the southeast.

*Old DuPont's and 3M's Actual Malice / Wanton and Willful Disregard*

195.   Old DuPont and 3M, as detailed above, committed acts and omissions with respect to PFOA and other PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their products, or to reduce or eliminate expenses they would otherwise have

incurred to remove PFAS from their waste streams, despite the impacts on the Site, the State, and its citizens relating to contamination of groundwater, surface water, and other natural resources.

196.     Therefore, Plaintiffs are requesting an award of punitive damages for Old DuPont's and 3M's especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future.  Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

*Old DuPont's Three Step Fraudulent Scheme to Isolate Its Valuable Tangible Assets From Its PFAS Liabilities and Hinder Creditors*

197.     Old DuPont and Chemours have substantial liabilities due to their polluting activities.  Old DuPont's and Chemours' liabilities for PFOA and other PFAS contamination account for a substantial portion of their environmental liabilities nationwide, and therefore affect their overall ability to satisfy their environmental liabilities for Chambers Works.

198.     These liabilities include remediation obligations, tort damages, natural resource damages, and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

199.     Old DuPont sought to insulate itself from billions of dollars of legacy pollution liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country.

200.     Upon information and belief, Old DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the persistence, mobility, bio-accumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

201.     For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina.  As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment.  Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment, and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which Old DuPont had contaminated.  Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

202.     For example, in 1999, members of the Tennant family, who owned property impacted by PFOA contamination adjacent to Old DuPont's Washington Works plant in Parkersburg, West Virginia, sued Old DuPont in West Virginia federal court.

203.     Old DuPont's in-house counsel was very concerned about Old DuPont's exposure related to PFOA.  In November 2000, one of Old DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head.  Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . .  Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

204.     In 2005, after confidentially settling the *Tennant* case, Old DuPont agreed to pay $10.25 million to resolve eight counts brought by EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act.  Old DuPont also was required to commit an additional $6.25 million to supplemental environmental projects.  *See*

https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental.

205.    Also, in 2005, Old DuPont agreed to settle a class action lawsuit, which had been filed on behalf of 70,000 residents of Ohio and West Virginia who had been exposed to PFOA that Old DuPont had discharged from Washington Works, for $343 million.  Under the terms of the settlement, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.  The settlement also provided that any class members who developed the linked diseases would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that exposure to PFOA could cause those diseases.

206.    After eight years, the Science Panel found several human diseases with "probable links" to PFOA exposure, including: high cholesterol; ulcerative colitis; pregnancy-induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

207.    More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia as part of the 2005 settlement.  These claims were consolidated in the federal multidistrict litigation styled *In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio. Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

208.    Old DuPont knew that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country, including Chambers Works, among others, and that its liability was likely billions of dollars.

209. In light of this significant exposure, upon information and belief, by 2013, Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

210. Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In that connection, in or about 2013, Old DuPont and The Dow Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

211. Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS and environmental liabilities that Old DuPont faced.

212. Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Dow to pursue the proposed merger.

213. Old DuPont engaged in a three-part restructuring plan.

214. The first step in Old DuPont's plan was to transfer its Performance Chemicals Business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

215. Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

216. Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades-long bad conduct with regard to the environment and PFAS.

217. The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

218. Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

219. The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

220. The third step involved DowDuPont spinning off two, new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (*i.e.*, New DuPont).

221. As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or approximately one-half.

222.    New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

223.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like the State, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

224.    The below graphic depicts the restructuring as it progressed through each of the three steps:



*The Three Steps in Detail*
*Step 1: The Chemours Spinoff*

225.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary. Chemours was originally incorporated on February 18, 2014 under the name "Performance Operations, LLC."

226.     On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

227.     Prior to July 1, 2015, Chemours was a wholly owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, and Chemours became a separate, publicly traded entity.

228.     At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluorochemicals segments.

229.     The Performance Chemicals Business included the business units that had manufactured, used, and discharged PFOA into the environment.

230.     Prior to the Chemours Spinoff, Chemours was a wholly owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

231.     On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

232.     On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and seven new members were appointed to fill the vacancies.

233.     To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

234.     Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37

active chemical plants. Upon information and belief, Chambers Works was one of the 37 sites referenced in the Chemours Separation Agreement and one or more schedules to that Agreement.

235. Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff to ensure the transfer of all of its Performance Chemicals Business assets to Chemours.

236. At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to DuPont's Performance Chemicals Business, including those arising from its discharge of contaminants, such as PFOA and other PFAS, into the environment. The specific details regarding the nature and value of probable maximum loss, and anticipated timing of the liabilities that Chemours assumed are set forth in the non-public schedules and exhibits to the Chemours Separation Agreement.

237. Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

238. Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

239. Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future environmental and PFAS claims, and Old DuPont stripped Chemours' value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours.

240. The Chemours Separation Agreement also required Chemours to assume billions of dollars of Old DuPont's PFAS liabilities and includes an indemnification of Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

241. Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . .," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

242. Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

243. The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

244. In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

245. Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated, and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time it was spun off from Old DuPont

246. There was no meaningful, arms-length negotiation of the Chemours Separation Agreement and Old DuPont largely dictated its terms.

247. In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

248. Chemours' independent board, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

249. It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and, in so doing, shield Old DuPont.

250. Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and

unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

251. Indeed, shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

252. At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

253. Removing Chemours's Goodwill and Other Intangibles of $176 million, which were reported at that time, yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets).

254. For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

255. Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

256. For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multi-district litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's

Washington Works plant.  Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.  For all future PFOA costs incurred from July 6, 2017 through July 6, 2022, Chemours agreed to cover the first $25 million per 12-month period, Old DuPont agreed to cover the next $25 million per 12-month period, and Chemours agreed to cover any additional amounts. Chemours is a named defendant in many lawsuits relating to Old DuPont's historical use of PFAS and other contaminants.

257.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been, at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis; Chemours would have been rendered insolvent at that time.

*Step 2: The Old Dow/Old DuPont "Merger"*

258.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

259.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and Chemours had assumed.

260.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

261.   On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

262.   To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for: (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., (*i.e.*, New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge. Thus, as a result of the Merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

263.   Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont.

264.   The corporate organization following the "merger" is depicted under "Step 2" in the graphic at ¶ 224.

265. Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

266. While, again, the details of these transactions remained hidden from the State and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities. The significant internal reorganization instituted by DowDuPont was in preparation for the conglomerate being split into three separate, publicly-traded companies.

267. Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

268. While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont for far less than the assets were worth.

269. Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds

the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

270. The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned disposition of the new companies):



271. The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

272. The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

273.     Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

274.     Corteva and New DuPont also assumed direct financial liability of Old DuPont that was ***not*** related to the Agriculture, Materials Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

275.     This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State of New Jersey's claims in this case.

276.     While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of the State's natural resources.

277.     The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

278. On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company.

279. Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now trades on the NYSE under the stock ticker "CTVA."

280. The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

281. The corporate structures of New DuPont, New Dow, Old Dow, Corteva, and Old DuPont, respectively, following the separations are depicted in "Step 3" of the graphic at ¶ 224.

282. Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (*i.e.*, New DuPont).

283. On or about January 1, 2023, Old DuPont changed its name to EIDP, Inc.

_The Effect of the Years-Long Scheme to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities_

284. The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

285. Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer *tangible* assets than it had prior to the restructuring.

286. In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

287. For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of *negative* $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

288. Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of *negative* $422 million.

289. The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

290. That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

291. As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

292.     At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was *negative* $644 million.

293.     Old DuPont's financial condition has continued to deteriorate. By the fiscal year ended 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

294.     Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, ending fiscal year 2019 with tangible net worth of *negative* $1.125 billion.

295.     In addition, the State cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

296.     Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

297.     New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

298.     In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

299.     In December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

300.     In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

301.     In addition, New DuPont has issued Notices of Intent to Sell relating to: six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

302.     Moreover, while New DuPont has received substantial proceeds on the sale of Old DuPont's former business segments, those proceeds are not available to creditors, such as the State, because New DuPont is distributing them to its shareholders through aggressive stock buyback programs.  Between January 1, 2018 and September 30, 2023, New DuPont spent more than $13.5 billion to repurchase its own stock. Furthermore, in the first quarter of 2024, New DuPont's Board of Directors authorized the repurchase and retirement of up to an additional $1 billion of its common stock. New DuPont's business segment divestitures and stock buybacks have substantially diminished the value of its assets.

303.     Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## **SCOPE OF ACTION**

304.     Through this action, Plaintiffs are not seeking damages, remediation or restoration with respect to any contamination related to AFFF, which is a product that contains PFAS compounds, and not within the scope of this litigation.

