[19-14766, Docket Nos. 344, 387]
[19-14758, Docket No. 442]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION, *et al.*,

        Plaintiff,

    v.

E.I. DUPONT DE NEMOURS AND
COMPANY, *et al.*,

        Defendants.

Civil Nos.

19-14758 (RMB/JBC)
(Pompton Lakes)

19-14766 (RMB/JBC)
(Chambers Works)

**OPINION**

**RENÉE MARIE BUMB, Chief United States District Judge**

This Opinion addresses E.I. DuPont De Nemours and Company's and the Dupont entities' (collectively, "EIDP" or "Defendants") objections to Special Master Case Management Order Nos. 2, 3 and 4. The Court heard oral argument on those Objections, and now writes to expand on its reasoning. For the reasons stated on the record and below, the Court **DENIES** EIDP's objections and **ADOPTS** the Special Master's rulings.

## I.      BACKGROUND

Because the Court writes for the parties only, it does not provide a full recitation of the facts. In 2019, the New Jersey Department of Environmental Protection ("NJDEP" or "Plaintiffs") sued EIDP claiming that it severely contaminated the environment surrounding the company's Chambers Works facility located in Carney's

Point, New Jersey as well the environment surrounding its Pompton Lakes, New Jersey facility.

NJDEP claims that Chambers Works is riddled with chemical contaminants from its soil to the sky. NJDEP alleges EIDP's manufacturing, processing, treatment, and disposal of various chemicals—pre- and polyfluoroalkyl substances ("PFAS") has caused that contamination. PFAS—sometimes called "forever chemicals"—"are a diverse group of chemicals that are generally characterized by being comprised of carbon chains of various lengths and carbon-flourine bonds." [19-14766, Docket No. 344-1 at 1.] "PFAS encompasses thousands of substances." [*Id.*] According to NJDEP, the Chambers Work site is contaminated with PFAS, including perfluorooctanoic acid ("PFOA"), perfluorononanoic acid ("PFNA"), perfluorooctanesulfonic ("PFOS") and "GenX"—a substance that EIDP developed to replace PFOA. By its Third Amended Complaint, NJDEP seeks, among other things, cleanup costs, costs to restore the natural environment, and an injunction against EIDP to stop the release of PFAS into the environment at Chambers Works. [Third Am. Compl. ("TAC") ¶ 7 (19-14766, Docket No. 332).]

## II.    SPECIAL MASTER ORDER NO. 2

In May 2022, NJDEP moved to compel discovery, seeking an order compelling EIDP to, among other things, "identify, to the extent currently known, all contaminants released from the sites." [19-14758, Docket No. 244-1.] About six months later, Magistrate Judge Clark granted NJDEP's motion, but narrowed the definition of "Hazardous Substances, Pollutants, or Contaminants" (collectively,

"Contaminants"). [19-14766, Docket No. 252 at 14.] Judge Clark found NJDEP could seek discovery on Contaminants that it had "a reasonable belief that [EIDP] [has] released into the environment and which are included in the environmental hazardous substance lists adopted by state and federal authorities." [*Id*.] NJDEP appealed that ruling on the Contaminants definition, but the Court sent this case and three others that NJDEP filed against EIDP to mediation. [19-14766, Docket Nos. 255, 268.] The Court administratively terminated NJDEP's appeal of Magistrate Judge Clark's discovery order.

Mediation was ultimately unsuccessful, and the parties requested the Court to return the cases to active status. [19-14765, Docket No. 245.] The parties requested the Court to appoint a Special Master. [19-14766, Docket No. 290.] The Court granted that request, appointing the requested Special Master "to perform non-dispositive case management and scheduling matters." [19-14766, Docket No. 292.] The Court then referred NJDEP's appeal of Magistrate Judge Clark's discovery ruling to "the Special Master for resolution." [19-14758, Docket No. 380.] In doing so, the Court explained it would only address the appeal after "all good faith efforts to resolve the issues with the Special Master have been exhausted." [*Id.*]

With the Special Master's assistance, the parties largely resolved NJDEP's appeal of Magistrate Judge Clark's discovery rulings. Yet the definition of PFAS became a sticking point for the parties. EIDP insisted that the NJDEP could only obtain discovery on PFAS relating to the Chambers Works facility if it has "a reasonable belief that [EIDP] released [it] into the environment" as set forth in

Magistrate Judge Clark's discovery ruling, which includes, among other things, PFOA and PFNA. [19-14766, Docket No. 344-11.] Plaintiffs proposed that the PFAS definition would include "any compound that contains, breaks down into, or may cause the formation in the environment of any of those substances." [*Id.*]

The Special Master heard the parties' argument on an acceptable PFAS definition over several hearings. The Special Master ordered a few rounds of briefing and ordered the parties to provide him with the definition of PFAS used in other litigations. The NJDEP proposed the following PFAS definition:

> "PFAS" is defined as any per- and polyfluoroalkyl substances, including without limitation, PFOA, PFNA, PFOS, and GenX, that have been used, handled, stored, processed, treated, disposed, emitted, intentionally or unintentionally generated in any manufacturing process, intentionally or unintentionally generated in any waste treatment and/or disposal process, or discharged from the Chambers Works Site, as well as any brought on to the Site as transported waste.

