**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs*

By:     Gwen Farley
         Deputy Attorney General
         Attorney ID No. 000081999
         Ph. (609) 376-2740
         Gwen.Farley@law.njoag.gov

**KELLEY DRYE & WARREN LLP**
One Jefferson Road
Parsippany, New Jersey 07054
*Special Counsel to the Attorney General*

By:     Geoffrey W. Castello, Esq.
         Ph. (973) 503-5900
         GCastello@kelleydrye.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> E. I. DU PONT DE NEMOURS AND COMPANY, et al., <br><br> Defendants. | Civil Action No. 1:19-cv-14766-RMB-JBC <br> Hon. Renée Marie Bumb, Chief U.S.D.J <br><br> **PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO STRIKE PLAINTIFFS' JURY DEMAND** <br><br> **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD............................................................................................... 4

ARGUMENT ............................................................................................................ 5

    I.    The State's Environmental Claims Present Legal Issues That Must Be Tried Before a Jury............................................................................. 5

        A.    The State is Entitled to Try Its Common Law Claims to a Jury............................................................................................. 6

        B.    Future Remediation and Primary Restoration Natural Resource Damages Are Legal Remedies. ...................................... 8

        C.    Compensatory Restoration Natural Resource Damages Are Legal Remedies.......................................................................... 15

        D.    Civil Penalties and Punitive Damages Are Legal Remedies. ...... 18

    II.    The State's Legal Claims Must Be Tried First. ...................................... 25

        A.    There Is No Factual or Precedential Basis for DuPont's Proposed Bifurcation of Remediation and Natural Resources Damages Claims....................................................... 26

        B.    Defendants Do Not Meet the High Bar Set Out in *Beacon* for the "Imperative Circumstances" Exception. ......................... 28

        C.    Hearing Legal Claims First Promotes Efficiency. ...................... 30

CONCLUSION......................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Acushnet River & New Bedford Harbor Proc.*,
481 U.S. 417–18 ...............................................................................................17, 19

*Alcoa, Inc. v. Alcan Rolled Prods.-Ravenswood LLC*,
439 F. Supp. 3d 325 (D. Del. 2020)...................................................................27

*re Alleged PCB Pollution*,
712 F. Supp. 994 (D. Mass. 1989) ..............................................................17, 18

*AstenJohnson, Inc. v. Columbia Cas. Co.*,
562 F.3d 213 (3d Cir. 2009)...............................................................................26

*Beacon Theatres, Inc. v. Westover*,
359 U.S. 500 (1959)..............................................................................4, 28, 29

*Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*,
801 F.3d 347 (3d Cir. 2015)...............................................................................22

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
494 U.S. 558 (1990)......................................................................................12, 13

*City of New York v. Chem. Waste Disposal Corp.*,
836 F. Supp. 968 (E.D.N.Y. 1993) .....................................................................10

*In re City of Philadelphia Litigation*,
158 F.3d 723 (3d Cir. 1998)................................................................................5

*Curtis v. Loether*,
415 U.S. 189 (1973).............................................................................................4

*Dairy Queen, Inc. v. Wood*,
369 U.S. 469 (1962)...........................................................................................29

*Dep't of Transp. v. PSC Res., Inc.*,
175 N.J. Super. 447 (Law Div.1980) ..................................................................18

*Great–W. Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002)......................................................................................12, 13

*Hatco Corp. v. W.R. Grace & Co. Conn.*,
59 F.3d 400 (3d Cir. 1995)..................................................................................10

*Kairys v. S. Pines Trucking, Inc.*,
    75 F.4th 153 (3d Cir. 2023) ...................................................................26

*In Matter of Kimber Petroleum Corp.*,
    110 N.J. 69 (1988) ...................................................................................9

*Laskaris v. Thornburgh*,
    733 F.2d 260 (3d Cir. 1984)....................................................................22

*Lynch v. Pan American World Airways*,
    475 F.2d 764 (5th Cir. 1973) ..................................................................22

*Marra v. Philadelphia Hous. Auth.*,
    497 F.3d 286 (3d Cir. 2007)......................................................................5

*N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp.*,
    393 N.J. Super. 388 (App. Div. 2007) ...................................8, 9, 14, 18

*New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.*,
    2018 WL 2317534 (D.N.J. May 22, 2018) ..................................... *passim*

*New Jersey Dep't of Env't Prot. v. Ventron*,
    94 N.J. 473 (1983) .................................................................................18

*Ohaus v. Cont'l Cas. Ins. Co.*,
    292 N.J. Super. 501 (App. Div. 1996) ...................................................18

*Paolino v. JF Realty*,
    2013 WL 12320080 (D.R.I. Aug. 8, 2013)........................................19, 20

*Parsons v. Bedford*,
    28 U.S. 433 (1830)....................................................................................4

*Reiner v. State of N.J.*,
    732 F. Supp. 530 (D.N.J. 1990) ...........................................................4, 29

*Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*,
    39 F. Supp. 3d 1059 (D. Ariz. 2014) ......................................................11

*Sec. & Exch. Comm'n v. Jarkesy*,
    603 U.S. 109 (2024)......................................................................5, 19, 25

*Simler v. Conner*,
    372 U.S. 221 (1962)...................................................................................5

*State, Dep't of Envtl. Prot. v. Lewis*,
    215 N.J. Super. 564 (App. Div. 1987) .......................................19, 21, 22

*Thomas v. Frank*,
791 F. Supp. 470 (D.N.J. 1992) ................................................................. 6

*Tull v. U.S.*,
481 U.S. 412 (1987) ...................................................................... *passim*

*Twp. of Haddon v. Royal Ins. Co. of Am.*,
929 F. Supp. 774 (D.N.J. 1996) ........................................................... 4, 5

*United States v. Atchison, Topeka & Santa Fe Ry. Co.*,
2003 WL 26029235 (E.D. Cal. Sep. 10, 2003), *amended by* 2009 WL
7768690 (E.D. Cal. Aug. 27, 2009) ......................................................... 11

*United States v. Northeastern Pharmaceutical & Chemical Co.*,
579 F. Supp. 823 (W.D. Mo. 1984) ......................................................... 10

*United States v. Viking Res., Inc.*,
607 F. Supp. 2d 808 (S.D. Tex. 2009) ..................................................... 17

*United States v. Wade*,
653 F. Supp. 11 (E.D. Pa. 1984) ............................................................. 11

**Statutes**

42 U.S.C. § 9607(a)(4)(A) ............................................................... 15, 16, 17

42 U.S.C. § 9607(a)(4)(B) ............................................................... 11, 16

42 U.S.C. § 9607(a)(4)(C) ....................................................................... 17

42 U.S.C. § 9613(g)(2) ............................................................................. 9

N.J.S.A. 13:1K-13.1(a) .......................................................................... 21

N.J.S.A. 58:10–23.11g(c)(1) .................................................................... 7

N.J.S.A. 58:10-23.11u ....................................................................... 19, 21

N.J.S.A. 58:10-23.11u(b) ................................................................. 15, 16, 17

N.J.S.A. 58:10-23.11u(b)(1) .................................................................. 20

N.J.S.A 58:10–23.11u(b)(4) ...................................................................... 7

N.J.S.A. 58:10A-10(a) ............................................................................ 21

N.J.S.A. 58:10A-10(c) ............................................................................ 23

N.J.S.A. 58:10A-10(e) ....................................................................... 19, 21

**Other Authorities**

9 Fed. Prac. & Proc. Civ. § 2338 (4th ed.)......................................................................28

Fed. R. Civ. P. 38(a) .............................................................................................................4

N.J.A.C. 7:26B-1.11(a) ..................................................................................................19, 21

N.J. Const. art. VIII, § 2 ¶ 9.............................................................................................23

U.S. Const. Amend. VII..........................................................................................................4

Pursuant to Case Management Order No. 5, plaintiffs the New Jersey Department of Environmental Protection ("NJDEP"), the Commissioner of the NJDEP, and the Administrator of the New Jersey Spill Compensation Fund (collectively "Plaintiffs" or the "State"), submit this response to Defendants' Motions to Strike Plaintiffs' Jury Demand as asserted in the State's Third Amended Complaint. *See* ECF 332 at 115.

