# EXHIBIT 2

## FRAUDULENT TRANSFER MINI TRIAL
## STIPULATED FACTS[1]

**IT IS HEREBY STIPULATED, BY AND BETWEEN THE PARTIES AS FOLLOWS:**

1. By 2013, DuPont was considering spinning off its Performance Chemicals segment as part of "Project Beta." ECF 351 ¶ 209.

2. In February 2014, DuPont formed Chemours as a wholly owned subsidiary of DuPont under the name "Performance Operations, LLC." ECF 351 ¶¶ 225–26; ECF 352 ¶¶ 225–26.

3. In or about April 2014, DuPont renamed Performance Operations, LLC to The Chemours Company, LLC. *See* ECF 351 ¶ 226; ECF 352 ¶ 226.

4. On April 30, 2015, DuPont converted The Chemours Company, LLC to a corporation named The Chemours Company—*i.e.*, Chemours. *See* ECF 351 ¶ 226; ECF 352 ¶ 226.

5. Between its organization in February 2014 and July 1, 2015, Chemours was a wholly owned subsidiary of DuPont. ECF 351 ¶ 225; ECF 352 ¶¶ 225, 227.

6. Chemours FC is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. ECF 351 ¶ 20.

7. In April 2014, Chemours FC was formed as a wholly owned subsidiary of Chemours. ECF 351 ¶ 20; ECF 352 ¶ 20.

---

[1] For purposes of this stipulation, "Plaintiffs" means the New Jersey Department of Environmental Protection, the Commissioner of the Department, and the Administrator of the New Jersey Spill Compensation Fund; "DuPont" means EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company); "Chemours" means The Chemours Company; "Chemours FC" means The Chemours Company FC, LLC; "Corteva" means Corteva, Inc. (DuPont's current parent company); and "New DuPont" means DuPont de Nemours, Inc. (Corteva's former parent company).

8. On January 23, 2015, DuPont executed a deed for transfer of ownership of the real property of the Chambers Works site to Chemours FC with an effective date of February 1, 2015. ECF 351 ¶ 20; ECF 352 ¶ 20.

9. As part of the spinoff of Chemours, DuPont transferred to Chemours its Performance Chemicals segment, which consisted of DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts business lines. ECF 351 ¶¶ 228, 234; ECF 352 ¶ 228.

10. As part of the spinoff of Chemours, Chemours issued a dividend to DuPont of approximately $3.9 billion, which consisted of (i) about $507,049,000 aggregate principal amount of 7.000% senior notes and (ii) about $3,400,000,000 of cash.

11. Prior to the spinoff, Mark Vergnano was named as designated CEO of Chemours.

12. Prior to the spinoff, Mark Newman was named as designated CFO of Chemours.

13. Prior to the spinoff, David Shelton was named as designated General Counsel of Chemours.

14. Vergnano, Newman, and Shelton remained in those positions following the Chemours spinoff.

15. On April 30, 2015, three DuPont employees were appointed by DuPont to Chemours's board: Nigel Pond, Michael Heffernan, and Steven Zelac. Zelac Dep. Ex. 20 at AFFF-MDL-EID-FT-00148250.

16. Pond, Heffernan, and Zelac remained DuPont employees following the spinoff.

17. The dividend to DuPont was authorized by Chemours's board on May 11, 2015. Pond Ex. 6; Pond Ex. 7.

18. On or about May 12, 2015, Chemours incurred approximately $4 billion in debt ("Chemours Debt").

19. Chemours FC is a guarantor on the Chemours Debt.

20. Chemours issued the approximately $3.9 million dividend to DuPont on or about May 12, 2015.

21. On May 12, 2015, Pond, Heffernan and Zelac resigned from the Chemours board effective as of the date of the spinoff.

22. On June 9, 2015, the Chemours board—still consisting of Pond, Heffernan, and Zelac—met again and approved the spinoff and Separation Agreement. Zelac Ex. 26.

