**MEYNER AND LANDIS LLP**
Albert Telsey, Esq.
One Gateway Center, Suite 2500
Newark, New Jersey 07102
Telephone: (973) 602-3439
Facsimile: (973) 624-0356
atelsey@meyner.com
*Attorneys for Intervenor, Carneys Point Township*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; et al., <br> *Plaintiffs*, <br> v. <br> E.I. DU PONT DE NEMOURS AND COMPANY; et al. <br> *Defendants*, | Case No.: <br> 1:19-cv-14758-RMB-JBC (Pompton Lakes) <br> 1:19-cv-14765-RMB-JBC (Repauno) <br> 1:19-cv-14766-RMB-JBC (Chambers Works) <br> 1:19-cv-14767-RMB-JBC (Parlin/Sayreville) <br><br> Hon. Renée Marie Bumb, Chief U.S.D.J. <br> James B. Clark, III, U.S.M.J. |

---

**INTERVENOR CARNEYS POINT TOWNSHIP'S BRIEF IN SUPPORT OF WRIT OF MANDAMUS TO MODIFY THE DUPONT/CHEMOURS JUDICIAL CONSENT ORDER**

---

Dated: November 17, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................i

TABLE OF AUTHORITIES ................................. i**Error! Bookmark not defined.**

SUMMARY ........................................................................................1

BACKGROUND ................................................................................6

LEGAL ARGUMENTS...........................................................................11

  POINT 1

  DEP IS VIOLATING THE SPILL ACT NOTICE PROVISION BY
  NOT PUBLISHING THE GOVERNING ESCROW AGREEMENT............... 11

  POINT 2

  DEP DOES NOT HAVE CONSTITUTIONAL AND STATUTORY
  AUTHORITY TO IMPLEMENT THE JCO WITHOUT MODIFICATION......13

    A.  DEP is violating the NRD Constitutional Amendment for the years 2026
      to 2050 .....................................................................................15

    B.  DEP is violating the 2026 Appropriations Act (NRD legal fees)............17

    C.  DEP is violating the 2026 Appropriations Act (HDSCF) .......................19

    D.  DEP cannot appropriate the entire $875M in Settlement Payments
      without enabling legislation ....................................................................22

    E.  DEP cannot dismiss Carneys Point's two State Court Actions
      because this Court does not have constitutional or statutory authority ...23

    F.  DEP cannot act on behalf of non-party Political Subdivisions
      and private attorneys general to deny their statutory rights ....................26

<u>POINT 3</u>

DEP CANNOT DENY CARNEYS POINT WATER INFRASTRUCTURE
PROJECTS BECAUSE IT VIOLATES THE TAX DEDUCTION RULE.........31

<u>POINT 4</u>

CARNEYS POINT IS ENTITLED TO INTERVENE BY WAY OF
WRIT OF MANADMUS......................................................................................35

<u>CONCLUSION</u>.....................................................................................................40

# TABLE OF AUTHORIES

Cases                                                                                    Page(s)

Ailor v. City of Maynardville, Tennessee,
   368 F.3d 587 (2004)..............................................................................27

Barlow v. Colgate Palmolive Co.,
   750 F.3d 437 (2014)..............................................................................24

*Browning v. Navarro*,
   743 F.3d (1984)....................................................................................24

*Burgos v. New Jersey*,
   225 N.J. (2015)....................................................................................20

*Burgos v. State*,
   222 N.J. 175 (2015)..............................................................................14

*City of Camden v. Byrne*,
   82 N.J. 133 (1980)................................................................................14

*City of Seattle v Monsanto*,
   U.S.D.J., W.D. Washington, 2023 WL 4373432............................................29

Communications Workers of America, AFL-CIO v. Florio,
   130 N.J. 439 (1992)..............................................................................14

D.J. Miller & Associates, Inc. v. State of New Jersey,
   356 N.J. Super. (App. Div. 2002) ............................................................20

Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.,
   54 F.3d 156 (3d Cir. 1995)....................................................................36

General Assembly of State of N. J. v. Byrne,
   90 N.J. 376 (1982)................................................................................14

*Harris v. Pernsley*,
   820 F.2d 592 (3d Cir. 1987)....................................................................36

Howell Tp. v. Waste Disposal, Inc.,
   207 N.J. Super. 80 (1986) .......................................................................27

*In re Mullarkey*,
  536 F.3d 215 (3d Cir. 2008)..................................................................... 25

Kleissler v. United States Forest Serv.,
  157 F.3d 964 (3d Cir. 1998)..................................................................... 36

Knight v. City of Margate,
  86 N.J. 374 (1981).................................................................................... 14

*Lahue v. Pio Costa*,
  263 N.J. Super. 575 (1993) ...................................................................... 12

Mayor and Council of Borough of Rockaway v. Klocker & Klocker,
  811 F. Supp. 1039 (1993)......................................................................... 27

Mid-Atlantic Solar Energy Industries Ass'n v. Chrisitie,
  418 N.J. Super. 499 (App. Div. 2011) ..................................................... 23

Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.,
  72 F.3d 361 (3d Cir. 1995)....................................................................... 36

New Jersey Department of Environmental Protection v. Exxon Mobil Corporation,
  453 N.J. Super. 272 (2018) ...................................................................... 14

New Jersey Department of Environmental Protection v. ExxonMobil,
  452 N.J. Super. 272 (App. Div. 2018) ..................................................... 23

New Jersey Department of Environmental Protection v. ExxonMobil,
  453 N.J. Super. 588 (Law Div. 2015) ...................................................... 19

*New Jersey Educ. Ass'n v State*,
  412 N.J. Super. 192 (App. Div. 2010) ..................................................... 28

New Jersey Hosp. Ass'n v. New Jersey State Dept. of Health,
  249 N.J. Super. 194 (1991) ...................................................................... 20

Sussex Woodlands, Inc. v. Mayor and Council of West Milford Tp.,
  109 N.J. Super. 432 (1970) ...................................................................... 27

*Switz v. Middletown Tp.*,
  23 N.J. 580 (1957)..................................................................................... 40

Weichert Co. Realtors v. Ryan,
    128 NJ 427 (1992) ............................................................................ 12

Statutes

28 U.S.C.A. §1447 ........................................................................... 3, 24, 26

28 U.S.C.A. §2283 ........................................................................... 4, 25, 26

Art. III, Para. 1 of the New Jersey State Constitution ..................................... 13, 28

Article VIII, Section II, paragraph 9 of the State Constitution ........................... 17

N.J.S.A. 2:15D-14 ............................................................................ 22

N.J.S.A. 39:6-61 ............................................................................. 22

N.J.S.A. 40:69A .............................................................................. 27

N.J.S.A. 52:18A-8 ............................................................................ 14

N.J.S.A. 52:18-29 ............................................................................ 14

N.J.S.A. 58:10-23.34 ......................................................................... 19

N.J.S.A. 58:10-23.11e2 ....................................................................... 11, 12

Rules

Fed. R. Civ. P. 24(a) ........................................................................ 35

Fed. R. Civ. P. 24(b) ........................................................................ 37

Regulations

26 CFR §1.162-21 ............................................................................. 31

N.J.A.C. 7:7A-22.19 .......................................................................... 6, 37

Treas. Reg. section 1.162-21(e)(4) ........................................................... 18

Other Authorities

P.L. 2023, Ch. 25 ................................................................................. 22

P.L. 2025 ................................................................................. 17, 19, 20

P.L. 2025, c. 74 ................................................................................. 20

P.L.2009 ................................................................................. 19

Senate Bill 3029 ................................................................................. 22

## SUMMARY

Carneys Point Township ("Carneys Point" or "Township") submits that the Judicial Consent Order ("JCO") in the E.I. DuPont de Nemours and Company /Chemours Company ("DuPont/Chemours) matter is arbitrary, capricious, unreasonable, and unlawful, unless modified.

