MEYNER AND LANDIS LLP
Albert Telsey, Esq.
One Gateway Center, Suite 2500
Newark, New Jersey 07102
Telephone: (973) 602-3439
Facsimile: (973) 624-0356
atelsey@meyner.com
*Attorneys for Intervenor, Carneys Point Township*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; et al., *Plaintiffs*, v. E.I. DU PONT DE NEMOURS AND COMPANY; et al. *Defendants*. | Case No.: 1:19-cv-14758-RMB-JBC (Pompton Lakes) 1:19-cv-14765-RMB-JBC (Repauno) 1:19-cv-14766-RMB-JBC (Chambers Works) 1:19-cv-14767-RMB-JBC (Parlin/Sayreville) Hon. Renée Marie Bumb, Chief U.S.D.J. James B. Clark, III, U.S.M.J. |

### IN RE WRIT OF MANDAMUS BY CARNEYS POINT TOWNSHIP

Plaintiff, Carneys Point Township, ("Carneys Point" or "Township") files this Writ of Mandamus pursuant to Fed. R. Civ. P. 21 against the New Jersey Office of Attorney General; the New Jersey Department of Environmental Protection ("NJDEP" or "Department"); the Commissioner of NJDEP; and the Administrator of the New Jersey Spill Compensation Fund (collectively, "State Respondents") to challenge the proposed Judicial Consent Order ("JCO") in this

1

matter as arbitrary, capricious, unreasonable, and unlawful for the reasons set forth herein unless modified as set forth in the attached redlined JCO (<u>Attachment A</u>).

<u>SUMMARY</u>

1.    The State Constitution recognizes the separation of powers between the Executive, Legislative, and Judicial Branches of government.  However, the courts still have the power to compel the Executive branch and its departments to perform their ministerial obligations.

2.    The New Jersey Supreme Court in *Switz v. Middletown Tp*., 23 N.J. 580, 588-89 (1957) described the difference between a ministerial act and discretionary act as follows:  A Writ of mandamus can be used "to compel the performance, in a specified manner, of ministerial duties so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of their performance."  <u>Id</u>.

3.    Here, Carneys Point seeks to have this court compel the State Respondents to comply with their lawful and required ministerial functions that do not include discretion.  In particular, Carneys Point seeks to have this court compel the State Respondents to (1) publish the Escrow Agreement for public review and comment, (2) obtain legislative authority to appropriate the $875M Settlement Payments over its 25-year payout schedule, (3) comply with the 2017 Natural Resource Damages ("NRD") Constitutional Amendment by dedicating

yearly NRD funds to each of the four Industrial Sites (Chambers Works, Pompton Lakes, Repauno, and Parlin/Sayreville) on a per-Site basis, (4) comply with the 2016 Appropriations Act by allocating the $100M 2026 bulk NRD/Abatement Damages allocation so an identified NRD portion can be deposited into the Dedicated NRD Account on a per-Site basis, and an identified non-NRD Abatement Damages can be deposited into the Hazardous Discharge Site Cleanup Fund ("HDSCF") in a segregated account to satisfy the Tax Deduction Rule, (5) dedicate all Abatement Damages to water infrastructure projects at and around Chambers Works in order the satisfy the Tax Deduction Rule, (6) delete paragraph 83 of the JCO that directly seeks to dismiss the Township's two State Court Actions since this court does not have jurisdiction over them, and (7) modify the broad definitions in the JCO to exclude Carneys Point and its two State Court Actions so that they are not subject to dismissal as a result of a definitional and indirect challenge to those Actions.

4.    The State Respondents must also comply with these requirements in order to satisfy the NJDEP Mission Statement that states the Department will "follow the law" and "be transparent and honest with the public." N.J.A.C. 7:1-1.1.

## PARTIES

5.      Intervenor, Carneys Point Township, is a political subdivision of the State of New Jersey with its offices at 303 Harding Highway, Carneys Point, Salem County, New Jersey.

6.      State Respondent, the New Jersey Office of the Attorney General is a principal department within the Executive Branch of the State Government and is the chief legal advisor to the State and its departments and agencies.

7.      State Respondent, the NJDEP is a principal department within the Executive Branch of the State government vested with authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety. N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

8.      State Respondent, the Commissioner of the NJDEP is vested by law with various powers and authority, including those conferred by the Department's enabling legislation, to manage the NJDEP. N.J.S.A. 13:1D-1 to -19.

9.      State Respondent, Administrator of the New Jersey Spill Compensation Fund ("the Spill Fund") is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10- 23.11f(c) and

(d), and to certify the amount of any claim to be paid from the Spill Fund. N.J.S.A. 58:10-23.11j(d).

## JURISDICTION AND VENUE

10.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 1367.

11.    Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and 1395(a), because this action arises from alleged acts or omissions that occurred at the Pompton Lakes Works Site, the Repauno Works Site, the Chambers Works Site, the Parlin Site, and locations where PFAS has been discharged within New Jersey.

## COUNT 1

## THE JCO FAILS TO INCLUDE THE ESCROW AGREEMENT

12.    The JCO provides that the $875M Settlement Payments shall be paid into an unidentified Escrow Account, "governed by" an unidentified Escrow Agent, and paid out over the next 25 years pursuant to unidentified terms and conditions in an Escrow Agreement that is not attached to the JCO (Exhibit B) (¶7.b).

13.    The Escrow Agreement has not been made available for public comment or review and approval by the court. That is because, according to the

JCO, the Escrow Agreement still needs to be negotiated and drafted "in the form to be mutually agreed to by the Parties." (¶7.b).  In other words, no one knows what the Escrow Agreement is going to say.

14.    The principals that will govern how DEP pays out $875M in Settlement Damages over the next 25 years were not discussed in the published settlement notice.  This failure violates the Spill Act notice provisions because the Escrow Agreement is a material element of the settlement.[1]    (Atty Cert19,Ex11).  As such, the JCO does not comply with paragraph 90 of the JCO, and the court cannot make this finding of fact (90. "The notice described in this Section XVI is deemed compliant with the notice requirements of N.J.S.A. 58:10-23.11e2.")

