Albert I. Telsey, Esq.
*New Jersey Attorney ID #016961985*
Catherine Pastrikos Kelly, Esq.
*New Jersey Attorney ID #179042016*
Matthew P. Dolan, Esq.
*New Jersey Attorney ID #078222013*

MEYNER AND LANDIS LLP
One Gateway Center Suite 2500
Newark, New Jersey 07102
P:   973-624-2800
F:   973-624-0356
*Attorneys for Plaintiff*
*Carneys Point Township*

RECEIVED & FILED

NOV 2 2 2017

SUPERIOR COURT OF NEW JERSEY
SALEM COUNTY CIVIL PART

———————————————————— x
)
CARNEYS POINT TOWNSHIP,                  )    SUPERIOR COURT OF NEW JERSEY
)    LAW DIVISION: SALEM COUNTY
)
Plaintiff,                        )    Docket No. SLM-L-251-16
)
v.                              )
)
E. I. DUPONT De NEMOURS AND COMPANY, )
SHERYL A. TELFORD, THE CHEMOURS        )
COMPANY and THE CHEMOURS               )
COMPANY FC, LLC,                       )    **SECOND AMENDED**
)    **VERIFIED COMPLAINT**
Defendants.                   )
)
———————————————————— x

Plaintiff Carneys Point Township ("Plaintiff" or "Carneys Point") files this Second

Amended Verified Complaint against E.I. DuPont De Nemours and Company ("DuPont"),

Sheryl A. Telford ("Telford"), The Chemours Company ("Chemours") and The Chemours

Company, FC, LLC ("Chemours FC" and together with Chemours, "Chemours") upon personal

knowledge about their own actions and upon information and belief as to all other matters, as

follows:

## I.   PRELIMINARY STATEMENT

1

For over 100 years DuPont owned and operated the Chambers Works chemical manufacturing plant located in Pennsville and Carneys Point Townships, in Salem County, New Jersey ("Chambers Works" or the "Site"). During that time DuPont released over 100 million pounds of hazardous waste into the soil and groundwater, which has now migrated to the Delaware River to the west, the Salem Canal to the south, environmentally sensitive areas to the north and residential neighborhoods to the east as far away as 2-miles from the Site. Carneys Point has calculated it will cost at least $1.126 Billion to clean up the Site and the surrounding areas. The New Jersey Department of Environmental Protection ("DEP") has determined it will take 999 years to complete the cleanup at the rate it is currently being addressed. The Chambers Works Site is a disaster worse than the Exxon Valdez, which spilled 88 million pounds of crude oil in Alaska resulting in over $1 Billion in civil and criminal penalties.

## A. **ISRA Violations**

New Jersey has been home to many industrial sites like Chambers Works since the industrial revolution. The unfortunate reality of this manufacturing activity, however, is that New Jersey is saddled with many defunct manufacturing sites as a result of companies going bankrupt or otherwise abandoning their New Jersey locations. It is an understatement to say that these contaminated sites ruin the health, safety and economic life of local communities.

To protect the State and its residents from having to pay to cleanup these sites, in 1983, New Jersey passed the Environmental Responsibility Cleanup Act of 1983 ("ECRA"), now known as the Industrial Site Recovery Act ("ISRA"), which requires that owners and operators of industrial property or businesses in New Jersey—like DuPont—to cleanup all hazardous substances and wastes they discharged to the environment *prior to*: (1) transferring the real property of the industrial establishment; (2) transferring the stock and non-real property assets of

the industrial business; or (3) executing a merger agreement, among other triggers. ISRA tied cleanup to these transfers because they are sensitive moments when money is on the table—money that could be used to cleanup a site before it goes to enriching corporate executives and shareholders.

If an owner or operator cannot remediate the property prior to the transfer, ISRA allows the owner or operator to provide DEP with the cost to remediate the site and surrounding areas calculated by a computer software program called RACER®. The money must be reserved and set aside as a "remediation funding source" ("RFS"), which the company can use to remediate the site. The RFS also acts like a "cookie jar" of money specifically set aside in the event the company fails to undertake or complete the work. In that instance, DEP can use the money to complete the cleanup or affected municipalities can petition DEP to use the money to complete the cleanup. Carneys Point's RACER® analysis of the Chambers Works Site revealed that the cleanup will cost at least $1.126 Billion.

In 2014 and 2015, DuPont began a series of corporate transfers to shed itself of its "dirty" businesses to become a more attractive merger partner with Dow Chemical Company ("Dow"). To accomplish that goal, DuPont transferred its Titanium Technologies, Fluoroproducts and Chemical Solutions businesses (collectively, the "Performance Chemicals Businesses") and the properties associated with them, including Chambers Works among others, to Chemours and its subsidiaries, including Chemours FC, in exchange for $3.9 billion and Chemours' assumption of much of DuPont's environmental liabilities.

These transfers triggered ISRA at Chambers Works three times. The first ISRA trigger occurred on January 23, 2015 when DuPont transferred the Chambers Works real property by deed to Chemours FC ("Count One"). The second ISRA trigger occurred on July 1, 2015 when

3

DuPont transferred all the stock it held in Chemours to DuPont's shareholders ("Count Two"). The third ISRA trigger occurred on December 11, 2015 when DuPont entered into a Merger Agreement with Dow and when DuPont completed its merger and created DowDuPont, Inc. ("DowDuPont") on August 31, 2017 ("Count Three"). These are referred to as "DuPont's ISRA Violations."

Despite the fact that DuPont triggered ISRA three times, DuPont—a Fortune 100 company whose operations at Chambers Works have yielded billions of dollars in revenue—intentionally did not comply with ISRA. In particular, DuPont failed to remediate the Chambers Works Site and the surrounding areas or post the at least $1.126 Billion required as an RFS.

Sheryl A. Telford, as the Director of DuPont's Corporate Remediation Group charged with managing DuPont's ISRA compliance, played an integral role in assisting DuPont violate ISRA by knowingly misinforming and misdirecting DEP about DuPont's corporate transfers of real estate, assets, stocks and liabilities. ISRA holds corporate managers, like Telford, who direct or authorize ISRA noncompliance to be personally liable for penalties. Ms. Telford met with, spoke to and wrote to DEP representatives many times over many months with the purpose of knowingly misinforming and misdirecting them about the details of DuPont's separation of Chemours to make it appear the separation did not trigger ISRA when it did trigger ISRA. ("Count Four"). This is referred to as "Telford's ISRA Violation."

## B. Remediation Violations

The amount of at least $1.126 Billion for the RFS may actually be insufficient because it does not include the cost to remediate contamination in lower groundwater aquifers that have not been delineated by DuPont and/or Chemours. Given the longstanding history of the Chambers Works Site as a heavily polluted site, by May 7, 2014 DuPont was required pursuant to the New

4

Jersey Site Remediation Reform Act and its applicable regulations ("SRRA") to fully delineate contamination at the Site, including delineating the horizontal and vertical extent of contamination in all groundwater aquifers. DuPont failed to complete the delineation of all groundwater aquifers by this deadline. ("Count Five").

Pursuant to the SRRA, by May 7, 2014, DuPont was required to prove it had control over the contaminated groundwater at the Site by applying for a Remedial Action Permit ("RAP") and posting a financial assurance to cover the cost of the pump and treat system for the 999 years the system was expected to operate. DuPont failed to apply for a RAP or post the financial assurance. ("Count Seven").

DuPont's failure to delineate groundwater by May 7, 2014 (Count Five) and failure to obtain a groundwater Remedial Action Permit by May 7, 2014 (Count Seven) required the Chambers Works Site to be under the direct oversight of DEP pursuant to the SRRA. As such, the SRRA required DuPont to post the cost of cleanup in a Remediation Trust Fund regardless of ISRA and to prepare a Public Participation Plan that would permit Carneys Point to get involved with the cleanup of the Site. DuPont failed to post the Remediation Trust Fund and failed to prepare a Public Participation Plan. ("Count Six").

Chemours and Chemours FC as the subsequent and current owners and operators of the Site are also required to remediate the Site pursuant to the SRRA. Chemours and Chemours FC have also failed to complete the delineation of all groundwater aquifers by May 7, 2014 ("Count Eight"), failed to post the Remediation Trust Fund and prepare a Public Participation Plan by May 7, 2014 ("Count Nine") and failed to apply for a RAP or post the financial assurance by May 7, 2014. ("Count Ten"). All the ISRA and remediation violations continue to this date.

### C.  Penalties/Disgorgement of Economic Gain

DEP regulations require owners and operators to pay base penalties of $10,000 to $25,000 per day for each ISRA Violation and Remediation Violation until compliance is achieved.  Violators must also disgorge the economic gain reaped as a result of not complying with ISRA.  In addition, ISRA holds corporate officers or managers who direct or authorize ISRA noncompliance to be personally liable for penalties.

The daily penalties for DuPont's ISRA Violations and Remediation Violations currently exceed $250 Million; the daily penalties for Telford's ISRA Violation currently exceeds $150 Million; and the economic gain reaped by DuPont in not posting the at least $1.126 Billion ISRA RFS is at least $63 Million as of January 2017.  The daily penalties for the Remediation Violations by Chemours and Chemours FC exceed $100 Million.  Penalties accrue daily until compliance is achieved.

### D.  Summary Action

The Effective Time of DuPont's merger with Dow occurred on August 31, 2017, and as a result, DuPont no longer exists as a stand-alone corporation but is now a wholly-owned subsidiary of DowDupont.  In addition, Chemours assumed all of DuPont's environmental liability.  As a result, Chemours—a company with far fewer assets than DuPont—may be forced into bankruptcy and the Chambers Works Site may be abandoned.  Consequently, Chambers Works would be left as a rusting industrial nightmare that the residents of New Jersey will be left to clean up without the funds to do so.

This is exactly the scenario that ISRA was designed to prevent.  DuPont's, Chemours' and Chemours FC's ISRA and Remediation Violations have jeopardized the health, safety,

6

welfare and environment of the residents of Carneys Point and the surrounding area. If DuPont, Chemours and/or Chemours FC abandon the Site it would be one of the most polluted abandoned chemical manufacturing sites in history.

New Jersey Court Rule 4:70-1(a) provides that an action to enforce a civil penalty imposed by any statute such as ISRA shall be brought as a summary action in the Law Division pursuant to R. 4:67. ISRA allows an action to compel compliance and to assess penalties for noncompliance, including disgorgement of economic gain, to be brought in a *summary manner* against the corporation and any officer or manager who directed or authorized ISRA violations.

As a political subdivision of the state, Carneys Point files this action under the Environmental Rights Act, N.J.S.A. 2A:35A-1 et. seq. ("ERA"), which allows Carneys Point to bring an enforcement action against the Defendants directly without prior notice to DEP.

## II.    PARTIES

### A.    Plaintiff

1.    Plaintiff Carneys Point Township is a political subdivision of the State of New Jersey with its offices at 303 Harding Highway, Carneys Point, Salem County, New Jersey.

### B.    Defendants

2.    Defendant E. I. DuPont de Nemours and Company is a Delaware Corporation with its principal place of business located at 1007 N. Market Street, Wilmington, Delaware.

3.    Defendant Sheryl A. Telford is an individual who resides at 618 Main Street, Riverton, New Jersey 08077. Sheryl Telford was at all times relevant hereto a DuPont management official and Director of the DuPont Corporate Remediation Group with her principal place of business at 974 Centre Road, Wilmington, Delaware.

