Albert I. Telsey, Esq.
*New Jersey Attorney ID#016961985*
Catherine Pastrikos Kelly, Esq.
*New Jersey Attorney ID # 179042016*
MEYNER AND LANDIS LLP
One Gateway Center Suite 2500
Newark, New Jersey 07102
P:  973-624-2800
F:  973-624-0356
*Attorneys for Plaintiff, Carneys Point Township*

|  | SUPERIOR COURT OF NEW JERSEY |
|---|---|
|  | CHANCERY DIVISION - SALEM COUNTY |
|  | DOCKET NO.: SLM-C-7-18 |

TOWNSHIP OF CARNEYS POINT,

        PLAINTIFF,

V.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

        DEFENDANT.

*Civil Action*

<u>AMENDED</u>
COMPLAINT

       Plaintiff Carneys Point Township ("Carneys Point" or "Township") files this Amended Complaint against the New Jersey Department of Environmental Protection ("DEP") upon personal knowledge about its own actions and upon information and belief as to all other matters as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.    Carneys Point is pursuing the redevelopment of the Chambers Works site (<u>Attachment A</u>-site map) and is entitled to environmental liability protection pursuant to N.J.S.A. 58:10-23.11g-d(4).  Pursuant to the Declaratory Judgment Act, Carneys Point seeks an order declaring that the Chambers Works site is not being remediated in a timely manner given the

decades of delay created by obstructions and diversions presented by E. I. DuPont de Nemours and Company ("DuPont") over the past 50 years.

2.      Carneys Point also seeks an order compelling the DEP to comply with the direct oversight due process protocols of a Feasibility Study, public hearing, and Public Participation Plan set forth in N.J.S.A. 58:10C-27.

3.      Carneys Point is threatened by the non-performance of unreliable parties like DuPont and The Chemours Company FC, LLC ("Chemours") because their failure to remediate the Site and post an RFS puts the health, safety and welfare of the community in jeopardy, especially since DuPont is abandoning the Site.

4.      The due process protocols of direct oversight ensure the Township that DuPont and Chemours will remediate the onsite and offsite impacts of their pollution in a manner that will be protective of the community and in the event they fail to do so DEP and the Township can access a sufficiently funded RFS to complete the remediation work.

5.      Carneys Point's RACER® expert spent six months reviewing hundreds of thousands of documents related to the investigation of the Site prepared over the past thirty years. He concluded that over 100M pounds of hazardous waste had been discharged at the Site; the contamination has travelled and impacted drinking water wells as far as 2-miles from the Site (See Attachment B); only 8% of the contamination has been remediated over the past 30 years; it will take hundreds of years to complete the work at the slow rate DuPont and Chemours are working and the RFS required to address the onsite and offsite pollution is $1.126 Billion (net present value). While a large sum this is hardly the only $1B cleanup in New Jersey and elsewhere.

6.      Carneys Point provided the above information to the DEP in 2017 and demanded its right pursuant to the SRRA to participate at the Site. DEP ignored the demand. Carneys Point

then submitted a Petition in 2017 signed by over 1,000 residents demanding participation. DEP ignored it. Carneys Point then had its legislators intervene. DEP then responded and held a meeting in May 2017 with the Carneys Point Mayor, councilmen and professionals to tell them that Carneys Point and its residents could not participate at the Site. Prior to filing this suit in 2018 the Mayor met with DEP representatives again, presented them with a Public Participation Plan and asked DEP to sign and approve it. DEP refused.

7.     The Township is outraged by DEP's conduct because it violates the SRRA and is arbitrary and capricious. In addition, in an identical situation involving a DuPont/Chemours site in Pompton Lakes DEP gave the Borough of Pompton Lakes the opportunity to review and approve the remediation plan and RFS for that site without obstruction. DEP is denying Carneys Point those same rights here.

8.     DEP is violating Governor Murphy's "Environmental Justice" Executive Order No. 23 signed April 20, 2018, which requires DEP to teach other state agencies how to protect low income communities from the ravages of pollution. How can DEP teach other agencies the lesson of environmental justice when DEP is promoting environmental *injustice* in Salem County, the poorest county in the State, for the spectacular benefit of multi-billion-dollar international corporate polluters? DEP has not proven itself to be a worthy teacher of environmental justice principles here. As such Carneys Point must be permitted to protect itself as the SRRA provides.

9.     This court can correct DEPs failure to comply with the SRRA pursuant to the Environmental Rights Act ("ERA"), Writ of Mandamus, and action in lieu of prerogative writ.

## PARTIES

10.     Plaintiff Carneys Point Township is a political subdivision of the State of New Jersey with its offices at 303 Harding Highway, Carneys Point, Salem County, New Jersey.

11.    Defendant DEP is an agency of the State of New Jersey located at 401 E. State St., Trenton, New Jersey.

### III.    JURISDICTION AND VENUE

12.    Jurisdiction and venue are proper in this Court because Defendants are a state agency with jurisdiction over this matter and this Site.  Moreover Plaintiff's causes of action arise from transactions and occurrences that took place in Salem County.

### IV.    FACTS COMMON TO ALL COUNTS

#### A.    DuPont And Chemours are Under Direct Oversight.

13.    The SRRA provides that if a responsible party has been subject to two enforcement actions related to the remediation of the site in a 5-year period and/or failed to meet the May 7, 2014 statutory deadline to complete the remedial investigation that party is deemed "unreliable" and is subject to direct oversight by DEP.

14.    .[1] DuPont triggered DEP direct oversight because DuPont was hit with two significant remediation enforcement actions in 2011 – one for 220 hazardous waste spills and another for mismanaging rail cars filled with hazardous waste resulting in approximately $1 million in penalties. That misconduct subjected DuPont to direct oversight by DEP.

15.    DuPont and Chemours also failed to investigate the full horizontal and vertical extent of the pollution problem at and emanating from the Site by the SRRA deadline of May 7, 2014.  That misconduct also caused DuPont and Chemours to be under direct oversight by DEP.

16.    DuPont and Chemours had to comply with the direct oversight protocols of a Feasibility Study, public hearing, and Public Participation Plan in 2011 and 2014 when the direct oversight triggers occurred, and each time failed to do so.  DEP did not compel them to comply

---

[1] See Material Statement of Facts ¶¶18-24

even though DEP has determined that, "the [SRRA] statute leaves no further room for negotiating another result [other than direct oversight]. In such a case, the person responsible for conducting the remediation has already demonstrated an inability to remediate according to SRRA and the ARRCS rules."

**B.    As A Result Of DEP's Failure To Act Pursuant To New Jersey Law, Carneys Point Took Action To Protect Itself.**

17.    In 2016, Carneys Point hired an independent certified RACER® consultant to review 30-years of reports submitted by DuPont and Chemours to DEP and the U.S. Environmental Protection Agency ("EPA") regarding the Site. The RACER® consultant spent 6-months inputting Site data for all areas of environmental concern onsite and offsite. He concluded that over 100 million pounds of hazardous waste had been discharged at the Site; the contamination has travelled and impacted drinking water wells as far as 2-miles from the Site; only 8% of the contamination has been remediated over the past 30 years; and it will take hundreds of years to complete the work at the slow rate DuPont and Chemours are working.

