SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
MIDDLESEX COUNTY
DOCKET NO. MID-L-008749-07
APP. DIV. NO. _____

NEW JERSEY DEPARTMENT OF :
ENVIRONMENTAL PROTECTION, :
                          :            TRANSCRIPT
        Plaintiff,        :
                          :               OF
    v.                    :
                          :             HEARING
HERCULES INC.,            :
                          :
        Defendant.        :

                    Place:  Middlesex County Courthouse
                            56 Paterson Street
                            New Brunswick, NJ 08903
                            (Heard partially remotely)

                    Date:   August 28, 2025

BEFORE:

    HONORABLE BENJAMIN S. BUCCA, JR., J.S.C.

TRANSCRIPT ORDERED BY:

    ALBERT I. TELSEY, ESQ. (Meyner & Landis, LLP)

APPEARANCES:

    RICHARD F. ENGEL, ESQ., Deputy Attorney General
    (Office of the Attorney General)
    - and -
    ALLAN KANNER, ESQ.  - and -
    CYNTHIA ST. AMANT, ESQ.
    (Kanner & Whiteley, L.L.C.)
    Attorneys for Plaintiff New Jersey Department of
    Environmental Protection

        Transcriber:  Tammy DeRisi, AD/T 518

        Agency:    KLJ Transcription Service, LLC
                   P.O. Box 352
                   Oakland, NJ  07436
                   (201) 703-1670
                   www.kljtranscription.com
                   info@kljtranscription.com
                   Digitally Recorded
                   Operator - Annamaria Bonano

APPEARANCES (CONT'D):

      JOSHUA R. ELIAS, ESQ.  - and -
      MICHELE J. GLASS, ESQ.  - and -
      WILLIAM S. HATFIELD, ESQ. (Gibbons PC)
      Attorneys for Defendant Hercules Inc.

      ALBERT I. TELSEY, ESQ. (Meyner & Landis, LLP)
      Attorney for the Borough of Sayreville

I N D E X

                                                          PAGE

ARGUMENT ON MOTION FOR CONSOLIDATION
By:  Mr. Telsey . . . . . . . . . . . . . . . . . 7
By:  Mr. Engel. . . . . . . . . . . . . . . . . . 28
By:  Mr. Kanner . . . . . . . . . . . . . . . . . 43
By:  Mr. Elias. . . . . . . . . . . . . . . . . . 50

DECISION
By:  The Court (Reserved) . . . . . . . . . . . . 61

```
                           Colloquy                    4
 1              (Proceeding commenced at 10:40:16 a.m.)
 2              THE COURT:  We're moving on now -- are you
 3      ready, Anna?
 4              COURT CLERK:  Yes.
 5              THE COURT:  Okay.  This is the matter of New
 6      Jersey Department of Environmental Protection v.
 7      Hercules, and it's Docket Number 8749-07.  If everyone
 8      could just enter their appearance, but say it slowly so
 9      I can write down their name -- write down your names?
10      Okay.  Let's first start with who is here for the DEP?
11              MR. ENGEL:  I'm Richard Engel, E-n-g-e-l,
12      Deputy Attorney General.
13              THE COURT:  Good morning, Mr. Engel.  I hope
14      all is going well for you.
15              MR. ENGEL:  Yeah.  Thank you, Your Honor.  It
16      is okay.
17              THE COURT:  Good.
18              MR. ENGEL:  And I have with me two of my
19      outside counsel.  I'll let them introduce themselves.
20              THE COURT:  Okay.
21              MR. KANNER:  Good morning, Your Honor.  Allan
22      Kanner, K-a-n-n-e-r, also for the State of New Jersey.
23              THE COURT:  Uh-huh.
24              MS. ST. AMANT:  Good morning, Your Honor.
25      Cindy St. Amant from Kanner & Whiteley for the State of
```

```
                           Colloquy                    5
 1      New Jersey.
 2              THE COURT:  Thank you.  Okay.  Who else do we
 3      have here?  Who do we have for Hercules?
 4              MR. ELIAS:  Good morning, Your Honor.  Joshua
 5      Elias of Gibbons PC for Hercules, and also a couple of
 6      my colleagues are on the line as well.  I'll let them
 7      introduce themselves.
 8              THE COURT:  Are you the lead attorney?
 9              MR. ELIAS:  I'll be taking the lead today,
10      Your Honor.  Yes.
11              THE COURT:  Okay.  Very good.  So who else do
12      we have from Hercules?
13              MS. GLASS:  Michele Glass from Gibbons.
14              THE COURT:  I'm sorry.  Say your name again?
15      It broke up.
16              MS. GLASS:  I apologize.  Michele Glass.
17              THE COURT:  Okay.  Very good.
18              MR. HATFIELD:  William Hatfield from Gibbons,
19      Your Honor.
20              THE COURT:  William?
21              MR. HATFIELD:  H-a-t-f-i -- Hatfield, H-a-t-
22      f-i-e-l-d.
23              THE COURT:  Okay.  Thank you.  All right.
24      And I guess we have Sayreville left, right?
25              MR. TELSEY:  Good morning, Judge.  Albert
```

Colloquy                                    6

1    Telsey, T-e-l-s-e-y, with Meyner and Landis, for
2    Sayreville.
3              THE COURT:  Okay.  I think that should be it.
4    Is there anyone who has not put their name on the
5    record?  Hearing none, we will proceed.  All right.  So
6    I have three motions before me.  The one was the motion
7    for approval of the consent judgment with the proposed
8    consent judgment.  I also have a motion by Sayreville
9    to -- for permission to intervene, as well as I have a
10   motion by Sayreville to consolidate the civil complaint
11   it filed under Docket Number 5903-25, and to
12   consolidate.
13             MR. ENGEL:  Your Honor, Mr. Engel speaking.
14   I think you also have before you a motion to approve
15   attorney's fees and costs.
16             THE COURT:  Yes.  Thank you.  And there's a
17   motion to approve attorney's fees and costs.  All
18   right.  So, I think what I'd like to do is, Mr. Telsey,
19   you correct me if I'm wrong, but it seems whether I
20   grant your motion to intervene or whether I grant your
21   motion to consolidate the complaints, it results in
22   practically speaking the same -- has the same impact,
23   so to me it seems like the motion to consolidate would
24   have a priority.  Would you agree with that?
25             MR. TELSEY:  Yes, I would.

Telsey - Argument                           7

1              THE COURT:  Terrific.  Then let's -- I want
2    to hear that motion first.  So I will hear you as to
3    your motion for consolidation.
4              MR. TELSEY:  Thank you, Judge.  This all
5    started from the proposed settlement agreement which we
6    weren't provided except by publication in the New
7    Jersey Register 45 days after it was published.  That's
8    when it became known to the Borough that we were a
9    necessary party to this settlement.  We were required
10   to sign a conservation easement, and that conservation
11   easement provided that the proposed consent judgment
12   with Hercules would be the consideration for the
13   Borough signing the conservation easement.
14             This created a hustle and bustle between the
15   Borough, DEP, Hercules to talk through these issues
16   that had -- and had been left moribund for many years,
17   the details of that conservation easement.  We were
18   looking for compliance with all.  We want the consent
19   judgment and the conservation easement to comply with
20   the New Jersey 2017 NRD constitutional amendment with
21   the New Jersey Constitution itself, with the 2025
22   Appropriations Act, with the Conservation Easement Act,
23   with ISRA, with the DEP administrative orders for how
24   NRD money is allocated, and throughout our efforts to
25   convince DEP that these are conditions that need to be

Telsey - Argument                                    8

1    in writing as part of the consideration, we were just
2    stonewalled.  We were met with a position of the DEP
3    has absolute overarching authority to settle NRD cases,
4    and that's just the way it is.  There's going to be no
5    consideration.  There will be no modifications to any
6    documents.
7              THE COURT:  All right.  So, to me when you're
8    talking about procedurally issues that you feel as
9    though DEP must follow regarding this matter, such as
10   where is the money to be deposited, should there be
11   ISRA compliance?  Does that apply to this case?  I feel
12   as though those are issues that are very much
13   independent, and can be resolved after the fact if I
14   should approve the settlement.
15             What I thought was, as part of your complaint
16   that would create issues as to whether the matter
17   should be consolidated, were your issues dealing
18   directly with the -- what you were suggesting were the
19   inadequacies of the conservation easement, such as
20   exhibits weren't attached, and the restraints on the
21   property that perhaps was not considered in the
22   original agreement.  So could you -- would you -- well,
23   one, you know, would you agree with that?  And then
24   secondly, if so, could you address those issues?
25             MR. TELSEY:  Yes, Judge.  Those are parts of

