**MEYNER AND LANDIS LLP**
Albert Telsey, Esq.
One Gateway Center, Suite 2500
Newark, New Jersey 07102
Telephone: (973) 602-3439
Facsimile: (973) 624-0356
atelsey@meyner.com
*Attorneys for Intervenor, Carneys Point Township*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; et al., <br> *Plaintiffs*, <br> v. <br> E.I. DU PONT DE NEMOURS AND COMPANY; et al. <br> *Defendants,* | Case No.: <br> 1:19-cv-14758-RMB-JBC (Parlin) <br> 1:19-cv-14766-RMB-JBC (Chambers Works) <br><br><br> Hon. Renée Marie Bumb, Chief U.S.D.J. <br> James B. Clark, III, U.S.M.J. |

## INTERVENOR CARNEYS POINT TOWNSHIP'S BRIEF IN SUPPORT OF WRIT OF MANDAMUS TO MODIFY THE 3M JUDICIAL CONSENT ORDER

Dated: November 21, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................i

TABLE OF AUTHORITIES ................................ ¡**Error! Bookmark not defined.**

SUMMARY ...........................................................................................1

LEGAL ARGUMENTS...........................................................................6

POINT 1

DEP IS VIOLATING THE SPILL ACT NOTICE PROVISION BY
NOT PUBLISHING THE GOVERNING ESCROW AGREEMENT................ 4

POINT 2

DEP DOES NOT HAVE CONSTITUTIONAL AND STATUTORY
AUTHORITY TO IMPLEMENT THE JCO WITHOUT MODIFICATION........8

   A.  DEP is violating the NRD Constitutional Amendment regarding the
     Parlin Site, AFFF Sites, and other 3M Source Sites ...............................10

   B.  DEP cannot appropriate the Settlement Payments over 25 years without
     enabling legislation...................................................................................12

   C.  DEP cannot disenfranchise Political Subdivisions of the State and private
     attorneys general of their Constitutional and statutory rights .................14

     1.  DEP cannot assert statewide res judicata without a fairness hearing .16

POINT 3

THE JCO DOES NOT COMPLY WITH THE TAX DEDUCTION RULE.......21

POINT 4

 CARNEYS POINT IS ENTITLED TO INTERVENE BY WAY OF
 WRIT OF MANADMUS....................................................................26

CONCLUSION .....................................................................................30

# TABLE OF AUTHORITIES

Cases                                                                                           Page(s)

Ailor v. City of Maynardville, Tennessee,
   368 F.3d 587 (2004) .............................................................................. 27

Barlow v. Colgate Palmolive Co.,
   750 F.3d 437 (2014) .............................................................................. 24

Browning v. Navarro,
   743 F.3d (1984) ..................................................................................... 24

Burgos v. New Jersey,
   225 N.J. (2015) ...................................................................................... 20

Burgos v. State,
   222 N.J. 175 (2015) ............................................................................... 14

City of Camden v. Byrne,
   82 N.J. 133 (1980) ................................................................................. 14

City of Seattle v Monsanto,
   U.S.D.J., W.D. Washington, 2023 WL 4373432 .................................. 29

Communications Workers of America, AFL-CIO v. Florio,
   130 N.J. 439 (1992) ............................................................................... 14

D.J. Miller & Associates, Inc. v. State of New Jersey,
   356 N.J. Super. (App. Div. 2002) ......................................................... 20

Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.,
   54 F.3d 156 (3d Cir. 1995) .................................................................... 36

General Assembly of State of N. J. v. Byrne,
   90 N.J. 376 (1982) ................................................................................. 14

Harris v. Pernsley,
   820 F.2d 592 (3d Cir. 1987) .................................................................. 36

Howell Tp. v. Waste Disposal, Inc.,
   207 N.J. Super. 80 (1986) ...................................................................... 27

*In re Mullarkey*,
  536 F.3d 215 (3d Cir. 2008).................................................................. 25

Kleissler v. United States Forest Serv.,
  157 F.3d 964 (3d Cir. 1998).................................................................. 36

Knight v. City of Margate,
  86 N.J. 374 (1981).............................................................................. 14

*Lahue v. Pio Costa*,
  263 N.J. Super. 575 (1993) ................................................................. 12

Mayor and Council of Borough of Rockaway v. Klocker & Klocker,
  811 F. Supp. 1039 (1993)..................................................................... 27

Mid-Atlantic Solar Energy Industries Ass'n v. Chrisitie,
  418 N.J. Super. 499 (App. Div. 2011) ................................................ 23

Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.,
  72 F.3d 361 (3d Cir. 1995)................................................................... 36

New Jersey Department of Environmental Protection v. Exxon Mobil Corporation,
  453 N.J. Super. 272 (2018) ................................................................. 14

New Jersey Department of Environmental Protection v. ExxonMobil,
  452 N.J. Super. 272 (App. Div. 2018) ................................................ 23

New Jersey Department of Environmental Protection v. ExxonMobil,
  453 N.J. Super. 588 (Law Div. 2015) ................................................. 19

*New Jersey Educ. Ass'n v State*,
  412 N.J. Super. 192 (App. Div. 2010) ................................................ 28

New Jersey Hosp. Ass'n v. New Jersey State Dept. of Health,
  249 N.J. Super. 194 (1991) ................................................................. 20

Sussex Woodlands, Inc. v. Mayor and Council of West Milford Tp.,
  109 N.J. Super. 432 (1970) ................................................................. 27
*Switz v. Middletown Tp.*,
  23 N.J. 580 (1957)............................................................................... 40

Weichert Co. Realtors v. Ryan,
  128 NJ 427 (1992) ................................................................................. 12

Statutes

28 U.S.C.A. §1447 ......................................................................... 3, 24, 26

28 U.S.C.A. §2283 ......................................................................... 4, 25, 26

Art. III, Para. 1 of the New Jersey State Constitution ...................... 13, 28

Article VIII, Section II, paragraph 9 of the State Constitution .............. 17

N.J.S.A. 2:15D-14 ................................................................................. 22

N.J.S.A. 39:6-61 ................................................................................... 22

N.J.S.A. 40:69A ................................................................................... 27

N.J.S.A. 52:18A-8 ................................................................................ 14

N.J.S.A. 52:18-29 ................................................................................ 14

N.J.S.A. 58:10-23.34 ........................................................................... 19

N.J.S.A. 58:10-23.11e2 ................................................................... 11, 12

