**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs (Additional Counsel Listed Below)*

By:  Gwen Farley
     Deputy Attorney General
     Attorney ID No. 000081999
     Ph. (609) 376-2740
     Gwen.Farley@law.njoag.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, | Case No.: 2:19-cv-14758-RMB-JBC<br>1:19-cv-14765-RMB-JBC<br>1:19-cv-14766-RMB-JBC<br>3:19-cv-14767-RMB-JBC |
| Plaintiffs, | |
| v. | Hearing Date: January 7, 2026 |
| E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS), | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE JUDICIAL CONSENT ORDERS WITH SETTLING DEFENDANTS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ...............................................4

OVERVIEW OF THE SETTLEMENTS..............................................................16

      A.     The DuPont JCO .........................................................................18

      B.     The 3M JCO ...............................................................................23

      C.     The Department's Deployment of Settlement Funds.........................24

STANDARD OF REVIEW ...................................................................................27

ARGUMENT .......................................................................................................29

I.       THE SETTLEMENTS ARE PROCEDURALLY FAIR. ............................29

II.      THE SETTLEMENTS ARE SUBSTANTIVELY FAIR AND REASONABLE.........................................................................................33

           1.     The Settlements Are Substantively Fair and Reasonable as to the Four DuPont Industrial Sites. ...................................35

           2.     The Settlements Are Substantively Fair and Reasonable as to Statewide PFAS Claims..................................................37

III.    THE SETTLEMENTS ARE CONSISTENT WITH THE SPILL ACT'S OBJECTIVES ................................................................................51

      A.     Relief Obtained Against the DuPont Defendants as "Dischargers" Is Consistent with the Spill Act's Objectives ............52

      B.     Relief Obtained Against Settling Defendants as Persons "In Any Way Responsible" Further Promotes the Spill Act's Objectives...........................................................................................54

IV.    THE SETTLEMENTS ARE IN THE PUBLIC INTEREST .......................56

V.     THE PUBLIC COMMENTS RECEIVED DID NOT LEAD THE DEPARTMENT TO CONCLUDE THE SETTLEMENTS ARE NOT FAIR, REASONABLE, CONSISTENT WITH THE SPILL ACT'S OBJECTIVES, AND IN THE PUBLIC INTEREST ...................................57

CONCLUSION ....................................................................................................65

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982)................................................................................58

*In re Certified Question from U.S. Dist. Ct. for E. Dist. of Mich.*,
   638 N.W. 2d 409 (Mich. Sup. Ct. 2002)............................................64

*People ex rel. Devine v. Time Consumer Mktg., Inc.*,
   782 N.E. 2d 761 (Ill. App. Ct. 2002) ................................................64

*Georgia v. Tenn. Copper Co.*,
   206 U.S. 230 (1907)............................................................................58

*Howell Twp. v. Waste Disposal, Inc.*,
   504 A.2d 19 (N.J. Super. Ct. App. Div. 1986) ..............................5, 27

*Commonwealth ex rel. Krasner v. Att'y Gen.*,
   309 A.3d 265 (Pa. Commw. Ct. 2024) ..............................................65

*Missouri v. Illinois*,
   180 U.S. 208 (1901)............................................................................59

*N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*,
   183 A.3d 289 (N.J. Super. Ct. Law Div. 2015), *aff'd*, 181 A.3d 257
   (N.J. Super. Ct. App. Div. 2018) ...............................................*passim*

*N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*,
   923 A.2d 345 (N.J. Super. Ct. App. Div. 2007) ...................................5

*New Jersey v. New York*,
   345 U.S. 369 (1953)............................................................................58

*Petition of Pub. Serv. Coordinated Transp.*,
   74 A.2d 580 (N.J. Sup. Ct. 1950) ......................................................57

*State, Dep't of Env't Prot. v. Jersey Cent. Power & Light Co.*,
   308 A.2d 671 (N.J. Super. Ct. Law. Div. 1973)................................60

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990).............................................................*passim*

*United States v. Charles George Trucking, Inc.*,
34 F.3d 1081 (1st Cir. 1994)...............................................38, 45

*United States v. Davis*,
261 F.3d 1 (1st Cir. 2001)..............................................................28

*United States v. Kramer*,
19 F. Supp. 2d 273 (D.N.J. 1998)....................................28, 33, 39

*United States v. Rohm & Haas Co.*,
721 F. Supp. 666 (D.N.J. 1989).......................................28, 34, 56

*United States v. Se. Pa. Transp. Auth.*,
235 F.3d 817 (3d Cir. 2000) ..........................................................34

*United States v. Unimatic Mfg. Corp.*,
Civil No. 2:20-cv-17284, 2021 WL 1811651 (D.N.J. May 6, 2021) ................27

**Statutes**

N.J.S.A. 13:1D-9..............................................................................4

N.J.S.A. 58:10-23.11a...............................................................4, 60

N.J.S.A. 58:10-23.11f...................................................................60

N.J.S.A. 58:10-23.11g.c.(1)..........................................................51

N.J.S.A. 58:10-23.11i.....................................................................5

N.J.S.A. 58:10-23.11u...................................................................60

N.J.S.A. 58:10-23.34......................................................................5

N.J.S.A. 58:10A-5...........................................................................5

N.J.S.A. 58:12A-2..........................................................................43

N.J.S.A. 58:12A-9............................................................................5

N.J.S.A. 58:12A-9a........................................................................61

## PRELIMINARY STATEMENT

This memorandum of law supports the motion for approval ("Motion") of two landmark settlements that resolve some of the most significant environmental litigation in New Jersey's history. On May 12 and August 4, 2025, Plaintiffs New Jersey Department of Environmental Protection ("Department"), its Commissioner, and the Administrator of the New Jersey Spill Compensation Fund (collectively, "Plaintiffs" or "State") entered into Judicial Consent Orders ("JCOs" or "Settlements") with 3M Company ("3M") and the DuPont Defendants[1] (collectively, "Settling Defendants"), respectively, to resolve claims concerning per- and polyfluoroalkyl substances ("PFAS") and other harmful contaminants.

The Settlements provide up to approximately $*2.5 billion* in value to the State. They resolve the State's lawsuits, brought in its *parens patriae*, natural resource trustee, and regulatory capacities, regarding contamination at and from four DuPont industrial sites as well as PFAS contamination statewide. These landmark Settlements will provide significant protection for New Jersey's natural resources and the health and safety of its residents for generations.

---

[1] DuPont Settling Defendants are: EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP"), Corteva, Inc. ("Corteva"), DuPont de Nemours Inc. ("New DuPont"), DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), The Chemours Company ("Chemours") and The Chemours Company FC, LLC ("Chemours FC").

The Court's role in reviewing the Settlements under the Spill Compensation and Control Act ("Spill Act") is to ensure they are fair, reasonable, faithful to the objectives of the Spill Act, and in the public interest. *See N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*, 183 A.3d 289, 304 (N.J. Super. Ct. Law Div. 2015), *aff'd*, 181 A.3d 257 (N.J. Super. Ct. App. Div. 2018). The Settlements amply satisfy this standard, and the State respectfully requests that this Court approve them.

The hard-fought and years-long adversarial litigation preceding these Settlements, alongside years of negotiation supervised and guided by a Court-appointed mediator, is powerful evidence of their fairness. The Settlements follow more than six years of litigation, including the production of over 1.4 million documents totaling over 14.6 million pages; completion of over 100 depositions; over 60 expert reports; numerous rounds of motions practice and extensive legal briefing on array of environmental statutes and common law theories; numerous pre-trial hearings and trial preparation; and, with respect to the DuPont Defendants, several weeks of trial featuring testimony from 28 fact and expert witnesses.

Moreover, over the course of several years, the Parties engaged in arms-length and contentious settlement negotiations overseen by a mediator, a former U.S. Magistrate Judge, involving difficult legal, technical, and financial issues. On top of all that, the Department solicited comments on the Settlements from the public, carefully reviewed all comments it received, met with many commenters to better

understand their perspectives about the Settlements, and published a thorough response to comments before seeking this Court's approval.

The Settlements forged through this intensive process are substantively fair, reasonable, and in the public interest. In furtherance of its responsibilities to the people and the communities it serves, the State has secured relief of historic magnitude from Settling Defendants that holds them accountable for their pollution and will meaningfully improve and protect public health and the environment. As to the cleanup of industrial sites, this resolution holds the DuPont Defendants responsible for finally and fully remediating contamination at and from the Chambers Works, Pompton Lakes Works, Parlin, and Repauno Works sites, and requires that they set aside up to $1.68 billion to ensure this remediation is completed and that its costs do not fall to the State or its taxpayers.

The State's monetary recoveries are equally historic. Up to $365 million in natural resource damages will compensate the public for injuries to their resources, which the Department will make available to support a wide variety of natural resource restoration projects. Up to $795 million in abatement funding will address PFAS and other contamination that impacts environmental media and infrastructure, supplementing and enhancing the financial support that the Department already makes available to the State's political subdivisions, homeowners, and others who need assistance addressing such pollution. While no single settlement or defendant

could possibly pay for the tremendous cost of removing all PFAS contamination from New Jersey, these Settlements represent an essential step toward that objective by guaranteeing cleanup at industrial sources and providing another critical funding source that will force-multiply existing State actions to abate contamination for the long-term protection of its people and their natural resources.

## BACKGROUND AND PROCEDURAL HISTORY

*The Department Improves and Protects New Jersey's Environment and Public Health.* The New Jersey Legislature charged the Department with the "conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State." N.J.S.A. 13:1D-9. The Department is responsible for addressing these objectives on a statewide basis, including by acting as the trustee, for the benefit of all of the State's residents, of all natural resources within the State's jurisdiction, N.J.S.A. 58:10-23.11a, and by "supervis[ing] Statewide, regional and local programs of conservation and environmental protection." N.J.S.A. 13:1D-9(f).

The Department is also specifically charged with "[e]nforc[ing] the State air pollution, water pollution, conservation, [and] environmental protection" laws, and when necessary, is empowered to institute legal proceedings based on violations of those laws and more generally "for the prevention of pollution of the environment and abatement of nuisances in connection therewith." N.J.S.A. 13:1D-9(e), (n). It is

well settled that the Department has primary authority to enforce, litigate, and resolve claims under New Jersey's environmental laws. *See*, *e.g.*, *Howell Twp. v. Waste Disposal*, Inc., 504 A.2d 19, 26-27 (N.J. Super. Ct. App. Div. 1986).

The Department, in furtherance of its charge to protect the environment and address pollution statewide, also serves as "keeper of the public purse" in "deploying public funds to restore the environment and abate damages" across the State. *See N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*, 923 A.2d 345, 352 (N.J. Super. Ct. App. Div. 2007). The Department oversees numerous funds through which it provides critical relief to the State's political subdivisions, residents, and others, including to clean up contaminated sites and protect water resources. *See*, *e.g.*, N.J.S.A. 58:10-23.34 (Hazardous Discharge Site Cleanup Fund), N.J.S.A. 58:10-23.11i (Spill Compensation Fund), N.J.S.A. 58:12A-9 (Drinking Water State Revolving Fund, "DWSRF")), N.J.S.A. 58:10A-5 (Clean Water State Revolving Fund ("CWSRF")).

