**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
*Attorney for Plaintiffs*

By: David M. Reap, Esq.
    Special Counsel
    Attorney ID No. 025632012
    Ph. (212) 808-7636
    DReap@kelleydrye.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>　　　　　　　Plaintiffs,<br>　v.<br><br>E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),<br><br>　　　　　　　Defendants. | Case No.: 2:19-cv-14758-RMB-JBC<br>　　　　　　1:19-cv-14765-RMB-JBC<br>　　　　　　1:19-cv-14766-RMB-JBC<br>　　　　　　3:19-cv-14767-RMB-JBC<br><br>**DECLARATION OF DAVID M. REAP, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE JUDICIAL CONSENT ORDERS WITH SETTLING DEFENDANTS** |

I, **DAVID M. REAP**, an attorney admitted to practice law before this Court and the Courts of the State of New Jersey, and of full age, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am Special Counsel at the law firm Kelley Drye & Warren LLP ("Kelley Drye"). My firm, along with the Law Offices of John K. Dema, P.C. ("Dema Law"), Cohn Lifland Pearlman Herrmann & Knopf LLP ("Cohn Lifland"), and Taft Stettinius & Hollister, LLP ("Taft"), serve as Special Counsel to the New Jersey Attorney General and represent Plaintiffs the New Jersey Department of Environmental Protection ("the Department"), its Commissioner, and the Administrator of the New Jersey Spill Compensation Fund (collectively, "Plaintiffs") in the above-captioned matters.

2. I submit this Declaration in support of Plaintiffs' Motion to Approve Proposed Judicial Consent Orders ("JCOs" or "Settlements") with Defendant 3M Company ("3M") and the DuPont Defendants[1] (collectively, "Settling Defendants"). I am familiar with all the facts and circumstances set forth herein.

## **Background**

3. These two Settlements bring to a close more than six years of hard-fought litigation proceeding alongside years of negotiation supervised and guided by a Court-appointed mediator.

---

[1] The DuPont Defendants are: EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company ("EIDP"), Corteva, Inc. ("Corteva"), DuPont de Nemours Inc. ("New DuPont"), Dupont Specialty Products USA, LLC ("DuPont Specialty Products"), The Chemours Company ("Chemours") and The Chemours Company FC, LLC ("Chemours FC").

2

4. A primary focus of this litigation was on per- and polyfluoroalkyl substances ("PFAS"). As detailed further in Plaintiffs' memorandum of law, the Department has been a national leader in addressing PFAS, including by investigating, studying, and regulating these chemicals. The Department has also made it a priority to provide information to and assist the State's political subdivisions, residents, and others in responding to PFAS contamination.

5. For example, the Department has provided technical and financial assistance to water systems throughout the State, including systems serving tens of thousands of consumers, elementary schools, and childcare facilities; investigated sources of PFAS around the State; and is currently engaged in projects that include collecting unused stockpiles of PFAS-containing aqueous film-forming foam ("AFFF") from public fire departments for safe disposal. To date, the New Jersey Water Bank—a partnership between the Department and the New Jersey Infrastructure Bank—has allocated over $237 million in low-cost loans and dispersed $138 million through the DWSRF to support infrastructure upgrades to address PFAS. To reduce contaminated private well owners' exposure to PFAS, through the Spill Compensation Fund, the Department has authorized compensation for the installation of over 1,500 PFAS treatment systems and ongoing maintenance and monitoring services for eligible well owners.

6. A key component of the Department's strategy to address PFAS has been to bring legal claims and other actions against responsible parties, including those that led to these Settlements. As part of that strategy, the Department in 2019 instituted a litigation campaign focused on the Settling Defendants. The goal of this campaign was to, among other things, obtain recoveries to supplement funds already available to assist with the cleanup of PFAS across New Jersey and reduce residents' exposure to these chemicals.

7. On March 25, 2019, the Department issued a Statewide PFAS Directive pursuant to the Spill Act addressed to the DuPont Defendants, 3M, and other respondents. Attached as Exhibit A is a true and correct copy of the Department's Statewide PFAS Directive. Defendants asserted numerous defenses and indicated they would not comply with the most critical requirements of the Directive.

