# EXHIBIT B

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION'S RESPONSE TO PUBLIC COMMENTS REGARDING PROPOSED JUDICIAL CONSENT ORDER RESOLVING CLAIMS AGAINST EIDP, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, DUPONT SPECIALTY PRODUCTS, DUPONT DE NEMOURS, AND CORTEVA**

## Background

On August 5, 2025, the Department announced a proposed Judicial Consent Order ("Proposed DuPont JCO" or "Settlement") to resolve the State's claims against the DuPont Defendants[1] related to the Chambers Works Site, the Pompton Lakes Works Site, the Parlin Site, and the Repauno Works Site, as well as to protect the public from the harms of PFAS Contamination statewide. Those claims included those asserted against the DuPont Defendants by the State through the Chambers Works case, 1:19-cv-14766 (D.N.J.), the Pompton Lakes Works case, 2:19-cv-14758 (D.N.J.), the Repauno Works case, 1:19-cv-14765 (D.N.J.), the Parlin case, 3:19-cv-14767 (D.N.J.), the New Jersey AFFF Statewide Case, 2:19-cv-02199 (D.S.C.), and the Statewide PFAS Directive, along with related unasserted claims.

Under the Settlement, the DuPont Defendants will make payments of $875 million, including $225 million for natural resource damages ("NRD"), $525 million in abatement funding, and $125 million for costs, attorneys' fees, and punitive damages. The Proposed DuPont JCO also reaffirms the DuPont Defendants' obligation to fully and finally remediate the Chambers Works Site, the Pompton Lakes Works Site, the Parlin Site, and the Repauno Works Site, and to establish up to $1.676 billion in financial assurance mechanisms to ensure the costs of cleaning up those sites is not borne by the State and its taxpayers. The State's Settlement with the DuPont Defendants is further complemented by its proposed settlement with 3M, as well as the State's previously approved settlements with Solvay Specialty Polymers USA, LLC and Arkema Inc. Together, these settlements accumulate over $1.2 billion in cash to be used for PFAS abatement projects across the State that protect the public health and environment, in addition to nearly $3 billion in total value (including enforceable commitments by the settling defendants to complete remediation that includes PFAS). These settlements represent critical and essential steps in protecting the State's residents and resources from the impacts of PFAS contamination.

The Department created a dedicated website for this Settlement, available at https://dep.nj.gov/dupont/, that includes pertinent information and documents, including the press release announcing the Proposed DuPont JCO, frequently asked questions, PFAS information, the Proposed DuPont JCO, and the scheduling order for briefing on the State's motion to approve the Settlement. The Department also published notice of the Proposed DuPont JCO in the *New Jersey Register* on September 2, 2025, which stated that the Department would accept public comments on the Proposed DuPont JCO a period of 60 days. 57 N.J.R. 2017(a) (Sept. 2, 2025). Copies of the notices were also posted to the Department's dedicated website, emailed to each of the Department's political subdivision contacts, and sent to numerous other interested parties in accordance with the notice provisions set out in the Settlement. Also as required under the

---

[1] As referred to herein, the "DuPont Defendants" are EIDP Inc., The Chemours Company, The Chemours Company FC, DuPont de Nemours (also known as "New DuPont"), DuPont Specialty Products, and Corteva.

1

Settlement, the DuPont Defendants arranged for notices to be published in print and electronic versions of widely-circulated New Jersey newspapers.

The Department acknowledges and extends appreciation to all commenters for their submissions during the public comment period; all comments were carefully considered. The Department received 64 comments from political subdivisions, associations, individuals, and others, raising a variety of important issues for the Department's consideration.

After carefully considering all comments received, including late-submitted comments, the Department has determined that the Settlement is fair, reasonable, consistent with the objectives of the New Jersey Spill Compensation and Control Act ("Spill Act"), and in the public interest. Accordingly, the Department will file a motion in the U.S. District Court of New Jersey on November 21, 2025, seeking approval of the Proposed DuPont JCO along with the Proposed 3M JCO. Further information regarding deadlines associated with this briefing is available on the dedicated settlement webpage and the federal court docket.

This Response to Public Comments Received addresses the comments received on the Proposed DuPont JCO by topic. Capitalized terms have the meaning given to them in the Proposed DuPont JCO. Where comments shared similar subjects or issues, they were grouped together and responded to collectively. Comments have been paraphrased unless they appear in quotations.

## Response to Public Comments Received

1. **COMMENT:** Numerous commenters commended the Department on this historic Settlement to remediate PFAS and other contamination.

   **RESPONSE:** The Department appreciates the comment. The Settlement, which was achieved after more than six years of hard-fought litigation, is the largest environmental settlement in the history of New Jersey. The Department has secured exceptional relief from the DuPont Defendants that will meaningfully improve and protect the State's environment, natural resources, and public health.

## Recovered Amount – in General

2. **COMMENT:** The recoveries under the Proposed DuPont JCO should not be paid out over a span of 25 years.

   **RESPONSE:** The Proposed DuPont JCO includes significant up-front payments—a total of $275 million in the first two years and a total of $400 million within the first 5 years—with the remainder to be paid over time, as provided in Exhibit A. The Department will leverage the earning potential of this money, in addition to the money received under the Proposed 3M JCO, as it is received, growing and maximizing the amounts received—and thus available to the State's Political Subdivisions and residents—through highly effective programs like the New Jersey Water Bank that have invested billions of dollars to improve the State's water infrastructure and clean up contamination around the State.

Notably, courts have recently approved settlements addressing PFAS contamination that include payment schedules, such as 3M's nationwide water provider settlement. The court approved a 13-year payment schedule for that settlement due to "insolvency risk," which the State believes should be taken into account here as well. *See* Final Approval Order, *In re Aqueous Film-Forming Foams Products Liability Litigation*, 2:18-mn-2873, (D.S.C.), D.E. 4754, at 24 (Mar. 29, 2024).

3.  **COMMENT:** The Proposed 3M JCO allocates redundant funding to the Chambers Works Site due to the funding and commitments provided in the Proposed DuPont JCO.

    **RESPONSE:** For numerous reasons, it was appropriate that the Proposed 3M JCO allocated significant funds to PFAS Contamination Abatement Funding related to the Chambers Works Site. The Department alleges that the Chambers Works Site is one of the most significant sources of PFAS contamination in the world and has caused widespread PFAS contamination throughout Southern New Jersey, for which 3M bears unique responsibility having supplied over 500,000 pounds of PFOA products over the course of decades to the Chambers Works Site for use and disposal. The Chambers Works Site was also the subject of a scheduled trial with 3M that resulted in the Proposed 3M JCO. Further, when the 3M Proposed JCO was reached, the outcome of the Department's claims against DuPont related to the Chambers Works Site remained uncertain. As noted in the Response to Comments on the Proposed 3M JCO, Paragraph 51 of the Proposed 3M JCO provides the Department with discretion to allocate PFAS Contamination Abatement Funding statewide to protect the public health, safety, and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS.

4.  **COMMENT:** The amount recovered under the Proposed DuPont JCO is insufficient. How did the State calculate its damages and determine that the amount recovered is reasonable and in the public interest? Did it conduct a statewide damage assessment?

    **RESPONSE:** The Department understands this comment to apply to the monetary recovery for PFAS contamination statewide. The Department took into account a variety of factors in assessing statewide PFAS cleanup costs, including (1) the well understood impacts of PFAS and resulting fiscal needs to address the presence of these chemicals in environmental media and infrastructure, (2) the known and suspected impacts of PFAS that have not been fully characterized, (3) the uncertainty with respect to the overall future costs to address PFAS on a statewide basis, and (4) the availability of existing funding sources to address PFAS impacts.

    As an initial matter, 3M's and the DuPont Defendants' Public Water System Class Settlements will provide nearly $500 million to New Jersey's public water systems to address PFAS abatement costs. In addition, it is important to take into account the fact that the DuPont JCO requires remediation of PFAS contamination emanating from the Chambers Works and Parlin sites, while the Department's earlier settlements with Solvay and Arkema require certain remediation of PFAS related to their West Deptford Site and required payment to the Department of $122.3 million for PFAS abatement damages. Accordingly, by considering these prior settlements in conjunction with the 3M and DuPont

Settlements, there will be approximately *$1.4 billion* available to address PFAS in environmental media and infrastructure in the State, which is in addition to the expansive remediation efforts required under the State's settlements, which will address potable water impacts at some of the most significant PFAS-discharge sites in the State.

5.   **COMMENT:** The Proposed DuPont JCO is not substantively fair because it seeks to resolve the Settling Defendants' liability for the Delaware River without a comparative fault basis. The Proposed JCO must be modified to either carve out claims associated with the Delaware River or identify the total estimated investigation and remediation costs and natural resource damages associated with the Delaware River and a calculation of Settling Defendants' comparative fault for those costs and damages.

