# EXHIBIT C

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION'S RESPONSE TO PUBLIC COMMENTS REGARDING PROPOSED JUDICIAL CONSENT ORDER RESOLVING CLAIMS AGAINST 3M COMPANY**

### Background

On May 13, 2025, the Department announced a proposed Judicial Consent Order ("Proposed 3M JCO" or "Settlement") to resolve the State's claims against 3M Company ("3M") related to the Chambers Works Site as well as to protect the public from the harms of PFAS Contamination statewide. Those claims included those asserted against 3M by the State through the Chambers Works case, 1:19-cv-14766 (D.N.J.), the Parlin case, 3:19-cv-14767 (D.N.J.), the New Jersey AFFF Statewide Case, 2:19-cv-02199 (D.S.C.), and the Statewide PFAS Directive, along with related unasserted claims.

Under Settlement, 3M will make a payment of up to $400 to $450 million, including $140 million for natural resource damages, $170 million for PFAS abatement funding, $40 million for costs, attorneys' fees, punitive damages, and penalties, and an additional $50 to $100 million designated as the New Jersey Leadership Payment to supplement PFAS abatement funding. The State's Settlement with 3M is further complimented by its proposed settlement with the DuPont Defendants[1], as well as the State's previously approved settlements with Solvay Specialty Polymers USA, LLC and Arkema Inc. Together, these settlements accumulate over $1.2 billion in cash to be used for PFAS abatement projects across the State that protect the public health and environment, in addition to nearly $3 billion in total value (including enforceable commitments by the settling defendants to complete remediation that includes PFAS). These settlements represent critical and essential steps in protecting the State's residents and resources from the impacts of PFAS contamination.

The Department published a dedicated online website (https://dep.nj.gov/3M/) for the Settlement that included pertinent information and documents, including a press release, frequently asked questions, information about PFAS, the Proposed 3M JCO, and the scheduling order for briefing on the State's motion to approve the Settlement. The Department also published notice of the Settlement in the *New Jersey Register* on July 21, 2025, 57 N.J.R. 1624(a), which stated that the Department would accept public comments on the Settlement for a period of 60 days. Copies of the notices were also posted to the Department's dedicated website, emailed to each of the Department's political subdivision contacts, and sent to numerous other interested parties in accordance with the notice provisions set out in the Settlements. Also as required under the Settlements, 3M arranged for notices to be published in print and electronic versions of widely-circulated New Jersey newspapers.

The Department acknowledges and extends appreciation to all commenters for their submissions during the public comment period; all comments were carefully considered. The Department received 56 comments from political subdivisions, associations, individuals, and

---

[1] The DuPont Defendants are: EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP"), Corteva, Inc. ("Corteva"), DuPont de Nemours Inc. ("New DuPont"), DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), The Chemours Company ("Chemours") and The Chemours Company FC, LLC ("Chemours FC").

others raising a variety of important issues for the Department's consideration. Notably, the Department received several comments after the deadline, but is considering them regardless.

After carefully considering all of the comments received, the Department has determined that the Settlement is fair, reasonable, consistent with the objectives of the New Jersey Compensation and Control Act ("Spill Act"), and in the public interest. Accordingly, the Department has filed a motion in the U.S. District Court of New Jersey seeking approval of this Settlement along with the proposed settlement with the DuPont Defendants. Further information regarding deadlines associated with this briefing are available on the dedicated settlement webpages, as well as the federal court docket, which is 1:19-cv-14766 (D.N.J.).

This Response to Public Comments Received addresses the comments received on the Settlement by topic. Capitalized terms have the meaning as defined by the Proposed 3M JCO. Where comments shared similar subjects or issues, they were grouped together and responded to collectively. Comments have been paraphrased unless they appear in quotations.

## Response to Public Comments Received

1. **COMMENT:** Numerous commenters commended the Department on this historic settlement to protect the public and the State's resources from PFAS contamination, and on its efforts to hold PFAS polluters accountable.

    **RESPONSE:** The Department appreciates the comment. The Settlement, which was achieved after more than six years of hard-fought litigation, is the second largest environmental settlement in the history of New Jersey, exceeded only by the State's recent proposed settlement with the DuPont Defendants. The Department has secured exceptional relief from 3M that will meaningfully improve and protect the State's environment, natural resources, and public health.

## Recovered Amount – in General

2. **COMMENT:** How much will the State recover under the Proposed 3M JCO? The press releases issued by the State and 3M stated different amounts.

    **RESPONSE:** 3M is required to make Settlement Payments of between $400 and $450 million[2] to the State over a period of 25 years. The schedule for these payments is set forth in Exhibit A of the Proposed 3M JCO.

    3M's press release announcing the settlement described the value of the Settlement based on its pre-tax, present value calculation. The Department expresses no opinion on 3M's evaluation of its tax obligations or net present value calculations, and such evaluation does

---

[2] The total amount of the Settlement Payments will depend on the amount of the New Jersey Leadership Payment that 3M will make to the State, which is described in ¶ 44(e). The New Jersey Leadership Payment requires 3M to pay between $50 and $100 million to the State, which amount will be determined based on the amount that 3M is ultimately required to pay pursuant to its nationwide Public Water System Class Settlement.

not impact 3M's payment obligation under the Settlement, which is $400 to $450 million as stated above.

3. **COMMENT:** The Proposed 3M JCO allocates redundant funding to the Chambers Works Site due to the funding and commitments provided in the Proposed DuPont JCO.

**RESPONSE:** For numerous reasons, it was appropriate that the Proposed 3M JCO allocated significant funds to PFAS Contamination Abatement Funding related to the Chambers Works Site. The Department alleges that the Chambers Works Site is one of the most significant sources of PFAS contamination in the world and has caused widespread PFAS contamination throughout Southern New Jersey, for which 3M bears unique responsibility having supplied over 500,000 pounds of PFOA products over the course of decades to the Chambers Works Site for use and disposal. The Chambers Works Site was also the subject of a scheduled trial with 3M that resulted in the Proposed 3M JCO. Further, when the 3M Proposed JCO was reached, the outcome of the Department's claims against DuPont related to the Chambers Works Site remained uncertain. What is more, Paragraph 51 of the Proposed 3M JCO provides the Department with discretion to allocate PFAS Contamination Abatement Funding statewide to protect the public health, safety, and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS.

4. **COMMENT:** The amount recovered under the Proposed 3M JCO is insufficient to address Statewide PFAS cleanup costs and damages. What type of assessment did the State undertake to reach the settlement amount?

**RESPONSE**: The Department took into account a variety of factors in assessing statewide PFAS cleanup costs, including (1) the well understood impacts of PFAS and resulting fiscal needs to address the presence of these chemicals in environmental media and infrastructure, (2) the known and suspected impacts of PFAS that have not been fully characterized, (3) the uncertainty with respect to the overall future costs to address PFAS on a statewide basis, and (4) the availability of existing funding sources to address PFAS impacts.

As an initial matter, 3M's and the DuPont Defendants' Public Water System Class Settlements will provide nearly $500 million to New Jersey's public water systems to address PFAS abatement costs. In addition, it is important to take into account the fact that the DuPont JCO requires remediation of PFAS contamination emanating from the Chambers Works and Parlin sites, while the Department's earlier settlements with Solvay and Arkema require certain remediation of PFAS related to their West Deptford Site and required payment to the Department of $122.3 million for PFAS abatement damages. Accordingly, by considering these prior settlements in conjunction with the 3M and DuPont Settlements, there will be approximately *$1.4 billion* available to address PFAS in environmental media and infrastructure in the State, which is in addition to the expansive remediation efforts required under the State's settlements, which will address potable water impacts at some of the most significant PFAS-discharge sites in the State.

**5. COMMENT:** Commenters expressed that the Proposed 3M JCO's effect would be to make clean water utilities and sewerage authorities responsible for bearing the costs of contamination 3M caused.

