# EXHIBIT F

E.     A defendant removed the Chambers Works Litigation and the Parlin Litigation to this Court on July 5, 2019.  The cases were subsequently consolidated, along with two related actions that do not name 3M, and are currently before Chief Judge, the Honorable Renée Marie Bumb.

F.     3M filed responsive pleadings in the Chambers Works Litigation and the Parlin Litigation denying liability, denying Plaintiffs' claims and allegations against 3M, and asserting various defenses to the allegations in the Chambers Works complaint and the Parlin complaint.

G.     On March 25, 2019, the Department issued a *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination in the State to 3M and other respondents (the "Statewide PFAS Directive").  The Statewide PFAS Directive was issued pursuant to the authority vested in the Commissioner under the Spill Act, the Water Pollution Control Act ("WPCA"), N.J.S.A. 58:10A-1 to -20, the Air Pollution Control Act ("APCA"), N.J.S.A. 26:2C-1 to -68, and the Solid Waste Management Act ("SWMA"), N.J.S.A. 13-1E-1 to -230.   The Directive provides notice that the Department believes 3M to be responsible for "significant contamination of New Jersey's natural resources, including the air and waters of the State, with [PFAS]."  The Directive seeks, among other things, to compel 3M to provide information about its uses and Discharges or potential Discharges of certain PFAS into the State's environment, to meet with the Department to develop a good-faith estimate of costs to investigate, test, treat, clean up, and remove certain PFAS from the State's environment, including damages for economic impacts of PFAS Contamination, and to provide information about 3M's financial condition and ability to pay for or perform the cleanup and removal of certain PFAS.

PFAS at or from the sites at issue in the Chambers Works Litigation and the Parlin Litigation. *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 148).

K.      On December 30, 2021, this Court denied 3M's motion to dismiss Plaintiffs' claims against it in the Chambers Works Litigation and the Parlin Litigation.  *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 156).  The Court held, among other things, that Plaintiffs had sufficiently pled that 3M, as a manufacturer and supplier of PFOA (perfluorooctanoic acid, a PFAS substance) to Chambers Works and Parlin, was a person "in any way responsible" for PFOA discharged from the Chambers Works Site and the Parlin Site for purposes of Plaintiffs' Spill Act claim.

L.      On October 29, 2024, this Court entered an Order reserving all of 3M's cross-claims against the other defendants in the Chambers Works Litigation, apart from those cross-claims previously reserved by the Court's December 9, 2021 Order.  *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 385).

M.      On November 12, 2024, the Court entered an Order reserving 3M's and the other defendants' potential claims and third-party claims in the Chambers Works Litigation against parties not named in that action, apart from those claims and third-party claims against such parties previously reserved by the Court's December 9, 2021 Order.  *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 391).

N.      ~~This Court has confirmed that t~~The Chambers Works Litigation ~~is~~was set for trial, to commence May 19, 2025.  *See, e.g.*, Case No. 1:19-cv-14766-RMB-JBC (Dkt. 480).

O.      Settling Plaintiffs assert that, beyond the current claims they are pursuing against 3M in the matters referenced above, there is a potentially broad range of additional claims that they could pursue against 3M related to PFAS.

"Class-Member Public Water System" means any Public Water System that is a class member under the Public Water System Class Settlement, regardless of whether such system has asserted any Claim against 3M.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commissioner" means the New Jersey Commissioner of Environmental Protection.

"Compensatory Restoration" means compensation for the State's citizens and residents for the period of time that Natural Resources remained injured or altered, before Primary Restoration returned the Natural Resources to their Pre-Discharge Condition.

"Contribution Claims" has the meaning set forth in Paragraph 73.

"Costs, Fees, and Punitive Damages Payment" ~~shall have~~has the meaning set forth in Paragraph 44.

"Court" (or "this Court") means the United States District Court for the District of New Jersey unless expressly stated to be a different court.

"Covenant Not To Sue" has the meaning set forth in Paragraph 56.

"Covered Conduct" means:

a.    Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind, intentional or unintentional, whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity that occurred prior to the Effective Date) that has arisen, is arising, or may arise at any time in the future from, was, is, or will be based on,

13

involved, involves, or will involve, or was, is, or will be caused by PFAS, or that did result, is resulting, or will result in PFAS Contamination.  Without limiting the foregoing, the term "Covered Conduct" includes conduct arising from, based on, involving, or caused by:

      i.      the design, development, manufacture, formulation, distribution, handling, control, disposal, marketing, sale, testing, labeling, transportation, import, export, storage, loading, mixing, application, use, ~~and~~or instructions for use of PFAS or any PFAS-Containing Product;

      ii.      any transport, treatment, storage, disposal, or arrangement for transportation, treatment, storage, or disposal, or use of PFAS-containing Sludge or PFAS-containing Wastewater (from any Site, facility, or location), including any use for irrigation, spraying on agricultural fields, or manufacturing;

      iii.      any action, activity, omission, or other conduct that in any way resulted in or threatens to result in the presence of PFAS in the Environment, including any known, suspected, or threatened Discharge of any PFAS into the Environment from the beginning of time through the Effective Date, including any known, suspected, or threatened Discharge of PFAS into the Environment that commenced prior to the Effective Date and is continuing as of the Effective Date;

      iv.      compliance with any reporting, recordkeeping, disclosure, notification, or permit-process requirement related to, ~~and~~or any representations or omissions about, PFAS or any PFAS-Containing Product (to the extent any

Waste Facility. It is the intention of this JCO that the definition of "Discharge" be as broad, expansive, and inclusive as possible.

