**MURPHY ORLANDO LLC**
Jason F. Orlando, Esq. (#016482000)
Arthur R. Sypek, Jr., Esq. (#08341974)
Mallory B. Olwig, Esq. (#467232024)
494 Broad Street, 5th Floor
Newark, New Jersey 07102
(201) 451-5000
jorlando@murphyorlando.com
asypek@murphyorlando.com
*Attorneys for Intervenor, County of Mercer*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; et al., <br><br> *Plaintiffs* <br><br> v. <br><br> E.I. DU PONT DE NEMOURS AND COMPANY; et al., <br><br> *Defendants*. | Case Nos.: <br> 1:19-cv-14758-RMB-JBC (Pompton Lakes) <br> 1:19-cv-14765-RMB-JBC (Repauno) <br> 1:19-cv-14766-RMB-JBC (Chambers Works) <br> 1:19-cv-14767-RMB-JBC (Parlin/Sayreville) <br><br> Hon. Renée Marie Bumb, Chief U.S.D.J. <br> James B. Clark, III, U.S.M.J. |

## IN WRIT OF MANDAMUS BY COUNTY OF MERCER

Plaintiff the County of Mercer ("Mercer County") files this Writ of Mandamus pursuant to Fed. R. Civ. P. 21 against the New Jersey Office of Attorney General; the New Jersey Department of Environmental Protection ("NJDEP" or "Department"); the Commissioner of the NJDEP; and the Administrator of the New Jersey Spill Compensation Fund (collectively, "State Respondents") to challenge the proposed Judicial Consent Orders ("JCOs" or individually "JCO") in the 3M and E.I. DuPont de Nemours and Company/Chemours Company ("DuPont/Chemours") matters are arbitrary, capricious, unreasonable, and unlawful unless modified. Until certain issues are resolved, this Court should delay approval of the JCOs.

# INTRODUCTION

1. Mercer County is a centrally located and highly significant county in New Jersey, anchored by Trenton, the State's capital and county seat. As of the 2020 United States Census, Mercer County had a population of 387,340, its highest population ever recorded, ranking it as New Jersey's 12th-most populous county. Mercer County is home to major statewide and national institutions. Princeton University, one of the world's leading research universities. Trenton–Mercer Airport in Ewing Township serves as a regional commercial and corporate aviation hub.

2. Mercer County has filed its own suit against the defendants attempting to settle under the JCOs for PFAS related damages to its airport, fire training center, two public water systems, a marina, and other properties that are potentially impacted by the use of firefighting foam or other PFAS sources.[1]

3. This suit was an exercise of Mercer County's rights to protect its own interests. Despite this suit being filed in the public record, the State did not consult Mercer County about its damages and legal claims when negotiating this settlement. The State did not perform an assessment of the full monetary value of the damage caused to the properties of Mercer County and the potential financial losses that Mercer may incur because of environmental cleanup and remediation.

4. Although all losses for the counties in New Jersey have not been assessed, the losses for Mercer County alone could total hundreds of millions of dollars, depending on the extent of the contamination discovered and the outcome of future regulatory actions taken by the DEP and EPA. The JCOs do not adequately protect the interests of Mercer County. The State has never articulated how much any county would get, how the money would be distributed to individual municipal

---

[1] *Mercer County, New Jersey v. 3M Company, et al.*, 2:25-cv-00866-RMG filed in the United States District Court for the District of South Carolina on February 17, 2025.

entities, or even whether there's anywhere near enough money to address the PFAS crisis created by the defendants seeking to dismiss and release absent parties' claims forever and always.

5. Mercer County sent timely comments to the JCOs demonstrating its concerns and highlighting the legal issues. The New Jersey Association of Counties similarly filed comment strenuously opposing the settlement on behalf of its 21 member counties.[2] Counsel for Mercer also had several conversations with the State of New Jersey's Office of the Attorney General to resolve these concerns. Unfortunately, the concerns appear to have been disregarded and answers to the questions posed never received.

