### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,** | : : : : : : : : : : | Case No.:<br><br>1:19-cv-14758-RMB-JBC (Pompton Lakes)<br>1:19-cv-14765-RMB-JBC (Repauno)<br>1:19-cv-14766-RMB-JBC (Chambers Works)<br>1:19-cv-14767-RMB-JBC (Parlin/Sayreville) |
| **Plaintiff,** | : : | |
| **v.** | : : | |
| **E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),** | : : : : : : : : : : : | |
| **Defendants.** | : | |
| **CAPE MAY COUNTY; CUMBERLAND COUNTY; SALEM COUNTY; SOMERSET COUNTY THE COUNTY OF UNION; MIDDLESEX COUNTY; and MONMOUTH COUNTY,** | : : : : : : | |
| **Intervening Third-Party Plaintiffs** | : : | |
| **v.** | : : | |
| **NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION** | : : : : : : : : : | |

**FUND; and THE 3M COMPANY,**                    :

                                                 :

                    **Third-Party Defendants.**

---

# MEMORANDUM OF LAW IN SUPPORT OF INTERVENING THIRD PARTY PLAINTIFFS' MOTION TO INTERVENE

---

**KEEFE LAW FIRM**
John E. Keefe, Jr.
Galleria
Building 6, 2nd Floor, Suite 623
Red Bank, New Jersey 07701
*Attorneys for Intervening Third-Party Plaintiffs*
*Cape May County, Cumberland County, Salem*
*County, Somerset County, the County of Union,*
*Middlesex County, and Monmouth County*

# Table of Contents

PRELIMINARY STATEMENT................................................................................................1

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY..............................3

    A.    PROCEDURAL HISTORY ..................................................................................3

    B.    THE PROPOSED JCO AND ITS PURPORTED "STATEWIDE" RELEASE .........................4

    C.    INTERVENORS' TIMELY COMMENT AND OBJECTION ...................................4

    D.    THE JCO APPROVAL PROCEEDINGS..............................................................5

LEGAL ARGUMENT..........................................................................................................6

  POINT I .........................................................................................................................6

  INTERVENORS ARE ENTITLED TO INTERVENTION AS OF RIGHT ..........................6

    A.    INTERVENORS' MOTION IS TIMELY ..............................................................7

    B.    INTERVENORS HAVE DIRECT AND PROTECTABLE INTERESTS THAT THE JCO THREATENS TO IMPAIR .................................................................................8

    C.    INTERVENORS' INTERESTS ARE NOT ADEQUATELY REPRESENTED BY EXISTING PARTIES, BUT ARE AFFIRMATIVELY THREATENED BY THE JCO UNDER THE GUISE OF PARENS PATRIAE AUTHORITY ...........................................................10

  POINT II.......................................................................................................................15

  ALTERNATIVELY, INTERVENORS SATISFY THE STANDARD FOR PERMISSIVE INTERVENTION ..........................................................................................................15

  POINT III......................................................................................................................16

  INTERVENORS ARE ENTITLED TO A JUDGMENT DECLARING THAT THEY CANNOT BE LAWFULLY TREATED AS "RELEASORS" UNDER THE JCO ....................................16

  POINT IV......................................................................................................................18

  INTERVENORS ARE ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING THE STATE FROM REPRESENTING THAT THE JCO IS BINDING ON INTERVENORS ...............18

CONCLUSION..................................................................................................................21

## TABLE OF AUTHORITIES

**Cases**........................................................................................................................ **Pages(s)**

*Acierno v. New Castle Cty.*, 40 F.3d 645 (3d Cir. 1994) ........................................................ 18

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ................... 10, 19

*Baraga County v. State Tax Comm'n*, 645 N.W.2d 13 (Mich. 2002)........................................ 12

*Benjamin v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938 (3d Cir. 2012)................................. 7, 8

*Brody v. Spang*, 957 F.2d 1108 (3d Cir. 1992) ............................................................ 10, 13, 15

*City of Martinez v. Texaco Trading & Transp., Inc.*, 353 F.3d 758 (9th Cir. 2003) ................. 12

Golden v. Zwickler, 394 U.S. 103, 108, 89 S. Ct. 956, 22 L. Ed. 2d 113 (1969)........................ 16

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192 (3d Cir. 2014) ................... 18

*Harris v. Pernsley*, 820 F.2d 592 (3d Cir. 1987) .......................................................... 6, 8, 9

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F. 3d 721
(7th Cir. 2009)....................................................................................................................... 18

*Hoots v. Pennsylvania*, 672 F.2d 1133 (3d Cir. 1982)................................................................ 10

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005) ......................................................... 7

*In re Fine Paper Antitrust Litig.*, 695 F.2d 494, (3d Cir. 1982) ................................................. 7

*In re Fine Paper Antitrust Litigation*, 685 F.2d 810 (3d Cir. 1982) .......................................... 21

*Kleissler v. United States Forest Serv.*, 157 F.3d 964 (3d Cir. 1998)............................... 8, 10, 13

*Link v. Wabash R. Co.*, 370 U.S. 626(1962) ............................................................................ 21

*Marino v. Ortiz*, 484 U.S. 301 (1988)....................................................................................... 15

