## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, | : : : : : : : : : : | Case No.: 1:19-cv-14758-RMB-JBC (Pompton Lakes) 1:19-cv-14765-RMB-JBC (Repauno) 1:19-cv-14766-RMB-JBC (Chambers Works) 1:19-cv-14767-RMB-JBC (Parlin/Sayreville) |
| **Plaintiff,** | : | |
| v. | : : | |
| E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS), | : : : : : : : : : : | **DECLARATION OF JOHN E. KEEFE, JR.** |
| **Defendants.** | : | |
| CAPE MAY COUNTY, CUMBERLAND COUNTY, SALEM COUNTY, SOMERSET COUNTY, THE COUNTY OF UNION, MIDDLESEX COUNTY, and MONMOUTH COUNTY, | : : : : : : : | |
| **Intervening Third-Party Plaintiffs** | : : | |
| v. | : : | |
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION | : : : : : : : : | |

FUND; and THE 3M COMPANY,                    :
                                             :
                    Third-Party Defendants.  :

I, John E. Keefe, Jr., Esq., pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am an attorney with the law firm of Keefe Law Firm, counsel for proposed intervening third-party plaintiffs Cape May County, Cumberland County, Salem County, Somerset County, the County of Union, Middlesex County, and Monmouth County ("Intervenors"). I submit this Declaration in support of the Intervenors motion pursuant to Federal Rule of Civil Procedure 24(a) and (b) to intervene in this action.

2.    Attached hereto as Exhibit A is a true and correct copy of the Intervenors proposed Third-Party Complaint for a declaratory judgment.

3.    Attached hereto as Exhibit B is a true and correct copy of the proposed Judicial Consent Order ("JCO") entered by the parties in this action.

4.    Attached hereto as Exhibit C is a true and correct copy of this firm's September 19, 2025 comment and objection to the JCO.

5.    Attached hereto as Exhibit D is a true and correct copy of State Senator Anthony M. Bucco's September 10, 2025 comment and objection to the JCO.

6.    Attached hereto as Exhibit E is a true and correct copy of the Hanover Sewerage Authority's September 19, 2025 comment and objection to the JCO.

7.      Attached hereto as Exhibit F is a true and correct copy of James Aversano's

September 18, 2025 comment and objection to the JCO.

8.      Attached hereto as Exhibit G is a true and correct copy of H2M Associates,

Inc.'s January 2025 Site Investigation Report at the Monmouth County Fire Academy.


December 22, 2025                    */s/ John E. Keefe, Jr.*
                                     JOHN E. KEEFE, JR., ESQ.

# EXHIBIT "A"

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,** | Case No.: |
| | 1:19-cv-14758-RMB-JBC (Pompton Lakes) |
| | 1:19-cv-14765-RMB-JBC (Repauno) |
| | 1:19-cv-14766-RMB-JBC (Chambers Works) |
| | 1:19-cv-14767-RMB-JBC (Parlin/Sayreville) |
| **Plaintiff,** | |
| **v.** | **THIRD-PARTY COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| **E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),** | |
| **Defendants.** | |
| **CAPE MAY COUNTY, CUMBERLAND COUNTY, SALEM COUNTY, SOMERSET COUNTY, THE COUNTY OF UNION, MIDDLESEX COUNTY, and MONMOUTH COUNTY** | |
| **Intervening Third-Party Plaintiffs** | |
| **v.** | |
| **NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION** | |

1

| FUND; and THE 3M COMPANY, | : |
|---|---|
| | : |
| **Third-Party Defendants.** | : |
| | : |

Intervening Third-Party Plaintiffs the Cape May County, Cumberland County, Salem County, Somerset County, the County of Union, Middlesex County, and Monmouth County (together, "Third-Party Plaintiffs" or "Intervenors"), by their attorneys, allege as follows against Plaintiffs/Third-Party Defendants the New Jersey Department of Environmental Protection (the "NJDEP"), the Commissioner of the NJDEP (the "Commissioner"), the Administrator of the New Jersey Spill Compensation Fund (the "Administrator") (collectively, the "State"), and against Defendant/Third-Party Defendant 3M Company ("3M"). Intervenors bring this action for declaratory and injunctive relief to establish that they are not bound—nor can they lawfully be bound—by the proposed Judicial Consent Order that the Plaintiffs and Third-Party Defendants seek to have entered in this matter.

## INTRODUCTION

1.      This action concerns a proposed Judicial Consent Order ("JCO") between the State and 3M that purports to resolve "statewide" PFAS liability in exchange for a payment of $400–$450 million. The JCO, however, goes far beyond the natural-resource-damages ("NRD") claims actually litigated in this case: it attempts to release *all* PFAS-related claims held by *all* of New Jersey's political subdivisions (i.e. counties, municipalities, and authorities), whether or not those entities were parties to the litigation, consulted during negotiations, or even aware their rights were at stake.

2.      By its terms, the JCO defines every political subdivision in New Jersey as a "Releasor," extinguishing their existing and future PFAS property-damage claims, including claims for contamination at fire-training facilities, airports, wastewater treatment plants,

2

stormwater systems, and other critical infrastructure. The State has never investigated these subdivision-specific injuries of the Intervenors, never valued their claims, and never provided any opportunity for participation or consent.

3.    This sweeping release comes despite the State's acknowledgment that the total cost of PFAS remediation in New Jersey will be measured in the billions—many times more than the settlement amount—and even though local governments and their taxpayers, not the State, will bear the bulk of those costs.

4.    The State justifies this unprecedented settlement on the theory that it may act as *parens patriae* for political subdivisions. But the doctrine of *parens patriae* does not authorize a state to settle away the sovereign or proprietary property-damage claims of counties and municipalities, and nothing in New Jersey law expands that doctrine to permit the State to bind its subdivisions to a release they did not negotiate or approve.

5.    In effect, the State seeks to bind entities whose interests it does not represent, concerning claims it did not evaluate, through authority it does not possess, all while granting 3M—one of the primary contributors to statewide PFAS contamination—a release that bears no meaningful relationship to the harms suffered at the local level.

6.    Intervenors therefore seek: (a) a declaration that they are not "Releasors" under the JCO; (b) an injunction preventing the Department and the Commissioner from enforcing or representing that the JCO extinguishes their PFAS-related claims; and (c) equitable relief in the nature of an Order to Show Cause requiring the State to explain the factual and legal basis for invoking *parens patriae* authority over political subdivisions and permitting limited discovery into what information the State considered—if anything—before purporting to release the claims of New Jersey's counties and municipalities.

3

7.     Such relief is necessary to prevent the unauthorized forfeiture of subdivision claims and to protect taxpayers from an improper transfer of liability.

## THE PARTIES

8.     Intervenors are political subdivisions of the State of New Jersey.

9.     The NJDEP is a principal department within the Executive Branch of the New Jersey government.

10.    The Commissioner is the chief executive officer of the NJDEP.

11.    The Administrator is the chief executive officer of the New Jersey Spill Compensation Fund.

12.    3M is a corporation organized under the laws of the State of Delaware, with its principal place of business at 3M Center, St. Paul, Minnesota 55144-1000.

## JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367 because this action arises under federal law. Jurisdiction is also proper pursuant to Sections 106, 107, and 113(b) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606, 9607, and 9613(b).

## FACTS COMMON TO ALL COUNTS

### A. The Consolidated State Court Actions

14.    On March 27, 2019, the Department and related State entities filed two PFAS actions in New Jersey Superior Court—one in Salem County concerning the Chambers Works facility (Docket No. SLM-L-000057-19) and another in Middlesex County concerning the Parlin site (Docket No. MID-L-002448-19). Both complaints asserted claims under the Spill Act, the Brownfield and Contaminated Site Remediation Act, and New Jersey common law, including

negligence and product-liability theories. Those suits sought costs to investigate and remediate

PFAS contamination, damages for alleged natural resource injuries, penalties, and related relief.

15.    The matters were removed to this Court, and the cases were subsequently

consolidated. Just days before filing those complaints, the NJDEP issued a Statewide PFAS

Directive to 3M and other respondents, invoking statutory authority under the Spill Act, the New

Jersey Water Pollution Control Act, the New Jersey Air Pollution Control Act, and the New Jersey

Solid Waste Management Act. The Directive sought comprehensive disclosures regarding PFAS

use and releases into the environment, remediation and response costs, and the respondents'

financial ability to undertake or fund cleanup efforts.

**B.    The State Pivots to a Sweeping Statewide JCO**

16.    After several years of substantial motion practice and discovery, the Chambers

Works Litigation was scheduled for trial on May 19, 2025. On May 12, 2025, however, the State

and 3M reached a proposed JCO, and proceedings were stayed pending judicial review.

17.    Despite acknowledging that the total cost of PFAS remediation in New Jersey is

unknown, the JCO purports to resolve 3M's PFAS liability on a "statewide" basis, extending far

beyond the NRD claims asserted in the pleadings. Under the JCO, 3M agrees to pay between $400

million and $450 million in exchange for a release of not only the litigated NRD claims, but a

broad array of environmental, consumer-protection, common-law, and other alleged liabilities,

including contingent and unfiled claims.

18.    Critically, the JCO defines the "Releasors" to include *every* political subdivision in

New Jersey—including counties, municipalities, authorities, districts, and their agencies—despite

that most of these entities were neither parties to the litigation nor consulted during the

negotiations.  The JCO thus purports to extinguish the rights of entities whose claims were never

5

evaluated, valued, or even identified—effectively granting 3M and others a sweeping release without any assessment of the distinct harms suffered by political subdivisions.

### C. The Limited and Insufficient Comment Process

19.    The JCO provided a 60-day comment period expiring September 19, 2025.

20.    Intervenors submitted a timely comment, explaining that the underlying lawsuits were traditional NRD actions and did not seek to adjudicate or release the independent property-damage claims held by counties, municipalities, or authorities. The comment stated that by attempting to extinguish "any and all" PFAS claims of political subdivisions—filed or unfiled—the JCO sweeps far beyond the scope of the pleadings and the authority of the settling parties.

21.    Indeed, the State has not identified what, if anything, is being allocated to counties and municipalities under the settlement, leaving political subdivisions blind as to what rights they are being forced to surrender and what compensation—if any—they are purportedly receiving in return.

22.    Intervenors further noted that the JCO contains no allocation framework for political subdivisions. In other PFAS resolutions—such as the United States Bankruptcy Court for the District of Delaware approval of the Kidde Fund (Case No. 23-10638-LSS, ECF No. 2411-1 at p. 50)—the settlement proceeds were expressly divided among distinct categories of harm. Those allocations included, among others, state trust reserve funds, water provider reserves, airport reserves, property damage reserves, personal injury reserves, tribal reserves, business loss reserves, fire training facility reserves, landfill reserves, stormwater reserves, and wastewater reserves.

23.    Such structures ensure transparency, fairness, and a clear nexus between the claims being released and the compensation offered. They also allow affected governmental entities to

understand how their specific harms are evaluated and what portion of the settlement is intended to address their needs.

24.     By contrast, the JCO here provides only broad references to natural resource damages and general "contamination abatement" initiatives. It identifies no formula, category-based allocation, or mechanism to direct funds to counties, municipalities, or authorities whose claims the State proposes to release.

25.     The absence of any structured allocation further underscores that the State did not even consider the value of political-subdivision claims before purporting to extinguish them.

26.     Intervenors cannot meaningfully evaluate what they are being asked to give up—nor can the Court—because the JCO provides no basis to understand how subdivision claims were considered or compensated.

27.     The problem is especially pronounced for fire-training facilities, which are irrefutably among the most significant sources of PFAS contamination. 3M, a primary AFFF manufacturer, occupies a dominant share of the market. Yet the JCO effectively grants 3M a broad release for this contamination absent any consultation with, or compensation directed to, the counties and municipalities that bear these burdens. Those burdens necessarily fall on Intervenors' taxpayers and ratepayers—i.e., New Jersey residents who will be bound to a settlement in which they had no participation or voice.

28.     The impact is not confined to this single category of harm. Intervenors' comment emphasized that they have active and ongoing investigations which will lead to the filing of complaints in the national AFFF MDL. Indeed, water providers across the country, including New Jersey political subdivisions, have already secured multibillion-dollar settlements to fund PFAS treatment upgrades. PFAS contamination at not only fire-training facilities, but airports,

7

wastewater treatment plants, and other critical infrastructure, continues to impose substantial, ongoing liabilities, and future regulatory obligations such as mandatory PFAS wastewater treatment are imminent. The JCO would bar political subdivisions from recovering these costs, effectively shifting billions in PFAS-related liability from 3M onto Intervenors and their taxpayers.

29.    Put simply, the settlement structure of the JCO bears no relation to the actual cleanup and compliance costs political subdivisions will face, and would significantly curtail 3M's PFAS liability while leaving taxpayers to absorb the resulting financial burden.

30.    Despite the comment period, Intervenors have been divested of legally cognizable claims through a settlement to which they are not parties.

31.    Following the close of the comment period, the Court entered a scheduling order on November 13, 2025, directing briefing on the motion to approve the JCO and setting a hearing for January 7, 2026.

32.    Plaintiffs filed their motion to approve the JCO on November 21, 2025, acknowledging that the total cost of PFAS remediation in New Jersey will be measured in the billions—far surpassing the settlement amount.

**COUNT I**
**Declaratory Judgment**

33.    Intervenors incorporate by reference all preceding paragraphs as though fully set forth herein.

34.    Intervenors and their taxpayers face substantial and ongoing exposure to PFAS-related investigation, remediation, compliance, and infrastructure-upgrade costs. If the JCO is enforced against them, Intervenors would be barred from pursuing direct claims against 3M and others for its contamination of fire-training facilities, airports, wastewater treatment systems, stormwater systems, and other local-government property.

8

35.     The magnitude of these costs is significant and continues to develop as environmental investigations proceed and as federal and state PFAS regulatory standards evolve. Intervenors cannot reasonably quantify their ultimate financial burden unless and until they complete site-specific assessments and determine the full extent of contamination and required remediation.

36.     The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to "declare the rights and other legal relations of any interested party seeking such declaration" where an actual controversy exists, whether or not further relief is sought. An actual and immediate controversy exists here because the JCO purports to extinguish Intervenors' existing and future claims, including claims presently being investigated and claims already recognized in national PFAS litigation.

37.     A judicial declaration is necessary to resolve whether Intervenors may permissibly be bound as "Releasors" under the JCO despite not being parties to the underlying litigation, not participating in the settlement negotiations, and not consenting to the release of their claims. Intervenors require clarity as to whether they retain the right to assert—and to continue asserting—PFAS claims against 3M and others for contamination within their jurisdictions.

38.     The State's reliance on *parens patriae* does not authorize it to release the proprietary claims of counties and municipalities. Because the Department lacks authority to bind Intervenors in this manner, declaratory relief is required.

39.     Intervenors respectfully request a declaration that they are not "Releasors" under the JCO, are not bound by its terms, and retain all rights to pursue PFAS-related claims against 3M and any other responsible party.

## COUNT II
### Preliminary Injunctive Relief

40.    Intervenors incorporate all preceding paragraphs as though fully set forth herein.

41.    The JCO purports to extinguish Intervenors' existing and future PFAS-related claims despite the fact that Intervenors are not parties to the litigation, did not participate in settlement negotiations, and did not consent to the release of their claims.

42.    *Parens patriae* does not permit the State to compromise the independent claims of political subdivisions. Any attempt to apply the JCO to Intervenors therefore exceeds the State's authority.

43.    The Department and the Commissioner lack statutory, constitutional, or common-law authority to settle or waive the independent claims of counties, municipalities, or authorities.

44.    Enforcing the JCO against Intervenors would result in immediate and irreparable harm, including the loss of substantive legal claims, the imposition of unfunded PFAS remediation and compliance costs, and the shifting of billions of dollars in liability to local taxpayers.

45.    No adequate remedy at law exists because the loss of governmental claims and sovereign prerogatives cannot be compensated by monetary damages.

46.    Intervenors therefore seek preliminary and permanent injunctive relief enjoining the NJDEP, the Commissioner, and the Administrator from enforcing or representing that the JCO binds Intervenors as "Releasors" or extinguishes their PFAS-related claims.

## COUNT III
### Equitable Relief in the Nature of An Order to Show Cause and Limited Discovery

47.    Intervenors incorporate all preceding paragraphs as though fully set forth herein.

48.     The Department asserts that its invocation of *parens patriae* authority permits it to bind all political subdivisions in New Jersey and release their independent PFAS-related property-damage claims.

49.     There is no record demonstrating what, if anything, the State evaluated in determining that it could act on behalf of counties, municipalities, and authorities, including:

  a.  the specific injuries suffered by political subdivisions;

  b.  the value or scope of their existing and future claims;

  c.  the impact of releasing those claims; and

  d.  the factual or legal basis for treating political subdivisions as constituents whose claims may be settled without their consent.

50.     The JCO contains no findings, analysis, or administrative record establishing that the State conducted any inquiry into subdivision harms, remediation costs, allocation needs, or the consequences of extinguishing local-government claims. Intervenors cannot meaningfully evaluate the JCO—or the State's claimed authority—without access to the information the State may have considered.

51.     Equitable relief is therefore necessary to permit targeted discovery and to require the Department to set forth the basis for its assertion that it may release subdivision claims under the doctrine of *parens patriae*.

52.     Equitable relief is also necessary to allow sufficient time for Intervenors and similarly situated political subdivisions to assess the claims the JCO purports to release; a minimum period of 180 days is required to conduct that evaluation and to assemble a representative body of political subdivisions to meet and confer with the State regarding the proposed settlement.

53.     Intervenors respectfully request that the Court issue an Order to Show Cause directing the State to explain the factual and legal basis for its claimed authority to bind political

11

subdivisions and granting Intervenors limited, focused discovery regarding the State's evaluation (or lack thereof) of subdivision injuries, claims, and remediation obligations. Intervenors further request that the Court grant a 180-day period for political subdivisions to evaluate the claims the JCO purports to release and to organize such a representative body for structured discussions with the State.

## **PRAYER FOR RELIEF**

WHEREFORE, Intervening Third-Party Plaintiffs Cape May County, Cumberland County, Salem County, Somerset County, the County of Union, Middlesex County, and Monmouth County respectfully request that the Court enter judgment in their favor and grant the following relief:

1.    A declaration pursuant to 28 U.S.C. § 2201 that Intervenors are not "Releasors" under the proposed Judicial Consent Order and are not bound by any provision of the JCO;

2.    A declaration that Intervenors retain all rights to pursue existing and future PFAS-related claims against 3M and any other responsible party;

3.    Preliminary and permanent injunctive relief prohibiting the NJDEP, the Commissioner, and the Administrator from enforcing or representing that the JCO extinguishes, releases, or impairs Intervenors' PFAS-related claims;

4.    An Order to Show Cause directing the NJDEP, the Commissioner, and the Administrator to articulate the factual and legal basis for their asserted authority to bind political subdivisions under the doctrine of *parens patriae*;

5.    Limited, targeted discovery permitting Intervenors to obtain information concerning the State's evaluation (if any) of subdivision-specific harms, claims, remediation costs, and settlement allocations prior to executing the JCO;

12

6.     A minimum 180-day period for Intervenors and similarly situated political subdivisions to evaluate the claims the JCO purports to release and to assemble a representative body of political subdivisions to meet and confer with the State regarding the proposed settlement;

7.     Such other and further relief as the Court deems just, proper, and equitable.

December 22, 2025                          /s/ John E. Keefe, Jr
                                           John E. Keefe, Jr.
                                           **KEEFE LAW FIRM**
                                           2 Bridge Ave, Bldg 6, 2nd Fl, Suite 623
                                           Red Bank, NJ 07701
                                           Telephone: 732-224-9400
                                           Facsimile: 732-224-9494
                                           *Attorneys for Intervening Third-Party Plaintiffs*
                                           *Cape May County, Cumberland County, Salem*
                                           *County, Somerset County, the County of Union,*
                                           *Middlesex County, and Monmouth County*

13

EXHIBIT "B"

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs*

By:     Gwen Farley
        Deputy Attorney General
        Attorney ID No. 000081999
        Ph. (609) 376-2740
        Gwen.Farley@law.njoag.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>               Plaintiffs,<br><br>   v.<br><br>E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),<br><br>               Defendants. | Case No.: 1:19-cv-14758-RMB-JBC<br><br>Civil Action<br><br>This document relates to:<br><br>Case No.: 1:19-cv-14766-RMB-JBC<br><br>**JUDICIAL CONSENT ORDER**<br>**AS TO DEFENDANT 3M COMPANY** |

This matter was opened to the Court by Matthew J. Platkin, Attorney General of New Jersey, Deputy Attorney General Gwen Farley, appearing, and Kelley Drye & Warren LLP, the Law Offices of John K. Dema, P.C., Cohn, Lifland, Pearlman, Herrmann & Knopf LLP, and Taft Stettinius & Hollister, LLP, Special Counsel to the Attorney General, appearing, as attorneys for Plaintiffs New Jersey Department of Environmental Protection (the "Department") and the Commissioner of Environmental Protection (the "Commissioner"), in their named capacity, as

1

*parens patriae,* and as Trustee of the Natural Resources of the State of New Jersey ("State"), and

the Administrator of the New Jersey Spill Compensation Fund (the "Administrator") (the

Department, Commissioner, and Administrator collectively, "Plaintiffs"), and Thomas J. Perrelli,

Jenner & Block LLP, representing Defendant 3M Company ("3M"). Plaintiffs are joined by the

New Jersey Division of Consumer Affairs and its Director (collectively, "DCA," and collectively

with Plaintiffs and the State, "Settling Plaintiffs") in the AFFF Litigation (as defined below), and

as a Party to this Judicial Consent Order ("JCO"). The Attorney General and the Director of DCA

will be added to the caption of this case for purposes of this JCO upon entry of the JCO. These

Parties, having amicably and in good faith resolved their disputes before trial, seek Court approval

and entry of this JCO as follows:

## I.    BACKGROUND

A.    3M is a corporation organized and existing under the laws of the State of Delaware,

with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000. Settling

Plaintiffs allege that 3M designed, manufactured, marketed, and sold certain PFAS, as well as

PFAS-Containing Products, that were transported, stored, handled, used, released, spilled, or

disposed of in, and thus resulted in PFAS Contamination in, the State of New Jersey.

B.    Settling Plaintiffs have initiated multiple litigations against and have issued an

administrative directive to 3M seeking to compel 3M to investigate and remediate PFAS

Contamination in various locations throughout the State, to pay related costs expended by Settling

Plaintiffs, and to pay damages and penalties.

C.    On March 27, 2019, Plaintiffs filed a complaint against 3M and other defendants

in the Superior Court of the State of New Jersey, Law Division, Salem County, Docket No. SLM-

L-000057-19#, pursuant to the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-

2

23.11 to -23.24, the Brownfield and Contaminated Site Remediation Act ("BCSRA"), N.J.S.A. 58:10B-1 to -31, and New Jersey common law, including negligence/gross negligence and products-liability theories (the "Chambers Works Litigation," *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. SLM-L-000057-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019)). Through the Chambers Works Litigation, Plaintiffs seek, among other things, (i) costs to investigate, respond to, and remediate PFAS Contamination at and around the Chambers Works Site, located in Salem County, (ii) damages due to injuries to Natural Resources, including the costs to restore those resources and to compensate for lost use and value, and (iii) Punitive Damages or other penalties.

D.    Plaintiffs initiated a separate lawsuit against 3M and other defendants on March 27, 2019, by filing a complaint in the Superior Court of the State of New Jersey, Law Division, Middlesex County, Docket No. MID-L-002448-19#, pursuant to the Spill Act, the BCSRA, and New Jersey common law, including negligence and products-liability theories (the "Parlin Litigation," *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. MID-L-002448-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019)). Through the Parlin Litigation, Plaintiffs seek, among other things, (i) costs to investigate, respond to, and remediate PFAS Contamination at and around the Parlin Site, located in Middlesex County, (ii) damages due to injuries to Natural Resources, including the costs to restore those resources and to compensate for lost use and value, and (iii) Punitive Damages or other penalties.

E.    A defendant removed the Chambers Works Litigation and the Parlin Litigation to this Court on July 5, 2019. The cases were subsequently consolidated, along with two related actions that do not name 3M, and are currently before Chief Judge, the Honorable Renée Marie Bumb.

3

F.      3M filed responsive pleadings in the Chambers Works Litigation and the Parlin Litigation denying liability, denying Plaintiffs' claims and allegations against 3M, and asserting various defenses to the allegations in the Chambers Works complaint and the Parlin complaint.

G.      On March 25, 2019, the Department issued a *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination in the State to 3M and other respondents (the "Statewide PFAS Directive"). The Statewide PFAS Directive was issued pursuant to the authority vested in the Commissioner under the Spill Act, the Water Pollution Control Act ("WPCA"), N.J.S.A. 58:10A-1 to -20, the Air Pollution Control Act ("APCA"), N.J.S.A. 26:2C-1 to -68, and the Solid Waste Management Act ("SWMA"), N.J.S.A. 13-1E-1 to -230. The Directive provides notice that the Department believes 3M to be responsible for "significant contamination of New Jersey's natural resources, including the air and waters of the State, with [PFAS]." The Directive seeks, among other things, to compel 3M to provide information about its uses and Discharges or potential Discharges of certain PFAS into the State's environment, to meet with the Department to develop a good-faith estimate of costs to investigate, test, treat, clean up, and remove certain PFAS from the State's environment, including damages for economic impacts of PFAS Contamination, and 3M's financial condition and ability to pay for or perform the cleanup and removal of certain PFAS.

H.      On April 25, May 17, May 24, and October 2, 2019, 3M submitted a series of letters denying liability and asserting various defenses to the Statewide PFAS Directive.

I.      On May 4, 2019, Settling Plaintiffs filed a separate lawsuit against 3M and other manufacturers of aqueous film-forming foam, a PFAS-containing firefighting product ("AFFF"), and suppliers of PFAS ingredients for AFFF (the "AFFF Litigation") in the Superior Court of New Jersey, Mercer County. 3M is named as a defendant in the AFFF Litigation as a manufacturer of

4

certain AFFF and its component PFAS ingredients. Through the AFFF Litigation, Settling Plaintiffs assert claims against 3M pursuant to common-law products-liability theories, common-law negligence, common-law public nuisance, and the Spill Act, the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -20, and the Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 to -25. The AFFF Litigation was removed to this Court and thereafter transferred to the multidistrict litigation in the United States District Court for the District of South Carolina, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.) ("AFFF MDL"), where it remains pending. Through the AFFF Litigation, Settling Plaintiffs seek to recover all costs related to the investigation, cleanup, restoration, treatment, and monitoring of statewide AFFF contamination of the State's Natural Resources, as well as compensatory damages for lost value (including lost use) of those resources, Punitive Damages, and penalties.

J.     On December 9, 2021, this Court entered an Order reserving the parties' potential claims, cross-claims, counterclaims, and third-party claims arising out of the Statewide PFAS Directive in the Chambers Works Litigation and the Parlin Litigation, except for those based on defendants' alleged failure to properly respond to the Statewide PFAS Directive with respect to PFAS at or from the sites at issue in the Chambers Works Litigation and the Parlin Litigation. *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 148).

K.     On December 30, 2021, this Court denied 3M's motion to dismiss Plaintiffs' claims against it in the Chambers Works Litigation and the Parlin Litigation. *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 156). The Court held, among other things, that Plaintiffs had sufficiently pled that 3M, as a manufacturer and supplier of PFOA (perfluorooctanoic acid, a PFAS substance) to Chambers Works and Parlin, was a person "in any way responsible" for PFOA discharged from the Chambers Works Site and the Parlin Site for purposes of Plaintiffs' Spill Act claim.

5

L.      On October 29, 2024, this Court entered an Order reserving all of 3M's cross-claims against the other defendants in the Chambers Works Litigation, apart from those cross-claims previously reserved by the Court's December 9, 2021 Order. *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 385).

M.      On November 12, 2024, the Court entered an Order reserving 3M's and the other defendants' potential claims and third-party claims in the Chambers Works Litigation against parties not named in that action, apart from those claims and third-party claims against such parties previously reserved by the Court's December 9, 2021 Order. *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 391).

N.      This Court has confirmed that the Chambers Works Litigation is set for trial, to commence May 19, 2025. *See, e.g.*, Case No. 1:19-cv-14766-RMB-JBC (Dkt. 480).

O.      Settling Plaintiffs assert that, beyond the current claims they are pursuing against 3M in the matters referenced above, there is a potentially broad range of additional claims that they could pursue against 3M related to PFAS.

P.      The Parties wish to resolve 3M's alleged liability with respect to PFAS statewide, including for the specific costs and damages alleged in these Litigations and in the Statewide PFAS Directive, for environmental, consumer protection, and other liabilities (including common-law, cost-recovery, and other claims), as well as for additional costs and damages related to PFAS and alleged PFAS Contamination, subject to the limitations and exclusions discussed herein.

Q.      After a thorough investigation and after carefully considering the relevant circumstances, including the Claims that have been or could be asserted, the legal and factual defenses to those Claims, and the applicable law, and the burdens, risks, uncertainties, and expense of litigation, as well as the fair, cost-effective, and assured method of resolving the Claims, Settling

6

Plaintiffs have concluded that it would be in the public interest to enter into this JCO to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the Political Subdivisions, citizens, and residents of New Jersey. Settling Plaintiffs have further concluded that resolution of 3M's liability with respect to PFAS and PFAS Contamination are best resolved statewide, including environmental, consumer protection, and other liabilities (subject to the exclusions set forth herein), rather than piecemeal, consistent with this JCO.

R.    While continuing to deny any violation, wrongdoing, or liability with respect to any and all Claims that have been or could be asserted by Settling Plaintiffs, and while continuing to specifically deny and dispute the scientific, medical, factual, and other bases asserted in support of any of those Claims, 3M has nevertheless concluded that it will enter into this JCO to, among other things, avoid the delays, uncertainties, and distraction of further litigation.

S.    The Parties recognize and agree, and the Court by entering this JCO finds, that the Parties have negotiated this JCO at arm's length with the support of a Court-appointed mediator and in good faith; that the implementation of this JCO will allow the Parties to avoid continued, prolonged, and complicated litigation, including appeals; and that this JCO is fair, reasonable, in the public interest, and consistent with applicable law.

T.    Settling Plaintiffs acknowledge that 3M has taken actions, which other companies have not taken, to cease manufacturing of AFFF and PFAS and to seek to phase out the use of PFAS in its products. On May 16, 2000, 3M announced that it would voluntarily phase out manufacturing of certain long-chain PFAS compounds. Within approximately two years after the announcement, 3M ceased manufacturing the vast majority of those PFAS compounds, as well as AFFF; and 3M ceased manufacturing those long-chain PFAS compounds by the end of 2008. On December 20, 2022, 3M announced that it will exit all PFAS manufacturing and will work to

7

discontinue the use of PFAS across its product portfolio by the end of 2025. Thus, 3M represents and Settling Plaintiffs understand that after 2025 all newly manufactured PFAS that becomes present in New Jersey will be manufactured by sources other than 3M. For details, see 3M Company, Form 10-Q, at 24, 58 (S.E.C. filed Apr. 22, 2025).

U.    3M's decisions were based on careful consideration and a thorough evaluation of the evolving external landscape, including multiple factors such as accelerating regulatory trends focused on reducing or eliminating the presence of PFAS in the environment and changing stakeholder expectations. 3M remains committed to site remediation and advancing water-treatment technologies at sites where 3M has historically manufactured PFAS across the globe, and is doing so in partnership with leading scientists, community advisers, and the appropriate authorities.

THEREFORE, with the consent of the Parties to this JCO, it is hereby **ORDERED and ADJUDGED:**

## II.    JURISDICTION AND VENUE

1.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and sections 106, 107, and 113(b) of CERCLA, 42 U.S.C. §§ 9606, 9607, 9613(b). The Court has personal jurisdiction over the Parties for purposes of approving, entering, and implementing this JCO and resolving, solely as to 3M, the Chambers Works Litigation, the Parlin Litigation, and the AFFF Litigation (together, the "Litigations"). Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and 1395(a), and section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because this action arises from alleged acts or omissions that occurred at the Chambers Works Site, the Parlin Site, and other Sites within the District of New Jersey.

2.      The Chambers Works Litigation and the Parlin Litigation were both removed to this Court pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446(d).

3.      For purposes of this Court approving, entering, and implementing this JCO, the Parties waive all objections and defenses they may have to this Court's jurisdiction over the Parties, the subject matter of this action, and this JCO.  The Parties shall not challenge this Court's jurisdiction to enforce this JCO.

### III.      PARTIES BOUND

4.      This JCO applies to, and is binding on, each Settling Plaintiff, each other Releasor, 3M, and each other Released Entity, as defined herein.

### IV.      DEFINITIONS

5.      Whenever, in describing or referring to any person, party, manner, or thing, any word importing the singular number is used, the same shall be understood to include and to apply to several persons or parties as well as to one person or party, and to bodies corporate as well as individuals, and to several matters and things as well as one matter or thing.  Unless the specific reference or context clearly indicates otherwise, (a) words expressed in the masculine or feminine form include the masculine, feminine, and gender-neutral forms; (b) the word "will" has the same meaning as the word "shall," and vice versa; (c) the word "or" is not exclusive; (d) the word "extent" in the phrase "to the extent" (or "to the … extent") means the degree to which a subject or other thing extends, and such phrase does not simply mean "if"; (e) references to any law include all rules, regulations, and sub-regulatory guidance promulgated thereunder as of the Effective Date; (f) the terms "include," "includes," and "including" are deemed to be followed by "without limitation"; and (g) references to dollars or "$" are to United States dollars.

9

6.     Except where otherwise expressly provided (as in the next sentence) or where the specific reference or context clearly indicates otherwise, terms used in this JCO that are defined in the Spill Act, the WPCA, the APCA, the SWMA, the BCSRA, or the SDWA, shall have their statutory or regulatory meaning. Whenever the capitalized terms listed below are used in this JCO, the following definitions apply:

"3M" means 3M Company.

"Administrator" means the chief executive of the New Jersey Spill Compensation Fund.

"AFFF" means aqueous film-forming foam, a firefighting product, that contains PFAS.

"AFFF Litigation" means the case that Settling Plaintiffs filed against 3M and that was transferred to the AFFF MDL.

"AFFF MDL" means the multidistrict litigation in the United States District Court for the District of South Carolina, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.).

"Aggregate Amount" has the meaning set forth in Paragraph 114.c.

"Annual Payments" (or "Annual Payment" in the singular) has the meaning set forth in Paragraph 44.

"APCA" means the Air Pollution Control Act, N.J.S.A. 26:2C-1 to -68.

"Attorney General" means the Attorney General of New Jersey, the State's chief law-enforcement officer and chief legal officer.

"BCSRA" means the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to -31.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601–9675.

10

"CFA" means the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20.

"Chambers Works Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. SLM-L-000057-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)).

"Chambers Works Site" means the Site including the facility located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships, Salem County, New Jersey.

"Claim" means any past, present, or future claim, including any counterclaim, cross-claim, action, right, remedy, cause of action, liability, suit, proceeding, demand, damages, injury, loss, payment, judgment, verdict, debt, dues, sum of money, lien, cost or expense (including attorneys' fees or costs), account, reckoning, bill, covenant, contract, controversy, agreement, obligation, promise, request, assessment, charge, dispute, performance, warranty, omission, grievance, order, or monetary imposition of any sort, in each case in any forum and on any theory, whether legal, equitable, regulatory, administrative, or statutory; arising under federal, state, or local constitutional or common law, statute, regulation, order, guidance, ordinance, contract, or principle of equity; filed or unfiled; asserted or unasserted; fixed, contingent, or non-contingent; known or unknown; patent or latent; open or concealed; discovered or undiscovered; suspected or unsuspected; foreseen, foreseeable, unforeseen, or unforeseeable; matured or unmatured; manifested or not; accrued or unaccrued; ripened or unripened; perfected or unperfected; choate or inchoate; developed or undeveloped; liquidated or unliquidated; now recognized by law or that may be created or recognized in the future by statute, regulation, order, judicial decision, or in any other manner, including any of the foregoing for direct damages, indirect damages, compensatory damages, consequential damages, incidental damages, nominal damages, economic loss, cost recovery, natural resource damages, restoration, diminution, punitive or exemplary damages,

statutory and other multiple damages or penalties of any kind, or any other form of damages whatsoever; any request for declaratory, injunctive, or equitable relief, strict liability, joint and several liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorneys' fees, expert fees, consultant fees, fines, penalties, expenses, costs, or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever, whether direct, representative, derivative, class, or individual in nature. It is the intention of this JCO that the definition of "Claim" be as broad, expansive, and inclusive as possible.

"Claim-Over" means a Claim by any Non-Released Entity against any Released Entity on the basis of contribution, indemnity, or other claim-over on any theory, relating to a Non-Party Covered Harm Claim asserted by a Releasor.

"Class-Member Public Water System" means any Public Water System that is a class member under the Public Water System Class Settlement, regardless of whether such system has asserted any Claim against 3M.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commissioner" means the New Jersey Commissioner of Environmental Protection.

"Compensatory Restoration" means compensation for the State's citizens and residents for the period of time that Natural Resources remained injured or altered, before Primary Restoration returned the Natural Resources to their Pre-Discharge Condition.

"Contribution Claims" has the meaning set forth in Paragraph 73.

"Costs, Fees, and Punitive Damages Payment" shall have the meaning set forth in Paragraph 44.

12

"Court" (or "this Court") means the United States District Court for the District of New Jersey unless expressly stated to be a different court.

"Covenant Not To Sue" has the meaning set forth in Paragraph 56.

"Covered Conduct" means:

a.    Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind, intentional or unintentional, whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity that occurred prior to the Effective Date) that has arisen, is arising, or may arise at any time in the future from, was, is, or will be based on, involved, involves, or will involve, or was, is, or will be caused by PFAS, or that did result, is resulting, or will result in PFAS Contamination.  Without limiting the foregoing, the term "Covered Conduct" includes conduct arising from, based on, involving, or caused by:

i.    the design, development, manufacture, formulation, distribution, handling, control, disposal, marketing, sale, testing, labeling, transportation, import, export, storage, loading, mixing, application, use, and instructions for use of PFAS or any PFAS-Containing Product;

ii.    any transport, treatment, storage, disposal, or arrangement for transportation, treatment, storage, or disposal, or use of PFAS-containing Sludge or PFAS-containing Wastewater (from any Site, facility, or location), including any use for irrigation, spraying on agricultural fields, or manufacturing;

13

iii.    any action, activity, omission, or other conduct that in any way resulted in or threatens to result in the presence of PFAS in the Environment, including any known, suspected, or threatened Discharge of any PFAS into the Environment from the beginning of time through the Effective Date, including any known, suspected, or threatened Discharge of PFAS into the Environment that commenced prior to the Effective Date and is continuing as of the Effective Date;

iv.    compliance with any reporting, recordkeeping, disclosure, notification, or permit-process requirement related to, and any representations or omissions about, PFAS or any PFAS-Containing Product (to the extent any Claim that could be asserted about such Covered Conduct arises from, is based on, involves, or is caused by PFAS); or

v.    any act, use, or employment by any Person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact in connection with the sale or advertisement of PFAS or any PFAS-Containing Product (to the extent any Claim that could be asserted about such Covered Conduct arises from, is based on, involves, or is caused by PFAS), including any failure to warn others concerning any human health or environmental hazards associated with PFAS or any PFAS-Containing Product, or concerning the proper use and disposal of such substances or products, and including any such conduct that could be actionable under the CFA, other statutes, or the common law.

b.    The term "Covered Conduct" does not include any conduct that a Releasor demonstrates, by clear and convincing evidence, arises solely from conduct by one or more

14

Released Entities that occurs entirely after the Effective Date. For the avoidance of doubt, the term "Covered Conduct" includes conduct involving PFAS that was subject to a Discharge prior to the Effective Date or entered the Environment prior to the Effective Date but migrated or was transported to another location after the Effective Date.

      c.     It is the intention of this JCO that the definition of "Covered Conduct" be as broad, expansive, and inclusive as possible.

"Covered Harm" means any actual or alleged harm, injury, or damage actually or allegedly arising from, based on, involving, or caused by Covered Conduct, including any actual or alleged harm, injury, or damages actually or allegedly arising from, based on, involving, or caused by PFAS or PFAS Contamination. It is the intention of this JCO that the definition of "Covered Harm" be as broad, expansive, and inclusive as possible. Without limiting the foregoing, the term "Covered Harm" includes harm arising from, based on, involving, or caused by:

      a.     the design, engineering, installation, maintenance, or Operation of, or cost associated with any kind of treatment, filtration, Remediation, management, investigation, testing, or monitoring of PFAS in, any Drinking Water Supplies or Water System, or the rates for Potable Water that any Releasor or Water System charges its customers;

      b.     any Released Entity's liability for Natural Resource Damages arising from, based on, involving, or caused by PFAS in the State;

      c.     any costs that any Government Entity of the State or of any of the State's Political Subdivisions has paid or will pay due to impacts that allegedly arose from, were based on, involved, or were caused by PFAS in the Environment or by human exposure to PFAS, including payments (i) to compensate for time spent on cleanup activity, travel to and from any Site, contractor costs at any Site, or equipment used at any Site; (ii) to offset

15

costs of restricting access to a Site necessary to perform these other activities; (iii) to any medical facility, healthcare provider, pharmacy, medical or healthcare patient, or healthcare insurer; (iv) to investigate or delineate PFAS compounds; or (v) to compensate for administrative matters, personnel issues, guidance development, or office, utility, or supply costs; or

d.      any Claim, including any Claim involving any public interest or diffused public right (including any claim for Punitive Damages that may be associated with any Claim of a public or private entity), that has arisen or may arise at any time in the future from, is or will be based on, involves or will involve, or is or will be caused by PFAS, PFAS Contamination, or any PFAS-Containing Product (to the extent such Claim arises from, is based on, involves, or is caused by PFAS).

"Credit-Eligible Claim" means a Claim by a non-Releasor or a Releasor against any Released Entity arising from, based on, involving, or caused by Covered Conduct or Covered Harm that occurred entirely or partly in the State, other than a Purely Private Claim or a Claim that a Public Water System that expressly and timely opted out from the Public Water System Class Settlement filed against 3M before January 1, 2025.

"CW Fairness Credit" has the meaning set forth in Paragraph 114.c.

"Day" means a calendar day unless expressly stated to be a Working Day.

"DCA" means the New Jersey Division of Consumer Affairs and its Director.

"Department" means the New Jersey Department of Environmental Protection.

"Director" means the Director of the New Jersey Division of Consumer Affairs.

"Discharge" (or "Discharged") means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying, injecting,

16

escaping, leaching, dumping, or disposing of, or any contamination by, certain substances into or on any land, water, air, the Environment, or any Natural Resource, regardless of whether such discharge was reported to or otherwise discovered by any Settling Plaintiff. The term "Discharge" includes the release of such substances into or from any Treatment Works or Solid Waste Facility. It is the intention of this JCO that the definition of "Discharge" be as broad, expansive, and inclusive as possible.

"Dismissal" (or "Dismiss" or "Dismissed") means dismissal with prejudice, with each party bearing its own costs, of pending litigation brought against any Released Entity involving any Released Claim.

"Drinking Water Supplies" means any raw or finished water source that is or may be used by a Water System, by a Private Potable Well, or as Potable Water by one or more individuals.

"DuPont" means E.I. du Pont de Nemours & Company, now known as EIDP, Inc.

"Effective Date" has the meaning set forth in Section XV.

"Environment" means the Waters Of The State, any other Drinking Water Supplies, land surface or subsurface strata, or ambient air within the State or within the jurisdiction of the State.

"Escrow Account" has the meaning set forth in Paragraph 44.

"Exhibits" (or "Exhibit" in the singular) means Exhibits A through D, attached to and incorporated by reference in this JCO, so that each Exhibit's terms are expressly made a part of this JCO.

"Firefighting Training Academy" means Real Property that is or has been used for firefighter training with AFFF.

"Government Entity" means a governing body, department, agency, authority, or any other unit or quasi-governmental unit of any federal, State, county, or local government. It is the

17

intention of this JCO that the definition of "Government Entity" be as broad, expansive, and inclusive as possible.

"Governor" means the Governor of New Jersey.

"Groundwater" means all water beneath the land surface that is within the saturated zone (below the water table).

"Hazardous Waste" means any waste or combination of wastes that poses a present or potential threat to human health, living organisms, or the Environment, including waste material that is toxic, carcinogenic, corrosive, irritating, sensitizing, biologically infectious, explosive, or flammable.

"Hazardous Waste Facility" means any area, plant, or other facility for the treatment, storage, or disposal of Hazardous Waste, including loading and transportation facilities or equipment used in connection with the processing of Hazardous Wastes.

"Initial Payment" has the meaning set forth in Paragraph 44.

"JCO" or "Judicial Consent Order" means this document, including all Exhibits attached hereto.

"Litigations" means the Chambers Works Litigation, the Parlin Litigation, and the AFFF Litigation.

"Multistate Catchup Payment" has the meaning set forth in Paragraph 114.a.

"Multistate Settlement" means a multistate settlement that 3M enters into with at least 25 states (including the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, Guam, the U.S. Virgin Islands, and the Commonwealth of the Northern Mariana Islands) that releases Claims relating to PFAS.

18

"Natural Resource Damages" means all Claims arising from, based on, involving, or caused by any PFAS Contamination or Discharge of PFAS for any injury to any Natural Resource under the Spill Act, the WPCA, the APCA, the SWMA, the BCSRA, CERCLA, or any other State or federal statute, regulation, order, or common law, and include (i) the costs of assessing injury to Natural Resources; (ii) the Department's Office of Natural Resource Restoration's costs, attorneys' fees, consultants' and experts' fees, other litigation costs, and interest, incurred prior to the Effective Date; and (iii) compensation for the lost value of, loss of use of, impairment of, injury to, or destruction of Natural Resources.

"Natural Resources" (or "Natural Resource" in the singular) means all land, vegetation, biota, fish, shellfish, wildlife and the habitats of each, all Waters Of The State, Drinking Water Supplies, the air, and other such resources owned by, managed by, held in trust by, under the jurisdiction of, or otherwise controlled by the State.

"New Jersey Leadership Credit" has the meaning set forth in Paragraph 45.

"New Jersey Leadership Payment" has the meaning set forth in Paragraph 44.

"Non-Party Covered Harm Claim" means a Claim against any Non-Released Entity arising from, based on, involving, or caused by Covered Conduct or Covered Harm (or conduct that would be Covered Conduct or Covered Harm if engaged in by a Released Entity). It is the intention of this JCO that the definition of "Non-Party Covered Harm Claim" be as broad, expansive, and inclusive as possible.

"Non-Party Settlement" means a settlement by any Releasor that settles any Non-Party Covered Harm Claim and includes a release of any Non-Released Entity.

"Non-Released Entity" means a Person or entity that is neither a Released Entity nor a Releasor.

19

"Operator" (or "Operates," "Operated," or "Operation") means any Person operating a facility by lease, contract, or other form of agreement.

"Paragraph" means a portion of this JCO identified by an Arabic numeral or an uppercase or lowercase letter.

"Parlin Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. MID-L-002448-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)).

"Parlin Site" means the Site including the facility located at 250 Cheesequake Road, Parlin, Old Bridge Township, Sayreville Borough, Middlesex County, New Jersey.

"Parties" ("Party" in the singular) means Settling Plaintiffs and 3M. To the extent that any Settling Plaintiff or 3M performs any of its obligations under this JCO through agents, the actions of those agents shall be considered the actions of that Party.

"Pathway" means the direct route or medium through which certain PFAS was transported, is transported, has migrated, or is migrating (i) from the source of PFAS Contamination or from a Discharge to any Natural Resource or (ii) from any Natural Resource to any source of Drinking Water Supplies or any other source of human exposure or contact.

"Person" means any individual, public or private corporation, company, association, society, firm, partnership, joint stock company, estate, trust, the United States, the State, or any of the State's Political Subdivisions, departments, agencies, authorities, or instrumentalities.

"Personal Injury" means any personal physical illness, injury, or death allegedly caused by exposure to PFAS, or any loss of consortium deriving from such illness, injury, or death.

"Personal Property" means goods, chattels, and other tangible property that may be the subject of ownership but is not Real Property.

"PFAS" means, solely for purposes of this JCO, any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to it). It is the intention of this JCO that the definition of "PFAS" be as broad, expansive, and inclusive as possible.

"PFAS-Containing Product" means any consumer, industrial, or other material, substance, article, or product (including AFFF) manufactured with or containing PFAS (including any material, substance, article, or product that intentionally or unintentionally contains PFAS as an ingredient, byproduct, or degradation product) that was sold, supplied, transported, treated, stored, disposed of, or arranged for transportation, treatment, storage, or disposal in the State. For the avoidance of doubt, the term "PFAS-Containing Product" includes (1) a material, substance, article, or product made by a manufacturer that contains PFAS made by another manufacturer and (2) a material, substance, article, or product made by a manufacturer that contains a component that (a) was made by another manufacturer and (b) contains PFAS.

"PFAS-Containing Waste" means any waste, waste materials (or combination of wastes or waste materials), Sludge, or Wastewater that qualifies as a PFAS-Containing Product.

"PFAS Contamination" means, solely for purposes of this JCO, any presence of PFAS in the Environment, whether from a Discharge or from any other source.

"PFAS Contamination Abatement Funding" has the meaning set forth in Paragraph 50.

"PFAS Contamination Abatement Project" refers to any project described in Paragraph 50, for which 3M has agreed to pay funds to the Department, to assist the State in abating PFAS Contamination or a Discharge of PFAS, regardless of whether the source of or potential responsibility for such PFAS Contamination or Discharge is disputed.

"Plaintiffs" (or "Plaintiff" in the singular) means the Department, the Commissioner, and the Administrator.

"POET System" means a device by which Drinking Water Supplies are treated for PFAS Contamination at the point of entry into a building.

"Political Subdivision" means any city, borough, town, township, village, county, or other political subdivision of the State, or any agency or instrumentality of one or more thereof.

"Potable Water" means drinking water, water for other personal uses, and water for purposes requiring a supply of water which the Department determines is suitable for human consumption, and does not include water for use in firefighting, for agricultural (*e.g.*, livestock or crop production) purposes, for manufacturing, or for other non-potable purposes.

"Pre-Discharge Condition" means the condition of injured or altered Natural Resources prior to the Discharge of PFAS that caused the injury or alteration, including the same quality, quantity, function, and value that existed prior to the injury or alteration.

"Primary Restoration" means returning injured or altered Natural Resources to their Pre-Discharge Condition.

"Private Non-Released Entity" means any Private Person that is a Non-Released Entity.

"Private Person" means any private individual, corporation, company, association, society, firm, partnership, or joint stock company that is not, and is not owned, Operated, managed, held in trust, or otherwise controlled by, and is not acting as an employee, agent, lessee, contractor, representative, or official of, the United States, the State, or any of the State's Political Subdivisions, departments, agencies, authorities, or instrumentalities.

"Private Potable Well" means a hole or excavation that (i) is drilled, bored, core driven, jetted, dug, driven, or otherwise constructed for the purpose of removing water from the subsurface

22

for Potable Water supply; (ii) is not abandoned, inactive, or out of use, so long as such well is not abandoned, inactive, or out of use based in whole or in part on the presence or threatened presence of PFAS; (iii) is not Operated for mineral extraction, for chemical manufacturing or processing, for scrap-metal processing or recycling, for power generation, as a refinery, or as a fuel-storage facility; and (iv) is owned, Operated, managed, or otherwise controlled by a Private Person.

"Property Damage" refers solely to any diminution in the value of Real Property or Personal Property (other than a Private Potable Well) caused by and proximately resulting from PFAS Contamination or a Discharge of PFAS, by comparison with its value prior to such PFAS Contamination or Discharge, provided that such property is owned by a Private Person.

"Public Water System" means a Water System for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least 15 service connections or regularly serves an average of at least 25 individuals daily at least 60 Days out of the year, including (i) any collection, treatment, storage, and distribution facilities under control of the Operator of such system and used primarily in connection with such system; (ii) any collection or pre-treatment storage facilities not under such control which are used primarily in connection with such system; and (iii) any Person (but not any financing or lending institution) that has legal authority or responsibility (by statute, regulation, order, other law, or contract) to fund or incur financial obligations for the design, engineering, installation, Operation, or maintenance of any facility or equipment that treats, filters, remediates, or manages water that has entered or may enter any Drinking Water Supplies or any Public Water System. It is the intention of this JCO that the definition of "Public Water System" be as broad, expansive, and inclusive as possible. For the avoidance of doubt, the term "Public Water System" includes

23

community water systems, non-transient non-community water systems, and transient non-community water systems.

"Public Water System Class Settlement" means the *Settlement Agreement Between Public Water Systems and 3M Company* that was approved by the United States District Court for the District of South Carolina in the AFFF MDL on March 29, 2024 (Dkt. 4754).

"Punitive Damages" means punitive damages, exemplary damages, treble or multiple damages, civil or administrative fines or penalties, or other damages that serve the public interest or protect the general public primarily by punishing or penalizing civil defendants' conduct or by deterring them and others from engaging in similar conduct in the future.

"Purely Private Claim" means a civil Claim brought by any Private Non-Released Entity against any Released Entity that (a) arises from, is based on, involves, or was caused by Covered Conduct or seeks recovery for a Covered Harm; (b) could not have been brought by any Releasor; (c) presents an individual's (or an individual's estate's) Claim for Personal Injury or an individual's Claim for Property Damage; (d) does not seek damages or relief directly related to any Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System, which are addressed by this JCO; and (e) does not seek double recovery or relief that is identical to, redundant with, or duplicative of any relief that is received under this JCO or that any Settling Plaintiff could receive arising from Covered Conduct or Covered Harm. For the avoidance of doubt, the term "Purely Private Claims" includes any Private Non-Released Entity's Claim for Property Damage that seeks damages or relief related to Remediation (*e.g.*, of soil) that is not directly related to any Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System.

"PWS Shortfall" has the meaning set forth in Paragraph 44.e.

24

"Real Property" means any land, tenement, or hereditament that may be the subject of ownership, and all rights thereto and interests therein.

"Release" means the release or releases defined in Section VIII.

"Released Claims" ("Released Claim" in the singular) means any and all Claims that directly or indirectly, in any way, arose from, were based on, involved, or were caused by Covered Conduct or Covered Harm occurring at least in part prior to the Effective Date and were or could have been asserted against any Released Entity by any Releasor.  Without limiting the foregoing, the term "Released Claims" includes any Claims that have been asserted against any Released Entity by the State or any Releasor in any federal, state, or local action or proceeding (whether judicial, arbitral, regulatory, or administrative) arising from, based on, involving, or caused by, in whole or in part, Covered Conduct or Covered Harm, or any such Claim that could be or could have been asserted as of the Effective Date or in the future in those actions or in any comparable action or proceeding brought by the State or any Releasor (whether or not the State or such Releasor has brought such action or proceeding).  Released Claims also include any Claim for cost recovery or contribution, including pursuant to section 107 or 113 of CERCLA (42 U.S.C. §§ 9607, 9613) or any State or federal statute related to liability (which this JCO resolves) for the Discharge or threatened Discharge of PFAS.  Released Claims also include all Claims asserted in any action or proceeding that is subject to Dismissal under this JCO, whether or not such Claims arise from, are based on, involve, or are caused by Covered Conduct or Covered Harm.  It is the intention of this JCO that the definition of "Released Claims" be as broad, expansive, and inclusive as possible; however, the term "Released Claims" does not include (i) any Claim based on a Released Entity's failure to satisfy a requirement in this JCO; (ii) any Claim arising under or to enforce this JCO and any subsequent related order or judgment; (iii) any criminal liability that any

25

Private Person, including any Released Entity, has or may have to the State; (iv) any Claim for a

State or federal antitrust violation; (v) any Claim arising under State tax law; (vi) any Claim that a

Releasor demonstrates, by clear and convincing evidence, arises solely from conduct by one or

more Released Entities that occurs entirely after the Effective Date; (vii) 3M's Remediation

obligations described in Paragraph 48; or (viii) any Claim for compensatory relief that falls within

the definition of a Purely Private Claim. For the avoidance of doubt, the term "Released Claims"

includes all Claims that were or could have been asserted by any Settling Plaintiff against any

Released Entity in the Litigations or the Statewide PFAS Directive, and also includes all Claims

arising from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water,

a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's

jurisdiction.

"Released Entities" ("Released Entity" in the singular) means (i) 3M and its respective

past, present, or future administrators, advisors, affiliated business entities, affiliates, agents,

assigns, attorneys, constituent corporation or entity (including constituent of a constituent)

absorbed by 3M in a consolidation or merger, contractors, counsel, directors, divisions, employee

benefit plans, employee benefit plan participants or beneficiaries, employees, executors, founders,

heirs, insurers, managers, members, officers, owners, parents, partners, partnerships, predecessors,

principals, resulting corporation or entity, servants, shareholders, subcontractors, subrogees,

subsidiaries, successors, trustees, trusts, and (ii) any other representatives, individually or in their

corporate or personal capacity, and anyone acting on their behalf, including in a representative or

derivative capacity, but only to the extent that the alleged liability of the entity in subsection (ii) is

based on its status and in its capacity related to 3M, and not to the extent that the alleged liability

of the entity arose independently of its status and capacity related to 3M. Other than 3M, no

26

currently named defendant in the Litigations and no currently named respondent in the Statewide PFAS Directive shall be considered a Released Entity.  It is the intention of this JCO that the definition of "Released Entities" be as broad, expansive, and inclusive as possible; however, to the extent that a Released Entity is involved in Covered Conduct or Covered Harm through participation in a joint venture with any Non-Released Entity that gives rise to a Non-Party Covered Harm Claim, the joint venture shall be released only for such Covered Conduct or Covered Harm attributable to the Released Entity or reflecting its share of the joint venture and shall not be released for such Covered Conduct or Covered Harm attributable to a Non-Released Entity that is a co-owner of the joint venture.  For the avoidance of doubt, the term "Released Entities" does not include the direct or indirect customer of a Released Entity unless such customer otherwise qualifies as a Released Entity pursuant to subsections (i) and (ii) of this definition.

"Releasors" ("Releasor" in the singular) means, with respect to Released Claims, (1) Settling Plaintiffs; (2) the State and, without limitation and to the maximum extent that the Attorney General and other State signatories to this JCO may release Claims, (a) all of the State's departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, including the Attorney General and county prosecutors, and any Person claiming by or through any of the foregoing (collectively, "State's departments et al."); (b) all of the State's Political Subdivisions and their departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, and any Person claiming by or through any of the foregoing; and (c) any Person or entity acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity (whether or not such Person or entity signs this JCO or participates in the JCO process set forth in Section XIII) seeking relief on behalf of or generally applicable to the general public in the State

27

or the people of the State, as opposed to solely to private or individual relief for separate and distinct injuries, or with respect to the State's departments et al. as set forth in clause 2(a) of this definition; and (3) any Person or entity on whose behalf any Releasor identified in clause (1) or (2) brought or could have brought a Released Claim, whether individually or in any corporate, personal, representative, or derivative capacity.

"Remedial Action" means those actions taken at a Site or offsite if a contaminant has migrated or is migrating therefrom, as may be required by the Department, including the removal, treatment, containment, transportation, securing, or other engineering or treatment measures, whether to an unrestricted use or otherwise, designed to ensure that any discharged contaminant at the Site or that has migrated or is migrating from the Site, is remediated in compliance with the applicable health risk or environmental standards.

"Remedial Investigation" means a process to determine the nature and extent of PFAS Contamination, a Discharge of a contaminant at a Site, or a Discharge of a contaminant that has migrated or is migrating from the Site, and the problems presented by such PFAS Contamination or Discharge, and may include data collected, Site characterization, sampling, monitoring, and the gathering of any other sufficient and relevant information necessary to determine the necessity for Remedial Action and to support the evaluation of Remedial Actions if necessary.

"Remediation" (or "Remediate") means all actions to investigate, clean up, or respond to any known, suspected, or threatened PFAS Contamination or Discharge of PFAS, including the preliminary assessment, Site investigation, Remedial Investigation, and Remedial Action, or any portion thereof, provided, however, that "Remediation" (or "Remediate") shall not include the payment of compensation for damage to, or loss of, Natural Resources and shall not include

Restoration to Pre-Discharge Conditions (Primary Restoration) beyond what is necessary to comply with all applicable State and federal remediation standards.

"Restoration" (or "Restore") means all Primary Restoration and all Compensatory Restoration.

"SDWA" means the Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 to -25.

"Section" means a portion of this JCO identified by a Roman numeral.

"Settlement Date" means May 12, 2025.

"Settlement Payments" has the meaning set forth in Paragraph 44, and will be an amount not less than $400,000,000 and not more than $450,000,000, subject to potential credits, as set forth in Paragraphs 44 and 45 and Exhibit A.

"Settling Plaintiffs" ("Settling Plaintiff" in the singular) means Plaintiffs, the DCA, and the State, including in their capacities as described in Paragraph 9, and any successor department, agency, or official.

"Site" means (a) the Chambers Works Site; (b) the Parlin Site; (c) additional properties or facilities included or identified in the Statewide PFAS Directive or the Litigations to which Settling Plaintiffs allege that 3M sent PFAS, any PFAS-Containing Product, or any PFAS-Containing Waste, including the West Deptford Site; the Joint Base McGuire-Dix-Lakehurst in Burlington and Ocean Counties, New Jersey; the Naval Weapons Station Earle in Monmouth County, New Jersey; the Naval Air Warfare Center in Trenton, New Jersey; and the Federal Aviation Administration William J. Hughes Technical Center in Atlantic County, New Jersey; or (d) any other property or facility in the State at which or from which PFAS has been Discharged or which is a source of PFAS Contamination. It is the intention of this JCO that the definition of "Site" be as broad, expansive, and inclusive as possible. For the avoidance of doubt, the term "Site" includes

29

any areas in or around the identified property or facility to which PFAS Discharged from the property or facility may have migrated.

"Sludge" means the solids, semi-solids, precipitates, and liquids, including biosolids, that are (i) generated from any Wastewater Treatment Plant (other than the treated effluent from such a plant) or from any Public Water System's water-supply treatment plant; (ii) produced as a result of the storage or physical, chemical, or biological treatment of domestic or industrial sewage or Wastewaters; (iii) generated as residue by the processes of any Treatment Works; or (iv) discharged as domestic or industrial Wastewater into a sewerage system.

"Solid Waste Facility" means any transfer station, incinerator, resource recovery facility, landfill facility, dump, or other plant or facility for the disposal, deposition, or storage of garbage, refuse, and other discarded materials resulting from industrial, commercial, and agricultural operations, and from domestic and community activities, and all other waste materials including liquids, Sludge, or other material applied to the land or placed on the land in a manner constituting disposal.

"Spill Act" means the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24.

"Spill Fund" means the New Jersey Spill Compensation Fund established pursuant to the Spill Act.

"State" means the State of New Jersey.

"Statewide PFAS Directive" means the *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination that the Department issued to 3M and other respondents on March 25, 2019.

"Surface Water" means water at or above the land's surface, which is neither Groundwater nor contained within the unsaturated zone, including the ocean and its tributaries, all springs,

30

streams, creeks, rivers, lakes, ponds, reservoirs, lagoons, bays, estuaries, wetlands, and artificial waterbodies.

"SWMA" means the Solid Waste Management Act, N.J.S.A. 13-1E-1 to -230.

"Treas. Reg." means the Treasury Regulations under the Internal Revenue Code of 1986, as amended.

"Treatment Works" means any device or systems, whether public or private, used in the storage, treatment, recycling, or reclamation of municipal or industrial waste of a liquid nature, including intercepting sewers, outfall sewers, sewage collection systems, cooling towers and ponds, pumping, power and other equipment and their appurtenances; extensions, improvements, remodeling, additions, and alterations thereof; elements essential to provide a reliable recycled supply such as standby treatment units and clear well facilities; and any other works including sites for the treatment process or for ultimate disposal of residues resulting from such treatment; as well as any other method or system for preventing, abating, reducing, storing, treating, separating, or disposing of pollutants, including stormwater runoff, or industrial waste in combined or separate stormwater and sanitary sewer systems.

"Trustee" means the State trustee for a Natural Resource regardless of whether any Government Entity or Person other than the State also owns, manages, holds in trust, has jurisdiction of, or otherwise controls the Natural Resource.

"Wastewater" means residential, commercial, industrial, or agricultural liquid waste, sewage, stormwater runoff, or any combination thereof, or other residue discharged to or collected by a sewerage system. It is the intention of this JCO that the definition of "Wastewater" be as broad, expansive, and inclusive as possible.

31

"Wastewater Treatment Plant" means any structure or system by means of which liquid waste, Wastewater, or Sludge, whether domestic or industrial or both, is subjected to any treatment process. For the avoidance of doubt, the term "Wastewater Treatment Plant" includes any network of pipes, pumping stations, and appurtenances that convey sewage and waste from its points of origin to a point of treatment and disposal.

"Water Purveyor" means a Person that owns, Operates, manages, or controls a water supply system, plant, or equipment.

"Water System" means a system for providing Potable Water to any Person.

"Waters Of The State" means the ocean and its estuaries to the seaward limit of the State's jurisdiction, all springs, streams, and bodies of Surface Water or Groundwater, whether natural or artificial, within the boundaries of the State or subject to the State's jurisdiction, including the water column, sediments suspended in water or lying on the bank, bed, or shoreline, and sediments in or transported through coastal and marine areas.

"West Deptford Site" means the Site including the facility located at 10 Leonard Lane, West Deptford, Gloucester County, New Jersey.

"Working Day" means a day other than a Saturday, Sunday, or State or federal holiday. In computing time under this JCO, when the last day would fall on a Saturday, Sunday, or State or federal holiday, time shall run until 5:00 p.m. Eastern Time on the next Working Day.

"WPCA" means the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20.

## V.   PARTIES' MUTUAL UNDERSTANDINGS AND OBJECTIVES

7.    The Parties agree to and the Court by entering this JCO finds each of the provisions set forth in Paragraphs 8 through 43 of this Section V.

8.    As the State's chief law-enforcement and legal officer, the Attorney General is invested with all the powers of the office conferred by the common, statutory, and constitutional law of the State and may exercise all such power and authority in his discretion to advance the public interests of the State and to protect the State's consumers and the public generally, and the economic well-being, health, and safety of the State and its Political Subdivisions, citizens, and residents.

9.    In entering into this JCO, each Settling Plaintiff, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State, acts in all its capacities to the maximum extent allowable by law, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, including:

a.    Each Settling Plaintiff's capacity as *parens patriae*;

b.    the Commissioner's capacity as Trustee of the State's Natural Resources;

c.    the Director's responsibility for administering the CFA and its related laws and regulations;

d.    each Settling Plaintiff's capacity as an entity that owns, Operates, manages, holds in trust, or otherwise controls Real Property and Personal Property (and interests therein), including certain Water Systems, in the State; and

e.    each Settling Plaintiff's capacity to exercise the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interests that can be addressed by those powers, to recover costs that have been incurred or will be incurred by any Settling Plaintiff for any Covered Conduct or Covered Harm, and to protect the health and well-being, both physical and economic, of all Persons subject to the State's jurisdiction.

33

10.     The Attorney General enforces the provisions of the Constitution and all other laws of the State, including the State's environmental laws, the CFA, the State's rights to recover costs incurred, and such other laws (including under the common law) that involve PFAS Contamination or are related to PFAS, and attends to legal matters in which the State or any officer, department, board, body, commission, agency, authority, or instrumentality of the State government is a party or in which its rights or interests are involved.

11.     This JCO directly affects and impacts:

a.      the State;

b.      the State's departments, agencies, authorities, and instrumentalities;

c.      the State's Political Subdivisions;

d.      public interests and rights common to all the State's citizens and residents;

e.      the public health and safety of the State's citizens and the State's residents generally;

f.      the State's sovereign or quasi-sovereign interests in protecting the health and well-being, both physical and economic, of its citizens and residents with respect to the statewide water supply specifically; and

g.      the Natural Resources and the Environment within the State's boundaries or under the State's jurisdiction.

12.     The conservation, protection, and Restoration of the State's Natural Resources promote the health, safety, and welfare of the State's current and future citizens and residents, support community and economic development, and benefit households and businesses dependent upon clean water and other Natural Resources vital to the State's economy.

34

13.     The use, enjoyment, and existence of uncontaminated Natural Resources is a right common to the general public.

14.     By law, the State's Natural Resources are precious and invaluable public resources held by the State in trust for the benefit of the public.

15.     The people of New Jersey share a common right to enjoy their Natural Resources free from interference by pollution and contamination.

16.     The Commissioner serves as the Trustee of all Natural Resources of the State with a possessory interest to protect those Natural Resources, and a fiduciary duty to the State's citizens and residents to ensure that Natural Resource injuries are assessed, that injured Natural Resources are restored, and that the public is compensated for injuries to the State's Natural Resources.

17.     To fulfill his public-trust and fiduciary responsibilities, the Commissioner, through the instrumentalities of the Department, is empowered to direct, procure, and administer Natural Resource Restoration activities, including the administrative or judicial pursuit of Restoration commitments, monetary damages in lieu of or in addition to Restoration, costs of Natural Resource injury assessment, and legal fees and costs.

18.     The Department is responsible for enabling the expeditious Restoration of the greatest quantity and quality of Natural Resources that, in the Trustee's sole judgment (subject to any applicable judicial review), best compensate the public for injury.

19.     The Legislature of New Jersey has granted the Department broad powers to take appropriate action to prevent the pollution of the State's Environment, to abate nuisances in connection therewith, and to protect the health, safety, and welfare of the State's citizens and residents under the State's environmental laws.  The Department is specifically charged with enforcing the State's environmental laws, including the Spill Act, the WPCA, the SWMA, the

APCA, the BCSRA, the SDWA, other environmental statutes, and the common-law public-trust and *parens patriae* doctrines.

20.    The Attorney General has broad authority under the common, statutory, and constitutional law of the State to protect the interests of the State's consumer public and its citizens' and residents' economic well-being. The Attorney General is empowered to take appropriate legal action on behalf of its citizens and residents to vindicate the interests of the consumer public and enforce the State's consumer-protection laws in a manner consistent with the interests of the consumer public.

21.    The Attorney General is specifically empowered to enforce the provisions of the CFA and the common law on behalf of its citizens and residents in the interests of the consumer public, including by seeking penalties, recovering costs, and obtaining restitution for citizens or residents for conduct actionable under the CFA. In passing the CFA, the Legislature of New Jersey conferred on the Attorney General broad power to act in the interest of the consumer public.

22.    The Attorney General thus has broad authority to vindicate the interests of the consumer public regarding PFAS-Containing Products by pursuing and recovering costs and obtaining restitution for its citizens and residents, including with respect to any conduct actionable under the CFA and under common law.

23.    The Department has discovered PFAS in Drinking Water Supplies, Groundwater, Surface Water, sediments, soils, wetlands, air, fish, plants, and other Natural Resources across New Jersey on an ongoing basis and thus has concluded that PFAS Contamination is now ubiquitous in New Jersey. The Department has not yet identified and may never identify every source of PFAS Contamination or every Discharge of PFAS that has occurred in the State; the nature, source, extent, and location of every such Discharge; the type, timing, location, nature, or extent of every

injury to every Natural Resource in the State; or every Person in the State who has been affected by such PFAS Contamination, Discharges, or Natural Resource injuries. Across New Jersey, the Department has identified multiple Sites with a presence of PFAS that may have derived, in part or in whole, from 3M or products designed, manufactured, marketed, distributed, or sold by 3M (although 3M disputes this point), as well as dozens of fire departments that collectively maintain stockpiles of thousands of gallons of PFAS-containing AFFF that 3M may have designed, manufactured, marketed, distributed, or sold from the 1960s to the early 2000s.

24.    In 2022, 3M announced that it will exit all PFAS manufacturing and will work to discontinue the use of PFAS across its product portfolio by the end of 2025. Thus, 3M represents and Settling Plaintiffs understand that after 2025 all newly manufactured PFAS that becomes present in New Jersey will be manufactured by sources other than 3M. For details, see 3M Company, Form 10-Q, at 24, 58 (S.E.C. filed Apr. 22, 2025).

25.    The Department is well-positioned to enter into this JCO based on its leadership on and experience with PFAS issues, including investigations demonstrating disproportionate occurrence of PFAS Contamination in New Jersey relative to other states.

26.    Under the Department's leadership, New Jersey was the first state in the country to conduct statewide occurrence studies of PFAS in Drinking Water Supplies, which the Department undertook in 2006 and 2009. And in 2018, New Jersey became the first state to establish a maximum contaminant level for any PFAS substance.

27.    New Jersey has also been uniquely impacted by PFAS Contamination as a result of Discharges of PFAS from the Chambers Works Site, one of the largest sources of PFAS contamination in the world. The Department alleges that vast quantities of PFAS were Discharged by DuPont from the Chambers Works Site—including through air emissions, disposal sites, and

37

releases from the Site's Wastewater Treatment Plant—for more than 50 years. The Department further alleges that 3M was the exclusive supplier of PFOA (perfluorooctanoic acid, a PFAS substance) products to DuPont for use at the Chambers Works Site from at least the 1970s until 2002, and during such time 3M supplied more than 500,000 pounds of PFOA products used at the Chambers Works Site, making that Site the second largest historic customer of 3M's PFOA products in the United States. Moreover, the Department alleges that DuPont transferred PFAS-Containing Waste from its Washington Works facility in Parkersburg, West Virginia, to the Chambers Works Site for disposal in New Jersey. The Department alleges that the PFAS-Containing Waste from Washington Works was also generated by DuPont as a result of using 3M's PFOA products. The Department alleges that these activities have caused significant amounts of PFOA and other PFAS to be Discharged from the Chambers Works Site, and such Discharges have contaminated the Site and surrounding area and have injured New Jersey's Natural Resources miles from the Site.

28.    The Department has concluded that PFAS Contamination from all sources—whether related to 3M or not—is particularly prevalent in New Jersey, when compared with the rest of the United States. Specifically, the Department has concluded that, while New Jersey ranks as the eleventh largest state in terms of population, with about 3 percent of the total United States population, it represents a disproportionately large fraction of the Nation's PFAS contamination and Discharges of PFAS based on, among others, the following indicia:

- New Jersey's higher rate of detection of PFOA, PFOS (perfluorooctane sulfonic acid), and PFNA (perfluorononanoic acid), all of which are PFAS substances, in its Public Water Systems compared to those in the rest of the Nation, as reflected in data collected during the U.S. Environmental

Protection Agency's Third and Fifth Unregulated Contaminant Monitoring Rules;

- New Jersey's disproportionately large share of non-transient non-community water systems that provide Potable Water but were generally excluded from eligibility under the Public Water System Class Settlement;

- New Jersey's disproportionately large share of transient non-community water systems that provide Potable Water but were entirely excluded from eligibility under the Public Water System Class Settlement;

- New Jersey-based Public Water Systems' disproportionately large share of the Public Water System Class Settlement;

- New Jersey's disproportionately large share of Private Potable Wells that have been tested and found to have PFAS Contamination;

- New Jersey's disproportionately large share of National Pollutant Discharge Elimination System (NPDES) permits, which limit Discharges of PFAS and other substances in order to safeguard water quality and public health and safety, in compliance with the federal Clean Water Act;

- New Jersey's disproportionately large share of landfills and other Solid Waste Facilities that may have PFAS Contamination;

- New Jersey's disproportionately large share of Superfund sites under CERCLA;

- New Jersey's disproportionately large share of Superfund sites under CERCLA that have been monitored and found to have PFAS Contamination; and

39

- New Jersey's disproportionately large number of industrial facilities in industry sectors that the U.S. Environmental Protection Agency has identified as especially likely to handle PFAS, including glass-products manufacturing, fire training facilities, cleaning-products manufacturing, paints and coatings manufacturing, chemical manufacturing, electronics manufacturing, plastics and resin manufacturing, textiles and leather mills, printing, national-defense manufacturing, paper mills and products, and metal-machinery manufacturing.

29.    The Department alleges that the harm caused by PFAS Contamination and Discharges of PFAS is so widespread that it counts as injury not just to individuals who may be able to demonstrate a specific, personal harm derived from PFAS Contamination, but to the State as a whole.

30.    The Department has expended and will continue to expend substantial financial resources to identify and investigate the presence of PFAS in the State's Environment, as well as to monitor, test, treat, Remediate, clean up, and remove PFAS in or around the Chambers Works Site, the Parlin Site, and other Sites and Pathways across New Jersey.

31.    The Department has elected to pursue Natural Resource injury assessment and Restoration, to promote Remediation of the effects of PFAS Contamination and Discharges of PFAS, and to address harms allegedly arising from, based on, involving, or caused by PFAS, through a settlement process with 3M, while reserving all rights to pursue legal action against others related to PFAS Contamination and Discharges of PFAS where necessary and appropriate in Settling Plaintiffs' discretion and in consultation with the Attorney General.

40

32.     This JCO will empower Settling Plaintiffs to protect the public health and safety, the State's economic well-being and consumer public, and the State's Environment and Natural Resources by restoring Natural Resources, remediating the effects of PFAS Contamination and Discharges of PFAS, and deterring PFAS Contamination and Discharges of PFAS in the future.

33.     The New Jersey Legislature has authorized the Department broadly to pursue the Spill Act's remedial purposes and to recover cleanup and removal costs and certain damages from responsible parties, including with respect to certain public and private property, while authorizing Private Persons to recover cleanup and removal costs and certain damages related to their private property by making claims against the Spill Fund.

34.     New Jersey law broadly authorizes the Attorney General to recover costs incurred by Government Entities of the State or of the State's Political Subdivisions due to impacts that allegedly arose from, were based on, involved, or were caused by human health risks due to exposure to certain substances, including PFAS.

35.     New Jersey law broadly authorizes the Attorney General to protect and vindicate the interests of the consumer public and to pursue relief on behalf of the State, the State's Political Subdivisions, and the State's citizen and resident consumers related to PFAS and PFAS Contamination.  The Attorney General and the Director consider pursuing relief on behalf of the State's Political Subdivisions and the State's citizens and residents related to PFAS and PFAS Contamination to be consistent with the interests of the consumer public and the State's consumer-protection laws, including the CFA.  Among other things, the CFA authorizes the State to seek restitution for the State's Political Subdivisions, including fire departments, that purchased 3M AFFF and have stockpiles requiring safe collection and disposal.

41

36.    New Jersey law authorizes Settling Plaintiffs to seek, and Settling Plaintiffs here have sought from 3M, all damages that Settling Plaintiffs may be entitled to recover, including damages for injuries to all the State's Natural Resources; the costs of Restoration of the State's Natural Resources; damages, costs incurred, and abatement (including Remediation) arising from, based on, involving, or caused by PFAS Contamination; damages to State and local government-owned properties; economic damages; healthcare costs; lost State or Political Subdivision tax revenues due to damage to Real Property or Personal Property caused by and proximately resulting from PFAS Contamination or a Discharge of PFAS; damages and penalties related to potential misrepresentations or other conduct actionable under the CFA; restitution and disgorgement of 3M's profits; Punitive Damages; and other damages, fees, costs, and equitable relief.

37.    Under New Jersey law, Settling Plaintiffs sought Punitive Damages against 3M. The Supreme Court of New Jersey has recognized that Punitive Damages serve a public interest and are meant to punish and deter defendants for the benefit of society, not to compensate private parties. Being quintessentially and exclusively public in their ultimate orientation and purpose, it is consistent with the reasoning of the New Jersey Supreme Court that these Punitive Damages Claims are appropriate for prosecution by the Attorney General in a *parens patriae* action brought and ultimately settled on behalf of all the people of the State. As the Supreme Court of New Jersey has reasoned, the purpose of these Punitive Damages Claims is to vindicate common public interests, not to provide redress to injured individuals.

38.    Settlement of Punitive Damages Claims in this JCO resolves all such Claims and has been calculated to serve the public interest, have adequate punitive and deterrence effects, and fairly reflect the circumstances alleged here.

39.     Aside from Punitive Damages, 3M's payments to Settling Plaintiffs shall, among other things, compensate the State's Political Subdivisions, citizens, and residents for Claims related to PFAS Contamination and Discharges of PFAS that such Political Subdivisions, citizens, or residents otherwise might have against Released Entities.

40.     For purposes of resolving filed Claims and precluding filed or unfiled Claims with respect to PFAS Contamination and Discharges of PFAS in the State, except for Purely Private Claims, Settling Plaintiffs have interests and common public rights aligned with, are authorized by New Jersey law to represent the interests and rights of, and in fact do represent adequately the interests and rights of the State's Political Subdivisions and of the State's citizens and residents. As an enforceable, binding final judgment, the JCO is res judicata.

41.     This JCO resolves, among other Claims, (i) all Claims, other than Purely Private Claims, against all Released Entities with respect to PFAS Contamination of the State's Natural Resources and (ii) all Claims, other than Purely Private Claims, against all Released Entities with respect to PFAS Contamination and Discharges of PFAS in the State that migrated or was transported to or from any of the State's Natural Resources via any Pathway.

42.     The release of Claims, including the release of both compensatory damages and Punitive Damages, resolves Claims including those seeking to vindicate public interests and diffused public rights.

43.     Through the public notice and comment process set forth in Paragraphs 86 through 95, Settling Plaintiffs have engaged directly with members of the public concerning PFAS Contamination and Discharges of PFAS and Natural Resource injuries that have affected, or may affect, such members and their communities, and has sought and will continue to seek input from affected communities, stakeholders, and members of the public concerning the identification,

planning, and implementation of Restoration and PFAS Contamination Abatement Projects consistent with the purposes of this JCO.

## VI.   3M'S SETTLEMENT PAYMENTS AND OTHER OBLIGATIONS

44.   Settlement Payments.  3M shall pay the State, or cause the State to be paid on 3M's behalf, certain payments in full and complete satisfaction of all Released Claims and of any Credit-Eligible Claims ("Settlement Payments").  Consistent with the schedule set forth in Exhibit A and subject to adjustment based on Credit-Eligible Claims as set forth in Paragraph 45, the Settlement Payments shall be paid over a period of years as follows:

a.   Payment Schedule.  Within 30 Days after the Effective Date, 3M shall pay $100,000,000 by wire transfer to an escrow account (the "Escrow Account") with a mutually agreed-upon bank (the "Initial Payment").  On (or within 2 Working Days of) the same date in each of 22 consecutive calendar years, starting 3 years after the Initial Payment and ending 24 years after the Initial Payment, 3M shall make Settlement Payments in accordance with Exhibit A (the "Annual Payments") by wire transfer to the Escrow Account or, if this JCO has become final and non-appealable as of that date, by wire transfer pursuant to instructions provided by Settling Plaintiffs.  In addition, 3M shall pay a New Jersey Leadership Payment in one or more installments as described in Paragraph 44.e by wire transfer to the Escrow Account or, if this JCO has become final and non-appealable as of the installment's payment date, by wire transfer pursuant to instructions provided by Settling Plaintiffs.  Except as provided in Paragraph 44.b, the Initial Payment, the New Jersey Leadership Payment, the Costs, Fees, and Punitive Damages Payment, and the first six Annual Payments shall not be reduced, withheld, returned to 3M, or subjected to any credit under Paragraph 45.

44

b.      Until this JCO becomes final and non-appealable, the settlement funds in the Escrow Account shall earn interest and may not be used by the State for any purpose. If the approval of this JCO is overturned, remanded, vacated, or modified on appeal such that the JCO is void, is of no effect, or is deemed by the Parties, exercising good faith, to be materially altered, the settlement funds placed into the Escrow Account by 3M shall be returned to 3M within 30 Days, with any interest.  The Escrow Account shall be governed by an escrow agreement in substantially the same form as the form agreement appended as Exhibit B (or in a form to be mutually agreed to by the Parties).

c.      In furtherance of the public health, safety, and welfare, and to ensure that the environmental, consumer protection, and other purposes of this JCO are accomplished, the Parties have determined that the Settlement Payments to be paid over a period of years as set forth in Exhibit A shall be allocated as follows:

i.      $140,000,000 for Natural Resource Damages, of which:

(1)     $105,000,000 is for Natural Resource Damages arising out of or relating to Discharges from the Chambers Works Site;

(2)     $17,500,000 is for Natural Resource Damages arising out of or relating to PFAS Contamination or Discharges from AFFF; and

(3)     $17,500,000 is for Natural Resource Damages arising out of or relating to PFAS Contamination or Discharges from other sources;

ii.     $170,000,000 for PFAS Contamination Abatement Projects, of which:

(1)     $40,000,000 is for PFAS Contamination Abatement Projects arising out of or relating to Discharges from the Chambers Works Site;

45

(2)       $65,000,000 is for PFAS Contamination Abatement Projects arising out of or relating to PFAS Contamination or Discharges from AFFF; and

(3)       $65,000,000 is for PFAS Contamination Abatement Projects arising out of or relating to PFAS Contamination or Discharges from other sources;

iii.       the New Jersey Leadership Payment described in Paragraph 44.e; and

iv.       $40,000,000 for all Claims for costs, including direct and indirect costs, and including attorneys' fees and costs, that Settling Plaintiffs incurred on or before the Effective Date to investigate and litigate Claims concerning Covered Conduct or Covered Harm of a Released Entity; for Claims for Punitive Damages and penalties; or for other amounts not constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), and section 1.162-21(e)(4) of the Treasury Regulations thereunder ("Treas. Reg.") (the "Costs, Fees, and Punitive Damages Payment").

d.       The Initial Payment and each Annual Payment described in Paragraph 44.a shall be allocated among the categories of payments described in Paragraph 44.c and in accordance with Exhibit A.  The payments set forth in Paragraph 44.c.i(2) and Paragraph 44c.ii(2) are the sole and exclusive consideration paid by 3M to resolve the AFFF Litigation.

e.       New Jersey Leadership Payment.  3M agrees to a set of exceptional payments to the State to acknowledge and recognize New Jersey's unique role as a national leader in PFAS abatement and Remediation efforts and specifically as the first state in the country to conduct statewide occurrence studies of PFAS in Drinking Water Supplies, the

first state in the country to establish a maximum contaminant level for any PFAS substance, and the first state in the country to enter into the type of comprehensive PFAS settlement memorialized in this JCO (the "New Jersey Leadership Payment").

      i.     3M will pay the New Jersey Leadership Payment in one or more installments as described in Paragraph 44.e.ii through 44.e.iv.

      ii.    Within 60 Days after 3M makes its first payment for the Phase Two Action Fund pursuant to paragraph 6.8.6 and exhibit K of the Public Water System Class Settlement, if the Phase Two Cap described in paragraphs 6.8.6 and 6.8.10 of that Settlement does not apply, 3M shall pay the State, or cause the State to be paid on 3M's behalf, the first installment of the New Jersey Leadership Payment. The amount of that first installment will be the lesser of $75,000,000 or the PWS Shortfall. For purposes of this Paragraph 44.e, the "PWS Shortfall" equals the difference between such Phase Two Cap and the total amount of 3M's payments for the Phase Two Action Fund pursuant to paragraph 6.8.6 and exhibit K of the Public Water System Class Settlement.

      iii.   Within 1 year after the deadline for paying the first installment of the New Jersey Leadership Payment, if the Phase Two Cap described in Paragraphs 6.8.6 and 6.8.10 of the Public Water System Class Settlement does not apply, 3M shall pay the State, or cause the State to be paid on 3M's behalf, the second installment of the New Jersey Leadership Payment. The amount of that second installment will be the lesser of $25,000,000 or the amount calculated by subtracting $75,000,000 from 6 percent of the PWS Shortfall. The 6 percent figure, although more than double New Jersey's share of the total U.S. population, reflects

the disproportionate occurrence of PFAS Contamination in New Jersey and its Drinking Water Supplies relative to other states.

iv.    Within 2 years after the deadline for paying the first installment of the New Jersey Leadership Payment, if the sum of the first and second installments that 3M paid pursuant to Paragraph 44.e.ii and Paragraph 44.e.iii was less than $50,000,000, 3M shall pay the State, or cause the State to be paid on 3M's behalf, the difference between $50,000,000 and the sum of the first and second installments.  For the avoidance of doubt, if neither the first nor the second installment was paid because the Phase Two Cap described in paragraphs 6.8.6 and 6.8.10 of the Public Water System Class Settlement applied, the sum of the first and second installments shall be deemed to be zero.

v.    This Paragraph 44.e ensures that Settling Plaintiffs shall receive a New Jersey Leadership Payment that totals not less than $50,000,000 and not more than $100,000,000, with the precise amount based on the size of the PWS Shortfall and on New Jersey's disproportionately large fraction of the Nation's PFAS contamination and Discharges of PFAS.

vi.    Subject to Paragraph 44.e.vii, the Department has sole discretion to allocate the New Jersey Leadership Payment as it determines to be appropriate to protect the public health and safety and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS.  After the State receives each installment of the New Jersey Leadership Payment, Settling Plaintiffs shall notify 3M in writing as to how the Department has decided to allocate such installment.

48

vii.    Settling Plaintiffs may allocate up to, but not more than, $30,000,000 of the New Jersey Leadership Payment for any purpose described in Paragraph 44.c.iv.  The remainder of the New Jersey Leadership Payment constitutes restitution or remediation within the meaning of Code section 162(f)(2)(A) and Treas. Reg. section 1.162-21(e)(4) and shall be used exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(1).

f.    Any 3M payment that comes due under this Paragraph 44 or Exhibit A on a date in January, February, or March may be paid by 3M (or on 3M's behalf) on or before April 15 of the same calendar year.

45.    Credit for Non-Releasor Covered-Conduct Judgments, Awards, or Settlements.

a.    If a Released Entity pays a judgment, award, or settlement after the Effective Date to resolve a Credit-Eligible Claim that was filed before, on, or after the Effective Date, 3M shall have the right to reduce its next Annual Payment or its next Annual Payment after the sixth Annual Payment has been made, whichever is later, by credits equal to a certain percentage of the judgment, award, or settlement amount as described in this Paragraph 45.a. For the avoidance of doubt, application of credits under this Paragraph 45 reduces the total amount of Settlement Payments made by 3M to the State under this JCO.

i.    Absent the circumstances set forth below, 3M would insist upon a credit of 85 percent, which would give 3M the right to reduce its next Annual Payment or its next Annual Payment after the sixth Annual Payment has been made, whichever is later, by a credit equal to 85 percent of any judgment, award, or settlement that resolves a Credit-Eligible Claim.

49

ii.      3M agrees to adjust such credit to acknowledge and recognize New Jersey's unique role as a national leader in PFAS abatement and Remediation efforts and specifically as the first state in the country to conduct statewide occurrence studies of PFAS in Drinking Water Supplies, the first state in the country to establish a maximum contaminant level for any PFAS substance, and the first state in the country to enter into the type of comprehensive PFAS settlement memorialized in this JCO (the "New Jersey Leadership Credit"). The New Jersey Leadership Credit shall reduce 3M's credit by 35 percentage points. For the avoidance of doubt, the combination of 3M's credit and the New Jersey Leadership Credit means that, if a Released Entity pays a judgment, award, or settlement after the Effective Date to resolve a Credit-Eligible Claim that was filed before, on, or after the Effective Date, 3M shall have the right to reduce its next Annual Payment or its next Annual Payment after the sixth Annual Payment has been made, whichever is later, by a total credit equal to 50 percent of the judgment, award, or settlement amount.

b.      If credit amounts from Paragraph 45.a exceed the amount that 3M owes for its next Annual Payment after the sixth Annual Payment has been made, any credit amounts in excess of that Annual Payment shall be carried over and deducted from the next Annual Payment until such credit amounts have been fully satisfied.

c.      Clean-Docket Acceleration. If no Credit-Eligible Claim has been pending in any federal, state, or local action or proceeding (whether judicial, arbitral, regulatory, or administrative) at any time during the period between July 1, 2034, and July 1, 2036, inclusive, 3M will increase each of its next five Annual Payments by $5,000,000 and will decrease its final Annual Payment (or, if need be, its final Annual Payments) by

50

$25,000,000. For the avoidance of doubt, this Paragraph 45.c alone may alter the timing, but not the total amount, of 3M's payments to the State.

      d.      Notification. For 3M to receive a credit under Paragraph 45.a, a Released Entity shall provide Settling Plaintiffs with notice (pursuant to Section XXI) and an opportunity to meet and confer as soon as reasonably practicable after identifying a Claim that the Released Entity in good faith believes is a Credit-Eligible Claim. Notice and opportunity should be provided as follows:

      i.      Within 30 Days after receiving service of a newly filed Claim that a Released Entity in good faith believes is a Credit-Eligible Claim, a Released Entity shall notify Settling Plaintiffs;

      ii.      Within 30 Days after a Released Entity determines in good faith that a filed and served Claim is a Credit-Eligible Claim or within 30 Days after the Effective Date, whichever is later, a Released Entity shall notify Settling Plaintiffs;

      iii.      Within 30 Days after an unopposed motion for class certification is filed and served or a contested motion for class certification is granted, if the class action asserts a Claim that the Released Entity in good faith believes is a Credit-Eligible Claim, a Released Entity shall notify Settling Plaintiffs;

      iv.      Within 30 Days after a Claim that a Released Entity in good faith believes is a Credit-Eligible Claim results in a judgment or award against a Released Entity, a Released Entity shall notify Settling Plaintiffs;

      v.      At least 7 Days before settlement of a Claim that a Released Entity in good faith believes is a Credit-Eligible Claim, a Released Entity shall notify Settling Plaintiffs;

51

vi.    Promptly after any notification under this Paragraph 45.d, a Released Entity shall offer to meet (in person or electronically) and confer with Settling Plaintiffs; and

vii.    Notwithstanding Paragraph 45.d.i.-45.d.vi., if Released Entities fail to provide a timely notice, a timely offer to meet and confer, or a timely meeting, the Parties shall cooperate fully with each other and shall use all reasonable efforts to agree to a reasonable cure for that failure.  If the Parties do not reach such an agreement within 30 Days, any remaining dispute may be resolved pursuant to the dispute-resolution process provided for in Paragraph 99.

e.    Within 30 Days after receiving a request from any Released Entity that is the subject of a Claim that the Released Entity in good faith believes is a Credit-Eligible Claim, and subject to Settling Plaintiffs' reasonable determination that the Claim is a Credit-Eligible Claim, Settling Plaintiffs must provide a letter substantially in the form of Exhibit C (or in a form to be mutually agreed to by the Parties), which makes clear (i) that Releasors have fully and forever released all Released Entities from all Released Claims; (ii) the scope of 3M's obligations under this JCO and how they help address PFAS Contamination and Discharges of PFAS throughout the State; and (iii) the Releasors' efforts, using funds received from 3M under this JCO and funds derived from other sources, to promote compliance with federal and State regulatory limits for PFAS throughout New Jersey.

f.    The Parties reserve the right to seek a determination by the Court as to whether any Claim is a Credit-Eligible Claim.  If 3M withholds any portion of any Annual Payment as a credit under this Paragraph 45 and the Court later determines that the

52

corresponding Claim was not a Credit-Eligible Claim, and that determination has become final and non-appealable, 3M shall pay the portion of the Annual Payment it previously withheld to Settling Plaintiffs within 30 Days of such determination, with such payment to be made by wire transfer pursuant to instructions provided by Settling Plaintiffs.

46.     Natural Resource Damages.  Pursuant to Paragraph 44.c.i and Exhibit A, and subject to any credits under Paragraph 45, $140,000,000 of the Settlement Payments shall be allocated for Natural Resource Damages.  The Natural Resource Damages payments derived from this JCO shall pay for costs incurred by the State to repair, Restore, or replace damaged, impaired, injured, or lost Natural Resources of the State, pay for costs incurred by the State to permanently protect the Natural Resources of the State, or pay the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards against Non-Released Entities relating to Natural Resource Damages, including attorneys' fees, consultants' and experts' fees, other litigation costs, and interest.  For the avoidance of doubt, 3M's payments made pursuant to Paragraph 44.c.i for Natural Resource Damages satisfy all obligations that 3M might otherwise have under applicable law to perform or fund any activities to Restore any Natural Resources damaged by any PFAS Contamination or Discharge of PFAS that may have occurred at any Site or anywhere else within the boundaries of the State before the Effective Date.  The Natural Resource Damages payments derived from this JCO constitute restitution or remediation within the meaning of Code section 162(f)(2)(A) and Treas. Reg. section 1.162-21(e)(4).  Settling Plaintiffs shall use the Natural Resource Damages payments derived from this JCO exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(1).

53

47.    PFAS Contamination Abatement Projects.  Pursuant to Paragraph 44.c.ii and Exhibit A, and subject to any credits under Paragraph 45, $170,000,000 of the Settlement Payments shall be allocated for PFAS Contamination Abatement Projects.  The constraints on the use of the payments for PFAS Contamination Abatement Projects derived from this JCO are described in Section VII of this JCO.  Settling Plaintiffs recognize that, alongside Natural Resource Damages, PFAS Contamination Abatement Projects can be the best and most cost-efficient means to remedy all forms of Covered Conduct and Covered Harm, including harms that the State's citizens and residents may have suffered as members of the consumer public.  The payments for PFAS Contamination Abatement Projects derived from this JCO constitute restitution or remediation within the meaning of Code section 162(f)(2)(A) and Treas. Reg. section 1.162-21(e)(4).  Settling Plaintiffs shall use payments for PFAS Contamination Abatement Projects derived from this JCO exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(1).

48.    3M represents and warrants that it does not currently own, Operate, manage, or control any Site in the State, and that, to the best of 3M's current knowledge based on a review of documents reasonably available to 3M, Exhibit D lists all sites (*i.e.*, properties and facilities) that 3M formerly owned, Operated, managed, or controlled in the State.  3M also represents and warrants that, to the best of 3M's current knowledge based on a review of documents reasonably available to 3M, 3M is currently conducting a PFAS Remedial Investigation or Remedial Action and has identified itself to the Department as a person responsible for conducting Remediation at only the Belle Mead, Flemington, and Freehold manufacturing-facility sites listed in Exhibit D and not at any other site listed in Exhibit D.  Settling Plaintiffs represent and warrant that, to the best of their current knowledge based on a review of documents reasonably available to them, 3M's

54

representations and warranties set forth in this Paragraph 48 are complete and accurate. With respect to the Belle Mead, Flemington, and Freehold sites formerly owned or Operated by 3M, 3M shall continue to Remediate PFAS in accordance with its obligations under applicable State and federal law. With respect to a site listed in Exhibit D, (i) 3M shall satisfy any obligations that it has under applicable State and federal law to Remediate any hazardous substance that is not PFAS; and (ii) 3M shall satisfy any obligations that it has under applicable State and federal law to Remediate PFAS Discharged from such site (other than the Belle Mead, Flemington, and Freehold manufacturing-facility sites) only if (a) the Discharge of PFAS from such site occurred when 3M owned, Operated, managed, or controlled the site; (b) PFAS is detected in the soil or Waters Of The State at such site at a level exceeding an applicable State or federal environmental standard or presenting an imminent and substantial endangerment to New Jersey citizens' or residents' human health or safety or to the Environment; (c) 3M cannot demonstrate that the presence of PFAS that was Discharged from such site in the soil or the Waters Of The State at such site was known to Settling Plaintiffs as of the Effective Date; and (d) a Settling Plaintiff demonstrates that 3M knew, as of the date (following the public notice and comment process set forth in Paragraphs 86 through 95) on which the Parties moved for Court approval and entry of this JCO, based on 3M's review of documents reasonably available to 3M, that 3M's representations and warranties in this Paragraph 48 were materially inaccurate as to such site or that PFAS that had been Discharged from such site while 3M owned, Operated, managed, or controlled such site subsequently had been detected at a level exceeding an applicable State or federal environmental standard in the soil or the Waters Of The State at such site. For the avoidance of doubt, however, this JCO resolves for all Released Entities all Claims for Restoration, Natural Resource Damages, and Punitive Damages Claims arising from, based on, involving, or caused by any PFAS Contamination or Discharge of

PFAS anywhere in the State or within the State's jurisdiction. The Parties agree that Exhibit D will be finalized prior to the Court's approval of this JCO.

49.    3M covenants not to sue or assert any Claim against Settling Plaintiffs or any Government Entity of the State or of any of the State's Political Subdivisions concerning the matters addressed in the Litigations, the Statewide PFAS Directive, or this JCO, with the exception of the enforcement of the terms of this JCO, unless 3M is involved in litigation concerning a Claim-Over or is the subject of a Claim brought by a Non-Released Entity for which a Settling Plaintiff or any department, agency, authority, or instrumentality of the State may be liable. The 3M covenant described in this Paragraph 49 does not apply where any Releasor sues or takes judicial, administrative, criminal, or other action against any Released Entity related to anything other than Covered Conduct or Covered Harm. For the avoidance of doubt, nothing in this Paragraph 49 bars a Released Entity from asserting a counterclaim against a Government Entity of any of the State's Political Subdivisions if such Government Entity sues or takes judicial, administrative, criminal, or other action against such Released Entity.

## VII.    PFAS CONTAMINATION ABATEMENT FUNDING

50.    Subject to Paragraph 51, to assist the State's efforts in abating PFAS Contamination in New Jersey, "PFAS Contamination Abatement Funding" may include funding toward environmental, consumer protection, and other projects such as:

a.    Taking actions to assist community water systems in installing, operating, and maintaining treatment sufficient to reduce concentrations of PFAS to applicable drinking-water standards;

56

b.      Taking actions to assist non-transient non-community water systems in installing, operating, and maintaining treatment sufficient to reduce concentrations of PFAS to applicable drinking-water standards;

c.      Taking actions to assist transient non-community water systems in installing, operating, and maintaining treatment sufficient to reduce concentrations of PFAS to applicable drinking-water standards;

d.      Taking actions to assist State-owned Public Water Systems in installing, operating, and maintaining treatment sufficient to reduce concentrations of PFAS to applicable drinking-water standards;

e.      Taking actions to assist owners of Private Potable Wells in installing, operating, and maintaining POET Systems or other treatment sufficient to reduce concentrations of PFAS to applicable drinking-water standards;

f.      Paying Spill Fund Claims and any other liability that the Spill Fund has incurred, is incurring, or may continue to incur as a result of PFAS Contamination or Discharges of PFAS;

g.      Taking actions to support the cleanup and removal of PFAS Contamination;

h.      Investigating and identifying concentrations of PFAS associated with Discharges;

i.      Testing Private Potable Wells to identify concentrations of PFAS;

j.      Connecting to a Public Water System privately owned structures whose residents currently rely on a Private Potable Well;

k.      Providing interim water supplies to residents whose water supplies were contaminated due to PFAS Contamination or Discharges of PFAS;

57

l.      Taking actions to assist in installing, operating, and maintaining Treatment Works to reduce concentrations of PFAS associated with PFAS Contamination or Discharges of PFAS;

m.      Taking actions to support Remedial Investigations, Remedial Actions, cleanup, or removal with respect to the impact on Groundwater, Surface Water, sediments, porewater, soils, and Pathways, of PFAS Contamination or Discharges of PFAS;

n.      Taking actions to support Remedial Investigations, Remedial Actions, cleanup, or removal with respect to the impact on Groundwater, Surface Water, sediments, porewater, soils, and Pathways, of PFAS Contamination or Discharges of PFAS resulting from offsite placement or disposal of PFAS-containing Sludge, including residuals from any Wastewater Treatment Plant;

o.      Taking actions to protect against or address any imminent and substantial endangerment to New Jersey residents' human health or safety, or to the Environment, arising from, based on, involving, or caused by PFAS Contamination or Discharges of PFAS;

p.      Identifying, investigating, collecting, disposing of, or replacing with a PFAS-free alternative the AFFF stored by an airport, fire department, or Firefighting Training Academy;

q.      Taking actions to assist any Person who owns, Operates, manages, or controls an airport, fire department, Firefighting Training Academy, Hazardous Waste Facility, Private Potable Well, Site, Solid Waste Facility, Treatment Works, Wastewater Treatment Plant, Water Purveyor, or Water System in commencing or implementing an abatement project related to PFAS Contamination or Discharges of PFAS;

58

r.      Reimbursing any Settling Plaintiff or other Government Entity of the State or of any of the State's Political Subdivisions for funding distributed through any revolving fund, spill cleanup fund, loan, or grant program of any kind for addressing PFAS Contamination, regardless of the source of such funding;

s.      Conducting toxicology, bioaccumulation, or bioavailability studies of any PFAS;

t.      Engaging consultants or other professionals to assist the Department in carrying out its obligations under this JCO; and

u.      Taking actions to educate the New Jersey public on minimizing their exposure to PFAS, including through consumer products.

51.    Settling Plaintiffs agree that such PFAS Contamination Abatement Funding shall be administered by the Department.  The Department, in allocating PFAS Contamination Abatement Funding, shall prioritize taking actions to treat PFAS in Public Water Systems and Private Potable Wells serving residential properties, schools, and child-care facilities.  In allocating funds, the Department also shall use the PFAS Contamination Abatement Funding derived from this JCO exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(1).  Except as specifically provided herein, nothing in this Section VII shall alter the Department's sole discretion to use the funds paid pursuant to Paragraph 44.c.ii and Exhibit A as it determines to be appropriate to protect the public health and safety and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS.  The Parties acknowledge the Department's sole discretion to allocate and disburse PFAS Contamination Abatement Funding

(including, in the Department's sole discretion, reallocating funds within Paragraph 44.c.ii) and to identify specific PFAS Contamination Abatement Projects to address PFAS Contamination.

52.     The Department shall establish an application process for interested Persons to receive PFAS Contamination Abatement Funding provided under this JCO.  Such application process shall require the applicant, prior to receiving any distribution or payment of PFAS Contamination Abatement Funding provided under this JCO, to affirmatively acknowledge in writing that certain PFAS-related Claims that the applicant otherwise might bring or litigate against 3M or other Released Entities are precluded, as described in Paragraph 40's discussion of res judicata and elsewhere in this JCO.

53.     Subject to Paragraph 48, 3M's payments made pursuant to Paragraph 44.c.ii, Paragraph 45, and Exhibit A to fund PFAS Contamination Abatement Projects satisfy all obligations that 3M might otherwise have under State or federal law to perform or fund any activities to Remediate any PFAS Contamination or Discharge of PFAS that may have occurred at any Site or anywhere else within the boundaries of the State before the Effective Date.

## VIII.    SETTLING PLAINTIFFS' RELEASE AND COVENANT NOT TO SUE

54.     The Release.  As of the Effective Date, in consideration of this JCO and other consideration identified herein, the Releasors, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State government, and acting in all Settling Plaintiffs' capacities as described in Paragraph 9, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, fully and forever release all Released Entities from all Released Claims and fully discharge all Released Claims against all Released Entities.  The releases provided for in this JCO (individually and collectively, the "Release") extend to Released Claims that the Releasors

60

do not know or suspect to exist in their favor as of the Effective Date, regardless of whether they could have materially affected the terms of this JCO. It is the intention of this JCO that the definition of "Release" be as broad, expansive, and inclusive as possible, so as to give the Released Entities the broadest possible bar against any liability in any way arising from, based on, involving, or caused by any Covered Conduct or Covered Harm and extend to the full extent of the power of the State, the Governor, and the Attorney General to release Claims, to the maximum extent allowable by law. This JCO shall be a complete bar to any Released Claim. By the State exercising its authority and the Court entering this JCO, any Claim (regardless of the identity of the Person asserting the Claim) arising from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's jurisdiction and any Claim asserted by a Government Entity of the State or of any of the State's Political Subdivisions against any Released Entity in any way arising from, based on, involving, or caused by any Covered Conduct or Covered Harm is released, barred, and precluded.

55.    The Attorney General's Power and Authority to Release. By executing this JCO, the Attorney General represents that he (i) has the power and authority needed to enter into this JCO and to fully release all Released Claims on behalf of all Releasors and (ii) does in fact release all such Released Claims. For the avoidance of doubt, all Released Claims that can be released by any officer of the State can be fully released by the Attorney General as the State's chief legal officer.

56.    The Covenant Not To Sue. As of the Effective Date, and in consideration of this JCO and other consideration identified herein, the Releasors absolutely, unconditionally, and irrevocably covenant not at any time hereafter, whether directly or indirectly or individually or

61

collectively, to sue or take administrative action or commence, bring, file, assign, or prosecute (or to cause, assist, or permit to be commenced, brought, filed, assigned, or prosecuted), or to otherwise seek to establish liability for, any Released Claim against any Released Entity in any forum whatsoever, or any Claim arising from, based on, involving, or caused by any act, error, omission, event, or thing within the scope of the Release against any Released Entity as to any Covered Conduct or Covered Harm (the "Covenant Not To Sue"). For the avoidance of doubt, the term "Covenant Not To Sue" includes any Claim that could be asserted against any Released Entity by any Releasor—including in any corporate, personal, direct, representative, derivative, class, or individual capacity—in any federal, state, or local action or proceeding (whether judicial, arbitral, regulatory, or administrative) to recover damages or funds for any Person who owns, Operates, manages, or controls any airport, fire department, Firefighting Training Academy, Hazardous Waste Facility, Private Potable Well, Site, Solid Waste Facility, Treatment Works, Wastewater Treatment Plant, Water Purveyor, or Water System in the State or within the State's jurisdiction. It is the intention of this JCO that the definition of "Covenant Not To Sue" be as broad, expansive, and inclusive as possible.

57. **Exclusive Remedy.** The relief provided for in this JCO shall be the sole and exclusive remedy for all Releasors with respect to any Released Claim, and the Released Entities shall not be subject to liability or expense of any kind with respect to any Released Claim other than as set forth in this JCO.

58. The Release and the Covenant Not To Sue described in this Section VIII shall take effect upon the Effective Date.

59. The Release and Covenant Not To Sue described in this Section VIII extend only to Released Entities and not to any other Person.

62

60.    The Release and Covenant Not To Sue described in this Section VIII do not pertain to any matters other than those expressly stated.

## IX.    RESERVATIONS AND FUTURE LITIGATION

61.    Nothing in this JCO shall be construed to preclude Settling Plaintiffs from taking any action they deem necessary or appropriate to protect public health and safety and the Environment, and to enforce the State's environmental laws, to the extent those actions are not inconsistent with this JCO or any resolution of liability effected thereby.  For the avoidance of doubt, no action or enforcement that any Settling Plaintiff takes pursuant to this Paragraph 61 can alter in any way any Releasor's obligations under the Dismissals, the Release, the Covenant Not To Sue, or any other provision of this JCO.

62.    Settling Plaintiffs reserve, and this JCO is without prejudice to, all rights against 3M and defenses to actions brought by 3M against any Settling Plaintiff concerning all matters not addressed in this JCO.

63.    3M reserves, and this JCO is without prejudice to, all rights against Releasors and defenses to actions brought by any Releasor against 3M concerning all matters not addressed in this JCO.

64.    Nothing in this JCO shall be construed, nor is intended by the Parties, to limit the right of any Class-Member Public Water System to obtain its designated recovery under the Public Water System Class Settlement.

65.    Nothing in this JCO shall be construed, nor is intended by the Parties, to create any rights in, or to grant any cause of action to, any Non-Released Entity, provided, however, that nothing in this Paragraph 65 affects the enforceability of the Release, obligations, or covenants contained herein.

63

66. Nothing in this JCO shall be construed, nor is intended by the Parties, to limit in any way the liability of any Non-Released Entity or to diminish the right of any Releasor to pursue Claims against any such Non-Released Entity.

67. Except as expressly set forth in this JCO, nothing in this JCO shall waive or impair any rights or defenses that any Released Entity or Releasor may have.

## X.    CONTRIBUTION PROTECTION

68. The Parties agree and the Court by entering this JCO intends that:

a.    The Settlement Payments made under this JCO shall be the sole payment made by the Released Entities to the Releasors arising from, based on, involving, or caused by Covered Conduct or Covered Harm (or conduct that would be Covered Conduct or Covered Harm if engaged in by a Released Entity);

b.    Claims by Releasors against Non-Released Entities should not result in additional payments by Released Entities, whether through contribution, indemnification, or any other means; and

c.    This JCO meets the requirements for providing contribution protection to 3M from contribution actions under CERCLA, the Spill Act, the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -61, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, the Uniform Contribution Among Joint Tortfeasors Act, and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

69. The provisions of this Section X are intended to be implemented consistent with these principles.

70.    This JCO constitutes a good-faith settlement of the Releasors' Released Claims against the Released Entities.  The Releasors stipulate that they give all Dismissals, the Release, and the Covenant Not To Sue provided in this JCO in good faith pursuant to the State's Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -61.  The Parties further stipulate that this JCO and the Dismissals, the Release, and the Covenant Not To Sue provided herein were entered into in good faith based upon arm's-length negotiation among the Parties and their counsel.  The Parties further stipulate that the Dismissals, the Release, and the Covenant Not To Sue provided in this JCO are intended to and shall serve as a bar to all cross-claims, counterclaims, and complaints for contribution which have been brought or may be brought against the Released Entities arising from, based on, involving, or caused by Covered Conduct or Covered Harm.

71.    This JCO constitutes a judicially approved settlement for purposes of section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).  By entering this JCO, the Released Entities are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), for "matters addressed" in this JCO.  The "matters addressed" in this JCO are all the Released Claims set forth in the Release in Paragraph 54.

72.    Upon entry by the Court, this JCO shall constitute a judicially approved settlement within the meaning of N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2) and a final judgment resolving the Chambers Works Litigation and the Parlin Litigation with respect to 3M (but not as to other defendants), for purposes of providing 3M with protection from contribution actions addressing State Trustee-settled Natural Resource Damages.  The Parties agree and the Court by entering this JCO intends that 3M has resolved its liability for Natural Resource Damages to the State's Natural Resource Trustee.  To the maximum extent allowable by law, 3M shall not

65

be liable for Claims for contribution for Natural Resource Damages, including for contribution actions under N.J.S.A. 58:10-23.11f.a.(2)(a), 42 U.S.C. § 9613(f), and 42 U.S.C. § 9622(h)(4).

73.     As set forth in Paragraph 82, Releasors acknowledge that 3M's making the payments set forth in Paragraphs 44 through 47 and Exhibit A, including funding PFAS Contamination Abatement Projects, fully satisfies 3M's Remediation obligations, including liability to the State for Remediation or associated costs, for any PFAS Contamination or Discharge of PFAS, including any PFAS Contamination at or Discharge of PFAS from the Chambers Works Site, the Parlin Site, or the West Deptford Site. As a result, upon entry by the Court, this JCO shall constitute a judicially approved settlement within the meaning of N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2) for purposes of providing protection from contribution actions or contribution Claims related to any PFAS Contamination or Discharge of PFAS, and from contribution actions or contribution Claims related to any PFAS Contamination Abatement Project or to any Site, all to the maximum extent provided for in N.J.S.A. 58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2) (collectively, the "Contribution Claims"). To the maximum extent allowable by law, 3M shall not be liable for any Contribution Claims, including for contribution actions or contribution Claims under N.J.S.A. 58:10-23.11f.a.(2)(a), 42 U.S.C. § 9613(f)(2), and 42 U.S.C. § 9622(h)(4).

74.     This JCO will resolve the liability of 3M to Settling Plaintiffs for the purpose of providing contribution protection to 3M and other Released Entities from contribution actions under CERCLA, the Spill Act, the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-l to -61, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, or any other statute, regulation, order, or common-law principle related to the causes of action that were or could have been pleaded in the Litigations or the Statewide PFAS Directive or matters addressed in this JCO. The Parties

66

agree and the Court by entering this JCO finds that 3M is entitled to protection from contribution actions pursuant to section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), the Spill Act, N.J.S.A. 58:10-23.11f.a.(2)(b), and any other statute, regulation, order, or common-law principle that provides contribution rights against any Released Entity with regard to the subject matter of the Litigations or the Statewide PFAS Directive or matters addressed in this JCO. In any action in which a Non-Released Entity asserts a Claim-Over against a Released Entity, Settling Plaintiffs shall not oppose any Released Entity's assertion that the Released Entities have paid through this JCO their equitable share of damages for Covered Conduct and Covered Harm.

75.    With respect to any Claim, Claim-Over, or contribution action not covered by Paragraphs 70 through 74:

a.    To the extent that, on or after the Settlement Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on Claim-Over or a release from such Non-Released Entity in favor of the Released Entities (that is equivalent in nature and scope to the Release contained in this JCO) of any Claim-Over. The obligation to obtain the prohibition or release required by this Paragraph 75.a is a material term of this JCO.

b.    If any Releasor obtains a judgment with respect to non-Party Covered Conduct or Covered Harm against a Non-Released Entity that does not contain a prohibition like that described in Paragraph 75.a, or any Releasor files a Non-Party Covered Harm Claim against a Non-Released Entity in bankruptcy, or a Releasor is prevented for

any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Paragraph 75.a, and such Non-Released Entity asserts a Claim-Over against a Released Entity, 3M shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct or Covered Harm to Releasors or to Non-Released Entities than the amounts owed by 3M under this JCO:

      i.    3M shall notify that Releasor of the Claim-Over within 60 Days after the assertion of the Claim-Over or 60 Days after the Effective Date, whichever is later;

      ii.    3M and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that they are not required to pay more with respect to Covered Conduct or Covered Harm than the amounts owed by 3M under this JCO;

      iii.    That Releasor and 3M shall take steps sufficient and permissible under the law of the State to hold Released Entities harmless from the Claim-Over and ensure that Released Entities are not required to pay more with respect to Covered Conduct or Covered Harm than the amounts owed by 3M under this JCO. Such steps may include, where permissible:

      (1)    Filing of motions to Dismiss or such other appropriate motion by any Released Entity, and supported by Releasors, in response to any Claim filed in litigation or arbitration;

      (2)    Reduction of that Releasors' Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to

the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(3)    Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(4)    Return of monies paid by 3M to that or any other Releasor under this JCO to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(5)    Payment of monies to 3M by that Releasor to ensure that Released Entities are held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(6)    Credit to 3M under this JCO to reduce the overall amounts to be paid under the JCO such that 3M is held harmless from the Claim-Over; and

(7)    Such other actions as that Releasor and 3M may devise to hold any Released Entity harmless from the Claim-Over.

iv.    The actions of that Releasor and 3M taken pursuant to Paragraph 75.b.iii must, in combination, ensure that the Released Entities are not required to pay more with respect to Covered Conduct or Covered Harm than the amounts owed by 3M under this JCO.

v.    In the event of any dispute over the sufficiency of the actions taken pursuant to Paragraph 75.b.iii, that Releasor and 3M may seek review by this Court. If this Court's actions do not result in Released Entities being held fully harmless, 3M shall have a claim for breach of this JCO by Releasors, with the remedy being

payment of sufficient funds to hold the Released Entities harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that 3M may have.

76.    3M expressly reserves all rights, including any right to indemnification and contribution (including indemnification and contribution pursuant to an insurance contract for 3M's payment obligations under this JCO), defenses, Claims, demands, and causes of action that 3M may have concerning any matter, transaction, or occurrence, whether or not arising out of the subject matter of the Litigations or the Statewide PFAS Directive, whether before or after the final resolution of a site remediation plan, against any Person not a Party to this JCO, with the following exceptions:

a.    3M shall not seek contribution to recover any amount relating to the Chambers Works Site or the Chambers Works Litigation that 3M has paid pursuant to Paragraph 44.c.i(1) or Paragraph 44.c.ii(1) from any defendant in the Chambers Works Litigation that has entered into a settlement resolving the Chambers Works Litigation against such defendant unless such defendant has filed against a Released Entity a Claim, Claim-Over, or contribution action relating to the Chambers Works Site.

b.    3M shall not seek contribution to recover any amount that 3M has paid pursuant to Paragraph 44.c from any Releasor, from any Government Entity of the State or of any of the State's Political Subdivisions, or from any Non-Released Entity that pursuant to this JCO has fully and forever released all Released Entities from all Released Claims, provided, however, that if, notwithstanding this Paragraph 76.b, such a Non-Released Entity brings a Claim, Claim-Over, or contribution action against a Released Entity, 3M

expressly reserves all rights to seek contribution to recover as an offset from such Non-Released Entity any amount that 3M has agreed to pay pursuant to Paragraph 44.c.

c.    Nothing about 3M's reservation of contribution rights in this Paragraph 76 shall prohibit or impair Settling Plaintiffs or any Government Entity of the State from resolving Claims against any Non-Released Entity, including providing such Non-Released Entity with contribution protection that limits 3M's ability to seek contribution or indemnity from such Non-Released Entity (except for indemnification or contribution pursuant to an insurance contract for 3M's payment obligations under this JCO).

77.    Nothing in this JCO shall be construed, nor is intended by the Parties, to limit in any way the liability of any Person that is not a Released Entity.

78.    Nothing in this JCO shall be construed, nor is intended by the Parties, to create any rights in, or to grant any cause of action to, any Person not a Party to this JCO. The preceding sentence shall not be construed to waive or nullify any rights that any Person not a Party to this JCO may have under applicable State or federal law.

## XI.    NO FINDING OR ADMISSION OF LIABILITY

79.    Nothing in this JCO shall be considered an admission by any Released Entity, or a finding by Settling Plaintiffs or this Court, of any wrongdoing, fault, or liability on the part of any Released Entity. Nothing in this JCO shall be considered to acknowledge any validity to the Claims asserted, or any weakness in the defenses asserted, in the Litigations; or to acknowledge any scientific, medical, factual, or other bases asserted in support of any of those Claims. Nothing in this JCO, any negotiations, statements, communications, proceedings, filings, or orders relating thereto, or the fact that the Parties entered into the JCO and settled the Released Claims against the Released Entities shall be construed, deemed, or offered as an admission or concession by any

71

Party or as evidentiary, impeachment, or other material available for use or subject to discovery in any suit, action, or proceeding, except (i) as required or permitted to comply with or enforce the terms of this JCO, or (ii) in connection with a defense based on res judicata, claim preclusion, collateral estoppel, issue preclusion, release, or other similar theory asserted by any Released Entity. Nothing in this JCO is intended to limit any right, Claim, or defense that any Released Entity may have with respect to any litigation or Claim brought by a Non-Released Entity.

80.    This JCO shall not be used as evidence in any other litigation or future proceedings other than (a) a proceeding to enforce the terms of this JCO; (b) any other proceeding involving this JCO's contribution-protections provisions; or (c) any contribution action brought by any Released Entity.

81.    No part of this JCO, nor the JCO as a whole, nor any activity taken by any Released Entity pursuant to this JCO, shall constitute, nor shall be interpreted or used as, an admission of wrongdoing, fault, liability, law, or fact, nor shall this JCO or any Section or Paragraph thereof be admissible in any proceeding or hearing as an admission, except to the extent necessary for a Released Entity or a Settling Plaintiff to enforce a provision of this JCO or to establish the scope of this JCO's Release or contribution-protection provisions.

## XII.    EFFECT OF SETTLEMENT

82.    The Parties agree and the Court by entering this JCO finds that 3M's making the payments set forth in Paragraphs 44 through 47 and Exhibit A, including funding the PFAS Contamination Abatement Projects, compensates the public for at least 3M's fair share of any and all Natural Resource Damages caused by any PFAS Contamination or Discharge of PFAS, and satisfies fully 3M's Remediation obligations related to any PFAS Contamination or Discharge of PFAS. Therefore, the Parties agree and the Court by entering this JCO finds that the compensation

72

and commitments provided in the JCO constitute at least 3M's fair share of the Natural Resource

Damages, Remediation obligations, and other damages related to any Covered Conduct or Covered

Harm with respect to PFAS, PFAS Contamination, and Discharges of PFAS.

83.　　The Parties agree and the Court by entering this JCO finds that 3M's payments set

forth in Paragraphs 44 through 47 and Exhibit A, including funding the PFAS Contamination

Abatement Projects, are not intended to and do not extinguish Settling Plaintiffs' Claims against

any Non-Released Entity for Natural Resource Damages and Remediation obligations.

Furthermore, the Parties agree and the Court by entering this JCO finds that nothing herein is

intended to modify any Non-Released Entity's potential joint and several liability for any and all

Claims in any way arising from, based on, involving, or caused by any PFAS Contamination or

Discharge of PFAS, including Natural Resource Damages and Claims for Remediation.

84.　　To the extent any Non-Released Entity seeks to contest the effect of this JCO,

Settling Plaintiffs shall cooperate with the defense in any such action brought against any Released

Entity by providing documents and assistance with discovery to the extent such requests for

assistance are reasonable.

## XIII.　JUDICIAL CONSENT ORDER PROCESS

85.　　This JCO has been subject to public notice and comment as required by Paragraphs

86 through 95.

86.　　In accordance with N.J.S.A. 58:10-23.11e2, Settling Plaintiffs published in the *New*

*Jersey Register* and on the Department's website the names of the Litigations and the Statewide

PFAS Directive, the names of the Parties to this proposed JCO, the location of the properties on

which the Department had notice at the time of the publication that Discharges of PFAS had

occurred, and a summary of the terms of this proposed JCO, including the amount of monetary

payments to be made. The Department provided written notice of this proposed JCO, including the information listed above, to certain other parties in the Litigations and to other potentially responsible parties of whom the Department had notice at the time of the publication.

87.     Plaintiffs also published a copy of this proposed JCO on the Department's website and arranged for notice to certain known interested persons, as described in this Section XIII.

88.     In addition to the contents described in Paragraph 86, Plaintiffs' notices explained that a copy of this proposed JCO was available on the Department's website, explained that there were 60 Days to comment on this proposed JCO, and summarized this proposed JCO's res judicata effects as an enforceable, binding final judgment that will preclude certain Claims in future litigation.

89.     The Department arranged for written notice of this proposed JCO to all Political Subdivisions.

90.     The Department arranged for written notice of this proposed JCO to counsel for (i) all parties in the Chambers Works Litigation; (ii) all parties in the Parlin Litigation; (iii) all plaintiffs (including plaintiff-intervenors) residing in the State (except for those bringing Claims only for Personal Injury or for Property Damage) and all defendants (including defendant-intervenors) in the AFFF Litigation, (iv) all respondents to the Statewide PFAS Directive; and (v) to the extent that 3M identified them and provided the State with contact information for them, all plaintiffs in PFAS-related cases pending against 3M at the time of the publication described in Paragraph 86 in any State or federal court in New Jersey.

91.     To the extent practicable, the Department assisted 3M in identifying other known interested Persons to whom written notice of this proposed JCO could be sent and contact information for such Persons. To the extent practicable, the Department then arranged for written

notice of this proposed JCO to Persons (i) who 3M identified, (ii) for whom 3M provided contact information to the State, and (iii) who 3M in good faith believed owned, Operated, managed, or controlled an airport, fire department, Firefighting Training Academy, Hazardous Waste Facility, Solid Waste Facility, Treatment Works, Wastewater Treatment Plant, Water System, or potentially relevant industrial facility in the State or within the State's jurisdiction.

92.    In fulfillment of N.J.S.A. 58:10-23.11e2, the Parties provided written notice of this proposed JCO by:

    a.    3M publishing notice in each of the following newspapers, in print or, where such newspaper is digital-only, digitally:  Asbury Park Press, Atlantic City Press, Bergen Record, Burlington County Times, Courier Post, New Jersey Herald; South Jersey Times, and Star Ledger; and

    b.    The Department publishing a copy of the *New Jersey Register* notice on the Contaminated Site Remediation and Redevelopment Program's website and the Office of Natural Resource Restoration's website, which the public can access at http://www.nj.gov/dep/srp/legal/ and https://dep.nj.gov/nrr/proposed-settlements/, respectively.

93.    The notice described in this Section XIII is deemed compliant with the notice requirement of N.J.S.A. 58:10-23.11e2.

94.    Upon conclusion of the 60-Day comment period set forth in Paragraph 88, the Department notified 3M that:

    a.    the Department received no comments that disclosed facts or considerations that indicated to the Department, in its sole discretion, that this JCO was inappropriate, improper, or inadequate; or

75

b.    the Department received comments that disclosed facts or considerations that indicated to the Department, in its sole discretion, that this JCO required amendment or was inappropriate, improper, or inadequate.

95.    If, as set forth in Paragraph 94.b, the Department notified 3M that it believed this JCO required amendment or should be voided, the Department provided 3M with (i) the specifics of those draft amendments and a revised version of this JCO incorporating the amendments or (2) a notification that the Department had determined preliminarily that this JCO should be voided. 3M had an opportunity to respond to the Department's revised version of this JCO incorporating the amendments or to the Department's preliminary determination that this JCO should be voided, and the Department considered 3M's response with respect to the amended JCO or objections to the Department's preliminary determination that this JCO should be voided.  The Department did not make any final decision that this JCO should be voided until the Department worked in good faith with 3M to address the public comments that the Department received.

## XIV.   GENERAL PROVISIONS

96.    This JCO will constitute the final, complete, and exclusive agreement and understanding between Settling Plaintiffs and 3M with respect to the settlement embodied in this JCO.  Settling Plaintiffs and 3M agree and acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those that are expressly contained in this JCO.  Settling Plaintiffs and 3M agree not to disclose any pre-Settlement Date draft of this JCO or any of its Exhibits except pursuant to valid legal process or if required by a court of competent jurisdiction.

97.    This JCO shall be governed and interpreted under the laws of the State of New Jersey, without regard to conflict-of-law principles.

76

98.    This JCO shall be binding on 3M, its successors, assignees, and any trustee in bankruptcy or receiver appointed pursuant to a proceeding in law or equity.

99.    Dispute Resolution. Any dispute between any Settling Plaintiff and 3M arising out of, based on, or involving this JCO shall be submitted to mediation on an expedited basis before a retired Judge of a New Jersey State Court or New Jersey Federal Court to be mutually agreed upon by the Parties. To the extent such mediation is unsuccessful within 90 Days, any Party may seek a judicial resolution of the dispute from this Court. In such an event, this JCO shall be interpreted in accordance with the terms of this JCO and the standards governing the interpretation of contracts under the laws of the State of New Jersey.

100.    3M and Settling Plaintiffs agree to cooperate in good faith to effectuate the terms of this JCO, including the scope of the Release and all other provisions of Section VIII, assist with the administration of the JCO, and aid in any public-notice requirements as set forth in Section XIII.

101.    The Parties agree, upon entry of this JCO, not to contest the terms of this JCO, except that the Parties do not waive their rights to contest the interpretation or application of such terms in an action or proceeding brought to enforce this JCO pursuant to the dispute-resolution process provided for in Paragraph 99.

102.    Nothing in this JCO shall be deemed to constitute preauthorization of a claim against the Spill Fund within the meaning of N.J.S.A. 58:10-23.11k. or N.J.A.C. 7:1J.

103.    If, prior to the Court's approval and entry of this JCO, any provision of this JCO or the application thereof to any Person or circumstance, to any extent, is held to be invalid or unenforceable, 3M shall have the right to render any changes to the JCO's terms void and unenforceable and the right to render the entire JCO void and unenforceable if the JCO has been

amended in any way.  If, following the Court's approval and entry of this JCO, any Dismissal, the Release, or the Covenant Not To Sue provided in this JCO or the application thereof to any Person or circumstance, to any extent, is held to be invalid or unenforceable, 3M shall have the right to render the entire JCO void and unenforceable.  If, following the Court's approval and entry of this JCO, any provision of this JCO other than its Dismissals, the Release, or the Covenant Not To Sue or the application thereof to any Person or circumstance, to any extent, is held to be invalid or unenforceable, (a) the Parties shall negotiate in good faith a valid and enforceable provision as similar in substance and in terms to such invalid or unenforceable provision as may be possible and (b) the remainder of this JCO or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each provision of this JCO shall remain valid and be enforced to the maximum extent allowable by law.

## XV.   EFFECTIVE DATE

104.    The Effective Date of this JCO shall be the date upon which this JCO is entered by the Court, which shall be no earlier than January 1, 2026.

## XVI.  RETENTION OF JURISDICTION

105.    This Court retains jurisdiction over both the subject matter of this JCO and the Parties for the duration of the performance of the terms of this JCO for the purpose of enabling any Party to apply to the Court at any time for such further order, direction, or relief as may be necessary or appropriate for the construction, interpretation, or modification of this JCO, or to effectuate or enforce compliance with this JCO's terms.

106.    The Parties consent to this Court's jurisdiction to enter an injunction barring any Releasor from violating the Covenant Not To Sue or from commencing or prosecuting any action or other proceeding, or seeking other benefits, based upon the Released Claims.

## XVII.  COOPERATION AND DOCUMENT RETENTION

107.    The Parties shall cooperate fully with each other and shall use all reasonable efforts to obtain Court approval of this JCO and its terms, including the scope of the Release and all other provisions of Section VIII, and to give force and effect to this JCO and all its terms, including the scope of the Release and all other provisions of Section VIII, in this Court and in in any federal, state, or local action or proceeding (whether judicial, arbitral, regulatory, or administrative).

108.    Settling Plaintiffs shall cooperate fully with 3M, 3M's agents, and 3M's counsel by providing 3M with any non-privileged, non-work-product-protected documents, data, communications, or information that 3M deems necessary to any insurance-recovery effort or tax-related filings.  Settling Plaintiffs shall prepare and file any IRS Forms 1098-F required to be filed in connection with this JCO consistent with the terms of this JCO, including the Parties' agreement as to the amounts paid under this JCO that constitute restitution or remediation for tax purposes.

109.    3M agrees to make a current employee available to testify at Plaintiffs' request at or prior to trial for the Chambers Works Litigation for purposes of laying a foundation for the admission of documents as evidence, including, at a minimum, the Certification of 3M dated October 30, 2024, and verified by 3M's Director of TEBG Business Transformation and Deployment.

110.    3M shall comply with the provisions of any and all orders regarding preservation of evidence entered in the Chambers Works Litigation, the Parlin Litigation, or the AFFF MDL, for as long as required under the terms of such orders.  Settling Plaintiffs in no way authorize or

endorse destruction of documents or other evidence following the expiration of such orders should 3M be under any other obligation, to Settling Plaintiffs or otherwise, to preserve such documents or other evidence.

111.    3M agrees that, effective at the time the application described in Paragraph 120 is submitted, its counsel and experts (*i.e.*, Persons who have been identified in the Chambers Works Litigation solely as expert witnesses for 3M and for no other defendant) will no longer participate in the defense of the Chambers Works Litigation and that it will terminate its participation in any joint defense agreement it may have entered concerning the Chambers Works Litigation.

## XVIII. MODIFICATION

112.    This JCO or any provision of this JCO may be modified or waived only by written agreement duly executed by all Parties and approved by the Court.

113.    This JCO represents the entire integrated agreement between Settling Plaintiffs and 3M regarding the subject matter of the JCO, and supersedes all prior negotiations, representations, agreements, or understandings, whether written or oral, regarding the subject matter of the JCO.

114.    Most Favored Nation Provisions.

a.    If, on or before the date 10 years after the Effective Date, 3M enters into a Multistate Settlement that would have paid Settling Plaintiffs an amount whose net present value would have been more than the net present value of the Settlement Payments that the State could be paid under this JCO, using the same discount rate and starting date described below and excluding the New Jersey Leadership Payment, the $145,000,000 in Settlement Payments relating to the Chambers Works Site, and the Costs, Fees, and Punitive Damages Payment, Settling Plaintiffs shall, for 30 Days after the Multistate Settlement becomes effective in all participating states, have the option to file in this Court an unopposed motion

80

to modify this JCO to incorporate a requirement that 3M pay the State a "Multistate Catchup Payment" described in this Paragraph 114.a, so long as Settling Plaintiffs agree to any portion of the Multistate Settlement's release that is broader than the Release in Paragraph 54, including any broader scope, broader definition of Covered Conduct or Covered Harm, and narrower reservations than in Section IX. The same method shall be used to calculate the net present values of the payments to be compared for purposes of this Paragraph 114.a.

   i.    The "Multistate Catchup Payment" shall be calculated in six steps. First, using a discount rate of 8 percent from the date the Multistate Settlement becomes final, non-appealable, or effective in all participating states (whichever is latest) (the "starting date"), calculate the net present value of the amount that the State of New Jersey would have received under the Multistate Settlement in the past, present, or future. Second, calculate the net present value of the past, present, or future Settlement Payments that the State could be paid under this JCO, using the same discount rate and starting date described above and excluding the New Jersey Leadership Payment, the $145,000,000 in Settlement Payments relating to the Chambers Works Site, and the Costs, Fees, and Punitive Damages Payment. Third, subtract the amount calculated in the second step from the amount calculated in the first step. Fourth, adjust that difference, using the same discount rate, to account for the period of time that will elapse between the date in the first step and the date on which the State is anticipated to receive the third of the 5 installments of its Multistate Catchup Payment. Fifth, if that adjusted amount exceeds

81

$50,000,000, reduce the amount to $50,000,000. Sixth, divide the amount by 5 to reflect that it will be paid in 5 equal installments.

      ii.      The "amount that the State of New Jersey would have received under the Multistate Settlement" referenced in Paragraph 114.a.i shall be calculated by applying the same formula used in the Multistate Settlement for determining the amount of settlement funds that the Multistate Settlement allocates to each participating state and should exclude the amount that under that formula would be the State of New Jersey's share of amounts payable under the Multistate Settlement not constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the Code and Treas. Reg. section 1.162-21(e)(4).

      iii.     3M shall pay any Multistate Catchup Payment in 5 equal installments over the 5 years following this Court's order granting Settling Plaintiffs' unopposed motion.

      iv.     The portion of the Multistate Catchup Payment which bears the same ratio to the Multistate Catchup Payment that the net present value of 3M's payments made or to be made pursuant to Paragraphs 44.c.i, 44.c.ii, and 44.c.iii bears to the net present value of all of 3M's payments made or to be made pursuant to Paragraph 44 constitutes restitution or remediation within the meaning of the Code and Treas. Reg. section 1.162-21(e)(4). The remaining portion of the Multistate Catchup Payment constitutes the settlement value of reimbursements for costs incurred in Settling Plaintiffs' investigation into, and litigation concerning, Covered Conduct or Covered Harm of a Released Entity, or other amounts not constituting restitution or remediation. Settling Plaintiffs shall use the amount

identified as restitution or remediation exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(1).

b.      If, on or before the date 10 years after the Effective Date, 3M enters into a Multistate Settlement that provides certain injunctive relief to all participating states, Settling Plaintiffs shall, for 30 Days after the injunctive-relief provisions of the Multistate Settlement become effective in all participating states, have the option to file in this Court an unopposed motion to modify this JCO to incorporate the same injunctive relief, so long as Settling Plaintiffs agree to any portion of the Multistate Settlement's release that is broader than the Release in Paragraph 54, including any broader scope, broader definition of Covered Conduct or Covered Harm, and narrower reservations than in Section IX. The "certain injunctive relief" referenced in this Paragraph 114.b shall not include provisions (even if characterized as injunctive) under which 3M might agree to remediate sites formerly owned or operated by 3M or other sites or to commit funds or take actions to address alleged PFAS contamination, alleged discharges of PFAS, or alleged natural resource damages.

c.      If, on or before the date 10 years after the Effective Date, any or all Settling Plaintiffs enter into any settlement or multiple settlements with any or all defendants (other than 3M) in the Chambers Works Litigation to fully resolve Claims relating to the Chambers Works Site, and the "Aggregate Amount" of such settlement(s) is less than $435,000,000, 3M shall have the right to reduce its next five Annual Payments by an amount calculated pursuant to this Paragraph 114.c (the "CW Fairness Credit").

i.    The amount of the CW Fairness Credit shall be calculated in three steps.  First, divide the Aggregate Amount of payments that the State of New Jersey will receive from Settling Plaintiffs' settlement or settlements with any or all defendants (other than 3M) in the Chambers Works Litigation by 3.  Second, subtract that figure from $145,000,000.  Third, divide the amount (so long as it is a positive amount) by 5 to reflect that it will be credited in 5 equal installments.  For the avoidance of doubt, $435,000,000 is 3 times the $145,000,000 in Settlement Payments directly relating to the Chambers Works Site that the State will be paid under this JCO.  The CW Fairness Credit does not cap, provide a credit against, or otherwise impact the value of Settling Plaintiffs' claims against the defendants (other than 3M) in the Chambers Works Litigation.

ii.    The Aggregate Amount shall include the face value of all cleanup and removal costs and damages to be paid, the value of any work to be performed, and the value of other forms of relief or compensation to be paid or performed, including the stated value of any Remediation Funding Source or other financial assurance mechanism that the Chambers Works Litigation defendant(s) other than 3M is or are required to provide in order to effectuate such work.

iii.    3M shall receive the CW Fairness Credit in 5 equal installments over the 5 years immediately following the settlement or settlements; and if the next installment of the CW Fairness Credit (by itself or in combination with other credits) exceeds the amount that 3M owes for its next Annual Payment, any amount of the CW Fairness Credit in excess of that Annual Payment shall be carried over

84

and deducted from the next Annual Payment until the CW Fairness Credit has been fully satisfied.

115.    Nothing in this JCO shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this JCO.

## XIX.    ENTRY OF THIS JCO

116.    3M has consented to the entry of this JCO without further notice after the comment period specified in Paragraph 88.

117.    So long as Settling Plaintiffs do not receive public comments that disclose facts or considerations that indicate to Settling Plaintiffs, in their sole discretion, that the JCO is inappropriate, improper, or inadequate, upon conclusion of Settling Plaintiffs' review of any public comments received as a result of the notice described in Paragraphs 86 through 95, Settling Plaintiffs shall promptly submit this JCO to the Court for entry.

118.    Upon entry of this JCO by the Court, this JCO constitutes a final judgment under Federal Rules of Civil Procedure 54 and 58 among the Parties.

119.    If for any reason the Court should decline to approve this JCO, including the scope of the Release and all other provisions of Section VIII, in the form signed or executed by the Parties or in the form presented to the Court, or if for any reason the Court should approve this JCO in a form different from the form signed or executed by the Parties or presented to the Court, the agreement memorialized in this JCO is voidable at the sole discretion of any Party, and the terms of the agreement may not be used as evidence in any litigation.

120.    Settling Plaintiffs, with the input and consent of 3M, filed an application with the Court to sever the claims against 3M or stay all proceedings as to 3M in the Chambers Works Litigation, pursuant to Federal Rule of Civil Procedure 21 or 42.  Settling Plaintiffs' application

85

requested that the stay remain in place at least until the Court approves and enters this JCO, provided, however, that if the stay is terminated because the JCO is not approved or is overturned, remanded, vacated, or modified on appeal such that the JCO is void, is of no effect, or is deemed by the Parties, exercising good faith, to be materially altered, then Settling Plaintiffs and 3M shall work cooperatively to address scheduling with the Court. To the extent it may be necessary to do so, the Parties shall also seek a stay of all proceedings involving 3M in the Parlin Litigation and the AFFF Litigation pending the Court's consideration of approval and entry of this JCO.

121.    Dismissals. Not later than 3 Working Days after Settling Plaintiffs' (or the Escrow Account's) receipt of the first payment described in Paragraph 44.a, (i) Settling Plaintiffs shall file in this Court a motion for Dismissal of the Chambers Works Litigation and the Parlin Litigation as to 3M pursuant to Federal Rule of Civil Procedure 41(a)(2); (ii) Settling Plaintiffs shall file a motion for Dismissal of the AFFF Litigation as to 3M pursuant to Federal Rule of Civil Procedure 41(a)(2); and (iii) the Department shall withdraw and close the Statewide PFAS Directive as to 3M. These Dismissals will Dismiss all of Settling Plaintiffs' pending Claims against 3M and will not Dismiss Settling Plaintiffs' Claims against other defendants.

## XX.    SIGNATORIES/SERVICE

122.    Each undersigned representative of each Party certifies that he or she is fully authorized to enter into the terms of this JCO and to execute and legally bind such Party to this JCO.

123.    This JCO may be signed and dated in any number of counterparts, each of which shall be an original, and such counterparts shall together be one and the same JCO.

124.    Any Party may execute this JCO by having its duly authorized signatory sign his or her name on the designated signature block below and transmitting that signature page

86

electronically to counsel for all Parties. Any signature made and transmitted electronically for the purpose of executing this JCO shall be deemed an original signature for purposes of this JCO and shall be binding upon the Party transmitting the signature electronically.

125.    The Parties agree that this JCO was negotiated fairly between the Parties at arm's length and that the terms of this JCO shall be deemed to have been jointly and equally drafted by them, and that no provision of this JCO therefore should be construed against any Party on the grounds that the Party drafted, or was more responsible for drafting, the provision.

## XXI.    NOTICES UNDER THIS JCO

126.    Except as otherwise provided herein, any notices or other documents required to be sent to any Party pursuant to this JCO shall be sent by email as well as a hard copy by United States Mail, Certified Mail Return Receipt requested, or other nationally recognized courier service that provides for tracking services and identification of the Person signing for the document. The notices or documents shall be sent to the following addresses:

For the Division of Law:

        Gary Wolf
        Section Chief
        Division of Law
        Department of Law and Public Safety
        R.J. Hughes Justice Complex
        25 Market Street
        P.O. Box 093
        Trenton, New Jersey 08625-093
        Gary.Wolf@law.njoag.gov

For the Department and the Commissioner:

        Kimberly Cahall
        Chief Advisor and Chief Enforcement Officer
        Legal, Regulatory, and Enforcement Policy
        New Jersey Department of Environmental Protection
        401 East State Street
        Trenton, New Jersey 08625

87

Kimberly.Cahall@dep.nj.gov

For the Administrator:

David E. Haymes
Administrator
Spill Compensation Fund
New Jersey Department of Environmental Protection
ECA/Spill Fund
Mail Code: 401-06J
P.O. Box 420
Trenton, NJ 08625-0420
David.Haymes@dep.nj.gov

For DCA:

Cary Fais
Director
Division of Consumer Affairs,
One Christie Street, Suite 1010
Trenton, NJ 08608
faisc@dca.njoag.gov

For 3M:

Kevin H. Rhodes
Executive Vice President, Chief Legal Affairs Officer and Secretary
Legal Affairs Department
3M Company
3M Center, 220-9E-01
St. Paul, MN 55144-1000
krhodes@mmm.com

Thomas J. Perrelli
Jenner & Block LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001-4412
TPerrelli@jenner.com

SO ORDERED this __ day of _____, 2025:


_____

The Honorable Renée Marie Bumb
Chief United States District Judge

.

89

THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE NEW JERSEY COMMISSIONER OF ENVIRONMENTAL PROTECTION CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: _____

 Shawn M. LaTourette
 Commissioner
 New Jersey Department of Environmental Protection

Dated: [Month, Day], 2025

NEW JERSEY SPILL COMPENSATION FUND CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: _____

 David E. Haymes, Administrator
 New Jersey Spill Compensation Fund

Dated: [Month, Day], 2025

NEW JERSEY DIVISION OF CONSUMER AFFAIRS AND ITS DIRECTOR CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: _____

 Cari Fais, Director
 New Jersey Division of Consumer Affairs

Dated: [Month, Day], 2025

**Matthew J. Platkin**
**Attorney General of New Jersey**
*Attorney for Plaintiffs and Division of Consumer Affairs*

By: _____

 Gwen Farley, Esq.
 Deputy Attorney General

90

Dated: <mark>[Month, Day]</mark>, 2025

3M COMPANY


By:    _____

        Steven F. Reich
        Executive Vice President and Chief Counsel, Enterprise Risk Management

Dated: <mark>[Month, Day]</mark>, 2025

## **EXHIBIT LIST**

Exhibit A:  Settlement Payments Schedule

Exhibit B:  Escrow Agreement

Exhibit C:  Letter to Claimants

Exhibit D:  Former 3M Sites

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs*

By:    Gwen Farley
       Deputy Attorney General
       Attorney ID No. 000081999
       Ph. (609) 376-2740
       Gwen.Farley@law.njoag.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>                    Plaintiffs,<br><br>      v.<br><br>E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),<br><br>                    Defendants. | Case No.: 1:19-cv-14758-RMB-JBC<br><br>Civil Action<br><br>This document relates to:<br><br>Case No.: 1:19-cv-14758-RMB-JBC<br>            1:19-cv-14765-RMB-JBC<br>            1:19-cv-14766-RMB-JBC<br>            1:19-cv-14767-RMB-JBC<br><br>**JUDICIAL CONSENT ORDER**<br>**AS TO DEFENDANTS E. I. DUPONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, DUPONT SPECIALTY PRODUCTS USA, LLC, CORTEVA, INC., AND DUPONT DE NEMOURS, INC.** |

This matter was opened to the Court by Matthew J. Platkin, Attorney General of New

Jersey, Deputy Attorney General Gwen Farley, appearing, and Kelley Drye & Warren LLP, the

Law Offices of John K. Dema, P.C., Cohn, Lifland, Pearlman, Herrmann & Knopf LLP, and Taft

Stettinius & Hollister, LLP, Special Counsel to the Attorney General, appearing, as attorneys for

Plaintiffs New Jersey Department of Environmental Protection (the "Department") and the

Commissioner of Environmental Protection (the "Commissioner"), in their named capacity, as *parens patriae,* and as Trustee of the Natural Resources of the State of New Jersey ("State"), and the Administrator of the New Jersey Spill Compensation Fund (the "Administrator") (the Department, Commissioner, and Administrator collectively, "Plaintiffs"), and Cravath, Swaine & Moore LLP, representing Defendants EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP") and Corteva, Inc. ("Corteva"), Kirkland & Ellis LLP, representing Defendants DuPont de Nemours Inc. ("New DuPont") and DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), and Wachtell, Lipton, Rosen & Katz, representing Defendants The Chemours Company ("Chemours") and The Chemours Company FC, LLC ("Chemours FC") (EIDP, Corteva, New DuPont, DuPont Specialty Products, Chemours, and Chemours FC, collectively, "Settling Defendants").  Plaintiffs are joined by the New Jersey Division of Consumer Affairs and its Director (collectively, "DCA," and collectively with Plaintiffs and the State, "Settling Plaintiffs") in the AFFF Litigation (as defined below), and as a Party to this Judicial Consent Order ("JCO").  The Attorney General and the Director of DCA ("Director") will be added to the caption of this case for purposes of this JCO upon entry of the JCO.  These Parties, having amicably and in good faith resolved their disputes, seek Court approval and entry of this JCO as follows:

## I. <u>BACKGROUND</u>

A.    Defendant Chemours is a corporation organized under the laws of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly owned subsidiary of EIDP until July 2015, when EIDP spun-off Chemours as a separate publicly traded entity.  Plaintiffs allege that, in connection with the spin-off, Chemours assumed direct liability for certain of EIDP's contamination in New Jersey and elsewhere.

B.      Defendant Chemours FC is a limited liability company organized under the laws of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours FC is a subsidiary of Chemours that was formed in April 2014. Chemours FC owns the Pompton Lakes Works, Repauno Works, and Chambers Works Sites, as described below.

C.      Defendant New DuPont, formerly known as DowDuPont Inc., is a corporation organized under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.  Plaintiffs allege that New DuPont contractually assumed EIDP's liabilities at issue and being resolved herein.  New DuPont denies this allegation.

D.      Defendant Corteva is a corporation duly organized under the laws of Delaware, with its principal place of business located at 9330 Zionsville Road, Indianapolis, IN 46268 and 974 Centre Road, Wilmington, Delaware 19805.  Plaintiffs allege that Corteva contractually assumed EIDP's liabilities at issue and being resolved herein.  Corteva denies this allegation.

E.      Defendant EIDP is a corporation organized under the laws of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

F.      Defendant DuPont Specialty Products is a limited liability company organized under the laws of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  On or about June 1, 2019, EIDP transferred ownership of DuPont Specialty Products to New DuPont.  DuPont Specialty Products owns the Parlin Site, as described below.

G.      Pompton Lakes Works is located at 2000 Cannonball Road in Pompton Lakes as well as Wanaque Borough in Passaic County.  EIDP operated Pompton Lakes Works until 1994. On or around January 23, 2015, EIDP transferred ownership of Pompton Lakes Works to

3

Chemours FC.   Plaintiffs allege that EIDP discharged contaminants, including hazardous substances, pollutants, and wastes, at and from Pompton Lakes Works, including the former Haskell operations, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief.   Plaintiffs further allege there are unmet remediation obligations at the Pompton Lakes Works Site, and that EIDP and Chemours have failed to fully delineate the contamination related to the Pompton Lakes Works Site as required under New Jersey law. Settling Defendants deny these allegations.

H.      Repauno Works is located at 200 North Repauno Avenue, Gibbstown, Greenwich Township, Gloucester County, New Jersey.   EIDP owned and operated Repauno Works from 1880 until 2015.   In 2015, EIDP transferred Repauno Works to Chemours FC.   On June 30, 2016, Chemours FC sold a portion of Repauno Works to Delaware River Partners, LLC, for redevelopment.   Plaintiffs allege that EIDP discharged contaminants, including hazardous substances, pollutants, and wastes, at and from Repauno Works, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief.   Plaintiffs further allege there are unmet remediation obligations at Repauno Works, and that certain Settling Defendants have failed to fully delineate the contamination related to the Repauno Works Site as required under New Jersey law.   Settling Defendants deny these allegations.

I.      Chambers Works, including the former Carneys Point Works operations, is located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships in Salem County. EIDP owned and operated Chambers Works until 2015.   Chambers Works is an EPA Lead RCRA GPRA 2020 Site and also has established financial assurance ("CW RCRA FA").   Effective February 1, 2015, EIDP transferred Chambers Works to Chemours FC.   In 2015, EIDP leased a portion of Chambers Works from Chemours FC to continue certain operations.   On June 1, 2019,

EIDP transferred leaseholds in certain portions of Chambers Works to DuPont Specialty Products. Plaintiffs allege that EIDP, DuPont Specialty Products, and Chemours and/or Chemours FC discharged contaminants, including hazardous substances, pollutants, and wastes from Chambers Works, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief. Plaintiffs further allege that there are unmet remediation obligations at the Chambers Works Site, and that Settling Defendants have failed to establish remediation funding sources required under New Jersey law. Settling Defendants deny these allegations.

J.       The Parlin Site is located at 250 Cheesequake Road, Parlin. The Parlin Site is located in both Sayreville Borough and Old Bridge Township, Middlesex County. On January 29, 2019, EIDP sold all or part of the Parlin Site to DuPont Specialty Products. Plaintiffs allege that Chemours and/or Chemours FC operate on the Parlin Site as tenants. Plaintiffs further allege that EIDP, DuPont Specialty Products, Chemours, and/or Chemours FC have discharged contaminants, including hazardous substances, pollutants, and wastes at and from the Parlin Site, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief. Plaintiffs also allege that there are unmet remediation obligations at the Parlin Site, and that Settling Defendants have failed to establish remediation funding sources required under New Jersey law. Settling Defendants deny these allegations.

K.       In addition to the above, Plaintiffs allege that certain of the Settling Defendants designed, manufactured, marketed, and sold certain PFAS, as well as PFAS-Containing Products, that were transported, stored, handled, used, released, spilled, disposed of in, and thus resulted in PFAS Contamination in, the State of New Jersey. Settling Defendants deny these allegations.

L.       Plaintiffs have initiated multiple litigations and have issued multiple administrative directives against certain Settling Defendants seeking various relief concerning the Pompton Lakes

Works Site, the Repauno Works Site, the Chambers Works Site, and the Parlin Site, including claims involving PFAS, as well as to take certain action with respect to PFAS on a statewide basis.

      M.      On August 30, 2017, the Department issued a *Directive and Notice to Insurers* regarding the Chambers Works Site directing EIDP and Chemours FC to prepare a cost estimate for the full cost of remediation of Chambers Works for the Department's approval and to establish and maintain a Remediation Funding Source, excluding the use of a self-guarantee, for the full cost of the remediation as approved by the Department, and to enter into an Administrative Consent Order requiring them to remediate Chambers Works, among other directives (the "2017 Chambers Works Directive"). On September 6, 2017, counsel for the recipients submitted their "good faith response" to the 2017 Chambers Works Directive.

      N.      On March 26, 2019, Plaintiffs filed a complaint against the Settling Defendants, except DuPont Specialty Products, in the Superior Court of the State of New Jersey, Law Division, Passaic County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. PAS-L-000936-19 (N.J. Super. Ct. Law Div. Mar. 26, 2019) (the "Pompton Lakes Works Litigation"). Through the Pompton Lakes Works Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 to -23.24, the Water Pollution Control Act ("WPCA"), N.J.S.A. 58:10A-1 to -20, the Solid Waste Management Act ("SWMA"), N.J.S.A. 13:1E-1 to -230, the Department's enabling statute, N.J.S.A. 13:1D-1, *et seq.*, the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and the New Jersey common law, including public nuisance, trespass, negligence/gross negligence/willful or wanton misconduct, and abnormally dangerous activity.

O.      On March 27, 2019, the Department issued a *Directive and Notice to Insurers* regarding the Pompton Lakes Works Site (the "Pompton Lakes Works Directive") directing EIDP, DowDuPont, Inc., DuPont Specialty Products, Chemours FC, Chemours, and other respondents to reimburse the Department for the costs to prepare a natural resource damage assessment of the Pompton Lakes Works Site.  On April 23, 2019, EIDP, Chemours, and Chemours FC jointly responded to the Pompton Lakes Directive.

P.      On March 27, 2019, Plaintiffs filed a complaint against the Settling Defendants, except DuPont Specialty Products, in the Superior Court of the State of New Jersey, Law Division, Gloucester County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. GLO-L-000388-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019) (the "Repauno Works Litigation").  Through the Repauno Works Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Act, the WPCA, the SWMA, the Department's enabling statute, N.J.S.A. 13:1D-1, *et seq.*, the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and New Jersey common law, including public nuisance, trespass, and negligence.

Q.      On March 27, 2019, Plaintiffs filed a complaint against the Settling Defendants and The 3M Company in the Superior Court of the State of New Jersey, Law Division, Salem County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. SLM-L-000057-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019) ("the Chambers Works Litigation").  Through the Chambers Works Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Act, the WPCA, the Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1K-6 to -13.1, the Brownfield and Contaminated Site Remediation Act ("BCSRA"), N.J.S.A. 58:10B-1 to -31, the SWMA, the Air Pollution Control Act ("APCA"), N.J.S.A. 26:2C-1 to -68, the New

Jersey Safe Drinking Water Act, N.J.S.A. 58:12A-1, *et seq.* ("NJSDWA"), the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and New Jersey common law, including public nuisance, trespass, negligence/gross negligence/willful or wanton misconduct, and abnormally dangerous activity.

R.    On March 27, 2019, Plaintiffs filed a complaint against the Settling Defendants and The 3M Company in the Superior Court of the State of New Jersey, Law Division, Middlesex County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. MID-L-002448-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019) (the "Parlin Litigation"). Through the Parlin Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Act, the WPCA, the BCSRA, the SWMA, the ISRA, the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and New Jersey common law, including public nuisance, trespass, negligence, and abnormally dangerous activity.

S.    The Settling Defendants removed the Pompton Lakes Works, Repauno Works, Chambers Works, and Parlin Litigations to this Court on July 5, 2019. *See, N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. 1:19-cv-14766-RMB-JBC (Dkt. 1) (Chambers Works Litigation); *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 2:19-cv-14758-RMB-JBC (Dkt. 1) (Pompton Lakes Works Litigation); *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 1:19-cv-14765-RMB-JBC (Dkt. 1) (Repauno Works Litigation); *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 3:19-cv-14767-RMB-JBC (Dkt. 1) (Parlin Works Litigation). The cases were subsequently consolidated for case management (Case No. 2:19-cv-14758, D.E. 31), and are currently before the Chief Judge, the Honorable Renée Marie Bumb.

T.      The Settling Defendants filed responsive pleadings in the Industrial Sites Litigations denying liability, denying Plaintiffs' claims and allegations against them, and asserting various defenses to the allegations in the complaints.  Additionally, certain of the Settling Defendants filed counterclaims in the Industrial Sites Litigations.

U.      On March 25, 2019, the Department issued a *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination in the State to EIDP, Chemours, Chemours FC, DuPont Specialty Products, New DuPont's predecessor, DowDuPont, Inc., and other respondents (the "Statewide PFAS Directive," and collectively with the 2017 Chambers Work Directive and the Pompton Lakes Works Directive, the "Spill Act Directives"). The Statewide PFAS Directive was issued pursuant to the authority vested in the Commissioner under the Spill Act, the WPCA, the APCA, and the SWMA.  The Directive provides notice that the Department believes the recipients to be responsible for "significant contamination of New Jersey's natural resources, including the air and waters of the State, with [PFAS]."  The Statewide PFAS Directive seeks, among other things, to compel the recipients to provide information about their uses and discharges or potential discharges of certain PFAS into the State's environment, to meet with the Department to develop a good-faith estimate of costs to investigate, test, treat, clean up, and remove certain PFAS from the State's environment, including damages for economic impacts of PFAS Contamination, and the recipients' abilities to pay for or perform the cleanup and removal of certain PFAS.

V.      On April 17, 2019, EIDP, Chemours, Chemours FC, DowDupont, Inc. and DuPont Specialty Products each responded to the Statewide PFAS Directive.  DowDuPont, Inc. supplemented its response on May 1, 2019.  EIDP, Chemours, and Chemours FC later supplemented their responses on September 16, 2019.

W.      On May 14, 2019, Settling Plaintiffs filed a separate lawsuit against EIDP, Chemours, and other suppliers of PFAS ingredients for aqueous film-forming foam ("AFFF"), a PFAS-containing firefighting product, and manufacturers of AFFF (the "AFFF Litigation") in the Superior Court of New Jersey, Mercer County, captioned *Gurbir S. Grewal, et al. v. 3M Co. et al*., No. MER-L-000953-19 (N.J. Super. Ct. Law Div. May 14, 2019).  EIDP and Chemours are named as defendants in the AFFF Litigation as a manufacturer of certain PFAS ingredients used in AFFF. Through the AFFF Litigation, Settling Plaintiffs assert claims against EIDP and Chemours pursuant to common-law products-liability theories, common-law negligence, common-law public nuisance, and the Spill Act, the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -20, the New Jersey Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 to -25, and the Federal Safe Drinking Water Act, 42 U.S.C. § 300(f) *et seq*.  The AFFF Litigation was removed to this Court and thereafter transferred to the multidistrict litigation in the United States District Court for the District of South Carolina, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.) ("AFFF MDL"), where it remains pending.

X.      On December 8, 2021, this Court entered an Order denying Corteva's and New DuPont's motions to dismiss the Pompton Lakes Works Litigation for lack of personal jurisdiction or for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (2:19-cv-14758, D.E. 180.)

Y.      On December 9, 2021, this Court entered an Order reserving the parties' potential claims, cross-claims, counterclaims, and third-party claims arising out of the Statewide PFAS Directive, except for those based on defendants' alleged failure to properly respond to the Statewide PFAS Directive with respect to PFAS at or from the Industrial Sites.  *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 148).

Z.      On December 21, 2021, this Court issued an order denying in part and granting in part Settling Defendants' motions to dismiss the Industrial Sites Litigations with respect to the 2005 Compensatory Restoration Administrative Consent Order ("CRACO"), common law trespass, and common law public nuisance.  (*See, e.g.*, Case No. 1:19-cv-14766-RMB-JBC (Dkt. 153); Case No. 2:19-cv-14758, D.E. 196).

AA.     On August 26, 2022, this Court issued an order denying EIDP, Corteva, and New DuPont's motion to dismiss a count of Plaintiffs' Second Amended Complaint in the Chambers Works Litigation for alleged violations of ISRA.  *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 206).

BB.     The first five of seven scheduled bench trials in the Chambers Works Litigation occurred between May 19 and June 9, 2025.  *See, e.g.*, Case No. 1:19-cv-14766-RMB-JBC (Dkt. 643, Dkt. 691).  Two additional bench trials were scheduled to begin in the summer of 2025.  On July 1, 2025, the Court issued an order postponing the trials pending further order of the Court. *See id.* (Dkt. 709).

CC.     Settling Plaintiffs assert that, beyond the current claims they are pursuing against the Settling Defendants in the matters referenced above, there is a potentially broad range of additional claims that they could pursue against them related to PFAS.  Settling Defendants deny this assertion.

DD.     The Parties wish to resolve the Industrial Sites Litigations, the AFFF Litigation, and the Department's Spill Act Directives as set forth herein.  They also wish to resolve Settling Defendants' alleged liability with respect to all PFAS statewide and all other Released Claims as set forth herein.

11

EE.     In entering into this JCO, each Settling Plaintiff, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State, acts in all its capacities to the maximum extent allowable by law, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, including:

- Each Settling Plaintiff's capacity as *parens patriae*;

- the Commissioner's capacity as Trustee of the State's Natural Resources;

- the Director's responsibility for administering the CFA and its related laws and regulations;

- each Settling Plaintiff's capacity as an entity that owns, operates, manages, holds in trust, or otherwise controls Real Property and/or Personal Property (and/or interests therein), including certain Water Systems, in the State; and

- each Settling Plaintiff's capacity to exercise the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interests that can be addressed by those powers, and to protect the health and well-being, both physical and economic, of all Persons subject to the State's jurisdiction.

FF.     After a thorough investigation and after carefully considering the relevant circumstances, Settling Plaintiffs have concluded that it would be in the public interest to enter into this JCO to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the State, Political Subdivisions, citizens, and residents of New Jersey.  Settling Plaintiffs have further concluded that the Settling Defendants' alleged liability with respect to

PFAS are best resolved statewide, including environmental, consumer protection, and other liabilities (subject to the exclusions set forth herein), rather than piecemeal, consistent with this JCO.

GG.    While continuing to deny any violation, wrongdoing, culpability, or liability with respect to any and all Claims that have been or could be asserted by Settling Plaintiffs, and while continuing to specifically deny and dispute the scientific, medical, factual, and other bases asserted in support of any of those Claims, the Settling Defendants have nevertheless concluded that they will voluntarily enter into this JCO to, among other things, avoid the delays, uncertainties, and distraction of further litigation.

HH.    The Parties recognize and agree, and the Court by entering this JCO finds, that the Parties have negotiated this JCO at arm's length and in good faith; that the implementation of this JCO will allow the Parties to avoid continued, prolonged, and complicated litigation, including appeals; and that this JCO is fair, reasonable, in the public interest, and consistent with applicable law.

**THEREFORE,** with the consent of the Parties to this JCO, it is hereby **ORDERED and ADJUDGED:**

## II.  JURISDICTION AND VENUE

1.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.  Settling Plaintiffs assert that, beyond the current claims they are pursuing against the Settling Defendants in the matters referenced above, there are additional claims that they could pursue against them under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606, 9607, 9613(b).  The Court has personal jurisdiction over the Parties for purposes of approving, entering, and implementing this JCO and resolving, solely as to the Settling Defendants, the Industrial Sites Litigations and the

13

AFFF Litigation (together, the "Litigations"). Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and 1395(a), because this action arises from alleged acts or omissions that occurred at the Pompton Lakes Works Site, the Repauno Works Site, the Chambers Works Site, the Parlin Site, and locations where PFAS has been discharged within New Jersey.

2.      The Industrial Sites Litigations were removed to this Court pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446(d).

3.      For purposes of this Court approving, entering, and implementing this JCO, the Parties waive all objections and defenses they may have to this Court's jurisdiction over the Parties, the subject matter of this action, and this JCO. The Parties shall not challenge this Court's jurisdiction to enforce this JCO.

## III. **PARTIES BOUND**

4.      This JCO applies to, and is binding on, each of the Settling Plaintiffs and the Settling Defendants, as defined herein.

## IV. **DEFINITIONS**

5.      Whenever, in describing or referring to any person, party, manner, or thing, any word importing the singular number is used, the same shall be understood to include and to apply to several persons or parties as well as to one person or party, and to bodies corporate as well as individuals, and to several matters and things as well as one matter or thing. Unless the specific reference or context clearly indicates otherwise, (a) words expressed in the masculine or feminine form include the masculine, feminine, and gender-neutral forms; (b) the word "will" has the same meaning as the word "shall," and vice versa; (c) the word "or" is not exclusive; (d) the word "extent" in the phrase "to the extent" (or "to the … extent") means the degree to which a subject or other thing extends, and such phrase does not simply mean "if"; (e) references to any law include all rules, regulations, and sub-regulatory guidance promulgated thereunder as of the JCO Entry

14

Date (collectively, "Law"); (f) the terms "include," "includes," and "including" are deemed to be followed by "without limitation"; and (g) references to dollars or "$" are to United States dollars.

6.      Whenever the capitalized terms listed below are used in this JCO, the following definitions apply:

"2017 Chambers Works Directive" means the *Directive and Notice to Insurers* regarding the Chambers Works Site that the Department issued to certain Settling Defendants on August 30, 2017.

"3M JCO" means the proposed Judicial Consent Order between Settling Plaintiffs and The 3M Company, formal notice of which was published in the *New Jersey Register* on July 21, 2025.

"Abatement Damages" means damages, excluding Natural Resource Damages, recovered by the Department through the Chambers Works Litigation, the proceeds of which are to be administered and used by the Department, in its sole discretion, for the purpose of improving and protecting public health, safety, and the environment, including but not limited to (i) taking actions to address environmental, public health, and safety-related impacts from Industrial Sites Discharges; and (ii) supporting water quality infrastructure projects, including projects to install, operate, and maintain water treatment in public and private wells sufficient to meet applicable state standards and protect the public health, including with respect to PFAS Contamination. Such damages shall not be used for the purpose of satisfying Settling Defendants' Remediation obligations.

"Abatement Damages Amount" means, subject to Paragraph 11, payments with respect to Abatement Damages under this JCO that constitute restitution or remediation within the meaning of IRS Code section 162(f)(2)(A) and Treas. Reg. section 1.162-21(e)(4), to be held in dedicated

Departmental trust accounts for purposes consistent with the administration and use by the Department of Abatement Damages.

"Additional CRACO Industrial Sites" means the properties of Agrico Chemical Company, located at Roosevelt Avenue and Liebig Street in Carteret (Program Interest No. G000004565); Cookson Pigments Inc., located at 256 Vanderpool Street in Newark (PI # 005048); DuPont Grasselli Plant, located at South Wood Avenue in Linden (PI # G000001666); and Pitt Consol Chemical Company, located at Doremus Avenue in Newark (PI # G000002172).

"Additional Fees and Costs Amount" has the meaning set forth in Paragraph 11.

"Administrator" means the chief executive of the New Jersey Spill Compensation Fund.

"AFFF" means aqueous film-forming foam, a firefighting product, that contains PFAS.

"AFFF Litigation" means the case that Settling Plaintiffs filed against Settling Defendants and that was transferred to the AFFF MDL, captioned *Matthew J. Platkin, Attorney General of the State of New Jersey, et al., vs. The 3M Company, et al.*, MDL No. 2:18-mn-2873; Civ. Action No. 2:19-cv-02199 (D.S.C.).

"AFFF MDL" means the multidistrict litigation in the United States District Court for the District of South Carolina, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.).

"Agreed Scope and/or Costs" means agreements between the PRCRs and the Department reached through the Year One Technical Meetings over the scope of Remediation and/or the cost(s) of any aspect of the Remediation that must be performed for any of the four Industrial Sites to be compliant with federal and State statutes, regulations, and guidance.

"Annual Payments" (or "Annual Payment" in the singular) has the meaning set forth in Paragraph 7.

"APCA" means the Air Pollution Control Act, N.J.S.A. 26:2C-1 to -68.

"Area of Concern" shall be defined in accordance with N.J.A.C. 7:26E.

"Attorney General" means the Attorney General of New Jersey.

"BCSRA" means the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to -31.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601–9675.

"CFA" means the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20.

"Chambers Works Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. SLM-L-000057-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. 1:19-cv-14766-RMB-JBC (Dkt. 1).

"Chambers Works Site" means the facility located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships, Salem County, New Jersey, including any location to which Contaminants Discharged at or from the Site have become located.

"CW RCRA FA" has the meaning set forth in Paragraph I.

"Claim" means any past, present, or future claim, including any counterclaim, cross-claim, action, right, remedy, cause of action, liability, suit, proceeding, demand, damages, injury, loss, payment, judgment, verdict, debt, dues, sum of money, lien, cost or expense (including attorneys' fees or costs), account, reckoning, bill, covenant, contract, controversy, agreement, obligation, promise, request, assessment, charge, dispute, performance, warranty, omission, grievance, order, or monetary imposition of any sort, in each case in any forum and on any theory, whether legal, equitable, regulatory, administrative, or statutory; arising under federal, state, or local

17

constitutional or common law, statute, regulation, order, guidance, ordinance, contract, or principle of equity; filed or unfiled; asserted or unasserted; fixed, contingent, or non-contingent; known or unknown; patent or latent; open or concealed; discovered or undiscovered; suspected or unsuspected; foreseen, foreseeable, unforeseen, or unforeseeable; matured or unmatured; manifested or not; accrued or unaccrued; ripened or unripened; perfected or unperfected; choate or inchoate; developed or undeveloped; liquidated or unliquidated; now recognized by law or that may be created or recognized in the future by statute, regulation, order, judicial decision, or in any other manner, including any of the foregoing for direct damages, indirect damages, compensatory damages, consequential damages, incidental damages, nominal damages, economic loss, cost recovery, natural resource damages, restoration, diminution, punitive or exemplary damages, statutory and other multiple damages or penalties of any kind, or any other form of damages whatsoever; any request for declaratory, injunctive, or equitable relief, strict liability, joint and several liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorneys' fees, expert fees, consultant fees, fines, penalties, expenses, costs, or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever, whether direct, representative, derivative, class, or individual in nature. It is the intention of this JCO that the definition of "Claim" be as broad, expansive, and inclusive as possible.

"Class-Member Public Water System" means any Public Water System that is a class member under the Public Water System Class Settlement, regardless of whether such system has asserted any PFAS Claim against the Settling Defendants.

"Commissioner" means the Commissioner of the New Jersey Department of Environmental Protection.

"Contamination" or "Contaminant" means any (i) hazardous substance as defined by the Spill Act, N.J.S.A. 58:10-23.11b; hazardous substance designated under CERCLA, as set forth in 40 CFR part 302.4; hazardous waste as defined by the SWMA, N.J.S.A. 13:1E-38; or pollutant as defined by the WPCA, N.J.S.A. 58:10A-3; (ii) PFAS; or (iii) any other substance alleged in the Industrial Sites Litigations to have been Discharged from an Industrial Site.

"Corporate Reorganization Claim" means any Claim that was or could have been asserted related to: (i) the transfers, assignments, or assumptions of assets (including real property) or liabilities by, between, or among the Settling Defendants and/or their subsidiaries and/or affiliates in connection with EIDP's 2015 restructuring and spinoff of its performance chemicals business as Chemours, and including liabilities associated with the performance chemicals business, along with any other transfers, assignments, assumptions, indemnities, exchanges or other similar transactions related to such performance chemicals business, and in connection with the merger of The Dow Chemical Company and EIDP and subsequent restructurings and/or spinoffs of Dow Inc., and Corteva, and the formation of New DuPont (collectively, the "Corporate Reorganizations"); and (ii) any alleged violations of ISRA in any way relating to any aspect of the Corporate Reorganizations, and any damages, penalties, or other relief (including attorneys' fees) associated with those alleged violations.

"Cost Sharing Agreements" means, collectively, (i) the Separation Agreement by and between EIDP and Chemours dated June 26, 2015; (ii) the Separation and Distribution Agreement, dated April 1, 2019, between New DuPont, Corteva, and Dow Inc.; (iii) the Letter Agreement, dated June 1, 2019, between New DuPont and Corteva; and (iv) the Memorandum of Understanding, dated January 22, 2021, between Chemours, New DuPont and Corteva.

"Costs, Fees, and Punitive Damages Payment" has the meaning set forth in Paragraph

7.c.iii.

"Court" (or "this Court") means the United States District Court for the District of New Jersey unless expressly stated to be a different court.

"Covenants Not To Sue" refers to the covenants not to sue in Paragraphs 49 and 50.

"Covered PFAS Conduct" means:

a.      Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind, intentional or unintentional, whatsoever from the beginning of time through the JCO Entry Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity that occurred prior to the JCO Entry Date) that has arisen, is arising, or may arise at any time in the future from, was, is, or will be based on, involved, involves, or will involve, or was, is, or will be caused by PFAS, any Discharge of PFAS, or that did result, is resulting, or will result in PFAS Contamination.  Without limiting the foregoing, the term "Covered PFAS Conduct" includes conduct arising from, based on, involving, or caused by:

    i.      the design, development, manufacture, formulation, distribution, handling, control, disposal, marketing, sale, testing, labeling, transportation, import, export, storage, loading, mixing, application, use, and instructions for use of PFAS or any PFAS-Containing Product;

    ii.     any transport, treatment, storage, disposal, or arrangement for transportation, treatment, storage, or disposal, or use of PFAS-containing Sludge or PFAS-containing Wastewater (from any site, facility, or

location), including any use for irrigation, spraying on agricultural fields, or manufacturing;

iii.    any action, activity, omission, or other conduct that in any way resulted in or threatens to result in the presence of PFAS in the Environment, including any known, suspected, or threatened Discharge of any PFAS into the Environment from the beginning of time through the JCO Entry Date, including any known, suspected, or threatened Discharge of PFAS into the Environment that commenced prior to the JCO Entry Date and is continuing as of the JCO Entry Date;

iv.    compliance with any reporting, recordkeeping, disclosure, notification, or permit-process requirement related to, and any representations or omissions about, PFAS or any PFAS-Containing Product (to the extent any PFAS Claim that could be asserted about such Covered PFAS Conduct arises from, is based on, involves, or is caused by PFAS); or

v.    any act, use, or employment by any Person of any commercial practice that is allegedly or arguably unconscionable, abusive, or involves deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact in connection with the sale or advertisement of PFAS or any PFAS-Containing Product (to the extent any PFAS Claim that could be asserted about such Covered PFAS Conduct arises from, is based on, involves, or is caused by PFAS), including any failure to warn others concerning any human health or environmental hazards associated with PFAS or any

21

PFAS-Containing Product, or concerning the proper use and disposal of such substances or products, and including any such conduct that could be actionable under the CFA, other statutes, or the common law.

b.    The term "Covered PFAS Conduct" does not include any conduct that a Statewide PFAS Releasor demonstrates, by clear and convincing evidence, arises solely from conduct by one or more Released Entities that occurs entirely after the JCO Entry Date.  For the avoidance of doubt, the term "Covered PFAS Conduct" includes conduct involving PFAS that was the result of a Discharge prior to the JCO Entry Date or entered the Environment prior to the JCO Entry Date but migrated or was transported to another location after the JCO Entry Date.

c.    It is the intention of this JCO that the definition of "Covered PFAS Conduct" be as broad, expansive, and inclusive as possible.

"Covered PFAS Harm" means any actual or alleged harm, injury, or damage in any way actually or allegedly arising from, based on, involving, related to or caused by Covered PFAS Conduct, including any actual or alleged harm, injury, or damages actually or allegedly arising from, based on, involving, or caused by PFAS or PFAS Contamination.  It is the intention of this JCO that the definition of "Covered PFAS Harm" be as broad, expansive, and inclusive as possible. Without limiting the foregoing, the term "Covered PFAS Harm" includes harm arising from, based on, involving, or caused by:

a.    the design, engineering, installation, maintenance, or operation of, or cost associated with any kind of treatment, filtration, Remediation, management, investigation, testing, or monitoring of PFAS in, any Drinking Water Supplies or Water System, or the rates for Potable Water that any Statewide PFAS Releasor or Water System charges its customers;

b.    any Released Entity's liability for Natural Resource Damages arising from, based

22

on, involving, or caused by PFAS in the State;

c.      any costs that any Government Entity of the State or of any of the State's Political Subdivisions has paid or will pay due to impacts that allegedly arose from, were based on, involved, or were caused by PFAS in the Environment or by human exposure to PFAS, including payments (i) to compensate for time spent on cleanup activity, travel to and from any site, contractor costs at any site, or equipment used at any site; (ii) to offset costs of restricting access to a site necessary to perform these other activities; (iii) to any medical facility, healthcare provider, pharmacy, medical or healthcare patient, or healthcare insurer; (iv) to investigate or delineate PFAS compounds; or (v) to compensate for administrative matters, personnel issues, guidance development, or office, utility, or supply costs; or

d.      any PFAS Claim, including any PFAS Claim involving any public interest or diffused public right (including any claim for punitive damages that may be associated with any PFAS Claim of a public or private entity), that has arisen or may arise at any time in the future from, is or will be based on, involves or will involve, or is or will be caused by PFAS, any Discharge of PFAS, PFAS Contamination, or any PFAS-Containing Product (to the extent such PFAS Claim arises from, is based on, involves, or is caused by PFAS).

"CRACO" means the Compensatory Restoration Administrative Consent Order between the Department, the New Jersey Spill Compensation Fund, and EIDP, with an effective date of June 30, 2005, attached as Exhibit E.

"CRACO Releasees" means the "Releasees" as defined in paragraph 30 of the CRACO.

"Credit-Eligible PFAS Claim" means a PFAS Claim against any Released Entity arising from, based on, involving, or caused by Covered PFAS Conduct or Covered PFAS Harm that occurred entirely or partly in the State, other than a Purely Private PFAS Claim or a Claim that a

Public Water System that expressly and timely opted out from the Public Water System Class Settlement filed against Settling Defendants before July 31, 2025.

"Day" means a calendar day.

"DCA" means the New Jersey Division of Consumer Affairs and its Director.

"Delaware Estuary Claims" means any claims or actions for Natural Resource Damages for injuries to or Contamination of the Delaware Estuary, including the Delaware River and/or Delaware Bay.

"Department" means the New Jersey Department of Environmental Protection.

"Detailed Remediation Cost Estimate Worksheet" means a worksheet in substantially the same form as https://dep.nj.gov/wp-content/uploads/srp/rfs_detailed_cost_estimate_spreadsheet.xlsx or such other worksheet or form the Department may publish in the future.

"Director" means the Director of the New Jersey Division of Consumer Affairs.

"Discharge" (or "Discharged") means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying, injecting, escaping, leaching, dumping, or disposing of, or Contamination by, Contaminants into the environment, including the waters, air, or lands of the State, or into waters, air, or lands outside the jurisdiction of the State when damage has or may result to the lands, waters, air, or Natural Resources within the jurisdiction of the State, regardless of whether such discharge was reported to or otherwise known by any Settling Plaintiff.  It is the intention of this JCO that the definition of "Discharge" be as broad, expansive, and inclusive as possible.

"Discretionary Direct Oversight" means discretionary direct oversight of an Industrial Site under N.J.A.C. 7:26C-14.3.

"Dismissal" (or "Dismiss" or "Dismissed") means dismissal with prejudice, with each Party bearing its own costs, of the pending Litigations brought against any Settling Defendant.

"Disputed Scope and/or Costs" means disagreements between the PRCRs and the Department over the scope of Remediation or the cost(s) of any aspect of the Remediation that must be performed for any of the four Industrial Sites to be compliant with federal and State statutes, regulations, and guidance.

"Drinking Water Supplies" means any raw or finished water source that is or may be used by a Water System, by a Private Potable Well, or as Potable Water by one or more individuals.

"Effective Date" means the date upon which this JCO becomes final and non-appealable.

"Environment" means the Waters Of The State, any other Drinking Water Supplies, land surface or subsurface strata, biota, or ambient air within the State or within the jurisdiction of the State.

"EPA" means the United States Environmental Protection Agency.

"Escrow Account" has the meaning set forth in Paragraph 7.a.

"Exhibits" (or "Exhibit" in the singular) means Exhibits A through I, attached to and incorporated by reference in this JCO, so that each Exhibit's terms are expressly made a part of this JCO.

"Final Remediation Document" shall have the meaning in N.J.A.C. 7:26C-1.3.

"Government Entity" means a governing body, department, agency, authority, or any other unit or quasi-governmental unit of any federal, State, county, or local government.  It is the intention of this JCO that the definition of "Government Entity" be as broad, expansive, and inclusive as possible.

"Groundwater" means all water beneath the land surface that is within the saturated zone

(below the water table).

"Industrial Sites" ("Industrial Site" in the singular form) means the Chambers Works Site, the Parlin Site, the Pompton Lakes Works Site, and the Repauno Works Site, and any divisions or subsections of each.

"Industrial Sites Discharges" ("Industrial Site Discharge" in the singular form) means Discharges at or from any of the Industrial Sites prior to the JCO Entry Date.

"Industrial Sites Litigations" ("Industrial Site Litigation" in the singular form) means the Chambers Works Litigation, the Parlin Litigation, the Pompton Lakes Works Litigation, and the Repauno Works Litigation.

"Industrial Sites Releasors" ("Industrial Sites Releasor" in the singular form) has the meaning set forth in Paragraph 49.

"Industrial Sites Release" has the meaning set forth in Paragraph 49.

"Initial Payment" has the meaning set forth in Paragraph 7.a.

"Interim Remediation Assurance" means one or more forms of Remediation Funding Sources to be established and/or maintained for each Industrial Site as set forth in Paragraph 14, which shall establish interim compliance with N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption), respectively, until such time as the Year One RFS is established, as required herein.

"IRS Code" means the Internal Revenue Code of 1986, as amended.

"JCO" or "Judicial Consent Order" means this document, including all Exhibits attached hereto.

"JCO Entry Date" means the date upon which this JCO is entered by the Court, but no earlier than January 1, 2026.

used

"Known to the Department" means, as of the Notice Date, and for purposes of Paragraph 17.b, information regarding the nature, scope, and extent of Contamination at or from the Industrial Sites that is: (a) within the scope of the Department's actual knowledge (including its consultants or counsel in their agency capacity), including that which is within the Department's possession as of the Notice Date; (b) public information; or (c) information held by the EPA, that is reasonably available to the Department.  Without limiting the foregoing, Known to the Department includes information contained or referenced in expert reports in the Litigations, pleadings in the Litigations, and any previous submissions or correspondence to or from the Department concerning the establishment of any RFS for the Industrial Sites.  For the avoidance of doubt, if the Parties dispute whether information is Known to the Department pursuant to any of the foregoing standards and the Parties cannot resolve the dispute, the dispute will be subject to the dispute resolution provision in Paragraph 96, and the burden to demonstrate that any information is Known to the Department shall be on the Settling Defendants.

"Litigations" means, collectively, the Industrial Sites Litigations and the AFFF Litigation.

"LSRP" means a licensed site remediation professional who has been issued and actively maintains a license pursuant to N.J.S.A. 58:10C-1 et seq.

"NAPL" means Non-Aqueous Phase Liquid, including Dense Non-Aqueous Phase Liquid ("DNAPL") and/or Light Non-Aqueous Phase Liquid ("LNAPL").

"NAPL Work" means activities related to the Remediation of NAPL at Areas of Concern ("AOCs") where NAPL has been identified or is identified in the future within the manufacturing area at the Chambers Works Site that is or may be the subject of a TI Waiver Application.

"Natural Resources" (or "Natural Resource" in the singular) means all land, vegetation, biota, fish, shellfish, wildlife and the habitats of each, all Waters Of The State, Drinking Water

Supplies, the air, and other such resources owned by, managed by, held in trust by, under the jurisdiction of, or otherwise controlled by the State.

"Natural Resource Damages" means all Claims arising from, based on, involving, or caused by any Industrial Sites Discharges or PFAS Contamination for any injury to any Natural Resource under the Spill Act, the WPCA, the APCA, the SWMA, the BCSRA, CERCLA, or any other State or federal statute, regulation, order, or common law, and include Claims for (i) the costs of assessing injury to Natural Resources; (ii) the Department's Office of Natural Resource Restoration's costs, attorneys' fees, consultants' and experts' fees, other litigation costs, and interest, incurred prior to the JCO Entry Date; and (iii) compensation for the lost value of, loss of use of, impairment of, injury to, or destruction of Natural Resources.

"Natural Resource Damages Amount" means, subject to Paragraph 11, payments with respect to Natural Resource Damages under this JCO that constitute restitution or remediation within the meaning of IRS Code section 162(f)(2)(A) and Treas. Reg. section 1.162-21(e)(4) to be held in the Department's dedicated account for specific natural resource restoration activities in accordance with the New Jersey State Constitution, Article VIII, Section 2, Paragraph 9.

"Non-Party Covered PFAS Harm Claim" means a PFAS Claim by a Statewide PFAS Releasor against any Non-Released Entity arising from, based on, involving, or caused by Covered PFAS Conduct or Covered PFAS Harm (or conduct that would be Covered PFAS Conduct or Covered PFAS Harm if engaged in by a Released Entity).

"Non-Released Entity" means a Person that is not a Released Entity.

"Notice Date" means the date that notice of this JCO is published in the New Jersey Register as required by N.J.S.A. 58:10-23.11e2.

"Paragraph" means a portion of this JCO identified by an Arabic numeral or an uppercase or lowercase letter.

"Parlin Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. MID-L-002448-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 3:19-cv-14767-RMB-JBC (Dkt. 1).

"Parlin Site" means the facility located at 250 Cheesequake Road, Parlin, in Old Bridge Township and Sayreville Borough, Middlesex County, New Jersey, including any former portions of the facility that were transferred to third parties, and including any location to which Contaminants Discharged at or from the Site have become located.

"Parties" ("Party" in the singular) means Settling Plaintiffs and Settling Defendants. To the extent that any Settling Plaintiff or Settling Defendant performs any of its obligations under this JCO through agents, the actions of those agents shall be considered the actions of that Party.

"Permitted Exceptions" means easements, covenants, conditions, restrictions and other similar matters of record affecting title to a Remaining CRACO Parcel or other title defect revealed through a title search or a survey conducted in accordance with Exhibit H that the Department reasonably determines does or would not materially impair a conservation easement or property conveyance for its intended use.

"Person" means any individual, public or private corporation, company, association, society, firm, partnership, joint stock company, estate, trust, the United States, any of the United States' Political Subdivisions, departments, agencies, authorities, or instrumentalities, the State, or any of the State's Political Subdivisions, departments, agencies, authorities, or instrumentalities.

"Person Responsible for Conducting the Remediation" (or "PRCR") means Chemours FC for the Pompton Lakes Works Site, Repauno Works Site, and Chambers Works Site, and DuPont Specialty Products for the Parlin Site, as well as any existing or future Person that has assumed Remediation obligations for any of the Industrial Sites.

"Personal Property" means goods, chattels, and other tangible property that may be the subject of ownership but is not Real Property.

"PFAS" includes, for purposes of this JCO only, any fluorinated organic substance that contains one or more carbon atoms on which at least one of the hydrogen substituents has been replaced by a fluorine atom, and which is included in the United States Environmental Protection Agency's list of "Per- and Polyfluoroalkyl Substances" to be monitored in its fifth Unregulated Contaminant Rule, codified at 40 C.F.R. § 141.40(a)(3), or is a per- or polyfluoroalkyl ether-based substance. Solely for purposes of this JCO, "PFAS" also includes, in addition to all substances described in the preceding sentence (along with each substance's conjugate acid and any salts, derivatives, isomers, or combinations thereof), perfluorooctanoic acid ("PFOA"), per- and polyfluoroalkyl acids (and any salts thereof), per- and polyfluoroalkyl halides, per- and polyfluoroalkyl alcohols, per- and polyfluoroalkyl olefins, per- and polyfluoroalkane sulfonyl fluorides (including any acids and salts thereof), perfluoroalkyl iodides, per- and polyfluoroalkyl ether-based substances, fluoropolymers, perfluoropolyethers, per- and polyfluoroalkanes, side-chain fluorinated aromatics, per- and polyfluorinated phosphates and phosphonates, per- and polyfluorinated sulfonamides, per- and polyfluorinated urethanes, and chemical precursors and degradation products of all such substances, including fluorinated monomers, polymers and side-chain fluorinated polymers and metabolites of all such substances, as well as any substance

asserted to be PFAS in any of the Litigations. It is the intention of this JCO that the definition of "PFAS" be as broad, expansive, and inclusive as possible.

"PFAS-Containing Product" means any consumer, industrial, or other material, substance, article, or product (including AFFF) manufactured with or containing PFAS (including any material, substance, article, or product that intentionally or unintentionally contains PFAS as an ingredient, byproduct, or degradation product) that was sold, supplied, transported, treated, stored, disposed of, or that someone arranged for the transportation, or treatment, storage, or disposal of in the State. For the avoidance of doubt, the term "PFAS-Containing Product" includes (1) a material, substance, article, or product made by a manufacturer that contains PFAS made by another manufacturer and (2) a material, substance, article, or product made by a manufacturer that contains a component that (a) was made by another manufacturer and (b) contains PFAS.

"PFAS Claim" means any Claim that relates to PFAS, a Discharge of PFAS, or PFAS Contamination. It is the intention of this JCO that the definition of "PFAS Claim" be as broad, expansive, and inclusive as possible.

"PFAS Contamination" means, solely for purposes of this JCO, any presence of PFAS in the Environment, whether from a Discharge or from any other source.

"PFAS Personal Injury" means any personal physical or mental illness, injury, or death allegedly caused by exposure to PFAS, or any loss of consortium deriving from such illness, injury, or death.

"PFAS Property Damage" refers solely to any loss of or diminution in the value of Real Property or Personal Property (other than a Private Potable Well) caused by and proximately resulting from PFAS Contamination, by comparison with its value prior to such PFAS Contamination, provided that such property is owned by a Private Person.

"Plaintiffs" (or "Plaintiff" in the singular) means the Department, the Commissioner, and the Administrator.

"Political Subdivision" means any city, borough, town, township, village, county, or other political subdivision of the State, or any agency or instrumentality of one or more thereof.

"Pompton Lakes Works Directive" means the *Directive and Notice to Insurers* regarding the Pompton Lakes Works Site that the Department issued to certain Settling Defendants on March 27, 2019.

"Pompton Lakes Works Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. PAS-L-000936-19 (N.J. Super. Ct. Law Div. Mar. 26, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 2:19-cv-14758-RMB-JBC (Dkt. 1).

"Pompton Lakes Works Site" means the facility located at 2000 Cannonball Road in Pompton Lakes Borough as well as Wanaque Borough in Passaic County, including EIDP's former Haskell Works operations, and any location to which Contaminants Discharged at or from the Site have become located.

"Potable Water" means drinking water, water for other personal uses, and water for purposes requiring a supply of water which the Department determines is suitable for human consumption, and does not include water for use in firefighting, for agricultural (*e.g.*, livestock or crop production) purposes, for manufacturing, or for other non-potable purposes.

"Preliminary Assessment Report" shall be defined in accordance with N.J.A.C. 7:26E.

"Private Non-Released Entity" means any Private Person that is a Non-Released Entity.

"Private Person" means any private individual, corporation, company, association, society, firm, partnership, or joint stock company that is not, and is not owned, operated, managed, held in

trust, or otherwise controlled by, and is not acting as an employee, agent, lessee, contractor, representative, or official of, the United States, any of the United States' Political Subdivisions, departments, agencies, authorities, or instrumentalities, the State, or any of the State's Political Subdivisions, departments, agencies, authorities, or instrumentalities.

"Private Potable Well" means a hole or excavation that (i) is drilled, bored, core driven, jetted, dug, driven, or otherwise constructed for the purpose of removing water from the subsurface for Potable Water supply; (ii) is not abandoned, inactive, or out of use, so long as such well is not abandoned, inactive, or out of use based in whole or in part on the presence or threatened presence of PFAS; (iii) is not operated for mineral extraction, for chemical manufacturing or processing, for scrap-metal processing or recycling, for power generation, for a refinery, or for a fuel-storage facility; and (iv) is owned, operated, managed, or otherwise controlled by a Private Person.

"Public Water System" means a Water System for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least 15 service connections or regularly serves an average of at least 25 individuals daily at least 60 Days out of the year, including (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system; (ii) any collection or pre-treatment storage facilities not under such control which are used primarily in connection with such system; and (iii) any Person (but not any financing or lending institution) that has legal authority or responsibility (by statute, regulation, order, other law, or contract) to fund or incur financial obligations for the design, engineering, installation, operation, or maintenance of any facility or equipment that treats, filters, remediates, or manages water that has entered or may enter any Drinking Water Supplies or any Public Water System. It is the intention of this JCO that the definition of "Public Water System" be as broad, expansive, and

33

inclusive as possible. For the avoidance of doubt, the term "Public Water System" includes community water systems, non-transient non-community water systems, and transient non-community water systems.

"Public Water System Class Settlement" means the Class Action Settlement Agreement that was approved by the United States District Court for the District of South Carolina in the AFFF MDL on February 26, 2024 (AFF MDL Dkt. 4543).

"Punitive Damages" means punitive damages, exemplary damages, treble or multiple damages, civil or administrative fines or penalties, or other damages that serve the public interest or protect the general public primarily by punishing or penalizing civil defendants' conduct or by deterring them and others from engaging in similar conduct in the future.

"Purely Private PFAS Claim" means a civil PFAS Claim brought by any Private Non-Released Entity against any Released Entity that (a) arises from, is based on, involves, or was caused by Covered PFAS Conduct or seeks recovery for a Covered PFAS Harm; (b) could not have been brought by any Statewide PFAS Releasor; (c) presents an individual's (or an individual's estate's) PFAS Claim for PFAS Personal Injury or an individual's PFAS Claim for PFAS Property Damage; (d) does not seek damages or relief directly related to any Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System, which are addressed by this JCO; and (e) does not seek double recovery or relief that is identical to, redundant with, or duplicative of any relief that is received under this JCO or that any Statewide PFAS Releasor could receive arising from Covered PFAS Conduct or Covered PFAS Harm. For the avoidance of doubt, the term "Purely Private PFAS Claim" includes any Private Non-Released Entity's Claim for PFAS Property Damage that seeks damages or relief related to Remediation

34

(*e.g.*, of soil) that is not directly related to any Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System.

"Real Property" means any land, tenement, or hereditament that may be the subject of ownership, and all rights thereto and interests therein.

"Released Claims" means, collectively, the Released Industrial Sites Claims and the Released Statewide PFAS Claims.

"Released Entities" ("Released Entity" in the singular) means (i) any of the Settling Defendants and its respective past, present, or future administrators, advisors, affiliated business entities, affiliates, agents, assigns, attorneys, constituent corporation or entity (including constituent of a constituent) absorbed by any of the Settling Defendants in a consolidation or merger, contractors, counsel, directors, divisions, employee benefit plans, employee benefit plan participants or beneficiaries, employees, executors, founders, heirs, insurers, managers, members, officers, owners, parents, partners, partnerships, predecessors, principals, resulting corporation or entity, servants, shareholders, subcontractors, subrogees, subsidiaries, successors, trustees, trusts, and (ii) any other representatives, individually or in their corporate or personal capacity, and anyone acting on their behalf, including in a representative or derivative capacity, but only to the extent that the alleged liability of the entity in subsection (ii) is based on its status and in its capacity related to any Settling Defendant, and not to the extent that the alleged liability of the entity arose independently of its status and capacity related to any Settling Defendant.  Other than any Settling Defendant, no currently named defendant in the Chambers Works Litigation, Parlin Litigation, Pompton Lakes Works Litigation, Repauno Litigation, and AFFF Litigation, and no currently named respondent in the Spill Act Directives shall be considered a Released Entity.  It is the intention of this JCO that the definition of "Released Entities" be as broad, expansive, and

35

inclusive as possible; however, to the extent that a Released Entity is involved in Covered PFAS Conduct or Covered PFAS Harm through participation in a joint venture with any Non-Released Entity that gives rise to a Non-Party Covered PFAS Harm Claim, the joint venture shall be released only for such Covered PFAS Conduct or Covered PFAS Harm attributable to the Released Entity or reflecting its share of the joint venture and shall not be released for such Covered PFAS Conduct or Covered PFAS Harm attributable to a Non-Released Entity that is a co-owner of the joint venture; provided, however, that to the extent a Released Entity is responsible for the Covered PFAS Conduct or Covered PFAS Harm of the joint venture, such responsibility of the Released Entity is released. For the avoidance of doubt, the term "Released Entities" does not include the direct or indirect customer of a Released Entity, the supplier or indirect supplier of a Released Entity, any waste generator or waste transporter that shipped waste to a Released Entity, any waste transporter that received any wastes generated at any of the Industrial Sites, or any owner or operator of a site that received for treatment or disposal any wastes generated at any of the Industrial Sites unless such customer, supplier, waste generator, waste transporter, owner, or operator otherwise qualifies as a Released Entity pursuant to clauses (i) and (ii) of this definition.

"Released Industrial Sites Claims" ("Released Industrial Site Claim" in the singular) means any and all Claims that were alleged by Settling Plaintiffs in the Industrial Sites Litigations or that were asserted or could have been asserted by Settling Plaintiffs arising out of or relating to any Industrial Site Discharge, including alternative theories of liability arising out of or relating to any Industrial Site Discharge and any Corporate Reorganization Claim. Released Industrial Sites Claims also include any Claim for cost recovery or contribution, including pursuant to section 107 or 113 of CERCLA (42 U.S.C. §§ 9607, 9613) or any State or federal statute related to liability (which this JCO resolves) for Industrial Sites Discharges. The term "Released Industrial Sites

Claims" does not include (i) any Claim based on a Released Entity's failure to satisfy a requirement in this JCO; (ii) any Claim arising under or to enforce this JCO and any subsequent related order or judgment; (iii) any criminal liability that any Private Person, including any Released Entity, has or may have to the State; (iv) a Claim brought by the United States; (v) any Claim that an Industrial Sites Releasor demonstrates arises from a Discharge (or a portion of a Discharge) that occurs entirely after the JCO Entry Date; or (vi) any of the Settling Defendants' Remediation obligations described in Sections VI, VII, and VIII.  For the avoidance of doubt, the term "Released Industrial Sites Claims" includes all Claims that were or could have been asserted by any Settling Plaintiff against any Settling Defendant in the Litigations or the Spill Act Directives related to Discharges of PFAS at or from an Industrial Site that occurred prior to the JCO Entry Date.

"Released Statewide PFAS Claims" ("Released Statewide PFAS Claim" in the singular) means any and all PFAS Claims that directly or indirectly, in any way, arose from, were based on, involved, or were caused by Covered PFAS Conduct or Covered PFAS Harm occurring at least in part prior to the JCO Entry Date and were or could have been asserted against any Released Entity by any Statewide PFAS Releasor, including Corporate Reorganization Claims.  Without limiting the foregoing, the term "Released Statewide PFAS Claims" includes any PFAS Claims that have been asserted against any Released Entity by the State or any Statewide PFAS Releasor in any federal, state, or local action or proceeding (whether judicial, arbitral, regulatory, or administrative) arising from, based on, involving, or caused by, in whole or in part, Covered PFAS Conduct or Covered PFAS Harm, or any such PFAS Claim that could be or could have been asserted as of the JCO Entry Date or in the future in those actions or in any comparable action or proceeding brought by the State or any Statewide PFAS Releasor (whether or not the State or such Statewide PFAS Releasor has brought such action or proceeding).  Released Statewide PFAS

Claims also include any PFAS Claim for cost recovery or contribution, including pursuant to section 107 or 113 of CERCLA (42 U.S.C. §§ 9607, 9613) or any State or federal statute related to liability (which this JCO resolves) for the Discharge or threatened Discharge of PFAS.  It is the intention of this JCO that the definition of "Released Statewide PFAS Claims" be as broad, expansive, and inclusive as possible; however, the term "Released Statewide PFAS Claims" does not include (i) any PFAS Claim based on a Released Entity's failure to satisfy a requirement in this JCO; (ii) any PFAS Claim arising under or to enforce this JCO and any subsequent related order or judgment; (iii) any criminal liability that any Private Person, including any Released Entity, has or may have to the State; (iv) any PFAS Claim for a State or federal antitrust violation; (v) any PFAS Claim arising under State tax law; (vi) any PFAS Claim that a Statewide PFAS Releasor demonstrates, by clear and convincing evidence, arises solely from conduct by one or more Released Entities that occurs entirely after the JCO Entry Date; (vii) any of the Settling Defendants' Remediation obligations described in Sections VI, VII, and VIII; or (viii) any PFAS Claim for compensatory relief that falls within the definition of a Purely Private PFAS Claim.  For the avoidance of doubt, the term "Released Statewide PFAS Claims" includes all PFAS Claims that were or could have been asserted by any Settling Plaintiff against any Settling Defendant in the Litigations or the Spill Act Directives unrelated to Industrial Sites Discharges, and also includes all PFAS Claims arising from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's jurisdiction.

"Releases" means the release of Released Claims by Releasors.

"Releasors" ("Releasor" in the singular) means, collectively, the Industrial Sites Releasors and the Statewide PFAS Releasors.

"Remaining CRACO Parcels" means (i) Pompton Lakes #1 Cannonball Trail (Block 479, Lot 1) in Passaic County comprising 58.52 acres; (ii) Pompton Lakes #2 Highlands (Block 479, Lot 5) in Passaic County comprising 14.7 acres; (iii) Repauno Works #1 Wiggins Pond (Block 8, partial Lot 4) in Gloucester County comprising 78.5 acres; (iv) Repauno Works #2 White Sluice (Blocks 3, 5 and 6, multiple Lots) in Gloucester County comprising 356 acres; and (v) Chambers Works Salem Creek (multiple Blocks and Lots) in Salem County comprising 954 acres, all as further described in Appendix B of the CRACO and as modified by surveys reviewed and previously approved by the Department, subject to the Department's approval of the updated surveys referenced in Paragraph 42.b.

"Remediation" (or "Remediate") has the same meaning as the definition for such term contained within N.J.A.C. 7:26E-1.8.

"Remediation Funding Source" or "RFS" means the methods of financing the Remediation of a Discharge required to be established by a person performing the remediation pursuant to N.J.S.A. 58:10B-3.

"Restricted Use Remedial Action" shall be defined in accordance with N.J.A.C. 7:26E.

"Repauno Works Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. GLO-L-000388-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 1:19-cv-14765-RMB-JBC (Dkt. 1).

"Repauno Works Site" means the facility at 200 North Repauno Avenue, Gibbstown, Greenwich Township, Gloucester County New Jersey, including any former portions of the facility that were transferred to third parties, and including any location to which Contaminants Discharged at or from the Site have become located.

"Reserve Fund Defendants" means New DuPont and Corteva.

"SDWA" means the Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 to -25.

"Section" means a portion of this JCO identified by a Roman numeral.

"Settlement Payments" has the meaning set forth in Paragraph 7.

"Settling Plaintiffs" ("Settling Plaintiff" in the singular) for purposes of this JCO means Plaintiffs, the DCA, and the State, including in their capacities as described in Paragraph EE, and any successor department, agency, or official.

"Settling Defendants" means EIDP, Corteva, New DuPont, DuPont Specialty Products, Chemours, and Chemours FC.

"Site Investigation Report" shall be defined in accordance with N.J.A.C. 7:26E.

"Sludge" means the solids, semi-solids, precipitates, and liquids, including biosolids, that are (i) generated from any Wastewater Treatment Plant (other than the treated effluent from such a plant) or from any Public Water System's water-supply treatment plant; (ii) produced as a result of the storage or physical, chemical, or biological treatment of domestic or industrial sewage or Wastewater; (iii) generated as residue by the processes of any Treatment Works; or (iv) discharged as domestic or industrial Wastewater into a sewerage system.

"Spill Act" means the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24.

"Spill Act Directives" means, collectively, the 2017 Chambers Works Directive, the Pompton Lakes Works Directive, and the Statewide PFAS Directive.

"State" means the State of New Jersey.

"Statewide PFAS Releasors" ("Statewide PFAS Releasor" in the singular) means, with respect to Released Statewide PFAS Claims, (1) the Settling Plaintiffs; (2) the State and, without limitation and to the maximum extent that the Attorney General and other State signatories to this

JCO may release PFAS Claims, (a) all of the State's departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, including the Attorney General and county prosecutors, and any Person claiming by or through any of the foregoing (collectively, "State's departments et al."); (b) all of the State's Political Subdivisions and their departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, and any Person claiming by or through any of the foregoing; and (c) any Person or entity acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity (whether or not such Person or entity signs this JCO or participates in the JCO process set forth in Section XVI) seeking relief on behalf of or generally applicable to the general public in the State or the people of the State, as opposed to solely to private or individual relief for separate and distinct injuries, or with respect to the State's departments et al. as set forth in clause 2(a) of this definition; and (3) any Person or entity on whose behalf any Statewide PFAS Releasor identified in clause (1) or (2) brought or could have brought a Released Statewide PFAS Claim, whether individually or in any corporate, personal, representative, or derivative capacity. Without limiting the foregoing, the Statewide PFAS Releasors include (i) all State-owned and/or operated Public Water Systems within New Jersey that were excluded from the Public Water System Class Settlement, including all Public Water Systems owned by New Jersey listed on Exhibit I of the Public Water System Class Settlement and in Appendix 1 of the Letter Agreement of December 8, 2023 regarding State Owned Systems between the State and Settling Defendants, and (ii) all other publicly owned and/or operated Public Water Systems located in the State that submitted a request for exclusion from the Public Water System Class Settlement, to the full extent of the Attorney General's and the other Settling

41

Plaintiffs' authority under the law to release Claims on behalf of such publicly owned and/or operated Public Water Systems.

"Statewide PFAS Directive" means the *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination in the State that the Department issued to certain Settling Defendants on March 25, 2019.

"Surface Water" means water at or above the land's surface, which is neither Groundwater nor contained within the unsaturated zone, including the ocean and its tributaries, all springs, streams, creeks, rivers, lakes, ponds, reservoirs, lagoons, bays, estuaries, wetlands, and artificial waterbodies.

"SWMA" means the Solid Waste Management Act, N.J.S.A. 13-1E-1 to -230.

"TI Waiver Application" means an application for a technical impracticability waiver determination submitted by the PRCR to the EPA and/or the Department for the Chambers Works Site with respect to NAPL Work.

"Total Remediation Cost Estimate" has the meaning set forth in Paragraph 26.

"Treas. Reg." means U.S. treasury regulations promulgated under the IRS Code.

"Treatment Works" means any device or systems, whether public or private, used in the storage, treatment, recycling, or reclamation of municipal or industrial waste of a liquid nature, including intercepting sewers, outfall sewers, sewage collection systems, cooling towers and ponds, pumping, power and other equipment and their appurtenances; extensions, improvements, remodeling, additions, and alterations thereof; elements essential to provide a reliable recycled supply such as standby treatment units and clear well facilities; and any other works including sites for the treatment process or for ultimate disposal of residues resulting from such treatment; as well as any other method or system for preventing, abating, reducing, storing, treating, separating, or

disposing of pollutants, including stormwater runoff, or industrial waste in combined or separate stormwater and sanitary sewer systems.

"Year One RFS" means the RFSs to be established in accordance with Paragraphs 15 and 16 for each of the Industrial Sites and that will replace the Interim Remediation Assurance at such time.

"Year One Technical Meetings" has the meaning set forth in Paragraph 16.a.

"Wastewater" means residential, commercial, industrial, or agricultural liquid waste, sewage, stormwater runoff, or any combination thereof, or other residue discharged to or collected by a sewerage system.  It is the intention of this JCO that the definition of "Wastewater" be as broad, expansive, and inclusive as possible.

"Wastewater Treatment Plant" means any structure or system by means of which liquid waste, Wastewater, or Sludge, whether domestic or industrial or both, is subjected to any treatment process.  For the avoidance of doubt, the term "Wastewater Treatment Plant" includes any network of pipes, pumping stations, and appurtenances that convey sewage and waste from its points of origin to a point of treatment and disposal.

"Water Purveyor" means a Person that owns, operates, manages, or controls a water supply system, plant, or equipment.

"Water System" means a system for providing Potable Water to any Person.

"Waters Of The State" means the ocean and its estuaries to the seaward limit of the State's jurisdiction, all springs, streams, and bodies of Surface Water or Groundwater, whether natural or artificial, within the boundaries of the State or subject to the State's jurisdiction, including the water column, sediments suspended in water or lying on the bank, bed, or shoreline, and sediments in or transported through coastal and marine areas.

43

"WPCA" means the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20.

## V. <u>SETTLEMENT PAYMENTS</u>

7.      *The Settlement Payments*.  The Settling Defendants shall pay the Settling Plaintiffs $875,000,000, subject to adjustment based on Credit-Eligible PFAS Claims as set forth in Paragraph 9, consistent with the schedule set forth in Exhibit A (the "Settlement Payments").  The Settlement Payments shall be paid as follows:

        a.      Payment Schedule.  Within 30 Days after the JCO Entry Date, the Settling Defendants shall pay $200,000,000 by wire transfer to an escrow account (the "Escrow Account") with a mutually agreed-upon bank (the "Initial Payment").  Within 30 Days of the anniversary of the JCO Entry Date for each of the next 24 consecutive calendar years, except in the event of a pre-payment as provided in Paragraph 10, the Settling Defendants shall make Settlement Payments in accordance with Exhibit A (the "Annual Payments") by wire transfer to the Escrow Account or, if this JCO has become final and non-appealable as of the date that an Annual Payment becomes due, by wire transfer to the Settling Plaintiffs pursuant to instructions to be provided by the Settling Plaintiffs.  Except as provided in Paragraphs 7.b and 10, the Initial Payment and the first six Annual Payments shall not be reduced, withheld, returned to the Settling Defendants, or subjected to any credit under Paragraph 9.

        b.      Until this JCO becomes final and non-appealable, the settlement funds in the Escrow Account shall earn interest and may not be used by the Settling Plaintiffs for any purpose.  If the approval of this JCO is overturned, remanded, vacated, or modified on appeal such that the JCO is void, is of no effect, or is deemed by the Parties, exercising good faith, to be materially altered, the settlement funds placed into the Escrow Account by the Settling Defendants shall be returned to the Settling Defendants within 30 Days,

44

with any interest earned thereon.  The Escrow Account shall be governed by an escrow agreement among all Parties in substantially the same form as the form agreement appended as Exhibit B (or in a form to be mutually agreed to by the Parties).  The escrow agreement will specify the terms on which any funds will be released from escrow, including joint written instructions from all Parties confirming that the JCO has become final and non-appealable and that the Effective Date has therefore occurred.

      c.     The Settlement Payments shall be allocated as follows:

      i.     $225,000,000 as the Natural Resource Damages Amount, of which:

      1.     $100,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Chambers Works Site;

      2.     $75,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Pompton Lakes Works Site;

      3.     $30,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Parlin Site;

      4.     $20,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Repauno Works Site;

      ii.     $525,000,000 as the Abatement Damages Amount; and

      iii.     $125,000,000 for all claims for costs, including direct and indirect costs, and including attorneys' fees and costs, that Settling Plaintiffs incurred on or before the Effective Date to investigate, prosecute, and resolve the Litigations; for claims for Punitive Damages and penalties; or for other amounts not constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS

Code and Treas. Reg. section 1.162-21(e)(4) (the "Costs, Fees, and Punitive Damages Payment").

iv.     The Parties agree that no more than $16,500,000 of the Settlement Payments is specifically recovered for the resolution of Released Statewide PFAS Claims wholly unrelated to the Industrial Sites.  Further, of that $16,500,000, no more than $4,125,000 is specifically recovered to resolve such claims related to AFFF.  Notwithstanding the foregoing, the Settling Plaintiffs retain the discretion to apply additional portions of the Settlement Payments for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the State.

d.     Notwithstanding anything to the contrary in this JCO, subject only to the return of settlement funds in the Escrow Account under Paragraph 7.b, adjustments up to the Credit-Eligible PFAS Claim Cap under Paragraph 9 or a present value reduction for a pre-payment under Paragraph 10, there shall be no reduction, credit, repayment, refund, reimbursement, or deduction of any kind from the Settlement Payments paid by Settling Defendants to Settling Plaintiffs.

8.     *Responsibility for the Settlement Payments*.  The Initial Payment and subsequent Annual Payments shall be made by the Settling Defendants to the Settling Plaintiffs as follows: 50% paid by Chemours and/or Chemours FC; 35.5% paid by New DuPont; and 14.5% paid by EIDP and/or Corteva.  The Settling Plaintiffs agree that they will accept the Initial Payment and Annual Payments from the Settling Defendants in such allocations as agreed among the Settling Defendants under their Cost Sharing Agreements.  Nothing herein is intended to alter or modify the Settling Defendants' Cost Sharing Agreements.  Notwithstanding anything else in this

Paragraph, the Settling Defendants' Cost Sharing Agreements in no way alter or absolve EIDP's responsibility to pay the Settling Plaintiffs 100% of the Settlement Payments pursuant to the schedule established by Exhibit A, subject to the following conditions:

a.      If any of the Settling Defendants fails to make its share of the Initial Payment or any Annual Payment (the "Defaulting Company"), the Settling Plaintiffs agree that they shall not seek from EIDP a Defaulting Company's allocation of the Initial Payment and/or any Annual Payment unless (i) the Settling Plaintiffs have notified the Settling Defendants of any Defaulting Company's failure to make the Initial Payment or any Annual Payment and (ii) have provided any Defaulting Company with no less than 40 Days to cure its failure to pay its portion of the Settlement Payment ("the Cure Period").

b.      If a Defaulting Company fails to cure its default within the Cure Period, the Settling Plaintiffs will accept payment of the defaulted amount within another 40 Days from the non-defaulting Settling Defendants consistent with the Settling Defendants' allocations under their Cost Sharing Agreements.

c.      If the defaulted payment amount is not fully paid within 40 Days of the end of the Cure Period, EIDP is responsible for and will pay the Settling Plaintiffs any unpaid portion of the defaulted payment amount(s) within a further 40 Days.

d.      Nothing herein, however, prevents EIDP from pursuing a Defaulting Company for any defaulted payment(s) EIDP has paid the Settling Plaintiffs in lieu of the Defaulting Company, as permitted in the Cost Sharing Agreements, and the Settling Plaintiffs agree to provide EIDP with reasonable cooperation in connection with its efforts to recover any defaulted payment(s) it had paid to the Settling Plaintiffs on behalf of any Defaulting Company.

9.      *Credit for PFAS Judgments, Awards, or Settlements.*

a.      Except as limited by Paragraph 10.b, if a Settling Defendant pays a judgment, award, or settlement after the JCO Entry Date to resolve a Credit-Eligible PFAS Claim that was filed before, on, or after the JCO Entry Date, the Settling Defendants shall have the right to reduce their next Annual Payment or their next Annual Payment after the sixth Annual Payment has been made, whichever is later, by a credit equal to 50 percent of any judgment, award, or settlement that resolves a Credit-Eligible PFAS Claim until such time as the Settling Defendants have been credited a total of $16,500,000 (the "Credit-Eligible PFAS Claim Cap").

b.      Notification.  For the Settling Defendants to receive a credit under Paragraph 9.a, the Settling Defendants shall provide the Settling Plaintiffs with notice (pursuant to Section XXIII) and an opportunity to meet and confer as soon as reasonably practicable after identifying a PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim.  Notice and opportunity should be provided as follows:

i.      Within 30 Days after receiving service of a newly filed PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim, the Settling Defendants shall notify the Settling Plaintiffs of such PFAS Claim unless prohibited by law;

ii.      Within 30 Days after the Settling Defendants determine in good faith that a filed and served PFAS Claim is a Credit-Eligible PFAS Claim or within 30 Days after the JCO Entry Date, whichever is later, the Settling Defendants shall notify the Settling Plaintiffs;

      iii.      Within 30 Days after an unopposed motion for class certification is filed and served or a contested motion for class certification is granted, if the class action asserts a PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim, the Settling Defendants shall notify the Settling Plaintiffs;

      iv.      Within 30 Days after a PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim results in a judgment or award against a Settling Defendant, the Settling Defendants shall notify Settling Plaintiffs;

      v.      At least 21 Days before settlement of a PFAS Claim that a Settling Defendant in good faith believes is a Credit-Eligible PFAS Claim, the Settling Defendants shall notify the Settling Plaintiffs;

      vi.      Promptly after any notification under this Paragraph 9.b, the Settling Defendants shall offer to meet (in person or electronically) and confer with the Settling Plaintiffs; and

      vii.      Notwithstanding Paragraphs 9.b.i.-9.b.vi., if the Settling Defendants fail to provide a timely notice, a timely offer to meet and confer, or a timely meeting, the Parties shall cooperate fully with each other and shall use all reasonable efforts to agree to a reasonable cure for that failure.  If the Parties do not reach such an agreement within 30 Days, any remaining dispute may be resolved pursuant to the dispute-resolution process provided for in Paragraph 96.

      c.      Within 30 Days after receiving a request from any Settling Defendant that is the subject of a PFAS Claim that such Settling Defendant in good faith believes is a Credit-Eligible PFAS Claim, and subject to the Settling Plaintiffs' reasonable

determination that the PFAS Claim is a Credit-Eligible PFAS Claim, the Settling Plaintiffs must provide a letter substantially in the form of Exhibit C (or in a form to be mutually agreed to by the Parties), which makes clear (i) that the Settling Plaintiffs have fully and forever released all of the Settling Defendants from all Released Statewide PFAS Claims; (ii) the scope of the Settling Defendants' obligations under this JCO and how they help address PFAS Contamination throughout the State; and (iii) the Settling Plaintiffs' efforts, using funds received from the Settling Defendants under this JCO and funds derived from other sources, including the 3M JCO, to address PFAS Contamination throughout New Jersey.

d.     The Parties reserve the right to seek a determination by the Court as to whether any PFAS Claim is a Credit-Eligible PFAS Claim.  If the Settling Defendants withhold any portion of any Annual Payment as a credit under this Paragraph 9 and the Court later determines that the corresponding PFAS Claim was not a Credit-Eligible PFAS Claim, and that determination has become final and non-appealable, the Settling Defendants shall pay the portion of the Annual Payment they previously withheld to the Settling Plaintiffs within 30 Days of such determination, with such payment to be made by wire transfer pursuant to instructions provided by Settling Plaintiffs.

10.     *Pre-Payment Option*.  Any of the Settling Defendants may pre-pay its share of all remaining Annual Payments required to be paid as allocated between them pursuant to Paragraph 8 calculated at the net present value of such remaining Annual Payments using an 8% annual discount rate compounded (discounted) annually from the date of payment, subject to the following:

a.    The election of one Settling Defendant to pre-pay its portion of the Annual Payments shall not obligate any other Settling Defendant to pre-pay its portion of the Annual Payments, nor shall such election alter the amount of the Annual Payments owed by the other Settling Defendant(s) (*e.g.*, if New DuPont and Corteva elect to pre-pay their portion of the Annual Payments, Chemours shall continue to owe 50% of the Annual Payments set forth in each year as set forth in the schedule in Exhibit A, unless and until Chemours exercises its pre-payment option);

b.    In the event that a Settling Defendant has paid and/or pre-paid all of its allocated share of the Annual Payments, that Settling Defendant's allocation of credits available for Credit-Eligible PFAS Claims available under Paragraph 9 above, if any, is forfeited and cannot be transferred to another Settling Defendant.  For the avoidance of doubt, if a Settling Defendant opts to pre-pay its share of the Annual Payments, the balance of the Credit-Eligible PFAS Claim Cap shall be reduced by 50% if the pre-payment is made by Chemours and/or Chemours FC, by 35.5% if the pre-payment is made by New DuPont; and by 14.5% if the pre-payment is made by EIDP and/or Corteva.

c.    A pre-payment by a Settling Defendant does not relieve it from its obligations to the Settling Plaintiffs in the event of a default or non-payment by another Settling Defendant; and

d.    A pre-payment by a Settling Defendant (if any) does not relieve it from any other obligations it has to the Settling Plaintiffs under this JCO, including but not limited to any Remediation obligations.

11.    Notwithstanding Paragraph 7, Settling Plaintiffs may allocate up to an additional $50,000,000 of the Settlement Payments set forth in Paragraphs 7.c.i and ii for costs, including

attorneys' fees and costs, that do not constitute restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS Code, and Treas. Reg. section 1.162-21(e)(4) if necessary based on fees and costs actually incurred ("Additional Fees and Costs Amount"). Settling Plaintiffs shall use their reasonable best efforts to minimize the Additional Fees and Costs Amount. In the event that the Settling Plaintiffs allocate any Additional Fees and Costs Amount, they shall provide written notice of such amount to Settling Defendants. For the avoidance of doubt, Settling Plaintiffs' incurrence of any Additional Fees and Costs Amount will in no event increase the total amount of the Settlement Payments owed by Settling Defendants.

12.     No more than $175,000,000 of the Settlement Payments may be used for amounts not constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS Code, and Treas. Reg. section 1.162-21(e)(4). Each of the Settling Defendants and Settling Plaintiffs acknowledges and agrees that the remainder of the Settlement Payments are being paid solely as compensatory restitution and remediation for alleged harms suffered by the Settling Plaintiffs relating to the Released Industrial Sites Claims and the Released Statewide PFAS Claims, have had or will have a direct nexus or connection with such alleged harms, and are intended to restore, in part, the Settling Plaintiffs to the same or substantially similar position or condition they would have been in had the Settling Plaintiffs not suffered such alleged harms. Settling Plaintiffs agree that they will use the remainder of the Settlement Payments that they receive exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(i). In the event of any material change to applicable tax laws or regulations after the JCO Entry Date that impacts the foregoing, the Parties will meet and confer to ensure that the intent of this provision is carried out to the fullest extent practicable in accordance with then-applicable tax laws and regulations.

13.     The Settlement Payments required herein are inclusive of the one percent annual surcharge under N.J.S.A. 58:10B-11(a) and N.J.A.C. 7:26C-5.9, and thus the Settling Defendants need not pay any such surcharge on any RFS posted for the four Industrial Sites for the duration of the Settlement Payments or the next 24 consecutive calendar years from the JCO Entry Date, whichever is later.  Nothing in this Paragraph 13 alters the provisions of this JCO concerning the allocation of the Settlement Payments to amounts constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS Code, and Treas. Reg. section 1.162-21(e)(4).

## VI.  REMEDIATION FUNDING SOURCES

14.     *Interim Remediation Assurance.*  Within 35 Days of the Notice Date and until such time as the Year One RFS for each Industrial Site is established, the PRCR shall establish and/or maintain Interim Remediation Assurance for each of the Industrial Sites in accordance with the following requirements:

a.      Chemours and/or Chemours FC, jointly and severally, shall establish and maintain the Interim Remediation Assurance for the Chambers Works Site in the amount of $130,298,677 (to be reduced by the amount of then-existing CW RCRA FA for the Chambers Works Site), using any of the following financial mechanisms in a manner consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption): a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond.

b.      Chemours and/or Chemours FC, jointly and severally, shall maintain the Interim Remediation Assurances for the Pompton Lakes Works Site and the Repauno Works Site in the amount of the RFSs established for those Sites as of the Notice Date, respectively, using any of the following financial mechanisms in a manner consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C,

Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption): a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond.

      c.     New DuPont and/or DuPont Specialty Products, jointly and severally, shall maintain an Interim Remediation Assurance for the Parlin Site in the amount of the RFS for the Site established as of the Notice Date using any of the following financial mechanisms in a manner consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption): a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond.

      d.     The Interim Remediation Assurance for each Industrial Site shall be maintained in the same amount and form as required by this Paragraph until such time as the Year One RFS for that Industrial Site is established.

15.    *Year One RFS.*  Within 35 Days of the later of (i) the JCO Entry Date, (ii) if there are no Disputed Scope and/or Costs for such Industrial Site, the Parties' agreement on the RFS amount, or (iii) the LSRP Panel's determination for such Industrial Site pursuant to Paragraph 16.e, the PRCR shall establish and maintain a Year One RFS for each Industrial Site in the form of a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption) in accordance with the following:

      a.     Chemours and/or Chemours FC, jointly and severally, shall establish and maintain Year One RFSs for the following Industrial Sites in an amount within the ranges

set forth below, with such amount to be determined in accordance with the process set forth in Paragraph 16:

      i.      Chambers Works Site:  $130,298,677 to $450,000,000 (the Year One RFS amount determined within this range shall not take into account any NAPL Work, addressed through Paragraph 18);

      ii.     Pompton Lakes Works Site:  $31,133,301 to $350,000,000; and

      iii.    Repauno Works Site:  $16,141,953 to $248,000,000.

b.     DuPont Specialty Products shall establish and maintain a Year One RFS for the Parlin Site in an amount within the range of $54,487,339 to $153,150,000, with such amount to be determined in accordance with the process set forth in Paragraph 16.

c.     The Year One RFS for each Industrial Site, once established, shall supersede the Interim Remediation Assurance for such Site.

16.    *Year One RFS Process.*  The Parties shall engage in the following process to determine the specific Year One RFS amount within the above ranges for each Industrial Site:

a.     As soon as practicable, the PRCRs and the Department and their respective consultants and technical staff shall engage in technical meetings with the objective of completing a Detailed Remediation Cost Estimate Worksheet for each Industrial Site to establish the specific amount of the Year One RFS for each Industrial Site (the "Year One Technical Meetings").

b.     In the event that the Parties are unable to resolve any dispute regarding the scope and/or any estimated costs of remediation to be included in the Year One RFS through the Year One Technical Meetings for any of the Industrial Sites, the dispute will

be submitted to a panel of Licensed Site Remediation Professionals ("LSRP Panel") established in accordance with the requirements set forth below:

       i.      Within 30 Days after the Notice Date, the Settling Defendants, collectively, and the Department shall each appoint one LSRP to serve on the LSRP Panel.

       ii.     Within 30 Days thereafter, the Party-appointed LSRPs shall appoint a third independent LSRP to the Panel.  Such third LSRP shall be an LSRP in good standing, based in New Jersey, and have been an LSRP for more than five years.

       iii.    In the event that the Party-appointed LSRPs are unable to select a third LSRP within 30 Days, the Parties shall apply to the Court within the next 14 Days for assistance in selecting the third LSRP to be appointed to the LSRP Panel.

       iv.    In order to ensure the neutrality of the LSRP Panel, at all times, the Parties shall treat the LSRPs they interview during the appointment process and that are ultimately appointed as neutrals, and the Parties and the LSRPs shall further comply with the following:

           1.      When speaking with any potential LSRP Panel members during the appointment process, no Party shall discuss any technical or legal issues concerning or the history of the Industrial Sites.  Moreover, no Party may allude to or discuss or seek opinions regarding specific issues that may be in dispute or concerning hypotheticals that are analogous to specific issues that may be in dispute during the interview process.  To ensure neutrality, discussions shall be limited to logistical matters, such as availability, conflicts of interest, and billing rates, as well as the LSRP's

past technical experience, training, and qualifications with respect to certain types of Contaminants, sites, and Natural Resources. Notwithstanding the foregoing, a Party may discuss with an LSRP general information regarding the nature of the assignment and categories of issues that may arise, including providing a copy of this JCO and any other written materials agreed by the Parties, to the extent necessary to determine the LSRP's interest in and suitability for serving on the LSRP Panel.

2.      From the time of an LSRP's appointment onward, the LSRP Panel members shall not have ex parte communications with any Party concerning any matters in dispute.

3.      The LSRPs appointed to the LSRP Panel, and the companies for which the appointed LSRPs work or have worked, shall not have been an LSRP, consultant, or expert involved in the Remediation of any of the Industrial Sites or the Industrial Sites Litigations, or performed any previous work for any Party, unless the Parties agree otherwise.

4.      Each LSRP serving on the LSRP Panel shall function as a neutral third party and shall act consistent with their roles as an LSRP pursuant to applicable federal and State statutes, regulations, and guidance, including without limitation the BCSRA; the Site Remediation Reform Act ("SRRA"), N.J.S.A. 58:10C-1, *et seq*.; the Spill Act; the Administrative Requirements for the Remediation of Contaminated Sites, N.J.A.C. 7:26C-1.1, *et seq*. ("ARRCS"); the Technical Requirements for Site Remediation, N.J.A.C. 7:26E-1.1, *et seq*. ("Tech Regs"); the Remediation Standards,

N.J.A.C. 7:26D; and the Regulations of the New Jersey Site Remediation Professional Licensing Board, N.J.A.C. 7:26I-1.1, *et seq.*

     5.    The Settling Defendants, jointly and severally, although they may allocate internally amongst themselves as agreed amongst them under their Cost Sharing Agreements, and the Department shall each pay, respectively, 50% of the fees and costs of the LSRP Panel pursuant to an engagement agreement with each member of the LSRP Panel in a form upon which the Parties will mutually agree.

c.    For each Industrial Site for which the Parties are unable to resolve any dispute regarding any Disputed Scope and/or Costs for Remediation to be included in the Year One RFS, the PRCR and the Department shall jointly submit such dispute to the LSRP Panel in accordance with the following deadlines, unless otherwise agreed to by the Parties:

     i.    Chambers Works Site: 120 Days after the Notice Date;

     ii.    Pompton Lakes Works Site: 150 Days after the Notice Date;

     iii.    Parlin Site: 180 Days after the Notice Date; and

     iv.    Repauno Works Site: 210 Days after the Notice Date.

d.    The Parties' submissions to the LSRP Panel for each Industrial Site shall include the following:

     i.    The PRCR and the Department shall jointly submit to the LSRP Panel a Detailed Remediation Cost Estimate Worksheet setting forth the Agreed Scope and/or Costs, and a short, neutral description of the Disputed Scope and/or Costs.

ii.    The PRCR and the Department shall also each submit to the LSRP Panel their competing positions concerning any Disputed Scope and/or Costs. Each Party's submission shall include:

1.    A Detailed Remediation Cost Estimate Worksheet setting forth the Party's position as to the Disputed Scope and/or Costs; and

2.    A detailed explanation in support of the Party's position as to any Disputed Scope and/or Costs not to exceed a number of pages to be set by agreement of the Parties for each Industrial Site, which number of pages shall take into account the complexity of the Disputed Scope and/or Costs at issue.

e.    The LSRP Panel shall issue its determinations as to Disputed Scope and/or Costs for each Industrial Site within 90 Days after receiving the Parties' simultaneous submissions for a particular Industrial Site, unless the LSRP Panel reasonably requests an extension of such time (to which the Parties will not unreasonably withhold consent). The LSRP Panel shall make its determinations for each Industrial Site in accordance with the following:

i.    The LSRP Panel must accept and may not alter the Agreed Scope and/or Costs;

ii.    The LSRP Panel shall not consider the ranges agreed to by the Parties as set forth in Paragraph 15 above (*i.e.*, the LSRP Panel shall determine each Disputed Scope and/or Cost based on its independent judgment);

iii.    The LSRP Panel may request one or more meetings with the technical staff and consultants from the PRCRs (including the PRCRs' LSRPs) and

the Department to answer questions and/or clarify the record. All Parties' counsel shall be copied on such requests and all Parties and their technical staff and consultants (including the PRCRs' LSRPs) shall be invited to and permitted to attend any such meetings;

iv.    In deciding each Disputed Scope and/or Cost, the LSRP Panel shall follow applicable federal and State statutes and regulations and shall also consider the Department's applicable guidance as well as this JCO;

v.    The LSRP Panel shall make a good faith effort to reach a unanimous decision, although the determination may be made by majority vote in the absence of unanimity;

vi.    The LSRP Panel's determination as to each Disputed Scope and/or Cost shall be set forth in a Detailed Remediation Cost Estimate Worksheet for each Industrial Site, which shall be supported by a detailed written explanation and a certification that is signed by at least two of the three LSRP Panel members in their LSRP capacities with respect to each Disputed Scope and/or Cost at issue.

f.    Notwithstanding the LSRP Panel's determinations, for the avoidance of doubt, the LSRP Panel's determinations shall not result in the PRCR being required to establish a Year One RFS that is above or below the ranges specified in Paragraph 15.

g.    If this JCO does not become final in accordance with its terms, any determinations made by the LSRP Panel shall be of no force and effect and shall not bind the Parties.

h.    In no circumstance shall the LSRP Panel be responsible for any decision other than providing an estimate for a Disputed Scope and/or Cost the Parties submit to it.

60

i.      Any and all Disputed Scope and/or Cost issues for the Year One RFS shall only be resolved through the process set forth herein in Paragraphs 16.b through 16.f, and in no event shall such a dispute affect any other terms of the JCO.

j.      For the avoidance of doubt, it is the Parties' intention that the PRCR shall be given a credit from the Year One RFS and any subsequent RFS for the monetary amount of any RCRA or NJDEP financial assurance the PRCR has established and maintained for any Remediation work within the RFS calculation that is duplicative of work that the PRCR is performing or will perform under the RCRA and/or New Jersey closure, post-closure, and/or operation, maintenance and monitoring requirements.

17.    *Subsequent Annual Cost Reviews*.  The PRCR at each of the Industrial Sites will continue to be obligated to submit an annual cost review, as set forth in N.J.A.C. 7:26C-5.10, to the Department every 365 Days after the Year One RFS is established for each of the Industrial Sites, as set forth below:

a.      The total amount of the RFS(s) for any Industrial Site in subsequent annual cost reviews may increase or decrease in accordance with applicable federal and State laws, regulations, and guidance.  For the avoidance of doubt, with regard to any Remediation cost issues, including NAPL Work, as discussed in detail in Paragraph 18, after the Year One RFS, the Parties agree that the amount of the RFS will be determined exclusively through the RFS determination and approval process under applicable law, regulations, and guidance.

b.      Notwithstanding Paragraph 17.a, after the Year One RFSs are determined, neither the Department nor the PRCRs may seek adjustments to the RFS amounts at any of the Industrial Sites based on information that was Known to the Department, except as

expressly set forth below with respect to NAPL Work. For the avoidance of doubt, however, adjustments to the RFS amounts may be made based upon new information that becomes available after the Notice Date regarding the nature, scope, or extent of Contamination that was Known to the Department or changes in applicable federal or state law or regulations regarding such Contamination after the Notice Date. However, such adjustments to the RFS amounts shall be limited to the additional increased or decreased cost related to such new information after the Notice Date regarding the nature, scope or extent of Contamination or changes in law or regulations.

c.    Downward adjustments, with Department approval, not to be unreasonably withheld, can be made per applicable law, N.J.A.C. 7:26C-5.11 and 5.12, once funds are expended and work is performed.

d.    The future Industrial Sites RFSs shall be maintained in the form of a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption), respectively.

e.    Notwithstanding Paragraph 17.d, the PRCR, provided it is performing the Remediation and is otherwise in compliance with all other provisions of this JCO, may apply to the Department in the following timeframes to be permitted to maintain not more than the following percentages of an Industrial Site RFS using any combination of the financial mechanisms provided for in N.J.A.C. 7:26C, Subchapter 5, with the remainder, if any, to be maintained using the financial mechanisms set forth in Paragraph 17.d:

i.    Not earlier than 5 years after the JCO Entry Date, 50%;

ii.      Not earlier than 10 years after the JCO Entry Date, 75%; and

iii.     Not earlier than 15 years after the JCO Entry Date, 100%.

The Department will not unreasonably withhold consent to such an application, provided that with respect to any application to use a self-guarantee, the PRCR making such application submits to the Department information that demonstrates that the PRCR satisfies the standard set forth in N.J.A.C 7:26C, Subchapter 5, Section 5.8 to maintain a self-guarantee for the portion of the RFS sought to be so maintained, or a different standard in New Jersey regulations in effect at the time of such application. Any decision by the Department pursuant to the foregoing sentence, whether approving or denying an application, will be subject to reconsideration annually based on the PRCR's submission of the required information at such time. In no event will the PRCR for the Chambers Works Site be permitted to use a self-guarantee during a time when the Total Remediation Cost Estimate for the Chambers Works Site exceeds $450,000,000.

18.    *Chambers Works Site NAPL Work*. The Parties acknowledge that the PRCR for the Chambers Works Site submitted a TI Waiver Application with respect to the NAPL located in AOC 1 on December 17, 2024, which application remains pending. The Parties further acknowledge that the PRCR for the Chambers Works Site has submitted additional reports concerning NAPL located in additional AOCs and may submit additional TI Waiver Applications to the EPA and Department. The Parties also acknowledge that the RFS and Reserve Fund obligations at the Chambers Works Site may need to be modified in the future to account for any additional future costs to address NAPL Work that is the subject of the pending or any future TI Waiver Application. The Parties agree as follows:

a.    Only upon a decision denying a TI Waiver Application shall the Chambers Works Site RFS value be increased (subject to Paragraphs 26 through 28) to reflect the

estimated costs of the NAPL Work that was the subject of that TI Waiver Application. Such increase in value is not required until such time as a Final TI Waiver Decision has been issued.

b.      A Final TI Waiver Decision with respect to Chambers Works shall occur as follows:

i.      The PRCR has submitted a TI Waiver Application or, with respect to any future TI Waiver Applications, will submit such application to the EPA and Department concurrently.

ii.     If a TI Waiver Application is granted by both EPA and the Department, a Final TI Waiver Decision will occur at the time of the later approval.

iii.    If a TI Waiver Application is granted by EPA (either initially or on appeal) but denied, in whole or in part, by the Department, the Department will provide the PRCR with a detailed separate decision setting forth the basis for the denial, which decision shall be subject to appeal as set forth below.

iv.     If EPA and/or the Department denies a TI Waiver Application, the PRCR shall retain all administrative and judicial appeals available under state and federal law, regulations, and court rules, and only after the expiration of the period by which an appeal must be filed or the exhaustion of such appeal(s) if one or more appeals are filed will the denial constitute a Final TI Waiver Decision.

v.      Once a Final TI Waiver Decision has been issued for one or more particular AOCs or portions of AOCs (but not before), the PRCR, its LSRP of record, and the Department will take into account for the next annual cost review the additional projected costs to perform the NAPL Work that was the subject of

that TI Waiver Application for the particular AOC(s) in accordance with applicable law, regulations, and guidance.

vi.    For the avoidance of doubt, until such time as a TI Waiver Application has reached a Final TI Waiver Decision, the PRCR and its LSRP of record may assume that a technical impracticability waiver or similar regulatory relief will be available for purposes of calculating the annual RFS value in the annual cost review submission to the Department.

19.    *Non-PRCR Settling Defendants' Obligations to Ensure RFSs for the Industrial Sites Are Established and Maintained*.    If a PRCR remains a going concern and is performing Remediation, but is unable to post the RFS for one or more of the Industrial Sites, the following shall occur:

a.    The PRCR shall provide notice to the Department and to the other Settling Defendants of such inability to maintain an RFS, and the other Settling Defendants, consistent with their Cost Sharing Agreements, shall spend 60 Days providing assistance to the PRCR in obtaining the necessary financing or other financial arrangements to allow the PRCR to maintain the requisite RFS;

b.    If the PRCR fails to maintain the requisite RFS with the assistance of the Settling Defendants pursuant to Paragraph 19.a, the Department may require EIDP to provide sufficient guarantees, including but not limited to co-signing one or more of the RFS funding mechanisms permitted pursuant to this JCO, to allow the PRCR to maintain the requisite RFS; and

c.    If the PRCR is unable to maintain the required RFS at any Industrial Site, notwithstanding Paragraphs 19.a and 19.b, the Department may direct EIDP in writing to

establish, and EIDP will establish within 45 Days of receipt of such written communication, the RFS required by this JCO for any Industrial Site for which the PRCR has not maintained the required RFS.

      d.    In the event a Settling Defendant that is not the PRCR assists the PRCR for an Industrial Site to maintain the required RFS or EIDP is directed to establish an RFS for an Industrial Site, neither the non-PRCR Settling Defendant nor EIDP shall become responsible for conducting the required Remediation, provided the PRCR remains a going concern and is performing Remediation.

      e.    Nothing herein prevents the non-PRCR Settling Defendants, including EIDP, from pursuing recovery of their Remediation costs pursuant to the Settling Defendants' Cost Sharing Agreements, and the Department agrees to provide the Settling Defendants with reasonable cooperation in connection with these efforts.

## VII.  <u>RESERVE FUND</u>

20.    *Requirements for Establishing and Maintaining the Reserve Fund*.  Within 60 Days of the JCO Entry Date, the Reserve Fund Defendants (*i.e.*, New DuPont and Corteva) shall establish a Reserve Fund in the amount of $475,000,000, which is not an RFS as defined in N.J.A.C. 7:26C-5.1 et seq. but is to be established and maintained for the purpose of providing further assurance that Remediation of the Industrial Sites will be completed, consistent with the following:

      a.    The Reserve Fund Defendants shall be responsible for establishing the Reserve Fund exclusively for the Department's benefit to be held, administered, and maintained by a third-party trustee (the "Reserve Fund Trustee") appointed by the Department pursuant to the terms of the Reserve Fund Agreement between New DuPont, Corteva, and the Department, attached as Exhibit D.

b.      The Reserve Fund Defendants shall fund their respective shares of the Reserve Fund and the costs of the Reserve Fund Trustee in accordance with their Cost Sharing Agreements, which, as between the parties thereto, would provide for New DuPont to be responsible for 71 percent thereof and Corteva 29 percent.

c.      Although the Parties acknowledge that the Reserve Fund is not an RFS, the Reserve Fund shall be established through a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond, consistent with the requirements for each such financial mechanism as set forth in N.J.S.A. 58:10B-3 and N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption), respectively.

d.      The Reserve Fund Defendants shall be obligated to fund, and the Reserve Fund Trustee shall be obligated to maintain, the Reserve Fund until such time as each of the Industrial Sites has received a sitewide Final Remediation Document for all environmental media from (i) the Department, and (ii) as applicable, EPA.

e.      The Reserve Fund is capped at $475,000,000 (the "Reserve Fund Cap").

f.      The amount of the Reserve Fund shall be adjusted annually in proportion with the percentage decrease or increase in the annual aggregate amount of the RFSs, starting with the RFSs immediately following the Year One RFSs, required by the Department for the four Industrial Sites, but in no event shall the Reserve Fund exceed the Reserve Fund Cap.  For the avoidance of doubt, the initial Reserve Fund that is established in the amount of $475,000,000 may decrease in value proportionately to any decrease in the annual aggregate value of the RFSs for the four Industrial Sites.  Only once the value of the Reserve Fund falls below $475,000,000 can its value increase in proportion to any

increase in the aggregate value of the RFSs for the Industrial Sites, but under no circumstance shall the Reserve Fund exceed $475,000,000.

g.       The Reserve Fund Defendants and the Reserve Fund Trustee shall submit written documentation to the Department on an annual basis demonstrating that the Reserve Fund is in compliance with the above-stated Reserve Fund requirements.

21.       The Department shall be entitled to draw on the Reserve Fund in accordance with the Reserve Fund Agreement only if each of the following conditions are met:

a.       The funds are drawn in connection with Remediation work identified in the prior year's Detailed Remediation Cost Estimate Worksheet submitted by the PRCR and its LSRP and approved by the Department for one or more of the Industrial Sites where the Department has determined that the PRCR has failed to perform the Remediation as required;

b.       The Department has notified all Settling Defendants and the Reserve Fund Trustee that the PRCR has failed to perform the Remediation of one or more of the Industrial Sites and has given the PRCR a reasonable opportunity to cure of at least 30 Days;

c.       After such opportunity to cure has lapsed, the Department has notified all Settling Defendants of such failure to cure;

d.       The Department has made a demand to avail itself of the funds in the RFS(s) for the particular Industrial Site(s) for which the Department has determined that the required Remediation is not being performed; and

68

e.    The Department has not received within 30 Days the funds demanded in Paragraph 21.d from the RFS(s) for the particular Industrial Site(s) for which the Department has determined that the required Remediation is not being performed.

22.    The Department shall have the right to avail itself of the funds in the Reserve Fund for the purpose of performing the Remediation of the Industrial Site after the foregoing conditions in Paragraph 21 have been met, subject to these additional requirements:

a.    The Department may access the funds consistent with the Reserve Fund Agreement;

b.    The Department shall provide a written communication to the Reserve Fund Defendants and the Reserve Fund Trustee briefly summarizing the Remediation in the Detailed Remediation Cost Estimate Worksheet for which the Reserve Fund funds will be used;

c.    The Department shall submit proof of the expense(s) (e.g., bid, invoice, purchase order, deposited check) for which the Reserve Fund funds were used to the Reserve Fund Defendants and the Reserve Fund Trustee on an annual basis; and

d.    The Department shall continue to issue a written demand to the PRCR that has failed to perform the Remediation on a quarterly basis that it perform the Remediation of the Industrial Site(s) for which a determination has been made by the Department that the required Remediation is not being performed.

23.    Any amount drawn by the Department from the Reserve Fund shall decrease the Reserve Fund Cap by that amount unless or until funds are recouped pursuant to Paragraph 24 below concerning Reserve Fund Recoupment, in which case the Reserve Fund Cap shall be

replenished up to its value prior to the Department drawing on the funds, but in no circumstance greater than $475,000,000.

24.    If and to the extent that the Department recovers funds from the PRCR for which the Reserve Funds were used, the Department shall assign its rights to recover any amount previously utilized from the Reserve Fund to the Reserve Fund Defendants.  If Reserve Funds are recovered, whether by the Department or the Reserve Fund Defendants, those funds shall be deposited back into the Reserve Fund (the "Reserve Fund Recoupment"), subject to the Reserve Fund Cap and subject to the annual adjustment in proportion with the percentage decrease or increase in the annual aggregate amount of the RFSs required by the Department for each of the four Industrial Sites.

25.    If this JCO fails to become a final court order and the Effective Date herein never occurs, the Reserve Fund and the Reserve Fund Trust will be terminated by the Reserve Fund Defendants without the consent of the Department.

26.    *Reserve Fund as Supplemental RFS*.  If the total estimated costs for Remediation of the Chambers Works Site, including any NAPL Work that has been the subject of a Final TI Waiver Decision (the "Total Remediation Cost Estimate"), exceed $450,000,000, then the Reserve Fund, not to exceed the Reserve Fund Cap, shall function as a supplemental RFS for the costs of the estimated Remediation amount over $450,000,000.

27.    In the event the Chambers Works Site Total Remediation Cost Estimate exceeds $925,000,000, there shall be no obligation to establish any supplemental RFS for the Chambers Works Site beyond the $450,000,000 RFS established by the PRCR plus the Reserve Fund, not to exceed the Reserve Fund Cap, functioning as a supplemental RFS for the costs of the estimated Remediation amount over $450,000,000; provided, however, that the provisions of this JCO,

including Sections VI, VII, and VIII with respect to the responsibility of the Settling Defendants to perform the Remediation of the Chambers Works Site shall continue to apply.

28.     At any time when the Total Remediation Cost Estimate for a particular year based on the annual cost review exceeds $450,000,000 for the Chambers Works Site, the original RFS established by the PRCR shall remain static at $450,000,000 and shall not be reduced in value during the annual cost review process until the remaining Total Remediation Cost Estimate for the Chambers Works Site is determined to be less than $450,000,000.    So long as the Total Remediation Cost Estimate for the Chambers Works Site falls below $925,000,000, the portion of the Reserve Fund that is functioning as a supplemental RFS for the Chambers Works Site may be reduced during the annual cost review as costs are expended to perform the Remediation of the Site.

## VIII.  REMEDIATION OBLIGATIONS

29.     *Continuing Obligation to Perform Remediation.* Except as expressly set forth in this JCO, nothing in this JCO is intended to alter, in any way, any Settling Defendant's obligation to conduct Remediation at the Industrial Sites consistent with applicable federal and State laws, regulations, and guidance.

30.     Remediation is required at each Industrial Site until each Site is fully and finally Remediated pursuant to applicable federal and State laws, regulations, and guidance and receives a sitewide Final Remediation Document for all environmental media from (i) the Department and (ii) as applicable, EPA.

31.     The PRCR shall continue to conduct the Remediation at each Industrial Site in the first instance.

32.     *Defaulting PRCR.* Notwithstanding Paragraph 31, if the PRCR fails to perform the
Remediation at any Industrial Site (the "Defaulting PRCR"), EIDP shall perform the required
Remediation at such Site so long as each of the following conditions has been met:

a.     The Department has issued a Spill Act Directive to the Defaulting PRCR
providing the Defaulting PRCR with 21 Days to restart the performance of the Remediation
and the Defaulting PRCR has not resumed performance of the Remediation in such time;

b.     The Department has provided the non-PRCR Settling Defendants with an
additional 21 Days to discuss the Remediation responsibilities at the Industrial Site that
they may have under their Cost Sharing Agreements and the non-PRCR Settling
Defendants have not resumed the Remediation in such time; and

c.     At least some of the Remediation remaining at the Industrial Site involves
Discharges that occurred prior to July 2015.

33.     If EIDP performs the Remediation pursuant to Paragraph 32, EIDP may utilize
funds from the RFS(s) established by the Defaulting PRCR for the Industrial Site where the
Defaulting PRCR has failed to conduct the Remediation until such funds are exhausted as if EIDP
were the PRCR.

34.     If the RFS(s) for the Industrial Site where the Defaulting PRCR has failed to
conduct the Remediation are unavailable for EIDP to use to perform Remediation, EIDP shall
notify the Department in writing.  If, in the opinion of the Department, the RFS funds are
unavailable, the Department shall notify EIDP and the Reserve Fund Trustee that EIDP may utilize
the Reserve Fund to perform the Remediation until the Reserve Fund is exhausted.   Once the
Reserve Fund is exhausted, EIDP shall perform the Remediation using its own financial resources

and shall have the right to seek contribution from any other responsible party that may have Discharged Contaminants at the particular Industrial Site at issue after July 2015.

35.    Nothing herein prevents EIDP from pursuing recovery of EIDP's Remediation costs pursuant to the Settling Defendants' Cost Sharing Agreements, and the Department agrees to provide the Settling Defendants with reasonable cooperation in connection with these efforts.  Nothing herein is intended to alter or modify the Companies' Cost Sharing Agreements.

36.    The Department and the PRCRs recognize that the Industrial Sites encompass historic, current, and potential future manufacturing and/or commercial operations.  Thus, subject to the Department's obligation to protect human health, safety and the environment, the Department recognizes that future Remediation, including long-term remedial action implementation, operation, maintenance, and monitoring, at the Industrial Sites will consider current operations and potential future industrial and/or commercial land uses.

37.    *Discretionary Direct Oversight*.  The Department agrees to withdraw in writing its assertion of Discretionary Direct Oversight of the Chambers Works Site, as set forth in letters dated February 28, 2025 and March 6, 2025, on or before the JCO Entry Date.

38.    The Department agrees not to assert Discretionary Direct Oversight at any of the four Industrial Sites based on Discharges of Contaminants that occurred prior to the JCO Entry Date.

39.    With respect to the Parlin Site's compulsory direct oversight status pursuant to N.J.A.C. 7:26C-14.2, the Department agrees to meet with DuPont Specialty Products and its representatives (including its LSRP) as soon as reasonably practicable to discuss whether it would be appropriate to adjust certain direct oversight requirements pursuant to N.J.A.C. 7:26C-14.4 on

the basis that such action would be (i) in the public interest, and (ii) protective of public health and safety and the environment.

## IX.  MITIGATION OF ONGOING PFAS DISCHARGES AT THE CHAMBERS WORKS AND PARLIN SITES

40.    Abatement actions have been taken at the Chambers Works and Parlin Sites to reduce PFAS Discharges from ongoing Site operations, including but not limited to the use of carbon beds to abate water and air discharges from individual operating units.  As part of continuing efforts to reduce PFAS Discharges from ongoing operations at the Chambers Works and Parlin Sites, Chemours and DuPont Specialty Products agree to undertake, for their respective operations at the two Sites, an evaluation, including without limitation the collection of data, of the continued presence and discharge (including emissions) of PFAS within and from their ongoing operations.  Chemours and DuPont Specialty Products shall report the results to the Department within 12 months of the JCO Entry Date, after which Chemours and DuPont Specialty Products and the Department will meet to discuss any additional measures that may or may not be appropriate to mitigate PFAS Discharges that occur after the JCO Entry Date based on consideration of available technology; applicable New Jersey regulations, including any that become applicable after the JCO Entry Date; the significance of such PFAS Discharges from ongoing site operations (if any); the steps already taken and being taken to abate such PFAS Discharges; and the economic feasibility of such steps.  For the Chambers Works Site, any mitigation of Discharges of PFAS to Surface Waters will be determined by the ongoing New Jersey Pollutant Discharge Elimination System permit renewal process and, as part of such process, Chemours will agree to implement PFAS abatement projects to achieve reductions of such Discharges.

## X.  RESOLUTION OF THE COMPENSATORY RESTORATION ADMINISTRATIVE CONSENT ORDER

41.     *Novation of the CRACO*.  The Parties agree that this JCO is a novation to and supersedes the CRACO.  No rights or obligations under the CRACO shall survive the entry of this JCO except for those rights or obligations under the CRACO that are expressly incorporated herein.

42.     *Remaining CRACO Parcels*.  Settling Defendants shall take the following steps regarding the Remaining CRACO Parcels.  The Parties shall cooperate to implement these steps, and the Department shall identify a point of contact for the Settling Defendants to implement these steps:

a.     *Updated Title Insurance Commitment*.  Within 90 Days of the JCO Entry Date, Settling Defendants shall provide the Department with an updated title insurance commitment for each Remaining CRACO Parcel prepared in accordance with the Green Acres Program's "Title Insurance Commitment and Title Insurance Policy Checklist" (attached      as      Exhibit      F,      and      available      at      https://dep.nj.gov/wp-content/uploads/greenacres/pdf/title-checklist-10-2022.pdf).

b.     *Updated Survey*.  Within 60 Days of the JCO Entry Date, the Department shall review the last surveys performed, attached hereto as Exhibit G, and identify any necessary updates.  Within 60 Days of a request for an updated survey, Settling Defendants shall submit to the Department an updated survey for such Parcel prepared in accordance with the Green Acres Program's "Scope of Survey Services and Standard Detail Requirements"      (attached      as      Exhibit      H,      and      available      at https://dep.nj.gov/greenacres/survey-section-standard-scope-of-work/).

c.      *Encroachment Issues*.  Within 60 Days of receiving an updated survey for a Remaining CRACO Parcel, the Department shall identify to Settling Defendants (i) Permitted Exceptions for the Parcel and (ii) any encroachments on such Parcel that must be resolved by the Settling Defendants.  Within 30 Days thereafter, the Settling Defendants shall submit to the Department for approval a plan to resolve the encroachments identified by the Department as requiring resolution.  Subject to Permitted Exceptions, Settling Defendants shall be obligated to resolve all encroachments on each Remaining CRACO Parcel before any easement or conveyance of title may be effectuated.

d.      *Demolition of Abandoned/Derelict Structures on Pompton Lakes Parcels.* The requirements of paragraphs 11 through 15 of the CRACO regarding the demolition of all abandoned/derelict structures on the Pompton Lakes #1 and #2 Parcels are expressly incorporated herein.  Within 60 Days of the JCO Entry Date, Settling Defendants shall submit a report regarding the implementation of the Demolition Work Plan, and take any additional steps, if any, required by paragraph 15 of the CRACO.

e.      *Updated Preliminary Assessment Report and Site Investigation Report.*

i.      Within 90 Days after the JCO Entry Date, the PRCR shall provide the Department with a Preliminary Assessment Report and Site Investigation Report for the Chambers Works Salem Creek Parcel, prepared in accordance with the Tech Regs.  With respect to the Repauno Works and Pompton Lakes Parcels, the PRCR shall, within 90 Days after the JCO Entry Date, provide a written update report to the Department on the Remediation status of each such Parcel, including by reference to existing Remediation reports.  The Department shall determine if the reports contain the required information and shall notify the PRCR as follows:

1.      If the Department determines that the reports do not contain the required information, including but not limited to identifying all Areas of Concern, the Department shall send the PRCR a deficiency letter identifying the additional information that must be submitted. The PRCR shall submit the information by the date specified in the letter.

2.      If the Department determines that the reports contain the required information, the Department shall send the PRCR a letter acknowledging the sufficiency of the reports.

ii.      If the report(s) approved by the Department for a Remaining CRACO Parcel identify one or more contaminated Areas of Concern, the PRCR shall conduct further Remediation of the Parcel as necessary to complete a Restricted Use Remedial Action necessary for the intended use of the Parcel, consistent with Paragraph 42.f.

f.      *Remedial Action.*

i.      Unless otherwise agreed to by the Department, the PRCR shall complete a Restricted Use Remedial Action of each Remaining CRACO Parcel at which a contaminated Area of Concern has been identified, consistent with federal and state laws, regulations, and guidance, including consideration of natural background levels, prior to the placement of an easement and/or conveyance of title.

ii.      Unless otherwise agreed to by the Department, no easement or conveyance of title may be effectuated until the PRCR has submitted a final Remedial Action Report, as applicable, for the subject Remaining CRACO Parcel

in compliance with N.J.A.C. 7:26E-5.7 (except that the remedial timeframes set forth therein shall not apply), and the Department has approved the same and confirmed in writing that the Remedial Action is complete.

        iii.      For a Restricted Use Remedial Action, the PRCR shall obtain and comply with a Remedial Action Permit pursuant to N.J.A.C. 7:26C-7.  The PRCR shall be designated in such permit as the sole "party responsible for permit compliance" and shall enter into a site access agreement with the Department in order to perform any activity as may be required pursuant to the Remedial Action Permit.  The PRCR shall thereafter perform all actions as may be required pursuant to such Remedial Action Permit for as long as it remains in effect.

        iv.      The PRCR shall provide the Department with a status report of the Remediation being conducted at each Remaining CRACO Parcel every 90 Days, or as otherwise agreed, until the Remedial Action at such Parcel is complete.

        g.      *Conservation Easements*.  Each CRACO Remaining Parcel that is designated for a conservation easement shall be subject to the following process.

        i.      *Chambers Works Salem Creek Parcel*.  Within 60 Days of the Department's approval of the Parcel for conveyance, Chemours and Chemours FC shall place a conservation easement on the Chambers Works Salem Creek Parcel in substantially the same form as Exhibit I.  The conservation easement shall be filed with the Clerk of the county in which the property is located, and Chemours and Chemours FC shall submit copies of the recorded conservation easement to the Department.

ii. *Repauno Works Parcels*. The Parties acknowledge that fee title to the Repauno Works #1 Wiggins Pond and Repauno Works #2 White Sluice Parcels is currently held by Delaware River Partners ("DRP") subject to an obligation by DRP to convey conservation easements pursuant to Amendment No. 2 to Environmental and Indemnification Agreement and Amendment No. 4 to Agreement of Sale. Within 60 Days of the Department's approval of the Parcels for conveyance, Chemours and Chemours FC shall take all commercially reasonable steps to convey a conservation easement for such Parcel in substantially the same form as Exhibit I, including enforcing DRP's contractual obligations to convey such easement. The conservation easement shall be filed with the Clerk of the county in which the property is located, and Chemours and Chemours FC shall submit copies of the recorded conservation easement to the Department.

h. *Conveyance of Pompton Lakes Parcels*. Within 90 Days of the Department's approval of the Pompton Lakes # 1 and #2 Parcels for conveyance, whichever is last to occur, Chemours FC shall convey fee simple absolute title to both Parcels to the Department subject to any Permitted Exceptions. The conveyances shall occur at the same time and shall be accomplished through the delivery by Chemours FC of the following documents to the Department: (i) bargain and sale deed with covenants against grantor's acts, (ii) affidavit of title, (iii) evidence of authority to convey, (iv) seller's residency certification, *i.e.* Form GIT/REP-3, (v) affidavit of consideration for use by seller, *i.e.* Form RTF-1; (vi) a title insurance policy; and (vii) any other documents the Department may request.

43.    *Costs.*  The Settling Defendants agree to bear their full cost of the required steps herein.

44.    *CRACO Release.*  Plaintiffs hereby fully and forever release, covenant not to sue, and agree not to otherwise take administrative action against the CRACO Releasees for any "Natural Resource Damages" as that term is defined in the CRACO.

45.    *Contribution Protection*.  The contribution protection for the CRACO Releasees provided for in paragraph 30 of the CRACO is hereby expressly preserved and remains in effect.

46.    *Extensions of Time.*  Settling Defendants may request a reasonable extension of time to satisfy any requirement in this Section X by submitting to the Department a written request for an extension no later than 14 Days prior to the applicable deadline.  The Department's failure to respond to such a request shall be deemed approval of the request for an extension.

47.    *CRACO Enforcement*.  In the event that Settling Plaintiffs assert a claim for breach against Settling Defendants for failure to comply with the requirements of this Section X, the Department shall retain, in connection with any such alleged breach, all remedies available to the Department, and Settling Defendants shall retain all defenses available to Settling Defendants, under applicable law or in equity.  For the avoidance of doubt, however, Plaintiffs shall have no right to reinstitute any Claims or causes of action for "Natural Resource Damages" as that term is defined and not otherwise reserved in the CRACO.

48.    Nothing herein relieves Settling Defendants of their Remediation obligations with respect to Discharges at and from the Additional CRACO Industrial Sites or the Remaining CRACO Parcels.

## XI.  THE SETTLING PLAINTIFFS' RELEASES AND COVENANT NOT TO SUE; DISMISSALS AND WITHDRAWALS OF DIRECTIVES

49.     *Industrial Sites Release and Covenant Not to Sue.*  As of the Effective Date, in consideration of this JCO, Settling Plaintiffs acting in all of their capacities, including in the Department's standing as *parens patriae*, as trustee of the State's natural resources, as an entity with interests in real property in the State, and in its regulatory capacity, fully and forever release, covenant not to sue, and agree not to otherwise take administrative or civil action against any of the Released Entities for any and all Released Industrial Sites Claims. To the full extent of the Attorney General's and other Settling Plaintiffs' authority under the law to release the Released Industrial Sites Claims, the foregoing release shall apply to (i) the State (including its departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, including the Attorney General and county prosecutors, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing); (ii) all Political Subdivisions, but only to the full extent of the Attorney General's and the Settling Plaintiffs' power and authority under New Jersey law to release such claims; and (iii) any Person or entity acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity (whether or not such Person or entity signs this JCO or participates in the JCO process set forth in Section XVI) seeking relief on behalf of or generally applicable to the general public in the State or the people of the State (Settling Plaintiffs and all persons and entities in clauses (i), (ii), and (iii), collectively, the "Industrial Sites Releasors").  The releases of Released Industrial Sites Claims provided for in this JCO (individually and collectively, the "Industrial Sites Release") extend to Released Industrial Sites Claims that Settling Plaintiffs do not know or suspect to exist in their favor as of the JCO Entry Date, regardless of whether they could have materially affected the terms of this JCO.  It is the intention of this JCO that the definition of "Industrial Sites

Release" be as broad, expansive, and inclusive as possible, so as to give the Released Entities the broadest possible bar against Released Industrial Sites Claims and extend to the full extent of the power of the Attorney General and the other Settling Plaintiffs to release Released Industrial Sites Claims, to the maximum extent allowable by law. This JCO shall be a complete bar to any Released Industrial Sites Claim.

50.    *Statewide PFAS Release and Covenant Not to Sue.*  As of the Effective Date, in consideration of this JCO, the Statewide PFAS Releasors, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State government, and acting in all of the Settling Plaintiffs' capacities as described in Paragraph EE, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, fully and forever release all Released Entities from all Released Statewide PFAS Claims and fully discharge all Released Statewide PFAS Claims against all Released Entities. The statewide releases provided for in this JCO (individually and collectively, the "Statewide PFAS Release") extend to Released Statewide PFAS Claims that the Statewide PFAS Releasors do not know or suspect to exist in their favor as of the Effective Date, regardless of whether they could have materially affected the terms of this JCO. It is the intention of this JCO that the definition of "Statewide PFAS Release" be as broad, expansive, and inclusive as possible, so as to give the Released Entities the broadest possible bar against any liability in any way arising from, based on, involving, or caused by any Covered PFAS Conduct or Covered PFAS Harm and extend to the full extent of the power of the State, the Governor, and the Attorney General to release PFAS Claims, to the maximum extent allowable by law. This JCO shall be a complete bar to any Released Statewide PFAS Claim. By the State exercising its authority and the Court entering this JCO, any Released Statewide PFAS Claim (regardless of the identity of the

Person asserting the Released Statewide PFAS Claim) arising from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's jurisdiction and any Released Statewide PFAS Claim asserted by a Government Entity of the State or of any of the State's Political Subdivisions against any Released Entity in any way arising from, based on, involving, or caused by any Covered PFAS Conduct or Covered PFAS Harm is released, barred, and precluded, but only to the full extent of the Attorney General's and Settling Plaintiffs' power and authority under New Jersey law to release such claims.

51.     The Releases and Covenants Not To Sue described in Paragraphs 49 and 50 extend only to the Settling Defendants and the Released Entities, respectively, and not to any other Person.

52.     The Releases and Covenants Not To Sue described in this Section XI do not pertain to any matters other than those expressly stated.

53.     *Dismissals*.  Within 5 Days of the Settling Plaintiffs' receipt of the Initial Payment: (i) the Settling Plaintiffs shall file a motion for Dismissal of the Chambers Works Litigation, the Pompton Lakes Litigation, the Parlin Litigation, and the Repauno Works Litigation as to the Settling Defendants pursuant to Federal Rule of Civil Procedure 41(a)(2); (ii) the Settling Plaintiffs shall file a motion for Dismissal of the AFFF Litigation as to the Settling Defendants pursuant to Federal Rule of Civil Procedure 41(a)(2); and (iii) the Department shall withdraw and close the Statewide PFAS Directive, the 2017 Chambers Works Directive, and the Pompton Lakes Works Directive as to Settling Defendants.  To the extent necessary to avoid any further non-settlement related proceedings in the Litigations, the Parties shall seek a stay of non-settlement related proceedings involving Settling Defendants in the Litigations pending the filing of the Dismissals.

## XII.  RESERVATIONS AND FUTURE LITIGATION

54.    *Delaware Estuary Claims*.  A portion of the Settlement Payments for Natural Resource Damages arising out of or relating to Discharges at or from the Chambers Works Site and the Repauno Works Site will be applied to restoration of the State of New Jersey's trust resources within the Delaware Estuary, including the Delaware River and/or Delaware Bay ("Delaware Estuary Restoration Projects").  The Delaware Estuary Restoration Projects will be designed to benefit Natural Resources held in trust by the State of New Jersey, but the Parties recognize that Natural Resources held jointly or alone by other tribal, state, and/or federal trustees (the "Other Delaware Estuary Trustees") will likely benefit from the Delaware Estuary Restoration Projects.  However, nothing in this JCO shall be construed as releasing any Delaware Estuary Claims to the extent such claims belong to any Other Delaware Estuary Trustees.

55.    Nothing in this JCO shall be construed as precluding the Settling Plaintiffs from taking any action permitted by law that they deem necessary or appropriate to protect public health and safety and the environment, and to enforce the environmental laws of the State, to the extent those actions are not inconsistent with this JCO or any resolution of liability effected hereby.  For the avoidance of doubt, no action or enforcement that any Settling Plaintiff takes pursuant to this Paragraph 55 can alter in any way the Dismissals, the Releases, the Covenants Not to Sue, or any other provision of this JCO.

56.    *Acknowledgement of Continuing Remediation Obligations*.  Notwithstanding anything else to the contrary in this JCO, the Dismissals, the Releases, and the Covenants Not To Sue with respect to Released Industrial Sites Claims and Released Statewide PFAS Claims do not relieve any Settling Defendant or any Released Entity of their obligations to perform and/or fund Remediation at and from the Industrial Sites in accordance with federal and State statutes, regulations, and guidance as they exist now or in the future.  Further, for the avoidance of doubt,

this JCO does not relieve any Settling Defendant or any Released Entity of any obligations that may exist under federal and State statutes, regulations, and guidance to perform and/or fund Remediation at or from any other sites currently or formerly owned, operated, or otherwise controlled by any of the Settling Defendants or any Released Entity anywhere within the State of New Jersey.

57.    The Settling Defendants understand and acknowledge that the PRCRs' and EIDP's failure to comply with their Remediation obligations at the Industrial Sites may give rise to enforcement and liability pursuant to federal or state law.

58.    Nothing in the JCO shall limit the Department's right or ability to seek to have the Settling Defendants or Released Entities take any action consistent with the Department's powers and authorities to evaluate, minimize, control, or eliminate Discharges, including Industrial Sites Discharges or any other Discharge within the State, that occur after the JCO Entry Date.

59.    Nothing in this JCO shall be construed as releasing any of the Settling Defendants or any Released Entity for any Claims for non-PFAS Contamination at or from any New Jersey sites other than the Industrial Sites where Settling Defendants or any Released Entity by contract, agreement, or otherwise arranged for disposal or treatment of such non-PFAS Contaminants, or arranged with a transporter for transport for disposal or treatment of such non-PFAS Contaminants.

60.    The Settling Plaintiffs reserve, and this JCO is without prejudice to, all rights against the Settling Defendants and Released Entities concerning all matters not addressed in this JCO, including but not limited to applicable State and federal laws and regulatory requirements, including permitting.

61.     The Settling Defendants reserve, and this JCO is without prejudice to, all rights against the Settling Plaintiffs and defenses to actions brought by the Settling Plaintiffs against any of the Settling Defendants concerning all matters not addressed in this JCO.

62.     Except as otherwise set forth in this JCO, nothing in this JCO shall waive or impair any rights or defenses that the Settling Defendants or the Settling Plaintiffs may have.

63.     Notwithstanding anything else to the contrary in this JCO, nothing in this JCO alters or releases the existing obligations of the Settling Defendants in any existing agreement with third parties for testing, treatment, or Remediation of Contaminants, including but not limited to PFAS.

64.     Nothing in this JCO shall be construed, nor is intended by the Parties, to limit the right of any Class-Member Public Water System to obtain its designated recovery under the Public Water System Class Settlement.

65.     Nothing in this JCO shall be construed to release any Claim concerning any sites that have been owned, operated, or otherwise controlled by any of the Settling Defendants or any Released Entity, including the Industrial Sites, that arises solely from conduct by one or more of the Settling Defendants or Released Entities that occurs entirely after the JCO Entry Date.

66.     The Settling Plaintiffs reserve, and this JCO is without prejudice to, all rights against the Settling Defendants and Released Entities for any criminal liability.

### XIII.  <u>CONTRIBUTION PROTECTION</u>

67.     The Parties agree and the Court finds that this JCO meets the requirements for providing protection to Settling Defendants from contribution actions under CERCLA, the Spill Act, the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -61, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to-5.8, the Uniform Contribution Among Joint Tortfeasors Act, and any similar state law or doctrine that reduces or discharges a released party's liability to any other Persons.

68.    The Parties further agree and the Court by entering this JCO intends that Claims by Releasors against Non-Released Entities should not result in additional payments by Released Entities for the Released Claims, whether through contribution, indemnification, or any other means.

69.    This JCO constitutes a good-faith settlement of the Released Claims against the Released Entities.  The Releasors stipulate that they give all Dismissals, the Releases, and the Covenants Not To Sue provided in this JCO in good faith pursuant to the State's Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -61.  The Parties further stipulate that this JCO and the Dismissals, the Releases, and the Covenants Not To Sue provided herein were entered into in good faith based upon arm's-length negotiation among the Parties and their counsel.  The Parties further stipulate that the Dismissals, the Releases, and the Covenants Not To Sue provided in this JCO are intended to and shall serve as a bar to all cross-claims, counterclaims, and complaints for contribution which have been brought or may be brought against the Released Entities arising from, based on, involving, or caused by the Released Claims.

70.    Upon entry by the Court, this JCO shall constitute a judicially approved settlement within the meaning of N.J.S.A. 58:10-23.11f.a(2)(b) and section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and a final judgment in the Litigations with respect to Settling Defendants (but not as to other defendants) for purposes of providing Settling Defendants protection from contribution actions and contribution Claims for "matters addressed" in this JCO (collectively, the "Contribution Claims"), all to the maximum extent provided for in N.J.S.A.58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2).  The "matters addressed" in this JCO are all the Released Claims. To the maximum extent allowable by law, Settling Defendants shall not be liable for Contribution

Claims, including under N.J.S.A. 58:10-23.11f.a(2)(a), 42 U.S.C. § 9613(f), and 42 U.S.C. § 9622(h)(4).

71.    The Settlement Payments made under this JCO shall be the sole payment made by the Released Entities to the Releasors for the Released Claims.

72.    This JCO will resolve the liability of Settling Defendants to Settling Plaintiffs for the purpose of providing contribution protection to Settling Defendants and other Released Entities from contribution actions under CERCLA, the Spill Act, the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-l to -61, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, or any other statute, regulation, order, or common-law principle related to the causes of action that were or could have been pleaded in the Litigations or the Spill Act Directives or matters addressed in this JCO.  The Parties agree and the Court by entering this JCO finds that Settling Defendants are entitled to protection from contribution actions pursuant to section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), the Spill Act, N.J.S.A. 58:10-23.11f.a.(2)(b), and any other statute, regulation, order, or common-law principle that provides contribution rights against any Released Entity with regard to the subject matter of the Litigations or the Spill Act Directives or the matters addressed in this JCO.  In any action in which a Non-Released Entity asserts a Claim against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory seeking to recover any amounts paid by or awarded against that Non-Released Entity by way of settlement, judgment, or otherwise on any Released Claims (a "Claim-Over"), Settling Plaintiffs shall use best efforts to support any Released Entity's assertion that the Released Entities have paid through this JCO their equitable share of damages.

73.    To the extent that, on or after the JCO Entry Date, any Releasor enters into a settlement with a Non-Released Entity to resolve a Claim that would be a Released Claim if

brought against a Released Entity (a "Non-Party Settlement"), including in any bankruptcy case

or through any plan of reorganization (whether individually or as a class of creditors), the Releasor

will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case,

will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-

Party Settlement a prohibition on Claim-Over or a release from such Non-Released Entity in favor

of the Released Entities (that is equivalent in nature and scope to the Releases contained in this

JCO) of any Claim-Over.

74.    Settling Defendants expressly reserve all rights, including any right to

indemnification and contribution (including indemnification and contribution pursuant to an

insurance contract for Settling Defendants' payment obligations under this JCO), defenses,

Claims, demands, and causes of action that Settling Defendants may have concerning any matter,

transaction, or occurrence, whether or not arising out of the subject matter of the Litigations or the

Spill Act Directives, against any Person not a Party to this JCO, with the following exceptions:

a.    No Settling Defendant or Released Entity shall seek contribution from 3M

to recover any amount paid pursuant to this JCO unless 3M has filed against any Settling

Defendant or Released Entity a Claim, a Claim-Over, or a Contribution Claim.

b.    No Settling Defendant or Released Entity shall seek contribution to recover

any amount that Settling Defendants have paid pursuant to this JCO from any Releasor,

from any Government Entity of the State or of any of the State's Political Subdivisions, or

from any Non-Released Entity that pursuant to this JCO has fully and forever released all

Released Entities from all Released Claims, provided, however, that if, notwithstanding

this Paragraph 74.b, such a Non-Released Entity brings a Claim, Claim-Over, or

contribution action against a Released Entity, Settling Defendants expressly reserve all

rights to seek contribution to recover as an offset from such Non-Released Entity any amount that Settling Defendants has agreed to pay pursuant to this JCO.

75.    If any Releasor obtains a judgment with respect to Released Claims that does not contain a prohibition like that described in Paragraph 73, or any Releasor files a Claim relating to the foregoing against a Non-Released Entity in bankruptcy, or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Paragraph 73, and such Non-Released Entity asserts a Claim-Over against a Released Entity, the Settling Defendants shall take the following actions to ensure that the Released Entities do not pay more with respect to Released Claims to Releasors or to Non-Released Entities than the amounts owed by the Settling Defendants under this JCO:

    a.    Settling Defendants shall notify that Releasor of the Claim-Over within 60 Days after the assertion of the Claim-Over or 60 Days after the JCO Entry Date, whichever is later;

    b.    Settling Defendants and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that they are not required to pay more with respect to Released Claims than the amounts owed by Settling Defendants under this JCO; and

    c.    That Releasor and Settling Defendants shall take steps sufficient and permissible under the law of the State to hold Released Entities harmless from the Claim-Over and ensure that Released Entities are not required to pay more with respect to Released Claims than the amounts owed by Settling Defendants under this JCO.  Settling Plaintiffs must use best efforts to support the Released Entities' efforts to enforce their

Claim-Over rights against that Releasor and to support all of the following steps.  Such steps may include, where permissible:

        i.      Filing of motions to Dismiss or such other appropriate motion by any Released Entity, and supported by Releasors, in response to any Claim filed in litigation or arbitration;

        ii.      Reduction of that Releasors' Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

        iii.      Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

        iv.      Return of monies paid by Settling Defendants to that Releasor to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

        v.      Payment of monies to Settling Defendants by that Releasor to ensure that Released Entities are held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity; and

        vi.      Such other actions as that Releasor and Settling Defendants may devise to hold any Released Entity harmless from the Claim-Over.

        d.      The actions of that Releasor and Settling Defendants taken pursuant to Paragraph 75.c must, in combination, ensure that the Released Entities are not required to

pay more with respect to the matters addressed in this JCO than the amounts owed by Settling Defendants under this JCO.

e.      In the event of any dispute over the sufficiency of the actions taken by Settling Plaintiffs pursuant to Paragraph 75.c, Settling Plaintiffs and Settling Defendants may seek review by this Court.  If this Court's actions do not result in Released Entities being held harmless in accordance with the protections of the JCO, Settling Defendants shall have a claim for breach of this JCO by the Settling Plaintiffs.

## XIV.  <u>NO FINDING OR ADMISSION OF LIABILITY</u>

76.      This JCO shall not be used as evidence in any other litigation or future proceedings other than (a) in a proceeding to enforce the terms hereof; or (b) any other proceeding involving the contribution protections provided by this JCO.

77.      No part of this JCO, nor the JCO as a whole, nor any activity taken by any Settling Defendant pursuant to this JCO, shall constitute, nor shall be interpreted or used as, an admission of wrongdoing, fault, liability, law, or fact, nor shall this JCO or any Section or Paragraph thereof be admissible in any proceeding or hearing as an admission, except to the extent necessary for a Settling Defendant, a Released Entity, or a Settling Plaintiff to enforce a provision of this JCO or to establish the scope of the release or contribution protection provisions of this JCO.

## XV.  <u>EFFECT OF SETTLEMENT</u>

78.      The Parties agree and the Court by entering this JCO finds that the Settlement Payments set forth in Paragraph 7 and Exhibit A fully satisfy the Settling Defendants' share of payments for the Released Claims.

79.      The Parties agree and the Court by entering this JCO finds that the Settling Defendants' payments set forth in Paragraph 7 and Exhibit A are not intended to and do not

extinguish the Settling Plaintiffs' Claims against any other party, other than Settling Defendants and the Released Entities.

80.     Nothing in this JCO shall be construed, nor is intended by the Parties, to limit in any way the liability of any Person that is not a Settling Defendant or a Released Entity.

81.     Nothing in this JCO shall be construed, nor is intended by the Parties, to create any rights in, or to grant any cause of action to, any Person not a Party to, or not a Released Entity under, this JCO.  The preceding sentence shall not be construed to waive or nullify any rights that any Person not a Party to this JCO may have under applicable State or federal law.

82.     Based on the terms of the JCO, the Court finds that the Settlement Payments together with the other financial commitments made by the Settling Defendants in this JCO resolve Claims relating to the Chambers Works Site for a value exceeding $435,000,000.

83.     The Parties intend, and this Court finds, that the Releases in the JCO resolve, release and bar Claims, including to the extent applicable by res judicata, brought by Carneys Point Township that seek to recover for the same or materially similar relief that Settling Plaintiffs are releasing in the JCO, and specifically including Carneys Point's Environmental Rights Act Claims and all Claims within the scope of the Released Claims with respect to the Chambers Works Site (or that would be within the scope of the Released Claims if asserted by Settling Plaintiffs).  Based on this, upon entry of this JCO, Settling Plaintiffs and the Settling Defendants will seek an order promptly dismissing the following litigation currently pending in the New Jersey court:  *Carneys Point Twp. v. E.I. du Pont de Nemours et al.,* Salem County Superior Court Docket No. SLM-L-251-16, Appeal Docket No. A-002427-24.  The Parties will reasonably cooperate to seek dismissal of, or otherwise address, any other Claims brought by Carneys Point Township that are resolved, released, and barred by this JCO.

## XVI.  JUDICIAL CONSENT ORDER PROCESS

84.    This JCO has been subject to public notice and comment as required by Paragraphs 85 through 89.

85.    In accordance with N.J.S.A. 58:10-23.11e2, Settling Plaintiffs published in the *New Jersey Register* and on the Department's website the names of the Litigations and the Spill Act Directives, the names of the Parties to this proposed JCO, the location of the properties on which the Department had notice at the time of the publication that Discharges had occurred, and a summary of the terms of this proposed JCO, including the amount of monetary payments to be made.  The Department provided written notice of this proposed JCO, including the information listed above, to other parties in the Litigations and to other potentially responsible parties of whom the Department had notice at the time of the publication.

86.    Plaintiffs also published a copy of this proposed JCO on the Department's website and arranged for notice to certain known interested persons, as described in this Section XVI.

87.    In addition to the contents described in Paragraph 85, Plaintiffs' notices explained that a copy of this proposed JCO was available on the Department's website, explained that there were 60 Days to comment on this proposed JCO, and summarized this proposed JCO's res judicata effects as an enforceable, binding final judgment that will preclude certain Claims in future litigation.

88.    In addition to fulfilling the requirements of N.J.S.A. 58:10-23.11e2, the Department transmitted a copy of the notice described in Paragraph 85 to:

a.    Its primary contacts for all counties and municipalities within the State;

b.    Counsel for (i) all plaintiffs (including plaintiff-intervenors) residing in the State (except for those bringing PFAS Claims only for PFAS Personal Injury or for PFAS Property Damage) and all defendants (including defendant-intervenors) in the AFFF

94

Litigation, (ii) all respondents to the Spill Act Directives; and (iii) to the extent that Settling Defendants identified them and provided the Department with contact information for them, all plaintiffs in PFAS-related cases pending against Settling Defendants at the time of the publication described in Paragraph 85 in any State or federal court in New Jersey; and

  c. Other known interested Persons to whom written notice of the 3M JCO was distributed to by the Department.

89. The Parties also provided written notice of this proposed JCO by:

  a. Settling Defendants publishing notice in each of the following newspapers, in print or, where such newspaper is digital-only, digitally: Asbury Park Press, Atlantic City Press, Bergen Record, Burlington County Times, Courier Post, New Jersey Herald; South Jersey Times, and Star Ledger; and

  b. The Department publishing a copy of the *New Jersey Register* notice on the Contaminated Site Remediation and Redevelopment Program's website and the Office of Natural Resource Restoration's website, which the public can access at http://www.nj.gov/dep/srp/legal/ and https://dep.nj.gov/nrr/proposed-settlements/, respectively.

90. The notice described in this Section XVI is deemed compliant with the notice requirement of N.J.S.A. 58:10-23.11e2.

91. Upon conclusion of the 60-Day comment period set forth in Paragraph 87, the Department notified Settling Defendants that:

a.      the Department received no comments that disclosed facts or considerations that indicated to the Department, in its sole discretion, that this JCO was inappropriate, improper, or inadequate; or

b.      the Department received comments that disclosed facts or considerations that indicated to the Department, in its sole discretion, that this JCO required amendment or was inappropriate, improper, or inadequate.

92.     If, as set forth in Paragraph 91.b, the Department notified Settling Defendants that it believed this JCO required amendment or should be voided, the Department provided Settling Defendants with (i) the specifics of those draft amendments and a revised version of this JCO incorporating the amendments or (ii) a notification that the Department had determined preliminarily that this JCO should be voided.  Settling Defendants had an opportunity to respond to the Department's revised version of this JCO incorporating the amendments or to the Department's preliminary determination that this JCO should be voided, and the Department considered Settling Defendants' response with respect to the amended JCO or objections to the Department's preliminary determination that this JCO should be voided.  The Department did not make any final decision that this JCO should be voided until the Department worked in good faith with Settling Defendants to address the public comments that the Department received.

## XVII.  GENERAL PROVISIONS

93.     This JCO will constitute the final, complete, and exclusive agreement and understanding between the Settling Plaintiffs and the Settling Defendants with respect to the settlement embodied in this JCO.  The Settling Plaintiffs and the Settling Defendants agree and acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those that are expressly contained in this JCO.  The Settling Plaintiffs and

the Settling Defendants agree not to disclose any draft of this JCO or any drafts of its Exhibits except pursuant to valid legal process or if required by a court of competent jurisdiction.

94.    This JCO shall be governed and interpreted under the laws of the State of New Jersey, without regard to conflict-of-law principles.

95.    This JCO shall be binding on the Settling Defendants, their successors, assignees, and any trustee in bankruptcy or receiver appointed pursuant to a proceeding in law or equity.

96.    *Dispute Resolution*.  Except as provided below and in Paragraph 16 with respect to resolution by the LSRP Panel of Disputed Scope and/or Costs in connection with the Year One RFS, any dispute between the Parties arising out of, based on, or involving this JCO shall be submitted to mediation on an expedited basis before a retired Judge of a New Jersey State Court or New Jersey Federal Court mutually agreed upon by the Parties.  To the extent such mediation is unsuccessful within 90 Days, any Party may seek a judicial resolution of the dispute from this Court.  In such an event, the terms of this JCO shall be interpreted in accordance with the standards governing the interpretation of contracts under the laws of the State of New Jersey.  However, disputes with respect to the actual performance of Remediation at or from the Industrial Sites shall not be subject to this dispute resolution provision, and any such disputes will be resolved in accordance with applicable State and federal law, regulations, and court rules.  Nothing herein prohibits the Parties from agreeing to mediate any disputes concerning the actual performance of Remediation at or from the Industrial Sites.

97.    The Parties agree, upon entry of this JCO, not to contest the terms of this JCO, except that the Parties do not waive their rights to contest the interpretation or application of such terms in an action or proceeding brought to enforce this JCO pursuant to the dispute resolution process provided for in Paragraph 96.

98.    Nothing in this JCO shall be deemed to constitute preauthorization of a claim against the Spill Fund within the meaning of N.J.S.A. 58:10-23.11k. or N.J.A.C. 7:1J.

99.    If, following the Effective Date, any provision of this JCO is construed by a different court in a different matter (*i.e.*, not on an appeal of the approval of this JCO, which will be subject to Paragraph 7.b) to be invalid or unenforceable (a) the Parties shall negotiate in good faith to the extent it may be necessary to modify any such provision to ensure its validity and enforceability, with such provision to be as similar in substance and in terms as the prior provision as may be possible and (b) the remainder of this JCO or the application of such provision to Persons or circumstances other than those as to which it is construed invalid or unenforceable shall not be affected thereby, and each provision of this JCO shall remain valid and be enforced to the maximum extent allowable by law.

100.    The Parties agree that this JCO was negotiated fairly between the Parties at arm's length and that the terms of this JCO shall be deemed to have been jointly and equally drafted by them, and that no provision of this JCO therefore should be construed against any Party on the grounds that the Party drafted, or was more responsible for drafting, the provision.

## XVIII.  **RETENTION OF JURISDICTION**

101.    This Court retains jurisdiction over both the subject matter of this JCO and the Parties for the duration of the performance of the terms of this JCO for the purpose of enabling any Party to apply to the Court, subject to the dispute resolution requirements set forth in Paragraph 96, at any time for such further order, direction, or relief as may be necessary or appropriate for the construction, interpretation, or modification of this JCO, or to effectuate or enforce compliance with this JCO's terms.

## XIX.  COOPERATION AND DOCUMENT RETENTION

102.    Settling Plaintiffs shall cooperate fully with Settling Defendants, Settling Defendants' agents, and Settling Defendants' counsel by providing Settling Defendants with any non-privileged, non-work-product-protected documents, data, communications, or information that Settling Defendants deem necessary to any insurance-recovery effort or tax-related filings. Settling Plaintiffs shall identify the allocation of Settlement Payments to (1) amounts constituting restitution or remediation within the meaning of IRS Code section 162(f)(2)(A) and (2) amounts not constituting restitution or remediation within the meaning of IRS Code section 162(f)(2)(A). Each of Settling Plaintiffs (i) will timely file IRS Forms 1098-F (or other required information return) and timely deliver a notice in accordance with Treas. Reg. section 1.6050X-1(c), in each case with respect to each Settling Defendant and prepared consistent with the terms of this JCO, including reporting all amounts paid under this JCO, other than the amount referenced in Paragraphs 7.c.iii and 11, as "Restitution/remediation amount" in Box 3 thereof, and (ii) will cooperate with the Settling Defendants as reasonably necessary for the Settling Defendants to establish the statements in Paragraph 12, including as contemplated by Treas. Reg. section 1.162-21(b)(3)(ii).

103.    The Settling Defendants agree not to oppose or interfere in any way with the Court's approval of the 3M JCO.

104.    The Parties will cooperate in good faith to carry out (i) the terms of this JCO, including the scope of the Releases and (ii) the ongoing permitting and Remediation actions at the Industrial Sites, including with applications for necessary licenses or permits (and renewals thereof) for manufacturing activities in relevant existing manufacturing locations.  The Parties will provide reasonable assistance with the administration of the JCO and will aid in any public-notice requirements as set forth in Section XVI.

## XX.  **MODIFICATION**

105.    This JCO or any provision of this JCO may be modified or waived only by written agreement duly executed by all Parties and approved by the Court.

106.    Nothing in this JCO shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this JCO.

## XXI.  **ENTRY OF THIS JCO**

107.    The Settling Defendants have consented to the entry of this JCO without further notice after the comment period specified in Paragraph 87.

108.    So long as the Settling Plaintiffs do not receive public comments that disclose facts or considerations that indicate to Settling Plaintiffs, in their sole discretion, that the JCO is inappropriate, improper, or inadequate, upon conclusion of the Settling Plaintiffs' review of any public comments received as a result of the notice described in Paragraphs 85 through 89 above, Plaintiffs shall promptly submit this JCO to the Court for entry.

109.    Upon entry of this JCO by the Court, this JCO constitutes a final judgment under Federal Rules of Civil Procedure 54 and 58 among the Parties.

110.    If for any reason the Court should decline to approve this JCO in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation among the Parties or third parties.

## XXII.  **SIGNATORIES/SERVICE**

111.    Each undersigned representative of each Party certifies that he or she is fully authorized to enter into the terms of this JCO and to execute and legally bind such Party to this JCO.

112.    This JCO may be signed and dated in any number of counterparts, each of which shall be an original, and such counterparts shall together be one and the same JCO.

113.     Any Party may execute this JCO by having its duly authorized signatory sign his or her name on the designated signature block below and transmitting that signature page electronically to counsel for all Parties.  Any signature made and transmitted electronically for the purpose of executing this JCO shall be deemed an original signature for purposes of this JCO and shall be binding upon the Party transmitting the signature electronically.

## XXIII.  NOTICES UNDER THIS JCO

114.     Except as otherwise provided herein, any notices or other documents required to be sent to any Party pursuant to this JCO shall be sent by email as well as a hard copy by United States Mail, Certified Mail Return Receipt requested, or other nationally recognized courier service that provides for tracking services and identification of the Person signing for the document.  The notices or documents shall be sent to the following addresses:

For the Division of Law:

> Gary Wolf
> Section Chief
> Division of Law
> Department of Law and Public Safety
> R.J. Hughes Justice Complex
> 25 Market Street
> P.O. Box 093
> Trenton, New Jersey 08625-0093
> Gary.Wolf@law.njoag.gov

For the Department and the Commissioner:

> Kimberly Cahall
> Chief Advisor and Chief Enforcement Officer
> Legal, Regulatory, and Enforcement Policy
> New Jersey Department of Environmental Protection
> 401 East State Street
> Trenton, New Jersey 08625
> Kimberly.Cahall@dep.nj.gov

For the Administrator:

David E. Haymes
Administrator
Spill Compensation Fund
New Jersey Department of Environmental Protection
ECA/Spill Fund
Mail Code: 401-06J
P.O. Box 420
Trenton, NJ 08625-0420
David.Haymes@dep.nj.gov

For the Department, with respect to the CRACO:

Stacey MacEwan
Manager
Office of Natural Resource Restoration
New Jersey Department of Environmental Protection
Mail Code: 501-03
P.O. Box 420
Trenton, NJ 08625-0420
stacey.macewan@dep.nj.gov

For DCA:

Gregory K. Turner
Assistant Deputy of Enforcement
Office of Consumer Protection, Division of Consumer Affairs
124 Halsey Street
PO Box 45025
Newark, NJ 07101
TurnerG@dca.njoag.gov

For Chemours and Chemours FC:

The Chemours Company
Office of the General Counsel
1007 Market Street
Wilmington, DE 19801
Attn:  Kristine M. Wellman
          kristine.m.wellman@chemours.com

With a copy to:

Graham W. Meli

102

JB Kelly
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
gwmeli@wlrk.com
jbkelly@wlrk.com

For New DuPont and DuPont Specialty Products:

DuPont de Nemours, Inc.
974 Centre Rd.
Wilmington, DE 19806
Attn:  Erik T. Hoover
        erik.t.hoover@dupont.com

With a copy to:

Bradley H. Weidenhammer, P.C.
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL  60654
bweidenhammer@kirkland.com

For Corteva:

Corteva Inc.
974 Centre Road
Building 735
Wilmington, DE 19805
Attn:  Cornel B. Fuerer
        cornel.b.fuerer@corteva.com

With a copy to:

Michael T. Reynolds
Cravath, Swaine & Moore LLP
375 Ninth Avenue
New York, NY  10001
mreynolds@cravath.com

For EIDP:

        EIDP, Inc.
        974 Centre Road
        Building 735
        Wilmington, DE 19805
        Attn:  Thomas A. Warnock
            thomas.a.warnock@corteva.com

        With a copy to:

        Michael T. Reynolds
        Cravath, Swaine & Moore LLP
        375 Ninth Avenue
        New York, NY  10001
        mreynolds@cravath.com

SO ORDERED this __ day of _____, 2025:

_____
The Honorable Renée Marie Bumb
Chief United States District Judge

THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE NEW JERSEY COMMISSIONER OF ENVIRONMENTAL PROTECTION CONSENT TO THE FORM AND ENTRY OF THIS ORDER


By: _____
     Shawn M. LaTourette
     Commissioner
     New Jersey Department of Environmental Protection

Dated: [Month, Day], 2025

NEW JERSEY SPILL COMPENSATION FUND CONSENTS TO THE FORM AND ENTRY OF THIS ORDER


By: _____
     David E. Haymes, Administrator
     New Jersey Spill Compensation Fund

Dated: [Month, Day], 2025

NEW JERSEY DIVISION OF CONSUMER AFFAIRS AND ITS DIRECTOR CONSENT TO THE FORM AND ENTRY OF THIS ORDER


By: _____
     Elizabeth M. Harris, Acting Director
     New Jersey Division of Consumer Affairs

Dated: [Month, Day], 2025

**Matthew J. Platkin**
**Attorney General of New Jersey**
*Attorney for Plaintiffs and Division of Consumer Affairs*


By:    _____
      Gwen Farley, Esq.
      Deputy Attorney General

Dated: [Month, Day], 2025


THE CHEMOURS COMPANY CONSENTS TO THE FORM AND ENTRY OF THIS ORDER


By:    _____
      [To come]
      [Title]

Dated: [Month, Day], 2025

THE CHEMOURS COMPANY FC, LLC CONSENTS TO THE FORM AND ENTRY OF THIS ORDER


By:    _____
      [To come]
      [Title]

Dated: [Month, Day], 2025

DUPONT DE NEMOURS INC. CONSENTS TO THE FORM AND ENTRY OF THIS ORDER


By:    _____
      [To come]
      [Title]

Dated: [Month, Day], 2025

CORTEVA, INC. CONSENTS TO THE FORM AND ENTRY OF THIS ORDER


By: _____
      [To come]
      [Title]

Dated: [Month, Day], 2025

EIDP, INC. (F/K/A E. I. DU PONT DE NEMOURS AND COMPANY) CONSENTS TO THE
FORM AND ENTRY OF THIS ORDER


By: _____
      [To come]
      [Title]

Dated: [Month, Day], 2025

DUPONT SPECIALTY PRODUCTS USA, LLC CONSENTS TO THE FORM AND ENTRY
OF THIS ORDER


By: _____
      [To come]
      [Title]

Dated: [Month, Day], 2025

# EXHIBIT "C"



# KEEFE LAW FIRM

**John E. Keefe, Jr., Esq.**
*Managing Partner*

Galleria
Building 6, 2nd Floor, Suite 623
Red Bank, New Jersey  07701
T. 732-224-9400 ext. 202
F. 732-224-9494
www.keefe-lawfirm.com

jkeefe@keefe-lawfirm.com

*Certified Civil Trial Attorney*
*Admitted to Practice in:*
*N.J., D.N.J., U.S. 3d. Cir.*
*D.C., N.D. Fla.*

September 19, 2025

I write on behalf of our firm's New Jersey clients (Monmouth, Union, Middlesex, and Gloucester Counties, and numerous other municipal and county clients) who are involved in the national AFFF MDL in Charleston, South Carolina, and on behalf of our retained clients who are investigating and preparing to litigate against PFAS manufacturers and distributors. This letter will serve as a brief comment and objection to the proposed Judicial Consent Order between 3M, DuPont, and the State of New Jersey Department of Environmental Protection.

The gravamen of the underlying lawsuit, which gave rise to the May 12, 2025 JCO, was essentially an NRD claim to provide $450 million over 25 years to compensate New Jersey citizens for PFAS contamination of the state's <u>natural resources</u>, reimbursement of DEP costs, penalties, and "other purposes." If the release language did not seek to overly expand the relief afforded to the world's largest PFAS polluters, encompassing relief far beyond the plead and litigated <u>NRD</u> case so as to bar "political subdivisions," i.e. the state's municipalities, counties and authorities, from claims it "might otherwise bring," then this JCO would rest or fall based on the appropriate and rigorous scrutiny of all NRD claims.

However, 3M and Dupont have sought global resolution from the State of New Jersey under the pretense of an NRD settlement to resolve <u>any and all</u> PFAS claims, filed or unfiled. The Attorney General's office has overstated and constitutionally misused the doctrine of *parens patriae* to attempt to justify this JCO. We will leave to others the Home Rule and Political Subdivision Sovereignty arguments that have existed in our political institutions and permeated the co-existence of state and local government. Rather, we offer comment and opposition to the exercise of *parens patriae* in this JCO. Its misuse is an overreach which will prevent existing and future claims from being litigated – claims that would hold polluters accountable for PFAS injury to municipalities, counties, and authorities. These are not claims that "<u>might</u> otherwise be brought;" these are <u>actual</u> claims for PFAS property damage. Water providers in New Jersey and across the country have settled for <u>billions</u> of dollars for AFFF and PFAS contamination in order to upgrade water facilities to reduce PFOA and PFOS to 4 parts per trillion or less. This was a historic multi-billion-dollar lawsuit achieved through the hard work and filing of many water authorities across the nation, including New Jersey "political subdivisions."



Without these water provider claims that are now settled, the economic burden would have fallen exclusively to consumers. This JCO will eliminate current and future claims to clean fire academy property, which is a major source of PFAS contamination affecting our state's water supplies, municipal airports, wastewater treatment facilities, and other PFAS liabilities. These lawsuits are <u>ongoing</u>. If the polluters achieve *res judicata* in this JCO, barring these existing and future claims, New Jesey rate payors and taxpayers will once again solely bear the financial burdens at a cost of, perhaps, billions of dollars.

*Parens patriae* is indeed a power belonging to the state which allows the state to sue on behalf of its residents. It traditionally refers to the role of the state to act as guardian of persons under "legal disability." It is a protective shield of last resort that, in this instance, has strayed from its proper origins to usurp the legitimate present and future rights of New Jersey municipalities, counties, and authorities, while offering grossly overstated relief to the largest PFAS polluters – to the economic detriment of New Jersey taxpayers and citizens. Putting aside for now the constitutional scrutiny required of this JCO, the Attorney General did not consult with its constituents, nor did it seek advice the advice, or counsel, or input of the municipalities who are in the best position to evaluate the harm to its property. There has been no due process afforded to municipal government, nor has there been an opportunity to "opt out." Rather, all that has been provided is an opportunity to "comment." This JCO violates a maxim of constitutional due process: one cannot be deprived of a legally cognizable claim without adequate process. The preclusion effect on entities that <u>have</u> and will <u>continue</u> to exercise their own rights for the benefit of their local citizens cannot be swept away with a mere opportunity to comment. Due process demands more.

In PFAS litigation to date, billions of dollars have been recovered for water providers. It is historic, but it is only a <u>start</u> to hold polluters accountable. New Jersey "political subdivisions" are currently litigating property damage claims. Even non-litigating New Jersey entities have benefitted from the MDL litigation. There is simply no need to invoke *parens patriae* and deprive local government of its rights and remedies, all while providing <u>polluters</u> with a global resolution. The funding purportedly being allocated to "subdivisions" for existing and future claims under the JCO, with a majority of the funds being allocated to NRD initiatives, leaves local governments and New Jersey citizens exposed and severely undercompensated.

Regarding the extinguishment of future claims: wastewater needs to be treated for PFAS before it is reinjected into our aquifers.  That day is coming. PFAS standards applicable to wastewater treatment facilities will ensure clean reinjection into our aquifers. When wastewater regulations are enacted, the JCO will bar municipal wastewater entities from seeking compensation to install and upgrade facilities. State government that will enact these standards will have given *res judicata* in this settlement to polluters and will bar New Jersey municipalities and authorities from seeking appropriate legal remedy. As a result, this JCO will needlessly shift the <u>entire</u> financial burden onto New Jersey taxpayers, rate payors, and its citizens by unconstitutionally barring current <u>and</u> future claims.

The gravity and effect of this overreaching JCO cannot be adequately addressed in this comment. On behalf of the counties, municipalities, and authorities that we represent, and to give opportunity to the unrepresented, the undersigned requests that the DEP reject the JCO language that provides *res judicata* to existing and future PFAS claims on behalf of New Jersey political subdivisions. Alternatively, we request an additional 180 days to fully evaluate the claims that are to be released, and to form a body of interested and affected "subdivision" representatives to meet and confer with the Attorney General and DEP representatives.

We take no position and offer no comment as to the NRD relief sought in this settlement.

Respectfully,

John E. Keefe, Jr.

# EXHIBIT "D"

# Senator Anthony M. Bucco



**LEGISLATIVE DISTRICT - 25**
75 BLOOMFIELD AVENUE
SUITE 302, 3ᴿᴰ FLOOR
DENVILLE, NJ 07834

**BUCCO.SENATENJ.COM**
SENBUCCO@NJLEG.ORG
P: (973) 627-9700
F: (973) 627-0131

September 10, 2024

Commissioner Shawn M. LaTourette
NJ Department of Environmental Protection
401 E. State Street
7th Floor, East Wing
P.O. Box 402
Trenton, NJ 08625-0402

      RE:  Proposed Judicial Consent Order Approving Settlement with the 3M Company
          In the Matter of NJDEP, et al. v. E.I. DuPont De Nemours and Company, et al
          Case No.:  1:19-CV-14766-RMB-JCB (D.N.J.)

Dear Commissioner LaTourette:

I write with regard to the proposed Judicial Consent Order (JCO) in the matter of <u>NJDEP et al. v.
E.I. Du Pont De Numours and Company, et al.,</u> which is intended to settle claims against defendant
The 3M Company (3M).  The JCO is subject to a 60-day public comment period that is set to
expire on September 19, 2025, at which time it may be submitted to the court for approval.  Until
such time, the JCO is not yet binding.  Therefore, I respectfully ask that you consider the concerns
outlined below.

As you are aware, the NJDEP filed lawsuits in 2019 against multiple defendants, including 3M,
seeking remediation of and compensation for the statewide contamination of New Jersey's natural
resources, which resulted from the manufacture, distribution, and improper disposal of per- and
polyfluoroalkyl substances (PFAS).  On May 13, 2025, the NJDEP announced that a settlement
agreement has been reached to resolve the claims pertaining to 3M, the terms of which are
expressed in the proposed JCO.  On July 21, 2025, the NJDEP posted formal notice of the proposed
JCO, which began the current 60-day public comment period.  According to the terms of the JCO,
if approved, 3M would pay up to $450 million directly to the State of New Jersey over 25 years
for its role in PFAS contamination.

It has been brought to my attention that, although the initial complaint was pled and prosecuted
against 3M as a Natural Resource Damages claim on behalf of the State, the proposed JCO now
purports to settle *all* governmental claims against 3M.  In fact, the scope of the settlement would
even appear to encompass existing or future claims brought by counties, municipalities, and other
local governmental entities that are neither a party to the current lawsuit, nor a signatory to the
proposed JCO.  This would mean that current and future contamination claims brought by New

Jersey counties and municipalities, including those related to fire training facilities, airports, and wastewater treatment facilities, would be dismissed or barred from filing in the future.

Therefore, if approved and held to be enforceable, there is concern that the JCO would severely impede the crucial remediation efforts of county and municipal governments. In settling all claims on a statewide basis, the JCO would result in the dismissal of pending cases against 3M without proper valuation, restricting a local government's ability to demand fair compensation for damages it has incurred. Thus, the JCO would effectively strip counties and municipalities of their statutory authority to independently seek legal redress and adequately meet their remediation responsibilities. Taken together, all this would undermine New Jersey's statutorily enshrined and judicially recognized tradition of Home Rule.

In light of the complexity of the proposed JCO and the underlying litigation, as well as the potential impacts on local governmental entities, I am requesting that the comment period be extended for an additional 120 days. This extension will afford all interested stakeholders, as well as members of the public, time to review, analyze, and develop meaningful feedback on the JCO.

I trust that you share my goal of ensuring that all local governmental entities in this State continue to enjoy the statutory autonomy designated to them by the Legislature. To this end, I urge you to take any steps necessary to prevent these entities from being deprived of the recourse to which they are entitled under the laws of this State.

Thank you for your time and attention to this important matter.

Sincerely,


Sincerely,

Senator Anthony M. Bucco

EXHIBIT "E"

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 227 of 283
Case 1:19-cv-14758-RMB-JBC     Document 563-3 871 Filed 11/25/25     Page 2 of 27 PageID:
PageID: 13351

## Hanover Sewerage Authority

1000 Route 10, P.O. Box 320
Whippany, N.J. 07981-0320

(973) 428-2477
Fax: (973) 515-3774

Michael C. Wynne, P.E.
Executive Director

September 19, 2025

**VIA Email (3MSettlement@dep.nj.gov) and FedEx**
New Jersey Department of Environmental Protection
Legal, Regulatory and Enforcement Policy
401 East State Street, 7th Floor
P.O. Box 402
Trenton, New Jersey 08625-0402
Attn: 3M Settlement

> RE: **Comments In Opposition to the Proposed Judicial Consent Order as to
> Defendant 3M Company**
> Proposed Judicial Consent Order Approving Settlement With The 3M Company
> In the Matter of NJDEP, et al., v. E.I. Du Pont De Nemours and Company, et al.
> Case No.: 1:19-CV-14766-RMB-JBC (D.N.J.)

Dear Commissioner LaTourette:

      The Hanover Sewerage Authority ("Authority") respectfully submits these comments
objecting to the "Covenant Not To Sue"; the "Release"; the "Exclusive Remedy" and a variety of
definitions that include Wastewater Treatment Plants and Treatment Works in the proposed
Judicial Consent Order ("JCO") that will preclude all Claims, as defined therein, as to PFAS
Contamination in Wastewater and Sludge against the 3M Company and its affiliated persons and
entities defined as Released Entities ("3M").

### The Hanover Sewerage Authority

      The Authority was created pursuant to the Sewerage Authorities Law (N.J.S.A. 40:14A-1
et. sec.) as a public body politic and corporate and, as such, has the power, among many others,
to sue and be sued. It provides wastewater treatment to residential and non-residential users in
the Township of Hanover; the Borough of Morris Plains; the Township of Morris and portions of
the Township of Parsippany-Troy Hills and the Township of East Hanover. It is a Delegated
Local Agency pursuant to the Federal Clean Water Act, the administration of which is delegated
to NJDEP. The Authority owns and operates a Wastewater Treatment Plant and Treatment Works,
as defined in the proposed JCO.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 228 of 283
Case 1:19-cv-14758-RMB-JBC    Document 637-72  Filed 11/25/25    Page 3 of 27 PageID:
PageID: 37372
13352

## The Proposed JCO Must Be Modified to Preserve the Right of the Authority to Assert PFAS Claims Against 3M.

The Hanover Sewerage Authority **respectfully requests that the proposed JCO be modified** to exclude Wastewater Treatment Plants and Treatment Works be from: (1) the definitions, including, but not limited to "Covered Conduct"; "Covered Harm"; "Released Claims"; "Releasors"; "Political Subdivision"; "Person"; "Governmental Entity" and "Site"; (2) the "Release"[1]; (3) the "Covenant Not To Sue"[2]; (4) the "Exclusive Remedy"[3]; (5) the entirety of the "Contribution Protection" under Section 10 of the JCO; and (6) all other revisions necessary to exclude Wastewater Treatment Plants and Treatment Plants from having any Claim against the Released Entities for PFAS that has entered into the environment since the beginning of time, so that the right to seek damages from 3M is preserved.

The Authority requests this modification for reasons described in this Comment Letter.

## The JCO Relieves the Polluter of All Responsibility of the Enormous Costs of PFAS Removal and Shifts That Burden to the Users of the Authority's Wastewater Facilities

In order to properly address the impact of the proposed JCO, it *must* be discussed in conjunction with another current proposal from the New Jersey Department of Environmental Protection ("NJDEP"): anticipated amendments to PFAS Surface Water Quality Standards.

This combination of PFAS related decisions will result in an unconscionable and inequitable result which is against public policy. NJDEP's Settlement with 3M will preclude future PFAS Wastewater and Sludge Claims by the Authority on the one hand, but on the other hand, NJDEP has proposed new PFAS Surface Water Quality Standards, which will cause the Authority to incur multi-million-dollar Capital and Operating expenses, which will shift the financial burden to the residences and businesses served by the Authority. Even if NJDEP's proposed Surface Water Quality Standards are not implemented, the Authority will incur significant costs to meet less stringent NJPDES Permit limitations derived from drinking water standards for PFAS.

## The Anticipated New PFAS Surface Water Quality Standards.

In November 2024, NJDEP publicly released its PowerPoint presentation entitled "Anticipated Amendments to the Surface Water Quality Standards (SWQS) at N.J.A.C. 7:9B". NJDEP's 2024 presentation states that the NJDEP freshwater criteria anticipated for the following PFAS compounds is as follows: (1) perfluorooctanoic acid (PFOA) at 0.00057 ng/L; (2) perfluorooctane sulfonate (PFOS) at 0.032 ng/L; and (3) perfluorononanoic acid (PFNA) at 5 ng/L. Importantly, NJDEP has not yet determined with finality what the new limits will be through rulemaking. To put this in perspective, the EPA's drinking water standard for six PFAS chemicals under the Safe Drinking Water Act is 4 ng/L, (over 7,000 times less stringent than the

---

[1] JCO, para. 54.
[2] JCO, para. 56.
[3] JCO, para. 57.

announced anticipated amendments), with a compliance deadline of 2029. As a Wastewater Treatment Plant and Treatment Works, the Authority will be required to achieve effluent limits that are at the current detection level (which are far lower than those limits required by potable water treatment plants). With such a strict standard, Wastewater Treatment Plant and Treatment Works will naturally be burdened with extensive costs towards treating and maintaining the quality of water with respect to PFAS contamination. The enormous commitment of public resources that will result from the adoption of such limits is described below.

### Projected Wastewater PFAS Capital Costs

The projected capital cost of infrastructure to remove PFAS from wastewater in compliance with the anticipated new Surface Water Quality Standards has conservatively been estimated to be in the tens of millions of dollars for just this Authority. This is a conservative estimate and it does not include the continuing financial burden upon the users of the Authority associated with the annual operation and maintenance of such PFAS treatment technologies, and the increased costs associated with the disposal of any residuals.

The Report prepared for the Authority by Mott MacDonald, its consulting engineering firm, estimated that the conceptual capital cost for PFAS treatment at the Authority is estimated in the range of **$72 to $119 million** and will have operating costs in the range of **$4 to $9 million** annually in 2025 dollars.[4]

The annual debt service on a thirty (30) year $91 million loan (Mott MacDonald's mid-point), at current interest rates, is more than $5.4 million. This is more than six (6) times greater than the Authority's current annual debt service. The annual operating cost of $6.2 million is greater than our entire 2025 operating budget.

On a statewide basis, the estimated cost of PFAS treatment is likely to be in the range of billions of dollars: the entire burden of which will fall solely on ratepayers, since the proposed JCO prohibits sewerage authorities and other governmental entities from bringing future claims against 3M for PFAS released into the Environment from the beginning of time through the date of execution of the JCO.

The Certification of James F. Cosgrove, P.E., President, One Water Consulting LLC, which was submitted with the Comments of the Somerset Raritan Valley Sewerage Authority on the proposed JCO, sets forth in detail the matters outlined above and is incorporated herein by reference.

---

[4] See report entitled: Hanover Sewerage Authority PFAS Removal, prepared by Mott MacDonald, dated September, 2025, attached hereto as **Exhibit A.**

**The Practical Effect of the Proposed JCO is to Exclude Wastewater Treatment Plants and Treatment Works from Any Benefit of the PFAS Contamination Funding Provision.**

While it is understood that the PFAS Contamination Abatement Funding in the proposed JCO may include, as set forth at paragraph 50(q), "taking action to assist any Person who owns, Operates, manage, or controls . . . [a] Treatment Works [or] Wastewater Treatment Plant," the following paragraph states: "The Department, in allocating PFAS Contamination Abatement Funding, shall prioritize taking actions to treat PFAS in Public Water Systems and Private Potable Wells serving residential properties, schools, and child-care facilities."

Even if the entire Settlement Amount of up to $450 million were to be awarded exclusively to Wastewater Treatment Plants over twenty-five (25) years, the Settlement would still not even come close to relieving a fraction of the financial burden placed on the Authority's ratepayers to address PFAS in wastewater and sludge. However, this JCO proposes only a total of $170 million over twenty-five (25) years to be allocated towards PFAS Contamination Abatement Projects, which may or may not include wastewater abatement projects.

Even this large sum of $170 million, as inadequate as they would be to address even a small fraction of the financial burden of Wastewater Treatment Plants and Treatment Works, is a theoretical best-case scenario payout. In fact, Wastewater Treatment Plants and Treatment Works are not guaranteed or otherwise entitled to *any funding* from this JCO because the use of those funds "shall prioritize taking actions to treat PFAS in Public Water Systems and Private Potable Wells serving residential properties, schools and child care facilities."[5]

As a result, this severely limited amount of funding (relative to the extent of possible PFAS Contamination Abatement Projects outlined in the permissive list of Paragraph 50 of the JCO)[6] will most certainly be depleted through funding the Paragraph 51 priorities alone, especially given how "ubiquitous" PFAS is in New Jersey[7] and the population density of the state. If there happened to be any money to fund non-priority projects, Wastewater Treatment Plants, Treatment Works and other non-priority government entities would then have to join an application pool filled with potentially countless persons and government entities representing twenty-one (21) types of eligible projects; just for the opportunity to potentially receive some funding. The result of these facts is tantamount to totally excluding Wastewater Treatment Plants and Treatment Faculties from any distribution at all. Thus, the JCO proposes that Wastewater Treatment Plants and Treatment Works must accept this forced deprivation of their ability to bring future claims against 3M, with no ascertainable benefit to Wastewater Treatment Plants and Treatment Works.

---

[5] JCO, para. 51.
[6] The expansive permissive list of possible PFAS Contamination Abatement Projects outlined in Paragraph 50 is reflective of the immense demand and need for PFAS Contamination Abatement statewide due to the harmful PFAS contamination 3M and other Defendants continued to place in the environment.
[7] JCO, para. 23.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 231 of 283
Case 1:19-cv-14758-RMB-JBC    Document 567-3 75 Filed 11/25/25    Page 6 of 27 PageID:
PageID:
13355

Therefore, while the $450 million settlement to be paid by 3M over twenty-five (25) years is an impressive achievement by NJDEP for the prioritized Public Water Systems and Private Potable Wells, it will effectively deprive Wastewater Treatment Plants and Treatment Works of all their remedies against 3M as to PFAS contamination with no semblance of a benefit to the Authority and other Wastewater Treatment Plants and Treatment Eorks. The proposed JCO will have the consequence of costing New Jersey's ratepayers billions of dollars over the same payment period, with no recourse against the actual polluter, 3M.

## The Definition of "Covered Conduct" Is Overbroad and Unreasonably Encompasses Wastewater Activities

The JCO, as currently drafted, raises several substantial concerns, particularly regarding its scope, legal implications under New Jersey law, and its potential to impair the delegated authority of Delegated Local Agencies ("DLAs") to effectively implement and enforce local and state environmental protection programs. The Authority respectfully requests that the NJDEP consider the concerns outlined in reviewing the fairness, legality, and environmental integrity of the proposed JCO.

The JCO defines "Covered Conduct" in extraordinarily broad terms, encompassing virtually all conceivable actions involving PFAS from "the beginning of time" through the "Effective Date." This includes, but is not limited to: the transport, treatment, storage, and disposal of PFAS-containing sludge and wastewater; any discharge or threatened discharge of PFAS into the environment; and all conduct related to compliance, reporting, or permitting obligations involving PFAS.

Such a wide-ranging release risks immunizing 3M and the "Released Entities" from responsibility for both ongoing discharges and future consequences tied to historical PFAS usage. It could also preclude the Authority and other delegated local agencies from seeking redress or taking enforcement actions for continuing contamination or violations linked to 3M's legacy products.

## The JCO Undermines the Pretreatment Program and Obligations of Delegated Local Agencies

Pursuant to federal and state law, the U.S. Environmental Protection Agency has delegated responsibility for the National Pretreatment Program to the NJDEP, which in turn has delegated implementation authority to 17 DLAs, including the Authority.[8] DLAs are charged with: issuing permits to Significant Industrial Users (SIUs); monitoring and enforcing permit conditions; and administering Service Rules that apply to all users of the public treatment works.[9] These responsibilities are central to ensuring that pollutants, including PFAS, do not: endanger worker health and safety; interfere with treatment plant operations; disrupt sludge management practices; or pass through into receiving waters untreated.

---

[8] https://dep.nj.gov/wp-content/uploads/dwq/pdf/permits_and_licenses/wastewater/wastewater_dla_list.pdf.
[9] https://dep.nj.gov/dwq/wastewater/pretreatment/local-agency-pretreatment-program/.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 232 of 283
Case 1:19-cv-14758-RMB-JBC    Document 637-3    Filed 11/25/25    Page 7 of 27 PageID:
                                          PageID: 13376
                                          13356

By releasing 3M and other "Released Entities" from obligations involving compliance, permitting, and reporting, the JCO directly conflicts with the mission and responsibilities of DLAs under the Federal Clean Water Act, the NJ Water Pollution Control Act and the NJDEP-approved pretreatment programs.

**The JCO Conflicts with the New Jersey Clean Water Enforcement Act (CWEA)**

The CWEA was enacted in 1990 after hearings and testimony and over the strong objection of the NJDEP, to strengthen the state's water pollution laws by mandating stricter enforcement and penalties for violations.[10] The act supplemented the Water Pollution Control Act (WPCA) and was designed to prevent the NJDEP from exercising "enforcement discretion" for serious violations, a change advanced by environmental groups in the late 1980s who argued that the NJDEP was failing to enforce water pollution permits. The CWEA provides for mandatory minimum penalties for certain "serious violations" and for violations by facilities that are classified as "significant noncompliers" and restricts the NJDEP Commissioner's, as well as the DLA's, authority to compromise civil administrative penalty assessments by more than 50% of the assessed penalty, and in no instance less than the statutory minimum.

The "Released Entities" cannot lawfully be Released from compliance, reporting, or permitting obligations involving PFAS, even if the PFAS detected is the result of legacy contamination that has migrated into the sewer system. However, the JCO not only releases these parties, but also compromises the liability of the "Released Entities" by eliminating it entirely. To the extent that any WPCA claims that fall under the CWEA's penalty regime are "Released", the JCO represents an unlawful and improper circumvention of a mandatory state enforcement framework, rendering the JCO inconsistent with New Jersey law.

The Authority urges the Court and the relevant regulatory entities to reconsider the scope and structure of the proposed JCO. Any settlement concerning PFAS liability must respect the unambiguous legislative intent of the Clean Water Enforcement Act, to strengthen the enforcement of New Jersey's water pollution control program by establishing mandatory minimum penalties for violations and eliminating the previous discretionary powers of the Department of Environmental Protection (DEP) in enforcement actions. This enforcement-driven, punitive approach was intended to ensure compliance and improve water quality, which had been suffering from the widespread failure to enforce existing permits.

While the Authority is not aware of a list of all of the "Released Entities" apart from the list of 3M former sites included in the JCO at Exhibit D, the Authority is aware that 3M manufacturing facilities were historically located within its sewer service area. To the extent that legacy contamination migrates into the Authority system from a Released Entity and is detected, as a DLA, the Authority is empowered to require monitoring and take such actions as are

---

[10] https://www.nj.gov/dep/enforcement/report-cwea.html.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 233 of 283
Case 1:19-cv-14758-RMB-JBC    Document 637-3    Filed 11/25/25    Page 8 of 27 PageID:
13357

necessary to prevent hazardous pollutants from entering the system. To the extent that the JCO impedes upon the Authorities ability to monitor and protect worker health and safety, sludge disposal methodologies, public health or the environment, the JCO must be modified.

### The Preclusion of all Remedies by the Authority for Damages for Removal of PFAS is Premature and Unreasonable

The proposed JCO precludes claims for all PFAS-related damages against 3M before NJDEP adopts Surface Water Quality Standards for PFAS, and before the impact of such Standards is fully understood.

A decision at this time to forever bar Wastewater Treatment Plants and Treatment Works from having a remedy against 3M for forever chemicals is blind to what NJDEP is separately proposing as amendments to its Surface Water Quality Standards. This is recklessly detrimental to the ratepayers in New Jersey due to projected capital, operation and maintenance costs that would be necessary to treat PFAS-contaminated Wastewater and PFAS-contaminated Sludge.

Therefore, the proposal to exclude Wastewater Treatment Plants and Treatment Works from having any remedy against 3M for PFAS-contaminated Wastewater and PFAS-contaiminated Sludge is based on incomplete information, is premature and is unreasonable.

### The Net Effect of the Proposed JCO is to Reward the Polluter and Punish the Public

The JCO's imposition of claim preclusion is especially egregious in the face of expensive PFAS-removal technology that would not need to be installed but for 3M and other Defendants' role in PFAS Contamination. This technology when required to be installed, operated, and maintained by Wastewater Treatment Plants and Treatment Works through yet to be finalized amendments to the Surface Water Quality Standards, will likely cost billions of dollars statewide. This unthinkable outcome will result in the shocking reversal of the long-standing public policy under CERCLA and other federal and state law and policy that the "polluter pays" for the remediation of the contamination it has caused.

### The Proposed JCO Unlawfully Extinguishes Statutory Rights Under CERCLA For a Contribution Claim Against 3M

The Authority performs a critical public service by overseeing the transportation and final disposal of sewage sludge (biosolids) generated within its service area. This responsibility includes the routine movement of digested and thickened sludge to the Passaic Valley Sewerage Commission.

As PFAS compounds are known to persist in the environment and accumulate in landfills over time, the Authority may face the possibility that one or more of these disposal sites could, in the future, be designated as federal Superfund sites under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").[11] If such designations occur, entities involved in the generation, arrangement, transportation, or disposal of biosolids could be

---

[11] https://www.epa.gov/pfas/pfas-explained.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 234 of 283
Case 1:19-cv-14758-RMB-JBC    Document 637-378    Filed 11/25/25    Page 9 of 27 PageID:
                                                    PageID: 37378
13358

named as potentially responsible parties ("PRPs") and held liable for the costs of site
investigation and remediation.

In such a scenario, the Authority would typically retain the right under CERCLA
Sections 107(a) and 113(f) to pursue contribution or cost recovery from third parties, such as
3M, whose products or activities contributed to the contamination, including, but not limited to,
manufacturers of PFAS-containing materials. Specifically:

- **Section 107(a)(3)** of CERCLA imposes a strict and joint and several liability[12] on any
  party who "arranged for disposal or treatment…of hazardous substances" at a site that
  later becomes the subject of a response action.[13]

- **Section 113(f)(1)** allows such a liable party to "seek contribution from any other person
  who is liable or potentially liable under section 9607(a)."[14]

However, the proposed JCO, through both the Release and the Covenant Not to Sue
provisions, would effectively extinguish these statutory rights for the Authority and all other
similarly situated entities. The JCO defines "Releasor" to include all Political Subdivisions of the
State of New Jersey, including "authorities" such as the Hanover Sewerage Authority. As a
Releasor, as defined by the JCO, the Authority would be deemed to have fully released 3M from:

"…[A]ny Claim for cost recovery or contribution, including pursuant to Section 107 or 113
of CERCLA…for the Discharge or threatened Discharge of PFAS."

Moreover, the Covenant Not to Sue provision unambiguously prohibits Releasors from
initiating or supporting *any* present or future legal or administrative action against 3M for these
claims, stating that:

"…[T]he Releasors absolutely, unconditionally, and irrevocably covenant not to…sue or
take administrative action…or to otherwise seek to establish liability for any Released
Claim against any Released Entity in any forum whatsoever…"

The combined effect of these provisions is to immunize 3M from future contribution
actions that public entities such as the Authority may need to pursue in order to protect
themselves, and ultimately, the ratepayers and taxpayers they serve, from the significant
financial burdens associated with environmental cleanups involving PFAS. Importantly, this
outcome would apply even in cases where 3M-manufactured PFAS are conclusively identified as
a source of contamination, and where the Authority's only connection to the site was its statutory
obligation to manage and transport sludge for disposal.

This is not only inequitable but also undermines fundamental CERCLA principles, which
are rooted in the notion that polluters should bear the costs of pollution ("polluter pays").[15] By
preemptively releasing 3M from all future CERCLA-based claims by public entities, the State
risks shifting those financial and operational burdens onto the very entities charged with
environmental stewardship and public protection.

---

[12] https://www.epa.gov/enforcement/superfund-liability.
[13] 42 U.S.C. §9607(a)(3).
[14] 42 U.S.C. §9613(f)(1).
[15] https://www.epa.gov/enforcement/comprehensive-environmental-response-compensation-and-liability-act-cercla-and-federal.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 235 of 283
Case 1:19-cv-14758-RMB-JBC    Page 783-8    Filed 11/25/25    Page 10 of 27
PageID: 13359

**Wastewater Treatment Plants and Treatment Works Will Be Arbitrarily Excluded from Any Nationwide Class Action Lawsuit Against 3M As to PFAS Contaminated Wastewater and PFAS Contaminated Sludge**

The proposed JCO arbitrarily discriminates against Wastewater Treatment Plants and Treatment Works. It acknowledges that potable water supply systems have had the right to litigate its claims against 3M in the multi-district AFFF litigation (which resulted in in the AFFF settlement). Yet, at the same time, the proposed JCO precludes the similarly situated Wastewater Treatment Plants and Treatment Works, which have **not** had their day in court. In the event that there is a nationwide class-action lawsuit for wastewater treatment plants against 3M in the future, all of New Jersey's Wastewater Treatment Plants and Treatment Works would be unfairly precluded by the proposed JCO from joining such a class-action. The preclusive effect of the proposed JCO does not protect the public interest, but rather works against the public interest in preventing every Wastewater Treatment Plant and Treatment Work from seeking damages against 3M.

**The Proposed JCO is Inappropriate, Improper and Inadequate and is an Invalid Exercise of the Powers of the Commissioner of NJDEP and the Attorney General of the State of New Jersey and Must be Modified**

For the reasons explained in this Comment Letter, the exercise of the discretion of the Commissioner of NJDEP and of the Attorney General of the State of New Jersey is not fair and reasonable as it relates to the Authority. It is an overbroad use of the powers of both state agencies. It wholly negates the ability of the Authority to claim reasonably foreseeable and substantial damages from 3M, while at the same time it provides substantial relief to 3M by settling a comparatively meager payment in exchange for the release of liability for all future claims for the overwhelming liability and financial exposure it faces.

**The Proposed JCO Deviates from Principals of Fair Dealing by Elimination of All Remedies of Non-Participating Entities**

The result of the Proposed JCO is tantamount to the elimination of any remedy of Wastewater Treatment Plants and Treatment Works against 3M. This result is especially egregious because the Authority was never a participant in the litigation and never had a "seat at the table" when the terms of the proposed JCO were discussed. In fact, the Authority was not even aware that a settlement was contemplated until it received the Notice **less than sixty days (60) ago.** Until that Notice was received, the Authority had neither informal, nor formal notice that its rights to ultimately seek to recover some or all of the overwhelming expenses it is likely to incur due to the conduct of 3M, were about to be permanently stripped away. The proposed JCO is an unreasonable and arbitrary use of the settlement discretion of the NJDEP and the Attorney General of the State of New Jersey and is a violation of the long-honored precept that governmental entities must "turn square corners".

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 236 of 283
PageID: 37380
Case 1:19-cv-14758-RMB-JBC    Document 588-8    Filed 11/25/25    Page 11 of 27
PageID: 13360

## CONCLUSION

There is an overwhelming public need to exclude Wastewater Treatment Plants and Treatment Works from the preclusive effect of the proposed JCO so that Wastewater Treatment Plants and Treatment Works are not arbitrarily excluded from having the ability to defray capital and maintenance costs as against 3M for PFAS-contaminated Wastewater and PFAS-contaminated Sludge after NJDEP amends the Surface Water Quality Standards in the future.

Based on the foregoing, **we respectfully request that the JCO be amended** such that Wastewater Treatment Plants and Treatment Works be excluded from: (1) the definitions, including, but not limited to "Covered Conduct"; "Covered Harm"; "Released Claims"; "Releasors"; "Political Subdivision"; "Person"; "Governmental Entity" and "Site"; (2) the "Release[16]"; (3) the "Covenant Not To Sue[17]"; (4) the "Exclusive Remedy[18]"; (5) the entirety of the "Contribution Protection" under Section 10 of the JCO; and (6) all other revisions necessary to exclude Wastewater Treatment Plants and Treatment Plants from having any Claim against the Released Entities for PFAS that has entered into the Environment since the beginning of time.

Very truly yours,

Hanover Sewerage Authority

Michael C. Wynne, P.E.
Executive Director

cc:
    The Honorable Philip Murphy, Governor of the State of New Jersey
    The Honorable Mikie Sherrill
    Senator Anthony Bucco
    Senator Joseph Pennacchio
    Assemblyman Christian Barranco
    Assemblyman Brian Bergen
    Assemblywoman Aura Dunn
    Assemblyman Jay Webber
    Mayor and Township Committee of the Township of Hanover
    Mayor and Borough Council of the Borough of Morris Plains
    Mayor and Township Committee of the Township of Morris
    Mayor and Township Committee of the Township of Parsippany-Troy Hills
    Mayor and Township Committee of the Township of East Hanover
    Peggy Gallos, Executive Director, AEA
    Michael Cerra, Executive Director, NJLM

---

[16] JCO para. 54.
[17] JCO, para. 56.
[18] JCO, para. 57.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 237 of 283
PageID: 37381
Case 1:19-cv-14758-RMB-JBC    Document 588-8    Filed 11/25/25    Page 12 of 27
PageID: 13361

Page I of v

**M M**
**MOTT**
**MACDONALD**



# Hanover Sewerage Authority PFAS Removal

September 2025

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 238 of 283
PageID: 37382
Case 1:19-cv-14758-RMB-JBC    Document 500-8    Filed 11/25/25    Page 13 of 27
PageID: 13362

Page II of v

This page left intentionally blank for pagination.

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 239 of 283
PageID: 37383
Case 1:19-cv-14758-RMB-JBC     Document 568-8     Filed 11/25/25     Page 14 of 27
PageID: 13363
Page III of v

Mott MacDonald
111 Wood Avenue South
Iselin
NJ 08830-4112
United States of America

T +1 (800) 832 3272
mottmac.com

# Hanover Sewerage Authority PFAS Removal

September 2025

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 240 of 283
PageID: 37384
Case 1:19-cv-14758-RMB-JBC    Document 588-8    Filed 11/25/25    Page 15 of 27
PageID: 13364
Mott MacDonald | Hanover Sewerage Authority PFAS Removal    Page iv of v

# Issue and revision record

| Revision | Date | Originator | Checker | Approver | Description |
|---|---|---|---|---|---|
| 0 | 09/16/25 | Zeynep Bartek | Philip Pedros | John Scheri | PFAS Removal |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 241 of 283
PageID: 37385
Case 1:19-cv-14758-RMB-JBC     Document 506-8     Filed 11/25/25     Page 16 of 27
PageID: 13365

# Contents

1     Introduction                                                                                          1

2     Background                                                                                            2

3     PFAS Removal Technologies Evaluation                                                                  4
      3.1     Ozone–BAC–GAC (Non-RO Route)                                                                  5
      3.2     GAC–AIX (Non-RO Route)                                                                        5
      3.3     MF–RO (RO Route)                                                                              5

4     Selected Process                                                                                      6

5     Cost Analysis                                                                                         8

6     Summary                                                                                              10


Tables

**Table 5.1: Overall Project Cost**                                                                        8

**Table 5.2: OPEX Summary**                                                                                9


Figures

**Figure 2.1: Site Overview**                                                                              3

**Figure 4.1: PFAS Removal Process Train**                                                                 6

**Figure 4.2: PFAS Removal Treatment Addition Site Map**                                                   7

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 242 of 283
Case 1:19-cv-14758-RMB-JBC    Document 786-8    Filed 11/25/25    Page 17 of 27
PageID: 37386    PageID: 13366

Mott MacDonald | Hanover Sewerage Authority PFAS Removal

# 1 Introduction

Mott MacDonald has prepared a technical report that summarizes available treatment technologies to address potential future per and poly flouro alkaline substances (PFAS) removal at the Hanover Sewerage Authority (HSA) Wastewater Treatment Plant (WWTP). A suggested conceptual treatment process is recommended based upon a review of available operating data and anticipated potential future regulatory requirements. Capital and operating costs have been developed for the selected treatment process to provide information on the potential requirements should PFAS treatment be required at the facility.

The scope of work was performed under the annual consulting agreement between the HSA and Mott MacDonald.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 243 of 283
PageID: 37387
Case 1:19-cv-14758-RMB-JBC    Document 588-8    Filed 11/25/25    Page 18 of 27
PageID: 13367
Mott MacDonald | Hanover Sewerage Authority PFAS Removal

Page 2 of 11

# 2   Background

Hanover Sewerage Authority (HSA, Authority) Wastewater Treatment Plant (WWTP) has an estimated residential service population of 16,912 and serves Hanover Township and portions of East Hanover Township, Morris Plains Borough, Morris Township, and Parsippany-Troy Hills Township. The HSA's WWTP discharge is regulated by the New Jersey Department of Environmental Protection (NJDEP) under New Jersey Pollutant Discharge Elimination System Permit (NJPDES) No. NJ0024902. The HSA WWTP has a NJPDES flow of 4.61 MGD, which has been used as the basis for the evaluations in this report.

The NJDEP has provided a public notice of a proposed settlement with two major manufacturers of per- and polyfluoroalkyl substances (PFAS). The proposed terms of the settlement includes a release of liability for the parties responsible for the manufacture of PFAS substances. However, the proposed settlement currently does not relieve the local municipalities or sewerage authorities of any future liability from third parties for release of PFAS to the surface water from its treatment facilities.

The NJDEP, in November 2024, presented proposed anticipated amendments to the Surface Water Quality Standards (SWQS) at NJAC 7:9B, that included criteria for PFAS substances Per fluoro nonanoic acid (PFNA), Per fluoro Octanoic acid (PFOA) and Per fluoro octane sulfonate (PFOS). NJPDES permittees, including the HSA, could potentially face significant and complex challenges to comply with these anticipated amendments to the SWQS. The SWQS criteria for PFNA, PFOA and PFOS are anticipated for proposal at levels several orders of magnitude below USEPA and NJDEP Drinking Water Standards, and laboratory analytical test methods of detection.

To better understand the potential treatment requirements that might be required to address the NJDEP's anticipated SWQS criteria proposal, the HSA has requested that Mott MacDonald to assist with evaluating currently available technologies that can reliably reduce PFAS concentrations in treated effluent to non-detectable levels, how these technologies could be implemented at the HSA WWTP along with conceptual capital and annual operating costs.

In support of this objective, Mott MacDonald has evaluated a range of advanced treatment technologies with consideration of the anticipated treatment effectiveness to comply with the anticipated SWQS amendments, compatibility with existing infrastructure, space and cost. Treatment processes reviewed included granular activated carbon (GAC), ion exchange (IX), and Reverse Osmosis systems with emphasis placed on their ability to address both long-chain and short-chain PFAS compounds. Many of the systems reviewed included total organic carbon reduction (TOC) approaches to optimize GAC performance.

The conceptual PFAS treatment facility would occupy the area shown in Figure 2.1, which illustrates available space on the HSA WWTP site. The area is currently unoccupied and covers approximately 1.52 acres (~66,000 sq ft).

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 244 of 283
PageID: 37388
Case 1:19-cv-14758-RMB-JBC     Document 568-8     Filed 11/25/25     Page 19 of 27
PageID: 13368

Mott MacDonald | Hanover Sewerage Authority PFAS Removal     PageID: 13368

Page 3 of 11



**Figure 2.1: Site Overview**

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 245 of 283
PageID: 37389
Case 1:19-cv-14758-RMB-JBC    Document 588-8    Filed 11/25/25    Page 20 of 27
PageID: 13369

Mott MacDonald | Hanover Sewerage Authority PFAS Removal

# 3    PFAS Removal Technologies Evaluation

There are currently no full-scale municipal wastewater treatment facilities specifically designed to remove PFAS compounds in the United States. Furthermore, a review of literature has indicated that there are no known full-scale municipal wastewater treatment facilities specifically designed to remove PFAS compounds outside of the United States. Accordingly, a literature review of operating domestic and international water re-use facilities was conducted to identify available technologies applied at full-scale municipal wastewater treatment facilities where PFAS removal data is available. Several treatment processes were assessed.

Literature points to two primary technology pathways for PFAS control in wastewater: (1) advanced reuse projects that rely heavily on Reverse Osmosis (RO) for maximum PFAS removal, and (2) non-RO systems employing Biologically Activated Carbon (BAC) and Granular Activated Carbon (GAC) to achieve a balance of micropollutant removal, cost-effectiveness, and operational sustainability. These technologies are being used at full-scale to treat effluent from advanced wastewater treatment facilities for direct or indirect potable water re-use.

**RO Technology**

Reverse Osmosis systems are used in several water re-use facilities domestically and internationally, notably in California and in Singapore. These facilities typically employ Microfiltration (MF) or ultrafiltration (UF) followed by RO, with optional UV-AOP applied downstream for removal of trace organics and pharmaceuticals. This technology is highly effective in reducing PFAS to non-detectable levels.

**Non-RO Technologies**

At Hampton Roads Sanitation District (HRSD) in Virginia, the advanced water treatment train includes Ozone, BAC, GAC and ultraviolet advanced oxidation (UV-AOP). This approach achieves high levels of PFAS removal (<4ng/L PFOA and PFAS), with GAC serving as the primary treatment for PFAS removal.

Similarly, many full-scale applications outside of the US, particularly in Switzerland, are advancing non-RO treatment approaches that combine oxidation and adsorption. Limited PFAS removal data is available for these facilities as performance is evaluated more holistically for pharmaceuticals and trace contaminants rather than for specific PFAS compounds. Facilities such as ARA Morgenthal and ARA Hofen employ ozonation followed by BAC and GAC. These systems are designed to specifically address pharmaceuticals, pesticides, and other trace contaminants. ARA Bern similarly utilizes ozonation with downstream activated carbon polishing, while WWTP Buholz in Luzern incorporates a GAC system marketed as Carboplus®. which is a suspended activated carbon technology.

Collectively, these case studies demonstrate that BAC–GAC trains can provide measurable PFAS reduction (<4 ng/L PFOA and PFOS) with lower energy demands and without the need for brine disposal. However, they are less effective at capturing short-chain PFAS compared to RO-based processes, and performance is highly dependent on activated carbon replacement frequency and biological activity.

Another non-RO alternative is the use of AIX (anion exchange) in combination with GAC, which has been assessed on wastewater effluent in bench and pilot scale trails at the Kungsängsverket WWTP in Uppsala, Sweden. Assessment results showed significant PFOS removal (though not

Case 1:19-cv-14766-RMB-JBC   Document 783-4   Filed 12/22/25   Page 246 of 283
PageID: 37390
Case 1:19-cv-14758-RMB-JBC   Document 588-8   Filed 11/25/25   Page 21 of 27
PageID: 13370

Mott MacDonald | Hanover Sewerage Authority PFAS Removal

Page 5 of 11

to non-detectable levels), with above 80% PFOS removal at high empty bed contact time volumes and strong pharmaceutical removal performance with the use of AIX and GAC.

A desktop comparison of three treatment process alternatives was performed for the Hanover Sewerage Authority WWTP.

## 3.1   Ozone–BAC–GAC (Non-RO Option)

This process train consists of ozonation, biologically activated carbon (BAC) and granular activated carbon (GAC). The combination of ozone and BAC provides organics removal to improve the performance of the primary PFAS treatment step, which relies on GAC adsorption. This treatment train has been demonstrated at facilities such as HRSD (Virginia), ARA Morgenthal and ARA Hofen (Switzerland), and Winterswijk WWTP (Netherlands), which were designed for removal of pharmaceuticals, pesticides and other trace contaminants. The key advantages include lower energy demand compared to RO, no brine concentrate. These installations also include additional process steps downstream of GAC, to address compounds like 1,4-dioxane and NDMA (N-Nitrosodimethylamine) via UV-AOP. Limitations include the need for frequent GAC replacement and less reliable short-chain PFAS removal compared to RO. Management and disposal of spent GAC is an additional consideration. The PFAS removal rate is <4ng/L PFOA and PFOS.

## 3.2   GAC–AIX (Non-RO Option)

This train employs GAC for long-chain PFAS and anion exchange (AIX) to improve short-chain removal. Pilot work at Kungsängsverket WWTP in Uppsala, Sweden, showed PFOS removal above 80% at high empty bed contact time volumes and strong pharmaceutical removal performance. The system offers lower energy use than RO, but challenges include frequent GAC changeouts, AIX fouling, and management or disposal of spent AIX media, which may generate brine. Like other non-RO options, short-chain PFAS removal is less effective than RO.

## 3.3   MF–RO (RO Option)

This option achieves the most effective removal of both long and short-chain PFAS, consistently reaching non-detectable levels. The system is used in Orange County's GWRS and the Singapore PUB plants such as the Changi NEWater Plant with PFAS removal to non-detectable levels. This process includes Microfiltration (MF) followed by RO, with optional UV-AOP for removal of 1,4 dioxane and NDMA. This system comes with significant challenges: high capital and operating costs, higher energy requirements, and the need to manage a concentrate stream (approximately 10% to 20% of influent flow) and remineralization steps.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 247 of 283
PageID: 37391
Case 1:19-cv-14758-RMB-JBC    Document 788-8    Filed 11/25/25    Page 22 of 27
PageID: 13371

Mott MacDonald | Hanover Sewerage Authority PFAS Removal

# 4  Selected Process

Mott MacDonald has identified the Microfiltration-Reverse Osmosis (MF-RO) process train as the preferred treatment process technology option due to the limited data available on plant PFAS levels and extremely low SWQC anticipated to be proposed by NJDEP for PFAS compounds. The anticipated NJDEP freshwater criteria for proposal are 5 ng/L for PFNA, 0.00057 ng/L for PFOA and 0.032 ng/L for PFOS. While pilot testing is recommended for more detailed assessment of technologies on the HSA WWTP effluent, Mott MacDonald recommends MF-RO because reverse osmosis is a proven and established technology with the highest effectiveness for PFAS removal including both long and short chain.

Multiple advanced treatment processes were evaluated for per- and polyfluoroalkyl substances (PFAS) removal. Options considered included non-RO options such as ozone–biologically activated carbon (BAC)–granular activated carbon (GAC) systems, which have been demonstrated at HRSD SWIFT (Virginia), Winterswijk WWTP (Netherlands), and ARA Morgenthal and ARA Hofen (Switzerland). These systems have shown the ability to achieve PFOS and PFOA concentrations of less than 4 ng/L while also providing strong removal of pharmaceuticals and other micropollutants. Despite these successes, the ozone–BAC–GAC configuration is less reliable for short-chain compounds and is not regarded as conservative enough to meet New Jersey's anticipated SWQC proposal.

The reverse osmosis system is a proven and highly established system with the highest PFAS removal rates for both long chain and short chain PFAS. Considering the anticipated SWQC proposal as well as the unknown PFAS levels of the HSA plant, Mott MacDonald recommends microfiltration–reverse osmosis (MF–RO) process train as the preferred option.

The recommended treatment sequence would be placed downstream of the plant's existing tertiary sand filters and consists of the following elements: a new pump station to feed the MF system, microfiltration, a second pump station to feed the RO system, reverse osmosis, remineralization using carbon dioxide and lime which then will tie back into the existing downstream disinfection facilities. Pressured vessel GAC contactors are included for RO concentrate management to remove PFAS compounds from the RO concentrate. Treated concentrate would be returned to the existing plant raw sewage pump station. The process train layout is provided in Figure 4.1.



**Figure 4.1: PFAS Removal Process Train**

The proposed PFAS Treatment facility addition will be constructed within a vacant footprint of approximately 66,000 sq ft (1.52 acres) at the Hanover Sewerage Authority Wastewater Treatment Plant site. Of this available area, the new treatment infrastructure will include two pump stations with wet wells, microfiltration system, reverse osmosis system, remineralization facilities

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 248 of 283
PageID: 37392
Case 1:19-cv-14758-RMB-JBC    Document 593-8    Filed 11/25/25    Page 23 of 27
PageID: 13372

Mott MacDonald | Hanover Sewerage Authority PFAS Removal

Page 7 of 11

including Lime and CO2, GAC system for concentrate treatment.  The layout in Figure 4.1 presents the site layout with PFAS facilities.



**Figure 4.2: PFAS Removal Treatment Addition Site Map**

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 249 of 283
PageID: 37393
Case 1:19-cv-14758-RMB-JBC    Document 588-8    Filed 11/25/25    Page 24 of 27
PageID: 13373

Mott MacDonald | Hanover Sewerage Authority PFAS Removal

Page 8 of 11

# 5 Cost Analysis

The proposed PFAS treatment addition has been sized and priced to accommodate the required treatment processes to efficiently remove PFAS to non-detectable levels. The overall footprint fits the available area shown in Figure 2.1. These units would provide a proven approach to PFAS removal based on technology currently available for full scale facilities while addressing concentrate management. The cost analysis is based upon the existing NJPDES flow rating of 4.61 MGD (Maximum Monthly average) for the HSA WWTP. Currently, New Jersey proposed PFAS SQWS are limited three PFAS compounds (PFOA, PFOS, PFNA), while USEPA has proposed limits on three additional PFAS, including PFHxS, HFDO-DA (Gen-X) and a hazard index mixture of PFNA, PFHxS, HFDO-DA and PFBS. Based upon the available performance information, the selected PFAS treatment design option is anticipated to remove both long chain and short chain PFAS compounds to non-detect low-level method detection levels (Method 1633).

The conceptual capital costs and operating costs were analyzed by evaluating the major unit processes suggested for PFAS treatment facilities described above for the HSA WWTP. All costs are in 2025 dollars and Class 5 conceptual estimates as defined by AACE (Low: -20% to -50%, High: +30% to +100%).

**Capital Cost**

An estimate was developed by assigning each major process component a cost based on a variety of sources including available historical project data and vendor information. The values were normalized to 2025 construction using engineering cost indices. Table 5.1 provides the summary of the cost analysis, which represents reflects the total conceptual capital cost for the installation of a PFAS treatment system at the HSA WWTP.

| DESCRIPTION | COST ($) |
|---|---|
| MF Feed Pump Station | 4,000,000 |
| MF System | 8,000,000 |
| RO Feed Booster Pumping | 2,000,000 |
| RO System & Remineralization | 16,000,000 |
| GAC (concentrate management) | 11,000,000 |
| **Subtotal** | 41,000,000 |
| General conditions | 9,000,000 |
| Civil & site piping | 3,000,000 |
| Electrical | 5,000,000 |
| **Subtotal** | 58,000,000 |
| Contingency (20%) | 12,000,000 |
| **Opinion of Probable Construction Cost** | 70,000,000 |
| Administration & Engineering (30%) | 21,000,000 |
| **Total Capital Cost** | 91,000,000 |
| **SAY** | 72,000,000 to 119,000,000 |

Table 5.1: Conceptual Project Capital Cost

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 250 of 283
PageID: 37394
Case 1:19-cv-14758-RMB-JBC    Document 568-8    Filed 11/25/25    Page 25 of 27
PageID: 13374
Mott MacDonald | Hanover Sewerage Authority PFAS Removal                                    Page **9** of 11

## Annual Operating Cost

In addition to the capital cost analysis, an estimated annual operating cost analysis (OPEX) was established. Annual operating costs were evaluated to capture the long-term financial impacts of the PFAS Treatment system addition. RO membrane replacement and GAC replacement and disposal represent the largest expenses, followed by electric power consumption. Table 5.2 summarizes the annual OPEX costs of the project.

| Units | OPEX Items | Annual Cost ($) |
|---|---|---|
| MF & RO Pumping | Electricity | 200,000 |
| | Maintenance | 100,000 |
| | Chemicals | 200,000 |
| Microfiltration | Membrane Replacement | 300,000 |
| | Electricity | 300,000 |
| | Maintenance | 100,000 |
| Reverse Osmosis & Remineralization | Electricity | 600,000 |
| | Remineralization Chemicals | 400,000 |
| | CIP Chemicals | 500,000 |
| | RO Membrane Replacement | 1,000,000 |
| | Maintenance | 100,000 |
| GAC | Carbon replacement | 1,000,000 |
| | Spent Carbon disposal | 1,000,000 |
| | Electricity | 200,000 |
| | Maintenance | 100,000 |
| Labor | Operations | 100,000 |
| **Total Amount Annual** | | **6,200,000** |
| **SAY** | | **4,000,000 to 9,000,000** |

**Table 5.2: OPEX Summary**

Case 1:19-cv-14766-RMB-JBC   Document 783-4   Filed 12/22/25   Page 251 of 283
PageID: 37395
Case 1:19-cv-14758-RMB-JBC   Document 568-8   Filed 11/25/25   Page 26 of 27
PageID: 13375

Mott MacDonald | Hanover Sewerage Authority PFAS Removal

Page **10** of 11

# 6   Summary

Based upon a review of available technologies, Mott MacDonald's has identified a microfiltration-reverse osmosis (MF-RO) process treatment train for the HSA WWTP as the most effective treatment process to address potential anticipated NJDEP PFAS criteria.  The PFAS treatment train would be located downstream of existing tertiary filters on space available at the existing HSA WWTP site.

The conceptual capital cost for PFAS treatment facilities is estimated in the range of $72 to $119 million and will have operating costs in the range of $4 to $9 million annually in 2025 dollars. These estimates are at a Class 5 conceptual level with typical accuracy ranges.

The capital and annual operating costs associated with PFAS treatment for the HSA will have significant and continued financial impacts to the participants served by the system.

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 252 of 283
PageID: 37396
Case 1:19-cv-14758-RMB-JBC     Document 380-8     Filed 11/25/25     Page 27 of 27
PageID: 13376

Page 11 of 11



EXHIBIT "F"

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 254 of 283
PageID: 37398
Case 1:19-cv-14758-RMB-JBC    Document 5869-9    Filed 11/25/25    Page 2 of 3 PageID:
13378



**JAMES AVERSANO III**
javersano@taknjlaw.com

September 18, 2025

*Via Email: 3Msettlement@dep.nj.gov*
New Jersey Department of Environmental Protection
Legal, Regulatory, and Enforcement Policy
401 East State Street, 7th Floor
PO Box 402
Trenton, NJ 08625-0402
Attn: 3M Settlement

Re:    Proposed Judicial Consent Order Approving Settlement with the
       3M Company in the Matter of NJDEP, et al., v. E.I. Du Pond De
       Nemours and Company, et al., Case No.: 1:19-CV-14766-RMB-
       JBC (D.N.J.)

Dear Madam or Sir,

   Thank you for the opportunity to provide comments to the proposed Judicial Consent Order
among the New Jersey Department of Environmental Protection ("DEP"), the New Jersey
Department of Community Affairs ("DCA") and 3M Company ("3M") in the above-referenced
matter ("JCO"). We appreciate the time and efforts by the parties in negotiating and drafting the
JCO and working towards a landmark settlement. The following are our comments to the JCO:

1.  The amount of potential state-wide damage claims from per- or poly-fluoroalkyl substance
    that contains at least one fully fluorinated methyl or methylene carbon atom (without any
    hydrogen, chlorine, bromine, or iodine atom attached to it) ("PFAS") that the JCO would
    be releasing has not been assessed, or if such assessment has been made, it has not been
    made public. Without such an assessment it is not possible to determine whether or not
    the payout by 3M is fair and reasonable and fairly compensates the public for natural
    resource damages and remediation measures. The JCO provides a range of the potential
    money (estimated to be more than $400,000,000) that DEP is to receive from 3M.
    However, significantly absent from the JCO is an estimate- even of the order-of-magnitude
    variety- of statewide Natural Resource Damages ("NRD") and remediation costs for all of
    the sites within the New Jersey municipalities impacted by the discharge of a 3M product
    containing PFAS, against which to measure the reasonableness of the 3M settlement.
    Without such an estimate of the projected total NRD and remediation costs (even on an
    order of magnitude basis), the public and the Court do not have a benchmark to determine

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 255 of 283
Case 1:19-cv-14758-RMB-JBC    Document 585-9    Filed 11/25/25    Page 3 of 3 PageID:
PageID: 37399
13379

Tyler Aversano & Krantz, P.C.
New Jersey Department of Environmental Protection
September 18, 2025
Page 2

whether or not the settlement satisfactorily compensates the public for the known and/or anticipated damages from exposure to 3M's PFAS.

2.  The contribution protection afforded to 3M should not apply to any 3M site not identified in Exhibit D of the JCO for remediation claims. The list of sites in Exhibit D are identified as 3M manufacturing, sales office, warehousing, office, or service center sites. That list obviously does not include any site where 3M manufactured foam was lawfully purchased and lawfully discharged, such as aqueous film-forming foam ("AFFF"), a PFAS containing product used primarily to fight fires. Users of such AFFF include fire departments, firefighting training academies, airports which maintained independent fire-fighting capabilities, as well as other entities. Those entities which lawfully used the 3M manufactured product, and those property owners and operators at which locations the 3M AFFF was used, should not be precluded from recovering money from 3M for remediation claims, particular at a site of such discharge that does not receive any money from the JCO settlement (see Comment 3). Furthermore, if the JCO is to provide contribution protection for NRD, that protection should only apply to a site if a site actually receives or is to receive money from the 3M payment as noted in Comment 3 below.

3.  The JCO does not provide a comprehensive procedure for filing claims, determining the appropriate amount of such claims, allocating settlement moneys, and paying out such allocations. Instead, the JCO provides DEP with the broad discretion to distribute the funds and leaves DEP to establish an application process at an unspecified later date. The absence of such procedures prevents a meaningful identification of the parties or entities who may be eligible to receive or eventually receive settlement funds, which further prevents an assessment of the reasonableness of the JCO. The failure to provide any meaningful guidance as to who or what specific site will be eligible to receive settlement funds, how much they might receive, and when, exacerbates the unfairness of the broad release that the JCO would give to 3M. To avoid this shortcoming, any court-approved settlement should limit the contribution protection afforded to 3M to sites to which settlement funds are actually allocated.

Thank you for your attention to this matter.

Respectfully submitted,

James Aversano III

JA/ss

cc: Robert A. Goodsell, Esq. (via email)

_1 AAA Drive, Suite 204, Robbinsville, New Jersey 08691  Phone: (609) 631-0600  Fax: (609) 631-0651_

EXHIBIT "G"

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 257 of 283
PageID: 37401
Case 1:19-cv-14758-RMB-JBC    Document 560-10    Filed 11/25/25    Page 2 of 28
PageID: 13381

## Site Investigation Report
## Monmouth County Fire Academy

1027 Highway 33, Freehold NJ
Block 183, Lot 53
Freehold, Monmouth County, New Jersey 07728
Program Identification No. 032680
Case #24-10-30-1227-57



**JANUARY 2025**

Prepared for:

County of Monmouth
Division of Engineering & Traffic Safety
One East Main Street
Freehold, New Jersey 07728

Prepared by:

H2M Associates, Inc.
119 Cherry Hill Road, Suite 110
Parsippany, New Jersey 07054

H2M Project No.: MONM2201



architects + engineers

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 258 of 283
PageID: 37402
Case 1:19-cv-14758-RMB-JBC    Document 568-10    Filed 11/25/25    Page 3 of 28
PageID: 13382



### SITE INVESTIGATION REPORT
Monmouth County Firing Academy
1027 Highway 33 (Block 183, Lot 53), Freehold, Monmouth County, New Jersey 07728
Program Identification No. 032680

January 2025

### TABLE OF CONTENTS

|   |   | Page No. |
|---|---|---|
| 1.0 | Introduction | 3 |
| 2.0 | Site Description and Physical Setting | 4 |
| 2.1 | Site Location and Description | 4 |
| 2.2 | Physical Setting, Site Topography and Drainage | 4 |
| 2.3 | Surface Water and Wetlands | 4 |
| 2.4 | Geology and Hydrogeological Setting | 4 |
| 3.0 | Site History | 6 |
| 4.0 | Technical Overview | 6 |
| 4.1 | Applicable Soil Remediation and Ground Water Quality Standards | 6 |
| 4.2 | Reliability and Usability of Laboratory Analytical Data | 7 |
| 4.3 | Significant Events or Seasonal Variation Influencing Sampling | 7 |
| 4.4 | Variances from N.J.A.C. 7:26E and Deviations from Technical Guidance | 7 |
| 4.5 | Timeframes | 7 |
| 4.6 | Rounding | 7 |
| 5.0 | Site Investigation Activities | 8 |
| 5.1 | Monitoring Well Installation – October 28, 2022 | 8 |
| 5.2 | Groundwater Sampling – November 17, 2022 | 8 |
| 5.3 | Potable Well Sampling – April 13, 2023 | 9 |
| 5.4 | Soil Sampling – September 1, 2023 | 9 |
| 5.5 | Migration to Groundwater Pathway | 9 |
| 6.0 | Receptor Evaluation | 10 |
| 6.1 | Land Use | 10 |
| 6.2 | Groundwater | 10 |
| 6.3 | Ecological Evaluation | 11 |
| 6.4 | Vapor Intrusion Pathway | 11 |
| 7.0 | Findings and Recommendations | 11 |
| 7.1 | AOC-1 - Soil Investigation Findings | 11 |
| 7.2 | AOC-2 - Groundwater Investigation Findings | 11 |
| 7.3 | Ecological Evaluation | 12 |
| 8.0 | References | 13 |

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 259 of 283
PageID: 37403
Case 1:19-cv-14758-RMB-JBC     Document 966-10     Filed 11/25/25     Page 4 of 28
PageID: 13383



## FIGURES

Figure 1     Site Location Map
Figure 2     Site Plan
Figure 3     Historic Groundwater PFAS Analytical Results
Figure 4     PFAS Analytical Results – November 17, 2022
Figure 5     Soil Sample Location Plan
Figure 6     Historic Sediment/Surface Water PFAS Analytical Results

## TABLES

Table 1     Groundwater Analytical Results
Table 2     Potable Well Analytical Results
Table 3     Soil Analytical Results

## APPENDICES

Appendix A     Copies of SRRA Forms
Appendix B     Soil Boring Logs
Appendix C     Naval Weapon Station Earle Data and Reports
Appendix D     Analytical Laboratory Deliverables and EDDs
Appendix E     Monitoring Well Construction Logs
Appendix F     Groundwater Field Sampling Forms
Appendix G     Site-Specific Migration to Groundwater Calculations/Spreadsheet

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 260 of 283
Case 1:19-cv-14758-RMB-JBC    Document 760-10    Filed 11/25/25    Page 5 of 28
PageID: 37404
PageID: 13384

H 2 M

SITE INVESTIGATION REPORT
Monmouth County Firing Academy
1027 Highway 33 (Block 183, Lot 53), Freehold, Monmouth County, New Jersey 07728
Program Identification No. 032680

January 2025

1.0     Introduction

This Site Investigation Report (SIR) has been prepared on behalf of Monmouth County to investigate contaminants of emerging concern (CECs), specifically Per- and Polyfluoroalkyl substances (PFAS), at the Monmouth County Fire Academy located at 1027 Highway 33 East, Howell, Monmouth County, New Jersey (the Site). According to New Jersey Department of Environmental Protection's (NJDEP's) GeoWeb, the Site is known as Block 183, Lot 53. The location of the Site is shown on **Figure 1** (Site Location Map).

In accordance with the NJDEP guidance for the investigation of CECs, PFAS compounds should be investigated if historic use may have resulted in a discharge at the facility. The Site currently operates as a Fire Academy, which provides fire response training facilities for municipal and county fire departments' personnel and volunteers. The Site contains two (2) burn towers utilized for fire suppression/rescue training, a retention pond, and a building which houses classrooms, the Fire Marshall's Office, and other offices that service the fire departments of Monmouth County. The remainder of the Site is comprised of associated roadways and parking areas. Historic operations, including fire training activities, conducted at the Site may have utilized materials that contained PFAS.

The purpose of this PFAS Groundwater Site Investigation is to investigate potential CECs associated with historic operations at the Site. Included is a description of completed investigation activities, findings, conclusions, and recommendations for additional investigation based on the findings.

The following Site Remediation Reform Act (SRRA) forms have been completed as part of this submittal and copies are included in **Appendix A** of this report.

- Authorization to Submit a Report/Form through NJDEP Online;
- Receptor Evaluation; and
- Case Inventory Document (CID).

The following NJDEP standards were applied to the review of analytical results:

- NJDEP Ground Water Quality Standards (GWQS; New Jersey Administrative Code [N.J.A.C.] 7:9C, June 1, 2020); and
- NJDEP Interim Soil Remediation Standards (SRS).

Case 1:19-cv-14766-RMB-JBC  Document 783-4  Filed 12/22/25  Page 261 of 283
PageID: 37405
Case 1:19-cv-14758-RMB-JBC  Document 965-10  Filed 11/25/25  Page 6 of 28
PageID: 13385



## 2.0     Site Description and Physical Setting
### 2.1     Site Location and Description
The Site is located at 1027 Highway 33, Howell, New Jersey as shown on the Site Location Map included as **Figure 1**. The property is currently owned and operated by Monmouth County and is bordered by wooded areas and the Monmouth County Police Firing Range to the north, Naval Weapons Station Earle (NWSE) to the north and east, wooded area to the west, and State Highway 33 followed by wooded area to the south. Current Site conditions are depicted on **Figure 2**.

The Site is currently operated as a fire academy and contains two (2) burn towers/training areas as well as a 22,841 square foot building which houses classrooms, the Fire Marshall's Office, and other offices that service the fire departments of Monmouth County. The remainder of the Site is comprised of asphalt-paved parking lots and roadways and landscaped areas.

### 2.2     Physical Setting, Site Topography and Drainage
The Site is located in the northern portion of Howell Township along State Highway 33. According to NJDEP's GeoWeb, the Site is identified predominantly as commercial land with mapped wetlands/wooded areas. The Site's approximate elevation is 100 to 115 feet above the mean sea level and is primarily flat with a slight decrease in elevation from north to south. A copy of the 7.5-minute United States Geological Survey (USGS) Topographic Map is included a **Figure 1**.

The adjoining properties to the west of the Site are undeveloped land owned by Monmouth County and Howell Township. State Highway 33 followed by undeveloped land are located immediately south of the Site. The Monmouth County Police Firing Range is located to the north of the Site and the NWSE property is located adjacent to the east and north of the Site.

### 2.3     Surface Water and Wetlands
Three (3) surface water bodies are identified at the Site per the historic USGS topographic maps and the NJDEP's GeoWeb service. West Fork Yellow Brook extends from the vacant properties to the north and northwest of the Site to the southern property boundary. The East Fork Yellow Brook extends from north to south along the eastern property boundary. Additionally, the fire retention pond is located to the east of the fire training building at the Site. Refer to **Figure 2** for the locations of the surface water bodies at the Site. No additional water sources were identified within 200 feet of the Site.

According to NJDEP GeoWeb Wetlands Geographic Information System (GIS) Layers, wetlands were identified at multiple locations covering approximately 35% of the Site. The wetlands are classified as deciduous, coniferous, and mixed wooded wetlands. The wetlands extents are depicted in **Figure 2**.

### 2.4     Geology and Hydrogeological Setting
According to the NJDEP's GeoWeb GIS website, the Site is located in the Coastal Plain Physiographic Province of New Jersey. The Site is specifically located in the northeast portion of the basin. The New Jersey Coastal Plain encompasses the southeast portion of the state below the Fall Line of Mercer and Middlesex Counties and is underlain by alternating bands of permeable sand and gravel inter-bedded with confining units of silt and clay. The entire sedimentary basin generally strikes in a northeast-southwest direction and gently dips towards the southeast at approximately 10 to 60 feet per mile with increasing

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 262 of 283
PageID: 37406
Case 1:19-cv-14758-RMB-JBC    Document 508-10    Filed 11/25/25    Page 7 of 28
PageID: 13386

H 2
M

thickness of the depositional beds occurring in the down-dip direction. This wedge-shaped mass of unconsolidated sediments range in age from Cretaceous to Miocene (145 to 5.3 million years old) and was emplaced typically within deltaic and marine depositional environments due to fluctuating pre-historic sea levels.

Overlying the majority of the Coastal Plain Physiographic Province are Quaternary aged (2.58 million to 10,000 years old), horizontally deposited, fluvial formations, emplaced during inter-glacial periods when seas were higher than the modern-day levels. Holocene-aged (less than 11,700 years old) estuarine, saltmarsh, and beach deposits are located along the coastal areas of the Atlantic Ocean and Delaware Bay.

Primarily, the unconsolidated Coastal Plain Deposits are unconformably underlain by Precambrian- and early Paleozoic-aged crystalline bedrock of the Passaic Formation (formerly the Wissahickon Formation), except locally along the Fall Line where the Triassic- and Jurassic-aged (252 to 145 million years old) rocks associated with the Piedmont Physiographic Province unconformably contacts the Inner Coastal Plain sedimentary deposits.

The NJDEP's GeoWeb website and the New Jersey Geological Survey's Surficial Geology of Farmingdale Quadrangle, Monmouth and Ocean Counties, New Jersey Open File Map (OFM) 35 were used to determine the bedrock and surficial geology underlying the Site. The Site is located in the Vincentown Formation with lithology defined by the NJDEP as sandy silt with quartz sand, minor mica and pyrite, and clayey glauconite sand. According to the New Jersey Geological Survey's Surficial Geology of the Farmingdale Quadrangle, Monmouth and Ocean Counties, New Jersey OFM 35, surficial geologic formations consist of Alluvium Formation (Qal) and Weathered Coastal Plains Formations (Qwcp). Beneath the Site are exposed sand and clay of the Coastal Plain bedrock formation. Overlaying the Coastal Plain is Weathered Coastal Plains Formation (Qwcp). Overlaying the Weathered Coastal Plains Formation is the Alluvium Formation which consists of yellowish brown to dark brown sand, silt, clay, peat with minor pebbles and gravel (Qal).

During site-specific soil sampling activities, soils were observed to be a mixture of fine silts and sands. The Soil Survey for Union County (US Department of Agriculture [USDA], 1983) indicates that the Site is underlain by soils of Sassafras-Downer-Woodstown, which is described as nearly level to steep, deep, well drained, loamy soils and Urban land; on uplands. Soil boring logs are included as **Appendix B**.

The detailed Soil Map for Monmouth County (USDA, 1983) and the Web Soil Survey (USDA, 1983) indicates that the Site is specifically designated as Urban Land.

The Site is located within the Kirkwood-Cohansey aquifer. Groundwater monitoring conducted by H2M identified groundwater depths between 3 and 6 feet below ground surface (bgs). Groundwater contours developed during the Police Firing Range investigation indicated that groundwater flows to the south-southeast across the Site.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 263 of 283
Case 1:19-cv-14758-RMB-JBC    Document 788-10    Filed 11/25/25    Page 8 of 28
PageID: 13387

3.0    Site History

In accordance with the NJDEP Technical Requirements for Site Remediation (TRSR; N.J.A.C. 7:26E), a CEC investigation is required to evaluate for the potential presence of PFAS substances associated with the historic site operations as a fire training facility. Two (2) fire suppression/rescue training areas with associated burn towers are located on the property and were targeted as potential source areas.

According to the NJDEP, AFFF is considered a significant potential source of PFAS at fire stations and fire suppression training areas due to their ability to extinguish petroleum hydrocarbon fires. Typical PFAS substances found in AFFF include perfluorooctanesulfonic acid (PFOS) and perfluorooctanoic acid (PFOA).

It should be noted that additional investigation and remediation of lead in soil and groundwater associated with the Monmouth County Police Firing Range (NJDEP Activity Number LSR 120001), and a petroleum discharge from a former heating oil underground storage tank (UST) have been conducted at the Site. A total of 29 groundwater monitoring wells have been installed at the Site and at off-site locations to investigate discharges related to former operations as a firing range as well as the former heating oil UST at the Fire Academy.

The adjacent NSWE property, located immediately northeast of the Monmouth County Fire Academy, has been conducting a PFAS investigation since at least 2016. H2M has reviewed data provided by the Department of the Navy including analytical results of groundwater samples collected between 2016 and 2022 as well as surface water/sediment samples from the fire retention pond situated between the Fire Academy and NSWE properties. The NWSE investigation included monitoring wells from the NWSE property, and Monmouth County's Fire Academy and Firing Range. Data provided by the NWSE indicates the presence of a PFAS plume extending from a potential source area at their designated fire training area to the downgradient border of the Site. Groundwater samples were collected from monitoring wells located at the NSWE property as well as monitoring wells located at the Fire Academy/Firing Range property (MW-2, MW-3, MW-4, MW-5, MW-7, MW-8, MW-10, MW-16, MW-17, MW-18, and MW-20). The groundwater data reviewed as part of this investigation was associated with sampling events conducted by NWSE between 2016 and 2021.

The NWSE laboratory analytical data provided to Monmouth County is included in **Appendix C**. Review of NWSE analytical data indicates concentrations of PFOA, PFOS, and Perfluorononanoic Acid (PFNA) exceeded the NJDEP GWQS of 14 nanograms per liter (ng/L), 13 ng/L and 13 ng/L, respectively. PFOS was identified at concentrations between 0.49 and 4800 ng/L, PFOA was identified at concentrations between 0.45 and 380 ng/L, and PFNA was identified at concentrations between 0.43 and 380 ng/L. The highest concentrations of PFOS appear downgradient of the NWSE training area with some concentrations along the southeastern portion of the Fire Academy Site. The Navy sampling data from 2016 through 2021 indicates a significant source area is located at the NWSE fire training area. PFOA and PFNA exceedances appear across both the NWSE and Fire Academy properties at similar concentrations. The historic groundwater sample results are provided in **Appendix C** and are depicted on **Figure 3**.

4.0    Technical Overview

4.1    Applicable Soil Remediation and Ground Water Quality Standards

The following NJDEP standards were applied to the review of analytical results:

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 264 of 283
Case 1:19-cv-14758-RMB-JBC     Document 508-10     PageID: 37408     Filed 11/25/25     Page 9 of 28
PageID: 13388



- NJDEP Class II-A GWQS – N.J.A.C. 7:9C Ground Water Quality Standards (June 1, 2020); and
- NJDEP Interim Soil Remediation Standards.

### 4.2    Reliability and Usability of Laboratory Analytical Data

H2M evaluated the current laboratory analytical data report for compliance with the reduced deliverable data format required by the TRSR (N.J.A.C. 7:26E). Analytical results are presented in **Table 1** through **Table 3**, and in the laboratory reduced data deliverables package provided in **Appendix D.**

Pace Analytical, (Formerly Alpha Laboratories [Alpha]), a New Jersey-certified laboratory (NJDEP Certification #07010) analyzed soil and groundwater samples. H2M reviewed laboratory reduced deliverables reports to assess the reliability of analytical data based on quality assurance and quality control issues, which included compliance with sample holding times, ability to achieve Method Detection Limits (MDLs), and precision and accuracy criteria for employed analytical method(s). Analytical results appear reliable based on the evaluation of the laboratory reports.

### 4.3    Significant Events or Seasonal Variation Influencing Sampling

No significant events or seasonal variations were identified during the duration of investigation of this Site.

### 4.4    Variances from N.J.A.C. 7:26E and Deviations from Technical Guidance

There were no deviations from the TRSR (N.J.A.C. 7:26E) or NJDEP Technical Guidance Documents.

### 4.5    Timeframes

The regulatory timeframe applicable to this Site for completion of a Remedial Investigation and submission of a Remedial Investigation Report (RIR) is five (5) years after the date remediation was required to be initiated. According to NJDEP's DataMiner, remediation was required to be initiated on October 30, 2024. The regulatory timeframe to submit an RIR is October 30, 2029. The mandatory timeframe for submission of the RIR is within two (2) years from the regulatory timeframe, or by October 30, 2031.

### 4.6    Rounding

When making a decision regarding the exceedance of a standard, screening level or criteria, H2M employs the *Technical Guidance for the Attainment of Remediation Standards and Site-Specific Criteria* Version 2.0, July 2022, Appendix B2.2. As such, concentrations that are reported by the laboratory are rounded to match the significant figures identified as the standard, screening level or criteria. For example, if a laboratory reports a concentration of 0.11 milligram per kilogram (mg/kg), or parts per million [ppm]) and the NJDEP standard, screening level or criteria for that respective constituent is 0.1 mg/kg, H2M will round the laboratory concentration to 0.1 mg/kg to match the significant figures. Therefore, the reported concentration of 0.11 mg/kg rounded to 0.1 mg/kg would not be identified as an exceedance of the associated standard, screening level or criteria. This rounding approach is consistent with NJDEP technical guidance as noted above.

Rounding was utilized when determining if there was an exceedance of PFNA while reviewing soil analytical results from the September 1, 2023, soil sampling event. Analytical results for PBS-1 were reported as 0.00173 mg/kg. The calculated Site-Specific Migration to Groundwater Soil Remediation Standard (SSMGW-SRS) for PFNA is 0.0017 mg/kg, therefore the significant figure approach was applied to PBS-1 which rounds the result to 0.0017 mg/kg, which meets the SSMGW-SRS.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 265 of 283
                                          PageID: 37409
Case 1:19-cv-14758-RMB-JBC    Document 368-10    Filed 11/25/25    Page 10 of 28
                                          PageID: 13389



5.0    Site Investigation Activities

To evaluate for potential soil and groundwater impacts associated with historic operations at the Fire Academy, soil samples and monitoring wells were installed surrounding both fire suppression/rescue training areas to characterize conditions in these potential source areas. Additionally, a potable well sample was collected from the on-site potable well servicing the administrative building to evaluate if there was an impact to a potential sensitive receptor.

The following Areas of Concern (AOCs) were created to investigate potential impacts at the Site:

- **AOC 1 – Fire Training Areas**
- **AOC 2 – Groundwater Associated with Fire Training Areas**

Soil and groundwater samples were collected in accordance with the NJDEP Field Sampling Procedures Manual and the NJDEP PFAS Sampling Information for Certified Samplers Performing Sample Collection for the Private Well Testing Act (N.J.S.A. 58:12A-26). H2M personnel minimized potential background contamination by avoiding the use of flame-resistant clothing, water repellent clothing, clothing washed with fabric softener, moisturizers, creams, toothpaste, cosmetics, shaving cream, shampoo and conditioner, sunscreen, insect repellent and similar products for the days leading up to the sampling events and day of the event.

5.1    Monitoring Well Installation – October 28, 2022

On October 28 and 31, 2022, H2M coordinated and oversaw the installation of four (4) permanent monitoring wells (FAMW-06 through FAMW-09) by Foresight Enviroprobe Inc. (a New Jersey-licensed well driller). The monitoring wells were installed in proximity to the two (2) fire training burn towers where fire training activities occurred. Monitoring wells were installed to 15-feet bgs with 10 feet of screen from 5 to 15-feet bgs. Well construction details were recorded in the field at the time of installation and are provided in **Appendix E**. After installation, the monitoring wells were developed using a submersible pump in accordance with the NJDEP Field Sampling Procedures Manual. Development water was carbon filtered and discharged to the ground surface. Monitoring well locations are depicted on **Figure 2**.

5.2    Groundwater Sampling – November 17, 2022

On November 17, 2022, H2M returned to Site to sample the newly installed wells along with previously existing wells MW-5, MW-8, and MW-10 to determine if PFAS compounds are present in groundwater at the Site. A total of seven (7) groundwater samples were collected from the seven (7) monitoring wells via low-flow purging and sampling (LFPS) methodologies in accordance with the NJDEP's Field Sampling Procedures Manual (FSPM). In accordance with LFPS methodologies, groundwater samples to be analyzed for PFAS compounds were collected from the pump after achieving purge stabilization. LFPS field sampling forms are included in **Appendix F**. Groundwater samples were transferred directly from the pump to laboratory provided, unpreserved plastic 250 milliliter (mL) containers. The groundwater samples were submitted to Alpha (now Pace Analytical) for PFAS analysis via USEPA Method 537.

Analytical results of the November 17, 2022 sampling event identified concentrations of PFOS and PFOA exceeding their respective NJDEP GWQS in monitoring wells FAMW-6, FAMW-7, FAMW-8, FAMW-9, MW-5, and MW-10. PFOA exceedances ranged from 37.2 to 142 ng/L and PFOS exceedances ranged from 15.6 to 293 ng/L. PFNA was only detected at a concentration exceeding its respective NJDEP GWQS in monitoring well FAMW-6 at a concentration of 49.7 ng/L.

Case 1:19-cv-14766-RMB-JBC     Document 783-4     Filed 12/22/25     Page 266 of 283
Case 1:19-cv-14758-RMB-JBC     Document 568-10     Filed 11/25/25     Page 11 of 28
PageID: 37410
PageID: 13390

H 2
M

A summary of the groundwater results is provided on **Table 1** and depicted on **Figures 3 and 4**.

### 5.3    Potable Well Sampling – April 13, 2023

On April 13, 2023, H2M mobilized to Site to collect a potable well sample from the Monmouth County Fire Academy potable well. Information provided on the NJDEP's Well Permit/Record database indicates that the potable well was installed to a depth of 380 feet bgs in March 2009. The potable well sample was collected directly from a spigot located inline prior to the facility's treatment system. In accordance with the NJDEP's FSPM, standing water was evacuated from plumbing lines by running the spigot for at least 15 minutes prior to collecting the sample. The potable well sample was submitted to Alpha for PFAS analysis via USEPA Method 537.1.

Analytical results of the potable well sample did not identify any targeted PFAS compounds at concentrations exceeding their respective NJDEP Drinking Water Quality Standards (DWQS). A summary of the Fire Academy potable well results is provided on **Table 2**.

### 5.4    Soil Sampling – September 1, 2023

On September 1, 2023, H2M mobilized to Site to conduct soil sampling via hand auger at the Monmouth County Fire Academy. Soil borings were advanced at nine (9) locations (PSB-1 through PSB-9) surrounding the two (2) fire training areas to characterize surface soil (0'-2' bgs) conditions for potential impacts from fire training operations. Soil sample locations were selected biased towards runoff areas (low points) on each side of the training areas. One soil sample was collected at each location from the 0.5-foot to 1.0-foot interval and submitted to Alpha for analysis for PFAS compounds via USEPA Method 537.

Analytical results of the September 1, 2023 soil sampling event did not identify concentrations of targeted PFAS compounds at concentrations greater than their respective NJDEP Residential and Non-Residential Interim SRS for the Ingestion-Dermal Exposure Pathway (ISRS-IG).

### 5.5    Migration to Groundwater Pathway

In accordance with the NJDEP's PFAS Soil and Soil Leachate Remediation Standards Basis & Background for the Migration to Groundwater Exposure Pathway for PFNA, PFOA, PFOS and GenX guidance document (June 2023, Version 1.1), a SSMGW-SRS is required to be calculated to address the migration to groundwater pathway for PFAS compounds. H2M authorized the three (3) highest concentrations of PFOA, PFNA, and PFOS in soil for additional laboratory analysis for Synthetic Precipitation Leaching Procedure (SPLP). The SPLP results were input into the NJDEP's Soil and Soil Leachate Migration to Groundwater Exposure Pathway Calculator to calculate the SSMGW-SRS for the Site. Copies of the SSMGW-SRS calculation are provided in **Appendix G**. The following table summarizes the calculated SSMGW-SRS.

**Site-Specific Migration to Groundwater Soil Remediation Standards**

| Compound | SSMGW-SRS (mg/kg) |
|---|---|
| Perfluorooctanoic Acid (PFOA) | 0.00057 |
| Perfluorononanoic Acid (PFNA) | 0.0017 |
| Perfluorooctanesulfonic Acid (PFOS) | 0.016 |

mg/kg – milligrams per kilogram
SSMGW-SRS: Site-Specific Migration to Groundwater Soil Remediation Standard
SSMGW-SRS was calculated using the NJDEP's Soil and Soil Leachate Migration to Groundwater Exposure Pathway Calculator (Version 1.1, October 2022)

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 267 of 283
PageID: 37411
Case 1:19-cv-14758-RMB-JBC    Document 508-10    Filed 11/25/25    Page 12 of 28
PageID: 13391



Soil analytical results identified concentrations of PFOS in samples PBS-2 (0.0503 mg/kg) and PBS-3 (0.0218 mg/kg) exceeding its respective SSMGW-SRS of 0.016 mg/kg. All other boring locations reported targeted PFAS compounds at concentrations less than their respective SSMGW-SRS.

SSMGW calculations using the NJDEP 2023 PFAS SPLP Spreadsheet are provided in **Appendix G**. A summary of the soil sample results is provided on **Table 3** and on **Figure 5**.

6.0     Receptor Evaluation

A copy of the initial Receptor Evaluation form, which was submitted electronically through the NJDEP's portal along with this submission is included in **Appendix A**.

6.1     Land Use

Land use within 200 feet of the Site boundary includes a single residential property to the southeast followed by State Highway 33 and commercial properties; a federal navy facility (NWSE) to the east, and commercial properties to the west and south. A list of land uses within 200 feet of the Site boundary and a map showing the location of the Site and the properties identified is provided in **Appendix A, Figure 1**.

6.2     Groundwater

In accordance with N.J.A.C. 7:26E-1.14, a list of potentially potable wells (e.g., domestic, public community, public non-community) located within a half (0.5)-mile of the Site was compiled through NJDEP DataMiner "XY Well Search". The wells were then plotted using ArcGIS so that the list of potentially potable wells was narrowed down to include only the wells that are located within an atlas grid that intersects the 0.5-mile radial marker. Based on the results of H2M's well search, multiple potable wells were identified at properties within 0.5 mile of the Site, thereby, triggering the need to perform a door-to-door well survey in accordance with N.J.A.C. 7:26E-1.14 (a)1ii. The locations of the potentially potable wells identified through the NJDEP DataMiner "XY Well Search" are depicted in **Appendix A, Figure 2**.

Utilizing ArcGIS, 250-foot and 500-foot radius buffers were plotted around the two Monmouth County fire training areas and the area immediately surrounding. Based on this extent, the vacant properties to the west and the NWSE to the east are within the trigger distances. Previous well searches conducted at the Site evaluated the vacant properties and potable wells were not found at these properties. However, a potable well is located at the Site and was sampled (see Section 5.3). The potable well sample results did not identify PFAS compounds at concentrations exceeding their respective NJDEP DWQS.

An electronic copy of the NJDEP's Well Search Spreadsheet Version 1.1 is being submitted to the NJDEP through the online portal along with this submission. A copy of the well search spreadsheet and list of properties canvased are included in the Receptor Evaluation in **Appendix A**

In 2016, the Navy conducted a potable well investigation in the downgradient direction (south-southeast) from the NWSE and Monmouth County Fire Academy properties. According to information available on the Navy's website (https://www.navfac.navy.mil/Divisions/Environmental/Products-and-Services/Environmental-Restoration/Mid-Atlantic/Earle-NWS/PFAS-Sampling/), a total of 29 potable wells were sampled and analyzed for PFOS and PFOA. PFOS was detected in four (4) of the potable wells at concentrations exceeding its respective NJDEP GWQS of 13 ng/L and PFOA was detected in three (3) of the potable wells at concentrations exceeding its respective NJDEP GWQS of 14 ng/L. A second potable well investigation was conducted by the Navy in 2023 in which 41 potable wells were sampled and analyzed

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 268 of 283
Case 1:19-cv-14758-RMB-JBC    Document 508-10    Filed 11/25/25    Page 13 of 28
PageID: 37412
PageID: 13392

H 2
M

for PFOS and PFOA. PFOA was detected in one (1) of the potable well at a concentration exceeding its respective NJDEP GWQS of 14 ng/L. PFOS was not detected in any potable well at a concentration exceeding its respective NJDEP GWQS of 13 ng/L during the 2023 potable well investigation conducted by the Navy. Based on these results, no further evaluation is required for potable wells at this time.

### 6.3    Ecological Evaluation

Based on the results of the groundwater investigation presented above that confirmed the presence of PFAS compounds in groundwater at concentrations exceeding their respective NJDEP GWQS and the presence of potential receptors (wetlands, streams) in proximity to the Site, an ecological evaluation is required to be completed in accordance with N.J.A.C. 7:26E-1.16 and the NJDEP's Ecological Evaluation Technical Guidance.

In 2019, the Navy investigated the Fire Pond located to the east of the Monmouth County Fire Academy (side-gradient) and downgradient of the NWSE Site. The investigation included the collection of five (5) sediment samples and five (5) surface water samples at various locations within the fire pond. PFOS was identified exceeding the applicable Surface Water and Sediment Ecological Screening Values in each of the five (5) samples. Based on these results, further investigation of surface water and sediment is required to determine if an ecological concern is present. Surface water and sediment sample locations and analytical results from the Navy's 2019 investigation of the Fire Pond is included in **Figure 6**.

The investigation of potential receptors will be conducted as part of the Remedial Investigation. Recommendations for surface water and/or sediment sampling will be determined by the groundwater plume delineation to be conducted as part of the Remedial Investigation.

### 6.4    Vapor Intrusion Pathway

PFAS compounds currently do not have a designated NJDEP Vapor Intrusion Groundwater Screening Levels. Therefore, there are no conditions at the Site that trigger a vapor intrusion investigation as per (N.J.A.C 7:26E-1.18).

## 7.0    Findings and Recommendations

### 7.1    AOC-1 - Soil Investigation Findings

On September 1, 2023, a total of nine (9) soil samples were installed in areas surrounding the two (2) fire suppression/rescue training areas at the Site to characterize soil for PFAS contamination due to potential historic use of AFFF. Analytical results of soil sampling did not identify targeted PFAS compounds at concentrations exceeding their respective NJDEP Interim SRS. However, the migration to groundwater pathway investigation identified concentrations of PFOS in soil collected from samples PBS--2 (0.0503 mg/kg) and PBS-3 (0.0218 mg/kg) exceeding the calculated SSMGW-SRS of 0.016 mg/kg. Although the concentrations of PFOS in soil are not indicative of a discharge, additional horizontal and vertical delineation of the migration to groundwater pathway is required in this AOC. The Remedial Investigation of the migration to groundwater pathway will include the collection of additional soil samples around previous samples PBS-2 and PBS-3 to further delineate PFOS in soil.

### 7.2    AOC-2 - Groundwater Investigation Findings

In October and November 2022, a groundwater investigation was conducted in the vicinity of the two (2) fire suppression/rescue training areas to characterize groundwater for PFAS contamination due to historic

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 269 of 283
PageID: 37413
Case 1:19-cv-14758-RMB-JBC    Document 568-10    Filed 11/25/25    Page 14 of 28
PageID: 13393

H 2 M

operations. A total of seven (7) groundwater samples were collected from seven (7) monitoring wells and submitted for laboratory analysis for PFAS compounds. Analytical results identified concentrations of PFOS, PFNA, and/or PFOA in exceedance of the NJDEP GWQS in six (6) of the seven (7) monitoring wells sampled during this investigation. Concentrations of PFOS and PFOA exceeding their respective NJDEP GWQS were reported in samples from monitoring wells FAMW-6, FAMW-7, FAMW-8, FAMW-9, MW-5, and MW-10. PFOA exceedances ranged from 37.2 to 142 ng/L and PFOS exceedances ranged from 15.6 to 293 ng/L. PFNA was only detected at a concentration exceeding its respective NJDEP GWQS in monitoring well FAMW-6 at a concentration of 49.7 ng/L.

H2M was provided historical groundwater data from the PFAS investigation being conducted by the Navy on the upgradient adjacent NWSE property. Based on a review of the NWSE data for groundwater samples collected between 2016 and 2021, PFAS compounds, including PFOS, PFNA, and PFOA, have been detected in monitoring wells on the NWSE property at concentrations exceeding the NJDEP GWQS. Exceedances identified on the NWSE property included PFOS ranging between 17 and 4,800 ng/L; exceedances of PFOA ranging between 19 and 180 ng/L; and exceedances of PFNA ranging between 14 and 29 ng/L.

The NWSE investigation also included monitoring wells installed by Monmouth County during the investigation of the Police Firing Range and former UST at the Fire Academy. A summary of historical PFAS groundwater data is included on **Figure 3**. Concentrations of PFOS, on average, are significantly higher in monitoring wells located on the upgradient NWSE property and in some cases, an order of magnitude greater than monitoring wells immediately surrounding the Fire Academy fire suppression/rescue training areas. Concentrations of PFOA and PFNA reported in monitoring wells on the Site and in downgradient areas were similar to concentrations reported in NWSE monitoring wells.

According to USEPA's *Technical Fact Sheet – PFOS and PFOA* (November 2017)**,** PFOS is commonly associated with the usage of AFFF and can be indicative of a release if detected in soil or groundwater. Additionally, PFOA, to a lesser extent than PFOS, can also be attributed to the use of AFFF. As noted above, PFOS concentrations were reported at the NWSE property at concentrations significantly higher than concentrations reported at the Monmouth County Fire Academy. Concentrations of PFOA and PFNA were reported at similar concentrations at the Monmouth County Fire Academy to those reported at the NWSE property.

Additional investigation to delineate PFOS, PFOA, and PFNA at the Site are required to comply with NJDEP regulations. Although significant evidence is available indicating that PFAS are migrating onto the Site from the upgradient NWSE property, historic operations at the Monmouth County Fire Academy cannot be excluded as a potential contributor to the PFAS plume. A Remedial Investigation of groundwater is required to delineate the extent of PFAS contamination at the Site. Monmouth County intends to coordinate the Remedial Investigation with additional investigations planned by the Navy to further characterize conditions as they relate to PFAS contamination in groundwater.

### 7.3    Ecological Evaluation

The Receptor Evaluation identified wetlands and surface water bodies located on and adjacent to the Site. Additional investigation is required to determine if PFAS compounds detected in groundwater have impacted these potential sensitive receptors. At this time, the full extent of the PFAS plume has not been

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 270 of 283
PageID: 37414
Case 1:19-cv-14758-RMB-JBC    Document 568-10    Filed 11/25/25    Page 15 of 28
PageID: 13394

H 2 M

delineated. The proposed Remedial Investigation will include additional sampling of on-site and off-site monitoring wells as well as surface water and sediment/soil to determine if a pathway exists between PFAS in groundwater and potential receptors.

## 8.0    References

Naval Facilities Engineering Systems Command (NAVFAC) Environmental Restoration Program Public Website, 2023. Naval Weapons Station Earle. https://www.navfac.navy.mil/Divisions/Environmental/Products-and-Services/Environmental-Restoration/Mid-Atlantic/Earle-NWS/PFAS-Sampling/

New Jersey Department of Environmental Protection (NJDEP), 2016. NJ GeoWeb, Geology. http://njwebmap.state.nj.us/NJGeoWeb/WebPages/Map/MapViewer.aspx?THEME=Surf&UH=True& RIDZ=635446676182124845.

NJDEP, 2014. Ground Water Quality Standards (N.J.A.C. 7:9C). March 4, 2014.

NJDEP, 2013a. Guidance Document - Development of Impact to Ground Water Soil Remediation Standards Using the Soil-Water Partition Equation. Version 2.1. November 2013. Trenton, NJ.

NJDEP, 2013b. Administrative Requirements for the Remediation of Contaminated Sites (N.J.A.C. 7:26C). July 1, 2013.

NJDEP, 2013c. Guidance Document – Development of Site-Specific Impact to Ground Water Soil Remediation Standards Using the Synthetic Precipitation Leaching Procedure. Version 3.0. November 2013. Trenton, NJ.

NJDEP, 2012a. Remediation Standards (N.J.A.C. 7:26D). May 7, 2012.

NJDEP, 2012b. Technical Requirements for Site Remediation (TRSR, N.J.A.C. 7:26E). May 7, 2012. Trenton, NJ.

NJDEP, 2012d. Technical Guidance for Site Investigation of Soil, Remedial Investigation of Soil, and Remedial Action Verification Sampling of Soil. Version 1.1. August 1, 2012. NJDEP Site Remediation Program, Trenton, NJ.

NJDEP, 2012e. Technical Guidance for the Attainment of Remediation Standards and Site-Specific Criteria, Version 1.0. September 24, 2012. Trenton, NJ

NJDEP, 2011. Frequently Asked Questions for the Impact to Ground Water Pathway in Soil Remediation Standards. Version 1.0, January 27, 2011. Trenton, NJ.

NJDEP, 2009. Site Remediation Reform Act (SRRA) N.J.S.A. 58:10C-1 *et seq.* May 7, 2009. Trenton, NJ.

NJDEP, 2005. Field Sampling Procedures Manual. Site Remediation Program. August 2005. Trenton, NJ.

NJDEP, 1995. Site Remediation News Spring (Vol 7 N0 2) Article 08 – Compliance Averaging. Brian J. Sogorka. Bureau of Environmental Evaluation and Risk Assessment.

United States Department of Agriculture (USDA), 2014. Natural Resources Conservation Service, Web Soil Survey: http://websoilsurvey.nrcs.usda.gov/app/. March 20, 2014.



United States Environmental Protection Agency (USEPA), 1992. Guidance for Data Usability in Risk Assessment, Part A. Publication 9285.7-09A, PB92-963356. April 1992. Office of Emergency and Remedial Response Washington, DC

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 272 of 283
Case 1:19-cv-14758-RMB-JBC    Document 383-10    Filed 11/25/25    Page 17 of 28
PageID: 37416
PageID: 13396

TABLES

**Table 1**
**Groundwater Analytical Results**
Monmouth County Fire Academy
1027 Highway 33, Freehold NJ
PI # 032680

H 2 M

Page 1 of 2

| Sample ID | | FAMW-6 | | | FAMW-7 | | | FAMW-8 | | | FAMW-9 | | |
| Lab Sample ID | | L2265206-01 | | | L2265206-02 | | | L2265206-03 | | | L2265206-04 | | |
| Sample Date | | 11/17/2022 | | | 11/17/2022 | | | 11/17/2022 | | | 11/17/2022 | | |
| Units | | ng/L | | | ng/L | | | ng/L | | | ng/L | | |
| Analyte | NJDEP GWQS (ng/L) | Results | Q | RL | Conc | Q | RL | Conc | Q | RL | Conc | Q | RL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Perfluorobutanesulfonic Acid (PFBS) | NS | 58.4 | | 1.75 | 12.2 | | 1.73 | 40.4 | | 1.89 | 6.34 | J | 10.0 |
| Perfluorohexanoic Acid (PFHxA) | NS | 107 | | 1.75 | 85.2 | | 1.73 | 710 | | 1.89 | 21.4 | | 10.0 |
| Perfluoroheptanoic Acid (PFHpA) | NS | 38.6 | | 1.75 | 17.3 | | 1.73 | 244 | | 1.89 | 17.8 | | 10.0 |
| Perfluorohexanesulfonic Acid (PFHxS) | NS | 290 | | 1.75 | 185 | | 1.73 | 304 | | 1.89 | 64.6 | | 10.0 |
| Perfluorooctanoic Acid (PFOA) | 14 | 49.4 | | 1.75 | 52.5 | | 1.73 | 142 | | 1.89 | 103 | | 10.0 |
| Perfluorononanoic Acid (PFNA) | 13 | 49.7 | | 1.75 | 6.97 | | 1.73 | 13 | | 1.89 | 10.2 | | 10.0 |
| Perfluorooctanesulfonic Acid (PFOS) | 13 | 293 | | 1.75 | 156 | J | 1.73 | 210 | | 1.89 | 61.3 | | 10.0 |
| Perfluorodecanoic Acid (PFDA) | NS | 4.5 | | 1.75 | 0.566 | J | 1.73 | 4.06 | | 1.89 | ND | | 10.0 |
| N-Methyl Perfluorooctanesulfonamidoacetic Acid (NMeFOSAA) | NS | ND | | 1.75 | ND | | 1.73 | ND | | 1.89 | ND | | 10.0 |
| Perfluoroundecanoic Acid (PFUnA) | NS | ND | | 1.75 | ND | | 1.73 | 0.581 | JF | 1.89 | ND | | 10.0 |
| N-Ethyl Perfluorooctanesulfonamidoacetic Acid (NEtFOSAA) | NS | ND | | 1.75 | ND | | 1.73 | ND | | 1.89 | ND | | 10.0 |
| Perfluorododecanoic Acid (PFDoA) | NS | ND | | 1.75 | ND | | 1.73 | ND | | 1.89 | ND | | 10.0 |
| Perfluorotridecanoic Acid (PFTrDA) | NS | ND | | 1.75 | ND | | 1.73 | ND | | 1.89 | ND | | 10.0 |
| Perfluorotetradecanoic Acid (PFTeDA) | NS | ND | | 1.75 | ND | | 1.73 | ND | | 1.89 | ND | | 10.0 |

NOTES:

J: The concentration is an approximate value

JF: Results less than ten times the reporting limit were qualified as
presumptively present (F) and estimated (J) due to excessively
high recovery in the RL standard.

GWQS: NJDEP Class IIA Groundwater Quality Standard (GWQS)

ND: Analyte was not detected above the reporting limit

NS: No Standards

Q: Qualifier

RL: Reporting Limit

ng/L: Nanograms per Liter

Exceeds NJDEP Class IIA Groundwater Quality Standards (GWQS)

H 2 M

**Table 1**
Groundwater Analytical Results
Monmouth County Fire Academy
1027 Highway 33, Freehold NJ
PI # 032680

| Analyte | NJDEP GWQS (ng/L) | MW-5 L226S206-05 11/17/2022 ng/L Conc | Q | RL | MW-8 L226S206-06 11/17/2022 ng/L Conc | Q | RL | MW-10 L226S206-07 11/17/2022 ng/L Conc | Q | RL | FB-11172022 L226S206-08 11/17/2022 ng/L Conc | Q | RL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Perfluorobutanesulfonic Acid (PFBS) | NS | 7.15 | | 1.73 | 1.73 | J | 1.77 | 15.5 | | 1.72 | ND | | 1.75 |
| Perfluorohexanoic Acid (PFHxA) | NS | 42 | | 1.73 | 1.72 | J | 1.77 | 16.1 | | 1.72 | ND | | 1.75 |
| Perfluoroheptanoic Acid (PFHpA) | NS | 16 | | 1.73 | 0.3 | J | 1.77 | 9.87 | | 1.72 | ND | | 1.75 |
| Perfluorohexanesulfonic Acid (PFHxS) | NS | 56.8 | | 1.73 | 31.1 | | 1.77 | 37.8 | | 1.72 | ND | | 1.75 |
| Perfluorooctanoic Acid (PFOA) | 14 | 23.2 | | 1.73 | 0.742 | JF | 1.77 | 37.2 | | 1.72 | ND | | 1.75 |
| Perfluorononanoic Acid (PFNA) | 13 | 0.936 | J | 1.73 | ND | | 1.77 | 4.91 | | 1.72 | ND | | 1.75 |
| Perfluorooctanesulfonic Acid (PFOS) | 13 | 15.6 | | 1.73 | 1.5 | J | 1.77 | 47.7 | | 1.72 | ND | | 1.75 |
| Perfluorodecanoic Acid (PFDA) | NS | ND | | 1.73 | ND | | 1.77 | 0.852 | J | 1.72 | ND | | 1.75 |
| N-Methyl Perfluorooctanesulfonamidoacetic Acid (NMeFOSAA) | NS | ND | | 1.73 | ND | | 1.77 | 0.518 | JF | 1.72 | ND | | 1.75 |
| N-Ethyl Perfluorooctanesulfonamidoacetic Acid (NEtFOSAA) | NS | ND | | 1.73 | ND | | 1.77 | ND | | 1.72 | ND | | 1.75 |
| Perfluoroundecanoic Acid (PFUnA) | NS | ND | | 1.73 | ND | | 1.77 | ND | | 1.72 | ND | | 1.75 |
| Perfluorododecanoic Acid (PFDoA) | NS | ND | | 1.73 | ND | | 1.77 | ND | | 1.72 | ND | | 1.75 |
| Perfluorotridecanoic Acid (PFTrDA) | NS | ND | | 1.73 | ND | | 1.77 | ND | | 1.72 | ND | | 1.75 |
| Perfluorotetradecanoic Acid (PFTA) | NS | ND | | 1.73 | ND | | 1.77 | ND | | 1.72 | ND | | 1.75 |

NOTES:

J: The concentration is an approximate value

JF: Results less than ten times the reporting limit were qualified as presumptively present (F) and estimated (J) due to excessively high recovery in the RL standard.

GWQS: NJDEP Class IIA Groundwater Quality Standard (GWQS)

ND: Analyte was not detected above the reporting limit

NS: No Standards

Q: Qualifier

RL: Reporting Limit

ng/L: Nanograms per Liter

Exceeds NJDEP Class IIA Groundwater Quality Standards (GWQS)

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 275 of 283
PageID: 37419
Case 1:19-cv-14758-RMB-JBC    Document 762-10    Filed 11/25/25    Page 20 of 28
PageID: 13399

**Table 2**
Potable Well Analytical Results
Monmouth County Fire Academy
1027 Highway 33, Freehold NJ
PI # 032680



| | Sample ID | PW-FA | | | FIELD BLANK | | |
| | Lab ID | L2320050-01 | | | L2320050-02 | | |
| | Collection Date | 4/13/2023 | | | 4/13/2023 | | |
| | Units | ug/L | | | ug/L | | |
| | NJDEP DWQS | | | | | | |
| Analyte | (ug/L) | Conc | Q | RL | Conc | Q | RL |
|---|---|---|---|---|---|---|---|
| Perfluorobutanesulfonic Acid (PFBS) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorohexanoic Acid (PFHxA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Hexafluoropropylene Oxide Dimer Acid (HFPO-DA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Perfluoroheptanoic Acid (PFHpA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorohexanesulfonic Acid (PFHxS) | NS | ND | | 0.00172 | ND | | 0.00186 |
| 4,8-Dioxa-3h-Perfluorononanoic Acid (ADONA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorooctanoic Acid (PFOA) | 0.014 | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorononanoic Acid (PFNA) | 0.013 | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorooctanesulfonic Acid (PFOS) | 0.013 | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorodecanoic Acid (PFDA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| 9-Chlorohexadecafluoro-3-Oxanone-1-Sulfonic Acid (9Cl-PF3ONS) | NS | ND | | 0.00172 | ND | | 0.00186 |
| N-Methyl Perfluorooctanesulfonamidoacetic Acid (NMeFOSAA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Perfluoroundecanoic Acid (PFUnA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| N-Ethyl Perfluorooctanesulfonamidoacetic Acid (NEtFOSAA) | NS | ND | | 0.00172 | 0.000671 | J | 0.00186 |
| Perfluorododecanoic Acid (PFDoA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| 11-Chloroeicosafluoro-3-Oxaundecane-1-Sulfonic Acid (11Cl-PF3OUdS) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorotridecanoic Acid (PFTrDA) | NS | ND | | 0.00172 | ND | | 0.00186 |
| Perfluorotetradecanoic Acid (PFTA) | NS | ND | | 0.00172 | ND | | 0.00186 |

NOTES:
J: The concentration is an approximate value
DWQS: NJDEP Drinking Water Quality Standards
NS: No Standards
Q: Qualifier
RL: Reporting Limit
ug/L: micrograms per liter
Exceeds NJDEP Drinking Water Quality Standards (DWQS)

X:\MCNM (Monmouth County, NJ)\MCNM2302 - On-Call LSRP (2023-2024)\01-Reports\03 - FA PFAS IR-RI\Tables\Table 2 - PFAS PW Analytical Results

Page 1 of 1



**Table 3**
**Soil Analytical Results**
**Monmouth County Fire Academy**
**1027 Highway 33, Freehold NJ**
**PI #020600**

Sample columns: PBS-1, PBS-2, PBS-3, PBS-4, PBS-5, PBS-6, PBS-7, PBS-8, PBS-9 (Lab Sample IDs L2012130-xx; Sample Date 9/10/2023; Sample Depth 0.5'–1.0'; units mg/kg)

Analyte list (with NJDEP Residential RS [mg/kg] and SRMGWSRS [mg/kg] standard columns):

- Perfluorobutanoic Acid (PFBA)
- Perfluoropentanoic Acid (PFPeA)
- Perfluorobutanesulfonic Acid (PFBS)
- Perfluorohexanoic Acid (PFHxA)
- Perfluoroheptanoic Acid (PFHpA)
- Perfluorooctanoic Acid (PFOA)
- Perfluorononanoic Acid (PFNA)
- Perfluorohexanesulfonic Acid (PFHxS)
- Perfluorooctanesulfonic Acid (PFOS)
- Perfluorodecanoic Acid (PFDA)
- N-Methyl Perfluorooctanesulfonamidoacetic Acid (NMeFOSAA)
- N-Ethyl Perfluorooctanesulfonamidoacetic Acid (NEtFOSAA)
- Perfluoroundecanoic Acid (PFUnA)
- Perfluorododecanoic Acid (PFDoA)
- Perfluorotridecanoic Acid (PFTrDA)
- Percent Solids (%)

NOTES:
NJDEP - New Jersey Department of Environmental Protection
SRMGWSRS - Site Specific Migration to Groundwater Soil Remediation Standard
RS - is non-threshold Standard
mg/kg - milligram per kilogram
ND - Non-detect
NS - No Standards
RL - Reporting Limit
Q - Qualifier
RSL - the concentration is an approximate value.
F - Re-flates reported; no response fall outside of the laboratory criteria. Results are considered to be an estimated concentration.
J/F - Results less than the reporting limit were qualified as the prescriptively present (F) and estimated (J) due to exceedingly high recovery in the Reporting Limit standard.
* - Rounding to significant figures were applied resulting in the analytical result meeting the associated standard.

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 277 of 283
PageID: 37421
Case 1:19-cv-14758-RMB-JBC    Document 568-10    Filed 11/25/25    Page 22 of 28
PageID: 13401

FIGURES

Case 1:19-cv-14766-RMB-JBC    Document 783-4    Filed 12/22/25    Page 278 of 283
PageID: 37422
Case 1:19-cv-14758-RMB-JBC    Document 568-10    Filed 11/25/25    Page 23 of 28
PageID: 13402



**Legend**

Site Parcel

N

0    1,000    2,000
Feet

**Figure 1**
Site Location Map
Monmouth County Fire Academy
(PI No. 032680)
1027 Highway 33
Freehold Township, Monmouth County, NJ

H 2 M

architects
+
engineers

Melville, NY  Parsippany, NJ
Albany, NY  Suffern, NY  Riverhead NY
Westchester, NY  Wall, NJ  New York, NY

**Figure 2**
Site Plan
Monmouth County Fire Academy
(PI No. 032680)
1027 Highway 33
Freehold Township, Monmouth County, NJ



**Figure 3**

Historic Groundwater PFAS Analytical Results
Monmouth County Fire Academy
(PI No. 032680)
1027 Highway 33
Freehold Township, Monmouth County, NJ



Figure 4
PFAS Analytical Results - November 17, 2022
Monmouth County Fire Academy
(PI No. 032680)
1027 Highway 33
Freehold Township, Monmouth County, NJ



Figure 5
Soil Sample Location Plan
Monmouth County Fire Academy
(PI No. 032680)
1027 Highway 33
Freehold Township, Monmouth County, NJ



Figure 6

Historic Sediment/Surface Water PFAS Analytical Results
Naval Weapon Station Earle and Monmouth Fire Academy
1027 Highway 33, Howell, NJ