**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs*
By:    Gwen Farley
       Deputy Attorney General
       Attorney ID No. 000081999
       Ph. (609) 376-2740
       Gwen.Farley@law.njoag.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>E. I. DU PONT DE NEMOURS AND COMPANY, et al.,<br><br>    Defendants. | Case Nos. 1:19-cv-14758-RMB-JBC,<br>        1:19-cv-14765-RMB-JBC,<br>        1:19-cv-14766-RMB-JBC,<br>        3:19-cv-14767-RMB-JBC<br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO COUNTIES' MOTIONS TO INTERVENE

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND AND PROCEDURAL HISTORY ............................................3

     A.    MONMOUTH COUNTY ........................................................4

     B.    MERCER COUNTY ..............................................................6

ARGUMENT ......................................................................................................9

I.    THE COUNTIES' OBJECTIONS TO THE SETTLMENTS DO NOT WARRANT THE COURT'S REJECTION OF THE SETTLEMENTS, NOR ANY MODIFICATION OF THEIR TERMS ........9

     A.    THE COUNTIES' ASSERTION THAT THE STATE DID NOT RECOVER THE FULL COSTS OF PFAS REMEDIATION THROUGH THE SETTLEMENTS IS NOT GROUNDS FOR REJECTING THE JCOS. ....................................10

     B.    THE COUNTIES HAVE VIRTUALLY NO RESPONSE TO THE STATE'S ARGUMENT THAT THE STATE HAS THE AUTHORITY TO RELEASE THE CLAIMS OF ITS POLITICAL SUBDIVISIONS, INCLUDING THE COUNTIES. ..............................................................................15

     C.    MERCER COUNTY'S ARGUMENTS ADOPTED FROM CARNEYS POINT'S FILINGS SHOULD BE REJECTED FOR REASONS ALREADY EXPRESSED BY THE STATE. .......17

II.    THE COURT SHOULD DENY THE COUNTIES' MOTIONS TO INTERVENE IN THIS ACTION ................................................18

     A.    THE NON-PARTY COUNTIES ARE NOT ENTITLED TO INTERVENE AS OF RIGHT BECAUSE THE STATE ADEQUATELY REPRESENTS THEIR INTERESTS. ...................19

     B.    PERMISSIVE INTERVENTION WOULD CAUSE UNDUE DELAY AND PREJUDICE TO THE EXISTING PARTIES IN THIS ACTION. ...............................................................24

CONCLUSION ..................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Certified Question from the U.S. Dist. Ct. for the E.D. Mich. v. Philip Morris*,
  638 N.W.2d 409 (Mich. 2002) ..........................................................................16

*City of Bloomington, Ind. v. Westinghouse Elec. Corp.*,
  824 F.2d 531 (7th Cir. 1987) ............................................................................26

*Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*,
  674 F.2d 970 (3d Cir. 1982) ........................................................................20, 26

*Hunter v. City of Pittsburgh*,
  207 U.S. 161 (1907)..........................................................................................23

*Jones v. Caddo Par. Sch. Bd.*,
  735 F.2d 923 (5th Cir. 1984) ............................................................................25

*Kleissler v. U.S. Forest Service*,
  157 F.3d 964 (3rd Cir. 1998) ............................................................................22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)..........................................................................................23

*New Hampshire v. Exxon Mobil Corp.*,
  126 A.3d 266 (N.H. 2015) ................................................................................16

*Reynolds v. Sims*,
  377 U.S. 533 (1964)..........................................................................................23

*Sierra Club v. Glickman*,
  82 F.3d 106 (5th Cir. 1996) ........................................................................22, 23

*Sokaogon Chippewa Cmty v. Babbitt*,
  214 F.3d 941 (7th Cir. 2000) ......................................................................24, 25

*State v. City of Dover*,
  891 A.2d 524 (N.H. 2006) ........................................................................*passim*

*Sugzdinis v. Spang*,
   957 F.2d 1108 (3d Cir. 1992) ...............................................................19

*Symbiont Sci. Eng'g & Constr., Inc. v. Ground Improvement Servs., Inc.*,
   No. CV 22-4905, 2024 WL 378691 (D.N.J. Feb. 1, 2024) ................................18

*United States v. Charles George Trucking, Inc.*,
   34 F.3d 1081 (1st Cir. 1994)...............................................................11

*United States v. Territory of Virgin Islands*,
   748 F.3d 514 (3d Cir. 2014) ...............................................................21

*Wagner v. Mayor & Mun. Council of City of Newark*,
   132 A.2d 794 (N.J. 1957) ..................................................................23

*Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Penn.*,
   701 F.3d 938 (3d Cir. 2012) ...............................................................21

## PRELIMINARY STATEMENT

Two of New Jersey's twenty-one counties, Monmouth County and Mercer County (collectively, "the Counties"), seek to intervene in the final chapter of the State's[1] long-running litigations against the 3M Company ("3M") and the DuPont Defendants[2] (collectively, the "Defendants"). The Counties seek to force a re-negotiation of the terms of the State's Judicial Consent Orders ("JCOs" or "Settlements") that would bring these cases to a close and distribute significant financial assistance for the protection of the public health and environment across New Jersey. The State submits this consolidated memorandum of law in opposition to the Counties' motions, which seek intervention to make objections that, in any event, do not warrant rejecting the Settlements or modifying them according to the Counties' wishes.

