Donald J. Camerson, II, Esq.
James W. Crowder, IV, Esq.
BRESSLER, AMERY & ROSS, P.C.
325 Columbia Turnpike
Florham Park, NJ 07932
Tel: (973) 514-1200
Fax: (973) 514-1660
djcamerson@bressler.com
jcrowder@bressler.com
*Attorneys for Defendant 3M Company*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> E.I. DU PONT DE NEMOURS AND COMPANY, *et al.*, <br><br> Defendants. | Civil Action No. 1:19-cv-14766-RMB-JBC-JS <br><br><br> Hon. Renée M. Bumb, U.S.D.J. <br> Hon. James B. Clark, U.S.M.J. <br> Hon. Joel Schneider (Ret.), Special Master |

**CERTIFICATION OF DONALD J. CAMERSON, II, ESQ. IN SUPPORT OF
3M COMPANY'S RESPONSE OPPOSING
MONMOUTH COUNTY'S AND MERCER COUNTY'S MOTIONS TO INTERVENE**

DONALD J. CAMERSON, II, of full age, hereby declares and certifies as follows:

1.     I am an attorney duly admitted to practice law in the State of New Jersey and the United States District Court for the District of New Jersey and a Principal of the firm, Bressler, Amery & Ross, P.C., attorneys for Defendant 3M Company ("3M") in the above-captioned matter.

2.      I submit this Certification in support of 3M's Response Opposing Monmouth County's and Mercer County's Motions to Intervene.

3.      Attached hereto as **Exhibit A** is a true and accurate copy of *Chavez v. PVH Corp.*, No. 13-cv-01797, 2014 WL 6617142 (N.D. Cal. Nov. 20, 2014).

4.      Attached hereto as **Exhibit B** is a true and accurate copy of *United States v. New Jersey*, No. 10-91, 2012 WL 3265905 (D.N.J. June 12, 2012).

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: December 22, 2025                      */s/Donald J. Camerson, II*
                                              Donald J. Camerson, II
                                              BRESSLER, AMERY & ROSS, P.C.
                                              325 Columbia Turnpike, Suite 301
                                              Florham Park, New Jersey 07932
                                              (973) 512-1200
                                              djcamerson@bressler.com

                                              *Attorneys for Defendant 3M Company*

# EXHIBIT A

**Chavez v. PVH Corporation, Not Reported in Fed. Supp. (2014)**

2014 WL 6617142

Case 1:19-cv-14766-RMB-JBC    Document 786-1    Filed 12/22/25    Page 4 of 34 PageID: 37478

2014 WL 6617142
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Jessie CHAVEZ, as an individual and on
behalf of all others similarly situated, Plaintiff,

v.

PVH CORPORATION, a Delaware
corporation, Tommy Hilfiger Retail, LLC,
and PVH Retail Stores LLC, Defendants,

Case No.: 13–CV–01797 LHK
|
Signed November 20, 2014

**Attorneys and Law Firms**

Larry W. Lee, Daniel Hyo–Shik Chang, Diversity Law Group,
P.C., Los Angeles, CA, William Lucas Marder, Polaris Law
Group, LLP, Hollister, CA, for Plaintiff.

Dean Hansell, Asheley Greshaune Dean, Rachel A. Patta,
Hogan Lovells U.S. LLP, Los Angeles, CA, for Defendants.

ORDER DENYING MOTION TO INTERVENE

LUCY H. KOH, United States District Judge

**\*1** Plaintiff Jessie Chavez ("Plaintiff") filed this putative
class action on behalf of herself and others similarly situated
against Defendants PVH Corporation, Tommy Hilfiger
Retail, LLC, and PVH Retail Stores LLC, (collectively,
"Defendants") for various violations of California labor
laws. Before the Court is Proposed Intervenors Jodi Scott–
George and Melissa Wiggs's ("Proposed Intervenors") motion
to intervene, as well as Jeffrey Lapan, Ashwin Chandra,
Dakkar Hunter, and Danah Lapan's joinders to the motion
to intervene. Having considered the parties' and Proposed
Intervenors' submissions, the relevant law, and the record in
this case, the Court DENIES Proposed Intervenors' motion to
intervene.

**I. Background**

Three different groups of plaintiffs filed three separate
putative class actions against PVH Corporation and other
related Defendants within a nine-month period from January

2013 to October 2013. Proposed Intervenors Scott–George
and Wiggs filed the first putative class action complaint
against PVH Corporation in Nevada County Superior Court
on January 29, 2013, which was removed to the Eastern
District of California on March 5, 2013. In the instant
case, Plaintiff Chavez filed this putative class action against
Defendants on March 20, 2013 in Santa Clara County
Superior Court, which Defendants removed to the Northern
District of California on April 19, 2013. ECF No. 1. Jeffrey
Lapan and Ashwin Chandra filed the third putative class
action complaint against PVH Corporation on October 25,
2013, in the Northern District of California.

**A. *Chavez* and *Scott–George/Wiggs* Complaints**
The Court begins by summarizing the relevant claims in the
instant action. Plaintiff Chavez's putative class action asserts
that PVH Corporation, Tommy Hilfiger Retail, LLC, and
PVH Retail Stores violated provisions of the California Labor
Code and Government Code based on Defendants' alleged
pattern and practice of issuing ATM cards as payment of
wages and other wrongful acts directed solely at Plaintiff. [1]
In Plaintiff's original Complaint, she alleged violations of
California Labor Code §§ 201, 202, 203, and 226. ECF
No. 1. After removal, Plaintiff filed her First Amended
Complaint alleging the same labor code violations and
alleging additional violations of California Labor Code §
2698 and California Government Code §§ 12940 *et seq.* and
12945. ECF No. 14. On December 9, 2013, Plaintiff filed
her Second Amended Complaint, the operative complaint in
the instant action. The Second Amended Complaint added
additional claims for alleged violations of California Labor
Code § 204 and California Business and Professions Code §
17200. ECF No. 40.

The *Scott–George/Wiggs* action against PVH Corporation, in
both the original Complaint and First Amended Complaint,
pled causes of action for failure to pay overtime wages,
provide meal breaks, rest breaks, provide itemized wage
statements, pay vacation wages, and unfair business practices
in violation of California Labor Code §§ 510, 1194, 1198,
226.7, 512, 201, 202, 203, 226, 227 and California Business
and Professions Code § 17200. *See* No. 13–0441, ECF Nos.
1, 24. Proposed Intervenors did not allege violations based
on the use of payroll ATM cards. Proposed Intervenors filed
their Second Amended Complaint on August 8, 2013, five
months after the original complaint in the *Chavez* action.
The Second Amended Complaint added an additional class
representative, Luke Sperlin, and PVH Corporation's use of

Chavez v. PVH Corporation, Not Reported in Fed. Supp. (2014)
2014 WL 6617142

Case 1:19-cv-14766-RMB-JBC    Document 786-1    Filed 12/22/25    Page 5 of 34 PageID: 37479

payroll ATM cards as an additional basis for their originally pled claims. *See* No. 13–441, ECF No. 37. Approximately three months later, Proposed Intervenors filed their Third Amended Complaint, which retained all of the previous causes of action, including the payroll ATM card claims, but replaced class representative Luke Sperlin with Melissa Wiggs. *See* No. 13–441, ECF No. 41

### B. Procedural Background

**\*2** On August 8, 2013, the Court held an initial case management conference in the instant action, where the Court ordered the parties to complete by March 14, 2014, the private mediation to which the parties stipulated. ECF No. 28. After the initial case management conference, the parties engaged in "significant discovery," including written discovery and depositions. November 1, 2013, Joint Case Management Statement, ECF No. 37. On December 12, 2013, the parties mediated the case before mediator Michael Loeb of JAMS. *See* Plaintiff's Opposition to Proposed Intervenors Jodi Scott–George and Melissa Wiggs' Motion to Intervene ("Chavez Opp."), ECF No. 81, at 3. On January 2, 2014, the parties filed a joint case management statement alerting the Court that they had reached a tentative class settlement following mediation. ECF No. 44. At the January 8, 2014, case management conference, the Court set a complete case schedule and ordered the parties to file any motion for preliminary approval by January 31, 2014, with a hearing set for June 19, 2014. ECF No. 47.

Plaintiff filed her motion for preliminary approval of class action settlement on January 31, 2014. ECF No. 50. The parties filed a joint stipulation of class action settlement and release on February 7, 2014. ECF No. 52. On June 5, 2014, Jeffrey Lapan and Ashwin Chandra filed an objection to the motion for preliminary approval, ECF No. 57, to which Defendants and Plaintiff separately replied, ECF Nos. 58, 59. The Court held the hearing on the motion for preliminary approval on June 19, 2014, where counsel for Plaintiff, Defendants, and Jeffrey Lapan and Ashwin Chandra made appearances. ECF No. 60. On June 20, 2014, the Court denied Plaintiff's motion for preliminary approval, finding that the interaction between the reversion term and attorney's fees term could create a "conflict of interest" for Plaintiff's counsel, and "may not be in the best interest of the class." ECF No. 63.

On June 23, 2014, the parties filed an amended joint stipulation of class action settlement and release. ECF No. 64. In their amended joint stipulation, the parties removed

the reversion term to address the concerns raised by the Court in its denial of preliminary approval. Plaintiff filed an amended motion for preliminary approval on June 25, 2014, which the Court granted on July 17, 2014. ECF No. 73. On August 8, 2014, the Claims Administrator mailed Notice Packets to 9,474 Class members. Declaration of Cory Lefebrve ("Lefebrve Decl."), ¶ 9, ECF No. 97. The Administrator mailed reminder notices on September 2, 2014, and September 17, 2014. *Id.* ¶ 10– 11. The deadline to submit a claims form or request exclusion was October 7, 2014. *Id.*

The Court now turns to Proposed Intervenors' involvement with the instant case. Proposed Intervenors' counsel, Ronald Bae, first contacted Plaintiff Chavez's counsel, Larry Lee, on December 12, 2013. Declaration of Larry W. Lee ("Lee Decl."), ECF No. 81, ¶ 14. In that initial email, Mr. Bae indicated his awareness of Plaintiff's scheduled mediation. *Id.* That same day, Mr. Bae and Mr. Lee had a telephone conference regarding their respective cases. *Id.* Mr. Lee further attests that he has had "numerous conversations" with Mr. Bae since December 12, 2013, regarding the two actions and the settlement in this action. *Id.* ¶ 16. On July 10, 2014, approximately five months after Plaintiff Chavez filed her motion for preliminary approval of settlement, the Proposed Intervenors engaged in an unsuccessful mediation with Defendant PVH Corporation. Declaration of Dean Hansell ("Hansell Decl."), ECF No. 80, ¶ 10. A few days after that unsuccessful mediation, the Proposed Intervenors and PVH Corporation scheduled a second mediation to occur on September 9, 2014. *Id*

On August 18, 2014, Proposed Intervenors filed a notice of pendency of other action in the instant case. ECF No. 76. On the following day, Proposed Intervenors filed their motion to intervene. ("Motion") ECF No. 77. Plaintiff filed her opposition to Proposed Intervenors' notice of pendency and motion to intervene on September 2, 2014. ("Chavez Opp.") ECF Nos. 79, 81. Defendants also filed their opposition to Proposed Intervenor's motion to intervene that day. ("PVH Opp.") ECF No. 80. Proposed Intervenors replied on September 29, 2014. ("Reply") ECF No. 82. On September 16, 2014, Defendants filed objections to the Reply. ECF No. 87.

**\*3** On September 15, 2014, Jeffrey Lapan and Ashwin Chandra filed a joinder to Proposed Intervenors' motion to intervene, ECF No. 86, which Defendants and Plaintiff opposed, ECF Nos. 88, 90. On October 30, 2014, Dakkar Hunter, an objector to the settlement agreement, also filed

a joinder to Proposed Intervenors' motion to intervene, ECF No. 96. The next day, Danah Lapan also filed a joinder to the motion to intervene. ECF No. 98.

## II. Discussion

Before the Court is Proposed Intervenors' motion to intervene in the instant action, and the various joinders to that motion. Proposed Intervenors argue that they are entitled to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2). In the alternative, Proposed Intervenors request that the Court allow permissive intervention under Federal Rule of Civil Procedure 24(b). More specifically, Proposed Intervenors contend that Chavez is an inadequate class representative, the release clause is overly broad, and that the settlement amount is too low. Proposed Intervenors "seek a global resolution to all three cases," or, if that is not possible, to "revis[e] the scope" of the *Chavez* settlement release. Motion at 2. The Court addresses each basis for intervention in turn.

### A. Intervention as of Right

#### 1. Legal Standard

Federal Rule of Civil Procedure 24(a)(2) requires that a court permit anyone to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Ninth Circuit has identified four elements that a putative intervenor must show are met to establish an entitlement to intervention as of right:

> (1) the applicant's motion must be timely; (2) the applicant must assert an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that without intervention the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be

inadequately represented by the other parties.

*United States v. Oregon,* 839 F.2d 635, 637 (9th Cir. 1988).

"Although the party seeking to intervene bears the burden of showing those four elements are met, 'the requirements for intervention are broadly interpreted in favor of intervention.' " *Prete v. Bradbury,* 438 F.3d 949, 954 (9th Cir. 2006) (internal quotation marks omitted). "Failure to satisfy any one of the requirements is fatal to the application, and [the Court] need not reach the remaining elements if one of the elements is not satisfied." *Perry v. Proposition 8 Official Proponents,* 587 F.3d 947, 950 (9th Cir. 2009).

#### 2. Analysis

The Court begins with the first factor of timeliness. Timeliness is "the threshold requirement" for intervention as of right. *Oregon,* 913 F.2d at 588. In determining whether a motion is timely, the Court considers three factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Cnty. of Orange v. Air California,* 799 F.2d 535, 537 (9th Cir. 1986). "Where a proposed intervenor seeks to intervene for purposes of objecting to a proposed settlement, timeliness generally is measured from the date the proposed intervenor received notice that the proposed settlement was contrary to its interest." *Glass v. UBS Fin. Servs., Inc.,* No. 06–4068, 2007 WL 474936, at *3 (N.D.Cal. Jan. 17, 2007), *aff'd* 331 Fed.Appx. 452 (9th Cir. 2009).

**\*4** As to the issue of timeliness based on the "stage of the proceedings," Proposed Intervenors contend that their motion is timely because the Court has not yet granted final approval of the settlement, [2] and because the Court has not "substantially engaged the issues in the case." Motion at 7. However, the "stage of the proceedings" factor requires a "more nuanced, pragmatic approach" to timeliness than an assertion that a motion is timely merely because the Court has yet to reach the final approval stage. *See League of United Latin Am. Citizens v. Wilson,* 131 F.3d 1297, 1303 (9th Cir. 1997). Proposed Intervenors are correct that the Court has not held the final approval hearing or granted final approval. However, Proposed Intervenors' "focus on what had *not* yet occurred prior to [their motion] ... ignores

what *had* already occurred by that time." *See League of United Latin Am. Citizens,* 131 F.3d at 1303. Here, between December 12, 2013, the date Proposed Intervenors first learned of this action, and August 19, 2014, the date of this motion, the Court had held case management conferences, granted a motion to relate the instant action to the Lapan and Chandra action, held a fairness hearing on preliminary approval of settlement, reviewed objections to the settlement, issued an order denying preliminary approval, reviewed a revised settlement agreement and class notice, and issued an order granting preliminary approval of the revised settlement. Moreover, the parties have engaged in written and deposition discovery and mediation. The Court concludes that during the relevant nine months, the Court did "substantially engage" in pertinent issues of the case. *See, e.g., Cohorst v. BRE Props., Inc.,* No. 10–2666, 2011 WL 3475274, at *6 (S.D.Cal. Aug. 5, 2011). Taking into consideration the Court's engagement in the case up to this point and the countervailing arguments raised by Proposed Intervenors, the Court concludes that, on balance, the first factor weighs against timeliness.

