**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs (Additional Counsel Listed Below)*
By:    Gwen Farley
       Deputy Attorney General
       Attorney ID No. 000081999
       Ph. (609) 376-2740
       Gwen.Farley@law.njoag.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> E.I. DU PONT DE NEMOURS AND COMPANY, et al., <br><br> Defendants. | Case Nos. 1:19-cv-14758-RMB-JBC, <br> 1:19-cv-14765-RMB-JBC, <br> 1:19-cv-14766-RMB-JBC, <br> 3:19-cv-14767-RMB-JBC <br><br> Hearing Date: January 7, 2026 |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE JUDICIAL CONSENT ORDERS WITH SETTLING DEFENDANTS AND RESPONSE TO BRIEFS OF *AMICI CURIAE*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................1

ARGUMENT ................................................................................6

    I.    AMICI'S SPECULATION ABOUT WORST CASE SCENARIOS DOES NOT MERIT REJECTING THE PROPOSED SETTLEMENTS IN LIGHT OF AMICI'S HEAVY BURDEN AND THE DEFERENCE OWED TO GOVERNMENTAL SETTLEMENTS. ...............................6

        A.    The Nature of Settlements Is Compromise. ...............................7

        B.    Amici Overestimate the Future Cost for POTWs to Address PFAS in Wastewater and Biosolids. ..........................10

        C.    Amici Base Their Concerns on Hypothetical Future Scenarios. ...............................................................17

        D.    These JCOs Are Not the Only Sources of Funding Available to Wastewater Facilities. ...........................21

    II.    AMICI'S EFFORTS TO CAST DOUBT ON THE STATE'S AUTHORITY TO RELEASE POLITICAL SUBDIVISION CLAIMS DO NOT WARRANT REJECTING THE SETTLEMENTS OR MODIFYING THEM TO EXCLUDE POLITICAL SUBDIVISIONS. ...............................................23

        A.    Neither New Jersey's Courts Nor Its Legislature Have Found the Attorney General's Entrance Into the Tobacco MSA Releasing Claims of Political Subdivisions Improper. ...............................................................24

        B.    Amici Fail to Counteract Compelling Law Regarding the State's Parens Patriae and Broad Settlement Authority. .........25

        C.    The Settlements' Structure Allows for Future Resolutions Regarding Application of the Releases. ....................33

i

III.   NONE OF AMICI'S REMAINING GRIEVANCES RENDER
       THE SETTLEMENTS UNFAIR OR UNREASONABLE. ..............34

       A.    The Settlements were published with ample notice, and the
             Department carefully considered and responded to all
             comments received..................................................................34

       B.    These Settlements will not impair the ability of DLAs to
             carry out their statutory duties. ...............................................37

CONCLUSION .......................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alaska Sport Fishing Ass'n v. Exxon Corporation*,
   34 F. 3d 769 (9th Cir. 1994) ........................................................30

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982)..........................................................26, 27, 32

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997)...........................................................24, 32, 33

*Broselow v. Fisher*,
   319 F.3d 605 (3d Cir. 2003) ........................................................27

*City of New York v. Exxon Corp.*,
   697 F. Supp. 677 (S.D.N.Y. 1988) .................................................6

*Commonwealth ex rel. Krasner v. Attorney General of Commonwealth*,
   309 A.3d 265 (Pa. Commw. Ct. 2024) ........................................31

*Georgia v. Tenn. Copper Co.*,
   206 U.S. 230 (1907)........................................................................26

*Hackensack Riverkeeper, Inc. v. N.J. Department of Environmental Protection*,
   128 A.3d 749 (N.J. Super. Ct. App. Div. 2015) .....................29, 30

*Halifax Hospital Medical Center v. Office of the Attorney General*,
   393 So. 3d 1253 (Fla. Dist. Ct. App. 2024).................................34

*Harris v. City of Philadelphia*,
   137 F.3d 209 (3d Cir. 1998) ..........................................................9

*Hojnowksi v. Vans Skate Park*,
   901 A.2d 381 (N.J. 2006) .............................................................25

*Homeowners Ass'n v. Woodmont Builders, L.L.C.*,
   655 F. Supp. 2d 473 (D.N.J. 2009)...............................................20

*Howell Twp. v. Waste Disposal Inc.*,
   504 A.2d 19 (N.J. Super. Ct. App. Div. 1986) .....................27, 28

*In re Certified Question from U.S. Dist. Ct. for E. Dist. of Mich.*,
   638 N.W.2d 409 (Mich. 2002) .................................................24, 28, 31

*In re D.C.*,
   679 A.2d 634 (N.J. 1996) .............................................................27

*In re KFI Wind-Down Corp.*,
   No. 23-10638 (LSS) (Bankr. D. Del. Nov. 8, 2023) .....................8

*Macedo v. Dello Russo*,
   840 A.2d 238, 242 (N.J. 2004) ....................................................25

*Miller v. D.C. Water & Sewer Auth.*,
   No. 17-cv-0840 (KBJ), 2018 WL 4762261 (D.D.C. Oct. 2, 2018),
   *aff'd*, 790 F. App'x 218 (D.C. Cir. 2019) ..................................................18

*N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*,
   183 A.3d 289, 305 (N.J. Super. Ct. Law Div. 2015) ..................................36

*New York v. Panex Indus., Inc.*,
   No. 94-CV-0400E(H), 2000 WL 743966 (W.D.N.Y. June 6, 2000) ...........6

*People ex rel. Devine v. Time Consumer Marketing*,
   782 N.E.2d 761 (Ill. App. 2002) ................................................................31

*Rowe v. E.I. DuPont De Nemours & Co.*,
   Nos. 06-1810 (RMB/AMD), 06-3080 (RMB/AMD), 2011 WL 3837106
   (D.N.J. Aug. 26, 2011) ..............................................................................37

*Sashihara v. Nobel Learning Cmtys., Inc.*,
   219 A.2d 1070 (N.J. Super. Ct. App. Div. 2019) ......................................26

*State v. City of Dover*,
   891 A. 2d 524 (N.H. 2006) .................................................................30, 34

*State ex rel. Dep't of Health v. N. Jersey Dist. Water Supply Comm'n.*,
   317 A.2d 86 (N.J. Super. Ct. App. Div. 1974) ..........................................29

*Susko v. Borough of Belmar*,
   206 A.3d 979 (N.J. Super. Ct. App. Div. 2019) ........................................30

*United States v. Unimatic Mfg. Co.*,
   No. 2:20-cv-17284, 2021 WL 1811651 (D.N.J. May 6, 2021) ....................6

*Wagner v. Mayor of Newark*,
   132 A.2d 794 (N.J. 1957) ..........................................................................28

**Statutes**

42 U.S.C. § 6903(27) ......................................................................................18

42 U.S.C. § 6972(a)(1)(B) ..............................................................................18

42 U.S.C. § 9613(f)(2) ....................................................................................19

N.J.S.A. 13:1D-9 .............................................................................................27

N.J.S.A. 40:14B-20 ...................................................................................28, 29

N.J.S.A. 40:43-1 ..............................................................................................28

N.J.S.A. 52:17A-4c ....................................................................................28, 31

N.J.S.A. 58:10-23.11a .....................................................................................29

N.J.S.A. 58:10-23.11b ................................................................18

N.J.S.A. 58:10-23.11e2 ...........................................................35

N.J.S.A. 58:10-23.11f .............................................................19

N.J.S.A. 58:10A-5a ................................................................29

N.J.S.A. 58:10A-5e ................................................................28

N.J.S.A. 58:12A-6 ..................................................................29

**Regulations**

40 C.F.R. § 261.4(a) ...............................................................18

N.J.A.C. 1:30 *et seq.* ...............................................................11

N.J.A.C. 7:1-1.5(a) .................................................................37

N.J.A.C. 7:14-8.2 ..................................................................37

N.J.A.C. 7:14A-19.1(a) ...........................................................12

N.J.A.C. 7:1D *et seq* ...............................................................11

N.J.A.C. 7:9B-1.5(e) ...............................................................12

N.J.A.C. 7:9B-1.6(d) ...............................................................12

N.J.A.C. 7:9B-1.8 ..................................................................11

N.J.A.C. 7:9B-1.9 ..................................................................11

**Other Authorities**

*Biolargo's AEC Technology Breaks New Ground In PFAS Water Treatment*,
    Innovation News Network (July 30, 2025),
    https://www.innovationnewsnetwork.com/biolargos-aec-technology-
    breaks-new-ground-in-pfas-water-treatment/60224/ ..................................16

