**JENNIFER DAVENPORT**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs (Additional Counsel Listed Below)*

By:   Gwen Farley
      Deputy Attorney General
      Attorney ID No. 000081999
      Ph. (609) 376-2740
      Gwen.Farley@law.njoag.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, <br><br> Plaintiffs, <br> v. <br><br> E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS), <br><br> Defendants. | Case No.: 2:19-cv-14758-RMB-JBC <br> 1:19-cv-14765-RMB-JBC <br> 1:19-cv-14766-RMB-JBC <br> 3:19-cv-14767-RMB-JBC <br><br><br> Hearing Date: June 24, 2026 <br> **ORAL ARGUMENT REQUESTED** |

## SUPPLEMENTARY REPORT IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE JUDICIAL CONSENT ORDERS WITH SETTLING DEFENDANTS

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................3

RESPONSES TO QUESTIONS PRESENTED ......................................................6

I.      THE STATE'S ANALYSIS OF PFAS COSTS TO THE PUBLIC DEMONSTRATES THE SETTLEMENTS FAIRLY AND REASONABLY ADDRESS THESE COSTS. ...............................................6

      A.      The State Undertook an Analysis of PFAS Costs to the Public. ..........7

      B.      The Settlements Fairly and Reasonably Address PFAS Costs...........15

II.     THE STATE'S DISTRIBUTION PLAN FOR SETTLEMENT FUNDS. ...............................................................................................21

      A.      Distribution of Settlement Funds for PFAS Water Quality Projects ..............................................................................................21

      B.      Distribution of Settlement Funds for PFAS Abatement Projects.......25

III.    THE SETTLEMENT FUNDS ARE PROTECTED FOR THEIR INTENDED PURPOSE. ....................................................................28

      A.      The Settlement Payments Are to Be Used for Restitution or Remediation of Harm to the Environment. ......................................29

      B.      The NRD Constitutional Amendment Governs the NRD Settlement Payments. ........................................................................30

      C.      The Settlements Require that PFAS Abatement Funds Be Used for Specific Purposes.........................................................................33

CONCLUSION ...........................................................................................................37

## INTRODUCTION

This Supplementary Report is submitted at the Court's direction and in further support of the State's Motion to Approve the JCOs with the Settling Defendants.[1]

Through this Report, the State responds to the Court's remaining questions regarding the Settlements and provides supporting declarations from current and former officials of the Department of Environmental Protection ("Department"), a Deputy Attorney General, and an environmental expert retained by the State.[2] As this Report demonstrates, the State (1) generated reasonable estimates of the potential statewide costs to abate PFAS for purposes of settlement, and determined that the proposed Settlement Payments, in combination with additional financial assistance provided to public entities in New Jersey, reasonably and fairly addresses those costs that may be attributable to Settling Defendants; (2) developed a responsible plan for distributing funds recovered through the Settlements, and is memorializing that plan in a formal Settlement Funds Distribution Plan appended

---

[1] Unless otherwise defined herein, capitalized terms in this Report have the same meaning as in the Memorandum of Law in Support of Plaintiffs' Motion to Approve Judicial Consent Orders with Settling Defendants, ECF No. 746-1. Further, unless otherwise noted, citations to the electronic case record ("ECF") refer to the Chambers Works docket, 1:19-cv-14766.

[2] The State submits as evidence the Declarations of Former Department Commissioner Shawn LaTourette, Department Chief Legal Advisor and Chief Law Enforcement Officer Kimberly Cahall, Deputy Attorney General Gwen Farley, and Robert E. Unsworth of Industrial Economics, Inc.

hereto; and (3) incorporated measures into the Settlements' structure and has taken additional steps to safeguard the Settlement Payments for their intended and beneficial purposes. This Report further confirms the State negotiated, crafted, and established the Settlements, including their funding distribution processes, with special consideration not only for the protection of public health, safety and the environment, but also for the benefit of the State's taxpayers and ratepayers. The State thus remains confident that these landmark Settlements will protect and benefit New Jersey's residents for generations.

Additionally, the State is pleased to inform the Court that it has reached agreements with the Association of Environmental Authorities of New Jersey and seven of the Association's individual members (collectively, "AEA"), as well as 18 of New Jersey's counties ("Participating Counties"), to address their concerns with and resolve their objections to the Settlements. Such agreements were filed on the docket shortly before the filing of this Report. *See* ECF Nos. 825, 826. As a result, the AEA's and the Participating Counties' objections to the Settlements are being withdrawn, and thus all objections raised by parties appearing at the January 7, 2026 hearing have been resolved—save for those of Carneys Point Township and the Borough of Sayreville.[3]

---

[3] While the State was unable to reach a resolution with Carneys Point and Sayreville regarding their objections to the JCOs by the date of the filing of this Report, the State remains actively engaged in discussions with the municipalities and will

The State thus submits that this Report, along with the resolutions reached with the AEA and the Participating Counties, confirms that after a thorough public engagement and review process, these historic Settlements are ripe for this Court's approval. That process has involved public comment periods, the Department's publication of responses to those comments, voluminous briefing in connection with the State's Motion to Approve the JCOs, a day-long hearing on the Settlements, and numerous mediations with groups of objectors, all culminating in this Report.

The State appreciates the opportunity to provide this further information to the Court.

## **BACKGROUND**

On January 7, 2026, the Court held a hearing on the State's Motion to Approve the JCOs. The Court heard argument from counsel for the State as well as objectors including the AEA; various counties; and two municipalities, Carneys Point and Sayreville (collectively, "Objectors").

At the conclusion of the hearing, the Court directed the State to supplement the record with a Report containing evidentiary support to address three questions:

---

continue to explore reasonable resolutions in good faith. The State has previously responded to the various issues Carneys Point and Sayreville raised to this Court in its filing at ECF No. 764 and at the hearing on January 7, and the State maintains its position that the municipalities' objections, which generally rest on legal arguments already addressed by the Court, should not prevent approval of the Settlements if resolutions cannot otherwise be reached.

1.  What analysis did the State conduct in determining that the amounts recovered under the Settlements fairly and reasonably address the costs to the public of abating PFAS contamination attributable to the Settling Defendants?

2.  What process will the State follow in distributing funding from the Settlements to political subdivisions?

3.  What measures will the State take to protect the funds recovered through the Settlements for their intended purposes?

*See* Hearing Tr. 189:16–191:6, Jan. 7, 2026. Additionally, the Court encouraged the State to furnish a draft of its Report to the Objectors to facilitate negotiations to resolve their objections to the extent possible. *Id.* at 191:17–22, 194.

Following that guidance, the State furnished a draft of this Report to the Objectors on January 30, 2026. Thereafter, the State participated in dozens of meetings, including several formal mediation sessions overseen by Magistrate Judge Schneider (Ret.), with the Objectors, both virtually and in-person. Those negotiations, which touched upon challenging regulatory, settlement allocation, and other issues, occurred throughout the past several months. As a result, the State reached breakthrough agreements with the AEA and the Participating Counties, the terms of which were ultimately approved by the Attorney General, the Commissioner, AEA's Board of Directors, seven of AEA's individual members' Boards of Directors, and 18 Boards of County Commissioners. Those resolutions,

4

which themselves are persuasive evidence of the Settlements' reasonableness and fairness, are further discussed below and have been integrated into the State's responses to the Court's questions.

## LEGAL STANDARD

Prior to approving a Spill Act settlement, a court must determine that the settlement is fair, reasonable, faithful to the objectives of the statute, and in the public interest. *New Jersey Department of Environmental Protection v. Exxon Mobil Corp.*, 183 A.3d 289, 304 (N.J. Super. Ct. Law Div. 2015), *aff'd*, 181 A.3d 257 (N.J. Super. Ct. App. Div. 2018) (applying the standard of review for federal CERCLA settlements to Spill Act settlements). However, in making this determination, "when the court encounters technical decisions made by the [Department], it reviews them under the arbitrary and capricious standard." *Id.* at 309.

