# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> E.I. DU PONT DE NEMOURS AND COMPANY, et al., <br><br> Defendants. | Case No.  2:19-cv-14758-RMB-JBC <br> 1:19-cv-14765-RMB-JBC <br> 1:19-cv-14766-RMB-JBC <br> 3:19-cv-14767-RMB-JBC <br><br><br> **DECLARATION OF SHAWN M. LATOURETTE IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE JUDICIAL CONSENT ORDERS** |

I, **SHAWN M. LATOURETTE**, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I was the Commissioner of the New Jersey Department of Environmental Protection, one of the named Plaintiffs in the above-captioned matters, until January 20, 2026. The other Plaintiffs were the Department of Environmental Protection ("Department") and the Administrator of the Spill Compensation Fund (collectively, "Plaintiffs" or "State"). I was the Commissioner at the time the State entered into the Judicial Consent Order with the 3M Company ("3M") and the Judicial Consent Order with EIDP, Inc (f/k/a E.I. DuPont de Nemours and Company), Corteva, Inc., DuPont de Nemours Inc., DuPont Specialty Products USA, LLC, The Chemours Company, and The Chemours Company FC, LLC (collectively, the "DuPont Defendants").[1]

---

[1] The Judicial Consent Orders are referred to collectively herein as "the JCOs" or "the Settlements."

1

2.      I submit this Declaration in support of Plaintiffs' Motion to Approve Proposed Judicial Consent Orders With Settling Defendants (Case 1:19-cv-14766-RMB-JBC, ECF 746) ("Approval Motion"), and more specifically in support of Plaintiffs' Supplementary Report in Support of Approval of the Judicial Consent Orders ("Supplementary Report") filed herewith. I am familiar with all the facts and circumstances set forth herein.

3.      I served at the Department from September 24, 2018, to January 20, 2026. Prior to being appointed Acting Commissioner by Governor Philip D. Murphy in January 2021 and confirmed by the Senate as Commissioner in June 2021, I served first as the Deputy Commissioner for legal and regulatory affairs and as Chief of Staff to former Department Commissioner Catherine R. McCabe.

4.      During my service as Commissioner, I was the chief executive and primary public facing representative of the Department. As Commissioner, Deputy Commissioner, and Chief of Staff, I was authorized to speak on behalf of the Department and represent its positions to the public.

5.      As Commissioner, I was responsible for the formulation and implementation of statewide environmental policy. I oversaw regulatory and administrative programs that implement environmental laws and served as the trustee of New Jersey's natural resources on behalf of the public.

6.      In each of my roles at the Department, my responsibilities included developing regulations, policies, and programs to address contamination from chemicals known as PFAS (per- and polyfluoroalkyl substances), also commonly referred to as "forever chemicals." This work required understanding the Department's historical approach to investigating and responding to the presence of PFAS in New Jersey's environment.

2

7.      From the time I began serving at the Department in September 2018, I worked closely with the Department's legal counsel on the above-captioned matters, was deposed, and testified during the Chambers Works trial. I was directly involved in the settlement negotiations between the State, 3M, and the DuPont Defendants, and was the final decision-maker in the Department's subsequent approval of the JCOs.

8.      This Declaration is based upon personal information and reflects only my own knowledge and understanding of the positions of the Department during my time at the Department. I cannot represent the current policy or positions of the Department after my tenure ended on January 20, 2026. To the extent any part of this Declaration can be interpreted as speaking to the Department's current or future policy, that is not my intent.

9.      In support of the State's Approval Motion, this Declaration details the Department's (1) investigations and assessments of the scope of PFAS contamination across the State, including contamination from aqueous film-forming foam ("AFFF") and PFAS contamination in the water cycle, including as it affects wastewater treatment facilities; and (2) actions taken by the Department to combat PFAS contamination, including: (a) the establishment of regulatory standards to reduce the impact of PFAS upon human health and the environment; (b) the Department's existing financial supports for pollution abatement, including remedial funding and environmental infrastructure financing programs; (c) enforcement actions to ensure the accountability of manufacturers and industrial dischargers of PFAS; (d) the State's recovery of funding through prior enforcement actions; and (e) the recovery of additional funding through the JCOs (if approved) to support the State's framework for PFAS remediation and abatement.

3

I.      **The Department Investigates and Assesses the Scope of PFAS Contamination in New Jersey.**

   A.   ***The Department's Coordination and Review of Scientific Studies to Assess PFAS Occurrence and Impacts.***

10.     The Department has played a national leadership role in assessing and responding to environmental and public health risks presented by PFAS through scientific research, standards development, monitoring, reporting, and regulation of PFAS.

11.     Between 2006 and 2009, New Jersey conducted the country's first statewide studies of the presence of PFAS in drinking water. *See* N.J. Dep't Envtl. Prot., *Determination of Perfluorooctanoic Acid (PFOA) in Aqueous Samples* (Jan. 2007), https://dspace.njstatelib.org/server/api/core/bitstreams/c898e90d-eff3-40aa-95b7-deb6f65a3363/content; N.J. Dep't Envtl. Prot., *Occurrence of Perfluorinated Chemicals in Untreated New Jersey Drinking Water Sources* (April 2014), https://www.nj.gov/dep/watersupply/pdf/pfc-study.pdf.

12.     In February 2007, the Department published a health-based guidance level for perfluorooctanoic acid ("PFOA") in drinking water at 40 parts per trillion ("ppt"), the most protective guidance for PFOA at the time. *See* Guidance for perfluorooctanoic acid (PFOA) in drinking water at Pennsgrove Water Supply Company (Feb. 13, 2007), http://www.nj.gov/dep/watersupply/pdf/pfoa_dwguidance.pdf.

13.     In addition to its drinking water investigations, the Department has conducted and overseen studies on the occurrence and impact of PFAS in surface waters, sediment, and fish tissue. Those studies are publicly available, including, for example: Sandra M. Goodrow et al., *Investigation of levels of perfluoroalkyl substances in surface water, sediment, and fish tissue in New Jersey, USA*, ELSEVIER (Aug. 10, 2020),

4

https://www.sciencedirect.com/science/article/abs/pii/S0048969720323561?via%3Dihub) and

David H. Keller et al., *Determination of Fish Bioaccumulation Factors (BAFs) for Selected PFAS Contaminants in Marine and Freshwater Systems* (Nov. 2024), https://dspace.njstatelib.org/server/api/core/bitstreams/93e9e373-3414-425d-9e78-c3c76b263aba/content.

