**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al., <br><br>Plaintiffs, <br><br>v. <br><br>E.I. DU PONT DE NEMOURS AND COMPANY, et al., <br><br>Defendants. | Case No.  2:19-cv-14758-RMB-JBC <br>1:19-cv-14765-RMB-JBC <br>1:19-cv-14766-RMB-JBC <br>3:19-cv-14767-RMB-JBC <br><br>**DECLARATION OF KIMBERLY CAHALL IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE JUDICIAL CONSENT ORDERS** |

I, **KIMBERLY CAHALL**, an attorney admitted to practice law before this Court and the Courts of the State of New Jersey, and of full age, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.    I am Chief Advisor and Chief Enforcement Officer for the New Jersey Department of Environmental Protection ("Department"). The Department is a Plaintiff in the above-captioned matters, along with its Commissioner and the Administrator of the New Jersey Spill Compensation Fund (collectively, "Plaintiffs"). At the Department, I have served as Chief Advisor since 2024 and Chief Enforcement Officer since 2022.

2.    I have personal knowledge of the matters set forth herein, either through my personal involvement in the activities and events described or, in the case of activities and events that predate my time at the Department or in which I was not personally involved, through the knowledge I gained in my role at the Department.

3.    I submit this Declaration in further support of Plaintiffs' Motion to Approve Proposed Judicial Consent Orders with Settling Defendants (Case 1:19-cv-14766-RMB-JBC, ECF 746) ("Motion to Approve"), and more specifically in support of Plaintiffs' Supplementary Report

in Support of Approval of the Judicial Consent Orders ("Supplementary Report") filed herewith. I am familiar with all the facts and circumstances set forth herein.

4.      I am familiar with the State's enforcement efforts against the Settling Defendants (as defined in the Supplementary Report),[1] which are described in detail in Paragraphs 3 through 18 of the previously filed Declaration of David M. Reap in Support of Plaintiffs' Motion to Approve ("Reap Decl.," Case 1:19-cv-14766-RMB-JBC ECF 746-2).

5.      I am familiar with the terms of both the Proposed Judicial Consent Order entered into with 3M ("3M JCO") and the Proposed Judicial Consent Order entered into with the DuPont Defendants ("DuPont JCO") (collectively, "JCOs").

6.      I am familiar with the Department's collection of and responses to public comments on the JCOs and have reviewed the Department's filings before this Court in support of the JCOs.

## I. Background

7.      During the January 7, 2026, hearing on the State's Motion to Approve, the Court asked the State to explain how it considered the concerns expressed by certain groups who objected to the Court's approval of the JCOs, including publicly-owned treatment works ("POTWs") and Counties that own fire training academies and airports, with respect to the costs they may incur to treat PFAS. As described further below, the State considered these concerns as part of its analysis.

### A. PFAS Contamination in Wastewater

8.      The Department has pursued a policy of "Identify, Reduce, and Eliminate" to reduce or eliminate PFAS from waste streams before such substances ever enter the treatment streams of POTWs. These strategies are intended to place the burden of the costs of treating

---

[1] Capitalized terms herein have the same meaning as in the Supplementary Report, unless otherwise defined.

2

wastewater containing PFAS on "upstream" dischargers, thereby alleviating the costs that POTWs may incur to treat for PFAS.

9. The Department has been working with POTWs on this effort, encouraging the collection of data that will aid in efforts to identify, reduce, and eliminate upstream sources of PFAS contamination in wastewater.

10. The Department will continue to work closely with POTWs to address PFAS by providing them with robust technical and financial assistance, as needed, to address PFAS.

11. In furtherance of that commitment, following the January 7 hearing, the State and the Association of Environmental Authorities of New Jersey and seven of the Association's individual members (collectively, "AEA") were able to reach an agreement designed to provide financial support to POTWs for capital infrastructure upgrades to address PFAS, while also providing protection from certain PFAS liabilities.

12. Further, the Department will continue to engage with POTWs with respect to any regulations that may ultimately be proposed requiring PFAS treatment in wastewater. If and when such regulations are proposed, there will be a public comment period during which the Department will invite, thoughtfully consider, and respond to comments received before adopting any such regulations.

### B. PFAS Contamination from AFFF

13. The State has identified 22 county-owned fire training academies (including a former academy for Union County) and two county-owned airports in New Jersey.

14. Many of these sites are just beginning investigations and initial remedial activities with respect to the prior use of AFFF and associated PFAS contamination.

3

15.    The Department expects there to be variability throughout New Jersey with respect to the amount of AFFF used at each site and, therefore, the extent of any PFAS contamination at a given site. Approaches to remediation at each site therefore will depend on site-specific conditions.

16.    Given the variability among AFFF sites throughout New Jersey with respect to the amount of AFFF used, the extent of any PFAS contamination, and the status of remedial investigation, definitive cost projections for PFAS abatement on a site-by-site basis are currently unavailable and could remain unknown for years.

