**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> E.I. DU PONT DE NEMOURS AND COMPANY, et al., <br><br> Defendants. | Case No.  2:19-cv-14758-RMB-JBC <br> 1:19-cv-14765-RMB-JBC <br> 1:19-cv-14766-RMB-JBC <br> 3:19-cv-14767-RMB-JBC <br><br> **DECLARATION OF GWEN FARLEY IN SUPPORT OF PLAINTIFFS' MOTION TO APPROVE JUDICIAL CONSENT ORDERS** |

I, **GWEN FARLEY**, an attorney admitted to practice law before this Court and the Courts of the State of New Jersey, and of full age, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Deputy Attorney General in the State of New Jersey Office of the Attorney General ("OAG"), Division of Law ("DOL"). I am lead counsel and represent Plaintiffs the New Jersey Department of Environmental Protection ("the Department"), its Commissioner, and the Administrator of the New Jersey Spill Compensation Fund (collectively, "Plaintiffs") in the above-captioned matters.

2. I submit this Declaration in further support of Plaintiffs' Motion to Approve Proposed Judicial Consent Orders With Settling Defendants (Case 1:19-cv-14766-RMB-JBC, ECF 746) ("Approval Motion"), and more specifically in support of Plaintiffs' Supplementary Report in Support of Approval of the Judicial Consent Orders ("Supplementary Report") filed herewith. I am familiar with all the facts and circumstances set forth herein.

**I.      The State's Litigation Against Settling Defendants.**

3.      The State's efforts through more than six years of prosecuting multiple civil litigations and directives against the Settling Defendants are described in detail in Paragraphs 3 through 18 of the previously filed Declaration of David M. Reap in Support of Plaintiffs' Motion to Approve Proposed Judicial Consent Orders ("Proposed JCOs") with Settling Defendants ("Reap Decl.," Case 1:19-cv-14766-RMB-JBC ECF 746-2).

4.      For purposes of this Declaration, it is worth stressing that the State was early and aggressive in initiating litigation against Settling Defendants regarding PFAS both in comparison to other states and other public entities in New Jersey. Moreover, from the outset, the State sought to leverage its authority by seeking statewide relief, understanding that New Jersey would be combating a significant PFAS contamination problem.

5.      For example, on March 25, 2019, my office assisted the Department with the preparation of a Statewide PFAS Directive that the Department issued against the Settling Defendants (among other respondents) pursuant to the Spill Compensation and Control Act. The Statewide PFAS Directive was the first of its kind nationally, directing the Settling Defendants to provide the Department with information related to their PFAS products and discharges in the State, and to provide funding to assist the State in addressing PFAS in drinking water and the environment across New Jersey.

6.      As this Court knows, my office followed this action by filing several suits against Settling Defendants on behalf of the Plaintiffs. On March 26 and 27, 2019, the State filed lawsuits concerning the Chambers Works, Pompton Lakes Works, Parlin, and Repauno Works Sites in New Jersey Superior Court, in Salem County, Passaic County, Middlesex County, and Gloucester County, respectively ("Industrial Site Cases"), which were later removed by the DuPont

2

Defendants to the U.S. District Court for the District of New Jersey. Additionally, on May 4, 2019, the State filed another lawsuit against manufacturers of PFAS-containing aqueous film-forming foam ("AFFF"), which included the Settling Defendants, in Mercer County Superior Court ("NJ Statewide AFFF Case"). The NJ Statewide AFFF Case was also removed to the U.S. District Court for the District of New Jersey and thereafter transferred to the multidistrict litigation *In re Aqueous Film-Forming Foams Products Liability Litigation,* MDL No. 2:18-mn-2873 (D.S.C.) ("AFFF MDL").

