**KELLEY DRYE & WARREN LLP**
7 Giralda Farms, Suite 340
Madison, NJ 07940
*Special Counsel to the Attorney General*

By:   Geoffrey W. Castello, Esq.
      Ph. (973) 503-5900
      GCastello@kelleydrye.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENT PROTECTION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> E. I. DU PONT DE NEMOURS AND COMPANY, et al., <br><br> Defendants. | Case No.  2:19-cv-14758-RMB-JBC <br> 1:19-cv-14765-RMB-JBC <br> 1:19-cv-14766-RMB-JBC <br> 3:19-cv-14767-RMB-JBC |

**DECLARATION OF ROBERT E. UNSWORTH IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTARY REPORT IN SUPPORT OF APPROVAL OF THE JUDICIAL
CONSENT ORDERS**

1

I, ROBERT E. UNSWORTH, declare:

1.          I am a Senior Fellow with Industrial Economics, Incorporated ("IEc"), a 150-person economics and environmental policy consultancy based in Cambridge, Massachusetts. I have been employed with IEc since 1985, where I have held the titles of  Principal, Director, Chief Operating Officer, and President.  Prior to joining IEc I received a Bachelor of Science in Forestry from the State University of New York at Syracuse (1984), and a Master of Forest Science from Yale University (1986).  The focus of my studies at Yale was environmental and natural resource economics.

2.          My consulting practice focuses on applied natural resource and environmental economics.  Throughout my career I have assessed the economic damage resulting from changes in the environment, as well as the cost of compliance with new and existing regulatory measures designed to protect the environment. My clients have included the U.S. Department of Justice, U.S. Environmental Protection Agency and other federal agencies, States Attorneys General, tribal governments, non-governmental organizations, and private law firms.  I have testified on behalf of both defendants and plaintiffs, and my testimony has been accepted in state, federal, and international courts.

3.          Over the past decade, my firm has worked with several states to assess the expected costs to governmental entities of addressing the presence of PFAS in the environment, including but not limited to drinking water and waste-water utilities.

4.          IEc and I were retained in 2019 to assist New Jersey as a non-testifying confidential consultant with respect to its various matters involving PFAS, including its five cases it filed against the Settling Defendants.

5.      When the State was preparing settlement demands and in negotiations with the Settling Defendants, including during the Court-ordered mediation, IEc examined data and cost projections both nationally and across New Jersey to forecast the potential costs of PFAS abatement to Public Entities across the State, including costs to entities in the public sectors covered by the Objectors to the draft settlement agreements.

6.      During this evaluation, IEc considered in detail the Minnesota study by Barr, et al.[1] to forecast potential costs of adding PFAS treatment to the effluent streams from all publicly owned wastewater treatment works ("POTWs") in New Jersey. IEc considered both the nature of these cost estimates as well as their applicability for purposes of forecasting future treatment costs to POTWs in the State.

7.      By February 2024, IEc determined that the assumptions and goals behind the Minnesota study rendered it a poor proxy for likely future costs to address PFAS in wastewater and biosolids in New Jersey.

8.      Based on its analysis of the Minnesota study, IEc determined that this study provides cost estimates that are not realistically applied to POTWs in New Jersey (cost estimates, which if applied to POTWs throughout the entire United States, would amount to hundreds of billions of dollars in effluent treatment costs).

9.      As noted in the Minnesota study itself, it is reasonable to expect that various PFAS source control, elimination, and treatment efforts will substantially reduce PFAS loading coming into POTWs over time.[2]

---

[1]     Barr Eng'g Co. *et al.*, prepared for the Minnesota Pollution Control Agency, "Evaluation of Current Alternatives and Estimated Cost Curves for PFAS Removal and Destruction from Municipal Wastewater, Biosolids, Landfill Leachate, and Compost Contact Water," dated May 2023 (ECF 771-26).

