**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; et al., *Plaintiffs*, v. E.I. DU PONT DE NEMOURS AND COMPANY; et al. *Defendants.* | Case No.: 1:19-cv-14758-RMB-JBC (Pompton Lakes) 1:19-cv-14765-RMB-JBC (Repauno) 1:19-cv-14766-RMB-JBC (Chambers Works) 1:19-cv-14767-RMB-JBC (Parlin/Sayreville) Hon. Renée Marie Bumb, Chief U.S.D.J. James B. Clark, III, U.S.M.J. |

**RESPONSE TO THE STATE'S SUPPLEMENTAL REPORT**

Prepared by:

**MEYNER AND LANDIS LLP**
Albert Telsey, Esq.
One Gateway Center, Suite 2500
Newark, New Jersey 07102
Telephone: (973) 602-3439
Facsimile: (973) 624-0356
atelsey@meyner.com
*Attorneys for Intervenor, Carneys Point Township*

Dated: June 10, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS.....................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ ii

SUMMARY .......................................................................................................................1

LEGAL ARGUMENTS....................................................................................................4

POINT 1
THE COURT CANNOT RULE ON CARNEYS POINT'S STATE COURT
ACTION (Para. 83) BECAUSE IT DOES NOT HAVE JURISDICTION............4

POINT 2
THE PFAS ABATEMENT FUND IS NOT A RELIABLE AND CONSISTENT
FUNDING SOURCE SUFFICIENT TO EXECUTE THE SETTLEMENT PLAN
FOR THE NEXT 25-YEARS ....................................................................................9

POINT 3
BUNDLING NRD AND PFAS PAYMENTS INTO UNDIFFERENTIATED
YEARLY PAYMENTS IS UNLAWFUL ..........................................................25

POINT 4
A FORCED RELEASE CAN ONLY BE AUTHORIZED BY STATUTE NOT
*PARENS PATRIAE* AUTHORITY ....................................................................34

POINT 5
TO COMPLY WITH THE TAX DEDUCTION RULE PFAS FUNDS MUST
BE USED FOR PROJECTS WITH A "DIRECT NEXUS" TO CHAMBERS
WORKS..................................................................................................................38

POINT 6
THE PUBLIC WAS NEVER PROVIDED NOTICE OR AN OPPORTUNITY
TO COMMENT ON THE NEW SETTLEMENT ARCHITECTURE UPON
WHICH PLAINTIFFS NOW RELY ....................................................................41

CONCLUSION................................................................................................................43

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    Page(s)

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982) ................................................................................ 10

*Asbury Park Press v. County of Monmouth*,
   201 N.J. 5 (2010) .................................................................................... 31

*Avant v. Clifford*,
   67 N.J. 496 (1975) ................................................................................... 29

*Becker v. Evans*,
   496 F. Supp. 20 (1980) .............................................................................. 6

*Bernie Corp. v. Government of the,*
   *Virgin Islands*, 2011 WL 13228471 ...................................................... 22

*Broselow v. Fisher*,
   319 F.3d 605 (2003) ................................................................................. 10

*Burgos v. State*,
   222 N.J. 175 (2015) ................................................................................. 17

*Burlington Ins. Co. v. Panacorp, Inc.*,
   758 F.Supp.2d 1121 (2010) ....................................................................... 6

*Cargill Meat Solutions Corp. v. Director, Division of Taxation*,
   477 N.J. Super. 85 (2023) ........................................................................ 17

*City of Camden v. Byrne*,
   82 N.J. 133 (1980) ............................................................................. 10, 17

*City of Jersey City v. Roosevelt Stadium Marina, Inc.*,
   210 N.J. Super. 315 (1986) ...................................................................... 34

*Commonwealth ex rel. Krasner v. Attorney General of Commonwealth*,
   309 A.3d 265 (Pa. Commw. Ct. 2024) .................................................... 35

*Communications Workers of America, AFL-CIO v. Florio*,
    130 N.J. 439 (1992).............................................................................. 29

*Community Action Programs Executive Directors Ass'n of New Jersey, Inc., v Ash*,
    365 F. Supp. 1355 (1973)..................................................................... 17

*Del Sontro v. Cendant Corp., Inc.*,
    223 F.Supp.2d 563 (2002)..................................................................... 27

*E.I. du Pont de Nemours and Co. v. State, Dept. of Environmental Protection and Energy*,
    283 N.J. Super. 331 (1995) .................................................................. 30

*Garden State Equality v. Dow*,
    434 N.J. Super. 163 (2013) .................................................................. 17

*Girsh v. Jepson*,
    521 F.2d 153 (3d. Cir. 1975)................................................................ 36

*Harris v. City of Philadelphia*,
    137 F.3d 209 (1998)....................................................................... 25, 26

*In re Certified Question*,
    638 N.W.2d 409 (2002) ........................................................................ 35

*In re General Motors Corp. Pickup Truck Tank Products Liability Litigation*,
    55 F.3d 768 (3d. Cir. 1995)................................................................. 36

*In re Lead Paint Litigation*,
    191 N.J. 405 (2007)........................................................................... 33

*Jeff D. v. Kempthorne*,
    365 F.3d 844 (2004) ............................................................................. 6

*Karcher v. Kean*,
    97 N.J. 483 (1984).............................................................................. 17

*Matter of D.C.*,
    146 N.J. 31 (1996).............................................................................. 10

*Mid-Atlantic Solar Energy Industries Ass'n v. Christie*,
418 N.J. Super. 499 (2011) .............................................................. 14, 17

*New Jersey Department of Environmental Protection v. Exxon Mobil Corporation*,
453 N.J. Super. 588 (2015) .............................................................. 16, 32

*People ex rel. Devine v. Time Consumer Marketing*,
782 N.E.2d 761 (Ill. App. 2002) ............................................................ 35

*PJM Power Providers Group v. Federal Energy Regulatory Commission*,
96 F.4th 390 (2024).............................................................................. 35

*Press of Atlantic City v. Ocean County Joint Ins. Fund*,
337 N.J. Super. 480 (2000) .................................................................. 30

*Pueblo of Pojoaque v. Biedscheid*,
689 F.Supp.3d 1033 (2023)..................................................................... 5

*Smith v. Goldman*,
159 N.J. Super. 297 (App. Div. 1978) .................................................. 17

*Tutu Water Wells CERCLA Litigation*,
326 F.3d 201 (2003).............................................................................. 31

*U.S. v. Alpine Land & Reservoir Co.*,
174 F.3d 1007 (1999).............................................................................. 5

*U.S. v. City of New Orleans*,
35 F.Supp.3d 788 (2013)....................................................................... 16

*U.S. v. Kramer*,
19 F.Supp.2d 273 (1998)....................................................................... 31

*U.S. v. SBC Communications, Inc.*,
489 F.Supp.2d 1 (2007)......................................................................... 16

*U.S. v. Wisconsin Elec. Power Co.*,
522 F.Supp.2d 1107 (2007).................................................................... 16

Statutes

28 U.S.C.A. §1447 ........................................................................................... 5, 6

28 U.S.C.A. §2283 ............................................................................................... 5

Mich. Comp. Laws §445.2051 ........................................................................... 35

N.J.S.A. 2:15D-14 .............................................................................................. 18

N.J.S.A. 26:2G-39 .............................................................................................. 18

N.J.S.A. 39:6-61 ................................................................................................. 18

N.J.S.A. 47:1A-1 ................................................................................................ 30

N.J.S.A. 52:4D-1 ................................................................................................ 18

N.J.S.A. 52:4D-2 ................................................................................................ 34

N.J.S.A. 52:18A-8 .............................................................................................. 11

N.J.S.A. 52:18-29 ............................................................................................... 11

N.J.S.A. 58:10-23.11e2 ................................................................................. 42, 43

N.J.S.A. 58:11B-9.5 ........................................................................................... 19

N.J.S.A. 58:11B-20.4 ......................................................................................... 19

N.J.S.A. 58:11B-23 ............................................................................................ 19

New Jersey State Constitution, Article VIII, Section 2, Paragraph 9 .............. 26, 27

NJ Const. Art. 8, §2, ¶ 2............................................................................ 10, 14, 29

NJ Const., Art. III, Para. 1 ................................................................................. 10

Regulations

26 C.F.R. §1.6050X-1 ............................................................................ 40

26 CFR §1.162-21 ................................................................................ 38

Other Authorities

P.L. 2025 ............................................................................................... 19

P.L.1976 ................................................................................................ 42

**SUMMARY**

The court granted Carneys Point Township ("Carneys Point") the right to intervene and address the proposed DuPont and 3M Judicial Consent Orders ("JCOs").

The state recognizes the Chambers Works site as one of the worst PFAS polluted sites in the world. As the host community to this site, Carneys Point, in Salem County, is in the unique and unenviable position of being the most PFAS-polluted community in the state.

The Township has been taking action to protect itself from PFAS pollution since 2016. That is why it is motivated to comment on the JCOs and the new settlement architecture recently developed by Plaintiffs. It is critical that they are lawful, fair, and reasonable.

