**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

<table>
<tr><td>

NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION; et al.,
   *Plaintiffs*,
   v.
E.I. DU PONT DE NEMOURS
AND COMPANY; et al.
   *Defendants,*

</td><td>

Case No.:
1:19-cv-14758-RMB-JBC (Pompton Lakes)
1:19-cv-14765-RMB-JBC (Repauno)
1:19-cv-14766-RMB-JBC (Chambers Works)
1:19-cv-14767-RMB-JBC (Parlin/Sayreville)


Hon. Renée Marie Bumb, Chief U.S.D.J.
James B. Clark, III, U.S.M.J.

</td></tr>
</table>

**CERTIFICATION OF ALBERT I. TELSEY, ESQ.**

**In support of Carneys Point  Response to Supplemental Report**

I, ALBERT I. TELSEY, of full age, am counsel to Intervenor Carneys Point Township ("Carneys Point" or the "Township").  I am personally familiar with the facts set forth herein as follows:

1. Attached as <u>Exhibit 1</u> is the transcript of the hearing on January 7, 2026.

2. Attached as <u>Exhibit 2</u> is the case *Bernie Corp. v. Government of the Virgin Islands*, 2011 WL 13228471 (District Ct. of the Virgin Islands, January 22, 2011).

3. Attached as <u>Exhibit 3</u> is the DEP Notice of the DuPont proposed JCO.

1

I declare under penalty of perjury that the foregoing is true and correct.

_/s/ Albert I Telsey_

_____

Albert I. Telsey, Esq.

June 10, 2026

Exhibit 1

*1*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

| | |
|---|---|
| **NEW JERSEY DEPARTMENT OF** | **CIVIL ACTION NUMBERS:** |
| **ENVIRONMENTAL PROTECTION,** | **1:19-cv-14758-RMB-JBC** |
| **et al.,** | **1:19-cv-14765-RMB-JBC** |
| _Plaintiffs_, | **1:19-cv-14766-RMB-JBC** |
| | **3:19-cv-14767-RMB-JBC** |
| **vs.** | |
| | |
| **E.I. DU PONT DE NEMOURS AND** | **Motions to Intervene** |
| **COMPANY, et al.,** | |
| _Defendants._ | |

_____

Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets
Camden, New Jersey 08101
Wednesday, January 7, 2026
Commencing at 8:58 a.m.

**B E F O R E:**          **THE HONORABLE RENÉE MARIE BUMB,**
**CHIEF UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

MATTHEW J. PLATKIN, ATTORNEY GENERAL OF NEW JERSEY
BY:  GWEN FARLEY, DEPUTY ATTORNEY GENERAL
R.J. Hughes Justice Complex, 25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
For the Plaintiffs

KELLEY DRYE & WARREN, LLP
BY:  WILLIAM J. JACKSON, ESQUIRE
515 Post Oak Boulevard, Suite 900
Houston, Texas 77027
Special Counsel to the Attorney General

John J. Kurz, Federal Official Court Reporter
John_Kurz@njd.uscourts.gov (856)576-7094

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

2

**A P P E A R A N C E S:** (Continued)

KELLEY DRYE & WARREN, LLP
BY:  DAVID M. REAP, ESQUIRE
     DANIEL J. HARRISON, ESQUIRE
     SABRINA EVE MORELLI, ESQUIRE
3 World Trade Center, 175 Greenwich Street
New York, New York 10007
Special Counsel to the Attorney General

KELLEY DRYE & WARREN, LLP
BY:  GEOFFREY W. CASTELLO, ESQUIRE
One Jefferson Road
Parsippany, New Jersey 07054
Special Counsel to the Attorney General

KELLEY DRYE & WARREN, LLP
BY: ANDREW HOMER, ESQUIRE
888 Prospect Street, Suite 200
La Jolla, CA 92037
Special Counsel to the Attorney General

LAW OFFICES OF JOHN K. DEMA, P.C.
BY:  JOHN T. DEMA, ESQUIRE
     JACK DEMA, ESQUIRE
     BRIANA DEMA, ESQUIRE
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Special Counsel to the Attorney General

LAW OFFICES OF JOHN K. DEMA, P.C.
BY:  SCOTT E. KAUFF, ESQUIRE
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
Special Counsel to the Attorney General

McCARTER & ENGLISH, LLP
BY:  LANNY S. KURZWEIL, ESQUIRE
100 Mulberry Street, Four Gateway Center
Newark, New Jersey 07102
For the Defendants EIDP, Inc., The Chemours Company, and The
Chemours Company FC, LLC (As to all claims other than ISRA and
fraudulent transfer)

                    (APPEARANCES CONTINUED ONTO NEXT PAGE.)

*United States District Court*
*District of New Jersey*

3

**A P P E A R A N C E S:** (Continued)

HOLLINGSWORTH LLP
BY:  ANN MARIE DUFFY, ESQUIRE (*Pro hac vice*)
     DAVID I. SCHIFRIN, ESQUIRE (*Pro hac vice*)
1350 I Street NW
Washington, DC 20005
For the Defendants EIDP, Inc., The Chemours Company, and The
Chemours Company FC, LLC (As to all claims except fraudulent
transfer in all matters; and the Third Count, ISRA claim)


BALLARD SPAHR, LLP
BY:  DAVID A. HAWORTH, ESQUIRE
     BRITTANY MARIE WILSON, ESQUIRE
700 East Gate Drive, Suite 330
Mt. Laurel, New Jersey 08054-0015
For the Defendants EIDP, Inc., DuPont Specialty Products USA,
LLC, Corteva, Inc. (As to claims other than fraudulent
transfer), and DuPont de Nemours, Inc. (As to claims other than
fraudulent transfer)

KING & SPALDING, LLP
BY:  ANDREW J. CALICA, ESQUIRE
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
For the Defendants The 3M Company

BRESSLER, AMERY & ROSS, p.c.
BY:  DONALD J. CAMERSON, II, ESQUIRE (*pro hac vice)*
325 Columbia Turnpike
Florham Park, New Jersey 07932
For the Defendants The 3M Company

JENNER & BLOCK
BY:  SAM HIRSCH, ESQUIRE (*pro hac vice*)
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
For the Defendants The 3M Company

NORRIS, McLAUGHLIN & MARCUS, P.A.
BY:  MARGARET M. RAYMOND-FLOOD, ESQUIRE
400 Crossing Boulevard, 8th Floor
PO Box 5933
Bridgewater, New Jersey 08807
For the Defendants The Chemours Company and The Chemours
Company, FC, LLC (As to fraudulent transfer claims)

4

**A P P E A R A N C E S:** (Continued)

MURPHY ORLANDO, LLC
BY:  JASON F. ORLANDO, ESQUIRE
494 Broad Street, 5th Floor
Newark, New Jersey 07102
On Behalf of Intervenor, County of Mercer

MEYNER AND LANDIS, LLP
BY:  ALBERT I. TELSEY, ESQUIRE
One Gateway Center, Suite 2500
Newark, New Jersey 07102
On Behalf of Intervenor, Carneys Point Township and Intervenor
Borough of Sayreville

MARAZITI FALCON, LLP
BY:  BRAD CARNEY, ESQUIRE
     GABRIELLE HARTMAN, ESQUIRE
240 Cedar Knolls Road, Suite 301
Cedar Knolls, New Jersey 07927
On Behalf of Association of Environmental Authorities, Morris
County Municipal Utilities Authority, Somerset Raritan Valley
Sewerage Authority, Hanover Sewerage Authority, Rahway Valley
Sewerage Authority, Rockaway Valley Regional Sewerage
Authority, and the Musconetcong Sewerage Authority
(Collectively Amici Curiae)

KEEFE LAW FIRM, LLC
BY:  JOHN E. KEEFE, JR., ESQUIRE
2 Bridge Avenue, #623
Red Bank, New Jersey 07701
On Behalf of Intervenors, Middlesex, Union, Somerset,
Cumberland, and Cape May Counties

SPIRO HARRISON & NELSON
BY:  THOMAS M. KENNY, ESQUIRE
     BRIAN M. NELSON, ESQUIRE
     EDWARD BANK, ESQUIRE
200 Monmouth Street, Suite 310
Red Bank, New Jersey 07701
On Behalf of Intervenor, Monmouth County

**Also Present:**

The Honorable Joel Schneider, Ret., Special Master, Montgomery
McCracken Walker & Rhoads, LLP

Arthur Roney, The Courtroom Deputy

*United States District Court*
*District of New Jersey*

**Also Present:**

Zach Bailey, Judicial Law Clerk

Shawn LaTourette, Commissioner DEP

Richard Serp, IT Trial Technician

(PROCEEDINGS held in open court before The Honorable Renée Marie Bumb, Chief United States District Judge, at 8:58 a.m. as follows:)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Good morning.  Happy New Year!

MR. JACKSON:  Good morning, Your Honor.  Happy New Year!

MS. FARLEY:  Happy New Year!

MR. KURZWEIL:  Happy New Year, Your Honor.

MS. DUFFY:  Happy New Year!

THE COURT:  You can all have a seat.  Thank you.

All right.  Let me just get organized and then I'm going to get your appearances.

See what I've been doing?

(Laughter.)

Okay.  So I'm going to start with appearances.  Let me make a chart.  Okay.  Some of you I know.  Some of you I don't know.  Okay, Mr. Jackson, for the plaintiffs.

MS. FARLEY:  Actually --

THE COURT:  Ms. Farley.

MS. FARLEY:  -- I'm going to start this morning.  Thank you.  Happy New Year!

THE COURT:  Happy New Year!

MS. FARLEY:  Deputy Attorney General Gwen Farley for the State Plaintiffs.  We have also with us this morning Shawn

LaTourette, the Department of Environmental Protection Commissioner.

THE COURT:  Uh-huh.

MS. FARLEY:  And I'll turn it over to Bill Jackson, our Special Counsel.

MR. JACKSON:  Good morning, Your Honor.  Bill Jackson of Kelley Drye for the State.

Also appearing today and who may argue specific arguments and points are Briana Dema of the Dema Law Firm, David Reap of Kelley Drye, and Andrew Homer of Kelley Drye.

THE COURT:  Okay.

MR. JACKSON:  Thank you.

THE COURT:  Okay.  Nice to see you all.

Okay.  Let's start with DuPont.

MR. KURZWEIL:  Good morning, Your Honor.  Happy New Year.

THE COURT:  Happy New Year.

MR. KURZWEIL:  Lanny Kurzweil from McCarter & English.  I'm joined today by Ann Marie Duffy, from the Hollingsworth firm.

MS. DUFFY:  Good morning, Your Honor.

MR. KURZWEIL:  And by her colleague, David Schifrin, also from the Hollingsworth firm.

THE COURT:  Okay.  Nice to see you.

3M.

MR. CALICA:  Good morning, Your Honor.  Good to be with you again.  Andrew Calica of King & Spalding.  I'm joined at counsel table by Sam Hirsch of Jenner & Block, and DJ Camerson of Bressler, Amery, Ross, for the 3M Company.

THE COURT:  All right.  Thank you.  Nice to see you all.

MR. HAWORTH:  Good morning, Your Honor.  David Haworth with Ballard Spahr, and my colleague, Brittany Wilson, on behalf of EIDP.

THE COURT:  And your colleague?

MR. HAWORTH:  Brittany Wilson on behalf of EIDP on ISRA claims, DuPont Specialty Products, Corteva, and Corteva Inc., and DuPont de Nemours, Inc.

THE COURT:  For those of you standing in the back, there's an overflow courtroom if you wish to participate.

Okay.  The Intervenors, those who are representing the -- those who have moved to intervene, where are those counsel?  Okay.  Can you just -- well, speak loudly or else I'll have you come forward.  So just introduce yourself.

MR. TELSEY:  I'll start.  Good morning, Judge.  Albert Telsey with Meyner and Landis for Intervenors Carneys Point Township and Borough of Sayreville.

THE COURT:  Okay.

MR. KENNY:  Thomas Kenny, Spiro, Harrison & Nelson, and Brian Nelson...

THE COURT: You have to talk louder.

MR. KENNY: Thomas Kenny of Spiro, Harrison & Nelson with Brian Nelson and Ed Bank for the County of Monmouth.

(Court reporter clarification.)

THE COURT: Can't hear him. Come forward to the microphone because we can't hear him.

Let's get chairs for the Intervenors. So we're going to put some chairs... all right. We're going to put the counsel for Intervenors in the jury box, okay.

Mr. Telsey, take your seat, please, Juror No. 12.

MR. KENNY: Thank you, Your Honor. Thomas Kenny of Spiro Harrison & Nelson with my colleagues, Brian Nelson and Ed Bank, for the County of Monmouth.

THE COURT: Okay.

MR. KENNY: I'll go to the jury box.

THE COURT: Jury No. 11, whatever, okay.

MR. KEEFE: Good morning, Your Honor. John Keefe, Jr., with the Keefe Law Firm, on behalf of the County Intervenors Middlesex, Union, Somerset, Cumberland, Cape May. I think that's it. Thank you.

THE COURT: Okay. Good morning.

MR. KEEFE: Good morning.

THE COURT: Nice to meet you. Is that it?

Let me check my docket. Carneys Point, Mercer, Monmouth, yeah, and Morris, right? We're all covered.

*10*

Okay.  So I thought the way that I would proceed is I want to work from the chart and move forward on that.

Where are the attorneys representing the Amici, the Associations?

MR. CARNEY:  Your Honor.

THE COURT:  Yes.

MR. CARNEY:  Good morning, Brad Carney.  I'm with the firm of Maraziti Falcon.  We are representing the Association of Environmental Authorities of New Jersey, the Morris County Municipal Utilities Authority, the Somerset Raritan Valley Sewerage Authority, Hanover Sewerage Authority, Musconetcong Sewerage Authority, Rahway Valley Sewerage Authority, and as Amici.  And I have my associate with me here today, Gabrielle Hartman.

THE COURT:  Okay.  Welcome.  You can take a seat in the jury box, too.

MR. CARNEY:  Thank you.

THE COURT:  Any others?

(No response.)

THE COURT:  Well, I guess what I'm going to do is -- I think what I'll do is I'll start with the motions to intervene and whether or not those should be granted.  And so here is my ruling:

So it is within the Court's discretion to limit the scope of any intervention. *Chevron Corp. v. Donziger,* 2011

Westlaw 2150450 (So. Dist. of New York 2011).

That case cites *Stringfellow vs. Concerned Neighbors in Action*, 480 U.S. 370 (1987).  See also *Harris vs. Pernsley*, 820 F.2d 592 (3d Cir. 1987), as well as the *Department of Natural Resources vs. Mountaire Farms of Delaware*, 375 F. Supp. 3d, 522, 532 (District of Delaware 2019).

These cases all stand for the proposition that the Court has the discretion to limit the scope of any intervenor's participation to certain phases of the action, which I do intend to do that.  I do think that it will be helpful to this conversation -- or to the analysis that this Court has to conduct in determining whether or not it should approve the consent decree.  And I think that having the Intervenors' positions considered by this Court I think will lead to a more fruitful analysis and productive analysis of whether or not the consent decree is fair, reasonable, and equitable.

And so I'm going to permit the Intervenors' motions solely for the purpose of objecting and voicing their objections to the consent decree, okay?  So for that limited purpose, I'm going to permit their participation, all right?

So to the extent I have questions and they involve the objections, then I'll hear from counsel for those Intervenors or the Amici.

Okay.  So I'm going to turn it to the State.  Talk to me about what I think is one of the overarching issues, which

*12*

is the Doctrine of Parens Patriae.

MR. JACKSON:  Your Honor, we actually put together a few PowerPoint presentations.

THE COURT:  Okay.

MR. JACKSON:  May I pass those up and around?

THE COURT:  Yes.

MR. JACKSON:  Thank you.

THE COURT:  And let me tell you, I'll sort of preview what my questions are that I want you to answer in your presentation.  Help me understand the source of the authority.  Is it statutory?  Is it common law?  Is it a combination of both?  I want you to talk about is it coextensive with this trustee doctrine that the parties have talked about?  So it will be helpful in making your comments to me, tell me the source of the authority.

I mean, I'll just say, I've read the *Snapp* case, and I think it's pretty extensive, the authority of the State.  But the objectors don't quite see it that way.  But let's hear it.

MR. JACKSON:  Thank you, Your Honor.

Let me make sure, this PowerPoint presentation is really to help crystallize these particular issues.  And so I may speed through some pieces of this, but definitely want to address your questions first.

So, first, the parens patriae doctrine is a constitutional doctrine.  It goes back to the founding of the

country.  The powers that were in the -- the king in the English common law went to the 13 colonies originally, and then when the 13 colonies created the United States, they delegated certain authorities obviously to the federal government, but they retained the rest.

Fundamental to that was the parens patriae doctrine, that is, the parent of the country; that the State has the ability and the power to protect its citizens and its environment for environmental issues, economic issues.  It's a standing doctrine that basically allows the State to protect the people and the citizenry-at-large for economic- or environmental-type issues.

Let's go to the next slide.  Sorry, just kind of jumping ahead.

So you mentioned the *Snapp* case.  Obviously the fundamental holding there is the State may exercise the parens patriae authority to vindicate its quasi-sovereign interests, including the health and well-being, both physical and economic, of its residents.

The quasi-sovereign interest is what I was just referring to.  That's the powers that were delegated to the states originally from the English common law.

Next slide.

What is, I think, most important here is that the parens patriae doctrine has its foundations in American

*14*

jurisprudence in environmental cases just like this one.  These are nuisance cases that the State has the power to step in and protect the people and the environment broadly.

The two cases that were cited that I think are most on point are the *Missouri vs. Illinois* case and *Georgia vs. Tennessee Copper*.  *Georgia vs. Tennessee Copper* may be, you know, one of the best statements on this.  It was Justice Holmes.  "The State, in its capacity of quasi-sovereign, holds an interest that is independent of and behind the titles of its citizens, in all the earth and air within its domain, and has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air."  This is that fundamental common law authority that rests within the states.

We can go to the next slide.

This doctrine has been recognized and codified in New Jersey.  This is important.

So, first of all, the New Jersey courts have recognized that this parens patriae doctrine in New Jersey also conveys that quasi-sovereign power to the State, and it's protective of all of the State's residents, not just those of a particular region or municipality.  This is a Howell Township case.

Importantly, the parens patriae doctrine and the public trust doctrine, which we'll get to in just a moment,

have also both been codified in New Jersey.  New Jersey, as you are aware, has a perhaps unique history with environmental contamination going back to the mills of Alexander Hamilton on the Passaic River.  This is a huge and fundamental problem. And the State and the Legislature of New Jersey have put tremendous powers into the Department of Environmental Protection via statute over and over and over again.  And they've codified both the parens patriae doctrine and the public trust to allow the State to do that.

THE COURT:  Through the regulations?

MR. JACKSON:  Yes.

THE COURT:  I don't know that you can speak to this, but it does strike me, why didn't they -- why didn't they amend the legislation to sort of put this issue to rest?  Because they did it in the New Jersey antitrust statute in 2022.

MR. JACKSON:  Which is to do what?  I'm sorry.

THE COURT:  Well, that statute specifically says, quote, the attorney general on behalf of the State or any of its political subdivisions or public agencies or the political subdivision of any public agency, et cetera, et cetera, may institute an action to recover the damages provided for by this section, et cetera, et cetera.

That kind of puts the issue to rest.

So you're not going to have much of a disagreement with me.  The objectors are going to -- they have a long row to

*16*

hoe on this issue, because I do think that the State's authority derives from this doctrine.  But it does strike me as odd that, for whatever reason, the Legislature decided to put it to rest in the antitrust context but not in the environmental context.

And are you saying to me, well, they really did because of the regulations?

MR. JACKSON:  Well, the Legislature has passed law after law after law, and I've got numerous slides to work through where it is expressly said that the State, and in particular, the Department of Environmental Protection, is the entity that is charged with protecting the environment of New Jersey and the waters of New Jersey and the public resources of New Jersey, statewide, comprehensively, it is so.  And the --

THE COURT:  No; and I agree.  I understand that.

MR. JACKSON:  Okay.

THE COURT:  But why not just put the issue to rest in the legislation that says, "On behalf of all political subdivisions," like they did in the antitrust case statute?

MR. JACKSON:  So perhaps the answer is in the Spill Act, where the State -- the Department of Environmental Protection is the only entity that is actually afforded the right to bring a claim for cleanup and removal costs.

The other claimants that are there have a right in

*17*

contribution, if they are also a responsible party, or a claim against the Spill Fund.  But it is the Department of Environmental Protection that is charged with protecting the environment and seeking cleanup and removal costs statewide.

THE COURT:  Okay.

MR. JACKSON:  I think -- you could go to the next slide.

I think that there are a couple different places where we see this issue of, broadly, the State's powers to manage an issue that is statewide versus a local power.  And this is where I'd like to go, is obviously discuss the State's powers broadly, the *Hunter* doctrine, and the *Trenton vs. New Jersey* case distinguishing statewide versus local, and then explaining the powers of the authorities here.  Is that acceptable?

THE COURT:  Yes.

MR. JACKSON:  Okay.

So the *New Jersey vs. New York* case is also -- it's a good place from the United States Supreme Court opinion 1953, recognizing that the State represents the interests of the people broadly, the entire state, where a local government -- in that instance it was the City of Philadelphia trying to intervene regarding sewage being dumped into the Delaware River -- that its interests were subsumed by the State.  The State represents all of the people of the state and all of

*18*

these public interests.  And the city was not allowed to bring a parens patriae case.  That would have interfered with the states.  The quote here is, "Otherwise, a state might be judicially impeached on matters of policy by its own subjects, and there should [sic] be no practical limitation on the number of citizens, as such, who would be entitled to be made parties."

Next slide.

The issue here is, as you know, and, you know, through these proceedings in this trial, PFAS is an issue that has affected the state of New Jersey broadly.  It has affected the state in all of its water, surface waters, groundwaters, drinking water, wastewater, soils.  It's an extraordinarily broad problem, and it's also something that has affected the natural resources, including the fish, the biota and the navigable waterways.  So the State has been acting, and I will discuss later, you know, through 20 years of action to address PFAS broadly.

Each of the local governments and the counties and the municipalities, you know, demonstrated on this map, they all have a localized interest, a particularized, a local concern.  None of them have the ability to address PFAS as a comprehensive issue, a statewide issue.  That is the parens patriae doctrine.  That's why the local governments must give way to the State.

*19*

So the *Hunter* doctrine basically sets the stage in terms of the structures between the states and the local governments by holding that the local governments, they don't have a power independent of the State.  When the Constitution was created and the parens patriae doctrine was codified in New Jersey as well, it's clear that the State gives the municipal governments and the local governments and its subdivisions the powers that it might for management and control of local issues, but those powers can be taken away.  And the State has the ultimate authority to manage all of the State's interests.

I think that the best case on this and the one that I would like to go to and discuss with you is *Trenton vs. New Jersey*.  This is a case that's exactly on point for us and in these purposes where Trenton was objecting to fees that were being put on its rights to withdraw water from the Delaware River, and they were claiming it was a constitutional taking, it was a contract violation, it was a violation of the city's rights.  And the New Jersey courts first held and then the United States Supreme Court held that the state of New Jersey has this power to resolve these issues for the benefit of all of the people.  And I'm going to read you just a quote of that.

"The State undoubtedly has the power and the duty to control and conserve the use of the water resources for the benefit of all of its inhabitants.  The only way the city could

acquire those rights would be to take from the state itself or from an entity that had been granted those rights."

The court went on to hold that "the city is a political subdivision of the state, created as convenient agencies for the exercise of such governmental powers as the state is entrusted to them.  The diversion of waters for the sources of supply for the use of inhabitants of the state is a proper and legitimate function of the state."

The court in the *Wagner* decision I think is also perhaps the most powerful voice from New Jersey in the Supreme Court opinion holding there that it's fundamental in our law that there's no inherent right of local self-government beyond the control of the State, and that the municipalities are but creations of the State, limited in their powers, and capable of exercising only those powers of the government granted to them by the Legislature.

THE COURT:  So on that note, in your objections, and in the summary chart, you talk about that you acknowledge that the State has its parens patriae authority but that it may be specifically curtailed.  You don't give examples.  Is that what you're referring to by the Legislature?

MR. JACKSON:  The Legislature --

THE COURT:  Or another way of asking it is, can you give me examples of where it was specifically curtailed?

MR. JACKSON:  I can give you -- I'd like to give you

*21*

specific examples, numerous, where the State has -- the Legislature has put the power to manage the environment and the water resources and all of the natural resources of the State in the Department of Environmental Protection.

THE COURT:  I'm asking about the reverse.

You say that there are times or there may be times, you acknowledge in your chart that it may be specific -- I think the word you used, "specifically curtailed."  Let me look.

And my question is, can you give me examples of that?  Yeah.  Footnote 13 on your chart.  You say, "New Jersey has the authority to address the claims on a statewide basis unless specifically curtailed in New Jersey."

And so what does that mean?

MR. JACKSON:  They haven't been.  The only time that the powers that have been put into local governments, and we hear about the Home Rule Statute a lot, and I think the *Wagner* case is the best case that distinguishes the Home Rule provisions, the ability to sue and be sued.

The right for political subdivisions for their environmental powers are local and they're subject to the department's oversight.  That's on slide 24.  And we cite to a couple of different statutory provisions there, 40:37A-100 to 102, and under the Pollution Control Financing Authorities, 40:37C-3, -5, -11, and -14.

What is clear is that the Legislature has over and over and over again put these powers, these statewide issues into the Department of Environmental Protection. I don't want to belabor this point. Actually, let me back up real quickly. You asked me about the public trust doctrine as well.

THE COURT: Yes.

MR. JACKSON: So let's go forward in the slide deck to slide 14.

So the public trust doctrine is also like the parens patriae doctrine; that it's an English common law concept that moved to the states upon their creation. And in the public trust doctrine, it's similar, but it's a little bit different. And the idea is that the state is the trustee or the sovereign was the trustee of all of the natural resources within its boundaries. It holds those trusts -- those resources in trust for the benefit of the public. So this is a constitutional doctrine.

THE COURT: So you see it as coterminous with parens patriae?

MR. JACKSON: It's different. Parens patriae is a standing doctrine that is more of -- it's broader. It's more like police powers. The State has the ability under parens patriae to act, to protect the public and its interests in economic as well as environmental issues.

So the *Snapp* case, it was Puerto Rico obviously

*23*

moving to protect its citizens from economic harm, from discrimination.

The *Georgia vs. Tennessee Copper* and *Missouri vs. Illinois* cases are examples of the parens patriae doctrine being utilized in a public nuisance setting.

The public trust doctrine is more narrow.  It says that it's particular to natural resources, and it holds that the State is the trustee for the benefit of the public, of the natural resources.

The case law notes that the State as the trustee not only, you know, holds the resources in trust for the benefit of the public, it has an obligation to protect that trust and to act to ensure that the trust resources are not contaminated.

But what's important is -- go to slide 16.  There you go.

In New Jersey, the Legislature has incorporated the public trust doctrine into the New Jersey law.  The Legislature chose to include, in its enabling the legislation, the natural resources include all springs, streams, bodies of water, and the other natural resources.  And they're held in trust by New Jersey.

Next slide.

In *Arnold vs. Mundy*, I'll say real quickly, is a New Jersey Supreme Court case, one of the first cases in the country to actually recognize the public trust doctrine was in

*24*

New Jersey in that case.

The extent of the public trust doctrine and the ability of the State to act and protect the resources is again codified by New Jersey Legislature.  And this is the beginning of many of these issues where the Legislature incorporated these common law concepts into the statutory framework in New Jersey.

The *New Jersey versus* -- or the *DEP vs. Jersey Central Power and Light* case does a nice job of discussing the historical cases in the common law and the distinction actually between parens patriae and public trust.  And it says basically no matter how you get there, the conclusion is inescapable to this court that if the State is deemed to be the trustee of the waters, then as trustee, the State must be empowered to bring suit to protect the corpus of the trust, the waters, and for the benefits of the public.

THE COURT:  Yeah.  That to me seems to conflate the two concepts of standing versus trustee.

MR. JACKSON:  It does in this instance.

THE COURT:  Right.

MR. JACKSON:  Absolutely.

And the court went on to note that under these circumstances, it's questionable whether anyone but the State can be considered the proper party to sue for the recovery of damages to the environment.

The next slide.

I don't want to belabor this one, but this is the enabling legislation of the Department of Environmental Protection, and it outlines the powers of the department.  And we cited this to you, all of these in the brief.

But this is important because this goes to this nature of state versus local, broad, comprehensive environmental powers versus local powers.

The enabling legislation notes that -- sorry, losing my voice -- that the department has the power to prepare, administer, and supervise statewide, regional, and local programs for the conservation and environmental protection. This department shall encourage, direct, and aid in coordinating state, regional, and local plans and programs concerning conservation and environmental protection.  It shall supervise sanitary engineering facilities and projects within the state.

It will enforce the state or shall enforce the state air pollution, water pollution, conservation, environmental protection, solid and hazardous waste management laws, rules and regulations.

It's within the approval of the governor and the Department of Environmental Protection to apply for and receive and expend funds from the federal government, the state government, or any county or municipal government from any

*26*

public or private sources for the objects of this act.

