**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; et al.,<br>*Plaintiffs*,<br>v.<br>E.I. DU PONT DE NEMOURS AND COMPANY; et al.<br>*Defendants*. | Case No.:<br>1:19-cv-14758-RMB-JBC (Pompton Lakes)<br>1:19-cv-14765-RMB-JBC (Repauno)<br>1:19-cv-14766-RMB-JBC (Chambers Works)<br>1:19-cv-14767-RMB-JBC (Parlin/Sayreville)<br><br>Hon. Renée Marie Bumb, Chief U.S.D.J.<br>James B. Clark, III, U.S.M.J. |

# SUR-REPLY MEMORANDUM

Prepared by:

**MEYNER AND LANDIS LLP**
Albert Telsey, Esq.
One Gateway Center, Suite 2500
Newark, New Jersey 07102
Telephone: (973) 602-3439
Facsimile: (973) 624-0356
atelsey@meyner.com
*Attorneys for Intervenors, Carneys Point Township, Borough of Sayreville*

Dated: June 22, 2026

**SUR-REPLY MEMORANDUM**

This court must determine if the Judicial Consent Orders ("JCOs") here are fair, reasonable, lawful, and in the public interest. Carneys Point and Sayreville submit the JCOs are not workable or enforceable because, among other things, they do not provide the "lockbox" control over the PFAS Funds this court required and the public demands.

This funding control has two components. First, what will the New Jersey Department of Environmental Protection ("DEP") do with the PFAS Funds as they get the money each year for 25 years? Plaintiffs have prepared a Distribution Plan.

Second, how does DEP retain control of the PFAS Funds so they can distribute those funds over the next 25 years? Plaintiffs repeat in their Reply Brief that they will have a special revenue fund built into the proposed FY2027 Appropriations Act, similar to the Volkswagen Fund, that will distribute the PFAS payments to DEP each year for 25 years. [ECF 839 p9-10]. A special revenue fund is the absolutely wrong vehicle and makes the entire settlement unworkable.

Carneys Point has been claiming the PFAS Fund must be managed and distributed by standalone enabling legislation not a special revenue fund because standalone legislation (1) provides the legal presumption of program continuity needed to maintain and operate a $1B PFAS Fund for 25 years, (2) is permanent until repealed, (3) avoids the risk that the legislature will not appropriate the PFAS

Fund during each of the next 25 budget cycles, (4) anchors decision-making power directly with the DEP, (5) is immune from shifting politics, unexpected legislative deletions and freezes, yearly line-item vetoes, and the Governor diverting PFAS Funds to preferred projects without application or competitive bidding or being used to fill budget gaps, (6) protects the DEP's annual budget by making sure PFAS Funds "supplement" the DEP budget and is not used to "supplant" or water down the DEP budget, and (7) can be used to codify the JCOs proposed forced release on political subdivisions and citizens, which is unenforceable without enabling legislation.

A special revenue fund is vulnerable to all the above risks and concerns. That is why standalone legislation is the lockbox required here.

The key evidence the Plaintiffs have not provided to this court is testimony establishing that a special revenue fund gives Plaintiffs control over 25 years of PFAS payments in the absence of standalone enabling legislation. The court wants to hear this type of testimony and said so in its briefing order [ECF 835].[1]

In contrast, Carneys Point intends to offer testimony from David Rousseau, the former Treasurer of the State of New Jersey, that this settlement is only workable

[1] ORDERED that each party is fully prepared to argue and ***offer testimony*** on whether the proposed settlements are fair, reasonable, faithful to the objectives of the governing statute(s), and in the public interest, as well as on the objections raised by Carneys Point Township and Borough of Sayreville.

if it is supported by enabling legislation not a special revenue fund. Mr. Rousseau's Certification is attached.

Plaintiffs claim the PFAS Abatement Fund, as a special revenue fund, is akin to the non-lapsing Volkswagen Fund. Non-lapsing just means that if there is money left over after one fiscal year it stays in the Fund and does not default to the general fund. Non-lapsing does not mean the Fund is self-actualizing and perpetually reappropriated year after year. On the contrary, it is not reappropriated year after year and is therefore not secure for the reasons mentioned above. And that is its fundamental flaw.

The Volkswagen Fund is a poor example of a funding model that provides perpetual control over settlement funds. The Volkswagen Fund ($72.2M) was itself supposed to be managed through standalone legislation when it was proposed in 2017. S3029 and A4749, Session 2017-2018. However, that legislation was vetoed by Governor Chris Christie because he wanted the flexibility to control those funds. As such, the Volkswagen Fund defaulted to a special revenue fund subject to all the control flaws mentioned above.

