**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; et al., *Plaintiffs*, v. E.I. DU PONT DE NEMOURS AND COMPANY; et al. *Defendants,* | Case No.:<br>1:19-cv-14758-RMB-JBC (Pompton Lakes)<br>1:19-cv-14765-RMB-JBC (Repauno)<br>1:19-cv-14766-RMB-JBC (Chambers Works)<br>1:19-cv-14767-RMB-JBC (Parlin/Sayreville)<br><br>Hon. Renée Marie Bumb, Chief U.S.D.J.<br>James B. Clark, III, U.S.M.J. |

**CERTIFICATION OF ALBERT I. TELSEY, ESQ.**

**(In support of Sur-Reply Memorandum)**

I, ALBERT I. TELSEY, of full age, am counsel to Intervenor, Carneys Point Township. I am personally familiar with this matter. Attached are true copies of the following:

1. Exhibit 1. October 25, 2025 Report from Thomas F. McGuire, PG, LSRP (pp. 1-15).

I declare under penalty of perjury that the foregoing is true and correct.

***/s/ Albert I Telsey***

Albert I. Telsey, Esq.

June 22, 2026

# Exhibit 1

# Expert Report of
# Thomas F. Maguire, PG, LSRP

**Pertaining to: The April 11, 2025 *Preliminary Redevelopment Need Investigation, Condemnation Redevelopment Area, "DuPont/Chemours Study Area"* (revised September 9, 2025), prepared by Leah Furey Bruder on behalf of the Township of Carneys Point.**

**October 24, 2025**

**Prepared for:**

**McCarter & English LLP**

**Prepared by:**

**Forensic Environmental Services, Inc.**
**113 John Robert Thomas Drive**
**Exton, Pennsylvania 19341**

## 1.0 Introduction

As a retained consultant to E. I. du Pont de Nemours & Company ("EIDP"), The Chemours Company, and The Chemours Company FC, LLC (collectively "Chemours") since 2022, I have had the opportunity to review reports, empirical data and correspondence to/from the United States Environmental Protection Agency (US EPA) and the New Jersey Department of Environmental Protection (NJDEP) with respect to environmental conditions regarding the Chemours Chambers Works site, located at Route 130, Deepwater, New Jersey (i.e., "the Site"). Additionally, I have had the opportunity to conduct a site visit and engage with the current site environmental consultant (AECOM). As a result of these activities and more than 40 years of experience working as a contaminant hydrogeologist in the environmental consulting field, I have developed a comprehensive understanding of the environmental conditions at the Site.

At the request of Counsel for Chemours, I have reviewed the April 11, 2025 (Revised September 9, 2025) *Preliminary Redevelopment Need Investigation, Condemnation Redevelopment Area, "DuPont/Chemours Study Area"*, prepared by Leah Furey Bruder on behalf of the Township of Carneys Point. This document also included Appendix 1 *Chambers Works Redevelopment Study – Environmental Section*, prepared by Albert I. Telsey, Esq. My report summarizes relevant background information regarding potentially applicable environmental regulations and conditions regarding the portion of the Site that lies within Carneys Point Township, provides context regarding site environmental conditions and offers a critique of the above-noted documents, in particular Appendix 1. Based upon my review of Appendix 1, Mr. Telsey is not a qualified environmental professional and provides no degree of certainty to support his statements; moreover, there are numerous statements that are erroneous, incorrect or misleading. Consequently, Mr. Telsey's report is unreliable. I have provided examples of some of the erroneous statements in Appendix 1 below, but this report is not intended to be a comprehensive analysis of each and every statement in Appendix 1, as that task would be monumental and beyond the scope of my retention. Rather, this report is intended to highlight examples of the many types of errors, misstatements and incorrect or unsupported assertions that are set forth in Appendix 1.

## 2.0 Qualifications

I hold a Bachelor of Science in Geology from the University of New Hampshire (1981) and a Master of Science in Geology, with an emphasis on Geophysics, from the University of Rhode Island (1983). I am founder and President of Forensic Environmental Services, Inc. I have been engaged as a contaminant hydrogeologist in the environmental consulting industry for more than 40 years.

I am a licensed Professional Geologist in the State of New York, Commonwealth of Pennsylvania and the State of Indiana. I am also a Licensed Site Remediation Professional (LSRP) in the State of New Jersey and a Licensed Environmental Professional (LEP) in the State of Connecticut and a Licensed Site Professional (LSP) in the State of Massachusetts. As such, I am duly authorized by the States of New Jersey, Connecticut and Massachusetts to serve in the capacity of an

environmental regulator. For example, in the context of the Site Remediation Reform Act (SRRA), the NJDEP states that "LSRPs step into the shoes of the Department of Environmental Protection (Department) to oversee the remediation of contaminated sites" (NJDEP, June 2014, *Overview of the Licensed Site Remediation Professional (LSRP) Program*). To this end, I routinely evaluate the nature, extent and potential risk to human health and the environment associated with organic and inorganic contaminants.

I am a member in good standing of the American Institute of Professional Geologists, the Geological Society of America and the National Groundwater Association. As a function of my continuing education requirements, I have and continue to attend numerous courses, conferences, and symposia focused on the assessment and remediation of environmental contaminants in soil, groundwater and air.

I have investigated the nature and extent of organic and inorganic contaminants in soil, groundwater and air at numerous federal-led (e.g., Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Resource Conservation and Recovery Act (RCRA)) and state-led (e.g., New Jersey Spill Compensation and Control Act (Spill Act) and Industrial Site Recovery Act (ISRA)) environmental contamination sites. I have evaluated the persistence and movement ("fate and transport") of dissolved and non-aqueous phase contaminants through the analysis of hydrogeologic and chemical data and the use of analytical and numerical computer models. I have been qualified by State and Federal courts as a technical expert regarding the above-noted matters.

