**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| **NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al.,** ***Plaintiffs,*** | **CIVIL ACTION NUMBERS:** |
| | **1:19-cv-14758-RMB-JBC** |
| | **1:19-cv-14765-RMB-JBC** |
| | **1:19-cv-14766-RMB-JBC** |
| **vs.** | **3:19-cv-14767-RMB-JBC** |
| **E.I. DU PONT DE NEMOURS AND COMPANY, et al.,** ***Defendants.*** | **Evidentiary Hearing** |

---

Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets
Camden, New Jersey 08101
Wednesday, June 24, 2026
Commencing at 9:43 a.m.

**B E F O R E:** **THE HONORABLE RENÉE MARIE BUMB, CHIEF UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

MATTHEW J. PLATKIN, ATTORNEY GENERAL OF NEW JERSEY
BY: GWEN FARLEY, DEPUTY ATTORNEY GENERAL
R.J. Hughes Justice Complex, 25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
For the Plaintiffs

KELLEY DRYE & WARREN, LLP
BY: WILLIAM J. JACKSON, ESQUIRE
515 Post Oak Boulevard, Suite 900
Houston, Texas 77027
Special Counsel to the Attorney General

John J. Kurz, Federal Official Court Reporter
John_Kurz@njd.uscourts.gov (856)576-7094

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**A P P E A R A N C E S: (Continued)**

KELLEY DRYE & WARREN, LLP
BY: DAVID M. REAP, ESQUIRE
DANIEL J. HARRISON, ESQUIRE
SABRINA EVE MORELLI, ESQUIRE
3 World Trade Center, 175 Greenwich Street
New York, New York 10007
Special Counsel to the Attorney General

KELLEY DRYE & WARREN, LLP
BY: GEOFFREY W. CASTELLO, ESQUIRE
One Jefferson Road
Parsippany, New Jersey 07054
Special Counsel to the Attorney General

DEMA LAW
BY: BRIANA DEMA, ESQUIRE
JOHN T. DEMA, ESQUIRE
JACK DEMA, ESQUIRE
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Special Counsel to the Attorney General

DEMA LAW
BY: SCOTT E. KAUFF, ESQUIRE
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
Special Counsel to the Attorney General

McCARTER & ENGLISH, LLP
BY: LANNY S. KURZWEIL, ESQUIRE
100 Mulberry Street, Four Gateway Center
Newark, New Jersey 07102
For the Defendants EIDP, Inc., The Chemours Company, and The Chemours Company FC, LLC (As to all claims other than ISRA and fraudulent transfer)

HOLLINGSWORTH LLP
BY: ANN MARIE DUFFY, ESQUIRE (*Pro hac vice*)
1350 I Street NW
Washington, DC 20005
For the Defendants EIDP, Inc., The Chemours Company, and The Chemours Company FC, LLC (As to all claims except fraudulent transfer in all matters; and the Third Count, ISRA claim)

(Appearances continued on next page.)

**A P P E A R A N C E S: (Continued)**

BALLARD SPAHR, LLP
BY: DAVID A. HAWORTH, ESQUIRE
700 East Gate Drive, Suite 330
Mt. Laurel, New Jersey 08054-0015
For the Defendants EIDP, Inc., DuPont Specialty Products USA, LLC, Corteva, Inc. (As to claims other than fraudulent transfer), and DuPont de Nemours, Inc. (As to claims other than fraudulent transfer)

KING & SPALDING, LLP
BY: ANDREW J. CALICA, ESQUIRE
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
For the Defendants The 3M Company

JENNER & BLOCK
BY: SAM HIRSCH, ESQUIRE (*pro hac vice*)
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
For the Defendants The 3M Company

MEYNER AND LANDIS, LLP
BY: ALBERT I. TELSEY, ESQUIRE
One Gateway Center, Suite 2500
Newark, New Jersey 07102
On Behalf of Intervenor, Carneys Point Township and Intervenor Borough of Sayreville

MARAZITI FALCON, LLP
BY: BRAD CARNEY, ESQUIRE
DIANE ALEXANDER, ESQUIRE
240 Cedar Knolls Road, Suite 301
Cedar Knolls, New Jersey 07927
On Behalf of Association of Environmental Authorities, Morris County Municipal Utilities Authority, Somerset Raritan Valley Sewerage Authority, Hanover Sewerage Authority, Rahway Valley Sewerage Authority, Rockaway Valley Regional Sewerage Authority, the Musconetcong Sewerage Authority, and Stony Brook (Collectively Amici Curiae)

KEEFE LAW FIRM, LLC
BY: JOHN E. KEEFE, JR., ESQUIRE
ANTHONY J. TAGLIAFERRO, ESQUIRE
2 Bridge Avenue, #623
Red Bank, New Jersey 07701
On Behalf of Intervenors, Middlesex, Union, Somerset, Cumberland, and Cape May Counties

**Also Present:**

The Honorable Joel Schneider, Ret., Special Master, Montgomery McCracken Walker & Rhoads, LLP

Judge Hogan

Larry MacStravic, The Courtroom Deputy

Zach Bailey, Judicial Law Clerk

Richard Serp, IT Trial Technician

**INDEX**



| **WITNESSES:** | **PAGE** |
|---|---|
| **FOR THE PLAINTIFFS:** | |
| ROBERT E. UNSWORTH | |
| Direct Examination By Mr. Jackson | 64 |
| KIMBERLY CAHALL | |
| Direct Examination By Mr. Castello | 98 |
| Cross-Examination By Mr. Telsey | 126 |

**EXHIBITS**

| **NUMBER** | **MARKED** |
|---|---|
| Unsworth-1 | 95 |
| Cahall-1 | 105 |
| Cahall-2 | 106 |
| Cahall-3 | 122 |
| Carneys Point-1 | 126 |
| Carneys Point-2 | 127 |
| Carneys Point-3 | 134 |
| Carneys Point-4 | 182 |

**EXHIBITS**

| **NUMBER** | **IN EVIDENCE** |
|---|---|
| Unsworth-1 | 95 |
| Cahall-1 | 105 |
| Cahall-2 | 106 |
| Cahall-3 | 122 |

(PROCEEDINGS held in open court before The Honorable Renée Marie Bumb, Chief United States District Judge, at 9:43 a.m. as follows:)

THE COURTROOM DEPUTY: All rise.

THE COURT: Good morning.

MR. CASTELLO: Good morning.

MR. JACKSON: Good morning.

MS. FARLEY: Good morning, Your Honor.

MS. DUFFY: Good morning.

MR. KURZWEIL: Good morning, Your Honor.

THE COURT: Nice to see you all.

MR. JACKSON: Good to see you.

THE COURT: Okay. Have a seat. Thank you.

We're going to start with appearances.

All right. Let's start with the case, let's call the case, New Jersey Department of Environmental Protection versus DuPont de Nemours and Company, et al., 19-14758 and all related cases.

All right. We're going to start with the plaintiffs.

MS. FARLEY: Good morning, Your Honor. Deputy Attorney General Gwen Farley for the plaintiffs. And we have today who will be speaking, Bill Jackson.

MR. JACKSON: Good morning, Your Honor.

MS. FARLEY: Geoff Castello, Scott Kauff, Dave Reap, and Briana Dema.

MR. REAP: Good morning, Your Honor.

MR. KAUFF: Good morning.

THE COURT: Good morning. Welcome.

Defendants.

MR. KURZWEIL: Good morning, Your Honor. Lanny Kurzweil from McCarter English.

THE COURT: Good morning.

MR. KURZWEIL: For EIDP, Inc., Chemours Company, the Chemours Company FC, LLC, and I am joined today by Ms. Duffy.

MS. DUFFY: Ann Marie Duffy, Your Honor, on behalf of the same defendants.

THE COURT: Okay.

MR. HAWORTH: Good morning, Your Honor. David Haworth, Ballard Spahr, on behalf of Corteva, Inc., DuPont de Nemours, Inc., DuPont Specialty Products USA, LLC, and EIDP on the ISRA claims only.

THE COURT: Good morning.

MR. CALICA: Good morning, Your Honor. Good to be with you again. Andrew Calica of King & Spalding for 3M Company. And I'm joined by my colleague Sam Hirsch of Jenner & Block.

THE COURT: Okay. Good morning.

All right. So, objectors, where are you? Okay. Enter your appearances, please.

MR. TELSEY: Good morning, Judge. Albert Telsey with

Meyner and Landis for Borough of Carneys Point and Sayreville.

THE COURT: Okay. Good morning.

MS. ALEXANDER: Good morning, Your Honor. Diane Alexander of Maraziti Falcon on behalf of the AEA, Hanover Sewerage Authority, Rockaway Valley Sewerage Authority, Rahway Valley Sewerage Authority, Morris County MUA, and a few others.

THE COURT: Okay. Well --

MS. ALEXANDER: With me today is Brad Carney, my partner, also at Maraziti Falcon.

THE COURT: Okay. All right. So when you say "a few others," let's put their appearance on. They are? Who have you missed?

MS. ALEXANDER: Musconetcong Sewerage Authority and...

THE COURT: Mr. Carney?

MR. CARNEY: Your Honor, yes, so we represent the AEA and the seven utilities: Morris County Municipal Utilities Authority, the Rockaway Valley Regional Sewerage Authority, the Hanover Sewerage Authority, the Musconetcong Sewerage Authority, the Rahway Valley Sewerage Authority, the Stony Brook Regional Sewerage Authority, and the Somerset Raritan Valley Sewerage Authority.

THE COURT: Okay. Thank you.

MR. KEEFE: Good morning, Your Honor. John Keefe, Jr., appearing on behalf of 12 of the 18 counties with my

colleague, Anthony Tagliaferro. We are also liaison counsel for all 18 of the intervening counties, only some of which got granted intervention status, but we are liaison to 18 of the participating counties.

THE COURT: Okay.

MR. KEEFE: Thank you.

MR. TAGLIAFERRO: Thank you, Your Honor.

THE COURT: Okay. Are there any motions to intervene? There are some that are still pending, but I thought that I had granted or I had resolved all of those.

Is there any intervention motion that any party thinks that hasn't been granted? Because otherwise I'll direct my deputy clerk to "term" those motions. Because if you look at the docket, it looks like some motions to intervene are still pending, which there shouldn't be.

Does anybody dispute what I just said?

(No response.)

THE COURT: No? Okay. Good. All right. So we'll do that.

All right. Anyone else that I need to get an appearance from? I think we're set, right?

(No response.)

THE COURT: So I thought the best way to begin is to work forward from -- and my plan was -- oh, no, let me start with this: The stipulations. Is there any reason -- I guess,

Mr. Jackson, you'll address this -- is there any reason why I shouldn't sign those stipulations today? The stipulations with, let's see, between the State and the -- yeah. Any reason why I shouldn't sign them?

MR. JACKSON: I believe they would be signed in conjunction with --

THE COURT: With the approval?

MR. JACKSON: -- with the JCOs, yes, Your Honor.

THE COURT: Okay.

MR. JACKSON: I can't recall the terms on their face, are they subject to entry of the JCO?

MR. REAP: Your Honor, you can enter them as soon as today. The point of the stipulation was to memorialize the terms upon which the JCOs were not being opposed, but --

THE COURT: Are not being what?

(Court reporter clarification.)

THE COURT: My thinking was that I could because they weren't contingent upon the entry of the JCOs or the approval of the JCOs, but that they were memorializing that the parties had stipulated to the terms of the JCOs, but you tell me.

MR. REAP: That is correct, Your Honor. You can enter them today. The basis is the terms upon which they will not oppose the JCOs, so...

THE COURT: Okay. All right.

MR. TELSEY: Judge --

THE COURT: And so then the only other issue I think we're going to want to address is I think Mr. Telsey's objection is that entering these stipulations materially alters or substantially changes -- which we're going to get to because I don't know where that language comes from -- the terms of the JCO and require republication.

Is that what you were going to say, Mr. Telsey?

MR. TELSEY: Yes.

THE COURT: Yeah, so... but we can get to that later. Okay.

MR. JACKSON: Thank you, Your Honor.

THE COURT: All right. So I'm just going to go through some comments. Paragraph 83, I feel that I have exhausted that. Does any party feel the need? Mr. Telsey, you feel the need to elaborate and make any other arguments that I haven't considered?

MR. TELSEY: Yes, Judge.

THE COURT: You want to make further arguments?

MR. TELSEY: Yes.

THE COURT: All right. Can you come over to the podium, please.

MR. TELSEY: Thank you, Judge.

THE COURT: Uh-huh.

MR. TELSEY: The further argument I make is this: Paragraph 83 says that this Court finds that this JCO bars the

township's state court action, and this Court does not have jurisdiction to make that finding. And to the extent that this Court is going to say something about the language in that paragraph 83 orally or in writing, I, as counsel for Carneys Point, am left with two pieces of paper that contradict each other that the defendants in this case are going to take to the state court judge and say, well, the finding that the case is barred is still signed by the judge so why don't you listen to that. And I'm left with that contradiction that I can't explain away unless this Court does that for me in a formal way.

THE COURT: So why does it have to be formal? And what changed since then? Because at our last hearing you were fine with what -- I mean, your response was, "I'll take that." You didn't seem to have a problem with how I would interpret it, but now you do.

Why the change of heart?

MR. TELSEY: Well, the comment that "I'll take that" was your observation and conclusion that you do not have the jurisdiction to make a ruling or a finding about how this Court can impact the state court. And I was expecting that there would be an amendment since this Court at that time had asked the plaintiffs to make that amendment, to which they said they would not.

THE COURT: Well, we had a conversation about it. I

don't know that I ever said -- I asked the State to make an amendment.

But here's the situation that I find myself in, is that I don't have authority to tell a state court what to do. Your proposed amendment, seems to me, is telling the state court what to do. So to my way of thinking, you can't have it both ways. You can't object to this amendment on the grounds that the federal court is telling the state court what to do but propose an amendment that's telling the state court what to do. Because your proposed amendment basically says: "State court, you're not bound by this," where if I make it very clear that this language does not tell a state court what to do, and to get to your point, I find "to the extent applicable by *res judicata*" I think is qualifying language sufficient enough that if it's *res judicata*, it's *res judicata*, but it's not for me to decide. It's for the state court to decide. And the paragraph also allows the parties to cooperate or otherwise address.

So I read paragraph 83, and I would make it very clear that I'm not making any finding. That is up to the state court to make a finding. If the State wants to go to the state court judge and say, look, this is *res judicata*, you want to go before the court and say it's not *res judicata*, those are arguments that I think are sufficient, as long as I make it very clear that that's how I'm interpreting it. And I think

that is what will govern how this -- if I say I'm not making this conclusion, this is for the state court to do, then why isn't that sufficient?

MR. TELSEY: Because the inclusion of my state court case should not be a part of this JCO.

THE COURT: It's not.

MR. TELSEY: It is. It's in paragraph 83. It's the only one that's referenced, my state court case.

THE COURT: Oh, I thought you said "conclusion." I'm reading the transcript. You said "inclusion."

MR. TELSEY: Inclusion. It's the only one that's being included in this JCO for some kind of special finding by this Court.

THE COURT: Well, this is how I see it: The State is acknowledging that there is this state court action out there, and it's yours. You're the only ones objecting to the settlement, right?

And as I recall from my conversation with Mr. Jackson the last time, it's the only state court action that they're aware of. Am I right about that?

MR. JACKSON: That's correct, Your Honor.

THE COURT: And so it makes sense that they would refer to the -- I mean, it seems to me if it weren't included in the JCO, you would be standing up before me and saying, "Why are they conveniently ignoring my state court action?"

Do you see what I'm saying? It seems to me that you kind of want to have it both ways. So they're putting it in here. They're acknowledging, they, the State, the parties are acknowledging that the state court action exists, and there is a dispute about what the effect of this JCO is going to be on the state court action, and that's for the state court judge to figure out.

MR. TELSEY: Then why doesn't the paragraph say: "I find that based upon *res judicata* that the state court action is or is not barred?" Why doesn't it give me the negative?

THE COURT: Well --

MR. TELSEY: Why do I get the positive?

THE COURT: I mean, we could get into could it have been better written? Could it -- we can. But I don't quite understand why given how I am interpreting paragraph 83 it's posing a problem for Carneys Point.

MR. TELSEY: Well, the Court -- now I have paragraph 83, I have things the Court said on January 7th. I have things the Court said today, and I don't have any follow-up, separate order regarding paragraph 83. So this jumble of paper is now going to go to Judge Malestein, and he has to figure it out. What I'm saying is that --

THE COURT: Well, I'm going to respectfully disagree with "this jumble of papers." We've been having conversations back and forth, and that's what advocacy is all about.

At the end of the day, I'm going to take the jumble of papers and I'm going to have a final opinion and order. I wouldn't call my final opinion and order a "jumble of papers."

MR. TELSEY: I didn't --

THE COURT: I think it will give clear direction to Judge Malestein.

MR. TELSEY: I hadn't heard that yet, Judge. I hadn't heard that you were going to add this into your final judgment.

THE COURT: What do you think I -- Mr. Telsey.

MR. TELSEY: I thought we were relying on this.

THE COURT: I'm being asked to approve the JCOs. I'm being asked to address the objections. I think it would require me or behoove me to address this objection in my final opinion.

So if it satisfies your concerns to know that I will issue a final opinion and order that sets forth my conclusions about paragraph 83, I will do so. Does that satisfy your concerns?

MR. TELSEY: Yes.

THE COURT: Okay.

So that takes care of paragraph 83.

Okay. Let's move to what I think -- there's some other things I don't want to get too bogged down on, but I do want to hear argument on it. But I do think that we should get

to the heart of the matter, which is, is this a fair, reasonable settlement.

So, Mr. Jackson, I'll start with you, yes.

MR. JACKSON: Yes, Your Honor.

THE COURT: What would be helpful to me is -- and if you want to do it by argument, that's fine, you want to do it by witness, that's fine -- a roadmap of the JCOs, the general terms, what they provide, and then testimony that tells me why those terms are fair and reasonable to the public of New Jersey.

MR. JACKSON: Yes, Your Honor.

THE COURT: Okay.

MR. JACKSON: I have a PowerPoint that I'd like to use if that's all right.

THE COURT: Okay.

MR. JACKSON: And I'll provide copies.

May I?

THE COURT: Yes.

(Counsel approached; handing out documents.)

THE COURT: Thank you.

Okay. Whenever you're ready, Mr. Jackson.

MR. JACKSON: Thank you, Your Honor.

So what we'll do today, as you just mentioned, if we go to the next slide, I was quickly going to hit just the standards and procedural substantive factors that we're going

to be looking at, the key terms, and then move to the heart of the issues that you had addressed.

I think the way we intend to address these issues is to first give you an outline of the way the State evaluated the -- after the JCOs themselves and the terms, how the State evaluated the damages and the estimated costs to the public of PFAS. Then I do have a witness here, Bob Unsworth, who can testify to those issues as well. He also submitted a declaration with our supplementary report.

Separately then, Mr. Castello and our co-counsel will address the application of the funds, the concerns raised by the POTWs in the counties, and we also have Kim Cahall here who is counselor to the Commissioner to address and testify as to how the State is going to allocate the funds and secure the funds. And then finally, with your blessing, I'll address the public interest question.

Okay. So next slide. And this is -- I'll be brief. This is in all of the briefing from November and January. The standard of review, obviously the DEP has discretion when it's determining what solution will best resolve a problem on a state or regional basis given its expertise and ability to view the problems broadly, as it did, as you heard extensively on January the 7th with these two JCOs.

As that actor and government agency charged with protecting the public, DEP is afforded some level of deference,

as is the Court, because the Court's obviously sitting -- sat as fact finder and tried this case last year as well.

So today -- next slide -- what we are here to do and what the Court is to do is to review the settlements and JCOs to determine -- and this is largely under the Spill Act and CERCLA, but there's also a public interest component to it as well, as set forth in the *Exxon* case. But the factors that we'll be discussing is: Are the JCOs, and I'm saying that quickly of course, but what we're referring to is the two proposed Judicial Consent Orders between the State of New Jersey and DuPont and 3M.

THE COURT: One second, Mr. Jackson.

MR. JACKSON: Uh-huh.

THE COURT: Okay. Go ahead. Thank you.

MR. JACKSON: So when reviewing a Spill Act-type settlement and a settlement that's, you know, in the public interest, the Court's obligation is to review the settlement and to determine whether or not it is fair, reasonable, faithful to the objectives of the Spill Act and CERCLA, and in the public interest.

This comes from the *New Jersey Department of Environmental Protection vs. Exxon* matter. That case is kind of on all fours with what we're doing here today.

Next slide, please.

So I thought this *Rohm and Haas* case and this quote

was actually probably the most succinct analysis of the factors that we shall be talking about today. And when we talk about the JCOs and the terms, you'll see why we have checked these boxes and why the settlement is fair and reasonable.

So as set forth in *Rohm and Haas*, the factors that we're looking at is the relative costs and benefits of continuing to litigate the case; the risks of establishing liability on the part of the settlors; the good-faith efforts and the adversarial relationship of the negotiators who crafted the settlement; the reasonableness of the settlement as compared to the settlors' potential contribution; the ability of the settlors to withstand a greater judgment; and finally, the effect of the settlement on the public interest as expressed in the Spill Act or CERCLA.

The fairness component has both a procedural and a substantive component to it. The procedural piece really goes to was this case actively litigated? Were the parties adversarial? Is this settlement a product of a hard-fought battle? And I think that we all can agree that that's the case here.

Next slide.

So let's go through, as you requested, I'm going to kind of give you the context of the settlements and then the key terms, which will both help explain why these settlements are fair and reasonable.

So with respect to 3M, I'm going to break them down separately. The settlement was driven by the trial in the Chambers Works case, as you know. The litigation was filed in 2019. After many years of discovery and litigation and motion practice, we tried that case last May. The claims against 3M were specific and a little bit different than the DuPont issues. They were brought under the Spill Act and under the common law because 3M supplied PFAS into the state of New Jersey and to DuPont at Chambers Works.

It's important because 3M was not a discharger in the traditional sense, not a CERCLA-liable party in the traditional sense, but under the Spill Act we argued that they were in any way responsible. We also brought claims against 3M because of failure to warn. They had failed to warn the DEP of the risks of the PFAS, and PFOA in particular that they were selling to DuPont. As you know, we had extensive fact and expert discovery. It was hotly litigated for many years, over 14 million pages of documents, 100 fact depositions and 53 experts.

The 3M legal arguments focused on preemption, primary jurisdiction, the Spill Act defenses to "in any way responsible," a lack of duty to warn, timeliness, numerous *Daubert* challenges on the science around PFAS, and myriad other arguments.

We're good to go?

THE COURT: Yes.

MR. JACKSON: Okay. On the eve of trial right before, the week before May 19th, 3M and the State of New Jersey announced that they had settled the claims brought by the State against 3M for all of the claims related to Chambers Works, to the Parlin site, for the AFFF claims, as well as statewide PFAS matters.

Next slide.

THE COURT: Remind me, 3M supplied the PFAS from when to when? Remind me.

MR. JACKSON: So 3M -- DuPont was 3M's first customer. They began selling them PFOA in 1950. I don't recall when the first shipment of PFAS to Chambers Works was, but it was, you know, from the beginning that relationship was there, and there was a constant relationship and sale of PFOA to DuPont through decades of operation to Chambers Works.

THE COURT: Until?

MR. JACKSON: 3M got out of the business of the long-chain PFAS in 2000. That's when DuPont began making its own PFOA.

THE COURT: And was that in the record? I'm sure it was.

MR. JACKSON: It was.

THE COURT: Yeah. And if I wanted to find it, where would I find it?

MR. JACKSON: That particular date would be probably in the April 1, 2025 hearing when we went through some of the -- when we were giving you the offer of proof as to 3M, or in the follow-up hearing, which I believe was April the 19th, 17th perhaps.

THE COURT: Okay.

MR. JACKSON: But those two hearings that led up to the trial, because obviously 3M settled out before the trial.

THE COURT: Right.

Mr. Calica, where would I find it?

MR. CALICA: I'm sorry, Your Honor, could you restate the question?

THE COURT: Where would I find that?

MR. CALICA: I think Mr. Jackson's correct. There is a declaration that was produced in the case that provided the history of the sales records. I can't recall as we --

THE COURT: Can you make a note to submit that on the docket?

MR. CALICA: Sure, Your Honor. It may already be on the docket. If it is, we'll be sure to --

THE COURT: Just remind me where.

MR. CALICA: Sure.

THE COURT: Okay.

MR. HIRSCH: Your Honor, Document 751 at page 9 says 3M discontinued supplying PFAS to the Chambers Works site in

2001.

THE COURT: Does it say -- what is that, a declaration?

MR. HIRSCH: No. It's the brief of 3M Company in support of the motion to approve the JCOs.

THE COURT: Does it say when they started?

MR. HIRSCH: It does not.

THE COURT: Okay.

MR. CALICA: Your Honor, there's no sales records that go back to that date.

THE COURT: The '50s.

MR. CALICA: So there's a dispute. The State alleges that the supply began I believe sometime in the 1950s, at least to DuPont writ large, not necessarily to this location.

THE COURT: Well --

MR. CALICA: But the history --

THE COURT: -- I'm only asking the question because I think it matters in terms of reasonableness and fairness, like how long a period this was, and if the parties agree on it, if they don't agree on it, but where it is in the record is helpful to me.

MR. CALICA: Yeah.

THE COURT: So can you --

MR. JACKSON: I think we would agree it's at least 40 years.

MR. CALICA: Yeah. I think the sales records, if my memory is correct, Your Honor, I believe they go back into the '70s.

THE COURT: Okay. So you'll tell me where in the record I can rely on that. And if it's not in the record, then you folks will put it in the record if there's no dispute about it.

MR. CALICA: Of course.

MR. JACKSON: Thank you, Your Honor.

THE COURT: Okay. Go ahead.

MR. CALICA: Thank you, Your Honor.

MR. JACKSON: So let me then address the key terms of the settlement. 3M's settlement is largely a cash settlement. The total value is between 400- and 450 million dollars. 100 million of that is to be paid within 30 days of the effective date. That's when the JCOs are entered and no longer -- or not subject to further appeal.

The payments in the first four years are between 225- and 275 million dollars to the State. That variation, that $50 million difference, is a function of the settlement that 3M entered with the public water systems.

In the year 2023, 3M had entered in a nationwide class action settlement with public water providers across the country, and that settlement was valued between 10.5 and 12.5 billion dollars. The agreement that New Jersey has

entered, and I should say that New Jersey public water providers overwhelmingly accepted and chose to partake in that settlement with 3M and together with the settlement with DuPont, the public water providers in the state are expected to receive over $500 million from DuPont and 3M, from these two entities, to assist with the water treatment of the public water systems in the state.

Because that had a range on it and there is a possibility, and I'll say maybe a probability, that the settlement will not exhaust the 12 and a half billion dollars that 3M's settlement was up to. The State and 3M agreed that the first $50 million of those settlements, there's a formula, but basically that those dollars would come to New Jersey if there is a shortfall. So that New Jersey because of, you know, the issues that we were facing here and the extent of PFAS contamination, 3M is basically saying if the public water providers' settlement has any shortfall, that would go to the State of New Jersey pursuant to the terms of the JCO.

Part of this, as I'm going to talk about a little bit in the next slide, but part of this was driven by cash flow obligations of 3M. A lot of the issues around the way this is structured and the way the settlement and why the settlement is structured as it is and why there's a time horizon on it is because that 12 and a half billion dollars settlement that 3M entered with the public water providers was entered at the same

time it entered I think it was approximately $6 billion for class action litigation regarding earplug litigation.

And so together, 3M had obligated itself to pay over 18 -- 18 and a half billion dollars in these both very large settlements. And so there were cash flow considerations that were significant to 3M, and that informed the structure of this arrangement.

Go back one slide, please. I'm sorry. Yeah.

So in total, in the first eight years, the settlement, what 3M will pay to the State of New Jersey is between 275 and $325 million. And I said it's not subject to any credits. The reason I said that is that there are provisions in this agreement and in the DuPont agreement that, as we discussed in January, if the State and 3M have agreed, for example, or DuPont agreed that a case is resolved and we believe the claims and the damages are resolved and a later court -- like the Carneys Point issue -- were to find that a particular settlement is not effective for whatever reason, there's a credit-eligible claim concept built into this arrangement that 3M would have to litigate that case or DuPont would have to litigate that case and either lose it at judgment or a reasonable settlement could be reached, and then half of that value, 50 percent, could be a credit against later payments.

This was designed, again, to give maximum resolution

to the State and to these entities, but to allow for the fact that a later court, a later state court, may determine that a particular cause of action or claim that these parties thought was released was not.

Finally, there's a provision for up to $50 million more to the State of New Jersey if there is a national multistate settlement regarding the natural resource damages that are occasioned by PFAS, and the State would have received more in that settlement. So there's an opportunity for the State to actually receive up to $500 million through this Most Favored Nations clause as well.

One other point. As you know, 3M was not brought into Chambers Works as a discharger and not perceived or known to be a CERCLA-liable party in the state of New Jersey, period. As part of this settlement, however, we did work with 3M and the Department of Environmental Protection to evaluate every former 3M site we could find in the state. There were dozens. Most of them were warehouses or office buildings. There were three that could be associated with PFAS discharges. It's unclear as to whether that was a 3M issue or a later tenant. But in this JCO, we have agreed that if there was a site like that, that 3M owned or operated where there was a discharge of PFAS, that that would be addressed and remediated by 3M in the normal course of business and is not released as part of this settlement.

THE COURT: Where is that in the agreement? What paragraph?

MR. JACKSON: Oh, gosh.

THE COURT: Well, someone can find it and then tell me.

MR. JACKSON: Okay.

THE COURT: Okay.

MR. JACKSON: And we did discuss that on January the 7th as well, and at that point I had the paragraph number, so we'll get back to it.

In any event --

THE COURT: You've got a lot of help over here; they'll find it.

MR. JACKSON: Alone, the 3M settlement is one of the five largest natural resource damage and abatement-type recoveries in history. This is a huge and significant outcome for the State, and obviously designed to help the State and the public address PFAS across the state.

Next.

So these are some of the key considerations that went into the decision to settle. And as I mentioned -- in a bit, I'm going to talk to you about kind of how the State was evaluating the public costs, but this is what we were evaluating. This is in the State's supplementary report and some of the declarations filed in support of that. Obviously

there was significant litigation risk. This was a very hard-fought battle against excellent counsel, great expert team, and no one perceived that this was, you know, it was an easy case. The litigation risks, thus, were considered to be substantial up until the date of settlement.

As I just mentioned, 3M's national public water provider settlement was an enormous consideration both kind of in a positive and a negative sense. Positively, we recognize that there was over $500 million of 3M and DuPont settlement proceeds coming into New Jersey to assist public water providers in the costs necessary to test and treat for PFAS. You can treat for it in your drinking water. You can put a carbon filtration system on and remove the PFAS to nondetect levels, but it's expensive. And so that public water provider settlement was critical to helping New Jersey cut off human health exposure to PFAS. We don't want our citizens drinking this stuff. So that was a big piece of this analysis.

But as I mentioned, that settlement also put financial constraints on 3M, and the timing of payments were significant. And so the structure, a lot of what we did was designed to allow for a payment period that 3M could do, could withstand.

The question -- thank you. I was just handed a note. The paragraph regarding the 3M sites is in the 3M JCO at paragraph 48.

THE COURT: Thank you.

MR. JACKSON: Also during this time period, the State was evaluating the wherewithal of all of the defendants in this action. And 3M is facing and continues to face, you know, significant causes of action and claims regarding PFAS around the country. This includes some 15,000 cases that have been filed in the AFFF MDL ranging from, you know, personal injury, wrongful death claims of firefighters to other personal injury-type claims to 37 state and sovereign claims and hundreds of local governments. So an enormous number of claims and liabilities are still bottled up in the AFFF MDL.

Additionally, there are numerous litigations regarding environmental contamination, consumer protection claims and other non-firefighting foam-related claims that are proceeding outside of that MDL, akin to this case, Chambers Works.

And there are also foreign liabilities and claims outside of the country, including Australia I think just announced last week or the week before that it had filed claims against 3M for 1.4 billion U.S. in damages associated with military facilities in Australia.

So those PFAS global exposures and liabilities absolutely weigh on all parties as we were trying to find a resolution here.

As I mentioned, the values and the precedent of the

settlement for the State of New Jersey were enormous. This case is and the settlement value by itself is huge.

But it was important, as we looked at these values and this, you know, everybody in the country was looking at this case and these numbers and extrapolating what does this mean for the rest of the states, and what does this mean for 3M. And so that valuation also was significant. And obviously the values that the case that New Jersey received here are enormous, but that precedential concern weighed heavily in all of this as well.

And then finally, I'll say that the structure and timing were critical. Because of these concerns that we're talking about and because of the agreement to the water providers, a lot of effort went into how do you construct this settlement for 3M to allow it to pay its, you know, liabilities to the State of New Jersey, but do it in a way that both protects the State of New Jersey but also allows 3M to continue business and to address these other litigations and concerns.

Next page, please.

So I'm going to move on to the DuPont settlements.

So DuPont, as you know, was a much larger player in the state of New Jersey. DuPont had several facilities. The trial in this case that Your Honor tried was the Chambers Works case. But as you know, the State in 2019 had filed litigation involving four significant industrial facilities. In addition

to Chambers Works, there was Pompton Lakes, Parlin, and Repauno. Chambers Works and Pompton Lakes in particular are both enormous facilities with a century of operations and notorious contamination from both. New Jersey asserted numerous claims against DuPont and the related entities under the Spill Act, the Water Pollution Control Act, common law claims for negligence, gross negligence, nuisance, trespass, as well as the fraudulent transfer and ISRA claims.

As Your Honor knows, there is an extensive record that was developed, and that was the sixth of the trials that you were to try regarding the restructuring that Old DuPont undertook beginning in 2015 when it put all of its PFAS liabilities, including other environmental liabilities, into Chemours and spun that company off.

That transaction led to a series of claims related to the fraudulent transfers, the efforts to remove the liabilities from the assets at issue. Subsequently DuPont merged with Old Dow, and those two companies reorganized to create three new publicly-traded companies: The New Dow, the New DuPont, and a company called Corteva. And that was in 2019. And there was another round of claims associated with the 2019 restructuring and transactions as fraudulent transfers.

Ultimately, Corteva holds the stock of Old DuPont, which has changed its name EIDP, Inc., as a wholly-owned subsidiary, and through that company holds all of its assets.

And so that became a significant issue as we litigated these claims, and the companies' ability, and especially Chemours' ability to pay, the concerns regarding its bankruptcy, as well as, frankly, just trying to trace the money and the assets necessary to address these problems.

From day one, the State of New Jersey made it very clear at both, you know, in litigation filings and communications with the defendants, the primary goal of this case was to make sure that DuPont and those related entities pay to clean up these industrial sites and the PFAS that they emitted in the state of New Jersey, not the taxpayers, not the citizens, not the public, not the ratepayers. The goal has always been to ensure that these defendants, the DuPont Defendants, remediate and restore the natural resources that they contaminated.

As you know, there was extensive discovery, countless number discovery disputes. We were very appreciative of the efforts of the Special Master, you know, Judge Schneider, to keep these cases going and to plow through these issues. Obviously several of those discovery disputes also made their way to you. And in that process there were numerous legal arguments and issues that came up on a near daily basis. I think the Court once observed that these parties can't agree on anything, and I think that was probably an accurate assessment.

THE COURT: Did I say that?

MR. JACKSON: I think you did.

(Laughter.)

MR. JACKSON: The arguments that DuPont put forward against the State's claims ranged from preemption to the CRACO. It was a significant issue, and all of this, this was a 2005 settlement of natural resource damages across the state. There was significant dispute between the parties as to whether or not that agreement had been performed and whether or not it was enforceable as to PFAS.

DuPont also raised numerous arguments regarding timing, laches, equitable estoppel, the government contractor defense, numerous Spill Act defenses. We had significant disputes regarding the toxicity issues of PFAS, numerous *Daubert* issues on the science, and myriad other arguments.

We tried that case against DuPont through the first five mini trials that the Court had set up. And on a break, before we came back for the final bench trial on the fraudulent transfer and ISRA cases, the parties did finally come to a resolution.

Next slide.

So the summary of the key terms, first is that the DuPont entities resolved with the State for a package of remediation obligations and other undertakings that I'll describe as well as cash consideration that is valued by the State at over $2 billion. This is the largest environmental

recovery by any single state in the history of the country.

I want to talk about first the remediation obligations. They are uncapped. There is no dollar value to which those remediation obligations are capped or must, you know, stop. DuPont and the DuPont entities have agreed to clean up the hazardous substances, including the PFAS, from the four industrial sites to the satisfaction of the Department of Environmental Protection and, as appropriate, to the United States EPA.

THE COURT: And tell me where that's at in the agreement.

MR. JACKSON: Give me one moment.

THE COURT: You can go on. Somebody will tell me.

MR. JACKSON: Okay. There's a series of paragraphs that talk about the reservations, if somebody can find that.

THE COURT: Yes. It just is going to be helpful that it's in the record, which will be helpful.

MR. JACKSON: Of course. Of course.

THE COURT: Yeah.

MR. JACKSON: So one of the things that was significant and that the State was worried about as we put these issues together was, again, making sure that the DuPont entities were the ones that were paying to do this cleanup and it doesn't bounce back to the public and to the ratepayers. And so the extensive negotiations and extensive provisions in

these JCOs are designed to ensure that these companies, plural, pay for this remediation, not the State.

So what we did is we used the existing structure under the law for a remediation funding source, RFS process, and we agreed to a process whereby there is up to $1.2 billion of RFS, remediation funding source, protections to ensure that, again, that those remediation obligations are paid for by these entities.

There is a series of provisions in the agreement that discuss how the RFS will be valued for year one. There was a panel of LSRPs determined that were going to help the parties come to that starting point, because at the time of the settlement there wasn't even an RFS in place for Chambers Works.

And then after year one, those remediation funding source numbers will float as the typical processes under the statutes determined by -- you know, they'll adjust based upon how much work is being performed in the last year, what the estimates are going forward, things of that nature.

One of the paragraphs that deals with the remediation obligation is at paragraph 30 in the DuPont JCO. And I think there are a couple others. I'll get to them on the RFS in just a moment.

The way we structured that was that the primary responsibility is the entity that actually is operating the

site, but we also created obligations behind that. And most importantly, if one of those companies cannot -- so if Chemours cannot secure its obligations or perform its obligations at Chambers Works, then the other entities, New DuPont and Corteva, are responsible to pay their share. And ultimately, if they cannot do so, then EIDP must come in and pay. So it's almost like joint and several obligations; that it will tier through them. We respected their contractual allocation between them, but --

THE COURT: And is there anything in the JCO that talks about who the final arbiter is about whether or not the remediation has been done to -- you used the word -- to the State's satisfaction?

MR. JACKSON: Yes. That is in the JCO as well.

THE COURT: Okay. So where?

MR. JACKSON: One moment, please.

THE COURT: And does it address if there's a dispute between DuPont and the State, like who is the arbiter? Please don't tell me it comes back to this Court.

(Laughter.)

MR. JACKSON: Yeah. So paragraph 30 obviously references that the remediation is required at each site until each site is fully and finally remediated pursuant to applicable laws for all environmental media from the department and, as applicable, EPA.

The remediation process moving forward is actually under the regulations. So that the department is the ultimate decider. We've got this LSRP panel for the first round.

THE COURT: Where is that at?

MR. JACKSON: Give me one moment.

THE COURT: Well, it seems that the agreement contemplates that, at the end of the day, the department is the final arbiter.

MR. JACKSON: That's correct.

THE COURT: And DuPont and related companies are willing to abide by that, which seems fairly generous to the citizens.

MR. JACKSON: That's correct.

THE COURT: Is that a fair observation?

MR. JACKSON: That's a very fair observation.

THE COURT: Okay.

MR. JACKSON: Yeah. I guess paragraph 29 sets the initial framework that except as expressly set forth in the JCO, nothing in the JCO is intended to alter in any way any settling defendants' obligations to conduct remediation at the industrial sites, consistent with the applicable federal and state laws, regulations and guidance.

THE COURT: Yeah. I mean, and paragraph 30 as well.

MR. JACKSON: Right.

THE COURT: Where is the panel of LSRPs, is that in

the agreement or was that in --

MR. JACKSON: It is. It is.

THE COURT: Where is that?

MR. JACKSON: That is -- give me one second. I'm sorry, Your Honor.

THE COURT: Well, we can come back to it. I'm just -- I'm taking notes.

Oh, here it is, I found it.

MR. JACKSON: 15 and 16.

THE COURT: I think I did.

What I heard you saying is that the agreement sets up a panel of LSRPs. They're coming up with an initial remediation number, right?

MR. JACKSON: Just for the -- so that's that financial assurance mechanism, the RFS, that's correct.

THE COURT: Yeah. That's what I want to know, where that is. So I'll come back to it once you tell me.

MR. JACKSON: I believe it's paragraphs 15 and 16.

MS. FARLEY: And 14.

MR. JACKSON: And 14. Thank you.

THE COURT: All right. Thank you.

Okay.

MR. JACKSON: I also want to just -- there were several paragraphs that were very important to the department. Looking at paragraphs 55, 56, 57 through 59 really. But 56

points out that nothing in the JCO shall be construed as precluding the settling plaintiffs from taking any action permitted by law that they deem necessary or appropriate to protect public health and safety and the environment and to enforce the environmental laws of the state to the extent those actions are not inconsistent with the JCO or the resolutions of the liabilities contained herein.

Fifty-six acknowledges that ongoing obligation for remediation, and that whole section basically it's under Article XII, reservations and future litigation, discusses that this obligation to clean up these sites is DuPont's. It's not going to fall to the taxpayers and it's not going to fall to the State to do that. And nothing about this resolution changes that.

There is also, I'm sorry, behind the typical processes that are set up for the RFS, the State also secured a reserve fund of $475 million that is being created by the New DuPont and Corteva and held by them. That's an Article VII reserve fund to back up those obligations. And if there is additional remediation requirements that are triggered, that that money is also there. So it was another protection, again, just to ensure that those costs never come to the public.

Finally, as I mentioned, if all else fails, EIDP, which is Old DuPont, which is strictly, jointly and severally liable for all of these costs "at law" by the State's

estimation anyway, is always on the hook, and we can always go back to them and they will always be there.

So in addition to the remedial obligations, and to be clear, at and from the sites, so, you know, the PFAS that's emitting from the sites has got to be cleaned up to the satisfaction of the State.

The cash consideration that was agreed to by these three defendants or the group of defendants is $875 million, and that was broken down into three categories. There's 525 million that is to be used for PFAS abatement funds. That is to address PFAS contamination across the state.

There's $225 million of natural resource damages that are tied to discharges at these facilities. And there's another 125 million for costs, fees, penalties, and punitive damages.

The costs, these obligations, the cash consideration and the PFAS abatement funds and the NRD are also set up so that if any one entity is unable to make a payment, those obligations will be borne by the others. The State has the ability to go to the other defendants. Corteva and EIDP have the ability to pursue Chemours or New DuPont if they end up paying the obligations of another one. But, again, there are layers of protection to make sure that the natural resource restoration and the PFAS abatement funds that are provided for herein are actually paid by the defendants.

The other thing I wanted to point out, you know, it wasn't a huge thing coming into the case, but it was a huge thing by the end of the case was we actually also managed to get the CRACO resolved after 20 years of battle. There is work that will be performed to secure and finalize the obligations that were agreed to originally in 2005. And that will also secure the preservation of another 1,400 acres of land and transfer 73 acres near Repauno -- or I'm sorry, Ramapo Mountain State Forest.

Next slide.

So key settlement considerations, again, going to the fairness and reasonableness factors, start with the fraudulent transfers and the bankruptcy concerns. They were significant, and they were ever present both because of the State's concerns to ensure that these entities collectively pay to clean up and restore the natural resources and abate the PFAS, but it also was very significant because the entities involved, they're now three separate publicly-traded companies and there's a lot of, you know, frankly, dispute between them, and so it was very complex and it was very complicated to get these negotiated. Incredible efforts by all involved to find a solution to structure this in a way that was viable and worked for the three companies.

The litigation risks were significant. Obviously we had a significant number of trials, but we weren't done. We

had not tried the ISRA and fraudulent transfer case yet. We had a jury trial on the damages ahead of us, and that was just the first site. And so we know there was a long way to go with respect to the litigation.

As mentioned, just as with 3M, the DuPont and Chemours' exposure to PFAS litigation nationwide in the AFFF MDL also subject to some 15,000 claims, and worldwide, significant issue. There's, you know, a tremendous exposure for the liabilities for these chemicals out there.

Another key consideration, frankly, was just the closure on 20 years of DuPont and, you know, kind of battle with the New Jersey Department of Environmental Protection. It had been a contentious and difficult pathway for a long time. And so finding a path to get these sites cleaned up to the satisfaction of the department was a huge success and benefit for the state.

As I mentioned, the redundant structural provisions that we put in there repeatedly to ensure that it is not the State, it is not the public, it is not the taxpayers or the ratepayers.

THE COURT: What do you mean by redundant? You mean if not this company, then this company, then this company?

MR. JACKSON: Yes. And we have several provisions that are backing that up in one way or the other, including the creation of the reserve fund to sit behind the RFS which sits

in front of an absolute protection by EIDP. Structurally we created layers of protection to do all that we could to ensure that the public is protected here, both, you know, in a public health and environmental sense but also in a financial sense.

This settlement, you know, based on everything I just described to you, you can see why timing was deemed to be critical. This was important. It was important to get this done now and not face years of additional litigation between the State and DuPont. Timing matters, and the State obviously felt it was important to be able to try to get these contractual structures and agreements in place to protect the public and do it now.

Next slide.

Okay. Go to the next slide.

So collectively, this is going to those factors, you know, these two settlements are valued at over 2 and a half billion dollars for PFAS remediation, restoration and abatement. It accomplishes an agreement for full and final remediation at some of the most notorious sites in New Jersey. You've heard a lot about Chambers Works, but Pompton Lakes has a very long and difficult history of its own. Thousands, tens of thousands of New Jersey citizens have been affected by the operations and contaminations of these facilities.

We also recovered $365 million, the State recovered $365 million for natural resource damages cumulatively between

these two settlements, and $795 million for PFAS abatement efforts across the state.

Another key provision in these agreements is that they exclude purely private claims. So claims for personal injury, claims for personal property damage, things of that nature, are not contemplated or covered within this.

Obviously, on January 7th you heard a lot about the scope of the release as to the State, its agencies and political subdivisions, which was viewed by the State as an all of government's resolution trying to protect the public and the public fisc from these PFAS issues. One of the benefits of that is it avoided litigation for all of the state agencies, for all of those local governments, for the towns and counties, the vast majority of whom had not even filed the litigation yet, so even with the litigation risks, the evolving science and timing issues, statutes of repos around the fraudulent transfer issues, CERCLA defenses of these entities and so forth.

And so we thought -- the State also thought that was an important benefit obviously, and we'll talk about that in a minute, what the State valued and received as compensation for the scope of that release, which we discussed obviously at length on January the 7th and the supplementary report and the evidence that you'll hear today address.

And then I think it's incredibly important to

remember that these JCOs with DuPont and 3M, these are partial settlements. They resolve with these two defendants or the groups, but there are significant claims, causes of actions and remedies available to the State and to all the political subdivisions and agencies in the state. Among them, claims for direct dischargers of PFAS at other industrial sites or processes. You know, the State obviously had brought claims against Solvay and Arkema. Those settlements by themselves were significant, and there is a series of other litigations that are out there and the additional claims that are coming.

Importantly, there are also numerous claims that are filed against the Department of Defense or the United States for federal facilities. I mentioned to you last time that New Jersey had brought a claim against the United States for not -- for refusing to follow the New Jersey drinking water standards around some of the military facilities in the state of New Jersey, because there is a waiver of federal sovereign immunity under the Safe Drinking Water Act just like there is in CERCLA.

Additionally, the State and many of these local governments have brought claims against other manufacturers of AFFF and PFAS. I mentioned Solvay and Arkema previously. But claims against BASF, Tyco, Chemguard, numerous other entities that made these chemicals or made the firefighting foam are also going forward. They were not resolved by this. So there

is a lot of other opportunity to address these costs, and that's why the State approached this again kind of as we did.

The next slide.

So I'm going to go ahead and go through this argument now and then whenever the Court would like, I can also put up Mr. Unsworth to address some of these issues. But at a high level, in evaluating the settlements, the State estimated the costs that New Jersey public entities were going to -- could be exposed to for PFAS is up to $5.5 billion.

The costs, that $5.5 billion cost estimate broke down with the majority being in drinking water, to be clear. Public water systems, private water wells, state-owned water systems, they were the majority of the costs that were estimated, but there were also significant other costs. And I'm going to talk to you in more detail about the wastewater treatment facilities, the POTWs and the soil remediation at the county sites.

But as you heard testimony during the trial about New Jersey's drinking water standards and the evolution of those standards and the regulation of this chemistry, the primary way that these chemicals get into the human body and pose risk of cancers and other health effects is through drinking water. And so priority one has been in the state of New Jersey, it was to protect drinking water. And so that's why the public water provider settlements actually are also a

significant piece of this as we go forward.

But with respect to the POTWs and to the soil and to the counties, what the State did was it evaluated for the POTWs the wastewater treatment costs, and it evaluated the testing and treatment and the biosolids costs and estimated those to be $1.5 billion, the potential costs that the POTWs would face.

The State also estimated that for soil remediation at the county and fire training sites, the airports, was approximately $500 million.

Those sites, and Mr. Unsworth can describe it in more detail than I, but soil remediation, there are different ways to do it; that you have to delineate the site and understand what you need to clean up, and that needs to be done, and that's part of this fabulous agreement that we have reached with the counties in terms of how these will work, but the main goal of the soil remediation is to protect water. You're using the soil remediation to cut off a source area from either impacting water or another natural resource. And so the State focused on the airports where the AFFF had been used and then the county properties that we'll discuss where, again, there have been training facilities that had been used and where you knew you had soil contamination.

Next slide.

So this is how the State evaluated these dollars and whether the sufficiency of the settlement with 3M and DuPont

was enough. Broadly speaking, what the State did and what we did was we estimated roughly 50/50 in terms of who should pay for the remediation at these various sites. Half goes to the dischargers. And I will tell you under a CERCLA or Spill Act analysis, usually the site owner/operator/discharger pays more than half if they're able to. But we did a 50 percent allocation statewide to, kind of, the discharger liability.

And that also is important because that type of discharger liability under CERCLA or the Spill Act is strict, joint and several. I don't have to prove that the chemistry is harmful. I don't have to prove a toxic effect. I don't have to prove a proportionate share. If I've got an owner of a site that discharges a hazardous substance that needs to be cleaned up pursuant to the Spill Act, the State can pursue them for 100-cents on the dollar and they can then turn around and seek contribution to other entities, but those claims are very powerful. And honestly, that's in part why this fairness hearing is even here is because that credit mechanism is pro tonto. It's dollar-for-dollar credit mechanism rather than proportionate share.

But, again, what that means is that the State has significant claims and ability to bring cleanup costs against these additional dischargers of this chemistry in the future.

THE COURT: Wait. Tell me again where the 50 percent came from.

MR. JACKSON: Basically it's a -- we -- the State allocated between the liability of dischargers.

THE COURT: Yeah.

MR. JACKSON: And that basic rubric and legal construct --

THE COURT: Dischargers and then manufacturers.

MR. JACKSON: And then the PFAS manufacturers. And that was --

THE COURT: But is there any rhyme or reason to it or --

MR. JACKSON: There is. There is a -- and I didn't cite the law to you, but I can get you some cases. CERCLA case law and Spill Act case law, there's a lot of discussion about those kinds of allocations and between responsible parties how that's done. And so that was just part of the analysis was looking at the CERCLA liabilities on the one hand versus product liability on the other.

I will say that, generally speaking, you know, the state of New Jersey and almost every other state would seek first CERCLA and Spill Act claims because it is strict, joint and several. It's much easier, and the responsible party has to pay 100-cents on the dollar. They can then go seek contribution from others. It's harder, as you know, to bring the claims under the tort law for a product manufacturer for a products liability claim or a nuisance/trespass type claim.

It's a higher bar in many instances. You have more difficult proofs to put forward. So --

THE COURT: That makes sense. But can you cite to me settlements that have been approved by other courts where this calculation of 50 percent liability percentage between the dischargers and the strict liability parties was approved?

MR. JACKSON: Not -- no, actually, I don't know that I've got case law that's going to do that, because this is a little bit unusual. Obviously here at Chambers Works DuPont was both, you know, where with 3M the settlement was a little bit different. But we're looking at this is for the statewide analysis. The State basically just, you know, we determined that we have a lot of other causes of action and sites and claims that can be addressed through other mechanisms. And the decision was to basically allocate 50/50 between them equally, even though the CERCLA claims, frankly, are more powerful and they're joint and several in their scope.

But I can provide you a great deal of CERCLA analysis and Spill Act cases that discuss allocation between responsible parties and how was an allocation done. But that's typically going to be under the rubric of there are multiple parties at a site, a CERCLA or Spill Act site, that --

THE COURT: But what I'm interested in is versus manufacturers. So --

MR. JACKSON: So Mr. Kauff just handed me one case

that was cited in the briefing that's really more akin to what I'm discussing is the *Charles George Trucking, Inc.*, 34 F.3d at 1089, upholding an equal division of responsibility between owner operators on the one hand and generators/transporters on the other hand, generators of waste. So that's akin to the product manufacturer. But that is evaluated under the same law and where this is a little bit different.

THE COURT: So try it one more time, why 50/50? It seems to me it wasn't just sort of an arbitrary number; that you did a calculus saying that you thought it was a reasonable apportionment between the strict liability parties and the manufacturing parties because you still have available to you claims against the manufacturers, right?

MR. JACKSON: That's correct.

THE COURT: And if you had gone with 100 percent apportionment of liability, would that mean then you wouldn't even bother with the manufacturers and suing the manufacturers? And so it seems -- I'm just sort of talking out loud. But you included in your calculation of the apportionment the possibility that you would go after the manufacturers, right?

MR. JACKSON: That's correct.

THE COURT: That has to go into your calculation.

MR. JACKSON: That's correct.

THE COURT: Because if you determined that you had no causes of action, you, the State, had no causes of action

against the manufacturers, then you would put a zero in that column and 100 in the other column for dischargers, right?

MR. JACKSON: Correct.

THE COURT: I mean, that's kind of -- I'm just trying to get to how the State went about getting to 50/50. And it seems to me that, you tell me, a fair analysis is, well, because you still have potential claims against the manufacturers, so it would seem unfair -- I don't know if "unfair" is the right word -- but imprudent to assess 100 percent against the dischargers. Is that fair?

MR. JACKSON: I think it's -- what -- in going through this analysis, the fact of the matter is, you know, and you remember the regulatory evolution that has been going on in the last many years as well, an incredibly important event occurred when PFOA and PFOS were listed as hazardous substances under the Spill Act and then again under CERCLA a couple years later, because that gave the State the ability to bring these claims, and, again, they are the easier claims. I mean, from a legal point of view. They are strict, they are strict liability and they are joint and several liability.

THE COURT: Right. Which leads to the question --

MR. JACKSON: Why not more?

THE COURT: -- that the public will ask, well, why not 100 percent? It's strictly liable. How easy is that? And your answer is?

MR. JACKSON: Perhaps we were overly generous to DuPont and 3M in this evaluation. The State was looking at and trying to evaluate what is a fair settlement to, and, frankly, what was our marching orders and what was our settlement authority, what can you do. This was the math that we were provided, and this was the analysis that we were provided. And so, arguably, you know, it made our job a little harder in terms of how much to allocate to these entities.

THE COURT: But if you sought 100 percent -- I don't -- here's my question: If you sought 100 percent, does that mean you don't go after the manufacturers? Otherwise, it's a double recovery, isn't it?

MR. JACKSON: No. Well, it's not a double recovery.

THE COURT: It's not?

MR. JACKSON: It cannot be. Under CERCLA there cannot be a double recovery.

THE COURT: That's what I'm asking you. So it can't be 100 -- assume you are going after the manufacturers too --

MR. JACKSON: Right.

THE COURT: -- can it be 100 and 100 or 150? I mean --

MR. JACKSON: So if -- well, the short answer is no, you can only get 100 percent of your damages and costs, period.

THE COURT: Total, right.

MR. JACKSON: So there could be a contribution claim

between these parties to allocate between them.

THE COURT: Forget -- assume there's not.

MR. JACKSON: Yeah. But you may not double recover.

THE COURT: Okay.

MR. JACKSON: There cannot be a double recovery.

THE COURT: So my question is, it seems to me that in determining, I mean, whether the State was generous to DuPont or not isn't the issue that I have to decide, but I have to figure out, I have to answer the public's question, well, why not 100 percent? And it seems to me the answer is, from what you're telling me, is that it's not 100 percent because the State has available the remedy of going after the manufacturers, and so that's not a zero. It's not a 100 and then a zero. It's a something and a something. And the State came up with 50/50. Did I summarize that right?

MR. JACKSON: The State estimated that in terms of the public costs and how these would be addressed, that it was basically 50/50.

Now, I will say this, that when we're talking about across the state, many sites that are discharging or might be, you know, CERCLA or Spill Act-liable parties, the State would likely choose not to pursue if it's a mom and pop that didn't know they had PFAS at their site and they discharged it.

So part of this was the State went after 3M and DuPont because they created this chemistry, they knew the

toxicity, and they continued to discharge it and sell it across New Jersey for decades. And so there was a culpability piece of this as well. So, you know, I don't want to say we were trying to be generous. That's the wrong way to look at it. But the fact of the matter was with respect to the claims statewide, you know, the State will and intends to pursue the manufacturers of these products when and where it can. But there are also going to be, you know, there are industrial dischargers that may dump something on purpose, but there might be others that are --

THE COURT: Well, no, and I think that that's important to the calculation. I think that's important to this Court finding whether or not the 50 percent and 50 percent was a reasonable allocation. Because if you were to stand before me and say, well, no, the State is not going to do anything else, then it does leave the question of when -- well, it leads to two questions. Why not?

MR. JACKSON: Right.

THE COURT: And assuming I'm satisfied as to that, then why not 100 for DuPont?

But what you're saying to me is that the State remains vigilant in pursuing manufacturers where appropriate. And so that has -- that can't be a zero column.

MR. JACKSON: That's correct.

THE COURT: Okay.

MR. JACKSON: That's correct.

THE COURT: Okay.

MR. JACKSON: And the Solvay and Arkema, you know, site --

THE COURT: Is an example.

MR. JACKSON: -- is a great example of a discharger site.

THE COURT: Yes, okay. Got it.

MR. JACKSON: And that was another $400 million recovery, a massive cleanup.

THE COURT: Okay.

MR. JACKSON: So part of this is based on just the experience where the state is as well. So --

THE COURT: And then the 75 percent of the 50?

MR. JACKSON: So that is based on -- there was an assessment done in the MDL court that DuPont and 3M, at least in that court, they allocated 75 percent of the liabilities with respect to the foam and PFAS to these two entities. And so we used that as a go-by, which ultimately resulted in basically an allocation of 2 billion to these two companies.

THE COURT: Okay.

MR. JACKSON: Again, for public water, public costs associated with PFAS in the state of New Jersey.

From that, there are two significant contributions or payments by these defendants. One is, it's $500 million plus.

There's still a process that's going on so it's not a done deal, but something above $500 million to the public water providers, and then the $795 million that they are paying the State here for statewide PFAS abatement. Again, we aren't calculating in this math that we're discussing the individual sites, the remediation, the natural resource damages at the industrial facilities of DuPont. This is about statewide PFAS abatement. And so that's why the State did this calculus.

So these settlements resulted in almost $1.3 billion to the public for PFAS treatment costs, which is approximately 65 percent of what the State estimated to be damages caused by these defendants.

Next slide.

So this is going to go into actually the next step, which we'll talk about in a minute with respect to the process by the State to allocate, protect the funds, things of that nature. So if the Court is interested, maybe we can either go through that now at a high level or --

THE COURT: I can wait. It can wait. Yeah.

MR. JACKSON: Okay. Good to hear from Mr. Unsworth perhaps?

THE COURT: Yes.

So before we do that, so did you conclude?

MR. JACKSON: Yes, Your Honor.

THE COURT: Yeah, okay.

So what I want to do is I want to go to the signatories for the JCOs.

MR. JACKSON: Yes, Your Honor.

THE COURT: So what I want to do is to make sure that counsel for the signatories to the JCOs agree with what you have represented to me. So you want to do the colloquy? And I don't know who the appropriate counsel should be, but, I mean, I guess I can do it. Let's see.

For 3M, it would be you, Mr. Calica, or you tell me?

What I want to make sure is that what Mr. Jackson is representing to me that these agreements provided, that the signatories to these agreements agreed with what was represented to me. I don't want any party coming back later and saying, "Well, we didn't quite mean it that way."

MR. CALICA: Yes, Your Honor. I think I would defer to my co-counsel, Mr. Hirsch, because it's his firm's name on the signature line.

THE COURT: Mr. Hirsch.

MR. HIRSCH: Your Honor, I think the answer is yes. We heard Mr. Jackson's presentation. I cannot vouch for every single comment in there but, yes, what he said seemed accurate entirely to me, as far as I can tell.

THE COURT: Okay. And then the DuPont JCO.

MS. DUFFY: Yes. Ann Marie Duffy. The signatories are our settlement counsel. And provided that they concur,

yes, I'm getting the nod of the head, they agree. While they might not agree with every characterization and how it was represented, in general we agree that the JCO is a fair, reasonable settlement as set forth as well.

THE COURT: And anything that Mr. Jackson said that you disagree with? You don't have to agree with his characterizations, I suppose. But any substantive terms that you disagree with that he represented?

MS. DUFFY: The substantive terms were represented correctly.

THE COURT: All right. I guess the same question to you, Mr. Hirsch, yes?

MR. HIRSCH: Yes, Your Honor.

THE COURT: Okay. Okay.

MR. CALICA: Sorry, Your Honor. You had asked earlier about -- for a citation on the sales.

THE COURT: Yes. Can you tell me.

MR. CALICA: Just before we go to something else, I didn't know if -- I located that.

THE COURT: Okay. Wait one second, let me go to my notes.

MR. CALICA: Yes. So I've been looking at Docket 699-6. Your Honor, that's the list of the State's exhibits that it entered during the trials. And within that are the exhibit numbers which I can provide for Your Honor for the

references.

THE COURT: Okay.

MR. CALICA: The first I would point Your Honor to is PTX03084. That's the Tomer, T-O-M-E-R, certification that was entered in this case that regards sales to the Chambers Works facility.

There is also PTX00298. That's another Tomer certification. You may find it duplicative, Your Honor. That was actually entered in a companion litigation before Judge Donio that also concerns the Chambers Works facility.

THE COURT: Okay.

MR. CALICA: But I, just for completeness, I wanted to point you to it.

And lastly is PTX03160. That's an exhibit to, I believe, the 2024 Tomer certification in this case. And the exhibits, I'll just point you to the, you know, specific products and the dates, to the extent we have them.

THE COURT: Okay.

MR. CALICA: Of course, if Your Honor would like us to resubmit because you --

THE COURT: No, no, I can find them on the docket.

MR. CALICA: Okay. Thank you, Your Honor.

THE COURT: Okay. Thank you.

All right. Let's take a ten-minute break and then we'll start with testimony. Okay.

MR. JACKSON: Thank you, Your Honor.

THE COURTROOM DEPUTY: All rise.

(Recess was taken at 11:05 a.m. until 11:17 a.m.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Are we all set?

Okay. You can all have a seat. Thank you.

Mr. Jackson, your witness.

MR. JACKSON: Okay. Thank you, Your Honor.

Let's go ahead and we'll call to the stand Bob Unsworth, please.

THE COURT: Okay.

(Witness took the stand.)

THE COURTROOM DEPUTY: Please raise your right hand.

Do you swear or affirm that the testimony you're about to give in the matter pending before this Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

*ROBERT E. UNSWORTH, called as a witness for the Plaintiffs, having been first duly sworn by the Deputy, was examined and testified as follows:*

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Robert Edward Unsworth. Unsworth is U-N-S-W-O-R-T-H.

THE COURT: Okay. Good morning. Have a seat. Make

yourself comfortable.

There should be water in the pitcher if you need it.

THE WITNESS: Thank you.

THE COURT: Could you do me a favor, is there a way that we can move that monitor over here? It's okay if not. This way you're not looking away. I should have mentioned that earlier. Well, we'll get started and maybe we can fuss with it.

MR. JACKSON: You can see the screen over here as well, Bob.

THE WITNESS: Yeah.

THE COURT: Do you think you need that screen or do you want to use this screen?

THE WITNESS: I can use that screen.

THE COURT: Okay. Can we take that screen down?

MR. SERP: Sure.

THE COURT: Yeah, okay.

All right. Go ahead, Mr. Jackson.

DIRECT EXAMINATION

BY MR. JACKSON:

Q. Mr. Unsworth, you prepared a PowerPoint presentation to assist with your presentation and your testimony today?

A. That's correct.

Q. The Court will use that. And we're handing up copies of that as well.

MR. JACKSON: So, Judge, just to kind of level set it at least at the outset, we're presenting Mr. Unsworth's testimony here today to give you, you know, a sense of his qualifications and background and the estimates that were provided to the State as part of this process. I don't intend to try to qualify him as an expert. I think his expertise is going to be obvious as we go through this, but I just wanted to be clear that we're not trying to offer expert testimony, and we're also just cognizant and trying to be careful as we go through some particular issues with respect to any particular, you know, waiver of privilege-type issues and arguments as well.

THE COURT: Okay.

MR. JACKSON: Thank you, Your Honor.

BY MR. JACKSON:

Q. Mr. Unsworth, can you tell the Court where you work.

A. So I'm a senior fellow with Industrial Economics in Cambridge, Massachusetts.

Q. And what is Industrial Economics?

A. IEC is a 40-year-old-plus consultancy which works on matters involving environmental science, environmental economics, public policy.

Q. How many employees does IEC have?

A. We have 150 total employees.

Q. And what types of disciplines or specialties fall within

that?
A. So we have folks like myself who are environmental economists. We have agricultural economists. We have public policy experts, chemists, biologists, ecotox folks, finance folks. So all the skills we need to work with in our space.
Q. And broadly speaking, what is your space?
A. So our space has largely been considering both environmental regulations, both their costs and their benefits, so forecasting costs and benefits of environmental regulation, or understanding how relaxation and environmental regulation might save money or change benefits, and doing environmental damage assessment for oil spills, hazardous waste sites, forest fires, acts of war, et cetera.
Q. Does IEC design the remedy at a contaminated site?
A. We don't do site-specific designs. We're working typically at the policy level or programmatic levels. But we rely on engineers we have to understand and forecast those costs.
Q. And your job is the economic piece of that, to take either a remedy or the impact from a contamination event and to cost it; is that correct?
A. That's right. I have to have all the engineering and science and other pieces of it described to me and then we build the economics from there.
Q. Okay. Can you just give us an example besides what you

did here?
A. So a good example would be the work we did on the Gulf oil spill. So we worked for states and the federal government in that case. And I had biologists telling me what they thought the biological implications might be. I had economists telling me what the behavioral responses of the public might be. Folks weren't going recreating at the Gulf. And we had folks telling us what it was going to cost to fix the problem, and so we bring all of that together into an economic claim.
Q. Thank you.
You said you're a senior fellow?
A. I'm a senior fellow, which means I no longer have responsibility for administration, so...
Q. When did you first start at IEC?
A. I started at IEC in 1986 as an associate.
Q. And tell us your career path from there.
A. Yeah. So we're set up typically like a consultancy. So I was an associate for a number of years, became a senior associate. I then became an owner and a principal in 1992, and became president and COO in 2001, and held that position till 2011 when I went back to being a principal and doing consulting with my clients.
Q. And when did you become a senior fellow?
A. Two years ago.
Q. Okay. Please just tell the Court your educational

background.
A. So I have a bachelor's degree in forestry with a specialization in forest economics from the State University of New York, and I have a master's in forest science where I studied environmental economics and natural resource economics at Yale University.
Q. Give us a sense of what environmental economics and natural resource economics means, what you do in that field.
A. Sure. What we do is applied environmental natural resource economics. Applied environmental economics looks at the costs and benefits typically of environmental regulation or environmental change. So if we're trying to figure out, for example, we've been asked recently to look at what it might cost to reduce nitrates in drinking water and what benefits might result from that to the public health, and so we work on those issues.
On the natural resource side, we're looking at changes in natural resources, you know, whether it's groundwater or wetlands or beaches, and how that affects the public in terms of economic values.
Q. In terms of the economic consequences of a hazardous substance in the environment, is it fair to say that breaks down between costs that the public might incur with respect to how to address those environmental contaminants versus the damages that might be done by a natural resource impact or

injury?
A. That's right. I mean, usually in environmental economics we're dealing with regulations that are being set in advance. In natural resource damages, we're typically dealing with events or histories that have resulted in harms and we have to deal with what actually happened.
Q. Okay. What types of clients do you typically represent?
A. So our clients include the federal government, U.S. Department of Justice, various federal agencies, the Department of Interior, EPA, NOAA. We work for a large number of states, a large number of Indian tribes, various private parties bringing claims for environmental harms, for example, from explosions or disasters, and I also do work abroad on oil spills, acts of war, and other harms to the environment.
Q. Are you recognized internationally as an expert on the economic consequences to the public from environmental harms?
A. Yeah, I think we are. We were hired by the United Nations Compensation Commission following the Iraq war to adjudicate claims against Iraq for all the harms of invading Kuwait. And I was hired by Nicaragua to defend claims brought against them by Costa Rica associated with an incursion. And I do work in Saudi Arabia. I do work in the Hague giving testimony on environmental harms.
Q. Okay. Did you play a role in the settlements here in New Jersey?

A. I think what we did here was what we typically do, we tried to provide the best available information to help the client understand what liabilities could be claimed in court and answer questions in settlement about the strengths and weaknesses of those claims. We also helped build some models to calculate values over time.

Q. Did the outcome of the settlement here appear fair and reasonable based on your experience?

A. I think it was based on sound information. The numbers the State was using were in the ballpark of what we felt the damages are in this case. And compared to other claims, this is an extremely reasonable claim, in terms of the outcome.

Q. Are you representing other states in PFAS matters?

A. We are.

Q. How many?

A. Probably close to three dozen we're working with.

Q. Do you recall when you were first retained by the State of New Jersey?

A. I think if you want to switch the slides, I can do that.

THE COURT: This may not be a fair question. If it's not, you'll tell me. So you're working with other states, you said?

THE WITNESS: Yes.

THE COURT: Are you using this settlement as a base?

THE WITNESS: No. Our work at my firm would not be

using the settlement as a base, but --

THE COURT: What I mean by that is, the calculations that you're using for other states, are they the similar calculations that you're using here? Did this case sort of -- is this case sort of providing a framework for you in other states?

THE WITNESS: So we do have a framework across the states, which is the same as what we used here. So I don't -- New Jersey wasn't out ahead of those other states. That framework has been around, but the issues are the same.

THE COURT: Okay.

THE WITNESS: Yeah.

BY MR. JACKSON:

Q. So when were you first retained by the State of New Jersey?

A. So in 2019 we were hired as non-testifying consultants on the sites that are listed on the chart there, in particular, looking at natural resource damages. And then in June of '23, we were hired to begin evaluating settlement values for New Jersey, including the statewide harms of PFAS.

Q. Can you describe for me specifically what you did to assist the State in preparing for its settlement demands.

That would be the next slide.

A. So what we've been doing in all of our work is considering the published literature on the effects of PFAS on both human

health and the environment. So we considered in particular in these cases it's going to be primarily added cost damages or cost to cure. So we're looking at what actions might need to be taken in response to state and federal regulation, as well as what actions might be taken at sites that have been contaminated. And so we look at data that are available in the literature and have been published by engineering firms on the costs of that. We look at a great deal of information on the occurrence rate of these compounds in the environment, whether it's based on, say, EPA's survey of water providers or based on, in the case of New Jersey, the chemistry of wells, private wells that is reported when folks sell their homes.

And, yeah, we forecast what we think the timing of regulatory actions would be and what the response of the regulated community would be to that, to those requirements.

Q. And then from that, estimating the costs to the public?

A. That's correct.

Q. Okay. What types of public entities and costs did you consider in this case?

A. So specifically for New Jersey, we considered wastewater treatment plants, and we considered sites at which AFFF was used in firefighting training and may have been released to the environment.

Q. So with respect to those two, why didn't you just get the cost data from the POTWs with the counties?

A. Sure.

So, you know, the regulations at the time we did this were still in a formative stage. And in addition, there wasn't a great deal of experience with POTWs in managing these -- the chemistry of their waste streams. And so we felt a better approach than asking folks directly would be to ask engineers what the cost curves would look like and what the options were for compliance. We're dealing here with hundreds of facilities, so we would also need some kind of a sampling protocol, and the data just wouldn't be there.

Q. Okay. And with the counties?

A. With the counties we have --

Q. Or other soil contaminated entities.

A. Yeah. The soil contamination sites, there's far fewer of those, so we can count them explicitly and identify them explicitly. And as far as I know, there hadn't been any attempts to calculate costs for those as of the time we did this work.

Q. Okay. Did you evaluate the settlement values, New Jersey settlement values for drinking water?

A. I'm aware of New Jersey's settlement value for drinking water. We weren't asked to assist in that piece, so...

Q. Do you know how the State estimated the additional drinking water costs that the public entities were going to face as a result of PFAS?

A. Yeah. New Jersey took an approach that's sort of logical. They looked at EPA's estimate nationally of what the requirements on MCLs would be and used a per capita estimate, you know, divided that number by a total per capita and then assigned it to New Jersey. I think it's 3 or 4 percent. It yields a number -- we use a different approach, but it yields a number that brackets -- we bracket that number.
Q. So I was going to ask you, did you evaluate those kinds of costs for other states?
A. Yes.
Q. And based on that, do you think that New Jersey's approach was reasonable?
A. Yes.
Q. Okay. Do you know how the State calculated anticipated drinking water well costs?
A. Yeah. I think they did what is logical, attempted to get a population of homes that have wells. There's actually a surprisingly large number of drinking household wells in New Jersey, and they considered occurrence rate and what it costs per household to buy a treatment system and to operate it.
Q. And did you believe that approach was appropriate based on your work?
A. Yeah. It's very similar to what we've been doing.
Q. Okay. So specifically, let's go back to what you were

asked to do. What was IEC asked to do with respect to the wastewater treatment plants and the remediation costs for the AFFF locations?

A. So specifically wastewater treatment plants, we were asked what the costs would be, if any, of dealing with effluent, treating effluent, so it met water quality standards, it met the discharge standards. And we considered what the costs would be of addressing their biosolids, which is the solid part of what's left over after sewerage is treated. And for the sites that had used AFFF, we were asked what it would cost to do source control of those sites, get rid of the source of the contaminants at the surface and reduce the exposure of the environment.

Q. Let's go to the next slide. Tell us about the POTW cost estimate. What did you do specifically?

A. Yeah. So I think the process here is important. What we do in any situation like this is we evaluate what's likely to be required, so we're looking ahead here. So we're trying to forecast what the performance standards are going to be and what outcomes the regulatory community is going to ask the regulated entities, in this case publicly-owned treatment works.

We have to forecast that based on the information that's available at the time and what the regulators are saying, and then we identify the population of the regulated

community. So in this case it's publicly-owned treatment works, not privately owned, but also you have to get at some facilities that might be a little odd, like universities or prisons or things like that that aren't typically considered.

And then once we know what we think the requirements are going to be and who we think is going to have to comply, we ask the question, "What are their options to achieve compliance?" And that may be an engineering option. It might be an operational change.

So, you know, for example, drinking water providers on the drinking water side have the option of treating water. They also have an option of moving to a different source of water if that, you know, might be less expensive. And so we look at all the choices that are available and we pick the most cost-effective choice. So all the choices are going to achieve the objective of compliance, but we look to the least-cost version of that, so...

Q. Okay. Is this the type of work that IEC typically does?

A. Yes. This is the bread and butter. In fact, the company name, Industrial Economics, which is a little odd given that I deal with pollution events, was because we were founded to build models of the cost of environmental compliance across industries, and so that was the "industrial economics" part of our firm.

Q. Perfect.

Okay. Let's go to the next slide. With respect to POTWs, how did you go about estimating the potential cost of PFAS?

A. So at the time there was some literature and some other folks that already considered what might be required of POTWs and what their actions might be to resolve those requirements, and we'll talk about one study in particular. We looked at national data on concentrations of contaminants in the discharge from those facilities and in the influent to those facilities.

We also considered, in the absence of that information, what we would -- where we would think there would be problems given information about water utilities, so we know what the concentrations were at the water utility. That water ultimately makes its way to the POTW.

We considered New Jersey-specific data. I mentioned the data that's available from household drinking water wells, which is a little unusual in the U.S. that that's required. So that's helpful data.

And we talked to POTW operators and engineers both outside our firm and in our firm and the state regulators who are among our clients about what they expected. And we visited several POTWs to understand their operations, not specific to New Jersey but in work we're doing around the country.

Q. Okay. Based on the collection of documents and data and

these discussions that you had, what kind of costs did you initially consider in estimating the potential cost to POTWs in New Jersey?

A. Yeah. So there are three primary categories we initially considered. So if there's going to be requirements that you limit PFAS discharge to the environment, you're going to have to treat effluent, so that would be -- there might be costs associated with treating effluent. There's also a not insignificant cost of sampling. PFAS sampling, those samples are relatively expensive to get processed. So there's influent sampling, effluent sampling. You need to do both to see if you're successful in your treatment.

And then there's sampling of biosolids, you understand the chemistry of the biosolid portion of the waste stream. And biosolids go out of POTWs either as a sludge or as dried material, like pellets. So you would sample those. And then you have to get rid of the biosolids. And so facilities currently use a variety of means to get rid of their biosolids, some of which are considered beneficial use. So they're using it for fertilizer or using it at landfills, and some folks pay just to have it hauled away. So we considered whether those disposal costs would change.

Q. Okay. Let's break this down separately.

What did you do to estimate the cost to treat the wastewater at the POTWs in New Jersey?

A. Yeah. So at the time that we were developing estimates to support consideration of settlement, there was a study done by Barr Engineering from Minnesota. Minnesota had a rather notorious PFAS site, so they proceeded to do some research on how to address PFAS in the waste stream from POTWs. And the question Barr Engineering was asked -- and that was the most exhaustive study at the time we did our work.

So the question they were asked is: "What treatment technologies are available for end-of-pipe treatment and for the destruction of PFAS in the -- that's been separated out from the waste stream both on the liquid side and on the biosolids side?"

So they looked at several techniques. You can look at the report. It talks about the success of those techniques and the costs. And they talk about -- yeah, they talk about whether they would be -- achieved the objective both with long- and short-chain PFAS and whether they achieved the objective of destruction. So they were asked a very specific engineering question, which was narrower than the question we're answering and I think narrower than the question that we should be answering.

Q. And so what did you conclude after reviewing the Barr study?

A. So at that time, Barr Engineering was proposing technology. So it's not like a lot of folks out in the world

are already doing this, so it was not proven. And I think what we concluded is that it's not cost effective to treat PFAS in effluent; that folks just aren't going to do that. It's much less expensive for the public and much less expensive just pragmatically to ask significant sources of PFAS to the waste stream that winds up at POTWs to reduce their discharges, and that's pretreatment. It's called "pretreatment." And it's what POTWs have been doing for a long time. We do work in Vermont. There's a lot of pretreatment to remove, for example, nutrient load from beer manufacturers, you know, so they don't wait till that material gets to the POTW, they ask the manufacturers to treat their waste first before they discharge.

And I think we also concluded that, as I mentioned, the need to remove all the short-chain PFAS, which is very expensive, you see in the study, and to get total destruction through incineration were somewhat dramatic solutions to a problem that weren't necessarily going to be required.

Q. Okay. So taking all that into consideration, what did you conclude with respect to the treatment of PFAS in wastewater?

A. So taking that into consideration and also taking into consideration -- we can flip to the next slide.

Q. Sorry. Oh.

A. You know, their own statement and their study as well as what at that time EPA and a number of states were already determining is that there is this option of asking for source

reduction at sources of these contaminants. And keep in mind that as we treat drinking water, that's one of the major sources at POTWs. So as we treat drinking water from public systems, you'll see less PFAS in the waste stream at the POTWs, as we, you know. And then the Minnesota study recognizes and simply says that they weren't being asked to consider alternative compliant strategies. They were asked to do engineering.

Q. Okay. So when you said that reduction of PFAS in drinking water would have an effect in the wastewater stream, can you elaborate on that a bit? I want to make sure that I understand that.

A. Sure.

So for a lot of POTWs, a primary source of PFAS is from household, domestic, commercial, and industrial folks who are buying water from water utilities, using it, and discharging it to the sewer, and that winds up at the POTW. And whatever was in the original source of water is now -- kind of finds its way to the POTW. There's also obviously additions along the way, both domestic and commercial, and there's plans to try to reduce those as well.

Q. So if drinking water standards go in New Jersey from 14 to 4, would you expect to see a reduction?

A. Yeah, absolutely.

Q. So taking all that into consideration then, how did you

calculate or evaluate the treatment costs in New Jersey?
A. Yeah. So the next slide here just gets to that punchline, which is that you would look to identify sources whether by, you know, industry type or commercial type. They sometimes sample in stream within waste -- within sewerage systems to find out where the compounds are coming from and look for pretreatment at commercial and industrial facilities. And hopefully, as you've pointed out, reductions associated with concentrations in drinking water will yield lower, and that relates to how the permitting process works.
EPA has given primacy to New Jersey to operate the Clean Water Act, and that passes down to the local agencies who have the responsibility and the authority to request pretreatment.
And I think the next slide just summarizes what's already been said about, you know, there's going to be -- we didn't know it at the time, but in 2026 there's now been an action to reduce the use of PFAS in domestic commerce, in different products.
Q. Slow down for a second. Tell us a little bit more about that, because you're referring to the New Jersey Protection Against Forever Chemicals Act?
A. Yes.
Q. Can you tell the Court about that, please.
A. So the Act, which there was discussion of at the time and

other states were considering the same, this identifies sources of exposure to the public of PFAS in certain consumer products and comes up with a schedule of products and a time schedule for removing PFAS from those products, if at all possible, so carpeting and cosmetics and things like that. It -- yeah, so that's one major way in which to reduce these concentrations at POTWs.

Q. By taking the -- by addressing the source areas basically?

A. Yes.

Q. Okay.

A. And of course, the goal is to reduce the concentration being discharged to the environment, and that's, you know, this helps the POTWs along the way.

Q. Of course, of course.

And then the next bullet is "require remediation." Can you elaborate on that, please.

A. Yeah. So to the extent that there's ongoing sources of PFAS, such as we're going to talk about AFFF at sites, that then finds its way to groundwater or surface water and then that finds its way to water utilities. So as you deal with those, you'll also see a reduction. There's also a possibility some addition of groundwater to sewer systems directly. They're not under pressure. The groundwater gets into sewers.

Q. And you've already discussed the impact of drinking water standards.

A. Yeah, yeah. And that's going to be substantial, so...
Q. All right. So once you considered all these factors and concluded extensive treatment at most of the POTWs was not realistic, what costs did you consider in estimating the cost to the POTWs for the state of New Jersey?
A. Yeah. So you're still left with two relatively significant cost items here. One is the cost of sampling. So these are -- it's like 400 bucks to process a PFAS sample. And you do that, we assume they would be doing that monthly for about 15 years. And we also still had the challenge of what to do with biosolids, which for some POTWs are currently disposed of at no cost because they go to beneficial use or are sold.
Q. And describe beneficial use in this context.
A. So in this context the beneficial use would be using it as fertilizer, either forest, farm or going to commercial fertilizer production. So it's not unusual. It's why there are several sites around. There's a notorious one in Maine and a notorious one in Vermont where sewage sludge was used as fertilizer at farms and found its way into cattle and into products. So that --
Q. That PFAS was in the sewage sludge?
A. That's correct, yeah. And because of that, our belief is it will become increasingly difficult to give the stuff away. And so to be confident that we're capturing costs, we included the cost of now disposing of that portion that is currently

either being given away or sold.

Q. So this next slide, can you tell the Court what this is, please.

A. Yeah. This just breaks down what I just described. So the gray boxes are data that we had at the time. The yellow boxes are assumptions. The blue boxes are intermediate results, and then the final result. So we have a really good source from the National Biosolids Data Project in 2018 that summarized for all the states what portion of the biosolids goes, for example, to beneficial use by state.

We also have census data on state population, and so we were able to estimate the number of POTWs in the site. We actually estimated it, it's a little bit higher than probably the true number of POTWs, but we estimated it that way. And then we come up with a 15 -- my chemistry staff came up with a guesstimate of a 15-year sampling cycle with the hopes that after 15 years, the concentrations have declined so you stop doing this or you've learned enough so you don't need to do it anymore. And then we have -- we got some quotes on sample costs. And this slide just shows the math. And it came out to about 18 million bucks just for sampling.

Q. 247 POTWs times 12 sampling events times $400 per an event, right?

A. Yes.

Q. Okay. Let's go to the next slide. Tell the Court about

this, please.
A. Yeah. So the next slide here deals with this biosolids problem. So, again, the biosolids disposal project tells us how much this was occurring, and then we have another factor we put in here, which is in the purple box there. We have the occurrence rate. So the unregulated contaminant survey that's done by EPA tells us for drinking water systems what the occurrence rate is of PFAS. And so we scaled down our estimate of who's affected here by considering that there were certain communities that don't have a problem. So if they didn't show a problem in their drinking water, they're not likely to have a problem at the POTW, so we have a scale or factor there.
And then the middle calculations are just math. So the cost numbers that I have available to me are what it cost to dispose of wet sludge, but what we have are estimates of the total tonnage of dry sludge. So I got to calculate -- do a calculation there to get it back to wet sludge, and then multiply that by a cost per ton and we get a total cost.
Q. So let's show the Court the math.
A. Yeah. And that's on the next page. And as I said, the conversion here of dry to wet, it literally just gets the units in the right units so I can apply a cost figure to it. We --
Q. What did you estimate?
A. So we're estimating about $1.5 billion over 15 years in additional cost to the public or ratepayers of having to

dispose of this stuff.

(Court reporter clarification.)

BY MR. JACKSON:

Q. And just to sum up, what are those additional costs for?

A. That's the cost of sending the stuff away as waste at a fee.

Q. Because you can't use it for fertilizer because of the PFAS in it?

A. That's correct. And that's not a regulatory determination at this time, and there are POTWs that would strongly disagree with that, but this is a conservative way of saying what if this stuff just has a stigma associated with it.

THE COURT: They would disagree with what? They still think that it has a value even though it shows up in cattle?

THE WITNESS: It's not that simple, Your Honor.

So, you know, for example, Washington, D.C., sells their biosolids as a product, and they like doing that, and they don't believe the concentrations they have should be affecting people because they don't believe it should be getting into the food chain. Whether the folks who buy it will continue to believe that and take on that liability is the question.

THE COURT: Oh, that's what you meant by "stigma"?

THE WITNESS: Yeah, yeah. I think it's --

THE COURT: So the stigma may control the narrative eventually is what you're saying.

THE WITNESS: Yeah. If you own a farm, do you want to apply this stuff?

THE COURT: Yeah. Gotcha.

THE WITNESS: Or if you're a manufacturer of fertilizer, are there better choices of feedstocks?

BY MR. JACKSON:

Q. So at the end of the day, did you walk through these issues and estimates with the State and its counsel?

A. We did.

Q. And did they agree with you?

A. They did.

Q. So based on your experience and training, did you ultimately conclude that for purposes of settlement, a fair estimate of the potential public costs to New Jersey for addressing PFAS in wastewater was approximately 1.5 billion?

A. Approximately, yeah.

Q. Let's go to the county sites and then addressments there.

A. Sure. So the process here is the same. You have to figure out how many facilities are going to be affected, and you have to figure out what it's going to cost per facility, which includes a consideration of what are they actually going to do at these sites.

So these are both sites where fire personnel were

trained to use AFFF, so they light things on fire, they put the fire out. They have experience with it now and they know how to use the chemical. And that, we estimate, had occurred at Part 139 airports, which is just an easy way of saying these are basically commercial airports. There's four of them in the state, two of which are interstate authorities that we're not dealing with. The other two are regional airports. So these are airports that have some commercial traffic and with minimal seats per plane. So there's two of those. And the assumption was at some point they did train folks there at the fire department to use this stuff and they did apply it in the environment. And then the fire training academies, working with the State, we determined there were up to 22 that may have this material present in soils.

We also looked at, you know, aerial photos to see whether they actually had on-site training at these sites. You see a tank car or a tower or something where they're training people and determined that 22 was probably the best estimate of facilities that might need remediation associated with spraying AFFF that is now in the soils.

Q. So what did you do to estimate the costs of these facilities?

A. So there are two sources of information. You can flip, yeah. You could probably flip another slide there to estimating the cost.

There are several things to consider. There are cost models that have been developed. So these are engineers who have published or presented estimates of the cost per acre of remediating soil that has AFFF in it. And they provide cost curves that show increasing costs as the size of the site increases, and then there are some -- a few sites at which attempts have been made to deal with this. And so we also considered those.

So, as you said earlier, the primary goal here is to get the source out of the environment so it's not adding to the burden on the environment, and so you either dig the stuff up and send it somewhere, or you can dig it up, process it, and put it back down after removing the AFFF. You can contain it, which might mean putting pavement over it so the groundwater doesn't infiltrate through it, or putting some sort of a slurry wall around it, or you can do some kind of treatment in site. So it's still in development where you might apply a chemical to the surface and let the chemical leech out the AFFF and then collect it through collection wells.

So we have, and I'll show them in a moment, we have cost curves for each of these, and we also have two military sites, one of which this has been attempted, in particular the ex-situ treatment. So they dig the stuff up, they process the soil, take the rocks out, put it through a washing machine, and what they're left with is something that hopefully doesn't have

a lot of AFFF in it, and another air base where they've estimated the cost of doing this.

So if you go to the next slide, these are the cost curves that have been presented. There has not been a lot of this at the time we did this work, so we're working with what we got. But remember these are relatively small sites. This is stuff that's been sprayed to put out a fire that's been lit on purpose to train the firemen, usually on a pad or at a -- might be on soil at a facility. But it's going to be single digit acres in size.

Q. So tell the Court what we're looking at with these four cost curves.

A. Yeah. So these four cost curves are for the four options I just described.

Q. Just walk through each one, please.

A. Yeah, sure.

So the upper left is probably the simplest. So that's what does it cost to dig up soil and send it to a landfill that can accept this type of waste? So the source area is along the bottom, that's in acres, and then the costs are in millions of dollars going from there. Obviously, what's left out here is the third dimension, which is how deep the problem is, but the presumption is that most of these compounds are getting caught in the organic matter and in the soil. And so they make an estimate of what they think the average depth

would be to dig it up.

So all the cost curves here are dollars, millions of dollars per acre. And in the case of the sites we have, which are, again, small, single-digit acres, it doesn't much matter, the costs are all on the order of low tens of millions of dollars per site.

Q. And show the next slide.

It puts it together? Yeah.

A. Yeah. That's what this slide does. It shows that obviously each of these cost curves has uncertainty associated with it, so it has some error bounds around it. And when you look at that, you know, you're talking 10-, $20 million, you know, for a 2-acre site or 20-, $30 million for a 6-acre site. So that was what we started with. We started with that, and then I asked my staff to consider has anybody done this, and do we have any actual data on what it costs? And that led to the two Air Force base examples where they've either done this or planned for it.

And interestingly, those are running about $20 million per AFFF subsite within those sites. Some of them there were multiple locations. But it's on the same order of magnitude, so we had some confidence it's not unreasonable.

Q. Okay. And the sites in New Jersey, how large are those?

A. I'm sorry, I couldn't hear you.

Q. I'm sorry. The sites in New Jersey, how large are those

in terms of --
A. As I mentioned, they're all going to be relatively small. And as I said, we looked at aerial photos of them to see how big the operational areas are. A little tougher for the airports because we don't know where they practice. But in general, the sites are relatively small.
Q. Okay. So why don't you just walk the Court then through how you calculated the cost estimates here.
A. Yeah. So we have two airports that are publicly-owned where the costs may fall on the public, and we have 22 fire training academies in the state that the State believed could be affected by this.
Keep in mind, it's not a guarantee that remedy has to take place at these sites, but they could be affected. So there's 24 total at about $20 million a site gives about $500 million total in cost.
Q. Okay. Were the POTW and county PFAS cost estimates that you provided to the State appropriate for scaling the DuPont and 3M settlements and estimating future public costs?
THE COURT: Wait. Can you just hold on one second.
Do you know what he's asking you?
THE WITNESS: Yeah.
THE COURT: What do you mean by "scaling"? Can you just say it -- rephrase it.
MR. JACKSON: Sure.

BY MR. JACKSON:

Q. Were these estimates that you provided and calculated, do you believe they were appropriate for the State to use in ascertaining and determining settlement values for purposes of the settlement negotiations with DuPont and 3M?

A. Yeah, absolutely. I mean, this is what we do. We have to consider what the added costs are going to be associated with the presence of environmental contaminants, and the data here were the best available data at the time, in some cases remain the best available data. And so I think it is a reasonable, yeah, it's a reasonable basis for understanding the order of magnitude damages.

Q. Okay. Are you confident that your numbers are reliable estimates of the POTW costs and county remediation costs for purposes of evaluating potential settlement values?

A. Yes.

MR. JACKSON: Okay. That's all I have.

THE COURT: Okay.

Mr. Telsey, I think you're the remaining objector.

MR. JACKSON: Oh, pardon me, Your Honor.

THE COURT: Yeah.

MR. JACKSON: I'm so sorry. Mr. Unsworth has with him a binder of documents that are not, by any stretch, everything he reviewed. I think he described that as rooms full, but there is documentation, you know, some of the

underlying information, like the Minnesota study, for example, I don't know if you wanted that information or not, but it's available.

THE COURT: I think it should be part of the record. He testified and relied upon it. So is it just in one binder?

MR. JACKSON: Yes, it is, Your Honor. There's tabs 1 through 19.

THE COURT: Okay.

MR. JACKSON: And --

THE COURT: So let's just mark his binder as Unsworth-1, and it can be part of the record. And I can keep the -- well, I only need one binder.

MR. JACKSON: Perfect. All right. Thank you, Your Honor.

THE COURT: Okay.

(Exhibit Unsworth-1 was marked for identification.)

(Exhibit Unsworth-1 was received in evidence.)

MS. MORELLI: Permission to approach.

THE COURT: Yeah. You can give it to my law clerk. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Just one second.

Mr. Telsey, you're our only objector. Do you have any cross?

MR. TELSEY: No, not of this witness.

THE COURT: Okay. Thank you, Mr. Unsworth. You can step down. Thank you.

MR. JACKSON: Thank you.

Your Honor, I was going to alert you to one issue just while we're at it.

(Witness left the stand.)

MR. JACKSON: Literally in the last hour or so, the U.S. EPA announced an agreement with the DuPont Defendants regarding -- and Chemours, excuse me.

MS. FARLEY: Only Chemours.

MR. JACKSON: Only Chemours, pardon me, with respect to several facilities that are PFAS sites, one in West Virginia, one in North Carolina, and the Chambers Works facility as well. We haven't seen the agreement yet. I wanted to just bring it to your attention, and on the break I was inquiring. I'm told that it doesn't affect what we're doing here today, but I didn't want you to be unaware of it and be concerned. So I just wanted to flag that for your awareness.

THE COURT: Okay. Thank you. So maybe I'll ask you to give me more on it, but we'll see. Yeah.

MR. JACKSON: Okay.

THE COURT: Do you have another witness?

MR. JACKSON: So I think at this point we want to, yes, we're going to turn to the use of the funds, the securing of the funds and those issues, and I'll turn it over to

Mr. Castello.

THE COURT: Okay.

And as I had alerted to you in my text order, I wanted you to be prepared to address the concerns that Carneys Point has raised about, well, what is the guarantee. You'll address that in your presentation?

MR. CASTELLO: Yes, Your Honor.

THE COURT: Okay. Thank you.

Okay. Mr. Castello.

MR. CASTELLO: Thank you, Your Honor. Plaintiffs call Kimberly Cahall.

(Witness took the stand.)

THE COURTROOM DEPUTY: Good afternoon. Please step up. Please raise your right hand.

Do you swear or affirm that the testimony you're to give in the matter pending before this Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

*KIMBERLY CAHALL, called as a witness for the Plaintiffs, having been first duly sworn by the Deputy, was examined and testified as follows:*

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Kimberly Cahall, C-A-H-A-L-L.

THE COURT: Okay. Welcome. There's water in the

pitcher if you should need it. And if you can remember to talk into the microphone, please.

THE WITNESS: Thank you.

THE COURT: Uh-huh. Counsel.

DIRECT EXAMINATION

BY MR. CASTELLO:

Q. Ms. Cahall, where do you currently work?

A. I work at the New Jersey Department of Environmental Protection.

Q. What is your role at the department?

A. I currently serve the dual roles of chief advisor and chief enforcement officer.

Q. When did you assume the role of chief advisor?

A. In November of 2024.

Q. What are your responsibilities as chief advisor?

A. So I oversee DEP, which is short for New Jersey Department of Environmental Protection, so I'll refer to it as such.

At DEP, I oversee the department's legal, regulatory and enforcement policy programs. I report directly to the Commissioner and advise him at strategic points on all litigation. I also oversee all of the department's rulemaking efforts as well.

And in addition, I serve as the primary liaison with the Office of the Attorney General and the Division of Law.

Q. Did you go to law school?

A. Yes.
Q. Are you an attorney?
A. Yes, I am.
Q. What are your responsibilities as chief enforcement officer for the DEP?
A. As chief enforcement officer, I oversee the department's affirmative enforcement agenda. So as part of that, I work with every media program within the department to ensure effective and robust enforcement and also ensure that we're providing compliance assistance and technical assistance as needed.
Q. When did you assume the role of chief enforcement officer?
A. At the beginning of 2022.
Q. Were you the chief advisor and chief enforcement officer for the DEP while Commissioner LaTourette was the Commissioner?
A. Yes, during some of his tenure.
Q. Are you in the same role under Commissioner Potosnak?
A. Yes, I am.
Q. When did you first become familiar with PFAS chemicals?
A. So I became generally familiar with PFAS chemicals probably around 2016 when there started to be media reporting about potential health risks associated with those chemicals, and I gained additional knowledge when I joined the DEP back in 2022, and, you know, furthered that knowledge when I assumed the title of chief advisor at the end of 2024.

Q. When did you first become familiar with this lawsuit?
A. When I joined the department in 2022.
Q. Did you have any responsibilities with respect to this lawsuit?
A. Not in my role as chief enforcement officer. I began my involvement with this lawsuit when I started as chief advisor.
Q. And what did that involve?
A. So that involved frequent meetings with the Office of the Attorney General, Division of Law, and outside counsel. It included briefing and advising the Commissioner and making recommendations as needed and also coordinating very closely with the programs within the department, including water resource management and contaminated site remediation, redevelopment.
Q. Okay. Did you have any responsibilities with regard to the settlements we are here to discuss today?
A. Yes. Although I was not involved with the financial analysis of the cost and damages, I was directly involved with the preparation of the Settlement Distribution Plan.
Q. Did you have any other responsibilities with respect to these settlements?
A. Yes. I advised the Commissioner and made recommendations and worked closely with our counsel.
Q. Did the State have an approval process with respect to both the 3M and the DuPont JCOs prior to the time they were

executed?
A. Yes. We have long established approval processes in the department. I consult with the various programs who are impacted by a particular decision, and then I bring ultimately my recommendation up to the Commissioner. The Commissioner in this case signed off and approved both settlements directly. Within the Office of the Attorney General, there is also a multi-tiered approval process, and in this case both settlements required approval by the attorney general.

We also ensure that the governor's office, although they don't have a formal approval role, that they are briefed and they are aware, and they sign off on the Register notice that's published with any proposed settlement.
Q. Does the New Jersey Department of Environmental Protection consider these settlements to be fair and reasonable?
A. Yes, absolutely. These settlements represent a landmark victory in DEP's perspective for the citizens of New Jersey. It creates an overall framework where we can address PFAS effectively throughout the state. Very meaningfully, we're holding those responsible to account here, and DuPont is going to be required to remediate all four industrial sites regardless of costs.

And in addition, there's going to be a $1.6 billion financial mechanism to ensure that those costs don't come back to the taxpayers of New Jersey.

And in addition, through the abatement fund, we will provide meaningful financial support for water infrastructure upgrades necessary to address PFAS within the water cycle.
Q. Okay. Just talk about the fairness prong for a second. Why does the DEP consider these settlements to be fair?
A. From the procedural aspects, the department is very much committed to transparency as a core value, and that's reflected in the process that we pursued here. So once the settlements were announced, we created microsites for each settlement which provided resources to the public as well as copies of each JCO.
In addition, we published the settlements in the New Jersey Register and received public comment, which we responded to.
Q. Can you just discuss briefly for us, what is the Water Bank?
A. The Water Bank is a partnership between DEP and the New Jersey Infrastructure Bank. And through the partnership of the Water Bank, we provide low-cost financing for necessary infrastructure upgrades both through the Clean Water State Revolving Fund and through the Drinking Water State Revolving Fund. So that covers both drinking water projects and wastewater projects.
Q. Will the Water Bank have a role in connection with these settlements?
A. Yes.

Q. Could you explain that for us, please.
A. Yes. So funding through the abatement funds to be received for these settlements will be prioritized to go to the Water Bank for the provision of low interest, no interest loans, as well as principal forgiveness through the Water Bank, for projects that address PFAS within the water cycle.
Q. All right. You submitted a declaration in this case on June 1st; is that right?
A. Yes.
MR. CASTELLO: Mr. Serp, can you just pull up the first page of that declaration, please.
BY MR. CASTELLO:
Q. Is that the first page of your declaration?
A. Yes, it is.
Q. For the record, it's ECF Document No. 827-2.
I'm not going to go through the whole declaration, but I do want to go through some aspects of it.
Have you ever heard the phrase "public notice and comment"?
A. Yes.
Q. Can you explain to the Court what that is.
A. In this context, the Spill Act requires the department to provide notice of its settlements and publish its proposed settlements in the New Jersey Register. And in this case, we had a public comment period of 60 days.

MR. CASTELLO: Mr. Serp, if you could just pull up paragraph 6, please.

BY MR. CASTELLO:

Q. There's a reference to the public comments in paragraph 6.

Do you see that?

A. Yes.

Q. What's the purpose of having or inviting public comments to a settlement like this?

A. Inviting public comment is a core value at DEP and engaging with the public to receive their feedback and to determine whether the settlement is appropriate and of course whether we missed something. And so we respond thoughtfully to every comment that we receive in the Spill Act required public comment period, as we did so here.

Q. And so is it fair to assume that DEP did receive public comments regarding both JCOs?

A. Yes.

Q. Did you have a role during the notice and comment period?

A. Yes.

Q. What was that role?

A. I directly assisted in preparing the responses to comments for both settlements.

Q. Is it fair to say then you would have firsthand knowledge of the DEP's comments or responses to the comments?

A. Yes.

Q. All right. I'm going to show you a document now on the screen. It's the public comments, first page of the public comments to the 3M JCO. Do you see that?

A. Yes.

Q. Okay.

MR. CASTELLO: Your Honor, I'd like to move what is on the Court's docket as ECF 746-5 into evidence.

THE COURT: What do you want to call it? Do you have an exhibit number?

MR. CASTELLO: Oh, no, Your Honor, I don't.

THE COURT: Well, just call it Cahall-1.

MR. CASTELLO: Thank you, Your Honor.

(Exhibit Cahall-1 was marked for identification.)

THE COURT: Yes, in evidence.

(Exhibit Cahall-1 was received in evidence.)

BY MR. CASTELLO:

Q. Did you also work on the department's responses to the DuPont settlement public comments?

A. Yes, I worked on that as well.

Q. Okay.

MR. CASTELLO: Mr. Serp, if you could just pull up the first page of that document. And for the record, that's ECF 746-4.

BY MR. CASTELLO:

Q. Do you see that, Ms. Cahall?

A. Yes.
Q. And you worked on these as well; is that correct?
A. Yes, I did.
MR. CASTELLO: Your Honor, I'd like to move ECF 746-4 into evidence as Cahall-2.
THE COURT: All right. In evidence.
(Exhibit Cahall-2 was marked for identification.)
(Exhibit Cahall-2 was received in evidence.)
BY MR. CASTELLO:
Q. At some point during the public notice period, did the department receive comments from both POTWs and various counties in the state?
A. Yes, we did.
Q. Did the department respond to those comments?
A. Yes.
Q. And you were involved in that process?
A. Yes, I was.
Q. Do you know if the POTWs asserted any objections to the settlements that we're here talking about today?
A. Yes.
Q. Did the State undertake any efforts to assist the POTWs with PFAS and PFAS-related concerns prior to the announcement of the settlements?
A. Yes. Prior to announcement of the settlements, the Department's Division of Water Quality engaged in a

collaborative effort to identify upstream sources of PFAS and information gathering, including a request for information. And we also created a public web portal for submission of information in order to enable source identification of significant industrial users that, you know, that may be sources of PFAS.

Q. Okay.

MR. CASTELLO: Mr. Serp, could we go back to the declaration and pull up paragraph 8, please.

BY MR. CASTELLO:

Q. Do you see in quotes there, "Identify, Reduce and Eliminate"?

A. Yes.

Q. What does that mean?

A. Identify, reduce and eliminate is the Division of Water Quality's policy within the department, and that's the priority and the focus in terms of addressing PFAS within the wastewater stream.

MR. CASTELLO: Mr. Serp, if you could pull up slide 6, please.

BY MR. CASTELLO:

Q. Is this a graphic of the department's strategy with respect to "identify, reduce and eliminate"?

A. Yes.

Q. Could you just explain that for us quickly.

A. So in the top left square, you see that it says POTWs typically do not use or generate PFAS. So in the department's view, that essentially makes them a passive receiver. So due to that, it's important for us to identify those upstream sources and to reduce and eliminate those sources before that PFAS makes its way into the POTW's waste stream, because you'll see in the bottom left yellow square, treatment technology for PFAS at POTWs may not fully be viable at this time, although the technology is evolving.

Q. Did you hear Mr. Unsworth's testimony just a little while ago?

A. Yes.

Q. Is that consistent with -- or is that similar to the approach that Mr. Unsworth testified about?

A. Yes.

MR. CASTELLO: Mr. Serp, please pull up slide 7.

BY MR. CASTELLO:

Q. Could you just explain slide 7 for us, please.

A. Yeah. So this slide is consistent and is another representation of the policy of identify, reduce and eliminate. So on the identification efforts by the department, the department sent out requests for information and surveys just to certain POTWs in order to assist in targeting upstream sources. And then reduce and eliminate are, you know, the steps that come along down the road.

Q. What is New Jersey doing to reduce PFAS in wastewater in addition to what you've just testified about?
A. DEP is a national leader in addressing PFAS. We were the first state in the nation to adopt enforceable standards for drinking water for PFAS back in 2018.
As far as our current efforts in just this year, legislation was enacted that Bob Unsworth also mentioned that restricts the sale of certain consumer products that contain intentionally added PFAS, including cosmetics, food packaging and carpeting. And so that's one way of eliminating the source.
In addition, just this past month, the department formally adopted remediation standards for PFAS, which will ensure that remediation of sites, contaminated sites, is addressing sources, including soil and groundwater. And finally, consistent with past practice, the department will continue to ensure that its MCLs or maximum contaminant levels for PFAS in drinking water remain as stringent or more stringent than the federal standards.
Q. All right. Let's move on, please, to paragraph 10.
MR. CASTELLO: Mr. Serp, if you could pull that up, please.
BY MR. CASTELLO:
Q. In paragraph 10 you note: "The Department will continue to work closely with POTWs to address PFAS."

Is that still true today?
A. Yes.
Q. All right. Let's move on to paragraph 11.
And if you could just explain quickly what you intended to convey in paragraph 11.
A. Yeah. So this reflects that following the January 7 hearing, the Department and the Association of Environmental Authorities of New Jersey and seven of their members, collectively AEA, you know, we did engage in a large number of meetings and discussions, and we were able to reach an agreement that will provide financial support for the POTWs to implement necessary capital infrastructure upgrades to address PFAS.
Q. And was that memorialized in the stipulation that was also filed on June 1st?
A. Yes.
MR. CASTELLO: Mr. Serp, if you could please pull up slide 9.
And, Your Honor, that stipulation with the POTWs is ECF No. 828.
BY MR. CASTELLO:
Q. Do you see that in front of you, Ms. Cahall?
A. Yes.
Q. Can you explain, just briefly, how the POTW stipulation will work.

A. The POTW stipulation creates a funding source, again, for infrastructure upgrades through the Water Bank, which is the partnership that I described between the DEP and the New Jersey Infrastructure Bank. Under this stipulation, out of the PFAS Abatement Funds to be received under these settlements, a total minimum I should say of $150 million will be allocated toward the POTWs through the existing mechanism of the Water Bank. $100 million will be earmarked for principal forgiveness. And another $50 million will go towards the provision of no-interest financing through the Water Bank.

In addition, under this stipulation, the department has agreed to reduce its loan origination fee from 2 percent to 1 percent. And the reason why that's significant is that the loan origination fee is based on the total amount of the loans. So that represents a 50 percent reduction.

Q. And if we could just move on to paragraph 12, please.

In part, in paragraph 12 you state that, "The Department will continue to engage with POTWs with respect to any regulation that may ultimately be proposed requiring PFAS treatment in wastewater."

Can you tell us how the department plans to engage with the POTWs in that regard?

A. Yes. We had very productive conversations with the POTWs in the course of our discussions regarding the overall agreement, and that feedback was very helpful to us. Again,

one of the core values of the department is transparency as well as stakeholdering. So we would obviously follow the Administrative Procedures Act requirements of notice and comment, as well as direct stakeholder engagement.

Q. All right. You also --

THE COURT: May I ask a question?

MR. CASTELLO: Yeah, please. Yes, Your Honor.

THE COURT: So one of the objections is that this stipulation that you thereafter entered into with the parties required further publication and comment because it materially altered the original agreement.

Do you have an opinion on that?

THE WITNESS: I'll look to counsel, is that a legal opinion?

THE COURT: It might be.

MR. CASTELLO: I think it's argument, Your Honor, and we are prepared to argue on that point. But I think it's -- I certainly would object to somebody putting a witness up to discuss that aspect. I think it is a legal argument. So I --

THE COURT: Well, but is it?

In your experience, have you had occasion where the terms of an agreement have been altered and you had to repost it, republish it?

THE WITNESS: I have not --

THE COURT: And whose decision is that? I mean,

obviously a court can rule whether you have to or not. But, I mean, are there occasions when you have -- I mean --

THE WITNESS: I have not personally in my tenure as chief advisor experienced a situation where we have made a material amendment to settlement and needed to renotice and publish it. Presumably, if that were to happen, it would be something that we would consult closely with the Division of Law and the Attorney General's Office on.

THE COURT: Did you consider this -- if there's an objection, I'll wait for it. Did you consider this stipulation to be a material amendment to the settlement agreement?

MR. CASTELLO: I'll ask the question. I don't have an objection.

THE WITNESS: Okay.

MR. CASTELLO: I'll be happy to ask that question as well, so you can answer.

THE COURT: Okay.

THE WITNESS: I did not consider it to be a material amendment.

THE COURT: Because?

THE WITNESS: Because primarily it didn't alter any of the existing terms in either JCO. It just provided further clarification consistent with those JCOs providing transparency about how the department intends to disburse those funds consistent with the JCOs that were already published and for

which we received public comment.

THE COURT: So the terms didn't change, it just provided greater clarity to how the funds were going to get distributed; is that a fair summary?

THE WITNESS: Yes, exactly.

THE COURT: Okay.

BY MR. CASTELLO:

Q. All right. Let's just talk about the counties for just a little bit here.

What is your understanding of how counties might be affected by PFAS?

A. Counties have ownership of certain AFFF sites. Those primarily are airports and fire training academies.

MR. CASTELLO: Okay. Just pull up paragraph 14, please, Mr. Serp. And I'll just confirm, paragraph 14, please, from the declaration.

BY MR. CASTELLO:

Q. And the sites that you're referring to in paragraph 14, are those the types of sites that you just testified about?

A. Yes.

Q. County-owned training academies as well as airports?

A. Yes.

Q. And then you also heard Mr. Unsworth's testimony on that?

A. Yes, I did.

Q. On those two issues?

A. Yep. Uh-huh, yes.
Q. Do you agree with what Mr. Unsworth said?
A. Yes, I do.
Q. And paragraph 15 refers to site-specific conditions at the end of that paragraph. Do you see that?
A. Yes, I see it.
Q. What do you mean by "site-specific conditions"?
A. So by its very nature, site remediation really depends on individualized characteristics of the site, including the nature and extent of any contamination, as well as the particular geology of the site and any other features there.
Q. All right. Let's just move on to paragraph 18, please.
In paragraph 18 you reference assisting Sussex County with investigating PFAS at its fire training academy. Can you just explain that for us, briefly.
A. The department has collaborated closely with Sussex County for the purpose of assisting them with investigating PFAS at its fire training academy, including through the provision of funding to provide private well treatment, private potable wells, as well as to provide financial assistance for step-out sampling in the area of the fire training academy.
MR. CASTELLO: Mr. Serp, please put up slide 10.
BY MR. CASTELLO:
Q. Ms. Cahall, is this the stipulation between the State and the counties?

A. Yes.
Q. And that is ECF Docket No. 830.
Does the stipulation say anything about the way that the settlement funds will be distributed to the counties?
A. Yes, it does.
Q. Okay. How so?
A. It sets forth an allocation of $90 million from the PFAS abatement funds to assist the counties with investigation and remediation of PFAS at the county-owned fire training academies and airports.
Q. Is there a mechanism by which those funds would be distributed?
A. Yes. Through something called a Qualified Settlement Fund. That would be overseen by a special master and a trustee to ensure -- and this was critical from the department's perspective -- to ensure that the funds are expended consistent with the purposes of the JCO.
Q. Okay. Just tell us quickly what the Qualified Settlement Fund means in connection with these settlements and the stipulation with the counties.
A. So, again, the Qualified Settlement Fund would be overseen by a special master and trustee who would ensure that the $90 million in funding was used for the purposes for which it's intended, which is for investigation and remediation of PFAS. And ultimately, the department would have audit rights as well.

Q. Did the department ask for audit rights?
A. Yes. The audit rights were really critical from the department's perspective.
Q. Why is that?
A. The audit rights were critical in order for the department to ensure that the funds were being expended for the purpose of addressing PFAS and also for the purpose of public transparency, to ensure that we're reporting out to the public on the status of projects, as well as for certain project approvals as well.
Q. Okay.
MR. CASTELLO: Slide 11, please, Mr. Serp.
BY MR. CASTELLO:
Q. Does this slide, paragraph 5, does that reflect the limitations on the county's use of funds that were agreed to in the stipulation?
A. Yes.
Q. Can you just explain that for us.
A. So this provides that the participating counties will use the available funding for the sole purpose of investigating or remediating PFAS contamination at the county-owned fire training academies and airports where PFAS of course is known or suspected, consistent both with U.S. Treasury regs and with the settling plaintiffs' obligations under the settlements, the JCOs.

Q. Has the department commenced any efforts to plan for the distribution of funding for PFAS-related projects under the settlements?
A. Yes. We've taken two important steps. So the department has issued the Settlement Disbursement Plan, as well as we have made arrangements to establish the PFAS Abatement Fund itself.
MR. CASTELLO: Please pull up slide 13, please, Mr. Serp.
THE COURT: So let me ask the same question. In your opinion, in your view, does this second stipulation materially alter the terms of the published settlement?
THE WITNESS: In my view, it does not alter any provision within the published JCO.
THE COURT: For the same reasons, it's really elaborating or elucidating how the payments are going to be made?
THE WITNESS: Yes, Your Honor. It's providing additional clarity about how the department intends to use the funds, consistent with the provisions and the guardrails within the settlements about the use of the PFAS Abatement Funds.
THE COURT: Do you have much more, Mr. Castello?
MR. CASTELLO: I don't, Your Honor. I'm really wrapping it up.
THE COURT: So when you finish up, we'll break for lunch.

MR. CASTELLO: Okay. Thank you, Your Honor.

THE COURT: Do you happen to have copies of this PowerPoint?

MR. CASTELLO: Yes, Your Honor.

May we approach, Your Honor?

THE COURT: Yes, please.

(Counsel approached.)

THE COURT: Thank you.

Okay.

MR. CASTELLO: We're on slide 13.

BY MR. CASTELLO:

Q. On the left-hand side of the screen, Ms. Cahall, it reads the Governor's Fiscal Year 2027 Budget. Do you see that?

A. Yes.

Q. Can you just explain, what is the image on the right-hand side of the screen?

A. I'm actually having difficulty reading it from here.

Q. All right. I'm going to ask --

THE COURT: You want to see my copy? I have it. Go ahead.

MR. CASTELLO: Mr. Serp, if you could pull up -- there you go.

And then if you could just enlarge the paragraph that starts "any funds" right at the bottom there.

So I'd like to focus on what's been blown up on the

screen here where it starts, "Any funds received by the State of New Jersey."

Do you see that?

THE WITNESS: Yes. Thank you.

So this is an excerpt from the Governor's Fiscal Year 2027 Budget Recommendation. Would you like me to read from the top?

THE COURT: That's okay. I can see it. It's in the record.

BY MR. CASTELLO:

Q. Yeah. You could just briefly explain what that is.

A. So this describes that any funds received from PFAS abatement settlements are to be deposited into a separate, nonlapsing fund, and that means separate from the general fund, to be known as the PFAS Abatement Fund.

And it also describes that all funds that are to be deposited into that fund are appropriated solely for projects which are eligible abatement actions consistent with the underlying settlement agreements.

Q. Thank you.

What steps did the department take to establish the PFAS Abatement Fund?

A. We worked with the Office of Management and Budget within Treasury to make the arrangements to establish the fund.

THE COURT: In response to the settlement agreement?

THE WITNESS: Yes.
BY MR. CASTELLO:
Q. Well, let me ask a more general question then. Did the department work with the State Treasury Office regarding these specific settlements?
A. Yes. We engaged directly with State Treasury.
Q. Okay.
MR. CASTELLO: I'm getting ready to wrap it up here. I'd like to go back to the declaration, please, Mr. Serp, and specifically paragraph 25.
BY MR. CASTELLO:
Q. So in paragraph 25 you reference use of the funds in the PFAS Abatement Fund, and then you also state that the department will develop a PFAS settlement information website. Can you explain that for us, please.
A. Yes. So the department intends to build upon the existing 3M and DuPont microsites to provide public transparency on the use of the abatement funds to be received, and that will include frequently asked questions, resources for the public, information on eligible and approved projects, and existing funds, and what's been expended so far.
Q. Thank you.
MR. CASTELLO: If we could just then go to paragraph 28, please.
BY MR. CASTELLO:

Q. There's a reference to a Settlement Funds Distribution Plan. Do you see that?
A. Yes.
Q. What is the Settlement Funds Distribution Plan?
A. So the Settlement Funds Distribution Plan is a document that provides additional information on how the department intends to distribute the PFAS Abatement Funds consistent with the settlements.
Q. Okay. Did you work on the distribution plan?
A. Yes.
Q. Did the department approve the distribution plan?
A. Yes.
MR. CASTELLO: Your Honor, the distribution plan is on the docket as ECF Docket No. 827. And I would like to move it into evidence as Cahall-3.
THE COURT: Okay. In evidence.
(Exhibit Cahall-3 was marked for identification.)
(Exhibit Cahall-3 was received in evidence.)
THE COURT: Can I have my PowerPoint back? Do you still need it?
THE WITNESS: Oh, apologies, Your Honor.
THE COURT: It's okay.
BY MR. CASTELLO:
Q. I just want to walk through briefly the distribution plan. Can you tell us how it was structured?

A. So the distribution plan starts with providing an explanation that this is a document that sets forth the processes through which the department will distribute the funding available through these settlements and providing initial background on the settlements, and then it sets forth the main categories of funding that the department will prioritize for distribution, including PFAS water quality projects. So that's the funding through the Water Bank that I described previously, to provide capital infrastructure support for both clean water and drinking water projects.

The next category is PFAS abatement projects. And what that means is building upon the existing Spill Fund application process to allow political subdivisions and members of the public to apply for funding.

And then finally, the third category of funding is what I touched on earlier in the stipulation between the department and the counties, which is the County-Qualified Settlement Fund, which provides funding for investigation and remediation of county-owned AFFF sites.

MR. CASTELLO: Okay. Mr. Serp, please go to -- stay on 4, but if you could just blow up under the heading, "PFAS Abatement Projects."

BY MR. CASTELLO:

Q. Do you see the reference to the Spill Fund there?

A. Yes.

Q. What is the Spill Fund?
A. So the Spill Fund is a revolving, nonlapsing fund that was created under the Spill Act for purposes consistent with that legislation. It's administered by our assistant commissioner who oversees contaminated site remediation and redevelopment, David Haymes.
Q. Mr. Haymes was a guest of this courtroom this time last year. I'm sure he's happy he's not here.
If you could just -- do you see the section -- well, let me ask you this: Has the department used the Spill Fund for PFAS abatement?
A. Yes, we have.
Q. How? How so?
A. Primarily for the provision of private potable well treatment.
Q. All right.
A. To address PFAS in those private wells.
Q. How will the PFAS Abatement Funds extend financial assistance to counties and municipalities relating to PFAS contamination?
A. So we intend to build upon the existing Spill Fund process, and there's a publicly available application process that's available on our website. So this will supplement that funding as well as, you know, the third bucket of funding is that we will allocate the $90 million to the Qualified

Settlement Fund for the purpose of investigation and remediation.

Q. And are those funds through the Spill Fund available to all the counties of New Jersey and all the municipalities of New Jersey?

A. Yes.

MR. CASTELLO: I have no further questions, Your Honor.

THE COURT: Okay. It's a good breaking time, so we'll break. Let's come back at quarter -- we'll take an hour break, okay.

MR. CASTELLO: Thank you, Your Honor.

THE COURT: Be back in an hour. Thank you.

THE COURTROOM DEPUTY: All rise.

(Recess was taken at 12:42 p.m. until 1:41 p.m.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Okay. You can all have a seat. Thank you.

Okay. Ms. Cahall, can you resume the stand, please.

Mr. Castello, you finished; yes?

MR. CASTELLO: Yes, Your Honor.

THE COURT: Okay. Any cross-examination, Mr. Telsey?

MR. TELSEY: Yes, Judge.

THE COURT: Okay. Come forward.

CROSS-EXAMINATION

BY MR. TELSEY:
Q. Good afternoon, Ms. Cahall.
A. Good afternoon.
Q. My name is Albert Telsey. I'm an attorney for Carneys Point Township and Borough of Sayreville, and I wanted to follow up your direct testimony with some further questions that I had, because I was most interested in the effort by the State to be transparent with the distribution of funds from the settlement.

With that in mind, I wanted to show you Exhibit A to the DuPont settlement.

MR. TELSEY: If I could have this marked as, I guess, Carneys Point-1.

THE COURT: Okay.

(Exhibit Carneys Point-1 was marked for identification.)

(Counsel approached.)

MR. TELSEY: Judge, here's a copy.

THE COURT: Oh, thank you.

BY MR. TELSEY:
Q. Ms. Cahall, this is the payment schedule for the DuPont JCO, correct?
A. I believe so.
Q. Okay. What I want to do is I just want to understand where the money goes.

So on year one, there's going to be a $200 million payment; is that right?
A. Yes; that's what the document says.
Q. Okay. So that payment is going to be made to an escrow account, correct?
A. Yes. However, there is the nuance that this does not provide a breakdown based on whether the funds are allocated for the purposes of the PFAS Abatement Funds or NRD.
Q. All right. Well, let me show you the escrow agreement. We can mark this as Carneys Point-2.
(Exhibit Carneys Point-2 was marked for identification.)
(Counsel approached.)
(Counsel conferring.)
BY MR. TELSEY:
Q. Ms. Cahall, I want to direct you to Exhibit A on the document. It's page B-4.
This document is captioned Form of Escrow Release Notice Joint Written Instructions. It's designed so that the escrow agent is given authority by all plaintiffs and all defendants to release the $200 million.
Would you agree?
MR. CASTELLO: Objection, Your Honor.
THE COURT: What line? Wait. Let me get to it first. What line?

MR. TELSEY: Page B-4.

THE COURT: But where?

MR. TELSEY: The first paragraph, we refer to an escrow agreement dated certain date by and among the defendants and the DEP.

THE COURT: Page 4? I don't see it on my page 4.

MR. TELSEY: B-4.

THE COURT: B-4.

MR. TELSEY: Yeah. I think it's an attachment.

THE COURT: Okay. So are you there? It's like -- did you find it?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. So now you're directing her attention to -- what's your question?

BY MR. TELSEY:

Q. My question is: This document says that the entire $200 million is going to be paid to a specified party as instructed below. Who will be the party to receive the $200 million?

A. I don't see a reference to $200 million on B-4.

Q. Well, the $200 million is set forth in the body of the document at page...

THE COURT: Page 1.

MR. TELSEY: Page 1.

THE COURT: Under paragraph 2?

MR. TELSEY: Yes.

THE COURT: Is that what you're referring her to?

MR. TELSEY: Yes.

THE COURT: All right. Paragraph 2, page 1, deposit of settlement payments. Settling defendants agree to deposit with escrow agent by wire transfer of immediately available funds the following amounts: A, initial payment at the time specified in the JCO. Settling defendants shall deposit an aggregate amount of $200 million. That's the initial payment. Okay.

BY MR. TELSEY:

Q. So we know that as part of the structure of the deal, the defendants pay in $200 million to the escrow agent. And then when the 45-day appeal period expires and there's no appeal, there can be a release of those funds to a specified party. And that's what I showed you first on this page B-4, the Form of Escrow Release Notice.

This is where everybody agrees, plaintiffs and defendants, that the $200 million would go to a specified party.

So my question is: Who is that specified party?

THE COURT: Where does it say "specified party," Mr. Telsey?

MR. TELSEY: Where the paragraph that begins, "Pursuant to Section 5 of the Escrow Agreement."

THE COURT: Okay.

MR. TELSEY: "The parties instruct escrow agent to release the escrow funds or the portion or portions of the escrow funds specified below to the specified party, as instructed below."

THE COURT: Okay.

BY MR. TELSEY:

Q. Who is the specified party?

A. The document is blank.

Q. Well, who will it be?

A. Based on this document, I -- I can't speculate.

Q. Well, that's -- that's kind of confusing to me because the whole idea of collecting the money is to distribute it out to others, and this is the first moment where $200 million will get distributed.

Who would know who the specified party is that gets the money?

THE COURT: Can you point to me in the JCOs where it talks about to whom the $200 million goes? Is it in the JCO?

And if counsel has the answer, that's fine, too. If someone wants to point that to me, that's fine, too.

MR. REAP: I can address the specified party term instead of necessarily the JCOs.

THE COURT: Well, you know, I don't -- I don't think it's fair to, you know, try to presume that this witness knows

the agreement inside and out every word. I think the lawyers probably know it better.

Is there an answer to Mr. Telsey's question?

MR. REAP: The answer as to specified party depends on the outcome of the appeal. As the JCO provides, if the appeal -- if this Court approves the settlement and for whatever reason the appellate court overturns it, the settlement monies are returned to defendants, the specified parties. If the JCO is upheld, it goes to plaintiffs, the specified parties.

The only point of that term is to say to control what happens pursuant to the appeal. It's not -- it's not a mechanism for doing anything else.

THE COURT: Okay. So let's take this in steps. I am presuming, and maybe I'm wrong, Mr. Telsey will tell me, I'm presuming that where he is headed with this line of questioning is that the JCOs do not provide with clarity how the $200 million is going to get distributed if approved finally. Is that where you're going?

MR. TELSEY: Yes.

THE COURT: Okay. What's the answer to that question in the agreement?

MR. REAP: You're asking -- so I think what Mr. Telsey is getting at is on any given year -- and Ms. Cahall already testified to this -- there is an allocation of money

but there's not a suballocation between NRD and PFAS abatement. And, I mean, we've already submitted a lot of briefing on that issue. But the whole point is that each year the Commissioner will make a decision about which monies go for PFAS abatement and which money goes into NRD. And the point --

THE COURT: Okay. I don't think that's in dispute.

MR. REAP: Okay.

THE COURT: I don't think -- Mr. Telsey will tell me if I'm wrong. Where is it in the agreement as to of that $200 million it is going to A entity, B entity, and C entity?

MR. REAP: There's not a -- there's not an A, B or C entity. It's -- when -- this is pretty standard for us for escrow agreements and settlements, including ones that --

THE COURT: Forget the escrow agreement for a second.

MR. REAP: Okay.

THE COURT: Where in the JCO does it say what's going to happen with that $200 million? Does the State have the discretion to determine where to -- because I'm understanding that that was the reason why these stipulations came forward, because it provided greater clarity as to where the money was going to go.

MR. REAP: Well, that wasn't the purpose really in the stipulations. The stipulations were about earmarking certain funds to make sure the objectors know what allotments that they were going to receive.

THE COURT: Okay. So it's a --

MR. REAP: Really the -- I think a lot of this is being taken out of context.

THE COURT: And that's what I'm worried about, okay. That's exactly what I'm worried about. I think that we might be maybe three ships crossing in the night here.

Let me hear your argument, Mr. Telsey.

MR. TELSEY: Judge, I want to get the clarity on this issue, and --

THE COURT: Okay. What's the question? What is the issue?

MR. TELSEY: My question --

THE COURT: How do you frame the issue?

MR. TELSEY: I frame the issue as there are a number of different accounts that this money has to be directed to, and they include the constitutional NRD dedicated account --

THE COURT: Yeah.

MR. TELSEY: -- the PFAS fund, which is to be broken out into the Water Bank and the Spill Fund, the South Dakota Qualified Settlement Fund, and counsel fees.

THE COURT: Okay.

MR. TELSEY: And I'm trying to get a sense from this witness how that first $200 million gets released to these different funds. And to assist this witness and the Court, I have a table which I'll mark as Carneys Point-3.

(Exhibit Carneys Point-3 was marked for identification.)

(Counsel approached.)

THE COURT: I just -- I really need greater clarity as to what the question is, because it sounds like this doesn't have anything to do with the escrow agreement. The escrow agreement sounds like a little bit of a red herring. I think we're confusing apples and oranges.

Try it again, Mr. Telsey, tell me where you're headed with this.

MR. TELSEY: Okay. With this chart, Judge, I wanted to understand where the first $200 million went, because it had to go to someplace. The escrow agreement release form says it only goes to one party and one account. So I want --

THE COURT: Well, right. But counsel just stood up and said, this is what I'm hearing, you're misconstruing it. The escrow agreement is, the agent is just holding these funds and once it's final and the appellate court's spoken and it's all done, the specified party that it's releasing that $200 million to is the State. So that's just sort of a sideshow going on. The escrow agent is not doing an independent disbursement of the funds. I think -- did I say that right?

MR. REAP: That's correct. We will provide the transfer instructions. The State provides the transfer

instructions to the escrow agent and it goes where the State's transfer instructions instruct it to go.

THE COURT: Yeah. So the escrow agent is just waiting to hear has the Judge approved it, has the appellate court approved it, are we done? We ready to go? Your question is now that $200 million, what?

MR. TELSEY: Now that there's $200 million in escrow, it's going to go somewhere else.

THE COURT: It's going to go to the State. But then your question is?

MR. TELSEY: It's going to go to the State, and then the State is going to do something with it, and that's my line of questioning with this witness.

THE COURT: Okay. It is the "something with it" that is your line of questioning.

MR. TELSEY: Yes.

THE COURT: So keep the escrow agent out of it. I think that's a little bit of a red herring, okay. The State now has $200 million.

MR. TELSEY: The State has $200 million.

THE COURT: Yeah.

BY MR. TELSEY:

Q. Ms. Cahall, if you look at this table, which we've marked as Carneys Point-3, this is a table that shows how the entire payout of the $875 million in the DuPont JCO will be allocated

to the different categories of payouts over its entire life frame of 25 years, and I wanted to just focus on the first year.

A. I don't --

MR. CASTELLO: Objection, Your Honor.

THE WITNESS: -- I don't believe I've seen this document.

MR. CASTELLO: Wait. Objection.

THE COURT: Wait.

MR. CASTELLO: Your Honor, foundation. I don't know what this is. I don't know who created this.

THE COURT: I don't either, but where did the red come from?

MR. TELSEY: The red --

THE COURT: To be honest, I think it might -- Mr. Telsey, have you talked to them about how the -- have you talked to them about these questions?

MR. TELSEY: Judge, this form is similar to a form I've had in my papers for months on --

THE COURT: No, I know, but that wasn't my question. Have you talked to them and tried to get clarity? Because I think -- I think -- I'm not sure --

MR. TELSEY: My --

MR. CASTELLO: This is argument, Your Honor.

THE COURT: I know. I'm just trying to understand

what the objection and the issue is.
THE TELSEY: The issue is, I want to understand how the department takes a bundled pile of cash --
THE COURT: 200 million.
MR. TELSEY: -- that's supposed to be spread out over a half a dozen or more different categories and then unbundles it to fit each of the categories. What criteria, what metrics do they use to unbundle the huge pile of cash?
THE COURT: The 200 million?
MR. TELSEY: Yes.
THE COURT: Okay. Forget the chart that's in front of you, can you answer that question? And if you can't answer it, then I'm going to turn to the lawyers and tell me where in the agreement does it answer that question.
MR. CASTELLO: Yes, Your Honor.
THE COURT: Of the $200 million, that's the initial payment, contemplated by the settlement, what happens to it? Where does it all go? Where does some of it go?
THE WITNESS: I think it would be best for counsel to answer upon the terms of the JCOs.
THE COURT: Okay. Somebody show me the agreement. Tell me where it's at. And then we're going to look at that and then we're going to figure out where we go from there.
MS. DEMA: Your Honor, Briana Dema.
So where the funds go is controlled by the

Constitution and Appropriations Acts. So the department has obligations for those $200 million that include attorneys' fees, for example. We have an application for attorneys' fees before you. They have commitments in certain years to the stipulations with the counties and the AEA. And the Commissioner will decide in any given year how much goes to NRD versus how much goes to abatement.

THE COURT: Where is that in the agreement?

MS. DEMA: It is in Exhibit A at the top, it specifies -- do you have a copy of Exhibit A?

MR. CASTELLO: Yes.

MS. DEMA: That in year one, for example, $100 million of the 200 million is allocated to costs, fees and punitive damages. So that is our attorneys' fee application.

So up to $100 million, if you approve the application, is owed to outside counsel.

For the rest of the $100 million, if you see in the title, it says, "Except where otherwise indicated, all funds are to be allocated between NRD and abatement damages by the department."

THE COURT: Where in the agreement does it say anything like the following: "The parties agree that whether or not part of the payment goes to NRD or part of the payment goes to abatement damages is within the sound discretion of the Commissioner?" Does it say anything like that?

MS. DEMA: Except for in the heading of Exhibit A, no. That is where it is located.

I'm sorry, I might be mistaken. Paragraph -- let's go to paragraph -- the settlement payment terms, paragraph 7.

MR. KURZWEIL: 7c.

MS. DEMA: The settlement payments shall be allocated as follows. Little i covers NRD --

THE COURT: Wait. Let me just read this, please.

MS. DEMA: Of course.

(Pause.)

THE COURT: Okay. So let's just walk through this, and then we'll see where your questions go, Mr. Telsey.

So under the agreement, 200 million goes -- that's the initial payment.

MS. DEMA: The year one payment, yes.

THE COURT: Within 30 days. For the next 24 years, the payments are going to be made pursuant to Exhibit A, which we've talked about, which is in, okay.

The settlement payments are allocated as follows: 225 million for NRD damages. 100 million is going to the Chambers Works site. 75 million for NRDs is going for the Pompton Lakes. And it lays it all out. I don't need to lay it all out here. And then 125 million are for costs, including direct and indirect costs, including attorneys' fees, okay.

Now, so that lays out how all the funds are getting

allocated. And then the other question is, I presume it's in here, I would be surprised if it's not, but if it's not, it's not, that someone has to make the decision as to whether it's going to NRD and when. The agreement says what's going for NRD and what's going for abatement, but someone has to be making these decisions. And I assume it's in the agreement somewhere that that discretion is to the State, right? Otherwise, it's a free-for-all.

MS. DEMA: Well, Exhibit A is part of the JCO, and it makes clear that the allocation between NRD and abatement in any given year is -- that allocation is to be determined by the department.

THE COURT: By the department, okay.

MS. DEMA: And the Commissioner, you know, is the trustee of public natural resources in New Jersey and has an obligation to ensure NRD trust funds are used for their purposes.

THE COURT: Can someone just satisfy me that that paragraph isn't in this agreement? I really would be surprised that it's not; that these decisions are being made by the Commissioner who's acting for the public's interests. All right. We'll look at that.

Okay. Now, we have fine-tuned it a little bit. What's your question?

MR. TELSEY: So my question is that on this first

$200 million, the JCO says that the only allocation is: $100 million is allocated among NRD for Chambers Works, Pompton Lakes, Repauno, Parlin, and the abatement damages that will be used with the Water Bank and the Spill Fund and that another $100 million is unallocated between attorneys' fees and costs, state costs, other costs, punitive damages, and penalties. So I have these two $100 million blocks for these two groupings of payouts.

My question is: How does that 100 million in each grouping get further paid to these subcategories in those groups? How does the NRD get paid amongst the four NRD sites or does none go there? Does it all go to PFAS?

THE COURT: All right. Just don't answer it yet so I can understand it.

Well, I think the premise of the question is wrong because it doesn't say the first 200 million, that the only allocation is 100 -- I don't think that the agreement says that, Mr. Telsey.

MR. TELSEY: Exhibit A does.

THE COURT: No, I don't think it says that.

MR. TELSEY: Exhibit A says under year one, 200 million.

THE COURT: Right.

MR. TELSEY: Of which 100 million is allocated to the costs, fees and punitive damages payment.

THE COURT: Right.

MR. TELSEY: Meaning that the other 100 million must be related to the NRD and the PFAS, because those are the only three categories.

THE COURT: Okay. But I didn't think that was your question. Okay. So far I agree with you.

MR. TELSEY: So now that I have 100 million in one category of costs, fees, and punitives and another 100 million under NRD and PFAS --

THE COURT: Yes.

MR. TELSEY: -- my question is: Well, how does that 100 million under NRD and PFAS get distributed between NRD and PFAS if it's unallocated, according to this?

Is anything going to NRD? Is it all going to PFAS? Is there some split?

THE COURT: And the answer that I'm being provided is that that is the discretion of the department, the Commissioner, who's acting in the public's interest.

MR. TELSEY: Well, the department has to --

THE COURT: And I've asked for -- I'm surprised that that paragraph isn't in the JCO, but we'll see. Okay.

MR. TELSEY: Well, these are two different types of funds. The NRD fund is a constitutionally dedicated account that lives on and on. The PFAS fund lives on for 12 months. And to the extent that NRD money is dedicated to

pollution-impacted communities, like mine, they're supposed to go to the NRD fund. And I don't know how this bundle of NRD and PFAS gets unbundled to go to the NRD fund or the PFAS fund, and I'm entitled to know that.

THE COURT: Well, but isn't the answer that it is the -- this is what I'm hearing -- that by the terms of the agreement, and I don't know that we need witness testimony on that, probably counsel argument, but by the terms of the agreement, the fund is coming in and it is the Commissioner who's deciding where to put those funds, what bucket to put them in. Forget the attorneys' fees, forget the 100 million. It is the Commissioner who's deciding what bucket to put them in, either the NRD bucket or the abatement bucket. And once they're in that NRD bucket, they got to stay in that bucket because of the Constitution. What's wrong with that picture?

MR. TELSEY: I don't know if discretion and arbitrary and capricious can go together. How can you have unfettered discretion to either put money in a dedicated account or put money in a 24 -- a 12-month account and not tell the public where it goes?

THE COURT: They are telling the public where it goes. They're just not telling them exactly which -- the public knows that $200 million is going in one of those buckets, right?

So your issue is, is that the public is entitled to

know which bucket it's going into. But isn't that an ebb and flow with the State's analysis of what's going on in the state as they are remediating and doing all of their work over 25 years? Don't you have to give the State some flexibility to do its job? Isn't it a better -- let me pose the question:

Isn't it a better solution to give the State this flexibility to do its job for the benefit of the citizens other than to 25 years earlier decide -- because what it all looks like 25 years down the road is probably a much different picture, but give the State the flexibility over the course of these years to figure out are the funds better suited into an NRD fund where they must stay once we make that decision versus an abatement fund?

So why is it in the public's interest to take that flexibility away?

MR. TELSEY: There is -- there is a need to be able to plan. For example, NRD, the JCO says the DEP has the discretion to move it from NRD to PFAS.

THE COURT: Where does it say that?

MR. TELSEY: It says it in --

THE COURT: "To move it from," where is that language?

MR. TELSEY: It's on page 46, section 7c4 where the language is --

THE COURT: Wait. Can I just get there?

Okay. The parties agree that no more than 16 million, is that it?

MR. TELSEY: That's the paragraph in the middle. It says, "Notwithstanding the foregoing, the settling plaintiffs retain the discretion to apply additional portions of the settlement funds" -- which includes NRD -- "for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the state," which is the PFAS. So --

THE COURT: Okay. But that's on the front end. Because once they've made a decision to put it into NRD or to put it into the abatement, under the Constitution they can't take it out of the NRD.

MR. TELSEY: But their discretion allows them to alter the allocation of the cumulative amount of NRD that's dedicated to each of the four sites.

MS. DEMA: Your Honor --

MR. TELSEY: For example, Carneys Point, which is impacted by Chambers Works, is entitled to $100 million of NRD. When does Carneys Point get that money? At the moment it's unknown. It could be year one. It could be year 20. It could be in dribs and drabs over 25 years. It could be moved to PFAS and we get less or no NRD.

THE COURT: Okay. So you had me until you said it could be moved to PFAS. Where do you get that?

MR. TELSEY: That language I cited gives the State the discretion to move settlement funds, which includes NRD, for the betterment of water quality projects, which is the whole purpose of the PFAS fund, as you've heard.

MS. DEMA: Your Honor, I'm happy to address that.

THE COURT: Do you agree with that last sentence?

MS. DEMA: No, I absolutely do not.

THE COURT: Okay. Then say it. Let me hear you.

MS. DEMA: The DuPont JCO recovers $225 million in NRD, and those funds cannot be reallocated. All that paragraph 7c4 says is that the State may use more than 16.5 million specifically covered for statewide PFAS claims to improve water quality and fund the treatment of drinking water. There's no inherent intention or contradiction between the NRD provisions and that provision. The State can use $225 million for NRD and it can also use more than $16.5 million to fund the treatment of drinking water. They're not intentioned.

THE COURT: Is there anywhere -- okay. You just said that the $225 million in NRD cannot be reallocated. Okay. That's what the Constitution says, right?

MS. DEMA: Yes.

THE COURT: Okay. Is that in the agreement or it's just in the Constitution?

MS. DEMA: In the definition of Natural Resource Damages amount, it makes clear that the Natural Resource

Damages amount, so that's paragraph 6, payments with respect to natural resource damages --

THE COURT: Wait. Let me get there. What page?

MS. DEMA: Yeah, page 28.

THE COURT: Let me just read it.

Okay. It doesn't quite say it, but it says it. I mean, it says it. Basically it's an acknowledgment by the parties that Natural Resource Damages amount are governed by the Constitution. The Constitution says they got to go to NRD, so...

Okay. I feel like we're talking in circles. So the agreement gives the discretion to the Commissioner to determine whether or not 100 million of the initial payment goes to NRD or goes to abatement damages.

I don't think there's any quarrel with anyone that once that determination is -- once those funds go to NRD, they stay there. They do not go out, unless you show me somewhere else where the State is willing to disobey the Constitution in this agreement. I don't see where that is.

MR. TELSEY: Judge, if I could continue with my line of thinking on this --

THE COURT: Okay.

MR. TELSEY: -- and questioning or discussion with this Court.

BY MR. TELSEY:

Q. So if you look at the first year, there's 200 million, gives the Commissioner the discretion to spend it as he likes. There is also --

THE COURT: Well, wait. I have to just stop you. I mean, okay, spend it as -- okay. Let's assume that the Commissioner says it's all going to go to abatement, okay. I guess the Commissioner can say that, right?

MR. TELSEY: He can say the $100 million unallocated between NRD and abatement could all go to abatement if he wanted to do that.

THE COURT: Yeah, okay. Or it could all go to NRD.

MR. TELSEY: Or all go to NRD.

THE COURT: And do you agree that once it goes into NRD, the Constitution prevents anyone from taking it out of NRD for abatement purposes?

MR. TELSEY: I agree with that.

THE COURT: Okay.

MR. TELSEY: So my question then is, for the first year, there is 100 million in unallocated across the costs, fees and punitive, let's presume that all goes to a counsel fee. Let's presume, too, that there's another 40 million in similar costs, fees in the 3M, that goes to a counsel fee. I'm up to 140. We know that the fee is 195. There's $55 million short to pay the fee. Can't the DEP use the mixed bag of NRD and abatement to pay the balance of 55? If the answer is yes,

then there's 45 million left in unallocated dollars in year one for NRD and abatement.

So then the question becomes: What happens to that 45 million? Is it abatement or is it NRD? And how does the Court or the Commissioner make the decision as to what bucket it goes into? And why don't we know?

THE COURT: Is that a question for the witness? I don't know that this witness can answer that. And I think --

MS. DEMA: Your Honor --

THE COURT: I think the answer is, let me just posit this, because I think is this not a moving target in the sense of the Commissioner has to have some form of discretion, does he not, to figure out where this money is best spent?

And if I'm hearing you correctly, it just seems so unrealistic, because let's say you're satisfied with the initial payment, what is to stop you from saying, well, I want to know in year 16 where the payment's going with clarity and aren't I entitled to know that?

It just seems to me that that seems unreasonable that a party can object to a settlement because there is no clarity as to where these payments over the course of 25 years specifically are going, to NRD or to abatement, because this is a moving process. The abatement might go much smoother, maybe it won't, whatever. But there has to be some ebb and flow, it seems to me.

MR. TELSEY: Well, even if you give --

THE COURT: And I think that's the point that I think you're missing, unless I'm totally missing it.

MR. TELSEY: Well, you know, presume ebb and flow. There still needs to be a backstop when the flowing and the ebbing stops at some point. And in this case, for example, if Chambers Works is entitled to $100 million in NRD and the Commissioner says, well, hold your horses, I've got a lot of other moving parts to deal with, I'll get to you whenever --

THE COURT: Right.

MR. TELSEY: -- what's the backstop that says you can't delay this any further than this moment or this event? Otherwise, I don't get any money.

THE COURT: Well, you are getting something under the agreement; are you not?

MR. TELSEY: I'm getting 100 million. When?

THE COURT: Right.

MS. DEMA: Over 25 years.

THE COURT: Over 25 years.

MR. TELSEY: How?

MS. DEMA: And the Commissioner's discretion includes -- he has to abide by the constitutional amendment for the use of NRD funds and the abatement damages, what they're required to be spent for in the JCOs under the Settlement Distribution Plan. So the Department -- or the State

completely agrees with the Court that the Department needs the discretion to consider, for example, whether a feasibility study has been developed to make sure that a $10 million NRD award to the Chambers Works site is ready to be put into an actionable project, and it might weigh that actually the Repauno site is further ahead in that process or --

THE COURT: Okay. I think I'm understanding what the objection is. I think what I'm getting is that, okay, we've resolved a couple of things. So the agreement gives the discretion to the Commissioner as to how these payments, putting aside the $100 million of the initial payment, it says it must go to costs, fees and punitive damages. I don't know what punitive damages is, but whatever, okay. So that's clear.

But the remaining 100 million of the initial payment and then all of the subsequent payments -- well, I guess payment two has some fees and costs, too. But then all of the subsequent payments, the Commissioner has the discretion to determine whether or not they go to NRD or they go to abatement. To me that seems reasonable and necessary given the subject matter, okay.

Carneys Point says, I want to know that I'm going to be paid, okay. So the question for the Court is: Is Carneys Point entitled to know that, or is Carneys Point entitled to know that the Commissioner, exercising his discretion for the benefit of the public, will exercise it in a way responsibly

that all affected parties are addressed and all affected parties are taken care of? I think that's the question.

Carneys Point, under the terms of this agreement, is assured of some money specifically, unlike other entities. You agree with that?

MR. TELSEY: Yes, under the Chambers Works, we agree.

THE COURT: So it seems like Carneys Point is getting a little bit more than what other entities might not be getting, which is an assurance in black and white that they're getting something. What Carneys Point is not happy about, it seems to me, is they want to know when. But I don't know that you need to know when. Just know that the Commissioner's exercising his best discretion and is addressing the problem the State faces across the board.

So is there a reason why Carneys Point should get special treatment?

MR. TELSEY: Well, I'll say yes, for the same reason that Sayreville is entitled to special treatment under the Parlin site, which is also a named site. They are dedicated $30 million under the JCO for DuPont, but dedicated nothing under the 3M JCO, which is a problem, because they are a dedicated NRD site, just like they were in the DuPont JCO, but they get zero. That's a problem.

THE COURT: Okay. Well, they'll address that.

MR. TELSEY: And in terms of the mixed bag of

monies --

THE COURT: I wish you had crossed Mr. Unsworth on that. You didn't have any questions for him.

MR. JACKSON: Unsworth.

MS. DEMA: Unsworth.

THE COURT: Thank you. Okay.

MR. TELSEY: I'll put a pin in the Sayreville, there's zero allocations. I'd still like to question this witness on the Qualified Settlement Fund, which is a new piece of the settlement puzzle that's just come on board.

THE COURT: Okay. I'm going to let you do that, but did you -- you're both standing. Did you want to say something?

MR. JACKSON: I'm sorry. I was just going to add one thing. In the distribution plan that is attached to the report that we filed, the supplementary report, we gave a draft of this to Mr. Telsey and all the objectors 30 days after the January 7th hearing. We've had months of discussions about this. This document reflects exactly what Your Honor suggested and said. There is flexibility built into this that's necessary because some projects are shovel ready and others are not. And there might be an urgent need for water protection over here or there might be an urgent project for natural resource damages over there.

THE COURT: You get no quarrel with me about that.

MR. JACKSON: And this document sets out an application process and an annual review process. It tells the public we got to build the website and we're going to report to you all about exactly how we're doing it and about how the applications will come in for the different kinds of funding. So it's all spelled out here, and Mr. Telsey knows it.

THE COURT: Where is that?

MR. JACKSON: This is the distribution plan that is attached to the supplementary report that we filed. The JCOs give you top-level numbers. We said we're going to put this much to natural resource damages, this much to abatement, and clearly, you know, these were lawyers negotiating these very broad terms of the DEP. This document is the product of many months of work, and we've discussed it back in January in terms of how do you allocate these funds across all these areas of needs. And so the department is giving you a roadmap or giving the public a roadmap as to how it is going to do it in the distribution plan.

MR. CASTELLO: And the distribution plan, Your Honor, was received into evidence as Cahall-3.

THE COURT: Does anybody have a copy of it? I probably have it up here, but --

MR. CASTELLO: It's in the binder, Your Honor. Thank you. May I approach?

THE COURT: Yes.

(Counsel approached.)

THE COURT: Oh, this, yeah. Okay.

Okay. Yeah, this was in evidence, yes. This was in evidence this morning. Yeah, okay.

MS. DEMA: Your Honor, just one more point turning back to the department's discretion. I wanted to point you to paragraph 6, the definition of abatement damages.

THE COURT: Where? Paragraph 6, what page?

MS. DEMA: 15.

So it states that abatement damages, the proceeds of which are to be administered and used by the department in its sole discretion for the specific purposes enumerated. So, again, that doesn't go to the discretion to allocate between the NRD and abatement, but it does speak to the department has discretion to use the funds for specific purposes as enumerated here.

THE COURT: So, Mr. Telsey, I'm going to let you move on, but I do want to pin you down. When you say that the agreement provides that the Commissioner can move funds from the NRD to the abatement, what language are you relying upon?

MR. TELSEY: Well, two pieces. The Exhibit A also says that all funds are to be allocated between natural resource damages and abatement damages by the department in a distribution methodology that is unknown. So all could be NRD or all could be PFAS.

THE COURT: Okay.

MR. TELSEY: There's none known.

THE COURT: But that's not moving from one -- that's not moving from NRD to abatement.

MR. TELSEY: And the other was the reference we spoke of in section 7c4, about moving -- or the settling plaintiffs retain the discretion to apply additional portions of the settlement funds, meaning NRD, for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the state, which is the PFAS.

THE COURT: So let me ask you a question. So if I approve the agreement, again, I feel like I'm kind of where we started with this morning, if I approve the agreement and I make it clear that there is no language in here that prevents the State from moving funds that it has now decided should be earmarked that year for NRD, that they cannot, under the Constitution and under the Court's approval, move it from NRD to abatement, that would satisfy your concern, right?

MR. TELSEY: With the caveat that since under the DuPont JCO, $225 million at the end of the payment journey has to be distributed among the four sites, Chambers Works, Pompton Lakes, Parlin and Repauno, without reduction due to discretion by Commissioner.

THE COURT: Okay. Help me understand that one. What

do you mean?

MR. TELSEY: Well, under the section we read, which was up on the board, section 7c.

THE COURT: All right. Let me get to it.

Okay.

MR. TELSEY: This says with regard to NRD --

THE COURT: Yeah.

MR. TELSEY: -- these amounts shall be allocated. So "shall," mandatory word.

THE COURT: Yeah.

MR. TELSEY: 225 to these four.

THE COURT: Yeah.

MR. TELSEY: So no matter how the DEP Commissioner is exercising his discretion over the course of years, he can never at the end of the day pay out less than this amount in these quantities to these entities.

THE COURT: At the end of the 25 years, right. That's right. I don't think they're disputing that.

MS. DEMA: No.

THE COURT: They agree. You can take these amounts to the bank.

MS. DEMA: The State believes it is clear on the face of the JCO that at the end of 25 years -- yeah.

THE COURT: Yeah, no, I think we're getting somewhere.

MS. DEMA: So if you wish to include that in your order, we have no opposition.

THE COURT: Okay. Yeah. Well, I thought you were saying that the initial payment had to be -- the agreement doesn't say that. The agreement says: NRD damages to Chambers Works, you're getting 100 million. You just don't know when. I think there's a good reason. I think you got to give the Commissioner some discretion. 75 million is going to Pompton. 30 million is going to Parlin, and 20 million is going to Repauno, et cetera.

So, okay, that answers your question, right?

MR. TELSEY: With regard to the Commissioner's discretion, yes, but not with regard to these questions regarding Exhibit A.

THE COURT: Okay.

MR. TELSEY: Again, which talks about year two, which is also a large payment of $75 million.

In year two, the JCO says that $75 million will be allocated. So that 50 million will pertain to NRD for Chambers Works and Pompton Lakes and another 25 million in costs, fees and punitive damages, designed to provide additional funds for paying counsel fees.

The question is: Does that mean that $50 million has indeed been allocated to Chambers Works and Pompton Lakes for NRD such that if they're not needed for something else, they

are indeed allocated to Chambers Works and Pompton Lakes for NRD?

THE COURT: Can I ask you a question, Mr. Telsey? This is how I read the agreement, and I'm going to ask, here's my question, and then I'm going to tell you why I'm asking it. You seem to be saying that the amounts that are going to these sites, let's stick with Chambers Works and Pompton, you seem to be saying that those amounts have to get paid in an initial one payment or initial two.

As I read the agreement, it is over the course of 25 years. Why do you keep trying to pigeonhole the amounts that are in the agreement into the first or the second payment?

MR. TELSEY: Because whereas the Court is saying there's discretion between NRD and PFAS for a 25-year stretch --

THE COURT: Yeah.

MR. TELSEY: -- there is one year where there is not discretion, and that's year two.

THE COURT: Okay. Let's see.

Okay. You're saying there's no discretion year two.

MR. TELSEY: Correct.

THE COURT: 75 million, of which at least 25 million, plus no more than the additional fees and costs amounts, what does that mean? Let's go to the agreement, paragraph 11. Settling plaintiffs...

So you are saying that -- this is what I think you're saying -- that pursuant to paragraph 11 of the agreement, that 75 million can all go to attorneys' fees?

MR. TELSEY: It can be if they need it.

THE COURT: Right.

MR. TELSEY: And if it's not all used up in the 200 million for year one.

THE COURT: Yeah.

MR. TELSEY: The question is: Do they need it? It doesn't seem like they need it.

THE COURT: Does who need it?

MR. TELSEY: The State doesn't need the second-year tranche of money to pay attorneys' fees. They're --

THE COURT: Well, how do you know? And maybe they do. But this is what the attorneys were willing to do for the State. They were --

MR. TELSEY: I'm not -- I'm not -- in this setting, I'm not quibbling about the number. It's the number.

THE COURT: Uh-huh.

MR. TELSEY: But what I'm saying is that that number is covered in year one.

THE COURT: How do you know?

MR. TELSEY: Because there's enough money here to do it.

MS. DEMA: Your Honor, we have submitted an

application for fees to this Court, and it provides the exact number. I can't recall off the top of my head. It is less than 175 million for the DuPont settlement. So there will be leftover money in year two.

THE COURT: Well, but his argument is how do we know that? How do we know that there's not going to be another, you know, 25 --

MR. TELSEY: No. Actually, my argument is the reverse.

THE COURT: What?

MR. TELSEY: That I do know that there is leftover money and that in year two, given paragraph 11, I know that that 50 million was earmarked for Chambers Works and Pompton Lakes. Therefore, unlike the vagaries of all the other money that can be spread out over years, that 50 million is dedicated to those two sites in that year.

MS. DEMA: I don't follow. Where is that?

THE COURT: Where do you see -- what --

MR. REAP: Where? Where do you see that?

MR. TELSEY: Number 11, allocation of up to an additional 50 million of settlement payments set forth in paragraph 7c1, that's Chambers Works, and 2, that's Pompton Lakes.

MR. JACKSON: No, it's not.

MS. DEMA: No.

THE COURT: All right. Hold on.

MS. DEMA: No.

THE COURT: I'm really finding -- you know what I'm really finding hard? I feel like I'm sitting at the conference table just discussing what the paragraphs -- this agreement means. And I'm being asked to approve an agreement that I think a lot of these questions could have been gone over. But it's kind of -- it's just a little kind of unusual to me. But let's read the agreement.

"Settling plaintiffs may allocate up to an additional 50 million of the settlement payments set forth in 7c1."

MR. TELSEY: Judge, I'm going to withdraw that one.

THE COURT: Next.

MR. TELSEY: I'm going to go to the Qualified Settlement Fund, as I was mentioning earlier.

THE COURT: Okay.

BY MR. TELSEY:

Q. Ms. Cahall, have you read the --

THE COURT: Is this in your objections anywhere, Mr. Telsey? Because this is sounding new to me.

MR. TELSEY: This was in my reply.

THE COURT: Reply?

MR. TELSEY: My surreply, yes.

THE COURT: Okay.

BY MR. TELSEY:

Q. The Qualified Settlement Fund agreement, have you read it?
A. The stipulation with the counties?
Q. No. The agreement that supports the Qualified Settlement Fund. There's an agreement, correct?
A. Would you be able to provide me with a copy?
Q. No. I was hoping you could provide me with a copy, because I've never seen it.

And apparently the stipulation is based upon this agreement between the Special Master in South Dakota and certain addendums that are a part of that agreement that provide that South Dakota Special Master with powers to manage these New Jersey state funds. I wanted to see that agreement.

THE COURT: Mr. Keefe.

MR. KEEFE: Your Honor, if I may, on behalf of the counties, when we negotiated with the State on behalf of the 18 counties, we appreciated one of the issues that is being palpated here. The counties wanted to, amongst themselves, make sure that the money was coming to the counties but then going to be allocated to the counties in the most need at the time.

So, for example, what we could do through a Qualified Settlement Fund is under, ironically or strangely enough, South Dakota law, some states allow for these Qualified Settlement Funds with a trust and the fiduciary relationship that the counties can then work with a special master to say, we, and we

can be the smallest county, we have an immediate need, we need this money.

THE COURT: Uh-huh.

MR. KEEFE: After several years, if a county doesn't need that money, for example, the DEP says "no further action required," Warren County or Hunterdon County, well, then that county doesn't need the money. So then the remaining counties said, well, we want to use that money. So a Qualified Settlement Fund is designed to be flexible. Mr. Telsey references where is the Qualified Settlement Fund?

The answer is, it's not yet created legally, the legal instrument, until the JCO gets approved. Then we will go to South Dakota, we will create the fund consistent with what Your Honor has here before her, which is the stipulation, but we're not putting the cart before the horse.

But all of the counties have agreed, with the State's approval, that the Qualified Settlement Fund makes a lot of sense. As the witness testified, she said we want to make sure the money goes actually where it's supposed to go. It's not going to go to fill budget gaps. It's not going to go to some county in a fund that they may never use because they may have less of a problem than another county.

THE COURT: So here's what I'm hearing --

MR. KEEFE: Yeah.

THE COURT: -- that to assuage the counties'

concerns, and maybe they weren't entirely sold on giving all of the discretion to the Commissioner, they created this qualified settlement agreement that has a traffic cop and an auditor and a something else in it to kind of help them be the intermediary with the State. Is that right?

MR. KEEFE: To -- to administer these funds, this $90 million, to the direct benefit of the counties, and --

THE COURT: Well, it's sort of an intermediary, right?

MR. KEEFE: Yes. It's a check and a balance on how we're going to use the 90.

THE COURT: Yeah. I called it a traffic cop --

MR. KEEFE: Yes, that's fair.

THE COURT: -- or someone who says, you know what, we don't need the money, make it go that way, or we don't need that money now, make it go that way or whatever. So it's really, I sort of see it more of a... let me think of an analogy...

MR. KEEFE: Judge, if I may.

THE COURT: Like a guardian. I don't know.

MR. KEEFE: It's a guardrail.

THE COURT: Yeah.

MR. KEEFE: It's a guardrail to ensure, look, the negotiation established that there was a need for the counties to use money directly and quickly. How we do that within this

process is the guardrail to make sure that the funds go to assessment and ultimately abatement. And what the counties agreed to, with the State's cooperation and agreement, was not all counties are going to need the same amount of money. That's the guardrail.

THE COURT: So if each county was a teenager and the other person monitoring the agreement was the adult in the room, you're all fine with that? That's the analogy.

MR. KEEFE: That's a good analogy, yeah.

THE COURT: Okay. All right. So --

MR. KEEFE: So there is no trust agreement until this JCO gets approved. Then consistent with the stipulation, the trust is created, the guardrails are in place, and the counties are agreeing to abide by the allocations, because it is that flexibility. I mean, today we know certain counties have immediate needs. Some counties may have very small needs in the future.

THE COURT: And the adult will decide it.

MR. KEEFE: That's the idea.

THE COURT: Okay.

MR. KEEFE: Consistent with the goals of what we all want to do here.

THE COURT: And no money is different. The money stays the same as contemplated in the agreement.

MR. KEEFE: Right. And if --

THE COURT: Okay.

MR. KEEFE: Just one other issue.

THE COURT: Yeah.

MR. KEEFE: We believe the monies will be used over a period of time. If all the counties get a "no further action" letter, and there's a truth serum in this, that if we don't use it we lose it, but the counties that need it the most will be able to transfer the funds with the assistance of the special master to say you got -- you folks need it more. So those are the guardrails that are in play.

Thank you.

THE COURT: Yeah, okay. Well, that sounds fine.

So you don't need that. Why do you need that? Why do you need to see that? Well, first of all, it doesn't exist.

MR. TELSEY: I need to see it because it is a material amendment to the settlement that I nor the public have seen.

In addition, the PFAS fund that is in the budget says that the DEP Commissioner is supposed to make decisions about eligible abatement actions, not a South Dakota special master.

THE COURT: Yeah.

MR. TELSEY: And that executive authority is now being delegated to an out-of-state special master.

THE COURT: No. But that's not what he said. Let's not -- I don't want to misconstrue what he said.

MR. TELSEY: I don't know either because I haven't seen the agreement.

THE COURT: Okay. So if I characterize it the following way, which is the State has reached -- the counties objected because they wanted to know that they would have a voice at the table. And to resolve all of that dispute, they all got together and said we need to appoint an adult in the room that will interface with the Commissioner back and forth and will help us decide where the money should best be spent, and we, counties, we the young ones in the room, we all are fine with that. We're going to let the special master help be our advocate and we all agree to give that special master the discretion that he or she needs to communicate with the Commissioner. It doesn't have anything to do with the DEP, other than the DEP only has one person to talk to as opposed to 18, whatever the number is.

So I don't know that it's relevant for you to see that, because why do you care how they are -- it's kind of like saying, well, I need to talk to every lawyer that each county has.

MR. TELSEY: The agreement is delegating appropriations, legislative appropriation authority, to spend money, because it's bypassing New Jersey jurisdiction being resolved by South Dakota courts.

THE COURT: But I need to pin you down on why you

keep saying "being resolved."
MR. TELSEY: Because if there's a dispute, where is it going to be resolved, in New Jersey or South Dakota according to the special master?
THE COURT: There's no dispute with the DEP. The DEP is out of it. They're just waiting on the sidelines waiting to see what the counties are telling them.
MR. TELSEY: That's the problem.
THE COURT: Why?
MR. TELSEY: It's not supposed to be a special master waiting for decisions to be made by others. The actual PFAS Abatement Fund that was shown up on the screen says that these decisions for eligible abatement actions are by the DEP Commissioner, not a third party.
THE COURT: Right. I don't -- I don't -- can someone show me the language in the stipulations that says that we all agree to let this dispute be fought between our delegated special master and the Commissioner?
MR. KEEFE: Judge, the stipulation in paragraph 4 --
THE COURT: Okay. Hold on. Do we still have it up, the one I signed? Okay.
MR. KEEFE: This language in the second sentence, the State and the participating counties agree that if -- if there's any dispute --
THE COURT: I'm sorry, Mr. Keefe, which one are you

looking at? Maybe it doesn't matter. Oh, here it is. Let me see.

(Document displayed.)

MR. KEEFE: Thank you.

So this clause says "if there is a dispute." So, for example, the guardrail that --

THE COURT: Well, the first sentence says the State is not bound by it. This is just a side deal going on with the counties, isn't it?

MR. KEEFE: This is an agreement that funds go to the counties so we can -- so we have our own money for purposes of assessment and abatement, and if within that process, because we want to make sure that nobody's putting it to fill a budget gap, if there's any dispute about the spending, that's the guardrail, any dispute, then it goes to the special master. But the laws of the state of New Jersey apply.

THE COURT: Yeah.

MR. KEEFE: The special master makes a recommendation. That's a mechanism to make sure -- this is just an insurance that the money goes to the right goals. The funding, this is the difference between -- before this stipulation, before we were here in January and today, this is now county money. This is now county money, and it is going into a Qualified Settlement Fund that is only created under South Dakota law, not South Dakota law governs how the DEP acts

or how the special master acts or even what the counties can do with the money.

THE COURT: Not that this matters, but how does South Dakota enter into any of this?

MR. KEEFE: It's -- only a few states have Qualified Settlement Funds that allow for these guardrails.

THE COURT: Oh.

MR. KEEFE: So when you have multiple plaintiffs, sometimes in an MDL you see it.

THE COURT: Oh.

MR. KEEFE: Multiple plaintiffs, like 18 counties, we wanted the flexibility, there's the ebb and flow. The same argument that you heard here today applies to us. So we wanted that flexibility to make sure that the money was being used in the counties that need it the most, the most over a period of time. That's what the trust does. We could have done it in Delaware and some other implications. South Dakota is a statutory creation. But we're saying right in this stipulation if there's a dispute, because don't forget, we don't get to a dispute if a county says, hey, I need to go do a test for $400, or if a county says I have to shut down a well and I need a pump-and-treat facility, that's all what it's for. That's what it's designed to do.

It's only if there's a dispute. "Hey, we want to spend it on an ambulance." No, you can't do that. So there's

a guardrail. This is not a nefarious thing between counties to say we're going to avoid the very purpose --

THE COURT: I got it. Okay.

MR. KEEFE: Okay.

MR. TELSEY: Judge --

THE COURT: Yeah.

MR. TELSEY: -- this already breaches the first guardrail of the PFAS fund, which says that money will only be spent after competitive bidding. And this deal wasn't competitively bid. That's a problem.

THE COURT: Oh, I think that's an apples-oranges argument.

MR. REAP: Judge, this is a resolution to an objection before this Court.

THE COURT: Wait. Wait. What do you mean by "competitive bidding"?

MR. TELSEY: Well, the PFAS fund, the language that was put up on the screen that's in the budget about to be adopted says that only money from the PFAS fund can be spent with competitive bidding.

THE COURT: Or the person that's going to do the work.

MR. TELSEY: Right; like a special master who's going to manage $90 million.

THE COURT: But this doesn't have anything to do with

the State. This is a side deal that the counties have worked together on to try to make sure that the State isn't bombarded with 18 -- how many counties are there? 18 different people grabbing at the same money. I think this was such an amicable resolution so that it brought clarity and it narrowed and focused where can the money best be spent. The State's got the money. They are saying it should -- to me this helps facilitate getting to where the problems need to be addressed in the best way.

I'm surprised -- I'm having a hard time understanding why anyone would object to a resolution like this which seems so smart.

MR. TELSEY: It's not transparent. I don't know what the fund says. I'm entitled to know. It's a material amendment to the JCO.

THE COURT: Well, we can --

MR. TELSEY: And it doesn't fit the PFAS fund.

THE COURT: Okay. It's hard for me to keep this record straight. This has nothing to do with the PFAS fund. The PFAS fund says if we are going to go and remediate -- tell me if I'm wrong -- we're going to go remediate something, we've got to do competitive bidding. The company that bids the best is the one we're going to take. That's that. That doesn't have anything to do with over here. If 18 counties -- they're trying to get to a resolution, you know what, at the end of the

day, we think this county is best, should get the money first. We've agreed. We sat at the table with the Special Master, and we all are all convinced, we're going to work famously together and, yes, this county should get the money first, and we're going to let the State know that we agreed on that. Now, the State's not bound by that, but I can't imagine that the Commissioner wouldn't say, okay, thank you for your cooperation.

MR. TELSEY: This settlement has had no provisions for priority payments. People get money first; other people get money later.

THE COURT: Yeah.

MR. TELSEY: This is the first time.

THE COURT: That's right.

MR. TELSEY: And that's a material amendment, especially the way it's being done.

THE COURT: No. But that's why it says this doesn't bind the State.

MR. TELSEY: Where does the money come from? It comes from the PFAS fund.

THE COURT: Uh-huh.

MR. TELSEY: And the PFAS fund, therefore, governs how the money gets put into the Qualified Settlement Fund, and that requires competitive bidding. It requires that the Commissioner does not delegate his executive power. And in

addition --

THE COURT: Yeah, I don't want to distort the record. So let me say it again this way. So this is how I understand it. Mr. Keefe, you'll tell me if I'm not getting it, okay. The counties are all together on this. They all decide -- give me a county.

MR. KEEFE: Monmouth.

THE COURT: Monmouth County, they need it the most. They all agree. They don't agree, the special master says, you know what, I've analyzed all of this, Monmouth needs it, okay. So when the State's doling out the money, we're going to step to the side and let Monmouth go and get abatement money first.

The State's going to say, "Thank you very much for your cooperation, we agree with your assessment. Monmouth needs it the most." Then they're going to call up three different bidders and they're going to decide who's going to do the work because it requires competitive bidding.

What did I say about that scenario that's wrong?

MR. REAP: If I may, Your Honor, I don't know that there's a -- the idea was that this fund is provided for the counties. I don't know that the competitive bidding element to this is really where this stops and starts.

THE COURT: No. That's a separate issue. That's why I just told the story that I told.

MR. REAP: Okay.

THE COURT: Which is, Monmouth has convinced all the other counties they need it most.

MR. REAP: Uh-huh.

THE COURT: They then presented that to the State and the Commissioner says, you know what, I agree with you. So now some money is going to go to Monmouth, but whoever is going to do the work, it has to be under a competitive bidding process. So competitive bidding has nothing to do with what the special master is doing.

MR. KEEFE: Correct, Your Honor. That's way down the stream.

THE COURT: Yeah.

MR. KEEFE: So that's the governmental entity. Once -- you have 18 counties, all have different needs. It's not an "all for nothing." You got to start testing here, you got to do more projects here. The ebb and flow is what this is about. What the State is really concerned about, and we agree with them, is that, hey, make sure it fits the spirit of what we're doing here. Make sure it is for assessment. Make sure it is for abatement.

THE COURT: Uh-huh.

MR. KEEFE: Only when there's -- that's the guidelines. That's the guidelines of it. That's what the trust is created to do. The only element of the trust is to allow a fiduciary responsibility to oversee it and make sure it

stays in the guardrails and if -- that one clause is only if there's a dispute. That's if there's a charge that doesn't look right, and the special master --

THE COURT: But that's a dispute amongst the counties, not the State.

MR. REAP: Correct.

MR. KEEFE: That's correct. That's totally correct.

THE COURT: Yeah.

MR. KEEFE: So this is -- when we first came here in January, Your Honor, it was we had real losses, that we were being asked to release our claims. We have real injury, we want our money, okay. And there was a lot of discussion that went into this.

And the concern always was, the guiding force, which we've agreed on, was to make sure it went to the right places with these ebbs and flows that Your Honor articulated just over the last few hours. So I think this issue of, you know, it's more of a public advocate argument, quite frankly, Your Honor.

THE COURT: All right. Well, I think I've gotten the argument, and I think that I have -- I just want to make sure that I'm getting it correct for purposes of the record. And I think the arguments that you're making, Mr. Telsey, or the objections that you're making are not connecting the appropriate dots.

So if anyone is reviewing it, I want to make sure

that I have connected the appropriate dots. And I think that I have. I'm being told that I have.

So I think for the objection to be, well, this is improper abatement spending, no. I've just connected the dots and showed that that is something distinct from the QSF totally, and that's down the road or upstream, whatever. And then the other objection is that you're entitled to see it. Well, one, it doesn't exist. And two, it really is a side agreement amongst the counties and how they have decided to work together to address their needs collectively, which I don't really think goes to the agreement.

Okay. What's your next objection?

MR. TELSEY: Judge, just sticking on this point a little bit to follow up what the witness has said.

BY MR. TELSEY:

Q. She said that, during her direct, that the $90 million was going to be paid from the Spill Fund. Is that right?

A. No, I did not say that.

Q. I heard it. Where is it coming from? Where is the $90 million coming from?

MR. CASTELLO: Your Honor, I think at this point we've got argument that's cloaked in questions, and I think if Mr. Telsey has questions for the witness that are truly derived at getting to what fact --

THE COURT: The question was, do you know where the

90 million is coming from?

THE WITNESS: Yes.

THE COURT: Okay. Where?

THE WITNESS: The 90 million is an allocation from the PFAS Abatement Fund.

BY MR. TELSEY:

Q. And it will be paid into what?

A. Into the QSF.

Q. You mentioned, too, that the PFAS fund is intended to be used to supplement the Spill Fund, correct?

A. Can you please repeat the question?

Q. That money from the PFAS fund will be used to supplement the Spill Fund.

A. Yes.

Q. And you're aware that there is a one-year application limitation on submitting claims to the Spill Fund, correct?

A. I'm not aware of that limitation.

Q. Okay. Let me show you your certification.

I want to point you to paragraph 47 of your certification.

That paragraph says: "Moreover, by law, there are certain limitations on claims that can be paid by the Spill Fund. See, for example, N.J.S.A. 58:10-23.11k."

Do you know what that statutory reference is?

A. Could you provide it?

Q. Well, I'll summarize it. It means that there is a one-year period upon which, when you discover or should have discovered a PFAS claim, you have to make a claim with the Spill Fund or else you lose your right to make a claim.

MR. CASTELLO: Your Honor, the statute speaks for itself. So I'm not sure what the question is.

THE COURT: What's the question?

MR. TELSEY: I'm getting to it.

THE COURT: Okay. Ask the question.

BY MR. TELSEY:

Q. I want to show you what I'll mark as the next exhibit. And this is a DEP memo to the public about PFAS and the obligations to make claims for PFAS funds dated May 19, 2025. And this document is supposed to alert people to make their claims because there's money in the PFAS -- for PFAS in the Spill Fund. But it's already been over a year.

So would you agree with me that of all people who have not made Spill Fund claims for PFAS by May 19, 2026, they have missed the one-year time period to submit a claim?

MR. CASTELLO: Objection; argumentative.

THE COURT: What is the relevance of it all?

MR. TELSEY: The relevance is that the State is saying we're going to put money in the Water Bank which we prioritized because that's for utilities and counties and big people, and we're going to fund the Spill Fund for the little

people and their PFAS-contaminated groundwater wells and drinking water wells, but the little people are going to be stuck with a blown one-year statute of limitations and maybe that doesn't need any funding by the PFAS fund because there's nothing to fund in the Spill Fund.

Why wasn't there an amendment to the one-year limitation for these PFAS funds to allow everybody who can benefit from the settlement to make a claim within one year of this approved settlement?

THE COURT: Well, why is it -- I mean, can I just ask the rhetorical question because that's kind of a rhetorical question? Why isn't a one-year statute of limitations sufficient? The New Jersey Legislature decided it was.

So why should the DEP elevate itself above the Legislature? The Legislature saw fit to put a one-year statute of limitations. Why should the Court require something more than what the Legislature enacted?

MR. TELSEY: The settlement is advertising the fact that people can make claims for the Spill Fund.

THE COURT: Sure, they can. They should do it in a year.

MR. TELSEY: The year is over.

THE COURT: Okay. But the year existed. And is it not a continuing -- I mean, could there not be things going forward?

MR. TELSEY: No claims from this point forward can be -- can be paid if they should have been made on the date of that memo to the public.

THE COURT: Where in the agreement does it say that any claims that accrue in the future are barred?

MR. TELSEY: In paragraph 47 of Ms. Cahall's declaration.

THE COURT: Can someone put it on the screen? I don't have it.

MR. TELSEY: I put it on your desk there, Judge.

MR. CASTELLO: It's on the screen, Your Honor.

(Pause.)

MS. DEMA: Your Honor, may I help clarify this?

THE COURT: Yeah, in a second.

MS. DEMA: Sure.

(Exhibit Carneys Point-4 was marked for identification.)

THE COURT: I'm going backwards for a little bit here.

I pride myself -- I guess, I assume, Mr. Telsey, that you had withdrawn your objection to the qualified settlement agreement because I did not see it in your reply, but I see that there's a sentence about it in your first brief, so I was just -- okay.

It's up on the screen. What am I looking at?

MR. TELSEY: This witness said that there would be monies put in the Spill Fund subject to limitations, and that first statutory reference is the one-year statute of limitations.

THE COURT: Okay. You're shaking your head, tell me why.

THE WITNESS: My testimony was not that the money would be put in the Spill Fund. It was that it would supplement existing funding available through the Spill Fund.

THE COURT: Yeah. I think that's clear.

Next question.

MR. TELSEY: That's all I have, Judge.

THE COURT: Okay. Any redirect?

MR. CASTELLO: No. Thank you, Your Honor. No redirect.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: Thank you.

(Witness left the stand.)

THE COURT: Okay. Do you have any other witnesses?

MR. CASTELLO: No, Your Honor.

MR. JACKSON: No, Your Honor.

THE COURT: Okay. So I have some questions, and then we're going to get to some of these objections.

Mr. Jackson, can you help me connect the dots to the

5.5 billion? So I've heard testimony and the number that Mr. Unsworth --

MR. JACKSON: Unsworth.

THE COURT: -- Unsworth, but how did you -- I'm still not clear where the 5.5 billion came from. I have the Farley declaration. Is there more than that?

MR. JACKSON: So the number is in the Farley declaration, and that was the number that was used internally when the State was evaluating and considering what were anticipated or potential public costs to address PFAS.

THE COURT: But did it rely on the Unsworth declaration and sort of to extrapolate from that? And if so, how?

MR. JACKSON: So at the time when we were having the settlement negotiations, we were working with Mr. Unsworth, with the DEP staff, Commissioner, but staff-level people as well, the Division of Law counsel, and, frankly, there were other experts involved in all of these different, you know, estimates of cost and the like, and we were evaluating the various types of costs that could be suffered by the public.

So Mr. Unsworth's role was specific to the questions that had been raised by the POTWs and the counties, and so that's why he was, you know, he submitted a separate declaration and he was here. But he was part of those conversations with Ms. Farley and myself and others with

respect to the drinking water costs, as we discussed with Mr. Unsworth. That was always kind of front of mind, and the most costs were attributed to those, as Mr. Unsworth testified back in the 2024 time frame, whatever that was. The best we had to evaluate and estimate those costs were based on U.S. EPA had published what it anticipated to be public costs of public drinking water, and so the State was taking a percentage basically, you know, an allocable share of what New Jersey would share of that to come up with an internal estimate of public drinking water costs.

The State also took a -- had a count of, I think, 290,000 individual wells and was extrapolating what those potential costs could be as well as other drinking water costs. Those costs accumulated to be approximately 3.5 billion. And then you had the 200 -- sorry, yeah, 3.5 billion. And then the 2 billion was broken down 1.5 to the POTWs and 500 million, you know, potentially to the counties.

As Mr. Unsworth said, with the counties in particular, there was a great deal of uncertainty because we don't know if any given site is going to need to be cleaned up at all, and some may be much more significant, which was the reason why for this construction that we just went through and that analysis of having that flexibility between those sites as they are investigated and cleaned up. But ultimately, that's how that number came to be, and that's where the, you know, the

total evaluation. You asked obviously kind of how the sausage was being made internally and I'm trying to -- and the State was trying to protect some of the obviously attorney-client communications along the way as well, but those were the discussions, that was the analysis. And the State basically evaluated the total costs to the public to be $5.5 billion associated with PFAS.

THE COURT: But to be clear, what I have in the record is what I've heard today and in the Farley declaration. Is there anything else?

MR. JACKSON: So from the original submittal, there was actually -- and the original motion to approve the settlements, we actually articulated where the State had evaluated the EPA estimates and how the State had come to some of those numbers.

So on page --

THE COURT: Wait. Hold on.

MR. JACKSON: So this is the memorandum to approve or, yeah, memorandum of law in support of the motion to approve, so ECF Document 746.

THE COURT: I don't have that one. Okay.

MR. JACKSON: On page 41, there is a discussion according to the U.S. EPA, and I'm just quoting, the present value costs to address PFAS in public water systems across the nation is approximately $63.41 billion. There's a footnote

there that goes through how that analysis was conducted by EPA to cite to the public record of EPA's calculations and what they published. It then goes on to state that New Jersey represents approximately 2.79 percent of that population according to the 2024 census based on that data.

THE COURT: Okay. I can look at that.

MR. JACKSON: Yeah.

THE COURT: And what about NRD?

MR. JACKSON: It goes on, how that was calculated to 1.77 billion for the public water system piece of it. And then there's a discussion about the POET systems, the 290,000, how we were looking at those numbers as well. And there's just a discussion of a lot of that kind of analysis.

THE COURT: And what about NRD?

MR. JACKSON: The natural resource damages were actually separately assessed. And the natural resource damages --

THE COURT: Where?

MR. JACKSON: Oh, in terms of the internal analysis of what was going to be --

THE COURT: What evidence do I have in front of me?

MR. JACKSON: The evidence of the values of the natural resource damages, those were all in expert reports and depositions and those were, you know, litigated kind of hotly. We discussed some of those issues at the trial. Mr. Unsworth's

expert report -- I'm trying to think if it was submitted to Your Honor -- had a value for groundwater around Chambers Works I'm going to say $130 million. It was about that, for the groundwater impacts, the natural resource impacts to the PFAS. I'm going to have to just double-check on that.

But that analysis and that work, I'm trying to remember, Your Honor, if it was submitted to you during the course of the trial or not. But the State's analysis of the NRD, we ended -- oh, actually, I do think we actually state in here in the filing that ultimately the recoveries for natural resource damages ended up being approximately 50 percent of what the State would have sought at trial. Let me find that cite for you.

THE COURT: Okay.

MR. JACKSON: Just one moment.

Thirty-six. I passed it. Thank you.

There you are. Yeah. Okay. So on page 36 of that same filing, we go through the analysis of the natural resource damages. The State's also recovering 330 million in natural resource damages related to the industrial sites distributed fairly among the DuPont Defendants and 3M. The Chambers Works natural resource damages recovery of 205 million is approximately 50 percent of the primary and compensatory restoration natural resource damages the State would have sought to obtain at the conclusion of the Chambers Works trial

based on the estimates prepared by its experts, which totaled over 425 million. So 50 cents on the dollar.

THE COURT: Okay. I can look at that. All right. So did you want to say something?

MR. JACKSON: No. I'm answering your questions right now.

THE COURT: Yeah. So what I want to do now is I just want to go through the objections and make sure that I address them all. And Carneys Point and Sayreville are the only objectors, correct?

MR. JACKSON: That is correct.

THE COURT: Okay. So I want to go through and make sure that I've addressed them all, or ask questions of them all.

Okay. So the first objection was paragraph 83. I think that's been exhausted.

The second objection, well, let me get back to that in a moment. This is the argument that the Legislature must pass legislation ensuring future allocations, so maybe we should talk about that a little bit more.

The third is -- the third objection is that there's language in the agreement that leaves it unclear that the $225 million in NRD damages will actually be spent on NRD projects in violation of the Constitution. I think that I've asked enough about that.

Next objection, plaintiffs can only force a release of the political subdivisions' claims via a statutory brand of such power.

Mr. Telsey, that's your *parens patriae* argument, right, I think?

MR. TELSEY: Yes, Judge. My argument is that you need statutory approval to do that, not *parens patriae.*

THE COURT: Yeah, okay. I think we've talked about that. There's the -- okay. Let me -- I don't want to spend too much time on it, but, Mr. Telsey, let me hear you about the tax issue.

Could you come over here and answer my questions, please? Can you tell me how you have standing to object to this issue. Because what happens between DuPont and the IRS is between DuPont and the IRS, isn't it?

MR. TELSEY: No; because to make that happen, the State of New Jersey needs to submit reports to the IRS --

THE COURT: Uh-huh.

MR. TELSEY: -- which state that the money that DuPont is spending in Bergen County is related to pollution in Carneys Point, Salem County, and that's not the case. That's why I have standing, because I was admitted or allowed to come in as an intervenor to address the issues of the JCO, and the JCO is sprinkled with this IRS tax issue. And it seems unfair to me that whereas Carneys Point doesn't have priority the way

the counties do, they still -- that DuPont is still allowed to take a tax deduction for monies being spent for others at a priority that we don't get. And either you take off the tax deduction because it's unprovable or you give us priority, and we don't have priority, but they get tax deduction.

THE COURT: So giving you priority goes to the terms of the settlement, which goes to fair and reasonable, okay. That's one argument. Then the other one is that I shouldn't allow DuPont this tax benefit. But that's --

MR. TELSEY: Well, it's because the money in the PFAS fund in the JCO for DuPont says that $525 million originates solely because of the pollution originating from Chambers Works only, no other site. And, therefore, if you're going to actually be entitled to a tax deduction, all that money needs to be spent at and around Carneys Point, which the State doesn't want to have to do.

THE COURT: Oh, I understand the argument. You just don't think it's fair. Like, if they're going to get a tax break on the back of Chambers Works, then Chambers Works should be the beneficiary of that tax break?

MR. TELSEY: Yes.

THE COURT: Oh, okay. All right. That goes to the reasonableness of the settlement, not that they are violating the law or something like that, okay. I understand it now.

MR. TELSEY: Okay.

THE COURT: Okay. Then the next one is "materially changed, the stipulations." We did kind of address this a little bit, but, Mr. Telsey, you say materially changed. Mr. Jackson, you say substantively modified. Nowhere do I know what the standard is, assuming there even is an alteration. So what is the standard? And then my second question is, does the APA even apply?

MR. JACKSON: Sure. Mr. Reap is going to handle this.

THE COURT: Okay.

MR. REAP: So, Your Honor, I'll take your questions in reverse. The answer to your last question is that the APA does not apply. That's where a substantial change comes from. We were trying to make a comparison for Your Honor that if it were subject to the APA, perhaps we could get into the idea of substantial or material change, but we are not. So the only analysis, the crux of it is the statutory provision under the Spill Act, which requires 60-day notice, a very simple summary of the terms of the settlement once it goes out for public comment.

There is no renotice requirement in that statutory provision. There is no similar requirement like there would be under the APA. So our position is there's no basis in the law for any re-noticing whatsoever.

And of course, you know, we gave you the facts as

well to show that there hasn't been a material change in any event. So under both the law and the facts, there is no basis for re-noticing. And so, again, the substantial change was just an example as to, you know, the difference between where we are and where we would normally be for something like rulemaking, which is very different from what we have here.

THE COURT: Under the Administrative Code.

MR. REAP: Yes, correct.

THE COURT: So you argued that by analogy?

MR. REAP: Yes. We were trying to show the distinction between what this process is about and what rulemaking is about, which has different considerations.

THE COURT: Oh, I see.

MR. REAP: Yeah.

THE COURT: Okay. I understand now.

Okay. Did you want to add anything else, Mr. Telsey, to your argument?

MR. TELSEY: Judge, material change has a common-sense meaning as well. And to the extent that this deal can be modified to provide priority treatment to some and not others is a material change that the public should be aware of. Maybe they have an objection to it, maybe they don't. But that kind of change is material in the common sense of the phrase, and that's why it needs to be re-noticed, especially with things like Qualified Settlement Fund, the stipulations, the

distribution plan that didn't exist. There's a lot to these JCOs that did not exist when it was first published.

THE COURT: What about the argument that these qualified funds can't exist until it's approved? I mean, it's a horse and a cart issue. So that's kind of a, you know, you put the Court in a no-win situation. I can't -- I can't -- assume I agree with you, you can't see the QSFs until I approve it, but you won't let me approve it until you see the QSFs. So we're in a game of chicken.

MR. TELSEY: I'm sorry, I didn't understand the rationale for why the Qualified Settlement Fund agreement has to be sealed when it's --

THE COURT: It's not sealed. It doesn't -- they're not going to put it into existence until the agreement gets approved, because why would they bother? Because if the agreement doesn't get approved, then why bother?

MR. TELSEY: The same reason you bothered to put the JCOs together and the distribution plan together and all the other components of this settlement, because they're key elements of the settlement that the public should be aware of. I don't know why a Qualified Settlement Fund suddenly gets put in a separate category of "who cares, nobody needs to know."

THE COURT: Well, I think it goes a little beyond that. It just seemed -- this is how I see it, and I'm just going to ask the question. It seems to me that the objections

that have been lodged I have addressed. There is one that we'll get to.

Let's see, talk a little bit more about the legislative, but I think I have a handle on that. The objection to 83 has been if not withdrawn, I think implicitly withdrawn, assuming, you know, my opinion isn't a jumble of papers.

The contradictory language, I think that's been cleared up. So the *parens patriae* I have a handle on. The tax issue I have a handle on.

And so, assuming the Court has confidence in itself that it has a handle on these issues and that the objections are without merit, what is the harm of preliminarily approving the agreement saying put the QSF in, repost it for 60 days and final approval is on day 61, what's the harm?

It gives further clarity and conclusion to the matter; does it not?

MR. REAP: Well, I believe our experience with Mr. Telsey is that it does not, because if you keep continuing the process, he will only continue to challenge the settlement on a new issue. And that's why we put in --

THE COURT: Well, no, the only issue -- no, no. That doesn't mean Mr. Telsey gets a second bite at the apple.

MR. REAP: Okay.

THE COURT: That means that the only one worth even

entertaining is repost it for 60 days, which I'm not inclined to do because I think it's Carneys Point just, I think, making an objection for the sake of an objection.

MR. REAP: Yes.

THE COURT: That these QSFs do not matter. They are a side agreement between the counties. But to put the issue to bed, what's 60 days?

MR. REAP: Well, the only point I'd make to the Court is that Carneys Point is not just asking Your Honor to delay this for 60 days. Carneys Point is asking for a whole new public comment process.

THE COURT: But nothing has changed other than the QSF. So what kind of comments are you going to get? You shorten the comment -- does the comment period have to be long?

MR. REAP: It has to be 60 days. It goes into the New Jersey Register which takes another few weeks to coordinate. This is not a -- Judge, if you're asking for one compromise maybe to at least acknowledge the spirit of that provision, if you do want to put a 60-day hold on this without going through the formal public notice and comment, without going through the Register, that may be a compromise. But the problem is, to go out with public notice, full public notice of a settlement is a lot for the department to do. We have to coordinate it in the New Jersey Register. We put it out, we receive comments and we respond to them.

But if all you're looking for is an additional amount of time to see if anybody comes out with any other arguments or responses to the QSF, then --

THE COURT: Well, that's the only thing he's complaining about; that the public didn't know about these stipulations and that there's this qualified fund that he's entitled to see. I don't -- I'm not saying I'm agreeing with him. I think it's -- quite frankly, I think it's unnecessary makework, but it puts the issue to bed.

MR. JACKSON: It doesn't, Your Honor. I think the settlement and the JCOs obviously have broad terms in terms of the payment provisions in terms of, you know, which amount of money would go for natural resource damages versus abatement funds and to those particular issues, for example.

And they were open or broad, you know, in part because of the place where everybody was at the moment, but in large part because of the flexibility that we discussed, that the Commissioner and the DEP is going to have to have in the years ahead as all of these public entities are dealing with these issues. How do we spend this money? Which projects are prioritized? Where do I have a drinking water issue versus a wastewater issue? All of that, it's extraordinarily complicated.

And so we have been following a notice and comment period and we responded to those comments. We came and saw you

on January the 7th, and we spent the last six months going through in excruciating detail the administrative process, the application processes, negotiating with those who could be negotiated with, with respect to how can we find resolution pathways that made sense, that allowed the counties flexibility understanding they don't know the remediation at any given site, and how can we do that in that way? How can we put some more gloss around the POTW issues and some of those applications? And we had come to agreements on those issues.

But if you were to go back through and start over and do a renotice on what is, at most, gloss to, you know, provisions that said the State is going to spend -- shall, by the way. Mr. Telsey said it's a mandatory word, "shall" spend $225 million on natural resource damages. If you go back out for public notice and comment, it's not for Al Telsey's benefit. It's for the whole public. You renotice it publicly for documents that are ancillary and not necessary and we start all over again. And so I don't know that it's --

THE COURT: So it seems to me that what would be important to my calculation is -- well, I'll have to determine whether or not it is -- I mean, when you look at what needs to be posted, it's a summary of the terms. That exists whether you repost it or not, that exists. The summary of the terms remain the same.

MR. JACKSON: Correct.

THE COURT: The fact that the counties, I think, worked out a good solution to keep them from fighting with each other was a good thing. That's still a summary of the term. I don't think it materially changes. And I guess the question is, which I'm just now thinking about, is how does Carneys Point have standing to object to that? I guess it does, but just like how does it have standing to object to what DuPont does with its taxes?

But now we've clarified that issue. Carneys Point is just unhappy that DuPont is going to get a tax break because of them. I get it now. That I get. I didn't get it before.

MR. JACKSON: And that particular issue, you know, the State has agreed to spend the money that it has received for specific remedial and restoration-type projects, and that's where the money is going. And everything that the State has done from the time the JCOs were entered until now have been nothing but to add more clarity on exactly how that's going to be done.

THE COURT: Yeah.

MR. JACKSON: And they shall be spent within those confines. And the county agreement, for example, those funds shall be spent on, you know, in conformance with the JCO and no other way --

THE COURT: Yeah.

MR. JACKSON: -- as Mr. Keefe mentioned.

So it is the State that is actually allocating these funds and spending for the PFAS abatement. It's not DuPont spending money on getting tax breaks. The State is saying we are agreeing that the money is going to be spent to address PFAS in the environment, to restore and remediate. And so the fact that that might get a separate -- a different tax treatment for DuPont, that's great that that's their motive. It's fabulous for us because it ensures the money is going exactly where it needs to be spent. So it's a benefit to the public. It's not a detriment. That they get a tax treatment, that's between them and the IRS. It has nothing to do with Mr. Telsey or, frankly, anyone else. The issue is the money goes to treatment. That's what's important.

But these agreements, the stipulations, and they all contemplate, I would say, further agreements. The county agreements, for example, there's, you know, a site will be cleaned up to the satisfaction and they want an ACO that says it, they're going to have to come back in, and that agreement will be separately noticed. That agreement for the cleanup of a county site will have a separate notice and comment period for it. So it's a very different thing, and you'll go through that again.

So I think that to go back and say that because the State has agreed to, you know, these different processes and applications and the like that it will go through every year

when it makes a determination as to how these funds will be spent, you know, we can't go back and renotice it every year.

THE COURT: Okay. Last question and then I want to take a break. Mr. Telsey says you can't do any of this, it has to be by the Legislature. Your argument is?

MS. DEMA: Your Honor, the State agrees with the Court's order from the other day that Carneys Point's argument about legislation conflates the authority of the Executive and the Legislative Branches. Requiring the State to enact special legislation to manage the use of settlement funds before entering a proposed JCO would render the authority of the Executive to settle cases on behalf of the State meaningless, and it would also interfere with the role of the Legislature.

Even if the Executive Branch proposed special legislation, there is no guarantee that the Legislature would pass it. It is the legislators' prerogative to make laws and to appropriate funds.

And finally, special legislation is not the cure-all solution Carneys Point claims it to be. Legislation passed today can be repealed and amended tomorrow. And even when there is a special legislation, the Legislature has the authority to appropriate funds for other purposes in an Annual Appropriations Act. So the reality is, the ultimate constitutional responsibility for appropriations is vested in the Legislature. That's fundamental to the New Jersey

Constitution. None of us here today can change that, including through special legislation.

And if you set aside the hypotheticals about future legislative action that may or may not happen, I think we've gone through in detail in our briefing and today the specific requirements in the JCOs that are contracts and court orders that require NRD funds to be spent according to the Constitution and the PFAS Abatement Funds to be used for very specific purposes. 3M and DuPont bargained hard for these provisions. These provisions matter to them. So if the State were to ignore those provisions, we have every expectation that the defendants would notice and would bring that issue to the dispute resolution provisions of the JCOs.

THE COURT: What about Carneys Point? If the State, for whatever reason, DuPont doesn't make a -- I'll just make it up -- DuPont doesn't make a payment and the State is like, eh, Carneys Point have standing to come in?

MS. DEMA: If DuPont doesn't make a payment under the terms of the settlement, the State would enforce that breach.

THE COURT: Let's assume they don't, can Carneys Point come in and enforce it? Do they have standing?

MS. DEMA: I --

MR. JACKSON: I think this is entered as an order of this Court, and anybody that -- if a term of this Judicial Consent Order is breached, I'm sorry to say for Your Honor, but

they're going to be back in here with you.

THE COURT: Do I retain jurisdiction under this court order?

MR. JACKSON: You do.

MS. DEMA: Yes.

(Laughter.)

MR. JACKSON: Sorry.

THE COURT: Okay. Anything else?

MS. DEMA: I would just like to say briefly that the task for the Court is to evaluate whether the settlement is fair and reasonable based on the language of the JCOs and the facts as they exist today, and the State submits that they are.

THE COURT: Okay. One last, Mr. Telsey, yeah, did you want to be heard?

MR. TELSEY: Yes.

THE COURT: Okay. Go ahead.

MR. TELSEY: One of the things the Court asked --

THE COURT: Can you come over here, Mr. Telsey? Can you come to the podium so I can hear you?

MR. TELSEY: One of the things the Court asked the State was, what do you do if this thing falls apart, if there's no re-appropriation of the PFAS fund and where does the money go and how does -- what's your backstop for that kind of event? I haven't heard that.

THE COURT: They come before me and get an injunction

or they get a declaratory judgment. I retain jurisdiction to enforce the court order. I think that's clear.

MR. TELSEY: And the second thing is that the PFAS fund hasn't been enacted today. It may be enacted next week or whenever the budget is, but it doesn't exist today. And presuming that it will be I think is a problem.

And third, I do have a witness I want to present, Mr. Russo, who's a former treasurer of New Jersey, to talk about the distinction between Special Revenue Fund and enabling standalone legislation.

THE COURT: Yeah. I mean, I've read the declaration. Anything else in addition to the declaration, or anything to supplement it, because I have his declaration?

MR. TELSEY: He would be testifying about his declaration.

THE COURT: Yeah. So if it's just the declaration, I don't need to hear testimony.

All right. We're going to take a break, but one last question. Mr. Telsey, here's my question: If for whatever reason you left today and the State said, all right, we'll give you some more money or whatever they say, they alter the terms of the agreement, would you come back before me and say it needs to be reposted?

(Pause.)

MR. TELSEY: Judge, if we got some relief, as you're

proposing, the momentum of negotiation would perhaps convince me to accept negotiated terms and surrender, like you're supposed to do.

THE COURT: Ah, I think you've just answered my question.

MR. TELSEY: What those surrender terms are haven't been presented here to me in any form, certainly not by priority, prioritization, and certainly not by -- this is the key -- certainly not by protecting my initial state court case from being dismantled, because I'm entitled to relief there that is being jeopardized by this JCO.

THE COURT: Is it a question of surrender or transparency?

MR. TELSEY: I'm not sure of the difference.

THE COURT: Well, you protested because the stipulations materially altered the JCO and you said it needs to be reposted. Now you've said to me that if the terms of the JCO were altered to benefit Carneys Point, it wouldn't need to be reposted, you would surrender. That seems to be talking out of both sides.

MR. TELSEY: Judge, I'm supposed to be candid. You asked me if I had got --

THE COURT: I know. And that's --

MR. TELSEY: -- if I got something that I needed and wanted, would I stand down? In the jury box, there's a bunch

of other objectors. They said the same thing about this JCO that I've said. They wrote writs of mandamus. They wrote briefs, amicus, all kinds of things, and they got a lollipop and they stood down.

THE COURT: I know, but -- okay, fair point. But, I mean, it kind of says a lot to me about what's really going on.

All right. Let's take a five-minute break. I'll be back.

THE COURTROOM DEPUTY: All rise.

(Recess was taken at 3:40 p.m. until 3:51 p.m.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Okay. You can all have a seat.

Okay. So the record is closed on everything that I need to consider. Any other evidence that the parties want me to consider?

MR. TELSEY: Judge --

THE COURT: Yeah.

MR. TELSEY: -- two things. One, I'm not going to call anyone else.

Number two, we put a list of objections down. There was one you don't have.

THE COURT: Which one?

MR. TELSEY: And that one is, we object to the fact that the 3M JCO does not give a specific carve-out to Parlin in Sayreville, which is one of the four industrial site cases.

And they're entitled to that NRD allocation and dedication.

THE COURT: That 3M doesn't give a carve-out to Parlin?

MR. TELSEY: Correct.

THE COURT: Okay. Did you make that argument before?

MR. TELSEY: It's in one of my briefs, reply or surreply.

THE COURT: Did you respond to it?

MR. JACKSON: Did we respond to that particular point?

MS. DEMA: Yes. Would you --

THE COURT: Okay. Let me hear you.

MS. DEMA: Okay.

THE COURT: Did you respond to it in your brief?

MS. DEMA: In --

THE COURT: At this point I just -- I can't remember.

MS. DEMA: I believe this was primarily raised by Carneys Point in their first motion for intervention, and we did respond to it in our opposition to that motion back in December or January.

THE COURT: Okay.

MS. DEMA: But briefly, as with all NRD recoveries, the 3M NRD recovery is consistent -- is controlled by the NRD amendment, and nothing in the amendment requires or limits the claims the State can bring to site-specific claims, nor does it

limit the State's recoveries to site-specific recoveries. The State asserted statewide claims against 3M and that recovered NRD in connection with those claims. 3M JCO allocates a specific amount of NRD to Chambers Works because Chambers Works was unique in terms of 3M's extensive ties to that site.

For other sites, including Parlin and the AFFF sites, the settlement, the NRD amount deals with them comprehensively as a whole. So the State will still adhere to the constitutional prioritization process. There is nothing in the JCO that prevents the State from adhering to that process by first prioritizing projects in the immediate area of sites affected by the discharges like Parlin and AFFF. There's a difference between specifically allocating in the settlement and still adhering to the Constitution by prioritizing the use of those funds.

THE COURT: Where is it in the record that 3M primarily was involved with Chambers Works as opposed to Parlin?

MS. DEMA: That would be, I think, extensively covered in the pretrial filings for the -- in preparation for the April 2025 hearings and the Joint Pretrial Order related to the trial that didn't end up happening against 3M.

THE COURT: So what you're saying to me is that the evidence bore out before me that with respect to Chambers Works, 3M was more extensively involved than Parlin, and Parlin

is subsumed within all the other categories for recovery?

MS. DEMA: Correct.

THE COURT: Yeah. Mr. Telsey.

MR. TELSEY: Judge, the State brought a specific lawsuit against DuPont Chemours, 3M for the Parlin site, just like they did for Chambers Works, Repauno, Pompton Lakes, because there was natural resource damage done at and around Parlin, just like there was at the other sites.

THE COURT: Yeah.

MR. TELSEY: And the Constitution says that when you settle an NRD case, the first priority is that you pay the money to the ground-zero impacted community, and that's Parlin. That's Sayreville. You don't get to just negotiate away the first-priority constitutional provision because it's expedient for settlement. And that's what happened.

THE COURT: Okay. But do you dispute the proposition that 3M was much more extensive in the Chambers Works site?

MR. TELSEY: I have to defer. I don't know.

THE COURT: Okay. All right. Thank you.

All right. So here's what I'm going to ask the parties. So I've asked some questions throughout the day where is the evidence of that in the record. I'm counting on counsels' representations to me about the state of the evidence. But to the extent that I've asked those questions or to the extent the objector disputes that evidence, submit that

to me in ten pages or less within two -- within ten days. Cite me to the evidence. And I would prefer if you can hyperlink it, that would be great. So you'll just have to review the record and see what was the evidence that I looked for.

It is my intent to approve the agreements. I do believe that I have exhausted my analysis of the objections to the extent I can. I think that the objections do not warrant a disapproval of the agreements. I find that the agreement is fair and reasonable, and I will lay it out in a -- hopefully a comprehensive opinion, which I hope to get out as expeditiously as I can. I'll obviously wait for your submissions, but I don't think that it will be within ten days, but hopefully not too much longer after that, okay.

It has been a pleasure seeing you all here. I wish you all well. A happy, happy birthday to America celebration.

(Laughter.)

MR. JACKSON: Judge --

THE COURT: Yes.

MR. JACKSON: -- before you adjourn, I won't go into argument, may I just reference Your Honor to the *New Jersey vs. Exxon* opinion that Judge Hogan sat on when he approved the New Jersey settlement with *Exxon*.

THE COURT: Uh-huh.

MR. JACKSON: The last page of that opinion is discussing arguments that the settlement that New Jersey

reached in that case did not -- that the allocations to the Spill Fund were not limited statutorily, and so that those funds could be redirected by Governor Christie. In response to that, there was a later amendment, this constitutional amendment that you've heard about.

THE COURT: Right.

MR. JACKSON: But at the time of the settlement, that amendment was not yet effective. And so Judge Hogan went through this analysis and basically said, yeah, this is very unfortunate that the statute doesn't require that the money go to specific things, but this is not for the judiciary to weigh in on, this is a legislative executive decision.

THE COURT: And that's what they did.

MR. JACKSON: And so this is exactly what was addressed in the *Exxon* opinion.

THE COURT: Right.

MR. JACKSON: The distinction here is, is that now the constitutional amendment does exist, the NRD funds are protected that way, and the abatement funds are protected throughout this agreement time and time again; that they shall be spent on abatement funding and mechanism. So the agreement, the JCOs required that they go that way, and that's how we protect those funds. Sorry.

THE COURT: As part of my goodbye, I forgot to say, and I should say, I thank you all for your very great advocacy,

your hard work, well fought. You've all worked very hard to serve your clients. And so I appreciate all of the advocacy and the great work that you have done. And it's been a pleasure having you all in my courtroom.

Okay. Wish you all well.

MR. JACKSON: Thank you, Your Honor. Thank you for all your hard work.

MR. CASTELLO: Thank you, Your Honor.

MS. FARLEY: Thank you, Your Honor.

MR. KURZWEIL: Thank you, Your Honor, very much.

MS. DUFFY: Thank you, Your Honor.

MR. HAWORTH: Thank you, Your Honor.

MR. KEEFE: Thank you, Your Honor.

MR. CALICA: Thank you, Your Honor.

THE COURTROOM DEPUTY: All rise.

(Proceedings concluded at 3:59 p.m.)

- - - - - - - - - - - - - - - - - - - - -

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

- - - - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/John J. Kurz, RDR-RMR-CRR-CRC June 27, 2026

Court Reporter/Transcriber

**BY MR. CASTELLO: [22]** 98/6 103/12 104/3 105/16 105/24 106/9 107/10 107/21 108/17 109/23 110/21 114/7 114/17 115/23 117/13 119/11 120/10 121/2 121/11 121/25 122/23 123/23
**BY MR. JACKSON: [6]** 64/20 65/15 71/13 87/3 88/8 94/1
**BY MR. TELSEY: [13]** 126/1 126/20 127/15 128/15 129/11 130/7 135/22 147/25 162/17 162/25 178/15 179/6 180/10
**MR. CALICA: [21]** 7/18 23/11 23/14 23/19 23/22 24/9 24/12 24/16 24/22 25/1 25/8 25/11 60/15 61/15 61/18 61/22 62/3 62/12 62/19 62/22 212/14
**MR. CARNEY: [1]** 8/16
**MR. CASTELLO: [51]** 6/6 97/7 97/10 103/10 104/1 105/6 105/10 105/12 105/21 106/4 107/8 107/19 108/16 109/21 110/17 112/7 112/16 113/12 113/15 114/14 115/22 117/12 118/7 118/22 119/1 119/4 119/10 119/21 121/8 121/23 122/13 123/20 125/7 125/12 125/21 127/23 136/5 136/8 136/10 136/24 137/15 138/11 154/19 154/23 178/21 180/5 180/20 182/11 183/14 183/21 212/8
**MR. HAWORTH: [2]** 7/13 212/12
**MR. HIRSCH: [5]** 23/24 24/4 24/7 60/19 61/13
**MR. JACKSON: [139]** 6/7 6/12 6/23 10/5 10/8 10/10 11/11 14/21 17/4 17/11 17/13 17/16 17/22 19/13 19/15 22/2 22/11 22/18 22/23 23/1 23/7 24/24 25/9 25/12 29/3 29/6 29/8 29/14 31/2 35/1 35/3 36/12 36/14 36/18 36/20 38/14 38/16 38/21 39/5 39/9 39/13 39/15 39/17 39/24 40/2 40/4 40/9 40/14 40/18 40/20 40/23 44/23 51/1 51/4 51/7 51/11 52/7 52/25 53/14 53/21 53/23 54/3 54/11 54/22 55/1 55/13 55/15 55/19 55/22 55/25 56/3 56/5 56/16 57/18 57/24 58/1 58/3 58/6 58/9 58/12 58/15 58/22 59/20 59/24 60/3 63/1 63/8 64/9 65/1 65/14 93/25 94/17 94/20 94/22 95/6 95/9 95/13 96/3 96/7 96/11 96/21 96/23 153/4 153/14 154/1 154/8 161/24 183/22 184/3 184/7 184/14 186/11 186/18 186/22 187/7 187/9 187/15 187/19 187/22 188/15 189/5 189/11 192/8 197/10 198/25 199/12 199/20 199/25 202/23 203/4 203/7 207/9 210/17 210/19 210/24 211/7 211/14 211/17 212/6
**MR. KAUFF: [1]** 7/2
**MR. KEEFE: [34]** 8/24 9/6 163/14 164/4 164/24 165/6 165/10 165/13 165/19 165/21 165/23 166/9 166/11 166/19 166/21 166/25 167/2 167/4 169/19 169/22 170/4 170/10 170/18 171/5 171/8 171/11 172/4 175/7 176/10 176/13 176/22 177/7 177/9 212/13
**MR. KURZWEIL: [5]** 6/10 7/5 7/8 139/5 212/10
**MR. REAP: [27]** 7/1 10/12 10/21 130/22 131/4 131/23 132/7 132/11 132/15 132/22 133/2 134/24 161/19 172/13 175/19 175/25 176/3 177/6 192/11 193/8 193/10 193/14 195/18 195/24 196/4 196/8 196/15
**MR. SERP: [1]** 64/16
**MR. TAGLIAFERRO: [1]** 9/7
**MR. TELSEY: [162]** 7/25 10/25 11/8 11/17 11/19 11/22 11/24 12/18 14/4 14/7 14/11 15/8 15/12 15/17 16/4 16/7 16/11 16/20 95/25 125/23 126/12 126/18 128/1 128/3 128/7 128/9 128/24 129/1 129/3 129/24 130/2 131/20 133/8 133/12 133/14 133/18 133/22 134/11 135/7 135/11 135/16 135/20 136/14 136/18 136/23 137/5 137/10 140/25 141/19 141/21 141/24 142/2 142/7 142/11 142/19 142/22 143/16 144/16 144/20 144/23 145/3 145/14 145/18 146/1 147/20 147/23 148/8 148/12 148/16 148/18 150/1 150/4 150/11 150/16 150/20 152/6 152/17 152/25 153/7 155/21 156/2 156/5 156/20 157/2 157/6 157/8 157/11 157/13 158/12 158/16 159/13 159/17 159/21 160/4 160/6 160/9 160/12 160/17 160/20 160/23 161/8 161/11 161/20 162/12 162/14 162/21 162/23 167/15 167/22 168/1 168/21 169/2 169/8 169/10 172/5 172/7 172/17 172/23 173/13 173/17 174/9 174/13 174/15 174/19 174/22 178/13 180/8 180/22 181/18 181/22 182/1 182/6 182/10 183/1 183/12 190/6 190/16 190/19 191/10 191/21 191/25 193/18 194/10 194/17 203/15 203/17 203/20 204/3 204/14 204/25 205/6 205/14 205/21 205/24 206/16 206/18 206/23 207/4 207/6 209/4 209/10 209/18
**MS. ALEXANDER: [3]** 8/3 8/8 8/13
**MS. DEMA: [43]** 137/24 138/9 138/12 139/1 139/6 139/9 139/15 140/9 140/14 145/17 146/5 146/7 146/9 146/21 146/24 147/4 149/9 150/18 150/21 153/5 155/5 155/9 157/19 157/22 158/1 160/25 161/17 161/25 162/2 182/13 182/15 201/6 202/18 202/22 203/5 203/9 207/11 207/13 207/15 207/17 207/22 208/19 209/2
**MS. DUFFY: [5]** 6/9 7/10 60/24 61/9 212/11
**MS. FARLEY: [6]** 6/8 6/20 6/24 40/19 96/10 212/9
**MS. MORELLI: [1]** 95/18
**THE COURT: [484]**
**THE COURTROOM DEPUTY: [12]** 6/4 63/2 63/4 63/13 63/21 97/13 97/22 125/14 125/16 206/9 206/11 212/15
**THE TELSEY: [1]** 137/2
**THE WITNESS: [37]** 63/17 63/23 64/3 64/11 64/14 70/23 70/25 71/7 71/12 87/16 87/25 88/3 88/6 93/22 95/21 97/18 97/24 98/3 112/13 112/24 113/3 113/14 113/18 113/21 114/5 118/12 118/17 120/4 121/1 122/21 128/12 136/6 137/19 179/2 179/4 183/7 183/17

**$**

**$1.2 [1]** 37/5
**$1.2 billion [1]** 37/5
**$1.3 [1]** 59/9
**$1.3 billion [1]** 59/9
**$1.5 [2]** 49/6 86/24
**$1.5 billion [2]** 49/6 86/24
**$1.6 [1]** 101/23
**$1.6 billion [1]** 101/23
**$10 [1]** 151/3
**$10 million [1]** 151/3
**$100 [11]** 111/8 138/13 138/15 138/17 141/2 141/5 141/7 145/19 148/8 150/7 151/11
**$100 million [11]** 111/8 138/13 138/15 138/17 141/2 141/5 141/7 145/19 148/8 150/7 151/11
**$130 [1]** 188/3
**$130 million [1]** 188/3
**$150 [1]** 111/6
**$150 million [1]** 111/6
**$16.5 [1]** 146/16
**$16.5 million [1]** 146/16
**$2 [1]** 35/25
**$2 billion [1]** 35/25
**$20 [3]** 92/12 92/20 93/15
**$20 million [3]** 92/12 92/20 93/15
**$200 [25]** 127/1 127/21 128/17 128/19 128/20 128/21 129/9 129/13 129/19 130/14 130/19 131/18 132/10 132/17 133/23 134/12 134/20 135/6 135/7 135/19 135/20 137/16 138/2 141/1 143/23
**$200 million [25]** 127/1 127/21 128/17 128/19 128/20 128/21 129/9 129/13 129/19 130/14 130/19 131/18 132/10 132/17 133/23 134/12 134/20 135/6 135/7 135/19 135/20 137/16 138/2 141/1 143/23
**$225 [7]** 42/12 146/9 146/15 146/19 156/21 189/23 198/14
**$225 million [7]** 42/12 146/9 146/15 146/19 156/21 189/23 198/14
**$30 [2]** 92/13 152/20
**$30 million [2]** 92/13 152/20
**$325 [1]** 27/11
**$325 million [1]** 27/11
**$365 [2]** 45/24 45/25
**$365 million [2]** 45/24 45/25
**$400 [3]** 58/9 85/22 171/20
**$400 million [1]** 58/9
**$475 [1]** 41/17
**$475 million [1]** 41/17
**$5.5 [3]** 48/9 48/10 186/6
**$5.5 billion [2]** 48/9 186/6
**$50 [5]** 25/20 26/12 28/5 111/9 158/23
**$50 million [5]** 25/20 26/12 28/5 111/9 158/23
**$500 [7]** 26/5 28/10 30/9 49/9 58/25 59/2 93/16
**$500 million [7]** 26/5 28/10 30/9 49/9 58/25 59/2 93/16
**$525 [1]** 191/11
**$525 million [1]** 191/11
**$55 [1]** 148/23
**$55 million [1]** 148/23
**$6 [1]** 27/1
**$6 billion [1]** 27/1
**$63.41 [1]** 186/25
**$63.41 billion [1]** 186/25
**$75 [2]** 158/17 158/18
**$75 million [2]** 158/17 158/18
**$795 [2]** 46/1 59/3
**$795 million [2]** 46/1 59/3
**$875 [2]** 42/8 135/25
**$875 million [2]** 42/8 135/25
**$90 [7]** 116/7 116/23 124/25 165/7 172/24 178/16 178/20
**$90 million [7]** 116/7 116/23 124/25 165/7 172/24 178/16 178/20

**'**

**'23 [1]** 71/18
**'50s [1]** 24/11
**'70s [1]** 25/3

**-**

**-- and [1]** 147/23
**-- as [1]** 199/25
**-- before [1]** 210/19
**-- can [1]** 55/20
**-- is [1]** 58/6
**-- that [1]** 164/25
**-- that's [1]** 137/5
**-- the [1]** 133/18
**-- there [1]** 159/17
**-- these [1]** 157/8
**-- this [1]** 172/7
**-- two [1]** 206/18
**-- what's [1]** 150/11
**-- which [1]** 190/19

**/**

**/S/John [1]** 212/23

**0**

**0015 [1]** 3/3
**00820-5034 [1]** 2/12
**0093 [1]** 1/17
**07054 [1]** 2/7
**07102 [2]** 2/18 3/14
**07701 [1]** 3/24
**07927 [1]** 3/18
**08054-0015 [1]** 3/3
**08101 [1]** 1/10
**08625-0093 [1]** 1/17
**093 [1]** 1/16

**1**

**1 percent [1]** 111/13
**1,400 [1]** 43/7
**1.4 billion [1]** 31/20
**1.5 [1]** 185/16
**1.5 billion [1]** 88/17
**1.77 billion [1]** 187/10
**10 [4]** 92/12 109/20 109/24 115/22
**10.5 [1]** 25/24
**100 [11]** 2/17 21/18 54/2 55/18 55/20 55/20 56/13 57/20 141/17 142/8 142/12
**100 million [12]** 25/15 139/20 141/9 141/24 142/2 142/7 143/11 147/13 148/19 150/16 151/14 158/6
**100 percent [8]** 53/15 54/10 54/24 55/9 55/10 55/23 56/10 56/11
**100-cents [2]** 50/15 51/22
**10007 [1]** 2/4
**10036 [1]** 3/8
**103 [1]** 2/11
**1089 [1]** 53/3
**1099 [1]** 3/10
**11 [7]** 110/3 110/5 117/12 159/24 160/2 161/12 161/20
**112 [1]** 2/14
**11300 [1]** 2/14
**1185 [1]** 3/7
**11:05 [1]** 63/3
**11:17 [1]** 63/3
**12 [7]** 8/25 26/10 26/24 85/22 111/16 111/17 142/24
**12-month [1]** 143/19
**12.5 billion [1]** 25/25
**1236 [1]** 2/11
**125 million [2]** 42/14 139/23
**12:42 [1]** 125/15
**13 [2]** 118/7 119/10
**1350 [1]** 2/21
**139 [1]** 89/4
**14 [6]** 40/19 40/20 81/22 114/14 114/15 114/18
**14 million [1]** 21/18
**140 [1]** 148/23
**14758 [1]** 6/17
**15 [8]** 40/9 40/18 84/10 85/15 85/17 86/24 115/4 155/9
**15,000 [2]** 31/6 44/7
**15-year [1]** 85/16
**150 [2]** 55/20 65/24
**16 [3]** 40/9 40/18 149/17
**16 million [1]** 145/2
**16.5 million [1]** 146/11

**1**

**175 [1]** 2/4
**175 million [1]** 161/3
**17th perhaps [1]** 23/5
**18 [14]** 8/25 9/2 9/3 27/4 27/4 115/12 115/13 163/15 168/16 171/11 173/3 173/3 173/24 176/14
**18 million [1]** 85/21
**19 [3]** 95/7 180/13 180/18
**19-14758 [1]** 6/17
**195 [1]** 148/23
**1950 [1]** 22/12
**1950s [1]** 24/13
**1986 [1]** 67/15
**1992 [1]** 67/19
**19th [2]** 22/3 23/4
**1:19-cv-14758-RMB-JBC [1]** 1/4
**1:19-cv-14765-RMB-JBC [1]** 1/4
**1:19-cv-14766-RMB-JBC [1]** 1/5
**1:41 [1]** 125/15
**1st [2]** 103/8 110/15

**2**

**2 billion [2]** 58/20 185/16
**2 percent [1]** 111/12
**2-acre [1]** 92/13
**2.79 percent [1]** 187/4
**20 [4]** 43/4 44/11 92/13 145/21
**20 million [1]** 158/9
**200 [2]** 137/9 185/15
**200 million [7]** 137/4 138/13 139/13 141/16 141/22 148/1 160/7
**2000 [1]** 22/19
**20001 [1]** 3/11
**20005 [1]** 2/22
**2001 [2]** 24/1 67/20
**2005 [2]** 35/5 43/6
**2011 [1]** 67/21
**2015 [1]** 33/12
**2016 [1]** 99/21
**2018 [2]** 85/8 109/5
**2019 [5]** 21/4 32/24 33/20 33/21 71/16
**2022 [3]** 99/13 99/24 100/2
**2023 [1]** 25/22
**2024 [5]** 62/15 98/14 99/25 185/4 187/5
**2025 [3]** 23/2 180/13 208/21
**2026 [4]** 1/11 82/17 180/18 212/23
**2027 [2]** 119/13 120/6
**205 million [1]** 188/22
**20852 [1]** 2/15
**22 [3]** 89/13 89/18 93/10
**225 [2]** 25/18 157/11
**225 million [1]** 139/20
**23.11k [1]** 179/23
**24 [4]** 1/11 93/15 139/16 143/19
**240 [1]** 3/17
**247 [1]** 85/22
**25 [14]** 1/16 121/10 121/12 136/2 144/3 144/8 144/9 145/22 149/21 150/18 150/19 157/17 157/23 161/7
**25 million [2]** 158/20 159/22
**25 years [1]** 159/11
**25-year [1]** 159/14
**2500 [1]** 3/13
**27 [1]** 212/23
**275 [1]** 27/11
**275 million [1]** 25/19
**28 [2]** 121/24 147/4
**29 [1]** 39/17
**290,000 [2]** 185/12 187/11

**3**

**3.5 billion [2]** 185/14 185/15
**30 [6]** 25/15 37/21 38/21 39/23 139/16 153/17
**30 million [1]** 158/9
**301 [1]** 3/17
**330 [1]** 3/3
**330 million [1]** 188/19
**34 [1]** 53/2
**34th [1]** 3/7
**36 [1]** 188/17
**37 [1]** 31/9
**3:19-cv-14767-RMB-JBC [1]** 1/5
**3:40 [1]** 206/10
**3:51 [1]** 206/10
**3:59 p.m [1]** 212/16
**3M [76]** 3/8 3/11 7/19 19/11 21/1 21/5 21/8 21/10 21/13 21/20 22/3 22/5 22/9 22/11 22/18 23/3 23/8 23/25 24/4 25/20 25/22 26/3 26/5 26/11 26/16 26/21 26/24 27/3 27/6 27/10 27/14 27/20 28/12 28/15 28/17 28/20 28/22 28/23 29/14 30/9 30/19 30/21 30/24 30/24 31/4 31/20 32/7 32/15 32/17 44/5 47/1 49/25 52/10 55/2 56/24 58/16 60/9 93/19 94/5 100/25 105/3 121/17 148/22 152/21 188/21 202/9 206/24 207/2 207/23 208/2 208/3 208/16 208/22 208/25 209/5 209/17
**3M's [5]** 22/11 25/13 26/11 30/6 208/5

**4**

**4 percent [1]** 74/5
**40 million [1]** 148/21
**40 years [1]** 24/25
**40-year-old-plus [1]** 65/20
**400 [2]** 25/14 84/8
**41 [1]** 186/22
**425 million [1]** 189/2
**45 million [2]** 149/1 149/4
**45-day [1]** 129/14
**450 million [1]** 25/14
**46 [1]** 144/23
**47 [2]** 179/19 182/6
**48 [1]** 30/25
**4th [1]** 1/10

**5**

**5.5 billion [2]** 184/1 184/5
**50 [8]** 50/2 52/15 53/8 54/5 56/15 56/18 58/14 189/2
**50 million [5]** 158/19 161/13 161/15 161/21 162/11
**50 percent [9]** 27/23 50/6 50/24 52/5 57/13 57/13 111/15 188/11 188/23
**50/50 [6]** 50/2 52/15 53/8 54/5 56/15 56/18
**500 million [1]** 185/16
**5034 [1]** 2/12
**515 [1]** 1/19
**525 million [1]** 42/10
**53 [1]** 21/18
**55 [2]** 40/25 148/25
**56 [2]** 40/25 40/25
**57 [1]** 40/25
**576-7094 [1]** 1/22
**58:10-23.11k [1]** 179/23
**59 [1]** 40/25

**6**

**6-acre [1]** 92/13
**60 [6]** 103/25 195/14 196/1 196/7 196/10 196/15
**60-day [2]** 192/18 196/19
**61 [1]** 195/15
**623 [1]** 3/23
**65 percent [1]** 59/11
**699-6 [1]** 61/23

**7**

**700 [1]** 3/3
**7094 [1]** 1/22
**73 [1]** 43/8
**746 [1]** 186/20
**746-4 [2]** 105/23 106/4
**746-5 [1]** 105/7
**75 million [4]** 139/21 158/8 159/22 160/3
**75 percent [2]** 58/14 58/17
**751 [1]** 23/24
**77027 [1]** 1/20
**7c [2]** 139/5 157/3
**7c1 [2]** 161/22 162/11
**7c4 [3]** 144/23 146/11 156/6
**7th [7]** 15/18 18/23 29/9 46/7 46/23 153/18 198/1

**8**

**827 [1]** 122/14
**827-2 [1]** 103/15
**828 [1]** 110/20
**83 [12]** 11/13 11/25 12/4 13/19 14/7 15/15 15/18 15/20 16/18 16/22 189/15 195/5
**830 [1]** 116/2
**856 [1]** 1/22

**9**

**90 [1]** 165/11
**90 million [2]** 179/1 179/4
**900 [2]** 1/19 3/10
**9:43 [1]** 1/11
**9:43 a.m [1]** 6/3

**A**

**a.m [4]** 1/11 6/3 63/3 63/3
**abate [1]** 43/16
**abatement [71]** 29/15 42/10 42/17 42/24 45/18 46/1 59/4 59/8 102/1 103/2 111/5 116/8 118/6 118/20 120/13 120/15 120/18 120/22 121/13 121/18 122/7 123/11 123/22 124/11 124/18 127/8 132/1 132/4 138/7 138/19 138/24 140/5 140/10 141/3 143/13 144/13 145/12 147/14 148/6 148/9 148/9 148/15 148/25 149/2 149/4 149/22 149/23 150/23 151/19 154/11 155/7 155/10 155/14 155/20 155/23 156/4 156/19 166/2 167/20 169/12 169/13 170/12 175/12 176/20 178/4 179/5 197/13 200/2 202/8 211/19 211/21
**abatement-type [1]** 29/15
**abide [3]** 39/11 150/22 166/14
**ability [8]** 18/21 20/11 34/2 34/3 42/20 42/21 50/22 54/17
**able [7]** 45/10 50/6 85/12 110/10 144/16 163/5 167/8
**above [3]** 59/2 181/14 212/20
**above-entitled [1]** 212/20
**abroad [1]** 69/13
**absence [1]** 77/11
**absolute [1]** 45/1
**absolutely [5]** 31/23 81/24 94/6 101/16 146/7
**academies [6]** 89/12 93/11 114/13 114/21 116/9 117/22
**academy [3]** 115/14 115/18 115/21
**accept [2]** 91/19 205/2
**accepted [1]** 26/2
**accomplishes [1]** 45/18
**according [5]** 142/13 169/4 186/23 187/5 202/7
**account [7]** 101/20 127/5 133/16 134/14 142/23 143/18 143/19
**accounts [1]** 133/15
**accrue [1]** 182/5
**accumulated [1]** 185/14
**accurate [2]** 34/24 60/21
**achieve [2]** 76/7 76/15
**achieved [2]** 79/16 79/17
**acknowledge [1]** 196/18
**acknowledges [1]** 41/8
**acknowledging [3]** 14/15 15/3 15/4
**acknowledgment [1]** 147/7
**ACO [1]** 200/17
**acre [4]** 90/3 92/3 92/13 92/13
**acres [5]** 43/7 43/8 91/10 91/20 92/4
**across [15]** 25/23 29/18 35/6 42/11 46/2 56/20 57/1 71/7 76/22 145/8 148/19 152/14 154/15 156/10 186/24
**Act [29]** 19/5 19/15 19/19 20/14 21/7 21/12 21/21 33/6 33/6 35/12 47/18 50/4 50/9 50/14 51/13 51/20 52/19 52/22 54/16 56/21 82/12 82/22 82/25 103/22 104/13 112/3 124/3 192/18 201/23
**Act-liable [1]** 56/21
**Act-type [1]** 19/15
**acting [2]** 140/21 142/18
**action [21]** 1/3 12/1 14/15 14/19 14/25 15/4 15/6 15/9 25/23 27/2 28/3 31/4 31/5 41/2 52/13 53/25 53/25 82/18 164/5 167/5 202/4
**actionable [1]** 151/5
**actions [9]** 41/6 47/3 72/3 72/5 72/14 77/6 120/18 167/20 169/13
**actively [1]** 20/17
**actor [1]** 18/24
**acts [5]** 66/13 69/14 138/1 170/25 171/1
**actual [2]** 92/16 169/11
**actually [27]** 20/1 28/10 37/25 39/1 42/25 43/3 48/25 52/7 59/14 62/9 69/6 74/17 85/13 88/23 89/16 119/17 151/5 161/8 164/19 186/12 186/13 187/16 188/9 188/9 189/23 191/14 200/1
**add [4]** 16/8 153/14 193/16 199/17
**added [3]** 72/2 94/7 109/9
**addendums [1]** 163/10
**adding [1]** 90/10
**addition [14]** 32/25 42/3 73/3 83/22 98/23 101/23 102/1 102/11 109/2 109/12 111/11 167/18 175/1 204/12
**additional [17]** 41/20 45/8 47/10 50/23 73/23 86/25 87/4 99/23 118/18 122/6 145/5 156/7 158/22 159/23 161/21 162/10 197/1
**Additionally [2]** 31/12 47/20
**additions [1]** 81/19
**address [38]** 10/1 11/2 13/18 16/13 16/14 18/3 18/11 18/13 18/15 25/12 29/18 32/18 34/5 38/17 42/11 46/24 48/1 48/6 68/24 79/5 97/4 97/6 101/18 102/3 103/6 109/25 110/12 124/17 130/22 146/5 152/24 178/10 184/10 186/24 189/8 190/23 192/2 200/4
**addressed [9]** 18/2 28/23 52/14 56/17 152/1 173/8 189/13 195/1 211/15
**addressing [8]** 75/8 83/8 88/17 107/17 109/3 109/15 117/7 152/13
**addressments [1]** 88/19
**adhere [1]** 208/8
**adhering [2]** 208/10 208/14
**adjourn [1]** 210/19
**adjudicate [1]** 69/18
**adjust [1]** 37/17
**administer [1]** 165/6
**administered [2]** 124/4 155/11
**administration [1]** 67/13
**administrative [3]** 112/3 193/7 198/2
**admitted [1]** 190/22
**adopt [1]** 109/4
**adopted [2]** 109/13 172/19
**adult [3]** 166/7 166/18 168/7
**advance [1]** 69/3
**adversarial [2]** 20/9 20/18
**advertising [1]** 181/18
**advise [1]** 98/20
**advised [1]** 100/22
**advising [1]** 100/10
**advisor [7]** 98/11 98/13 98/15 99/14 99/25 100/6 113/4
**advocacy [3]** 15/25 211/25 212/2
**advocate [2]** 168/12 177/18
**AEA [4]** 8/4 8/16 110/9 138/5
**aerial [2]** 89/15 93/3
**affect [1]** 96/16
**affected [9]** 45/22 86/9 88/21 93/12 93/14 114/11 152/1 152/1 208/12
**affecting [1]** 87/20
**affects [1]** 68/19

**A**

**AFFF [21]** 22/6 31/7 31/11 44/6 47/22 49/19 72/21 75/3 75/10 83/18 89/1 89/20 90/4 90/13 90/18 91/1 92/20 114/12 123/19 208/6 208/12
**affirm [2]** 63/14 97/15
**affirmative [1]** 99/7
**afforded [1]** 18/25
**after [17]** 18/5 21/4 37/15 43/4 53/20 55/11 55/18 56/12 56/24 75/9 79/22 85/17 90/13 153/17 164/4 172/9 210/13
**afternoon [3]** 97/13 126/2 126/3
**again [29]** 7/19 27/25 36/22 37/7 41/21 42/22 43/11 48/2 49/20 50/21 50/24 54/16 54/18 58/22 59/4 86/3 92/4 111/1 111/25 116/21 134/9 155/13 156/13 158/16 175/3 193/3 198/18 200/22 211/20
**against [25]** 21/5 21/13 22/5 27/23 30/2 31/20 33/5 35/4 35/15 47/8 47/12 47/14 47/21 47/23 50/22 53/13 54/1 54/7 54/10 69/19 69/20 82/22 208/2 208/22 209/5
**agencies [5]** 46/8 46/12 47/5 69/9 82/12
**agency [1]** 18/24
**agenda [1]** 99/7
**agent [9]** 127/20 129/6 129/13 130/2 134/17 134/21 135/1 135/3 135/17
**aggregate [1]** 129/9
**ago [2]** 67/24 108/11
**agree [33]** 20/19 24/19 24/20 24/24 34/23 60/5 61/1 61/2 61/3 61/6 88/12 115/2 127/22 129/5 138/22 142/6 145/1 146/6 148/13 148/16 152/5 152/6 157/20 168/12 169/17 169/23 175/9 175/9 175/14 176/5 176/17 180/17 194/7
**agreed [18]** 26/11 27/14 27/15 28/21 36/5 37/5 42/7 43/6 60/12 111/12 117/15 164/16 166/3 174/2 174/5 177/15 199/13 200/24
**agreeing [3]** 166/14 197/7 200/4
**agreement [93]** 25/25 27/13 27/13 29/1 32/13 35/8 36/11 37/9 39/6 40/1 40/11 45/18 49/14 96/8 96/14 110/11 111/25 112/11 112/22 113/11 120/25 127/9 128/4 129/25 131/1 131/22 132/9 132/14 134/6 134/7 134/13 134/17 137/14 137/21 138/8 138/21 139/13 140/4 140/6 140/19 141/17 143/7 143/9 146/22 147/12 147/19 150/15 151/9 152/3 155/19 156/13 156/14 158/4 158/5 159/4 159/10 159/12 159/24 160/2 162/5 162/6 162/9 163/1 163/3 163/4 163/9 163/10 163/12 165/3 166/3 166/7 166/11 166/24 168/2 168/21 170/10 178/9 178/11 182/4 182/22 189/22 194/11 194/14 194/16 195/14 196/6 199/21 200/18 200/19 204/22 210/8 211/20 211/21
**agreements [12]** 45/11 46/3 60/11 60/12 120/19 132/13 198/9 200/14 200/15 200/16 210/5 210/8
**agrees [3]** 129/18 151/1 201/6
**agricultural [1]** 66/3
**Ah [1]** 205/4
**ahead [12]** 19/14 25/10 44/2 48/4 63/9 64/18 71/9 75/18 119/20 151/6 197/19 203/16
**aided [1]** 1/24
**air [2]** 91/1 92/17
**airports [12]** 49/8 49/19 89/4 89/5 89/7 89/8 93/5 93/9 114/13 114/21 116/10 117/22
**akin [3]** 31/15 53/1 53/5
**al [4]** 1/3 1/7 6/17 198/15
**ALBERT [3]** 3/13 7/25 126/4
**alert [2]** 96/4 180/14
**alerted [1]** 97/3
**ALEXANDER [2]** 3/17 8/4
**all [186]** 2/19 2/23 2/23 6/4 6/11 6/15 6/17 6/19 7/23 8/10 9/2 9/10 9/18 9/20 10/24 11/12 11/20 15/25 17/14 18/18 19/23 20/19 22/5 31/3 31/23 32/9 33/12 33/25 35/5 38/24 40/21 41/23 41/25 43/21 45/2 46/9 46/12 46/13 47/4 61/11 62/24 63/2 63/4 63/5 63/6 64/18 66/5 66/22 67/9 69/19 71/24 76/14 76/15 80/14 80/18 81/25 83/4 84/2 84/2 85/9 92/2 92/5 93/2 94/17 95/13 98/20 98/21 101/21 103/7 105/1 106/6 109/20 110/3 112/5 114/8 115/12 119/18 120/16 124/16 125/4 125/4 125/14 125/16 125/17 127/9 127/20 127/20 129/4 134/19 137/18 138/18 139/22 139/23 139/25 140/8 140/21 141/12 141/13 142/14 144/3 144/8 146/10 148/6 148/9 148/11 148/12 148/20 151/15 151/16 152/1 152/1 153/17 154/4 154/6 154/15 155/22 155/24 155/25 157/4 160/3 160/6 161/14 162/1 164/16 165/1 166/4 166/8 166/10 166/21 167/5 167/14 168/6 168/7 168/10 168/12 169/16 171/22 174/3 174/3 175/5 175/5 175/9 175/10 176/1 176/14 176/15 177/19 180/17 180/21 183/12 184/18 185/21 187/23 189/3 189/9 189/13 189/14 191/14 191/22 194/18 197/1 197/19 197/22 198/18 200/14 201/18 204/18 204/20 206/3 206/7 206/9 206/11 206/12 207/22 209/1 209/19 209/20 210/14 210/15 210/25 212/1 212/2 212/4 212/5 212/7 212/15
**alleges [1]** 24/12
**allocable [1]** 185/8
**allocate [9]** 18/14 52/15 55/8 56/1 59/16 124/25 154/15 155/13 162/10
**allocated [18]** 51/2 58/17 111/6 127/7 135/25 138/13 138/19 139/6 139/19 140/1 141/2 141/24 155/22 157/8 158/19 158/24 159/1 163/19
**allocates [1]** 208/3
**allocating [2]** 200/1 208/13
**allocation [16]** 38/8 50/7 52/19 52/20 57/14 58/20 116/7 131/25 140/10 140/11 141/1 141/17 145/15 161/20 179/4 207/1
**allocations [5]** 51/14 153/8 166/14 189/19 211/1
**allotments [1]** 132/24
**allow [9]** 28/1 30/21 32/15 123/13 163/23 171/6 176/25 181/7 191/9
**allowed [3]** 190/22 191/1 198/5
**allows [3]** 13/17 32/17 145/14
**almost [3]** 38/7 51/19 59/9
**Alone [1]** 29/14
**along [5]** 81/20 83/13 91/20 108/25 186/4
**already [11]** 23/19 77/5 80/1 80/24 82/16 83/24 113/25 131/25 132/2 172/7 180/16
**also [78]** 4/1 8/9 9/1 13/17 18/8 18/12 19/6 21/13 30/18 31/2 31/17 32/7 32/17 34/20 35/10 38/1 40/23 41/15 41/16 41/21 42/17 43/3 43/6 43/16 44/7 45/4 45/24 46/19 47/11 47/25 48/5 48/14 48/25 49/7 50/8 57/8 62/7 62/10 65/9 69/13 70/5 73/9 76/2 76/12 77/11 78/8 80/13 80/20 81/19 83/21 83/21 84/10 85/11 89/15 90/7 90/21 98/21 99/9 100/11 101/7 101/10 105/17 107/3 109/7 110/14 112/5 114/23 117/7 120/16 121/13 146/16 148/3 152/19 155/21 158/17 185/11 188/19 201/13
**alter [6]** 39/19 113/21 118/11 118/12 145/15 204/21
**alteration [1]** 192/5
**altered [4]** 112/11 112/22 205/16 205/18
**alternative [1]** 81/7
**alters [1]** 11/3
**although [3]** 100/17 101/10 108/8
**always [6]** 34/13 42/1 42/1 42/2 177/14 185/2
**am [8]** 7/9 12/5 14/20 15/15 99/3 99/18 131/14 182/25
**ambulance [1]** 171/25
**amended [1]** 201/20
**amendment [21]** 12/22 12/23 13/2 13/5 13/7 13/9 13/10 113/5 113/11 113/19 150/22 167/16 173/15 174/15 181/6 207/24 211/4 211/5 211/8 211/18
**America [1]** 210/15
**Americas [1]** 3/7
**amicable [1]** 173/4
**Amici [1]** 3/21
**amicus [1]** 206/3
**among [8]** 47/5 77/22 128/4 141/2 145/7 156/9 156/22 188/21
**amongst [4]** 141/11 163/17 177/4 178/9
**amount [12]** 111/14 129/9 145/15 146/25 147/1 147/8 157/15 166/4 197/1 197/12 208/4 208/7
**amounts [7]** 129/7 157/8 157/20 159/6 159/8 159/11 159/23
**analogy [4]** 165/18 166/8 166/9 193/9
**analysis [22]** 20/1 30/17 50/5 51/15 52/12 52/18 54/6 54/12 55/6 100/18 144/2 185/23 186/5 187/1 187/13 187/19 188/6 188/8 188/18 192/17 210/6 211/9
**analyzed [1]** 175/10
**ancillary [1]** 198/17
**ANDREW [2]** 3/7 7/19
**ANN [3]** 2/21 7/10 60/24
**Ann Marie [1]** 60/24
**announced [4]** 22/4 31/19 96/8 102/9
**announcement [2]** 106/22 106/24
**annual [2]** 154/2 201/22
**another [23]** 33/21 41/21 42/14 42/22 43/7 44/10 46/3 49/18 58/9 62/7 86/4 89/24 91/1 96/22 108/19 111/9 141/4 142/8 148/21 158/20 161/6 164/22 196/16
**answer [24]** 54/25 55/22 56/9 56/10 60/19 70/4 113/16 130/20 131/3 131/4 131/21 137/12 137/12 137/14 137/20 141/13 142/16 143/5 148/25 149/8 149/10 164/11 190/12 192/12
**answered [1]** 205/4
**answering [3]** 79/19 79/21 189/5
**answers [1]** 158/11
**ANTHONY [2]** 3/23 9/1
**anticipated [3]** 74/14 184/10 185/6
**any [69]** 9/8 9/11 9/11 9/25 10/1 10/3 11/14 11/15 13/20 15/19 21/12 21/21 26/17 27/12 29/11 36/1 39/19 39/19 41/2 42/18 51/9 60/13 61/7 65/10 73/16 75/5 75/17 92/16 94/23 95/24 100/3 100/15 100/20 101/13 106/18 106/21 111/19 113/21 115/10 115/11 118/1 118/12 119/24 120/1 120/12 125/22 131/24 138/6 140/11 147/15 150/12 150/13 153/3 169/24 170/14 170/15 171/4 181/4 182/5 183/13 183/20 185/20 192/24 193/1 197/2 198/6 201/4 205/7 206/14
**anybody [5]** 9/16 92/15 154/21 197/2 202/24
**anymore [1]** 85/19
**anyone [7]** 9/20 147/15 148/14 173/11 177/25 200/12 206/19
**anything [18]** 34/24 38/10 57/15 61/5 116/3 131/13 134/6 138/22 138/25 142/14 168/14 172/25 173/24 186/10 193/16 203/8 204/12 204/12
**anyway [1]** 42/1
**anywhere [2]** 146/18 162/19
**APA [4]** 192/7 192/12 192/15 192/23
**apart [1]** 203/21
**apologies [1]** 122/21
**apparently [1]** 163/8
**appeal [6]** 25/17 129/14 129/14 131/5 131/6 131/12
**appear [1]** 70/7
**appearance [2]** 8/11 9/21
**appearances [3]** 2/25 6/14 7/24
**appearing [1]** 8/25
**appellate [3]** 131/7 134/18 135/4
**apple [1]** 195/23
**apples [2]** 134/8 172/11
**apples-oranges [1]** 172/11
**applicable [4]** 13/13 38/24 38/25 39/21
**application [10]** 18/11 123/13 124/22 138/3 138/14 138/16 154/2 161/1 179/15 198/3
**applications [3]** 154/5 198/9 200/25
**applied [2]** 68/9 68/10
**applies [1]** 171/13
**apply [10]** 86/22 88/4 89/11 90/17 123/14 145/5 156/7 170/16 192/7 192/13
**appoint [1]** 168/7
**apportionment [3]** 53/11 53/16 53/19
**appreciate [1]** 212/2
**appreciated [1]** 163/16
**appreciative [1]** 34/17
**approach [9]** 73/6 74/1 74/6 74/11 74/22 95/18 108/14 119/5 154/24
**approached [7]** 17/19 48/2 119/7 126/17 127/13 134/3 155/1
**appropriate [12]** 36/8 41/3 57/22 60/7 74/22 93/18 94/3 104/11 177/24 178/1 201/17 201/22
**appropriated [1]** 120/17
**appropriation [2]** 168/22 203/22
**appropriations [4]** 138/1 168/22 201/23 201/24
**approval [11]** 10/7 10/18 100/24 101/2 101/8 101/9 101/11 156/18 164/17 190/7 195/15
**approvals [1]** 117/10
**approve [13]** 16/12 24/5 122/11 138/15 156/13 156/14 162/6 186/12 186/18 186/20 194/7 194/8 210/5
**approved [14]** 52/4 52/6 101/6 121/20 131/18 135/4 135/5 164/12 166/12 181/9

**A**

**approved... [4]** 194/4 194/15 194/16 210/21
**approves [1]** 131/6
**approving [1]** 195/13
**approximately [10]** 27/1 49/9 59/10 88/17 88/18 185/14 186/25 187/4 188/11 188/23
**April [3]** 23/2 23/4 208/21
**April 1 [1]** 23/2
**April 2025 [1]** 208/21
**Arabia [1]** 69/22
**arbiter [3]** 38/11 38/18 39/8
**arbitrary [2]** 53/9 143/16
**are [240]**
**area [4]** 49/17 91/20 115/21 208/11
**areas [3]** 83/8 93/4 154/15
**aren't [4]** 59/4 76/4 80/3 149/18
**arguably [1]** 55/7
**argue [1]** 112/17
**argued [2]** 21/12 193/9
**argument [27]** 11/24 16/25 17/6 48/4 112/16 112/19 133/7 136/24 143/8 161/5 161/8 171/13 172/12 177/18 177/20 178/22 189/18 190/4 190/6 191/8 191/17 193/17 194/3 201/5 201/7 207/5 210/20
**argumentative [1]** 180/20
**arguments [13]** 11/15 11/18 13/24 21/20 21/24 34/22 35/3 35/10 35/14 65/11 177/22 197/2 210/25
**Arkema [3]** 47/8 47/22 58/3
**around [16]** 21/23 26/21 31/5 46/16 47/16 50/15 71/10 77/24 84/17 90/16 92/11 99/21 188/2 191/15 198/8 209/7
**arrangement [2]** 27/7 27/20
**arrangements [2]** 118/6 120/24
**Article [2]** 41/10 41/18
**articulated [2]** 177/16 186/13
**ascertaining [1]** 94/4
**aside [2]** 151/11 202/3
**ask [24]** 54/23 73/6 74/8 75/20 76/7 80/5 80/11 96/19 112/6 113/12 113/15 117/1 118/9 119/18 121/3 124/10 156/12 159/3 159/4 180/9 181/10 189/13 194/25 209/20
**asked [28]** 12/22 13/1 16/12 16/13 61/15 68/13 73/22 75/1 75/1 75/4 75/10 79/6 79/8 79/18 81/6 81/7 92/15 121/19 142/20 162/6 177/11 186/1 189/25 203/17 203/20 205/22 209/21 209/24
**asking [10]** 24/17 55/17 73/6 80/25 93/21 131/23 159/5 196/9 196/10 196/17
**aspect [1]** 112/19
**aspects [2]** 102/6 103/17
**asserted [3]** 33/4 106/18 208/2
**assess [1]** 54/9
**assessed [1]** 187/16
**assessment [7]** 34/24 58/16 66/12 166/2 170/12 175/14 176/19
**assets [3]** 33/17 33/25 34/4
**assigned [1]** 74/5
**assist [9]** 26/6 30/10 64/22 71/22 73/22 106/21 108/23 116/8 133/24
**assistance [5]** 99/10 99/10 115/20 124/19 167/8
**assistant [1]** 124/4
**assisted [1]** 104/21
**assisting [2]** 115/13 115/17
**associate [3]** 67/15 67/18 67/19
**associated [13]** 28/19 31/20 33/21 58/23 69/21 78/8 82/8 87/12 89/19 92/10 94/7 99/22 186/7
**Association [2]** 3/18 110/7
**assuage [1]** 164/25
**assume [11]** 55/18 56/2 84/9 98/13 99/12 104/15 140/6 148/5 182/20 194/7 202/20
**assumed [1]** 99/24
**assuming [4]** 57/19 192/5 195/6 195/11
**assumption [1]** 89/9
**assumptions [1]** 85/6
**assurance [2]** 40/15 152/9
**assured [1]** 152/4
**attached [2]** 153/15 154/9
**attachment [1]** 128/9
**attempted [2]** 74/16 90/22
**attempts [2]** 73/17 90/7
**attention [2]** 96/15 128/14
**attorney [16]** 1/15 1/15 1/20 2/5 2/8 2/12 2/15 6/21 98/24 99/2 100/9 101/7 101/9 113/8 126/4 186/3
**attorney-client [1]** 186/3
**attorneys [1]** 160/15
**attorneys' [8]** 138/2 138/3 138/14 139/24 141/5 143/11 160/3 160/13
**attributed [1]** 185/3
**audit [4]** 116/25 117/1 117/2 117/5
**auditor [1]** 165/3
**Australia [2]** 31/18 31/21
**authorities [3]** 3/18 89/6 110/8
**authority [26]** 3/19 3/19 3/19 3/20 3/20 3/20 8/5 8/5 8/6 8/13 8/18 8/18 8/19 8/20 8/20 8/21 8/22 13/4 55/5 82/13 127/20 167/22 168/22 201/8 201/11 201/22
**available [20]** 47/4 53/12 56/12 70/2 72/6 75/24 76/14 77/17 79/9 86/14 94/9 94/10 95/3 117/20 123/4 124/22 124/23 125/3 129/6 183/9
**Avenue [3]** 3/7 3/10 3/23
**average [1]** 91/25
**avoid [1]** 172/2
**avoided [1]** 46/12
**award [1]** 151/4
**aware [7]** 14/20 73/21 101/12 179/15 179/17 193/21 194/20
**awareness [1]** 96/18
**away [8]** 12/10 64/6 78/21 84/23 85/1 87/5 144/15 209/13

**B**

**B-4 [3]** 128/7 128/8 128/20
**bachelor's [1]** 68/2
**back [40]** 15/25 24/10 25/2 27/8 29/10 35/17 36/24 38/19 40/6 40/17 41/19 42/2 60/13 67/21 74/25 86/17 90/13 99/23 101/24 107/8 109/5 121/9 122/19 125/10 125/13 154/14 155/6 168/8 185/4 189/17 191/19 198/10 198/14 200/18 200/23 201/2 203/1 204/22 206/8 207/19
**background [3]** 65/4 68/1 123/5
**backing [1]** 44/24
**backstop [3]** 150/5 150/11 203/23
**backwards [1]** 182/18
**bag [2]** 148/24 152/25
**Bailey [1]** 4/6
**balance [2]** 148/25 165/10
**BALLARD [2]** 3/2 7/14
**ballpark [1]** 70/10
**bank [17]** 3/24 102/15 102/16 102/17 102/18 102/23 103/4 103/5 111/2 111/4 111/7 111/10 123/8 133/19 141/4 157/21 180/23
**bankruptcy [2]** 34/3 43/13
**bar [1]** 52/1
**bargained [1]** 202/9
**Barr [4]** 79/3 79/6 79/22 79/24
**barred [3]** 12/8 15/10 182/5
**bars [1]** 11/25
**base [4]** 70/24 71/1 91/1 92/17
**based [22]** 15/9 37/17 45/5 58/12 58/15 70/8 70/9 72/10 72/10 74/11 74/22 75/23 77/25 88/14 111/14 127/7 130/11 163/8 185/5 187/5 189/1 203/11
**BASF [1]** 47/23
**basic [1]** 51/4
**basically [15]** 13/10 26/13 26/16 41/9 51/1 52/12 52/15 56/18 58/20 83/8 89/5 147/7 185/8 186/5 211/9
**basis [6]** 10/22 18/21 34/22 94/11 192/23 193/2
**battle [4]** 20/19 30/2 43/4 44/11
**beaches [1]** 68/19
**became [5]** 34/1 67/18 67/19 67/20 99/20
**because [108]** 9/12 9/13 10/17 11/4 12/13 13/10 14/4 19/1 21/8 21/10 21/13 23/8 24/17 26/8 26/14 26/24 32/12 32/13 37/12 43/14 43/17 47/17 50/8 50/18 51/20 52/8 53/12 53/24 54/7 54/17 56/11 56/25 57/14 60/16 62/20 76/21 82/21 84/12 84/22 87/7 87/7 87/20 93/5 108/6 112/10 113/20 113/21 126/7 130/12 132/18 132/20 134/5 134/12 136/21 141/16 142/3 143/15 144/8 145/11 149/11 149/15 149/20 149/22 152/21 153/21 159/13 160/23 162/20 163/7 164/21 166/14 167/15 168/1 168/5 168/18 168/23 169/2 170/12 171/19 175/17 180/15 180/24 181/4 181/11 182/22 185/19 190/14 190/16 190/22 191/4 191/10 191/12 194/15 194/15 194/19 195/19 196/2 197/16 197/17 199/10 200/8 200/23 204/13 205/10 205/15 208/4 209/7 209/14
**become [4]** 67/23 84/23 99/19 100/1
**becomes [1]** 149/3
**bed [2]** 196/7 197/9
**been [58]** 9/12 15/14 15/24 31/6 34/13 35/8 38/12 44/13 45/22 48/23 49/19 49/21 49/21 52/4 54/13 61/22 63/19 66/7 68/13 71/10 71/24 72/5 72/7 72/22 73/16 74/24 79/10 80/8 82/16 82/17 90/2 90/7 90/22 91/4 91/4 91/7 91/7 97/20 112/22 119/25 121/21 151/3 158/24 162/7 180/16 182/2 184/22 189/16 193/1 195/1 195/5 195/8 197/24 199/16 204/4 205/7 210/14 212/3
**beer [1]** 80/10
**before [29]** 6/1 13/23 14/24 22/3 22/3 23/8 31/19 35/17 57/14 59/23 61/18 62/9 63/15 80/12 97/16 108/5 138/4 164/14 164/15 170/21 170/22 172/14 199/11 201/10 203/25 204/22 207/5 208/24 210/19
**began [4]** 22/12 22/19 24/13 100/5
**begin [2]** 9/23 71/19
**beginning [3]** 22/14 33/12 99/13
**begins [1]** 129/24
**behalf [10]** 3/14 3/18 3/24 7/10 7/14 8/4 8/25 163/14 163/15 201/12
**behavioral [1]** 67/6
**behind [3]** 38/1 41/15 44/25
**behoove [1]** 16/14
**being [31]** 10/14 10/15 14/12 16/12 16/13 37/18 41/17 48/11 67/21 69/3 81/6 83/12 85/1 117/6 133/3 140/20 142/16 162/6 163/16 167/23 168/23 169/1 171/14 174/16 177/11 178/2 186/2 188/11 191/2 205/10 205/11
**belief [1]** 84/22
**believe [18]** 10/5 23/4 24/13 25/2 27/16 40/18 62/15 74/22 87/19 87/20 87/22 94/3 126/23 136/6 167/4 195/18 207/17 210/6
**believed [1]** 93/11
**believes [1]** 157/22
**below [3]** 128/18 130/4 130/5
**bench [1]** 35/17
**beneficial [5]** 78/19 84/12 84/13 84/14 85/10
**beneficiary [1]** 191/20
**benefit [10]** 44/15 46/20 144/7 151/25 165/7 181/8 191/9 198/16 200/9 205/18
**benefits [7]** 20/6 46/11 66/8 66/9 66/11 68/11 68/14
**Bergen [1]** 190/20
**besides [1]** 66/25
**best [15]** 9/23 18/20 70/2 89/18 94/9 94/10 137/19 149/13 152/13 168/9 173/6 173/9 173/22 174/1 185/4
**better [7]** 15/14 73/5 88/7 131/2 144/5 144/6 144/11
**betterment [1]** 146/3
**between [49]** 10/3 19/10 25/14 25/18 25/24 27/11 35/7 38/9 38/18 43/19 45/8 45/25 51/2 51/14 52/5 52/15 52/19 53/3 53/11 56/1 56/1 68/23 102/16 111/3 115/24 123/16 132/1 138/19 140/10 141/5 142/12 146/14 148/9 155/13 155/22 159/14 163/9 169/17 170/21 172/1 185/23 190/14 190/15 193/4 193/11 196/6 200/11 204/9 208/13
**beyond [1]** 194/23
**bid [1]** 172/10
**bidders [1]** 175/16
**bidding [9]** 172/9 172/16 172/20 173/22 174/24 175/17 175/21 176/7 176/8
**bids [1]** 173/22
**big [3]** 30/17 93/4 180/24
**Bill [1]** 6/22
**billion [25]** 25/25 26/10 26/24 27/1 27/4 31/20 35/25 37/5 45/17 48/9 48/10 49/6 58/20 59/9 86/24 88/17 101/23 184/1 184/5 185/14 185/15 185/16 186/6 186/25 187/10
**bind [1]** 174/18
**binder [5]** 94/23 95/5 95/10 95/12 154/23
**biological [1]** 67/5
**biologists [2]** 66/4 67/4
**biosolid [1]** 78/14
**biosolids [13]** 49/5 75/8 78/13 78/15 78/17 78/18 79/12 84/11 85/8 85/9 86/2 86/3 87/18
**birthday [1]** 210/15
**bit [19]** 21/6 26/19 29/21 52/9 52/11 53/7 81/11 82/20 85/13 114/9 134/7 135/18 140/23 152/8 178/14 182/18 189/20 192/3 195/3
**bite [1]** 195/23
**black [1]** 152/9
**blank [1]** 130/9
**blessing [1]** 18/15
**BLOCK [2]** 3/9 7/21
**blocks [1]** 141/7
**blow [1]** 123/21
**blown [2]** 119/25 181/3
**blue [1]** 85/6
**board [3]** 152/14 153/10 157/3
**Bob [4]** 18/7 63/9 64/10 109/7
**body [2]** 48/21 128/21
**bogged [1]** 16/24
**bombarded [1]** 173/2
**bore [1]** 208/24
**borne [1]** 42/19
**Borough [3]** 3/15 8/1 126/5

## B

**both [35]** 13/7 15/2 20/15 20/24 27/4 30/7 32/16 33/3 33/4 34/7 43/14 45/3 52/10 66/7 66/8 71/25 77/20 78/11 79/11 79/16 81/20 88/25 100/25 101/6 101/8 102/19 102/21 104/16 104/22 106/11 117/23 123/10 153/12 193/2 205/20
**bother [3]** 53/17 194/15 194/16
**bothered [1]** 194/17
**bottled [1]** 31/11
**bottom [3]** 91/20 108/7 119/24
**Boulevard [1]** 1/19
**bounce [1]** 36/24
**bound [3]** 13/11 170/8 174/6
**bounds [1]** 92/11
**box [3]** 1/16 86/5 205/25
**boxes [4]** 20/4 85/5 85/6 85/6
**bracket [1]** 74/7
**brackets [1]** 74/7
**BRAD [2]** 3/16 8/8
**Branch [1]** 201/14
**Branches [1]** 201/9
**brand [1]** 190/2
**breach [1]** 202/19
**breached [1]** 202/25
**breaches [1]** 172/7
**bread [1]** 76/19
**break [14]** 21/1 35/16 62/24 78/23 96/15 118/24 125/10 125/11 191/19 191/20 199/10 201/4 204/18 206/7
**breakdown [1]** 127/7
**breaking [1]** 125/9
**breaks [3]** 68/22 85/4 200/3
**BRIANA [3]** 2/9 6/25 137/24
**Bridge [1]** 3/23
**brief [4]** 18/17 24/4 182/23 207/14
**briefed [1]** 101/11
**briefing [5]** 18/18 53/1 100/10 132/2 202/5
**briefly [7]** 102/14 110/24 115/15 120/11 122/24 203/9 207/22
**briefs [2]** 206/3 207/6
**bring [8]** 50/22 51/23 54/17 67/9 96/15 101/4 202/12 207/25
**bringing [1]** 69/12
**broad [3]** 154/13 197/11 197/15
**broadly [3]** 18/22 50/1 66/6
**broke [1]** 48/10
**broken [3]** 42/9 133/18 185/16
**Brook [2]** 3/20 8/21
**brought [10]** 21/7 21/13 22/4 28/12 47/7 47/14 47/21 69/20 173/5 209/4
**bucket [9]** 124/24 143/10 143/12 143/13 143/13 143/14 143/14 144/1 149/5
**buckets [1]** 143/24
**bucks [2]** 84/8 85/21
**budget [8]** 119/13 120/6 120/23 164/20 167/18 170/13 172/18 204/5
**build [6]** 66/24 70/5 76/22 121/16 124/21 154/3
**building [2]** 1/9 123/12
**buildings [1]** 28/18
**built [2]** 27/19 153/20
**bullet [1]** 83/15
**BUMB [2]** 1/12 6/2
**bunch [1]** 205/25
**bundle [1]** 143/2
**bundled [1]** 137/3
**burden [1]** 90/11
**business [3]** 22/18 28/24 32/18
**butter [1]** 76/19
**buy [2]** 74/20 87/21
**buying [1]** 81/16
**bypassing [1]** 168/23

## C

**C-A-H-A-L-L [1]** 97/24
**Cahall [26]** 18/12 97/11 97/19 97/24 98/7 105/11 105/13 105/15 105/25 106/5 106/7 106/8 110/22 115/24 119/12 122/15 122/17 122/18 125/19 126/2 126/21 127/16 131/24 135/23 154/20 162/18
**Cahall's [1]** 182/6
**Cahall-1 [3]** 105/11 105/13 105/15
**Cahall-2 [3]** 106/5 106/7 106/8
**Cahall-3 [4]** 122/15 122/17 122/18 154/20
**calculate [4]** 70/6 73/17 82/1 86/16
**calculated [4]** 74/14 93/8 94/2 187/9
**calculating [1]** 59/5
**calculation [6]** 52/5 53/19 53/22 57/12 86/17 198/20
**calculations [4]** 71/2 71/4 86/13 187/2
**calculus [2]** 53/10 59/8
**CALICA [4]** 3/7 7/19 23/10 60/9
**call [8]** 6/15 16/3 63/9 97/11 105/8 105/11 175/15 206/19
**called [6]** 33/20 63/18 80/7 97/19 116/13 165/12
**Cambridge [1]** 65/18
**Camden [1]** 1/10
**came [11]** 34/22 35/17 50/25 56/15 85/15 85/20 132/19 177/9 184/5 185/25 197/25
**can [147]** 10/12 10/21 11/9 11/20 12/21 15/14 18/7 20/19 23/17 24/23 25/5 29/4 30/12 30/12 36/13 36/15 40/6 42/1 45/6 48/5 49/10 50/14 50/15 51/12 51/22 52/3 52/14 52/18 55/5 55/20 55/23 57/7 59/17 59/19 59/19 60/8 60/22 61/17 61/25 62/21 63/6 64/5 64/7 64/9 64/14 64/15 65/16 66/25 70/19 71/21 73/15 79/13 80/21 81/10 82/24 83/16 85/2 86/22 89/23 90/12 90/13 90/16 91/19 93/20 93/23 95/11 95/11 95/19 96/1 98/1 101/18 102/14 103/10 103/21 110/24 111/21 113/1 113/16 115/14 117/18 119/15 120/8 121/15 122/19 122/25 125/17 125/19 127/10 129/15 130/18 130/22 137/12 140/18 141/14 143/17 143/17 144/25 146/15 146/16 148/7 148/8 149/8 149/20 155/19 157/14 157/20 159/3 160/3 160/4 161/15 163/25 164/1 169/15 170/11 171/1 172/19 173/6 173/16 179/11 179/22 181/7 181/10 181/19 181/20 182/1 182/2 182/8 183/25 187/6 189/3 190/1 190/13 193/20 198/4 198/7 198/7 201/20 202/1 202/20 203/18 203/18 203/19 206/12 207/25 210/2 210/7 210/11
**can't [24]** 10/10 12/9 13/6 13/7 23/16 34/23 55/17 57/23 87/7 130/11 137/12 145/12 148/24 150/12 161/2 171/25 174/6 194/4 194/6 194/6 194/7 201/2 201/4 207/16
**cancers [1]** 48/22
**candid [1]** 205/21
**cannot [10]** 38/2 38/3 38/6 55/15 55/16 56/5 60/20 146/10 146/19 156/17
**Cape [1]** 3/25
**capita [2]** 74/3 74/4
**capital [2]** 110/12 123/9
**capped [1]** 36/4
**capricious [1]** 143/17
**captioned [1]** 127/18
**capturing [1]** 84/24
**car [1]** 89/17
**carbon [1]** 30/13
**care [3]** 16/22 152/2 168/18
**career [1]** 67/16
**careful [1]** 65/9
**cares [1]** 194/22
**CARNEY [3]** 3/16 8/8 8/15
**Carneys [40]** 3/14 8/1 12/4 15/16 27/17 97/4 126/4 126/13 126/15 127/10 127/11 133/25 134/1 135/24 145/18 145/20 151/21 151/22 151/23 152/3 152/7 152/10 152/15 182/16 189/9 190/21 190/25 191/15 196/2 196/9 196/10 199/5 199/9 201/7 201/19 202/14 202/17 202/20 205/18 207/18
**Carolina [1]** 96/13
**carpeting [2]** 83/5 109/10
**cart [2]** 164/15 194/5
**carve [2]** 206/24 207/2
**carve-out [2]** 206/24 207/2
**case [55]** 6/15 6/16 12/6 12/7 14/5 14/8 19/2 19/7 19/22 19/25 20/7 20/17 20/19 21/3 21/5 23/15 27/15 27/20 27/21 30/4 31/15 32/2 32/5 32/8 32/23 32/24 34/9 35/15 43/2 43/3 44/1 51/12 51/13 52/8 52/25 62/5 62/15 67/4 70/11 71/4 71/5 72/11 72/19 75/21 76/1 92/3 101/6 101/8 103/7 103/24 150/6 190/21 205/9 209/11 211/1
**cases [10]** 6/18 31/6 34/19 35/18 51/12 52/19 72/2 94/9 201/12 206/25
**cash [8]** 25/13 26/20 27/5 35/24 42/7 42/16 137/3 137/8
**CASTELLO [7]** 2/6 6/24 18/10 97/1 97/9 118/21 125/20
**categories [8]** 42/9 78/4 123/6 136/1 137/6 137/7 142/4 209/1
**category [4]** 123/11 123/15 142/8 194/22
**cattle [2]** 84/19 87/15
**caught [1]** 91/24
**cause [1]** 28/3
**caused [1]** 59/11
**causes [5]** 31/5 47/3 52/13 53/25 53/25
**caveat [1]** 156/20
**Cedar [2]** 3/17 3/18
**celebration [1]** 210/15
**census [2]** 85/11 187/5
**Center [3]** 2/4 2/17 3/13
**cents [3]** 50/15 51/22 189/2
**century [1]** 33/3
**CERCLA [18]** 19/6 19/19 20/14 21/11 28/14 46/17 47/19 50/4 50/9 51/12 51/16 51/20 52/16 52/18 52/22 54/16 55/15 56/21
**CERCLA-liable [2]** 21/11 28/14
**certain [12]** 83/2 86/9 108/23 109/8 114/12 117/9 128/4 132/24 138/4 163/10 166/15 179/22
**certainly [4]** 112/18 205/7 205/8 205/9
**CERTIFICATE [1]** 212/17
**certification [5]** 62/4 62/8 62/15 179/18 179/20
**certify [1]** 212/19
**cetera [2]** 66/13 158/10
**chain [4]** 22/19 79/17 80/14 87/21
**challenge [2]** 84/10 195/20
**challenges [1]** 21/23
**Chambers [44]** 21/3 21/9 22/6 22/13 22/16 23/25 28/13 31/15 32/23 33/1 33/2 37/13 38/4 45/20 52/9 62/5 62/10 96/13 139/21 141/2 145/19 150/7 151/4 152/6 156/22 158/5 158/20 158/24 159/1 159/7 161/13 161/22 188/2 188/21 188/25 191/12 191/19 191/19 208/4 208/4 208/17 208/24 209/6 209/17
**Chambers Works [6]** 21/9 33/2 158/20 159/7 161/22 191/12
**change [14]** 12/17 66/11 68/12 76/9 78/22 114/2 192/13 192/16 193/1 193/3 193/18 193/21 193/23 202/1
**changed [5]** 12/13 33/24 192/2 192/3 196/12
**changes [4]** 11/4 41/14 68/18 199/4
**characteristics [1]** 115/9
**characterization [1]** 61/2
**characterizations [1]** 61/7
**characterize [1]** 168/3
**charge [1]** 177/2
**charged [1]** 18/24
**Charles [1]** 53/2
**chart [3]** 71/17 134/11 137/11
**check [2]** 165/10 188/5
**checked [1]** 20/3
**Chemguard [1]** 47/23
**chemical [3]** 89/3 90/17 90/18
**chemicals [7]** 44/9 47/24 48/21 82/22 99/19 99/20 99/22
**chemistry [8]** 48/20 50/10 50/23 56/25 72/11 73/5 78/14 85/15
**chemists [1]** 66/4
**Chemours [13]** 2/18 2/19 2/22 2/23 7/8 7/9 33/14 38/2 42/21 96/9 96/10 96/11 209/5
**Chemours' [2]** 34/2 44/6
**chicken [1]** 194/9
**chief [15]** 1/13 6/2 98/11 98/12 98/13 98/15 99/4 99/6 99/12 99/14 99/14 99/25 100/5 100/6 113/4
**choice [1]** 76/15
**choices [3]** 76/14 76/15 88/7
**choose [1]** 56/22
**chose [1]** 26/2
**Christiansted [1]** 2/11
**Christie [1]** 211/3
**circles [1]** 147/11
**citation [1]** 61/16
**cite [5]** 51/12 52/3 187/2 188/13 210/1
**cited [2]** 53/1 146/1
**citizens [6]** 30/16 34/12 39/12 45/22 101/17 144/7
**CIVIL [1]** 1/3
**claim [14]** 2/23 27/19 28/3 47/14 51/25 51/25 55/25 67/9 70/12 180/3 180/3 180/4 180/19 181/8
**claimed [1]** 70/3
**claims [70]** 2/19 2/23 3/4 3/5 7/16 21/5 21/13 22/4 22/5 22/6 27/16 31/5 31/8 31/9 31/9 31/10 31/14 31/14 31/17 31/19 33/5 33/7 33/8 33/15 33/21 34/2 35/4 44/7 46/4 46/4 46/5 47/3 47/5 47/7 47/10 47/11 47/21 47/23 50/16 50/22 51/20 51/24 52/14 52/16 53/13 54/7 54/18 54/18 57/5 69/12 69/19 69/20 70/5 70/11 146/12 177/11 179/16 179/22 180/13 180/15 180/18 181/19 182/1 182/5 190/2 201/19 207/25 207/25 208/2 208/3
**clarification [3]** 10/16 87/2 113/23
**clarified [1]** 199/9
**clarify [1]** 182/13
**clarity [12]** 114/3 118/18 131/17 132/20 133/8 134/4 136/21 149/17 149/20 173/5 195/16 199/17
**class [2]** 25/23 27/2
**clause [3]** 28/11 170/5 177/1
**clean [8]** 34/10 36/6 41/11 43/15 49/13 82/12 102/19 123/10
**cleaned [6]** 42/5 44/14 50/13 185/20 185/24 200/17
**cleanup [4]** 36/23 50/22

C

**cleanup... [2]** 58/10 200/19
**clear [17]** 13/11 13/20 13/25 16/5 34/7 42/4 48/11 65/8 140/10 146/25 151/13 156/15 157/22 183/10 184/5 186/8 204/2
**cleared [1]** 195/9
**clearly [1]** 154/12
**clerk [3]** 4/6 9/13 95/19
**client [2]** 70/3 186/3
**clients [5]** 67/22 69/7 69/8 77/22 212/2
**cloaked [1]** 178/22
**close [1]** 70/16
**closed [1]** 206/13
**closely [5]** 100/11 100/23 109/25 113/7 115/16
**closure [1]** 44/11
**co [2]** 18/10 60/16
**co-counsel [2]** 18/10 60/16
**Code [1]** 193/7
**cognizant [1]** 65/9
**Cohen [1]** 1/9
**collaborated [1]** 115/16
**collaborative [1]** 107/1
**colleague [2]** 7/20 9/1
**collect [1]** 90/19
**collecting [1]** 130/13
**collection [2]** 77/25 90/19
**collectively [5]** 3/21 43/15 45/15 110/9 178/10
**colloquy [1]** 60/6
**column [3]** 54/2 54/2 57/23
**come [29]** 11/20 26/13 35/18 37/12 38/6 40/6 40/17 41/22 85/15 101/24 108/25 125/10 125/24 136/13 153/10 154/5 174/19 185/9 186/14 190/12 190/22 198/9 200/18 202/17 202/21 203/18 203/19 203/25 204/22
**comes [7]** 11/5 19/21 38/19 83/3 174/20 192/13 197/2
**comfortable [1]** 64/1
**coming [11]** 30/10 40/12 43/2 47/10 60/13 82/6 143/9 163/18 178/19 178/20 179/1
**commenced [1]** 118/1
**Commencing [1]** 1/11
**comment [20]** 12/18 60/21 102/12 103/19 103/25 104/9 104/13 104/14 104/18 112/4 112/10 114/1 192/20 196/11 196/14 196/14 196/20 197/24 198/15 200/20
**comments [15]** 11/13 104/4 104/7 104/16 104/21 104/24 104/24 105/2 105/3 105/18 106/11 106/14 196/13 196/25 197/25
**commerce [1]** 82/18
**commercial [7]** 81/15 81/20 82/4 82/7 84/15 89/5 89/8
**Commission [1]** 69/18
**commissioner [43]** 18/13 98/20 99/15 99/15 99/17 100/10 100/22 101/5 101/5 124/4 132/3 138/6 138/25 140/14 140/21 142/18 143/9 143/12 147/12 148/2 148/6 148/7 149/5 149/12 150/8 151/10 151/17 151/24 155/19 156/24 157/13 158/8 165/2 167/19 168/8 168/14 169/14 169/18 174/7 174/25 176/5 184/16 197/18
**Commissioner's [3]** 150/21 152/12 158/12
**commitments [1]** 138/4
**committed [1]** 102/7
**common [4]** 21/8 33/6 193/19 193/23
**common-sense [1]** 193/19
**communicate [1]** 168/13
**communications [2]** 34/8 186/4
**communities [2]** 86/10 143/1
**community [4]** 72/15 75/20 76/1 209/12
**companies [8]** 33/18 33/19 37/1 38/2 39/10 43/18 43/23 58/20
**companies' [1]** 34/2
**companion [1]** 62/9
**company [20]** 1/7 2/18 2/19 2/22 2/23 3/8 3/11 6/17 7/8 7/9 7/20 24/4 33/14 33/20 33/25 44/22 44/22 44/22 76/19 173/22
**compared [2]** 20/11 70/11
**comparison [1]** 192/14
**compensation [2]** 46/21 69/18
**compensatory [1]** 188/23
**competitive [9]** 172/9 172/16 172/20 173/22 174/24 175/17 175/21 176/7 176/8
**competitively [1]** 172/10
**complaining [1]** 197/5
**completely [1]** 151/1
**completeness [1]** 62/12
**complex [2]** 1/16 43/20
**compliance [5]** 73/8 76/8 76/16 76/22 99/10
**compliant [1]** 81/7
**complicated [2]** 43/20 197/23
**comply [1]** 76/6
**component [3]** 19/6 20/15 20/16
**components [1]** 194/19
**compounds [3]** 72/9 82/6 91/23
**comprehensive [1]** 210/10
**comprehensively [1]** 208/7
**compromise [2]** 196/18 196/21
**computer [1]** 1/24
**computer-aided [1]** 1/24
**concentration [1]** 83/11
**concentrations [6]** 77/8 77/14 82/9 83/6 85/17 87/19
**concept [1]** 27/19
**concern [3]** 32/9 156/19 177/14
**concerned [2]** 96/18 176/17
**concerns [12]** 16/16 16/19 18/11 32/12 32/18 34/3 43/13 43/14 62/10 97/4 106/22 165/1
**conclude [4]** 59/23 79/22 80/19 88/15
**concluded [4]** 80/2 80/13 84/3 212/16
**conclusion [5]** 12/19 14/2 14/9 188/25 195/16
**conclusions [1]** 16/17
**concur [1]** 60/25
**conditions [2]** 115/4 115/7
**conduct [1]** 39/20
**conducted [1]** 187/1
**conference [1]** 162/4
**conferring [1]** 127/14
**confidence [2]** 92/22 195/11
**confident [2]** 84/24 94/13
**confines [1]** 199/21
**confirm [1]** 114/15
**conflates [1]** 201/8
**conformance [1]** 199/22
**confusing [2]** 130/12 134/8
**conjunction [1]** 10/6
**connect [1]** 183/25
**connected [2]** 178/1 178/4
**connecting [1]** 177/23
**connection [3]** 102/23 116/19 208/3
**Consent [2]** 19/10 202/25
**consequences [2]** 68/21 69/16
**conservative [1]** 87/11
**consider [15]** 72/19 78/2 81/6 84/4 90/1 92/15 94/7 101/15 102/5 113/9 113/10 113/18 151/2 206/14 206/15
**consideration [11]** 30/7 35/24 42/7 42/16 44/10 79/2 80/18 80/20 80/21 81/25 88/23
**considerations [4]** 27/5 29/20 43/11 193/12
**considered [16]** 11/16 30/4 72/1 72/20 72/21 74/19 75/7 76/4 77/5 77/11 77/16 78/5 78/19 78/21 84/2 90/8
**considering [5]** 66/7 71/24 83/1 86/9 184/9
**consistent [16]** 39/21 108/13 108/19 109/16 113/23 113/25 116/16 117/23 118/19 120/18 122/7 124/3 164/13 166/12 166/21 207/23
**constant [1]** 22/15
**Constitution [15]** 138/1 143/15 145/12 146/20 146/23 147/9 147/18 148/14 156/18 189/24 202/1 202/8 208/14 209/10
**constitutional [7]** 133/16 150/22 201/24 208/9 209/14 211/4 211/18
**constitutionally [1]** 142/23
**constraints [1]** 30/19
**construct [2]** 32/14 51/5
**construction [1]** 185/22
**construed [1]** 41/1
**consult [2]** 101/3 113/7
**consultancy [2]** 65/20 67/17
**consultants [1]** 71/16
**consulting [1]** 67/21
**consumer [3]** 31/13 83/2 109/8
**contain [2]** 90/13 109/8
**contained [1]** 41/7
**contaminant [2]** 86/6 109/17
**contaminants [5]** 68/24 75/12 77/8 81/1 94/8
**contaminated [8]** 34/15 66/14 72/6 73/13 100/13 109/14 124/5 181/1
**contamination [10]** 26/16 31/13 33/4 42/11 49/22 66/20 73/14 115/10 117/21 124/20
**contaminations [1]** 45/23
**contemplate [1]** 200/15
**contemplated [3]** 46/6 137/17 166/24
**contemplates [1]** 39/7
**contentious [1]** 44/13
**context [5]** 20/23 84/13 84/14 103/22 133/3
**contingent [1]** 10/18
**continue [7]** 32/17 87/22 109/17 109/24 111/18 147/20 195/20
**continued [4]** 2/1 2/25 3/1 57/1
**continues [1]** 31/4
**continuing [3]** 20/7 181/24 195/19
**contractor [1]** 35/11
**contracts [1]** 202/6
**contractual [2]** 38/8 45/11
**contradict [1]** 12/5
**contradiction [2]** 12/9 146/14
**contradictory [1]** 195/8
**contribution [4]** 20/11 50/16 51/23 55/25
**contributions [1]** 58/24
**control [4]** 33/6 75/11 88/1 131/11
**controlled [2]** 137/25 207/23
**conveniently [1]** 14/25
**conversation [2]** 12/25 14/18
**conversations [3]** 15/24 111/23 184/25
**conversion [1]** 86/21
**convey [1]** 110/5
**convince [1]** 205/1
**convinced [2]** 174/3 176/1
**COO [1]** 67/20
**Cooper [1]** 1/10
**cooperate [1]** 13/17
**cooperation [3]** 166/3 174/8 175/14
**coordinate [2]** 196/17 196/24
**coordinating [1]** 100/11
**cop [2]** 165/3 165/12
**copies [4]** 17/16 64/24 102/10 119/2
**copy [6]** 119/19 126/18 138/10 154/21 163/5 163/6
**core [3]** 102/7 104/9 112/1
**correct [38]** 10/21 14/21 23/14 25/2 39/9 39/13 40/15 53/14 53/21 53/23 54/3 57/24 58/1 64/23 66/21 72/17 84/22 87/9 106/2 126/22 127/5 134/24 159/21 163/4 176/10 177/6 177/7 177/7 177/21 179/10 179/16 189/10 189/11 193/8 198/25 207/4 209/2 212/19
**correctly [2]** 61/10 149/14
**Corteva [7]** 3/4 7/14 33/20 33/23 38/5 41/18 42/20
**cosmetics [2]** 83/5 109/9
**cost [49]** 48/10 66/20 67/8 68/14 72/2 72/3 72/25 73/7 75/10 75/14 76/15 76/16 76/22 77/2 78/2 78/9 78/24 80/2 84/4 84/7 84/7 84/12 84/25 86/14 86/14 86/18 86/18 86/22 86/25 87/5 88/22 89/25 90/1 90/3 90/4 90/21 91/2 91/3 91/12 91/13 91/18 92/2 92/10 93/8 93/16 93/17 100/18 102/18 184/19
**cost-effective [1]** 76/15
**Costa [1]** 69/21
**costs [85]** 18/6 20/6 29/23 30/11 41/22 41/25 42/14 42/16 48/1 48/8 48/10 48/13 48/14 49/4 49/5 49/6 50/22 55/23 56/17 58/22 59/10 66/8 66/9 66/18 68/11 68/23 72/8 72/16 72/18 73/17 73/24 74/9 74/15 74/20 75/2 75/5 75/7 78/1 78/7 78/22 79/15 82/1 84/4 84/24 85/20 87/4 88/16 89/21 90/5 91/20 92/5 92/16 93/10 93/19 94/7 94/14 94/14 101/22 101/24 138/13 139/23 139/24 141/5 141/6 141/6 141/25 142/8 148/19 148/22 151/12 151/16 158/21 159/23 184/10 184/20 185/1 185/3 185/5 185/6 185/10 185/13 185/13 185/14 186/6 186/24
**could [59]** 10/17 15/13 15/13 15/14 23/11 27/22 27/23 28/17 28/19 30/21 30/21 45/2 48/8 55/25 64/4 70/3 89/24 93/11 93/14 103/1 104/1 105/21 107/8 107/19 107/25 108/18 109/21 110/4 110/17 111/16 119/21 119/23 120/11 121/23 123/21 124/9 126/12 145/21 145/21 145/21 145/22 145/25 147/20 148/9 148/11 155/24 155/25 162/7 163/6 163/21 171/16 179/25 181/24 184/20 185/13 190/12 192/15 198/3 211/3
**couldn't [1]** 92/24
**counsel [35]** 1/20 2/5 2/8 2/12 2/15 9/1 12/4 17/19 18/10 30/2 60/5 60/7 60/16 60/25 88/10 98/4 100/9 100/23 112/13 119/7 126/17 127/13 127/14 130/20 133/20 134/3 134/15 137/19 138/16 143/8 148/20 148/22 155/1 158/22 184/17
**counselor [1]** 18/13
**counsels' [1]** 209/23
**count [3]** 2/23 73/15 185/11
**counties [69]** 3/25 8/25 9/2 9/4 18/12 46/13 49/3 49/15 72/25 73/11 73/12 106/12 114/8 114/10 114/12 115/25 116/4 116/8 116/20 117/19 123/17 124/19 125/4 138/5 163/2 163/15 163/16 163/17 163/18 163/19 163/25 164/7 164/16 165/7 165/24 166/2 166/4 166/13 166/15 166/16 167/5 167/7 168/4 168/10 169/7 169/23 170/9 170/11 171/1 171/11 171/15 172/1 173/1 173/3

## C

**counties... [15]** 173/24 175/5 175/21 176/2 176/14 177/5 178/9 180/24 184/22 185/17 185/18 191/1 196/6 198/5 199/1
**counties' [1]** 164/25
**counting [1]** 209/22
**countless [1]** 34/16
**country [6]** 25/24 31/6 31/18 32/4 36/1 77/24
**county [38]** 3/19 8/6 8/17 48/16 49/8 49/20 88/19 93/17 94/14 114/21 115/13 115/16 116/9 117/21 123/17 123/19 164/1 164/4 164/6 164/6 164/7 164/21 164/22 166/6 168/19 170/23 170/23 171/20 171/21 174/1 174/4 175/6 175/8 190/20 190/21 199/21 200/15 200/20
**county's [1]** 117/15
**county-owned [4]** 114/21 116/9 117/21 123/19
**County-Qualified [1]** 123/17
**couple [3]** 37/22 54/16 151/9
**course [19]** 19/9 25/8 28/24 36/18 36/18 62/19 83/11 83/14 83/14 104/11 111/24 117/22 139/9 144/10 149/21 157/14 159/10 188/8 192/25
**court [91]** 1/1 1/22 6/1 10/16 11/25 12/1 12/1 12/3 12/7 12/10 12/20 12/21 12/22 13/4 13/6 13/8 13/8 13/9 13/11 13/12 13/16 13/21 13/22 13/23 14/2 14/4 14/8 14/13 14/15 14/19 14/25 15/4 15/6 15/6 15/9 15/17 15/18 15/19 19/1 19/4 27/17 28/2 28/2 34/23 35/16 38/19 48/5 57/13 58/16 58/17 59/17 63/15 64/24 65/16 67/25 70/3 82/24 85/2 85/25 86/19 87/2 91/11 93/7 97/16 103/21 113/1 131/6 131/7 133/24 135/5 147/24 149/5 151/1 151/22 159/13 161/1 172/14 181/16 194/6 195/11 196/8 202/6 202/24 203/2 203/10 203/17 203/20 204/2 205/9 212/17 212/24
**court's [6]** 19/1 19/17 105/7 134/18 156/18 201/7
**Courthouse [1]** 1/9
**courtroom [3]** 4/5 124/7 212/4
**courts [2]** 52/4 168/24
**covered [4]** 46/6 146/12 160/21 208/20
**covers [2]** 102/21 139/7
**CRACO [2]** 35/4 43/4
**crafted [1]** 20/9
**CRC [1]** 212/23
**create [2]** 33/18 164/13
**created [13]** 38/1 41/17 45/2 56/25 102/9 107/3 124/3 136/11 164/11 165/2 166/13 170/24 176/24
**creates [2]** 101/18 111/1
**creation [2]** 44/25 171/18
**credit [4]** 27/19 27/23 50/18 50/19
**credit-eligible [1]** 27/19
**credits [1]** 27/12
**criteria [1]** 137/7
**critical [6]** 30/15 32/12 45/7 116/15 117/2 117/5
**Croix [1]** 2/11
**cross [3]** 95/24 125/22 125/25
**cross-examination [2]** 125/22 125/25
**crossed [1]** 153/2
**crossing [1]** 133/6
**CRR [1]** 212/23
**crux [1]** 192/17
**culpability [1]** 57/2
**Cumberland [1]** 3/25
**cumulative [1]** 145/15
**cumulatively [1]** 45/25
**cure [2]** 72/3 201/18
**cure-all [1]** 201/18
**Curiae [1]** 3/21
**current [1]** 109/6
**currently [5]** 78/18 84/11 84/25 98/7 98/11
**curves [8]** 73/7 90/5 90/21 91/4 91/12 91/13 92/2 92/10
**customer [1]** 22/12
**cut [2]** 30/15 49/17
**cv [4]** 1/4 1/4 1/5 1/5
**cycle [3]** 85/16 102/3 103/6

## D

**D.C [1]** 87/17
**daily [1]** 34/22
**Dakota [12]** 133/19 163/9 163/11 163/23 164/13 167/20 168/24 169/3 170/25 170/25 171/4 171/17
**damage [4]** 29/15 46/5 66/12 209/7
**damages [53]** 18/6 27/16 28/7 31/20 35/6 42/12 42/15 44/2 45/25 55/23 59/6 59/11 68/25 69/4 70/11 71/18 72/2 94/12 100/18 138/14 138/19 138/24 139/20 141/3 141/6 141/25 146/25 147/1 147/2 147/8 147/14 150/23 151/12 151/13 153/24 154/11 155/7 155/10 155/23 155/23 158/5 158/21 187/15 187/17 187/23 188/11 188/19 188/20 188/22 188/24 189/23 197/13 198/14
**DANIEL [1]** 2/3
**data [16]** 72/6 72/25 73/10 77/8 77/16 77/17 77/19 77/25 85/5 85/8 85/11 92/16 94/8 94/9 94/10 187/5
**date [6]** 23/1 24/10 25/16 30/5 128/4 182/2
**dated [2]** 128/4 180/13
**dates [1]** 62/17
**Daubert [2]** 21/23 35/14
**Dave [1]** 6/24
**DAVID [4]** 2/2 3/2 7/13 124/6
**day [12]** 16/1 34/6 39/7 88/9 129/14 157/15 174/1 192/18 195/15 196/19 201/7 209/21
**days [11]** 25/15 103/25 139/16 153/17 195/14 196/1 196/7 196/10 196/15 210/1 210/12
**DC [2]** 2/22 3/11
**de [4]** 1/7 3/5 6/17 7/14
**deal [15]** 52/18 59/2 69/6 72/8 73/4 76/21 83/20 90/7 129/12 150/9 170/8 172/9 173/1 185/19 193/19
**dealing [6]** 69/3 69/4 73/8 75/5 89/7 197/19
**deals [3]** 37/20 86/2 208/7
**death [1]** 31/8
**decades [2]** 22/16 57/2
**December [1]** 207/20
**decide [9]** 13/16 13/16 56/8 138/6 144/8 166/18 168/9 175/5 175/16
**decided [3]** 156/16 178/9 181/13
**decider [1]** 39/3
**deciding [2]** 143/10 143/12
**decision [10]** 29/21 52/15 101/4 112/25 132/4 140/3 144/12 145/11 149/5 211/12
**decisions [5]** 140/6 140/20 167/19 169/11 169/13
**declaration [21]** 18/9 23/15 24/3 103/7 103/11 103/13 103/16 107/9 114/16 121/9 182/7 184/6 184/8 184/12 184/24 186/9 204/11 204/12 204/13 204/15 204/16
**declarations [1]** 29/25
**declaratory [1]** 204/1
**declined [1]** 85/17
**dedicated [9]** 133/16 142/23 142/25 143/18 145/16 152/19 152/20 152/22 161/15
**dedication [1]** 207/1
**deduction [4]** 191/2 191/4 191/5 191/14
**deem [1]** 41/3
**deemed [1]** 45/6
**deep [1]** 91/22
**defend [1]** 69/20
**defendants [30]** 1/8 2/18 2/22 3/4 3/8 3/11 7/4 7/11 12/6 31/3 34/8 34/13 34/14 42/8 42/8 42/20 42/25 47/2 58/25 59/12 96/8 127/21 128/4 129/5 129/8 129/13 129/19 131/8 188/21 202/12
**defendants' [1]** 39/20
**defense [2]** 35/12 47/12
**defenses [3]** 21/21 35/12 46/17
**defer [2]** 60/15 209/18
**deference [1]** 18/25
**definition [2]** 146/24 155/7
**degree [1]** 68/2
**Delaware [1]** 171/17
**delay [2]** 150/12 196/9
**delegate [1]** 174/25
**delegated [2]** 167/23 169/17
**delegating [1]** 168/21
**delineate [1]** 49/12
**DEMA [7]** 2/9 2/9 2/10 2/10 2/13 6/25 137/24
**demands [1]** 71/22
**DEP [31]** 18/19 18/25 21/14 98/16 98/18 99/5 99/15 99/23 102/5 102/16 104/9 104/15 109/3 111/3 128/5 144/17 148/24 154/13 157/13 164/5 167/19 168/14 168/15 169/5 169/5 169/13 170/25 180/12 181/14 184/16 197/18
**DEP's [2]** 101/17 104/24
**department [70]** 1/3 6/16 19/21 28/16 36/7 38/24 39/2 39/7 40/24 44/12 44/15 47/12 69/9 69/9 89/11 98/8 98/10 98/16 99/8 100/2 100/12 101/3 101/14 102/6 103/22 106/11 106/14 107/16 108/21 108/22 109/12 109/16 109/24 110/7 111/11 111/18 111/21 112/1 113/24 115/16 116/25 117/1 117/5 118/1 118/4 118/18 120/21 121/4 121/14 121/16 122/6 122/11 123/3 123/6 123/17 124/10 137/3 138/1 138/20 140/12 140/13 142/17 142/19 150/25 151/1 154/16 155/11 155/14 155/23 196/23
**department's [10]** 98/18 98/21 99/6 105/17 106/25 107/22 108/2 116/15 117/3 155/6
**depends [2]** 115/8 131/4
**deposit [3]** 129/4 129/5 129/8
**deposited [2]** 120/13 120/17
**depositions [2]** 21/18 187/24
**depth [1]** 91/25
**deputy [6]** 1/15 4/5 6/20 9/13 63/19 97/20
**derived [1]** 178/23
**describe [4]** 35/24 49/10 71/21 84/13
**described [7]** 45/6 66/23 85/4 91/14 94/24 111/3 123/9
**describes [2]** 120/12 120/16
**design [1]** 66/14
**designed [8]** 27/25 29/17 30/21 37/1 127/19 158/21 164/9 171/23
**designs [1]** 66/15
**desk [1]** 182/10
**destruction [3]** 79/10 79/18 80/15
**detail [4]** 48/15 49/11 198/2 202/5
**determination [3]** 87/9 147/16 201/1
**determine [8]** 19/5 19/18 28/2 104/11 132/18 147/12 151/18 198/20
**determined [7]** 37/11 37/17 52/12 53/24 89/13 89/18 140/11
**determining [4]** 18/20 56/7 80/25 94/4
**detriment [1]** 200/10
**develop [1]** 121/14
**developed [3]** 33/10 90/2 151/3
**developing [1]** 79/1
**development [1]** 90/17
**DIANE [2]** 3/17 8/3
**did [106]** 18/22 28/15 29/8 30/20 34/25 35/1 35/18 37/3 40/10 48/2 49/3 50/1 50/2 50/6 53/10 56/15 59/8 59/23 67/1 67/2 67/14 67/23 69/24 70/1 70/7 71/4 71/21 72/18 73/2 73/17 73/19 74/8 74/16 74/22 75/15 77/2 78/1 78/24 79/7 79/22 80/18 81/25 84/4 86/23 88/9 88/11 88/12 88/13 88/14 89/10 89/11 89/21 91/5 98/13 98/25 99/12 99/19 100/1 100/3 100/7 100/15 100/20 100/24 104/14 104/15 104/18 105/17 106/3 106/10 106/13 106/14 106/21 108/10 110/9 113/9 113/10 113/18 114/24 117/1 120/11 121/3 122/9 122/11 128/11 134/22 136/12 153/12 153/12 175/18 178/18 182/22 184/4 184/11 189/4 192/2 193/16 194/2 203/13 207/5 207/8 207/9 207/14 207/19 209/6 211/1 211/13
**didn't [19]** 12/15 16/4 51/11 56/22 60/14 61/19 72/24 82/17 86/10 96/17 113/21 114/2 142/5 153/3 194/1 194/10 197/5 199/11 208/22
**difference [5]** 25/20 170/21 193/4 205/14 208/13
**different [24]** 21/6 49/11 52/11 53/7 74/6 76/12 82/19 133/15 133/24 136/1 137/6 142/22 144/9 154/5 166/23 173/3 175/16 176/14 184/18 193/6 193/12 200/6 200/21 200/24
**difficult [4]** 44/13 45/21 52/1 84/23
**difficulty [1]** 119/17
**dig [5]** 90/11 90/12 90/23 91/18 92/1
**digit [2]** 91/10 92/4
**dimension [1]** 91/22
**direct [10]** 9/12 47/6 64/19 98/5 112/4 126/6 127/16 139/24 165/7 178/16
**directed [1]** 133/15
**directing [1]** 128/13
**direction [1]** 16/5
**directly [8]** 73/6 83/22 98/19 100/18 101/6 104/21 121/6 165/25
**disagree [5]** 15/23 61/6 61/8 87/10 87/13
**disapproval [1]** 210/8
**disasters [1]** 69/13
**disburse [1]** 113/24
**disbursement [2]** 118/5 134/22
**discharge [6]** 28/22 57/1 75/7 77/9 78/6 80/12
**discharged [2]** 56/23 83/12
**discharger [6]** 21/10 28/13 50/5 50/7 50/9 58/6
**dischargers [9]** 47/6 50/4 50/23 51/2 51/6 52/6 54/2 54/10 57/9
**discharges [5]** 28/19 42/13 50/13 80/6 208/12
**discharging [2]** 56/20 81/17
**disciplines [1]** 65/25
**discontinued [1]** 23/25
**discover [1]** 180/2
**discovered [1]** 180/3
**discovery [5]** 21/4 21/17

**D**

**discovery... [3]** 34/16 34/17 34/20
**discretion [34]** 18/19 132/18 138/24 140/7 142/17 143/16 143/18 144/18 145/5 145/14 146/2 147/12 148/2 149/12 150/21 151/2 151/10 151/17 151/24 152/13 155/6 155/12 155/13 155/15 156/7 156/23 157/14 158/8 158/13 159/14 159/18 159/20 165/2 168/13
**discuss [7]** 29/8 37/10 49/20 52/19 100/16 102/14 112/19
**discussed [7]** 27/14 46/22 83/24 154/14 185/1 187/25 197/17
**discusses [1]** 41/10
**discussing [5]** 19/8 53/2 59/5 162/5 210/25
**discussion [7]** 51/13 82/25 147/23 177/12 186/22 187/11 187/13
**discussions [5]** 78/1 110/10 111/24 153/18 186/5
**dismantled [1]** 205/10
**disobey [1]** 147/18
**displayed [1]** 170/3
**disposal [2]** 78/22 86/3
**dispose [2]** 86/15 87/1
**disposed [1]** 84/11
**disposing [1]** 84/25
**dispute [23]** 9/16 15/5 24/12 25/6 35/7 38/17 43/19 132/6 168/6 169/2 169/5 169/17 169/24 170/5 170/14 170/15 171/19 171/20 171/24 177/2 177/4 202/13 209/16
**disputes [4]** 34/17 34/20 35/13 209/25
**disputing [1]** 157/18
**distinct [1]** 178/5
**distinction [3]** 193/11 204/9 211/17
**distort [1]** 175/2
**distribute [3]** 122/7 123/3 130/13
**distributed [8]** 114/4 116/4 116/12 130/15 131/18 142/12 156/22 188/20
**distribution [20]** 100/19 118/2 122/1 122/4 122/5 122/9 122/11 122/13 122/24 123/1 123/7 126/8 150/25 153/15 154/8 154/18 154/19 155/24 194/1 194/18
**DISTRICT [4]** 1/1 1/1 1/13 6/2
**divided [1]** 74/4
**division [7]** 53/3 98/24 100/9 106/25 107/15 113/7 184/17
**docket [9]** 9/14 23/18 23/20 61/22 62/21 105/7 116/2 122/14 122/14
**document [20]** 23/24 103/15 105/1 105/22 122/5 123/2 127/3 127/17 127/18 128/16 128/22 130/9 130/11 136/7 153/19 154/1 154/13 170/3 180/14 186/20
**documentation [1]** 94/25
**documents [5]** 17/19 21/18 77/25 94/23 198/17
**does [72]** 9/16 11/14 12/1 12/10 12/12 13/12 16/18 24/2 24/6 24/7 32/5 32/6 38/17 55/10 57/16 65/23 66/14 76/18 91/18 92/9 101/14 102/5 107/14 116/3 116/5 117/14 117/14 118/10 118/12 127/6 129/22 132/16 132/17 137/14 137/18 137/18 138/21 138/25 141/9 141/11 141/12 141/12 141/19 142/11 144/19 145/20 149/4 149/12 154/21 155/14 158/23 159/24 160/11 171/3 171/16 174/19 174/25 182/4 192/6 192/13 195/17 195/19 196/14 199/5 199/6 199/7 199/8 203/22 203/23 206/24 207/25 211/18
**doesn't [38]** 15/8 15/10 36/24 90/15 90/25 92/4 96/16 134/5 141/16 147/6 155/13 158/5 160/10 160/12 164/4 164/7 167/14 168/14 170/1 172/25 173/17 173/23 174/17 177/2 178/8 181/4 190/25 191/16 194/13 194/16 195/23 197/10 202/15 202/16 202/18 204/5 207/2 211/10
**doing [20]** 19/23 66/11 67/21 71/24 74/24 77/24 80/1 80/8 84/9 85/18 87/18 91/2 96/16 109/1 131/13 134/21 144/3 154/4 176/9 176/19
**doling [1]** 175/11
**dollar [6]** 36/3 50/15 50/19 50/19 51/22 189/2
**dollars [14]** 25/14 25/19 25/25 26/10 26/13 26/24 27/4 45/17 49/24 91/21 92/2 92/3 92/6 149/1
**domestic [3]** 81/15 81/20 82/18
**done [21]** 38/12 43/25 45/8 49/13 51/15 52/20 58/16 59/1 68/25 79/2 86/7 92/15 92/17 134/19 135/5 171/16 174/16 199/16 199/18 209/7 212/3
**Donio [1]** 62/10
**dots [4]** 177/24 178/1 178/4 183/25
**double [6]** 55/12 55/13 55/16 56/3 56/5 188/5
**double-check [1]** 188/5
**Dow [2]** 33/18 33/19
**down [25]** 16/24 21/1 42/9 48/10 64/15 68/23 78/23 82/12 82/20 85/4 86/8 90/13 96/2 108/25 144/9 155/18 168/25 171/21 176/10 178/6 183/16 185/16 205/25 206/4 206/20
**dozen [2]** 70/16 137/6
**dozens [1]** 28/17
**drabs [1]** 145/22
**draft [1]** 153/16
**dramatic [1]** 80/16
**dribs [1]** 146/22
**dried [1]** 78/16
**drinking [40]** 30/12 30/16 47/15 47/18 48/11 48/19 48/23 48/24 68/14 73/20 73/21 73/24 74/15 74/18 76/10 76/11 77/17 81/2 81/3 81/9 81/22 82/9 83/24 86/7 86/11 102/20 102/21 109/5 109/18 123/10 145/8 146/13 146/17 156/10 181/2 185/1 185/7 185/10 185/13 197/21
**Drive [1]** 3/3
**driven [2]** 21/2 26/20
**dry [2]** 86/16 86/21
**DRYE [3]** 1/18 2/2 2/6
**DU [1]** 1/7
**dual [1]** 98/11
**due [2]** 108/3 156/23
**DUFFY [4]** 2/21 7/9 7/10 60/24
**duly [2]** 63/19 97/20
**dump [1]** 57/9
**duplicative [1]** 62/8
**DuPont [87]** 3/4 3/5 6/17 7/14 7/15 19/11 21/6 21/9 21/16 22/11 22/16 22/19 24/14 26/4 26/5 27/13 27/15 27/20 30/9 32/20 32/21 32/22 33/5 33/11 33/17 33/19 33/23 34/9 34/13 35/3 35/10 35/15 35/22 36/5 36/5 36/22 37/21 38/4 38/18 39/10 41/18 41/24 42/21 44/5 44/11 45/9 47/1 49/25 52/9 55/2 56/7 56/25 57/20 58/16 59/7 60/23 93/18 94/5 96/8 100/25 101/20 105/18 121/17 126/11 126/21 135/25 146/9 152/20 152/22 156/21 161/3 188/21 190/14 190/15 190/20 191/1 191/9 191/11 199/7 199/10 200/2 200/7 202/9 202/15 202/16 202/18 209/5
**DuPont's [1]** 41/11
**during [8]** 31/2 48/18 61/24 99/16 104/18 106/10 178/16 188/7
**duty [1]** 21/22

**E**

**E.I [1]** 1/7
**each [15]** 12/5 38/22 38/23 90/21 91/15 92/10 102/9 102/10 132/3 137/7 141/9 145/16 166/6 168/19 199/2
**earlier [6]** 61/16 64/7 90/9 123/16 144/8 162/15
**earmarked [3]** 111/8 156/17 161/13
**earmarking [1]** 132/23
**earplug [1]** 27/2
**easier [2]** 51/21 54/18
**East [1]** 3/3
**easy [3]** 30/4 54/24 89/4
**ebb [5]** 144/1 149/24 150/4 171/12 176/16
**ebbing [1]** 150/6
**ebbs [1]** 177/16
**ECF [8]** 103/15 105/7 105/23 106/4 110/20 116/2 122/14 186/20
**economic [5]** 66/19 67/9 68/20 68/21 69/16
**economics [14]** 65/17 65/19 65/22 66/24 68/3 68/5 68/5 68/7 68/8 68/10 68/10 69/2 76/20 76/23
**economists [3]** 66/3 66/3 67/5
**ecotox [1]** 66/4
**educational [1]** 67/25
**Edward [1]** 63/23
**effect [4]** 15/5 20/13 50/11 81/10
**effective [6]** 25/16 27/18 76/15 80/2 99/9 211/8
**effectively [1]** 101/19
**effects [2]** 48/22 71/25
**effluent [6]** 75/5 75/6 78/7 78/8 78/11 80/3
**effort [3]** 32/14 107/1 126/7
**efforts [10]** 20/8 33/16 34/18 43/21 46/2 98/22 106/21 108/21 109/6 118/1
**eh [1]** 202/16
**EIDP [10]** 2/18 2/22 3/4 7/8 7/15 33/24 38/6 41/23 42/20 45/1
**eight [1]** 27/9
**either [15]** 27/21 49/17 59/17 66/19 78/15 84/15 85/1 90/11 92/17 113/22 136/12 143/13 143/18 168/1 191/3
**elaborate [3]** 11/15 81/11 83/16
**elaborating [1]** 118/15
**element [2]** 175/21 176/24
**elements [1]** 194/20
**elevate [1]** 181/14
**eligible [5]** 27/19 120/18 121/20 167/20 169/13
**eliminate [6]** 107/12 107/15 107/23 108/5 108/20 108/24
**eliminating [1]** 109/10
**else [16]** 9/20 41/23 57/16 61/18 131/13 135/8 147/18 158/25 165/4 180/4 186/10 193/16 200/12 203/8 204/12 206/19
**elucidating [1]** 118/15
**emitted [1]** 34/11
**emitting [1]** 42/5
**employees [2]** 65/23 65/24
**enable [1]** 107/4
**enabling [1]** 204/9
**enact [1]** 201/9
**enacted [4]** 109/7 181/17 204/4 204/4
**end [15]** 16/1 39/7 42/21 43/3 79/9 88/9 99/25 115/5 145/10 156/21 157/15 157/17 157/23 173/25 208/22
**ended [2]** 188/9 188/11
**enforce [4]** 41/5 202/19 202/21 204/2
**enforceable [2]** 35/9 109/4
**enforcement [9]** 98/12 98/19 99/4 99/6 99/7 99/9 99/12 99/14 100/5
**engage [3]** 110/9 111/18 111/21
**engaged [2]** 106/25 121/6
**engagement [1]** 112/4
**engaging [1]** 104/10
**engineering [8]** 66/22 72/7 76/8 79/3 79/6 79/18 79/24 81/8
**engineers [4]** 66/17 73/6 77/20 90/2
**ENGLISH [2]** 2/16 7/6
**enlarge [1]** 119/23
**enormous [5]** 30/7 31/10 32/1 32/9 33/3
**enough [6]** 13/14 50/1 85/18 160/23 163/22 189/25
**ensure [20]** 34/13 37/1 37/6 41/22 43/15 44/18 45/2 99/8 99/9 101/10 101/24 109/14 109/17 116/15 116/16 116/22 117/6 117/8 140/16 165/23
**ensures [1]** 200/8
**ensuring [1]** 189/19
**enter [4]** 7/24 10/12 10/22 171/4
**entered [13]** 25/16 25/21 25/22 26/1 26/25 26/25 27/1 61/24 62/5 62/9 112/9 199/16 202/23
**entering [2]** 11/3 201/11
**entertaining [1]** 196/1
**entire [3]** 128/16 135/24 136/1
**entirely [2]** 60/22 165/1
**entities [25]** 26/6 28/1 33/5 34/9 35/22 36/5 36/23 37/8 38/4 43/15 43/17 46/17 47/23 48/8 50/16 55/8 58/18 72/18 73/13 73/24 75/21 152/4 152/8 157/16 197/19
**entitled [15]** 143/4 143/25 145/19 149/18 150/7 151/23 151/23 152/18 173/14 178/7 191/14 197/7 205/10 207/10 212/20
**entity [7]** 37/25 42/18 132/10 132/10 132/10 132/12 176/13
**entry [2]** 10/11 10/18
**enumerated [2]** 155/12 155/15
**environment [13]** 41/4 68/22 69/14 72/1 72/9 72/23 75/13 78/6 83/12 89/12 90/10 90/11 200/5
**environmental [37]** 1/3 3/18 6/16 19/22 28/16 31/13 33/13 35/25 36/8 38/24 41/5 44/12 45/4 65/21 65/21 66/2 66/8 66/9 66/10 66/11 68/5 68/7 68/9 68/10 68/11 68/12 68/24 69/2 69/12 69/16 69/23 76/22 94/8 98/8 98/17 101/14 110/7
**EPA [11]** 36/9 38/25 69/10 80/24 82/11 86/7 96/8 185/5 186/14 186/23 187/1
**EPA's [3]** 72/10 74/2 187/2
**equal [1]** 53/3
**equally [1]** 52/15
**equitable [1]** 35/11
**error [1]** 92/11
**escrow [23]** 127/4 127/9 127/18 127/20 128/4 129/6 129/13 129/17 129/25 130/2 130/3 130/4 132/13 132/14 134/6 134/6 134/13 134/17 134/21 135/1 135/3 135/7 135/17
**especially [3]** 34/2 174/16 193/24
**ESQUIRE [19]** 1/19 2/2 2/3 2/3 2/6 2/9 2/10 2/10 2/14 2/17 2/21 3/2 3/7 3/10 3/13 3/16 3/17 3/22 3/23
**essentially [1]** 108/3

## E

**establish [3]** 118/6 120/21 120/24
**established [2]** 101/2 165/24
**establishing [1]** 20/7
**estimate [15]** 48/10 74/2 74/3 75/15 78/24 85/12 86/8 86/23 88/16 89/3 89/18 89/21 91/25 185/5 185/9
**estimated [12]** 18/6 48/7 48/13 49/5 49/7 50/2 56/16 59/11 73/23 85/13 85/14 91/2
**estimates [13]** 37/19 65/4 79/1 86/15 88/10 90/3 93/8 93/17 94/2 94/14 184/19 186/14 189/1
**estimating [7]** 72/16 77/2 78/2 84/4 86/24 89/25 93/19
**estimation [1]** 42/1
**estoppel [1]** 35/11
**et [5]** 1/3 1/7 6/17 66/13 158/10
**et al [1]** 6/17
**et cetera [2]** 66/13 158/10
**evaluate [8]** 28/16 55/3 73/19 74/8 75/17 82/1 185/5 203/10
**evaluated [8]** 18/4 18/6 49/3 49/4 49/24 53/6 186/6 186/14
**evaluating [8]** 29/23 29/24 31/3 48/7 71/19 94/15 184/9 184/19
**evaluation [2]** 55/2 186/1
**eve [2]** 2/3 22/2
**even [14]** 37/13 46/14 46/15 50/18 52/16 53/17 87/14 150/1 171/1 192/5 192/7 195/25 201/14 201/20
**event [7]** 29/11 54/14 66/20 85/23 150/12 193/2 203/23
**events [3]** 69/5 76/21 85/22
**eventually [1]** 88/2
**ever [3]** 13/1 43/14 103/18
**every [11]** 28/16 51/19 60/20 61/2 99/8 104/13 131/1 168/19 200/25 201/2 202/11
**everybody [4]** 32/4 129/18 181/7 197/16
**everything [4]** 45/5 94/24 199/15 206/13
**evidence [24]** 5/21 46/24 95/17 105/7 105/14 105/15 106/5 106/6 106/8 122/15 122/16 122/18 154/20 155/3 155/4 187/21 187/22 206/14 208/24 209/22 209/24 209/25 210/2 210/4
**Evidentiary [1]** 1/7
**evolution [2]** 48/19 54/13
**evolving [2]** 46/15 108/9
**ex [1]** 90/23
**ex-situ [1]** 90/23
**exact [1]** 161/1
**exactly [8]** 114/5 133/5 143/22 153/19 154/4 199/17 200/9 211/14
**examination [4]** 64/19 98/5 125/22 125/25
**examined [2]** 63/20 97/20
**example [26]** 27/15 58/5 58/6 66/25 67/2 68/13 69/12 76/10 80/9 85/10 87/17 95/1 138/3 138/12 144/17 145/18 150/6 151/2 163/21 164/5 170/6 179/23 193/4 197/14 199/21 200/16
**examples [1]** 92/17
**excellent [1]** 30/2
**except [4]** 2/23 39/18 138/18 139/1
**excerpt [1]** 120/5
**exclude [1]** 46/4
**excruciating [1]** 198/2
**excuse [1]** 96/9
**executed [1]** 101/1
**executive [6]** 167/22 174/25 201/8 201/12 201/14 211/12
**exercise [1]** 151/25
**exercising [3]** 151/24 152/13 157/14
**exhaust [1]** 26/10
**exhausted [3]** 11/14 189/16 210/6
**exhaustive [1]** 79/7
**exhibit [27]** 61/25 62/14 95/16 95/17 105/9 105/13 105/15 106/7 106/8 122/17 122/18 126/10 126/15 127/11 127/16 134/1 138/9 138/10 139/1 139/17 140/9 141/19 141/21 155/21 158/14 180/11 182/16
**exhibits [4]** 5/10 5/20 61/23 62/16
**exist [8]** 167/14 178/8 194/1 194/2 194/4 203/12 204/5 211/18
**existed [1]** 181/23
**existence [1]** 194/14
**existing [8]** 37/3 111/7 113/22 121/16 121/20 123/12 124/21 183/9
**exists [3]** 15/4 198/22 198/23
**expect [1]** 81/23
**expectation [1]** 202/11
**expected [2]** 26/4 77/22
**expecting [1]** 12/21
**expedient [1]** 209/14
**expeditiously [1]** 210/10
**expended [3]** 116/16 117/6 121/21
**expensive [6]** 30/14 76/13 78/10 80/4 80/4 80/15
**experience [7]** 58/13 70/8 73/4 88/14 89/2 112/21 195/18
**experienced [1]** 113/4
**expert [7]** 21/16 30/2 65/6 65/8 69/15 187/23 188/1
**expertise [2]** 18/21 65/6
**experts [4]** 21/19 66/4 184/18 189/1
**expires [1]** 129/14
**explain [13]** 12/10 20/24 103/1 103/21 107/25 108/18 110/4 110/24 115/15 117/18 119/15 120/11 121/15
**explanation [1]** 123/2
**explicitly [2]** 73/15 73/16
**explosions [1]** 69/13
**exposed [1]** 48/9
**exposure [5]** 30/16 44/6 44/8 75/12 83/2
**exposures [1]** 31/22
**expressed [1]** 20/14
**expressly [1]** 39/18
**extend [1]** 124/18
**extensive [8]** 21/16 33/9 34/16 36/25 36/25 84/3 208/5 209/17
**extensively [3]** 18/22 208/19 208/25
**extent [12]** 12/2 13/13 26/15 41/5 62/17 83/17 115/10 142/25 193/19 209/24 209/25 210/7
**extraordinary [1]** 197/22
**extrapolate [1]** 184/12
**extrapolating [2]** 32/5 185/12
**extremely [1]** 70/12
**Exxon [5]** 19/7 19/22 210/21 210/22 211/15

## F

**F.3d [1]** 53/2
**fabulous [2]** 49/14 200/8
**face [6]** 10/10 31/4 45/8 49/6 73/25 157/22
**faces [1]** 152/14
**facilitate [1]** 173/8
**facilities [21]** 31/21 32/22 32/25 33/3 42/13 45/23 47/13 47/16 48/16 49/21 59/7 73/9 76/3 77/9 77/10 78/17 82/7 88/21 89/19 89/22 96/12
**facility [6]** 62/6 62/10 88/22 91/9 96/14 171/22
**facing [2]** 26/15 31/4
**fact [12]** 19/2 21/16 21/18 28/1 54/12 57/5 76/19 178/24 181/18 199/1 200/6 206/23
**factor [2]** 86/4 86/12
**factors [7]** 17/25 19/7 20/1 20/5 43/12 45/15 84/2
**facts [3]** 192/25 193/2 203/12
**failed [1]** 21/14
**fails [1]** 41/23
**failure [1]** 21/14
**fair [27]** 17/1 17/9 19/18 20/4 20/25 39/14 39/15 54/6 54/10 55/3 61/3 68/22 70/7 70/20 88/15 101/15 102/5 104/15 104/23 114/4 130/25 165/13 191/7 191/18 203/11 206/5 210/9
**fairly [2]** 39/11 188/21
**fairness [5]** 20/15 24/18 43/12 50/17 102/4
**faith [1]** 20/8
**faithful [1]** 19/19
**FALCON [3]** 3/16 8/4 8/9
**fall [4]** 41/12 41/12 65/25 93/10
**falls [1]** 203/21
**familiar [3]** 99/19 99/20 100/1
**famously [1]** 174/3
**far [6]** 60/22 73/14 73/16 109/6 121/21 142/6
**FARLEY [6]** 1/15 6/21 184/5 184/7 184/25 186/9
**farm [2]** 84/15 88/3
**farms [1]** 84/19
**favor [1]** 64/4
**Favored [1]** 28/11
**FC [3]** 2/19 2/23 7/9
**feasibility [1]** 151/2
**features [1]** 115/11
**federal [11]** 1/22 13/8 39/21 47/13 47/17 67/3 69/8 69/9 72/4 109/19 212/17
**fee [8]** 87/6 111/12 111/14 138/14 148/21 148/22 148/23 148/24
**feedback [2]** 104/10 111/25
**feedstocks [1]** 88/7
**feel [6]** 11/13 11/14 11/15 147/11 156/13 162/4
**fees [20]** 42/14 133/20 138/3 138/3 138/13 139/24 141/5 141/25 142/8 143/11 148/20 148/22 151/12 151/16 158/21 158/22 159/23 160/3 160/13 161/1
**fellow [4]** 65/17 67/11 67/12 67/23
**felt [3]** 45/10 70/10 73/5
**fertilizer [6]** 78/20 84/15 84/16 84/19 87/7 88/7
**few [6]** 8/6 8/10 90/6 171/5 177/17 196/16
**fewer [1]** 73/14
**fiduciary [2]** 163/24 176/25
**field [1]** 68/8
**Fifty [1]** 41/8
**Fifty-six [1]** 41/8
**fighting [1]** 199/2
**figure [10]** 15/7 15/21 56/9 68/12 86/22 88/21 88/22 137/23 144/11 149/13
**filed [10]** 21/3 29/25 31/7 31/19 32/24 46/14 47/12 110/15 153/16 154/9
**filing [2]** 188/10 188/18
**filings [2]** 34/7 208/20
**fill [2]** 164/20 170/13
**filtration [1]** 30/13
**final [12]** 16/2 16/3 16/8 16/14 16/17 35/17 38/11 39/8 45/18 85/7 134/18 195/15
**finalize [1]** 43/5
**finally [11]** 18/15 20/12 28/5 32/11 35/18 38/23 41/23 109/16 123/15 131/18 201/18
**finance [1]** 66/4
**financial [9]** 30/19 40/15 45/4 100/17 101/24 102/2 110/11 115/20 124/18
**financing [2]** 102/18 111/10
**find [21]** 13/3 13/13 15/9 22/24 22/25 23/10 23/13 27/17 28/17 29/4 29/13 31/23 36/15 43/21 62/8 62/21 82/6 128/11 188/12 198/4 210/8
**finder [1]** 19/2
**finding [10]** 12/2 12/7 12/20 13/20 13/21 14/12 44/14 57/13 162/3 162/4
**finds [4]** 11/25 81/19 83/19 83/20
**fine [9]** 12/14 17/6 17/7 130/20 130/21 140/23 166/8 167/12 168/11
**fine-tuned [1]** 140/23
**finish [1]** 118/24
**finished [1]** 125/20
**fire [14]** 49/8 88/25 89/1 89/2 89/10 89/12 91/7 93/10 114/13 115/14 115/18 115/21 116/9 117/21
**firefighters [1]** 31/8
**firefighting [3]** 31/14 47/24 72/22
**firemen [1]** 91/8
**fires [1]** 66/13
**firm [5]** 3/22 70/25 76/24 77/21 77/21
**firm's [1]** 60/16
**firms [1]** 72/7
**first [55]** 18/4 22/11 22/13 25/18 26/12 27/9 35/15 35/21 36/2 39/3 44/3 51/20 62/3 63/19 67/14 70/17 71/14 80/12 97/20 99/19 100/1 103/11 103/13 105/2 105/22 109/4 127/25 128/3 129/16 130/14 133/23 134/12 136/2 140/25 141/16 148/1 148/18 159/12 167/14 170/7 172/7 174/1 174/4 174/10 174/13 175/12 177/9 182/23 183/3 189/15 194/2 207/18 208/11 209/11 209/14
**first-priority [1]** 209/14
**firsthand [1]** 104/23
**fisc [1]** 46/11
**Fiscal [2]** 119/13 120/5
**fit [3]** 137/7 173/17 181/15
**fits [1]** 176/18
**five [3]** 29/15 35/16 206/7
**five-minute [1]** 206/7
**fix [1]** 67/8
**flag [1]** 96/18
**flexibility [11]** 144/4 144/7 144/10 144/15 153/20 166/15 171/12 171/14 185/23 197/17 198/5
**flexible [1]** 164/9
**flip [3]** 80/21 89/23 89/24
**float [1]** 37/16
**Floor [1]** 3/7
**flow [7]** 26/20 27/5 144/2 149/24 150/4 171/12 176/16
**flowing [1]** 150/5
**flows [1]** 177/16
**foam [3]** 31/14 47/24 58/18
**foam-related [1]** 31/14
**focus [3]** 107/17 119/25 136/2
**focused [3]** 21/20 49/19 173/6
**folks [16]** 25/6 66/2 66/4 66/5 67/6 67/7 72/12 73/6 77/5 78/20 79/25 80/3 81/15 87/21 89/10 167/9
**follow [7]** 15/19 23/4 47/15 112/2 126/6 161/17 178/14
**follow-up [2]** 15/19 23/4
**following [6]** 69/18 110/6 129/7 138/22 168/4 197/24
**follows [5]** 6/3 63/20 97/21 139/7 139/19
**food [2]** 87/21 109/9
**footnote [1]** 186/25
**force [3]** 92/17 177/14 190/1
**forecast [4]** 66/17 72/13 75/19 75/23
**forecasting [1]** 66/9
**foregoing [2]** 145/4 212/19
**foreign [1]** 31/17
**forest [5]** 43/9 66/12 68/3 68/4 84/15
**forestry [1]** 68/2
**Forever [1]** 82/22
**forget [6]** 56/2 132/14 137/11 143/11 143/11 171/19
**forgiveness [2]** 103/5 111/8
**forgot [1]** 211/24

## F

**form [7]** 127/18 129/16 134/13 136/18 136/18 149/12 205/7
**formal [4]** 12/10 12/12 101/11 196/20
**formally [1]** 109/13
**formative [1]** 73/3
**former [2]** 28/17 204/8
**formula [1]** 26/12
**forth [14]** 15/25 16/17 19/7 20/5 39/18 46/18 61/4 116/7 123/2 123/5 128/21 161/21 162/11 168/8
**forward [11]** 9/24 35/3 37/19 39/1 47/25 49/1 52/2 125/24 132/19 181/25 182/1
**fought [4]** 20/18 30/2 169/17 212/1
**found [2]** 40/8 84/19
**foundation [1]** 136/10
**founded [1]** 76/21
**four [14]** 2/17 25/18 32/25 36/7 89/5 91/11 91/13 91/13 101/21 141/11 145/16 156/22 157/11 206/25
**fours [1]** 19/23
**frame [4]** 133/13 133/14 136/2 185/4
**framework [5]** 39/18 71/5 71/7 71/10 101/18
**frankly [9]** 34/4 43/19 44/10 52/16 55/3 177/18 184/17 197/8 200/12
**fraudulent [11]** 2/19 2/23 3/4 3/5 33/8 33/16 33/22 35/17 43/12 44/1 46/16
**free [1]** 140/8
**frequent [1]** 100/8
**frequently [1]** 121/19
**front [6]** 45/1 110/22 137/11 145/10 185/2 187/21
**full [5]** 45/18 63/22 94/25 97/23 196/22
**fully [2]** 38/23 108/8
**function [1]** 25/20
**fund [95]** 41/17 41/19 44/25 102/1 102/20 102/21 116/14 116/19 116/21 118/6 120/14 120/14 120/15 120/17 120/22 120/24 121/13 123/12 123/18 123/24 124/1 124/2 124/2 124/10 124/21 125/1 125/3 133/18 133/19 133/20 141/4 142/23 142/24 143/2 143/3 143/3 143/9 144/12 144/13 146/4 146/13 146/16 153/9 162/15 163/1 163/4 163/22 164/9 164/10 164/13 164/17 164/21 167/18 169/12 170/24 172/8 172/17 172/19 173/14 173/17 173/19 173/20 174/20 174/22 174/23 175/20 178/17 179/5 179/9 179/10 179/12 179/13 179/16 179/23 180/4 180/16 180/18 180/25 180/25 181/4 181/5 181/5 181/19 183/2 183/8 183/9 191/11 193/25 194/11 194/21 197/6 203/22 204/4 204/9 211/2
**fundamental [1]** 201/25
**funding [24]** 37/4 37/6 37/15 103/2 111/1 115/19 116/23 117/20 118/2 123/4 123/6 123/8 123/14 123/15 123/18 124/24 124/24 145/8 154/5 156/9 170/21 181/4 183/9 211/21
**funds [88]** 18/11 18/14 18/15 42/10 42/17 42/24 59/16 96/24 96/25 103/2 111/5 113/24 114/3 116/4 116/8 116/11 116/16 117/6 117/15 118/19 118/20 119/24 120/1 120/12 120/16 121/12 121/18 121/21 122/1 122/4 122/5 122/7 124/18 125/3 126/8 127/7 127/8 129/7 129/15 130/3 130/4 132/24 133/24 134/17 134/22 137/25 138/18 139/25 140/16 142/23 143/10 144/11 145/6 146/2 146/10 147/16 150/23 154/15 155/15 155/19 155/22 156/8 156/16 158/22 163/12 163/24 165/6 166/1 167/8 170/10 171/6 180/13 181/7 194/4 197/14 199/21 200/2 201/1 201/10 201/17 201/22 202/7 202/8 208/15 211/3 211/18 211/19 211/23
**further [14]** 11/18 11/24 25/17 112/10 113/22 125/7 126/6 141/10 150/12 151/6 164/5 167/5 195/16 200/15
**furthered [1]** 99/24
**fuss [1]** 64/7
**future [7]** 41/10 50/23 93/19 166/17 182/5 189/19 202/3

## G

**gained [1]** 99/23
**game [1]** 194/9
**gap [1]** 170/14
**gaps [1]** 164/20
**Gate [1]** 3/3
**Gateway [2]** 2/17 3/13
**gathering [1]** 107/2
**gave [3]** 54/17 153/16 192/25
**general [19]** 1/15 1/15 1/20 2/5 2/8 2/12 2/15 6/21 17/7 61/3 93/6 98/24 100/9 101/7 101/9 120/14 121/3 145/6 156/8
**General's [1]** 113/8
**generally [2]** 51/18 99/20
**generate [1]** 108/2
**generators [2]** 53/4 53/5
**generators/transporters [1]** 53/4
**generous [4]** 39/11 55/1 56/7 57/4
**Geoff [1]** 6/24
**GEOFFREY [1]** 2/6
**geology [1]** 115/11
**George [1]** 53/2
**gets [13]** 80/11 82/2 83/23 86/21 130/16 133/23 143/3 164/12 166/12 174/23 194/14 194/21 195/23
**getting [21]** 54/5 61/1 87/21 91/24 121/8 131/24 139/25 150/14 150/16 151/8 152/7 152/9 152/10 157/24 158/6 173/8 175/4 177/21 178/24 180/8 200/3
**give [28]** 15/10 16/5 18/4 20/23 27/25 36/12 39/5 40/4 63/15 65/3 66/25 68/7 84/23 95/19 96/20 97/16 144/4 144/6 144/10 150/1 154/10 158/7 168/12 175/5 191/4 204/20 206/24 207/2
**given [14]** 15/15 18/21 76/20 77/13 82/11 85/1 127/20 131/24 138/6 140/11 151/19 161/12 185/20 198/6
**gives [6]** 93/15 146/1 147/12 148/2 151/9 195/16
**giving [6]** 23/3 69/22 154/16 154/16 165/1 191/6
**global [1]** 31/22
**gloss [2]** 198/8 198/11
**go-by [1]** 58/19
**goal [5]** 34/8 34/12 49/16 83/11 90/9
**goals [2]** 166/21 170/20
**goes [36]** 20/16 50/3 85/10 126/25 130/19 131/9 132/5 134/14 135/1 138/6 138/7 138/23 138/24 139/13 143/20 143/22 147/13 147/14 148/13 148/20 148/22 149/6 164/19 170/15 170/20 178/11 187/1 187/3 187/9 191/6 191/7 191/22 192/19 194/23 196/15 200/13
**gone [3]** 53/15 162/7 202/5
**good [38]** 6/5 6/6 6/7 6/8 6/9 6/10 6/12 6/20 6/23 7/1 7/2 7/3 7/5 7/7 7/13 7/17 7/18 7/18 7/22 7/25 8/2 8/3 8/24 9/18 20/8 21/25 59/20 63/25 67/2 85/7 97/13 125/9 126/2 126/3 158/7 166/9 199/2 199/3
**good-faith [1]** 20/8
**goodbye [1]** 211/24
**gosh [1]** 29/3
**got [28]** 9/2 22/18 29/12 39/3 42/5 50/12 52/8 58/8 85/19 86/16 91/6 143/14 147/9 150/8 154/3 158/7 167/9 168/7 172/3 173/6 173/22 176/15 176/16 178/22 204/25 205/22 205/24 206/3
**Gotcha [1]** 88/5
**gotten [1]** 177/19
**govern [1]** 14/1
**governed [1]** 147/8
**government [4]** 18/24 35/11 67/3 69/8
**government's [1]** 46/10
**governmental [1]** 176/13
**governments [3]** 31/10 46/13 47/21
**Governor [1]** 211/3
**governor's [3]** 101/10 119/13 120/5
**governs [2]** 170/25 174/22
**grabbing [1]** 173/4
**granted [3]** 9/3 9/10 9/12
**graphic [1]** 107/22
**gray [1]** 85/5
**great [10]** 30/2 52/18 58/6 72/8 73/4 185/19 200/7 210/3 211/25 212/3
**greater [4]** 20/12 114/3 132/20 134/4
**Greenwich [1]** 2/4
**gross [1]** 33/7
**ground [1]** 209/12
**ground-zero [1]** 209/12
**grounds [1]** 13/7
**groundwater [9]** 68/19 83/19 83/22 83/23 90/14 109/15 181/1 188/2 188/4
**group [1]** 42/8
**grouping [1]** 141/10
**groupings [1]** 141/7
**groups [2]** 47/3 141/11
**guarantee [3]** 93/13 97/5 201/15
**guardian [1]** 165/20
**guardrail [8]** 165/21 165/23 166/1 166/5 170/6 170/15 172/1 172/8
**guardrails [5]** 118/19 166/13 167/10 171/6 177/1
**guess [10]** 9/25 39/17 60/8 61/11 126/12 148/7 151/15 182/20 199/4 199/6
**guesstimate [1]** 85/16
**guest [1]** 124/7
**guidance [1]** 39/22
**guidelines [2]** 176/23 176/23
**guiding [1]** 177/14
**Gulf [2]** 67/2 67/7
**GWEN [2]** 1/15 6/21
**Gwen Farley [1]** 6/21

## H

**Haas [2]** 19/25 20/5
**hac [2]** 2/21 3/10
**hadn't [3]** 16/7 16/8 73/16
**Hague [1]** 69/22
**half [8]** 26/10 26/24 27/4 27/22 45/16 50/3 50/6 137/6
**hand [7]** 51/16 53/4 53/5 63/13 97/14 119/12 119/15
**handed [2]** 30/23 52/25
**handing [2]** 17/19 64/24
**handle [5]** 192/8 195/4 195/9 195/10 195/12
**Hanover [3]** 3/19 8/4 8/19
**happen [5]** 113/6 119/2 132/17 190/16 202/4
**happened [2]** 69/6 209/15
**happening [1]** 208/22
**happens [4]** 131/12 137/17 149/3 190/14
**happy [6]** 113/15 124/8 146/5 152/10 210/15 210/15
**hard [9]** 20/18 30/2 162/4 173/10 173/18 202/9 212/1 212/1 212/7
**hard-fought [2]** 20/18 30/2
**harder [2]** 51/23 55/7
**harm [2]** 195/13 195/15
**harmful [1]** 50/11
**harms [7]** 69/5 69/12 69/14 69/16 69/19 69/23 71/20
**HARRISON [1]** 2/3
**has [87]** 15/21 18/19 20/15 25/25 26/17 33/24 34/12 38/12 42/5 42/19 45/20 48/23 50/21 51/21 53/22 54/13 56/12 57/23 66/7 71/10 82/11 87/12 87/14 90/4 90/22 91/4 92/10 92/11 92/15 93/13 94/22 97/5 111/12 115/16 118/1 118/5 124/10 130/20 133/15 135/4 135/4 135/19 135/20 138/1 140/3 140/5 140/15 142/19 144/17 149/12 149/24 150/22 151/3 151/16 151/17 155/14 156/16 156/21 158/23 164/14 165/3 168/4 168/15 168/20 173/19 174/9 176/1 176/7 176/8 178/14 178/23 193/12 193/18 194/11 195/5 195/11 195/12 196/12 196/15 199/13 199/13 199/15 200/11 200/24 201/4 201/21 210/14
**hasn't [3]** 9/12 193/1 204/4
**hauled [1]** 78/21
**have [248]**
**haven't [5]** 11/16 96/14 168/1 203/24 205/6
**having [10]** 15/24 63/19 86/25 97/20 104/7 119/17 173/10 184/14 185/23 212/4
**HAWORTH [2]** 3/2 7/14
**Haymes [2]** 124/6 124/7
**hazardous [5]** 36/6 50/13 54/15 66/12 68/21
**he [24]** 15/21 18/8 60/21 61/8 94/24 94/24 95/5 131/16 148/2 148/8 148/9 149/13 150/22 157/14 167/24 167/25 168/13 184/23 184/23 184/24 184/24 195/20 204/14 210/21
**he's [5]** 93/21 124/8 124/8 197/4 197/6
**head [3]** 61/1 161/2 183/5
**headed [2]** 131/16 134/9
**heading [2]** 123/21 139/1
**health [7]** 30/16 41/4 45/4 48/22 68/15 72/1 99/22
**hear [12]** 16/25 46/24 59/20 92/24 108/10 133/7 135/4 146/8 190/10 203/19 204/17 207/12
**heard [18]** 16/7 16/8 18/22 40/11 45/20 46/7 48/18 60/20 103/18 114/23 146/4 171/13 178/19 184/1 186/9 203/14 203/24 211/5
**hearing [11]** 1/7 12/13 23/2 23/4 50/18 110/7 134/16 143/6 149/14 153/18 164/23
**hearings [2]** 23/7 208/21
**heart [3]** 12/17 17/1 18/1
**heavily [1]** 32/9
**held [3]** 6/1 41/18 67/20
**help [11]** 20/24 29/12 29/17 37/11 70/2 156/25 165/4 168/9 168/11 182/13 183/25
**helped [1]** 70/5
**helpful [6]** 17/5 24/21 36/16 36/17 77/19 111/25
**helping [1]** 30/15
**helps [2]** 83/13 173/7
**her [4]** 128/13 129/2 164/14 178/16
**here [81]** 15/3 18/7 18/12 19/3 19/23 20/20 26/15 29/12 31/24 32/8 40/8 45/3 50/18 52/9 59/4 64/5 64/9 65/3 67/1 69/24 70/1 70/7 71/4 71/8 73/8 75/16 75/18 82/2 84/7 86/2 86/5 86/9 86/21 88/20 90/9 91/22 92/2

## H

**here... [44]** 93/8 94/8 96/17 100/16 101/20 102/8 104/14 106/19 114/9 119/17 120/1 121/8 124/8 133/6 139/23 140/2 153/23 154/6 154/22 155/16 156/15 160/23 163/17 164/14 166/22 170/1 170/22 171/13 173/24 176/15 176/16 176/19 177/9 182/19 184/24 188/10 190/12 193/6 202/1 203/1 203/18 205/7 210/14 211/17
**here's [7]** 13/3 55/10 126/18 159/4 164/23 204/19 209/20
**herein [2]** 41/7 42/25
**herring [2]** 134/7 135/18
**hey [3]** 171/20 171/24 176/18
**high [2]** 48/6 59/18
**higher [2]** 52/1 85/13
**him [5]** 65/6 94/23 98/20 153/3 197/8
**hired [4]** 69/17 69/20 71/16 71/19
**HIRSCH [5]** 3/10 7/20 60/16 60/18 61/12
**his [13]** 60/16 61/6 65/3 65/6 95/10 99/16 151/24 152/13 157/14 161/5 174/25 204/13 204/14
**histories [1]** 69/5
**history [5]** 23/16 24/16 29/16 36/1 45/21
**hit [1]** 17/24
**Hogan [3]** 4/4 210/21 211/8
**hold [6]** 93/20 150/8 162/1 169/20 186/17 196/19
**holding [2]** 101/20 134/17
**holds [2]** 33/23 33/25
**HOLLINGSWORTH [1]** 2/20
**homes [2]** 72/12 74/17
**honest [1]** 136/15
**honestly [1]** 50/17
**Honor [117]** 6/8 6/10 6/20 6/23 7/1 7/5 7/10 7/13 7/18 8/3 8/16 8/24 9/7 10/8 10/12 10/21 11/11 14/21 17/4 17/11 17/22 23/11 23/19 23/24 24/9 25/2 25/9 25/11 32/23 33/9 40/5 59/24 60/3 60/15 60/19 61/13 61/15 61/23 61/25 62/3 62/8 62/19 62/22 63/1 63/8 65/14 87/16 94/20 95/6 95/14 95/21 96/4 97/7 97/10 105/6 105/10 105/12 106/4 110/19 112/7 112/16 118/17 118/22 119/1 119/4 119/5 122/13 122/21 125/8 125/12 125/21 127/23 128/12 136/5 136/10 136/24 137/15 137/24 145/17 146/5 149/9 153/19 154/19 154/23 155/5 160/25 163/14 164/14 175/19 176/10 177/10 177/16 177/18 178/21 180/5 182/11 182/13 183/14 183/21 183/22 188/2 188/7 192/11 192/14 196/9 197/10 201/6 202/25 210/20 212/6 212/8 212/9 212/10 212/11 212/12 212/13 212/14
**HONORABLE [3]** 1/12 4/2 6/1
**hook [1]** 42/1
**hope [1]** 210/10
**hopefully [4]** 82/8 90/25 210/9 210/12
**hopes [1]** 85/16
**hoping [1]** 163/6
**horizon [1]** 26/23
**horse [2]** 164/15 194/5
**horses [1]** 150/8
**hotly [2]** 21/17 187/24
**hour [3]** 96/7 125/10 125/13
**hours [1]** 177/17
**household [4]** 74/18 74/20 77/17 81/15
**Houston [1]** 1/20
**however [2]** 28/15 127/6
**huge [6]** 29/16 32/2 43/2 43/2 44/15 137/8
**Hughes [1]** 1/16
**huh [11]** 11/23 19/13 98/4 115/1 160/19 164/3 174/21 176/3 176/21 190/18 210/23
**human [3]** 30/15 48/21 71/25
**hundreds [2]** 31/10 73/8
**Hunterdon [1]** 164/6
**hyperlink [1]** 210/2
**hypotheticals [1]** 202/3

## I

**I'd [7]** 17/13 105/6 106/4 119/25 121/9 153/8 196/8
**I'll [33]** 9/12 12/14 12/18 17/3 17/16 18/15 18/17 26/9 32/11 35/23 37/22 40/17 62/16 90/20 96/19 96/25 98/17 112/13 113/10 113/12 113/15 114/15 133/25 150/9 152/17 153/7 180/1 180/11 192/11 198/20 202/15 206/7 210/11
**I'm [128]** 7/20 11/12 12/9 13/20 13/25 14/1 14/9 15/1 15/22 15/23 16/1 16/2 16/12 16/12 19/8 20/22 21/1 22/21 23/11 24/17 26/19 27/8 29/22 32/20 40/4 40/6 40/7 41/15 43/8 48/4 48/14 52/23 53/2 53/18 54/4 55/17 57/19 61/1 65/17 67/12 73/21 92/24 92/25 94/22 96/16 103/16 105/1 118/22 119/17 119/18 121/8 124/8 126/4 131/15 131/15 132/9 132/18 133/4 133/5 133/22 134/16 136/22 136/25 137/13 139/3 142/16 142/20 143/4 143/6 146/5 148/22 149/14 150/3 150/16 151/7 151/8 151/21 153/11 153/14 155/17 156/13 159/4 159/5 159/5 160/17 160/17 160/18 160/20 162/3 162/3 162/4 162/6 162/12 162/14 164/23 169/25 173/10 173/10 173/14 173/21 175/4 177/21 178/2 179/17 180/6 180/8 182/18 184/4 186/2 186/23 188/1 188/3 188/5 188/6 189/5 194/10 194/24 196/1 197/7 197/7 199/5 202/25 205/10 205/14 205/21 206/18 209/20 209/22
**I've [19]** 50/12 52/8 61/22 136/6 136/19 142/20 150/8 163/7 175/10 177/19 178/4 184/1 186/9 189/13 189/24 204/11 206/2 209/21 209/24
**idea [4]** 130/13 166/19 175/20 192/15
**identification [10]** 95/16 105/13 106/7 107/4 108/21 122/17 126/16 127/12 134/2 182/17
**identifies [1]** 83/1
**identify [9]** 73/15 75/25 82/3 107/1 107/11 107/15 107/23 108/4 108/20
**IEC [7]** 65/20 65/23 66/14 67/14 67/15 75/1 76/18
**ignore [1]** 202/11
**ignoring [1]** 14/25
**image [1]** 119/15
**imagine [1]** 174/6
**immediate [3]** 164/1 166/16 208/11
**immediately [1]** 129/6
**immunity [1]** 47/18
**impact [4]** 12/21 66/20 68/25 83/24
**impacted [4]** 101/4 143/1 145/19 209/12
**impacting [1]** 49/18
**impacts [2]** 188/4 188/4
**implement [1]** 110/12
**implications [2]** 67/5 171/17
**implicitly [1]** 195/5
**important [17]** 21/10 32/3 40/24 45/7 45/7 45/10 46/20 46/25 50/8 54/14 57/12 57/12 75/16 108/4 118/4 198/20 200/13
**importantly [2]** 38/2 47/11
**improper [1]** 178/4
**improve [1]** 146/12
**improving [2]** 145/7 156/9
**imprudent [1]** 54/9
**Inc [10]** 2/18 2/22 3/4 3/4 3/5 7/8 7/14 7/15 33/24 53/2
**incineration [1]** 80/16
**inclined [1]** 196/1
**include [5]** 69/8 121/19 133/16 138/2 158/1
**included [5]** 14/12 14/23 53/19 84/24 100/10
**includes [5]** 31/6 88/23 145/6 146/2 150/22
**including [17]** 31/18 33/13 36/6 44/24 71/20 100/12 107/2 109/9 109/15 115/9 115/18 123/7 132/13 139/23 139/24 202/1 208/6
**inclusion [3]** 14/4 14/10 14/11
**inconsistent [1]** 41/6
**increases [1]** 90/6
**increasing [1]** 90/5
**increasingly [1]** 84/23
**Incredible [1]** 43/21
**incredibly [2]** 46/25 54/14
**incur [1]** 68/23
**incursion [1]** 69/21
**indeed [2]** 158/24 159/1
**independent [1]** 134/22
**INDEX [1]** 4/9
**Indian [1]** 69/11
**indicated [1]** 138/18
**indirect [1]** 139/24
**individual [2]** 59/5 185/12
**individualized [1]** 115/9
**industrial [17]** 32/25 34/10 36/7 39/21 47/6 57/8 59/7 65/17 65/19 76/20 76/23 81/15 82/7 101/21 107/5 188/20 206/25
**industries [1]** 76/23
**industry [1]** 82/4
**infiltrate [1]** 90/15
**influent [2]** 77/9 78/10
**information [16]** 70/2 70/9 72/8 75/23 77/12 77/13 89/23 95/1 95/2 107/2 107/2 107/4 108/22 121/14 121/20 122/6
**informed [1]** 27/6
**infrastructure [7]** 102/2 102/17 102/19 110/12 111/2 111/4 123/9
**inherent [1]** 146/14
**initial [15]** 39/18 40/12 123/5 129/7 129/9 137/16 139/14 147/13 149/16 151/11 151/14 158/4 159/8 159/9 205/9
**initially [2]** 78/2 78/4
**injunction [1]** 203/25
**injury [5]** 31/7 31/9 46/5 69/1 177/11
**injury-type [1]** 31/9
**inquiring [1]** 96/16
**inside [1]** 131/1
**insignificant [1]** 78/9
**instances [1]** 52/1
**instead [1]** 130/23
**instruct [2]** 130/2 135/2
**instructed [2]** 128/18 130/5
**instructions [4]** 127/19 134/25 135/1 135/2
**instrument [1]** 164/12
**insurance [1]** 170/20
**intend [3]** 18/3 65/5 124/21
**intended [4]** 39/19 110/5 116/24 179/9
**intends [5]** 57/6 113/24 118/18 121/16 122/7
**intent [1]** 210/5
**intention [1]** 146/14
**intentionally [1]** 109/9
**intentioned [1]** 146/17
**interest [10]** 18/16 19/6 19/17 19/20 20/13 103/4 103/4 111/10 142/18 144/14
**interested [3]** 52/23 59/17 126/7
**interestingly [1]** 92/19
**interests [1]** 140/21
**interface [1]** 168/8
**interfere [1]** 201/13
**Interior [1]** 69/10
**intermediary [2]** 165/4 165/8
**intermediate [1]** 85/6
**internal [2]** 185/9 187/19
**internally [2]** 184/8 186/2
**internationally [1]** 69/15
**interpret [1]** 12/15
**interpreting [2]** 13/25 15/15
**interstate [1]** 89/6
**intervene [2]** 9/9 9/14
**intervening [1]** 9/2
**intervenor [3]** 3/14 3/14 190/23
**Intervenors [1]** 3/24
**intervention [3]** 9/3 9/11 207/18
**invading [1]** 69/19
**investigated [1]** 185/24
**investigating [3]** 115/14 115/17 117/20
**investigation [4]** 116/8 116/24 123/18 125/1
**inviting [2]** 104/7 104/9
**involve [1]** 100/7
**involved [9]** 43/17 43/21 100/8 100/17 100/18 106/16 184/18 208/17 208/25
**involvement [1]** 100/6
**involving [2]** 32/25 65/21
**Iraq [2]** 69/18 69/19
**ironically [1]** 163/22
**IRS [5]** 190/14 190/15 190/17 190/24 200/11
**Islands [1]** 2/12
**isn't [14]** 14/3 55/12 56/8 140/19 142/21 143/5 144/1 144/5 144/6 170/9 173/2 181/12 190/15 195/6
**ISRA [6]** 2/19 2/23 7/16 33/8 35/18 44/1
**issue [36]** 11/1 16/17 27/17 28/20 33/17 34/1 35/5 44/8 56/8 96/4 132/3 133/9 133/11 133/13 133/14 137/1 137/2 143/25 167/2 175/23 177/17 190/11 190/14 190/24 194/5 195/10 195/21 195/22 196/6 197/9 197/21 197/22 199/9 199/12 200/12 202/12
**issued [1]** 118/5
**issues [30]** 18/2 18/3 18/8 21/7 26/15 26/21 34/19 34/22 35/13 35/14 36/22 46/11 46/16 46/17 48/6 65/10 65/11 68/16 71/10 88/10 96/25 114/25 163/16 187/25 190/23 195/12 197/14 197/20 198/8 198/9
**items [1]** 84/7
**its [32]** 18/21 22/19 32/15 33/12 33/24 33/25 34/3 38/3 38/3 45/21 46/8 71/22 77/15 81/19 83/19 83/20 84/19 88/10 103/23 103/23 108/6 109/17 111/12 115/8 115/14 115/18 136/1 144/5 144/7 155/11 189/1 199/8
**itself [6]** 27/3 32/2 118/6 180/6 181/14 195/11

## J

**JACK [1]** 2/10
**JACKSON [13]** 1/19 6/22 10/1 14/18 17/3 17/21 19/12 60/10 61/5 63/7 64/18 183/25 192/4
**Jackson's [2]** 23/14 60/20
**January [14]** 15/18 18/18 18/23 27/14 29/8 46/7 46/23 110/6 153/18 154/14 170/22 177/10 198/1 207/20
**January 7 [1]** 110/6
**January 7th [3]** 15/18 46/7 153/18
**JBC [4]** 1/4 1/4 1/5 1/5
**JCO [57]** 10/11 11/6 11/25

## J

**JCO... [54]** 14/5 14/12 14/24 15/5 26/18 28/21 30/24 37/21 38/10 38/14 39/19 39/19 41/1 41/6 60/23 61/3 102/10 105/3 113/22 116/17 118/13 126/22 129/8 130/19 131/5 131/9 132/16 135/25 140/9 141/1 142/21 144/17 146/9 152/20 152/21 152/22 156/21 157/23 158/18 164/12 166/12 173/15 190/23 190/24 191/11 199/22 201/11 205/11 205/16 205/18 206/1 206/24 208/3 208/10
**JCOs [38]** 10/8 10/14 10/18 10/19 10/20 10/23 16/12 17/7 18/5 18/23 19/4 19/8 20/3 24/5 25/16 37/1 47/1 60/2 60/5 100/25 104/16 113/23 113/25 117/25 130/18 130/23 131/17 137/20 150/24 154/9 194/2 194/18 197/11 199/16 202/6 202/13 203/11 211/22
**Jefferson [1]** 2/7
**JENNER [2]** 3/9 7/21
**jeopardized [1]** 205/11
**JERSEY [99]** 1/1 1/3 1/10 1/15 1/17 2/7 2/18 3/3 3/14 3/18 3/24 6/16 17/10 19/11 19/21 21/9 22/4 25/25 26/1 26/13 26/14 26/18 27/10 28/6 28/14 30/10 30/15 32/1 32/8 32/16 32/17 32/22 33/4 34/6 34/11 44/12 45/19 45/22 47/14 47/15 47/17 48/8 48/24 51/19 57/2 58/23 69/25 70/18 71/9 71/15 71/20 72/11 72/20 73/19 74/1 74/5 74/19 77/16 77/24 78/3 78/25 81/22 82/1 82/11 82/21 84/5 88/16 92/23 92/25 98/8 98/16 101/14 101/17 101/25 102/12 102/17 103/24 109/1 110/8 111/3 120/2 125/4 125/5 140/15 163/12 168/23 169/3 170/16 181/13 185/8 187/3 190/17 196/16 196/24 201/25 204/8 210/20 210/22 210/25
**Jersey's [3]** 48/19 73/21 74/11
**job [4]** 55/7 66/19 144/5 144/7
**Joel [1]** 4/2
**John [6]** 1/22 1/22 2/10 3/22 8/24 212/23
**joined [4]** 7/9 7/20 99/23 100/2
**joint [7]** 38/7 50/10 51/20 52/17 54/20 127/19 208/21
**jointly [1]** 41/24
**journey [1]** 156/21
**JR [2]** 3/22 8/25
**judge [42]** 1/13 4/4 6/2 7/25 10/25 11/17 11/22 12/7 12/8 13/22 15/6 15/21 16/6 16/7 34/18 62/9 65/1 125/23 126/18 133/8 134/11 135/4 136/18 147/20 162/12 165/19 169/19 172/5 172/13 178/13 182/10 183/12 190/6 193/18 196/17 204/25 205/21 206/16 209/4 210/17 210/21 211/8
**judgment [4]** 16/9 20/12 27/21 204/1
**judicata [6]** 13/14 13/15 13/15 13/22 13/23 15/9
**Judicial [3]** 4/6 19/10 202/24
**judiciary [1]** 211/11
**jumble [5]** 15/20 15/24 16/1 16/3 195/6
**June [5]** 1/11 71/18 103/8 110/15 212/23
**June 1st [2]** 103/8 110/15
**jurisdiction [6]** 12/2 12/20 21/21 168/23 203/2 204/1
**jury [2]** 44/2 205/25
**just [161]** 9/16 11/12 17/23 17/24 23/21 30/6 30/23 31/18 34/4 36/16 37/22 40/7 40/14 40/23 41/22 44/2 44/5 44/10 45/5 47/18 51/15 52/12 52/25 53/9 53/18 54/4 58/12 61/18 62/12 62/16 65/1 65/7 65/9 66/25 67/25 72/24 73/10 78/21 80/3 80/4 82/2 82/15 85/4 85/4 85/20 85/21 86/13 86/21 87/4 87/12 89/4 91/14 91/15 93/7 93/20 93/24 95/5 95/10 95/22 96/5 96/15 96/18 102/4 102/14 103/10 104/1 105/11 105/21 107/25 108/10 108/18 108/22 109/2 109/6 109/12 110/4 110/24 111/16 113/22 114/2 114/8 114/8 114/14 114/15 114/19 115/12 115/15 116/18 117/18 119/15 119/23 120/11 121/23 122/24 123/21 124/9 126/24 134/4 134/15 134/17 134/20 135/3 136/2 136/25 139/8 139/11 140/18 141/13 143/22 144/25 146/18 146/23 147/5 148/4 149/10 149/14 149/19 152/12 152/22 153/10 153/14 155/5 158/6 162/5 162/8 167/2 169/6 170/8 170/20 175/24 177/16 177/20 178/4 178/13 181/10 182/24 185/22 186/23 187/12 188/5 188/15 189/7 191/17 193/4 194/24 194/24 196/2 196/9 199/5 199/7 199/10 202/15 203/9 204/16 205/4 207/16 209/5 209/8 209/13 210/3 210/20
**Justice [2]** 1/16 69/9

## K

**KAUFF [3]** 2/14 6/24 52/25
**KEEFE [7]** 3/22 3/22 8/24 163/13 169/25 175/4 199/25
**keep [10]** 34/19 81/1 93/13 95/11 135/17 159/11 169/1 173/18 195/19 199/2
**KELLEY [3]** 1/18 2/2 2/6
**key [10]** 18/1 20/24 25/12 29/20 35/21 43/11 44/10 46/3 194/19 205/9
**Kim [1]** 18/12
**Kimberly [3]** 97/11 97/19 97/24
**kind [32]** 14/12 15/2 19/22 20/23 29/22 30/7 44/11 48/2 50/7 54/4 65/1 73/9 78/1 81/18 90/16 130/12 156/13 162/8 162/8 165/4 168/18 181/11 185/2 186/1 187/13 187/24 192/2 193/23 194/5 196/13 203/23 206/6
**kinds [4]** 51/14 74/8 154/5 206/3
**KING [2]** 3/6 7/19
**knew [2]** 49/22 56/25
**Knolls [2]** 3/17 3/18
**know [168]** 11/5 13/1 16/16 19/16 21/3 21/16 22/14 26/14 28/12 30/3 31/4 31/7 32/4 32/15 32/21 32/24 34/7 34/16 34/18 36/5 37/17 40/16 42/4 43/1 43/19 44/3 44/8 44/11 45/3 45/5 45/16 47/7 51/18 51/23 52/7 52/10 52/12 54/8 54/12 55/7 56/21 56/23 57/3 57/6 57/8 58/3 60/7 61/19 62/16 65/3 65/11 68/18 73/2 73/16 73/23 74/4 74/14 76/5 76/10 76/13 77/13 80/10 80/23 81/5 82/4 82/16 82/17 83/12 87/17 89/2 89/15 92/12 92/13 93/5 93/21 94/25 95/2 99/24 106/18 107/5 108/24 110/9 124/24 129/12 130/16 130/24 130/25 131/2 132/24 136/10 136/11 136/20 136/25 140/14 143/2 143/4 143/7 143/16 144/1 148/23 149/6 149/8 149/17 149/18 150/4 151/12 151/21 151/23 151/24 152/11 152/11 152/12 152/12 154/12 158/6 160/14 160/22 161/5 161/6 161/7 161/11 161/12 162/3 165/14 165/20 166/15 168/1 168/5 168/17 173/13 173/14 173/25 174/5 175/10 175/19 175/21 176/5 177/17 178/25 179/24 184/18 184/23 185/8 185/17 185/20 185/25 187/24 192/4 192/25 193/4 194/5 194/21 194/22 195/6 197/5 197/12 197/15 198/6 198/11 198/18 199/12 199/22 200/16 200/24 201/2 205/23 206/5 209/18
**knowledge [3]** 99/23 99/24 104/23
**known [4]** 28/13 117/22 120/15 156/2
**knows [4]** 33/9 130/25 143/23 154/6
**Kurz [3]** 1/22 1/22 212/23
**KURZWEIL [2]** 2/17 7/6
**Kuwait [1]** 69/19

## L

**laches [1]** 35/11
**lack [1]** 21/22
**Lakes [12]** 33/1 33/2 45/20 139/22 141/3 156/23 158/20 158/24 159/1 161/14 161/23 209/6
**land [1]** 43/7
**landfill [1]** 91/19
**landfills [1]** 78/20
**LANDIS [2]** 3/12 8/1
**landmark [1]** 101/16
**language [15]** 11/5 12/3 13/12 13/14 144/22 144/24 146/1 155/20 156/15 169/16 169/22 172/17 189/22 195/8 203/11
**LANNY [2]** 2/17 7/5
**large [10]** 24/14 27/4 69/10 69/11 74/18 92/23 92/25 110/9 158/17 197/17
**largely [3]** 19/5 25/13 66/7
**larger [1]** 32/21
**largest [2]** 29/15 35/25
**Larry [1]** 4/5
**last [18]** 12/13 14/19 19/2 21/5 31/19 37/18 47/13 54/14 96/7 124/7 146/6 177/17 192/12 198/1 201/3 203/13 204/18 210/24
**lastly [1]** 62/14
**later [10]** 11/9 27/16 27/23 28/2 28/2 28/20 54/17 60/13 174/11 211/4
**LaTourette [1]** 99/15
**Laughter [4]** 35/2 38/20 203/6 210/16
**Laurel [1]** 3/3
**law [29]** 2/9 2/13 3/22 4/6 21/8 33/6 37/4 41/3 41/25 51/12 51/13 51/13 51/24 52/8 53/6 95/19 98/24 98/25 100/9 113/8 163/23 170/25 170/25 179/21 184/17 186/19 191/24 192/23 193/2
**laws [5]** 38/24 39/22 41/5 170/16 201/16
**lawsuit [4]** 100/1 100/4 100/6 209/5
**lawyer [1]** 168/19
**lawyers [3]** 131/1 137/13 154/12
**lay [2]** 139/22 210/9
**layers [2]** 42/23 45/2
**lays [2]** 139/22 139/25
**leader [1]** 109/3
**leads [2]** 54/21 57/16
**learned [1]** 85/18
**least [7]** 24/13 24/24 58/16 65/2 76/16 159/22 196/18
**least-cost [1]** 76/16
**leave [1]** 57/16
**leaves [1]** 189/22
**led [3]** 23/7 33/15 92/16
**leech [1]** 90/18
**left [14]** 12/5 12/9 75/9 84/6 90/25 91/17 91/22 96/6 108/1 108/7 119/12 149/1 183/19 204/20
**left-hand [1]** 119/12
**leftover [2]** 161/4 161/11
**legal [8]** 21/20 34/21 51/4 54/19 98/18 112/13 112/19 164/12
**legally [1]** 164/11
**legislation [11]** 109/7 124/4 189/19 201/8 201/10 201/15 201/18 201/19 201/21 202/2 204/10
**legislative [5]** 168/22 195/4 201/9 202/4 211/12
**legislators' [1]** 201/16
**Legislature [10]** 181/13 181/15 181/15 181/17 189/18 201/5 201/13 201/15 201/21 201/25
**length [1]** 46/23
**less [9]** 76/13 80/4 80/4 81/4 145/23 157/15 161/2 164/22 210/1
**let [34]** 9/24 25/12 61/20 90/18 118/9 121/3 124/10 127/9 127/24 133/7 139/8 144/5 146/8 147/3 147/5 149/10 153/11 155/17 156/12 157/4 165/17 168/11 169/17 170/1 174/5 175/3 175/12 179/18 188/12 189/17 190/9 190/10 194/8 207/12
**let's [37]** 6/15 6/15 8/11 10/3 16/23 20/22 60/8 62/24 63/9 74/25 75/14 77/1 78/23 85/25 86/19 88/19 95/10 109/20 110/3 114/8 115/12 125/10 131/14 139/3 139/11 148/5 148/20 148/21 149/15 159/7 159/19 159/24 162/9 167/24 195/3 202/20 206/7
**letter [1]** 167/6
**level [7]** 18/25 48/7 59/18 65/1 66/16 154/10 184/16
**levels [3]** 30/14 66/16 109/17
**liabilities [12]** 31/11 31/17 31/22 32/15 33/13 33/13 33/16 41/7 44/9 51/16 58/17 70/3
**liability [13]** 20/8 50/7 50/9 51/2 51/17 51/25 52/5 52/6 53/11 53/16 54/20 54/20 87/22
**liable [5]** 21/11 28/14 41/25 54/24 56/21
**liaison [3]** 9/1 9/3 98/23
**life [1]** 136/1
**light [1]** 89/1
**like [62]** 9/14 17/13 24/18 27/17 28/21 38/7 38/18 47/18 48/5 62/19 66/2 67/17 73/7 75/17 76/3 76/4 78/16 79/25 83/5 84/8 87/18 95/1 104/8 105/6 106/4 119/25 120/6 121/9 122/14 128/10 134/5 134/7 138/22 138/25 143/1 144/9 147/11 152/7 152/22 153/8 156/13 160/10 162/4 165/20 168/18 171/11 172/23 173/11 184/19 191/18 191/24 192/22 193/5 193/25 199/7 200/25 202/16 203/9 205/2 208/12 209/6 209/8
**likely [3]** 56/22 75/17 86/11
**likes [1]** 148/2
**limit [2]** 78/6 208/1
**limitation [3]** 179/16 179/17 181/7
**limitations [7]** 117/15 179/22 181/3 181/12 181/16 183/2 183/4
**limited [1]** 211/2
**limits [1]** 207/24
**line [7]** 60/17 127/24 127/25 131/16 135/12 135/15 147/20
**liquid [1]** 79/11
**list [2]** 61/23 206/20
**listed [2]** 54/15 71/17
**listen [1]** 12/8
**lit [1]** 91/7
**literally [2]** 86/21 96/7
**literature [3]** 71/25 72/7

## L

**literature... [1]** 77/4
**litigate [3]** 20/7 27/20 27/21
**litigated [4]** 20/17 21/17 34/1 187/24
**litigation [18]** 21/3 21/4 27/2 27/2 30/1 30/4 32/24 34/7 41/10 43/24 44/4 44/6 45/8 46/12 46/14 46/15 62/9 98/21
**litigations [3]** 31/12 32/18 47/9
**little [28]** 21/6 26/19 52/9 52/10 53/7 55/7 76/3 76/20 77/18 82/20 85/13 93/4 108/10 114/9 134/7 135/18 139/7 140/23 152/8 162/8 178/14 180/25 181/2 182/18 189/20 192/3 194/23 195/3
**lives [2]** 142/24 142/24
**LLC [6]** 2/19 2/23 3/4 3/22 7/9 7/15
**LLP [10]** 1/18 2/2 2/6 2/16 2/20 3/2 3/6 3/12 3/16 4/2
**load [1]** 80/10
**loan [2]** 111/12 111/14
**loans [2]** 103/5 111/14
**local [4]** 31/10 46/13 47/20 82/12
**located [2]** 61/19 139/2
**location [1]** 24/14
**locations [2]** 75/3 92/21
**lodged [1]** 195/1
**logical [2]** 74/1 74/16
**lollipop [1]** 206/3
**long [10]** 13/24 22/19 24/19 44/3 44/13 45/21 79/16 80/8 101/2 196/14
**long-chain [1]** 22/19
**longer [3]** 25/17 67/12 210/13
**look [23]** 9/13 13/22 57/4 68/13 72/6 72/8 73/7 76/14 76/16 79/13 82/3 82/6 92/12 112/13 135/23 137/22 140/22 148/1 165/23 177/3 187/6 189/3 198/21
**looked [7]** 32/3 74/2 77/7 79/13 89/15 93/3 210/4
**looking [18]** 18/1 20/6 32/4 40/25 51/16 52/11 55/2 61/22 64/6 68/17 71/18 72/3 75/18 91/11 170/1 182/25 187/12 197/1
**looks [3]** 9/14 68/10 144/8
**lose [3]** 27/21 167/7 180/4
**losses [1]** 177/10
**lot [25]** 26/21 29/12 30/20 32/14 43/18 45/20 46/7 48/1 51/13 52/13 79/25 80/9 81/14 91/1 91/4 132/2 133/2 150/8 162/7 164/17 177/12 187/13 194/1 196/23 206/6
**loud [1]** 53/18
**low [3]** 92/5 102/18 103/4
**low-cost [1]** 102/18
**lower [1]** 82/9
**LSRP [1]** 39/3
**LSRPs [3]** 37/11 39/25 40/12
**lunch [1]** 118/25

## M

**machine [1]** 90/24
**MacStravic [1]** 4/5
**made [19]** 34/6 34/20 47/24 47/24 55/7 90/7 100/22 113/4 118/6 118/16 127/4 139/17 140/20 145/11 169/11 180/18 182/2 186/2 198/5
**magnitude [2]** 92/22 94/12
**main [2]** 49/15 123/6
**Maine [1]** 84/17
**major [2]** 81/2 83/6
**majority [3]** 46/14 48/11 48/13
**make [62]** 11/15 11/18 11/24 12/2 12/20 12/23 13/1 13/11 13/19 13/21 13/24 23/17 34/9 42/18 42/23 60/4 60/10 63/25 81/11 91/25 120/24 132/4 132/24 140/3 144/12 149/5 151/3 156/15 163/18 164/18 165/15 165/16 166/1 167/19 170/13 170/19 171/14 173/2 176/18 176/19 176/19 176/25 177/15 177/20 177/25 180/3 180/4 180/13 180/14 181/8 181/19 189/8 189/12 190/16 192/14 196/8 201/16 202/15 202/15 202/16 202/18 207/5
**makes [10]** 14/22 52/3 77/15 108/3 108/6 140/10 146/25 164/17 170/18 201/1
**makework [1]** 197/9
**making [9]** 13/20 14/1 22/19 36/22 100/10 140/5 177/22 177/23 196/2
**Malestein [2]** 15/21 16/6
**manage [3]** 163/11 172/24 201/10
**managed [1]** 43/3
**management [2]** 100/13 120/23
**managing [1]** 73/4
**mandamus [1]** 206/2
**mandatory [2]** 157/9 198/13
**manufacturer [3]** 51/24 53/6 88/6
**manufacturers [17]** 47/21 51/6 51/7 52/24 53/13 53/17 53/17 53/20 54/1 54/8 55/11 55/18 56/13 57/7 57/22 80/10 80/12
**manufacturing [1]** 53/12
**many [11]** 21/4 21/17 47/20 52/1 54/14 56/20 65/23 70/15 88/21 154/13 173/3
**MARAZITI [3]** 3/16 8/4 8/9
**marching [1]** 55/4
**MARIE [5]** 1/12 2/21 6/2 7/10 60/24
**mark [4]** 95/10 127/10 133/25 180/11
**marked [11]** 5/11 95/16 105/13 106/7 122/17 126/12 126/15 127/11 134/1 135/23 182/16
**Market [1]** 1/16
**Maryland [1]** 2/15
**Massachusetts [1]** 65/18
**massive [1]** 58/10
**master [23]** 4/2 34/18 116/14 116/22 163/9 163/11 163/25 167/9 167/20 167/23 168/11 168/12 169/4 169/10 169/18 170/15 170/18 171/1 172/23 174/2 175/9 176/9 177/3
**master's [1]** 68/4
**material [14]** 78/16 80/11 89/14 113/5 113/11 113/18 167/16 173/14 174/15 192/16 193/1 193/18 193/21 193/23
**materially [7]** 11/3 112/10 118/10 192/1 192/3 199/4 205/16
**math [5]** 55/5 59/5 85/20 86/13 86/19
**matter [15]** 17/1 19/22 54/12 57/5 63/15 91/24 92/4 97/16 151/20 157/13 170/1 195/17 196/5 202/10 212/20
**matters [7]** 2/23 22/7 24/18 45/9 65/21 70/13 171/3
**MATTHEW [1]** 1/15
**maximum [2]** 27/25 109/17
**may [39]** 3/25 17/17 21/5 22/3 23/19 28/2 56/3 57/9 62/8 70/20 72/22 76/8 88/1 89/13 93/10 107/5 108/8 111/19 112/6 119/5 146/11 154/24 162/10 163/14 164/21 164/21 165/19 166/16 175/19 180/13 180/18 182/13 183/16 185/21 196/21 202/4 202/4 204/4 210/20
**May 19 [2]** 180/13 180/18
**May 19th [1]** 22/3
**maybe [15]** 26/9 59/17 64/7 96/19 131/15 133/6 149/23 160/14 165/1 170/1 181/3 189/19 193/22 193/22 196/18
**McCARTER [2]** 2/16 7/6
**McCracken [1]** 4/2
**MCLs [2]** 74/3 109/17
**MDL [6]** 31/7 31/11 31/15 44/7 58/16 171/9
**me [131]** 8/8 9/24 10/20 12/10 13/5 13/16 14/23 14/24 15/1 15/10 16/14 16/14 17/5 17/8 22/9 22/10 23/21 24/21 25/4 25/12 29/5 36/10 36/12 36/13 38/19 39/5 40/4 40/17 50/24 52/3 52/25 53/9 54/6 54/6 56/6 56/10 56/11 57/15 57/21 60/6 60/9 60/11 60/13 60/22 61/17 61/20 64/4 66/23 67/4 67/6 70/21 71/21 86/14 94/20 96/9 96/11 96/20 118/9 120/6 121/3 124/10 127/9 127/24 130/12 130/18 130/21 131/15 132/8 133/7 134/9 137/13 137/21 137/22 139/8 140/18 144/5 145/24 146/8 147/3 147/5 147/17 149/10 149/19 149/25 151/19 152/11 153/25 156/12 156/25 157/4 162/8 162/20 163/5 163/6 165/17 169/16 170/1 173/7 173/18 173/21 175/3 175/4 175/6 179/18 180/17 183/5 183/25 187/21 188/12 189/17 190/9 190/10 190/13 190/25 194/8 194/25 198/19 203/25 204/22 205/2 205/7 205/17 205/22 206/6 206/14 207/12 208/23 208/24 209/23 210/1 210/2
**mean [41]** 12/14 14/23 15/13 32/6 32/6 39/23 44/21 44/21 53/16 54/4 54/18 55/11 55/21 56/7 60/7 60/14 69/2 71/2 90/14 93/23 94/6 107/14 112/25 113/2 113/2 115/7 132/2 147/7 148/5 157/1 158/23 159/24 166/15 172/15 181/10 181/24 194/4 195/23 198/21 204/11 206/6
**meaning [3]** 142/2 156/8 193/19
**meaningful [1]** 102/2
**meaningfully [1]** 101/19
**meaningless [1]** 201/12
**means [10]** 50/21 67/12 68/8 78/18 116/19 120/14 123/12 162/6 180/1 195/25
**meant [1]** 87/24
**mechanical [1]** 1/23
**mechanism [9]** 40/15 50/18 50/19 101/24 111/7 116/11 131/13 170/19 211/21
**mechanisms [1]** 52/14
**media [3]** 38/24 99/8 99/21
**meetings [2]** 100/8 110/10
**members [2]** 110/8 123/13
**memo [2]** 180/12 182/3
**memorandum [2]** 186/18 186/19
**memorialize [1]** 10/13
**memorialized [1]** 110/14
**memorializing [1]** 10/19
**memory [1]** 25/2
**mentioned [17]** 17/23 29/21 30/6 30/18 31/25 41/23 44/5 44/17 47/13 47/22 64/6 77/16 80/13 93/2 109/7 179/9 199/25
**mentioning [1]** 162/15
**merged [1]** 33/17
**merit [1]** 195/13
**met [2]** 75/6 75/6
**methodology [1]** 155/24
**metrics [1]** 137/7
**MEYNER [2]** 3/12 8/1
**microphone [1]** 98/2
**microsites [2]** 102/9 121/17
**middle [2]** 86/13 145/3
**Middlesex [1]** 3/24
**might [33]** 56/20 57/9 61/2 66/11 67/5 67/6 68/13 68/15 68/23 68/25 72/3 72/5 76/3 76/8 76/13 77/5 77/6 78/7 89/19 90/14 90/17 91/9 112/15 114/10 133/5 136/15 139/3 149/23 151/5 152/8 153/22 153/23 200/6
**military [3]** 31/21 47/16 90/21
**million [139]** 21/18 25/14 25/15 25/19 25/20 26/5 26/12 27/11 28/5 28/10 30/9 41/17 42/8 42/10 42/12 42/14 45/24 45/25 46/1 49/9 58/9 58/25 59/2 59/3 85/21 92/12 92/13 92/20 93/15 93/16 111/6 111/8 111/9 116/7 116/23 124/25 127/1 127/21 128/17 128/19 128/20 128/21 129/9 129/13 129/19 130/14 130/19 131/18 132/10 132/17 133/23 134/12 134/20 135/6 135/7 135/19 135/20 135/25 137/4 137/9 137/16 138/2 138/13 138/13 138/15 138/17 139/13 139/20 139/20 139/21 139/23 141/1 141/2 141/5 141/7 141/9 141/16 141/22 141/24 142/2 142/7 142/8 142/12 143/11 143/23 145/2 145/19 146/9 146/11 146/15 146/16 146/19 147/13 148/1 148/8 148/19 148/21 148/23 149/1 149/4 150/7 150/16 151/3 151/11 151/14 152/20 156/21 158/6 158/8 158/9 158/9 158/17 158/18 158/19 158/20 158/23 159/22 159/22 160/3 160/7 161/3 161/13 161/15 161/21 162/11 165/7 172/24 178/16 178/20 179/1 179/4 185/16 188/3 188/19 188/22 189/2 189/23 191/11 198/14
**millions [3]** 91/21 92/2 92/5
**mind [4]** 81/1 93/13 126/10 185/2
**mine [1]** 143/1
**mini [1]** 35/16
**minimal [1]** 89/8
**minimum [1]** 111/6
**Minnesota [4]** 79/3 79/3 81/5 95/1
**minute [4]** 46/21 59/15 62/24 206/7
**misconstrue [1]** 167/25
**misconstruing [1]** 134/16
**missed [3]** 8/12 104/12 180/19
**missing [2]** 150/3 150/3
**mistaken [1]** 139/3
**Mitchell [1]** 1/9
**mixed [2]** 148/24 152/25
**models [3]** 70/5 76/22 90/2
**modified [2]** 192/4 193/20
**mom [1]** 56/22
**moment [11]** 36/12 37/23 38/16 39/5 90/20 130/14 145/20 150/12 188/15 189/18 197/16
**momentum [1]** 205/1
**money [76]** 34/4 41/21 66/11 126/25 130/13 130/17 131/25 132/5 132/20 133/15 142/25 143/18 143/19 145/20 149/13 150/13 152/4 160/13 160/23 161/4 161/12 161/14 163/18 164/2 164/5 164/7 164/8 164/19 165/15 165/16 165/25 166/4 166/23 166/23 168/9 168/23 170/11 170/20 170/23 170/23 171/2 171/14 172/8 172/19 173/4 173/6 173/7 174/1 174/4 174/10 174/11 174/19 174/23 175/11 175/12 176/6 177/12 179/12 180/15 180/23 183/7 190/19 191/10 191/14 197/13 197/20 199/13 199/15 200/3 200/4 200/8 200/12 203/22 204/21 209/12 211/10
**monies [6]** 131/8 132/4

**M**

**monies... [4]** 153/1 167/4 183/2 191/2
**monitor [1]** 64/5
**monitoring [1]** 166/7
**Monmouth [7]** 175/7 175/8 175/10 175/12 175/14 176/1 176/6
**Montgomery [1]** 4/2
**month [2]** 109/12 143/19
**monthly [1]** 84/9
**months [5]** 136/19 142/24 153/18 154/14 198/1
**more [36]** 28/6 28/9 48/15 49/10 50/5 52/1 52/16 53/1 53/8 54/22 82/20 96/20 109/18 118/21 121/3 137/6 145/1 146/11 146/16 152/8 155/5 159/23 165/17 167/9 176/16 177/18 181/16 184/6 185/21 189/20 195/3 198/8 199/17 204/21 208/25 209/17
**MORELLI [1]** 2/3
**Moreover [1]** 179/21
**morning [24]** 6/5 6/6 6/7 6/8 6/9 6/10 6/20 6/23 7/1 7/2 7/3 7/5 7/7 7/13 7/17 7/18 7/22 7/25 8/2 8/3 8/24 63/25 155/4 156/14
**Morris [3]** 3/18 8/6 8/17
**most [19]** 20/1 28/10 28/18 38/1 45/19 76/14 79/6 84/3 91/23 126/7 163/19 167/7 171/15 171/15 175/8 175/15 176/2 185/3 198/11
**motion [7]** 9/11 21/4 24/5 186/12 186/19 207/18 207/19
**motions [3]** 9/8 9/13 9/14
**motive [1]** 200/7
**Mountain [1]** 43/8
**move [17]** 16/23 18/1 32/20 64/5 105/6 106/4 109/20 110/3 111/16 115/12 122/14 144/18 144/21 146/2 155/17 155/19 156/18
**moved [2]** 145/22 145/25
**moving [9]** 39/1 76/12 149/11 149/23 150/9 156/3 156/4 156/6 156/16
**Mr [4]** 16/10 64/18 118/21 163/13
**Mr. [102]** 8/15 10/1 11/2 11/7 11/14 14/18 17/3 17/21 18/10 19/12 23/10 23/14 48/6 49/10 52/25 59/20 60/9 60/10 60/16 60/18 60/20 61/5 61/12 63/7 64/21 65/2 65/16 94/19 94/22 95/23 96/1 97/1 97/9 103/10 104/1 105/21 107/8 107/19 108/10 108/14 108/16 109/21 110/17 114/15 114/23 115/2 115/22 117/12 118/8 119/21 121/9 123/20 124/7 125/20 125/22 129/23 131/3 131/15 131/24 132/8 133/7 134/9 136/16 139/12 141/18 153/2 153/17 154/6 155/17 159/3 162/20 164/9 169/25 175/4 177/22 178/23 182/20 183/25 184/2 184/15 184/21 185/2 185/3 185/18 187/25 190/4 190/10 192/3 192/4 192/8 193/16 195/19 195/23 198/13 199/25 200/12 201/4 203/13 203/18 204/8 204/19 209/3
**Mr. Calica [2]** 23/10 60/9
**Mr. Carney [1]** 8/15
**Mr. Castello [4]** 18/10 97/1 97/9 125/20
**Mr. Haymes [1]** 124/7
**Mr. Hirsch [3]** 60/16 60/18 61/12
**Mr. Jackson [10]** 10/1 14/18 17/3 17/21 19/12 60/10 61/5 63/7 183/25 192/4
**Mr. Jackson's [2]** 23/14 60/20
**Mr. Kauff [1]** 52/25
**Mr. Keefe [3]** 169/25 175/4 199/25
**Mr. Reap [1]** 192/8
**Mr. Russo [1]** 204/8
**Mr. Serp [15]** 103/10 104/1 105/21 107/8 107/19 108/16 109/21 110/17 114/15 115/22 117/12 118/8 119/21 121/9 123/20
**Mr. Telsey [36]** 11/7 11/14 94/19 95/23 125/22 129/23 131/15 131/24 132/8 133/7 134/9 136/16 139/12 141/18 153/17 154/6 155/17 159/3 162/20 164/9 177/22 178/23 182/20 190/4 190/10 192/3 193/16 195/19 195/23 198/13 200/12 201/4 203/13 203/18 204/19 209/3
**Mr. Telsey's [2]** 11/2 131/3
**Mr. Unsworth [15]** 48/6 49/10 59/20 64/21 65/16 94/22 96/1 108/14 115/2 153/2 184/2 184/15 185/2 185/3 185/18
**Mr. Unsworth's [5]** 65/2 108/10 114/23 184/21 187/25
**Ms. [15]** 7/9 98/7 105/25 110/22 115/24 119/12 125/19 126/2 126/21 127/16 131/24 135/23 162/18 182/6 184/25
**Ms. Cahall [12]** 98/7 105/25 110/22 115/24 119/12 125/19 126/2 126/21 127/16 131/24 135/23 162/18
**Ms. Cahall's [1]** 182/6
**Ms. Duffy [1]** 7/9
**Ms. Farley [1]** 184/25
**Mt [1]** 3/3
**MUA [1]** 8/6
**much [22]** 32/21 37/18 51/21 55/8 80/3 80/4 86/4 92/4 102/6 118/21 138/6 138/7 144/9 149/23 154/11 154/11 175/13 185/21 190/10 209/17 210/13 212/10
**Mulberry [1]** 2/17
**multi [1]** 101/8
**multi-tiered [1]** 101/8
**multiple [4]** 52/21 92/21 171/8 171/11
**multiply [1]** 86/18
**multistate [1]** 28/7
**Municipal [2]** 3/19 8/17
**municipalities [2]** 124/19 125/4
**Musconetcong [3]** 3/20 8/13 8/19
**must [6]** 36/4 38/6 142/2 144/12 151/12 189/18
**my [65]** 7/20 8/8 8/25 9/13 9/24 10/17 13/6 14/4 14/8 14/18 14/25 16/3 16/14 16/17 25/1 55/10 56/6 60/16 61/20 67/22 70/25 85/15 92/15 95/19 97/3 100/5 100/5 101/5 113/3 118/12 119/19 122/19 126/4 128/6 128/16 129/21 133/12 135/12 136/19 136/20 136/23 140/25 141/9 142/11 147/20 148/18 159/5 161/2 161/8 162/21 162/23 183/7 190/6 190/12 192/6 195/6 198/20 204/19 205/4 205/9 207/6 210/5 210/6 211/24 212/4
**myriad [2]** 21/23 35/14
**myself [4]** 13/3 66/2 182/20 184/25

**N**

**N.J.S.A [1]** 179/23
**name [6]** 33/24 60/16 63/22 76/20 97/23 126/4
**named [1]** 152/19
**narrative [1]** 88/1
**narrowed [1]** 173/5
**narrower [2]** 79/19 79/20
**nation [2]** 109/4 186/25
**national [5]** 28/6 30/6 77/8 85/8 109/3
**nationally [1]** 74/2
**Nations [2]** 28/11 69/17
**nationwide [2]** 25/22 44/6
**natural [38]** 28/7 29/15 34/14 35/6 42/12 42/23 43/16 45/25 49/18 59/6 68/5 68/8 68/9 68/17 68/18 68/25 69/4 71/18 140/15 146/24 146/25 147/2 147/8 153/23 154/11 155/22 187/15 187/16 187/23 188/4 188/10 188/18 188/19 188/22 188/24 197/13 198/14 209/7
**nature [5]** 37/19 46/6 59/17 115/8 115/10
**near [2]** 34/22 43/8
**necessarily [3]** 24/14 80/17 130/23
**necessary [9]** 30/11 34/5 41/3 102/3 102/18 110/12 151/19 153/21 198/17
**need [57]** 9/20 11/14 11/15 49/13 64/2 64/12 66/5 72/3 73/9 78/11 80/14 85/18 89/19 95/12 98/1 122/20 134/4 139/22 143/7 144/16 152/12 153/22 160/4 160/9 160/10 160/11 160/12 163/19 164/1 164/1 164/5 164/7 165/15 165/15 165/24 166/4 167/7 167/9 167/13 167/13 167/14 167/15 168/7 168/19 168/25 171/15 171/20 171/21 173/8 175/8 176/2 181/4 185/20 190/7 204/17 205/18 206/14
**needed [5]** 99/11 100/11 113/5 158/25 205/24
**needs [20]** 49/13 50/13 150/5 151/1 154/16 166/16 166/16 168/13 175/10 175/15 176/14 178/10 190/17 191/14 193/24 194/22 198/21 200/9 204/23 205/16
**nefarious [1]** 172/1
**negative [2]** 15/10 30/8
**negligence [2]** 33/7 33/7
**negotiate [1]** 209/13
**negotiated [4]** 43/20 163/15 198/4 205/2
**negotiating [2]** 154/12 198/3
**negotiation [2]** 165/24 205/1
**negotiations [3]** 36/25 94/5 184/15
**negotiators [1]** 20/9
**NEMOURS [4]** 1/7 3/5 6/17 7/15
**never [4]** 41/22 157/15 163/7 164/21
**new [118]** 1/1 1/3 1/10 1/15 1/17 2/4 2/4 2/7 2/18 3/3 3/8 3/8 3/10 3/14 3/18 3/24 6/16 17/10 19/11 19/21 21/9 22/4 25/25 26/1 26/13 26/14 26/18 27/10 28/6 28/14 30/10 30/15 32/1 32/8 32/16 32/17 32/22 33/4 33/18 33/19 33/19 34/6 34/11 38/4 41/17 42/21 44/12 45/19 45/22 47/14 47/15 47/17 48/8 48/19 48/24 51/19 57/2 58/23 68/4 69/25 70/18 71/9 71/15 71/20 72/11 72/20 73/19 73/21 74/1 74/5 74/11 74/19 77/16 77/24 78/3 78/25 81/22 82/1 82/11 82/21 84/5 88/16 92/23 92/25 98/8 98/16 101/14 101/17 101/25 102/12 102/17 103/24 109/1 110/8 111/3 120/2 125/4 125/5 140/15 153/9 162/20 163/12 168/23 169/3 170/16 181/13 185/8 187/3 190/17 195/21 196/10 196/16 196/24 201/25 204/8 210/20 210/22 210/25
**New Jersey [87]** 6/16 17/10 19/11 19/21 21/9 22/4 25/25 26/1 26/13 26/14 26/18 27/10 28/6 28/14 30/10 30/15 32/1 32/8 32/16 32/17 32/22 33/4 34/6 34/11 44/12 45/19 45/22 47/14 47/15 47/17 48/8 48/24 51/19 57/2 58/23 69/25 70/18 71/9 71/15 71/20 72/11 72/20 73/19 74/1 74/5 74/19 77/24 78/3 78/25 81/22 82/1 82/11 82/21 84/5 88/16 92/23 92/25 98/8 98/16 101/14 101/17 101/25 102/12 102/17 103/24 109/1 110/8 111/3 120/2 125/4 125/5 140/15 163/12 168/23 169/3 170/16 181/13 185/8 187/3 190/17 196/16 196/24 201/25 204/8 210/20 210/22 210/25
**New Jersey's [3]** 48/19 73/21 74/11
**New Jersey-specific [1]** 77/16
**Newark [2]** 2/18 3/14
**next [40]** 2/25 17/24 18/17 19/3 19/24 20/21 22/8 26/20 29/19 32/19 35/20 43/10 45/13 45/14 48/3 49/23 59/13 59/14 71/23 75/14 77/1 80/21 82/2 82/15 83/15 85/2 85/25 86/2 86/20 91/3 92/7 123/11 139/16 162/13 178/12 180/11 183/11 190/1 192/1 204/4
**Nicaragua [1]** 69/20
**Nice [1]** 6/11
**night [1]** 133/6
**nitrates [1]** 68/14
**njd.uscourts.gov [1]** 1/22
**no [85]** 9/17 9/18 9/22 9/24 24/4 24/9 25/6 25/16 30/3 36/3 52/7 53/24 53/25 55/13 55/22 57/11 57/15 62/21 62/21 67/12 70/25 84/12 95/25 103/4 103/15 105/10 110/20 111/10 116/2 122/14 125/7 129/14 136/20 139/2 141/20 145/1 145/23 146/7 146/13 149/20 153/25 156/15 157/13 157/19 157/24 158/2 159/20 159/23 161/8 161/24 161/25 162/2 163/3 163/6 164/5 166/11 166/23 167/5 167/24 169/5 171/25 174/9 174/17 175/23 178/4 178/18 182/1 183/14 183/14 183/21 183/22 189/5 190/16 191/13 192/21 192/22 192/23 193/2 194/6 195/22 195/22 195/22 199/22 201/15 203/22
**no-interest [1]** 111/10
**no-win [1]** 194/6
**NOAA [1]** 69/10
**nobody [1]** 194/22
**nobody's [1]** 170/13
**nod [1]** 61/1
**non [2]** 31/14 71/16
**non-firefighting [1]** 31/14
**non-testifying [1]** 71/16
**nondetect [1]** 30/13
**none [3]** 141/12 156/2 202/1
**nonlapsing [2]** 120/14 124/2
**normal [1]** 28/24
**normally [1]** 193/5
**North [1]** 96/13
**not [212]** 10/14 10/15 10/23 12/1 12/19 12/24 13/11 13/12 13/15 13/20 13/23 14/1 14/5 14/6 15/10 19/18 21/10 21/11 24/7 24/14 25/5 25/17 26/10 27/11 27/18 28/4 28/12 28/13 28/24 34/11 34/11 34/12 34/12 35/8 35/8 37/2 38/11 41/6 41/11 41/12 44/1 44/18 44/19 44/19 44/22 45/8 46/6 46/14 47/15 47/25 52/7 54/22 54/24 55/13 55/14 56/2 56/3 56/8 56/10 56/11 56/13 56/13 56/22 57/13 57/15 57/17 57/20 59/1 61/2 64/5 64/6 65/8 70/20 70/21 70/25 76/2 77/23 78/8 79/25 80/1 80/2 83/23 84/3 84/16

## N

**not... [128]** 86/11 87/9 87/16 89/6 90/10 91/4 92/22 93/13 94/23 95/2 95/25 100/5 100/17 103/16 108/2 108/8 112/24 113/1 113/3 113/18 118/12 124/8 127/6 131/12 131/12 131/17 132/1 132/11 132/11 134/21 136/22 138/23 140/2 140/2 140/3 140/20 143/19 143/22 146/7 146/17 147/13 147/17 149/11 149/13 150/15 151/18 152/8 152/10 153/22 156/3 156/4 158/13 158/25 159/17 160/6 160/17 160/17 160/18 161/6 161/24 164/11 164/15 164/19 164/20 166/3 167/20 167/24 167/25 169/10 169/14 170/8 170/25 171/3 172/1 173/13 174/6 174/25 175/4 176/15 177/5 177/23 178/18 179/17 180/6 180/18 181/24 181/24 182/22 183/7 184/5 188/8 190/7 190/21 191/23 192/13 192/16 193/20 194/2 194/13 194/14 195/5 195/17 195/19 196/1 196/5 196/9 196/17 197/7 198/15 198/17 198/21 198/23 200/2 200/10 201/18 202/4 205/7 205/8 205/9 205/14 206/18 206/24 210/7 210/12 211/1 211/2 211/8 211/11

**note [3]** 23/17 30/23 109/24
**notes [2]** 40/7 61/21
**nothing [15]** 39/19 41/1 41/13 63/16 97/17 152/20 173/19 176/8 176/15 181/5 196/12 199/17 200/11 207/24 208/9
**notice [16]** 101/12 103/18 103/23 104/18 106/10 112/3 127/19 129/17 192/18 196/20 196/22 196/22 197/24 198/15 200/20 202/12
**noticed [2]** 193/24 200/19
**noticing [2]** 192/24 193/3
**notorious [5]** 33/4 45/19 79/4 84/17 84/18
**Notwithstanding [1]** 145/4
**November [2]** 18/18 98/14
**now [39]** 12/16 15/17 15/20 43/17 45/8 45/12 48/5 56/19 59/18 81/18 82/17 84/25 89/2 89/20 105/1 128/13 135/6 135/7 135/19 139/25 140/23 142/7 156/16 165/16 167/22 170/23 170/23 174/5 176/5 189/6 189/7 191/24 193/15 199/5 199/9 199/11 199/16 205/17 211/17
**Nowhere [1]** 192/4
**NRD [88]** 42/17 127/8 132/1 132/5 133/16 138/6 138/19 138/23 139/7 139/20 140/4 140/4 140/10 140/16 141/2 141/11 141/11 142/3 142/9 142/12 142/12 142/14 142/23 142/25 143/2 143/2 143/5 143/13 143/14 144/12 144/17 144/18 145/6 145/11 145/13 145/15 145/19 145/23 146/2 146/10 146/14 146/15 146/19 147/9 147/13 147/16 148/9 148/11 148/12 148/14 148/14 148/24 149/2 149/4 149/22 150/7 150/23 151/3 151/18 152/22 155/14 155/20 155/24 156/4 156/8 156/17 156/18 157/6 158/5 158/19 158/25 159/2 159/14 187/8 187/14 188/9 189/23 189/23 202/7 207/1 207/22 207/23 207/23 208/3 208/4 208/7 209/11 211/18
**NRDs [1]** 139/21
**nuance [1]** 127/6
**nuisance [2]** 33/7 51/25
**nuisance/trespass [1]** 51/25
**number [33]** 5/11 5/21 29/9 31/10 34/17 40/13 43/25 53/9 67/18 69/10 69/11 74/4 74/6 74/7 74/7 74/18 80/24 85/12 85/14 105/9 110/9 133/14 160/18 160/18 160/20 161/2 161/20 168/16 184/1 184/7 184/8 185/25 206/20
**numbers [10]** 1/3 32/5 37/16 61/25 70/9 86/14 94/13 154/10 186/15 187/12
**numerous [9]** 21/22 31/12 33/5 34/21 35/10 35/12 35/13 47/11 47/23
**nutrient [1]** 80/10
**NW [2]** 2/21 3/10

## O

**Oak [1]** 1/19
**object [8]** 13/7 112/18 149/20 173/11 190/13 199/6 199/7 206/23
**objected [1]** 168/5
**objecting [1]** 14/16
**objection [23]** 11/3 16/14 113/10 113/13 127/23 136/5 136/8 137/1 151/8 172/14 178/3 178/7 178/12 180/20 182/21 189/15 189/17 189/21 190/1 193/22 195/5 196/3 196/3
**objections [12]** 16/13 106/18 112/8 162/19 177/23 183/24 189/8 194/25 195/12 206/20 210/6 210/7
**objective [3]** 76/16 79/16 79/17
**objectives [1]** 19/19
**objector [3]** 94/19 95/23 209/25
**objectors [5]** 7/23 132/24 153/17 189/10 206/1
**obligated [1]** 27/3
**obligation [5]** 19/17 37/21 41/8 41/11 140/16
**obligations [19]** 26/21 35/23 36/3 36/4 37/7 38/1 38/3 38/3 38/7 39/20 41/19 42/3 42/16 42/19 42/22 43/5 117/24 138/2 180/13
**observation [3]** 12/19 39/14 39/16
**observed [1]** 34/23
**obtain [1]** 188/25
**obvious [1]** 65/7
**obviously [24]** 18/19 19/1 23/8 29/17 29/25 32/7 34/20 38/21 43/24 45/9 46/7 46/20 46/22 47/7 52/9 81/19 91/21 92/10 112/2 113/1 186/1 186/3 197/11 210/11
**occasion [1]** 112/21
**occasioned [1]** 28/8
**occasions [1]** 113/2
**occurred [2]** 54/15 89/3
**occurrence [4]** 72/9 74/19 86/6 86/8
**occurring [1]** 86/4
**odd [2]** 76/3 76/20
**off [7]** 30/15 33/14 49/17 101/6 101/12 161/2 191/3
**offer [2]** 23/3 65/8
**office [8]** 28/18 98/24 100/8 101/7 101/10 113/8 120/23 121/4
**officer [6]** 98/12 99/5 99/6 99/12 99/14 100/5
**Official [2]** 1/22 212/17
**oh [20]** 9/24 14/9 29/3 40/8 80/22 87/24 94/20 105/10 122/21 126/19 155/2 170/1 171/7 171/10 172/11 187/19 188/9 191/17 191/22 193/13
**oil [3]** 66/12 67/2 69/13
**okay [243]**
**old [5]** 33/11 33/17 33/23 41/24 65/20
**once [14]** 34/23 40/17 76/5 84/2 102/8 134/18 143/13 144/12 145/11 147/16 147/16 148/13 176/14 192/19
**one [102]** 2/7 3/13 14/8 14/11 19/12 27/8 28/12 29/14 30/3 34/6 36/12 36/20 37/10 37/15 37/20 38/2 38/16 39/5 40/4 42/18 42/22 44/24 46/11 48/23 51/16 52/25 53/4 53/8 58/25 61/20 77/7 81/2 83/6 84/7 84/17 84/18 90/22 91/15 93/20 95/5 95/12 95/22 96/4 96/12 96/13 109/10 112/1 112/8 127/1 134/14 134/14 138/12 139/15 141/21 142/7 143/23 145/21 149/1 153/14 155/5 156/3 156/25 159/8 159/17 160/7 160/21 162/12 163/16 167/2 168/15 169/21 169/25 173/23 177/1 178/8 179/15 180/2 180/19 181/3 181/6 181/8 181/12 181/15 183/3 186/21 188/15 191/8 191/8 192/1 195/1 195/25 196/17 203/13 203/17 203/20 204/18 206/18 206/21 206/22 206/23 206/25 207/6
**one-year [8]** 179/15 180/2 180/19 181/3 181/6 181/12 181/15 183/3
**ones [4]** 14/16 36/23 132/13 168/10
**ongoing [2]** 41/8 83/17
**only [36]** 7/16 9/2 11/1 14/8 14/11 14/16 14/19 24/17 55/23 95/12 95/23 96/10 96/11 131/11 134/14 141/1 141/16 142/3 168/15 170/24 171/5 171/24 172/8 172/19 176/22 176/24 177/1 189/9 190/1 191/13 192/16 195/20 195/22 195/25 196/8 197/4
**open [2]** 6/1 197/15
**operate [2]** 74/20 82/11
**operated [1]** 28/22
**operating [1]** 37/25
**operation [1]** 22/16
**operational [2]** 76/9 93/4
**operations [3]** 33/3 45/23 77/23
**operator [1]** 50/5
**operators [2]** 53/4 77/20
**opinion [12]** 16/2 16/3 16/15 16/17 112/12 112/14 118/10 195/6 210/10 210/21 210/24 211/15
**opportunity [2]** 28/9 48/1
**oppose [1]** 10/23
**opposed [3]** 10/14 168/15 208/17
**opposition [2]** 158/2 207/19
**option [4]** 76/8 76/11 76/12 80/25
**options [3]** 73/7 76/7 91/13
**orally [1]** 12/4
**oranges [2]** 134/8 172/11
**order [18]** 15/20 16/2 16/3 16/17 92/5 92/21 94/11 97/3 107/4 108/23 117/5 158/2 201/7 202/23 202/25 203/3 204/2 208/21
**orders [3]** 19/10 55/4 202/6
**organic [1]** 91/24
**original [4]** 81/18 112/11 186/11 186/12
**originally [1]** 43/6
**originates [1]** 191/11
**originating [1]** 191/12
**origination [2]** 111/12 111/14
**other [84]** 2/19 3/4 3/5 11/1 11/15 12/6 16/24 21/23 28/12 31/8 31/14 32/18 33/13 35/14 35/23 38/4 42/20 43/1 44/24 47/6 47/9 47/21 47/23 48/1 48/14 48/22 50/16 51/17 51/19 52/4 52/13 52/14 53/5 54/2 66/23 69/14 70/11 70/13 70/21 71/3 71/5 71/9 73/13 74/9 77/4 83/1 89/7 100/20 115/11 140/1 141/6 142/2 144/7 145/7 150/9 152/4 152/8 156/5 156/9 161/14 166/7 167/2 168/15 171/17 174/10 176/2 178/7 183/20 184/18 185/13 191/8 191/13 194/19 196/12 197/2 199/3 199/23 201/7 201/22 206/1 206/14 208/6 209/1 209/8
**others [12]** 8/6 8/11 37/22 42/19 51/23 57/10 130/14 153/21 169/11 184/25 191/2 193/21
**otherwise [6]** 9/12 13/17 55/11 138/18 140/7 150/13
**our [36]** 12/13 18/9 18/10 30/16 55/4 55/4 55/7 60/25 66/5 66/7 69/8 70/25 71/24 76/24 77/21 77/21 77/22 79/7 84/22 86/8 95/23 100/23 109/6 111/24 124/4 124/23 138/14 168/12 169/17 170/11 177/11 177/12 192/23 195/18 202/5 207/19
**out [66]** 14/15 15/7 15/21 17/19 22/18 23/8 41/1 43/1 44/9 47/10 53/18 56/9 68/12 71/9 78/15 79/10 79/25 82/6 82/8 85/20 88/21 88/22 89/2 90/10 90/18 90/24 91/7 91/22 108/22 111/4 115/20 117/8 130/13 131/1 133/3 133/19 135/17 137/5 137/23 139/22 139/23 139/25 144/11 145/13 147/17 148/14 149/13 154/1 154/6 157/15 161/15 167/23 169/6 175/11 192/19 196/22 196/24 197/2 198/14 199/2 205/19 206/24 207/2 208/24 210/9 210/10
**outcome [4]** 29/16 70/7 70/12 131/5
**outcomes [1]** 75/20
**outline [1]** 18/4
**outset [1]** 65/2
**outside [5]** 31/15 31/18 77/21 100/9 138/16
**over [40]** 11/20 21/17 26/5 27/3 29/12 30/9 35/25 45/16 64/5 64/9 70/6 75/9 86/24 90/14 96/25 136/1 137/5 144/3 144/10 145/22 149/21 150/18 150/19 153/23 153/24 157/14 159/10 161/15 162/7 167/4 171/15 173/24 177/16 180/16 181/22 189/2 190/12 198/10 198/18 203/18
**overall [2]** 101/18 111/24
**overly [1]** 55/1
**oversee [5]** 98/16 98/18 98/21 99/6 176/25
**overseen [2]** 116/14 116/21
**oversees [1]** 124/5
**overturns [1]** 131/7
**overwhelmingly [1]** 26/2
**owed [1]** 138/16
**own [5]** 22/20 45/21 80/23 88/3 170/11
**owned [11]** 28/22 33/24 48/12 75/21 76/1 76/2 93/9 114/21 116/9 117/21 123/19
**owner [4]** 50/5 50/12 53/4 67/19
**owner/operator/discharger [1]** 50/5
**ownership [1]** 114/12

## P

**p.m [5]** 125/15 125/15 206/10 206/10 212/16
**P.O [1]** 1/16
**package [1]** 35/22
**packaging [1]** 109/9
**pad [1]** 91/8
**page [26]** 2/25 5/2 23/24 32/19 86/20 103/11 103/13 105/2 105/22 127/17 128/1 128/6 128/6 128/22 128/23 128/24 129/4 129/16 144/23 147/3 147/4 155/8 186/16 186/22 188/17

# P

**page... [1]** 210/24
**page 1 [3]** 128/23 128/24 129/4
**page 28 [1]** 147/4
**page 36 [1]** 188/17
**page 4 [2]** 128/6 128/6
**page 41 [1]** 186/22
**page 46 [1]** 144/23
**page 9 [1]** 23/24
**page B-4 [3]** 127/17 128/1 129/16
**pages [2]** 21/18 210/1
**paid [12]** 25/15 37/7 42/25 128/17 141/10 141/11 151/22 159/8 178/17 179/7 179/22 182/2
**palpated [1]** 163/17
**panel [4]** 37/11 39/3 39/25 40/12
**paper [2]** 12/5 15/20
**papers [5]** 15/24 16/2 16/3 136/19 195/7
**paragraph [64]** 11/13 11/25 12/4 13/17 13/19 14/7 15/8 15/15 15/17 15/20 16/18 16/22 29/2 29/9 30/24 30/25 37/21 38/21 39/17 39/23 104/2 104/4 107/9 109/20 109/24 110/3 110/5 111/16 111/17 114/14 114/15 114/18 115/4 115/5 115/12 115/13 117/14 119/23 121/10 121/12 121/23 128/3 128/25 129/4 129/24 139/3 139/4 139/4 140/19 142/21 145/3 146/10 147/1 155/7 155/8 159/24 160/2 161/12 161/22 169/19 179/19 179/21 182/6 189/15
**paragraphs [6]** 36/14 37/20 40/18 40/24 40/25 162/5
**pardon [2]** 94/20 96/11
**parens [3]** 190/4 190/7 195/9
**Parlin [16]** 22/6 33/1 141/3 152/19 156/23 158/9 206/24 207/3 208/6 208/12 208/18 208/25 208/25 209/5 209/8 209/12
**Parsippany [1]** 2/7
**part [28]** 14/5 20/8 26/19 26/20 28/15 28/24 49/14 50/17 51/15 56/24 58/12 65/5 75/8 76/23 89/4 95/4 95/11 99/7 111/17 129/12 138/23 138/23 140/9 163/10 184/24 197/15 197/17 211/24
**partake [1]** 26/2
**partial [1]** 47/1
**participating [3]** 9/4 117/19 169/23
**particular [17]** 21/15 23/1 27/18 28/3 33/2 65/10 65/10 71/17 72/1 77/7 90/22 101/4 115/11 185/19 197/14 199/12 207/9
**parties [31]** 10/19 13/17 15/3 20/17 24/19 28/3 31/23 34/23 35/7 35/18 37/11 51/14 52/6 52/20 52/21 53/11 53/12 56/1 56/21 69/11 112/9 130/2 131/9 131/10 138/22 145/1 147/8 152/1 152/2 206/14 209/21
**partner [1]** 8/9
**partnership [3]** 102/16 102/17 111/3
**parts [1]** 150/9
**party [21]** 9/11 11/14 21/11 28/14 51/21 60/13 128/17 128/18 129/15 129/20 129/21 129/22 130/4 130/8 130/16 130/22 131/4 134/14 134/19 149/20 169/14
**pass [2]** 189/19 201/16
**passed [2]** 188/16 201/19
**passes [1]** 82/12
**passive [1]** 108/3
**past [2]** 109/12 109/16
**path [2]** 44/14 67/16
**pathway [1]** 44/13
**pathways [1]** 198/5
**patriae [3]** 190/4 190/7 195/9
**Pause [3]** 139/10 182/12 204/24
**pavement [1]** 90/14
**pay [18]** 27/3 27/10 32/15 34/3 34/10 37/2 38/5 38/6 43/15 50/2 51/22 78/20 129/13 148/24 148/25 157/15 160/13 209/11
**paying [4]** 36/23 42/22 59/3 158/22
**payment [27]** 30/21 42/18 126/21 127/2 127/4 129/7 129/9 137/17 138/23 138/23 139/4 139/14 139/15 141/25 147/13 149/16 151/11 151/14 151/16 156/21 158/4 158/17 159/9 159/12 197/12 202/16 202/18
**payment's [1]** 149/17
**payments [17]** 25/18 27/24 30/19 58/25 118/15 129/5 139/6 139/17 139/19 147/1 149/21 151/10 151/15 151/17 161/21 162/11 174/10
**payout [1]** 135/25
**payouts [2]** 136/1 141/8
**pays [1]** 50/5
**pellets [1]** 78/16
**penalties [2]** 42/14 141/6
**pending [4]** 9/9 9/15 63/15 97/16
**people [12]** 87/20 89/18 173/3 174/10 174/10 180/14 180/17 180/25 181/1 181/2 181/19 184/16
**per [11]** 74/3 74/4 74/20 85/22 86/18 88/22 89/9 90/3 92/3 92/6 92/20
**perceived [2]** 28/13 30/3
**percent [24]** 27/23 50/6 50/24 52/5 53/15 54/10 54/24 55/9 55/10 55/23 56/10 56/11 57/13 57/13 58/14 58/17 59/11 74/5 111/12 111/13 111/15 187/4 188/11 188/23
**percentage [2]** 52/5 185/7
**Perfect [2]** 76/25 95/13
**perform [1]** 38/3
**performance [1]** 75/19
**performed [3]** 35/8 37/18 43/5
**perhaps [5]** 23/5 55/1 59/21 192/15 205/1
**period [17]** 24/19 28/14 30/21 31/2 55/23 103/25 104/14 104/18 106/10 129/14 167/5 171/15 180/2 180/19 196/14 197/25 200/20
**Permission [1]** 95/18
**permitted [1]** 41/3
**permitting [1]** 82/10
**person [3]** 166/7 168/15 172/21
**personal [4]** 31/7 31/8 46/4 46/5
**personally [1]** 113/3
**personnel [1]** 88/25
**perspective [3]** 101/17 116/16 117/3
**pertain [1]** 158/19
**PFAS [175]** 18/7 21/8 21/15 21/23 22/7 22/9 22/13 22/19 23/25 26/15 28/8 28/19 28/23 29/18 30/11 30/13 30/16 31/5 31/22 33/12 34/10 35/9 35/13 36/6 42/4 42/10 42/11 42/17 42/24 43/16 44/6 45/17 46/1 46/11 47/6 47/22 48/9 51/7 56/23 58/18 58/23 59/4 59/7 59/10 70/13 71/20 71/25 73/25 77/3 78/6 78/9 79/4 79/5 79/10 79/17 80/2 80/5 80/14 80/19 81/4 81/9 81/14 82/18 83/2 83/4 83/18 84/8 84/21 86/8 87/8 88/17 93/17 96/12 99/19 99/20 101/18 102/3 103/6 106/22 106/22 107/1 107/6 107/17 108/2 108/6 108/8 109/1 109/3 109/5 109/9 109/13 109/18 109/25 110/13 111/4 111/19 114/11 115/14 115/17 116/7 116/9 116/24 117/7 117/21 117/22 118/2 118/6 118/20 120/12 120/15 120/22 121/13 121/14 122/7 123/7 123/11 123/21 124/11 124/17 124/18 124/19 127/8 132/1 132/4 133/18 141/12 142/3 142/9 142/12 142/13 142/14 142/24 143/3 143/3 144/18 145/9 145/22 145/25 146/4 146/12 155/25 156/11 159/14 167/18 169/11 172/8 172/17 172/19 173/17 173/19 173/20 174/20 174/22 179/5 179/9 179/12 180/3 180/12 180/13 180/15 180/15 180/18 181/1 181/4 181/7 184/10 186/7 186/24 188/4 191/10 200/2 200/5 202/8 203/22 204/3
**PFAS-contaminated [1]** 181/1
**PFAS-related [2]** 106/22 118/2
**PFOA [5]** 21/15 22/12 22/15 22/20 54/15
**PFOS [1]** 54/15
**photos [2]** 89/15 93/3
**phrase [2]** 103/18 193/23
**pick [1]** 76/14
**picture [2]** 143/15 144/10
**piece [8]** 20/16 30/17 49/1 57/2 66/19 73/22 153/9 187/10
**pieces [3]** 12/5 66/23 155/21
**pigeonhole [1]** 159/11
**Pike [1]** 2/14
**pile [2]** 137/3 137/8
**pin [3]** 153/7 155/18 168/25
**pipe [1]** 79/9
**pitcher [2]** 64/2 98/1
**place [5]** 37/13 45/11 93/14 166/13 197/16
**places [1]** 177/15
**plaintiffs [20]** 1/4 1/17 5/3 6/19 6/21 12/23 41/2 63/19 97/10 97/19 127/20 129/18 131/9 145/4 156/6 159/25 162/10 171/8 171/11 190/1
**plaintiffs' [1]** 117/24
**plan [20]** 9/24 100/19 118/1 118/5 122/2 122/4 122/5 122/9 122/11 122/13 122/24 123/1 144/17 150/25 153/15 154/8 154/18 154/19 194/1 194/18
**plane [1]** 89/9
**planned [1]** 92/18
**plans [2]** 81/20 111/21
**plants [3]** 72/21 75/2 75/4
**PLATKIN [1]** 1/15
**play [2]** 69/24 167/10
**player [1]** 32/21
**please [48]** 7/24 11/21 19/24 27/8 32/19 38/16 38/18 63/10 63/13 63/21 67/25 82/24 83/16 85/3 86/1 91/15 97/13 97/14 97/22 98/2 103/1 103/11 104/2 107/9 107/20 108/16 108/18 109/20 109/22 110/17 111/16 112/7 114/15 114/15 115/12 115/22 117/12 118/7 118/7 119/6 121/9 121/15 121/24 123/20 125/19 139/8 179/11 190/13
**pleasure [2]** 210/14 212/4
**plow [1]** 34/19
**plural [1]** 37/1
**plus [3]** 58/25 65/20 159/23
**podium [2]** 11/21 203/19
**POET [1]** 187/11
**point [70]** 3/14 8/1 10/13 12/5 13/13 15/16 27/17 28/12 29/9 37/12 43/1 54/19 62/3 62/13 62/16 89/10 96/23 97/5 106/10 112/17 126/5 126/13 126/15 127/10 127/11 130/18 130/21 131/11 132/3 132/5 133/25 134/1 135/24 145/18 145/20 150/2 150/6 151/21 151/23 151/23 152/3 152/7 152/10 152/15 155/5 155/6 178/13 178/21 179/19 182/1 182/16 189/9 190/21 190/25 191/15 196/2 196/8 196/9 196/10 199/6 199/9 201/19 202/14 202/17 202/21 205/18 206/5 207/10 207/16 207/18
**Point's [1]** 201/7
**Point-1 [2]** 126/13 126/15
**Point-2 [2]** 127/10 127/11
**Point-3 [3]** 133/25 134/1 135/24
**Point-4 [1]** 182/16
**pointed [1]** 82/8
**points [2]** 41/1 98/20
**policy [6]** 65/22 66/4 66/16 98/19 107/16 108/20
**political [4]** 46/9 47/4 123/13 190/2
**pollution [5]** 33/6 76/21 143/1 190/20 191/12
**pollution-impacted [1]** 143/1
**Pompton [14]** 33/1 33/2 45/20 139/22 141/2 156/22 158/8 158/20 158/24 159/1 159/7 161/13 161/22 209/6
**PONT [1]** 1/7
**pop [1]** 56/22
**population [4]** 74/17 75/25 85/11 187/4
**portal [1]** 107/3
**portion [4]** 78/14 84/25 85/9 130/3
**portions [3]** 130/3 145/5 156/7
**pose [2]** 48/22 144/5
**posing [1]** 15/16
**posit [1]** 149/10
**position [2]** 67/20 192/23
**positive [2]** 15/12 30/8
**Positively [1]** 30/8
**possibility [3]** 26/9 53/20 83/21
**possible [1]** 83/4
**Post [1]** 1/19
**posted [1]** 198/22
**potable [2]** 115/19 124/14
**potential [10]** 20/11 49/6 54/7 77/2 78/2 88/16 94/15 99/22 184/10 185/13
**potentially [1]** 185/17
**Potosnak [1]** 99/17
**POTW [12]** 75/14 77/15 77/20 80/11 81/17 81/19 86/12 93/17 94/14 110/24 111/1 198/8
**POTW's [1]** 108/6
**POTWs [43]** 18/12 48/16 49/2 49/3 49/6 72/25 73/4 77/2 77/5 77/23 78/2 78/15 78/25 79/5 80/6 80/8 81/3 81/4 81/14 83/7 83/13 84/3 84/5 84/11 85/12 85/14 85/22 87/10 106/11 106/18 106/21 108/1 108/8 108/23 109/25 110/11 110/19 111/7 111/18 111/22 111/23 184/22 185/16
**power [2]** 174/25 190/3
**powerful [2]** 50/17 52/16
**PowerPoint [4]** 17/13 64/21 119/3 122/19
**powers [1]** 163/11
**practice [3]** 21/5 93/5 109/16
**pragmatically [1]** 80/5
**precedent [1]** 31/25
**precedential [1]** 32/9
**precluding [1]** 41/2
**preemption [2]** 21/20 35/4
**prefer [1]** 210/2
**preliminarily [1]** 195/13
**premise [1]** 141/15
**preparation [2]** 100/19 208/20
**prepared [4]** 64/21 97/4 112/17 189/1
**preparing [2]** 71/22 104/21
**prerogative [1]** 201/16
**presence [1]** 94/8
**present [5]** 4/1 43/14 89/14 186/23 204/7

**P**

**presentation [4]** 60/20 64/21 64/22 97/6
**presented [4]** 90/3 91/4 176/4 205/7
**presenting [1]** 65/2
**preservation [1]** 43/7
**president [1]** 67/20
**pressure [1]** 83/23
**Presumably [1]** 113/6
**presume [5]** 130/25 140/1 148/20 148/21 150/4
**presuming [3]** 131/15 131/16 204/6
**presumption [1]** 91/23
**pretreatment [5]** 80/7 80/7 80/9 82/7 82/14
**pretrial [2]** 208/20 208/21
**pretty [1]** 132/12
**prevents [3]** 148/14 156/15 208/10
**previously [2]** 47/22 123/9
**pride [1]** 182/20
**primacy [1]** 82/11
**primarily [6]** 72/2 113/21 114/13 124/14 207/17 208/17
**primary [9]** 21/20 34/8 37/24 48/21 78/4 81/14 90/9 98/23 188/23
**principal [4]** 67/19 67/21 103/5 111/8
**prior [3]** 100/25 106/22 106/24
**prioritization [2]** 205/8 208/9
**prioritize [1]** 123/7
**prioritized [3]** 103/3 180/24 197/21
**prioritizing [2]** 208/11 208/14
**priority [12]** 48/23 107/16 174/10 190/25 191/3 191/4 191/5 191/6 193/20 205/8 209/11 209/14
**prisons [1]** 76/4
**private [8]** 46/4 48/12 69/11 72/11 115/19 115/19 124/14 124/17
**privately [1]** 76/2
**privilege [1]** 65/11
**privilege-type [1]** 65/11
**pro [3]** 2/21 3/10 50/19
**pro tonto [1]** 50/19
**probability [1]** 26/9
**probably [13]** 20/1 23/1 34/24 70/16 85/13 89/18 89/24 91/17 99/21 131/2 143/8 144/9 154/22
**problem [18]** 12/15 15/16 18/20 67/8 80/17 86/3 86/10 86/11 86/12 91/23 152/13 152/21 152/23 164/22 169/8 172/10 196/22 204/6
**problems [4]** 18/22 34/5 77/13 173/8
**procedural [4]** 17/25 20/15 20/16 102/6
**Procedures [1]** 112/3
**proceeded [1]** 79/4
**proceeding [1]** 31/15
**proceedings [4]** 1/23 6/1 212/16 212/20
**proceeds [2]** 30/10 155/10
**process [33]** 34/21 37/4 37/5 39/1 59/1 59/15 65/5 75/16 82/10 84/8 88/20 90/12 90/23 100/24 101/8 102/8 106/16 123/13 124/22 124/22 149/23 151/6 154/2 154/2 166/1 170/12 176/7 193/11 195/20 196/11 198/2 208/9 208/10
**processed [1]** 78/10
**processes [7]** 37/16 41/16 47/7 101/2 123/3 198/3 200/24
**produced [2]** 1/24 23/15
**product [6]** 20/18 51/17 51/24 53/6 87/18 154/13
**production [1]** 84/16
**productive [1]** 111/23
**products [11]** 3/4 7/15 51/25 57/7 62/17 82/19 83/2 83/3 83/4 84/20 109/8
**program [1]** 99/8
**programmatic [1]** 66/16
**programs [3]** 98/19 100/12 101/3
**project [5]** 85/8 86/3 117/9 151/5 153/23
**projects [18]** 102/21 102/22 103/6 117/9 118/2 120/17 121/20 123/8 123/10 123/11 123/22 146/3 153/21 176/16 189/24 197/20 199/14 208/11
**prong [1]** 102/4
**proof [1]** 23/3
**proofs [1]** 52/2
**properties [1]** 49/20
**property [1]** 46/5
**proportionate [2]** 50/12 50/20
**propose [1]** 13/9
**proposed [8]** 13/5 13/10 19/10 101/13 103/23 111/19 201/11 201/14
**proposing [2]** 79/24 205/1
**proposition [1]** 209/16
**protect [8]** 41/4 45/11 46/10 48/24 49/16 59/16 186/3 211/23
**protected [3]** 45/3 211/19 211/19
**protecting [2]** 18/25 205/9
**protection [16]** 1/3 6/16 19/22 28/16 31/13 36/8 41/21 42/23 44/12 45/1 45/2 82/21 98/9 98/17 101/14 153/22
**protections [1]** 37/6
**protects [1]** 32/17
**protested [1]** 205/15
**protocol [1]** 73/10
**prove [3]** 50/10 50/11 50/12
**proven [1]** 80/1
**provide [23]** 17/8 17/16 52/18 61/25 70/2 90/4 102/2 102/18 103/23 110/11 115/19 115/20 121/17 123/9 127/7 131/17 134/24 158/21 163/5 163/6 163/11 179/25 193/20
**provided [15]** 23/15 42/24 55/6 55/6 60/11 60/25 65/5 93/18 94/2 102/10 113/22 114/3 132/20 142/16 175/20
**provider [3]** 30/7 30/14 48/25
**providers [9]** 25/23 26/2 26/4 26/25 30/5 32/14 59/3 72/10 76/10
**providers' [1]** 26/17
**provides [7]** 117/19 122/6 123/18 131/5 134/25 155/19 161/1
**providing [6]** 71/5 99/10 113/23 118/17 123/1 123/4
**provision [12]** 28/5 46/3 103/4 111/9 115/18 118/13 124/14 146/15 192/17 192/22 196/19 209/14
**provisions [14]** 27/13 36/25 37/9 44/17 44/23 118/19 146/14 174/9 197/12 198/12 202/10 202/10 202/11 202/13
**PTX00298 [1]** 62/7
**PTX03084 [1]** 62/4
**PTX03160 [1]** 62/14
**public [110]** 17/9 18/6 18/16 18/25 19/6 19/16 19/20 20/13 25/21 25/23 26/1 26/4 26/6 26/16 26/25 29/18 29/23 30/6 30/10 30/14 34/12 36/24 41/4 41/22 44/19 45/3 45/3 45/12 46/10 46/11 48/8 48/11 48/25 54/23 56/17 58/22 58/22 59/2 59/10 65/22 66/3 67/6 68/15 68/20 68/23 69/16 72/16 72/18 73/24 80/4 81/3 83/2 86/25 88/16 93/10 93/19 102/10 102/12 103/18 103/25 104/4 104/7 104/9 104/10 104/13 104/15 105/2 105/2 105/18 106/10 107/3 114/1 117/7 117/8 121/17 121/19 123/14 140/15 143/19 143/21 143/23 143/25 151/25 154/3 154/17 167/16 177/18 180/12 182/3 184/10 184/20 185/6 185/6 185/10 186/6 186/24 187/2 187/10 192/19 193/21 194/20 196/11 196/20 196/22 196/22 197/5 197/19 198/15 198/16 200/10
**public's [4]** 56/9 140/21 142/18 144/14
**publication [1]** 112/10
**publicly [7]** 33/19 43/18 75/21 76/1 93/9 124/22 198/16
**publicly-owned [3]** 75/21 76/1 93/9
**publicly-traded [2]** 33/19 43/18
**publish [2]** 103/23 113/6
**published [11]** 71/25 72/7 90/3 101/13 102/11 113/25 118/11 118/13 185/6 187/3 194/2
**pull [11]** 103/10 104/1 105/21 107/9 107/19 108/16 109/21 110/17 114/14 118/7 119/21
**pump [1]** 171/22
**punchline [1]** 82/2
**punitive [8]** 42/14 138/14 141/6 141/25 148/20 151/12 151/13 158/21
**punitives [1]** 142/8
**purely [1]** 46/4
**purple [1]** 86/5
**purpose [13]** 57/9 91/8 104/7 115/17 117/6 117/7 117/20 125/1 132/22 145/7 146/4 156/8 172/2
**purposes [15]** 88/15 94/4 94/15 116/17 116/23 124/3 127/8 140/17 148/15 155/12 155/15 170/11 177/21 201/22 202/9
**pursuant [7]** 26/18 38/23 50/14 129/25 131/12 139/17 160/2
**pursue [4]** 42/21 50/14 56/22 57/6
**pursued [1]** 102/8
**pursuing [1]** 57/22
**put [46]** 8/11 25/6 30/12 30/18 33/12 35/3 36/21 44/18 48/5 52/2 54/1 86/5 89/1 90/13 90/24 91/7 115/22 143/10 143/10 143/12 143/18 143/18 145/11 145/12 151/4 153/7 154/10 172/18 174/23 180/23 181/15 182/8 182/10 183/2 183/8 194/6 194/14 194/17 194/21 195/14 195/21 196/6 196/19 196/24 198/7 206/20
**puts [2]** 92/8 197/9
**putting [7]** 15/2 90/14 90/15 112/18 151/11 164/15 170/13
**puzzle [1]** 153/10

**Q**

**QSF [5]** 178/5 179/8 195/14 196/13 197/3
**QSFs [3]** 194/7 194/8 196/5
**qualifications [1]** 65/4
**qualified [25]** 116/13 116/18 116/21 123/17 124/25 133/20 153/9 162/14 163/1 163/3 163/21 163/23 164/8 164/10 164/17 165/2 170/24 171/5 174/23 182/21 193/25 194/4 194/11 194/21 197/6
**qualify [1]** 65/6
**qualifying [1]** 13/14
**quality [7]** 75/6 106/25 123/7 145/7 146/3 146/13 156/9
**Quality's [1]** 107/16
**quantities [1]** 157/16
**quarrel [2]** 147/15 153/25
**quarter [1]** 125/10
**question [73]** 18/16 23/12 24/17 30/23 54/21 55/10 56/6 56/9 57/16 61/11 70/20 76/7 79/6 79/8 79/19 79/19 79/20 87/23 112/6 113/12 113/15 118/9 121/3 128/14 128/16 129/21 131/3 131/21 133/10 133/12 134/5 135/5 135/10 136/20 137/12 137/14 140/1 140/24 140/25 141/9 141/15 142/6 142/11 144/5 148/18 149/3 149/7 151/22 152/2 153/8 156/12 158/11 158/23 159/3 159/5 160/9 178/25 179/11 180/6 180/7 180/9 181/11 181/12 183/11 192/6 192/12 194/25 199/4 201/3 204/19 204/19 205/5 205/12
**questioning [4]** 131/16 135/13 135/15 147/23
**questions [20]** 57/17 70/4 121/19 125/7 126/6 136/17 139/12 153/3 158/13 162/7 178/22 178/23 183/23 184/21 189/5 189/13 190/12 192/11 209/21 209/24
**quibbling [1]** 160/18
**quickly [6]** 17/24 19/9 107/25 110/4 116/18 165/25
**quite [5]** 15/14 60/14 147/6 177/18 197/8
**quote [1]** 19/25
**quotes [2]** 85/19 107/11
**quoting [1]** 186/23

**R**

**R.J [1]** 1/16
**Rahway [3]** 3/19 8/5 8/20
**raise [2]** 63/13 97/14
**raised [5]** 18/11 35/10 97/5 184/22 207/17
**Ramapo [1]** 43/8
**range [1]** 26/8
**ranged [1]** 35/4
**ranging [1]** 31/7
**Raritan [2]** 3/19 8/21
**rate [4]** 72/9 74/19 86/6 86/8
**ratepayers [4]** 34/12 36/24 44/20 86/25
**rather [2]** 50/19 79/3
**rationale [1]** 194/11
**RDR [1]** 212/23
**RDR-RMR-CRR-CRC [1]** 212/23
**re [4]** 192/24 193/3 193/24 203/22
**re-appropriation [1]** 203/22
**re-noticed [1]** 193/24
**re-noticing [2]** 192/24 193/3
**reach [1]** 110/10
**reached [4]** 27/22 49/14 168/4 211/1
**read [11]** 13/19 120/6 139/8 147/5 157/2 159/4 159/10 162/9 162/18 163/1 204/11
**reading [2]** 14/10 119/17
**reads [1]** 119/12
**ready [5]** 17/21 121/8 135/5 151/4 153/21
**real [2]** 177/10 177/11
**realistic [1]** 84/4
**reality [1]** 201/23
**reallocated [2]** 146/10 146/19
**really [20]** 20/16 40/25 53/1 85/7 115/8 117/2 118/14 118/22 132/22 133/2 134/4 140/19 162/3 162/4 165/17 175/22 176/17 178/8 178/11 206/6
**REAP [3]** 2/2 6/24 192/8
**reason [16]** 9/25 10/1 10/3 27/12 27/18 51/9 111/13 131/7 132/19 152/15 152/17 158/7 185/22 194/17 202/15 204/20
**reasonable [19]** 17/2 17/9 19/18 20/4 20/25 27/22 53/10 57/14 61/4 70/8 70/12 74/12 94/10 94/11 101/15 151/19 191/7 203/11 210/9
**reasonableness [4]** 20/10 24/18 43/12 191/23

R

reasons [1] 118/14
recall [6] 10/10 14/18 22/13 23/16 70/17 161/2
receive [9] 26/5 28/10 104/10 104/13 104/15 106/11 128/18 132/25 196/25
received [16] 28/8 32/8 46/21 95/17 102/12 103/3 105/15 106/8 111/5 114/1 120/1 120/12 121/18 122/18 154/20 199/13
receiver [1] 108/3
recently [1] 68/13
Recess [3] 63/3 125/15 206/10
recognize [1] 30/8
recognized [1] 69/15
recognizes [1] 81/5
recommendation [3] 101/5 120/6 170/19
recommendations [2] 100/11 100/22
record [24] 22/21 24/20 25/5 25/5 25/6 33/9 36/17 63/22 95/4 95/11 97/23 103/15 105/22 120/9 173/19 175/2 177/21 186/9 187/2 206/13 208/16 209/22 210/4 212/20
recorded [1] 1/23
records [3] 23/16 24/9 25/1
recover [1] 56/3
recovered [3] 45/24 45/24 208/2
recoveries [5] 29/16 188/10 207/22 208/1 208/1
recovering [1] 188/19
recovers [1] 146/9
recovery [9] 36/1 55/12 55/13 55/16 56/5 58/10 188/22 207/23 209/1
recreating [1] 67/7
red [5] 3/24 134/7 135/18 136/12 136/14
redevelopment [2] 100/14 124/5
redirect [2] 183/13 183/15
redirected [1] 211/3
reduce [15] 68/14 75/12 80/6 81/21 82/18 83/6 83/11 107/11 107/15 107/23 108/5 108/20 108/24 109/1 111/12
reduction [6] 81/1 81/9 81/23 83/21 111/15 156/23
reductions [1] 82/8
redundant [2] 44/17 44/21
refer [3] 14/23 98/17 128/3
reference [10] 104/4 115/13 121/12 122/1 123/24 128/20 156/5 179/24 183/3 210/20
referenced [1] 14/8
references [3] 38/22 62/1 164/10
referring [4] 19/9 82/21 114/18 129/2
refers [1] 115/4
reflect [1] 117/14
reflected [1] 102/7
reflects [2] 110/6 153/19
refusing [1] 47/15
regard [5] 100/15 111/22 157/6 158/12 158/13
regarding [15] 15/20 27/2 28/7 30/24 31/5 31/13 33/7 33/4 90/13 34/3 35/10 35/13 96/9 104/16 111/24 121/4 158/14
regardless [1] 101/22
regards [1] 62/5
regional [5] 3/20 8/18 8/21 18/21 89/7
Register [6] 101/12 102/12 103/24 196/16 196/21 196/24
regs [1] 117/23
regulated [3] 72/15 75/21 75/25
regulation [6] 48/20 66/9 66/10 68/11 72/4 111/19
regulations [5] 39/2 39/22 66/8 69/3 73/2
regulators [2] 75/24 77/21
regulatory [5] 54/13 72/14 75/20 87/9 98/18
related [13] 6/17 22/5 31/14 33/5 33/15 34/9 39/10 106/22 118/2 142/3 188/20 190/20 208/21
relates [1] 82/10
relating [1] 124/19
relationship [4] 20/9 22/14 22/15 163/24
relative [1] 20/6
relatively [5] 78/10 84/6 91/6 93/2 93/6
relaxation [1] 66/10
release [10] 46/8 46/22 127/18 127/21 129/15 129/17 130/3 134/13 177/11 190/1
released [4] 28/4 28/24 72/22 133/23
releasing [1] 134/19
relevance [2] 180/21 180/22
relevant [1] 168/17
reliable [1] 94/13
relied [1] 95/5
relief [2] 204/25 205/10
rely [3] 25/5 66/17 184/11
relying [2] 16/11 155/20
remain [3] 94/9 109/18 198/24
remaining [3] 94/19 151/14 164/7
remains [1] 57/22
remedial [2] 42/3 199/14
remediate [5] 34/14 101/21 173/20 173/21 200/5
remediated [2] 28/23 38/23
remediating [3] 90/4 117/21 144/3
remediation [39] 35/23 36/2 36/4 37/2 37/4 37/6 37/7 37/15 37/20 38/12 38/22 39/1 39/20 40/13 41/9 41/20 45/17 45/19 48/16 49/7 49/11 49/16 49/17 50/3 59/6 75/2 83/15 89/19 94/14 100/13 109/13 109/14 115/8 116/9 116/24 123/19 124/5 125/2 198/6
remedies [1] 47/4
remedy [4] 56/12 66/14 66/20 93/13
remember [6] 47/1 54/13 91/6 98/1 188/7 207/16
remind [3] 22/9 22/10 23/21
remove [4] 30/13 33/16 80/9 80/14
removing [2]
render [1] 201/11
renotice [5] 113/5 192/21 198/11 198/16 201/2
RENÉE [2] 1/12 6/2
reorganized [1] 33/18
Repauno [7] 33/2 43/8 141/3 151/6 156/23 158/10 209/6
repealed [1] 201/20
repeat [1] 179/11
repeatedly [1] 44/18
rephrase [1] 93/24
reply [4] 162/21 162/22 182/22 207/6
report [10] 18/9 29/24 46/23 79/14 98/19 153/15 153/16 154/3 154/9 188/1
reported [1] 72/12
reporter [4] 1/22 10/16 87/2 212/24
REPORTER'S [1] 212/17
Reporter/Transcriber [1] 212/24
reporting [2] 99/21 117/8
reports [2] 187/23 190/17
repos [1] 46/16
repost [4] 112/22 195/14 196/1 198/23
reposted [3] 204/23 205/17 205/19
represent [3] 8/16 69/7 101/16
representation [1] 108/20
representations [1] 209/23
represented [5] 60/6 60/13 61/3 61/8 61/9
representing [2] 60/11 70/13
represents [2] 111/15 187/4
republication [1] 11/6
republish [1] 112/23
request [2] 82/13 107/2
requested [1] 20/22
requests [1] 108/22
require [6] 11/6 16/14 83/15 181/16 202/7 211/10
required [12] 38/22 75/18 77/5 77/18 80/17 101/9 101/21 104/13 112/10 150/24 164/6 211/22
requirement [2] 192/21 192/22
requirements [8] 41/20 72/15 74/3 76/5 77/6 78/5 112/3 202/6
requires [6] 103/22 174/24 174/24 175/17 192/18 207/24
requiring [2] 111/19 201/9
res [6] 13/14 13/15 13/15 13/22 13/23 15/9
res judicata [1] 13/14
research [1] 79/4
reservations [2] 36/15 41/10
reserve [3] 41/17 41/19 44/25
resolution [11] 27/25 31/24 35/19 41/13 46/10 172/13 173/5 173/11 173/25 198/4 202/13
resolutions [1] 41/6
resolve [4] 18/20 47/2 77/6 168/6
resolved [10] 9/10 27/15 27/16 35/22 43/4 47/25 151/9 168/24 169/1 169/3
resource [35] 28/7 29/15 35/6 42/12 42/23 45/25 49/18 59/6 68/5 68/8 68/10 68/17 68/25 69/4 71/18 100/13 146/24 146/25 147/2 147/8 153/24 154/11 155/23 187/15 187/16 187/23 188/4 188/11 188/18 188/20 188/22 188/24 197/13 198/14 209/7
resources [6] 34/14 43/16 68/18 102/10 121/19 140/15
respect [22] 21/1 44/4 49/2 57/5 58/18 59/15 65/10 68/23 72/24 75/1 77/1 80/19 96/11 100/3 100/20 100/24 107/23 111/18 147/1 185/1 198/4 208/24
respected [1] 38/8
respectfully [1] 15/23
respond [7] 104/12 106/14 196/25 207/8 207/9 207/14 207/19
responded [2] 102/13 197/25
response [7] 9/17 9/22 12/14 72/4 72/14 120/25 211/3
responses [5] 67/6 104/21 104/24 105/17 197/3
responsibilities [5] 98/15 99/4 100/3 100/15 100/20
responsibility [6] 37/25 53/3 67/13 82/13 176/25 201/24
responsible [7] 21/13 21/22 38/5 51/14 51/21 52/19 101/20
responsibly [1] 151/25
rest [2] 32/6 138/17
restate [1] 23/11
restoration [4] 42/24 45/17 188/24 199/14
restoration-type [1] 199/14
restore [3] 34/14 43/16 200/5
restricts [1] 109/8
restructuring [2] 33/11 33/21
resubmit [1] 62/20
result [3] 68/15 73/25 85/7
resulted [3] 58/19 59/9 69/5
results [1] 85/7
resume [1] 125/19
Ret [1] 4/2
retain [4] 145/5 156/7 203/2 204/1
retained [2] 70/17 71/14
returned [1] 131/8
Revenue [1] 204/9
reverse [2] 161/9 192/12
review [5] 18/19 19/4 19/17 154/2 210/3
reviewed [1] 94/24
reviewing [3] 19/15 79/22 177/25
revolving [3] 102/20 102/20 124/2
RFS [8] 37/4 37/6 37/10 37/13 37/22 40/15 41/16 44/25
rhetorical [2] 181/11 181/11
Rhoads [1] 4/2
rhyme [1] 51/9
Rica [1] 69/21
Richard [1] 4/7
rid [3] 75/11 78/17 78/18
right [98] 6/15 6/19 7/23 8/10 9/18 9/20 9/21 10/24 11/12 11/20 14/17 14/20 17/14 22/2 23/9 39/24 40/13 40/21 53/13 53/20 54/2 54/9 54/21 55/19 55/24 56/15 57/18 61/11 62/24 63/13 64/18 66/22 69/2 84/2 85/23 86/22 95/13 97/14 103/7 103/8 105/1 106/6 109/20 110/3 112/5 114/8 115/12 119/15 119/18 119/24 124/16 127/2 127/9 129/4 134/15 134/23 140/7 140/22 141/13 141/23 142/1 143/24 146/20 148/7 150/10 150/17 156/19 157/4 157/17 157/18 158/11 160/5 162/1 165/5 165/9 166/10 166/25 169/15 170/20 171/18 172/23 174/14 177/3 177/15 177/19 178/17 180/4 189/3 189/5 190/5 191/22 204/18 204/20 206/7 209/19 209/20 211/6 211/16
right-hand [1] 119/15
rights [4] 116/25 117/1 117/2 117/5
rise [8] 6/4 63/2 63/4 125/14 125/16 206/9 206/11 212/15
risk [2] 30/1 48/22
risks [6] 20/7 21/14 30/4 43/24 46/15 99/22
RMB [4] 1/4 1/4 1/5 1/5
RMR [1] 212/23
road [5] 2/7 3/17 108/25 144/9 178/6
roadmap [3] 17/7 154/16 154/17
ROBERT [2] 63/18 63/23
robust [1] 99/9
Rockaway [3] 3/20 8/5 8/18
rocks [1] 90/24
Rockville [2] 2/14 2/15
Rohm [2] 19/25 20/5
role [12] 69/24 98/10 98/13 99/12 99/17 100/5 101/11 102/23 104/18 104/20 184/21 201/13
roles [1] 98/11
room [3] 166/8 168/8 168/10
rooms [1] 94/24
roughly [1] 50/2
round [2] 33/21 39/3
rubric [2] 51/4 52/21
rule [1] 113/1
rulemaking [3] 98/21 193/6 193/12
ruling [1] 12/20
running [1] 92/19
Russo [1] 204/8

S

SABRINA [1] 2/3
Safe [1] 47/18
safety [1] 41/4
said [41] 9/16 12/23 13/1 14/9 14/10 15/18 15/19 27/11 27/12 60/21 61/5 67/11 70/22 81/9 82/16

## S

**said... [26]** 86/20 90/9 93/3 115/2 134/16 145/24 146/18 153/20 154/10 164/8 164/18 167/24 167/25 168/7 178/14 178/16 183/1 185/18 198/12 198/13 204/20 205/16 205/17 206/1 206/2 211/9
**sake [1]** 196/3
**sale [2]** 22/15 109/8
**Salem [1]** 190/21
**sales [5]** 23/16 24/9 25/1 61/16 62/5
**SAM [2]** 3/10 7/20
**same [21]** 7/11 26/25 53/6 61/11 71/8 71/10 83/1 88/20 92/21 99/17 118/9 118/14 152/17 166/4 166/24 171/12 173/4 188/18 194/17 198/24 206/1
**sample [4]** 78/16 82/5 84/8 85/19
**samples [1]** 78/9
**sampling [11]** 73/9 78/9 78/9 78/11 78/11 78/13 84/7 85/16 85/21 85/22 115/21
**sat [3]** 19/1 174/2 210/21
**satisfaction [5]** 36/7 38/13 42/6 44/15 200/17
**satisfied [2]** 57/19 149/15
**satisfies [1]** 16/16
**satisfy [3]** 16/18 140/18 156/19
**Saudi [1]** 69/22
**sausage [1]** 186/1
**save [1]** 66/11
**saw [2]** 181/15 197/25
**say [62]** 8/10 11/7 12/3 12/7 13/22 13/23 14/1 15/8 24/2 24/6 26/1 26/9 32/11 34/25 51/18 56/19 57/3 57/15 68/22 72/10 93/24 104/23 111/6 116/3 129/22 131/11 132/16 134/22 138/21 138/25 141/16 144/19 146/8 147/6 148/7 148/8 149/15 152/17 153/12 155/18 158/5 163/25 167/9 172/2 174/7 175/3 175/13 175/18 178/18 182/4 188/3 189/4 192/3 192/4 200/15 200/23 202/25 203/9 204/21 204/22 211/24 211/25
**saying [31]** 14/24 15/1 15/22 19/8 26/16 40/11 53/10 57/21 60/14 75/25 87/11 88/2 89/4 149/16 158/4 159/6 159/8 159/13 159/20 160/1 160/2 160/20 168/19 169/1 171/18 173/7 180/23 195/14 197/7 200/3 208/23
**Sayreville [8]** 3/15 8/1 126/5 152/18 153/7 189/9 206/25 209/13
**says [53]** 11/25 13/10 23/24 81/6 108/1 127/3 128/16 134/13 138/18 140/4 141/1 141/17 141/20 141/21 144/17 144/20 145/4 146/11 146/20 147/6 147/7 147/9 148/6 150/8 150/11 151/11 151/21 155/22 157/6 158/5 158/18 164/5 165/14 167/18 169/12 169/16 170/5 170/7 171/20 171/21 172/8 172/19 173/14 173/20 174/17 175/9 176/5 179/21 191/11 200/17 201/4 206/6 209/10
**scale [1]** 86/12
**scaled [1]** 86/8
**scaling [2]** 93/18 93/23
**scenario [1]** 175/18
**schedule [3]** 83/3 83/3 126/21
**Schneider [2]** 4/2 34/18
**school [1]** 98/25
**science [6]** 21/23 35/14 46/15 65/21 66/23 68/4
**scope [3]** 46/8 46/22 52/17
**SCOTT [2]** 2/14 6/24
**screen [14]** 64/9 64/12 64/13 64/14 64/15 105/2 119/12 119/16 120/1 169/12 172/18 182/8 182/11 182/25
**sealed [2]** 194/12 194/13
**seat [5]** 6/13 63/6 63/25 125/17 206/12
**seats [1]** 89/9
**second [17]** 19/12 40/4 61/20 82/20 93/20 95/22 102/4 118/10 132/14 159/12 160/12 169/22 182/14 189/17 192/6 195/23 204/3
**second-year [1]** 160/12
**section [7]** 41/9 124/9 129/25 144/23 156/6 157/2 157/3
**secure [4]** 18/14 38/3 43/5 43/7
**secured [1]** 41/16
**securing [1]** 96/24
**see [63]** 6/11 6/12 10/3 14/14 15/1 20/3 45/6 60/8 64/9 78/11 80/15 81/4 81/23 83/21 89/15 89/17 93/3 96/20 104/5 105/3 105/25 107/11 108/1 108/7 110/22 115/5 115/6 119/13 119/19 120/3 120/8 122/2 123/24 124/9 128/6 128/20 138/17 139/12 142/21 147/19 159/19 161/18 161/19 163/12 165/17 167/14 167/15 168/17 169/7 170/2 171/9 178/7 179/23 182/22 182/22 193/13 194/7 194/8 194/24 195/3 197/2 197/7 210/4
**seeing [1]** 210/14
**seek [3]** 50/15 51/19 51/22
**seem [5]** 12/15 54/8 159/6 159/7 160/10
**seemed [2]** 60/21 194/24
**seems [22]** 13/5 14/23 15/1 39/6 39/11 53/9 53/18 54/6 56/6 56/10 149/14 149/19 149/19 149/25 151/19 152/7 152/11 173/11 190/24 194/25 198/19 205/19
**seen [5]** 96/14 136/6 163/7 167/17 168/2
**sell [2]** 57/1 72/12
**selling [2]** 21/15 22/12
**sells [1]** 87/17
**send [2]** 90/12 91/18
**sending [1]** 87/5
**senior [5]** 66/7 67/11 67/12 67/18 67/23
**sense [15]** 14/22 21/11 21/12 30/8 45/4 45/4 52/3 65/3 68/7 133/22 149/11 164/18 193/19 193/23 198/5
**sent [1]** 108/22
**sentence [4]** 146/6 169/22 170/7 182/23
**separate [9]** 15/19 43/18 120/13 120/14 175/23 184/23 194/22 200/6 200/20
**separated [1]** 79/10
**separately [5]** 18/10 21/2 78/23 187/16 200/19
**series [4]** 33/15 36/14 37/9 47/9
**Serp [16]** 4/7 103/10 104/1 105/21 107/8 107/19 108/16 109/21 110/17 114/15 115/22 117/12 118/8 119/21 121/9 123/20
**serum [1]** 167/6
**serve [3]** 98/11 98/23 212/2
**set [16]** 9/21 19/7 20/5 35/16 39/18 41/16 42/17 61/4 63/5 65/1 67/17 69/3 128/21 161/21 162/11 202/3
**sets [7]** 16/17 39/17 40/11 116/7 123/2 123/5 154/1
**setting [1]** 160/17
**settle [3]** 29/21 201/12 209/11
**settled [2]** 22/4 23/8
**settlement [146]** 14/17 17/2 19/16 19/16 19/17 20/4 20/10 20/10 20/13 20/18 21/2 25/13 25/13 25/13 25/20 25/23 25/24 26/3 26/3 26/10 26/11 26/17 26/22 26/22 26/24 27/10 27/18 27/22 28/7 28/9 28/15 28/25 29/14 30/5 30/7 30/9 30/15 30/18 32/1 32/2 32/15 35/6 37/13 43/11 45/5 49/25 52/10 55/3 55/4 60/25 61/4 70/4 70/7 70/24 71/1 71/19 71/22 73/19 73/20 73/21 79/2 88/15 94/4 94/5 94/15 100/19 101/13 102/9 104/8 104/11 105/18 113/5 113/11 116/4 116/13 116/18 116/21 118/5 118/11 120/19 120/25 121/14 122/1 122/4 122/5 123/18 125/1 126/9 126/11 129/5 131/6 131/8 133/20 137/17 139/4 139/6 139/19 145/6 146/2 149/20 150/24 153/9 153/10 156/8 161/3 161/21 162/11 162/15 163/1 163/3 163/22 163/23 164/9 164/10 164/17 165/3 167/16 170/24 171/6 174/9 174/23 181/8 181/9 181/18 182/21 184/15 191/7 191/23 192/19 193/25 194/11 194/19 194/20 194/21 195/20 196/23 197/11 201/10 202/19 203/10 208/7 208/13 209/15 210/22 210/25 211/7
**settlements [45]** 19/4 20/23 20/24 26/12 27/5 32/20 45/16 46/1 47/2 47/8 48/7 48/25 52/4 59/8 69/24 93/19 100/16 100/21 101/6 101/9 101/15 101/16 102/5 102/8 102/11 102/24 103/3 103/23 103/24 104/22 106/19 106/23 106/24 111/5 116/19 117/24 118/3 118/20 120/13 121/5 122/8 123/4 123/5 132/13 186/13
**settling [9]** 39/20 41/2 117/24 129/5 129/8 145/4 156/6 159/25 162/10
**settlors [2]** 20/8 20/12
**settlors' [1]** 20/11
**seven [2]** 8/17 110/8
**several [15]** 32/22 34/20 38/7 40/24 44/23 50/10 51/21 52/17 54/20 77/23 79/13 84/17 90/1 96/12 164/4
**severally [1]** 41/24
**sewage [2]** 84/18 84/21
**sewer [2]** 81/17 83/22
**sewerage [17]** 3/19 3/19 3/20 3/20 3/20 8/5 8/5 8/6 8/13 8/18 8/19 8/19 8/20 8/21 8/22 75/9 82/5
**sewers [1]** 83/23
**shaking [1]** 183/5
**shall [11]** 20/2 41/1 129/8 139/6 157/8 157/9 198/12 198/13 199/20 199/22 211/20
**share [5]** 38/5 50/12 50/20 185/8 185/9
**she [3]** 164/18 168/13 178/16
**shipment [1]** 22/13
**ships [1]** 133/6
**short [5]** 55/22 79/17 80/14 98/16 148/24
**short-chain [2]** 79/17 80/14
**shorten [1]** 196/14
**shortfall [2]** 26/14 26/17
**should [29]** 14/5 16/25 26/1 50/2 60/7 64/2 64/6 79/20 87/19 87/20 95/4 98/1 111/6 152/15 156/16 168/9 173/7 174/1 174/4 180/2 181/14 181/16 181/20 182/2 189/20 191/19 193/21 194/20 211/25
**shouldn't [4]** 9/15 10/2 10/4 191/8
**shovel [1]** 153/21
**show [15]** 86/10 86/19 90/5 90/20 92/7 105/1 126/10 127/9 137/21 147/17 169/16 179/18 180/11 193/1 193/10
**showed [2]** 129/16 178/5
**shown [1]** 169/12
**shows [4]** 85/20 87/14 92/9 135/24
**shut [1]** 171/21
**side [11]** 68/17 76/11 79/11 79/12 119/12 119/16 170/8 173/1 175/12 178/8 196/6
**sidelines [1]** 169/6
**sides [1]** 205/20
**sideshow [1]** 134/21
**sign [3]** 10/2 10/4 101/12
**signatories [4]** 60/2 60/5 60/12 60/24
**signature [1]** 60/17
**signed [4]** 10/5 12/8 101/6 169/21
**significant [28]** 27/6 29/16 30/1 30/21 31/5 32/7 32/25 34/1 35/5 35/7 35/12 36/21 43/13 43/17 43/24 43/25 44/8 47/3 47/9 48/14 49/1 50/22 58/24 80/5 84/7 107/5 111/13 185/21
**similar [6]** 71/3 74/24 108/13 136/18 148/22 192/22
**simple [2]** 87/16 192/18
**simplest [1]** 91/17
**simply [1]** 81/6
**since [3]** 12/13 12/22 156/20
**single [4]** 36/1 60/21 91/9 92/4
**single-digit [1]** 92/4
**sit [1]** 44/25
**site [51]** 22/6 23/25 28/17 28/21 38/1 38/22 38/23 44/3 49/12 50/5 50/12 52/22 52/22 56/23 58/4 58/7 66/14 66/15 79/4 85/12 89/16 90/5 90/16 92/6 92/13 92/13 93/15 100/13 115/4 115/7 115/8 115/9 115/11 124/5 139/21 151/4 151/6 152/19 152/19 152/22 185/20 191/13 198/7 200/16 200/20 206/25 207/25 208/1 208/5 209/5 209/17
**site-specific [5]** 66/15 115/4 115/7 207/25 208/1
**sites [58]** 30/24 34/10 36/7 39/21 41/11 42/4 42/5 44/14 45/19 47/6 48/17 49/8 49/10 50/3 52/13 56/20 59/6 66/12 71/17 72/5 72/21 73/14 75/10 75/11 83/18 84/17 88/19 88/24 88/25 89/16 90/6 90/22 91/6 92/3 92/20 92/23 92/25 93/6 93/14 96/12 101/21 109/14 109/14 114/12 114/18 114/19 123/19 141/11 145/16 156/22 159/7 161/16 185/23 188/20 208/6 208/6 208/11 209/8
**sits [1]** 44/25
**sitting [2]** 19/1 162/4
**situ [1]** 90/23
**situation [4]** 13/3 75/17 113/4 194/6
**six [3]** 41/8 188/16 198/1
**sixth [1]** 33/10
**size [2]** 90/5 91/10
**skills [1]** 66/5
**slide [39]** 17/24 18/17 19/3 19/24 20/21 22/8 26/20 27/8 35/20 43/10 45/13 45/14 48/3 49/23 59/13 71/23 75/14 77/1 80/21 82/2 82/15 85/2 85/20 86/23 86/2 89/24 91/3 92/7 92/9 107/19 108/16 108/18 108/19 110/18 115/22 117/12 117/14 118/7 119/10
**slides [1]** 70/19
**Slow [1]** 82/20
**sludge [6]** 78/15 84/18 84/21 86/15 86/16 86/17
**slurry [1]** 90/15
**small [5]** 91/6 92/4 93/2 93/6 166/16
**smallest [1]** 164/1
**smart [1]** 173/12
**smoother [1]** 149/23

## S

**so [454]**
**soil [15]** 48/16 49/2 49/7 49/11 49/16 49/17 49/22 73/13 73/14 90/4 90/24 91/9 91/18 91/24 109/15
**soils [2]** 89/14 89/20
**sold [3]** 84/12 85/1 165/1
**sole [2]** 117/20 155/12
**solely [2]** 120/17 191/12
**solid [1]** 75/8
**solution [5]** 18/20 43/21 144/6 199/2 201/19
**solutions [1]** 80/16
**Solvay [3]** 47/8 47/22 58/3
**some [69]** 9/2 9/9 9/14 11/13 14/12 16/23 18/25 23/2 29/20 29/25 31/6 44/7 45/19 47/16 48/6 51/12 65/10 70/5 73/9 76/2 77/4 77/4 78/19 78/20 79/4 83/22 84/11 85/19 89/8 89/10 90/6 90/15 90/16 92/11 92/20 92/22 94/9 94/25 99/16 103/17 106/10 126/6 137/18 142/15 144/4 149/12 149/24 150/6 151/16 152/4 153/21 158/8 163/23 164/20 166/16 171/17 176/6 183/23 183/24 185/21 186/3 186/14 187/25 193/20 198/7 198/8 204/21 204/25 209/21
**somebody [4]** 36/13 36/15 112/18 137/21
**someone [8]** 29/4 130/21 140/3 140/5 140/18 165/14 169/15 182/8
**someplace [1]** 134/13
**Somerset [3]** 3/19 3/24 8/21
**something [25]** 12/3 56/14 56/14 57/9 59/2 61/18 89/17 90/25 104/12 113/7 116/13 135/12 135/14 150/14 152/10 153/13 158/25 165/4 173/21 178/5 181/16 189/4 191/24 193/5 205/24
**sometime [1]** 24/13
**sometimes [2]** 82/4 171/9
**somewhat [1]** 80/16
**somewhere [5]** 90/12 135/8 140/6 147/17 157/25
**soon [1]** 10/12
**sorry [18]** 23/11 27/8 40/5 41/15 43/8 61/15 80/22 92/24 92/25 94/22 139/3 153/14 169/25 185/15 194/10 202/25 203/7 211/23
**sort [10]** 53/9 53/18 71/4 71/5 74/1 90/15 134/20 165/8 165/17 184/12
**sought [4]** 55/9 55/10 188/12 188/25
**sound [2]** 70/9 138/24
**sounding [1]** 162/20
**sounds [3]** 134/5 134/7 167/12
**source [17]** 37/4 37/6 37/16 49/17 75/11 75/11 76/12 80/25 81/14 81/18 83/8 85/8 90/10 91/19 107/4 109/11 111/1
**sources [13]** 80/5 81/1 81/3 82/3 83/1 83/17 89/23 107/1 107/6 108/5 108/5 108/24 109/15
**South [12]** 133/19 163/9 163/11 163/22 164/13 167/20 168/24 169/3 170/25 170/25 171/3 171/17
**sovereign [2]** 31/9 47/17
**space [3]** 66/5 66/6 66/7
**SPAHR [2]** 3/2 7/14
**SPALDING [2]** 3/6 7/19
**speak [1]** 155/14
**speaking [4]** 6/22 50/1 51/18 66/6
**speaks [1]** 180/5
**special [37]** 1/20 2/5 2/8 2/12 2/15 4/2 14/12 34/18 116/14 116/22 152/16 152/18 163/9 163/11 163/25 167/8 167/20 167/23 168/11 168/12 169/4 169/10 169/18 170/15 170/18 171/1 172/23 174/2 175/9 176/8 177/3 201/9 201/14 201/18 201/21 202/2 204/9
**specialization [1]** 68/3
**specialties [1]** 65/25
**Specialty [2]** 3/4 7/15
**specific [21]** 21/6 62/16 66/15 77/16 77/23 79/18 115/4 115/7 121/5 155/12 155/15 184/21 199/14 202/5 202/9 206/24 207/25 208/1 208/4 209/4 211/11
**specifically [10]** 71/21 72/20 74/25 75/4 75/15 121/10 146/12 149/22 152/4 208/13
**specified [15]** 128/17 129/8 129/15 129/19 129/21 129/22 130/4 130/4 130/8 130/16 130/22 131/4 131/8 131/10 134/19
**specifies [1]** 138/10
**speculate [1]** 130/11
**spell [2]** 63/21 97/22
**spelled [1]** 154/6
**spend [9]** 148/2 148/5 168/22 171/25 190/9 197/20 198/12 198/13 199/13
**spending [5]** 170/14 178/4 190/20 200/2 200/3
**spent [17]** 149/13 150/24 168/9 172/9 172/19 173/6 189/23 191/2 191/15 198/1 199/20 199/22 200/4 200/9 201/2 202/7 211/21
**spill [47]** 19/5 19/15 19/19 20/14 21/7 21/12 21/21 33/6 35/12 50/4 50/9 50/14 51/13 51/20 52/19 52/22 54/16 56/21 67/3 103/22 104/13 123/12 123/24 124/1 124/2 124/3 124/10 124/21 125/3 133/19 141/4 178/17 179/10 179/13 179/16 179/22 180/4 180/16 180/18 180/25 181/5 181/19 183/2 183/8 183/9 192/18 211/2
**spills [2]** 66/12 69/14
**spirit [2]** 176/18 196/18
**split [1]** 142/15
**spoke [1]** 156/5
**spoken [1]** 134/18
**sprayed [1]** 91/7
**spraying [1]** 68/19
**spread [2]** 137/5 161/15
**sprinkled [1]** 190/24
**spun [1]** 33/14
**square [2]** 108/1 108/7
**St [1]** 2/11
**staff [4]** 85/15 92/15 184/16 184/16
**staff-level [1]** 184/16
**stage [1]** 73/3
**stakeholder [1]** 112/4
**stakeholdering [1]** 112/2
**stand [8]** 57/14 63/9 63/12 96/6 97/12 125/19 183/19 205/25
**standalone [1]** 204/10
**standard [4]** 18/19 132/12 192/5 192/6
**standards [12]** 17/25 47/16 48/19 48/20 75/6 75/7 75/19 81/22 83/25 109/4 109/13 109/19
**standing [8]** 14/24 153/12 190/13 190/22 199/6 199/7 202/17 202/21
**start [11]** 6/14 6/15 6/19 9/24 17/3 43/12 62/25 67/14 176/15 198/10 198/17
**started [8]** 24/6 64/7 67/15 92/14 92/14 99/21 100/6 156/14
**starting [1]** 37/12
**starts [4]** 119/24 120/1 123/1 175/22
**state [244]**
**State's [17]** 29/24 35/4 38/13 41/25 43/14 61/23 135/1 144/2 164/16 166/3 173/6 174/6 175/11 175/13 188/8 188/19 208/1
**state-owned [1]** 48/12
**statement [1]** 80/23
**states [22]** 1/1 1/13 6/2 32/6 36/9 47/12 47/14 67/3 69/10 70/13 70/21 71/3 71/6 71/8 71/9 74/9 80/24 83/1 85/9 155/10 163/23 171/5
**statewide [9]** 22/7 50/7 52/11 57/6 59/4 59/7 71/20 146/12 208/2
**status [2]** 9/3 117/9
**statute [6]** 180/5 181/3 181/12 181/15 183/3 211/10
**statutes [2]** 37/17 46/16
**statutorily [1]** 211/2
**statutory [7]** 171/18 179/24 183/3 190/2 190/7 192/17 192/21
**stay [4]** 123/20 143/14 144/12 147/17
**stays [2]** 166/24 177/1
**stenography [1]** 1/23
**step [6]** 59/14 96/2 97/13 115/20 175/11 183/16
**step-out [1]** 115/20
**steps [4]** 108/25 118/4 120/21 131/14
**stick [1]** 159/7
**sticking [1]** 178/13
**stigma [3]** 87/12 87/24 88/1
**still [23]** 9/9 9/15 12/8 31/11 53/12 54/7 59/1 73/3 84/6 84/10 87/14 90/17 110/1 122/20 150/5 153/8 169/20 184/4 191/1 191/1 199/3 208/8 208/14
**stipulated [1]** 10/20
**stipulation [22]** 10/13 110/14 110/19 110/24 111/1 111/4 111/11 112/9 113/10 115/24 116/3 116/20 117/16 118/10 123/16 163/2 163/8 164/14 166/12 169/19 170/22 171/18
**stipulations [14]** 9/25 10/2 10/2 11/3 132/19 132/23 132/23 138/5 169/16 192/2 193/25 197/6 200/14 205/16
**stock [1]** 33/23
**Stony [2]** 3/20 8/20
**stood [2]** 134/15 206/4
**stop [4]** 36/5 85/17 148/4 149/16
**stops [2]** 150/6 175/22
**story [1]** 175/24
**straight [1]** 173/19
**Strand [1]** 2/11
**strangely [1]** 163/22
**strategic [1]** 98/20
**strategies [1]** 81/7
**strategy [1]** 107/22
**stream [10]** 78/15 79/5 79/11 80/6 81/4 81/10 82/5 107/18 108/6 176/11
**streams [1]** 73/5
**Street [5]** 1/16 2/4 2/11 2/17 2/21
**Streets [1]** 1/10
**strengths [1]** 70/4
**stretch [2]** 94/23 159/15
**strict [6]** 50/9 51/20 52/6 53/11 54/19 54/19
**strictly [2]** 41/24 54/24
**stringent [2]** 109/18 109/19
**strongly [1]** 87/10
**structural [1]** 44/17
**Structurally [1]** 45/1
**structure [6]** 27/6 30/20 32/11 37/3 43/22 129/12
**structured [4]** 26/22 26/23 37/24 122/25
**structures [1]** 45/11
**stuck [1]** 181/3
**studied [1]** 68/5
**study [9]** 77/7 79/2 79/7 79/23 80/15 80/23 81/5 95/1 151/3
**stuff [10]** 30/17 84/23 87/1 87/5 87/12 88/4 89/11 90/11 90/23 91/7
**suballocation [1]** 132/1
**subcategories [1]** 141/10
**subdivisions [3]** 46/9 47/5 123/13
**subdivisions' [1]** 190/2
**subject [7]** 10/11 25/17 27/11 44/7 151/20 183/2 192/15
**submission [1]** 107/3
**submissions [1]** 210/11
**submit [4]** 23/17 180/19 190/17 209/25
**submits [1]** 203/12
**submittal [1]** 186/11
**submitted [7]** 18/8 103/7 132/2 160/25 184/23 188/1 188/7
**submitting [1]** 179/16
**subsequent [2]** 151/15 151/17
**Subsequently [1]** 33/17
**subsidiary [1]** 33/25
**subsite [1]** 92/20
**substance [2]** 50/13 68/22
**substances [2]** 36/6 54/15
**substantial [5]** 30/5 84/1 192/13 192/16 193/3
**substantially [1]** 11/4
**substantive [4]** 17/25 20/16 61/7 61/9
**substantively [1]** 192/4
**subsumed [1]** 209/1
**success [2]** 44/15 79/14
**successful [1]** 78/12
**succinct [1]** 20/1
**such [5]** 83/18 98/17 158/25 173/4 190/3
**suddenly [1]** 194/21
**suffered [1]** 184/20
**sufficiency [1]** 49/25
**sufficient [4]** 13/14 13/24 14/3 181/13
**suggested [1]** 153/19
**suing [1]** 53/17
**Suite [7]** 1/19 2/11 2/14 3/3 3/10 3/13 3/17
**suited [1]** 144/11
**sum [1]** 87/4
**summarize [2]** 56/15 180/1
**summarized [1]** 85/9
**summarizes [1]** 82/15
**summary [6]** 35/21 114/4 192/18 198/22 198/23 199/3
**supplement [5]** 124/23 179/10 179/12 183/9 204/13
**supplementary [5]** 18/9 29/24 46/23 153/16 154/9
**supplied [2]** 21/8 22/9
**supply [1]** 24/13
**supplying [1]** 23/25
**support [7]** 24/5 29/25 79/2 102/2 110/11 123/9 186/19
**supports [1]** 163/3
**suppose [1]** 61/7
**supposed [8]** 137/5 143/1 164/19 167/19 169/10 180/14 205/3 205/21
**sure [42]** 22/21 23/19 23/20 23/22 34/9 36/22 42/23 60/4 60/10 64/16 68/9 73/1 81/11 81/13 88/20 91/16 93/25 124/8 132/24 136/22 151/3 163/18 164/18 166/1 170/13 170/19 171/14 173/2 176/18 176/19 176/19 176/25 177/15 177/20 177/25 180/6 181/20 182/15 189/8 189/13 192/8 205/14
**surface [3]** 75/12 83/19 90/18
**surprised [4]** 140/2 140/19 142/20 173/10
**surprisingly [1]** 74/18
**surrender [4]** 205/2 205/6 205/12 205/19
**surreply [2]** 162/23 207/7
**survey [2]** 72/10 86/6
**surveys [1]** 108/22
**suspected [1]** 117/23
**Sussex [2]** 115/13 115/16
**swear [2]** 63/14 97/15
**switch [1]** 70/19
**sworn [2]** 63/19 97/20
**system [3]** 30/13 74/20 187/10
**systems [10]** 25/21 26/7 48/12 48/12 81/4 82/5 83/22 86/7 186/24 187/11

**T**

**T-O-M-E-R [1]** 62/4
**table [6]** 133/25 135/23 135/24 162/5 168/6 174/2
**tabs [1]** 95/6
**TAGLIAFERRO [2]** 3/23 9/1
**take [23]** 12/6 12/14 12/18 16/1 62/24 64/15 66/19 87/22 90/24 93/14 120/21 125/10 131/14 144/14 145/13 157/20 173/23 191/2 191/3 192/11 201/4 204/18 206/7
**taken [8]** 63/3 72/4 72/5 118/4 125/15 133/3 152/2 206/10
**takes [3]** 16/22 137/3 196/16
**taking [9]** 40/7 41/2 80/18 80/20 80/20 81/25 83/8 148/14 185/7
**talk [20]** 20/2 26/19 29/22 36/2 36/15 46/20 48/14 59/15 77/7 79/15 79/15 83/18 98/1 102/4 114/8 168/15 168/19 189/20 195/3 204/8
**talked [6]** 77/20 136/16 136/17 136/21 139/18 190/8
**talking [8]** 20/2 32/13 53/18 56/19 92/12 106/19 147/11 205/19
**talks [4]** 38/11 79/14 130/19 158/16
**tank [1]** 89/17
**target [1]** 149/11
**targeting [1]** 108/23
**task [1]** 203/10
**tax [14]** 190/11 190/24 191/2 191/3 191/5 191/9 191/14 191/18 191/20 195/9 199/10 200/3 200/6 200/10
**taxes [1]** 199/8
**taxpayers [4]** 34/11 41/12 44/19 101/25
**team [1]** 30/3
**technical [1]** 99/10
**Technician [1]** 4/7
**techniques [2]** 79/13 79/14
**technologies [1]** 79/9
**technology [3]** 79/25 108/7 108/9
**teenager [1]** 166/6
**tell [39]** 10/20 13/4 13/12 25/4 29/4 36/10 36/13 38/19 40/17 50/4 50/24 54/6 60/9 60/22 61/17 65/16 67/16 67/25 70/21 75/14 82/20 82/24 85/2 85/25 91/11 111/21 116/18 122/25 131/15 132/8 134/9 137/13 137/22 143/19 159/5 173/20 175/4 183/5 190/13
**telling [10]** 13/5 13/8 13/9 56/11 67/4 67/5 67/7 143/21 143/22 169/7
**tells [4]** 17/8 86/3 86/7 154/2
**TELSEY [40]** 3/13 7/25 11/7 11/14 16/10 94/19 95/23 125/22 126/4 129/23 131/15 131/24 132/8 133/7 134/9 136/16 139/12 141/18 153/17 154/6 155/17 159/3 162/20 164/9 177/22 178/23 182/20 190/4 190/10 192/3 193/16 195/19 195/23 198/13 200/12 201/4 203/13 203/18 204/19 209/3
**Telsey's [3]** 11/2 131/3 198/15
**ten [4]** 62/24 210/1 210/1 210/12
**ten-minute [1]** 62/24
**tenant [1]** 28/20
**tens [2]** 45/21 92/5
**tenure [2]** 99/16 113/3
**term [5]** 9/13 130/22 131/11 199/3 202/24
**terms [52]** 10/10 10/14 10/20 10/22 11/5 17/8 17/9 18/1 18/5 20/3 20/24 24/18 25/12 26/18 35/21 49/15 50/2 55/8 56/16 61/7 61/9 68/20 68/21 70/12 93/1 107/17 112/22 113/22 114/2 118/11 137/20 139/4 143/6 143/8 152/3 152/25 154/13 154/14 187/19 191/6 192/19 197/11 197/11 197/12 198/22 198/23 202/19 204/21 205/2 205/6 205/17 208/5
**test [2]** 30/11 171/20
**testified [9]** 63/20 95/5 97/21 108/14 109/2 114/19 131/25 164/18 185/3
**testify [2]** 18/8 18/13
**testifying [2]** 71/16 204/14
**testimony [16]** 17/8 48/18 62/25 63/14 64/22 65/3 65/8 69/22 97/15 108/10 114/23 126/6 143/7 183/7 184/1 204/17
**testing [2]** 49/4 176/15
**Texas [1]** 1/20
**text [1]** 97/3
**thank [64]** 6/13 8/23 9/6 9/7 11/11 11/22 17/20 17/22 19/14 25/9 25/11 30/23 31/1 40/20 40/21 62/22 62/23 63/1 63/6 63/8 64/3 65/14 67/10 95/13 95/20 95/21 96/1 96/2 96/3 96/19 97/8 97/10 98/3 105/12 119/1 119/8 120/4 120/20 121/22 125/12 125/13 125/17 126/19 153/6 154/23 167/11 170/4 174/7 175/13 183/14 183/17 183/18 188/16 209/19 211/25 212/6 212/6 212/8 212/9 212/10 212/11 212/12 212/13 212/14
**them [46]** 10/4 10/12 10/22 21/1 22/12 28/18 37/22 38/8 38/9 41/18 42/2 43/19 47/5 50/14 52/15 56/1 62/17 62/21 69/20 73/15 73/15 89/5 90/20 92/20 93/3 108/3 115/17 136/16 136/17 136/21 143/11 143/12 143/22 145/14 165/4 169/7 176/18 189/9 189/13 189/13 196/25 199/2 199/11 200/11 202/10 208/7
**themselves [3]** 18/5 47/8 163/17
**thereafter [1]** 112/9
**therefore [3]** 161/14 174/22 191/13
**these [148]** 10/3 18/3 18/23 20/3 20/24 26/5 27/4 28/1 28/3 29/20 32/3 32/5 32/12 32/18 34/1 34/5 34/10 34/13 34/19 34/19 34/23 36/22 37/1 37/1 37/7 41/11 41/25 42/7 42/13 42/16 43/15 43/20 44/9 44/14 45/10 45/16 45/23 46/1 46/3 46/11 46/17 47/1 47/1 47/2 47/20 47/24 48/1 48/6 48/21 49/15 49/24 50/3 50/23 54/17 55/8 56/1 56/17 57/7 58/18 58/20 58/25 59/9 59/12 60/11 60/12 72/2 72/9 73/4 78/1 81/1 83/6 84/2 84/8 88/9 88/24 88/25 89/4 89/7 89/16 89/21 90/2 90/21 91/3 91/6 91/11 91/13 91/23 92/10 93/14 94/2 100/21 101/15 101/16 102/5 102/23 103/3 106/2 111/5 116/19 121/4 123/4 132/19 133/23 134/17 136/17 140/6 140/20 141/7 141/7 141/10 142/22 144/11 149/21 151/10 154/12 154/12 154/15 154/15 157/8 157/11 157/16 157/16 157/20 158/13 159/6 162/7 163/12 163/23 165/6 169/12 171/6 177/16 181/7 183/24 184/18 194/1 194/3 195/12 196/5 197/5 197/19 197/20 200/1 200/14 200/24 201/1 202/9 202/10
**they'll [3]** 29/13 37/17 152/24
**they're [32]** 14/19 15/2 15/3 40/12 43/17 50/6 52/17 78/19 83/23 86/11 89/17 90/25 93/2 143/1 143/14 143/22 146/17 150/23 152/9 157/18 158/25 160/13 169/6 173/24 175/15 175/16 191/18 194/13 194/19 200/18 203/1 207/1
**they've [3]** 91/1 92/17 145/11
**thing [11]** 43/1 43/2 43/3 153/15 172/1 197/4 199/3 200/21 203/21 204/3 206/1
**things [21]** 15/18 15/18 16/24 36/20 37/19 46/5 59/16 76/4 83/5 89/1 90/1 145/7 151/9 156/9 181/24 193/25 203/17 203/20 206/3 206/18 211/11
**think [135]** 9/21 11/1 11/2 13/14 13/24 13/25 16/5 16/10 16/13 16/23 16/25 18/3 20/19 23/14 24/18 24/24 25/1 27/1 31/18 34/23 34/24 35/1 37/21 40/10 46/25 54/11 57/11 57/12 60/15 60/19 64/12 65/6 69/17 70/1 70/9 70/19 72/13 74/5 74/11 74/16 75/16 76/5 76/6 77/12 79/20 80/1 80/13 82/15 87/14 87/25 91/25 94/10 94/19 94/24 95/4 96/23 112/16 112/17 112/19 128/9 130/24 131/1 131/23 132/6 132/8 133/2 133/5 134/7 134/22 135/18 136/15 136/22 136/22 137/19 141/15 141/17 141/20 142/5 147/15 149/8 149/10 149/11 150/2 150/2 151/7 151/8 152/2 157/18 157/24 158/7 158/7 160/1 162/7 165/17 172/11 173/4 174/1 177/17 177/19 177/20 177/22 178/1 178/3 178/11 178/21 178/22 183/10 185/11 188/1 188/9 189/16 189/24 190/5 190/8 191/18 194/23 195/4 195/5 195/8 196/2 196/2 197/8 197/8 197/10 199/1 199/4 200/23 202/4 202/23 204/2 204/6 205/4 208/19 210/7 210/12
**thinking [4]** 10/17 13/6 147/21 199/5
**thinks [1]** 9/12
**third [8]** 2/23 91/22 123/15 124/24 169/14 189/21 189/21 204/7
**Thirty [1]** 188/16
**Thirty-six [1]** 188/16
**this [380]**
**though [2]** 52/16 87/14
**thought [11]** 9/10 9/23 14/9 16/11 19/25 28/3 46/19 46/19 53/10 67/4 158/3
**thoughtfully [1]** 104/12
**thousands [2]** 45/21 45/22
**three [11]** 28/19 33/18 42/8 42/9 43/18 43/23 70/16 78/4 133/6 142/4 175/15
**through [60]** 11/13 20/22 22/16 23/2 28/10 33/25 34/19 35/15 38/8 40/25 48/4 48/22 52/14 54/12 59/18 65/7 65/10 80/16 88/9 90/15 90/19 90/24 91/15 93/7 95/7 102/1 102/17 102/19 102/20 103/2 103/5 103/16 103/17 111/2 111/7 111/10 115/18 116/13 122/24 123/3 123/4 123/8 125/3 139/11 163/21 183/9 185/22 187/1 188/18 189/8 189/12 196/20 196/21 198/2 198/10 200/21 200/25 202/2 202/5 211/9
**throughout [3]** 101/19 209/21 211/20
**thus [1]** 30/4
**tied [1]** 42/13
**tier [1]** 38/7
**tiered [1]** 101/8
**ties [1]** 208/5
**till [2]** 67/20 80/11
**time [45]** 12/22 14/19 26/23 27/1 31/2 37/12 44/13 47/13 53/8 70/6 73/2 73/17 75/24 77/4 79/1 79/7 79/24 80/8 80/24 82/17 82/25 83/3 85/5 87/10 91/5 94/9 100/25 108/8 124/7 125/9 129/7 163/20 167/5 171/16 173/10 174/13 180/19 184/14 185/4 190/10 197/2 199/16 211/7 211/20 211/20
**timeliness [1]** 21/22
**times [2]** 85/22 85/22
**timing [7]** 30/19 32/12 35/11 45/6 45/9 46/16 72/13
**title [2]** 99/25 138/18
**today [29]** 6/22 7/9 8/8 10/2 10/13 10/22 15/19 17/23 19/3 19/23 20/2 46/24 64/22 65/3 96/17 100/16 106/19 110/1 166/15 170/22 171/13 186/9 201/20 202/1 202/5 203/12 204/4 204/5 204/20
**together [13]** 26/3 27/3 36/22 67/9 92/8 143/17 168/7 173/2 174/3 175/5 178/10 194/18 194/18
**told [4]** 96/16 175/24 175/24 178/2
**Tomer [3]** 62/4 62/7 62/15
**tomorrow [1]** 201/20
**ton [1]** 86/18
**tonnage [1]** 86/16
**tonto [1]** 50/19
**too [9]** 16/24 55/18 130/20 130/21 148/21 151/16 179/9 190/10 210/13
**took [4]** 63/12 74/1 97/12 185/11
**top [5]** 108/1 120/7 138/9 154/10 161/2
**top-level [1]** 154/10
**tort [1]** 51/24
**total [14]** 25/14 27/9 55/24 65/24 74/4 80/15 86/16 86/18 93/15 93/16 111/5 111/14 186/1 186/6
**totaled [1]** 189/1
**totally [3]** 150/3 177/7 178/6
**touched [1]** 123/16
**tougher [1]** 93/4
**toward [1]** 111/6
**towards [1]** 111/9
**tower [1]** 89/17
**towns [1]** 46/13
**Township [2]** 3/14 126/5
**township's [1]** 12/1
**toxic [1]** 50/11
**toxicity [2]** 35/13 57/1
**trace [1]** 34/4
**Trade [1]** 2/4
**traded [2]** 33/19 43/18
**traditional [2]** 21/11 21/11
**traffic [3]** 89/8 165/3 165/12
**train [2]** 89/10 91/8
**trained [1]** 89/1
**training [15]** 49/8 49/21 72/22 88/14 89/12 89/16 89/17 93/11 114/13 114/21 115/14 115/18 115/21 116/9 117/22
**tranche [1]** 160/13
**transaction [1]** 33/15
**transactions [1]** 33/22
**Transcriber [1]** 212/24
**transcript [3]** 1/23 14/10 212/19
**transcription [1]** 1/24
**transfer [14]** 2/19 2/23 3/5 3/5 33/8 35/18 43/8 44/1 46/17 129/6 134/25 134/25 135/2 167/8
**transfers [3]** 33/16 33/22 43/13
**transparency [6]** 102/7 112/1 113/23 117/8 121/17 205/13
**transparent [2]** 126/8 173/13
**transporters [1]** 53/4
**treasurer [1]** 204/8
**Treasury [4]** 117/23 120/24 121/4 121/6
**treat [9]** 30/11 30/12 78/7

**T**

**treat... [6]** 78/24 80/2 80/12 81/2 81/3 171/22
**treated [1]** 75/9
**treating [3]** 75/6 76/11 78/8
**treatment [33]** 26/6 48/15 49/4 49/5 59/10 72/21 74/20 75/2 75/4 75/21 76/1 78/12 79/8 79/9 80/19 82/1 84/3 90/16 90/23 108/7 111/20 115/19 124/15 145/8 146/13 146/16 152/16 152/18 156/10 193/20 200/7 200/10 200/13
**tremendous [1]** 44/8
**Trenton [1]** 1/17
**trespass [2]** 33/7 51/25
**trial [14]** 4/7 21/2 22/2 23/8 23/8 32/23 35/17 44/2 48/18 187/25 188/8 188/12 188/25 208/22
**trials [4]** 33/10 35/16 43/25 61/24
**tribes [1]** 69/11
**tried [7]** 19/2 21/5 32/23 35/15 44/1 70/2 136/21
**triggered [1]** 41/20
**Trucking [1]** 53/2
**true [2]** 85/14 110/1
**truly [1]** 178/23
**trust [7]** 140/16 163/24 166/11 166/13 171/16 176/24 176/24
**trustee [3]** 116/14 116/22 140/15
**truth [7]** 63/16 63/16 63/16 97/16 97/17 97/17 167/6
**try [8]** 33/11 45/10 53/8 65/6 81/21 130/25 134/9 173/2
**trying [20]** 31/23 34/4 46/10 54/4 55/3 57/4 65/8 65/9 68/12 75/18 133/22 136/25 159/11 173/25 186/2 186/3 188/1 188/6 192/14 193/10
**tuned [1]** 140/23
**turn [4]** 50/15 96/24 96/25 137/13
**turning [1]** 155/5
**two [42]** 12/5 18/23 19/9 23/7 26/5 33/18 45/16 46/1 47/2 57/17 58/18 58/20 58/24 67/24 72/24 84/6 89/6 89/7 89/9 89/23 90/21 92/17 93/9 114/25 118/4 141/7 141/7 142/22 151/16 155/21 158/16 158/18 159/9 159/18 159/20 161/4 161/12 161/16 178/8 206/18 206/20 210/1
**Tyco [1]** 47/23
**type [11]** 19/15 29/15 31/9 50/8 51/25 65/11 76/18 82/4 82/4 91/19 199/14
**types [6]** 65/25 69/7 72/18 114/19 142/22 184/20
**typical [2]** 37/16 41/15
**typically [10]** 52/20 66/16 67/17 68/11 69/4 69/7 70/1 76/4 76/18 108/2

**U**

**U-N-S-W-O-R-T-H [1]** 63/24
**U.S [9]** 1/9 2/12 31/20 69/8 77/18 96/8 117/23 185/5 186/23
**Uh [11]** 11/23 19/13 98/4 115/1 160/19 164/3 174/21 176/3 176/21 190/18 210/23
**Uh-huh [11]** 11/23 19/13 98/4 115/1 160/19 164/3 174/21 176/3 176/21 190/18 210/23
**ultimate [2]** 39/2 201/23
**ultimately [11]** 33/23 38/5 58/19 77/15 88/15 101/4 111/19 116/25 166/2 185/24 188/10
**unable [1]** 42/18
**unallocated [5]** 141/5 142/13 148/8 148/19 149/1
**unaware [1]** 96/17
**unbundle [1]** 137/8
**unbundled [1]** 143/3
**unbundles [1]** 137/6
**uncapped [1]** 36/3
**uncertainty [2]** 92/10 185/19
**unclear [2]** 28/20 189/22
**under [53]** 19/5 21/7 21/7 21/12 33/5 37/4 37/16 39/2 41/9 47/18 50/4 50/9 51/24 52/21 53/6 54/16 54/16 55/15 83/23 99/17 111/4 111/5 111/11 117/24 118/2 123/21 124/3 128/25 139/13 141/21 142/9 142/12 145/12 150/14 150/24 152/3 152/6 152/18 152/20 152/21 156/17 156/18 156/20 157/2 163/22 170/24 176/7 192/17 192/23 193/2 193/7 202/18 203/2
**underlying [2]** 95/1 120/19
**understand [18]** 15/15 49/12 66/17 70/3 77/23 78/14 81/11 126/24 134/12 136/25 137/2 141/14 156/25 175/3 191/17 191/24 193/15 194/10
**understanding [7]** 66/10 94/11 114/10 132/18 151/7 173/10 198/6
**undertake [1]** 106/21
**undertakings [1]** 35/23
**undertook [1]** 33/12
**unfair [3]** 54/8 54/9 190/24
**unfettered [1]** 143/17
**unfortunate [1]** 211/10
**unhappy [1]** 199/10
**Union [1]** 3/24
**unique [1]** 208/5
**UNITED [7]** 1/1 1/13 6/2 36/8 47/12 47/14 69/17
**units [2]** 86/21 86/22
**universities [1]** 76/3
**University [2]** 68/3 68/6
**unknown [2]** 145/21 155/24
**unless [3]** 12/10 147/17 150/3
**unlike [2]** 152/4 161/14
**unnecessary [1]** 197/8
**unprovable [1]** 191/4
**unrealistic [1]** 149/15
**unreasonable [2]** 92/22 149/19
**unregulated [1]** 86/6
**Unsworth [29]** 18/7 48/6 49/10 59/20 63/10 63/18 63/23 63/23 64/21 65/16 94/22 95/11 95/16 95/17 96/1 108/4 109/7 115/2 153/2 153/4 153/5 184/2 184/3 184/4 184/11 184/15 185/2 185/3 185/18
**Unsworth's [5]** 65/2 108/10 114/23 184/21 187/25
**Unsworth-1 [3]** 95/11 95/16 95/17
**until [14]** 22/17 30/5 38/22 63/3 125/15 145/24 164/12 166/11 194/4 194/7 194/8 194/14 199/16 206/10
**unusual [4]** 52/9 77/18 84/16 162/8
**up [89]** 13/20 14/24 15/19 23/4 23/7 26/11 28/5 28/10 30/5 31/11 34/10 34/22 35/16 36/6 37/5 40/11 40/12 41/11 41/16 41/19 42/5 42/17 42/21 43/15 44/14 44/24 48/5 48/9 49/13 50/14 56/15 64/24 67/17 80/6 81/17 83/3 85/15 85/15 87/4 87/14 89/13 90/11 90/12 90/23 91/18 92/1 97/14 101/5 103/10 104/1 105/21 107/9 107/19 108/16 109/21 110/17 112/18 114/14 115/22 118/7 118/23 118/24 119/21 119/25 121/8 123/21 126/6 134/15 138/15 148/23 154/22 157/3 160/6 161/20 162/10 169/12 169/20 172/18 175/15 178/14 182/25 185/9 185/20 185/24 188/11 195/9 200/17 202/16 208/22
**upgrades [4]** 102/3 102/19 110/12 111/2
**upheld [1]** 131/9
**upholding [1]** 53/3
**upon [13]** 10/14 10/18 10/22 15/9 37/17 95/5 121/16 123/12 124/21 137/20 155/20 163/8 180/2
**upper [1]** 91/17
**upstream [4]** 107/1 108/4 108/23 178/6
**urgent [2]** 153/22 153/23
**us [28]** 44/2 62/19 66/25 67/8 67/16 68/7 75/14 82/20 86/3 86/7 102/14 103/1 107/25 108/4 108/18 111/21 111/25 115/15 116/18 117/18 121/15 122/25 132/12 168/9 171/13 191/4 200/8 202/1
**USA [2]** 3/4 7/15
**use [39]** 17/14 64/13 64/14 64/24 74/6 78/18 78/19 82/18 84/12 84/13 84/14 85/10 87/7 89/1 89/3 89/11 94/3 96/24 108/2 117/15 117/19 118/18 118/20 121/12 121/18 137/8 146/11 146/15 146/16 148/24 150/23 155/15 164/8 164/21 165/11 165/25 167/6 201/10 208/14
**used [23]** 37/3 38/12 42/10 49/19 49/21 58/19 71/8 72/22 74/3 75/10 84/18 116/23 124/10 140/16 141/4 155/11 160/6 167/4 171/14 179/10 179/12 184/8 202/8
**users [1]** 107/5
**using [10]** 49/16 70/10 70/24 71/1 71/3 71/4 78/19 78/20 81/16 84/14
**usually [3]** 50/5 69/2 91/8
**utilities [7]** 3/19 8/17 8/17 77/13 81/16 83/20 180/24
**utility [1]** 77/14

**V**

**vagaries [1]** 161/14
**Valley [8]** 3/19 3/19 3/20 8/5 8/6 8/18 8/20 8/22
**valuation [1]** 32/7
**value [10]** 25/14 27/23 32/2 36/3 73/21 87/14 102/7 104/9 186/24 188/2
**valued [5]** 25/24 35/24 37/10 45/16 46/21
**values [12]** 31/25 32/3 32/8 68/20 70/6 71/19 73/19 73/20 94/4 94/15 112/1 187/22
**variation [1]** 25/19
**variety [1]** 78/18
**various [6]** 50/3 69/9 69/11 101/3 106/11 184/20
**vast [1]** 46/14
**Vermont [2]** 80/9 84/18
**version [1]** 76/17
**versus [8]** 6/16 51/16 52/23 68/24 138/7 144/12 197/13 197/21
**very [35]** 13/11 13/19 13/25 27/4 30/1 34/6 34/17 39/15 40/24 43/17 43/19 43/20 45/21 50/16 74/24 79/18 80/14 100/11 101/19 102/6 111/23 111/25 115/8 154/12 166/16 172/2 175/13 192/18 193/6 200/21 202/8 211/9 211/25 212/1 212/10
**vested [1]** 201/24
**via [1]** 190/2
**viable [2]** 43/22 108/8
**vice [2]** 2/21 3/10
**victory [1]** 101/17
**view [5]** 18/21 54/19 108/3 118/10 118/12
**viewed [1]** 46/9
**vigilant [1]** 57/22
**VII [1]** 41/18
**violating [1]** 191/23
**violation [1]** 189/24
**Virgin [1]** 2/12
**Virginia [1]** 96/13
**visited [1]** 77/22
**voice [1]** 168/6
**vouch [1]** 60/20
**vs [3]** 1/5 19/22 210/20

**W**

**wait [18]** 50/24 59/19 59/19 61/20 80/11 93/20 113/10 127/24 136/8 136/9 139/8 144/25 147/3 148/4 172/15 172/15 186/17 210/11
**waiting [4]** 135/4 169/6 169/6 169/11
**waiver [2]** 47/17 65/11
**walk [5]** 88/9 91/15 93/7 122/24 139/11
**Walker [1]** 4/2
**wall [1]** 90/16
**want [65]** 11/2 11/18 13/22 15/2 16/24 16/25 17/6 17/6 30/16 36/2 40/16 40/23 57/3 60/1 60/1 60/4 60/6 60/10 60/13 64/13 70/19 81/11 88/3 96/17 96/23 103/17 105/8 119/21 122/24 126/24 126/24 127/16 133/8 134/14 137/2 149/16 151/21 152/11 153/12 155/18 164/8 164/18 166/22 167/25 170/13 171/24 175/2 177/12 177/20 177/25 179/19 180/11 189/4 189/7 189/8 189/12 190/9 191/16 193/16 196/19 200/17 201/3 203/14 204/7 206/14
**wanted [20]** 22/24 43/1 62/12 65/7 95/2 96/14 96/18 97/4 126/5 126/10 134/11 136/2 148/10 155/6 163/12 163/17 168/5 171/12 171/13 205/25
**wants [2]** 13/21 130/21
**war [3]** 66/13 69/14 69/18
**warehouses [1]** 28/18
**warn [3]** 21/14 21/14 21/22
**warrant [1]** 210/7
**WARREN [4]** 1/18 2/2 2/6 164/6
**washing [1]** 90/24
**Washington [3]** 2/22 3/11 87/17
**wasn't [9]** 37/13 43/2 53/9 71/9 73/3 132/22 136/20 172/9 181/6
**waste [13]** 53/5 66/12 73/5 78/14 79/5 79/11 80/5 80/12 81/4 82/5 87/5 91/19 108/6
**wastewater [14]** 48/15 49/4 72/20 75/2 75/4 78/25 80/19 81/10 88/17 102/22 107/17 109/1 111/20 197/22
**water [103]** 25/21 25/23 26/1 26/4 26/6 26/7 26/16 26/25 30/6 30/10 30/12 30/14 32/13 33/6 47/15 47/18 48/11 48/12 48/12 48/12 48/19 48/23 48/24 48/25 49/16 49/18 58/22 59/2 64/2 68/14 72/10 73/20 73/22 73/24 74/15 75/6 76/10 76/11 76/11 76/13 77/13 77/14 77/14 77/17 81/2 81/3 81/10 81/16 81/16 81/18 81/22 82/9 82/12 83/19 83/20 83/24 86/7 86/11 97/25 100/12 102/2 102/3 102/14 102/16 102/18 102/19 102/20 102/21 102/23 103/4 103/5 103/6 106/25 107/15 109/5 109/18 111/2 111/7 111/10 123/7 123/8 123/10 123/10 133/19 141/4 145/7 145/8 146/3 146/12 146/13 146/17 153/22 156/9 156/10 180/23 181/2 185/1 185/7 185/10 185/13 186/24 187/10 197/21
**way [50]** 9/23 12/11 13/6 18/3 18/4 21/13 21/21 26/21 26/22 32/16 34/21 37/24 39/19 43/22 44/3 44/24 48/21 57/4 60/14 64/4 64/6 77/15 81/19 81/20 83/6 83/13 83/19 83/20 84/19 85/14 87/11 89/4 108/6 109/10 116/3 151/25 165/15 165/16 168/4 173/9

## W

**way... [10]** 174/16 175/3 176/10 186/4 190/25 198/7 198/13 199/23 211/19 211/22
**ways [3]** 13/7 15/2 49/11
**we'll [21]** 9/18 17/23 19/8 23/20 29/10 46/20 49/20 59/15 62/25 63/9 64/7 77/7 96/20 118/24 125/10 125/10 139/12 140/22 142/21 195/2 204/20
**we've [19]** 15/24 39/3 68/13 71/24 74/24 118/4 132/2 135/23 139/18 151/8 153/18 154/14 173/21 174/2 177/15 178/22 190/8 199/9 202/4
**weaknesses [1]** 70/5
**web [1]** 107/3
**website [3]** 121/14 124/23 154/3
**Wednesday [1]** 1/11
**week [4]** 22/3 31/19 31/19 204/4
**weeks [1]** 196/16
**weigh [3]** 31/23 151/5 211/11
**weighed [1]** 32/9
**Welcome [2]** 7/3 97/25
**wells [12]** 48/12 72/11 72/12 74/17 74/18 77/17 90/19 115/20 124/17 181/1 181/2 185/12
**went [11]** 23/2 29/20 32/14 54/5 56/24 67/21 134/12 177/13 177/15 185/22 211/8
**weren't [8]** 10/18 14/23 43/25 67/7 73/22 80/17 81/6 165/1
**West [1]** 96/12
**wet [3]** 86/15 86/17 86/21
**wetlands [1]** 68/19
**whatever [12]** 27/18 81/18 131/7 149/24 151/13 165/16 168/16 178/6 185/4 202/15 204/19 204/21
**whatsoever [1]** 192/24
**whenever [4]** 17/21 48/5 150/9 204/5
**whereas [2]** 159/13 190/25
**whereby [1]** 37/5
**wherewithal [1]** 31/3
**whether [28]** 19/18 28/20 35/7 35/8 38/11 49/25 56/7 57/13 68/18 72/9 78/21 79/16 79/17 82/3 87/21 89/16 104/11 104/12 113/1 127/7 138/22 140/3 147/13 151/2 151/18 198/21 198/22 203/10
**while [4]** 61/1 96/5 99/15 108/10
**white [1]** 152/9
**who's [8]** 86/9 140/21 142/18 143/10 143/12 172/23 175/16 204/8
**whoever [1]** 176/6
**whole [10]** 41/9 63/16 97/17 103/16 130/13 132/3 146/4 196/10 198/16 208/8
**wholly [1]** 33/24
**wholly-owned [1]** 33/24
**whom [2]** 46/14 130/19
**whose [1]** 112/25
**why [63]** 10/1 10/4 12/8 12/12 12/17 14/2 14/24 15/8 15/10 15/12 15/15 17/8 20/3 20/4 20/24 26/22 26/23 45/6 48/2 48/25 50/17 53/8 54/22 54/23 56/9 57/17 57/20 59/8 72/24 84/16 93/7 102/5 111/13 117/4 132/19 144/14 149/6 152/15 159/5 159/11 167/13 167/13 168/18 168/25 169/9 173/11 174/17 175/23 181/6 181/10 181/12 181/14 181/16 183/6 184/23 185/22 190/22 193/24 194/11 194/15 194/16 194/21 195/21
**will [90]** 6/22 10/22 14/1 16/5 16/16 16/18 18/10 18/20 20/24 25/6 26/10 27/10 36/13 36/17 37/10 37/16 38/7 42/2 42/19 43/5 43/6 49/15 50/4 51/18 54/23 56/19 57/6 63/15 64/24 82/9 84/23 87/21 97/16 102/1 102/23 103/3 109/13 109/16 109/24 110/11 110/25 111/6 111/8 111/9 111/18 116/4 117/19 121/14 121/18 123/3 123/6 124/18 124/23 124/25 128/18 130/10 130/14 131/15 132/4 132/8 134/24 135/25 138/6 141/3 151/25 154/5 158/18 158/19 161/3 164/12 164/13 166/18 167/4 167/7 168/8 168/9 172/8 179/7 179/12 189/23 195/20 200/16 200/19 200/20 200/25 201/1 204/6 208/8 210/9 210/12
**WILLIAM [1]** 1/19
**willing [3]** 39/11 147/18 160/15
**win [1]** 194/6
**winds [2]** 80/6 81/17
**wire [1]** 129/6
**wish [4]** 153/2 158/1 210/14 212/5
**withdraw [1]** 162/12
**withdrawn [3]** 182/21 195/5 195/6
**within [27]** 25/15 46/6 61/24 65/25 82/5 82/5 92/20 99/8 100/12 101/7 102/3 103/6 107/16 107/17 118/13 118/19 120/23 138/24 139/16 165/25 170/12 181/8 199/20 209/1 210/1 210/1 210/12
**without [4]** 156/23 195/13 196/19 196/20
**withstand [2]** 20/12 30/22
**witness [25]** 17/7 18/7 63/7 63/12 63/18 95/25 96/6 96/22 97/12 97/19 112/18 130/25 133/23 133/24 135/13 143/7 149/7 149/8 153/9 164/18 178/14 178/23 183/1 183/19 204/7
**witnesses [2]** 5/2 183/20
**won't [3]** 149/24 194/8 210/19
**word [5]** 38/12 54/9 131/1 157/9 198/13
**work [42]** 9/24 28/15 37/18 43/4 49/15 65/16 66/5 67/2 68/15 69/10 69/13 69/21 69/22 70/25 71/24 73/18 74/23 76/8 77/24 79/7 80/8 91/5 98/7 98/8 99/7 105/17 109/25 110/25 121/4 122/9 144/3 154/14 163/25 172/22 174/3 175/17 176/7 178/10 188/6 212/1 212/3 212/7
**worked [9]** 43/22 67/3 100/23 105/19 106/2 120/23 173/1 199/2 212/1
**working [6]** 66/15 70/16 70/21 89/12 91/5 184/15
**works [48]** 21/3 21/9 22/6 22/13 22/16 23/25 28/13 31/16 32/23 33/1 33/2 37/14 38/4 45/20 52/9 62/5 62/10 65/20 75/22 76/2 82/10 96/13 139/21 141/2 145/19 150/7 151/4 152/6 156/22 158/6 158/20 158/24 159/1 159/7 161/13 161/22 188/2 188/21 188/25 191/12 191/19 191/19 208/4 208/4 208/17 208/25 209/6 209/17
**world [2]** 2/4 79/25
**worldwide [1]** 44/7
**worried [3]** 36/21 133/4 133/5
**worth [1]** 195/25
**wouldn't [5]** 16/3 53/16 73/10 174/7 205/18
**wrap [1]** 121/8
**wrapping [1]** 118/23
**writ [1]** 24/14
**writing [1]** 12/4
**writs [1]** 206/2
**written [2]** 15/14 127/19
**wrong [7]** 57/4 131/15 132/9 141/15 143/15 173/21 175/18
**wrongful [1]** 31/8
**wrote [2]** 206/2 206/2

## X

**XII [1]** 41/10

## Y

**Yale [1]** 68/6
**yeah [109]** 10/3 11/9 22/24 24/22 25/1 27/8 36/19 38/21 39/17 39/23 40/16 51/3 56/3 59/19 59/25 64/11 64/17 67/17 69/17 71/12 72/13 73/14 74/1 74/16 74/24 75/16 78/4 79/1 79/15 81/24 82/2 83/5 83/17 84/1 84/1 84/6 84/22 85/4 86/2 86/20 87/25 87/25 88/3 88/5 88/18 89/24 91/13 91/16 92/8 92/9 93/9 93/22 94/6 94/11 94/21 95/19 96/20 108/19 110/6 112/7 120/11 128/9 133/17 135/3 135/21 147/4 148/11 155/2 155/3 155/4 157/7 157/10 157/12 157/23 157/24 158/3 159/16 160/8 164/24 165/12 165/22 166/9 167/3 167/12 167/21 170/17 172/6 174/12 175/2 176/12 177/8 182/14 183/10 185/15 186/19 187/7 188/17 189/7 190/8 193/14 199/19 199/24 203/13 204/11 204/16 206/17 209/3 209/9 211/9
**year [54]** 19/2 25/22 37/10 37/15 37/18 65/20 85/16 109/6 119/13 120/5 124/8 127/1 131/24 132/3 136/3 138/6 138/12 139/15 140/11 141/21 145/21 145/21 148/1 148/19 149/1 149/17 156/17 158/16 158/18 159/14 159/17 159/18 159/20 160/7 160/12 160/21 161/4 161/12 161/16 179/15 180/2 180/16 180/19 181/3 181/6 181/8 181/12 181/15 181/21 181/22 181/23 183/3 200/25 201/2
**years [33]** 21/4 21/17 24/25 25/18 27/9 43/4 44/11 45/8 54/14 54/16 67/18 67/24 84/10 85/17 86/24 136/2 138/4 139/16 144/4 144/8 144/9 144/11 145/22 149/21 150/18 150/19 157/14 157/17 157/23 159/11 161/15 164/4 197/19
**yellow [2]** 85/5 108/7
**Yep [1]** 115/1
**yes [140]** 8/16 10/8 11/8 11/17 11/19 16/20 17/3 17/4 17/11 17/18 22/1 36/16 38/14 44/23 58/8 59/22 59/24 60/3 60/15 60/19 60/21 60/24 61/1 61/12 61/13 61/17 61/22 63/17 70/23 74/10 74/13 76/19 82/23 83/9 85/24 94/16 95/6 96/24 97/7 97/18 99/1 99/3 99/16 99/18 100/17 100/22 101/2 101/16 102/25 103/2 103/9 103/14 103/20 104/6 104/17 104/19 104/25 105/4 105/14 105/19 106/1 106/3 106/13 106/15 106/17 106/20 106/24 107/13 107/24 108/12 108/15 110/2 110/16 110/23 111/23 112/7 114/5 114/20 114/22 114/24 115/1 115/3 115/6 116/1 116/5 116/13 117/2 117/17 118/4 118/17 119/4 119/6 119/14 120/4 121/1 121/6 121/16 122/3 122/10 122/12 123/25 124/12 125/6 125/20 125/21 125/23 127/3 127/6 128/12 129/1 129/3 131/20 135/16 137/10 137/15 138/11 139/15 142/10 146/21 148/25 152/6 152/17 154/25 155/3 158/13 162/23 165/10 165/13 174/4 179/2 179/14 190/6 191/21 193/8 193/10 196/4 203/5 203/15 207/11 210/18
**yet [7]** 16/7 44/1 46/15 96/14 141/13 164/11 211/8
**yield [1]** 82/9
**yields [2]** 74/6 74/6
**York [6]** 2/4 2/4 3/8 3/8 3/10 68/4
**you [661]**
**you'll [12]** 10/1 20/3 25/4 46/24 70/21 81/4 83/21 97/5 108/6 175/4 200/21 210/3
**you've [11]** 29/12 45/20 82/8 83/24 85/18 109/2 146/4 205/4 205/17 211/5 212/1
**young [1]** 168/10
**yours [1]** 14/16
**yourself [1]** 64/1

## Z

**Zach [1]** 4/6
**zero [7]** 54/1 56/13 56/14 57/23 152/23 153/8 209/12