305.     Likewise, and notwithstanding anything to the contrary herein, Plaintiffs are not asserting claims or seeking costs or damages regarding the remediation or restoration of the Delaware River at this time.  While the State is seeking that Defendants pay all costs necessary to investigate, locate, and assess hazardous substances, pollution, and contamination that has emanated, released, or discharged from Chambers Works, the State is explicitly reserving its claims to remediate and restore the Delaware River of Defendants' hazardous substances, pollutants, and contaminants until such time as the investigation work is more fully complete.

306.     In 2005, the Department, the Administrator and Old DuPont entered into a Compensatory Restoration Administrative Consent Order ("CRACO").  The CRACO is not a bar to the claims asserted in this Third Amended Complaint for reasons including, but not limited to, the following: Old DuPont has failed to comply with the CRACO, concealed the nature and extent of contamination at its facilities, has attempted to provide contaminated property to fulfill its obligations, additional injuries have been incurred, additional discharges have occurred since the CRACO became effective, and injuries to natural resources, including groundwater, have resulted from remedial action implementation.

307.     On August 30, 2017, DEP issued a Directive and Notice to Insurers pursuant to the Spill Act (the "2017 Directive") to Old DuPont and Chemours FC, finding that Old DuPont and Chemours FC were responsible for the remediation of hazardous substances discharged at the Site. The 2017 Directive ordered Old DuPont and Chemours FC, in accordance with N.J.A.C. 7:26C,

to: (1) prepare and submit for DEP's approval within 30 days a cost estimate for remediating the Site; and (2) within 60 days of DEP's approval of the cost estimate, to establish a Remediation Funding Source ("RFS") in the amount of the approved estimate. Old DuPont and Chemours FC failed to submit an approvable cost estimate to the DEP and, therefore, remains in violation of the Directive.

308. On March 25, 2019, DEP issued a Directive, Information Request and Notice to Insurers (the "2019 Directive") pursuant to the Spill Act and other New Jersey environmental statutes requiring Old DuPont, Chemours, Chemours FC, Specialty Products, 3M, and New DuPont to, among other things, within 21 days of receipt of the Directive, provide DEP with information identifying the nature, source, extent and location of PFAS discharged into waters of the State and into air.

## First Count
### (Spill Act – As Against All Defendants)

309. Plaintiffs repeat each allegation of Paragraphs 1 through 308 above as though fully set forth in its entirety herein.

310. Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

311. The unauthorized discharge of hazardous substances is prohibited. N.J.S.A. 58:10-23.11c.

312. Many of the contaminants of concern at the Site are hazardous substances as defined in N.J.S.A. 58:10-23.11b, including PFOA and PFNA.

313. Except as otherwise provided in N.J.S.A. 58:10-23.11g(12), which is not applicable here, any person who discharges a hazardous substance, or is in any way responsible for any hazardous substance, shall be liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. 58:10-23.11g(c)

314. The Department and the Administrator have incurred, and will continue to incur, costs and damages, including lost use and value, costs of restoration and replacement for natural resources of this State that have been, or may be, injured as a result of discharges at Chambers Works, and assessment costs.

315. The costs and damages the Department and the Administrator have incurred, and will incur, associated with discharges at Chambers Works, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

316. Old DuPont, Chemours, and Chemours FC, as dischargers of hazardous substances at Chambers Works, are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge hazardous substances at Chambers Works. N.J.S.A. 58:10-23.11g(c)(1).

317. Old DuPont, Chemours, and Chemours FC, as owners and/or operators of Chambers Works at the time hazardous substances were discharged there, also are persons in any way responsible, and are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works. N.J.S.A. 58:10-23.11g(c)(1).

318.    Chemours FC, as the knowing purchaser of contaminated property, Chambers Works, at which hazardous substances were previously discharged, is also a person in any way responsible, and is liable, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, that the Department and the Administrator have incurred, and will incur, to assess, mitigate, restore or replace, any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works.  N.J.S.A. 58:10-23.11g(c)(3).

319.    Specialty Products, as the knowing lessee and operator of contaminated property, and/or the controller of contaminated property at the time hazardous substances were discharged there, is also a person in any way responsible, and is liable, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, that the Department and the Administrator have incurred, and will incur, to assess, mitigate, restore or replace, any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works.  N.J.S.A. 58:10-23.11g(c)(3).

320.    3M, as the manufacturer, distributor, and/or seller of hazardous substances discharged at Chambers Works, is a person in any way responsible, and is liable, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs, that the Department and the Administrator have incurred, and will incur, to assess, mitigate, restore or replace, any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works.  N.J.S.A. 58:10-23.11g(c)(3).

321. Upon information and belief, New DuPont and Corteva have assumed Old DuPont's liabilities for PFAS contamination and its former Performance Chemicals Business, as well as its obligations pertaining to the remediation of hazardous substances, at the Site. New DuPont and Corteva are therefore parties "in any way responsible" for the discharged hazardous substances at the Site pursuant to the Spill Act, and are therefore liable, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, and assessment costs the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works. N.J.S.A. 58:10-23.11g(c)(1).

322. As recipients of the 2017 Directive, Old DuPont and Chemours FC were required to submit to DEP an approvable cost estimate for the establishment of an RFS and, upon DEP's approval of the estimate, to establish an RFS in such approved amount in accordance with N.J.A.C. 7:26C, Subchapter 5. They have not done so.

323. As recipients of the 2019 Directive, Old DuPont, Chemours, Chemours FC, New DuPont, 3M, and Specialty Products were required, among other things, to provide DEP with information identifying the nature, extent, source, and location of discharges of PFAS into waters of the State and air. They have not done so.

324. Pursuant to N.J.S.A. 58:10-23.11u(a)(1)(a) and N.J.S.A. 58:10-23.11u(b), the Department may bring an action in the Superior Court for, *inter alia*, injunctive relief, N.J.S.A. 58:10-23.11u(b)(1); its unreimbursed investigation, cleanup and removal costs, including the reasonable costs of preparing and successfully litigating the action, N.J.S.A. 58:10-23.11u(b)(2); natural resource restoration and replacement costs, N.J.S.A. 58:10-23.11u(b)(4); and any other

unreimbursed costs or damages the Department incurs under the Spill Act, N.J.S.A. 58:10-23.11u(b)(5). The injunctive relief that the Department is authorized to obtain pursuant to N.J.S.A. 58:10-23.11u(b)(1) may include, among other things, an order requiring the recipient of a directive issued pursuant to the Spill Act to comply with the directive. 58:10-23.11u(b)(1).

325. Pursuant to N.J.S.A. 58:10-23.11g(a) and (b), Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, Specialty Products, and 3M are also liable for lost income due to damage to natural resources destroyed or damaged by a discharge.

326. As a direct or indirect result of such violations, the Department and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

a.    the investigation, cleanup, and removal of discharged hazardous substances;

b.    the restoration of natural resources contaminated by discharges of hazardous substances at the Site;

c.    the compensation of the citizens of New Jersey for the lost interim value and benefits of natural resources contaminated by discharges of hazardous substances the Site; and

d.    the institution of corrective measures including monitoring of all impacted and potentially impacted public and private drinking water supplies for the presence of hazardous substances, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage.

327. Upon information and belief, Corteva and New DuPont assumed Old DuPont's Spill Act liability.

328. The costs the Department and the Administrator have incurred, and will incur, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

329. Pursuant to N.J.S.A. 58:10-23.11q, the Administrator is authorized to bring an action in the Superior Court for any unreimbursed costs or damages paid from the Spill Fund.

330. Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, Specialty Products, and 3M as "persons subject to liability" under the Spill Act, repeatedly failed to "immediately notify the department" of discharges both "prior to and after the effective date of the [Spill A]ct." N.J.S.A. 58:10-23.11e. Defendants' [f]ailure to so notify shall make persons liable to the penalty provisions of section 22 of this act." *Id.*

331. Pursuant to N.J.S.A. 58:10-23.11u.d, Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, Specialty Products, and 3M are liable as "person[s] who violate[d] a provision of P.L.1976, c. 141 (C. 58:10-23.11 et seq.), . . . [and are therefore] subject to a civil penalty not to exceed $50,000.00 per day for each violation and each day's continuance of the violation shall constitute a separate violation."