EIDP countered, again seeking a definition that had a "reasonable belief" standard but adding a detection requirement:

> For the purpose of discovery in this action, PFAS shall be defined as those compounds that Plaintiffs have a reasonable belief have been released into the environment from the Chambers Works site and for which there has been a detection in a known sample.

The Special Master adopted NJDEP's PFAS definition, reasoning that given NJDEP's claims, the department "need[s] to know all PFAS used[,] transported to, stored … at Chambers Works." [19-14766, Docket No. 333 ("SM Order No. 2").] This is so, according to the Special Master, because NJDEP: (1) seeks to have EIDP

4

investigate, delineate, and remediate the company's "alleged historical PFAS releases[;]" and (2) seeks "an injunction to cease all PFAS releases from [Chambers Works.]" [*Id.*] The Special Master found EIDP to be "in the best position to know all PFAS at the Site[.]" [*Id.* at 3.] The Special Master also found Chambers Works "unique" because EIDP received PFAS manufactured at other EIDP facilities at Chambers Works and treated off-site PFAS brought to Chambers Works from other facilities and third parties. [*Id.*]

The Special Master found EIDP's PFAS definition unworkable, reasoning that it "will inevitably lead to squabbles about whether [the NJDEP has] a reasonable belief or what has been detected in a sample." [*Id.*] The Special Master also noted that the NJDEP's proposed PFAS definition would assist it "to identify where [it] should test for PFAS to find out if PFAS is located on site and/or is being released off-site." [*Id.*] On top of those reasons, the Special Master found that EIDP had not made an undue burden argument on complying with the NJDEP's proposed PFAS definition. [*Id.*]

## A.    EIDP's Arguments

EIDP largely makes a procedural challenge to the Special Master's PFAS definition. [19-14766, Docket No. 344-1 at 8–10.] EIDP contends the Special Master lacked the authority to adopt a PFAS definition given this Court's Appointment Order that authorized him only to resolve NJDEP's discovery appeal. [*Id.* at 9.] According to EIDP, the Special Master only had the power to help the parties' resolve their dispute and make a non-binding recommendation on a PFAS definition. [*Id.*] Because

this Court's Order did not grant the Special Master authority to override Magistrate Judge Clark's discovery ruling, the argument goes, the Special Master exceeded his authority, and therefore, the Court must set aside the Special Master's PFAS definition. [*Id.* at 9–10.]

With the Special Master's PFAS definition gone, EIDP argues the case procedurally resorts back to NJDEP's original appeal of Magistrate Judge Clark's ruling. [*Id.* at 10–16.] Given that posture, EIDP contends Magistrate Judge Clark's ruling must be upheld unless the Court finds he abused his discretion. [*Id.* at 10–11.] EIDP points out that before Magistrate Judge Clark, NJDEP never raised a relevancy or proportionality argument about any PFAS not identified in its Complaint. [*Id.* at 11–12.] EIDP goes onto argue that Magistrate Judge Clark properly limited NJDEP's discovery requests to require the department to have a reasonable belief a contaminant was released into the environment before it can have discovery on it. [*Id.* at 14.] EIDP argues that NJDEP never identified any other PFAS in its Complaint other than PFOA, PFOS, PFNA, and GenX. [*Id.* at 17.] To allow discovery into all PFAS, NJDEP would engage in an impermissible fishing expedition. [*Id.* at 15, 18.] EIDP contends Magistrate Judge Clark recognized this, and thus, properly narrowed discovery to require NJDEP to have a reasonable belief that a contaminant was released. [*Id.* at 16.]

Even if this Court reviews either the Special Master's or Magistrate Judge Clark's rulings anew, EIDP argues the Court still should reject NJDEP's proposed PFAS definition. [*Id.* at 17–23.] EIDP again reiterates that NJDEP only lists four types

6

of PFAS in its Complaint— PFOA, PFOS, PFNA, and GenX—and explains NJDEP cannot use discovery as a vehicle to develop new claims against it. [*Id.* at 18.] Pointing to the Court's decision in *Bond v. Solvay Specialty Polymers, USA, LLC*, 583 F. Supp. 3d 643 (D.N.J. 2022), EIDP argues that NJDEP's generic use of the phrase "PFAS" in the Complaint does not justify unlimited discovery into all PFAS substances. [*Id.* at 19.] And pointing to a Vermont trial court decision in *Vermont v. 3M Company*, No. 547-6-19 (Vt. Sup. Ct. Feb. 16, 2023), EIDP argues the proper course is to limit discovery on PFAS that can be verified by testing. [*Id.* at 21.] EIDP explains that NJDEP agrees that certain PFAS cannot be tested in the environment. [*Id.*] At any rate, EIDP argues NJDEP's proposed PFAS definition is unworkable since it will not help it prove its claims. [*Id.* at 22.] EIDP contends the sought after discovery is irrelevant because NJDEP's proposed PFAS definition that requires EIDP to turn over discovery on chemicals that are being lawfully stored and handled will not prove that those chemicals were released or discharged into the environment. [*Id.*]