## <u>INTRODUCTION</u>

Plaintiffs brought this civil action and demand for a jury trial to recover investigation and cleanup costs (for both remediation and primary restoration), damages (including compensatory damages and punitive damages), and other relief as a result of the discharges of hazardous substances and pollutants at and from the Chambers Works facility. As set forth in the State's complaint—and as will be shown at trial—E.I. du Pont de Nemours and Company ("Old DuPont") knowingly and intentionally discharged and emitted a wide variety of contaminants, including per- and polyfluoroalkyl substances ("PFAS"), into the State's environment for decades. All the while, Old DuPont and the 3M Company ("3M")—its former PFAS supplier—knew that PFAS were associated with certain cancers and other human diseases; persisted in humans and the environment; and were present in the blood of Defendants' employees, members of the surrounding communities, and Americans nationwide. Old DuPont and 3M continued to manufacture and discharge massive amounts of PFAS, notwithstanding this knowledge, in order to reap the associated profits—which were enormous. Then, in an attempt to sidestep its cleanup obligations, Old DuPont transferred ownership of Chambers Works to the Chemours Company ("Chemours") in 2015 without posting a remediation funding source as required by New Jersey's Industrial Site Recovery Act ("ISRA")—which was specifically designed to prevent polluters such

as Old DuPont from transferring contaminated sites without first posting the funds necessary to clean up their mess.

This case is about more than Defendants' strict liability remediation obligations. This case is also about Old DuPont's decades of misconduct—misconduct that gives rise to legal relief in the form of, among other things, punitive damages, penalties, and disgorgement of ill-gotten gains. To that point, Plaintiffs' complaint raises a host of statutory and common law claims that provide a mixture of legal and equitable remedies. ECF 332 at ¶¶ 309–514.  Where—as here—a plaintiff's claims are associated with both legal and equitable remedies, controlling Third Circuit precedent, discussed *infra*, instructs that the plaintiff is entitled to first try its legal claims to a jury.

Given the Third Circuit's mandate, in their forthcoming letter regarding trial sequencing, Plaintiffs propose a simultaneous jury and bench trial on five select claims in their complaint associated with legal remedies ("Phase I") followed by a bench trial on all remaining claims ("Phase II"). Even though additional claims in Plaintiffs' complaint are also associated with legal remedies, in the interest of efficiency, Plaintiffs are willing to limit Phase I to their statutory claims arising under the Spill Compensation and Control Act ("Spill Act"), the Water Pollution Control Act ("WPCA"), and ISRA, and to their common law claims for negligence/gross negligence and failure to warn, all of which derive from the same core set of facts. *See* Declaration of Geoffrey W. Castello ("Castello Decl."), Ex. 1 (Plaintiffs' "Phase I Trial Plan"). Each of these claims is associated with legal remedies that must be tried to a jury. For Plaintiffs' statutory claims, in particular, such legal remedies include future cleanup and removal costs, compensatory damages, legal disgorgement, and penalties. To further streamline the proceedings, Plaintiffs are willing to reserve their common law claims against Chemours, the Chemours Company FC, LLC ("Chemours FC"), and DuPont Specialty Products ("DSP") for Phase II of the trial so that the jury

can focus on the conduct of Old DuPont and 3M through 2015. Meanwhile, during Phase I, the Court can address the equitable remedies arising from Plaintiffs' select statutory claims for which all Defendants are jointly and severally liable.

Contrary to the case law and relevant statutes, Defendants argue that Plaintiffs have ***no*** right to trial by jury. DuPont[1] and 3M filed separate Motions to Strike Plaintiffs' Jury Demand, primarily arguing that Plaintiffs' claims are entirely equitable and thus do not warrant a jury trial.[2] DuPont applies this argument to Plaintiffs' claims seeking to hold Defendants liable for the cost of remediation and restoration costs (past and future), civil penalties, and punitive damages. 3M argues that Plaintiffs' jury demand should be struck with respect to Plaintiffs' claims for remediation and restoration costs (past and future). DuPont additionally asserts that Plaintiffs' remediation claims should be severed from Plaintiffs' restoration claims and tried first.

This Court decided many of these same issues and rejected many of the same arguments made by Defendants in an earlier case: *New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.*, 2018 WL 2317534 (D.N.J. May 22, 2018) (Wolfson, Ch. J.). In *Amerada Hess*, the court surveyed the relevant law and held that the plaintiffs were entitled to a jury trial on their claims for future primary restoration costs (*i.e.*, cleanup of natural resources to their pre-discharge condition), compensatory restoration damages (*i.e.*, compensation for interim losses for the time a natural resource is contaminated), and other miscellaneous relief sought in connection with the plaintiffs' common law claims, including punitive damages. *Id.* at *12. In their Motions to Strike, Defendants

---

[1]    One motion was filed by Old DuPont, Chemours, Chemours FC, DSP, Corteva, Inc., and DuPont de Nemours, Inc. *See* ECF 481. These defendants will hereinafter be referred to, collectively, as "DuPont."

[2]    Due to the degree of overlap in the content of the Motions to Strike, this Omnibus Response refers to "DuPont" or "3M" only when addressing arguments unique to one Motion. Arguments asserted in both Motions are attributed to "Defendants."

attempt to discredit this Court's opinion in *Amerada Hess*. However, Defendants' arguments are based on a profound misunderstanding of the case. Plaintiffs are entitled to a jury trial, and Defendants' Motions to Strike fail to establish otherwise and should be denied.

## LEGAL STANDARD

The legal standard governing the State's right to a jury trial is well-settled. The Seventh Amendment of the U.S. Constitution provides that, "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved[.]" U.S. Const. Amend. VII. This "right of trial by jury as declared by the Seventh Amendment to the Constitution . . . is preserved to the parties inviolate." Fed. R. Civ. P. 38(a). Accordingly, a court's "discretion is very narrowly limited and must, wherever possible, be exercised to preserve [the] jury trial [right]." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959).

For nearly 200 years, the U.S. Supreme Court has interpreted the term "common law" in the Seventh Amendment to mean "not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined." *Parsons v. Bedford*, 28 U.S. 433, 446–447 (1830). Thus, the Seventh Amendment right to a jury trial applies with equal force to "statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether*, 415 U.S. 189, 193 (1973); *Tull v. United States*, 481 U.S. 412, 417 (1987).

When a statute does not expressly provide a right to a jury trial, the U.S. Supreme Court has adopted a two-part test to determine if a statutory cause of action "is more analogous to a suit brought in a court of law rather than a court of equity." *Reiner v. New Jersey*, 732 F. Supp. 530, 532 (D.N.J. 1990) (citing *Tull*, 481 U.S. at 417). "First, a court must compare 'the statutory action

to 18th century actions brought in the Courts of England prior to the merger of the courts of law and equity.'" *Id.* (quoting *Tull*, 481 U.S. at 417). This is the "historical test." *Twp. of Haddon v. Royal Ins. Co. of Am.*, 929 F. Supp. 774, 778 (D.N.J. 1996). Second, a court "must examine 'the remedy sought and determine whether it is legal or equitable in nature.'" *Reiner*, 732 F. Supp. at 532 (quoting *Tull*, 481 U.S. at 417). This is the "remedial test." *Haddon*, 929 F. Supp. at 777. Of these factors, the remedial test is more important. *Sec. & Exch. Comm'n v. Jarkesy,* 603 U.S. 109, 110–111 (2024).

Federal law governs the State's right to a jury trial in this Court. *Simler v. Conner,* 372 U.S. 221, 222 (1962) ("Only through a holding that the jury trial right is to be determined according to federal law can the uniformity in its exercise which is demanded by the Seventh Amendment be achieved."). This is true "regardless of whether the claim [at issue] arises under state law." *In re City of Philadelphia Litig.,* 158 F.3d 723, 726 (3d Cir. 1998). This is also true even if a state statute, constitution, or past practice suggests or requires that the claim be tried to the bench. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 313 (3d Cir. 2007); *Amerada Hess*, 2018 WL 2317534, at *5 n.10 ("[T]he Court will not rely upon the state authorities identified by Defendant in reaching its decision on Plaintiff's entitlements under the Seventh Amendment.").