23. To effectuate the spinoff, Chemours and DuPont entered into a separation agreement ("Separation Agreement") dated June 26, 2015. ECF 351 ¶ 224.

24. Pond executed the Separation Agreement on behalf of Chemours on June 26, 2015.

25. DuPont's management commissioned Houlihan Lokey to prepare a solvency opinion for Chemours.

26. Under the Separation Agreement, Chemours assumed certain of DuPont's historic liabilities relating to its Performance Chemicals segment, including those arising from the discharge of perfluorooctanoic acid ("PFOA") and other per- and polyfluoroalkyl substances ("PFAS"). *See* ECF 351 ¶ 236; ECF 352 ¶ 236.

27. Section 2.2(c) of the Separation Agreement states, in part, as follows:

> (ii) pursuant to this Agreement or the applicable Conveyancing and Assumption Instruments, Chemours shall, or shall cause a member of the Chemours Group to, Assume all of the Chemours Liabilities, in each case, regardless of (A) when or where such Liabilities arose or arise, (B) whether the facts upon which they are based occurred prior to, on or subsequent to the Effective Time, (C) where or against whom such Liabilities are asserted or determined (D) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the DuPont Group or the Chemours Group, as the case may be, or any of their past or present respective directors, officers, employees, agents, Subsidiaries or Affiliates, (E) which entity is named in any Action associated with any Liability.

Separation Agreement § 2.2(c).

28. Section 1.1(73) of the Separation Agreement defines "Effective Time" as "12:01 a.m., New York time, on the Distribution Date." Separation Agreement § 1.1(73).

29. The Distribution Date was July 1, 2015.

30. Section 1.1(34)(a) of the Separation Agreement defines "Chemours Liabilities to include:

> [A]ny and all Liabilities relating (a) primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Time[.]

Separation Agreement § 1.1(34)(a).

31. Section 1.1(21) of the Separation Agreement defines "Chemours Business" as:

> [T]he performance chemicals segment, which includes its titanium technologies, fluoroproducts and chemical solutions businesses, of DuPont conducted by the Chemours Business Units and those Business Entities and businesses acquired, as such business is described in the Information Statement, or established by or for Chemours or any of its Subsidiaries after the Effective Time.

Separation Agreement § 1.1(21).

32. Section 1.1(112) of the Separation Agreement defines "Liabilities" as follows:

> [A]ny and all Indebtedness, liabilities, costs, expenses, interest and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, known or unknown, reserved or unreserved, or determined or determinable, including those arising under any Law (including Environmental Law), Action, whether asserted or unasserted, or order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity and those arising under any Contract or any fines, damages or equitable relief which may be imposed and including all costs and expenses related thereto. Except as otherwise specifically set forth herein or in the Tax Matters Agreement, the rights and obligations of the Parties

> with respect to Taxes shall be governed by the Tax Matters Agreement and, therefore, Taxes shall not be treated as Liabilities governed by this Agreement other than for purposes of indemnification related to the Distribution Disclosure Documents.

Separation Agreement § 1.1(112).

33. Section 1.1(34)(c) of the Separation Agreement defines "Chemours Liabilities" to include:

> [A]ny and all Liabilities relating … (c) to any Chemours Business Units or relating to, arising out of, or resulting from any Chemours Asset, whether arising before, on or after the Effective Time[.]"

Separation Agreement § 1.1(34)(c).

34. Section 1.1(18)(v) of the Separation Agreement defines "Chemours Assets" to include:

> [A]ll rights, title and interest in and to the owned real property set forth on Schedule 1.1(18)(v), including all land and land improvements, structures, buildings and building improvements, other improvements and appurtenances located thereon (the 'Chemours Owned Real Property').

Separation Agreement § 1.1(18)(v).