The $875M in Settlement Payments is broken out into three categories (1) $225M in natural resource damages ("NRD"), which are dedicated to NRD restoration projects on a "first priority" basis to municipalities impacted by pollution from the four Industrial Sites pursuant to the 2017 NRD Constitutional Amendment, (2) $525M in Abatement Damages, which must be dedicated to water infrastructure projects at and around the Chambers Works Site pursuant to the Tax Deduction Rule, and (3) $125M in punitive damages and penalties to reimburse Costs and Fees to be paid out over 25 years.

The DuPont/Chemours JCO violates the separation of powers in the New Jersey State Constitution because the State legislature has not enacted enabling legislation that authorizes the Department of Environmental Protection ("DEP") to appropriate the $825M in Settlement Payments each year over the next 25 years.

As an unlawful substitute for enabling legislation, the JCO provides that the appropriation of the $875M will be "governed" by DEP's sole discretion pursuant

to an Escrow Agreement (Exhibit B) that is not attached to the JCO, and which has not been made available for public comment or judicial review.

The JCO allows DEP to use the $225M in NRD and $525M in Abatement Damages in its sole discretion as a discretionary fund for any DEP purpose it chooses anywhere in the State without regard to the dedicated nature of these funds as required by the NRD Constitutional Amendment and the Tax Deduction Rule.

Table 1 (attached) shows the 25-year payout grid for the three settlement categories. All of the payment boxes for the years 2026 to 2050 are empty except for several unallocated bulk payments in 2026 and 2027 totaling $275M, which is intended to pay a contingency fee to DEP's outside counsel. These empty payment boxes confirm that the three payment categories are pretexts and that DEP is retaining sole discretion to appropriate the entire $875M Settlement Payments for any purpose it chooses for the next 25 years without enabling legislation or the governing Escrow Agreement.

To make sure Settling Defendants pay funds only to DEP and no one else, DEP wants this court to rule that Carneys Point's 2016 Environmental Rights Act ("ERA") action against DuPont, Chemours and Sheryl L. Telford, DuPont's

environmental director, be dismissed in order to deny the Township reimbursement of millions of dollars it is entitled to recover.[1]

Carneys Point brought that ERA action to compel the defendants to comply with the Industrial Site Recovery Act ("ISRA"), pay penalties and attorney's fees, and post a $1B remediation funding source ("RFS"), among other things, because DEP refused to take action against the defendants. Sheryl L. Telford, a former DEP official working for DuPont, personally asked DEP to turn a blind eye to DuPont's ISRA noncompliance and DEP did turn a blind eye. This forced Carneys Point to take action under the ERA.

This court lacks jurisdiction to dismiss the Township's Action against the defendants because it was removed to Federal Court in 2017 and remanded back to state court by Judge Noel L. Hillman, U.S.D.J. 28 U.S.C.A. §1447. In addition, the State Court thereafter ruled that the Township retains ERA jurisdiction despite this Federal Court matter for daily penalties prior to the filing of the Federal Court action in 2019.

Carneys Point also brought a 2018 ERA action against DEP to demand the right to evaluate the plan to abandon millions of pounds of hazardous waste discharged at the Chambers Works Site without undertaking remediation, a plan

---

[1] *Carneys Point Twp. v. E.I. du Pont de Nemours et al.,* Salem County Superior Court Docket No. SLM-L- 251-16, Appeal Docket No. A-002427-24 removed and remanded as Civil Action No. 1:17-cv-00264-NLH-JS

DEP calls "technological impracticability."[2]  This plan will leave the Township with a polluted site that may not be remediated, restored, or redeveloped for generations.  Carneys Point seeks a Public Participation Plan, feasibility study, and public hearing regarding this plan as required by law.

DEP seeks to have this court rule that this Action against DEP also be dismissed.  This court lacks jurisdiction to dismiss this Township Action against the DEP. 28 U.S.C.A. §2283 (anti-injunction statute).  In addition, the State Court has ruled that the Township retains ERA jurisdiction because the claims the Township seeks against DEP are not the same claims DEP seeks against the Settling Defendants.

In order to prohibit Carneys Point and other Political Subdivisions of the State from bringing any actions against the Settling Defendants, Released Entities, and DEP now or anytime in the future, through the ERA as "private attorney's general" or otherwise, the JCO defines Settling Plaintiffs and other defined terms to include all Political Subdivisions of the State and private attorneys general so that the Release and contribution protection sections of the JCO apply to them without them being parties to this action, without consideration, and without their consent.  This is unlawful.

---

[2] *Carneys Point Twp. v. New Jersey Department of Environmental Protection,* Salem County Superior Court Docket No. SLM-C-7-18.

The JCO must be modified and republished as follows:

A.    Since the Escrow Agreement is intended to "govern" the use of Settlement Damages for the next 25 years, the Escrow Agreement is a material element of the settlement and must be published and made know to the public and the court.

B.    The JCO must be made contingent on enabling legislation akin to the opioid and VW litigation settlement legislation that provides a non-lapsing fund with protocols, regulations, advisory boards and other trappings of due process and public participation to fairly manage settlement payments over the next 25 years without reliance on DEP's unchecked discretion or the unpredictability of yearly legislative appropriations.  Otherwise, most of the Settlement Payments may end up in the General Fund, which will defeat the purpose of the settlement.

C.    Paragraph 83 of the JCO must be stricken because it seeks direct judicial rulings by this court to render Carneys Point's two State Court ERA Actions subject to dismissal.  This court has no jurisdiction over those Actions.

D.    The JCO must be modified to exclude the Township's two State Court Actions from certain broad definitions in the JCO because, otherwise, the State and the Settling Defendants could still claim the JCO indirectly countenances dismissal of the Township's two Actions.

E.    The JCO must be modified to exclude the Political Subdivisions of the State and "private attorney's general" from certain broad definitions in the JCO because this court cannot foreclose their rights under the ERA and other citizen suit statutes to act when the DEP fails to act, fails to act sufficiently, or acts in bad faith.

Required modifications to the JCO are set forth as a redlined version of the JCO attached in the proposed Petition for Writ of Mandamus provided as the pleading in support of this motion to intervene.

Carneys Point has standing to intervene because (1) N.J.A.C. 7:7A-22.19 permits intervention in DEP settlements involving the remediation and restoration of wetlands associated with NRD restoration projects, like those required here, (2) the Township is an intended third-party beneficiary to the NRD payments and Abatement payments, and (3) the JCO seeks rulings from this court to dismiss the Township's two State Court Actions and to disenfranchise Political Subdivisions of the State and private attorneys general without their consent.

## **BACKGROUND**

1.    DEP recognizes the Chambers Works Site and its surrounding communities, like Carneys Point, is one of the most PFAS polluted Sites in the world.  ("New Jersey has been uniquely impacted by PFAS Contamination as a result of Discharges of PFAS from the Chambers Works Site, *one of the largest*

*sources of PFAS contamination in the world*").[3]  The Chambers Works Site is also the largest Brownfields site in the state at 1-mile wide by 2-miles long. (Telsey Certification, paragraph 1 ("Atty Cert1")).

2.    In December 2016, Carneys Point sued DuPont, Chemours, and Sherly L. Telford, DuPont's environmental director, pursuant to the ERA, for violating ISRA without posting a $1B RFS, as well as for other remediation violations, seeking penalties and attorney's fees, among other things. (Atty Cert2 Ex1)

3.    In January 2017, the Township contacted DEP to inform them about its lawsuit to seek assistance.  The Department did not respond.  (Atty Cert3, Ex2)

4.    On January 13, 2017, the Defendants removed the Township's State Court Action to Federal Court. (Atty Cert4)

5.    On July 26, 2017, Judge Noel L. Hillman, U.S.D.J. remanded the matter back to State Court with a certified copy of the decision. (Atty Cert5 Ex3)

6.    The Township submitted a petition to DEP signed by over 1,000 residents demanding a meeting.  The Department ignored the petition.  (Atty Cert6 Ex4)

7.    A meeting was eventually held in May 2017 only after local legislators intervened.  At the meeting, the Department told the Township it could

---

[3] Proposed 3M settlement (¶27).

not participate in the remediation of the site and to just write letters if it wanted to know anything. (Atty Cert8 Ex5)

8.     At the time of the May 2017 meeting, the Department was in secret negotiations with DuPont and Chemours about posting a $51M RFS – a fraction of the $1B required.  The Township learned about this months later. (Atty Cert8)

9.     In 2017-2018 the Township told DEP to cease its secret negotiations. The Township sent letters to DEP for months and met with DEP officials.  DEP would not cooperate with the Township. (Atty Cert9)

10.    In 2018, the Township sued DEP pursuant to the ERA to compel DEP to cease its secret negotiations with DuPont and Chemours and to allow the Township into the remediation and RFS process.  (Atty Cert10 Ex6)

11.    DEP told the court that it was <u>not</u> going to sue DuPont for ISRA violations.  In a May 2018 Certification of DEP Assistant Director Kevin Kratina, he stated, "Rather than fight about legal requirements, in particular whether ISRA was triggered, in 2017 DEP met with DuPont and Chemours on a number of occasions." Kratina went on to state he was hopeful DuPont and Chemours would voluntarily agree to post an adequate RFS.  That settlement never happened. (Atty Cert11 Ex7).   Thereafter, the DEP, defendants, and the Township agreed to mediate the matters.  However, the Township did not give up its ERA actions.