15.    The JCO states DEP can decide "in its sole discretion" to reject any public comment, including an objection that the Escrow Agreement is missing (¶91).  A settlement agreement requires terms that are sufficiently definite so that the performance to be rendered by each party can be ascertained by the parties, the public, and the court with reasonable certainty.[2]  DEP has no discretion to forgo a material element of the settlement, like the Escrow Agreement, and the court cannot approve a settlement if material terms are missing.[3]

---

[1] N.J.S.A. 58:10-23.11e2
[2] *Weichert Co. Realtors v. Ryan*, 128 NJ 427, 435 (1992)
[3] *Lahue v. Pio Costa*, 263 N.J. Super. 575 (1993)

16.    In August 2025, the Middlesex County Superior Court addressed a proposed NRD JCO with Hercules, Inc. that was supposed to include a 300-acre Conservation Easement valued at over $15M.   However, the Easement was missing all of its essential attachments.   Judge Benjamin S. Bucca, Jr., J.S.C. found the attachments to be material elements of the settlement and did not approve the settlement pending resolution of the missing documents. (Atty Cert20,Ex12).[4]

17.    The court here cannot approve this JCO until DEP provides the public with the Escrow Agreement for review and comment.

18.    Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

A. Order the State Respondents to republish the proposed JCO with the Escrow Agreement for review and public comment as required by N.J.S.A. 58:10-23.11e2.

---

[4] *New Jersey Department of Environmental Protection v. Hercules, Inc.,* New Jersey Superior Court, Middlesex County, Docket MID-L-8749-07, Hearing to approve NRD JCO, August 28, 2025.  Regarding the Conservation Easement and the missing attachments, Judge Benjamin S. Bucca, Jr., J.S.C. stated, "There are some substantive issues here. So -- and I think it's -- in the long run it will save time to -- let's -- on some substantive issues which I believe this issue of what can Sayreville do in terms of improvement on the property as it relates to their water supply, that's a real issue. And I don't think that that should -- that that -- I'm just not so sure that that should -- that I would be responsible as a judge to say, all right, well, you know, I'll let the parties just settle it after the fact.  Let's get it done now." P.40

B.  Attorney's fees and costs.

C.  Such other relief as the court may deem just and proper.

<u>COUNT 2</u>

THE JCO VIOLATES CONSTITUTIONAL AND STATUTORY AUTHORITY
(DEP is violating the NRD Constitutional Amendment for the years 2026-2050)

19.    Intervenor repeats the prior paragraphs as if set forth herein.

<u>The Plaintiffs' alleged authority</u>

20.    The Settling Plaintiffs claim they are exercising "the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interest that can be addressed by those powers, and to protect the health and well-being, both physical and economic, of all Persons subject to the State's jurisdiction" "in all its capacities to the maximum extent allowable by law," including its capacity as *parens patriae* and Trustee of the State's Natural Resources. (¶6, EE.)

21.    The State acknowledges in the above statement that it is not certain what the "maximum extent" of these powers are under the law, and rightly so. The State does not have the power to appropriate the $875M in Settlement Payments without enabling legislation; does not have the power to dismiss Carneys Point's two State Court Actions; and does not have the power to act on behalf of local government and private attorneys general without their consent as discussed in this Point II.

Legislative appropriation authority

22.   Regarding appropriation power, Art. III, Para. 1 of the New Jersey State Constitution identifies the separation of powers between the executive, legislative, and judicial branches.[5]   All state revenues, including litigation recoveries, are deposited into the General Fund and appropriated by the legislature.[6]   See, Department of Treasury Act of 1948, N.J.S.A. 52:18A-8[7] and N.J.S.A. 52:18-29, which states that all funds "shall not be disbursed therefrom unless specifically appropriated by the legislature in an annual or supplemental appropriation act" or other legislative enactment.[8]   In other words, the legislature controls state funds, like the $875M in Settlement Damages here, not DEP.

---

[5] *Communications Workers of America, AFL-CIO v. Florio*, 130 N.J. 439 (1992).  The separation of powers is to ensure cooperative action among the branches while maintaining their distinct roles. *General Assembly of State of N. J. v. Byrne,* 90 N.J. 376 (1982), *Knight v. City of Margate*, 86 N.J. 374 (1981).

[6] Article VIII, Section 2, Paragraph 2, See also, *City of Camden v. Byrne*, 82 N.J. 133 (1980), *Burgos v. State*, 222 N.J. 175 (2015), *New Jersey Department of Environmental Protection v. Exxon Mobil Corporation,* 453 N.J. Super. 272 (2018)

[7] N.J.S.A. 52:18A-8. "All State revenue collected by any department, institution, commission, board, committee or official of this State shall, except as otherwise provided by law, be deposited, in the method prescribed by the director of the Division of Budget and Accounting, to the credit of the State of New Jersey in such depositories as the State Treasurer shall designate."

[8] N.J.S.A. 52:18-29. "All moneys of the state collected or received by any state institution, board, commission, department, committee, agent or servant, from any source, shall except as otherwise provided by law be paid into the state treasury not later than the tenth day of the month following the month during which such moneys were collected or received, and shall not be disbursed therefrom unless specifically appropriated by the legislature in an annual or supplemental appropriation act; provided, that moneys collected or received by the department of motor vehicles during the month of December of any year shall be paid into the state treasury not later than the tenth day of February following such month in which the moneys were collected or received."

The JCO violates legislative appropriation authority

23.    The JCO violates legislative appropriation authority for 2026, 2027, and 2027 to 2050.

24.    First, regarding 2026, the JCO violates the 2017 NRD Constitutional Amendment because the JCO (Exhibit A) fails to break apart a bulk 2026 $100M NRD/non-NRD Settlement Payment making it impossible to deposit the NRD portion of that bulk payment into the Dedicated NRD Account held by the legislature for each of the four Industrial Sites, and impossible to deposit the non-NRD portion into the Hazardous Discharge Site Cleanup Fund ("HDSCF") for non-NRD purposes as provided by the 2026 Appropriations Act.

25.    Second, regarding 2027, the JCO violates the 2017 NRD Constitutional Amendment because it fails to break apart a bulk 2027 $50M NRD payment between two Sites for deposit into the Dedicated NRD Account.