4.    Defendant The Chemours Company is a Delaware corporation with its principal place of business located at 1007 N. Market Street, Wilmington, Delaware.

5.    Defendant The Chemours Company FC, LLC is a Delaware limited liability company with its principal place of business located at 1007 N. Market Street, Wilmington, Delaware.  The Chemours Company FC, LLC is a wholly owned subsidiary of The Chemours Company.

### III.    JURISIDICTION AND VENUE

6.    Jurisdiction and venue are proper in this Court because Defendants either do business, own property or live in New Jersey.  Moreover, Plaintiff's causes of action arise from transactions and occurrences that took place in Salem County.

### IV.    THE ENVIRONMENTAL RIGHTS ACT

7.    Plaintiff asserts this action pursuant to the ERA, which permits Carneys Point to act as an enforcement agency to compel DuPont, Chemours and Chemours FC to comply with environmental statutes and regulations and assess penalties for noncompliance.

8.    Carneys Point is a political subdivision of the State of New Jersey and, therefore, pursuant to the ERA, need not provide DEP with prior notice of this action or obtain DEP approval prior to suit.

9.    New Jersey Court Rule 4:70-1(a) (pertaining to the summary collection of civil penalties) provides that, "an action to enforce a civil penalty imposed by any statute or ordinance providing for its collection or enforcement by a civil proceeding shall be brought as a summary action in the Law Division pursuant to R. 4:67 unless the statute requires a plenary action."

10.    An action to compel compliance with ISRA and the remediation statutes and regulations referenced herein and to assess penalties for noncompliance, including disgorgement

of economic gain, can be brought in a *summary manner against the corporation and any officer or manager who directed or authorized ISRA violations.* See N.J.S.A. 13:1K-13.1c. An action to compel compliance with the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq. ("Spill Act") and the SRRA and to assess penalties for non-compliance with these acts can also be brought in a summary manner. N.J.S.A. 58:10-23.11g7.

11.     The statutes and regulations set forth herein are designed to prevent or minimize pollution, impairment or destruction of the environment, and the violations set forth herein are continuous and likely to recur in the future for the reasons set forth herein.

12.     DEP has not taken action and/or has taken insufficient action to address the violations set forth herein.

## V.     FACTS

### A.     The History Of The Chambers Works Site

13.     In 1892, DuPont established an ammunition plant along the Delaware River in Carneys Point, New Jersey because the location had what DuPont needed—a marshy swamp that would act as a firebreak in the event the plant exploded. By the 1920's, DuPont's operations at Carneys Point expanded to include a huge chemical manufacturing complex to the south. In total, DuPont's operations at Carneys Point expanded south along the Delaware River to the Salem Canal for a total distance of 2.7 miles of riverfront capturing 1,445 acres.

14.     For most of the 20th century, DuPont manufactured dyes, synthetic plastic and rubber, anti-knock lead for gasoline and other products at Chambers Works. The hazardous substances DuPont used in its dye and synthetic plastic and rubber operations, for example, included mercury, benzene, acids, sodium hydroxide, aluminum chloride, ammonia, sodium, sulfur, benzene, nitrobenzene, nitrotoluene, chlorobenzene, methyl amines and ethyl chloride,

among others.  As a result of the processes employed by DuPont's dye manufacturing, DuPont also produced large quantities of sludge and nitrobenzene waste.  Lead flu dust and furnace slag was also stored in the open or in drums on the Site, among many other forms of waste.

15.    Throughout its history at Chambers Works, DuPont produced billions of pounds of chemicals formulated from billions of pounds of raw materials and intermediaries using thousands of processes in a hundred or more buildings.

16.    Sales of the products manufactured at the Site have resulted in billions of dollars of revenue for DuPont and have helped the company become a Fortune 100 Company with facilities located all over the United States and the world.

**B.    DuPont Discharged Over 100 Million Pounds Of Hazardous Substances Into The Environment At The Chambers Works Site.**

17.    For approximately 80 years, from 1892 to the early 1970s, DuPont operated at Carneys Point without meaningful environmental controls.

18.    DuPont used huge quantities of water obtained from the Salem Canal and groundwater wells in its production processes.  After finishing its production processes DuPont dumped millions of gallons of wastewater contaminated with hazardous waste from its hundreds of production buildings into miles of mostly unlined earthen ditches that discharged directly to the Salem Canal, the Delaware River, or into large settling basins where contaminated solids settled to the bottom as sludge and the contaminated water was pumped to the river.  Periodically DuPont dredged the sludge from these ditches for use as fill material throughout the Site.  These ditches and basins were direct conduits for hazardous waste to enter the environment.

19.    DuPont's raw materials and waste products were also stored outdoors on the open ground and DuPont used unlined landfills to dispose of production wastes.  As a result of 100

years of DuPont's discharge of hazardous substances, soil and groundwater at the Site contain over 100 million pounds of hazardous waste.

20.    In 1970, DuPont installed an interceptor well system in an attempt to control migrating contaminated groundwater and to recover hazardous organic constituents.

21.    In 1975, DuPont constructed a wastewater treatment plant and began treating contaminated groundwater that was pumped to the treatment plant prior to discharge to the Delaware River.  Hazardous sludge waste generated by the treatment plant was landfilled onsite in a hazardous waste landfill.

22.    DuPont was supposed to obtain a groundwater Remedial Action Permit ("RAP") and post a financial assurance by May 7, 2014 for its operation of the treatment plant to confirm that it is operating effectively and will continue to do so but DuPont failed to obtain the RAP or post the financial assurance.

23.    DuPont acknowledges that it will take "generations" to remediate the Site and DEP has determined it will take 999 years to return groundwater to potable use, presuming the interceptor wells and wastewater treatment plant continue to operate.

**C.    DuPont's Severe Contamination Of The Chambers Works Site And The Surrounding Areas Will Cost Over $1 Billion To Remediate.**

24.    DuPont, Chemours and Chemours FC have failed to contain contaminated groundwater from migrating offsite and have failed to develop and execute a plan to remove the contamination.

25.    DuPont, Chemours and Chemours FC were required by the New Jersey Site Remediation Reform Act ("SRRA") to investigate the horizontal and vertical extent of contaminated groundwater by May 7, 2014 and have failed to do so.  N.J.S.A. 58:10C-27(a)(3).

11

26.     Indeed, the Delaware River, Salem Canal and communities of Carneys Point, Pennsville, Mannington and Penns Grove have all been and continue to be directly impacted by the Site's migrating contamination.

27.     A large plume of the Site's contamination exists in the sediment of the Delaware River to the west and the Salem Canal to the south.

28.     In addition, Perfluorooctanoic Acid ("PFOA"), a raw material and byproduct of the manufacture of fluoropolymers such as Teflon, has left the Site and has contaminated the drinking water of Carneys Point, Pennsville, Mannington and Penns Grove as far away as 2-miles from the Site.

29.     Hazardous substances are impacting the ecology of Carneys Point to the north and contamination beneath buildings is emanating harmful vapors to the potential detriment of people working onsite.

30.     In order to determine the cost of remediation of large industrial sites such as Chambers Works and surrounding areas, DEP approved the use of a computer software program called RACER®.

31.     Using this program and the assistance of an economist, Carneys Point determined that it would cost at least $1.126 Billion net present value to clean up Chambers Works and the surrounding area.  This calculation was based on a review of hundreds of thousands of environmental documents prepared by DuPont over the years.

32.     Carneys Point also calculated the economic gain received by DuPont for not posting the at least $1.126 Billion as a remediation funding source ("RFS") to be at least $63 million through January 2017.  This was based on the formula developed by DEP regulations to calculate economic gain.

     **D.**     **New Jersey Passed ISRA To Protect Its Residents From Being Responsible For The Remediation Of Industrial Sites Like Chambers Works**

     **1.**     **ISRA in general**

33.     New Jersey has been home to multiple industrial sites like Chambers Works since the industrial revolution.  As a result, New Jersey is saddled with many of these contaminated sites due to companies going bankrupt or abandoning their New Jersey operations.

34.     In 1983, in order to avoid having New Jersey residents continue to be responsible for the cleanup of abandoned industrial sites New Jersey adopted ECRA now known as ISRA. ISRA is the same as ECRA but more streamlined.  ISRA and its regulations are collectively referred to as "ISRA."

35.     ISRA requires that direct and indirect owners and operators of industrial property or businesses in New Jersey remediate all hazardous substances and wastes discharged to the environment *prior to*:  (a) the transfer of the property on which the industrial establishment operates; (b) the transfer of the non-real estate assets and stocks of the business; or (c) the merger of the industrial business, among other "ISRA Triggers."

36.     If the remediation cannot be completed before the transfer of ownership, ISRA alternatively allows owners and operators to provide DEP with the calculated cost to remediate the site and surrounding areas based upon a calculation using RACER®.  That calculated cost must be posted as a remediation funding source or "RFS."

37.     The owners and operators can then complete their business transfers prior to remediating the site and use the RFS as a drawdown account to perform the remediation work thereafter.  In that instance, DEP can use the money to complete the remediation or affected municipalities can petition DEP to use the money to complete the cleanup if the owner or operator fails to do the work.

### 2.    ISRA Triggering Events

38.    ISRA is triggered when there is a change in ownership of the industrial establishment.  There are a number of ways that happens.  The most common trigger is when an owner or operator transfers ownership of the real estate of the industrial establishment or transfers a controlling interest (more than 50%) of the non-real estate assets or stock of the industrial business.  Another ISRA trigger is when an owner or operator executes a merger agreement.  Each transfer is known as an "ISRA Trigger."

39.    An industrial establishment can undergo numerous consecutive ISRA Triggers related to the transfer of real estate, non-real estate assets, stock or merger.  ISRA requires that each ISRA Trigger be addressed separately.

### 3.    ISRA Compliance

40.    In order to comply with ISRA the owners and operators of an industrial establishment, like Chambers Works, must first provide DEP and the New Jersey municipalities in which they operate with a General Information Notice ("GIN") within five days of triggering ISRA.  The GIN sets forth the facts and circumstances of the pending ISRA triggering event and allows DEP and affected municipalities to track ISRA compliance.

41.    In addition, before transferring the real property, non-real estate assets, stock or executing a merger agreement, the owners and operators must remediate onsite and offsite contamination and obtain a No Further Action letter ("NFA") from DEP or its equivalent confirming that the remediation has been completed in a manner protective of human health, safety and the environment.

42.    As an alternative to completing the remediation prior to transfer, ISRA permits owners and operators to submit to DEP: (i) a Remediation Certification that certifies to DEP that

the person responsible for conducting the remediation will complete the cleanup after the ISRA transfer occurs; (ii) a Remediation Cost Review Form that calculates the cost of remediation using RACER® or another method approved by DEP; and (iii) proof that the calculated cost for remediation known as the remediation funding source ("RFS") has been properly posted to the benefit of DEP and the host municipalities in a Remediation Trust Fund or other financial vehicle approved by applicable law.

43.     The RFS is a key component of ISRA because it allows DEP, the host municipalities and others access to funds to complete the remediation if the owners and operators are unwilling or unable to complete the work.

44.     The failure of owners and operators to file a GIN, remediate an industrial establishment or post the RFS in lieu of remediation is a violation of ISRA and the owners and operators are responsible for daily penalties for those violations until ISRA compliance is achieved.  In addition, the owners and operators must disgorge the economic gain realized as a result of their ISRA violations.  Corporate officers and managers also face personal liability for penalties for knowingly authorizing or directing the violation of ISRA.