18.    He also calculated that it would cost $1.7 Billion to remediate the contamination onsite and offsite.

19.    Carneys Point hired an economist to reduce the $1.7 Billion remediation total to net present value, which was calculated to be $1.126 Billion.

20.    While a large sum, Chambers Works is hardly the only billion-dollar cleanup site in New Jersey or the country. For example, the Lower Passaic River cleanup in Newark is more than $1B.

21.    The reason this number is so high is because, from its beginnings in the 1890s until the early 1970s, DuPont operated a chemical manufacturing facility at the Site with no meaningful environmental controls on its operations. Millions of gallons of contaminated wastewater from

chemical production buildings located all over the Site flowed into unlined earthen ditches to settling basins and then to the Delaware River. Huge quantities of water obtained from the Salem Canal and groundwater wells were used in production processes. Contaminated process water was discharged from hundreds of production buildings into miles of unlined earthen ditches that discharged directly to the Salem Canal, the Delaware River or to large unlined settling basins. These earthen ditches and unlined basins provided a direct pathway for hazardous waste to enter the soil and groundwater.

22.     In December 2016 (later amended), Carneys Point sued DuPont and Chemours pursuant to the ERA because: (a) DuPont and Chemours failed to post an RFS for the Site and failed to solicit a Public Participation Plan from Carneys Point in 2011 and 2014 as required by the SRRA when it triggered direct oversight; and (b) DuPont failed to post an RFS in 2015 as required by the New Jersey Industrial Site Recovery Act ("ISRA") when it transferred the Site to Chemours in 2015, among other things.

23.     In January 2017, Carneys Point wrote to the DEP Commissioner to inform him about its lawsuit against DuPont and its RACER® findings and demanded participation fearing the Site might become a huge unfunded abandoned facility and a danger to the community. The DEP Commissioner never responded to Carneys Point.

24.     The SRRA and its regulations provide the public with the opportunity to petition DEP to demand participation if it is not provided.

25.     In March 2017, the Township submitted a petition to DEP demanding public participation. Although only 25 signatures are required by New Jersey law to initiate a public participation plan, more than 1,000 concerned residents of Carneys Point signed the Township's

petition. DEP, however, refused to respond to the petition until the Township's legislative representatives intervened.  DEP then set a meeting for May 12, 2017.

26.    Prior to the meeting, Chemours sent a letter to DEP admitting it did not have a Public Participation Plan for the Site but would work with DEP to prepare one.

27.    On May 12, 2017, DEP and EPA representatives held a meeting with Township representatives, including the Township's Mayor, councilmen, attorneys, RACER® consultant, LSRP and environmental consultant. At the meeting, Township representatives told DEP that the Township wanted: (a) a seat at the table to participate in the remediation at the Site and the RFS process; (b) the DEP's reaction to the RACER® calculation of $1.126B for the RFS; (c) confirmation that DEP is requiring DuPont and Chemours to post an RFS and prepare a Public Participation Plan; and (d) confirmation that DEP will post its response to the Township's petition on the DEP website as required by regulation. DEP refused all these requests and told the Township to write a letter to DEP whenever they wanted to know something, and someone would get back to them.

28.    In June 2017 Carneys Point sent a letter to DEP asking specific questions and requesting a public participation plan.  DEP responded that Carneys Point should prepare one for DEP's review.  When Carneys Point submitted its Public Participation Plan DEP refused to accept it.

29.    At an identical but smaller DuPont/Chemours site in Pompton Lakes the Borough of Pompton Lakes asked for the right to participate by reviewing the remediation plan and RFS for that site and the DEP Commissioner personally made sure the remediation plan and RFS for the Pompton Lakes site was accepted by DEP only if the Borough approved them, which the Borough

eventually did.  DEP, however, has denied the same rights to Carneys Point for the much larger DuPont/Chemours Chambers Works Site.

### C.   DEP, DuPont And Chemours Engage In Secret Negotiations To Develop A Remediation Plan For The Site.

30.    Unbeknownst to Carneys Point, at the time of the May 12, 2017 meeting, DEP was already in secret negotiations with DuPont and Chemours to have them develop a remediation plan for the Site and to calculate an RFS.  DEP did not tell Carneys Point about these secret discussions at the meeting on May 12, 2017, or thereafter.  Carneys Point discovered these secret negotiations were occurring on its own much later.

31.    Specifically, in the secret negotiations, DEP, DuPont and Chemours prepared a term-sheet on how to describe current Site conditions and how to prepare a workplan for remediating the Site ("Secret Remediation Plan").  Using that term sheet, Chemours' counsel then commissioned AECOM, DuPont and Chemours' long-time consultant on the Site, to prepare the Secret Remediation Plan.  The Secret Remediation Plan provided that: (a) DuPont and Chemours would leave the 100 million pounds of hazardous waste where it is because they do not want to clean it up; (b) they will spend only 30 years in their casual effort to remediate the Site rather than the hundreds of years calculated by DEP; and (c) they will post the RFS as some kind of credit letter instead of cash, as required by the SRRA.

32.    Although AECOM invented the RACER® software, AECOM did not calculate the RFS for DuPont and Chemours during the secret negotiations.  Instead, DEP let Chemours calculate the RFS itself, which violated DEP regulations.  Chemours told DEP that based on its own internal calculations, the RFS for the Site was going to be $54M posted as a credit letter ("Secret RFS Proposal").  This is 4% of the amount required for the RFS.

33.     Chemours was then pushing DEP to quickly accept the Secret Remediation Plan and Secret RFS Proposal so DEP, DuPont and Chemours can enter into an Administrative Consent Order ("ACO") that might short circuit Carneys Point's lawsuit demanding DuPont and Chemours post an accurate RFS in cash as calculated by RACER® and as required by the SRRA.

34.     When Carneys Point discovered these secret negotiations were happening the Township demanded DEP provide it with documents related to the secret plan.  DEP provided the Township with redacted correspondence, emails and memos with all the text blacked out.

35.     The Township again requested documents about what was going on.  DEP refused to provide them claiming this was all part of a settlement with DuPont and Chemours and that DEP was entitled to deny the Township its participation rights.

36.     In December 2017, the Township told DEP via letter that, pursuant to New Jersey law, DEP could not enter into an ACO with DuPont and Chemours without the Township's involvement and consent.  DEP ignored the Township's letter.

37.     In March 2018, Carneys Point wrote to the DEP Commissioner demanding that the Commissioner not accept the Chemours RFS for the Site and that DEP permit the Township to participate as it did in the Borough of Pompton Lakes.  DEP did not respond to the letter.

38.     In March 2018, Carneys Point sent another letter to DEP requesting that DEP set aside each month's correspondence and reports on the Chambers Works remediation so a Township representative could drive up from Salem County and review the documents at DEP in Trenton.  DEP denied the request.

39.     In March 2018, DuPont announced it was ceasing operations at most of its leasehold locations at Chambers Works.  This cessation might lead to the ultimate abandonment of the Site.

40.     In April 2018, the Mayor asked DEP one last time to allow the Township to participate.  Mark Pedersen from DEP visited Mayor Kenneth Brown and told him Carneys Point would not be allowed to participate, Carneys Point should just try to keep its residents calm and to stop writing letters to the DEP.