Telsey - Argument                                    9

1    the concern we have, not only legal compliance but
2    simply the factual deficiencies and inadequacies of
3    these documents.  They're reciting facts that simply
4    aren't true.  For example, these documents recite to a
5    2016 Hercules transfer agreement between Sayreville and
6    Hercules, and makes statements about what that document
7    says with regard to what obligations the Borough
8    allegedly has to sign some future created conservation
9    easement that was never presented to the Borough in
10   2016.
11             We take umbrage with the fact that they are
12   simply factually inaccurate.  We take umbrage with the
13   fact that the document -- the conservation easements we
14   were provided just a few months ago failed to include
15   the necessary attachments, such as the NRD valuation
16   report, which defines and clarifies what the -- what
17   the pollution damage was by Hercules, and what the
18   value of the conservation easement is as a substitute,
19   and comparison to that pollution damage.
20             The DEP's document says we are obligated and
21   must indemnify the DEP to maintain these conservation
22   advantages.  We don't even know what they are or what
23   their value is, because that document wasn't included.
24   Neither was the environmental assessment report.
25             THE COURT:  What would you say in response,

Telsey - Argument                    10

1   though, to the DEP argument, which my recollection is
2   that they are saying that with regard to the NRD
3   assessment report, or even the baseline condition
4   report, that these don't go to the -- that these can be
5   filed afterwards, they're not -- they should not be a
6   condition that should stop the process.  What would you
7   say in response to that?
8           MR. TELSEY:  I don't see how necessary
9   documents requiring our review to make a business
10  assessment as to value and Borough intentions for 300
11  acres of its water-bearing property, I don't see how
12  necessary documents get to be provided after the fact
13  of an approval of something that we're not approving.
14  Those documents could say horrible things.  They could
15  say things that we don't like.  We're entitled to see
16  these documents.  We don't even know the meets and
17  bounds description.  We don't even have the roads and
18  impervious surfaces maps.  These are -- we don't have
19  the environmental assessment report.  These are all the
20  things that were supposed to be attached to this
21  conservation easement.  This conservation easement has
22  been sitting on a shelf for seven, eight, nine years.
23  There's no reason why this is a rush to judgment, and
24  that we have to hope that whatever is produced after
25  this settlement is approved, which I hope it is not, is

Telsey - Argument                    11

1   satisfactory to us.  We need to see a map.
2           THE COURT:  To your knowledge why isn't a
3   meets and bounds description provided, if you have any
4   information on that?
5           MR. TELSEY:  I have no information as to why
6   it hasn't been provided.
7           THE COURT:  Okay.  And then the other issue
8   that I want your thoughts on is that under the easement
9   it appears on its face that it restricts any
10  improvements of structures contained within these two
11  existing structures, and only to repair or to replace
12  in essence within the footprint of the existing
13  structures.  And so, are you arguing that that impairs
14  your client's rights to the extent that the easement is
15  not enforceable?
16          MR. TELSEY:  It is an impairment, Judge.  We
17  were provided this water source as an alternative to
18  the water source the Borough had before it was polluted
19  by this defendant, Hercules, and others.  So we're
20  dependent on this water source.  We're a growing
21  community.  This water source may need to be expanded.
22  We're entitled to and expect to use our water bearing
23  property for the benefit of our community, which
24  includes the necessity of expanding that water bearing
25  capability as we need to expand it.  And that is one of

Telsey - Argument                                    12

1    the limitations that this conservation easement imposes
2    on us.  It imposes a limitation on expansion, and it
3    also captured another lot on the property that was not
4    in the original easement.  So it's overbearing in those
5    two respects --
6            THE COURT:  Okay.  So I want to try to
7    understand the -- the nature of the property itself.
8    So do I understand correctly that originally the
9    property was owned by Dupont, Sayreville and Hercules,
10   and that then at some point in time Dupont and Hercules
11   conveyed to the town the Duhernal property, which
12   consisted of -- and then I believe either they built or
13   -- or there was an existing water supply facility on
14   that property.  Could you just -- like I just kind of
15   want to get in my mind, because it's not clear in my
16   mind as to what exactly is the history.  And then is
17   the conservation easement area, does that include then
18   additional property presently owned by Hercules and
19   ultimately -- and I gather Dupont, that they're then
20   conveying to Sayreville, that that's contiguous to the
21   Duhernal property where the water station is.  And it
22   would be subject -- and then all the property, that
23   entire property would then be subject to the
24   conservation easement?  Is that correct?
25           MR. TELSEY:  Partly.  Judge, there is an

Telsey - Argument                                    13

1    ongoing operational water providing facility on this
2    property.  The transaction in 2016 between Dupont,
3    Hercules and Sayreville was to transfer all of Dupont's
4    property and Sayreville's property related to the
5    Duhernal water project to Sayreville, and all the
6    property related to this conservation easement is
7    captured within that property transfer, but does not
8    capture all of those acres.
9            THE COURT:  Okay.  Hold on.  I was taking a
10   note.  I do want to understand this, because it's not
11   clear in my mind.  So this -- so you have -- you first
12   had, in essence, I'm going to call it Lot A, which
13   originally was three separate lots.  Lot A is now where
14   the water supply station is, and that was originally
15   then conveyed by Dupont and Hercules.  Okay.  Am I --
16   and that was --
17           MR. TELSEY:  In your example Lot A is owned
18   by Dupont, and Dupont conveys it to Sayreville.
19           THE COURT:  Yeah.  Okay.
20           MR. TELSEY:  Lot B is owned by Hercules, and
21   --
22           THE COURT:  Right.
23           MR. TELSEY:  -- and Hercules conveys Lot B to
24   Sayreville.
25           THE COURT:  Okay.  And then that -- okay.  So

Telsey - Argument                    14

1   then we have those.  Now, what comprises the -- the
2   easement -- the conservation easement area?  It
3   comprises this land, Lots A and B that were conveyed to
4   Sayreville, and additional land, correct?
5               MR. TELSEY:  It conveys 300 acres of land
6   that is part of your example Lot B, all owned by
7   Hercules.
8               THE COURT:  I'm sorry.  I just don't
9   understand it.  I'm missing something here.  Okay.  I
10  --
11              MR. TELSEY:  Well, you had -- your example
12  was Lot A is owed by Dupont, Lot B is owned by
13  Hercules, Lot C was owend by NL Industries.  Lot C was
14  transferred to Sayreville --
15              THE COURT:  Right.
16              MR. TELSEY:  -- earlier.  So now the Duhernal
17  work project was made up of Sayreville, Dupont and
18  Hercules.  In 2016 Dupont and Hercules decided to
19  transfer their interests in the water project and their
20  respective ownership of different parcels to
21  Sayreville.  And Dupont transferred their acres to
22  Sayreville, which is your example, Lot A, and -- and
23  Hercules transferred their acres to Sayreville, which
24  is your example Lot B.
25              THE COURT:  Okay.

Telsey - Argument                    15

1               MR. TELSEY:  Therefore Sayreville had A, B
2   and C at the end of that transaction.
3               THE COURT:  And is A, B and C -- thank you.
4   Now I -- okay.  So I understand that.  And is A, B and
5   C the entire area of the conservation easement?
6               MR. TELSEY:  No.
7               THE COURT:  That's what I'm trying to get at.
8   So then what's the -- because the conservation easement
9   is, like, 600 some-odd acres, correct?
10              MR. TELSEY:  Yes.
11              THE COURT:  And so what -- what's the --
12              MR. TELSEY:  (Indiscernible) other towns.
13              THE COURT:  I'm sorry.  What's that?
14              MR. TELSEY:  It captures other towns.
15              THE COURT:  Oh.  Okay.  So what's the -- is
16  -- so what's the -- is all -- so the 300 -- the
17  additional -- I forget what the exact amount is.  For
18  some reason 640 comes to my mind, but I'm not a hundred
19  percent sure.  Let's just say 600 acres.  So the
20  additional 300 acres, is that 300 acres that's
21  contiguous to A, B and C?
22              MR. TELSEY:  No.  They're in different towns.
23  One in Kenville, one in Chester.  So they're different
24  counties, different properties that Hercules owned.
25              THE COURT:  Oh.  Okay.

Telsey - Argument                              16

```
 1              MR. ELIAS:  Your Honor, I'm sorry.  I don't
 2      mean to interrupt, but can I --
 3              THE COURT:  Yeah.
 4              MR. ELIAS:  -- help clarify some issues here?
 5              THE COURT:  Okay.  Thank you.
 6              MR. ELIAS:  So the --
 7              THE COURT:  Put your name on the record.  Say
 8      it again?
 9              MR. ELIAS:  Sure.  Sorry.  Josh Elias for --
10      from Gibbons for Hercules.
11              THE COURT:  Okay.
12              MR. ELIAS:  The Duhernal water project was a
13      contiguous piece of property that is in excess of 1,000
14      acres.  They are not -- they weren't owned in separate
15      lots by Hercules, Dupont and Sayreville.  They all
16      owned the entirety of the, you know, 1,000 plus acres
17      with a third interest each.  So in 2016 when Dupont and
18      Hercules entered into transfer agreements with
19      Sayreville they weren't transferring any particular
20      lots within the Duhernal water project.  They were
21      transferring their one-third interest in the project to
22      Sayreville.
23              And within those transfer agreements Dupont
24      agreed with Sayreville to X number of acres to preserve
25      as a conservation easement, and similarly Hercules in
```