Rules

Fed. R. Civ. P. 24(a) ............................................................................ 35

Fed. R. Civ. P. 24(b) ............................................................................ 37

Regulations

26 CFR §1.162-21 ................................................................................ 31

N.J.A.C. 7:7A-22.19 .......................................................................... 6, 37

Treas. Reg. section 1.162-21(e)(4) ...................................................... 18

Other Authorities

P.L. 2023, Ch. 25 ................................................................................................ 22

P.L. 2025 ............................................................................................... 17, 19, 20

P.L. 2025, c. 74 ................................................................................................. 20

P.L.2009 ............................................................................................................ 19

Senate Bill 3029 ............................................................................................... 22

## SUMMARY

The 3M Company ("3M") Judicial Consent Order ("JCO") recognizes the Chambers Works Site and its surrounding communities, like Carneys Point Township ("Carneys Point" or "Township") as one of the most PFAS polluted Sites in the world.[1]  (Telsey Certification ("Atty Cert. Ex1")).

The $400M-$450M in Settlement Payments provided in the JCO are broken out into four categories:

(1) <u>NRD Payments</u>. $140M in natural resource damages ("NRD") dedicated to NRD restoration projects on a "first priority" basis to Carneys Point, Parlin, the AFFF Sites, and other communities impacted by 3M PFAS pollution ("NRD Payments").

(2) <u>Abatement Payments</u>.  $170M in "PFAS Contamination Abatement Projects" dedicated to restoring the environment, wildlife, and natural resources at 3M PFAS pollution impacted communities in accordance with the Tax Deduction Rule ("Abatement Payments").

(3) <u>Leadership Payments</u>.  $50M-$100M in self-congratulatory payments to the Department of Environmental Protection ("DEP") for their discretionary use as a leader in implementing PFAS regulations, which

---

[1] "New Jersey has been uniquely impacted by PFAS Contamination as a result of Discharges of PFAS from the Chambers Works Site, *one of the largest sources of PFAS contamination in the world*" (¶27).

must also be used to comply with the Tax Deduction Rule ("Leadership Payments").

(4) <u>Costs and Fees</u>.  $40M in Cost, Fees, and Punitive Damages Payments to be used to reimburse DEP costs.

Collectively, "Settlement Payments" all to be paid out over 25 years.

Carneys Point submits that the 3M JCO is arbitrary, capricious, unreasonable, and unlawful and that it must be modified and republished for the following reasons:

A.    <u>Escrow Agreement</u>.  The Escrow Agreement (Exhibit B) is intended to "govern" DEP's use of Settlement Damages for the next 25 years and is therefore a material element of the settlement.  These governing principles were not made known to the public because the Escrow Agreement was not attached to the draft JCO for public review and comment.  The JCO must be republished with the Escrow Agreement.

B.    <u>NRD – Parlin Site</u>.  The 2017 NRD Constitutional Amendment requires that NRD settlements be made in connection with each contaminated site because the pollution impacted municipality is entitled to use the funds for NRD restoration projects in their communities on a "first priority" basis.  The JCO violates the NRD Constitutional Amendment because the allocation table (Exhibit

A) does not allocate NRD settlement dollars specifically to the Parlin Site Litigation being settled as part of the JCO.

C.    NRD – AFFF Sites.  The JCO violates the 2017 NRD Constitutional Amendment because the allocation table (Exhibit A) does not allocate NRD dollars specifically to the four AFFF Litigation Sites being settled as part of the 3M JCO but instead allocates NRD dollars to the AFFF Sites as unallocated bulk payments.[2]

D.    NRD – Other 3M PFAS Sources.  The JCO violates the 2017 NRD Constitutional Amendment because the allocation table (Exhibit A) does not allocate NRD dollars to the "other sources" of 3M contamination being settled as part of the 3M JCO but instead allocates NRD dollars to the other sources as unallocated bulk payments.

E.    Enabling Legislation.  The JCO violates separation of powers because the legislature has not enacted enabling legislation authorizing the DEP to appropriate the $170M in Abatement Payments and the $50M-$100M in Leadership Payments in its "sole discretion" for the 25-year payout period, and the 2026 Appropriations Act does not provide DEP with appropriation authority for

---

[2] The AFFF sites include (1) the McGuire Air Force Base ("McGuire"), the Naval Air Engineering Station Lakehurst ("NAES-Lakehurst"), and the Fort Dix Army Base ("Fort Dix"), known collectively as the Joint Base McGuire-Dix-Lakehurst ("JBMDL") Base, (2) the Naval Weapons Station Earle ("NWS Earle"), (3) the Earle Military Sealift Command Fire Training School ("Earle MSC"), and (4) the former Naval Air Warfare Center in Trenton (Collectively "the four AFFF Sites").

the years 2027 to 2050. The opioid and VW litigation settlement legislation are examples of enabling legislation for large litigation settlements. They provide a non-lapsing fund with protocols, regulations, advisory boards and other trappings of due process and public participation to fairly manage settlement funds like the Abatement Projects and Leadership Payments over the next 25 years without reliance on DEP's unchecked discretion or the unpredictability of yearly legislative appropriations. Without enabling legislation, most of the Settlement Payments may end up in the General Fund, which will defeat the purpose of the settlement.

      F.    <u>Disenfranchising Political Subdivisions and private attorneys general.</u> The JCO must be modified to exclude the Political Subdivisions of the State and "private attorneys general" from certain broad definitions in the JCO because this court cannot foreclose their rights under the Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq. ("ERA") and other citizen suit statutes to act when the DEP fails to act, fails to act sufficiently, or acts in bad faith.

      G.    <u>Res Judicata – Fairness Hearing.</u> The Attorney General and DEP are seeking to have the 3M JCO deemed a final judgment with statewide res judicata effect that will foreclose all statewide non-party Political Subdivisions and others from challenging the fairness of the settlement. The JCO must therefore be made contingent on a fairness hearing.

   H. <u>Tax Deduction Rule</u>.  The JCO requires that all Abatement Payments and Leadership Payments must be (a) used to restore the environment, wildlife, or natural resources, (b) directly linked to 3M sources of PFAS pollution, and (c) deposited into a segregated account because that is what is required by the Tax Deduction Rule, which governs the use of these funds.  The JCO violates the Tax Deduction Rule because it does not dedicate and segregate Abatement Payments and Leadership Payments solely for these purposes.  Instead, the funds can be used for any purpose in DEP's sole discretion.