***The Department Is A National Leader In Addressing PFAS.*** The Department has undertaken unparalleled efforts to dedicate resources and expertise to investigating, studying, and regulating PFAS for the protection of New Jersey's residents and environment. For example, between 2006 and 2009, the Department conducted the country's first statewide study of the occurrence of PFAS in drinking

water supplies.[2] The Department has since conducted and overseen numerous statewide occurrence studies of environmental media and biological receptors, including surface waters, groundwater, sediment, soils, vegetation, and fish tissue.[3]

The Department also spearheaded the development of drinking water and other environmental standards for PFAS. In 2007, the Department published a nation-leading guidance level for perfluorooctanoic acid ("PFOA") in drinking water, which was the most protective guidance for PFOA at that time.[4] The Department thereafter became the first regulator in the country—state or federal—to establish a formal drinking water standard, a maximum contaminant level ("MCL"), for any PFAS chemical, which took years of intensive research and regulatory effort. The Department's MCL for perfluorononanoic acid ("PFNA") was finalized in 2018, followed by MCLs for PFOA and perfluorooctane sulfonic acid

---

[2] N.J. Dep't Envtl. Prot., *Determination of Perfluorooctanoic Acid (PFOA) in Aqueous Samples* (Jan. 2007), https://dspace.njstatelib.org/server/api/core/bitstreams/c898e90d-eff3-40aa-95b7-deb6f65a3363/content; N.J. Dep't Envtl. Prot., *Occurrence of Perfluorinated Chemicals in Untreated New Jersey Drinking Water Sources* (April 2014), https://www.nj.gov/dep/watersupply/pdf/pfc-study.pdf.

[3] *See, e.g.,* Sandra M. Goodrow et al., *Investigation of levels of perfluoroalkyl substances in surface water, sediment, and fish tissue in New Jersey, USA*, ELSEVIER (Aug. 10, 2020), https://www.sciencedirect.com/science/article/abs/pii/S0048969720323561?via%3Dihub; Jennifer Willemsen et al., *Per- and Polyfluoroalkyl Substances in New Jersey Soils: A Statewide Investigation* (Sept. 2025), https://dep.nj.gov/wp-content/uploads/srp/pfas_soil_survey_report.pdf.

[4] *Guidance for PFOA in drinking water at Pennsgrove Water Supply Company* (Feb. 13, 2007), http://www.nj.gov/dep/watersupply/pdf/pfoa_dwguidance.pdf.

("PFOS") in 2020. 50 N.J. Reg. 1939(a) (Sept. 4, 2018), 54 N.J. Reg. 1165(b) (June

1, 2020). The Department also designated PFNA, PFOA, and PFOS as "hazardous

substances" under the Spill Act, and established groundwater and soil standards for

these and other PFAS. *See* 50 N.J. Reg. 334(a) (Jan. 16, 2018), 52 N.J. Reg. 1165(b)

(June 1, 2020). Notably, the Department's MCLs for PFOA and PFOS were finalized

four years before the U.S. EPA first established federal MCLs for these PFAS. As a

result of these and other efforts, New Jersey is a leader in addressing the threat of

PFAS contamination, including through executing a statewide PFAS strategy.[5]

The Department has already provided abundant technical and financial

assistance to water systems throughout the State, including systems serving tens of

thousands of consumers, elementary schools, and childcare facilities; investigated

sources of PFAS around the State; and is currently engaged in projects that include

collecting unused stockpiles of PFAS-containing aqueous film-forming foam

("AFFF") from public fire departments for safe disposal. To date, the New Jersey

Water Bank—a partnership between the Department and the New Jersey

Infrastructure Bank—has allocated over $237 million in low-cost loans and

dispersed $138 million through the DWSRF to support infrastructure upgrades to

address PFAS. To reduce contaminated private well owners' exposure to PFAS,

---

[5] The Department's statewide PFAS Strategy, which summarizes the State's response
to PFAS as of 2025 and sets a course for further action, is available at:
https://dep.nj.gov/pfas/strategy/.

through the Spill Compensation Fund, the Department has also authorized compensation for the installation of over 1,500 PFAS treatment systems and ongoing maintenance and monitoring services for eligible well owners. (Declaration of David M. Reap, dated November 21, 2025 ("Reap Decl."), ¶ 5.)

 ***The Department Takes Legal Action Against Defendants.*** A key component of the Department's strategy to address PFAS has been to bring legal and enforcement actions against responsible parties, including the administrative actions and lawsuits that led to these Settlements. As part of that strategy, the Department in 2019 instituted a litigation campaign focused on the Defendants. As an initial action, on March 25, 2019, the Department issued a groundbreaking Statewide PFAS Directive pursuant to the Spill Act addressed to the DuPont Defendants, 3M, and other respondents seeking to hold them responsible for PFAS contamination in New Jersey. (Reap. Decl. ¶ 7, Ex. A.) The Directive required the DuPont Defendants and 3M to, among other things, participate in a process with the Department through which costs to investigate and clean up PFAS contamination across New Jersey, including in drinking water supplies and natural resources, would be estimated, and provide the necessary funding toward such costs. In response, Defendants asserted numerous defenses and indicated they would not comply with the most critical requirements of the Directive. (*Id.*)

Then, on March 26 and March 27, 2019, the State, in its *parens patriae*, trustee, and regulatory capacities, filed civil actions concerning the Chambers Works, Pompton Lakes Works, Parlin, and Repauno Works Sites in New Jersey Superior Court, in Salem County, Passaic County, Middlesex County, and Gloucester County, respectively ("Industrial Sites Cases"). (*Id.* ¶ 8.) As filed and thereafter amended, the complaints in each of the Industrial Sites Cases are expansive in scope, collectively seeking injunctive relief and damages for discharges over decades that caused a wide variety of contamination across the State, including from PFAS. On July 5, 2019, the DuPont Defendants removed each of the cases to the U.S. District Court for New Jersey under 28 U.S.C. § 1442(a)(1). (*Id.*)

Shortly thereafter, on May 4, 2019, the State, in its *parens patriae*, trustee, and regulatory capacities, brought another lawsuit against the Settling Defendants, as well as other manufacturers of PFAS-containing AFFF in Mercer County Superior Court ("NJ Statewide AFFF Case"). (*Id.* ¶ 9.) The NJ Statewide AFFF Case sought relief related to PFAS contamination across New Jersey caused by the manufacture and sale of AFFF products, including at and around sites where AFFF was used throughout New Jersey. The NJ Statewide AFFF Case was also removed to the U.S. District Court of New Jersey and thereafter transferred to the multidistrict litigation

9

*In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.) ("AFFF MDL").[6] (*Id.*)

**The State Prosecutes The Industrial Sites Cases.** In June 2020, the Industrial Sites Cases were consolidated for pretrial purposes before U.S. District Judge John Michael Vazquez. D.E. 40.[7] In the fall of 2020, the parties initiated voluminous discovery—including, across the four cases, over 500 requests for production and over 100 interrogatories—in parallel with briefing on a series of motions to dismiss filed by the Defendants. (Reap Decl. ¶ 12.) Those motions sought to dismiss, among other things, the State's groundwater natural resource damages claims against the DuPont Defendants, and the State's claims against 3M entirely. 2:19-cv-14758, D.E. 88-90; 3:19-cv-14767, D.E. 93. Following intensive briefing, Judge Vazquez denied the motions in December 2021. 2:19-cv-14758, D.E. 180, 196; D.E. 156.

---

[6] Beyond these Defendants and matters, the State has initiated additional significant litigation focused on PFAS. The State in November 2020 brought a lawsuit against Solvay Specialty Polymers USA, LLC, which was also a respondent of the Statewide PFAS Directive, for PFNA and other PFAS discharged from its West Deptford manufacturing plant, as well as Arkema Inc., the prior owner of the plant. *NJDEP, et al. v. Solvay Specialty Polymers USA, LLC, et al.*, GLO-L-1239-20. The State also sued the United States in January 2021, related to its failure to address PFAS contamination released from federal facilities around New Jersey, including but not limited to Joint Base McGuire-Dix-Lakehurst in Burlington and Ocean Counties, Naval Weapons Station Earle in Monmouth County, and the Naval Warfare Center in Trenton, which has also been consolidated with the AFFF MDL. *New Jersey v. U.S.*, 2:21-cv-146 (D.S.C.). (Reap Decl. ¶¶ 10-11.)

[7] Unless otherwise indicated, docket cites are to 1:19-cv-14766.

In January 2022, the State filed a motion for a preliminary injunction to require EIDP and Chemours to establish a remediation funding source ("RFS") for the Chambers Works Site pursuant to the Industrial Site Recovery Act ("ISRA"). 2:19-cv-14758, D.E. 207. Resolution of the motion required extensive expert testimony, and the parties engaged in seventeen days of expert depositions during the summer and fall of 2022. In early 2023, the parties began filing further briefing in preparation for a hearing on the injunction. (Reap Decl. ¶ 13.)

On March 27, 2023, the Court ordered the parties to mediation with U.S. Magistrate Judge Joel Schneider (Ret.) and stayed all other proceedings. 1:19-cv-14758, D.E. 351. With the mediator's approval, the parties' negotiations encompassed claims against the Settling Defendants at the Industrial Sites as well as those set forth in the Statewide Directive and the NJ Statewide AFFF Case, and for remaining PFAS liability statewide to the maximum extent the State could resolve. (Reap Decl. ¶ 14.)

Factoring heavily into the negotiations were substantial settlements that 3M and the DuPont Defendants reached through the AFFF MDL with nationwide classes of water providers that were announced in 2023. (*Id*. ¶ 15.) Those settlements were reached on the eve of the first water provider bellwether trial in the AFFF MDL. In June 2023, 3M announced a class action settlement that would provide up to $12.5

billion in funding to treat PFAS in drinking water[8] and the DuPont Defendants announced a similar settlement amounting to approximately $1.2 billion.[9] Those settlements represented significant financial commitments to the nation's, including New Jersey's, water providers in exchange for their release of drinking water claims, but at the same time placed strain on the finances of Defendants.

After the State prepared and issued demands to the Settling Defendants, the Parties participated in numerous meetings and information exchanges over the course of nearly a year. Negotiations stalled with the DuPont Defendants, however, due to deep differences between the Parties. (Reap Decl. ¶ 16.) The State thus informed the Court that it was at an impasse with the DuPont Defendants. 1:19-cv-14765, D.E. 245.

As a result of the impasse, on April 3, 2024, the Court issued an order putting the Chambers Works Site case on an accelerated track, directing that the case proceed to trial within roughly one year. 2:19-cv-14758, D.E. 371. The Court appointed a Special Master—Judge Schneider—to oversee an intensely accelerated discovery schedule. 2:19-cv-14758, D.E. 376. Under the guidance of Judge Schneider, the

---

[8] 3M, "3M Resolves Claims by Public Water Suppliers," https://news.3m.com/2023-06-22-3M-Resolves-Claims-by-Public-Water-Suppliers,-Supports-Drinking-Water-Solutions-for-Vast-Majority-of-Americans (Jun. 22, 2023).

[9] DuPont, "Chemours, DuPont and Corteva Reach Comprehensive PFAS Settlements with U.S. Water Systems," https://www.dupont.com/news/chemours-dupont-and-corteva-reach-comprehensive-pfas-settlement-with-us-water-systems.html (Jun. 2, 2023).

parties briefed and argued numerous discovery disputes, produced over a million documents, and took over 100 fact and expert depositions in the span of 11 months. (Reap Decl. ¶ 17.) The parties also briefed a motion to intervene by the Township of Carneys Point, which the Special Master denied. D.E. 396.

Finally, after more than 40 pre-trial conferences with Special Master Schneider and two full-day pre-trial hearings before this Court, the parties were scheduled for trial beginning May 19, 2025. (Reap Decl. ¶ 18.)

***The State Reaches Settlements On The Eve Of And During Trial.*** Just days before trial, on May 12, 2025, the State and 3M finalized their Settlement, which was the culmination of over two years of negotiations to finish a complex, nearly 100-page agreement. (Reap Decl. ¶ 19.) The State pressed forward, however, on its claims against the DuPont Defendants. On May 19, 2025, the first of a series of bench trials began, focused on the State's claims under the Spill Act and Brownfield Act against EIDP. That first trial ended with EIDP and Chemours entering into a stipulation delineating the scope of their liability at the Site. D.E. 659. The Court then moved to the next trial on EIDP's affirmative defense based on the 2005 Compensatory Restoration Administrative Consent Order ("CRACO"), which was rejected. Trial Tr., 1812:09-1812:25.