8. On March 26 and 27, 2019, the State filed lawsuits concerning the Chambers Works, Pompton Lakes Works, Parlin, and Repauno Works Sites in New Jersey Superior Court, in Salem County, Passaic County, Middlesex County, and Gloucester County, respectively ("Industrial Site Cases"). *See* 2:19-cv-14758-RMB-JBC, D.E. 1-1; 1:19-cv-14765-RMB-JBC, D.E. 1-1; 1:19-cv-14766-RMB-JBC. D.E. 1-1; 3:19-cv-14767-RMB-JBC; D.E. 1-1. The DuPont Defendants removed each of these cases to the U.S. District Court for New Jersey under 28 U.S.C. § 1442(a)(1).

9. On May 4, 2019, the State filed another lawsuit against manufacturers of PFAS-containing aqueous film-forming foam ("AFFF"), which included the DuPont Defendants and 3M, in Mercer County Superior Court ("NJ Statewide AFFF Case"). 2:19-cv-02199 (D.S.C.), D.E. 1-1. The NJ Statewide AFFF Case was also removed to the U.S. District Court of New Jersey and thereafter transferred to the multidistrict litigation *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.) ("AFFF MDL").

10. Beyond the Settling Defendants and the matters referenced above, the State has initiated additional significant litigation focused on PFAS. The State in November 2020 brought a lawsuit against Solvay Specialty Polymers USA, LLC, which was also a respondent of the Statewide PFAS Directive, for PFAS discharged from its West Deptford manufacturing plant, as well as Arkema Inc., the prior owner of the plant. *NJDEP, et al. v. Solvay Specialty Polymers USA, LLC, et al.*, GLO-L-1239-20.

11. The State also sued the United States in January 2021, related to its failure to address PFAS contamination released from federal facilities around New Jersey, including but not limited to Joint Base McGuire-Dix-Lakehurst in Burlington and Ocean Counties, Naval Weapons Station Earle in Monmouth County, and the Naval Warfare Center in Trenton, which has also been consolidated with the AFFF MDL. *New Jersey v. U.S.*, 2:21-cv-146 (D.S.C.).

## The Industrial Site Cases

12. The Industrial Site Cases, after removal, proceeded in this Court and were consolidated before one District Court Judge for pretrial purposes. From the outset, litigation of the cases involved voluminous discovery and challenging legal issues. In the fall of 2020, the parties commenced discovery across the four cases, which included over 500 requests for production and over 100 interrogatories on complex regulatory, scientific, and environmental topics. Simultaneously, Plaintiffs and Defendants briefed a series of motions to dismiss filed by the Defendants in the Industrial Site Cases, which ultimately were largely denied.

13. In January 2022, the State filed a motion for a preliminary injunction to require EIDP and Chemours to establish a remediation funding source ("RFS") for the Chambers Works Site, which became a significant focus of the litigation. As resolution of the motion required extensive expert testimony, the parties engaged in seventeen days of expert depositions in connection with the preliminary injunction in the summer and fall of 2022. In the beginning of 2023, the parties began filing further briefing in preparation for a hearing on the injunction, and at the same time continued to brief several significant discovery disputes.

14. On March 27, 2023, the Court ordered the parties to mediation with U.S. Magistrate Judge Joel Schneider (Ret.). With the mediator's approval, the parties' negotiations encompassed claims against the Defendants at the Industrial

Sites as well as those set forth in the Statewide Directive and the NJ Statewide AFFF Case, and for remaining PFAS liability statewide to the maximum extent the State could resolve.

15. Factoring heavily into the negotiations were substantial settlements that 3M and the DuPont Defendants reached through the AFFF MDL with nationwide classes of water providers announced in the spring and summer of 2023, which will provide up to $12.5 billion and $1.2 billion, respectively, to water providers to treat PFAS in drinking water.

16. After the State prepared and issued demands to the Defendants, the Parties participated in numerous meetings and information exchanges over the course of nearly a year. Negotiations stalled with the DuPont Defendants, however, due to deep differences between the Parties. The State thus informed the Court that it was at an impasse with the DuPont Defendants.

17. On April 3, 2024, the Court issued an order placing the Chambers Works case on an accelerated track. Pursuant to that expedited schedule, between April 2024 and May 2025, the parties produced over one million documents, took over 100 fact and expert depositions, and briefed and argued numerous discovery disputes, all under the guidance of Special Master Schneider.