> **RESPONSE:** While the Department appreciates this comment, it respectfully disagrees with the legal analysis contained therein for several reasons. First, the Proposed DuPont JCO requires the DuPont Defendants to fully remediate the Industrial Sites, including any location to which Contaminants Discharged at or from the Sites have become located. The Proposed DuPont JCO does not release the DuPont Defendants from their obligation to remediate the Sites, including off-site impacts to the Delaware River, pursuant to applicable federal and State laws, regulations, and guidance.
>
> Second, unlike the West Deptford Solvay/Arkema plant, which is adjacent to a portion of the Delaware River that is owned, in part, by the State of New Jersey, the Chambers Works Site abuts a portion of the Delaware River (both upstream and downstream of the Site) that is owned by the State of Delaware, not the State of New Jersey.  Accordingly, the Delaware River in the vicinity of the Chambers Works Site, the location where the DuPont Defendants have contributed the vast majority of their PFAS to the River and where concentrations of PFAS being discharged from Chambers Works would be highest, is not a trust resource of the State of New Jersey. The Proposed DuPont JCO confirms that it cannot be construed as releasing the claims of any other trustees. The Delaware River, however, is a trust resource of the State in the vicinity of the Solvay/Arkema plant. Accordingly, the Department opted to reserve its Delaware River claims with respect to that site.
>
> Finally, to the extent the DuPont Defendants can be liable under the Spill Act as parties "in any way responsible for the hazardous substance" based upon their manufacture of PFAS-containing products, the State has determined that it would be extraordinarily difficult to prove such PFAS-containing products have caused measurable injuries to the Delaware River, itself, which has received PFAS from a substantial number of direct dischargers of PFAS.  The Department therefore determined that the value of a global settlement with the DuPont Defendants today, which ensures remediation of four of the most contaminated Industrial Sites in the State, while also obtaining hundreds of millions of dollars to address natural resource damages and PFAS abatement, was far greater than the value of any PFAS-manufacturer NRD claims the Department might be able to pursue with respect to the Delaware River at some unknown time in the future, especially in light of the astronomical cost of proving such claims in court.

6.  **COMMENT:** One commenter noted that the Proposed DuPont JCO allocates only $75 million of the total settlement to Pompton Lakes and asked whether that is equitable.

    **RESPONSE:** The Department wishes to clarify that the commenter's reference to $75 million concerns the NRD recovery arising out of or relating to Discharges at or from the Pompton Lakes Works Industrial Site, but the Proposed DuPont JCO has multiple components that are to the benefit of Pompton Lakes.

    The Proposed DuPont JCO recovers $225 million in NRD, of which $75,000,000—or one third of the total NRD recovery—is for NRD arising out of or relating to Discharges at or from the Pompton Lakes Works Industrial Site. In addition to the NRD recovery, the Proposed DuPont JCO requires the DuPont Defendants to pay $525,000,000 in Abatement Damages, which will be used in part to take actions to address environment, public health, and safety-related impacts from Industrial Sites Discharges, including Discharges associated with the Pompton Lakes Works Industrial Site. *See* Paragraph 6 (definition of "Abatement Damages"). Finally, the Proposed DuPont JCO requires the DuPont Defendants to fully and finally remediate the Pompton Lakes Works Industrial Site, and to secure the estimated cost to remediate with a Remediation Funding Source of up to $350,000,000 to ensure that the costs of remediation are not borne by the State and its taxpayers. Regardless of the ultimate cost, the DuPont Defendants are responsible for the full and final remediation of the Site.

7.  **COMMENT:** Commenters expressed that the Proposed DuPont JCO's effect would be to make clean water utilities and sewerage authorities responsible for bearing the costs of contamination DuPont caused.

    **RESPONSE:** The total abatement damages received under the 3M and DuPont Settlements—up to $795 million that will be held in a dedicated trust account ("PFAS Abatement Fund") administered by DEP—will provide a substantial source of funding to assist utilities and sewerage authorities. Using the best available science, DEP will prioritize the use of the PFAS Abatement Fund to most effectively address otherwise unmet needs to protect the public health and environmental from PFAS impacts, including the provision of water infrastructure funding for drinking water and clean water projects.

    New Jersey has a long-standing, successful framework to provide funding to support critical water infrastructure improvements. The New Jersey Water Bank (NJWB) is a partnership between the Department and the New Jersey Infrastructure Bank (I-Bank) to provide low-cost financing for the design, construction, and implementation of projects that help protect and improve water quality and ensure safe and adequate drinking water. Since making its first loan in 1987, the NJWB has supported approximately $11.5 billion in infrastructure projects across New Jersey and has saved approximately $3.3 billion in public financing.

    To ensure that water systems and publicly-owned treatment works ("POTWs") have a long-term, reliable funding source available for the necessary capital upgrades to address PFAS, the Department will allocate funding from the PFAS Abatement Fund to create a

brand-new capitalization source for the NJWB to supplement New Jersey's Clean Water and Drinking Water State Revolving Funds ("CWSRF" and "DWSRF," respectively), which will be dedicated to providing low-cost financing of water quality projects to address PFAS throughout the state. Deployment of the PFAS Abatement Fund to supplement the revolving SRFs ensures that long-term state-wide needs can be met through a stable, self-sustaining source of financing for PFAS water infrastructure, especially as PFAS monitoring, detection, and treatment technology continue to evolve.

The Department will allocate funds from the PFAS Abatement Fund as a significant additional capitalization source to supplement the CWSRF to provide financial assistance to owners of POTWs (towns, boroughs, municipal utilities authorities, counties, regional water authorities, other local government units, etc.) for clean water infrastructure projects that address PFAS. Such projects will be given a high project priority, and financial assistance will be allocated to clean water projects that address PFAS on a readiness to proceed basis.

In addition to securing significant funds, the Proposed DuPont JCO removes the risks and uncertainties of litigation, including but not limited to issues related to statute of limitations periods, causation, product identification, evidentiary issues, contributory negligence and/or statutory contribution claims against such entities, and more.

Over and above the funds that will be obtained through the Proposed DuPont JCO and the Proposed 3M JCO, the Department already has recovered approximately $122.3 million in abatement funds from Solvay Specialty Polymers USA, LLC and Arkema Inc.; the Department is prioritizing the provision of financial support to Public Water Systems to address PFAS contamination in the disbursement of those funds.

8. **COMMENT:** As a result of the Department's anticipated new Surface Water Quality Standards, WWTPs will soon be regulatorily required to remove PFAS from wastewater and/or biosolids. The costs of installing treatment to comply with these standards will far exceed the amount recovered through the Proposed DuPont JCO.

**RESPONSE:** The Department intends to propose and adopt Surface Water Quality Standards for PFAS, in accordance with the requirements of the New Jersey Administrative Procedure Act. Surface Water Quality Standards for PFAS will not automatically result in the inclusion of water quality-based effluent limitations (WQBELs) in NJPDES permits, nor will end-of-pipe treatment be the default remedy.

The Department has developed a strategy to "Identify, Reduce and Eliminate" industrial discharges that may contain PFAS. The strategy focuses on industrial facilities that discharge either directly to surface water or to POTWs. NJPDES Discharge to Surface Water permits authorize the discharge of wastewater to surface water including domestic wastewater from POTWs. This strategy seeks to identify sources of PFAS via data collection and to reduce the use and discharge of PFAS through source reduction measures.

Consistent with DWQ's existing identify-reduce-eliminate strategy, the first step will be to require POTW operators to begin or complete their own data collection efforts so that they can identify sources of PFAS in their systems. In alignment with the NJPDES rules and current practices, monitoring requirements would be added to those permits where sufficient data is not yet available.

Upon adoption of the new standards, effective source identification and reduction will continue to be prioritized. Surface Water Quality Standards will authorize delegated local agencies (DLAs) to regulate discharges of PFAS by their upstream significant indirect users to reduce the levels of PFAS being sent to their POTWs. Again, end-of-pipe PFAS treatment will not be a presumptive requirement.

DWQ will continue to provide robust compliance assistance to POTWs, including through the development of compliance schedules as appropriate. DWQ intends to establish a compliance assistance plan and work closely with facilities to secure funding from the PFAS Abatement Fund through the NJWB in those instances where treatment infrastructure is needed.

The Department is aware that some delegated POTWs are actively investigating and/or implementing source control measures (i.e., treatment) with their industrial users through sampling and outreach. The Department is also aware that certain POTWs, both delegated and non-delegated, are actively sampling influent, effluent and residuals. The Department strongly encourages advanced planning through sampling and investigation to assess current needs. POTWs that have proactively assessed existing needs will be well positioned to apply for financial assistance made available under the PFAS Abatement Fund through the NJWB.