> **RESPONSE:** The total abatement funding damages received under the 3M and DuPont settlements—up to $795 million that will be held in a dedicated trust account ("PFAS Abatement Fund") administered by DEP—will provide a substantial source of funding to assist utilities and sewerage authorities. Using the best available science, DEP will prioritize the use of the PFAS Abatement Fund to most effectively address otherwise unmet needs to protect the public health and environmental from PFAS impacts, including the provision of water infrastructure funding for drinking water and clean water projects.
>
> New Jersey has a long-standing, successful framework to provide funding to support critical water infrastructure improvements. The New Jersey Water Bank (NJWB) is a partnership between the Department and the New Jersey Infrastructure Bank (I-Bank) to provide low-cost financing for the design, construction, and implementation of projects that help protect and improve water quality and ensure safe and adequate drinking water. Since making its first loan in 1987, the NJWB has supported $11.5 billion in infrastructure projects across New Jersey and has saved approximately $3.3 billion in public financing.
>
> To ensure that water systems and publicly-owned treatment works ("POTWs") have a long-term, reliable funding source available for the necessary capital upgrades to address PFAS, the Department will allocate funding from the PFAS Abatement Fund to create a brand-new capitalization source for the NJWB to supplement New Jersey's Clean Water and Drinking Water State Revolving Funds ("CWSRF" and DWSRF," respectively), which will be dedicated to providing low-cost financing of water quality projects to address PFAS throughout the state. Deployment of the PFAS Abatement Fund to supplement revolving SRFs ensures that long-term state-wide needs can be met through a stable, self-sustaining source of financing for PFAS water infrastructure especially as PFAS monitoring, detection, and treatment technology continue to evolve.
>
> DEP will allocate funds from the PFAS Abatement Fund as a significant additional capitalization source to supplement the CWSRF to provide financial assistance to owners of POTWs (towns, boroughs, municipal utilities authorities, counties, regional water authorities, other local government units, etc.) for clean water infrastructure projects that address PFAS. Such projects will be given a high project priority, and financial assistance will be allocated to clean water projects that address PFAS on a readiness to proceed basis.
>
> In addition to securing significant funds, the Proposed 3M JCO removes the risks and uncertainties of litigation, including but not limited to issues related to statute of limitations periods, causation, product identification, evidentiary issues, contributory negligence and/or statutory contribution claims against such entities, and more.
>
> Over and above the funds that will be obtained through the Proposed 3M JCO, the Department already has recovered approximately $122.3 million in abatement funds from Solvay Specialty Polymers USA, LLC and Arkema Inc., DEP is prioritizing the provision

of financial support to Public Water Systems to address PFAS contamination in the disbursement of those funds.

6. **COMMENT:** As a result of the Department's anticipated new Surface Water Quality Standards, WWTPs will soon be regulatorily required to remove PFAS from wastewater and/or biosolids. The costs of installing treatment to comply with these standards will far exceed the amount recovered through the Proposed 3M JCO.

> **RESPONSE:** The Department intends to propose and adopt Surface Water Quality Standards for PFAS, in accordance with the requirements of the New Jersey Administrative Procedure Act. Surface Water Quality Standards for PFAS will not automatically result in the inclusion of water quality-based effluent limitations (WQBELs) in NJPDES permits, nor will end-of-pipe treatment be the default remedy.
>
> The Department has developed a strategy to "Identify, Reduce and Eliminate" industrial discharges that may contain PFAS. The strategy focuses on industrial facilities that discharge either directly to surface water or to POTWs. NJPDES Discharge to Surface Water permits authorize the discharge of wastewater to surface water including domestic wastewater from POTWs. This strategy seeks to identify sources of PFAS via data collection and to reduce the use and discharge of PFAS through source reduction measures.
>
> Consistent with DWQ's existing identify-reduce-eliminate strategy, the first step will be to require POTW operators to begin or complete their own data collection efforts so that they can identify sources of PFAS in their systems. In alignment with the NJPDES rules and current practices, monitoring requirements would be added to those permits where sufficient data is not yet available.
>
> Upon adoption of the new standards, effective source identification and reduction will continue to be prioritized. Surface Water Quality Standards will authorize delegated local agencies (DLAs) to regulate discharges of PFAS by their upstream significant indirect users to reduce the levels of PFAS being sent to their POTWs. Again, end-of-pipe PFAS treatment will not be a presumptive requirement.
>
> DWQ will continue to provide robust compliance assistance to POTWs, including through the development of compliance schedules as appropriate. DWQ intends to establish a compliance assistance plan and work closely with facilities to secure funding from the PFAS Abatement Fund through the NJWB in those instances where treatment infrastructure is needed.
>
> DEP is aware that some delegated POTWs are actively investigating and/or implementing source control measures (i.e., treatment) with their industrial users through sampling and outreach. DEP is also aware that certain POTWs, both delegated and non-delegated, are actively sampling influent, effluent and residuals. DEP strongly encourages advanced planning through sampling and investigation to assess current needs. POTWs that have proactively assessed existing needs will be well positioned to apply for financial assistance made available under the PFAS Abatement Fund through the NJWB.

7.  **COMMENT:** Regulators are also considering air quality standards for PFAS, which would impose additional costs on sewerage authorities that use or intend to use an incinerator for biosolids. These costs will also exceed the amount recovered through the Proposed 3M JCO.

> **RESPONSE:** New Jersey regulates air pollution pursuant to the Air Pollution Control Act (N.J.S.A. 26:2C) and specifically at N.J.A.C 7:27. The Air Pollution Control Program regulates stationary sources through an Air Quality Permitting Program and prohibits and limits toxic air. Reducing air toxics are critical to limit exposure of the public to adverse health impacts from inhaling these substances or deposition that impacts waterways and therefore water quality. The overwhelming majority of regulated Air Toxics are based on the substances already regulated nationwide under the federal Clean Air Act. The Air Pollution Control Act establishes all substances designated under the federal Clean Air Act will be designated as air toxics under New Jersey law. New Jersey can and has independently regulated additional air toxic substances when doing so is in the best interest of human health, welfare, and the environment.
>
> Currently, PFAS are not regulated by EPA under the federal Clean Air Act as hazardous air pollutants (HAP). In an August 29, 2024, petition to EPA, New Jersey joined with two other states urging the EPA to list PFOA, PFOS, PFNA, and GenX (HFPO-DA) as HAPs under Section 112 of the Clean Air Act. PFAS are also currently not regulated under the State air toxics regulations. While EPA considers whether it will act upon the interstate petition, New Jersey will begin the process to regulate PFAS as an air toxic at the state level. DEP is pursuing the first step in the process of amending the air quality regulations, which is to publish a determination that it is in the best interest of human health, welfare and the environment to regulate certain PFAS as air contaminants.
>
> While those efforts are ongoing, DEP recommends that sewerage authorities monitor biosolids for PFAS contamination, identify likely industrial discharges of PFAS, and implement source reduction measures where appropriate. Doing so will help prevent downstream PFAS contamination and reduce the concentration of PFAS in biosolids.

8.  **COMMENT:** The Department should require 3M to negotiate supplemental settlements with private entities that own and/or operate public drinking water systems in the State of New Jersey to make them whole.

> **RESPONSE:** The Proposed 3M JCO is intended, in part, to serve as an additional source of funding to be distributed to Public Water Systems for addressing PFAS contamination in drinking water, beyond 3M's Public Water System Class Settlement. Virtually all Public Water Systems are participating in that settlement, and, in agreement for releasing their claims related to drinking water, are receiving settlement funds. The State, through entering into this Settlement, also sought to secure financial assistance for systems that were not or could not participate in that settlement.
>
> The requirement suggested by the commenter runs contrary to the framework of the Settlement, which provides the Department with resources that it can best calibrate and

deploy throughout the State to protect public health and the environment from the impacts of PFAS.

9. **COMMENT:** How much of the settlement will be used for paying legal fees?

**RESPONSE:** The Proposed 3M JCO provides that no more than $70 million of the Settlement Payments may be used for costs (including attorneys' fees and costs), punitive damages, or for other amounts not constituting restitution or remediation. The total amount of attorneys' fees that will be paid to the Department's counsel is still being finalized; however, the Department expects the amount to be less than $70 million. The Department will file a motion with the U.S. District Court requesting approval of the fee amount, and the Court will only approve those fees if it finds that they are reasonable.