"Dismissal" (or "Dismiss" or "Dismissed") means dismissal with prejudice, with each party bearing its own costs, of pending litigation brought against any Released Entity involving any Released Claim.

"Drinking Water Supplies" means any raw or finished water source that is or may be used by a Water System, by a Private Potable Well, or as Potable Water by one or more individuals.

"DuPont" means E.I. du Pont de Nemours & Company, now known as EIDP, Inc.

"Effective Date" has the meaning set forth in Section XV.

"Environment" means the Waters Of The State, any other Drinking Water Supplies, land surface or subsurface strata, biota, or ambient air within the State or within the jurisdiction of the State.

"Escrow Account" has the meaning set forth in Paragraph 44.

"Exhibits" (or "Exhibit" in the singular) means Exhibits A through D, attached to and incorporated by reference in this JCO, so that each Exhibit's terms are expressly made a part of this JCO.

"Firefighting Training Academy" means Real Property that is or has been used for firefighter training with AFFF.

"Government Entity" means a governing body, department, agency, authority, or any other unit or quasi-governmental unit of any federal, State, county, or local government. It is the intention of this JCO that the definition of "Government Entity" be as broad, expansive, and inclusive as possible.

"Governor" means the Governor of New Jersey.

18

assessing injury to Natural Resources; and (ii) ~~the Department's Office of Natural Resource Restoration's costs, attorneys' fees, consultants' and experts' fees, other litigation costs, and interest, incurred prior to the Effective Date; and (iii)~~ compensation for the lost value of, loss of use of, impairment of, injury to, or destruction of Natural Resources.

"Natural Resources" (or "Natural Resource" in the singular) means all land, vegetation, biota, fish, shellfish, wildlife and the habitats of each, all Waters Of The State, Drinking Water Supplies, the air, and other such resources owned by, managed by, held in trust by, under the jurisdiction of, or otherwise controlled by the State.

"New Jersey Leadership Credit" has the meaning set forth in Paragraph 45.

"New Jersey Leadership Payment" has the meaning set forth in Paragraph 44.

"Non-Party Covered Harm Claim" means a Claim against any Non-Released Entity arising from, based on, involving, or caused by Covered Conduct or Covered Harm (or conduct that would be Covered Conduct or Covered Harm if engaged in by a Released Entity). It is the intention of this JCO that the definition of "Non-Party Covered Harm Claim" be as broad, expansive, and inclusive as possible.

"Non-Party Settlement" means a settlement by any Releasor that settles any Non-Party Covered Harm Claim and includes a release of any Non-Released Entity.

"Non-Released Entity" means a Person or entity that is neither a Released Entity nor a Releasor.

"Operator" (or "Operates," "Operated," or "Operation") means any Person operating a facility by lease, contract, or other form of agreement.

"Paragraph" means a portion of this JCO identified by an Arabic numeral or an uppercase or lowercase letter.

"Parlin Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. MID-L-002448-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)).

"Parlin Site" means the Site including the facility located at 250 Cheesequake Road, Parlin, in Old Bridge Township, and Sayreville Borough, Middlesex County, New Jersey.

"Parties" ("Party" in the singular) means Settling Plaintiffs and 3M.  To the extent that any Settling Plaintiff or 3M performs any of its obligations under this JCO through agents, the actions of those agents shall be considered the actions of that Party.

"Pathway" means the direct route or medium through which certain PFAS was transported, is transported, has migrated, or is migrating (i) from the source of PFAS Contamination or from a Discharge to any Natural Resource or (ii) from any Natural Resource to any source of Drinking Water Supplies or any other source of human exposure or contact.

"Person" means any individual, public or private corporation, company, association, society, firm, partnership, joint stock company, estate, trust, the United States, the State, or any of the State's Political Subdivisions, departments, agencies, authorities, or instrumentalities.

"Personal Injury" means any personal physical illness, injury, or death allegedly caused by exposure to PFAS, or any loss of consortium deriving from such illness, injury, or death.

"Personal Property" means goods, chattels, and other tangible property that may be the subject of ownership but is not Real Property.

"PFAS" means, solely for purposes of this JCO, any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to it).  It is the intention of this JCO that the definition of "PFAS" be as broad, expansive, and inclusive as possible.

Entity.  It is the intention of this JCO that the definition of "Released Entities" be as broad, expansive, and inclusive as possible; however, to the extent that a Released Entity is involved in Covered Conduct or Covered Harm through participation in a joint venture with any Non-Released Entity that gives rise to a Non-Party Covered Harm Claim, the joint venture shall be released only for such Covered Conduct or Covered Harm attributable to the Released Entity or reflecting its share of the joint venture and shall not be released for such Covered Conduct or Covered Harm attributable to a Non-Released Entity that is a co-owner of the joint venture.  For the avoidance of doubt, the term "Released Entities" does not include the direct or indirect customer of a Released Entity unless such customer otherwise qualifies as a Released Entity pursuant to subsections (i) and (ii) of this definition.

"Releasors" ("Releasor" in the singular) means, with respect to Released Claims, (1) Settling Plaintiffs; (2) the State and, without limitation and to the maximum extent that the Attorney General and other State signatories to this JCO may release Claims, (a) all of the State's departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, including the Attorney General and county prosecutors, and any Person claiming by or through any of the foregoing (collectively, "State's departments et al."); (b) all of the State's Political Subdivisions and their departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, and any Person claiming by or through any of the foregoing; and (c) any Person or entity acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity (whether or not such Person or entity signs this JCO or participatesd in the JCO process set forth in Section XIII) seeking relief on behalf of or generally applicable to the general public in the State or the people of the State, as opposed to

28

Restoration to Pre-Discharge Conditions (Primary Restoration) beyond what is necessary to comply with all applicable State and federal remediation standards.