6. The State's proposed settlement with DuPont/Chemours[3] appears to focus on certain plant sites and does not clearly allocate money to address the costs and contamination that exists at County owned properties like airports, fire training centers, landfills, wastewater treatment facilities, and sewerage treatment plants. Instead, the $2 billion settlement is largely allocated to address certain plant sites but also releases as all other PFAS related liabilities.

7. Like DuPont, the 3M settlement[4] fails to specifically dedicate money to address the damages the Counties will incur. Although 3M's market share exposure for firefighting foam liabilities is approximately ten times that of DuPont, the DEP negotiated a settlement in which 3M

---

[2] The New Jersey Association of Counties (NJAC) is a non-profit representing New Jersey's 21 counties and is committed to advocating for legislation, regulations, and policy directives that empower county governments to operate more effectively and efficiently. As a non-partisan organization that represents the only true regional form of government in the State of New Jersey with a unified and proactive voice, NJAC is committed to advancing innovative programs and initiatives that enhance the level of service provided and save valuable taxpayer dollars. NJAC is uniquely positioned to highlight the issues facing counties in New Jersey and the complete inadequacy of the current settlement.

[3] Mercer County hereby adopts and asserts the same arguments in support of intervention brought by Carneys Point Township in its intervention pleading filed in Case 1:19-cv-14766-RMB-JBC, Document 742-2 on 11/17/25.

[4] Mercer County hereby adopts and asserts the same arguments in support of intervention brought by Monmouth County filed in Case 1:19-cv-14758-RMB-JBC, Document 568 on 11/25/25.

pays only $450 million, less than one-quarter (1/4) of the amount to be paid by DuPont.[5] The Counties will bear the brunt of the losses resulting from this bad deal. As the Proposed 3M Settlement noted: *"While New Jersey ranks as the eleventh largest state in terms of population, with about 3 percent of the total United States population, it represents a disproportionately large fraction of the Nation's PFAS contamination and Discharges of PFAS."*[6]

8.  The Settlement further notes the evidence that New Jersey's PFAS problem is outsized:

- *New Jersey's disproportionately large share of National Pollutant Discharge Elimination System (NPDES) permits, which limit Discharges of PFAS and other substances in order to safeguard water quality and public health and safety, in compliance with the federal Clean Water Act;*
- *New Jersey's disproportionately large share of landfills and other Solid Waste Facilities that may have PFAS Contamination;*
- *New Jersey's disproportionately large share of Superfund sites under CERCLA;*
- *New Jersey's disproportionately large share of Superfund sites under CERCLA that have been monitored and found to have PFAS Contamination; and*
- *New Jersey's disproportionately large number of industrial facilities in industry sectors that the U.S. Environmental Protection Agency has identified as especially likely to handle PFAS, including glass-products manufacturing, fire training facilities, cleaning-products manufacturing, paints and coatings manufacturing, chemical manufacturing, electronics manufacturing, plastics and resin manufacturing, textiles and leather mills, printing, national-defense manufacturing, paper mills and products, and metal-*

---

[5] The public drinking water settlements in the *Aqueous Film-Forming Foams (AFFF) Products Liability Litigation* MDL No. 2873 illustrate the relative liability of 3M and DuPont and raise serious doubt about the allocation of settlement funds and the overall settlement amounts. The Court in AFFF approved nationwide class settlements for public drinking water systems of $12.5 billion for 3M and $1.185 billion for DuPont. Applying New Jersey's approximate 3 percent share of the U.S. population provides a reasonable estimate of the value of these settlements to the State. On that basis, 3M's settlement equates to approximately $375 million for New Jersey's AFFF-related public drinking water claims, while DuPont's equates to approximately $35 million, less than 10% of the amount paid by 3M. By contrast, the State of New Jersey settlements flip the script, releasing 3M for four times less than the amount being paid by DuPont. The DEP has presented no analysis quantifying AFFF-related damages to other public infrastructure, including airports, fire training centers, landfills, wastewater treatment facilities, and sewerage treatment plants. The DEP promotes a settlement that fails to seriously consider the AFFF-related liabilities that remain unsettled in the AFFF MDL. In short, the State should not be allowed to release 3M for any and all PFAS liability (including AFFF) for only ¼ of the amount being paid by DuPont.
[6] Paragraph 28 of the 3M proposed JCO.