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)....................................................... 16

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361
(3d Cir. 1995)...................................................................................................................... 7, 8

*Reilly v. City of Harrisburg*, 858 F. 3d 173 (3d Cir. 2017) ...................................................... 18

*Sherwin-Williams Company v. County of Delaware, Pennsylvania*, 968 F.3d 264
(3d Cir. 2020)...................................................................................................................... 16

South Carolina v. North Carolina, 558 U.S. 256 (2010).................................................. 11, 12, 13

*State v. City of Dover 153 N.H. 181 (2006)*............................................................................... 14

*Valentine v. Beyer*, 850 F.2d 951 (3d Cir. 1988) ...................................................................... 19

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ................................................................................ 18

*Wyatt, Virgin Islands, Inc. v. Gov't of V.I.*, 385 F.3d 801 (3d Cir. 2004) ................................. 16

**Rules**

Fed. R. Civ. P. 24(b)(1), (3).................................................................................................... 15

Federal Rule of Civil Procedure 24(a)(2) .................................................................... 1, 6, 9, 15

Rule 24(b) ......................................................................................................................... 1, 15

Cape May County, Cumberland County, Salem County, Somerset County, the County of Union, Middlesex County and Monmouth County[1] ("Intervenors"), by and through their undersigned counsel, hereby move to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2) and 24(b), and, in connection therewith, seek declaratory and injunctive relief to prevent enforcement or representation that the Plaintiffs' Proposed Judicial Consent Order ("JCOs") binds Intervenors and extinguishes their existing or future PFAS-related claims.

## PRELIMINARY STATEMENT

In this litigation, the State of New Jersey proposes to perfect a settlement with 3M and DuPont. The settlement stems from DEP lawsuits involving the Chambers Works, Parlin, Repauno, and Carney's Point sites, The State alleged NRD claims in complaints filed by the State in March 2019 in which it sought investigation and remediation costs for damages for site remediation and related injury to the State's natural resources caused by PFAS.

After six years of litigating, the State negotiated a settlement with 3M and DuPont that went far beyond the State's complaints and its legitimate interest in protecting natural resources. If approved, the Settlement Agreements will bar all present and future claims that the intervenor Counties have, or could bring, against 3M and DuPont for damage to their property. The State's agreement to bar the Intervenor Counties in this way was without consultation or consent. In summary, the State settled cases it did not bring for injury to county and municipal interests that it did not evaluate; nor did the State confer with its governmental entities. In fact, the State has failed to show that it has made a "thorough investigation and carefully considered the relevant circumstances" in making its decision that it was in a better position than government entities to

---

[1] To the extent the intervention by Monmouth County filed on November 25, 2025, moves to intervene as to the 3M JCO, this application expands to include objection to the DuPont JCO.

settle their property damage claims as it claimed in both JCO's.

In the face of objections by Intervenors and others, the State attempts to justify its authority using the *parens patriae* doctrine. The doctrine permits a State, as sovereign, to act in a protective role on behalf of those who cannot fully protect their own interests. However, where the sovereign's policy abridges the established interests and rights of political subdivisions, the doctrine fails to be justification for the State action. It cannot be disputed that Counties and governmental entities generally, have the right to purchase property for public purposes and have rights and obligations pertaining to their property. It cannot be disputed that NJDEP, for example, will look to a County to resolve pollution on County property. Therefore, if, as an example, a County has a fire fighter training academy and the property has been polluted by fire extinguishing foam containing PFAS, the State has essentially placed the burden of remediation on County taxpayers and prevents the County from seeking address for the wrongdoer whose PFAS is in the foam.

The state lawsuits did not contemplate, discuss or evaluate municipal and county PFAS exposures to fire academy land, municipal and county airports and wastewater treatment facilities. Nonetheless, in settling its litigation, the State has given the broadest relief to the largest polluters of PFAS in the country. The potential, and discretionary, financial subsidy to political subdivisions is indeed insufficient for such injury.

The notion that "polluter pays" is a gross exaggeration and wholly inaccurate given the scope of the 3M and DuPont JCO release. Had the settlement resolved that which was plead and litigated, this litigation should have been celebrated as a site remediation and natural resource recovery victory. Instead, the rate payers and taxpayers of New Jersey will be burdened with Billions of dollars in PFAS related clean up costs while the worlds largest PFAS polluters are

given blanket immunity from current and future exposures.

### STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

#### A. PROCEDURAL HISTORY

On March 27, 2019, Plaintiffs New Jersey Department of Environmental Protection (the "NJDEP"), the Commissioner of the NJDEP (the "Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund (the "Administrator") (collectively, "Plaintiffs" or the "State") filed two PFAS actions in the Superior Court of New Jersey against 3M and other defendants. (Certification of John E. Keefe, Jr. ("Keefe Decl."), Proposed Judicial Consent Order ("JCO") at 2–3.)  One action was filed in Salem County (Docket No. SLM-L-000057-19) (the "Chambers Works Litigation"), and the other in Middlesex County (Docket No. MID-L-002448-19) (the "Parlin Litigation"). (*Ibid.*)

In each action, the State asserted claims under the Spill Compensation and Control Act (the "Spill Act"), the Brownfield and Contaminated Site Remediation Act ("BCSRA"), and New Jersey common law, including negligence and products-liability theories, seeking among other things investigation and remediation costs, natural resource damages ("NRD"), and related relief. (*Id.*, JCO 3M at 3.)