It was unnecessary for the Counties to move to intervene in this action for their objections to be heard by this Court. The State has consented to multiple non-parties filing objections in an *amicus* capacity to avoid expending the parties' and the Court's time and resources on procedural hurdles and to promote the creation of

---

[1] Plaintiffs in this litigation are the New Jersey Department of Environmental Protection, its Commissioner, and the Administrator of the New Jersey Spill Compensation Fund (collectively, the "State").

[2] DuPont Defendants are: EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP"), Corteva, Inc., DuPont de Nemours Inc., DuPont Specialty Products USA, LLC, The Chemours Company and The Chemours Company FC, LLC.

a full record as the Court considers the Settlements. Monmouth County's sole explanation for not following the *amicus* process is purportedly to "safeguard its right to appeal," ECF 568-2 at 18,[3] while Mercer County never offers its own rationale. For both Counties, an *amicus* brief would have sufficed.

Setting aside procedure, the Counties' objections fall far short of the standards governing this Court's review and approval of the Settlements. Monmouth County, which only seeks to object to the 3M JCO, takes issue with that Settlement because it does not "cover[] the total cost of PFAS remediation." ECF 568-2 at 2. If that were the standard for approving (or rejecting) an environmental settlement, virtually none would gain approval. Monmouth County also contests the State's authority to release its political subdivisions' claims by targeting a single case cited by the State, *State v. City of Dover*, 891 A.2d 524 (N.H. 2006). *See* ECF 568-2 at 16–17. But its attack on that case is ineffective, and the County's brief fails to engage with the State's broader argument on this issue.

Mercer County, for its part, relies on select objections made by Carneys Point in its earlier-filed motion to intervene. *See* ECF 742-2. But those objections rest on arguments that are wrong for the reasons the State has already recounted in its

---

[3] Monmouth County and Mercer County filed their respective motions to intervene on separate dockets. Cites to Monmouth County's motion, ECF 568, are to the 1:19-cv-14758 docket while Mercer County's motion, ECF 770, are to the 1:19-cv-14766 docket.

opposition to Carneys Point's motion. *See* ECF 764. The Court should overrule each of these objections.

The only remaining issue, then, is the question of intervention, which should be denied because neither Monmouth County nor Mercer County satisfies the applicable standard. The Counties are not entitled to become parties to this action through intervention as of right because the State under applicable law represents the interests of all its political subdivisions—including Monmouth County and Mercer County—when vindicating the State's sovereign and quasi-sovereign interests in protecting the health of its citizens and safeguarding New Jersey's environment and natural resources. There are likewise no legitimate grounds for permissive intervention here. There are hundreds of municipal government entities and 21 counties in New Jersey; there is no reason to empower these two Counties to dictate the course of the State's actions on behalf of all State residents and unnecessarily delay resolution of these matters.

For these reasons, the State submits that the Counties' objections should be rejected and their motions denied in their entirety.

## BACKGROUND AND PROCEDURAL HISTORY

The background and procedural history of the State's actions against Defendants, the State's notice of the proposed JCOs to the public, and the public comment and response process generally are set out extensively in the State's

Memorandum of Law in Support of Plaintiffs' Motion to Approve Judicial Consent Orders with Settling Defendants ("Motion to Approve the JCOs"). *See* ECF 746-1 at 4–16. The State incorporates that background herein.

### A.   Monmouth County

*Monmouth County's Public Comment.* During the public comment process on the 3M JCO, Monmouth County submitted comments to the New Jersey Department of Environmental Protection ("Department") through a letter submitted by the Keefe Law Firm "on behalf of [its] [] New Jersey clients." *See* ECF 568-6. Among other things, the Keefe Law Firm's comments made generalized arguments about the State's *parens patriae* authority and asserted that 3M's settlement payment was insufficient.[4] *See id.* The State provided detailed responses to the Keefe Law Firm's comment, including through 3M JCO Response to Comments Nos. 4, 5, 35, 37, and 38. *See* ECF 746-5.

*Monmouth County's Counsel Contacts the State's Counsel.* On November 17, 2025, Monmouth County's counsel contacted the State's counsel via email stating that the County was aware of the *amicus* opposition process established through the Amended Scheduling Order and was considering "the most efficient

---

[4] Monmouth County's brief also refers to comments submitted by other parties (including a sewerage authority from a different county), but it fails to explain the connection between those comments and its own specific circumstances or the particular relief it seeks, which is to exempt itself, and no others, from the terms of the 3M JCO.

procedure for participating in this action," and asking to discuss the same with the State. (Declaration of David M. Reap, dated December 22, 2025 ("Reap Decl."), ¶ 3.) The State's counsel made themselves available for a call that same afternoon, during which they provided additional details on the *amicus* process and indicated that they would consent to Monmouth County proceeding in this manner. The State's counsel also informed Monmouth County's counsel that they were willing to work on a modified *amicus* process to address any further concerns the County might have, so that the parties and the Court could remain focused on the substance of objections rather than needlessly addressing procedural hurdles associated with intervention. The State did not receive further outreach from Monmouth County after that call. *Id*. ¶ 4.