Addressing the second factor, Proposed Intervenors broadly argue that "no prejudice" will result if the Court allows intervention. Motion at 7. However, Proposed Intervenors ignore the prejudice to the parties and members of the class. As of the date Proposed Intervenors filed their motion, the parties had engaged in written and deposition discovery, spent over 10 hours in mediation, filed a joint stipulation of settlement, filed and argued a motion for preliminary approval, met and conferred regarding a revised settlement, filed a joint revised stipulation of settlement, and began the claims administration process. *See* Chavez Opp. at 8–9. Since the Court granted preliminary approval in July 2014, the 9,474 members of the class have received multiple class notices and 2,337 have submitted claim forms. Lefebvre Decl. ¶ 14. Both the parties and the claims administrator have expended significant time and resources, not to mention the efforts of class members who have submitted claims forms. *See* Lefebvre Decl., ¶¶ 3–12. While Proposed Intervenors might be correct that "no money has changed hands," they have failed to acknowledge the significant and substantive actions the parties, the claims administrator, and the class have taken. To allow intervention at this point would waste the significant resources the parties and the class have expended in reliance on the settlement agreement and substantially prejudice the parties. *See Morazan v. Aramark Uniform & Career Apparel Grp., Inc.,* No. 13–00936, 2013 WL 4734061, at *3–5 (N.D.Cal. Sept. 3, 2013) (prejudice to class

members who have submitted claim forms); *Cohorst,* 2011 WL 3475274, at *6 (prejudice to parties and class).

Moreover, Proposed Intervenors' contention that "it is quite feasible to allow intervention, tailor the scope of the release, and send a corrective notice ..." assumes that Plaintiff, Proposed Intervenors, and Defendants would *reach a new, revised settlement agreement.* While Plaintiff Chavez and Defendants reached a proposed settlement agreement after mediating on December 12, 2013, Proposed Intervenors' July 10, 2014 mediation with PVH Corporation was unsuccessful. The Court agrees with Plaintiff Chavez that there is no guarantee that the parties would again reach a settlement agreement, much less the global settlement Proposed Intervenors envision, if the Court grants the motion to intervene. If the parties and Proposed Intervenors were unable to reach a revised settlement agreement, the thousands of class members who have been contacted and submitted claim forms would be significantly prejudiced. The Court therefore concludes that the second factor weighs heavily against timeliness.

**\*5** The third and final timeliness factor examines the "reason for and length of" the Proposed Intervenors' delay. A potential intervenor must act "as soon as he [or she] knows *or has reason to know* that his [or her] interests might be adversely affected by the outcome of the litigation." *Cal. Dept. of Toxic Substances Control v. Comm. Realty Projects, Inc.,* 309 F.3d 1113, 1120 (9th Cir. 2002) (emphasis in original); *see also United States v. Alisal Water Corp.,* 370 F.3d 915, 923 (9th Cir. 2004) (potential intervenors were on "constructive notice" of potential adverse interests). Here, the Court concludes Proposed Intervenors had "reason to know" that their interests might be adversely affected several months prior to the Court's decision to grant preliminary approval in July 2014.

Proposed Intervenors do not dispute that they have been aware of the instant action since December 2013 and the relevant terms of the settlement agreement in the instant case since February 7, 2014. Counsel for Proposed Intervenors, Mr. Bae, and for Plaintiff, Mr. Lee, had "numerous conversations" following their initial telephone conference on December 12, 2013. Lee Decl. ¶ 16. Proposed Intervenors do not contest that they knew of the potential overlap in class claims and class definitions, [3] especially since Proposed Intervenors had amended their complaint to include payroll ATM card claims against PVH Corporation. While Proposed Intervenors may not have been "certain that the [settlement]

would be adverse to their interests, they had reason to know that negotiations might produce" a settlement that would affect their own interests based on the overlapping causes of action, identical Defendant, and overlapping proposed class definitions. *See Cal Dept. of Toxic Substances,* 309 F.3d at 1120. Additionally, Proposed Intervenors cannot contest that the release clause and amount of settlement to which Proposed Intervenors object have not changed since the parties first filed their joint stipulation of settlement agreement on February 7, 2014. In fact, Lapan and Chandra filed an objection to preliminary approval on June 5, 2014, raising virtually the same concerns as Proposed Intervenors do now, in addition to concerns about the potential for a conflict of interest based on the reversion term. *See* ECF No. 57. After evaluating that objection, the Court initially denied preliminary approval to Plaintiff's motion based on the use of a reversion term. ECF No. 63. In light of Proposed Intervenors' actual knowledge of the settlement agreement and the overlapping and potentially adverse interests at stake, the Court concludes that Proposed Intervenors failed to act in a timely manner to protect their interests.

**\*6** In opposition, Proposed Intervenors contend that "the potential harm to Proposed Intervenors' interests did not crystallize until approximately one month before the filing of this motion ... [when] PVH represented that the settlement release barred § 203 claims based on facts outside the scope of the *Chavez* action." Motion at 6. Without relying on improperly disclosed privileged mediation communications,[4] the Court concludes that Proposed Intervenors' argument fails. The timeliness inquiry under the third factor does not allow a potential intervenor to wait until a potential harm "crystallizes" or becomes "certain." *See Cal Dept. of Toxic Substances,* 309 F.3d at 1120. Instead, a potential intervenor must act when he or she "knows or had reason to know" that his or her interests might be adversely affected. *Cal Dept. of Toxic Substances,* 309 F.3d at 1120; *see also Sokaogon Chippewa Cmty. v. Babbitt,* 214 F.3d 941, 949 (7th Cir. 2000)* ("The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal. As soon as a prospective intervenor knows or has reason to know that his [or her] interests might be adversely affected by the outcome of the litigation he [or she] must move promptly to intervene."). As discussed above, Proposed Intervenors' concerns with the settlement agreement involve terms that *have not changed* since the parties filed their first joint stipulation of settlement in February 2014. The Court therefore concludes that the third factor also weighs against timeliness.

In summary, the Court finds that Proposed Intervenors' motion to intervene is untimely. Proposed Intervenors filed their motion after the Court had already granted preliminary approval, after the parties had invested time and resources into reaching and relying on the proposed settlement agreement, after the class received class notices, and more than six months after Proposed Intervenors had actual knowledge that the settlement agreement might adversely affect their interests. To the extent Proposed Intervenors are concerned that the settlement agreement does not protect their interests, the Court notes that Proposed Intervenors have opted out of the settlement.[5] Other individuals that filed joinders to the motion to intervene, including Dakkar Hunter and Danah Lapan, have filed objections to the settlement agreement in the instant case. Objectors who filed timely objections may participate at the fairness hearing on January 15, 2015 at 1:30 p.m. *See, e.g., Zepeda v. PayPal, Inc.,* No. 10–2500, 2014 WL 1653246, at \*4 (N.D.Cal. Apr. 23, 2014) (collecting cases denying motions to intervene based on prejudice to the parties and concluding that potential intervenors could protect their interests by opting out or participating in the approval process).

**\*7** Timeliness is a required element under Rule 24(a) and failure to satisfy this element is sufficient grounds to deny a motion to intervene. In light of the Court's finding of untimeliness, the Court declines to reach the other factors. *See Perry,* 587 F.3d at 950. The Court therefore denies Proposed Intervenors' motion to intervene under Rule 24(a).[6]

### B. Permissive Intervention
In the alternative, Proposed Intervenors request that the Court allow permissive intervention under Rule 24(b). The Court addresses this request below.

### 1. Legal Standard

Federal Rule of Civil Procedure 24(b) provides for permissive intervention. "[A] court may grant permissive intervention where the applicant for intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *Nw. Forest Res. Council v. Glickman,* 82 F.3d 825, 839 (9th Cir. 1996). "Where a putative intervenor has met these requirements, the court may also consider other factors in the exercise of its

**Chavez v. PVH Corporation, Not Reported in Fed. Supp. (2014)**

2014 WL 6617142

discretion, including the nature and extent of the intervenors' interest and whether the intervenors' interests are adequately represented by other parties." *Perry*, 587 F.3d at 955 (internal quotation marks omitted). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed.R.Civ.P. 24(b)(3).

### 2. Analysis

As the Court has already concluded that Proposed Intervenors are not entitled to intervene as a matter of right under Rule 24(a) because their motion was not timely, Proposed Intervenors request for permissive intervention is also untimely. A determination of timeliness for permissive intervention "consider[s] precisely the same three factors—the stage of the proceedings, the prejudice to existing parties, and the length of and reason for the delay—that [the Court] consider[s] in determining timeliness [for intervention as of right]." *League of United Am. Citizens*, 131 F.3d at 1308.

"In the context of permissive intervention, however, [the Court] analyze[s] the timeliness element more strictly than ... with intervention as of right." *Id.* Proposed Intervenors have failed to meet the less restrictive timeliness requirement under Rule 24(a), as such they cannot meet the stricter timeliness requirement under Rube 24(b). As Proposed Intervenors have failed to meet an essential "threshold requirement[ ]" of permissive intervention under Rule 24(b), the Court denies Proposed Intervenors request to intervene in the instant action. *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).

### III. Conclusion

For the reasons stated above the Court DENIES Proposed Intervenors' motion to intervene.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2014 WL 6617142

---

## Footnotes

1    Plaintiff Chavez's individual claims arising under California Government Code §§ 12940(n), 12940, and 12945 are not at issue here.

2    Proposed Intervenors cite "*West Coast Seafood Processors Ass'n v. NRDC*, 643 F.3d 701, 708 (9th Cir. 2011)" in support of their argument that the filing of this motion before final approval renders the motion timely. Motion at 7. What Proposed Intervenors fail to mention, however, is that their citation is to Judge Bea's *dissent*. The *West Coast Seafood Processors* majority declined to reach the issue of timeliness altogether, concluding that the appeal was rendered moot. *See id.* at 703–05.

3    The *Scott–George/Wiggs* Complaint defines the proposed class as "All non-exempt employees who have been employed by Defendants [sic] in the State of California within four years prior to the filing of this complaint until certification of the class in this lawsuit." No. 13–0441, ECF No. 37, ¶ 11. The *Chavez* complaint proposes multiple classes and sub-classes, but in relevant part includes "All current and former employees who were employed by Defendants in the State of California at any time from March 20, 2009 who were paid wages through an ATM card kit (the "ATM Card Class")," all former California employees of Defendants who left Defendants' employ for whatever reason from March 20, 2012, to the present, and all current and former California employees who "have received at least one itemized wage statement during their employment with Defendants." ECF No. 40, ¶ 11.

4    Defendants object to Proposed Intervenors' disclosure of confidential mediation statements and Mr. Bae's declaration attaching copies of Defendant PVH Corporation's mediation brief. ECF No. 87. Proposed Intervenors argue that such disclosures are admissible under Federal Rule of Evidence 408, while Defendants contend California law on privileges should apply under Federal Rule of Evidence 501. The Court finds that

2014 WL 6617142

"state law supplies the rule of decision" because both the instant action and the *Scott–George/Wiggs* action implicate only state law causes of action. As such, under Federal Rule of Evidence 501, the Court applies California law as to the scope of the mediation privilege. *See, e.g., Gonzales v. T–Mobile, USA,* No. 14–4055256, 2014 WL 4055356 (S.D.Cal. Aug. 14, 2014); *Wilcox v. Arpaio,* 753 F.3d 872, 876–77 (9th Cir. 2014). Under California law, any oral or written communication made "for the purpose of, in the course of, or pursuant to, a mediation or mediation consultation," is privileged and therefore inadmissible unless it falls within a statutory exception. Cal. Evid.Code § 1119; *Simmons v. Ghaderi,* 187 P.3d 934, 939–43 (Cal.2008). Proposed Intervenors fail to identify an applicable statutory exception, and the Court concludes that none would apply here. The Court therefore disregards Proposed Intervenors' improper disclosures of the actual contents of Defendant PVH Corporation's written mediation statements.

Moreover, the Court concludes that even if the disclosures were admissible, they would not change the timeliness analysis here. Proposed Intervenors were on notice of the terms of the *Chavez* settlement agreement and the potential overlap in claims and classes by February 7, 2014. This was well before the unsuccessful July 10, 2014, mediation in the *Scott–George/Wiggs* action where PVH Corporation made its privileged mediation communications.

5    Plaintiff moved to supplement the record with information about Proposed Intervenors' decision to opt-out of the *Chavez* settlement. ECF No. 99. Plaintiff contends that Proposed Intervenors' decision to opt-out from the settlement deprives them of standing as potential intervenors. Proposed Intervenors opposed Plaintiff's motion with regards to the standing argument only. ECF No. 100. The Court GRANTS Plaintiff's motion to supplement the record regarding Proposed Intervenors' decision to exclude themselves from the *Chavez* settlement. ECF No. 99. Proposed Intervenors did not exclude themselves until September 25, 2014 and October 7, 2014, which was after Plaintiff filed her opposition to the motion to intervene. ECF No. 99, at 3. At least two joinders to the motion to intervene, Hunter and Lapan, have objected to the settlement and thus would have standing to intervene. Accordingly, the Court need not reach the standing argument.

6    None of the joinders to the motion to intervene offer any argument or analysis as to why the Court's ruling on the motion to intervene as to Proposed Intervenors would not also dispose of the joinders' motion to intervene. The Court therefore denies the motions to intervene by Jeffrey Lapan, Ashwin Chandra, Dakkar Hunter, and Danah Lapan for the reasons discussed above.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.    7

# EXHIBIT B

2012 WL 3265905
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

UNITED STATES of America, Plaintiff,

v.

State of NEW JERSEY and New Jersey
Civil Service Commission, Defendants.

Civ. No. 10–91 (KSH)(MAS).

|
June 12, 2012.