Doug Peterson, *Public Health And Parens Patriae: How Attorneys General
    Can Preserve State's Exclusive Litigation Authority* 28 (Wash. Legal
    Found., Working Paper No. 236, July 2025), https://www.wlf.org/wp-
    content/uploads/2025/07/7.16.2025-peterson-wp-full-copy.pdf .................34

Hiroko Tabuchi, *3m To Pay New Jersey Up To $450 Million For Drinking-
    Water Contamination*, N.Y. Times, May 13, 2025,
    https://www.nytimes.Com/2025/05/13/Climate/3m-Pfas-Forever-
    Chemical-Lawsuit-Water-New-Jersey.Html; ..................................34

Hiroko Tabuchi, *Chemical Makers To Pay N.J. $875 Million To Settle
    'Forever Chemicals' Claims*, N.Y. Times, Aug. 4, 2025,
    https://www.nytimes.com/2025/08/04/climate/new-jersey-pfas-

settlement.html............................................................................................35

*In Re Aqueous Film-Forming Prods. Liability Lit.*, 2:18-mn-2873-RMG (MDL)......................................................................................................8

N.J. All. For Action, *Passaic Valley Sewerage Commission Invests In Its Aging Infrastructure*, https://allianceforaction.com/passaic-valley-sewerage-commission-invests-in-its-aging-infrastructure/ .........................17

N.J. Dep't of Env't Prot., *Request For Information* (Apr. 22, 2021), https://dep.nj.gov/wp-content/uploads/dwq/pdf/pfas_dla_letter_20210422.pdf. ...........................20

N.J. Dep't of Env't Prot., *Local Agency Pretreatment Program*, https://dep.nj.gov/dwq/wastewater/pretreatment/local-agency-pretreatment-program/ ................................................................................37

N.J. Dep't of Env't Prot., *NJ Sludge Management Methods 2023*, https://dep.nj.gov/wp-content/uploads/dwq/sludgeproductiondata2023-final-02-27-2025.pdf.....15

N.J. Dep't of Env't Prot., Administrative Order No. 2023-01 (Jan. 17, 2023), https://dep.nj.gov/wp-content/uploads/dwq/pdf/pfas/pfas_ao_2023_01_pfas_wastewater_data_sharing.pdf (Last Accessed Dec. 20, 2025). ......................................2, 20

Sydney Cromwell, *Maine Was First To Ban Spreading PFAS-Contaminated Sludge On Farmland. Now Sludge Is Filling Up Landfills,* Inside Climate News (Nov. 24, 2025), https://insideclimatenews.org/news/24112025/maine-landfill-pfas-contamination/ ..............................................................................15

Tonya Chandler & Sam Liao, *Treating PFAS-Laden Waste Using Aqueous Electrostatic Concentration*, Journal AWWA (Jan./Feb. 2025), https://doi.org/10.1002/awwa.2391 ...........................................................16

U.S. EPA, *PFAS Enforcement Discretion And Settlement Policy Under CERCLA* (April 19, 2024) https://www.epa.gov/system/files/documents/2024-04/pfas-enforcement-discretion-settlement-policy-cercla.pdf................................19

Water Systems PFAS Liability Protection Act, H.R. 1267, 119th Cong. (2025)......................................................................................................18

Yahoo! Finance, NYSE - *NASDAQ Real Time Price*, The Chemours Company (CC), https://finance.yahoo.com/quote/cc/key-statistics/ (last visited Dec. 22, 2025). ...........................................................................................8

Plaintiffs New Jersey Department of Environmental Protection (the "Department" or "NJDEP"), the Commissioner of the Department, and the Administrator of the New Jersey Spill Compensation Fund (collectively, "Plaintiffs" or the "State") respectfully submit this reply in further support of their Motion to Approve Judicial Consent Orders with Settling Defendants (ECF 746) ("Motion") and in response to the opposition briefs of *amici curiae* National Association of Clean Water Agencies ("NACWA") (ECF 769) and Association of Environmental Authorities of New Jersey and Seven Authorities ("AEA") (ECF 771) (NACWA and AEA together, "Amici").[1]

## **PRELIMINARY STATEMENT**

In the twenty years since DuPont first disclosed to the Department that PFAS were being discharged in New Jersey, the State has undertaken a comprehensive effort to study the impacts of PFAS chemistry, to publish and implement risk-based standards to protect human health and the environment in New Jersey, to regulate the discharges of PFAS across the state, to issue statewide directives to the manufacturers of PFAS in New Jersey, and to aggressively litigate several cases addressing significant PFAS sources across the state. Through the 3M and DuPont

---

[1] As used herein, "State Br." refers to ECF 746-1, "NACWA Br." refers to ECF 769, and "AEA Br." refers to ECF 771. Unless otherwise stated, docket citations refer to Case No. 1:19-cv-14766-RMB-JBC (Chambers Works). All other abbreviations used herein have the same meaning as set forth in the Motion.

JCOs, the State is now on the cusp of finalizing a pair of historic Settlements with sweeping relief and benefits for all of New Jersey. The Settlements will ensure the clean-up of contaminated sites, compensate the public for natural resource damages, and provide significant financial assistance across the State. With resolution close to the finish line, three groups of objectors have emerged seeking to prevent approval of the Settlements: two towns seeking intervention, two counties seeking the same, and two trade organizations, NACWA and AEA, that have filed *amicus* oppositions. This reply responds to AEA's and NACWA's *amicus* oppositions. For the reasons set forth below, these oppositions should not prevent approval of the Settlements for the benefit of the State's people, environment, and natural resources.

To start, the State agrees with Amici that addressing PFAS in wastewater is an important priority for New Jersey. That is why, over the course of the last five years, the Department has taken concrete steps to promote the evaluation and proactive reduction of sources of PFAS in wastewater. The Department has issued an Administrative Order dedicated to this very issue,[2] and has participated in numerous meetings with stakeholders to discuss potential solutions. Now, as part of the Settlements, the State has secured up to $795 million in PFAS abatement

---

[2] N.J. Dep't of Env't Prot., Administrative Order No. 2023-01 (Jan. 17, 2023), *available                    at*                    https://dep.nj.gov/wp-content/uploads/dwq/pdf/pfas/pfas_ao_2023_01_pfas_wastewater_data_sharing.pdf (last visited Dec. 20, 2025) ("AO 2023-01").

funding—on top of $365 million in natural resource damages recoveries—that can be used to assist publicly owned treatment works ("POTWs").

Amici criticize the Settlements for providing insufficient funding for POTWs and for releasing POTWs' potential claims against the Settling Defendants for PFAS contamination. The State respectfully disagrees with Amici's views and the implication that these objections render the Settlements unfair, unreasonable, unfaithful to the objectives of the Spill Act, and against the public interest.

In short, Amici engage in Monday morning quarterbacking without proposing realistic alternatives. Amici overlook that the fundamental nature of settlements is compromise. They appear to demand nothing less than full payment on all possible categories of expenses and damages, exclusively recovered from these particular Settling Defendants. They present no analysis of the many hurdles they would face—procedural, substantive, temporal, or financial—in pursuing these claims against these Defendants. They downplay the massive commitments and broader financial risk the Settling Defendants took on through agreeing to these Settlements.

As discussed below, the State submits that Amici largely rely on speculation to generate hypothetical, worst-case financial scenarios in an effort to argue the insufficiency of the Settlement recoveries. In service of that speculation, Amici rely on flawed assumptions about the implications of the to-be-proposed Surface Water Quality Standards ("SWQSs") for PFAS, and tout unsupported, generalized

3

statewide cost estimates that are, in any event, unreasonable to expect from any one settlement. For example, NACWA cites to one wastewater utility's $5 billion cost estimate for wastewater treatment "improvements" to treat PFAS. That estimate, on its own, is ***roughly one-half*** of 3M's settlement to resolve the claims of public water systems to treat PFAS ***in the entire country*** ($10.5 to $12.5 billion) and almost ***four times more*** than DuPont's settlement with public water systems nationwide ($1.2 billion). AEA's $20 to $50 billion estimate to treat wastewater in New Jersey, of course, dwarfs those nationwide settlements to treat public drinking water.

Amici similarly raise hypothetical scenarios speculating that they will be continuously subject to contribution actions under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and New Jersey Spill Compensation and Control Act ("Spill Act") and deprived of their claims to seek contribution from 3M and DuPont. But, again, Amici overstate risk in service of their argument. Both statutes already have a measure of protection related to "sewage," and as New Jersey's Congressional Representatives noted on December 18, 2025: "since the Superfund listings for PFOA and PFOS went into effect[] [the] claim they would lead to a flood of liability lawsuits against municipal entities have simply not materialized." Castello Decl. Ex. A. Even so, federal legislators are likely to continue to explore an exemption for wastewater operators. Just as important, POTWs simply never had strong contribution claims against 3M

4

and DuPont as sellers of PFAS—they stand to lose little from the contribution protection provided here to 3M and DuPont.