For the reasons set forth in the State's Motion to Approve the JCOs, the Settlements meet the four-pronged *Exxon* standard of review. *See* Pl.'s Mem. in Supp. of Approval, ECF No. 746-1, at 27–56. The State is providing here its analysis—with evidentiary support—as a public record that sets forth the information the State had, the costs and projections it evaluated, and how it ultimately assessed that the up to $2.5 billion in remediation work and cash payments from the Settling Defendants was reasonable under the circumstances. The State appropriately and thoroughly evaluated the information it had when it estimated

5

statewide damages, mediated the case, and ultimately decided to grant releases to the Settling Defendants. As this Report details, the Department's technical decisions involved in calculating damages and remediation costs more than meet the applicable arbitrary and capricious standard of review, and the JCOs themselves are fair, reasonable, faithful to the objectives of the governing statute, and in the public interest.

## RESPONSES TO QUESTIONS PRESENTED

**I.    THE STATE'S ANALYSIS OF PFAS COSTS TO THE PUBLIC DEMONSTRATES THE SETTLEMENTS FAIRLY AND REASONABLY ADDRESS THESE COSTS.**

Prior to reaching its determination that these Settlements meet the standard for approval, the State analyzed the costs to abate PFAS contamination in New Jersey and the Settling Defendants' share of responsibility for these costs. The State prepared reasonable cost estimates for numerous categories of damages by leveraging the Department's expertise in addressing PFAS contamination and the assistance of nationally renowned environmental economics consultants. Throughout settlement negotiations, the State also remained mindful of its overarching objectives of protecting human health and the environment and safeguarding the economic interests of New Jersey's taxpayers and ratepayers.

Below, the State summarizes the cost estimates it developed for the purposes of settlement negotiations and further explains how the recoveries achieved through

6

the Settlements fairly and reasonably address those costs attributable to the Settling Defendants, particularly when the State's recoveries are combined with additional funding available to political subdivisions.

### A.    The State Undertook an Analysis of PFAS Costs to the Public.

During the Court-ordered mediation of these matters, and with the approval of the Mediator, the State's negotiations with the Settling Defendants sought to resolve the State's cases concerning the four industrial sites formerly owned by Old DuPont as well as Defendants' statewide PFAS liabilities. Declaration of Gwen Farley, Esq., dated June 1, 2026 ("Farley Decl."), at ¶¶ 3, 4, 8. Such a resolution would allow the State to provide broad and meaningful assistance to the public to address PFAS throughout New Jersey, in exchange for a comprehensive resolution for Settling Defendants.

The State, its counsel, and its consultants worked to develop a reasonable estimate of the costs to address PFAS contamination across the State to inform its mediation strategy. *Id.* at ¶ 9. In preparing the State's settlement demands and throughout the mediation and settlement negotiations, the State and its consultants examined data and cost projections both nationally and in New Jersey to estimate the costs of PFAS abatement, including those faced by publicly-owned treatment works ("POTWs") and counties. *Id.* ¶¶ 9, 13, 14, 15, 17, 18, 19, 21; Declaration of Robert Unsworth, dated June 1, 2026 ("Unsworth Decl.") at ¶¶ 4-5. The State

considered numerous categories of damages including the costs to abate PFAS in public drinking water supplies, private wells, wastewater systems, and on public property. Farley Decl. at ¶¶ 14, 15, 17, 18. Based on extensive analysis undertaken by the State's consultants, Department technical staff, and the State's counsel, the State reasonably estimated that, for purposes of these Settlements, statewide public costs to abate PFAS in New Jersey are $5.5 billion.[4] *Id.* at ¶ 19.

During the January 7 hearing, the Court asked the State to explain how it considered potential costs of the Objectors, including POTWs and counties that own fire training academies and airports. As confirmed below, the State considered these costs as part of its initial analysis, and that work further informed the ultimate resolutions the State reached with AEA and the Counties.

***POTWs.*** The State included in its analysis of statewide PFAS costs the potential future costs for POTWs to address PFAS. Specifically, the State asked its consultants to analyze potential future costs for POTWs to treat PFAS in wastewater and conduct related sampling activities and disposal of biosolids. Cost calculations

---

[4] Separate and apart from these costs, Settling Defendants have a continuing obligation to remediate PFAS discharged at and from sites that they owned, operated, or controlled in New Jersey. Most critically, through its settlement with the DuPont Defendants, the State has obtained financial protections up to an amount exceeding $1.6 billion to ensure that the DuPont Defendants, and not the public, pay to remediate the contamination at and from their sites.

were based on available New Jersey-specific information. *See* Farley Decl. at ¶¶ 14, 17; Unsworth Decl. at ¶¶ 5, 11, 12, 13.

For purposes of generating cost estimates, the State's consultants first assumed POTWs would need to comply with New Jersey or federal regulations to remove PFAS from their effluent in the future, although no such regulations are currently proposed.[5] The potential compliance costs with any such regulation on POTWs, however, is significantly mitigated by the State's promotion of multiple strategies and policies today—before any PFAS effluent limitations ever become law—to reduce or eliminate PFAS before they reach POTWs. Unsworth Decl. at ¶¶ 11-13.

These strategies and policies already underway are collectively referred to by the Department as an effort to "Identify, Reduce, and Eliminate." Declaration of Shawn LaTourette, dated April 30, 2026 ("LaTourette Decl."), at ¶¶ 20, 26, 68; Declaration of Kimberly Cahall, dated June 1, 2026 ("Cahall Decl."), at ¶¶ 8-9. The objective behind these actions is to place the burden of addressing this problem

---

[5] While the Department has been considering proposed regulations on this subject, there has been no final determination to formally propose any such regulations, and any such determination will be reviewed for consistency with the policies and priorities of Governor Mikie Sherrill's Administration. *See*, *e.g.*, Executive Order No. 7 (Jan. 23, 2026), https://nj.gov/infobank/eo/057sherrill/pdf/EO-7.pdf (providing for review of proposed administrative rules not yet published, for consistency with policies and priorities of Sherrill's Administration, including addressing the current economic and affordability crisis in New Jersey).

"upstream," including on manufacturers of products containing PFAS and industrial users discharging PFAS waste into the public sewer systems. Cahall Decl. at ¶ 8.

This effort involves, among other things, collaboration between the Department and wastewater operators, including POTWs, to identify through data collection significant sources of PFAS contamination and take collective action to reduce PFAS in upstream effluent discharged to the POTWs. LaTourette Decl. at ¶¶ 20-28; Cahall Decl. at ¶¶ 9, 10, 12. Beyond this, the State is taking additional steps, further upstream, to reduce PFAS by prohibiting the use of certain PFAS products in New Jersey through recently enacted legislation titled the "Protecting Against Forever Chemicals Act." *See* P.L.2025, c.202. The Act prohibits the sale of products such as carpet fabric treatments and food packaging with intentionally added PFAS, and further funds a "source reduction program" to assist POTWs and others in efforts to reduce PFAS in the environment. *Id.*

In sum, the State's consultants reasonably factored in these "Identify, Reduce, and Eliminate" efforts ongoing in New Jersey when generating an estimate for purposes of settlement, including that these efforts would minimize the need for POTWs to treat PFAS in wastewater. Based on that reasonable assumption, the consultants estimated that future costs to assist POTWs with managing PFAS in New Jersey would be $1.5 billion. Unsworth Decl. at ¶ 11.

10

The State respectfully disagreed with the AEA's reliance on a competing, out-of-state cost model that is not based on efforts ongoing in New Jersey. During the public comment period on the Settlements and in briefing on the Motion to Approve the JCOs, the AEA and certain of its members offered substantially higher cost projections based on a model created for the Minnesota Pollution Control Agency in 2023 ("Barr Report").[6] The State's experts reviewed that same report when initially preparing their estimates, and reviewed it again after it was raised by the AEA. Unsworth Decl. at ¶¶ 6-10; Farley Decl. at ¶ 18. The State's view was then and continues to be that the Barr Report should not be used to predict costs in New Jersey, based on its methodology. The Barr Report did not factor any upstream PFAS source control into the estimates of costs POTWs could face, while that is a central strategy in New Jersey that is already underway. *See* Unsworth Decl. at ¶¶ 7-13. For that and several other technical reasons,[7] the State does not believe application of that study to predict costs here—which would produce unrealistic worst-case scenario cost estimates—is appropriate.

---

[6] Barr Eng'g Co. *et al.*, "Evaluation of Current Alternatives and Estimated Cost Curves for PFAS Removal and Destruction from Municipal Wastewater, Biosolids, Landfill Leachate, and Compost Contact Water," dated May 2023.