16.    The Department has also overseen studies of PFAS occurrence, biotransformation, and transport in vegetation. *See* Dr. Mengyan Li and Dr. Lucia Rodriguez-Friere, *PFAS Occurrence, Biotransformation, and Transport through Vegetation* (Aug. 2024), https://dspace.njstatelib.org/server/api/core/bitstreams/e71e4ead-7d45-4df6-9bbd-0f940a2fa3d9/content.

15.    The Department has identified several industrial sectors in the State that have potentially handled PFAS in their operations and may be potential sources of PFAS discharges to the environment. Those industrial sectors included textile and fabric finishing mills, carpet and rug mills, textile bag and canvas mills, leather and hide tanning and finishing, paper mills, paperboard container manufacturing, paper bag and coated and treated paper manufacturing, commercial printing, petrochemical manufacturing, synthetic dye and pigment manufacturing, resin and synthetic rubber manufacturing, paint and coating manufacturing, soap and other detergent manufacturing, film and toner manufacturing, tire manufacturing, glass product manufacturing, electroplating, and others. *See* N.J. Dep't Envt'l. Prot., *PFAS Handling Industry Sectors - IV*, Dec. 2019, https://dep.nj.gov/wp-content/uploads/srp/pfas_handling_industry_sectors.pdf.

16.    The Department has conducted and overseen statewide soil investigations of PFAS occurrence, the results of which are also publicly available. *See* Jennifer Willemsen et al., *Per- and Polyfluoroalkyl Substances in New Jersey Soils: A Statewide Investigation* (Sept. 2025),

5

https://dep.nj.gov/wp-content/uploads/srp/pfas_soil_survey_report.pdf. Though it was ultimately published in September 2025, the Department began collecting and analyzing this data beginning in October 2022.

17.    In addition to the studies directly coordinated and overseen by the Department, the Department and its staff have reviewed developments in our understanding of PFAS occurrence, including via reviews of published studies and guidance. *See*, *e.g.*:

- Paustenbach, Dennis J., Panko, Julie M., Scott, Paul K., and Unice, Kenneth M., "A Methodology for Estimating Human Exposure to Perfluorooctanoic Acid (PFOA): A Retrospective Exposure Assessment of a Community (1951–2003)," Journal of Toxicology and Environmental Health, Part A, 70 (2007): 28–57;

- Environmental Protection Agency (EPA). 2024. Per- and Polyfluoroalkyl Substances (PFAS), Final PFAS National Primary Drinking Water Regulation. Accessed January 2025, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas; EPA, Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances (Dec. 18, 2020) https://www.epa.gov/pfas/interim-guidance-destruction-and-disposal-pfas-and-materials-containing-pfas;

- Frisbee, Stephanie J., Brooks Jr. A. Paul, Maher, Arthur, et al., "The C8 Health Project: Design, Methods, and Participants," Environmental Health Perspectives 117(12) (December 2009): 1873-1882;

- Hu, Xindi C., Andrews, David Q., Lindstrom, Andrew B., et al, Detection of Poly- and Perfluoroalkyl Substances (PFASs) in U.S. Drinking Water Linked to Industrial Sites, Military Fire Training Areas, and Wastewater Treatment Plants, Environmental

6

Science        and        Technology        Letters        2016. https://pubs.acs.org/doi/pdf/10.1021/acs.estlett.6b00260;

- Interstate Technology Regulatory Counsel, PFAS Fact Sheets, updated 2023-2025 https://pfas-1.itrcweb.org/fact-sheets/; Mattson, R. R., & Conageski, R. (2007, November 9). Solids and Surfactants Removal from Wastewater. Basic Data Report - Project 7177, W9 Phase II - Project at Washington Works, [026-2007-0000828-59]. (J. Flynn, Ed.) Parkersburg, West Virginia: DuPont Company, Fluoroproducts;

- Nakayama, Shoji, Strynar, Mark J, Helfant, Laurence, et al, "Perfluorinated compounds in the Cape Fear drainage basin in North Carolina," Environmental Science & Technology, 2007, https://pubs.acs.org/doi/10.1021/es070792y;

- Simcik, M. F., & Dorweiler, K. J. (2005, November 15). Ratio of Perfluorochemical Concentrations as a Tracer of Atmospheric Deposition to Surface Waters. Environmental Science & Technology, 39(22), pp. 8678–8683;

- Sinclair, E., & Kannan, K. (2006, March 1). Mass Loading and Fate of Perfluoroalkyl Surfactants in Wastewater Treatment Plants. Environmental Science & Technology, 40(5), pp. 1408–1414;

- Speth, T. (2020, September 16). PFAS Treatment in Drinking Water and Wastewater - State of the Science;

- United States Government Accountability Office, (2024, April 15) Persistent Chemicals: Navy Efforts to Address PFAS at Joint Base Pearl Harbor-Hickam, GAO-24-106812. https://www.gao.gov/products/gao-24-106812;

- Vieira, Veronica M., Hoffman, Kate, Shin, Hyeong-Moo, et al., Perfluorooctanoic Acid Exposure and Cancer Outcomes in a Contaminated Community: A Geographic

Analysis," Environmental Health Perspectives 121(3) (March 2013): 318–323, https://ehp.niehs.nih.gov/doi/epdf/10.1289/ehp.1205829.

18.    The Department, its staff, and I were also aware of Barr Eng'g Co. *et al*., "Evaluation of Current Alternatives and Estimated Cost Curves for PFAS Removal and Destruction from Municipal Wastewater, Biosolids, Landfill Leachate, and Compost Contact Water," May 2023 (filed as ECF 771-26) ("Minnesota Study"), which was prepared for the Minnesota Pollution Control Agency and included estimates of future wastewater treatment costs for addressing PFAS. I also reviewed filings that reference and analyze the Minnesota Study. *See* ECF 788; ECF 771; ECF 769.