17.    Notwithstanding, the Department acknowledges the importance of addressing PFAS as a source-control measure at county-owned AFFF sites.

18.    The Department has provided funding to assist local government units with PFAS abatement projects at such properties. For example, the Department is currently assisting Sussex County with investigating PFAS at its fire training academy, including through the provision of state funding for step-out sampling and treatment of private potable wells in the surrounding area.

19.    After the hearing on January 7, 2026, the Department's counsel participated in multiple mediation sessions with the Participating Counties and reached an agreement that provides for a process for the disbursement of funds to those counties to abate PFAS at county-owned fire training academies and airports. The Department determined that this process was appropriate in recognition of counties' unique responsibility for investigating and remediating these sites with significant use of AFFF.

## II. Management of PFAS Abatement Funds

20.    I have had extensive discussions with Department staff, the Office of the Attorney General ("OAG") and the Division of Law ("DOL"), and the Department's outside counsel regarding the processes the Department will use to manage PFAS Abatement Funds.

21.     Pursuant to the terms of the JCOs, which, if approved, will be entered as orders of the Court, the PFAS Abatement Funds are dedicated and must be administered by the Department for the specific purpose of abating PFAS contamination throughout the State to improve and protect public health, safety, and the environment.

22.     To ensure that PFAS Abatement Funds will be used for dedicated purposes as required by the JCOs, the State will establish a special revenue fund outside of the General Fund to administer abatement payments from both JCOs for their dedicated purposes.

23.     This fund, described in the Governor's Detailed Budget Recommendations for Fiscal Year 2027, will be a separate, non-lapsing fund known as the PFAS Abatement Fund. The Governor's Detailed Budget Recommendations state that "All funds deposited into the PFAS Abatement Fund are appropriated solely for projects which are eligible abatement actions consistent with the terms of the settlement agreements, consent orders, or both, governing the use of such funds . . . ."[2]

24.     The Department is committed to ensuring transparency as to the receipt and use of funds in the PFAS Abatement Fund.

25.     To that end, the Department intends to regularly report on the availability and use of the funds in the PFAS Abatement Fund. The Department will develop a PFAS Settlement Information Website that provides the public with information regarding the PFAS Abatement Funds, including eligible and approved projects; amount of funding available and expended; frequently asked questions; and additional resources.

---

[2] *See* Office of Management and Budget, *The State of New Jersey Governor's Message, Detailed Budget Recommendations, Fiscal Year 2027* (March 2026), at D-163, https://www.nj.gov/treasury/omb/publications/27budget/FY%202027%20Budget%20Detail%20-%20Full.pdf.

26.     Further, the Department will publish annual funding reports on the PFAS Settlement Information Website that state the amount of funding that has been received by and disbursed from the Fund consistent with the JCOs.

### III. <u>Distribution of PFAS Abatement Funds</u>

27.     I also have had extensive discussions with Department staff, OAG and DOL, and the Department's outside counsel regarding the Department's establishment of a process by which political subdivisions and other entities will be able to apply for and receive PFAS Abatement Funds recovered through the JCOs.

28.     In response to the Court's request at the January 7 hearing that the State further explain how PFAS Abatement Funds will be used to help political subdivisions, the Department has prepared a Settlement Funds Distribution Plan ("Distribution Plan") that further describes the process it will use to distribute PFAS Abatement Funds. The Distribution Plan is attached to the Supplementary Report as Addendum 1.

29.     In short, the Department will use the PFAS Abatement Funds primarily as a source of infrastructure funding through the Water Bank for drinking water and clean water projects. PFAS Abatement Funds also will be used to assist political subdivisions with the costs of remediating publicly owned property (*e.g.*, fire training academies and airports) and treating contaminated private potable wells. Each of these types of funding are described further below.

### *A.  The Water Bank*

30.     The PFAS Abatement Funds received through the JCOs over the 25-year payment schedules will be used primarily to supplement funding available to "local government units," as defined by N.J.A.C 7:22-3.4, through the New Jersey Water Bank.

6

31.     The PFAS Abatement Funds from the JCOs will be utilized through several well-established and successful funding mechanisms, including the Drinking Water State Revolving Fund ("DWSRF") and the Clean Water State Revolving Fund ("CWSRF"), which are administered by the Water Bank.

32.     The Department sets the priorities and funding packages for the Water Bank on a yearly basis in a manner that seeks to maximize the impact of available resources across the State.

33.     The Department will deploy PFAS Abatement Funds as a focused category of funding to provide no-interest, low-interest, and principally forgiven loans to finance water quality projects to address PFAS throughout the State ("PFAS Water Quality Projects").