7.      Collectively, these actions represented a series of critical steps to hold Settling Defendants accountable for their PFAS contamination in New Jersey and were at the forefront of efforts by states to address PFAS holistically through the court system, long before much of the rest of the country began to focus on the risks of PFAS in public drinking water supplies or take any action in response. For example, the State's cases regarding Chambers Works and Parlin were some of the first lawsuits in the country against DuPont to seek natural resource damages related to PFAS. Through its tireless PFAS litigation and related efforts the State sought "damages for injuries to all of the State's natural resources [and] property damages to State and local government-owned properties" in addition to other broad, statewide relief. *See*, *e.g.*, No. 2:19-cv-2199 (D.S.C.), ECF 1 (Original Complaint) at ¶ 13, ECF 62 (Second Amended Complaint) at ¶ 14.

**II.      The State's Efforts to Resolve These Matters.**

8.      The State's efforts to resolve these matters through Court-ordered mediation with the Settling Defendants are described generally in Paragraphs 14 through 22 of the Reap Declaration. For purposes of this Declaration, it is important to note that the mediation and all settlement negotiations included not only the four DuPont-related Industrial Site Cases before this

Court, but also the Settling Defendants' statewide PFAS liability. From the outset, and with the agreement of all parties, the mediation of these matters, with the support of Hon. Joel Schneider, U.S.M.J. (Ret.), involved statewide PFAS damages caused by the Settling Defendants.

9.      Throughout this process, the State strove to achieve settlement terms that would provide fair, reasonable, and adequate relief to the State and its citizens in exchange for the statewide scope of release the Settling Defendants sought. Among other things, the State's analyses considered whether the Settlements would provide sufficient funding to significantly further remediation and abatement of PFAS contamination that may be required by public entities statewide, protect human health and the environment, and ensure that New Jersey's taxpayers and ratepayers are not left with the costs of remediating contamination caused by the Settling Defendants. The Proposed JCOs accomplish this imperative.

10.      In developing its settlement demands and negotiating final settlement amounts and allocations, the State also considered significant litigation risks. For example, the State faced the possibility of recovering nothing from 3M, given its primary responsibility with respect to PFAS contamination associated with Chambers Works was as a past product supplier rather than as a direct discharger. And the DuPont Defendants asserted throughout the litigation a complete defense to claims for groundwater natural resource damages based upon the 2005 CRACO settlement, along with myriad other asserted defenses.

11.      The State also considered that, in the absence of the Settlements, litigation would be prolonged, costly, and the outcome of the State's claims would remain uncertain. While the Chambers Works case alone would have involved at least one more bench trial and later, a jury trial, there were still the three other Industrial Site Cases to be fully litigated and tried to this Court. Accounting for inevitable appeals, litigating and trying these four cases to completion would have

taken, at a minimum, many more years—on top of the more than six years it already took for the State to prepare for and bring the Chambers Works case to trial. Separately, but relatedly, it was apparent that the timeline for additional various New Jersey public entities to bring and litigate to resolution claims against the Settling Defendants was likely to be prolonged (in addition to having uncertain outcomes) and costly.

12.    The State also analyzed the Settling Defendants' current and future ability to pay for the full extent of statewide damages attributable to them, even if proven through litigation and reduced to judgment, and how that ability to pay may be reduced over time given mounting liabilities alleged against, and even already resolved by, Settling Defendants nationwide.

13.    The State engaged numerous experts to assist with analyzing the Settlements, including highly sophisticated financial experts, economists, engineers, hydrogeologists, and environmental scientists, all of whom assisted the State in evaluating site-specific and statewide damages.

14.    The State and its litigation consultants developed, among other things, confidential analyses and estimates of statewide damages for categories including but not limited to public water treatment costs, private well treatment costs, publicly-owned treatment works ("POTWs") costs, remediation of public properties (including but not limited to airports and fire training academies), and natural resource damages and associated restoration costs.

15.    The State and its expert consultants also developed site-specific damage estimates for the four industrial sites that were the specific subjects of the four active litigations pending before this Court and sources of significant contamination. The State demanded, at all times, that the Settling Defendants—not the taxpayers—pay to fully remediate PFAS and all other

contaminants they discharged from the sites they owned, operated, and controlled, no matter the cost.