[2]     *See* Barr Eng'g Co. Study, ECF 771-26, at 8 ("Source-reduction strategies are not included as treatment options because the study evaluates end-of pipe treatment options for PFAS. However, source-reduction strategies can potentially decrease source loads of PFAS routed to the waste streams under consideration, reducing the need to

10.     Further, the Minnesota study relies on certain assumptions that generate unrealistic cost estimates for public entities in New Jersey. For example, the Minnesota study assumes that short-chain PFAS must be addressed through the treatment of sewage effluent from POTWs and that the complete destruction of all PFAS will be required. These assumptions were made in the Minnesota study despite the fact that these contaminants are not being regulated or proposed to be regulated in this fashion in New Jersey or nationally.

11.     IEc determined that the future costs to public entities to address PFAS in New Jersey wastewater and biosolids from POTWs could be reasonably estimated as $1.5 billion. This estimate recognizes the Department's use of various tools anticipated to reduce PFAS loading to POTWs over time and that upstream PFAS reduction, elimination, and treatment by domestic users and significant indirect users (*i.e.*, commercial and industrial) of POTWs, as defined in N.J.A.C. 7:14A-1.2, are much more cost-effective ways to reduce PFAS management costs for POTWs than removing most of the PFAS from the large volumes of wastewater passing through these POTWs.

12.     IEc developed a cost estimate for POTWs by considering and analyzing the potential costs to analytically sample for PFAS in influent to POTWs as well as the expected added costs to these POTWs to dispose of biosolids generated throughout the State. IEc performed its cost calculations using New Jersey specific information where available.

13.     IEc determined that inclusion of significant costs to filter or otherwise treat sewage effluent at POTWs for the presence of PFAS was not supported. Neither New Jersey nor Federal regulators have suggested that the methods costed in the Minnesota study will be required in New

---

rely on end-of-pipe treatment. Source-reduction strategies may include phasing out PFAS use (Cousins *et al.* 2019) and continued treatment of concentrated point sources [*i.e.*, pretreatment of waste streams at the discharge point to the sanitary sewer system]. As the cost of removing PFAS from the water phase is more related to the volume of water treated than to the mass of PFAS present, removal of PFAS from concentrated sources is more cost-effective than downstream treatment of lower-concentration WRRF flows.")

Jersey. As such, IEc determined that the Minnesota study treatment cost estimates were inapplicable for purposes of forecasting costs in New Jersey.

14.        To understand the potential long-term costs associated with the remediation of PFAS contaminated soils on publicly owned properties, IEc analyzed costs to remediate PFAS at airports and fire training facilities where AFFF releases likely have occurred.

15.        IEc presented a range of cost calculations to the State for "Part 139" airports[3] and fire training facilities.

16.        In developing this estimate, IEc assumed that all the Part 139 airports would require remediation.  Ultimately, the Department opted to only include two of the four airports in its costing analysis because two of the airports were owned by an interstate body (the Port Authority of New York and New Jersey) and not a subdivision of the State.

17.        Based on the average available cost estimates of $19.9 million to treat soil through "soil washing" at two Department of Defense Air Force Bases, IEc estimated a total cost of $39.8 million to address PFAS contamination at the two New Jersey airports.

18.        In analyzing the costs to remediate PFAS from fire training facilities, the State focused its analysis on the 22 primary county fire training academies (including a former academy for Union County) within the State.

19.        Applying the same $19.9 million remediation cost estimate that IEc identified for the Air Force Bases to the 22 fire training academies, the Department estimated that the costs to address fire academies could be $438 million.

---

[3]    Federal Regulations under 14 C.F.R. Part 139 require the Federal Aviation Administration ("FAA") to issue operating certificates to airports that serve flights above defined passenger seat counts. To obtain a certificate, an airport must agree to certain operational and safety standards and provide for firefighting and rescue equipment. As such, the designation of an airport as a Part 139 facility is an indication that AFFF was present at the facility.

20.     Based on these calculations, the total estimated cost to address the two relevant Part 139 airports and 22 county-owned fire academies was estimated to be approximately $477.8 million.

21.     This cost estimate assumes all County-owned airports and fire academies will require significant remediation to address past PFAS releases; it is expected that that not all these facilities, however, will require the same degree of remediation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:      1 June 2026

_____
ROBERT E. UNSWORTH
Senior Fellow
Industrial Economics, Inc.
Cambridge, MA