This brief explains why, in their current form, the JCOs and the new settlement architecture are not lawful, fair and reasonable, and why the court cannot approve the JCOs unless they are modified.

1.      Township's State Court Action. Paragraph 83 of the DuPont JCO seeks to have the court make findings of law about how the release in the DuPont JCO impacts the Township's 2016 state court action. At the January 7, 2026 hearing, this court acknowledged that it has no authority to make such a ruling and required that

- 1 -

paragraph 83 be modified.  Carneys Point provides the court with a form of order making the necessary modification.

2.    <u>Insufficient funding mechanism</u>.  The Plaintiffs acknowledge that their *parens patriae* authority does not provide them with legislative appropriation authority.  They have therefore proposed using a new legislatively proposed PFAS Abatement Fund to manage the $1B in PFAS funds to be recovered over the 25-year lifespan of this settlement.  This is a special revenue fund that must be reappropriated every year for 25 years.  It is subject to the risk that 25 successive legislatures (FY2027 to FY 2051) will not appropriate the Fund and will use the PFAS settlement funds for other state purposes.  It is not, for example, special legislation that dedicates the entire 25-year revenue flow for its intended purposes, like the special legislation enacted by the state to manage tobacco and opioid settlement funds.  The Plaintiffs' proposed funding plan is uncertainty and makes their PFAS settlement plan aspirational and illusory.  Since the Plaintiffs cannot reasonably guarantee they can execute the settlement plan, the JCOs are not ripe for judicial approval.

If the Court concludes that approval turns upon unresolved questions of New Jersey appropriations law, the legal effect of the PFAS Abatement Fund, or the extent to which future settlement receipts may be dedicated through annual appropriations legislation, those and similar questions warrant certification to the New Jersey Supreme Court.

3.    Bundled NRD/PFAS.  The JCOs combine natural resource damages ("NRD") and PFAS payments together in an undifferentiated bundle making it impossible to know how much of each bundle is attributable to NRD, which gets credited to a constitutional NRD account, and how much gets attributable to the PFAS Abatement Fund.  This frustration violates the geographic priorities of the State's constitutional NRD provisions, usurps legislative appropriation authority, and violates standards of agency discretion and transparency.  The NRD/PFAS bundles must be separated.

4.    Forced release.  The releases being forced on political subdivisions are unlawful without legative support and the Plaintiffs do not have legislative support.

5.    Tax deduction rule.  The Plaintiffs are required to comply with the "direct nexus" element of the tax deduction rule if they are to provide the Defendants with a tax deduction.  This means that the Plaintiffs must spend the PFAS funds at and around the Chambers Works site because that is the site that generated the $525M PFAS Abatement Fund.  Plaintiffs are instead going to use the PFAS funds for statewide purposes unrelated to the Chambers Works site (in order to promote their statewide funding Distribution Plan), but they are also going to report to the IRS that they are using the funds for projects with a "direct nexus" to the Chambers Works site (in order to give Defendants their tax deduction).   The Plaintiffs'

noncompliance with the rule to be reported to the IRS as compliance is a misuse of the tax deduction rule and is impermissible.

6.    <u>New public notice and comment period</u>.    The Plaintiffs have constructed a drastically new settlement architecture in recent months that is very different from the settlement architecture they described in their 2025 public notice seeking public comment on the settlement.  It now includes a Distribution Plan, PFAS Abatement Fund, and County and Utility Authority Stipulations, among other things.  The public has never seen this new settlement architecture, nor have they had an opportunity to comment on it.  The law requires that the JCOs with these new settlement components be republished for public comment.

## LEGAL ARGUMENTS

## POINT 1

**THE COURT CANNOT RULE ON CARNEYS POINT'S STATE COURT ACTION (Para. 83) BECAUSE IT DOES NOT HAVE JURISDICTION**

Paragraph 83 of the DuPont JCO provides that this court "finds," as a matter of law, that the Releases in the JCO will specifically "resolve, release, and bar" Carneys Point's 2016 Environmental Rights Act ("ERA") State Court Action against Defendants, and that, based upon this finding of law made by the federal court in the

- 4 -

JCO, the Defendants can take the JCO to the State Court and "seek an order promptly dismissing" Carneys Point's 2016 ERA action.[1]

Carneys Point filed its ERA action in December 2016 claiming, among other things, that DuPont failed to comply with the Industrial Site Recovery Act ("ISRA") and failed to post a $1B remediation funding source when it split off Chemours as an independent company. The ERA permits a person or municipality to compel compliance, assess penalties, and recover attorney's fees and costs against a responsible party when the New Jersey Department of Environmental Protection ("DEP") fails or refuses to take action.

A week after filing its December 2016 ERA action, the Township wrote to DEP and told them about it to seek their assistance. ECF 742-10. The DEP refused to assist the Township and continued to refuse assistance for years. ECF 742-15. That refusal has continued to this day. ECF 742-2 pp7-10.

---

[1] "83. The Parties intend, and this Court finds, that the Releases in the JCO resolve, release and bar Claims, including to the extent applicable by res judicata, brought by Carneys Point Township that seek to recover for the same or materially similar relief that Settling Plaintiffs are releasing in the JCO, and specifically including Carneys Point's Environmental Rights Act Claims and all Claims within the scope of the Released Claims with respect to the Chambers Works Site (or that would be within the scope of the Released Claims if asserted by Settling Plaintiffs). Based on this, upon entry of this JCO, Settling Plaintiffs and the Settling Defendants will seek an order promptly dismissing the following litigation currently pending in the New Jersey court: *Carneys Point Twp. v. E.I. du Pont de Nemours et al.,* Salem County Superior Court Docket No. SLM-L-251-16, Appeal Docket No. A-002427-24. The Parties will reasonably cooperate to seek dismissal of, or otherwise address, any other Claims brought by Carneys Point Township that are resolved, released, and barred by this JCO."

The Township spent millions of dollars on its matter and won a liability judgment against DuPont on February 13, 2019. ECF 742-16.  A few weeks after that ruling, the state then filed this matter on March 27, 2019.

In 2024, DuPont filed a motion to dismiss the Township's ERA action claiming this federal court matter superseded it.  The state court denied the motion by a decision dated November 5, 2024 claiming the Township was entitled to pursue all its claims and penalties that predated the state's March 27, 2019 action.  ECF 742-17.  The opinion was affirmed by the Appellate Division on December 2, 2025. ECF 754-1.

The ERA was enacted to provide self-help remedies in just this type of case – where DEP refused to take action even after they were contacted for assistance.  The Plaintiffs now want this court to dismiss the Township's action since the Appellate Division refused to do so.

To put it bluntly, the Plaintiffs want all of DuPont's assets going to them so they can use them to fund their distribution plan and to pay their counsel $195M in fees; and to do that, they want to use paragraph 83 to deny Carneys Point the right to recover their attorney's fees for being a successful ERA litigant, and their right to seek and assess ERA penalties as a successful ERA litigant.

This is completely unacceptable and unlawful.  Not only does it deny Carneys Point their rights under the ERA, but it would also chill any other person or

municipality from using the ERA when DEP fails to act if DEP could undo everything an ERA litigant accomplished, even when those accomplishments were affirmed by the Appellate Division.

As part of its intervention petition, which was granted by the court for the purpose of responding to the JCOs, Carneys Point demanded that paragraph 83 of the DuPont JCO be stricken because this court does not have jurisdiction to tell a state court what to do given the principles of comity, federalism, the Anti-Injunction Act, 28 U.S.C.A. §2283, and 28 U.S.C.A. §1447.

The Anti-Injunction Act provides that "a court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." The Supreme Court has emphasized that this Act represents "an absolute prohibition against any injunction of any state-court proceedings" subject only to three narrow exceptions that "are not to be loosely construed." *Pueblo of Pojoaque v. Biedscheid,* 689 F.Supp.3d 1033 (2023). Courts must resolve "doubts in favor of letting the state action proceed." *U.S. v. Alpine Land & Reservoir Co.*, 174 F.3d 1007 (1999).

Paragraph 83 seeks to make a binding determination that the state court must honor – that is, that the JCO releases "resolve, release, and bar" the state action. This

is the equivalent of an injunction in violation of the Anti-Injunction Act because none of the exceptions apply.[2]

Paragraph 83 also violates principles of comity and federalism that underlie the Anti-Injunction Act. Federal courts have recognized that "interference with state proceedings is at the core of the comity concern" and that allowing federal courts to determine the validity or scope of pending state actions undermines the balance between state and federal judicial systems.  In *Burlington Ins. Co. v. Panacorp, Inc.*, 758 F.Supp.2d 1121 (2010).

The federal court lacks authority to make binding determinations about the preclusive effect of its consent decree on independent state court litigation. While federal courts retain jurisdiction to enforce their own consent decrees, this does not extend to making advance rulings about how those decrees affect separate state proceedings. *Jeff D. v. Kempthorne*, 365 F.3d 844 (2004).