The department is charged not only with enforcing statewide and protecting the environmental laws and protecting the natural resources, but a large function of the department is also to protect the public first and to oversee these programs and funding mechanisms to ensure that the environment of the state, statewide, is protected.

One of the issues that came up often, and I'm sure we'll hear about it today, is the surface water quality standards, for example, and how those regulations will be implemented in the future, if they are passed and become law.

But one of the things that's important to note is that the department is charged with protecting all of New Jersey and all of these waters.  And so this water cycle that you have that runs from, you know, surface waters and groundwaters through wastewaters or vice versa and into drinking water ultimately, there's a cycle of all of these waters.  And the department is trying to, one, protect consumption through drinking water, of course, as that is the primary exposure for humans to PFAS.  So drinking water was always the fundamental piece of this.  Once you get that captured, you look at sources and you step out and you're looking at different surface waters, groundwater quality standards, other things like that.

But part of surface water quality is also fish, the

*27*

fish consumption advisories and the issue with respect to the economic effects on the New Jersey fishing industry and the oyster beds.  These issues are extraordinarily broad, and they cascade through all of the state.  And it's only the Department of Environmental Protection that has the charge and the authority to tackle these things in a comprehensive statewide fashion.

Through the next several slides, there are numerous other pieces of legislation that list the department's authorities.  I guess the *Builders Association* case notes, you know, "undoubtedly, given the breadth of the legislation and its goal to promote public health and welfare through preservation of water quality and the environment, any question about the jurisdiction of DEP Commissioner presumptively should be resolved in his favor."

These statutes go on and on.  They're listed here for the Court's knowledge.  I don't want to belabor this point too much, but go to slide 21.

This is another piece that I just mentioned that I think that's incredibly powerful.  The Spill Act empowers the Department of Environmental Protection.  And except for a right of contribution, only the Department of Environmental Protection may recover cleanup and removal costs and other damages from responsible parties under the Spill Act.  And the Spill Act clearly provides that only the DEP may sue to recover

natural resource damages.  That's the *Exxon* case.

Howell Township went on to note, "As noted, the statutory authority and its legislative history make clear that it is the DEP which is entrusted initially with the right to determine the primary course of action to be taken against persons who damage or threaten the environment.  In order to be effective, it must normally be free to determine what solution will be best to resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly."

I'll just note quickly that the powers of the attorney general are also important to these equations and this discussion, as was the case in the tobacco settlements and the like.  The attorney general has the power to sue and to resolve statewide claims in its parens patriae authority for the state.

With respect to the interplay between the Home Rule issues and this express delegation of authority, I think that, as I mentioned before, the *Trenton vs. New Jersey* case is probably the best both because it's New Jersey, but the statement of law with respect to the State's powers to resolve these issues statewide are tremendous, as well as the *Wagner* case, which we went through in some discussion about the interplay between Home Rule and the State's authority and constrained the Home Rule to these local issues that are not of the same variety as the states.

*29*

THE COURT:  So I'm going to turn to the objectors because I have questions for them, but before I do, can you just help me understand, the Appellate Division, they allowed -- the Appellate Division allowed the Carneys Point case to continue, and there was something in the opinion. Let's see if I can find it.

Do you read the Appellate Division's opinion as saying that or is disagreeing with your position?

MR. JACKSON:  No.  The Appellate Division in that opinion, and I think others might -- are a bit more versed in all of that history.

THE COURT:  Yeah.

MR. JACKSON:  But the Appellate Division opinion of course did not have the input of New Jersey or in particular, this resolution in this JCO.  I don't think that the Appellate Division, frankly, would disagree with the State, that the State has the power to resolve these claims.  The State has the statewide power to settle.

THE COURT:  Let me see if I can find what I want to ask you about what they wrote, what the court wrote.  Let's see.

I can maybe get back to it.  I can't find what I'm looking for, but the Superior Court -- the Appellate Division found that they had standing to litigate its ERA action, right, despite the pending federal action here.

*30*

So to me it just seems that there's going to be some tension between the State's argument that they're making to me here versus what the Appellate Division is finding in the Carneys Point matter; no?

MR. JACKSON:  I don't believe so.  But I'm going to let Mr. Reap address that, if that's all right, Your Honor.

THE COURT:  Okay.

I mean, I'm understanding that the Appellate Division is allowing Carneys Point to go forward with its action, right?

MR. REAP:  Good morning, Judge.

THE COURT:  Good morning.

MR. REAP:  Yeah, that was the determination the Appellate Division had made.  But as Mr. Jackson had expressed, the difference between the situation as it exists now --

THE COURT:  Yeah.

MR. REAP:  -- is the very presence of this settlement agreement.  And that is not something that the Appellate Division ever considered.

THE COURT:  No; I agree with that.  But I'm just trying to play it out.  The Appellate Division said Carneys Point, you can go forward, okay.  You have standing to bring the action, which is not what the State is arguing to me here.  The State is arguing it has the authority, it is the trustee, if you will, to speak on behalf of its political subdivisions, including Carneys Point, right?

MR. REAP:  Correct.

THE COURT:  Okay.  The Appellate Division has said, Carneys Point, you can go forward, you can go forward with your ERA action, okay.

Assuming I approve the settlement, what happens then? The State then moves to intervene in the state action and says it's all res judicata?  I mean, I guess now that Carneys Point is somewhat participating, I mean, how does it go?  How do you see it going?

MR. REAP:  Yes, Judge.  And just to put that in context, that's the only ERA action currently pending.

THE COURT:  Yeah.

MR. REAP:  And that's something we tried to address. This is really just about this one ERA claim pending in state court.

And, again, I point out to you, this -- we've already touched upon this in this litigation with Judge Schneider denying intervention and finding in part --

THE COURT:  I know; because Mr. Telsey is going to have to answer the question why he didn't forfeit the right here.  But that's another question.

MR. REAP:  Sure.  Yes, Judge.

And so to answer your question directly about what will the State do after this settlement, assuming it's approved --

*32*

THE COURT:  Yeah.

MR. REAP:  Yes.

THE COURT:  How does it play out then?

MR. REAP:  Yes.  We intend, as part of our comprehensive agreement with the DuPont Defendants, there's a provision, as you know, in the agreement, paragraph 83 in the DuPont JCO, which requires the parties to apply to the Superior Court, take the settlement there and have that court rule on the effect of the settlement on the claims pending before it.

THE COURT:  Oh, and, by the way, I mean, I think there's an agreement I cannot tell the Appellate Division or the Superior Court what to do.  So I don't know how you folks are handling that, but we'll have to get to that.  I'm trying to go in order with the objections.

MR. REAP:  Yes, Judge.

THE COURT:  So that's how you see it playing out if I approve the settlement?

MR. REAP:  With respect to -- because of that one singular claim on the ERA that implicates this issue, yes, that's how we see that being resolved.

THE COURT:  Okay.  Just to play devil's advocate, you don't prevail, does this all go up?  It goes up two different -- and it ultimately goes before the Supreme Court. I mean, how does this all play out?

MR. REAP:  Are you asking if you reject the

settlement, in other words, Judge?

THE COURT:  No.  I approve the settlement, but you don't persuade the Superior Court.

MR. REAP:  Hmm... Yes, I think it's hard to say. But -- and, again, I think the DuPont Defendants would carry a lot of this burden, but it may be the case that that determination would be appealed and, again, it would go up to the Supreme Court.

THE COURT:  Yeah.

MR. REAP:  Right.

THE COURT:  I mean, it does seem somewhat strange to me.

MR. REAP:  Well, Judge, I don't think that -- these two things can happen.  The settlement can be approved and we can go to the State -- yeah.

THE COURT:  I'm not disagreeing with that.

MR. REAP:  Yeah.

THE COURT:  But because I, you know, like to kind of avoid train wrecks if I can, it just seems a little strange.

MR. JACKSON:  So, Your Honor, there's a couple points I'd like to make.

One, the Environmental Rights Act, you know, it is, you know, only triggered when the State hasn't acted or hasn't acted fully.  That by its nature it was created, but what we're saying is the State has acted statewide here.  For 20 years

*34*

we've been dealing with these issues and we're resolving these claims statewide.  And the Environmental Rights Act is designed if the State is not acting.

So Carneys Point filed that action before the State's action.  And the question was, could they get penalties under ISRA for ISRA violations before the State's action?  That's what the issue is.

THE COURT:  Well, you think that what the Superior Court had in mind -- or the Appellate Division had in mind is that limited view of the case?

MR. JACKSON:  Yes.  That's what it says.

THE COURT:  Oh, you do?

MR. JACKSON:  Yes.  It is for that moment in time before the State acted.

THE COURT:  That I didn't appreciate.

MR. JACKSON:  And then I'll say one other thing. These settlements both have provisions in them and the DuPont provisions have a -- it's a credit eligible claim concept.  But if a -- the intent of this JCO is to dismiss the claims of the State and the political subdivisions and there is later a claim that a court in state court finds that, for whatever reason, for whatever facts in that particular case, the releases here don't cover that fact pattern, there is a concept of a credit eligible claim built into both of these.

Because it was from the tobacco settlements and

*United States District Court*
*District of New Jersey*

opioids where the concept was the State is releasing these claims to the maximum extent of the authority of the State and for itself and for its political subdivisions, and if that claim in the state court were to succeed, then there is a credit that is potentially eligible for a reduction.

So out of the $875 million that DuPont has agreed to pay the State, there's $16.5 million that could be a credit against the monies that they owe the State later, if a credit eligible claim was allowed to proceed and they ultimately pay it.

So that's the solution.  The safety valve is the credit eligible claim.

THE COURT:  Okay.  All right.  Okay.  Thank you.

Okay.  Who on the Objectors' side or I think the Intervenors, I'm sorry, would like to answer my question?

Mr. Telsey, can you come forward?

Okay.  Mr. Telsey, here's my question.  Somewhat of a loaded question.

If you were satisfied with the terms of the settlement, would you really be challenging the authority of the State under parens patriae?  And aren't you really just challenging the scope of the release?  Isn't that really what you're doing?

MR. TELSEY:  No.

THE COURT:  Tell me why.

*36*

MR. TELSEY:  From the Carneys Point point of view, you've spent the last few moments talking about our ERA case. Let me deal with that first and then the other issues.

Our ERA case was filed ten years ago.  We litigated it.  We told DEP about it.  DEP did not participate.  They did not help.  They let us proceed for years.  We spent millions of dollars prosecuting and litigating the case.  We got a judgment against DuPont for failing to comply with ISRA, then DEP filed its case, and we marched the last six or seven years since then.

THE COURT:  And so it's that -- that -- so what I'm gathering is that that part, before the DEP got involved, is what -- is how you persuaded the state court to allow you to continue to proceed.

MR. TELSEY:  The state --

THE COURT:  And there isn't this tension that I'm worried about.

MR. TELSEY:  I don't think there is, Judge.  I --

THE COURT:  Okay.

MR. TELSEY:  I read the Appellate Division case to say that Carneys Point has the right to proceed with its litigations for the three years of penalties, et cetera, related to the ISRA violations that the State didn't litigate.

THE COURT:  Right.

MR. TELSEY:  And that we have other unrelated claims

37

in that lawsuit against the director of environmental remediation for DuPont.  We have claims regarding the failure to post certain financial assurances for the operation of wastewater treatment plants, lots of other things that aren't part of this.

THE COURT:  Okay.  Fine.  But implicit in that ruling is not a finding that the DEP or the State does not possess in parens patriae authority.

MR. TELSEY:  I --

THE COURT:  Right?

MR. TELSEY:  You're right, Judge.

THE COURT:  Okay.

MR. TELSEY:  Because that's why the Appellate Division said that from the date that the State filed its action forward, the State has the authority to do what it's doing from that date forward.

THE COURT:  Okay.

MR. TELSEY:  But from the date prior, Carneys Point has the authority to proceed with its action.

THE COURT:  Okay.  And so you didn't challenge -- you haven't challenged that.  You have an Appellate Division case that says the State can proceed forward under parens patriae and that's what they're doing here, right?

MR. TELSEY:  What I'm challenging is that this paragraph 83 in the consent judgment says that this Court is

*38*

going to make findings of law and of fact regarding how this federal court settlement is going to impact the state court action that we have. And what we're saying is that this Court simply has no jurisdiction to make any such finding.

THE COURT: Well, I got the sense -- well, let's just turn to that paragraph then since we're on it, 83.

MR. JACKSON: Yes, Your Honor.

THE COURT: I thought there was -- at least I thought that the parties had worked this out and it's not going -- maybe there's going to have to be an amendment, I guess, right? I cannot tell the state court what to do.

MR. JACKSON: We don't believe that this is telling the state court what to do. We believe that this -- obviously the Court --

THE COURT: That should --

MR. JACKSON: I'm sorry.

THE COURT: Well, I mean, I guess it all matters -- I guess it all matters in how it's interpreted.

If I approve the settlement, you folks will go back before the state court and persuade the state court to do whatever it's going to do with that action. This Court cannot tell the state court what to do.

MR. JACKSON: Absolutely.

THE COURT: You agree with that?

MR. JACKSON: Absolutely.

*39*

THE COURT:  Okay.  So what are you quarreling with?

MR. TELSEY:  I'm quarreling with the language in paragraph 83 which says this.  It says that this Court has reviewed the facts and circumstances of the Carneys Point state court action and "finds" that the release in the DuPont JCO will "resolve, release, and bar," the township's state court action and that "based on this finding" by this Court, the plaintiffs and defendants shall be entitled to present this signed JCO to the state court judge as legal grounds for why the state court must dismiss the township's state court action.

That language is having this Court tell a state court what to do.  I think that's inappropriate, especially since the state court action that --

THE COURT:  What paragraph are you reading from?

MR. TELSEY:  83.  I'm summarizing it.

(Laughter.)

MR. TELSEY:  But the key --

THE COURT:  Well, no, don't summarize it.  I mean, words matter.  Tell me what you're saying here.

MR. TELSEY:  I'm saying that the fact that this paragraph is requiring this Court to, quote, find --

THE COURT:  Where does it say that?  Tell me.

I'm going to -- can someone just tell me, is 83 the same on both agreements?

MR. JACKSON:  No, Your Honor.

*United States District Court*
*District of New Jersey*

*40*

MR. REAP:  No.

MR. JACKSON:  So it's paragraph 83 in the DuPont JCOs is the one at issue.

THE COURT:  All right.  I just want to make sure we're on the same page.  Tell me.  Words matter.

MR. JACKSON:  Page 83.

MR. TELSEY:  Words matter.  It says that this Court is going to find quote-unquote --

THE COURT:  Where?  Where is the word "find"?  Is the word "find" in here?

MR. TELSEY:  Yes.

THE COURT:  It is?

MR. JACKSON:  Paragraph 83 starts with, "The parties intend, and this Court finds, that the releases in the JCO resolve, release and bar claims, including to the extent applicable by res judicata, brought by Carneys Point Township."

THE COURT:  Wait.  Okay.  That language I can't do.

MR. JACKSON:  "That seek to recover for the same or materially similar relief that the settling plaintiffs are releasing in this JCO."

THE COURT:  So I thought that there was an agreement that the parties agreed that I -- I -- if the parties are interpreting "including to the extent applicable by res judicata" that I am telling the state court judge that you must find res judicata applies, I can't do that.

*41*

MR. JACKSON:  That is not what the intent is.

THE COURT:  Right.

MR. JACKSON:  The intent is to find -- obviously the State and the defendants have agreed that these claims were -- are releasing the claims of the State, its agencies and sub-sovereigns, the local governments.  And to the extent that that release is effective, that is effective.  And so I think we do expect --

THE COURT:  And it's -- well, if I approve the release, if I approve the settlement and I approve the releases, whether or not the state court determines that those releases bar Carneys Point claims is a decision that that court makes.

MR. JACKSON:  Exactly.  Exactly right.

THE COURT:  Okay.

MR. JACKSON:  And that's why the paragraph goes on to state that the State and the defendants will take the action to the state court and it's the state court's decision.

THE COURT:  So what --

MR. JACKSON:  Nobody expects -- I'm sorry, Judge. That's the point of the credit eligible claim piece as well.

THE COURT:  So why do you quarrel with that explanation?  Because you don't believe what he says?

MR. TELSEY:  I quarrel because the first sentence of paragraph 83 says:  "The parties intend, and this Court finds,"

*42*

and it goes on to state what this Court is finding.  And I quarrel with it because this --

THE COURT:  But I'm only finding to the extent applicable by res judicata.  I'm not saying to the state court, "And here's how you must rule."

If the state court finds that res judicata applies, so be it.  But now you have an explanation.  I mean, can the parties go back and flesh this out a little bit better to your satisfaction?  I suppose they could.

MR. TELSEY:  I'm -- my point is that this Court doesn't have jurisdiction to make that finding on the grounds that our state court case was brought and removed to federal court and remanded back by Judge Hillman, and that 28 U.S.C. Section 1447 says that therefore the federal court has no jurisdiction thereafter to make any findings about the matter that has been remanded back to state court.  And this paragraph 83 is making a finding about that.

THE COURT:  Why -- I guess there's two questions.  Do you see a distinction between this Court making a finding that the releases are proper versus this Court making a finding that the claims in the state action are barred by res judicata?  Do you see a distinction?

MR. TELSEY:  The distinction I see is that there is an appearance of superior review by a federal court on the issue of how this release will impact the state court action,

*43*

which is the very tension that this Court recognizes exists here, and that the appearance of the federal court having made some kind of finding about it is an unfair and improper advantage to the State and the defendants against Carneys Point in state court.

THE COURT:  But then you're holding this Court hostage from ever making a finding.  You're holding this Court hostage.  Political subdivisions will sue across the state and say, well, Judge, you can't make any findings because you're going to interfere with our state court proceedings.

If I find that these releases are proper, if I find that the State has the proper authority, if I find that they're fair, reasonable, and equitable, I can approve the releases.

MR. TELSEY:  There are --

THE COURT:  But what I can't be told is, Judge, you can't do that because you've got to wait to see how the state court rules.

MR. TELSEY:  The specific finding here is this Court is making a finding on this one case, and even though there are dozens or hundreds of other cases upon which this JCO may apply, this JCO doesn't single out that list of hundreds of other cases saying this release applies to that list of cases, only this case.

THE COURT:  Let me see if I can shortcut this.  Do you have an objection to amending it to make this more clear?

*44*

MR. JACKSON:  I'm going to look to DuPont counsel on this, but I think that the answer is that the JCO is obviously a product of negotiation, it is established, and it's not something that we can amend.

THE COURT:  Well, sure, you can.  I mean, I don't know what that all means, but of course you could amend it, or you're estopped from arguing otherwise, I suppose, or I could make it very clear if I approve it, that I've approved it interpreting the language as such and contrary to how Mr. Telsey interprets it.

MR. JACKSON:  That's -- I think that would be the easier thing.  I mean, clearly what the State and what DuPont has said in their response to comments is the finding of the release and the breadth of the release is obviously essential. But this paragraph goes on to state that that release, you know, will then go back to the state court and it is the state court's finding.  And if the state court disagrees with this Court, there's a mechanism to resolve for that as well.  So that's the point, is that the scope of the release is essential.  It is an absolutely fundamental piece obviously of both of these JCOs, and that is what we think we were doing in 83.

THE COURT:  Well, and then that kind of gets back to the first question I asked you, which is, are you really arguing about the authority, the State's authority under the

*45*

parens patriae doctrine or are you just really arguing about the scope of the release?  And it seems to me that that's what you're really arguing about.  You're arguing that the scope of the release isn't fair.  You're asking me not to approve the release because you don't want my findings that the releases are proper and resolve the claims because you don't want that, because you don't want the State then to take my findings and use them against you in your litigation before the state -- I mean in the state court.

MR. TELSEY:  No.  Judge, this Court is making a finding as to the applicability of this release --

THE COURT:  Yeah.

MR. TELSEY:  -- by signing the JCO in its entirety.

THE COURT:  Yeah.

MR. TELSEY:  It's uniquely specifically focusing only on this one case to say, and in particular, the release that applies to everybody is going to apply particularly to this one case.  There's no need for that emphasis, especially --

THE COURT:  Where does it say this one case?

MR. TELSEY:  This one case, in paragraph 83, is the only one case of the hundreds of other cases that this release is going to apply to.  That is specifically mentioned in this JCO.  It's the Carneys Point case.

MR. JACKSON:  Clearly --

THE COURT:  I think that if you read it in context,

though, let's just read it in context; that if this Court approves the releases, it then says that the settling plaintiffs and the settling defendants will then seek an order, they'll go before the state court asking them to dismiss under res judicata or whatever other preclusion doctrines they find fitting. And either the state court does or it doesn't.

MR. TELSEY: Dismiss what? The entire case? The claim? The part that wasn't addressed by the Appellate Division? What are you ordering? What is this Court ordering the plaintiffs and defendants to do? They're ordering them to go to state court and try to dismiss my case. And I'm saying that --

THE COURT: What I --

MR. TELSEY: What I'm saying is that the plaintiffs and defendants can go to state court and do the same thing with a JCO in hand that doesn't have paragraph 83 in it and make the same arguments.

MR. JACKSON: The paragraph clearly only applies to those claims that seek the same or materially similar relief that the settling plaintiffs are releasing in the JCO. That's the issue.

THE COURT: But can you answer his question, which is why -- if you can take the JCO, if it's approved, and take it to state court and say, yeah, res judicata, preclusion, whatever, why do you need to single out his case? Can you

*47*

answer that question?

MR. JACKSON:  To the extent -- this is the only case that I'm aware of that's pending against Carneys -- or the Chambers Works site.  We were obviously focusing on the ISRA violations, the fraudulent transfer issues that we litigated at length.  These were the subject of these claims and extensive litigation for six years.  And this is the only claim that is particular to that.  So that's why we said and specifically, yes, this is the issue that we have litigated for six years and we are settling.

THE COURT:  Okay.

MR. JACKSON:  We have resolved the fraudulent transfer claims and we have resolved the ISRA claims, and it will be up to the state court to determine then, in the face of that JCO and resolution, whether or not that Carneys Point can continue with any of its claims.  Many of them may proceed.  I have no idea.  I am gratefully not subject --

THE COURT:  Okay.  Now that Mr. Jackson has said that, you have the interpretation of the State.  I assume DuPont concurs; yes?

MS. DUFFY:  Yes.

THE COURT:  If I were to approve the settlement and make it very clear that I'm not dictating to the state court what to do or how to rule, why doesn't that satisfy your concern?

*48*

MR. TELSEY:  Is the Court saying that it's going to leave 83 in but make a ruling or amendment orally on the bench as to how 83 gets interpreted?

THE COURT:  How the parties have interpreted it and how this Court interprets it and that this Court is impotent to tell a state court how to rule.  Why wouldn't that satisfy your concern?

MR. TELSEY:  I would take it.

THE COURT:  Okay.

Next.

MR. TELSEY:  But I still wanted to address the other part of why we're here objecting to the settlement, if Your Honor would --

THE COURT:  Well, I want to sort of take it -- so --

MR. TELSEY:  Okay.

THE COURT:  You haven't answered my question, though, about are you really objecting to the authority of the State --

MR. TELSEY:  Yeah, exactly.

THE COURT:  -- to proceed under its authority under the doctrine of parens patriae or are you really challenging the scope of the release?

MR. TELSEY:  I have an answer.

THE COURT:  And then I have a second question.

MR. TELSEY:  Oh.

THE COURT:  If you were satisfied with the terms of

the settlement, that Carneys Point got whatever it wanted under the terms of the settlement, would you really be up here challenging the authority of the State?

MR. TELSEY:  Judge --

THE COURT:  And so that's why it seems to me that what you're really doing is you're just not happy with the terms.

MR. TELSEY:  Carneys Point accepts the terms, the money, of the settlement.  Here's our objection:  We have been listening to the power of the State.  But the State is executive, judicial, legislative.  And the parens patriae, given the breadth of what it is and what you've heard it is doesn't include the power of appropriation.  And that's the money.  And the money is how the protectionism of environmental harm and the remediation of environmental harm is going to happen.

THE COURT:  And on that, and I guess we're kind of moving on, but that's going to be a concern that they're going to have to address, okay.  So I agree with you that there's got to be some -- I don't know if you want to call it a guarantee, some measure.  You can't just say, okay, the State gets all the money and, you know, it's their discretion.  I think that's a valid objection that you make.  And we'll get to that.

MR. TELSEY:  That is the point, Judge, that I wanted to make, which is that the DEP as the plaintiff, the

*50*

Commissioner, the Spill Fund Administrator, they presented this settlement as a settlement where they've acquired money that they have the power to control and to dictate and direct to what they believe to be a PFAS abatement fund that they're going to use to supplement existing funds for the benefit of water purveyors and others in the state and for other reasons, which is fine. It's good.

THE COURT: Gee, I wish you had said that a lot earlier.

(Laughter.)

MR. TELSEY: The trouble is, the State does not have -- the DEP does not have the authority to claim they can control the money this way.

They have blended, combined and bulked the NRD money, which is dedicated to a legislative account, and non-NRD money, which is this abatement money, into some global pile of money for each year over 25 years. There's no way to figure out how much goes to the NRD. The public doesn't know. How much goes to abatement. And each year after this year there's no appropriation that has the money going anywhere. It could go to the -- it's supposed to go to the general fund.

THE COURT: Okay. And those are all legitimate questions. And that goes to, tell me why this is fair and reasonable and equitable and let's lay it out. But, you know, you've spent a lot of your paper talking about they can't even

*51*

do what they can do.  I think we're -- I think we all agree they can, okay.  We've resolved it.

Anybody object?

(No response.)

THE COURT:  Okay.  We resolved it.  In parens patriae, good.  We're going to move on.  Now we've got to figure out how are the political subdivisions protected, I mean, is it fair?  Is it appropriate?

This Court has to find that the value, the settlement is fair, the citizens are being protected, okay.  That doesn't mean you just give the State all of this money and, yeah, if they want to spend it on, you know, whatever, okay.  No, that's not what it means.  That's what I have to figure out, and that's why we're here.

But truth be told, you folks have submitted a lot of paper on arguing that they can't even do what they can do, and now I'm getting the sense that you all agree they can do what they can do.  So we're moving on.

Okay.  I want to -- thank you.

May I -- so here's what's for the amici, may I talk to counsel for the amici?

MR. ORLANDO:  Your Honor, if I may, real quick, Jason Orlando for Mercer County.  We have similar-type arguments to Mr. Telsey.

THE COURT:  I know.  I know.  We're going to get to

*52*

that.

MR. ORLANDO:  Okay.

THE COURT:  Because I'm going to talk to Mr. Jackson or whomever about that issue.  But I want to -- I'm going to tell you what's bugging me.  But it's the amici.  I mean, they're not bugging me, but the issue they raised.

So who's going to speak for that?  Because this is really what I want an answer to.  And it kind of blends into what Mr. Telsey and I were talking about.

MR. CARNEY:  Good morning, Your Honor.  Brad Carney. I'm with the firm of Maraziti Falcon, and we represent the Amicus here, which is eight independent entities.

THE COURT:  Yeah.  Treatment plants, utilities.

MR. CARNEY:  Yes.  Treatment plants.  One exception is the Morris County Municipal Utilities Authority.

THE COURT:  Yeah.

MR. CARNEY:  They do solid waste.  They collect all the residential and commercial garbage in Morris County and send it to landfills in Pennsylvania.

THE COURT:  Okay.

MR. CARNEY:  They are not a sewer plant or a treatment works --

THE COURT:  Can I just say "utilities" and we all understand what we're talking about?

MR. CARNEY:  Yes, Your Honor.

*53*

THE COURT:  Okay.  So this is how I understand your argument in a nutshell.

You're saying this is not a fair and reasonable settlement because what it does is it helps the citizens and then it turns around and hurts the citizens.

So I understand what you're saying is that from all of this, the State will engage in abatement and they will address the environmentals, environmental concerns, but what they will do is they will go to your clients and say:  Build this infrastructure that cost a gazillion dollars and then when Judge Bumb approves the settlement and isn't around any longer ten years later, all of the residents in the state of New Jersey's water bills have now tripled.

MR. CARNEY:  Right.  Yes.

THE COURT:  That's the concern you have?

MR. CARNEY:  Well, not the water bills.  We are -- so --

THE COURT:  Utility bills.

MR. CARNEY:  Utility bills.

By the way, I want to make a distinction perhaps on behalf of Amici as to how we're a little bit different than those that were seeking intervention.

I just want to say that on behalf of the AEA and all the other entities that we are representing here, our opposition to these proposed Judicial Consent Orders is limited

*54*

in scope, okay.

And I just want to make this sort of preliminary statement that we actually commend the DEP and the Attorney General and the State of New Jersey, together with the other plaintiffs, in seeking the legal redress for PFAS contamination in the state. And we do not challenge anything that has anything to do with natural resource damages. We understand natural resource damages are within the exclusive jurisdiction of the State. We're not here to challenge anything regarding NRDs. We're not here to challenge anything regarding the State's release of their 2019 statewide directive.

Our focus is targeted really on three things. The proposed release in the 3M and the DuPont proposed JCO; the covenant not to sue in the proposed JCOs for DuPont and 3M, and this one is only in the 3M JCO, which is the exclusive remedy.