The standalone legislation for the 2017 Volkswagen Fund was actually the second standalone environmental fund bill that Governor Christie vetoed. The first one involved the 2015 ExxonMobil natural resource damages ("NRD") settlement. The Governor took that $8.9B NRD case from the DEP and settled it for $225M so

he could use the money to fill budget gaps.[2] This infuriated New Jersey legislators. They proposed standalone enabling legislation to control and manage the $225M ExxonMobil NRD settlement funds. S2791, Session 2014-2015. However, Governor Christie also vetoed that bill because he wanted control over environmental funds.[3]

This strongarm veto tactic prompted the legislature to put a referendum on the ballot to amend the state Constitution to protect NRD recoveries from being raided by the executive branch.[4] That referendum was overwhelmingly approved by New Jersey voters and became the NRD Constitutional amendment, which prohibited executive branch raiding of NRD settlements by crediting 100% of those settlements to a dedicated NRD legislative account. (NJ Const. Art. VIII, Sec. II, para 9).

It is against this backdrop that DEP now stands before this court claiming a special revenue fund is the proper vehicle for managing the $1B PFAS Fund for 25 years. It is not the proper vehicle for all the flaws mentioned above. Even Plaintiffs admit that the Volkswagen Fund is susceptible to being disabled if it is not reappropriate every year as part of the budget cycle. ECF 827, p36.

---

[2] "Under Law, Christie Can Use Exxon Settlement to Help Balance Budget," New York Times, March 2, 2015, by Benjamin Weiser.

[3] "Christie vetoes environmental clean up funding bill pushed after Exxon settlement" NJ.Com May 11, 2015.

[4] "Ballot question Closer to Stop Raiding of Natural Resource Damage," NJ Spotlight, October 6, 2017, by Tom Johnson.

The problem is that DEP has little to no experience constructing the legislative architecture needed for a multi-year environmental settlement. That is because DEP's settlements typically involve one-year payouts, which were appropriated to the DEP in the Appropriations Act in the year the matter settled. See DEPs website of settled matters over the past eight years.[5]

The DEP simply pulled a special revenue fund model off the shelf and decided that was good enough without understanding its vulnerabilities that made it inferior to standalone legislation. A special revenue fund actually works against the Plaintiffs' interest (it does not provide 25 years of control), <u>and</u> it works against the public's interest (it does not dedicate PFAS funding for 25 years).

The decision to use a special revenue fund instead of standalone legislation is not harmless error. It is a fundamental and catastrophic error that puts the entire $1B PFAS settlement component at risk of not being renewed every year for 25 years.

Even though this court will be considering this settlement at a hearing on June 24, 2026, the legislature has not yet approved the PFAS Abatement Fund. Even if the legislature does approve it for FY2027, that is only one of the next twenty-four years in a row that approval must happen without fail. Neither Plaintiffs nor this court can assure the public that will happen.

---

[5] List of NRD settlements

Carneys Point's additional issues.

Carneys Point is the ground zero host community to Chambers Works, and one of the most PFAS polluted sites in the world, according to Plaintiffs. The Township therefore has a vested interest in making sure Plaintiffs get the settlement right.

Despite Plaintiffs' claims to the contrary, Carneys Point's pollution harm from the Chambers Works site is unfairly being used to benefit others while Carneys Point is being denied the benefit of those funds.

Regarding the remediation funding source ("RFS") being posted for the Chambers Works site, DEP is allowing the Defendants to assume that it is "technically impracticable" to clean up the Chambers Works site, meaning RFS funds may not have to be spent or increased. This benefits the Defendants at the expense of Carneys Point.

Regarding NRD funds allocated to Chambers Works, DEP can convert them to PFAS funds and divert them for their own administrative purposes. This benefits DEP at the expense of Carneys Point.

Regarding PFAS, DEP is prioritizing these funds for counties and environmental authorities that have not proven they are impacted by PFAS from Chambers Works or anywhere else; DEP is excluding Carneys Point from this priority PFAS funding; and DEP is confirming Defendants tax deduction for those

priority PFAS payments unrelated to Chambers Works PFAS pollution. This benefits unimpacted far away counties and environmental authorities, DEP, and the Defendants at the expense of Carneys Point.