As a result of my education, training and technical experience, I have expertise in interpreting environmental data, identifying sources, evaluating the fate and transport of environmental contaminants, assessing the potential threat of organic and inorganic contaminants to human health, safety and the environment, characterizing contaminated sites, interpreting and complying with environmental regulations, designing/implementing remedial actions and evaluating the applicability and cost of response actions. I have testified as a technical expert on a number of occasions as both a defense and plaintiff expert regarding these matters. My Curriculum Vitae is attached as Exhibit A.

## 3.0 Regulatory Framework Regarding the Investigation and Remediation of Contaminated Sites in New Jersey

The principal objective of environmental guidelines, regulations and statutes is to protect human health, safety and the environment. The investigation and remediation of environmentally impacted sites in New Jersey may be subject to Federal and State laws and regulations including, but not limited to: CERCLA; RCRA; Spill Act; the New Jersey Water Pollution Control Act; ISRA; and the New Jersey Brownfield and Contaminated Site Remediation Act. With respect to the Site, implementation of response actions (investigation and cleanup) is subject to compliance with both Federal and/or State regulatory programs. Both Federal and State guidance, regulations and statutes establish the technical requirements to remediate a contaminated site and ensure that the remediation is protective of public health and safety and of the environment.

Prior to 2010, the NJDEP provided direct oversight of responsible parties with regard to the investigation and remediation of all contaminated sites. To this end, NJDEP review and approval was required prior to implementing investigation work plans and selecting/conducting remedial measures. Due, in part, to the number of contaminated sites across the state and the NJDEP's staff limitations, the investigation and remediation of contaminated sites languished. Ultimately, following the cleanup of contaminated sites to applicable remediation criteria (or Areas of Concern (AOCs) within contaminated sites), the NJDEP would issue No Further Action (NFA) determinations.

In 2009, the State of New Jersey promulgated the Site Remediation Reform Act (SRRA). "SRRA established the affirmative obligation for responsible parties to remediate contaminated sites in a timely manner" (NJDEP, June 2014, *Overview of the Licensed Site Remediation Professional (LSRP) Program*) The development and promulgation of SRRA was borne out of the NJDEP's inability (due in part to staffing limitations) to efficiently provide oversight, direct requisite response actions and move sites to closure, thereby alleviating the backlog of identified environmentally contaminated sites in the state. To this end, SRRA set forth a pathway to certify qualified environmental remediation practitioners, identified as Licensed Site Remediation Professionals (LSRPs), to "step into the shoes" of the NJDEP and oversee the investigation and remediation of contaminated sites. Specifically, effective May 7, 2012, parties responsible for conducting remediation (PRCRs) were required to retain an LSRP to oversee the remediation of those sites subject to the jurisdiction of the State environmental regulations.

In order to achieve timely remediation of contaminated sites, SRRA identified Regulatory and Mandatory Timeframes to complete investigations and remedial actions. Failure to comply with Regulatory or Mandatory Timeframes could result in either an enforcement action (monetary penalty and establishment of an ACO) or direct department oversight. The NJDEP employed a "compliance assistance" approach to work with PRCRs to help maintain compliance with applicable regulations. Separately, the NJDEP required the establishment of either a Remediation Funding Source (RFS) or a Financial Assurance (FA) mechanism to ensure sufficient funding was available to complete remediation of applicable sites. In general, establishment of an RFS was required to complete the investigation and remediation of a site while an FA was established to ensure that requirements of an approved Remedial Action Permit (RAP) incorporating engineering controls were funded to maintain protection of public health, safety and the environment.

In certain instances, for example sites located in New Jersey subject to Federal Regulations (e.g., RCRA), the U.S. EPA maintained primacy over the investigation and cleanup and retention of an LSRP was not required. In particular, those sites included on EPA's RCRA Government Performance and Results Act (GPRA) 2020 list where EPA is the lead agency, retention of an LSRP is not required. The Chambers Works Site, including the portion located in Carneys Point, is a site identified on the GRPA 2020 list and consequently EPA has maintained primacy regarding compliance with regard to Solid Waste Management Units (SWMUs) and Areas of Concern (AOCs) included on the Hazardous and Solid Waste Amendments of 1984 (HSWA) Permit for this Site. In these instances, the NJDEP serves "as a support agency" reviewing reports/key submittals and issuing comments to EPA; final document approval is in the hands of the EPA. Moreover,

timeframes for completing milestone response actions (e.g., RFI, CMS, CA, etc.[1]) are dictated by EPA not the NJDEP or the Party Responsible for Conducting Remediation (PRCR). Additionally, EPA's Financial Assurance requirements have previously been the primary applicable financial assurance obligations for remediation at the Chambers Works site, and Chemours has posted such assurances as applicable.

On August 4, 2025, the NJDEP posted a news release (https://dep.nj.gov/dupont/) generally describing a proposed Judicial Consent Order (JCO) between the NJDEP and Chemours which will provide the NJDEP with additional input and involvement with respect to the investigation and cleanup of the Chambers Works Site. A notice regarding the Proposed JCO, which is subject to public notice and comment, was subsequently posted in the New Jersey Register on September 2, 2025 (https://dep.nj.gov/wp-content/uploads/dupont/dupont-jco-proposed.pdf). As a primary component, the proposed JCO includes provisions to establish and maintain a Remediation Funding Source (RFS) and Reserve Fund to ensure that the investigation and remediation of the Site will continue uninterrupted into the future.