## PRAYER FOR RELIEF

**WHEREFORE,** the Department and the Administrator request that this Court enter judgment against Defendants as follows:

a. Ordering each Defendant to reimburse the Department and Administrator, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages they have incurred, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result

of the discharge of hazardous substances at Chambers Works, with applicable interest, and assessment costs;

b. Finding each Defendant liable, jointly and severally, without regard to fault, for all future cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at Chambers Works, with applicable interest, and assessment costs;

c. Compelling each Defendant, jointly and severally, without regard to fault, to perform any further cleanup of the Site and contaminated areas off-site in conformance with the Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29, including the preparation of a public participation plan pursuant to N.J.S.A. 58:10C-27.c(7), and all other applicable laws and regulations;

d. Compelling each Defendant, jointly and severally, without regard to fault, to fund the Department's performance of an assessment of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances at Chambers Works, and compelling each Defendant to compensate the citizens of New Jersey for the costs of restoration and replacement, including lost use and value of any injured natural resource;

e. Ordering Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

f. Ordering Old DuPont and Chemours FC to comply with the 2017 Directive.

g.     Ordering Old DuPont, Chemours, Chemours FC, New DuPont, 3M, and DuPont Specialty Products to comply with the 2019 Directive.

h.     Finding each Defendant liable, jointly and severally, without regard to fault, for lost income due to damage to natural resources destroyed or damaged by a discharge;

i.     Awarding the Department and the Administrator their costs and fees in this action pursuant to N.J.S.A. 58:10-23.11u(b)(2);

j.     Awarding the Department and the Administrator penalties pursuant to N.J.S.A. 58:10-23.11e and N.J.S.A. 58:10-23.11u.d; and

k.     Awarding the Department and the Administrator interest and such other relief as this Court deems appropriate.

## Second Count
### (Water Pollution Control Act – As Against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont)

332.    Plaintiffs repeat each allegation of Paragraphs 1 through 331 above as though fully set forth in its entirety herein.

333.    Old DuPont, Chemours and Chemours FC are each a "person" within the meaning of N.J.S.A. 58:10A-3.

334.    Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6(d) and (p), which are not applicable here, it is unlawful for any person to discharge any pollutant except to the extent the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by the Commissioner pursuant to the WPCA, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to -1387.  N.J.S.A. 58:10A-6(a).

335. The unauthorized discharge of pollutants is a violation of the WPCA for which any person who is the discharger is strictly liable, without regard to fault. N.J.S.A. 58:10A-6(a).

336. The Department has incurred, and will continue to incur, costs as a result of the discharge of pollutants at Chambers Works.

337. The Department also has incurred, and will continue to incur, costs and damages, including the costs of investigation to establish a violation at Chambers Works, costs in removing, correcting or terminating the adverse effects upon water quality or public health due to violations at Chambers Works, and compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at Chambers Works.

338. The costs and damages the Department has incurred, and will incur, for Chambers Works are recoverable by the Commissioner within the meaning of N.J.S.A. 58:10A-10(c)(2)-(4).

339. Old DuPont, Chemours, and Chemours FC discharged pollutants at Chambers Works, which discharges were neither permitted pursuant to N.J.S.A. 58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-6(d) or N.J.S.A. 58:10A-6(p), and are liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at Chambers Works.

340. Upon information and belief, Corteva and New DuPont assumed Old DuPont's Water Pollution Control Act liability.

341. Pursuant to N.J.S.A. 58:10A-10(c), the Commissioner may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10(c)(1); for the costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the costs

of preparing and litigating the case, N.J.S.A. 58:10A-10(c)(2); any cost incurred by the State in removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which action under this subsection may have been brought, N.J.S.A. 58:10A-10(c)(3); compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the unauthorized discharge of pollutants, N.J.S.A. 58:10A-10(c)(4); and the actual amount of any economic benefits accruing to the violator from any violation, including savings realized from avoided capital or noncapital costs resulting from the violation, the return earned or that may be earned on the amount of avoided costs, any benefits accruing as a result of a competitive market advantage enjoyed by reason of the violation, or any other benefit resulting from the violation, N.J.S.A. 58:10A-10(c)(5).

342. Pursuant to N.J.S.A. 10A-10(e), Old DuPont, Chemours, and Chemours FC, Corteva and New DuPont are liable for penalties due to violations of the WPCA.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commissioner requests that this Court enter judgment against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont as follows:

a.   Permanently enjoining Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont, requiring them to remove, correct, or terminate the adverse effects on water quality resulting from any unauthorized discharge of pollutants at or from Chambers Works;

b.   Assessing Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont without regard to fault, for the costs for any investigation, inspection, or monitoring

survey, leading to establishment of the violation, including the costs of preparing and litigating the case;

c.     Finding Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont liable, without regard to fault, for all costs for removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants at Chambers Works;

d.     Finding Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont liable, without regard to fault, for all compensatory damages and other actual damages for any natural resource of the State that has been, or may be, injured, lost, or destroyed as a result of the unauthorized discharge of pollutants at Chambers Works;

e.     Finding Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont liable, without regard to fault, for the amount of any economic benefits they have accrued, including any savings realized from avoided capital or noncapital costs, the return they have earned of the amount of avoided costs, and benefits each Defendant has enjoyed as a result of a competitive market advantage, or any other benefit they have received as a result of having violated the WPCA;

f.     Awarding the Commissioner his costs and fees in this action pursuant to N.J.S.A. 58:10A-49.1(c)(2);

g.     Awarding the Commissioner penalties pursuant to N.J.S.A. 10A-10(e); and

h.     Awarding the Commissioner interest and such other relief as the Court deems appropriate.

**Third Count**
**(Industrial Site Recovery Act – As Against Old DuPont, Corteva, and New DuPont)**

343.    Plaintiffs repeat each allegation of Paragraphs 1 through 342 above as though fully set forth in its entirety herein.

344.    The purpose of ISRA is to ensure that any place of business meeting the definition of an "industrial establishment" will be investigated for potential environmental impacts and, if warranted, remediated in accordance with Department regulatory requirements if and when the establishment, or the entity that owns or operates an establishment, either closes the operations of the establishment or transfers the establishment's ownership or operations.  N.J.S.A. 13:1K-7.  A principal goal of ISRA is to ensure that "funding for the cleanup [of industrial establishments] is set aside at the time it is available from a transfer or closing" such that "contaminated property is not abandoned to the State for cleanup."  *Id.*

345.    An "industrial establishment" is defined by Department regulation as "any place of business or real property at which such business is conducted" that falls within a range of North American Industry Classification System ("NAICS") codes listed in Appendix C to N.J.A.C. 7:26B-1.1, whereon operations were conducted on or after December 31, 1983, involving the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances and wastes on-site, above or below ground, unless otherwise provided at N.J.A.C. 7:26B-2.1.  N.J.A.C. 7:26B-1.4.

346.    For any ISRA-applicable transfer of ownership or operations of an industrial establishment, the owner or operator of the industrial establishment that is the subject of the transfer is required to file a General Information Notice with the Department within five days after (1) the execution of an agreement to transfer ownership or operations or (2) closing operations of

or its public release of its decision to close operations, whichever occurs first. N.J.S.A. 13:1K-9(a).

347. For any ISRA-applicable transfer of ownership or operations of an industrial establishment, except in limited circumstances not relevant here, the owner or operator of the industrial establishment that is the subject of the transfer also is required, prior to the transfer, to establish ISRA compliance either by obtaining Department approval of one of several forms as set forth at N.J.A.C. Sections 7:26B-5.3 through 5.9 or by filing a completed Remediation Certification as defined pursuant to N.J.A.C. 7:26B-3.3 (collectively, "ISRA Compliance).

348. If the form of ISRA Compliance is a Remediation Certification, the transferring party must also establish an RFS prior to the transfer in accordance with applicable requirements in NJDEP's Administrative Requirements for the Remediation of Contaminated Sites ("ARRCS") at N.J.A.C. 7:26C-5.1 to -5.13. The transferring party is thereafter required to conduct the remediation in accordance with N.J.A.C. 7:26C-2.3 and the Technical Requirements for Site Remediation, N.J.A.C. 7:26E (the "Technical Requirements").

349. Chambers Works is a chemical manufacturing facility and, as such, falls within either or both NAICS Codes 325 and 326, both of which are within the range of ISRA-applicable NAICS codes. *Id.*

350. By special warranty deed dated January 23, 2015, Old DuPont transferred the ownership of Chambers Works to Chemours FC (the "Deed Transfer"), which transfer constituted a "change in ownership" and a "transfer of ownership or operations" as defined in ISRA, thereby triggering ISRA's requirements.

351. Old DuPont failed to file a General Information Notice with the Department within five days of the Deed Transfer, thereby violating ISRA, which violation has continued each day thereafter that Old DuPont failed to file such General Information Notice.

352. Old DuPont's January 23, 2015 transfer of a deed to Chemours FC for Chambers Works without previously obtaining ISRA Compliance and establishing an RFS constitutes a separate and individual violation of ISRA, which Old DuPont has failed to cure to this day.

353. On or about June 26, 2015, Old DuPont entered into the Chemours Separation Agreement with Chemours to spin off Old DuPont's Performance Chemicals Business via a transfer of stock and assets into a new public company, Chemours (the "Chemours Spinoff").

354. The Chemours Separation Agreement constituted an agreement to "transfer ownership or operations" of Chambers Works, an industrial establishment, within the meaning of ISRA, that would result in the transfer of more than 10 percent of Old DuPont's assets available for remediation of Chambers Works. *See* N.J.S.A. 13:1K-8. As such, Old DuPont's execution of the Chemours Separation Agreement triggered an obligation for Old DuPont to file a General Information Notice with the Department notifying it of the transaction.