### B.    NJDEP's Arguments

Starting with EIDP's procedural arguments, NJDEP contends EIDP seeks to improperly limit the Special Master's authority. [19-4766, Docket No. 368 at 7–11.] NJDEP contends that Federal Rule of Civil Procedure 53 and this Court's Appointment Order gave the Special Master the authority to resolve the parties' discovery disputes. [*Id.* at 7–8.] What is more, NJDEP asserts EIDP conflates the discovery order under review—Magistrate Judge Clark's 2022 discovery order or the

Special Master's PFAS definition. [*Id.* at 8–11.] NJDEP explains that Judge Clark's 2022 discovery order concerned discrete interrogatories but the Special Master's ruling on the PFAS definition arose in response to objections to Rule 30(b)(6) deposition topics. [*Id.*] According to NJDEP, the parties fully resolved NJDEP's appeal of Magistrate Judge Clark's discovery rulings, and thus, EIDP cannot reopen that appeal. [*Id.* at 9–10.]

Because EIDP can only challenge the Special Master's PFAS definition, NJDEP contends the abuse of discretion standard applies to the Special Master's decision. [*Id.* at 12–15.] Under that deferential standard, NJDEP argues this Court should adopt the Special Master's PFAS definition. [*Id.* at 15–25.] NJDEP asserts the Special Master thoroughly considered its claims and the relief it seeks. [*Id.* at 16–17.] NJDEP faults EIDP for taking a stingy view of its claims by focusing only on the department's natural resource damage claims and ignoring the others. [*Id.* at 17–18.] NJDEP explains that its Complaint its replete with allegations concerning PFAS contamination. [*Id.* at 18.] It goes onto explain that it seeks an injunction to prohibit all PFAS releases into the environment. [*Id.* at 19.]

Turning to EIDP's reliance on *Bond* and *3M*, NJDEP contends those cases are different. [*Id.* at 19–20.] NJDEP explains *Bond* is about a motion to dismiss in a personal injury case where the plaintiffs failed to plead enough allegations that "toxins" other than PFNAs and PFOAs proximately caused their injuries. [*Id.* at 21–22.] For *3M*, NJDEP asserts that case involved only natural resource damages. [*Id.* at

20.] Unlike *Bond* and *3M*, NJDEP brings natural resource damages claims and seeks injunctive relief. [*Id.* at 20–21.] In addition, the Chambers Works site is unique because EIDP accepted and treated PFAS at that site even though the PFAS was manufactured elsewhere. [*Id.*]

Finally, NJDEP contends EIDP has never raised an undue burden challenge to the department's discovery requests on PFAS. [*Id.* at 21–22.] NJDEP explains that the Special Master's PFAS definition is proportional to the needs of the case and limited to the Chambers Works site. [*Id.* at 22.] It also points out that EIDP's definition is impractical and overly restrictive. [*Id.* at 23.] For example, NJDEP notes that EIDP admits that certain PFAS will change its chemical structure when released into the environment. [*Id.* at 24.] Thus, EIDP proposed PFAS definition that imposes a detection in a known sample component will be unworkable. [*Id.*] This is so because "[t]he release of a certain PFAS does not directly translate into the ability to test for that particular PFAS in the environment." [*Id.*]

## C.    Analysis

For starters, at oral argument, the Court questioned whether EIDP's challenge presents a live controversy if EIDP has been complying with Special Master Order No. 2 and had produced responsive documents. EIDP's counsel admitted that it had complied with that Order, turning over millions of documents. [19-14766, Docket No. 450; 19-14758, Docket No. 481, Transcript of December 18, 2024 Oral Argument and Status Conference ("Tr.") at 16:4–15.] Yet EIDP still pressed its appeal, arguing that

9

this Court needs to resolve the parties' PFAS definition dispute given upcoming Rule 30(b)(6) depositions. Accordingly, to avoid further disagreement and to resolve the disputes on deposition subjects, the Court considers the merits of EIDP's challenge to the Special Master's PFAS definition.

First, the Court rejects EIDP's procedural arguments that the Special Master had no authority to resolve NJDEP's appeal of Magistrate Judge Clark's discovery ruling. Unless limited by the appointment order, Federal Rule 53 confers broad powers on Special Masters to, among other things, "regulate all proceedings" and "take all appropriate measures to perform the assigned duties fair and efficiently[.]" FED R. CIV. P. 53(c)(1)(A)–(B). This Court's Appointment Order did not limit the Special Master's authority, rather, the order gave the Special Master the power "to perform non-dispositive case management[,]" which includes discovery. [19-14766, Docket No. 292.] The Court also referred NJDEP's appeal of Magistrate Judge Clark's discovery ruling to "the Special Master for resolution." [19-14758, Docket No. 380.] Thus, the Special Master had the authority to adjudicate NJDEP's appeal of Magistrate Judge Clark's discovery ruling on the PFAS definition and adopt a new one. What is more, is that when trying to resolve the PFAS definition, EIDP proposed definitions that varied from Magistrate Judge Clark's definition and urged the Special Master to adopt its definition. So EIDP's conduct undermines its claims the Special Master had no authority to resolve the parties' PFAS definition dispute.