## <u>ARGUMENT</u>

### I. The State's Environmental Claims Present Legal Issues That Must Be Tried Before a Jury.

As set out above, in Phase I, the State proposes litigating its damages claims under common law claims of negligence/gross negligence and failure to warn (as to 3M), as well as the Spill Act, the WPCA, and ISRA. The legal relief sought by the State in its Phase I claims falls into three broad categories: (i) future costs to investigate and clean up contamination and restore natural resources, including remediation and primary restoration natural resource damages; (ii)

compensatory damages, including compensatory restoration natural resource damages; and (iii) penalties, punitive damages, and disgorgement/restitution. The State's right to a jury trial may be evaluated for each category of relief sought, rather than by individual cause of action, "[a]s the focus of the Seventh Amendment inquiry is first and foremost on the nature of the relief sought, rather than the particular form of the action." *Amerada Hess*, 2018 WL 2317534, at *3.

In *Amerada Hess*—a case with many parallels—the State brought claims for past and future natural resource damages, including primary and compensatory restoration damages under the common law, the Spill Act, and the WPCA. *Id.* at *1. Based on its review of applicable federal precedent, this Court held that the State was entitled, under the Seventh Amendment, to a jury trial on its statutory and common law claims "(i) for primary restoration damages for estimated future costs not yet incurred, (ii) for compensatory restoration damages, and (iii) for all other miscellaneous legal relief sought in connection with plaintiffs' common law claims, including punitive damages." *Id.* Accordingly, "to ensure the efficient resolution of [the State's] claims while preserving [the State's] right to trial by jury," the Court bifurcated the trial proceedings into "an initial jury trial" of the claims to which the jury trial right attached and a "subsequent bench trial" on the State's remaining claims, to which no jury trial right attached. *Id.* at *1–2. This case should be no different.

### A.  The State is Entitled to Try Its Common Law Claims to a Jury.

Compensatory damages "are viewed as a legal remedy, not an equitable one." *Thomas v. Frank*, 791 F. Supp. 470, 475 (D.N.J. 1992). In Phase I, Plaintiffs' claims include an old-fashioned negligence/gross negligence claim for damages that are simply measured by (i) the costs to clean up the mess caused by Defendants' pollution, (ii) damages for the harm suffered by Plaintiffs, and (iii) punitive damages. In addition, the State seeks compensatory and punitive damages from 3M for its common law failure to warn claim. These are quintessential torts that seek a legal remedy.

6

Although the State is entitled to a jury trial based purely on its common law claims, this Response addresses Defendants' statutory arguments as well. It bears emphasis that the monetary relief requested in the State's common law causes of action overlaps significantly with its statutory claims. The State's Spill Act claims sound in traditional tort and seek the same legal remedies as the common law claims (other than punitive damages). Moreover, since the State seeks similar legal relief under the Spill Act and the WPCA, the State's "claims under the WPCA are subject to the same analysis under the Seventh Amendment as Plaintiffs' Spill Act claims." *Amerada Hess*, 2018 WL 2317534, at *3 n.9.[3] Since neither statute nor its legislative history expressly provides for a right to trial by jury on the statutory claims, the Court must apply the two-part test set forth in *Tull* to determine whether the claims are legal or equitable.

The Spill Act imposes strict liability for all "cleanup and removal costs" associated with a discharge, including "the cost of restoration and replacement, where practicable, of any natural resource damaged or destroyed by a discharge." N.J.S.A. 58:10–23.11g(c)(1); N.J.S.A 58:10–23.11u(b)(4). "'Cleanup and removal costs' are defined as direct and indirect costs incurred in the 'removal or attempted removal of hazardous substances' or 'taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare.'" *Amerada Hess*, 2018 WL 2317534, at *3 (quoting N.J.S.A. 58:10–23.11b). Cleanup and removal costs "include the costs of both primary and compensatory restoration." *Id.*

---

[3]   The WPCA provides for remediation and restoration of "pollutants"—including numerous PFAS compounds—in addition to "hazardous substances." It also provides for additional categories of relief, including disgorgement, punitive damages, ***and*** penalties for unpermitted and unlawful discharges of pollutants, which are particularly germane to DuPont's conduct at issue in this action. Those additional remedies are discussed in Part I(D), *infra.*

**B. Future Remediation and Primary Restoration Natural Resource Damages Are Legal Remedies.**

The State seeks all cleanup and removal costs, including costs necessary to investigate, remediate and restore the natural resources contaminated by DuPont and 3M. Those cleanup and removal costs include damages for future costs incurred for remediation (*i.e.*, the reduction of contaminants to risk-based standards) and primary restoration (*i.e.*, the reduction of pollutants in the environment to pre-discharge conditions). *See N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp*., 393 N.J. Super. 388, 406 (App. Div. 2007). As explained *infra*, the Spill Act authorizes the State to seek future cleanup and removal costs associated with Chambers Works. As this Court held in *Amerada Hess*, such relief is legal in nature. Defendants' attempt to discredit *Amerada Hess* on this point is based on a false comparison between the Spill Act and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")—a federal statute that, while similar to the Spill Act in certain respects, does not authorize the recovery of future cleanup costs; CERCLA only permits recovery of "incurred" cleanup costs.

**1. The Spill Act Authorizes the Unique Remedy of Present Payment for Future Cleanup and Removal Costs.**

Plaintiffs seek relief under the Spill Act that is indisputably ***unavailable*** under CERCLA. Defendants' arguments—including their attempts to challenge this Court's holding in *Amerada Hess*, the only federal precedent discussing the right to a trial by jury in the Spill Act context—largely rely on the erroneous premise that the two statutes offer the same remedies for recovery of cleanup costs. Thus, Plaintiffs begin by addressing this threshold issue.

CERCLA provides for two forms of cost recovery: payment for response costs already incurred and declaratory judgment as to liability for future response costs. *See* 42 U.S.C. §§ 9607(a), 9613(g)(2). While both public and private CERCLA plaintiffs are limited to

declaratory relief for future response costs, the Spill Act allows NJDEP to pursue another form of cost recovery: ***payment now for cleanup and removal costs NJDEP has yet to incur***. *See In Matter of Kimber Petroleum Corp.*, 110 N.J. 69, 74–75 (1988). In *Kimber*, the Supreme Court of New Jersey expressly highlighted this crucial difference between CERCLA and the Spill Act. Holding that the Spill Act gives NJDEP authority to require responsible polluters to pay for cleanup and removal costs prior to remedial action, the *Kimber* court noted that "the EPA," by contrast, "does not seem to be authorized by CERCLA to act in a way analogous to [NJDEP] . . . *i.e.*, to maintain control of the cleanup operations while requiring the responsible parties ***to prepay*.**" *Id.* at 74–75 n.1 (emphasis added); *see also Exxon Mobil*, 393 N.J. Super. at 399–400 ("DEP can require responsible polluters to pay for cleanup and removal costs prior to remedial action"). In short, whereas CERCLA provides only for declaratory judgment as to liability for future response costs, under the Spill Act, "unlike CERCLA, the State may seek an award of cleanup and removal costs, before actually incurring those costs." *Amerada Hess*, 2018 WL 2317534, at *8.

Consistent with *Kimber* and *Amerada Hess*, the State seeks reimbursement for future cleanup and removal costs pursuant to the Spill Act. ECF 332 ¶ 315; *see also id.* at ¶¶ 338, 424 (seeking similar relief under the WPCA and pursuant to the State's common law negligence claim). Consistent with *Amerada Hess* and the federal authorities cited therein, discussed *infra*, the recovery of such costs is a legal remedy.[4]

---

[4]    3M seems to fundamentally misunderstand the relief requested by the State, contending that "Plaintiffs are essentially seeking an order … to require Defendants, in the future, to cover Plaintiffs' costs of restoring the status quo at and around the Chambers Works site." ECF 480-1 at 9-10. This is not correct; the State seeks to require Defendants to cover its costs ***now***.