35. Chambers Works is a Chemours Owned Real Property. Separation Agreement, Schedule 1.1(18)(v) at p. 1.

36. Washington Works is a Chemours Owned Real Property. Separation Agreement, Schedule 1.1(18)(v) at p. 4.

37. Fayetteville Works is a Chemours Owned Real Property. Separation Agreement, Schedule 1.1(18)(v) at p. 2.

38. Dordrecht Works is a Chemours Owned Real Property. Separation Agreement, Schedule 1.1(18)(v) at p. 5.

39. Section 6.3 of the Separation Agreement provides, in part:

> Chemours shall and shall cause the other members of the Chemours Group … to indemnify, defend and hold harmless the DuPont Indemnitees from and

against any and all Indemnifiable Losses of the DuPont Indemnitees to the extent related to, arising out of, by reason of or otherwise in connection with (a) the Chemours Liabilities, including the failure of any member of the Chemours Group or any other Person to pay, perform or otherwise discharge any Chemours Liability in accordance with its respective terms, whether prior to, on or after the Effective Time, (b) any Chemours Asset or Chemours Business, whether arising prior to, on or after the Effective Time[.]

Separation Agreement § 6.3.

40. Section 1.1(67) of the Separation Agreement defines DuPont Indemnitees as:

[E]ach member of the DuPont Group and each of their respective Affiliates from and after the Effective Time and each member of the DuPont Group's and such Affiliate's respective directors, officers, employees and agents and each of the heirs, executors, successors and assigns of any of the foregoing[.]

Separation Agreement § 1.1(67)

41. Section 1.1(64) of the Separation Agreement defines "DuPont Group" as "(i) DuPont, the DuPont Retained Business and each Person that is a direct or indirect subsidiary of DuPont as of immediately following [*sic*] the Distribution and (ii) each Business Entity that becomes a subsidiary of DuPont after the Effective Time." Separation Agreement § 1.1(64).

42. The Separation Agreement defines "DuPont" as "E. I. du Pont de Nemours and Company," which has since changed its name to EIDP, Inc. Separation Agreement at NJ-CTVA-00001456.

43. Section 1.1(96) of the Separation Agreement defines Indemnifiable Losses as:

[A]ny and all damages, losses, deficiencies, Liabilities, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs and expenses (including the costs and expenses of any and all Actions and demands, assessments, judgments, settlements and compromises relating thereto and the costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense thereto or the enforcement of rights hereunder).

Separation Agreement § 1.1(96).

44. On June 9, 2015, Chemours's pre-spin board declared a Q3 stockholder dividend of $100 million, which was paid on September 11, 2015 to Chemours's stockholders of record as of August 3, 2015. Chemours Q2 2015 10-Q at 8; Chemours Q3 2015 10-Q at 41.

45. On July 1, 2015, DuPont spun off Chemours as an independent, publicly traded company. ECF 351 ¶ 18; ECF 352 ¶ 18.

46. On September 1, 2015, Chemours's post-spinoff board declared a dividend of $0.03 per share (approximately $5 million) to be paid on December 14, 2015 to Chemours's stockholders of record as of November 13, 2015. Chemours Q3 2015 10-Q at 41; Chemours 2015 10-K at F-7.

47. Chemours does not, and has never, used PFOA as a polymerization aid nor sold it as a commercial product. Chemours 2024 10-K at F-51.

48. Prior to the Chemours spinoff, the Performance Chemicals segment of DuPont made PFOA at Fayetteville Works and used PFOA as a polymerization aid in the manufacture of fluoropolymers and fluoroelastomers at other sites, including Chambers Works, Washington Works, and Dordrecht Works. These sites are now owned and operated by Chemours. Chemours 2024 10-K at F-51.

49. Plaintiffs filed their lawsuit against DuPont and Chemours, among others, on March 27, 2019, seeking cleanup and removal costs, damages, and other relief as a result of the discharges of hazardous substances and pollutants by DuPont, Chemours and Chemours FC from Chambers Works. ECF 1-2 ¶ 1.

50. Plaintiffs' claims in this action include claims against DuPont for its pre-spin conduct at Chambers Works. ECF 332 at *passim*.