12.    In 2018, the Township filed a Motion for Partial Summary Judgment claiming DuPont violated ISRA by transferring the Chambers Works deed to Chemours in January 2015 without posting a $1B RFS. (Atty Cert12).  In February 2019, Judge Anne McDonnell, P.J.Ch., concluded the Township had ERA jurisdiction and entered judgment against DuPont for transferring the deed to Chemours, which "triggered the requirement for DuPont to comply with [ISRA] at Chambers Works and surrounding impacted areas." (Atty Cert12 Ex8)

13.    A month later, in March 2019, the State filed this matter including ISRA claims duplicating the Township's deed transfer ISRA claim it had just won a month earlier. The State then usurped the ISRA judgment the Township obtained from Judge McDonnell to support its own duplicative ISRA claim as if the State had won the judgment. (Atty Cert13)

14.    In 2022, the Township filed an application to intervene in this Federal Court action due to a lack of mediation progress and the State's continued dismissiveness towards the Township.  The application was withdrawn when the State promised to keep the Township involved in the RFS mediation negotiations. (Atty Cert14)

15.    In 2024, DuPont/Chemours filed a motion to dismiss the Township's State Court ERA Action against Defendants claiming this Federal Court action supersedes the Township's Action.  Judge Robert Malestein, J.S.C. denied the

motion ruling that the Township's Action was correctly filed under the ERA and that the Township can pursue penalties and attorney's fees for daily violations that occurred prior to the State filing its action in March 2019 and for all claims unrelated to the State's action, including the claims against Sheryl Telford. (Atty Cert15 Ex9)

16.     In 2024, the DEP filed a motion to dismiss the Township's State Court Action against the DEP also claiming it is superseded by this Federal Court Action. Judge Malestein denied this motion too, ruling that, pursuant to the ERA, the Township is entitled to demand a Public Participation Plan, feasibility study, and hearing to understand the cleanup process, or lack thereof, at the Chambers Works Site. (Atty Cert16 Ex10)

17.     The Township sought to intervene in 2024 when the trial of this matter was put back on the active docket after being administratively dismissed. However, the Special Master denied the Township's intervention at that time. (Atty Cert17)

18.     Now that the draft JCO has been issued and the Township has sent its comments to DEP, the Township has exhausted its administrative remedies and seeks intervention to address the JCO. (Atty Cert18

# **LEGAL ARGUMENTS**

## POINT 1

### DEP IS VIOLATING THE SPILL ACT NOTICE PROVISION BY NOT PUBLISHING THE GOVERNING ESCROW AGREEMENT

The JCO provides that the $875M Settlement Payments shall be paid into an unidentified Escrow Account, "governed by" an unidentified Escrow Agent, and paid out over the next 25 years pursuant to unidentified terms and conditions in an Escrow Agreement that is not attached to the JCO (Exhibit B) (¶7.b).

The Escrow Agreement has not been made available for public comment or review and approval by the court. That is because, according to the JCO, the Escrow Agreement still needs to be negotiated and drafted "in the form to be mutually agreed to by the Parties." (¶7.b). In other words, no one knows what the governing Escrow Agreement is going to say.

The principals that will govern how DEP pays out $875M in Settlement Damages over the next 25 years were not discussed in the published settlement notice. This failure violates the Spill Act notice provisions because the Escrow Agreement is a material element of the settlement.[4] (Atty Cert19,Ex11). As such, the JCO does not comply with paragraph 90 of the JCO, and the court cannot make

---

[4] N.J.S.A. 58:10-23.11e2

this finding of fact (90. "The notice described in this Section XVI is deemed compliant with the notice requirements of N.J.S.A. 58:10-23.11e2.")

The JCO states DEP can decide "in its sole discretion" to reject any public comment, including an objection that the Escrow Agreement is missing (¶91). A settlement agreement requires terms that are sufficiently definite so that the performance to be rendered by each party can be ascertained by the parties, the public, and the court with reasonable certainty.[5]  DEP has no discretion to forgo a material element of the settlement, like the Escrow Agreement, and the court cannot approve a settlement if material terms are missing.[6]

In August 2025, the Middlesex County Superior Court addressed a proposed NRD JCO with Hercules, Inc. that was supposed to include a 300-acre Conservation Easement valued at over $15M.  However, the Easement was missing all of its essential attachments.  Judge Benjamin S. Bucca, Jr., J.S.C. found the attachments to be material elements of the settlement and did not approve the settlement pending resolution of the missing documents. (Atty Cert20,Ex12).[7]

---

[5] *Weichert Co. Realtors v. Ryan*, 128 NJ 427, 435 (1992)

[6] *Lahue v. Pio Costa*, 263 N.J. Super. 575 (1993)

[7] *New Jersey Department of Environmental Protection v. Hercules, Inc.,* New Jersey Superior Court, Middlesex County, Docket MID-L-8749-07, Hearing to approve NRD JCO, August 28, 2025.  Regarding the Conservation Easement and the missing attachments, Judge Benjamin S. Bucca, Jr., J.S.C. stated, "There are some substantive issues here. So -- and I think it's -- in the long run it will save time to -- let's -- on some substantive issues which I believe this issue of what can Sayreville do in terms of improvement on the property as it relates to their water supply, that's a real issue. And I don't think that that should -- that that -- I'm just not so sure that that should --

The court here cannot approve this JCO until DEP provides the public with the Escrow Agreement for review and comment.

POINT 2

DEP DOES NOT HAVE CONSTITUTIONAL AND STATUTORY
AUTHORITY TO IMPLEMENT THE JCO WITHOUT MODIFICATION

The Settling Plaintiffs claim they are exercising "the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interest that can be addressed by those powers, and to protect the health and well-being, both physical and economic, of all Persons subject to the State's jurisdiction" "in all its capacities to the maximum extent allowable by law," including its capacity as *parens patriae* and Trustee of the State's Natural Resources. (¶6, EE.)

The State acknowledges in the above statement that it is not certain what the "maximum extent" of these powers are under the law, and rightly so. The State does not have the power to appropriate the $875M in Settlement Payments without enabling legislation; does not have the power to dismiss Carneys Point's two State Court Actions; and does not have the power to act on behalf of local government and private attorneys general without their consent as discussed in this Point II.

Regarding appropriation power, Art. III, Para. 1 of the New Jersey State Constitution identifies the separation of powers between the executive, legislative,

---

that I would be responsible as a judge to say, all right, well, you know, I'll let the parties just settle it after the fact. Let's get it done now." P.40

and judicial branches.[8]   All state revenues, including litigation recoveries, are

deposited into the General Fund and appropriated by the legislature.[9]   See,

Department of Treasury Act of 1948, N.J.S.A. 52:18A-8[10] and N.J.S.A. 52:18-29,

which states that all funds "shall not be disbursed therefrom unless specifically

appropriated by the legislature in an annual or supplemental appropriation act" or

other legislative enactment. [11]   In other words, the legislature controls state funds,

like the $875M in Settlement Damages here, not DEP.