26.    Third, regarding 2027 to 2050, the JCO violates the 2017 NRD Constitutional Amendment because it fails to break apart each bulk NRD/non-NRD payments for each year 2027 to 2050 for deposit into the Dedicated NRD Account for each of the four Sites, and it fails to identify the non-NRD portion for deposit into the HDSCF, or elsewhere.  See Table 1.

27.    The only way DEP can manage future settlement payments over the next 25-years is if the legislature enacted legislation in 2025 enabling the DEP to manage these future Settlement Payments.  This the legislature has not done.

<u>2017 NRD Constitutional amendment</u>

28.    The 2017 NRD Constitutional Amendment credits NRD recoveries obtained each year to a Dedicated NRD Constitutional Account held by the legislature, not the DEP.[9]  This is a non-lapsing account.  One hundred (100%) of the NRD recovery for each NRD Site is deposited into the account.  The funds are dedicated to each NRD Site for NRD restoration projects at and around each Site on a "first priority" bases.[10]  NRD recoveries are not used for general statewide purposes.

29.    Here, the JCO (Exhibit A) violates the 2017 NRD Constitutional Amendment because it fails to allocate NRD recoveries to the four NRD Sites in each year of the 25-year payout. See <u>Table 1</u>.

---

[9] Art. VIII, Sec. II, para. 9 eff. December 7, 2017. "There shall be credited annually to a special account in the General Fund an amount equivalent to the revenue annually derived from all settlements and judicial and administrative awards relating to natural resource damages collected by the State in connection with claims based on environmental contamination. The amount annually credited pursuant to this paragraph shall be dedicated, and shall be appropriated from time to time by the Legislature, for paying for costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, or for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to natural resource damages."

[10] Art. VIII, Sec. II, para. 9 eff. December 7, 2017. "The first priority for the use of any moneys by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, pursuant to this paragraph shall be in the immediate area in which the damage to the natural resources occurred *in connection with the claim for which the moneys were recovered*." [Emphasis added].

30.    This failure to allocate per Site, per year, denies pollution-impacted municipalities the ability to design and budget appropriate NRD restoration projects for their communities because they will not know how much each yearly payment will be, if any, for each Site.  This municipal involvement in the NRD restoration process is baked into the Constitutional Amendment through the DEP NRD Administrative Order 2023-08.[11]  Here, the JCO disenfranchises pollution-impacted municipalities from meaningful participation.

31.    Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

A. Allocate 2026 NRD per Site.  Order the State Respondents to allocate the bulk 2026 $100M NRD/non-NRD Settlement Payment into an identified NRD amount or no amount to be credited to the Dedicated NRD Account for each of the four Industrial Sites in accordance with the NRD Constitutional Amendment.

B. Allocate 2027 NRD per Site.  Order the State Respondents to allocate the bulk 2027 $50M NRD Payment into an identified NRD amount or

---

[11] "It is the policy of the Department to engage directly with the public whose natural resources the State holds in trust concerning the Department's identification, selection, planning, and implementation of restoration projects, and to provide information and seek input on restoration projects from communities affected by the relevant discharges(s) of hazardous substances, contaminants, or other pollutants."

no amount to be credited to the Dedicated NRD Account for the
Chambers Works Site and the Pompton Lakes Site.

C. <u>Allocate 2028-2050 NRD per Site</u>.   Order the State Respondents to
allocate the yearly bulk NRD/non-NRD Settlement Payments for the
years 2028 to 2050 into an identified NRD amount or no amount to be
credited to the Dedicated NRD Account for each of the four Industrial
Sites in accordance with the NRD Constitutional Amendment.

D. <u>Court Trust Account</u>.   Deposit Settlement Damages into the Court
Registry Investment System ("CRIS") in the interim.

E. Attorney's fees and costs.

F. Such other relief as the court may deem just and proper.

## COUNT 3

**THE JCO VIOLATES CONSTITUTIONAL AND STATUTORY AUTHORITY**
(DEP is violating the 2026 Appropriations Act (NRD and non-NRD legal fees))

32.    Intervenor repeats the prior paragraphs as if set forth herein.

33.    The 2026 Appropriations Act appropriates funds from 2026 NRD
recoveries to pay for legal and other costs incurred by the State in obtaining 2026
NRD recoveries per Site.[12] This appropriation lapses after the 2026 fiscal year.

---

[12] "Notwithstanding the provisions of any law or regulation to the contrary, there are hereby
appropriated from the Natural Resource Damages – Constitutional Dedication account such
amounts as are required, as determined by the Director of the Division of Budget and
Accounting, in consultation with the Attorney General, and consistent with the requirements of
the constitutional dedication pursuant to Article VIII, Section II, paragraph 9 of the State

34. The JCO allocates $200M in 2026 (Exhibit A). One hundred million ($100M) is an unallocated bulk payment between NRD for the four Sites and non-NRD Abatement Damages, and the other $100M is for Costs and Fees (unrelated to NRD or non-NRD costs). See Table 1.

35. The $100M bulk payment for NRD/non-NRD Abatement Damages does not allocate between the two categories. As such, the four impacted communities (Carneys Point, Pompton Lakes, Repauno, and Parlin/Sayreville) cannot budget for NRD restoration projects, and the State's legal counsel cannot calculate NRD legal fees and costs incurred for each of the four Sites.

36. The JCO also fails to allocate a bulk 2027 $50M NRD Settlement Payment between the Chambers Works and Pompton Lakes Sites. See Table 1. The JCO refers to this $50M as a comingled "Additional Fees and Costs Amount," that can be used to pay NRD and non-NRD attorney's fees up to the entire $50M for the State's Outside Counsel's statewide NRD and non-NRD activities. (¶11).[13]

---

Constitution, to pay the legal or other costs incurred by the State to pursue settlements and judicial administrative awards relating to natural resource damages." 2026 Appropriations Act, P.L. 2025, c.74, p.103

[13] "11. Notwithstanding Paragraph 7, Settling Plaintiffs may allocate up to an additional $50,000,000 of the Settlement Payments set forth in Paragraphs 7.c.i [Chambers Works] and ii [Pompton Lakes] for costs, including attorney's fees and costs, that do not constitute restitution or remediation within the meaning of section 162 (f)(2)(A) of the IRCS Code, and Treas. Reg. section 1.162-21(e)(4) if necessary based on fees and costs actually incurred ("Additional Fees and Costs Amount")."