**E.      DuPont Triggers ISRA Three Times and Intentionally Ignored Its ISRA Obligations.**

45.     Despite the fact that DuPont is obligated to comply with ISRA because it owned and/or operated Chambers Works—an industrial establishment—DuPont intentionally ignored its ISRA obligations.

46.     In particular, in order to finalize its merger with Dow, DuPont needed to shed 100 years of accumulated environmental liability to become a more attractive merger partner.  In order to accomplish this goal DuPont hatched a scheme to transfer its "dirty" business units—its Performance Chemicals Businesses and related properties, including Chambers Works, among

15

others—to Chemours, an independent, publicly-traded company that DuPont created through a series of corporate transfers.

47.    On October 24, 2013, DuPont announced its plans to transfer its Performance Chemicals Businesses to Chemours in exchange for $3.9 Billion and Chemours' assumption of most of DuPont's environmental liabilities.  Chemours would be a separate publicly traded company that DuPont would not own, operate or otherwise control.

48.    On December 18, 2014 The Chemours Company, LLC—a holding company created for the purpose of effectuating the separation plan—filed a Registration Statement with the Securities and Exchange Commission ("SEC") seeking approval to separate the real estate, non-real estate assets, stock and liabilities of DuPont's Performance Chemicals Businesses from DuPont's other business segments and transfer them to Chemours and its subsidiaries.

49.    The Registration Statement included a Separation Agreement between DuPont and Chemours that:  (a) provided for the transfer of the real estate, non-real estate assets, stock and liabilities of Chambers Works to Chemours or its subsidiaries; (b) required Chemours and its subsidiaries to assume DuPont's environmental obligations with regard to Chambers Works and other sites; and (c) required Chemours and its subsidiaries to indemnify DuPont against environmental liabilities at Chambers Works and elsewhere.

50.    Prior to filing the Registration Statement, DuPont created Chemours FC, a wholly owned subsidiary to hold Chambers Works and other facilities pending the separation.

51.    On January 23, 2015, DuPont transferred the Chambers Works real estate to its subsidiary Chemours FC.  This deed transfer was a change in ownership and the "First ISRA Trigger."

52.     On February 1, 2015, DuPont transferred Chambers Works non-real estate assets to Chemours FC.  At this point, the Chemours FC subsidiary had the Chambers Works real estate and non-real estate assets in its possession.

53.     On April 30, 2015, the holding company, The Chemours Company, LLC, was converted to the ultimate spin off company Chemours and 100% of Chemours' stock went to DuPont.

54.     On June 5, 2015, DuPont transferred Chemours FC as a wholly owned subsidiary of Chemours.  That way, since Chemours FC held the real estate and non-real estate assets of Chambers Works, when DuPont separated from Chemours, all of Chambers Works would go with Chemours.

55.     On July 1, 2015, DuPont transferred 100% of the controlling interest of Chemours stock to DuPont stockholders.  Chemours then became an independent publicly-traded company on the New York Stock Exchange.  DuPont separated from and did not own, operate or control Chemours or its subsidiaries, including Chemours FC.  This stock transfer was another change in ownership of Chambers Works because it transferred more than 50% of the stock and was, therefore, the "Second ISRA Trigger."

56.     At some point in 2015, DuPont leased a portion of the Chambers Works Site from Chemours FC to continue operating its non-Performance Chemical businesses at the Site ("DuPont Tenant Space").

57.     In December 2015, DuPont entered into a Merger Agreement with Dow to form DowDuPont subject to regulatory approvals.  The execution of the Merger Agreement triggered ISRA on DuPont's Tenant Space at Chambers Works requiring DuPont to send DEP and host

17

municipalities a GIN to inform them about the pending ISRA transaction. This is the "Third ISRA Trigger." Dow and DuPont shareholders approved the merger on July 20, 2016.

58.    On August 31, 2017 (the "Effective Time"), DuPont and Dow completed its merger to form DowDuPont.

59.    Despite knowing its ISRA obligations DuPont did not submit a GIN to DEP or Carneys Point for any of the three ISRA Triggers. In addition, DuPont did not remediate the Site prior to the ISRA Triggers and did not post an RFS in lieu of remediating the Site prior to any of the ISRA Triggers.

**F.    Instead Of Complying With ISRA, Telford Misleads DEP Into Believing That The Real Estate and Stock Transfer Did Not Trigger ISRA.**

60.    Sheryl A. Telford knows how real property, non-real estate asset and stock transactions trigger ISRA. In the 1980s and 1990s, she worked for the Office of the Assistant DEP Commissioner for Site Remediation. She was on the Assistant Commissioner's Leadership Team where she worked on the site remediation and waste management programs, including ISRA policy, application and compliance.

61.    She holds a Bachelor's Degree in chemistry and physics from Wheaton College, Norton, MA.

62.    After leaving DEP, Telford was the environmental policy manager for PSE&G in Newark, New Jersey, where she managed the company's land use, hazardous waste and site remediation programs, including ISRA compliance.

63.    When leaving PSE&G, Telford joined DuPont where she became Director of DuPont's Corporate Remediation Group. According to her LinkedIn profile, Telford described her job as leading "an organization of engineers and scientists to *manage* company remediation responsibilities at 200+ sites globally to protect people and the environment, *comply with*

18

*regulations*, conduct remediation due diligence as part of all M&A and establish the company as an environmental leader."

64.    Because Telford is an expert in site remediation issues related to ISRA, the Spill Act and other site remediation programs, after she left DEP, in 1995, Telford was often brought back to DEP as a member of the private sector to chair, co-chair or work on important DEP policy initiatives, such as the Comparative Risk Project and the Environmental Justice Advisory Committee.

65.    In recent years (2007-2009), DEP sought Telford's expertise again to help make the ISRA site remediation program work better.    Telford was asked by DEP Assistant Commissioner Irene Kropp to assist DEP with the Legislative Reform Stakeholder Committee that was set up to develop White Papers on ISRA and site remediation reform initiatives and to draft legislative reform measures.    The Legislative Reform Stakeholder Committee worked for two years to produce the SRRA enacted in 2009, which made the ISRA process and other remediation programs more efficient by introducing the Licensed Site Remediation Professional ("LSRP") into the cleanup process, among other things.

66.    Telford is also a global thought leader on the regulatory and business aspects of complying with environmental laws and regulations and managing site remediation projects for large multi-national companies, including the development of cost-effective management structures, operational protocols, cleanup strategies and budgets.

67.    The National Association of Environmental Management ("NAEM") is a non-profit educational association with a mission to advance the professional goals of environmental, health and safety managers working for large corporations.    Given her experience from both the

public and private sectors, Telford assumed a leadership role in NAEM as a member of its Board of Regents.

68.     The AHC Group is an elite group of multi-national environmental management consulting professionals who "serve as trusted advisors to middle and upper management staff in organizations whose responsibilities include environmental health and safety." AHC accomplishes its mission by training and advising senior environmental mangers through publications and workshops. Telford is a frequent lecturer for AHC's Executive Workshops.

69.     One of AHC Group's key members is Dwight Bedsole who was the founding Director of DuPont's Corporate Remediation Group. Bedsole and Telford both lecture at AHC Workshops. At these Workshops, Telford teaches the philosophy and environmental strategy developed by Bedsole and employed by Telford and other members of DuPont's Corporate Remediation Group. The philosophy of DuPont's Corporate Remediation Group is to have "a passion for being cost effective and increasing shareholder return." To accomplish that goal, Telford and DuPont's Corporate Remediation Group seek to "reduce environmental liability by more than a dollar for every dollar we spend and to leverage our remediation know how to help grow the top line." According to DuPont's Corporate Remediation Group, this strategy has helped the Group "be regarded as a peer rather than a 'corporate tax."

70.     In order for Telford and the DuPont Corporate Remediation Group to boost its esteem among DuPont's business managers, Telford and the Group try to avoid posting hard money financial assurances or RFS in the context of cleanup obligations whenever, in their opinion, they appear to be irrelevant or duplicitous. Telford and the DuPont Corporate Remediation Group prefer to post no RFS for a cleanup project or, if forced to do so by regulation or a government agency, to post only a self-guarantee, which does not require the

posting of cash dollars. Telford and the Corporate Remediation Group regard posting a hard money RFS as a negative because it impacts the top line of DuPont's profitability and decreases the Group's esteem in the eyes of DuPont upper management.

71.     DuPont's Corporate Remediation Group has stated that, "states will continue to pursue revisions to their regulations to restrict, if not eliminate, the use of self-guarantee for financial assurance. They may instead require trust funds, surety bonds, letters of credit, and insurance. The impact to industry for these additional liquid financial assurance mechanisms has been estimated to exceed $1 billion per year in out-of-pocket costs." As such, Telford and DuPont's Corporate Remediation Group avoid posting hard money RFS dollars because they negatively impact DuPont's top line and reduce the reputation of the Corporate Remediation Group as a profit center.

72.     Telford was Director of DuPont's Corporate Remediation Group when DuPont was planning to transfer Chambers Works to Chemours. That transaction was going to trigger ISRA and the requirement to post an RFS of at least $1.126B. Telford was faced with the very real issue of negatively impacting DuPont's top line if DuPont had to post an RFS of at least $1.126B for the Chambers Works Site as a result of the DuPont-Chemours ISRA triggers.

73.     As Director of DuPont's Corporate Remediation Group and the top environmental manager for DuPont, Telford personally undertook efforts to knowingly direct DuPont away from complying with ISRA so DuPont could avoid posting and spending the $1.126B RFS on the cleanup of the Chambers Works Site.

74.     Telford sought the assistance of DuPont's in house environmental counsel Stephen Rahaim, Esq., Michael Lukas, a manager with the DuPont Remediation Group and

outside environmental counsel with Manko Gold Katcher and Fox, LLP to support her plan to avoid ISRA compliance at Chambers Works.

75.     To that end, Telford also met with DEP representatives in Trenton, New Jersey, on September 8, 2014.  Thereafter, she spoke to them on the phone, wrote them emails and wrote DEP a letter, dated January 30, 2015 (the "Letter").

76.     In the Letter, Telford told DEP that the DuPont-Chemours separation was exempt from ISRA as a "corporate reorganization not substantially affecting ownership."  That exemption, however, applies only to stock and non-real estate asset transfers—not real estate transfers.

77.     When applied to stock and non-real estate asset transfers, the transferor can only establish that the transfer does not substantial affect ownership if the transferor retains control of the transferee after the transfer occurs and the net worth of the transferee is not more than 10% less than the net worth of the transferor.

78.     Telford's Letter, however, was deceptive.  She did not tell DEP that DuPont had just transferred the real estate to Chemours FC a week earlier on January 23, 2015 because no ISRA exemptions applied to that real estate transfer and she did not want to alert DEP that the First ISRA Trigger had already occurred.

79.     With regard to the Second ISRA Trigger (the stock transfer): (1) Telford did not tell DEP in her Letter that DuPont's shareholders were independent of DuPont and therefore not under common ownership with DuPont; and (2) she did not tell DEP that the net worth of Chemours was 87% less than the net worth of DuPont—significantly greater than the 10% threshold allowed by the exemption.  In other words, the ISRA exemption for a corporate reorganization not substantially affecting ownership, which was the focus of the Letter, did not

22

apply to the Second ISRA Trigger. To the contrary, DuPont's transfer of 100% of the Performance Chemical Businesses to Chemours was by definition a corporate reorganization that did substantially affect ownership and was subject to ISRA.