41.     Having exhausted its administrative remedies Carneys Point files this action.

## UPDATE

42.     This matter was stayed for many years pending mediation and the outcome of the trial in State v DuPont, Chemours, 3M, United States District Court, District of New Jersey, Case No. 1:19-cv-14766-RMB-JBC ("State's Federal Matter").  The trial ended in a settlement by way of a Judicial Consent Order with DuPont, Chemours and their related entities, and a Judicial Consent Order with 3M (both pending public review and judicial approval at the time of this Amended Complaint).

43.     The Third Amended Complaint in the State's Federal Matter alleged that DuPont and Chemours undertook a decades-long campaign to delay the cleanup of the Chambers Works Site.  Selected paragraphs of the Third Amended Complaint are attached hereto as Attachment C.

44.     Paragraph 3 of the Third Amended Complaint stated, "3. For decades, the Department has worked to allow Old DuPont to investigate and remediate Chambers Works without the need for enforcement or litigation. However, it has recently become clear that Old DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, Old DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its Titanium Technologies, Chemical Solutions, and Flourochemicals segments (the "Performance Chemicals Business") (including its PFAS-related product lines), the Site itself, and the associated

liabilities to Chemours and Chemours FC and away from Old DuPont (and tens of billions of dollars of its assets). Old DuPont also concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused.

45.     Paragraph 4 of the Third Amended Complaint stated, "4. For example, for over 50 years, Old DuPont emitted vast quantities of PFAS chemicals—including perfluorooctanoic acid ("PFOA") and perfluorononanoic acid ("PFNA")— from Chambers Works. For most of that time, Old DuPont had clear and unequivocal knowledge that: PFOA, PFNA and other PFAS compounds are extremely resistant to degradation, they persist indefinitely in the environment, they bioaccumulate in blood, and they pose a substantial threat to human health and the environment. Yet, Old DuPont actively concealed the true nature of PFAS compounds, while it utilized, discharged, emitted, released, and dumped vast quantities of these compounds into New Jersey's air, waters, and natural resources. Old DuPont knowingly undertook this course of conduct for one reason: to maximize its profits from Teflon® and myriad other consumer products and industrial uses for PFAS-containing compounds. Both Old DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

46.     Paragraph 10 of the Third Amended Complaint stated, "10. Old DuPont has known for decades that it faces unprecedented environmental and tort liabilities for the PFAS that it released into the environment in numerous parts of the country in combination with its massive environmental liabilities unrelated to PFAS. For years, it has, at every step, sought to hinder the State of New Jersey, and many other states facing massive harm to the well-being of their citizens and their natural resources, from being able to recover on their eventual judgments by attempting to put assets outside of the reach of creditors."

47.     Paragraphs 119-148 of the Third Amended Complaint addressed DuPont's knowledge about the dangers of PFOA, which had been used by DuPont at Chambers Works for decades.  The State alleged DuPont knew about the bio-accumulative and bio-persistent nature of PFOA, workers exposed to PFOA, and DuPont's conclusion PFOA is toxic.

48.     The State also claimed that DuPont knew PFOA could be emitted into the air contaminating areas beyond the Chambers Works facility, causing drinking water contamination.

49.     The State also claimed that in 1984, DuPont undertook a campaign to deny and downplay the health risks caused by PFOA.

50.     The State also claimed, "For decades, 3M and DuPont worked together to minimize, conceal, and misrepresent the risks of their PFAS chemistry from federal regulators, New Jersey, and the public, throughout which time 3M continued to supply DuPont with PFOA products for use in New Jersey." (para. 148).

51.     Paragraphs 149-158 of the Third Amended Complaint addressed DuPont's use and discharge of PFOA at Chambers Works.  The State alleged that "massive amounts of PFOA have been discharged at Chambers Works, that included taking in PFOA waste from other DuPont facilities and private disposal customers, which was then discharged into surface water from the [Waste Water Treatment Plant] WWTP and emitted into air from stacks and vents and leached to groundwater from PFOA contaminated soils and/or onsite landfills with contaminated waste."

52.     Paragraphs 159-186 of Third Amended Complaint addressed DuPont's efforts to conceal and downplay PFOA contamination at and around Chambers Works.  The State alleged that DuPont artificially inflated screening levels to avoid the conclusion that PFOA discharged and emitted from Chambers Works was harmful so DuPont could claim no health risk was present and no remediation was required.  DuPont also claimed that if the State used PFOA screening levels

lower than DuPont's screening levels that would be "irresponsible," and "confusing," and DuPont would have to challenge the State.

53.     Paragraphs 187-194 of Third Amended Complaint addressed the PFOA and PFAS contamination at and around Chambers Works.  The State alleged that "PFOA and other PFAS contaminate Chambers Works and the surrounding area, though the full extent of this contamination remains to be determined." (para. 187).  The State further claims that wetlands and offsite contamination has yet to be fully investigated.  However, hundreds of residential drinking water wells have been sampled and almost half exceed PFAS screening levels.

54.     Paragraphs 195-196 of Third Amended Complaint allege that DuPont acted with "actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their products, or to reduce or eliminate expenses they would otherwise have incurred to remove PFAS from their waste streams, despite the impacts on the Site, the State, and its citizens relating to contamination of groundwater, surface water, and other natural resources."  The State therefore sought punitive damages.

## COUNT 1
### DuPont/Chemours is not undergoing timely remediation at Chambers Works

55.     Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

56.     Carneys Point is pursuing the redevelopment of the Chambers Works site by undertaking a redevelopment study that may result in a redevelopment plan with the power of condemnation.

57.     Carneys Point claims it is entitled to condemn the entire Chambers Works site or subdivided lots to promote redevelopment without assuming the preexisting environmental liability associated with the site because the Spill Compensation and Control Act, ("Spill Act") at N.J.S.A. 58:10-23.11g-d(4) states that a local governmental entity that condemns a contaminated parcel will not assume the preexisting environmental liability if the property is not "being remediated in a timely manner at the time of the condemnation or eminent domain action."[2] (The "Local Government Immunity Statute").

58.     The Declaratory Judgment Act, N.J.S.A. 2A:16-53 ("DCA") provides that a person "whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract*, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

59.     The DCA entitles Carneys Point to seek a judicial declaration as to its rights under the Local Government Immunity Statute that the Chambers Works site is not being remediated in a timely manner.

60.     As stated in paragraphs 47 through 59 above, the State claims that DuPont undertook a plan of evasion and deception to avoid identifying PFOA as a source of environmental

---

[2] N.J.S.A. 58:10-23.11g-d(4) state, "Any federal, State, or local governmental entity which acquires ownership of real property through bankruptcy, tax delinquency, abandonment, escheat, eminent domain, condemnation or any circumstance in which the governmental entity involuntarily acquires title by virtue of its function as sovereign, or where the governmental entity acquires the property by any means for the purpose of promoting the redevelopment of that property, shall not be liable, pursuant to subsection c. of this section or pursuant to common law, to the State or to any other person for any discharge which occurred or began prior to that ownership. This paragraph shall not provide any liability protection to any federal, State or local governmental entity which has caused or contributed to the discharge of a hazardous substance. This paragraph shall not provide any liability protection to any federal, State, or local government entity that acquires ownership of real property by condemnation or eminent domain where the real property is being remediated in a timely manner at the time of the condemnation or eminent domain action."

concern at the site, which effectively delayed for decades the remediation of PFOA and other PFAS compounds at and emanating from the site.