Telsey - Argument                              17

```
 1      their 2016 transfer agreement with Sayreville agreed to
 2      300 acres within the Duhernal water project to be
 3      conserved under a conservation easement.
 4              The total amount of conservation easement
 5      acreage under the consent judgment is, you're correct,
 6      Your Honor, 640 acres.  Three hundred of those acres
 7      were agreed to be at the Duhernal site.  The remainder
 8      were at other sites, Gibbstown, Kenvil, Chester.
 9              THE COURT:  Okay.  I've got it now.
10              MR. ELIAS:  Okay.
11              THE COURT:  Okay.  So the 300 -- so that when
12      we were talking about the A, B, C, I'm going to call
13      that now the mother lot.  So that the mother lot is
14      what's subject to the conservation easement that's
15      subject to the water supply.
16              MR. ELIAS:  A portion of it.
17              THE COURT:  Just a -- oh.  The whole -- A, B
18      and C is 1,000 acres, and only 300 of those acres is
19      subject to the easement?
20              MR. ELIAS:  The conservation easement that
21      we're talking about, yes.  Dupont had a separate
22      conservation easement agreement with Sayreville.
23      That's different.  I'm not sure of the acreage of that
24      agreement.
25              THE COURT:  Uh-huh.
```

Telsey - Argument                    18

1        MR. ELIAS:  But this would be a separate 300
2    acres out of the 1,000 plus acres --
3        THE COURT:  Okay.
4        MR. ELIAS:  -- would be considered under a
5    conservation easement.
6        THE COURT:  And Sayreville presently is then
7    the owner and title of that property?
8        MR. ELIAS:  Correct.
9        MR. TELSEY:  Correct.
10       THE COURT:  So that the only change in title
11   would be the layering of the conservation easement?
12       MR. TELSEY:  The impact to -- as an
13   encumbrance the conservation easement would be an
14   encumbrance.
15       THE COURT:  Okay.  All right.  Thank you.
16   I've got it now.  All right.  Go on.  I -- go on, Mr.
17   Telsey.
18       MR. TELSEY:  Okay.  So you asked me about the
19   consolidation.  So as you can tell by just going
20   through the exercise we went through, that Sayreville
21   is an integral party to this settlement, especially
22   with this conservation easement and what its terms and
23   conditions are.  And those terms and conditions are
24   onerous and impact our use of the property beyond which
25   the New Jersey Conservation Easement Act requires,

Telsey - Argument                    19

1    because it impacts our fee simple title use of the
2    property.  For example, it entitles the State to a
3    right of first refusal.  They can buy this property
4    (indiscernible).  They can actually remove the
5    conservation easement at their whim.  They can sell it
6    for a fair market value.  It puts our use of the
7    property at tremendous risk beyond which -- the purpose
8    of the conservation.
9        THE COURT:  Wait a second.  Where -- what
10   gives DEP the right to sell your property over your
11   objection?
12       MR. TELSEY:  It wouldn't be our objection.
13   It would be right of first refusal.  If we had somebody
14   come to us --
15       THE COURT:  Well, that's completely
16   different.  Yeah.  Okay.  That I understand.  Okay.  I
17   thought you were saying DEP could just sell the
18   property outright.  You mean if you have a buyer --
19       MR. TELSEY:  (Indiscernible).
20       THE COURT:  -- DEP gets right of first
21   refusal.  Why -- with the conservation easement as part
22   of a significant settlement why should that come as a
23   surprise to you?
24       MR. TELSEY:  Well, because DEP can remove the
25   conservation easement at their election.  We cannot.

Telsey - Argument                    20

 1    And that -- that creates an advantage that we don't
 2    have and they have.  But more to the point --
 3              THE COURT:  No, but that wasn't my question.
 4    My question was why was -- why was that not reasonably
 5    anticipated when you signed the transfer agreement?  As
 6    part of that -- as part of that this was -- this was
 7    what the conservation easement was going to include.
 8    It seems to me to be rather standard language.
 9              MR. TELSEY:  A right of first refusal?
10              THE COURT:  Yes.
11              MR. TELSEY:  It is not a condition in the New
12    Jersey Conservation Easement Act.  It's not required
13    for conservation purposes.
14              THE COURT:  Okay.
15              MR. TELSEY:  And we don't want to give up
16    that right to (indiscernible) ourselves with that
17    exposure.
18              THE COURT:  All right.
19              MR. TELSEY:  And that's just one of the other
20    items in the conservation easement that are
21    (indiscernible) to us, especially the fact that we
22    don't have any of these underlying documents.  The fact
23    that we have to indemnify the State to maintain
24    compliance with the conservation values, none of which
25    we really know what they are.  The fact that we have to

Telsey - Argument                    21

 1    pay penalties and pay fees for non-compliance.  These
 2    are issues that should have been and could have been
 3    resolved many years ago.  DEP presented their
 4    conservation easement to Dupont in 2016, and they just
 5    never prepared the conservation easement for Sayreville
 6    in 2016.
 7              THE COURT:  Weren't you on notice though as
 8    to the terms and conditions of the Dupont easement?  I
 9    thought that was the case.
10              MR. TELSEY:  We saw the Dupont -- we saw the
11    easement between Dupont and DEP.
12              THE COURT:  Yeah.
13              MR. TELSEY:  But that had an entirely
14    different set of considerations that were set forth in
15    the Dupont conservation easement related to a certain
16    administrative consent order that DEP had entered into
17    with Dupont that had nothing to do with Sayreville or
18    Hercules or -- or the -- a conservation easement that
19    the DEP was looking for from -- from Sayreville, which
20    is why that document said there's open issues.
21    Hercules thinks these open issues are something.
22    Sayreville never acknowledged what their open issues
23    were because we never saw a version of the Sayreville
24    conservation easement.  Hercules said, look, once you
25    get going on the negotiation with DEP we'll pay the

Telsey - Argument                          22

1    costs necessary for you, Sayreville, to negotiate this
2    easement.  They just disappeared for eight years.  And
3    when they came back to us with a conservation easement
4    it was a completely different version.  And that's what
5    caused a lot of the rift here, Judge.  And --
6              THE COURT:  If you -- if you're the title
7    owner in the property that's subject to the
8    conservation easement, who is to prepare the meets and
9    bounds description?
10             MR. TELSEY:  We were told that it was going
11   to be Dupont or Hercules, and they were going to
12   provide it to us.
13             THE COURT:  Okay.  Why didn't you -- why
14   didn't you get a --
15             UNIDENTIFIED ATTORNEY:  Not Dupont
16   (indiscernible).
17             THE COURT:  Why didn't you get a meets and
18   bounds description when you took title to the property?
19             MR. TELSEY:  Well, as -- as Mr. Elias said,
20   the title was one-third already in Sayreville, and that
21   the two-thirds owned by Dupont and Hercules was
22   therefore transferred.  So the conservation easement is
23   just a subset of acres that comprises the mother lot of
24   the Duhernal water project.
25             THE COURT:  I think the nature of my question

Telsey - Argument                          23

1    really goes to the issue of if you're looking for an
2    easement, a meets and bounds description, which is
3    standard, that's certainly an understandable request.
4    Anyone closing title or allowing an encumbrance on
5    property without a description, you know, that's not
6    good lawyering.  But if you are the title owner of that
7    property and you have held that property for a number
8    of years now, how -- how important is that -- how
9    should the Court consider, you know, the importance of
10   that request in light of the fact that you've owned the
11   property and you could have -- you could have had a
12   meets and bounds description done when you took -- took
13   title to the property or at any time thereafter.
14   You're in control of the property.
15             MR. TELSEY:  The actual acreage was always up
16   to approximately 300 acres subject to a survey and
17   meets and bounds description of the actual acres that
18   DEP wanted.  And that was never provided to us.  As a
19   matter of fact the -- the version of the conversation
20   easement that was ultimately published included an
21   extra lot that we didn't even know was in the original
22   one, because it wasn't.  So we need the DEP to talk to
23   us and tell us why these acres, and where is the meets
24   and bounds in the survey.  And they just haven't done
25   it, claiming that they can just do it later.  We

Telsey - Argument                                    24

```
 1    object.
 2              THE COURT:  Okay.  I'm sorry.  I keep
 3    peppering you with questions, and I am getting you off
 4    topic -- off what I suspect is some arranged argument,
 5    so I apologize for that.
 6              MR. TELSEY:  That's all right.
 7              THE COURT:  Go on.
 8              MR. TELSEY:  So we don't understand or accept
 9    the fact that this conservation easement was
10    unilaterally redrafted from whatever version Dupont
11    signed to include this preamble of events leading up to
12    last year when they presented this conservation
13    easement to us to sign.  That was eight years after
14    that closing.  And that conservation easement was wrong
15    in terms of the claims set forth in the preamble about
16    how we have this overarching obligation to simply sign
17    whatever this document was presented to us in 2024,
18    because the -- the transfer agreement from 2016 never
19    said anything of the sort.
20              Also, it was the first time we understood
21    that the consideration we were getting was not a -- a
22    DEP (indiscernible) with Dupont, which was Dupont's
23    conservation easement consideration, but it was going
24    to be the consent judgment with Hercules.  And when we
25    got that conservation easement in the end of last year,
```