   Required modifications to the JCO are set forth as a redlined version of the JCO attached in the proposed Petition for Writ of Mandamus provided as the pleading in support of this motion to intervene.

   Carneys Point has standing to intervene because (1) N.J.A.C. 7:7A-22.19 permits intervention in DEP settlements involving the remediation and restoration of wetlands associated with NRD restoration projects, like those required here, and (2) the Township is an intended third-party beneficiary to the $105M in NRD Damages dedicated to communities impacted by pollution from the Chambers Works Site and is a third-party beneficiary to part of the $170M in Abatement Damages for the remediation and restoration or the environment, wetlands, and natural resources in its community.

# **LEGAL ARGUMENTS**

## POINT 1

### DEP IS VIOLATING THE SPILL ACT NOTICE PROVISION BY NOT PUBLISHING THE GOVERNING ESCROW AGREEMENT

The JCO provides that the Settlement Payments shall be paid into an unidentified Escrow Account, "governed by" an unidentified Escrow Agent, and paid out over the next 25 years pursuant to unidentified terms and conditions in an Escrow Agreement that is not attached to the JCO (Exhibit B) (¶44.b).

The JCO further provides that the DEP intended to set up an application process for interested Persons to apply for Abatement Damages, but DEP never described that application process in the JCO or the Escrow Agreement because the Escrow Agreement was not attached to the JCO (¶52).

The Escrow Agreement has not been made available for public comment or review and approval by the court. That is because, according to the JCO, the Escrow Agreement still needs to be negotiated and drafted "in the form to be mutually agreed to by the Parties." (¶44.b). In other words, no one knows what the governing Escrow Agreement is going to say.

The principals that will govern how DEP pays out $400M-450M in Settlement Damages over the next 25 years were not discussed in the published settlement notice. (Atty Cert. Ex2). This failure violates the Spill Act notice provisions because the Escrow Agreement is a material element of the settlement.

As such, the JCO does not comply with paragraph 93 of the JCO, and the court cannot make this finding of fact (93. "The notice described in this Section XVI is deemed compliant with the notice requirements of N.J.S.A. 58:10-23.11e2.")

The JCO states DEP can decide "in its sole discretion" to reject any public comment, including an objection that the Escrow Agreement is missing (¶94). A settlement agreement requires terms that are sufficiently definite so that the performance to be rendered by each party can be ascertained by the parties, the public, and the court with reasonable certainty.[3] DEP has no discretion to forgo a material element of the settlement, like the Escrow Agreement, and the court cannot approve a settlement if material terms are missing.[4]

In August 2025, the Middlesex County Superior Court addressed a proposed NRD JCO with Hercules, Inc. that was supposed to include a 300-acre Conservation Easement valued at over $15M. However, the Easement was missing all of its essential attachments. Judge Benjamin S. Bucca, Jr., J.S.C. found the attachments to be material elements of the settlement and did not approve the settlement pending resolution of the missing documents. (Atty Cert. Ex3).[5]

---

[3] *Weichert Co. Realtors v. Ryan*, 128 NJ 427, 435 (1992)

[4] *Lahue v. Pio Costa*, 263 N.J. Super. 575 (1993)

[5] *New Jersey Department of Environmental Protection v. Hercules, Inc.,* New Jersey Superior Court, Middlesex County, Docket MID-L-8749-07, Hearing to approve NRD JCO, August 28, 2025. Regarding the Conservation Easement and the missing attachments, Judge Benjamin S. Bucca, Jr., J.S.C. stated, "There are some substantive issues here. So -- and I think it's -- in the long run it will save time to -- let's -- on some substantive issues which I believe this issue of what can Sayreville do in terms of improvement on the property as it relates to their water supply, that's

The court here cannot approve this JCO until DEP republishes it with the Escrow Agreement for public review and comment.

<u>POINT 2</u>

DEP DOES NOT HAVE CONSTITUTIONAL AND STATUTORY
AUTHORITY TO IMPLEMENT THE JCO WITHOUT MODIFICATION

The Settling Plaintiffs seek to have this court "find" (¶7) that the Attorney General acts, "in all its capacities to the maximum extend allowable by law" (¶9), through DEP's "capacity to exercise the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interests that can be addressed by those powers" (¶9e), including DEP being "empowered to direct, *procure*, and administer" NRD Payments, Abatement Payments, and Leadership Payments (¶17), through the "broad powers" granted to DEP by the Legislature set forth in the State's environmental laws (¶19,33), such that the 3M JCO "will empower" (¶32) DEP to settle all claims on behalf of the Political Subdivisions of the State in the manner set forth in the JCO (¶¶9, 34,36,39,40). (Collectively, "DEP's Alleged Authority").

---

a real issue. And I don't think that that should -- that that -- I'm just not so sure that that should -- that I would be responsible as a judge to say, all right, well, you know, I'll let the parties just settle it after the fact.  Let's get it done now." P.40

The Attorney General and DEP acknowledge, however, that they are not certain what the "maximum extent" of their powers are under the law, and rightly so.

The Attorney General and DEP have significant power to address environmental needs of the State; however, they do not have procurement power, which is vested exclusively in the legislature and they cannot set State policy by executive contract without legislative authority.[6]

Regarding appropriation and procurement power, Art. III, Para. 1 of the New Jersey State Constitution identifies the separation of powers between the executive, legislative, and judicial branches.[7]   All state revenues, including litigation recoveries, are deposited into the General Fund and appropriated by the legislature.[8]  See, Department of Treasury Act of 1948, N.J.S.A. 52:18A-8[9] and N.J.S.A. 52:18-29, which states that all funds "shall not be disbursed therefrom

---

[6] *New Jersey Educ. Ass'n v State*, 412 N.J. Super. 192 (App. Div. 2010).

[7] *Communications Workers of America, AFL-CIO v. Florio*, 130 N.J. 439 (1992).  The separation of powers is to ensure cooperative action among the branches while maintaining their distinct roles. *General Assembly of State of N. J. v. Byrne,* 90 N.J. 376 (1982), *Knight v. City of Margate*, 86 N.J. 374 (1981).