The third and fourth trials concerned the State's claims under the Water Pollution Control Act and the DuPont Defendants' government contractor defense,

respectively. D.E. 682, 686. By mid-June 2025, the Parties had engaged in 12 trial days that included testimony from 28 live witnesses and the admission of over 150 trial exhibits. The fifth bench trial was scheduled to begin after a hiatus of several weeks, during which time the Parties conducted post-trial briefing and prepared for the next trial. (Reap Decl. ¶ 20.)

During this time, the State and the DuPont Defendants also renewed settlement discussions, with the benefit of key rulings. Those negotiations included multiple days of in-person negotiations at the courthouse and the mediator's offices on a host of complex issues. After numerous days of negotiations, the Parties reached a settlement in principle on July 1, 2025. The Court thereafter postponed trial but kept in place existing pre-trial and post-trial submission deadlines, D.E. 709, while the parties set to the task of drafting a JCO to fully detail the terms of settlement. On August 4, 2025, the JCO was finalized. D.E. 724. (Reap Decl. ¶¶ 21-22.)

***The Department Provides Public Notice Of The Settlements, And Carefully Reviews, Considers, And Responds To The Public's Comments***. The State publicly announced the Settlements shortly after each of them were reached, with a press release for each[10] that included the relevant proposed JCO. The Department further

---

[10] *See* Press Release, dated May 13, 2025 (https://www.njoag.gov/ag-platkin-and-dep-commissioner-latourette-announce-historic-settlement-of-up-to-450-million-with-3m-for-statewide-pfas-contamination/); Press Release, dated August 4, 2025 (https://www.njoag.gov/ag-platkin-dep-commissioner-latourette-landmark-settlement-with-dupont-valued-at-over-2-billion/).

published dedicated websites[11] for the Settlements that included the press release, frequently asked questions, PFAS information, the JCO, and, later, the Scheduling Order for briefing on this Motion. (Reap Decl. ¶ 23.)

Consistent with the Spill Act, the Department also published notice of the Settlements in the *New Jersey Register*, which announced that the Department sought public comments on the Settlements for a period of 60 days. Notices of the 3M JCO and the DuPont JCO were published in the *Register* on July 21, 2025, and September 2, 2025, respectively. 57 N.J.R. 1624(a); 57 N.J.R. 2017(a). The same day the notices were published in the *Register*, copies of the notices were also posted to the Department's dedicated website, emailed to each of the Department's political subdivision contacts, and sent to numerous other potentially interested parties in accordance with the notice provisions set out in the Settlements. Also as required under the Settlements, the Settling Defendants arranged for notices to be published in print and electronic versions of widely-circulated New Jersey newspapers. The Department provided updates to the Court on the comment process. D.E. 732, 735. The comment period for the Proposed 3M and DuPont JCOs closed on September 19, 2025, and November 1, 2025, respectively. (Reap Decl. ¶ 24.)

The Department received 56 comments on the 3M JCO and 64 comments on the DuPont JCO, including from political subdivisions, associations, non-

---

[11] *See* https://dep.nj.gov/3m/; https://dep.nj.gov/dupont/.

governmental organizations, law firms, individuals, and others.[12] The comments raised a variety of topics related to the Settlements, and each was carefully reviewed and considered by the Department. The State's counsel and the Department also met with many commenters to better understand their perspectives about the Settlements. The Department thereafter dedicated itself to preparing comprehensive responses to all comments received. The Department's responses to comments are provided with this Motion will also be posted on the Department's dedicated websites. (Reap Decl. ¶¶ 25-27, Exs. B & C.)

## OVERVIEW OF THE SETTLEMENTS[13]

Through the Settlements, the State[14] will obtain exceptional monetary consideration and remediation commitments. The Settlements collectively include up to $1.325 billion in monetary payments, including up to $795 million for abatement funding; $365 million for natural resource damages; and $165 million for costs, attorneys' fees, punitive damages, and penalties.

---

[12] Although a number of comments were submitted after the deadlines, the Department nevertheless accepted them for consideration.

[13] The State provides this summary for the Court's convenience; the terms of the Settlements are fully set forth in the JCOs, which are attached as Exhibits D and E to the Reap Declaration.

[14] Upon approval of the Settlements, as required by their terms, the New Jersey Attorney General and the Acting Director of the New Jersey Division of Consumer Affairs are to be added as plaintiffs for purposes of the JCOs.

Proceeds from these payments will be deployed in communities across the entire State to fund projects to, among other things, ensure New Jersey has safe and reliable water available for current and future needs, as well as to repair, restore, and replace injured natural resources. A crucial feature of the Settlements is the dedicated abatement funding, which will supplement and enhance the Department's ability to provide financial assistance through existing programs that support its political subdivisions, homeowners, and others in addressing PFAS and other contaminants, including through investments in drinking water and wastewater infrastructure improvements. By administering abatement funds on a statewide basis, the Department will ensure significant and critically necessary financial resources are available to the State's political subdivisions and others without the need for them to meet the difficult demands, challenges, and levels of proof that would otherwise be required in the course of litigation against the Defendants, including PFAS source attribution, causation, and expert work and associated costs.

The natural resource damages recovery will be used by the Department to repair, restore, or replace damaged or lost natural resources, and/or permanently protect the natural resources of the State, for the benefit of all of its residents, consistent with the New Jersey Constitution, Article VIII, § 2, ¶ 9. Pursuant to Departmental policy, the Department will seek public input on restoration projects

17

and will communicate with impacted communities during the identification, planning, and implementation of restoration projects.

Importantly, the Settlements also include crucial remediation commitments, including requirements that the DuPont Defendants fully and finally remediate the Chambers Works, Pompton Lakes Works, Parlin, and Repauno Works Sites and establish and maintain RFSs and a Reserve Fund of up to $1.675 billion to ensure that the costs of cleaning up those Sites will not be borne by the State and its taxpayers.

In exchange for the Settling Defendants' unprecedented monetary payments and remediation commitments, the State is providing them with broad releases and covenants not to sue, as well as protection from contribution claims.

## A.    __The DuPont JCO__

***Settlement Payments.*** The DuPont Settling Defendants have agreed to pay the State $875 million in accordance with a payment schedule. DuPont JCO, ¶ 7; Ex. A.[15] The payment is allocated as follows: $225 million for natural resource damages, including $100 million related to the Chambers Works Site, $75 million related to the Pompton Lakes Works Site, $30 million related to the Parlin Site, and $20 million

---

[15] Any of the DuPont Defendants may pre-pay their share of settlement payments, resulting in expedited payment to the State. A pre-payment is subject to a net present value calculation using an 8% annual discount rate.

related to the Repauno Works Site; $525 million in abatement funding; and $125 million for costs, attorneys' fees, punitive damages and penalties. DuPont JCO, ¶ 7c.

*Remediation Funding Sources*. The Settlement further accomplishes a priority objective of the State's litigation: ensuring there are adequate RFSs for each of the Industrial Sites. DuPont JCO, § VI. The purpose of an RFS is to ensure that funds are available to complete the remediation of a contaminated site if the person required to conduct the remediation fails to do so, such that the State and its taxpayers are not saddled with the cleanup costs.[16] At the time the Settlement was reached, there was still *no* RFS in place for Chambers Works, and long-running disputes continued to impact the value of the RFSs in place at the remaining Industrial Sites, leaving the State and its residents exposed to significant potential future remediation costs. The State's concerns were exacerbated by growing worries regarding the financial condition of the parties currently remediating the Sites. The Settlement requires RFSs for each of the Industrial Sites in values that may collectively add up to approximately $1.2 billion, avoiding years of litigation to ensure adequate RFSs are put in place today.

---

[16] *See, e.g., Remediation Funding Source ("RFS")*, N.J. Dep't of Envtl. Prot., https://www.nj.gov/dep/srp/rfs/ (last updated Feb. 13, 2020).

Pursuant to the Year One RFS Process created under the Settlement, the Department and the DuPont Defendants are participating[17] in technical meetings to arrive at acceptable remediation cost estimates to inform the value of the Year One RFSs. Any remediation scope or cost issues that cannot be resolved will be submitted for determination by a panel of neutral Licensed Site Remediation Professionals ("LSRP Panel").[18] DuPont JCO, ¶ 16. Importantly, the Settlement requires that the Panel's determinations be made quickly, by requiring the Parties to submit disputes to the Panel on an accelerated schedule, with those disputes to be resolved promptly.

After the Year One RFSs are established, going forward the RFSs will be subject to annual cost reviews in accordance with applicable State law, regulations, and guidance, and may be adjusted based on those reviews—including increases if remediation costs prove to be higher than anticipated. DuPont JCO, ¶¶ 17a, 18.

***Reserve Fund.*** The Settlement further requires New DuPont and Corteva to establish a Reserve Fund, such that the resources of these Defendants may also be easily accessed to support cleanup activities, for the Department's benefit in the amount of $475 million. DuPont JCO, § VII. The Reserve Fund provides another

---

[17] Pursuant to the Parties' agreement, the Year One RFS Process is already underway, to ensure that it could be completed in a timely manner if the Settlement is approved.
[18] The LSRP Panel was established through the following process. First, on October 2, 2025, the Parties each appointed one LSRP to serve on the LSRP Panel. The Department appointed Kathleen Stetser, P.G., LSRP, and the DuPont Defendants appointed John M. Brennan, LSRP. Ms. Stetser and Mr. Brennan then recommended the appointment Jonathan Perse, P.G., LSRP, to which the Parties agreed.

layer of protection, on top of the RFSs, to ensure that funds remain available for the cleanup of the Industrial Sites. The Department may access the Reserve Fund in the event any DuPont Defendant primarily responsible for remediation at a specific Site fail to perform the remediation and the RFS funds are not available. DuPont JCO, ¶ 21. The Reserve Fund may also be adjusted annually and will remain in place until remediation at each of the Sites is complete. DuPont JCO, ¶ 20e-f.

*EIDP's Remaining Obligation To Perform The Remediation.* The Settlement leaves no doubt that the remediation of the Sites must be completed. DuPont JCO, § VIII. As a final layer of protection, the DuPont JCO requires EIDP to step into the shoes of a responsible entity that fails to perform remediation and complete remediation at each of the Sites. DuPont JCO, ¶ 32. This is true even if the RFSs and/or the Reserve Fund have been exhausted. DuPont JCO, ¶ 34.

*CRACO.* The Settlement also resolves outstanding disputes related to the CRACO, which the Court and the Parties recognized was a necessary component of achieving a resolution. Most critically, the Settlement creates an updated process for conservation easements and conveyances to be completed for the remaining parcels. DuPont JCO, § X. This process will secure the preservation of almost 1,400 acres of land, and transfer to the State approximately 73 acres of land near Ramapo Mountain State Forest.

*Release, Covenant Not to Sue, And Contribution Protection.* The State has agreed to provide broad releases and covenants not to sue for the State's claims specific to the Sites, as well as for the State's claims to protect the public from the harms of PFAS statewide. DuPont JCO, § XI. The State is providing the releases in its capacities as *parens patriae*, trustee, and regulator, and thus the releases extend, to the maximum extent provided by law, to the State, its political subdivisions, and persons seeking relief on behalf of the public. DuPont JCO, ¶ 49-50. At the same time, the release explicitly preserves individualized types of private claims such as for personal injury, which are referred to as Purely Private PFAS Claims. The Settlement serves as a bar to any released claims. *Id.*

In the event the DuPont Defendants are required in the future to resolve a PFAS-related claim that the Parties intended to be subject to the releases, the DuPont Defendants have the opportunity to receive a limited credit against their Settlement Payment, provided they follow certain procedures. The DuPont Defendants may receive a credit for 50% of any such judgment, award, or settlement that resolves such a claim, known as a Credit-Eligible Claim, up to an aggregated cap of $16.5 million across all Credit-Eligible Claims. After that point, the DuPont Defendants are fully responsible for payment of any such claims.