18. Additionally, in the year leading up to trial, the parties participated in more than 40 pre-trial conferences with Special Master Schneider. The parties also

participated in two full-day pre-trial hearings before this Court on April 1 and 17, 2025. The State was prepared for the trial to begin on May 19, 2025.

## Settlements Are Reached

19. Just days before trial, on May 12, 2025, the State and 3M finalized their Settlement, which was the culmination of over two years of painstaking negotiations to finish a complex, nearly 100-page agreement.

20. The State proceeded to trial against the DuPont Defendants on May 19, 2025, when the first in a series of bench trials began. By the middle of June 2025, the parties had completed 12 trial days that included testimony from 28 live witnesses and the admission of over 150 trial exhibits. The Parties and the Court then took a several week hiatus from trial, after which time trial was scheduled to resume.

21. During that time, the State and the DuPont Defendants renewed their settlement discussions, with the benefit of key rulings from the trial. The negotiations included multiple long days of in-person negotiation sessions at the courthouse and the mediator's offices.

22. After days of negotiations, on July 1, 2025, the State and the DuPont Defendants reached a settlement in principle. The parties then set to the task of drafting a JCO to fully detail the terms of the settlement. On August 4, 2025, the JCO was finalized.

## Public Comment Process

23. The State publicly announced the Settlements shortly after each of them were reached, with a press release for each that included each proposed JCO. The Department further published dedicated websites for the Settlements, which included the press releases, frequently asked questions, PFAS information, the JCO and later, the Scheduling Order for briefing on this Motion.

24. Consistent with the Spill Act, the Department also published notice of the Settlements in the *New Jersey Register*, which announced that the Department sought public comments on the Settlements for a period of 60 days. Notices of the 3M JCO and the DuPont JCO were published in the *Register* on July 21, 2025, and September 2, 2025, respectively. The same day the notices were published in the *Register*, copies of the notices were also posted to the Department's dedicated website, emailed to each of the Department's political subdivision contacts, and sent to numerous other interested parties in accordance with the notice provisions set out in the Settlements. Also as required under the Settlements, Defendants arranged for notices to be published in print and electronic versions of widely-circulated New Jersey newspapers. The comment period for the Proposed 3M and DuPont JCOs closed on September 19, 2025, and November 1, 2025, respectively.

25. The Department received 56 comments on the Proposed 3M JCO and 64 comments on the Proposed DuPont JCO. The Department received comments

from political subdivisions, associations, individuals, among others. Although a number of comments were submitted after the deadlines, the Department nevertheless accepted them for consideration.

26. The comments raised numerous topics related to the two Settlements, which the Department carefully reviewed and considered. The State's counsel and the Department also met with many of the commenters to better understand their perspectives concerning the Settlements. The Department prepared detailed responses to all comments received.

27. The Department's responses to comments are attached to this Declaration. Attached as Exhibit B is a true and correct copy of the Department's Response to Comments on the Proposed DuPont JCO. Attached as Exhibit C is a true and correct copy of the Department's Response to Comments on the Proposed 3M JCO. The Department's responses to comments are also being published on the Department's dedicated websites for each of the Settlements.

**The Settlements Are Fair, Reasonable, Consistent with the Spill Act, and in the Public Interest**

28. Attached as Exhibit D is a true and correct copy of the Proposed DuPont JCO.

29. Attached as Exhibit E is a true and correct copy of the Proposed 3M JCO.

30. The 3M JCO was revised before the State filed this Motion. Revisions include typographical error fixes and clarifications. Attached hereto as Exhibit F is a true and correct copy of redlines of relevant pages reflecting revisions.

31. The State submits that the Settlements are fair, reasonable, consistent with the Spill Act, and in the public interest, for reasons more fully set forth in Plaintiffs' memorandum and addressed in part below.

32. The Settlements' fairness is informed by the negotiation process, which involved highly sophisticated parties on equal footing participating in arms-length negotiations overseen by a Court-appointed mediator.

33. The Department's Outside Counsel conducted negotiations on behalf of the State, under the supervision of Deputy Attorneys General ("DAsG") within the New Jersey Office of the Attorney General's ("OAG") Division of Law with decades of experience in environmental claims and natural resource damages litigation brought on behalf of the State, who participated directly in and oversaw settlement negotiations at every step. Ultimate approval of the terms of the JCOs were subject to the review of OAG and the Commissioner in consultation with the Department's legal advisors and staff.