9. **COMMENT:** Regulators are also considering air quality standards for PFAS, which would impose additional costs on sewerage authorities that use or intend to use an incinerator for biosolids. These costs will also exceed the amount recovered through the Proposed DuPont JCO.

> **RESPONSE:** New Jersey regulates air pollution pursuant to the Air Pollution Control Act (N.J.S.A. 26:2C) and specifically at N.J.A.C 7:27. The Air Pollution Control Program regulates stationary sources through an Air Quality Permitting Program and prohibits and limits toxic air. Reducing air toxics are critical to limit exposure of the public to adverse health impacts from inhaling these substances or deposition that impacts waterways and therefore water quality. The overwhelming majority of regulated Air Toxics are based on the substances already regulated nationwide under the federal Clean Air Act. The Air Pollution Control Act establishes all substances designated under the federal Clean Air Act will be designated as air toxics under New Jersey law. New Jersey can and has independently regulated additional air toxic substances when doing so is in the best interest of human health, welfare, and the environment.

> Currently, PFAS are not regulated by EPA under the federal Clean Air Act as hazardous air pollutants (HAP). In an August 29, 2024, petition to EPA, New Jersey joined with two

other states urging the EPA to list PFOA, PFOS, PFNA, and GenX (HFPO-DA) as HAPs under Section 112 of the Clean Air Act. PFAS are also currently not regulated under the State air toxics regulations. While EPA considers whether it will act upon the interstate petition, New Jersey will begin the process to regulate PFAS as an air toxic at the state level. DEP is pursuing the first step in the process of amending the air quality regulations, which is to publish a determination that it is in the best interest of human health, welfare and the environment to regulate certain PFAS as air contaminants.

While those efforts are ongoing, DEP recommends that sewerage authorities monitor biosolids for PFAS contamination, identify likely industrial discharges of PFAS, and implement source reduction measures where appropriate. Doing so will help prevent downstream PFAS contamination and reduce the concentration of PFAS in biosolids.

10. **COMMENT:** The Department should require the DuPont Defendants to negotiate supplemental settlements with private entities that own and/or operate public drinking water systems in the State of New Jersey to make them whole.

> **RESPONSE:** The Proposed DuPont JCO is intended, in part, to serve as an additional source of funding to be distributed to Public Water Systems for addressing PFAS contamination in drinking water, beyond 3M's and the DuPont Defendants' Public Water System Class Settlements. Virtually all Public Water Systems are participating in those settlements, and, in agreement for releasing their claims related to drinking water, are receiving settlement funds. The State, through entering into this Settlement, also sought to secure financial assistance for systems that were not or could not participate in those settlements.
>
> The requirement suggested by the commenter runs contrary to the framework of the Settlement, which provides the Department with resources that it can best calibrate and deploy throughout the State to protect public health and the environment from the impacts of PFAS.

### Recovered Amount – Management of Funds

11. **COMMENT:** The Department should use the AFFF MDL Public Water System Settlement Claims Form agreed to in the AFFF MDL as a guide to allocating funds. The Department also should use the scoring system and range table implemented in the AFFF MDL to allocate settlement funds.

> **RESPONSE:** The Department has existing frameworks for distributing the PFAS Abatement Funds that are designed to protect the public health and the environment and calibrate funding across the State, purposes which are not taken into account in the process referenced by the commenter.
>
> New Jersey has a long-standing, successful framework to provide funding to support critical water infrastructure improvements. The NJWB is a partnership between the Department and the New Jersey Infrastructure Bank (I-Bank) to provide low-cost financing

for the design, construction, and implementation of projects that help protect and improve water quality and ensure safe and adequate drinking water. Since making its first loan in 1987, the NJWB has supported approximately $11.5 billion in infrastructure projects across New Jersey and has saved approximately $3.3 billion in public financing.

The NJWB currently finances projects by utilizing two primary funding sources. The I-Bank issues revenue bonds which are used in combination with zero percent interest funds to provide very low interest loans for water infrastructure improvements. The Department administers a combination of Federal State Revolving Fund (SRF) capitalization grants, as well as the State's matching funds, loan repayments, State appropriations, and interest earned on such funds. The NJWB administers New Jersey's CWSRF and DWSRF under the federal Clean Water Act and Safe Drinking Water Act, respectively. SRF is a revolving/self-perpetuating loan program, in that SRF loan repayments are committed to finance future projects in perpetuity.

The Department's existing funding strategy through the NJWB is designed to provide essential capital for critical water infrastructure projects that safeguard public health and the environment for current and future generations of New Jersey citizens. The Department's long-term goals include maintaining the NJWB as the State's leading source of environmental infrastructure financing through self-sustaining, efficient, and transparent programs; establishing a permanent funding source for clean and drinking water infrastructure; offering significantly lower-cost financing than individual participants could typically secure; and improving access to capital markets for systems facing challenges due to credit ratings or limited experience with debt financing.

Through the proposed 3M and DuPont Settlements, the PFAS Abatement Fund will provide significant additional capitalization for necessary PFAS infrastructure projects through the NJWB to supplement the Clean Water and Drinking Water SRFs.

The priorities and policies of the NJWB are established in annual Intended Use Plans (IUPs). The Priority System/IUP document must be developed annually, undergo a public participation process, and be approved by the US Environmental Protection Agency or the State to qualify for SRF capitalization grants to support the NJWB. This yearly planning mechanism is informed by users of the Water Bank and is rooted in transparency and stakeholder input in the use of funds.

12. **COMMENT:** The Department should make clear that the abatement funds will not be allocated or distributed solely through the Spill Fund.

**RESPONSE:** The Department will not distribute the Abatement Damages received through the Settlement solely, or even primarily, through the Spill Fund. To ensure that water systems and POTWs have a long-term, reliable funding source available for the necessary capital upgrades to address PFAS, the Department will primarily use the Abatement Damages to create a brand-new capitalization source for the New Jersey Water Bank to supplement New Jersey's Clean Water and Drinking Water State Revolving Funds

(the "CWSRF" and "DWSRF," respectively) that will be dedicated to providing low-cost financing of water quality projects to address PFAS throughout the state.

13. **COMMENT:** The funds recovered under the Proposed DuPont JCO, other than those recovered for natural resource damages, must be deposited to the State's General Fund or into a new fund created by legislative enactment.

    **RESPONSE:** The Department disagrees with the comment. The funds will be placed in an appropriate dedicated account(s) consistent with the purposes of the Settlement and in accordance with applicable law.

14. **COMMENT:** The Department should modify the Proposed DuPont JCO to include a requirement that the State will enact legislation creating a remediation and victim compensation fund with an advisory board, into which the abatement funding would be deposited. The Advisory Board should be granted rulemaking authority for the administration of these funds.

    **RESPONSE:** The Department does not believe such modification is necessary or that this is an appropriate term in a settlement agreement. Further, the Proposed DuPont JCO does not release personal injury claims. For that reason, the Settlement Payments will not be used to compensate individuals who allege personal injury from PFAS.

15. **COMMENT:** The escrow agreement referenced in paragraph 7(b) of the Proposed DuPont JCO has not been made available for review. The escrow agreement is a material element of the Settlement and the Court cannot approve the Settlement without reviewing such agreement.

    **RESPONSE:** The Escrow Agreement is not a material element of Proposed DuPont JCO. Rather, it is an exhibit that relates to a standard settlement provision in the Proposed DuPont JCO.

    The essential terms governing the purpose and use of the Escrow Account are set forth in Paragraph 7 of the Proposed DuPont JCO. As stated in Paragraph 7(b), the purpose of the Escrow Account is to hold the Settlement Payments in escrow until the Proposed DuPont JCO has become final and non-appealable. When the Proposed DuPont JCO becomes final after all appeals (if any) have been exhausted, all funds in the Escrow Account will be paid to the State Treasury and placed in appropriate State accounts. If, on the other hand, the Proposed DuPont JCO is overturned on appeal, the funds in the Escrow Account will be returned to the Settling Defendants. The Department has used escrow accounts for this purpose in numerous prior settlements approved by New Jersey courts.

    The escrow agreement for the Escrow Account is consistent with the substantive requirements of the Proposed DuPont JCO and is being presented to the Court as an exhibit to the Proposed DuPont JCO with the State's submission of a motion for approval.

16. **COMMENT:** The Proposed DuPont JCO violates the 2017 NRD Constitutional Amendment because it fails to allocate NRD recoveries to specific Industrial Sites on a yearly basis. The

Proposed DuPont JCO also violates the 2026 Appropriations Act because it fails to allocate between NRD and non-NRD recoveries on a yearly basis.