10. **COMMENT:** Paragraph 46 of the Proposed 3M JCO states that the natural resource damages recovery will be used to pay for investigation and litigation costs for unrelated litigation and administrative matters. The Proposed 3M JCO should be modified to exclude this provision because payment of legal fees for other unrelated matters dilutes the recovery in this matter.

**RESPONSE:** The Natural Resource Damages Constitutional Amendment permits NRD funds collected by the State to be used for (1) costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State, (2) to permanently protect the natural resources of the State, or (3) for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to NRD. N.J. Const. art. VII, § II, ¶ 9. Because Paragraph 46 of the Proposed 3M JCO mirrors the New Jersey State Constitution, the Department declines the commenters' request for modification.

### Recovered Amount – Management of Funds

11. **COMMENT:** The Department should use the AFFF MDL Public Water System Settlement Claims Form agreed to by 3M in the AFFF MDL as a guide to allocating funds. The Department also should use the scoring system and range table implemented in the AFFF MDL to allocate settlement funds.

**RESPONSE:** The Department has existing frameworks for distributing PFAS Abatement Funds that are designed to protect the public health and the environment and calibrates funding across the State, purposes which are not taken into account in the processes referenced by the commenter.

New Jersey has a long-standing, successful framework to provide funding to support critical water infrastructure improvements. The NJWB is a partnership between the Department and the New Jersey Infrastructure Bank (I-Bank) to provide low-cost financing for the design, construction, and implementation of projects that help protect and improve water quality and ensure safe and adequate drinking water. Since making its first loan in 1987, the NJWB has supported approximately $11.5 billion in infrastructure projects across New Jersey and has saved approximately $3.3 billion in public financing.

The NJWB currently finances projects by utilizing two primary funding sources. The I-Bank issues revenue bonds which are used in combination with zero percent interest funds to provide very low interest loans for water infrastructure improvements. The Department administers a combination of Federal State Revolving Fund (SRF) capitalization grants, as well as the State's matching funds, loan repayments, State appropriations and interest earned on such funds. The NJWB administers CWSRF and DWSRF under the federal Clean Water Act and Safe Drinking Water Act, respectively. SRF is a revolving/self-perpetuating loan program, in that SRF loan repayments are committed to finance future projects in perpetuity.

The Department's existing funding strategy through the NJWB is designed to provide essential capital for critical water infrastructure projects that safeguard public health and the environment for current and future generations of New Jersey citizens. The Department's long-term goals include maintaining the NJWB as the State's leading source of environmental infrastructure financing through self-sustaining, efficient, and transparent programs; establishing a permanent funding source for clean and drinking water infrastructure; offering significantly lower-cost financing than individual participants could typically secure; and improving access to capital markets for systems facing challenges due to credit ratings or limited experience with debt financing.

Through the proposed 3M and DuPont settlements, the PFAS Abatement Fund will provide significant additional capitalization for necessary PFAS infrastructure projects through the NJWB to supplement the Clean Water and Drinking Water SRFs.

The priorities and policies of the NJWB are established in annual Intended Use Plans (IUPs). The Priority System/IUP document must be developed annually, undergo a public participation process, and be approved by the US Environmental Protection Agency or the State to qualify for SRF capitalization grants to support the NJWB. This yearly planning mechanism is informed by users of the Water Bank and is rooted in transparency and stakeholder input in the use of funds.

12. **COMMENT:** The funds recovered under the Proposed 3M JCO, other than those recovered for natural resource damages, must be deposited to the State's General Fund or into a new fund created by legislative enactment.

   **RESPONSE:** The Department disagrees with the comment. The funds will be placed in an appropriate dedicated account(s) consistent with the purposes of the Settlement and in accordance with applicable law.

13. **COMMENT:** The Department should modify the Proposed 3M JCO to include a requirement that the State will enact legislation creating a remediation and victim compensation fund with an advisory board, into which the Abatement Projects funds and Leadership Payment would be deposited. The Advisory Board should be granted rulemaking authority for the administration of these funds.

**RESPONSE:** The Department does not believe such modification is necessary or that this is an appropriate term in a settlement agreement. Further, the Proposed 3M JCO does not release Claims for Personal Injury. For that reason, the Settlement Payments will not be used to compensate individuals who allege personal injury from PFAS.

14. **COMMENT:** The Department should confirm it will not divert the natural resource damages recovery under the Proposed 3M JCO before crediting the recovery to the Natural Resource Damages-Constitutional Dedication Account.

**RESPONSE:** The natural resource damages payments collected by the State in connection with the Proposed 3M JCO will be credited to the Natural Resource Damages-Constitutional Dedication Account consistent with Article VIII, Section, II, Paragraph 8 of the New Jersey State Constitution. The natural resource damages payments will be spent consistent with the New Jersey State Constitution, as authorized by Legislative appropriations.

15. **COMMENT:** The Proposed 3M JCO creates a "secret escrow" account that contains the entire recovery, without segregating the recoveries for particular purposes. The Department must publish the escrow agreement and allow further public comment.

**RESPONSE:** The commenter is incorrect that the Proposed 3M JCO creates a "secret escrow." The sole purpose of the escrow account, which is created pursuant to Paragraph 44(a) of the Proposed 3M JCO, is to hold Settlement Payments made pending the outcome of any appeals of the Settlement and their resolution. The use of an escrow to hold payments pending appeals is a standard provision. The Department has used escrow accounts in its Court-approved settlements for this very purpose.

The Department and 3M have selected Deutsche Bank Trust Company Americas as the escrow agent for the escrow account created by Paragraph 44. The standard escrow agreement is Exhibit B to the Proposed 3M JCO, and has been posted on the Department's website since October 3, 2025.

### Recovered Amount – Eligibility to Receive Funds

16. **COMMENT:** The Proposed 3M JCO does not provide sufficient clarity regarding how the settlement funds will be disbursed. Failure to provide an application framework now makes the Proposed 3M JCO deficient.

**RESPONSE:** Pursuant to Paragraphs 51 and 52 of the Proposed 3M JCO, the Department will develop a process through which Political Subdivisions, residents, and others can apply to receive PFAS Contamination Abatement Funding provided to, then allocated by, the Department under the Proposed 3M JCO. This process will not be, and need not be, finished before the Proposed 3M JCO may be approved. Indeed, the Department followed a similar procedure with respect to its court-approved settlement with Solvay Specialty Polymers USA, LLC. The Department finished developing a process for submitting applications for funding projects to address PFAS contamination under the settlement after, not before, the Court's approval of the settlement. Moreover, different Public Water

Systems, POTWs, and others will be in a position to obtain and use funds for various projects at different times. To pre-allocate funds at this point would reduce the Department's ability to have flexibility in the future to best deploy those funds for the protection of the State's residents and resources.

17. **COMMENT:** Paragraph 51 of the Proposed 3M JCO explicitly prioritizes drinking water utilities to receive PFAS Contamination Abatement funds. Will any of the $170 million PFAS Contamination Abatement Projects recovery be reserved for wastewater treatment?

**RESPONSE:** The Department has continued to prioritize addressing PFAS in Drinking Water Supplies because this remains the most significant exposure pathway. The Department continues to recognize that other sources of PFAS to the environment must be addressed, including wastewater, and confirms here that funding sources will be reserved under the Proposed 3M JCO for this purpose. See also Response to Comment #5.

DEP will allocate funds from the PFAS Abatement Fund as a significant additional capitalization source to the NJWB to supplement the Clean Water State Resolving Fund to provide financial assistance to owners of POTWs (towns, boroughs, municipal utilities authorities, counties, regional water authorities, other local government units, etc.) for clean water infrastructure projects that address PFAS. Such projects will be given a high project priority, and financial assistance will be allocated to clean water projects that address PFAS on a readiness to proceed basis. Funding packages may consist of principal forgiveness, interest free DEP loans and I-Bank's AAA Market Interest Rate loan funding for remaining project costs.

18. **COMMENT:** Please confirm that the funding available for "Treatment Works" under Paragraph 50(l) of the Proposed 3M JCO encompasses sewerage authorities, including but not limited to the treatment of process waste streams on- or off-site.

**RESPONSE:** Paragraph 50 of the Proposed 3M JCO outlines types of projects that may receive PFAS Contamination Abatement Funding under the settlement. The Department notes this is not intended to be an exclusive list of projects, and the Department retains the discretion to identify and fund additional projects pursuant to Paragraph 51 of the JCO.