"Restoration" (or "Restore") means all Primary Restoration and all Compensatory Restoration.

"SDWA" means the Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 to -25.

"Section" means a portion of this JCO identified by a Roman numeral.

"Settlement Date" means May 12, 2025.

"Settlement Payments" has the meaning set forth in Paragraph 44, and will be an amount not less than $400,000,000 and not more than $450,000,000, subject to potential credits, as set forth in Paragraphs 44 and 45 and Exhibit A.

"Settling Plaintiffs" ("Settling Plaintiff" in the singular) means Plaintiffs, the DCA, and the State, including in their capacities as described in Paragraph 9, and any successor department, agency, or official.

"Site" means (a) the Chambers Works Site; (b) the Parlin Site; (c) additional properties or facilities included or identified in the Statewide PFAS Directive or the Litigations to which Settling Plaintiffs allege that 3M sent PFAS, any PFAS-Containing Product, or any PFAS-Containing Waste, including the West Deptford Site; the Joint Base McGuire-Dix-Lakehurst in Burlington and Ocean Counties, New Jersey; the Naval Weapons Station Earle in Monmouth County, New Jersey; the Naval Air Warfare Center in Trenton, New Jersey; and the Federal Aviation Administration William J. Hughes Technical Center in Atlantic County, New Jersey; or (d) any other property or facility in the State at which or from which PFAS has been Discharged or which is a source of PFAS Contamination. It is the intention of this JCO that the definition of "Site" be as broad, expansive, and inclusive as possible. For the

30

avoidance of doubt, the term "Site" includes any areas in or around the identified property or facility to which PFAS Discharged from the property or facility may have migrated.

"Sludge" means the solids, semi-solids, precipitates, and liquids, including biosolids, that are (i) generated from any Wastewater Treatment Plant (other than the treated effluent from such a plant) or from any Public Water System's water-supply treatment plant; (ii) produced as a result of the storage or physical, chemical, or biological treatment of domestic or industrial sewage or Wastewaters; (iii) generated as residue by the processes of any Treatment Works; or (iv) discharged as domestic or industrial Wastewater into a sewerage system.

"Solid Waste Facility" means any transfer station, incinerator, resource recovery facility, landfill facility, dump, or other plant or facility for the disposal, deposition, or storage of garbage, refuse, and other discarded materials resulting from industrial, commercial, and agricultural operations, and from domestic and community activities, and all other waste materials including liquids, Sludge, or other material applied to the land or placed on the land in a manner constituting disposal.

"Spill Act" means the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24.

"Spill Fund" means the New Jersey Spill Compensation Fund established pursuant to the Spill Act.

"State" means the State of New Jersey.

"Statewide PFAS Directive" means the *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination that the Department issued to 3M and other respondents on March 25, 2019.

"Surface Water" means water at or above the land's surface, which is neither Groundwater nor contained within the unsaturated zone, including the ocean and its tributaries, all springs, streams, creeks, rivers, lakes, ponds, reservoirs, lagoons, bays, estuaries, wetlands, and artificial waterbodies.

"SWMA" means the Solid Waste Management Act, N.J.S.A. 13-1E-1 to -230.

"Treas. Reg." means the Treasury Regulations promulgated under the ~~Internal Revenue~~ Code ~~of 1986, as amended~~.

"Treatment Works" means any device or systems, whether public or private, used in the storage, treatment, recycling, or reclamation of municipal or industrial waste of a liquid nature, including intercepting sewers, outfall sewers, sewage collection systems, cooling towers and ponds, pumping, power and other equipment and their appurtenances; extensions, improvements, remodeling, additions, and alterations thereof; elements essential to provide a reliable recycled supply such as standby treatment units and clear well facilities; and any other works including sites for the treatment process or for ultimate disposal of residues resulting from such treatment; as well as any other method or system for preventing, abating, reducing, storing, treating, separating, or disposing of pollutants, including stormwater runoff, or industrial waste in combined or separate stormwater and sanitary sewer systems.

"Trustee" means the State trustee for a Natural Resource regardless of whether any Government Entity or Person other than the State also owns, manages, holds in trust, has jurisdiction of, or otherwise controls the Natural Resource.

"Wastewater" means residential, commercial, industrial, or agricultural liquid waste, sewage, stormwater runoff, or any combination thereof, or other residue discharged to or

## V.    PARTIES' MUTUAL UNDERSTANDINGS AND OBJECTIVES

7.    The Parties agree to and the Court by entering this JCO finds each of the provisions set forth in Paragraphs 8 through 43 of this Section V.

8.    As the State's chief law-enforcement and legal officer, the Attorney General is invested with all the powers of the office conferred by the common, statutory, and constitutional law of the State and may exercise all such power and authority in his discretion to advance the public interests of the State and to protect the State's consumers and the public generally, and the economic well-being, health, and safety of the State and its Political Subdivisions, citizens, and residents.