*machinery manufacturing.*

9. Each of these items supports a conclusion that the State of New Jersey and its municipal entities have PFAS related damages that exceed those of many other states. However, many of these claims have not been identified to date, making the severity of the environmental damage largely unknown by the State and the municipal subdivisions at the time when this settlement is being contemplated.

10. Both the 3M and DuPont settlements violate fundamental principles of due process and fairness, which are the bedrock of any binding settlement, especially one that purports to be so broad. At a minimum, the JCOs must be modified and republished as follows:

1. Since the Escrow Agreement is intended to "govern" the use of Settlement Damages for the next 25 years, the Escrow Agreement is a material element of the settlement and must be published and made know to the public and the court.
2. The JCO must be made contingent on enabling legislation akin to the opioid and VW litigation settlement legislation that provides a non-lapsing fund with protocols, regulations, advisory boards and other trappings of due process and public participation to fairly manage settlement payments over the next 25 years without reliance on DEP's unchecked discretion or the unpredictability of yearly legislative appropriations. Otherwise, most of the Settlement Payments may end up in the General Fund, which will defeat the purpose of the settlement.
3. The JCO must be modified to exclude the County's potential claims from certain broad definitions in the JCO because, otherwise, the State and the Settling Defendants could still claim the JCO indirectly countenances dismissal of the County's future Actions.
4. The JCO must be modified to exclude the Political Subdivisions of the State and "private attorney's general" from certain broad definitions in the JCO because this court cannot foreclose their rights under the ERA and other citizen suit statutes to act when the DEP fails to act, fails to act sufficiently, or acts in bad faith.

11. Mercer County has standing to intervene because (1) the Counties are intended third-party beneficiaries to the settlement payments, and (2) the JCO seeks rulings from this Court to disenfranchise Political Subdivisions of the State and private attorney's general without their consent.

## PARTIES

12. Intervenor, Mercer County, is a political subdivision of the State of New Jersey with its offices at Mercer County Administration Building 640 South Broad Street P.O. Box 8068 Trenton, NJ 08650-0068.

13. State Respondent, the New Jersey Office of the Attorney General is a principal department within the Executive Branch of the State Government and is the chief legal advisor to the State and its departments and agencies.

14. State Respondent, the NJDEP is a principal department within the Executive Branch of the State government vested with authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety. N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

15. State Respondent, the Commissioner of the NJDEP is vested by law with various powers and authority, including those conferred by the Department's enabling legislation, to manage the NJDEP. N.J.S.A. 13:1D-1 to -19.

16. State Respondent, Administrator of the New Jersey Spill Compensation Fund ("the Spill Fund") is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10-23.11f (c) and (d) to certify the amount of any claim to be paid from the Spill Fund. N.J.S.A. 58:10-23.11j(d).

## JURISDICTION AND VENUE

17. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 1367.

18. Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and 1395(a), because

5

This action arises from alleged acts or omissions that occurred at locations where PFAS has been discharged within New Jersey.

### COUNT 1
### THE DEP VIOLATES THE SPILL ACT NOTICE PROVISION BY FAILING TO PUBLISH THE GOVERNING ESCROW AGREEMENT

19. The JCO provides that the $875M Settlement Payments shall be paid into an unidentified Escrow Account, "governed by" an unidentified Escrow Agent, and paid out over the next 25 years pursuant to unidentified terms and conditions in an Escrow Agreement that is not attached to the JCO (Exhibit B) (¶7.b).

20. The Escrow Agreement has not been made available for public comment or review and approval by the court. That is because, according to the JCO, the Escrow Agreement still needs to be negotiated and drafted "in the form to be mutually agreed to by the Parties." (¶7.b). In other words, no one knows what the governing Escrow Agreement is going to say. The principles that will govern how DEP pays out $875M in Settlement Damages over the next 25 years were not discussed in the published settlement notice. This failure violates the Spill Act notice provisions because the Escrow Agreement is a material element of the settlement. As such, the JCO does not comply with paragraph 90 of the JCO, and the court cannot make this finding of fact (90. "The notice described in this Section XVI is deemed compliant with the notice requirements of N.J.S.A. 58:10-23.11e2.").