Two days before the State filed those complaints, on March 25, 2019, NJDEP issued a Statewide PFAS Directive, Information Request, and Notice to Insurers to 3M and other respondents. (*Id.*, JCO 3M at 4.)  The Directive invoked authority under the Spill Act, the Water Pollution Control Act, the Air Pollution Control Act, and the Solid Waste Management Act, and sought broad disclosures about PFAS use and discharges and information relevant to PFAS response and remediation costs. (*Ibid.*)

The Chambers Works and Parlin actions were removed to this Court on July 5, 2019, and the Court subsequently consolidated them. (*Ibid.*)

3

Over the next several years, the parties engaged in substantial motion practice and discovery, The Chambers Works Litigation was set for trial to begin on May 19, 2025. (*Id.*, JCO 3M at 4–6.)

### B. THE PROPOSED JCO AND ITS PURPORTED "STATEWIDE" RELEASE

On May 12, 2025—shortly before trial—the State and 3M reached a proposed settlement in the form of the JCOs and proceedings were stayed pending this Court's review of the proposed settlement. (Case No. 1:19-cv-14766, ECF No. 638.)  By its express terms, the JCOs do`

 not merely resolve the NRD and related claims litigated in these consolidated actions. Instead, it purports to resolve 3M's and DuPont's alleged PFAS liability "statewide," including alleged "environmental, consumer protection, and other liabilities," as well as additional claimed costs and damages related to PFAS contamination, subject to certain exclusions. (*Id.*, JCO 3M at 6.)

The JCOs further provides that it binds "each Settling Plaintiff, each other Releasor; 3M, DuPont, and each other Released Entity," and defines "Releasors" to include all of New Jersey's "Political Subdivisions," including counties, municipalities, and authorities, along with their agencies and instrumentalities. (*Id.*, JCO 3M at 9, 27.) In exchange for the JCO's releases, 3M agrees to make a settlement payment "not less than $400,000,000 and not more than $450,000,000." (*Id.*, JCO at 29.)

### C. INTERVENORS' TIMELY COMMENT AND OBJECTION

The JCOs established a 60-day public comment period, which expired on September 19, 2025 (*Id.*, JCO 3M at 74), and Intervenors timely submitted a written comment and objection (*Id.*, at Ex. A, Intervenors' Comment and Objection to Proposed JCOs). In that Comment, Intervenors objected that the State was attempting—through a settlement to which they were not parties—to extinguish the independent proprietary and property-damage claims of New Jersey's political subdivisions without notice, participation, valuation, or consent, and without any lawful authority

to do so. (*Ibid.*) Intervenors maintained that the underlying litigation was a traditional NRD action limited to claims asserted by the State itself, and was not brought to adjudicate, evaluate, or release the distinct property-damage claims held by counties, municipalities, and other political subdivisions. (*Ibid.*)

Intervenors further objected that the JCOs attempt to release "any and all" PFAS claims of political subdivisions—filed or unfiled, known or unknown—which constitutes an ultra vires expansion of the settlement well beyond the pleadings and the State's authority. Further, the State cannot invoke *parens patriae* to compromise political subdivisions' independent property-damage claims without their consent. (*Ibid.*) Intervenors also explained that PFAS liabilities borne by political subdivisions are substantial and ongoing—particularly with respect to contamination at fire-training facilities, airports, wastewater systems, stormwater systems, and other local-government property and infrastructure. Intervenors object that the JCOs broad release would unlawfully transfer billions of dollars in PFAS-related liability from 3M to local governments and their taxpayers, while foreclosing political subdivisions' ability to pursue responsible parties for compensation. (*Ibid.*)

### D.  THE JCO APPROVAL PROCEEDINGS

Following the close of the comment period, on November 13, 2025, the Court entered an order setting a briefing schedule for the parties' motions to approve the JCO and scheduling a hearing for January 7, 2026. (Case No. 1:19-cv-14766, ECF No. 741.)

On November 21, 2025, Plaintiffs filed their motion to approve the JCOs. (Case No. 1:19-cv-14766, ECF No. 746.) In support, Plaintiffs acknowledged that the overall cost of PFAS remediation in New Jersey is not precisely known but admitted that such costs will be measured in the billions of dollars—far exceeding the maximum $450 million settlement amount. (Case No. 1:19-cv-14766, ECF No. 746-1 at 23, 39.) Plaintiffs nevertheless urge approval of the JCOs while

conceding that the settlement consideration bears no defined or proportional relationship to the scope or magnitude of the claims the JCOs purports to release. (Third-Party Compl. ¶¶ 16-17.)

If approved as written, the JCOs would immediately and irrevocably extinguish Intervenors' independent PFAS-related claims—without adjudication, valuation, or consent— based solely on a settlement negotiated by other parties. Absent intervention, Intervenors will have no procedural mechanism to protect their rights or to prevent the State, 3M, and DuPont from maintaining that those claims have been released. (*Id.* ¶¶ 34–35.)