**Monmouth County Seeks to Intervene As to the 3M JCO.** On November 25, 2025, Monmouth County moved to intervene in this action. *See* ECF 568. Monmouth County's proposed third-party complaint for declaratory judgment seeks to have the Court declare that "Monmouth County shall not be a 'Releasor' under the [3M] JCO or otherwise bound by the terms of the [3M] JCO." ECF 568-4 ¶ 49.

In support of the relief it seeks, Monmouth County alleges in conclusory fashion that "Monmouth County and its taxpayers stand to incur significant additional costs if the [3M] JCO bars them from seeking relief directly from 3M for PFAS contamination." *Id*. ¶ 46. However, Monmouth County further states that

"[t]he total costs are currently unknown costs and can only be determined upon completion of Monmouth County's environmental investigation." *Id*. ¶ 47. The only category of potential costs for PFAS remediation that it has identified are those associated with the clean-up of the Monmouth County Fire Academy. *See* ECF 568-2 at 13–14. No further explanation of those costs is provided; instead, the County asserts only that a Site Investigation Report "found PFAS contamination in groundwater and soil." *Id*. at 13. That same report demonstrates that Monmouth County has been aware of PFAS in its groundwater since as early as 2022, and that sampling as far back as 2016 showed PFAS coming from the adjacent Naval Weapons Station Earle. *See* ECF 568-10. To date, Monmouth County has not initiated any litigation against 3M regarding PFAS (aside from its proposed third-party complaint here). Monmouth County's intervention motion does not explain how it plans to "seek relief directly from 3M for PFAS contamination," ECF 568-4 ¶ 46, or the anticipated results of any such effort.

## B. Mercer County

***The State's Counsel Participates in Multiple Discussions with Mercer County's Counsel Regarding the Settlements.*** The State's counsel participated in calls with a team of lawyers representing Mercer County—including on August 20, September 10, and September 19, 2025—to answer their questions about the terms of the 3M and DuPont JCOs to the best of the State's counsel's ability and in good

faith. The State also invited Mercer County's counsel to provide further information regarding the County's efforts to address PFAS contamination, including with respect to remediation costs. It never did so. Reap Decl. ¶ 5.

*Mercer County's Public Comments.* On September 19, 2025, the Stag Liuzza law firm submitted a comment on the 3M JCO on behalf of "municipal entities [who] hired our firm," including Mercer County. ECF 770-4, Ex. A. The comment consisted of a series of questions posed to the Department. On October 31, 2025, the Stag Liuzza law firm submitted a substantially similar comment on the DuPont JCO. *Id.*, Ex. B.

The State responded to the Stag Liuzza firm's comments, including through 3M JCO Response to Comments Nos. 4, 5, 16, 22, 23, 25, 29, 35, 36, 37, 38, and 39 and DuPont JCO Response to Comments Nos. 4, 5, 19, 24, 26, 35, 40, 41, 42, 43, and 44.[5] *See* ECF 746-5 and ECF 746-4, respectively. Following the September 19, 2025 call, the State's counsel received no further contact from Mercer County's counsel. Reap Decl. ¶ 6.

*Mercer County Seeks to Intervene As to the 3M JCO and the DuPont JCO.*
On December 12, 2025, Mercer County moved to intervene in this action. *See* ECF

---

[5] The State is perplexed by Mercer County's inaccurate claims that "answers to the questions posed" by the County were "never received" and that "[t]he State failed to respond to any of the comments submitted by the counties." ECF 770-2 at 15. Responses were provided to comments received.

770. Its motion is an amalgamation of certain of Carneys Point's objections to the JCOs and Monmouth County's arguments in support of its intervention. Indeed, Mercer County's objections and arguments are virtually the same as those in Carneys Point's and Monmouth County's briefs, respectively. Little to no information is provided regarding Mercer County's specific circumstances, save for the bald claim that "losses for Mercer County alone could total hundreds of millions of dollars."[6] *See* ECF 770-2 at 2.

Like Carneys Point, Mercer County seeks intervention to file a writ of mandamus directed at State officials, with counts containing similar substance as those made by Carneys Point, and compelling those officials to "negotiate with Mercer County and other political subdivisions . . . to reach a settlement" and/or to "amend[] [] the" 3M JCO and the DuPont JCO "to exclude the claims of Mercer County and the other political subdivisions." ECF 770-1 at 15–16.

---

[6] Mercer County references its pending lawsuit, 2:25-cv-866-RMG (D.S.C.) against more than 20 defendants, including 3M and the DuPont Defendants, which was filed less than one year ago, and less than three months before the State announced its settlement with 3M. The docket reflects little action taken with respect to 3M and the DuPont Defendants, specifically, beyond service of the complaint and the issuance of a summons. Mercer County's complaint states "Mercer County will need to fully sample the [Trenton-Mercer Airport] and surrounding areas in order to delineate any PFAS contaminated by Defendants' AFFF Products …." Notably, the Trenton-Mercer Airport is presented with the same issue as Monmouth Fire Training Academy, as the airport is a "joint-civil-military public airport" upon which the Naval Air Warfare Center-Trenton is alleged to have discharged PFAS. 2:25-cv-866, ¶¶ 107, 110, 114.