**OPINION**

KATHARINE S. HAYDEN, District Judge.

| | | |
|---|---|---|
| I. | Introduction .......... | 1 |
| II. | Facts and Procedural History .......... | 2 |
| | A. The Complaint .......... | 2 |
| | B. The Consent Decree .......... | 4 |
| | C. Objections .......... | 10 |
| | D. Intervention .......... | 10 |
| | E. Fairness Hearing .......... | 11 |
| III. | Motion for Final Entry of Consent Decree .......... | 12 |
| | A. Standard of Review .......... | 12 |
| | B. Underlying Merits of the Claim .......... | 13 |
| |     1. Disparate Impact Framework .......... | 14 |
| |     2. Disparate Impact Evidence in Present Case .......... | 16 |
| |         a. Evidence of Statistical Disparate Impact .......... | 16 |
| |         b. Job–Relatedness and Consistency with Business Necessity .......... | 22 |
| |         c. *Ricci v. DeStefano* .......... | 27 |
| |             i. The *Ricci* Facts and Holding.......... | 27 |
| |             ii. Applicability to this Case.......... | 29 |
| |     3. Facial Neutrality .......... | 30 |
| |     4. Conclusion as to the Merits .......... | 33 |
| | C. Proposed Relief .......... | 33 |
| |     1. Pre–Approval .......... | 34 |
| |     2. Back Pay .......... | 36 |

Case 1:19-cv-14766-RMB-JBC    Document 786-1    Filed 12/22/25    Page 13 of 34
PageID: 37487

|  |  | 3. | Priority Promotions with Retroactive Seniority .......... | 38 |
|  |  |  | a. | Unfairness to Non–Claimants .......... | 3 9 |
|  |  |  | b. | Insufficient Priority Promotions .......... | 43 |
|  |  |  | c. | Administrative Aspects .......... | 44 |
|  |  |  | d. | Qualifications .......... | 45 |
|  |  | 4. | New Examination .......... | 45 |
|  | D. | Miscellaneous Objections .......... | 47 |
|  |  | 1. | Notice .......... | 47 |
|  |  | 2. | Discovery .......... | 48 |
|  | E. | Findings on Settlement Terms .......... | 50 |
| IV. | Motion for Intervention .......... | 50 |
|  | A. | Motion to Intervene Framework .......... | 50 |
|  | B. | Timeliness .......... | 51 |
|  |  | 1. | The Stage of the Proceeding .......... | 52 |
|  |  | 2. | Prejudice That Delay May Cause Parties .......... | 52 |
|  |  | 3. | The Reason for the Delay .......... | 53 |
|  |  | 4. | Totality of the Circumstances .......... | 5 3 |
|  | C. | Conclusion as to Intervention .......... | 55 |
| V. | Conclusion .......... | 55 |

## I. Introduction

**\*1** In 2010, the United States filed a complaint against the State of New Jersey ("the State") and the New Jersey Civil Service Commission ("NJCSC"), alleging that the NJCSC's selection process for the position of police sergeant has a disparate impact on African American and Hispanic applicants in violation of Title VII of the Civil Rights Act of 1964. Specifically, the complaint alleged that African American and Hispanic applicants pass the promotional examination at lower rates than their white counterparts, and that those African American and Hispanic applicants who do pass achieve lower average scores than their white counterparts, thus adversely affecting their rankings on promotional lists. The parties conducted extensive discovery, and in the summer of 2011, they reached a settlement. The Court provisionally entered a consent decree on September 15, 2011 and then entered amended consent decrees on November 2, 2011 and November 22, 2011. The present consent decree requires ten New Jersey jurisdictions to obtain pre-approval from the United States before certifying candidates for promotion to sergeant; provides back pay for eligible claimants; provides a system of priority promotions with retroactive seniority for a more limited group of eligible claimants; and sets the stage for the NJCSC to create a new examination and promotion process for police sergeants.

The parties created a system for the submission of written objections. The Court received 468 written objections to the consent decree. Some came from officers who had already passed the examination and were frustrated by delays in the promotion process and the prospect of being bypassed for

promotion due to the consent decree's imposition of priority promotions. Other objections came from African American and Hispanic officers who did not do well enough on the examination to be promoted but who did not reside in a jurisdiction afforded the full scope of relief under the consent decree. At the initial fairness hearing held on March 12, 2012, objectors appeared in person and addressed the Court.

The Court has considered the written submissions of the United States, the written objections to the consent decree, and the presentations and statements at the initial fairness hearing. For the reasons that follow, the Court approves the second amended consent decree and enters it as an order.

**II. Facts and Procedural History**

On May 22, 2008, the United States Department of Justice informed the State by letter "that it would be investigating whether the State had engaged in a pattern or practice of discrimination against African–Americans and Hispanics based on its use of a written exam for promotion to police sergeant." (Br. Supp. Joint Mot. for Provisional Entry of Consent Decree and Scheduling of Fairness Hearing 2 n. 3 ("Br.Supp.Prov.Entry").) This pre-suit investigation, which included "document review, data analysis, and consultation with experts," continued for almost two years and culminated in the present action. (*Id.*)

**A. The Complaint**

 **\*2**  On January 7, 2010, the United States filed a complaint against the State and the NJCSC. [D.E. 1.] According to the complaint, the NJCSC is responsible for maintaining "selection procedures for promotion to the rank of Police Sergeant." (Compl.¶ 8.) "These procedures are utilized by hundreds of New Jersey cities and counties that participate in the New Jersey Civil Service system." (*Id.*) Since 2000, part of this system has included a multiple-choice examination that the NJCSC develops, administers, and scores. (*Id.* ¶ 9.) The NJCSC also determines the cutoff score for passing the examination, "establish[es] Police Sergeant eligibility lists and certif[ies] Police Sergeant candidates to the local jurisdictions participating in the New Jersey Civil Service system." (*Id.*) Local jurisdictions participating in the New Jersey Civil Service system may not deviate from the NJCSC's selection procedures. (*Id.* ¶ 10.)

Candidates for police sergeant who meet other qualifications and achieve a passing score on the written examination are placed on eligibility lists for their jurisdiction; the lists rank candidates by a "final score" that is 80% attributable to the examination score and 20% attributable to seniority credits. (*Id.* ¶ 11.) When deciding which candidates to promote, the local jurisdictions must use "certification lists" created by the NJCSC at the local jurisdiction's request. (*Id.* ¶ 12.) Under N.J.S.A. 11A:4–8, for the first police sergeant vacancy, the NJCSC certifies the three highest-ranking candidates on the eligibility list, and for each additional vacancy, it certifies the next ranked candidate on the list. (*Id.*) Under what is known as the Rule of Three, the local jurisdiction takes the list of certified candidates and chooses which one(s) to promote; this system "recognizes employment discretion and seeks to ensure that such discretion is not exercised in a way inconsistent with 'merit' considerations." *In re Foglio,* 207 N.J. 38, 45–46 (2011) (quoting *Terry v. Mercer Cnty. Bd. of Chosen Freeholders,* 86 N.J. 141, 149–50 (1981)).

From 2000 to 2008, 89% of white candidates passed the written examination, compared to 73% of African American candidates and 77% of Hispanic candidates. (Compl.¶¶ 14, 16.) In addition to the aggregate pass rate for that period, African American and Hispanic candidates "passed at a rate statistically significantly lower than did the white candidates" in each annual administration of the examination. (*Id.* ¶¶ 15, 17.) Moreover, even among passing candidates, African Americans "were under-represented in the higher score ranges and over-represented in the lower score ranges for each year between 2000 and 2008," and "Hispanics were under-represented in the higher score ranges and over-represented in the lower score ranges for each year between 2001 and 2008." (*Id.* ¶¶ 19, 21.) The end result is that in jurisdictions with white and either African American or Hispanic applicants, 35% of white candidates appearing on eligibility lists were certified, compared with 20% of African American candidates and 22% of Hispanic candidates. (*Id.* ¶ 23.) In the end, "while approximately 18% of the white candidates on the eligibility lists in such jurisdictions were promoted, approximately 9% of African American candidates and 13% of Hispanic candidates were promoted." (*Id.*)

 **\*3**  Based on this data, the United States alleged in its complaint that the pass/fail written examination resulted in a statistical disparate impact on African American and Hispanic candidates and that the NJCSC has not demonstrated that its written examination and certification ranking process "is job related for the Police Sergeant position and consistent with business necessity." (*Id.* ¶¶ 24–26.) Accordingly, the United States alleged that the use of the written examination and the ranking of candidates based in part on those examinations

constitutes unlawful discrimination due to race in violation of section 707 of Title VII, 42 U.S.C. § 2000e–6. (*Id.* ¶ 27.)

### B. The Consent Decree

After the United States filed the complaint, "the State produced voluminous information relating to the issues of disparate impact, job-relatedness, and validity during discovery." (Br. Supp. Prov. Entry 2.) The parties exchanged expert reports on disparate impact, job-relatedness, and validity, and they conducted depositions of expert and fact witnesses on these matters. (*Id.*) During discovery, the parties took part in in-person settlement conferences before Magistrate Judge Michael A. Shipp on March 3, 2011, April 4, 2011, and April 26, 2011. On May 19, 2011, the parties informed Magistrate Judge Shipp in a telephone conference that they had reached a settlement in principle. [D.E. 35.]

On August 1, 2011, the parties filed a joint motion for provisional entry of a consent decree and scheduling of an initial fairness hearing, which the Court granted. The original consent decree was later superseded by a first amended consent decree entered on November 2, 2011, and a second amended consent decree entered on November 22, 2011. [D.E. 48, 49.] The second amended consent decree (hereinafter "the consent decree" or "the decree") set March 12, 2012 as the date for an initial fairness hearing. (Second Am. Consent Decree ¶ 20.) The decree sets forth the factual and legal underpinning of the case and prescribes remedial action to be taken. As its factual recital in the decree indicates, for the purposes of the present proceedings, the State does not dispute certain predicate facts: of particular note, the State agreed not to dispute that "[f]rom 2000 to 2009, African–American and Hispanic candidates passed the police sergeant written exam at a lower rate than white candidates, and the disparity in pass rates is statistically significant"; "[f]rom 2000 to 2008, African–American and Hispanic candidates ranked lower on eligible lists than white candidates, and the disparity in ranks is statistically significant"; the disparities are sufficient to establish a prima facie case of disparate impact under Title VII; at least 48 additional African Americans and at least 20 additional Hispanics "would have been promoted to the position of police sergeant in local jurisdictions throughout New Jersey from 2000 to 2009 absent the disparate impact resulting from the State's pass/fail use of the police sergeant written exam and from the State's determination and use of final scores to certify candidates in descending rank order"; and that the State's promotional system for police sergeants is neither job-related nor "consistent with business necessity

under professionally acceptable standards for validity." (*Id.* at 2–3.) The consent decree indicates that it is designed to achieve three purposes: (1) ensuring that the State no longer violates Title VII in promotions to police sergeant; (2) creating a new selection procedure; and (3) providing back pay and priority promotions with retroactive seniority to those who were denied a promotion to police sergeant due to the challenged employment practices. (*Id.* ¶ 12.)

**\*4** As remedies, the decree first provides general injunctive relief precluding the State from using "any selection device for the position of police sergeant that has a disparate impact upon African–American or Hispanic candidates on the basis of race or national origin and is not job related for that position and consistent with business necessity, or otherwise does not meet the requirements of Title VII." (*Id.* ¶ 13.) Further, the State is precluded from retaliating against any person who participates or cooperates in the "initiation, investigation, litigation or administration" of the decree. (*Id.* ¶ 14.) The State may no longer administer the current written examination for promotion to police sergeant. (*Id.* ¶ 15.)

The decree precludes the State from using "current eligible lists as part of its selection procedure for police sergeant in" ten municipalities that the United States' expert identified as jurisdictions in which continued use of the existing eligible list "may result in disparate impact on African American and/or Hispanic candidates." (*Id.* ¶ 16.) These jurisdictions are Atlantic City, Camden, Irvington, Jersey City, Passaic, Paterson, Pleasantville, Salem City, Teaneck, and Trenton. (*Id.* ¶ 16 & Ex. D.) Until the existing eligibility lists expire, the State must provide certification requests to the United States for prior approval before certifying candidates in those jurisdictions; the United States "shall determine through its expert whether the requested certification(s) would create an additional African American or Hispanic shortfall in that jurisdiction." (*Id.* ¶ 16.) In determining whether a shortfall would ensue, the United States "will treat each request for certification as an actual appointment." (*Id.*) The State is permitted to continue using existing eligible lists in all other local jurisdictions. (*Id.* ¶ 17.)

In addition to the systemic relief, the decree provides individual relief for eligible claimants. The overall adequacy of individual relief was an issue presented at the initial fairness hearing, and the decree further provides that person-by-person entitlement to relief will be the subject of a subsequent "individual relief fairness hearing." (*Id.* ¶ 43.) Only eligible "claimants" under the decree in certain

jurisdictions are entitled to individual relief. The decree defines the term "claimant" as:

> any African–American or Hispanic person from those jurisdictions identified in Attachment A who has not been promoted to police sergeant and who:
>
> a. between 2000 and 2009, failed a police sergeant written exam where appointments from the eligible list resulted in a shortfall of his or her race; or
>
> b. between 2000 and 2008, passed a police sergeant written exam where appointments from the eligible list resulted in a shortfall of his or her race, but ranked below the lowestranking candidate appointed from that eligible list.

**\*5** (*Id.* ¶ 3.)

The jurisdictions identified in Attachment A are: Asbury Park, Atlantic City, Bayonne, Bridgeton, Burlington, Camden, Deptford, Dover, East Orange, Elizabeth, Ewing, Garfield, Hackensack, Hamilton, Hillside, Hoboken, Irvington, Jersey City, Kearny, Lawrence, Magnolia, Morristown, New Brunswick, Newark, North Brunswick, Orange, Passaic, Paterson, Pennsauken, Perth Amboy, Plainfield, Pleasantville, Roselle, Scotch Plains, Somerdale, Teaneck, Trenton, Vineland, Wallington, Weehawken, West New York, Willingboro, and Wood–Ridge. (*Id.* Ex. A.) The first portion of individual relief comes in the form of back pay. The State is required to deposit $710,000.00 into one settlement fund for African–American claimants and $290,000.00 into another settlement fund for Hispanic claimants. (*Id.* ¶ 29.) Much of the process of determining eligible claimants will take place after the decree is entered, notice is dispensed, and a future individual relief fairness hearing is held to approve a Final Relief Awards List. (*See id.* ¶¶ 31–36, 40–59.)

Additionally, certain claimants are entitled to priority promotion with retroactive seniority. This provision of the decree provides that the State must "certify Claimants eligible for priority promotion over all other eligible candidates until a minimum of, and no more than, 68 offers of priority promotions have been made to eligible Claimants who pass the new selection procedure for police sergeant as developed under this Decree." (*Id.* ¶ 60.) The 68 priority promotions are allocated to 48 African American candidates and 20 Hispanic candidates. (*Id.* ¶ 61.) They are available only in specific jurisdictions and in amounts specified in the decree: Atlantic City (five African American, two Hispanic);

Bridgeton (two African American, one Hispanic); Camden (three African American, one Hispanic); East Orange (two African American, one Hispanic); Elizabeth (three African American, three Hispanic); Hoboken (three Hispanic); Jersey City (six African American, three Hispanic); New Brunswick (one African American, two Hispanic); Newark (14 African American, one Hispanic); Passaic (two African American, one Hispanic); Paterson (five African American, one Hispanic); Teaneck (two African American, one Hispanic); and Trenton (three African American). (*Id.* ¶ 61 & Ex. K.)