Amici's attempts to narrow the State's authority to release their claims through the Settlements also fall flat. The State has already entered into a statewide settlement containing a similar release of municipal claims in the past. And Amici's efforts to argue that the State's *parens patriae* authority is constrained by common law or statute fails.

None of Amici's remaining grievances warrant denial of the Settlements, which are patently reasonable. The Settlements included robust notice followed by a public comment period and thorough responses from the Department. Efforts to demonstrate that the Settlements are not procedurally fair—particularly those rooted in mere disagreement with the substance of the Department's response to particular comments—do not pass muster. Likewise, Amici still have not explained how these Settlements interfere with any duties of delegated local agencies.

Finally, Amici suggest that these Settlements can simply be revised to exclude POTWs and then be consummated by the parties. Of course, that is just not the case. These Settlements are comprehensive—cleaving a category of public entities from the statewide resolution would scuttle the hard-fought agreements and deprive the rest of the State of an estimated $2.5 billion in public health and environmental benefits.

5

## **ARGUMENT**

**I.    AMICI'S SPECULATION ABOUT WORST CASE SCENARIOS DOES NOT MERIT REJECTING THE PROPOSED SETTLEMENTS IN LIGHT OF AMICI'S HEAVY BURDEN AND THE DEFERENCE OWED TO GOVERNMENTAL SETTLEMENTS.**

Amici "carry a heavy burden in opposing judicial approval of settlements, inasmuch as the State's negotiated consent decrees are presumptively valid." *New York v. Panex Indus., Inc.*, No. 94-CV-0400E(H), 2000 WL 743966, at *1 (W.D.N.Y. June 6, 2000) (citations omitted). In addition to this presumption, the "standard of review applied by the district court in reviewing CERCLA [and Spill Act] consent decrees is deferential," and the "NJDEP, as a government actor committed to protection of the public, is also afforded deference for its decision to enter into settlements negotiated on behalf of the public interest." *United States v. Unimatic Mfg. Co.*, No. 2:20-cv-17284 (KSH) (CLW), 2021 WL 1811651, at *2 (D.N.J. May 6, 2021); *see also City of New York v. Exxon Corp.*, 697 F. Supp. 677, 692 (S.D.N.Y. 1988) (presumption in favor of settlement "particularly where 'a government agency committed to the protection of the public interest' has participated in and endorsed the agreement" (citation omitted)).

With that standard in mind, the Court should reject Amici's argument that the Settlements should not be approved in their current form because the abatement funding recovered through the Settlements is insufficient. The State carefully considered potential risks and benefits prior to agreeing to the Settlements, and

6

Amici's assertions as to future costs are speculative and hyperbolic.

## A.    *The Nature of Settlements Is Compromise.*

Amici criticize the sufficiency of the Settlements without appropriately accounting for the weighing of interests that go into any settlement, particularly ones of this magnitude. The State has been addressing PFAS across New Jersey for twenty years—including aggressively pursuing 3M and DuPont over the last six years—and absent these settlements, had years of litigation ahead with uncertain outcomes and no guarantee of success. *See* State Br. at 17, 38, 50, 56.

Amici also downplay the real risk that PFAS liabilities can push a company into insolvency.[3] While NACWA acknowledged that "it would be impractical to expect the chemical manufacturers . . . to fully pay for their environmental remediation and treatment," NACWA Br. at 7, that acknowledgement is distinctly at odds with its argument that the Settlements must fully compensate utilities (at hypothetically enormous amounts). *Id.* at 18. In negotiating the Settlements, however, the State had to confront the hard truth that the Settling Defendants cannot fully remedy the entire scope of the PFAS problem in New Jersey, nationally, or

---

[3] AEA cites to a comment by an executive of DuPont Specialty Products ("DSP"). AEA Br. at 33. DSP is one of six DuPont Settling Defendants, was only named in the Chambers Works and Parlin cases, and is responsible for only the remediation and RFS for the Parlin site. DSP is not responsible for any portion of the Settlement Payments. *See* DuPont JCO ¶ 8.

7

globally.[4]

The risk of PFAS-related insolvency is not merely hypothetical; it was borne out by the bankruptcy of Kidde-Fenwal, Inc.[5] New Jersey and other plaintiffs and courts have to consider this reality in the context of PFAS settlements as well. Judge Richard Gergel in the District of South Carolina acknowledged as much in considering the class action settlements of these same defendants with public water systems: "There's not enough money in the private sector to pay for this [PFAS cleanup]." *In re Aqueous Film-Forming Prods. Liability Litigation*, 2:18-mn-2873-RMG, ECF 4262 at 29:21-23 ("AFFF MDL").[6]

It is in neither the public interest nor the interest of any individual plaintiff to bankrupt these companies; their continued operation provides continued funding of the required cleanup. This concept underpins the Settlements' structured payment

---

[4] For example, Chemours's market capitalization over the last year has averaged around $2 billion, while it remains a defendant in thousands of lawsuits nationwide and globally. *See* Yahoo! Finance, NYSE - Nasdaq Real Time Price, The Chemours Company (CC), https://finance.yahoo.com/quote/CC/key-statistics/ (last visited Dec. 22, 2025).

[5] Kidde-Fenwal, Inc. ("KFI") manufactured PFAS-containing aqueous film-forming foam ("AFFF") and retained historic liability for certain AFFF products. KFI filed for Chapter 11 bankruptcy on May 14, 2023. *See In re KFI Wind-Down Corp.*, No. 23-10638 (LSS) (Bankr. D. Del. Nov. 8, 2023). Over 18 months later, that bankruptcy remains ongoing with no plan of liquidation yet approved by the court.

[6] *See also id.* at 25:4-11 (noting the "risk . . . of having parties go into bankruptcy"), 30:10-13 ("the Kidde bankruptcy was a wake-up call for everybody, that this is a very real threat"); AFFF MDL, ECF 4452 at 15:2-4 ("I don't think it's in the interests of anyone to push 3M into bankruptcy."); State Br. at 48-49.

schedules and the layers of structural protections among the Settling Defendants to ensure that these Defendants—and not the public—pay what is estimated to cost well over $1 billion in remediation costs on top of over $1 billion in abatement funding and natural resource damages.

Amici do not provide any support for the proposition that any utility provider will achieve a better result as a percentage of the costs they are going to incur—because such a promise would be impossible. Nor can AEA succeed on its request that this Court modify the Settlements as AEA sees fit. AEA Br. at 53-55.[7] *See Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d Cir. 1998) ("A court should not later modify the decree by interposing terms not agreed to by the parties or not included in the language of the decree."). Rather, that would lead to the rejection of the Settlements and *no* funds being made available, resulting in ratepayers bearing the entire cost. As a representative of the public interest, the State balanced the above risks. On the whole, the guarantees of remediation and substantial payments benefit the State and its public more than years of protracted litigation and continued uncertainty.

---

[7] AEA further demands that the State must provide an estimate for what the Settling Defendants would have paid in the absence of the release provisions. AEA Br. at 3. Such an estimate would be purely speculative; that would be a different agreement with different material terms. The State need not provide estimates for every possible formulation the Settlements could have taken during the negotiations.

**B.**    ***Amici Overestimate the Future Cost for POTWs to Address PFAS in Wastewater and Biosolids.***

**i.    Amici's dire predictions about to-be-proposed SWQSs ignore the regulatory process and real-world implementation.**

Much of Amici's argument is premised on their contention that a future final rule imposing new SWQSs for certain PFAS will require POTWs to imminently treat all wastewater and biosolids to completely remove PFAS. *See* AEA Br. at 30–32; NACWA Br. at 9–10.

As explained in the Department's responses to comments, the anticipated SWQSs have yet to be adopted. *See* State Br. Ex. B at 6–7 (Resp. to Comment No. 8); *id.* Ex. C at 5 (Resp. to Comment No. 6). Contrary to Amici's assumptions, SWQSs for PFAS—if adopted—will not automatically result in the inclusion of water quality-based effluent limitations in New Jersey Pollutant Discharge Elimination System ("NJPDES") permits.[8] Nor is it certain that end-of-pipe treatment to remove all PFAS from wastewater streams will be required. *See* State Br. Ex. B at 6 (Resp. to Comment No. 8); *id.* Ex. C at 5 (Resp. to Comment No. 6). Before POTWs could be required to comply with any new SWQSs, those SWQSs must (1) be promulgated, (2) go into effect, and (3) be used to establish water quality-based effluent limits that are incorporated into each POTW's NJPDES permits.