[7] For example, the Barr report also estimated ongoing PFAS removal costs based on removing certain PFAS that are not regulated in New Jersey. Unsworth Decl. at ¶ 10.

Regardless of their differing views on the best way to estimate future potential costs to POTWs in New Jersey, the State remains committed to working with AEA and POTWs on addressing PFAS. In furtherance of that commitment, following the January 7 hearing, the State and AEA reached an agreement designed to reduce costs for POTWs associated with any PFAS treatment while also protecting them from potentially debilitating PFAS liability, which is discussed further below. *See* Stipulation and Order Between the State, AEA, and Certain Utilities Authorities Regarding Plaintiffs' Motion to Approve JCOs, ECF 826 ("AEA Stipulation").

Additionally, the Department will continue to engage with the AEA and POTWs with respect to any regulations that may ultimately be proposed requiring PFAS treatment in the future. Cahall Decl. at ¶ 12. If those regulations are proposed, there will be a public comment period during which the Department will invite and take into account comments received before finalizing any such regulations. *Id*.

***County-Owned Fire Training Academies & Airports.*** The State undertook a macro analysis to generate, for purposes of settlement, an overall estimate of the costs to clean up county-owned fire training academies and airports in New Jersey where aqueous film forming foam ("AFFF") may have been used and resulted in PFAS contamination. Farley Decl. at ¶ 14; Unsworth Decl. at ¶¶ 14-20. The State determined that this was an appropriate approach under the circumstances, because many of these sites are only beginning investigations and initial remedial activities,

12

and more definite cost projections on a site-by-site basis are thus unavailable and could remain unknown for years. Cahall Decl. at ¶¶ 14-16.

As a starting point for this macro analysis, the State's consultants estimated cleanup costs per site to be $19.9 million. Unsworth Decl. at ¶ 17. This figure was derived from averaging available cost estimates for cleaning up two Department of Defense Air Force bases where AFFF was used and PFAS-contaminated soil was treated using "soil washing." *Id.* Using this figure of $19.9 million in cleanup costs per site, the State estimated—for purposes of settlement—that the costs to address PFAS contamination at the 22 county fire training academies (including a former academy for Union County) and two county-owned airports in New Jersey reasonably could be $478 million. *Id.* at ¶¶ 17-20.

Nevertheless, accounting for critical considerations demonstrates $478 million to be an over-estimation, because not all of those 24 sites are likely to require such expansive remediation. Among other things, there is expected to be variation at the sites in New Jersey with respect to the amount of AFFF used and extent of any PFAS contamination. *Id.* ¶ 21; Cahall Decl. at ¶ 15. Indeed, the Air Force bases used for the estimate are likely to have more significant AFFF use and contamination than many county properties. Further still, the per-site figure is based on the selection of soil washing as the remedy, *see* Unsworth Decl. at ¶ 17, which the Department has not required for PFAS contamination at sites in New Jersey. Instead, New Jersey law

generally requires that remedial actions be protective of public health and safety and the environment, a goal that can likely be achieved in other, less costly ways at a given site. Thus, while IEc's cost estimates assumed that each of these sites will have significant PFAS contamination requiring costly remediation, that is unlikely to be the case.

Additionally, the State considered that these costs will be reduced further based on contributions to fund investigations and cleanups from the Department of Defense, among other responsible parties such as additional AFFF manufacturers and distributors. LaTourette Decl. at ¶¶ 51, 91; Farley Decl. at ¶ 20. The Department of Defense is anticipated to make significant contributions as the leading user of AFFF and its ownership of property adjacent to multiple county-owned properties in New Jersey as it is likely a source of PFAS contamination to those nearby county-owned properties.[8] *See, e.g.*, LaTourette Decl. at ¶ 51.

Finally, the State's interactions with the Participating Counties through the public comment, briefing, and mediation process demonstrated that the State's approach to estimating costs was not fundamentally inconsistent with the Participating Counties' position. The State and the Participating Counties agreed on

---

[8] *See also* Naval Facilities Eng'g Systems Command, Naval Weapons Station Earle Environmental Restoration Program Public Website, https://www.navfac.navy.mil/Divisions/Environmental/Products-and-Services/Environmental-Restoration/Mid-Atlantic/Earle-NWS/PFAS-Sampling/.

the importance of addressing PFAS at these county-owned sites to reduce PFAS in the environment and in furtherance of protecting the public and likewise agreed that, as a general matter, the precise costs on a site-by-site basis are unknown at this time.[9] *See*, *e.g.*, Cahall Decl. at ¶ 16. Ultimately, the State and the Participating Counties were able to reach an agreement that balances the important interest of getting remediation work started at these sites against current uncertainty, by providing immediate funding to Participating Counties to begin investigations and cleanup activities while incorporating a rebalancing of that funding based on the "special needs" of certain Participating Counties that are found to be facing more significant PFAS costs over the longer-term. *See* Stipulation and Order Between the State and Participating Counties Regarding Plaintiffs' Motion to Approve JCOs, ECF 825 ("Participating County Stipulation").

**B.** **The Settlements Fairly and Reasonably Address PFAS Costs**

The State submits that, based on reasonable estimates of costs of PFAS to the public, the recoveries under the Settlements fairly and reasonably address those costs

---

[9] During the January 7 hearing, the Court inquired whether the State had reviewed a Site Investigation Report prepared by Monmouth County as part of its process to estimate potential costs. The purpose of this type of report under New Jersey law is to outline initial steps a party intends to take to confirm what contamination is on or around a site. *See* N.J.A.C. 7:26E-3.13. Because this type of report does not include an estimate of potential remediation costs, Monmouth County's report did not include an estimate of its remediation costs; for that reason the report was not used by the State to generate its cost estimates.

that may be attributable to the Settling Defendants. This is particularly the case when these recoveries will work in combination with additional financial assistance the State is providing and will continue to provide to public entities in New Jersey.

As the State set forth in its Motion to Approve the JCOs, the State, for purposes of settlement only, attributed 37.5% of the total estimated PFAS abatement costs of $5.5 billion to the Settling Defendants, which is approximately $2 billion. ECF No. 746-1, at 45-46; Farley Decl. at ¶ 20. Through these Settlements, the Settling Defendants are making payments of up to $795 million to abate PFAS in the State.[10] Farley Decl. at ¶ 21. When taking into account that Settling Defendants are also paying over $500 million directly to New Jersey public water systems through the nationwide water provider PFAS class action settlements, the Settling Defendants are paying approximately $1.295 billion to address an estimated $2 billion in statewide PFAS costs that the State allocated to them, or approximately 65% of the share of estimated costs attributed to them, which is an exceptional recovery for the State for the benefit of its residents and New Jersey's environment. *Id.* That is particularly the case given the uncertainties of numerous litigations that

---

[10] Notably, in addition to these payments to abate PFAS statewide, the Settling Defendants are also paying natural resource damages as compensation for the release of PFAS from Chambers Works, Parlin, and other sites in the amount of $270 million. The DuPont Defendants are further committed to posting financial guarantees to remediate the Chambers Works and Parlin sites, sites with significant PFAS contamination, up to $1.075 billion.

it would otherwise take to secure such recoveries, and the associated costs and time of pursuing those litigations. *Id.* ¶¶ 11, 12, 22.

The State's additional agreements with the AEA, a trade organization that advocates for POTWs' interests in New Jersey with a mission to assist its members in providing cost-effective service to their ratepayers, and the Participating Counties, which collectively act to protect the interests of the taxpayers within their jurisdictions, further evidence that the Settlements fairly and reasonably address these costs. As a result of extensive negotiations and cooperation, the State came together with these critical public partners to ensure there were clear mechanisms in the Settlements for them to receive the assistance they need in the broader effort to abate PFAS and safeguard New Jersey's taxpayers and ratepayers from the costs of such abatement. These parties are now united in urging the Court to approve these Settlements. *See* AEA Stipulation; Participating County Stipulation.

Finally, the recoveries obtained through these Settlements will be enhanced by existing Department programs that provide financial assistance to public entities and individual members of the public, such that the overall funding made possible through these Settlements will go even further towards removing PFAS from the water cycle and the environment in New Jersey.