19.    In forming its litigation strategy and settlement demands, the Department considered the Minnesota Study in consultation with the State's experts, including both its internal technical experts and staff as well as outside experts such as Industrial Economics, Inc. ("IEc"), and considered the merits and limitations of the Minnesota Study.

**B.    *The Department's Investigation of PFAS Impacts on Wastewater and Biosolids.***

20.    Having a developed understanding of the impact of PFAS upon the overall water cycle, the Department has recognized the potential impacts of PFAS on wastewater treatment facilities. Accordingly, the Department has prioritized source identification and reduction to reduce and eliminate PFAS discharges before they ever reach a wastewater treatment facility.

21.    On March 17, 2021, the Department required all industrial dischargers to surface water, and significant indirect users with discharge permits, to complete a "PFAS Source Evaluation and Reductions Requirements Survey" ("2021 Survey") to better understand the occurrence of PFAS in effluent and wastewater. *See* N.J. Dep't Envt'l. Prot., *PFAS Data Collection*, https://dep.nj.gov/dwq/pfas/pfas-data-collection/.

22.     On April 22, 2021, the Department directed its 17 Delegated Local Agencies ("DLAs") to participate in characterizing PFAS that may affect their wastewater treatment plants by surveying their users. A DLA is a local sewerage authority or municipality with a pretreatment program that is authorized by the Department to issue permits to local industrial users that discharge to a DLA wastewater treatment plant.

23.     The Department directed DLAs to ask over 150 detailed questions to investigate which of the dischargers to their Publicly Owned Treatment Works would possibly be discharging PFAS. The questions included what type of operations occurred at each facility, what chemicals were used, whether fires had occurred that could have been extinguished using PFAS-containing "Class B" AFFF, whether AFFF was stored on-site, and many more.

24.     The Department collected this data to develop a better understanding of the nature, extent and potential industrial sources of PFAS entering wastewater treatment plants insofar as a discharge containing PFAS from a DLA's user may reach and pass through the wastewater treatment plant, thereby discharging PFAS into surface waters or contaminating biosolids (i.e., sewage sludge) that is reused or disposed elsewhere. All 17 of the Department's DLAs have submitted results of the 2021 Survey, which the Department reviewed and made publicly available online: https://dep.nj.gov/dwq/pfas/surface-water-pfas/pfas-dla/#survey-results.

25.     After the Department analyzed the results of the 2021 Survey, it redoubled its efforts to collect information on PFAS in wastewater. The Department required industrial dischargers to surface water and significant indirect users permitted by the Department to collect samples of their effluent and analyze those samples for PFAS on August 18, 2021, March 23, 2022, and October 5, 2022.

9

26. On January 17, 2023, I issued Administrative Order 2023-01. https://dep.nj.gov/wpcontent/uploads/dwq/pdf/pfas/pfas_ao_2023_01_pfas_wastewater_data_sharing.pdf ("AO 2023-01"). That Administrative Order was designed to encourage the submission and sharing of PFAS data to help the Department "better understand the presence of PFAS within wastewater systems, locate potential sources of PFAS to wastewater systems, assess impacts of PFAS on wastewater treatment processes…and develop solutions to reduce or eliminate sources of PFAS entering the wastewater systems." AO 2023-01 at 2.

27. The Department received a limited response to its request that DLAs conduct PFAS sampling. *See* N.J. Dep't Envt'l. Prot., *Forever No More: New Jersey's Commitment to PFAS Action*, July 2025, at 14 ("NJDEP PFAS Strategy"), https://dep.nj.gov/wp-content/uploads/pfas/docs/njdep-pfas-strategy-2025.pdf. Accordingly, on January 13, 2025, the Department directed its DLAs to conduct quarterly sampling to characterize the types and quantities of PFAS present in their influent, effluent, and residuals. *See* https://dep.nj.gov/wp-content/uploads/dwq/pdf/pfas/pfas_dla_request_for_information_letter_20251120.pdf.

28. As of January 2026, the Department had continued to encourage submission of data to help identify and reduce PFAS in wastewater and its residuals as a significant part of the Department's strategy to reduce PFAS discharges. NJDEP PFAS Strategy at 14. As part of that effort, the Department's Division of Water Quality met regularly with the regulated community to discuss wastewater concerns.

29. Before moving for approval of the JCOs, the Department carefully reviewed the comments and reports that sewerage authorities and utilities authorities provided during the public comment periods for the JCOs as well as those filed before this Court.

30.     The Department received comments that included anticipated cost figures from Ocean County Utilities Authority, Passaic Valley Sewerage Commission, South Monmouth Regional Sewerage Authority, Somerset Raritan Valley Sewerage Authority, Hanover Sewerage Authority, Rockaway Valley Sewerage Authority, and Two Rivers Water Reclamation Authority. Many of these initial comments on the Settlements did not include any supporting documentation for their cost figures. The Department considered the cost estimate support that was submitted with the comments of Hanover Sewerage Authority, Rockaway Valley Sewerage Authority, and Somerset Raritan Valley Sewerage Authority. Much of the analysis relied on the Minnesota Study, which has limited application as explained in the State's previous filings. *See* ECF 788.

31.     The Department has also considered the impact and occurrence of PFAS in biosolids. According to 2023 data, land application of biosolids accounted for less than 1% of residuals management in New Jersey. NJDEP PFAS Strategy at 15.

32.     The Department also analyzed a U.S. Environmental Protection Agency document released on January 14, 2025, which provided critical criteria to assess PFOA and perfluorooctane sulfonic acid ("PFOS") exposure pathways, modeled risks to human health and environment, and prioritized mitigation strategies for areas impacted by PFOA and PFOS in biosolids. NJDEP PFAS Strategy at 15.

33.     The Department was also aware of the PFAS that has been disposed of in landfills. The Department launched a landfill monitoring initiative to sample for PFAS at active or inactive landfills with monitoring wells and evaluate landfill leachate data. NJDEP PFAS Strategy at 16.