34.     The Department will reserve funds each year for the Water Bank to invest in PFAS Water Quality Projects. Every year, through the Department's publicly available Intended Use Plans for DWSRF and the CWSRF, the Department will specify the projects eligible for funding, the principal forgiveness share of funding available, the principial forgiveness cap per applicant, the total amount of principal forgiveness funding that will be available in the next fiscal year, the share of loan funding available through the Department interest free, and the share of loan funding available through the I-Bank. The PFAS Water Quality Projects process will be governed by the Water Bank's existing and future statutory and regulatory requirements.

35.     Through an agreement reached with AEA, the Department has agreed to allocate to the POTWs from the PFAS Abatement Fund, at a minimum, $100 million in principal forgiveness and an additional $50 million in financing through the Water Bank for clean water infrastructure projects that address PFAS. The Department anticipates allocating additional funds to the Water Bank to assist POTWs through the proceeds of the Settlement Payments.

7

### B. County-Specific Qualified Settlement Fund

36.    Pursuant to an agreement with the County Objectors, the Department has agreed to work cooperatively with Participating Counties to establish and fund a Qualified Settlement Fund in the amount of $90 million with a portion of the PFAS Abatement Funds, which will be used to assist the Participating Counties with investigating and remediating PFAS ("the County Fund").

37.    The County Fund ensures funding will be earmarked for the purpose of assisting Participating Counties with investigating and remediating PFAS contamination at county-owned and operated fire training facilities and airports.

38.    The County Fund addresses the County Objectors' concerns by expressly providing a funding mechanism under the JCOs that includes specific procedures governing the funds that will be provided to each county. These procedures were proposed by the Participating Counties and agreed to by the Department after the hearing on January 7, 2026.

39.    Each Participating County will receive initial allotments, followed by "special needs" distributions in the event more significant contamination issues are uncovered in particular counties during the course of investigation and remediation.

40.    The agreement with the Participating Counties is designed to encourage the Participating Counties to quickly initiate cleanup activities, through providing allotments on a "use it or lose it basis" and allowing for remaining funds to revert to the State if they are unused.

41.    The agreement further contemplates that the Department and the Participating Counties will enter into Administrative Consent Orders ("ACOs") to govern the remediation at county-owned and operated fire training facilities and airports where PFAS contamination is known or suspected. Each ACO will be negotiated based on the particular circumstances present

at each county property and will provide contribution protection to each Participating County under CERCLA and the Spill Act as to PFAS contamination at the respective county property.

42.     The County Fund will be overseen by a trustee and a special master. The Department will have the right to audit the Participating Counties' expenditures to ensure that the funds are expended for the abatement of PFAS and in conformance with the terms of the JCOs.

### C.  Additional Abatement Funding

43.     The Department will also disburse PFAS Abatement Funds via an application process that builds off the Department's existing Spill Fund Damage Claim Process through which political subdivisions and individual members of the public may apply for funding to assist with the costs of abating and remediating PFAS contamination.

44.     Currently, public entities and individuals in New Jersey can file a claim against the Spill Fund for damages resulting from the discharge of hazardous substances. The Environmental Claims Administration, the office within the Department that administers the Spill Fund, accepts and reviews damage claims on an ongoing basis through a standard application available on the Department's website.

45.     The Spill Fund has awarded damages relating to potable well treatment systems, public waterline installations, remediation of contaminated sites, and other real and personal property damages caused by discharges of hazardous substances.

46.     The Spill Fund receives annual revenues of approximately $24 million from a tax on the transfer of petroleum products or other hazardous substances within New Jersey and investment earnings. While it is an important funding source for addressing PFAS across the State, the Spill Fund has limited resources.

47.     Moreover, by law, there are certain limitations on claims that can be paid by the Spill Fund. *See, e.g.*, N.J.S.A. 58:10-23.11k; 58:10-23.11g.

48.     The Department therefore will use PFAS Abatement Funds to supplement monies available through the Spill Fund to assist political subdivisions and individuals with the costs of projects to abate PFAS.

49.     Applicants will be directed to file claims with the Spill Fund, and the Environmental Claims Administration will be authorized to provide supplementary funding for PFAS abatement through that process.

50.     The PFAS Abatement Funds therefore will be used to extend the reach of the State's existing financial assistance funds, including the Spill Fund, which will ease the financial burden associated with the costs of PFAS contamination on political subdivisions and New Jersey taxpayers.

51.     Applicants will be required through this process to document previously incurred costs and/or to provide detailed project costs for estimated future costs, to ensure that funds are disbursed appropriately.

### Conclusion

52.     The process outlined here and in the Distribution Plan will put the PFAS Abatement Funds to their best use and provide the State and its residents with significant long-term support for the improvement and protection of public health, safety, and the environment.

10

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 1, 2026

_____

Kimberly Cahall
Chief Advisor & Chief Enforcement Officer
Department of Environmental Protection

11