16. In carrying out this analysis, the State's counsel engaged in dozens of meetings with Department staff from various programs, including the Division of Water Quality, the Contaminated Site Remediation & Redevelopment program, the Office of Natural Resource Restoration, the Division of Solid and Hazardous Waste, and the Commissioner's Office.

17. The State, through its outside counsel, also retained Industrial Economics, Incorporated ("IEc"), an economic consulting firm with a particular focus on and expertise in evaluating environmental damages, to prepare estimates of various costs and damages that may be incurred by public entities within New Jersey because of the presence of PFAS in the environment and/or infrastructure those public entities own and/or operate. Categories of damages IEc analyzed included, but were not limited to, the cost to treat public drinking water, the cost to treat wastewater at POTWs, remediation costs for publicly owned properties such as fire training academies and airports, and natural resource damages. IEc presented its estimates to the State through a series of meetings beginning in fall of 2023 and continuing through fall of 2024.

18. Additionally, to conduct yet another layer of review of estimated costs, the State asked S.S. Papadopulos & Associates ("SSPA") to independently analyze the cost estimates and information provided by the objectors during the public comment periods and briefings on the Motion to Approve. SSPA concurred that the out-of-state model used by AEA to predict costs to POTWs in New Jersey resulted in overestimated costs because the model relies on unrealistic assumptions. SSPA further conducted an independent review of the circumstances at Monmouth County Fire Academy to confirm the State's estimated costs to remediate a county-owned fire training academy were within a range of reasonability.

### III.     The State Determined the Settlements Fairly and Reasonably Address Costs Attributable to Settling Defendants.

19.     The State estimated that, in the context of the mediation and settlement, the future PFAS abatement costs facing public entities could be reasonably estimated as $5.5 billion.

20.     As further explained in the Memorandum in Support of Plaintiffs' Motion to Approve Judicial Consent Orders with Settling Defendants ("Memorandum in Support"), for purposes of its settlement analysis, the State allocated 50% of total statewide PFAS damages to manufacturers of PFAS and AFFF and 50% to other dischargers of PFAS located in New Jersey (*e.g*., the United States at federal facilities and various industrial users/dischargers other than DuPont). Of the 50% of liability assigned to PFAS manufacturers and sellers, the State allocated a share of 75% to the Settling Defendants. As a result, for purposes of settlement, the State estimated that Settling Defendants were responsible for an overall share of 37.5% of the total estimated statewide PFAS damages, or approximately $2 billion.

21.     Including the $795 million in PFAS abatement funding payments Settling Defendants are making through these Settlements, combined with the more than $500 million to be paid to New Jersey public water systems under the separate nationwide class action settlements entered into with the same Settling Defendants, more than $1.295 billion in cash payments will be made available and dedicated to PFAS related abatement in New Jersey by these Settling Defendants. As a result, the Settling Defendants are paying approximately 65% of their share of estimated costs that the State allocated to them for purposes of settlement.

22.     Absent the Settlements, political subdivisions and POTWs would need to pursue their own claims with significantly less legal authority than the State, face the same or more litigation risks, and likely wait years or decades for any recovery—all while taxpayers and ratepayers bear the costs of both PFAS treatment and the litigation itself. Through the Proposed

7

JCOs, the State has instead proactively recovered funds from Settling Defendants to help reduce PFAS-related costs otherwise borne by New Jersey's citizens, taxpayers, and ratepayers, making New Jersey the first state in the country to achieve this type of comprehensive result to address PFAS contamination.

23.    The State and the Department will continue to aggressively prosecute civil claims against responsible parties that caused or cause PFAS contamination in New Jersey and will continue to use proceeds from such enforcement efforts to address PFAS impacts that may otherwise be borne by the State, public entities, citizens, and residents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 1, 2026

_____
Gwen Farley
Deputy Attorney General