In addition, 28 U.S.C.A. §1447 provides that once a federal court remands a matter back to state court, the state court has jurisdiction of the matter, and the District Court loses jurisdiction.  Here, the Township's State Court Action was removed to District Court in 2017 and remanded back to State Court by Judge Noel

---

[2] None of the three statutory exceptions apply here: there is no express Congressional authorization for this type of interference, the federal court does not need to protect its jurisdiction over a matter the state court is already adjudicating, and the federal court is not protecting or effectuating its own judgment but rather attempting to dictate the disposition of an independent state court action. *Becker v. Evans,* 496 F. Supp. 20 (1980).

L. Hillman, U.S.D.J. ECF 742-11. As such, for this reason and the others above, this court does not have jurisdiction to make judicial "findings" affecting the Township's ERA State Court Action, which paragraph 83 seeks to do.

The court addressed this issue during the January 7, 2026 hearing because the court recognized there was tension between the Township's Action and the state's Chambers Works Litigation, and the court wanted to "avoid train wrecks."[3]

The court had the parties explain the conflict and was relieved to understand that the tension it feared was resolved by the New Jersey Appellate Division, which ruled that there was no conflict with the Township proceeding with its State Court Action for penalties and other relief it was seeking for events that occurred prior to March 27, 2019, the date the state filed its Chambers Works Litigation. ECF 754.

As part of the January 2026 hearing, the court wanted to understand how the Chambers Works Litigation could be settled, while the Township's ERA State Court Action could proceed without each disrupting the other. The Plaintiffs actually provided the court with the correct response when they said that the JCO included credit eligibility provisions as a "safety valve." In other words, presuming the Defendants are ordered to pay additional ERA penalties in the Township's ERA State Court Action for its conduct that occurred prior to March 27, 2019, the JCO provides that the Defendants can apply for a credit for those penalty payments so

---

[3] Telsey Certification, <u>Ex. 1</u>, Transcript of January 7, 2026 hearing, P33, l18-19.

that the Defendants do not have to pay them twice.  It was this understanding that led the court to conclude that, as long as paragraph 83 is amended to provide clarity, "there isn't this tension that I'm worried about."[4]

The court admitted it "is impotent to tell a state court how to rule"[5] and that, "I cannot tell the Appellate Division or the Superior Court what to do."[6]  The court then stated that, given the above, paragraph 83 in the JCO must be amended. ("Maybe there's going to have to be an amendment, I guess, right? I cannot tell the state court what to do.")[7]

The court then asked the state, "Do you have an objection to amending it to make this more clear?"  The state, surprisingly, did object.  The state claimed that, since all sections of the JCO, including paragraph 83, were the "product of negotiation," "It's not something that we can amend."  The court replied, "sure, you can."[8]

Since the January 2026 hearing, Carneys Point, the state, and Defendants have sought to mediate this issue.  The State and Defendants will not amend paragraph 83 and have not addressed this issue in the Supplemental Report to the court.

---

[4] Telsey Certification, Ex. 1, Transcript of January 7, 2026 hearing, P36 L16-17.
[5] Telsey Certification, Ex. 1, Transcript of January 7, 2026 hearing, P48 L4-9
[6] Telsey Certification, Ex. 1, Transcript of January 7, 2026 hearing, P 32. L10-14
[7] Telsey Certification, Ex. 1, Transcript of January 7, 2026 hearing, P38 L8-11
[8] Telsey Certification, Ex. 1, Transcript of January 7, 2026 hearing, P44 L1-10

Given the above, Carneys Point submits that paragraph 83 must be amended as follows:

> 83.  The Releases in the JCO do not apply to claims and relief sought by plaintiff in *Carneys Point Twp. v. E.I. du Pont de Nemours et al.,* Salem County Superior Court Docket No. SLM-L-251-16, Appeal Docket No. A-002427-24, related to events that occurred prior to March 27, 2019, the date the state filed the Chambers Works Litigation, and for claims unrelated to the Chambers Works Litigation, for the reasons set forth in the Law Division opinion dated November 5, 2024, and the Appellate Division opinion dated December 2, 2025.

Carneys Point respectfully requests that the court enter the enclosed order so that the Township can proceed with its referenced State Court Action, which has been suspended pending a resolution of this paragraph 83.

## **POINT 2**

**THE PFAS ABATEMENT FUND IS NOT A RELIABLE AND CONSISTENT FUNDING SOURCE SUFFICIENT TO EXECUTE THE SETTLEMENT PLAN FOR THE NEXT 25-YEARS**

The court cannot make the Plaintiffs' settlement plan better.  However, the court must make sure the settlement plan can be implemented and is not merely aspirational; otherwise, the settlement is not workable, enforceable, fair, reasonable, or consistent with law.

At first, the Plaintiffs were relying solely on their *parens patriae* authority to control and manage the PFAS funds.  Plaintiffs also argued that the environmental statutes supporting their *parens patriae* authority gave them appropriation authority.

Carneys Point objected, claiming *parens patriae* does not provide Plaintiffs with appropriation authority.[9]  In addition, environmental statutes "do not constitute legislative appropriations in and of themselves." *City of Camden v. Byrne*, 82 N.J. 133, 146 (1980).

The Plaintiffs now admit that PFAS settlement funds "will be transferred to the New Jersey Department of Treasury and disbursed in accordance with the purposes of the Settlements and annual legislative appropriations." See, ECF 764 at 24.  Plaintiffs further acknowledge, "it is axiomatic that there are no appropriation acts beyond 2026" ECF 764 at 25, and that "the settlement payments in 2027 and beyond will be accounted for and incorporated into the State's annual budget process." ECF 764 at 26.

In other words, Plaintiffs agree that PFAS payments must be deposited into the General Fund, N.J.S.A. 52:18A-8, unless yearly Appropriation Acts or special

---

[9] The Plaintiffs relied on *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) and New Jersey's environmental statutes for the proposition that they have standing under the *parens patriae* doctrine to litigate against the Defendants in lieu of counties and municipalities. That is true.  However, *parens patriae* standing is entirely separate from the constitutional and statutory requirements governing how settlement funds must be appropriated and spent once recovered.

*Parens patriae* authority does not include the fiscal management of recovered funds because that would interfere with separation of powers, NJ Const., Art. III, Para. 1, and the exclusive function of the legislature to appropriate funds, NJ Const. Art. 8, § 2, ¶ 2, *Broselow v. Fisher*, 319 F.3d 605 (2003).

The Attorney General's *parens patriae* authority does not override constitutional fiscal controls and does not authorize the Attorney General to commit the State Treasury to multi-year expenditures without legislative appropriation.  *Matter of D.C.*, 146 N.J. 31 (1996).

legislation redirects the funds elsewhere. N.J.S.A. 52:18-29. That is how fiscal management works in the state.

Plaintiffs now claim that a nonlapsing PFAS Abatement Fund (similar to the Volkswagen Environmental Mitigation Fund) to be enacted as part of the FY2027 Appropriations Act may provide sufficient legislative appropriation authority to manage the flow of PFAS settlement funds over the next 25 years.[10] It does not.

That is because, as Plaintiffs admit, the Volkswagen Fund must be appropriated every year for it to remain effective. ECF 827 p.36. That leaves the PFAS settlement here subject to the uncertainty of 25 consecutive legislatures to appropriate the PFAS Abatement Fund, or not. That is not a reliable funding strategy.

Carneys Point raised this appropriation concern in its comments on the draft JCOs, in its intervention brief, and at the January 7, 2026 hearing, where the court acknowledged this issue needed to be addressed.[11] The issue is now front and center.

---

[10] The PFAS Abatement Fund provides, "Any funds received by the State of New Jersey of funds from Per-- and Polyfluoroalkyl Substances ("PFAS") abatement settlements are deposited into a separate, nonlapsing fund to be known as the PFAS Abatement Fund. All funds deposited into the PFAS Abatement Fund are appropriated solely for projects which are eligible abatement actions consistent with the terms of the settlement agreements, consent orders, or both, governing the use of such funds and may include administrative costs in amounts that are consistent with the terms of such settlement agreements, consent orders or both, subject to the approval of the Director of the Division of Budget and Accounting. The Commissioner of Environmental Protection shall select the projects which are eligible abatement actions consistent with the terms of the settlement agreements, consent orders, or both. Any grants awarded through new or existing grant programs shall be awarded on a competitive basis, using criteria determined by the Department of Environmental Protection."

[11] At the hearing the court acknowledged this was an issue that needed to be addressed. The court said, "that's going to be a concern that they're going to have to address, okay. So, I agree with you that there's got to be some -- I don't know if you want to call it a guarantee, some measure. You

This court can only approve the settlement if the settlement plan is actually capable of being executed.  It is not capable of being executed.  Here are the mechanics of how the plan will work and not work as currently constructed:

The DuPont JCO (¶7) and the 3M JCO (¶44) require that the initial Settlement Payments be wired to Escrow Accounts where the money will stay until the 45-day appeal period expires.  The Escrow Agreement "will specify the terms on which any funds will be released from escrow." (¶7b).