THE COURT: But does it -- let me take those in reverse order.

MR. CARNEY: Yeah.

THE COURT: You really wouldn't -- it's sort of like a similar question that I asked Mr. Telsey, you wouldn't really object to the covenant not to sue or the exclusivity provision if you had the assurance that this parade of horribles that you think might happen down the road were satisfied, right?

MR. CARNEY: I don't think so, because --

THE COURT: You don't agree with me or you don't --

*55*

MR. CARNEY:  I don't agree with that statement.  What we are proposing here is in the definitions for the political subdivisions, that the wastewater treatment plants, the treatment works, and the solid waste facilities be excluded because of all of the uncertainty in the future as to the cost that the rate payers may be put.  To take away the covenant not to sue now and the release now is shortsighted, because it takes away a potential remedy.  And the arguments about, well, we don't want to bankrupt anybody, all those arguments can be made if there ever is litigation brought in the future, but at least we retain that right to do so.

THE COURT:  But, Mr. Carney, if I were to adopt that principle just in general, I would never have a settlement, never, okay.  And this is what settlements do.

MR. CARNEY:  The --

THE COURT:  So what I'm asking you is, and it may be that I have to take expert testimony.  I don't know.

MR. CARNEY:  Okay.

THE COURT:  But if that concern that you had -- because you're never going to get certainty.  And the Court will never be able to settle cases if there's always this notion that, well, this horrible thing may happen to us so we don't know and we should always reserve the right to sue.  Why would any defendant ever settle?

MR. CARNEY:  Well, I'm sorry, I don't want to

*United States District Court*
*District of New Jersey*

*56*

interrupt.

THE COURT:  So what I'm saying is, is that if that concern of yours was somehow assuaged that you had the -- your concerns were addressed that you're not going to be settled with this by the State, go build this infrastructure and then pass it on to the citizens because there's a calculation that's done and there's projections that are made.  Experts do it all the time.  Doesn't that -- I mean, because at some point I've got to decide whether this is fair or reasonable.  I can't say, well, I'm not going to settle it because I don't know what the future holds, and that's really what you're asking me to do.

MR. CARNEY:  No.  Well, let me make this point.  I think this is very unique, it's very unique in a couple of ways.

Number one is, it's not just general speculation that the surface water quality standards may or may not be amended. As recently as November, the state of New Jersey sent to all 17 delegated local agencies in the state of New Jersey a letter saying, get ready, it's coming.  And, again, I'm paraphrasing. I do have that letter.  I can read the exact words.  That is coming.  It's not some thing "pie in the sky" that -- and I don't think the State of New Jersey will be taking the position in the future that because PFAS is so ubiquitous, it's just everywhere, that it's going to be considered background and therefore it doesn't need to be -- we don't need to meet, you

know, treatment standards.

The proposed amendments, the surface water quality standards that went to a stakeholder's meeting in November of 2024, and it's still obviously moving forward with their letter to the DLAs in 2025, is proposing that for freshwater -- let's see. I have all this down. I think it's PFOS at extraordinarily low, low limits, .00057 parts per trillion. And just to put that in perspective with current drinking water standards in New Jersey, which is 14 parts per trillion, that's 25,000 times more stringent than the current drinking water standard.

The technology, the land acquisition, the costs and you know, we have -- and I have a whole written presentation here to go through, if I have the opportunity. I'm not sure if this is the point now, but it's projected in the tens of billions of dollars. And the only case that they -- that the State refers to in their reply brief as to where we've bound political subdivisions -- and, again, I'm not here representing and saying that the carve-out is to all political subdivisions. I'm being very specific as to wastewater treatment plants. I'll get to solid waste facilities -- is the tobacco master litigation. That was -- that is the only matter they reference in their reply brief where they say, well, hey, we've done it in the past. All the political subdivisions in the state of New Jersey, even though they were nonparties, became bound to

*58*

the master tobacco settlement.

That was a settlement where the state of New Jersey received I believe it was $7.6 billion out of a $202 billion nationwide settlement. It involved I think 46 states and the District of Columbia, a payment out over 25 years. There is a gigantic distinction between the tobacco litigation and the present matter. And this is the key difference.

The tobacco release allows for the financial money to go to the State without any further obligation from the political subdivisions, from its political subdivisions. However, the proposed JCOs here creates a scenario where the State receives money, but the wastewater treatment plants and the treatment works, they must fund the whole -- they have to fund the cleanup. And it would be analogous --

THE COURT: Wait. Can you say that last part again.

MR. CARNEY: So the wastewater treatment plants are still going to be funding the cleanup in the sense that they have to build -- it's -- you know, it's a ton of money on the capital costs and then there's annual operation and maintenance costs.

THE COURT: But what if I find in the course of this proceeding, if I have to take testimony or whatever, I do, that really what the State is saying: Here's our letter, get ready and we're here to help.

MR. CARNEY: But they can't be here to help.

*59*

THE COURT:  Why?

MR. CARNEY:  Because they are taking away our right, the rights of all the wastewater treatment plants and the solid waste facilities in the state of New Jersey to have the remedy to go after DuPont and 3M in the future if necessary.  They're taking it away now, and they don't need to do it, because the state of New Jersey is statutorily charged to do the cleanup, right, at all these properties.  And 3M and DuPont, you know, if DEP does the cleanup, then DEP goes after 3M and DuPont for all the costs of the cleanup.  This settlement doesn't make any of that go away.

I think the parties --

THE COURT:  No.  But aren't you -- but if the funds were earmarked to help you build this infrastructure, to buy the land, whatever it is that you're -- if you had that guarantee, then what are we left with?  We're left with you standing before me saying, well, but it's a "what if," and what if it's more than that, okay.  But I can make findings, I can hear testimony.  I can hear from the experts, whatever I need to do.

I think the bigger concern is, you standing before me and telling me that this really is not for the benefit of the citizens because their bills are going to go up.  That's the bigger concern.

MR. CARNEY:  Yes.  That's -- that's --

*60*

THE COURT:  But it's less of a concern, because if you're standing before me saying that you have this fear that it's going to cost -- you said 10 billion.  I have no idea because I haven't made any findings, haven't heard any testimony.  If it turns out that it's going to cost 1 billion and you get a guarantee from the State that they're going to earmark that 1 billion towards meeting these levels, then the concern that this is all going to be passed on to the citizens of New Jersey is less concerning to me.  So --

MR. CARNEY:  So, Your Honor -- I'm sorry.

THE COURT:  Because at the end of the day, the analysis that I am most focused on is what does this mean for the residents of this state.

MR. CARNEY:  So when we look at the proposed JCOs and their payment schedules, and I'm going to start with 3M, there is a category called PFAS Contamination Abatement Funding, and that's what the State is relying upon to say don't worry about it.  And even though this is not in the JCOs, we will make it somehow -- we'll make money somehow available in the I-Bank and you guys can borrow at interest.  That's not a --

THE COURT:  Yeah.  I'm not talking about that. That's not persuasive to me.  I'll agree with that.

MR. CARNEY:  Let me get back to the money part that you're talking about.  There is no PFAS abatement funding under the 3M JCO for the first five years.  There's nothing.  The

PFAS Contamination Abatement Funding begins in year 5, and it's $3.1 million.  And it's $3.1 million up to year 9, and then in year 10, it's $9.8 million.  These numbers, and by the way, in the 3M JCO, there is a paragraph there that talks about here's what the money may be used for, and there's over 20 different things that the money may be used for.  And then it's either one or two paragraphs later, it's not "may," it's "shall."  The money shall be used for PFAS remediation for childcare facilities, schools, and residential water treatment.  Not saying that all the money, but certainly that's where the priority of this money that I'm talking about is going to.

So I don't know what money they're talking about is going to go to the I-Bank to be of any help to wastewater treatment plants or treatment facilities.  And then let me talk about the money in the DuPont JCO.

THE COURT:  Okay.  Can I ask this question?  All right.  Go ahead, I'll wait.

MR. CARNEY:  So in the DuPont JCO, that JCO, by the way, completely omits the paragraphs in the 3M JCO about what the money may be used for and what the priorities will be.  That's nowhere to be found.

What is to be found is the exhibit of the payment schedule.  And it says this:  The settlement payments schedule should be read in conjunction with the JCO, which explains the terms and conditions for settlement payments described herein.

*62*

I'm sorry.  Let me go down.

It says that payment, except otherwise indicated, all funds are to be allocated between natural resources damages and abatement damages by the department.

So year one is $200 million, 100 million of which is costs and fees and punitive damages.  And year two is 75 million.  And there's a schedule 45 million, 40 million, so on and so forth.  I have no idea how much of this money is being used for PFAS abatement and when.

THE COURT:  Okay.  So here's my question:  Assuming I approve the settlement and the covenant not to sue and exclusivity provision remain, what provision could be put into, just hypothetically, put into the consent order that would satisfy you?  It may not be 100 percent, but would alleviate much of the concern that you have.

MR. CARNEY:  That it would leave the right to pursue damages against 3M --

THE COURT:  No.  You have to assume -- you have to assume that those two provisions remain.

MR. CARNEY:  Well, if the covenant not to sue and the release remain, I mean, that's our whole remedy here.  They --

THE COURT:  And so -- okay.  We're going in circles, and that's my whole point.

I'm just going to say this hypothetically:  DuPont and 3M could have agreed to give the State $700 billion and

*63*

you'd be standing before me saying that's just not enough,

right?

MR. CARNEY:  Your Honor, what I actually would

recommend is that the State, 3M and DuPont take the next

60 days to actually consider negotiating the carve-out for

these wastewater facilities and solid waste facilities.  That's

what we're asking for.

THE COURT:  But why -- we're going in --

MR. CARNEY:  And why would that impact the money?

THE COURT:  But why would -- we're going in circles.

Why would any defendant settle if they knew that they couldn't

put the matters to rest?  This is why they're called

"settlements."

MR. CARNEY:  Your Honor --

THE COURT:  No party ever gets 100 percent of what it

wants.  You know that.

MR. CARNEY:  Your Honor, it --

THE COURT:  We all know that, okay.

At some point the Court has to determine whether or

not the settlement is reasonable.  And what I hear you saying

is no amount of money will ever satisfy us because we have no

idea what this means for us, and so they should just accept the

fact that they might get sued down the road.  And that

statement in and of itself is not persuasive to me.

But what is persuasive to me is, there is no

*64*

guarantee that when the State tells us to get ready, that we even get any assistance in it. And, by the way, Judge, get ready because the residents' bills are going to triple. That to me is problematic.

MR. CARNEY: Okay.

THE COURT: Okay. That is problematic. I agree with you on that.

But what I don't agree with you on is, you got to come to some sort of resolution of what will assuage those concerns. You can't stand before me and say, well, you know, nope, nope, because we have no idea. Because that's what settlements are all about.

MR. CARNEY: Your Honor, the settlement that the State of New Jersey entered into with *Solvay Specialty Products* -- I forget their whole full name -- in January of 2024, which is mentioned in their briefing, when you look at that Judicial Consent Order, it reads like a blueprint to the existing JCOs, with one huge exception.

In that case the State took $180 million -- it was a $180 million settlement. I forget how long it was paid out over time. But there is no covenant not to sue and there's no release. Exact -- and it also releases the 2019 statewide directive that the State of New Jersey has. It's for natural resource damages, PFAS abatement. Reads just like --

THE COURT: Could it be -- and, look, I got enough of

this case to worry about, not that case, but could it be that at least there was an agreement in principle between the parties as to what are we really dealing with here?

But you stand before me and you say this could cost, you know, a gazillion dollars, and DuPont and 3M, get ready. That just doesn't strike me as a position of reasonableness.

There has to be some sort of a number that you can put on it so that you can then say to the State, this is the number we see, and then all of you can persuade me that the residents of New Jersey aren't going to get socked with utility bills that skyrocket. Has to be. You can't stand before me and just say, nope, can't do it. Has to be.

MR. CARNEY: I have a couple arguments to make. One is, we've been focused right now, too, just on fairness, reasonableness and is in the public interest under the *Exxon* standard.

THE COURT: Right.

MR. CARNEY: There's also a criteria, and I want to turn a little bit to solid waste, which is it also has to be consistent with statutory law, in this case CERCLA and the Spill Act.

The Morris -- and I know I'm switching gears a little bit. I want to come back to the costs, but the Morris County Municipal Utilities Authority, there's something there called Solid Waste Flow Control. And since 1988, the MUA there has

been responsible for having all of the garbage, residential, commercial garbage collected at one of its two transfer stations.  It's then bulked up on gigantically huge tractor trailers that travel Route 80, and they go out and they dispose of it at three different landfills in Pennsylvania.  That has happened since 1988.  Over 14 million tons of garbage has been disposed at those landfills.

Now, we are always, you know, concerned that we go to good landfills, ones that hopefully won't turn into Superfund sites in the future.  But if those landfills ever become Superfund sites because of a leachate leak, the EPA will go, you know, there's strict liability under CERCLA.  DuPont and 3M may very well have PFAS contamination, and I recognize right now as we sit here today there's only two -- of the 16,000 different types of PFAS chemicals, there's only two right now under CERCLA.  That could change, too, in the future.

The irony of this is, is that DuPont and 3M could be named as a potential responsible party, so could the Morris County MUA.  Under the terms of this settlement for which MCUA is not a party, 3M and DuPont would have a right of contribution against the Morris County MUA and the Morris County MUA would have no right of contribution against 3M and DuPont.  That can't be.  Those rights are granted by Congress. They can't be taken away by this settlement agreement.

The argument made in the reply brief, first of all, I

don't think -- I don't think plaintiffs understood that the Morris County MUA is not a publicly-owned treatment work.  It's they deal with solid waste disposal.

THE COURT:  Well, then it doesn't come under the terms of the --

MR. CARNEY:  But in their reply brief -- I'm losing all my papers here.

THE COURT:  Do you agree with that, Mr. Jackson?  I mean, if we don't need to argue over it, we won't.

MR. JACKSON:  I've gotten lost on some of these issues, but I would say that both --

THE COURT:  Well, I think he's saying --

MR. JACKSON:  -- both of these JCOs preclude 3M and DuPont from suing the public entities.  Paragraph 74b says that they shall not seek contribution from any of the public entities on this example.

THE COURT:  But I'm hearing Mr. Carney say the -- what did you say, the MUA is not a public --

MR. CARNEY:  We don't -- so we made an argument on behalf of all our public-owned treatment work facilities that sludge, the sludge product from wastewater can be landfilled. It -- I'm -- we're also making the argument for the Morris County MUA, which deals with residential and commercial garbage and has landfilled all of that, that under this, if you were to sign the JCOs as they're written currently --

*68*

THE COURT:  Yeah.

MR. CARNEY:  -- the Morris County MUA would not have a right of contribution against 3M and DuPont under CERCLA or Spill.  And that can't be.  It's not -- it's completely against the statutory law.

MR. JACKSON:  May I address that one before we move to the next one?

THE COURT:  Yeah.

MR. CARNEY:  Sure.

MR. JACKSON:  So, first of all -- well, unless 3M or DuPont is -- we're talking about a discharger site, where they have discharged and generated waste, this entity, MUA, doesn't have a CERCLA claim or a Spill Act claim against either.

CERCLA is designated -- they're delegated specified potentially responsible parties.  It's an owner of a site.  It's an arranger or discharger.

THE COURT:  I think -- right.  You agree with that?

MR. JACKSON:  Right.

MR. CARNEY:  Well, we're an arranger.  We arrange the transportation and disposal of solid waste to these landfills.

THE COURT:  We're really getting --

MR. JACKSON:  I'm not talking about you.  I'm talking about DuPont or 3M.

MR. CARNEY:  Oh, DuPont or 3M.

MR. JACKSON:  You -- whether or not the sewage

*United States District Court*
*District of New Jersey*

exemptions and a lot of the other issues that are out there, whether or not under this example there is CERCLA or Spill Act liability, I honestly don't know the facts of this well enough to know whether or not what we're talking about has an exemption for domestic sewage, for example.

But what I'm saying is, is that there is not, at law, a contribution claim. And statutorily, if the department settles with these entities, they get contribution protection as a matter of law.

THE COURT: Okay. So that --

MR. JACKSON: What the argument was --

THE COURT: This argument that's being raised here sounds to me that you folks just need to talk. Because it sounds like I think you're in agreement even though you don't think you're in agreement.

MR. CARNEY: I just would like to say that in their reply brief, the way that our argument is addressed by them --

THE COURT: Yeah.

MR. CARNEY: -- is they say Congress is actively considering complete protections under CERCLA that would exempt public-owned treatment works from PFAS liability as passive receivers.

And my point there is, first, that may not happen. And second, the Morris County MUA is not a POTW.

THE COURT: Well, so what are you saying to me; that

if I approve the settlement, then somewhere down the road if this parade of horribles that you think about happens, then you're all back in court as to whether or not the MUA is bound by this Court's opinion?

MR. CARNEY:  I would say the argument that I'm making on behalf of the MCUA also applies, frankly, to our public-owned treatment works to the extent that the sludge product -- they call it "biosolids" -- is disposed of in landfills instead of incinerated, and some of it is incinerated.

And my remedy here is the fact that I don't know why -- what the rush is here and why the parties cannot take 60 days, 30 days, and discuss how, if anything, it would impact this settlement to remove solid waste facilities and wastewater treatment plants from the definition of releasor, I'm sorry, yeah, releasor and covenant not to sue.

THE COURT:  Well, I think the time would be better spent by the parties coming together to get better realistic projections as opposed to standing before me and saying the sky might fall and therefore we want to -- we want to protect our right to sue DuPont and 3M.  That's just not helpful to me.

MR. CARNEY:  So I hope I'm coming across as more than the sky might fall.

THE COURT:  Well --

MR. CARNEY:  And the only reason why I say that --

THE COURT:  I don't mean to be flippant, and I shouldn't have said that.  I apologize.

MR. CARNEY:  If --

THE COURT:  But what you are coming across as is saying to me that we have no idea, this could be just horrible, when I don't know that that's necessarily true.

You know what the State is expecting of you.  You know what the projections might look at.  You've got your experts that look at this.  The State will have its experts that look at this, and I can determine what those projections are.  I can determine whether or not those funds should be earmarked and are earmarked under the agreement.  And then I can be satisfied that the citizens of New Jersey are not going to get quote-unquote punished by this settlement.

MR. CARNEY:  Your Honor, I would --

THE COURT:  That's what I'm most concerned about.

MR. CARNEY:  I would be open to have expert testimony.  I mean, we have certifications that we have presented from, for example, John Cherry, who's licensed in ten states, in District of Columbia, has 35 years of experience in wastewater facility planning, design, permitting, and construction.  And he's prepared a report that we submitted with his certification.  It's called, "Estimated Capital and Operating Costs for the Removal of PFAS Substances of New Jersey Wastewater Treatment Facilities."

*72*

And he's basing a lot of what he does on -- it's over a 200-page report done by Hazen and Sawyer and Barr Engineering in Minnesota.  He has projected for New Jersey that the ranges in capital costs are between 21.8 billion and on the high end $53.4 billion.

And on one of our treatment plants, Hanover Sewerage Authority, who we're representing here as well today, he has the capital cost to the Hanover Sewerage Authority projected between -- now, again, this is a smaller treatment plant.  This is 4.61 million gallons per day.  That's not a big plant.  There are much larger plants.  The Rahway Valley Sewerage Authority, for example, treats over 30 million gallons per day.

So as to a 4.61-million-gallon-a-day plant, he projects $72 million, between $72 million and $119 million in the capital.  That's just to build what would need to be built to treat PFAS.  And then he's got the annual operating costs of that, operation and maintenance, to be between 4- and $9 million.

THE COURT:  What's the answer?

MR. CARNEY:  The answer is --

THE COURT:  What's the answer, Mr. Carney?

MR. CARNEY:  The answer is the remedy that we're seeking here, which is a small carve-out of the definition of releasor.  We're not saying that we don't want this -- the State can --

THE COURT:  But if I take your numbers, and I have no idea, I haven't looked at the financial net worth of these defendants, I mean they're public entities, anyone can, and I take your number and I multiply it by what, how many utilities there are in all of the 50 states, what are we really talking about?  I mean, really, what are we talking about?

MR. CARNEY:  We're talking about --

THE COURT:  It almost becomes a fantastical exercise to me because companies don't have this kind of money.  This is why settlements become important.

I mean, it doesn't -- okay.  They are companies of wealth, absolutely.  And parties should have remedies, absolutely.  But there has to be a semblance of reasonableness into settlements.  And to say don't approve this settlement because we want to be able to sue for these gigantic numbers --

MR. CARNEY:  I'm not saying don't approve the settlement agreement.  I want to be very clear here, we are not attacking the entire settlement agreement.

THE COURT:  Yes.  You want these provisions out.  I understand that.

MR. CARNEY:  We just want a slight amendment to it. When you look at the definition of political subdivisions, it's very broad.

THE COURT:  You want the slight amendment so that you and others similarly situated across the country, because it's

*74*

not lost on this Court that all eyes are on the state of New Jersey, okay, you want this carve-out so that all others can follow suit and sue these defendants.

Why would these defendants settle?

MR. CARNEY:  So in the water world, right, they've had their day in court.  The class -- I'm going to call it a class action lawsuit.  It's multi-district litigation, right.  It's the AFFF settlement that we hear a lot about.  The water community had their day in court.  The wastewater treatment world has not.

What if there is a class action lawsuit that is brought?  Everybody in New Jersey would be precluded from joining that.

I mean, that didn't happen in the water community.  Why should it happen here?

Let me give you an example.  Minnesota.  Minnesota was one of the very first states, New Jersey very close behind, but Minnesota was one of the very first states to go after PFAS.  And Minnesota, I believe it was in 2018, entered into a settlement agreement with 3M regarding their PFAS.  But that did not preclude Minnesota from participating in the class action MDL that occurred thereafter and obtaining money from the AFFF litigation.

If these JCOs are signed, it will be an absolute preclusion of everybody, and, again, I don't want to -- I'm not

*75*

here to talk about every political subdivision.  I'm here just on behalf of wastewater treatment plants, solid waste facilities.  We would be precluded from joining that action even though other participants in other states could.  And that doesn't seem fair, reasonable, or in the public interest.

THE COURT:  Okay.  We're going to take a break.  Give my court reporter a break.  We'll take a ten-minute break, okay?

THE COURTROOM DEPUTY:  All rise.

(Recess was taken at 10:38 a.m. until 10:51 a.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Okay.  You can all have a seat.  Thank you.

Okay.  Mr. Carney, what else did you want to say to me?

MR. CARNEY:  Your Honor, I want to just address delegated local agencies in terms of how I believe these JCOs also violate statutory criteria regarding the forever release on forever chemicals as to delegated local agencies.

The EPA has delegated responsibility for the national pretreatment program to NJDEP, which in turn has delegated implementation authority to 17 delegated local agencies statewide.  We are representing four of those 17 here today: The Somerset Raritan Valley Sewerage Authority, the Hanover Sewerage Authority, Rahway Valley Sewerage Authority, and

Rockaway Valley Regional Sewerage Authority.

The DLA, delegated local agencies, are charged with issuing permits to significant industrial users, monitoring and enforcing permit conditions, and administrating service rules that apply to all users of the public-owned treatment work. These responsibilities are central to ensuring that pollutants, including PFAS, do not endanger worker health, safety, interfere with the treatment plant operations, disrupt sludge and management processes, or pass through into receiving waters untreated.

By releasing 3M and DuPont from obligations involving compliance, permitting, reporting, the JCOs directly conflict with responsibilities of the delegated local agencies under the Clean Water Act and the New Jersey Water Pollution Control Act, and NJDEP-approved pretreatment programs.

As an example, the comment letter from Hanover Sewerage Authority, which I believe is in the record --

THE COURT: Where would I find that?

MR. CARNEY: The comment letters -- did the State include the comment letters?

MR. JACKSON: We included --

THE COURT: Summaries of them, right?

MR. JACKSON: -- a summary.

MR. CARNEY: Oh, you included a summary, okay.

THE COURT: Well, okay. Yeah. I don't have the

summary.

MR. CARNEY:  It's a short comment.  I'm not going to read everything.

THE COURT:  Okay.

MR. CARNEY:  So here's the comment:  While the authority is not aware of a list of all of the released entities apart from the list of 3M former sites included in the JCO, which is -- 3M's JCO is Exhibit D, the authority is aware that 3M manufacturing facilities were historically located within its sewer service area.  To the extent that legacy contamination migrates into the authority's system from a released entity and it's detected as a delegated local agency, the authority, meaning Hanover Sewerage Authority, is empowered to require monitoring and take such actions as are necessary to prevent hazardous pollutants from entering the system.  To the extent that the JCO impedes upon the authority's ability to monitor and protect worker health, safety, sludge, disposal methodologies, public health, or the environment, the JCO must be modified.

And in fact, there is at least one site that is identified in Exhibit D of the proposed JCO with 3M which includes a facility within Hanover Sewerage Authority's sewer service area.  In fact, it's the last one that's identified on Exhibit D of the 3M proposed JCO, which is Whippany, 140 -- I'm going to mispronounce the name of this parkway -- 140

Algonquin, Algonquin Parkway, Whippany, New Jersey.  It is a half mile from the treatment plant.

The release and the covenant not to sue would directly interfere with the statutes that I just mentioned, because Hanover Sewerage Authority is in fact a delegated local agency.  That would need to be addressed in the release.

And I just want to, I guess, just sort of sum up that it --

THE COURT:  What -- I'm kind of losing you.

MR. CARNEY:  Sure.

THE COURT:  What is it that you say that the defendants would have an obligation to do that somehow they no longer have an obligation to do?  I thought you said monitoring and reporting.  I'm losing you on this.

MR. CARNEY:  Sure.  So in the reply brief of the State, they said don't worry, delegated local agencies, there are no -- there are no 3M sites or DuPont sites that you are permitting as a significant industrial user, don't worry about it.  And I think they mentioned some -- I forget where the facility was.  They mentioned some category B permit, which I believe is a surface water permit that the State deals with.

What I am saying is that's wrong; that in Exhibit D of the 3M proposed JCO, there is in fact a site, a former 3M site, could have legacy PFAS contamination for which the Hanover Sewerage Authority as a delegated local agency is

*79*

responsible for permitting as a significant industrial user

issuing fines, penalties, and so on.

And so this JCO as written, if signed, would take

away what -- it would take away what statutorily cannot be

taken away.

THE COURT:  Take away what?  What's the "what"?

MR. CARNEY:  The delegation to the Hanover Sewerage

Authority as a delegated local agency and all of its

responsibilities that flow from that.

MR. JACKSON:  Can I ask, is that does or could

discharge PFAS from that facility?

MR. CARNEY:  So it's no longer a 3M facility.

MR. JACKSON:  Right.  Are you telling me that there

was PFAS that's known from that facility or is it "could"?

MR. CARNEY:  Well, I'm not the treatment work

operator there.  I'm going to use the word "could" here as an

officer of the court.  But I don't -- the whole point of this

is, is that the Hanover Sewerage Authority is the DLA that

include -- I mean, why have Exhibit D with all the former 3M

sites if they're not important?

THE COURT:  Okay.

MR. JACKSON:  They are important, and they're

addressed, and I would like to address that.

THE COURT:  Okay.  Maybe you two understand what

you're talking about; I don't.  What is it that's being taken

*80*

away, in your view?

MR. CARNEY:  The ability for the Hanover Sewerage Authority to seek penalties, fines from a former 3M site for PFAS legacy contamination.

THE COURT:  Okay.  That's what's being taken away, or something that you don't know.  It's somewhat hypothetical and speculative, right?  Yes or no?

MR. CARNEY:  Well, I'm going to say yes.

THE COURT:  Yes or no.

MR. CARNEY:  It's yes, but it's not like it's zero probability.

THE COURT:  No, I'm not saying that you're not standing before me in good faith.

MR. CARNEY:  Yeah, right.

THE COURT:  These are legitimate concerns that you have.  You don't have a quarrel with me about that.

MR. CARNEY:  Okay.

THE COURT:  But by the same token, a court can't simply say in a vacuum there will be no settlement that this Court will approve because I don't have answers to all of these questions that nag us, okay.

I have to do the best to get answers to those questions.  And if at the end of the day I feel -- not "I feel," but I find that I'm satisfied with the answers I've gotten, and I either find that they're not fair, they're not

*81*

reasonable, then I know how to rule.

If I find otherwise, then I know how to rule.

But what I can't do is just -- I can't just sit up here and say -- I mean, I've used the word, you know, I feel like I'm being held hostage to these scenarios, these hypotheticals that may or may not happen.  And that's where I need the objectors' assistance, the parties' assistance. You've got to give me more than just like anxiety and worry.

MR. CARNEY:  Okay.  I am trying to identify -- so in the *Exxon* case, right, the standard of review here is whether or not the proposed JCO is fair, reasonable, consistent with statutory objectives, and in the public interest.

THE COURT:  Yes.

MR. CARNEY:  I am saying -- I'm giving examples as to why this JCO is not consistent with statutory objectives, which alone should prevent the execution of the JCOs as written.

THE COURT:  Yeah.