Lastly, unless amended, the DuPont JCO seeks to "resolve, release, and bar" the Township's state court action thereby denying the Township its attorney's fees and penalty assessments. This simply harms Carneys Point based on no lawful authority to do so.

This court and Carneys Point have been told that the parties will not change one word or punctuation mark of the JCOs or else the settlement will be rejected by the Defendants. That is why the Plaintiffs have not made a single change to the JCOs despite six months of mediation. The Plaintiffs are merely going to staple Stipulations and a Distribution Plan to the existing JCOs. To the extent any of those add-on documents create confusion, conflicts or contradictions, then the Plaintiffs are asking the courts and the public to live with it.

John Bibeau, Director of the Township's Industrial Commission for Economic Development will testify about how the below provisions of the JCOs are unfair and unreasonable to Carneys Point.

First, Carneys Point has spent more than $5M over the past ten years litigating environmental violations against DuPont, Chemours, and others in its state court action. The state court found DuPont liable for violating the Industrial Site Recovery

Act ("ISRA"). The Appellate Division confirmed Carneys Point retains its right under the Environmental Rights Act ("ERA") to litigate its claims prior to March 27, 2019, the date Plaintiffs filed this federal court action. The Township is entitled to recover its fees and costs, and it is entitled to recover significant ISRA penalties.

Nevertheless, Plaintiffs want this court to "find" that the releases in the DuPont JCO "resolve, release, and bar" the claims in Carneys Point's state court action (DuPont JCO ¶83). This paragraph further puts this court's stamp of approval on the Defendants' intention to use this paragraph when asking the state court to dismiss the Township's state court action.

As previously noted by this court, it has no jurisdiction to make such a finding. That is why it is imperative that the JCO be properly amended, as the court instructed Plaintiffs to do, but which they have refused to do. Carneys Point has provided the court with a form of order making the appropriate change to paragraph 83.

Second, the $525M PFAS Fund in the DuPont JCO originates solely from PFAS pollution at the Chambers Works site.[6] Plaintiffs have decided to prioritize far away counties and environmental authorities that have no proven PFAS impacts from Chambers Works or any other sources for priority access to this PFAS Fund.

---

[6] DuPont JCO ¶6 Definition of "Abatement Damages." "Abatement Damages" means "damages, excluding Natural Resource Damages, recovered by the Department through the Chambers Works Litigation."

These PFAS funds will be used to supplement the New Jersey Water Bank for water infrastructure projects.

The stipulations executed by Plaintiffs prioritize $240M of the $525M PFAS payments to counties ($90M) and environmental authorities ($150M) for priority funding from the New Jersey Water Bank with the proviso to "use it or loses it," meaning unused priority funds will "revert" back to DEP if not used for something.[7] Even though Carneys Point has a "strong nexus" to the PFAS pollution from Chambers Works, it has been excluded from priority PFAS funding.

The New Jersey Water Bank identifies a project for priority funding according to indicators set forth in its Priority Systems Ranking Methodology.[8] Carneys Point hits all these priority funding indicators. Far away counties and environmental authorities that have not proven to be impacted by PFAS do not meet these criteria. Nevertheless, as part of six months of mediation with counties and environmental authorities that excluded Carneys Point, DEP is prioritizing them for PFAS funding using unknown criteria that do not satisfy the Priority Systems Ranking Methodology.

---

[7] Stipulation with Counties, ECF825, p7-8.

[8] The Priority System Ranking Methodology considers the severity of the water quality impact, the classification of the receiving waters being impacted, the projects alignment with the state's Master Water Supply Plan, the project's improvement in flood protection, the community's median household income, and environmental justice overburdened community protocols, among other things.

In addition to providing unearned priority PFAS funding to far away counties and environmental authorities, the Plaintiffs are also using the $525M PFAS Fund to provide Defendants with an undeserved tax deduction. The Plaintiffs intend to report to the IRS that the PFAS funds to be paid on a priority basis to far away counties and environmental authorities that have not proven a strong nexus to the Chambers Works site pollution nevertheless have a "strong nexus" to that pollution when they do not.[9] (DuPont JCO ¶102).

It is fundamentally unfair to prioritize counties and environmental authorities not impacted by Chambers Works PFAS pollution and to then use that unproven impact to support a tax deduction for the Defendants while, at the same time, denying priority PFAS funding to Carneys Point, which is the ground zero PFAS impacted community adjacent to Chambers Works.