For LSRP lead sites and those where the NJDEP serves as the sole or lead agency, N.J.A.C. 7:26E Technical Requirements for Site Remediation ("Technical Requirements"), outlines the process through which a contaminated site is investigated and ultimately remediated in accordance with applicable NJDEP regulations. Generally, the process is iterative and incorporates the following principal elements: 1) receptor evaluation; 2) Preliminary Assessment/Site Investigation (PA/SI); 3) Remedial Investigation (RI); 4) Remedial Action (RA); 5) NJDEP approval of a soil and/or groundwater Remedial Action Permit (Soil-RAP or GW-RAP); 6) Issuance of a Response Action Outcome (RAO); and 6) biennial certification of the continued protectiveness of the Soil-RAP or GW-RAP. Sites in New Jersey requiring soil and groundwater remediation which incorporate engineering controls (e.g., soil/engineered cap; soil vapor extraction (SVE), subsurface depressurization systems (SSDS), active/passive groundwater remedy) require NJDEP review/approval of a RAP. Currently, the NJDEP is requiring one to two years to complete its review of RAP applications.

NJDEP Land Use Restrictions, including Wetland and Tideland designation restrict/limit the area of the Site (and in particular the portion of the Site that lies within Carneys Point Township) that can be developed. The NJDEP 2020 Wetland map for the Carneys Point area is presented in Figure 1. As illustrated in Figure 1, much of the Carneys Point area of the Site has been identified as Wetlands by the NJDEP.

## 4.0 Review of Appendix 1

Despite a vague reference by Mr. Telsey to a "huge bibliography of information", only three Documents are referenced/cited in Appendix 1: 1) the December 2006 Preliminary

[1] Although New Jersey's regulatory framework is described herein, Federal environmental regulations and statutes generally serve as templates for State regulations. In the context of Federal regulations, a RCRA Facility Investigation (RFI) has similar objectives and is generally equivalent to NJDEP's Remedial Investigation (RI). Similarly, an NJDEP Remedial Action Work Plan (RAWP) or Feasibility Study (FS) are generally equivalent to a RCRA Corrective Measures Study (CMS) and an NJDEP Remedial Action (RA) is equivalent to a RCRA Corrective Action (CA).

Assessment/Site Investigation ("PA/SI") Report; 2) DuPont's August 2007 Fact Sheets describing solid waste management unit or SWMUs; and 3) The Chemours Company ("Chemours") 2017 PA/SI Report. A keystone report, the 2014 RCRA Facility Investigation, prepared by URS, is not referenced in Appendix 1, nor are the SWMU/AOC Fact Sheets that were updated in 2014 and appended to the RFI report[2]. In fact, more than 70 technical reports have been prepared which document the environmental conditions and remedial actions taken at and beneath the portion of the Site that lies within Carneys Point Township. In addition to technical reports, a review of publicly available correspondence and the interactions between Chemours and the US EPA/NJDEP provides important context with respect to determining Site environmental conditions and the status of regulatory compliance. A partial list of these technical reports is included as Attachment 1 to provide examples of the wealth of information that is available for the Site. Further, as noted above, the proposed JCO between the NJDEP and Chemours provides additional context regarding my review of Appendix 1. In conjunction with my involvement at the site since 2022, I have reviewed many of the reports listed in Attachment 1 including the proposed JCO.

### 4.1 History of Carneys Point

Appendix C to the 2006 Preliminary Assessment Report prepared by the DuPont Corporate Remediation Group (CRG) provides a detailed history of the development and manufacturing history of Carneys Point. Presented below is an abbreviated summary of relevant historical activities in Carneys Point.

In its entirety, the Chambers Works/Carneys Point site covers 1,455 acres and is generally divided into two areas, Carneys Point located in the north and the approximately 700-acre Chambers Works Manufacturing Area, located in the south. Henby Creek generally separates Carneys Point from the Chambers Works Manufacturing Area. Both Carneys Point and the Chambers Works Manufacturing Area have extensive and different histories of industrial activities and chemical manufacturing. Moreover, environmental regulatory compliance for the Carneys Point area can and should be viewed separately from the environmental conditions and cleanup requirements associated with the Chambers Works Manufacturing Area.

Operations at the Chambers Works Complex began circa 1892 when Carneys Point smokeless gunpowder plant was constructed in the northern portion of Carneys Point. In addition to research, development and manufacturing of many chemicals and commercial products, the Chambers Works facility, including the Carneys Point area, manufactured chemicals and products pursuant to federal contract for more than a century. Some of the products produced by EIDP pursuant to contracts with the federal government are listed below.

| Product | Area Manufactured | Potential Environmental Contaminants (parent and bi-products) |
| --- | --- | --- |

[2] Mr. Telsey cites to the Fact Sheets dated August 2007.

| | | |
|---|---|---|
| Smokeless Powder | Carneys Point | nitric acid, sulfuric acid, sulfides, sulfates, organic compounds, metals |
| Explosives (e.g., Trinitrotoluene, Ammonium Picrate) | Carneys Point | organic compounds, nitric acid |
| Dinitro toluene | Carneys Point | organic compounds, nitric acid |
| Ethyl Fluid | Chambers Works Manufacturing Area | lead, organic lead, organic compounds |
| Tetraethyl Lead | Chambers Works Manufacturing Area | lead, organic lead, organic compounds |
| Fluorinated Lubricating Oil | Chambers Works Manufacturing Area | fluorine, hydrocarbons, PAHs |
| Dyes | Carneys Point and Chambers Works Manufacturing Area | organic solvents (e.g., benzene, toluene, xylene) and metals (e.g., arsenic, lead, chromium, zinc) |
| Miscellaneous Chemicals | Chambers Works Manufacturing Area | Organic solvents, acids, hydrocarbons, etc. |
| Hydraulic/Cutting/Lubricating Oils | Chambers Works Manufacturing Area | Hydrocarbons, PAHs |
| Neoprene | Chambers Works Manufacturing Area | Organic solvents (e.g., toluene, xylene, etc.) |
| Hydrofluoric Acid | Chambers Works Manufacturing Area | Fluorine |
| Freon-12 | Chambers Works Manufacturing Area | Fluorine and Freon |