355. Old DuPont failed to file a General Information Notice with the Department notifying it of the pending transfer of ownership or operations of Chambers Works to Chemours within five days of Old DuPont's execution of the Chemours Separation Agreement, thereby violating ISRA, which violation has continued each day thereafter that Old DuPont failed to file such General Information Notice.

356. The Chemours Spinoff constituted a "change of ownership" and a "transferring of ownership or operations" of Chambers Works, an industrial establishment, within the meaning of

ISRA, that would result in the transfer of more than 10 percent of Old DuPont's assets available for remediation of Chambers Works.  N.J.S.A. 13:1K-8.

357.    By its actions initiating and completing the Chemours Spinoff, including its execution of the Chemours Separation Agreement, without having obtained the Department's approval pursuant to N.J.A.C. Sections 7:26B-5.3 through 5.9 or without having first filed a Remediation Certification and establishing an RFS, Old DuPont violated ISRA and has continued to violate ISRA each day that it has failed to do so.

358.    By its actions initiating and completing the January 29, 2019 transfer of the leasehold to certain portions of the Site associated with fluoroelastomer-related manufacturing operations to Specialty Products, without having obtained the Department's approval pursuant to N.J.A.C. Sections 7:26B-5.3 through 5.9 or without having first filed a Remediation Certification and establishing an RFS, Old DuPont violated ISRA and has continued to violate ISRA each day that it has failed to do so.

359.    By its actions initiating and completing the June 1, 2019 transfer of ownership of Specialty Products to New DuPont, without having obtained the Department's approval pursuant to N.J.A.C. Sections 7:26B-5.3 through 5.9 or without having first filed a Remediation Certification and establishing an RFS, Old DuPont violated ISRA and has continued to violate ISRA each day that it has failed to do so.

360.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's ISRA liability.

361.    As a direct or indirect result of the foregoing violations, Plaintiffs have incurred, are incurring, and will continue to incur substantial costs, including costs relating to the investigation, cleanup, and removal of discharged hazardous substances and pollutants, and New

Jersey has been thwarted in its right pursuant to ISRA to obtain the financial assurance necessary to ensure that all hazardous substances and pollutants at and emanating from Chambers Work will be remediated in accordance with ISRA and the Department's regulatory requirements.

362. Pursuant to N.J.S.A. 13:1K-13.1, the Commissioner is authorized to bring an action in the Superior Court for relief for each day of each violation of ISRA to enforce the provisions of ISRA and to prohibit or to prevent the violation of ISRA or of any rule or regulation adopted pursuant ISRA. As further provided pursuant to N.J.S.A. 13:1K-13.1, such relief may include civil penalties (N.J.S.A. 13:1K-13.1(a)(4) and N.J.S.A. 13:1K-13.1(e)), assessment of costs of any investigation that led to the establishment of the violation, and for the reasonable costs of preparing and litigating a claim seeking the enforcement of its ISRA obligations.

363. Pursuant to N.J.S.A. 13:1K-13.1(a)(4) and N.J.S.A. 13:1K-13.1(e), Old DuPont, Corteva, and New DuPont are liable for civil penalties due to Old DuPont's failure to obtain ISRA Compliance, including the failure to establish an RFS.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commissioner requests that this Court enter judgment against Old DuPont, Corteva, and New DuPont as follows:

a. Ordering Old DuPont, Corteva, and New DuPont to fully comply with ISRA and its regulations by, *inter alia*, the submission of a General Information Notice, Remediation Certification, Response Action Outcome, and the establishment of a Remediation Funding Source for Chambers Works in conformance with N.J.A.C. 7:26C-5.1 to -5.13, N.J.S.A. 13:1K-13.1(a)(2), and N.J.S.A. 13:1K-13.1(e);

b.  Finding Old DuPont, Corteva, and New DuPont liable for civil penalties for each day of the ISRA violations pursuant to N.J.S.A. 13:1K-13.1(a)(4) and N.J.S.A. 13:1K-13.1(e);

c.  Ordering Old DuPont, Corteva, and New DuPont to reimburse the Commissioner for the reasonable costs of preparing and litigating his claim seeking the enforcement of ISRA against Old DuPont, Corteva, and New DuPont; and

d.  Awarding the Commissioner such other relief as this Court deems appropriate.

**Fourth Count**
**(Brownfield and Contaminated Site Remediation Act – As Against All Defendants)**

364.  Plaintiffs repeat each allegation of Paragraphs 1 through 363 above as though fully set forth in its entirety herein.

365.  Each of the Defendants is a "person" within the meaning of N.J.S.A. 58:10-23.11b and N.J.S.A 58:10B-1.

366.  Many of the contaminants of concern at the Site are hazardous substances as defined in N.J.S.A. 58:10-23.11b.

367.  Old DuPont, Chemours and Chemours FC are "dischargers" of hazardous substances at the Site and/or are each a "person in any way responsible," pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, for any hazardous substance that was discharged at the Site, as either an "owner of the real property where the discharge occurred at the time of the discharge" or a "subsequent owner of the real property where the discharge occurred prior to the filing of a final remediation document with the Department." N.J.A.C. 7:26C-1.4.

368.  Specialty Products, as the knowing lessee and operator of contaminated property, and/or the controller of contaminated property at the time a hazardous substance was discharged at the Site, is also a person in any way responsible for hazardous substances discharged at the Site.

369. 3M, as the manufacturer, distributor, and/or seller of a hazardous substance discharged at Chambers Works, is also a person in any way responsible for hazardous substances discharged at the Site.

370. Pursuant to Section 58:10B-1.3 of the Brownfield Act, as the dischargers of hazardous substances at the Site or a person in any way responsible for a hazardous substance pursuant to N.J.S.A. 58:10-23.11g, Old DuPont, Chemours, and Chemours FC are affirmatively obligated to remediate the discharged hazardous substances at the Site.

371. Pursuant to Section 58:10B-1.3 of the Brownfield Act, as a person in any way responsible for a hazardous substance pursuant to N.J.S.A. 58:10-23.11g, Specialty Products and 3M are affirmatively obligated to remediate the discharged hazardous substances at the Site.

372. Pursuant to Section 58:10B-1.3 of the Brownfield Act, as persons in any way responsible for a hazardous substance and as recipients of the 2017 Directive and/or 2019 Directive, Old DuPont, Chemours, Chemours FC, Specialty Products, and 3M are required to establish an RFS in an amount necessary to pay the cost to remediate the Site.

373. Pursuant to N.J.A.C. 7:26C-1.4, Old DuPont, Chemours, Chemours FC, Specialty Products, and 3M, each a person "in any way responsible" pursuant to the Spill Act, are required to comply with the Department's ARRCS rules.

374. Pursuant to the Technical Requirements, N.J.A.C. 7:26E-1.3 and 7:26E-1.5(a), as persons subject to the ARRCS rules, Old DuPont, Chemours, Chemours FC, Specialty Products, and 3M are required to conduct a remediation of contaminants discharged at the Site in accordance with the Technical Requirements.

375. Pursuant to N.J.A.C. 7:26E-4.3(a)(4), 7:26E-5.1(b) and 7:26E-5.1(d)(1) and (4) of the Technical Requirements, Old DuPont, Chemours, Chemours FC, Specialty Products, and 3M

are required to, *inter alia*, (1) delineate the horizontal and vertical extent of all groundwater contamination to the groundwater remediation standard, and (2) remediate such contaminants in a manner that is "protective of public safety, health and the environment" and "complies with all applicable remediation standards."

376.    Old DuPont, Chemours, Chemours FC, Specialty Products, and 3M are required to investigate and remediate PFOA, PFNA and other hazardous substances to applicable standards and to post an RFS in connection with same.

377.    As a direct or indirect result of the foregoing violations, the Department and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to the investigation, cleanup, and removal of discharged constituents and other materials, and NJDEP has been thwarted in its right pursuant to the Brownfield Act to obtain the financial assurance necessary to ensure that all hazardous substances at and emanating from the Site will be cleaned up in accordance with the Brownfield Act and NJDEP's regulatory requirements.

378.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's Brownfield Act liability.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Department and the Administrator request that this Court enter judgment against Old DuPont, Chemours, Chemours FC, Specialty Products, 3M, Corteva, and New DuPont as follows:

a.    Ordering Old DuPont, Chemours, Chemours FC, Specialty Products, 3M, Corteva, and New DuPont to, jointly and severally, fully comply with the Brownfield Act and its associated regulations by, *inter alia,* the submission of a remedial

investigation workplan and remedial investigation report pertaining to all off-site locations at which pollutants, contaminants and/or hazardous substances originating from the Site have come to be located, and the establishment of a RFS for Chambers Works in conformance with N.J.A.C. 7:26C-5.1 to -5.13;

b.     Ordering Old DuPont, Chemours, Chemours FC, Specialty Products, 3M, Corteva, and New DuPont jointly and severally, to reimburse the Department and Administrator for the reasonable costs of preparing and litigating their claim seeking the enforcement of Old DuPont's, Chemours', Chemours FC's, Specialty Products', and 3M's obligations under the Brownfield Act; and

c.     Awarding the Department and the Administrator such other relief as this Court deems appropriate.