Second, irrespective of the standard of review that applies, the Court adopts the Special Master's PFAS definition. Discovery in federal litigation is broad. *Lawson v.*

*Praxair, Inc.*, 2023 WL 7170273, at *3 (D.N.J. Apr. 28, 2023). By Rule 26, litigants "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" FED. R. CIV. P. 26(b)(1). To define the scope of discovery, courts must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

"Relevance is a broader inquiry at the discovery stage than at the trial stage … and [i]nformation within the scope of discovery need not be admissible in evidence to be discoverable." *Deibler v. SanMedica Int'l, LLC*, 2021 WL 6198062, at *4 (D.N.J. Dec. 30, 2021) (citations and internal quotation marks omitted, alteration in original). "While relevant information need not be admissible, the burden remains on the party seeking discovery to show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Becton, Dickinson & Co.*, 2019 WL 1771996, at *3 (D.N.J. Apr. 23, 2019) (citation and internal quotation marks omitted). Rule 26 relevance depends on the context of each case, and whether information is relevant for discovery purposes falls within the District Court's discretion. *Takahashi v. Cuyco*, 2019 WL 2028715, at *2 (D.N.J. May 8, 2019).

Against that backdrop, the Special Master's PFAS definition will lead to the discovery of information relevant to NJDEP's claims. NJDEP brings natural resource

11

damage claims against EIDP for releasing PFAS into the environment and seeks an injunction to prevent EIDP from doing so. NJDEP's environmental claims are about PFAS contamination. While NJDEP identifies four specific types of PFAS in its pleading—PFOA, PFNA, PFOS, and GenX, NJDEP alleges contamination by other "PFAS compounds." [TAC ¶¶ 4–7.] Indeed, NJDEP alleges that "PFAS compounds, including PFOA and GenX, emitted from Chambers Works are air contaminants that have, upon information and belief, caused air pollution by contaminating drinking water wells as far as five miles away (and possibly farther) from Chambers Works[.]" [*Id.* ¶ 394.] "[D]iscovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Indeed, at oral argument, EIDP admitted that NJDEP's claims are broader. [Tr. at 15:15–19.] As the Special Master put it, the PFAS definition he adopted will help NJDEP "identify where [it] should test for PFAS to find out if PFAS is located on site and/or is being released off-site." [SM Order No. 2 at 3.] A broad PFAS definition will help NJDEP to define and clarify the severity of PFAS contamination at Chambers Works. Thus, the Special Master's PFAS definition will lead to the discovery of relevant information to NJDEP's claims.

Turning to the scope of discovery, several Rule 26 proportionality factors support adopting the Special Master's PFAS definition. Indeed, as this Court noted at oral argument and EIDP agreed, EIDP is in the best position to know what PFAS are at Chambers Works, how those substances are handled, and how they can be released into the environment through, among other things, EIDP's use, storage, manufacture,

processing, treatment, and so on. [Tr. at 13:22–25]; FED. R. CIV. P. 26(b)(1) (requiring courts to consider "the parties' relative access to relevant information"). Indeed, EIDP operated the Chambers Works site for over a hundred years. [TAC ¶¶ 73–74.] Moreover, as alleged by NJDEP, EIDP operated Chambers Works like a clearinghouse for PFAS by using the site to accept PFAS manufactured at other EIDP facilities or from third parties, like 3M. [*Id.* ¶ 118.] Simply stated, EIDP should know what PFAS are at Chambers Works.

And as the Special Master recognized, "this case involves issues of immense importance to the public at large and to the general health and safety of those that may be impacted by PFAS at and from the site." [SM Order No. 2 at 3.] Again, NJDEP ultimately seeks a judgment to compel EIDP to remediate Chambers Works to rid it of PFAS contamination, and to prevent EIDP from releasing all PFAS compounds into the environment.

This Court thus rejects EIDP's proposed PFAS definition for the same reasons the Special Master did. On top of those reasons, EIDP's known sample requirement is unworkable given the chemical composition of certain PFAS. All agree that publicly available testing cannot detect all PFAS in the environment or that technology is not yet available. All agree also that certain PFAS change their chemical composition during a manufacturing process or when introduced into the environment. Given those testing and chemical composition issues, EIDP's proposed definition may not capture all the PFAS released at Chambers Works.

Likewise, EIDP's reliance on *Bond* and *3M* are misplaced. Unlike *Bond*, the plaintiff here is a state regulator seeking to hold a company liable for environmental contamination and prevent future occurrences through an injunction. And while *3M* concerned natural resource damage claims, that case did not involve a unique site like Chambers Works. Nor does *3M* address a state regulator's discovery needs in a PFAS contamination case. It is also unclear whether the state agency in *3M* sought an injunction to stop the release of PFAS like NJDEP does here. So *3M* is unpersuasive. Accordingly, the Court **DENIES** EIDP's objections to Special Master Order No. 2 and **ADOPTS** the Special Master's PFAS definition.