### 2. *Hatco* Does Not Apply to Future Cleanup and Removal Costs Pursuant to the Spill Act.

Seeking to paper over the differences between CERCLA and the Spill Act, Defendants place heavy emphasis on *Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400, 414 (3d Cir. 1995). There, the Third Circuit held that the plaintiff's claim for past cleanup costs **under CERCLA** constituted an equitable remedy, and the plaintiff was not entitled to trial by jury. Whereas NJDEP is authorized to recover future cleanup and removal costs under the Spill Act in advance of incurring such costs, CERCLA allows only declaratory judgment for future costs not yet incurred. Despite this significant difference between the statutes, Defendants disagree with this Court's finding in *Amerada Hess* that "CERCLA and the Spill Act are simply too dissimilar in their treatment of future primary restoration costs for this Court to draw any meaningful conclusions concerning future costs from the Third Circuit's decision [in *Hatco*]." 2018 WL 2317534 at *8; *see* ECF 481-1 at 17 ("But this purported distinction between past and future costs does not exist. CERCLA does in fact contemplate such relief for future response costs."); ECF 480-1 at 10 ("[*Hatco*] did not turn on whether the cost-recovery claims were past- or future-facing, and *Amerada Hess* was wrong to disregard that precedent.").

Defendants' argument in this regard is unsupported, as they continue to ignore the key difference between the remedies available under the Spill Act and CERCLA. To this point, Defendants marshal CERCLA cases purportedly holding that "the government is entitled to recovery for future costs"—but separately acknowledge that "CERCLA provides for declaratory judgment as to liability for future response costs." ECF 481-1 at 17, 18; *see also* ECF 480-1 at 10 (similar). Indeed, the cases Defendants cite involve only declaratory judgment as a remedy for future response costs under CERCLA. *See United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F. Supp. 823, 852 (W.D. Mo. 1984), *aff'd in part, rev'd in part*, 810 F.2d 726

(8th Cir. 1986) ("While the Court cannot award costs [under CERCLA] until they are incurred, the Court can presently determine liability for future costs."); *City of New York v. Chem. Waste Disposal Corp.*, 836 F. Supp. 968, 972 (E.D.N.Y. 1993) ("In addition to providing for recovery of response costs already incurred, CERCLA provides for declaratory relief imposing liability for future response costs."); 42 U.S.C. § 9607(a)(4)(A) & (B) (a plaintiff can only recover costs that have already been "incurred").[5] Tellingly, Defendants cite no case in which actions to recover damages in based on future costs have been found to be equitable relief.[6]

Defendants' reliance on cases holding that "no right to a jury trial attaches when a party seeks a declaration of rights and liabilities under that statute" is equally misplaced. *See, e.g.*, *United States v. Wade*, 653 F. Supp. 11, 13 (E.D. Pa. 1984). Plaintiffs do not dispute that declaratory judgment is equitable in nature. Although courts interpreting CERCLA have used the phrase "recovery for future costs" in reference to declaratory judgment, the fact remains that the Spill Act allows NJDEP to require ***present payment*** for future costs where CERCLA does not. CERCLA merely allows for a finding of liability to reimburse future costs in the future; it does not provide any mechanism to recover future costs in the present or in advance of such costs actually being

---

[5]  The verdicts in the cases cited by DuPont illustrate that dollar amounts are not awarded in litigation for future response costs pursuant to CERCLA. *See, e.g.,* Judgment, *United States v. Atchison, Topeka & Santa Fe Ry. Co.*, 2003 WL 26029235 (E.D. Cal. Sep. 10, 2003), *amended by* 2009 WL 7768690 (E.D. Cal. Aug. 27, 2009) (naming dollar amounts for past response costs and declaring percent liability for future response costs).

[6]  DuPont miscites *Roosevelt Irrigation* as evidence that "courts have held that the government is entitled to recovery for future costs in other [CERCLA] cases." ECF 481-1 at 10 (citing *Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*, 39 F. Supp. 3d 1059 (D. Ariz. 2014)). In that case, the defendants moved to strike the plaintiff's claims for "a present award of future response costs under CERCLA." Castello Decl., Ex. 2. The defendants argued that "before it can recover anything in the future, [Plaintiff] will have to in fact incur response costs and prove that those costs were both necessary and consistent with the National Contingency Plan." *Id.* at 4. The plaintiff concurred, clarifying in response that it sought "only a present award of damages related to necessary response costs it has already incurred, and a declaration of liability for future necessary response costs." Castello Decl., Ex. 3 at 2. *Roosevelt Irrigation* stands only for the unremarkable proposition that a CERCLA plaintiff can pursue declaratory judgment on the issue of liability for future costs.

incurred. Thus, "*Hatco* cannot be read to govern primary restoration damages under the Spill Act for future costs, not yet incurred." *Amerada Hess*, 2018 WL 2317534, at *10.

### 3. The Remedy of Future Cleanup and Removal Costs Is Legal Restitution.

Money damages are the "classic form" of legal relief, subject only to two exceptions: (i) damages that are restitutionary; and (ii) damages that are "incidental to or intertwined with" injunctive relief. *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 571 (1990); *Great–W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002). In *Knudson*, discussed *infra*, the U.S. Supreme Court clarified that restitution can be an equitable or legal remedy, depending on the basis for the plaintiff's claim. 534 U.S. at 212. In *Amerada Hess*, the court applied the definition of legal restitution from *Knudson* and held—correctly—that a claim for future primary restoration costs under the Spill Act seeks legal restitution (and thus implicates a plaintiff's jury trial rights). *Amerada Hess*, 2018 WL 2317534, at *10-11.

Defendants contend that *Amerada Hess* incorrectly applies *Knudson* to the Spill Act because *Knudson* "did not involve CERCLA or any other environmental law, did not apply the Seventh Amendment, and did not make any distinction between claims for past restitution versus future restitution." ECF 481-1 at 19; *see* ECF 480-1 at 10. But this Court, in *Amerada Hess*, carefully considered those factors before applying *Knudson*, 2018 WL 2317534, at *8-9, and its reasoning is equally relevant here.

As established above, the right to a jury trial in federal court presents a question of federal law.[7] In *Amerada Hess*, Judge Wolfson determined that since there "are no federal precedents

---

[7]   Like the defendants in *Amerada Hess*, DuPont cites several state cases involving the Spill Act wherein the claims were tried to the bench to argue that, "applying the 'historical test,' Plaintiffs' jury demand should be struck." ECF 481-1 at 13. First, this is a misapplication of the "historical test," which seeks to compare statutory claims to traditional common law

discussing the right to a trial by jury in the Spill Act context . . . the Court must look to analogous circumstances and general federal law to resolve the present motions." 2018 WL 2317534, at *5. While "[c]ost recovery actions under CERCLA are clearly analogous to Spill Act actions to recover primary restoration damages *for costs already incurred*," actions to presently recover future costs—not declaratory judgement as to future liability—have no federal analogue. *Id*. at *10 (emphasis added).

In the absence of controlling federal precedent, *Amerada Hess* correctly analyzed the Spill Act's provision for future primary restoration costs through the framework established by the U.S. Supreme Court in *Knudson.* The dispositive issue in determining the applicability of the Seventh Amendment is whether the relief is legal or equitable, *id.* at *3 n.8, especially because not every "award of monetary relief must *necessarily* be 'legal' relief." *Chauffeurs*, 494 U.S. at 570 (emphasis in original). Money damages are equitable where a plaintiff seeks "money wrongfully held by the [defendant], not money that plaintiff 'would have received' if not for defendant's improper conduct." *Chauffeurs*, 494 U.S. at 570–71. This determination is at the root of *Knudson,* which explains that "whether [restitution] is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." *Knudson*, 534 U.S. at 212–13 (quoting *Reich v. Continental Casualty Co*., 33 F.3d 754, 756 (7th Cir. 1994)).

*Knudson* defines "legal restitution" as "the imposition of personal liability for the benefits that [plaintiffs] conferred upon respondents"—as opposed to the return "to the plaintiff [of] particular funds or property in the defendant's possession," which is equitable restitution. 534 U.S.