51. In August 2001, a class action captioned *Leach v. DuPont* ("*Leach*") was filed in West Virginia state court alleging that residents living near DuPont's Washington Works site in West Virginia had suffered, or may suffer, deleterious health effects from exposure to PFOA in drinking water. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 65; *see* Chemours 2024 10-K at F-51.

52. DuPont reached a settlement in *Leach* in 2004. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-51.

7

53. Pursuant to the *Leach* settlement agreement, DuPont was obligated to fund up to $235 million for a medical monitoring program for eligible class members and, in addition, administrative costs associated with the program, including class counsel fees. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-52.

54. Pursuant to the *Leach* settlement agreement, DuPont funded a series of health studies which were completed in October 2012 by an independent science panel of experts ("Science Panel"). DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-51.

55. The studies were conducted in communities exposed to PFOA to evaluate available scientific evidence on whether any probable link exists, as defined in the *Leach* settlement agreement, between exposure to PFOA and human disease. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-51.

56. The Science Panel found probable links, as defined in the *Leach* settlement agreement, between exposure to PFOA and pregnancy-induced hypertension, including preeclampsia; kidney cancer; testicular cancer; thyroid disease; ulcerative colitis; and diagnosed high cholesterol. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-52.

57. Under the *Leach* settlement agreement, class members could pursue personal injury claims against DuPont for those human diseases for which the Science Panel determined a probable link exists. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-52.

58. Section 3.3 of the *Leach* settlement agreement states, in part:

> Upon delivery of any Probable Link Finding to the Administrator, Defendant agrees that, in any personal injury or wrongful death action brought by or on behalf of or otherwise pertaining to a Class Member, Defendant will not contest the issue of General Causation between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered, but reserves the right to contest Specific Causation and damages as to any individual Class Member or plaintiff and to assert any other defenses not barred by this Agreement.

Mazza Dep. Ex. 2 § 3.3.

59. Section 6 of the *Leach* settlement agreement states, in part:

8

> Each of the Settling Parties hereby agrees that as of the Effective Date of this Agreement as described in Section 14.15 hereof, the running of the statute of limitations with respect to (a) the Conditionally Released Claims, and (b) any and all claims, counterclaims and defenses of the parties with respect to the Conditionally Released Claims shall be tolled from August 30, 2001 through and including the date on which the Science Panel delivers to the Administrator a Probable Link Finding with respect to the particular Human Disease(s) at issue in a Conditionally Released Claim.

*Leach* settlement agreement § 6.

60.  PFOA is also known as "C-8." Mazza Dep. Ex. 2 § 1.8.

61.  Class members filed lawsuits in federal and state courts in Ohio and West Virginia alleging personal injury claims against DuPont for those human diseases for which the Science Panel determined a probable link exists. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-52.

62.  Those lawsuits were consolidated in a multi-district litigation in Ohio federal court ("Ohio MDL"). DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66; Chemours 2024 10-K at F-52; ECF 351 ¶ 207; ECF 352 ¶ 207.

63.  In 2014, six plaintiffs from the Ohio MDL were selected for individual trials. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66.

64.  In 2014, the Ohio MDL court scheduled the first trial to begin in September 2015 and the second to begin in November 2015. DuPont 2014 10-K (EIDP Dep. Ex. 6) at 66.

65.  In February 2017, DuPont and plaintiffs' counsel in the Ohio MDL agreed to a settlement in the Ohio MDL. DuPont 2017 10-K at 4; ECF 332 ¶ 256.

66.  The total settlement amount for the Ohio MDL was $670.7 million. DuPont 2017 10-K at 4.

67.  In February 2017, DuPont and Chemours executed a binding term sheet pursuant to which Chemours agreed to pay half of the Ohio MDL settlement and DuPont agreed to pay the other half (which payment by DuPont was not subject to indemnification by Chemours). DuPont 2017 10-K at 4; Amendment No. 1 to Chemours separation agreement.