The JCO violates legislative appropriation authority for 2026, 2027, and

2027 to 2050.  <u>First</u>, regarding 2026, the JCO violates the 2017 NRD Constitutional

Amendment because the JCO (Exhibit A) fails to break apart a bulk 2026 $100M

NRD/non-NRD Settlement Payment making it impossible to deposit the NRD

---

[8] *Communications Workers of America, AFL-CIO v. Florio*, 130 N.J. 439 (1992).  The separation of powers is to ensure cooperative action among the branches while maintaining their distinct roles. *General Assembly of State of N. J. v. Byrne,* 90 N.J. 376 (1982), *Knight v. City of Margate*, 86 N.J. 374 (1981).

[9] Article VIII, Section 2, Paragraph 2, See also, *City of Camden v. Byrne*, 82 N.J. 133 (1980), *Burgos v. State*, 222 N.J. 175 (2015), *New Jersey Department of Environmental Protection v. Exxon Mobil Corporation,* 453 N.J. Super. 272 (2018)

[10] N.J.S.A. 52:18A-8. "All State revenue collected by any department, institution, commission, board, committee or official of this State shall, except as otherwise provided by law, be deposited, in the method prescribed by the director of the Division of Budget and Accounting, to the credit of the State of New Jersey in such depositories as the State Treasurer shall designate."

[11] N.J.S.A. 52:18-29. "All moneys of the state collected or received by any state institution, board, commission, department, committee, agent or servant, from any source, shall except as otherwise provided by law be paid into the state treasury not later than the tenth day of the month following the month during which such moneys were collected or received, and shall not be disbursed therefrom unless specifically appropriated by the legislature in an annual or supplemental appropriation act; provided, that moneys collected or received by the department of motor vehicles during the month of December of any year shall be paid into the state treasury not later than the tenth day of February following such month in which the moneys were collected or received."

portion of that bulk payment into the Dedicated NRD Account held by the legislature for each of the four Industrial Sites, and impossible to deposit the non-NRD portion Abatement Damages into the Hazardous Discharge Site Cleanup Fund ("HDSCF") for non-NRD purposes as provided by the 2026 Appropriations Act.

Second, regarding 2027, the JCO violates the 2017 NRD Constitutional Amendment because it fails to break apart a bulk 2027 $50M NRD payment between two Sites for deposit into the Dedicated NRD Account.

Third, regarding 2027 to 2050, the JCO violates the 2017 NRD Constitutional Amendment because it fails to break apart each bulk NRD/non-NRD payments for each year 2027 to 2050 for deposit into the Dedicated NRD Account for each of the four Sites, and it fails to identify the non-NRD Abatement Damages portion for deposit into the HDSCF, or elsewhere. See Table 1.

The only way DEP can manage future settlement payments over the next 25-years is if the legislature enacted legislation enabling the DEP to manage these future Settlement Payments. The legislature has not done this.

A.  DEP is violating the NRD Constitutional Amendment

The 2017 NRD Constitutional Amendment credits NRD recoveries obtained each year to a Dedicated NRD Constitutional Account held by the legislature, not

the DEP.[12]  This is a non-lapsing account.  One hundred (100%) of the NRD recovery for each NRD Site is deposited into the account.  The funds are dedicated to each NRD Site for NRD restoration projects at and around each Site on a "first priority" bases.[13] NRD recoveries are not used for general statewide purposes.

Here, the JCO (Exhibit A) violates the 2017 NRD Constitutional Amendment because it fails to allocate NRD recoveries to the four NRD Sites in each year of the 25-year payout. See Table 1.

This failure to allocate per Site, per year, denies pollution-impacted municipalities the ability to design and budget appropriate NRD restoration projects for their communities because they will not know how much each yearly payment will be, if any, for each Site.  This municipal involvement in the NRD restoration process is baked into the Constitutional Amendment through the DEP

---

[12] Art. VIII, Sec. II, para. 9 eff. December 7, 2017. "There shall be credited annually to a special account in the General Fund an amount equivalent to the revenue annually derived from all settlements and judicial and administrative awards relating to natural resource damages collected by the State in connection with claims based on environmental contamination. The amount annually credited pursuant to this paragraph shall be dedicated, and shall be appropriated from time to time by the Legislature, for paying for costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, or for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to natural resource damages."

[13] Art. VIII, Sec. II, para. 9 eff. December 7, 2017. "The first priority for the use of any moneys by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, pursuant to this paragraph shall be in the immediate area in which the damage to the natural resources occurred *in connection with the claim for which the moneys were recovered.*" [Emphasis added].

NRD Administrative Order 2023-08.[14]    Here, the JCO violates the NRD Constitutional Amendment and disenfranchises pollution-impacted municipalities from meaningful participation.

     B. <u>DEP is violating the 2026 Appropriations Act (NRD legal fees)</u>

The 2026 Appropriations Act appropriates funds from 2026 NRD recoveries to pay for legal and other costs incurred by the State in obtaining 2026 NRD recoveries per Site.[15] This appropriation lapses after the 2026 fiscal year.

The JCO allocates $200M in 2026 (Exhibit A).  One hundred million ($100M) is an unallocated bulk payment between NRD for the four Sites and non-NRD Abatement Damages, and the other $100M is for Costs and Fees (unrelated to NRD or non-NRD costs). See <u>Table 1</u>.

The $100M bulk payment for NRD/non-NRD Abatement Damages does not allocate between the two categories. As such, the four impacted communities (Carneys Point, Pompton Lakes, Repauno, and Parlin/Sayreville) cannot budget

---

[14] "It is the policy of the Department to engage directly with the public whose natural resources the State holds in trust concerning the Department's identification, selection, planning, and implementation of restoration projects, and to provide information and seek input on restoration projects from communities affected by the relevant discharges(s) of hazardous substances, contaminants, or other pollutants."

[15] "Notwithstanding the provisions of any law or regulation to the contrary, there are hereby appropriated from the Natural Resource Damages – Constitutional Dedication account such amounts as are required, as determined by the Director of the Division of Budget and Accounting, in consultation with the Attorney General, and consistent with the requirements of the constitutional dedication pursuant to Article VIII, Section II, paragraph 9 of the State Constitution, to pay the legal or other costs incurred by the State to pursue settlements and judicial administrative awards relating to natural resource damages." 2026 Appropriations Act, P.L. 2025, c.74, p.103

for NRD restoration projects, and the State's legal counsel cannot calculate NRD legal fees and costs incurred for each of the four Sites.

The JCO also fails to allocate a bulk 2027 $50M NRD Settlement Payment between the Chambers Works and Pompton Lakes Sites. See Table 1. The JCO refers to this $50M as a comingled "Additional Fees and Costs Amount," that can be used to pay NRD and non-NRD attorney's fees up to the entire $50M for the State's Outside Counsel's statewide NRD and non-NRD activities. (¶11).[16]

This is unlawful because, first, NRD recoveries can only be used to pay NRD attorney's fees/costs calculated from the recovery of each NRD site, and not attorney's fees for non-NRD recoveries on a statewide basis. Second, this 2027 bulk $50M allocation is not allocated between the two sites as required by the NRD Constitutional Amendment. Third, even if it was allocated, there is no 2027 Appropriations Act that authorizes the payment of attorney's fees from this 2027 $50M NRD payment. Fourth, even if there was a 2027 appropriation for 2027 NRD attorney's fees, the State cannot use the entire $50M NRD unallocated bulk payment to pay attorney's fees/costs for NRD and non-NRD recoveries because this violates the 2017 NRD Constitutional Amendment.

---

[16] "11. Notwithstanding Paragraph 7, Settling Plaintiffs may allocate up to an additional $50,000,000 of the Settlement Payments set forth in Paragraphs 7.c.i [Chambers Works] and ii [Pompton Lakes] for costs, including attorney's fees and costs, that do not constitute restitution or remediation within the meaning of section 162 (f)(2)(A) of the IRCS Code, and Treas. Reg. section 1.162-21(e)(4) if necessary based on fees and costs actually incurred ("Additional Fees and Costs Amount")."