37.    This is unlawful because NRD recoveries can only be used to pay NRD attorney's fees/costs calculated from the recovery of each NRD site, and not attorney's fees for non-NRD recoveries on a statewide basis.

38.    First, this 2027 bulk $50M allocation is not allocated between the two sites as required by the NRD Constitutional Amendment.

39.    Second, even if it was allocated, there is no 2027 Appropriations Act that authorizes the payment of attorney's fees from this 2027 $50M NRD payment.

40.    Third, even if there was a 2027 appropriation for 2027 NRD attorney's fees, the State cannot use the entire $50M NRD unallocated bulk payment to pay attorney's fees/costs for NRD and non-NRD recoveries because this violates the 2017 NRD Constitutional Amendment.

41.    Using 100% of a recovery to pay a contingency fee also violates New Jersey Court Rules on contingency fees.[14]

42.    A 100% attorney's fee also violates the reasonableness and fairness standard in NRD settlements.  In a recent ExxonMobil NRD settlement, the court held that it would be unfair or unreasonable for an entire NRD settlement to be

---

[14] R. 1:21-7.

paid over to attorney's fees with nothing left for pollution-impacted municipalities.[15]

43.    The JCO also cannot allocate NRD attorney's fees for the 2028 to 2050 yearly allocations set forth on Exhibit A in the JCO because each of those payments is a bulk payment that does not differentiate the amount to be allocated to NRD and the amount to be allocated to non-NRD Abatement Damages.

44.    Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

A. 2026 NRD and non-NRD attorney's fees.  Order the State Respondents to allocate the bulk 2026 $100M NRD/non-NRD Settlement Payment into an identified NRD amount or no amount to be credited to the Dedicated NRD Account for each of the four Industrial Sites in accordance with the NRD Constitutional Amendment so that NRD attorney's fees and non-NRD attorney's fees can be calculated for each Site.

---

[15] *New Jersey Department of Environmental Protection v. ExxonMobil*, 453 N.J. Super. 588, 658 (Law Div. 2015).  Here, a large attorney's fee was awarded on a large NRD settlement but was found to be reasonable.  However, the court did state, "Had the express terms of the Proposed Consent Judgment mandated that <u>no money</u> would go towards environmental cleanup or restoration purposes, this would be a different issue. This situation, however, is not before the court." [Emphasis in original].

B. 2027 NRD attorney's fees.  Order the State Respondents to allocate the bulk 2027 $50M NRD Payment into an identified NRD amount or no amount to be credited to the Dedicated NRD Account for the Chambers Works Site and the Pompton Lakes Site so that NRD attorney's fees can be calculated for each Site.

C. 2028-2050 NRD and non-NRD attorney's fees.  Order the State Respondents to allocate the yearly bulk NRD/non-NRD Settlement Payments for the years 2028 to 2050 into an identified NRD amount or no amount to be credited to the Dedicated NRD Account for each of the four Industrial Sites in accordance with the NRD Constitutional Amendment so that NRD attorney's fees and non-NRD attorney's fees can be calculated for each Site for each year.

D. Court Trust Account.  Deposit Settlement Damages into the CRIS program in the interim.

E. Attorney's fees and costs.

F. Such other relief as the court may deem just and proper.

## COUNT 4

THE JCO VIOLATES CONSTITUTIONAL AND STATUTORY AUTHORITY
(DEP is violating the 2026 Appropriations Act (HDSCF))

45.     Intervenor repeats the prior paragraphs as if set forth herein.

46.    The 2026 Appropriations Act also has two provisions dealing with the Hazardous Discharge Site Cleanup Fund ("HDSCF"), which is a DEP account dedicated to the cleanup of hazardous waste sites unrelated to NRD.[16]

47.    One provision is a deposit provision.  It authorizes funds received from cost recoveries obtained in fiscal year 2026 to be deposited into the HDSCF for the cleanup of hazardous waste sites.[17]

48.    The other provision is an appropriation provision.  It authorizes the use of non-NRD funds deposited into the HDSCF in fiscal year 2026 to pay for administrative costs associated with the cleanup of hazardous waste sites incurred in 2026 unrelated to NRD.[18]

49.    These provisions are lapsing appropriations and apply only to 2026 non-NRD cost recoveries.[19]

---

[16] N.J.S.A. 58:10-23.34

[17] "In addition to the amount hereinabove, there is appropriated **to** the Hazardous Discharge Site Cleanup Fund - Responsible Party account such additional amounts, as necessary, received from cost recoveries and from the Licensed Site Remediation Professionals fees and deposited into the Hazardous Discharge Site Cleanup Fund, for the cleanup of hazardous waste sites and the costs associated with the "Site Remediation Reform Act," P.L.2009, c.60 (C.58:10C-1 et seq.), subject to the approval of the Director of the Division of Budget and Accounting." 2026 Appropriations Act, P.L. 2025, c.74, p.101.

[18] "The amount hereinabove for the Hazardous Discharge Site Cleanup Fund – Responsible Party account is appropriated **from** responsible party cost recoveries and Licensed Site Remediation Professionals fees deposited into the Hazardous Discharge Site Cleanup Fund, together with an amount not to exceed $15,423,000 for administrative costs associated with the cleanup of hazardous waste sites, subject to the approval of the Director of the Division of Budget and Accounting." P.101. P.L. 2025, c. 74.

[19] A third provision in the 2026 Appropriations Act authorizes the use of HDSCF funds to pay for the disposal of Class B firefighting foam containing PFAS.  P. 101-102, P.L. 2025, c.74. The JCO did authorize $4.125M to pay for firefighting foam damages throughout the State

50.     The JCO provides that DEP can arbitrarily decide, in its sole discretion, the allocation of Settlement Payments, if any, that go to the Dedicated NRD Account, and non-NRD Abatement Damages, if any, that go to the HDSCF for each year of the 25-years of this settlement.[20]

51.     The notice of the JCO confirms that DEP intends to manage the $525M non-NRD Abatement Payments in its own trust account pursuant to its own discretion for any environmental purposes regardless of legislative appropriation.[21]

52.     The DEP has settled more than a dozen NRD cases over the past 6 years.[22]  They each involve a one-year, lump sum settlement payment with an identified allocation to NRD and non-NRD payments without a multiple year payout schedule.  Some used an escrow merely to hold the cash payment pending exhaustion of the 45-day appeal period for the settlement.