80.     Telford also did not tell DEP in the Letter that the net worth of Chemours might be even less than 87% of DuPont's net worth because she did not tell DEP that the cleanup of Chambers Works is over $1 Billion. She also did not tell DEP that Chemours had entered into a Separation Agreement with DuPont agreeing to indemnify DuPont from much of its worldwide environmental responsibility, including ISRA and thousands of PFOA lawsuits pending in Ohio and West Virginia that may result in huge judgments against Chemours—expenses that would further dilute the net worth of Chemours.

81.     Telford worked with DEP for months on the ISRA issue affecting the DuPont-Chemours separation and the Chambers Works Site.

82.     DEP never gave Telford or DuPont written confirmation that ISRA did not apply to the DuPont-Chemours separation. To the contrary, DEP concluded that DuPont was obligated to post an RFS for each site impacted by the separation plan including Chambers Works.

83.     Confirming Telford's status as a management official, DuPont actually authorized Telford to sign and she did sign Amendments to DEP Administrative Consent Orders ("ACOs") binding DuPont to ISRA compliance for certain New Jersey sites other than Chambers Works with regard to the separation plan.

84.     However, with regard to the Chambers Works Site, DuPont never signed an ISRA ACO or Amended ACO, an ISRA GIN, an ISRA Remediation Certification, an ISRA Remediation Cost Review Form or an ISRA Remediation Trust Fund Agreement. In short,

23

DuPont did not post the $1.126B RFS or otherwise comply with ISRA for the Chambers Works Site.

85.    This ISRA noncompliance was knowingly directed by Telford as the leading environmental manager for DuPont who was given authority by DuPont to manage its ISRA compliance and non-compliance for all of DuPont's New Jersey sites.

86.    As a DuPont manager responsible for ensuring environmental compliance and a former DEP official, Telford acted knowingly in her deceptions because she knew the DuPont-Chemours separation triggered ISRA and she knew her actions to misdirect DEP violated ISRA.

87.    DuPont's scheme to separate itself from its Performance Chemicals Businesses including Chambers Works without complying with ISRA was designed to saddle the cost of cleaning up the Site on the state of New Jersey and residents of Carneys Point in order for DuPont to save expenses and reap profits. This was Telford's mission statement as Director of the DuPont Remediation Group, which she carried out at Chambers Works.

88.    DuPont avoided ISRA compliance at Chambers Works by not cleaning up the Site or posting the RFS in excess of $1B, which failure has jeopardized the health, safety, welfare and economic vitality of Carneys Point and its surrounding areas.

89.    ISRA was designed specifically to deny DuPont the opportunity to off-load its contaminated New Jersey sites to an undercapitalized company, such as Chemours, without first remediating the site or posting an RFS—but that is just what DuPont did under the direction of Telford. DuPont and Telford's conduct violate ISRA and is unacceptable.

90.    DuPont's obligation to investigate and remediate the Site as a responsible party is not triggered only as a result of the DuPont-Chemours separation and the DuPont-Dow merger, each of which triggered ISRA. Even if DuPont did not trigger ISRA, DuPont had remediation

obligations as a responsible party under the SRRA to complete the delineation of groundwater contamination by May 7, 2014 (Count Five), apply for a groundwater Remedial Action Permit by May 7, 2014 (Count Seven) and post a Remediation Trust Fund for the remediation of the Site (Count Six). As the current owner of the Site, Chemours too has these remediation obligations (Counts Eight, Nine and Ten).

91.    Carneys Point brings this ERA action to compel DuPont and Chemours to comply with ISRA, the SRRA and applicable regulations and to compel DuPont, Telford and Chemours to pay penalties for noncompliance, including DuPont's disgorgement of economic gain.

## VI.    CAUSES OF ACTION

### COUNT ONE
**DuPont's Violations of ISRA and its Regulations**
**First ISRA Trigger – Transfer of Chambers Works Real Estate**

92.    Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

93. On or about December 18, 2014, DuPont's holding company filed a Registration Statement with the SEC seeking approval to separate the real estate, non-real estate assets, stock and liabilities of DuPont's Performance Chemicals Businesses, including Chambers Works, from DuPont's other business segments into Chemours and its subsidiaries, a separate publicly traded company that DuPont would not own, operate or otherwise control.

94. Having indicated its intention to transfer the real estate of Chambers Works in the SEC Registration Statement, dated December 18, 2014, DuPont failed to submit a GIN to DEP within 5 days thereafter or by December 23, 2014, as required by ISRA and N.J.A.C. 7:26B-3.2 ("Violation No. 1"). The base regulatory penalty is $15,000 per day.

95.  In addition, DuPont failed to send a copy of the GIN to Carneys Point within 5 days of December 18, 2014 or by December 23, 2014, as required by ISRA and N.J.A.C. 7:26B-3.2 ("Violation No. 2").  The base regulatory penalty is $15,000 per day.

96. On January 23, 2015, DuPont transferred the Chambers Works real estate by deed to its subsidiary Chemours FC, which was recorded on January 30, 2015 without remediating the Site, as required by ISRA and N.J.A.C. 7:26B-3.3(a) ("Violation No. 3"). The base regulatory penalty is $20,000 per day.

97. In lieu of remediation, DuPont failed to submit a Remediation Certification Form to DEP prior to transferring the real property, which certified DuPont's intention to remediate the Site after transferring the real estate as required by ISRA and N.J.A.C. 7:26B-1.10(b) ("Violation No. 4").  The base regulatory penalty is $15,000 per day.

98. In lieu of remediation, DuPont failed to submit a Remediation Cost Review Form that properly calculated the amount of the RFS using RACER® or other approved method prior to transferring the real property as required by ISRA and N.J.A.C. 7:26C-5.10 ("Violation No. 5"). The base regulatory penalty is $10,000 per day.

99. In lieu of remediation, DuPont failed to establish and maintain an RFS in a Remediation Trust Fund in the amount of at least $1.126B calculated by RACER® prior to transferring the real estate as required by ISRA and N.J.A.C. 7:26B-3.4 ("Violation No. 6").  The base regulatory penalty is $15,000 per day.

100.    DuPont is liable for base regulatory penalties for each day DuPont has been and continues to be in violation of the Violations set forth in Count One until compliance is achieved. *See* Table 1 attached.

26

101.    DuPont is liable for the disgorgement of the economic gain of at least $63M as of January 2017 or more if compliance is achieved thereafter as a result of the Violations set forth in Count One until compliance is achieved.

## COUNT TWO
### DuPont's Violations of ISRA and its Regulations
### Second ISRA Trigger – Transfer of Chemours Stock to DuPont Shareholders

102.    Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

103.    On or about December 18, 2014, DuPont's holding company filed a Registration Statement with the SEC seeking approval to separate the real estate, non-real estate assets, stock and liabilities of DuPont's Performance Chemicals Segments including Chambers Works from DuPont's other business segments into Chemours and its subsidiaries.   The Registration Statement announced DuPont's intentions to transfer the stock of Chemours to DuPont stockholders.

104.    Prior to July 1, 2015, DuPont was the owner of 100% of the outstanding shares of common stock of Chemours.

105.    On July 1, 2015, DuPont transferred 100% of the stock in Chemours to DuPont shareholders.

106.    That transfer of stock resulted in a change in the person holding the controlling interest in Chemours, the indirect owner of Chambers Works, from DuPont to DuPont shareholders.  This transfer triggered ISRA and was not exempt from ISRA.

107.    Having indicated its intention to transfer the Chemours stock to DuPont stockholders in the SEC Registration Statement, dated December 18, 2014, DuPont failed to

submit a GIN to DEP within 5 days thereafter or by December 23, 2014, as required by ISRA and N.J.A.C. 7:26B-3.2 ("Violation No. 7"). The base regulatory penalty is $15,000 per day.

108. In addition, DuPont failed to send a copy of the GIN to Carneys Point within 5 days of December 18, 2014 or by December 23, 2014, as required by ISRA and N.J.A.C. 7:26B-3.2 ("Violation No. 8"). The base regulatory penalty is $15,000 per day.

109. On July 1, 2015, DuPont transferred 100% of the Chemours stock to DuPont stockholders without remediating the Site, as required by ISRA and N.J.A.C. 7:26B-3.3(a) ("Violation No. 9"). The base regulatory penalty is $20,000 per day.

110. In lieu of remediation, DuPont failed to submit a Remediation Certification Form to DEP prior to transferring 100% of the Chemours stock to DuPont stockholders, which certified DuPont's intention to remediate the Site after transferring the stock as required by ISRA and N.J.A.C. 7:26B-1.10(b) ("Violation No. 10"). The base regulatory penalty is $15,000 per day.

111. In lieu of remediation, DuPont failed to submit a Remediation Cost Review Form that properly calculated the amount of the RFS using RACER® or other approved method prior to transferring 100% of the Chemours stock to DuPont stockholders, as required by ISRA and N.J.A.C. 7:26C-5.10 ("Violation No. 11"). The base regulatory penalty is $10,000 per day.

112. In lieu of remediation, DuPont failed to establish and maintain an RFS in a Remediation Trust Fund or other approved vehicle in the amount of at least $1.126B calculated by RACER® prior to transferring 100% of the Chemours stock to DuPont stockholders as required by ISRA and N.J.A.C. 7:26B-3.4 ("Violation No. 12"). The base regulatory penalty is $15,000 per day.

113.    DuPont is liable for base regulatory penalties for each day DuPont has been and continues to be in violation of the Violations set forth in Count Two until compliance is achieved. *See* Table 1 attached.

114.    DuPont is liable for the disgorgement of the economic gain of at least $63M presuming compliance is achieved by January 2017 or more if compliance is achieved thereafter result of the Violations set forth in Count Two until compliance is achieved.

### COUNT THREE
**DuPont's Violations of ISRA and its Regulations**
**Third ISRA Trigger – DowDuPont Merger Agreement**

115.    Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

116.    On or about December 11, 2015, Dow and DuPont executed a Merger Agreement to approve the transfer of Dow and DuPont's assets and stock into DowDuPont. The Merger Agreement approved the integration of the assets and liabilities of both companies into DowDuPont and the separation of the combined companies into three independent, publicly traded companies focused on the agricultural business, material science business and specialty products business of the integrated DowDuPont company. DowDuPont claims the separations will occur within 18-24 months after merger.

117.    Primary components of the merger are as follows:

117.1.  Pursuant to the Merger Agreement, Dow and DuPont formed DowDuPont, a Delaware Corporation that would become the new parent company to Dow and DuPont.

117.2.  Dow and DuPont also caused DowDuPont to form two separate wholly owned subsidiary companies, Diamond Merger Sub, Inc. (the "Dow Merger Sub") and Orion Merger Sub, Inc. (the "DuPont Merger Sub").

29

117.3.  Subject to the terms of the Merger Agreement and receipt of regulatory approvals among other preconditions, which occurred on August 31, 2017 (the "Effective Date"), Dow Merger Sub merged into Dow with Dow surviving as a wholly owned subsidiary of DowDuPont and DuPont Merger Sub merged into DuPont with DuPont surviving as a wholly owned subsidiary of DowDuPont.