61.    DuPont and Chemours also are not timely remediating the site because they have violated the mandatory remediation deadlines set forth in the Site Remediation Reform Act, N.J.S.A. 58C-1 et seq.   See Counts herein.

62.    According to the State, Carneys Point has been "uniquely impacted by PFAS Contamination as a result of Discharges of PFAS from the Chambers Works Site, *one of the largest sources of PFAS contamination in the world.*" [Emphasis added]. (Para. 27, 3M Judicial Consent Order Case No.: 1:19-cv-14766-RMB-JBC).

63.    Therefore, given the immensity of the contamination at and emanating from the Chambers Works site, the evasion and deception employed by DuPont to remediate the contamination, and that the contamination may take decades longer to remediate now than it otherwise would have if DuPont had not delayed remediation for decades, the State cannot claim the Chambers Works site is being remediated in a timely manner.

64.    The State may be settling with DuPont, Chemours and 3M; however, that settlement did not erase the decades delay in remediation, nor is it accelerating the remediation that has been delayed for decades.

WHEREFORE, Carneys Point respectfully requests that the Court:

A.  Declare that the Chambers Works site is not being remediated in a timely manner.

B.  Order such other relief as the court deems just and proper.

## COUNT 2
### Direct Oversight Due Process Protocols

### Feasibility Study
### Public Hearing
### Public Participation Plan)

65.     Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

66.     The Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq. ("ERA") permits a municipality to enforce New Jersey environmental laws, such as the SRRA, when DEP is unwilling or unable to do so and the violation is of a continuous nature.

67.     Section 4.b of the ERA provides that: "[] any person may commence a civil action in any court of competent jurisdiction for declaratory and equitable relief against any other person for the protection of the environment, or the interest of the public therein, from pollution, impairment or destruction."

68.     The ERA further provides that no conduct shall be permitted if a feasible and prudent alternative exists consistent with public health, safety and welfare.

69.     The ERA further provides that a court "may grant temporary and permanent equitable relief, including the imposition of such conditions as may be necessary to protect the environment, or the interest of the public therein, from pollution, impairment or destruction."

70.     As a political subdivision of the state, the ERA does not require Carneys Point to provide DEP or others with a 30-day notice letter in advance of suit.

71.     The DEP's failure to comply with the direct oversight protocols has been continuous.

<u>Direct oversight triggers</u>

72.     The SRRA outsourced site remediation to Licensed Site Remediation Professionals ("LSRPs") and created hard remediation deadlines that would reduce the backlog and bring sites to final cleanup sooner.[3]

73.     One of the key tools that helped achieve the goals of the SRRA was the use of DEP direct oversight whenever a responsible party proved to be an unreliable remediating party by (1) missing the SRRA mandatory deadline of May 7, 2014 to complete all remediation investigation work, including the horizontal and vertical delineation of groundwater onsite and offsite, for sites that have been undergoing remediation since prior to 1999 or (2) having two remediation enforcement actions within a five year period.[4]

74.     Whenever either of these events occur the site is automatically subject to DEP direct oversight, which is an obligation that runs with the land.[5]

75.     DEP has stated that, "the [SRRA] statute leaves no further room for negotiating another result [other than direct oversight].  In such a case, the person responsible for conducting the remediation has already demonstrated an inability to remediate according to SRRA and the ARRCS rules."[6]  In other words, if the person violated the SRRA requirements for remediation the person is deemed an unreliable remediating party.

76.     DuPont triggered DEP direct oversight because it failed to complete the remedial investigation of the Site by the SRRA deadline of May 7, 2014.  In particular, DuPont failed to

---

[3] Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390 (2014)
[4] N.J.S.A. 58:10C-27a.
[5] See N.J.A.C. 7:26C-3.3 Statutory and mandatory remediation timeframes. This regulation confirms that the compliance deadlines imposed by N.J.S.A. 58:10C-27 relate to the "site" and therefore run with the land. See also N.J.A.C. 7:26C-3.4(d); N.J.A.C. 7:26C-5.2(k), N.J.A.C. 7:26C-14.2.
[6] May 7, 2012 New Jersey Register, Final Rule Adoption ARRCS DEP RESPONSE to COMMENTS 352 through 355.

delineate contaminated groundwater underneath the hazardous waste landfill; failed to delineate contamination in sediment within the Delaware River; failed to delineate contamination in the Salem Canal; failed to delineate contamination in the northern part of the Site; failed to delineate contamination in the deepest aquifer E; failed to delineate contamination exiting the western boundary of the Site towards Carneys Point; and failed to delineate contamination within the Township, which contamination has now spread as far as five miles from the Site and beyond.

77.    DuPont also triggered DEP direct oversight because DuPont was the respondent in two significant remediation enforcement actions in 2011 – one for 220 hazardous waste spills and another for mismanaging rail cars filled with hazardous waste.

Direct oversight runs with the land

78.    Chemours acquired the Site subject to DEP direct oversight when it took possession of the property and all its business assets and operations in July 2015.  Therefore, Chemours inherited the Site subject to DEP direct oversight given that the horizontal and vertical extent of contamination at and emanating from the Site had not been completed as required by the SRRA deadline of May 7, 2014.

No exception to direct oversight applies to Chambers Works

79.    An exception to DEP direct oversight is if the responsible party was issued a federal order under the Resource Conservation and Recovery Act ("RCRA") prior to the 2009 enactment of SRRA with different deadlines for compliance.[7]

80.    Neither DuPont nor Chemours have been issued a federal RCRA order. The DEP RCRA Guidance Document confirms that this is the only exception to DEP direct oversight.

---

[7] N.J.S.A. 58:10C-27.

("Remediation occurring under a federal order which includes specified timeframes will not be required to comply with the mandatory and regulatory timeframes specified in SRRA.").

Direct Oversight requirements

81.     DEP direct oversight requires the unreliable party to do the following: (1) do the remediation as designed by DEP; (2) do a feasibility study to determine what remediation needs to be done, including a public hearing; (3) do each remedial action as DEP approves; (4) submit an initial remediation cost review form required to address the cost of all remediation required onsite and offsite and submit it to DEP within 60-days of the direct oversight triggering event with yearly updates; (5) establish a financially backed RFS in the amount of the estimated cost of cleanup within 90-days of the direct oversight triggering event; (6) pay DEP the annual 1% RFS surcharge; (7) obtain DEP prior approval before distributing funds from the RFS; (8) provide all submissions to DEP; and (9) "submit a proposed public participation plan, with a schedule [to DEP] that contains the strategy for soliciting public comment concerning the remediation from the members of the surrounding community concerning the remediation of the site," within 30-days of the direct oversight triggering event and implement the public participation plan once approved by DEP.[8]

Feasibility Study and  Public Hearing

82.     The unreliable remediating party must prepare a feasibility study pursuant to 42 U.S.C. 9617(a)(2) and in accordance with EPA guidelines.  The feasibility study describes where contamination is located onsite and offsite; the type of contamination identified; migration pathways; impacts to drinking water wells; the potential for vapor intrusion into dwellings from contaminated groundwater; immediate environmental concerns; the schedule of remedial activity;

---

[8] N,J,A.C. 7:26C-14.2

the type of activity to be undertaken; the efficacy of the remedial choices taken; the sufficiency of the posted RFS necessary to complete the work; and the impact of remedial work on health and safety, among other things.