Telsey - Argument                                    25

```
 1    we didn't have the consent judgment to understand what
 2    value that was providing to us.  It was supposed to
 3    provide $4.5 million in cash that would be deposited to
 4    the state dedicated NRD fund that would be used, et
 5    cetera, for NRD restoration projects, or community as a
 6    pollution impact first priority municipality.  We saw
 7    some value there.
 8              But we didn't see that -- that Hercules
 9    consent judgment until just a couple of months ago.
10    And we certainly had no opportunity to discuss that
11    with DEP or Hercules before there was a rush to get
12    that settlement approved leading -- and leading us to
13    months of frantic activity to communicate with DEP and
14    Hercules to send them our comments, to suggest
15    revisions and changes, all of which were summarily
16    rejected because DEP claims to have overarching
17    superior jurisdiction (indiscernible).
18              THE COURT:  Okay.  So I think this will be
19    hopefully maybe my last question, so then I can allow
20    you to continue with your argument, but assuming, and
21    I'm just assuming for now that I should say
22    consolidation is appropriate, to me the issues that you
23    raise that would cause the need for further evaluation
24    have to do really with the form of the easement,
25    either, you know, inserting language or deleting
```

Telsey - Argument                                    26

1    language from the easement that doesn't go, or
2    attaching exhibits.  But it doesn't go to the issue of
3    your obligation to ultimately enter into a conservation
4    easement.  So if that's the case, if I am correct in
5    that, how long would you need to get this matter ready
6    for a final hearing if there should be the need for a
7    declaratory judgment as to what the appropriate terms
8    of the agreement should be?
9               MR. TELSEY:  Well, just to start from what
10   you started from, Judge, our separate action seeks to
11   make changes to not just the conservation easement, but
12   to the consent judgment --
13              THE COURT:  Right.
14              MR. TELSEY:  -- to make sure that as
15   consideration would include these legal flows of NRD
16   cash compliance, because that's what provides us with
17   confirmation that the consent judgment is in compliance
18   with the law, they would provide us with it, having
19   (indiscernible) opportunity to some -- a benefit from
20   that.  So you've asked me -- also, the consent judgment
21   needs to be amended to compel Hercules to comply with
22   ISRA.  That's the remediation part of this.  There's
23   two parts to (indiscernible) --
24              THE COURT:  I don't see those -- but I don't
25   see those issues as being complicated.  Those are going

Telsey - Argument                                    27

1    to be straightforward questions of law, I think.
2               MR. TELSEY:  Agreed.  (Indiscernible).
3               THE COURT:  Okay.  So that -- that we can do
4    on a motion, you know, in a month's time.  How about
5    the other stuff as to -- am I correct that you're not
6    looking to say that if -- if the State insists on the
7    language in this -- in the easement, that that then --
8    that that was never contemplated by your client at the
9    time of signing the transfer agreement, so it blows up
10   the obligation to sign a conservation easement?
11              MR. TELSEY:  The (indiscernible) conservation
12   easement we got in 2024 was not the conservation
13   easement we were shown as some kind of model in 2016,
14   and if we don't consent to it, we're not going to sign
15   it, Judge, and that puts us in jeopardy because
16   Hercules now says that we have to sign it, and we're
17   going to sue you if you don't sign it.  And that's why
18   we're in front of you right now.  You're asking me how
19   long will it take you to sort this out?
20              THE COURT:  Right.
21              MR. TELSEY:  You know, my instincts are, and
22   I'm always light.  I'm going to say 90 days, which
23   probably means 120.
24              THE COURT:  Okay.  All right.  So it would be
25   expedited?

Telsey - Argument / Engel - Argument                28

```
 1            MR. TELSEY:  Yeah.  I -- like you, Judge, I
 2    think this is mostly legal.  So it's not, you know, a
 3    ponderous effort of depositions and yada yada.
 4            THE COURT:  Uh-huh.  And I just want to make
 5    sure I understand this.  You're not -- you're not
 6    looking for relief to include that the -- that the
 7    conservation -- the scope of the conservation easement
 8    that the State is looking for Sayreville to sign, that
 9    that was beyond what was the parties' agreement in the
10    2016 Duhernal transfer agreement?  You're acknowledging
11    your obligation to sign a conservation easement.  It's
12    just as to what is -- what should be the form of that
13    easement.  Am I correct in that?
14            MR. TELSEY:  Yes.
15            THE COURT:  Okay.  Good.  Okay.  All right.
16    Do you have anything else you need to add?
17            MR. TELSEY:  No, Judge.
18            THE COURT:  Thank you.
19            MR. TELSEY:  Other than my -- thank you.
20            THE COURT:  Okay.  All right.  I guess let's
21    go to the State.  Let's go to DEP.  Who is going to
22    argue?
23            MR. ENGEL:  Thank you, Your Honor.  This is
24    Mr. Engel.  I think what you can see from the colloquy
25    you just had with Mr. Telsey is that Sayreville is
```

Engel - Argument                29

```
 1    trying to way overly complicate something that is
 2    actually very simple for Your Honor.  What we have
 3    before you is a motion to approve our judicial consent
 4    order.  The judicial consent order has to do with
 5    natural resource damages, and that's it.
 6            Sayreville wants to get involved in the case,
 7    either through a motion to consolidate or motion to
 8    intervene to try to try to somehow influence the
 9    judicial consent order that has no sign by Sayreville.
10    Sayreville is not a party to this case.  Remember, this
11    is litigation that was brought back in 2007, was put on
12    the record as a settlement in 2011, and we have been
13    working, I understand it's a long time, but we've been
14    working with various towns and the DEP to try to get
15    these easements settled and -- and the judicial consent
16    order in the proper form.
17            Mr. Telsey is right in the sense of that when
18    we started talking to Sayreville about the actual form
19    of the language of the conservation easement they did
20    not see this, but neither did they ask for the judicial
21    consent order.  If they were that concerned about what
22    the language of the judicial consent order was, they
23    had more than a year to ask the State or Hercules to
24    see the form of the judicial consent order, and they
25    never asked.  All right?
```

Engel - Argument                                30

1   All we did was -- so let me step back a
2   minute, Your Honor, and I apologize for taking a while,
3   but I want to make this clear.  In 2016 Hercules and
4   Sayreville worked out a deal whereby these 300 or so
5   acres were going to be a conservation easement in --
6   with the approval of Sayreville if that was okay.  As
7   part of the deal $3 million was exchanged.
8         THE COURT:  Well, not three million -- no.
9   Wait.  Because I think that's important in this case.
10  Sayreville didn't give Dupont -- Hercules three
11  million.  It was a credit on the water.
12        MR. ENGEL:  Well, I understand.  I mean,
13  there was --
14        THE COURT:  Okay.
15        MR. ENGEL:  -- consideration of $3 million
16  (indiscernible).
17        THE COURT:  So Sayreville didn't have to up
18  front three -- yeah.  Sayreville didn't have to up
19  front $3 million and pay Hercules.  This was going to
20  be paid over time based on a water credit that Hercules
21  was going to get, which I think was a significant
22  political benefit for Sayreville at that time.
23        MR. ENGEL:  Absolutely, Your Honor.  Right.
24  And so, the consideration was exchanged, and what
25  Sayreville agreed to back in 2016 was the only thing

Engel - Argument                                31

1   left that had to be done was to be provided a meets and
2   bounds description.  I don't know why Hercules didn't
3   provide it to them in the meantime, but they didn't,
4   but they have agreed to do that.  They will do that.
5   But the key here is that DEP relied on the fact that
6   Hercules and Sayreville had this conservation easement
7   worked out, and the only thing left to do was to do the
8   meets and bounds description, which didn't say it had
9   to be done before any agreement with DEP was going to
10  take place.  It just said at some point Sayreville was
11  going to be provided with a meets and bounds
12  description, which as Your Honor noted is
13  (indiscernible) necessary.
14        So the problem is you have before you, Judge,
15  a 2007 case that's been on your docket, I'm going to
16  make a guess, this is probably the oldest case you have
17  by far.  (Indiscernible) --
18        THE COURT:  I will look like a star from the
19  Administrative Office of the Courts if I can get this
20  case settled.
21        MR. ENGEL:  Well, that's what I was just
22  going to say.  I was just going to say that, Your
23  Honor, because I'm sure that the various assignment
24  judges have all been badgering you, and the prior
25  judges, for having such an old case on your docket.