[8] Article VIII, Section 2, Paragraph 2, See also, *City of Camden v. Byrne*, 82 N.J. 133 (1980), *Burgos v. State*, 222 N.J. 175 (2015), *New Jersey Department of Environmental Protection v. Exxon Mobil Corporation,* 453 N.J. Super. 272 (2018)

[9] N.J.S.A. 52:18A-8. "All State revenue collected by any department, institution, commission, board, committee or official of this State shall, except as otherwise provided by law, be deposited, in the method prescribed by the director of the Division of Budget and Accounting, to the credit of the State of New Jersey in such depositories as the State Treasurer shall designate."

unless specifically appropriated by the legislature in an annual or supplemental appropriation act" or other legislative enactment. [10]

A. DEP is violating the NRD Constitutional Amendment regarding the Parlin Site, AFFF Sites, and other 3M Source Sites

The 2017 NRD Constitutional Amendment credits NRD recoveries obtained each year to a Dedicated NRD Constitutional Account held by the legislature, not the DEP.[11] This is a non-lapsing account. One hundred (100%) of the NRD recovery for each NRD Site is deposited into the account. The funds are dedicated to each NRD Site for NRD restoration projects at and around each Site on a "first priority" bases.[12] NRD recoveries are not used for general statewide purposes.

---

[10] N.J.S.A. 52:18-29. "All moneys of the state collected or received by any state institution, board, commission, department, committee, agent or servant, from any source, shall except as otherwise provided by law be paid into the state treasury not later than the tenth day of the month following the month during which such moneys were collected or received, and shall not be disbursed therefrom unless specifically appropriated by the legislature in an annual or supplemental appropriation act; provided, that moneys collected or received by the department of motor vehicles during the month of December of any year shall be paid into the state treasury not later than the tenth day of February following such month in which the moneys were collected or received."

[11] Art. VIII, Sec. II, para. 9 eff. December 7, 2017. "There shall be credited annually to a special account in the General Fund an amount equivalent to the revenue annually derived from all settlements and judicial and administrative awards relating to natural resource damages collected by the State in connection with claims based on environmental contamination. The amount annually credited pursuant to this paragraph shall be dedicated, and shall be appropriated from time to time by the Legislature, for paying for costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, or for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to natural resource damages."

[12] Art. VIII, Sec. II, para. 9 eff. December 7, 2017. "The first priority for the use of any moneys by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, pursuant to this paragraph shall be in the immediate area in which the damage to the natural resources occurred *in connection with the claim for which the moneys were recovered.*" [Emphasis added].

Here, the JCO (¶44) (Exhibit A) violates the 2017 NRD Constitutional Amendment because it fails to allocate NRD recoveries over the 25-year payout period.

First, the allocation table (Exhibit A) violates the 2017 NRD Constitutional Amendment because it does not allocate NRD settlement dollars specifically to the Parlin Site Litigation referenced in the 3M JCO as required by the Constitutional Amendment.

Second, the allocation table (Exhibit A) violates the 2017 NRD Constitutional Amendment because it does not allocate NRD dollars specifically to the four AFFF Litigation Sites referenced in the 3M JCO but instead allocates NRD dollars to the AFFF Sites as unallocated bulk payments.

Third, the allocation table (Exhibit A) violates the 2017 NRD Constitutional Amendment because it does not allocate NRD dollars to the "other sources" of 3M contamination referenced in the 3M JCO but instead allocates NRD dollars to the other sources as unallocated bulk payments.

This failure to allocate per Site, per year, denies pollution-impacted municipalities the ability to design and budget appropriate NRD restoration projects for their communities because they will not know how much each yearly payment will be, if any, for each Site.  This municipal involvement in the NRD restoration process is baked into the NRD Constitutional Amendment through the

- 11 -

DEP NRD Administrative Order 2023-08.[13]   Here, the JCO disenfranchises pollution-impacted municipalities from meaningful participation.

The DEP has settled more than a dozen NRD cases over the past 6 years. [14] They each involve a one-year, lump sum settlement payment with an identified allocation to NRD and non-NRD payments without a multiple year payout schedule.   Some used an escrow merely to hold the cash payment pending exhaustion of the 45-day appeal period for the settlement.   None of these settlements sought to bind the then-current legislature to future appropriations or to use an Escrow Agreement as a "governing" document to manage payment payouts over multiple years based on DEP's "sole discretion."   These are unique and unlawful features found only in the DuPont/Chemours and 3M settlements.

B.  DEP cannot appropriate the Settlement Payments over 25 years without enabling legislation

The JCO violates separation of powers because the legislature has not enacted enabling legislation authorizing the DEP to appropriate Settlement Payments for the 25-year payout period.  In addition, the 2026 Appropriations Act only applies to DEP's allocation of Abatement Payments and Leadership Payments

---

[13] "It is the policy of the Department to engage directly with the public whose natural resources the State holds in trust concerning the Department's identification, selection, planning, and implementation of restoration projects, and to provide information and seek input on restoration projects from communities affected by the relevant discharges(s) of hazardous substances, contaminants, or other pollutants."

[14] https://dep.nj.gov/nrr/proposed-settlements/

for 2026 not for the years 2027 to 2050 leaving those future allocations to DEP's "sole discretion" without legislative authority (¶¶44e.vi, 51).[15]

The DEP cannot use its "sole discretion" to appropriate Abatement Payments and Leadership Payments each year over the next 25-years because that unbridled administrative discretion violates the legislative appropriations clause. When it comes to managing large litigation settlements recovered over many years, the legislature enacts special legislation to avoid the unpredictability of yearly appropriations.

For example, the legislature has established the Opioid Recovery and Remediation Fund to manage the State's $1B recovery in the national opioid litigation to be handled through the Department of Human Services ("DHS"),[16] and the VW emission fraud litigation settlement fund to be handled through the DEP.[17] These non-lapsing funds are managed with victim compensation protocols, project requirements, Advisory boards, regulations, and reports to the Governor and the legislature, and not left to the whim of an executive department.[18] Other similar funds have also been enacted by the legislature.[19]

---

[15] 2026 Appropriations Act, P.L. 2025, c.74, p.101-103
[16] P.L. 2023, Ch. 25
[17] Senate Bill 3029 (2R) of 2017.  See DEP website: https://dep.nj.gov/vw/
[18] N.J.A.C. Executive Order 323 (2023) [Opioid settlement protocols].
[19] Fraud Response Fund to address contractor fraud during federal disaster recovery programs, N.J.S.A. 2:15D-14, and the New Jersey Unsatisfied Claim and Judgment Fund to provide relief to victims of uninsured or hit-and-run drivers, N.J.S.A. 39:6-61 et seq.