Additionally, the Settlement, once approved, will constitute a judicially approved settlement under the Spill Act and the Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA," 42 U.S.C. §§ 9601 *et seq.*), providing protection to the DuPont Defendants from contribution claims for matters addressed in the Settlement. DuPont JCO, § XIII.

### B.    The 3M JCO[19]

***Settlement Payment.*** 3M has agreed to pay the State a total of up to $400 to $450 million,[20] in accordance with a payment schedule. 3M JCO § VI, Ex. A. The Settlement Payment includes $140 million for natural resource damages, including $105 million related to PFAS from the Chambers Works Site and $35 million related to PFAS from other sources, including AFFF; $170 million for PFAS contamination abatement funding; and $40 million for costs, attorneys' fees, punitive damages, and penalties. 3M JCO, ¶ 44c. The Settlement Payment also includes an additional $50 to $100 million, which 3M has designated as the New Jersey Leadership Payment[21] to further supplement PFAS abatement funding. 3M JCO, ¶ 44e.

---

[19] The 3M JCO was revised before the State made this Motion. Revisions include typographical error fixes and clarifications. (*See* Reap. Decl. ¶ 30, Ex. F Redline Comparison).

[20] The Settlement also contemplates a scenario where 3M will pay the State a total of up to $500 million, in the event 3M enters into a multi-state settlement in the future that uses a calculation that would have awarded the State more than it received under this Settlement. 3M JCO, ¶ 114a.

[21] The final amount of the New Jersey Leadership Payment is dependent upon the total amount that 3M is required to pay pursuant to its nationwide public water system class action settlement. The 3M JCO requires 3M to re-direct certain amounts not ultimately required to be paid to the public water system class pursuant to the terms of that agreement, to be added to the New Jersey Leadership Payment.

***Additional Obligations.*** While 3M does not own, operate, or manage any sites in the State, 3M has agreed to complete PFAS investigations and satisfy any PFAS remediation obligations at three former 3M sites in New Jersey. 3M JCO, ¶ 48.

***Release, Covenant Not To Sue, And Contribution Protection.*** 3M will receive broad releases and covenants not to sue regarding PFAS-related claims, and released claims will be barred. 3M JCO, § VIII.  3M has the opportunity to receive credits against its payments to be made in years 10 to 25 of the schedule, up to a total of $125 million.  3M JCO, ¶ 45. And 3M is provided protection from contribution for matters addressed under the Settlement.  3M JCO, § X.

### C.     The Department's Deployment of Settlement Funds

***Natural Resource Damage Restoration Projects.*** The $365 million in natural resource damages recoveries will enable the Department, through its Office of Natural Resource Restoration ("ONRR"), to pursue restoration projects to repair, restore, and replace injured natural resources consistent with the New Jersey Constitution, Article VIII, Section 2, Paragraph 9. The Department through its natural resource restoration program has restored, conserved, enhanced, and protected thousands of acres of wetlands, fish and wildlife habitat, water resources, including groundwater aquifer recharge areas, and public open space. *See* ONRR, "Completed          Restoration          Projects,"          *available          at* https://dep.nj.gov/nrr/restoration/completed-restoration-projects/.          The          natural

24

resource damages recovered through the Settlements will be used for restoration projects identified, planned, and implemented in consultation with impacted communities and the Department's 10-member Natural Resource Restoration Advisory Council, consistent with Department policy. *See*, *e.g.*, Commissioner Administrative Order 2023-08 at ¶¶ 7-13 (March 2023), *available at* https://dep.nj.gov/wp-content/uploads/dep-ao-2023-08-natural-resource-restoration-policy.pdf.

***Statewide Abatement***. The Department will prioritize the up to $795 million in abatement funds to provide consistent year-over-year support for water infrastructure improvements throughout the State necessary to reduce the occurrence of PFAS in the water cycle. The Department will provide this support by expanding upon its existing contamination response and environmental infrastructure programs. The Department will enhance water infrastructure funding programs available through the New Jersey Water Bank—a partnership between the Department and the New Jersey Infrastructure Bank that has supported $11.5 billion in infrastructure projects over more than 30 years that have helped to protect, maintain and improve water quality and ensure safe drinking water.[22] The Water

---

[22] The Water Bank's no-interest, low-interest, and principally forgiven loans have together saved ratepayers and taxpayers *3.3 billion* on long-term financing costs. *See* New Jersey Infrastructure Bank, "New Jersey Water Bank," https://www.njib.gov/njeit.

Bank has a well-established and highly accessible process for soliciting water infrastructure investment needs from municipalities, counties, regional authorities, and water purveyors across the State. Each year, the Water Bank constructs funding packages through an open and collaborative dialogue with program users based on their identified needs, and funds projects based on a transparent, public-facing prioritization system and their readiness to proceed. *See* DEP, "Water Infrastructure Investment Plan," https://dep.nj.gov/wiip/. The Department will also use other existing financial assistance mechanisms available through the Hazardous Discharge Site Remediation Fund and the Spill Fund to fund the investigation and cleanup of PFAS and other contaminants with Settlement abatement funds.

The Department is committed to integrating abatement funds into the Water Bank, effectively leveraging them to provide consistent year-over-year support for water infrastructure improvements—rather than simply drawing them down—an approach that will substantially increase their efficacy to reach the maximum amount of water infrastructure project value possible. Utilizing this successful statewide program to allocate abatements funds will enable the Department to make the best use of the funds by expanding their reach and impact. By way of example, based on analyses performed by the Water Bank, $390 million in additional funding could enable the Water Bank to facilitate $1.8 to $2.1 billion in new water infrastructure projects across the State.

By expanding and enhancing already successful statewide programs, the Department will make the best use of the abatement funds by expanding their reach and impact to reduce the occurrence of PFAS and other contaminants in the State's water cycle and prevent further pollution through well-developed processes with built-in transparency.

## STANDARD OF REVIEW

The decision to settle an environmental matter for the benefit of the public is at the core of the Department's mission and consistent with its authority under New Jersey's environmental laws. The State, acting through the Department, "determine[s] the primary course of action to be taken against persons who damage or threaten the environment." *Howell Twp. v. Waste Disposal, Inc.*, 504 A.2d at 26-27. (N.J. Super. Ct. App. Div. 1986). To do so, the Department must be able "to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly." *Id.* at 27. As "a government actor committed to the protection of the public," the Department is "afforded deference for its decision to enter into settlements negotiated on behalf of the public interest." *United States v. Unimatic Mfg. Corp.*, Civil No. 2:20-cv-17284, 2021 WL 1811651, at *2 (D.N.J. May 6, 2021).

Under New Jersey law, which generally parallels federal-law principles concerning CERCLA settlements, a court reviewing a settlement under the Spill Act

must ensure that it is (i) fair, (ii) reasonable, (iii) faithful to the objectives of the statute, and (iv) in the public interest. *Exxon*, 183 A.3d at 304; *see United States v. Kramer*, 19 F. Supp. 2d 273, 280 (D.N.J. 1998). This standard of review balances the strong public policy favoring settlements with protection of parties and the public. *Exxon*, 183 A.3d at 307 (citations omitted). Fairness has a procedural and a substantive component; the latter is informed by the former. When the settlement "process [is] fair and full of adversarial vigor," such as it is here, "the results come before the court with a much greater assurance of substantive fairness." *Exxon*, 183 A.3d at 312. A court's "finding of procedural fairness may" thus serve as "an acceptable proxy for substantive fairness." *Id.*; *see also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87, n.4 (1st Cir. 1990); *United States v. Davis*, 261 F.3d 1, 23 (1st Cir. 2001); *Kramer*, 19 F. Supp. 2d at 285.

Overall, the test for approval is not whether the court would have ordered the same remedy or considers the settlement "ideal." *Exxon*, 183 A. 3d at 305 (citation omitted). Rather, the court's task is to "determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition towards" resolution via settlement. *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 680–81 (D.N.J. 1989).

# ARGUMENT

## I.    THE SETTLEMENTS ARE PROCEDURALLY FAIR.

An essential component of the Court's fairness inquiry is to examine the Settlements' procedural fairness, through which the Court "look[s] to the negotiation process and attempt[s] to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86. These Settlements are abundantly fair in this respect because they are the result of arm's-length negotiations between sophisticated parties overseen by an experienced mediator, and further because the Department thoroughly evaluated and responded to public comments on the Settlements before seeking this Court's approval of the Settlements.

*First*, as discussed *supra* at pp. 11-14, the Settlements are the result of "negotiations between [] highly sophisticated parties with sharply conflicting interests" that were "full of adversarial vigor." *Exxon*, 183 A.3d at 309. The Parties maintained diametrically opposed positions on a variety of issues over the course of more than six years of heated litigation. Despite the Parties' good-faith engagements in court-ordered mediation for a year, continued impasse between the Parties resulted in this matter being set for expedited trial. That history demonstrates the strength of the Parties' commitment to their respective claims and defenses. Indeed, as this Court observed on a number of occasions, with respect to the Department and the DuPont Defendants, "it [was] remarkable to me how [these Parties] really just don't

agree on anything," including facts, law, and procedure. Trial Tr. 511:6-8. It was only with the looming trial, and in the case of the DuPont Defendants, after several phases of trial and rulings from the Court, that the Parties were finally able to make the required, difficult compromises necessary to reach the Settlements.

*Second*, the "highly sophisticated parties" involved in these negotiations "were on equal footing." *Exxon*, 183 A.3d at 309. Clients and counsel on both sides of the negotiations include some of the most well-versed and knowledgeable agencies, companies, individuals, and lawyers on the issues involved in these Settlements. For the protection of public health, the environment, the State's natural resources, the Department has entered into hundreds of settlements involving remediation and natural resource damages under the Spill Act and is recognized as a national leader in addressing PFAS contamination. The Department's Outside Counsel have litigated and resolved impactful environmental and natural resource damages claims on behalf of numerous States and U.S. territories, including some of the largest environmental cases in New Jersey's history, and have helped lead the most significant PFAS litigation across the country. Among the other matters outside counsel have handled, they represented the Department in its litigation against Solvay Specialty Polymers USA, LLC for PFAS contamination, resulting in a settlement valued at approximately $394 million and which informed various aspects of the negotiations here. Further, some of the most experienced environmental

30

attorneys from within the New Jersey Division of Law, with decades of experience, participated directly in and oversaw both the extensive litigation and the settlement negotiations at every step. (Reap Decl. ¶¶ 32-34.)

On the other side, the DuPont Defendants and 3M are large companies with significant resources, deeply knowledgeable about PFAS and other environmental issues affecting their businesses, including the litigation and liabilities they face. Settling Defendants each retained preeminent settlement counsel to negotiate with the State—EIDP and Corteva retained Cravath, Swaine & Moore LLP, New DuPont and DuPont Specialty Products retained Kirkland & Ellis LLP, Chemours and Chemours FC retained Wachtell, Lipton, Rosen & Katz, and 3M engaged Jenner & Block, LLP—working in conjunction with Defendants' existing trial counsel, which likewise included several prominent firms.[23] Settling Defendants' counsel have litigated cases on behalf of their clients across the country, including those brought by other states, and have negotiated some of the largest PFAS-related settlements, including the nationwide water provider class action settlements.

Additionally, the negotiations between these Parties, as overseen by the mediator, were "conducted forthrightly and in good faith." *Exxon,* 183 A.3d at 309 (citation omitted). The Parties participated in countless meetings with the mediator

---

[23] Those additional firms include McCarter & English LLP; Hollingsworth LLP; Ballard Spahr LLP; Bressler, Amery & Ross, P.C.; Mayer Brown LLP; and King & Spalding LLP.

and with each other, and exchanged large amounts of data, technical information, and analyses. Term sheets and proposed JCOs were reached through multiple days of in-person negotiations that often went late into the evening with the mediator's supervision, and following the exchange of many drafts reviewed by numerous lawyers and client representatives on all sides. The mediator's supervision of these activities ensured they proceeded in the utmost good faith, and his dual role as Special Master and grasp of the issues enabled the Parties to receive frank, open perspective about their positions aiding resolution. (Reap Decl. ¶ 35.)