34. Outside Counsel was well-suited to represent the State in these negotiations, given their subject matter expertise and deep experience. Kelley Drye, Dema Law, and Cohn Lifland each have a long track record of representing the State

11

in environmental remediation and natural resource damages litigation for more than 20 years, during which they have worked side-by-side with OAG and the Department to obtain some of the largest settlements in New Jersey history for the benefit of the State and its residents. Among other matters, the firms obtained for the State settlements with Solvay Specialty Polymers USA, LLC as a result of litigation related to releases of PFAS from Solvay's West Deptford plant valued at approximately $394 million, settlements resulting from the Passaic River litigation, which involved ten years of complex litigation leading to a total recovery of approximately $355 million, and numerous settlements with multiple defendants as part of the State's broader litigation effort to address methyl tert-butyl ether (MTBE) contamination across the State, totaling more than $425 million to date.[2] Taft, and,

---

[2] In addition to their work on behalf of New Jersey, the firms have broader experience that also informed their strategy and negotiations. Kelley Drye represents more than a dozen states and U.S. territories, as well as numerous public entities, including water providers, in connection with claims related to PFAS against these Settling Defendants and others. Bill Jackson also chairs the State Sovereign Committee of the AFFF MDL, which coordinates among the majority of the states and U.S. territories in the country on the pursuit of PFAS claims against, among other defendants, Settling Defendants here. Notably, Kelley Drye secured for the State of Ohio a $110 million settlement with E. I. du Pont and related companies to resolve claims concerning discharges of PFOA into Ohio from the Washington Works plant. *See* https://governor.ohio.gov/media/news-and-media/state-secures-111-million-settlement-with-dupont-for-environmental-restoration-along-ohio-river). Dema Law has been recognized as the first firm to serve as outside counsel to a sovereign government in NRD litigation, filing the first such claim over 25 years ago, and has represented four states and territories in complex environmental litigation. And Cohn Lifland is one of the oldest law firms in New Jersey, having been founded in 1924, and has a long history of driving environmental litigation in this State.

particularly, Rob Bilott, has over two decades of experience with PFAS litigation, including the first ever PFAS litigation in 1999, which served as the foundation for all such litigation that followed, including these litigations.[3]

35. In order to reach the Settlements, the Parties participated in countless meetings with the mediator and with each other, and exchanged large amounts of data, technical information, and analyses. Term sheets and proposed JCOs were reached through multiple days of in-person negotiations that often went late into the evening with the mediator's supervision, and following the exchange of dozens of drafts reviewed by numerous lawyers and client representatives on all sides. The mediator's supervision of these activities ensured they proceeded in the utmost good faith, and his dual role as Special Master and grasp of the issues enabled the Parties to receive frank, open perspective about their positions, aiding resolution.

36. The Settlements' substantive fairness and reasonableness are supported by the State undertaking an evaluation of the potential costs and damages at the Industrial Sites and to address PFAS statewide, analyzing pragmatic factors to assign liability to the Settling Defendants, and recovering what it could under the

---

[3] *See* NY Times Magazine, "The Lawyer Who Became DuPont's Worst Nightmare," (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html; Taft Stettinius & Hollister, LLP, "Taft is a Global Leader in PFAS Forever Chemicals Litigation and Advisory Work," https://www.taftlaw.com/services/case-studies/taft-is-a-global-leader-in-pfas-forever-chemicals-litigation-and-advisory-work/).

circumstances, taking into account time, litigation risk, and the Settling Defendants' financial position in consideration of their mounting PFAS liabilities.

37. For example, the State's recovery of natural resource damages related to Chambers Works through the Settlements, which is $205 million, is approximately 50% of the primary and compensatory restoration NRD the State would have sought to obtain at the conclusion of the Chambers Works trial based on the estimates prepared by its experts, which totaled over $425 million.

38. For purposes of settlement, the State's consultants also conducted an estimate for compensatory restoration for the three remaining industrial sites, based on Habitat Equivalency Analysis and Resource Equivalency Analysis (which are standard methods often used for calculating compensatory restoration damages). The combined natural resource damages recovery for the Industrial Sites to be paid by the DuPont Defendants represents approximately 30% of the estimated compensatory restoration natural resource damages for those Sites.