> **RESPONSE:** The Department disagrees that the Proposed DuPont JCO violates either the NRD Constitutional Amendment or any legislation. There is no requirement in the NRD Constitutional Amendment that prospective yearly recoveries of NRD be specifically stated in the Settlement. There is also no requirement in the 2026 Appropriations Act or elsewhere that prospective yearly recoveries of NRD or Abatement Damages be specifically stated in the Settlement. The Settlements sets out the total NRD amounts and the total Abatement Damages in Paragraph 7(c), and nothing more is required under the law.

17. **COMMENT:** The Proposed DuPont JCO allows for the 2027 NRD payment of $50 million to be spent as Additional Legal Fees. This would violate the Court Rule on contingency fees (R. 1:21-7) and New Jersey's NRD Constitutional Amendment.

> **RESPONSE:** The Proposed DuPont JCO secures $125 million as payment for attorneys' fees, costs, and punitive damages. If necessary, based on actual attorneys' fees and costs incurred, the Proposed DuPont JCO allows for up to $50 million of the Natural Resource Damages Amount and/or the Abatement Damages Amount to be used for attorneys' fees and costs. The total amount of attorneys' fees and costs that will be paid to the Department's counsel in connection with the Settlement has not yet been calculated. However, the Department expects this amount to be less than $175 million. When the final amount of attorneys' fees has been determined, the Department's counsel will file a motion with the U.S. District Court requesting approval of the fee amount, and the Court will only approve those fees if it finds that they are reasonable and consistent with the law.

### Recovered Amount – Eligibility to Receive Funds

18. **COMMENT:** Will the Department involve the Political Subdivisions that surround the four Industrial Sites in the NRD allocation process?

> **RESPONSE:** The Department is committed to robust engagement with stakeholders and the wider community in the process of identifying, selecting, planning, and implementing restoration projects with the NRD funds recovered through the Proposed DuPont JCO. *See, e.g.*, Commissioner Administrative Order 2023-08 at ¶¶ 7-13 (March 2023), *available at* https://dep.nj.gov/wp-content/uploads/dep-ao-2023-08-natural-resource-restoration-policy.pdf (last visited Nov. 13, 2025). The Department will work with community leaders in each of the impacted municipalities as part of its careful consideration of appropriate restoration projects.

19. **COMMENT:** The Proposed DuPont JCO does not provide sufficient clarity regarding how the settlement payments will be allocated. Failure to provide an application framework now makes the Proposed DuPont JCO deficient.

> **RESPONSE:** The Department will develop a process through which Political Subdivisions, residents, and others can apply to receive PFAS Contamination Abatement

Funding provided to, then allocated by, the Department under the Proposed DuPont JCO. This process will not be, and need not be, finished before the Proposed DuPont JCO may be approved. Indeed, the Department followed a similar procedure with respect to its court-approved settlement with Solvay Specialty Polymers USA, LLC. The Department finished developing a process for submitting applications for funding projects to address PFAS contamination under the settlement after, not before, the Court's approval of the settlement. Moreover, different Public Water Systems, POTWs, and others will be in a position to obtain and use funds for various projects at different times. To pre-allocate funds at this point would reduce the Department's ability to have flexibility in the future to best deploy those funds for the protection of the State's residents and resources.

20. **COMMENT:** The Proposed DuPont JCO should be modified to make clear that the entire amount of Abatement Damages recovered through the Settlement ($525 million) will be allocated to Political Subdivisions with contaminated water and other media in exceedance of applicable regulations, such as MCLs.

> **RESPONSE:** The Department agrees with the commenter that a priority use for the Abatement Damages recovered through the Settlement should be to assist Political Subdivisions with the costs of treating drinking water in exceedance of applicable regulations. However, Abatement Damages will also be used to protect public health, safety, and the environment in other ways, including through the provision of assistance to residents with the costs of treating contaminated drinking water sourced from Private Potable Wells.
>
> The Department reiterates that the Abatement Damages recovered through the Proposed DuPont JCO will supplement and enhance other funding sources already available to Political Subdivisions, such as the CWSRF, the DWSRF, and the Spill Fund. The Abatement Damages recovered through the Proposed DuPont JCO is not, and will not be, the only source of funding made available by the Department to the State's Political Subdivisions for the purpose of treating contaminated water and other resources.

21. **COMMENT:** The Proposed DuPont JCO should be modified to earmark at least half of the abatement fund ($262.5 million) to New Jersey public water providers that opted out of the AFFF MDL Public Water System Class Settlement.

> **RESPONSE:** The Department must retain discretion to allocate Abatement Damages to Political Subdivisions, residents, and others for the benefit of the State's environment and residents as a whole. The Department therefore declines to modify the Proposed DuPont JCO as requested, which would pre-designate funds for a very small number of Public Water Systems without regard to a more comprehensive strategy to protect the State's natural resources and residents.

22. **COMMENT:** Will any abatement funding be reserved specifically for wastewater treatment?

> **RESPONSE:** The Department has continued to prioritize addressing PFAS in Drinking Water Supplies because this remains the most significant exposure pathway. The

Department continues to recognize that other sources of PFAS to the environment must be addressed, including wastewater, and confirms here that funding sources will be reserved under the Proposed DuPont JCO for this purpose. See also Response to Comment #7.

DEP will allocate funds from the PFAS Abatement Fund as a significant additional capitalization source to the NJWB to supplement the Clean Water State Resolving Fund to provide financial assistance to owners of POTWs (towns, boroughs, municipal utilities authorities, counties, regional water authorities, other local government units, etc.) for clean water infrastructure projects that address PFAS. Such projects will be given a high project priority, and financial assistance will be allocated to clean water projects that address PFAS on a readiness to proceed basis. Funding packages may consist of principal forgiveness, interest free DEP loans and I-Bank's AAA Market Interest Rate loan funding for remaining project costs.

**23. COMMENT:** The Department should clarify whether the scope of eligible funding includes both up-front capital costs to install PFAS treatment facilities and the increased operations and maintenance costs of PFAS treatment.

**RESPONSE:** DEP will prioritize the allocation of funding from the PFAS Abatement Fund to provide consistent year-over-year support for water infrastructure improvements necessary to reduce the occurrence of PFAS within the water cycle. The Department will consider the most efficient way to provide funding for the protection of the public health and the environment, and while some funding may be made available for operations and maintenance costs, the Department will be prioritizing up-front capital expenditures, which it anticipates prioritizing over ongoing operation and maintenance activities.

**24. COMMENT:** It would be impractical to require municipalities to pay for PFAS remediation and/or treatment and then seek reimbursement for those costs.

**RESPONSE:** The Department will develop a process through which Public Water Systems and/or other entities can apply to receive abatement funding provided to the Department under the Proposed DuPont JCO. Nothing in the Proposed DuPont JCO requires the Department to solely allocate or prioritize allocation of abatement funding to reimbursement of past expenditures, and it is not the Department's intent to limit availability of funding that way.

**25. COMMENT:** Please confirm that nothing in the Proposed DuPont JCO precludes the Department from expending funds to reimburse any water system that has already commenced and implemented abatement projects related to PFAS Contamination. Further, the Department should confirm that the priority of Public Water Systems, among others, is not diminished in any way where a Public Water System has already expended costs to address PFAS Contamination.

**RESPONSE:** Nothing in the Proposed DuPont JCO is intended to preclude potential reimbursement of funds that have already been expended to address PFAS Contamination. The Department will develop a process through which entities impacted by PFAS can apply

to receive PFAS Contamination Abatement Funding. The Department will also continue to offer funds to Public Water Systems, wastewater treatment systems and facilities, and/or other impacted entities or individuals through other sources of funding, including through its existing loan programs and revolving funds. The Department notes that although nothing in Proposed DuPont JCO precludes the Department from reimbursing Public Water Systems for past expenditures to address PFAS contamination, the circumstances of such expenditures and any prior reimbursement the Public Water System may have already received, including but not limited to funding already received by a Public Water System through the Public Water System Class Settlement, may be factors that the Department considers when allocating PFAS Contamination Abatement Funding.

26. **COMMENT:** Does the State intend to use the funds recovered under the Proposed DuPont JCO to indemnify municipal entities for claims of PFAS damages? Will the indemnification continue after all settlement funds are exhausted?

> **RESPONSE:** The Proposed DuPont JCO recoveries will not be used to indemnify Political Subdivisions. The Department notes that the Proposed DuPont JCO offers important protection to Political Subdivisions in that under Paragraph 74(b): "No Settling Defendant or Released Entity shall seek contribution to recover any amount that Settling Defendants have paid pursuant to this JCO…from any Government Entity of the State or any of the State's Political Subdivisions."

27. **COMMENT:** Will there be a fund created under the Proposed DuPont JCO to treat individuals' illnesses?

> **RESPONSE:** The Proposed DuPont JCO is not intended to address personal injury claims. For that reason, there is no funding for this purpose. Individuals retain the ability to pursue claims for personal injury, which are "Purely Private PFAS Claims," against the DuPont Defendants. Personal injury claims are not released by the Proposed DuPont JCO.