Paragraph 50(l)'s reference to "Treatment Works" includes sewerage authorities and nothing in the Proposed 3M JCO is intended to limit the Department's discretion to allocate PFAS Contamination Abatement Funds to the owner or operator of a Treatment Works to treat process waste streams, whether on- or off-site.

19. **COMMENT:** Please confirm that the funding available for addressing "residuals from any WWTP" under Paragraphs 50(m) and 50(n) of the Proposed 3M JCO includes all PFAS containing sludge or residuals collected by a sewerage authority at any point in its operational or treatment system processes.

**RESPONSE:** The language in Paragraphs 50(m) and (n) is not intended to limit the Department's discretion to allocate PFAS Contamination Abatement Funding to address

PFAS-containing Sludge or residuals from wastewater treatment plants at any point in its operational or treatment system processes.

20. **COMMENT:** The Department should clarify whether the scope of eligible funding includes both up-front capital costs to install PFAS treatment facilities and the increased operations and maintenance costs of PFAS treatment.

   **RESPONSE:** Pursuant to Paragraphs 51 and 52 of the Proposed 3M JCO, the Department will develop a process through which Public Water Systems and/or other entities can apply to receive PFAS Contamination Abatement Funding provided to the Department under the Proposed 3M JCO. The Department will consider the most efficient way to provide funding for the protection of the public health and the environment, and while some funding may be made available for operations and maintenance costs, the Department will be prioritizing up-front capital expenditures, which it anticipates prioritizing over ongoing operation and maintenance activities.

21. **COMMENT:** Please confirm whether funding under Paragraph 50(r) of the Proposed 3M JCO would be applicable to the reimbursement of a municipal utility authority's loan through the New Jersey Infrastructure Bank.

   **RESPONSE:** Paragraph 50(r) of the Proposed 3M JCO allows PFAS Contamination Abatement Funding to be used to reimburse "Government Entities of the State or any of the State's Political Subdivisions for funding distributed through any revolving fund, spill cleanup fund, loan, or grant program of any kind for addressing PFAS Contamination." The purpose of this Paragraph is to make PFAS Abatement Funds available to replenish funds that were used to provide loans or grants to address PFAS Contamination so that additional funds may become available for disbursement (i.e., continuing the ability of such funding to be "revolving"). The purpose of this Paragraph is not to provide reimbursement of an existing loan to a municipal utility authority, particularly when such loan was provided through the New Jersey Water Bank, the New Jersey Infrastructure Bank, or another government source.

22. **COMMENT:** It would be impractical to require municipalities to pay for PFAS remediation and/or treatment and then seek reimbursement for those costs.

   **RESPONSE:** Pursuant to Paragraphs 51 and 52 of the Proposed 3M JCO, the Department will develop a process through which Public Water Systems and/or other entities can apply to receive PFAS Contamination Abatement Funding provided to the Department under the Proposed 3M JCO. Nothing in the Proposed 3M JCO requires the Department to solely allocate or prioritize allocation of PFAS Contamination Abatement Funding to reimbursement of past expenditures, and it is not the Department's intent to limit availability of funding that way.

23. **COMMENT:** Please confirm that nothing in Paragraph 50 precludes the Department from expending funds to reimburse any water system that has already commenced and implemented abatement projects related to PFAS Contamination. Further, the Department should confirm

that the priority of Public Water Systems, among others, is not diminished in any way where a Public Water System has already expended costs to address PFAS Contamination.

**RESPONSE:** Nothing in the Proposed 3M JCO is intended to preclude potential reimbursement of funds that have already been expended to address PFAS Contamination. Pursuant to Paragraphs 51 and 52 of the Proposed 3M JCO, the Department will develop a process through which entities impacted by PFAS can apply to receive PFAS Contamination Abatement Funding. The Department will also continue to offer funds to Public Water Systems, wastewater treatment systems and facilities, and/or other impacted entities or individuals through other sources of funding, including through its existing loan programs and revolving funds. The Department notes that although nothing in Proposed 3M JCO precludes the Department from reimbursing Public Water Systems for past expenditures to address PFAS contamination, the circumstances of such expenditures and any prior reimbursement the Public Water System may have already received, including but not limited to funding already received by a Public Water System through the Public Water System Class Settlement, may be factors that the Department considers when allocating PFAS Contamination Abatement Funding.

**24. COMMENT:** The Department should confirm that Public Water Systems that recovered in the AFFF MDL are not precluded from recovering funds under the Proposed 3M JCO.

**RESPONSE:** Nothing in the JCO precludes Public Water Systems that agreed to accept funds through the Public Water System Class Settlement or otherwise from receiving additional funds from the Department obtained through the Proposed 3M JCO. However, for Public Water Systems that are class members of the national Public Water System Class settlements, any funding that will be recouped under those national settlements must be used first to address any unmet needs before seeking any financial assistance from the PFAS Abatement Fund.

**25. COMMENT:** Does the State intend to use the funds recovered under the Proposed 3M JCO to indemnify municipal entities for claims of PFAS damages?

**RESPONSE:** The Proposed 3M JCO recoveries will not be used to indemnify Political Subdivisions. The Department notes that the Proposed 3M JCO offers important protection to Political Subdivisions in that under Paragraph 49: "3M covenants not to sue or assert any Claim against . . . any of the State's Political Subdivisions concerning the matters addressed" in the JCO.

**26. COMMENT:** Will funds be available from this settlement to retrofit AFFF fire suppression systems in NJ?

**RESPONSE:** The Department will consider a variety of projects to receive PFAS Contamination Abatement Funding under the Proposed 3M JCO. The projects listed under Paragraph 50 are not intended to be exhaustive, and the Department retains the discretion to provide funding to projects that would protect the public health and safety and the

Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharges of PFAS.

27. **COMMENT:** Will there be a fund created under the Proposed 3M JCO to treat individuals' illnesses?

    **RESPONSE:** The Proposed 3M JCO is not intended to address Claims for Personal Injury. For that reason, there is no funding for this purpose. Individuals retain the ability to pursue Claims for Personal Injury, which are "Purely Private Claims," against 3M. Claims for Personal Injury are not released by the Proposed 3M JCO.

<u>**Scope of Release – in General**</u>

28. **COMMENT:** The Proposed 3M JCO threatens to extinguish virtually all personal injury claims by private citizens in New Jersey related to PFAS exposure given the definition and use of the term "Purely Private Claim."

    **RESPONSE:** Paragraph 54 of the Proposed 3M JCO ("The Release") excludes "Purely Private Claims." Purely Private Claim, in turn, is defined to include any Personal Injury that allegedly arises from Covered Conduct or seeks recovery for a Covered Harm. The Department asserts that, with respect to Claims for Personal Injury, the Parties intended this to be true regardless of whether the individual's claim alleges that one source of potential PFAS exposure is drinking water with elevated PFAS levels. This point holds true for Claims for Personal Injury that have or have not yet been filed, whether in state court or in federal court.

29. **COMMENT:** The release is inappropriate due to continuing unknowns regarding PFAS, including impacts on human health and the environment, the number of sites that may ultimately require remediation, and future regulations, among other unknowns.

    **RESPONSE**: By their nature, settlements of litigation often must consider both known unknown information. There is significant benefit to the public in obtaining relief from 3M now as opposed to potential, speculative relief years from now, which would be by no means guaranteed if the State or its Political Subdivisions were to continue to litigate against 3M.

    Moreover, while not everything is known about PFAS, their harmful effects on humans and the environment, even at low concentrations, are well established. Drinking water that contains PFAS is one of the most significant pathways of exposure and has the potential to contribute to human exposure more than other common sources of PFAS. Addressing what is known to be a significant threat today, by prioritizing the treatment and removal of PFAS found in drinking water to protect the public health and the State's water resources is appropriate under the circumstances. The State has obtained significant resources to be used for PFAS abatement projects through the Proposed 3M JCO, Proposed DuPont JCO, and the Solvay and Arkema JCOs. Were the State to have waited until there was absolutely

certainty about all aspects of potential future issues, none of these settlements and the benefits they provide would be possible.