9.    In entering into this JCO, each Settling Plaintiff, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State, acts in all its capacities to the maximum extent allowable by law, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, including:

  a.    Eeach Settling Plaintiff's capacity as *parens patriae*;

  b.    the Commissioner's capacity as Trustee of the State's Natural Resources;

  c.    the Director's responsibility for administering the CFA and its related laws and regulations;

  d.    each Settling Plaintiff's capacity as an entity that owns, Operates, manages, holds in trust, or otherwise controls Real Property and Personal Property (and interests therein), including certain Water Systems, in the State; and

  e.    each Settling Plaintiff's capacity to exercise the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interests that can be

Payments in accordance with Exhibit A (the "Annual Payments") by wire transfer to the Escrow Account or, if this JCO has become final and non-appealable as of that date, by wire transfer pursuant to instructions provided by Settling Plaintiffs. In addition, 3M shall pay a New Jersey Leadership Payment in one or more installments as described in Paragraph 44.e by wire transfer to the Escrow Account or, if this JCO has become final and non-appealable as of the installment's payment date, by wire transfer pursuant to instructions provided by Settling Plaintiffs. Except as provided in Paragraph 44.b, the Initial Payment, the New Jersey Leadership Payment, the Costs, Fees, and Punitive Damages Payment, and the first six Annual Payments shall not be reduced, withheld, returned to 3M, or subjected to any credit under Paragraph 45.

      b.     Until this JCO becomes final and non-appealable, the settlement funds in the Escrow Account shall earn interest and may not be used by the State for any purpose. If the approval of this JCO is overturned, remanded, vacated, or modified on appeal such that the JCO is void, is of no effect, or is deemed by the Parties, exercising good faith, to be materially altered, the settlement funds placed into the Escrow Account by 3M shall be returned to 3M within 30 Days, with any interest earned thereon. The Escrow Account shall be governed by an escrow agreement in substantially the same form as the form agreement appended as Exhibit B (or in a form to be mutually agreed to by the Parties). If 3M pays any tax on any interest earned on the settlement funds in the Escrow Account, 3M shall have the right to reduce its next Annual Payment by the amount of the taxes paid; and if that credit amount (by itself or in combination with other credits) exceeds the amount that 3M owes for its next Annual Payment, any credit amount in

excess of that Annual Payment shall be carried over and deducted from the next Annual Payment until the credit amount has been fully satisfied.

      c.     In furtherance of the public health, safety, and welfare, and to ensure that the environmental, consumer protection, and other purposes of this JCO are accomplished, the Parties have determined that the Settlement Payments to be paid over a period of years as set forth in Exhibit A shall be allocated as follows:

      i.     $140,000,000 for Natural Resource Damages, of which:

      (1)     $105,000,000 is for Natural Resource Damages arising out of or relating to Discharges from the Chambers Works Site;

      (2)     $17,500,000 is for Natural Resource Damages arising out of or relating to PFAS Contamination or Discharges from AFFF; and

      (3)     $17,500,000 is for Natural Resource Damages arising out of or relating to PFAS Contamination or Discharges from other sources;

      ii.     $170,000,000 for PFAS Contamination Abatement Projects, of which:

      (1)     $40,000,000 is for PFAS Contamination Abatement Projects arising out of or relating to Discharges from the Chambers Works Site;

      (2)     $65,000,000 is for PFAS Contamination Abatement Projects arising out of or relating to PFAS Contamination or Discharges from AFFF; and

      (3)     $65,000,000 is for PFAS Contamination Abatement Projects arising out of or relating to PFAS Contamination or Discharges from other sources;

iii.     the New Jersey Leadership Payment described in Paragraph 44.e; and

iv.     $40,000,000 for all Claims for costs, including direct and indirect costs, and including attorneys' fees and costs, that Settling Plaintiffs incurred on or before the Effective Date to investigate and litigate Claims concerning Covered Conduct or Covered Harm of a Released Entity; for Claims for Punitive Damages and penalties; or for other amounts not constituting restitution or remediation within the meaning of Code section 162(f)(2)(A) ~~of the Internal Revenue Code of 1986, as amended (the "Code"), and~~and Treas. Reg. section 1.162-21(e)(4) ~~of the Treasury Regulations thereunder ("Treas. Reg.")~~ (the "Costs, Fees, and Punitive Damages Payment").

d.     The Initial Payment and each Annual Payment described in Paragraph 44.a shall be allocated among the categories of payments described in Paragraph 44.c and in accordance with Exhibit A.  The payments set forth in Paragraph 44.c.i(2) and Paragraph 44c.ii(2) are the sole and exclusive consideration paid by 3M to resolve the AFFF Litigation.

e.     New Jersey Leadership Payment.  3M agrees to a set of exceptional payments to the State to acknowledge and recognize New Jersey's unique role as a national leader in PFAS abatement and Remediation efforts and specifically as the first state in the country to conduct statewide occurrence studies of PFAS in Drinking Water Supplies, the first state in the country to establish a maximum contaminant level for any PFAS substance, and the first state in the country to enter into the type of comprehensive PFAS settlement memorialized in this JCO (the "New Jersey Leadership Payment").

48

managed, or controlled such site subsequently had been detected at a level exceeding an applicable State or federal environmental standard in the soil or the Waters Of The State at such site.  For the avoidance of doubt, however, this JCO resolves for all Released Entities all Claims for Restoration, Natural Resource Damages, and Punitive Damages Claims arising from, based on, involving, or caused by any PFAS Contamination or Discharge of PFAS anywhere in the State or within the State's jurisdiction.  ~~The Parties agree that Exhibit D will be finalized prior to the Court's approval of this JCO.~~

49.     3M covenants not to sue or assert any Claim against Settling Plaintiffs or any Government Entity of the State or of any of the State's Political Subdivisions concerning the matters addressed in the Litigations, the Statewide PFAS Directive, or this JCO, with the exception of the enforcement of the terms of this JCO, unless 3M is involved in litigation concerning a Claim-Over or is the subject of a Claim brought by a Non-Released Entity for which a Settling Plaintiff or any department, agency, authority, or instrumentality of the State may be liable.  The 3M covenant described in this Paragraph 49 does not apply where any Releasor sues or takes judicial, administrative, criminal, or other action against any Released Entity related to anything other than Covered Conduct or Covered Harm.  For the avoidance of doubt, nothing in this Paragraph 49 bars a Released Entity from asserting a counterclaim against a Government Entity of any of the State's Political Subdivisions if such Government Entity sues or takes judicial, administrative, criminal, or other action against such Released Entity.