21. The JCO states DEP can decide "in its sole discretion" to reject any public comment, including an objection that the Escrow Agreement is missing (¶91). A settlement agreement requires terms that are sufficiently definite so that the performance to be rendered by each party can be ascertained by the parties, the public, and the court with reasonable certainty.[7] DEP has no

---

[7] *Weichert Co. Realtors v. Ryan*, 128 NJ 427, 435 (1992).

discretion to forgo a material element of the settlement, like the Escrow Agreement, and the court cannot approve a settlement if material terms are missing.[8]

22. Faced with a similar situation, in August 2025, the Middlesex County Superior Court addressed a proposed NRD JCO with Hercules, Inc. that was supposed to include a 300-acre Conservation Easement valued at over $15M. However, the Easement was missing all of its essential attachments. Judge Benjamin S. Bucca, Jr., J.S.C. found the attachments to be material elements of the settlement and suggested it would be irresponsible to approve a settlement pending resolution of the missing documents. The settlement was not approved.

23. Similarly, the JCO should not be considered for approval by this Court until after the DEP first provides the public with the Escrow Agreement for review and comment.

## COUNT 2
## THE DEP EXCEEDS ITS CONSTITUTIONAL AND STATUTORY AUTHORITY TO IMPLEMENT THE JCO

24. The DEP claims to exercise "the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interest that can be addressed by those powers, and to protect the health and well-being, both physical and economic, of all Persons subject to the State's jurisdiction" "in all its capacities to the maximum extent allowable by law," including its capacity as *parens patriae* and Trustee of the State's Natural Resources. (¶6, EE.).

25. The State's own statement acknowledges uncertainty as to the "maximum extent" of its authority under the law and rightly so. The State lacks the power to appropriate the $875 million in Settlement Payments without enabling legislation, lacks the power to extinguish or bar future legal actions based on unknown or unasserted claims, and lacks the power to act on behalf of local governments and private attorneys general without their consent, as discussed herein.

---

[8] *Lahue v. Pio Costa*, 263 N.J. Super. 575 (1993).

7

26. Regarding appropriation power, Art. III, Para. 1 of the New Jersey State Constitution identifies the separation of powers between the executive, legislative, and judicial branches.[9] All state revenues, including litigation recoveries, are deposited into the General Fund and appropriated by the legislature.[10] See, Department of Treasury Act of 1948, N.J.S.A. 52:18A-810[11] and N.J.S.A. 52:18-29, which states that all funds "shall not be disbursed therefrom unless specifically appropriated by the legislature in an annual or supplemental appropriation act" or other legislative enactment.[12] In other words, the legislature controls state funds, like the $875M in Settlement Damages here, not DEP.

27. **The legal fees paid by the DEP violate the 2026 Appropriations Act.** The 2026 Appropriations Act appropriates funds from 2026 NRD recoveries to pay for legal and other costs incurred by the State in obtaining 2026 NRD recoveries per Site.[13] This appropriation lapses after

---

[9] *Communications Workers of America, AFL-CIO v. Florio*, 130 N.J. 439 (1992). The separation of powers is to ensure cooperative action among the branches while maintaining their distinct roles. *General Assembly of State of N. J. v. Byrne,* 90 N.J. 376 (1982), *Knight v. City of Margate*, 86 N.J. 374 (1981).

[10] Article VIII, Section 2, Paragraph 2, See also, *City of Camden v. Byrne*, 82 N.J. 133 (1980), *Burgos v. State*, 222 N.J. 175 (2015), *New Jersey Department of Environmental Protection v. Exxon Mobil Corporation,* 453 N.J. Super. 272 (2018).