## **LEGAL ARGUMENT**

## **POINT I**
## **INTERVENORS ARE ENTITLED TO INTERVENTION AS OF RIGHT**

Federal Rule of Civil Procedure 24(a)(2) provides that a court must permit intervention where the applicant "claims an interest relating to the property or transaction that is the subject of the action" and is "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," unless that interest is adequately represented by existing parties. Fed. R. Civ. P. 24(a)(2). Put another way, an applicant may intervene as of right where:

> (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.
>
> [*Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987).]

Here, Intervenors readily satisfy each of these requirements because the proposed JCOs would extinguish their existing and future PFAS-related property-damage claims—claims the State

neither evaluated nor negotiated on their behalf—thereby threatening, as a practical matter, to foreclose their ability to pursue relief for contamination within their jurisdictions.

### A. INTERVENORS' MOTION IS TIMELY

The timeliness inquiry for both types of Rule 24 motions requires considering the totality of the circumstances arising from three factors: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005); *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 500 (3d Cir. 1982) (treating the timeliness inquiry the same for both permissive and as-of-right intervention motions). "[T]he stage of the proceeding is inherently tied to the question of the prejudice the delay in intervention may cause to the parties already involved." *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 370 (3d Cir. 1995). Courts maintain "a general reluctance to dispose of a motion to intervene as of right on untimeliness grounds because the would-be intervenor actually may be seriously harmed if not allowed to intervene." *Benjamin v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938, 949 (3d Cir. 2012).

Here, under the totality of the circumstances, Intervenors' motion is timely. Intervenors acted promptly upon publication of the JCOs that would extinguish their PFAS-related claims despite their non-party status, timely submitting objections during the comment period and moving to intervene immediately after the Court established a briefing schedule and hearing on JCOs approval. Allowing intervention will not prejudice the existing parties, as Intervenors do not seek to reopen the merits of the underlying litigation or prevent approval of the JCOs as between the settling parties, but instead seek targeted declaratory and injunctive relief clarifying that the JCOs cannot be applied to bar their PFAS claims. Nor is there any undue delay attributable to Intervenors, whose intervention was not required before the scope and asserted effect of the proposed settlement became apparent. Accordingly, intervention is timely.

7

## B. INTERVENORS HAVE DIRECT AND PROTECTABLE INTERESTS THAT THE JCO THREATENS TO IMPAIR

"The polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote." *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998). A proposed intervenor's interest need not be a legal interest, provided that he or she "will be practically disadvantaged by the disposition of the action." *Benjamin*, 701 F.3d at 951 (citation omitted). The applicant need only "demonstrate that there is a tangible threat to a legally cognizable interest to have the right to intervene." *Harris*, 820 F.2d at 601. A proposed intervenor need not have an interest in every aspect of the litigation and is "entitled to intervene" on discrete issues where it has a "significantly protectable interest." *Mountain Top Condo. Ass'n*, 72 F.3d at 368.

Here, Intervenors' interests are direct, concrete, and significantly protectable. The JCOs expressly defines all New Jersey political subdivisions—including counties, municipalities, and authorities—as "Releasors" and purports to extinguish their existing and future PFAS-related claims on a statewide basis. (Keefe Decl., JCO 3M at 9, 27.) Those claims are not abstract or contingent. They include proprietary property-damage and cost-recovery claims arising from contamination at fire-training facilities, airports, wastewater treatment plants, stormwater systems, landfills, and other local-government property and infrastructure under the jurisdiction or operation of Intervenors. (*Id.*, Ex. A, Intervenors' Comment.)

These are precisely the types of interests deemed sufficient for intervention as of right. Intervenors are not asserting a generalized policy disagreement with the State's settlement strategy; they seek to protect their own property interests and their statutory and common-law rights to pursue compensation for contamination within their respective jurisdictions. The JCOs would, as a practical matter, foreclose those rights by operation of its release provisions, thereby

8

practically disadvantaging Intervenors in the manner Rule 24(a)(2) is designed to prevent.

The impairment is neither speculative nor remote. If the JCOs are approved as written, the State, 3M and DuPont will assert that Intervenors' PFAS-related claims have been released, regardless of whether those claims have been filed, investigated, or even identified. That representation would immediately cloud Intervenors' ability to pursue existing actions, to file new claims, or to participate meaningfully in coordinated PFAS litigation and settlement frameworks elsewhere. As the Third Circuit has emphasized, Rule 24(a)(2) requires only that disposition of the action "may as a practical matter impair or impede" the intervenor's interests—not that preclusion be certain, though it almost certainly would be. *See Harris*, 820 F.2d at 596.

Moreover, Intervenors' interests are distinct from, and not coextensive with, the State's asserted interests in this litigation. The underlying actions were pleaded and litigated as natural resource damages cases brought by the State in its sovereign capacity. They were not brought to adjudicate, value, or release the proprietary property-damage claims of political subdivisions, nor did the State investigate or quantify those subdivision-specific harms before negotiating the JCOs. (*Id.*, JCO 3M at 3–6.) The JCOs attempt to sweep those independent claims into a global "statewide" release only underscores the direct and substantial nature of Intervenors' stake in the approval proceedings.