## ARGUMENT

**I. THE COUNTIES' OBJECTIONS TO THE SETTLMENTS DO NOT WARRANT THE COURT'S REJECTION OF THE SETTLEMENTS, NOR ANY MODIFICATION OF THEIR TERMS**

The Court may consider the Counties' objections to the Settlements without their intervention in this action, as the State consents to such consideration to ensure a full record.[7] A review of those objections demonstrates they are without merit and do not warrant rejecting the Settlements or modifying their terms.

Monmouth County appears to advance two main objections to the 3M JCO, which Mercer County adopts. First, Monmouth County suggests that the 3M JCO cannot be approved because it does not "cover[] the total cost of PFAS remediation" in New Jersey. *See* ECF 568-2 at 2. Second, Monmouth County argues that the State does not have the authority to release political subdivisions' claims based on its contention that one case cited by the State in its Motion to Approve the JCOs, *State v. City of Dover*, 891 A.2d 524 (N.H. 2006), is distinguishable. *See* ECF 568-2 at 16–17.

In addition, Mercer County merely repeats additional objections made by Carneys Point concerning (a) the sufficiency of the State's notice of the use of escrow agreements in connection with the JCOs, (b) the Settlements' consistency

---

[7] The State has provided its consent to multiple *amicus* opposition briefs, consented to the Court considering Carneys Point's objections, and previously indicated to Monmouth County that it would consent to its filing of an *amicus* brief.

with appropriations acts, including the necessity of "enabling legislation," and the Natural Resource Damages Constitutional Amendment, and (c) the need to modify the terms of the JCOs related to political subdivisions based on "home rule" and the Environmental Rights Act. None of these objections withstands scrutiny.

**A.     The Counties' Assertion That the State Did Not Recover the Full Costs of PFAS Remediation Through the Settlements Is Not Grounds for Rejecting the JCOs.**

Monmouth County's primary objection to the 3M JCO is that the settlement amount to be paid by 3M "will likely not come close to covering the total cost of PFAS remediation" in New Jersey, which—as the State acknowledged in its Motion to Approve the JCOs—may be measured in the billions of dollars. *See, e.g.*, ECF 568-2 at 1–2.

Yet the State's monetary recoveries through the 3M JCO and the companion DuPont JCO remain historic. Up to $365 million in natural resource damages will compensate the public for injuries to their resources, which the Department will make available to support a wide variety of natural resource restoration projects. Up to $795 million in abatement funding will address PFAS and other contamination that impacts environmental media and infrastructure, supplementing and enhancing the financial support that the Department already makes available to the State's political subdivisions, homeowners, and others who need assistance addressing such pollution. While no single settlement or defendant could possibly pay the

10

tremendous cost of removing all PFAS contamination from New Jersey, these Settlements represent an essential step toward that objective by guaranteeing cleanup at industrial sources and providing another critical funding source that will multiply existing State funds to enable action to abate contamination for the long-term protection of its people and their natural resources.

That the State has recovered less than the total potential damages through its Settlement with 3M is not grounds to reject the 3M JCO. As the Court of Appeals for the First Circuit has observed, for a variety of reasons, environmental contamination settlements "often compensate the public for only a tiny fraction of the overall expense." *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1087 n.4 (1st Cir. 1994). Such reasons include, for example, litigation risks, insolvency risk, issues of proof, and the saving of time and resources—all factors that the State expressly considered here. *See* ECF 746-1 at 47–51. As the AFFF MDL Court held when considering a similar objection to 3M's nationwide public water system class settlement, where, as here, such factors have been extensively considered and "objectors argue, without evidentiary support[,] … that 3M should have or could have 'paid more,'" such argument is "unconvincing." *In re Aqueous Film-Forming Foams (AFFF) Prods. Liab. Litig.*, MDL No. 2:18-mn-2873, ECF 4754 at 24 (D.S.C. Mar. 29, 2024).

To be clear, Monmouth County offers no evidence or legal argument to support its implicit assertion that 3M could have or should have paid more, and it ignores the significant payments to be made by the DuPont Defendants under the second JCO pending before the Court. Indeed, the 3M and DuPont JCOs are complementary and together provide up to approximately $2.5 billion in value to the State, including up to $365 million in natural resource damages and up to $795 million in abatement funding, the latter of which the State will deploy to reduce the occurrence of PFAS in the water cycle and assist remediation efforts from sites including fire training academies and airports. As the State previously explained in its Motion to Approve the JCOs, there are myriad reasons supporting its decision to accept less than the full amount of its potential damages from these parties— arguments that Monmouth County fails to address. *See* ECF 746-1 at 36–51.