The decree expressly provides that no claimant is eligible for priority promotion unless he or she passes the new police sergeant examination developed under the terms of the decree and is certified to a local jurisdiction; "[i]f the number of eligible Claimants who pass the new selection procedure exceeds the number of priority promotions allocated to a particular local jurisdiction, eligible Claimants will be selected for priority promotions in accordance with the new selection procedure." (*Id.* ¶¶ 61–62.) No claimant is obligated to participate in the priority promotion process, but regular promotions will not count toward satisfying priority promotion allotments. (*Id.* ¶ 63.) Priority promotions will be considered exhausted only after each claimant eligible for priority promotion: has been appointed as a police sergeant; has rejected an offer of priority promotion; has accepted an offer but fails to appear for the first day of employment as a police sergeant; has failed the new police sergeant examination; or has been determined to be unqualified through lawful, objective appointment criteria other than a written examination or residency requirement. (*Id.* ¶ 64.) After a priority promotion list is created, the State shall certify candidates on those lists until all promotions for a local jurisdiction have been distributed or the group of available claimants is exhausted. (*Id.* ¶ 66.)

**\*6** The decree also requires the State to develop a new selection procedure for future administrations, based on the "Police Sergeant Test Validation Report 2011." (*Id.* ¶¶ 77–78.) The decree provides detailed instructions for the process under which the United States and the State will collaborate to develop the new selection procedure. (*See id.* ¶¶ 79–84.)

For as long as the decree is in effect, the State bears specific responsibilities for record-keeping with regard to the examination. (*Id.* ¶ 85.) The State is further required to furnish the records to the United States upon request, and to make available to the United States "any agent, employee or official of the State who the United States reasonably believes

has knowledge of information necessary to verify the State's compliance with the terms of this Decree or to resolve a dispute arising under this Decree." (*Id.* ¶¶ 86–88.)

The decree remains in effect until the latest of three dates: three years from the entry of the decree; the parties' fulfillment of the individual relief obligations; or the State's administration of the second police sergeant examination in accordance with paragraph 80 of the decree. (*Id.* ¶ 89.) The Court retains jurisdiction over the decree in order to resolve disputes or enter orders appropriate to the decree's implementation. (*Id.* ¶ 93.)

### C. Objections

All affected persons were provided an opportunity to present objections prior to the final entry of the decree at an initial fairness hearing on March 12, 2012. (*Id.* ¶¶ 19–20.) The consent decree required objectors to mail written objections to a designated post office box; the deadline for objections was 45 days prior to the initial fairness hearing, or January 27, 2012. (*Id.* ¶ 24.) The decree further provided objectors with the right to appear at the initial fairness hearing and voice objections either in person or through counsel. (*Id.*)

The United States received 468 written objections. (*See generally* Br. Supp. Final Entry of Consent Decree & Response to Objections ("Br. Supp. Final Entry"), App'x E, Exhs. 1–467; Letter from United States dated Mar. 23, 2012 (D.E.68).) The content of these objections will be discussed later in this opinion.

### D. Intervention

On February 9, 2012, 27 police officers employed by the City of Paterson, New Jersey (collectively "movants") filed a proposed answer, a motion to intervene, a motion for discovery, and a motion for preliminary injunction. [D.E. 56–59.] All 27 movants also submitted, through counsel, timely objections to the consent decree. (*See* Br. Supp. Final Entry, App'x E, Exhs. 18, 29, 34, 74, 75, 95, 96, 106, 111, 112, 131, 138, 194, 199, 234, 262, 263, 281, 321, 332, 342, 352, 358, 365, 410, 412, 413.) While the movants' motions were still pending, on March 8, 2012, they filed a motion for postponement of the initial fairness hearing. [D.E. 65.] That same day, the Court: denied the motion for postponement of the initial fairness hearing; denied the motion for discovery and motion for preliminary injunction as premature because the Court had not yet granted movants' motion to intervene; and informed the parties that the Court would hear argument

on the motion to intervene at the initial fairness hearing. [D.E. 66.]

### E. Fairness Hearing

*7 On March 12, 2012, the Court held the initial fairness hearing. The United States made a presentation on the consent decree and presented arguments in opposition to the written objections. In addition, the United States made its two expert witnesses, Dr. Bernard Siskin and Dr. David Jones, available for the Court and for objectors.

Most of the fairness hearing was dedicated to hearing from objectors. The Court first heard from those objectors represented by counsel. Jesse D. Stovin appeared for the Office of Joseph S. Murphy, Esq., which represents 59 objectors from the Paterson Police Department. (*See* Br. Supp. Final Entry, App'x D.) He also presented arguments regarding the movants' motion to intervene. Michael F. Myers appeared for Jacobs & Barbone, P.A., which represents Gena Dorn, Stacy Herrerias, Joseph Jasiecki, Richard Johnson, and Omar Martin of the Atlantic City Police Department. (*See id.*) Raymond R. Jones, Esq. appeared for the Law Office of Raymond R. Jones, which represents Quincy Hendryx, James Walters, and Brian Davis of the Hamilton Police Division. (*See id.*) Brian F. Curley, Esq. appeared on behalf of Desmond Clark of the Irvington Police Department. (*See id.*) Seven objectors—Saverio Binetti, Arbend Drishti, Ranaldo Gonzalez, Abdelmonim Hamdeh, Eric Jackson, George F. Moore, and Antonio Pistone—spoke on their own behalf.

At the end of the initial fairness hearing, the Court reserved judgment on both the United States' motion for final entry of the consent decree and the movants' motion for intervention.

### III. Motion for Final Entry of Consent Decree

### A. Standard of Review

The consent decree provides that the Court's task is to "determine whether the terms of the Decree are fair, reasonable, equitable and otherwise consistent with federal law." (Second Am. Consent Decree ¶ 19.) Neither the Supreme Court nor the Third Circuit has set forth an express standard of review for how district courts should measure the propriety of consent decrees arising in the context of a government-initiated lawsuit in which the settlement has a direct impact on non-litigant third parties. Therefore, in discerning a standard, guidance is taken from other circuits and from other district courts within this circuit.

Courts have long recognized that when Congress enacted Title VII of the Civil Rights Act of 1964, "[c]ooperation and voluntary compliance were selected as the preferred means for achieving" the goal of eliminating discrimination in the workplace. *See Alexander v. GardnerDenver Co.,* 415 U.S. 36, 44 (1974); *Kennedy v. St. Joseph's Ministries, Inc.,* 657 F.3d 189, 194 (4th Cir.2011); *Shikles v. Sprint/United Mgmt. Co.,* 426 F.3d 1304, 1313 (10th Cir.2005). Recognizing this policy, and the general benefits of having cases resolved through settlement rather than protracted litigation, it has been said that a district court's only task is to ensure "that the proposed settlement is not unconstitutional, unlawful, ... contrary to public policy, or unreasonable." *United States v. City of Miami,* 614 F.2d 1322, 1333 (5th Cir.1980), *aff'd in part, rev'd in part on other grounds,* 664 F.2d 435 (Former 5th Cir.1981) (en banc). Stated differently, "the trial court must find the settlement fair, adequate, and reasonable." *United States v. City of Alexandria,* 614 F.2d 1358, 1361 & n. 6 (5th Cir.1980). *Accord United States v. New Jersey,* Nos. 88– 5087, 88–4080, 87–2331, 1995 WL 1943013, at *11 (D.N.J. Mar. 14, 1995) (Bassler, J.) (utilizing standard from *City of Alexandria* and *City of Miami* ).

**\*8** Accordingly, when reviewing the propriety of consent decrees such as this one, courts determine whether its terms are fair, adequate, reasonable, and consistent with the law. Though deferential, courts must not "shirk their duty to consider proposed decrees carefully." *City of Alexandria,* 614 F.2d at 1362 n. 10 (citing *City of Miami,* 614 F.2d at 1333.) It is especially important for courts to scrutinize the fairness and reasonableness of the decree closely when, as here, the decree has an impact on non-parties. *Cf. Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 779 n. 41 (1976) (district courts retain equitable powers to deny relief when it would involve "unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases"); *Romasanta v. United Air Lines, Inc.,* 717 F.2d 1140, 1156 (7th Cir.1983) (holding that district court need not grant relief having "unusual adverse impact" on innocent incumbent employees), *cert. denied,* 466 U.S. 944 (1984). [1]

**B. Underlying Merit s of the Claim**

In assessing the reasonableness of the decree, the paramount question is whether the United States has presented a strong claim on the merits. Such a showing is significant for two reasons. First, it ensures that the State's decision to settle the matter was borne of a sincere concern that it might be held

liable for discrimination if the action were decided on the merits after full litigation. Second, it addresses the concerns expressed in 219 objections that the United States has failed to establish disparate impact discrimination under Title VII. For the reasons that follow, the Court finds that the United States has adduced strong evidence that the State's promotional process for police sergeants runs afoul of Title VII.

**1. Disparate Impact Framework**

In 1971, the Supreme Court recognized that "[t]he objective of Congress in the enactment of Title VII ... was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees," and held that the Civil Rights Act "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–31 (1971). Accordingly, "[i]f an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431. Although disparate impact had its genesis in case law, Congress later validated the Supreme Court's approach by codifying disparate impact discrimination in the Civil Rights Act of 1991. *See Ricci v. DeStefano,* 129 S.Ct. 2658, 2673 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)); *see also NAACP v. N. Hudson Reg'l Fire & Rescue,* 665 F.3d 464, 477 n. 9 (3d Cir.2011) (noting that the Civil Rights Act of 1991 reversed a Supreme Court case that had weakened the standard for finding employment practices not a violation of Title VII), *cert. denied,* No. 11–1247, 2012 WL 1358789 (June 11, 2012).

**\*9** Title VII is meant to ensure that workplaces are free from discrimination and that employment decisions are made based on qualifications rather than extraneous factors such as race and color. *N. Hudson Reg'l Fire & Rescue,* 665 F.3d at 476 (citing *Ricci,* 129 S.Ct. at 2674; *Griggs,* 401 U.S. at 434.) To that end, "Title VII makes it illegal for an employer to 'limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual's race, color, religion, sex, or national origin.' *Id.* (quoting 42 U.S .C. § 2000e–2(a)(2)). To establish a claim for disparate impact, a complaining party must "demonstrate[ ] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent [must] fail[ ] to demonstrate that the challenged practice is job related for the position in question and

consistent with business necessity." *Id.* (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(1)). Thus, the employer's actual motive is irrelevant. *Id.* (quoting *Lewis v. City of Chicago,* 130 S.Ct. 2191, 2200 (2010)).

The test for disparate impact discrimination proceeds in three steps. First, a plaintiff must establish a prima facie case through a demonstration "that application of a facially neutral standard has caused a 'significantly discriminatory hiring pattern.' " *Id .* (quoting *Newark Branch, NAACP v. City of Bayonne,* 134 F.3d 113, 121 (3d Cir.1998) (quoting *Newark Branch, NAACP v. Town of Harrison,* 940 F.2d 792, 798 (3d Cir.1991))). This means that the plaintiff must show not only a significant disparity, but also that the disparity "is the result of one or more of the employment practices that [he is] attacking." *Id.* at 476–77 (quoting *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 657 (1989)). Statistical disparities may show causation "when those disparities are substantial and the evidence is reliable." *Id.* at 477 (citing *Bayonne,* 134 F.3d at 121).

If the prima facie case is established, the second step is that the employer may defend the claim through a showing that the practice is "job related for the position in question and consistent with business necessity." *Id.* (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). To establish job-relatedness and business necessity, the employer bears the burdens of production and persuasion to show that the discriminatory criteria "define the minimum qualifications necessary to perform the job"; the reasons must be "*actual* reasons why the challenged employment practice is important to the position" and not "the mere assertion of ... conceivable bases." *Id.* (citations omitted). Even a "common sense" job requirement will fail if it is not supported by "some level of empirical proof that challenged hiring criteria accurately predicted job performance." *El v. Se. Pa. Transp. Auth.,* 479 F.3d 232, 240 (3d Cir.2007). For example, in a claim of disparate impact by sex, the Supreme Court rejected a prison's argument that height and weight requirements for the position of prison guard were job related and consistent with business necessity. *See generally Dothard v. Rawlinson,* 433 U.S. 321 (1977). Because the only business reason for those job requirements was to ensure strength, the Court rejected the business necessity argument, finding the prison could have simply tested for actual strength rather than presuming height and weight to be a proxy for it. *El,* 479 F.3d at 239–40 (citing *Dothard,* 433 U.S. at 331–32). Accordingly, the "employers [must] show that a discriminatory hiring policy accurately— but not perfectly—ascertains an applicant's ability to perform

successfully the job in question." *Id.* at 242. If the employer cannot satisfy this requirement, "the plaintiff wins simply by showing the stated elements." *N. Hudson Reg'l Fire & Rescue,* 665 F.3d at 477 (quoting *Lewis,* 130 S.Ct. at 2198).

**\*10** If the defendant demonstrates job relatedness and business necessity, the third step is that a plaintiff can still prevail "by showing that alternative practices would have less discriminatory effects while ensuring that candidates are duly qualified." *Id.*

**2. Disparate Impact Evidence in the Present Case**

**a. Evidence of Statistical Disparate Impact**

As discussed above, the first step in a disparate impact analysis is that a plaintiff must establish a prima facie case through a demonstration "that application of a facially neutral standard has caused a 'significantly discriminatory hiring pattern.' " *Id.* 476 (citations omitted). Statistical disparities are appropriate to demonstrate such causation. *Id.* at 477. For evidence of statistical disparities in the selection process for police sergeants, the United States presented the report of Dr. Bernard R. Siskin ("Siskin"), who also appeared at the initial fairness hearing.

Siskin is the Director of BLDS, LLC, based in Philadelphia, Pennsylvania. (Second Am. Decl. of Bernard Siskin ¶ 1, appended to Br. Supp. Final Entry, App'x E, Ex. 468 ("Siskin Decl.").) He received a Ph.D. in Statistics with a minor in Econometrics from the Wharton School of the University of Pennsylvania and has authored four books on statistical methodology, as well as numerous book chapters, monographs, and papers. (*Id.*) He specializes in using statistics to analyze employment practices. (*Id.*)

According to Siskin's report, from 2000 to 2009, at least 182 counties and municipalities participated in New Jersey's civil service system. (*Id.* ¶ 2.) "Candidates for police sergeant who meet the minimum qualifications set by New Jersey, and who achieve a passing score on a written exam administered by New Jersey, are placed in descending rank order on eligible lists based on final scores. Final scores are a combination of written exam scores, which are weighted 80 percent, and seniority credits, which are weighed 20 percent." (*Id.*) The written examination is administered statewide each year to all police officers seeking promotion to police sergeant, provided that their jurisdiction is participating in the promotional process for that year. (*Id.* ¶ 4.) Each jurisdiction also has the same pass score, which the NJCSC sets. (*Id.*)

Siskin's conclusions regarding disparate impact all emanate from an analysis in which he determined the number of standard deviations separating white applicants' performance on the examination from African American and Hispanic applicants' performance. At the initial fairness hearing, Siskin explained the meaning of these numbers and the method by which he arrived at them. (*See* Transcript of Initial Fairness Hearing 61–75 ("Tr.").) The question his analysis is designed to answer is whether the difference in performance between white applicants and African American and Hispanic applicants is predicated on pure chance. (*See id.* 66:24–68:6.) To that end, he takes the raw difference in performance and converts it into units of standard deviation; the units of standard deviation can then be used to ascertain placement on a bell curve, which in turn makes it possible to determine the probability of an outcome occurring by chance. (*See id.* 68:7–18 .) If a disparity is equal to 1.96 standard deviations, then it means that there is only a 5% chance of that outcome occurring randomly, and "[w]e conclude that it didn't occur by chance." (*See id.* 68:19–69:9.)