---

[8] NJPDES Discharge to Surface Water permits authorize the discharge of wastewater to surface water including domestic wastewater from POTWs.

POTWs thus would have time to come into compliance with any SWQSs. Amici also ignore the opportunities for them to (1) weigh in with their cost-related concerns during both the regulatory process and the permit implementation process and (2) work with the Department to obtain flexibility in the timing for compliance and funding through the New Jersey Water Bank.

First, the proper forum to address Amici's concerns with any proposed SWQSs or water quality-based effluent limitations calculated using those SWQSs is within the required public notice-and-comment process under the New Jersey Administrative Procedure Act ("APA").[9] *See generally* N.J.A.C. 1:30 *et seq.*; *id.* 7:1D *et seq*. The Department must consider and respond to any comments it receives, and it may also provide an opportunity for participation in a public hearing.

Second, after any new SWQSs are adopted, the Department will work with POTWs in achieving the water quality-based effluent limitations ultimately incorporated into their NJPDES permits. In addition, an individual discharger, including a POTW, may seek a modification to water quality-based effluent limitations on a case-by-case basis to accommodate adverse social or economic impact. *See* N.J.A.C. 7:9B-1.8; *id.* 7:9B-1.9. And once a NJPDES permit is finalized,

---

[9] Amici also raise concerns about future air quality standards for PFAS. The State has not proposed air quality standards that include PFAS limitations. If that process occurs at any time in the future, it will likewise be subject to the APA process, including notice and comment.

the Department will provide compliance assistance with new water quality-based effluent limitations, including by developing compliance schedules and/or by assisting POTWs in securing funding from the New Jersey Water Bank in those instances where treatment infrastructure is needed. *See, e.g.*, N.J.A.C. 7:9B-1.6(d); *id.* 7:9B-1.5(e)(6). The Department will integrate PFAS abatement funds into the Water Bank, effectively leveraging them to provide consistent year-over-year support for water infrastructure improvements rather than simply drawing them down—an approach that will substantially increase their efficacy to reach the maximum amount of water infrastructure project value possible.

At the same time, the Department will continue to prioritize PFAS source identification and reduction, thereby shifting much of the economic burden of industrial waste treatment to the *dischargers* themselves rather than POTWs. *See* State Br. Ex. B at 6–7 (Resp. to Comment No. 8); *id.* Ex. C at 5 (Resp. to Comment No. 6). The Department oversees a robust pretreatment program designed to prevent the introduction of pollutants into POTWs by industrial discharge sources. *See* N.J.A.C. 7:14A-19.1(a). Through this program, the Department and certain delegee-POTWs can directly regulate upstream significant industrial users' wastewater discharges into POTW facilities through user permits. Once water quality-based effluent limitations for PFAS resulting from any adopted SWQSs are incorporated into POTWs' NJPDES permits, these POTWs would be authorized to regulate PFAS

12

discharges by upstream industrial users to reduce the levels of PFAS sent to the POTWs, thereby lowering the POTWs' treatment burden.[10]

In sum, Amici's assumptions about anticipated SWQSs and how they may impact potential future PFAS treatment costs are based upon speculation, including the inaccurate premise that end-of-pipe treatment will be the default requirement, and overlook the importance of effective PFAS source identification and reduction as first priorities. Finally, the appropriate forum for concerns about the SWQSs' rulemaking is the comment process on the rule proposal, consistent with the APA.

### ii. Amici's estimates of future costs are based on flawed assumptions.

Once again, Amici's future cost estimates are premised upon the inaccurate assumption that there is certainty that end-of-pipe PFAS treatment will be a presumptive requirement. In addition, Amici's estimates of future costs to treat PFAS in wastewater depend upon worst-case scenarios about (1) the need to remove PFAS to non-detectable levels; and (2) the current cost of treatment technologies.

---

[10] Indeed, as the Chief Operating Officer of the Passaic Valley Sewerage Commission ("PVSC"), the largest POTW in New Jersey, has testified, "the best way to prevent PFAS contamination is to stop it at its source . . . . As a co-regulator implementing and enforcing an industrial pretreatment program, we are uniquely positioned to drive source identification and minimization." Thomas A. Laustsen, PVSC, *Permitting of PFAS Compounds in NJPDES Discharges to Surface Water* (Jan. 21, 2021), https://dep.nj.gov/wp-content/uploads/cleanwatercouncil/pdf/2020_cwc_public_hearing_pvsc_comments.pdf.

Specifically, AEA relies on calculations by John Scheri, P.E., B.C.E.E., who derived his New Jersey statewide cost estimate from a 2023 Minnesota Pollution Control Agency report on PFAS treatment costs prepared by Barr Engineering ("Minnesota Study"). *See* ECF 771-3 ("Scheri Cert.") at 5 (citing Minnesota Study); ECF 771-26 (Minnesota Study). NACWA also cites the Minnesota Study's cost estimates. *See* NACWA Br. at 11.

There are fundamental issues with both Scheri's calculations and the Minnesota Study. To begin, the inputs and assumptions underlying Scheri's statewide capital cost estimates are not presented in Scheri's certification or its attachments. The Minnesota Study employs four models that each rely on different treatment technologies. Scheri does not clarify which model(s), if any, he used to derive his statewide cost estimates. In any event, the cost estimates for all models presented in the Minnesota Study rely on assumptions that have significant implications for evaluating potential costs for one POTW, let alone POTWs statewide. For example, the Minnesota Study calculates PFAS treatment costs based on treatment technology as it existed in 2023 and, for some facilities, assumes complete destruction of PFAS through incineration of single-use filtration media and therefore fails to consider less expensive treatment alternatives. *See* Minnesota Study at 58–59, 63–74. Thus, in extrapolating from the Minnesota Study's approach to derive a statewide cost estimate for POTWs in New Jersey, Scheri's analysis of

14

PFAS treatment costs presents a hypothetical doomsday scenario that most likely will exceed actual costs by billions of dollars.[11]

The Minnesota Study also assumes that POTWs will need to treat *biosolids* to non-detectable levels of PFAS. *See* Minnesota Study at 81. To date, unlike Maine, New Jersey has no regulations on PFAS in biosolids. Amici point to Maine and predict a parade of horribles if New Jersey adopts similar regulations limiting the beneficial application of biosolids containing PFAS to farmland. *See* AEA Br. at 13–14. But unlike Maine, where the vast majority of biosolids were applied to farmland before a ban on land application of PFAS-contaminated biosolids, only a very small percentage (1%) of biosolids in New Jersey were applied to farmland in 2023, so the impact of any such regulation in New Jersey would be far smaller.[12]

Another overarching flaw in Scheri's cost estimate is that it fails to account

---

[11] In applying the Minnesota Study's approach to New Jersey, Scheri also fails to account for variable changeout frequency of granular activated carbon ("GAC") or resin filters, which significantly impacts operations and management costs. *See* Minnesota Study at 63–74. The changeout frequency of filters depends on the PFAS concentration in wastewater entering POTWs (influent), which will continue to decrease over time through PFAS reduction efforts at source inputs (i.e., industrial discharger pretreatment and drinking water remediation). PFAS concentrations in influent will also vary depending on the PFAS sources discharging into each of the POTWs, so changeout frequency will vary, likely substantially, across the State.

[12] *See* Sydney Cromwell*, Maine Was First to Ban Spreading PFAS-Contaminated Sludge on Farmland. Now Sludge is Filling up Landfills,* INSIDE CLIMATE NEWS (Nov. 24, 2025), https://insideclimatenews.org/news/24112025/maine-landfill-pfas-contamination/; N.J. Dep't of Env't Prot., *NJ Sludge Management Methods 2023*, https://dep.nj.gov/wp-content/uploads/dwq/sludgeproductiondata2023-final-02-27-2025.pdf (last visited Dec. 17, 2025) (Class B beneficial use of domestic sludge).

for either emerging technologies or cost reductions in existing technologies as they become more efficient. As the Minnesota Study acknowledges, "[n]ew, targeted technologies to concentrate and destroy PFAS exist and have been demonstrated at bench- and pilot-scale" and "have the potential to reduce future capital and operating costs." Minnesota Study at 5. For example, in bench-scale testing, aqueous electrostatic concentration ("AEC") technology has been shown to remove over 99% of certain PFAS, and the developer of the technology claims that AEC could result in total life-cycle savings of 80% compared to conventional GAC or ion exchange treatment.[13]

Finally, NACWA mentions that PVSC has estimated that it will incur $5 billion in capital costs and $300 million in yearly operating costs to treat PFAS. *See* NACWA Br. at 10–11 (citing ECF 769-1 ("Aspatore Decl.") ¶ 4); *see also* ECF 769-4 ("PVSC Comment Letter on 3M JCO") at 3. However, neither NACWA's brief nor PVSC's comment provides any support for these figures. If PVSC's figures include delayed costs for upgrading and maintaining aging infrastructure rather than costs strictly devoted to PFAS treatment, then PVSC's PFAS-related capital and

---

[13] *See* Tonya Chandler & Sam Liao, *Treating PFAS-Laden Waste Using Aqueous Electrostatic Concentration*, Journal AWWA (Jan./Feb. 2025), https://doi.org/10.1002/awwa.2391; *see also BioLargo's AEC Technology Breaks New Ground in PFAS Water Treatment*, Innovation News Network (July 30, 2025), https://www.innovationnewsnetwork.com/biolargos-aec-technology-breaks-new-ground-in-pfas-water-treatment/60224/.

operating cost estimates are inappropriately inflated.[14] And, in any event, an unsupported projection for hypothetical future treatment costs is not a sufficient basis to disapprove valuable and reasonable Settlements that will provide significant funding to be invested now to ensure that POTWs like Amici's members are not left on their own to address PFAS. Settlement funding will be allocated to the PFAS Abatement Fund as a first priority to provide consistent year-over-year support for water infrastructure improvements necessary to reduce the occurrence of PFAS within the water cycle.