For example, the Department will use a substantial portion of the proceeds from the Settlements as a funding source for the New Jersey Water Bank, a proven

17

program that has financed water quality infrastructure projects in New Jersey for nearly 40 years in a manner specifically designed to save taxpayers and ratepayers significant money. Cahall Decl. at ¶¶ 29, 31, 33, 34; *see also* LaTourette Decl. at ¶¶ 74-79. This will provide consistent year-over-year support for water infrastructure improvement projects necessary to reduce the occurrence of PFAS within the water cycle. *See* Settlement Funds Distribution Plan at 3.

The Water Bank, a partnership between the Department and the New Jersey Infrastructure Bank ("I-Bank"), provides low-cost financing for these projects from a variety of federal and state funding sources. LaTourette Decl. at ¶¶ 74-75. The Water Bank offers public entities and others financing from the Department at a 0% interest rate combined with funding from the I-Bank at its AAA-rated interest rate— resulting in substantially below-market interest rates that save local governments significant financing costs. *See, e.g.,* I-Bank, "Financing Benefits," https://www.njib.gov/nj/financing-benefits. In recent years, this blended rate has saved Water Bank users 25% to 40% on their financing costs versus financing their projects through other means—and since its inception, this financing program is estimated to have saved Water Bank users at least $2.77 billion through lower interest costs alone. *Id.*

Beyond this, the Water Bank also offers other forms of financial assistance such as principal forgiveness, further reducing costs to local governments to take on

18

critical clean water and drinking water projects. When the Water Bank provides principal forgiveness, the amount of principal forgiveness functions like a grant that results in direct savings to the local governments.

The Water Bank's principal forgiveness, below-market interest rates, and other assistance have, in total, produced more than $3.26 billion in estimated cost savings for users' taxpayers and ratepayers.[11] This cumulative figure demonstrates the immense cost savings provided by the Water Bank over time, and that leveraging the Water Bank in using funds from the Settlements will promote the fair and reasonable implementation of infrastructure projects in a responsible and impactful manner.[12] Further as discussed in Section II, the Water Bank has existing procedures

---

[11] New Jersey Environmental Infrastructure Financing Program, State Fiscal Year 2026 Financial Plan (May 2025) at 2, available at https://cdn.njib.gov/njeit/publications/2026/SFY26_WB_May_Report.pdf. The Merchantville Pennsauken Water Commission's ("MPWC") financing of drinking water improvements related to treating PFAS through the Water Bank is just one recent example as to how the Water Bank benefits ratepayers of New Jersey. MPWC saved approximately 44% (or approximately $3.5 million) of the total project costs through the Water Bank's principal forgiveness and low interest rates as compared to financing it independently. *See* I-Bank, "Merchantville Pennsauken Water Commission National Highway PFC Plant" (Nov. 12, 2025), https://www.njib.gov/news/merchantville-pennsauken-water-commission-national-highway-pfc-plant-690b9a10578da.

[12] Notably, the portion of the financing for PFAS water quality projects not subject to principal forgiveness will be returned to the Water Bank through gradual and manageable re-payments by its customers. Those payments, in turn, will be recommitted for further PFAS water quality projects. In that way, these Settlement funds will not just finance one round of projects but rather will become part of a perpetuating cycle of funding, where the Department's initial allocation for PFAS

19

for providing this financing across the State that can be leveraged in distributing funds recovered here.

Additional funding from the Settlements will further complement the Department's efforts to provide New Jersey's residents—at no cost to them—treatment for their PFAS-contaminated private wells and to provide critical support to public entities. In recent years, the Spill Fund has been a reliable resource for addressing PFAS in private wells and has paid for approximately 1,700 claims totaling $7.7 million to treat PFAS in wells by providing the claimants with point-of-entry-treatment systems or connections to public water systems. NJDEP, *State of the Environment*, at 189 (Jan. 15, 2026), https://dep.nj.gov/nj-state-of-the-environment/. By assisting these private well owners, the Department's Spill Fund has protected members of the public from continuing PFAS exposure at no cost to them, while also minimizing costs for public entities that may have otherwise absorbed these treatment costs. *See* LaTourette Decl. at ¶¶ 82-84. Settlement funds, in combination with Spill Fund annual revenues, will ensure the Department can continue to play this critical role in protecting the health and finances of New Jersey residents into the future.

---

water quality projects financing supports multiple rounds of projects over the course of decades for the benefit of present and future New Jersey citizens in a coordinated effort to reduce PFAS in the water cycle. *See generally* LaTourette Decl. at ¶¶ 77-78.

## II.    THE STATE'S DISTRIBUTION PLAN FOR SETTLEMENT FUNDS.

The Court also asked the State to further explain how the settlement "monies are going to be earmarked to help" public entities, including the Objectors. *See* Hearing Tr. at 59:13–14. In response to the Court's request for clarification, the Department has prepared a memorandum that describes how it will distribute the PFAS Abatement Funds to public entities and individual members of the public (the "Settlement Funds Distribution Plan"), attached as Addendum 1. The Settlement Funds Distribution Plan sets forth the processes the State will use to distribute PFAS Abatement Funds, including pursuant to agreements the State has reached with the AEA and the Participating Counties.[13]

### A.    <u>Distribution of Settlement Funds for PFAS Water Quality Projects</u>

As confirmed in the Settlement Funds Distribution Plan, the Department will use the PFAS Abatement Funds primarily as a source of funding for the Water Bank to promote water quality infrastructure projects. Cahall Decl. at ¶ 29; Settlement Funds Distribution Plan at 2-4. The Department will thus deploy a large share of the PFAS Abatement Funds through the Water Bank's existing annual review process,

---

[13] The State respectfully requests that the Court accept the Settlement Funds Distribution Plan as a clarification of the JCOs' terms and to include it with any Order the Court may enter approving the JCOs.

21

including a minimum amount of guaranteed funding that will be made available to POTWs to reduce costs for these entities to address PFAS.

The Department sets the priorities and funding packages for the Water Bank on a yearly basis in a manner that seeks to maximize the impact of available resources across the State. Cahall Decl. at ¶ 32; *see also* LaTourette Decl. at ¶¶ 35, 74-79. Each year, as required by the New Jersey Infrastructure Trust Act, N.J.S.A. 58:11B-1 *et seq.*, the Clean Water Act, 33 U.S.C. § 1381–1389, and the Safe Drinking Water Act, 42 U.S.C. § 300j-12, the Department develops and publishes an Intended Use Plan ("IUP") and associated documents for both water supply facilities ("Drinking Water Projects") and wastewater treatment facilities ("Clean Water Projects") that establish priorities and policies for the financial assistance offered through the Water Bank, describe the projects eligible for financing, and provide information on the funding packages available for the next fiscal year. *See* 40 C.F.R. Part 35 Subparts K and L; N.J.A.C. 7:22, Subchapters 3 and 4.

This yearly planning mechanism incorporates stakeholder input and ensures transparency through a public reporting process regarding the use of funds deployed by the Water Bank. *See, e.g.*, Water Infrastructure Investment Plan, "WIIP Sessions," https://dep.nj.gov/wiip/wiip-sessions. The IUPs for Drinking Water Projects and Clean Water Projects are subject to at least one public hearing and one public comment period before they are finalized. *See* N.J.A.C. 7:22-3.7(b) and 7:22-4.7(b).

Multiple resources are available to applicants in New Jersey, including detailed guidance, technical assistance, and a dedicated website. *See, e.g.*, NJWB, Applicant Guidance for New Jersey's Clean Water and Drinking Water State Revolving Funds (2023), https://dep.nj.gov/wp-content/uploads/wiip/srf-applicants-guide.pdf. Further, the Department maintains a publicly accessible Spending Dashboard that provides detailed information regarding eligible and approved projects. *See* NJDEP, "Water Infrastructure Spending Dashboard," https://dep.nj.gov/wiip/spending-dashboard/.