34.     As Commissioner, I also oversaw the Clean Water Needs Survey ("CWNS") that is completed every four years and am aware of the results of past surveys. The CWNS collects information about publicly owned wastewater collection and treatment facilities, combined sewer

11

overflows control facilities, stormwater management activities, nonpoint source pollution control projects, and decentralized wastewater treatment facilities. Specifically, the information included these facilities' estimated needs to address water quality or water quality related public health problems, costs and technical information, facility populations served, flow, effluent, and unit process information, among other needs.

35.    In addition, I was directly involved in the development of the Water Infrastructure Investment Plan ("WIIP"), New Jersey's program to optimize the use of state and federal resources to address high priority water infrastructure needs throughout the State. The WIIP is implemented through the administration of the New Jersey Water Bank, a partnership between the Department and the New Jersey Infrastructure Bank, where I served as a member of the Board of Directors. The Water Bank was specifically created to help meet the cost of upgrading the State's wastewater treatment capacity in order to comply with State water quality standards. N.J.S.A. 58:11B-2(a). It has since been expanded to also provide funding for drinking water infrastructure projects.

36.    The Department also implements the New Jersey Pollutant Discharge Elimination System ("NJPDES"), which issues permits to wastewater treatment facilities and is obligated to ensure compliance with permit conditions.

37.    The Department has been involved for years in advancing treatment technology that degrade and/or destroy PFAS. NJDEP PFAS Strategy at 5; *see also* Omowunmi Sadik and Francis Osonga, N.J. Dep't Envtl. Prot., *Development of electrochemical treatment technologies for PFAS, PFOS and 1,4-Dioxane in New Jersey Drinking Water and Regional Wastewater Treatment Plants* (Apr. 2025), https://hdl.handle.net/10929/145641; Mujovic, S., Arias, L., N.J. Dep't Envtl. Prot., Plasma Water Treatment of Emerging Contaminants: Assessing PFAS and 1,4-Dioxane in New Jersey (Mar. 3, 2025), https://hdl.handle.net/10929/145703.

38. At the Department, I also became aware of bench-scale testing of aqueous electrostatic concentration technology that has been shown to remove over 99% of certain PFAS for apparently substantially lower costs than traditional granular activated carbon or ion exchange treatments. *See* Tonya Chandler & Sam Liao, *Treating PFAS-Laden Waste Using Aqueous Electrostatic Concentration*, Journal AWWA (Jan./Feb. 2025), https://doi.org/10.1002/awwa.2391; *see also BioLargo's AEC Technology Breaks New Ground in PFAS Water Treatment*, Innovation News Network (July 30, 2025), https://www.innovationnewsnetwork.com/biolargos-aec-technology-breaks-new-ground-in-pfas-water-treatment/60224/.

39. Additionally, under my leadership, the Department conducted research on the transformation and removal of PFAS through wastewater treatment plants and has been collaborating with the Stevens Institute of Technology to monitor and understand the fate of PFAS and chemical precursors to PFAS in wastewater and sludge. NJDEP PFAS Strategy at 6.

40. My roles leading the Department and overseeing its regulatory, compliance, enforcement, and funding programs required that I become familiar with the operation, maintenance, and capital needs of wastewater treatment facilities in New Jersey.

41. As of January 20, 2026, multiple relevant indicators—including, but not limited to, the CWNS, the Clean Water State Revolving Fund Project Priority List, the Long-Term Control Plans (LTCPs) that obligate municipalities with Combined Sewer Overflow (CSO) systems to address deferred capital improvements, existing NJPDES obligations, and other unmet state and federal water quality requirements—reflected that certain capital improvement and maintenance projects were anticipated but overdue at wastewater treatment facilities throughout New Jersey. Further, as of January 20, 2026, the relevant indicators reflected that such necessary but deferred

13

upgrades and improvements persisted separate and apart from any capital needs that may be necessary to address the presence of PFAS affecting wastewater treatment systems.

42.    I have reviewed the estimates of potential PFAS treatment costs submitted by the wastewater systems that objected to the JCOs.

43.    Based on my knowledge of and experience with the Department's regulation, oversight, and support of wastewater treatment facilities, the Department's long-term evaluation of PFAS contamination in the State, and the relevant studies referenced herein, the potential costs associated addressing PFAS that may affect wastewater treatment systems have been expected to cost substantially less than the estimates submitted by the various wastewater systems that objected to the JCOs. Further, the actual cost associated with addressing PFAS at wastewater treatment plants in New Jersey would be expected to decrease consistent with DLAs' (treatment plant operators') establishment of limitations on the discharge of PFAS into their systems by their upstream industrial users. As DLAs work to limit the influx of PFAS into their systems, and as PFAS removal, treatment, and destruction technology continues to improve, the actual total cost incurred by wastewater systems could substantially decrease.

### C.   *The Department's Investigation and Mitigation of PFAS Impacts from AFFF.*

44.    Because certain PFAS are present in AFFF, since as early as 2014 the Department has specifically collected data on PFAS contamination at and around fire training academies, airports, and other sites likely to store or use AFFF.

45.    In July 2019, after the Department announced an investigation into Class B AFFF, the Department worked with the New Jersey Department of Community Affairs to notify fire training academies that Class B AFFF was not to be used for training purposes and should only be used to extinguish a fire as a last resort. In the event Class B AFFF was used, the Department

14

should be notified immediately. Class B Foam Guidance, N.J. Dep't Env'tl Prot., https://www.nj.gov/dca/divisions/dfs/pdf/class_b_foam.pdf. In 2019, the Department surveyed counties across the State to determine how many continued to store AFFF at their county-owned or -run facilities ("2019 Survey").

46.     In 2023, the Department, in partnership with the Department of Community Affairs, conducted a survey of fire departments across the State to assess the continued presence of AFFF at their facilities ("2023-2024 Survey").

47.     The Department launched an AFFF collection program to reduce the possibility of AFFF-related PFAS contamination across the State. The AFFF collection program encourages entities that possess PFAS-containing AFFF to register with the Department to allow the Department to collect and properly dispose of the AFFF to ensure PFAS does not enter the environment. The Department is "responsible for," and must "bear the cost of" "collecting Class B firefighting foams containing intentionally added PFAS from fire departments that participate in the program and disposing of the foam in an environmentally sound manner." N.J.S.A. 13:1K-43c.