The Escrow Agreement for the DuPont JCO provided that the first year $200M initial payment shall be *released to the "Settling Plaintiffs* on the occurrence of the Effective Date (as defined in the JCO)."  ECF 746-6 at 2.  Similar language appears in the 3M JCO for its initial $100M payment.

The DuPont JCO and 3M JCO further provide that the balance of the Settlement Payments to be paid out over the next 24 years shall be paid directly "*by wire transfer to the Settling Plaintiffs* pursuant to instructions to be provided by the Settling Plaintiffs." (¶7a).

Clearly, the PFAS payments here are state assets being placed in Plaintiffs direct control immediately upon this court signing the JCOs.  However, this self-

---

can't just say, okay, the State gets all the money and, you know, it's their discretion.  I think that's a valid objection that you make. And we'll get to that." Telsey Certification, Ex. 1, Transcript of January 7, 2026 hearing, P49 l 8-23.

serving strategy to take immediate control of state funds does not override legislative fiscal protocols.

This tension between who controls the PFAS money – the Plaintiffs or the legislature – has left Plaintiffs straddling the fence. They recognize that the PFAS funds must be appropriated by the legislature, but they only have a one-year FY2027 PFAS Abatement Fund appropriation (pending). They do not have the other 24 years of appropriation authority they need to administer their PFAS distribution plan.

Plaintiffs are presenting this special revenue fund to the court as the solution to their 25-year control problem when it is not an effective solution. This can be illustrated by simply looking at how settlement payments will be distributed or not distributed over the next 25 years. By year 2 (FY2028), the entire revenue fund structure of this settlement collapses.

In FY 2027, the Plaintiffs will receive $300M – DuPont will pay $200M, 3M will pay $100M. After NRD moneys are credited to the constitutional NRD account, $10M is paid to the Counties Qualified Settlement Fund, and $195M is paid to outside counsel, the FY2027 balance in the PFAS Abatement Fund will be $51.55M.

In FY2028, the Plaintiffs will receive up to $175M. The PFAS Abatement Fund will have a carryover of $51.55M. However, unless the FY2028 legislature reappropriates the Fund in 2028, which is uncertain today, the carryover $51.55M will not be accessible by the DEP, and the 2028 PFAS settlement payments of up to

$175M will end up in the General Treasury.  NJ Const. Art. 8, §  2, ¶ 2, *Mid-Atlantic Solar Energy Industries Ass'n v. Christie*, 418 N.J. Super. 499 (2011).

This uncertainty in PFAS funding seen in year 2 (FY2028) will continue ever year for the next 24 years, from FY2028 to FY2051.

Table 1 focuses on the availability or non-availability of all PFAS funds over the next 24 years, which amounts to as much as $962,450,000 (excluding NRD payments which go to a constitutional NRD account).  Table 1 shows that the availability of PFAS funds over the next 24 years is uncertain because no one can predict whether subsequent legislatures will reappropriate the PFAS Abatement Fund each year or not.  This means that the Plaintiffs cannot confirm with certainty that the benefits promised to the public by this PFAS settlement will be delivered.

Table 1

| Fiscal Year | DuPont JCO NRD/PFAS bundled $875M | DuPont JCO PFAS Appropriation Authority | 3M JCO PFAS and Leadership only $400M-$450M | 3M JCO PFAS Appropriation Authority |
|---|---|---|---|---|
| 1..2027 | $45M* * Remaining after counsel fees | Certain | $16.550M | Certain |
| Total certain PFAS appropriations: $61,550,000 | | | | |
| 2  2028 | $75M | Uncertain | | Uncertain |
| 3  2029 | $45M | Uncertain | Up to $100M | Uncertain |
| 4  2030 | $40M | Uncertain | | Uncertain |
| 5  2031 | $40M | Uncertain | $6.850M | Uncertain |
| 6  2032 | $20M | Uncertain | $6.850M | Uncertain |
| 7  2033 | $20M | Uncertain | $6.850M | Uncertain |
| 8  2034 | $20M | Uncertain | $6.850M | Uncertain |
| 9  2035 | $20M | Uncertain | $6.850M | Uncertain |
| 10  2036 | $45M | Uncertain | $19.7M | Uncertain |

| | | | | | |
|---|---|---|---|---|---|
| 11  2037 | $20M | Uncertain | $3.9M | Uncertain |
| 12  2038 | $20M | Uncertain | $3.9M | Uncertain |
| 13  2039 | $20M | Uncertain | $3.9M | Uncertain |
| 14  2040 | $20M | Uncertain | $3.9M | Uncertain |
| 15  2041 | $20M | Uncertain | $3.2M | Uncertain |
| 16  2042 | $25M | Uncertain | $3.2M | Uncertain |
| 17  2043 | $25M | Uncertain | $3.2M | Uncertain |
| 18  2044 | $25M | Uncertain | $2.4M | Uncertain |
| 19  2045 | $25M | Uncertain | $2.4M | Uncertain |
| 20  2046 | $25M | Uncertain | $2.4M | Uncertain |
| 21  2047 | $25M | Uncertain | $2.4M | Uncertain |
| 22  2048 | $25M | Uncertain | $1.6M | Uncertain |
| 23  2049 | $25M | Uncertain | $1.6M | Uncertain |
| 24  2050 | $25M | Uncertain | $1.6M | Uncertain |
| 25  2051 | $25M | Uncertain | $39.2M | Uncertain |
| Subtotal | $675M | | up to $225.9M | |
| Total uncertain PFAS appropriations: **Up to $900,900,000** | | | | |

This immense uncertainty makes the JCOs unreasonable, unfair, and flawed because almost all of the benefits promised to the public cannot be guaranteed.

Federal and New Jersey courts evaluating consent decrees examine whether settlement terms are "clear" and whether "compliance mechanisms" are capable of execution and are enforceable. *U.S. v. SBC Communications, Inc.,* 489 F.Supp.2d 1, 17 (2007) (Courts should "pay attention to a proposed judgment's clarity in order to make implementation of judgment manageable" and "should closely examine compliance mechanisms in a proposed settlement.")

The court in *New Jersey Department of Environmental Protection v. Exxon Mobil Corporation*, 453 N.J. Super. 588, 617 (2015) noted that "fairness and reasonableness of a consent decree in environmental cases are pragmatic concepts"

- 17 -

requiring "common sense, practical wisdom, and a dispassionate assessment of the attendant circumstances."

Funding certainty is relevant to a fairness determination. *U.S. v. City of New Orleans*, 35 F.Supp.3d 788 (2013). A settlement based on the hope that 25 consecutive legislatures will appropriate funds is clearly uncertain and unworkable.

Courts reviewing consent decrees assess "substantive fairness" by examining "concepts of corrective justice and accountability" to ensure "a party should bear the cost of the harm for which it is legally responsible" *U.S. v. Wisconsin Elec. Power Co.*, 522 F.Supp.2d 1107, 1112 (2007). If the settlement structure allows the State to collect funds but not be able to deploy them, this defeats the state's ability to execute the agreed remedial and restoration actions promised in the JCOs.

Each subsequent legislature (FY2028 to FY2051) retains full discretion to appropriate different amounts, redirect funds for other purposes, or decline to appropriate PFAS settlement funds at all.  Neither the Attorney General, DEP, nor the court can do anything about it. *Cargill Meat Solutions Corp. v. Director, Division of Taxation*, 477 N.J. Super. 85 (2023), *Mid-Atlantic Solar Energy Industries Ass'n v. Christie, supra.*

This court cannot (1) assume that the PFAS Abatement Fund will be reappropriate each year for the next 25 years or that the legislature will eventually enact special legislation to manage the PFAS funds, *Garden State Equality v. Dow*,

434 N.J. Super. 163 (2013), *State v O'Donnell*, 255, N.J. 60 (2023); (2) compel the executive branch to seek special legislation, *Karcher v. Kean,* 97 N.J. 483 (1984); or (3) compel the legislature to make a specific appropriation or enact special legislation, *Community Action Programs Executive Directors Ass'n of New Jersey, Inc., v Ash*, 365 F. Supp. 1355 (1973).  *See, also*, *Burgos v. State*, 222 N.J. 175 (2015); see also, *City of Camden v. Byrne*, 82 N.J. 133 (1980).[12]  This limits the court's corrective powers.

This also puts the Plaintiffs in a tough spot to try and explain how they have appropriation authority to manage 25 years of PFAS settlement payments with only one year of appropriation authority (pending).

Their first effort at explaining their appropriation authority was to point to the 1998 tobacco litigation settlement as an example of how a court permitting a state executive agency to appropriate settlement funds for specific purposes solely on the strength of its *parens patriae* authority.  ECF-788 p24-25.  That analogy, however, is incorrect.  The proceeds of tobacco litigation were not managed through executive *parens patriae* authority, they were managed through special legislation.