MR. CARNEY:  In addition to that, I'm also arguing that it's not fair, reasonable, or in the public interest because this is a forever release as to nonparties.

The first time we learned that any of this was even taking place was at the end of July.  And, by the way, the public notices that went out don't mention anything about amendments to surface water quality standards.  They're not even discussed as being considered in the Judicial Consent

Orders anywhere.

THE COURT:  You're throwing a lot at me, okay.

You're having your day in court, so let's move on.
Okay.  That's why you're here.  That's why I'm allowing you to
be heard.  I think it's fruitful to the conversation.  It's
fruitful to this Court's analysis.

Okay.  You're still losing me on the first prong.
Let me go back.

MR. CARNEY:  Well, I don't want to lose you because
I --

THE COURT:  Well, you got me and you don't got me.

MR. CARNEY:  Okay.  Well, I want to be lockstep,
so...

THE COURT:  Okay.  Wait.  I want to see what you said
to me.  Hang on.

You say -- okay.  You make two prongs.  This is what
you've said.  You're saying, this JCO is not consistent with
statutory objectives, which alone should prevent the execution
of the JCO as written.

What are you saying?

MR. CARNEY:  Okay.  So the statutory -- where I'm
saying the JCO conflicts with statute --

THE COURT:  Yes.

MR. CARNEY:  -- is, number one, the release as to the
delegated -- there's 17 delegated local agencies in the state.

83

THE COURT:  Yes.

MR. CARNEY:  Okay.  As to those 17 DLAs, of which we're representing four here today, it's contrary to their ability as a delegated local agency to issue fines and penalties.  Let me just back up because I started with the Clean Water Act.

So I think I started this by saying that EPA has delegated responsibility of the national pretreatment program to DEP and DEP has delegated that to 17 DLAs.  By taking away our power to issue permits, enforce those permit conditions, that is contrary to this entire statutory framework and program.

So that's the -- that's number one.  Number two --

THE COURT:  But hang on.  Where does it take away your power to issue permits?  Are you talking about going forward?

MR. CARNEY:  I'm talking, yes.  So --

THE COURT:  Okay.

MR. CARNEY:  If there is legacy PFAS from this former 3M facility and it discharges into the Hanover Sewerage -- well, if.  It does.  It discharges into the Hanover Sewerage Authority, if those contaminant levels -- it's the responsibility of the Hanover Sewerage Authority to enforce the permit from that facility, that it gave to that facility.

THE COURT:  Right.

*84*

MR. CARNEY:  This release will take that power impermissibly away.

THE COURT:  Okay.  That I'm not getting.

Are you getting it?

MR. JACKSON:  I am.  I'd like to address it, if I might.

THE COURT:  Okay.  Let me hear from Mr. Jackson.

MR. CARNEY:  Okay.  Sure.

THE COURT:  Because I am not getting why -- I'm not getting this argument.

MR. JACKSON:  So --

THE COURT:  He says that it takes away their ability to permit.

MR. JACKSON:  Okay.  I'll let -- Andrew Homer actually would address the permitting question if you don't mind, Your Honor.

THE COURT:  Okay.

MR. HOMER:  Good morning, Your Honor.  Andrew Homer for the plaintiffs.  And I wanted to address this sort of DLA issue and maybe take a step back where Mr. Carney started.  So --

THE COURT:  Okay.  Mr. Carney, you can sit down in his chair if you want.

MR. HOMER:  As Mr. Carney said, the Clean Water Act delegates certain enforcement authorities to the New Jersey DEP

*United States District Court*
*District of New Jersey*

*85*

or under the Clean Water Act the USEPA has delegated its authority to DEP, and then DEP turns around and delegates certain authorities to these delegated local agencies which are essentially POTWs or the entities that run POTWs.

THE COURT:  Got all that.

MR. HOMER:  They're responsible for issuing permits on an ongoing basis to significant industrial users that exist today, that are discharging today, that are putting pollutants and other things into the sanitary sewer that then reports to their POTW.

Nothing in this delegation empowers those DLAs to address legacy contamination at sites owned in the past by 3M or DuPont.

So what they could do with respect to this one facility that Mr. Carney described is if there's an existing ongoing licensed operational business there, which is not 3M, they could issue a significant industrial user permit to that business, if in fact it was discharging to the sanitary sewer.

They don't have any rights, responsibilities to go remediate former contamination.  There's no evidence that there is former contamination.  In fact, Exhibit D to the 3M JCO is a list of properties that 3M formerly owned or operated for which it represents and warrants they're not aware of any contamination after a review of their files.  And DEP is not aware of contamination or a release of PFAS after review of

*86*

their files.

THE COURT:  So at the end, I mean, I don't know, this is just needless anxiety on their part?

MR. HOMER:  Absolutely.  And I don't want to say that lightly, because like the agency or the association that Mr. Carney represents, AEA, DEP views this as a collaborative partnership.  We applaud these sanitary agencies for the work they do.  And DEP has consistently throughout the life of this industrial pretreatment program, and specifically since 2021 with respect to PFAS, enabled, empowered, authorized, required these DLAs to take some responsibility for controlling PFAS inputs to their systems.  And, you know, part of the PFAS abatement funding will be available to continue that relationship.

But there is an existing administrative order in effect right now from 2023 where DEP again authorized, empowered, encouraged, directed these DLAs to go find out what the PFAS inputs are to their systems.  They will have the power to develop local limits that put numeric limits on the discharges from those facilities to the sanitary system and in turn, cut down what comes to the POTW, what would ever have to be treated at the POTW.

You know, they're here telling you that the sky is falling and that there's going to have to be this end-of-pipe treatment at their facilities, and that's not the answer.  The

*87*

answer is, as DEP has consistently shown with its enforcement

activities, we need to go after the upstream sources.  They are

a step, the DLAs, the POTWs themselves are a critical step in

that chain.  They are the ones that understand the inputs to

their system.  They are the ones that control it.  DEP provides

them technical assistance, funding, legal assistance,

et cetera, in implementing that permit program to cut down what

comes to their plants.

THE COURT:  Okay.  Let me ask Mr. Carney.

MR. HOMER:  Sure.

THE COURT:  So isn't that concession all you need?

MR. CARNEY:  No, I'm not going to make any

concessions.

THE COURT:  No.  The State's concession.

MR. CARNEY:  I understand what he just --

THE COURT:  They pretty much said -- you know, years

from now you order the transcript and say you're estopped,

State.

MR. CARNEY:  Okay.  I'm not going to -- I'm not going

to contradict anything that he just said.  All I'm saying is --

THE COURT:  You're going to use --

MR. CARNEY:  -- that I represent four of the 17 DLAs.

I don't know what the other DLAs have, you know, in terms of

former DuPont or 3M legacy PFAS contamination.

THE COURT:  But the State has provided all of that.

The only one that they've said -- the only one they know of is the Exhibit D to the --

MR. CARNEY:  That's just 3M.  There's also DuPont.

THE COURT:  Okay.  What will satisfy you?

MR. CARNEY:  What will satisfy me?

THE COURT:  What will satisfy you?

MR. CARNEY:  And then I'll probably just -- I'll just conclude because I know there's others here, including somebody representing some of the counties.

I do not think it is in the public interest and it's certainly not fair and it's not reasonable to provide a forever release and a forever covenant not to sue regarding forever chemicals.  It's shortsighted.  And all we're saying is in the event -- it just -- we're not saying that the money should be higher or lower.  The I-Bank is not a remedy.  It's the same cost to the rate payers plus interest.  We just want to be able to have our day in court if it ever should come to that in the future.

You're making a decision to do a forever release and a covenant not to sue based on not all the facts.

THE COURT:  Mr. Carney, Mr. Carney, I'm going to be pretty blunt.  You had me until now, okay.

To stand before me and say as a matter of principle, you should not approve a forever chemical release is not persuasive; it's not, okay.  Because that just is not helpful

*89*

to determining whether or not a settlement is fair and reasonable.

Where you have me is this concern that I have that the State acting on behalf of its citizens is really not.

MR. CARNEY:  Your Honor --

THE COURT:  That's where you have me.

MR. CARNEY:  Okay.  Well, let me keep you there.

THE COURT:  Okay.  Don't stand before me and say, as a matter of principle, these types of releases, these forever chemical releases should never be approved because we don't know what it all means for the next umpteen centuries is simply not helpful.

MR. CARNEY:  Okay.

THE COURT:  Because the world would stop spinning.

MR. CARNEY:  Okay.  Well, I don't want that to happen either.  So just disregard that last portion and just keep in mind what I have before, which is that, yes, the State I think is not being reasonable, fair here in using its power in this way because of the extraordinary cost it will have with no remedy in the future to ever even have the opportunity to go after them.

THE COURT:  It's not -- stick with what I think your best argument is.  It's not that you're going to be stuck with the remedy.  It's that the remedy that you're going to be using is you're going to sock it to the citizens.  That's the concern

*90*

I have.

MR. CARNEY:  Yeah.  That's my concern, too.

THE COURT:  Okay.  And that's -- they'll have to persuade me on that.

MR. CARNEY:  Okay.  Your Honor, thank you.

THE COURT:  Thank you.

MR. JACKSON:  May I address this, the remediation-type issues in the release, or would you like to hear from others first?

THE COURT:  Let me hear from -- are there any other counsel for the Intervenors that something hasn't been said that needs to be said?

MR. KEEFE:  Yes, Judge, yes, please.

THE COURT:  All right.

MR. KEEFE:  Good morning, or good afternoon, Your Honor.  John Keefe, Jr.

THE COURT:  Good morning.

MR. KEEFE:  Keefe Law Firm for the counties.

THE COURT:  Yes, Mr. Keefe.

MR. KEEFE:  First, Your Honor, and it's my intention to be brief and to the point listening to some of your questions.

First and foremost, I know almost all these folks up here.  And I applaud this Commissioner for what he's accomplished.  I applaud these private lawyers, these attorneys

*91*

general.  You know better than anybody.  You were ready and were trying the case.

Our problem is not with that.  We don't dispute the public trust doctrine with NRD.  We think the State does a terrific job with that.

The question is whether under parens patriae they've gone too far, not whether they have the right.  But back to your question, is it fair?  Is it fair to the public?

THE COURT:  So you don't dispute -- see, again, a lot of ink has been spilled on this about they don't have the authority.  I think there's no one in this courtroom right now that is telling me that they don't have the authority.  That's how I'm seeing it.

MR. KEEFE:  Generally, generally, I agree with you.  They have the authority.  They've gone too far.

THE COURT:  Okay.  They've gone too far because -- and I'll stop and then I'll let you speak -- they've gone too far because you don't like the release.  It's a question I asked Mr. Carney.

MR. KEEFE:  We don't like the release, for sure.  I'm going to agree with you on that.  And I'm going to tell you, I hope, why.

THE COURT:  All right.

MR. KEEFE:  You are correct, Your Honor, when you say that the eyes of the environmental world of cases throughout

*92*

the country, precisely the MDL in Charleston, the eyes are on this.  And the question is why?

You know these cases that were brought before you.  We could read the complaints.  There is a major problem with some of these sites that was the subject of the DEP litigation.  And Mr. Jackson, one of the finest environmental lawyers and his team in the country, with the Attorney General's Office, worked really hard before you.  Our problem is not with that case.

What is the county's case?  And in explaining that to you very briefly, not getting into damages or value, I hope to show you where our real objection is.  In some of the papers by the State, they make very clear example this is not an AFFF case.  Your Honor presided over it.

There was an AFFF case -- actually, there was a New Jersey American Water case out of Chambers Works many years ago in this very courthouse before Judge Rodriguez.

In the discovery in that American Water case, there was reference to AFFF.  My very respected friend and adversary here, Mr. Kurzweil, who knows more about environmental law than I will, and his team removed that case because of AFFF.  Where?  To Charleston.

So I think it's pretty clear that this is not, nor should it be, an AFFF case -- aqueous film-forming foam.

The case so far after many years of litigation in the

MDL is settled based upon individual claims brought, in large part, by governmental entities like New Jersey's water providers, of which I was involved with, and those cases were settled.

They were settled using a class action mechanism so that the court, Judge Gergel, could learn and understand what's at stake here, what's really happening here.  Is it fair, reasonable and adequate?  Slightly different than Your Honor's standard, but very, very similar.  And the parties agreed to do a Rule 23 for all these individual cases.

In those settlements with DuPont and 3M, Judge Gergel made it very, very clear these are a settlement of this MDL, this judicial order from the judicial panel that gives me the authority and jurisdiction to handle multiple AFFF cases from all over the country.

He did not give a blessing or a release to 3M or to DuPont, later on to BASF and Tyco, for anything other than that which was before him.  I fully understand what Your Honor's struggle is.

We don't struggle with expecting billions of dollars. That's not realistic.  That's a pipe dream.  We're not here to say "we object."  And I don't think Mr. Carney as amicus is saying we want all those billions of dollars and we expect them to pay it.  That's not realistic.

What Your Honor is struggling with, I believe, is the

*94*

scope of the release.  That's what we're struggling with.  The counties' primary claims are to their fire academies.  There's 21 counties in the state.  There's roughly 17 to 18 fire academies.  Some of them are municipal.  I don't represent any of those folks.

What pollutes our water system?  What pollutes these fire academies?  The copious, continuous, longstanding use of foam at these facilities.  If it's foam, it's Judge Gergel.  If it's foam, the MDL panel has said it's Charleston.  When Judge Gergel struggled with this mass of cases all over the country, he understood when he approved the water provider cases and he said there's not enough money here, in his best Southern accent, "We don't have enough money.  This is historic.  This is good."  I will borrow a line from Judge Gergel.  "This is historic.  This is good."  It's just gone too far with respect to the county claims which are pollution claims arising from AFFF exposure.

Now, what the plaintiffs have said is, yeah, but it's more than just NRD.  I don't quarrel with NRD.  I don't quarrel with all the site pollution that has occurred at these various places down at Carneys Point, Chambers Works, Sayreville, et cetera.  Kudos.

However, when you're extinguishing a governmental entity claim and that claim arises from an AFFF exposure, just like Mr. Kurzweil did with American Water, said to Judge

Rodriguez, we're out of here, we're going to Charleston.

So, when those cases -- there was some mention of Kidde Fenwal in here, which is a defendant, a small market defendant that's in bankruptcy. That bankruptcy case is winding down already. We've seen proposals under the Kidde plan to come out of bankruptcy. And to give you a perspective, Kidde is a relatively small player. 3M, DuPont, Tyco, BASF, and I'll address very briefly why in that order. But the Kidde bankruptcy discussion is instructive, and it applies to your concern about well, what about the public.

When Kidde comes out of bankruptcy, they have a plan, and what they've done is they've categorized Kidde's exposures to water providers, to states, to municipalities, to land, to airports, and so on, because there's an appreciation for these distinct categories.

THE COURT:  And hasn't the State done that?

MR. KEEFE:  No, not in the least. And here's why --

THE COURT:  Okay.

MR. KEEFE:  -- their claims are not AFFF claims. If they were, if they were, there would have been a removal to federal court. They're very, very careful. In fact, some of the papers are very clear --

THE COURT:  Their claims are not --

MR. KEEFE:  Foam-based claims. What they're claiming is property damage from PFAS.

THE COURT:  Look.  I --

MR. JACKSON:  May I just?

THE COURT:  But can I -- I don't -- are we kind of not --

MR. JACKSON:  This --

THE COURT:  I'm feeling apples/oranges here.  I'm not quite --

MR. JACKSON:  The State filed as part of, you know, a series of litigations that were launched in 2019 regarding PFAS.  One of the State's claims was regarding AFFF.  That's the firefighting foam.  It's aqueous film-forming foam.

THE COURT:  Yeah.  I'm familiar with that, but what's --

MR. JACKSON:  And that case is in Charleston.  And we sued these defendants for their contribution, among many defendants, for the damages at issue here, the natural resource damages, the property rights.

THE COURT:  No.  But what's that got to do with PFAS?

MR. JACKSON:  Because PFAS is in the firefighting foam.

THE COURT:  I know.  But what does it have to do with this case?

MR. JACKSON:  Oh, the JCO releases our claims and the State's claims, the agency claims, and the sub-sovereign claims for all PFAS, including that from AFFF.  So the JCO is

releasing those claims.

THE COURT:  What paragraph is that?

MR. KEEFE:  So with that, our county claims are being released for claims that are really under the jurisdiction of the MDL.

THE COURT:  But you have claims in the MDL; do you not?

Let me see the language.  Where is the language?

MR. JACKSON:  It's within the scope of the release. That it's all PFAS, the State is releasing its claims and the claims that the State has brought for --

THE COURT:  But Mr. Keefe is saying that he is a party in Charleston, right?

MR. KEEFE:  I'm saying that there are categories of claims being litigated dealing with AFFF.

MR. JACKSON:  Are any of the counties in Charleston?

MR. KEEFE:  None of the counties that I currently represent.  However, I'm going to answer, the eyes of the world are on you, because Judge Gergel has managed this case.  There is no mandate to file in a pollution case a continuous tort. There is a process in the MDL.  Do I believe those cases will be brought?  Absolutely.  Do I believe airport claims which governmental entities own will be brought?  Absolutely.

Do they have AFFF exposure at airports?  They do. Here's --

THE COURT:  Have those claims been brought?  That's what I'm asking.

MR. KEEFE:  Some of them in the MDL have been brought.  My clients have -- I'm sorry.

THE COURT:  By your clients?

MR. KEEFE:  My personal clients have not yet filed.  And there's a reason for that, which I'll get to.  Number one, we're not obligated to do it.

Number two, case management orders currently say within 98 days certain events need to happen.  The judge is -- this is a huge air traffic control management issue.  There are over 15,000 personal injury cases down there, after the water cases which the judge prioritized as key, let's get it out of our water.  And when he blessed 3M and DuPont, he blessed only the water exposure cases.  He says now we're moving on to the sick firefighters and military.  We're going to get to the rest.

And the other categories are airports.  So when we talk about governmental entity releases, what these JCOs do, really what DuPont and 3M is doing is they're avoiding the current MDL structure and their exposure by saying we're going to settle with you guys up here for your four claims, but we want complete peace.  The same issue that Your Honor had with the Appellate Division and what is your authority vis-a-vis the state court.  What I'm here to represent to you is not just my

*99*

counties that do have foam exposure and will bring those cases when the time is right in Charleston, we're limited.  But this is a blueprint to do an end-around the entire MDL.

3M and DuPont are going to say, hey, look, airports in New Jersey, you're out.  Fire academies, you're out.  Any other governmental claim is out.

Now, these same defendants took a case out of this courthouse for the Chambers Works site brought by American Water because there was AFFF overlay.  They removed it.  Now they're back here saying to Your Honor give me peace.  I want complete peace.  Don't worry about what's happening in the MDL. Don't worry about the transfer order.  Don't worry about Judge Gergel.  But the struggle that you're having, Your Honor, Judge Gergel had.

THE COURT:  Well, I don't know that I'm really struggling with what you're saying, because it would seem to me that if I found that the parties all got together and they in their calculus, which Mr. Jackson or someone will come up and stand up and tell me, in their calculus they put a number on what if the parties were to be involved in that MDL meant to them, then good.

MR. KEEFE:  Or not, then Judge Gergel would decide that.  See --

THE COURT:  But, again, we go in circles because if the State has the authority because it's the parent and it's

looking out for its children, and if it has the authority to say, you know what, we've done a calculus, we've looked at these fire academies, we've looked at the facilities here, yes, we understand there's this potential in the MDL in South Carolina, that at the end of all of our analysis, we think this is a fair and reasonable number, if they stand before me and persuade me of that, what's wrong?

MR. KEEFE:  If it includes an AFFF analysis, there's no jurisdiction here.  There's no jurisdiction for you to approve any element of this settlement that has an AFFF component.  That's our position.

THE COURT:  Well, it has a PFAS component.

MR. KEEFE:  Yes.  But as Judge Gergel said, anything having to do -- look, there were -- and I'm not saying I agree with it -- there were drinking water cases all over the country, tens of thousands, that are PFAS related.  Judge Gergel said, well, if there's PFAS, there's probably AFFF in there.  I have the authority by the federal courts, all those cases come before me.  I'm not giving you an opinion whether I agree with that or not.  But in PFAS and AFFF --

THE COURT:  What did he say?  Say that again.

MR. KEEFE:  Drinking water cases, right, different than kind of the categories that I've spoken to you. Individuals who drink water who have an injury or a disease who wanted to bring private causes of action --

THE COURT:  Yeah.

MR. KEEFE:  -- to say, hey, there's PFAS in my water.  The defendants are like, wait a minute, we don't want to be stretched all over the country.  Judge, if there's PFAS in the water, there's AFFF basis for it.  Judge Gergel said all those cases, they're in my courthouse, they're in my courtroom, because they have an AFFF component to it.

THE COURT:  Well, I don't know.  I mean, maybe that's -- that I'm --

MR. KEEFE:  So I'm going to try to cut to the chase about what you've asked my predecessors, what do we want?

THE COURT:  Okay.

MR. KEEFE:  We want an AFFF carve-out to recognize the authority of the transfer court, the federal transfer court to send any AFFF case to Judge Gergel.

Our claims, and we're the master of our own claims, and when we --

THE COURT:  You're just masking the PFAS as AFFF.  You're just masking the case, aren't you?

MR. KEEFE:  No.

THE COURT:  Yeah.  I mean, it's a PFAS case.  If you want to call it a PFAS or an AFFF.  And I'm not so sure I agree with the analysis that Judge Gergel has done.

MR. KEEFE:  Well, I will say, the transfer order is very clear.  AFFF cases throughout the country are directed to

the federal court in Charleston to be administered.

THE COURT:  Yeah, right.

MR. KEEFE:  So one of the -- just taking --

THE COURT:  Right.  But I think what you're saying to me is that because the judge in South Carolina said that those AFFF cases are also called PFAS cases, bring them all to me.

MR. KEEFE:  No.  All PFAS cases that have an AFFF component to them, bring them to me.

THE COURT:  Yeah.  Okay.

MR. KEEFE:  All right.  So what we're saying is our county claims are foam-based claims that will be, should be brought in Charleston.  That's the MDL order.

If I brought the case here right now before Your Honor, it would be transferred to Charleston.  I would say --

THE COURT:  So I understand now what you mean about it's sort of the flip side of the Appellate Division case.

MR. KEEFE:  Yes.

THE COURT:  Because if I approve the settlement, and it will be an interesting scenario, the State and DuPont go before the Court in South Carolina and say, yeah, those claims can't be brought because they've been resolved, and then I suppose the judge down there will have to decide that issue. But, again, where I come back to is, but if the parties convince me that this has been taken into their calculus, I'm coming back to is it fair and reasonable.

MR. KEEFE:  So let's go to "fair and reasonable."  That's really where this whole thing rests.

THE COURT:  But I thought you said it wasn't about the money.

MR. KEEFE:  No; it's about fair and reasonable.  And of course, it's always about money.  I'm not going to tell you it's not about money.  Of course it's about money.

THE COURT:  Okay.

MR. KEEFE:  Whether it's enough money -- whether it's 100 percent, what I'm saying to you is we don't expect that.  Whether it's enough money and whether the risk will be transferred by this global release to the payors, the taxpayers in our case, the rate payors in Mr. Carney's case, to the citizens of New Jersey I think is pretty clear.  Eventually it will.

The whole concept of civil actions in environmental matters was the DEP, EPA would go after a polluter, and the idea is polluter pays.  A lot of that money went to abatement well before NRD and Brad Campbell and our predecessors who focused on NRD, and the polluter didn't pay, right?  The water providers in New Jersey didn't get 100 cents on the dollar.  Judge Gergel made that clear.  Our clients who litigated that case, who accepted those settlements, who agreed it was fair, reasonable and adequate, who agreed to that limited release understood it was a lot of money.  It wasn't enough.  It wasn't

perfect.

THE COURT:  Okay.

MR. KEEFE:  The same things you're struggling with. Our point is, the counties who have AFFF claims that are being managed and adjudicated should be in Charleston; that there shouldn't be a release.

Your Honor asked about -- I wrote down the exact words -- basically what was the check, statutory, what's the check on parens patriae?  And I'll say two things.  One is the concept.  The parent acts fundamentally where it has the right and where those for whom they act on behalf can't act.  That wasn't the case in the water case.  Happened in Charleston.  It will happen with airports.  It will happen with sewerage authorities.  It is happening now just the way the judge structured it with all these sick firefighters and airmen.

But the question that the Court is grappling with is the scope of the release.  When you settle a case in this courtroom, of course the defendants want as much peace as they could get for this case.

This case before Your Honor, which was litigated, tried by some of the best people you're ever going to find has nothing to do with the foam on the county properties; it just doesn't.  And I am -- I am -- I would love to say, okay, Judge, you know what, I'll bring my claim here if there's no JCO.  I'd love to stay in New Jersey.  As nice as Charleston is, I'd love

*United States District Court*
*District of New Jersey*

to stay here.  In fact, we started here with Judge Rodriguez and we were removed by DuPont.

So the fact of the matter is, is it fair to give it that type of release, not "a release"?

THE COURT:  And that's where you're going to have to persuade me, because you're telling me -- this is how I'm hearing it, okay, you're telling me the State hasn't yet injected itself into the MDL.  The counties haven't yet injected themselves into the MDL.  You're telling me that there's still time to do that under the case management order.

MR. KEEFE:  Yes.

THE COURT:  Fine.  The State says in its calculus that this is all caused by PFAS, okay.  These AFFF claims really are PFAS claims.  It's all one in the same.  So rather than all of us injecting ourselves into the MDL, we have decided on a global resolution.

So you would have to persuade me somehow that that resolution is not fair to your clients.  Again, I kind of feel like now I'm talking to Mr. Carney again, it can't be speculative.  It can't be hypothetical.  You have an idea, kind of, of what kind of claims are being settled already because you've got the benefit of the judge's ruling in South Carolina.  Your clients go down to South Carolina, you file a lawsuit.  You recover a million dollars.  The State stands before me here today, pretending, and says this is all in our calculus and we

determined that the approximate value of the damage to your clients is a million dollars, what are we doing?

MR. KEEFE:  I would agree.  But we don't -- so it's the State's burden.  I would agree with --

THE COURT:  Well, he hasn't -- you haven't even let him stand up yet.

MR. KEEFE:  No, no.

THE COURT:  And he's got a lot to answer, but then you really don't have a beef.

MR. KEEFE:  No.  The --

THE COURT:  You don't really have a beef.

MR. KEEFE:  Yes, I still do.  And the reason I do is because he's settling a claim that he doesn't have the authority to bring or settle in this courtroom when the --

THE COURT:  So now you're arguing about parens patriae again?

MR. KEEFE:  The scope of it, not the concept.  The scope of whether the State has the authority to do an end-around a federal court order that says all AFFF claims must be brought here.  "Well, I'm not going to deal with Judge Gergel."  It's forum shopping.

And, by the way, Judge, what's really happening is the defendants are sending a message --

THE COURT:  But you don't -- I think --

MR. KEEFE:  -- by getting a scope of a release that

they know -- again, I use Kidde because it's a bankruptcy workout; that there's these categories.  I could go on about what Judge Gergel has done and how he's managed the case.  What they're doing is running from that process to say to the State, hey, look, we were under fire with you here in New Jersey on these cases, we want to settle those cases, but we want this big release.  Because if they get that release here, they do an end-around the federal panel that sent everything to Judge Gergel, around the MDL, all the work that's been done down there to say, "We don't have to deal with that."

THE COURT:  I -- I --

MR. KEEFE:  We're going to get a New Jersey judge to agree and bless this global settlement, and, Judge Gergel, don't worry about the federal order, don't worry about the cases that are down there.  You don't have to worry about future airport claims.

THE COURT:  You want to know what I'm thinking?  I think you're being unfair to the parties, okay.  Because what you're saying, and this is how I hear it, you'll tell me differently, I think you're being unfair.

You're saying that -- you're accusing these parties of violating a court order.  That court order says if you have a claim, you should bring it here, okay.  The State has done its analysis and it believes it is protecting you, okay.  There's nothing -- there is no court order that says,

*108*

"Mr. Keefe, you and your clients must sue DuPont, bring it to South Carolina."  It says, "if you have a claim, bring it to South Carolina."

The State is trying to persuade me that they are looking out for your clients.  But I just am not persuaded by this argument that somehow they're violating Judge Gergel's order.  I just don't think that's a fair argument.

MR. KEEFE:  Well, the gravamen of -- if I stood here on behalf of New York/New Jersey Port Authority, Newark Airport, a municipal airport and say, Judge, I have the right to bring this claim and the State says, well, we have the right to resolve all global PFAS claims, and we had the time to do a hearing before Your Honor and say here's our exposure, it is AFFF, here's the transcripts from Judge Gergel, and, by the way, my cause of action hasn't accrued yet, but they're foreclosing, and that's kind of the struggle that I heard in the colloquy between the Court and Mr. Carney.

We're trying to get our hands around a very big, complex problem of what ifs.  And Your Honor's point is, hey, we need settlements.  They're good.  We agree.  Judge Gergel said it's good.  These folks did a good job.  But the release is too broad.  So the request is:  Carve out the AFFF cases. It gives due respect to the federal transfer court and that order which says any AFFF case goes here.  That's -- I don't mean to be hard on people I respect.