Third, the settlement provides that a $130M RFS must be posted to clean up the Chambers Works site, with the possibility, but not the necessity, of more RFS funding up to $925M. However, the settlement allows Defendants to "assume" that the defense of "technical impracticability" to remediate the site "*will be available*" for all areas of the site where a technical impracticability waiver *is or may be* requested (DuPont JCO ¶18.b.vi, ¶6 definition of "NAPL Work"). This means that

[9] 26 CFR §1.162-21(e)(4)(i)(A)(4).

there is no assurance that any or all of the posted $130M will be used or that any additional RFS funding will be posted to clean up the Chambers Works site.

This intention to do little or no further work at Carneys Point was confirmed by Thomas F. Maguire, PG, LSRP, Chemours' environmental professional, who recently testified before the Carneys Point Planning Board. Against the backdrop of the DuPont JCO pending before this court, which Mr. Maguire acknowledged in his report to the Planning Board (p.4), and the technological impracticability application currently pending and others that may be filed by Chemours as referenced in the JCO (DuPont JCO¶,18.b.vi), Mr. Maguire generally claimed that "investigation activities have been completed" on the Carneys Point 1,100-acres, and he offered no opinion if or when the licensed site remedial professional ("LSRP") for the site will issue an environmental clearance letter for Carneys Point.[10]

The settlement here does not compel the remediation of Carneys Point, much to the frustration of its residents. This is the very situation that prompted the Township to sue DuPont, Chemours, and others 10 years ago. The settlement here allows the pollution to linger without end. This is unfair and unreasonable.

Fourth, the DuPont JCO says $100M is allocated to the Chambers Works site for NRD. However, DEP has the discretion to convert NRD to the PFAS Fund.

[10] Telsey Certif., Ex. 1 (Expert Report of Thomas F. Maguire, PG, LSRP (p.11, 12, 13, 14, 15).

(DuPont JCO ¶7.c).[11] No one knows if, when, or how DEP will convert the $100M NRD to PFAS.

This uncertainty is compounded by the fact that the DuPont JCO combines yearly NRD and PFAS payments into one undifferentiated bundle. No one knows if, when, or how DEP will unbundle each payment into an NRD component and PFAS component. This alchemy will be shrouded in mystery for 25 years.

In the last footnote on the last page of the Distribution Plan attached to Plaintiffs' Supplemental Report, Plaintiffs now state, "NRD funds will not be re-allocated by the Department for abatement funding." [ECF827 p.47].

What does this mean? It contradicts the JCOs that permit re-allocation of NRD to PFAS. Which provision controls? How is the allocation decision between NRD and PFAS to be made? No one knows.

To compound this confusion, DEP takes the position that it can use an NRD recovery for its own purposes in its sole discretion and that only an undefined "narrow set" of NRD recoveries must actually be credited to the constitutional NRD legislative account. In other words, even if DEP were to unbundle a yearly NRD/PFAS payment into a separate NRD amount and a separate PFAS amount,

---

[11] DuPont JCO ¶7.c.iv [NRD Funds, PFAS Funds, other Settlement Payments]. "Notwithstanding the foregoing, the Settling Plaintiffs retain the *discretion* to apply additional portions of the Settlement Payments for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the State."

DEP takes the position that not all of the separated NRD amounts must be credited to the constitutional NRD legislative account.

Senator Michael L. Testa addressed this with DEP Commissioner Shawn M. LaTourette during a budget hearing on May 2, 2023.[12] Senator Testa specifically asked the Commissioner if DEP could divert NRD settlement funds before crediting 100% of the recovery to the constitutional NRD legislative account. The Commissioner said yes. He interprets the NRD constitutional amendment to require only a "narrow set of natural resource damage monetary recoveries" to actually be credited to the NRD legislative account because the DEP can first divert NRD recoveries to pay its own "administrative costs" however DEP interprets that phrase.[13] Senator Testa disagreed with this type of NRD diversion because it contradicts the 100% credit requirement of the constitutional NRD amendment. ("I just don't think that's consistent with my interpretation of the constitutional amendment.")[14]

[12] May 2, 2023, DEP Senate Budget Hearing. Minutes 55 to 63. https://www.njleg.state.nj.us/archived-media/2022/SBAB-meeting-list/media-player?committee=SBAB&agendaDate=2023-05-02-13:00:00&agendaType=H&av=V

[13] ***Senator Testa (ST)**:* "I thought the constitutional amendment did specifically say that 10 percent could go towards administrative and legal fees. Am I wrong about that? I may be misremembering that."