By the early 1980s, dye and explosives manufacturing activities at the Site had ceased, and a majority of the buildings in Carneys Point had been razed. By 1991, the Motor Fuel Antiknock Production Area (AOC 2 at Chambers Works) and associated tetraethyl lead production ceased. From 1993 through 2022 a coal-fired steam and electricity cogenerating plant was operated in the southern portion of Carneys Point. Currently, the Carneys Point portion of the chambers Works site houses the Site's Waste Water Treatment Plant (WWTP) near the manufacturing area and the Secure C Landfill in the center portion of the property, as well as certain other tenant operations, all of which are surrounded by woodlands and wetland areas. Figure 1 provides a depiction of NJDEP's 2020 determination regarding the spatial distribution of designated wetland areas across Carneys Point. Chemical manufacturing currently continues in certain portions of the Chambers Works Manufacturing Area which also utilizes the WWTP and Secure C Landfill.

EIDP/Chemours is remediating the Site pursuant to the November 7, 1998, Hazardous and Solid Waste Amendments of 1984 (HSWA) Permit, (I.D. Number NJD002385730) issued by the United States Environmental Protection Agency (the "US EPA"). The US EPA has thus far maintained primacy regarding compliance with RCRA Corrective Action with respect to Solid Waste Management Units (SWMUs) and Areas of Concern (AOCs) included on the HSWA Permit for the Site. Consequently, the NJDEP has served as a support agency reviewing reports/key submittals and issuing comments to the US EPA; final document approval has been in the hands

of the US EPA. Moreover, timeframes for completing milestone response actions (*e.g.*, RCRA Facility Investigations (RFI), Corrective Measures Studies (CMS), Corrective Action, etc.) are dictated by the US EPA, not the NJDEP or Chemours. Additionally, the US EPA's financial assurance requirements have obviated the NJDEP RFS/FA obligations for areas subject to federal regulations (*e.g.*, RCRA SWMUs and AOCs). As previously noted, the proposed JOC will provide the NJDEP with additional input and involvement with respect to the investigation and cleanup of the both the Chambers Works Manufacturing Area and the Carneys Point portion of the Site

Prior to issuance of the HSWA permit, EIDP established a groundwater interceptor well system in 1971[3] to control and recover groundwater contamination within the Site boundary. Subsequent expansion and optimization of the site-wide groundwater Interceptor Well System ("IWS"), installation of a Sheet Pile Barrier (SPB) along the boundaries of the Site abutting the Delaware River and Salem Canal and other focused remedial actions and institutional/engineering controls function as Interim Corrective Measures pursuant to RCRA.

In the context of the RCRA Corrective Action program, where necessary, Interim Corrective Actions are implemented to protect against potential imminent threats to human health, safety and the environment, while characterization regarding the nature and extent of contamination (RCRA Facility Investigation – "RFI") and screening of potential remedial alternatives CMS are conducted. Although Chemours submitted an RFI to US EPA and NJDEP in 2014, certain data gaps remain with respect to completing a comprehensive RFI for the Site. Given the complexity of Site historical manufacturing operations, the number of SWMU/AOCs and requisite regulatory review/oversight, it is not unexpected that certain data collection activities are ongoing. Chemours continues to work with the US EPA and the NJDEP (in part, through participation in quarterly status meetings, submittal of investigation work plans, preparation and submittal of investigation and compliance monitoring reports and public participation, and as envisioned by the proposed JCO), to comply with applicable environmental regulations and complete site-wide RFI and a CMS[4] requirements and continue to implement/maintain interim corrective measures.

---

[3] "In 1967 DuPont installed and sampled ground water monitoring wells at the CWF [Chambers Works Facility] site." "Analysis of the monitoring well samples indicated that contamination had occurred in the shallow glacial aquifer underlying and adjacent to the plant site …" "DuPont subsequently performed a hydrogeologic study and determined that an interceptor well system was needed." "In 1971, DuPont installed an interceptor well system along the north and east boundary of the CWF site." (1984 Administrative Consent Order, NJDEP-DPNT-CW00397701).

[4] On February 28, 2025, the NJDEP informed EIDP/Chemours that it was placing the Site under Discretionary Direct Oversight pursuant to the NJ Site Remediation Reform Act (SRRA) and the NJ Administrative Requirements for the Remediation of Contaminated Sites (ARRCS). On March 7, 2025, EIDP/Chemours informed the Court of NJDEP's actions and of EIDP/Chemours's Objections. *See N.J. Dep't of Env't. Prot. v. E.I. DuPont de Nemours & Co. et al.*, United States District Court for the District of New Jersey, No. 1:19-cv-14766-RMB-JBC and ECF No. 530. NJDEP responded on March 10, 2025, noting that it would defer any action while the case was being litigated in federal court. *See* ECF No. 532. Two days later, on March 12, 2025, the Court issued a Memorandum Order emphasizing "NJDEP's eve-of-trial decision . . . left this Court scratching its judicial head." *See* ECF No. 536. EIDP/Chemours also filed an appeal with the New Jersey Appellate Division (Docket No: A-002128-24), and the state matter was ultimately stayed. The parties ultimately agreed to enter a settlement and, under the proposed JCO, the NJDEP February 28, 2025 letter (and the identified requirements therein) will be withdrawn, *i.e.*, the NJDEP's letter was never adjudicated.