**Fifth Count**
**(Solid Waste Management Act – As Against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont)**

379.    Plaintiffs repeat each allegation of Paragraphs 1 through 378 above as though fully set forth in its entirety herein.

380.    Old DuPont, Chemours, Chemours FC, and Specialty Products are each a "person" within the meaning of N.J.S.A. 13:1E-3.

381.    The Solid Waste Management Act ("SWMA" or the "Act") defines "[s]olid waste" as, *inter alia*, "discarded materials resulting from industrial, commercial and agricultural operations" and "all other waste materials." N.J.S.A. 13:1E-3. N.J.A.C. 7:26-1.6(b) defines "other waste material," in pertinent part, as "any solid, liquid, semi-solid or contained gaseous material, including, but not limited to spent material, sludge, by-product, discarded commercial chemical products, or scrap metal resulting from industrial, commercial, mining or agricultural operations,

from community activities, or any other material which has served or can no longer serve its original intended use, which . . . [i]s discarded or intended to be discarded . . . [i]s applied to the land or placed on the land or contained in a product that is applied to or placed on the land in a manner constituting disposal." N.J.A.C. 7:26-1.6(b) provides that "a material is also a solid waste if it is 'disposed of' by being discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or surface waters."

382.    N.J.S.A. 13:1E-3 of the SWMA and N.J.A.C. 7:26-1.4 define "disposal" as "the storage, treatment, utilization, processing, resource recovery of, or the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or hazardous waste into or on any land or water, so that the solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

383.    Various constituents present in soils, groundwater and surface water in and around the Site, including PFAS-related chemicals, are discarded materials and are "solid waste" as defined under N.J.S.A. 13:1E-3 and N.J.A.C. 7:26-1.6.

384.    Old DuPont, Chemours, and Chemours FC have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and around the Site in the form of various constituents, including PFAS-related chemicals, without first having filed a completed application for and received approval of a solid waste facility ("SWF") permit for such activities, resulting in the widespread presence of such solid wastes in soils, groundwater, and surface water in and around the Site, all in violation of N.J.A.C. 7:26-2.8(e).

385.    Old DuPont, Chemours, and Chemours FC have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and/or around the Site in the form

of hazardous constituents, including PFAS-related chemicals, in excess of 0.148 cubic yards of solids and/or 30 gallons of liquids, at locations other than a permitted SWF, resulting in the widespread presence of such solid wastes in soils, groundwater, and surface water in and around the Site, in violation of N.J.S.A. 13:1E-9.3.

386.    Pursuant to N.J.S.A. 13:1E-9(b) and (d), when the Commissioner finds that a person has violated any provision of the SWMA or any regulations adopted pursuant to the SWMA, the Commissioner is authorized to bring a civil action in Superior Court seeking temporary or permanent injunctive and other relief, as well as assessment of the violator for the costs of any investigation leading to the establishment of the violation, costs incurred by the State in removing, correcting or terminating the adverse effects to water and air quality resulting from the violation, and assessment against the violator of compensatory damages for any loss or destruction of wildlife, fish or aquatic life, and for any other actual damages, all of which relief may be awarded in a summary manner.

387.    Old DuPont, Chemours, Chemours FC, and Specialty Products have violated the SWMA and are thus liable for civil penalties of up to $50,000.00 per day of the violation pursuant to N.J.S.A. 13:1E-9(f).

388.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's SWMA liability.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commissioner requests that this Court enter judgment against Old DuPont, Chemours, Chemours FC, Specialty Products, Corteva, and New DuPont as follows:

a.    Ordering Old DuPont, Chemours, Chemours FC, Specialty Products, Corteva, and New DuPont to, jointly and severally, fully comply with the SWMA by, *inter alia*, removing all unlawfully disposed of solid waste, including PFAS-related chemicals, from all

locations in and around the Site at which the same have come to be located and for which Old DuPont, Chemours, and Chemours FC did not obtain a SWF permit;

b. Ordering Old DuPont, Chemours, Chemours FC, Specialty Products, Corteva, and New DuPont, jointly and severally, to reimburse the Commissioner for the reasonable costs of preparing and litigating his claim seeking the enforcement of Old DuPont's, Chemours', and Chemours FC's obligations pursuant to the SWMA;

c. Ordering Old DuPont, Chemours, Chemours FC, Specialty Products, Corteva, and New DuPont, jointly and severally, to reimburse the Commissioner for the cost incurred by the Department in removing, correcting or terminating the adverse effects upon water and air quality resulting from their violations of the SWMA;

d. Ordering Old DuPont, Chemours, Chemours FC, Specialty Products, Corteva, and New DuPont, jointly and severally, to compensate the State for the loss or destruction of wildlife, fish or aquatic life, and other actual damages caused by their violations of the SWMA;

e. Finding Old DuPont, Chemours, Chemours FC, Specialty Products, Corteva, and New DuPont liable for penalties pursuant to N.J.S.A. 13:1E-9(f); and

f. Awarding the Commissioner such other relief as this Court deems appropriate.

## Sixth Count
### (Air Pollution Control Act – As Against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont)

389. Plaintiffs repeat each allegation of Paragraphs 1 through 388 above as though fully set forth in its entirety herein.

390. Old DuPont, Chemours, and Chemours FC are each a "person" within the meaning of N.J.S.A. 26:2C-2 and N.J.A.C. 7:27-1.4.

391.     It is unlawful for any person to "cause, suffer, allow or permit to be emitted into the outdoor atmosphere substances in quantities which shall result in air pollution." N.J.A.C. 7:27-5.2.

392.     "'Air pollution' means the presence in the outdoor atmosphere of one or more air contaminants in such quantities and duration as are, or tend to be, injurious to human health or welfare, animal or plant life or property, or would unreasonably interfere with the enjoyment of life or property throughout the State and in such territories of the State as shall be affected thereby and excludes all aspects of employer-employee relationship as to health and safety hazards." N.J.A.C. 7:27-5.1.

393.     "'Air contaminant' means any substance, other than water or distillates of air, present in the atmosphere as solid particles, liquid particles, vapors, or gases." N.J.S.A. 26:2C-2.

394.     PFAS compounds, including PFOA and GenX, emitted from Chambers Works are air contaminants that have, upon information and belief, caused air pollution by contaminating drinking water wells as far as five miles away (and possibly farther) from Chambers Works with concentrations of PFOA exceeding the maximum contaminant level of 14 ppt. These emissions of air contaminants are injurious to human health or welfare, animal or plant life or property, and unreasonably interfere with the enjoyment of life or property within the State, thereby violating N.J.A.C. 7:27-5.2.

395.     Pursuant to N.J.S.A. 26:2C-19(a), and 13:1D-9(e) and (n), the Department may bring an action for injunctive relief and any other appropriate relief to prohibit and prevent the violations.

396.     Old DuPont, Chemours, and Chemours FC are not entitled to any affirmative defense because their emissions of PFAS contaminants from Chambers Works threatened and

continue to pose a potential threat to public health, welfare, or the environment.  N.J.S.A. 26:2C-19.3.

397.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's Air Pollution Control Act liability.

## PRAYER FOR RELIEF

**WHEREFORE**, the Department requests that this Court enter judgment against Defendants as follows:

a.    Permanently enjoining Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont from emitting PFAS air contaminants from Chambers Works;

b.    Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to remediate all soils and waters contaminated by their PFAS emissions in order to mitigate the injuries to human health and welfare, animal and plant life and property, and the unreasonable interference with the enjoyment of life and property; and

b.    Awarding the Commissioner his costs and fees in this action and any other relief the Court deems appropriate pursuant to N.J.S.A. 26:2C-19(a).

## Seventh Count
### (Public Nuisance – As Against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont)

398.    Plaintiffs repeat each allegation of Paragraphs 1 through 397 above as though fully set forth in its entirety herein.

399.    Groundwater, surface water, sediment, wetlands, and biota are natural resources of the State held in trust by the State.

400. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

401. The contamination of the groundwater, surface water, sediment, wetlands, and biota at and around Chambers Works constitutes a physical invasion of the State's natural resources, and upon information and belief, the State's real property in the vicinity of the Site, and an unreasonable and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the Department, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

402. As the owner of the New Jersey Natural Land Trust Game Branch Preserve and the New Jersey Fish & Wildlife Salem River Wildlife Management Area, which upon information and belief has become contaminated by Chambers Works, the Department has suffered a special injury different from that common to the general public.