## III.    SPECIAL MASTER ORDER NO. 3

Special Master Order No. 3 concerns the discoverability of letters of non-applicability ("LNAs") issued by NJDEP concerning whether certain corporate sales, transfers, or changes in control affected by the regulated community triggered the obligations of New Jersey's Industrial Site Recovery Act ("ISRA") under which NJDEP brings claims against Defendants. [TAC ¶¶ 343–78.] ISRA mandates that when a company transfers "ownership or operations" of a contaminated "industrial establishment," it must establish a remediation funding source at the time of the transfer and ensure that "contaminated property is not abandoned to the State for cleanup." N.J.S.A. 13:1K-7, 13:1K-9.

It is not always clear when an ownership transfer of a contaminated industrial site triggers ISRA obligations. So, members of the regulated community intending to

14

affect an industrial site transfer used to be able to submit a letter to NJDEP advocating that a contemplated corporate transaction did not trigger ISRA or its predecessor statute. If NJDEP agreed, it would issue an LNA. NJDEP issued over 87,000 LNAs between the mid-1980s and 2008. They exist only in microfiche format. They were never otherwise publicly published. NJDEP concedes that the LNAs themselves are not privileged.

NJDEP mostly stopped its practice of issuing LNAs by 2008. Occasionally, however, it would respond to a request from a member of the regulated community. For example, in 2012, the ConocoPhillips Corporation intended to affect a corporate restructuring (the "ConocoPhillips Restructuring") and solicited an LNA from NJDEP. NJDEP issued an LNA agreeing with ConocoPhillips that its proposed restructuring would not trigger ISRA. EIDP apparently relied on the ConocoPhillips LNA when planning its own corporate restructuring in 2015 (the "2015 Reorganization") whereby it would transfer the Chambers Works site to the Chemours Company. EIDP worked closely with NJDEP on the Reorganization and was allegedly told by Richard Engel, an attorney for NJDEP, that the 2015 Reorganization would not trigger ISRA as long as the Restructuring mirrored the ConocoPhillips Restructuring. NJDEP's operative complaint brings an ISRA claim against EIDP alleging that the 2015 Reorganization did, in fact, trigger ISRA obligations.

EIDP maintains that the 2015 Reorganization is analogous to the ConocoPhillips Restructuring as well as six other corporate reorganizations for which

NJDEP issued LNAs and which EIDP has in its possession. Therefore, EIDP argues, NJDEP's application of ISRA in this case is arbitrary and capricious.

EIDP served NJDEP with a notice of deposition pursuant to Rule 30(b)(6) seeking testimony and supporting documents regarding:

> Topic 42: All ISRA LNAs issued by the DEP, including but not limited to the LNAs for ConocoPhillips, General Motors, James River, PSE&G, and General Dynamics. This topic includes DEP's interpretation of the factors under each of the asserted ISRA exceptions (corporate reorganization, common ownership, and indirect ownership), including "diminution of value" or "diminution of net worth" in the context of these LNAs."

[19-14766, Docket No. 387-2, Declaration of David A. Haworth in Support of Defendants' Objections to and Appeal of Special Master Order No. 3 ("Haworth Decl., Order No. 3"), Ex. A.] NJDEP objected because (i) the burden of producing 87,000 LNAs stored on microfiche would be undue; (ii) corporate representative testimony regarding NJDEP's interpretation of the LNAs would be protected by the deliberative process privilege; and (iii) that production of the 87,000 LNAs was not relevant because EIDP did not rely on any LNA other than the ones already in its possession (including the ConocoPhillips Restructuring LNA) to affect the 2015 Reorganization. [Haworth Decl., Order No. 3, Exs. C, E.] Defendants raised a dispute with the Special Master. [Haworth Decl., Order No. 3, Ex. D.]

The Special Master heard oral argument and rendered his ruling by email on August 27, 2024, summarily sustaining NJDEP's objections to Topic No. 42. [Haworth Decl., Order No. 3, Ex. K.] In a separate email ruling that same day on Plaintiffs' objections to Defendants' proposed ISRA custodians, the Special Master

16

explained that discovery on every single LNA NJDEP had ever issued would be "marginally and minimally relevant" and unduly burdensome because EIDP already has in its possession the LNAs it allegedly relied upon in structuring the 2015 Reorganization avoid application of ISRA. [Haworth Decl., Ex. J at 2.] The Special Master advised the parties that if they wanted a more formal order to be filed on the docket to let him know. [*Id.* at 1.]

The Special Master requested additional briefing on the remainder of EIDP's proposed ISRA 30(b)(6) topics and held oral argument. At oral argument, counsel for EIDP asked the Special Master whether, in issuing a written order on the remaining ISRA 30(b)(6) topics, the Special Master would also include his ruling on Topic No. 42 so that Defendants could have a single order from which to appeal to this Court. The Special Master stated he did not intend to do so because EIDP waited too long. [Haworth Decl., Ex. M at 53:7–12.] The Special Master then issued Order No. 3 denying EIDP's request that he issue a formal written order because EIDP waited over two months to request a formal order on the August rulings. [19-14766, Docket No. 373.]

## A.   Analysis

EIDP argues that Order No. 3 should be vacated because the Special Master was obligated under Federal Rule 53(d) to render a formal ruling on his decision to deny EIDP access to the 87,000 LNAs and because, on the merits, those LNAs are relevant to its arbitrary and capricious defense and would not be unduly burdensome

to produce. The Court will address EIDP's defenses on the merits and **ADOPT** the Special Master's rulings.