---

causes of action, not to state court precedent. *Tull*, 481 U.S. at 417. Second, DuPont fails to cite any precedential opinion supporting its suggestion that the State is somehow estopped from demanding a jury in this matter simply because it has not done so in the past. Moreover, Defendants forfeited the right to rely on state court cases to defeat the State's jury trial right when they removed this case to federal court—where *federal* law, not state law, governs the scope of the State's jury trial right.

at 214. Here, as in *Amerada Hess*, Plaintiffs' claim for future cleanup and removal costs "may be viewed as an action to obtain a monetary award in recompense for assuming the Defendants' duties to restore public health and safety in the form of environmental cleanup costs, thereby conferring an unearned benefit upon Defendants." 2018 WL 2317534, at *11 (citing Restatement (First) of Restitution § 115 (1937)).

In particular, the State alleges that DuPont and 3M wrongfully and intentionally caused vast contamination at and from the Chambers Works site, and that DuPont and 3M are responsible to clean up the contamination that they caused and restore the State's natural resources they had impacted.  DuPont and 3M held the properties and risks of PFAS secret for decades and received enormous benefits and profits by contaminating New Jersey freely and consistently for decades. ECF 332 at ¶ 4.[8] As a result, the State will be forced to shoulder the costs for cleanup and removal of contamination—costs which the State must now incur only because DuPont and 3M for decades gleaned the benefits of polluting with impunity.

Thus, the basis for the State's claims for future cleanup and removal costs, including future costs to investigate and clean up contamination, is not based on "Defendants hold[ing] particular funds that, in good conscience, belong to Plaintiffs, but rather that Plaintiffs are entitled to some funds for benefits that they conferred." *Amerada Hess*, 2018 WL 2317534, *9 (quotation omitted). Because the State seeks legal restitution, "there is a right to trial by jury under the Seventh Amendment." *Id.*[9]

---

[8]   The State seeks legal restitution pursuant to the WPCA and its trespass claim as well.

[9]   DuPont also argues that *Knudson*'s definition of "legal restitution" would not apply because the "land at issue in this case still exists." ECF 481-1, at 21 n.5. Legal restitution claims are not limited to those literal cases "where 'the property [sought to be recovered] or its proceeds have been dissipated so that no product remains[.]" *Id.* (quoting *Knudson*, 534 U.S. at 213-14).

### C. Compensatory Restoration Natural Resource Damages Are Legal Remedies.

Here, Plaintiffs seek traditional compensatory damages in the form of compensatory restoration natural resource damages; these damages concern "replacement of the ecological services and values" injured by Defendants' contamination. *Exxon Mobil,* 393 N.J. Super. at 406. "In the Spill Act context, 'compensatory restoration' damages plainly fall within the category of compensatory damages, comprising a monetary award intended to redress the concrete 'ecological services and values lost' by the State as a result of responsible parties' wrongful conduct in discharging pollutants into the environment." *Amerada Hess*, 2018 WL 2317534, at *11 (quoting *Exxon Mobil*, 393 N.J. Super at 406).

As described in Part I(B)(1), *supra*, recovery of future cleanup and removal costs is available under the Spill Act in advance of such costs being incurred, while only declaratory judgment as to liability for future costs is available under CERCLA, rendering federal precedent about future cost recovery under CERCLA inapposite to evaluating the Spill Act's provision for such relief. Where the statutes provide comparable relief, however, CERCLA is an appropriate federal analogue to the Spill Act, which is why *Hatco*, "resolving a question of law on what the parties acknowledge to be the most closely analogous federal statute [CERCLA], binds this Court only as to Plaintiffs' claims seeking to recover ***past*** primary restoration costs." *Amerada Hess*, 2018 WL 2317534, at *8 (emphasis added).

As with past primary restoration costs, the Spill Act and CERCLA provide comparable relief regarding compensatory restoration in the form of natural resource damages. Defendants avoid acknowledging this point by comparing ***all*** remedies available through civil actions pursuant to the Spill Act, N.J.S.A. 58:10-23.11u(b), to ***one*** subsection of CERCLA, 42 U.S.C. § 9607(a)(4)(A). *See* ECF 481-1, at 14-15 ("Like the Spill Act, CERCLA imposes liability for,

among other things, 'all costs of removal or remedial action . . .' *Compare* N.J.S.A. 58:10-23.11u.b. *with* 42 U.S.C. § 9607(a)(4)(A).").

Such a comparison is flawed. While the referenced subsection of CERCLA permits recovery for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan," 42 U.S.C. § 9607(a)(4),[10] the referenced section of the Spill Act allows NJDEP to bring a civil suit for remedies including:

(1) a temporary or permanent injunction;

(2) the costs of any investigation, cleanup or removal, and for the reasonable costs of preparing and successfully litigating an action under this subsection;

(3) the cost of restoring, repairing, or replacing real or personal property damaged or destroyed by a discharge, any income lost from the time the property is damaged to the time it is restored, repaired or replaced, and any reduction in value of the property caused by the discharge by comparison with its value prior thereto;

(4) the cost of restoration and replacement, where practicable, of any natural resource damaged or destroyed by a discharge; ***and***

---

[10]    CERCLA, at 42 U.S.C. § 9607(a)(4), reads:

    [A]ny person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

    (A) all costs of removal or remedial action ***incurred by*** the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

    (B) any other necessary costs of response ***incurred by*** any other person consistent with the national contingency plan;

    (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

    (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

    (emphasis added).

(5) any other costs incurred by the department pursuant to P.L.1976, c. 141.

N.J.S.A. 58:10-23.11u(b).

The entirety of N.J.S.A. 58:10-23.11u(b) cannot be characterized as a "removal or remedial action" comparable to 42 U.S.C. § 9607(a)(4)(A). Indeed, "federal courts differentiate between claims under § 9607(a)(4)(A) and (B), referred to as actions for cleanup or 'response costs,' and claims under § 9607(a)(4)(C), referred to as claims for natural resource damages." *Amerada Hess*, 2018 WL 2317534, at *6 (citing *Northeastern Pharmaceutical*, 842 F.2d at 986). Subsection (4) of N.J.S.A. 58:10-23.11u(b) is far more comparable to the natural resource damages contemplated by 42 U.S.C. § 9607(a)(4)(C): "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

While Defendants cite cases in which courts find the relief provided in 42 U.S.C. § 9607(a)(4)(A) to be equitable, federal courts share a "unanimous interpretation" of claims for natural resource damages under 42 U.S.C. § 9607(a)(4)(C) as being legal in nature. *Amerada Hess*, 2018 WL 2317534, at *11. Applying *Tull*'s "historical test," federal courts have found that "[a]n action for natural resource damages under [CERCLA § 9607(a)(4)] subsection (C) . . . 'sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for injury caused by the defendant's wrongful breach.'" *In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution*, 712 F. Supp. 994, 1000 (D. Mass. 1989) (quoting *Curtis v. Loether*, 415 U.S. at 195); *see also United States v. Viking Res., Inc.*, 607 F. Supp. 2d 808, 830 (S.D. Tex. 2009) ("at least one component of natural resource damages—the diminution in value of those natural resources pending restoration—is legal in nature. It amounts to compensating the plaintiff for injury to its property[.]").

17

Compensatory restoration and natural resource damages echo the common law, which "has long recognized a duty not to injure the property of another." *In re Acushnet* 712 F. Supp. at 1000 ("On more than one occasion the Supreme Court has thought it 'unmistakeabl[e]' that an action to recover for injury to property is triable to a jury.") (citing *Ross v. Bernhard*, 396 U.S. 531, 533 (1970); *Pernell v. Southall Realty*, 416 U.S. 363, 370 (1974)). The natural resource damages sought by Plaintiffs, including "diminution in value and loss of use, are precisely the type a common law court could award . . . [and] present legal issues that must be tried to a jury as matter of right." *Id.*

The Spill Act did "not so much change substantive liability as it establishe[d] new remedies for activities recognized as tortious both under prior statutes and the common law." *N.J. Dep't of Env't Prot. v. Ventron,* 94 N.J. 473, 499 (1983).[11] "[O]ne of these remedies is the State's right to recover for the 'loss of use' [and values and benefits] of natural resources injured or destroyed by a discharge, a claim embodied in both agency regulations and policy directive." *Exxon Mobil*, 393 N.J. Super. at 399–401.