68. Concurrent with the Ohio MDL settlement, DuPont and Chemours agreed to a framework for sharing future PFOA costs. DuPont 2017 10-K at 4; Shelton Dep. Ex. 21.

69. In August 2017, DuPont and Chemours executed an amendment to the Chemours separation agreement. Amendment No. 1 to Chemours separation agreement.

70. The amendment implemented prior agreements between Chemours and DuPont related to DuPont's settlement of the Ohio MDL and future PFOA costs. Amendment No. 1 to Chemours separation agreement.

71. Pursuant to the amendment, DuPont and Chemours agreed to share Future PFOA Costs, as that term is defined in the amendment, for a period of five years starting on July 1, 2017 and ending on July 1, 2022. Chemours 2018 10-K at F-43; Amendment No. 1 to Chemours separation agreement.

72. Pursuant to the amendment:

   a. Chemours agreed to pay annual Future PFOA Costs up to $25 million;

   b. DuPont agreed to pay annual Future PFOA Costs up to the next $25 million, which payment would not be subject to indemnification by Chemours; and

   c. Chemours agreed to pay any further annual Future PFOA Costs.

Chemours 2018 10-K at F-43; Amendment No. 1 to Chemours separation agreement.

73. The Ohio MDL settlement did not resolve the personal injury claims of plaintiffs who did not have claims in the Ohio MDL at the time of the settlement, nor did it resolve personal injury claims based on diseases first diagnosed after February 11, 2017. Chemours 2018 10-K at F-43.

74. Following the Ohio MDL settlement, additional plaintiffs claiming to be members of the *Leach* Class filed personal injury claims against DuPont and Chemours. Chemours 2018 10-K at F-43.

75. On May 30, 2019, Chemours filed a complaint in the Delaware Court of Chancery against DuPont, Corteva, and New DuPont (the "Chemours lawsuit").

76. In the Chemours lawsuit, Chemours sought a declaratory judgment that Chemours's indemnification obligations to DuPont, Corteva and DuPont, collectively, should be limited to the "high-end (maximum) realistic exposure" numbers referenced in materials prepared in connection with the Chemours spin or, alternatively, requiring the return of the approximately $3.9 billion dividend Chemours paid to DuPont prior to its separation. Corteva 2019 10-K at 27.

77. On March 30, 2020, before any defendant filed an answer, the Delaware Court of Chancery granted the defendants' motion to dismiss the Chemours lawsuit for lack of subject matter jurisdiction based on arbitration provisions in the Chemours separation agreement. *See* Order, *The Chemours Company v. DowDuPont Inc. et al.*, C.A. No. 2019-0351 (Del. Ch.) (March 30, 2020).

78. DuPont, Chemours, Corteva and New DuPont participated in a confidential arbitration process regarding Chemours's claims in the Chemours lawsuit and other claims. Corteva 2021 10-K at F-45.

79. On January 22, 2021, DuPont, Chemours, Corteva and New DuPont entered into a Memorandum of Understanding ("MOU") to resolve legal disputes originating from the Chemours lawsuit and the arbitration and to establish a cost sharing arrangement and escrow account to be used to fund "PFAS Liabilities," as that term is defined in the MOU. Corteva 2021 10-K at 55.

**IT IS HEREBY STIPULATED, BY AND BETWEEN PLAINTIFFS AND CHEMOURS, THAT:**

1. Prior to the spinoff, DuPont designated a prospective management team for Chemours. Shelton 1 ¶ 27.

2. In the Chemours lawsuit, Chemours alleged in its verified pleading that Chemours's prospective management team had no power regarding the spinoff terms. Shelton 1 ¶ 27.

3. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont refused to allow Chemours or its prospective management team to hire independent counsel to represent Chemours's interests in structuring the spinoff. Shelton 1 ¶ 26.

4. In the Chemours lawsuit, Chemours alleged in its verified pleading that although the spinoff was announced in October 2013, DuPont refused to allow the designated management team for Chemours to see drafts of the Separation Agreement until late December 2014. Shelton 1 ¶ 27.