Using 100% of a recovery to pay a contingency fee also violates New Jersey

Court Rules on contingency fees.[17]  It also violates the reasonableness and fairness

standard in NRD settlements.  In a recent ExxonMobil NRD settlement, the court

held that it would be unfair or unreasonable for an entire NRD settlement to be

paid over to attorney's fees with nothing left for pollution-impacted

municipalities.[18]

C.  <u>DEP is violating the 2026 Appropriations Act (HDSCF)</u>

The 2026 Appropriations Act also has two provisions dealing with the

Hazardous Discharge Site Cleanup Fund ("HDSCF"), which is a DEP account

dedicated to the cleanup of hazardous waste sites unrelated to NRD.[19]  One

provision is a deposit provision.  It authorizes funds received from cost recoveries

obtained in fiscal year 2026 to be deposited into the HDSCF for the cleanup of

hazardous waste sites.[20]  The other provision is an appropriation provision.  It

---

[17] R. 1:21-7.

[18] *New Jersey Department of Environmental Protection v. ExxonMobil*, 453 N.J. Super. 588, 658 (Law Div. 2015).  Here, a large attorney's fee was awarded on a large NRD settlement but was found to be reasonable.  However, the court did state, "Had the express terms of the Proposed Consent Judgment mandated that <u>no money</u> would go towards environmental cleanup or restoration purposes, this would be a different issue. This situation, however, is not before the court." [Emphasis in original].

[19] N.J.S.A. 58:10-23.34

[20] "In addition to the amount hereinabove, there is appropriated **to** the Hazardous Discharge Site Cleanup Fund - Responsible Party account such additional amounts, as necessary, received from cost recoveries and from the Licensed Site Remediation Professionals fees and deposited into the Hazardous Discharge Site Cleanup Fund, for the cleanup of hazardous waste sites and the costs associated with the "Site Remediation Reform Act," P.L.2009, c.60 (C.58:10C-1 et seq.), subject to the approval of the Director of the Division of Budget and Accounting." 2026 Appropriations Act, P.L. 2025, c.74, p.101.

authorizes the use of funds deposited into the HDSCF in fiscal year 2026 to pay for administrative costs associated with the cleanup of hazardous waste sites incurred in 2026 unrelated to NRD.[21]  These provisions are lapsing appropriations and apply only to 2026 cost recoveries.[22]

The JCO provides that DEP can, in its sole discretion, decide to allocate Settlement Payments, if any, to the Dedicated NRD Account, and non-NRD Abatement Damages, if any, to the HDSCF for each year of the 25-years of this settlement.[23]  The published notice of the JCO confirms that DEP intends to manage the $525M non-NRD Abatement Payments in its own trust account pursuant to its own discretion for any environmental purposes regardless of legislative appropriation.[24]

---

[21] "The amount hereinabove for the Hazardous Discharge Site Cleanup Fund – Responsible Party account is appropriated **from** responsible party cost recoveries and Licensed Site Remediation Professionals fees deposited into the Hazardous Discharge Site Cleanup Fund, together with an amount not to exceed $15,423,000 for administrative costs associated with the cleanup of hazardous waste sites, subject to the approval of the Director of the Division of Budget and Accounting." P.101. P.L. 2025, c. 74.

[22] A third provision in the 2026 Appropriations Act authorizes the use of HDSCF funds to pay for the disposal of Class B firefighting foam containing PFAS.  P. 101-102, P.L. 2025, c.74.  The JCO did authorize $4.125M to pay for firefighting foam damages throughout the State (¶7c.iii).  This amount could be deposited into the HDSCF as part of the 2026 $100M allocation to the Costs/Fees category.

[23] "The Settling Plaintiffs retain discretion to apply additional portions of the Settlement Payments *for the general purpose of, among other things,* improving water quality and funding the treatment of drinking water across the State." (¶7.c.iv).  *Burgos v. New Jersey*, 225 N.J. 175 (2015), *New Jersey Hosp. Ass'n v. New Jersey State Dept. of Health,* 249 N.J. Super. 194 (1991); *D.J. Miller & Associates, Inc. v. State of New Jersey*, 356 N.J. Super. 414 (App. Div. 2002).

[24] The notice regarding the JCO states, "Abatement damages recovered will be held in a dedicated trust account to be administered and used by NJDEP for the purpose of improving and protecting public health, safety, and the environment . ." (Atty Cert19,Ex11).

The DEP has settled more than a dozen NRD cases over the past 6 years. [25] They each involve a one-year, lump sum settlement payment with an identified allocation to NRD and non-NRD payments without a multiple year payout schedule. Some used an escrow merely to hold the cash payment pending exhaustion of the 45-day appeal period for the settlement. None of these settlements sought to bind the then-current legislature to future appropriations or to use an Escrow Agreement as a "governing" document to manage payment payouts over multiple years. These are unique and unlawful features found only in the DuPont/Chemours and 3M settlements.

The only guidelines DEP offered on the use of the $875M over the next 25 years was a comment in the notice of the JCO, which stated, "The NJDEP intends to conduct public outreach and engagement in the consideration and selection of restoration activities to be pursued with funds recovered by this settlement." (Atty Cert19,Ex11). How this outreach is done or not done, or what criteria, if any, will be used to determine how this money gets spent is unknown and left to the sole discretion of DEP for the next 25 years. The use of this money is a legislative function, not a DEP function.

---

[25] https://dep.nj.gov/nrr/proposed-settlements/

D.  DEP cannot appropriate the entire $875M in Settlement Payments without enabling legislation

The DEP cannot use its "sole discretion" to appropriate unallocated bulk payments each year over the next 25-years because that unbridled administrative discretion violates the legislative appropriations clause.  When it comes to managing large litigation settlements recovered over many years, the legislature adopts special legislation to avoid the unpredictability of yearly appropriations. For example, the legislature has established the Opioid Recovery and Remediation Fund to manage the State's $1B recovery in the national opioid litigation to be handled through the Department of Human Services ("DHS"),[26] and the VW emission fraud litigation settlement fund to be handled through the DEP.[27]  These funds are managed with victim compensation protocols, project requirements, Advisory boards, regulations, and reports to the Governor and the legislature, and not left to the whim of an executive department.[28]  Other similar funds have also been enacted by the legislature.[29]

This court has no judicial authority to circumvent the legislative appropriations process by approving this JCO with a 1-page payout schedule

---

[26] P.L. 2023, Ch. 25
[27] Senate Bill 3029 (2R) of 2017.  See DEP website: https://dep.nj.gov/vw/
[28] N.J.A.C. Executive Order 323 (2023) [Opioid settlement protocols].
[29] Fraud Response Fund to address contractor fraud during federal disaster recovery programs, N.J.S.A. 2:15D-14, and the New Jersey Unsatisfied Claim and Judgment Fund to provide relief to victims of uninsured or hit-and-run drivers, N.J.S.A. 39:6-61 et seq.

(Exhibit A) governed by a nonexistent Escrow Agreement intended to allocate $875M over the next 25 years.  The Appellate Division in the ExxonMobil NRD settlement stated, "Under the Appropriations Clause of the New Jersey Constitution [citation omitted] the power and authority to appropriate funds is vested in the Legislature. [citation omitted].  The Judiciary has no authority for any role in the budgetary process."[30]

E.  DEP cannot dismiss Carneys Point's two State Court Actions because this Court does not have constitutional or statutory authority to do so

Paragraph 83 of the JCO seeks to have this court find that the Releases in the JCO should dismiss Carneys Points 2016 ERA State Court Action against Defendants.[31]  Defendants removed this State Court Action to Federal Court.  On July 26, 2017, Judge Noel L. Hillman, U.S.D.J. remanded the Action back to State Court.  On July 27, 2017, the Clerk of the District Court sent a certified copy of

---

[30] *New Jersey Department of Environmental Protection v. ExxonMobil*, 452 N.J. Super. 272, 307-308 (App. Div. 2018).  See also, *Mid-Atlantic Solar Energy Industries Ass'n v. Chrisitie*, 418 N.J. Super. 499 (App. Div. 2011) [Legislature can alter the appropriation of funds authorized by a legislative Act to a different destination if done by the legislature in the yearly Appropriations Act].