53.     None of these settlements sought to bind the then-current legislature to future appropriations or to use an Escrow Agreement as a "governing"

---

(¶7c.iii).  This amount could be deposited into the HDSCF as part of the 2026 $100M allocation to the Costs/Fees category.

[20] "The Settling Plaintiffs retain discretion to apply additional portions of the Settlement Payments *for the general purpose of, among other things,* improving water quality and funding the treatment of drinking water across the State." (¶7.c.iv).  *Burgos v. New Jersey*, 225 N.J. 175 (2015), *New Jersey Hosp. Ass'n v. New Jersey State Dept. of Health,* 249 N.J. Super. 194 (1991); *D.J. Miller & Associates, Inc. v. State of New Jersey*, 356 N.J. Super. 414 (App. Div. 2002).

[21] The notice regarding the JCO states, "Abatement damages recovered will be held in a dedicated trust account to be administered and used by NJDEP for the purpose of improving and protecting public health, safety, and the environment . ." (Atty Cert19,Ex11).

[22] https://dep.nj.gov/nrr/proposed-settlements/

document to manage payment payouts over multiple years. These are unique and unlawful features found only in the DuPont/Chemours and 3M settlements.

54. The only guidelines DEP offered on the use of the $875M over the next 25 years was a comment in the notice of the JCO, which stated, "The NJDEP intends to conduct public outreach and engagement in the consideration and selection of restoration activities to be pursued with funds recovered by this settlement." (Atty Cert19,Ex11). How this outreach is done or not done, or what criteria, if any, will be used to determine how this money gets spent is unknown and left to the sole discretion of DEP for the next 25 years.

55. The use of this money is a legislative function, not a DEP function.

56. Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

A. Allocate 2026 NRD and non-NRD Abatement Damages recoveries. Order the State Respondents to allocate the bulk 2026 $100M NRD/non-NRD Settlement Payment into an identified NRD amount or no amount to be credited to the Dedicated NRD Account for each of the four Industrial Sites in accordance with the NRD Constitutional Amendment and an identified non-NRD Abatement Damages amount

or no amount so that the non-NRD Abatement Damages amount can be deposited into the HDSCF.

B. <u>Court Trust Account</u>.    Deposit Settlement Damages into the CRIS program in the interim.

C. Attorney's fees and costs.

D. Such other relief as the court may deem just and proper.

## COUNT 5

**THE JCO VIOLATES CONSTITUTIONAL AND STATUTORY AUTHORITY**
(DEP cannot appropriate the entire $875M in Settlement Payments without enabling legislation)

57.    Intervenor repeats the prior paragraphs as if set forth herein.

58.    The DEP cannot use its "sole discretion" to appropriate unallocated bulk payments each year over the next 25-years because that unbridled administrative discretion violates the legislative appropriations clause.

59.    When it comes to managing large litigation settlements recovered over many years, the legislature adopts special legislation to avoid the unpredictability of yearly appropriations.

60.    For example, the legislature has established the Opioid Recovery and Remediation Fund to manage the State's $1B recovery in the national opioid litigation to be handled through the Department of Human Services ("DHS"),[23]

---

[23] P.L. 2023, Ch. 25

and the VW emission fraud litigation settlement fund to be handled through the DEP.[24]

61.    These funds are managed with victim compensation protocols, project requirements, Advisory boards, regulations, and reports to the Governor and the legislature, and not left to the whim of an executive department.[25]  Other similar funds have also been enacted by the legislature.[26]

62.    This court has no judicial authority to circumvent the legislative appropriations process by approving this JCO with a 1-page payout schedule (Exhibit A) governed by a nonexistent Escrow Agreement intended to allocate $875M over the next 25 years.

63.    The Appellate Division in the ExxonMobil NRD settlement stated, "Under the Appropriations Clause of the New Jersey Constitution [citation omitted] the power and authority to appropriate funds is vested in the Legislature. [citation omitted].  The Judiciary has no authority for any role in the budgetary process."[27]

---

[24] Senate Bill 3029 (2R) of 2017.  See DEP website: https://dep.nj.gov/vw/
[25] N.J.A.C. Executive Order 323 (2023) [Opioid settlement protocols].
[26] Fraud Response Fund to address contractor fraud during federal disaster recovery programs, N.J.S.A. 2:15D-14, and the New Jersey Unsatisfied Claim and Judgment Fund to provide relief to victims of uninsured or hit-and-run drivers, N.J.S.A. 39:6-61 et seq.
[27] *New Jersey Department of Environmental Protection v. ExxonMobil*, 452 N.J. Super. 272, 307-308 (App. Div. 2018).  See also, *Mid-Atlantic Solar Energy Industries Ass'n v. Chrisitie*, 418 N.J. Super. 499 (App. Div. 2011) [Legislature can alter the appropriation of funds authorized by a legislative Act to a different destination if done by the legislature in the yearly Appropriations Act].

64.     Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

A.     <u>Enabling legislation</u>.     Order the State Respondents to obtain enabling legislation authorizing the Settling Plaintiffs to allocate the Settlement Payments in this matter in accordance with the terms and conditions of the JCO, the Escrow Agreement, and other terms and conditions agreed to among the parties.

B.     <u>Court Trust Account</u>.  Deposit Settlement Damages into the CRIS program in the interim.

C.     Attorney's fees and costs.

D.     Such other relief as the court may deem just and proper.

<u>COUNT 6</u>

**THE JCO VIOLATES CONSTITUTIONAL AND STATUTORY AUTHORITY**
(DEP cannot dismiss Carneys Point's two State Court Actions because this Court does not have constitutional or statutory authority to do so)

65.     Intervenor repeats the prior paragraphs as if set forth herein.

<u>Carneys Point's 2016 State Court ERA Action against</u>
<u>DuPont/Chemours/Telford</u>

66.    Paragraph 83 of the JCO seeks to have this court find that the Releases in the JCO should dismiss Carneys Points 2016 ERA State Court Action against Defendants.[28]

67.    Defendants removed this State Court Action to Federal Court.

68.    On July 26, 2017, Judge Noel L. Hillman, U.S.D.J. remanded the Action back to State Court.

69.    On July 27, 2017, the Clerk of the District Court sent a certified copy of the remand order to the Clerk of the Salem County Superior Court.  The remand order was never vacated.