117.4.  The post-merger DuPont entity is different than the pre-merger DuPont entity in that, among other things (i) all outstanding shares of pre-merger DuPont common stock were cancelled with no rights attached thereto other than the right of each shareholder to receive approximately one fully paid share of DowDuPont stock in its place; (ii) DuPont assets are now owned indirectly by its new indirect owner and parent, DowDuPont; (iii) new Board Members in the post-merger DuPont were appointed to replace the Board Members in the pre-merger DuPont; (iv) and DuPont was no longer an independent, stand-alone entity but a wholly owned subsidiary of a parent company, DowDuPont.

118.  DuPont's execution of the Merger Agreement with Dow triggered DuPont's obligation to file an ISRA GIN with DEP and Carneys Point because the merger plan involved a change in ownership of DuPont's industrial establishment operations at DuPont's Tenant Space at Chambers Works in the following ways pursuant to N.J.A.C. 7:26B-3.2:

118.1.  DuPont's execution of the Merger Agreement triggered ISRA because at the Effective Time of the merger: (i) DuPont transferred the industrial establishment that it operates at DuPont's Tenant Space at Chambers Works to its new indirect owner and parent, DowDuPont; (ii) DuPont transferred more than 50 percent of the assets of DuPont's industrial establishment located at Chambers Works to its new indirect owner

and parent, DowDuPont; (iii) DuPont transferred more than 50% of the stock of DuPont to its new indirect owner and parent, DowDuPont, which resulted in a change in the person holding the controlling interest in DuPont; and (iv) DuPont merged and/or consolidated its assets and liabilities with Dow's assets and liabilities as part of DowDuPont's integration and separation plan to combine and separate the assets and liabilities of DowDuPont into three independent publicly traded companies not associated with Dow or DuPont.

119.    DuPont's execution of the Merger Agreement is not exempt from ISRA because the pre-merger version of DuPont is not the surviving entity of the plan of merger, integration and separation.

120.    DuPont failed to submit a GIN to DEP within 5 days of the December 11, 2015 Merger Agreement, or by December 16, 2015, as required by ISRA and N.J.A.C. 7:26B-3.2 ("Violation No. 13"). The base regulatory penalty is $15,000 per day.

121.    DuPont failed to send a copy of the GIN to Carneys Point within 5 days of December 11, 2015, or by December 16, 2015, as required by ISRA and N.J.A.C. 7:26B-3.2 ("Violation No. 14"). The base regulatory penalty is $15,000 per day.

122.    On or about the Effective Date of August 31, 2017, DuPont completed its merger with Dow into DowDuPont and DuPont failed to remediate the DuPont Tenant Space as required by ISRA and N.J.A.C. 7:26B-3.3(a) ("Violation No. 15"). The base regulatory penalty is $20,000 per day.

123.    In lieu of remediation, DuPont failed to submit a Remediation Certification Form to DEP prior to the August 31, 2017 merger, which certified DuPont's intention to remediate the

31

DuPont Tenant Space after the merger as required by ISRA and N.J.A.C. 7:26B-1.10(b) ("Violation No. 16"). The base regulatory penalty is $15,000 per day.

124.    In lieu of remediation, DuPont failed to submit a Remediation Cost Review Form that properly calculated the amount of the RFS to address the DuPont Tenant Space using RACER® or other approved method prior to the August 31, 2017 merger, as required by ISRA and N.J.A.C. 7:26C-5.10 ("Violation No. 17"). The base regulatory penalty is $10,000 per day.

125.    In lieu of remediation, DuPont failed to establish and maintain an RFS in a Remediation Trust Fund or other approved vehicle to address the DuPont Tenant Space in an amount calculated by RACER® prior to the August 31, 2017 merger, as required by ISRA and N.J.A.C. 7:26B-3.4 ("Violation No. 18"). The base regulatory penalty is $15,000 per day.

126.    DuPont is liable for base regulatory penalties for each day DuPont has been and continues to be in violation of the Violations set forth in Count Three until compliance is achieved. *See* Table 1 (attached).

127.    DuPont is liable for the disgorgement of the economic gain of at least $63M presuming compliance is achieved by January 2017 or more if compliance is not achieved by then as a result of the Violations set forth in Count Three until compliance is achieved.

## COUNT FOUR
### Telford's Penalties for Directing DuPont to Violate ISRA

128.    Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

129.    Telford failed to tell DEP in her Letter that DuPont triggered ISRA by transferring the Chambers Works real estate to Chemours FC on January 23, 2015, which deed was recorded on January 30, 2015—the date of the Letter ("First ISRA Trigger").

32

130.    In her Letter, Telford misinformed DEP about the applicability of the ISRA corporate reorganization exemption to the stock transfer by: (i) failing to tell DEP that DuPont and the DuPont stockholders were not under common ownership; (ii) failing to tell DEP that the net worth of Chemours was 87% less than the net worth of DuPont thereby failing the 10% test for the exemption; (iii) failing to tell DEP that the cost of cleanup at Chambers Works was over $1 Billion thereby further impacting the net worth of Chemours; and (iv) failing to tell DEP that Chemours assumed the obligation to indemnify DuPont for thousands of PFOA lawsuits in Ohio and West Virginia, which would further erode the net worth of Chemours.

131.    Telford is a former DEP official who continued to work with DEP on stakeholder groups after joining DuPont including the stakeholder group dealing with the development of the SRRA, which impacts how cleanups would be done under ISRA and other statutory programs.

132.    Telford knew it was practically certain she could make the ISRA exemption argument appear plausible if she omitted the above facts, which she did in order to direct DuPont's ISRA non-compliance.

133.    Telford informed DuPont that DEP did not respond to her letter and that DuPont could proceed with the real estate transfer ("First ISRA Trigger") and stock transfer ("Second ISRA Trigger").

134.    Telford is personally liable for penalties for DuPont's failure to submit a GIN to DEP by December 23, 2014, as required by ISRA and N.J.A.C. 7:26B-3.2 for the First ISRA Trigger ("Violation No. 19") and the Second ISRA Trigger ("Violation No. 20").  The base regulatory penalty for each violation is $15,000 per day.

135.    Telford is personally liable for penalties for DuPont's failure to submit a GIN to Carneys Point by December 23, 2014, as required by ISRA and N.J.A.C. 7:26B-3.2 for the First

33

ISRA Trigger ("Violation No. 21") and the Second ISRA Trigger ("Violation No. 22"). The base regulatory penalty for each violation is $15,000 per day.

136.    Telford is personally liable for penalties for DuPont's failure to remediate the Site, as required by ISRA and N.J.A.C. 7:26B-3.3(a) for the First ISRA Trigger ("Violation No. 23") and the Second ISRA Trigger ("Violation No. 24"). The base regulatory penalty is $20,000 per day.

137.    Telford is personally liable for penalties for DuPont's failure to submit a Remediation Certification Form to DEP, as required by ISRA and N.J.A.C. 7:26B-1.10(b) for the First ISRA Trigger ("Violation No. 25") and the Second ISRA Trigger ("Violation No. 26"). The base regulatory penalty for each violation is $15,000 per day.

138.    Telford is personally liable for penalties for DuPont's failure to submit a Remediation Cost Review Form, as required by ISRA and N.J.A.C. 7:26C-5.10 for the First ISRA Trigger ("Violation No. 27") and the Second ISRA Trigger ("Violation No. 28"). The base regulatory penalty for each violation is $10,000 per day.

139.    Telford is personally liable for penalties for DuPont's failure to establish and maintain an RFS in a Remediation Trust Fund in the amount of at least $1.126B calculated by RACER® for the First ISRA Trigger ("Violation No. 29") and the Second ISRA Trigger ("Violation No. 30"). The base regulatory penalty for each violation is $15,000 per day.

140.    Telford is liable for base regulatory penalties for each day DuPont has been and continues to be in violation of the Violations set forth in Count Four until compliance is achieved. *See* Table 2 (attached).

## COUNT FIVE
### DuPont's Violation of the Statutory Deadline to
### Delineate Groundwater Contamination

133.    Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

134.    Even before DuPont triggered ISRA, DuPont was obligated to remediate the Site pursuant to the SRRA and the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq. ("Spill Act").

135.    The Administrative Requirements for the Remediation of Contaminated Sites, N.J.A.C. 7:26C-1 et seq. ("ARRCS") and the Technical Requirements for Site Remediation, N.J.A.C. 7:26E-1 et seq. ("Tech. Regs.") provide the means and methods for how a person responsible for conducting remediation as required by ISRA, SRRA and the Spill Act must investigate and remediate the discharge of hazardous substances to the environment.

136.    With regard to contaminated groundwater, the Tech Regs require that the person responsible for conducting the remediation identify and delineate the vertical and horizontal extent of all contaminated groundwater aquifers.  N.J.A.C. 7:26E-4.3(a).

137.    Soil and/or groundwater at the Site is contaminated with the discharge of the following hazardous substances and related compounds including but not limited to: Actone, Alpha BHC, Aluminum, Ammonia, Antimony, Arsenic, Benzene, Benzo(a)anthracene, Benzo(b)fluoranthene, Benzo(k)fluoranthene, Beryllium, Beta BHC, Bis (2-ethylhexyl) phthalate, Bromodichloromethane, Bromoform, Cadmium, Carbon tetrachloride, Chlorobenzene, Chloroform, Chlorophenol (2-), Chromium, Chrysene, Copper, Cyanide, Dichlorobenzene (1.2-), Dichlorobenzene (1,3-), Dichlorobenzene (1,4-), Dichloroethane (1,2-), Dichloroethylene (trans-1.2-), Dichloroethyl ether, Dichlorophenol (2.4-), Dieldrin, Dimethyl phthalate, Dinitrophenol (2,

35

4-), Dinitrotoluene (2, 4-), Diphenylhydrazine (1, 2-), Endosulfan I, Endosulfan II, Ethylbenzene, Heptachlor, Hexachlorobenzene, Hexachlorobutadiene, Hexachloroethane, Iron, pentacarbonyl-, Lead, Manganese, Mercury, Methylene chloride (Dichloromethane), Methyl isobutyl ketone (MIBK), Methyl isobutyl ketone (MIBK), Nickel, Nitrate, Nitrobenzene, N-Nitrosodiphenylamine, PCB 1016, PCB 1232, PCB 1248, Pentachlorophenol, Perfluorooctanoic Acid (PFOA), Propylene dichloride, Selenium, Silver, Styrene, Teri-butyl alcohol, Tetrachloroethane (1, 1.2, 2-), Tetrachloroethylene, Thallium, Toluene, Toxaphene, Trichlorobenzene (1.2, 4-), Trichloroethane (1, 1.1), Trichloroethane (1, 1.2), Trichloroethylene, Trichlorofluoromethane, Vinyl chloride, Xylenes (total) and Zinc.

138.    The SRRA requires a person responsible for conducting remediation as required by ISRA, the SRRA and the Spill Act to investigate and remediate hazardous substances discharged to the environment within certain timeframes.

139.    In particular, for sites contaminated prior to May 7, 1999 (longer than 10 years prior to the enactment of the SRRA), the SRRA requires that the person responsible for conducting remediation under ISRA and the Spill Act complete the remedial investigation of soil and groundwater at and emanating from the entire contaminated site by May 7, 2014 (within 5 years after the enactment of the SRRA). N.J.S.A. 58:10C-27a(3).

140.    The Chambers Works Site has five aquifers one on top of the other identified as Aquifers A, B, C, D and E, with Aquifer A being closest to the surface and Aquifer E being the deepest.