83.    The feasibility study must be submitted to DEP and the public.  After submitting the feasibility study to the public, the remediating party must hold a public hearing so pollution impacted communities can ask questions, understand the risks posed by the pollution, and take precautions to protect their property, health and community.[9]

84.    With the Feasibility Study and public hearing completed, a pollution-impacted community can then participate in the preparation of a Public Participation Plan.

Public Participation Plan

85.    DEP published a Guidance Documents on how to prepare a Public Participation Plan.[10]  The Guidance Document requires that the plan be "site-specific, commensurate with site conditions and the level of public interest in the site and remain flexible to accommodate ongoing changes in community concerns. For example, a contaminated site located in an industrial area may not need as comprehensive a public participation plan as one in a residential area, which has an off-site ground water plume that involves vapor intrusion sampling. In other words, a one-size-fits-all approach is not appropriate when preparing a public participation plan. When developing the public participation plan, a critical factor to evaluate is the likelihood of, or the actual impact to off-site properties. Experience has shown that heightened community concern in the form of

---

[9] See NJDEP Guidance Document "Earning Adjustments to the Direct Oversight Requirements Administrative Requirements for the Remediation of Contaminated Sites (ARRCS) N.J.A.C. 7:26C-14, which references "The Feasibility Study: Detailed Analysis of Remedial Action Alternatives," (March 1990) OSWER 9355.3-01FS4, NTIS: PB90-2726751NX)

[10] DEP Direct Oversight Public Participation Plan Guidance Version 1.0, Issued 9/13/2016, Posted 9/15/2016 http://www.nj.gov/dep/srp/guidance/srra/direct_oversight_pp_plan.pdf

public health and property value questions arise when there is off-site migration of contamination."[11]

<u>DEP failure to compel DuPont and Chemours to comply</u>

86.     The feasibility study, public hearing, and Public Participation Plan are environmental due process protocols baked into the direct oversight provisions given the direct impact of pollution on the community. N.J.S.A. 58:10C- 27(c)(2).

87.     The DEP acknowledged that the Chambers Work site was subject to direct oversight protocols because the DEP sought to compel DuPont and Chemours to prepare a Public Participation Plan for the Chambers Works site as part of the Third Amended Complaint in the State's Federal Matter, but DEP did not require that they actually prepare it as part of the Judicial Consent Order in the State's Federal Matter.[12]

88.     The DEP has failed to compel DuPont and Chemours to comply with the direct oversight due process protocols.

89.     The DEP cannot unilaterally modify the direct oversight protocols to allow DuPont and Chemours to ignore them unless the DEP publishes a public notice explaining good reasons why it "is in the public interest and protective of the public health, safety, and the environment" for DuPont and Chemours to ignore these due process protocols, such as financial hardship or public emergency.  N.J.S.A. 58: 10C-27g(2).  The DEP has published no reasons of any kind.

90.     In addition, the DEP cannot use N.J.A.C. 7:26C-14.4(a) to "adjust" the due process notice and comment requirements of the direct oversight statute, N.J.S.A. 58: 10C-27g(2), because

---

[11] Id.

[12] First Count WHEREFORE clause states, "c. Compelling each Defendant, jointly and severally, without regard to fault, to perform any further cleanup of the Site and contaminated areas off-site in conformance with the Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29, including the preparation of a public participation plan pursuant to N.J.S.A. 58:10C-27.c(7), and all other applicable laws and regulations."

the regulation does not permit the Department to unilaterally ignore the due process requirements of the direct oversight statute.

91.     The DEP's failure to compel DuPont and Chemours to prepare a feasibility study, hold a public hearing, and engage with Carneys Point in the preparation of a Public Participation Plan has kept Carneys Point uninformed about the options and strategies to be considered and employed to remediate the pollution impacting the Chambers Works site and its adjacent polluted community.  These due process protocols protect the public health, safety and welfare by allowing Carneys Point to participate in the free flow of ideas, concerns and solutions related to the Site, as permitted by the SRRA.  Carneys Point's participation will also assist the community to protect the environment and the interest of the public from pollution.

92.     Compelling DuPont and Chemours to comply with the direct oversight due process protocols is a feasible and prudent alternative, as promoted by the ERA, to not ignoring these protocols.

WHEREFORE, Carneys Point respectfully requests that the Court:

A.  Declare that the Chambers Work site is under direct oversight.

B.  Compel the DEP to require DuPont and Chemours to prepare a Feasibility Study as required by applicable statutes, regulations, and Guidance Documents.

C.  Compel the DEP to require DuPont and Chemours to hold a public hearing to discuss the Feasibility Study and the remediation of the Chambers Works site and surrounding impacted areas as required by applicable statutes, regulations, and Guidance Documents.

D.  Compel the DEP to require DuPont and Chemours to participate with Carneys Point in the preparation of a Public Participation Plan that the Township finds acceptable.

E.   Order such other relief as the court deems just and proper.

### **COUNT 3**
Writ of Mandamus

93.    Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

94.    The 1947 State Constitution continues to recognize the distinction and separation of powers between the Executive, Legislative, and Judicial Branches of government.  As such, the courts retain the power to compel the Executive branch and its departments and agencies to perform their ministerial obligations, which do not require the exercise of discretion in the mode of performance of that obligation.

95.    The New Jersey Supreme Court in *Switz v. Middletown Tp*., 23 N.J. 580, 588-89 (1957) described mandamus: "It is a coercive process that commands the performance of a ministerial act or duty, or commands the exercise of a discretionary function, but does not seek to interfere with or control the mode and manner of its exercise or to influence or direct a particular result.  Mandamus lies to compel but not control the exercise of discretion."

96.    The Supreme Court further described the difference between a ministerial act and discretionary act as follows:  A Writ of mandamus can be used "to compel the performance, in a specified manner, of ministerial duties so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of their performance, but as to all acts or duties depending upon a jurisdiction to decide questions of law or to ascertain matters of fact, on the part of the officer or body at whose hands the performance is required, mandamus will not lie." Id.

97.     Carneys Point can seek relief pursuant to a Writ of Mandamus because the direct oversight protocols of a Feasibility Study, public hearing, and Public Participation plan are clear, identifiable, ministerial acts that do not require the exercise of discretion.

WHEREFORE, Carneys Point respectfully requests that the Court:

A.  Declare that the Chambers Work site is under direct oversight.

B.  Compel the DEP to require DuPont and Chemours to prepare a Feasibility Study as required by applicable statutes, regulations, and Guidance Documents.

C.  Compel the DEP to require DuPont and Chemours to hold a public hearing to discuss the Feasibility Study and the remediation of the Chambers Works site and surrounding impacted areas as required by applicable statutes, regulations, and Guidance Documents.