Engel - Argument                          32

1    But we're -- what we're trying to do, Your Honor, is to
2    give you -- make this simple for you.  We're simply
3    asking that you approve this judicial consent order,
4    and that Hercules and Sayreville can continue to try to
5    work out these problems that Mr. Telsey is raising,
6    some of which I think are absolutely wrong, and
7    misreads the law completely.  Mr. Telsey and I are good
8    friends, and we've worked together for years, so no
9    disparagement, but I believe that Sayreville is
10   misunderstanding very strongly a number of issues in
11   this case.  So --
12           THE COURT:  All right.  So let me ask you
13   something, because I had -- I had particular concern
14   about in essence requiring Sayreville to sign the
15   easement when, one, there's no meets and bounds
16   description, and that then secondly from my reading of
17   the easement it only allows for Sayreville to repair or
18   replace existing structures on the property.  It
19   doesn't allow for any expansion.  So if in the future
20   Sayreville should have a greater need for water and
21   needs to expand its facilities, from the literal
22   language of that easement it does not allow it.  And I
23   think that those are two very legitimate concerns that
24   need to be addressed.
25           So you just addressed the meets and bounds,

---

Engel - Argument                          33

1    although I don't know when it's going to get done.  But
2    now how about the second one with regard to that
3    language?
4            MR. ENGEL:  Well, Your Honor, my
5    understanding of the language of the conservation
6    easement is that Sayreville can come back to -- to the
7    DEP and ask for relief from the restrictions in the
8    conservation easement.
9            I don't have the language in front of me,
10   Your Honor.  I apologize.  But my understanding is that
11   in these conversation easements if someone needs some
12   relief, not just for example for the building size, but
13   let's suppose they need to cut down some trees for some
14   reason, or they have a road that needs to be repaired,
15   and they need to put in a different surface, that they
16   can come to DEP and ask for relief.  So I think that
17   that is a maybe misunderstanding by Sayreville that
18   they have to somehow be stuck with exactly what's
19   there, and if they have a good need to change something
20   that they can't do it.  I just don't think that's true.
21           THE COURT:  Well, I didn't see that.  So
22   maybe -- and I think -- and that's important to me.  So
23   does someone have -- because what I have is existing
24   structures, 4.6, grantor shall retain the right to
25   keep, utilize, maintain, operate, and as approved by

Colloquy                                34

1    grantee in advance and in writing, which approval shall
2    be in grantee's sole discretion, replace with
3    substantially similar items all existing structures,
4    which structures are annotated on the survey, which we
5    don't have, without expanding the current footprint of
6    each structure located on the property, except as
7    needed for compliance with building codes or other
8    regulatory requirements.  So I read that that
9    Sayreville can repair or replace, and you can approve
10   that, but they can't expand.  And there's no provision
11   --
12           MS. ST. AMANT:  Your Honor?
13           THE COURT:  -- there's no provision that
14   allows for expansion.  And I don't know why that's not
15   a big deal, why that just couldn't be included.
16           MS. ST. AMANT:  Your Honor, this is Cindy St.
17   Amant.  If you could -- if you continue reading in that
18   paragraph 4.6, and you get to the last sentence --
19           THE COURT:  I just -- I read the whole part.
20   Maybe -- I don't know.
21           MS. ST. AMANT:  The last sentence of 4.6 says
22   replacement of an existing structure as set forth
23   herein that will expand the current footprint of each
24   structure must be approved by grantee in writing in
25   advance.

Colloquy                                35

1            THE COURT:  All right.  I must be reading
2    from a different -- you know, there's a bunch of
3    different -- I am reading from -- let me see here,
4    because there was a bunch -- all right.  Hold on.  I
5    was reading from Hercules to DEP.  Let me find the one
6    from Sayreville to DEP.
7            UNIDENTIFIED ATTORNEY:  What's the number,
8    Cindy?
9            THE COURT:  4.6.
10           UNIDENTIFIED ATTORNEY:  4.6.
11           THE COURT:  Okay.  So, grantor shall retain
12   the right to keep, utilize, maintain, operate, and upon
13   providing advance notice to grantee replace with
14   substantially similar items all existing structures,
15   without expanding the current footprint of each, except
16   as noted for building codes.  And including but not
17   limited to wells drilled for procuring and monitoring
18   water.  Replacement of an existing structure as set
19   forth herein that will expand the current footprint of
20   such structure must be approved.  Okay.  I must have
21   been reading other ones.
22           MS. ST. AMANT:  Yes.  And then I just wanted
23   to point out also the agreement that was attached to
24   the 2016 transfer agreement that had the forum easement
25   had a similar provision --

Colloquy                                    36

1            THE COURT:  Okay.
2            MS. ST. AMANT:  -- about only limiting
3    replacement to the existing footprint.
4            THE COURT:  Hmm.  I'd like to go back to Mr.
5    Telsey.  Mr. Telsey, can you comment on that, please?
6    It seems like you -- you're not limited to your
7    existing structures, that you can, so long as the
8    grantee provides approval, and they would obviously
9    have the approval to do so in good faith, and if they
10   failed to do so you could file an action.  What would
11   you say in response to that.
12           MR. TELSEY:  (Indiscernible) discussed that,
13   Judge.  I mean, the idea that we can do it if he says
14   we can do it without any examination of the process by
15   which the DEP makes that determination does not give us
16   the comfort we need to know that if and when we need to
17   expand we are entitled to.  It leaves it fuzzy.  And
18   that fuzziness on such a critical issue is not
19   acceptable.  And that needs to be (indiscernible).
20           THE COURT:  Well, you have suggested language
21   in here that to me is very similar.  You know, it's not
22   exactly what you want, but I'm not sure why it's -- I
23   think anyone reasonably reading it would say that --
24   and you correct me if I'm wrong, but reasonably -- your
25   language is is so long as they add any activity related

Colloquy                                    37

1    to grantor's operation or expansion of a water supply.
2    And what they're saying is --
3            MR. TELSEY:  (Indiscernible) --
4            THE COURT:  What they're saying is, you could
5    expand so long as we approve, because they're the owner
6    of the easement.
7            MR. TELSEY:  And we're the owner of the fee.
8    So we have to understand how we are each entitled to
9    interfere with each other.  And the language of just
10   come to the DEP and we'll make a decision, and we're
11   the final arbiter is not that kind of understanding
12   between the parties that's necessary for Sayreville.
13           THE COURT:  Well, what more can you say other
14   than that they -- they would be under the obligation of
15   -- I mean, to me, I can't imagine the DEP arguing to
16   the contrary, but this language would include that they
17   have to make a good faith assessment of it in
18   accordance with their rules and regulations.
19           MR. TELSEY:  Well, that's the point.  I think
20   you just added the point that I would want to add in if
21   I was given the opportunity to sit at a table with the
22   State, which is the rules and regulations somehow a
23   water department can make a request for expansion, what
24   are the permit requirements?  What are the
25   preconditions to that?  What are the --

Colloquy                                        38

1          THE COURT:  All right.
2          MR. TELSEY:  -- (indiscernible) say no.
3          THE COURT:  Let me see -- let me see, DEP,
4    would you object to language like that, if we added
5    language like that --
6          MS. ST. AMANT:  Well --
7          THE COURT:  -- grantee, advance in writing
8    said application to be, you know, reviewed in good
9    faith and in accordance with appropriate rules and
10   regulations?  Mr. Engel?
11         UNIDENTIFIED ATTORNEY:  It looks like --
12         UNIDENTIFIED SPEAKER:  We have lost him.
13         MR. KANNER:  Just one point, Your Honor.
14         THE COURT:  Hold on.  Hold on.  Hold on.
15   This is Mr. Kanner speaking now.
16         MR. KANNER:  This is Mr. Kanner.  And, you
17   know, I would defer to Mr. Engel, but I just would note
18   that when we were negotiating this a long time ago,
19   part of the understanding of the parties in 2016 at
20   least was that the one-third, one-third, one-third was
21   acquired by Sayreville, took care of their water needs.
22   The conservation easement was originally designed to
23   enhance what's called the Old Bridge aquifer, which
24   the, you know, subsurface water body that serves
25   Sayreville, but also other communities, so long as


Colloquy                                        39

1    they're not claiming primacy with respect to that
2    aquifer, which is a limited good in the state of New
3    Jersey, and which hopefully the settlement will
4    enhance, as well as other aquifers.  So long as that
5    flexibility remains for the State and neighboring
6    communities, I think that's fine, or something along
7    those lines would be fine.  Rick?  (Indiscernible)?
8          MR. ENGEL:  I apologize, Your Honor.  Somehow
9    I got cut off.  And by the way, I wanted to thank you
10   for accommodating us by Zoom.  This is one of the
11   problems I have seen when you're not in person, but I
12   apologize.  So --
13         THE COURT:  That's okay.
14         MR. ENGEL:  I'm not sure what -- I'm sorry.
15   But, no, but I think the point I wanted to get back to,
16   in addition to the particular questions about the
17   easement is how what Mr. Telsey is trying to do here
18   with his motion to intervene and to consolidate is
19   needlessly complicate a case that I believe has issues
20   that as you said at one point in the beginning here,
21   can be worked out afterwards.
22         Hercules and Sayreville -- well, first of
23   all, let me back up one second --
24         THE COURT:  Yeah, but hold on a second, Mr.
25   Engel, because we may have a fundamental disagreement

Colloquy                                    40

1    there.
2            MR. ENGEL:  Okay.
3            THE COURT:  Because I don't know if I want to
4    -- I don't know if I want to approve a settlement that
5    has to work things out afterwards if it's more than
6    just, like, you know, let's change the date so it's a
7    correct date.  You know?  It's just more ministerial.
8            There are some substantive issues here.  So
9    -- and I think it's -- in the long run it will save
10   time to -- let's -- on some substantive issues which I
11   believe this issue of what can Sayreville do in terms
12   of improvement on the property as it relates to their
13   water supply, that's a real issue.  And I don't think
14   that that should -- that that -- I'm just not so sure
15   that that should -- that I would be responsible as a
16   judge to say, all right, well, you know, I'll let the
17   parties just settle it after the fact.  Let's get it
18   done now.
19           MR. ENGEL:  Well, I understand --
20           THE COURT:  Not now meaning -- not now
21   meaning in this moment, now meaning, you know, some
22   time in the near future.
23           MR. ENGEL:  I get it.  But, Your Honor, let's
24   back up a second.  In 2016 Sayreville agreed to a form
25   of easement that is -- we said to them in our