- 13 -

This court has no judicial authority to circumvent the legislative appropriations process by approving this JCO with a 3-page payout schedule (Exhibit A) governed by a nonexistent Escrow Agreement and nonexistent application protocols intended to allocate $400M-$450M over the next 25 years. The Appellate Division in the ExxonMobil NRD settlement stated, "Under the Appropriations Clause of the New Jersey Constitution [citation omitted] the power and authority to appropriate funds is vested in the Legislature. [citation omitted]. The Judiciary has no authority for any role in the budgetary process."[20]

> C. DEP cannot disenfranchise Political Subdivisions of the State and private attorneys general of their Constitutional and statutory rights

As a function of DEP's Alleged Authority discussed above, DEP claims that "New Jersey law authorizes Settling Plaintiffs to seek, and Settling Plaintiffs have sought from 3M all damages that Settling Plaintiffs may be entitled to recover" (¶36), that "3M's payments shall, among other things, compensate the State's Political Subdivisions" for all PFAS Claims, including, among other things, "Political Subdivision tax revenues due to the damage to Real Property or Personal Property caused by and proximately resulting from PFAS Contamination" (¶39), that the Settling Plaintiffs "adequately represent the interests and rights of the

---

[20] *New Jersey Department of Environmental Protection v. ExxonMobil*, 452 N.J. Super. 272, 307-308 (App. Div. 2018). See also, *Mid-Atlantic Solar Energy Industries Ass'n v. Chrisitie*, 418 N.J. Super. 499 (App. Div. 2011) [Legislature can alter the appropriation of funds authorized by a legislative Act to a different destination if done by the legislature in the yearly Appropriations Act].

State's Political Subdivisions" (¶40), that the JCO is "res judicata" against all Political Subdivisions of the State (¶40), and that the only Claims Political Subdivisions might have had against 3M or the State for 3M pollution, but no longer have, are claims against the Spill Fund (¶33).

The JCO provides that, before receiving any funds from the Abatement Damages through the JCO's unidentified allocation process, all Political Subdivisions of the State must "affirmatively acknowledge in writing that certain PFAS-related Claims that the applicant otherwise might bring or litigate against 3M or other Released Entities are precluded, as described in Paragraph 40's discussion of res judicata and elsewhere in this JCO." (¶52).

The Attorney General and DEP claim they have the power to act on behalf of Political Subdivisions of the State and private attorneys general without them being named parties, without providing them with consideration, and without their consent. As such, the Settling Plaintiffs define "Settling Plaintiff" (¶6), "Covered Harm" (¶6), and "Releasors" (¶6) to include all Political Subdivisions in the State and private attorneys general without consideration or consent.

These definitions enable Settling Plaintiffs to accomplish indirectly what this court cannot do directly; that is, disenfranchise Political Subdivisions of the State and private attorneys general of their rights under New Jersey statutes, including the ERA and other citizen suit statutes. To do so would violate the New

- 15 -

Jersey State Constitution that prohibits a contract, such as this JCO, from "depriving a party of any remedy" which existed when the contract was made. (Art 4,§7,¶3).

Political subdivisions. The State Constitution provides that New Jersey laws empower local government to operate without sovereign interference and that these laws "shall be liberally construed in their favor" in accordance with their "express terms" and reasonable inferences that are "not inconsistent with or prohibited by this Constitution or by law." (Art. IV, §VII, ¶11). New Jersey is deemed a "liberal legislative home rule state."[21]

The express terms and liberal interpretation of municipal enabling statutes like N.J.S.A. 40A (Counties and Municipalities) and N.J.S.A. 40:69A (Faulkner Act) do not empower the DEP to make local government release claims and provide contribution protection against their will and without their consent merely because it is expedient for a settlement in a State litigated matter.

1. DEP cannot assert statewide res judicata without a fairness hearing

These statutes also do not require local government to submit to acting in privity with the State for the purpose of res judicata claim preclusion against their will and without consideration. Res judicata is fact sensitive as to the claim and the concept of privity, especially when the matter involves significant principles of

---

[21] *Sussex Woodlands, Inc. v. Mayor and Council of West Milford Tp.*, 109 N.J. Super. 432 (1970).

- 16 -

public importance on a statewide basis, like this settlement, and the underlying facts have not been proven.  The Parties here admit nothing (¶¶80-82).

Settlements are favored because they avoid litigation.  As such, the State may be able to bind its Political Subdivisions if the settlement addresses significant public interests, as is the case here, and the settlement is fair and reasonable to all non-parties who must be subject to its terms and conditions.

This fairness view of class action style settlements like this one was decided some time ago by the *Mount Laurel* cases that addressed affordable housing issues that impact a wide number of non-parties subject to claim preclusion res judicata.[22] As set forth in *Mount Laurel*, the key to these types of settlements was a fairness hearing – an opportunity for non-parties to present information to the court from which the court can determine the fairness and reasonableness of the settlement before res judicata has a preclusive effect.

Carneys Point and all other affected Political Subdivisions of the State are entitled to a fairness hearing regarding this settlement, especially given the challenged legal underpinnings to the settlement, and the State's failure to even explain how $400M-$450M in settlement funds are going to be allocated.

---

[22]  *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 92 N.J. 158 (1983) (*Mount Laurel II* ); *Morris County Fair Hous. Council v. Boonton Township,* 197 N.J. *Super.* 359, 364 (Law Div.1984), *aff'd o.b.* 209 N.J. *Super.* 108 (App.Div.1986), *East/West Venture v. Borough of Fort Lee,* 286 N.J. Super. 311 (1996).

For example, the Attorney General and DEP could have dedicated Abatement Payments and Leadership Payments to the Spill Fund, a pre-existing non-lapsing, revolving fund in the DEP that already has a statutory and regulatory superstructure for its administration. N.J.S.A. 58:10-23.11i.  Spill Funds are intended to reimburse Political Subdivisions and others for cleanup and removal costs (N.J.S.A. 58:10-23.11f), damage to real and personal property caused by contamination, including lost income and lost municipal tax revenue (N.J.S.A. 58: 10-23.11g), and research, administration costs and water supply system claims (N.J.A.C. 7:1J-3.1 et seq.), among other reimbursable claims (N.J.S.A. 58:10-23.11o).