*Third*, the Department went to great lengths to solicit comments from the public on the Settlements, thoroughly considered the comments received, and provided meaningful responses, evidencing its transparency, good faith, and fairness. The Department's notices were comprehensive, including by providing direct notices and setting up dedicated websites for information on the Settlements. Additionally, after receiving comments, the Department further engaged with commenters through calls and meetings to better understand their perspective. The Department dedicated significant resources to responding to numerous comments and the topics raised therein, kept commenters apprised of the briefing schedule before the Court to approve the motions, and even facilitated commenters' ability to make filings with this Court should they wish. *Exxon,* 183 A.3d at 309 (where the Department provides "numerous substantive responses to" public comments and

supplies "the court and commenters with additional information," this is "evidence of good faith and fairness") (citations omitted).

## II. THE SETTLEMENTS ARE SUBSTANTIVELY FAIR AND REASONABLE.

These Settlements are a substantively fair and reasonable compromise. Substantive fairness and reasonableness are "pragmatic concepts, and evaluating them requires common sense, practical wisdom, and a dispassionate assessment of the attendant circumstances." *Exxon*, 183 A.3d at 305 (quoting *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994)). Substantive fairness broadly requires that "settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done." *Cannons Eng'g Corp.*, 899 F.2d at 87. Reasonableness involves evaluation of "the technical adequacy of the work to be performed for cleansing and protecting the environment, whether the compensation to the public . . . is satisfactory, and the risks and delays inherent in continuing the litigation." *Kramer,* 19 F. Supp. 2d at 287.

Fairness and reasonableness are "mutable figures, taking on different forms and shapes in different factual settings." *Cannons Eng'g Corp.*, 899 F.2d 79 at 86. That is because courts must "take a broad view of proposed settlements . . . [and] treat each case on its own merits, recognizing the wide range of potential problems

33

and possible solutions." *Id.* at 85-86. As a result, an analysis of a settlement's

fairness and reasonableness may be intertwined, weighing factors such as:

> (1) [T]he relative costs and benefits of [continuing to] litigat[e] the case under [the Spill Act] or CERCLA; (2) the risks of establishing liability on the part of the settlors; (3) the good faith efforts and adversarial relationship of the negotiators who crafted the settlement; (4) the reasonableness of the settlement as compared to the settlor's potential . . . contribution; (5) the ability of the settlors to withstand a greater judgment; and (6) . . . the effect of the settlement on the public interest as expressed in [the Spill Act and] CERCLA.

*Rohm & Haas Co.*, 721 F. Supp. at 687. Indeed, a court's role in evaluating a Spill

Act settlement "is not to make . . . finding[s] of fact" but "rather [] to determine

whether the settlement represents a reasonable compromise." *Id.* at 680-81. What is

more, because the determination to resolve an environmental matter is foundational

to the Department's statutorily delegated role, the Court owes deference to the

Department's expertise in crafting these Settlements on behalf of the public interest.

*See United States v. Se. Pa. Transp. Auth.,* 235 F.3d 817, 822 (3d Cir. 2000).

The Settlements more than satisfy this standard, both as to the four Industrial

Sites and to the resolution of the statewide PFAS claims. As to the former, the

DuPont Defendants are required to fully and completely remediate the Sites,

regardless of ultimate cost, and the Settling Defendants will pay substantial natural

resource damages. As to the statewide claims, the State obtained a landmark

recovery—up to $795 million in abatement damages—informed by a reasonable

evaluation of the Settling Defendants' responsibility for New Jersey's PFAS

pollution. And the Settlements will substantially enhance the Department's continued ability to invest in much-needed water infrastructure projects *today*, for the benefit of all New Jerseyans, rather than holding out for the hypothetical possibility of a more favorable resolution down the road. The latter outcome would not only be unlikely, but also potentially counterproductive. Indeed, even if the State had extracted more damages from the Settling Defendants, or left them exposed to claims from political subdivisions, this could have compromised their ability to pay out everything they owed. More than fair and reasonable, the Settlements are a victory for the health and safety of New Jersey.

### 1. The Settlements Are Substantively Fair and Reasonable as to the Four DuPont Industrial Sites.

With respect to the four Industrial Sites, the Settlements obtain very significant remediation commitments and natural resource damages based on a sensible approach to comparative fault. The DuPont JCO requires the DuPont Defendants—the current and/or former owners and operators of the Industrial Sites—to fully remediate the Sites, regardless of the ultimate costs. And they must establish up to $1.675 billion in financial mechanisms to assure the availability of funds for that remediation as a significant measure of protection to the State and its taxpayers.[24] The DuPont JCO's relief related to the RFS for Chambers Works is

---

[24] The process involved in setting the initial RFSs for each of the four Sites, which is already underway, is rigorous, expert-driven, and designed to be swift, ensuring

particularly noteworthy. The State sought to require EIDP and Chemours to establish an RFS in the amount of $943,360,026. 2:19-cv-14758, D.E. 207. The DuPont JCO includes a scenario under which the RFS for Chambers Works could be in an amount as high as $925 million, accounting for a $450 million RFS and $475 million Reserve Fund that may be converted into a supplemental RFS for the Chambers Work Site, DuPont JCO ¶ 26—98% of the value of the RFS sought by Plaintiffs.

The State is also recovering $330 million in natural resource damages related to the Industrial Sites distributed fairly among the DuPont Defendants and 3M, and additional natural resource damages recoveries from the DuPont Defendants through the CRACO. *See supra* pp. 18-19, 23 (detailing amounts per Site). The Chambers Works natural resource damages recovery of $205 million, divided nearly equally between the DuPont Defendants and 3M, is approximately 50% of the primary and compensatory restoration natural resource damages the State would have sought to obtain at the conclusion of the Chambers Works trial based on the estimates prepared by its experts, which totaled over $425 million. With respect to the three remaining Industrial Sites, the combined natural resource damages recovery to be paid by the DuPont Defendants represents approximately 30% of the estimated compensatory

---

that RFSs supported by evidence-based remediation cost estimates are quickly put in place, and then thereafter regularly revisited through annual cost reviews. *Supra* p. 20.

restoration natural resource damages for those Sites,[25] before even considering the federal Department of Interior's natural resource damages assessment and process proceeding with respect to Pompton Lakes Works. (Reap Decl. ¶¶ 37-38.)

The total amount of natural resource damages recovered from each of the Settling Defendant groups is noteworthy given each group's vigorously litigated defenses. The State faced the possibility of recovering nothing from 3M, given its primary responsibility with respect to PFAS contamination associated with Chambers Works is as a product supplier rather than as a direct discharger. And the DuPont Defendants asserted throughout the litigation a complete defense to claims for groundwater natural resource damages based upon the 2005 CRACO. *See supra* p. 13. In light of these and other risks, *see infra* pp. 48-51, the State's recovery as to the four Industrial Sites is a remarkable recovery for the people of New Jersey.

### 2.  The Settlements Are Substantively Fair and Reasonable as to Statewide PFAS Claims.

The resolution of the statewide PFAS claims includes up to $795 million in abatement funding, which the Department is prepared to immediately begin channeling to combat PFAS contamination in water throughout the State through long-established disbursement programs that benefit all New Jerseyans. *See supra*

---

[25] The State's consultants conducted these estimates for purposes of evaluating settlement values, based on Habitat Equivalency Analysis and Resource Equivalency Analysis, which are standard methods often used for calculating compensatory restoration damages.

pp. 22-26. The Department's decision not to hold out for a hypothetically heftier sum and to strike the landmark Settlements before the Court, which include the release of local political subdivisions' claims, is substantively fair and reasonable for a multitude of reasons.

To view the Settlements in broader context, one must consider the magnitude of statewide PFAS contamination against what could be reasonably recovered from these Settling Defendants. While the statewide costs to abate PFAS are no doubt immense, there remain challenges in assigning a specific dollar figure to the problem overall or, by extension, to the Settling Defendants' share of the liability. And even if it was possible to do so with precision, a task that is not required, *see Exxon*, 183 A.3d at 305, it is far from certain that years of additional litigation would have yielded a substantially greater return for the State. Moreover, it is quite unlikely that the Settling Defendants would have been able to bear any amount close to the true costs of their liabilities. Settlements in similar contexts underscore the reasonableness of seizing the "bird in hand" in the face of incomplete information and significant risk. *See, e.g.*, *id.* at 339 (approving a $225 million settlement between the Department and Exxon Mobil after the Department sought $8.9 billion for natural resource damages at trial, based on litigation risk and other considerations); *Charles George Trucking, Inc.*, 34 F.3d 1081, 1087 n.4.

38

(environmental contamination settlements are often only able to "compensate the public for [ ] a tiny fraction of the overall expense.").

On top of all that, the Settlements simply would not have been possible without releasing the claims of the State, its agencies, and subdivisions to the extent allowable by law, whose hypothetical future recoveries against the Settling Defendants are not guaranteed either. In this case, as in all CERCLA and Spill Act settlements, the Department must "be accorded flexibility to . . . address special factors not conducive to regimented treatment," such as "the uncertainty of future events and the timing of particular settlement decisions." *Cannons Eng'g*, 899 F.2d at 88; *see also Kramer*, 19 F. Supp. 2d at 280. Here, the Department leveraged that flexibility to reach a deal that is fair, reasonable, and a significant win for New Jersey.

***Potential Magnitude Of Statewide PFAS Cleanup Costs.*** As an initial matter, the total cost to cleanup PFAS in all environmental media across New Jersey is not ascertainable without decades of remedial investigations across thousands of individual sites, waterways, natural areas, and environmental management systems. Undoubtedly, as discussed below, the costs will be measured in the billions of dollars. That the precise amount of cleanup costs and damages is currently unknown does not undermine the fairness of the proposed Settlements. That is because "it would disserve a principal end of the [Spill Act]—achievement of prompt settlement

and a concomitant head start on response activities—to leave matters in limbo until more precise information was amassed." *Cannons Eng'g Corp.,* 899 F.2d at 88. "As long as the data 'falls along the broad spectrum of plausible approximations, judicial intrusion is unwarranted . . . .'" *Exxon*, 183 A.3d at 306 (internal citations omitted).

Perhaps the most powerful example of how courts have grappled with the magnitude of potential PFAS costs in the context of settlement was the AFFF MDL court's approval of the multi-billion-dollar 3M and DuPont nationwide water provider class settlements. The court approved those settlements despite class counsel not providing the court with a class-wide damage estimate, *i.e.*, the total estimated cost for water providers to treat PFAS across the country. *See, e.g.*, 2:18-mn-2873, D.E. 3971, at 25 (objection that no overall damages were presented), D.E. 4754 at 23 (rejecting objection and approving 3M settlement); *see also* D.E. 4471 (rejecting similar objection and approving DuPont settlement). The uncertainty surrounding these costs did not prevent those meaningful settlements from being finalized, and should not do so with these Settlements, either. A general understanding of the magnitude of the costs faced, the same situation the AFFF MDL court was in, is sufficient for purposes of the substantive fairness inquiry.

In evaluating the proposed Settlements, the State considered: (1) the well understood impacts of PFAS and resulting fiscal needs to address the presence of these chemicals in environmental media and infrastructure, (2) the known and

suspected impacts of PFAS that have not been fully characterized, (3) the uncertainty with respect to the overall future costs to address PFAS on a statewide basis, and (4) the availability of existing funding sources to address PFAS impacts. For starters, the 3M's and DuPont's nationwide class settlements with most public water systems within New Jersey[26] will provide nearly $500 million to New Jersey's public water systems to address PFAS abatement costs. Accordingly, significant funding to support PFAS treatment costs by public water systems within the State is already being provided through the 3M and DuPont nationwide class settlements.