39. With respect to statewide PFAS cleanup costs, the total cost to cleanup PFAS in all environmental media across New Jersey is not ascertainable without decades of remedial investigations across thousands of individual sites, waterways, natural areas, and environmental management systems.

40. Nevertheless, the State considered: (1) the well understood impacts of PFAS and resulting fiscal needs to address the presence of these chemicals in

environmental media and infrastructure, (2) the known and suspected impacts of PFAS that have not been fully characterized, (3) the uncertainty with respect to the overall future costs to address PFAS on a statewide basis, and (4) the availability of existing funding sources to address PFAS impacts.

41.    The State considered that the total statewide present value estimated cost to address PFAS in New Jersey's public water systems might be $1.77 billion based on one estimate. However, 3M's and DuPont's nationwide class settlements with most public water systems within New Jersey will provide nearly $500 million to New Jersey's public water systems to address PFAS abatement costs. Accordingly, significant funding to support PFAS treatment costs by public water systems within the State is already being provided through the 3M and DuPont nationwide class settlements.

42.    The State is also providing assistance to homeowners whose private potable drinking water wells have been contaminated with PFAS and has invited thousands of additional private well owners to apply for State funds to treat their PFAS-contaminated well water.

43.    Utilizing PFAS data collected pursuant to the Private Well Testing Act, the Department invited thousands of additional private well owners to apply for State funds to treat their PFAS-contaminated well water.

44. Based on the Department's historic Spill Fund payment data, the average capital costs to install PFAS-treatment on a private well is between $3,500 and $4,500. Even if a substantial percentage of the State's 290,000 private well owners ultimately seek reimbursement from the State to address PFAS, the total costs to address private wells are anticipated to be far less than those to address public water systems.

45. As discussed above, the nearly $500 million that will be paid to New Jersey's impacted community public water systems under the nationwide class settlements will address a substantial portion of the costs necessary to address PFAS-contaminated drinking water in the State. Consequently, a very substantial portion of the settlement funds from the State's proposed DuPont and 3M Settlements will be available to address other public needs, including drinking water that is not covered by the class settlements, publicly-owned treatment works, and direct-PFAS-discharge sites, including airports, firefighting training academies, and landfills.

46. The State also considered a variety of information to evaluate the Settling Defendants' responsibility for statewide cleanup costs. For example, the State considered various groups that bear responsibility for statewide PFAS contamination, including manufacturers of PFAS and PFAS-containing products as well as dischargers. In developing an allocation for the purposes of the Settlements, the State considered allocations undertaken in the AFFF MDL, information

16

regarding the relative contribution of PFAS to the environment from use in manufacturing versus AFFF and other products, and the types and extent of manufacturing in New Jersey, specifically. Attached as Exhibit G is a true and correct copy of the Bates NJ-LEGACY-0010217, which summarizes a study on the relative contribution of PFOA and PFNA to the environment.

47. Throughout the negotiations, the State leveraged the expertise of the Department as well as worked with confidential highly sophisticated financial experts, economists, engineers, hydrogeologists, and environment scientists to assist the State in evaluating damages and costs as well as Settling Defendants' ability to pay. In addition to considering the companies' cashflow and assets, the State weighed the companies' potential nationwide and global liabilities and considered them in evaluating what the Settling Defendants could pay.

48. The State also took into account that, in the absence of the Settlements, litigation would be prolonged, while the outcome of the State's claims would remain uncertain. While the Chambers Works case alone would have involved at least one more bench trial and a jury trial, there were still the *three other* Industrial Site-specific cases that needed to be fully litigated (involving voluminous documents, witnesses, and experts) and tried to this Court. Accounting for inevitable appeals, litigating and trying these four cases to completion would have taken, at a minimum,

many more years—on top of the more than six years it already required for the State to get the Chambers Works case to trial.

49. In sum, the State negotiated reasonable Settlements that secure significant remediation commitments and substantial monetary payments that will allow the State to immediately invest funds throughout New Jersey to address PFAS and other contamination.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 21, 2025

_____/s/ David M. Reap_____<br>David M. Reap, Esq.