## **Remediation**

28. **COMMENT:** DuPont should be required to clean up all of the on- and off-site contamination related to the Industrial Sites (Parlin, Pompton Lakes, Repauno, and Chambers Works), and to pay the entire cost of cleanup.

> **RESPONSE:** The Department agrees. The DuPont JCO requires that the Chambers Works Site, the Pompton Lakes Works Site, the Parlin Site, and the Repauno Works Site be fully and finally remediated by the Settling Defendants. The DuPont JCO also secures Remediation Funding Sources to support cleanup activities, but the DuPont Defendants must complete the cleanup regardless of its ultimate cost.

29. **COMMENT:** What is the timeline for the remediation of each of the Industrial Sites?

> **RESPONSE:** The timeline for the remediation for each of the Industrial Sites will differ based on site-specific considerations. The Proposed DuPont JCO affirms the obligations of

the DuPont Defendants to fully and finally remediate each of the Industrial Sites in accordance with applicable State and federal law, regulations, and guidance.

30. **COMMENT:** How can the public participate and comment on the remediation activities at the Industrial Sites?

**RESPONSE:** There are several avenues by which interested members of the public may be kept informed about the status of the remediation at any of the Industrial Sites. Sampling data and other materials submitted to the Department may be obtained via a request to the Department under the Open Public Records Act; request forms are available at https://www.nj.gov/dep/opra/opraform.html. Members of the public can also obtain information through the DEP DocMiner (https://dep.nj.gov/docminer/), which allows a user to download copies of documents received by the DEP, or through the DEP DataMiner (https://njems.nj.gov/DataMiner), which makes available a variety of reports on sites undergoing remediation. Parties conducting remediation are also subject to the public outreach requirements of N.J.A.C. 7:26C-1.7, including the requirement, set forth at N.J.A.C. 7:26C-1.7(o), to conduct additional public outreach based on the needs of the community, substantial public interest, and other site-specific circumstances as determined by the Department. The Department will also engage with the public on the selection of restoration projects funded by the NRD recovered as part of the Settlement.

31. **COMMENT:** Does the Proposed JCO require the DuPont entities to stop or change their operations that caused PFAS contamination in the first place?

**RESPONSE**: The Department notes as an initial matter that most of the allegations forming the basis of the State's complaints regarding the Chambers Works and Parlin Industrial Sites concerned operations related to PFAS that have ceased or been modified over the course of many years. Nevertheless, there are still operations that may result in the release of PFAS from these Sites. Therefore, the Department has required the DuPont Defendants to further reduce PFAS releases from the Sites, including but not limited to issuing more stringent permitting requirements.

To ensure that all effective measures are being taken to control any ongoing or future PFAS releases from these Sites, the Proposed DuPont JCO also requires Chemours and DuPont Specialty Products to undertake, for their respective operations at the two Sites, an evaluation of the continued presence and discharge of PFAS within and from their ongoing operations. Chemours and DuPont Specialty Products are required to report the results of their evaluation to the Department within 12 months of the JCO Entry Date and then meet with the Department to discuss additional measures to further reduce PFAS releases. The Department will evaluate that report and reserves the right to take action in the future if warranted.

32. **COMMENT:** The Department should not withdraw Discretionary Direct Oversight for the Chambers Works Site. It should instead place the Pompton Lakes and Repauno Sites in Discretionary Direct Oversight and maintain the Compulsory Direct Oversight requirements

in place for the Parlin Site. The DuPont Defendants have shown they cannot be trusted to properly remediate these sites.

>**RESPONSE:** While the Department appreciates the commenter's concern, the Department believes that Proposed DuPont JCO provides sufficient protections to ensure that the Industrial Sites will be fully remediated. The Proposed DuPont JCO affirms the Settling Defendants' obligations to fully remediate each of the Industrial Sites until such time as the Department issues a sitewide Final Remediation Document for all environmental media for the Site. The Proposed DuPont JCO also requires the Settling Defendants to establish (and maintain) Remediation Funding Sources for each of these Sites—ensuring that if the DuPont Defendant responsible for the remediation at an Industrial Site fails to complete the remediation, the Department will have the ability to step in and have access to adequate funding to complete the remediation itself. Considering the totality of the commitments made by the DuPont Defendants through the Proposed DuPont JCO, the Department believes it is appropriate to withdraw the Chambers Works Site from Discretionary Direct Oversight and to agree not to assert Discretionary Direct Oversight over any of the Industrial Sites for past Discharges. The Department has reserved the right to assert Discretionary Direct Oversight over any of the Industrial Sites for Discharges that may occur in the future.

>The Department notes that Compulsory Direct Oversight is triggered by statute and the Department has not agreed to waive Compulsory Direct Oversight for any of the Industrial Sites if the relevant statutory criteria are met. The commenter is correct that the Parlin Site is in Compulsory Direct Oversight due to a failure to meet specific remediation timeframes. The Department has agreed through the Proposed DuPont JCO to meet with DuPont Specialty Products to discuss whether it would be appropriate to adjust certain Direct Oversight requirements. Such meeting has not yet occurred, and the Department has not made a determination that it would be appropriate to adjust any Direct Oversight requirements at the Parlin Site. Any proposed adjustment to Direct Oversight at the Parlin Site would be subject to additional public notice and comment.

**33. COMMENT:** The Proposed DuPont JCO should not rely on financial security mechanisms, such as surety bonds, in lieu of cash payments.

>**RESPONSE:** The surety bond mechanisms permitted under Paragraph 14(a) of the Proposed DuPont JCO are for the purposes of establishing Remediation Funding Sources to secure the remediation of each of the Industrial Sites. The Brownfield Act specifically permits surety bonds as a reliable mechanism for establishing an RFS. N.J.S.A. 58:10B-3(b)(6).

## <u>Scope of Release – in General</u>

**34. COMMENT:** The Proposed DuPont JCO threatens to extinguish virtually all personal injury claims by private citizens in New Jersey related to PFAS exposure given the definition and use of the term "Purely Private PFAS Claim."

**RESPONSE:** Paragraph 54 of the Proposed DuPont JCO ("Statewide PFAS Release and Covenant Not to Sue") excludes "Purely Private PFAS Claims." Purely Private PFAS Claim, in turn, is defined to include any Personal Injury that allegedly arises from Covered Conduct or seeks recovery for a Covered Harm. The Department asserts that the Parties intended this to be true regardless of whether the individual's injury was allegedly caused by ingesting, or being exposed to, drinking water with elevated PFAS levels. This point holds true for Claims for Personal Injury that have or have not yet been filed, whether in state court or in federal court.

35. **COMMENT:** The release is inappropriate due to continuing unknowns regarding PFAS, including impacts on human health and the environment, the number of sites that may ultimately require remediation, and future regulations, among other unknowns.

**RESPONSE**: By their nature, settlements of litigation often must consider both known unknown information. There is significant benefit to the public in obtaining relief from the DuPont Defendants now as opposed to potential, speculative relief years from now, which would be by no means guaranteed if the State or its Political Subdivisions were to continue to litigate against the DuPont Defendants.

Moreover, while not everything is known about PFAS, their harmful effects on humans and the environment, even at low concentrations, are well established. Drinking water that contains PFAS is one of the most significant pathways of exposure and has the potential to contribute to human exposure more than other common source of PFAS. Addressing what is known to be a significant threat today, by prioritizing the treatment and removal of PFAS found in drinking water to protect the public health and the State's water resources is appropriate under the circumstances. The State has obtained significant resources to be used for PFAS abatement projects through the Proposed 3M JCO, the Proposed DuPont JCO, and the Solvay and Arkema JCOs. Were the State to have waited until there was absolutely certainty about all aspects of potential future issues, none of these settlements and the benefits they provide would be possible.

36. **COMMENT:** The Proposed DuPont JCO treats wastewater treatment plants inequitably and arbitrarily, because public water systems had the opportunity to litigate their claims in the AFFF MDL and participate in a national class action settlement with the DuPont Defendants, but wastewater treatment systems will not have this opportunity.

**RESPONSE:** The Department has determined that the PFAS Abatement Funding that will be made available through the Proposed 3M JCO and the Proposed DuPont JCO, in combination with other State and federal funding sources, best positions the State's Political Subdivisions, including wastewater system owners and/or operators, to receive funds to address PFAS Contamination for the protection of the State's residents and natural resources in a timeframe appropriate for the pressing need to take such protective action. In addition to making funds available sooner than they could ever be through a hypothetical class action settlement that has not been proposed, let alone entered into and judicially approved (processes that take years in and of themselves), this mechanism removes the risks of litigation, including but not limited issues related to limitation periods, causation,

product identification, evidentiary issues, contributory negligence and/or statutory contribution claims against such entities, and more.