30. **COMMENT:** Certain municipalities passed resolutions noting their objection to the Proposed 3M JCO, including because they have filed claims and received payments from 3M under the Public Water System Class Settlement.

**RESPONSE**: The Department wishes to make clear that the Proposed 3M JCO does not preclude any Public Water System that is participating in the Public Water System Class Settlement from continuing to receive payments or any other benefits it is entitled to under the Public Water System Class Settlement. The Proposed 3M JCO resolves certain claims not previously released by such Public Water System Class Settlement class members and provides the State with an important additional funding mechanism to further assist Public Water Systems as they continue to address harms caused by PFAS contamination.

31. **COMMENT:** The Proposed 3M JCO treats wastewater treatment plants inequitably and arbitrarily, because public water systems had the opportunity to litigate their claims in the AFFF MDL and participate in a national class action settlement with 3M, but wastewater treatment systems will not have this opportunity.

**RESPONSE:** The Department has determined that the PFAS Contamination Abatement Funding that will be made available through the Proposed 3M JCO, in combination with other State and federal funding sources, best positions the State's Political Subdivisions, including wastewater system owners and/or operators, to receive funds to address PFAS Contamination for the protection of the State's residents and natural resources in a timeframe appropriate for the pressing need to take such protective action. In addition to making funds available sooner than they could ever be through a hypothetical class action settlement that has not been proposed, let alone entered into and judicially approved (processes that take years in and of themselves), this mechanism removes the risks of litigation, including but not limited issues related to limitation periods, causation, product identification, evidentiary issues, contributory negligence and/or statutory contribution claims against such entities, and more.

Indeed, while the commenters suggest they will be barred from joining a hypothetical nationwide class action on behalf of wastewater treatment plants against 3M, there is no certainty that such an action will ever be certified, maintained, or ultimately resolved, let alone on terms that provide more compensation to class members than may be available to them through funding obtained by the State through the Proposed 3M JCO. Public water systems, on the other hand, were recognized as a claimant group and prioritized as the first bellwether track by the AFFF MDL Court soon after the MDL was created in 2018, more than four years before the first water provider bellwether case was set for trial and 3M announced its Public Water System Class Settlement in June of 2023, which took further time to be approved until March 2024. There is no indication of when, if ever, a bellwether trial or individual wastewater cases could be tried in the AFFF MDL.

The Department disagrees that the Proposed 3M JCO treats WWTPs inequitably or arbitrarily, as this circumstance is dictated largely by the sequencing of various stages of litigations.

32. **COMMENT:** The Proposed 3M JCO should not release the claims municipal entities may have against 3M because this will take away funding from local governments and drive increased privatization of New Jersey's water and sewer systems.

> **RESPONSE:** The Department disagrees that the Proposed 3M JCO operates so as to take away funding from local governments. The objective of the Proposed 3M JCO is to obtain funding for Political Subdivisions in a manner that will best protect the State's residents as a whole, leveraging many of the Department's existing funding programs that have proven over many decades to be effective for this very purpose.
>
> The Proposed 3M JCO works with the Proposed DuPont JCO and the previously approved Solvay and Arkema JCOs to accumulate over $1.2 billion in cash to be used for PFAS abatement projects that protect the public health and environment of the State, in addition to nearly $3 billion in total value (including enforceable commitments by the settling defendants to complete remediation). A large part of this funding will be made available to Political Subdivisions through Department funding mechanisms to address PFAS contamination. Left on their own, Political Subdivisions were not guaranteed any compensation from these defendants, in the short-term or long-term, and the Political Subdivisions retain the right to pursue claims against other defendants.

33. **COMMENT:** The broad releases in the Proposed 3M JCO will impair the ability of Delegated Local Agencies ("DLAs") to implement and enforce federal and state environmental protection programs, in the federal Clean Water Act, the New Jersey Water Pollution Control Act, and Department-approved pretreatment programs. This also conflicts with the New Jersey Clean Water Enforcement Act's penalty provisions.

> **RESPONSE:** In Paragraph 48 of the Proposed 3M JCO, 3M represents and warrants that it does not currently own, operate, manage, or control any property in New Jersey. With respect to properties in New Jersey it historically owned or operated and from which there are known PFAS discharges, 3M has agreed to satisfy any cleanup obligations it may have under applicable law for the three formerly 3M-owned or -operated properties where PFAS contamination is known to exist. For other historically owned properties, 3M has agreed to remediate PFAS contamination associated with 3M's ownership/operations if certain conditions are met, including that if the Department later determines such contamination exists in concentrations above regulatory standards or poses an imminent and substantial endangerment, and the Department did not know of that contamination at the time the Department sought court approval for the Proposed 3M JCO. No public commenter has identified additional properties formerly owned or operated by 3M that are not described in the Proposed 3M JCO. Thus, other than the limited exceptions noted here, 3M is not a "discharger" under the Clean Water Act or any other regulation.

34. **COMMENT**: The Proposed 3M JCO cannot release the rights or claims of Municipal Utility Authority users who are not from New Jersey.

> **RESPONSE:** The Department agrees that the mere fact that waste produced by an individual residing in another state is treated at a facility in New Jersey does not cause that individual's claims to be released under the Proposed 3M JCO.

## Scope of Release - Authority

35. **COMMENT:** The Department received comments from and/or on behalf of Political Subdivisions asserting that the State does not have the authority to release its Political Subdivisions' claims related to statewide PFAS contamination through the Proposed 3M JCO.

> **RESPONSE:** The Department has closely examined the comments making this assertion, and has concluded that the State has ample bases and legal support for entering into the 3M Proposed JCO, including the release provisions.
>
> The State is entering into the Proposed 3M JCO in its capacity as *parens patriae* and trustee of New Jersey's natural resources to protect the health and well-being of its residents against the threat of PFAS contamination and to safeguard and restore public trust resources, including water supplies, for current and future generations. The State's interests in these matters are represented by the Attorney General—the State's chief legal officer and "defender of the public interest." *Petition of Pub. Serv. Coordinated Transp.,* 5 N.J. 196, 208 (1950). The State, acting through the Attorney General, is representing the public interest in matters of statewide significance, and its authority to sue and settle to protect the public interest includes the authority to sue and settle on behalf of its political subdivisions.
>
> It is well established that a state may take legal action as *parens patraie* to protect the "well-being of its populace." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 601 (1982). Under the *parens patriae* doctrine, a state may seek to remedy an injury that infringes upon its "quasi-sovereign" interests, such as its interests in the health of its citizens or in a clean environment. *Id*. at 602. Here, the State is acting as *parens patriae* to protect its "quasi-sovereign interests" in the general health of its residents and the environment. PFAS contamination is prevalent in the environment throughout New Jersey, particularly in the State's water resources.
>
> The State's authority to act as *parens patriae* under these circumstances is bolstered by its responsibilities as trustee of the State's natural resources. The Commissioner, on behalf of the State, acts as the trustee, for the benefit of all the State's citizens, of all natural resources within the State's jurisdiction, including but not limited to water resources stretching across municipalities' borders. N.J.S.A. 58:10-23.11a. As trustee, the Commissioner acts as the ultimate guardian of these resources, and it is the Department—and the Department alone—that may sue to protect natural resources held in the public trust to serve all of the State's residents, rather than for the interests of only a subset of residents. *State, Dep't of Env't Prot. v. Jersey Cent. Power & Light Co.,* 125 N.J. Super. 97, 103 (Law. Div. 1973), *aff'd*, 133 N.J. Super. 375, (App. Div. 1975), *rev'd on other ground*s, 69 N.J. 102, (1976).

All of this is further consistent with the State's broader role in the environmental arena as carried out by the Department and recognized by New Jersey's courts: the Department has the primary authority to enforce the State's environmental laws and is the primary line of defense in ensuring those laws are carried out for the protection of the public. *See*, *e.g.*, N.J.S.A. 58:12A-9a (authorizing Commissioner to "[p]erform any and all actions to carry out the purposes and requirements of the" New Jersey Safe Drinking Water Act).