## VII.    PFAS CONTAMINATION ABATEMENT FUNDING

50.     Subject to Paragraph 51, to assist the State's efforts in abating PFAS Contamination in New Jersey, "PFAS Contamination Abatement Funding" may include funding toward environmental, consumer protection, and other projects such as:

58

authorities, and instrumentalities of the State government, and acting in all Settling Plaintiffs'
capacities as described in Paragraph 9, on behalf of and for the benefit of all the State's Political
Subdivisions, citizens, and residents, fully and forever release all Released Entities from all
Released Claims and fully discharge all Released Claims against all Released Entities.  The
releases provided for in this JCO (individually and collectively, the "Release") extend to
Released Claims that the Releasors do not know or suspect to exist in their favor as of the
Effective Date, regardless of whether they could have materially affected the terms of this JCO.
It is the intention of this JCO that the definition of "Release" be as broad, expansive, and
inclusive as possible, so as to give the Released Entities the broadest possible bar against any
liability in any way arising from, based on, involving, or caused by any Covered Conduct or
Covered Harm and extend to the full extent of the power of the State, the Governor, and the
Attorney General to release Claims, to the maximum extent allowable by law.  This JCO shall be
a complete bar to any Released Claim.  By the State exercising its authority and the Court
entering this JCO, any Claim (regardless of the identity of the Person asserting the Claim) arising
from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water, a
Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's
jurisdiction and any Claim asserted by a Government Entity of the State or of any of the State's
Political Subdivisions against any Released Entity in any way arising from, based on, involving,
or caused by any Covered Conduct or Covered Harm is released, barred, ~~and~~or precluded.

55.    The Attorney General's Power and Authority to Release.  By executing this JCO,
the Attorney General represents that he (i) has the power and authority needed to enter into this
JCO and to fully release all Released Claims on behalf of all Releasors and (ii) does in fact
release all such Released Claims.  For the avoidance of doubt, all Released Claims that can be

Contribution Law, N.J.S.A. 2A:53A-1 to -61, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, the Uniform Contribution Among Joint Tortfeasors Act, and any similar state law or doctrine that reduces or discharges a released party's liability to any other ~~parties~~Persons.

69.     The provisions of this Section X are intended to be implemented consistent with these principles.

70.     This JCO constitutes a good-faith settlement of the Releasors' Released Claims against the Released Entities.  The Releasors stipulate that they give all Dismissals, the Release, and the Covenant Not To Sue provided in this JCO in good faith pursuant to the State's Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -61.  The Parties further stipulate that this JCO and the Dismissals, the Release, and the Covenant Not To Sue provided herein were entered into in good faith based upon arm's-length negotiation among the Parties and their counsel.  The Parties further stipulate that the Dismissals, the Release, and the Covenant Not To Sue provided in this JCO are intended to and shall serve as a bar to all cross-claims, counterclaims, and complaints for contribution which have been brought or may be brought against the Released Entities arising from, based on, involving, or caused by Covered Conduct or Covered Harm.

71.     This JCO constitutes a judicially approved settlement for purposes of section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).  By entering this JCO, the Released Entities are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), for "matters addressed" in this JCO. The "matters addressed" in this JCO are all the Released Claims set forth in the Release in Paragraph 54.

72.    Upon entry by the Court, this JCO shall constitute a judicially approved settlement within the meaning of N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2) and a final judgment resolving the Chambers Works Litigation and the Parlin Litigation with respect to 3M (but not as to other defendants), for purposes of providing 3M with protection from contribution actions addressing State Trustee-settled Natural Resource Damages.  The Parties agree and the Court by entering this JCO intends that 3M has resolved its liability for Natural Resource Damages to the State's Natural Resource Trustee.  To the maximum extent allowable by law, 3M shall not be liable for Claims for contribution for Natural Resource Damages, including for contribution actions under N.J.S.A. 58:10-23.11f.a.(2)(a), 42 U.S.C. § 9613(f), and 42 U.S.C. § 9622(h)(4).

73.    As set forth in Paragraph 82, Releasors acknowledge that 3M's making the payments set forth in Paragraphs 44 through 47 and Exhibit A, including funding the PFAS Contamination Abatement Projects and the commitments described in Paragraph 48, fully satisfies 3M's Remediation obligations, including liability to the State for Remediation or associated costs, for any PFAS Contamination or Discharge of PFAS, including any PFAS Contamination at or Discharge of PFAS from the Chambers Works Site, the Parlin Site, or the West Deptford Site.  As a result, upon entry by the Court, this JCO shall constitute a judicially approved settlement within the meaning of N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2) for purposes of providing protection from contribution actions or contribution Claims related to any PFAS Contamination or Discharge of PFAS, and from contribution actions or contribution Claims related to any PFAS Contamination Abatement Project or to any Site, all to the maximum extent provided for in N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2) (collectively, the "Contribution Claims").  To the maximum extent allowable by law, 3M shall

Claim-Over and ensure that Released Entities are not required to pay more with respect to Covered Conduct or Covered Harm than the amounts owed by 3M under this JCO.  Such steps may include, where permissible:

(1)    Filing of motions to Dismiss or such other appropriate motion by any Released Entity, and supported by Releasors, in response to any Claim filed in litigation or arbitration;

(2)    Reduction of that Releasor's~~'~~ Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(3)    Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

~~(4) Return of monies paid by 3M to that or any other Releasor under this JCO to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;~~

(4)    ~~(5)~~ Payment of monies to 3M by that Releasor to ensure that Released Entities are held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(5)    ~~(6)~~ Where the Claim-Over results from a judgment or settlement obtained by any Settling Plaintiff, ~~C~~credit to 3M ~~under this JCO~~ to

71

reduce the overall amounts to be paid under the JCO such that 3M is held harmless from the Claim-Over; and

(6) ~~(7)~~ Such other actions as that Releasor and 3M may devise to hold any Released Entity harmless from the Claim-Over.

iv. The actions of that Releasor and 3M taken pursuant to Paragraph 75.b.iii must, in combination, ensure that the Released Entities are not required to pay more with respect to Covered Conduct or Covered Harm than the amounts owed by 3M under this JCO.

v. In the event of any dispute over the sufficiency of the actions taken pursuant to Paragraph 75.b.iii, that Releasor and 3M may seek review by this Court. If this Court's actions do not result in Released Entities being held fully harmless, 3M shall have a claim for breach of this JCO ~~by Releasors,~~ with the remedy being payment of sufficient funds by that Releasor to hold the Released Entities harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that 3M may have.

76. 3M expressly reserves all rights, including any right to indemnification and contribution (including indemnification and contribution pursuant to an insurance contract for 3M's payment obligations under this JCO), defenses, Claims, demands, and causes of action that 3M may have concerning any matter, transaction, or occurrence, whether or not arising out of the subject matter of the Litigations or the Statewide PFAS Directive, whether before or after the final resolution of a site remediation plan, against any Person not a Party to this JCO, with the following exceptions:

72

80. This JCO shall not be used as evidence in any other litigation or future proceedings other than (a) a proceeding to enforce the terms of this JCO; (b) any other proceeding involving this JCO's contribution-protections provisions; or (c) any contribution action brought by any Released Entity.

81. No part of this JCO, nor the JCO as a whole, nor any activity taken by any Released Entity pursuant to this JCO, shall constitute, nor shall be interpreted or used as, an admission of wrongdoing, fault, liability, law, or fact, nor shall this JCO or any Section or Paragraph thereof be admissible in any proceeding or hearing as an admission, except to the extent necessary for a Released Entity or a Settling Plaintiff to enforce a provision of this JCO or to establish the scope of this JCO's Release or contribution-protection provisions.

## XII. EFFECT OF SETTLEMENT

82. The Parties agree and the Court by entering this JCO finds that 3M's making the payments set forth in Paragraphs 44 through 47 and Exhibit A, including funding the PFAS Contamination Abatement Projects and the commitments described in Paragraph 48, compensates the public for at least 3M's fair share of any and all Natural Resource Damages caused by any PFAS Contamination or Discharge of PFAS, and satisfies fully 3M's Remediation obligations related to any PFAS Contamination or Discharge of PFAS. Therefore, the Parties agree and the Court by entering this JCO finds that the compensation and commitments provided in the JCO constitute at least 3M's fair share of the Natural Resource Damages, Remediation obligations, and other damages related to any Covered Conduct or Covered Harm with respect to PFAS, PFAS Contamination, and Discharges of PFAS.

83. The Parties agree and the Court by entering this JCO finds that 3M's payments set forth in Paragraphs 44 through 47 and Exhibit A, including funding the PFAS Contamination

Abatement Projects and the commitments described in Paragraph 48, are not intended to and do not extinguish Settling Plaintiffs' Claims against any Non-Released Entity for Natural Resource Damages and Remediation obligations.  Furthermore, the Parties agree and the Court by entering this JCO finds that nothing herein is intended to modify any Non-Released Entity's potential joint and several liability for any and all Claims in any way arising from, based on, involving, or caused by any PFAS Contamination or Discharge of PFAS, including Natural Resource Damages and Claims for Remediation.

84.    To the extent any Non-Released Entity seeks to contest the effect of this JCO, Settling Plaintiffs shall cooperate with the defense in any such action brought against any Released Entity by providing documents and assistance with discovery to the extent such requests for assistance are reasonable.

## XIII.   JUDICIAL CONSENT ORDER PROCESS

85.    This JCO has been subject to public notice and comment as required by Paragraphs 86 through 95.

86.    In accordance with N.J.S.A. 58:10-23.11e2, Settling Plaintiffs published in the *New Jersey Register* and on the Department's website the names of the Litigations and the Statewide PFAS Directive, the names of the Parties to this proposed JCO, the location of the properties on which the Department had notice at the time of the publication that Discharges of PFAS had occurred, and a summary of the terms of this proposed JCO, including the amount of monetary payments to be made.  The Department provided written notice of this proposed JCO, including the information listed above, to certain other parties in the Litigations and to other potentially responsible parties of whom the Department had notice at the time of the publication.

87.    Plaintiffs also published a copy of this proposed JCO on the Department's website and arranged for notice to certain known interested persons, as described in this Section XIII.

88.    In addition to the contents described in Paragraph 86, Plaintiffs' notices explained that a copy of this proposed JCO was available on the Department's website, explained that there were 60 Days to comment on this proposed JCO, and summarized this proposed JCO's res judicata effects as an enforceable, binding final judgment that will preclude certain Claims in future litigation.