[11] N.J.S.A. 52:18A-8. "All State revenue collected by any department, institution, commission, board, committee or official of this State shall, except as otherwise provided by law, be deposited, in the method prescribed by the director of the Division of Budget and Accounting, to the credit of the State of New Jersey in such depositories as the State Treasurer shall designate."

[12] N.J.S.A. 52:18-29. "All moneys of the state collected or received by any state institution, board, commission, department, committee, agent or servant, from any source, shall except as otherwise provided by law be paid into the state treasury not later than the tenth day of the month following the month during which such moneys were collected or received, and shall not be disbursed therefrom unless specifically appropriated by the legislature in an annual or supplemental appropriation act; provided, that moneys collected or received by the department of motor vehicles during the month of December of any year shall be paid into the state treasury not later than the tenth day of February following such month in which the moneys were collected or received."

[13] "Notwithstanding the provisions of any law or regulation to the contrary, there are hereby appropriated from the Natural Resource Damages – Constitutional Dedication account such amounts as are required, as determined by the Director of the Division of Budget and Accounting, in consultation with the Attorney General, and consistent with the requirements of the constitutional dedication pursuant to Article VIII, Section II, paragraph 9 of the State Constitution, to pay the legal or other costs incurred by the State to pursue settlements and judicial administrative awards relating to natural resource damages." 2026 Appropriations Act, P.L. 2025, c.74, p.103

the 2026 fiscal year. The JCO allocates $200M in 2026 (Exhibit A). One hundred million ($100M) is an unallocated bulk payment between NRD for the four Sites and non- NRD Abatement Damages, and the other $100M is for Costs and Fees (unrelated to NRD or non-NRD costs). The $100M bulk payment for NRD/non-NRD Abatement Damages does not allocate between the two categories. The JCO also fails to allocate a bulk 2027 $50M NRD Settlement Payment between the Chambers Works and Pompton Lakes Sites. The JCO refers to this $50M as a comingled "Additional Fees and Costs Amount," that can be used to pay NRD and non-NRD attorney's fees up to the entire $50M for the State's Outside Counsel's statewide NRD and non-NRD activities. (¶11).[14] This is unlawful for four reasons. First, NRD recoveries can only be used to pay NRD attorney's fees and costs calculated from the recovery of each NRD site. It does not allow recovery of attorney's fees for non-NRD recoveries on a statewide basis. Second, this 2027 bulk $50M allocation is not allocated between the two sites as required by the NRD Constitutional Amendment. Third, even if it was allocated, there is no 2027 Appropriations Act that authorizes the payment of attorney's fees from this 2027 $50M NRD payment. Fourth, even if there was a 2027 appropriation for 2027 NRD attorney's fees, the State cannot use the entire $50M NRD unallocated bulk payment to pay attorney's fees/costs for NRD <u>and</u> non-NRD recoveries because this violates the 2017 NRD Constitutional Amendment. Using 100% of a recovery to pay a contingency fee also violates New Jersey Court Rules on contingency fees.[15] It also violates the reasonableness and fairness standard in NRD settlements. In a recent ExxonMobil NRD

---

[14] "11. Notwithstanding Paragraph 7, Settling Plaintiffs may allocate up to an additional $50,000,000 of the Settlement Payments set forth in Paragraphs 7.c.i [Chambers Works] and ii [Pompton Lakes] for costs, including attorney's fees and costs, that do not constitute restitution or remediation within the meaning of section 162 (f)(2)(A) of the IRCS Code, and Treas. Reg. section 1.162-21(e)(4) if necessary based on fees and costs actually incurred ("Additional Fees and Costs Amount")."
[15] R. 1:21-7.

settlement, the court held that it would be unfair or unreasonable for an entire NRD settlement to be paid over to attorney's fees with nothing left for pollution-impacted municipalities.[16]