Intervenors do not seek to inject themselves into every aspect of this long-running litigation. They seek to intervene for the limited and discrete purpose of protecting and preserving their own claims from being extinguished through a settlement to which they are not parties. The JCO squarely threatens to impair Intervenors' concrete proprietary interests and legal rights. That threat is immediate, substantial, and direct, satisfying Rule 24(a)(2)'s interest and impairment requirements.

**C.  INTERVENORS' INTERESTS ARE NOT ADEQUATELY REPRESENTED
BY EXISTING PARTIES, BUT ARE AFFIRMATIVELY THREATENED BY
THE JCO UNDER THE GUISE OF PARENS PATRIAE AUTHORITY**

The existing parties do not adequately represent Intervenors' interests and rights; rather,

they seek to permanently extinguish Intervenors' known and unknown claims.  The adequacy of

representation element requires the applicant to demonstrate "'that his interests are not adequately

represented by the existing parties.'" *Brody v. Spang*, 957 F.2d 1108, 1123 (3d Cir. 1992) (quoting

*Hoots v. Pennsylvania*, 672 F.2d 1133, 1135 (3d Cir. 1982)).  Inadequate representation may be

based on three potential grounds: "(1) that although the applicant's interests are similar to those of

a party, they diverge sufficiently that the existing party cannot devote proper attention to the

applicant's interests; (2) that there is collusion between the representative party and the opposing

party; or (3) that the representative party is not diligently prosecuting the suit." *Ibid.* While "a

government entity charged by law with representing a national policy is presumed adequate for

the task," *Brody*, 957 F.2d at 1123, "when an agency's views are necessarily colored by its view

of the public welfare rather than the more parochial views of a proposed intervenor whose interest

is personal to it, the burden [of demonstrating inadequate representation] is comparatively light."

*Kleissler*, 157 F.3d at 972.

Purporting to exercise *parens patriae* authority, the State seeks to bind non-party political

subdivisions to the JCOs, a result the law does not permit because it necessarily disregards the

interests of entities such as Intervenors.  To be sure, the doctrine of *parens patriae* describes a

state's capacity, as sovereign, to act in a protective role on behalf of those who cannot fully protect

their own interests. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592,

600 (1982).  The Supreme Court has made clear that *parens patriae* authority is limited to

circumstances in which a state "articulate[s] an interest apart from the interests of particular private

parties," and is "more than a nominal party." *Id.* at 607. Accordingly, even where an underlying

10

transaction implicates broad public concerns, a state's *parens patriae* authority does not extend to representing or compromising the distinct interests of political subdivisions or other entities that possess their own property rights or bear direct financial consequences.

In *South Carolina v. North Carolina*, the Supreme Court considered whether non-state governmental and regulated entities could intervene in an original action between two States seeking an equitable apportionment of an interstate river. 558 U.S. 256, 259-61 (2010). The dispute concerned North Carolina's authorization of upstream water withdrawals that South Carolina alleged deprived it of its equitable share of the Catawba River. *Id.* at 260. Although the States were litigating sovereign interests, the Court permitted intervention by entities whose infrastructure, financial obligations, and regulatory responsibilities would be directly affected by any allocation of water rights. *Id.* at 270–72. The Catawba River Water Supply Project, for example, had made substantial capital investments in water infrastructure—financed through county-incurred debt and ongoing operational costs—such that any disruption to its operations would impose concrete burdens on the participating counties and, by extension, their ratepayers. *Ibid.* Duke Energy likewise was allowed to intervene because it operated dams and reservoirs controlling river flow pursuant to long-term federal licenses, and any reallocation of water would directly affect its regulated facilities, compliance obligations, and ability to provide electric service. *Id.* at 272–73. In allowing intervention, the Court recognized that these entities faced specific, localized financial and operational consequences that were not coextensive with the states' generalized sovereign interests and therefore could not be adequately represented by the states acting alone.[2] *Ibid.*

---

[2] Courts applying principles representational authority in contexts outside of the *parens patriae* doctrine have likewise recognized that a state's settlement of public claims does not bar a political subdivision from pursuing its own proprietary injuries. *See City of Martinez v. Texaco Trading & Transp., Inc.*, 353 F.3d 758, 764–66 (9th Cir. 2003) (holding, on *res judicata* grounds,

The same inadequacy of representation is present here. As in *South Carolina*, the State's pursuit of a sovereign, statewide resolution does not—and cannot—account for the concrete, localized consequences that the JCOs would impose on Intervenors. The JCOs purports to resolve PFAS liability on a "statewide" basis while extinguishing existing and future claims arising from contamination at county-owned and county-operated facilities, including fire-training facilities, wastewater treatment plants, stormwater systems, airports, and other infrastructure. Those facilities are owned, operated, and maintained by Intervenors, not the State, and the costs of investigation, remediation, compliance, and long-term treatment will be borne by Intervenors and their taxpayers.