What is more, as the State explained in its Motion to Approve the JCOs, the payments to be made by 3M and the DuPont Defendants to the State through the JCOs are in addition to the nearly $500 million in payments that will be made by these companies to New Jersey's public water systems through the 3M and DuPont nationwide water provider class settlements. *See* ECF 746-1 at 41. The State's Motion to Approve the JCOs also explained that there are multiple parties that bear responsibility for PFAS contamination throughout the State. *See id.* at 44–47. That much is clear from the State's prior settlements with Solvay and Arkema regarding

PFAS contamination related to a manufacturing facility in West Deptford that collectively provided approximately $122.3 million for PFAS remedial projects on top of natural resource damages and commitments to perform required remediation. *See id.* at 47–48.

In short, Monmouth County's assertion that the State is recovering only $450 million fails to place that recovery into any context whatsoever. And Monmouth County offers no explanation or argument as to why 3M—and 3M alone—must bear 100% of the costs of remediating PFAS across the State. For example, it is highly likely that Monmouth County's Fire Academy is impacted by PFAS from a large federal facility, Naval Weapons Station Earle, immediately adjacent to it, *see* ECF 568-10 at 23, and as such, the federal government would be a liable party under Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") with strict joint and several liability for PFAS cleanup costs. *See also* ECF 568-2 at 13–14 (noting "U.S. [EPA] had found PFAS contamination at significantly higher levels at Naval Weapons Station Earle which is adjacent to the Fire Academy"). Monmouth County's arguments contesting the sufficiency of the 3M recovery are thus unconvincing.

Mercer County tries a different line of attack on the value of the 3M Settlement, arguing that the State has "flip[ped] the script" by reaching a more valuable settlement with DuPont than 3M because in the AFFF MDL the 3M public

drinking water settlement was ten times larger than the DuPont settlement, and the State "should not be allowed" here to strike a settlement with 3M "for only ¼ the amount being paid by DuPont." ECF 770-2 at 3 n.6. However, there are multiple reasons why such a strict comparison does not apply here, and this certainly does not disqualify the Settlement.

The nationwide water provider class settlements reached in the MDL, for example, did not consider the specific circumstances of individual states. As the State discussed in its motion to approve, New Jersey is a highly industrialized state, including major fluoropolymer manufacturing plants such as the Chambers Works facility, for which the DuPont Defendants bear responsibility as direct dischargers, which distinguishes it from a state where the primary statewide source of PFAS contamination is AFFF and discarded consumer products. Moreover, differences in the amount reached also reflect the posture of the State's claims against each Defendant; that the State proceeded to trial against DuPont allowed it to recover a premium for the benefit of the State and its citizens, which is certainly an appropriate factor to consider in evaluating the fairness and reasonableness of a settlement. In any event, Mercer County also overlooks that the PFAS abatement funding from the two Settlements will work to complement one another, which is why the State has highlighted this abatement funding in the total amount of up to $795 million, which

14

will provide meaningful assistance to political subdivisions in addressing PFAS contamination across New Jersey.

**B.** **The Counties Have Virtually No Response to the State's Argument that the State Has the Authority to Release the Claims of its Political Subdivisions, including the Counties.**

The State previously set forth the bases of its authority to release certain claims of its political subdivisions, including through its roles as *parens patriae*, natural resource trustee, and environmental regulator. *See* ECF 746-1 at 57–65; *see also* ECF 746-5 at 17–18 (Resp. to Comments Nos. 35–38). After having had the opportunity to review the State's arguments, the Counties only attempt to distinguish a single case, *State v. City of Dover*, 891 A.2d 524 (N.H. 2006). *See* ECF 568-2 at 16–17; ECF 770-2 at 18–19. The Counties' suggestion that this Court should disregard the *City of Dover* case is mistaken, and their singular focus on that case fails to engage with the State's argument as whole.

The Counties ask this Court to set aside the *City of Dover* opinion on two grounds: (1) because it is from "another circuit" and therefore is not "precedential here"; and (2) because it was not considering a state's settlement that did not provide "full compensation for all communities." ECF 568-2 at 17; ECF 770-2 at 19. Neither reason is compelling. First, *City of Dover* remains persuasive (the State has never claimed it to be "precedential") because of its close parallels to the circumstances presented here. Specifically, it squarely addresses a case in which a state exercised

its *parens patriae* authority for the benefit of its citizens and natural resources in its pursuit of damages from manufacturers of the products causing drinking water contamination that certain municipalities sought to recover or might have sought in the future to recover by filing overlapping claims. *City of Dover*, 891 A.2d at 532 (holding under such circumstances that "the doctrine of *parens patriae* controls and the cities' suits must yield to the attorney general's suit"). Indeed, this Court has not hesitated to consider *parens patriae* opinions from other states in determining matters in this very litigation, including consideration of the same New Hampshire methyl tertiary butyl ether litigation. *See* ECF 156 at 16–18 (considering *New Hampshire v. Exxon Mobil Corp.*, 126 A.3d 266 (N.H. 2015), on question of the duty to warn owed to a state as *parens patriae* because such cases were "analogous").