**\*11** Standard deviation analyses like Siskin's are frequently used in disparate impact cases. For example, in discussing how to apply specific statistics, the Third Circuit has explained that

> [a] standard deviation is a unit of measurement that allows statisticians to measure all types of disparities in common terms. In context, the greater number of standard deviations from the mean, the greater the likelihood that the result is not due to chance. To offer some sense of the relationship between these two measures, two standard deviations corresponds roughly to a probability level of 0.05 [or 5 percent]; three standard deviations correspond to a probability level of 0.0027 [or 0.27 percent].

> As a legal matter, the Supreme Court has stated that "[a]s a general rule for ... large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the [result] was random and would be suspect to a social scientist...."

*Stagi v. Nat'l R.R. Passenger Corp.,* 391 F. App'x 133, 137–38 (3d Cir.2010) (footnote and citations omitted).

In his report, Siskin concluded that from 2000 to 2009, there was a statistically significant disparity between African American passage rate and white passage rate, and this disparity was equal to 17.33 units of standard deviation. (Siskin Decl. ¶ 5.) When looking year to year, the standard deviations ranged from a low of 4 .09 in 2003 to a high of 9.62 in 2002. (*Id.*) Moreover, African Americans who passed the exam from 2000 to 2008 were ranked on eligibility lists statistically significantly lower than whites, equal to 7.77 units of standard deviation. (*Id.* ¶ 7.)

From 2000 to 2009, there was also a statistically significant disparity between Hispanic passage rate and white passage rate; this disparity was equal to 12.88 units of standard deviation. (*Id.* ¶ 6.) When looking year to year, the standard deviations ranged from a low of 3.03 in 2003 to a high of 9.24 in 2002. (*Id.*) Moreover, Hispanics who passed the exam from 2000 to 2008 were ranked on eligible lists statistically significantly lower than whites, equal to 4.66 units of standard deviation. (*Id.* ¶ 8.)

As discussed above, a standard deviation of 1.96 indicates a 5% probability of the cited event occurring randomly, and such a deviation is regarded as statistically significant in disparate impact cases. Here, even the lowest disparity far exceeds 1.96 standard deviations. As Siskin explained at the initial fairness hearing:

> [V]alues of seven almost never occur by chance.... A probability of five percent being greater than two, greater than three, occurring three in one thousand times. A probability as great as eight, occurring one in 100 billion. When you get above eight, computers can't calculate how small that probability is. When we get a probability of 17 and 12, it's almost nothing, absolutely, okay. There is a probability, but it is so small that we can't even calculate how small it is. The probability of that occurring by chance essentially is zero. Which means that the conclusion of the statisticians in this case is absolutely clear, this difference of what we observed in the pass rate between blacks and whites, Hispanics and whites, is not occurring by chance. This is a result of this test.

**\*12** (Tr. 69:10–23.)

Siskin has made an ample showing that a statistically significant disparity exists between the passage rates and placement positions of white candidates as opposed to African American and Hispanic candidates. No objector has contested the existence of this disparity. Objections have been largely predicated on the idea that other factors, such as cultural distinctions or amount of time dedicated to preparing

for the examination, account for the different passage rates. *See infra.*

Many objectors presented arguments with regard to the 80 percent rule in their written objections. (*See, e.g.,* Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 1, ¶ 7 ("I object to the Consent Decree because the statistics underlying the opinion [do] not show disparate impact per 29 C.F.R. § 1607.4(D)....").) The "80 percent rule" is a component of the EEOC's Uniform Guidelines on Employee Selection Procedures designed "to assess whether a plaintiff has established a prima facie disparate impact case." *Stagi,* 391 F. App'x at 138. It provides that a selection rate for one group "which is less than four-fifths ... of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D). In the present case, the difference in passage rates between white candidates and African American and Hispanic candidates is not so great that it runs afoul the 80 percent rule. But as the Third Circuit has noted, the 80 percent rule "has come under substantial criticism, and has not been particularly persuasive, at least as a prerequisite for making out a prima facie disparate impact case." *Stagi,* 391 F. App'x at 138. Rather, it provides nothing "more than a rule of thumb for the courts." *Id.* (quoting *Watson v. Forth Worth Bank & Trust,* 487 U.S. 977, 995 n. 3 (1988)). In light of these critiques, and the Third Circuit's previous reliance on standard deviation analysis in lieu of following the 80 percent rule, the Court finds Siskin's detailed analysis to be more persuasive than simple reliance on a regulation that even the Supreme Court describes as nothing more than a "rule of thumb" for courts. *See Watson,* 487 U.S. at 995 n. 3.

Siskin estimates that absent the disparate impact, at least one or more African American and/or Hispanic would have been promoted to Police Sergeant in 43 jurisdictions across the State, for an overall total of 75 African Americans and 30 Hispanics. (Siskin Decl. ¶ 10.) These 43 jurisdictions comprise the basis for determining whether a former test-taker is a claimant eligible for back pay. (*See* Second Am. Consent Decree ¶ 3.) If limiting that number to only jurisdictions in which at least three African Americans and/or Hispanics were excluded due to disparate impact, the result is a total shortfall of 48 African Americans and 20 Hispanics across 13 jurisdictions. (Siskin Decl. ¶ 10.) In the consent decree, these 13 jurisdictions are the ones in which claimants

may be eligible for priority promotion with retroactive seniority. (*See* Second Am. Consent Decree ¶ 61.) By using the average annual appointment rate from 2000 to 2009, as well as the current eligibility lists, Siskin estimated that the use of the existing eligible lists would result in an increase in the shortfall of African Americans or Hispanics in ten municipalities. (Siskin Decl. ¶¶ 12–13.) These municipalities are the ones for which the consent decree would require the United States to pre-approve any certifications from current eligibility lists. (Second Am. Consent Decree ¶ 16.)

**\*13** Siskin also makes estimates of back pay based on "salary information reported by State agencies and publicly available through www.app.com." (*Id.* ¶¶ 15–16.) Operating under the assumption that losses began accruing at the time an applicant failed the exam, and based on the total shortfall statewide, he estimated the overall back pay owed to be over $1,000,000.[2] (*Id.* ¶¶ 17–20.) He recommends splitting any back pay award 71% to African American claimants and 29% to Hispanic claimants, based on their relative makeup of the overall shortfall. (*Id.* ¶¶ 22–24.) The payments would be based upon the median appointment date for a claimant's eligibility list and would not exceed the pay that each claimant would have received if promoted to police sergeant on his or her presumptive appointment date. (*Id.* ¶¶ 23, 26.)

### b. Job–Relatedness and Consistency with Business Necessity

The second step in the disparate impact analysis is that the employer may defend the claim through a showing that the practice is "job related for the position in question and consistent with business necessity." *N. Hudson Reg'l Fire & Rescue,* 665 F.3d at 476–77 (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). For this portion of the test, the United States relies on the expert report and testimony of Dr. David P. Jones ("Jones"). (*See generally* Decl. of David P. Jones, Ph.D., appended to Br. Supp. Prov. Entry, Ex. 3 ("Jones Decl.").)

Jones is President and CEO of Growth Ventures, Inc., a human capital advisory firm. (*Id.* ¶ 1.) He holds a Ph.D. in Industrial/Organizational Psychology from Bowling Green University, and he has been involved in developing promotional examinations for the position of police sergeant. (*Id.*) He has previously served as an expert witness in cases regarding employment selection and promotion. (*Id.*)

Drawing on professional principles and standards, Jones's report explains that a promotional procedure's job relatedness

and consistency with business necessity "depends on the manner in which the procedure is used to make promotional decisions," and that to demonstrate validity, an employer must show that "the procedure is valid for making the kinds of employment decisions the employer wishes to make." (*Id.* ¶¶ 3–4.) He notes that the State has argued only that the written exam is supported by evidence of content validity. (*Id.* ¶ 5.)

To establish that the use of a written examination is content valid, the State would need to satisfy four elements. (*Id.*) First, the State must show that "[a] suitable job analysis of police sergeant position has been conducted, providing information regarding the job's important tasks, the tasks' relative importance, and the knowledge, skills, and abilities required to perform the tasks." (*Id.* ¶ 5(a).) Second, the State must demonstrate that it exercised "[r]easonable competence ... in constructing the exam, including the involvement of individuals qualified to undertake and participate in creating the exam." (*Id.* ¶ 5(b) .) Third, the examination's content must be "both (i) related to the content of the job, a requirement focusing in the specific knowledge, skills, and abilities addressed, and their connection with information produced by the job analysis; and (ii) representative of the content of the job, a requirement that the exam not leave unaddressed any major parts of the job's knowledge, skill, and ability requirements." (*Id.* ¶ 5(c).) Last, the examination must be scored in a manner that "usefully selects from among candidates who can better perform the job, including a showing of sound justification for pass versus fail cut-off scores, and rank-ordered use of candidate scores." (*Id.* ¶ 5(d).) Jones's description of the requirements for content validity is consistent with the EEOC's Uniform Guidelines on Employee Selection Procedures, to which courts have previously deferred when considering arguments of content validity. *See Vulcan Pioneers, Inc. v. N.J. Dep't of Civil Serv.,* 832 F.2d 811, 814–15 (3d Cir.1987); 28 C.F.R. §§ 50.14(14)(C), (15)(C).

**\*14** Jones first states that the New Jersey's police sergeant examination is based on an analysis that does not comport with professional requirements. (*Id.* ¶ 6.) Specifically, the State based its job analysis on a 1996 questionnaire that asked questions regarding the job's most important tasks and most important knowledge, skill, and ability requirements; the State distributed the questionnaire to 578 police sergeants from 147 police departments, with each asked to make 750 ratings judgments. (*Id.* ¶ 6(a).) When reviewing the conclusions of the questionnaire results, the State did not review the results to determine whether the responding

officers were actually representative of the overall population of sergeants. (*Id.* ¶ 6(b).) Ultimately, only 57% of rural police departments returned a questionnaire, compared to 84% of urban police departments. (*Id.*) The State did not examine the extent of agreement in the job analysis data, thus making it unclear whether different sergeants might have identified substantially different tasks and knowledge, skill, and ability requirements as important to the job. (*Id.*) Moreover, after 59 tasks and 85 knowledge, skill, and ability requirements were parsed from the questionnaire results, 11 police sergeants were asked to make 5,000 ratings judgments in less than eight hours to determine the extent to which knowledge, skill, and ability requirements were necessary to perform each task effectively. (*Id.* ¶ 6(c).)

In addition, Jones concludes that the police sergeant examination was not designed in a manner consistent with professional standards for content validity. (*Id.* ¶ 7.) He points out that the State's decision to utilize a multiple-choice, written examination curtailed the type of information that could be tested, thus rendering many important knowledge, skill, and ability requirements "not testable." (*Id.* ¶ 7(a)-(b).) Additionally, the State never created test plans to indicate which tasks and knowledge, skill, and ability requirements were to be tested and how many questions would be dedicated to each; rather, "the State identified only four general work components to be measured, and the relative weight to be given each work component." (*Id.* ¶ 7(c).)

On the third element of content validity, Jones finds that the examination "fails to meet standards of representativeness because it does not reflect the range of job requirements identified during the course of the job analysis process." (*Id.* ¶ 8.) Thus, even if the job analysis process were valid, the conversion of that analysis into the examination fell short of professional standards. The principal problem is that the State's 1996 Validation Report "does not document the [subject matter experts'] input in the exam development process, instead describing a process where test questions were developed by consensus." (*Id.* ¶ 8(b).) The result is the absence of a structured process and the inability to determine whether the exam measures what it was actually intended to measure. (*Id.* ¶ 8(b)-(c).) The State only once, in 2004, identified the task or knowledge, skill, and ability requirement that each question was designed to measure; in that instance, "[o]f the 90 questions related to the 'supervise patrol' work component, a full 30 percent were related to the same task" out of 27 possible tasks, and 14 of the 27 tasks within that work component were not tested at all. (*Id.* ¶ 8(e).)

Many important aspects of the job went entirely untested, especially those aspects requiring personal interaction and communication skills, as those types of issues are largely untestable in a multiple-choice examination. (*Id.* ¶ 8(f).)

**\*15** Jones last notes that the use of "pass-fail qualification" and "rank-ordering of candidates in descending rank order based in large part on exam scores, do not usefully distinguish among candidates more and less qualified to perform the job." (*Id.* ¶ 9.) The State provided the United States with "no analysis or documentation to establish that the pass versus fail cut-off scores established for its written exam bear any relationship to identifying more versus less qualified candidates," despite the existence of professionally recognized techniques for doing so. (*Id.* ¶ 9(a).) The State instead "deferr [ed] to an approach that attempts to establish a cut-off score for each exam that meets the Uniform Guidelines' referenced ′80 percent rule′ for identifying disparate impact." (*Id.* ¶¶ 9(a)-(b).) The Court considers this point critical because it demonstrates that the State determined the passage rate for the police sergeant examination based not on job-related criteria designed to determine whether an applicant is actually qualified for the position, but on the goal of avoiding a disparate impact lawsuit like this one. The State has "offered no evidence to support this rank-order use of the written exam, along with minor consideration of seniority." (*Id.* ¶ 9(d).)

Jones concludes that alternative selection procedures exist that could serve the State's needs while avoiding the risk of disparate impact. (*Id.* ¶ 10.) Specifically, multiple-choice exams are "among the most likely to introduce group-based disparate impact, as compared to other assessment formats" such as "oral board reviews, assessment center approaches, job simulation, etc." (*Id* . ¶ 10(a).) Such approaches can be valid and also result in less disparate impact, and they are already being used in many jurisdictions. (*Id.* ¶ 10(b)-(c).)

The Court finds Jones's report and testimony persuasive. He outlines not only the standards for content validity, but also the manner in which the State failed to comply with those standards when designing the police sergeant examination. Although the State took steps to determine important job functions through the use of the questionnaire, it neglected to conduct many of the essential follow-up procedures necessary to ensure a fair test. Also notable is that the State apparently never took steps to ensure the validity of the test by having current sergeants take it to check their scores against their actual performance, or by going back to

assess whether sergeants promoted under the test actually had job performances that tracked their test results. Moreover, as discussed above, the threshold for passing the examination apparently bore no relation to the minimal standards for serving as a police sergeant and was instead predicated on ensuring that enough minority candidates passed to avoid a violation of the 80 percent rule. Thus, the Court finds that the United States has produced ample evidence to demonstrate that it has a strong case against the State for a claim of disparate impact.