In sum, Amici overlook numerous aspects of the implementation of future SWQSs and their own ability to participate in the creation and implementation of those standards, exaggerate likely estimates of future treatment costs, and disregard promising new treatment technologies on the horizon in an attempt to undermine the JCOs' historic recovery for PFAS remediation statewide. The Court should not be swayed by arguments based on flawed and conjectural future cost estimates.

## C.    *Amici Base Their Concerns on Hypothetical Future Scenarios.*

Amici argue that the Settlements will leave them exposed to hypothetical future litigation under CERCLA and the Spill Act, while preventing them from seeking contribution or recovery from any of the Settling Defendants. AEA Br. at 5;

---

[14] *See* N.J. All. for Action, *Passaic Valley Sewerage Commission Invests In Its Aging Infrastructure*, https://allianceforaction.com/passaic-valley-sewerage-commission-invests-in-its-aging-infrastructure/ (last visited Dec. 21, 2025).

NACWA Br. at 4, 14-16. These arguments rely on speculation and misunderstandings of both CERCLA and the Spill Act.

To start, Amici overstate the risk of hypothetical future actions against them under CERCLA and the Spill Act. Both CERCLA and the Spill Act include certain exemptions for sewage and sewage sludge. *See, e.g.,* N.J.S.A. 58:10-23.11b (excluding "sewage and sewage sludge" from the definition of "hazardous substances"); *Miller v. D.C. Water & Sewer Auth.*, No. 17-cv-0840 (KBJ), 2018 WL 4762261, at *8 (D.D.C. Oct. 2, 2018), *aff'd,* 790 F. App'x 218 (D.C. Cir. 2019) (finding "sewage is expressly exempted" from "solid and hazardous waste" under RCRA and CERCLA) (citing 42 U.S.C. § 6972(a)(1)(B); 42 U.S.C. § 6903(27); 40 C.F.R. § 261.4(a)(1)). And, as New Jersey Representatives noted last week, "since the Superfund listings for PFOA and PFOS went into effect, [the] claim they would lead to a flood of liability [l]awsuits against municipal entities have simply not materialized." Castello Decl., Ex. A. Even so, Congress is actively considering complete protections under CERCLA that would exempt POTWs from PFAS liability as "passive receivers." Water Systems PFAS Liability Protection Act, H.R. 1267, 119th Cong. (2025).

Nor are Amici likely subjects of future CERCLA or Spill Act enforcement actions. As evidenced by the five complaints resolved through these Settlements, the Statewide Directive, and the previous litigation against Solvay Specialty Polymers

USA, LLC and Arkema Inc., the Department has focused its enforcement efforts on manufacturers of PFAS and industrial dischargers. *See* State Br., Ex. A (Statewide PFAS Directive, Information Request, and Notice to Insurers sent to certain dischargers).[15] EPA has likewise determined to "focus on holding accountable … those who have manufactured PFAS or used PFAS in the manufacturing process," as opposed to pursuing community water systems or POTWs under CERCLA. U.S. EPA, *PFAS Enforcement Discretion and Settlement Policy Under CERCLA* (April 19, 2024) at 2-3, 6-7, https://www.epa.gov/system/files/documents/2024-04/pfas-enforcement-discretion-settlement-policy-cercla.pdf.

Moreover, the contribution protection afforded to the Settling Defendants in the Settlements is a standard provision required by both CERCLA and the Spill Act. Under each statute, "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement *shall not be liable* for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2) (emphasis added); *see* N.J.S.A. 58:10-23.11f(a)(2)(b) (nearly identical). The Settling Defendants are entitled to contribution protection as a matter of law, separate and apart from the Settlements' release provisions.

---

[15] To the extent Amici are concerned that the *Settling Defendants* will pursue Amici for contribution, the State secured protection for political subdivisions in each Proposed JCO. *See* Proposed 3M JCO ¶ 49; Proposed DuPont JCO ¶ 74(b); State Br., Ex. C at 21 (Resp. to Comment No. 42); Ex. B at 24 (Resp. to Comment No. 49).

Finally, Amici could never comfortably rely on their hypothetical claims against the Settling Defendants here. Amici do not proffer any bases for direct discharger claims against any of the Settling Defendants independent of the discharges Settling Defendants have committed to remediate as part of the Settlements. And the Settling Defendants' Covered Conduct is not actionable under CERCLA, which creates liability for limited categories of "person" that *do not include the manufacturer of a product that is or includes a "hazardous substance."* State Br. Ex. B at 23-24 (Resp. to Comment No. 48 (citing cases)) (emphasis added); *id.* Ex. C at 20-21 (Resp. to Comment No. 41 (same)) (emphasis added). Even "arranger liability" requires a showing of "intent to *dispose of* hazardous substances," rendering the mere sale of PFAS or PFAS-containing products in or into New Jersey outside of the statute's reach. *Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F. Supp. 2d 473, 493 (D.N.J. 2009) (emphasis added). Amici would face overwhelming—if not fatal—litigation risk even in the absence of Settling Defendants' contribution protection. There is simply no guarantee (or indeed, likelihood) that any POTW could achieve a better result by pursuing claims on its own.[16]

---

[16] AEA references hypothetical future participation in the AFFF MDL in a wastewater class action. AEA Br. at 19. The Department responded to this argument in its response to comments. State Br. Ex. B at 17-18 (Resp. to Comment No. 36); *id.* Ex. C at 14 (Resp. to Comment No. 31). This future class-action is speculative, and any recovery even more so.

**D.**    ***These JCOs Are Not the Only Sources of Funding Available to Wastewater Facilities.***

Beyond the speculation and flaws underlying Amici's presentation of future costs for wastewater treatment, Amici overstate the purported insufficiency of the Settlement recoveries. As a preliminary matter, the Department has committed to making wastewater treatment a priority in the funding application process for PFAS abatement funds from the Settlements. *See, e.g.*, State Br. Ex. B at 7 ("DWQ intends to establish a compliance assistance plan and work closely with facilities to secure funding from the PFAS Abatement Fund through the NJWB in those instances where treatment infrastructure is needed."); *id.* Ex. C at 5 (same).

In a highly industrialized state like New Jersey, one of the most significant sources of PFAS to POTWs is industrial dischargers. *See* State Br. at 46-47. In April 2021, the Department sent a Request for Information Letter with instructions for certain POTWs to issue a PFAS Source Evaluation and Reduction Requirements Survey in order to gather general information regarding the storage, use, and/or handling of chemicals, process aids, or other products that contain PFAS. N.J. Dep't Env't Prot., *Request for Information* (Apr. 22, 2021), https://dep.nj.gov/wp-content/uploads/dwq/pdf/pfas_dla_letter_20210422.pdf. In January 2023, the Department issued an Administrative Order that encourages dischargers to submit data to help identify and reduce PFAS in wastewater. AO 2023-01. The Department continues to encourage permittees to submit this data, as it is essential for the

development of next steps to reduce and eliminate PFAS discharges before they ever enter a POTW—which will ultimately result in reduction of PFAS-related wastewater treatment costs.

In focusing on the purported insufficiency of the Settlement amounts, Amici lose sight of the other sources of funding available to POTWs through established funding frameworks. The Water Bank and the Department's leveraging of existing public funding mechanisms is the best way to provide the most support to the most systems. *See* State Br. at 25-26. For over thirty years, the Department has administered a variety of water infrastructure funding sources under the auspices of the Water Bank. Utilizing this successful statewide program to allocate PFAS abatement funds will enable the Department to make the best use of the funds by expanding their reach and impact. While AEA argues that these sources still will not be sufficient to fill the gap, AEA Br. at 27, that argument is speculative at best given that future costs are uncertain, as discussed above. Rather, immediate funding through these Settlements allows the State to quickly address PFAS contamination and direct funds to the entities that need them most.