The Department will deploy PFAS Abatement Funds as a focused category of funding through the Water Bank to provide no-interest, low-interest, and principally forgiven financing for water quality projects to address PFAS throughout the State ("PFAS Water Quality Projects"). Cahall Decl. at ¶ 33; Settlement Funds Distribution Plan at 3. The Department will reserve funds each year for the Water Bank to invest in PFAS Water Quality Projects. Cahall Decl. at ¶ 34; Settlement Funds Distribution Plan at 2-3. Funds allocated by the Department to PFAS Water Quality Projects will be incorporated into the Department's annual IUPs and associated documents for Drinking Water Projects and Clean Water Projects. Cahall Decl. at ¶¶ 34; Settlement Funds Distribution Plan at 3.

Each year, through these documents, the Department will specify the projects eligible for funding, the principal forgiveness share of funding available, the

principal forgiveness cap per applicant, the total amount of principal forgiveness funding that will be available in the next fiscal year, the share of funding available through the Department interest free, and the share of funding available through the I-Bank at its AAA market rates. Cahall Decl. at ¶ 34; Settlement Funds Distribution Plan at 3. The process through which funding will be available will be governed by the Water Bank's existing and future statutory and regulatory requirements. Cahall Decl. at ¶ 34; Settlement Funds Distribution Plan at 3.

Through its agreement with the AEA, the State is committed to providing a set of benefits to POTWs that will enhance the assistance available to them through the Water Bank to address PFAS. The Department will provide, at a minimum, $100 million in principal forgiveness and an additional $50 million in financing to provide support for POTWs to abate PFAS. Settlement Funds Distribution Plan at 4; AEA Stipulation at ¶ 1. This is a minimum commitment, as the Department anticipates allocating additional PFAS Abatement Funds to the Water Bank to assist POTWs if and where necessary. Cahall Decl. at ¶ 35. Additionally, the Department is agreeing to reduce its origination fee associated with financing PFAS Water Quality Projects through the Water Bank from 2% to 1%, a reduction that will provide meaningful savings in project costs for POTWs. AEA Stipulation at ¶ 2. Finally, the State is providing further protection to POTWs by creating a mechanism for them to obtain a release, covenant not to sue, and contribution protection for certain types of claims

24

related to PFAS. *Id*. ¶ 3. This will protect POTWs, which are "passive receivers" of PFAS, preventing litigation and other costs from siphoning away funds that POTWs could put towards treatment and abatement of releases.

### B.    <u>Distribution of Settlement Funds for PFAS Abatement Projects</u>

PFAS Abatement Funds also will be used to assist public entities and individual members of the public with the costs of remediating publicly owned property (*e.g.*, fire training academies and airports) and treating contaminated potable wells. *See* Settlement Funds Distribution Plan at 2, 4. PFAS Abatement Funds will be disbursed for these purposes through two avenues: (1) through a Qualified Settlement Fund that will be established for the benefit of Participating Counties[14]; and (2) by the Department through its Spill Fund claims program via a rolling application process.

First, pursuant to an agreement with the Participating Counties, the Department has agreed to work cooperatively with the Participating Counties to establish and fund a Qualified Settlement Fund in the amount of $90 million, which will be used to assist the Participating Counties with investigating and remediating county-owned and operated fire training facilities and airports ("the County Fund").

---

[14] The Participating Counties are those that filed interventions with the Court or later entered notices as Interested Parties on the docket, which are the counties of Bergen, Burlington, Camden, Cape May, Cumberland, Gloucester, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Salem, Somerset, Sussex, Union, and Warren.

*See* Cahall Decl. at ¶ 36; Settlement Funds Distribution Plan at 4-5. The Department's agreement in this regard acknowledges that counties are uniquely situated public entities that will be responsible for remediating properties where significant volumes of AFFF were used. Cahall Decl. at ¶ 19. This County Fund assures funding will be earmarked for the Counties for this purpose, with each Participating County receiving initial allotments, followed by "special needs" distributions in the event more significant contamination issues are uncovered in particular counties. Participating County Stipulation at ¶ 6. The County Fund will be overseen by a trustee and a special master dedicated to managing any issues arising amongst the Participating Counties as it relates to that Fund. *Id*. ¶ 2. Additional details of this Fund are outlined in the agreement between the State and Participating Counties filed with the Court.

The State's agreement with the Participating Counties will benefit the public in multiple ways. Among other things, the agreement encourages the Counties to quickly initiate cleanup activities by providing allotments on a "use it or lose it basis" with remaining unused funds reverting to the State to address otherwise unmet PFAS abatement priorities. Cahall Decl. ¶ 40. The agreement also provides a pathway for the Department and the Counties to enter into cooperative Administrative Consent Orders, through which the Department will work with the Counties to address additional remediation cost issues and provide contribution protection to the

26

Counties, protecting them from certain types of third-party claims concerning PFAS contamination, all in pursuit of the shared goal of protecting New Jersey's residents and taxpayers.[15] Cahall Decl. at ¶ 41.

Second, the Department will disburse PFAS Abatement Funds via an application process that builds off the Department's existing Spill Fund Damage Claim Process through which public entities and individual members of the public may apply for funding to assist with the costs of abating and remediating PFAS contamination. Cahall Decl. at ¶ 43; Settlement Funds Distribution Plan at 4. Currently, public entities and individuals in New Jersey can file a claim against the Spill Fund for damages resulting from the discharge of hazardous substances. *See* N.J.S.A. 58:10-23.11g. The Environmental Claims Administration, the office that administers the Spill Fund, accepts and reviews damage claims on an ongoing basis through a standard application available on the Department's website. Cahall Decl. at ¶ 44; DEP, Spill Compensation Damage Claim Form (ECA-001) (Rev. 2/2/22), https://dep.nj.gov/wp-content/uploads/srp/spillfund.pdf?202202. Examples of damages paid out by the Spill Fund include damages relating to potable well treatment systems, public waterline installations, remediation of contaminated sites,

---

[15] The Department is committed to working cooperatively with the remaining non-Participating Counties and treating all New Jersey counties equitably.

and other real and personal property damages caused by discharges of hazardous substances. Cahall Decl. at ¶ 45.

The Spill Fund is funded primarily from a tax on the transfer of petroleum products or other hazardous substances within New Jersey and has limited resources. Cahall Decl. at ¶ 46. Moreover, by law, there are certain limitations on claims that can be paid by the Spill Fund. *See, e.g.*, N.J.S.A. 58:10-23.11k; 58:10-23.11g. The Department therefore will use PFAS Abatement Funds to supplement monies available through the Spill Fund to assist public entities and individuals with PFAS Abatement Projects. Cahall Decl. at ¶ 48.

Applicants will thus be directed to file claims with the Spill Fund, and the Environmental Claims Administration will be authorized to provide supplementary funding for PFAS abatement through that process. Cahall Decl. at ¶ 49; Settlement Funds Distribution Plan at 4. Applicants will be required to document previously incurred costs and/or provide detailed project costs for estimated future costs, to ensure that funds are disbursed appropriately. Cahall Decl. at ¶ 51; Settlement Funds Distribution Plan at 4.

## III.   THE SETTLEMENT FUNDS ARE PROTECTED FOR THEIR INTENDED PURPOSE.

The State has acted to protect the Settlement Payments for their intended purpose to the greatest extent possible within the bounds of the New Jersey State Constitution. First, as explained below, each JCO requires that, of the up to $1.325

billion in cash payments from the JCOs, no more than $245 million may be used for purposes other than restitution or remediation of a harm to the environment or natural resources. Second, each JCO identifies a specific amount of natural resource damages ("NRD") that must be deposited into the State's NRD Constitutional Dedication Account used for purposes consistent with the State's NRD Constitutional Amendment. *See* N.J. Const. art. VIII, § 2, ¶ 9. Third, the State will establish a special revenue account with the State Treasury, the PFAS Abatement Fund, where abatement funding will be deposited and managed for its intended purpose.

### A. <u>The Settlement Payments Are to Be Used for Restitution or Remediation of Harm to the Environment.</u>

The State's agreements with Settling Defendants included provisions in the JCOs to make clear that the use of certain funds were restricted to ensure the Settling Defendants' payments would be used in an agreed-upon manner and that Settling Defendants would receive proper tax treatment for their payments. Together, these provisions have the effect of requiring that, subject only to specified credits or reductions for pre-payment, a minimum of $1.080 billion from the JCOs must be used for restitution or remediation of a harm to the environment or natural resources.