48.     As of January 20, 2026, the Department had allocated approximately $18.3 million to collect and destroy AFFF as part of its AFFF collection program, and another $625,000 had been committed for replacement grants.

49.     The Department has also provided financial assistance through its publicly funded hazardous substance and pollutant remediation programs, including the Spill Compensation Fund, to investigate and provide treatment for PFAS contamination affecting public and private drinking water, including contamination attributable to AFFF discharges.

50.     To the extent any property owner is aware of a discharge of a hazardous substance on its property, the owner is required to "immediately notify the department," including discharges both "before and after the effective date of the [New Jersey Spill Compensation and Control Act ("Spill Act")]." N.J.S.A. 58:10-23.11e. Therefore, any county or political subdivision that believed it may be a "person subject to liability" under the Spill Act as an owner or operator of a site on which discharges of PFOA or PFOS have occurred would have been required to report such discharges to the Department.

51.     The Department has been engaged in active, ongoing litigation against the United States related to the federal government's failure to address PFAS contamination at several federal facilities across New Jersey, some of which are located adjacent to or on county-owned property, such as Naval Weapons Station Earle which is located directly next to Monmouth County Fire Training Academy, for years. *New Jersey v. U.S.*, 2:21-cv-146 (D.S.C.). Under the terms of the JCOs, Counties and other political subdivisions remain free to pursue any party other than 3M or the DuPont Defendants—including the United States—as well as any other AFFF or PFAS manufacturer or discharger.

52.     In the course of my service at the Department, I also discussed documents produced in *In re Aqueous Film-Forming Foams Products Liability Litigation,* MDL No. 2:18-mn-2873 (D.S.C.) ("AFFF MDL"), including sales records, with Department staff and counsel. These and other relevant documents supported the Department's identification of publicly owned and operated sites that could be impacted by PFAS contamination, including airports, firehouses, and fire training academies ("Potential Public PFAS Sites"). The Department also carefully reviewed each of the public comments submitted in response to the JCOs, including comments from public entities that could be responsible for investigating and, where necessary, remediating PFAS

16

contamination at Potential Public PFAS Sites. In its review, the Department examined comments

from the counties of Monmouth, Mercer, Cape May, Cumberland, Mercer, Middlesex, Monmouth,

Union, Salem, and Somerset ("County Commentors").

53.     During the JCO public comment periods, the County Commentors did not provide

the Department with any specific cost estimates concerning their purported PFAS response.

54.     The County Commentors' comments identified few circumstances or conditions

specific to any particular County Commentor and contained generalized arguments regarding

possible costs associated with unspecified PFAS contamination without specific support for those

forecasted costs.

55.     In determining whether to enter the proposed JCOs, I considered the public

comments and the broader circumstances and records before me, including the comprehensive

Department studies and records referenced herein, and the reports of PFAS contamination

submitted to the Department (including from Intervenors and *Amici* in this matter). Given the

public entities' lack of sufficient PFAS characterization or specific cost estimates, I discounted the

worst-case scenario arguments concerning Potential Public PFAS Sites, focused on the likely

impacts and costs to public entities, and also considered the multiple programs and funding sources

through which the Department has consistently provided public entities with support for pollution

abatement, which programs and funding sources would be supplemented by the proposed

settlements. In view of these circumstances and the detailed record before me, I concluded that the

JCOs are reasonable.

**II.    The State Implements a Broad Strategy to Combat PFAS Contamination.**

**A. *The Department Establishes Standards to Reduce PFAS Exposure.***

56.    The State has cited the Department's nation-leading regulation of PFAS in numerous briefings. *See*, *e.g.*, ECF 746-1 at 5–7; ECF 609 at 9–10. I testified about the State's national leadership in responding to PFAS and the Department's process to establish enforceable PFAS standards during the Chambers Works trial in May 2025.

57.    Given the risks associated with human exposure to PFAS in drinking water, the Department's first regulatory priority was to establish drinking water standards for PFAS. In 2018, the Department was the first regulatory agency in the country to set any standard for PFAS in drinking water: a Maximum Contaminant Level ("MCL") for perfluorononanoic acid ("PFNA"). 50 N.J. Reg. 1939(a) (Sept. 4, 2018). In 2020, the Department also established MCLs for PFOS and PFOA. 50 N.J. Reg. 1939(a), 54 N.J. Reg. 1165(b) (June 1, 2020). At the same time, those PFAS were listed as "hazardous substances" under the Spill Act, and the State's groundwater quality standards were amended to establish limits on the discharges of those PFAS to groundwater. 51 N.J. Reg. 437(a) (Apr. 1, 2019).

58.    The MCLs for PFOA and PFOS were challenged by trade groups and concerned utilities. The Appellate Division upheld the Department's PFOA and PFOS MCLs on August 3, 2023. *In re New Jersey Dep't of Env't Prot.'s June 1, 2020, Adopted Amends.*, No. A-0307-20, 2023 WL 4939334 (N.J. App. Div. Aug. 3, 2023).

59.    The legal challenges and in-depth analysis in support of the MCLs and their subsequent legal defense informed the Department's understanding of the priorities and concerns of the regulated community, in particular their concerns regarding the costs of compliance for water providers and wastewater utilities. *See id.* at *9.

18

60.    The MCL challengers alleged that the proposed MCLs would have a significant economic impact on wastewater and sewage treatment facilities that required discharge to groundwater permits. *Id.* at \*15. As the Appellate Division recognized, "DEP evaluated costs for both drinking water and wastewater treatment facilities, stating '[p]otable water and wastewater treatment plants have similar considerations and engineering challenges.'" *Id.* (quoting 52 N.J. Reg. at 1171).

61.    The Department had considered how the citizens of New Jersey, ratepayers of drinking water systems, would be impacted by the MCLs, "acknowledg[ing] that some costs may be passed on to consumers." *Id.* at \*7. The Appellate Division found that the Department's estimates of compliance costs and per capita costs were "de minimis and well within the range of practicability and feasibility." *Id.* at \*14.