---

[12] The judiciary has "accepted its own absence of authority to compel either the Legislature to make a specific appropriation or the Governor to recommend or approve one." *Karcher v. Kean*, 97 N.J. 483, 490 (1984).  Courts are "without power to order the Legislature to appropriate money or to order the Governor to approve an appropriation if one were made." *Smith v. Goldman*, 159 N.J. Super. 297, 303 (App. Div. 1978).

New Jersey participated in the multi-state tobacco litigation settlement that resulted in a multi-year payment plan.  The state enacted special legislation to manage the tobacco settlement funds.  See, N.J.S.A. 52:4D-1 et seq.  The state did not rely on executive *parens patriae* authority because that authority does not include appropriation powers.

When the state settled the multidistrict fraud litigation with opioid distributors, that too resulted in a multi-year payout.  Again, the state created special permanent legislation to manage the settlement funds.  See, N.J.S.A. 26:2G-39 et seq.[13]

On the environmental front, New Jersey has enacted special legislation to manage the New Jersey Infrastructure Trust, Community Hazard Assistance Mitigation Program, and Disaster Relief Emergency Financing Program Fund. N.J.S.A. 58:11B-9.5, N.J.S.A. 58:11B-20.4, N.J.S.A. 58:11B-23.

These permanent statutory frameworks direct future receipts into the fund year after year without reappropriation, make the fund nonlapsing, authorize administration, authorize specified expenditures, and continue indefinitely until amended or repealed.  This is the kind of legislation needed here as part of the PFAS settlement.

---

[13] See also, Fraud Response Fund to address contractor fraud during federal disaster recovery programs, N.J.S.A. 2:15D-14, and the New Jersey Unsatisfied Claim and Judgment Fund to provide relief to victims of uninsured or hit-and-run drivers, N.J.S.A. 39:6-61 et seq.

For example, P.L. 2025, c. 109 appropriates funds to DEP for environmental infrastructure projects through the New Jersey Infrastructure Bank (formerly the I-Bank). This legislation identifies sources of income that will be used to fund the I-Bank (various federal and state funds), and how it can be used (zero-interest loans, principal forgiveness, etc.).

P.L. 2025, c.109 demonstrates the traditional constitutional model for large-scale environmental funding programs in New Jersey. The Legislature identifies the funding sources, appropriates the money, creates the funding mechanism, defines the permissible uses, and delegates administration to DEP.

This is the legislative architecture for the management of funds that the Plaintiffs are talking about in their Supplemental Report.  The tobacco and opioid funds have similar architecture.  With these permanent statutory acts in place the executive branch can then operates inside that architecture.  Comparable comprehensive legislation would effectively manage $1B in PFAS settlement payments without the risk that 25 years of consecutive legislatures may fail to appropriate settlement funds to the PFAS Abatement Fund.

Plaintiffs nevertheless are using a special revenue fund similar to the one used in the Volkswagen settlement.  ECF 827, p.35-37.  The special revenue fund model is based on a trust-beneficiary model.  In that matter, settling states, including New Jersey, did not recover or control the settlement funds.  They went to a national

- 21 -

trustee.  New Jersey makes application to the national trustee to use the $72.2M earmarked for New Jersey for specific purposes set forth in the Volkswagen settlement agreement.  The national trustee then releases funds to the state if the application for release meets the dedicated use requirements.  In essence, the state is a grant recipient.

A grant recipient does not need special legislation to accept a grant.  That is why New Jersey simply created a nonlapsing special revenue account, the Volkswagen Environmental Mitigation Fund, to receive Volkswagen settlement funds whenever the state makes application for them. ECF 827, p.35.

The PFAS settlement we have here is not a grant structure.  It requires sophisticated fund management architecture that is not included in the PFAS Abatement Fund.  This kind of grant recipient fund is subject to appropriation each year, which is why it is an unworkable model for the PFAS settlement.

Paragraph 7of the 3M JCO states that "The Parties agree to and the Court by entering this JCO *finds* each of the provisions set forth in Paragraphs 8 through 43 of this Section V" to be true.  In particular, paragraph 8 provides that the Attorney General "is *invested with all the powers of the office conferred by the common, statutory, and constitutional law* [];"[14] paragraph 9 provides that the Attorney

---

[14] Paragraph 8 of the 3M JCO provides that the court finds that the Attorney General "is *invested with all the powers of the office conferred by the common, statutory, and constitutional law* of the State and may exercise all such power and authority in his discretion to advance the public interests

General and NJDEP act, pursuant to their powers, "*to the maximum extent allowable by law*, "*to vindicate the interests that can be addressed by those powers,* [];"[15] and paragraph 17 provides that those powers include the power to "*procure*" "*monetary damages in lieu of or in addition to Restoration*," such as PFAS Funds.[16]

Both the DuPont JCO and 3M JCO state that by signing the JCOs, this court "finds" the JCOs to be "fair, reasonable, in the public interest, and consistent with applicable law."[17]

In essence, Plaintiffs want this court to "find" that their executive *parens patriae* power and the one-year FY2027 PFAS Abatement Fund provides Plaintiffs

---

of the State and to protect the State's consumers and the public generally, and the economic well-being, health, and safety of the State and its Political Subdivisions, citizens, and residents."

[15] Paragraph 9 of the 3M JCO provides that the court finds that "each Settling Plaintiff, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State, acts in all its capacities *to the maximum extent allowable by law*, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, including a. Each Settling Plaintiff's capacity as *parens patriae*; [] and e. each Settling Plaintiff's capacity to exercise the State's sovereign, quasi-sovereign, regulatory, and police powers, *to vindicate the interests that can be addressed by those powers,* []."

[16] Paragraph 17 of the 3M JCO provides that the court finds that "To fulfill his public-trust and fiduciary responsibilities, the Commissioner, through the instrumentalities of the Department, is empowered to direct, *procure*, and administer Natural Resource Restoration activities, including the administrative or judicial pursuit of Restoration commitments, *monetary damages in lieu of or in addition to Restoration*, costs of Natural Resource injury assessment, and legal fees and costs" (Paragraph 17). "Monetary damages" include the PFAS Abatement Funds.

[17] Paragraph HH of the DuPont JCO states, "The Parties recognize and agree, and *the Court by entering this JCO finds,* that [] this JCO is *fair, reasonable, in the public interest, and consistent with applicable law.*" Paragraph S of the 3M JCO states, "The Parties recognize and agree, and the Court by entering this JCO *finds*, that [] this JCO is fair, reasonable, in the public interest, and *consistent with applicable law.*"

with all the power they need to "procure" the PFAS settlement funds for 25 years, and they want this court to sign the JCOs to "vindicate" this procurement power.

That is simply not accurate. This court cannot sign the JCOs approving the Plaintiffs' power to appropriate the PFAS Funds over the next 25 years because the Plaintiffs do not have that power. For the JCOs to be "consistent with applicable law," this court can only "find" that, except for FY2027, all other PFAS Funds are not under Plaintiffs control and will have to be deposited into the General Fund unless a yearly Appropriations Act or special legislation directs otherwise. This finding does not accomplish the goals set out in the JCOs.

The FY2027 PFAS Abatement Fund does not allow the Plaintiffs to reliably execute their settlement plan. The court in *Bernie Corp. v. Government of the Virgin Islands*, 2011 WL 13228471 (District Ct. of the Virgin Islands, January 22, 2011) was asked to sign a consent decree that required the Governor to promote a piece of legislation and the court refused claiming it is not in the business of "abdicating its responsibility" or turning a "blind eye" to issues that touch the third rail of legislative prerogatives.[18]

This abdication of responsibility is what Plaintiffs are asking this court to do now by signing the JCOs in their present form and the court must refuse. As currently constructed, the JCOs fail as a fair and reasonable settlement because they

---

[18] Telsey Certification, Ex.2.

lack the clarity, enforceability, and practical feasibility essential to execute the settlement. As such, this court cannot approve the settlement as it is currently proposed.

If the Court concludes that approval turns upon unresolved questions of New Jersey appropriations law, the legal effect of the PFAS Abatement Fund, or the extent to which future settlement receipts may be dedicated through annual appropriations legislation, those and similar questions warrant certification to the New Jersey Supreme Court.

## POINT 3

### BUNDLING NRD AND PFAS PAYMENTS INTO UNDIFFERENTIATED YEARLY PAYMENTS IS UNLAWFUL

The DuPont JCO provides that $225M "shall be allocated" to NRD (Chambers Works $100M, Pompton Lakes $75M, Parlin $30M, Repauno $20M) and $525M "shall be allocated" to PFAS (DuPont JCO ¶7.c.).

Exhibit A to the DuPont JCO (attached to this brief) bundles each yearly NRD and PFAS payment without differentiating how much goes to NRD or PFAS. Even if the DuPont JCO did make this differentiation, which it does not, the JCO also does not differentiate how much the NRD amount being paid each year, if any, goes to the four Industrial Sites (Chambers Works, Pompton Lakes, Parlin, Repauno).