THE COURT:  It's -- okay.  I'm not --

MR. KEEFE:  It's just too far.

THE COURT:  Okay.  I understand what you're saying. I'm not going to carve it out if I find that the settlement is fair and reasonable and protects your claim, just like I'm not going to do the same for Mr. Carney's clients if I find that it's fair and reasonable and doesn't sock it to the residents.

So I do find that we're kind of going back and forth in circles to the point, which is, it is going to be the State's burden.  Mr. Jackson, they're all listening to me. Persuade me why this is fair to the political subdivisions, to the utilities, persuade me.  And persuade me that these citizens of this state are not going to get socked.

MR. KEEFE:  And I look forward to hearing that as well.

THE COURT:  Okay.

MR. KEEFE:  I would just say, up until this point in terms of why did we intervene in the JCO, and there's been discussions amongst county counsels and county officials, what is our case being settled for?  What is fair?  What is fair?

THE COURT:  I know.  And I'm just a little like -- I'm a little like whatever because, I mean, you folks stand up before me and say it's not really about the money, but, you know, I hear you say that, but --

MR. KEEFE:  No, I didn't say it wasn't about the

money.  I said we don't expect 100 cents on the dollar.  And what I don't know from the papers, from the JCO, and what we've been told in the papers is, we got your best interests at heart.  And I'm just saying, "Show me, Judge."  And if the "show me" and "show the Court" is that they're going to --

THE COURT:  See, that's -- okay.  That's where we kind of are going to part company, you and those in my jury box.  If you folks had just come to me and said show me how we're being protected, I'd have no problem because that's what the State has got to do.

MR. KEEFE:  Uh-huh.

THE COURT:  But instead, I've spent, you know, hours and days and days arguing about the State's authority.  Now you've all conceded that.  And Mr. Telsey stands up and says it's not about the money.  It is about the money.

MR. KEEFE:  It is.

THE COURT:  You folks -- well, to some of you.  To Mr. Telsey, he just wants to pursue his litigation, which he'll do.

You folks just want some assurances that the monies are going to be earmarked and that you're going to be taken care of.  So why don't we just get to it?

MR. KEEFE:  Your Honor --

THE COURT:  Please don't stand before me and say we're violating Judge Gergel's order.  That's just -- it's

wrong.

MR. KEEFE:  It's not my intention to be wrong.  It's my intention to --

THE COURT:  No.  But you're accusing them of violating an order.  They're not.

MR. KEEFE:  I think if it's an AFFF case, that's where it should be.  That's my position.  I'm not accusing anybody of being underhanded.  What I'm saying is, is that these claims brought before Your Honor had merit and they should settle, and you should approve them.  You should approve the NRD.  And we've been told in the papers, and I've been told personally, hey, do what you have to do, to the amicus, but we're not going to consent to the Intervenors.  That's it.  That's all I've been told, read the papers, read the papers.  And the papers say, well, we can't really tell you about the allocation, because it's not in the JCO.  I can't read it anywhere.  So the State hasn't in its papers so far, and we'll hear --

THE COURT:  About the what?

MR. KEEFE:  About the allocation of funds.

THE COURT:  Yeah, right, I know.

MR. KEEFE:  And when we talk about what gets paid when and to whom, it's clear we don't have answers to that.

I would say, though, that the gravamen of county claims -- and I'll make this point if and when we ever chat --

is AFFF.  And that was not what was before Your Honor.  And the idea that you're struggling with, that Judge Gergel struggled with is what is the scope of the release and what is fair.

I think the defendants are entitled to peace, to a certain extent.  I think the State is entitled to the public trust doctrine and NRD.  My problem isn't with the concept of parens patriae; it's that they've taken the whole bite of the apple.

I heard somewhere in the papers the counties want another bite of the apple.  We haven't gotten our bite yet.  It's not our time yet.

But for the State, with the defendants, has done a sweeping scope of the release.  And I look forward to, Your Honor, to frame the issue correctly.  Not arguing over parens patriae; the scope of it, yes, but what has the State done?

THE COURT:  Well, it's the scope of the release.  You don't like the fact that they are releasing your AFFF claims.

MR. KEEFE:  That's right.

THE COURT:  Putative AFFF claims.  Mr. Jackson says they really are one in the same.  They're PFAS/AFFF claims.

MR. KEEFE:  And all AFFF cases, every single case of the tens of thousands in Charleston are PFAS cases.

THE COURT:  Yeah, right.

MR. KEEFE:  Okay.  So I'm making a specific distinction about AFFF.

*113*

THE COURT:  Got it.

MR. KEEFE:  Thank you, Your Honor.  Appreciate it.

THE COURT:  Thank you, Mr. Keefe.

Okay, Mr. Jackson.

Oh, yes.

MR. ORLANDO:  Yes.  If I may.  It's related to that.

THE COURT:  You want to talk to Mr. Jackson?

MR. ORLANDO:  No.  I want to talk to Your Honor about Mercer County, because we have filed claims in the MDL.

THE COURT:  All right.  Real quick.

MR. ORLANDO:  My name is Jason Orlando from the law firm Murphy Orlando appearing on behalf of the County of Mercer.

Thank you, Your Honor, and thank you for allowing us to intervene and be heard today.  We really appreciate it, and appreciate your time.  And, again, I'm going to be brief because it's piggybacking a lot on what Albert said in Carneys Point, as well as a little bit of what Mr. Keefe just said.

We represent Mercer County.  Mercer County has filed already in the MDL.  They have filed, and they filed -- the docket number is 2:25-cv-00866.  It was filed in February of 2025.  So that is currently pending.  So similar to Mr. Telsey, we have the same concern that the release would release our claims that are already pending.

THE COURT:  Uh-huh.

MR. ORLANDO:  And the State might be a party to its own claims in the MDL but not to our claims.  So we are concerned about those being released.  And this is why we're concerned, because Mercer --

THE COURT:  Let me ask this question.

MR. ORLANDO:  Sure.

THE COURT:  What's the wording in the release?  Pending?  Current?  Future?  Somebody tell me.

MR. JACKSON:  Give me one moment, Your Honor.  I'll look it up while we're doing this.

But without question, the intent of the parties was to release all claims between the State of New Jersey and the political subdivisions.

THE COURT:  Okay.  But words matter, so let's see.

MR. JACKSON:  All right.

(Pause.)

MR. KURZWEIL:  It's page 37 of the plaintiff's JCO, Your Honor.

THE COURT:  Page 37?

MR. KURZWEIL:  Page 37, 36 and 37.

MR. JACKSON:  I'm sorry, Lanny.  You're looking at the DuPont agreement, which page?

MR. KURZWEIL:  Yes, I am.  I believe I've got the DuPont agreement up here.

THE COURT:  Okay.  So it says "were" or "could have been."

Okay.  So it does seem to cover -- it does seem to cover claims that have been filed, if I'm reading this -- I'm reading it a little hastily, but I think it says this.

Okay.  All right, Mr. Orlando.

MR. ORLANDO:  Right.  That's our concern, Your Honor.  I'm not sure.  We're not here challenging the State's parens patriae -- I hope I pronounce that right -- power.  In fact, we represent other local government entities throughout the state, and we have not sought to intervene on their behalf here because they haven't yet brought claims, but Mercer County has.  They have a claim.

THE COURT:  Okay.  So I'm going to ask the same question that I've sort of been asking your colleagues, which is you have an idea -- so I'll pose it as a hypothetical.  You filed a claim.  You have an idea of what you believe that claim is worth.

MR. ORLANDO:  Correct.

THE COURT:  Everyone in this courtroom agrees you're not going to get 100 percent on the dollar, at least you've said that.  If the State were to guarantee or convince you or convince me that somehow we're getting close to what you think your claim is, what are you complaining about?

MR. ORLANDO:  Well, we're complaining about just that

process, and we have tried to engage with the State in those conversations.  We had multiple conversations with DAG Farley, with Mr. Reap regarding Mercer County's claims.  We believe that they are -- they could be in excess of $100 million.  And I'll tell you why it's a concern specifically for the County Executive and for Mercer County, because Mercer County has 300,000 residents.  I believe it is -- it's in our papers, I think it's the 12th or 13th largest county in the state.  However, it has three major sources of the fire foam, firefighting foam contamination, PFAS contamination from the foam, which is why we're in the MDL, the AFFF.

We have an airport that is not run by a multi-state agency like the port authority, so it's run by Mercer County, owned and operated by Mercer County.  It also owns a jail which supplies its own water.  And it owns and it operates a fire training academy, which obviously the firefighting foam with the PFAS is all over it.

So those are going to be three substantial remediation projects to be borne, unlike the Port of Authority of New York, New Jersey, or down here in South Jersey, the Delaware River Port Authority, you know, that can raise tolls or raise revenues.  The only access for Mercer County to do that is to raise taxes on its citizens.

So there is a huge concern.  And there's a concern that's exacerbated by the lack of clarity in the settlement as

to how these funds are going to be disbursed.  Like if your Honor were to tell us, like, hey, you know, as part of the settlement, Mercer County will get $80 million, $60 million, whatever it is, then, yes, we could go back to the County Executive, and perhaps that would alleviate, because it is about the money.  And for Mercer County, it's about the money for Mercer County and for the residents of Mercer County.

So, yes, it could be like -- but we want the ability -- we don't believe from our conversations thus far and from what we've seen in the settlement, we're just not comfortable saying like, oh, yeah, this settlement is good for us, because we don't know how the money is going to be disbursed.

THE COURT:  And that's why I think we're getting somewhere, okay.

MR. ORLANDO:  Right.

THE COURT:  I think the objectors have valid concerns, okay.  And it just strikes me that had the parties gotten together and had more fruitful conversations, perhaps we could have saved a lot of time.

But it just strikes me that what the objectors are saying is, we just don't know and that's not fair to us.  And that's a valid point.

MR. ORLANDO:  Correct.

THE COURT:  Okay.  What's not a valid point is, well,

you just -- you can't force us to release everything because we want the ability -- that's where Mr. Carney and I somewhat part company.  So I think we're getting somewhere.

So if there's not anything else, I'm going to pick on Mr. Jackson.

MR. ORLANDO:  Well, yes.  And I would just -- just to reiterate, too, I do think that with the parens patriae authority and the ability to release claims, and we've done some research on this, and I've not found a definitive answer, and I don't know if Mr. Jackson or the State has, but I don't know if that authority can extend to release claims in an ongoing litigation to which the State is not a party.  So I don't know -- I don't believe legally the State -- I think the State could release claims if Mercer County had yet to file. It could under its parens patriae power release claims.  But we've already filed.  I don't think those claims can be released by this settlement.

THE COURT:  So who decides that issue, me or Judge Gergel?  Because it's the same issue with the Appellate Division case.

MR. ORLANDO:  Right.  Well --

THE COURT:  Which I find somewhat interesting.

MR. ORLANDO:  Yeah.  I mean, I think it's -- as far as we can tell, and we have done research on this, and, you know, I'm not going to --

THE COURT:  But you're not going to challenge it if the State convinces you you're going to be treated fairly. See, this is -- we're going in circles.

MR. ORLANDO:  Right.  That could be true.

THE COURT:  We're going in circles.

Okay.  Thank you, Mr. Orlando.

MR. ORLANDO:  Thank you.

THE COURT:  So, Mr. Jackson, here's the two big questions.

So you have to persuade me that at the end of the day, I don't think -- I don't think there's any objection to the State's authority to do this.  I think we've resolved that. And if not, someone will speak up, but I think that's been resolved.

So you have to persuade me that you are acting in the best interest of the citizens.  And at the end of the day, the citizens aren't going to get these -- you know, their bills aren't going to be higher in five years or ten years or the income tax bills are higher or lower, because at the end of the day, that's not for the benefit of the citizens, number one.

And number two, you're going to have to provide clarity to, in general, but primarily to these objectors so that they can make a more precise, if they chose to do so, objection.  Because right now they're just sort of objecting saying we just don't know.  And I think those are all valid

*120*

concerns.

So you have the floor.

MR. JACKSON:  Thank you, Your Honor.

Let me -- may I, if you don't mind, we've gone through kind of a litany of issues, I'd like to hit just a couple points by Mercer County, address the AFFF issue.

THE COURT:  Okay.  How ever you wish.

MR. JACKSON:  And then I'll go back to these things.

So, first of all, with respect to the Amici and the Intervenors, without question during the comment period and up to this point, there have been a lot of conversations with different parties about what does this mean for me.

And some, you know, basically said, look, if you could give us $10 million or if you could give us $100 million, we'll go away.  The State is not doing that.  The State is not in a position to do that at this moment, and we're going to explain to you how the monies will be distributed.

THE COURT:  Okay.

MR. JACKSON:  But let me just say that of the $1.2 billion that is going to go to natural resource damages and to PFAS abatement, there is an annual process where the needs of all of the public entities are going to be evaluated, and we'll get into that, and that will be on an annual basis.

The payment structure of the settlements was intentional for a couple of reasons.  One, it helped with the

cash flow of the defendants.  They were able to pay.  But importantly, two, is because the State has an annual process when every year -- I think it's next week -- they go through and evaluate the needs of these water infrastructure entities, local governments and treatment plants, and they distribute -- this year it was almost $2 billion for water infrastructure, capital improvements, PFAS abatement.  There's a lot going on that's happening and we're going to get to that in more detail.

Mercer County got $38,312,400 as part of a filtration, liquid mechanical filtration system and project, including a PFAS study, as part of these distributions.  There is money going from the state taxpayers to these local governments for PFAS right now, and it will continue.

What the State is not able to do today is to give everybody that's here today, whether they've asserted a claim or not, some amount of money that they might expend in 20 years based on a regulatory system and process that hadn't even gotten there yet.

A lot of the AEA commentary, they put out a blog post encouraging the members to be here today, and they even said they're more concerned about the surface water quality standards.  And that's what they're really anxious about, because of those surface water quality standards, which are at the quantification limit of 2 parts per trillion, not some microscopic number below that, because it's about protecting

*122*

the water system.  And nobody has asked them to put a filter on the end of a sewage pipe, no one.  No one has asked them to do that.  What they have been asked to do is to look at the industrial dischargers above them that are putting PFAS into their POTWs.  And we have asked them to do that.  And we're going to talk about that a little bit more as well as part of the systematic approach.

And real quickly on the AFFF issues.  I represent the State of New Jersey in the AFFF litigation.  In 2018, the JPML created a multi-district litigation regarding AFFF, the firefighting foam.  3M and Tyco asked that it actually be brought in to include all cases regarding PFAS.  And the JPML said, no, that's not going to be the case.  That's too broad.  It would include industrial sites and all the thousands of uses of PFAS that are in our system every single day.

As you know, there's over 15,000 of these chemicals and there are hundreds of industries that use this chemistry every day.  If you're wearing waterproof clothing, it's in it.

So the MDL is about AFFF.  New Jersey filed a claim, a statewide claim in the AFFF MDL for AFFF sites.  And it included -- and we put this in the letter responding to Mr. Keefe's late motion to intervene.  The State's case is brought statewide, in parens patriae, public trust, regulatory capacities against 3M and DuPont and the numerous other AFFF and PFAS defendants, seeking cleanup and removal costs, natural

resource damages, and it also actually expressly seeks --

excuse me.

THE COURT:  What's the status of the claim?

MR. JACKSON:  It's -- it's resolved pursuant to the JCO.

THE COURT:  No.

MR. JACKSON:  The rest of it is continuing with respect to the other litigants and the other defendants. New Jersey also sued the United States of America for not following New Jersey's drinking water standards at Joint Base Dix.  And so we basically said you've got to follow our drinking water standards and they weren't.

So the AFFF claims as to other defendants are there and they're proceeding.  New Jersey is resolving its claims and the claims of its agencies and sub-sovereigns for PFAS from these two defendants, period.

And just like the state of Ohio did, which I also represented, when they settled their claims regarding the Washington Works facility in West Virginia, the claim also released the claims from the state of Washington to the extent that it has the authority for the local governments.

And that is -- Delaware did the same thing.  If they're resolving with 3M and DuPont, the problem is the PFAS gets into the cycle and it mixes and you can't tell where it's from.  And so if you were resolving a claim for PFAS, whether

*124*

it's from your Gore-Tex clothing or from, you know, an AI chip or some other use or foam, the result is the state is resolving its claims for PFAS.

THE COURT:  And I don't want to spend more time on the issue, but it really is the Carneys Point issue; is it not? So if I approve the settlement and the release, nothing prevents Mercer County from trying to persuade the South Carolina judge differently.  It's a res judicata.  The State is back there saying -- well, how does that go?

MR. JACKSON:  I guess to the extent that it goes to the scope of the release, I mean, I --

THE COURT:  I guess it wouldn't be the State.  It would be the defendants.

MR. JACKSON:  The defendants would be arguing, that's correct.  It's not the State.

THE COURT:  All right.  Okay.

MR. JACKSON:  But without question, it all ties to the scope of the release and the power of the State's ability to release those claims.

Okay.  Let me take just a step back because there's been a lot of things said that I just -- I need to kind of clarify.

I want to be clear first about what is being released here and what is not being released here.

The State and the releasors, the agencies and

*125*

subdivisions, have released claims against these parties for natural resource damages, as we've discussed.  The State did not release, in the same way anyway, claims for remediation. And I want to be really clear because -- and I'll start with the DuPont settlement, then we can talk about the 3M settlement as well.  They both did the same thing.

First of all, they have agreed to resolve these litigations, including claims for PFAS, at these four industrial sites.  The four industrial sites, Chambers Works of course is, you know, the subject of the trial.  But Pompton Lakes, Parlin, Repauno were all on the heels of this.

And those claims at those four sites are -- two of them anyway, at Pompton Lakes and Chambers Works, are two of the most notorious sites in New Jersey.  And we have taken extraordinary pains to have extensive remediation at these sites to the satisfaction of the agency.  There is $1.2 million of RFS assurances built into these settlements which go to these ISRA issues.  There's another $475 million of financial reserve funds behind that.  Behind those, DuPont, EIDP, has unconditional obligations to remediate these sites to the satisfaction of the agency.  And that goes on until it's done. There's no release as to the remediation at those sites.

Likewise, let me pull up the language exactly.

And this is just super important as you look at this, and then let me talk about *Exxon*.

Paragraph 30 of the DuPont JCO, if I can find it, states that remediation is required at each of the industrial sites until each site is fully and finally remediated pursuant to the laws, regulations and guidance, and receives a final approval basically from the department and the federal government.

The next few paragraphs discuss what happens if the parties that are remediating those sites aren't able to pay. You go through the -- this is the process where you have the RFS procedures and then the backup fund and then DuPont's ultimate obligation.

The release itself --

THE COURT:  What page is that on?  My thing isn't working.  What page?

MR. JACKSON:  I'm sorry, it's page 71 and 72 --

THE COURT:  Okay.

MR. JACKSON:  -- of the DuPont JCO.

So I guess maybe, if you go to the -- well, look at the definition of released claims in the DuPont JCO, released PFAS claim.  It expressly excludes any remediation obligations under sections 6, 7 and 8.  So to be clear, it's expressly excluded from the definition of released claims.  These obligations continue until they're done.

What I'd like to do is turn to section 12, the reservations, paragraph 55, which is on page 84.  "Nothing in

this JCO shall be construed as precluding the settling plaintiffs from taking any action permitted by law that they deem necessary or appropriate to protect public health and safety and the environment, and to enforce the environmental laws of the state, to the extent those actions are not inconsistent with the resolution of liability effected hereby."

The State is still pursuing and able to ensure the public health.

Let's look at 56.  This is hugely important. "Notwithstanding anything else to the contrary in this JCO, the dismissals, the releases, and the covenants not to sue with respect to the released industrial site claims and the released statewide PFAS claims do not relieve any settling defendant or any released entity of their obligations to perform and/or fund remediation at and from the industrial sites in accordance with the federal and state statutes, regulations, and guidance."

Next sentence.  "Further, for the avoidance of doubt, this JCO does not relieve any settling defendant or any released entity of any obligations that may exist under federal and state statutes, regulations, and guidance to perform and/or fund remediation at or from any other sites currently or formerly owned, operated, or otherwise controlled by any of the settling defendants or any released entity anywhere within the state of New Jersey."

If you look at the definition of remediation.

THE COURT:  Which page is that?

MR. JACKSON:  The definition of remediation is --
actually I think in the JCO what it does -- I'm sorry.  I'll
look, but I think it's going to cite us to the tech regs.

THE COURT:  I found it.  It has the same meaning as
7:2C.  So what is that?

MR. JACKSON:  That's the technical regulations --

THE COURT:  Yeah.  What's the definition?

MR. JACKSON:  -- which says, remediation or remediate
means all actions to investigate, clean up, or respond to any
known, suspected, or threatened discharges, including the
preliminary assessment, site investigation, remedial
investigation, and remediation action or any other portion
thereof provided however that remediation or remediate shall
not include the payment of compensation for damages to loss of
natural resources.  So it's not NRD, but it's to clean up
these, you know, discharges from these other facilities.

Real quickly, paragraph 58.  Similarly, "Nothing in
the JCO shall limit the department's right or ability to seek
to have the settling defendants or released entities take any
action consistent with the department's powers and authorities
to evaluate, minimize, control, or eliminate discharges,
including industrial sites discharges or any other discharge
within the state that occur after the JCO entry date."

The point is that the State has continued the

*129*

obligation and the right to make sure that these industrial facilities and the remediation of discharges from them will continue.  The State has not given up the remediation obligations.

In the 3M JCO, we have an exactly similar situation. There, actually they were fewer facilities and they listed the 30-some-odd facilities that were --

THE COURT:  It's not just limited to the industrial sites, you're saying?

MR. JACKSON:  Correct, the remediation obligations.

THE COURT:  Yes.

MR. JACKSON:  Correct.  They must continue.  And with 3M, since they didn't have any -- remember, 3M had no active sites in New Jersey, none, and they were never known to be a discharger of PFAS into the state.  They were sued as a supplier.  And we had the big fight about did that qualify as in any way responsible or not under the Spill Act in the context of Chambers Works supplying the facility with PFAS.

Statewide, what we've got was 36 facilities, I believe it was, that were formerly owned, some are office buildings, some are warehouses, there were some manufacturing facilities.  3M checked its records.  We checked our records. They found that there were three that had -- at some sites today there were PFAS actions going forward.  And those actions, whether they were from a later owner or operator or

*130*

prior, I don't know, but the remediation obligations at those sites also continues, not released.  And then if there is another PFAS site determined pursuant to paragraph 30 -- sorry.

THE COURT:  It's 3M still?

MR. JACKSON:  Yeah, I'm in 3M.

48.  There are triggers if a site is later discovered to be a PFAS source, that was associated with the time period that 3M owned or operated the facility.  Under certain circumstances, they're still obligated to address the issues at those sites.

So all these sites that were owned or operated throughout the state by both defendants have ongoing remediation obligations that will be taken care of by these defendants.  And those claims have not been discharged.  And that's one of the things I wanted to be really clear about. The PFAS natural resource damages and the PFAS abatement statewide is fundamental to what we have done here.  But especially as to DuPont, because of the nature of those industrial facilities, those obligations continue.

THE COURT:  Now, translate that into what the objectors are saying with respect to their clients.

MR. JACKSON:  So -- well, one of the reasons I wanted to address this was the commentary that the 3M facility might be releasing -- discharging into a POTW, one, it's not, because it's not a 3M facility today.  There's somebody else there if

there's an active operation.

But the POTWs in particular, their claims are for and their obligations under the ability to regulate are looking at the industrial dischargers that are discharging into their system, right?  There's some 600 I think they said of the 17 facilities at issue, that have a permit to release industrial waste into the treatment works.  What the State is doing is in creating a surface water quality standard is actually enabling these POTWs to look up and tell these industrial dischargers, knock it off, stop discharging PFAS into the POTW.  That's the point, is look up and ask the folks that are discharging into the facilities to stop.  And they can regulate that.  And that's the permits that can be changed.  It says that the industrial discharger, the hundreds of industrial dischargers that are discharging into POTWs can do that.

THE COURT:  Nothing prevents them from doing that?

MR. JACKSON:  No, no.  We're encouraging them to do that.  For years the department has asked them to be doing this.  Some have.  Some have not.  But that's the point of this.  Nobody's asking them to put -- these crazy numbers are associated with putting a filter on the end of a sewage pipe.  Nobody's asking them to do that.

THE COURT:  So what is the -- when Mr. Carney stood up and said that his clients received a letter that -- I forgot how he phrased it -- hurry up and get it done or whatever he

said, what's he talking about?

MR. JACKSON:  The fact that the department has asked them to look, to look at the dischargers, the industrial dischargers, and to determine who is discharging PFAS into your system.  What's coming is, you're going to have that obligation, as the 17 agencies, the different agencies, absolutely.  They have the ability to affect those permits of those industrial dischargers.  They have the obligation or will have the obligation.

THE COURT:  Who are not these defendants?

MR. JACKSON:  Not these defendants.  None of them are.  None of them are.

THE COURT:  So what --

MR. JACKSON:  And if it was one of these defendants, the State has the ability to control these discharges.  The State did not release them.  The remediation obligations that these --

THE COURT:  So what's the disconnect?  Now I'm -- what's the disconnect between you and Mr. Carney?

MR. JACKSON:  I believe that the disconnect is there is an extraordinary fear about what the surface water quality standards could mean and what might they have to do in the future.  And that's --

THE COURT:  So why don't you clear that up?  Why don't you help assuage their anxiety?

MR. JACKSON:  Well, there's absolutely ongoing dialogue, I mean, that will take place for years.  The surface water quality standards have not been promulgated.  There is a rulemaking, like you went through the drinking water.  When the State does push it out as a proposed rule, then there will be a notice and comment period and all of these concerns will come in.  And there will be a cost evaluation and an effectiveness evaluation of all these different issues and --

THE COURT:  I know.  But, Mr. Jackson, you're not going to persuade me by saying, Judge, this may or may not happen, okay.  Because if the State's going to change the regulations and they're going to make it very difficult or they're going to put a burden on these utilities that is going to then translate to the taxpayers paying more, there has to be some assurance --

MR. JACKSON:  Yes.

THE COURT:  -- that this PFAS settlement was a positive thing.

MR. JACKSON:  Absolutely.  Absolutely.  Okay.  So let me -- may I?

THE COURT:  Okay.

MR. JACKSON:  I actually -- the Commissioner, who is an attorney, is chomping at the bit and would very much like to address this particular question.  May I let the Commissioner explain this to you?

*134*

THE COURT:  Sure.

MR. JACKSON:  Would you put up slide deck D?

THE COURT:  Just so everyone knows, we're going to break at 12:30.  I need to give my court reporter, my chambers family a lunch break --

MR. JACKSON:  Yes.

THE COURT:  -- and you all a lunch break.  I have a criminal matter at 1:00.  We'll pick up when that matter concludes at 1:30, hopefully around then, okay?

MR. JACKSON:  Thank you, Your Honor.

THE COURT:  Commissioner.

COMMISSIONER LaTOURETTE:  Your Honor, first and foremost, I thank you so much for your time and your patience and what I can tell all morning is your such sincere commitment to the people of New Jersey and making sure that they're taken care of.  And on their behalf, because I am duty bound to them, I just want to thank you.

So the DEP, it's a multifaceted and really unique agency.  In this case, the Court has gotten to know the parts of the DEP that study science and emerging contaminants and that establish policies and regulations to make sure that pollution is cleaned up to protect the health of people and their environment; that we enforce state and environmental laws; and that we make sure folks like these defendants are held accountable.

But as we seek the Court's approval of these settlements, it's, I think, important that we introduce the Court to another part of the DEP that you haven't gotten to meet and its important role as a primary steward of the State's public environmental infrastructure. DEP is in fact one of the largest investors in environmental infrastructure in not just this state but this region through a variety of different programs that we have run for decades.

We invest in publicly -- we invest publicly-administered funds, including those that we procure through settlements like this one, into improvements in water supply in drinking water plants and wastewater treatment plants, flood control, waste management, all the things that you've heard about. And we do that by providing grants. We do that by providing zero-interest loans. We do that through a lot of different ways and a lot of different funding sources that we can show you. This settlement does not stand alone.

You've heard everyone here today acknowledge, right, and the Court itself acknowledges that these defendants don't have infinite resources; that no one in the world of recovering from the realities of PFAS and the mess it has caused will be able to get 100 cents on the dollar. No one expects that. And so it is our obligation in the state government, in DEP in particular, to get everything that we possibly can, but knowing that that's not enough, because we don't get 100 percent on the

*136*

dollar, to couple it with a variety of other resources that we do have access to, that we readily deploy, in order to leverage those different resources off of one another and to promote the greatest amount of investment possible into the infrastructure that needs it so that we do not triple, quadruple, orders of magnitude increase the bills that are paid by ordinary residents that expect their government and deserve their government to protect them.

And so with respect to drinking water and wastewater as well as waste management needs, we are the state agency that is responsible for assessing statewide needs for infrastructure improvement and for administering the state's water infrastructure investment plan.  And I'll run you through just a few steps and I think it might enlighten some of the questions.