***Commissioner LaTourette (CL)**:* "I think that the constitutional amendment is looking at a narrow set of natural resource damage monetary recoveries. And that those recoveries go into the constitutionally dedicated fund. And that the constitutional amendment is governing what goes into that fund and such, such that we are able to utilize a percentage of what's in that fund in order to operate the program itself." See fn. 12.

[14] ***ST**:* "Okay. So, what you're saying is we got a hundred million dollars settlement. So, and the. . . So, of that, I would interpret or up until now, uh, and I'm open to some discussion on this, but

Senator Testa's instincts were correct. The Spill Act, which governs NRD recoveries, provides that funds dedicated to third parties, like NRD, must go to those third parties. N.J.S.A. 58:10-23.11u(b.)[15]"

The JCOs, the new footnote 6, and DEPs off putting interpretation of the NRD constitutional amendment creates a hopelessly conflicting jumble of discretion and intention that does not inform Carneys Point, the public, or this court how DEP is going to manage more than $1B in bundled NRD and PFAS funding over the next 25 years. The DEP's shifting word play is fundamentally unfair, unreasonable, and unlawful.

Sayreville. This uncertainty surrounding NRD funding is the reason Sayreville joins in objecting to the settlement. Sayreville has been allocated $30M NRD in the DuPont JCO and $0 in the 3M JCO. Sayreville faces the same uncertainty regarding its $30M NRD allocation in the DuPont JCO that Carneys Point faces with its $100M NRD allocation.

---

that 10 million could go to administrative fees and legal fees, 90 million would go into the fund and be dispersed back to wherever it's going to go to restoration, etc. Um, your contention is that, uh, maybe a third of that 100 million gets taken out because it was outside counsel. Uh, so 33 and a third million come out already and the remainder goes into the fund. Is that your interpretation?"
***CL:*** "That, that would be, that would be accurate. But I think it's also important to, to, to recognize that, that not every, um, not every engagement on natural resource, uh, damage, um, matters is subject to some contingent fee arrangement."
***ST:*** "So that's fine. I'm just wondering, those that are, you know, are we lopping 33 percent off? Cause I, I just don't think that's consistent with my interpretation of the constitutional amendment that 10 million. Okay. 10%, but. No more than that. Uh, we'll dive more into that and maybe have a, yeah." See fn. 12.

[15] "Compensatory damages for damages awarded to a person other than the State shall be paid to the person injured by the discharge."

In addition, even though the DuPont Parlin site, located in Sayreville, was actually one of the litigated cases being settled here, the 3M JCO allocates $0 NRD to Sayreville. This violates the NRD constitutional amendment that requires that the pollution impacted community be entitled to NRD recoveries on a "first priority" basis. Being allocated $0 is the opposite of first priority status.

Conclusion

Carneys Point submits that it is getting little to nothing of what this settlement promises to deliver. (1) Carneys Point is not getting the Chambers Works site cleaned up because DEP is allowing Defendants to assume it is "technically impractical" to clean it up. (2) Carneys Point is not getting priority PFAS funding because its pollution is being used to feed funding for other far away counties and environmental authorities that have not even proven they are impacted by the Chambers Works site. (3) The use of a special revenue fund instead of standalone legislation makes DEP's entire PFAS payment strategy an illusion of wishful thinking for everyone expecting to get PFAS payments. (4) Carneys Point is not getting NRD funding from the DuPont JCO because the muddle of conflicting intentions and discretion that surrounds NRD allocations lets DEP allocate nothing or next to nothing to Carneys Point at the end of this 25-year settlement journey. (5) To compound these insults, DEP wants this court to find that Carneys Point's claims in its state court lawsuit are "barred" by the DuPont JCO and that the JCO can be

relied upon to dismiss the lawsuit thereby depriving the Township of the fees, expenses, and penalties it is entitled to recover. Lastly, the settlement must be republished for public comment given the major revisions to the settlement structure set forth in the Distribution Plan and Stipulations. Sayreville joins objections (2), (3), and (4) mentioned above, as well as the need to republish the settlement.

The settlement here is not fair, reasonable, lawful, or in the public interest for the reasons set forth herein, and in the Intervenors' prior filed papers, including its Writ of Mandamus.

MEYNER AND LANDIS LLP

By: /s/ *Albert I. Telsey*

Albert I. Telsey, Esq.
*Attorneys for Intervenors, Carneys Point Township and Borough of Sayreville*

Date: June 22, 2026