To date, a site-wide CMS has not been prepared to screen potentially applicable final remedies. Moreover, a fundamental component of a CMS is to identify Remedial Action Objectives as a basis to compare and contrast potential Corrective Measures. Accordingly, Remedial Action Objectives have not been established by the US EPA/NJDEP for impacted site media (e.g., soil, groundwater, surface water, sediments). In the absence of Remedial Action Objectives, neither the scope nor cost of additional response actions required to transition from Interim to Final Corrective Measures can be precisely determined, but regardless the proposed JCO provides for added financial assurance and a Reserve Fund, ensuring the investigation and remediation of the Site is uninterrupted.

Despite the absence of an EPA approved site-wide CMS and EPA's establishment of Remedial Action Objectives for the Site, Chemours has continued to implement cleanup activities in addition to conducting/maintaining Interim Corrective Measures. For example, these additional cleanup activities (including those previously performed by EIDP) have included the excavation and disposal of contaminated soils, extraction of Dense Non-Aqueous Phase Liquid (DNAPL) contamination from the subsurface and pilot testing of additional/innovative remedial technologies to facilitate residual source mass removal and accelerate Site cleanup.

### 4.2 Environmental Conditions at Carneys Point

#### 4.2.1 Carneys Point Area of Concern

The Carneys Point AOC occupies approximately 720 acres in the northernmost portion of the Chambers Works/Carneys Point Site (Figure 2). Much of this AOC contains areas designated as wetlands by the NJDEP. This area was generally the focal point for gun powder and explosive manufacturing from 1892 until approximately 1978 associated with the Carneys Point Works. The investigation and remediation, if necessary, regarding the Carneys Point AOC is subject to RCRA Corrective Action requirements and regulations under the jurisdiction of the US EPA through the Hazardous and Solid Waste Amendments of 1984 (HSWA) permit no. NJD002385730 (effective on November 7, 1988). Additionally, response actions in this area have been conducted pursuant to the: (a) terms of the amended 1988 (satisfied and closed 2014) Administrative Consent Order (ACO) between EIDP and the NJDEP; (b) the New Jersey Pollutant Discharge Elimination System – Discharge to Groundwater (NJPDES-DGW) permits; and (c) investigation work plans and Interim Stabilization Measure (ISM) work plans approved by the NJDEP and US EPA.

The Carneys Point AOC in general and the 30 identified RCRA SWMUs located in this AOC have been thoroughly evaluated through the completion of more than 36 environmental investigations over the period 1992 through 2017. Additionally, remedial measures have been conducted in several SWMUs to facilitate the removal of residual sources of environmental impact and/or eliminate the potential for human/ecological exposure. Both the investigation and remedial measures have been conducted under the oversight by the US EPA and the NJDEP.

The locations of the individual SWMUs are illustrated on Figure 3 and listed below.

| SWMU No. | Description | Current Regulatory Status |
|---|---|---|
| 13 | Secure C Landfill | Active – RCRA Permit – 2002 EPA NFA Approval for Cell 1 |
| 19 | Nitrocellulose Waste Disposal Areas | Soil excavation, RFI Complete, 1993 EPA NFA Approval |
| 37 | Waste Accumulation/Disposal Area | RFI Complete, 2002 EPA NFA Approval |
| 42 | Henby Creek | RFI Complete, BEE, Ecological Investigation, NFI |
| 44 (Not a SWMU) | Surface Impoundment Complex | RFI Complete |
| 45-1 to 45-9 | Manufacturing Areas | RFI Conducted, removal of subsurface pipes and nitrocellulose in multiple SWMUs, 45-9 removal of process drainage system and nitrocellulose, CMS required for 45-2 |
| 46 | Dredge Spoils Area | RFI Complete, 2002 EPA NFA Approval |
| 47 | Areas of Fill Deposition | RFI Complete, 2002 EPA NFA Approval |
| 48-1 to 48-7 | Drum Storage/Cleaning Areas | removal of subsurface pipes and nitrocellulose in multiple SWMUs, RFI Complete, BEE, 1993 EPA NFA Approval for 48-4, |
| 49 | Dewatering Pad | Soil excavation, RFI Complete, 1993 EPA NFA Approval |
| 52 | Debris Disposal Area | RFI Complete, ISM, RAR |
| 53 (Not a SWMU) | Water Reservoir | RFI Complete |
| 54 | Solvent Recovery Units | RFI Complete, 2002 EPA NFA Approval |
| 60 | Drum Disposal Area | RFI Conducted |
| 61 | Disposal Area II | RI Conducted, 2002 EPA NFA Approval |

In conjunction with the above-noted environmental investigations, a total of 964 soil, 68 sediment, 145 groundwater and 35 surface water locations have been sampled within the Carneys Point AOC. These samples have been subjected to quantitative laboratory analysis for identified potential environmental contaminants. The majority of the samples collected from these locations have not exhibited an exceedance of NJDEP's Non-Residential Direct Contact Soil Cleanup Criteria NRDCSCC). Where exceedances of NRDCSCC were found, the constituents were principally limited to selected metals (arsenic and lead) and certain poly-nuclear aromatic hydrocarbons (PAHs). Similarly, the detections of COCs in groundwater (selected metals and PAHs) correspond with the discrete areas where COCs have been detected above applicable NJDEP standards in soil. Groundwater quality compliance monitoring is conducted across the Carneys Point AOC pursuant to a NJPDES-DGW Permit. One SWMU (45-2, refer to attached Figure 3) has been identified by the Site consultant (AECOM) for additional investigation and potential remedial action.