403. As long as these natural resources at and around Chambers Works remain contaminated due to Old DuPont, Chemours, and Chemours FC's conduct, the public nuisance continues.

404. Until these natural resources are restored to their pre-injury quality, Old DuPont, Chemours, and Chemours FC are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

405. Old DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

406. Upon information and belief, Corteva and New DuPont assumed Old DuPont's public nuisance liability.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont as follows:

a. Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to reimburse the Department and Administrator for their costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition;

b. Compelling Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination in the State's natural resources so that such natural resources are restored to their original condition;

c. Compelling Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay special damages to Plaintiffs, funding the Department's performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances and pollutants at Chambers Works, and compelling Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to compensate the citizens of New Jersey, for the

costs of restoration and replacement, including lost use and value of any injured natural resource;

d.    Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

e.    Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

f.    Awarding Plaintiffs such other relief as this Court deems proper.

**Eighth Count**
**(Trespass – As Against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont)**

407.    Plaintiffs repeat each allegation of Paragraphs 1 through 406 as if fully set forth in their entirety herein.

408.    Groundwater, surface water, sediment, wetlands, and biota are natural resources of the State held in trust by the State for the benefit of the public. Water resources are owned by the State for the benefit of its citizens.

409.    The State brings this claim in both its public trustee and *parens patriae* capacities.

410.    As the trustee over the State's natural resources, the State has a duty to protect and restore all natural resources of the State and protect the health and comfort of its inhabitants.

411.    In its *parens patriae* capacity, the State may protect its "quasi-sovereign" interests, including the State's interest in the well-being of its populace, as well as the populace's interest in the integrity of the State's natural resources. Accordingly, the State is bringing this action for the invasion of a substantial number of its residents' possessory interests in the State's natural resources. Waters, sediments, and biota that have been affected by Old DuPont, Chemours, and Chemours FC's contamination are mobile, moving to and inhabiting areas far from the immediate area of the initial contamination.

412.    Additionally, the State is the owner of lands, including the New Jersey Natural Land Trust Game Branch Preserve and the New Jersey Fish & Wildlife Salem River Wildlife Management Area, in the vicinity of Chambers Works.

413.    The hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around Chambers Works, including, upon information and belief, on State-owned lands, constitute a physical invasion of property without permission or license.

414.    Old DuPont, Chemours, and Chemours FC are liable for trespass, and continued trespass, because the hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around Chambers Works, as well as contamination previously removed from Chambers Works, resulted from discharges of hazardous substances and pollutants at the Site.

415.    As long as the natural resources remain contaminated due to Old DuPont's, Chemours', and Chemours FC's conduct, the trespass continues.

416.    Old DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

417.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's trespass liability.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont as follows:

a.    Finding Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor,

and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

2) Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

3) Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b. Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c. Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d. Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.    Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Old DuPont's, Chemours', and Chemours FC's acts and omissions alleged herein;

f.    Entering an order against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont for all appropriate injunctive relief to abate or mitigate the contamination that Old DuPont, Chemours, and Chemours FC caused;

g.    Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.    Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.    Awarding Plaintiffs such other relief as this Court deems appropriate.

## Ninth Count
### (Negligence /Gross Negligence/Willful or Wanton Misconduct – As Against All Defendants)

418.    Plaintiffs repeat each allegation of Paragraphs 1 through 417 above as though fully set forth in its entirety herein.

419.    Old DuPont, Chemours, and Chemours FC had a duty to Plaintiffs to ensure that hazardous substances and pollutants were not discharged at Chambers Works and did not injure groundwater, surface water, sediment, wetlands, and biota at and around the Site.

420.    3M had a duty to Plaintiffs to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of PFAS and/or products containing PFAS, and other pollutants and hazardous substances.

421.    Defendants breached these duties.

422.     As a direct and proximate result of Old DuPont's, Chemours', and Chemours FC's discharge of hazardous substances and pollutants at Chambers Works, groundwater, surface water, sediment, wetlands, soils, biota, and other natural resources at and around the Site have been injured.  Old DuPont, Chemours, and Chemours FC are jointly and severally liable for such injuries and the consequential damages.

423.     As a direct and proximate result of 3M's negligence in designing PFAS and in failing to warn PFAS purchasers, the State, and others that it was reasonably foreseeable would be harmed by PFAS of the dangers of 3M's products, groundwater, surface water, and other natural resources at and around Chambers Works became contaminated with PFAS in varying amounts over time, causing the State and its citizens significant injury and damage.

424.     As a further direct and proximate result of Old DuPont's, Chemours', and Chemours FC's discharge of hazardous substances and pollutants at Chambers Works, the Department and the Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, treatment, monitoring and restoration costs, and expenses for which Old DuPont, Chemours, and Chemours FC are jointly and severally liable.

425.     Upon information and belief, Corteva and New DuPont assumed Old DuPont's negligence liability.

426.     As detailed in Paragraphs 119-148 and 195-196, Defendants committed each of the above-described acts and omissions with actual malice or with wanton, willful or reckless disregard of their knowledge that Plaintiffs would foreseeably be harmed by those acts or omissions and with indifference to that consequence.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants as follows:

a.    Finding Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

        1)    Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

        2)    Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

        3)    Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b.    Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c.     Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d.     Ordering Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.     Ordering Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

f.     Entering an order against Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g.     Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.     Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.     Awarding Plaintiffs such other relief as this Court deems appropriate.

### Tenth Count
**(Abnormally Dangerous Activity – As Against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont)**

427.     Plaintiffs repeat each allegation of Paragraphs 1 through 426 above as though fully set forth in its entirety herein.

428.     During the relevant period, Old DuPont, Chemours, and Chemours FC, utilized, disposed of, discharged, and emitted their PFAS at Chambers Works. These activities occurred in

the immediate vicinity of the State's natural resources, including groundwater, air, surface water, sediments and soils, wetlands, and biota.

429.     As a result of Old DuPont's, Chemours', and Chemours FC's use of PFAS at Chambers Works, the State's natural resources were contaminated by PFAS.

430.     The use of PFAS in the manufacture of other products and their disposal, discharge, and emission constitute abnormally dangerous activities that introduce an unusual danger into the community.   These activities presented and continue to present a high degree of risk of harm to the State's natural resources.   These activities have presented a high likelihood that the harm they would cause would be great.   Neither Plaintiffs nor the broader community were able to eliminate this risk by the exercise of reasonable care, particularly in light of Old DuPont's, Chemours', and Chemours FC's failure to provide an adequate warning about the dangers involved.

431.     The use, disposal, discharge, and emission of PFAS is not a matter of common usage in the areas in which Old DuPont, Chemours, and Chemours FC carried out these activities, and these activities were inappropriate to carry out in these locations.

432.     At all relevant times, the risks of Old DuPont's, Chemours', and Chemours FC's abnormally dangerous activities outweighed the value to the community.

433.     Old DuPont's, Chemours', and Chemours FC's acts and omissions in using, disposing, discharging, and emitting PFAS in the areas in which they did proximately caused the contamination of the State's natural resources.   Old DuPont, Chemours, and Chemours FC are thus strictly liable for the harm these ultra-hazardous activities caused.

434.     Old DuPont, Chemours, and Chemours FC committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

435. Upon information and belief, Corteva and New DuPont assumed Old DuPont's abnormally dangerous activity liability.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont as follows:

a. Finding Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont liable, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination in the State's groundwater, surface waters, and other natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by PFAS products, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of groundwater, surface waters, and natural resources likely to have been contaminated for the presence of PFAS;

2) Past and future treatment of all groundwater, surface waters, and other natural resources containing detectable levels of PFAS until restored to non-detectable levels; and

3) Past and future monitoring of the State's groundwater, surface waters, and other natural resources to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b.  Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's groundwater, surface waters, and other natural resources caused by PFAS;

c.  Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all damages in an amount at least equal to the full cost of restoring the State's groundwater, surface waters, and other natural resources to their original condition prior to the contamination of such waters by PFAS;

d.  Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all compensatory damages for the lost value (including lost use) of the State's groundwater, surface waters, and other natural resources as a result of the contamination of such natural resources with PFAS;

e.  Ordering Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont to pay for all other damages sustained by Plaintiffs as a direct and proximate result of their acts and omissions alleged herein, including remedial, administrative, oversight, and legal fees and expenses;

f.  Entering an order against Old DuPont, Chemours, Chemours FC, Corteva, and New DuPont for all appropriate injunctive relief to abate or mitigate the PFAS contamination that they caused;

g.  Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.  Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Awarding Plaintiffs such other relief as this Court deems appropriate.

**Eleventh Count**
**(Strict Products Liability – Defective Design as Against 3M)**

436.    Plaintiffs repeat each allegation of Paragraphs 1 through 435 above as though fully set forth in its entirety herein.