EIDP argues that the seven LNAs it already has in its possession and which it relied on in carrying out the 2015 Reorganization—including the 2012 ConocoPhillips Restructuring LNA—are not enough. They need all 87,000 LNAs because they are "the primary precedent available for the interpretation of many of the ISRA regulations." [19-14766, Docket No. 387-1 at 28.] And so, EIDP argues, it should be allowed to review each of these LNAs to determine how NJDEP previously interpreted the same ISRA regulations at issue here. Limiting EIDP to the seven LNAs it already has in its possession, it argues, would be the equivalent of "limiting a party to only those legal cases that it cited in its original letter of complaint throughout the course of an entire case, rather than allowing the party to search all the authority in Westlaw or Lexis to find and cite any and all relevant authority." [*Id.* at 30.]

The Court disagrees. As the Court noted at oral argument, EIDP's request for the additional 87,000 LNAs is irrelevant, cumulative, and unduly burdensome. [Tr. at 64:24–65:1, 71:12–72:2.] The request is irrelevant because EIDP did not rely on any of the 87,000 LNAs to structure the 2015 Reorganization other than the seven in its possession. If EIDP's arbitrary and capricious defense (to the extent it applies) is that it structured the 2015 Reorganization to mirror other corporate reorganizations which NJDEP found did not trigger ISRA, EIDP only needs discovery on the reorganizations it in fact relied upon to structure the 2015 Reorganization.

18

The request is cumulative because EIDP already has seven LNAs—including the ConocoPhillips Restructuring LNA—it says are analogous to or distinguishable from the 2015 Reorganization and which were relied upon to structure the Reorganization. How many more LNAs does it need to make its point that the Department treated the 2015 Reorganization differently from other similarly structured transactions? Defendants' analogy that limiting the universe of LNAs Defendants can rely upon in establishing its ISRA defense would be equivalent to limiting the universe of cases Defendants can cite in a legal brief is unpersuasive. The Special Master's Order does not limit Defendants to anything more than the documents they relied upon in structuring their Reorganization.

Finally, the request is unduly burdensome. There are over 87,000 LNAs. They are all on microfiche dating back to the mid-1980s. The Court questions whether Defendants' have a good faith basis to look through those LNAs in the hopes of finding other similar spin-off transactions that did not trigger ISRA. *See* FED. R. CIV. P. 26(b)(1) (burden or expense of proposed discovery must outweigh its likely benefit). As the Court explained at oral argument, if Defendants can demonstrate a good faith basis that there are other LNAs in addition to those already in its possession that address similarly situated spin-off transactions, it may seek discovery into those LNAs with the permission of the Special Master. [Tr. at 72:10–20.] But without more at this time, the Court will not sanction a fishing expedition into the remaining 87,000 LNAs.

## IV.    SPECIAL MASTER ORDER NO. 4

This dispute concerns whether certain ISRA 30(b)(6) topics (the "Topics") are protected by the deliberative process privilege, specifically, NJDEP's analysis and communications, including external communications, relating to the 2015 Reorganization.

- In Topics 36, 37, Defendants seek testimony concerning NJDEP's analysis and communications regarding the applicability of ISRA at Chambers Works prior to and following each alleged ISRA trigger;

- In Topics 38 and 39, Defendants seek testimony concerning NJDEP's analysis and communications about the remediation funding source ("RFS") amount;[1]

- In Topic 40, Defendants seek NJDEP's analysis, communications, and drafts to a letter that EIDP sent to NJDEP detailing why the 2015 Reorganization did not trigger ISRA;

- In Topic 41, Defendants seek testimony concerning NJDEP's analysis and decision that the 2015 Reorganization was not the same as the corporate restructurings that NJDEP analyzed in its LNAs to ConocoPhillips, General Motors, James River, PSE&G, and General Dynamics; and

- In Topic 44 Defendants seek testimony concerning NJDEP's analysis, communications, and understanding regarding the applicability of the Resource Conservation and Recovery Act ("RCRA") to Chambers Works and the scope of the RCRA/HSWA Permit and the GPRA 2020 Corrective Action Program.[2]

---

[1] Plaintiffs seek over $1 Billion for to establish an RFS and assert that Defendants' proposed RFS is not sufficient.

[2] Under ISRA, a site that is covered by other state or federal programs, such as RCRA or the GPRA 2020 Corrective Action Program, may be exempt from the definition of an industrial establishment and therefore does not have to comply with ISRA regulations. N.J.S.A. 13:1K-8. Plaintiffs claim that Chambers Works is not entirely subject to RCRA.

Plaintiffs were unwilling to produce any 30(b)(6) witnesses on any of these ISRA topics, arguing that the topics sought irrelevant information and/or were protected by privileges, including the deliberative process privilege, attorney-client privilege, and the work-product doctrine. Defendants raised a dispute with the Special Master.