### D. Civil Penalties and Punitive Damages Are Legal Remedies.

DuPont claims that the civil penalties sought by the State "are equitable in nature because these penalties are restorative, not punitive" and because a "claim for monetary relief that is incidental to or intertwined with injunctive or other equitable relief can be considered an equitable

---

[11]  The Spill Act "is quite comprehensive in its scope" and "consistent with the long-standing principle that the Legislature may prohibit activities that constitute a nuisance." *Ventron Corp.*, 94 N.J. at 494, 496–97; *see also Dep't of Transp. v. PSC Res., Inc*., 175 N.J. Super. 447, 459 (Law Div. 1980) ("Torts against the environment find their origin in the law of nuisance and trespass."). In fact, the Spill Act has been viewed as a codification of the common law cause of action in nuisance, under which "the State has the right to obtain damages for an injury to public resources or the environment." *Ohaus v. Cont'l Cas. Ins. Co*., 292 N.J. Super. 501, 509 (App. Div. 1996) (*citing Lansco, Inc. v. Dep't of Envtl. Prot*., 138 N.J. Super. 275, 283 (Ch. Div. 1975), *aff'd o.b.*, 145 N.J. Super. 433 (App. Div. 1976), *certif. denied*, 73 N.J. 57 (1977)).

remedy." ECF 481-1 at 24 (citing *Chauffeurs*, 494 U.S. at 571). While DuPont might like to avoid civil penalties or reframe them as "restorative," make no mistake about it: the State of New Jersey seeks to punish DuPont for intentionally polluting the natural resources of New Jersey with its "forever chemicals."

In *Tull*, a case involving the civil penalty section of the Clean Water Act, 33 U.S.C. § 1319(d), the U.S. Supreme Court held that "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo," are legal, not equitable. 481 U.S. 417–18. Expanding upon that, the U.S. Supreme Court held, in *Jarkesy*, that a "civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment," making such a monetary sanction legal in nature for purposes of determining whether the Seventh Amendment jury trial right applies." 603 U.S. at 123–24 (quotation marks omitted). Notably, the Court did not say that penalties with equitable purposes are always equitable, only penalties with **solely** equitable purposes. A civil penalty is "intended to punish culpable individuals" where a statute "does not direct that the 'civil penalty' imposed be calculated solely on the basis of equitable determinations . . . but simply imposes a maximum penalty[.]" *Tull*, 481 U.S. at 422-23; *see* N.J.A.C. 7:26B-1.11(a); N.J.S.A. 58:10A-10(e); N.J.S.A. 58:10-23.11u. Additionally, the "existence of a penalty section in a statute is generally strong evidence of the Legislature's intent to deter violations." *State, Dep't of Envtl. Prot. v. Lewis*, 215 N.J. Super. 564, 575 (App. Div. 1987).

### 1. The State is Entitled to a Jury Trial on the Issue of Civil Penalties.

DuPont takes the position that civil penalties imposed pursuant to the Spill Act, ISRA, and the WPCA are equitable, but the cases DuPont cites show that its position is misguided. Regarding

ISRA, for instance, DuPont argues that "[w]here the facts plaintiffs must prove to establish their right to ***injunctive relief*** are the same facts needed to recover an award of civil penalties, the injunctive relief and the civil penalties cannot be separated from one another and are 'inextricably intertwined.'" ECF 481-1 at 25 (emphasis in original). In *Paolino v. JF Realty*—the sole case DuPont cites in support of this position—the court addressed a ***citizen suit*** under the federal Clean Water Act ("CWA"). 2013 WL 12320080, at *3 (D.R.I. Aug. 8, 2013). The court held that a citizen plaintiff proceeding under a citizen suit provision does not stand in the same position with respect to civil penalties as the government in an action proceeding under an agency enforcement provision. *Id.* As noted in *Paolino*, if "the primary purpose of the statute is to provide injured private citizens with an equitable remedy when the Government is unwilling or unable to enforce the CWA, it is difficult to see how civil penalties could be anything but incidental[.]" *Id*.

Contrastingly, in *Tull*, the U.S. Supreme Court explained that the agency enforcement provision of the CWA "does ***not*** intertwine equitable relief with the imposition of civil penalties . . . [because] each kind of relief is separably authorized in a separate and distinct statutory provision." *Tull*, 481 U.S. at 425 (emphasis added) ("Subsection (b), providing injunctive relief, is independent of subsection (d), which provides only for civil penalties.").

Here, as in *Tull*, the environmental statutes pursuant to which Plaintiffs seek civil penalties separate each kind of relief. The Spill Act states:

> Whenever, on the basis of available information, the department determines that a person is in violation of a provision of [the Spill Act] . . . or that a person knowingly has given false testimony, documents or information to the department, the department may:
>
> . . . (c) bring an action for a civil penalty in accordance with subsection d. of this section.

Use of any remedy specified in this section shall not preclude use of any other remedy. The department may simultaneously pursue administrative and judicial remedies provided in this section.

N.J.S.A. 58:10-23.11u(b)(1). The WPCA states:

(a) Whenever the commissioner finds that any person is in violation of any provision of this act, he shall:

. . . (4) bring an action for a civil penalty in accordance with subsection e. of this section . . .

Use of any of the remedies specified under this section shall not preclude use of any other remedy specified.

N.J.S.A. 58:10A-10(a). And ISRA states:

(a) Whenever the Commissioner of Environmental Protection finds that a person has violated any provision of this act, or any rule or regulation adopted pursuant thereto, or knowingly makes a false statement, representation, or certification in any application, record, or other document filed or required to be maintained pursuant to [ISRA], the commissioner may:

. . . (4) bring an action for a civil penalty in accordance with subsection e. of this section.

Pursuit of any of the remedies specified under this section shall not preclude the seeking of any other remedy specified.

N.J.S.A. 13:1K-13.1(a).

Pursuant to *Tull*, where, as here, civil penalties and equitable relief are separately authorized, "the right to jury trial on the legal claim, including all issues common to both claims, remains intact.'" *Tull*, 481 U.S. at 425 (quotation omitted).

Moreover, as *Tull* also instructs, a clear indication that civil penalties are not solely equitable arises when a statute "does not direct that the 'civil penalty' imposed be calculated solely on the basis of equitable determinations, such as the profits gained from violations of the statute, but simply imposes a maximum penalty[.]" *Id.* at 422–23. The civil penalties Plaintiffs seek pursuant to the Spill Act, the WPCA, and ISRA are not restricted by the value of equitable

21

considerations, only capped by the maximum penalty for each violation. *See* N.J.A.C. 7:26B-1.11(a); N.J.S.A. 58:10A-10(e); N.J.S.A. 58:10-23.11u.

Although it is a state court case, *Lewis*, cited *supra*, also offers a helpful frame of reference regarding penalties. There, the Appellate Division found that the trial judge erred by not imposing WPCA and Solid Waste Management Act penalties on corporations that dumped large quantities of sewage onto land owned by the State. 215 N.J. Super. at 575–76. The Appellate Division "emphasize[d] that the goals of the environmental laws at issue here are both remedial and preventative[,] . . . designed to help deter individuals from polluting the environment, and must be read broadly with that goal in mind." *Id.* (citing *K.S.B. Tech. Sales v. No. Jersey Dist. Water Supply Comm'n*, 75 N.J. 272 (1977); *N.J. Bldrs. v. Dept. of Envtl. Protec.*, 169 N.J. Super. 76, 85–86 (App. Div. 1979)). As in *Lewis*, Defendants' conduct "has created significant risks which the environmental laws were intended to safeguard against," and penalties must be assessed "in a sufficient amount to deter others from polluting the environment." *Id.*

### 2. The State is Entitled to a Jury Trial on the Issue of Punitive Damages and Disgorgement.

Plaintiffs also seek punitive damages. "By definition . . . punitive damages are left to the discretion of the jury and need not be defined on a tort-by-tort basis." *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 358–59 (3d Cir. 2015); *see* Castello Decl., Ex. 1. DuPont cites a lone decision from the Fifth Circuit—*Lynch v. Pan Am. World Airways*, 475 F.2d 764 (5th Cir. 1973)—as support for the proposition that seeking punitive damages does not entitle a plaintiff to a jury trial when the "gist" of the complaint is equitable. ECF 481-1 at 29. *Lynch* is inapposite and is not the law of this Circuit. The Third Circuit expressly rejected *Lynch* in *Laskaris v. Thornburgh* and held that the plaintiffs were entitled to a jury trial "even though the claim [for

compensatory and punitive damages] is based upon the same facts that support equitable claims." 733 F.2d 260, 263–64 (3d Cir. 1984).