5. In the Chemours lawsuit, Chemours alleged in its verified pleading that the draft Separation Agreement DuPont provided to Chemours's designated management team in December 2014 did not include the schedules listing assets and liabilities to be allocated to Chemours. Shelton 1 ¶ 29.

6. In the Chemours lawsuit, Chemours alleged in its verified pleading that Chemours's designated management team requested copies of these liability schedules through the winter and spring of 2015 and DuPont repeatedly refused to provide them. Shelton 1 ¶ 29.

7. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont maintained that Chemours's designated management team had no reason or right to assess the economic terms of the spinoff transaction because "this was not a negotiation." Shelton 1 ¶ 30.

8. In the Chemours lawsuit, Chemours alleged in its verified pleading that Chemours requested that DuPont remove the false clause in the Separation Agreement stating that "[t]he parties have participated jointly in the negotiation and drafting" of the agreement, and DuPont refused. Shelton 1 ¶ 33.

9. In the Chemours lawsuit, Chemours alleged in its verified pleading that no one affiliated with Chemours was given the opportunity to negotiate the terms of the Separation Agreement. Shelton 1 ¶ 36.

10. In the Chemours lawsuit, Chemours alleged in its verified pleading that no one representing Chemours's interests agreed to the Separation Agreement. Shelton 1 ¶ 36.

11. In the Chemours lawsuit, Chemours alleged in its verified pleading that, in May 2015, DuPont caused Chemours to assume approximately $4 billion in debt so that the proceeds of the debt could be used to fund a dividend to DuPont in approximately the same amount. Shelton 1 ¶ 35(a).

12. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont arranged for Houlihan Lokey to base its solvency opinion for Chemours on numbers that DuPont supplied as the "High End (Maximum) Realistic Exposure" for the liabilities transferred to Chemours. Shelton 1 ¶ 50.

13. In the Chemours lawsuit, Chemours alleged in its verified pleading that, in May 2015, DuPont presented Chemours's designated CFO, Mark Newman, with a certification containing a list of "High End (Maximum) Realistic Exposure" numbers for 87 separate categories of transferred liabilities ("Newman Certification"). Shelton 1 ¶ 52.

14. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont drafted the Newman Certification. Shelton 1 ¶ 53.

15. In the Chemours lawsuit, Chemours alleged in its verified pleading that Mr. Newman refused to sign the Newman Certification unless it was made clear that the "High End (Maximum) Realistic Exposure" numbers came from DuPont and he was relying on DuPont for the accuracy of the numbers. Shelton 1 ¶ 53.

16. DuPont employees signed multiple "Backup Certificates" that certified the accuracy of the 87 "High End (Maximum) Realistic Exposure" numbers in the Newman Certification. Shelton 1 ¶ 55.

17. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont did not conduct a reasonable inquiry into the "maximum" estimates in the Newman Certification. Shelton 1 ¶ 56.

18. In the Chemours lawsuit, Chemours alleged in its verified pleading that in itemizing the environmental contingent remediation liabilities in the Newman

13

Certificate, DuPont relied on figures used to prepare DuPont's accounting reserves. Shelton 1 ¶ 57.

19. In the Chemours lawsuit, Chemours alleged in its verified pleading that this approach understated the actual maximum liabilities because DuPont's accounting reserves only included liabilities that DuPont deemed to be probable and estimable. Shelton 1 ¶ 57.

20. In the Chemours lawsuit, Chemours alleged in its verified pleading that the accounting reserves excluded liabilities and amounts that DuPont determined to be possible though not probable. Shelton 1 ¶ 57.

21. In the Chemours lawsuit, Chemours alleged in its verified pleading that the accounting reserves excluded liabilities that DuPont regarded as probable, but for which DuPont had not yet made an estimate (including because DuPont deemed them not to be estimable). Shelton 1 ¶ 57.

22. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont relied on numbers provided by Deloitte for the "High End (Maximum) Realistic Exposure" numbers for the litigation liabilities in the Newman Certification. Shelton 1 ¶ 58.

23. In the Chemours lawsuit, Chemours alleged in its verified pleading that the numbers provided by Deloitte were not "maximum" liabilities. Shelton 1 ¶ 58.

24. In the Chemours lawsuit, Chemours alleged in its verified pleading that the numbers provided by Deloitte were not "worst case scenarios." Shelton 1 ¶ 58.

25. In the Chemours lawsuit, Chemours alleged in its verified pleading that the numbers provided by Deloitte were not based on a claims analysis or a value assessment of the cases. Shelton 1 ¶ 58.

26. In the Chemours lawsuit, Chemours alleged in its verified pleading that Deloitte did not account for the fact that the *Leach* settlement agreement bars DuPont from contesting general causation with respect to PFOA personal injury claims brought by class members diagnosed with a disease for which the Science Panel found a probable link. Shelton 1 ¶ 58.

27. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont assigned to Chemours liabilities that were not related to the Performance Chemicals segment—including all liabilities related to DuPont's historical explosives operations and asbestos and benzene exposures. Shelton 1 ¶ 40.

14

28. In the Chemours lawsuit, Chemours alleged in its verified pleading that it had no say in any of the allocation of liabilities and did not see the final schedule of liabilities until days before the spinoff was consummated. Shelton 1 ¶ 40.

29. In the Chemours lawsuit, Chemours alleged in its verified pleading that, prior to the spinoff, DuPont's advisors warned DuPont that the discovery of new environmental liabilities and imposition of new environmental cleanup costs had bankrupted prior spin-offs. Shelton 1 ¶ 44.

30. In the Chemours lawsuit, Chemours alleged in its verified pleading that, after the spin, Chemours recognized that the shareholder dividend was not sustainable, even assuming that the maximum liability numbers in the Newman Certification were respected. Shelton 1 ¶ 75.

31. In the Chemours lawsuit, Chemours alleged in its verified pleading that, even after cutting the shareholder dividend, it was running short of liquidity within months of the spinoff. Shelton 1 ¶ 76.

32. In the Chemours lawsuit, Chemours alleged in its verified pleading that, to preserve cash, Chemours had to lay off 1,000 employees, shutter plants or productions lines in Delaware and Tennessee, sell off business lines, and undertake two corporate restructurings and multiple amendments to its credit agreements. Shelton 1 ¶ 76.

33. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont, Corteva and New DuPont claimed a right to unlimited indemnification from Chemours for DuPont's historical liabilities, without regard for the "maximum" liability numbers in the Newman Certification. Shelton 1 ¶ 2.

34. In the Chemours lawsuit, Chemours alleged in its verified pleading that, after the spinoff, DuPont claimed that the maximum liability numbers in the Newman Certification have no effect. Shelton 1 ¶ 80.

35. In the Chemours lawsuit, Chemours alleged in its verified pleading that, after the spinoff, DuPont claimed that the indemnification provisions in the Chemours separation agreement apply even after the "maximum" liability numbers in the Newman Certification are exceeded. Shelton 1 ¶ 80.

36. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont inserted a requirement in the Chemours separation agreement that all disputes regarding the separation agreement go to a "confidential" arbitration in New

York "as part of an effort by DuPont to shield its machinations from scrutiny under Delaware law." Shelton 1 ¶ 60.

37. After the spinoff, DuPont took the position that Chemours, and not DuPont, is responsible for costs related to alleged PFAS contamination. ECF 352 ¶ 258.

38. In the Chemours lawsuit, Chemours alleged in its verified pleading that, in connection with the spinoff, DuPont certified $128 million as the "High End (Maximum) Realistic Exposure" number for the PFOA personal injury claims pending in the Ohio MDL, including defense costs. Shelton 1 ¶¶ 82–84.

39. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont did not make a serious attempt to evaluate the maximum possible liability those cases represented when it certified the $128 million "High End (Maximum) Realistic Exposure" number. Shelton 1 ¶ 84.

40. In the Chemours lawsuit, Chemours alleged in its verified pleading that, when it was spun-off by DuPont in 2015, DuPont knew that the Fayetteville Works site had been discharging PFAS for 30 years or more into the Cape Fear River. Shelton 1 ¶ 94.

41. In the Chemours lawsuit, Chemours alleged in its verified pleading that the Cape Fear River serves as a source of drinking water for tens of thousands of people. Shelton 1 ¶ 94.

42. In the Chemours lawsuit, Chemours alleged in its verified pleading that, prior to the spinoff, DuPont commissioned a "Blue Ribbon Panel" of company managers, scientists and engineers to identify a solution for the recognized issue at Fayetteville Works. Shelton 1 ¶ 94.

43. In the Chemours lawsuit, Chemours alleged in its verified pleading that the Blue Ribbon Panel provided options to DuPont, including a $60 million investment in abatement technology that the Panel believed would end the PFAS discharges and a $20 million investment in abatement technology that the Panel believed would reduce the PFAS discharges by 70%. Shelton 1 ¶ 94.

44. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont spent $2.3 million on technology that eliminated one wastewater stream and terminated the project in 2013. Shelton 1 ¶ 95.

16

45. In the Chemours lawsuit, Chemours alleged in its verified pleading that, in connection with the spinoff, DuPont certified $2.09 million as the "High End (Maximum) Realistic Exposure" number for the Fayetteville Works site. Shelton 1 ¶ 96.

46. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont did not account for the technological improvements necessary to abate the PFAS discharges from Fayetteville Works or the tort liability that could arise from DuPont's historical emissions. Shelton 1 ¶ 96.

47. In the Chemours lawsuit, Chemours alleged in its verified pleading that, beginning in September 2017, the State of North Carolina, public water authorities, well owners and a consolidated putative class of North Carolina residents, among others, filed suit against Chemours and/or DuPont. Shelton 1 ¶ 97.

48. In the Chemours lawsuit, Chemours alleged in its verified pleading that, in February 2019, Chemours entered into a consent order with the State of North Carolina.

49. In the Chemours lawsuit, Chemours alleged that the consent order required Chemours to adopt the same abatement technology that DuPont declined to install prior to the spinoff and undertake remediation regarding the cumulative effects of DuPont's historical emissions from Fayetteville Works. Shelton 1 ¶ 99.

50. In the Chemours lawsuit, Chemours alleged in its verified pleading that the total cost to Chemours to comply with the consent order would be more than $200 million. Shelton 1 ¶ 99.

51. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont claimed that the $2.09 million maximum liability number has no effect and Chemours must pay all costs associated with the consent order. Shelton 1 ¶ 100.

52. In the Chemours lawsuit, Chemours alleged in its verified pleading that, in connection with the spinoff, DuPont certified an aggregate $337 million as the maximum liability number divided among different sites in the State of New Jersey. Shelton 1 ¶ 101.

53. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont claimed that Chemours must indemnify DuPont with respect to Plaintiffs' four lawsuits arising from DuPont's four New Jersey sites, without regard for the maximum liability number in the Newman Certificate. Shelton 1 ¶ 107.

17

54. In the Chemours lawsuit, Chemours alleged in its verified pleading that DuPont claimed that Chemours must indemnify DuPont's liabilities under ISRA. Shelton 1 ¶ 107.

55. The factual allegations in Chemours's verified pleading in the Chemours lawsuit were based on a reasonable investigation by Chemours and its counsel, and are supported by a sworn verification signed by Newman affirming that as of August 13, 2019, "[t]he factual statements in the [c]omplaint as they relate[d] to [his] acts and deeds [we]re true and correct to the best of [his] knowledge, information, and belief, and insofar as they relate[d] to the acts and deeds of any other person [we]re believed by [him] to be true and correct."