[31] "83. The Parties intend, and this Court finds, that the Releases in the JCO resolve, release and bar Claims, including to the extent applicable by res judicata, brought by Carneys Point Township that seek to recover for the same or materially similar relief that Settling Plaintiffs are releasing in the JCO, and specifically including Carneys Point's Environmental Rights Act Claims and all Claims within the scope of the Released Claims with respect to the Chambers Works Site (or that would be within the scope of the Released Claims if asserted by Settling Plaintiffs). Based on this, upon entry of this JCO, Settling Plaintiffs and the Settling Defendants will seek an order promptly dismissing the following litigation currently pending in the New Jersey court: *Carneys Point Twp. v. E.I. du Pont de Nemours et al.,* Salem County Superior Court Docket No. SLM-L-251-16, Appeal Docket No. A-002427-24. The Parties will reasonably cooperate to seek dismissal of, or otherwise address, any other Claims brought by Carneys Point Township that are resolved, released, and barred by this JCO."

the remand order to the Clerk of the Salem County Superior Court. The remand order was never vacated.

In 2024, the defendants filed a motion to dismiss the State Court Action claiming this matter supersedes it. The trial court denied that motion finding that Carneys Point retains ERA jurisdiction for daily violation that occurred prior to this matter being filed in March 2019 and for claims not addressed in this matter.

According to 28 U.S.C.A. §1447, once a certified copy of a remand order is sent back to state court, the state court thereafter has jurisdiction of the matter, and the District Court no longer retains jurisdiction of the matter.[32] Consequently, this court has no jurisdiction to make any ruling regarding the preclusive effect, if any, that this JCO has on the Township's State Court Action against Defendants.

Paragraph 83 also seeks to dismiss the Township's 2018 State Court Action against DEP as "other Claims brought by Carneys Point Township." The DEP sought to dismiss this Action claiming this matter supersedes it. The State Court denied that motion.

The State Plaintiffs Complaint in this matter does not seek the relief sought by Carneys Point in its State Court Action against DEP, and the JCO in this matter

---

[32] *Barlow v. Colgate Palmolive Co.*, 750 F.3d 437 (2014), *Browning v. Navarro*, 743 F.3d 1069 (1984).

does not provide the relief the Township seeks in its State Court Action against DEP.

This court does not have jurisdiction to enjoin the State Court Action against the DEP because to do so would violate the Anti-Injunction Act, which prevents the Federal Court from enjoining state court proceedings. 28 U.S.C.A. §2283. Res judicata also does not apply because there is no commonality between the two matters.[33] For these reasons, paragraph 83 of the JCO must be stricken.

_Amending JCO definitions._ Paragraph 83 was a direct assault on the Township's two State Court Actions and must be stricken for the above reasons. However, certain definitions in the JCO must also be amended to exclude Carneys Point and the two State Court Actions. Otherwise, DEP can appear in State Court and claim the Release and contribution protection in the JCO indirectly include Carneys Point and the two State Court Actions based on the definitions in the JCO.

This court cannot countenance the Parties using the definitions to accomplish indirectly what this court must rule the JCO cannot do directly; that is, dismiss Carneys Point's two State Court Actions. To do so would violate the New Jersey State Constitution that prohibits a contract, such as this JCO, from "depriving a party of any remedy" which existed when the contract was made. (Art 4,§7,¶3).

---

[33] _In re Mullarkey_, 536 F.3d 215, 225 (3d Cir. 2008)

Here, Carneys Point is entitled to the protections provided by 28 U.S.C.A. §1447 to prevent dismissal of its State Court Action against DuPont/Chemours/Telford, and 28 U.S.C.A. §2283 to prevent dismissal of its State Court Actions against DEP. DEP is not entitled to use the contractual definitions in the JCO to deny the Township its rights under these statutes.

Therefore, the following definitions in the JCO must be amended to specifically exclude Carneys Point and the two State Court Actions: "Corporate Reorganization Claim," "Industrial Site Releasors," "Person," "Political Subdivision," "Released Industrial Site Claims," "Released Statewide PFAS Claims," "Settling Plaintiffs," "Statewide PFAS Releasors," and "Released Entities" (which must exclude Sheryl L. Telford under the definition of "employee.") See the redlined JCO pleading attached to the Writ of Mandamus.

F. DEP cannot act on behalf of non-party Political Subdivisions and private attorneys general to deny their statutory rights

The Settling Plaintiffs claim they have the power to act on behalf of Political Subdivisions of the State and private attorneys general without them being named parties, without providing them consideration, without their consent, "without limitation, and to the maximum extent that the Attorney General and other State signatories to this JCO may release PFAS Claims," to include them within the JCO definitions of "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites Releasors" and to make them each provide a general release and

contribution protection to all "Settling Defendants" and "Released Entities" for all "PFAS Claims" throughout the State from now until the end of time (¶6,49).

Political subdivisions.  The State Constitution provides that New Jersey laws empower local government to operate without sovereign interference and that these laws "shall be liberally construed in their favor" in accordance with their "express terms" and reasonable inferences that are "not inconsistent with or prohibited by this Constitution or by law." (Art. IV, §VII, ¶11).  New Jersey is deemed a "liberal legislative home rule state."[34]

The express terms and liberal interpretation of municipal enabling statutes like N.J.S.A. 40A (Counties and Municipalities) and N.J.S.A. 40:69A (Faulkner Act) do not empower the DEP to make local government release claims and provide contribution protection against their will and without their consent merely because it is expedient for a settlement in a litigated matter.

Private attorneys general.  The ERA was enacted in 1974.  It provides "supplemental" jurisdiction, not superseding jurisdiction, which allows citizens and municipalities the right to take action against polluters and the DEP as a private attorney general when the DEP refuses to act, is unwilling to act, or acts in bad faith.[35]  Sponsors of the bill recognized the primary jurisdiction of DEP; however,

---

[34] *Sussex Woodlands, Inc. v. Mayor and Council of West Milford Tp.*, 109 N.J. Super. 432 (1970).
[35] The Sponsors also stated, "The Committee makes no recommendation on the basic question of policy posed by this bill, i.e. whether interested citizens and groups should have the right to

the sponsors also recognized the need for supplemental jurisdiction to allow citizens and municipalities to protect the environment without having to prove special damages when DEP fails to act, refuses to act, or acts in bad faith.[36]

Including Political Subdivisions of the State and private attorneys general within the definitions of "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites Releasors" against their will deny them their statutory ERA right to take action against polluters and DEP when DEP fails to act, refuses to act, or acts in bad faith. This is unlawful because it violates the intent of the ERA and separation of powers (NJ Const., Art. III, ¶1). It is also unlawful because it sets State policy by executive contract without legislative authority.[37]

---

supplement governmental enforcement programs by bringing Court actions in aid of such enforcement. However, if the Legislature desires to implement this basic policy, the Committee sees no reason why this bill should not be enacted into law in its' present form." See, *Howell Tp. v. Waste Disposal, Inc.*, 207 N.J. Super. 80 (1986); *Mayor and Council of Borough of Rockaway v. Klocker & Klocker,* 811 F. Supp. 1039 (1993), *Ailor v. City of Maynardville, Tennessee*, 368 F.3d 587 (2004).

[36] Sponsors of the ERA stated, "The bill recognizes that the primary responsibility to prosecute polluters rests with government. In those instances where government is unable or unwilling to take the necessary action, any person should be assured of an alternative course of' action." (Atty Cert Ex__). The sponsors further stated that, "The purpose of the bill is to overturn the doctrine long established in our law that in order to have sufficient standing to sue for abatement or prevention of a public 'nuisance, a private person must show special damage peculiar to himself and distinct from that done to the public at large. [citations omitted]. . . It would thus remedy what its supporters believe to be an unnecessary and obsolete impediment to enforcement of antipollution laws."

[37] *New Jersey Educ. Ass'n v State*, 412 N.J. Super. 192 (App. Div. 2010).