70.    In 2024, the defendants filed a motion to dismiss the State Court Action claiming this matter supersedes it.

71.    The trial court denied that motion finding that Carneys Point retains ERA jurisdiction for daily violation that occurred prior to this matter being filed in March 2019 and for claims not addressed in this matter.

---

[28] "83. The Parties intend, and this Court finds, that the Releases in the JCO resolve, release and bar Claims, including to the extent applicable by res judicata, brought by Carneys Point Township that seek to recover for the same or materially similar relief that Settling Plaintiffs are releasing in the JCO, and specifically including Carneys Point's Environmental Rights Act Claims and all Claims within the scope of the Released Claims with respect to the Chambers Works Site (or that would be within the scope of the Released Claims if asserted by Settling Plaintiffs). Based on this, upon entry of this JCO, Settling Plaintiffs and the Settling Defendants will seek an order promptly dismissing the following litigation currently pending in the New Jersey court: *Carneys Point Twp. v. E.I. du Pont de Nemours et al.,* Salem County Superior Court Docket No. SLM-L-251-16, Appeal Docket No. A-002427-24. The Parties will reasonably cooperate to seek dismissal of, or otherwise address, any other Claims brought by Carneys Point Township that are resolved, released, and barred by this JCO."

72.     According to 28 U.S.C.A. §1447, once a certified copy of a remand order is sent back to state court, the state court thereafter has jurisdiction of the matter, and the District Court no longer retains jurisdiction of the matter.[29] Consequently, this court has no jurisdiction to make any ruling regarding the preclusive effect, if any, that this JCO has on the Township's State Court Action against Defendants.

Carneys Point's 2018 State Court ERA Action against DEP

73.     Paragraph 83 also seeks to dismiss the Township's 2018 State Court Action against DEP as "other Claims brought by Carneys Point Township."

74.     The DEP sought to dismiss this Action claiming this matter supersedes it. The State Court denied that motion.

75.     The State Plaintiffs Complaint in this matter does not seek the relief sought by Carneys Point in its State Court Action against DEP, and the JCO in this matter does not provide the relief the Township seeks in its State Court Action against DEP.

76.     This court does not have jurisdiction to enjoin the State Court Action against the DEP because to do so would violate the Anti-Injunction Act, which prevents the Federal Court from enjoining state court proceedings. 28 U.S.C.A. §2283.

---

[29] *Barlow v. Colgate Palmolive Co.*, 750 F.3d 437 (2014), *Browning v. Navarro*, 743 F.3d 1069 (1984).

77.    Res judicata also does not apply because there is no commonality between the two matters.[30]

78.    For these reasons, paragraph 83 of the JCO must be stricken.

<u>Amending JCO definitions</u>

79.    Paragraph 83 was a direct assault on the Township's two State Court Actions and must be stricken for the above reasons.  However, certain definitions in the JCO must also be amended to exclude Carneys Point and the two State Court Actions.  Otherwise, DEP can appear in State Court and claim the Release and contribution protection in the JCO indirectly include Carneys Point and the two State Court Actions based on the definitions in the JCO.

80.    This court cannot countenance the Parties using the definitions to accomplish indirectly what this court must rule the JCO cannot do directly; that is, dismiss Carneys Point's two State Court Actions.

81.    To do so would violate the New Jersey State Constitution that prohibits a contract, such as this JCO, from "depriving a party of any remedy" which existed when the contract was made. (Art 4,§7,¶3).

82.    Here, Carneys Point is entitled to the protections provided by 28 U.S.C.A. §1447 to prevent dismissal of its State Court Action against DuPont/Chemours/Telford, and 28 U.S.C.A. §2283 to prevent dismissal of its

---

[30] *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008)

State Court Actions against DEP. DEP is not entitled to use the contractual definitions in the JCO to deny the Township its rights under these statutes.

83. Therefore, the following definitions in the JCO must be amended to specifically exclude Carneys Point and the two State Court Actions: "Corporate Reorganization Claim," "Industrial Site Releasors," "Person," "Political Subdivision," "Released Industrial Site Claims," "Released Statewide PFAS Claims," "Settling Plaintiffs," "Statewide PFAS Releasors," and "Released Entities" (which must exclude Sheryl L. Telford under the definition of "employee.")

84. Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

A. Paragraph 83. The court must strike paragraph 83 in its entirety.

B. Amend definitions. The court must amend the following definitions in the JCO to specifically exclude Carneys Point and the two State Court Actions: "Corporate Reorganization Claim," "Industrial Site Releasors," "Person," "Political Subdivision," "Released Industrial Site Claims," "Released Statewide PFAS Claims," "Settling Plaintiffs,"

"Statewide PFAS Releasors," and "Released Entities" (which must

exclude Sheryl L. Telford under the definition of "employee.")

C. Attorney's fees and costs.

D. Such other relief as the court may deem just and proper.

<u>COUNT 7</u>

THE JCO VIOLATES CONSTITUTIONAL AND STATUTORY AUTHORITY
(DEP cannot act on behalf of non-party Political Subdivisions and private
attorneys general to deny their statutory rights)

85.    Intervenor repeats the prior paragraphs as if set forth herein.

86.    The Settling Plaintiffs claim they have the power to act on behalf of

Political Subdivisions of the State and private attorneys general without them

being named parties, without providing them consideration, without their

consent, "without limitation, and to the maximum extent that the Attorney

General and other State signatories to this JCO may release PFAS Claims," to

include them within the JCO definitions of "Settling Plaintiffs," "Persons,"

"Statewide PFAS Releasors," and "Industrial Sites Releasors" and to make them

each provide a general release and contribution protection to all "Settling

Defendants" and "Released Entities" for all "PFAS Claims" throughout the State

from now until the end of time (¶6,49).

Political subdivisions

87.    The State Constitution provides that New Jersey laws empower local government to operate without sovereign interference and that these laws "shall be liberally construed in their favor" in accordance with their "express terms" and reasonable inferences that are "not inconsistent with or prohibited by this Constitution or by law." (Art. IV, §VII, ¶11).  New Jersey is deemed a "liberal legislative home rule state."[31]

88.    The express terms and liberal interpretation of municipal enabling statutes like N.J.S.A. 40A (Counties and Municipalities) and N.J.S.A. 40:69A (Faulkner Act) do not empower the DEP to make local government release claims and provide contribution protection against their will and without their consent merely because it is expedient for a settlement in a litigated matter.