141.    Since prior to May 7, 1999 Aquifers A through E have been and presently are contaminated with hazardous substances.

36

142.    The horizontal and vertical extent of groundwater contamination in one or more of Aquifers A through E at the Site and emanating from the Site was not delineated prior to May 7, 2014.

143.    To this day, DuPont has not fully delineated the horizontal and vertical extent of contamination in one or more of Aquifers A through E at the Site and emanating from the Site.

144.    DuPont is in violation of the May 7, 2014 deadline to fully delineate groundwater contamination at and emanating from the Chambers Works Site as set forth in N.J.S.A. 58:10C-27a(3).

145.    The Chambers Works Site is under the oversight of DEP to ensure compliance with New Jersey environmental laws and regulations.  The Site is also under the oversight of the United States Environmental Protection Agency ("EPA") with regard to a hazardous waste permit issued by EPA under the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et. seq. ("RCRA").

146.    The Government Performance and Results Act 31 U.S.C. §1101 ("GPRA") requires EPA to show Congress that the work EPA is doing as a federal agency is making a difference for the better.

147.    EPA is evaluating the Chambers Work Site under the RCRA 2020 Corrective Action Program, which is a program EPA uses to fulfill its obligations under the GPRA for RCRA sites.

148.    DEP takes the position that the investigation and remediation deadlines of the SRRA apply to all New Jersey sites whether or not EPA under the RCRA 2020 Corrective Action Program is evaluating the site, unless a court order has established deadlines other than those required by New Jersey law.  No court has issued an order to DuPont or Chemours

37

providing for different investigation and remediation deadlines for the Chambers Works Site other than those set forth in the SRRA and its regulations.

149.    DuPont failed to delineate the horizontal and vertical extent of groundwater at the Chambers Work Site as required by N.J.A.C. 7:26E-4.1 et. seq. in violation of the May 7, 2014 deadline set forth at N.J.S.A. 58:10C-27a(3) ("Violation No. 31").  Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $15,000 per day.

150.    DuPont is liable for base regulatory penalties from May 7, 2014 for each day DuPont has been and continues to be in violation of the May 7, 2014 statutory deadline until DuPont completes the horizontal and vertical delineation of all contaminated groundwater aquifers at and emanating from the Site.  *See* Table 3 attached.

## COUNT SIX
### DuPont's Violation of DEP Direct Oversight Obligations
### [Remediation Trust Fund/Public Participation Plan]

151. Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

152. Pursuant to the SRRA at N.J.S.A. 58:10C-27a.3, the DEP is mandated to undertake direct oversight of the investigation and remediation of the Chambers Works Site, instead of a Licensed Site Remediation Professional ("LSRP"), because DuPont has failed to delineate the horizontal and vertical extent of contaminated groundwater at and emanating from the Site by May 7, 2014 and no court has issued an order extending that deadline.

153. DEP has not granted DuPont or Chemours an extension of that deadline.

154. DEP has taken direct oversight, of the Chambers Works Site and neither DuPont nor Chemours has hired an LSRP to undertake oversight of the Site.

38

155. For every site under direct DEP oversight the SRRA at N.J.S.A. 58:10C-27c requires, among other things, that the person responsible for conducting the remediation of the site establish a remediation trust fund in the amount of the estimated cost of the remediation of the site and to prepare a public participation plan approved by the DEP to solicit public comment from members of the surrounding community concerning the remediation of the site.

156. DuPont failed to establish a remediation trust fund in the amount of the estimated cost of the remediation of the Chambers Works Site by May 7, 2014 as required by N.J.S.A. 58:10C-27. (Violation No. 32"). Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $25,000 per day.

157. DuPont failed to prepare a public participation plan approved by the DEP to solicit public comment from members of the surrounding community concerning the remediation of the Chambers Works Site by May 7, 2014 as required by N.J.S.A. 58:10C-27. (Violation No. 33"). Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $25,000 per day.

158. DuPont is liable for base regulatory penalties from May 7, 2014 for each day DuPont has been and continues to be in violation of Violations 28 and 29 until DuPont comes into compliance. *See* Table 3 attached.

## COUNT SEVEN
### DuPont's Violation of the Deadline to
### Obtain a Groundwater Remedial Action Permit

159. Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

160. In the 1970s, DEP required that DuPont install a "groundwater pump and treat system" to remediate the contaminated groundwater at and emanating from the Site. DuPont installed interceptor groundwater wells and built a large hazardous wastewater treatment, storage and disposal facility on Site (the "Facility"). The interceptor groundwater wells were designed

to recover contaminated groundwater and pipe it to the Facility for treatment, storage and disposal. The system has been running since the 1970s and is supposed to run for many generations into the future.

161.     New Jersey owns the groundwater of the State, not individual property owners. New Jersey classifies groundwater into different categories such as potable and non-potable. Groundwater at the Chambers Works Site is classified as Class IIA or potable. However, in its present state of contamination it is not potable.

162.     DEP requires that a person responsible for conducting remediation obtain a Classification Exception Area ("CEA") from DEP for potable groundwater that is contaminated and in the process of being remediated. DEP will permit a defined area of Class IIA potable groundwater to be identified temporarily as non-potable as long as a plan is in place to return the area to potable use using, for example, a pump and treat system, such as the one installed by DuPont at the Site.

163.     DuPont obtained an approved CEA from DEP in 1999 for the entire Site given its installation and operation of the groundwater pump and treat system that is the Facility. According to the CEA the Facility is expected to operate for 999 years. According to DuPont, the Facility costs $1M/year to operate.

164.     The CEA covers all groundwater across the entire Site and addresses the list of hazardous substances identified in paragraph 138 herein.

165.     The ARRCS Regs require that DEP monitor CEA areas to make sure that the person responsible for conducting the remediation is doing what must be done to effectively remediate contaminated groundwater in a timely fashion. As such, the ARRCS Regs require a person responsible for conducting the remediation who has a CEA for groundwater at a site to

apply for a RAP, which enables DEP and impacted communities to better monitor the remediation of sites covered by a CEA and to make sure remediation will occur in a timely and effective manner. That is because the RAP included terms and conditions to compel the permit holder to comply with remediation obligations in accordance with a schedule.

166.    According to the ARRCS Regs, the person responsible for conducting remediation at a site that includes a pump and treat system, such as the Facility in operation at the Chambers Works Site, must apply for a RAP and provide DEP with the following information: a Fact Sheet that describes the CEA area in detail; drawings and manuals that describe the Facility operations in detail; a report that confirms that the Facility is operating and functioning effectively; a groundwater monitoring plan that confirms that the groundwater contamination is and will remain under control and that the remediation system is working effectively; an estimate of the future cost to run the Facility for as long as it must run; and the posting of a financial assurance to cover the cost to operate, maintain and inspect the Facility for as long as the system must operate.

167.    According to the ARRCS Regs, DuPont was required to apply to DEP for a RAP and provide DEP with the required information by May 7, 2014. DuPont did not submit a groundwater RAP application to DEP or post appropriate financial assurance.

168.    DuPont's failure to apply for a groundwater RAP by May 7, 2014 is a violation of N.J.A.C. 7:26C-7.6. ("Violation No. 34"). Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $15,000 per day.

169.    DuPont also failed to submit to DEP by May 7, 2014 an estimate of the future costs to operate, maintain and inspect the onsite pump and treat system including the Facility and failed to submit to DEP proof that it posted financial assurance to operate the pump and treat

41

system for as long as it is required to be in operation in violation of N.J.A.C. 7:26C-7.10 ("Violation No. 35"). According to N.J.S.A. 58:10C-27c.(4) the financial assurance must be in the form of a remediation trust fund. Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $15,000 per day.

170. DuPont is liable for base regulatory penalties for each day beginning May 7, 2014 that DuPont has been and continues to be in violation of Violation No. 34 and Violation No. 35 until compliance is achieved. *See* Table 3 attached.

## COUNT EIGHT
### Chemours' Violation of the Statutory Deadline to Delineate Groundwater Contamination

171. Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

172. Chemours acquired ownership of the Chambers Works Site as a result of a deed transfer from DuPont to Chemours on or about January 23, 2015.

173. The Spill Act requires Chemours, as the current owner of the Chambers Works Site, to investigate and remediate the Site.

174. The ARRCS Regs and the Tech Regs provide the means and methods for how a person responsible for conducting remediation as required by the Spill Act must investigate and remediate the discharge of hazardous substances to the environment.

175. The ARRCS Regs and Tech Regs also define a "person responsible for conducting the remediation" required by the Spill Act to include "each subsequent owner of the real property where the discharge occurred prior to the filing of a final remediation document with the Department." Chemours is a "person responsible for conducting remediation" at the Chambers Works Site pursuant to the Spill Act because Chemours is the subsequent owner of the

42

Site after DuPont owned it and no final remediation document has been filed with DEP with regard to the Site.

176.    With regard to contaminated groundwater, the Tech Regs require that the person responsible for conducting the remediation identify and delineate the vertical and horizontal extent of all contaminated groundwater aquifers. N.J.A.C. 7:26E-4.3(a).

177.    Soil and/or groundwater at the Site is contaminated with the discharge of hazardous substances and related compounds including but not limited to those set forth in paragraph 138.

178.    The SRRA requires a person responsible for conducting remediation as required by the Spill Act to investigate and remediate hazardous substances discharged to the environment within certain timeframes.

179.    In particular, for sites contaminated prior to May 7, 1999 (longer than 10 years prior to the enactment of the SRRA), the SRRA requires that the person responsible for conducting remediation under the Spill Act or other remedial programs complete the remedial investigation of soil and groundwater at and emanating from the entire contaminated site by May 7, 2014 (within 5 years after the enactment of the SRRA). N.J.S.A. 58:10C-27a(3).

180.    The Chambers Works Site has five aquifers one on top of the other identified as Aquifers A, B, C, D and E, with Aquifer A being closest to the surface and Aquifer E being the deepest.

181.    Since prior to May 7, 1999 Aquifers A through E have been and presently are contaminated with hazardous substances.

43

182.    The horizontal and vertical extent of groundwater contamination in one or more of Aquifers A through E at the Site and emanating from the Site was not delineated prior to May 7, 2014.

183.    When Chemours acquired the Site on or about January 23, 2015 the horizontal and vertical extent of contamination in one or more of Aquifers A through E at the Site and emanating from the Site was not delineated.

184.    To this day Chemours has not fully delineated the horizontal and vertical extent of contamination in one or more of Aquifers A through E at the Site and emanating from the Site.

185.    The obligation to comply with the May 7, 2014 deadline runs with the land.

186.    As such, Chemours is in violation of the May 7, 2014 deadline to fully delineate groundwater contamination at and emanating from the Chambers Works Site as set forth in N.J.S.A. 58:10C-27a(3).

187.    Chemours failed to delineate the horizontal and vertical extent of groundwater at the Chambers Work Site as required by N.J.A.C. 7:26E-4.1 et. seq. in violation of the May 7, 2014 deadline set forth at N.J.S.A. 58:10C-27a(3) ("Violation No. 36").  Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $15,000 per day.

188.    Chemours is liable for base regulatory penalties for each day Chemours has been and continues to be in violation of the May 7, 2014 statutory deadline until Chemours completes the horizontal and vertical delineation of all contaminated groundwater aquifers at and emanating from the Site.  See Table 4 [Penalty Schedule] attached.