D.  Compel the DEP to require DuPont and Chemours to participate with Carneys Point in the preparation of a Public Participation Plan that the Township finds acceptable.

E.  Order such other relief as the court deems just and proper.

## COUNT 4
### Action in Lieu of Prerogative Writ

98.     Carneys Point incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

99.     An action in lieu of prerogative writ ordering the Public Participation Plan is appropriate for the following reasons:

100.    The administrative action of providing the Township with such a Plan pursuant to the SRRA is mandatory and not discretionary.  The SRRA requires that the Township "shall" be entitled to the Plan.

101.    A substantial public interest is being affected.   Carneys Point is facing the abandonment of a huge manufacturing facility that has polluted the Township as far as 2-miles from the Site. The Township is seeking its statutory right to participate in the remediation of the Site to make sure it gets cleaned up, so the community is protected. Obtaining a Public Participation Plan for that purpose is within the public interest.

102.    There is a substantial likelihood that Carneys Point's interests will be adversely affected if the Township is not provided with a Public Participation Plan.   Without a Public Participation Plan, the township will not be able to inform its community and residents as to what is happening with the Site by way of remediation, which is expected to take over 100 years to complete.

103.    There is no adequate remedy at law.   The Township is seeking participation in the remediation process at Chambers Works. The Township is not seeking money for itself.

104.    The administrative requirement for the Plan is an obligation that continues daily until compliance is achieved so the 45-day rule pertaining to action in lieu of a prerogative writ does not apply.   Each day of DEP's failure to permit a Public Participation Plan is a new start to calculating the 45-day timeframe.

105.    Carneys Point has exhausted its administrative remedies.   Carneys Point has sought DEP intervention numerous times, including a formal petition, without obtaining relief.   The Township is not entitled to appeal the decision of the DEP to deny it a Public Participation Plan. The Township cannot take an appeal directly to the Appellate Division. Thus, the Township has exhausted its administrative remedies.

WHEREFORE, Carneys Point respectfully requests that the Court:

A.  Declare that the Chambers Work site is under direct oversight.

B.  Compel the DEP to require DuPont and Chemours to prepare a Feasibility Study as required by applicable statutes, regulations, and Guidance Documents.

C.  Compel the DEP to require DuPont and Chemours to hold a public hearing to discuss the Feasibility Study and the remediation of the Chambers Works site and surrounding impacted areas as required by applicable statutes, regulations, and Guidance Documents.

D.  Compel the DEP to require DuPont and Chemours to participate with Carneys Point in the preparation of a Public Participation Plan that the Township finds acceptable.

E.  Order such other relief as the court deems just and proper.

Respectfully submitted,

**MEYNER AND LANDIS LLP**

Dated:  September 15, 2025          By:   _/s/ Albert I. Telsey_____

Albert I. Telsey (*ID#016961985*)
atelsey@meyner.com
One Gateway Center, Suite 2500
Newark, New Jersey 07102
P:  973.602.3439
F:  973.624.0356
*Attorneys for Plaintiff*
*Carneys Point Township*

## <u>CERTIFICATION PURSUANT TO R. 4:5-1</u>

I hereby certify, pursuant to R. 4:5-1, that except for the matter captioned <u>Carneys Point Township v. E. I. DuPont De Nemours and Co., et. al.</u>, Docket No. SML-L-251-16, and <u>State v DuPont, Chemours and 3M</u>, United States District Court, District of New Jersey, Case No. Case No. 1:19-cv-14766-RMB-JBC the matter in controversy is not, to my knowledge, the subject of any action pending in any Court, nor of any Arbitration proceeding, that no other action or Arbitration proceeding is contemplated at this time and that I know of no other party who should be joined in this action.

**MEYNER AND LANDIS LLP**
*Attorneys for Plaintiff, Carneys Point Twp.*

By: */s/ Albert I. Telsey*
    Albert I. Telsey, Esq.

Dated: September 15, 2025

## AFFIDAVIT

(Re initial complaint)


STATE OF NEW JERSEY   )
                      )  ss
COUNTY OF SALEM       )


KENNETH BROWN, being duly sworn upon his oath says:

I am Mayor of Carneys Point Township.  I am authorized to make this verification.

I certify that I have personally examined and am familiar with the information submitted herein, including all attached documents, and that based on my inquiry of those individuals immediately responsible for obtaining the information, to the best of my knowledge, I believe that the submitted information is true, accurate and complete.


/s/ Kenneth Brown
_____
KENNETH BROWN
Mayor, Carneys Point Township


DATED: May 3, 2018

**Attachment A**



**Attachment B**



**Attachment C**
**Excerpts of DEP's Third Amended Complaint**

<u>State v DuPont/Chemours/3M</u>
United States District Court
District of New Jersey
Case No. 1:19-cv-14766-RMB-JBC

3. For decades, the Department has worked to allow Old DuPont to investigate and remediate Chambers Works without the need for enforcement or litigation. However, it has recently become clear that Old DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, Old DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its Titanium Technologies, Chemical Solutions, and Flourochemicals segments (the "Performance Chemicals Business") (including its PFAS-related product lines), the Site itself, and the associated liabilities to Chemours and Chemours FC and away from Old DuPont (and tens of billions of dollars of its assets). Old DuPont also concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused.

4. For example, for over 50 years, Old DuPont emitted vast quantities of PFAS chemicals— including perfluorooctanoic acid ("PFOA") and perfluorononanoic acid ("PFNA")— from Chambers Works. For most of that time, Old DuPont had clear and unequivocal knowledge that: PFOA, PFNA and other PFAS compounds are extremely resistant to degradation, they persist indefinitely in the environment, they bioaccumulate in blood, and they pose a substantial threat to human health and the environment. Yet, Old DuPont actively concealed the true nature of PFAS compounds, while it utilized, discharged, emitted, released, and dumped vast quantities of these compounds into New Jersey's air, waters, and natural resources. Old DuPont knowingly undertook this course of conduct for one reason: to maximize its profits from Teflon® and myriad other consumer and industrial uses for PFAS-containing compounds. Both Old DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey.

10. Old DuPont has known for decades that it faces unprecedented environmental and tort liabilities for the PFAS that it released into the environment in numerous parts of the country in combination with its massive environmental liabilities unrelated to PFAS. For years, it has, at every step, sought to hinder the State of New Jersey, and many other states facing massive harm to the well-being of their citizens and their natural resources, from being able to recover on their eventual judgments by attempting to put assets outside of the reach of creditors.

**OLD DUPONT AND 3M's KNOWLEDGE OF THE DANGERS OF PFAS**

119. Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities, including in West Virginia, North Carolina, and New Jersey.

120. Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment, and that tens of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

123. Old DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

129. Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. Old DuPont was aware of 3M's findings no later than 1981.

130. Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine. (As noted above, PFAS contain carbon and fluorine, and human exposure to these chemicals therefore has been linked to elevated organic fluorine levels.)

133. By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not report this data or the results of its worker health analysis to any government agency or community at this time.