Colloquy                                    41

1    negotiations we would be willing to go back to it.
2    Okay?  So Mr. Telsey keeps talking about a redlined
3    version, and this and that, and he ignores the fact
4    that we made it clear to Sayreville that if they wanted
5    to go with the language that they agreed to in 2016,
6    which also has these restrictions that Mr. Telsey is
7    complaining about, (indiscernible) worry about new
8    buildings and this and that, they agreed to that in
9    2016.  The only thing left to do was a meets and bounds
10   description.
11           So what Mr. Telsey is trying to do here,
12   eight years later, nine years later, is hold up a
13   settlement that's going to (indiscernible) other
14   places, Gibbstown, Kenvil, and all, and -- and maybe --
15   he says maybe 120 days, but what if it goes on for a
16   year or two, Your Honor?  We meanwhile have no
17   conservation easements on these other pieces of
18   property.  We have no money that can be paid into the
19   NRD fund.  And all this is going to take a lot of time
20   and trouble, whereas you can get this case off your
21   docket by approving that.  And I'm sure that all the
22   parties will work in good faith to resolve this.
23           And what we've said -- just one final point,
24   Your Honor, what we've said to Hercules is if for some
25   reason we cannot work out this language with

Colloquy                                    42

1    Sayreville, they cannot do that, that they can find
2    another piece of property of 300 acres that we'd be
3    willing to accept, so that if for some reason in the
4    period of time that they would negotiate afterwards, if
5    they can't work this out we'll find another piece of
6    property.  But meanwhile these other properties
7    protected and you get this case off your docket.
8            THE COURT:  Okay.  So the 4.5 million is
9    going to the NRD settlement fund, correct?
10           MR. ENGEL:  Absolutely, Your Honor.
11           THE COURT:  All right.  That's what I
12   thought.  And then Mr. Kanner's office is going to get
13   paid thereafter?
14           MR. ENGEL:  Correct.
15           THE COURT:  All right.  So, Sayreville's
16   concern about there not being a proper channel of the
17   money is -- you're representing that that's not an
18   issue in this case, you will follow the proper
19   procedure?
20           MR. ENGEL:  Absolutely.
21           THE COURT:  Yeah.  Okay.
22           MR. KANNER:  Your Honor, the -- the --
23           THE COURT:  Just give me one second, please?
24           MR. KANNER:  Sure.
25           THE COURT:  Sometimes I just need a little

Kanner - Argument                              43

1    time to process things.
2                    (Pause)
3            THE COURT:  Okay.  Go on, Mr. Kanner.
4            MR. KANNER:  All right.  I just wanted to
5    reiterate one point that Mr. Engel made.  So, Exhibit C
6    to the agreement in 2016, we had agreed that it will
7    keep that form and not -- you know, I guess over the
8    passage of time DEP changed its form, and that was what
9    was originally sent, the redlined version, to Mr.
10   Telsey.  We've walked away from that.
11           So we're using the exact document they agreed
12   to, both in the transfer agreement, but also in the
13   ordinance, subsequently memorializing both the Hercules
14   and Dupont settlements.  We're using the exact same
15   form as Dupont.  Interestingly, because I had the same
16   questions -- some of the same questions Your Honor had,
17   that form specifically says that the meets and bounds
18   and survey will be delivered, you know, in time.  So
19   there obviously was a little bit of play in there, and
20   it was understood by Sayreville at that time, though
21   currently they seem to act like it's all new to them.
22   We believe that the meets and bounds, you know, once
23   Hercules gets access, they'll do the survey, we the
24   State have reserved the right to review the survey at
25   some point, nobody thinks that's going to be a major

Kanner - Argument                           44

```
 1    problem in any of this.  And again, as Mr. Engel said,
 2    all of the rights and benefits of taking that easement
 3    were well understood and clear to Sayreville.  I think
 4    they were glad to do the deal.  And they understood
 5    that the whole point of this deal was so that Hercules
 6    could ultimately settle with the State, and that's why
 7    the easement was, you know -- they knew they weren't
 8    getting a fee simple property.
 9              THE COURT:  I think it's pretty clear from
10    the agreement that --
11              UNIDENTIFIED ATTORNEY:  Judge, just --
12              THE COURT:  -- it was going to be a
13    conservation easement.  Okay.  Mr. Engel, how about the
14    other exhibits?  The assessment report and I forget
15    what the other -- road --
16              UNIDENTIFIED ATTORNEY:  NRD valuation.
17              THE COURT:  Yeah.  Mr. Engel, why -- why
18    can't they be attached?
19              MR. ENGEL:  Well, they will be provided.  I'm
20    not sure they're all done, but when they're done they
21    will be provided, Your Honor.
22              THE COURT:  Yeah, but why can't we just --
23    why can't we dot that I and cross that T before they
24    have to sign?
25              MR. ENGEL:  Let me ask my colleagues.  Are
```

Colloquy                                 45

```
 1    they able to be provided?  Ms. St. Amant?
 2              MS. ST. AMANT:  Oh.  The survey still needs
 3    to be done is my understanding, and I think Hercules is
 4    working towards that, and they can speak to that
 5    better.  They'll need permission to access the
 6    property.
 7              THE COURT:  I'm not talking about the -- I'll
 8    get to Hercules for that.  But how about the other
 9    documents?  I'm --
10              MS. ST. AMANT:  The other documents, the
11    consent judgment requires there to be a preliminary
12    assessment report done before (indiscernible) --
13              THE COURT:  No, no, no, no.  The documents --
14    I just want to first start with the easement.  They
15    were supposed to be --
16              MS. ST. AMANT:  The easement on the part of
17    the present -- you're talking about the baseline
18    document --
19              THE COURT:  Right.
20              MS. ST. AMANT:  -- and the present report?
21              THE COURT:  Right.
22              MS. ST. AMANT:  Yes.  That -- it will be
23    done.  It's going to be done before the easement is
24    executed.
25              THE COURT:  How much time will it take?
```

Colloquy                                46

```
 1              MS. ST. AMANT:  The survey is part of that.
 2              THE COURT:  How much time will it take?
 3              MS. ST. AMANT:  That's more of a Hercules
 4      question, because they will be preparing it.
 5              THE COURT:  Okay.
 6              MS. ST. AMANT:  They will prepare and provide
 7      it to DEP, who will then review and approve it.  And
 8      then once it's approved there's 45 days for the
 9      easement to be executed and recorded.
10              THE COURT:  Okay.  All right.  And then how
11      about on the -- hold on.  Let me pull up the consent
12      judgment.  There was -- were there any documents
13      regarding the consent judgment?  I don't think so.
14              MS. ST. Amant:  There's a preliminary
15      assessment report that's referenced in Paragraph 12 of
16      the consent judgment.
17              THE COURT:  Okay.
18              MS. ST. AMANT:  And that -- a draft has
19      already been provided, and it just needs to be
20      finalized, and we can provide that, as well.
21          THE COURT:  All right.
22              MS. ST. AMANT:  And that (indiscernible) a
23      matter of that's in progress.
24              THE COURT:  Okay.
25              MR. TELSEY:  Judge, I don't want to lose
```

Colloquy                                47

```
 1      track of what's called the NRD valuation report, which
 2      is the report that DEP did to determine what the
 3      conservation values are for the 300 acres, and it is
 4      that we are being required to protect.  We need to know
 5      that, and have that, as well, as part of the
 6      preliminary assessment baseline.
 7              THE COURT:  That's on the conservation
 8      easement document?
 9              MR. TELSEY:  Yes, Your Honor.
10              MS. ST. AMANT:  There's no reference to it in
11      our D.E. (sic) valuation report.  There's a baseline
12      report, which is the present condition report.  It
13      includes, like, photographs of the property, the
14      survey.  There's  a -- on the DEP's website there's a
15      checklist, you know, everything that it needs to
16      include.  But it's not a valuation.  That basically
17      says what the condition of the property is at the time
18      the easement is granted so that DEP can then use that
19      to determine if there has been any material changes in
20      compliance with the easement itself.  So that's what
21      the parties to the easement would use to evaluate, you
22      know, what resources (indiscernible).
23              UNIDENTIFIED ATTORNEY:  No, that's not right.
24      It's --
25              THE COURT:  All right.  Hold on.  Hold on.
```