Instead, DEP has chosen to deposit the Abatement Payments and Leadership Payments into a secret escrow with unknown allocation parameters.  In addition, according to the JCO, DEP claims that all non-parties to the JCO have forfeited their rights to compensation from the Spill Fund and must rely on DEP's sole discretion, pursuant to unstated protocols, as to whether DEP will address their claims or not.[23]  This is unfair to the PFAS pollution communities entitled to these funds.

---

[23] 102. "Nothing in this JCO shall be deemed to constitute preauthorization of a claim against the Spill Fund within the meaning of N.J.S.A. 58:10-23.11k. or N.J.A.C. 7:1J."

The JCO is not subject to enabling legislation, the notice of the JCO published by DEP did not describe how DEP would allocate settlement funds, and non-parties have not had a fairness hearing.

The Attorney General and DEP claim throughout the JCO that "New Jersey law broadly authorizes" DEP to appropriate and procure the Settlement Payments pursuant to DEP's "sole discretion" and without legislative authority even though that claimed power is untethered to New Jersey law. In addition, the Attorney General and DEP expect this court to "find" that untethered power exists when it does not exist (¶7). The court cannot make such a finding that DEP is entitled to proceed here as it seeks to do without a fairness hearing for the reasons set forth herein.

_Private attorneys general_. The ERA was enacted in 1974. It provides "supplemental" jurisdiction, not superseding jurisdiction, which allows citizens and municipalities the right to take action against polluters and the DEP as a private attorney general when the DEP refuses to act, is unwilling to act, or acts in bad faith.[24] Sponsors of the bill recognized the primary jurisdiction of DEP; however,

---

[24] The Sponsors also stated, "The Committee makes no recommendation on the basic question of policy posed by this bill, i.e. whether interested citizens and groups should have the right to supplement governmental enforcement programs by bringing Court actions in aid of such enforcement. However, if the Legislature desires to implement this basic policy, the Committee sees no reason why this bill should not be enacted into law in its' present form." See, _Howell Tp. v. Waste Disposal, Inc_., 207 N.J. Super. 80 (1986); _Mayor and Council of Borough of Rockaway v. Klocker & Klocker,_ 811 F. Supp. 1039 (1993), _Ailor v. City of Maynardville, Tennessee_, 368 F.3d 587 (2004).

the sponsors also recognized the need for supplemental jurisdiction to allow citizens and municipalities to protect the environment without having to prove special damages when DEP fails to act, refuses to act, or acts in bad faith.[25]

The definitions of "Covered Harm," "Releasors," "Settling Plaintiff" include private attorneys general.  This inclusion is unlawful because it violates the intent of the ERA and separation of powers (NJ Const., Art. III, ¶1).  It is also unlawful because it sets State policy by executive contract without legislative authority.[26]

DEP wants to deny pollution-impacted municipalities their statutory rights under the ERA to challenge DEP's unauthorized appropriation of the funds so DEP can use them for unspecified environmental purposes in DEP's sole discretion. This is unacceptable.

In *City of Seattle v Monsanto,* U.S.D.J., W.D. Washington, 2023 WL 4373432, the State of Washington wanted to release environmental claims in a JCO against Monsanto on behalf of the City of Seattle by operation of sovereign law even though the City was not a party to the lawsuit and did not consent to the

---

[25] Sponsors of the ERA stated, "The bill recognizes that the primary responsibility to prosecute polluters rests with government. In those instances where government is unable or unwilling to take the necessary action, any person should be assured of an alternative course of' action." (Atty Cert, Ex4).  The sponsors further stated that, "The purpose of the bill is to overturn the doctrine long established in our law that in order to have sufficient standing to sue for abatement or prevention of a public 'nuisance, a private person must show special damage peculiar to himself and distinct from that done to the public at large. [citations omitted]. . . It would thus remedy what its supporters believe to be an unnecessary and obsolete impediment to enforcement of antipollution laws."

[26] *New Jersey Educ. Ass'n v State*, 412 N.J. Super. 192 (App. Div. 2010).

release of its claims against Monsanto. (Atty Cert, Ex5). The court concluded that the State could not force the city to release its claims because the State's sovereign power in this regard was unclear. Since every contract is presumed to incorporate the law of the state at the time of execution, and since the law on this point was unclear, the State could not compel the city to release Monsanto.

Here, in New Jersey, it is clear that DEP cannot act on behalf of the Political Subdivisions of the State or private attorneys general without their participation or consent on the pretext it has the power to act on their behalf because DEP has no such power. Even if the State has such power for purposes of large-scale matters of public importance, impacted non-party Persons and Political Subdivision of the State are entitled to a fairness hearing and the JCO must be approved by enabling legislation.

Ms. Jerry English, former DEP Commissioner, State Senator, and Counsel to the Governor at the time the ERA was passed in 1974 states that the ERA was intended to supplement DEP jurisdiction, not supplant it, to allow citizens and municipalities to take action when DEP fails to act, refuses to act, or acts in bad faith. That is why the ERA provides a 30-day notice to DEP for private citizens before they can act, but no prior notice is required for municipalities before they can act. N.J.S.A. 2A:25A-11.

Ms. English acknowledges that the ERA was designed to allow a municipality to take immediate action against a polluter or DEP to protect its residents pursuant to its own municipal police power and without prior permission from DEP. She stated that DEP cannot disenfranchise citizens and Political Subdivisions of the State by contract or settlement from their statutory rights to self-protection and environmental protection provided by the ERA. See, Certification of Jerry English. [Document 742-5].

The DEP is acting in bad faith and acting unlawfully by denying Political Subdivisions and private attorneys general the right to take action under the ERA.