According to the U.S. EPA, the present value cost to address PFAS in public water systems across the nation is approximately $63.41 billion.[27] New Jersey represents approximately 2.79% of the U.S. population according to 2024 U.S. Census data.[28] Based on these Census data, the present value estimated cost to

---

[26] The nationwide public water system class settlements included all community public water systems, as well as non-transient non-community systems that serve more than 3,300 people, that are not state-, territory-, or federal-owned systems.

[27] This number was derived by taking the undiscounted annualized costs, as calculated by EPA, to treat public water systems for PFAS nationwide over an 82-year period, as provided in Table P-38 of EPA's Economic Analysis for the Final Per- and Polyfluoroalkyl Substances National Primary Drinking Water Regulation [EPA-815-R-24-001 and -002], *available at* https://www.epa.gov/sdwa/additional-supporting-materials-final-pfas-npdwr. The net present value to treat public water systems nationwide was then calculated by applying a 2% discount rate to standard equations that take into account each annual cost over the 82-year period. The State is not endorsing this particular estimate and is using it for illustrative purposes only.

[28] Census data available for download at https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html.

address PFAS in public water systems in New Jersey could be calculated by multiplying New Jersey's share of the U.S. population by the U.S. EPA's estimated nationwide costs. This results in a total statewide present value estimated cost of $1.77 billion to address PFAS in New Jersey's public water systems.

In addition to public water systems, the State is providing assistance to homeowners whose private potable drinking water wells have been contaminated with PFAS. The Department has already funded the installation of hundreds of point-of-entry treatment ("POET") systems at individual residences across the State to address PFAS. Moreover, utilizing PFAS data collected pursuant to the Private Well Testing Act ("PWTA"), N.J.A.C. 7:9E-2.1(a); *see* 52 N.J. Reg. 1165(b) (June 1, 2020), the Department invited thousands of additional private well owners to apply for State funds to treat their PFAS-contaminated well water. Based upon the Department's own Spill Fund costs data, the average capital costs to install PFAS-treatment on a private well is between $3,500 and $4,500. (Reap Decl. ¶ 44). Thus, the costs to address private wells will pale in comparison to the costs to address large community public water systems. So even if a substantial percentage of the State's 290,000 private well owners ultimately seek reimbursement from the State to

address PFAS, the total costs to address private wells are anticipated to be far less than those to address community public water systems.[29]

As discussed above, the nearly $500 million that is heading to New Jersey's impacted community public water systems under the nationwide class settlements will address a substantial portion of the costs necessary to address PFAS-contaminated drinking water in the State.[30] Those public water systems that participated in the class settlements will be receiving substantial help in exchange for having already released their claims against 3M and the DuPont Defendants.

---

[29] The State has relatively robust data on the presence of PFAS in drinking water, and the associated costs to address such contamination. All Public Water Systems in New Jersey are required to regularly test water quality for multiple parameters, including PFNA, PFOA, and PFOS. *See* 50 N.J. Reg. 1939(a) (Sept. 4, 2018); 52 N.J. Reg. 1165(b) (June 1, 2020). In addition, New Jersey includes these three PFAS in the list of contaminants that are measured in private drinking water wells pursuant to the Private Well Testing Act ("PWTA"). N.J.A.C. 7:9E-2.1(a); *see* 52 N.J. Reg. 1165(b) (June 1, 2020). The Department also has additional private well sampling data from its own investigations around the State and claims made to the Spill Fund.

[30] The initial focus on drinking water is well-founded. The fundamental importance of safe drinking water for the State's residents is enshrined in New Jersey law. *See, e.g.*, N.J.S.A. 58:12A-2 (establishing that "it is a paramount policy of the State to protect the purity of the water we drink"). Drinking water is one of the most significant human exposure pathways to PFAS. New Jersey Department of Health, Drinking Water Facts: Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water, *available at* https://www.nj.gov/health/ceohs/documents/pfas_drinking%20water.pdf ("PFOA, PFOS, and PFNA dissolve in drinking water. If drinking water is contaminated, it is a primary source of exposure compared with other common exposure sources."). Exposure to PFAS in drinking water is associated with a multitude of health harms, including several types of cancer, liver damage, increased cholesterol, and decreased vaccine responses, among others. *Id.*

Consequently, a very substantial portion of the settlement funds from the State's proposed DuPont and 3M Settlements will be available to address other public needs, including drinking water that is not covered by the class settlements, publicly-owned treatment works, and direct-PFAS-discharge sites, including airports, firefighting training academies, and landfills. PFAS contamination emanating from such publicly owned sites and instrumentalities presents risks to water supplies and other environmental media and infrastructure. By administering abatement funds to support PFAS reduction from these sources through existing Department programs, the State will reduce New Jerseyans' exposure to contaminated water and improve and protect their public health and environment.

*Assessing The Settling Defendants' Share Of Responsibility.* The State's approach to its negotiations with the Settling Defendants was to obtain as much compensation from them as possible to offset the PFAS cleanup costs being faced by public entities throughout the State. The State believes it accomplished that goal here when factoring in the Settling Defendants' share of liability for statewide PFAS contamination, the global liabilities Settling Defendants face, and the risks and time associated with prolonged litigation.

There are two primary groups that bear responsibility for statewide PFAS contamination: (1) current and former manufacturers of PFAS and PFAS-containing products, including but not limited to the Settling Defendants, and (2) direct

dischargers, including private industrial dischargers within the State (*e.g.*, Solvay, DuPont, and many others), and public entity dischargers (*e.g.*, the U.S. Government, which utilized a significant quantity of AFFF at military bases throughout the State). Because the primary focus of CERCLA and the Spill Act is on parties that release or discharge hazardous substances, including certain PFAS, the State, for purposes of evaluating the Settlements, has allocated 50% of the responsibility for statewide PFAS to manufacturers and 50% to dischargers. *See Charles George Trucking, Inc.*, 34 F.3d at 1089 (upholding "the district court's [equal] division of responsibility between owner/operators, on one hand, and generators/transporters, on the other hand" where each of the two defendant groups were jointly and severally liable).

Prior litigants have undertaken analyses to assign responsibility for PFAS contamination to PFAS manufacturers, broadly, based on the market share of their products. For example, class counsel in the AFFF MDL used a PFAS products market share analysis to inform their allocation of responsibility for PFAS damages, attributing approximately 75% to 3M and DuPont collectively.[31] Based on the MDL parties' 75% allocation of the manufacturers' share of liability to 3M and DuPont, the Settling Defendants would be liable for 75% of half of the total statewide liability

---

[31] 3M and DuPont PWS Settlements FAQ Cleaning Up Forever Chemicals – Making Wrongdoers Pay Instead of Ratepayers, Aqueous Film-Forming Foams (AFFF) Products Liability MDL No. 2873 Website, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf, at 3.

(as the State has estimated that 50% of the statewide PFAS liability is attributable to manufacturers and 50% is attributable to industrial and other dischargers)— approximately 37.5% of the total statewide PFAS liability.

The State believes this allocation is reasonable given that New Jersey is a highly industrialized state. The Department has identified scores of industrial sectors that have handled PFAS chemicals in their operations, including textile and fabric finishing mills, carpet and rug mills, textile bag and canvas mills, leather and hide tanning and finishing, paper mills, paperboard container manufacturing, paper bag and coated and treated paper manufacturing, commercial printing, petrochemical manufacturing, synthetic dye and pigment manufacturing, resin and synthetic rubber manufacturing, paint and coating manufacturing, soap and other detergent manufacturing, film and toner manufacturing, tire manufacturing, glass product manufacturing, electroplating, and many others.[32] New Jersey is also home to two of the largest fluoropolymer manufacturing plants in the world: Chambers Works and the Solvay/Arkema West Deptford plant, each of which used PFOA and PFNA in their manufacturing operations. Releases from industrial operations involving PFAS, such as the manufacture of fluoropolymers, can be more substantial relative

---

[32] *See* NJDEP, PFAS Handling Industry Sectors – IV, https://dep.nj.gov/wp-content/uploads/srp/pfas_handling_industry_sectors.pdf.

46

to contributions from the use and disposal of PFAS-containing products.[33] There can

be no doubt that in considering sources of PFAS contamination statewide, industrial

sources are likely the most significant sources, and at a very minimum should be

deemed responsible for at least 50% of the State's PFAS contamination.

*Weighing The Costs Of Statewide Contamination Attributable To The*

*Settling Defendants.* In addition to considering the benefits to New Jersey from the

previously approved nationwide public water system class settlements with 3M and

the DuPont Defendants (nearly $500 million), it is important to take into account the

fact that the DuPont JCO requires remediation of PFAS contamination from the

Chambers Works and Parlin Sites, while the Department's earlier settlements with

Solvay and Arkema require certain remediation of PFAS related to their West

Deptford Site and required payment to the Department of $122.3 million for PFAS

abatement damages.[34] Accordingly, by considering these prior settlements in

conjunction with the 3M and DuPont Settlements, there will be up to an additional,

approximate *$1.4 billion* in cash available to address PFAS in environmental media

---

[33] For example, one analysis of sources of emissions of perfluorocarboyxlic acids
("PFCAs"), which include PFOA and PFNA, calculated that, globally, 74% of
emissions of PFCAs are due to the industrial manufacture of fluoropolymers, while
less than 4% of emissions of PFCAs are due to AFFF or consumer products. *See*
DuPont Presentation to NJDEP, dated July 17, 2006, at 15 (Bates NJ-LEGACY-
0010217). (Reap Decl. ¶ 46, Ex. F.)

[34] *See generally* Solvay Judicial Consent Order, available at https://dep.nj.gov/wp-
content/uploads/solvay/final-jco.pdf; Arkema Judicial Consent Order, available at
https://dep.nj.gov/wp-content/uploads/arkema/arkema-final-executed-jco.pdf.

and infrastructure in the State and up to over *$1.2 billion* in potential remediation at three of the most significant PFAS-discharge sites in the State.[35]

While some commenters asserted that the State should have obtained more from the Settling Defendants, the State here had to contend with the unavoidable reality looming over these litigations—the Settling Defendants' ability to pay the substantial PFAS-related liabilities being pursued by states and other parties, here and abroad. There are approximately 14,000 claims pending in the AFFF multidistrict litigation as of October 2025, including claims by the vast majority of U.S. states and territories.[36] New Jersey is just one among thousands of plaintiffs seeking relief against the Settling Defendants, and all plaintiffs are seeking to recover from the same finite pot of funds. Potential PFAS liabilities have already pushed one manufacturer of AFFF, Kidde-Fenwal, Inc., into bankruptcy. As AFFF MDL Judge Gergel cautioned the state plaintiffs at a 2024 AFFF MDL Status Conference:

> Now, let me say, there's much talk [from the states] about the unfairness of imposing the costs of PFAS remediation on state taxpayers. I get that. Sure, I get that. But if you take that argument to its logical end, what you're talking about is suing these private defendants for everything they're worth. And let me tell you what's going to happen . . . They're

---

[35] This figure is based on the maximum first year RFS and Reserve Funds available for the Chambers Works, Parlin, and Solvay/Arkema sites under each of the settlements.

[36] United States Judicial Panel on Multidistrict Litigation, MDL Statistics Report – Distribution of Pending MDL Dockets by District, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-October-1-2025.pdf.

going to push them all into bankruptcy.  And that, number one, is no
good.

2:18-mn-2873-RMG, D.E. 5364, at 14:1-17; *see also* 3M Final Approval Order, D.E.

4754, at 24 (objectors' argument 3M "should have or could have 'paid more'"

"ignore[d] the 'insolvency risk' inherent here—a risk the Settlement Agreement

considers directly.").