Indeed, while the commenters suggest they will be barred from joining a hypothetical nationwide class action on behalf of wastewater treatment plants against the DuPont Defendants, there is no certainty that such an action will ever be certified, maintained, or ultimately resolved, let alone on terms that provide more compensation to class members than may be available to them through funding obtained by the State through the Proposed 3M JCO and the Proposed DuPont JCO. Public water systems, on the other hand, were recognized as a claimant group and prioritized as the first bellwether track by the AFFF MDL Court soon after the MDL was created in 2018, more than four years before the first water provider bellwether case was set for trial and 3M and DuPont announced their Public Water System Class Settlements in June of 2023, which were approved in 2024. There is no indication of when, if ever, a bellwether trial or individual wastewater cases could be tried in the AFFF MDL.

The Department disagrees that the Proposed DuPont JCO treats WWTPs inequitably or arbitrarily, as this circumstance is dictated largely by the sequencing of various stages of litigations.

37. **COMMENT:** The broad releases in the Proposed DuPont JCO will impair the ability of Delegated Local Agencies ("DLAs") to implement and enforce federal and state environmental protection programs.

    **RESPONSE:**  The Department disagrees with the commenters. Industrial facilities that discharge directly to surface water are regulated by the Department as NJPDES Category B (Industrial Wastewater) facilities. This includes Chemours's Chambers Works facility, DuPont Specialty Product's Parlin facility, and Chemours' former Repauno Works facility, which are permitted directly by the Department. The commenting Delegated Local Agencies have not identified any of the Settling Defendants as significant indirect users for which they have delegated permitting authority.

38. **COMMENT:** The Proposed DuPont JCO exceeds the Department's authority under the Clean Water Enforcement Act amendments to the Water Pollution Control Act.

    **RESPONSE:**  The Department disagrees with the commenters. The Department respectfully submits that the comment is based on speculation; the commenters have not identified any scenario based on present circumstances that would run afoul of the Clean Water Enforcement Act. Further, Paragraphs 29 and 56 of the Proposed DuPont JCO also make clear that the DuPont Defendants retain all obligations that may exist under federal and State statutes, regulations, and guidance to perform and/or fund Remediation at or from any sites currently or formerly owned, operated, or otherwise controlled by any of the Settling Defendants or any Released Entity anywhere within the State of New Jersey.

39. **COMMENT**: The Proposed DuPont JCO cannot release the rights or claims of Municipal Utility Authority users who are not from New Jersey.

**RESPONSE:** The Department agrees that the mere fact that waste produced by an individual residing in another state is treated at a facility in New Jersey does not cause that individual's claims to be released under the Proposed DuPont JCO.

### Scope of Release – Authority

40. **COMMENT:** The Department received comments from and/or on behalf of Political Subdivisions asserting that the State does not have the authority to release its Political Subdivisions' claims related to statewide PFAS contamination through the Proposed DuPont JCO.

    **RESPONSE:** The Department has closely examined the comments making this assertion, and has concluded that the State has ample bases and legal support for entering into the Proposed DuPont JCO, including the release provisions.

    The State is entering into the Proposed DuPont JCO in its capacity as *parens patriae* and trustee of New Jersey's natural resources to protect the health and well-being of its residents against the threat of PFAS contamination and to safeguard and restore public trust resources, including water supplies, for current and future generations. The State's interests in these matters are represented by the Attorney General—the State's chief legal officer and "defender of the public interest." *Petition of Pub. Serv. Coordinated Transp.,* 5 N.J. 196, 208 (1950). The State, acting through the Attorney General, is representing the public interest in matters of statewide significance, and its authority to sue and settle to protect the public interest includes the authority to sue and settle on behalf of its political subdivisions.

    It is well established that a state may take legal action as *parens patraie* to protect the "well-being of its populace." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Under the *parens patriae* doctrine, a state may seek to remedy an injury that infringes upon its "quasi-sovereign" interests, such as its interests in the health of its citizens or in a clean environment. *Id*. at 602. Here, the State is acting as *parens patriae* to protect its "quasi-sovereign interests" in the general health of its residents and the environment. PFAS contamination is prevalent in the environment throughout New Jersey, particularly in the State's water resources.

    The State's authority to act as *parens patriae* under these circumstances is bolstered by its responsibilities as trustee of the State's natural resources. The Commissioner, on behalf of the State, acts as the trustee, for the benefit of all the State's citizens, of all natural resources within the State's jurisdiction, including but not limited to water resources stretching across municipalities' borders. N.J.S.A. 58:10-23.11a. As trustee, the Commissioner acts as the ultimate guardian of these resources, and it is the Department—and the Department alone—that may sue to protect natural resources held in the public trust to serve all of the State's residents, rather than for the interests of only a subset of residents. *State, Dep't of Env't Prot. v. Jersey Cent. Power & Light Co.,* 125 N.J. Super. 97, 103 (Law. Div. 1973), *aff'd*, 133 N.J. Super. 375, (App. Div. 1975), *rev'd on other grounds*, 69 N.J. 102, (1976). All of this is further consistent with the State's broader role in the environmental arena as

carried out by the Department and recognized by New Jersey's courts: the Department has the primary authority to enforce the State's environmental laws and is the primary line of defense in ensuring those laws are carried out for the protection of the public. *See*, *e.g.*, N.J.S.A. 58:12A-9a (authorizing Commissioner to "[p]erform any and all actions to carry out the purposes and requirements of the" New Jersey Safe Drinking Water Act).

Courts have found under circumstances similar to those presented here that State-initiated lawsuits preempt municipal lawsuits against the same defendants on the same subject when the State is acting as *parens patriae* and natural resource trustee for the benefit of all a state's citizens, including in *State v. City of Dover*, 153 N.H. 181 (N.H. 2006). There, the State of New Hampshire alleged damage "to the State's ground and surface waters" against manufacturers of methyl tertiary-butyl ether (MTBE). *Id.* at 184. Two New Hampshire cities alleged damages to "their respective municipal water supplies." *Id.* at 188. The State subsequently sought a declaration that the cities' suits must "yield to the State's suit" and be dismissed. *Id.* at 184. The Supreme Court of New Hampshire agreed, basing its conclusion primarily on the fact that the state was suing as *parens patriae*. *Id.* In that capacity, the State was presumed to represent not just its residents' interests but also the cities' interests. *Id.* at 188–89. In the court's view, it did not matter that the cities wished to proceed against MTBE manufacturers under a different legal theory, nor did it matter that the State did not plan to distribute its proceeds from the lawsuits to the cities but would instead "establish a public fund." *Id.* at 189. The key, according to the court, was that both the State and its cities sought "economic" damages based on the defendants' pollution. "While the cities may have a direct economic interest in recovering for contamination to their water supplies," the court held, "this economic interest is represented by the State's suit." *Id.*

So too, here, are New Jersey's municipalities' claims and interests related to statewide PFAS contamination represented by the State. While certain political subdivisions may have preferred to pursue their own litigation against the Settling Defendants, the State believes that the Settlements best position the State's municipalities as a whole to receive funds to address PFAS contamination for the protection of the State's citizens and natural resources in the timeframe needed to take such protective action, removing the substantial risks of town-by-town litigation. Such is consistent with the recognition of New Jersey courts that the Department "must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly." *Howell Twp. v. Waste Disposal, Inc.*, 207 N.J. Super. 80, 96 (App. Div. 1986).

41. **COMMENT:** The release of the State's Political Subdivision claims is contrary to New Jersey's tradition of Home Rule and take away the statutory authority granted to counties and municipalities under New Jersey's Home Rule Act.

> **RESPONSE:** The Department respectfully disagrees, as a municipality's home rule authority is limited to matters of "local concern," and does not extend to "those matters involving state policy or in the realm of affairs of general public interest and applicability." *Wagner v. Mayor & Mun. Council of City of Newark*, 24 N.J. 467, 478 (1957). Here, the

State through the Proposed DuPont JCO is addressing an issue of general and statewide significance, as PFAS contamination is prevalent across the State, and thus threatens the health of all New Jersey residents. An issue such as this is most appropriately resolved by the State, which acts on behalf of and for the protection of all of the State's residents, and can thus craft the most appropriate solutions.

42. **COMMENT:** The State was required to give Political Subdivisions notice of the Proposed DuPont JCO before it was reached, an opportunity to participate in negotiations, and/or the ability to "opt out." Some comments relied on the U.S. Supreme Court's decision in *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) for this position.

   **RESPONSE:** The Department disagrees with the comment, including for reasons consistent with the responses provided above, as the State is appropriately exercising its *parens patriae* and trustee authority, which does not require pre-approval from its Political Subdivisions. The authority relied on by the comments, including *Amchem Prods.* is plainly inapplicable, given that it relates to class certification under Federal Rule of Civil Procedure 23. Aside from the State's strong legal support for its position, the State also notes the impracticality of coordinating among hundreds of Political Subdivisions before the Proposed DuPont JCO could be reached.