Courts have found under circumstances similar to those presented here that State-initiated lawsuits preempt municipal lawsuits against the same defendants on the same subject when the State is acting as *parens patriae* and natural resource trustee for the benefit of all a state's citizens, including in *State v. City of Dover*, 153 N.H. 181 (N.H. 2006). There, the State of New Hampshire alleged damage "to the State's ground and surface waters" against manufacturers of methyl tertiary-butyl ether (MTBE). *Id.* at 184. Two New Hampshire cities alleged damages to "their respective municipal water supplies." *Id.* at 188. The State subsequently sought a declaration that the cities' suits must "yield to the State's suit" and be dismissed. *Id.* at 184. The Supreme Court of New Hampshire agreed, basing its conclusion primarily on the fact that the state was suing as *parens patriae*. *Id.* In that capacity, the State was presumed to represent not just its residents' interests but also the cities' interests. *Id.* at 188–89. In the court's view, it did not matter that the cities wished to proceed against MTBE manufacturers under a different legal theory, nor did it matter that the State did not plan to distribute its proceeds from the lawsuits to the cities but would instead "establish a public fund." *Id.* at 189. The key, according to the court, was that both the State and its cities sought "economic" damages based on the defendants' pollution. "While the cities may have a direct economic interest in recovering for contamination to their water supplies," the court held, "this economic interest is represented by the State's suit." *Id.*

So too, here, are New Jersey's municipalities' claims and interests related to statewide PFAS contamination represented by the State. While certain political subdivisions may have preferred to pursue their own litigation against the Settling Defendants, the State believes that the Settlements best position the State's municipalities as a whole to receive funds to address PFAS contamination for the protection of the State's citizens and natural resources in the timeframe needed to take such protective action, removing the substantial risks of town-by-town litigation. Such is consistent with the recognition of New Jersey courts that the Department "must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly." *Howell Twp. v. Waste Disposal, Inc.*, 207 N.J. Super. 80, 96 (App. Div. 1986).

36. **COMMENT:** The release of the State's political subdivision claims is contrary to New Jersey's tradition of Home Rule and take away the statutory authority granted to counties and municipalities under New Jersey's Home Rule Act.

**RESPONSE:** The Department respectfully disagrees, as a municipality's home rule authority is limited to matters of "local concern," and does not extend to "those matters involving state policy or in the realm of affairs of general public interest and applicability."

17

*Wagner v. Mayor & Mun. Council of City of Newark*, 24 N.J. 467, 478 (1957). Here, the State through the Proposed 3M JCO is addressing an issue of general and statewide significance, as PFAS contamination is prevalent across the State, and thus threatens the health of all New Jersey residents. An issue such as this is most appropriately resolved by the State, which acts on behalf of and for the protection of all of the State's residents, and can thus craft the most appropriate solutions.

37. **COMMENT:** The State was required to give Political Subdivisions notice of the Proposed 3M JCO before it was reached, an opportunity to participate in negotiations, and/or the ability to "opt out." Some comments relied on the U.S. Supreme Court's decision in *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) for this position.

> **RESPONSE:** The Department disagrees with the comment, including for reasons consistent with the response provided above, as the State is appropriately exercising its *parens patriae* and trustee authority, which does not require pre-approval from its Political Subdivisions. The authority relied on by the comments, including *Amchem Prods.* is plainly inapplicable, given that it relates to class certification under Federal Rule of Civil Procedure 23. Aside from the State's strong legal support for its position, the State also notes the impracticality of coordinating among hundreds of Political Subdivisions before the Proposed 3M JCO could be reached.
>
> Moreover, the State has sought and received input on the Proposed 3M JCO from its Political Subdivisions through the public comment process. After the Department announced the Proposed 3M JCO on May 13, 2025, the Department provided public notice of the Proposed JCO in the *New Jersey Register* on July 21, 2025, beginning a formal public comment period of 60 days, lasting until September 19, 2025. The Department carefully considered all of the public comments received, including those from Political Subdivisions. Additionally, before, during, and after the comment period, State representatives corresponded, participated in telephone calls, held video conferences, and/or met in-person with representatives of many Political Subdivisions and other commenters, receiving further information and perspective regarding the Proposed 3M JCO before the State ultimately determined to move forward and seek court approval of the Settlement.

38. **COMMENT:** Does the State have authority to settle economic damage claims of municipal entities related to PFAS without consent or direct compensation?

> **RESPONSE:** The Department's answer is in the affirmative, in the appropriate circumstances. For reasons discussed above, the State is acting in its *parens patriae* and public trustee capacities in this circumstance based on the statewide challenges of PFAS; the State thus has the authority to resolve these claims without any pre-approval or pre-designated recoveries for municipalities. The State has also pursued these claims since initiating its various lawsuits against the Settling Defendants in 2019. *See, e.g., Grewal, et al. v. 3M Company, et al.*, Original Pleading, at ¶ 13 (Filed May 24, 2019) (seeking, among other things, "property damages to State and local government-owned properties").

The New Hampshire Supreme Court in the *City of Dover* case also considered similar circumstances. The Court there found that the State had the authority to "establish a public fund" from the proceeds of its lawsuit against MTBE manufacturers, rather than through a strict distribution to cities that had filed their own lawsuits. *Id.* at 189. The Court found that both the State and its cities sought "economic" damages based on the defendants' pollution. "While the cities may have a direct economic interest in recovering for contamination to their water supplies," the court held, "this economic interest is represented by the State's suit." *Id.* Here, the State is similarly representing the economic interests of political subdivisions in addressing PFAS contamination for the protection of the State's resources and residents.

**39. COMMENT:** Does the Proposed 3M JCO resolve claims that were not subject to the State's lawsuit (and if so, under what authority does it do so)?

> **RESPONSE:** To the extent the commenter is referring only to the State's case concerning Chambers Works, the Department wishes to point out that, prior to the Proposed 3M JCO, the State had a variety of administrative and legal claims pending against 3M related to PFAS, including claims asserted against 3M through the Statewide PFAS Directive, the Chambers Works case, the Parlin case, and the New Jersey AFFF Statewide PFAS case, which are collectively referred to in the Proposed 3M JCO as the Litigations. The claims in these Litigations seek a wide variety of relief meant to address PFAS attributable to 3M at specific sites, as well as statewide. The Proposed 3M JCO seeks to resolve all claims brought in the Litigations, as well as certain related unasserted claims to provide a comprehensive resolution.

> It is not at all uncommon for parties to resolve related but unasserted claims in a settlement. Indeed, the Department has done this previously for purposes of efficiency and to avoid additional protracted litigation, which courts approving the Department's settlements have found to be appropriate. *See, e.g., New Jersey Dep't of Env't Prot. v. Exxon Mobil Corp.*, 453 N.J. Super. 272, 305, 181 A.3d 257, 276 (App. Div. 2018).

**40. COMMENT:** The State has no authority to release the rights of private parties or corporations through settlement. The Department should clarify that the Proposed 3M JCO does not cover private owners and operators of water and wastewater systems. The JCO's use of the terms "Releasors," "Released Claims," "Private Person," and "Purely Private Claim" make this unclear.

> **RESPONSE:** Private owners and operators of water and wastewater systems are not included in the definition of "Releasor" in the Proposed 3M JCO. As such, the Department (and other Settling Plaintiffs) do not purport to release any of their claims.

> With respect to claims by private owners of drinking water systems, and as described in Section V ("Parties' Mutual Understandings and Objectives") and Paragraph 54 ("The Release") of the Proposed 3M JCO, the Parties agree and intend that –

"any Claim (regardless of the identity of the Person asserting the Claim) arising from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's jurisdiction [] against any Released Entity in any way arising from, based on, involving, or caused by any Covered Conduct or Covered Harm is released, barred, [or] precluded."

Proposed 3M JCO Paragraph 54.

To the extent such Claims are filed in the future in this or any other court, they would be addressed by that court based on the complaint filed, any defenses asserted, and the terms of the JCO that this Court has entered as an enforceable, binding final judgment. While the Department cannot predict every possible Claim that might be filed, Settling Plaintiffs and 3M agree and intend that, to the extent that such Claims are based on PFAS impacts to Drinking Water Supplies or a Water System arising from, based on, involving, or caused by Covered Conduct or Covered Harm, such Claims would be precluded by the JCO.