89.    The Department arranged for written notice of this proposed JCO to all Political Subdivisions.

90.    The Department and 3M arranged for written notice of this proposed JCO to counsel for (i) all parties in the Chambers Works Litigation; (ii) all parties in the Parlin Litigation; (iii) all plaintiffs (including plaintiff-intervenors) residing in the State (except for those bringing Claims only for Personal Injury or for Property Damage) and all defendants (including defendant-intervenors) in the AFFF Litigation, (iv) all respondents to the Statewide PFAS Directive; and (v) to the extent that 3M identified them and provided the StateDepartment with contact information for them, all plaintiffs in PFAS-related cases pending against 3M at the time of the publication described in Paragraph 86 in the AFFF MDL or in any State or federal court in New Jersey.

91.    To the extent practicable, the Department assisted 3M in identifying other known interested Persons to whom written notice of this proposed JCO could be sent and contact information for such Persons.  To the extent practicable, the Department3M then arranged for written notice of this proposed JCO to Persons (i) who 3M, sometimes with assistance from the

77

State, identified, and (ii) for whom 3M provided contact information to the State, and (iii) who

3M in good faith believed owned, Operated, managed, or controlled an airport, fire department,

Firefighting Training Academy, Hazardous Waste Facility, Solid Waste Facility, Treatment

Works, Wastewater Treatment Plant, Water System, or potentially relevant industrial facility in

the State or within the State's jurisdiction.

92.     In fulfillment of N.J.S.A. 58:10-23.11e2, the Parties provided written notice of

this proposed JCO by:

       a.     3M publishing notice in each of the following newspapers, in print or,

where such newspaper is digital-only, digitally:  Asbury Park Press, Atlantic City Press,

Bergen Record, Burlington County Times, Courier Post, New Jersey Herald; South Jersey

Times, and Star Ledger; and

       b.     The Department publishing a copy of the *New Jersey Register* notice on

the Contaminated Site Remediation and Redevelopment Program's website and the

Office of Natural Resource Restoration's website, which the public can access at

http://www.nj.gov/dep/srp/legal/     and     https://dep.nj.gov/nrr/proposed-settlements/,

respectively.

93.     The notice described in this Section XIII is deemed compliant with the notice

requirement of N.J.S.A. 58:10-23.11e2.

94.     Upon conclusion of the 60-Day comment period set forth in Paragraph 88, the

Department notified 3M that:

       a.     the Department received no comments that disclosed facts or

considerations that indicated to the Department, in its sole discretion, that this JCO was

inappropriate, improper, or inadequate; or

78

b.      the Department received comments that disclosed facts or considerations that indicated to the Department, in its sole discretion, that this JCO required amendment or was inappropriate, improper, or inadequate.

95.      If, as set forth in Paragraph 94.b, the Department notified 3M that it believed this JCO required amendment or should be voided, the Department provided 3M with (i) the specifics of those draft amendments and a revised version of this JCO incorporating the amendments or (2ii) a notification that the Department had determined preliminarily that this JCO should be voided.  3M had an opportunity to respond to the Department's revised version of this JCO incorporating the amendments or to the Department's preliminary determination that this JCO should be voided, and the Department considered 3M's response with respect to the amended JCO or objections to the Department's preliminary determination that this JCO should be voided.  The Department did not make any final decision that this JCO should be voided until the Department worked in good faith with 3M to address the public comments that the Department received.

## XIV.   GENERAL PROVISIONS

96.      This JCO will constitute the final, complete, and exclusive agreement and understanding between Settling Plaintiffs and 3M with respect to the settlement embodied in this JCO.  Settling Plaintiffs and 3M agree and acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those that are expressly contained in this JCO.  Settling Plaintiffs and 3M agree not to disclose any pre-Settlement Date draft of this JCO or any of its Exhibits except pursuant to valid legal process or if required by a court of competent jurisdiction.

106.    The Parties consent to this Court's jurisdiction to enter an injunction barring any Releasor from violating the Covenant Not To Sue or from commencing or prosecuting any action or other proceeding, or seeking other benefits, based upon the Released Claims.

## XVII.  COOPERATION AND DOCUMENT RETENTION

107.    The Parties shall cooperate fully with each other and shall use all reasonable efforts to obtain Court approval of this JCO and its terms, including the scope of the Release and all other provisions of Section VIII, and to give force and effect to this JCO and all its terms, including the scope of the Release and all other provisions of Section VIII, in this Court and in any federal, state, or local action or proceeding (whether judicial, arbitral, regulatory, or administrative).

108.    Settling Plaintiffs shall cooperate fully with 3M, 3M's agents, and 3M's counsel by providing 3M with any non-privileged, non-work-product-protected documents, data, communications, or information that 3M deems necessary to any insurance-recovery effort or tax-related filings.  Settling Plaintiffs shall prepare and file any IRS Forms 1098-F required to be filed in connection with this JCO consistent with the terms of this JCO, including the Parties' agreement as to the amounts paid under this JCO that constitute restitution or remediation for tax purposes.