28. **Enabling legislation is required for the DEP to appropriate the entire $87M in settlement Payments.** DEP may not rely on "sole discretion" to appropriate unallocated bulk settlement payments over the next 25 years because such unbounded administrative authority violates the Legislature's exclusive power of appropriation. When the State recovers large litigation settlements to be paid over many years, the Legislature routinely enacts special legislation to manage those funds and to avoid the uncertainty and constitutional problems associated with annual discretionary appropriations. For example, the Legislature created the Opioid Recovery and Remediation Fund to administer the State's approximately $1 billion recovery in the national opioid litigation through the Department of Human Services ("DHS"),[17] and it established a separate fund to administer the Volkswagen emissions fraud settlement through DEP.[18]

29. These legislatively created funds operate under detailed statutory frameworks that include victim-compensation protocols, project eligibility requirements, advisory boards, implementing regulations, and mandatory reporting to the Governor and the Legislature.[19] The management of such funds is therefore subject to legislative oversight and structure, not left to the unfettered discretion of an executive agency. The Legislature has enacted similar statutory settlement funds

---

[16] *New Jersey Department of Environmental Protection v. ExxonMobil*, 453 N.J. Super. 588, 658 (Law Div. 2015). Here, a large attorney's fee was awarded on a large NRD settlement but was found to be reasonable. However, the court did state, "Had the express terms of the Proposed Consent Judgment mandated that no money would go towards environmental cleanup or restoration purposes, this would be a different issue. This situation, however, is not before the court." [Emphasis in original].
[17] P.L. 2023, Ch. 25
[18] Senate Bill 3029 (2R) of 2017. *See Bureau of Mobile Sources: Volkswagen Settlement Information*, Dep't of Env't Prot. (July 20, 2023), https://dep.nj.gov/vw/.
[19] N.J.A.C. Executive Order 323 (2023) [Opioid settlement protocols].

10

in other contexts as well.[20] This court has no judicial authority to circumvent the legislative appropriations process by approving this JCO with a 1-page payout schedule (Exhibit A) governed by a nonexistent Escrow Agreement intended to allocate $875M over the next 25 years. The Appellate Division in the ExxonMobil NRD settlement stated, "Under the Appropriations Clause of the New Jersey Constitution [citation omitted] the power and authority to appropriate funds is vested in the Legislature. [citation omitted]. The Judiciary has no authority for any role in the budgetary process."[21]

30. **DEP cannot act on behalf of non-party Political Subdivisions and private attorneys general to deny their statutory rights.** The Settling Plaintiffs claim they have the power to act on behalf of Political Subdivisions of the State and private attorneys general without them being named parties, without providing them consideration, without their consent, "without limitation, and to the maximum extent that the Attorney General and other State signatories to this JCO may release PFAS Claims," to include them within the JCO definitions of "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites Releasors" and to make them each provide a general release and contribution protection to all "Settling Defendants" and "Released Entities" for all "PFAS Claims" throughout the State from now until the end of time (¶6,49). The State Constitution provides that New Jersey laws empower local government to operate without sovereign interference and that these laws "shall be liberally construed in their favor" in accordance with their "express terms" and reasonable inferences that are "not inconsistent with or

---

[20] Fraud Response Fund to address contractor fraud during federal disaster recovery programs, N.J.S.A. 2:15D-14, and the New Jersey Unsatisfied Claim and Judgment Fund to provide relief to victims of uninsured or hit-and-run drivers, N.J.S.A. 39:6-61 et seq.

[21] *New Jersey Department of Environmental Protection v. ExxonMobil*, 452 N.J. Super. 272, 307- 308 (App. Div. 2018). See also, *Mid-Atlantic Solar Energy Industries Ass'n v. Chrisitie*, 418 N.J. Super. 499 (App. Div. 2011) [Legislature can alter the appropriation of funds authorized by a legislative Act to a different destination if done by the legislature in the yearly Appropriations Act].

prohibited by this Constitution or by law." (Art. IV, §VII, ¶11). New Jersey is deemed a "liberal legislative home rule state."[22] The express terms and liberal interpretation of municipal enabling statutes like N.J.S.A. 40A (Counties and Municipalities) and N.J.S.A. 40:69A (Faulkner Act) do not empower the DEP to make local government release claims and provide contribution protection against their will and without their consent merely because it is expedient for a settlement in a litigated matter.