Additionally, as in *South Carolina*, Intervenors' interests extend well beyond a generalized concern shared by the public at large. Intervenors face direct financial exposure, capital and operational burdens, and regulatory obligations tied to specific facilities and sites—burdens that will materially increase if their ability to pursue recovery from responsible parties is eliminated. The Supreme Court made clear in *South Carolina* that where proposed intervenors have made substantial investments in infrastructure, incur ongoing operational costs, and face regulatory consequences that will be directly affected by the disposition of litigation, the presumption of adequate representation by a State yields. 558 U.S. at 271–73. The same is true here: the State's asserted *parens patriae* role is necessarily oriented toward broad policy objectives and aggregate

---

that a state agency's settlement of public environmental claims did not bar a municipality's suit for damage to its own property because the state was not the city's "virtual representative," "did not share in the [c]ity's private property interest," and therefore lacked both the authority and the incentive to obtain compensation for that distinct proprietary injury) *see also Baraga County v. State Tax Comm'n*, 645 N.W.2d 13, 17 (Mich. 2002) ("Courts have . . . generally found that no privity exists between state and federal governments, between the governments of different states, *or between state and local governments*.") (emphasis added) (quoting 47 Am. Jur. 2d Judgments § 700).

outcomes, not toward preserving the individualized claims needed by counties to fund site-specific PFAS remediation.

Indeed, the conflict is even starker in this case. In *South Carolina*, the states sought an equitable allocation of a shared natural resource, and intervention was necessary to ensure that third-party infrastructure and operational interests were not disregarded in that process. Here, by contrast, the State affirmatively seeks to extinguish Intervenors' claims altogether through a settlement that neither evaluates nor compensates their site-specific harms for which they have separate responsibility and obligations. That posture confirms that Intervenors' interests are not merely unrepresented—they are adverse to the position advanced by the existing parties. Under *Brody*, *Kleissler*, and *South Carolina*, such circumstances readily satisfy Rule 24(a)'s requirement that the applicant's interests are not adequately represented.

Notably, while the Court in *South Carolina* denied the City of Charlotte (a political subdivision, rather than a water or energy supply company) the right to intervene, Charlotte was **expressly named** in the complaint, and the relief sought would necessarily adjudicate the legality of all state-authorized water withdrawals, including Charlotte's. 558 U.S. at 274-75. As a result, the Court found Charlotte's interests were fully subsumed within—and rose or fell with—the state's sovereign position. *Ibid.* Here, by contrast, Intervenors are not named in the action, their facilities and site-specific injuries were never evaluated, and the JCO purports to extinguish their claims without any adjudication of their legality or value. Accordingly, the circumstances that justified denying intervention as to the political subdivision in *South Carolina* are absent here, and no presumption of adequate representation applies; instead, Intervenors' interests align with those entities the Court permitted to intervene because their distinct operational and financial interests were not subsumed within the state's sovereign claims.

13

The State's reliance on *State v. City of Dover*, to support its exercise of *parens patriae* authority is misplaced. 153 N.H. 181 (2006). *Dover*, a New Hampshire case involved MTBE suits in which the State of New Hampshire affirmatively sought to recover contamination damages for municipal water systems statewide and represented that it would pursue full compensation for affected communities through its own action. *Id.* at 187–90. Critically, the court found no showing that the State's litigation posture would extinguish municipal claims without compensation or leave municipalities bearing unrecoverable cleanup costs. *Id.* at 190. Disagreements as to the state's strategic approach to the litigation did not render improper New Hampshire's *parens patriae* authority over political subdivisions. *Id.* at 193

Here, by contrast, the JCOs unequivocally extinguishes municipal claims and leaves political subdivisions with unrecoverable cleanup costs. It purports to extinguish existing and future claims amongst counties and municipalities without any site-specific evaluation, allocation, or assurance that the substantial remediation and compliance costs associated with county-owned infrastructure will be funded through the settlement. Unlike *Dover*, Intervenors are not merely dissatisfied with litigation strategy or remedy preferences; they face the permanent loss of their ability to recover for concrete, localized harms that the State has neither investigated nor valued. In these circumstances—where the State's position is not only inadequate but directly adverse to Intervenors' financial and operational interests—*Dover* offers no support for denying intervention or for extending *parens patriae* authority to bind non-party political subdivisions.

Finally, although the Court's scheduling order permits non-parties, with consent, to submit amicus briefing in connection with approval of the JCO, (Case No. 1:19-cv-14766, ECF No. 741), that procedural accommodation does not protect Intervenors' legal rights. Amicus participation would leave Intervenors without party status and, critically, without the ability to seek appellate

14

review if the JCOs are approved in a form that purports to extinguish their claims. Indeed, the Supreme Court has made clear that entities who are not parties to a consent decree—and who do not intervene—lack standing to appeal its entry. *Marino v. Ortiz*, 484 U.S. 301, 304 (1988). Because the JCOs directly threatens Intervenors' existing and future claims, intervention is required to preserve their ability to protect those interests, including through appellate review if necessary.

Accordingly, Intervenors satisfy all requirements set forth by Rule 24(a)(2) and are entitled to intervene as of right.