Second, the Counties' attempts to distinguish the posture of *City of Dover* are unconvincing. True, *City of Dover* concerned a state's ongoing lawsuit rather than its settlement, but that is a distinction with little analytical difference. If a state may preempt municipal litigation by prosecuting a case, it must logically have the same ability to do so by resolving a case via settlement. *See, e.g.*, *In re Certified Question from the U.S. Dist. Ct. for the E.D. Mich. v. Philip Morris*, 638 N.W.2d 409, 414 (Mich. 2002) ("inherent in the Attorney General's authority to sue on behalf of a county in matters of state interest is the Attorney General's authority to settle such a suit"). Moreover, the Counties overstate the import of the single sentence from the

16

opinion they quote. *City of Dover* nowhere suggested that the state ultimately had to obtain through resolution of the case "full compensation for all communities" to maintain its *parens patriae* status. 891 A.2d at 531–32. Indeed, such a standard would lead to absurd results; it is axiomatic that almost no settlement is able to provide "full compensation," particularly in the environmental context.[8] Moreover, that the Counties have claims against additional product-manufacturer defendants and AFFF/PFAS dischargers undercuts their arguments that the JCOs are for less than full recovery. In sum, the Counties fail to lessen the persuasive authority that *City of Dover* carries here, and they otherwise fail to address the State's arguments with respect to its authority to release its political subdivisions' claims.

### C.    Mercer County's Arguments Adopted from Carneys Point's Filings Should Be Rejected for Reasons Already Expressed by the State.

Mercer County's adoption of objections made by Carneys Point in its interventions motions is of little benefit, as these objections have already been thoroughly addressed by the State and shown to be without merit. For the Court's convenience, the State refers to arguments made in opposition to Carneys Point's motions below.

---

[8] The Counties omit any response to the multiple settlements cited involving states and attorneys general, including the New Jersey Attorney General, that have previously released municipal claims. *See* ECF 746-1 at 63–65.

- For the purpose of the escrow agreements and the sufficiency of the State's notice thereof (ECF 770-2 at 6–7), the State refers the Court to ECF 764 at 19–23;

- For the Settlements' consistency with appropriations acts, including arguments alleging a need for "enabling legislation," and the NRD Constitutional Amendment (ECF 770-2 at 7–11), the State refers the Court to ECF 764 at 23–31;

- For arguments regarding "home rule" and the Environmental Rights Act (ECF 770-2 at 11–14), the State refers the Court to ECF 764 at 34–39.

## II.    THE COURT SHOULD DENY THE COUNTIES' MOTIONS TO INTERVENE IN THIS ACTION

As a concluding matter, the Counties cannot satisfy the requirements for intervention under Federal Rule of Civil Procedure 24.

To intervene as of right pursuant to Rule 24(a)(2), each County must show that (1) its motion to intervene is timely; (2) it has a sufficient interest in the litigation; (3) its interest will be impaired or impeded as a practical matter by the disposition of the action; and (4) its interest is not adequately represented by the existing parties to the litigation. Fed. R. Civ. P. 24(a)(2). The Counties "bear[] the burden of establishing the existence of all four factors, and 'failure to satisfy any one of the four factors justifies denial of [their] request[s].'" *Symbiont Sci. Eng'g &*

*Constr., Inc. v. Ground Improvement Servs., Inc.*, No. CV 22-4905, 2024 WL 378691, at *4 (D.N.J. Feb. 1, 2024) (internal citation omitted).

Permissive intervention of the Counties in this litigation is subject to the Court's discretion. *See ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1124 (3d Cir. 1992). The Court may allow intervention pursuant to Fed. R. Civ. P. 24(b) if the proposed intervenor shows that (1) the motion to intervene is timely, and (2) the movant has a claim or defense that shares with the main action a common question of law or fact. Fed. R. Civ. P. 24(b). In exercising its discretion, the Court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. 24(b)(3).

### A.    The Non-Party Counties Are Not Entitled to Intervene as of Right Because the State Adequately Represents Their Interests.

The Counties are not entitled to intervene in this litigation because they have failed to demonstrate that the State does not adequately represent their interests, which alone dooms their intervention under Rule 24(a)(2). Monmouth County generally asserts that it "ha[s] objected to the JCO, yet the plaintiffs still seek to move this court to approve it." ECF 568-2 at 16. Mercer County adopts Monmouth County's argument. *See* ECF 770-2 at 17. The Counties' objections to the JCOs do not render the State's representation inadequate. As the Court reasoned in *United States v. W.R. Grace*:

> The Township argues that the [government] cannot be said to adequately represent it because 'the [government] has moved to enter a consent decree that the Township strongly opposes.' However, this argument is irrelevant: the issue is not whether the Township agrees with the determination of the [government], but whether the [government] served as an adequate representative of the Township's interest.