### c. *Ricci v. DeStefano*

**\*16** Many objectors note factual parallels between this case and *Ricci v. DeStefano,* 129 S.Ct. 2658 (2009), and argue that *Ricci* should serve as a barrier to the relief requested here. Indeed, this reference was ubiquitous enough that the United States dedicated a portion of its presentation at the initial fairness hearing to distinguishing *Ricci* from the present case (Tr. 49:18–58:13) and one of the objectors who appeared at the fairness hearing specifically asked how this case can be distinguished from *Ricci* (*Id.* 179:17–23).

### i. The *Ricci* Facts and Holding

In *Ricci,* 118 New Haven firefighters took promotion examinations, with results showing that white candidates outperformed minority candidates. 129 S.Ct. at 2664. This caused a "rancorous" public debate in which many minority firefighters threatened litigation if the test results were used while white firefighters threatened litigation if they were not. *Id.* The City of New Haven ("the City") decided to discard the test results, and white and Hispanic firefighters who would have likely been promoted filed suit, asserting disparate treatment. *Id.* The district court granted summary judgment for the City. *Ricci v. DeStefano,* 554 F.Supp.2d 142 (D.Conn.2006). The Second Circuit affirmed. *Ricci v. DeStefano,* 530 F.3d 87 (2d Cir.2008). In a seven-to-six vote, the Second Circuit declined to rehear the case en banc. *Ricci v. DeStefano,* 530 F.3d 88 (2d Cir.2008). The Supreme Court granted certiorari. *Ricci v. DeStefano,* 129 S.Ct. 893 (2009); *Ricci v. DeStefano,* 129 S.Ct. 894 (2009).

In its opinion, the Supreme Court first noted that because the City made the decision to discard the results solely out of concern that they would lead to the promotion of too many white candidates and not enough minority candidates, it ran afoul of disparate treatment principles unless a defense applied. *Ricci,* 129 S.Ct. at 2673. The City argued that a "good-faith belief that its actions are necessary to comply

Case 1:19-cv-14766-RMB-JBC     Document 786-1     Filed 12/22/25     Page 24 of 34
PageID: 37498
U.S. v. New Jersey,, Not Reported in F.Supp.2d (2012)
2012 WL 3265905

with Title VII's disparate-impact provision should be enough to justify race-conscious conduct," while the plaintiffs argued that it should never "be permissible for an employer to take race-based adverse employment actions in order to avoid disparate-impact liability." *Id.* at 2674–75. Finding a balance between the two positions, the Court held that an employer may not make a race-based decision for the purpose of avoiding disparate impact liability "absent a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision." *Id.* at 2676. The Court added that although an employer may take affirmative efforts "to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made," that does not mean an employer may "invalidate ... test results, thus upsetting an employee's legitimate expectation not to be judged on the basis of race" without a "strong basis in evidence of an impermissible disparate impact," because such an action "amounts to the sort of racial preference that Congress has disclaimed ... and is antithetical to the notion of a workplace where individuals are guaranteed equal opportunity regardless of race." *Id.* at 2677.

**\*17** Applying this test, the Court first noted that statistical evidence demonstrated that the examination had a disparate impact on African American test-takers. *Id.* at 2677–78. But the Court held that merely demonstrating the prima facie case "and nothing more ... is far from a strong basis in evidence that the City would have been liable under Title VII had it certified the results" because the City could still avoid liability through the application of the second and third parts of the disparate impact analysis. *Id.* at 2678. The City had "turned a blind eye to evidence that supported the exams' validity" and the record was devoid of any indication that other, equally valid and less discriminatory tests were available. *See id.* at 2678–81.

### ii. Applicability to this Case

The United States argues that *Ricci* is not applicable because "the State did not take 'race-based action' " but rather "entered into a consent decree designed to provide remedial relief only to victims of discrimination," and that even if *Ricci* were applicable, "the United States has submitted more than sufficient evidence to establish a 'strong basis in evidence' to support the relief sought in the Decree." (Br. Supp. Final Entry 9.)

The Court is satisfied that there exists "a strong basis in evidence that the test was deficient," and that the State's decision to enter the consent decree "is necessary to avoid

violating the disparate-impact provision." *See Ricci,* 129 S.Ct. at 2676. In *Ricci,* a public uproar arose and the City took a preemptive step of voiding test results in order to ward off a potential disparate impact suit. Here, by contrast, the State defended the test through a nearly two-year investigative period and then defended this case for a year and a half before agreeing to enter the consent decree. In other words, the agreement behind the consent decree was not prompted by the fear of litigation. Rather, it was a calculated decision based on an evaluation of significant evidence, including expert reports and depositions. Moreover, the evidence of disparate impact discrimination is stronger than it was in *Ricci.* Siskin's testimony addresses the first prong of disparate impact discrimination through evidence of statistical disparity, and Jones's testimony takes the extra step, absent in *Ricci,* of showing that the State is unable to demonstrate the job-relatedness and business necessity of the police sergeant selection procedure, particularly in light of more accurate alternatives in use in other jurisdictions. Accordingly, *Ricci* poses no bar to the relief afforded under the consent decree.

### 3. Facial Neutrality

A recurring theme in the objections is that the examination had an objective scoring system and all applicants had an equal opportunity, regardless of race, to prepare for and to take the test. For example, a Jersey City officer submitted a written objection that stated:

**\*18** All candidates for the examination had study materials available to them and accessible to them in a non-discriminatory and transparent [manner]. Thus, there is no evidence of the United States allegations of disparate impact discrimination. Each person taking this examination no matter what race you are has had the same opportunities to excel. I put countless hours of studying and sacrifice for the prior examination. The score I received put me [in] the position of 131 on the Sergeants list. There were numerous Hispanics and African Americans who scored better than me and if the need for Sergeants arose they would be promoted first. They would be promoted first not because of their race but because they put the effort in to excel. I would commend these men and women just like I would any other person who put in the hard work.

(Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 266 .)

Similarly, an officer in the Paterson Police Department wrote, in an objection echoed by many others, that he objects "to

Case 1:19-cv-14766-RMB-JBC   Document 786-1   Filed 12/22/25   Page 25 of 34
PageID: 37499
U.S. v. New Jersey,, Not Reported in F.Supp.2d (2012)
2012 WL 3265905

being bypassed by candidates who failed to invest the same time and effort in preparing for the sergeant's exam as I did." (Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 269.) Several objectors who appeared at the initial fairness hearing also emphasized the equality of opportunity in taking the examination. (*See* Tr. 117:11–119:19, 121:2–122:10, 134:22–135:6, 136:25–137:21.)

Taking the sergeant's examination is a significant event in the careers of many dedicated police officers and those who take it make financial and personal sacrifices. But this point does not address the pertinent legal inquiry in disparate impact claims. As discussed above, to show disparate impact, a complaining party must "demonstrate[ ] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent [must] fail [ ] to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." *N. Hudson Reg'l Fire & Rescue,* 665 F.3d at 476 (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). Therefore, under disparate impact theory, "[i]f an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited." *Id.* (quoting *Griggs,* 401 U.S. at 431).

The objectors raise a fair question by asking how the test could be discriminatory when all applicants are provided an equal opportunity to take it. But sensible as that inquiry sounds, it is not the inquiry that the law demands. As the Supreme Court stated when it first recognized a claim based on disparate impact:

> Congress has now provided that tests or criteria for employment or promotion may not provide equality of opportunity merely in the sense of the fabled offer of milk to the stork and the fox. On the contrary, Congress has now required that the posture and condition of the job-seeker be taken into account. It has—to resort again to the fable —provided that the vessel in which the milk is proffered be one that all seekers can use. The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

**\*19** *Griggs,* 401 U.S. at 431.

A statistical showing that a "facially neutral standard" results in a "significantly discriminatory hiring pattern" will establish a prima facie case of disparate impact under Title VII, at which point any defense must focus upon job relatedness and business necessity. *N. Hudson Reg'l Fire & Rescue,* 665 F.3d at 476–77; *see also Lewis,* 129 S.Ct. at 2197–98 ("[A] plaintiff establishes a prima facie disparate-impact claim by showing that the employer *'uses* a particular employment practice that causes a disparate impact' on one of the prohibited bases." (citing *Ricci,* 129 S.Ct. at 2672–73)). "By enacting § 2000e–2(k)(1) (A)(i), Congress allowed claims to be brought against an employer who uses a practice that causes disparate impact, whatever the employer's motives and whether or not he has employed the same practice in the past. If that effect was unintended, it is a problem for Congress, not one that federal courts can fix." *Lewis,* 130 S.Ct. at 2200.

And so, once a statistical disparate impact is demonstrated, the question is not whether the applicant could have somehow overcome the predicate for that impact, but rather whether the test is job related and consistent with business necessity. As Jones's report explained, a great deal of evidence indicates that the current sergeant's exam is invalid. If the examination is invalid, then it does not matter whether more effort could have resulted in a better performance.

Siskin provided a helpful example. He explained that if the sergeant's examination consisted solely of a test of how many push-ups an applicant could perform in a given time period, it would be possible for an applicant to practice and perform excellently on the examination. (*See* Tr. 122:14–123:14.) If a disparate impact resulted, however, it would be no defense for the employer to say that each employee had an equal opportunity, because a push-up test has absolutely no correlation with the ability of an applicant to perform the job for which the test is given. (*Id.*) Although the sergeant's examination in this case is far more closely tethered to the job for the position of police sergeant, it, like the hypothetical push-up examination, falls short of providing an accurate means of determining whether an applicant is the best candidate for police sergeant. *See El,* 479 F.3d at 240. Therefore, the absence of discrimination on the face of the examination does not defeat the claim of disparate impact because the relevant inquiry at this stage is not whether those applicants who failed could have conceivably taken more effort in preparing for the exam, but rather whether the State is capable of demonstrating that the examination given was appropriate for its purpose. As Jones's report explains, it was not, and the objections on the grounds of facial neutrality must be overruled.

**4. Conclusion as to the Merits**

The State continues to deny that it violated Title VII, and the limited record does not provide a basis for concluding whether Title VII has actually been violated. But the Court's task at this time is only to determine whether the terms of the decree are fair, adequate, reasonable, and otherwise consistent with federal law. The United States has presented reports from two expert witnesses, both of whom fielded questions at the initial fairness hearing. Siskin's report and testimony indicate that the United States is capable of demonstrating a statistical disparate impact, and Jones's report and testimony indicate that the State would be unable to rebut that disparate impact with a showing that the examination is job related and consistent with business necessity. The Court finds the experts' testimony sufficient to address concerns that the relief afforded in the decree is without an underlying evidentiary basis. It is therefore not unfair, unreasonable, or inconsistent with federal law to require the State to take steps to remedy the discrimination alleged in the complaint.

**C. Proposed Relief**

*20 The next question is whether the relief provided in the consent decree is fair, adequate, reasonable, and consistent with federal statutory and constitutional law. As noted above, the consent decree provides numerous forms of relief. The most substantial relief can be generally divided into the following categories: (1) the requirement that ten jurisdictions obtain pre-approval before certifying candidates for promotion; (2) back pay to claimants; (3) priority promotions for eligible claimants in thirteen jurisdictions; and (4) the creation of a new examination for future administrations.

**1. Pre–Approval**

Under the decree, the State is enjoined from using "current eligible lists as part of its selection procedure for police sergeant" in ten municipalities that Siskin identified as jurisdictions in which continued use of the existing eligible list "may result in disparate impact on African American and/or Hispanic candidates." (Second Am. Consent Decree ¶ 16.) These ten jurisdictions are Atlantic City, Camden, Irvington, Jersey City, Passaic, Paterson, Pleasantville, Salem City, Teaneck, and Trenton. (*Id.* Ex. D.) Until the current lists expire, the State must provide certification requests to the United States for approval prior to certifying candidates. (*Id.* ¶ 16.) The United States shall then, through its expert, determine "whether the requested certification(s) would create an additional African American or Hispanic shortfall in that jurisdiction." (*Id.*)

Under Title VII, a court may enjoin a defendant from continuing to engage in an unlawful employment practice, and once a pattern or practice of discrimination is established, the exercise of that authority to put an end to continued discrimination is wholly proper. *See* 42 U.S.C. § 2000e–5(g)(1); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 361 (1977). The potential scope of this authority can be seen in this very case. The original consent decree entered on September 15, 2011 would have barred the ten jurisdictions described above from continuing to use their current promotion lists at all. (Consent Decree ¶ 16.) By contrast, the second amended consent decree only prevents the State from certifying promotions to police sergeant if those promotions would worsen the shortfall of African Americans or Hispanics for those jurisdictions. It also bears noting that although the United States could have potentially sought to freeze all promotions to sergeant for any civil service jurisdiction in the state, it agreed to limit the pre-approval requirement to those jurisdictions in which Siskin determined an additional shortfall to be most probable. Such remedial action, which ensures that the examination results are not used to worsen already-existing disparities, is inherently reasonable.

A group of 13 police officers from the Atlantic City Police Department submitted objections through counsel, arguing that Atlantic City should be exempt from the consent decree. (*See* Br. Supp. Final Entry, App'x E, Exhs. 79, 121, 125, 127, 177, 209, 224, 229, 296, 420, 423, 425, 465.) They point out that Atlantic City has 13 police sergeant vacancies, and that of the top 13 officers on the present list, three are African Americans (ranked sixth, ninth, and eleventh) and two are females; they further point out that females are "more of a minority in the law enforcement profession than African Americans and Hispanics combined." (*E.g.,* Objection at 2–3, appended to Br. Supp. Final Entry, App'x E, Exh. 79.) In substance, the objectors argue that the present list "exceeds the very criteria that the Department of Justice is seeking to obtain by the passing of this Second Amended Consent Decree," and that "[r]uling this present Atlantic City Police Department Sergeant list invalid would be a complete injustice not only to its candidates, but also to the citizens of Atlantic City." (*E.g., id.* at 5.) The Atlantic City objectors further suggest that the possibility of pre-approval does not overcome this unfairness and unreasonableness "because the municipalities involved may choose not to undertake the

exceptions allowed, but instead take the easy way out and simply let the current list expire. (*E.g., id.* at 6.)

**\*21** The Court is not persuaded that the decree is unreasonable as applied to Atlantic City. The present eligibility list has not been suspended or canceled. Rather, the decree provides that certifications may ensue from Atlantic City's current list only if those certifications would not result in an increase in Atlantic City's shortfall. If the objectors are correct and certifications from the current list will not further the shortfall, then the decree will not hinder its continued use. Even though African Americans and women did well on this examination and are now poised for promotion from the present list, the decree does not scuttle those promotions. It merely requires certainty that Atlantic City's shortfall not worsen as a result of any requested certifications.