Finally, AEA's assertion that its members need funding "to address other essential priorities associated with aging infrastructure," AEA Br. at 28, misses the point of these Settlements. The Settlements address claims *related to PFAS* and the Settling Defendants' sites. While the recoveries may help alleviate the cost of

upgrades, they were never intended to compensate for otherwise outdated or neglected infrastructure. In short, Amici's complaints about the insufficiency of the Settlements are overstated and unsupported.

## II.    AMICI'S EFFORTS TO CAST DOUBT ON THE STATE'S AUTHORITY TO RELEASE POLITICAL SUBDIVISION CLAIMS DO NOT WARRANT REJECTING THE SETTLEMENTS OR MODIFYING THEM TO EXCLUDE POLITICAL SUBDIVISIONS.

Amici's apparent objective is to cast sufficient doubt on the State's authority to release political subdivision claims to prevent approval of the Settlements. But that effort fails. As an initial matter, Amici fail to acknowledge that the New Jersey Attorney General has already entered into a statewide settlement for the benefit of its citizens—the 1998 Tobacco Master Settlement Agreement ("MSA")—that released political subdivisions' claims "to the full extent of the power" of the Attorney General, just as the Settlements here seek to release such claims "to the maximum extent that the Attorney General" may do so. In the more than *three decades* since the Tobacco MSA was signed, New Jersey courts have not found that release improper, nor has New Jersey's Legislature curtailed the Attorney General's powers in any way in response.

Beyond that, Amici's attacks on the State's authority here, which are focused mostly on the State's *parens patriae* authority, should be rejected. NACWA fails in its effort to narrowly cabin the State's *parens patriae* authority in a manner contrary to law, and neither AEA nor NACWA provide any New Jersey statute or authority

that otherwise limits the use of *parens patriae* to redress statewide PFAS contamination—indeed, multiple sources of New Jersey law support the opposite. Where NACWA dismissively waves off decisions from other jurisdictions that are contrary to its position, AEA fails to address them at all. AEA instead attempts to graft restraints upon the State's legitimate exercise of its authority by relying on Federal Rule of Civil Procedure 23 and its application to personal injury class actions in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), which is unwarranted and without precedent.

**A.** ***Neither New Jersey's Courts Nor Its Legislature Have Found the Attorney General's Entrance Into the Tobacco MSA Releasing Claims of Political Subdivisions Improper.***

The Tobacco MSA, to which the New Jersey Attorney General was a signatory, defined "Releasing Parties" as "each Settling State" and "to the full extent of the power of the signatories here to release past, present and future claims . . . any Settling State's subdivisions (political or otherwise, including but not limited to municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions . . . ." *In re Certified Question from U.S. Dist. Ct. for E. Dist. of Mich.*, 638 N.W.2d 409, 412 n.3 (Mich. 2002). The Settlements proposed here contain materially identical language, defining "Releasors" as "the State and, without limitation and to the maximum extent that the Attorney General and other State signatories may

release Claims . . . all of the State's Political Subdivisions and their departments, agencies, authorities, divisions, boards, commissions, districts, [and] instrumentalities of any kind . . . ." 3M JCO ¶ 6 (defining "Releasors"); DuPont JCO ¶ 6 (defining "Statewide PFAS Releasors").

No New Jersey court found such a release improper, and the Legislature never acted to prohibit the Attorney General from entering into similar settlements following the Tobacco MSA. *Cf. Macedo v. Dello Russo*, 840 A.2d 238, 242 (N.J. 2004) ("We consider ourselves bound by that Legislative acquiescence. If we are incorrect in our assumption, we would expect the legislature to take action to amend the statute."). Amici provide no reasonable basis to set aside *these* Settlements based on a release containing the same operative language as another decades-old New Jersey statewide settlement, the validity of which has never been drawn into question.

## B. *Amici Fail to Counteract Compelling Law Regarding the State's Parens Patriae and Broad Settlement Authority.*

NACWA's opening move is to suggest that *parens patriae* authority in New Jersey is limited to those situations where the State acts to protect individual minor children or others that traditionally cannot help themselves. *See* NACWA Br. at 22 (citing *Hojnowksi v. Vans Skate Park*, 901 A.2d 381 (N.J. 2006) (minor child); *Sashihara v. Nobel Learning Cmtys.*, Inc. 219 A.2d 1070 (N.J. Super. Ct. App. Div.

2019) (disabled child)). While this is certainly one strain[17] of the State's *parens patriae* authority, it is not the full extent of it, especially in the environmental context.[18]

Indeed, the U.S. Supreme Court confirmed the much broader scope of this authority long ago. In *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, the Court explained that *parens patriae* encompasses more than "the State's stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." 458 U.S. 592, 600 (1982). A State may exercise *parens patriae* authority to vindicate its "quasi-sovereign interest[s]," including "the health and well-being—both physical and economic—of its residents in general." *Id.* at 607. Particularly when it comes to the environment, the State has broad and sweeping *parens patriae* power: "The State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Alfred L. Snapp*, 458 U.S. at 604 ((quoting *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907)). The test in this

---

[17] *Hojnowski* concerned even a sub-category of this issue in analyzing *the court system's parens patriae* duties in assessing questions related to minor children. And *Nobel Learning Communities* has not been cited once by New Jersey's courts in their consideration of the full scope of the State's *parens patriae* authority.

[18] Even AEA concedes this previously non-controversial legal concept. AEA Br. at 42 ("*Parens patriae* empowers the State to vindicate the collective interests in public health and environmental welfare . . . .").

circumstance is one of quasi-sovereign interest—not an individual-by-individual examination of the extent to which select entities may be unable to protect themselves. *See, e.g., Broselow v. Fisher*, 319 F.3d 605, 610 (3d Cir. 2003) ("A State may seek recovery under *parens patriae* [] when it can show that it has a 'quasi sovereign interest.'" (quoting *Alfred L. Snapp*, 458 U.S. at 607–08)). Amici never contend that the State lacks a quasi-sovereign interest here.

AEA suggests that, while the State may indeed possess broad *parens patriae* authority in some areas, exercising it in a given scenario may be limited by legislative action. *See* AEA Br. at 42 (citing *In re D.C.*, 679 A.2d 634, 643 (N.J. 1996). Yet AEA fails to identify a specific statute so limiting the State's authority in this particular circumstance—unlike the civil commitment statute in *In re D.C.* On the contrary, New Jersey law *supports* the State's exercise of this power rather than constraining it. Multiple sources of State law confirm the State's ability to craft comprehensive statewide resolutions to redress pollution, including through litigation. *See, e.g.*, N.J.S.A. 13:1D-9 (charging the Department with the "conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State"); *id.* 13:1D-9(f) (Department is responsible for "supervi[sing] Statewide, regional and local programs of conservation and environmental protection"); *Howell Twp. v. Waste Disposal Inc.*, 504 A.2d 19, 26-27 (N.J. Super. Ct. App. Div. 1986) (the State,

acting through the Department, "determine[s] the primary course of action to be taken against persons who damage or threaten the environment"); *id.* at 27 (the Department must be able "to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view [] problems and solutions broadly."); N.J.S.A. 58:10A-5e (the Department administers "forms of financial assistance to municipalities, counties and other political subdivisions according to terms and conditions approved by him"); *id.* 52:17A-4c, g-h (noting the Attorney General's powers and duties include "exclusively attend[ing] to and control[ling] all litigation and controversies to which the State is a party or in which its rights and interests are involved"; "attend[ing] generally to all legal matters in which the State . . . is a party or in which its rights and interests are involved"; and "[e]nforcing the provisions of the Constitution and all others laws of the State . . . .").

NACWA's citations to specific New Jersey statutes it contends undercut the State's authority are likewise unavailing. NACWA primarily relies on the basic recognition that municipalities and their authorities may "sue and be sued." NACWA Br. at 23 (citing N.J.S.A. 40:43-1 and 40:14B-20). But this is an unremarkable fact, and the analysis does not simply end there: "the authority of [municipalities] to sue in matters of local interest cannot be used to undermine the authority of the state to sue in matters of state interest . . . ." *In re Certified Question*, 638 N.W.2d at 414; accord *Wagner v. Mayor of Newark*, 132 A.2d 794, 800 (N.J.