Specifically, the DuPont JCO requires the DuPont Defendants to pay up to $875 million to the State, subject to crediting or pre-payment. *See* DuPont JCO ¶¶ 7–13, Exh. A. Paragraph 12 of the DuPont JCO requires the State to use no more

than $175 million of this payment for purposes not constituting restitution or remediation of harm to the environment, wildlife, or natural resources. *Id.* ¶ 12. The 3M JCO requires 3M to pay an amount not less than $400 million and not more than $450 million to the State, subject to crediting. 3M JCO ¶¶ 44-45 & Exh. A. Paragraph 44 of the 3M JCO requires the State to use no more than $70 million of these payments for purposes not constituting restitution or remediation. *See* 3M JCO ¶¶ 44(c)(iv), 44(e)(vii).

Per the terms of the JCOs, then, the State cannot spend more than $245 million for purposes other than "restitution or remediation of a harm to the environment, wildlife, or natural resources." The balance of the $1.080 billion in cash payments, uncapped remediation obligations, and financial assurance mechanisms—together valued at over $2.2 billion—are required to address PFAS contamination and other environmental harms by the terms of the JCOs, subject to enforcement both as a contract and an Order of this Court.

**B.**     **The NRD Constitutional Amendment Governs the NRD Settlement Payments.**

In 2017, the New Jersey Constitution was amended to add a requirement that all natural resource damages paid to the State in connection with settlements and judicial and administrative awards be used to restore or protect the natural resources of the State. *See* N.J. Const. art. VIII, § 2, ¶ 9. Relevant here, the NRD Constitutional Amendment requires the State to "credit[ ] annually to a special account in the

General Fund an amount equivalent to the revenue annually derived from all settlements and judicial and administrative awards relating to natural resource damages collected by the State in connection with claims based on environmental contamination." *Id.*[16] Additionally,

> The amount annually credited pursuant to this paragraph shall be dedicated, and shall be appropriated from time to time by the Legislature, for paying for costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, or for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to natural resource damages . . . .

*Id.* Finally, the NRD Constitutional Amendment requires that "[t]he first priority for the use of" these NRD payments "by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, … shall be in the immediate area in which the damage to the natural resources occurred in connection with the claim for which the moneys were recovered." *Id.*

The NRD payments due under the JCOs—specifically, $225 million under the DuPont JCO and $140 million under the 3M JCO—must be administered in

---

[16] To implement the NRD Constitutional Amendment, a dedicated account exists within the General Fund for the deposit and use of NRD received by the State in connection with settlements and awards. *See* P.L. 2025, ch. 74 (2026), at 103 (referencing the "Natural Resource Damages – Constitutional Dedication account").

accordance with the NRD Constitutional Amendment. *See* DuPont JCO ¶ 7(c)(i); 3M JCO ¶¶ 44(c)(i)*,* 46; N.J. Const. art. VIII, § 2, ¶ 9. The 3M JCO allocates the portion of 3M's Settlement Payments that will be paid for NRD in each of the next 25 years. *See* 3M JCO at Exh. A. In each year that the State receives an NRD payment from 3M, that amount will be credited to the NRD Constitutional Dedication account. *See* N.J. Const. art. VIII, § 2, ¶ 9. The DuPont JCO allocates a total settlement payment amount per year for the next 25 years but does not specify the portion of each annual payment that is for NRD or Abatement Damages. *See* DuPont JCO at Exh. A. To comply with the NRD Constitutional Amendment, the Commissioner therefore will allocate a portion of each settlement payment due under the DuPont JCO to NRD or Abatement Damages on an annual basis, ensuring that the total amount of NRD and Abatement Damages paid over 25 years complies with Section V of the DuPont JCO. The amount allocated to NRD in any given year will be credited to the NRD Constitutional Dedication account. *See* N.J. Const. art. VIII, § 2, ¶ 9.

So too must the NRD payments due under the JCOs be spent in accordance with the purposes and geographic prioritization required by the NRD Constitutional Amendment. *See id*. As a result, the Department must prioritize its investment of NRD payments related to the Chambers Works, Parlin, Pompton Lakes Works, and Repauno Works Sites in restoration projects that are in the "immediate area" of those

Sites, which includes Carneys Point and Sayreville, if "reasonable project[s] [are] available." *See* N.J. Const. art. VIII, § 2, ¶ 9.

### C.      The Settlements Require that PFAS Abatement Funds Be Used for Specific Purposes.

Finally, each of the JCOs requires that the PFAS Abatement Funds be managed and used for specific purposes—primarily to abate PFAS contamination and discharges of PFAS throughout the State. Consistent with the requirements of the JCOs, the State will establish a dedicated special revenue fund to hold abatement payments from both JCOs and will regularly report on the availability and use of moneys in the account to manage the use of these funds for their dedicated purposes within the boundaries of the State Constitution.

As to the DuPont JCO, Paragraph 7(c)(ii) allocates $525,000,000 of the DuPont Settlement Payments to Abatement Damages and requires such Damages "to be held in dedicated Departmental trust accounts for purposes consistent with the administration and use by the Department of 'Abatement Damages.'" *See* DuPont JCO ¶ 7(c)(ii); *id.* ¶ 6 (definition of "Abatement Damages Amount"). Those purposes are specifically set forth in the JCO as follows: to "improv[e] and protect[ ] public health, safety, and the environment, including but not limited to (i) taking actions to address environmental, public health, and safety-related impacts from Industrial Sites Discharges; and (ii) supporting water quality infrastructure projects, including projects to install, operate, and maintain water treatment in public and private wells

33

sufficient to meet applicable state standards and protect the public health, including with respect to PFAS Contamination." *Id*. ¶ 6 (definition of "Abatement Damages").

The 3M JCO allocates $170,000,000 of the 3M Settlement Payments for PFAS Contamination Abatement Funding. *See* 3M JCO ¶¶ 44(c)(ii), 47. The JCO requires PFAS Contamination Abatement Funding paid by 3M to be used to "protect the public health and safety and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS." *Id*. ¶ 51. Projects that may be funded with PFAS Contamination Abatement Funding are described in Paragraph 50. *Id*. ¶ 50. The 3M JCO also requires a payment of an additional $50,000,000 to $100,000,000 as the New Jersey Leadership Payment. *Id*. ¶ 44(e). Similar to PFAS Contamination Abatement Funding, the State will use the New Jersey Leadership Payment for the protection of "the public health and safety and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS." *Id*. ¶ 44(e)(vi).

To ensure that PFAS Abatement Funds will be used for dedicated purposes as required by the JCOs, the State will establish a special revenue fund outside of the General Fund to administer abatement payments from both JCOs for their dedicated purposes. Cahall Decl. at ¶¶ 22-23. This fund, described in the Governor's Detailed Budget Recommendations for Fiscal Year 2027, will be a separate, non-lapsing fund known as the "PFAS Abatement Fund." *See* Office of Management and Budget, *The*

34

*State of New Jersey Governor's Message, Detailed Budget Recommendations, Fiscal Year 2027* (March 2026), at D-163, https://www.nj.gov/treasury/omb/publications/27budget/FY%202027%20Budget%20Detail%20-%20Full.pdf. As stated in the Governor's Detailed Budget Recommendations, which is the Governor's proposal for the State's Annual Appropriations Act:

> All funds deposited into the PFAS Abatement Fund are appropriated solely for projects which are eligible abatement actions consistent with the terms of the settlement agreements, consent orders, or both, governing the use of such funds and may include administrative costs in amounts that are consistent with the terms of such settlement agreements, consent orders or both, subject to the approval of the Director of the Division of Budget and Accounting. The Commissioner of Environmental Protection shall select the projects which are eligible abatement actions consistent with the terms of the settlement agreements, consent orders, or both. Any grants awarded through new or existing grant programs shall be awarded on a competitive basis, using criteria determined by the Department of Environmental Protection.

*Id*.