62.    In its economic impact statement accompanying the rules, the Department acknowledged the potential impact to wastewater treatment facilities but noted that "the actual economic impact on persons remediating contaminated sites, or on facilities discharging to ground water pursuant to a [] permit, is site-specific and will depend on many factors, such as the portion of the plume that must be remediated, the volume and characteristics of wastewater being discharged, the specific contaminants in the wastewater or ground water, the number of monitoring wells required and the length of time needed for sampling, and the type of treatment currently being implemented for other contaminants." 51 N.J. Reg. 437(a) (Apr. 1, 2019).

63.    The Department has estimated that approximately 65% of permit modifications or renewals that incorporate the new discharge to groundwater permits have been completed.

64.    The Department also established interim residential and nonresidential soil remediation standards for the ingestion-dermal exposure pathway and interim soil and soil leachate

19

remediation standards for the migration to groundwater exposure pathway for four PFAS: PFNA, PFOA, PFOS, and GenX. 54 N.J. Reg. 1980(a) (Oct. 17, 2022); 55 N.J. Reg. 1226(a) (June 5, 2023); *see also* N.J. Dep't Envtl. Prot., *Interim Soil, Soil Leachate, and Indoor Air Criteria, Reporting Limits, and Remediation Standards* (last updated Feb. 21, 2024), https://dep.nj.gov/srp/guidance/rs/interim-soil-ia-rl-rs/.

65.     Because of the nature of the soil exposure pathways and relative risk to human health, the remediation standards for soil are orders of magnitude higher than the Department's drinking water and groundwater standards. Historically, the Department has taken site-specific conditions into consideration, including relative risks to human health, when it applies remediation requirements.

66.     The Department developed a rule proposal to establish surface water quality standards ("SWQS") for a suite of toxic compounds, including for certain PFAS that, as of January 20, 2026, was pending formal proposal via publication in the New Jersey Register.

67.     As with any potential rulemaking, once SWQS are formally proposed, the proposal would be subject to a public comment period and could be revised in response to those comments, in accordance with the normal regulatory process. *See* N.J.S.A. 52:14B-4; N.J.A.C. 1:30 *et seq*.; *id.* 7:1D *et seq.*

68.     The Department's Division of Water Quality has long been focused on a strategy to identify, reduce, and eliminate industrial discharges that may contain PFAS, including those discharges that are sent through passive receivers like publicly owned treatment works.

69.     The remediation of upstream industrial sites and other contaminated properties, including through soil remediation at these sites, has continued to reduce PFAS loading to wastewater systems.

70.     Establishing SWQS for PFAS would provide a regulatory mechanism for DLAs to reduce PFAS discharges from upstream sources. Once there are enforceable standards, DLAs will be able to create and implement effluent limits for upstream dischargers to reduce the amount of PFAS they discharge, thereby limiting the amount of PFAS that ever reaches the DLA's wastewater treatment facilities. Without the surface water quality standards, DLAs have lacked an enforceable basis to require upstream dischargers of PFAS to reduce their loadings into public wastewater systems.

71.     The Protecting Against Forever Chemicals Act prohibits the sale of certain products that contain intentionally added PFAS in order to reduce sources of PFAS and their prevalence in the environment and protect human health and natural resources. P.L.2025, c.202., A.1421, S.1042., 2024–25 Reg. Sess (N.J. 2024) (signed into law on Jan. 12. 2026), https://www.njleg.state.nj.us/bill-search/2024/S1042/bill-text?f=S1500&n=1042_R3.

72.     Under the Act, "[t]he [D]epartment shall conduct PFAS-related research and comprehensive monitoring and testing of the presence and impact of PFAS on the environmental media within the State, including…ground and surface water…sediment, and soil." *Id.*

73.     The Protecting Against Forever Chemicals Act designated millions in funding to the Department for source control and continued research. *Id.* From the amounts appropriated to the Department in P.L.2025, c.202, $2.25 million would be specifically utilized for the Department's implementation of a "source reduction program," which the Department could use to support POTWs and municipalities' development, expansion, and implementation of pretreatment standards for PFAS as well as to educate users of publicly owned treatment works on PFAS sources and proper management to reduce those sources. The Act marked a step towards permanently eliminating the sources of PFAS in domestic or municipal PFAS-containing waste.

21

**B.** ***The Department's Existing Funding Framework for Water Infrastructure Projects and Remediation.***

74. As explained above, I was directly involved in the development of the WIIP, New Jersey's program to optimize the use of state and federal resources to address high priority water infrastructure needs throughout the State. The WIIP is implemented through the administration of the New Jersey Water Bank, a partnership between the Department and the New Jersey Infrastructure Bank, where I served as a member of the Board of Directors. The Department has handled project eligibility and prioritization of projects for the Water Bank, while the New Jersey Infrastructure Bank has served as the primary financing entity.

75. The Water Bank is the largest source of funding for all water-related infrastructure projects in New Jersey. It uses principal forgiveness paired with zero-interest and low-interest loans to fund water quality projects. Its structure was a natural fit to consider for the acceptance, disbursement, and compounding of the PFAS Abatement Funds (as defined in the Supplementary Report).

76. The Water Bank's principal forgiveness and zero- and low-interest financing were designed to create additional value for taxpayers and ratepayers. While the Water Bank has directly invested almost $11.5 billion in water-related infrastructure, it has also diverted the entities that rely on it away from more costly financing mechanisms. The Water Bank has estimated that it has reduced debt repayments for municipalities, counties, authorities, and water utilities by 25% to 40% of their loan amount. It has produced more than $3.26 billion in estimated cost savings for those entities. New Jersey Environmental Infrastructure Financing Program, State Fiscal Year 2026 Financial Plan (May 2025). https://cdn.njib.gov/njeit/publications/2026/SFY26 WB May Report.pdf.

22

77.     The New Jersey Infrastructure Bank leverages federal and State funds by issuing revenue bonds and re-investing revenue from those bonds into the State's Revolving Funds. This process has allowed the Water Bank to increase the total amount of funds available for low-cost loans to political subdivisions to fund critical water infrastructure projects. N.J.S.A. 58:11B-6. Investment earnings on these bond funds have also been credited back to the Infrastructure Bank's borrowers.