Exhibit A is a 25-year allocation table that bundles NRD, PFAS, and costs/fees into one undifferentiated yearly lump sum payment due each year for 25

years.   Exhibit A further states that, "except where otherwise indicated [on this Exhibit], all funds are to be allocated between Natural Resource Damages and Abatement Damages by the Department."

This discretion to move NRD to PFAS in whatever amounts DEP chooses is further amplified in the DuPont JCO itself.  "Notwithstanding the foregoing, the Settling Plaintiffs retain the discretion to apply additional portions of the Settlement Payments for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the State [which is the definition of PFAS "Abatement Damages" in the JCO]." (¶7.c).  In other words, no one knows how much, if any, of the NRD is really going to be paid as NRD or converted to PFAS.

The 3M JCO settled the Plaintiffs' Chambers Worls Litigation, Parlin Litigation, and AFFF Litigation against 3M, among other things.  Exhibit A to the 3M JCO allocates yearly payments of NRD to Chambers Works and AFFF sites but not to Parlin (located in Sayreville).  Instead, Exhibit A has a column for yearly payments to "other sources," which may or may not include Parlin.  Both the DuPont JCO and the 3M JCO have baked-in provisions allowing DEP to use recovered funds in its "sole discretion."[19]

---

[19] 3M JCO ¶51 [PFAS Fund]. "Except as specifically provided herein, nothing in this Section VII shall alter the Department's *sole discretion* to use the funds paid pursuant to Paragraph 44.c.ii and Exhibit A as it determines to be appropriate to protect the public health and safety and the

Unreconcilable contradiction. Courts cannot enforce contradictory terms that render a consent decree unworkable. *Harris v. City of Philadelphia,* 137 F.3d 209 (1998). In the *Harris* case, the Third Circuit held that courts "must not strain [a] decree's precise terms or impose other terms in an attempt to reconcile a decree with its own conception of its purpose," and "should not later modify a consent decree by interposing terms not agreed to by parties or not included in language of decree." Id. at 212.

The DEP's discretion to move any or all DuPont NRD to PFAS contradicts the "shall" language in the DuPont JCO that directed all NRD money to NRD uses only. Given this discretion, the DuPont JCO really provides that DEP shall pay NRD in the allocated amounts to the designated sites, unless DEP chooses to use that money for PFAS for unstated reasons in its sole discretion. "Shall" is now turned into "may or may not." That means DEP has the discretion to turn $225M in NRD into $0 NRD.

---

Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS. The Parties acknowledge the Department's *sole discretion* to allocate and disburse PFAS Contamination Abatement Funding (including, in the Department's *sole discretion*, reallocating funds within Paragraph 44.c.ii) and to identify specific PFAS Contamination Abatement Projects to address PFAS Contamination."

3M JCO ¶44e.vi [Leadership Fund]. "Subject to Paragraph 44.e.vii, the Department has *sole discretion* to allocate the New Jersey Leadership Payment as it determines to be appropriate to protect the public health and safety and the Environment from impacts caused directly or indirectly by any PFAS Contamination or Discharge of PFAS."

DuPont JCO ¶7.c.iv [NRD Funds, PFAS Funds, other Settlement Payments]. "Notwithstanding the foregoing, the Settling Plaintiffs retain the *discretion* to apply additional portions of the Settlement Payments for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the State."

That is a completely different promise than DEP made to the public. In the public notice for the DuPont JCO, the DEP said, "All natural resource damages recovered **will be** held in the NJDEP's dedicated natural resource damages account for specific natural resource restoration activities in accordance with the New Jersey State Constitution, Article VIII, Section 2, Paragraph 9."[20]  DEP did not tell the public that it had discretion to not pay any NRD to the constitutional account if it chose to convert all NRD to PFAS in its sole discretion.

The promise in the DuPont JCO to use $225M in settlement payments for NRD is an illusory promise where DEP as the promisor does not commit to perform. An illusory promise is one "which by its terms makes performance entirely optional with the promisor." *Del Sontro v. Cendant Corp., Inc.*, 223 F.Supp.2d 563, 577 (2002).

The DuPont JCO's contradictory provisions to pay or not pay NRD in any amount or to apply NRD funds to any Industrial Site or no Industrial Site creates an interpretive impossibility: the "shall be allocated" language regarding NRD cannot be given its plain mandatory meaning because other provisions grant unlimited discretion to reallocate those same NRD funds to PFAS. This internal contradiction means the DuPont JCO lacks the definiteness required for enforcement.

---

[20] Telsey Certification, Ex.3.

- 28 -

Constitutional NRD implications.  The constitutional implications here are particularly severe and they impact both the DuPont JCO and the 3M JCO.  The New Jersey Constitution mandates that NRD funds "shall be dedicated and shall be appropriated from time to time by the Legislature, on a "first priority" basis, to NRD restoration projects "in the immediate area in which the damage to the natural resources occurred."  N.J.S.A. Const. Art. 8, § 2, ¶ 9.  That means NRD recoveries in the DuPont JCO must be applied to Chambers Works, Pompton Lakes, Parlin, and Repauno; and that NRD recoveries in the 3M JCO must be applied to Chambers Works, Parlin, and AFFF sites.

The DuPont JCO uses mandatory "shall" language for NRD allocations but grants DEP discretion to convert those funds to PFAS.  This discretion prevents verification of NRD compliance with constitutional geographic priorities.  That is, if DEP can allocate NRD funds in its discretion regardless of the "shall" language, there is no way to ensure NRD funds are being spent "in the immediate area in which the damage to the natural resources occurred," which are the four Industrial Sites.

The 3M JCO omits the Parlin site all together, one of the four Industrial Sites being settled here.  That omission clearly violates the constitutional geographic mandate because no NRD funds are being allocated to that NRD site.  As such,

- 29 -

verification of NRD noncompliance is simple – DEP is not complying with the NRD geographic mandate for the Parlin site at all.[21]

This mismanagement of NRD funds also disenfranchises pollution-impacted municipalities from meaningful participation in the NRD restoration process. The failure to allocate NRD recoveries per Industrial Site, per year, denies pollution-impacted municipalities the ability to design and budget appropriate NRD restoration projects for their communities because they will not know how much each yearly NRD payment will be, if any, for each Site. This municipal involvement in the NRD restoration process is acknowledged by NJDEP as critical and is made part of the DEP NRD Administrative Order 2023-08.[22]

Usurping legislative appropriation authority. The DuPont JCO NRD/PFAS discretion and the 3M JCO omission of Parlin also delegates legislative appropriation authority to the executive branch in violation of separation of powers. The New Jersey Supreme Court has emphasized that the Legislature's appropriation power includes the authority to "attach conditions, restrictions, or limitations on the

---

[21] The 3M JCO Exhibit A has a column for NRD to be paid to "other sources" of NRD throughout the state, but this does not mean it includes Parlin, and if it does, it does not define the portion of the "other sources" NRD payments that goes to Parlin as required by the constitutional geographic protocols.

[22] "It is the policy of the Department to engage directly with the public whose natural resources the State holds in trust concerning the Department's identification, selection, planning, and implementation of restoration projects, and to provide information and seek input on restoration projects from communities affected by the relevant discharges(s) of hazardous substances, contaminants, or other pollutants."

expenditure, use, or application of appropriated funds," but this power is subject to separation of powers constraints. *Communications Workers of America, AFL-CIO v. Florio*, 130 N.J. 439 (1992). When settlement agreements fail to specify allocation amounts, they improperly delegate legislative appropriation authority to executive agencies like DEP, violating the principle that "no money shall be drawn from the State treasury but for appropriations made by law" N.J.S.A. Const. Art. 8, § 2, ¶ 2.

Improper delegation and lack of adequate standards. New Jersey law prohibits unconstitutional delegation of legislative authority unless "the administrative discretion is hemmed in by standards sufficiently definitive to guide its exercise" *Avant v. Clifford,* 67 N.J. 496, 553 (1975). Courts have held that while agencies may exercise discretion in implementing statutes, they cannot be given "excessive discretion" that amounts to legislative policymaking. *E.I. du Pont de Nemours and Co. v. State, Dept. of Environmental Protection and Energy*, 283 N.J. Super. 331 (1995).

The above DuPont case provides that, while DEP has expertise in environmental matters, a regulation or consent order cannot "empower DEP with excessive discretion" that forces parties to commit resources "without vaguely understanding the nature of that commitment." Id.  Here, the bundled NRD/PFAS payment structure in the DuPont JCO and the Parlin omission in the 3M JCO creates precisely this problem—neither the public nor the Legislature can determine how

NRD or PFAS funds are being allocated or not being allocated between the constitutional NRD account and the PFAS Abatement Fund or the identified NRD sites.