First, we obtain and manage infrastructure improvement funds, including those made available under a variety of federal sources of funding, state sources of funding, budgetary processes where we solicit additional funding, settlements, and longstanding existing sources of funding that are replenished every year.

Second, we solicit infrastructure improvement projects from public entities, including drinking water systems and wastewater systems, publicly-owned treatment works that are operated by municipalities, counties, and other political

subdivisions, authorities of all kinds.

Third, we provide technical assistance both through our in-house experts and by retaining contractors to assist localities in the design of infrastructure improvements and in the preparation of applications for funding that we then evaluate under the combined resources that I'm mentioning.

Fourth, we prioritize projects in the order of their funding based on health and safety needs, serviceability, and importantly, affordability criteria that are developed yearly in a public consultation process that includes all of the stakeholders I just mentioned and the local governments, authorities and systems you've heard from today.

Fifth, we develop and recalibrate infrastructure financing packages in each state fiscal year through a public consultation process that considers system needs and capacities and funding fluctuations.  We provide through that process again access to free money, grant-like funds, zero-percent interest funding from the DEP, and we make available from our partners at the I-Bank very low-interest loans that can help to extend the reach of the overall portfolio.  Because the reality is that when we are making improvements to infrastructure, and I stand before you as the national chair for infrastructure among all the state environment secretaries in this country, when we are making improvements for PFAS, it's not the only thing we're making improvements for.  There's existing

infrastructure where costs to improve have been long, for decades, deferred.  So you do these things at scale and you do them together using settlement funds, as grants, using state funds, zero-percent interest loans, making the I-Bank available to extend the reach of the whole.

THE COURT:  May I interrupt?

COMMISSIONER LaTOURETTE:  You may.

THE COURT:  So I hear what you're saying, and all of these resources are available and they are all put to good use, right?  And that's a good thing for the citizens of New Jersey. If you take the settlement out of it, then I think, you know, citizens might expect, because money just doesn't grow on trees and it's got to come from somewhere, and if the state is spending all of this money, they might expect their rates might go up, okay.

But here, you're getting a significant amount of funds to pay for that, that should not be passed on to the consumers.  And so what assurances are there?  It's all great that the citizens are being protected, that's great.  No one's quarreling about that.  But the reason the defendants, I would say, they're settling is because they want -- they too want to protect the citizens, okay.

Okay.  But where does that -- where can I have some assurance that this is really what's going on here, that they are not going to -- I mean, I'm just -- if it's not obvious, it

should be, I'm a little concerned about what Mr. Carney's raised.

COMMISSIONER LaTOURETTE:  So am I.

THE COURT:  Okay.

COMMISSIONER LaTOURETTE:  So am I.  Because unfortunately, in the past, the State of New Jersey has rerouted settlement funds in cases, not like this one because it is the first in the nation.  And as you mentioned, all eyes are on New Jersey, and we sure do want to make sure we are setting an example for everyone else.

That's why our settlement, right, unlike the settlements that were made in the MDL that water systems participated in and are getting $500 million flowing in to just the state of New Jersey alone, those monies aren't definitively tied to an infrastructure improvement, right?

THE COURT:  Okay.  So they'll persuade me.

COMMISSIONER LaTOURETTE:  But ours will be.

THE COURT:  Then persuade me.

COMMISSIONER LaTOURETTE:  These funds will be held in a separate trust fund that we have already began establishing in hopes that we can advance bureaucratic processes while we seek this Court's approval.  That sits outside the State's general fund and will never be compromised, just like our natural resource damage funds sit outside in the same way, right?  That happened several years ago after funds were

rerouted.  That cannot happen.

THE COURT:  Because of legislation, though, right?

COMMISSIONER LaTOURETTE:  What's that?

THE COURT:  With the NRD, it's because of legislation.

COMMISSIONER LaTOURETTE:  With the NRD it happened by legislation.  But we have since that time consistently used, the DEP that is, this trust fund model.  We've done it with our settlements in air quality, from the Volkswagen settlements that were had across the country because of emissions cheating.  We have a dedicated Volkswagen mitigation trust.  This would be established the same way, meaning putting it in that trust.

THE COURT:  Who oversees it?

COMMISSIONER LaTOURETTE:  That will be administered by the DEP specifically.  It will not be subject to the whims of appropriators.  It will be part of the litany -- if we can just advance to the slide, my friends behind me, that shows all the programs that we run; that it will --

THE COURT:  So let me see, because, you know, I don't know if you're --

MR. JACKSON:  There you go.

THE COURT:  The funds in the tobacco litigation, there was a lot of talk about how they were to be spent.  And if you look at the studies and you look at the articles written on the tobacco litigation, very little has gone to tobacco

cessation, smoking cessation.

COMMISSIONER LaTOURETTE:  We are making that impossible.  And I would imagine that with Your Honor's support in this order, should you determine to approve this settlement, that the trust model will be very clear.  And if we need an amendment in this JCO to make that clear, I'm sure we could do that as well.  But the import, Your Honor, I just want to point out because I'm not giving you a suggestion.  I'm giving you the result of a deep analysis that we've done, including evaluating how we can maximize the amount of the settlement funds leveraging them off other sources.

So by way of an example, through an analysis that we've performed --

THE COURT:  Excuse me.  Sorry to keep interrupting.  Do you have a copy of what's on the screen?

MR. JACKSON:  Yes.  It's in the slide deck I gave you.

THE COURT:  Oh, it is in the slide deck, I'm sorry.

MR. JACKSON:  Yes.  It's slide deck D, as in dog.

THE COURT:  Okay.  Because my -- maybe at the break someone can look at my monitor, please.

MR. JACKSON:  Yeah.

THE COURT:  Okay.  Where is it?  D?

MR. JACKSON:  So D, as in dog.

THE COURT:  Got it.

*142*

MR. JACKSON:  And it's probably about page 4, give or take.

THE COURT:  Thank you.

MR. JACKSON:  Oh, 12.

THE COURT:  Got it.  Okay, Commissioner, sorry.  Go ahead.

COMMISSIONER LaTOURETTE:  So by way of an example, based on an analysis that we have performed through the New Jersey Water Bank, which is a partnership between the Department of Environmental Protection and the infrastructure bank that has existed for 30 years, we have evaluated that if we were to even set aside just from the water perspective, right, and this is a discussion that everyone will be involved in through a public process, but as an example for the Court, if we are to evaluate the distinction in needs that you've heard from today, you've heard about needs for investment in water infrastructure, wastewater, drinking water or even landfill leachate, you've heard a bit about that as well, there's separate needs for the cleanup of sites that don't have a pocket to reach in or a deep one.

Those two types of funding sources need to be treated a different way.  When we're talking just about water infrastructure, our analysis was to look at a $390 million number.  When we look at leveraging that funding source, we can grow that $390 million number to facilitate $1.8 to

$2.1 billion of water infrastructure improvement because we know that they don't have enough money for all of New Jersey. And when we look to the MDLs, there's a fine example of that in the water settlements, right?

I mentioned before, the water purveyors settled their claims with these defendants. Approximately $500 million will flow to the state of New Jersey. We're talking about an $875 million abatement fund that we will then maximize off of these other sources.

You've asked several times the question, Your Honor, about the damages of the others here intervening today. I believe the accurate answer to the Court is that they don't know, right? But what we know, because it is our job to assess the impacts to waterways, right, looking at sampling data both from that that is received from dischargers and from our own networks of monitoring, we understand the significance of PFAS loading into waterways, right?

All water is connected, that which runs beneath our feet in the aquifers, that flows through the streams. There is only one water. It's all connected. And we've got to remove the PFAS both before it hits the waterway and before it goes out into the drinking water systems. Only by doing all of those things do we reduce the loadings and ultimately serve the people best and protect their health.

And so this year-over-year settlement matrix that has

resulted from these negotiations bears that in mind.  Because all of these wastewater systems, they need to test -- not all of them have -- to see what PFAS they have.  They're afraid they have it, the ones who don't know if they do, right?  And then we need to, as Mr. Jackson said, go up the chain.  Get those industrial users, who are not these defendants, to apply pretreatment so that those loadings aren't entering the systems and don't become the problem of the wastewater systems.

THE COURT:  Okay.  So talk to me about that.

So has the State sat down -- and there's no science to this, and there's no mathematical certainty to any of this, we all recognize that.  Have you sat down and said in your settlement, when you were having your settlement negotiations, we've looked at all of the studies, we've looked at all of the -- we've looked at Mercer County, we've looked at Carneys Point, you've looked at all of the objectors' clients' potential scenarios, and with that all in mind, you've come up with a number that you think will fairly protect them?  It's --

COMMISSIONER LaTOURETTE:  That is an accurate -- Your Honor's explanation, question, in a way, would be my answer.  Yes, we have done that.

Now, there are many known unknowns here, right?  There are many contributors to PFAS loadings that are not even in this case, those that the State is pursuing in its remaining

*145*

claims in the AFFF litigation, existing industrial users who are discharging into waterways right now that are not part of this case and who we are regulating to eliminate PFAS.

THE COURT:  And the upstream clients of Mr. Carney's clients.

COMMISSIONER LaTOURETTE:  They're going to -- so the delegated local agencies, those 17 POTWs, represent basically the majority of wastewater flow in the state of New Jersey.  We delegate them the authority not to sue on behalf of the State, only we have that.  But we delegate them the authority because they're operating a system.  They are a utility, right.  And they don't just get their funding from residents who flush their toilets but from major industrial dischargers into their systems.

THE COURT:  So you don't agree with him when he says to me what was bugging me; that you were taking away their ability to permit and delegate?

COMMISSIONER LaTOURETTE:  Oh, goodness, no.  We need them.  They're our partners, but we need to imbue them with authority, right, by having standards that are enforceable. They are able to then enforce those standards upon those who they are regulating in our place, and we've begun this for several years.

Back in the beginning of 2022, I issued an administrative order saying to these POTWs, please, work with

us, collect all of the -- test your waste streams for PFAS, right?  Go up your -- go upstream within your network of users to identify where are those significant loadings, send that information to DEP so we can analyze it with you.  And don't worry, we will not use that as an enforcement cudgel against you because we only do this together.

THE COURT:  Was it on PFAS?

COMMISSIONER LaTOURETTE:  Yes.

THE COURT:  And the utilities didn't do that?

COMMISSIONER LaTOURETTE:  Some of them did.  Many of them didn't, right?  It takes some time for that to turn over.

You know, look, our POTWs, they are -- they're good actors.  They are providing a public service.  They've got a lot on their plates.  I don't mean to in any way impugn them, right?  But we have something they lack, which is a statewide appreciation, detailed deeply that they aren't necessarily aware of.

THE COURT:  Why doesn't Mr. Carney feel the same comfort?  Why are you not comforting him?

COMMISSIONER LaTOURETTE:  I think I'm -- I may know things and understand this in a broader way.  But we have, for example, established a working group that is led by the DEP Water Resources Management Program, upon which many POTW, not their lawyers, but their professionals, sit to identify issues with emerging technologies.  What can be applied in the

settings of certain POTWs?  What are the issues that -- like there is a -- there's a sense, I think, that was sewn this morning that separate spheres are operating.

It is unquestionable that the lawyers representing the POTWs and I operate in separate spheres, but the DEP does not operate in separate spheres from their clients.  But these are engineering-level discussions, right, deep, and ongoing for a long time.

There's an entity called the Clean Water Council, right?  The Clean Water Council convenes yearly, and that Clean Water Council evaluates issues like PFAS, making recommendations to the DEP about how best to address these issues.

I'm not suggesting, Your Honor, that any of it is perfect.  This is a big problem.

THE COURT:  No, I don't -- and we're going to end it here and we'll pick back up, and we'll pick up with this.  I mean, it just -- it's interesting to me of this disconnect.  So you've got the objectors, you know, who are representing their clients who have this feeling that the State is just holding them out to dry.  And you stand before me saying we've got their back.  And I don't know why there's such a disconnect about all of that.  It's intriguing to me.

But we'll pick up there, okay?  We'll see you back.

COMMISSIONER LaTOURETTE:  Your Honor, thank you so

much.

THE COURT:  Yeah.  Okay.  All right.

(Recess was taken at 12:33 p.m. until 2:15 p.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Okay.  Thank you.  You can all have a seat.  Okay.  I apologize, longer than I thought.

Commissioner, you're up.

So when we last left off, you were going to continue by telling me why all the disconnect, I guess.  And you were going to connect the dots for me so everybody's on the same page.

COMMISSIONER LaTOURETTE:  So I thought about that question over lunch.  And I think the disconnect comes from a place of perhaps misunderstanding when a settlement like this one is announced, and there is a definite public process to follow about its implementation, yet that's not abundantly clear, and though I've had many personal conversations with folks who are affected by this settlement in some way or another.  You know, if the radio is not on, you're not -- not everyone's hearing the song, right?  So I think it's good that we're having this conversation today.

And I'll do everything I can to resolve any misunderstanding that might be borne of confusion or maybe, quite honestly, Judge, fear, fear of the unknown, right?  It's just human to be afraid of what's coming next.

And as I mentioned, you know, there have been settlements in past years, many years ago in fact, where it was not clear that funding would be made available from settlements and settlements were rerouted to other purposes.  That won't be the case here, right.  And the use of these funds, and, as we mentioned a bit, relative to the year-over-year payments that happen over the course of 20, 25 years, there is a definitive process where folks are identifying their needs.  If you're running a wastewater system or you're characterizing the leachate from a landfill that you own or operate, in many instances that work on a local level has not been as robust as the local water systems or landfills, et cetera, would need to do in order to identify what their needs actually are.

Thankfully, the -- and I'm not saying that that is the case for everyone.  There are plenty of publicly-owned treatment works that have advanced important ends towards sampling and even, to a lesser degree, on design and even pilot testing of PFAS treatment technology.  What we're saying is we want to help you.  This settlement gives us the opportunity to do that, but it doesn't exist on its own, right?

So as the users are -- the users of this funding source I mean -- identifying their needs, they're going to have an opportunity not once, right, every single year, because the projects that will be implemented that will be necessary as a matter of infrastructure improvement, they don't happen all at

*150*

once.  They happen over a long course of years.  And we're very -- we're very used to working in that environment, right?

We have through the programs that we run -- just one quick example.  I mentioned, yeah, we know, based on our own analysis, that we can maximize this funding source, yeah.  I gave you the 390 million example making -- you know, turning that into 1.8 to 2.1 billion.  But over the course of our -- just on the water infrastructure investment side, which has been going on for decades, we've invested $11.5 billion in systems, right?  And in the way that we do that, because we make that -- a portion of that is grant funds, a portion of that is principally forgiven funds, and a portion of that is zero-percent interest and, again, there's access to the private market using this, the triple A bond rating of our bank now.  That process, it has saved taxpayers $3.3 billion, right?

So, again, the ability of the State to sort of look -- not sort of, to appraise the field and to understand those needs, right, is something that we do constantly.  There's a regular needs assessment for investments in water infrastructure that systems participate in.  We use that to guide us, and we'll continue to do that here.

And importantly --

THE COURT:  How often are those done?

COMMISSIONER LaTOURETTE:  Those happen every, oh, goodness, I'm going to -- it's not on an annual basis, the

statewide needs assessment.  Those happen every several years.
I don't want to -- I don't want to give you a wrong answer.
One was recently completed.  And that's done.  One is done in
wastewater, in stormwater, and one is done in drinking water,
right?  And all together between drinking water and wastewater,
we know that over the next 20 years, New Jersey has nearly a
$30 billion need for water infrastructure improvement.  Now,
not every PFAS need is in that number, to be clear.

THE COURT:  What's that number?

COMMISSIONER LaTOURETTE:  What's that?

THE COURT:  What's the number?

COMMISSIONER LaTOURETTE:  $30 billion over the next
20 years.

But that is the nature of water infrastructure.  It
ages, and it can fail when it's not well maintained, and so we
plan that out, right?

THE COURT:  Right.  But have you done any estimates
related to the PFAS infrastructure?

COMMISSIONER LaTOURETTE:  Yes.  We've done estimates
on PFAS infrastructure.  And that varies based on a couple --
what infrastructure is needed to serve, what endpoint is going
to vary by system.  And I'll give you an example.

So when we're talking about a delegated local agency,
you've heard that "DLA" term, right, those are the biggest
wastewater systems, those wastewater systems are not just

serving domestic needs, the residents of New Jersey who are flushing their toilets or taking their showers.  They're also serving stormwater runoff needs, right, and they're also serving, importantly, commercial and industrial needs.

The scale of a PFAS technology that's going to be needed in a wastewater system is going to depend, in no small part, upon how the POTW tracks back the PFAS loadings, meaning looking at their significant indirect users, the commercial and industrial, and working with those commercial and industrials to enforce their own freestanding obligations to reduce or eliminate PFAS loadings into the POTW.

THE COURT:  This is the upstream argument?

COMMISSIONER LaTOURETTE:  The upstream argument.

There is -- and what I think folks are reacting to, to some degree, and, you know, this is not some empirical study, this is my impression, and I spend a lot of time on this topic, I think what folks are reacting to is industrial sources are not the only source of PFAS in wastewater.  There is a problem here in New Jersey and around the country.  We have it better characterized here in New Jersey than most other places in the country.  There is a problem where PFAS is circulating diffusely throughout the environment, right, because it doesn't break down and all the things you know, Your Honor.

And so there is -- I turn on my tap at home, there may be some amount of PFAS in my water, my drinking water, that

if it isn't treated to remove, right, I'm flushing that down the toilet or the drain.  It's going to the POTW.  Those aren't the highly concentrated loadings of PFAS.  We know that those are coming from places like landfills.  We've done these studies, right?

Landfill leachate, for example, is one of the highest -- is the highest source of loadings into a POTW apart from known significant indirect users, and not all of them are known and appraised.  So what we have to do moving forward -- and the funding will help for this.  The funding through these settlements, part of it can be put to this, right?  We'll decide year over year with every -- not the lawyers, but with the actual engineers at the treatment systems how we help support them with testing, how we help support them with our research that we invest in on PFAS destruction technology so that we can enforce against the significant industrial users, and then we have ultimately a much better sense of what that domestic number is.

It is not the case that we will start, presumptively, by putting some giant filter on the end of every sewer pipe. That would be both impracticable and kind of madness.  But we do that together.  And through that, we develop a -- the number that I think the Court is searching for.  I don't think anyone can give you that definitive number.

Now, the last needs assessment for wastewater was

upwards of, for the State, was upwards of $17 billion over that 20-plus years.

We, the Department of Environmental Protection, based on all we know, right, we don't expect that statewide PFAS treatment is going to somehow, in wastewater, exceed the known water infrastructure, wastewater infrastructure needs of the entire state, right?  It's more likely to be less than that 17 billion.

I think about the water systems settlement out of the -- if I could take just another moment, out of the --

THE COURT:  American Water?

COMMISSIONER LaTOURETTE:  The MDL.  Sorry, I'm forgetting my acronyms.  Out of the MDL, right?

In that settlement, the hundreds of drinking water systems, and there are more drinking water systems than wastewater systems by far, right?  So the municipalities, the local governments that engaged in that, right, they came to a calculation that the resulting approximately $500 million that will come to all the New Jersey drinking water systems was the best that they were going to be able to get, and it wasn't going to cover all of their costs, right?

And there are less wastewater systems than those drinking water systems, right?  And we are procuring here far more, right?  You've got PFAS settlements for the drinking water systems upward of $13 billion, right, for the entire

United States.  Here, we're talking about over a billion dollars, if you look at our other settlements as well, because this settlement doesn't stand alone, over a billion just for New Jersey alone.

When I think about fairness and I think about the realities of a defendant like these, and I was a corporate defense lawyer in my career prior to being Commissioner, among doing other things, thinking about how these funding sources are not endless, when I think about the 13 billion across the country for hundreds and hundreds of drinking water systems and 500 million of which is coming to New Jersey and we've got a billion in an abatement fund that we know we can grow through our regular process, I believe, Your Honor, it's the best we can do.

THE COURT:  But how do I -- okay.  I'm going to give you an example, and then you tell me how I get there, and it may seem elementary, but okay.  So the amount that's being -- let's just say that all that's involved here is drinking water. Let's just pretend, okay?

And if the parties were before me asking me to approve a settlement related to drinking water, then kind of what I would do is I would say, okay, if the settlement is for 100 million, and the settlement says that each resident, each home gets a filter in their sinks, then I can do the math.  I can say, you know what, 100 million is going to cover

*156*

100 percent of my residents or, you know, approximately or whatever, it's -- it's -- but what do I grab on to here?

It all sounds good.  And I don't mean this derogatorily, but I need more than, "Trust me, Judge.  Trust the State."

COMMISSIONER LaTOURETTE:  Yeah.  Yeah.

THE COURT:  You've got to help me do the filter system.  You got to help me.

COMMISSIONER LaTOURETTE:  Yeah.

THE COURT:  You got to help me.

COMMISSIONER LaTOURETTE:  Your Honor, I hear that.  And I'm going to try.  And I know that it's hard to hear "trust me" from the government.  I understand that.  And that's not what we're asking.

THE COURT:  And just so that we're clear, it's not "trust me, you're going to take care of the water."  It's "trust me, and we're not going to make you pay for it."

COMMISSIONER LaTOURETTE:  Yeah.

THE COURT:  We're going to take the money that is being given to us by the defendants and we're going to make sure that at the end of the day you're not going to pay for it.

COMMISSIONER LaTOURETTE:  Yeah.  I understand that.  I'm going to answer your question.  I do want to be clear about something, and, again, harkens back to what everyone here has acknowledged, these defendants are not the only defendants that

are paying settlement dollars for PFAS, right?  And we know that with any PFAS defendant, none of them can do 100 percent on the dollar.

THE COURT:  Agreed.

COMMISSIONER LaTOURETTE:  So there is no world in which --

THE COURT:  Agreed.

COMMISSIONER LaTOURETTE:  -- anyone is fully covered and will have to pay nothing.

THE COURT:  I think that goes without saying.

COMMISSIONER LaTOURETTE:  Okay.  I would have felt like I didn't do my job if I didn't say that.

So the --

THE COURT:  No.  And that's why I sort of, you know, Mr. Carney and I sort of had a little back and forth about, you know, that's what he wants me to rule, and I'm not prepared to rule that, okay?

COMMISSIONER LaTOURETTE:  Yeah.

THE COURT:  I'm not.

COMMISSIONER LaTOURETTE:  I appreciate your example of the water filter.

Now, in some instances, if we're using a drinking water example, that water filtration example is pretty apt, right?  We wouldn't go to the faucet and give someone a Brita, but where someone has a potable drinking water well.  And this

settlement will serve those in New Jersey who aren't connected to a water system, right. Those who are here, the lawyers here today are representing systems, right, that are, you know, municipally owned, possibly not all of them are municipally owned. But unaccounted for not being represented in this courtroom at all is the real people who get their drinking water well from an aquifer that's been polluted, and that is 15 percent of the land area in New Jersey.

This settlement will support those people directly. We are already doing that by giving them full home filtration if they have any -- any level of PFAS at all. Doesn't matter what the number is. That's about $5,000 a home. So that is -- that is one example. And we know that that math works out well. So part of this settlement will be specifically dedicated to that, right?

Now, when we're talking about a water system, the size of the water system matters greatly. Now, if we're talking -- and I'll give you the water system example as opposed to the wastewater. The drinking water system, the amount of the expenditure to apply new treatment for PFAS will depend on the size of that system, the throughput of gallons per day. It will depend upon what we call the existing treatment train within a water treatment plant.

Not every plant uses treatment, by and large, they don't, as a routine matter, use treatment that gets out PFAS.

They use other types of treatment that gets out bacterial and other chemicals that are routinely in our water.  They may need to recalibrate their treatment.  They may need to add additional steps to their treatment.  That will be entirely dependent upon each individual water system.

Those water systems that are really large that have a lot of throughput had no treatment before that would deal with PFAS.  If we're using granular activated carbon, for example, to get PFAS out of drinking water and they didn't have GAC in their system before, and most don't, or not routinely at least, then they're going to need to have an additional component of their treatment that they don't have now.

They're not building brand new treatment plants from scratch.  So, say, for example, in Cape May where we need to spend $45 million to build a new treatment plant that will get the water -- that will get the salt out of the water, right, we are adding to an existing asset.  The expense of the additional add will vary greatly.  In some instances, it will be single digits of millions.  In other instances, it could be up to 25 million we've seen in some systems, right?  Because we're already funding the treatment of water systems that have -- we're already providing funding to water systems that have to apply PFAS treatment.  And so we have a sense of those numbers.

It's different in wastewater, right?  But it requires us to look really hard at what those options are.  And the

*160*

systems are going to do this themselves.

I don't recall, Bill, how many water systems are in the -- settled in the MDL, in New Jersey?  2-, 300, something like that?

MR. JACKSON:  Something like that, yeah.

COMMISSIONER LaTOURETTE:  And they determined that of that $500 million number, right, and so think about that for a moment.  And if anybody has that number from counsel off the top of their heads about the number of water systems in the MDL, feel free to say it.

But if we were to just do plain simple math of dividing that 500 million by the number of water systems in that settlement, which is in the hundreds, right, we can already see that they're getting, you know, not a tremendous amount of dollars for each individual system.  Again, it will depend on that throughput.

So looking at that alone, we see that through these types of settlements, you're not -- you're defraying the cost of treatment.  You are never covering the full cost of treatment.  And so we're thinking of this in the same way in the wastewater side.

We've got to do a couple of different things at once.  We've got to track back, disrupt and remove loadings so that we can provide the funding to treat the delta where we'll still need that additional treatment at the end of a treatment

process or at some point in that treatment process in order to remove the contaminants that aren't being removed by getting them upstream.  It's -- it's incredibly complicated.

Do we believe that it's going to be more than the $17 billion assessed for water infrastructure in the wastewater side all across the state?  No, we do not, right.  We do not believe that.

I don't know if I'm helping Your Honor at all.  But I think if we can go back to that slide that we had that's not the -- that has all the different funding sources.

THE COURT:  Okay.  Let me see that, because --

MR. JACKSON:  Slide 12, yes.

THE COURT:  Okay.  Because, you know, I don't know how -- and so I gave you the example of the filters and, you know, what can you give me to grab on to.  Because obviously when you folks sat down and settled, right, you didn't just like -- a number just didn't come out of the sky.  You had projections.  You had reasonable estimates.  You had something.

COMMISSIONER LaTOURETTE:  Yes.

THE COURT:  Otherwise, I don't think you would have persuaded the defendants because they're just not going to take your word for it either.  So is that not something that a court can look at or what?

COMMISSIONER LaTOURETTE:  Maybe -- let me think for a moment and let me try to explain this another way that can help

to -- that can help.

THE COURT:  Yeah.  I mean, am I just not getting it?

COMMISSIONER LaTOURETTE:  I don't think you're --

THE COURT:  You can say yes.  I mean, if I'm not, I'm not.

COMMISSIONER LaTOURETTE:  I don't think that Your Honor isn't getting it.  I think it's -- I -- water is so much more complicated than it seems, right?  So --

THE COURT:  Right.  And I get all of that.  But it had to be that when you folks were sitting around the table, it had to be, you have all kinds of experts and you have, you know, well, we think that for the next 20 years based on our best estimates, it's going to cost X dollars or whatever, it had to be that you relied -- you didn't just pull these numbers out.

Because I'm being asked, and, you know, six eyes are going to be looking at, if I approve this settlement, you know, did I do my job in approving it?  Where did these numbers come from?  I mean, you got to give me something to grab on to.  And that's why I'm giving you the example of putting, you know, filters in the sinks.  At least I can, you know, this times the number of residents in New Jersey kind of gets close to what the number is, but I don't have it.  You folks haven't given me any of that.

COMMISSIONER LaTOURETTE:  Yeah, because it doesn't

quite work that way.  Before I go on, I'll let Bill say whatever he would like, Mr. Jackson.

MR. JACKSON:  I was just going to say that one of the things that -- and I know what you're trying to do, and I understand it, you know, the math.

THE COURT:  Well, yeah.  And it's not -- I don't mean two plus two is four.  I need -- give me at least a good-faith number.  Give me something.

MR. JACKSON:  Right.  So what we can do, and what we have been able to do, and the State as part of the presentation, you know, has evaluated this chemistry and these costs at a macroeconomic level across the state for 20 years. You know, what is it looking like in drinking water?  What is it looking like in public systems?  What is it looking like in private wells?

THE COURT:  You have done that?

MR. JACKSON:  Absolutely.

THE COURT:  Okay.  Where is that?

MR. JACKSON:  I think some of that is in public data and some of that is in expert reports, but certainly with respect to the drinking water, I think there's public data on some of those numbers.

THE COURT:  Okay.  But where -- okay.

MR. JACKSON:  But -- well, with respect to the larger costs and the societal costs, what we have done and what we

*164*

were doing is looking at two or three things.  One, dischargers across the state, not public entities.  So this whole thing is structured to try to protect the taxpayers, right?

THE COURT:  Yeah.