Sampling on behalf of the NJDEP in 2024 regarding the occurrence of PFAS in soils across the Carneys Point AOC did not identify an exceedance of either the Residential or Non-Residential

Ingestion/Dermal Remediation Standards. Additionally, these data did not identify the potential for adverse ecological risk due to detections of PFAS in soils or sediments.

Remedial actions including but not limited to; (a) the excavation and disposal of impacted soil/sediment; (b) removal of the historic process drain system; and (c) removal and neutralization of nitrocellulose waste, have been conducted in the: Formerly Proposed Landfill D area; SWMU-52; and T29 Area (adjacent to Bouttown Creek).

The Secure C Landfill covers an area of approximately 32 acres and has been in operation since 1975. Cell 1 (or Area 1) was constructed and operated as an experimental, single lined 5-acre area and was taken out of service in 1978. Cell 1 (SWMU 13) was closed in 1979, receiving an NFA and Covenant Not to Sue from the NJDEP on October 24, 2002. The remaining three original cells (2, 3 and 4) were constructed with double liners, leachate collection and leak detection systems. On April 16, 2001, the NJDEP issued the Secure Landfill Permit Modification, authorizing the construction of Cell 5A. Following its construction, on July 3, 2001, the NJDEP authorized the use of Cell 5A.

In recognition of its active status, the entire Secure C Landfill has not been the subject to RCRA Corrective Action compliance or completion of an RFI. A groundwater Corrective Action Plan (CAP) was developed in 1990 and initiated in 1991 to hydraulically control and extract impacted groundwater in the area beneath and surrounding Cell 1. Two groundwater recovery wells (P21-R01B and Q20-R01B) continuously pump on average 20 gallons per minute to establish hydraulic control over the area surrounding Cell 1. Post-closure monitoring of groundwater quality beneath and surrounding the landfill is conducted in accordance with the Groundwater Protection Plan (GWPP) pursuant to the NJPDES-DGW Permit No. NJ0105872.

All four phases of the Site RFI focused on the collection of surface water and/or sediment samples from Henby Creek (SWMU 42). The results of this sampling identified SVOCs (primarily PAHs) and several metals at concentrations above screening criteria. Findings from the 2010 *Summary of Ecological Investigations in Carneys Point* demonstrated that no unacceptable risk was identified for potential ecological receptors in Henby Creek and the Henby Creek Wetlands. Based upon this study, in December 2010 the NJDEP approved a No Further Investigation (NFI) designation for Henby Creek. Separately, the 2010 *Summary of Ecological Investigations in Carneys Point* concluded that no unacceptable risk was identified for potential ecological receptors in Bouttown Creek.

Although no complete exposure pathways regarding human health, safety or ecological receptors are currently present in the Carneys Point AOC, Institutional Controls including: (a) site-wide security measures; (b) procurement of work permits; (c) requisite Site/area-specific orientations; (d) the NJDEP approved site-wide Classification Exception Area (CEA); and (e) groundwater hydraulic and contaminant compliance monitoring program pursuant to the NJPDES-DGW Permit have been put in place by EIDP/Chemours to ensure that human health, safety and the environment are protected. Additionally, Engineering Controls including: (a) a perimeter fence and video monitoring system; (b) protective surface cover (soil, asphalt, concrete, crushed stone, etc.); (c) the Interceptor Well System (IWS) and Sheet Pile Barrier (SPB) to establish and maintain

hydraulic control within and beneath the boundary of the Chambers Works/Carneys Point Site, have been implemented by EIDP/Chemours.

With the exception of conducting a CMS for SWMU 54-2, investigation activities have been completed in all of the identified SWMUs. EPA issued NFAs for the following SWMUs within the Carneys Point AOC: 13, 19, 37, 46, 47, 48-4, 49, 54 and 61. Impacts to groundwater have been and continue to be contained through operation of the IWS. The ongoing demonstration of groundwater hydraulic containment within the Site in general and the Carneys Point AOC in particular, is conducted pursuant to a NJPDES-DGW Permit.

#### 4.2.2 Waste Water Treatment Plant ("WWTP") AOC

The WWTP (SWMU 18) occupies an area of approximately 70 acres and is located generally south of the Carneys Point AOC, south of Henby Creek and to the west of the Cogeneration/Praxair AOC (Figures 2, 3 and 4). As a function of its operational status, the WWTP is not currently subject to RCRA Corrective Action requirements but is regulated under NJPDES permit No. NJ00051000 which became effective October 1, 2005 and is renewed periodically.

DuPont initially constructed a wastewater treatment pilot plant to comply with the Delaware River Basin Commission's (DRBC) implementation of the 1965 Clean Water Act in the early 1970s. Wastewater treatment reportedly started some time in 1977 with an initial phase incorporating pH neutralization and biological treatment and a second phase including powdered activated-carbon treatment (PACT) to address the presence of aqueous-phase (dissolved) organic contaminants (e.g., VOCs and SVOCs). An additional PACT treatment stage was added to the treatment train in May 1991. The maximum design capacity of the WWTP is reportedly 40 million gallons per day.