437.    3M designed, manufactured, and sold PFAS that were used at Chambers Works during the relevant period.

438.    As a manufacturer and seller of PFAS, 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.  3M owed that duty both to reasonably foreseeable users of its products and also to any person who or property that might reasonably be expected to come into contact with those products.

439.    3M's PFAS were used in a reasonably foreseeable manner and without substantial change in the condition of such products.  These products were defective and unfit for their reasonable use.  3M's PFAS foreseeably contaminated groundwater, surface water, and other natural resources at and around the Site.  3M knew or reasonably should have known that its manufacture, transportation, and/or sale, as well as its customers' use of 3M's PFAS in an intended or reasonably foreseeable manner, would result in the spillage, discharge, disposal, or release of PFAS onto land or into water, including at Chambers Works.

440.    PFAS used at Chambers Works have injured and are continuing to injure groundwater, surface water, and other natural resources at and/or around the Site.  These PFAS were defective in design and unreasonably dangerous because, among other things:

a.      PFAS cause extensive and persistent contamination when they, or products containing them, are used in a reasonably foreseeable or intended manner;

b.  PFAS contamination in groundwater and surface water that are the sources of drinking water poses significant threats to public health and welfare; and

c.  3M failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFAS.

441.  At all times relevant to this action, the PFAS that 3M designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

442.  At all times relevant to this action, the foreseeable risk to public health and welfare posed by 3M's PFAS outweighed the cost to 3M of reducing or eliminating such risk.

443.  At all times relevant to this action, 3M knew or should have known about reasonably safer feasible alternatives to PFAS, and the omission of such alternative designs rendered 3M's PFAS not reasonably safe.

444.  As a direct and proximate result of the defects in the 3M's design, manufacture, and sale of PFAS, groundwater, surface water, and other natural resources at and/or near the Site became contaminated with PFAS in varying amounts over time, causing the State and its citizens significant injury and damage.

445.  As a direct and proximate result of 3M's acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages in an amount to be proved at trial related to PFAS contamination of groundwater, surface water, and other natural resources at and/or near the Site.

446.  As a further direct and proximate result of 3M's acts and omissions alleged herein, Plaintiffs have incurred, and will continue to incur, investigation, cleanup and removal, restoration,

treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface waters, and other natural resources at and/or near the Site with PFAS.

447.    3M knew it was substantially certain that its acts and omissions described above would cause the contamination and harms described herein.

448.    Plaintiffs seek redress for exposure to toxic chemicals and/or substances at the Site, an industrial site, caused by the use of PFAS.  Thus, this suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

449.    3M committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

450.    3M is strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment against 3M as follows:

a.    Finding 3M liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination at and around the Site so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFAS, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1)    Past and future testing of natural resources at and around the Site likely to have been contaminated by PFAS;

2) Past and future treatment of all natural resources at and around the Site containing detectable levels of PFAS until restored to non-detectable levels; and

3) Past and future monitoring of the State's natural resources at and around the Site to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b. Ordering 3M to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination of the State's natural resources;

c. Ordering 3M to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination;

d. Ordering 3M to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the PFAS contamination of such natural resources;

e. Ordering 3M to pay for all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of 3M's acts and omissions alleged herein;

f. Entering an order against 3M to abate or mitigate the PFAS contamination that it caused at and around the Site;

g. Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h. Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Awarding Plaintiffs such other relief as this Court deems appropriate.

**Twelfth Count**
**(Strict Products Liability – Failure to Warn as Against 3M)**

451.    Plaintiffs repeat each allegation of Paragraphs 1 through 450 above as though fully set forth in its entirety herein.

452.    As a designer, manufacturer, and seller of PFAS, 3M had a strict duty to Plaintiffs and to those who were at risk of being harmed by PFAS to warn users of those products and the State of the foreseeable harms associated with them.  3M had a duty to warn the State about the dangers of PFAS because, among other things, the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction; because the Department and the Commissioner are charged with enforcing the State's environmental laws and regulations; and because the State maintains a "quasi-sovereign" interest in the well-being of its residents.

453.    3M inadequately warned users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS of the likelihood that 3M's products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.  To the extent 3M provided any warnings about its products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by PFAS, and the warnings did not convey adequate information on the dangers of PFAS to the mind of a reasonably foreseeable or ordinary user or bystander.

454.    Despite the fact that 3M knew or should have known about the risks of PFAS, 3M withheld such knowledge from Plaintiffs, other regulators, and the public.  Moreover, 3M affirmatively distorted and/or suppressed its knowledge and the scientific evidence linking its

products to the unreasonable dangers they pose, and 3M instructed users to release its products directly to the ground where PFAS would infiltrate drinking water supplies.

455.    At no time relevant to this action did 3M warn users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS that PFAS would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

456.    3M's PFAS were in the same condition when they were purchased and/or used as they were when they left 3M's control.  3M's customers used 3M's PFAS in a reasonably foreseeable manner and without any substantial change in the condition of the products.

457.    Had 3M provided adequate warnings about the hazards associated with its PFAS, users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS would have heeded those warnings.

458.    As a direct and proximate result of 3M's failure to warn of the hazards of PFAS, groundwater, surface water, and other natural resources at and around Chambers Works were contaminated with PFAS.

459.    As a direct and proximate result of 3M's acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages in an amount to be proved at trial related to PFAS contamination of groundwater, surface water, and other natural resources at and/or near the Site.

460.    As a further direct and proximate result of 3M's acts and omissions alleged herein, Plaintiffs have incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface waters, and other natural resources at and/or near the Site with PFAS.

461. 3M knew it was substantially certain that its acts and omissions described above would cause Plaintiffs' injury and damage.

462. Plaintiffs seek redress for exposure to toxic chemicals and/or substances at the Site, an industrial site, caused by the use of PFAS. Thus, this suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

463. 3M committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

464. 3M is strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment against 3M as follows:

a. Finding 3M liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination at and around the Site so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFAS, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1) Past and future testing of natural resources at and around the Site likely to have been contaminated by PFAS;

2)     Past and future treatment of all natural resources at and around the Site containing detectable levels of PFAS until restored to non-detectable levels; and

3)     Past and future monitoring of the State's natural resources at and around the Site to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b.     Ordering 3M to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination of the State's natural resources;

c.     Ordering 3M to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination;

d.     Ordering 3M to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the PFAS contamination of such natural resources;

e.     Ordering 3M to pay for all other damages sustained by Plaintiffs in their public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of 3M's acts and omissions alleged herein;

f.     Entering an order against 3M to abate or mitigate the PFAS contamination that it caused at and around the Site;

g.     Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.     Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

### Thirteenth Count

**(Actual Fraudulent Transfer In Relation to Chemours Spinoff – As Against Old DuPont, Chemours, Corteva, and New DuPont)**

465.   Plaintiffs repeat each allegation of Paragraphs 1 through 464 above as though fully set forth in its entirety herein.

466.   Plaintiffs are and were creditors of Chemours at all relevant times.

467.   Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Chemours Separation Agreement (the "Chemours Assumed Liabilities").

468.   The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

469.   At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

470.   Chemours made the Chemours Transfers and incurred the Chemours Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours.

471.   Plaintiffs have been harmed as a result of the Chemours Transfers.

472.   Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Chemours Transfers, recover property or value transferred to Old DuPont, enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or

otherwise disposing of any property or value that Chemours transferred to Old DuPont, and a constructive trust over such property or value for the benefit of Plaintiffs.

473.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities for actual fraudulent transfer.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Corteva, and New DuPont as follows:

a.    Voiding the Chemours Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.    Enjoining Old DuPont from disposing of any property or value that Chemours transferred to Old DuPont;

c.    Imposing a constructive trust over the Chemours Transfers;

d.    Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e.    Awarding Plaintiffs such other relief as this Court deems appropriate.

### Fourteenth Count
**(Constructive Fraudulent Transfer in Relation to Chemours Spinoff – As Against Old DuPont, Chemours, Corteva, and New DuPont)**

474.    Plaintiffs repeat each allegation of Paragraphs 1 through 473 above as though fully set forth in its entirety herein.

475.    Plaintiffs are and were creditors of Chemours at all relevant times.

476.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

477.    Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

478. At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

479. Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

480. Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

481. At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

482. Plaintiffs have been harmed as a result of the Chemours Transfers.

483. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Chemours Transfers, recover property or value transferred to Old DuPont, enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and a constructive trust over such property or value for the benefit of Plaintiffs.

484. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

485. Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability for constructive fraudulent transfer.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Corteva, and New DuPont as follows:

a.      Voiding the Chemours Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.      Enjoining Old DuPont from disposing of any property or value that Chemours transferred to Old DuPont;

c.      Imposing a constructive trust over the Chemours Transfers;

d.      Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e.      Awarding Plaintiffs such other relief as this Court deems appropriate.