The Special Master issued Order No. 4, which sustained Plaintiffs' objections to Topics 36–40 and 44 and overruled Plaintiffs' objection to Topic 41. [19-14766, Docket No. 433 ("SM Order No. 4").] The Special Master found that NJPED properly asserted the deliberative process privilege as to Topics 36–40 and 44 because those topics seek information that is both pre-decisional and deliberative which would expose the Department's reasoning related to the applicability of ISRA, and whether and what remediation was required. And given that the Topics, as drafted, necessarily sought deliberative information, there would be no need to go through the formality of requiring NJDEP to assert a formal claim of deliberative process privilege during the questioning of a Rule 30(b)(6) deponent. [*See* SM Order No. 4 at 7 (citing cases limiting deposition topics in advance of a deposition where the noticed topics necessarily covered privileged material).] The Special Master additionally found that EIDP could not establish a need for testimony on the Topics that overrode the Department's interest in the confidentiality of its decision-making. He acknowledged that some non-privileged factual information might be discovered through the Topics but that such information has and will be obtained from other sources such as fact depositions, documents, and responses to interrogatories. [*Id.* at 8.] Thus, the Special

21

Master held, in the alternative, that the burden and expense of the requested discovery would be disproportional to the minimal potential benefit of the discovery because the information sought would likely be cumulative of the extensive discovery that has or will be taken. [*Id.* at 8–9.]

The Special Master, however, overruled Plaintiffs' objection to Topic 41—Defendants would be permitted to depose a 30(b)(6) witness regarding the Department's analysis and decision that the 2015 Reorganization was not the same as the corporate restructurings that NJDEP analyzed in its LNAs to ConocoPhillips, General Motors, James River, PSE&G, and General Dynamics. [*Id.* at 9.] Questioning a 30(b)(6) deponent on Topic 41 would be proper based on Defendants' repeated emphasis that the "LNA issue is central to their ISRA defense" and the Special Master's desire to "assure that defendants have a complete opportunity to create a record to support their defense." [*Id.*] Further, Topic 41, the Special Master noted, would be limited to a discrete subject area and time frame. [*Id.*] The Special Master predicted, however, that deposition testimony on Topic 41 would be "replete with privilege objections" but that those objections "can and will be addressed in the usual course." [*Id.*]

## A.    Analysis

EIDP raises a host of objections to Order No. 4. *First*, it argues that the Department did not carry its burden of establishing that the deliberative process privilege applied in the first place because NJDEP's Chief Legal & Regulatory Affairs Advisor, Paul Stofa, who submitted an affidavit averring that the privilege applied,

made only conclusory statements, and reviewed only examples of documents that might be protected by the privilege. [19-14758, Docket No. 442-2, Certification of David A. Haworth Declaration of David A. Haworth ("Haworth Decl., Order No. 4"), Ex. L.] *Second*, even if Mr. Stofa did properly assert the privilege, the Special Master improperly found that the Topics covered pre-decisional and deliberative material. *Third*, EIDP argues that the Special Master improperly interpreted the Topics too narrowly to include only Plaintiffs' internal analysis and communications and exclude any external communications which would not be privileged. *Fourth*, Defendants argue that the Special Master erred by holding, in the alternative, that the burden and expense of preparing a Rule 30(b)(6) witness on each of the Topics would be disproportionate to any benefit because fact depositions, documents, or responses to interrogatories are not adequate substitutes to the question-and-answer procedure of a 30(b)(6) deposition. *Fifth*, Defendants argue that the balance of the equities favor disclosure (*i.e.*, they have a compelling need for the information, even if privileged). *Finally*, Defendants argue that the Special Master's ruling was premature because the only way to fairly determine whether the deliberative process privilege applies is to require Plaintiffs to make a claim of privilege in response to specific questions posed to its 30(b)(6) witness. The usual rule, EIDP contends—and as the Special Master applied with respect to Topic 41—is to require the deliberative process privilege to be asserted in response to specific deposition questions rather than as a blanket objection to quash a proposed 30(b)(6) deposition topic altogether.

For the reasons more fully discussed at oral argument, the Court rejects Defendants' objections, and will **ADOPT** the Special Master's Order.

To properly invoke the deliberative process privilege there are three requirements. One is procedural. Two are substantive. The procedural requirement is that, to invoke the protections of the privilege, the head of an agency with control over matter must make a formal assertion of privilege providing precise and certain reasons for asserting the confidentiality over the material sought and identifying and describing the information or documents sought to be shielded. *See United States v. Ernstoff*, 183 F.R.D. 148, 152 (D.N.J. 1998). The substantive requirements are that the information sought to be shielded must be both (1) predecisional; and (2) deliberative. *Educ. L. Ctr. v. N.J. Dep't of Educ.*, 198 N.J. 274, 286 (2009). Information is pre-decisional if it is "generated before the adoption of an agency's policy or decision." *In re Liquidation of Integrity Ins. Co.*, 165 N.J. 75, 84 (2000). And information is deliberative if it is "part of a process by which governmental decisions and policies are formulated," *Del. Riverkeeper Network v. Del. River Basin Comm'n*, 300 F.R.D. 207, 211 (D.N.J. 2014), especially where "disclosure of materials would expose an agency's decision-making process" by exposing "the give and take of the consultative process," *id.*, where the agency is "weighing the pros and cons of ... one viewpoint or another," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