The State separately seeks damages in the form of disgorgement under the WPCA. Despite DuPont's insistence that disgorgement always sounds in equity, the text of the WPCA shows a clear punitive intent. The WPCA authorizes the Commissioner to commence a civil action for relief including "assessment against a violator of the actual amount of any economic benefits accruing to the violator from a violation." N.J.S.A. 58:10A-10(c). The statute defines "economic benefits" broadly to include "the amount of any savings realized from avoided capital or noncapital costs resulting from the violation; the return earned or that may be earned on the amount of avoided costs; any benefits accruing to the violator as a result of a competitive market advantage enjoyed by reason of the violation; or *any other benefits resulting from the violation*." *Id.* (emphasis added). Thus, the WPCA does not just provide for disgorgement of improper profits or restoring the status quo ante; rather, the State is entitled to demand that Defendants pay for their bad acts.

### 3. The New Jersey Constitution Does Not Transform Punitive Damages Into an Equitable Issue.

Additionally, DuPont incorrectly argues that NJDEP's use of money from civil penalties or punitive damages to protect the State's natural resources, in accordance with the state Constitution, somehow transforms those punitive awards into restorative, and therefore equitable, awards. ECF 481-1 at 27–28. This argument is entirely disingenuous. The constitutional provision relating to natural resource damages recoveries clearly does not apply to civil penalties or punitive damages awards by its plain language. It provides that "an amount equivalent to the revenue annually derived *from all settlements and judicial and administrative awards relating to natural resource damages* collected by the State in connection with claims based on environmental contamination" will be credited annually to a special fund. N.J. Const. art. VIII, § 2 ¶ 9 (emphasis

added). Civil penalties and punitive damages awards are distinct forms of recovery from natural resource damages and do not fall within the scope of the provision.

Even if N.J. Const. art. VIII, § 2 ¶ 9 did apply to civil penalties or punitive damages, which it decidedly does not,[12] the ultimate direction of the recoveries into the special fund would not transform the legal claims for penalties or punitive damages into equitable claims. According to the constitutional provision, the funds shall be dedicated to "paying for costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, or for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to natural resource damages." *Id*. The fund must prioritize the immediate area associated with the particular award, followed by the "same water region," or, finally, repair of natural resources in the State "without geographic constraint." *Id*.

By the plain language of this constitutional provision, awards recovered do not necessarily go towards restoring the particular natural resource damaged in connection with the associated

---

[12]    The legislative history concerning the Constitutional Amendment makes it absolutely clear that it was intended to ensure natural resource ***damage recoveries*** are not redirected to address general budget needs, like funds from two historic settlements concerning the Passaic River and Exxon Bayway and Bayonne facilities:

> So what you have here is the ***start of the process to do a constitutional amendment to say that Natural Resource Damages should be used for environmental purposes***. Now, those environmental purposes, to the extent possible — you want to clean up whatever the natural resource damage is; maybe secondly, you want to apply the ***damage money*** to related purposes for that watershed; and you also may want to use it for other environmental purposes, depending on the size of the proceeds, the nature of the claim, etc.

Senator Smith, Senate Environment and Energy Comm., Senate Concurrent Resolution 39, Nov. 3, 2016 (emphasis added). *See* Castello Decl., Ex. 4. There is absolutely no mention of penalties or punitive damages in the Constitutional Amendment or its legislative history because the Amendment only concerns the use of monetary natural resource damage recoveries.

environmental claim. The text makes clear that the funds may be used to "repair, restore, or replace" damaged or lost natural resources *or* "permanently protect" the natural resources. *Id.* Permanently protecting natural resources is forward-looking, and, thus, not restorative. Furthermore, the text further contemplates scenarios where funds are already sufficient to cover restoration of natural resources in the immediate area of the associated harm, in which case the additional funds may be used to benefit natural resources in the "same water region" or ultimately anywhere else in the State. *Id.* At bottom, the New Jersey Constitution's natural resource damages provision represents a voluntary determination *by the State* to use monies recovered as natural resource damages for environmental purposes. But that choice by the State to restore and protect the natural resources of New Jersey writ large does not (and cannot) transform the punitive nature of any of the penalties or punitive damages awards being directed into the fund.

DuPont cites *Jarkesy* repeatedly for the proposition that "[w]hat determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" 603 U.S. at 123 (quoting *Tull*, 481 U.S. at 422). In determining the nature of a remedy, however, courts do not look to how the penalty or punitive award will ultimately be spent; rather, courts look to the intent behind the remedy. *See, e.g. Tull v. United States*, 481 U.S. 412, 422–23 (1987) (holding that penalties imposed under the Clean Water Act were punitive in nature where "[t]he legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties.").

## II.    The State's Legal Claims Must Be Tried First.

DuPont proposes that the State's remediation claims should be tried first, followed by the natural resource damages claims, "regardless of the Court's determination of whether Plaintiffs'

claims involve only equitable or a mix of equitable and legal claims." ECF 481-1 at 31-32 n.8. As

discussed in Part I, *supra*, the State's environmental claims contain a mixture of legal and equitable

issues. Where a case involves both legal and equitable claims deriving from the same set of facts,

the legal claims must be determined first or simultaneously with the equitable claims, as DuPont

acknowledges. *Id.* at 32 ("The Supreme Court has held that where a case involves both equitable

and legal claims that rest upon the same factual analysis, 'the legal claims involved in the action

must be determined prior to any final court determination of respondents' equitable claims.'")

(citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962)). The Third Circuit has routinely

refused to try equitable claims first where there are common issues of fact for both types of claims.

*See, e.g., AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 228 (3d Cir. 2009) ("When

litigation involves both legal and equitable claims . . . the right to a jury trial on the legal claim,

including all issues common to both claims, *must* be preserved by trying the legal claim to a jury

first, or at least simultaneously with the equitable claim, and by accepting the jury's findings on

common facts for all purposes.") (emphasis added); *Kairys v. S. Pines Trucking, Inc.*, 75 F.4th

153, 160 (3d Cir. 2023) ("[T]he District Court *had to adhere to the principle that* "[w]hen litigation

involves both legal and equitable claims ... the right to a jury trial on the legal claim, including all

issues common to both claims, must be preserved by ... accepting the jury's findings on common

facts for all purposes.") (quotation omitted) (emphasis added).

### A.  There Is No Factual or Precedential Basis for DuPont's Proposed Bifurcation of Remediation and Natural Resources Damages Claims.

In an attempt to circumvent clear legal precedent and defy the State's Seventh Amendment

rights, DuPont erroneously argues that the remediation claims and the natural resource damages

claims are based upon "a distinct factual analysis." ECF 481-1 at 31. It defies logic to suggest that

remediation claims do not share facts in common with the State's common law and statutory claims

for the damages DuPont has done to the State's natural resources, when both derive from the

discharge of hazardous substances and pollutants at Chambers Works, resulting in contamination

of the State's natural resources. DuPont offers scant support for this assertion. According to

DuPont:

> [T]he issues to be decided in connection with Plaintiffs remediation claims are the
> cleanup actions necessary to reduce the concentration of contaminants at and/or
> migrating from the Chamber Works Site to established regulatory standards, or
> otherwise control their fate and transport. By contrast, Plaintiffs' claims for natural
> resource damages will depend on factual findings with respect to any natural
> resource services allegedly lost due to Site-related contamination and the actions
> necessary to restore those resources to pre-discharge conditions.