DEP wants to deny ERA plaintiffs their rights to pursue ERA actions by contract, this JCO, because DEP wants to provide the Settling Defendants with finality against future litigation.  In exchange for $875M in Settlement Payments that DEP intends to use for general environmental purposes throughout the State in its sole discretion, DEP will forgo its own litigation rights against the Settling Defendants.

However, DEP also wants to deny pollution-impacted municipalities their statutory rights under the ERA to challenge DEP's misappropriation of the funds, which are supposed to be dedicated for the restoration of damaged ecosystems within pollution-impacted municipalities, so DEP can use them for unspecified environmental purposes in DEP's sole discretion.

In *City of Seattle v Monsanto,* U.S.D.J., W.D. Washington, 2023 WL 4373432, the State of Washington wanted to release environmental claims in a JCO against Monsanto on behalf of the City of Seattle by operation of sovereign law even though the City was not a party to the lawsuit and did not consent to the release of its claims against Monsanto. (Atty Cert22,Ex14).  The court concluded that the State could not force the city to release its claims because the State's sovereign power in this regard was unclear.  Since every contract is presumed to incorporate the law of the state at the time of execution, and since the law on this point was unclear, the State could not compel the city to release Monsanto.

Here, in New Jersey, it is clear that DEP cannot act on behalf of the Political Subdivisions of the State or private attorneys general without their participation or consent on the pretext it has the power to act on their behalf because DEP has no such power.

Ms. Jerry English, former DEP Commissioner, State Senator, and Counsel to the Governor at the time the ERA was passed in 1974 states that the ERA was intended to supplement DEP jurisdiction, not supplant it, to allow citizens and municipalities to take action when DEP fails to act, refuses to act, or acts in bad faith. That is why the ERA provides a 30-day notice to DEP for private citizens before they can act, but no prior notice is required for municipalities before they can act.

Ms. English acknowledges that the ERA was designed to allow a municipality to take immediate action against a polluter or DEP to protect its residents pursuant to its own municipal police power and without prior permission from DEP. She stated that DEP cannot disenfranchise citizens and Political Subdivisions of the State by contract or settlement from their statutory rights to self-protection and environmental protection provided by the ERA. See, Certification of Jerry English.

The DEP is acting in bad faith and acting unlawfully by denying Political Subdivisions and private attorneys general the right to take action under the ERA now and forever in the future.

POINT 3

THE JCO DOES NOT COMPLY WITH THE TAX DEDUCTION RULE

The "Tax Deduction Rule" provides a settling defendant with a tax deduction if (1) the payment is used exclusively for restitution and remediation purposes to restore the environment, wildlife, and natural resources harmed by the defendant's damaging conduct, (2) there is a direct nexus between the site causing the harm and the restoration of the damage caused by that harm, and (3) the funds are paid into a "segregated fund or account" held by the government and used exclusively for these restorative purposes.[38]

The $225M in NRD payments fit the definition of the Tax Deduction Rule, the $525M Abatement Damages fit the definition, but only under the conditions discussed below, and the $125M in Costs, Fees, and Punitive Damages do not fit the definition.

"Abatement Damages" are defined to include the damages recovered only from the "Chambers Works Litigation" and not the Pompton Lakes, Repauno, or

---

[38] 26 CFR §1.162-21

Parlin litigations. (¶6) Abatement Damages exclude NRD or remediation work required to be performed by the Settling Defendants. (¶6)

The Chambers Works damages are to be used to pay for water quality infrastructure projects in and around Chambers Works or for the general protection of public health, safety and the environment. (¶6) However, general environmental protection costs do not satisfy the Tax Deduction Rule because they are unrelated to the source of the Chambers Works damages. Only onsite and offsite Chambers Works water infrastructure projects costs satisfy the Rule.

The definition of "Abatement Damages Amount" is defined specifically to require that the amounts be spent only to satisfy the Tax Deduction Rule. (¶6) The Tax Deduction Rule has been incorporated into all of the payment definitions in the JCO.[39] In addition, paragraph 102 obligates the Settling Plaintiffs to prepare, provide, and file all necessary documents that entitle the Settling Defendants to qualify for a tax deduction. In addition, paragraph 12 of the JCO requires that $700M of the $875M cash Settlement Payments be used to satisfy the Tax Deduction Rule. This may entitle the Settling Defendants to a tax deduction up to a $147M.

---

[39] The JCO carries the Tax Deduction Rule throughout the document and its definitions. See, ¶6 definition of "Abatement Damages Amount," "Natural Resource Damages Amount," ¶7.c.iii. definition of "Costs, Fees, and Punitive Damages," ¶11 definition of "Additional Fees and Costs Amount," and ¶13 regarding RFS surcharges.

The Third Amended Complaint in the Chambers Works Litigation specifically stated that the Defendants must "abate or mitigate the PFAS groundwater contamination affecting or which may affect drinking water supplies that they caused or contributed to in *areas located off-site from the [Chambers Works] Site.*" (Counts 17 and 18). Paragraph 40 of the JCO specifically obligates Chemours "to implement PFAS abatement projects" at the Chambers Works Site. Therefore, in order to satisfy the direct nexus component of the Tax Deduction Rule, Abatement Damages must be used to pay for water quality infrastructure projects at and around the Chambers Works Site.

The urban creek system within and surrounding the Chambers Works Site acts as a PFAS highway. Water from the offsite creek system flows towards Chambers Works. This offsite PFAS contaminated surface water flows into an onsite Chambers Works wetlands lake that was created artificially over the years due to poor property management. The lack of tide gates, levees, and other infrastructure leaves this pooled PFAS surface water as a flooding hazard. During storm events, the PFAS surface water within the Chambers Works Site overflows into surrounding neighborhoods exposing residents to additional PFAS contaminated water.

Carneys Point has been designing water quality infrastructure projects for years and has shared them with DuPont, Chemours, and DEP. The Township is

- 33 -

consulting with Dr. Peter Jaffe, Princeton; Dr. Amy Tuininga, Montclair State; WSP global engineers; Resource Environmental Solutions global contractors; The TBLS Group, NRD consultants, and others to design and cost out these projects. The DEP just recently gave Dr. Jaffe and Dr. Tuininga awards for the work they are doing on these regional PFAS contamination solutions.  DEP also works with the global engineers and contractors mentioned above.

Carneys Point's water infrastructure projects include the following:

(1) Flood control and stormwater control projects.  These projects include seawalls, tide gates, levees, and stormwater pumping stations; the redesign of the Chambers Works onsite wastewater treatment plant to address PFAS in stormwater and sanitary wastewater on a regional basis;  developing an alternative water supply with water treatment, which has been identified nearby, to replace temporary PFAS POET systems in hundreds of homes; stream cleaning; dam upgrades and modifications; and fish ladders.

(2) Phytoremediation PFAS projects for offsite wetlands.  These projects include planting plant species that can absorb PFAS, which will then be regularly harvested for disposal as hazardous waste in the Chambers Works onsite hazardous waste landfill.  This will reduce the load of PFAS polluted surface water entering the Chambers Works site from the surrounding urban creek system.

(3) Onsite wetlands PFAS treatment projects.  These projects involve transforming hundreds of acres of wetlands on the Chambers Works Site into a treatment wetland, by adding soil amendments, like biochar.  The onsite wetlands act like a "wetlands sink" where offsite urban creek water ends up.  The idea is that offsite phytoremediation will reduce the PFAS load that ends up in onsite wetlands.  The use of biochar and other amendments in the onsite wetlands will reduce the PFAS load even further before these waters enter the Delaware River or flood adjacent neighborhoods.  See water infrastructure projects portfolio.  (Atty Cert23,Ex15).

The bottom line is that the only way the Settling Defendants comply with the Tax Deduction Rule is if the Abatement Damages, which originate from the Chambers Works Site, are spent on water infrastructure projects in and around the Chambers Works Site because only those projects meet the direct nexus requirement of the Tax Deduction Rule. This is why Carneys Point has spent years preparing its water infrastructure project portfolio.