Private attorneys general.

89.    The ERA was enacted in 1974.  It provides "supplemental" jurisdiction, not superseding jurisdiction, which allows citizens and municipalities the right to take action against polluters and the DEP as a private attorney general when the DEP refuses to act, is unwilling to act, or acts in bad faith.[32]

---

[31] *Sussex Woodlands, Inc. v. Mayor and Council of West Milford Tp*., 109 N.J. Super. 432 (1970).
[32] The Sponsors also stated, "The Committee makes no recommendation on the basic question of policy posed by this bill, i.e. whether interested citizens and groups should have the right to

90.    Sponsors of the bill recognized the primary jurisdiction of DEP; however, the sponsors also recognized the need for supplemental jurisdiction to allow citizens and municipalities to protect the environment without having to prove special damages when DEP fails to act, refuses to act, or acts in bad faith.[33]

91.    Including Political Subdivisions of the State and private attorneys general within the definitions of "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites Releasors" against their will deny them their statutory ERA right to take action against polluters and DEP when DEP fails to act, refuses to act, or acts in bad faith.

92.    This is unlawful because it violates the intent of the ERA and separation of powers (NJ Const., Art. III, ¶1).

---

supplement governmental enforcement programs by bringing Court actions in aid of such enforcement. However, if the Legislature desires to implement this basic policy, the Committee sees no reason why this bill should not be enacted into law in its' present form." See, *Howell Tp. v. Waste Disposal, Inc*., 207 N.J. Super. 80 (1986); *Mayor and Council of Borough of Rockaway v. Klocker & Klocker,* 811 F. Supp. 1039 (1993), *Ailor v. City of Maynardville, Tennessee*, 368 F.3d 587 (2004).

[33] Sponsors of the ERA stated, "The bill recognizes that the primary responsibility to prosecute polluters rests with government. In those instances where government is unable or unwilling to take the necessary action, any person should be assured of an alternative course of' action." (Atty Cert Ex__).  The sponsors further stated that, "The purpose of the bill is to overturn the doctrine long established in our law that in order to have sufficient standing to sue for abatement or prevention of a public 'nuisance, a private person must show special damage peculiar to himself and distinct from that done to the public at large. [citations omitted]. . . It would thus remedy what its supporters believe to be an unnecessary and obsolete impediment to enforcement of antipollution laws."

93.    It is also unlawful because it sets State policy by executive contract without legislative authority.[34]

94.    DEP wants to deny ERA plaintiffs their rights to pursue ERA actions by contract, this JCO, because DEP wants to provide the Settling Defendants with finality against future litigation.  In exchange for $875M in Settlement Payments that DEP intends to use for general environmental purposes throughout the State in its sole discretion, DEP will forgo its own litigation rights against the Settling Defendants.

95.    However, DEP also wants to deny pollution-impacted municipalities their statutory rights under the ERA to challenge DEP's misappropriation of the funds, which are supposed to be dedicated for the restoration of damaged ecosystems within pollution-impacted municipalities, so DEP can use them for unspecified environmental purposes in DEP's sole discretion.

96.    In *City of Seattle v Monsanto,* U.S.D.J., W.D. Washington, 2023 WL 4373432*,* the State of Washington wanted to release environmental claims in a JCO against Monsanto on behalf of the City of Seattle by operation of sovereign law even though the City was not a party to the lawsuit and did not consent to the release of its claims against Monsanto. (Atty Cert22,Ex14).

---

[34] *New Jersey Educ. Ass'n v State*, 412 N.J. Super. 192 (App. Div. 2010).

97.    The court concluded that the State could not force the city to release its claims because the State's sovereign power in this regard was unclear.  Since every contract is presumed to incorporate the law of the state at the time of execution, and since the law on this point was unclear, the State could not compel the city to release Monsanto.

98.    Here, in New Jersey, it is clear that DEP cannot act on behalf of the Political Subdivisions of the State or private attorneys general without their participation or consent on the pretext it has the power to act on their behalf because DEP has no such power.

99.    Ms. Jerry English, former DEP Commissioner, State Senator, and Counsel to the Governor at the time the ERA was passed in 1974 states that the ERA was intended to supplement DEP jurisdiction, not supplant it, to allow citizens and municipalities to take action when DEP fails to act, refuses to act, or acts in bad faith.  That is why the ERA provides a 30-day notice to DEP for private citizens before they can act, but no prior notice is required for municipalities before they can act.  Ms. English acknowledges that the ERA was designed to allow a municipality to take immediate action against a polluter or DEP to protect its residents pursuant to its own municipal police power and without prior permission from DEP.  See, Certification of Jerry English.

32

100.   The DEP is acting in bad faith and acting unlawfully by denying Political Subdivisions and private attorneys general the right to take action under the ERA now and forever in the future.

101.   Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

A. The court must amend the following definitions in the JCO to specifically exclude Political Subdivisions and private attorneys general: "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites Releasors."

B. Attorney's fees and costs.

C. Such other relief as the court may deem just and proper.

<u>COUNT 8</u>

THE JCO DOES NOT COMPLY WITH THE TAX DEDUCTION RULE

102.   Intervenor repeats the prior paragraphs as if set forth herein.

103.   The "Tax Deduction Rule" provides a settling defendant with a tax deduction if (1) the payment is used exclusively for restitution and remediation purposes to restore the environment, wildlife, and natural resources harmed by the defendant's damaging conduct, (2) there is a direct nexus between the site

causing the harm and the restoration of the damage caused by that harm, and (3) the funds are paid into a "segregated fund or account" held by the government and used exclusively for these restorative purposes.[35]

104.    The $225M in NRD payments fit the definition of the Tax Deduction Rule, the $525M Abatement Damages fit the definition, but only under the conditions discussed below, and the $125M in Costs, Fees, and Punitive Damages do not fit the definition.