<u>COUNT NINE</u>
**Chemours' Violation of DEP Direct Oversight Obligations
[Remediation Trust Fund/Public Participation Plan]**

189.    Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

190.    Pursuant to the SRRA at N.J.S.A. 58:10C-27a.3, the DEP is mandated to undertake direct oversight of the investigation and remediation of the Chambers Works Site, instead of an LSRP, because DuPont and Chemours have failed to delineate the horizontal and vertical extent of contaminated groundwater at and emanating from the Site by May 7, 2014 and no court has issued an order extending that deadline.

191.    DEP has not granted DuPont or Chemours an extension of that deadline.

192.    DEP has taken direct oversight of the Chambers Works site and no LSRP has been hired by DuPont or Chemours to undertake oversight of the Site.

193.    For every site under direct DEP oversight, the SRRA at N.J.S.A. 58:10C-27c requires, among other things, that the person responsible for conducting the remediation of the site establish a remediation trust fund in the amount of the estimated cost of the remediation of the site and to prepare a public participation plan approved by the DEP to solicit public comment from members of the surrounding community concerning the remediation of the site.

194.    Chemours failed to establish a remediation trust fund in the amount of the estimated cost of the remediation of the Chambers Works Site by May 7, 2014 as required by N.J.S.A. 58:10C-27.  (Violation No. 37").  Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $25,000 per day.

195.    Chemours failed to prepare a public participation plan approved by the DEP to solicit public comment from members of the surrounding community concerning the remediation

of the Chambers Works Site by May 7, 2014 as required by N.J.S.A. 58:10C-27. (Violation No.

38"). Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $25,000 per day.

196.    Chemours is liable for base regulatory penalties for each day Chemours has been

and continues to be in violation of Violations 37 and 38 since May 7, 2014 until Chemours

comes into compliance. See Table 4 [Penalty Schedule] attached.

**COUNT TEN**
**Chemours' Violation of the Deadline to**
**Obtain a Groundwater Remedial Action Permit**

197.    Carneys Point incorporates by reference each and every allegation in the

preceding paragraphs as if fully set forth herein.

198.    In the 1970s, DEP required that DuPont install a groundwater pump and treat

system to remediate the contaminated groundwater at and emanating from the Site. DuPont

installed interceptor groundwater wells and built a large hazardous wastewater treatment, storage

and disposal facility on Site (*i.e.* the Facility). The interceptor groundwater wells were designed

to recover contaminated groundwater and pipe it to the Facility for treatment, storage and

disposal. The system has been running since the 1970s and is expected to run for many

generations into the future.

199.    New Jersey owns the groundwater of the State, not individual Site owners. New

Jersey classifies groundwater into different categories such as potable and non-potable.

Groundwater at the Chambers Works Site is classified as Class IIA or potable. However, in its

present state of contamination it is not potable.

200.    DEP requires that a person responsible for conducting remediation obtain a

Classification Exception Area ("CEA") from DEP for potable groundwater that is contaminated

and in the process of being remediated. DEP will permit a defined area of Class IIA potable

46

groundwater to be designated temporarily as non-potable as long as a plan is in place to return the area to potable use using, for example, a pump and treat system, such as the one installed by DuPont at the Site.

201.    DuPont obtained an approved CEA from DEP in 1999 for the entire Site given its installation and operation of the groundwater pump and treat system that is the Facility. According to the CEA the Facility is expected to operate for 999 years.  According to DuPont the Facility costs $1M/year to operate.

202.    The CEA covers all groundwater across the entire Site and addresses the list of hazardous substances identified in paragraph 138 herein.

203.    The ARRCS Regs require that DEP monitor CEA areas to make sure that the person responsible for conducting the remediation is doing what must be done to effectively remediate contaminated groundwater in a timely fashion.  As such, the ARRCS Regs require a person responsible for conducting the remediation who has a CEA for groundwater at a site to apply for a Remedial Action Permit ("RAP"), which enables DEP and impacted communities to better monitor the remediation of sites covered by a CEA and to make sure remediation will occur in a timely and effective manner.

204.    According to the ARRCS Regs, the person responsible for conducting remediation at a site that includes a pump and treat system, such as the Facility in operation at the Chambers Works Site, must apply for a RAP and provide DEP with the following information: a Fact Sheet that describes the CEA area in detail; drawings and manuals that describe the Facility operations in detail; a report that confirms that the Facility is operating and functioning effectively; a groundwater monitoring plan that confirms that the groundwater contamination is and will remain under control and that the remediation system is working

47

effectively; an estimate of the future cost to run the Facility for as long as it must run; and the posting of a financial assurance to cover the cost to operate, maintain and inspect the Facility for as long as the system must operate.

205.     According to the ARRCS Regs, DuPont was required to apply to DEP for a RAP and provide DEP with the required information by May 7, 2014.  DuPont did not submit a RAP application to DEP or post appropriate financial assurance.

206.     The obligation to comply with the May 7, 2014 deadline runs with the land.

207.     Chemours failed to apply to DEP for a RAP and post appropriate financial assurance by May 7, 2014.  Chemours' failure to apply for a RAP is a violation of N.J.A.C. 7:26C-7.6. ("Violation No. 39").  Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $15,000 per day.

208.     Chemours also failed to submit to DEP an estimate of the future costs to operate, maintain and inspect the onsite pump and treat system including the Facility and failed to submit to DEP proof that it posted financial assurance to operate the pump and treat system for as long as it is required to be in operation in violation of N.J.A.C. 7:26C-7.10 ("Violation No. 40"). According to N.J.S.A. 58:10C-27c.(4) the financial assurance must be in the form of a remediation trust fund.  Pursuant to N.J.A.C. 7:26C-9.5(b) the base penalty is $15,000 per day.

209.     Chemours is liable for base regulatory penalties for each day beginning May 7, 2014 that Chemours has been and continues to be in violation of Violation No. 39 and Violation No. 40 until compliance is achieved.  *See* Table 4 attached.

## VII.    REQUEST FOR RELIEF

**WHEREFORE**, for all of the foregoing reasons, Carneys Point respectfully requests that the Court issue an Order to Show Cause compelling Defendants to appear in Court and explain why the Court should not issue judgment as follows:

A. That DuPont failed to comply with ISRA when it transferred the Chambers Works real property to Chemours FC and that DuPont must comply with ISRA and pay penalties for this violation as determined by the court (Count One);

B. That DuPont failed to comply with ISRA when it transferred all of its stock of Chemours to DuPont stockholders and that DuPont must comply with ISRA and pay penalties for this violation as determined by the court (Count Two);

C. That DuPont failed to comply with ISRA when it executed a Merger Agreement with Dow and that DuPont must comply with ISRA and pay penalties for this violation as determined by the court (Count Three);

D. That DuPont, The Chemours Company and The Chemours Company FC, LLC failed to fully delineate the horizontal and vertical extent of contamination in all groundwater aquifers at and emanating from the Site by May 7, 2014 as required by law and that DuPont, The Chemours Company and The Chemours Company FC, LLC must comply with that obligation and pay penalties for this violation as determined by the court (Count Five and Count Eight);

E. That DuPont, The Chemours Company and The Chemours Company FC, LLC failed to post a Remediation Trust Fund and prepare a Public Participation Plan as required by the DEP direct oversight requirements and that DuPont, The Chemours Company

and The Chemours Company FC, LLC must comply with these obligations and pay penalties for these violations as determined by the court (Count Six and Count Nine);

F.  That DuPont, The Chemours Company and The Chemours Company FC, LLC failed to apply for a groundwater RAP and post a financial assurance by May 7, 2014 as required by law and that DuPont, The Chemours Company and The Chemours Company FC, LLC must comply with those obligations and pay penalties for these violations as determined by the court (Count Seven and Count Ten);

G.  That DuPont must comply with ISRA by submitting an ISRA Remediation Certification, ISRA Remediation Cost Review Form and ISRA Remediation Trust Fund Agreement with an RFS amount to be determined by the court by a date to be determined by the court;

H.  That the court set a short period of discovery followed by a hearing date as permitted by New Jersey Court Rule 4:67-1(a) where the court shall determine (i) that Telford was a DuPont management official who knowingly directed or authorized DuPont to violate ISRA (Count Four); (ii) that the amount of the RFS DuPont must post to comply with ISRA is at least $1.126B to be posted as a Remediation Trust Fund by a date to be determined by the court, (iii) that daily penalties shall be assessed against DuPont, Telford (ISRA penalties only), The Chemours Company and The Chemours Company FC, LLC in amounts to be determined by the court until DuPont, The Chemours Company and The Chemours Company FC, LLC achieve compliance with ISRA and remediation obligations and that the Defendants shall pay those penalties to the Superior Court Trust Fund Unit by a date determined by the court, and (iv) that the amount of the economic gain to be disgorged by DuPont for violating ISRA is at

50

least $63M as of January 2017 and shall be paid to the Superior Court Trust Fund
Unit by a date determined by the court;

I.   That Defendants shall pay Carneys Point its attorney's fees, expert fees and expenses
     as permitted by the ERA; and

J.   Such other relief as the court deems just and proper.


Respectfully submitted,

**MEYNER AND LANDIS LLP**

Dated:  November 20, 2017

By: _____

Albert I. Telsey (*016961985*)
Catherine Pastrikos Kelly (*179042016*)
Matthew P. Dolan, Esq. (*078222013*)
atelsey@meyner.com
ckelly@meyner.com
mdolan@meyner.com
One Gateway Center
Suite 2500
Newark, New Jersey 07102
P:  973.602.3439
F:  973.624.0356

*Attorneys for Plaintiff*
*Carneys Point Township*

51

## CERTIFICATION PURSUANT TO R. 4:5-1

I hereby certify, pursuant to R. 4:5-1, that the matter in controversy is not, to my knowledge, the subject of any action pending in any Court, nor of any Arbitration proceeding, that no other action or Arbitration proceeding is contemplated at this time and that I know of no other party who should be joined in this action.


MEYNER AND LANDIS LLP
*Attorneys for Plaintiff*

By: _____
          Albert I. Telsey, Esq.


**Dated:** November 20, 2017

**AFFIDAVIT**

STATE OF NEW JERSEY )
        ) ss
COUNTY OF SALEM  )

   DR. JOSEPH F. RACITE, being duly sworn upon his oath says:

   I am Mayor of Carneys Point Township. I am authorized to make this

verification.  I certify that I have personally examined and am familiar with the information

submitted herein, including all attached documents, and that based on my inquiry of those

individuals immediately responsible for obtaining the information, to the best of my knowledge,

I believe that the submitted information is true, accurate and complete.