134. The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

135. Not only did Old DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25 percent—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

136. In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of the study of its own plant workers.

137. While Old DuPont knew about this toxicity danger as early as the 1960s, Old DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

138. By late 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries.

139. Further, no later than 1984, Old DuPont was aware that PFOA is biopersistent.

141. Old DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont's plant in West Virginia, Old DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). Old DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials. Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

142. During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

146. Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

147. In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the Toxic Substances Control Act and RCRA. Old DuPont eventually settled the action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

148. Old DuPont and 3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment. This knowledge was accessible to and shared between Old DuPont and 3M, but not fully accessible to or shared with Plaintiffs. For decades, 3M and DuPont worked together to minimize, conceal, and misrepresent the risks of their PFAS chemistry from federal regulators, New Jersey, and the public, throughout which time 3M continued to supply DuPont with PFOA products for use in New Jersey.

**Old DuPont's Use and Discharge of PFOA from Chambers Works**

149. Beginning in the late 1950s, Old DuPont used PFOA, supplied by 3M, in its manufacturing processes at Chambers Works, created PFOA as a by-product in other processes, and discharged PFOA from its wastewater treatment plant. As a result of all these and other activities, massive amounts of PFOA have been discharged at Chambers Works.

150. Old DuPont used PFOA to manufacture fluoroelastomers at Chambers Works starting in the late 1950s. Production included standard fluoroelastomers, perfluoroelastomers, and specialty fluoroelastomers. Old DuPont used PFOA to make standard fluoroelastomers until 2001, and perfluoroelastomers and specialty fluoroelastomers until 2013.

151. PFOA is also a by-product of Old DuPont's fluorotelomer manufacturing process at Chambers Works. Fluorotelomer manufacture at Chambers Works started in the early 1960s, and chemicals that could break down into PFOA were used until 2014.

152. The WWTP also received on-site process wastewater streams, landfill leachate and groundwater from the IWS, all of which contained PFOA.

153. Additionally, the WWTP received wastewater streams from other Old DuPont facilities as well as other commercial wastewater streams, which contained PFOA streams in the parts per million.

154. Significantly, Old DuPont used PFOA supplied by 3M at Washington Works, located in West Virginia, and transferred PFOA-containing waste generated at Washington Works to Chambers Works, which was discharged through the WWTP or landfilled on-site.

155. Old DuPont did not install a carbon treatment system, which could assist with treatment of PFAS, at its WWTP until 2004.

156. Old DuPont accepted commercial waste streams that contained PFOA and other PFAS until 2012.

157. As a result of the above activities, PFOA was discharged into surface water from the WWTP and emitted into air from stacks and vents, and leached to groundwater from PFOA contaminated soils and/or onsite landfills with contaminated waste.

158. The scope of Old DuPont's PFOA-related activities at Chambers Works is demonstrated by its own estimates for the year 1999. For that year alone, Old DuPont estimates it transferred 13,400 pounds of PFOA-containing waste from Washington Works to Chambers Works; released at least 25,500 pounds of PFOA into water; dumped at least 8,000 pounds of PFOA-containing waste into landfills on-site; and emitted 300 pounds of PFOA-related chemicals into air.

## Old DuPont's Efforts to Conceal and Downplay PFOA Contamination at and around Chambers Works

159. Old DuPont engaged in a long-running campaign in New Jersey to conceal and downplay PFOA contamination at and around Chambers Works, and the effects that this contamination would have on human health and the environment. Among other things, Old DuPont compared sampling results to inflated screening levels, attacked New Jersey's efforts to establish more protective levels, and refused to acknowledge there was a contamination problem until it was forced to concede the issue.

160. In 2003, Old DuPont made one of its first meaningful disclosures about its PFOA related activities at Chambers Works, in a report titled Old DuPont Telomer Manufacturing Sites: Environmental Assessment of PFOA Levels in Air and Water. In the report, Old DuPont was supposed to give its assessment of the impact of its telomer manufacturing operations at Chambers Works.

161. Critically, Old DuPont sought to compare the results of the assessment to screening levels recently released by the "C-8 [PFOA] Assessment of Toxicity Team" ("CATT"). These levels were inflated by Old DuPont's own design. CATT was created through Old DuPont's Consent Order with West Virginia. The team, which included an Old DuPont representative, was tasked with assessing the health risks associated with releases of PFOA from Washington Works.

162. In 1991, Old DuPont had established an internal Community Exposure Guideline ("CEG") of 1 part per billion ("ppb") (1,000 ppt) for PFOA in community drinking water. Old DuPont sought to influence CATT to set screening levels significantly higher than its own CEG, which it could then present as proof that its releases posed no health risks. In 2002, CATT issued an "aquatic life advisory concentration" of 1,360 ppb (1,360,000 ppt). CATT also issued a "human health protective screening criteria" of 150 ppb (150,000 ppt), which was 150 times higher than Old DuPont's prior, internal standard.

163. In Old DuPont's 2003 report on Chambers Works, it disclosed that PFOA was present in groundwater throughout the Site and at the perimeter, up to 46.6 ppb (46,000 ppt). Old DuPont characterized these results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system." Old DuPont also dismissed the significance of

35

the results, asserting that because "[g]roundwater in the vicinity of Chambers Works is not removed from the ground for drinking water or other use," the 1,360 ppb (1,360,000 ppt) screening level should be applied.

164. Old DuPont further reported that it was discharging PFOA into the Delaware River at an average concentration of 133 ppb (133,000 ppt). Samples from the Delaware River (downstream of the facility) were as high as 0.556 ppb (556 ppt), and from the Salem Canal were 0.089 ppb (89 ppt). According to Old DuPont, however, these results were not concerning because they were "well below" CATT-established levels.

165. Old DuPont concluded its report by saying its operations at Chambers Works were "not a significant source of PFOA to the environment."

166. Following submission of the Telomer Manufacturing Sites report, Old DuPont continued to urge use of CATT screening levels in New Jersey. In or about January 2004, Old DuPont made a presentation to Department personnel about the CATT levels. It reiterated that "[a]ll" of its Chambers Works environmental assessment results were "[w]ell [b]elow [s]creening [c]riteria."

167. In March 2005, the Department directed Old DuPont to assess areas of Chambers Works where PFOA was used and may have caused contamination, and, in October 2005, Old DuPont provided its preliminary assessment and proposal for sampling ("2005 PAR").

168. Old DuPont sought in the 2005 PAR to sample limited areas. Old DuPont further stated that "[a]ir emissions from [PFOA-related] manufacturing processes were minimal," and that "contribution from air emissions to soil or groundwater impact would be insignificant."

169. Results of sampling done pursuant to the 2005 PAR were provided to the Department in October 2006 in a Site Investigation Report ("SIR"). PFOA was present in the areas investigated on the site in soil up to 0.990 ppm (990,000 ppt), and in groundwater up to 1,050 ppb (1,050,000 ppt). Nevertheless, Old DuPont concluded there was "limited potential for [PFOA] exposure to soil and groundwater."

170. Old DuPont did not propose remedial action. In fact, it prefaced the SIR's results by stating "[t]o date, there are no human health effects known to be caused by PFOA," and that it believed "the weight of scientific evidence indicates that PFOA exposure does not pose a health risk to the general public." Old DuPont knew from its own internal studies and environmental assessments that this was false.