Colloquy                                    48

1    UNIDENTIFIED ATTORNEY:  The conservation
2    easement --
3    THE COURT:  All right.  You guys can talk
4    about that later.  Hold on.  Let me just -- I had
5    prepared some questions in advance.  Let me just --
6    (Pause)
7    THE COURT:  Mr. Engel, if -- since there is a
8    lack of signed conservation easement, without the
9    signed agreement isn't that -- isn't that -- I think
10   this is obvious, but I just want to make sure, isn't
11   the execution of the conservation easement a material
12   term of the settlement?
13   MR. ENGEL:  Yes, Your Honor.  But what we
14   said to Hercules is that if there's some problem with
15   signing their conservation easement that we would be
16   willing to work out with them, as I said, another piece
17   of property that would be (indiscernible).
18   THE COURT:  You mean -- you said Hercules.
19   You mean Sayreville?
20   MR. ENGEL:  Or no.  Hercules has to provide
21   the conservation easement to DEP.  Not Sayreville.
22   It's Hercules that has to provide it.  And we've made
23   it clear that we're not going to consider them in
24   default of their obligation on the (indiscernible)
25   order.  If they cannot provide the one in Sayreville,

Colloquy                                    49

1    they can provide one somewhere else.
2    We think it's unfortunate what Mr. Telsey is
3    doing here because what may happen is --
4    THE COURT:  Wait a second.  I -- you just
5    confused me.  I'm confused now.  I'm sorry.
6    MR. ENGEL:  (Indiscernible), Your Honor.
7    THE COURT:  I must be missing something.  I
8    thought Sayreville is the title owner of the property
9    --
10   MR. ENGEL:  Right.
11   THE COURT:  -- and that then they are
12   conveying to DEP a conservation easement.
13   MR. ENGEL:  No.  No.  That's not how it
14   works.  Hercules is providing the conservation
15   easement.  Sayreville is (indiscernible) a conservation
16   easement with Sayreville, but it's Hercules that has
17   the obligation to provide a conservation easement to us
18   as part of the settlement.
19   MS. ST. AMANT:  Can I jump in?  This is --
20   THE COURT:  Hold on.  I have a deed of
21   conservation easement here from Sayreville to DEP,
22   which is what we just talked about on the language
23   about expanding the water supply.
24   MR. ENGEL:  Yeah.  (Indiscernible).  But I
25   wanted to make clear under the judicial consent order I

Elias - Argument                          50

```
 1     think that's what we were talking about.  Hercules has
 2     an obligation to make sure that there's a conservation
 3     easement on this piece of property, or another piece of
 4     property if they can't do it here.  That's all I'm
 5     saying is it's (indiscernible) --
 6               THE COURT:  Yeah, because otherwise you don't
 7     have an agreement because there's no fair and adequate
 8     compensation.  Am I correct in that?
 9               MR. ENGEL:  Correct.
10               THE COURT:  All right.
11               MR. ENGEL:  No, that's correct.
12               THE COURT:  All right.  All right.  Good.
13     Don't confuse me with the facts.  Okay?
14               MR. ENGEL:  Fair enough.
15                      (Laughter)
16               MR. ENGEL:  Right.  Understood.
17               THE COURT:  All right.  Okay.  All right.
18     Hold on just one second.  Okay.  Let me hear from
19     Hercules if I can, please?
20               MR. ELIAS:  Thank you, Your Honor.  Josh
21     Elias, Gibbons, for Hercules.  So I had this all lined
22     up to -- to -- to start off with --
23               THE COURT:  You're coming in for -- well,
24     listen -- okay.  How long will it take for you to do
25     the meets and bounds and whatever other -- and prepare
```

Elias - Argument                          51

```
 1     the documents?
 2               MR. ELIAS:  Yes, so -- look, the meets and
 3     bounds is something that had to await the conclusion of
 4     the preliminary assessment.  The preliminary
 5     assessment, my understanding, was submitted to DEP and
 6     approved in March of this year, which is right around
 7     the same time where we lost communication with
 8     Sayreville and, you know, we weren't getting any
 9     responses to our inquiries --
10               THE COURT:  All right.  Just answer my
11     question.  Just answer my question.  How long will it
12     take?
13               MR. ELIAS:  I'm thinking it -- it's telling
14     us months.  We're going to push for, like, 60 days.
15               THE COURT:  Sixty days for the meets and
16     bounds?
17               MR. ELIAS:  I think so.
18               THE COURT:  Has a surveyor been out there
19     yet?
20               MR. ELIAS:  No.  We need to get access.
21     That's part of the issue.  And we need to get a
22     surveyor who is available, and once we get access --
23               THE COURT:  Well, okay.
24               MR. ELIAS:  -- we can get on there.  So we
25     think we can do it hopefully in 60 days.
```

Elias - Argument                          52

1    THE COURT:  Okay.  And how about -- and then
2    how about the other exhibits to the easement?  Or the
3    consent judgment that you're to prepare?
4    MR. ELIAS:  My understanding is the present
5    conditions report is the other documents that's
6    probably something in around six to eight weeks.  The
7    issue with that document is we need to understand what
8    that easement, conservation easement says.  We need a
9    final conservation easement in place at that point
10   because, you know, the present conditions report needs
11   to be executed or submitted pretty much simultaneously
12   with the execution of the conservation easement,
13   otherwise it's no longer a present conditions report.
14   It's hard to identify what the present conditions
15   report -- you know, what the conditions on the property
16   are, and then go on to negotiate the -- the easement
17   terms because now we have (indiscernible) time, and
18   then by the time you execute the conservation easement
19   it may no longer be the present conditions of the
20   property.
21   So we -- we can't really put the cart before
22   the horse.  We need to understand what those terms are
23   within the conservation easement.  And from our
24   perspective we think that's already resolved.  And Your
25   Honor has seen the 2016 transfer agreement.  And, you

Elias - Argument                          53

1    know, Mr. Kanner touched upon this.  In Paragraph 17,
2    7.4A, it says that seller Dupont and buyer are
3    currently in negotiations with NJDEP in connection with
4    a grant of certain conservation easements.
5    Sayreville was in the room negotiating the
6    terms of these conservation easements.  And it goes on
7    to say that the current draft of the conservation
8    easement form is set forth in Exhibit C, and only the
9    following item relating to the terms of the
10   conservation easements is still subject to negotiations
11   as to the date hereof, and that's the meets and bounds.
12   There are not other issues outstanding on this
13   conservation easement, and the problem --
14   THE COURT:  Well, I understand what you're
15   saying, but the reality of it is is that subsequently
16   there were actions by the parties that might modify
17   that language.
18   MR. ELIAS:  Yeah.  They did.  They modified
19   it, and that was the problem.  NJDEP --
20   THE COURT:  Correct.
21   MR. ELIAS:  -- came and decided that they
22   have a new form.  And that's where our problems lie.
23   Right?  There's language in the new form that Mr.
24   Telsey takes issue with.  It was not part of, I guess,
25   what was agreed to in 2016.  I say we scrap it.  NJDEP

Elias - Argument                                    54

1    agreed let's scrap it, let's go back to the terms that
2    everybody agreed to in 2016, and let's be done. But as
3    of right now, until, you know, we get Sayreville to
4    agree to those terms, Hercules is sort of stuck in this
5    position between NJDEP and Sayreville, because we don't
6    have the ability to agree on certain terms. And Mr.
7    Engel told the Court that the Court should approve this
8    consent judgment and leave it to Hercules and
9    Sayreville to work out the terms of the conservation
10   easement. We don't have the ability to do that. If
11   they want to empower us with the ability to do that
12   we'll make up the terms and have them sign something.
13   But I have a funny feeling NJDEP wants specific terms
14   in this conservation easement and wants to have a say
15   in what this conservation easement says.
16              THE COURT:  Okay.
17              MR. ELIAS:  So until we can get them to sign
18   off on it, we're sort of just stuck in the middle and
19   we can't consent to this consent judgment because we
20   don't know if we can fulfill our obligations. And I
21   think Your Honor understands, you know, our position on
22   that.
23              THE COURT:  Yes.
24              MR. ELIAS:  As far as -- as what Mr. Engel
25   said, if we're unable to get Sayreville to do this

Colloquy                                            55

1    they'll accept some other property, well, I have a
2    number of issues with that. One, the --
3              THE COURT:  I don't even want to go there
4    yet. That's -- let's -- we'll cross that bridge if we
5    have to. Let's first -- we're -- listen, I think
6    everyone would like for this matter to get resolved. I
7    -- Sayreville is clearly -- has clearly acknowledged
8    their responsibility. They're saying we're not looking
9    to blow up the easement obligation, we're just talking
10   about the form of the easement. So that -- that very
11   -- that limits the scope of dispute in my opinion
12   regarding this matter.
13              So I have a -- I just have a practical
14   question, and I'll start with Mr. Telsey, and then I'll
15   go to Mr. Engel or any of the other attorneys for the
16   State, and then I'll come back to you, counselor.
17              UNIDENTIFIED ATTORNEY:  Sure.
18              THE COURT:  So, I'd just like to talk now
19   practically about this. It seems as though if the
20   Court has -- sees validity that the conservation
21   easement or the consent judgment has some documents --
22   or excuse me, contains some language -- specifically
23   I'm talking about the documents that should be attached
24   as exhibits, as well as then it -- you know, putting in
25   language that would be appropriate to make it clear