## POINT 3

### THE JCO DOES NOT COMPLY WITH THE TAX DEDUCTION RULE

The "Tax Deduction Rule" provides a settling defendant with a tax deduction if (1) the payment is used exclusively for restitution and remediation purposes to restore the environment, wildlife, and natural resources harmed by the defendant's damaging conduct, (2) there is a direct nexus between the site causing the harm and the restoration of the damage caused by that harm, and (3) the funds are paid into a "segregated fund or account" held by the government and used exclusively for these restorative purposes.[27]

---

[27] 26 CFR §1.162-21

The Tax Deduction Rule has been incorporated into all of the payment definitions in the JCO.[28] In addition, paragraph 108 obligates the Settling Plaintiffs to prepare, provide, and file all necessary documents that entitle the Settling Defendants to qualify for a tax deduction.

The JCO states that Abatement Damages can be used to restore the environment, wildlife, and natural resources harmed by 3M's damaging conduct, including the following: (1) investigate and remediate PFAS Contamination, (2) respond to an imminent and substantial environmental concern caused by a PFAS discharge (3) assist community and non-community water systems, Public Water Systems, and Private Potable Well owners install, operate, and maintain sufficient PFAS treatment, (4) test Private Potable Wells and provide their owners with an interim water supply and/or connection to a Public Water System, (5) assist Treatment Works and Wastewater Treatment Plants with PFAS reduction including the disposal of PFAS sludge and residue, (6) assist airport, fire departments, and other facilities with PFAS abatement projects, including PFAS-free alternative chemicals, (7) pay Spill Fund claims and reimburse the state and its Political Subdivisions for funds obtained from loans and grants to address PFAS

---

[28] The JCO carries the Tax Deduction Rule throughout the document and its definitions. See, ¶46 (NRD), ¶47 (Abatement Payments), ¶44.e.vii (Leadership Payments).

discharges, and (8) hire consultants, do research, and educate the public about PFAS (¶¶50-53).

To the extent that Abatement Payments are used for non-environmental, non-wildlife, and non-natural resource purposes, such as items (7) and (8) above, they do not satisfy the Tax Deduction Rule.

The Third Amended Complaint in the Chambers Works Litigation specifically stated that the Defendants must "abate or mitigate the PFAS groundwater contamination affecting or which may affect drinking water supplies that they caused or contributed to in *areas located off-site from the [Chambers Works] Site.*" (Counts 17 and 18). Therefore, in order to satisfy the direct nexus component of the Tax Deduction Rule, the $40M in Abatement Payments allocated to Chambers Works (Exhibit A) must be used to pay for water quality infrastructure projects at and around the Chambers Works Site.

Given the absence of guiding protocols here, that is, enabling legislation, an Escrow Agreement, and a fairness hearing, Carneys Point has no fair and reasonable way of knowing how, why, when, and where DEP may or may not use Abatement Damages to pay for any of the above defined uses. This uncertainty is compounded by the fact that the JCO specifically provides that DEP can spend the

Abatement Damages in any manner it chooses, in its sole discretion, regardless of the identified potential uses in the definition (¶50).[29]

Carneys Point environmental, wildlife, and natural resource projects

The urban creek system within and surrounding the Chambers Works Site acts as a PFAS highway. Water from the offsite creek system flows towards Chambers Works. This offsite PFAS contaminated surface water flows into an onsite Chambers Works wetlands lake that was created artificially over the years due to poor property management. The lack of tide gates, levees, and other infrastructure leaves this pooled PFAS surface water as a flooding hazard. During storm events, the PFAS surface water within the Chambers Works Site overflows into surrounding neighborhoods exposing residents to additional PFAS contaminated water.

Carneys Point has been designing NRD restoration projects that restore the environment, wildlife, and natural resources of the area for years and has shared them with DEP. The Township is consulting with Dr. Peter Jaffe, Princeton; Dr. Amy Tuininga, Montclair State; WSP global engineers; Resource Environmental

---

[29] "Except as specifically provided herein, nothing in this Section VII shall alter the Department's sole discretion to use the funds paid pursuant to Paragraph 44.c.ii and Exhibit A as it determines to be appropriate to protect the public health and safety and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS. The Parties acknowledge the Department's sole discretion to allocate and disburse PFAS Contamination Abatement Funding (including, in the Department's sole discretion, reallocating funds within Paragraph 44.c.ii) and to identify specific PFAS Contamination Abatement Projects to address PFAS Contamination." (¶51).

Solutions global contractors; The TBLS Group, NRD consultants, and others to design and cost out these projects. The DEP just recently gave Dr. Jaffe and Dr. Tuininga awards for the work they are doing on these regional PFAS contamination solutions. DEP also works with the global engineers and contractors mentioned above.

Carneys Point's NRD restoration projects that restore the environment, wildlife, and natural resources include the following:

(1) Flood control and stormwater control projects. These projects include seawalls, tide gates, levies, and stormwater pumping stations; the redesign of the Chambers Works onsite wastewater treatment plant to address PFAS in stormwater and sanitary wastewater on a regional basis; developing an alternative water supply with water treatment, which has been identified nearby, to replace temporary PFAS POET systems in hundreds of homes; stream cleaning; dam upgrades and modifications; and fish ladders.

(2) Phytoremediation PFAS projects for offsite wetlands. These projects include planting plant species that can absorb PFAS, which will then be regularly harvested for disposal as hazardous waste in the Chambers Works onsite hazardous waste landfill. This will reduce the load of PFAS polluted surface water entering the Chambers Works site from the surrounding urban creek system.

(3) Onsite wetlands PFAS treatment projects. These projects involve transforming hundreds of acres of wetlands on the Chambers Works Site into a treatment wetland, by adding soil amendments, like biochar. The onsite wetlands act like a "wetlands sink" where offsite urban creek water ends up. The idea is that offsite phytoremediation will reduce the PFAS load that ends up in onsite wetlands. The use of biochar and other amendments in the onsite wetlands will reduce the PFAS load even further before these waters enter the Delaware River or flood adjacent neighborhoods. See water infrastructure projects portfolio. See Certification of Andrilenas [Document 742-6].

- 26 -

The point being made here is that the only way that 3M can comply with the Tax Deduction Rule is if the $40M Abatement Payments allocated to Chambers Works (JCO Exhibit A) are spent on these projects in and around the Chambers Works Site because only these projects meet the direct nexus requirement of the Tax Deduction Rule. This is why Carneys Point has spent years preparing this project portfolio.