The State of New Jersey heeded this warning. Once the settlement

negotiations started to consider a statewide resolution of PFAS damages and costs,

the State worked with confidential highly sophisticated financial experts,

economists, and engineers to assist the State in evaluating Settling Defendants'

ability to pay estimated statewide PFAS damages and costs. In addition to

considering the companies' cashflow and assets, the State weighed the companies'

potential nationwide and global liabilities and considered them in evaluating what

the Settling Defendants could pay. (Reap Decl. ¶ 47.) Understanding that the Settling

Defendants were viewing their settlement authority through their ability to

financially withstand settlements with the remaining states and territories, in

addition to private plaintiffs, New Jersey also took its proportionate share of

nationwide PFAS liabilities into account throughout the negotiations. The decision

to accept a substantial compromise to assure very significant relief under these

circumstances is not only reasonable, but extraordinarily prudent.

49

With these issues in mind, the State also recognized the importance of resolving its claims sooner rather than later. Continuing to litigate in this Court and in the AFFF MDL would have substantially delayed any resolution of the State's claims. While the Chambers Works case alone would have involved at least one more bench trial and a jury trial, there were still the *three other* Industrial Site-specific cases that needed to be fully litigated (involving voluminous documents, witnesses, and experts) and tried to this Court. Accounting for inevitable appeals, litigating and trying these four cases to completion would have taken, at a minimum, many more years—on top of the more than six years it already required for the State to get the Chambers Works case to trial. And as discussed above, the MDL currently includes approximately 14,000 pending cases. Absent a national settlement for all states and political subdivisions, all of these cases cannot possibly be resolved for decades.

In sum, given the broader liability facing Settling Defendants, the State negotiated reasonable Settlements that secure significant remediation commitments and substantial monetary payments that will allow the State to immediately invest funds throughout New Jersey to address PFAS and other contamination. The State's Settlements remove the delay and uncertainties associated with the significant time horizons it would otherwise face to resolve its litigations against the Settling Defendants. And the Settlements provide relief, in the form of remediation, financial assurances, and funding, for the benefit of the State and its residents now, instead of

at an indeterminate date in the future, if at all. Finally, the Settlements free up the considerable existing resources that have been dedicated to litigation against the Settling Defendants and allow them to be re-directed to prosecute additional claims against additional responsible parties throughout the State, which the State has already demonstrated may yield additional funding in the hundreds of millions of dollars or more per site. The Settlements are substantively fair and reasonable, and the State's decision to settle on these terms is entitled to deference.

## III.    THE SETTLEMENTS ARE CONSISTENT WITH THE SPILL ACT'S OBJECTIVES

The Settlements are consistent with and directly promote the objectives of the Spill Act. The State has secured relief under the Spill Act through these Settlements against the DuPont Defendants as "dischargers" of PFAS at and from the Industrial Sites, as well as against the 3M and the DuPont Defendants as persons "in any way responsible" for PFAS contamination statewide. *See* N.J.S.A. 58:10-23.11g.c.(1) ("Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred."). Relief obtained through both of these avenues, each of which involves different benefits and considerations, advances the goals of the Spill Act now and into the future.

**A.  Relief Obtained Against the DuPont Defendants as "Dischargers" Is Consistent with the Spill Act's Objectives**

The State obtained exceptional relief against the DuPont Defendants in their capacity as "dischargers" at and from the Industrial Sites that is consistent with the Spill Act's objectives, including "(1) assur[ing] the prompt, effective cleanup of hazardous substances; (2) plac[ing] the financial burden of cleanup on polluters; and (3) encourag[ing] early settlements." *Exxon*, 183 A.3d at 328.

*First*, the DuPont JCO ensures the prompt and effective cleanup of hazardous substances released at and from the Industrial Sites by reaffirming and reinforcing the DuPont Defendants' remediation obligations as dischargers of hazardous substances. Critically, as the DuPont JCO makes clear "Remediation is required at each Industrial Site until each Site is fully and finally Remediated pursuant to applicable federal and State laws, regulations and guidance." DuPont JCO ¶ 30; *see also Exxon*, 183 A.3d at 329 (discussing importance of reaffirmation of remediation obligation). The DuPont JCO further reinforces this obligation by confirming that if Chemours or DSP fails to perform the remediation at any Industrial Site, EIDP must quickly step in and do so. *See* DuPont JCO ¶ 32.

The DuPont Defendants' remediation obligations will be backed by remediation funding of up to $1.675 billion, which will protect against, among other things, the remediation slowing due to any financial issues. Finally, this remediation funding is being established pursuant to an expedited process that will resolve

52

lingering disputes regarding the scope and estimated cost of the remediation, so that efforts going forward are focused on completing the cleanups at and from the Sites. Separate and apart from these commitments and funding, the DuPont Defendants' natural resources damages and abatement payments may be used in the areas surrounding the Sites, to repair, restore, and replace injured natural resources, improving and protecting public health, safety, and the environment.

*Second*, the DuPont JCO places the financial burden of the remediation of the Sites and the surrounding areas on the DuPont Defendants. The JCO requires the DuPont Defendants to complete this remediation regardless of its ultimate cost, even if the remediation funds set aside are exhausted. *See* DuPont JCO ¶ 34 (EIDP ultimately responsible for performing remediation, regardless of whether RFS and Reserve Fund are exhausted). And, again, this is on top of the DuPont Defendants' additional payments related to the Sites under the JCO as well as the protection and preservation of lands via conservation easements or transfer pursuant to the CRACO.

*Third*, the DuPont JCO is consistent with the Spill Act's objective of "encourag[ing] the efficiency of settlements over protracted litigation." *Exxon*, 183 A.3d at 332. Even if the DuPont JCO was not necessarily reached at an "early" phase of these litigations, it avoids years of additional, drawn-out litigation on the Industrial Sites. *See id.* at 332 ("the efficient and expeditious resolution of environmental cleanup claims strongly militates in favor of entering the" JCO). The

Settlements further provide a way to immediately "lock in" protections and funding, *see id.*, through the quick establishment of remediation funding at the Industrial Sites for the protection of the State and its taxpayers, and the commencement of a constant stream of payments to be made to the State.

## B. Relief Obtained Against Settling Defendants as Persons "In Any Way Responsible" Further Promotes the Spill Act's Objectives

The State also obtained relief against 3M and the DuPont Defendants in their capacity as "persons in any way responsible," further promoting the Spill Act's objectives, including pursuit of a wide range of responsible parties (such as product manufacturers) under the Act to secure critical funding from numerous sources for the benefit of the public in contributing to PFAS and other cleanups across the State.

*First*, the Settlements encourage the pursuit of product manufacturers under the Spill Act, putting the State in a strong position to litigate and settle claims against a wide range of responsible parties to fund cleanups. *See Exxon*, at 183 A.3d at 332-33 (finding settlement furthers Spill Act's objectives by "aid[ing] the State in future litigation and settlement negotiations"). The State aggressively pursued its claims under this theory and overcame significant hurdles to achieve this result. *See, e.g.*, D.E. 156 (denying 3M dismissal based on its role as product supplier). Additionally, through these litigations, the State has obtained useful opinions and guidance from the Court on prosecution of these claims, providing a pathway for further success in

the future. The State's ability to maintain these claims and ultimately obtain this outcome sends a strong message to future defendants.

*Second*, the Settlements promote the objectives of the Spill Act by securing a significant funding source for the benefit of the public to contribute to cleanup efforts across the State, supplementing recoveries from traditional "dischargers" and other funding the State already provides. Indeed, there are numerous, substantial "dischargers" of PFAS across New Jersey, including the owners and operators of facilities such as the Solvay/Arkema West Deptford plant and the Department of Defense at bases in multiple parts of the State. As a result, the statewide recoveries obtained through these litigations against the Settling Defendants as product manufacturers "in any way responsible" provides an important, but not the only, funding stream for cleanup. Beginning this funding stream today and locking in guaranteed payments "gives the [State] control over and the interest derived from a substantial amount of money" and will help to defray "cleanup and remediation costs which might otherwise be drawn from public coffers." *See Exxon,* 183 A.3d at 332. The Settlements accomplish this while avoiding protracted, site-by-site litigation across the State, which would otherwise take substantial time and pose individualized challenges.

## IV.    THE SETTLEMENTS ARE IN THE PUBLIC INTEREST

Finally, the Settlements are in the public interest. The State has obtained relief that secures the cleanup of four of the most contaminated industrial sites in the State, provides substantial compensation for natural resource damages, and enables the Department to deploy significant financial assistance to its political subdivisions, homeowners, and others to address PFAS and other contaminants. This relief will improve and protect public health and the environment across New Jersey. At the same time, the Settlements avoid years of further complex litigation with uncertain outcomes and associated risks, in favor of locking in this relief today. *Exxon*, 183 A.3d at 333 ("[W]hen an agency charged with acting in the public interest, such as the DEP, finds that the public interest is best served through settlement, that decision is entitled to deference.").

That the Settlements do not obtain even more funding from these Defendants for cleaning up PFAS across New Jersey does not render them against the public interest, as some of the comments suggest. *See Rohm & Haas Co.*, 721 F. Supp. 6at 696-97 ("[T]he question is not whether this is a perfect settlement but whether it is one which is fair, adequate, and reasonable, and within the reaches of the public interest."). The State has achieved through these Settlements, the product of hard-fought litigation and compromise, relief that will benefit the public to a significant and meaningful degree, and as such are ripe for approval.

## V. THE PUBLIC COMMENTS RECEIVED DID NOT LEAD THE DEPARTMENT TO CONCLUDE THE SETTLEMENTS ARE NOT FAIR, REASONABLE, CONSISTENT WITH THE SPILL ACT'S OBJECTIVES, AND IN THE PUBLIC INTEREST

As demonstrated above, the Settlements meet the standard for approval. Prior to moving for approval, the Department carefully considered all public comments received and determined that they did not warrant disturbing the Settlements. While the comments addressed a range of topics, many focused on questions regarding the State's authority to release the claims of its political subdivisions against 3M and the DuPont Defendants related to statewide PFAS contamination. As discussed herein, the State thoroughly evaluated this issue—before and then, again, after—receiving these comments. For reasons expanded upon below, the State had ample bases and legal support for entering into the Settlements.[37]

In entering into these Settlements, the State is acting in its capacity as *parens patriae* and trustee of New Jersey's natural resources to protect the health and well-being of its residents against the threat of PFAS contamination and to safeguard and restore public trust resources, including water supplies, for current and future generations. The State's interests in these matters are represented by the Attorney General—the State's chief legal officer and "defender of the public interest." *Petition of Pub. Serv. Coordinated Transp.,* 74 A.2d 580, 586 (N.J. Sup. Ct. 1950).

---

[37] The State refers the Court to the Department's Responses to Comments for its response to additional issues raised. (Reap Decl., Ex. B and C.)

The State, acting through the Attorney General, is representing the public interest in matters of statewide significance, and its authority to sue and settle to protect the public interest includes the authority to sue and settle on behalf of the State, its agencies, and its political subdivisions.

It is well established that a state may take legal action in its *parens patriae* capacity to protect the "well-being of its populace." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602 (1982). Under the *parens patriae* doctrine, a state may seek to remedy an injury that infringes upon its "quasi-sovereign" interests, such as its interests in the health of its citizens or in a clean environment.[38] *Id*. The Supreme Court has recognized that—unlike municipalities— a state suing as *parens patriae* is "deemed to represent *all* its citizens." *New Jersey v. New York*, 345 U.S. 369, 372-73 (1953) (emphasis added) (denying intervention to the City of Philadelphia, which represented "only a part of the citizens of Pennsylvania," where Pennsylvania had already intervened to represent all of its citizens' interests).

---

[38] States have long invoked *parens patriae* to remedy environmental contamination. As Justice Holmes described it, a state, "in its capacity of quasi-sovereign," holds an interest that is "independent of and behind the titles of its citizens, in all the earth and air within its domain," and "has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Georgia v. Tenn. Copper Co*., 206 U.S. 230, 237 (1907).