   Moreover, the State has sought and received input on the Proposed DuPont JCO from its Political Subdivisions through the public comment process. After the Department announced the Proposed DuPont JCO on August 4, 2025, the Department thereafter provided public notice of the Proposed JCO in the *New Jersey Register* on September 2, 2025, beginning a formal public comment period of 60 days, lasting until November 1, 2025. The Department carefully considered all of the public comments received, including those from Political Subdivisions. Additionally, before, during, and after the comment period, State representatives corresponded, participated in telephone calls, held video conferences, and/or met in-person with representatives of many Political Subdivisions and other commenters, receiving further information and perspective regarding the Proposed Dupont JCO before the State ultimately determined to move forward and seek court approval of the Settlement.

43. **COMMENT:** Does the State have authority to settle economic damage claims of municipal entities related to PFAS without consent or direct compensation?

   **RESPONSE:** The Department's answer is in the affirmative, in the appropriate circumstances. For reasons discussed above, the State is acting in its *parens patriae* and public trustee capacities in this circumstance based on the statewide challenges of PFAS; the State thus has the authority to resolve these claims without any pre-approval or pre-designated recoveries for municipalities. The State has also pursued these claims since initiating its various lawsuits against the Settling Defendants in 2019. *See*, *e.g.*, *Grewal, et al. v. 3M Company, et al.*, Original Pleading, at ¶ 13 (Filed May 24, 2019) (seeking, among other things, "property damages to State and local government-owned properties").

21

The New Hampshire Supreme Court in the *City of Dover* case also considered similar circumstances. The Court there found that the State had the authority to "establish a public fund" from the proceeds of its lawsuit against MTBE manufacturers, rather than through a strict distribution to cities that had filed their own lawsuits. *Id.* at 189. The Court found that both the State and its cities sought "economic" damages based on the defendants' pollution. "While the cities may have a direct economic interest in recovering for contamination to their water supplies," the court held, "this economic interest is represented by the State's suit." *Id.* Here, the State is similarly representing the economic interests of political subdivisions in addressing PFAS contamination for the protection of the State's resources and residents.

44. **COMMENT:** Does the Proposed DuPont JCO resolve claims that were not subject to the State's lawsuits (and if so, under what authority does it do so)?

    **RESPONSE:** To the extent the commenter is referring only the State's case concerning Chambers Works, the Department wishes to point out that, prior to the Proposed DuPont JCO, the State had a variety of administrative and legal claims pending against DuPont related to PFAS, including claims asserted against DuPont through the Statewide PFAS Directive, the Chambers Works case, the Parlin case, and the New Jersey AFFF Statewide PFAS case. The claims in these litigations seek a wide variety of relief meant to address PFAS attributable to the DuPont Defendants at specific sites, as well as statewide. The Proposed DuPont JCO seeks to resolve all claims brought in these litigations, as well as certain related unasserted claims to provide a comprehensive resolution.

    It is not at all uncommon for parties to resolve related but unasserted claims in a settlement. Indeed, the Department has done this previously for purposes of efficiency and to avoid additional protracted litigation, which courts approving the Department's settlements have found to be appropriate. *See, e.g., New Jersey Dep't of Env't Prot. v. Exxon Mobil Corp.*, 453 N.J. Super. 272, 305, 181 A.3d 257, 276 (App. Div. 2018).

45. **COMMENT:** Political Subdivisions acting as "private attorneys general" pursuant to the Environmental Rights Act and other environmental statutes should still be able to bring claims against the DuPont Defendants to protect themselves against future environmental harm.

    **RESPONSE:** The State's authority to release the claims of its Political Subdivisions is addressed on Response to Comment # 40. With respect to the commenter's concerns about future environmental harm, the Department notes that the Proposed DuPont JCO generally does not release claims based on conduct occurring after the Effective Date.

46. **COMMENT:** The State has no authority to release the rights of private parties or corporations through settlement. The Department should clarify that the Proposed DuPont JCO does not cover private owners and operators of water and wastewater systems. The JCO use of the terms "Releasors," "Released Claims," "Private Person," "Purely Private Claim" make this unclear.

    **RESPONSE:** Private owners and operators of water and wastewater systems are not included in the definition of "Statewide PFAS Releasor" included in the Proposed

DuPont JCO. As such, the Department (and other Settling Plaintiffs) do not purport to release any of their claims.

47. **COMMENT:** Paragraph 83 of the Proposed DuPont JCO should be stricken. The DNJ cannot make a ruling as to the preclusive effect of the JCO on Carneys Point's litigation that is ongoing in State Court.

> **RESPONSE:** Paragraph 83 states that the Parties intend, and the Court finds, that the Proposed DuPont JCO should bar Carneys Point's claims against the DuPont Defendants to the extent they seek the same relief that was resolved through the Proposed DuPont JCO. As discussed at length elsewhere herein, the District Court has the authority to recognize Plaintiffs' intent and authority to preempt and release Political Subdivision claims. Notwithstanding, the Department recognizes that the Superior Court would need to consider the effect of the Proposed DuPont JCO, if approved, and enter its own order with respect to a motion to dismiss Carneys Point's pending litigation and whether it should continue. As Paragraph 83 of the Proposed DuPont JCO acknowledges:

>> [U]pon entry of this JCO, Settling Plaintiffs and the Settling Defendants will seek an order promptly dismissing the following litigation currently pending in the New Jersey court: *Carneys Point Twp. v. E.I. du Pont de Nemours et al.,* Salem County Superior Court Docket No. SLM-L-251-16, Appeal Docket No. A-002427-24.

### Contribution Claims and Contribution Protection

48. **COMMENT:** The Proposed DuPont JCO would extinguish Political Subdivisions' CERCLA 107 and 113 rights of action against DuPont for PFAS. Political Subdivisions should be able to pursue the DuPont Defendants for contribution claims.

> **RESPONSE:** The Department disagrees with the concerns expressed in the comment. The Commenters have not articulated a basis for CERCLA 107 or 113 claims they might have against the DuPont Defendants for PFAS Contamination occurring in New Jersey. No commenter has alleged that it has incurred CERCLA-actionable response costs due to the release of PFOA or PFOS (the only PFAS that qualify as hazardous substances under CERCLA) from a DuPont Defendant's facility in New Jersey. Furthermore, for each Industrial Site, the DuPont Defendant that owns and operates the Site has committed under the Proposed DuPont JCO to fully remediate the contamination, including PFAS Contamination, to applicable standards.

> To the extent the commenters believe that the Proposed DuPont JCO cuts off their contribution claims with respect to the DuPont Defendants for their manufacture of useful PFAS-containing products, the commenters have not articulated a basis for any CERCLA 107 or 113 claims. To the extent the commenters suggest such a claim may exist based on DuPont's manufacture, sale, and/or distribution of PFAS products, such conduct is generally not actionable under CERCLA, which provides impacted parties the ability to recover response costs from certain categories of "persons" that bear a relationship to the CERCLA "facility" from which the "release" of hazardous substances that caused the incurrence of those costs occurred. The U.S. Supreme Court held in *Burlington Northern*

& *Santa Fe Railway Co. v. United States*, 556 U.S. 599, 608-13 (2009) that the sale of a "useful product" does not trigger CERCLA liability. *See Consolidation Coal Co. v. Georgia Power Co.*, 781 F.3d 129, 147-55 (4th Cir. 2015); *United States v. D.S.C. of Newark Enterprises, Inc.*, 2013 WL 2658929, at *7 (D.N.J. June 12, 2013) ("'[K]nowledge alone is insufficient to prove that an entity 'planned for' the disposal....'"); *cf. Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F.Supp.2d 473, 493 (D.N.J. 2009) ("arranger liability under § 107(a)(3) requires an intent to dispose of hazardous substances.").

This settlement is cognizable under and fully consistent with CERCLA's contribution protection provision. By law, "[a] person who has resolved its liability to...a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. 9613(f)(2). The contribution protection afforded to the DuPont Defendants here is provided for expressly by statute.

The Department notes that the Commenters retain their rights to bring claims under CERCLA against parties other than the DuPont Defendants and 3M.

49. **COMMENT:** The Proposed DuPont JCO does not protect Political Subdivisions under CERCLA. The DuPont Defendants could theoretically pursue the Political Subdivisions for contribution, but they cannot pursue the DuPont Defendants because the DuPont Defendants will have contribution protection statewide.

**RESPONSE**: Applicable law only allows the Department to provide contribution protection to the settling party, *see* N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2). Through the Proposed DuPont JCO, however, the DuPont Defendants have agreed not to "seek contribution to recovery any amount that Settling Defendants have paid pursuant to this JCO from any Releasor, from any Government Entity of the State or of any of the State's Political Subdivisions . . . ." Proposed DuPont JCO ¶ 74(b).