To make clear that the Department is not releasing any Claim of a private owner of a drinking water system, the Settling Plaintiffs and 3M have agreed to revise the last sentence of that Paragraph 54 to refer to certain Claims being "released, barred, *or* precluded," rather than, in the original Proposed 3M JCO, "released, barred, *and* precluded" (emphases added). This revision is included in brackets in the quotation from Paragraph 54 above.

The Parties further recognize and agree that there may be additional claims that, although not specifically released, may nevertheless be precluded under the terms of this JCO.

### Contribution Claims and Contribution Protection

41. **COMMENT:** The Proposed 3M JCO would extinguish Political Subdivisions' CERCLA 107 and 113 rights of action against 3M for PFAS. Political Subdivisions should be able to pursue 3M for contribution claims and not being able to do so undermines CERCLA's "polluter pays" principles.

**RESPONSE:** The Department disagrees with the concerns expressed in the comment. The commenters have not articulated a basis for any CERCLA 107 or 113 claims they might have against 3M for PFAS Contamination occurring in New Jersey. To the extent the commenters suggest such a claim may exist based on 3M's manufacture, sale, and/or distribution of PFAS products, such conduct is generally not actionable under CERCLA, which provides impacted parties the ability to recover response costs from certain categories of "persons" that bear a relationship to the CERCLA "facility" from which the "release" of hazardous substances that caused the incurrence of those costs occurred. The U.S. Supreme Court held in *Burlington Northern & Santa Fe Railway Co. v. United States*, 556 U.S. 599, 608-13 (2009) that the sale of a "useful product" does not trigger CERCLA liability. *See Consolidation Coal Co. v. Georgia Power Co.*, 781 F.3d 129, 147-55 (4th Cir. 2015); *United States v. D.S.C. of Newark Enterprises, Inc.*, 2013 WL 2658929, at *7 (D.N.J. June 12, 2013) ("'[K]nowledge alone is insufficient to prove that an entity 'planned for' the disposal….'"); *cf. Bonniview Homeowners Ass'n v. Woodmont Builders, L.L.C.*,

655 F.Supp.2d 473, 493 (D.N.J. 2009) ("arranger liability under § 107(a)(3) requires an intent to dispose of hazardous substances.").

In Paragraph 48 of the Proposed 3M JCO, 3M represents and warrants that it does not currently own, operate, manage, or control any property in New Jersey. With respect to properties in New Jersey it historically owned or operated and from which there are known PFAS discharges, 3M has agreed to satisfy any cleanup obligations it has under applicable law for the three formerly 3M-owned or -operated properties PFAS Contamination is known to exist. For other historically owned properties, 3M has agreed to remediate PFAS Contamination associated with 3M's ownership/operations if certain conditions are met, including that the Department later determines such contamination exists in concentrations above regulatory standards or poses an imminent and substantial endangerment, and the Department did not know of that contamination at the time the Department sought court approval for the Proposed 3M JCO. No public commenter has identified additional properties formerly owned or operated by 3M that are not described in the Proposed 3M JCO.

Further, based on the above, the Department disagrees that the Proposed 3M JCO undermines CERCLA's principles. In fact, the Proposed 3M JCO provides benefits beyond what CERCLA allows for, by obtaining funds from a polluter whose responsibility is based on the manufacture and sale and/or distribution of certain products that then caused contamination in New Jersey.

The Department notes that the commenters retain their rights to bring claims under CERCLA against any parties other than 3M and the DuPont Defendants that may have, for example, owned or operated a facility from which there was a release of PFOA and/or PFOS, or parties that "arranged for the disposal" at and/or "transported" PFOA and/or PFOS to such a facility.

42. **COMMENT:** The Proposed 3M JCO does not protect Political Subdivisions under CERCLA. 3M could theoretically pursue the Political Subdivisions for contribution, but they cannot pursue 3M because 3M will have contribution protection statewide.

    **RESPONSE**: Applicable law only allows the Department to provide contribution protection to the settling party, *see* N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2). Through the Proposed 3M JCO, however, 3M generally "covenants not to sue or assert any Claim against … any of the State's Political Subdivisions concerning the matters addressed in … this JCO." Proposed 3M JCO, ¶ 49.

    With respect to any broader, categorical protections of the State's Political Subdivisions under CERCLA or otherwise related to releases of PFAS, changes in federal or state law rest with the U.S. Congress and the New Jersey Legislature and cannot be made by the Department through its settlement with a third party.

43. **COMMENT:** 3M should not receive contribution protection for remediation claims at sites where 3M-manufactured aqueous film-forming foam ("AFFF") was lawfully purchased and

lawfully discharged. Further, the contribution protection afforded to 3M through the Proposed 3M JCO should only apply to sites at which settlement funds are actually allocated.

> **RESPONSE:** As discussed above, 3M is not a CERCLA liable party where its useful products have been released. Thus, contribution under CERCLA is not available. And the Spill Act automatically provides, as a matter of law, contribution protection to 3M "regarding matters addressed in the settlement" if the settlement is a judicially approved settlement. N.J.S.A. 58:10-23.11f.a(2)(b). Because the State intends to release remediation and natural resource damage claims, unless they constitute Purely Private Claims, with respect to AFFF-related PFAS contamination throughout the State, Spill Act claims for contribution to address AFFF remediation and natural resource damages anywhere in the State are subject to the contribution protection. *See id.*

> The Proposed 3M JCO is structured to provide statewide relief, such that in exchange 3M is provided certain statewide protections. The Department would only have been able to obtain the amounts in the Proposed 3M JCO to benefit the state as whole if such protections were provided. The Department considered the advantages and disadvantages of such a settlement and determined that it was in the best interest of the State and its citizens as a whole.

**44. COMMENT:** As written, it is unclear whether 3M's contribution protection for "matters addressed" in the Proposed 3M JCO extends to all contribution claims associated with sites identified on Appendix D. There should be a carveout for contribution protection for "any private party claims for contribution related to the Belle Mead, Flemington, or Freehold sites, as those sites are identified in paragraph 48 and Exhibit D of this JCO."

> **RESPONSE:** Paragraph 71 of the Proposed 3M JCO expressly states that the "matters addressed" in the JCO "are all the Released Claims set forth in the Release in Paragraph 54." The definition of "Released Claims," expressly carves out "3M's Remediation obligations described in Paragraph 48." According to Paragraph 48, "[w]ith respect to the Belle Mead, Flemington, and Freehold sites formerly owned or Operated by 3M, 3M shall continue to Remediate PFAS in accordance with its obligations under applicable State and federal law." 3M has made an express commitment to continue to perform Remediation of PFAS under State and federal law. Accordingly, 3M's Remediation obligations with respect to PFAS remain extant and are not released and are carved out of the definition of "matters addressed." Moreover, with respect to these properties, the Proposed 3M JCO does not affect contribution rights. To the extent any subsequent property owners/operators may have contractual claims against 3M with respect to Remediation at any of these three sites, the Proposed 3M JCO does not affect such claims or any defenses 3M may have.

### Credit-Eligible Claims and Credit System

**45. COMMENT:** 3M claiming 85% of all "Credit Eligible Claims" in all future settlements with other states and expressly including the fact that it would only deduct 50% (as opposed to 85%) of these credits from its payments to New Jersey as a purported "benefit" to the Department in the proposed settlement creates a national landscape whereby 3M arguably cannot offer any other state less than 85% credit against future offsets.

**RESPONSE:** The statement in Paragraph 45.a.i. that "[a]bsent the circumstances set forth below, 3M would insist upon a credit of 85 percent" is not binding on any other state or sovereign entity that enters into a future settlement with 3M related to PFAS or otherwise. Moreover, while the Department and other Settling Plaintiffs of course support efforts by other states and sovereign entities to address PFAS contamination within their respective jurisdictions, the Department and Settling Plaintiffs are primarily charged with protecting the public interest of and/or within the State of New Jersey, its resources, and citizens.

**46. COMMENT:** The credit system outlined in Paragraph 45 of the Proposed 3M JCO effectively means that successful litigation by other parties would reduce compensation to New Jersey's Public Water Systems, public utilities, and sewerage authorities.