109.    3M agrees to make a current employee available to testify at Plaintiffs' request at or prior to trial for the Chambers Works Litigation for purposes of laying a foundation for the admission of documents as evidence, including, at a minimum, the Certification of 3M dated October 30, 2024, and verified by 3M's Director of TEBG Business Transformation and Deployment.

the amount calculated in the first step.  Fourth, adjust that difference, using the same discount rate, to account for the period of time that will elapse between the date in the first step and the date on which the State is anticipated to receive the third of the 5 installments of its Multistate Catchup Payment.  Fifth, if that adjusted amount exceeds $50,000,000, reduce the amount to $50,000,000.  Sixth, divide the amount by 5 to reflect that it will be paid in 5 equal installments.

ii.    The "amount that the State of New Jersey would have received under the Multistate Settlement" referenced in Paragraph 114.a.i shall be calculated by applying the same formula used in the Multistate Settlement for determining the amount of settlement funds that the Multistate Settlement allocates to each participating state and should exclude the amount that under that formula would be the State of New Jersey's share of amounts payable under the Multistate Settlement not constituting restitution or remediation within the meaning of Code section 162(f)(2)(A) ~~of the Code~~ and Treas. Reg. section 1.162-21(e)(4).

iii.    3M shall pay any Multistate Catchup Payment in 5 equal installments over the 5 years following this Court's order granting Settling Plaintiffs' unopposed motion.

iv.    The portion of the Multistate Catchup Payment which bears the same ratio to the Multistate Catchup Payment that the net present value of 3M's payments made or to be made pursuant to Paragraphs 44.c.i , 44.c.ii, and 44.c.iii bears to the net present value of all of 3M's payments made or to be made pursuant to Paragraph 44 constitutes restitution or remediation within the meaning

Court, the agreement memorialized in this JCO is voidable at the sole discretion of any Party, and the terms of the agreement may not be used as evidence in any litigation.

120.    Settling Plaintiffs, with the input and consent of 3M, filed an application ~~with the Court to sever the claims against 3M or~~to stay all proceedings ~~as to~~against 3M in the Chambers Works Litigation, ~~pursuant to Federal Rule of Civil Procedure 21 or 42~~which the Court granted on May 13, 2025.  *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 638).  Settling Plaintiffs' application requested that the stay remain in place at least until the Court approves and enters this JCO, provided, however, that if the stay is terminated because the JCO is not approved or is overturned, remanded, vacated, or modified on appeal such that the JCO is void, is of no effect, or is deemed by the Parties, exercising good faith, to be materially altered, then Settling Plaintiffs and 3M shall work cooperatively to address scheduling with the Court.  To the extent it may be necessary to do so, the Parties shall also seek a stay of all proceedings involving 3M in the Parlin Litigation and the AFFF Litigation pending the Court's consideration of approval and entry of this JCO.

121.    Dismissals.  Not later than 3 Working Days after Settling Plaintiffs' (or the Escrow Account's) receipt of the first payment described in Paragraph 44.a, (i) Settling Plaintiffs shall file in this Court a motion for Dismissal of the Chambers Works Litigation and the Parlin Litigation as to 3M pursuant to Federal Rule of Civil Procedure 41(a)(2); (ii) Settling Plaintiffs shall file a motion for Dismissal of the AFFF Litigation as to 3M pursuant to Federal Rule of Civil Procedure 41(a)(2); and (iii) the Department shall withdraw and close the Statewide PFAS Directive as to 3M.  These Dismissals will Dismiss all of Settling Plaintiffs' pending Claims against 3M and will not Dismiss Settling Plaintiffs' Claims against other defendants.

## XX.    SIGNATORIES/SERVICE

122.    Each undersigned representative of each Party certifies that he or she is fully authorized to enter into the terms of this JCO and to execute and legally bind such Party to this JCO.

123.    This JCO may be signed and dated in any number of counterparts, each of which shall be an original, and such counterparts shall together be one and the same JCO.

124.    Any Party may execute this JCO by having its duly authorized signatory sign his or her name on the designated signature block below and transmitting that signature page electronically to counsel for all Parties.  Any signature made and transmitted electronically for the purpose of executing this JCO shall be deemed an original signature for purposes of this JCO and shall be binding upon the Party transmitting the signature electronically.

125.    The Parties agree that this JCO was negotiated fairly between the Parties at arm's length and that the terms of this JCO shall be deemed to have been jointly and equally drafted by them, and that no provision of this JCO therefore should be construed against any Party on the grounds that the Party drafted, or was more responsible for drafting, the provision.

## XXI.    NOTICES UNDER THIS JCO

126.    Except as otherwise provided herein, any notices or other documents required to be sent to any Party pursuant to this JCO shall be sent by email as well as a hard copy by United States Mail, Certified Mail Return Receipt requested, or other nationally recognized courier service that provides for tracking services and identification of the Person signing for the document.  The notices or documents shall be sent to the following addresses:

For the Division of Law:

Gary Wolf
Section Chief
Division of Law

90

Department of Law and Public Safety
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-093
Gary.Wolf@law.njoag.gov

For the Department and the Commissioner:

Kimberly Cahall
Chief Advisor and Chief Enforcement Officer
Legal, Regulatory, and Enforcement Policy
New Jersey Department of Environmental Protection
401 East State Street
Trenton, New Jersey 08625
Kimberly.Cahall@dep.nj.gov

For the Administrator:

David E. Haymes
Administrator
Spill Compensation Fund
New Jersey Department of Environmental Protection
ECA/Spill Fund
Mail Code: 401-06J
P.O. Box 420
Trenton, NJ 08625-0420
David.Haymes@dep.nj.gov

For DCA:

~~Cary Fais~~
Elizabeth M. Harris
Acting Director
Division of Consumer Affairs,
One Christie Street, Suite 1010
Trenton, NJ 08608
~~fais~~harris@dca.njoag.gov

For 3M:

Kevin H. Rhodes
Executive Vice President, Chief Legal Affairs Officer and Secretary
Legal Affairs Department
3M Company
3M Center, 220-9E-01

91