31. Furthermore, the ERA was enacted in 1974. It provides "supplemental" jurisdiction, not jurisdiction, which allows citizens and municipalities the right to act against polluters and the DEP as a private attorney general when the DEP refuses to act, is unwilling to act, or acts in bad faith.[23] Sponsors of the bill recognized the primary jurisdiction of DEP. However, the sponsors also recognized the need for supplemental jurisdiction to allow citizens and municipalities to protect the environment without having to prove special damages when DEP fails to act, refuses to act, or acts in bad faith.[24]

32. Including Political Subdivisions of the State and private attorneys general within the definitions of "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites

---

[22] *Sussex Woodlands, Inc. v. Mayor and Council of West Milford Tp.*, 109 N.J. Super. 432 (1970).

[23] The Sponsors also stated, "The Committee makes no recommendation on the basic question of policy posed by this bill, i.e. whether interested citizens and groups should have the right to supplement governmental enforcement programs by bringing Court actions in aid of such enforcement. However, if the Legislature desires to implement this basic policy, the Committee sees no reason why this bill should not be enacted into law in its' present form." See, *Howell Tp. v. Waste Disposal, Inc.*, 207 N.J. Super. 80 (1986); *Mayor and Council of Borough of Rockaway v. Klocker & Klocker,* 811 F. Supp. 1039 (1993), *Ailor v. City of Maynardville, Tennessee*, 368 F.3d 587 (2004).

[24] Sponsors of the ERA stated, "The bill recognizes that the primary responsibility to prosecute polluters rests with government. In those instances where government is unable or unwilling to take the necessary action, any person should be assured of an alternative course of' action.". The sponsors further stated that, "The purpose of the bill is to overturn the doctrine long established in our law that in order to have sufficient standing to sue for abatement or prevention of a public 'nuisance, a private person must show special damage peculiar to himself and distinct from that done to the public at large. [citations omitted]. . . It would thus remedy what its supporters believe to be an unnecessary and obsolete impediment to enforcement of antipollution laws."

Releasors" against their will deny them their statutory ERA right to take legal action against polluters and DEP when DEP fails to act, refuses to act, or acts in bad faith. This is unlawful because it violates the intent of the ERA and separation of powers (NJ Const., Art. III, ¶1). It is also unlawful because it sets State policy by executive contract without legislative authority.

33. DEP wants to deny ERA plaintiffs their rights to pursue ERA actions by contract, this JCO, because DEP wants to provide the Settling Defendants with finality against future litigation. In exchange for $875M in Settlement Payments that DEP intends to use for general environmental purposes throughout the State in its sole discretion, DEP will forgo its own litigation rights against the Settling Defendants. However, DEP also wants to deny pollution-impacted municipalities their statutory rights under the ERA to challenge DEP's misappropriation of the funds, which are supposed to be dedicated for the restoration of damaged ecosystems within pollution-impacted municipalities, so DEP can use them for unspecified environmental purposes in DEP's sole discretion.

34. In *City of Seattle v Monsanto,* U.S.D.J., W.D. Washington, 2023 WL 4373432, the State of Washington wanted to release environmental claims in a JCO against Monsanto on behalf of the City of Seattle by operation of sovereign law even though the City was not a party to the lawsuit and did not consent to the release of its claims against Monsanto. The court concluded that the State could not force the city to release its claims because the State's sovereign power in this regard was unclear. Since every contract is presumed to incorporate the law of the state at the time of execution, and since the law on this point was unclear, the State could not compel the city to release Monsanto. In New Jersey, it is clear that DEP cannot act on behalf of the Political Subdivisions of the State or private attorneys general without their participation or consent on the pretext it has the power to act on their behalf because DEP has no such power.

13

35. The DEP is acting in bad faith and acting unlawfully by denying Political Subdivisions and private attorneys the right to act under the ERA now and forever in the future.