## POINT II
## ALTERNATIVELY, INTERVENORS SATISFY THE STANDARD FOR PERMISSIVE INTERVENTION

Even if the Court were to conclude that intervention as of right is not warranted, permissive intervention is plainly appropriate. Rule 24(b) authorizes intervention where the movant's claim shares a common question of law or fact with the main action and the intervention will not unduly delay or prejudice the adjudication of the original parties' rights. Fed. R. Civ. P. 24(b)(1), (3). The decision rests within the Court's discretion. *Brody*, 957 F.2d at 1124.

Those requirements are readily satisfied here. Intervenors seek narrowly tailored declaratory and injunctive relief concerning the scope and effect of the JCOs—issues that are central to, and inseparable from, the Court's determination whether to approve the settlement. Resolution of Intervenors' claims will turn on the same legal and factual questions already before the Court, including the intended reach of the JCOs and the State's asserted authority to bind non-party political subdivisions. Moreover, permitting intervention will not delay or prejudice the existing parties. Intervenors do not seek to inject collateral issues or impede approval of the settlement as between the settling parties—they seek only to preserve their own claims. The Court

15

may resolve Intervenors' requested relief in parallel with its consideration of the JCOs approval motions. At most, intervention would result in a modest clarification of the JCOs scope, not disruption of the settlement itself.

## POINT III

## INTERVENORS ARE ENTITLED TO A JUDGMENT DECLARING THAT THEY CANNOT BE LAWFULLY TREATED AS "RELEASORS" UNDER THE JCO

The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to "declare the rights and other legal relations of any interested party seeking such declaration" where an actual controversy exists, whether or not further relief is sought. "Declaratory judgments are often forward-looking, but they are 'limited to cases and controversies in the constitutional sense.'" *Sherwin-Williams Company v. County of Delaware, Pennsylvania*, 968 F.3d 264, 269 (3d Cir. 2020) (citing *Wyatt, Virgin Islands, Inc. v. Gov't of V.I.*, 385 F.3d 801, 805 (3d Cir. 2004) (citations omitted). Courts may review only "concrete legal issues, presented in actual cases, not abstractions. . . . This is as true of declaratory judgments as any other field." Golden v. Zwickler, 394 U.S. 103, 108, 89 S. Ct. 956, 22 L. Ed. 2d 113 (1969) (citations and internal quotations omitted). Although there is no precise definition as to what constitutes a case or controversy, "the facts alleged, under all circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).

Intervenors satisfy the standard for issuance of a declaratory judgment. The JCOs expressly defines all New Jersey political subdivisions as "Releasors" and purports to extinguish their existing and future PFAS-related claims on a statewide basis. If enforced as written, the JCOs would bar Intervenors from pursuing proprietary property-damage and cost-recovery claims

16

arising from contamination at county-owned and county-operated facilities, including fire-training facilities, airports, wastewater treatment systems, stormwater systems, and other local-government infrastructure. (Third-Party Compl. ¶¶ 34–35.)  That threatened legal effect gives rise to an immediate and concrete controversy concerning whether Intervenors may lawfully be treated as "Releasors" under the JCOs despite not being parties to the underlying litigation, not participating in settlement negotiations, and not consenting to any release of their claims. (*Id.* ¶¶ 36–37.) The dispute is not hypothetical or advisory. Approval of the JCOs would foreclose Intervenors' ability to pursue existing PFAS actions, to file new claims, or to recover for PFAS contamination within their jurisdictions.

Moreover, the controversy is sufficiently immediate even though the full magnitude of Intervenors' damages continues to develop. Across New Jersey, PFAS investigation and remediation obligations are ongoing, regulatory standards are evolving, and site-specific assessments remain in progress. (*Id.* ¶ 35.) Declaratory relief is particularly appropriate in such circumstances, where clarification of legal rights is necessary before affected entities can determine whether they retain the ability to pursue responsible parties for future and presently unquantifiable harms.

Finally, Intervenors present a purely legal question regarding the scope of the State's authority and the legal effect of the JCOs—specifically, whether the State may invoke *parens patriae* to release the proprietary claims of counties and municipalities without their consent. (*Id.* ¶¶ 37–38.) Resolution of that question will clarify the parties' legal relations and determine whether Intervenors retain the right to pursue PFAS-related claims against 3M, DuPont, and other responsible parties. (Id. ¶ 39.)

## POINT IV

## INTERVENORS ARE ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING THE STATE FROM REPRESENTING THAT THE JCO IS BINDING ON INTERVENORS

To prevail on a motion for a preliminary injunction, the moving party must meet four factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without the injunction; (3) the balance of equities weighs in the moving party's favor; and (4) the public interest favors the injunction. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). A prohibitory injunction maintains "the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994). To obtain such an injunction the moving party must show that his or her likelihood of success on the merits is "significantly better than negligible but not necessarily more likely than not." *Reilly v. City of Harrisburg*, 858 F. 3d 173, 179 (3d Cir. 2017). "[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while supporting some preliminary relief." *Reilly*, 858 F. 3d at 179 (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F. 3d 721, 725 (7th Cir. 2009)).