185 F.R.D. 184, 192 (D.N.J. 1999) (internal citations omitted) (denying intervention).

As political "subdivision[s] of the state" seeking to intervene in a suit "involving a matter of sovereign interest" in which "the state is already a party," the Counties carry the burden to "overcome th[e] presumption" that the State "represent[s] the interests of its citizens." *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 674 F.2d 970, 973 (3d Cir. 1982) (internal citations omitted). Here, the State's actions certainly concern sovereign interests, as it is seeking to enter into the JCOs in its capacity as *parens patriae* and trustee of New Jersey's natural resources to protect the health and well-being of all residents and to safeguard and restore public trust resources. *See* ECF 746-1, at pp. 57–65. Indeed, as this Court has already recognized, the State—acting through the Department— has the primary authority and responsibility to pursue the sovereign interests of protecting the State's environment, public health, and natural resources by enforcing New Jersey's environmental laws. *See* ECF 396 at 16. Therefore, to overcome the presumption that the State adequately represents their interests, the Counties must

make a "compelling showing" as to "why the government's representation is not adequate." *United States v. Territory of Virgin Islands*, 748 F.3d 514, 520 (3d Cir. 2014) (internal citations omitted).[9]

The Counties have failed to carry their burden. The Counties argue that the State does not adequately represent their interests because they have objections to the JCOs, primarily based on their assertion that the Settlements do not recover enough money. However, the Counties' dissatisfaction with the amount of the State's recovery simply is not enough to render inadequate the State's representation of the Counties' interests in seeking to recover funds from Defendants to remediate PFAS contamination. As this Court has previously concluded, "[t]he fact that the [Counties] disagree[] with the amount of the proposed settlement is not sufficient to overturn the presumption that" the State "represent[s] the same interests that the [Counties] champion[]—the public interest, the interests of its residents." *W.R. Grace & Co.*, 185 F.R.D. at 191–92; *see also* ECF 396 at 18 (because the municipality and the State were seeking similar relief from Defendants, they had

---

[9] The Counties mistakenly argue that their burden to show inadequate representation is "minimal." ECF 568-2 at 14 (citing *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Penn.*, 701 F.3d 938, 958 (3d Cir. 2012)); ECF 770-2 at 17 (same). But their reliance on *Benjamin* is misguided. Unlike *Benjamin*, this is not a class action, the State is not defending claims against it, and the State and the purported intervenors' interests are not "quite divergent." *See Benjamin*, 701 F.3d at 958. In fact, the State and the Counties share the same interest: specifically, maximizing a recovery from 3M and the DuPont Defendants.

"the same ultimate objective," giving rise to a "presumption . . . that [the municipality's] interests [we]re adequately protected") (citing *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 315 (3d Cir. 2011)). Just as in *W.R. Grace & Co.*, the State and the Counties here represent the same interests and share the same objective of maximizing a recovery from the Defendants to secure funds for PFAS abatement, including remediation.

The cases Monmouth County cites do not alter this conclusion, as none of those cases involved a State's representation of its subdivisions in a matter implicating sovereign and quasi-sovereign interests. The intervenors in *Kleissler v. U.S. Forest Service*, 157 F.3d 964 (3rd Cir. 1998), and *Sierra Club v. Glickman*, 82 F.3d 106 (5th Cir. 1996), demonstrated direct and substantial interests that the federal government did not share. For example, the school districts and municipalities in *Kleissler* held a direct and substantial interest in the ongoing receipt of funds generated by logging operations in a national forest that state law required be distributed to them—an interest that was not represented by the U.S. Forest Service, an arm of the federal, and not state, government. 157 F.3d at 968. Similarly, in *Sierra Club*, which involved a federal agency defending its decision to permit pumping from an aquifer in Texas, the State of Texas identified its own competing interest in managing the use of the aquifer in question in accordance with state statutory authority and in providing financial assistance to farmers who relied on the

aquifer. 82 F.3d at 110. By contrast, the Counties here do not identify any interest that is distinct from the State's shared interest in recovering substantial funds to abate PFAS contamination throughout the State—including in Monmouth and Mercer Counties. Further, the intervention of a state in litigation involving the federal government is not analogous to the intervention of a municipality in litigation involving the state.[10] In short, while the Counties may "debat[e] the merits" of the State's settlements, specifically with respect to the amount of money recovered, the Counties have not shown a "divergence between their position and the position of the [State] on the primary issue involved in the litigation," making intervention as of right inappropriate in this case. *See Del. Valley*, 674 F.2d at 973–74.

---

[10] While municipalities are mere creations of and subordinate to the state, *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79 (1907), federalism is a fundamentally different paradigm. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535 (2012) ("The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people." (quoting U.S. Const., Amend. 10)); *cf. Reynolds v. Sims*, 377 U.S. 533, 575, (1964) ("Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities . . . The relationship of the States to the Federal Government could hardly be less analogous."). Moreover, contrary to Monmouth County's assertions, *see* ECF 568-2 at 8–9, New Jersey's home rule provisions do not bestow "omnipotence to local governments." *Wagner v. Mayor & Mun. Council of City of Newark*, 132 A.2d 794, 800 (N.J. 1957). Instead, a municipality's home rule authority is limited to matters of "local concern" and does not extend to "those matters involving state policy or in the realm of affairs of general public interest and applicability." *Id.*

**B.**    **Permissive Intervention Would Cause Undue Delay and Prejudice to the Existing Parties in this Action.**

The Counties cite no authority in support of the notion that intervention at the very end of a litigation—for the sole purpose of blocking a settlement—is appropriate under Rule 24(b). In fact, federal courts have rejected this approach. *See, e.g.*, *Sokaogon Chippewa Cmty v. Babbitt*, 214 F.3d 941, 948 (7th Cir. 2000) (that proposed intervenor "waited until settlement was imminent strongly suggests that [it] was not interested in intervening in the *litigation* but in blocking a settlement between the parties"). Rather, application of Rule 24(b) demonstrates that the Counties' intervention would "unduly delay [and] prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(4), particularly since the Court need not grant intervention to consider the Counties' objections to the JCOs.