### 2. Back Pay

The consent decree provides collective back pay of $1,000,000 for claimants in jurisdictions with a shortfall of at least one expected African American or Hispanic. Some objectors complain that this is inadequate because officers in certain jurisdictions are excluded from back pay relief altogether. Some other objectors who are entitled to relief have complained that the amount the settlement designates for back pay is inadequate. For example, an African American officer in Kearny wrote that he has taken and passed the sergeant examination three times, and that despite New Jersey's "long and Storied History of Hiring and Promotional discrimination against its African–American and Hispanic Citizens," he is not considered a claimant eligible for back pay or priority promotion. (Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 25; *see also* Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 86 (objection of another African American officer in Kearny stating same grounds).) Kearny's shortfall is such that although Hispanic candidates may be eligible for back pay, African Americans are not, and neither African Americans nor Hispanics are eligible for priority promotions there. (*See* Second Am. Consent Decree, Ex. A.)

At the initial fairness hearing, Brian F. Curley, Esq., appearing on behalf of an Irvington police officer, raised concerns over whether the $1,000,000 pool would be adequate. He noted that if the matter were fully litigated, the State would face the risk of having to pay much more back pay, and he argued that the settlement may have been preferential to the State at the expense of claimants, especially given the strong case he believed the United States presented and the number of

claimants whose relief will come solely from back pay. (Tr. 103:16–104:15, 195:14–196:3.) Similarly, a retired Newark officer expressed concern that back pay alone would not constitute adequate compensation in light of the expenses that many claimants incurred in taking the tests and forgoing outside employment. (*Id.* 159:19–160:11, 162:17–163:8.) He also noted that the back pay award does not account for the missed opportunities in terms of additional promotions that could have been obtained after becoming a sergeant. (*Id.*) Partially echoing this sentiment, another African American officer from an unspecified jurisdiction discussed not only extra costs incurred and opportunities forgone, but also the absence of any relief in terms of additional retirement benefits for claimants who took the examination but were never promoted. (*Id.* 163:19–164:7.)

**\*22** Lines are inevitably drawn when a settlement provides tiered relief. Although the record demonstrates this to be a strong case, that does not guarantee that the United States would have obtained the maximum relief available under Title VII had the case gone to trial. The Court's task here is to determine whether the settlement is fair, reasonable, adequate, and consistent with federal law. *See City of Alexandria,* 614 F.2d at 1361; *City of Miami,* 614 F.2d at 1333; *United States v. New Jersey,* 1995 WL 1943013, at \*11. The United States and the State reached an agreement in which limited back pay is made available only to claimants in jurisdictions with a shortfall of at least one. Such a decision is neither unreasonable nor inequitable; to the contrary, it targets the back pay remedy exclusively to officers in jurisdictions where a statistically discernible disparate impact exists, ensuring relief in the most affected jurisdictions. While retirement benefits are not addressed, again, the settlement is a product of arms-length negotiation, and the omission of retirement benefits from monetary relief is practical under the circumstances. The settlement extends relief to many affected claimants, and when taken in conjunction with the other relief afforded in the decree, the Court is satisfied that the totality of the relief afforded is adequate.

Accordingly, the Court finds that the back pay award is appropriate. Further, the exclusion of retirement benefits from this relief represents practical line-drawing with regard to the scope of settlement benefits available.

### 3. Priority Promotions with Retroactive Seniority

The most controversial aspect of the consent decree is the authorization of priority promotions in 13 jurisdictions, which has drawn reaction from some officers concerned that they

will be put at an unfair disadvantage through no fault of their own, and has similarly drawn reaction from potential claimants in non-priority-promotion jurisdictions who seek something more than just back pay and an opportunity to take a new test in the future. Four general themes are expressed: (1) that priority promotions affect the rights of those who out-perform the claimants on future tests; (2) that the limitation of priority promotions to 13 jurisdictions is too restrictive; (3) that the list of claimants attached to the decree is, in some places, incorrect or outdated; and (4) that priority promotions will result in the promotion of unqualified persons.

**a. Unfairness to Non–Claimants**
A common objection is that the use of priority promotions is unfair to those test takers who work hard, pass the new and fair examination, and then are bypassed in favor of candidates they outperformed. A subset of these objections comes from already-promoted sergeants who are concerned that the use of retroactive seniority might harm their prospects of future promotion.

An officer in the Paterson Police Department, in an objection filed by counsel and echoed by other objectors from Paterson, states that he: "will be wrongly bypassed by any priority promotion candidate who is promoted ahead of [him] on the next exam"; "object[s] to the fact that priority promotion candidates will be promoted ahead of others no matter how they score on the new exam"; and "object[s] to the fact that we are granting priority promotions to candidates scored lower than others on an otherwise fair and unbiased exam." (Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 1, ¶¶ 3–5.) Similarly, a sergeant in the Jersey City Police Department provided a detailed description of all the monetary and time commitments that were necessary for him to take the examination. (Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 36.) He believes that the examination was nondiscriminatory and that the retroactive promotions therefore constitute discrimination against him. (*Id.*) An officer in the Elizabeth Police Department notes that the consent decree provides six overall priority promotions for his jurisdiction and that as a result, when the next test is administered, he "can be the highest scoring candidate and have the number 1 score in the state and be promoted number seven in Elizabeth because of the priority promotion list." (Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 196.)

**\*23** Along with these written objections, similar concerns were raised at the initial fairness hearing. One suggested that the system constituted "reverse discrimination." (Tr. 137:15–21.) One police officer argued that it would be one thing if the remedy were simply to "[w]ipe the slate clean," but that after taking into account priority promotions and promotions of sergeants demoted for budgetary reasons, no matter how well he performs on the next examination, it is possible that the best placement he can achieve on the promotion list is thirty-fifth. (*Id.* 173:22–174:15; *see also* 173:3–7.) A sergeant expressed concerns that priority promotions could cause animosity between races within police departments. (*Id.* 185:12–187:24.)

Under the terms of the consent decree, eligible claimants who pass the new examination may be placed ahead of these objectors on promotional lists. Some objections overstate the role that race plays in priority promotions, as priority promotions are limited only to those applicants who: qualify as claimants under the terms of the decree; work in one of the 13 enumerated jurisdictions; and pass the new examination. Nevertheless, the objectors correctly state that race is a necessary prerequisite to eligibility for priority promotions.

The priority promotions are nonetheless consistent with federal statutory and constitutional law. As the Supreme Court has observed, "in enacting Title VII of the Civil Rights Act of 1964, Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin." *Franks,* 424 U.S. at 763. To that end, Congress provided courts equitable discretion to provide the relief necessary to effectuate Title VII's purpose of "mak[ing] persons whole for injuries suffered on account of unlawful employment discrimination." *Id.* (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418 (1975)). Congress intended courts to use this power robustly, so "that persons aggrieved by the consequences and effects of the unlawful employment practice [may] be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." *Id.* at 764 (citation omitted; alteration added).

In essence, Title VII considers the eradication of discrimination to be an utmost priority, and when discrimination exists, courts enjoy substantial equitable power to put parties into the position that they would have held absent the discriminatory treatment. And notably, the Supreme Court has affirmed retroactive seniority as a form of relief even in the face of potential harm to nonvictims, holding that "sharing of the burden of the past discrimination

Case 1:19-cv-14766-RMB-JBC    Document 786-1    Filed 12/22/25    Page 29 of 34
PageID: 37503
U.S. v. New Jersey,, Not Reported in F.Supp.2d (2012)
2012 WL 3265905

is presumptively necessary" and "entirely consistent with any fair characterization of equity jurisdiction, particularly when considered in light of our traditional view that '[attainment] of a great national policy ... must not be confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies.' " *See id.* at 776–78 (quoting *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 188 (1941)). This does not, of course, mean that courts are powerless to limit their exercise of that authority when appropriate for equitable reasons. "[T]he extent to which the legitimate expectations of nonvictim employees should determine when victims are restored to their rightful place is limited by basic principles of equity." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 374–75 (1977). This is especially true when "practical realities and necessities" make it necessary to "reconcil[e] competing interests ... to determine the 'special blend of what is necessary, what is fair, and what is workable.' " *Id.* (quoting *Lemon v. Kurtzman,* 411 U.S. 192, 200–01 (1973) (opinion of Burger, C.J.)); *see also Romasanta,* 717 F.2d at 1156.

**\*24** In this situation, the Court finds that the consent decree's priority promotion arrangement strikes an appropriate balance. It provides a ceiling on priority promotions to ensure that they do not exceed the number of African Americans or Hispanics who would have been expected to be promoted absent the disparate impact, and it provides those promotions only in the 13 jurisdictions in which the shortfall consists of at least three African Americans or Hispanics. In other words, the relief is narrowed to such a point that it has an impact on only those jurisdictions in which the examination's disparate impact has been most profound. To be sure, this leads to the unavoidable outcome that race will be a factor in administering promotions. However, the Supreme Court has held that such relief is legal, constitutional and appropriate when the racial consideration is necessary to remedy a past instance of discrimination. *Wynant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277–78 (1986). And such make-whole relief is the core of the consent decree. Disparate impact discrimination is premised on the idea that certain practices, even though facially neutral, deprive minority groups of the ability to compete fairly in the workplace. *See, e.g., Griggs,* 401 U.S. at 431. The relief afforded here is not designed to provide an arbitrary preference based on race. Rather, it arose out of careful examination of the outcomes of past examinations and through evaluations of where the disparate impact of the previous examinations was most profound, and it makes whole the qualified claimants who constitute the most probable victims of the disparate impact. Thus, given the very measured nature of the priority promotions, the Court

finds that the objections do not overcome the legitimacy of the remedy under Title VII's disparate impact framework. Moreover, the law is too evolved for the Court to find that the only permissible remedy is that the State must not do it again in the future. Some accommodation must be made to place officers in the position where they would have been if no disparate impact had occurred, and the consent decree's priority promotion compromise is a reasonable one.

### b. Insufficient Priority Promotions

At the opposite end of the spectrum, another set of objectors argues that the priority-promotion relief is rendered inadequate by the limitation of such promotions to jurisdictions with a shortfall of three or more.

An officer from the Irvington Police Department wrote through counsel that "the settlement will have virtually no application to the Town of Irvington," as Irvington "has continued to operate using the flawed 2009 exam as the basis for promotions." (Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 72.) He argues that "the settlement as framed does not appear to be applied uniformly and consistently." (*Id.; see also* Tr. 100:22–104:18.)

Similarly, the attorney for Hamilton police officers submitted objections based on Hamilton's exclusion from the priority promotions provision. (*See* Br. Supp. Final Entry, App'x E, Exhs. 101, 205, 447.) As he explained, Hamilton is a township in central New Jersey with a population of 88,464. (*E.g.,* Objection at 4, App'x E, Exh. 101.) The police department consists of 170 officers, only six of whom are African American. (*Id.*) The objectors submit that "[w]hen considering the history and lack of minority representation in a supervisory capacity, it is unthinkable that priority promotions in Hamilton would not be included in the Consent Decree." (*Id.* at 5.) In discussing this history, the objectors note: that there have been only seven African American police officers in Hamilton history; that it was not until 1994 that two African American officers served concurrently; and that no African American has ever held a supervisory position in the township's police force. (*Id.*) Because the consent decree does not limit Hamilton's present ability to promote from the existing list, and because it will take time before a new list can be developed, the decree "will keep any new promotions from joining the supervisor ranks for years to come." (*Id.* at 6.) The objectors argue that priority promotions should be spread evenly across all affected jurisdictions and that the United States should have required all jurisdictions to cease using the present eligibility lists under the decree. (*Id.* at 5–

Case 1:19-cv-14766-RMB-JBC   Document 786-1   Filed 12/22/25   Page 30 of 34
PageID: 37504
U.S. v. New Jersey,, Not Reported in F.Supp.2d (2012)

2012 WL 3265905

6.) The Hamilton objectors' counsel supplemented the written objections with a statement at the initial fairness hearing. (*See, e.g.,* Tr. 146:8–153:2, 154:13–156:4.)

**\*25** These are substantial objections and reflect the unintended but inevitable consequences of settlement, where lines are drawn as a matter of necessity. The State has not admitted liability, and the parties are entitled to some leeway in crafting the terms of a settlement. The practical decision to limit priority promotions to those jurisdictions with shortfalls of three or more serves the twofold purpose of affording the strongest relief only to those jurisdictions most affected by the examination's disparate impact while also limiting the disruptive effects of priority promotions. Recognizing the frustration, the Court still does not find the limitations unreasonable, especially where the decree provides objectors with the opportunity to pursue back pay claims and to take a new, fairer examination.

### c. Administrative Aspects

A third set of objections related to priority promotions addresses administrative issues, such as misidentified or absent claimants in the list of claimants appended to the Second Amended Consent Decree. For example, objections from the Bridgeton Police Department noted that their department is allocated five priority promotions and that of the five claimants named in Attachment C, one is retired, one has passed away, and three have transferred to other departments. (*See, e.g.,* Br. Supp. Final Entry, App'x E, Exhs. 23, 24.) Suffice it to say that although the consent decree provided a tentative list of claimants, that list is subject to change as the process continues to the individual relief fairness hearing and approval of a Final Relief Awards List.

dditionally, one objector served as a police officer in a jurisdiction in which priority promotions were available but has since transferred to a jurisdiction without priority promotion entitlement. (*See* Objection, appended to Br. Supp. Final Entry, App'x E, Exh. 40.) Because it is highly individualized, that officer's issue is better reserved for the individual relief fairness hearing.

### d. Qualifications

Some objectors expressed concerns that priority promotions will result in the promotion of officers unqualified to serve as police sergeants. The consent decree squarely confronts this threat by providing that no priority promotion can ensue if the applicant does not pass the new examination that the State

will develop pursuant to the consent decree. (*See* Second Am. Consent Decree ¶¶ 61–62, 64.)

### 4. New Examination

At the initial fairness hearing, objectors spoke against the suggested framework for a new examination and in favor of the present multiple-choice format, which they feel is fairer because of its objectivity. (Tr. 129:18–130:1, 131:17–132:8, 136:12–19.)

In response, Jones testified about how the present examination fell short and how a new examination could be more useful. The problem with the current examination is that it disregards certain qualities such as leadership, or tests them in a rigid, academic manner. (*Id.* 132:9–12.) Although a "face-to-face exercise" could obviously never be identical to experience in the field, it would serve as a "better measure," as can be ascertained from "the evidence that we pulled together, where people who behave in certain ways going through these simulations, when you go down the road, two, three, four, five years, and look at how they performed in the field." (*Id.* 132:9–22.) From past experience, Jones attests, there is evidence that these face-to-face tests "make far better predications of how you really behave than if you answer a paper and pencil multiple choice question." (*Id.* 132:24–133:3.)

**\*26** On the issue of objectivity, Jones explained that situational testing can call for a "right answer," a "better answer," "middle answer," and a "poor answer," so that it is possible to "structure that exercise so that if somebody says a certain thing in an answer you could evaluate that." (*Id.* 125:5–10.) He added that when testing is based on observations of a candidate, judges are trained what to look for, and "[y]ou hold them to the consistent rules when they make those evaluations" by having more than one judge assess a candidate's performance and by training judges through practice sessions and exercises to ensure that the tests are graded consistently and reliably. (*Id.* 125:11–25.) Objectivity is not only ensured at the front end, but also by going back, reviewing examination scores, and confirming consistency among the reviewing judges' scores of an applicant's performance. (*Id.* 126:1–11.)