1957) (municipal authority is limited to matters of "local concern" and does not extend to "those matters involving state policy or in the realm of affairs of general public interest and applicability"). Likewise, that the Legislature enabled municipal authorities to, among other things, "sell water and water services," NACWA Br. at 23 (quoting N.J.S.A. 40:14B-20), does not alter the State's role as the ultimate guardian of the State's water resources. *See State ex rel. Dep't of Health v. N. Jersey Dist. Water Supply Comm'n.*, 317 A.2d 86, 91 (N.J. Super. Ct. App. Div. 1974) (confirming "State's ultimate control over its water resources"); *see also* N.J.S.A. 58:12A-6 (the "[C]ommissioner, upon receipt of information that a contaminant which is present in or is likely to enter a water system may present an imminent and substantial endangerment to health of persons, may take such actions he may deem necessary in order to protect the health of such persons."); *id.* 58:10A-5a (the Department "exercise[s] general supervision over the administration and enforcement of" the Water Pollution Control Act); *id.* 58:10-23.11a ("[T]he State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction[.]"). There is no single constraint in these statutes prohibiting the State from acting here for the benefit of the State as whole.[19]

---

[19] NACWA discusses one case concerning the Department's invocation of the public trust doctrine, *Hackensack Riverkeeper, Inc. v. N.J. Department of Environmental Protection*, 128 A.3d 749 (N.J. Super. Ct. App. Div. 2015), but the particular issue raised in that opinion—regulation of public access to beaches—is inapposite here, when it comes to pursuing statewide relief for the public's benefit against polluters

NACWA also makes a half-hearted attempt to cabin persuasive case law contrary to its position from other jurisdictions. NACWA seeks to cast the New Hampshire Supreme Court's reasoned analysis in *City of Dover* as "erroneous" on the basis that *parens patriae* can only provide the State with standing. NACWA Br. at 24. But that court reached the very same issue raised here—the extent to which the state could supersede litigation by political subdivisions for the benefit of the public when the state and political subdivision seek overlapping relief: "we hold that the doctrine of *parens patriae* controls and the cities' suits must yield to the attorney general's suit." *State v. City of Dover*, 891 A. 2d 524, 532 (N.H. 2006); *accord Alaska Sport Fishing Ass'n v. Exxon Corporation*, 34 F. 3d 769, 773-74 (9th Cir. 1994) (finding private fishermen's claims barred by res judicata because of State's entry into consent decree for natural resource damages as *parens patriae*). To that, NACWA has no response, and makes no effort to meaningfully distinguish the circumstances in New Hampshire from those here.

NACWA's attempt to distinguish a trio of opinions cited by the State where courts found Attorneys General properly released claims of political subdivisions

---

of water resources. *See* NACWA Br. at 22 (citing 128 A.3d 749 (N.J. Super. Ct. App. Div. 2015)). Further, in response to the court's decision in *Hackensack Riverkeeper*, the New Jersey Legislature passed legislation that "reaffirmed the broad authority of the Department" on that issue under the public trust doctrine. *Susko v. Borough of Belmar*, 206 A.3d 979, 991 n. 10 (N.J. Super. Ct. App. Div. 2019).

through settlements that broadly protect the public—*In re Certified Question*, 638 N.W.2d 409; *People ex rel. Devine v. Time Consumer Marketing*, 782 N.E.2d 761 (Ill. App. 2002); and *Commonwealth ex rel. Krasner v. Attorney General of Commonwealth*, 309 A.3d 265 (Pa. Commw. Ct. 2024)—is even more contorted. NACWA charges that those cases involved the right types of broad harms appropriate for "statewide litigation efforts," while claims concerning PFAS contamination do not. NACWA Br. at 25. But NACWA fails to meaningfully explain how the claims in those cases—relating to consumer-protection, tobacco, and the marketing of opioids—involve somehow more "diffuse harms" that broadly affect State interests than the claims here. *Id.*

Indeed, after almost two decades of studying and investigating the scope, extent, risks and harms of PFAS across New Jersey, the State has spent the last six years pursuing a statewide PFAS campaign to address these ubiquitous contaminants, including through issuing the Statewide PFAS Directive, pursuing a Statewide AFFF case, and further bringing multiple litigations to address additional PFAS sources of regional contamination. *See* N.J.S.A. 52:17A-4c (Attorney General's powers include "control[ling] all litigation and controversies … in which [the State's] rights and interests are involved"); *In re Certified Question*, 638 N.W.2d 415 ("the Attorney General has the authority to bring actions involving matters of state interest, and the courts should accord substantial deference to the

31

Attorney General's decision that a matter constitutes a state interest"). PFAS contamination extends beyond the boundaries of any individual municipality and moves through the water cycle in New Jersey, affecting large populations of the State. In response to that unfortunate reality, NACWA offers only that certain political subdivisions are impacted differently than others.[20] NACWA Br. at 25. But that fact cannot preclude the State from seeking and obtaining a comprehensive solution to address a statewide problem.[21]

Finally, AEA's reliance on Rule 23 and *Amchem* is misplaced. Much of its lengthy discussion of *Amchem* offers quotes taken out-of-context, suggesting that the Court's analysis has broad application beyond Rule 23 (and more specifically Rule 23(e)), but there is no basis for that—and certainly no basis for applying the

---

[20] It bears emphasizing that the statewide relief here against 3M and the DuPont Defendants are related to their placement of PFAS products in the stream of commerce, which have ended up in and impacted the water cycle and the environment. To the extent that specific political subdivisions have been affected by specific dischargers in their area (other than as addressed through these Settlements), they remain free to pursue claims against those dischargers based on those circumstances. This Settlement does not resolve all PFAS claims of all political subdivisions against all responsible parties.

[21] Indeed, as Justice Brennan once noted, "a State is no ordinary litigant. As a sovereign entity, a State is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention." *Alfred L. Snapp*, 458 U.S. at 612 (Brennan, J., concurring (opining that "nothing—except the Constitution or overriding federal law—[] might lead a federal court to superimpose its judgment for that of a State with respect to the substantiality or legitimacy of a State's assertion of sovereign interest").

Court's specific holdings as to Rules 23(a), (b), and (e) to a State as *parens patriae*.[22]

Indeed, much of *Amchem* concerned the potential conflicts among a personal injury settlement class, and who is most appropriate to represent the class. This matter concerns neither personal injury,[23] nor representation by class counsel.

## C. *The Settlements' Structure Allows for Future Resolutions Regarding Application of the Releases.*

The cases NACWA cites for the proposition that there is a "jurisdictional split on states' authority to release the claims of political subdivisions," NACWA Br. at 26, were all in the context of a court considering the application of a release to specific parties in specific circumstances after the settlements were executed—a scenario that the parties here have taken into account.[24] The State does not concede

---

[22] AEA seems to suggest in its brief that the burden is on the State to show why *Amchem* is not applicable; the State submits that makes little sense, and that it is AEA that must (and has failed) to demonstrate its applicability. In any event, that AEA is relying on *Amchem* for far more than the opinion supports is easily demonstrable: AEA's assertion that the opinion generally addresses notions of due process in settlements is belied by the fact that the opinion is limited to Rule 23 and never once mentions "due process." That term is only used once in the partial dissent. *See Amchem*, 521 U.S. at 640 (Breyer, J., dissenting in part).

[23] The Settlements specifically exclude claims to compensate individuals for personal injuries. *See, e.g.*, State Br. Ex. C (Resp. to Comment No. 27). While much of *Amchem* concerned questions about an individual's potential to develop diseases as a result of exposure to asbestos, these Settlements are about preventing exposures to a contaminant to the public, not the more complex question about compensating individuals for illnesses that may or may not be due to past exposures.

[24] The Settlements provide the Settling Defendants with the opportunity to receive limited monetary credits against their settlement payments to the State if, despite the terms of the Settlements, those claims ultimately require resolution by judgment or settlement. 3M JCO ¶ 45; DuPont JCO ¶ 9.

those cases are otherwise informative here. Neither of the cases concerned the State's role as primary protector of the environment, as the *City of Dover* case does. 891 A.2d 524. And *Halifax Hospital Medical Center v. Office of the Attorney General* concerned an extraordinary exercise of power by the Florida Attorney General where it specifically "disavowed" representing certain hospitals but sought to release their claims anyway. 393 So. 3d 1253, 1255 (Fla. Dist. Ct. App. 2024).