This proposed approach follows one that the State used to hold and administer funds received by the State from the Environmental Mitigation Trust established in partial settlement of *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, Case No: MDL No. 2672 CRB (JSC) (N.D. Cal.). *See* NJDEP Bureau of Mobile Sources, "Volkswagen Settlement Information," https://dep.nj.gov/vw/. Following the settlement of that matter, the State established

35

a separate, non-lapsing fund known as the "Volkswagen Environmental Mitigation Fund." *See* Fiscal Year 2019 Appropriations Act, P.L. 2018, c. 53, at ¶ 95. Each year, the New Jersey Legislature, following the Governor's Budget Recommendations, has included in the State's Annual Appropriations Act a requirement that all funds received by the State from the Volkswagen Environmental Mitigation Trust "are appropriated solely for projects which are eligible mitigation actions consistent with the terms of the trust agreement." *Id.*[17] Such projects have been selected by the Department, which has regularly released detailed spending reports to the public accounting for the use of the Volkswagen settlement funds. *See* NJDEP Bureau of Mobile Sources, "Volkswagen Settlement Information," https://dep.nj.gov/vw/.

As with the Volkswagen settlement, the Department is committed to ensuring transparency as to the receipt and use of funds in the PFAS Abatement Fund. Cahall Decl. at ¶ 24. To that end, the Department will develop a PFAS Settlement Information Website that provides the public with information regarding PFAS Abatement Funds, including eligible and approved projects; the amount of funds available and expended; frequently asked questions; and additional resources.

---

[17] *See also* Fiscal Year 2026 Appropriations Act, P.L.2025, c.74, at ¶ 89; Fiscal Year 2025 Appropriations Act, P.L. 2024, c. 22, at ¶ 93; Fiscal Year 2024 Appropriations Act, P.L. 2023, c. 74, at ¶ 93; Fiscal Year 2023 Appropriations Act, P.L. 2022, c. 49, at ¶ 92; Fiscal Year 2022 Appropriations Act, P.L. 2021, c. 133, at ¶ 93; Fiscal Year 2021 Appropriations Act, P.L. 2020, c. 97, at ¶ 94; Fiscal Year 2020 Appropriations Act, P.L. 2019, c. 150, at ¶ 95.

Settlement Funds Distribution Plan at 4; Cahall Decl. at ¶ 25. Further, the Department will publish annual funding reports on the PFAS Settlement Information Website that state the amount of funding that has been received by and disbursed from the Fund consistent with the JCOs. Settlement Funds Distribution Plan at 4; Cahall Decl. at ¶ 26.

## CONCLUSION

For the reasons set in the State's Motion to Approve the JCOs and further set forth in this Report,[18] the State respectfully requests that the Court approve these historic Settlements.

Dated: June 1, 2026                          Respectfully submitted,

                                             **JENNIFER DAVENPORT**
                                             **ATTORNEY GENERAL**
                                             **OF NEW JERSEY**
                                             *Attorney for Plaintiffs*

                                             By: */s/ Gwen Farley*
                                             Gwen Farley, Esq.
                                             Deputy Attorney General
                                             R.J. Hughes Justice Complex
                                             25 Market Street, P.O. Box 093
                                             Trenton, New Jersey 08625-0093
                                             Tel.: (609) 376-2761
                                             Gwen.Farley@law.njoag.gov

---

[18] The analysis contained in this Supplementary Report and supporting materials were conducted solely for purposes of the Settlements and certain objections made to the Settlements and not for any other purpose. The State thus reserves all rights to pursue costs and damages relating to PFAS or other contaminants, including as against Settling Defendants should the Settlements not be approved and finalized.

**KELLEY DRYE & WARREN LLP**
*Special Counsel to the Attorney General*

By: */s/ Geoffrey W. Castello*
Geoffrey W. Castello, Esq.
7 Giralda Farms, Suite 340
Madison, NJ 07940
Tel.: (973) 503-5900
GCastello@KelleyDrye.com

*William J. Jackson, Esq.
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000
BJackson@kelleydrye.com

David M. Reap, Esq.
Zoe Peer Makoul, Esq.
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800
DReap@KelleyDrye.com
ZMakoul@kelleydrye.com

Erin Hodge, Esq.
670 Maine Avenue SW
Suite 600
Washington, DC 20024
Tel.: (202) 342-8400
EHodge@kelleydrye.com

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General

*John K. Dema, Esq.
*Briana Dema, Esq.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034

38

Tel.: (340) 773-6142
jdema@demalaw.com
jtdema@demalaw.com
bdema@demalaw.com

Scott E. Kauff, Esq.
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
Tel.: (202) 309-0200
skauff@demalaw.com

# ADDENDUM 1



# State of New Jersey

**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
OFFICE OF CHIEF ADVISOR
Legal, Regulatory and Legislative Affairs
401 East State Street
P.O. Box 402, Mail Code 401-07
Trenton, New Jersey 08625-0420
www.nj.gov/dep

**Mikie Sherrill**
*Governor*

**Dr. Dale G. Caldwell**
*Lt. Governor*

**Ed Potosnak**
*Commissioner*

## MEMORANDUM

**DATE:** June 1, 2026

**SUBJECT:** Dupont/3M Settlement Funds Distribution Plan

---

This memorandum sets forth the processes through which the Department of Environmental Protection ("Department") will distribute certain funds under the State's Judicial Consent Orders with the DuPont Defendants and 3M Company ("JCOs" or "Settlements"). The Department asks the Court to accept this Distribution Plan as a clarification of the Settlements' terms and to include it with any order the Court may enter approving the JCOs.

### Background

On May 12, 2025, and August 4, 2025, respectively, the State entered into proposed JCOs with 3M and the DuPont Defendants to resolve certain claims, including claims related to PFAS. Following a public comment process, on November 21, 2025, the State moved before the U.S. District Court for the District of New Jersey for approval of the Settlements. The Court, during a hearing concerning approval of the Settlements on January 7, 2026, requested further information regarding the processes through which proceeds from the Settlements would be held and disbursed, including to county, municipal, and local government units. The Department has prepared this Distribution Plan in response to the Court's request.

The 3M JCO requires 3M to pay an amount not less than $400,000,000 and not more than $450,000,000 to the State, subject to potential credits, as set forth in Section VII and Exhibit A of the 3M JCO ("the 3M Settlement Payments"). Paragraph 44(c)(ii) and Paragraphs 47 through 51 of the 3M JCO allocate $170,000,000 of the 3M Settlement Payments for PFAS Contamination Abatement Projects and require that such amount be administered and used by the Department to abate PFAS contamination or discharges of PFAS. Paragraph 44(e) of the 3M JCO allocates between $50,000,000 and $100,000,000 of the 3M Settlement Payments to the New Jersey Leadership Payment, proceeds from which will be used to protect the public health and safety and the environment from impacts caused directly or indirectly by any PFAS contamination or discharge of PFAS.

The DuPont JCO requires the DuPont Defendants to pay $875,000,000 to the State, subject to potential credits, as set forth in Section V and Exhibit A of the DuPont JCO ("the DuPont Settlement Payments"). Paragraphs 6 and 7(c)(ii) of the DuPont JCO allocate $525,000,000 of the DuPont Settlement Payments to Abatement Damages and require that the Abatement Damages be held in one or more dedicated trust accounts and be administered and used by the Department for the specific purpose of improving and protecting public health, safety, and the environment, including but not limited to (i) taking actions to address environmental, public health, and safety-related impacts from Industrial Sites Discharges; and (ii) supporting water quality infrastructure projects, including with respect to PFAS Contamination.

Payments to be made by 3M and the DuPont Defendants for natural resource damages collectively total up to $365,000,000 and will be administered in accordance with N.J. Const. art. VIII, § 2, ¶ 9 ("NRD Constitutional Amendment"). The NRD Constitutional Amendment directs the Department as to how to credit and invest natural resource damages it collects from responsible parties. Administrative Order No. 2023-08, issued by the Commissioner of the NJDEP on March 14, 2023, established requirements for the Office of Natural Resource Restoration to enhance the public availability of information pertaining to the identification, planning, and implementation of restoration projects. As such, the NRD Constitutional Amendment and Administrative Order No. 2023-8 establish policies and procedures for the administration and use of the natural resource damages received through the 3M and DuPont JCOs and for public engagement related thereto.

Payments to be made by 3M for PFAS Abatement Projects and New Jersey Leadership Payments and payments to be made by the DuPont Defendants for Abatement Damages collectively total up to $795,000,000 (together referred to as "PFAS Abatement Damages"). The 3M and DuPont JCOs require the State to use PFAS Abatement Damages for dedicated purposes consistent with such JCOs.