78.     Even with the Water Bank's generous loan terms, including below-market interest and the availability of principal forgiveness, the Water Bank has still been able to take a single dollar and leverage it to fuel a revolving, perpetual financing mechanism that ensures water infrastructure financing remains available to political subdivisions across decades.

79.     Water Bank financing has long offered standardized, predictable terms that allow recipients to plan their finances with greater certainty. Unlike market-based financing, where terms and availability fluctuate with investor demand and economic conditions, the Water Bank has provided a reliable source of capital with consistent underwriting criteria.

80.     In addition to its role in the Water Bank, the Department also manages several additional financial assistance programs for remediation and treatment, including: the New Jersey Spill Compensation Fund ("Spill Fund"), the Hazardous Discharge Site Remediation Fund ("HDSRF"), and a planned grant program to reimburse qualifying municipalities for the costs of purchasing PFAS-free firefighting foam to replace their AFFF. These costs include but are not limited to the abatement of PFAS contamination in private potable wells and at and around fire-training academies, airports, and solid waste facilities.

81.     The Spill Fund has received approximately $24 million annually from a tax on the transfer of petroleum products or other hazardous substances in New Jersey and investment

earnings. Total payments for valid claims from the Spill Fund averaged $725,000 for fiscal years 2015 through 2021.

82.    After the Department adopted Ground Water Quality Standards for certain PFAS, the Spill Fund increased its damages awards. The Spill Fund disbursed $1.9 million in state fiscal year 2022, $4.7 million in 2023, $4.3 million in 2024, and $3.7 million in 2025. N.J. Dep't. Envtl. Prot., *State of the Environment*, at 189 (Jan. 15, 2026), https://dep.nj.gov/nj-state-of-the-environment/.

83.    As of January 20, 2026, it was estimated that approximately 95% of claims to the Spill Fund pertained to private well damage from the discharge of PFAS. By that time, the Spill Fund had financed 1,699 PFAS claims, and the Department projected approving Spill Fund PFAS claims for private well contamination amounting to an average of around $4 million per year.

84.    The Spill Fund is an important mechanism to protect the public from the costs of PFAS remediation, particularly for private potable wells, and reduces or eliminates remediation costs for political subdivisions.

85.    The Department has also managed the HDSRF in partnership with the New Jersey Economic Development Authority ("EDA"). The HDSRF was appropriated $21.4 million for remediation loans and grants from the corporate business tax in fiscal year 2026. Up to $3 million has been available to public entities from the HDSRF annually, and an additional $2 million has been available annually for certain designated areas in the State. N.J.S.A. 58:10B-5.

86.    Public entities have historically received grants from the HDSRF for their investigation and cleanup of sites contaminated with hazardous substances where the public entity is committed to redeveloping the site. The HDSRF would provide grants to public entities that

24

cover 100% of investigation costs for these brownfield sites, and up to 75% of the remedial action (cleanup) costs.

**C.** ***The Department Takes Enforcement Actions Against Industrial Dischargers and Major Manufacturers.***

87.     On March 25, 2019, the Department exercised its Spill Act authority to issue a Statewide PFAS Directive, Information Request, and Notice to Insurers ("Statewide PFAS Directive") to several known sources of PFAS contamination across the state, including the DuPont Defendants, 3M, and Solvay Specialty Polymers USA, LLC. ECF 746-3. As then-Deputy Commissioner for legal and regulatory affairs at the Department, I was directly involved in the development and issuance of the Statewide PFAS Directive. It required the DuPont Defendants and 3M to, among other things, participate in a process with the Department to estimate the costs to investigate and clean up PFAS contamination across New Jersey, including in drinking water supplies and natural resources, and provide the necessary funding toward such costs.

88.     The Statewide PFAS Directive reflected the Department's policy of pursuing manufacturers and industrial dischargers responsible for PFAS contamination. The State has not pursued passive receivers of PFAS, such as Publicly Owned Treatment Works ("POTWs"), for PFAS discharges under the Spill Act or the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

89.     The Department, in consultation with counsel, prepared and filed four lawsuits concerning industrial sites in New Jersey, at least two of which (the Chambers Works Site and Parlin Site) had known PFAS contamination. 2:19-cv-14758-RMB-JBC, D.E. 1-1; 1:19-cv-14765-RMB-JBC, D.E. 1-1; 1:19-cv-14766-RMB-JBC. D.E. 1-1; 3:19-cv-14767-RMB-JBC; D.E. 1-1. The State also filed a lawsuit against manufacturers of AFFF, which was removed and transferred

25

to the District of South Carolina as part of the AFFF MDL. I was directly involved in the development and filing of each of these complaints.

90.    The Department, in consultation with counsel, also prepared and filed a lawsuit against Solvay Specialty Polymers USA, LLC ("Solvay") and Arkema Inc. ("Arkema") related to a site in West Deptford with known PFAS contamination. *NJDEP, et al. v. Solvay Specialty Polymers USA, LLC, et al.,* GLO-L-1239-20 (Nov. 20, 2020). Solvay and Arkema had each owned and operated the West Deptford site as chemical manufacturers, and had used PFAS in their processes. I was directly involved in the development and filing of this complaint.

91.    Each of these lawsuits was designed to hold responsible parties accountable to the public for their contamination. The actions described in Paragraphs 89 and 90, in addition to the claims brought against the United States for their PFAS contamination (as noted in Paragraph 51, above), are collectively referred to herein as the "PFAS Actions." The Department has been able to amass significant funds from the PFAS Actions to abate PFAS pollution and support impacted communities. I was directly involved in the Department's pursuit of the PFAS Actions and the related settlements.

### D. *The Department Recovers Funding to Support PFAS Remediation and Abatement.*

92.    On June 28, 2023, the Department announced that it reached a settlement with Solvay for a total value of approximately $394 million. That value included remediation commitments valued at $214 million, $3.7 million to address past costs of the Department in addressing Solvay's contamination, $75 million in natural resource damages, and over $100 million to support treatment of affected communities' water supplies. Hon. Robert G. Malestein, P.J. Ch., of the Superior Court of New Jersey, approved the Judicial Consent Order with Solvay on March 6, 2024.