Public transparency and accountability. New Jersey has a "notably strong public policy in favor of open government." *Press of Atlantic City v. Ocean County Joint Ins. Fund,* 337 N.J. Super. 480 (2000). The Open Public Records Act establishes that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State" and "any limitations on the right of access shall be construed in favor of the public's right of access" N.J.S.A. 47:1A-1. Settlement agreements involving public agencies are generally subject to disclosure, particularly when they involve the expenditure of public funds or resolution of public rights. *Asbury Park Press v. County of Monmouth,* 201 N.J. 5 (2010).

The New Jersey Supreme Court has held that governmental entities "cannot enter into a voluntary agreement at the end of a public lawsuit to keep a settlement confidential" when transparency concerns are implicated Id. at 7. The bundled NRD/PFAS payment structure in the DuPont JCO, the failure to allocate NRD amount between the four Industrial Sites in the DuPont JCO, and the failure to include the Parlin site in the 3M JCO effectively conceals critical information about how public NRD damages are being valued and apportioned, preventing meaningful

public oversight of both the settlement terms and DEP's subsequent allocation decisions.

Consent decree approval standard and substantive fairness. Federal courts reviewing environmental consent decrees must determine whether settlements are "fair, reasonable, and faithful to the objective of the governing statute" *U.S. v. Kramer*, 19 F.Supp.2d 273, 280 (1998). The standard requires that settlements not be "arbitrary, capricious, and devoid of a rational basis" *n re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201 (2003). Critically, courts have held that while they need not conduct de novo review of allocation decisions, settlements must have "a highly rational basis for apportionment of liability, articulated by neutral evaluators" *U.S. v. Kramer, supra* at 285.

The lack of transparency regarding allocation between NRD and PFAS in the DuPont JCO and the omission of Parlin in the 3M JCO undermines the court's ability to assess substantive fairness. In *New Jersey Department of Environmental Protection v. Exxon Mobil Corporation*, 453 N.J. Super. 588 (2015), the court emphasized that settlement calculations must be "rational and not arbitrary and capricious." When allocation methodologies are concealed within bundled payments or omitted, neither courts nor the public can evaluate whether the settlement reasonably apportions liability between NRD and PFAS or properly values the different categories of recovery.

- 33 -

DEP's discretionary allocation authority to turn $225M in NRD into $0 NRD in the DuPont JCO prevents any meaningful assessment of whether the settlement reasonably values NRD versus PFAS damages. The bundled NRD/PFAS is a substantively unfair provision in the JCO because neither the public nor the court can evaluate how the settlement rationally apportions liability between NRD or PFAS.

The bottom line is that the DuPont and 3M JCOs as currently written do not meet the standard of fair, reasonable, and lawful for the reasons set forth herein.

## POINT 4

## A FORCED RELEASE CAN ONLY BE AUTHORIZED BY STATUTE NOT *PARENS PATRIAE* AUTHORITY

Plaintiffs have loaded up the JCOs with self-generated authority language to try to justify their authority to do what they want to do here, including forcing a release on political subdivisions.[23] However, this self-generated language does not

---

[23] The DuPont JCO states that the Plaintiffs act "in all its capacities to the maximum extent allowable by law, on behalf of and for the benefit of all the State's Political Subdivision, citizen and residents, including [its] capacity as *parens patriae*" (¶EE). It also states that the "Industrial Site Release" and "Statewide PFAS Release" include "all Political Subdivisions, *but only* to the full extent of the Attorney General's and the Settling Plaintiffs' power and authority under New Jersey law to release such claims" (¶¶49,50), and that by signing the JCO, "this Court *finds*, that the Releases in the JCO resolve, release and bar Claims, including to the extent applicable by res judicata" (¶83).

   The 3M JCO states that "By executing this JCO, the Attorney General represents that he (i) has the power and authority needed to enter into this JCO and to fully release all Released Claims on behalf of all Releasors and (ii) does in fact release all such Released Claims" (¶55). It also states that by signing the JCO, the Plaintiffs, acting in all their "capacities as described in Paragraph 9, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, fully and forever release all Released Entities from all Released Claims and fully discharge all

usurp legal authority, and the Plaintiffs do not have legal authority to compel a forced release on political subdivisions.

The New Jersey Supreme Court has recognized that municipalities and counties are separate legal entities with their own statutory powers and rights, and the state does not have *parens patriae* or other authority, unless provided by the legislature, to unilaterally release their claims through settlement. *In re Lead Paint Litigation*, 191 N.J. 405 (2007). If a municipality is going to release it claims, it must do so by consent and through resolution adopted at a public hearing not because the state forced it on them. *City of Jersey City v. Roosevelt Stadium Marina, Inc.*, 210 N.J. Super. 315 (1986).

Here, the PFAS Abatement Fund, as a pending legislative enactment, does not provide Plaintiffs with the statutory right to force a release on political subdivisions. Statutory authorization is exactly what the Plaintiffs need to force a release, and they do not have it.

Plaintiffs claim the 1998 Tobacco Master Settlement Agreement ("Tobacco MSA") provides authority for the state to impose a forced release on political subdivisions in a PFAS settlement. ECF-788 p24-25. That is incorrect. The Tobacco MSA provides that if a state does not have statutory authority to impose a

---

Released Claims against all Released Entities [] to the full extent of the power of the State, the Governor, and the Attorney General to release Claims, to the maximum extent allowable by law" (¶54).

forced release on political subdivisions with regard to the terms of the tobacco settlement, it must enact legislation that gives it that authority.

The Tobacco MSA actually provided a Model Statute (Exhibit N) that would give a state forced release authority for tobacco settlements if the state enacted it. New Jersey adopted that model statute, which incorporated the Tobacco MSA definition of "Releasing Parties" to include a forced release against political subdivisions. N.J.S.A. 52:4D-2.

The Plaintiffs argue they are entitled to graft the tobacco forced release statute into the DuPont and 3M PFAS JCOs because if the legislature wanted to limit it to tobacco settlements, they needed to say so.  (ECF-788 p25)[24]  The legislation did say so.  In addition, the general rule of statutory construction – the expression of one thing is the exclusion of others – applies here. *PJM Power Providers Group v. Federal Energy Regulatory Commission,* 96 F.4th 390 (2024).  Plaintiffs cannot graft the tobacco forced release onto the JCOs here.

All of the other cases cited by Plaintiffs to bolster the argument that *parens patriae* authority alone is enough to force a release on political subdivisions also fail because in each instance the state had statutory authority to impose the forced release.  The state cited the following cases:  *In re Certified Question*, 638 N.W.2d

---

[24] "The Legislature never acted to prohibit the Attorney General from entering into similar settlements following the Tobacco MSA."

409 (2002) (this was a tobacco case where Michigan also enacted the model forced release statute, Mich. Comp. Laws §445.2051).  *People ex rel. Devine v. Time Consumer Marketing*, 782 N.E.2d 761 (Ill. App. 2002) and *Commonwealth ex rel. Krasner v. Attorney General of Commonwealth*, 309 A.3d 265 (Pa. Commw. Ct. 2024) (these were consumer fraud cases where the court found that the consumer fraud statutes in each state provided the Attorney General with legislative authority to impose a force release on political subdivisions).  ECF-788 pp30-31.

Despite the Plaintiffs misplaced belief that they can use *parens patria* or the tobacco release to compel a forced release on political subdivisions; the Plaintiffs actually acknowledge in the JCOs that political subdivisions retain their independent rights to sue Defendants.  This acknowledgement is recognized in the application process for PFAS funds that are discussed in the JCOs.

The JCOs acknowledge that political subdivisions and others have Purely Private Claims against the Defendants and that before they can apply for DEP's PFAS funds they must relinquish their private claims.  The intent was to give persons the right to pursue private claims or seek state PFAS funds, but not both.  (3M JCO ¶6, 52).

In other words, private claims and state assistance exist independently and neither subsumes the other.  That is another reason why the forced release provisions

cannot stand.  They are inconsistent with the political subdivisions' right recognized in the JCOs to pursue private claims.

"The district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *In re General Motors Corp. Pickup Truck Tank Products Liability Litigation*, 55 F.3d 768, 785 (3d. Cir. 1995).  See also, *Girsh v. Jepson*, 521 F.2d 153 (3d. Cir. 1975).  Political subdivisions are absent class members.  They are not named parties to the JCOs, but their rights and interests are being affected.

As such, for the reasons set  forth herein, this court cannot (1) allow the Plaintiffs to forcibly release the rights of political subdivisions against their will even if they do not apply for PFAS funds, and (2) allow the Plaintiffs to deny a political subdivision's application for PFAS funds but still compel the forced release on them. Plaintiffs point to no statutory authority that allows them to do so and their *parens patriae* authority is insufficient.

The forced release is inherently unfair and unreasonable because it denies political subdivisions their legal and equitable remedies without their consent.  For these reasons the forced release against political subdivisions must be stricken from the JCOs.