MR. JACKSON:  Because it's the public side that we're trying to not have to endure these costs.  So all the remediation costs that we've discussed, all the dischargers statewide, we basically have accounted for those people paying those costs, other responsible parties, dischargers, the United States for, you know, where they apply to AFFF, things of that nature, where there was a responsible party, not a public entity, we have kind of put that on those buckets.  We also have looked at the costs and the calculus as between dischargers, as I said, versus the manufacturers of the product here.

THE COURT:  And everything that you're saying to me makes sense.  But where is that?  What -- if I were to approve the settlement and a citizen says, well, what does -- how did you get to that number, what would I say?

Well, the State asked me to trust them.  They know what they're doing versus the State persuaded me they looked at this, they looked at, well, they think the U.S. government will contribute this, the industrial polluters, the other ones other than the defendants will probably be responsible for this.  They've done that homework for me.

MR. JACKSON:  Right.

THE COURT:  And they have either persuaded me or not persuaded me.  Why can't you do that for me?

COMMISSIONER LaTOURETTE:  I think I understand the -- maybe the question a little bit better.

MR. JACKSON:  Go ahead.

COMMISSIONER LaTOURETTE:  And I'm sending myself off track on an idea of the cost of a particular filtration.

When we look at it from a macroeconomic level, we know that we have to derive funding from multiple sources in order to create a trust that is large enough on a cyclical basis.

THE COURT:  Right.

COMMISSIONER LaTOURETTE:  Because none of this is going to go away.

THE COURT:  Right.

COMMISSIONER LaTOURETTE:  It is not as though we are going to take $875 million and hand out a grant to each DLA.

THE COURT:  Right.

COMMISSIONER LaTOURETTE:  That would be a horrifying waste of money, right?

THE COURT:  No, but can I just interrupt?  But here's how it goes:  We, the State, have looked at this, we've analyzed it at a macro level.

COMMISSIONER LaTOURETTE:  Yeah.

THE COURT:  A high level, whatever you want to call it level, we have figured, you know what, in our best estimate, our best judgment, this is all -- to address this PFAS issue it's going to cost us X dollars.  We know we got funding here.  We know we got funding here.  We know this.  We know we have the defendants' money here.  We think we're in good shape.

COMMISSIONER LaTOURETTE:  Yeah.

THE COURT:  Where is that?

COMMISSIONER LaTOURETTE:  So that's what this slide is meant to demonstrate, and I think perhaps I'm not explaining it as well from the macro level as I could.

THE COURT:  Okay.

COMMISSIONER LaTOURETTE:  So let me try it again.

So the types of improvements that will need to be made in water systems and in wastewater systems as an example, set aside the other things we've heard about, private potable wells, fire academies that need to clean up soil, et cetera, just the water infrastructure numbers, let's talk about that for a moment.

So we've got a year-over-year system that's demonstrated for you on this slide, right?  The wastewater system fund availability in the last fiscal year was $1 billion, right?  That's available now.  That is around -- you can think of that as an annual number, give or take.

THE COURT:  Okay.

*167*

COMMISSIONER LaTOURETTE:  Think of that as an annual number, give or take, in this system.  In order to reach the amount of investment that will be needed in the subsequent years between one and, you know, 25, as we see these payouts, we know that we need to grow this number by at least 50 percent to account for the likely increases to the needs assessment for wastewater.

And so we've got to create a system that will funnel additional money into the water infrastructure investment plan, some of which will go out as, that I mentioned to you before, "free dollars."  Some of which will go out as loan dollars that get paid back at zero-percent interest rate.  I mentioned to you that we can take that 390 to turn that into 2 billion, right, over time.  And we then grow this -- we then grow this pot so that we are able to address the needs that are 5- to potentially, you know, anywhere between 5- to $10 billion, rough estimating, for the needs wastewater systems will face once they address the significant indirect users.

And we've got to establish that system, lock that money up in trust so no legislator with a bright idea can appropriate it somewhere else, right, so that this system can maximize and grow over and over and over again.

THE COURT:  Is that in --

COMMISSIONER LaTOURETTE:  That is the way that we do this, right?  That 5- to $10 billion, that is the likely cost

to wastewater improvements once you remove significant indirect users.  That is what we need to do.

THE COURT:  Where is what you just said to me other than this chart in terms of evidence?  Because that's persuasive, but you just saying it to me isn't evidence.

COMMISSIONER LaTOURETTE:  I understand that.  I understand that.

THE COURT:  That says to me, the State --

COMMISSIONER LaTOURETTE:  I don't know where in the record in this case because I'm not the lawyer --

THE COURT:  Well, I don't know that it is.  That's the issue, because it's been a settlement.  But that says to me that the State didn't just willy-nilly say, well, just take our word for it, citizens.  But that they calculated what it's going to look like for the next 20, 25 years, they figured out what it's all going to cost big picture-wise.  They figured out the different areas of funding.  They figured out how they're going to take the money, the annual payments that they get from the settlement, and how at the end of the day this all benefits its citizens.  That's what you just said to me.

COMMISSIONER LaTOURETTE:  That is what I'm telling you.  There's a part that I didn't get to, which is that this settlement doesn't plug that whole hole.  It plugs a big part of it.

THE COURT:  Yeah.

COMMISSIONER LaTOURETTE:  But not all of it.  Part of that will have to be through settlements that are still -- through cases that are still pending, but also funding that we expect from the annual appropriation process, which is reliable.  That does occur every single year.

We go every single year in our state to the Legislature and say here are all the needs, this is the projects we know we can get done and we balance that.  So it's not -- I just -- I don't want to sew the impression that these settlements are meant to address all of those needs.  They won't.

THE COURT:  You're not sewing that impression.  But what you are saying to me is that you have done an educated -- nothing is for certain, but that you've done an educated analysis for the benefit of the citizens of New Jersey.

COMMISSIONER LaTOURETTE:  That is correct.

THE COURT:  Right.  But that's not in the record.

It's not part of the -- and I think in order for me to be persuaded that you've done that analysis -- I don't know.  Is it a report that you would write up?  I don't know what it is.  Is it a confidential report that the Court reviews in camera?  I don't know what it is.  But at least it's something that I can grab on to, because I've got objectors, I've got citizens who, you know, who don't think the settlement is fair, and I have to find that it is.

*170*

And saying, well, just take our word for it, Judge -- and I'm not saying you're saying that -- is not going to work, and shouldn't.

So --

MR. JACKSON:  So what we had discussed was perhaps submitting something to you from the DEP, a statement, a document, whatever that report is, that would give you more detail on what this process is.  I know one part of this is ensuring that this money is locked down and spent only for these purposes.

THE COURT:  Is that in the order?  Is that in the consent decree?

MR. JACKSON:  It's in the JCO in multiple places that it's got to be in a trust fund.

THE COURT:  The lock --

MR. JACKSON:  But we don't use that.  You know, we don't use "it's locked down."  This is a consent order.  This is an order of the federal court, so the State is bound by these terms.  And it says the money will go for natural resource damages in a trust fund like this and it will go to abatement funds in a trust fund like that.

So the language is in there, but I will be honest in that with the time we did the settlements, the exact nature of this trust fund, so, i.e., we're going to put the PFAS abatement fund like we did the Volkswagen emissions fund where

it's locked in a trust that looks like this, we didn't know it. So we could actually provide a bit more detail about what that looks like in a submittal to the Court as well just so that it could be considered when you look at all of this.  This gives the detail to the language in here that says it shall be dedicated to this point.

THE COURT:  Yeah.  And the defendants, I can't imagine, object to that.  I mean, do you care?

MS. DUFFY:  I need to confer with my clients, Your Honor.  I'm not prepared to address this right now.

MR. JACKSON:  I believe that that submittal would be okay.  We discussed this idea, that giving you more clarity on the way the --

THE COURT:  Well, the defendants would -- I mean, they don't want the money going to, you know, I don't know, something else.

MR. JACKSON:  Right.  In fact, we are bound in the document, the State is bound to spend the money that way so that they get tax treatment that they want.  So it's actually a contractual term in here as it is.  So they're bound by it. But just to give you more clarity in that regard, that's absolutely the easy part of this.

Certainly there has been a lot of, you know, confidential and other, you know, analysis through time and space.  Some of it, like we said, some pieces of this is very

*172*

much in the public domain as well.  But to the extent that if you would like us to try to provide you some sense of scale and what the Commissioner is saying in terms of how and in some of these other systems, you know, this is --

THE COURT:  No.  The Commissioner --

MR. JACKSON:  This is $2 billion this year going to these programs that we're talking about and how these dollars would layer in on top of that to deal with, you know, PFAS or other issues like that.  We could certainly assist that as well.

THE COURT:  Okay.  So I'm going to require that so that I can be satisfied that this number just isn't being pulled out of a hat.

MR. JACKSON:  Okay.

THE COURT:  Which I'm not suggesting that it is.  Because I need a record.  I need evidence, okay.  So if I'm satisfied, I'm satisfied.

Next question.  Because the other objections are, but then what about us?  What about how do we know you're going to take care of us, right?  The earmarking objections that I've read about.

How do you address that?

MR. JACKSON:  So I'd like to address one piece of that.

So, again, because this is an annual process and the

needs will come up as we go along, some counties are saying we don't have any clue what it will cost us to clean up a particular site.  We think it's going to cost a lot.  We think it's going to cost something, but they haven't evaluated it yet either.  So there's a lack of information on the ground.

THE COURT:  Right.

MR. JACKSON:  You know, at a macro level, we were looking at, you know, PFAS across the state and some other types of issues.  They don't know exactly what any particular site might cost either.  But to the extent that funds are available to assist them on a soil remediation, for example, just as an example, the soil standard is, you know, obviously different than a water standard.  And whether or not soil needs to be remediated depends on the site and the characteristics and what the flow to groundwater might be, and there's a lot to it.  So nobody could tell you today what a particular parcel of land is going to cost until they do that kind of analysis.  And that may not even be done for another decade, which is why actually the annual nature of this is a good thing.

But what we can do is say that we will consider those applications and types of costs in the years ahead when they're submitted.  They don't -- they haven't submitted them.  We don't know them.  They don't know them.

THE COURT:  And they may not have the issues that they're concerned about.

MR. JACKSON:  Correct.

THE COURT:  So where is that in the JCO?

MR. JACKSON:  It's in the annual process, and there's lists of abatements, but we can build in, you know, that type of thing as well would also be considered.  I mean, it's all...

THE COURT:  How would you do that?

MR. JACKSON:  Well, it's within the definitions of abatement fund and within the definition of the project, so it may be a matter of just say these are the ways that we will annually look at these types of applications.

But it has to be a rolling basis when everybody -- you know, when people say, well, we'd like to have $10 million for this, can't do that right now.  There's just no -- there's an assessment that has to happen every year.

THE COURT:  But how -- tell me how we would accomplish that.

MR. JACKSON:  So let's just say in five years from now a particular facility, you know, comes in and they actually now have evaluated their costs and they say we think we need to clean it like this, one thing they would do is they go to the department and say, hey, do we need to clean it up like this or not?  Or what do we need to do?

THE COURT:  Yeah.

MR. JACKSON:  There's going to be a plan.  I think that they could go to the Spill Fund, frankly, depending on the

circumstances, and apply to the State for Spill Fund dollars for that particular project or apply to these PFAS funds that --

COMMISSIONER LaTOURETTE:  May I?

MR. JACKSON:  Please.  Please correct me if I'm wrong.

THE COURT:  But then how -- go ahead.

COMMISSIONER LaTOURETTE:  May I just add something in there?

I think in part where the Court is seeing me struggle is that earlier this morning, a lot of -- a lot of concerns about potential unknown impacts that haven't ever been explored are leaving folks with a sense of anxiety and fear.  You heard about the fear that what if a landfill where we sent garbage we collect from everyone some day becomes a Superfund site and we get tagged with responsibility, there's not a way for any of us to figure out how much that cost would be, right?

And so that is what leads us to, as a matter of state policy, evaluate this as we do environmental infrastructure needs.  And on the screen, I don't know if Your Honor can see that, you know, the New Jersey Environmental Infrastructure -- or it's called the Environmental Infrastructure Trust actually explains how it is our obligation, the states develop this priority system for ranking the funding and developing criteria and ranking the needs and distributing funding every year,

*176*

because the needs aren't completely known.

There are some of my, quite honestly, my colleagues in here, PVWC -- or PVSC, Passaic Valley Sewerage Commission is here, they're doing a lot of work.

(Court reporter clarification.)

COMMISSIONER LaTOURETTE:  Passaic Valley Sewerage Commission, they're doing a lot of work and running pilot scale programs to get PFAS out of their end waste stream.  But even they're not entirely sure yet, right, because they've got to run a pilot test and then you move on from there.  But our job is to create that funding source and rank and distribute every year.

And so the question becomes, what if there's not enough money?  And if we can go back to that other slide with the chart, right, it is not as though we haven't thought about that.  Of course we have.

And Mr. Jackson is mentioning the Spill Fund, right?  It is the obligation under the New Jersey Spill Compensation and Control Act, which created the Spill Fund, which is annually capitalized at around $24 million, to make sure that we are the payor of last resort.

If someone is affected by a discharge of hazardous substances that they did not create, that they are not responsible for, they get relief from the Spill Fund.  And we are required, the State is required to pay them if they are an

innocent party, if they did not contribute to it.

And so we go through that every year, too. And the DEP has to go to the Legislature and say this is a claims process set up by law, we must pay this much more this year. It happened last budget cycle. They had to appropriate 4.8, 5.8 million more dollars into the Spill Fund to pay those claims.

And so this, again, sits amidst all of these funding sources. The Spill Fund is an incredible backstop, as is the Hazardous Discharge Site Remediation Fund, which only local governments have access. That, too, is capitalized every year. That must pay out municipalities. And so we've got to look at these different buckets of funding as they come in.

And today we heard a bit about how folks don't know, they haven't assessed, they haven't filed claims, right? Those claims are probably years away from being filed because we've got tens of thousands of injured people who have at least alleged personal injury claims, first responders who were handling, right? And that is going to erode the resources on this side of the room. And so we've got to get as much resources as we possibly can right now, capitalize this program, keep it cycling. And if we are wrong, it is on us. It is on the Spill Fund. It is on the Hazardous Discharge Site Remediation Fund.

Now, the other players here, they've got to do their

part, too.  They've got to go to their significant indirect users and tell them to stop putting PFAS into their sewer systems.  We all know it's harmful, but the significant indirect users are still doing it, right?  And we know that.  We have that data.  We see again that a majority comes from large landfills and certain industrial users.  They can't be putting it into the POTWs anymore.  So no one has the precise answer of what that giant cost is, right?  It is a big one, and it's one that we will be dealing with for certainly as long as I am alive, right?  And these systems were developed in the 1970s and '80s under New Jersey law, right?  And we've done this since.  And we've got to do it continuously, we've got to do it moving forward, and it is in fact on us.

THE COURT:  Okay.  So let me ask this question, because the concern that's been raised is that you have these funds available as a result of the settlement which you wish to have the Court approve.

How do the objectors, we'll deal with them, how do they know that those -- if -- how do they know that they will have access to those funds?  Is it in the JCO or is it by virtue of the Infrastructure Trust Act?  Is it a whole combination of, you know, the Spill Act Fund?  I mean, how do they know that --

COMMISSIONER LaTOURETTE:  It is a combination of everything you see on this screen, Your Honor.

MR. JACKSON:  But I think what the Judge is asking, I think in this document that we're talking about, to describe this annual process.

THE COURT:  Yes.

MR. JACKSON:  Because there will be an annual needs evaluation --

THE COURT:  Yes.

MR. JACKSON:  -- which is built into the water infrastructure piece.

COMMISSIONER LaTOURETTE:  I see.

MR. JACKSON:  But it would also be because of the PFAS abatement.  If there are 100 homes who need, you know, water systems placed on their homes, they're going to, you know, those people will be evaluated and get funds as well.

So it would be an annual process with these funds coming in for the annual needs evaluation.  So I think that we need to describe that to you as well.

THE COURT:  And where is that?  That's in the JCO?

MR. JACKSON:  So it is -- it is built in conceptually to the JCO because there is an annual funding mechanism and there's an annual distribution process by the State.  But it's not -- there's not detailed like we're describing to you now because we didn't know it at the time.  Part of the JCO was the State is going to build this process.  The State has built the process, so we can describe it to you.

THE COURT:  You'll have to describe it to me, because the objections are that we want -- we want a seat at the table.

MR. JACKSON:  Right.

COMMISSIONER LaTOURETTE:  Yeah.

THE COURT:  And we -- you know.  And they have a right to.  And if there is a process in place that I find is fair, then, you know, perhaps I'm satisfied.

But, again, where is all that?

MR. JACKSON: Right.  Right.  I understand.  The funds -- and I can be certain in terms of the funds that are being paid under the terms of this settlement are absolutely dedicated to natural resource damages, PFAS abatement, and the Spill Fund as we've described it.  And of course, again, all the remediation obligations are outside of what we're talking about right now.

THE COURT:  And on a yearly basis, we will look to see where the needs are, most of the needs are.

MR. JACKSON:  Right.

THE COURT:  And we will contribute those funds in conjunction with other sources of funding to where the needs are most met.

MR. JACKSON:  To these processes, yes.

THE COURT:  Including to the objectors.

MR. JACKSON:  Okay.  Yes.

THE COURT:  But I don't -- where is that?

MR. JACKSON:  We need to -- well, we'll add that into this document, you're right.

Right now it's in the abatement projects and funding mechanisms that are broadly described.  But the nature of the annual review process and the needs evaluation is not described, and so we could do that.

THE COURT:  Is it in the -- is it in the JCO?

MR. JACKSON:  It's in the law.  It's in the Infrastructure Act and the like.  That's why this annual process exists is because of these.

COMMISSIONER LaTOURETTE:  Yeah.

THE COURT:  Yeah, okay.  Well, I have to know that. You know, I have to be able to...

But it doesn't reference the Infrastructure Trust Act?

MR. JACKSON:  It references a trust fund for PFAS abatement, but I don't believe we cross-referenced this act.

THE COURT:  Well, you probably should have, don't you think?  But I don't know that that's fatal.  But --

COMMISSIONER LaTOURETTE:  Your Honor, we can -- I am confident that the Department of Environmental Protection can detail the things that I've explained to you, expound upon them.

THE COURT:  Yeah.

COMMISSIONER LaTOURETTE:  And give you what I believe

that you're asking for.

THE COURT:  Can you show me where in the -- where what we're talking about is in here, in the JCO?

MR. JACKSON:  Yes, Your Honor.

So there are a couple different places.  The -- let's start with -- sorry.  This is the 3M settlement, paragraph 44.

THE COURT:  Well, you could just give me one.  I can find it in the others.  So just you're talking about -- can we do the --

MR. JACKSON:  So 44c.

THE COURT:  Which one are you looking at?

MR. JACKSON:  I'm sorry.  I'm looking at 3M.

THE COURT:  Okay.

MR. JACKSON:  It notes -- so, first of all, the first paragraph, 44c, Romanette i and ii, describe the monies going into natural resource damages and the PFAS contamination abatement projects, and the amounts of money tied to each.

THE COURT:  Okay.

MR. JACKSON:  Then 44e, Romanette vii talks about the remainder of the PFAS -- sorry, the New Jersey Leadership payments going into the same buckets.

Paragraph 46 is regarding natural resource damages, and it states pursuant to the paragraphs that I've just read you, the settlement payments shall be allocated for natural resource damages.  The natural resource damages payments

derived from this JCO shall pay for costs incurred by the State to repair, restore, or replace damaged, impaired, injured or lost natural resources of the State, and it just kind of keeps going there.

Later in that paragraph it states that settling plaintiffs shall use the natural resource damage payments derived from this JCO exclusively for the restitution or remediation of harm to the environment, wildlife, or natural resources, within the meaning of the sections cited, the Treasury Regs.

That to me -- and now I'll say in paragraph 47 there's similar language with respect to the PFAS abatement funds. But that's an order of this Court, if entered as a JCO. And obviously it's a contract between the State and these defendants. These monies shall be spent this way.

THE COURT: Yeah. I don't think there's a quarrel about that.

MR. JACKSON: Oh, I'm sorry.

THE COURT: But that you'll look at it annually and go where the need is met. Where is that?

MR. JACKSON: So that's what I was saying. The annual payments are of course built in, but the annual needs evaluation, that is more in the statutory processes that the Commissioner has been describing, and that's what I think if we submit something to you --

*184*

THE COURT:  Connect the dots.

MR. JACKSON:  -- to connect those dots.

THE COURT:  Yeah.  You'll have to connect those dots for me.  Uh-huh.  Okay.

COMMISSIONER LaTOURETTE:  I believe I understand what Your Honor is asking for.

THE COURT:  Okay.  I think that's it.  I'm going to hear from the objectors.  I'm sure they're satisfied.

(Laughter.)

COMMISSIONER LaTOURETTE:  Our job at DEP is always to make everyone happy.

(Laughter.)

THE COURT:  So are there any other objectors that have come to this hearing to object that I haven't heard from?

I see no hands.

The defendants, do you have anything to add?

MS. DUFFY:  Your Honor, Ann Marie Duffy on behalf of the DuPont Defendants.

I think the only thing we would add is that we concur with the State that this was a hard-fought litigation and that the proposed JCO is the result of an extensive arm's-length negotiation between the parties.  While we don't agree with everything that the State has said in all their papers, we do recognize the State's role to respond to the comments and establish a fairness for the settlement.

We agree that the proposed JCO meets the standards for approval, and our clients respectfully request that the Court enter the JCO as submitted.

THE COURT:  Okay.  Thank you.

3M.

MR. HIRSCH:  Your Honor, Sam Hirsch, H-I-R-S-C-H.

Your Honor, very similar to the other defendants, we spent more than two years negotiating a very difficult negotiation with the State, very sophisticated adversary, with great help from Judge Schneider, and we believe that the standard set forth for approving a judicial consent order like this has been satisfied, and therefore we support the State's motion to approve and enter the JCO as a final judgment.

THE COURT:  Okay.  Thank you.

MR. KENNY:  Thank you, Your Honor.  Good afternoon. Tom Kenny of Spiro Harrison for the County of Monmouth, and I'll obviously be very brief.

We just wanted to clarify that Monmouth County filed a very narrow motion to intervene related, you know, specifically to land owned by Monmouth County, specifically its fire academy, you know, seeking to be excluded from the released parties.

You know, as we set forth in our papers, you know, it doesn't appear the DEP has presented specific analysis created, you know, quantifying AFFF-related damages to fire academies

*186*

and other public infrastructure.  Yeah, I think that's been well covered today.

I also just wanted to echo one point that Mr. Keefe made earlier in his presentation.  While we're not necessarily disputing, you know, the doctrine of parens patriae or that the power exists, we are, as Mr. Keefe said, arguing that the State has gone beyond the scope of its authority specifically here related to county-owned land.

You know, virtually all the case law we've discussed today, you know, has involved the waterways and the public waters.  Here, we're solely seeking to be excluded from the settlement agreement as it relates to county-owned land and the damages incurred in county-owned land.

And so with that, I'm happy to answer any questions the Court has.

THE COURT:  Okay.  Has your client filed a claim?  I take it not.

MR. KENNY:  We have not at this time.  We're still in the process of quantifying our damages.

THE COURT:  Okay.  And that's -- well, not to belabor the point, but I think that is the point, which is, you know, when will you quantify the damages?  And will there be damages?  And that is the big question mark, right?  And that's the big question mark.

MR. KENNY:  Well, again, we've -- I mean -- and it's

in our papers, you know, we've submitted a preliminary report that the State did -- or that, rather, the county did at its fire academy, finding, you know, PFAS and AFFF contamination. And, again, you know, we obviously weren't anticipating that this process would lead -- that the process that the State and this litigation would lead to a settlement, you know, where Monmouth County would be forever barred from asserting any AFFF-related claims at its fire academy. We obviously only learned of that when the settlement agreement was published in July.

THE COURT: You raise a -- I'm glad you -- you raised something that I've been meaning to ask.

Mr. Jackson, when the State sat down to settle this case, was it aware of these such reports?

MR. JACKSON: I'm sorry, was it aware of?

THE COURT: Of these such reports that Mr. Kenny has -- I don't know, it's an expert report? What is it?

MR. KENNY: Yeah. It's a -- it's -- I can pull up what docket it is. It's attached to our motion.

THE COURT: Yeah. Were you aware of those reports?

MR. JACKSON: I've seen a variety of reports and damage estimates. With respect to this particular one, I don't know. I have seen the public water treatment POTW estimates of, you know, hundreds of billions to trillions of dollars for nationwide treatment of wastewater systems, which is all

constructed around this idea that they're going to put a filtration system at the end of a sewage pipe, which is quite different than what we're talking about.

But I've seen all those, and certainly I've seen a lot of property damage evaluations, estimating what a soil removal, again, it's always kind of worst case, removal might cost, but not for this particular site. But I've seen similar types of things.

THE COURT: And this is a "might cost," right?

MR. KENNY: I'm sorry?

THE COURT: This is a "might cost."

MR. KENNY: Might cost?

THE COURT: Yeah.

MR. KENNY: As in, yeah, we're not certain of the potential cost.

THE COURT: Right.

MR. KENNY: And just for the record, the report, we submitted it at Document No. 568-10 in the 758 docket. It's the Site Investigation Report of the Monmouth County Fire Academy prepared by H2M Architects & Engineers, and it was completed in January of 2025. So I'll just note, under a year ago.

THE COURT: So it seems to me the State knew about it, because this matter didn't settle until after that.

MR. JACKSON: I don't know if it was submitted.

MR. KENNY:  I don't know if it was submitted specifically to the State.  It was filed as part of our motion.

THE COURT:  Yeah.

MR. KENNY:  But it was certainly -- yeah, they obviously participated in the comment process, and these concerns were certainly raised as part of the comment process.

THE COURT:  Okay.  Thank you.

MR. KENNY:  Thank you.

(Counsel conferring.)

THE COURT:  Okay.  Can we take a five-minute break.  I want to collect my thoughts about where we go from here, okay?

(Recess was taken at 3:12 p.m. until 3:26 p.m.)

THE COURTROOM DEPUTY:  Judge will be out shortly.

All rise.

THE COURT:  Okay.  You can have a seat.  Thank you.

Okay.  So here's what I'm thinking.  We've talked a lot about a lot.  So what I would like to see is the record supplemented.  And I think -- I just jotted down some notes.

So much of this comes, you know, from my colloquy with the Commissioner.  I'd like to see evidence, in whatever form it is, I don't want argument, that the State conducted its own analysis that in settling this matter for this amount, and in its analysis in conjunction with other funding measures and other sources that the Commissioner was talking about, that the

State concluded, in its best judgment, that that would address, not 100 percent -- no one is suggesting 100 percent -- that it would address the concerns relating to the remediation and abatement of PFAS, okay. But I need -- I want evidence. I don't know what that means, a report, I don't know. I'll leave that to your folks' discretion.

And in that analysis, I would like to know that when that analysis was done, did the State take into consideration or did it know about the objectors' estimates and they considered them, or they didn't know about them. Well, either they knew about them and they didn't agree with them, or they didn't know about them, but they certainly considered these political subdivisions and municipalities in its calculation, in its entire analysis; that it took all of their concerns into consideration. And that may be the macro analysis that the Commissioner was talking about, okay.

Also, I would like further explanation on this annual certification process and how -- I don't think it's in the JCO, but how does it, you know, it was the Infrastructure Act we were talking about, help me understand how I can be satisfied that on a yearly basis the State must look at the concerns of these political subdivisions, you know, and what kind of analysis are they afforded, how are they considered. I need further elaboration on that.

And then lastly, I want further elaboration on this

idea of a lockbox, which I think is a good idea, but I don't -- you know, how is it effected?  What's the format?  How does it bind the parties?  I don't know what format it's going to take.  And we don't have time for a constitutional amendment, so what format is it going to take?  So those are the questions that I want answered, or I want the record supplemented further.

So then I thought -- well, let me hear your thoughts, Mr. Jackson, I guess.  Don't you think it behooves you to sort of share all of this before you submit it to the Court with the objectors because you might persuade them?

Because, I mean, they pretty much know that they haven't persuaded Judge Bumb that just as a matter of principle I'm going to say covenants not to sue don't belong in there, okay.  I've got to do a better analysis than that.  So they pretty much know they're not going to win on that.

So don't you think it would benefit you to sit down with them ahead of time before you submit that analysis, and so that when you do present it all to me, I have the benefit of what is it that I have to resolve now so that we don't have to go through these rounds of briefing back and forth and I don't have to hear objections again that might get resolved?  What do you think?

MR. JACKSON:  I think that -- I mean, with respect to some, it might be -- and let me be clear, when these went out for notice and comment, there have been a lot of conversations.

*192*

THE COURT:  Yes.  Okay.

MR. JACKSON:  It is the -- it is the "filter-at-the-end-of-the-sewage-pipe" anxiety that is not solvable because nobody's seeking $100 billion of those costs. So that's the anxiety piece.

THE COURT:  Well, let me look to my jury.  I mean, don't you kind of understand that there are arguments you're just not going to win with me?  I think you know that, okay.

MR. KEEFE:  On some of them.

THE COURT:  Well, maybe.  Maybe not.

MR. KEEFE:  Your Honor, I think we're very interested in what you're proposing, I will say that.

THE COURT:  Yes.  Okay.