Identified SWMUs proximal to or associated with the WWTP AOC and located within Carneys Point Township, include:

| SWMU No. | Description | Currently Regulatory Status |
|---|---|---|
| 12 | Storage Pad | Excavation of soils, RFI Complete |
| 17 | Segments of the Process Water Ditch System (PWDS) | RFI Complete, Removal of subsurface conveyance ditches, Excavation of Contaminated Soils, Construction of OTS, RCRA Closure Approved by EPA, Post-Closure Monitoring |
| 18 | WWTP | Operating |
| 18A | Pump Pit | Repair and Modifications, RFI Complete |
| 39-8 | Former Underground Storage Tanks | Removal, 1993 EPA NFA Approval |
| 55-1 | Fill Deposition Area 1 | RFI Complete |
| N/A | Rail Yard Area | RFI Complete |

Environmental samples have been collected from 12 separate locations for quantitative soil analysis and 26 locations for groundwater analysis. With the exception of SWMU 17 (segments of the PWDS), reported concentrations of COCs in the above-noted SWMUs did not exceed NRDCSCC. Groundwater beneath and adjacent to the WWTP has reported exceedances of applicable NJDEP Class II-A Standards for selected VOCs, PAHs, and metals.

Remedial actions, including the excavation and disposal of soils, removal and RCRA closure of the PWDS (SWMU 17), construction of a new overhead transfer system (OTS) in 1988 to convey process water, groundwater pumped from the IWS and storm-water overflow and excavation and removal of soils from SWMU 12 in 1989 have been conducted in the WWTP AOC.

As a function of: (a) the absence of soil concentration exceedances of NRDCSCC; (b) protective surface cover; (c) Institutional Controls; and (d) Engineering Controls, there are no complete exposure pathways regarding human health, safety or ecological receptors in the WWTP AOC.

Investigation activities have been completed in all of the identified SWMUs. EPA has issued an NFA or RCRA Closure approvals for the following SWMUs within the WWTP AOC: 17 and 39-8. Impacts to groundwater have been and continue to be contained through operation of the IWS and SPB systems. The ongoing demonstration of groundwater hydraulic containment within the Site is conducted pursuant to a NJPDES-DGW Permit.

#### 4.2.3 Cogen and Praxair AOC

The Cogen and Praxair AOC occupies approximately 58 acres and is located to the east of the WWTP and south of Henby Creek (Figures 2 , 3 and 4). This area was historically the location of Carneys Point Plant 2 buildings which were historically used to store gun powder, nitrocellulose, explosives and potentially raw materials used for manufacturing gun powder, nitrocellulose and explosives, for example ether, nitric acid, sulfuric acid and nitrotoluene, until approximately 1920. Prior to construction of the Cogen plant, sampling was conducted to confirm the absence/removal of explosive materials and on March 25, 1993, DuPont received acknowledgement from the NJDEP that the soil investigation in SWMU 32A was complete.

The name of this AOC reflects the location of a cogeneration plant and a facility previously operated by Praxair Corporation. The cogeneration facility, a 262-megawatt pulverized coal-fired plant, was constructed in 1994. This facility previously provided electricity and steam for the Site and electricity to Atlantic City Electric. The cogeneration plant continues to provide steam to the Site, but electricity is currently provided by Atlantic City Electric. The Praxair facility converted natural gas to carbon monoxide and hydrogen. The carbon monoxide was reportedly used as a raw material in a phosgene operation. In addition, an Explosion Hazards Lab (leased to DuPont) conducts research and development providing data in support of new and existing chemical processes/reactions.

Identified SWMUs proximal to or associated with the Cogen and Praxair AOC and located within Carney Point Township, include:

| SWMU No. | Description | Current Regulatory Status |
|---|---|---|

| | | |
|---|---|---|
| 32A and 32B | Cogen Plant and Coal Storage Area | PA/SI complete, RI, soil excavation, RAR, 1992 EPA NFA Approval for SWMU 32B |
| 50 | Asbestos Disposal Area | Soil/debris removal, 1993 EPA NFA Approval |

With the exception of an isolated detection of arsenic and asbestos (which was excavated and removed) there are no exceedances of NRDCSCC in soils in the Cogen and Praxair AOC.

As a function of: (a) the absence of soil concentration exceedances of NRDCSCC; (b) protective surface cover; (c) Institutional Controls; and (d) Engineering Controls, there are no complete exposure pathways regarding human health, safety or ecological receptors in the Cogen and Praxair AOC.

Investigation activities have been completed in all of the identified SWMUs. EPA issued NFAs for the following SWMUs within the Cogen and Praxair AOC: 32B and 50. Impacts to groundwater, if any, have been and continue to be contained through operation of the IWS. The ongoing demonstration of groundwater hydraulic containment within the Site is conducted pursuant to a NJPDES-DGW Permit.

#### 4.2.4 Landfill AOC (SWMU 8)

SWMU 8 covers approximately 140 acres and historically functioned as the Site's primary waste disposal area for the period 1940 through 1975. Materials reportedly disposed in SWMU 8 during the identified period included, but were not limited to: solid, semi-solid and liquid wastes; dredge spoils; bottom and fly ash; asbestos; construction debris; and building rubble. Prior to the 1970s, the on-site wastewater basin was dredged (SWMUs 14, 15 & 16) and a reported 600,000 cubic yards of dredge spoils were deposited in SWMU 8. Landfills A and B (SWMU 30) were permitted by the NJDEP in 1975 for the disposal of solid wastes and construction debris

Identified SWMUs proximal to or associated with the WWTP AOC and located within Carneys Point Township, include:

| SWMU No. | Description | Current Regulatory Status |
|---|---|---|
| 3 | Incinerator III | Completion of RI, NFA |
| 4 | Incinerator IV | Completion of RI, NFA |
| 17 | PWDS Segment | Remediated and Closed, RFI Complete, Post-Closure Monitoring |
| 21 | Thermal Decontamination Incinerator | RFI Complete, soil excavation, RCRA Closure, Post Closure Monitoring |
| 30 | Landfills A & B (SWMU 8) | RFI Complete, RI, CMS, RASR, Treatability Study |
| 39-4 | Underground Storage Tanks | Removal, 1993 EPA NFA Approval |

| | | |
|---|---|---|
| 55-2 | Fill Deposition Area 2 | RFI Complete, Treatability Study |
| 56A | B Ditch | RFI Complete, ISM, soil excavation, DNAPL Recovery |