### Fifteenth Count
**(Actual Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations – As Against Old DuPont, New DuPont, and Corteva)**

486.    Plaintiffs repeat each allegation of Paragraphs 1 through 485 above as though fully set forth in its entirety herein.

487.    Plaintiffs are and were creditors of Old DuPont at all relevant times.

488.    Through its participation in the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

489.    The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

490.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

491.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

492.     Plaintiffs have been harmed as a result of the Old DuPont Transfers.

493.     Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiffs that have been damaged as a result of the actions described in this Third Amended Complaint.

494.     Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva, enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Old DuPont transferred to them, and a constructive trust over such property or value for the benefit of Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, New DuPont, and Corteva as follows:

a.     Voiding the Old DuPont Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.     Enjoining New DuPont and Corteva from disposing of any property or value that Old DuPont transferred to them;

c.     Imposing a constructive trust over the Old DuPont Transfers;

d.     Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e.     Awarding Plaintiffs such other relief as this Court deems appropriate.

### Sixteenth Count
**(Constructive Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations – As Against Old DuPont, New DuPont, and Corteva)**

495.     Plaintiffs repeat each allegation of Paragraphs 1 through 494 above as though fully set forth in its entirety herein.

496.     Plaintiffs are and were creditors of Old DuPont at all relevant times.

497.     Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

498.     Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

499.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

500.     Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

501.     Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

502.     At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

503.     Plaintiffs have been harmed as a result of the Old DuPont Transfers.

504.     Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva, enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Old DuPont transferred to them, and a constructive trust over such property or value for the benefit of Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, New DuPont, and Corteva as follows:

a. Voiding the Old DuPont Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b. Enjoining New DuPont and Corteva from disposing of any property or value that Old DuPont transferred to them;

c. Imposing a constructive trust over the Old DuPont Transfers;

d. Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

e. Awarding Plaintiffs such other relief as this Court deems appropriate.

## Seventeenth Count
### (New Jersey Safe Drinking Water Act—As Against Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, and Specialty Products)

505. Plaintiffs repeat each allegation of Paragraphs 1 through 504 above as though fully set forth in its entirety herein.

506. New Jersey enacted its own version of the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq. ("SDWA"), NJSDWA, in 1977. Pursuant to NJSDWA, in addition to the enforcement authorities provided to NJDEP pursuant to that statute, NJDEP, through the Commissioner, is designated as the agency that has "primary enforcement responsibility under the Federal Safe Drinking Water Act." N.J.S.A. 58:12A-2.

507. Pursuant to the imminent and substantial endangerment provision of NJSDWA, "upon receipt of information that a contaminant which is present in or is likely to enter a water system may present an imminent and substantial endangerment to the health of persons," the Commissioner of NJDEP may "take such actions as he may deem necessary in order to protect the

health of such persons," including "commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction" against persons responsible for such endangerment. N.J.S.A. 58:12A-6.

508. NJSDWA defines "water system" as "a system for providing potable water to any person" and does not limit the definition to public water systems or wellhead protection areas. N.J.S.A. 58:12A-3(s).

509. A "person" is defined under NJSDWA as "any individual, corporation, company, firm, association, partnership, municipality, county, State agency or federal agency." *Id.* 58:12A-3(j). Old DuPont, Chemours FC, and Specialty Products are such persons.

510. Pursuant to SDWA's savings provision preserving all state law authorities that are more stringent or are broader in the scope of their applicability than those provided under SDWA, NJDEP is also authorized to assert claims against Old DuPont, Chemours FC, and Specialty Products pursuant to NJSDWA, including claims under the imminent and substantial endangerment section of NJSDWA, for the protection of both public and nonpublic water systems, including private wells. *See* 42 U.S.C. § 300j-8(e); N.J.S.A. 58:12A-6.

511. The PFAS contamination in excess of New Jersey's MCLs caused by Old DuPont, Chemours FC, and Specialty Products presents an "imminent and substantial endangerment to health of persons" within the meaning of N.J.S.A. 58:12A-6 by exposing water users in New Jersey to PFAS in drinking water. Old DuPont, Chemours FC, and Specialty Products have engaged and are engaging in activities that have caused or contributed to this imminent and substantial endangerment to the health of New Jersey water users. *See* N.J.S.A. 58:12A-6.

512. Because the PFAS contamination present in or threatening to enter drinking water supplies in areas located off-site from the Site poses an imminent and substantial endangerment to

human health, NJDEP seeks, inter alia, recovery of reasonable costs of any investigation, inspection, or monitoring that led to the discovery of the conditions posing such threats; recovery of reasonable costs incurred and to be incurred by New Jersey in removing, correcting, or terminating the adverse effects resulting from Old DuPont, Chemours FC, and Specialty Products' actions; and an order requiring Old DuPont, Chemours FC, and Specialty Products to remediate to acceptable levels, and/or provide alternative water supplies to residents whose drinking water has been impacted. *See* N.J.S.A. 58:12A-6, 58:12A-10.

513.    Furthermore, NJDEP seeks injunctive relief ordering Old DuPont, Chemours FC, and Specialty Products to control the source of PFAS that is contributing to the imminent and substantial endangerment to the health of New Jersey residents and to clean up the PFAS-contaminated soils endangering drinking water and drinking water supplies located off-site from the Site to New Jersey's MCLs.

514.    Chemours, New DuPont and Corteva assumed Old DuPont's NJSDWA liabilities described above.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, and Specialty Products as follows:

a.    Finding, pursuant to N.J.S.A. 58:12A-6, Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, and Specialty Products liable for all costs to investigate, clean up and remove, treat, monitor, and otherwise respond to PFAS contamination located in off-site areas that originated from the Site so that the contaminated and threatened drinking water supplies are treated and remediated and for such orders as may be necessary to provide full relief to address risks to the State of New Jersey, including the costs of:

1)     Past and future testing for PFAS contamination in soil and groundwater affecting or which may affect drinking water supplies located off-site from the Site;

2)     Past and future treatment and remediation of soil and groundwater affecting or which may affect drinking water supplies located off-site from the Site, including any and all such costs awarded through any revolving fund, spill cleanup fund, loan, and/or grant of any kind regardless of the source of such funding; and

3)     Past and future monitoring of groundwater affecting or which may affect drinking water supplies located off-site from the Site;

b.     Ordering, pursuant to N.J.S.A. 58:12A-6, Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, and Specialty Products to pay for all costs related to the investigation, cleanup, treatment, and monitoring of PFAS contamination and threatened contamination of drinking water supplies located off-site from the Site, including any and all such costs awarded through any revolving fund, spill cleanup fund, loan, and/or grant of any kind regardless of the source of such funding;

c.     Ordering, pursuant to N.J.S.A. 58:12A-6, Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, and Specialty Products to provide, or pay for the provision of, an alternative water supply for any and all drinking water supplies located off-site that originated from the Site that are presently contaminated in excess of New Jersey's MCLs for PFAS, including any and all such costs awarded through

any revolving fund, spill cleanup fund, loan, and/or grant of any kind regardless of the source of such funding;

e.  Ordering, pursuant to N.J.S.A. 58:12A-6, Old DuPont, Chemours, Chemours FC, New DuPont, Corteva, and Specialty Products to abate or mitigate the PFAS groundwater contamination affecting or which may affect drinking water supplies that they caused or contributed to in areas located off-site from the Site;

f.  Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the fullest extent permitted by law; and

g.  Granting Plaintiffs such other relief as the interests of justice may require.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

Dated:  August 26, 2024

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorney for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Ph. (609) 376-2740

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General

By: /s/ Geoffrey W. Castello
Geoffrey W. Castello, Esq.
One Jefferson Road
Parsippany, New Jersey 07054
Tel.: (973) 503-5900
GCastello@KelleyDrye.com

*William J. Jackson, Esq.
*John D.S. Gilmour, Esq.
*Lana M. Rowenko, Esq.
*Jennifer C. Barks. Esq.
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Ph. (713) 355-5000

*David Zalman, Esq.
David M. Reap, Esq.
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800
DReap@KelleyDrye.com

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General

By: *John K. Dema, Esq.
    Scott E. Kauff, Esq.
    *John T. Dema, Esq.
    *Briana Dema, Esq.
    Alex Latanision, Esq.
    *Elizabeth B. Petersen, Esq

1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Ph. (340) 773-6142

**TAFT STETTINIUS & HOLLISTER LLP**
Special Counsel to the Attorney General

*Robert A. Bilott, Esq.
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Telephone: (513) 381-2838
Facsimile: (513) 381-0205
bilott@taftlaw.com

*David J. Butler, Esq.
41 S. High Street
Suite 1800
Columbus, OH 43215-6106
Telephone: (614) 221-2838

**COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

Leonard Z. Kaufmann, Esq.
A Member of the Firm
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Ph. (201) 845-9600

* *admitted pro hac vice*