The Court agrees with the Special Master—the Topics, *as drafted*, facially seek the Department's own *internal* analysis and communications related to the

Department's reasoning behind finding that the 2015 Reorganization triggered ISRA. [*See* SM Order No. 4 at 7 (finding that the Topics as drafted "necessarily implicate privileged deliberative process information"); 19-14758, Docket No. 422-2, Declaration of David A. Haworth in Support of Defendants' Objections to and Appeal of Special Master Order No. 4 ("Haworth Decl., Order No. 4"), Ex. A. at Topics 36–40, 44 (each seeking DEP's own analysis and communications).] The Department's own internal analysis and communications lies at the core of the deliberative process privilege. It is predecisional because it was prepared before NJDEP brought this action and it is deliberative because it seeks to expose the Department's analysis and reasoning behind its finding that the 2015 Reorganization triggered ISRA. *See Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992); *Hall & Assocs. v. United States Env't Prot. Agency*, 633 F. Supp. 3d 35, 61 (D.D.C. 2022) (predecisional analysis pertaining to ongoing enforcement action is "core deliberative-process material").

NJDEP properly asserted the privilege through its Chief Advisor of Legal and Regulatory affairs, Mr. Stofa. *See United States v. Ernstoff*, 183 F.R.D. 148, 152 (D.N.J. 1998) (to invoke deliberative process privilege, head of department with control over matter must make a formal assertion of privilege providing precise and certain reasons for asserting the confidentiality and identify and describe the information or documents sought to be shielded). His assertion of the privilege was broad, but it was not conclusory—especially considering the overbroad sweep of the Topics. He explained that the Department's analysis and communications related to the 2015

25

Reorganization "are the types of pre-decisional, deliberative communications that NJDEP employees engage in with the expectation that they will not be subject to disclosure" and that it was "important to protect such communications from disclosure as the Department's employees should be able to candidly and freely deliberate with each other and with their legal representatives when making regulatory decisions." [Haworth Decl., Order No. 4, Ex. L at 2.] EIDP complains that Mr. Stofa only reviewed example documents. But where, as here, the Topics as drafted *necessarily* implicate the deliberative process privilege, the Court believes it is unnecessary to subject Mr. Stofa to a burdensome process of compiling and reviewing every single document possibly implicated by the Topics and logging those documents on a privilege log.[3]

Having found that the Topics sought internal, predecisional, deliberative material and that NJDEP properly asserted privilege in response to the Topics, the Court has little trouble in concluding that requiring a deposition-and-objection procedure before allowing NJDEP to assert the privilege would be futile. To be sure, some courts have required a deposition-and-objection procedure to flesh out an invocation of the deliberative process privilege. *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 33 F. Supp. 3d 914, 917 (S.D. Ohio 2014). But as the Special Master correctly

---

[3] The Court also finds no good reason to pierce the privilege after balancing the equities. Piercing the deliberative process privilege is a high hurdle applying in only "exceptional" cases. *Educ. L. Ctr.*, 198 N.J. at 287 (explaining that "in all but exceptional cases it is considered against the public interest to compel the government to produce" material protected by the deliberative process privilege). EIDP fails to make the requisite showing of "overriding need" to surmount that high hurdle. *Id.*

found, none of these cases sought to depose a 30(b)(6) witness regarding deposition topics that, as drafted, sought facially privileged material. Instead, and as here, where noticed deposition topics necessarily implicate or seek privileged information, the proper procedure is to quash or limit the topic prior to the deposition. *See Yost v. Anthem Life Ins. Co.*, 2019 WL 3423429, at *13 (M.D. Pa. July 29, 2019). Here, and as the Department argues, it is "impossible to conceive of questions about NJDEP's predecisional 'analysis" and related 'communications' that would not be subject to a privilege objection." [19-14758, Docket No. 448 at 38–39.] Quashing the Topics without a deposition-and-objection procedure was not error.[4]

In sum, Defendants' challenge to the Special Master's Order fails because the Topics, as drafted, implicate core material shielded by the deliberative process privilege. The Court does acknowledge that Defendants drafted the Topics early in this litigation without the benefit of much of the now-completed document discovery. So, as the Court explained at oral argument, it will allow Defendants to propound additional interrogatories or conduct depositions upon written question under Federal Rule 31 to uncover any ***non-privileged factual*** gaps related to the Topics that they have a ***good faith basis*** for believing that they do not already have. [Tr. 56:22–57:17, 72:25–73:22.] To be clear, this is not the chance for a do-over. Defendants cannot simply re-advance the quashed Topics or re-word the Topics to seek material protected by the

---

[4] Having found the Special Master's reasoning sound, the Court need not address his alternative holding, that the burden and expense of the requested discovery is disproportional to the minimal potential benefit of the discovery.

27

deliberative process privilege. Any interrogatories or written deposition questions must be tailored extremely narrowly to seek discoverable facts related to the Topics rather than privileged analysis, or internal communications.

## V.     CONCLUSION

For the reasons stated above, the Court will **ADOPT** each of the Special Master's Orders. An appropriate Order follows.

**December 31, 2024**                          **s/Renée Marie Bumb**
Date                                                     RENÉE MARIE BUMB
                                                             Chief United States District Judge