ECF 481-1 at 32-33.

DuPont offers the quoted language to argue that remediation does not share issues of fact

in common with the other environmental remedies. To the contrary, this statement only highlights

that both remedies derive from the same core set of facts related to contamination of the Chambers

Works site. Specifically, in the context of environmental contamination, this court recognized in

*Amerada Hess* that the State's contamination claims "inherently" shared in common "numerous

issues of fact." *Amerada Hess*, 2018 WL 2317534, at *12 ("[C]ontrary to Defendants' suggestion,

given the numerous issues of fact which must inherently be shared in common across Plaintiffs'

past and future primary restoration claims and compensatory restoration claims, it will certainly

be more efficient, in addition to being required under the Seventh Amendment, to try Plaintiffs'

legal claims first.").

DuPont claims that *Alcoa, Inc. v. Alcan Rolled Prods.-Ravenswood LLC*, 439 F. Supp. 3d

325 (D. Del. 2020), presents a "similar situation" and supports bifurcating Plaintiffs' remediation

and natural resource damages claims—but *Alcoa* does neither. ECF 481-1 at 33. In *Alcoa*, the

District of Delaware deferred the determination of **contract and indemnification issues** until after

27

the issue of CERCLA liability was tried to the bench. 439 F. Supp. 3d at 340. However, there was

no bifurcation of factually-related environmental claims. Rather, the court bifurcated contribution

claims under CERCLA from breach of contract and indemnification issues—which is more akin

to the trial sequencing that the State is proposing here. Furthermore, the State's claims in this case

do not arise under CERCLA; as discussed in Part I(B), *supra*, CERCLA is a federal statutory

structure separate and distinct from the state Spill Act, and it does not involve both legal and

equitable relief.

**B.  Defendants Do Not Meet the High Bar Set Out in *Beacon* for the "Imperative Circumstances" Exception.**

After offering scant support for its assertion that the State's remediation and natural

resource damages claims do not share common issues of fact, DuPont argues that, even if the

common factual issues exist, "imperative circumstances" warrant jettisoning the State's Seventh

Amendment rights in favor of trying the equitable claims before the legal claims. ECF 481-1 at

33. The "imperative circumstances" exception articulated by the Supreme Court in *Beacon*

*Theaters, Inc. v. Westover* provides that "only under the most imperative circumstances . . . can

the right to a jury trial of legal issues be lost through prior determination of equitable claims." 359

U.S. 500, 510–11 (1959). The court's discretion in overriding the constitutional right to a jury trial

"is very narrowly limited and must, wherever possible, be exercised to preserve [a] jury trial." *Id.*

at 510. Thus, there must be a showing of irreparable harm and inadequacy of legal remedies before

claims of equitable origin can be tried before legal ones, as that has the same effect as an equitable

injunction of the legal claims. *Id.* at 509; *see also* 9 Fed. Prac. & Proc. Civ. § 2338 (4th ed.).

Such is not the case here. The "imperative circumstances" that DuPont offers are merely

its assertion that "any determination of natural resource damages will necessarily rely on the scope

and extent of the remediation." ECF 481-1 at 34. The fact that equitable and legal claims are

intertwined or incidental to the other does not rise to the level of "imperative circumstances" that warrant negating the State's constitutional rights. As stated in *Tull*, "if a 'legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as "incidental" to the equitable relief sought' . . . Thus, petitioner has a constitutional right to a jury trial to determine his liability on the legal claims." 481 U.S. at 425 (quoting *Curtis*, 415 U.S. at 199, n.11). Further, DuPont's argument on this point directly contradicts its separate assertion that the remediation claims and natural resources claims are somehow factually unrelated.

In a strained attempt to fit this case into the very narrow exception to the constitutional right to a jury, DuPont argues that the claims for primary and compensatory damages "depend on" the scope of remediation, which is merely another way of saying that the damages claims are incidental to or intertwined with the remediation claims. ECF 481-1 at 35. This is precisely the type of scenario that the U.S. Supreme Court has held does ***not*** justify contravening a party's Seventh Amendment rights. *See Reiner*, 732 F. Supp. at 533 ("It is well settled that in the federal system the right to a jury trial cannot 'be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action or during its pendency.'") (quotation omitted); *Dairy Queen*, 369 U.S. at 473 ("This principle applies even if the legal issue presented is characterized as incidental to the equitable."); *Beacon Theatres* at 473 n.8 ("It would make no difference if the equitable cause clearly outweighed the legal cause so that the basic issue of the case taken as a whole is equitable."). That the remediation claims and the natural resource damages claims are related certainly does not rise to the level of "imperative circumstances" that justifies the Court setting aside the State's clear Seventh Amendment rights.

### C. Hearing Legal Claims First Promotes Efficiency.

Finally, DuPont urges this Court to "consider the significant legal and practical consequences of a non-sequenced trial" as a basis for depriving the State of its right to a jury trial. ECF 481-1 at 36. Despite previously arguing that the remediation claims and restoration claims are factually unrelated, DuPont asserts in this section of its motion that "it would be impossible for a jury to untangle remediation from restoration." ECF 481-1 at 36. This, of course, assumes that the State has no jury trial right with respect to its remediation claims—yet, as shown above, the State *does* have a jury trial right to recover future clean up and removal costs (including remediation).

Regardless, efficiency will be served best by following the State's proposed trial sequencing in which the State's central environmental claims against Old DuPont and 3M will be tried with the assistance of a jury in Phase I and the State's fraudulent transfer claims, environmental claims arising from post-2015 conduct, and all residual legal issues will be tried in Phase II. *See* Castello Decl., Ex. 1. This sequencing will simplify and streamline the presentation of evidence to the jury while preserving the State's Seventh Amendment rights. In contrast, given the undeniable overlap in relevant evidence, DuPont's proposal of bifurcating the State's remediation claims from its restoration claims notwithstanding that both arise from the same set of common facts (and bad acts) would require the State to present the same evidence twice (to the bench and to the jury).

### <u>CONCLUSION</u>

For the above reasons, the State respectfully requests that the Court deny Defendants' Motions to Strike Plaintiffs' Jury Demand.

Dated: February 4, 2025

Respectfully submitted,

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorney for Plaintiffs*

By: */s/ Gwen Farley_____*
Gwen Farley
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Ph. (609) 376-2740
gwen.farley@law.njoag.gov
**KELLEY DRYE & WARREN LLP**
*Special Counsel to the Attorney General*

By: */s/ Geoffrey W. Castello_____*
Geoffrey W. Castello, Esq.
One Jefferson Road
Parsippany, New Jersey 07054
Ph. (973) 503-5900
GCastello@KelleyDrye.com

*William J. Jackson, Esq.
*John D.S. Gilmour, Esq.
*Lana M. Rowenko, Esq.
*Jennifer C. Barks, Esq.
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Ph. (713) 355-5000

*David Zalman, Esq.
David M. Reap, Esq.
*William A. Escobar, Esq.
Daniel J. Harrison, Esq.
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Ph. (212) 808-7800

31

**LAW OFFICES OF JOHN K. DEMA, P.C.**
*Special Counsel to the Attorney General*

*John K. Dema, Esq.
Scott E. Kauff, Esq.
*John T. Dema, Esq.
*Briana Dema, Esq.
Alex Latanision, Esq.
*Elizabeth B. Petersen, Esq.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Ph. (340) 773-6142

**TAFT STETTINIUS & HOLLISTER LLP**
*Special Counsel to the Attorney General*

*Robert A. Bilott, Esq.
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Ph: (513) 381-2838

*David J. Butler, Esq.
41 S. High Street, Suite 1800
Columbus, OH 43215-6106
Ph: (614) 221-2838

**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
*Special Counsel to the Attorney General*

Leonard Z. Kaufmann, Esq.
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Ph. (201) 845-9600

*admitted pro hac vice*