The JCO fails to comply with the Tax Deduction Rule because Abatement Damages can also be used for general unspecified environmental purposes anywhere in the state. This general unspecified use must be stricken because it defeats the direct nexus component of the Tax Deduction Rule. Abatement Damages must therefore be dedicated solely to water infrastructure projects at and around Chambers Works, and the funds must be placed in a segregated account dedicated only for these projects; otherwise, the intent of the Tax Deduction Rule is not met and the purpose of the JCO is defeated.

### POINT 4

CARNEYS POINT IS ENTITLED TO INTERVENE

Fed. R. Civ. P. 24(a) provides that upon timely application anyone shall be permitted to intervene when the applicant "claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's

ability to protect its interest, unless existing parties adequately represent that interest."[40]

Timeliness.   This application is timely because the JCO has only been published for public comment 60 days, or until November 1, 2025.  The Township has already provided its comments to the State.  Since the State has no obligation to respond to the Township, submitting its comments has exhausted the Township's administrative remedy.  To timely file for intervention, the Township immediately thereafter filed this application for intervention.  As such, the parties to the JCO have not been prejudiced by the timing of this application.

Wetlands restoration intervention.   A significant focus of the JCO is the remediation and restoration of PFAS-contaminated wetlands in and around Chambers Works.   There are no regulations guiding the restoration of contaminated wetlands.  As such, the New Jersey Freshwater Wetlands Protection Act regulations opened up NRD litigation to allow all persons to participate in the wetlands restoration process.  Specifically, these regulations provide that if the NJDEP brings an NRD lawsuit that addresses the restoration of wetlands, the Department shall not oppose any municipality or citizen from intervening in that

---

[40] *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998); *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 365-66 (3d Cir. 1995); *Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.*, 54 F.3d 156, 161-62 (3d Cir. 1995). These requirements are "intertwined," *Harris v. Pernsley*, 820 F.2d 592, 596 & n.6 (3d Cir. 1987).

NRD litigation as long as there is a court rule permitting permissive intervention. N.J.A.C. 7:7A-22.19.[41]  Here, there is such a court rule, Fed. R. Civ. P. 24(b).  As such, the court must permit Carneys Point to intervene.

Significant and protectible interests. Carneys Point has significant and protectible interests in this matter that are not being protected by the Parties or the proposed JCO.

1.    The JCO unlawfully omits the Escrow Agreement, which is a material element of the JCO.

2.    The JCO unlawfully circumvents the legislative process and allows DEP to allocate all NRD and Abatement Damages in its sole discretion over the 25 year payout period without legislative appropriation authority.

3.    The JCO can unlawfully dismiss Carneys Point's ERA Actions against the DuPont/Chemours and DEP.

4.    The JCO can unlawfully empower the DEP to act on behalf of Carneys Point and other Political Subdivisions of the State and private attorneys general by releasing all their claims against the Settling Defendants and Released

---

[41] 7:7A-22.19 Public participation (a) To provide for public participation in the Department's enforcement process, the Department shall: 1. Investigate and provide responses to all citizen complaints submitted under Department procedures; 2. Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation; and 3. Publish notice of any proposed settlement of a Department enforcement action in the DEP Bulletin and provide at least 30 calendar days for public comment on the settlement.

Entities, providing them with contribution protection and denying them their right to sue DEP, Settling Defendants, and Released Entities now and forever, even though they are not named parties, have not been provided any consideration, and do not consent to the JCO.

For the past ten years the DEP has dismissed the Township's requests for assistance and participation, creating great harm to the Township, with more harm to come. Most recently, in 2025, the Township asked DEP for Brownfields Development Area ("BDA") assistance to remediate and redevelop the Chambers Works Site because the Township is pursuing a self-help redevelopment remedy for the Site. DEP refused to provide the Township with Brownfields assistance regarding the Chambers Works Site even though it is the largest Brownfields Site in the State. (Atty Cert24,Ex16).

This dismissiveness started 10 years ago when Carneys Point sued DuPont for violating ISRA when DEP refused to do so. This embarrassed DEP. Since then, DEP has turned away from the Township and its residents and is instead using Chambers Works, the worst PFAS contaminated Site in the world, as a means to generate an $875M supplemental budget infusion obtained outside of legislative appropriation protocols to use for projects elsewhere in the State, leaving Chambers Works abandoned as a technologically impracticable site to remediate.

<u>Mandamus</u>.   The State Constitution recognizes the separation of powers between the executive, legislative, and judicial branches of government.  However, the courts still have the power to compel the executive branch and its departments to perform their ministerial obligations.

The New Jersey Supreme Court in *Switz v. Middletown Tp*., 23 N.J. 580, 588-89 (1957) described the difference between a ministerial act and discretionary act as follows:  A Writ of mandamus can be used "to compel the performance, in a specified manner, of ministerial duties so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of their performance." <u>Id</u>. Here, Carneys Point seeks to have this court compel the Settling Plaintiffs to comply with their lawful and required ministerial functions that do not include discretion.

In particular, Carneys Point seeks to have this court compel the Settling Plaintiffs to (1) publish the Escrow Agreement, (2) obtain legislative authority to appropriate the $875M Settlement Payments over its 25-year payout schedule, (3) comply with the 2017 NRD Constitutional Amendment, (4) comply with the 2016 Appropriations Act (5) comply with the Tax Deduction Rule, (6) delete paragraph 83 of the JCO that directly seeks to dismiss the Township's two State Court Actions since this court does not have jurisdiction over them, and (7) modify the broad definitions in the JCO to exclude Carneys Point and its two State Court

Actions so that they are not subject to dismissal as a result of a definitional and indirect challenge to those Actions.

<u>CONCLUSION</u>

For the reasons set forth herein, Carneys Point respectfully requests that the court grant the Township's application for intervention to modify the JCO as attached in the Petition for Mandamus.

MEYNER AND LANDIS LLP

By: <u>/s/ *Albert I. Telsey*</u>
Albert I. Telsey, Esq.
*Attorneys for Intervenor, Carneys Point Township*

November 17, 2025

TABLE 1

| | | | [7c] **NRD $225M** | | | | [6/7c] **Abatement Damages $525M** | | [7c] **Costs, Fees, Punitive Damages $125M** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SETTLEMENT PAYMENTS    $875M** | | | | | | | | | | | | | |
| 1 | | | Constitutional NRD Account | | | | All from Chambers Works litigation DEP "sole discretion" NOT NRD / NOT Remediation | | [11] Additional Fees and Costs up to $50M (from NRD CW &  PL) | | | | |
| 2 | Year | $875M | Chambers Works $100M | Pompton Lakes $75M | Repauno $30M | Parlin $20M | Protect public health safety environment | Support public and private water quality infrastructure projects | Attys fees and costs | State's direct and indirect costs | "other" costs NOT restitution NOT remediation (not subject to tax deduction rule) | Punitive Damages | Penalties |
| 3 | 2026 | 200 | [ExA]$100M unallocated 2026 Appropriation (NRD attorney fees) 2026 Appropriation (cost recoveries-HDSCF) | | | | | | [ExA]$100M unallocated 2026 Appropriation (cost recoveries-HDSCF) | | | | |
| | 2027 | 75 | $50M unallocated | | | | | | [ExA & 11] $25M (+ up to $50M from the CW and PL NRD) | | | | |
| | 2028 | 45 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2029 | 40 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2030 | 40 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2031 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2032 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2033 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2034 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2035 | 45 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2036 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2037 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2038 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2039 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2040 | 20 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2041 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2042 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2043 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2044 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2045 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2046 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2047 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2048 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2049 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | 2050 | 25 | ? | ? | ? | ? | ? | ? | X | X | X | X | X |
| | Total | 875 | 100 | 75 | 30 | 20 | 525 | | 175 | | | | |
| | | No Appropriation – General Fund | | | | | | | | | | | |

Green question marks (?) for **NRD** mean the amount in that box is appropriated pursuant to the 2017 NRD Constitutional Amendment (green), but the amount per Site per year is not allocated, hence the question mark (?).

Red question marks (?) for **Abatement Damages** means the amount in that box is not appropriated by any legislation (red) and not allocated between the two subcategories, hence the question mark (?).