105.    "Abatement Damages" are defined to include the damages recovered only from the "Chambers Works Litigation" and not the Pompton Lakes, Repauno, or Parlin litigations. (¶6)    Abatement Damages exclude NRD or remediation work required to be performed by the Settling Defendants. (¶6)

106.    The Chambers Works damages are to be used to pay for water quality infrastructure projects in and around Chambers Works or for the general protection of public health, safety and the environment. (¶6)  However, general environmental protection costs do not satisfy the Tax Deduction Rule because they are unrelated to the source of the Chambers Works damages.  Only onsite and offsite Chambers Works water infrastructure projects costs satisfy the Rule.

---

[35] 26 CFR §1.162-21

107.    The definition of "Abatement Damages Amount" is defined specifically to require that the amounts be spent only to satisfy the Tax Deduction Rule. (¶6)

108.    The Tax Deduction Rule has been incorporated into all of the payment definitions in the JCO.[36]

109.    In addition, paragraph 102 obligates the Settling Plaintiffs to prepare, provide, and file all necessary documents that entitle the Settling Defendants to qualify for a tax deduction.

110.    In addition, paragraph 12 of the JCO requires that $700M of the $875M cash Settlement Payments be used to satisfy the Tax Deduction Rule. This may entitle the Settling Defendants to a tax deduction up to a $147M.

111.    The Third Amended Complaint in the Chambers Works Litigation specifically stated that the Defendants must "abate or mitigate the PFAS groundwater contamination affecting or which may affect drinking water supplies that they caused or contributed to in _areas located off-site from the [Chambers Works] Site._" (Counts 17 and 18).

112.    Paragraph 40 of the JCO specifically obligates Chemours "to implement PFAS abatement projects" at the Chambers Works Site.

---

[36] The JCO carries the Tax Deduction Rule throughout the document and its definitions. See, ¶6 definition of "Abatement Damages Amount," "Natural Resource Damages Amount," ¶7.c.iii. definition of "Costs, Fees, and Punitive Damages," ¶11 definition of "Additional Fees and Costs Amount," and ¶13 regarding RFS surcharges.

113.    Therefore, in order to satisfy the direct nexus component of the Tax Deduction Rule, Abatement Damages must be used to pay for water quality infrastructure projects at and around the Chambers Works Site.

114.    The urban creek system within and surrounding the Chambers Works Site acts as a PFAS highway.  Water from the offsite creek system flows towards Chambers Works.  This offsite PFAS contaminated surface water flows into an onsite Chambers Works wetlands lake that was created artificially over the years due to poor property management.

115.    The lack of tide gates, levies, and other infrastructure leaves this pooled PFAS surface water as a flooding hazard.

116.    During storm events, the PFAS surface water within the Chambers Works Site overflows into surrounding neighborhoods exposing residents to additional PFAS contaminated water.

117.    Carneys Point has been designing water quality infrastructure projects for years and has shared them with DuPont, Chemours, and DEP.  The Township is consulting with Dr. Peter Jaffe, Princeton; Dr. Amy Tuininga, Montclair State; WSP global engineers; Resource Environmental Solutions global contractors; The TBLS Group, NRD consultants, and others to design and cost out these projects.

118.   The DEP just recently gave Dr. Jaffe and Dr. Tuininga awards for the work they are doing on these regional PFAS contamination solutions.

119.   DEP also works with the global engineers and contractors mentioned above.

120.   Carneys Point's water infrastructure projects include the following:

(1) <u>Flood control and stormwater control projects</u>.  These projects include seawalls, tide gates, levies, and stormwater pumping stations; the redesign of the Chambers Works onsite wastewater treatment plant to address PFAS in stormwater and sanitary wastewater on a regional basis;  developing an alternative water supply with water treatment, which has been identified nearby, to replace temporary PFAS POET systems in hundreds of homes; stream cleaning; dam upgrades and modifications; and fish ladders.

(2) <u>Phytoremediation PFAS projects for offsite wetlands</u>.  These projects include planting plant species that can absorb PFAS, which will then be regularly harvested for disposal as hazardous waste in the Chambers Works onsite hazardous waste landfill.  This will reduce the load of PFAS polluted surface water entering the Chambers Works site from the surrounding urban creek system.

(3) <u>Onsite wetlands PFAS treatment projects</u>.  These projects involve transforming hundreds of acres of wetlands on the Chambers Works Site into a treatment wetland, by adding soil amendments, like biochar.  The onsite wetlands act like a "wetlands sink" where offsite urban creek water ends up.  The idea is that offsite phytoremediation will reduce the PFAS load that ends up in onsite wetlands.  The use of biochar and other amendments in the onsite wetlands will reduce the PFAS load even further before these waters enter the Delaware River or flood adjacent neighborhoods.  See water infrastructure projects portfolio.  (Atty Cert23,Ex15).

121.   The bottom line is that the only way the Settling Defendants comply with the Tax Deduction Rule is if the Abatement Damages, which originate from

the Chambers Works Site, are spent on water infrastructure projects in and around the Chambers Works Site because only those projects meet the direct nexus requirement of the Tax Deduction Rule. This is why Carneys Point has spent years preparing its water infrastructure project portfolio.

122.   The JCO fails to comply with the Tax Deduction Rule because Abatement Damages can also be used for general unspecified environmental purposes anywhere in the state.

123.   This general unspecified use must be stricken because it defeats the direct nexus component of the Tax Deduction Rule.

124.   Abatement Damages must therefore be dedicated solely to water infrastructure projects at and around Chambers Works, and the funds must be placed in a segregated account dedicated only for these projects; otherwise, the intent of the Tax Deduction Rule is not met and the purpose of the JCO is defeated.

125.   Unless the JCO is modified as set forth below, the JCO is arbitrary, capricious, unreasonable, and unlawful.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

 A. The court must amend the definition of "Abatement Damages" to exclude their use for unspecified environmental purposes and provide

that they be used only for water infrastructure projects at and around

the Chambers Works Site.

B. Attorney's fees and costs.

C. Such other relief as the court may deem just and proper.


**MEYNER AND LANDIS LLP**
*Attorneys for Carneys Point Township*

By: /s/ Albert I. Telsey
     Albert I. Telsey
     Meyner and Landis LLP
     One Gateway Center, Suite 2500
     Newark, New Jersey 07102
     Ph. (973) 602-3439
     atelsey@meyner.com