               DR. JOSEPH F. RACITE
               Mayor, Carneys Point Township

      DATED: __10/18/17__

**TABLE 1**
**DuPont ISRA Violations and Penalty Table**

| No | Defendant | Description of Violation Citation | Base regulatory penalty per day | No. of days for penalty assessment |
|----|-----------|-----------------------------------|--------------------------------|-------------------------------------|
| 1 | DuPont | Failure to submit GIN to DEP N.J.A.C. 7:26B-3.2 Due: December 23, 2014 – First ISRA Trigger | $15,000 | 12/23/14 to date of compliance |
| 2 | DuPont | Failure to submit GIN to Carneys Point N.J.A.C. 7:26B-3.2 Due: December 23, 2014 – First ISRA Trigger | $15,000 | 12/23/14 to date of compliance |
| 3 | DuPont | Failure to remediate the Site N.J.A.C. 7:26B-3.3(a) Due: January 30, 2015 – First ISRA Trigger | $20,000 | 01/30/15 to date of compliance |
| 4 | DuPont | Failure to submit Remediation Certification in lieu of remediation N.J.A.C. 7:26B-1.10(b) Due: January 30, 2015 – First ISRA Trigger | $15,000 | 01/30/15 to date of compliance |
| 5 | DuPont | Failure to submit Remediation Cost Review form in support of RFS N.J.A.C. 7:26C-5.10 Due: January 30, 2015 – First ISRA Trigger | $10,000 | 01/30/15 to date of compliance |
| 6 | DuPont | Failure to establish and maintain RFS for the Site N.J.A.C. 7:26B-3.4 Due: January 30, 2015 – First ISRA Trigger | $15,000 | 01/30/15 to date of compliance |
| 7 | DuPont | Failure to submit GIN to DEP N.J.A.C. 7:26B-3.2 Due: December 23, 2014– Second ISRA Trigger | $15,000 | 12/23/14 to date of compliance |
| 8 | DuPont | Failure to submit GIN to Carneys Point N.J.A.C. 7:26B-3.2 Due: December 23, 2014 DEP – Second ISRA Trigger | $15,000 | 12/23/14 to date of compliance |
| 9 | DuPont | Failure to remediate the Site N.J.A.C. 7:26B-3.3(a) Due: July 1, 2015 – Second ISRA Trigger | $20,000 | 07/01/15 to date of compliance |
| 10 | DuPont | Failure to submit Remediation Certification in lieu of remediation N.J.A.C. 7:26B-1.10(b) Due: July 1, 2015 – Second ISRA Trigger | $15,000 | 07/01/15 to date of compliance |
| 11 | DuPont | Failure to submit Remediation Cost Review form in support of RFS N.J.A.C. 7:26C-5.10 Due: July 1, 2015 – Second ISRA Trigger | $10,000 | 07/01/15 to date of compliance |
| 12 | DuPont | Failure to establish and maintain RFS for the Site N.J.A.C. 7:26B-3.4 Due: July 1, 2015 – Second ISRA Trigger | $15,000 | 07/01/15 to date of compliance |
| 13 | DuPont | Failure to submit GIN to DEP N.J.A.C. 7:26B-3.2 Due: December 16, 2015– Third ISRA Trigger | $15,000 | 12/16/15 to date of compliance |
| 14 | DuPont | Failure to submit GIN to Carneys Point N.J.A.C. 7:26B-3.2 Due: December 16, 2015– Third ISRA Trigger | $15,000 | 12/16/15 to date of compliance |
| 15 | DuPont | Failure to remediate the DuPont Tenant Space N.J.A.C. 7:26B-3.3(a) Due: August 31, 2017 – Third ISRA Trigger | $20,000 | 08/31/17 to date of compliance |
| 16 | DuPont | Failure to submit Remediation Certification in lieu of remediation  for the DuPont Tenant Space N.J.A.C. 7:26B-1.10(b) Due: August 31, 2017 – Third ISRA Trigger | $15,000 | 08/31/17 to date of compliance |
| 17 | DuPont | Failure to submit Remediation Cost Review form in support of RFS for the DuPont Tenant Space N.J.A.C. 7:26C-5.10 Due: August 31, 2017 – Third ISRA Trigger | $10,000 | 08/31/17 to date of compliance |

| 18 | DuPont | Failure to establish and maintain RFS for the DuPont Tenant Space N.J.A.C. 7:26B-3.4 Due: August 31, 2017 – Third ISRA Trigger | $15,000 | 08/31/17 to date of compliance |
|----|--------|---|---------|---|
| | | Total Daily Base Penalties for Violations 1-18 | $270,000/day | |

## TABLE 2
### Sheryl A. Telford ISRA Violations and Penalty Table

| No | Defendant | Description of Violation Citation | Base regulatory penalty per day | No. of days for penalty assessment |
|---|---|---|---|---|
| 19 | Telford | DuPont's failure to submit GIN to DEP N.J.A.C. 7:26B-3.2 Due: December 23, 2014 – First ISRA Trigger | $15,000 | 12/23/14 to date of compliance |
| 20 | Telford | DuPont's failure to submit GIN to DEP N.J.A.C. 7:26B-3.2 Due: December 23, 2014– Second ISRA  Trigger | $15,000 | 12/23/14 to date of compliance |
| 21 | Telford | DuPont's failure to submit GIN to Carneys Point N.J.A.C. 7:26B-3.2 Due: December 23, 2014 – First ISRA Trigger | $15,000 | 12/23/14 to date of compliance |
| 22 | Telford | DuPont's failure to submit GIN to Carneys Point N.J.A.C. 7:26B-3.2 Due: December 23, 2014 DEP  – Second ISRA Trigger | $15,000 | 12/23/14 to date of compliance |
| 23 | Telford | DuPont's failure to remediate the Site N.J.A.C. 7:26B-3.3(a) Due: January 30, 2015 – First ISRA Trigger | $20,000 | 01/30/15 to date of compliance |
| 24 | Telford | DuPont's failure to remediate the Site N.J.A.C. 7:26B-3.3(a) Due: July 1, 2015 – Second ISRA Trigger | $20,000 | 07/01/15 to date of compliance |
| 25 | Telford | DuPont's failure to submit Remediation Certification in lieu of remediation N.J.A.C. 7:26B-1.10(b) Due: January 30, 2015 – First ISRA Trigger | $15,000 | 01/30/15 to date of compliance |
| 26 | Telford | DuPont's failure to submit Remediation Certification in lieu of remediation N.J.A.C. 7:26B-1.10(b) Due: July 1, 2015 – Second ISRA Trigger | $15,000 | 07/01/15 to date of compliance |
| 27 | Telford | DuPont's failure to submit Remediation Cost Review form in support of RFS N.J.A.C. 7:26C-5.10 Due: January 30, 2015 – First ISRA Trigger | $10,000 | 01/30/15 to date of compliance |
| 28 | Telford | DuPont's failure to submit Remediation Cost Review form in support of RFS N.J.A.C. 7:26C-5.10 Due: July 1, 2015 – Second ISRA Trigger | $10,000 | 07/01/15 to date of compliance |
| 29 | Telford | DuPont's failure to establish and maintain RFS for the Site N.J.A.C. 7:26B-3.4 Due: January 30, 2015 – First ISRA Trigger | $15,000 | 01/30/15 to date of compliance |
| 30 | Telford | DuPont's failure to establish and maintain RFS for the Site N.J.A.C. 7:26B-3.4 Due: July 1, 2015 – Second ISRA Trigger | $15,000 | 07/01/15 to date of compliance |
| | | Total Daily Base Penalties for Violations 19-30 | $180,000/day | |

**TABLE 3**
**DuPont Remediation Violations and Penalty Table**

| No | Defendant | Description of Violation Citation | Base regulatory penalty per day | No. of days for penalty assessment |
|---|---|---|---|---|
| 31 | DuPont | Failure to delineate vertical/horizontal extent of groundwater contamination<br>N.J.S.A. 58:10C-27a(3); N.J.A.C. 7:26E-4.1<br>Due: May 7, 2014 | $15,000 | 05/07/14 to date of compliance |
| 32 | DuPont | Failure to establish RFS for DEP direct oversight<br>N.J.S.A. 58:10C-27<br>Due: May 7, 2014 | $25,000 | 05/07/14 to date of compliance |
| 33 | DuPont | Failure to prepare Public Participation Plan for DEP Direct Oversight<br>Due: May 7, 2014 | $25,000 | 05/07/14 to date of compliance |
| 34 | DuPont | Failure to apply for groundwater RAP<br>N.J.A.C. 7:26C-7.6<br>Due: May 7, 2014 | $15,000 | 05/07/14 to date of compliance |
| 35 | DuPont | Failure to submit financial assurance in support of groundwater RAP<br>N.J.A.C. 7:26C-7.10; N.J.S.A. 58:10C-27c.(4).<br>Due May 7, 2014 | $15,000 | 05/07/14 to date of compliance |
| Total Daily Base Penalties for Violations 31-35 | | | $95,000/day | |

57

**TABLE 4**
**Chemours Remediation Violations and Penalty Table**

| No | Defendant | Description of Violation Citation | Base regulatory penalty per day | No. of days for penalty assessment |
|----|-----------|----------------------------------|--------------------------------|-----------------------------------|
| 36 | Chemours | Failure to delineate vertical/horizontal extent of groundwater contamination N.J.S.A. 58:10C-27a(3); N.J.A.C. 7:26E-4.1 Due: May 7, 2014 | $15,000 | 05/07/14 to date of compliance |
| 37 | Chemours | Failure to establish RFS for DEP direct oversight N.J.S.A. 58:10C-27 Due: May 7, 2014 | $25,000 | 05/07/14 to date of compliance |
| 38 | Chemours | Failure to prepare Public Participation Plan for DEP Direct Oversight Due: May 7, 2014 | $25,000 | 05/07/14 to date of compliance |
| 39 | Chemours | Failure to apply for groundwater RAP N.J.A.C. 7:26C-7.6 Due: May 7, 2014 | $15,000 | 05/07/14 to date of compliance |
| 40 | Chemours | Failure to submit financial assurance in support of groundwater RAP N.J.A.C. 7:26C-7.10; N.J.S.A. 58:10C-27c.(4). Due May 7, 2014 | $15,000 | 05/07/14 to date of compliance |
| Total Daily Base Penalties for Violations 36-40 | | | $95,000/day | |

**MEYNER AND LANDIS LLP**
**One Gateway Center, Suite 2500**
**Newark, New Jersey 07102**
Telephone: (973) 624-3439
Fax (973) 624-0356
Albert I. Telsey, Esq.
New Jersey Attorney ID #: 016961985
*Attorneys for Plaintiff*
*Carneys Point Township*

|  |  |
|---|---|
| CARNEYS POINT TOWNSHIP,<br><br>                         Plaintiff,<br><br>                    v.<br><br>E.I. DUPONT De NEMOURS AND<br>COMPANY and SHERYL A. TELFORD,<br>THE CHEMOURS COMPANY and THE<br>CHEMOURS COMPANY FC, LLC,<br>                         Defendants. | SUPERIOR COURT OF NEW JERSEY<br>SALEM VICINAGE:  LAW DIVISION<br>DOCKET NO.: L-251-16<br><br>               *Civil Action*<br><br>        **CERTIFICATE OF**<br>      **SERVICE AND FILING** |

I hereby certify that on November 20, 2017, I caused an original and two (2) copies of Plaintiff Carneys Point Township's Second Amended Verified Complaint, to be hand delivered via New Jersey Lawyers Service to:  (1) the Superior Court of New Jersey, Law Division, Salem Vicinage located at 1 North Broad Street, Woodbury, New Jersey 08096 for filing; and (2) by email and First Class U.S. Mail to defendants' counsel at the following address:

> David A. Haworth, Esq.
> Glen Harris, Esq.
> Ballard Spahr LLP
> 210 Lake Drive East, Suite 200
> Cherry Hill, New Jersey 07044; and
>
> Martha N. Donovan, Esq.
> Norris McLaughlin & Marcus, P.A.
> 400 Crossing Blvd., 8th Floor
> P.O. Box 5933
> Bridgewater, New Jersey 08807

**MEYNER AND LANDIS LLP**
Attorneys for Plaintiff

By: _____
        ALBERT I. TELSEY

Dated:  November 20, 2017

2