171. Also during this time, PFOA was detected in public water supplies near Chambers Works. In February 2006, Old DuPont took samples from the Pennsgrove Water Supply Company's wells, which supply drinking water to households in Penns Grove and Carneys Point.  Old DuPont provided these results in a letter to the Department in May 2006. PFOA was detected in the wells up to 190 ppt.

172. In its letter, Old DuPont stated that "[t]he results reflect PFOA levels far below any established regulatory guidance for drinking water," and that the water must, "therefore," be." considered "safe for human consumption

173. Old DuPont, in its letter, dismissed the relevance of litigations seeking treatment for drinking water exceeding 50 ppt. Old DuPont stated "that number is neither a public health standard nor a threshold for obtaining compensation." Despite these statements, mere months later, in November 2006, EPA would issue a Consent Order relating to the Washington Works facility determining PFOA may present an imminent and substantial endangerment to human health at or above 50 ppt, and memorializing Old DuPont's obligation to provide sufficient treatment to the drinking water of residents of West Virginia and Ohio living around Washington Works to ensure that this 50 ppt level is met.

174. In 2007, the Department issued its drinking water guidance level for PFOA of 40 ppt.

175. Old DuPont made every effort to see that New Jersey would not issue guidance at this level.

176. As stated above, Old DuPont had previously dismissed any level of 50 ppt. Now sensing that New Jersey would be issuing an advisory with a lower level, Old DuPont sought to use 50 ppt, from its prior Consent Order with EPA.

177. However, the Department's drinking water guidance level was being developed for lifetime exposure, while the Consent Order's 50 ppt level was put in place for less-than-lifetime, subchronic exposure.

178. In January 2007, Old DuPont submitted a memo from one of its scientists, Dr. Robert Rickard, to the Department for the purpose of attacking the advisory to be issued regarding drinking water guidance. Among other things, Dr. Rickard's memo stated the Department's issuance of an advisory below 50 ppt would be "confusing" to the public. He wrote: "If a level lower than [50 ppt] is set in New Jersey it could cause undue concern among the communities at or above that level in New Jersey and elsewhere and the [Department] . . . will have difficulty explaining this variation."

179. Dr. Rickard further charged that "it would be irresponsible for New Jersey to set a lower level," and that doing so "would undermine public expectations that government agencies charged with protecting health do so in a deliberate and scientifically sound manner."

180. Dr. Rickard, on Old DuPont's behalf, went even further. With respect to setting a level below 50 ppt, which he characterized as "totally unjustified," he seemed to threaten the Department: "Based on the extensive scientific studies done by the government, research institutions and industry suggesting no human health effects at background levels, Old DuPont could not let a scientifically unsupported level go unchallenged."

181. Old DuPont's efforts, and its thinly veiled threat, failed, but it would resist taking remedial action based on the drinking water advisory.

182. In February 2007, the Department directed Old DuPont to undertake further groundwater sampling on and off-site, and to delineate its results at the drinking water guidance value.

183. Old DuPont, in a cover letter to its groundwater investigation work plan of May 2007, objected to delineation based on the guidance value, contending it was "inconsistent with other established health based standards," did "not incorporate the most recent available science," and did not "necessitate or warrant a remedial investigation."

184. Groundwater investigations conducted shortly thereafter revealed off-site contamination. In 2008, Old DuPont submitted a report showing that PFOA was detected in eight of nine monitoring wells that were sampled, at a distance of up to 2,000 feet from the Site's border. PFOA was detected at 2.2 ppb (2,200 ppt) in a well at the border, and up to 1.4 ppb (1,400 ppt) in an off-site monitoring well.

185. Even presented with data showing significant contamination of residential drinking water wells around Chambers Works, Old DuPont still clung to the highest advisory levels possible. In 2009, Old DuPont sampled wells within a two-mile radius of Chambers Works for PFOA. However, Old DuPont refused to use the Department's drinking water guidance value as the threshold for providing treatment. It would only compare the results to EPA's 2009 provisional advisory, which was 400 ppt. Use of this higher criterion resulted in only a single well qualifying for treatment.

186. Today, however, Old DuPont is no longer in a position to deny that PFOA and other PFAS contamination poses a risk to the surrounding environment and human population.

**PFOA and PFAS Contamination at and around Chambers Works**

187. PFOA and other PFAS contaminate Chambers Works and the surrounding area, though the full extent of this contamination remains to be determined.

188. With respect to the Site itself and the immediate surrounding area, sampling and monitoring have shown severe contamination of groundwater and soil, as well as surface waters and sediment. Still, the effect of PFAS on the wetlands area, in the northern part of the Site, has not been as thoroughly analyzed.

189. As to off-site contamination, between 2016 and 2017, Chemours re-sampled residential drinking water wells within the two-mile radius of Chambers Works. This time, Chemours sampled for 14 PFAS including PFOA, PFNA and PFOS. Other PFAS including PFNA are also released from Chambers Works as a result of operations there.

190. For purposes of this re-sampling, PFOA was compared to the Department's then existing drinking water guidance level of 40 ppt; PFNA was compared to the Department's then existing

specific groundwater quality standard of 10 ppt; and PFOA and PFOS were combined and compared to EPA's 2016 lifetime health advisory for the sum of the chemicals of 70 ppt. Use of these levels (as opposed to that insisted by Old DuPont in its 2009 sampling program), resulted in almost half of the wells sampled (43 wells) exceeding the screening criteria. These criteria were substantially less stringent than the MCLs and the specific groundwater quality criteria New Jersey more recently adopted for PFOA (14 ppt) and PFOS (13 ppt).

191. Also, as part of the 2016-2017 program, additional sampling was done outside the two-mile radius, up to 2.75 miles. Of those 64 wells sampled in these further areas, 21 wells exceeded the screening levels.

192. Since the initial 2016-2017 program, sampling has continued to expanded areas, largely to the northeast of Chambers Works, up to five miles away.

193. In total, 341 individual drinking water wells have been sampled; there are 168 (approximately half) that exceeded the following criteria: 14 ppt for PFOA, 13 ppt for PFNA, and 70 ppt for PFOA and PFOS combined together.

194. The results of the sampling program, to date, do not provide a full understanding of the off-site contamination that operations at Chambers Works has caused. For example, there has been less sampling of wells to the southeast of Chambers Works. Further still, there has been limited-to-no sampling, outside of drinking water wells, of natural resources in the area, including soil, surface water, wetlands, sediments, and biota. In addition to the natural resources the State holds in trust, the State owns real property, within the five-mile radius of the Site, including the New Jersey Natural Land Trust Game Branch Preserve to the northeast of the Site, and the New Jersey Fish & Wildlife Salem River Wildlife Management Area to the southeast.

**Old DuPont's and 3M's Actual Malice / Wanton and Willful Disregard**

195. Old DuPont and 3M, as detailed above, committed acts and omissions with respect to PFOA and other PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their products, or to reduce or eliminate expenses they would otherwise have incurred to remove PFAS from their waste streams, despite the impacts on the Site, the State, and its citizens relating to contamination of groundwater, surface water, and other natural resources.

196. Therefore, Plaintiffs are requesting an award of punitive damages for Old DuPont's and 3M's especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.