Colloquy                                    56

```
 1    that Sayreville can expand, so long as there is a good
 2    faith basis related to their water supply, and that the
 3    DEP could review it, I feel as though those issues can
 4    get resolved, and can get resolved, especially by
 5    having the judicial assistance.  So I would like to --
 6    so my inclination, I can either adjourn this for 60
 7    days, the motions, or I can allow, grant the State's --
 8    grant Sayreville's application to consolidate its
 9    complaint, and then put it down for a trial date for 90
10    to -- you know, four months away, give it a firm trial
11    date, with a conference date.
12              I'd like to have, before I make a final
13    decision, procedurally trying to -- just as to -- what
14    would be the most practical way to keep this ball
15    rolling so that it should -- it should lead to a
16    resolution.  Mr. Telsey?
17              UNIDENTIFIED SPEAKER:  Your Honor, before Mr.
18    Telsey goes, is there a way to let Rick Engel back into
19    the Zoom?  He was kicked off.
20              THE COURT:  What happened?
21              UNIDENTIFIED SPEAKER:  He said he's been
22    trying to rejoin.
23              THE COURT:  Oh.  Yeah.  Let's get him back
24    in, and then I want to repeat what I just said.  Thank
25    you for that.  There he is.  You can hear me, Mr.
```

Colloquy                                    57

```
 1    Engel?  We don't hear you.
 2              UNIDENTIFIED ATTORNEY:  You turned it off,
 3    Rick.
 4              MR. ENGEL:  Hold on.  I'm sorry.
 5              THE COURT:  Okay.  We've got you.
 6              MR. ENGEL:  Your Honor, I'm sorry about the
 7    technical difficulty.  Sorry about that.
 8              THE COURT:  Okay.  So what had just mentioned
 9    to the attorneys was, and I'm just going to start with
10    counsel for Sayreville, and then go to DEP, and then go
11    to -- back to Hercules.  I -- this oral argument has
12    been very helpful to the Court, and I feel as though
13    the Court's interest was that there was, in this
14    Court's mind, meaningful issues about whether the
15    conservation easement as -- as formed was adequate
16    enough, you know, where the exhibits needed to be
17    attached, and importantly the meets and bounds
18    description, as well as then some language could be
19    inserted regarding Sayreville's right to expand the
20    water supply facilities, so long as there's a -- you
21    know, a need for it, and DEP reviews it in good faith
22    in accordance with, you know, appropriate rules and
23    regulations.
24              And so I just wanted to look -- I just wanted
25    to have a discussion and input before I decide
```

Colloquy                                    58

```
 1    procedurally how to go with this motion practically
 2    speaking, so as to promote a resolution in this case,
 3    because in my mind the parties I think should be able
 4    to resolve this matter, especially maybe with some
 5    judicial assistance.
 6              So is it just worth it to -- one way that
 7    just comes off the top of my head was, you know, to
 8    just adjourn this out 60 days so that we can get the
 9    meets and bounds descriptions done, we can get the --
10    hopefully the reports all done, and you guys can work
11    out some appropriate language, it should be that hard,
12    appropriate language for both parties to agree as to
13    what -- you know, what rights Sayreville has for an
14    expansion, or, you know, so adjourn the motion for 60
15    days, come back, or allow the consolidation and just
16    give it a hard trial date of 120 days from now with a
17    settlement conference in 60 days.
18              So let me just -- let me just -- I'd ask for
19    counsel to just work, instead in the adversarial
20    concept, let's try to work on this in a more
21    collaborative process.  So, Mr. Telsey, your thoughts?
22              MR. TELSEY:  Thank you, Judge.  My thoughts
23    of this, I think that the consolidation should be
24    granted so that that keeps everyone's feet to the fire.
25    I think the motion to accrue settlement and counsel
```

Colloquy                                    59

```
 1    fees should be adjourned during the next 60 days, 90
 2    days.  Clearly we'll work together in good faith on
 3    these issues, but that's my recommendation.
 4              THE COURT:  Okay.
 5              MR. TELSEY:  (Indiscernible) quickly.
 6              THE COURT:  Thank you.  Mr. Engel?
 7              MR. ENGEL:  Yes --
 8              THE COURT:  Or anyone else -- or anyone from
 9    the Kanner law firm.
10              MR. ENGEL:  That's fine with us, Your Honor.
11              MR. KANNER:  Yeah.  The only thing that I
12    want to be clear about, Your Honor, is that we do
13    adhere to the 2016 agreement, forms that were used
14    there.  I mean, for example, Mr. Telsey has brought up
15    ISRA issues that have nothing to do with this.  And we
16    want to avoid a situation where it's just -- we're back
17    to square one of negotiating.  What I understand Your
18    Honor to be saying is let's clean this up, let's get
19    these documents finalized.
20              THE COURT:  Yes.
21              MR. KANNER:  And that we're -- that we're
22    willing to do.  We're not willing to start a whole new
23    discussion about new topics or things that were not
24    preserved in 2016, and --
25              THE COURT:  No.  I'm not looking to expand.
```

Colloquy                                    60

1       MR. KANNER:  -- ISRA issues.
2       THE COURT:  I'm looking to -- yes, you hit
3   the nail on the head.  I'm just looking to clean up --
4       MR. KANNER:  Thank you.
5       THE COURT:  -- clean up the documents that
6   should be cleaned up, and that's -- and then I would
7   make a decision.  All right.  Hercules?
8       MR. ELIAS:  Yes, Your Honor.  I think just
9   piggybacking off that last point, and what Mr. Kanner
10  was suggesting, I fear consolidation introduces a whole
11  bunch of new issues that we shouldn't really need to be
12  discussing right now in order to bring this thing to
13  final resolution.  I think we'd be more in favor of an
14  adjournment, or if the Court wants to hold the parties'
15  feet to the fire, if Your Honor wants to set some sort
16  of hearing, you know, in the not so distant future on
17  the issue of the charges of the consent easement -- or
18  the conservation easement, we'd be open to something
19  like that as well in order to make sure that that, you
20  know, we can get a final document in place, and with
21  the understanding of all parties so we can move forward
22  with, you know, a renewed motion --
23      THE COURT:  So, Mr. Elias, you feel -- what's
24  your comfort level to have the meets and bounds and
25  whatever the other documents that you're responsible to

Colloquy                                    61

1   prepare, to have that done and distributed to the
2   parties within 60 days?
3       MR. ELIAS:  It might be tight, and we will --
4   we will start working the phones as soon as we get on
5   this call.  I can update the parties on where we are in
6   the process if we start, you know, having some
7   resistance in order to be able to meet that deadline.
8   Obviously Mr. Telsey, we would have to get some access
9   to the property for both of those things for -- from
10  Sayreville.  But, you know, we will do our best to be
11  done with what we're responsible to do within 60 days.
12  I can tell you that.
13      THE COURT:  Okay.
14      UNIDENTIFIED ATTORNEY:  We agree on
15  adjournment as opposed to ruling on the merits at this
16  point.
17      THE COURT:  Yes.  Okay.  Here's what I'm
18  going to do.  I'm going to adjourn all motions to
19  November 7th.  And if you can provide me ten days
20  before that with -- hopefully, you know, provide me
21  then when you have an update, meets and bounds -- meets
22  and bounds description, you should be able to quickly
23  resolve issues of Sayreville -- if in the future
24  Sayreville has to expand.  I don't think that should be
25  any trouble at all to come to agreement on that.  And

Colloquy                                                          62

```
 1     then you can just provide me with when you're --
 2     hopefully by November 7th all the documents that were
 3     complained of that weren't part of the easement or
 4     consent judgment are now in every party's possession.
 5     So let's see where we're at in November.  So,
 6     returnable November 7th.
 7               UNIDENTIFIED ATTORNEY:  A letter to the Court
 8     ten days beforehand?
 9               THE COURT:  Yeah.  If you can -- yeah.  If
10     not, you might have to -- listen, just get something to
11     me in advance of the hearing.  I'm not going to -- the
12     earlier the better so that I know in advance.  But I
13     think I've really narrowed the issues here.
14               MS. ST. AMANT:  Your Honor, what time on
15     November 7th?
16               THE COURT:  We'll let you know.
17               MS. ST. AMANT:  Okay.
18               THE COURT:  Do you have a preference?  You
19     guys are only an hour behind me, right?  Or are you two
20     hours?
21               MS. ST. AMANT:  Yes.  We're one hour behind.
22               THE COURT:  You're one hour?  Okay.  We'll
23     let you -- you know what?  I'll have other motions
24     scheduled for that day, so I'll let you know as we get
25     closer to it.
```

Colloquy                                                          63

```
 1               MS. ST. AMANT:  Okay.  Thank you, Your Honor.
 2               THE COURT:  Okay.  All right.  Thank you very
 3     much, everyone.  I'll see everyone in November.
 4               UNIDENTIFIED ATTORNEY:  Thank you, Your
 5     Honor.
 6               UNIDENTIFIED ATTORNEY:  Thank you, Your
 7     Honor.
 8               UNIDENTIFIED ATTORNEY:  We appreciate your
 9     patience.  Thank you.
10               THE COURT:  Okay.  Bye, bye.
11          (Proceeding concluded at 11:57:40 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

64

CERTIFICATION

    I, TAMMY DeRISI, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, Index No. from 10:40:16 to 11:57:40, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings, as recorded.


*/s/ Tammy DeRisi*           AD/T 518
Tammy DeRisi           AOC Number


KLJ Transcription Service      10/20/25
Agency Name           Date