The JCO fails to comply with the Tax Deduction Rule because Abatement Payments and Leadership Payments can also be used generally and nonspecifically "to protect the public health and safety and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS" whether originating from 3M or not. (¶51). These general uses must be stricken because they defeat the direct nexus component of the Tax Deduction Rule. Abatement Payments and Leadership Payments must also be placed in a segregated account dedicated only for these projects; otherwise, the intent of the Tax Deduction Rule is not met and the purpose of the JCO is defeated.

<u>POINT 4</u>

CARNEYS POINT IS ENTITLED TO INTERVENE BY WAY OF WRIT OF MANDAMUS

Fed. R. Civ. P. 24(a) provides that upon timely application anyone shall be permitted to intervene when the applicant "claims an interest relating to the property or transaction that is the subject of the action and is so situated that

disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."[30]

Timeliness.   This application is timely because the JCO has only been published for public comment 60 days.  The Township has already provided its comments to the State.  Since the State has no obligation to respond to the Township, submitting its comments has exhausted the Township's administrative remedy.  To timely file for intervention, the Township immediately thereafter filed this application for intervention.  As such, the parties to the JCO have not been prejudiced by the timing of this application.

Wetlands restoration intervention.   A significant focus of the JCO is the remediation and restoration of PFAS-contaminated wetlands in and around Chambers Works.   There are no regulations guiding the restoration of contaminated wetlands.  As such, the New Jersey Freshwater Wetlands Protection Act regulations opened up NRD litigation to allow all persons to participate in the wetlands restoration process.  Specifically, these regulations provide that if the NJDEP brings an NRD lawsuit that addresses the restoration of wetlands, the

---

[30] *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998); *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 365-66 (3d Cir. 1995); *Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.,* 54 F.3d 156, 161-62 (3d Cir. 1995). These requirements are "intertwined," *Harris v. Pernsley*, 820 F.2d 592, 596 & n.6 (3d Cir. 1987).

Department shall not oppose any municipality or citizen from intervening in that

NRD litigation as long as there is a court rule permitting permissive intervention.

N.J.A.C. 7:7A-22.19.[31]   Here, there is such a court rule, Fed. R. Civ. P. 24(b).  As

such, the court must permit Carneys Point to intervene.

      <u>Inadequate representation</u>.    The Attorney General and DEP are not

representing the interests of Carneys Point and other Political Subdivisions of the

State because they are not protecting the significant and protectible interests of the

Political Subdivisions as set forth below.

      <u>Significant and protectible interests</u>. Carneys Point has significant and

protectible interests in this matter that are not being protected by the Parties or the

proposed JCO.  They include the following:

      A.    <u>Escrow Agreement</u>.  The Attorney General and DEP fail to include

the Escrow Agreement (Exhibit B) as an attachment to the JCO, which is a material

element of the settlement intended to "govern" DEP's use of Settlement Damages

for the next 25 years.

---

[31] 7:7A-22.19 Public participation (a) To provide for public participation in the Department's enforcement process, the Department shall: 1. Investigate and provide responses to all citizen complaints submitted under Department procedures; 2. Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation; and 3. Publish notice of any proposed settlement of a Department enforcement action in the DEP Bulletin and provide at least 30 calendar days for public comment on the settlement.

B.    <u>NRD – Parlin Site</u>.    The JCO violates the NRD Constitutional Amendment because the allocation table (Exhibit A) does not allocate NRD settlement dollars specifically to the Parlin Site Litigation being settled as part of the JCO.

C.    <u>NRD – AFFF Sites</u>.  The JCO violates the 2017 NRD Constitutional Amendment because the allocation table (Exhibit A) does not allocate NRD dollars specifically to the four AFFF Litigation Sites being settled as part of the 3M JCO but instead allocates NRD dollars to the AFFF Sites as unallocated bulk payments.

D.    <u>NRD – Other 3M PFAS Sources</u>.  The JCO violates the 2017 NRD Constitutional Amendment because the allocation table (Exhibit A) does not allocate NRD dollars to the "other sources" of 3M contamination being settled as part of the 3M JCO but instead allocates NRD dollars to the other sources as unallocated bulk payments.

E.    <u>Enabling Legislation.</u>  The JCO violates separation of powers because the legislature has not enacted enabling legislation authorizing the DEP to appropriate the $170M in Abatement Payments and the $50M-$100M in Leadership Payments for DEP to use in its "sole discretion" for the 25-year payout period, and the 2026 Appropriations Act does not provide DEP with appropriation authority for the years 2027 to 2050.

F.    <u>Disenfranchising Political Subdivisions and private attorneys general.</u>
The JCO must be modified to exclude the Political Subdivisions of the State and
"private attorneys general" from certain broad definitions in the JCO because this
court cannot foreclose their rights under the ERA and other citizen suit statutes to
act when the DEP fails to act, fails to act sufficiently, or acts in bad faith.

G.    <u>Res Judicata – Fairness Hearing.</u>  The Attorney General and DEP are
seeking to have the 3M JCO deemed a final judgment with statewide res judicata
effect that will foreclose all statewide non-party Political Subdivisions and others
from challenging the fairness of the settlement.  This cannot be done without a
fairness hearing.

H.    <u>Tax Deduction Rule</u>.  The JCO violates the Tax Deduction Rule
because it does not dedicate and segregate Abatement Payments and Leadership
Payments solely for these purposes.  Instead, the funds can be used for any purpose
in DEP's sole discretion.

<u>Mandamus</u>.  The State Constitution recognizes the separation of powers
between the executive, legislative, and judicial branches of government.  However,
the courts still have the power to compel the executive branch and its departments
to perform their ministerial obligations.

The New Jersey Supreme Court in *Switz v. Middletown Tp.*, 23 N.J. 580,
588-89 (1957) described the difference between a ministerial act and discretionary

act as follows: A Writ of mandamus can be used "to compel the performance, in a specified manner, of ministerial duties so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of their performance." Id.

Here, Carneys Point seeks to have this court compel the Settling Plaintiffs to comply with their lawful and required ministerial functions that do not include discretion as set forth in the State Constitution and statutes referenced above in Sections A-H.

<u>CONCLUSION</u>

For the reasons set forth herein, Carneys Point respectfully requests that the court grant the Township's application for intervention to modify the 3M Judicial Consent Order as attached in the Petition for Mandamus.

MEYNER AND LANDIS LLP

By: /s/ *Albert I. Telsey*
Albert I. Telsey, Esq.
*Attorneys for Intervenor, Carneys Point Township*

November 21, 2025