Here, the State is acting as *parens patriae* to protect its "quasi-sovereign interests" in the general health of its residents and the environment. PFAS contamination is prevalent in the environment throughout New Jersey, particularly in the State's water resources. Drinking water is one of the most significant pathways of PFAS exposure and has the potential to contribute to human exposure more than other common sources of PFAS.[39] Exposure to PFAS is known to cause adverse effects at even low levels. Due to the serious risks they pose to public health, New Jersey was the first state in the nation to adopt drinking water standards for certain PFAS in 2018. Since that time, New Jersey has provided significant financial assistance to municipalities, homeowners, and businesses to install treatment to reduce the public's exposure to PFAS. In short, the State has acted effectively to identify and abate the risks of PFAS in a comprehensive manner statewide—embodying a perspective, and duty, that any one town or city necessarily lacks. *See Missouri v. Illinois*, 180 U.S. 208 (1901) ("[I]t must surely be conceded that, if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them.").

The State's authority to act as *parens patriae* under these circumstances is bolstered by its responsibilities as trustee of the State's natural resources. The

---

[39] Drinking Water: Facts Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water, New Jersey Department of Health, April 2024 (available at https://www.nj.gov/health/ceohs/documents/pfas_drinking%20water.pdf).

Commissioner, on behalf of the State, acts as the trustee, for the benefit of all the State's citizens and all natural resources within the State's jurisdiction, including but not limited to water resources stretching across municipalities' borders. N.J.S.A. 58:10-23.11a. As trustee, the Commissioner acts as the ultimate guardian of these resources, and it is the Department—and the Department alone—that may sue to protect natural resources held in the public trust to serve all of the State's residents, rather than the interests of only a subset of residents. *See State, Dep't of Env't Prot. v. Jersey Cent. Power & Light Co.,* 308 A.2d 671, 674 (N.J. Super. Ct. Law. Div. 1973), *aff'd* 336 A.2d 750 (N.J. Super. Ct. App. Div. 1975), *rev'd on other ground*s 351 A.2d 337 (N.J. Sup. Ct. 1976), *rev'd on other ground*s, 69 N.J. 102, (1976) ("The State has not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public to a viable . . . environment are protected, and to seek compensation for any diminution in that trust corpus."). All this is consistent with the State's broader role in the environmental arena: the Department has the primary authority to enforce the State's environmental laws, and is the primary line of defense in ensuring those laws are carried out for the protection of the public.[40]

---

[40] Additionally, the Department alone is authorized to pursue cleanup and removal costs pursuant N.J.S.A. 58:10-23.11u. When the Department enters into settlements to resolve those claims, the settling party receives contribution protection pursuant to the statute. N.J.S.A. 58:10-23.11f. As a result, when the Department settles such claims, the effect of the settlement is to preclude contribution claims against the settling defendant, including here by Political Subdivisions.

*See*, *e.g.*, N.J.S.A. 58:12A-9a (authorizing Commissioner to "[p]erform any and all acts necessary to carry out the purposes and requirements of" the New Jersey Safe Drinking Water Act).

Because the State has sued as *parens patriae* and natural resource trustee for the benefit of all its citizens, it has the authority to execute Settlements that represent the interests of all of the State's political subdivisions, thus preempting municipal claims against the same defendants on the same subject. Indeed, courts have dismissed municipal lawsuits under similar circumstances. In *State v. City of Dover*, the State of New Hampshire and two New Hampshire cities filed separate lawsuits against manufacturers of methyl tertiary-butyl ether (MTBE), a gasoline additive. 153 N.H. 181 (2006). New Hampshire alleged damage "to the State's ground and surface waters." *Id.* at 184. The cities alleged damages to "their respective municipal water supplies." *Id.* at 188. The Supreme Court of New Hampshire agreed with the state that the cities' suits must "yield to the State's" and be dismissed, basing its conclusion primarily on the fact that the state was suing as *parens patriae*. *Id.* at 184. In that capacity, the State was presumed to represent not just its residents' interests but also the cities' interests. *Id.* at 188–89. In the court's view, it did not matter that the cities wished to proceed against MTBE manufacturers under a different legal theory, nor did it matter that the State did not plan to distribute its proceeds from the lawsuits to the cities but would instead "establish a public fund." *Id.* at 189. The key,

according to the court, was that both the State and its cities sought "economic" damages based on the defendants' pollution. *Id.* at 190. "While the cities may have a direct economic interest in recovering for contamination to their water supplies," the court held, "this economic interest is represented by the State's suit." *Id.*

So too, here, are New Jersey's municipalities' claims and interests related to PFAS contamination by 3M and the DuPont Defendants represented by the State. Left to their own devices, piecemeal litigation by municipalities would be unlikely to yield results more protective of the public's interest than the Settlement; a statewide resolution is crucial for maximizing the benefit for all the State's residents. PFAS have been detected more frequently in New Jersey's public water supply sources than in most other states and are also prevalent in New Jersey's private drinking water wells. PFAS have also been detected in soils in every county in the State. Due to their statewide occurrence, the State sought in its litigations "all damages that [it is] entitled to recover, including damages for injuries to all of the State's natural resources, property damages to State and local government-owned properties, economic damages, restitution and disgorgement of Defendants' ill-gotten profits, punitive damages, and all other damages, fees, costs, and equitable relief to which [it] may be entitled." NJ Statewide AFFF Case, Original Pleading, at ¶ 13 (Filed May 14, 2019), 2:19-cv-2199, D.E. 1. Through these Settlements, the

State has secured significant and comprehensive relief for all of New Jersey's residents that it will administer to maximize benefits across the State.[41]

While certain political subdivisions may have preferred to pursue their own litigation against the Settling Defendants, the Settlements best position the State's municipalities as a whole to receive funds to address PFAS contamination for the protection of the State's residents and environment in the timeframe needed to take such protective action, removing the substantial risks of piecemeal town-by-town litigation against the Settling Defendants. Municipalities retain their ability to pursue other defendants and parties responsible for PFAS contamination.

Finally, the State's decision to release the claims of its political subdivisions through these statewide Settlements is hardly novel. In matters affecting the public health and consumer fraud, the Attorney General has previously exercised his common law and statutory authority as the chief legal officer of the State to bring and settle litigation on behalf of the entire State—including the State's political subdivisions. For example, as a party to a 1998 nationwide settlement against tobacco companies, the New Jersey Attorney General—along with the Attorneys

---

[41] While the nationwide water provider settlements have commendable aspects, they also have limitations which demonstrate why the State is best positioned to provide funding. For example, there is no requirement in those settlements that water providers actually use the funds they receive for the purpose of treating PFAS contaminated drinking water. The settlements also provide strict allocation formulas, that do not take into account which systems are most in need of assistance, or factor in which systems have already received other forms of financial assistance.

General of 45 other states—released past, present, and future claims against those

companies on behalf of the State and its political subdivisions in exchange for

injunctive and monetary relief. *See In re Certified Question from U.S. Dist. Ct. for*

*E. Dist. of Mich.*, 638 N.W. 2d 409, 414 (Mich. Sup. Ct. 2002) (ruling that Michigan

Attorney General had the authority to release the claims of Michigan's counties

because his authority to sue on behalf of "the people of the state in matters of state

interest" encompasses the authority to "sue on behalf of the state's political

subdivisions in matters of state interest," and that authority to sue includes "the

authority to settle and release such claims," even without the counties' consent

(citations omitted);[42] *see also People ex rel. Devine v. Time Consumer Mktg., Inc.*,

782 N.E. 2d 761,765-68 (Ill. App. Ct. 2002) (dismissing an Illinois county's

previously-filed consumer fraud suit against Time after the Illinois Attorney

General—along with the Attorneys General of 48 states, including New Jersey—

entered into a settlement agreement that released "all [consumer fraud] claims on

behalf of such State against Time," and noting that "the Illinois Attorney General,

as the chief legal officer of Illinois, had the authority to issue the release");

---

[42] Much like the definition of "Releasors" in the DuPont and 3M JCOs, the Tobacco Master Settlement Agreement defined "Releasing Parties" as "each Settling State and . . . to the full extent of the power of the signatories here to release past, present and future claims, the following: (1) any Settling State's subdivisions (political or otherwise, including but not limited to municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions . . ." *Id*. at 412 n. 3.

*Commonwealth ex rel. Krasner v. Att'y Gen.*, 309 A.3d 265 (Pa. Commw. Ct. 2024) (dismissing district attorneys' previously filed suits after they failed to withdraw them following State's settlement with opioid manufacturers and distributors fully releasing them for claims under the state Unfair Trade Practices and Consumer Protection Law). In short, the Attorney General's authority to litigate and settle claims on behalf of the State in matters affecting the public interest statewide encompasses the authority to litigate and settle claims on behalf of its political subdivisions—authority he has exercised here.

Notwithstanding the State's strong confidence in all of the above, it was surely, at a minimum, reasonable for the State to understand that it possessed the authority to grant the release contained in the Settlements, such that the Settlements should pass the applicable test for approval. The Settlements have various mechanisms for addressing future issues related to the release of these and other claims, including allowing for limited crediting of settlement payments in the event certain claims, notwithstanding the provisions of this JCO, are permitted to proceed by another court. DuPont JCO, ¶ 9; 3M JCO ¶ 45. As such, the State does not believe this issue warrants rejection of the Settlement, as some commenters suggest.

## **CONCLUSION**

For the reasons set forth above, the State respectfully requests that the Court grant the Motion to Approve the JCOs.

65

Dated: November 21, 2025                Respectfully submitted,

                                        **MATTHEW J. PLATKIN**
                                        **ATTORNEY GENERAL**
                                        **OF NEW JERSEY**
                                        *Attorney for Plaintiffs*

                                        By: */s/ Gwen Farley*
                                        Gwen Farley, Esq.
                                        Deputy Attorney General
                                        R.J. Hughes Justice Complex
                                        25 Market Street, P.O. Box 093
                                        Trenton, New Jersey 08625-0093
                                        Tel.: (609) 376-2761
                                        Gwen.Farley@law.njoag.gov

                                        **KELLEY DRYE & WARREN LLP**
                                        *Special Counsel to the Attorney General*

                                        By: */s/ David M. Reap*
                                        David M. Reap, Esq.
                                        3 World Trade Center
                                        175 Greenwich Street
                                        New York, NY 10007
                                        Tel.: (212) 808-7800
                                        DReap@KelleyDrye.com

                                        Geoffrey W. Castello, Esq.
                                        One Jefferson Road
                                        Parsippany, New Jersey 07054
                                        Tel.: (973) 503-5900
                                        GCastello@KelleyDrye.com

                                        *William J. Jackson, Esq.
                                        515 Post Oak Blvd. Suite 900
                                        Houston, Texas 77027
                                        Tel. (713) 355-5000
                                        bjackson@kelleydrye.com

                                        Erin Hodge, Esq.

Washington Harbour, Suite 400
3050 K Street, NW
Washington, D.C. 20007
Tel. (202) 342-8445
ehodge@kelleydrye.com

**LAW OFFICES OF JOHN K. DEMA,
P.C.**
*Special Counsel to the Attorney General*

*John K. Dema, Esq.
*John T. Dema, Esq.
*Briana Dema, Esq.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands, 00820-5034
Tel: (340) 773-6142
jdema@demalaw.com
jtdema@demalaw.com
bdema@demalaw.com

Scott E. Kauff, Esq.
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
Tel: (202) 309-0200
skauff@demalaw.com

**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
*Special Counsel to the Attorney General*

Leonard Z. Kaufmann, Esq.
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
lzk@njlawfirm.com

**TAFT STETTINIUS & HOLLISTER
LLP**

67

*Special Counsel to the Attorney General*

*Robert A. Bilott, Esq.
425 Walnut Street – Suite 1800
Cincinnati, Ohio 45202
Tel.: (513) 381-2838
bilott@taftlaw.com

*Admitted Pro Hac Vice*