With respect to any broader, categorical protections of the State's Political Subdivisions under CERCLA or otherwise related to releases of PFAS, changes in federal or state law rest with the U.S. Congress and the New Jersey Legislature and cannot be made by the Department through its settlement with a third party.

50. **COMMENT:** The Court lacks subject matter jurisdiction under CERCLA and therefore cannot resolve the Settling Defendants' alleged CERCLA liability in the Proposed JCO or provide the Settling Defendants with contribution protection under CERCLA.

**RESPONSE**: The Department disagrees with the comment. The comment ignores the plain language of CERCLA § 113(f), 42 U.S.C. § 9613(f), which states that "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." Thus, *any* court may approve a settlement that resolves a party's CERCLA liability.

With respect to subject matter jurisdiction, this comment also ignores the plain language of CERCLA § 113(b), 42 U.S.C. § 9613(b), which provides:

> Except as provided in subsections (a) and (h) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides….

This provision of CERCLA is designed to ensure that matters arising under CERCLA are handled by the United States district courts and that venue lies in the district where the release or damages occurred or where the defendant resides.  Here, the Proposed DuPont JCO is being considered by the United States district court where the release and damages at issue occurred. The purpose of Section 113(b) is to ensure that federal courts have exclusive jurisdiction over CERCLA matters. Here, the proper federal court is considering the Proposed DuPont JCO.

## Credit-Eligible Claims and Credit System

**51. COMMENT:** The credit system outlined in Paragraph 9 of the Proposed DuPont JCO effectively means that successful litigation by other parties would reduce any possible compensation to New Jersey's Public Water Systems, public utilities, and sewerage authorities.

**RESPONSE:** The credit provisions in the Proposed DuPont JCO were designed to (a) increase the settlement value by providing the DuPont Defendants some assurance that it would not pay twice for claims it believed were "Released Claims" and (b) limit the amount of money that the DuPont Defendants could recoup in the event it did. The credit provisions confine the amount of settlement proceeds that are subject to potential credit to $16.5 million. To be eligible to receive a credit, the DuPont Defendants must provide notice to and cooperate with the Settling Plaintiffs to ensure that any properly precluded claim does not give rise to a credit. The Department reserves the right to dispute whether any "Credit-Eligible Claim" presented by the DuPont Defendants is in fact eligible for a credit. If such claim is in fact eligible, the DuPont Defendants are only entitled to recover 50% of the amount it pays to resolve the claim from the payments described above.

## Clarification of Terms and Definitions

**52. COMMENT:** Does the definition of "Covered PFAS Conduct" include the transport, treatment, storage and/or disposal of sludge or wastewater from a sewerage authority?

**RESPONSE:** Under Paragraph 6 of the Proposed DuPont JCO, "Covered PFAS Conduct" includes conduct arising from, based on, involving, or caused by, among other things, any transport, treatment, storage, disposal, or arrangement for transportation, treatment, storage, disposal, or arrangement for transportation, treatment, storage, or disposal, or use of PFAS-containing Sludge or PFAS-containing Wastewater (from any Site, facility, or

location). Based on that definition, Covered PFAS Conduct includes any transport, treatment, storage, and/or disposal of sludge or wastewater containing PFAS from a sewerage authority. Note, however, that only the DuPont Defendant-related Released Entities' Covered PFAS Conduct and resulting Covered PFAS Harm are resolved by the Proposed DuPont JCO.

53. **COMMENT**: Does the definition of "Covered PFAS Conduct" include any secondary/accessory plant improvements that are required to implement any new PFAS treatment operations?

**RESPONSE:** Under Paragraph 6 of the Proposed DuPont JCO, "Covered PFAS Conduct" includes acts involving PFAS or that result in PFAS Contamination. Additionally, under Paragraph 6, "Covered PFAS Harm" includes costs to the State's Political Subdivisions due to impacts by PFAS in the Environment. Based on those definitions, Covered PFAS Conduct and Covered PFAS Harm includes costs to a Political Subdivision related to PFAS treatment processes. Note, however, that only the DuPont Defendant-related Released Entities' Covered PFAS Conduct and resulting Covered PFAS Harm are resolved by the Proposed DuPont JCO.

54. **COMMENT:** Would a sewerage authority constitute a "Releasor" under the Proposed DuPont JCO?

**RESPONSE:** Under Paragraphs 6 and 49 of the Proposed DuPont JCO, "Industrial Sites Releasors" and "Statewide PFAS Releasors" include, among others, the State and, without limitation and "to the maximum extent" that the Attorney General and other State signatories to the Proposed DuPont JCO may release Claims, all of the State's Political Subdivisions and their departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, and any Person claiming by or through any of the foregoing. The above applies to a sewerage authority that is also a Political Subdivision or a Government Entity of the State.

### Miscellaneous

55. **COMMENT:** The DuPont JCO should be amended to require the DuPont Defendants to admit liability.

**RESPONSE:** The Department acknowledges the comment and its sentiment. Notwithstanding, a denial of liability by defendants is "standard settlement language in all fields of the law." *See New Jersey Dep't of Env't Prot. v. Exxon Mobil Corp.*, 453 N.J. Super. 588, 666, 183 A.3d 289, 335 (Law. Div. 2015), *aff'd*, 453 N.J. Super. 272, 181 A.3d 257 (App. Div. 2018).

56. **COMMENT:** The Proposed DuPont JCO is being used, in part, as a mechanism to facilitate the Settling Defendants' private corporate liability-sharing arrangements.

**RESPONSE:** The State has long been concerned that the company now known as EIDP engaged in a series of complex restructuring transactions beginning in 2015 designed to

shield assets from the PFAS liabilities of the company. That is why the Proposed DuPont JCO ensures that EIDP is ultimately responsible both for the Settlement Payments and the full remediation of each of the Industrial Sites. The DuPont Defendants' Cost Sharing Agreements in no way alter or absolve EIDP's responsibility to pay the State 100% of the Settlement Payments, *see* Proposed DuPont JCO ¶ 8, nor do they absolve EIDP of the responsibility to ensure that the Industrial Sites are fully and finally remediated should another DuPont Defendant fail to perform the required remediation, *see id*. ¶ 32.

57. **COMMENT:** Under the "Tax Deduction Rule," 26 CFR § 1.162-21, the DuPont Defendants may only receive a tax deduction for Abatement Damages if those funds are used to pay for water quality infrastructure projects in and around Chambers Works. The definition of Abatement Damages therefore must be revised to state that these funds will only be used for water infrastructure projects at and around Chambers Works.

   **RESPONSE:** The Department believes that the commenter has misstated the requirements of 26 CFR § 1.162-21. In any event, it is the DuPont Defendants' burden as taxpayers to establish their entitlement to a claimed tax deduction. The Department declines to revise the Proposed DuPont JCO to state that Abatement Damages may only be used for water quality infrastructure projects at and around the Chambers Works facility.

58. **COMMENT:** Several commenters that live in and around the Parlin Site expressed concerns that the contaminated property that would be remediated under this Proposed DuPont JCO would then be converted into a bus depot.

   **RESPONSE:** The Department appreciates being informed of this issue. The Department will work with DuPont Specialty Products to ensure that the property surrounding the Parlin Site is properly remediated under the Proposed DuPont JCO and applicable law. Any potential redevelopment of the Site or portions of the Site will be determined through a separate process.

59. **COMMENT:** Several individual commenters expressed concerns about the health risks of PFAS and sought additional information about the contamination of drinking water by PFAS and the adverse effects of PFAS.

   **RESPONSE:** The Department has several resources available at https://dep.nj.gov/pfas/ that explain our current understanding of PFAS and PFAS contamination, as well as the steps the Department is taking to regulate and mitigate PFAS discharges to environmental media in New Jersey.

   The State's response to PFAS and its course for further action is also detailed in the State's "Forever No More" PFAS Report, published in July 2025 and available here: https://dep.nj.gov/wp-content/uploads/pfas/docs/njdep-pfas-strategy-2025.pdf**.**

   The Department understands the commenters' concerns about PFAS and has made the cleanup and mitigation of PFAS contamination in the State a priority. New Jersey was the first state to set enforceable standards for PFAS in Drinking Water Supplies. It has

continued to study and to set a high standard for cleanup of these "forever chemicals" in order to ensure the protection of New Jersey's citizens and natural resources. These efforts include not only the comprehensive litigation that led to this landmark Proposed DuPont JCO and other settlements with PFAS polluters, but also the continuous investigation of PFAS sources and regulation of PFAS discharges to the environment. Today, New Jersey remains a leader in understanding and mitigating the effects of PFAS contamination.