**RESPONSE:** The credit provisions in the Proposed 3M JCO were designed to (a) increase the settlement value by providing 3M some assurance that it would not pay twice for certain types of claims and (b) limit the amount of money that 3M could recoup in the event it did. The credit provisions confine the amount of settlement proceeds that are subject to potential credit to the Annual Payments to be made during year 10 through 25, or a total of $125 million. To be eligible to receive a credit, 3M must provide notice to and cooperate with the Settling Plaintiffs to ensure that any properly precluded claim does not give rise to a credit. The Department reserves the right to dispute whether any "Credit-Eligible Claim" presented by 3M is in fact eligible for a credit. If such claim is in fact eligible, 3M is only entitled to recover 50% of the amount it pays to resolve the claim from the payments described above.

## Clarification of Terms and Definitions

**47. COMMENT:** Paragraph 6 of the Proposed 3M JCO defines "Restoration" in a way that blurs remediation and natural resource damages so that the Department may keep the $140 million natural resource damages recovery in the Department's "secret escrow." This violates the natural resource damages Constitutional Amendment because 100% of the recovery must be credited to the Natural Resource Damages-Constitutional Dedication Account.

**RESPONSE:** Paragraph 6 of the Proposed 3M JCO defines "Restoration" as "all Primary Restoration and all Compensatory Restoration." Both Primary Restoration and Compensatory Restoration are natural resource damage concepts, distinct from "remediation." *See New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.*, 323 F.R.D. 213, 223 (D.N.J. 2017). Further, as explained above, the Proposed 3M JCO does not create a "secret escrow." When the Settlement is final, the funds from the escrow account will be deposited into the State Treasury and the natural resource damages collected by the State in connection with the 3M JCO will be credited to the Natural Resource Damages-Constitutional Dedication Account.

**48. COMMENT:** Does the definition of "Covered Conduct" include the transport, treatment, storage and/or disposal of sludge or wastewater from a sewerage authority?

**RESPONSE:** Under Paragraph 5 of the Proposed 3M JCO, "Covered Conduct" includes conduct arising from, based on, involving, or caused by, among other things, any transport, treatment, storage, disposal, or arrangement for transportation, treatment, storage, or disposal, or use of PFAS-containing Sludge or PFAS-containing Wastewater (from any Site, facility, or location). Based on that definition, Covered Conduct includes any transport, treatment, storage, and/or disposal of sludge or wastewater containing PFAS from a sewerage authority.

49. **COMMENT**: Does the definition of "Covered Conduct" include any secondary/accessory plant improvements that are required to implement any new PFAS treatment operations?

**RESPONSE:** Under Paragraph 5 of the Proposed 3M JCO, "Covered Conduct" includes acts involving PFAS or that result in PFAS Contamination. Additionally, under Paragraph 5, "Covered Harm" includes costs to the State's Political Subdivisions due to impacts by PFAS in the Environment. Based on those definitions, Covered Conduct and Covered Harm includes costs to a Political Subdivision related to PFAS treatment processes.

50. **COMMENT:** Would a sewerage authority constitute a "Releasor" under the Proposed 3M JCO?

**RESPONSE:** Under Paragraph 5 of the Proposed 3M JCO, "Releasors" include, among others, with respect to Released Claims, the State and, without limitation and "to the maximum extent" that the Attorney General and other State signatories to the Proposed 3M JCO may release Claims, all of the State's Political Subdivisions and their departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, and any Person claiming by or through any of the foregoing. The above applies to a sewerage authority that is also a Political Subdivision or a Government Entity of the State.

51. **COMMENT:** The Department should clarify whether Paragraph 54 of the Proposed 3M JCO covers potential future claims from sewerage authorities that may arise as a result of new regulations applicable to sewerage authorities related to PFAS.

**RESPONSE:** Claims by sewerage authorities that are Political Subdivisions and/or Government Entities of the State against 3M related to PFAS removal and/or abatement caused by Covered Conduct that occurred prior to the Effective Date are released, whether or not they arise from future regulations. As stated above, the Department will assist sewerage authorities and others, through the provision of funding, as well as technical and regulatory support, as it may relate to regulations yet to be adopted.

## <u>Miscellaneous</u>

52. **COMMENT:** The Department should not have held its "PFAS Summit" after the close of the public comment period.

**RESPONSE:** The PFAS Summit was not held for the purpose of addressing the Proposed 3M JCO, but more generally was to bring together individuals with science, policy, and

industry backgrounds as well as communities to discuss issues related to PFAS in New Jersey. The Proposed 3M JCO was subject to a dedicated public comment process, and, as described above, the Department undertook significant efforts to solicit, carefully review, and then thoroughly respond to those comments.

53. **COMMENT:** Paragraph 48 of the Proposed 3M JCO is factually inaccurate. 3M has not identified itself to the Department as a person responsible for conducting remediation for PFAS at the Freehold Remediation Sites identified in Proposed 3M JCO Appendix D. 3M also has not remediated, opened a Spill Act case, or entered into an ACO with the Department. Language should be added to the Proposed 3M JCO to require 3M to take these steps.

   **RESPONSE:** The Proposed 3M JCO, if approved, will not only constitute a settlement agreement to which 3M will be a signatory, but will become a court order. The Proposed 3M JCO, itself, then not only identifies 3M as a person responsible for conducting remediation of PFAS at the Freehold Remediation Sites, but also binds 3M to perform such PFAS Remediation. According to Paragraph 48, "[w]ith respect to the Belle Mead, Flemington, and Freehold sites formerly owned or Operated by 3M, 3M shall continue to Remediate PFAS in accordance with its obligations under applicable State and federal law."

54. **COMMENT:** None of the Proposed 3M JCO recoveries satisfy the requirements of the IRS tax deduction rule because the amounts sent to a private escrow are not in a "segregated fund" that must be "used exclusively" for restitution or remediation purposes.

   **RESPONSE:** This comment misunderstands the purpose and function of the escrow account referenced in the Proposed 3M JCO, as was explained above. Moreover, while certain payments in the Proposed 3M JCO are designated for "the restitution or remediation of harm to the environment, wildlife, or natural resources," it is 3M's burden as a taxpayer to establish its entitlement to a claimed tax deduction.

55. **COMMENT:** The Department appears to have inappropriately based its decision that the settlement with 3M is in the public interest based solely on litigation risk.

   **RESPONSE:** The Department considered and weighed many factors in reaching its decision that the Proposed 3M JCO is in the public interest. These factors include, without limitation, the State's potential damages and costs resulting from PFAS contamination, 3M's responsibility for PFAS contamination in the State, the total amount of the Settlement Payments, the State's need for funding to take action to protect its citizens from the risks of exposure to PFAS, the benefit to the State of securing significant funds now, the strengths and weaknesses of the State's claims against 3M, and the costs and risks of continued litigation. The Department also evaluated and considered all public comments received regarding the Proposed 3M JCO before moving the Court for its approval. Litigation risk is only one of many factors the State considered in determining that the Proposed 3M JCO is in the public interest.

**56. COMMENT:** Several individual commenters expressed concerns about the health risks of PFAS and sought additional information about the contamination of drinking water by PFAS and the adverse effects of PFAS.

**RESPONSE:** The Department has several resources available at https://dep.nj.gov/pfas/ that explain our current understanding of PFAS and PFAS contamination, as well as the steps the Department is taking to regulate and mitigate PFAS discharges to environmental media in New Jersey.

The State's response to PFAS and its course for further action is also detailed in the State's "Forever No More" PFAS Report, published in July 2025 and available here: https://dep.nj.gov/wp-content/uploads/pfas/docs/njdep-pfas-strategy-2025.pdf.

The Department understands the commenters' concerns about PFAS and has made the cleanup and mitigation of PFAS contamination in the State a priority. New Jersey was the first state to set enforceable standards for PFAS in Drinking Water Supplies. It has continued to study and to set a high standard for cleanup of these "forever chemicals" in order to ensure the protection of New Jersey's citizens and natural resources. These efforts include not only the comprehensive litigation that led to this landmark Proposed 3M JCO and other settlements with PFAS polluters, but also the continuous investigation of PFAS sources and regulation of PFAS discharges to the environment. Today, New Jersey remains a leader in understanding and mitigating the effects of PFAS contamination.