### COUNT 3
### THE JCO VIOLATES CONSTITUTIONAL AND STATUTORY AUTHORITY

36. Intervenor repeats the prior paragraphs as if set forth herein.

37. The Settling Plaintiffs claim they have the power to act on behalf of Political Subdivisions of the State and private attorneys general without them being named parties, without providing them consideration, without their consent, "without limitation, and to the maximum extent that the Attorney General and other State signatories to this JCO may release PFAS Claims," to include them within the JCO definitions of "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites Releasors" and to make them each provide a general release and contribution protection to all "Settling Defendants" and "Released Entities" for all "PFAS Claims" throughout the State from now until the end of time (¶¶ 6, 49).

38. The State Constitution provides that New Jersey laws empower local government to operate without sovereign interference and that these laws "shall be liberally construed in their favor" in accordance with their "express terms" and reasonable inferences that are "not inconsistent with or prohibited by this Constitution or by law." (Art. IV, §VII, ¶11). New Jersey is deemed a "liberal legislative home rule state."

39. The express term and liberal interpretation of municipal enabling statutes like N.J.S.A. 40A (Counties and Municipalities) and N.J.S.A. 40:69A (Faulkner Act) do not empower the DEP to make local government release claims and provide contribution protection against their will and without their consent merely because it is expedient for a settlement in a litigated matter.

14

40. The ERA was enacted in 1974. It provides "supplemental" jurisdiction, not superseding jurisdiction, which allows citizens and municipalities the right to take action against polluters and the DEP as a private attorney general when the DEP refuses to act, is unwilling to act, or acts in bad faith.

41. Including Political Subdivisions of the State and private attorneys general within the definitions of "Settling Plaintiffs," "Persons," "Statewide PFAS Releasors," and "Industrial Sites Releasors" against their will deny them their statutory ERA right to take action against polluters and DEP when DEP fails to act, refuses to act, or acts in bad faith. This is unlawful because it violates the intent of the ERA and separation of powers (NJ Const., Art. III, ¶1).

42. DEP wants to deny ERA plaintiffs their rights to pursue ERA actions by contract, this JCO, because DEP wants to provide the Settling Defendants with finality against future litigation.

43. DEP also wants to deny pollution-impacted municipalities their statutory rights under the ERA to challenge DEP's misappropriation of the funds, which are supposed to be dedicated for the restoration of damaged ecosystems within pollution-impacted municipalities, so DEP can use them for unspecified environmental purposes in DEP's sole discretion.

WHEREFORE, Intervenor seeks judgment against State Respondents as follows:

1. Denying approval of the JCO until such time as the Escrow Agreement has not been made available for public comment or review and approval by the court.

2. Denying approval of the JCO until the parties to the JCO negotiate with Mercer County and the other political subdivisions whose rights are being impaired or released to reach a settlement that accounts for the damages of the political subdivisions and allocates money to the subdivisions in exchange for a release of the subdivision claims.

3.  The amendment of the JCO to exclude the claims of Mercer County and the other political subdivisions or amend the JCO to include specific allocation of damages to the political subdivisions.

4.  Attorney's fees and costs.

5.  Such other relief as the court may deem just and proper.

## CONCLUSION

For the reasons set forth herein, Mercer County respectfully requests that the Court grant this application for intervention and the relief requested.

**MURPHY ORLANDO LLC**
494 Broad Street, 5th Floor
Newark, NJ 07102
jorlando@murphyorlando.com
(201) 451-5000
*Attorneys for Plaintiff*

_____
Jason F. Orlando, Esq.

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

The undersigned certifies, in accordance with L. Civ. R. 11.2, that to the best of his knowledge, the matter in controversy is the subject of one related action, *Mercer County, New Jersey v. 3M Company, et al.,* 2:25-cv-00866-RMG, which was filed on February 17, 2025, and is currently pending in the United States District Court for the District of South Carolina.

                                                                                                                                        **MURPHY ORLANDO LLC**
494 Broad Street, 5th Floor
Newark, NJ 07102
jorlando@murphyorlando.com
(201) 451-5000
*Attorneys for Plaintiff*

_____
Jason F. Orlando, Esq.

Dated: December 12, 2025