***First***, Intervenors have a likelihood of success on the merits. The JCOs purports to define all New Jersey political subdivisions as "Releasors" and to extinguish their existing and future PFAS-related claims, even though Intervenors are not parties to the litigation, did not participate in settlement negotiations, and did not consent to any release of their claims. (Third-Party Complaint ¶¶ 41, 46.) As set forth above, *parens patriae* does not authorize the State to compromise the independent, proprietary claims of counties and municipalities, particularly where those entities can protect their own interests and bear site-specific financial and operational

18

consequences not coextensive with the State's sovereign interests. See *Snapp*, 458 U.S. at 607; *South Carolina*, 558 U.S. at 273. That limitation is especially salient here, where the State did not investigate, inventory, or value the PFAS contamination affecting county-owned and county-operated facilities before purporting to release those claims on a statewide basis. The JCOs thus attempts to foreclose recovery for unknown, site-specific, and potentially severe contamination—liabilities that continue to emerge as investigations proceed—without any assessment of their scope or cost. At a minimum, Intervenors have demonstrated a strong likelihood—well above the "better than negligible" threshold—that the State lacks statutory, constitutional, or common-law authority to enforce or represent that the JCOs extinguishes Intervenors' claims.

**Second**, absent injunctive relief, Intervenors will suffer immediate and irreparable harm. If the JCOs are approved and enforced as written, the State and 3M will represent that Intervenors' PFAS-related claims have been released, effectively barring Intervenors from pursuing existing actions, filing new claims, or recovering for contamination at county-owned and county-operated facilities. (*Id.* ¶¶ 41, 44–46.) The loss of access to the courts and the preclusion of legal claims constitute irreparable harm as a matter of law. *See Valentine v. Beyer*, 850 F.2d 951, 957 (3d Cir. 1988) ("Clearly no greater harm" than that which "potentially precludes litigation forever, is possible when the question of access to the courts is at issue."). Once Intervenors' claims are deemed released, no later monetary award can restore their right to litigate or recover for PFAS contamination, nor can damages undo the unlawful shifting of remediation and compliance costs to local taxpayers. (Third-Party Compl. ¶ 45.)

**Third**, the balance of equities overwhelmingly favors Intervenors. Intervenors do not seek to enjoin the settlement as between the State and 3M, reopen the merits of the underlying litigation, or interfere with the State's ability to resolve its own claims on whatever terms it deems

appropriate. They seek only to prevent the State from enforcing—or representing—that the JCOs binds non-party political subdivisions and extinguishes claims the State lacks authority to waive. (*Id.* ¶ 46.) Denying injunctive relief would permanently deprive Intervenors of their proprietary claims and expose them to ***billions*** of dollars in unfunded PFAS remediation and compliance costs, while granting relief merely preserves the status quo pending adjudication of the State's asserted authority. That limited restraint imposes no comparable hardship on the State or the settling defendant.

    ***Fourth***, the public interest favors injunctive relief. The public has a compelling interest in ensuring that governmental entities act within the limits of their lawful authority, that settlements are not used to extinguish the rights of non-parties without consent or process, and that the costs of environmental contamination are borne by responsible parties rather than shifted to counties, municipalities, and their taxpayers. Without injunctive relief, New Jersey residents face the prospect of bearing both the public-health consequences of PFAS contamination and the financial burden of remediation, with no recourse against those allegedly responsible. Enjoining the State from representing that it has released claims it lacks authority to waive promotes transparency, accountability, and the orderly and lawful resolution of PFAS liabilities, while preserving local governments' ability to secure the resources necessary to protect public health and critical infrastructure.

## POINT V

## THE COURT HAS AUTHORITY TO REQUIRE THE STATE TO SHOW CAUSE AND TO PERMIT LIMITED, TARGETED DISCOVERY REGARDING ITS ASSERTED POWER TO BIND NON-PARTY POLITICAL SUBDIVISIONS TO THE JCO

    Control is "necessarily vested in courts to manage their own affairs so as to achieve the

orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 631-32

(1962). Further, "matters of docket control and conduct of discovery are committed to the sound

discretion of the district court." *In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 817 (3d Cir.

1982). That discretion warrants the relief sought here. The State asserts sweeping *parens patriae*

authority to bind all political subdivisions and release their independent PFAS-related claims, yet

the record contains no findings or analysis showing that the State evaluated subdivision-specific

injuries, claim values, remediation obligations, or the consequences of extinguishing those claims.

In the absence of any developed record, the Court may require the State to show cause as to the

factual and legal basis for its asserted authority and permit limited, targeted discovery to ensure

orderly judicial review before any action is taken that may impair the rights of non-party political

subdivisions. The Court should therefore additionally grant a 180-day period for political

subdivisions, such as Intervenors, to evaluate the claims the JCOs purport to release and to

organize a representative body for structured discussions with the State.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that the Court grant their motion

to intervene and for declaratory and injunctive relief.

Respectfully submitted,

Dated: December 22, 2025

*/s/ John E. Keefe, Jr.*
**KEEFE LAW FIRM**
John E. Keefe, Jr.
Galleria
Building 6, 2nd Floor, Suite 623
Red Bank, New Jersey 07701
*Attorneys for Intervening Third-Party*
*Plaintiffs Cape May County, Cumberland*
*County, Salem County, Somerset County, the*

*County of Union, Middlesex County, and
Monmouth County*