Indeed, there is no doubt that intervention by the Counties would unduly delay these proceedings and cause prejudice to the existing parties. Mercer County candidly notes that it specifically seeks to intervene to "delay approval" of the JCOs. ECF 770-5. And Monmouth County's assertion that it "is not seeking to delay the action at all" because "[t]he parties remain free to enter the JCO in substantially the same form and only with a slightly narrower scope" misunderstands the implications

of its requested relief, which would send the parties back to the drawing board and potentially active litigation.[11] ECF 568-2 at 19.

The State has been litigating against the Defendants for more than six years, including a trial before this Court, and has spent several years and considerable resources engaged in complex settlement negotiations, including before a Court-appointed mediator. *See* ECF 746-1 at 8–14. The JCOs pending before the Court would conclude this litigation, whereas the intervention of the Counties "to block a settlement agreement after all that effort would result in the parties' combined efforts being wasted completely." *Sokaogon Chippewa Cmty*, 214 F.3d at 950; *see also Jones v. Caddo Par. Sch. Bd.*, 735 F.2d 923, 935 (5th Cir. 1984) (noting that allowing intervention post-settlement would mean that "all the time, effort, and meetings will have been wasted, and the lengthy and difficult process will have to begin all over again, from 'square one' or worse").

---

[11] Paragraph 119 of the 3M JCO provides: "If for any reason the Court should decline to approve this JCO, including the scope of the Release … in the form presented to the Court, or if for any reason the Court should approve this JCO in a form different from the form signed and executed by the Parties or presented to the Court, the agreement memorialized in this JCO is voidable at the sole discretion of any Party . . . ." And Paragraph 103 of the 3M JCO provides: "If, prior to the Court's approval and entry of the JCO, any provision of this JCO or the application thereof to any Person or circumstance, to any extent, is held to be invalid or unenforceable, 3M shall have the right … to render the entire JCO void and unenforceable . . . ." An exemption for Monmouth County or for any other political subdivision, would, at a minimum, force the parties back to the negotiation table with extremely uncertain results, which might include a resumption of litigation and trial.

Granting the Counties' intervention motions would also delay or impede recovery for all the State's citizens, since "the implementation of the provisions of the consent decree would necessarily be delayed, and thus the parties would be unable to commence the cleaning up process of the [PFAS] contamination which endangers public health." *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 824 F.2d 531, 536 (7th Cir. 1987); *see also Del. Valley,*, 674 F.2d at 975 (finding that "intervention would cause substantial prejudice to the original parties in the action, since the proposed intervenors seek to vacate the consent decree," so if intervention were granted, "the consent decree would probably have to be scrapped, and any implementation of the [] program would be delayed even further"); *W.R. Grace & Co.*, 185 F.R.D. at 192 ("The [County] has made it clear that if permitted to intervene, it would object to the proposed settlement, thus causing undue delay in the approval of a consent decree and the ultimate cleanup of the [] site.").

In sum, the participation of the Counties in this litigation would not offer anything other than objections to the JCOs—objections that the Counties have already voiced in the public comment process and which the Court can consider in determining whether to approve the JCOs, just as it can consider other objections submitted through the *amicus* briefing process sanctioned by the parties and the Court. The State therefore respectfully requests that the parties' motions to intervene be denied.

26

## <u>CONCLUSION</u>

For the foregoing reasons, the State respectfully requests that the Court deny the Counties' motions to intervene, overrule their objections, and approve the JCOs.

Dated: December 22, 2025

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW**
**JERSEY**
*Attorney for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Ph. (609) 376-2740
**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General

By: */s/ Geoffrey W. Castello*
Geoffrey W. Castello, Esq.
7 Giralda Farms, Suite 340
Madison, NJ 07940
Tel.: (973) 503-5900
GCastello@KelleyDrye.com

*William J. Jackson, Esq.
*John D.S. Gilmour, Esq.
*Lana M. Rowenko, Esq.
*Jennifer C. Barks, Esq.
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000

*David Zalman, Esq.
David M. Reap, Esq.
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800
DReap@KelleyDrye.com

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General

*John K. Dema, Esq.
*John T. Dema, Esq.
*Briana Dema, Esq.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Tel.: (340) 773-6142
jdema@demalaw.com
jtdema@demalaw.com
bdema@demalaw.com

Scott E. Kauff, Esq.
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
Tel.: (202) 309-0200
skauff@demalaw.com

**TAFT STETTINIUS & HOLLISTER LLP**
Special Counsel to the Attorney General

*Robert A. Bilott, Esq.
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Tel.: (513) 381-2838
Fax: (513) 381-0205
bilott@taftlaw.com

*David J. Butler, Esq.
41 S. High Street
Suite 1800
Columbus, OH 43215-6106
Tel.: (614) 221-2838

**COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

Leonard Z. Kaufmann, Esq.
A Member of the Firm
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600

*admitted pro hac vice*