Even if the current examination is wholly objective and capable of simple determinations of whether an answer is correct or incorrect, these qualities alone do not ensure an accurate measure of whether an applicant is qualified to serve as a police sergeant. As Jones explained, a supervisory

position includes many skills relating to leadership and decisionmaking that are not easily measured in multiple-choice format. Jones has demonstrated that there are means in existence that are more nuanced and ultimately more accurate than the present examination, and that methods exist to ensure that those examinations are scored in an objective and consistent manner. Accordingly, the Court finds that the consent decree's requirement that the State develop a new examination for future administrations is reasonable and fair.

### D. Miscellaneous Objections

There were two additional objection categories that do not fit into the overall discussion of the case's merits and relief. The first argument is that the notice provided to affected parties was insufficient or inadequate, and the second argument contends that the parties improperly concealed information from affected non-parties in a manner that stifled their ability to object to the decree.

### 1. Notice

When parties to a Title VII claim enter a consent judgment, the judgment may not be subject to collateral attack under the Constitution or federal civil rights laws if the challenger had "actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order." 42 U.S.C. § 2000e–2(n)(1). Due process requires "notice and an opportunity for hearing," so that a person has "an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (citations omitted). For due process purposes, notice need not be actual but must be "reasonably calculated, under all the circumstances, to apprise the interested parties of the pendency of the action and afford them the opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

**\*27** The two objectors who submitted objections citing notice issues obviously attained the actual notice necessary to satisfy both due process and Title VII. The objections relating to this matter—which come from different objectors but appear to be identical in substance—speak only to unspecified other officers, asserting that "several police officers who passed the most recent promotional exam administered by the service ... were not required to be served with notice as per

the terms of the Decree." (*See* Br. Supp. Final Entry, App'x E, Exhs. 58, 240.)

The notice provided here was adequate. The decree mandated widespread notice through several means. First, notice was provided through U.S. mail to each claimant. (Second Am. Consent Decree ¶ 21(a).) Second, notice was provided to each police sergeant as an attachment to or enclosure with a paycheck or notice of electronic deposit. (*Id.* ¶ 21(b).) Third, notice went through the U.S. mail to each appointing authority in each civil service jurisdiction, and "to each union or association recognized as being authorized to represent police sergeants in such local jurisdiction and to police officers in the local jurisdictions" in which pre-approval is required for use of present lists or for which priority promotions will be available. (*Id.* ¶ 21(c).) Further, in terms of constructive notice, the consent decree required that notice be posted on the NJCSC's website and appear "in newspapers or other widely-disseminated media" for 14 days. (*Id.* ¶¶ 22–23.) As discussed in detail in the State's presentation at the initial fairness hearing, the State complied with these notice requirements with very favorable results. (*See* Tr. 30:8–37:3.) Thus, the notice scheme was thorough and detailed enough that it would be reasonably expected to provide affected individuals with the notice necessary to satisfy due process.

### 2. Discovery

Some objectors contend that they did not receive sufficient information about the terms of the settlement. For example, the Paterson officers seeking to intervene in this case filed a motion, which the Court denied as premature, seeking to compel discovery, citing a dearth of available information. (*See generally* Br. Supp. Mot. Compel Discovery.) An officer from the Hackensack Police Department objected in writing through counsel, alleging a lack of full disclosure based on references to various interrogatories and depositions that do not appear on the docket.

Although "[i]t is well-settled that there exists ... a common law public right of access to judicial proceedings and records," and although that right "envisions a pervasive common law right to inspect and copy public records and documents, including judicial records and documents," the public right of access extends only to "judicial records." *See In re Cendant Corp.,* 260 F.3d 183, 192 (3d Cir.2001) (citations and quotation marks omitted). A document is a "judicial record" if it "has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings," such as if a court

Case 1:19-cv-14766-RMB-JBC    Document 786-1    Filed 12/22/25    Page 32 of 34
PageID: 37506
U.S. v. New Jersey,, Not Reported in F.Supp.2d (2012)
2012 WL 3265905

"interprets or enforces the terms of that document, or requires that it be submitted to the court under seal." *Id.* See also *United States v. Kushner,* 349 F.Supp.2d 892, 902 (D.N.J .2005) (Linares, J.) ("A document becomes integrated into court proceedings when, for example, it is 'placed under seal, interpreted or enforced by the Court." (citing *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 781 (3d Cir.1994)).

 **\*28** In this case, the Court is not privy to any evidence and does not rely on any evidence beyond that which is disclosed on the public docket. The only portion of the record placed under seal is a portion of the deposition of D. Hill which the United States cited in its motion for provisional entry of the decree; the seal was limited to permitting redaction of Hill's home address and phone number. (*See* Mot. Seal. (D.E.42); Order to Seal (D.E.43); *see also* D.E. 39 (redacted version of deposition transcript).) Moreover, to the extent the objectors appear to suggest that they should be entitled to conduct discovery of their own, such a system would be unworkable, as it would create unmanageably wide open litigation. In this case, the parties submitted expert reports to support their motion for the consent decree to be provisionally entered, and those experts later appeared at the initial fairness hearing, where they answered the questions of any objector with something to ask. (*See generally* Tr. 98:24–143:10.) The Court thus finds no support for the objectors' claim that they were entitled to more information in advance of the initial fairness hearing.

### E. Findings on Settlement Terms

The Court finds that although the objections made were thoughtful and well-articulated, none warrants a decision to reject the consent decree as written. For the reasons stated above, the Court finds that the settlement is reasonable, fair, adequate, and consistent with federal law.

### IV. Motion for Intervention

As discussed above, on February 9, 2012, 27 police officers employed by the City of Paterson ("movants") submitted a motion for intervention as of right. [D.E. 57.] The Court heard oral argument at the initial fairness hearing, and for the reasons that follow, denies the motion as untimely.

### A. Motion to Intervene Framework

The movants seek to intervene as of right due to their interest in the "property or transaction that is the subject of the action." (Br. Supp. Mot. Intervene 2.) *Federal Rule of Civil*

*Procedure 24(a)(2)* states: "On timely motion, the court must permit anyone to intervene who: ... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede movant's ability to protect its interest, unless existing parties adequately represent that interest." The Third Circuit utilizes a four-element test to determine whether to grant a motion for intervention as of right: the litigant "must establish: '1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests." *In re Pet Food Prods. Liab. Litig.,* 345 F. App'x 857, 860 (3d Cir.2009) (quoting *Liberty Mut. Ins. Co. v. Treesdale, Inc.,* 419 F.3d 216, 220 n. 4 (3d Cir.2005)); *see also Neidig v. Rendina,* 298 F. App'x 115, 116 (3d Cir.2008); *Kleissler v. United States Forest Serv.,* 157 F.3d 964, 969 (3d Cir.1998). A motion to intervene as of right cannot be granted unless each of these elements is satisfied. *In re Pet Food Prods. Liab. Litig.,* 345 F. App'x at 860 (citing *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.,* 72 F.3d 361, 366 (3d Cir.1995)).

### B. Timeliness

 **\*29** The United States argues that movants should not be permitted to intervene because their motion to intervene is untimely. (Br. Opp. Movants Mots. 9–13.) The determination of whether a motion to intervene is timely is based on a totality of the circumstances. *In re Cmty. Bank of N. Va.,* 418 F.3d 277, 314 (3d Cir.2005); *In re Fine Paper Antitrust Litig.,* 695 F.2d 494, 500 (3d Cir.1982). Factors to be considered include "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *In re Cmty. Bank of N. Va.,* 418 F.3d at 314 (citing *Mountain Top Condo. Ass'n,* 72 F.3d at 369). "[S]ince in situations in which intervention is of right the would-be intervenor may be seriously harmed if he is not permitted to intervene, courts should be reluctant to dismiss a request for intervention as untimely, even though they might deny the request if the intervention were merely permissive." *Mountain Top Condo. Ass'n,* 72 F.3d at 369 (quoting *7C Wright, Miller & Kane, Federal Practice & Procedure* § 1916, at 424 (1986)).

### 1. The Stage of the Proceeding

"The mere passage of time ... does not render an application untimely." *Id.* As discussed above, the complaint was filed

Case 1:19-cv-14766-RMB-JBC    Document 786-1    Filed 12/22/25    Page 33 of 34
PageID: 37507

on January 7, 2010. The parties submitted a joint motion for provisional entry of a consent decree on August 1, 2011. The Court entered the initial consent decree, without a fairness hearing date, on September 15, 2011. The Court entered the first amended consent decree on November 2, 2011. The Court entered the second amended consent decree on November 22, 2012. The second amended consent decree set the date for the initial fairness hearing as March 12, 2012, and required objections to be postmarked no later than 45 days prior to the initial fairness hearing, or January 27, 2012. (Second Am. Consent Decree ¶¶ 19, 24.) On February 9, 2012 that movants filed their motion to intervene. Thus, the movants filed their motion to intervene at a point in which the decree had been entered, notice had been dispensed, the time for objections had closed, and the initial fairness hearing was on the horizon.

### 2. Prejudice That Delay May Cause Parties

"[T]he stage of the proceeding is inherently tied to the question of the prejudice the delay in intervention may cause to the parties already involved." *Mountain Top Condo. Ass'n, 72 F.3d at 370.* Here, the parties had not only completed discovery and arrived at a proposed consent decree, but they also bore the administrative burdens incumbent with giving notice to parties in advance of the fairness hearing. The basis of the parties' present arrangement is at least partially contingent on the racial breakdowns of the current eligibility lists. Intervention even for the limited purpose of crafting a new agreement would require restructuring of the consent decree, new notice, a new fairness hearing. This unwelcome result after all the notice given requires a very strong reason for the failure to intervene earlier.

### 3. The Reason for the Delay

**\*30** When assessing the reason for the delay, "to the extent that the length of time an applicant waits before applying for intervention is a factor in determining timeliness, it should be measured from the point at which the applicant knew, or should have known, of the risk to its rights." *Mountain Top Condo. Ass'n, 72 F.3d at 370* (quoting *United States v. Alcan Aluminum, Inc., 25 F.3d 1174, 1183 (3d Cir.1994)*). A review of the movants' certifications reveals that of the 27 movants: one learned of the consent decree on an unspecified day in August 2011; 21 learned of the consent decree on September 14, 2011; two learned of the consent decree on September 15, 2011; one learned of the consent decree on September 16, 2011; one learned of the consent decree on an unspecified date in October 2011; and one learned of the

consent decree on October 22, 2011. (*See* Movants' Br. Supp. Mot. Intervene, Exh. 3.) Thus, most of the movants received actual notice in mid-September 2011, with the last receiving actual notice sometime in October 2011. The movants did not submit any explanation in their briefs for why they waited until February 9, 2012 to file their motion to intervene. At oral argument, movants' attorney's explanation was based on the costs, financial and otherwise, of litigating sooner. (Tr. 94:14–22 .) Based on the circumstances of this case and how far the litigation had progressed by the time the movants file their motion, this explanation for the delay is inadequate.

### 4. Totality of the Circumstances

Taking these factors together, the Court finds that the motion to intervene is untimely. The movants attained actual knowledge of the consent decree as early as August 2011, and no individual movant learned of the consent decree later than October 2011. Despite this knowledge, the movants waited until February 9, 2012—about five months after the first movant learned of the consent decree and over three months after the last movant learned of it—to file the motion to intervene. This delay is unusually long. *See, e.g., Mountain Top Condo. Ass'n, 72 F.3d at 370* (motion to intervene filed 37 days after intervenors "learn[ed] that their interests were in jeopardy"); *Alcan Aluminum, Inc., 25 F.3d at 1183* (motion to intervene filed 43 days after intervenors "became aware of the potential risk to their contribution claim"); *Rowe v. E.I. Dupont De Nemours & Co.,* No. 06–1810, 2011 WL 3837106, at *2, 4 (D.N.J. Aug. 26, 2011)* (Bumb, J.) (motion to intervene filed less than two months after receiving notice). *But see Hemy v. Perdue Farms, Inc.,* No. 11–888, 2011 WL 6002463, at *7 (D.N.J. Nov. 30, 2011)* (Wolfson, J.) (noting that five-month delay was abnormally long but that intervention was not untimely because suit was "still in its infancy").

The length of the delay is especially significant in light of how far the litigation had progressed by the time that movants filed their motion. Permitting intervention would have a real-world impact in that it would disrupt the administration of a consent decree negotiated over a lengthy period of time following extensive discovery. It would undo months of work, including not only the provisional entry of the decree, but also the subsequent distribution of notice and processing of objections. Against this backdrop is the absence of any compelling explanation for why movants waited until just over a month before the initial fairness hearing to submit this motion. The timeliness inquiry focuses on the prejudice the parties would suffer if an intervenor were permitted to join the

litigation at the point intervention was first sought. Regardless of the reasons that movants disagree with the consent decree, the record demonstrates that they were aware of it for some time, yet sat on their rights until the process reached a point at which intervention would scuttle much of the progress that the parties made toward settling.

**\*31** The availability of an opportunity to object has no effect on the Court's analysis of whether intervention is permissible, *see* 42 U.S.C. § 2000e–2(n)(2)(A), but the Court notes that although movants' motion for intervention is denied, they had a voice in this process. Movants each submitted timely objections to the consent decree, which the Court has considered carefully. (*See* Br. Supp. Final Entry, App'x E, Exhs. 18, 29, 34, 74, 75, 95, 96, 106, 111, 112, 131, 138, 194, 199, 234, 262, 263, 281, 321, 332, 342, 352, 358, 365, 410, 412, 413.) Movants' counsel appeared at the initial fairness hearing and presented arguments, and two movants personally addressed the Court to express their personal concerns with regard to the consent decree.

### C. Conclusion as to Intervention

For the foregoing reasons, the motion to intervene is denied as untimely.

### V. Conclusion

The parties' resolution of the issues reflects a conscientious and careful settlement, reached after lengthy litigation. The nature of the issues, not surprisingly, engendered strong objections. Applying well-settled authority, the Court finds that the United States and the State have arrived at a settlement that is fair, adequate, reasonable, and consistent with the law. For the reasons discussed in this opinion, the motion for final entry is granted and the motion for intervention is denied. Appropriate orders will be entered with this opinion.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 3265905

---

### Footnotes

1   The United States has suggested that the fairness of a consent decree should be evaluated through reference to the factors set forth in *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975), which in this circuit provides the standard for final approval of a class action settlement. (*See, e.g.,* Br. Supp. Prov. Entry 17.) However, although the *Girsh* factors provide some initial guidance, they do not supply the ultimate analytical framework for this type of case. First, some of the factors, such as "the risks of maintaining the class action through trial" and "the reaction of the class to the settlement," are simply inapplicable, as there is no "class" in this case of which to speak. Second, and more importantly, while the *Girsh* factors focus on the fairness of a settlement to the class, they contain no provision for fairness to third parties; here, by contrast, most of the objections to the decree have come from officers who are not intended beneficiaries of the settlement.

2   At the initial fairness hearing, counsel for the United States stated that total back pay owed could be as much as $7,000,000. (Tr. 184:8–9.)

---

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.