Here, the State is specifically establishing a funding source for the benefit of Amici's members and other political subdivisions to address the harms at issue. Thus, the structure of the Settlements is a reasonable exercise of the State's authority with respect to the interests it seeks to vindicate.[25]

## III.    NONE OF AMICI'S REMAINING GRIEVANCES RENDER THE SETTLEMENTS UNFAIR OR UNREASONABLE.

### A.    *The Settlements were published with ample notice, and the Department carefully considered and responded to all comments received.*

AEA argues that the State did not provide adequate notice to meet the required standard for fairness. AEA Br. at 14. Contrary to AEA's contentions, however, the

---

[25] *See, e.g.*, Doug Peterson, *Public Health and Parens Patriae: How Attorneys General Can Preserve State's Exclusive Litigation Authority* 28 (Wash. Legal Found., Working Paper No. 236, July 2025), https://www.wlf.org/wp-content/uploads/2025/07/7.16.2025-Peterson-WP-full-copy.pdf (discussing inclusion of settlement terms to "guard State's quasi-sovereign authority to be solely responsible for litigating cases that claim statewide harm" by "clearly provid[ing] that States are the proper party for parens patriae-related suits and expressly preempt[ing] municipal lawsuits").

State took several steps beyond those required by statute to ensure that the public had ample opportunity to review the Proposed JCOs and participate in the public comment process. First, AEA argues that it "had no formal or informal notice before the issuance of the Public Notice in the New Jersey Register." AEA Br. at 16-17. But the State announced and published the Settlements weeks before they were formally noticed in the *New Jersey Register*. The 3M Settlement was announced on May 13, 2025 (and published in the *Register* on July 21, 2025) and the DuPont Settlement was announced on August 4, 2025 (and published in the *Register* on September 2, 2025). *See* State Br. at 14 n. 10; *id.* at 15. The announcements were well-publicized and picked up by the national news the same day.[26] At the same time, the Department published the full text of each Settlement on a dedicated webpage. *See* https://dep.nj.gov/3m/ and https://dep.nj.gov/dupont/.

Once the Settlements were formally published in the *Register*, the State accepted not only the comments submitted during the statutory 60-day period, *see* N.J.S.A. 58:10-23.11e2, but also those comments submitted after the deadline had already passed. *See* State Br. at 16 n.12. The State and its counsel also met with

---

[26] *See, e.g.,* Hiroko Tabuchi, *3M to Pay New Jersey Up to $450 Million for Drinking-Water Contamination*, N.Y. Times, May 13, 2025, https://www.nytimes.com/2025/05/13/climate/3m-pfas-forever-chemical-lawsuit-water-new-jersey.html; Hiroko Tabuchi, *Chemical Makers to Pay N.J. $875 Million to Settle 'Forever Chemicals' Claims*, N.Y. Times, Aug. 4, 2025, https://www.nytimes.com/2025/08/04/climate/new-jersey-pfas-settlement.html.

several commenters and interested parties to discuss their comments and concerns and further clarify the scope and effect of each Settlement. *See id.* at 16. The State filed its responses to comments with the Court and published them on the dedicated webpages for the settlements on November 21, 2025. State Br. Exs. B & C. AEA was able to review the responses to its written comments for three weeks before filing its brief.

Amici filed these briefs after the State worked with them to establish a process for further participation before the Court. *See* ECF 737. But AEA does not take advantage of this opportunity to address the Department's responses to its comments. Instead, it offers only a conclusory statement of dissatisfaction. *See* AEA Br. at 14. The Department understands that AEA may continue to disagree with the explanations and analyses the State provided. But the standard for approval of the Proposed JCOs does not insist that every commenter ultimately agree with the Department, nor that the Department resolve all commenters' concerns. Indeed, "the standard is not whether the settlement is one which the court itself might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*, 183 A.3d 289, 305 (N.J. Super. Ct. Law Div. 2015) (citation omitted); *see also Rowe v. E.I. DuPont De Nemours & Co.*, Nos. 06-1810 (RMB/AMD), 06-3080 (RMB/AMD), 2011 WL 3837106, at *12 (D.N.J. Aug. 26,

2011).

**B.    *These JCOs will not impair the ability of DLAs to carry out their statutory duties.***

AEA is joined by four of its members that are also Delegated Local Agencies ("DLAs") in New Jersey.[27] *See* AEA Br. at 9-10 (citing *id.* Ex. E ¶ 7). On behalf of these DLAs, AEA suggests that the Settlements will "frustrate the implementation of state and federal laws such as CERCLA, the CWA, and the New Jersey Clean Water Enforcement Act." AEA Br. at 18. In support of that broad assertion, AEA argues that the Settlements would prevent DLAs from pursuing enforcement actions against Settling Defendants and that Settling Defendants are "releas[ed] . . . from obligations involving compliance, permitting, and reporting." AEA Br. at 41. These arguments were already raised and addressed through the public comment process. AEA does not engage with or address the responses it received.

As an initial matter, it is unclear what enforcement actions or applicable authority AEA contemplates on behalf of its members.[28] 3M has committed under

---

[27] A DLA is "a local agency with an industrial pretreatment program approved by the Department." N.J.A.C. 7:14-8.2. Though the Department delegates certain authority to DLAs, it engages in close oversight and remains the ultimate controlling authority. N.J. Dep't Envtl Prot., *Local Agency Pretreatment Program*, https://dep.nj.gov/dwq/wastewater/pretreatment/local-agency-pretreatment-program/ (last visited Dec. 22, 2025); *see also* N.J.A.C. 7:1-1.5(a).

[28] To the extent AEA intended to incorporate its arguments regarding contribution actions under CERCLA, such actions are not enforcement actions, are not specific to the responsibilities of DLAs, and, as discussed above, are unpersuasive.

the 3M Settlement to comply with all cleanup obligations for its known PFAS-contaminated properties. *See* State Br., Ex. C at 15 (Resp. to Comment No. 33). Likewise, the DuPont Defendants have committed to fully and finally remediating their known PFAS-contaminated Sites. *See* DuPont JCO ¶ 29 ( "[N]othing in th[e] JCO is intended to alter, in any way, any Settling Defendant's obligation to conduct Remediation at the Industrial Sites consistent with applicable federal and State laws, regulations, and guidance"); *id.* ¶ 30. AEA does not mention or raise any objections to the remediation terms under the Settlements.

Further, AEA does not identify any new, un-listed properties formerly owned or operated by 3M in New Jersey that would connect 3M to additional discharges in violation of the federal Clean Water Act or New Jersey Water Pollution Control Act. *See* State Br. Ex. C at 15 (Resp. to Comment No. 33). AEA likewise does not identify any of the DuPont Defendants as significant industrial users for which the DLAs have delegated permitting authority. *See id.* Ex. B at 18 (Resp. to Comment No. 37). As the Department reminded AEA in its comment response, the wastewater facilities at Chambers Works, Parlin, and Repauno Works are permitted directly by the Department as Category B facilities. *See id.* And, as noted, these facilities will continue to be required to comply with the applicable permits and regulations. *See id.* at 15 (Resp. to Comment No. 31). AEA fails to point to any basis for a DLA enforcement action against 3M or the DuPont Defendants, and none of the Settling

38

Defendants are immune to applicable regulatory requirements.

## **CONCLUSION**

For the foregoing reasons and those stated in the Motion, the State respectfully

requests that the Court grant the Motion and approve the JCOs.

Dated: December 22, 2025

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW**
**JERSEY**
*Attorney for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 376-2740

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General

By: */s/ Geoffrey W. Castello*
Geoffrey W. Castello, Esq.
7 Giralda Farms, Suite 340
Madison, NJ 07940
Tel.: (973) 503-5900
GCastello@KelleyDrye.com

David M. Reap, Esq.
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800
DReap@KelleyDrye.com

*William J. Jackson, Esq.
*Lana M. Rowenko, Esq.
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000
bjackson@kelleydrye.com
lrowenko@kelleydrye.com

Erin Hodge, Esq.
670 Maine Avenue SW, Suite 600
Washington, DC 20024
Tel.: (202) 342-8445
ehodge@kelleydrye.com

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General

*John K. Dema, Esq.
*John T. Dema, Esq.
*Briana Dema, Esq.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Tel.: (340) 773-6142
jdema@demalaw.com
jtdema@demalaw.com
bdema@demalaw.com

Scott E. Kauff, Esq.
11300 Rockville Pike, Suite 112
Rockville, MD 20852
Tel.: (202) 309-0200
skauff@demalaw.com

**TAFT STETTINIUS & HOLLISTER LLP**
Special Counsel to the Attorney General

*Robert A. Bilott, Esq.
50 E. RiverCenter Blvd., Suite 850
Covington, KY 41011-1683
Tel.: (859) 331-2838
bilott@taftlaw.com

**COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

Leonard Z. Kaufmann, Esq.
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600

*\* admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2025, a true and correct copy of the foregoing document was filed electronically with the Clerk of this Court and served on all parties of record via the Court's ECF system.

*/s/ Geoffrey W. Castello*
Geoffrey W. Castello, Esq.