The State will receive the 3M Settlement Payments and DuPont Settlement Payments, collectively totaling up to $1.16 billion, only if and when the JCOs become final and non-appealable, consistent with Paragraph 44(a)-(b) of the 3M JCO and Paragraph 7(a)-(b) of the DuPont JCO.

The State recognizes further information is helpful with respect to the disbursement procedures for PFAS Abatement Damages, including to county, municipal, and local government units. The State provides further information below.

**Distribution of PFAS Abatement Funding**

The PFAS Abatement Damages proceeds will be disbursed through two primary means.

First, PFAS Abatement Damages received by the State will be deposited into a separate, non-lapsing fund to be known as the "PFAS Abatement Fund" that will primarily be used as an additional source of funding for the New Jersey Water Bank to provide loans that include no-interest, low-interest, and/or principal forgiveness to finance water quality projects to address PFAS throughout the State ("PFAS Water Quality Projects"), including specific assistance for publicly owned wastewater treatment plants ("POTWs"). This funding will provide consistent

2

year-over-year support for water infrastructure improvements necessary to reduce the occurrence of PFAS within the water cycle.

The Department will also use this Fund to provide financial assistance to county, municipal, and local government units and the public, including private potable well owners, for projects to remediate and otherwise abate PFAS contamination ("PFAS Abatement Projects"). These processes are explained in further detail below.

Second, the Department has reached an agreement with 18 Participating Counties[1] that provides for a process for the disbursement of $90,000,000 of the PFAS Abatement Damages to a Qualified Settlement Fund to be used by those Counties to abate PFAS at county-owned fire training academies and airports. This process recognizes the Counties' unique responsibility for investigating and remediating publicly owned sites with significant use of AFFF, fire training academies and airports.

**PFAS Water Quality Projects**

New Jersey has a long-standing, successful framework to provide funding to support critical water infrastructure improvements. The Water Bank is a partnership between the Department and the New Jersey Infrastructure Bank ("I-Bank") to provide low-cost financing for the design, construction, and implementation of projects that help protect and improve water quality and ensure safe and adequate drinking water.

The Department will allocate funds from the PFAS Abatement Fund as an additional capitalization source to the Clean Water State Revolving Fund and Drinking Water State Revolving Fund (together, "SRF") administered by the Water Bank providing financial assistance for clean water and drinking water infrastructure projects that address PFAS.

The Department will accept applications to the Water Bank for funding for PFAS Water Quality Projects through www.h2loans.com. Each year, through the proposed Intended Use Plans that are subject to at least one public hearing and one public comment period, the Department will specify the following for PFAS Water Quality Projects: (a) the projects that are eligible for funding; (b) the principal forgiveness share of funding; (c) the principal forgiveness cap per applicant; (d) the total amount of principal forgiveness funding that will be available in the next fiscal year; (e) the share of loan funding available from the Department interest free; and (f) the share of loan funding available through the I-Bank at its AAA market rate. The requirements of N.J.A.C. 7:22, Subchapter 3, including any amendments thereto in the future, will be used to evaluate projects and determine the distribution of funds allocated by the Department from the PFAS Abatement Fund to the Water Bank for PFAS Water Quality Projects.[2]

---

[1]    The Participating Counties are Bergen, Burlington, Camden, Cape May, Cumberland, Gloucester, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Salem, Somerset, Sussex, Union, and Warren.

[2]    Public water systems that receive funds under the national Public Water System class settlements will need to use any such funds first to address unmet needs before seeking financial assistance from the Drinking Water State Revolving Fund made available through the PFAS Abatement Fund.

3

Pursuant to an agreement with the Association of Environmental Authorities of New Jersey and seven of its members,[3] the Department has agreed to provide a minimum of $150,000,000 from the PFAS Abatement Fund to the Water Bank to assist POTWs with the costs of infrastructure upgrades to abate PFAS. Of that amount, $100,000,000 will be used to provide principal forgiveness in connection with financing made available through the Water Bank, and another $50,000,000 will support the provision of no-interest loans. Additionally, the Department is agreeing to reduce its origination fee associated with financing PFAS Water Quality projects for POTWs through the Water Bank from 2% to 1%.

**PFAS Abatement Projects**

The Department will also disburse PFAS Abatement Funds via an application process that builds off the Department's existing New Jersey Spill Compensation Fund ("Spill Fund") Damage Claim Process through which political subdivisions and individual members may apply for financial assistance to help abate PFAS contamination. This funding will supplement monies available through the Spill Fund to assist political subdivisions and individuals with the costs of projects to abate PFAS. Applicants will be directed to file claims with the Spill Fund, and the Environmental Claims Administration will be authorized to provide supplementary funding for PFAS abatement through that process. Applicants will be required through this process to document previously incurred costs and/or to provide detailed project costs for anticipated future projects, to ensure that funds are disbursed appropriately. [4]

To ensure transparency regarding the availability and use of funds in the PFAS Abatement Fund, the Department will develop a PFAS Settlement Information Website that provides the public with information regarding the PFAS Abatement Funds, including eligible and approved projects; amount of funding available and expended; frequently asked questions; and additional resources. The Department will also publish annual funding reports on the PFAS Settlement Information Website that state the amount of funding that has been received by and disbursed from the Fund consistent with the JCOs.

**County Qualified Settlement Fund**

Pursuant to an agreement with the Participating Counties, the Department will direct the Settling Defendants to pay $90,000,000 of the PFAS Abatement Damages in annual installments over eight years into a Qualified Settlement Fund ("QSF") that will be established for the benefit of the Participating Counties and overseen by a trustee and a special master. Funds distributed by the

---

[3]    The seven members are: Morris County Municipal Utilities Authority, Rockaway Valley Regional Sewerage Authority, Somerset Raritan Valley Sewerage Authority, Hanover Sewerage Authority, Rahway Valley Sewerage Authority, Stony Brook Regional Sewerage Authority, and the Musconetcong Sewerage Authority.

[4]    The Department will also invest a comparatively smaller amount of funding from the PFAS Abatement Fund in PFAS-related research to benefit remediation efforts across the State. Since 2019, DEP has invested more than $3,000,000 in PFAS-related research. This dedicated research effort has improved the Department's understanding of PFAS contamination and exposure, enabling targeted cleanup actions and stronger public health protections. Continued research will further expand knowledge regarding human-health impacts, multimedia occurrence, cost-effective drinking water and wastewater treatment and destruction methods, improved onsite remediation techniques, legacy landfill impacts, indoor air exposure pathways, and ecological screening levels.

4

QSF will be used by the Participating Counties to investigate and remediate PFAS contamination at county-owned fire training academies and airports.[5]

**NRD Funding for Restoration Projects**

This memorandum also confirms that the NRD funds recovered from the 3M and DuPont Settlements will be governed by the processes and procedures set forth in the Natural Resource Damages Constitutional Amendment and Administrative Order ("AO") No. 2023-08.[6]

NRD funds received under the settlements totaling $365,000,000 include: (i) through the DuPont JCO (a) $100,000,000 relating to the Chambers Works Site, (b) $75,000,000 relating to the Pompton Lakes Works Site, (c) $30,000,000 relating to the Parlin Site, and (d) $20,000,000 relating to the Repauno Works Site; and (ii) through the 3M JCO (a) $105,000,000 relating to the Chambers Work Site, (b) $17,500,000 relating to PFAS contamination from AFFF, and (c) $17,500,000 relating to PFAS contamination from other sources.

Pursuant to the Natural Resource Damages Constitutional Amendment, those funds will be used according to a priority system, with "[t]he first priority for the use of any moneys by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, … in the immediate area in which the damage to the natural resources occurred in connection with the claim for which the moneys were recovered." *See* N.J. Const. art. VIII, § 2, ¶ 9.

Consistent with AO No. 2023-08, the Department will engage the public on potential restoration projects for which this NRD funding may be used. Municipalities and members of the public may submit potential restoration projects via ONNR's Potential Restoration Project Submission Portal accessible at https://dep.nj.gov/nrr/potential-restoration-project-submission-portal/.

---

[5]   The Department is committed to cooperating with the remaining non-Participating Counties and treating all New Jersey counties equitably.

[6]   NRD funds will not be re-allocated by the Department for abatement funding.