93.     At the time the Solvay settlement was announced, I reiterated my intention to continue to pursue other PFAS manufacturers and distributors for their obligations to the citizens and communities of New Jersey.

94.     The Department then settled with Arkema on May 6, 2024. Under the Judicial Consent Order for that matter, Arkema agreed to pay the Department a total of nearly $34 million, including $12.7 million for natural resource damages and over $21 million to supplement the Solvay funds that were dedicated to support remedial projects in affected communities. Hon. Robert G. Malestein, P.J. Ch., approved the Judicial Consent Order with Arkema.

95.     After accounting for the costs of litigation, the Solvay and Arkema settlements resulted in nearly $64 million in natural resource damages and nearly $87 million in remedial projects funding that can be used for PFAS abatement.

96.     The Department has been able to leverage the funds recovered through the Solvay and Arkema settlements to supplement its existing funding mechanisms. In addition, 3M and the DuPont Defendants have entered into substantial nationwide settlements with water providers in the AFFF MDL: 3M agreed to pay $10.5 to $12.5 billion, and DuPont agreed to pay $1.2 billion ("Public Water Systems AFFF MDL Settlements"). Public Water Systems in New Jersey are anticipated to receive at least $500 million from these settlements, with the distinct possibility of substantially more in the years ahead.

97.     The Department has continued to investigate and enforce against manufacturers and industrial dischargers of PFAS into New Jersey's environment, including through litigating against additional dischargers.

27

### E. *Consideration of the Terms of the 3M and DuPont JCOs.*

98.     Throughout my tenure in Department leadership, reducing and responding to PFAS contamination in New Jersey was a top priority for the Department. As part of that effort, I directly oversaw the Department's litigation against 3M and the DuPont Defendants. I was directly involved in the development of the PFAS Actions and the decision to commence litigation in 2019, directly involved in litigating the PFAS Actions over the course of almost seven years, and in consistent communication with relevant Department staff and counsel throughout.

99.      I participated in mediation for the PFAS Actions and testified during the 2025 Chamber Works trial in the litigation against the DuPont Defendants. I was involved in the assessment and ultimate decision to settle these matters statewide through the Judicial Consent Orders with 3M ("3M JCO") and the DuPont Defendants ("DuPont JCO"), respectively (collectively, "the JCOs").

100.     In determining to settle these matters, I considered the circumstances, research, records, and institutional knowledge of the Department described herein. I was familiar with the sources, scope, and magnitude of PFAS contamination in New Jersey, as well as with the available estimates of potential future costs of PFAS abatement.

101.     The JCOs would provide up to $795 million in additional abatement funding to address PFAS and other contamination. They would also provide up to $365 million in additional natural resource damages funding. Finally, the Judicial Consent Orders secure remediation obligations at DuPont and 3M sites around the State that do not have a cap on cost. Notably, the JCOs secure remediation funding sources for the four DuPont Industrial Sites valued at up to $1.2 billion, with an additional $475 million in a reserve fund designed to ensure that the public never

pays for PFAS or other remediation from the DuPont Industrial Sites (as defined in the DuPont JCO).

102.    The remediation obligations for the DuPont Defendants and 3M pursuant to the JCOs is a substantial benefit to the public and a key part of the strategy to abate significant sources of PFAS contamination in the State. Completing remediation at contaminated properties will continue to reduce PFAS loading to wastewater systems.

103.    The natural resource damages recoveries from these settlements are managed in accordance with the New Jersey Constitution. N.J. Const. Article VIII, § 2, ¶ 9.

104.    The Department has developed a process for selecting specific restoration projects. In 2023, I issued Administrative Order 2023-08 ("AO 2023-08"), which articulated the State's governing Natural Resource Restoration Policy and established a Natural Resource Restoration Advisory Council to advise the Department on potential restoration projects and public engagement, and established requirements for the Department's Office of Natural Resource Restoration to "enhance the public availability of information pertaining to the identification, planning, and implementation of restoration projects." AO No. 2023-08, at ¶¶ 7–14. The updated Policy was intended to bring clarity to the restoration project selection process.

105.    At the time the terms of the JCOs were being developed, I considered the Department's analysis of the responses from DLAs regarding PFAS discharges to wastewater from industrial users. I was able to weigh the potential value, or lack thereof, of future litigation against 3M and the DuPont Defendants by these DLAs. I was also able to consider the remaining avenues available to the DLAs and other wastewater treatment facilities against other defendants even after the approval of the JCOs.

29

106.    The Department considered each and every comment that was received by the Department during the public comment periods for the 3M and DuPont JCOs. Each JCO was published for 60 days for formal notice-and-comment, but the Department decided to consider even those comments that were received before and after the formal comment periods.

107.    The Department's responses to each of these comments were posted on dedicated webpages for each JCO. *See* https://dep.nj.gov/3m/ (3M JCO); https://dep.nj.gov/dupont/ (DuPont JCO). The Department's responses to public comments reflect the official position of the Department.

108.    At the time of entry into the JCOs, the State understood that no litigation nor settlement standing on its own would cover the dollar-for-dollar costs of PFAS abatement across New Jersey. Because of the State's ability to leverage existing funds and create additional value for water infrastructure projects, as well as its leadership and direct involvement in the remediation (and funding of remediation) at contaminated sites, I concluded that the Department is best-situated to recover these funds from the DuPont Defendants and 3M and irrevocably dedicate them to the State's comprehensive funding support framework, which would further enable a unified and consistent programmatic approach to addressing PFAS contamination across New Jersey.

109.    For all of the reasons stated herein, in evaluating the 3M and DuPont JCOs, I concluded that the JCOs provide the State and its residents with significant long-term support for the improvement and protection of public health, safety, and the environment.

I declare under penalty of perjury under the laws of the State of New Jersey and the United States of America that the foregoing is true and correct.

Dated: April 30, 2026

Shawn M. LaTourette,
Former Commissioner

30