## POINT 5

**TO COMPLY WITH THE TAX DEDUCTION RULE PFAS FUNDS MUST BE USED FOR PROJECTS WITH A "DIRECT NEXUS" TO CHAMBERS WORKS**

The DuPont JCO defines the $525M in "Abatement Damages" as environmental damages originating only from the Chambers Works Litigation and not from any other Industrial Sites or elsewhere in the state (DuPont JCO ¶5). This huge amount is justified because, according to the Plaintiffs, the Chambers Works site is *"one of the largest sources of PFAS contamination in the world."* (3M JCO ¶27).

Carneys Point is literally ground zero to one of the worst PFAS sites in the world. It has been taking action to protect itself from harm caused by this site for years.

The Township is challenging the tax deduction because the Plaintiffs are exploiting the Township's ground zero pollution injury to pay for statewide infrastructure and remediation projects elsewhere in the state that have no direct nexus to the pollution harm caused by the Chambers Works site.  This violates the Tax Deduction Rule.

The Tax Deduction Rule provides that a settling defendant may be entitled to a tax deduction if (1) the payment is used exclusively for restitution and remediation purposes to restore the environment, wildlife, and natural resources harmed by the

- 39 -

defendant's damaging conduct at and around the site of that conduct, (2) there is a direct nexus between the restoration projects and the site causing the environmental harm, and (3) the funds are paid into a "segregated fund or account" held by the government and used exclusively for these restorative purposes.  26 CFR §1.162-21.

The parties to the DuPont JCO specifically claim that they want the $525M in PFAS Abatement Damages to comply with the Tax Deduction Rule (¶12).  The Rule has actually been incorporated into all of the payment definitions in the DuPont JCO, including the definition of "Abatement Damages Amount." (¶5)[25]

Paragraph 102 of the DuPont JCO also obligates the Plaintiffs to prepare, provide, and file all necessary documents that entitle the Defendants to qualify for the tax deduction.  In other words, the tax deduction is a critical component of the bargain between the Plaintiffs and Defendants.

The problem is that the Plaintiffs are both complying with and not complying with the Tax Deduction Rule to gain the advantages from both compliance and non-compliance at the same time.

On the one hand, Plaintiffs will be reporting to the IRS that they are complying with the rule by only funding projects that have a "direct nexus" to the injury caused

---

[25] The JCO carries the Tax Deduction Rule throughout the document and its definitions. See, ¶6 definition of "Abatement Damages Amount," "Natural Resource Damages Amount," ¶7.c.iii. definition of "Costs, Fees, and Punitive Damages," ¶11 definition of "Additional Fees and Costs Amount," and ¶13 regarding RFS surcharges.

by Chambers Works in Salem County, New Jersey, even though they intend to use the funds for water infrastructure projects and remediation in Bergen County and elsewhere. On the other hand, Plaintiffs are saying they will not comply with the rule because they really want to use the $525M for statewide purposes instead of localized Chambers Works purposes since they prefer a statewide use of funds as part of their distribution plan.

The use of PFAS funds for statewide purposes in violation of the Tax Deduction Rule lets the Plaintiffs and Defendants exploit Carneys Point as an incubator that generates hundreds of millions of dollars in damages that they then intend to siphon off and use elsewhere. This harms Carneys Point and is unacceptable.

Carneys Point submits that, as a party granted the right to intervene in this matter, Carneys Point is entitled to challenge the fairness and reasonableness of the JCOs. Carneys Point submits that it is unfair and unreasonable to allow the Plaintiffs to claim PFAS Abatement Funds used throughout the state have a "direct nexus" to the Chambers Works site, when they do not. It is a misrepresentation.

Carneys Point submits that the court must order the Plaintiffs to use the PFAS Funds only for projects with a direct nexus to the Chambers Works site and to provide Carneys Point with the Plaintiffs' IRS Form 1098-F and Form 1096,

excluding confidential taxpayer information, required pursuant to 26 C.F.R. §1.6050X-1 for each year the JCOs are in effect.

## POINT 6

**THE PUBLIC WAS NEVER PROVIDED NOTICE OR AN OPPORTUNITY TO COMMENT ON THE NEW SETTLEMENT ARCHITECTURE UPON WHICH PLAINTIFFS NOW RELY**

In 2025, DEP published a settlement notice that described the original 2026 settlement architecture.  Since then that architecture has materially changed and the public has not had an opportunity to comment on it.

In particular, the settlement being presented to the court now is very different from the one published in 2025.  The settlement now includes:

(1) A detailed Distribution Plan for the distribution of hundreds of millions of settlement dollars.  This Plan describes how PFAS funds will be allocated, how counties and utilities will be treated, how I-Bank funding will work, and how PFAS projects will be prioritized and selected.

(2) A County Stipulation that includes a Qualified Settlement Fund, South Dakota trustee, special master, allocation formulas, reversion provisions, and county-specific distributions, as well as cooperative ACOs, contribution protection, future remediation arrangements, and modifications to the forced release and contribution protection provisions.  The reversion provision is

- 42 -

particularly important because it affects ownership and control of settlement proceeds.

(3) A Utility Authorities Stipulation that provides dedicated utility allocations, special treatment for participating authorities, coordination with the Water Bank, contribution protection tied to participation. and modifications to the forced release and contribution protection provisions.

(4) A PFAS Abatement Fund based on the Volkswagen funding model that provides a nonlapsing PFAS Fund and DEP's claimed spending and project-selection authority.

The public notice statute requires that a proposed settlement notice must include a "*summary of the terms of the settlement, including the amount of any monetary payments made or to be made.*" N.J.S.A. 58:10-23.11e2.[26]  None of the above was include in the 2025 public notice because these settlement elements have been developed just recently.

---

[26] N.J.S.A. 58:10-23.11e2. "At least 30 days prior to its agreement to any administrative or judicially approved settlement entered into pursuant to P.L.1976, c.141 (C.58:10-23.11 et seq.), the Department of Environmental Protection shall publish in the New Jersey Register and on the New Jersey Department of Environmental Protection's website the name of the case, the names of the parties to the settlement, the location of the property on which the discharge occurred, and a *summary of the terms of the settlement, including the amount of any monetary payments made or to be made.* The Department of Environmental Protection shall provide written notice of the settlement, which shall include the information listed above, to all other parties in the case and to any other potentially responsible parties of whom the department has notice at the time of the publication." [Emphasis added].

Paragraph 90 of the DuPont JCO and paragraph 93 of the 3M JCO provides that, "The notice described in this Section [XVI DuPont and XIII 3M] is deemed compliant with the notice requirements of N.J.S.A. 58:10-23.11e2." Given the above, the court can no longer make this finding of fact.

For these reasons, Carneys Point submits that the court cannot approve the settlements here without a new published notice describing the new settlement architecture and a new public comment period.

## CONCLUSION

Carneys Point respectfully submits that it is unfair and unreasonable for the court to approve the DuPont and 3M JCOs in their present form because (1) the release language affecting the Township's state court action must be amended, (2) the PFAS Abatement Fund cannot provide consistent funding over the 25-year lifespan of the JCOs, (3) the combined NRD/PFAS payment bundles are unlawful, (4) the forced release is unlawful, (5) the parties are not complying with the tax deduction rule, and (6) a new notice and public comment period is required.

MEYNER AND LANDIS LLP

By: /s/ *Albert I. Telsey*
Albert I. Telsey, Esq.
*Attorneys for Intervenor, Carneys Point Township*

Date: June 10, 2026

- 44 -

**EXHIBIT A**
**Settlement Payments Schedule**

This Settlement Payments Schedule should be read in conjunction with the JCO, which explains the terms and conditions for the Settlement Payments described herein. All capitalized terms shall have the meanings set forth in the JCO.

| Year | Payment (except where otherwise indicated, all funds are to be allocated between Natural Resource Damages and Abatement Damages by the Department) |
|---|---|
| Year 1 | $200,000,000 (of which $100,000,000 is allocated to the Costs, Fees, and Punitive Damages Payment) |
| Year 2 | $75,000,000 (of which at least $25,000,000, plus no more than the Additional Fees and Costs Amount, is allocated to the Costs, Fees, and Punitive Damages Payment) |
| Year 3 | $45,000,000 |
| Year 4 | $40,000,000 |
| Year 5 | $40,000,000 |
| Year 6 | $20,000,000 |
| Year 7 | $20,000,000 |
| Year 8 | $20,000,000 |
| Year 9 | $20,000,000 |
| Year 10 | $45,000,000 |
| Year 11 | $20,000,000 |
| Year 12 | $20,000,000 |
| Year 13 | $20,000,000 |
| Year 14 | $20,000,000 |
| Year 15 | $20,000,000 |
| Year 16 | $25,000,000 |
| Year 17 | $25,000,000 |
| Year 18 | $25,000,000 |
| Year 19 | $25,000,000 |
| Year 20 | $25,000,000 |
| Year 21 | $25,000,000 |
| Year 22 | $25,000,000 |
| Year 23 | $25,000,000 |
| Year 24 | $25,000,000 |
| Year 25 | $25,000,000 |
| **Total:** | $875,000,000 |