MR. KEEFE:  I think we're very interested in hearing what went into making the sausage here.

THE COURT:  As am I.

And I think that my jurors, and for the record I'm referring to counsel for my objectors, I mean, you're kind of shooting too high.  I mean, you're -- I would too if I were in your shoes.  Why not?  Okay.  But we got to get to a point of reasonableness, okay.

And that's why I think sitting down with them, showing them how you got to this number, assuaging their anxiety about the fact that you're just going to leave us hanging and certainly addressing my concern that the taxpayers

aren't going to get socked with, you know, higher rates, then we're really getting somewhere.  And it's really kind of drilling down, because that's really -- to me, that's the fairness and reasonableness inquiry that I have to be able to, at the end of the day, be satisfied that this is in the interest of the residents.

MR. JACKSON:  Understood.  Understood.

I think -- and, you know, obviously I was going to start today's presentation with going through the fairness and reasonableness of the settlements, given the litigation risks, the hard-fought nature of everything, the enormity of the claims that are out there with respect to these defendants, a lot of that analysis.  I get the sense we're okay there.  You understand those issues, that's in the briefing, and you understand those litigation decisions and all that type of analysis.

THE COURT:  You got me on that.

MR. JACKSON:  Okay.  So what we need to do is focus on these issues.

What we had discussed, we'd like to submit to you, to the Court, within -- we were saying the end of next week, this document.  We can pull this together relatively quickly.

THE COURT:  Well, what about sitting down with them?

MR. JACKSON:  That's what I was going to say, I think that we can try to do that next week as well, as quickly as

possible.  Can we work with Judge Schneider and try to set up a process perhaps?

THE COURT:  Yeah.  You folks all work together.  So are you clear on what I'm asking you to do?

MR. JACKSON:  I believe that I am, yes, Your Honor.

THE COURT:  Yeah, okay.

COMMISSIONER LaTOURETTE:  I most certainly am, Your Honor.

THE COURT:  Okay.  Good.  All right.  So then --

MR. JACKSON:  We would like to --

THE COURT:  I won't give you -- I had said within 30 days.  If you want to get it to me sooner, I know you folks are anxious to get this decided by me, and I will get to it as soon as I can.

But, again, to the extent that you folks can all work it out and you can satisfy most of the objections.  I mean, there are some other objections that have been raised.  Can I assume that those don't need to be decided?  You folks still pressing those?  Do I need to decide it?  I think there was a tax issue.  And what was the other?  Hmm.  Some pretty arcane objections.  I'm trying to remember.

MR. TELSEY:  Judge, I think the arcane ones are mine.

(Laughter.)

MR. JACKSON:  We all knew it.  Nobody wanted to say it.

(Laughter.)

THE COURT:  So does that -- so, Mr. Telsey, so does that mean you're withdrawing them?

MR. TELSEY:  No.

THE COURT:  Okay.  So you may have to do more work on them then.

MR. TELSEY:  Okay.

THE COURT:  Yeah.  Because I -- to be perfectly blunt, I wasn't quite getting them, so...

MR. ORLANDO:  Your Honor, same sort of objection.

THE COURT:  Yes, Mr. Orlando.

MR. ORLANDO:  Jason Orlando on behalf of Mercer County.  Again, same sort of objection as Mr. Telsey.  We do have a pending prefiled action in the MDL and, you know, it's our position that --

THE COURT:  Oh, yeah, that you've reserved because we've argued about it and we've talked about it, yes.

MR. ORLANDO:  Yes.  Just want to make sure.

THE COURT:  But, Mr. Telsey, you have an argument that somehow it violates some tax code or something.

MR. TELSEY:  Yes.

THE COURT:  Yeah.  Okay.  Well, you may have to do more briefing on it.  Let me look at it again, or maybe I'll just decide it, so...

JUDGE SCHNEIDER:  Can we --

MR. JACKSON:  What we'd like --

THE COURT:  Yes, Judge Schneider.

JUDGE SCHNEIDER:  Can I just ask, I think it would be very helpful if the objectors appoint a liaison point of contact rather than communicating with six or seven different people.

THE COURT:  Okay.  Let me see, juror number, raise your hand.

MR. CARNEY:  Well, I certainly want to be part of that, you know, because I'm representing the AEA, and half these people here today are from the AEA; they've taken their time off.

THE COURT:  Mr. Carney, he's your liaison.

JUDGE SCHNEIDER:  Yes.

MR. KEEFE:  Judge, I offer to be the liaison for the counties because we're different.

THE COURT:  How many liaisons do you need, Judge Schneider?  Because at this point you're all going to be liaison.  I'm going to give you two.  Mr. Carney and --

JUDGE SCHNEIDER:  We'll go with two.  Mr. Keefe and Mr. Carney.

THE COURT:  There we go.  That's it.

JUDGE SCHNEIDER:  And you'll be responsible for communicating with your people.

THE COURT:  Yeah.

MR. JACKSON:  May I ask that the briefing and the other issues be closed on this; that no new intervenors join?

THE COURT:  No, they can't.

MR. JACKSON:  No new filings come in tomorrow.

THE COURT:  No, they can't.

MR. JACKSON:  Well, I just wanted that certainty. I'd like to end the process with the folks that were here and that we're dealing with now.  And we'll do what you're asking.

THE COURT:  Why are my liaison counsel standing up?

MR. KEEFE:  I want to respond to Mr. Jackson.  Some of our clients do have some reports and some other information that we would like to supplement just as you may be supplementing.  So I don't want to be foreclosed from that.

THE COURT:  No, no, no.

MR. JACKSON:  No, no.

THE COURT:  Not to me.  You'll sit and meet with them about it.  That's what you folks are going to do, but not to me.  The record is closed except for what I'm asking for, okay?

MR. JACKSON:  Thank you.

THE COURT:  Because the time to be heard was today.

MR. CARNEY:  I just have a question.  After we meet, that report is submitted --

THE COURT:  Yeah.

MR. CARNEY:  -- will there be another -- are we all coming to court then to talk about the JCO --

THE COURT:  No, because Mr. Jackson and company and the Commissioner and Ms. Farley are going to persuade you why this is a fair settlement.

MR. CARNEY:  Okay.  All right.

MR. ORLANDO:  Your Honor, Jason Orlando on behalf of Mercer County.

In terms of the liaison, I know I risk -- Judge Schneider advised I might get my head chopped off, but I do think that Mercer County is uniquely situated, given the airport, the fire training school, and the prison and the fact that we've already filed an MDL.  So I don't know if the other people adequately represent that.

THE COURT:  No.  He just wants points of contact.

MR. ORLANDO:  Right.

THE COURT:  And then you'll all be contacted.  You can all sit and meet with the State.  You can have a seat at the table.  He just doesn't want to have to contact all seven of you.

MR. ORLANDO:  Okay.

THE COURT:  That's it.  You're not getting excluded. You're just not wearing the contact hat.

MR. ORLANDO:  Okay.

THE COURT:  Okay.  Yeah.

All right.  In all seriousness, I don't know the answer to that.

My hope is, is that, you know, you can have a very, very productive meeting and, you know, that you all can come together and find that it is fair and reasonable with the additional supplemented record.

If you can't and there are still objections, then of course I have to address them; I have to.  Otherwise, you know, it's not a complete record if I don't address it.

So I will wait to hear from you folks.  When I get the submissions, my deputy clerk will be in touch with you as to when, you know, if I need -- if I need to have another hearing, I'll let you know.

If not, then I reserve and you'll get my opinion, okay?

MR. JACKSON:  Thank you, Your Honor.

MR. KEEFE:  Thank you, Your Honor.

MR. JACKSON:  Thank you very much.

THE COURT:  Good to see you all.

MS. DUFFY:  Thank you, Your Honor.

THE COURT:  Happy New Year!  Thank you.

MR. KURZWEIL:  You, too.

Thank you, Your Honor.

MR. CALICA:  Thank you, Your Honor.

MR. SCHIFRIN:  Thank you, Your Honor.

COMMISSIONER LaTOURETTE:  Thank you very much, Your Honor.

THE COURTROOM DEPUTY:  All rise.

(Proceedings concluded at 3:38 p.m.)

- - - - - - - - - - - - - - - - - - - - - - -
**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
- - - - - - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


/S/John J. Kurz, RDR-RMR-CRR-CRC                January 9, 2026

Court Reporter/Transcriber

Exhibit 2

Berne Corp. v. Government of the Virgin Islands, Not Reported in Fed. Supp. (2011)

2011 WL 13228471
Only the Westlaw citation is currently available.
District Court of the Virgin Islands,
Division of St. Thomas & St. John.

BERNE CORP. and B & B Corp., Twenty-one Queens Quarter, Inc., Miller Properties, Inc., Equivest St. Thomas, Inc., Robert Schmidt, Kim Holdsworth, Robert Schmidt Development Corp., and Dori P. Derr, The Cyril V. Francois Associates, LLC, Shell Seekers, Inc., Charles W. Consolvo, Linda B. Consolvo, Snegle Gade Associates LP, Charles W. Consolvo as Trustee of the Yvette B. Lederberg Trust, Arthur B. Choate, Stewart Loveland, and Stacy Loveland, Elizabeth Sharp, Lindon Corp., Gordon L. Coffelt, Soraya Diase Coffelt, and One Stop, Inc., Plaintiff,
v.
GOVERNMENT OF THE VIRGIN ISLANDS, Bernadette Williams, in her official capacity as Tax Assessor, and the Board of Tax Review, Defendants.

Civil Nos. 2000-141, 2000-167, 2001-151, 2001-155, 2001-181, 2001-196, 2001-197, 2001-228, 2002-057
|
Filed 01/22/2011

**Attorneys and Law Firms**

James M. Derr, Esq., St. Thomas, U.S.V.I., For the plaintiffs Berne Corp., B & B Corp., Miller Properties, Inc., Robert Schmidt, Robert Schmidt Development Corp., Kim Holdsworth, Dori P. Derr, and Elizabeth Sharp.

Soraya Diase-Coffelt, Esq., St. Thomas, U.S.V.I., For plaintiffs Lindon Corp., Gordon L. Coffelt, Soraya Diase Coffelt, and One Stop, Inc.

David A. Bornn, Esq., St. Thomas, U.S.V.I., For plaintiffs The Cyril V. Francois Associates, LLC and Twenty-One Queen Quarter, Inc.

Carol Thomas-Jacobs, Esq., St. Thomas, U.S.V.I., For the defendants.

**ORDER**

CURTIS V. GÓMEZ, Chief Judge

**\*1** Before the Court is the motion by the plaintiffs for the Court's approval of a proposed consent decree[1].

It is generally understood that parties may enter any legal agreement they choose. *See, e.g., Steele v. Drummond*, 275 U.S. 199, 205 (1927)("[I]t is a matter of great public concern that freedom of contract be not lightly interfered with."); *Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1460 (9th Cir. 1988)(noting that the law's recognition of agreements entered into by private parties "embodies some very important ideas about the nature of human existence and about personal rights and responsibilities" including "that people have the right, within the scope of what is lawful, to fix their legal relationships by private agreement[.]"); *Hodge v. Evans Fin. Corp.*, 707 F.2d 1566, 1568 (D.C. Cir. 1983)("A basic principle of contract law is the concept of freedom of contract-the right of the contracting parties to structure their transactions in accordance with their wishes."). The subject matter contained in the terms of such legal agreements is limited by the imagination of, and shared understanding in, the minds of the parties. *Gray v. American Express Co.*, 743 F.2d 10, 17 (D.C. Cir. 1984)("It is certainly true that, from the common law immemorial, parties have been free to include whatever conditions and limitations that they may desire in a contract."). The parties' approval is usually apparent in their mutual assent to the terms of the agreement. The Court's approval of such agreements, however, is an entirely different matter.

Where the Court is called upon to approve a proposed consent decree, the ensuing order of approval implicates certain things. *See Holland v. N.J. Dep't of Corrections*, 246 F.2d 267, 277 (3d Cir. 2001) (noting the "hybrid" quality of a consent decree, as it "embodies the agreement of the parties and as such is in some respects contractual in nature; however, a decree is also in the form of a judicial order that the parties expect will be subject to the rules generally applicable to other judgments and orders."). Significantly, it is an enforceable order of the Court. Indeed, it reflects the Court's approval of the agreement's terms and suggests that such terms are legally enforceable. Given that a consent decree involves the Court's imprimatur, "[e]ven when [a consent decree] affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence." *United States v. City*

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Berne Corp. v. Government of the Virgin Islands, Not Reported in Fed. Supp. (2011)

*of Miami,* 664 F.2d 435, 441 (5th Cir. 1981)(en banc)(Rubin, J.); *see also Conservation Law Found. of New England v. Franklin,* 989 F.2d 54, 58 (1st Cir. 1993)(noting the obligation of a district court to review a consent decree to confirm that "the proposed decree will not violate the Constitution, a statute, or other authority; [and] that it is consistent with objectives of Congress....")(internal quotation omitted; alteration in original).

**\*2** Applying the standard outlined above, it is readily apparent that the proposed consent decree is problematic in at least one respect. The proposed consent decree purports to require the Executive to propose specific legislation[2]. That provision gives the Court great pause as it seems to fly in the face of several prohibitions, not the least of which is a violation of the principle of separation of powers provided in the Constitution. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102 n.4 (1998)("The courts must stay within their constitutionally prescribed sphere of action...."); *Bacon v. City of Richmond,* 475 F.3d 633, 641-42 (4th Cir. 2007)(reversing district court's order requiring the city to appropriate funds to the school board to facilitate schools' compliance with Americans with Disabilities Act requirements).

The proposal of legislation, which implicates policy decisions, is certainly within the executive authority contemplated in the Constitution, U.S. Const. art. II, § 3, and the Revised Organic Act, 48 U.S.C. § 1591 (providing that the Governor "may recommend bills to the legislature and give expression to his views on any matter before that body"). Neither the Constitution nor any statute suggests that the design of such proposals should originate within the judicial branch. *Cf. Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 230 (1986)(noting that judicial authority does not extend to "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.").

As a consequence, the Governor may propose whatever legislation he chooses. Any Court that suggests it can enforce a provision requiring an executive not just to propose legislation, but also dictating the specific subject matter of the legislation, steps boldly and impermissibly on turf where no Court should go. It is verboten, as that is entirely and exclusively within the executive's powers. Yet, that is precisely what the proposed consent decree requires.

To ask the Court to approve such a provision is to invite the Court to abdicate its responsibility and turn a blind eye to the law. Such an approach essentially would consign the Court to the role of merely providing a rubber stamp to the parties' agreement regardless of any Constitutional infirmity that may infect the agreement.

The Court is mindful of the parties' laudable efforts to reach common ground on certain matters in this litigation. Even so, certain principles cannot give way to those efforts. It is beyond cavil that the Executive may *legally* exercise his executive authority and prerogatives without interference from the other branches of government. Indeed, that principle is as timeless as the United States Constitution and as firmly rooted as the Mahogany trees that line portions of Centerline Road and the Flamboyant trees that dot the St. Thomas hillsides. The Court cannot lend its seal to a proposal that disturbs that principle.

The premises considered, it is hereby

**ORDERED** that the plaintiffs' motion to approve the proposed consent decree is **DENIED.**

**All Citations**

Not Reported in Fed. Supp., 2011 WL 13228471

---

**Footnotes**

[1]    The plaintiffs have captioned their motion as a "Motion for Entry of Order of Settlement Agreement." As the plaintiffs seek the Court's approval of a proposed order incorporating a settlement agreement, the Court will construe their motion as a motion for approval of a proposed consent decree.

[2]    The proposed consent decree includes a provision "that the Settlement Agreement of the Parties dated January 6, 2011, is hereby incorporated and made part of this Order for purposes of enforcement[.]"(Pls.' Mot. for Entry of Order on Settlement Agreement, Ex. 4.) One of the provisions of the January 6, 2011 Settlement Agreement, requires the Governor to submit proposed legislation "to extend the waiver of interest and penalties for six months for tax year 2009." (Pls.' Mot. for Entry of Order on Settlement Agreement, Ex. 1.)

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 3

57 NJR 9(1)
September 2, 2025
**Filed August 12, 2025**

PUBLIC NOTICE

**ENVIRONMENTAL PROTECTION**

**CONTAMINATED SITE REMEDIATION AND REDEVELOPMENT**

**OFFICE OF NATURAL RESOURCE RESTORATION**

**Notice to Receive Interested Party Comment on Proposed Judicial Consent Order Approving Settlement with EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company), Corteva, Inc., DuPont de Nemours Inc., DuPont Specialty Products USA, LLC, the Chemours Company, and The Chemours Company FC, LLC, and Notice of Withdrawal of Discretionary Direct Oversight in the Matter of NJDEP, et al., v. E.I. Du Pont de Nemours and Company, et al., Case No.: 1:19-CV-14766-RMB-JBC (D.N.J.)**

Take notice that the New Jersey Department of Environmental Protection, its Commissioner, and the Administrator of the New Jersey Spill Compensation Fund (collectively, "NJDEP" or "Department") seek comments on a proposed Judicial Consent Order that would resolve certain asserted and unasserted claims against EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company) (EIDP), Corteva, Inc. (Corteva), DuPont de Nemours Inc. (New DuPont), DuPont Specialty Products USA, LLC (DuPont Specialty Products), The Chemours Company (Chemours), and The Chemours Company FC, LLC (Chemours FC) (EIDP, Corteva, New DuPont, DuPont Specialty Products, Chemours, and Chemours FC (collectively, "Settling Defendants") in pending litigation for past and future cleanup and removal costs, unmet remediation obligations, and injuries to natural resources resulting from discharges at, from, and/or related to the "Chambers Works Property," the "Parlin Property," the "Pompton Lakes Works Property," the "Repauno Works Property" (all as described below), all properties listed in

the Statewide Directive described below, and broadly related to the Settling Defendants' sale, marketing, distribution, use of, and/or any other conduct related to per- or poly-fluoroalkyl substances (PFAS) in or into the State of New Jersey prior to entry of the proposed Judicial Consent Order, or January 1, 2026, whichever is later.

The proposed Judicial Consent Order resolves certain asserted and unasserted claims, including certain claims brought by: (1) the Department and the Commissioner of the Department; (2) the New Jersey Division of Consumer Affairs and its Director; (3) to the maximum extent allowable by law, acting through the Attorney General, the State of New Jersey; and (a) all of the State's political subdivisions, departments, agencies, authorities, divisions, boards, commissions, districts, and instrumentalities of any kind; and (b) any person or entity acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of, or generally applicable to the general public, as opposed to solely private or individual relief for separate and distinct injuries. The State signatories to the proposed Judicial Consent Order adequately represent the interests and rights of the State's political subdivisions, citizens, and residents such that entry of the proposed Judicial Consent Order will result in a binding final judgment that will operate as *res judicata* to preclude future claims related to the Settling Defendants' conduct regarding PFAS, as described in the proposed Judicial Consent Order, by all such persons and/or entities.

The Chambers Works Property, currently owned by Chemours, is located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships, Salem County, New Jersey.  The overall Chambers Works Site includes, collectively, the Chambers Works Property and all areas to which any contaminants discharged at or from the Chambers Works Property

have migrated.  The Chambers Works Property has been designated as Site Remediation Program Interest No. 008221.

The Parlin Property, currently owned by DuPont Specialty Products, is located at 250 Cheesequake Road, Parlin, Old Bridge Township and Sayreville Borough, Middlesex County, New Jersey. The overall Parlin Site includes, collectively, the Parlin Property and all areas to which any contaminants discharged at or from the Parlin Property have migrated.  The Parlin Property has been designated as Site Remediation Program Interest No. 008222.

The Pompton Lakes Property, currently owned by Chemours FC, is located at 2000 Cannonball Road in Pompton Lakes/Wanaque Borough in Passaic County, New Jersey. The overall Pompton Lakes Site includes, collectively, the Pompton Lakes Property and all areas to which any contaminants discharged at or from the Pompton Lakes Property have migrated.  The Pompton Lakes Property has been designated as Site Remediation Program Interest No. 007411.

The Repauno Works Property, currently owned in part by Chemours FC, and in part by Delaware River Partners, LLC, is located at 200 North Repauno Avenue, Gibbstown, Greenwich Township, Gloucester County, New Jersey. The overall Repauno Works Site includes, collectively, the Repauno Works Property and all areas to which any contaminants discharged at or from the Repauno Works Property have migrated.  The Repauno Works Property has been designated as Site Remediation Program Interest No. 008225.

In 2017, the NJDEP issued a Directive pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 through 23.24 (Spill Act), to EIDP and Chemours FC regarding remediation of the Chambers Works Property. In 2019, the NJDEP issued a Spill Act Directive to EIDP, Chemours, and Chemours FC regarding natural resource damages assessment costs for the Pompton Lakes Property.

Also in 2019, the NJDEP issued a *Statewide PFAS Directive, Information Request, and Notice to Insurers* (Statewide PFAS Directive) regarding PFAS contamination in the State to EIDP, Chemours, Chemours FC, DuPont Specialty Products, New DuPont's predecessor, DowDuPont, Inc., and other respondents. The Statewide PFAS Directive was issued pursuant to the authority vested in the Commissioner pursuant to the Spill Act. The Directive provided notice that the Department believes EIDP, Chemours, Chemours FC, DowDuPont, Inc., and DuPont Specialty Products to be responsible for "significant contamination of New Jersey's natural resources, including the air and waters of the State, with [PFAS]" and sought, among other things, to compel EIDP, Chemours, Chemours FC, DowDuPont, Inc., and DuPont Specialty Products to provide information about its uses and discharges or potential discharges of certain PFAS into the State's environment, to meet with the Department to develop a good-faith estimate of costs to investigate, test, treat, clean up, and remove certain PFAS from the State's environment, including damages for economic impacts of PFAS contamination, and recipients' financial condition and ability to pay for or perform the cleanup and removal of certain PFAS. EIDP, Chemours, Chemours FC, DowDuPont, Inc., and DuPont Specialty Products submitted letters denying liability and asserting various defenses to the Statewide PFAS Directive.

Also in 2019, the NJDEP filed legal actions in New Jersey Superior Court against the Settling Defendants and other companies, consistent with its authorities as the trustee of New Jersey's natural resources and, as later amended, pursuant to the Spill Act; the Water Pollution Control Act, N.J.S.A. 58:10A-1 through 20; the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 through 13.1; the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 through 31 (Brownfield Act); the Solid Waste Management Act, N.J.S.A. 13-1E-1 through 230, the Air Pollution Control Act, N.J.S.A. 26:2C-1 through 68; the Department's enabling statute,

N.J.S.A. 13:1D-1 et seq.; the Uniform Fraudulent Transfer Act, Del. Code Tit. 6, §§ 1301 to

1312, N.J.S.A. 25:2-20 through 36, and the common law of New Jersey.  The lawsuits alleged

that the Settling Defendants, as the owners/operators and/or affiliates of the owners/operators of

the Chambers Works Property, Parlin Property, Pompton Lakes Property, and Repauno Works

Property, and the other defendants were liable to the public for injuries to the natural resources of

the State due to discharges of contaminants at and emanating from the Chambers Works

Property, the Parlin Property, the Pompton Lakes Works Property, and the Repauno Works

Property, and for costs incurred by the NJDEP, and that the defendants had not performed

required remediation. The defendants removed the lawsuits to the United States District Court

for the District of New Jersey, where they were subsequently consolidated. The Settling

Defendants denied liability and asserted various defenses in the lawsuits.

Finally, also in 2019, the NJDEP filed a separate lawsuit against EIDP, Chemours, and

other manufacturers of aqueous film-forming foam (AFFF), a PFAS-containing firefighting

product, and suppliers of PFAS ingredients for AFFF (AFFF Litigation) in New Jersey Superior

Court. EIDP and Chemours are defendants in the AFFF Litigation as manufacturers of certain

AFFF and its component PFAS ingredients. Through the AFFF Litigation, the NJDEP asserts

claims against EIDP and Chemours, pursuant to common-law products-liability theories,

common law negligence, common-law public nuisance, and the Spill Act, the Consumer Fraud

Act, N.J.S.A. 56:8-1 through 20, and the Safe Drinking Water Act, N.J.S.A. 58:12A-1 through

25. The AFFF Litigation was removed to the United States District Court for the District of New

Jersey and, thereafter, transferred to the multidistrict litigation in the United States District Court

for the District of South Carolina, *In re Aqueous Film-Forming Foams Products Liability*

*Litigation*, MDL No. 2:18-mn-2873 (D.S.C.) (AFFF MDL), where it remains pending. Through

the AFFF Litigation, the NJDEP seeks to recover all costs related to the investigation, cleanup, restoration, treatment, and monitoring of Statewide AFFF contamination of the State's natural resources, as well as compensatory damages for lost value (including lost use) of those resources, punitive damages, and penalties.

The NJDEP has now reached an agreement with the Settling Defendants to resolve their alleged liability to the public for remediation costs, unmet remediation obligations, and injuries to the natural resources of the State, and other costs, fees, penalties, and punitive damages resulting from discharges of contaminants at, from, and/or related to the Chambers Works Property, the Parlin Property, the Pompton Lakes Property, the Repauno Works Property, and for claims related to PFAS, including from waste streams and consumer products, Statewide. In addition to NJDEP, the parties to the settlement also include the Office of the Attorney General and the Division of Consumer Affairs, which are both named plaintiffs in the AFFF Litigation. Pursuant to the terms of the agreement, the Settling Defendants will pay the State $875 million over a period of 25 years, including $225 million for Natural Resource Damages, $525 million for Abatement Damages, and $125 million to cover legal and other costs, penalties, and punitive damages.

The NJDEP hereby proposes to enter a Judicial Consent Order with the Settling Defendants to effectuate this settlement.  The NJDEP, exercising its responsibilities pursuant to statutes governing the remediation of contaminated sites, including the Spill Act, the Brownfield Act, the Site Remediation Reform Act, N.J.S.A. 58:10C-1 through 29, and the rules promulgated thereunder, including N.J.A.C. 7:26C and 7:26E, and as trustee of the State's natural resources, believes that the proposed settlement terms are fair, reasonable, and faithful to the intent of the applicable statutes, and in the public interest.  All natural resource damages recovered will be

held in the NJDEP's dedicated natural resource damages account for specific natural resource restoration activities in accordance with the New Jersey State Constitution, Article VIII, Section 2, Paragraph 9. Abatement damages recovered will be held in a dedicated trust account to be administered and used by NJDEP for the purpose of improving and protecting public health, safety, and the environment, including i. taking actions to address environmental, public health, and safety-related impacts from discharges from the Chambers Works Property, the Parlin Property, the Pompton Lakes Property, the Repauno Works Property; and ii. supporting water quality infrastructure projects, including projects to install, operate, and maintain water treatment in public and private wells sufficient to meet applicable state standards and protect the public health, including with respect to PFAS. The NJDEP intends to conduct public outreach and engagement in the consideration and selection of restoration activities to be pursued with funds recovered by this settlement.

It is the intent of the NJDEP and the Settling Defendants that this Judicial Consent Order will constitute a judicially approved settlement within the meaning of the relevant portions of the Spill Act (N.J.S.A. 58:10-23.11f.a(2)(b)) and of the Federal Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9613(f)(2)) for purposes of providing protection from contribution actions or contribution claims related to the matters addressed in the Judicial Consent Order, all to the full extent provided for at N.J.S.A. 58:10-23.11f.a(2)(b) and 42 U.S.C. § 9613(f)(2).

A copy of the proposed Judicial Consent Order is available for inspection virtually on the Department's dedicated website (https://dep.nj.gov/dupont), the Office of Natural Resource Restoration's webpage (https://dep.nj.gov/nrr/proposed-settlements), and the Contaminated Site Remediation and Redevelopment's webpage (https://dep.nj.gov/srp/settlements), and physically

through the NJDEP Office of Record Access at 401 East State Street, Trenton, New

Jersey.  Requests to inspect a physical copy of the proposed Judicial Consent Order should be

directed to records.custodian@dep.nj.gov. Interested persons may submit comments on the

proposed Judicial Consent Order on the Department's website

(https://dep.nj.gov/dupont/comment), by email to dupontsettlement@dep.nj.gov, or in hard-copy

form to the following address:

> New Jersey Department of Environmental Protection
>
> Legal, Regulatory, and Enforcement Policy
>
> 401 East State Street, 7th Floor
>
> PO Box 402
>
> Trenton, NJ  08625-0402
>
> Attn: DuPont Settlement

All comments must be submitted within 60 calendar days of the date of this public notice.

The NJDEP will consider all comments received and may decide to propose

modifications to, or to withdraw or withhold consent to the entry of, the Judicial Consent Order

if comments received disclose facts or considerations that demonstrate that the Judicial Consent

Order is inappropriate, improper, or inadequate.

The Department is also hereby giving notice that, based on the comprehensive

requirements of the proposed agreement that are in the public interest and protective of public

health and safety, the Department is exercising its discretion to withdraw its placement of the

Chambers Works Site into Direct Oversight. Among other things, the proposed Judicial Consent

Order terms require the establishment and maintenance of a Remediation Funding Source for the

Chambers Works Site, along with other financial and remediation commitments to ensure

remediation of the Site is completed.