Environmental samples have been collected from a total of 68 locations for soil analysis, 69 locations for groundwater analysis and four locations for surface water testing. VOCs, SVOCs, PAHs, metals, pesticides and PCBs have been found in soils in the SWMU 8 area at concentrations that exceed NRDCSRS. Additionally, VOCs, SVOCs, metals, pesticides and PCBs have been detected in shallow groundwater at concentrations exceeding NJDEP Class II A standards. Additionally, two isolated areas exhibiting the occurrence of DNAPL have been identified.

EIDP/Chemours have conducted multiple studies to identify and evaluate potential remedial technologies to address residual soil impact and shallow groundwater contamination in SWMU 8. Currently, impacted groundwater beneath and surrounding SWMU 8 is hydraulically contained, extracted and treated at the WWTP. DNAPL monitoring and recovery efforts have been implemented in the areas exhibiting its potential occurrence. Institutional controls manage/preclude complete exposure pathways regarding human health and safety.

As a function of: (a) protective surface cover; (b) Institutional Controls; and (c) Engineering Controls, there are no complete exposure pathways regarding human health, safety or ecological receptors in the Landfill AOC.

Investigation activities have been completed in all of the identified SWMUs. EPA issued NFAs for the following SWMUs within the Landfill AOC: 3, 4 and 39-4. Impacts to groundwater have been and continue to be contained through operation of the IWS and SPB Systems. The ongoing demonstration of groundwater hydraulic containment within the Site is conducted pursuant to a NJPDES-DGW Permit.

#### 4.2.5 Basins AOC

Prior to 1970, and construction of the WWTP, process water, non-contact cooling water and stormwater flowed through the PWDS, discharging into a low-lying marsh area (identified as the basins). This type of discharge was consistent with industry practices prior to the promulgation of Federal and State environmental regulations such as the Federal Water Pollution Control Act Amendments of 1972 and New Jersey's 1976 Spill Compensation and Control Act (Spill Act). In the period circa 1970, the A, B and C Basins were constructed. Basin A, a 17.3-acre basin, was designed to receive process water and stormwater flow, allowing particulate settling prior to discharge to the WWTP. The B Basin, a 16.6-acre basin, provided particulate settlement and cooling of non-contact cooling water from the plant prior to discharge to the Delaware River. The 3-acre C Basin (located in Pennsville not Carneys Point Township) was constructed as a particulate settling basin for process water generated during the period 1970 to 1988 from AOC 2 (Antiknocks Production Area) in the Chambers Works Manufacturing Area.

Identified SWMUs proximal to or associated with the Basins AOC and located within Carneys Point Township, include:

| SWMU No. | Description | Current Regulatory Status |
|---|---|---|
| 5A | Landfill I (Plant Side of Slurry Wall) | RFI Complete, Slurry Wall Install, Groundwater Extraction, SPB Install, EPA NFA Approval |
| 5B | Landfill I Beach Area (River Side of Slurry Wall) | RFI Complete, Slurry Wall Install, Groundwater Extraction, soil excavation, ISM, SPB Install, Conditional NFA Approved |
| 14 | A Basin | RI Complete, soil/sediment ISS and excavation, capping, RCRA Closure, RAR, Deed Notice, 2002 EPA/NJDEP NFA Approval, Post-Closure Monitoring |
| 15 | B Basin | RI Complete, soil/sediment ISS and excavation, capping, RCRA Closure, Reconstruction of Basin B, RAR, Deed Notice, 2002 EPA/NJDEP NFA Approval, Post-Closure Monitoring |
| 43 | Former Unified Basin Outfall | RFI Complete, ISM, Conditional NFA Approval |
| 55-1 | Fill Deposition Area 1 | RFI Complete |
| 55-4 | Fill Deposition Area 4 | RFI Complete |

Numerous investigations have been conducted within and surrounding SWMUs 14 and 15 (i.e., Basins A and B). These basins including SWMU 16 (C Basin) were closed in accordance with a 1984 (amended in 1988) ACO between the NJDEP and DuPont and NJPDES-DGW Permit No. 0083429. Closure activities included: in-situ stabilization (ISS) with Portland cement, consolidation of treated and dewatered soil/sediment in the A Basin Vault (a permitted Hazardous Waste Management Unit), installation of a capping/cover system; reconstruction of B Basin for water management and RCRA closure of the A Basin Vault in 2006. A Deed Notice identifying requisite property use restrictions, institutional and engineering controls was filed on August 18, 2002 for the areas occupied by SWMUS 14, 15 and 16. Subsequently, the NJDEP issued an NFA and Covenant Not to Sue for each of these Basins on October 21, 2002.

As a function of: (a) protective surface cover; (b) Institutional Controls; and (c) Engineering Controls, there are no complete exposure pathways regarding human health, safety or ecological receptors in the Basins AOC.

Investigation activities have been completed in all of the identified SWMUs. EPA issued NFAs for the following SWMUs within the Basins AOC: 5A, 5B, 14, 15 and 43. Impacts to groundwater have been and continue to be contained through operation of the IWS and SPB Systems. The ongoing demonstration of groundwater hydraulic containment within the Site is conducted pursuant to a NJPDES-DGW Permit.