**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-0093
*Attorney for Plaintiffs*

By: Gwen Farley
Deputy Attorney General
Attorney ID No. 000081999
Ph. (609) 376-2740
Gwen.Farley@law.njoag.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>Plaintiffs,<br>v.<br><br>E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; DUPONT SPECIALTY PRODUCTS USA, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),<br><br>Defendants. | Case No.: 1:19-cv-14758-RMB-JBC<br><br>Civil Action<br><br>This document relates to:<br><br>Case No.: 1:19-cv-14758-RMB-JBC<br>1:19-cv-14765-RMB-JBC<br>1:19-cv-14766-RMB-JBC<br>1:19-cv-14767-RMB-JBC<br><br>**JUDICIAL CONSENT ORDER AS TO DEFENDANTS E. I. DUPONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, DUPONT SPECIALTY PRODUCTS USA, LLC, CORTEVA, INC., AND DUPONT DE NEMOURS, INC.** |

This matter was opened to the Court by Matthew J. Platkin, Attorney General of New Jersey, Deputy Attorney General Gwen Farley, appearing, and Kelley Drye & Warren LLP, the Law Offices of John K. Dema, P.C., Cohn, Lifland, Pearlman, Herrmann & Knopf LLP, and Taft Stettinius & Hollister, LLP, Special Counsel to the Attorney General, appearing, as attorneys for Plaintiffs New Jersey Department of Environmental Protection (the "Department") and the

Commissioner of Environmental Protection (the "Commissioner"), in their named capacity, as *parens patriae,* and as Trustee of the Natural Resources of the State of New Jersey ("State"), and the Administrator of the New Jersey Spill Compensation Fund (the "Administrator") (the Department, Commissioner, and Administrator collectively, "Plaintiffs"), and Cravath, Swaine & Moore LLP, representing Defendants EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP") and Corteva, Inc. ("Corteva"), Kirkland & Ellis LLP, representing Defendants DuPont de Nemours Inc. ("New DuPont") and DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), and Wachtell, Lipton, Rosen & Katz, representing Defendants The Chemours Company ("Chemours") and The Chemours Company FC, LLC ("Chemours FC") (EIDP, Corteva, New DuPont, DuPont Specialty Products, Chemours, and Chemours FC, collectively, "Settling Defendants"). Plaintiffs are joined by the New Jersey Division of Consumer Affairs and its Director (collectively, "DCA," and collectively with Plaintiffs and the State, "Settling Plaintiffs") in the AFFF Litigation (as defined below), and as a Party to this Judicial Consent Order ("JCO"). The Attorney General and the Director of DCA ("Director") will be added to the caption of this case for purposes of this JCO upon entry of the JCO. These Parties, having amicably and in good faith resolved their disputes, seek Court approval and entry of this JCO as follows:

## I. <u>BACKGROUND</u>

A. Defendant Chemours is a corporation organized under the laws of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly owned subsidiary of EIDP until July 2015, when EIDP spun-off Chemours as a separate publicly traded entity. Plaintiffs allege that, in connection with the spin-off, Chemours assumed direct liability for certain of EIDP's contamination in New Jersey and elsewhere.

B. Defendant Chemours FC is a limited liability company organized under the laws of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC is a subsidiary of Chemours that was formed in April 2014. Chemours FC owns the Pompton Lakes Works, Repauno Works, and Chambers Works Sites, as described below.

C. Defendant New DuPont, formerly known as DowDuPont Inc., is a corporation organized under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Plaintiffs allege that New DuPont contractually assumed EIDP's liabilities at issue and being resolved herein. New DuPont denies this allegation.

D. Defendant Corteva is a corporation duly organized under the laws of Delaware, with its principal place of business located at 9330 Zionsville Road, Indianapolis, IN 46268 and 974 Centre Road, Wilmington, Delaware 19805. Plaintiffs allege that Corteva contractually assumed EIDP's liabilities at issue and being resolved herein. Corteva denies this allegation.

E. Defendant EIDP is a corporation organized under the laws of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

F. Defendant DuPont Specialty Products is a limited liability company organized under the laws of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. On or about June 1, 2019, EIDP transferred ownership of DuPont Specialty Products to New DuPont. DuPont Specialty Products owns the Parlin Site, as described below.

G. Pompton Lakes Works is located at 2000 Cannonball Road in Pompton Lakes as well as Wanaque Borough in Passaic County. EIDP operated Pompton Lakes Works until 1994. On or around January 23, 2015, EIDP transferred ownership of Pompton Lakes Works to

Chemours FC. Plaintiffs allege that EIDP discharged contaminants, including hazardous substances, pollutants, and wastes, at and from Pompton Lakes Works, including the former Haskell operations, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief. Plaintiffs further allege there are unmet remediation obligations at the Pompton Lakes Works Site, and that EIDP and Chemours have failed to fully delineate the contamination related to the Pompton Lakes Works Site as required under New Jersey law. Settling Defendants deny these allegations.

H. Repauno Works is located at 200 North Repauno Avenue, Gibbstown, Greenwich Township, Gloucester County, New Jersey. EIDP owned and operated Repauno Works from 1880 until 2015. In 2015, EIDP transferred Repauno Works to Chemours FC. On June 30, 2016, Chemours FC sold a portion of Repauno Works to Delaware River Partners, LLC, for redevelopment. Plaintiffs allege that EIDP discharged contaminants, including hazardous substances, pollutants, and wastes, at and from Repauno Works, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief. Plaintiffs further allege there are unmet remediation obligations at Repauno Works, and that certain Settling Defendants have failed to fully delineate the contamination related to the Repauno Works Site as required under New Jersey law. Settling Defendants deny these allegations.

I. Chambers Works, including the former Carneys Point Works operations, is located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships in Salem County. EIDP owned and operated Chambers Works until 2015. Chambers Works is an EPA Lead RCRA GPRA 2020 Site and also has established financial assurance ("CW RCRA FA"). Effective February 1, 2015, EIDP transferred Chambers Works to Chemours FC. In 2015, EIDP leased a portion of Chambers Works from Chemours FC to continue certain operations. On June 1, 2019,

EIDP transferred leaseholds in certain portions of Chambers Works to DuPont Specialty Products. Plaintiffs allege that EIDP, DuPont Specialty Products, and Chemours and/or Chemours FC discharged contaminants, including hazardous substances, pollutants, and wastes from Chambers Works, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief. Plaintiffs further allege that there are unmet remediation obligations at the Chambers Works Site, and that Settling Defendants have failed to establish remediation funding sources required under New Jersey law. Settling Defendants deny these allegations.

J. The Parlin Site is located at 250 Cheesequake Road, Parlin. The Parlin Site is located in both Sayreville Borough and Old Bridge Township, Middlesex County. On January 29, 2019, EIDP sold all or part of the Parlin Site to DuPont Specialty Products. Plaintiffs allege that Chemours and/or Chemours FC operate on the Parlin Site as tenants. Plaintiffs further allege that EIDP, DuPont Specialty Products, Chemours, and/or Chemours FC have discharged contaminants, including hazardous substances, pollutants, and wastes at and from the Parlin Site, resulting in cleanup and removal costs, and entitling Plaintiffs to other damages and relief. Plaintiffs also allege that there are unmet remediation obligations at the Parlin Site, and that Settling Defendants have failed to establish remediation funding sources required under New Jersey law. Settling Defendants deny these allegations.

K. In addition to the above, Plaintiffs allege that certain of the Settling Defendants designed, manufactured, marketed, and sold certain PFAS, as well as PFAS-Containing Products, that were transported, stored, handled, used, released, spilled, disposed of in, and thus resulted in PFAS Contamination in, the State of New Jersey. Settling Defendants deny these allegations.

L. Plaintiffs have initiated multiple litigations and have issued multiple administrative directives against certain Settling Defendants seeking various relief concerning the Pompton Lakes

Works Site, the Repauno Works Site, the Chambers Works Site, and the Parlin Site, including claims involving PFAS, as well as to take certain action with respect to PFAS on a statewide basis.

M. On August 30, 2017, the Department issued a *Directive and Notice to Insurers* regarding the Chambers Works Site directing EIDP and Chemours FC to prepare a cost estimate for the full cost of remediation of Chambers Works for the Department's approval and to establish and maintain a Remediation Funding Source, excluding the use of a self-guarantee, for the full cost of the remediation as approved by the Department, and to enter into an Administrative Consent Order requiring them to remediate Chambers Works, among other directives (the "2017 Chambers Works Directive"). On September 6, 2017, counsel for the recipients submitted their "good faith response" to the 2017 Chambers Works Directive.

N. On March 26, 2019, Plaintiffs filed a complaint against the Settling Defendants, except DuPont Specialty Products, in the Superior Court of the State of New Jersey, Law Division, Passaic County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. PAS-L-000936-19 (N.J. Super. Ct. Law Div. Mar. 26, 2019) (the "Pompton Lakes Works Litigation"). Through the Pompton Lakes Works Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 to -23.24, the Water Pollution Control Act ("WPCA"), N.J.S.A. 58:10A-1 to -20, the Solid Waste Management Act ("SWMA"), N.J.S.A. 13-1E-1 to -230, the Department's enabling statute, N.J.S.A. 13:1D-1, *et seq.*, the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and the New Jersey common law, including public nuisance, trespass, negligence/gross negligence/willful or wanton misconduct, and abnormally dangerous activity.

O. On March 27, 2019, the Department issued a *Directive and Notice to Insurers* regarding the Pompton Lakes Works Site (the "Pompton Lakes Works Directive") directing EIDP, DowDuPont, Inc., DuPont Specialty Products, Chemours FC, Chemours, and other respondents to reimburse the Department for the costs to prepare a natural resource damage assessment of the Pompton Lakes Works Site. On April 23, 2019, EIDP, Chemours, and Chemours FC jointly responded to the Pompton Lakes Directive.

P. On March 27, 2019, Plaintiffs filed a complaint against the Settling Defendants, except DuPont Specialty Products, in the Superior Court of the State of New Jersey, Law Division, Gloucester County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. GLO-L-000388-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019) (the "Repauno Works Litigation"). Through the Repauno Works Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Act, the WPCA, the SWMA, the Department's enabling statute, N.J.S.A. 13:1D-1, *et seq.*, the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and New Jersey common law, including public nuisance, trespass, and negligence.

Q. On March 27, 2019, Plaintiffs filed a complaint against the Settling Defendants and The 3M Company in the Superior Court of the State of New Jersey, Law Division, Salem County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. SLM-L-000057-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019) ("the Chambers Works Litigation"). Through the Chambers Works Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Act, the WPCA, the Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1K-6 to -13.1, the Brownfield and Contaminated Site Remediation Act ("BCSRA"), N.J.S.A. 58:10B-1 to -31, the SWMA, the Air Pollution Control Act ("APCA"), N.J.S.A. 26:2C-1 to -68, the New

Jersey Safe Drinking Water Act, N.J.S.A. 58:12A-1, *et seq*. ("NJSDWA"), the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and New Jersey common law, including public nuisance, trespass, negligence/gross negligence/willful or wanton misconduct, and abnormally dangerous activity.

R. On March 27, 2019, Plaintiffs filed a complaint against the Settling Defendants and The 3M Company in the Superior Court of the State of New Jersey, Law Division, Middlesex County, captioned *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. MID-L-002448-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019) (the "Parlin Litigation"). Through the Parlin Litigation, as amended, Plaintiffs assert claims against the Settling Defendants pursuant to the Spill Act, the WPCA, the BCSRA, the SWMA, the ISRA, the Uniform Fraudulent Transfer Act, Del. Code. Tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to -36, and New Jersey common law, including public nuisance, trespass, negligence, and abnormally dangerous activity.

S. The Settling Defendants removed the Pompton Lakes Works, Repauno Works, Chambers Works, and Parlin Litigations to this Court on July 5, 2019. *See, N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. 1:19-cv-14766-RMB-JBC (Dkt. 1) (Chambers Works Litigation); *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 2:19-cv-14758-RMB-JBC (Dkt. 1) (Pompton Lakes Works Litigation); *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 1:19-cv-14765-RMB-JBC (Dkt. 1) (Repauno Works Litigation); *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 3:19-cv-14767-RMB-JBC (Dkt. 1) (Parlin Works Litigation). The cases were subsequently consolidated for case management (Case No. 2:19-cv-14758, D.E. 31), and are currently before the Chief Judge, the Honorable Renée Marie Bumb.

T. The Settling Defendants filed responsive pleadings in the Industrial Sites Litigations denying liability, denying Plaintiffs' claims and allegations against them, and asserting various defenses to the allegations in the complaints. Additionally, certain of the Settling Defendants filed counterclaims in the Industrial Sites Litigations.

U. On March 25, 2019, the Department issued a *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination in the State to EIDP, Chemours, Chemours FC, DuPont Specialty Products, New DuPont's predecessor, DowDuPont, Inc., and other respondents (the "Statewide PFAS Directive," and collectively with the 2017 Chambers Work Directive and the Pompton Lakes Works Directive, the "Spill Act Directives"). The Statewide PFAS Directive was issued pursuant to the authority vested in the Commissioner under the Spill Act, the WPCA, the APCA, and the SWMA. The Directive provides notice that the Department believes the recipients to be responsible for "significant contamination of New Jersey's natural resources, including the air and waters of the State, with [PFAS]." The Statewide PFAS Directive seeks, among other things, to compel the recipients to provide information about their uses and discharges or potential discharges of certain PFAS into the State's environment, to meet with the Department to develop a good-faith estimate of costs to investigate, test, treat, clean up, and remove certain PFAS from the State's environment, including damages for economic impacts of PFAS Contamination, and the recipients' abilities to pay for or perform the cleanup and removal of certain PFAS.

V. On April 17, 2019, EIDP, Chemours, Chemours FC, DowDupont, Inc. and DuPont Specialty Products each responded to the Statewide PFAS Directive. DowDuPont, Inc. supplemented its response on May 1, 2019. EIDP, Chemours, and Chemours FC later supplemented their responses on September 16, 2019.

W. On May 14, 2019, Settling Plaintiffs filed a separate lawsuit against EIDP, Chemours, and other suppliers of PFAS ingredients for aqueous film-forming foam ("AFFF"), a PFAS-containing firefighting product, and manufacturers of AFFF (the "AFFF Litigation") in the Superior Court of New Jersey, Mercer County, captioned *Gurbir S. Grewal, et al. v. 3M Co. et al.*, No. MER-L-000953-19 (N.J. Super. Ct. Law Div. May 14, 2019). EIDP and Chemours are named as defendants in the AFFF Litigation as a manufacturer of certain PFAS ingredients used in AFFF. Through the AFFF Litigation, Settling Plaintiffs assert claims against EIDP and Chemours pursuant to common-law products-liability theories, common-law negligence, common-law public nuisance, and the Spill Act, the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -20, the New Jersey Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 to -25, and the Federal Safe Drinking Water Act, 42 U.S.C. § 300(f) *et seq*. The AFFF Litigation was removed to this Court and thereafter transferred to the multidistrict litigation in the United States District Court for the District of South Carolina, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.) ("AFFF MDL"), where it remains pending.

X. On December 8, 2021, this Court entered an Order denying Corteva's and New DuPont's motions to dismiss the Pompton Lakes Works Litigation for lack of personal jurisdiction or for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (2:19-cv-14758, D.E. 180.)

Y. On December 9, 2021, this Court entered an Order reserving the parties' potential claims, cross-claims, counterclaims, and third-party claims arising out of the Statewide PFAS Directive, except for those based on defendants' alleged failure to properly respond to the Statewide PFAS Directive with respect to PFAS at or from the Industrial Sites. *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 148).

Z. On December 21, 2021, this Court issued an order denying in part and granting in part Settling Defendants' motions to dismiss the Industrial Sites Litigations with respect to the 2005 Compensatory Restoration Administrative Consent Order ("CRACO"), common law trespass, and common law public nuisance. (*See, e.g.*, Case No. 1:19-cv-14766-RMB-JBC (Dkt. 153); Case No. 2:19-cv-14758, D.E. 196).

AA. On August 26, 2022, this Court issued an order denying EIDP, Corteva, and New DuPont's motion to dismiss a count of Plaintiffs' Second Amended Complaint in the Chambers Works Litigation for alleged violations of ISRA. *See* Case No. 1:19-cv-14766-RMB-JBC (Dkt. 206).

BB. The first five of seven scheduled bench trials in the Chambers Works Litigation occurred between May 19 and June 9, 2025. *See, e.g.*, Case No. 1:19-cv-14766-RMB-JBC (Dkt. 643, Dkt. 691). Two additional bench trials were scheduled to begin in the summer of 2025. On July 1, 2025, the Court issued an order postponing the trials pending further order of the Court. *See id.* (Dkt. 709).

CC. Settling Plaintiffs assert that, beyond the current claims they are pursuing against the Settling Defendants in the matters referenced above, there is a potentially broad range of additional claims that they could pursue against them related to PFAS. Settling Defendants deny this assertion.

DD. The Parties wish to resolve the Industrial Sites Litigations, the AFFF Litigation, and the Department's Spill Act Directives as set forth herein. They also wish to resolve Settling Defendants' alleged liability with respect to all PFAS statewide and all other Released Claims as set forth herein.

EE. In entering into this JCO, each Settling Plaintiff, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State, acts in all its capacities to the maximum extent allowable by law, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, including:

- Each Settling Plaintiff's capacity as *parens patriae*;
- the Commissioner's capacity as Trustee of the State's Natural Resources;
- the Director's responsibility for administering the CFA and its related laws and regulations;
- each Settling Plaintiff's capacity as an entity that owns, operates, manages, holds in trust, or otherwise controls Real Property and/or Personal Property (and/or interests therein), including certain Water Systems, in the State; and
- each Settling Plaintiff's capacity to exercise the State's sovereign, quasi-sovereign, regulatory, and police powers, to vindicate the interests that can be addressed by those powers, and to protect the health and well-being, both physical and economic, of all Persons subject to the State's jurisdiction.

FF. After a thorough investigation and after carefully considering the relevant circumstances, Settling Plaintiffs have concluded that it would be in the public interest to enter into this JCO to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the State, Political Subdivisions, citizens, and residents of New Jersey. Settling Plaintiffs have further concluded that the Settling Defendants' alleged liability with respect to

PFAS are best resolved statewide, including environmental, consumer protection, and other liabilities (subject to the exclusions set forth herein), rather than piecemeal, consistent with this JCO.

GG. While continuing to deny any violation, wrongdoing, culpability, or liability with respect to any and all Claims that have been or could be asserted by Settling Plaintiffs, and while continuing to specifically deny and dispute the scientific, medical, factual, and other bases asserted in support of any of those Claims, the Settling Defendants have nevertheless concluded that they will voluntarily enter into this JCO to, among other things, avoid the delays, uncertainties, and distraction of further litigation.

HH. The Parties recognize and agree, and the Court by entering this JCO finds, that the Parties have negotiated this JCO at arm's length and in good faith; that the implementation of this JCO will allow the Parties to avoid continued, prolonged, and complicated litigation, including appeals; and that this JCO is fair, reasonable, in the public interest, and consistent with applicable law.

**THEREFORE,** with the consent of the Parties to this JCO, it is hereby **ORDERED and ADJUDGED:**

## II. JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367. Settling Plaintiffs assert that, beyond the current claims they are pursuing against the Settling Defendants in the matters referenced above, there are additional claims that they could pursue against them under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606, 9607, 9613(b). The Court has personal jurisdiction over the Parties for purposes of approving, entering, and implementing this JCO and resolving, solely as to the Settling Defendants, the Industrial Sites Litigations and the

AFFF Litigation (together, the "Litigations"). Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and 1395(a), because this action arises from alleged acts or omissions that occurred at the Pompton Lakes Works Site, the Repauno Works Site, the Chambers Works Site, the Parlin Site, and locations where PFAS has been discharged within New Jersey.

2. The Industrial Sites Litigations were removed to this Court pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446(d).

3. For purposes of this Court approving, entering, and implementing this JCO, the Parties waive all objections and defenses they may have to this Court's jurisdiction over the Parties, the subject matter of this action, and this JCO. The Parties shall not challenge this Court's jurisdiction to enforce this JCO.

## III. PARTIES BOUND

4. This JCO applies to, and is binding on, each of the Settling Plaintiffs and the Settling Defendants, as defined herein.

## IV. DEFINITIONS

5. Whenever, in describing or referring to any person, party, manner, or thing, any word importing the singular number is used, the same shall be understood to include and to apply to several persons or parties as well as to one person or party, and to bodies corporate as well as individuals, and to several matters and things as well as one matter or thing. Unless the specific reference or context clearly indicates otherwise, (a) words expressed in the masculine or feminine form include the masculine, feminine, and gender-neutral forms; (b) the word "will" has the same meaning as the word "shall," and vice versa; (c) the word "or" is not exclusive; (d) the word "extent" in the phrase "to the extent" (or "to the … extent") means the degree to which a subject or other thing extends, and such phrase does not simply mean "if"; (e) references to any law include all rules, regulations, and sub-regulatory guidance promulgated thereunder as of the JCO Entry

Date (collectively, "Law"); (f) the terms "include," "includes," and "including" are deemed to be followed by "without limitation"; and (g) references to dollars or "$" are to United States dollars.

6. Whenever the capitalized terms listed below are used in this JCO, the following definitions apply:

"2017 Chambers Works Directive" means the *Directive and Notice to Insurers* regarding the Chambers Works Site that the Department issued to certain Settling Defendants on August 30, 2017.

"3M JCO" means the proposed Judicial Consent Order between Settling Plaintiffs and The 3M Company, formal notice of which was published in the *New Jersey Register* on July 21, 2025.

"Abatement Damages" means damages, excluding Natural Resource Damages, recovered by the Department through the Chambers Works Litigation, the proceeds of which are to be administered and used by the Department, in its sole discretion, for the purpose of improving and protecting public health, safety, and the environment, including but not limited to (i) taking actions to address environmental, public health, and safety-related impacts from Industrial Sites Discharges; and (ii) supporting water quality infrastructure projects, including projects to install, operate, and maintain water treatment in public and private wells sufficient to meet applicable state standards and protect the public health, including with respect to PFAS Contamination. Such damages shall not be used for the purpose of satisfying Settling Defendants' Remediation obligations.

"Abatement Damages Amount" means, subject to Paragraph 11, payments with respect to Abatement Damages under this JCO that constitute restitution or remediation within the meaning of IRS Code section 162(f)(2)(A) and Treas. Reg. section 1.162-21(e)(4), to be held in dedicated

Departmental trust accounts for purposes consistent with the administration and use by the Department of Abatement Damages.

"Additional CRACO Industrial Sites" means the properties of Agrico Chemical Company, located at Roosevelt Avenue and Liebig Street in Carteret (Program Interest No. G000004565); Cookson Pigments Inc., located at 256 Vanderpool Street in Newark (PI # 005048); DuPont Grasselli Plant, located at South Wood Avenue in Linden (PI # G000001666); and Pitt Consol Chemical Company, located at Doremus Avenue in Newark (PI # G000002172).

"Additional Fees and Costs Amount" has the meaning set forth in Paragraph 11.

"Administrator" means the chief executive of the New Jersey Spill Compensation Fund.

"AFFF" means aqueous film-forming foam, a firefighting product, that contains PFAS.

"AFFF Litigation" means the case that Settling Plaintiffs filed against Settling Defendants and that was transferred to the AFFF MDL, captioned *Matthew J. Platkin, Attorney General of the State of New Jersey, et al., vs. The 3M Company, et al.*, MDL No. 2:18-mn-2873; Civ. Action No. 2:19-cv-02199 (D.S.C.)

"AFFF MDL" means the multidistrict litigation in the United States District Court for the District of South Carolina, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.).

"Agreed Scope and/or Costs" means agreements between the PRCRs and the Department reached through the Year One Technical Meetings over the scope of Remediation and/or the cost(s) of any aspect of the Remediation that must be performed for any of the four Industrial Sites to be compliant with federal and State statutes, regulations, and guidance.

"Annual Payments" (or "Annual Payment" in the singular) has the meaning set forth in Paragraph 7.

"APCA" means the Air Pollution Control Act, N.J.S.A. 26:2C-1 to -68.

"Area of Concern" shall be defined in accordance with N.J.A.C. 7:26E.

"Attorney General" means the Attorney General of New Jersey.

"BCSRA" means the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to -31.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601–9675.

"CFA" means the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20.

"Chambers Works Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. SLM-L-000057-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. 1:19-cv-14766-RMB-JBC (Dkt. 1).

"Chambers Works Site" means the facility located at 67 Canal Road and Route 130 in Pennsville and Carneys Point Townships, Salem County, New Jersey, including any location to which Contaminants Discharged at or from the Site have become located.

"CW RCRA FA" has the meaning set forth in Paragraph I.

"Claim" means any past, present, or future claim, including any counterclaim, cross-claim, action, right, remedy, cause of action, liability, suit, proceeding, demand, damages, injury, loss, payment, judgment, verdict, debt, dues, sum of money, lien, cost or expense (including attorneys' fees or costs), account, reckoning, bill, covenant, contract, controversy, agreement, obligation, promise, request, assessment, charge, dispute, performance, warranty, omission, grievance, order, or monetary imposition of any sort, in each case in any forum and on any theory, whether legal, equitable, regulatory, administrative, or statutory; arising under federal, state, or local

constitutional or common law, statute, regulation, order, guidance, ordinance, contract, or principle of equity; filed or unfiled; asserted or unasserted; fixed, contingent, or non-contingent; known or unknown; patent or latent; open or concealed; discovered or undiscovered; suspected or unsuspected; foreseen, foreseeable, unforeseen, or unforeseeable; matured or unmatured; manifested or not; accrued or unaccrued; ripened or unripened; perfected or unperfected; choate or inchoate; developed or undeveloped; liquidated or unliquidated; now recognized by law or that may be created or recognized in the future by statute, regulation, order, judicial decision, or in any other manner, including any of the foregoing for direct damages, indirect damages, compensatory damages, consequential damages, incidental damages, nominal damages, economic loss, cost recovery, natural resource damages, restoration, diminution, punitive or exemplary damages, statutory and other multiple damages or penalties of any kind, or any other form of damages whatsoever; any request for declaratory, injunctive, or equitable relief, strict liability, joint and several liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorneys' fees, expert fees, consultant fees, fines, penalties, expenses, costs, or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever, whether direct, representative, derivative, class, or individual in nature. It is the intention of this JCO that the definition of "Claim" be as broad, expansive, and inclusive as possible.

"Class-Member Public Water System" means any Public Water System that is a class member under the Public Water System Class Settlement, regardless of whether such system has asserted any PFAS Claim against the Settling Defendants.

"Commissioner" means the Commissioner of the New Jersey Department of Environmental Protection.

"Contamination" or "Contaminant" means any (i) hazardous substance as defined by the Spill Act, N.J.S.A. 58:10-23.11b; hazardous substance designated under CERCLA, as set forth in 40 CFR part 302.4; hazardous waste as defined by the SWMA, N.J.S.A. 13:1E-38; or pollutant as defined by the WPCA, N.J.S.A. 58:10A-3; (ii) PFAS; or (iii) any other substance alleged in the Industrial Sites Litigations to have been Discharged from an Industrial Site.

"Corporate Reorganization Claim" means any Claim that was or could have been asserted related to: (i) the transfers, assignments, or assumptions of assets (including real property) or liabilities by, between, or among the Settling Defendants and/or their subsidiaries and/or affiliates in connection with EIDP's 2015 restructuring and spinoff of its performance chemicals business as Chemours, and including liabilities associated with the performance chemicals business, along with any other transfers, assignments, assumptions, indemnities, exchanges or other similar transactions related to such performance chemicals business, and in connection with the merger of The Dow Chemical Company and EIDP and subsequent restructurings and/or spinoffs of Dow Inc., and Corteva, and the formation of New DuPont (collectively, the "Corporate Reorganizations"); and (ii) any alleged violations of ISRA in any way relating to any aspect of the Corporate Reorganizations, and any damages, penalties, or other relief (including attorneys' fees) associated with those alleged violations.

"Cost Sharing Agreements" means, collectively, (i) the Separation Agreement by and between EIDP and Chemours dated June 26, 2015; (ii) the Separation and Distribution Agreement, dated April 1, 2019, between New DuPont, Corteva, and Dow Inc.; (iii) the Letter Agreement, dated June 1, 2019, between New DuPont and Corteva; and (iv) the Memorandum of Understanding, dated January 22, 2021, between Chemours, New DuPont and Corteva.

"Costs, Fees, and Punitive Damages Payment" has the meaning set forth in Paragraph

7.c.iii.

"Court" (or "this Court") means the United States District Court for the District of New Jersey unless expressly stated to be a different court.

"Covenants Not To Sue" refers to the covenants not to sue in Paragraphs 49 and 50.

"Covered PFAS Conduct" means:

a. Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind, intentional or unintentional, whatsoever from the beginning of time through the JCO Entry Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity that occurred prior to the JCO Entry Date) that has arisen, is arising, or may arise at any time in the future from, was, is, or will be based on, involved, involves, or will involve, or was, is, or will be caused by PFAS, any Discharge of PFAS, or that did result, is resulting, or will result in PFAS Contamination. Without limiting the foregoing, the term "Covered PFAS Conduct" includes conduct arising from, based on, involving, or caused by:

i. the design, development, manufacture, formulation, distribution, handling, control, disposal, marketing, sale, testing, labeling, transportation, import, export, storage, loading, mixing, application, use, and instructions for use of PFAS or any PFAS-Containing Product;

ii. any transport, treatment, storage, disposal, or arrangement for transportation, treatment, storage, or disposal, or use of PFAS-containing Sludge or PFAS-containing Wastewater (from any site, facility, or

location), including any use for irrigation, spraying on agricultural fields, or manufacturing;

iii. any action, activity, omission, or other conduct that in any way resulted in or threatens to result in the presence of PFAS in the Environment, including any known, suspected, or threatened Discharge of any PFAS into the Environment from the beginning of time through the JCO Entry Date, including any known, suspected, or threatened Discharge of PFAS into the Environment that commenced prior to the JCO Entry Date and is continuing as of the JCO Entry Date;

iv. compliance with any reporting, recordkeeping, disclosure, notification, or permit-process requirement related to, and any representations or omissions about, PFAS or any PFAS-Containing Product (to the extent any PFAS Claim that could be asserted about such Covered PFAS Conduct arises from, is based on, involves, or is caused by PFAS); or

v. any act, use, or employment by any Person of any commercial practice that is allegedly or arguably unconscionable, abusive, or involves deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact in connection with the sale or advertisement of PFAS or any PFAS-Containing Product (to the extent any PFAS Claim that could be asserted about such Covered PFAS Conduct arises from, is based on, involves, or is caused by PFAS), including any failure to warn others concerning any human health or environmental hazards associated with PFAS or any

PFAS-Containing Product, or concerning the proper use and disposal of such substances or products, and including any such conduct that could be actionable under the CFA, other statutes, or the common law.

b. The term "Covered PFAS Conduct" does not include any conduct that a Statewide PFAS Releasor demonstrates, by clear and convincing evidence, arises solely from conduct by one or more Released Entities that occurs entirely after the JCO Entry Date. For the avoidance of doubt, the term "Covered PFAS Conduct" includes conduct involving PFAS that was the result of a Discharge prior to the JCO Entry Date or entered the Environment prior to the JCO Entry Date but migrated or was transported to another location after the JCO Entry Date.

c. It is the intention of this JCO that the definition of "Covered PFAS Conduct" be as broad, expansive, and inclusive as possible.

"Covered PFAS Harm" means any actual or alleged harm, injury, or damage in any way actually or allegedly arising from, based on, involving, related to or caused by Covered PFAS Conduct, including any actual or alleged harm, injury, or damages actually or allegedly arising from, based on, involving, or caused by PFAS or PFAS Contamination. It is the intention of this JCO that the definition of "Covered PFAS Harm" be as broad, expansive, and inclusive as possible. Without limiting the foregoing, the term "Covered PFAS Harm" includes harm arising from, based on, involving, or caused by:

a. the design, engineering, installation, maintenance, or operation of, or cost associated with any kind of treatment, filtration, Remediation, management, investigation, testing, or monitoring of PFAS in, any Drinking Water Supplies or Water System, or the rates for Potable Water that any Statewide PFAS Releasor or Water System charges its customers;

b. any Released Entity's liability for Natural Resource Damages arising from, based

on, involving, or caused by PFAS in the State;

c. any costs that any Government Entity of the State or of any of the State's Political Subdivisions has paid or will pay due to impacts that allegedly arose from, were based on, involved, or were caused by PFAS in the Environment or by human exposure to PFAS, including payments (i) to compensate for time spent on cleanup activity, travel to and from any site, contractor costs at any site, or equipment used at any site; (ii) to offset costs of restricting access to a site necessary to perform these other activities; (iii) to any medical facility, healthcare provider, pharmacy, medical or healthcare patient, or healthcare insurer; (iv) to investigate or delineate PFAS compounds; or (v) to compensate for administrative matters, personnel issues, guidance development, or office, utility, or supply costs; or

d. any PFAS Claim, including any PFAS Claim involving any public interest or diffused public right (including any claim for punitive damages that may be associated with any PFAS Claim of a public or private entity), that has arisen or may arise at any time in the future from, is or will be based on, involves or will involve, or is or will be caused by PFAS, any Discharge of PFAS, PFAS Contamination, or any PFAS-Containing Product (to the extent such PFAS Claim arises from, is based on, involves, or is caused by PFAS).

"CRACO" means the Compensatory Restoration Administrative Consent Order between the Department, the New Jersey Spill Compensation Fund, and EIDP, with an effective date of June 30, 2005, attached as Exhibit E.

"CRACO Releasees" means the "Releasees" as defined in paragraph 30 of the CRACO.

"Credit-Eligible PFAS Claim" means a PFAS Claim against any Released Entity arising from, based on, involving, or caused by Covered PFAS Conduct or Covered PFAS Harm that occurred entirely or partly in the State, other than a Purely Private PFAS Claim or a Claim that a

Public Water System that expressly and timely opted out from the Public Water System Class Settlement filed against Settling Defendants before July 31, 2025.

"Day" means a calendar day.

"DCA" means the New Jersey Division of Consumer Affairs and its Director.

"Delaware Estuary Claims" means any claims or actions for Natural Resource Damages for injuries to or Contamination of the Delaware Estuary, including the Delaware River and/or Delaware Bay.

"Department" means the New Jersey Department of Environmental Protection.

"Detailed Remediation Cost Estimate Worksheet" means a worksheet in substantially the same form as https://dep.nj.gov/wp-content/uploads/srp/rfs_detailed_cost_estimate_spreadsheet.xlsx or such other worksheet or form the Department may publish in the future.

"Director" means the Director of the New Jersey Division of Consumer Affairs.

"Discharge" (or "Discharged") means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying, injecting, escaping, leaching, dumping, or disposing of, or Contamination by, Contaminants into the environment, including the waters, air, or lands of the State, or into waters, air, or lands outside the jurisdiction of the State when damage has or may result to the lands, waters, air, or Natural Resources within the jurisdiction of the State, regardless of whether such discharge was reported to or otherwise known by any Settling Plaintiff. It is the intention of this JCO that the definition of "Discharge" be as broad, expansive, and inclusive as possible.

"Discretionary Direct Oversight" means discretionary direct oversight of an Industrial Site under N.J.A.C. 7:26C-14.3.

"Dismissal" (or "Dismiss" or "Dismissed") means dismissal with prejudice, with each Party bearing its own costs, of the pending Litigations brought against any Settling Defendant.

"Disputed Scope and/or Costs" means disagreements between the PRCRs and the Department over the scope of Remediation or the cost(s) of any aspect of the Remediation that must be performed for any of the four Industrial Sites to be compliant with federal and State statutes, regulations, and guidance.

"Drinking Water Supplies" means any raw or finished water source that is or may be used by a Water System, by a Private Potable Well, or as Potable Water by one or more individuals.

"Effective Date" means the date upon which this JCO becomes final and non-appealable.

"Environment" means the Waters Of The State, any other Drinking Water Supplies, land surface or subsurface strata, biota, or ambient air within the State or within the jurisdiction of the State.

"EPA" means the United States Environmental Protection Agency.

"Escrow Account" has the meaning set forth in Paragraph 7.a.

"Exhibits" (or "Exhibit" in the singular) means Exhibits A through I, attached to and incorporated by reference in this JCO, so that each Exhibit's terms are expressly made a part of this JCO.

"Final Remediation Document" shall have the meaning in N.J.A.C. 7:26C-1.3.

"Government Entity" means a governing body, department, agency, authority, or any other unit or quasi-governmental unit of any federal, State, county, or local government. It is the intention of this JCO that the definition of "Government Entity" be as broad, expansive, and inclusive as possible.

"Groundwater" means all water beneath the land surface that is within the saturated zone

(below the water table).

"Industrial Sites" ("Industrial Site" in the singular form) means the Chambers Works Site, the Parlin Site, the Pompton Lakes Works Site, and the Repauno Works Site, and any divisions or subsections of each.

"Industrial Sites Discharges" ("Industrial Site Discharge" in the singular form) means Discharges at or from any of the Industrial Sites prior to the JCO Entry Date.

"Industrial Sites Litigations" ("Industrial Site Litigation" in the singular form) means the Chambers Works Litigation, the Parlin Litigation, the Pompton Lakes Works Litigation, and the Repauno Works Litigation.

"Industrial Sites Releasors" ("Industrial Sites Releasor" in the singular form) has the meaning set forth in Paragraph 49.

"Industrial Sites Release" has the meaning set forth in Paragraph 49.

"Initial Payment" has the meaning set forth in Paragraph 7.a.

"Interim Remediation Assurance" means one or more forms of Remediation Funding Sources to be established and/or maintained for each Industrial Site as set forth in Paragraph 14, which shall establish interim compliance with N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption), respectively, until such time as the Year One RFS is established, as required herein.

"IRS Code" means the Internal Revenue Code of 1986, as amended.

"JCO" or "Judicial Consent Order" means this document, including all Exhibits attached hereto.

"JCO Entry Date" means the date upon which this JCO is entered by the Court, but no earlier than January 1, 2026.

"Known to the Department" means, as of the Notice Date, and for purposes of Paragraph 17.b, information regarding the nature, scope, and extent of Contamination at or from the Industrial Sites that is: (a) within the scope of the Department's actual knowledge (including its consultants or counsel in their agency capacity), including that which is within the Department's possession as of the Notice Date; (b) public information; or (c) information held by the EPA, that is reasonably available to the Department. Without limiting the foregoing, Known to the Department includes information contained or referenced in expert reports in the Litigations, pleadings in the Litigations, and any previous submissions or correspondence to or from the Department concerning the establishment of any RFS for the Industrial Sites. For the avoidance of doubt, if the Parties dispute whether information is Known to the Department pursuant to any of the foregoing standards and the Parties cannot resolve the dispute, the dispute will be subject to the dispute resolution provision in Paragraph 96, and the burden to demonstrate that any information is Known to the Department shall be on the Settling Defendants.

"Litigations" means, collectively, the Industrial Sites Litigations and the AFFF Litigation.

"LSRP" means a licensed site remediation professional who has been issued and actively maintains a license pursuant to N.J.S.A. 58:10C-1 et seq.

"NAPL" means Non-Aqueous Phase Liquid, including Dense Non-Aqueous Phase Liquid ("DNAPL") and/or Light Non-Aqueous Phase Liquid ("LNAPL").

"NAPL Work" means activities related to the Remediation of NAPL at Areas of Concern ("AOCs") where NAPL has been identified or is identified in the future within the manufacturing area at the Chambers Works Site that is or may be the subject of a TI Waiver Application.

"Natural Resources" (or "Natural Resource" in the singular) means all land, vegetation, biota, fish, shellfish, wildlife and the habitats of each, all Waters Of The State, Drinking Water

Supplies, the air, and other such resources owned by, managed by, held in trust by, under the jurisdiction of, or otherwise controlled by the State.

"Natural Resource Damages" means all Claims arising from, based on, involving, or caused by any Industrial Sites Discharges or PFAS Contamination for any injury to any Natural Resource under the Spill Act, the WPCA, the APCA, the SWMA, the BCSRA, CERCLA, or any other State or federal statute, regulation, order, or common law, and include Claims for (i) the costs of assessing injury to Natural Resources; (ii) the Department's Office of Natural Resource Restoration's costs, attorneys' fees, consultants' and experts' fees, other litigation costs, and interest, incurred prior to the JCO Entry Date; and (iii) compensation for the lost value of, loss of use of, impairment of, injury to, or destruction of Natural Resources.

"Natural Resource Damages Amount" means, subject to Paragraph 11, payments with respect to Natural Resource Damages under this JCO that constitute restitution or remediation within the meaning of IRS Code section 162(f)(2)(A) and Treas. Reg. section 1.162-21(e)(4) to be held in the Department's dedicated account for specific natural resource restoration activities in accordance with the New Jersey State Constitution, Article VIII, Section 2, Paragraph 9.

"Non-Party Covered PFAS Harm Claim" means a PFAS Claim by a Statewide PFAS Releasor against any Non-Released Entity arising from, based on, involving, or caused by Covered PFAS Conduct or Covered PFAS Harm (or conduct that would be Covered PFAS Conduct or Covered PFAS Harm if engaged in by a Released Entity).

"Non-Released Entity" means a Person that is not a Released Entity.

"Notice Date" means the date that notice of this JCO is published in the New Jersey Register as required by N.J.S.A. 58:10-23.11e2.

"Paragraph" means a portion of this JCO identified by an Arabic numeral or an uppercase or lowercase letter.

"Parlin Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. MID-L-002448-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 3:19-cv-14767-RMB-JBC (Dkt. 1).

"Parlin Site" means the facility located at 250 Cheesequake Road, Parlin, in Old Bridge Township and Sayreville Borough, Middlesex County, New Jersey, including any former portions of the facility that were transferred to third parties, and including any location to which Contaminants Discharged at or from the Site have become located.

"Parties" ("Party" in the singular) means Settling Plaintiffs and Settling Defendants. To the extent that any Settling Plaintiff or Settling Defendant performs any of its obligations under this JCO through agents, the actions of those agents shall be considered the actions of that Party.

"Permitted Exceptions" means easements, covenants, conditions, restrictions and other similar matters of record affecting title to a Remaining CRACO Parcel or other title defect revealed through a title search or a survey conducted in accordance with Exhibit H that the Department reasonably determines does or would not materially impair a conservation easement or property conveyance for its intended use.

"Person" means any individual, public or private corporation, company, association, society, firm, partnership, joint stock company, estate, trust, the United States, any of the United States' Political Subdivisions, departments, agencies, authorities, or instrumentalities, the State, or any of the State's Political Subdivisions, departments, agencies, authorities, or instrumentalities.

"Person Responsible for Conducting the Remediation" (or "PRCR") means Chemours FC for the Pompton Lakes Works Site, Repauno Works Site, and Chambers Works Site, and DuPont Specialty Products for the Parlin Site, as well as any existing or future Person that has assumed Remediation obligations for any of the Industrial Sites.

"Personal Property" means goods, chattels, and other tangible property that may be the subject of ownership but is not Real Property.

"PFAS" includes, for purposes of this JCO only, any fluorinated organic substance that contains one or more carbon atoms on which at least one of the hydrogen substituents has been replaced by a fluorine atom, and which is included in the United States Environmental Protection Agency's list of "Per- and Polyfluoroalkyl Substances" to be monitored in its fifth Unregulated Contaminant Rule, codified at 40 C.F.R. § 141.40(a)(3), or is a per- or polyfluoroalkyl ether-based substance. Solely for purposes of this JCO, "PFAS" also includes, in addition to all substances described in the preceding sentence (along with each substance's conjugate acid and any salts, derivatives, isomers, or combinations thereof), perfluorooctanoic acid ("PFOA"), per- and polyfluoroalkyl acids (and any salts thereof), per- and polyfluoroalkyl halides, per- and polyfluoroalkyl alcohols, per- and polyfluoroalkyl olefins, per- and polyfluoroalkane sulfonyl fluorides (including any acids and salts thereof), perfluoroalkyl iodides, per- and polyfluoroalkyl ether-based substances, fluoropolymers, perfluoropolyethers, per- and polyfluoroalkanes, side-chain fluorinated aromatics, per- and polyfluorinated phosphates and phosphonates, per- and polyfluorinated sulfonamides, per- and polyfluorinated urethanes, and chemical precursors and degradation products of all such substances, including fluorinated monomers, polymers and side-chain fluorinated polymers and metabolites of all such substances, as well as any substance

asserted to be PFAS in any of the Litigations. It is the intention of this JCO that the definition of "PFAS" be as broad, expansive, and inclusive as possible.

"PFAS-Containing Product" means any consumer, industrial, or other material, substance, article, or product (including AFFF) manufactured with or containing PFAS (including any material, substance, article, or product that intentionally or unintentionally contains PFAS as an ingredient, byproduct, or degradation product) that was sold, supplied, transported, treated, stored, disposed of, or that someone arranged for the transportation, or treatment, storage, or disposal of in the State. For the avoidance of doubt, the term "PFAS-Containing Product" includes (1) a material, substance, article, or product made by a manufacturer that contains PFAS made by another manufacturer and (2) a material, substance, article, or product made by a manufacturer that contains a component that (a) was made by another manufacturer and (b) contains PFAS.

"PFAS Claim" means any Claim that relates to PFAS, a Discharge of PFAS, or PFAS Contamination. It is the intention of this JCO that the definition of "PFAS Claim" be as broad, expansive, and inclusive as possible.

"PFAS Contamination" means, solely for purposes of this JCO, any presence of PFAS in the Environment, whether from a Discharge or from any other source.

"PFAS Personal Injury" means any personal physical or mental illness, injury, or death allegedly caused by exposure to PFAS, or any loss of consortium deriving from such illness, injury, or death.

"PFAS Property Damage" refers solely to any loss of or diminution in the value of Real Property or Personal Property (other than a Private Potable Well) caused by and proximately resulting from PFAS Contamination, by comparison with its value prior to such PFAS Contamination, provided that such property is owned by a Private Person.

"Plaintiffs" (or "Plaintiff" in the singular) means the Department, the Commissioner, and the Administrator.

"Political Subdivision" means any city, borough, town, township, village, county, or other political subdivision of the State, or any agency or instrumentality of one or more thereof.

"Pompton Lakes Works Directive" means the *Directive and Notice to Insurers* regarding the Pompton Lakes Works Site that the Department issued to certain Settling Defendants on March 27, 2019.

"Pompton Lakes Works Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. PAS-L-000936-19 (N.J. Super. Ct. Law Div. Mar. 26, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 2:19-cv-14758-RMB-JBC (Dkt. 1).

"Pompton Lakes Works Site" means the facility located at 2000 Cannonball Road in Pompton Lakes Borough as well as Wanaque Borough in Passaic County, including EIDP's former Haskell Works operations, and any location to which Contaminants Discharged at or from the Site have become located.

"Potable Water" means drinking water, water for other personal uses, and water for purposes requiring a supply of water which the Department determines is suitable for human consumption, and does not include water for use in firefighting, for agricultural (*e.g.*, livestock or crop production) purposes, for manufacturing, or for other non-potable purposes.

"Preliminary Assessment Report" shall be defined in accordance with N.J.A.C. 7:26E.

"Private Non-Released Entity" means any Private Person that is a Non-Released Entity.

"Private Person" means any private individual, corporation, company, association, society, firm, partnership, or joint stock company that is not, and is not owned, operated, managed, held in

trust, or otherwise controlled by, and is not acting as an employee, agent, lessee, contractor, representative, or official of, the United States, any of the United States' Political Subdivisions, departments, agencies, authorities, or instrumentalities, the State, or any of the State's Political Subdivisions, departments, agencies, authorities, or instrumentalities.

"Private Potable Well" means a hole or excavation that (i) is drilled, bored, core driven, jetted, dug, driven, or otherwise constructed for the purpose of removing water from the subsurface for Potable Water supply; (ii) is not abandoned, inactive, or out of use, so long as such well is not abandoned, inactive, or out of use based in whole or in part on the presence or threatened presence of PFAS; (iii) is not operated for mineral extraction, for chemical manufacturing or processing, for scrap-metal processing or recycling, for power generation, for a refinery, or for a fuel-storage facility; and (iv) is owned, operated, managed, or otherwise controlled by a Private Person.

"Public Water System" means a Water System for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least 15 service connections or regularly serves an average of at least 25 individuals daily at least 60 Days out of the year, including (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system; (ii) any collection or pre-treatment storage facilities not under such control which are used primarily in connection with such system; and (iii) any Person (but not any financing or lending institution) that has legal authority or responsibility (by statute, regulation, order, other law, or contract) to fund or incur financial obligations for the design, engineering, installation, operation, or maintenance of any facility or equipment that treats, filters, remediates, or manages water that has entered or may enter any Drinking Water Supplies or any Public Water System. It is the intention of this JCO that the definition of "Public Water System" be as broad, expansive, and

inclusive as possible. For the avoidance of doubt, the term "Public Water System" includes community water systems, non-transient non-community water systems, and transient non-community water systems.

"Public Water System Class Settlement" means the Class Action Settlement Agreement that was approved by the United States District Court for the District of South Carolina in the AFFF MDL on February 26, 2024 (AFF MDL Dkt. 4543).

"Punitive Damages" means punitive damages, exemplary damages, treble or multiple damages, civil or administrative fines or penalties, or other damages that serve the public interest or protect the general public primarily by punishing or penalizing civil defendants' conduct or by deterring them and others from engaging in similar conduct in the future.

"Purely Private PFAS Claim" means a civil PFAS Claim brought by any Private Non-Released Entity against any Released Entity that (a) arises from, is based on, involves, or was caused by Covered PFAS Conduct or seeks recovery for a Covered PFAS Harm; (b) could not have been brought by any Statewide PFAS Releasor; (c) presents an individual's (or an individual's estate's) PFAS Claim for PFAS Personal Injury or an individual's PFAS Claim for PFAS Property Damage; (d) does not seek damages or relief directly related to any Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System, which are addressed by this JCO; and (e) does not seek double recovery or relief that is identical to, redundant with, or duplicative of any relief that is received under this JCO or that any Statewide PFAS Releasor could receive arising from Covered PFAS Conduct or Covered PFAS Harm. For the avoidance of doubt, the term "Purely Private PFAS Claim" includes any Private Non-Released Entity's Claim for PFAS Property Damage that seeks damages or relief related to Remediation

(*e.g.*, of soil) that is not directly related to any Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System.

"Real Property" means any land, tenement, or hereditament that may be the subject of ownership, and all rights thereto and interests therein.

"Released Claims" means, collectively, the Released Industrial Sites Claims and the Released Statewide PFAS Claims.

"Released Entities" ("Released Entity" in the singular) means (i) any of the Settling Defendants and its respective past, present, or future administrators, advisors, affiliated business entities, affiliates, agents, assigns, attorneys, constituent corporation or entity (including constituent of a constituent) absorbed by any of the Settling Defendants in a consolidation or merger, contractors, counsel, directors, divisions, employee benefit plans, employee benefit plan participants or beneficiaries, employees, executors, founders, heirs, insurers, managers, members, officers, owners, parents, partners, partnerships, predecessors, principals, resulting corporation or entity, servants, shareholders, subcontractors, subrogees, subsidiaries, successors, trustees, trusts, and (ii) any other representatives, individually or in their corporate or personal capacity, and anyone acting on their behalf, including in a representative or derivative capacity, but only to the extent that the alleged liability of the entity in subsection (ii) is based on its status and in its capacity related to any Settling Defendant, and not to the extent that the alleged liability of the entity arose independently of its status and capacity related to any Settling Defendant. Other than any Settling Defendant, no currently named defendant in the Chambers Works Litigation, Parlin Litigation, Pompton Lakes Works Litigation, Repauno Litigation, and AFFF Litigation, and no currently named respondent in the Spill Act Directives shall be considered a Released Entity. It is the intention of this JCO that the definition of "Released Entities" be as broad, expansive, and

inclusive as possible; however, to the extent that a Released Entity is involved in Covered PFAS Conduct or Covered PFAS Harm through participation in a joint venture with any Non-Released Entity that gives rise to a Non-Party Covered PFAS Harm Claim, the joint venture shall be released only for such Covered PFAS Conduct or Covered PFAS Harm attributable to the Released Entity or reflecting its share of the joint venture and shall not be released for such Covered PFAS Conduct or Covered PFAS Harm attributable to a Non-Released Entity that is a co-owner of the joint venture; provided, however, that to the extent a Released Entity is responsible for the Covered PFAS Conduct or Covered PFAS Harm of the joint venture, such responsibility of the Released Entity is released. For the avoidance of doubt, the term "Released Entities" does not include the direct or indirect customer of a Released Entity, the supplier or indirect supplier of a Released Entity, any waste generator or waste transporter that shipped waste to a Released Entity, any waste transporter that received any wastes generated at any of the Industrial Sites, or any owner or operator of a site that received for treatment or disposal any wastes generated at any of the Industrial Sites unless such customer, supplier, waste generator, waste transporter, owner, or operator otherwise qualifies as a Released Entity pursuant to clauses (i) and (ii) of this definition.

"Released Industrial Sites Claims" ("Released Industrial Site Claim" in the singular) means any and all Claims that were alleged by Settling Plaintiffs in the Industrial Sites Litigations or that were asserted or could have been asserted by Settling Plaintiffs arising out of or relating to any Industrial Site Discharge, including alternative theories of liability arising out of or relating to any Industrial Site Discharge and any Corporate Reorganization Claim. Released Industrial Sites Claims also include any Claim for cost recovery or contribution, including pursuant to section 107 or 113 of CERCLA (42 U.S.C. §§ 9607, 9613) or any State or federal statute related to liability (which this JCO resolves) for Industrial Sites Discharges. The term "Released Industrial Sites

Claims" does not include (i) any Claim based on a Released Entity's failure to satisfy a requirement in this JCO; (ii) any Claim arising under or to enforce this JCO and any subsequent related order or judgment; (iii) any criminal liability that any Private Person, including any Released Entity, has or may have to the State; (iv) a Claim brought by the United States; (v) any Claim that an Industrial Sites Releasor demonstrates arises from a Discharge (or a portion of a Discharge) that occurs entirely after the JCO Entry Date; or (vi) any of the Settling Defendants' Remediation obligations described in Sections VI, VII, and VIII. For the avoidance of doubt, the term "Released Industrial Sites Claims" includes all Claims that were or could have been asserted by any Settling Plaintiff against any Settling Defendant in the Litigations or the Spill Act Directives related to Discharges of PFAS at or from an Industrial Site that occurred prior to the JCO Entry Date.

"Released Statewide PFAS Claims" ("Released Statewide PFAS Claim" in the singular) means any and all PFAS Claims that directly or indirectly, in any way, arose from, were based on, involved, or were caused by Covered PFAS Conduct or Covered PFAS Harm occurring at least in part prior to the JCO Entry Date and were or could have been asserted against any Released Entity by any Statewide PFAS Releasor, including Corporate Reorganization Claims. Without limiting the foregoing, the term "Released Statewide PFAS Claims" includes any PFAS Claims that have been asserted against any Released Entity by the State or any Statewide PFAS Releasor in any federal, state, or local action or proceeding (whether judicial, arbitral, regulatory, or administrative) arising from, based on, involving, or caused by, in whole or in part, Covered PFAS Conduct or Covered PFAS Harm, or any such PFAS Claim that could be or could have been asserted as of the JCO Entry Date or in the future in those actions or in any comparable action or proceeding brought by the State or any Statewide PFAS Releasor (whether or not the State or such Statewide PFAS Releasor has brought such action or proceeding). Released Statewide PFAS

Claims also include any PFAS Claim for cost recovery or contribution, including pursuant to section 107 or 113 of CERCLA (42 U.S.C. §§ 9607, 9613) or any State or federal statute related to liability (which this JCO resolves) for the Discharge or threatened Discharge of PFAS. It is the intention of this JCO that the definition of "Released Statewide PFAS Claims" be as broad, expansive, and inclusive as possible; however, the term "Released Statewide PFAS Claims" does not include (i) any PFAS Claim based on a Released Entity's failure to satisfy a requirement in this JCO; (ii) any PFAS Claim arising under or to enforce this JCO and any subsequent related order or judgment; (iii) any criminal liability that any Private Person, including any Released Entity, has or may have to the State; (iv) any PFAS Claim for a State or federal antitrust violation; (v) any PFAS Claim arising under State tax law; (vi) any PFAS Claim that a Statewide PFAS Releasor demonstrates, by clear and convincing evidence, arises solely from conduct by one or more Released Entities that occurs entirely after the JCO Entry Date; (vii) any of the Settling Defendants' Remediation obligations described in Sections VI, VII, and VIII; or (viii) any PFAS Claim for compensatory relief that falls within the definition of a Purely Private PFAS Claim. For the avoidance of doubt, the term "Released Statewide PFAS Claims" includes all PFAS Claims that were or could have been asserted by any Settling Plaintiff against any Settling Defendant in the Litigations or the Spill Act Directives unrelated to Industrial Sites Discharges, and also includes all PFAS Claims arising from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's jurisdiction.

"Releases" means the release of Released Claims by Releasors.

"Releasors" ("Releasor" in the singular) means, collectively, the Industrial Sites Releasors and the Statewide PFAS Releasors.

"Remaining CRACO Parcels" means (i) Pompton Lakes #1 Cannonball Trail (Block 479, Lot 1) in Passaic County comprising 58.52 acres; (ii) Pompton Lakes #2 Highlands (Block 479, Lot 5) in Passaic County comprising 14.7 acres; (iii) Repauno Works #1 Wiggins Pond (Block 8, partial Lot 4) in Gloucester County comprising 78.5 acres; (iv) Repauno Works #2 White Sluice (Blocks 3, 5 and 6, multiple Lots) in Gloucester County comprising 356 acres; and (v) Chambers Works Salem Creek (multiple Blocks and Lots) in Salem County comprising 954 acres, all as further described in Appendix B of the CRACO and as modified by surveys reviewed and previously approved by the Department, subject to the Department's approval of the updated surveys referenced in Paragraph 42.b.

"Remediation" (or "Remediate") has the same meaning as the definition for such term contained within N.J.A.C. 7:26E-1.8.

"Remediation Funding Source" or "RFS" means the methods of financing the Remediation of a Discharge required to be established by a person performing the remediation pursuant to N.J.S.A. 58:10B-3.

"Restricted Use Remedial Action" shall be defined in accordance with N.J.A.C. 7:26E.

"Repauno Works Litigation" means *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, No. GLO-L-000388-19 (N.J. Super. Ct. Law Div. Mar. 27, 2019 (complaint filed)), as removed to this Court under the caption *N.J. Dep't Env't Prot. et al. v. E.I. Dupont de Nemours & Co. et al.*, Case No. 1:19-cv-14765-RMB-JBC (Dkt. 1).

"Repauno Works Site" means the facility at 200 North Repauno Avenue, Gibbstown, Greenwich Township, Gloucester County New Jersey, including any former portions of the facility that were transferred to third parties, and including any location to which Contaminants Discharged at or from the Site have become located.

"Reserve Fund Defendants" means New DuPont and Corteva.

"SDWA" means the Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 to -25.

"Section" means a portion of this JCO identified by a Roman numeral.

"Settlement Payments" has the meaning set forth in Paragraph 7.

"Settling Plaintiffs" ("Settling Plaintiff" in the singular) for purposes of this JCO means Plaintiffs, the DCA, and the State, including in their capacities as described in Paragraph EE, and any successor department, agency, or official.

"Settling Defendants" means EIDP, Corteva, New DuPont, DuPont Specialty Products, Chemours, and Chemours FC.

"Site Investigation Report" shall be defined in accordance with N.J.A.C. 7:26E.

"Sludge" means the solids, semi-solids, precipitates, and liquids, including biosolids, that are (i) generated from any Wastewater Treatment Plant (other than the treated effluent from such a plant) or from any Public Water System's water-supply treatment plant; (ii) produced as a result of the storage or physical, chemical, or biological treatment of domestic or industrial sewage or Wastewater; (iii) generated as residue by the processes of any Treatment Works; or (iv) discharged as domestic or industrial Wastewater into a sewerage system.

"Spill Act" means the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24.

"Spill Act Directives" means, collectively, the 2017 Chambers Works Directive, the Pompton Lakes Works Directive, and the Statewide PFAS Directive.

"State" means the State of New Jersey.

"Statewide PFAS Releasors" ("Statewide PFAS Releasor" in the singular) means, with respect to Released Statewide PFAS Claims, (1) the Settling Plaintiffs; (2) the State and, without limitation and to the maximum extent that the Attorney General and other State signatories to this

JCO may release PFAS Claims, (a) all of the State's departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, including the Attorney General and county prosecutors, and any Person claiming by or through any of the foregoing (collectively, "State's departments et al."); (b) all of the State's Political Subdivisions and their departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind, and attorneys, and any Person claiming by or through any of the foregoing; and (c) any Person or entity acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity (whether or not such Person or entity signs this JCO or participates in the JCO process set forth in Section XVI) seeking relief on behalf of or generally applicable to the general public in the State or the people of the State, as opposed to solely to private or individual relief for separate and distinct injuries, or with respect to the State's departments et al. as set forth in clause 2(a) of this definition; and (3) any Person or entity on whose behalf any Statewide PFAS Releasor identified in clause (1) or (2) brought or could have brought a Released Statewide PFAS Claim, whether individually or in any corporate, personal, representative, or derivative capacity. Without limiting the foregoing, the Statewide PFAS Releasors include (i) all State-owned and/or operated Public Water Systems within New Jersey that were excluded from the Public Water System Class Settlement, including all Public Water Systems owned by New Jersey listed on Exhibit I of the Public Water System Class Settlement and in Appendix 1 of the Letter Agreement of December 8, 2023 regarding State Owned Systems between the State and Settling Defendants, and (ii) all other publicly owned and/or operated Public Water Systems located in the State that submitted a request for exclusion from the Public Water System Class Settlement, to the full extent of the Attorney General's and the other Settling

Plaintiffs' authority under the law to release Claims on behalf of such publicly owned and/or operated Public Water Systems.

"Statewide PFAS Directive" means the *Statewide PFAS Directive, Information Request, and Notice to Insurers* regarding PFAS Contamination in the State that the Department issued to certain Settling Defendants on March 25, 2019.

"Surface Water" means water at or above the land's surface, which is neither Groundwater nor contained within the unsaturated zone, including the ocean and its tributaries, all springs, streams, creeks, rivers, lakes, ponds, reservoirs, lagoons, bays, estuaries, wetlands, and artificial waterbodies.

"SWMA" means the Solid Waste Management Act, N.J.S.A. 13-1E-1 to -230.

"TI Waiver Application" means an application for a technical impracticability waiver determination submitted by the PRCR to the EPA and/or the Department for the Chambers Works Site with respect to NAPL Work.

"Total Remediation Cost Estimate" has the meaning set forth in Paragraph 26.

"Treas. Reg." means U.S. treasury regulations promulgated under the IRS Code.

"Treatment Works" means any device or systems, whether public or private, used in the storage, treatment, recycling, or reclamation of municipal or industrial waste of a liquid nature, including intercepting sewers, outfall sewers, sewage collection systems, cooling towers and ponds, pumping, power and other equipment and their appurtenances; extensions, improvements, remodeling, additions, and alterations thereof; elements essential to provide a reliable recycled supply such as standby treatment units and clear well facilities; and any other works including sites for the treatment process or for ultimate disposal of residues resulting from such treatment; as well as any other method or system for preventing, abating, reducing, storing, treating, separating, or

disposing of pollutants, including stormwater runoff, or industrial waste in combined or separate stormwater and sanitary sewer systems.

"Year One RFS" means the RFSs to be established in accordance with Paragraphs 15 and 16 for each of the Industrial Sites and that will replace the Interim Remediation Assurance at such time.

"Year One Technical Meetings" has the meaning set forth in Paragraph 16.a.

"Wastewater" means residential, commercial, industrial, or agricultural liquid waste, sewage, stormwater runoff, or any combination thereof, or other residue discharged to or collected by a sewerage system. It is the intention of this JCO that the definition of "Wastewater" be as broad, expansive, and inclusive as possible.

"Wastewater Treatment Plant" means any structure or system by means of which liquid waste, Wastewater, or Sludge, whether domestic or industrial or both, is subjected to any treatment process. For the avoidance of doubt, the term "Wastewater Treatment Plant" includes any network of pipes, pumping stations, and appurtenances that convey sewage and waste from its points of origin to a point of treatment and disposal.

"Water Purveyor" means a Person that owns, operates, manages, or controls a water supply system, plant, or equipment.

"Water System" means a system for providing Potable Water to any Person.

"Waters Of The State" means the ocean and its estuaries to the seaward limit of the State's jurisdiction, all springs, streams, and bodies of Surface Water or Groundwater, whether natural or artificial, within the boundaries of the State or subject to the State's jurisdiction, including the water column, sediments suspended in water or lying on the bank, bed, or shoreline, and sediments in or transported through coastal and marine areas.

"WPCA" means the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20.

## V. SETTLEMENT PAYMENTS

7. *The Settlement Payments*. The Settling Defendants shall pay the Settling Plaintiffs $875,000,000, subject to adjustment based on Credit-Eligible PFAS Claims as set forth in Paragraph 9, consistent with the schedule set forth in Exhibit A (the "Settlement Payments"). The Settlement Payments shall be paid as follows:

a. Payment Schedule. Within 30 Days after the JCO Entry Date, the Settling Defendants shall pay $200,000,000 by wire transfer to an escrow account (the "Escrow Account") with a mutually agreed-upon bank (the "Initial Payment"). Within 30 Days of the anniversary of the JCO Entry Date for each of the next 24 consecutive calendar years, except in the event of a pre-payment as provided in Paragraph 10, the Settling Defendants shall make Settlement Payments in accordance with Exhibit A (the "Annual Payments") by wire transfer to the Escrow Account or, if this JCO has become final and non-appealable as of the date that an Annual Payment becomes due, by wire transfer to the Settling Plaintiffs pursuant to instructions to be provided by the Settling Plaintiffs. Except as provided in Paragraphs 7.b and 10, the Initial Payment and the first six Annual Payments shall not be reduced, withheld, returned to the Settling Defendants, or subjected to any credit under Paragraph 9.

b. Until this JCO becomes final and non-appealable, the settlement funds in the Escrow Account shall earn interest and may not be used by the Settling Plaintiffs for any purpose. If the approval of this JCO is overturned, remanded, vacated, or modified on appeal such that the JCO is void, is of no effect, or is deemed by the Parties, exercising good faith, to be materially altered, the settlement funds placed into the Escrow Account by the Settling Defendants shall be returned to the Settling Defendants within 30 Days,

with any interest earned thereon. The Escrow Account shall be governed by an escrow agreement among all Parties in substantially the same form as the form agreement appended as Exhibit B (or in a form to be mutually agreed to by the Parties). The escrow agreement will specify the terms on which any funds will be released from escrow, including joint written instructions from all Parties confirming that the JCO has become final and non-appealable and that the Effective Date has therefore occurred.

c. The Settlement Payments shall be allocated as follows:

i. $225,000,000 as the Natural Resource Damages Amount, of which:

1. $100,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Chambers Works Site;

2. $75,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Pompton Lakes Works Site;

3. $30,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Parlin Site;

4. $20,000,000 is for Natural Resource Damages arising out of or relating to Discharges at or from the Repauno Works Site;

ii. $525,000,000 as the Abatement Damages Amount; and

iii. $125,000,000 for all claims for costs, including direct and indirect costs, and including attorneys' fees and costs, that Settling Plaintiffs incurred on or before the Effective Date to investigate, prosecute, and resolve the Litigations; for claims for Punitive Damages and penalties; or for other amounts not constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS

Code and Treas. Reg. section 1.162-21(e)(4) (the "Costs, Fees, and Punitive Damages Payment").

iv. The Parties agree that no more than $16,500,000 of the Settlement Payments is specifically recovered for the resolution of Released Statewide PFAS Claims wholly unrelated to the Industrial Sites. Further, of that $16,500,000, no more than $4,125,000 is specifically recovered to resolve such claims related to AFFF. Notwithstanding the foregoing, the Settling Plaintiffs retain the discretion to apply additional portions of the Settlement Payments for the general purpose of, among other things, improving water quality and funding the treatment of drinking water across the State.

d. Notwithstanding anything to the contrary in this JCO, subject only to the return of settlement funds in the Escrow Account under Paragraph 7.b, adjustments up to the Credit-Eligible PFAS Claim Cap under Paragraph 9 or a present value reduction for a pre-payment under Paragraph 10, there shall be no reduction, credit, repayment, refund, reimbursement, or deduction of any kind from the Settlement Payments paid by Settling Defendants to Settling Plaintiffs.

8. *Responsibility for the Settlement Payments*. The Initial Payment and subsequent Annual Payments shall be made by the Settling Defendants to the Settling Plaintiffs as follows: 50% paid by Chemours and/or Chemours FC; 35.5% paid by New DuPont; and 14.5% paid by EIDP and/or Corteva. The Settling Plaintiffs agree that they will accept the Initial Payment and Annual Payments from the Settling Defendants in such allocations as agreed among the Settling Defendants under their Cost Sharing Agreements. Nothing herein is intended to alter or modify the Settling Defendants' Cost Sharing Agreements. Notwithstanding anything else in this

Paragraph, the Settling Defendants' Cost Sharing Agreements in no way alter or absolve EIDP's responsibility to pay the Settling Plaintiffs 100% of the Settlement Payments pursuant to the schedule established by Exhibit A, subject to the following conditions:

a. If any of the Settling Defendants fails to make its share of the Initial Payment or any Annual Payment (the "Defaulting Company"), the Settling Plaintiffs agree that they shall not seek from EIDP a Defaulting Company's allocation of the Initial Payment and/or any Annual Payment unless (i) the Settling Plaintiffs have notified the Settling Defendants of any Defaulting Company's failure to make the Initial Payment or any Annual Payment and (ii) have provided any Defaulting Company with no less than 40 Days to cure its failure to pay its portion of the Settlement Payment ("the Cure Period").

b. If a Defaulting Company fails to cure its default within the Cure Period, the Settling Plaintiffs will accept payment of the defaulted amount within another 40 Days from the non-defaulting Settling Defendants consistent with the Settling Defendants' allocations under their Cost Sharing Agreements.

c. If the defaulted payment amount is not fully paid within 40 Days of the end of the Cure Period, EIDP is responsible for and will pay the Settling Plaintiffs any unpaid portion of the defaulted payment amount(s) within a further 40 Days.

d. Nothing herein, however, prevents EIDP from pursuing a Defaulting Company for any defaulted payment(s) EIDP has paid the Settling Plaintiffs in lieu of the Defaulting Company, as permitted in the Cost Sharing Agreements, and the Settling Plaintiffs agree to provide EIDP with reasonable cooperation in connection with its efforts to recover any defaulted payment(s) it had paid to the Settling Plaintiffs on behalf of any Defaulting Company.

9. *Credit for PFAS Judgments, Awards, or Settlements.*

a. Except as limited by Paragraph 10.b, if a Settling Defendant pays a judgment, award, or settlement after the JCO Entry Date to resolve a Credit-Eligible PFAS Claim that was filed before, on, or after the JCO Entry Date, the Settling Defendants shall have the right to reduce their next Annual Payment or their next Annual Payment after the sixth Annual Payment has been made, whichever is later, by a credit equal to 50 percent of any judgment, award, or settlement that resolves a Credit-Eligible PFAS Claim until such time as the Settling Defendants have been credited a total of $16,500,000 (the "Credit-Eligible PFAS Claim Cap").

b. Notification. For the Settling Defendants to receive a credit under Paragraph 9.a, the Settling Defendants shall provide the Settling Plaintiffs with notice (pursuant to Section XXIII) and an opportunity to meet and confer as soon as reasonably practicable after identifying a PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim. Notice and opportunity should be provided as follows:

i. Within 30 Days after receiving service of a newly filed PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim, the Settling Defendants shall notify the Settling Plaintiffs of such PFAS Claim unless prohibited by law;

ii. Within 30 Days after the Settling Defendants determine in good faith that a filed and served PFAS Claim is a Credit-Eligible PFAS Claim or within 30 Days after the JCO Entry Date, whichever is later, the Settling Defendants shall notify the Settling Plaintiffs;

iii. Within 30 Days after an unopposed motion for class certification is filed and served or a contested motion for class certification is granted, if the class action asserts a PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim, the Settling Defendants shall notify the Settling Plaintiffs;

iv. Within 30 Days after a PFAS Claim that the Settling Defendants in good faith believe is a Credit-Eligible PFAS Claim results in a judgment or award against a Settling Defendant, the Settling Defendants shall notify Settling Plaintiffs;

v. At least 21 Days before settlement of a PFAS Claim that a Settling Defendant in good faith believes is a Credit-Eligible PFAS Claim, the Settling Defendants shall notify the Settling Plaintiffs;

vi. Promptly after any notification under this Paragraph 9.b, the Settling Defendants shall offer to meet (in person or electronically) and confer with the Settling Plaintiffs; and

vii. Notwithstanding Paragraphs 9.b.i.-9.b.vi., if the Settling Defendants fail to provide a timely notice, a timely offer to meet and confer, or a timely meeting, the Parties shall cooperate fully with each other and shall use all reasonable efforts to agree to a reasonable cure for that failure. If the Parties do not reach such an agreement within 30 Days, any remaining dispute may be resolved pursuant to the dispute-resolution process provided for in Paragraph 96.

c. Within 30 Days after receiving a request from any Settling Defendant that is the subject of a PFAS Claim that such Settling Defendant in good faith believes is a Credit-Eligible PFAS Claim, and subject to the Settling Plaintiffs' reasonable

determination that the PFAS Claim is a Credit-Eligible PFAS Claim, the Settling Plaintiffs must provide a letter substantially in the form of Exhibit C (or in a form to be mutually agreed to by the Parties), which makes clear (i) that the Settling Plaintiffs have fully and forever released all of the Settling Defendants from all Released Statewide PFAS Claims; (ii) the scope of the Settling Defendants' obligations under this JCO and how they help address PFAS Contamination throughout the State; and (iii) the Settling Plaintiffs' efforts, using funds received from the Settling Defendants under this JCO and funds derived from other sources, including the 3M JCO, to address PFAS Contamination throughout New Jersey.

d. The Parties reserve the right to seek a determination by the Court as to whether any PFAS Claim is a Credit-Eligible PFAS Claim. If the Settling Defendants withhold any portion of any Annual Payment as a credit under this Paragraph 9 and the Court later determines that the corresponding PFAS Claim was not a Credit-Eligible PFAS Claim, and that determination has become final and non-appealable, the Settling Defendants shall pay the portion of the Annual Payment they previously withheld to the Settling Plaintiffs within 30 Days of such determination, with such payment to be made by wire transfer pursuant to instructions provided by Settling Plaintiffs.

10. *Pre-Payment Option*. Any of the Settling Defendants may pre-pay its share of all remaining Annual Payments required to be paid as allocated between them pursuant to Paragraph 8 calculated at the net present value of such remaining Annual Payments using an 8% annual discount rate compounded (discounted) annually from the date of payment, subject to the following:

a. The election of one Settling Defendant to pre-pay its portion of the Annual Payments shall not obligate any other Settling Defendant to pre-pay its portion of the Annual Payments, nor shall such election alter the amount of the Annual Payments owed by the other Settling Defendant(s) (*e.g.*, if New DuPont and Corteva elect to pre-pay their portion of the Annual Payments, Chemours shall continue to owe 50% of the Annual Payments set forth in each year as set forth in the schedule in Exhibit A, unless and until Chemours exercises its pre-payment option);

b. In the event that a Settling Defendant has paid and/or pre-paid all of its allocated share of the Annual Payments, that Settling Defendant's allocation of credits available for Credit-Eligible PFAS Claims available under Paragraph 9 above, if any, is forfeited and cannot be transferred to another Settling Defendant. For the avoidance of doubt, if a Settling Defendant opts to pre-pay its share of the Annual Payments, the balance of the Credit-Eligible PFAS Claim Cap shall be reduced by 50% if the pre-payment is made by Chemours and/or Chemours FC, by 35.5% if the pre-payment is made by New DuPont; and by 14.5% if the pre-payment is made by EIDP and/or Corteva.

c. A pre-payment by a Settling Defendant does not relieve it from its obligations to the Settling Plaintiffs in the event of a default or non-payment by another Settling Defendant; and

d. A pre-payment by a Settling Defendant (if any) does not relieve it from any other obligations it has to the Settling Plaintiffs under this JCO, including but not limited to any Remediation obligations.

11. Notwithstanding Paragraph 7, Settling Plaintiffs may allocate up to an additional $50,000,000 of the Settlement Payments set forth in Paragraphs 7.c.i and ii for costs, including

attorneys' fees and costs, that do not constitute restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS Code, and Treas. Reg. section 1.162-21(e)(4) if necessary based on fees and costs actually incurred ("Additional Fees and Costs Amount"). Settling Plaintiffs shall use their reasonable best efforts to minimize the Additional Fees and Costs Amount. In the event that the Settling Plaintiffs allocate any Additional Fees and Costs Amount, they shall provide written notice of such amount to Settling Defendants. For the avoidance of doubt, Settling Plaintiffs' incurrence of any Additional Fees and Costs Amount will in no event increase the total amount of the Settlement Payments owed by Settling Defendants.

12. No more than $175,000,000 of the Settlement Payments may be used for amounts not constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS Code, and Treas. Reg. section 1.162-21(e)(4). Each of the Settling Defendants and Settling Plaintiffs acknowledges and agrees that the remainder of the Settlement Payments are being paid solely as compensatory restitution and remediation for alleged harms suffered by the Settling Plaintiffs relating to the Released Industrial Sites Claims and the Released Statewide PFAS Claims, have had or will have a direct nexus or connection with such alleged harms, and are intended to restore, in part, the Settling Plaintiffs to the same or substantially similar position or condition they would have been in had the Settling Plaintiffs not suffered such alleged harms. Settling Plaintiffs agree that they will use the remainder of the Settlement Payments that they receive exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(i). In the event of any material change to applicable tax laws or regulations after the JCO Entry Date that impacts the foregoing, the Parties will meet and confer to ensure that the intent of this provision is carried out to the fullest extent practicable in accordance with then-applicable tax laws and regulations.

13. The Settlement Payments required herein are inclusive of the one percent annual surcharge under N.J.S.A. 58:10B-11(a) and N.J.A.C. 7:26C-5.9, and thus the Settling Defendants need not pay any such surcharge on any RFS posted for the four Industrial Sites for the duration of the Settlement Payments or the next 24 consecutive calendar years from the JCO Entry Date, whichever is later. Nothing in this Paragraph 13 alters the provisions of this JCO concerning the allocation of the Settlement Payments to amounts constituting restitution or remediation within the meaning of section 162(f)(2)(A) of the IRS Code, and Treas. Reg. section 1.162-21(e)(4).

## VI. REMEDIATION FUNDING SOURCES

14. *Interim Remediation Assurance.* Within 35 Days of the Notice Date and until such time as the Year One RFS for each Industrial Site is established, the PRCR shall establish and/or maintain Interim Remediation Assurance for each of the Industrial Sites in accordance with the following requirements:

a. Chemours and/or Chemours FC, jointly and severally, shall establish and maintain the Interim Remediation Assurance for the Chambers Works Site in the amount of $130,298,677 (to be reduced by the amount of then-existing CW RCRA FA for the Chambers Works Site), using any of the following financial mechanisms in a manner consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption): a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond.

b. Chemours and/or Chemours FC, jointly and severally, shall maintain the Interim Remediation Assurances for the Pompton Lakes Works Site and the Repauno Works Site in the amount of the RFSs established for those Sites as of the Notice Date, respectively, using any of the following financial mechanisms in a manner consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C,

Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption): a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond.

c. New DuPont and/or DuPont Specialty Products, jointly and severally, shall maintain an Interim Remediation Assurance for the Parlin Site in the amount of the RFS for the Site established as of the Notice Date using any of the following financial mechanisms in a manner consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption): a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond.

d. The Interim Remediation Assurance for each Industrial Site shall be maintained in the same amount and form as required by this Paragraph until such time as the Year One RFS for that Industrial Site is established.

15. *Year One RFS.* Within 35 Days of the later of (i) the JCO Entry Date, (ii) if there are no Disputed Scope and/or Costs for such Industrial Site, the Parties' agreement on the RFS amount, or (iii) the LSRP Panel's determination for such Industrial Site pursuant to Paragraph 16.e, the PRCR shall establish and maintain a Year One RFS for each Industrial Site in the form of a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption) in accordance with the following:

a. Chemours and/or Chemours FC, jointly and severally, shall establish and maintain Year One RFSs for the following Industrial Sites in an amount within the ranges

set forth below, with such amount to be determined in accordance with the process set forth in Paragraph 16:

i. Chambers Works Site: $130,298,677 to $450,000,000 (the Year One RFS amount determined within this range shall not take into account any NAPL Work, addressed through Paragraph 18);

ii. Pompton Lakes Works Site: $31,133,301 to $350,000,000; and

iii. Repauno Works Site: $16,141,953 to $248,000,000.

b. DuPont Specialty Products shall establish and maintain a Year One RFS for the Parlin Site in an amount within the range of $54,487,339 to $153,150,000, with such amount to be determined in accordance with the process set forth in Paragraph 16.

c. The Year One RFS for each Industrial Site, once established, shall supersede the Interim Remediation Assurance for such Site.

16. *Year One RFS Process.* The Parties shall engage in the following process to determine the specific Year One RFS amount within the above ranges for each Industrial Site:

a. As soon as practicable, the PRCRs and the Department and their respective consultants and technical staff shall engage in technical meetings with the objective of completing a Detailed Remediation Cost Estimate Worksheet for each Industrial Site to establish the specific amount of the Year One RFS for each Industrial Site (the "Year One Technical Meetings").

b. In the event that the Parties are unable to resolve any dispute regarding the scope and/or any estimated costs of remediation to be included in the Year One RFS through the Year One Technical Meetings for any of the Industrial Sites, the dispute will

be submitted to a panel of Licensed Site Remediation Professionals ("LSRP Panel") established in accordance with the requirements set forth below:

i. Within 30 Days after the Notice Date, the Settling Defendants, collectively, and the Department shall each appoint one LSRP to serve on the LSRP Panel.

ii. Within 30 Days thereafter, the Party-appointed LSRPs shall appoint a third independent LSRP to the Panel. Such third LSRP shall be an LSRP in good standing, based in New Jersey, and have been an LSRP for more than five years.

iii. In the event that the Party-appointed LSRPs are unable to select a third LSRP within 30 Days, the Parties shall apply to the Court within the next 14 Days for assistance in selecting the third LSRP to be appointed to the LSRP Panel.

iv. In order to ensure the neutrality of the LSRP Panel, at all times, the Parties shall treat the LSRPs they interview during the appointment process and that are ultimately appointed as neutrals, and the Parties and the LSRPs shall further comply with the following:

1. When speaking with any potential LSRP Panel members during the appointment process, no Party shall discuss any technical or legal issues concerning or the history of the Industrial Sites. Moreover, no Party may allude to or discuss or seek opinions regarding specific issues that may be in dispute or concerning hypotheticals that are analogous to specific issues that may be in dispute during the interview process. To ensure neutrality, discussions shall be limited to logistical matters, such as availability, conflicts of interest, and billing rates, as well as the LSRP's

past technical experience, training, and qualifications with respect to certain types of Contaminants, sites, and Natural Resources. Notwithstanding the foregoing, a Party may discuss with an LSRP general information regarding the nature of the assignment and categories of issues that may arise, including providing a copy of this JCO and any other written materials agreed by the Parties, to the extent necessary to determine the LSRP's interest in and suitability for serving on the LSRP Panel.

2. From the time of an LSRP's appointment onward, the LSRP Panel members shall not have ex parte communications with any Party concerning any matters in dispute.

3. The LSRPs appointed to the LSRP Panel, and the companies for which the appointed LSRPs work or have worked, shall not have been an LSRP, consultant, or expert involved in the Remediation of any of the Industrial Sites or the Industrial Sites Litigations, or performed any previous work for any Party, unless the Parties agree otherwise.

4. Each LSRP serving on the LSRP Panel shall function as a neutral third party and shall act consistent with their roles as an LSRP pursuant to applicable federal and State statutes, regulations, and guidance, including without limitation the BCSRA; the Site Remediation Reform Act ("SRRA"), N.J.S.A. 58:10C-1, *et seq*.; the Spill Act; the Administrative Requirements for the Remediation of Contaminated Sites, N.J.A.C. 7:26C-1.1, *et seq*. ("ARRCS"); the Technical Requirements for Site Remediation, N.J.A.C. 7:26E-1.1, *et seq*. ("Tech Regs"); the Remediation Standards,

N.J.A.C. 7:26D; and the Regulations of the New Jersey Site Remediation Professional Licensing Board, N.J.A.C. 7:26I-1.1, *et seq*.

5. The Settling Defendants, jointly and severally, although they may allocate internally amongst themselves as agreed amongst them under their Cost Sharing Agreements, and the Department shall each pay, respectively, 50% of the fees and costs of the LSRP Panel pursuant to an engagement agreement with each member of the LSRP Panel in a form upon which the Parties will mutually agree.

c. For each Industrial Site for which the Parties are unable to resolve any dispute regarding any Disputed Scope and/or Costs for Remediation to be included in the Year One RFS, the PRCR and the Department shall jointly submit such dispute to the LSRP Panel in accordance with the following deadlines, unless otherwise agreed to by the Parties:

i. Chambers Works Site: 120 Days after the Notice Date;

ii. Pompton Lakes Works Site: 150 Days after the Notice Date;

iii. Parlin Site: 180 Days after the Notice Date; and

iv. Repauno Works Site: 210 Days after the Notice Date.

d. The Parties' submissions to the LSRP Panel for each Industrial Site shall include the following:

i. The PRCR and the Department shall jointly submit to the LSRP Panel a Detailed Remediation Cost Estimate Worksheet setting forth the Agreed Scope and/or Costs, and a short, neutral description of the Disputed Scope and/or Costs.

ii. The PRCR and the Department shall also each submit to the LSRP Panel their competing positions concerning any Disputed Scope and/or Costs. Each Party's submission shall include:

1. A Detailed Remediation Cost Estimate Worksheet setting forth the Party's position as to the Disputed Scope and/or Costs; and

2. A detailed explanation in support of the Party's position as to any Disputed Scope and/or Costs not to exceed a number of pages to be set by agreement of the Parties for each Industrial Site, which number of pages shall take into account the complexity of the Disputed Scope and/or Costs at issue.

e. The LSRP Panel shall issue its determinations as to Disputed Scope and/or Costs for each Industrial Site within 90 Days after receiving the Parties' simultaneous submissions for a particular Industrial Site, unless the LSRP Panel reasonably requests an extension of such time (to which the Parties will not unreasonably withhold consent). The LSRP Panel shall make its determinations for each Industrial Site in accordance with the following:

i. The LSRP Panel must accept and may not alter the Agreed Scope and/or Costs;

ii. The LSRP Panel shall not consider the ranges agreed to by the Parties as set forth in Paragraph 15 above (*i.e.*, the LSRP Panel shall determine each Disputed Scope and/or Cost based on its independent judgment);

iii. The LSRP Panel may request one or more meetings with the technical staff and consultants from the PRCRs (including the PRCRs' LSRPs) and

the Department to answer questions and/or clarify the record. All Parties' counsel shall be copied on such requests and all Parties and their technical staff and consultants (including the PRCRs' LSRPs) shall be invited to and permitted to attend any such meetings;

iv. In deciding each Disputed Scope and/or Cost, the LSRP Panel shall follow applicable federal and State statutes and regulations and shall also consider the Department's applicable guidance as well as this JCO;

v. The LSRP Panel shall make a good faith effort to reach a unanimous decision, although the determination may be made by majority vote in the absence of unanimity;

vi. The LSRP Panel's determination as to each Disputed Scope and/or Cost shall be set forth in a Detailed Remediation Cost Estimate Worksheet for each Industrial Site, which shall be supported by a detailed written explanation and a certification that is signed by at least two of the three LSRP Panel members in their LSRP capacities with respect to each Disputed Scope and/or Cost at issue.

f. Notwithstanding the LSRP Panel's determinations, for the avoidance of doubt, the LSRP Panel's determinations shall not result in the PRCR being required to establish a Year One RFS that is above or below the ranges specified in Paragraph 15.

g. If this JCO does not become final in accordance with its terms, any determinations made by the LSRP Panel shall be of no force and effect and shall not bind the Parties.

h. In no circumstance shall the LSRP Panel be responsible for any decision other than providing an estimate for a Disputed Scope and/or Cost the Parties submit to it.

i. Any and all Disputed Scope and/or Cost issues for the Year One RFS shall only be resolved through the process set forth herein in Paragraphs 16.b through 16.f, and in no event shall such a dispute affect any other terms of the JCO.

j. For the avoidance of doubt, it is the Parties' intention that the PRCR shall be given a credit from the Year One RFS and any subsequent RFS for the monetary amount of any RCRA or NJDEP financial assurance the PRCR has established and maintained for any Remediation work within the RFS calculation that is duplicative of work that the PRCR is performing or will perform under the RCRA and/or New Jersey closure, post-closure, and/or operation, maintenance and monitoring requirements.

17. *Subsequent Annual Cost Reviews*. The PRCR at each of the Industrial Sites will continue to be obligated to submit an annual cost review, as set forth in N.J.A.C. 7:26C-5.10, to the Department every 365 Days after the Year One RFS is established for each of the Industrial Sites, as set forth below:

a. The total amount of the RFS(s) for any Industrial Site in subsequent annual cost reviews may increase or decrease in accordance with applicable federal and State laws, regulations, and guidance. For the avoidance of doubt, with regard to any Remediation cost issues, including NAPL Work, as discussed in detail in Paragraph 18, after the Year One RFS, the Parties agree that the amount of the RFS will be determined exclusively through the RFS determination and approval process under applicable law, regulations, and guidance.

b. Notwithstanding Paragraph 17.a, after the Year One RFSs are determined, neither the Department nor the PRCRs may seek adjustments to the RFS amounts at any of the Industrial Sites based on information that was Known to the Department, except as

expressly set forth below with respect to NAPL Work. For the avoidance of doubt, however, adjustments to the RFS amounts may be made based upon new information that becomes available after the Notice Date regarding the nature, scope, or extent of Contamination that was Known to the Department or changes in applicable federal or state law or regulations regarding such Contamination after the Notice Date. However, such adjustments to the RFS amounts shall be limited to the additional increased or decreased cost related to such new information after the Notice Date regarding the nature, scope or extent of Contamination or changes in law or regulations.

c. Downward adjustments, with Department approval, not to be unreasonably withheld, can be made per applicable law, N.J.A.C. 7:26C-5.11 and 5.12, once funds are expended and work is performed.

d. The future Industrial Sites RFSs shall be maintained in the form of a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond consistent with the requirements of New Jersey laws and regulations, including N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption), respectively.

e. Notwithstanding Paragraph 17.d, the PRCR, provided it is performing the Remediation and is otherwise in compliance with all other provisions of this JCO, may apply to the Department in the following timeframes to be permitted to maintain not more than the following percentages of an Industrial Site RFS using any combination of the financial mechanisms provided for in N.J.A.C. 7:26C, Subchapter 5, with the remainder, if any, to be maintained using the financial mechanisms set forth in Paragraph 17.d:

i. Not earlier than 5 years after the JCO Entry Date, 50%;

ii. Not earlier than 10 years after the JCO Entry Date, 75%; and

iii. Not earlier than 15 years after the JCO Entry Date, 100%.

The Department will not unreasonably withhold consent to such an application, provided that with respect to any application to use a self-guarantee, the PRCR making such application submits to the Department information that demonstrates that the PRCR satisfies the standard set forth in N.J.A.C 7:26C, Subchapter 5, Section 5.8 to maintain a self-guarantee for the portion of the RFS sought to be so maintained, or a different standard in New Jersey regulations in effect at the time of such application. Any decision by the Department pursuant to the foregoing sentence, whether approving or denying an application, will be subject to reconsideration annually based on the PRCR's submission of the required information at such time. In no event will the PRCR for the Chambers Works Site be permitted to use a self-guarantee during a time when the Total Remediation Cost Estimate for the Chambers Works Site exceeds $450,000,000.

18. *Chambers Works Site NAPL Work*. The Parties acknowledge that the PRCR for the Chambers Works Site submitted a TI Waiver Application with respect to the NAPL located in AOC 1 on December 17, 2024, which application remains pending. The Parties further acknowledge that the PRCR for the Chambers Works Site has submitted additional reports concerning NAPL located in additional AOCs and may submit additional TI Waiver Applications to the EPA and Department. The Parties also acknowledge that the RFS and Reserve Fund obligations at the Chambers Works Site may need to be modified in the future to account for any additional future costs to address NAPL Work that is the subject of the pending or any future TI Waiver Application. The Parties agree as follows:

a. Only upon a decision denying a TI Waiver Application shall the Chambers Works Site RFS value be increased (subject to Paragraphs 26 through 28) to reflect the

estimated costs of the NAPL Work that was the subject of that TI Waiver Application. Such increase in value is not required until such time as a Final TI Waiver Decision has been issued.

b. A Final TI Waiver Decision with respect to Chambers Works shall occur as follows:

i. The PRCR has submitted a TI Waiver Application or, with respect to any future TI Waiver Applications, will submit such application to the EPA and Department concurrently.

ii. If a TI Waiver Application is granted by both EPA and the Department, a Final TI Waiver Decision will occur at the time of the later approval.

iii. If a TI Waiver Application is granted by EPA (either initially or on appeal) but denied, in whole or in part, by the Department, the Department will provide the PRCR with a detailed separate decision setting forth the basis for the denial, which decision shall be subject to appeal as set forth below.

iv. If EPA and/or the Department denies a TI Waiver Application, the PRCR shall retain all administrative and judicial appeals available under state and federal law, regulations, and court rules, and only after the expiration of the period by which an appeal must be filed or the exhaustion of such appeal(s) if one or more appeals are filed will the denial constitute a Final TI Waiver Decision.

v. Once a Final TI Waiver Decision has been issued for one or more particular AOCs or portions of AOCs (but not before), the PRCR, its LSRP of record, and the Department will take into account for the next annual cost review the additional projected costs to perform the NAPL Work that was the subject of

that TI Waiver Application for the particular AOC(s) in accordance with applicable law, regulations, and guidance.

vi. For the avoidance of doubt, until such time as a TI Waiver Application has reached a Final TI Waiver Decision, the PRCR and its LSRP of record may assume that a technical impracticability waiver or similar regulatory relief will be available for purposes of calculating the annual RFS value in the annual cost review submission to the Department.

19. *Non-PRCR Settling Defendants' Obligations to Ensure RFSs for the Industrial Sites Are Established and Maintained*. If a PRCR remains a going concern and is performing Remediation, but is unable to post the RFS for one or more of the Industrial Sites, the following shall occur:

a. The PRCR shall provide notice to the Department and to the other Settling Defendants of such inability to maintain an RFS, and the other Settling Defendants, consistent with their Cost Sharing Agreements, shall spend 60 Days providing assistance to the PRCR in obtaining the necessary financing or other financial arrangements to allow the PRCR to maintain the requisite RFS;

b. If the PRCR fails to maintain the requisite RFS with the assistance of the Settling Defendants pursuant to Paragraph 19.a, the Department may require EIDP to provide sufficient guarantees, including but not limited to co-signing one or more of the RFS funding mechanisms permitted pursuant to this JCO, to allow the PRCR to maintain the requisite RFS; and

c. If the PRCR is unable to maintain the required RFS at any Industrial Site, notwithstanding Paragraphs 19.a and 19.b, the Department may direct EIDP in writing to

establish, and EIDP will establish within 45 Days of receipt of such written communication, the RFS required by this JCO for any Industrial Site for which the PRCR has not maintained the required RFS.

d. In the event a Settling Defendant that is not the PRCR assists the PRCR for an Industrial Site to maintain the required RFS or EIDP is directed to establish an RFS for an Industrial Site, neither the non-PRCR Settling Defendant nor EIDP shall become responsible for conducting the required Remediation, provided the PRCR remains a going concern and is performing Remediation.

e. Nothing herein prevents the non-PRCR Settling Defendants, including EIDP, from pursuing recovery of their Remediation costs pursuant to the Settling Defendants' Cost Sharing Agreements, and the Department agrees to provide the Settling Defendants with reasonable cooperation in connection with these efforts.

## VII. RESERVE FUND

20. *Requirements for Establishing and Maintaining the Reserve Fund*. Within 60 Days of the JCO Entry Date, the Reserve Fund Defendants (*i.e.*, New DuPont and Corteva) shall establish a Reserve Fund in the amount of $475,000,000, which is not an RFS as defined in N.J.A.C. 7:26C-5.1 et seq. but is to be established and maintained for the purpose of providing further assurance that Remediation of the Industrial Sites will be completed, consistent with the following:

a. The Reserve Fund Defendants shall be responsible for establishing the Reserve Fund exclusively for the Department's benefit to be held, administered, and maintained by a third-party trustee (the "Reserve Fund Trustee") appointed by the Department pursuant to the terms of the Reserve Fund Agreement between New DuPont, Corteva, and the Department, attached as Exhibit D.

b. The Reserve Fund Defendants shall fund their respective shares of the Reserve Fund and the costs of the Reserve Fund Trustee in accordance with their Cost Sharing Agreements, which, as between the parties thereto, would provide for New DuPont to be responsible for 71 percent thereof and Corteva 29 percent.

c. Although the Parties acknowledge that the Reserve Fund is not an RFS, the Reserve Fund shall be established through a remediation trust fund, a line of credit, a letter of credit, and/or a surety (payment) bond, consistent with the requirements for each such financial mechanism as set forth in N.J.S.A. 58:10B-3 and N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption), respectively.

d. The Reserve Fund Defendants shall be obligated to fund, and the Reserve Fund Trustee shall be obligated to maintain, the Reserve Fund until such time as each of the Industrial Sites has received a sitewide Final Remediation Document for all environmental media from (i) the Department, and (ii) as applicable, EPA.

e. The Reserve Fund is capped at $475,000,000 (the “Reserve Fund Cap”).

f. The amount of the Reserve Fund shall be adjusted annually in proportion with the percentage decrease or increase in the annual aggregate amount of the RFSs, starting with the RFSs immediately following the Year One RFSs, required by the Department for the four Industrial Sites, but in no event shall the Reserve Fund exceed the Reserve Fund Cap. For the avoidance of doubt, the initial Reserve Fund that is established in the amount of $475,000,000 may decrease in value proportionately to any decrease in the annual aggregate value of the RFSs for the four Industrial Sites. Only once the value of the Reserve Fund falls below $475,000,000 can its value increase in proportion to any

increase in the aggregate value of the RFSs for the Industrial Sites, but under no circumstance shall the Reserve Fund exceed $475,000,000.

g. The Reserve Fund Defendants and the Reserve Fund Trustee shall submit written documentation to the Department on an annual basis demonstrating that the Reserve Fund is in compliance with the above-stated Reserve Fund requirements.

21. The Department shall be entitled to draw on the Reserve Fund in accordance with the Reserve Fund Agreement only if each of the following conditions are met:

a. The funds are drawn in connection with Remediation work identified in the prior year's Detailed Remediation Cost Estimate Worksheet submitted by the PRCR and its LSRP and approved by the Department for one or more of the Industrial Sites where the Department has determined that the PRCR has failed to perform the Remediation as required;

b. The Department has notified all Settling Defendants and the Reserve Fund Trustee that the PRCR has failed to perform the Remediation of one or more of the Industrial Sites and has given the PRCR a reasonable opportunity to cure of at least 30 Days;

c. After such opportunity to cure has lapsed, the Department has notified all Settling Defendants of such failure to cure;

d. The Department has made a demand to avail itself of the funds in the RFS(s) for the particular Industrial Site(s) for which the Department has determined that the required Remediation is not being performed; and

e. The Department has not received within 30 Days the funds demanded in Paragraph 21.d from the RFS(s) for the particular Industrial Site(s) for which the Department has determined that the required Remediation is not being performed.

22. The Department shall have the right to avail itself of the funds in the Reserve Fund for the purpose of performing the Remediation of the Industrial Site after the foregoing conditions in Paragraph 21 have been met, subject to these additional requirements:

a. The Department may access the funds consistent with the Reserve Fund Agreement;

b. The Department shall provide a written communication to the Reserve Fund Defendants and the Reserve Fund Trustee briefly summarizing the Remediation in the Detailed Remediation Cost Estimate Worksheet for which the Reserve Fund funds will be used;

c. The Department shall submit proof of the expense(s) (e.g., bid, invoice, purchase order, deposited check) for which the Reserve Fund funds were used to the Reserve Fund Defendants and the Reserve Fund Trustee on an annual basis; and

d. The Department shall continue to issue a written demand to the PRCR that has failed to perform the Remediation on a quarterly basis that it perform the Remediation of the Industrial Site(s) for which a determination has been made by the Department that the required Remediation is not being performed.

23. Any amount drawn by the Department from the Reserve Fund shall decrease the Reserve Fund Cap by that amount unless or until funds are recouped pursuant to Paragraph 24 below concerning Reserve Fund Recoupment, in which case the Reserve Fund Cap shall be

replenished up to its value prior to the Department drawing on the funds, but in no circumstance greater than $475,000,000.

24. If and to the extent that the Department recovers funds from the PRCR for which the Reserve Funds were used, the Department shall assign its rights to recover any amount previously utilized from the Reserve Fund to the Reserve Fund Defendants. If Reserve Funds are recovered, whether by the Department or the Reserve Fund Defendants, those funds shall be deposited back into the Reserve Fund (the "Reserve Fund Recoupment"), subject to the Reserve Fund Cap and subject to the annual adjustment in proportion with the percentage decrease or increase in the annual aggregate amount of the RFSs required by the Department for each of the four Industrial Sites.

25. If this JCO fails to become a final court order and the Effective Date herein never occurs, the Reserve Fund and the Reserve Fund Trust will be terminated by the Reserve Fund Defendants without the consent of the Department.

26. *Reserve Fund as Supplemental RFS*. If the total estimated costs for Remediation of the Chambers Works Site, including any NAPL Work that has been the subject of a Final TI Waiver Decision (the "Total Remediation Cost Estimate"), exceed $450,000,000, then the Reserve Fund, not to exceed the Reserve Fund Cap, shall function as a supplemental RFS for the costs of the estimated Remediation amount over $450,000,000.

27. In the event the Chambers Works Site Total Remediation Cost Estimate exceeds $925,000,000, there shall be no obligation to establish any supplemental RFS for the Chambers Works Site beyond the $450,000,000 RFS established by the PRCR plus the Reserve Fund, not to exceed the Reserve Fund Cap, functioning as a supplemental RFS for the costs of the estimated Remediation amount over $450,000,000; provided, however, that the provisions of this JCO,

including Sections VI, VII, and VIII with respect to the responsibility of the Settling Defendants to perform the Remediation of the Chambers Works Site shall continue to apply.

28. At any time when the Total Remediation Cost Estimate for a particular year based on the annual cost review exceeds $450,000,000 for the Chambers Works Site, the original RFS established by the PRCR shall remain static at $450,000,000 and shall not be reduced in value during the annual cost review process until the remaining Total Remediation Cost Estimate for the Chambers Works Site is determined to be less than $450,000,000. So long as the Total Remediation Cost Estimate for the Chambers Works Site falls below $925,000,000, the portion of the Reserve Fund that is functioning as a supplemental RFS for the Chambers Works Site may be reduced during the annual cost review as costs are expended to perform the Remediation of the Site.

## VIII. <u>REMEDIATION OBLIGATIONS</u>

29. *Continuing Obligation to Perform Remediation.* Except as expressly set forth in this JCO, nothing in this JCO is intended to alter, in any way, any Settling Defendant's obligation to conduct Remediation at the Industrial Sites consistent with applicable federal and State laws, regulations, and guidance.

30. Remediation is required at each Industrial Site until each Site is fully and finally Remediated pursuant to applicable federal and State laws, regulations, and guidance and receives a sitewide Final Remediation Document for all environmental media from (i) the Department and (ii) as applicable, EPA.

31. The PRCR shall continue to conduct the Remediation at each Industrial Site in the first instance.

32. *Defaulting PRCR.* Notwithstanding Paragraph 31, if the PRCR fails to perform the Remediation at any Industrial Site (the "Defaulting PRCR"), EIDP shall perform the required Remediation at such Site so long as each of the following conditions has been met:

a. The Department has issued a Spill Act Directive to the Defaulting PRCR providing the Defaulting PRCR with 21 Days to restart the performance of the Remediation and the Defaulting PRCR has not resumed performance of the Remediation in such time;

b. The Department has provided the non-PRCR Settling Defendants with an additional 21 Days to discuss the Remediation responsibilities at the Industrial Site that they may have under their Cost Sharing Agreements and the non-PRCR Settling Defendants have not resumed the Remediation in such time; and

c. At least some of the Remediation remaining at the Industrial Site involves Discharges that occurred prior to July 2015.

33. If EIDP performs the Remediation pursuant to Paragraph 32, EIDP may utilize funds from the RFS(s) established by the Defaulting PRCR for the Industrial Site where the Defaulting PRCR has failed to conduct the Remediation until such funds are exhausted as if EIDP were the PRCR.

34. If the RFS(s) for the Industrial Site where the Defaulting PRCR has failed to conduct the Remediation are unavailable for EIDP to use to perform Remediation, EIDP shall notify the Department in writing. If, in the opinion of the Department, the RFS funds are unavailable, the Department shall notify EIDP and the Reserve Fund Trustee that EIDP may utilize the Reserve Fund to perform the Remediation until the Reserve Fund is exhausted. Once the Reserve Fund is exhausted, EIDP shall perform the Remediation using its own financial resources

and shall have the right to seek contribution from any other responsible party that may have Discharged Contaminants at the particular Industrial Site at issue after July 2015.

35. Nothing herein prevents EIDP from pursuing recovery of EIDP's Remediation costs pursuant to the Settling Defendants' Cost Sharing Agreements, and the Department agrees to provide the Settling Defendants with reasonable cooperation in connection with these efforts. Nothing herein is intended to alter or modify the Companies' Cost Sharing Agreements.

36. The Department and the PRCRs recognize that the Industrial Sites encompass historic, current, and potential future manufacturing and/or commercial operations. Thus, subject to the Department's obligation to protect human health, safety and the environment, the Department recognizes that future Remediation, including long-term remedial action implementation, operation, maintenance, and monitoring, at the Industrial Sites will consider current operations and potential future industrial and/or commercial land uses.

37. *Discretionary Direct Oversight*. The Department agrees to withdraw in writing its assertion of Discretionary Direct Oversight of the Chambers Works Site, as set forth in letters dated February 28, 2025 and March 6, 2025, on or before the JCO Entry Date.

38. The Department agrees not to assert Discretionary Direct Oversight at any of the four Industrial Sites based on Discharges of Contaminants that occurred prior to the JCO Entry Date.

39. With respect to the Parlin Site's compulsory direct oversight status pursuant to N.J.A.C. 7:26C-14.2, the Department agrees to meet with DuPont Specialty Products and its representatives (including its LSRP) as soon as reasonably practicable to discuss whether it would be appropriate to adjust certain direct oversight requirements pursuant to N.J.A.C. 7:26C-14.4 on

the basis that such action would be (i) in the public interest, and (ii) protective of public health and safety and the environment.

## IX. MITIGATION OF ONGOING PFAS DISCHARGES AT THE CHAMBERS WORKS AND PARLIN SITES

40. Abatement actions have been taken at the Chambers Works and Parlin Sites to reduce PFAS Discharges from ongoing Site operations, including but not limited to the use of carbon beds to abate water and air discharges from individual operating units. As part of continuing efforts to reduce PFAS Discharges from ongoing operations at the Chambers Works and Parlin Sites, Chemours and DuPont Specialty Products agree to undertake, for their respective operations at the two Sites, an evaluation, including without limitation the collection of data, of the continued presence and discharge (including emissions) of PFAS within and from their ongoing operations. Chemours and DuPont Specialty Products shall report the results to the Department within 12 months of the JCO Entry Date, after which Chemours and DuPont Specialty Products and the Department will meet to discuss any additional measures that may or may not be appropriate to mitigate PFAS Discharges that occur after the JCO Entry Date based on consideration of available technology; applicable New Jersey regulations, including any that become applicable after the JCO Entry Date; the significance of such PFAS Discharges from ongoing site operations (if any); the steps already taken and being taken to abate such PFAS Discharges; and the economic feasibility of such steps. For the Chambers Works Site, any mitigation of Discharges of PFAS to Surface Waters will be determined by the ongoing New Jersey Pollutant Discharge Elimination System permit renewal process and, as part of such process, Chemours will agree to implement PFAS abatement projects to achieve reductions of such Discharges.

## X. RESOLUTION OF THE COMPENSATORY RESTORATION ADMINISTRATIVE CONSENT ORDER

41. *Novation of the CRACO*. The Parties agree that this JCO is a novation to and supersedes the CRACO. No rights or obligations under the CRACO shall survive the entry of this JCO except for those rights or obligations under the CRACO that are expressly incorporated herein.

42. *Remaining CRACO Parcels*. Settling Defendants shall take the following steps regarding the Remaining CRACO Parcels. The Parties shall cooperate to implement these steps, and the Department shall identify a point of contact for the Settling Defendants to implement these steps:

a. *Updated Title Insurance Commitment*. Within 90 Days of the JCO Entry Date, Settling Defendants shall provide the Department with an updated title insurance commitment for each Remaining CRACO Parcel prepared in accordance with the Green Acres Program's "Title Insurance Commitment and Title Insurance Policy Checklist" (attached as Exhibit F, and available at https://dep.nj.gov/wp-content/uploads/greenacres/pdf/title-checklist-10-2022.pdf).

b. *Updated Survey*. Within 60 Days of the JCO Entry Date, the Department shall review the last surveys performed, attached hereto as Exhibit G, and identify any necessary updates. Within 60 Days of a request for an updated survey, Settling Defendants shall submit to the Department an updated survey for such Parcel prepared in accordance with the Green Acres Program's "Scope of Survey Services and Standard Detail Requirements" (attached as Exhibit H, and available at https://dep.nj.gov/greenacres/survey-section-standard-scope-of-work/).

c. *Encroachment Issues*. Within 60 Days of receiving an updated survey for a Remaining CRACO Parcel, the Department shall identify to Settling Defendants (i) Permitted Exceptions for the Parcel and (ii) any encroachments on such Parcel that must be resolved by the Settling Defendants. Within 30 Days thereafter, the Settling Defendants shall submit to the Department for approval a plan to resolve the encroachments identified by the Department as requiring resolution. Subject to Permitted Exceptions, Settling Defendants shall be obligated to resolve all encroachments on each Remaining CRACO Parcel before any easement or conveyance of title may be effectuated.

d. *Demolition of Abandoned/Derelict Structures on Pompton Lakes Parcels.* The requirements of paragraphs 11 through 15 of the CRACO regarding the demolition of all abandoned/derelict structures on the Pompton Lakes #1 and #2 Parcels are expressly incorporated herein. Within 60 Days of the JCO Entry Date, Settling Defendants shall submit a report regarding the implementation of the Demolition Work Plan, and take any additional steps, if any, required by paragraph 15 of the CRACO.

e. *Updated Preliminary Assessment Report and Site Investigation Report.*

i. Within 90 Days after the JCO Entry Date, the PRCR shall provide the Department with a Preliminary Assessment Report and Site Investigation Report for the Chambers Works Salem Creek Parcel, prepared in accordance with the Tech Regs. With respect to the Repauno Works and Pompton Lakes Parcels, the PRCR shall, within 90 Days after the JCO Entry Date, provide a written update report to the Department on the Remediation status of each such Parcel, including by reference to existing Remediation reports. The Department shall determine if the reports contain the required information and shall notify the PRCR as follows:

1. If the Department determines that the reports do not contain the required information, including but not limited to identifying all Areas of Concern, the Department shall send the PRCR a deficiency letter identifying the additional information that must be submitted. The PRCR shall submit the information by the date specified in the letter.

2. If the Department determines that the reports contain the required information, the Department shall send the PRCR a letter acknowledging the sufficiency of the reports.

ii. If the report(s) approved by the Department for a Remaining CRACO Parcel identify one or more contaminated Areas of Concern, the PRCR shall conduct further Remediation of the Parcel as necessary to complete a Restricted Use Remedial Action necessary for the intended use of the Parcel, consistent with Paragraph 42.f.

f. *Remedial Action*.

i. Unless otherwise agreed to by the Department, the PRCR shall complete a Restricted Use Remedial Action of each Remaining CRACO Parcel at which a contaminated Area of Concern has been identified, consistent with federal and state laws, regulations, and guidance, including consideration of natural background levels, prior to the placement of an easement and/or conveyance of title.

ii. Unless otherwise agreed to by the Department, no easement or conveyance of title may be effectuated until the PRCR has submitted a final Remedial Action Report, as applicable, for the subject Remaining CRACO Parcel

in compliance with N.J.A.C. 7:26E-5.7 (except that the remedial timeframes set forth therein shall not apply), and the Department has approved the same and confirmed in writing that the Remedial Action is complete.

iii. For a Restricted Use Remedial Action, the PRCR shall obtain and comply with a Remedial Action Permit pursuant to N.J.A.C. 7:26C-7. The PRCR shall be designated in such permit as the sole "party responsible for permit compliance" and shall enter into a site access agreement with the Department in order to perform any activity as may be required pursuant to the Remedial Action Permit. The PRCR shall thereafter perform all actions as may be required pursuant to such Remedial Action Permit for as long as it remains in effect.

iv. The PRCR shall provide the Department with a status report of the Remediation being conducted at each Remaining CRACO Parcel every 90 Days, or as otherwise agreed, until the Remedial Action at such Parcel is complete.

g. *Conservation Easements*. Each CRACO Remaining Parcel that is designated for a conservation easement shall be subject to the following process.

i. *Chambers Works Salem Creek Parcel*. Within 60 Days of the Department's approval of the Parcel for conveyance, Chemours and Chemours FC shall place a conservation easement on the Chambers Works Salem Creek Parcel in substantially the same form as Exhibit I. The conservation easement shall be filed with the Clerk of the county in which the property is located, and Chemours and Chemours FC shall submit copies of the recorded conservation easement to the Department.

ii. *Repauno Works Parcels*. The Parties acknowledge that fee title to the Repauno Works #1 Wiggins Pond and Repauno Works #2 White Sluice Parcels is currently held by Delaware River Partners ("DRP") subject to an obligation by DRP to convey conservation easements pursuant to Amendment No. 2 to Environmental and Indemnification Agreement and Amendment No. 4 to Agreement of Sale. Within 60 Days of the Department's approval of the Parcels for conveyance, Chemours and Chemours FC shall take all commercially reasonable steps to convey a conservation easement for such Parcel in substantially the same form as Exhibit I, including enforcing DRP's contractual obligations to convey such easement. The conservation easement shall be filed with the Clerk of the county in which the property is located, and Chemours and Chemours FC shall submit copies of the recorded conservation easement to the Department.

h. *Conveyance of Pompton Lakes Parcels*. Within 90 Days of the Department's approval of the Pompton Lakes # 1 and #2 Parcels for conveyance, whichever is last to occur, Chemours FC shall convey fee simple absolute title to both Parcels to the Department subject to any Permitted Exceptions. The conveyances shall occur at the same time and shall be accomplished through the delivery by Chemours FC of the following documents to the Department: (i) bargain and sale deed with covenants against grantor's acts, (ii) affidavit of title, (iii) evidence of authority to convey, (iv) seller's residency certification, *i.e*. Form GIT/REP-3, (v) affidavit of consideration for use by seller, *i.e*. Form RTF-1; (vi) a title insurance policy; and (vii) any other documents the Department may request.

43. *Costs.* The Settling Defendants agree to bear their full cost of the required steps herein.

44. *CRACO Release.* Plaintiffs hereby fully and forever release, covenant not to sue, and agree not to otherwise take administrative action against the CRACO Releasees for any "Natural Resource Damages" as that term is defined in the CRACO.

45. *Contribution Protection*. The contribution protection for the CRACO Releasees provided for in paragraph 30 of the CRACO is hereby expressly preserved and remains in effect.

46. *Extensions of Time.* Settling Defendants may request a reasonable extension of time to satisfy any requirement in this Section X by submitting to the Department a written request for an extension no later than 14 Days prior to the applicable deadline. The Department's failure to respond to such a request shall be deemed approval of the request for an extension.

47. *CRACO Enforcement*. In the event that Settling Plaintiffs assert a claim for breach against Settling Defendants for failure to comply with the requirements of this Section X, the Department shall retain, in connection with any such alleged breach, all remedies available to the Department, and Settling Defendants shall retain all defenses available to Settling Defendants, under applicable law or in equity. For the avoidance of doubt, however, Plaintiffs shall have no right to reinstitute any Claims or causes of action for "Natural Resource Damages" as that term is defined and not otherwise reserved in the CRACO.

48. Nothing herein relieves Settling Defendants of their Remediation obligations with respect to Discharges at and from the Additional CRACO Industrial Sites or the Remaining CRACO Parcels.

## XI. THE SETTLING PLAINTIFFS' RELEASES AND COVENANT NOT TO SUE; DISMISSALS AND WITHDRAWALS OF DIRECTIVES

49. *Industrial Sites Release and Covenant Not to Sue.* As of the Effective Date, in consideration of this JCO, Settling Plaintiffs acting in all of their capacities, including in the Department's standing as *parens patriae*, as trustee of the State's natural resources, as an entity with interests in real property in the State, and in its regulatory capacity, fully and forever release, covenant not to sue, and agree not to otherwise take administrative or civil action against any of the Released Entities for any and all Released Industrial Sites Claims. To the full extent of the Attorney General's and other Settling Plaintiffs' authority under the law to release the Released Industrial Sites Claims, the foregoing release shall apply to (i) the State (including its departments, agencies, authorities, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, including the Attorney General and county prosecutors, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing); (ii) all Political Subdivisions, but only to the full extent of the Attorney General's and the Settling Plaintiffs' power and authority under New Jersey law to release such claims; and (iii) any Person or entity acting or purporting to act in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity (whether or not such Person or entity signs this JCO or participates in the JCO process set forth in Section XVI) seeking relief on behalf of or generally applicable to the general public in the State or the people of the State (Settling Plaintiffs and all persons and entities in clauses (i), (ii), and (iii), collectively, the "Industrial Sites Releasors"). The releases of Released Industrial Sites Claims provided for in this JCO (individually and collectively, the "Industrial Sites Release") extend to Released Industrial Sites Claims that Settling Plaintiffs do not know or suspect to exist in their favor as of the JCO Entry Date, regardless of whether they could have materially affected the terms of this JCO. It is the intention of this JCO that the definition of "Industrial Sites

Release" be as broad, expansive, and inclusive as possible, so as to give the Released Entities the broadest possible bar against Released Industrial Sites Claims and extend to the full extent of the power of the Attorney General and the other Settling Plaintiffs to release Released Industrial Sites Claims, to the maximum extent allowable by law. This JCO shall be a complete bar to any Released Industrial Sites Claim.

50. *Statewide PFAS Release and Covenant Not to Sue.* As of the Effective Date, in consideration of this JCO, the Statewide PFAS Releasors, acting through and by the Attorney General and on behalf of the State and all executive and administrative offices, departments, agencies, authorities, and instrumentalities of the State government, and acting in all of the Settling Plaintiffs' capacities as described in Paragraph EE, on behalf of and for the benefit of all the State's Political Subdivisions, citizens, and residents, fully and forever release all Released Entities from all Released Statewide PFAS Claims and fully discharge all Released Statewide PFAS Claims against all Released Entities. The statewide releases provided for in this JCO (individually and collectively, the "Statewide PFAS Release") extend to Released Statewide PFAS Claims that the Statewide PFAS Releasors do not know or suspect to exist in their favor as of the Effective Date, regardless of whether they could have materially affected the terms of this JCO. It is the intention of this JCO that the definition of "Statewide PFAS Release" be as broad, expansive, and inclusive as possible, so as to give the Released Entities the broadest possible bar against any liability in any way arising from, based on, involving, or caused by any Covered PFAS Conduct or Covered PFAS Harm and extend to the full extent of the power of the State, the Governor, and the Attorney General to release PFAS Claims, to the maximum extent allowable by law. This JCO shall be a complete bar to any Released Statewide PFAS Claim. By the State exercising its authority and the Court entering this JCO, any Released Statewide PFAS Claim (regardless of the identity of the

Person asserting the Released Statewide PFAS Claim) arising from, based on, involving, or caused by PFAS in Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's jurisdiction and any Released Statewide PFAS Claim asserted by a Government Entity of the State or of any of the State's Political Subdivisions against any Released Entity in any way arising from, based on, involving, or caused by any Covered PFAS Conduct or Covered PFAS Harm is released, barred, and precluded, but only to the full extent of the Attorney General's and Settling Plaintiffs' power and authority under New Jersey law to release such claims.

51. The Releases and Covenants Not To Sue described in Paragraphs 49 and 50 extend only to the Settling Defendants and the Released Entities, respectively, and not to any other Person.

52. The Releases and Covenants Not To Sue described in this Section XI do not pertain to any matters other than those expressly stated.

53. *Dismissals*. Within 5 Days of the Settling Plaintiffs' receipt of the Initial Payment: (i) the Settling Plaintiffs shall file a motion for Dismissal of the Chambers Works Litigation, the Pompton Lakes Litigation, the Parlin Litigation, and the Repauno Works Litigation as to the Settling Defendants pursuant to Federal Rule of Civil Procedure 41(a)(2); (ii) the Settling Plaintiffs shall file a motion for Dismissal of the AFFF Litigation as to the Settling Defendants pursuant to Federal Rule of Civil Procedure 41(a)(2); and (iii) the Department shall withdraw and close the Statewide PFAS Directive, the 2017 Chambers Works Directive, and the Pompton Lakes Works Directive as to Settling Defendants. To the extent necessary to avoid any further non-settlement related proceedings in the Litigations, the Parties shall seek a stay of non-settlement related proceedings involving Settling Defendants in the Litigations pending the filing of the Dismissals.

## XII. RESERVATIONS AND FUTURE LITIGATION

54. *Delaware Estuary Claims*. A portion of the Settlement Payments for Natural Resource Damages arising out of or relating to Discharges at or from the Chambers Works Site and the Repauno Works Site will be applied to restoration of the State of New Jersey's trust resources within the Delaware Estuary, including the Delaware River and/or Delaware Bay ("Delaware Estuary Restoration Projects"). The Delaware Estuary Restoration Projects will be designed to benefit Natural Resources held in trust by the State of New Jersey, but the Parties recognize that Natural Resources held jointly or alone by other tribal, state, and/or federal trustees (the "Other Delaware Estuary Trustees") will likely benefit from the Delaware Estuary Restoration Projects. However, nothing in this JCO shall be construed as releasing any Delaware Estuary Claims to the extent such claims belong to any Other Delaware Estuary Trustees.

55. Nothing in this JCO shall be construed as precluding the Settling Plaintiffs from taking any action permitted by law that they deem necessary or appropriate to protect public health and safety and the environment, and to enforce the environmental laws of the State, to the extent those actions are not inconsistent with this JCO or any resolution of liability effected hereby. For the avoidance of doubt, no action or enforcement that any Settling Plaintiff takes pursuant to this Paragraph 55 can alter in any way the Dismissals, the Releases, the Covenants Not to Sue, or any other provision of this JCO.

56. *Acknowledgement of Continuing Remediation Obligations*. Notwithstanding anything else to the contrary in this JCO, the Dismissals, the Releases, and the Covenants Not To Sue with respect to Released Industrial Sites Claims and Released Statewide PFAS Claims do not relieve any Settling Defendant or any Released Entity of their obligations to perform and/or fund Remediation at and from the Industrial Sites in accordance with federal and State statutes, regulations, and guidance as they exist now or in the future. Further, for the avoidance of doubt,

this JCO does not relieve any Settling Defendant or any Released Entity of any obligations that may exist under federal and State statutes, regulations, and guidance to perform and/or fund Remediation at or from any other sites currently or formerly owned, operated, or otherwise controlled by any of the Settling Defendants or any Released Entity anywhere within the State of New Jersey.

57. The Settling Defendants understand and acknowledge that the PRCRs' and EIDP's failure to comply with their Remediation obligations at the Industrial Sites may give rise to enforcement and liability pursuant to federal or state law.

58. Nothing in the JCO shall limit the Department's right or ability to seek to have the Settling Defendants or Released Entities take any action consistent with the Department's powers and authorities to evaluate, minimize, control, or eliminate Discharges, including Industrial Sites Discharges or any other Discharge within the State, that occur after the JCO Entry Date.

59. Nothing in this JCO shall be construed as releasing any of the Settling Defendants or any Released Entity for any Claims for non-PFAS Contamination at or from any New Jersey sites other than the Industrial Sites where Settling Defendants or any Released Entity by contract, agreement, or otherwise arranged for disposal or treatment of such non-PFAS Contaminants, or arranged with a transporter for transport for disposal or treatment of such non-PFAS Contaminants.

60. The Settling Plaintiffs reserve, and this JCO is without prejudice to, all rights against the Settling Defendants and Released Entities concerning all matters not addressed in this JCO, including but not limited to applicable State and federal laws and regulatory requirements, including permitting.

61. The Settling Defendants reserve, and this JCO is without prejudice to, all rights against the Settling Plaintiffs and defenses to actions brought by the Settling Plaintiffs against any of the Settling Defendants concerning all matters not addressed in this JCO.

62. Except as otherwise set forth in this JCO, nothing in this JCO shall waive or impair any rights or defenses that the Settling Defendants or the Settling Plaintiffs may have.

63. Notwithstanding anything else to the contrary in this JCO, nothing in this JCO alters or releases the existing obligations of the Settling Defendants in any existing agreement with third parties for testing, treatment, or Remediation of Contaminants, including but not limited to PFAS.

64. Nothing in this JCO shall be construed, nor is intended by the Parties, to limit the right of any Class-Member Public Water System to obtain its designated recovery under the Public Water System Class Settlement.

65. Nothing in this JCO shall be construed to release any Claim concerning any sites that have been owned, operated, or otherwise controlled by any of the Settling Defendants or any Released Entity, including the Industrial Sites, that arises solely from conduct by one or more of the Settling Defendants or Released Entities that occurs entirely after the JCO Entry Date.

66. The Settling Plaintiffs reserve, and this JCO is without prejudice to, all rights against the Settling Defendants and Released Entities for any criminal liability.

## XIII. CONTRIBUTION PROTECTION

67. The Parties agree and the Court finds that this JCO meets the requirements for providing protection to Settling Defendants from contribution actions under CERCLA, the Spill Act, the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -61, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to-5.8, the Uniform Contribution Among Joint Tortfeasors Act, and any similar state law or doctrine that reduces or discharges a released party's liability to any other Persons.

68. The Parties further agree and the Court by entering this JCO intends that Claims by Releasors against Non-Released Entities should not result in additional payments by Released Entities for the Released Claims, whether through contribution, indemnification, or any other means.

69. This JCO constitutes a good-faith settlement of the Released Claims against the Released Entities. The Releasors stipulate that they give all Dismissals, the Releases, and the Covenants Not To Sue provided in this JCO in good faith pursuant to the State's Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -61. The Parties further stipulate that this JCO and the Dismissals, the Releases, and the Covenants Not To Sue provided herein were entered into in good faith based upon arm's-length negotiation among the Parties and their counsel. The Parties further stipulate that the Dismissals, the Releases, and the Covenants Not To Sue provided in this JCO are intended to and shall serve as a bar to all cross-claims, counterclaims, and complaints for contribution which have been brought or may be brought against the Released Entities arising from, based on, involving, or caused by the Released Claims.

70. Upon entry by the Court, this JCO shall constitute a judicially approved settlement within the meaning of N.J.S.A. 58:10-23.11f.a(2)(b) and section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and a final judgment in the Litigations with respect to Settling Defendants (but not as to other defendants) for purposes of providing Settling Defendants protection from contribution actions and contribution Claims for "matters addressed" in this JCO (collectively, the "Contribution Claims"), all to the maximum extent provided for in N.J.S.A.58:10-23.11f.a.(2)(b) and 42 U.S.C. § 9613(f)(2). The "matters addressed" in this JCO are all the Released Claims. To the maximum extent allowable by law, Settling Defendants shall not be liable for Contribution

Claims, including under N.J.S.A. 58:10-23.11f.a(2)(a), 42 U.S.C. § 9613(f), and 42 U.S.C. § 9622(h)(4).

71. The Settlement Payments made under this JCO shall be the sole payment made by the Released Entities to the Releasors for the Released Claims.

72. This JCO will resolve the liability of Settling Defendants to Settling Plaintiffs for the purpose of providing contribution protection to Settling Defendants and other Released Entities from contribution actions under CERCLA, the Spill Act, the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-l to -61, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, or any other statute, regulation, order, or common-law principle related to the causes of action that were or could have been pleaded in the Litigations or the Spill Act Directives or matters addressed in this JCO. The Parties agree and the Court by entering this JCO finds that Settling Defendants are entitled to protection from contribution actions pursuant to section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), the Spill Act, N.J.S.A. 58:10-23.11f.a.(2)(b), and any other statute, regulation, order, or common-law principle that provides contribution rights against any Released Entity with regard to the subject matter of the Litigations or the Spill Act Directives or the matters addressed in this JCO. In any action in which a Non-Released Entity asserts a Claim against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory seeking to recover any amounts paid by or awarded against that Non-Released Entity by way of settlement, judgment, or otherwise on any Released Claims (a "Claim-Over"), Settling Plaintiffs shall use best efforts to support any Released Entity's assertion that the Released Entities have paid through this JCO their equitable share of damages.

73. To the extent that, on or after the JCO Entry Date, any Releasor enters into a settlement with a Non-Released Entity to resolve a Claim that would be a Released Claim if

brought against a Released Entity (a "Non-Party Settlement"), including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on Claim-Over or a release from such Non-Released Entity in favor of the Released Entities (that is equivalent in nature and scope to the Releases contained in this JCO) of any Claim-Over.

74. Settling Defendants expressly reserve all rights, including any right to indemnification and contribution (including indemnification and contribution pursuant to an insurance contract for Settling Defendants' payment obligations under this JCO), defenses, Claims, demands, and causes of action that Settling Defendants may have concerning any matter, transaction, or occurrence, whether or not arising out of the subject matter of the Litigations or the Spill Act Directives, against any Person not a Party to this JCO, with the following exceptions:

a. No Settling Defendant or Released Entity shall seek contribution from 3M to recover any amount paid pursuant to this JCO unless 3M has filed against any Settling Defendant or Released Entity a Claim, a Claim-Over, or a Contribution Claim.

b. No Settling Defendant or Released Entity shall seek contribution to recover any amount that Settling Defendants have paid pursuant to this JCO from any Releasor, from any Government Entity of the State or of any of the State's Political Subdivisions, or from any Non-Released Entity that pursuant to this JCO has fully and forever released all Released Entities from all Released Claims, provided, however, that if, notwithstanding this Paragraph 74.b, such a Non-Released Entity brings a Claim, Claim-Over, or contribution action against a Released Entity, Settling Defendants expressly reserve all

rights to seek contribution to recover as an offset from such Non-Released Entity any amount that Settling Defendants has agreed to pay pursuant to this JCO.

75. If any Releasor obtains a judgment with respect to Released Claims that does not contain a prohibition like that described in Paragraph 73, or any Releasor files a Claim relating to the foregoing against a Non-Released Entity in bankruptcy, or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Paragraph 73, and such Non-Released Entity asserts a Claim-Over against a Released Entity, the Settling Defendants shall take the following actions to ensure that the Released Entities do not pay more with respect to Released Claims to Releasors or to Non-Released Entities than the amounts owed by the Settling Defendants under this JCO:

a. Settling Defendants shall notify that Releasor of the Claim-Over within 60 Days after the assertion of the Claim-Over or 60 Days after the JCO Entry Date, whichever is later;

b. Settling Defendants and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that they are not required to pay more with respect to Released Claims than the amounts owed by Settling Defendants under this JCO; and

c. That Releasor and Settling Defendants shall take steps sufficient and permissible under the law of the State to hold Released Entities harmless from the Claim-Over and ensure that Released Entities are not required to pay more with respect to Released Claims than the amounts owed by Settling Defendants under this JCO. Settling Plaintiffs must use best efforts to support the Released Entities' efforts to enforce their

Claim-Over rights against that Releasor and to support all of the following steps. Such steps may include, where permissible:

i. Filing of motions to Dismiss or such other appropriate motion by any Released Entity, and supported by Releasors, in response to any Claim filed in litigation or arbitration;

ii. Reduction of that Releasors' Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

iii. Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

iv. Return of monies paid by Settling Defendants to that Releasor to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

v. Payment of monies to Settling Defendants by that Releasor to ensure that Released Entities are held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity; and

vi. Such other actions as that Releasor and Settling Defendants may devise to hold any Released Entity harmless from the Claim-Over.

d. The actions of that Releasor and Settling Defendants taken pursuant to Paragraph 75.c must, in combination, ensure that the Released Entities are not required to

pay more with respect to the matters addressed in this JCO than the amounts owed by Settling Defendants under this JCO.

e. In the event of any dispute over the sufficiency of the actions taken by Settling Plaintiffs pursuant to Paragraph 75.c, Settling Plaintiffs and Settling Defendants may seek review by this Court. If this Court's actions do not result in Released Entities being held harmless in accordance with the protections of the JCO, Settling Defendants shall have a claim for breach of this JCO by the Settling Plaintiffs.

## XIV. NO FINDING OR ADMISSION OF LIABILITY

76. This JCO shall not be used as evidence in any other litigation or future proceedings other than (a) in a proceeding to enforce the terms hereof; or (b) any other proceeding involving the contribution protections provided by this JCO.

77. No part of this JCO, nor the JCO as a whole, nor any activity taken by any Settling Defendant pursuant to this JCO, shall constitute, nor shall be interpreted or used as, an admission of wrongdoing, fault, liability, law, or fact, nor shall this JCO or any Section or Paragraph thereof be admissible in any proceeding or hearing as an admission, except to the extent necessary for a Settling Defendant, a Released Entity, or a Settling Plaintiff to enforce a provision of this JCO or to establish the scope of the release or contribution protection provisions of this JCO.

## XV. EFFECT OF SETTLEMENT

78. The Parties agree and the Court by entering this JCO finds that the Settlement Payments set forth in Paragraph 7 and Exhibit A fully satisfy the Settling Defendants' share of payments for the Released Claims.

79. The Parties agree and the Court by entering this JCO finds that the Settling Defendants' payments set forth in Paragraph 7 and Exhibit A are not intended to and do not

extinguish the Settling Plaintiffs' Claims against any other party, other than Settling Defendants and the Released Entities.

80. Nothing in this JCO shall be construed, nor is intended by the Parties, to limit in any way the liability of any Person that is not a Settling Defendant or a Released Entity.

81. Nothing in this JCO shall be construed, nor is intended by the Parties, to create any rights in, or to grant any cause of action to, any Person not a Party to, or not a Released Entity under, this JCO. The preceding sentence shall not be construed to waive or nullify any rights that any Person not a Party to this JCO may have under applicable State or federal law.

82. Based on the terms of the JCO, the Court finds that the Settlement Payments together with the other financial commitments made by the Settling Defendants in this JCO resolve Claims relating to the Chambers Works Site for a value exceeding $435,000,000.

83. The Parties intend, and this Court finds, that the Releases in the JCO resolve, release and bar Claims, including to the extent applicable by res judicata, brought by Carneys Point Township that seek to recover for the same or materially similar relief that Settling Plaintiffs are releasing in the JCO, and specifically including Carneys Point's Environmental Rights Act Claims and all Claims within the scope of the Released Claims with respect to the Chambers Works Site (or that would be within the scope of the Released Claims if asserted by Settling Plaintiffs). Based on this, upon entry of this JCO, Settling Plaintiffs and the Settling Defendants will seek an order promptly dismissing the following litigation currently pending in the New Jersey court: *Carneys Point Twp. v. E.I. du Pont de Nemours et al.*, Salem County Superior Court Docket No. SLM-L-251-16, Appeal Docket No. A-002427-24. The Parties will reasonably cooperate to seek dismissal of, or otherwise address, any other Claims brought by Carneys Point Township that are resolved, released, and barred by this JCO.

## XVI. JUDICIAL CONSENT ORDER PROCESS

84. This JCO has been subject to public notice and comment as required by Paragraphs 85 through 89.

85. In accordance with N.J.S.A. 58:10-23.11e2, Settling Plaintiffs published in the *New Jersey Register* and on the Department's website the names of the Litigations and the Spill Act Directives, the names of the Parties to this proposed JCO, the location of the properties on which the Department had notice at the time of the publication that Discharges had occurred, and a summary of the terms of this proposed JCO, including the amount of monetary payments to be made. The Department provided written notice of this proposed JCO, including the information listed above, to other parties in the Litigations and to other potentially responsible parties of whom the Department had notice at the time of the publication.

86. Plaintiffs also published a copy of this proposed JCO on the Department's website and arranged for notice to certain known interested persons, as described in this Section XVI.

87. In addition to the contents described in Paragraph 85, Plaintiffs' notices explained that a copy of this proposed JCO was available on the Department's website, explained that there were 60 Days to comment on this proposed JCO, and summarized this proposed JCO's res judicata effects as an enforceable, binding final judgment that will preclude certain Claims in future litigation.

88. In addition to fulfilling the requirements of N.J.S.A. 58:10-23.11e2, the Department transmitted a copy of the notice described in Paragraph 85 to:

a. Its primary contacts for all counties and municipalities within the State;

b. Counsel for (i) all plaintiffs (including plaintiff-intervenors) residing in the State (except for those bringing PFAS Claims only for PFAS Personal Injury or for PFAS Property Damage) and all defendants (including defendant-intervenors) in the AFFF

Litigation, (ii) all respondents to the Spill Act Directives; and (iii) to the extent that Settling Defendants identified them and provided the Department with contact information for them, all plaintiffs in PFAS-related cases pending against Settling Defendants at the time of the publication described in Paragraph 85 in any State or federal court in New Jersey; and

c. Other known interested Persons to whom written notice of the 3M JCO was distributed to by the Department.

89. The Parties also provided written notice of this proposed JCO by:

a. Settling Defendants publishing notice in each of the following newspapers, in print or, where such newspaper is digital-only, digitally: Asbury Park Press, Atlantic City Press, Bergen Record, Burlington County Times, Courier Post, New Jersey Herald; South Jersey Times, and Star Ledger; and

b. The Department publishing a copy of the *New Jersey Register* notice on the Contaminated Site Remediation and Redevelopment Program's website and the Office of Natural Resource Restoration's website, which the public can access at http://www.nj.gov/dep/srp/legal/ and https://dep.nj.gov/nrr/proposed-settlements/, respectively.

90. The notice described in this Section XVI is deemed compliant with the notice requirement of N.J.S.A. 58:10-23.11e2.

91. Upon conclusion of the 60-Day comment period set forth in Paragraph 87, the Department notified Settling Defendants that:

a. the Department received no comments that disclosed facts or considerations that indicated to the Department, in its sole discretion, that this JCO was inappropriate, improper, or inadequate; or

b. the Department received comments that disclosed facts or considerations that indicated to the Department, in its sole discretion, that this JCO required amendment or was inappropriate, improper, or inadequate.

92. If, as set forth in Paragraph 91.b, the Department notified Settling Defendants that it believed this JCO required amendment or should be voided, the Department provided Settling Defendants with (i) the specifics of those draft amendments and a revised version of this JCO incorporating the amendments or (ii) a notification that the Department had determined preliminarily that this JCO should be voided. Settling Defendants had an opportunity to respond to the Department's revised version of this JCO incorporating the amendments or to the Department's preliminary determination that this JCO should be voided, and the Department considered Settling Defendants' response with respect to the amended JCO or objections to the Department's preliminary determination that this JCO should be voided. The Department did not make any final decision that this JCO should be voided until the Department worked in good faith with Settling Defendants to address the public comments that the Department received.

## XVII. GENERAL PROVISIONS

93. This JCO will constitute the final, complete, and exclusive agreement and understanding between the Settling Plaintiffs and the Settling Defendants with respect to the settlement embodied in this JCO. The Settling Plaintiffs and the Settling Defendants agree and acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those that are expressly contained in this JCO. The Settling Plaintiffs and

the Settling Defendants agree not to disclose any draft of this JCO or any drafts of its Exhibits except pursuant to valid legal process or if required by a court of competent jurisdiction.

94. This JCO shall be governed and interpreted under the laws of the State of New Jersey, without regard to conflict-of-law principles.

95. This JCO shall be binding on the Settling Defendants, their successors, assignees, and any trustee in bankruptcy or receiver appointed pursuant to a proceeding in law or equity.

96. *Dispute Resolution*. Except as provided below and in Paragraph 16 with respect to resolution by the LSRP Panel of Disputed Scope and/or Costs in connection with the Year One RFS, any dispute between the Parties arising out of, based on, or involving this JCO shall be submitted to mediation on an expedited basis before a retired Judge of a New Jersey State Court or New Jersey Federal Court mutually agreed upon by the Parties. To the extent such mediation is unsuccessful within 90 Days, any Party may seek a judicial resolution of the dispute from this Court. In such an event, the terms of this JCO shall be interpreted in accordance with the standards governing the interpretation of contracts under the laws of the State of New Jersey. However, disputes with respect to the actual performance of Remediation at or from the Industrial Sites shall not be subject to this dispute resolution provision, and any such disputes will be resolved in accordance with applicable State and federal law, regulations, and court rules. Nothing herein prohibits the Parties from agreeing to mediate any disputes concerning the actual performance of Remediation at or from the Industrial Sites.

97. The Parties agree, upon entry of this JCO, not to contest the terms of this JCO, except that the Parties do not waive their rights to contest the interpretation or application of such terms in an action or proceeding brought to enforce this JCO pursuant to the dispute resolution process provided for in Paragraph 96.

98. Nothing in this JCO shall be deemed to constitute preauthorization of a claim against the Spill Fund within the meaning of N.J.S.A. 58:10-23.11k. or N.J.A.C. 7:1J.

99. If, following the Effective Date, any provision of this JCO is construed by a different court in a different matter (*i.e.*, not on an appeal of the approval of this JCO, which will be subject to Paragraph 7.b) to be invalid or unenforceable (a) the Parties shall negotiate in good faith to the extent it may be necessary to modify any such provision to ensure its validity and enforceability, with such provision to be as similar in substance and in terms as the prior provision as may be possible and (b) the remainder of this JCO or the application of such provision to Persons or circumstances other than those as to which it is construed invalid or unenforceable shall not be affected thereby, and each provision of this JCO shall remain valid and be enforced to the maximum extent allowable by law.

100. The Parties agree that this JCO was negotiated fairly between the Parties at arm's length and that the terms of this JCO shall be deemed to have been jointly and equally drafted by them, and that no provision of this JCO therefore should be construed against any Party on the grounds that the Party drafted, or was more responsible for drafting, the provision.

## XVIII. RETENTION OF JURISDICTION

101. This Court retains jurisdiction over both the subject matter of this JCO and the Parties for the duration of the performance of the terms of this JCO for the purpose of enabling any Party to apply to the Court, subject to the dispute resolution requirements set forth in Paragraph 96, at any time for such further order, direction, or relief as may be necessary or appropriate for the construction, interpretation, or modification of this JCO, or to effectuate or enforce compliance with this JCO's terms.

## XIX. COOPERATION AND DOCUMENT RETENTION

102. Settling Plaintiffs shall cooperate fully with Settling Defendants, Settling Defendants' agents, and Settling Defendants' counsel by providing Settling Defendants with any non-privileged, non-work-product-protected documents, data, communications, or information that Settling Defendants deem necessary to any insurance-recovery effort or tax-related filings. Settling Plaintiffs shall identify the allocation of Settlement Payments to (1) amounts constituting restitution or remediation within the meaning of IRS Code section 162(f)(2)(A) and (2) amounts not constituting restitution or remediation within the meaning of IRS Code section 162(f)(2)(A). Each of Settling Plaintiffs (i) will timely file IRS Forms 1098-F (or other required information return) and timely deliver a notice in accordance with Treas. Reg. section 1.6050X-1(c), in each case with respect to each Settling Defendant and prepared consistent with the terms of this JCO, including reporting all amounts paid under this JCO, other than the amount referenced in Paragraphs 7.c.iii and 11, as "Restitution/remediation amount" in Box 3 thereof, and (ii) will cooperate with the Settling Defendants as reasonably necessary for the Settling Defendants to establish the statements in Paragraph 12, including as contemplated by Treas. Reg. section 1.162-21(b)(3)(ii).

103. The Settling Defendants agree not to oppose or interfere in any way with the Court's approval of the 3M JCO.

104. The Parties will cooperate in good faith to carry out (i) the terms of this JCO, including the scope of the Releases and (ii) the ongoing permitting and Remediation actions at the Industrial Sites, including with applications for necessary licenses or permits (and renewals thereof) for manufacturing activities in relevant existing manufacturing locations. The Parties will provide reasonable assistance with the administration of the JCO and will aid in any public-notice requirements as set forth in Section XVI.

## XX. MODIFICATION

105. This JCO or any provision of this JCO may be modified or waived only by written agreement duly executed by all Parties and approved by the Court.

106. Nothing in this JCO shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this JCO.

## XXI. ENTRY OF THIS JCO

107. The Settling Defendants have consented to the entry of this JCO without further notice after the comment period specified in Paragraph 87.

108. So long as the Settling Plaintiffs do not receive public comments that disclose facts or considerations that indicate to Settling Plaintiffs, in their sole discretion, that the JCO is inappropriate, improper, or inadequate, upon conclusion of the Settling Plaintiffs' review of any public comments received as a result of the notice described in Paragraphs 85 through 89 above, Plaintiffs shall promptly submit this JCO to the Court for entry.

109. Upon entry of this JCO by the Court, this JCO constitutes a final judgment under Federal Rules of Civil Procedure 54 and 58 among the Parties.

110. If for any reason the Court should decline to approve this JCO in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation among the Parties or third parties.

## XXII. SIGNATORIES/SERVICE

111. Each undersigned representative of each Party certifies that he or she is fully authorized to enter into the terms of this JCO and to execute and legally bind such Party to this JCO.

112. This JCO may be signed and dated in any number of counterparts, each of which shall be an original, and such counterparts shall together be one and the same JCO.

113. Any Party may execute this JCO by having its duly authorized signatory sign his or her name on the designated signature block below and transmitting that signature page electronically to counsel for all Parties. Any signature made and transmitted electronically for the purpose of executing this JCO shall be deemed an original signature for purposes of this JCO and shall be binding upon the Party transmitting the signature electronically.

## XXIII. NOTICES UNDER THIS JCO

114. Except as otherwise provided herein, any notices or other documents required to be sent to any Party pursuant to this JCO shall be sent by email as well as a hard copy by United States Mail, Certified Mail Return Receipt requested, or other nationally recognized courier service that provides for tracking services and identification of the Person signing for the document. The notices or documents shall be sent to the following addresses:

For the Division of Law:

Gary Wolf
Section Chief
Division of Law
Department of Law and Public Safety
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Gary.Wolf@law.njoag.gov

For the Department and the Commissioner:

Kimberly Cahall
Chief Advisor and Chief Enforcement Officer
Legal, Regulatory, and Enforcement Policy
New Jersey Department of Environmental Protection
401 East State Street
Trenton, New Jersey 08625
Kimberly.Cahall@dep.nj.gov

For the Administrator:

David E. Haymes
Administrator
Spill Compensation Fund
New Jersey Department of Environmental Protection
ECA/Spill Fund
Mail Code: 401-06J
P.O. Box 420
Trenton, NJ 08625-0420
David.Haymes@dep.nj.gov

For the Department, with respect to the CRACO:

Stacey MacEwan
Manager
Office of Natural Resource Restoration
New Jersey Department of Environmental Protection
Mail Code: 501-03
P.O. Box 420
Trenton, NJ 08625-0420
stacey.macewan@dep.nj.gov

For DCA:

Gregory K. Turner
Assistant Deputy of Enforcement
Office of Consumer Protection, Division of Consumer Affairs
124 Halsey Street
PO Box 45025
Newark, NJ 07101
TurnerG@dca.njoag.gov

For Chemours and Chemours FC:

The Chemours Company
Office of the General Counsel
1007 Market Street
Wilmington, DE 19801
Attn: Kristine M. Wellman
kristine.m.wellman@chemours.com

With a copy to:

Graham W. Meli

JB Kelly
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
gwmeli@wlrk.com
jbkelly@wlrk.com

For New DuPont and DuPont Specialty Products:

DuPont de Nemours, Inc.
974 Centre Rd.
Wilmington, DE 19806
Attn: Erik T. Hoover
erik.t.hoover@dupont.com

With a copy to:

Bradley H. Weidenhammer, P.C.
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
bweidenhammer@kirkland.com

For Corteva:

Corteva Inc.
974 Centre Road
Building 735
Wilmington, DE 19805
Attn: Cornel B. Fuerer
cornel.b.fuerer@corteva.com

With a copy to:

Michael T. Reynolds
Cravath, Swaine & Moore LLP
375 Ninth Avenue
New York, NY 10001
mreynolds@cravath.com

For EIDP:

EIDP, Inc.
974 Centre Road
Building 735
Wilmington, DE 19805
Attn: Thomas A. Warnock
thomas.a.warnock@corteva.com

With a copy to:

Michael T. Reynolds
Cravath, Swaine & Moore LLP
375 Ninth Avenue
New York, NY 10001
mreynolds@cravath.com

**SO ORDERED** this 7th day of August :

Renée Marie Bumb
The Honorable Renée Marie Bumb
Chief United States District Judge

THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE NEW JERSEY COMMISSIONER OF ENVIRONMENTAL PROTECTION CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Kimberly Cahall
Chief Enforcement Officer
New Jersey Department of Environmental Protection

Dated: November 21, 2025

NEW JERSEY SPILL COMPENSATION FUND CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
David E. Haymes, Administrator
New Jersey Spill Compensation Fund

Dated: , 2025

NEW JERSEY DIVISION OF CONSUMER AFFAIRS AND ITS DIRECTOR CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Elizabeth M. Harris, Acting Director
New Jersey Division of Consumer Affairs

Dated: , 2025

THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE NEW JERSEY COMMISSIONER OF ENVIRONMENTAL PROTECTION CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Kimberly Cahall
Chief Enforcement Officer
New Jersey Department of Environmental Protection

Dated: November 21, 2025

NEW JERSEY SPILL COMPENSATION FUND CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
David E. Haymes, Administrator
New Jersey Spill Compensation Fund

Dated: 11/21, 2025

NEW JERSEY DIVISION OF CONSUMER AFFAIRS AND ITS DIRECTOR CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Elizabeth M. Harris, Acting Director
New Jersey Division of Consumer Affairs

Dated: , 2025

THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE NEW JERSEY COMMISSIONER OF ENVIRONMENTAL PROTECTION CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Kimberly Cahall
Chief Enforcement Officer
New Jersey Department of Environmental Protection

Dated: November 21, 2025

NEW JERSEY SPILL COMPENSATION FUND CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
David E. Haymes, Administrator
New Jersey Spill Compensation Fund

Dated: , 2025

NEW JERSEY DIVISION OF CONSUMER AFFAIRS AND ITS DIRECTOR CONSENT TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Elizabeth M. Harris, Acting Director
New Jersey Division of Consumer Affairs

Dated: November 21, 2025

**Matthew J. Platkin**
**Attorney General of New Jersey**
*Attorney for Plaintiffs and Division of Consumer Affairs*

By: Gwen Farley
Gwen Farley, Esq.
Deputy Attorney General

Dated: 11/21, 2025

THE CHEMOURS COMPANY CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________

Dated: , 2025

THE CHEMOURS COMPANY FC, LLC CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________

Dated: , 2025

DUPONT DE NEMOURS INC. CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________

Dated: , 2025

**Matthew J. Platkin**
**Attorney General of New Jersey**
*Attorney for Plaintiffs and Division of Consumer Affairs*

By: ________________________________
Gwen Farley, Esq.
Deputy Attorney General

Dated: November 21, 2025

THE CHEMOURS COMPANY CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ________________________________
Kristine M. Wellman
Senior Vice President, General Counsel and Corporate Secretary

Dated: November 21, 2025

THE CHEMOURS COMPANY FC, LLC CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ________________________________
Kristine M. Wellman
Senior Vice President and General Counsel

Dated: November 21, 2025

DUPONT DE NEMOURS INC. CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ________________________________
Erik T. Hoover
Senior Vice President and General Counsel

Dated: November 21, 2025

**Matthew J. Platkin**
**Attorney General of New Jersey**
*Attorney for Plaintiffs and Division of Consumer Affairs*

By: ______________________________
Gwen Farley, Esq.
Deputy Attorney General

Dated: November 21, 2025

THE CHEMOURS COMPANY CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Kristine M. Wellman
Senior Vice President, General Counsel and Corporate Secretary

Dated: November 21, 2025

THE CHEMOURS COMPANY FC, LLC CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Kristine M. Wellman
Senior Vice President and General Counsel

Dated: November 21, 2025

DUPONT DE NEMOURS INC. CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Erik T. Hoover
Senior Vice President and General Counsel

Dated: November 21, 2025

CORTEVA, INC. CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Cornel B. Fuerer
Senior Vice President, Strategic Advisor and Corporate Secretary

Dated: November 21, 2025

EIDP, INC. (F/K/A E. I. DU PONT DE NEMOURS AND COMPANY) CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Thomas A. Warnock
Vice President, Deputy General Counsel, Chief of Litigation

Dated: November 21, 2025

DUPONT SPECIALTY PRODUCTS USA, LLC CONSENTS TO THE FORM AND ENTRY OF THIS ORDER

By: ______________________________
Erik T. Hoover
Senior Vice President and General Counsel

Dated: November 21, 2025

# EXHIBIT A

**EXHIBIT A**
**Settlement Payments Schedule**

This Settlement Payments Schedule should be read in conjunction with the JCO, which explains the terms and conditions for the Settlement Payments described herein. All capitalized terms shall have the meanings set forth in the JCO.

| Year | Payment (except where otherwise indicated, all funds are to be allocated between Natural Resource Damages and Abatement Damages by the Department) |
|---|---|
| Year 1 | $200,000,000 (of which $100,000,000 is allocated to the Costs, Fees, and Punitive Damages Payment) |
| Year 2 | $75,000,000 (of which at least $25,000,000, plus no more than the Additional Fees and Costs Amount, is allocated to the Costs, Fees, and Punitive Damages Payment) |
| Year 3 | $45,000,000 |
| Year 4 | $40,000,000 |
| Year 5 | $40,000,000 |
| Year 6 | $20,000,000 |
| Year 7 | $20,000,000 |
| Year 8 | $20,000,000 |
| Year 9 | $20,000,000 |
| Year 10 | $45,000,000 |
| Year 11 | $20,000,000 |
| Year 12 | $20,000,000 |
| Year 13 | $20,000,000 |
| Year 14 | $20,000,000 |
| Year 15 | $20,000,000 |
| Year 16 | $25,000,000 |
| Year 17 | $25,000,000 |
| Year 18 | $25,000,000 |
| Year 19 | $25,000,000 |
| Year 20 | $25,000,000 |
| Year 21 | $25,000,000 |
| Year 22 | $25,000,000 |
| Year 23 | $25,000,000 |
| Year 24 | $25,000,000 |
| Year 25 | $25,000,000 |
| **Total:** | $875,000,000 |

# EXHIBIT B

**ESCROW AGREEMENT**

THIS ESCROW AGREEMENT (this "Agreement") is entered into as of [●], by and among EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP"), Corteva, Inc. ("Corteva"), DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) ("DuPont"), DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), The Chemours Company ("Chemours"), The Chemours Company FC, LLC ("Chemours FC") (EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours and Chemours FC, each referred to individually as a "Settling Defendant" and collectively as the "Settling Defendants"), the New Jersey Department of Environmental Protection (the "Settling Plaintiff") (Settling Plaintiff and Settling Defendants each referred individually as a "Party" and collectively as the "Parties"), and JPMorgan Chase Bank, N.A. ("Escrow Agent").

WHEREAS, Settling Plaintiff and other plaintiffs have brought lawsuits against Settling Defendants in the United States District Court of the District of New Jersey (the "Court") in Case Nos. 1:19-cv-14758-RMB-JBC; 1:19-cv-14765-RMB-JBC; 1:19-cv-14766-RMB-JBC and 1:19-cv-14767-RMB-JBC (the "Lawsuits").

WHEREAS, Settling Plaintiff and other plaintiffs have agreed to settle the claims brought in the Lawsuits and other litigations with Settling Defendants as set forth in the Judicial Consent Order (together with the exhibits thereto, the "JCO"), which was lodged with the Court on [●], along with a motion seeking the Court's entry of the JCO. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the JCO.

WHEREAS, pursuant to the JCO, the Parties have agreed to deposit in escrow certain funds for the purpose of holding such funds pending an appeal(s) of the JCO (if any), and wish such deposit to be subject to the terms and conditions set forth herein.

WHEREAS, Escrow Agent has agreed to accept, hold and disburse the funds deposited with it and any earnings thereon in accordance with the terms of this Agreement and the JCO.

WHEREAS, the Parties acknowledge that (i) Escrow Agent is not a party to and has no duties or obligations under the JCO, (ii) all references in this Agreement to the JCO are solely for the convenience of the Parties and (iii) Escrow Agent shall have no implied duties beyond the express duties set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1. **Appointment of Escrow Agent**. The Parties hereby appoint Escrow Agent as their escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein. The Parties agree that this Agreement shall be the "escrow agreement" as referenced in the JCO and that the Escrow Account (as defined herein) shall be the "Escrow Account" as defined in the JCO.

2. **Deposit of Settlement Payments**. Settling Defendants agree to deposit with Escrow Agent, by wire transfer of immediately available funds, the following amounts:

(a) *Initial Payment*. At the time specified in the JCO, Settling Defendants shall deposit an aggregate amount of $200,000,000 (the "Initial Payment").

(b) *Annual Payments*. To the extent required by the JCO (*i.e.*, the JCO has yet to become final and non-appealable as of the date an Annual Payment becomes due), at the time or times specified therein, Settling Defendants shall deposit additional amounts, subject to any applicable adjustments specified in or prepayments allowed under the JCO (such additional amounts, the "Annual Payments", and collectively with the Initial Payment, the "Settlement Payments").

Each Settling Defendant shall deposit or cause to be deposited its share of the Settlement Payments in accordance with the terms of and proportions set forth in Paragraph 8 of the JCO and shall provide Escrow Agent written notice via email prior to making any such deposit. Upon the receipt of any deposit of a Settlement Payment or portion thereof, Escrow Agent hereby agrees to promptly notify the Parties of the same.

3. **Investment of Settlement Payments**. (a) Escrow Agent shall hold the Settlement Payments in one or more demand deposit accounts and shall invest and reinvest the Settlement Payments and all interest or other income thereof (the "Escrow Funds") in an interest bearing demand deposit account at JPMorgan Chase Bank, N.A., or a successor investment offered by Escrow Agent (the "Escrow Account"). Interest bearing demand deposit accounts have rates of compensation that may vary from time to time as determined by Escrow Agent. No other investment of the Settlement Payments will be permitted during the term of this Agreement.

(b) Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Escrow Account or the purchase, sale, retention or other disposition of any investment described herein, and each Party acknowledges that it was not offered any investment, tax or accounting advice or recommendation by Escrow Agent with regard to any investment and has made an independent assessment of the suitability and appropriateness of any investment selected hereunder for purposes of this Agreement. Escrow Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of an Authorized Representative (as defined herein) of the Parties to give Escrow Agent instructions to invest or reinvest the Escrow Funds. Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement.

4. **Tax Reporting and Payments**. The Parties hereby acknowledge that, for U.S. federal income tax purposes, the Escrow Funds shall be treated as owned by Settling Plaintiff. All amounts disbursed to any person other than Settling Plaintiff shall be treated (unless otherwise provided in a Joint Written Instruction (as defined herein)) as paid by Settling Plaintiff, and any interest or other income earned under this Agreement shall be allocated, reported, and treated by Escrow Agent as income earned by Settling Plaintiff. The Parties' agreement in this regard is based on their understanding that Settling Plaintiff is not likely to have to pay taxes due on any income earned under this Agreement. If, for whatever reason, that understanding proves incorrect, the Parties will confer regarding appropriate steps. Settling Plaintiff shall be responsible for all taxes due on any income earned under this Agreement. Escrow Agent shall be responsible for the delivery and filing of tax information reporting forms required to be delivered and filed with the Internal Revenue Service ("IRS") or other taxing authority, including IRS Form 1099 (or other appropriate form), in each case in accordance with this Section 4. Prior to the date hereof, the Parties shall provide Escrow Agent with certified tax identification numbers by furnishing fully executed forms W-9 or W-8, as applicable, and such other forms and documents that Escrow Agent may reasonably request as will permit payments to be made without withholding. Escrow Agent shall be responsible only for income reporting to the IRS with respect to income earned under this Agreement. Escrow Agent shall withhold any taxes on income earned under this Agreement required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities. Escrow Agent shall not be responsible for other tax withholding or information reporting pursuant to this Agreement, except as provided in this Section 4.

5. **Disposition and Termination.** (a) (i) Joint Written Instructions. Escrow Agent shall disburse all or any portion of the Escrow Funds promptly, and in any event within three (3) Business Days, following its receipt of and in accordance with joint written instructions, signed by an Authorized Representative from each of the Parties, in substantially the form of Exhibit A annexed hereto (a "Joint Written Instruction") or otherwise using Escrow Direct (as defined below). The Joint Written Instruction shall specify the amount(s) to be disbursed, the Party or Parties to whom such amount(s) are to be disbursed and detailed payment instructions (including wiring instructions) related to such disbursement. In accordance with the JCO, the Parties hereby agree to submit a Joint Written Instruction to Escrow Agent releasing all Escrow Funds (A) to Settling Plaintiff on the occurrence of the Effective Date (as defined in the JCO) or (B) to Settling Defendants if approval of the JCO is overturned, remanded, vacated, or modified on appeal such that the JCO is void, is of no effect, or is deemed by the Parties, exercising good faith, to be materially altered. For the avoidance of doubt, Escrow Agent has no responsibility whatsoever to determine whether the provisions of the JCO are satisfied prior to the release of Escrow Funds. Escrow Agent shall be entitled to conclusively rely upon Joint Written Instruction.

(ii) Final Order. Escrow Agent shall disburse all or any portion of the Escrow Funds promptly, and in any event within three (3) Business Days, following its receipt of a copy of a final, non-appealable order issued by a court of competent jurisdiction directing the release of all or a portion of the Escrow Funds (a "Final Order") accompanied by (A) a written certification from counsel for the Party providing such Final Order to Escrow Agent attesting that such Final Order is final and not subject to further proceedings or appeal and from a court of competent jurisdiction (as applicable) and (B) written instructions from an Authorized Representative of such Party instructing Escrow Agent to disburse all or a portion of the Escrow Funds in accordance with such Final Order. Escrow Agent shall be entitled to conclusively rely upon any such certification and instructions and shall have no responsibility to review the Final Order to which such certification and instructions refer or to make any determination as to whether such Final Order is final, not appealable and from a court of competent jurisdiction (as applicable).

(iii) Notwithstanding anything to the contrary, any Joint Written Instruction in any way related to the transfer or distribution of the Escrow Funds must, in order to be deemed delivered and effective, be in writing and executed by each of the Parties as evidenced by the signatures of the person or persons signing this Agreement or one of the designated persons as set forth on the Designation of Authorized Representatives attached hereto as Schedules 1-A, 1-B, 1-C, 1-D, 1-E, 1-F and 1-G (each, an "Authorized Representative"), and delivered to Escrow Agent only by facsimile (as evidenced by a confirmed transmittal to the applicable Party's or Parties' transmitting fax number) or as a Portable Document Format ("PDF") attached to an email only at the fax number or email address set forth in Section 10 below or through an online platform offered by Escrow Agent's escrow services business ("Escrow Direct"). Escrow Agent shall not be liable to any Party or other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Escrow Funds that does not satisfy the requirements herein. Escrow Agent may rely and act upon the confirmation of anyone purporting to be an Authorized Representative in connection with any of Escrow Agent's verifying callbacks or email confirmations. Notwithstanding anything to the contrary, the Parties acknowledge and agree that Escrow Agent (i) shall have no obligation to take any action in connection with this Agreement on a non-Business Day and any action Escrow Agent may otherwise be required to perform on a non-Business Day may be performed by Escrow Agent on the following Business Day and (ii) may not transfer or distribute the Escrow Funds until Escrow Agent has completed its security procedures.

(b) Each Party authorizes Escrow Agent to use the funds transfer instructions ("Standing Instructions") specified for it in Schedule 3 attached hereto (as may be supplemented from time to time as described below) to disburse any funds due to such Party, without a verifying callback or email confirmation as set forth below.

(c) If any funds transfer instructions other than Standing Instructions are set forth in a permitted instruction, including a Joint Written Instruction, from a Party or the Parties in accordance with this Agreement, Escrow Agent may confirm such funds transfer instructions by a telephone callback or email confirmation to an Authorized Representative of such Party or Parties and thereafter, such funds transfer instructions shall also be considered the applicable Party's Standing Instructions hereunder. To the extent a callback or email confirmation is undertaken, no funds will be disbursed until such confirmation occurs. If multiple disbursements are provided for under this Agreement pursuant to any Standing Instructions, only the date, amount and/or description of payments may change without requiring a telephone callback or email confirmation.

(d) The persons designated as Authorized Representatives of a Party and telephone numbers and email addresses for the same may be changed only in a writing executed by an Authorized Representative or other duly authorized person of the applicable Party setting forth such changes and actually received by Escrow Agent via facsimile or as a PDF attached to an email or through Escrow Direct. Escrow Agent may confirm any such change in Authorized Representatives of a Party by a telephone callback or email confirmation according to its security procedures.

(e) Escrow Agent and other financial institutions, including any intermediary bank and the beneficiary's bank, may rely upon the identifying number of the beneficiary, the beneficiary's bank or any intermediary bank included in a funds transfer instruction, even if it identifies a person different from the beneficiary, the beneficiary's bank or intermediary bank identified by name. It is understood that the purpose of Escrow Agent's security procedures is to verify the authenticity of, and not to detect errors in, instructions.

(f) As used in this Agreement, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which Escrow Agent located at the notice address set forth below is authorized or required by law or executive order to remain closed. The Parties acknowledge that the security procedures set forth in this Section 5 are commercially reasonable. Upon delivery of the Escrow Funds in full by Escrow Agent, this Agreement shall terminate and all the related account(s) shall be closed, subject to the provisions of Sections 8 and 9; provided that, if any portion of the Escrow Funds are promptly returned to Escrow Agent due to an erroneous funds transfer instruction, such termination and closure shall not occur until the subsequent delivery of the Escrow Funds in full by Escrow Agent.

(g) Notwithstanding anything to the contrary contained in this Agreement, in the event that an electronic signature is affixed to an instruction issued hereunder to disburse or transfer funds, such instruction may be confirmed by a verifying callback (or email confirmation) to an Authorized Representative of the applicable Party.

6. **Escrow Agent**. Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be purely ministerial in nature, and no other duties, including but not limited to any fiduciary duty, shall be implied. Notwithstanding anything to the contrary, Escrow Agent has no knowledge of, nor any obligation to comply with, the terms and conditions of the JCO or any other agreement, Escrow Agent shall not be responsible for determining the meaning of any capitalized term not entirely defined herein, nor shall Escrow Agent be required to determine if any Party has complied with the JCO or any other agreement. Notwithstanding the terms of the JCO or any other agreement, the terms and conditions of this Agreement shall control the actions of Escrow Agent. Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by the Parties believed by Escrow Agent to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. With respect to any instruction or notice from a Party that Escrow Agent has received, Escrow Agent shall be entitled to conclusively presume that the other Parties have simultaneously received such instruction or notice. Any notice, document, instruction or request delivered by a Party but not contemplated under this Agreement may be disregarded by Escrow Agent. ESCROW AGENT SHALL NOT BE LIABLE FOR ANY ACTION TAKEN, SUFFERED OR OMITTED TO BE TAKEN BY IT IN GOOD FAITH EXCEPT TO THE EXTENT THAT ESCROW AGENT'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD WAS THE CAUSE OF ANY DIRECT LOSS TO THE PARTIES. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. In the event Escrow Agent shall be uncertain, or believes there is some ambiguity, as to its duties or rights hereunder or receives instructions, claims or demands from any Party hereto which in Escrow Agent's judgment conflict with the provisions of this Agreement, or if Escrow Agent receives conflicting instructions from the Parties, Escrow Agent shall be entitled either to: (a) refrain from taking any action until it shall be given (i) a joint written instructions executed by Authorized Representatives of each of the Parties which eliminates such ambiguity or conflict or (ii) a court order issued by a court of competent jurisdiction (it being understood that Escrow Agent shall be entitled conclusively to rely and act upon any such court order and shall have no obligation to determine whether any such court order is final); or (b) file an action in interpleader. Escrow Agent shall have no duty to solicit any payments which may be due it or any accounts governed by this Agreement, including, without limitation, the Settlement Payments nor shall Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, IN NO EVENT SHALL ESCROW AGENT BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF ESCROW AGENT HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION.

7. **Succession.** Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving no less than thirty (30) calendar days' advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect, which shall be no earlier than thirty (30) calendar days after such written notice has been furnished or (b) may be removed, with or without cause, by the Parties at any time by providing a joint written notice to Escrow Agent executed by an Authorized Representative of each of the Parties. Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold the Escrow Funds (without any obligation to reinvest the same) and to deliver the same to a designated successor escrow agent, if any, appointed by the Parties, or such other person designated by the Parties, or

in accordance with the directions of a final court order, at which time of delivery, Escrow Agent's obligations hereunder shall cease and terminate. If prior to the effective resignation or removal date, the Parties have failed to appoint a successor escrow agent, or to instruct Escrow Agent to deliver the Escrow Funds to another person as provided above, or if such delivery is contrary to applicable law, at any time on or after the effective resignation date, Escrow Agent may either (i) interplead the Escrow Funds with a court located in the State of New Jersey and the costs, expenses and reasonable attorney's fees which are incurred in connection with such proceeding may be charged against and withdrawn from the Escrow Funds; or (ii) appoint a successor escrow agent of its own choice. Any appointment of a successor escrow agent in accordance with the foregoing sentence shall be binding upon the Parties and no appointed successor escrow agent shall be deemed to be an agent of Escrow Agent. Escrow Agent shall deliver the Escrow Funds to any appointed successor escrow agent, at which time Escrow Agent's obligations under this Agreement shall cease and terminate. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be Escrow Agent under this Agreement without further act; provided that the Parties shall receive notice as soon as practicable following any such transaction or event.

8. **Compensation; Acknowledgment.** The Parties agree jointly and severally to pay Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing, shall be as described in Schedule 2. The Parties agree that, notwithstanding anything to the contrary, to the extent any Party deposits such compensation into an account governed by this Agreement, Escrow Agent shall have the right to withdraw such compensation from such account. Each of the Parties further agrees to the disclosures and agreements set forth in Schedule 2.

9. **Indemnification and Reimbursement.** Settling Defendants agree jointly and severally to indemnify, defend, hold harmless, pay or reimburse Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, taxes (other than taxes on income earned by an Indemnitee in connection herewith), costs or expenses (including reasonable and documented attorney's fees) (collectively, "Losses"), resulting directly or indirectly from (a) Escrow Agent's performance of this Agreement, except to the extent that such Losses are finally determined by a court of competent jurisdiction to have been caused by the gross negligence, willful misconduct, fraud or bad faith of any Indemnitee; and (b) Escrow Agent's following, accepting or acting upon any instructions or directions, whether joint or singular, from the Parties received in accordance with this Agreement. The obligations set forth in this Section 9 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

10. **Notices.** Except as otherwise provided in Section 5, all communications hereunder shall be in writing (which may be a PDF attached to an email) and shall be delivered by facsimile, email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party as follows:

If to EIDP:

EIDP, Inc.
974 Centre Road
Building 735
Wilmington, DE 19805
Attention: Thomas A. Warnock
Tel No: [●]
Fax No: [●]
Emai Address: thomas.a.warnock@corteva.com

With a copy to:

Michael T. Reynolds
Cravath, Swaine & Moore LLP
375 Ninth Avenue
New York, NY 10001
Tel No: (212) 474-1552
Fax No: (212) 474-3700
Email Address: mreynolds@cravath.com

| | |
|---|---|
| If to Corteva: | Corteva Inc.<br>974 Centre Road<br>Building 735<br>Wilmington, DE 19805<br>Attention: Cornel B. Fuerer<br>Tel No: [●]<br>Fax No: [●]<br>Email Address: cornel.b.fuerer@corteva.com<br><br>With a copy to:<br><br>Michael T. Reynolds<br>Cravath, Swaine & Moore LLP<br>375 Ninth Avenue<br>New York, NY 10001<br>Tel No: (212) 474-1552<br>Fax No: [●]<br>Email Address: mreynolds@cravath.com |
| If to DuPont or DuPont Specialty Products: | DuPont de Nemours, Inc.<br>974 Centre Rd.<br>Wilmington, DE 19806<br>Attn: Erik T. Hoover<br>Tel No: [●]<br>Fax No: [●]<br>Email Address: erik.t.hoover@dupont.com<br><br>With a copy to:<br><br>Bradley H. Weidenhammer, P.C.<br>Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, IL 60654<br>Tel No: [●]<br>Fax No: [●]<br>Email Address: bweidenhammer@kirkland.com |
| If to Chemours or Chemours FC: | The Chemours Company<br>Office of the General Counsel<br>1007 Market Street<br>Wilmington, DE 19801<br>Attn: Kristine M. Wellman<br>Tel No: [●]<br>Fax No: [●]<br>Email Address: kristine.m.wellman@chemours.com<br><br>With a copy to:<br><br>Graham W. Meli<br>JB Kelly<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Tel Nos: [●]<br>Fax Nos: [●]<br>Email Addresses: gwmeli@wlrk.com; jbkelly@wlrk.com |

| | |
|---|---|
| If to Settling Plaintiff: | Kimberly Cahall<br>Chief Advisor and Chief Enforcement Officer<br>Legal, Regulatory, and Enforcement Policy<br>New Jersey Department of Environmental Protection<br>401 East State Street<br>Trenton, New Jersey 08625<br>Tel No: [●]<br>Fax No: [●]<br>Email Address: Kimberly.Cahall@dep.nj.gov |
| If to Escrow Agent: | JPMorgan Chase Bank, N.A.<br>Escrow Services<br>575 Washington Blvd., 18th Fl<br>Jersey City, NJ 07310<br>Attention: Andrew Sack<br>Email Address:<br>(Jersey City) ec.escrow@jpmorgan.com |

10. **Compliance with Directives.** In the event that a legal garnishment, attachment, levy, restraining notice, court order or other governmental order (a "Directive") is served with respect to any of the Escrow Funds, or the delivery thereof shall be stayed or enjoined by a Directive, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such Directives so entered or issued, and in the event that Escrow Agent obeys or complies with any such Directive it shall not be liable to any of the Parties hereto or to any other person by reason of such compliance notwithstanding such Directive be subsequently reversed, modified, annulled, set aside or vacated.

11. **Miscellaneous**. (a) The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by Escrow Agent and each of the Parties. Neither this Agreement nor any right or interest hereunder may be assigned by any Party without the prior consent of Escrow Agent and each of the other Parties and any assignment in violation of this Agreement shall be ineffective and void. This Agreement shall be governed by and construed under the laws of the State of New Jersey. Each Party and Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the state or federal courts located in the State of New Jersey. To the extent that in any jurisdiction a Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process or immunity from liability, such Party shall not claim, and hereby irrevocably waives, such immunity. Escrow Agent and the Parties further hereby knowingly, voluntarily and intentionally irrevocably waive, to the fullest extent permitted by applicable law, any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

(b) No party to this Agreement shall be liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, public health emergencies, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Agreement and any Joint Written Instruction from the Parties may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable. This Agreement may be executed and transmitted by facsimile or as a PDF attached to an email and each such execution shall be of the same legal effect, validity and enforceability as a manually executed original, wet-inked signature. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Each Party represents, warrants and covenants that (i) each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations; (ii) such Party has full power and authority to enter into this Agreement and to perform all of the duties and obligations

to be performed by it hereunder; and (iii) the person(s) executing this Agreement on such Party's behalf and certifying Authorized Representatives in the applicable Schedule 1 has been duly and properly authorized to do so, and each Authorized Representative of such Party has been duly and properly authorized to take actions specified for such person in the applicable Schedule 1. Nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of the Escrow Funds or this Agreement.

[*Signature Pages Follow*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**ESCROW AGENT**

**JPMORGAN CHASE BANK, N.A.**

By: ______________________________
Name: [●]
Title: [●]

**SETTLING DEFENDANTS**

**EIDP, INC. (F/K/A E. I. DU PONT DE NEMOURS AND COMPANY)**

By: ______________________________
Name: [●]
Title: [●]

**CORTEVA, INC.**

By: ______________________________
Name: [●]
Title: [●]

**DUPONT DE NEMOURS INC. (F/K/A DOWDUPONT INC.)**

By: ______________________________
Name: [●]
Title: [●]

**DUPONT SPECIALTY PRODUCTS USA, LLC**

By: ______________________________
Name: [●]
Title: [●]

**THE CHEMOURS COMPANY**

By: ______________________________
Name: [●]
Title: [●]

**THE CHEMOURS COMPANY FC, LLC**

By: ______________________________
Name: [●]
Title: [●]

**SETTLING PLAINTIFF**

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTCTION**

By: ______________________________
Name: [●]
Title: [●]

**EXHIBIT A**

**FORM OF ESCROW RELEASE NOTICE – JOINT WRITTEN INSTRUCTIONS**

JPMorgan Chase Bank, N.A.
Escrow Services
575 Washington Blvd., 18th Fl
Jersey City, NJ 07310
Attention: Andrew Sack
Email Address:
(Jersey City) ec.escrow@jpmorgan.com [Date]

Re: EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company), Corteva, Inc., DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.), DuPont Specialty Products USA, LLC, The Chemours Company, The Chemours Company FC, LLC, the New Jersey Department of Environmental Protection and JPMorgan Chase Bank, N.A. – Escrow Agreement dated [ ]

Escrow Account no. [ ]

Dear Sir/Madam:

We refer to an escrow agreement dated [ ] by and among EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company), Corteva, Inc., DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.), DuPont Specialty Products USA, LLC, The Chemours Company, The Chemours Company FC, LLC, the New Jersey Department of Environmental Protection and JPMorgan Chase Bank, N.A., as Escrow Agent (the "Escrow Agreement").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

Pursuant to Section 5 of the Escrow Agreement, the Parties instruct Escrow Agent to release the Escrow Funds, or the portion or portions of the Escrow Funds specified below, to the specified party as instructed below.

Amount (In writing): [INSERT ONLY IF LESS THAN ENTIRE FUND IS BEING DISBURSED]
Beneficiary:
City:
Country:

**US Instructions:**
Bank Name:
Bank Address:
ABA Number:
Credit A/C Name:
Credit A/C #:
Credit A/C Address:
If Applicable:
FFC A/C Name:
FFC A/C #:
FFC A/C Address:

**International Instructions:**
Bank Name:
Bank Address
SWIFT Code:
US Pay Through ABA:
Credit A/C Name:
Credit A/C # (IBAN #):

Credit A/C Address:
If Applicable:
FFC A/C Name:
FFC A/C # (IBAN #):
FFC A/C Address:

**SETTLING DEFENDANTS**

**EIDP, INC. (F/K/A E. I. DU PONT DE NEMOURS AND COMPANY)**

By: ______________________________
Name: [●]
Title: [●]

**CORTEVA, INC.**

By: ______________________________
Name: [●]
Title: [●]

**DUPONT DE NEMOURS INC. (F/K/A DOWDUPONT INC.)**

By: ______________________________
Name: [●]
Title: [●]

**DUPONT SPECIALTY PRODUCTS USA, LLC**

By: ______________________________
Name: [●]
Title: [●]

**THE CHEMOURS COMPANY**

By: ______________________________
Name: [●]
Title: [●]

**THE CHEMOURS COMPANY FC, LLC**

By: ______________________________
Name: [●]
Title: [●]

**SETTLING PLAINTIFF**

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTCTION**

By: ______________________________
Name: [●]
Title: [●]

**SCHEDULE 1-A**

**EIDP, Inc.**

**DESIGNATION OF AUTHORIZED REPRESENTATIVES**

The undersigned, ________________________, being the duly elected, qualified and acting ________________________ of EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company) ("EIDP"), does hereby certify:

1. That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours, Chemours FC, Settling Plaintiff and Escrow Agent (each, as defined in the Escrow Agreement) to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by EIDP such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) EIDP is an individual. EIDP acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if EIDP nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, EIDP agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

***[Insert names and contact information of individuals who can be readily available to provide instructions and/or confirm disbursements on the telephone, as needed. Authorized Representatives may be set up on and receive requests to e-sign documents on JPMorgan's online Escrow Direct platform but will maintain the option to manually sign as well.]***

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |

2. Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3. This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative

and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4. That pursuant to EIDP's governing documents, as amended, the undersigned has the power and authority to execute this Schedule on behalf of EIDP.

5. Notwithstanding the above, if EIDP is an individual and the sole Authorized Representative, no signature will be required below.

Signature: ______________________________

Name: ______________________________

Title: ______________________________

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-A**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile, set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of EIDP.

**SCHEDULE 1-B**

**Corteva, Inc.**

**DESIGNATION OF AUTHORIZED REPRESENTATIVES**

The undersigned, ________________________, being the duly elected, qualified and acting ________________________ of Corteva, Inc. ("Corteva"), does hereby certify:

1. That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours, Chemours FC, Settling Plaintiff and Escrow Agent (each, as defined in the Escrow Agreement) to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by Corteva such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) Corteva is an individual. Corteva acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if Corteva nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, Corteva agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

***[Insert names and contact information of individuals who can be readily available to provide instructions and/or confirm disbursements on the telephone, as needed. Authorized Representatives may be set up on and receive requests to e-sign documents on JPMorgan's online Escrow Direct platform but will maintain the option to manually sign as well.]***

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ________________________ | ________________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ________________________ | ________________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ________________________ | ________________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |

2. Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3. This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative

and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4. That pursuant to Corteva's governing documents, as amended, the undersigned has the power and authority to execute this Schedule on behalf of Corteva.

5. Notwithstanding the above, if Corteva is an individual and the sole Authorized Representative, no signature will be required below.

Signature: ______________________________

Name: ______________________________

Title: ______________________________

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-B**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile, set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of Corteva.

**SCHEDULE 1-C**

**DuPont de Nemours, Inc.**

**DESIGNATION OF AUTHORIZED REPRESENTATIVES**

The undersigned, ________________________, being the duly elected, qualified and acting ________________________ of DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) ("DuPont"), does hereby certify:

1. That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours, Chemours FC, Settling Plaintiff and Escrow Agent (each, as defined in the Escrow Agreement) to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by DuPont such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) DuPont is an individual. DuPont acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if DuPont nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, DuPont agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

***[Insert names and contact information of individuals who can be readily available to provide instructions and/or confirm disbursements on the telephone, as needed. Authorized Representatives may be set up on and receive requests to e-sign documents on JPMorgan's online Escrow Direct platform but will maintain the option to manually sign as well.]***

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ________________________ | ________________________ | (ph)________________________<br>(cell)________________________<br>(email)________________________ |
| ________________________ | ________________________ | (ph)________________________<br>(cell)________________________<br>(email)________________________ |
| ________________________ | ________________________ | (ph)________________________<br>(cell)________________________<br>(email)________________________ |

2. Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3. This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative

and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4. That pursuant to DuPont's governing documents, as amended, the undersigned has the power and authority to execute this Schedule on behalf of DuPont.

5. Notwithstanding the above, if DuPont is an individual and the sole Authorized Representative, no signature will be required below.

Signature: ______________________________

Name: ______________________________

Title: ______________________________

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-C**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile, set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of DuPont.

# SCHEDULE 1-D

## DuPont Specialty Products USA, LLC

## DESIGNATION OF AUTHORIZED REPRESENTATIVES

The undersigned, _________________________, being the duly elected, qualified and acting _________________________ of DuPont Specialty Products USA, LLC, ("DuPont Specialty Products"), does hereby certify:

1. That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours, Chemours FC, Settling Plaintiff and Escrow Agent (each, as defined in the Escrow Agreement) to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by DuPont Specialty Products such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) DuPont Specialty Products is an individual. DuPont Specialty Products acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if DuPont Specialty Products nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, DuPont Specialty Products agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

***[Insert names and contact information of individuals who can be readily available to provide instructions and/or confirm disbursements on the telephone, as needed. Authorized Representatives may be set up on and receive requests to e-sign documents on JPMorgan's online Escrow Direct platform but will maintain the option to manually sign as well.]***

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ____________________ | ____________________ | (ph)________________<br>(cell)________________<br>(email)________________ |
| ____________________ | ____________________ | (ph)________________<br>(cell)________________<br>(email)________________ |
| ____________________ | ____________________ | (ph)________________<br>(cell)________________<br>(email)________________ |

2. Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3. This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4. That pursuant to DuPont Specialty Products's governing documents, as amended, the undersigned has the power and authority to execute this Schedule on behalf of DuPont Specialty Products.

5. Notwithstanding the above, if DuPont Specialty Products is an individual and the sole Authorized Representative, no signature will be required below.

Signature: ______________________________

Name: ______________________________

Title: ______________________________

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-D**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile, set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of DuPont Specialty Products.

**SCHEDULE 1-E**

**The Chemours Company**

**DESIGNATION OF AUTHORIZED REPRESENTATIVES**

The undersigned, ________________________, being the duly elected, qualified and acting ________________________ of The Chemours Company ("Chemours"), does hereby certify:

1. That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours, Chemours FC, Settling Plaintiff and Escrow Agent (each, as defined in the Escrow Agreement) to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by Chemours such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) Chemours is an individual. Chemours acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if Chemours nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, Chemours agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

***[Insert names and contact information of individuals who can be readily available to provide instructions and/or confirm disbursements on the telephone, as needed. Authorized Representatives may be set up on and receive requests to e-sign documents on JPMorgan's online Escrow Direct platform but will maintain the option to manually sign as well.]***

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |

2. Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3. This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative

and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4. That pursuant to Chemours's governing documents, as amended, the undersigned has the power and authority to execute this Schedule on behalf of Chemours.

5. Notwithstanding the above, if Chemours is an individual and the sole Authorized Representative, no signature will be required below.

Signature: ______________________________

Name: ______________________________

Title: ______________________________

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-E**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile, set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of Chemours.

**SCHEDULE 1-F**

**The Chemours Company FC, LLC**

**DESIGNATION OF AUTHORIZED REPRESENTATIVES**

The undersigned, _________________________, being the duly elected, qualified and acting _________________________ of The Chemours Company FC, LLC ("Chemours FC"), does hereby certify:

1. That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours, Chemours FC, Settling Plaintiff and Escrow Agent (each, as defined in the Escrow Agreement) to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by Chemours FC such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) Chemours FC is an individual. Chemours FC acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if Chemours FC nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, Chemours FC agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

***[Insert names and contact information of individuals who can be readily available to provide instructions and/or confirm disbursements on the telephone, as needed. Authorized Representatives may be set up on and receive requests to e-sign documents on JPMorgan's online Escrow Direct platform but will maintain the option to manually sign as well.]***

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |
| ____________________ | ____________________ | (ph)____________________<br>(cell)____________________<br>(email)____________________ |

2. Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3. This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative

and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4. That pursuant to Chemours FC's governing documents, as amended, the undersigned has the power and authority to execute this Schedule on behalf of Chemours FC.

5. Notwithstanding the above, if Chemours FC is an individual and the sole Authorized Representative, no signature will be required below.

Signature: ______________________________

Name: ______________________________

Title: ______________________________

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-F**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile, set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of Chemours FC.

**SCHEDULE 1-G**

**New Jersey Department of Environmental Protection**

**DESIGNATION OF AUTHORIZED REPRESENTATIVES**

The undersigned, ________________________, being the duly elected, qualified and acting ________________________ of New Jersey Department of Environmental Protection (the "Department"), does hereby certify:

1. That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among EIDP, Corteva, DuPont, DuPont Specialty Products, Chemours, Chemours FC, Settling Plaintiff and Escrow Agent (each, as defined in the Escrow Agreement) to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by the Department such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) the Department is an individual. The Department acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if the Department nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, the Department agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

***[Insert names and contact information of individuals who can be readily available to provide instructions and/or confirm disbursements on the telephone, as needed. Authorized Representatives may be set up on and receive requests to e-sign documents on JPMorgan's online Escrow Direct platform but will maintain the option to manually sign as well.]***

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ____________________ | ____________________ | (ph)__________________<br>(cell)__________________<br>(email)__________________ |
| ____________________ | ____________________ | (ph)__________________<br>(cell)__________________<br>(email)__________________ |
| ____________________ | ____________________ | (ph)__________________<br>(cell)__________________<br>(email)__________________ |

2. Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3. This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4. That pursuant to the Department's governing documents, as amended, the undersigned has the power and authority to execute this Schedule on behalf of the Department.

5. Notwithstanding the above, if the Department is an individual and the sole Authorized Representative, no signature will be required below.

Signature: ______________________________

Name: ______________________________

Title: ______________________________

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-H**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile, set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of the Department.

**SCHEDULE 2**

J.P.Morgan

# Schedule of Fees and Disclosures for Escrow Agent Services

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$ Waived**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation. Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$ Waived**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable upon closing and annually in advance thereafter, without pro-ration for partial years.

**Extraordinary Services and Out-of-Pocket Expenses:** Escrow Agent or any of its affiliates may receive compensation with respect to any investment directed hereunder including without limitation charging any applicable agency fee or trade execution fee in connection with each transaction. Any additional services beyond our standard services as specified above, and all reasonable and documented out-of-pocket expenses including attorney's or accountant's fees and expenses, will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at Escrow Agent's then standard rate. Escrow Agent may impose, charge, debit, pass-through and modify fees and/or charges for any account established and services provided by Escrow Agent, including but not limited to, transaction, maintenance, balance-deficiency, and service fees, agency or trade execution fees, and other charges, including those levied by any governmental authority.

**Fee Disclosure & Assumptions**: Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review, and assumes the escrow deposit will be continuously invested in an interest bearing demand deposit account at JPMorgan Chase Bank, N.A. Escrow Agent reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or other factors change from those used to set the fees described herein. Payment of an invoice is due within thirty (30) days after receipt of such invoice.

**Disclosures and Agreements:**

**Taxes.** The Parties shall duly complete such tax documentation or other procedural formalities necessary for Escrow Agent to complete required tax reporting and for the relevant Party to receive interest or other income without withholding or deduction of tax in any jurisdiction. Should any information supplied in such tax documentation change, the Parties shall promptly notify Escrow Agent. Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, including without limitation, the Foreign Account Tax Compliance Act ("FATCA"), and shall remit such taxes to the appropriate authorities.

**Know Your Customer**. To assist in the prevention of the funding of terrorism and money laundering activities, applicable law may require financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for the Parties: when the Parties open an account, Escrow Agent may ask for each Party's name, address, date of birth (for natural persons), and/or other information and documents that will allow Escrow Agent to identify such Party. Escrow Agent may also request and obtain certain information from third party vendors regarding any Party. To fulfill Escrow Agent's "know your customer" responsibilities and in connection with its performance of this Agreement, Escrow Agent may request information and/or documentation from each Party from time to time, including, without limitation, regarding such Party's organization, business and, to the extent applicable, beneficial owner(s) of such Party, including relevant natural or legal persons, and such Party shall procure and furnish the same to Escrow Agent in a timely manner. Any information and/or documentation furnished by any Party is the sole responsibility of such Party and Escrow Agent is entitled to rely on the information and/or documentation without making any verification whatsoever (except for the authentication under the security procedures, as applicable). Each Party represents and warrants that all such information and/or documentation is true, correct and not misleading and shall advise Escrow Agent promptly of any changes and, except as prohibited by applicable law, such Party agrees to provide complete responses to Escrow Agent's requests within the timeframes specified. If any Party fails to provide or consent to the provision of any information required by this paragraph, Escrow Agent may suspend or discontinue providing any service hereunder and resign pursuant to this Agreement.

**OFAC Disclosure**. Escrow Agent is required to act in accordance with the laws and regulations of various jurisdictions relating to the prevention of money laundering and the implementation of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. Escrow Agent is not obligated to execute payment orders or effect any other transaction where the beneficiary or

other payee is a person or entity with whom Escrow Agent is prohibited from doing business by any law or regulation applicable to Escrow Agent, or in any case where compliance would, in Escrow Agent's opinion, conflict with applicable law or banking practice or its own policies and procedures. Where Escrow Agent does not execute a payment order or effect a transaction for such reasons, Escrow Agent may take any action required by any law or regulation applicable to Escrow Agent including, without limitation, freezing or blocking funds. Transaction screening may result in delays in the posting of transactions.

**Loss of Contact & Unclaimed Property**. Escrow Agent is required to act in accordance with the laws and regulations of various states and jurisdictions relating to unclaimed property, escheatment, abandoned property, or similar law and, accordingly, shall be entitled, but not obligated, to report and remit dormant funds to any state as unclaimed property in accordance with such laws and regulations. Without limitation of the foregoing, notwithstanding any instruction to the contrary, Escrow Agent shall not be liable to any Party for any amount disbursed from an account maintained under this Agreement to a government entity or public official in compliance with any applicable unclaimed property, escheatment, abandoned property, or similar law. Similarly, Escrow Agent shall not be liable to any party for failing to disburse an amount from an account maintained under this Agreement to a government entity or public official in compliance with any applicable unclaimed property, escheatment, abandoned property, or similar law.

Should Escrow Agent reasonably determine that it has lost contact with the Parties for three (3) years or more, Escrow Agent may send to the Parties a notice of inactivity to the addresses and in the manner set forth in Section 10 of this Agreement. Should the Parties fail to respond to such notice of inactivity within sixty (60) days, Escrow Agent may, in its sole judgment, consider the Escrow Fund as payable and distributable for purposes of state unclaimed property laws as of the date of last contact with the Parties. In the absence of any agreement to the contrary, at the end of the applicable dormancy period, Escrow Agent may report and remit the Escrow Funds, listing the Parties as co-owners, to the state of the account holder's last-known address as set forth in this Agreement.

**Information.** Escrow Agent agrees to take customary and reasonable measures to maintain the confidentiality of the Parties' confidential information. Confidential information shall not include information that (a) is publicly available other than as a result of Escrow Agent's breach of this Agreement, (b) was obtained from a third party not known by Escrow Agent to be under an obligation of confidentiality with respect to such information or (c) was independently developed by Escrow Agent. The Parties authorize Escrow Agent to disclose information with respect to this Agreement and the account(s) established hereunder, the Parties, or any transaction hereunder if such disclosure is: (i) necessary in Escrow Agent's opinion, for the purpose of allowing Escrow Agent to perform its duties and to exercise its powers and rights hereunder or for operational or risk management purposes or compliance with legal, tax and regulatory requirements, including, without limitation, FATCA; (ii) to a proposed assignee of the rights of Escrow Agent; (iii) to a branch, affiliate, subsidiary, employee or agent of Escrow Agent or to their auditors, regulators or legal advisers or to any competent court; (iv) to the auditors of any of the Parties; or (v) required by applicable law, regardless of whether the disclosure is made in the country in which each Party resides, in which the Escrow Funds are maintained, or in which the transaction is conducted. The Parties agree that such disclosures by Escrow Agent and its affiliates may be transmitted across national boundaries and through networks, including those owned by third parties.

**Acknowledgment of Compensation and Multiple Roles.** Escrow Agent is authorized to act under this Agreement notwithstanding that Escrow Agent or any of its subsidiaries or affiliates (such subsidiaries and affiliates hereafter individually called an "Affiliate" and collectively called "Affiliates") may (A) receive fees or derive earnings (float) as a result of providing an investment product or account on the books of Escrow Agent pursuant to this Agreement or for providing services or referrals with respect to investment products, or (B) (i) act in the same transaction in multiple capacities, (ii) engage in other transactions or relationships with the same entities to which Escrow Agent may be providing escrow or other services under this Agreement, (iii) refer clients to an Affiliate for services or (iv) enter into agreements under which referrals of escrow or related transactions are provided to Escrow Agent. JPMorgan Chase Bank, N.A. may earn compensation from any of these activities in addition to the fees charged for services under this Agreement.

**FDIC Disclosure**. In the event Escrow Agent becomes insolvent or enters into receivership, Escrow Agent may provide to the Federal Deposit Insurance Corporation ("FDIC") account balance information for any account governed by this Agreement, as reflected on Escrow Agent's end-of-day ledger balance, and the customer name and tax identification number associated with such accounts for the purposes of determining the appropriate deposit insurance coverage. Escrow Funds held in such accounts will be insured by the FDIC under its applicable rules and limits.

**THE FOLLOWING DISCLOSURES ARE REQUIRED TO BE PROVIDED UNDER APPLICABLE U.S. REGULATIONS, INCLUDING, BUT NOT LIMITED TO, FEDERAL RESERVE REGULATION D. WHERE SPECIFIC INVESTMENTS ARE NOTED BELOW, THE DISCLOSURES APPLY ONLY TO THOSE INVESTMENTS AND NOT TO ANY OTHER INVESTMENT.**

**Demand Deposit Account Disclosure**. Escrow Agent is authorized, for regulatory reporting and internal accounting purposes, to divide an escrow demand deposit account maintained in the U.S. in which the Escrow Funds are held into a demand deposit internal account and a savings internal account, and to transfer funds on a daily basis between these internal accounts on Escrow Agent's general ledger in accordance with U.S. law at no cost to the Parties. Escrow Agent will record the internal accounts and any transfers between them on Escrow Agent's books and records only. The internal accounts and any transfers between them will not affect the Escrow Funds, any investment or disposition of the Escrow Funds, use of the escrow demand deposit account or any other activities under this Agreement, except as described herein. Escrow Agent will establish a target balance for the demand deposit internal account, which may change at any time. To the extent

funds in the demand deposit internal account exceed the target balance, the excess will be transferred to the savings internal account, unless the maximum number of transfers from the savings internal account for that calendar month or statement cycle has already occurred. If withdrawals from the demand deposit internal account exceeds the available balance in the demand deposit internal account, funds from the savings internal account will be transferred to the demand deposit internal account up to the entire balance of available funds in the savings internal account to cover the shortfall and to replenish any target balance that Escrow Agent has established for the demand deposit internal account. If a sixth transfer is needed during a calendar month or statement cycle, it will be for the entire balance in the savings internal account, and such funds will remain in the demand deposit internal account for the remainder of the calendar month or statement cycle.

**Account Use**. The Parties acknowledge and agree that the Escrow Funds may not be deposited or withdrawn by the Parties unless pursuant to the terms of this Agreement and consistent with the underlying purpose of this Agreement as communicated to Escrow Agent by the Parties, and the Escrow Funds will not be used for the general operating needs of the Parties while the Escrow Funds are held in any accounts governed by this Agreement.

**Unlawful Internet Gambling**. The use of any account to conduct transactions (including, without limitation, the acceptance or receipt of funds through an electronic funds transfer, or by check, draft or similar instrument, or the proceeds of any of the foregoing) that are related, directly or indirectly, to unlawful Internet gambling is strictly prohibited.

**Recordings.** Each Party and Escrow Agent consent to the other party or parties making and retaining recordings of telephone conversations between any Party or Parties, on the one hand, and Escrow Agent, on the other hand, in connection with Escrow Agent's security procedures.

**Use of Electronic Records and Signatures.** As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute", "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-inked signature. Any electronically signed agreement shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meanings ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

**SCHEDULE 3**

**STANDING INSTRUCTIONS**

| **New Jersey Department of Environmental Protection** | |
|---|---|
| Bank Name: | |
| Bank Address: | |
| ABA number: | |
| Credit A/C Name: | |
| Credit A/C # | |
| If Applicable: | |
| FFC A/C Name: | |
| FFC A/C #: | |
| FFC A/C Address: | |

| **EIDP, Inc.** | |
|---|---|
| Bank Name: | |
| Bank Address: | |
| ABA number: | |
| Credit A/C Name: | |
| Credit A/C # | |
| If Applicable: | |
| FFC A/C Name: | |
| FFC A/C #: | |
| FFC A/C Address: | |

| **Corteva, Inc.** | |
|---|---|
| Bank Name: | |
| Bank Address: | |
| ABA number: | |
| Credit A/C Name: | |
| Credit A/C # | |
| If Applicable: | |
| FFC A/C Name: | |
| FFC A/C #: | |
| FFC A/C Address: | |

| **DuPont de Nemours, Inc.** | |
|---|---|
| Bank Name: | |
| Bank Address: | |
| ABA number: | |
| Credit A/C Name: | |
| Credit A/C # | |
| If Applicable: | |
| FFC A/C Name: | |
| FFC A/C #: | |
| FFC A/C Address: | |

| **DuPont Specialty Products USA, LLC** | |
|---|---|
| Bank Name: | |
| Bank Address: | |
| ABA number: | |
| Credit A/C Name: | |
| Credit A/C # | |
| If Applicable: | |
| FFC A/C Name: | |
| FFC A/C #: | |
| FFC A/C Address: | |

| **The Chemours Company** | |
|---|---|
| Bank Name: | |
| Bank Address: | |
| ABA number: | |
| Credit A/C Name: | |
| Credit A/C # | |
| If Applicable: | |
| FFC A/C Name: | |
| FFC A/C #: | |
| FFC A/C Address: | |

| **The Chemours Company FC, LLC** | |
|---|---|
| Bank Name: | |
| Bank Address: | |
| ABA number: | |
| Credit A/C Name: | |
| Credit A/C # | |
| If Applicable: | |
| FFC A/C Name: | |
| FFC A/C #: | |
| FFC A/C Address: | |

# SCHEDULE 4

## ESCROW DIRECT (ONLINE PLATFORM) – ADDITIONAL USERS

Please list the names and email addresses of any additional contacts other than Authorized Representatives and contacts with email addresses listed in the Section 10 of the Escrow Agreement who shall have access for this transaction in Escrow Direct. Note that Authorized Representatives will be entitled to full access to Escrow Direct and contacts with email addresses in the notice section will automatically be added as additional users.

**EIDP, Inc.**

Name:
Email Address:

Name:
Email Address:

**Corteva, Inc.**

Name:
Email Address:

Name:
Email Address:

**DuPont de Nemours, Inc.**

Name:
Email Address:

Name:
Email Address:

**DuPont Specialty Products USA, LLC**

Name:
Email Address:

Name:
Email Address:

**The Chemours Company**

Name:
Email Address:

Name:
Email Address:

**The Chemours Company FC, LLC**

Name:
Email Address:

Name:
Email Address:

**New Jersey Department of Environmental Protection**

Name:
Email Address:

Name:
Email Address:

# EXHIBIT C

# EXHIBIT C

## Letter from State of New Jersey to Credit-Eligible Claimant

Dear [*Person or Entity*]:

This letter is to inform you that, pursuant to a settlement in the form of a Judicial Consent Order ("JCO") between the State of New Jersey and various State agencies and officials (collectively, the "State") and EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company); The Chemours Company; The Chemours Company FC, LLC; DuPont Specialty Products USA, LLC; Corteva Inc.; and DuPont de Nemours, Inc. (collectively "Settling Defendants"), approved by a federal judge on [*date of Final Approval*], the State has fully and forever released certain claims related to a group of chemicals commonly known as "PFAS," or per- and polyfluoroalkyl substances—including the claims that you are currently asserting in [*matter description*]. Under the settlement, Settling Defendants will, among other things, pay the State up to $875 million to be used to address PFAS and other contamination, as described further below.

A copy of the full JCO is available on the New Jersey Department of Environmental Protection's website.[1] All capitalized terms not otherwise defined in this letter have the meaning set forth in the JCO. This letter does not provide or purport to provide you with legal advice. Nothing in this letter modifies or purports to modify any part of the settlement or JCO.

**Claims Released by the State Under the Settlement**

Under the JCO, the State, in a *parens patriae* action brought on behalf of itself and the citizens and residents of the State, has fully and forever released certain Released Claims against Settling Defendants and other Released Entities. The State adequately represents the interests and rights of its political subdivisions, citizens, and residents (including any individual or entity that has owned, operated, managed, or controlled property in the State). Consequently, the JCO constitutes a binding final judgment that operates as res judicata to preclude future claims related to Settling Defendants' conduct regarding PFAS or PFAS Contamination by all such persons and/or entities, subject to certain exceptions. As described in the JCO, the State released any Claim arising from, based on, involving, or caused by Covered PFAS Conduct or Covered PFAS Harm, which includes:

1. PFAS in Drinking Water Supplies, Potable Water, a Private Potable Well, a Water Purveyor, or a Water System in the State or within the State's jurisdiction.
2. Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement,

[1] https://dep.nj.gov/dupont/

misleading statement, or other activity of any kind, intentional or unintentional that has arisen, is arising, or may arise at any time in the future caused by PFAS or resulting in PFAS Contamination, including:

a) the design, development, manufacture, formulation, distribution, handling, control, disposal, marketing, sale, testing, labeling, transportation, import, export, storage, loading, mixing, application, use, and instructions for use of PFAS or any PFAS-Containing Product;

b) any transport, treatment, storage, disposal, or arrangement for transportation, treatment, storage, or disposal, or use of PFAS-containing Sludge or PFAS-containing Wastewater (from any Site, facility, or location), including any use for irrigation, spraying on agricultural fields, or manufacturing;

c) any action, omission, or other conduct that in any way resulted in or threatens to result in the presence of PFAS in the Environment, including any known, suspected, or threatening discharge of any PFAS into the Environment that commenced prior to the JCO Entry Date and is continuing as of the JCO Entry Date;

d) compliance with any reporting, recordkeeping, disclosure, notification, or permit-process requirement related to, and any representations or omissions about, PFAS or any PFAS-Containing Product; or

e) any act, use, or employment by any Person of any commercial practice that is allegedly or arguably unconscionable, abusive, or involves deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact in connection with the sale or advertisement of PFAS or any PFAS-Containing Product, including any failure to warn others concerning any human health or environmental hazards associated with PFAS or any PFAS-Containing Product, or concerning the proper use and disposal of such substances or products, and including any such conduct that could be actionable under the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -20, other statutes, or the common law.

3. Any actual or alleged harm, injury, or damages actually or allegedly arising from, based on, involving, related to, or caused by PFAS or PFAS Contamination, including:

a) the design, engineering, installation, maintenance, or Operation of, or cost associated with any kind of treatment, filtration, Remediation, management, investigation, testing, or monitoring of PFAS in, any Drinking Water

Supplies or Water System, or the rates for Potable Water that any Releasor or Water System charges its customers;

b) any liability for Natural Resource Damages arising from, based on, involving, or caused by PFAS in the State;

c) any costs that any Government Entity of the State or of any of the State's Political Subdivisions has paid or will pay due to impacts that allegedly arose from, were based on, involved, or were caused by PFAS in the Environment or by human exposure to PFAS, including payments (i) to compensate for time spent on cleanup activity, travel to and from any site, contractor costs at any site, or equipment used at any site; (ii) to offset costs of restricting access to a site necessary to perform these other activities; (iii) to any medical facility, healthcare provider, pharmacy, medical or healthcare patient; (iv) to investigate or delineate PFAS compounds; or (v) to compensate for administrative matters, personnel issues, guidance development, or office, utility, or supply costs; or

d) any PFAS Claim, including any PFAS Claim involving any public interest or diffused public right (including any claim for Punitive Damages that may be associated with any Claim of a public or private entity) that has arisen or may arise at any time in the future from, is or will be based on, involves or will involve, or is or will be caused by PFAS, any discharge of PFAS, PFAS Contamination, or any PFAS-Containing Product.

4. Punitive or exemplary damages that have arisen or may arise at any time in the future out of, related to, or involving PFAS or any PFAS-Containing Product.

**The State's Use of the Funds Recovered from Settling Defendants**

The majority of the funds paid pursuant to the settlement will be used to abate environmental contamination in New Jersey, including PFAS contamination. These funds will be held in a dedicated trust account to be used by the Department for the purpose of improving and protecting public health, safety, and the environment, including, but not limited to, supporting water quality infrastructure projects, including projects to install, operate, and maintain water treatment in public and private wells sufficient to meet applicable state standards and protect the public health, including with respect to PFAS contamination. Under the JCO, the Settling Defendants will remediate the Chambers Works, Pompton Lakes Works, Parlin, and Repauno sites in accordance with New Jersey law, and the abatement funding paid pursuant to the JCO will not be used for the purpose of satisfying Settling Defendants' remediation obligations with respect to those sites. Moreover, to secure the remediation associated with the Chambers Works, Pompton Lakes Works, Parlin, and Repauno Works sites in accordance with New Jersey law, Settling

Defendants also agreed to create and maintain remediation funding sources and an additional reserve fund. The funds to be received from Settling Defendants under the JCO are in addition to up to $450 million the State will receive under a separate settlement with the 3M Company, which amount will also be used for, among other things, the restitution or remediation of harm to the environment related to PFAS. Additional information about the State's use of the settlement funds is available on the Department of Environmental Protection's website.[2]

Sincerely,

[*signature of authorized representative of the State*]

---

[2] [*link*]

# EXHIBIT D

# RESERVE FUND AGREEMENT

This Reserve Fund Agreement (the "Agreement") is entered into as of **[DATE]** by and between (i) DuPont de Nemours Inc. and Corteva, Inc., (together, the "RF Defendants"); (ii) the New Jersey Department of Environmental Protection (the "Department"); and (iii) ____________ (the "Reserve Fund Trustee").

WHEREAS, the RF Defendants are required by that certain Judicial Consent Order as to Defendants E.I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont Specialty Products USA, LLC, Corteva, Inc., and DuPont De Nemours, Inc. (the "Judicial Consent Order"), attached hereto as **Annex 1**, to establish and maintain the Reserve Fund for the sole benefit of the Department in order to provide further assurance that Remediation of the Industrial Sites will be completed;

WHEREAS, the Department has selected the Reserve Fund Trustee under this Agreement, and the Reserve Fund Trustee is willing to act as Reserve Fund Trustee.

NOW, THEREFORE, the RF Defendants, the Department, and the Reserve Fund Trustee agree as follows:

## Section 1. Interpretation and Definitions

(a) Interpretation

Capitalized terms not defined in this Agreement shall have the same meanings ascribed to them in the Judicial Consent Order.

As used in this Agreement, words in the singular include the plural and words in the plural include the singular. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The word "or" is not exclusive. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if". The word "will" shall be construed to have the same meaning and effect as the word "shall". The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the masculine as well as to the feminine and neuter genders of such term. References to a person are also to its permitted successors and assigns.

The descriptive headings for each Section of this Agreement shall not affect the interpretation or the legal efficacy of this Agreement.

In the event of any conflict or inconsistency between or among the terms or provisions of this Agreement and the Judicial Consent Order, the terms and provisions of the Judicial Consent Order shall govern and control to the extent of such conflict or inconsistency.

(b) Definitions

As used in this Agreement:

(i) The term "Department Release Instruction" has the meaning given in Section 5(a)(i).

(ii) The term "Effective Date" means the date of execution of this Agreement, which date shall be no later than 60 Days of the date upon which the Judicial Consent Order is entered by the Court.

(iii) The term "RF Defendants" means DuPont de Nemours Inc. and Corteva, Inc. who enter into this Agreement and any successors or assigns of the RF Defendants. The names, titles, addresses, telephone numbers and emails of the RF Defendants are:

**DuPont de Nemours Inc.**

________________________________________
________________________________________
________________________________________
________________________________________

**Corteva, Inc.**

________________________________________
________________________________________
________________________________________
________________________________________

(iv) The term "Financial Security" means one or more lines of credit, letters of credit or surety bond agreements (as applicable), consistent with N.J.S.A. 58:10B-3 and N.J.A.C. 7:26C, Subchapter 5, Sections 5.4, 5.6, 5.7, 5.14 (proposed rule pending final adoption) for the given financing mechanism, delivered to the Reserve Fund Trustee in accordance with Section 3(a).

(v) The term "Joint Release Instruction" means the joint written instructions of the RF Defendants and the Department to the Reserve Fund Trustee directing the Reserve Fund Trustee to disburse any amount from the Reserve Fund Accounts or draw upon the Financial Security.

(vi) The term "Release Instruction" means any of a Department Release Instruction or Joint Release Instruction.

(vii) The term "Reserve Fund" has the meaning given in Section 3(a).

(viii) The term "Reserve Fund Amount" means $475,000,000, subject to the adjustments set forth in Section 3(b) and 3(c).

(ix) The term "Reserve Fund Trustee" means [TRUSTEE] and any successor Reserve Fund Trustee, who has the authority to act as a Reserve Fund Trustee and whose operations are regulated and examined by a Federal or New Jersey agency. The name, title, address, telephone number and email of the Reserve Fund Trustee is:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

**Section 2. Establishment of the Reserve Fund**

(a) Reserve Fund

The RF Defendants, the Department and the Reserve Fund Trustee hereby establish the Reserve Fund, for the benefit of the Department as of the Effective Date, in accordance with the terms and conditions of this Agreement. Each RF Defendant shall fund its respective share of the Reserve Fund in accordance with Section 3(a). The RF Defendants, the Department and the Reserve Fund Trustee intend that none of the RF Defendants, the Department nor any third party shall have access to the Reserve Fund except as provided herein.

(b) Duration

The RF Defendants shall be obligated to fund, and the Reserve Fund Trustee shall be obligated to maintain, the Reserve Fund until such time as each of the Industrial Sites has received a sitewide Final Remediation Document for all environmental media from the Department and, if applicable, the U.S. Environmental Protection Agency.

Subject to the right of the parties to amend this Agreement, as provided in Section 13, the Reserve Fund shall be irrevocable and shall continue until terminated (i) automatically pursuant to the immediately preceding paragraph or (ii) at the written agreement of the RF Defendants, the Reserve Fund Trustee and the Department, or, if both RF Defendants have ceased to exist, the Reserve Fund Trustee and the Department.

If the Judicial Consent Order fails to become a final court order, the Reserve Fund may be terminated by the RF Defendants without the consent of the Department.

**Section 3. Reserve Fund Assets**

(a) Funding

Any funds deposited in the Reserve Fund Accounts (as defined below), any Financial Security delivered to the Reserve Fund Trustee, and any other property subsequently transferred to the Reserve Fund Trustee, together with all earnings and interest thereon, if any, less any payments or distributions made by the Reserve Fund Trustee pursuant to this Agreement, is referred to in this Agreement as the "Reserve Fund".

Simultaneously with the execution and delivery of this Agreement, each RF Defendant shall fund the Reserve Fund by making available to the Reserve Fund Trustee its applicable portion of the Reserve Fund Amount by:

(i) delivering to the Reserve Fund Trustee a line of credit or lines of credit which (1) are issued by an entity that is licensed by the New Jersey Department of Banking and Insurance to transact business in the State of New Jersey or by a bank regulated by U.S. federal rules and regulations, (2) include a reference to the Judicial Consent Order, (3) specify that such line of credit shall be issued for a period of one year, and shall be automatically extended for a period of at least one year, (3) indicate that, if the issuer of such line of credit decides not to extend such line of credit beyond the then current expiration date, such issuer shall notify the Reserve Fund Trustee, the applicable RF Defendant, and the Department by certified mail of a decision not at least 120 days before the then current expiration date and (4) indicate that the Reserve Fund Trustee may access such line of credit in accordance with the terms and conditions of this Agreement; or

(ii) delivering to the Reserve Fund Trustee a letter of credit or letters of credit which (1) are issued by an entity that is licensed by the New Jersey Department of Banking and Insurance to transact business in the State of New Jersey or by a bank regulated by U.S. federal rules and regulations, (2) include a reference to the Judicial Consent Order, (3) indicate that such letter of credit is irrevocable and issued for a period of one year, and shall be automatically extended for a period of at least one year, (3) specify that, if the issuer of such letter of credit decides not to extend such letter of credit beyond the then current expiration date, such issuer shall notify the Reserve Fund Trustee, the applicable RF Defendant, and the Department by certified mail of a decision not at least 120 days before the then current expiration date and (4) indicate that the Reserve Fund Trustee may access such letter of credit in accordance with the terms and conditions of this Agreement; or

(iii) delivering to the Reserve Fund Trustee a surety bond agreement or surety bond agreements, which (1) are issued by a certified surety company on the U.S. Treasury List of Approved Sureties, (2) include a reference to the Judicial Consent Order, (3) indicate that such surety bond cannot be canceled by the applicable RF Defendant without the prior written consent of the Department, and (4) specify that such certified surety company may cancel such surety bond by sending notice of cancellation by certified mail or courier to the Reserve Fund Trustee, the applicable RF Defendant, and the Department, provided that such cancellation shall not occur during the 120 days beginning on the date of receipt of the notice of cancellation by the Reserve Fund Trustee, the applicable RF Defendant, and the Department; or

(iv) depositing funds with the Reserve Fund Trustee, which shall be held by the Reserve Fund Trustee in a separate and distinct account for each RF

Defendant (a "Reserve Fund Account" and collectively, the "Reserve Fund Accounts"), subject to the terms and conditions of this Agreement.

For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, (i) no RF Defendant shall be required to provide to the Reserve Fund Trustee any amounts in excess of its respective share of the Reserve Fund Amount determined in accordance with the Cost Sharing Agreements, which, as between the parties thereto, would provide for New DuPont to be responsible for 71 percent thereof and Corteva 29 percent (the "Sharing Percentages"); (ii) each RF Defendant may satisfy its obligation to make available to the Reserve Fund Trustee its respective share of the Reserve Fund Amount through any combination of Sections 3(a)(i)-3(a)(iv), in such RF Defendant's sole discretion, and nothing in this Section 3(a) shall require any RF Defendant to satisfy any portion of its obligations under this Section 3(a) by way of Section 3(a)(iv); (iii) all funds received from (a) an RF Defendant, (b) drawing upon Financial Security provided by such RF Defendant, or (c) recoupment, pursuant to Section 3(c), of Reserve Fund funds provided by such RF Defendant shall be deposited solely in such RF Defendant's Reserve Fund Account and, to the extent not drawn by the Reserve Fund Trustee for payment to the Department, shall be returned solely to such RF Defendant, including any funds returned by the Reserve Fund Trustee pursuant to Section 3(b) or Section 3(d) below; (iv) each RF Defendant shall be solely responsible for the fees and expenses incurred in connection with providing its respective share of the Reserve Fund Amount to the Reserve Fund Trustee and (v) if the amount of the Reserve Fund funded by an RF Defendant exceeds its Sharing Percentage of the Reserve Fund Amount due to Reserve Fund Earnings (as defined below) allocable to such RF Defendant's Reserve Fund Account, such RF Defendant shall be entitled to disbursement of such Reserve Fund Earnings.

(b) Adjustment of Reserve Fund Amount

(i) Annual Adjustments. Upon any increases or decreases to the amount of the RFSs for each Industrial Site pursuant to Paragraph 17 of the Judicial Consent Order, the Department shall provide the Reserve Fund Trustee and the RF Defendants with written notice of such increase or decrease in a given calendar year no later than December 31st of each such year, and the Reserve Fund Amount shall be increased or decreased by the percentage change in the aggregate amount of the RFSs for all Industrial Sites by March 1st of the following year, provided, that in no event shall the Reserve Fund Amount exceed the Reserve Fund Amount Cap (as defined below). If the Reserve Fund Amount has increased pursuant to this Section 3(b) and subject to the Reserve Fund Amount Cap, the RF Defendants shall make available to the Reserve Fund Trustee such additional amount by March 1st in accordance with Section 3(a). If the Reserve Fund Amount has decreased pursuant to this Section 3(b), upon receipt of a Joint Release Instruction, the Reserve Fund Trustee shall promptly disburse to the RF Defendants any amounts in excess of the Reserve Fund Amount in the Reserve Fund Accounts or allow the RF Defendants to deliver replacement Financial Security such that the balance in the Reserve Fund Accounts and such replacement Financial Security equals the Reserve Fund Amount.

(ii) Supplemental Chambers Works Site RFS.

A. If the total estimated costs for Remediation of the Chambers Works Site, including any NAPL Work that has been the subject of a Final TI Waiver Decision (the "Total Remediation Cost Estimate") exceeds $450,000,000, then the Reserve Fund shall function as a supplemental RFS for the costs of the estimated Remediation amount over $450,000,000 ("Supplemental Chambers Works Site RFS"); provided that the amount of the Supplemental Chambers Works Site RFS shall not exceed the Reserve Fund Cap.

B. The Department shall promptly provide the Reserve Fund Trustee and the RF Defendants with written notice when the Total Remediation Cost Estimate for the Chambers Works Site exceeds $450,000,000, and the RF Defendants shall within 60 days make available to the Reserve Fund Trustee such additional amounts in accordance with Section 3(a) as may be required for the Supplemental Chambers Works Site RFS.

C. For so long as the Total Remediation Cost Estimate for Chambers Works exceeds $450,000,000, at each annual anniversary of the notice provided by the Department under Section 3(b)(ii)(B), the Department shall provide the Reserve Fund Trustee and the RF Defendants with written notice of the Total Remediation Cost Estimate for the Chambers Works Site. The amount of the Reserve Fund functioning as Supplemental Chambers Works Site RFS shall be adjusted to be equal to the amount of the Total Remediation Cost Estimate for the Chambers Works Site that exceeds $450,000,000, subject to the Reserve Fund Cap. Pursuant to Paragraph 28 of the Judicial Consent Order, if the Total Remediation Cost Estimate for the Chambers Works Site is below $925,000,000, the amount of the Supplemental Chambers Works Site RFS may be reduced as costs are expended to perform the Remediation of the Chambers Works Site.

(iii) In the event that a portion of the Reserve Fund is functioning as a Supplemental Chambers Works Site RFS and the Supplemental Chambers Works Site RFS is below the Reserve Fund Cap Amount, such amount remaining below the Reserve Fund Cap Amount shall continue to be used as the Reserve Fund for the Pompton Lakes Works, Repauno Works, and Parlin Sites ("Remaining Reserve Fund Amount") consistent with this Agreement. Annual adjustments to the Remaining Reserve Fund Amount shall be made in accordance with Section 3(b)(i), except that the aggregate amount of the RFSs for purposes of calculating annual adjustments to the

Reserve Fund shall be the aggregate amount of the RFSs for the Pompton Lakes Works, Repauno Works, and Parlin Sites.

(c) Recoupment

The Department shall assign its rights to recover any amount of the Reserve Fund previously used in accordance with Section 5 to the RF Defendants. If, and to the extent that, the PRCR reimburses the Department or the RF Defendants for any such amount so previously used, or any such amounts otherwise are recovered, whether by the Department or the RF Defendants ("Reserve Fund Recoupment"), such amounts shall be transferred to the Reserve Fund Trustee for deposit in each RF Defendant's applicable Reserve Fund Account and such amounts shall constitute part of the Reserve Fund subject to Sections 3(b) and 3(e). Amounts so recovered by the Reserve Fund Trustee shall be allocated among the Reserve Fund Accounts of the RF Defendants in accordance with their Sharing Percentages except to the extent the amounts so recouped originally were funded by the RF Defendants in a different proportion, in which case the funds recouped shall be so allocated in accordance with such original funding percentage.

(d) Reserve Fund Amount Cap

(i) For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, in no event shall the Reserve Fund Amount exceed $475,000,000 (subject to adjustment pursuant to Section 3(d)(ii), the "Reserve Fund Amount Cap"). If the Reserve Fund Amount exceeds the Reserve Fund Amount Cap, upon receipt of a Joint Release Instruction, the Reserve Fund Trustee shall promptly disburse any amounts in excess of the Reserve Fund Amount in the Reserve Fund Accounts or allow the RF Defendants to deliver replacement Financial Security such that the balance in the Reserve Fund Accounts and such replacement Financial Security equals the Reserve Fund Amount.

(ii) Any amounts disbursed or drawn in accordance with Section 5 shall decrease the Reserve Fund Amount Cap by such amount unless and until funds are recovered through Reserve Fund Recoupment pursuant to Section 3(c), following which the Reserve Fund Amount Cap shall be increased by the amount actually so recovered and made available to the Reserve Fund Trustee pursuant to Section 3(c).

(e) Reserve Fund Earnings

All products and proceeds of the Reserve Fund, including all interest, dividends, gains and other income on amounts in the Reserve Fund Accounts (collectively, the "Reserve Fund Earnings") shall be retained by the Reserve Fund Trustee in the applicable Reserve Fund Account that generated such Reserve Fund Earnings and shall constitute part of the Reserve Fund.

**Section 4. Entitlement to Draw on the Reserve Fund**

(a) The Department shall be entitled to draw on the Reserve Fund only if each of the following conditions are met:

(i) The funds are drawn in connection with Remediation work identified in the prior year's Detailed Remediation Cost Estimate Worksheet submitted by the PRCR and its LSRP and approved by the Department for one or more of the Industrial Sites where the Department has determined that the PRCR has failed to perform the Remediation as required;

(ii) The Department has notified all Settling Defendants and the Reserve Fund Trustee that the PRCR has failed to perform the Remediation of one or more of the Industrial Sites and has given the PRCR a reasonable opportunity to cure of at least 30 days;

(iii) After such opportunity to cure has lapsed, the Department has notified all Settling Defendants of such failure to cure;

(iv) The Department has made a demand to avail itself of the funds in the RFS(s) for the particular Industrial Site(s) for which the Department has determined that the required Remediation is not being performed; and

(v) The Department has not received within 30 days the funds demanded in Section 4(a)(iv) from the RFS(s) for the particular Industrial Site(s) for which the Department has determined that the required Remediation is not being performed.

(b) EIDP may draw on the Reserve Fund if each of the following conditions are met:

(i) EIDP is performing the Remediation of an Industrial Site pursuant to Paragraph 32 of the Judicial Consent Order;

(ii) EIDP has notified the Department in writing that the RFS(s) for such Industrial Site are unavailable to EIDP to use to perform Remediation and specifies the amount of the funds that EIDP seeks from the Reserve Fund to perform the Remediation; and

(iii) The Department concurs that the RFSs for such Industrial Site are unavailable to EIDP to use to perform the Remediation.

(c) Upon satisfaction of the conditions set forth in either Sections 4(a) or 4(b), the Department shall promptly notify the RF Defendants in writing of the funds that the Department or EDIP is entitled to draw and provide the RF Defendants with (i) written certification that such conditions in either Sections 4(a) or 4(b) have been satisfied with respect to such funds and (ii) a brief summary of the Remediation identified in the prior year's Detailed Remediation Cost Estimate Worksheet for which such funds will be used.

**Section 5. Disbursements**

(a) Timing and Manner

(i) Subject to satisfaction of the conditions set forth in Section 4, the Department may deliver a written instruction to the Reserve Fund Trustee, with a copy to each RF Defendant, to disburse funds from the Reserve Fund to, as applicable, (i) the Department or (ii) EIDP (each, a "Department Release Instruction").

(ii) The Reserve Fund Trustee shall promptly provide each RF Defendant with a copy of such Department Release Instruction and, on the 30th day following its receipt of such Department Release Instruction, shall disburse from each Reserve Fund Account, or draw upon the Financial Security to disburse, funds in an amount, and to the persons designated in such Department Release Instruction, subject to resolution of any dispute pursuant to Section 14. The Reserve Fund Trustee shall act upon any such Department Release Instruction without further inquiry; provided that, for the avoidance of doubt, in no event shall a Department Release Instruction direct the Reserve Fund Trustee to disburse from the Reserve Fund an amount in excess of the Reserve Fund Amount.

(iii) All payments of any part of the Reserve Fund shall be made by wire transfer as set forth in the applicable Department Release Instruction.

(iv) In drawing upon the Reserve Fund Accounts or the Financial Security, the Reserve Fund Trustee shall do so from the Reserve Fund Accounts or Financial Security provided by each RF Defendant in proportion to their Sharing Percentages. Except when acting in accordance with a Release Instruction, the Reserve Fund Trustee shall retain the Reserve Fund in the Reserve Fund Accounts or not draw upon the Financial Security.

(b) Additional Requirements

The Department may only use the funds it receives from the Reserve Fund in performing the Remediation of the Industrial Sites if (i) the Department continues to issue on a quarterly basis a written demand to the defaulting PRCR that it perform the Remediation of the Industrial Site(s) for which a determination has been made by the Department that the required Remediation is not being performed and (ii) the Department provides on an annual basis to the RF Defendants all invoices or other reasonable proof of the expenses relating to the Remediation of the Industrial Sites for which monies from the Reserve Fund were applied.

(c) Instructions to the Reserve Fund Trustee

The Department and each of the RF Defendants shall execute and deliver Joint Release Instructions, upon the written request of another of such parties, but only if such Joint Release Instruction is required to give effect to the terms and conditions of this Agreement.

**Section 6. Reserve Fund Accounts**

In the event that the RF Defendants fund any portion of the Reserve Fund in cash in accordance with Section 3(a)(i):

(a) The Reserve Fund Trustee shall invest and reinvest such principal and income of the Reserve Fund and keep the Reserve Fund invested as a single fund, without distinction between principal and income, in accordance with general investment policies and guidelines subject to the provisions of this Section. Any amounts in a Reserve Fund Account shall be invested in U.S. government securities and interest-bearing deposit obligations insured by the Federal Deposit Insurance Corporation.

(b) The Reserve Fund Trustee is authorized to invest the Reserve Fund in time or demand deposits of the Reserve Fund Trustee, to the extent insured by the Federal Deposit Insurance Corporation; and

(c) The Reserve Fund Trustee is authorized to hold cash awaiting investment of distribution uninvested for a reasonable time and without liability for the payment of interest thereon.

**Section 7. Express Powers and Obligations of Reserve Fund Trustee**

(a) Without in any way limiting the powers and discretions conferred upon the Reserve Fund Trustee by the other provisions of this Agreement or by law, the Reserve Fund Trustee is expressly authorized and empowered:

(i) To liquidate any investments held in order to provide funds for any amounts disbursed in accordance with Section 5;

(ii) To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(iii) To deposit any cash in a Reserve Fund Account in interest-bearing accounts maintained or savings certificates issued by the Reserve Fund Trustee, in its separate corporate capacity, or in any other banking institution affiliated with the Reserve Fund Trustee, to the extent insured by the Federal Deposit Insurance Corporation; and

(iv) To retain and consult with counsel with respect to any questions arising as to the construction of this Agreement or any action to be taken hereunder. The Reserve Fund Trustee shall be fully protected, to the extent permitted by law, in acting upon the advice of counsel.

(b) The Reserve Fund Trustee shall send an account statement to the Department and each RF Defendant on a monthly basis reflecting activity in the Reserve Fund Accounts for the preceding month. The Department and each RF Defendant may examine the records pertaining

to the Reserve Fund Accounts at any time during normal business hours at the Reserve Fund Trustee's office upon reasonable prior notice to the Reserve Fund Trustee.

(c) The Reserve Fund Trustee undertakes to perform only such duties as are expressly set forth herein, and no other duties, including but not limited to any fiduciary duty, shall be implied. The Reserve Fund Trustee shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the RF Defendants and the Department in connection herewith, if any, including the Judicial Consent Order, nor shall the Reserve Fund Trustee be required to determine if any person has complied with any such agreements, nor shall any additional obligations of the Reserve Fund Trustee be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.

(d) The Reserve Fund Trustee hereby agrees and covenants with the Department and each RF Defendant that it shall perform all of its obligations under this Agreement and shall not disburse from the Reserve Fund Accounts or draw upon the Financial Security except pursuant to the express terms of this Agreement or as otherwise required by applicable law.

(e) The Reserve Fund Trustee shall have no duty to solicit any payments which may be due to it or the Reserve Fund Accounts.

**Section 8. Taxes**

The RF Defendants hereby acknowledge that, for U.S. federal income tax purposes, the portion of the Reserve Fund contained in each Reserve Fund Account shall be treated as owned by the RF Defendant who contributed such funds. All amounts disbursed from a Reserve Fund Account shall be treated as paid by the RF Defendant who contributed such funds, and any Reserve Fund Earnings shall be allocated to the applicable RF Defendant whose Reserve Fund Account generated such Reserve Fund Earnings.

Each Defendant shall be responsible for all taxes due on any Reserve Fund Earnings allocated to it for the calendar year in which such Reserve Fund Earnings are earned. The Reserve Fund Trustee shall be responsible for the delivery and filing of tax information reporting forms required to be delivered and filed with the Internal Revenue Service ("IRS") or other taxing authority, including IRS Form 1099 (or other appropriate form), in each case in accordance with this Section 7. Prior to the date hereof, the parties shall provide the Reserve Fund Trustee with certified tax identification numbers by furnishing fully executed forms W-9 or W-8, as applicable, and such other forms and documents that the Reserve Fund Trustee may reasonably request as will permit payments to be made without withholding.

The Reserve Fund Trustee shall be responsible only for income reporting to the IRS with respect to any Reserve Fund Earnings. The Reserve Fund Trustee shall withhold any taxes on any Reserve Fund Earnings required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

The Department agrees to use funds disbursed to it from the Reserve Fund exclusively for "the restitution or remediation of a harm to the environment, wildlife, or natural resources," within the meaning of Treas. Reg. section 1.162-21(e)(4)(i).

**Section 9. Annual Valuation**

The Reserve Fund Trustee shall, annually, at least thirty (30) calendar days prior to the anniversary date of this Agreement, furnish to the Department and the RF Defendants a statement, pursuant to Paragraph 20 of the Judicial Consent Order, confirming that the Reserve Fund complies with the Reserve Fund requirements.

**Section 10. Reserve Fund Trustee Compensation and Expenses**

All fees and expenses of the Reserve Fund Trustee are described in **Schedule A** and shall be paid by the RF Defendants in accordance with their Sharing Percentages. The fees agreed upon for the services to be rendered hereunder are intended as full compensation to the Reserve Fund Trustee's services as contemplated by this Agreement.

**Section 11. Successor Reserve Fund Trustee**

The Reserve Fund Trustee may resign or the Department may replace the Reserve Fund Trustee, but such resignation or replacement shall not be effective until the Department has appointed a successor Reserve Fund Trustee and this successor accepts the appointment. The successor Reserve Fund Trustee shall have the same powers and duties as those conferred upon the Reserve Fund Trustee hereunder. Upon the successor Reserve Fund Trustee's acceptance of the appointment, the Reserve Fund Trustee shall assign, transfer and pay over to the successor Reserve Fund Trustee the funds and properties constituting the Reserve Fund. If for any reason, the Department cannot or does not act in the event of the resignation of the Reserve Fund Trustee, the Reserve Fund Trustee may apply to a court of competent jurisdiction for the appointment of a successor Reserve Fund Trustee or for other appropriate relief, and any such resulting appointment shall be binding upon the parties. The successor Reserve Fund Trustee shall specify the date on which it assumes administration of the Reserve Fund in writing sent to the RF Defendant, the Department, and the present Reserve Fund Trustee by certified mail ten (10) calendar days before such change becomes effective.

**Section 12. Instructions to the Reserve Fund Trustee.**

All orders, requests and instructions by the Department or the RF Defendants shall be in the form of either a Release Instruction or a joint order, request or instruction signed by the Department or each RF Defendant by such persons as are designated in **Schedule B**. The Reserve Fund Trustee shall be fully protected in acting without inquiry in accordance with such Release Instruction or such other joint order, request or instruction. The Reserve Fund Trustee shall have the right to assume, in the absence of written notice to the contrary, that no event constituting a change or a termination of the authority of any person to act on behalf of the RF Defendants or the Department hereunder has occurred. The Reserve Fund Trustee shall have no duty to act in the absence of such orders, requests and instructions from the Department, except as provided for herein.

**Section 13. Amendment of Agreement; Assignment of Agreement**

This Agreement may only be amended by an instrument in writing executed jointly by the RF Defendants, the Reserve Fund Trustee and the Department. This Agreement may not be assigned by operation of law or otherwise without the prior written consent of each of the parties hereto. Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

**Section 14. Dispute Resolution**

Any dispute arising out of this Agreement shall be subject to the Dispute Resolution process established in Paragraph 96 of the Judicial Consent Order.

**Section 15. Immunity**

The Reserve Fund Trustee shall not incur any liability in connection with any act of omission, made in good faith, other than liability resulting from any act or omission that is determined by a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud or a criminal act. The Reserve Fund Trustee shall be indemnified and saved harmless by the RF Defendants from and against any liability, including all expenses reasonably incurred in its defense, to which the Reserve Fund Trustee may be subjected by reason of (a) the Reserve Fund Trustee's performance of this Agreement, except to the extent such liability has been caused by any act or omission that is determined by a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud or a criminal act, or (b) the Reserve Fund Trustee following any written instructions from any party (including, for the avoidance of doubt, any Release Instruction or any joint written instructions of the RF Defendants and the Department delivered in accordance with the terms of this Agreement) received in accordance with the terms of this Agreement, except to the extent that following any such instruction or direction would be inconsistent with the terms of this Agreement. Notwithstanding anything to the contrary herein, the RF Defendants agree, solely as between themselves, that to the extent any obligation for indemnification under this Section 15 is satisfied pursuant to a payment by a RF Defendant on behalf of the other RF Defendant, such other RF Defendant shall promptly reimburse the paying RF Defendant by such amount that such other RF Defendant should have paid for indemnification (which shall be paid in accordance with the Sharing Percentages). The provisions of this Section 15 shall survive the resignation or removal of the Reserve Fund Trustee and the termination of this Agreement.

**Section 16. Choice of Law**

This Agreement shall be administered, construed and enforced according to the laws of the State of New Jersey.

**Section 17. Termination**

This Agreement shall terminate on the first to occur of (a) each of the Industrial Sites receiving a sitewide Final Remediation Document for all environmental media from the Department and, if applicable, the U.S. Environmental Protection Agency and (b) the distribution of all of the Reserve Fund in accordance with this Agreement, after which this Agreement shall be

of no further force and effect except that the provision of Section 15 shall survive termination. To the extent that part or all of the Reserve Fund is being held by the Reserve Fund Trustee in the Reserve Fund Accounts on the occurrence of clause (a) of the immediately foregoing sentence, the Reserve Fund Trustee shall return such funds to the applicable RF Defendant.

**Section 18. Entire Agreement**

This Agreement and the Judicial Consent Order taken together shall constitute the entire agreement among the parties hereto with respect to the subject matter of this Agreement and supersede all prior agreements (whether written or oral and whether express or implied) by or among the parties hereto to the extent related to the subject matter of this Agreement. Notwithstanding the terms of any other agreement between the parties, the terms and conditions of this Agreement shall control the actions of the Reserve Fund Trustee.

**Section 19. No Rights**

Except as expressly provided in Section 15, nothing in this Agreement, whether express or implied, shall be construed to give any person or entity other than the Reserve Fund Trustee, the Department and the RF Defendants any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds or financial security held hereunder.

**Section 20. Waiver of Offset Rights**

The Reserve Fund Trustee hereby waives any and all rights to offset that it may have against the Reserve Fund including claims arising as a result of any claims, amounts, liabilities, costs, expenses or other losses (collectively "Reserve Fund Trustee Claims") that the Reserve Fund Trustee may be otherwise entitled to collect from any party, other than Reserve Fund Trustee Claims arising under this Agreement.

*[remainder of page intentionally left blank; signature page follows]*

In Witness Whereof, the parties have caused this Agreement to be executed by their respective officer or management officials, duly authorized, and their corporate seals to be hereunto affixed and attested, as of the date first above written:

______________________________ DATE: ______________________________
[NAME OF RF DEFENDANT]

BY: ______________________________

TITLE: ______________________________

______________________________ DATE: ______________________________
[NAME OF RF DEFENDANT]

BY: ______________________________

TITLE: ______________________________

______________________________ DATE: ______________________________
[NAME OF DEPARTMENT OFFICIAL]

BY: ______________________________

TITLE: ______________________________

______________________________ DATE: ______________________________
[NAME OF RESERVE FUND TRUSTEE]

BY: ______________________________

TITLE: ______________________________

**Schedule A**

**Schedule B**

All orders, requests and instructions to the Reserve Fund Trustee shall be in writing, signed by such persons identified below.

For Department Release Instructions:

Kimberly Cahall
Chief Advisor and Chief Enforcement Officer
Legal, Regulatory, and Enforcement Policy
New Jersey Department of Environmental Protection
401 East State Street
Trenton, New Jersey 08625
Kimberly.Cahall@dep.nj.gov

For Joint Release Instructions and any other joint orders, requests, and instructions:

For the Department:

Kimberly Cahall
Chief Advisor and Chief Enforcement Officer
Legal, Regulatory, and Enforcement Policy
New Jersey Department of Environmental Protection
401 East State Street
Trenton, New Jersey 08625
Kimberly.Cahall@dep.nj.gov

For DuPont de Nemours Inc.:

[Insert]

For Corteva, Inc.:

[Insert]

# EXHIBIT E

TRIAL EXHIBIT
DX_DP1537
NJDEP v. E.I. DuPont 1:19-cv-14766

State of New Jersey
Department of Environmental Protection

Richard J. Codey
*Acting Governor*

Bradley M. Campbell
Commissioner

| | | |
|---|---|---|
| **IN THE MATTER OF** | : | |
| **THE DUPONT De NEMOURS SITES** | : | **COMPENSATORY RESTORATION** |
| **AND** | : | **ADMINISTRATIVE CONSENT** |
| **E. I. DUPONT DE NEMOURS AND** | : | **ORDER** |
| **COMPANY, INC.** | : | |

The New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund (jointly "the Department") enter this Compensatory Restoration Administrative Consent Order pursuant to the authority vested in the Administrator of the New Jersey Spill Compensation Fund by the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 et seq., and the Commissioner of the Department by N.J.S.A. 13:1D-1 et seq. and duly delegated to the Assistant Commissioner, Natural and Historic Resources pursuant to N.J.S.A. 13:1B-4.

## FINDINGS

1. The E. I. du Pont de Nemours and Company, ("DuPont") properties that are the subject of this Compensatory Restoration Administrative Consent Order include all the properties listed and described in Appendix A, which is attached hereto and made a part hereof (herinafter referred to as "the Properties"), including those areas outside the Properties to which discharges from each of the Properties have migrated (hereinafter referred to as "the Sites").

2. DuPont, which is incorporated under the laws of the State of Delaware and has its principal offices located at 1007 Market Street, Wilmington, Delaware, has agreed to enter into this Compensatory Restoration Administrative Consent Order in order to address natural resource injuries to ground water.

3. DuPont is conducting the remediation of discharges at the Properties identified in Appendix A pursuant to the Department's oversight.

4. As the trustee of all of the natural resources within the jurisdiction of the State for the benefit of the citizens of New Jersey, pursuant to Section 58:10-23.11a of the Spill Act and Section 107(f)(2)(B) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(f)(2)(B), the Department alleges that the discharges at the Properties have injured and continue to injure ground water and the natural

resource services that it provides. This Compensatory Restoration Administrative Consent Order is limited to injuries to ground water.

5. By entering into this Compensatory Restoration Administrative Consent Order, DuPont neither admits nor denies any of the Findings of the Department. This Compensatory Restoration Administrative Consent Order shall not constitute, nor be interpreted or used as, an admission of fault, liability, law or fact, nor shall it be admissible in any proceeding as such, except in a proceeding to enforce the provisions of this Compensatory Restoration Administrative Consent Order.

**ORDER**

6. "Natural Resource Damages" as used in this Compensatory Restoration Administrative Consent Order include any and all claims for lost use of, injury to, or destruction of, ground water, or for the restoration to compensate the citizens of New Jersey for the injury to ground water, arising from discharges of hazardous substances that occurred at the Properties prior to the Effective Date of this Compensatory Restoration Administrative Consent Order. Natural Resource Damages include, but are not limited to, claims for assessments, attorney's fees, consultant's or expert fees, interest, or any other expenses or compensation, injunctive relief, and administrative remedies, recoverable as Natural Resource Damages for injuries to ground water under CERCLA, the Oil Pollution Act, 33 U.S.C. §§ 2701 et seq., the Clean Water Act, 33 U.S.C. §§ 1251 et seq., the Spill Act, the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., or any other state or federal common law, statute, or regulation. However, Natural Resource Damages shall not include:

(i) any damages as a result of injuries to any natural resource other than ground water,

(ii) compliance, during the cleanup, i.e., primary restoration, of a discharge, with any statutory or regulatory requirement that is not within this definition of Natural Resource Damages, for example, without limitation, the mitigation of freshwater wetlands as required by N.J.A.C. 7:7A, or

(iii) the restoration or other compensation for injury to any natural resource, including ground water, caused after the Effective Date of this Compensatory Restoration Administrative Consent Order, by implementation of any remedial action, including a compensatory restoration remedial action, at any of the Sites.

7. DuPont agrees that the settlement values for the Sites reflected in this agreement are premised on current and future compliance with all lawfully imposed requirements for remedial or primary restoration measures at the covered sites. Failure to comply with such measures may give rise to additional natural resource damage liability, to the extent that the noncompliance increases the scope or duration of natural resource injury.

8. Within 90 calendar days after the Effective Date of this Compensatory Restoration Administrative Consent Order, DuPont agrees to pay to the Department the sum of

$500,000.00 in partial settlement of the Department's claims for Natural Resource Damages for injuries to ground water. DuPont agrees to make this payment required by this paragraph by a cashier's or certified check payable to the "Treasurer - State of New Jersey" and submitted to:

Administrator
Office of Natural Resource Restoration
Natural and Historic Resources Program
New Jersey Department of Environmental Protection
P.O. Box 404
Trenton, New Jersey 08625-0404

A copy of the letter transmitting the check, together with a copy of the check, shall be simultaneously sent to:

Section Chief
Cost Recovery & Natural Resource Damages Section
Division of Law
New Jersey Department of Law and Public Safety
Office of the Attorney General
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093

9. Within 365 calendar days after the Effective Date of this Compensatory Restoration Administrative Consent Order, DuPont agrees to submit to the Department for approval, at the first address listed in Paragraph 8, a survey prepared in accordance with New Jersey Green Acres, Minimum Specifications for Land Surveys and Property Descriptions," (found at: http://www.state.nj.us/dep/greenacres) of each property listed in Appendix B which is attached hereto and made a part hereof (hereinafter "the Parcels").

10. Within 120 calendar days after the approval of surveys required in paragraph 9 above, DuPont agrees to place a conservation easement, pursuant to the conservation easement model included in Appendix C, which is attached hereto and made a part hereof, on each of the Parcels, with the exception of Pompton Lakes Parcel #1 and Pompton Lakes Parcel #2, record each conservation easement with the Clerk of the county in which each property is located, and submit copies of the recorded conservation easements to the Department, at the first address listed in Paragraph 8, above.

11. Within 90 days after the Effective Date of this Compensatory Restoration Administrative Consent Order DuPont agrees to submit to the Department, a Demolition Work Plan for Pompton Lakes Parcel #1 and Pompton Lakes Parcel #2 which provides the following information:

(i) a list of all abandoned /derelict structures present on these parcels; and

(ii) a schedule for demolition of abandoned/derelict structures to ground surface grade and removal of the debris generated thereof at these parcels.

12. Within 30 calendar days after receipt of the Department's written comments on the Demolition Work Plan or longer as authorized by the Department, DuPont agrees to modify the Demolition Work Plan to conform to the Department's comments and agrees to submit the modified Demolition Work Plan to the Department. The determination as to whether or not the modified Demolition Work Plan, as resubmitted, conforms to the Department's written comments and is otherwise acceptable to the Department shall be made solely by the Department in writing.

13. Within 60 days of the Department's approval of the Demolition Work Plan or longer as authorized by the Department in order to properly implement the Demolition Work Plan and to ensure compliance with the Highlands Water Protection and Planning Act, DuPont agrees to implement the approved Demolition Work Plan.

14. Within 90 days of DuPont's completion of demolition activities, DuPont agrees to submit to the Department a Demolition Report containing the following information:

(i) a map of the Pompton Lakes Parcel #1 and Pompton Lakes Parcel #2 indicating the location of demolition activities;

(ii) a description of demolition methods and an inventory of materials disposed of as a result of the demolition activities; and

(iii) pictures documenting all phases of the demolition activities including pre-demolition and post-demolition conditions.

15. Within 30 calendar days after receipt of the Department's written comments on the Demolition Report or longer as authorized by the Department, DuPont agrees to modify the Demolition Report to conform to the Department's comments and agrees to submit the modified Demolition Report to the Department. The determination as to whether or not the modified Demolition Report as resubmitted, conforms to the Department's written comments and is otherwise acceptable to the Department shall be made solely by the Department in writing.

16. Within 60 calendar days after the Department's approval of the Demolition Report and DuPont's compliance with paragraph 9 above, which ever is later, DuPont agrees to undertake any and all steps to convey to the Department, fee simple title and all its right, title and interest in Pompton Lakes Parcel #1 and Pompton Lakes Parcel #2. Further, in the event DuPont no longer wishes to retain fee simple title to any or all of the parcel identified as the Salem Creek Parcel in Appendix B, DuPont agrees to undertake any and all steps to convey to the Department, fee simple title and all its right, title and interest in any or all of the Salem Creek Parcel.

17. DuPont agrees to bear the full cost of the tasks described in Paragraphs 9 through 16, including, without limitation, reimbursement of any oversight costs incurred by the Green

Acres program in participating in any of the foregoing tasks. Oversight costs will be determined consistent with N.J.A.C. 7:26C-9 et seq.

18. DuPont agrees to refrain from conducting any activity with respect to each of the Parcels that would be prohibited under the model conservation easement or that would be inconsistent with the protections to be provided under the conservation easement.

19. No later than 60 days after the Effective Date of this Compensatory Restoration Administrative Consent Order, and annually thereafter by January 15th for the following 4 years, DuPont agrees to make 5 equal payments of $360,000 each to an organization or entity established and recognized as an organization with expertise in the design and implementation of community tree planting projects, and which is acceptable to the Department as the chosen tree planting vendor. DuPont agrees to include in its contract with the chosen vendor the requirement that the trees to be planted meet a minimum 3-inch diameter breast height in size. No later than 90 days after the Effective Date of this Compensatory Restoration Administrative Consent Order and then beginning on February 15, 2006, and annually thereafter on the same calendar day for the following 4 years, DuPont agrees to submit to the Department, at the first address listed in Paragraph 8, above, a copy of the most recent proof of payment to the chosen tree planting vendor required by this paragraph. The obligations of DuPont under this paragraph shall be limited to providing the funding required herein. DuPont shall not be responsible for the procurement or planting of the trees, nor shall DuPont be responsible for any other costs, expenses or damages with respect to the trees. All decisions as to when, where and under what circumstances the trees are to be planted shall be made by the chosen tree planting vendor, which shall be solely responsible for the maintenance, welfare and replacement, if necessary of the trees.

20. DuPont agrees to design, construct, supply, and install a 15-foot wide boat ramp and associated facilities for public access to the Salem Creek off of Route 540 (Deepwater-Slapes Corner Road) in Mannington Township, Salem County, and indicated on the map in Figure 1, attached to and made a part of this Compensatory Restoration Administrative Consent Order, on land owned by DuPont which is also identified as the Salem Creek Parcel in Appendix B. The associated facilities include a gravel access road and parking area adequate to accommodate a minimum of 15 vehicles with trailers and 10 non-trailered vehicles, a semi-permanent sanitary facility, fencing and appropriate landscaping.

21. Within 120 calendar days after the Effective Date of this Compensatory Restoration Administrative Consent Order, DuPont agrees to submit to the Department, a draft Boat Ramp Design and Work Plan which provides the following:

(i) a narrative of the project;

(ii) a conceptual drawing of the boat ramp and associated facilities;

(iii) construction specifications;

(iv) a list of construction materials for the facilities;



NJDEP-DPNT-CW02201031

DX_DP1537.5

(v) an inventory of the landscaping plants and materials; and

(vi) a construction schedule for the project.

22. Within 30 calendar days after receipt of the Department's written comments on the Boat Ramp Design and Work Plan or longer as authorized by the Department in order that DuPont comply with all applicable rules, regulations and statutes applicable to implementation of the Boat Ramp Design and Work Plan, DuPont agrees to modify the Boat Ramp Design and Work Plan to conform to the Department's comments and agrees to submit the modified Boat Ramp Design and Work Plan to the Department. The determination as to whether or not the modified Boat Ramp Design and Work Plan, as resubmitted, conforms to the Department's written comments and is otherwise acceptable to the Department shall be made solely by the Department in writing.

23. Within 90 days of the Department's approval of the Boat Ramp Design and Work Plan or longer as authorized by the Department, in order that DuPont comply with all applicable rules, regulations and statutes applicable to implementation of the approved Boat Ramp Design and Work Plan, Dupont agrees to implement the approved Boat Ramp Design and Work Plan. The obligations of DuPont under this paragraph shall be limited to the construction of the boat ramp and associated facilities.

24. Within 90 calendar days of completion of construction, DuPont agrees to submit a final Construction Report that shall include:

(i) a narrative description of the final project with associated documentation (ex. maps, pictures);

(ii) as built designs;

(iii) a list and explanation of any deviations from the approved Boat Ramp Design and Work Plan;

(iv) inventory of construction materials; and

(v) manufacturers operation and maintenance manuals.

25. DuPont agrees to be responsible for repair and/or replacement of any of these facilities due to defects in construction techniques, construction materials or design for a period of not less than 5 years from the completion of construction. DuPont shall not be responsible for repair and replacement of the boat ramp and associated facilities as a result of normal wear and tear associated with the use of these facilities or failure to adhere to standard operation and maintenance procedures for these facilities. DuPont shall not be responsible for the operation or maintenance of the boat ramp and associated facilities.

26. DuPont agrees to notify the Department at least fourteen (14) calendar days prior to the initiation of any field activities related to construction or demolition activities.

27. Within 365 calendar days after the Effective Date of this Compensatory Restoration Administrative Consent Order, DuPont agrees to contribute $500,000.00 to a recognized non-profit land acquisition organization which is acceptable to the Department towards the acquisition of the Wildwood Water Utility Property located in Cape May County (Green Acres project number 4774). DuPont agrees to submit to the Department, at the first address listed in Paragraph 8, above, proof of payment of this contribution required by this paragraph. The obligations of DuPont under this paragraph shall be limited to the financial contribution required herein. DuPont shall not be responsible for any costs, expenses or damages incurred by any person with respect to the Wildwood Water Utility Property.

28. The Department will consider a written request for an extension of time to perform any requirement in this Compensatory Restoration Administrative Consent Order, provided that DuPont submits any extension request to the Department two weeks prior to any applicable deadline to which the extension request refers. This request shall be sent to the Office of Natural Resource Restoration address indicated in paragraph 8 above.

29. It is the intent of the Department and DuPont that this Compensatory Restoration Administrative Consent Order constitutes an administratively approved settlement within the meaning of 42 U.S.C. § 9613(f)2 that resolves the liability of DuPont to the Department for natural resource damages for injuries to ground water. The "matters addressed in the settlement" documented in this Order, for purposes of that provision, shall include natural resource damages for injuries to ground water.

30. It is the further intent of the Department and DuPont that by entering into this Compensatory Restoration Administrative Consent Order, DuPont and its past, present and future direct or ultimate predecessors, successors, parent, subsidiaries, officers, directors and employees (collectively "the Releasees") shall be protected to the greatest extent possible from any contribution claim a third party may assert to the extent the claim arises from any judgment entered in favor of the Department in any civil or administrative action the Department brings to recover for damages or injuries to ground water at the Properties. The Department further agrees that the payment described in Paragraph 8, above, and completion of compensatory restoration described in Paragraphs 9 through 27, above, constitute the Releasees' full and fair share of any claim or cause of action the Department has for natural resource damages for injuries to ground water. Further, the Department agrees that it will not oppose any motion or application by the Releasees in any subsequent action in which the Releasees seek the contribution protection that this Compensatory Restoration Administrative Consent Order is intended to provide. The Department agrees that it will require, in any future settlement that it reaches with any other person or entity regarding natural resource damages for injuries to ground water as a result of discharges at the Properties, a provision that such person or entity will not seek and thereby waives all rights of contribution from the Releasees for the natural resource damage liability settled thereunder.



NJDEP-DPNT-CW02201033

DX_DP1537.7

31. Within 20 calendar days after the Effective Date of this Compensatory Restoration Administrative Consent Order, DuPont agrees to publish legal notices in three newspapers of general circulation in the area of each of the Properties for a period of not less than three days and the Department agrees to arrange for the publication of a notice in the New Jersey Register, each giving notice to the public that:

(i) the New Jersey Department of Environmental Protection and DuPont have entered into this Compensatory Restoration Administrative Consent Order;

(ii) a copy of this Compensatory Restoration Administrative Consent Order is available for inspection via the Internet at the main branch of the county libraries for each of the counties where one of the Properties is located, the main office of the Department in Trenton, New Jersey, and on the Department's Internet site at *http://www.nj.gov/dep/nrr/settlements*; and

(iii) objections to, and comments on, the entry of this Compensatory Restoration Administrative Consent Order must be submitted to the Department in writing, at the first address listed in Paragraph 8, above, within thirty (30) calendar days after the date of publication in the New Jersey Register.

32. For and in consideration of the payments set forth in paragraph 8 of this Compensatory Restoration Administrative Consent Order, and the performance by DuPont of the compensatory restoration projects described in paragraphs 9 through 27 of this Compensatory Restoration Administrative Consent Order, the Department agrees to issue a Release/Covenant Not to Sue to DuPont that hereby fully and forever releases, covenants not to sue, or otherwise take administrative action against the Releasees for any and all of the State's claims and causes of action for Natural Resource Damages.

33. The Department reserves the right to withhold its execution of this Compensatory Restoration Administrative Consent Order if the public comments or objections regarding the Compensatory Restoration Administrative Consent Order disclose facts or considerations that indicate to the Department, in its sole discretion, that the natural resource damage settlement described in this Compensatory Restoration Administrative Consent Order is inappropriate, improper, or inadequate provided however, that the Department shall, if it deems appropriate, exercise its right to withhold its execution of this Compensatory Restoration Administrative Consent Order no later than forty five (45) days after the end of the comment period described in paragraph 31, in which case the Department will return to DuPont any monies that DuPont had paid to the Department pursuant to Paragraph 8, above.

34. The Department expressly reserves its right to pursue DuPont for natural resource damages for:

(i) injuries to any natural resource, other than ground water, resulting from a discharge at any of the Properties that occurred prior to the date of this Compensatory Restoration Administrative Consent Order;



NJDEP-DPNT-CW02201034

DX_DP1537.8

(ii) injuries to any natural resource, including ground water, resulting from a discharge at any of the Properties that occurs after the date of this Compensatory Restoration Administrative Consent Order; and

(iii) injuries to any natural resource, including ground water, resulting from the implementation of any remedial action implemented at any of the Properties; and

(iv) injuries to ground water pursuant to paragraph 7 above.

**General Provisions**

35. DuPont consents to the entry of this Compensatory Restoration Administrative Consent Order without further notice.

36. Nothing in this Compensatory Restoration Administrative Consent Order, including the Department's issuance of a Release/Covenant Not to Sue as described in Paragraph 32, above, shall impact DuPont's obligation to complete the remediation of all hazardous substances discharged at the Properties described in paragraph 3, above.

37. DuPont agrees to comply with this Compensatory Restoration Administrative Consent Order, which shall be fully enforceable as an Order in the New Jersey Superior Court pursuant to the Department's statutory authority.

38. No modification or waiver of this Compensatory Restoration Administrative Consent Order shall be valid except by written amendment to this Compensatory Restoration Administrative Consent Order duly executed by DuPont and the Department.

39. DuPont waives its rights to an administrative hearing concerning the entry of this Compensatory Restoration Administrative Consent Order.

40. This Compensatory Restoration Administrative Consent Order shall be governed and interpreted under the laws of the State of New Jersey except with respect to contribution protection as provided for in paragraph 30, above to which Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), as to which federal law shall govern.

41. DuPont agrees to submit to the Department, along with two original copies of the Compensatory Restoration Administrative Consent Order, signed by DuPont, documentary evidence, such as a corporate resolution or a certification by a corporate officer, that the signatory has the authority to bind DuPont to the terms of this Compensatory Restoration Administrative Consent Order.

42. This Compensatory Restoration Administrative Consent Order shall be binding, on DuPont, its successors, assignees, and any trustee in bankruptcy.or receiver appointed pursuant to a proceeding in law or equity. No change in the ownership or corporate status of DuPont or the Property shall alter any party's responsibilities under this Compensatory Restoration Administrative Consent Order.

43. This Compensatory Restoration Administrative Consent Order shall be effective upon the execution its execution by the Department, having first been executed by DuPont.

New Jersey Department of Environmental Protection

Date: 6/30/05

By: [signature]
John S. Watson, Jr.
Assistant Commissioner
Natural and Historic Resources

New Jersey Spill Compensation Fund

Date: 6/23/2005

By: Leonard Romino
Leonard Romino
Spill Fund Administrator

E.I. DuPont de Nemours Company, Inc.

Date: 6/22/05

By: James B. Porter
James B. Porter
Vice President - DuPont Safety, Health, Environment and Engineering

FIGURE
1

NJDEP-DPNT-CW02201038

FIGURE 1
Chambers Works Salem Creek Public Fishing / Boat Access, Salem County




New Jersey
Department of Environmental Protection
Office of Natural Resource Restoration
Richard J. Codey, Acting Governor
Bradley M. Campbell, Commissioner
composed: NJDEP ONRR 5/31/05

DX_DP1537.12

# APPENDIX
# A

## APPENDIX A - DuPont Properties

| PROPERTY NAME | NJDEP ID NUMBER | ADDRESS | TOWN | COUNTY | BLOCK | LOT(S) |
|---|---|---|---|---|---|---|
| Agrico Chemical Co. | G000001565 | Roosevelt Ave and Liebig St | Carteret | Middlesex | 5.2 | 1.01,2.01 |
| Cookson Pigments Inc. | 005048 | 256 Vanderpool St | Newark | Essex | 1171 | 1 |
| | | | | | 1172 | 1 |
| | | | | | 1176 | 1 |
| | | | | | 1177 | 40 |
| | | | | | 1177 | 58 |
| DuPont Chambers Works | 008221 | Route 130 | Pennsville | Salem | 301 | 1, 2, 3, 4, 5 |
| | | | | | 185 | 1,2,3 |
| | | | | | 193 | 5 |
| DuPont Grasselli Plant | G000001666 | Foot of South Wood Ave | Linden | Union | 586 | 8, 9, 10, 11 |
| Pitt Consol Chemical Company | G000002172 | Doremus Ave | Newark | Essex | 5016 | 1 |
| | | | | | 5010 | 10 |
| Dupont Pompton Lakes | 007411 | 2000 Cannonball Road | Pompton Lakes | Passaic | 100 | 3, 6.01, 7 |
| | | | | | 479 | 1,2,3 |
| | | | | | 479.01 | 3,4,5 |
| Dupont Repauno | 008225 | 200 North Repauno Ave | Greenwich | Gloucester | 3 | 8, 9,10,11 12,21,27,37 |
| | | | | | 1 | 1, 2, 3 |
| | | | | | 1.01 | 1 |
| | | | | | 4 | 1 |
| | | | | | 5 | 3, 5 |
| | | | | | 6 | 2 |
| | | | | | 8 | 1, 2, 3, 4, 5 |
| | | | | | 9 | 1, 2, 3, 4, 5 |
| | | | | | 246 | 6 |
| | | | | | 33.01 | 1 |
| Dupont Parlin Works | 008222 | 250 Cheesequake Road | Sayreville | Middlesex | 27.01 | 1 |
| | | | | | 28 | 1 |
| | | | | | 28.01 | 1, 1.01 |
| | | | | | 35 | 1 |
| | | | | | 36 | 1 |
| | | | | | 37 | 1 |
| | | | | | 38 | 1 |
| | | | | | 39 | 1 |
| | | | | | 41 | 1 |
| | | | | | 41.02 | 2 |
| | | | | | 42 | 1.04 |

# APPENDIX
# B

# APPENDIX B
# THE PARCELS

| PARCEL NAME | LOCATION | TOWN/COUNTY | BLOCK | LOT(S) | SIZE |
|---|---|---|---|---|---|
| Pompton Lakes #1 Cannonball Trail | North side of I-287, South of the bed of Fourth Ave. | Wanaque/Passaic | 479 | 01 | 58.52 acres |
| Pompton Lakes #2 Highlands | 1350 Ringwood Ave | Wanaque/Passaic | 479 | 5 | 14.7 acres |
| Repauno Works #1 Wiggins Pond | North of Morse St, East of North School st and South of Repauno Works Fence | Gibbstown/Gloucester | 8 | 4(partial) | 78.5 acres |
| Repauno Works #2 White Sluice | East of the Delaware River and South of White Sluice Race | Gibbstown/Gloucester | 3 | 8, 9, 10,11, 12, 21, 27, 37 | 356 acres |
| | | | 5 | 3, 5 | |
| | | | 6 | 2 | |
| Chambers Works Salem Creek | Riparian land and uplands along Salem Canal & Salem River system | Deepwater/Salem | 265 | 2, 4, 6, 2.01, 6.01 | 954 acres |
| | | | 267 | 20, 20.01 | |
| | | | 268 | 8, 8.01 | |
| | | | 228 | 1, 1.01 | |
| | | | 222 | 1, 1.01 | |
| | | | 264 | 1, 1.01 | |
| | | | 227 | 2 | |
| | | | 262 | 6 | |
| | | | 246 | 12 | |
| | | | 248 | 1.01 | |
| | | | 2 | 20 | |
| | | | 27 | 1 | |
| | | | 1 | 1 | |
| | | | 901 | 38 | |
| | | | 45 | 8 | |
| Duhernal | Upland and wetlands south of Duhernal Lake | Old Bridge/Middlesex | 26052.13 | 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 | 63.1 acres |

# APPENDIX
# C

## MODEL CONSERVATION EASEMENT

The model document in this Appendix contains blanks and matter in brackets [ ]. These blanks shall be replaced with the appropriate information prior to submission to the Department for approval. Matter bracketed [ ] is not intended for deletion, but rather is intended to be descriptive of the variable information that may be contained in the final document.

Prepared by: ______________________________________
[Signature]
______________________________________
[Print name below signature]

Recorded by: ______________________________________
[Signature, Officer of County Recording Office]
______________________________________
[Print name below signature]

## DEED OF CONSERVATION EASEMENT

This Deed of Conservation Easement ("Easement"), made this________day of ____________,200___ , between __________________ ("Grantor"), having a principal place of business at ______________________, New Jersey and State of New Jersey, Department of Environmental Protection having its principal place of business at 401 East State Street, Trenton, New Jersey 08625, ("Grantee").

1. THE PROPERTY. [Insert the full legal name and address of each current property owner] [Insert as appropriate: "is," or "are"] the owner in fee simple of certain real property designated as Block(s) _______ Lot(s) _______, on the tax map of the [insert, as appropriate: City/Borough/Township/Town] of [insert the name of municipality], [insert the name of county] County; and the property is more particularly described in Exhibit A, which is attached hereto and made a part hereof (the "Property").

2. PROPERTY CONDITION. The Property is undeveloped land and the qualities of the Property are documented in an inventory of the Property dated __________, and attached hereto as Exhibit B, a report and map and other documentation that the parties agree provide accurate representation of the Property at the time of this grant and which is intended to serve as baseline information for monitoring compliance with the terms of this grant.



NJDEP-DPNT-CW02201044

DX_DP1537.18

3. CONSERVATION VALUES OF PROPERTY. The Property is undeveloped land providing [watershed protection benefits, ground water recharge benefits, habitat preservation, recreational opportunities] to the general public,.

4. PRESERVATION OF CONSERVATION VALUES. Grantor intends, as owner of the Property, to convey to Grantee the right to preserve and protect the Conservation Values of the Property in perpetuity.

5. BIN\DING EASEMENT. this conservation easement shall be binding upon the Grantor, its successors and assigns, and upon the Grantee, its successors and assigns.

7. CONSIDERATION. In consideration of the execution of the Restoration Administrative Consent Order annexed to this document as Schedule [?], the Grantor does hereby convey to the Grantee, a conservation easement in perpetuity within the Easement Area, purusant to the laws of New Jersey, for the exclusive purpose of assuring that the character of the Easement Area will be conserved and maintained forever and that usees of the Easement Area that are inconsistent with this Conservation Value will be prevented or corrected.

8. PURPOSE. It is the purpose of this Conservation Easement to assure that the Conservation Values of the Property will be retained forever; to prevent any use of the Property that will impair or interfere with the Conservation Values; and to encourage management practices that are consistent with the terms of this easement and provide for long term protection of the Conservation Values of the Property.

9. PROHIBITED ACTS. Except for those rights expressly reserved or where Grantor has received written consent an/or permission of the Grantee, any activity on or use of the Property inconsistent with the purpose of this Conservation Easement is prohibited, including, without limitation, the following activities and uses:

i. Subdivision and Development. Any new development or subdivision of the Property is expressly prohibited, except for specific rights retained in this Conservation Easement;

ii. Structures. Construction of new structures, temporary or permanent, is specifically prohibited on the Property;

iii. Mining. No topsoil, sand, gravel, loam, rock, or other minerals shall be deposited on, excavated, dredged, or removed from the Property;

iv. Roads, Driveways and Impervious Cover. No portion of the Property shall be covered with concrete, asphalt, oiled stone or any other impervious paving material. No new roads or driveways may be constructed on the Property;

v. Trash. No dumping or placing of trash or waste material shall be permitted on the Property; and

vi. Natural Resource Protection. No activity shall be permitted on the Property that would be detrimental to drainage, flood control, water conservation, erosion control, or soil conservation.

10. RIGHTS OF GRANTOR. The ownership rights of the Grantor extend to Grantor's personal representatives, heirs, successors, and assigns and include, but are not limited to, the right to sell or otherwise transfer the Property, and the right to exclude any member of the public from the Property.

11. RIGHT OF FIRST REFUSAL. Grantor agrees to give the Grantee, jointly and severally, a Right of First Refusal to purchase the Property, which right shall be of perpetual duration. The conditions of this Right shall be such that whenever the Grantor receives a written offer from a person or persons to purchase all or any part of the Property, and Grantor accepts the offer subject to this Right of First Refusal, the Grantor shall notify the Grantee via certified mail of the offer. Grantee may elect to purchase the Property at the offered price and upon such other terms and conditions not less favorable to the Grantor than those contained in the conditionally accepted offer. Grantee shall have 90 days to elect to purchase the Property and will notify the Grantor by certified mail of such an election. This Right of First Refusal shall not apply to:

i. Any gift, inheritance, or other transfer of the Property without consideration, or

ii. Any sale or other conveyance of the Property to any of Grantor's children.

The Right of First Refusal shall apply to all other sales and conveyances of the Property, including any sale or conveyance for consideration of any interest in the Property including any conveyance by, or conveyance of any interest in a family corporation, partnership or other holding entity.

12. RIGHTS OF GRANTEE. To accomplish the conservation purposes of this Conservation Easement the following rights are conveyed to the Grantee:

i. Enforcement. Grantee has the right to preserve and protect the Conservation Values of the Property.

ii. Inspection. Grantee and its agents shall be permitted access to, and have the right to enter upon, the Property, for the purposes of inspection in order to enforce and assure compliance with the terms of this Conservation Easement.

13. RESPONSIBILITIES OF GRANTOR AND GRANTEE NOT AFFECTED. Other than as specified herein, this Conservation Easement is not intended to impose any legal or other responsibility on the Grantee, or in any way to affect any existing obligations of the Grantor as owner of the Property. This shall apply to:

i. Taxes. Grantor shall continue to be solely responsible for payment of all taxes and assessments levied against the Property.

ii. Upkeep and Maintenance. The Grantor, as owner of the Property, shall continue to be solely responsible for the upkeep and maintenance of the Property, to the extent it may be required by law. The Grantee shall have no obligation for the upkeep or maintenance of the Property. Nothing in this Conservation Easement shall require the Grantor to take any action to restore the condition of the Property after any Act of God or other event over which they had no control.

iii. Liability and Indemnification. Grantor shall hold harmless, indemnify and defend Grantee and its members, directors, officers, employees, agents, and contractors, and their successors and assigns from and against all liabilities, penalties, costs, losses, damages, expenses or claims, including, without limitation, reasonable attorneys fees arising from or in any way connected with injury to or the death of any person or physical damage to any property resulting from any act, omission condition or other matter related to or occurring on or about the Property, regardless of cause, unless due solely to the negligence of any of the indemnified parties. Grantee shall be responsible for losses or damages resulting from the negligent use, maintenance or occupancy of the Public Access Areas associated with Easement Area to the extent legally liable for such actions by the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq. The liability, if any, of the Grantee shall be subject to the availability of state of New Jersey funds. Grantor's agreement to hold harmless and indemnify Grantee shall not affect the statutory protections available to the Grantor under the Landowner's Liability Act, N.J.S.A. 2A:42A-2, et seq.

14. REMEDIES. The Grantee shall have the right to prevent and correct violations of the terms of this Conservation Easement. Enforcement of the terms of this Conservation Easement shall be at the discretion of the Grantee and any failure on behalf of the Grantee to exercise its rights hereunder shall not be deemed or construed to be a waiver of the Grantee of those rights. This shall be true regardless of the number of violations of the terms of this Conservation Easement by the Grantor that occur or the length of time it remains unenforced. If the Grantee finds what it believes is a violation of the terms of this Conservation Easement, it may without limitation as to other available legal recourse, at its discretion take any of the following action:

i. Notice of Violation; Corrective Action. If Grantee determines that a violation of the terms of this Conservation Easement has occurred or is threatened, Grantee shall give written notice to Grantor of such violation and demand corrective action sufficient to cure the violation in accordance with a plan approved by the Grantee.

ii. Injunctive Relief. If Grantor fails to cure the violation within 45 days after receipt of notice from the Grantee, or under circumstances where the violation cannot reasonably be cured with a 45 day period, fail to begin curing such violation, or fail to continue diligently to cure such violation until finally cured, Grantee may bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of this Conservation Easement, to enjoin ex parte the violation by temporary or permanent injunction, and to require the restoration of the Property to the condition that

existed prior to such injury. The Grantor acknowledges that any actual or threatened failure to comply or cure will cause irreparable harm to the Grantee and that money damages will not provide an adequate remedy.

iii. Damages. Grantee shall be entitled to recover damages for violation of the terms of this Conservation Easement or injury to any Conservation Values protected by this Conservation Easement, including, without limitation, damages for the loss of Conservation Values. Without limiting Grantors' liability, Grantee, in it sole discretion, may apply any damages recovered to the cost of undertaking any corrective action on the Property.

iv. Costs of Enforcement. In any case where a court finds that a violation has occurred, all reasonable costs incurred by Grantee in enforcing the terms of this Conservation Easement against Grantor, including, without limitation, costs and expenses of suit and reasonable attorney's fees, and any costs of restoration necessitated by Grantor's violation of the Conservation Easement shall be borne by the Grantor.

15. DEVELOPMENT RIGHTS. Grantor hereby grants to Grantee all development rights or credits, that are now or hereafter allocated to, implied, reserved or inherent in the Property, and the parties agree that such rights are terminated and extinguished, and may not be used on or transferred to any portion of the Property as it now or hereafter may be bounded or described, or to any other property adjacent or otherwise, nor used for the purpose of calculating permissible lot yield on the Property or any other property.

17. GRANTOR'S WARRANTIES.

i. Title. Grantor warrants good and sufficient title to the Property, free from all encumbrances and hereby promises to defend the same against all claims that may be made against it. Grantor warrants the Property to be free from all mortgages, liens, encumbrances, restrictions, Conservation Easements, covenants and conditions, except those that the Purchaser determines do not interfere with its proposed use of the Property. The Property may only be subject to a mortgage if the holder of such mortgage agrees to subordinate it to the Conservation Easement in a manner satisfactory to the Grantee.

ii. Hazardous Substances. Grantor warrants no actual knowledge of a discharge or threatened discharge of hazardous substances or hazardous wastes on the Property. Grantor hereby promises to defend and indemnify Grantee against all litigation, claims, demands, penalties and damages, arising from or connected with any discharge of a hazardous substances or hazardous waste, or violation of federal, state, or local environmental laws.

18. AMENDMENT OF CONSERVATION EASEMENT. This Conservation Easement may be amended only with the written consent of Grantee and Grantor. Any such amendment shall

be consistent with the purposes of this Conservation Easement and with the laws of the State of New Jersey and any regulations promulgated pursuant to those laws.

19. INTERPRETATION. This Conservation Easement shall be interpreted under the laws of the State of New Jersey, resolving any ambiguities and questions of the validity of specific provisions so as to give maximum effect to its conservation purposes.

20. PERPETUAL DURATION. This Conservation Easement shall be servitude running with the land in perpetuity. Every provision of this Deed that applies to the Grantor or Grantee shall also apply to their respective agents, heirs, executors, administrators, assigns, and all other successors as their interests may appear.

21. NOTICES. Any notices required by this Conservation Easement shall be in writing and shall be personally delivered or sent by first class mail, to Grantor and Grantee at the following addresses, unless a party has been notified of a change of address:

To Grantor:
[insert legal address]

To Grantee:
New Jersey Dept. of Environmental Protection
C/o Office of Natural Resource Restoration
PO Box 404
501 East State Street
Trenton, NJ 08625

22A. EXHIBIT A. Exhibit A includes the following maps of the Property and the vicinity:

i. Exhibit A-1: Vicinity Map – A map that identifies by name the roads, and other important geographical features in the vicinity of the Property (for example, Hagstrom County Maps);

ii. Exhibit A-2: Metes and Bounds Description – A metes and bounds description of the Property, including reference to municipal tax lot and block numbers for the Property;

iii. Exhibit A-3: Property Map – A scaled map of the Property, scaled at one inch to 200 feet or less, and if more than one map is submitted, the maps shall be presented as overlays, keyed to a base map; and the property map shall include diagrams of major surface topographical features;

22B. EXHIBIT B. Exhibit B includes a description of the following condition of the Property:

i. Description of any existing legal easements or other encumbrances on the Property;

ii. Property description; and

iii. Relation to other natural resources.

23. SIGNATURES. IN WITNESS WHEREOF, Owner has executed this Conservation Easement as of the date first written above.

| | |
|---|---|
| Witness as to Signature of Grantor | [Name] Grantor |

STATE OF NEW JERSEY )
ss.
COUNTY OF )

On , personally appeared before me who I am satisfied is the person named in and who executed this Conservation Easement and they acknowledged that they signed, sealed and delivered the same as their act and deed, for the uses and purposes therein expressed.

Attachments:
Exhibit A – Property Description
Exhibit B – Property Condition
Exhibit C – Monitoring and Biennial Certification

EXHIBIT A

Exhibit A includes the following maps of the Property and the vicinity:

Exhibit A-1: Vicinity Map – A map that identifies by name the roads, and other important geographical features in the vicinity of the Property (for example, Hagstrom County Maps);

Exhibit A-2: Metes and Bounds Description – A metes and bounds description of the Property, including reference to municipal tax lot and block numbers for the Property; and

Exhibit A-3: Property Map – A scaled map of the Property, scaled at one inch to 200 feet or less, and if more than one map is submitted, the maps shall be presented as overlays, keyed to a base map; and the property map shall include diagrams of major surface topographical features.

All maps shall conform to the requirements at N.J.A.C. 7:26J-4.4.

EXHIBIT B PROPERTY CONDITION

Exhibit B includes the following descriptions of the property and the surrounding area at the time the Grantor places the Conservation Easement on the Property. All maps shall conform to the requirements at N.J.A.C. 7:26J-4.4.

1. Description of any existing legal easements or other encumbrances on the Property, with a discussion of how each easement or other encumbrance will not inhibit attaining the Conservation Values of the Property;

2. Property description:

i. Size in acres;

ii. Metes and bounds description of the Property;

iii. A preliminary assessment and site investigation report for the Property prepared pursuant to N.J.A.C. 7:26E-3.13, including an aerial photographic history of the Property;

iv. Land use history of the property and within a 1,000 feet radius, including a map and a written description and location of any past or present utility, building, road, or other improvement on the Property;

v. Contemporary digital photographs of the Property;

vi. Geographical information system maps generated pursuant to the New Jersey Department of Environmental Protection, "Geographical Information System Mapping and Digital Standards," July 1, 2002, and all of the data used to prepare these maps on a compact computer disc, that include:

A. The outline of the municipal tax blocks and lots on which the Property is located;

B. Surface water and wetlands located within the boundaries of the Property and within one-half mile of the property;

C. All ground water recharge rates for the Property;

D. Known contaminated sites within one-half mile of the Property; and

E. Open space, public property, and other preserved property within one-half mile of the Property;

vii. A brief description of the surrounding land uses; and

viii. A topographic map that shows the location of the Property;

3. Relation to other natural resources:

i. The location of the Property in relation to other open space; land that is adjacent to other open space, public property, preserved property, or surface water may be more appropriate for transfer and or preservation;

ii. The ecological habitat value of the Property; land that will provide or provides habitat for critical wildlife species or threatened or endangered species may be more appropriate for transfer and or preservation;

iii. The potential interaction of natural resources on the Property with adjacent or nearby natural resources; land that complements existing nearby natural resources may be more appropriate for transfer and or preservation; for example, land that adds riparian wetland habitat to an existing stream enhances the riparian wetland and the stream or land that is preserved as open space may also provide recharge to a contaminated aquifer;

iv. The diversity of the ecological communities on the Property;

v. The proximity and relationship of the Property to existing and or planned development; and

vi. The designation of the Property in:

A. The name and number of the watershed management area that the Property is located in; and

B. The name and number of the water supply management area that the Property is located in.

EXHIBIT C – MONITORING AND BIENNIAL CERTIFICATION

Exhibit C contains the following monitoring report and biennial certification requirements:

1. All monitoring and reporting required by this Conservation Easement shall conform to the following:

2. Each biennial certification shall conform to the following:

# EXHIBIT F

**GREEN ACRES**

**LOCAL GOVERNMENT UNIT GUIDE**

# Title Insurance Commitment and Title Insurance Policy Checklist

**Green Acres can fund only the acquisition of land that has insurable, marketable title.** To determine ownership and identify any conditions and restrictions affecting the use of the parcel being acquired, Green Acres requires that the local government unit obtain a 60-year title search to include a commitment to insure prior to the purchase of a property, and a title insurance policy following that purchase. If a local government unit will be requesting payment *in advance of closing*, a valid title commitment along with its supporting documents must be submitted as part of the pre-closing process (note that a title commitment is not valid after 180 days from its effective date). All requirements must be satisfied in order for closing to take place; within 60 days after closing, a copy of the recorded deed is sent to the Title Company to prepare and issue the final Title Policy (See N.J.A.C. 7:36-9.4(c)1 for local government units or N.J.A.C. 7:36-20.4(c)1 for nonprofits). If Green Acres payment will be a reimbursement *after closing*, the title insurance policy must be submitted as part of a payment request. (See N.J.A.C. 7:36-9.4(c)2 for local government units or N.J.A.C. 7:36-20.4(c)2 for nonprofits.)

**Please note that the title commitment should be obtained and provided to the surveyor prior to preparation of the property survey.**

Provide a copy of the valid title commitment and all supporting documentation regarding current vesting title, liens, leases, easements, rights-of-way, and other encumbrances or benefits of record affecting the property, as well as filed maps and other referenced documents to both Green Acres and the surveyor contracted by the local unit/nonprofit.

The local government unit/nonprofit should review the following checklist items prior to ordering the title search with commitment to insure and final title insurance policy, and then verify that all requirements have been met prior to submitting these documents to Green Acres:

**<u>Title Insurance Commitment Items</u>**

___1) The commitment includes an effective date, Schedule A Legal Description, Schedule B, Section I/ Requirements, Schedule B, Section II/Exceptions, and a photocopy of the latest recorded deed in its entirety.

___2) The commitment includes copies of all mortgages, liens, judgments, and other outstanding debts against the property, if applicable, that appear in Schedule B, Section 1 or Schedule B, Section 2 of the commitment.

___2) The commitment includes photocopies of any and all recorded deed(s) of any easements, rights-of-way, restrictions, or conditions of record that appear in Schedule B, Section II of the commitment.

___3) Schedule A of the title commitment references a description of the parcel to be insured and indicates the current municipal tax block and lot numbers. The Title Company must supply a copy of the tax map depicting the parcel to be insured. If the parcel has a record description that refers to a <u>filed map</u>, the Title

Company must supply a copy of the filed map title block, recording information, a full copy of the filed map, and, if appropriate, a legible enlargement of the portion of the filed map that shows the subject parcel.

___ 4) The local government unit/nonprofit must advise the Title Company that the parcel will be surveyed and the surveyor's metes and bounds description will be used in the deed of conveyance. (A survey exception will appear in the Schedule B, Section II until after the survey is read by the Title Company and an endorsement is added to the policy.)

___5) The local government unit/nonprofit must advise the Title Company that the parcel is being acquired with funding through the Green Acres Program. Once acquired, the land will become encumbered by and subject to Green Acres restrictions. The local government unit/nonprofit will take title agreeing to accept these lands subject to the Green Acres restrictions against the disposal or diversion to a use for other than recreation and conservation purposes. (N.J.A.C. 7:36-1 et seq.)

**Title Insurance Policy Items**

___1) Date of closing to match Policy effective date. The title insurance policy amount (in Schedule A) is at least equal to the purchase price.

___2) All requirements regarding outstanding judgments, taxes, and proof of seller's status listed in Schedule B, Section I of the title commitment report have been met and removed. All exceptions regarding outstanding interests, mortgages, liens, encumbrances, and taxes listed in Schedule B, Section II of the title commitment report have been removed. Recorded easements, restrictions, grants, or covenants which do not pertain to the land being acquired must be removed from the policy. **The policy must show that the local government unit/nonprofit has clear title to the property.**

___3) The survey exception in Schedule B, Section II of the title commitment report has been replaced by a survey endorsement that insures title to the area within the deed description.

___4) The description of the insured premises is the surveyor's metes and bounds description prepared as part of the survey package, and is the same as used in the recorded deed of conveyance.

___ 5) The policy names the State as an additional insured, or at least acknowledges that Green Acres will have a tangible interest in the form of a restrictive covenant in the parcel, to be itemized as such with identification of deed book and page number in Schedule B, Section II. (Please notify your Green Acres project manager if the Title Company will not comply with this request.)

# EXHIBIT G






USGS MAP

United States Geological Survey
Bridgeport, NJ-PA Quadrangle No. 113
Scale= 1:2000

WHITE SLUICE RACE (WSR) LINE CHART

| PT. No. | NORTHING | EASTING |
|---|---|---|
| WSR-1 | 360616.6480 | 266141.4180 |
| WSR-2 | 360443.0770 | 265992.2908 |
| WSR-3 | 359200.3995 | 264906.9009 |
| WSR-4 | 359783.1976 | 264631.5952 |
| WSR-5 | 360053.3591 | 265190.4512 |
| WSR-6 | 360646.9531 | 265005.5675 |
| WSR-7 | 360264.0907 | 264350.3769 |
| WSR-8 | 360483.7397 | 263388.6695 |
| WSR-9 | 361010.0850 | 264285.2465 |
| WSR-10 | 361349.9209 | 264082.1115 |
| WSR-11 | 361031.8712 | 263783.9525 |
| WSR-12 | 361034.9344 | 263514.3901 |
| WSR-13 | 361845.2094 | 262132.7352 |
| WSR-14 | 361860.6124 | 262163.2892 |
| WSR-15 | 362534.1928 | 262077.5497 |
| WSR-16 | 364203.0488 | 261670.2354 |
| WSR-17 | 364040.5571 | 261220.5591 |
| WSR-18 | 364500.4998 | 261034.5557 |
| WSR-19 | 364612.5215 | 261331.8083 |
| WSR-20 | 365600.7459 | 260959.3890 |
| WSR-21 | 365594.4177 | 260881.4834 |
| WSR-22 | 365603.1947 | 260836.6838 |
| WSR-23 | 365766.0763 | 260784.6211 |
| WSR-24 | 365913.1687 | 261244.8043 |
| WSR-25 | 365561.5956 | 261379.5906 |
| WSR-26 | 365629.1803 | 261540.9501 |
| WSR-27 | 365967.0049 | 261413.2348 |
| WSR-28 | 366086.9353 | 261697.8252 |
| WSR-29 | 366042.7600 | 261758.8500 |
| WSR-30 | 366069.6089 | 261794.6743 |
| WSR-31 | 362409.1490 | 264363.3930 |
| WSR-32 | 363474.8084 | 266136.7326 |
| WSR-33 | 362261.6973 | 267011.9062 |
| WSR-34 | 361275.4335 | 266164.5335 |
| WSR-35 | 360937.7801 | 265509.3749 |

GENERAL NOTES:

1. THIS SURVEY IS BASED ON A REPORT OF TITLE PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, TITLE NO. 2015-80170, REVISED TO AUGUST 27, 2015 AND IS SUBJECT TO THE CONDITIONS AND RESTRICTIONS LISTED THEREON THE TITLE REPORT AND SEVERAL NOTED UNRECORDED DOCUMENTS WERE SUPPLIED BY E. I. du Pont de Nemours AND COMPANY.
2. BLOCK & LOT NUMBERS AS SHOWN ARE BASED UPON THE CURRENT TAX MAP OF RECORD.
3. THIS SURVEY MEETS OR EXCEEDS THE FEDERAL REQUIREMENTS FOR THIRD ORDER, CLASS 1 ACCURACY.
4. ALL BUILDING SURFACE AND SUBSURFACE IMPROVEMENTS ON OR ADJACENT TO THE SITE ARE NOT NECESSARILY SHOWN.
5. PLAN FEATURES SHOWN WERE TAKEN FROM AN ACTUAL FIELD SURVEY BY ADAMS, REHMANN, & HEGGAN ASSOC. INC. COMPLETED DURING JANUARY 2017 AND SUPPLEMENTED USING AERIAL PHOTOGRAPHY.
6. THE LOCATIONS OF UNDERGROUND UTILITIES MAY VARY FROM THE LOCATIONS ILLUSTRATED. THE UTILITIES WERE MAPPED FROM RECORD PLANS PROVIDED BY du Pont AND ORIENTED TO PHYSICAL FEATURES ILLUSTRATED ON THE RECORD PLANS. SITE IMPROVEMENT/INFRASTRUCTURE MAY NOT BE SHOWN BECAUSE OF LACK OF DEFINED RECORDS. A DETAILED SUBSURFACE INVESTIGATION TO VERIFY PRESENCE OF UNDERGROUND STRUCTURES/UTILITIES MUST BE PERFORMED PRIOR TO ANY EXCAVATION OR CONSTRUCTION.
7. THE PLANIMETRIC DATA SURVEY ILLUSTRATED IN THIS PLAN SET WAS PERFORMED DURING A TIME PERIOD WHERE THE GROUND WAS OBSCURED IN LARGE PART BY VEGETATIVE COVER. THE FINAL TOPOGRAPHY WAS DEVELOPED FROM A COMBINATION OF DATA SOURCES INCLUDING NEW LIDAR DATA ACQUIRED IN JULY, 2014; AERIAL PHOTOGRAPHY DATED JULY, 2014; NEW ORTHOPHOTOGRAPHY DATED JULY, 2014; NJ STATE LIDAR DATA OBTAINED IN THE SPRING OF 2007; NJ STATE ORTHOPHOTOGRAPHY (2012); PLANIMETRIC DETAIL ON A SURVEY BY CONSULTING ENGINEER SERVICES, DATED DECEMBER 15, 2000. THIS TOPOGRAPHIC SURVEY SHOULD NOT BE USED FOR FINAL DESIGN WITHOUT FIELD VERIFICATION OF THE PLANIMETRIC.
8. SURVEY BASED ON THE NEW JERSEY STATE PLANE COORDINATE SYSTEM NAD 1983. THE COORDINATE SHOWN HEREON WERE DERIVED FROM A VIRTUAL REFERENCE STATION (VRS) NETWORK (KEYNET GPS) USING TRIMBLE'S VRS NET APP SOFTWARE.

   SCALE FACTOR: 0.99995676

   GROUND COORDINATE (ORIGIN): N:360616.648
   E:266141.418
9. CORNER MARKERS (SEE DETAIL) SET ON ALL ASSESSABLE PROPERTY CORNERS.
10. THERE ARE NO ENCROACHMENTS EITHER WAY ACROSS PROPERTY LINES EXCEPT AS SHOWN.
11. PROPERTY CORNERS AND PROPERTY LINES INCLUDING WSR-3 THROUGH WSR-22; WSR-25 AND WSR-26; WSR-28 THROUGH WSR-32 COULD NOT BE ACCESSED WITHOUT TAKING EXTRAORDINARY MEASURES BECAUSE THEY FALL WITHIN A WATERWAY, WATER IMPOUNDMENT AND/OR AREAS OF DEEP SWAMP (COMBINATION OF HEAVY VEGETATIVE GROWTH AND WATER THAT MAKE NEGOTIATING THE AREA VIRTUALLY IMPOSSIBLE). THIS WAS AGREED TO BY NJDEP GREEN ACRES.

SCALE: 1"=200'
200' 100' 0 200'
SCALE IN FEET

## LEGEND

PROPERTY BOUNDARY LINE
RIGHT-OF-WAY LINE
RIGHT-OF-WAY CENTERLINE
ADJACENT PROPERTY LINE
UTILITY/ACCESS EASEMENT LINE
TOWNSHIP BOUNDARY LINE
MEAN HIGH WATER LINE/TIDELANDS LINE
EXISTING RAILROAD TRACKS
EXISTING WATER LINE
WIGGINS' POND/LOW AREA
LEASE AREA

**SET CAPPED PIN (SEE DETAIL)**
FOUND CONCRETE MARKER (FND CM)
INACCESSIBLE CORNER
FOUND PIN & CAP (Fnd. P/C)
**SET CONCRETE MARKER (SEE DETAIL)**
**SET PROPERTY LINE POSTS**

ALUMINUM CAP
(2½" DIAMETER)
18" RE-BAR
WEIGHT 1 TO 2 LBS.

CAP DETAIL
N.T.S.
1/2017

4"x4"x30" CONCRETE
MONUMENT RE-BAR
REINFORCED - METAL
DETECTABLE
WEIGHT 30 TO 35 LBS.

MONUMENT DETAIL
N.T.S.
1/2017

I HEREBY CERTIFY TO CHEMOURS COMPANY AND TO PURCHASER, STATE OF NEW JERSEY, AND ON BEHALF OF PURCHASER, TO PURCHASER'S TITLE INSURER THAT THIS PLAN, SURVEY, AND A CORRESPONDING METES AND BOUNDS DESCRIPTION HAVE BEEN PREPARED UNDER MY IMMEDIATE SUPERVISION IN ACCORDANCE WITH A WRITTEN CONTRACT WITH CHEMOURS COMPANY; THAT THIS PLAN IS A CORRECT AND ACCURATE REPRESENTATION OF CONDITIONS EXISTING AS OF JANUARY 2017, SUBJECT TO SUCH NOTES AS MAY APPEAR HEREON. I DO FURTHER CERTIFY THAT THE MONUMENTS AS DESIGNATED AND SHOWN HEREON HAVE BEEN SET.

ROBERT R. HEGGAN
NJ LAND SURVEYOR LICENSE No. 17775

2/06/2017
DATE

ROBERT R. HEGGAN
PROFESSIONAL LAND SURVEYOR
NEW JERSEY LICENSE No. 17775

ADAMS, REHMANN & HEGGAN ASSOCIATES, INC.
215 BELLEVUE AVENUE
PO BOX 579
HAMMONTON, NJ 08037-2019
TEL (609) 561-0482
FAX (609) 567-8909

revisions

WHITE SLUICE RACE
(BLOCK 3, LOTS 8-12, 21, 27, & PART OF 37;
BLOCK 5, LOTS 3 & 5; BLOCK 6, PART OF LOT 2)

SURVEY
OF
CONSERVATION EASEMENT
WHITE SLUICE RACE &
WIGGINS POND
Greenwich Township Gloucester County New Jersey

| | |
|---|---|
| date: | February 6, 2017 |
| scale: | 1"=200' |
| drawn by: | RCS |
| checked: | RRH |
| proj. no.: | 8082915 |

1 of 3

| | |
|---|---|
| DRAWING LOCATION | W:\FILEROOM\HQ\8082915\SUR\DWG\additional area base\S_8082915-GREEN.dwg |
| LAST DATE SAVED | 2/22/2017 |
| LAST SAVE BY | aeffl |







## USGS MAP

United States Geological Survey
Bridgeport, NJ-PA Quadrangle No. 113
Scale= 1:2000

## WHITE SLUICE RACE (WSR) LINE CHART

| PT. No. | NORTHING | EASTING |
|---|---|---|
| WSR-1 | 360616.6480 | 266141.4180 |
| WSR-2 | 360443.0770 | 265992.2908 |
| WSR-3 | 359200.3995 | 264906.9009 |
| WSR-4 | 359783.1976 | 264631.5952 |
| WSR-5 | 360053.3591 | 265190.4512 |
| WSR-6 | 360646.9531 | 265005.5675 |
| WSR-7 | 360264.0907 | 264350.3769 |
| WSR-8 | 360483.7397 | 263388.6695 |
| WSR-9 | 361010.0850 | 264285.2465 |
| WSR-10 | 361349.9209 | 264082.1115 |
| WSR-11 | 361031.8712 | 263783.9525 |
| WSR-12 | 361034.9344 | 263514.3901 |
| WSR-13 | 361845.2094 | 262132.7352 |
| WSR-14 | 361860.6124 | 262163.2892 |
| WSR-15 | 362534.1928 | 262077.5497 |
| WSR-16 | 364203.0488 | 261670.2354 |
| WSR-17 | 364040.5571 | 261220.5591 |
| WSR-18 | 364500.4998 | 261034.5557 |
| WSR-19 | 364612.5215 | 261331.8083 |
| WSR-20 | 365600.7459 | 260959.3890 |
| WSR-21 | 365594.4177 | 260881.4834 |
| WSR-22 | 365603.1947 | 260836.6838 |
| WSR-23 | 365766.0763 | 260784.6211 |
| WSR-24 | 365913.1687 | 261244.8043 |
| WSR-25 | 365561.5956 | 261379.5906 |
| WSR-26 | 365629.1803 | 261540.9501 |
| WSR-27 | 365967.0049 | 261413.2348 |
| WSR-28 | 366086.9353 | 261697.8252 |
| WSR-29 | 366042.7600 | 261758.8500 |
| WSR-30 | 366069.6089 | 261794.6743 |
| WSR-31 | 362409.1490 | 264363.3930 |
| WSR-32 | 362559.6181 | 264708.4962 |
| WSR-33 | 363048.4003 | 265480.3965 |
| WSR-34 | 363243.1327 | 265590.0032 |
| WSR-35 | 363474.8084 | 266136.7326 |
| WSR-36 | 362261.6973 | 267011.9062 |
| WSR-37 | 361275.4335 | 266164.5335 |
| WSR-38 | 360937.7801 | 265509.3749 |

## GENERAL NOTES:

1. THIS SURVEY IS BASED ON A REPORT OF TITLE PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, TITLE NO. 2015-80170, REVISED TO AUGUST 27, 2015 AND IS SUBJECT TO THE CONDITIONS AND RESTRICTIONS LISTED THEREON THE TITLE REPORT AND SEVERAL NOTED UNRECORDED DOCUMENTS WERE SUPPLIED BY E. I. du Pont de Nemours AND COMPANY.
2. BLOCK & LOT NUMBERS AS SHOWN ARE BASED UPON THE CURRENT TAX MAP OF RECORD.
3. THIS SURVEY MEETS OR EXCEEDS THE FEDERAL REQUIREMENTS FOR THIRD ORDER, CLASS 1 ACCURACY.
4. ALL BUILDING SURFACE AND SUBSURFACE IMPROVEMENTS ON OR ADJACENT TO THE SITE ARE NOT NECESSARILY SHOWN.
5. PLAN FEATURES SHOWN WERE TAKEN FROM AN ACTUAL FIELD SURVEY BY ADAMS, REHMANN, & HEGGAN ASSOC. INC. COMPLETED DURING JANUARY 2017 AND SUPPLEMENTED USING AERIAL PHOTOGRAPHY.
6. THE LOCATIONS OF UNDERGROUND UTILITIES MAY VARY FROM THE LOCATIONS ILLUSTRATED. THE UTILITIES WERE MAPPED FROM RECORD PLANS PROVIDED BY du Pont AND ORIENTED TO PHYSICAL FEATURES ILLUSTRATED ON THE RECORD PLANS. SITE IMPROVEMENT/INFRASTRUCTURE MAY NOT BE SHOWN BECAUSE OF LACK OF DEFINED RECORDS. A DETAILED SUBSURFACE INVESTIGATION TO VERIFY PRESENCE OF UNDERGROUND STRUCTURES/UTILITIES MUST BE PERFORMED PRIOR TO ANY EXCAVATION OR CONSTRUCTION.
7. THE PLANIMETRIC DATA SURVEY ILLUSTRATED IN THIS PLAN SET WAS PERFORMED DURING A TIME PERIOD WHERE THE GROUND WAS OBSCURED IN LARGE PART BY VEGETATIVE COVER. THE FINAL TOPOGRAPHY WAS DEVELOPED FROM A COMBINATION OF DATA SOURCES INCLUDING NEW LIDAR DATA ACQUIRED IN JULY, 2014; AERIAL PHOTOGRAPHY DATED JULY, 2014; NEW ORTHOPHOTOGRAPHY DATED JULY, 2014; NJ STATE LIDAR DATA OBTAINED IN THE SPRING OF 2007; NJ STATE ORTHOPHOTOGRAPHY (2012); PLANIMETRIC DETAIL ON A SURVEY BY CONSULTING ENGINEER SERVICES, DATED DECEMBER 15, 2000. THIS TOPOGRAPHIC SURVEY SHOULD NOT BE USED FOR FINAL DESIGN WITHOUT FIELD VERIFICATION OF THE PLANIMETRIC.
8. SURVEY BASED ON THE NEW JERSEY STATE PLANE COORDINATE SYSTEM NAD 1983. THE COORDINATE SHOWN HEREON WERE DERIVED FROM A VIRTUAL REFERENCE STATION (VRS) NETWORK (KEYNET GPS) USING TRIMBLE'S VRS NET APP SOFTWARE.

   SCALE FACTOR: 0.99995676

   GROUND COORDINATE (ORIGIN): N:360616.648
   E:266141.418
9. CORNER MARKERS (SEE DETAIL) SET ON ALL ASSESSABLE PROPERTY CORNERS.
10. THERE ARE NO ENCROACHMENTS EITHER WAY ACROSS PROPERTY LINES EXCEPT AS SHOWN.
11. PROPERTY CORNERS AND PROPERTY LINES INCLUDING WSR-3 THROUGH WSR-22; WSR-25 AND WSR-26; WSR-28 THROUGH WSR-32 COULD NOT BE ACCESSED WITHOUT TAKING EXTRAORDINARY MEASURES BECAUSE THEY FALL WITHIN A WATERWAY, WATER IMPOUNDMENT AND/OR AREAS OF DEEP SWAMP (COMBINATION OF HEAVY VEGETATIVE GROWTH AND WATER THAT MAKE NEGOTIATING THE AREA VIRTUALLY IMPOSSIBLE). THIS WAS AGREED TO BY NJDEP GREEN ACRES.

# CORNER DETAIL




SCALE: 1"=200'
200' 100' 0 200'
SCALE IN FEET

## LEGEND




I HEREBY CERTIFY TO CHEMOURS COMPANY AND TO PURCHASER, STATE OF NEW JERSEY, AND ON BEHALF OF PURCHASER, TO PURCHASER'S TITLE INSURER THAT THIS PLAN, SURVEY, AND A CORRESPONDING METES AND BOUNDS DESCRIPTION HAVE BEEN PREPARED UNDER MY IMMEDIATE SUPERVISION IN ACCORDANCE WITH A WRITTEN CONTRACT WITH CHEMOURS COMPANY; THAT THIS PLAN IS A CORRECT AND ACCURATE REPRESENTATION OF CONDITIONS EXISTING AS OF JANUARY 2017, SUBJECT TO SUCH NOTES AS MAY APPEAR HEREON. I DO FURTHER CERTIFY THAT THE MONUMENTS AS DESIGNATED AND SHOWN HEREON HAVE BEEN SET.

ROBERT R. HEGGAN — 2/06/2017 DATE
NJ LAND SURVEYOR LICENSE No. 17775

ROBERT R. HEGGAN
PROFESSIONAL LAND SURVEYOR
NEW JERSEY LICENSE No. 17775

ADAMS, REHMANN & HEGGAN ASSOCIATES, INC.

WHITE SLUICE RACE
(BLOCK 3, LOTS 8-12, 21, 27, & PART OF 37; BLOCK 5, LOTS 3 & 5; BLOCK 6, PART OF LOT 2)

SURVEY OF CONSERVATION EASEMENT WHITE SLUICE RACE & WIGGINS POND
Greenwich Township, Gloucester County, New Jersey

date: February 6, 2017

2 of 3

DRAWING LOCATION
LAST DATE SAVED 2/22/2017
LAST SAVE BY




## WIGGINS POND (WP) LINE CHART

| PT. No. | NORTHING | EASTING |
|---|---|---|
| WP-1 | 363588.5395 | 269868.2740 |
| WP-2 | 364399.7170 | 269847.5680 |
| WP-3 | 364403.7250 | 269919.4510 |
| WP-4 | 364544.3690 | 269960.2233 |
| WP-5 | 364953.0558 | 270689.5393 |
| WP-6 | 365483.5130 | 270932.3300 |
| WP-7 | 365576.7860 | 271109.2485 |
| WP-8 | 365532.5563 | 271132.5667 |
| WP-9 | 365551.2109 | 271167.9504 |
| WP-10 | 365595.4406 | 271144.6322 |
| WP-11 | 365670.8160 | 271287.6030 |
| WP-12 | 365747.2870 | 271359.4130 |
| WP-13 | 365720.1020 | 271588.3810 |
| WP-14 | 365683.3590 | 271767.8980 |
| WP-15 | 365453.3680 | 271998.6700 |
| WP-16 | 365284.7060 | 272307.2490 |
| WP-17 | 365245.6800 | 272387.0290 |
| WP-18 | 365183.3470 | 272554.3330 |
| WP-19 | 365106.0900 | 272889.5690 |
| WP-20 | 365067.8296 | 272959.1346 |
| WP-21 | 363996.8562 | 272396.3708 |
| WP-22 | 364025.6911 | 272342.0489 |
| WP-23 | 364015.0683 | 272336.4670 |
| WP-24 | 364318.3430 | 271765.1298 |
| WP-25 | 364429.3072 | 271578.7985 |
| WP-26 | 364565.2754 | 271322.6488 |
| WP-27 | 364117.4522 | 271394.9494 |
| WP-28 | 363947.0578 | 271715.9568 |
| WP-29 | 363629.1693 | 271547.2179 |
| WP-30 | 363637.5483 | 271229.3323 |
| WP-31 | 363632.5832 | 271227.9507 |
| WP-32 | 363645.0669 | 270754.3438 |
| WP-33 | 363608.9790 | 270271.3942 |

## SANITARY SEWER CENTERLINE LINE CHART

| SEG. | BEARING/DIST. | |
|---|---|---|
| S-1 | N.29°33'33"W. | 76.35' |
| S-2 | N.33°55'50"E. | 271.00' |
| S-3 | R=150.00' | L=84.56' |
| S-4 | N.01°37'58"E. | 162.90' |
| S-5 | N.24°07'58"E. | 61.27' |
| S-6 | N.69°07'58"E. | 73.98' |
| S-7 | N.46°37'58"E. | 70.00' |
| S-8 | N.24°07'58"E. | 24.00' |
| S-9 | N.16°37'58"E. | 155.00' |
| S-10 | N.26°24'53"E. | 164.55' |
| S-11 | N.29°49'30"E. | 14.48' |
| TIE TO WP17 | N.69°33'57"W. | 10.53' |




USGS MAP

United States Geological Survey
Bridgeport, NJ-PA Quadrangle No. 113
Scale= 1:2000

GENERAL NOTES:

1. THIS SURVEY IS BASED ON A REPORT OF TITLE PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, TITLE NO. 2015-80170, REVISED TO AUGUST 27, 2015 AND IS SUBJECT TO THE CONDITIONS AND RESTRICTIONS LISTED THEREON THE TITLE REPORT AND SEVERAL NOTED UNRECORDED DOCUMENTS WERE SUPPLIED BY E. I. du Pont de Nemours AND COMPANY.
2. BLOCK & LOT NUMBERS AS SHOWN ARE BASED UPON THE CURRENT TAX MAP OF RECORD.
3. THIS SURVEY MEETS OR EXCEEDS THE FEDERAL REQUIREMENTS FOR THIRD ORDER, CLASS 1 ACCURACY.
4. ALL BUILDING SURFACE AND SUBSURFACE IMPROVEMENTS ON OR ADJACENT TO THE SITE ARE NOT NECESSARILY SHOWN.
5. PLAN FEATURES SHOWN WERE TAKEN FROM AN ACTUAL FIELD SURVEY BY ADAMS, REHMANN, & HEGGAN ASSOC. INC. COMPLETED DURING JANUARY 2017 AND SUPPLEMENTED USING AERIAL PHOTOGRAPHY.
6. THE LOCATIONS OF UNDERGROUND UTILITIES MAY VARY FROM THE LOCATIONS ILLUSTRATED. THE UTILITIES WERE MAPPED FROM RECORD PLANS PROVIDED BY du Pont AND ORIENTED TO PHYSICAL FEATURES ILLUSTRATED ON THE RECORD PLANS. SITE IMPROVEMENT/INFRASTRUCTURE MAY NOT BE SHOWN BECAUSE OF LACK OF DEFINED RECORDS. A DETAILED SUBSURFACE INVESTIGATION TO VERIFY PRESENCE OF UNDERGROUND STRUCTURES/UTILITIES MUST BE PERFORMED PRIOR TO ANY EXCAVATION OR CONSTRUCTION.
7. THE PLANIMETRIC DATA SURVEY ILLUSTRATED IN THIS PLAN SET WAS PERFORMED DURING A TIME PERIOD WHERE THE GROUND WAS OBSCURED IN LARGE PART BY VEGETATIVE COVER. THE FINAL TOPOGRAPHY WAS DEVELOPED FROM A COMBINATION OF DATA SOURCES INCLUDING NEW LIDAR DATA ACQUIRED IN JULY, 2014; AERIAL PHOTOGRAPHY DATED JULY, 2014; NEW ORTHOPHOTOGRAPHY DATED JULY, 2014; NJ STATE LIDAR DATA OBTAINED IN THE SPRING OF 2007; NJ STATE ORTHOPHOTOGRAPHY (2012); PLANIMETRIC DETAIL ON A SURVEY BY CONSULTING ENGINEER SERVICES, DATED DECEMBER 15, 2000. THIS TOPOGRAPHIC SURVEY SHOULD NOT BE USED FOR FINAL DESIGN WITHOUT FIELD VERIFICATION OF THE PLANIMETRIC.
8. SURVEY BASED ON THE NEW JERSEY STATE PLANE COORDINATE SYSTEM NAD 1983. THE COORDINATE SHOWN HEREON WERE DERIVED FROM A VIRTUAL REFERENCE STATION (VRS) NETWORK (KEYNET GPS) USING TRIMBLE'S VRS NET APP SOFTWARE.

   SCALE FACTOR: 0.99995676

   GROUND COORDINATE (ORIGIN): N:360616.648
   E:266141.418
9. CORNER MARKERS (SEE DETAIL) SET ON ALL ASSESSABLE PROPERTY CORNERS.
10. THERE ARE NO ENCROACHMENTS EITHER WAY ACROSS PROPERTY LINES EXCEPT AS SHOWN.




SCALE: 1"=200'
200' 100' 0 200'
SCALE IN FEET

## CORNER DETAILS




## LEGEND

| | |
|---|---|
| PROPERTY BOUNDARY LINE | SET CAPPED PIN (SEE DETAIL) |
| RIGHT-OF-WAY LINE | FOUND CONCRETE MARKER (FND CM) |
| RIGHT-OF-WAY CENTERLINE | INACCESSIBLE CORNER |
| ADJACENT PROPERTY LINE | FOUND PIN & CAP (Fnd. P/C) |
| UTILITY/ACCESS EASEMENT LINE | SET CONCRETE MARKER (SEE DETAIL) |
| TOWNSHIP BOUNDARY LINE | SET PROPERTY LINE POSTS |
| MEAN HIGH WATER LINE/TIDELANDS LINE | |
| EXISTING RAILROAD TRACKS | |
| EXISTING WATER LINE | |
| WIGGINS' POND/LOW AREA | |
| LEASE AREA | |




I HEREBY CERTIFY TO CHEMOURS COMPANY AND TO PURCHASER, STATE OF NEW JERSEY, AND ON BEHALF OF PURCHASER, TO PURCHASER'S TITLE INSURER THAT THIS PLAN, SURVEY, AND A CORRESPONDING METES AND BOUNDS DESCRIPTION HAVE BEEN PREPARED UNDER MY IMMEDIATE SUPERVISION IN ACCORDANCE WITH A WRITTEN CONTRACT WITH CHEMOURS COMPANY; THAT THIS PLAN IS A CORRECT AND ACCURATE REPRESENTATION OF CONDITIONS EXISTING AS OF JANUARY 2017, SUBJECT TO SUCH NOTES AS MAY APPEAR HEREON. I DO FURTHER CERTIFY THAT THE MONUMENTS AS DESIGNATED AND SHOWN HEREON HAVE BEEN SET.

ROBERT R. HEGGAN — 2/06/2017
NJ LAND SURVEYOR LICENSE No. 17775 — DATE

ROBERT R. HEGGAN
PROFESSIONAL LAND SURVEYOR
NEW JERSEY LICENSE No. 17775

ARH ASSOCIATES
ADAMS, REHMANN & HEGGAN ASSOCIATES, INC.
218 BELLEVUE AVENUE
PO BOX 579
HAMMONTON, NJ 08037-2019

revisions

WIGGINS POND
(BLOCK 8, PART OF LOT 4)

SURVEY OF
CONSERVATION EASEMENT
WHITE SLUICE RACE &
WIGGINS POND
Greenwich Township, Gloucester County, New Jersey

| | |
|---|---|
| date: | February 6, 2017 |
| scale: | 1"=200' |
| drawn by: | RCS |
| checked: | RRH |
| proj. no.: | 8082915 |

3 of 3

| | |
|---|---|
| DRAWING LOCATION | W:\FILEROOM\HO\8082915\SUR\DWG\additional area base\S_8082915-GREEN.dwg |
| LAST DATE SAVED | 2/22/2017 |
| LAST SAVE BY | aelfi |

**SCHEDULE A** – EASEMENT DESCRIPTION AND REDUCED SURVEY

We Set Our Sights on Excellence.
Fralinger Engineering PA

CONSULTING ENGINEERS • PLANNERS
LAND SURVEYORS • ENVIRONMENTAL SERVICES

629 Shiloh Pike • Bridgeton • New Jersey • 08302
Phone: 856- 451-2990 • Fax: 856-455-9702
www.fralinger.com

Albert A. Fralinger, Jr., PE, PLS and PP
J. Michael Fralinger, Sr. (1957-2009)
Charles M. Fralinger, PLS
Carl R. Gaskill, PE, PLS, PP and CME
Stephen J. Nardelli, PE, PP, CME and CPWM
Barry S. Jones, PLS and PP
Guy M. DeFabrites, PLS and PP
Stephen P. McKeich, PLS
William J. Olbrich, PLS
Matthew Baldino, PE, CME
Robert A. Mulford, III, PE, CME
Scott A. Adams, PLS
Corey R. Gaskill, PE, CME
J. Michael Fralinger, Jr., PE, CME

Civil Engineering
Land Use Planning and Design
Site Engineering
Traffic Engineering
Land Surveying
Municipal Engineering
Soils Investigation
Traffic Impact Studies
NJDOT Permitting
Phase I Environmental Studies
Permeability Testing
Septic System Design
Wetlands Delineation
Global Positioning Surveying (GPS)
Geographic Information Systems (GIS)
Planning/Zoning Board Representation
3D Laser Scanning

# EASEMENT DESCRIPTION
# THE CHEMOURS COMPANY FC, LLC
# SALEM CREEK

**TRACT ONE**

**Township of Carney's Point**
**County of Salem**
**State of New Jersey**
**Lands now or formerly**
**The Chemours Company FC, LLC**

**May 10, 2007**
**Revised October 23, 2014**
**Revised November 1, 2016**
**Revised November 30, 2016**
**Revised April 11, 2017**
**Revised December 1, 2017**
**Last Revised December 27, 2017**
**Block 222, Lots 1 and 1.01**
**New Jersey State Highway 295**
**Salem Creek**
**AKA Salem Canal**

ALL that certain tract or parcel of land located on New Jersey State Highway Route 295 in the Township of Carney's Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at a point for a corner in the curved northerly line of New Jersey State Highway Route 295, (Also known as Route 108, Section 1B, Variable width); said point being along the boundary line between the Township of Pennsville and the Township of Carneys Point; said point being North 18° 40' 48" East, 36.00 feet, from an iron bar set in the dividing line between said townships, said Route 295 and land of New Jersey Turnpike, (said beginning point having NJPCS NAD '83 (92) values N 309,773.21 feet and E 213,687.57 feet) and from said beginning point and in the said bearing system running, thence:

(1) along said township boundary line, North 18° 35' 54" East, 383.75 feet to a point for a corner and passing over an iron bar set in line 353.75 feet from the beginning of this course; thence

(2) still along same, North 20° 06' 34" East, 151 feet more or less, to a point for a corner in or near the high water mark on the northeasterly side of Salem Creek; thence

(3) along the edge of said Salem Creek, in a southeasterly direction, various course thereof, approximately 892 feet (tie line = South 56° 29' 48" East, 890.35 feet) to a point for a corner in the right of way of said Route 295 as graphically shown on "New Jersey State Highway Department Construction Plan, Route 108 Section 1B, Route 60 Freeway from Hollywood Ave to New Jersey Turnpike dualization and Bridges" undated, Sheet 16 of 78; thence

(4) along line of said Route 295, a curve to the right and running westerly, having a radius of 1,750 feet more or less, an arc distance of 364.34 feet, (Chord = South 74° 20' 33" West, 363.68 feet), to a point for a corner; thence

(5) still along same, along a curve to the right and running westerly, having a radius of 6,850.00 feet, an arc distance of 572.92 feet, (Chord = North 81° 33' 21" West, 572.76 feet), to the Place of Beginning.

CONTAINING 6.5 acres of land, to be the same, more or less.

BEING Lots 1 (3.6 acres) and 1.01 (2.9 acres) of Block 222, as shown on the Carney's Point Township Tax Assessment Map.

**TRACT TWO**

**May 10, 2007**
**Revised October 23, 2014**
**Revised November 1, 2016**
**Revised November 30, 2016**
**Revised August 2, 2017**
**Last Revised December 1, 2017**

| | |
|---|---|
| **Township of Carney's Point** | **Block 227, Lot 2** |
| **Township of Carney's Point** | **Block 228, Lots 1 and 1.01** |
| **Township of Pennsville** | **Block 901, Lot 38** |
| **Township of Mannington** | **Block 27, Lot 1** |
| **Township of Carney's Point** | **Block 264, Lots 1 and 1.01** |
| **County of Salem** | **Hawks Bridge Road** |
| **State of New Jersey** | **New Jersey Turnpike** |
| **Lands now or formerly** | **Salem Creek** |
| **The Chemours Company FC, LLC** | **AKA Salem Canal** |

ALL that certain tract or parcel of land located on Hawks Bridge Road and New Jersey Turnpike in the Townships of Carney's Point, Pennsville, and Mannington, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an iron bar set for a corner in the westerly line of Hawks Bridge Road (a.k.a. County Route 540, 66 feet wide), said point being also the southeasterly corner of land of Patrick and

Patricia Bomba, (said beginning point having NJPCS NAD '83 (92) values N 307,705.54 feet and E 218,089.28 feet) and from said beginning point and in the said bearing system running, thence:

(1) along said westerly line, South 30° 49' 33" East, 285.14 feet, to an iron bar set for a corner; thence

(2) still along same, South 35° 57' 29" East, 1,211.62 feet, to an iron bar set for a corner; thence

(3) still along same and crossing Salem Creek, South 39° 43' 49" East, 172.75 feet, to an iron bar set for a corner; thence

(4) along line of land of the New Jersey Department of Environmental Protection, South 60° 55' 11" West, 76.87 feet, to an iron bar set for a corner; thence

(5) still along same, South 38° 31' 49" West, 60.00 feet, to an iron bar set for a corner; thence

(6) still along same, South 80° 51' 49" West, 133.90 feet, to an iron bar set for a corner; thence

(7) still along same, North 75° 03' 11" West, 187.70 feet, to an iron bar set for a corner; thence

(8) still along same, South 46° 46' 49" West, 217.90 feet, to an iron bar set for a corner; thence

(9) still along same, South 34° 47' 11" East, 1,679.90 feet, to an iron bar set for a corner; thence

(10) along the northerly line of land of Mark E Bennett, South 84° 26' 48" West, 898 feet more or less, to a point for a corner in or near the high water mark of Salem Creek, passing over an iron bar set in line 847.57 feet from the beginning of this course; thence

(11) along said high water mark, in a northwesterly direction, the various courses thereof, approximately 2,255 feet (tie line = North 40° 48' 58" West, 2,135.73 feet), to an iron bar set for a corner; thence

(12) along line of land of John R Humphreys, II, crossing Salem Creek, and crossing the boundary line between Mannington and Pennsville Townships, South 77° 29' 24" West, 221 feet, more or less, to an iron bar set for a corner; thence

(13) still along same, and along line of other land of John R Humphreys, II, North 11° 10' 27" West, 300.04 feet, to an iron bar set for a corner; thence

(14) still along same, North 17° 15' 54" East, 302.08 feet, to an iron bar set for a corner; thence

(15) still along same, North 31° 21' 36" West, 535.13 feet, to an iron bar set for a corner; thence

(16) still along same, South 68° 56' 24" West, 570.39 feet, to an iron bar set for a corner; thence

(17) still along same, North 72° 44' 06" West, 925.00 feet, to an iron bar set for a corner; thence

(18) still along same, South 22° 50' 36" East, 492.70 feet, to an iron bar set for a corner; thence

(19) still along same, South 01° 39' 24" West, 530.00 feet, to an iron bar set for a corner; thence

(20) still along same, South 89° 55' 36" East, 390.00 feet, to an iron bar set for a corner; thence

(21) still along same, and along the westerly line of other land of John R Humphreys, II, and along line of other land of John R Humphreys, II, South 14° 30' 24" West, 576.90 feet, to an iron bar set for a corner; thence

(22) still along same, South 37° 57' 24" West, 66.50 feet, to an iron bar set for a corner; thence

(23) still along same and along line of land of Melvin E. Humphreys, South 88° 24' 24" West, 117.10 feet, to an iron bar set for a corner; thence

(24) still along same, and the northeasterly line of land of Brent D. and Lois A. Newsome, North 36° 25' 36" West, 659.50 feet, to an iron bar set for a corner; thence

(25) along easterly line of land of Southbridge MHC LLC, along the easterly line of land of John R Humphreys, II, North 01° 39' 24" East, 1,555.65 feet, to an iron bar set for a corner, same being the southeasterly corner of land of William J. Mesogianes; thence

(26) along line of land of William J. and Renee Mesogianes, South 76° 56' 58" East, 1,152.45 feet, to a concrete monument found for a corner; thence

(27) still along same, and crossing the boundary line between Carney's Point and Pennsville Townships, and along other land of William J. Mesogiaines, North 23° 53' 14" East, 657.91 feet, to an iron bar set for a corner; thence

(28) still along same, and along line of other land of William J. Mesogianes, North 33° 35' 06" West, 182.84 feet, to an iron bar set for a corner; thence

(29) still along same, and along line of other land of William J. Mesogianes, North 67° 27' 23" West, 434.85 feet, to an iron pipe found for a corner; thence

(30) still along same, and along line of other land of William J. Mesogianes, South 28° 21' 34" West, 511.81 feet, to an iron pipe found for a corner; thence

(31) still along same, North 68° 01' 55" West, 676.11 feet, to an iron bar set for a corner; thence

(32) along line of land of Joseph A. and Louise C. Lucchesi, North 40° 06' 14" East, 649.24 feet, to an iron bar set for a corner; thence

(33) still along same, North 54° 18' 46" West, 697.86 feet, to an iron bar set for a corner; thence

(34) along line of land of The New Jersey Turnpike Authority, and crossing Salem Creek, North 26° 44' 32" East, 171.02 feet, to a point for a corner; thence

(35) still along same, North 88° 02' 44" East, 88.82 feet, to an iron bar set for a corner; thence

(36) along line of land of The New Jersey Turnpike Authority, and along line of land of Pedro Q. Dayit and along line of land of Gerald W. Carter, South 57° 47' 39" East, 1,645.60 feet, to an iron bar set for a corner; thence

(37) along line of said land of Carter, North 61° 37' 21" East, 65.30 feet, to an iron bar set for a corner; thence

(38) along line of land of Mary Hardy, South 43° 01' 39" East, 51.80 feet, to an iron bar set for a corner; thence

(39) along line of other land of Mary Hardy, South 43° 11' 39" East, 56.90 feet, to an iron bar set for a corner; thence

(40) still along same, South 33° 35' 39" East, 43.67 feet, to an iron bar set for a corner; thence

(41) still along same, South 43° 01' 39" East, 79.20 feet, to an iron bar set for a corner; thence

(42) along the southwesterly line of land of Lewis J. and Lindy L. Demaris, South 37° 35' 39" East, 113.40 feet, to an iron bar set for a corner; thence

(43) along line of land of Jeffrey S. and Roberta Schaal, South 30° 02' 21" West, 183.00, to an iron bar set for a corner; thence

(44) still along same, and along the southwesterly line of land of Mark S. Catenacci, and along line of land of Janet E. and William T. Boland, South 16° 23' 44" East, 438.70 feet, to an iron bar set for a corner, passing over an iron bar found in line 107.82 feet from the beginning of this course, also passing over another iron bar found in line 183.34 feet from the end of this course; thence

(45) still along line of said land of Janet E. and William T. Boland, South 78° 05' 39" East, 131.10 feet, to a point for a corner, witnessed by an iron bar found 1.81 feet north and 2.80 feet east of said point; thence

(46) along southeasterly line of land of Lawrence and Teresa Marini, South 61° 39' 59" East, 374.40 feet, to a point for a corner, witnessed by an iron pipe found 0.82 feet west of said point; thence

(47) along southeasterly line of Thor M. and Joyce K. Batenchuk, and along southeasterly line of land of Craig H. and Amy B. Schwarz, North 48° 48' 04" East, 519.58 feet, to a point for a corner, witnessed by an iron pipe found 0.93 feet north and 1.31 feet west of said point, passing over an iron pipe found in line 225.48 feet from the end of this course; thence

(48) along line of aforementioned land of Patrick and Patricia Bomba, South 76° 57' 18" East, 147.05 feet, to an iron bar set for a corner; thence

(49) still along same, South 43° 28' 39" East, 110.83 feet, to an iron bar set for a corner; thence

(50) still along same, South 76° 15' 25" East, 68.30 feet, to an iron bar set for a corner; thence

(51) still along same, North 49° 27' 40" East, 38.69 feet, to the Place of Beginning.

CONTAINING 150.8 acres of land, to be the same, more or less.

SUBJECT TO certain unrecorded lease agreements granted by E.I. DuPont DeNemours and Company to the owners of lands adjoining the above described parcel of land consisting of a total area of 6.8 acres, as described in Exception #8 below.

BEING Lot 2 (12.4 acres) of Block 227; Lots 1 (7.4 acres); 1.01 (12.2 acres) of Block 228, Lots 1 (0.9 acre) and 1.01 (3.0 acres) of Block 264 as shown on the Carney's Point Township Tax Assessment Map.

ALSO BEING Lot 38 (36.6 acres) of Block 901 as shown on the Pennsville Township Tax Assessment Map.

ALSO BEING Lot 1 (78.3 acres) of Block 27; as shown on the Mannington Township Tax Assessment Map.

EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #8

ALL that certain tract or parcel of land located on Hawks Bridge Road in the Township of Carney's Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an iron bar set for a corner in the southwesterly line of Hawks Bridge Road (a.k.a. County Route 540, 66 feet wide), said point being also the southeasterly corner

of land of Patrick and Patricia Bomba, (said beginning point having NJPCS NAD '83 (92) values N 307,705.54 feet and E 218,089.28 feet) and from said beginning point and in the said bearing system running, thence:

(1) along said southwesterly line, South 30° 49' 33" East, 115.15 feet to a point for a corner in the high water mark of Salem Creek, passing over an iron bar set in line, 100.15 feet from the beginning of this course, said high water mark also being the dividing line between land of The Chemours Company FC, LLC, (Block 228, Lot 1) and other land of The Chemours Company FC, LLC, (Block 228, Lot 1.01); thence

(2) along said dividing line, in a northwesterly direction, the various course thereof, approximately 3,450 feet (tie line = North 60° 29' 30" West, 2,658.31 feet), to a point for a corner; thence

(3) over and through land of Chemours Company FC, LLC, North 34° 25' 27" East, 50.11 feet, to an iron bar set for a corner, passing over an iron bar set in line, 40.11 feet from the end of this course; thence

(4) along line of land of Pedro Q. Dayit and along line of land of Gerald W. Carter, South 57° 47' 39" East, 887.29 feet, to an iron bar set for a corner; thence

(5) along line of said land of Carter, North 61° 37' 21" East, 65.30 feet, to an iron bar set for a corner; thence

(6) along line of land of Mary Hardy, South 43° 01' 39" East, 51.80 feet, to an iron bar set for a corner; thence

(7) along line of other land of Mary Hardy, South 43° 11' 39" East, 56.90 feet, to an iron bar set for a corner; thence

(8) still along same, South 33° 35' 39" East, 43.67 feet, to an iron bar set for a corner; thence

(9) still along same, South 43° 01' 39" East, 79.20 feet, to an iron bar set for a corner; thence

(10) along the southwesterly line of land of Lewis J. and Lindy L. Demaris, South 37° 35' 39" East, 113.40 feet, to an iron bar set for a corner; thence

(11) along line of land of Jeffrey S. and Roberta Schaal, South 30° 02' 21" West, 183.00, to an iron bar set for a corner; thence

(12) still along same, and along the southwesterly line of land of Mark S. Catenacci, and along line of land of Janet E. and William T. Boland, South 16° 23' 44" East, 438.70 feet, to an iron bar set for a corner, passing over an iron bar found in line 107.82 feet from the beginning of this

course, also passing over another iron bar found in line 183.34 feet from the end of this course; thence

(13) still along line of said land of Janet E. and William T. Boland, South 78° 05' 39" East, 131.10 feet, to a point for a corner, witnessed by an iron bar found 1.81 feet north and 2.80 feet east of said point; thence

(14) along southeasterly line of land of Lawrence and Teresa Marini, South 61° 39' 59" East, 374.40 feet, to a point for a corner, witnessed by an iron pipe found 0.82 feet west of said point; thence

(15) along southeasterly line of Thor M. and Joyce K. Batenchuk, and along southeasterly line of land of Craig H. and Amy B. Schwarz, North 48° 48' 04" East, 519.58 feet, to a point for a corner, witnessed by an iron pipe found 0.93 feet north and 1.31 feet west of said point, passing over an iron pipe found in line 225.48 feet from the end of this course; thence

(16) along line of land of the aforementioned Patrick and Patricia Bomba, South 76° 57' 18" East, 147.05 feet, to an iron bar set for a corner; thence

(17) still along same, South 45° 28' 39" East, 110.83 feet, to an iron bar set for a corner; thence

(18) still along same, South 76° 15' 25" East, 68.30 feet, to an iron bar set for a corner; thence

(19) still along same, North 49° 27' 40" East, 38.69 feet, to the place of beginning.

CONTAINING 6.8 acres of land, to be the same, more or less.

BEING a part of Lot 1 of Block 228 as shown on the Carney's Point Township Tax Assessment Map.

**TRACT THREE**

**Township of Carney's Point**
**County of Salem**
**State of New Jersey**
**Lands now or formerly**
**The Chemours Company FC, LLC**

**May 10, 2007**
**Revised October 23, 2014**
**Revised November 1, 2016**
**Revised November 30, 2016**
**Revised August 2, 2017**
**Last Revised December 1, 2017**
**Block 262, Lot 6**
**U.S. Route 40 (aka Wiley Road)**
**Game Creek**

ALL that certain tract or parcel of land located on U.S. Route 40 (aka Wiley Road, width varies), in the Township of Carney's Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an iron bar set for a corner in the curved southerly line of U.S. Route 40 (a.k.a. Wiley Road, west bound); said point also being the northeast corner of land of the New Jersey Turnpike Authority, (said beginning point having NJPCS NAD '83 (92) values N 310,373.38 feet and E 220,784.89 feet) and from said beginning point and in the said bearing system running, thence:

(1) along said southerly line, along a curve to the right and running southeasterly, having a radius of 4,069.09 feet, an arc distance of 302.93 feet (Chord = North 86° 05' 07" East, 302.86 feet), to an iron bar set for a corner; thence

(2) still along U.S. Route 40 connecting the east and westbound roadway, South 17° 39' 34" East, 22.29 feet, to an iron bar set for a corner in the curved northwesterly line of U.S. Route 40 (a.k.a. Wiley Road, east bound, variable width); thence

(3) along said northwesterly line, along a curve to the left and running southwesterly, having a radius of 7,940.73 feet, an arc distance of 358.02 feet (Chord = South 75° 38' 46" West, 357.99 feet), to an iron bar set for a corner; thence

(4) along said land of New Jersey Turnpike Authority, North 22° 59' 42" East, 97.02 feet, to the Place of Beginning.

CONTAINING 0.394 of an acre of land, to be the same, more or less.

BEING Lot 6 (0.394 acre) of Block 262, as shown on the Carney's Point Township Tax Assessment Map.

**TRACT FOUR**

**County of Salem**
**State of New Jersey**

**Revised October 23, 2014**
**Revised November 1, 2016**
**Revised November 30, 2016**
**Revised August 2, 2017**
**Last Revised December 1, 2017**
**Block 246, Lot 12**
**Block 248, Lot 1.01**
**New Jersey Turnpike**
**Game Creek**

**Township of Carney's Point**
**Township of Carney's Point**
**Lands now or formerly**
**The Chemours Company FC, LLC**

ALL that certain tract or parcel of land located on the New Jersey Turnpike in the Township of Carney's Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at a point for a corner in the northerly line of the New Jersey Turnpike (variable width); said point being in or near the southeasterly high water mark of Game Creek, (said beginning point having NJPCS NAD '83 (92) values N 310,971.42 feet and E 221,322.10 feet) and from said beginning point and in the said bearing system running, thence:

*P:\24000-24499\24214 02\Deeds\24214.00.DD-01 17 Chemours May 10 Revised December 27.docx*

(1) along said northerly line, South 77° 28' 20" West, 167 feet, more or less, to an iron bar set for a corner and passing over an iron bar set in line 60.77 feet from the end of this course; thence

(2) along line of land of South Jersey Land and Water Trust, North 73° 37' 56" West, 282.05 feet, to an iron bar set for a corner; thence

(3) still along same, South 62° 08' 04" West, 265.10 feet, to an iron bar set for a corner; thence

(4) still along same, North 13° 35' 04" East, 305.85 feet, to an iron bar set for a corner; thence

(5) still along same, South 78° 42' 56" East, 600 feet more or less, to a point for a corner in or near the northwesterly high water mark of said Game Creek, and passing over an iron bar set in line, 559.25 feet, from the beginning of this course; thence

(6) along the northwesterly high water mark of said Game Creek, in a northeasterly direction, the various course thereof, approximately 6,495 feet (tie line = North 43° 24' 14" East, 4,436.40 feet), to a point for a corner; thence

(7) crossing Game Creek, South 08° 03' 29" East, 65 feet more or less, to a point for a corner in or near the southeasterly high water mark of said Game Creek; thence

(8) along said southeasterly line, in a southwesterly direction, the various courses thereof, approximately 6,465 feet (tie line = South 42° 59' 27" West, 4,455.91 feet), to the Place of Beginning.

CONTAINING 15.0 acres of land, to be the same, more or less.

BEING Lot 12 (2.3 acres) of Block 246 and Lot 1.01 (12.7 acres) of Block 248, as shown on the Carney's Point Township Tax Assessment Map.

**TRACT FIVE**

**Revised October 23, 2014**
**Revised November 1, 2016**
**Revised November 30, 2016**
**Revised August 2, 2017**
**Last Revised December 1, 2017**

| | |
|---|---|
| **Township of Carney's Point** | **Block 265, Lots 2, 2.01, 4, 6, 6.01** |
| **Township of Carney's Point** | **Block 267, Lots 20, 20.01** |
| **Township of Carney's Point** | **Block 268, Lots 8, 8.01** |
| **Township of Mannington** | **Block 1, Lot 1; Block 2, Lot 20** |
| **County of Salem** | **Pointers - Auburn Road** |
| **State of New Jersey** | **Hawks Bridge Road** |
| **Lands now or formerly** | **Sportsman Road** |
| **The Chemours Company FC, LLC** | **U. S. Route 40 (a.k.a. Wiley Road)** |
| | **Courses Landing Road** |
| | **Salem Creek** |
| | **a.k.a. Salem Canal** |

*P:\24000-24499\24214 02\Deeds\24214 00 DD-01 17 Chemours May 10 Revised December 27 docx*

ALL that certain tract or parcel of land located on Pointers – Auburn Road, Hawks Bridge Road, Sportsman Road, U. S. Route 40 (a.k.a. Wiley Road), Courses Landing Road in the Township of Mannington and Township of Carney's Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an iron bar set for a corner in the northeasterly line of Hawks Bridge Road (a.k.a. Co. Rte. 540, 66 feet wide), said point being the southwesterly corner of land of Amy L. Carlson, (said beginning point having NJPCS NAD '83 (92) values N 307,100.24 feet and E 218,578.40 feet) and from said beginning point and in the said bearing system running, thence:

(1) along line of said land of Amy L. Carlson, North 64° 22' 51" East, 349.87 feet, to an iron bar set for a corner, passing over a concrete monument set in line 99.71 feet from the end of this course; thence

(2) still along same, North 15° 57' 51" East, 287.66 feet, to an iron bar set for a corner; thence

(3) still along same, South 60° 29' 09" East, 252.26 feet, to an iron bar set for a corner; thence

(4) still along same, North 05° 44' 51" East, 223.75 feet, to an iron bar set for a corner; thence

(5) along line of land of Luke and Patricia Ottinger, North 40° 22' 51" East, 384.89 feet, to a concrete monument found for a corner; thence

(6) along line of land of Amante N. and Lynn E. DeCastro, North 68° 07' 48" East, 404.78 feet, to an iron pipe found for a corner; thence

(7) still along same, North 70° 29' 43" East, 197.76 feet, to an iron pipe found for a corner; thence

(8) still along same, South 64° 59' 11" East, 255.62 feet, to an iron bar set for a corner; thence

(9) still along same, South 85° 51' 02" East, 222 feet more or less, to the center of Salem Creek, passing over an iron bar set in line 134.50 feet from the beginning of this course; thence

(10) still along same, and along the center of said Salem Creek, in a northeasterly direction, the various courses thereof, approximately 845 feet (tie line = North 26° 06' 36" East, 826.75 feet, to a point for a corner; thence

(11) crossing Salem Creek, and along said land of Amante N. and Lynn E. DeCastro, North 87° 50' 21" West, 132 feet more or less, to an iron bar set for a corner; thence

(12) still along same, North 88° 12' 02" West, 330.11 feet, to an iron bar set for a corner; thence

(13) still along same, North 32° 01' 02" West, 296.90 feet, to an iron bar set for a corner; thence

(14) still along same, North 06° 00' 02" West, 148.08 feet, to an iron bar found for a corner; thence

(15) still along same, North 04° 15' 06" East, 10.69 feet, to an iron bar found for a corner; thence

(16) along easterly line of land of Alan and Emilia Danner, North 18° 13' 43" West, 378.45 feet, to an iron bar found for a corner; thence

(17) still along same, North 00° 53' 43" West, 433.34 feet, to an iron bar found for a corner in the curved southerly line of U.S. Route 40, (a.k.a. Wiley Rd. varied width); thence

(18) along said southerly line, along a curve to the right and running easterly, having a radius of 10,073.19 feet, an arc distance of 1,359.89 feet (Chord = North 74° 09' 33" East, 1,358.86 feet), to an iron bar set for a corner; thence

(19) along the westerly line of Sportsman Road (66 feet wide), (non-radial to course 18 above), South 14° 41' 47" East, 150.14 feet, to an iron bar set for a corner at a point of curvature; thence

(20) still along same, along curve to the left and running southeasterly having a radius of 531.01 feet, an arc distance of 198.11 feet (Chord = South 25° 31' 27" East, 196.96 feet), to an iron bar set for a corner; thence

(21) along line of land of Thomas E. and Suzanne L. McDade, South 43° 48' 57" West, 177.47 feet, to an iron bar set for a corner; thence

(22) still along same and along line of land of William Widen, Jr. and Jacquelin Scott, South 46° 09' 35" East, 425.15 feet, to an iron bar set for a corner; thence

(23) still along same, North 50° 26' 21" East, 179.71 feet, to an iron bar set for a corner, at point of curvature in the southwesterly line of Sportsman Road; thence

(24) along said southwesterly line, along a curve to the left and running southeasterly, having a radius of 373.65 feet, an arc distance of 149.21 feet (Chord = South 68° 17' 26" East, 148.22 feet), to an iron bar set for a corner; thence

(25) along line of land of Kevin Grogan, South 10° 52' 00" East, 139.36 feet, to a concrete monument found for a corner; thence

(26) still along same, North 76° 02' 00" East, 211.75 feet, to an iron bar found for a corner; thence

(27) still along same, North 58° 26' 26" East, 121.65 feet, to an iron bar found for a corner; thence

(28) still along same, North 26° 37' 00" East, 188.46 feet, to an iron bar set for a corner; thence

(29) along the southerly line of Sportsman Road , North 62° 11' 43" East, 345.64 feet, to an iron bar set for a corner; thence

(30) along line of land of Howard T. and Edith E. Handy, South 51° 52' 06" East, 254.78 feet, to an iron bar found for a corner; thence

(31) still along same, and along line of land of Allen T. and Sharon D. Handy, North 86° 20' 41" East, 335.12 feet, to a concrete monument found for a corner; thence

(32) along line of land of William F. and Mirsha L. Lape, North 04° 27' 23" West, 301.78 feet, to a concrete monument found for a corner, passing over a concrete monument found in line 34.52 feet from the end of this course; thence

(33) along the southerly line of land of Michael B. Cunard, and along the southerly line of land of Lemuel A. and Linda J. Dyson, North 43° 36' 46" East, 294.77 feet, to an iron bar set for a corner; thence

(34) along line of said land of Dyson, and line of land of David L. and Delsea E. Schaffer, North 53° 01' 47" East, 256.05 feet, to an iron bar set for a corner, passing over an iron bar found in line 181.99 feet from the beginning of this course; thence

(35) still along line of said land of Schaffer, and along line of land of Joseph F. and Donna G. Micallef, South 43° 00' 46" East, 270.50 feet, to a concrete monument found for a corner; thence

(36) along line of said land of Micallef, South 53° 52' 55" East, 221.21 feet, to a concrete monument found for a corner; thence

(37) along line of land of Salem County Sportsman Club, South 20° 47' 48" West, 882.25 feet, to a concrete monument found for a corner; thence

(38) still along same, South 34° 55' 53" West, 169.04 feet, to a concrete monument found for a corner; thence

(39) still along same, South 40° 28' 41" East, approximately 2,952 feet, to a point for a corner, in the center of Salem Creek and passing over an iron bar set in line 2,444.71 feet from the beginning of this course; thence

(40) still along same, and along the center of said Salem Creek, South 58° 27' 40" East, 530.00 feet, to a point for a corner; thence

(41) still along same and crossing Salem Creek, North 51° 53' 51" East, 232.63 feet, to an iron bar set for a corner; thence

(42) still along same and along line of other land of Salem County Sportsman Club, South 52° 39' 09" East, 1,922.90 feet, to a point for a corner witnessed by an iron bar found, 2.62 feet northwest and 1.24 feet northeast of said point; thence

(43) along other land of Salem County Sportsman Club, South 52° 39' 28" East, 132.02 feet, to an iron bar found for a corner; thence

(44) still along same, South 82° 13' 08" East, 457.83 feet, to an iron bar found for a corner; thence

(45) still along same, North 31° 02' 14" East, 191.36 feet, to an iron bar found for a corner; thence

(46) still along same, North 43° 30' 50" East, 406.78 feet, to an iron bar found for a corner, passing over a concrete monument set in line, 74.85 feet from the beginning of this course; thence

(47) along line of land of Timothy S. O'Brien, South 22° 45' 47" East, 360.38 feet, to an iron bar found for a corner; thence

(48) still along same, South 16° 48' 23" West, 222.98 feet, to an iron bar set for a corner; thence

(49) still along same, South 43° 20' 12" East, 218.16 feet, to an iron bar found for a corner; thence

(50) still along same, South 64° 32' 30" East, 1,179.71 feet, to a concrete monument found for a corner; thence

(51) along line of land of Salvatore F. and Dina Vasta, South 74° 19' 08" East, 1,086.77 feet, to an iron bar set for a corner; thence

(52) still along same, South 82° 29' 09" East, 419.20 feet, to an iron bar set for a corner; thence

(53) still along same, South 87° 12' 09" East, 427.95 feet, to an iron bar set for a corner; thence

(54) still along same, North 77° 09' 51" East, 503.40 feet, to an iron bar set for a corner; thence

(55) still along same, North 27° 43' 51" East, 215.50 feet, to an iron bar set for a corner; thence

(56) still along same, North 73° 50' 51" East, 400.95 feet, to an iron bar set for a corner; thence

(57) still along same, South 25° 58' 09" East, 248.50 feet, to an iron bar set for a corner; thence

(58) still along same, South 81° 45' 09" East, 285.00 feet, to an iron bar set for a corner; thence

(59) still along same, South 07° 57' 09" East, 203.70 feet, to an iron bar set for a corner; thence

(60) still along same, South 89° 06' 09" East, 465.90 feet, to an iron bar set for a corner; thence

(61) still along same, North 53° 47' 51" East, 176.10 feet, to an iron bar set for a corner; thence

(62) still along same, North 64° 45' 51" East, 223.90 feet, to an iron bar set for a corner; thence

(63) still along same, North 06° 23' 51" East, 638.50 feet, to an iron bar set for a corner; thence

(64) still along same, North 23° 02' 51" East, 631.00 feet, to an iron bar set for a corner; thence

(65) still along same, North 11° 09' 09" West, 456.19 feet, to an iron bar set for a corner; thence

(66) along the southerly line of Courses Landing Road (49.50 feet wide), along a curve to the right and running southeasterly, having a radius of 311.80 feet, an arc distance of 89.61 feet (Chord = South 58° 21' 24" East, 89.30 feet), to an iron bar set for a corner; thence

(67) still along same, South 50° 07' 25" East, 269.01 feet, to an iron bar set for a corner; passing over a concrete monument set in line 10.29 feet from the beginning of this course and passing over a concrete monument set in line, 42.55 feet from the beginning of this course; thence

(68) along line of land of Richard W. Halter, South 21° 08' 17" East, 276.95 feet, to an iron bar set for a corner; thence

(69) still along same, South 19° 55' 43" West, 461.80 feet, to an iron bar found for a corner; thence

(70) still along same, South 05° 51' 43" West, 177.50 feet, to an iron bar found for a corner; thence

(71) still along same, South 21° 34' 43" West, 786.50 feet, to an iron bar set for a corner; thence

(72) still along same, South 51° 57' 43" West, 180.50 feet, to an iron bar set for a corner; thence

(73) still along same, South 51° 36' 17" East, 659.10 feet, to an iron bar set for a corner; thence

(74) along line of land of Joseph Racite, Jr., South 29° 02' 11" West, 156.22 feet, to an iron bar found for a corner; thence

(75) still along same, South 77° 07' 17" East, 109.81 feet, to an iron bar found for a corner; thence

(76) still along same, South 51° 03' 58" East, 301.82 feet, to an iron bar found for a corner; thence

(77) still along same, South 17° 22' 17" East, 175.30 feet, to an iron bar found for a corner; thence

(78) still along same, South 56° 07' 17" East, 274.35 feet, to an iron bar found for a corner; thence

(79) still along same, South 71° 32' 17" East, 333.40 feet, to an iron bar found for a corner; thence

(80) still along same, North 55° 31' 43" East, 510.90 feet, to an iron bar found for a corner; thence

(81) still along same, South 76° 03' 17" East, 318.70 feet, to an iron bar found for a corner; thence

(82) still along same, North 24° 02' 43" East, 128.50 feet, to an iron bar found for a corner; thence

(83) still along same, North 60° 59' 43" East, 166.25 feet, to an iron bar found for a corner; thence

(84) still along same, North 19° 24' 43" East, 252.30 feet, to an iron bar found for a corner; thence

(85) still along same, North 11° 49' 43" East, 350.70 feet, to an iron bar found for a corner; thence

(86) still along same, North 34° 25' 43" East, 84.44 feet, to an iron bar set for a corner; thence

(87) still along same, South 89° 10' 17" East, 33.33 feet, to an iron bar set for a corner; thence

(88) still along same, North 45° 49' 43" East, 111.63 feet, to an iron bar set for a corner; thence

(89) along the southwesterly line of the aforementioned Courses Landing Road, South 37° 30' 17" East, 181.37 feet, to an iron bar set for a corner; thence

(90) along line of land of Randall and Kathy L. Murschell, South 30° 37' 28" West, 250.36 feet, to an iron bar set for a corner; thence

(91) still along same, South 08° 26' 27" West, 283.18 feet, to an iron bar found for a corner; thence

(92) along the line of land of the New Jersey Department of Environmental Protection, South 38° 24' 12" West, 417.16 feet, to an iron bar set for a corner; thence

(93) still along same, South 03° 33' 09" East, 90.80 feet, to an iron bar set for a corner; thence

(94) still along same, South 61° 51' 51" West, 236.20 feet, to an iron bar set for a corner; thence

(95) still along same, North 70° 04' 09" West, 310.60 feet, to an iron bar set for a corner; thence

(96) still along same, South 60° 27' 51" West, 115.40 feet, to an iron bar set for a corner; thence

(97) still along same, South 22° 13' 51" West, 209.85 feet, to an iron bar set for a corner; thence

(98) still along same, South 72° 30' 09" East, 264.55 feet, to an iron bar set for a corner; thence

(99) still along same, South 05° 28' 51" West, 179 feet more or less, to a point for a corner in the center of the Salem Creek, passing over an iron bar set in line 110.12 feet from the beginning of this course; thence

(100) still along same, and along the center of said Salem Creek, North 78° 32' 45" East, 253 feet more or less, to a point for a corner; thence

(101) along the northwesterly line of Pointers-Auburn Road (49.50 feet wide), South 37° 27' 37" West, 565.24 feet more or less, to an iron bar set for a corner; thence

(102) along line of land of Richard, Jr. and Mary Anne Eber, North 80° 18' 23" West, 15.33 feet, to an iron bar set for a corner in or near the high water mark of the Salem Creek; thence

(103) still along same, along said high water mark, and along line of land of John D. and Knoell K. Catalano, in a westerly direction, various course thereof, approximately 1,973 feet more or less, (tie line = North 77° 34' 46" West, 1,697.50 feet, to an iron bar set for a corner; thence

(104) along line of said land of Catalano, North 72° 30' 26" West, 294 feet , more or less, to an iron bar set for a corner; thence

(105) still along same, South 89° 40' 34" West, 177.00 feet, to an iron bar set for a corner; thence

(106) still along same, North 71° 49' 26" West, 151.30 feet, to an iron bar set for a corner; thence

(107) still along same, South 83° 53' 34" West, 118.50 feet, to an iron bar set for a corner; thence

(108) still along same, South 89° 39' 34" West, 74.83 feet, to an iron bar set for a corner; thence

(109) still along same, South 20° 32' 47" West, 44.18 feet, to an iron bar set for a corner; thence

(110) still along same, South 70° 17' 47" West, 209.70 feet, to an iron bar set for a corner; thence

(111) still along same, North 25° 24' 13" West, 693.30 feet, to an iron bar set for a corner; thence

(112) still along same, North 04° 13' 47" East, 137.20 feet, to an iron bar set for a corner; thence

(113) still along same, North 35° 34' 47" East, 217.50 feet, to an iron bar set for a corner; thence

(114) still along same, North 14° 56' 13" West, 126.10 feet, to an iron bar set for a corner; thence

(115) still along same, and along line of land of Karl R. Morgan Jr, North 49° 09' 13" West, 143.63 feet, to an iron bar set for a corner; thence

(116) along line of land of said Morgan, North 41° 21' 27" West, 127.50 feet, to an iron bar set for a corner; thence

(117) still along same, South 77° 38' 50" West, 965.10 feet, to an iron bar set for a corner; thence

(118) still along same, South 84° 41' 50" West, 352.40 feet, to an iron bar set for a corner; thence

(119) still along same, South 07° 28' 50" West, 147.60 feet, to an iron bar set for a corner; thence

(120) still along same, South 65° 49' 10" East, 216.80 feet, to an iron bar set for a corner; thence

(121) still along same, South 09° 18' 10" East, 318.10 feet, to an iron bar set for a corner; thence

(122) still along same, South 15° 37' 50" West, 170.60 feet, to an iron bar set for a corner; thence

(123) still along same, South 43° 52' 50" West, 95.70 feet, to an iron bar set for a corner; thence

(124) still along same, North 11° 32' 10" West, 410.10 feet, to an iron bar set for a corner; thence

(125) still along same, North 42° 32' 10" West, 261.70 feet, to an iron bar set for a corner; thence

(126) still along same, North 57° 02' 10" West, 229.60 feet, to an iron bar set for a corner; thence

(127) still along same, South 77° 17' 50" West, 438.70 feet, to an iron bar set for a corner; thence

(128) still along same, South 28° 43' 10" East, 229.00 feet, to an iron bar set for a corner; thence

(129) still along same, South 08° 15' 50" West, 293.90 feet, to an iron bar set for a corner; thence

(130) still along same, South 23° 14' 32" West, 132.50 feet, to an iron bar set for a corner; thence

(131) still along same, South 42° 16' 32" West, 636.00 feet, to an iron bar set for a corner; thence

(132) still along same, South 48° 56' 28" East, 328.80 feet, to an iron bar set for a corner; thence

(133) still along same, South 05° 49' 28" East, 217.00 feet, to an iron pipe found for a corner; thence

(134) along line of land of Joseph F. Catalano, Jr, North 65° 16' 18" West, 167.79 feet, to an iron bar set for a corner; thence

(135) still along same, South 83° 35' 42" West, 71.00 feet, to an iron bar set for a corner; thence

(136) still along same, South 36° 44' 42" West, 208.50 feet, to an iron bar set for a corner; thence

(137) still along same, South 62° 44' 42" West, 192.90 feet, to an iron bar set for a corner; thence

(138) still along same, North 80° 46' 18" West, 25.10 feet, to an iron bar set for a corner; thence

(139) along line of land of Donna L. Madara, M. Lillya and B. Dunn, North 79° 18' 00" West, 142.30 feet, to an iron bar set for a corner; thence

(140) still along same, North 37° 24' 00" East, 334.40 feet, to an iron bar set for a corner; thence

(141) still along same, North 11° 41' 00" West, 116.50 feet, to an iron bar set for a corner; thence

(142) still along same, North 50° 57' 00" West, 392.30 feet, to an iron bar set for a corner; thence

(143) still along same, South 81° 53' 00" East, 263.80 feet, to an iron bar set for a corner; thence

(144) still along same, North 35° 40' 00" East, 891.90 feet, to an iron bar set for a corner; thence

(145) still along same, North 12° 37' 00" West, 452.60 feet, to an iron bar set for a corner; thence

(146) still along same, South 84° 12' 00" West, 445.85 feet, to an iron bar set for a corner; thence

(147) still along same, North 86° 04' 00" West, 214.75 feet, to an iron bar set for a corner; thence

(148) still along same, North 80° 11' 00" West, 172.20 feet, to an iron bar set for a corner; thence

(149) along line of land of R and D Spina, Inc., North 65° 40' 08" West, 250.80 feet, to an iron bar set for a corner; thence

(150) still along same, North 69° 01' 08" West, 210.00 feet, to an iron bar set for a corner; thence

(151) still along same, North 50° 06' 08" West, 255.20 feet, to an iron bar set for a corner; thence

(152) still along same, North 63° 20' 08" West, 209.70 feet, to an iron bar set for a corner; thence

(153) still along same, North 43° 33' 08" West, 150.70 feet, to an iron bar set for a corner; thence

(154) still along same, North 60° 23' 08" West, 257.70 feet, to an iron bar set for a corner; thence

(155) still along same, South 05° 40' 52" West, 121.22 feet, to an iron bar set for a corner; thence

(156) along line of land of Russell C. Jr and Michael E. Spina, South 83° 47' 49" West, 679.70 feet, to an iron bar set for a corner; thence

(157) still along same, South 29° 55' 49" West, 235.40 feet, to an iron bar set for a corner; thence

(158) still along same, North 56° 27' 20" West, 127.50 feet, to an iron bar found for a corner; thence

(159) still along same, North 13° 47' 56" West, 305.41 feet, to an iron bar set for a corner; thence

(160) still along same, South 63° 33' 49" West, 336.50 feet, to an iron bar found for a corner; thence

(161) still along same, South 81° 31' 49" West, 229.60 feet, to an iron bar found for a corner; thence

(162) still along same, South 20° 01' 49" West, 422.30 feet, to an iron bar found for a corner; thence

(163) still along same, and along line of land of New Jersey Department of Environmental Protection, North 55° 16' 38" West, 248.85 feet, to a concrete monument found for a corner; thence

(164) along line of said land of New Jersey Department of Environmental Protection, North 30° 54' 45" East, 342.30 feet, to an iron bar found for a corner; thence

(165) still along same, North 18° 35' 05" West, 80.25 feet, to a point for a corner witnessed by an iron bar found 1.07 feet south and 0.81 feet west of said point; thence

(166) still along same, North 52° 59' 00" West, 467.20 feet, to an iron bar set for a corner; thence

(167) still along same, North 04° 02' 00" West, 295.90 feet, to an iron bar set for a corner; thence

(168) still along same, North 74° 39' 06" West, 713.96 feet, to an iron bar found for a corner; thence

(169) along line of land of the New Jersey of Department Environmental Protection, North 37° 37' 38" West, 384.00 feet, to an iron bar found for a corner; thence

(170) still along same, North 55° 42' 38" West, 178.00 feet, to a point for a corner witnessed by an iron bar found 0.30 feet west of said point; thence

(171) still along same, South 40° 45' 22" West, 177.40 feet, to an iron bar found for a corner; thence

(172) still along same, North 72° 56' 38" West, 349.80 feet, to an iron bar found for a corner; thence

(173) still along same, South 49° 49' 22" West, 285.50 feet, to an iron bar found for a corner; thence

(174) still along same, South 81° 35' 22" West, 222.80 feet, to an iron bar found for a corner; thence

(175) still along same, North 31° 29' 38" West, 194.80 feet, to an iron bar found for a corner; thence

(176) still along same, North 85° 31' 38" West, 773.30 feet, to an iron bar found for a corner; thence

(177) still along same, North 24° 40' 38" West, 390.70 feet, to an iron bar found for a corner; thence

(178) still along same, North 33° 26' 22" East, 362.00 feet, to an iron bar found for a corner; thence

(179) still along same, North 49° 46' 22" East, 134.50 feet, to an iron bar found for a corner; thence

(180) still along same, North 80° 00' 22" East, 342.80 feet, to an iron bar found for a corner; thence

(181) still along same, North 46° 02' 22" East, 129.50 feet, to an iron bar set for a corner; thence

(182) still along same, North 40° 56' 38" West, 754.50 feet, to an iron bar found for a corner; thence

(183) still along same, North 88° 56' 38" West, 120.30 feet, to an iron bar found for a corner; thence

(184) still along same, North 47° 45' 38" West, 214.40 feet, to an iron bar found for a corner; thence

(185) still along same, North 48° 48' 38" West, 786.90 feet, to a point for a corner witnessed by an iron bar found 0.31 feet south of said point; thence

(186) still along same, North 64° 35' 38" West, 682.78 feet, to a point for a corner witnessed by an iron bar found 0.26 feet south of said point; thence

(187) still along same, South 00° 24' 38" East, 497.20 feet, to a point for a corner witnessed by an iron bar found 0.77 feet north and 1.73 feet east of said point; thence

(188) still along same, South 49° 04' 22" West, 112.65 feet, to an iron bar found for a corner; thence

(189) still along same, South 48° 29' 38" East, 176.90 feet, to a point for a corner witnessed by an iron bar found 0.46 feet south and 0.27 feet east of said point; thence

(190) still along same, South 33° 23' 22" West, 513.45 feet, to an iron bar found for a corner; thence

(191) still along same, North 84° 42' 38" West, 349.85 feet, to an iron bar found for a corner; thence

(192) still along same, South 33° 13' 13" West, 439.39 feet, to an iron bar found for a corner; thence

(193) still along same, North 48° 42' 58" West, 3.78 feet, to an iron bar found for a corner; thence

(194) still along same, South 23° 14' 23" West, 109.38 feet, to an iron bar found for a corner; thence

(195) still along same, South 41° 51' 56" West, 152.30 feet, to an iron bar found for a corner; thence

(196) still along same, South 63° 31' 49" West, 148.34 feet, to an iron bar found for a corner; thence

(197) still along same, South 81° 05' 24" West, 117.46 feet, to an iron bar found for a corner; thence

(198) still along same, South 83° 52' 17" West, 270.70 feet, to an iron bar found for a corner; thence

(199) still along same, North 80° 33' 22" West, 217.21 feet, to a point for a corner witnessed by an iron bar found 0.27 feet south of said point; thence

(200) still along same, North 64° 31' 12" West, 381.01 feet, to a point for a corner witnessed by an iron bar found 0.36 feet south and 0.26 feet east of said point, passing over a concrete monument set in line 275.15 feet from the end of this course and a concrete monument set in line 154.86 feet from the end of this course; thence

(201) still along same, South 85° 56' 10" West, 267.94 feet, to a point for a corner witnessed by an iron bar found 0.44 feet south and 0.28 feet west of said point; thence

(202) still along same, North 57° 56' 56" West, 326.89 feet, to an iron bar found for a corner; thence

(203) still along same, North 75° 23' 57" West, 359.78 feet, to an iron bar set for a corner; thence

(204) along the northeasterly line of Hawks Bridge Road, North 35° 57' 29" West, 906.37 feet, to the Place of Beginning.

CONTAINING 801.9 acres of land, to be the same, more or less.

BEING Lot 1 (224.6 acres) of Block 1 and Lot 20 (76.7 acres) of Block 2 as shown on the Mannington Township Tax Assessment Map and being Lots 2 (21.7 acres), 2.01 (5.5 acres), 4 (0.2 acres), 6 (69.3 acres) and 6.01 (16.3 acres) of Block 265; Lots 20 (144.9 acres) and 20.01 (17.0 acres) of block 267; Lots 8 (196.0 acres) and 8.01 (29.7 acres) of Block 268 as shown on the Carney's Point Township Tax Assessment Map.

P:\24000-24499\24214 02\Deeds\24214 00 DD-01 17 Chemours May 10 Revised December 27.docx

EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #1

ALL that certain tract or parcel of land located Northeast of Hawks Bridge Road in the Township of Mannington, County of Salem, State of New Jersey, bounded and described as follows:

COMMENCING at an iron bar found for a corner in the northeasterly line of Hawks Bridge Road (County Route No. 540, 66 feet wide); said iron bar being the northwesterly corner of land of New Jersey Department of Environmental Protection (Block 1, Lot 2); (said commencing point having NJPCS NAD '83 (92) values N 306,366.58 feet and E 219,110.61 feet) and from said commencing point and in the said bearing system running, thence:

(A) along the line of land of said New Jersey Department of Environmental Protection, South 75° 23' 57" East, 359.78 feet, to an iron bar found for a corner; thence

(B) still along same, South 57° 56' 56" East, 326.89 feet, to a point for a corner witnessed by an iron bar found 0.44 feet south and 0.28 feet west of said point; thence

(C) still along same, North 85° 56' 10" East, 267.94 feet, to a point for a corner witnessed by an iron bar found 0.36 feet south and 0.26 feet east of said point; thence

(D) still along same, South 64° 31' 12" East, 154.86 feet, to a concrete monument set (D - 1706002-1) for a corner at the True Point of Beginning; (said True Point of Beginning having NJPCS NAD '83 (92) values N 306,054.78 feet and E 220,142.91 feet) and from said True Beginning point and in the said bearing system running, thence:

(1) over and through lands of The Chemours Company FC, LLC, (Block 1, Lot 1), North 34° 17' 56" East, 127.80 feet, to a point not set (inaccessible) for a corner in the centerline of the Salem Creek; said Salem Creek being the Municipal Boundary Line between Mannington Township and Carney's Point Township; passing over a concrete monument set (D - 1706002-2), in line, 12.00 feet, from the beginning of this course; thence

(2) along said line being the centerline of the Salem Creek, South 58° 56' 27" East, 118.76 feet, to a point that is inaccessible; thence

(3) over and through lands of The Chemours Company FC, LLC, (Block 1, Lot 1), South 34° 09' 01" West, 116.07 feet, to a concrete monument set (D - 1706002-4) for a corner; passing over an iron bar set (D - 1706002-3), in line, 4.00 feet, from the end of this course; thence

(4) along the northerly line of land of said New Jersey Department of Environmental Protection (Block 1, Lot 2), North 64° 31' 12" West, 120.29 feet, to the Place of Beginning.

CONTAINING 0.332 of an acre of land, to be the same, more or less.

ALSO EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #2

ALL that certain tract or parcel of land located Northeast of Hawks Bridge Road in the Township of Carneys Point, County of Salem, State of New Jersey, bounded and described as follows:

COMMENCING at an iron bar set for a corner in the northeasterly line of Hawks Bridge Road (County Route No. 540, 66 feet wide); said iron bar being the southerly corner of land of Amy L. Carlson (Block 261, Lot 7); (said commencing point having NJPCS NAD '83 (92) values N 307,100.24 feet and E 218,578.40 feet) and from said commencing point and in the said bearing system running, thence

(A) along line of said land of Amy L. Carlson, North 64° 22' 51" East, 349.87 feet, to an iron bar set for a corner at the True Point of Beginning; (said True Point of Beginning having NJPCS NAD '83 (92) values N 307,251.52 feet and E 218,893.87 feet) and from said True Beginning point and in the said bearing system running, thence:

(1) over and through lands of The Chemours Company FC, LLC, South 58° 02' 39" West, 83.61 feet, to a concrete monument set for a corner, thence

(2) again over and through same, North 86° 32' 58" West, 18.99 feet, to a concrete monument set for a corner in the dividing line between said land of Amy L. Carlson and said land of Chemours Company FC, LLC, thence

(3) along said dividing line, North 64° 22' 51" East, 99.71 feet, to the Place of Beginning.

CONTAINING 0.011 of an acre of land, to be the same, more or less.

ALSO EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #3

ALL that certain tract or parcel of land located Westerly of Courses Landing Road in the Township of Carneys Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an iron bar found for a corner in the southwesterly line of land of Salem County Sportsman Club (Block 268, Lot 3.02); said iron bar also being the end of course #45 (Tract 5) of the hereinabove description, (said beginning point having NJPCS NAD '83 (92) values N 305,682.14 feet and E 228,309.04 feet) and from said point and in the said bearing system running, thence

(1) along line of land of said Salem County Sportsman Club, North 43° 30' 50" East, 74.85 feet, to a concrete monument set for a corner, thence:

(2) over and through lands of The Chemours Company FC, LLC, South 39° 22' 20" East, 38.73 feet, to a concrete monument set for a corner, thence

(3) again over and through same, South 57° 53' 32" West, 70.02 feet, to a concrete monument set for a corner, thence

(4) again over and through same, North 52° 30' 27" West, 21.16 feet, to the Place of Beginning.

CONTAINING 0.049 of an acre of land, to be the same, more or less.

ALSO EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #4

ALL that certain tract or parcel of land located adjacent to Courses Landing Road in the Township of Carneys Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an concrete monument set for a corner in the southwesterly right of way line of Courses Landing Road (49.50 feet wide); said concrete monument also being South 50° 07' 25" East, 10.29 feet from an iron bar set for a corner; said iron bar being the end of course #66 (Tract 5) of the hereinabove description, (said beginning point having NJPCS NAD 83 (92) values N 306,145.69 feet and E 234,287.92 feet) and from said point and in the said bearing system running, thence

(1) along said line of Courses Landing Road; South 50° 07' 25" East, 32.26 feet, to a concrete monument set for a corner, thence:

(2) over and through lands of The Chemours Company FC, LLC, South 39° 11' 53" West, 32.69 feet, to a concrete monument set for a corner, thence

(3) over and through same, North 51° 20' 40" West, 32.20 feet, to a concrete monument set for a corner, thence

(4) over and through same, North 39° 05' 30" East, 33.38 feet, to the Place of Beginning.

CONTAINING 0.024 of an acre of land, to be the same, more or less.

ALSO EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #5

ALL that certain tract or parcel of land located southwesterly of Courses Landing Road in the Township of Carneys Point, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at a concrete monument set for a corner, said concrete monument being North 64° 12' 20" West, 84.70 feet from an iron bar set for a corner; said iron bar being the northerly corner of land of Randal and Kathy L Murschell, (Block 268, Lot 7.01); said iron bar also being the end of course #89 (Tract 5) aforedescribed, (said beginning point having NJPCS NAD '83 (92) values N

304,113.75 feet and E 236,637.62 feet) and from said point and in the said bearing system running, thence

(1) over and through lands of The Chemours Company FC, LLC, South 46° 05' 43" West, 32.00 feet, to a concrete monument set for a corner, thence:

(2) over and through same, North 43° 48' 13" West, 32.39 feet, to a concrete monument set for a corner, thence

(3) over and through same, North 47° 29' 26" East, 31.64 feet, to a concrete monument set for a corner, thence

(4) over and through same, South 44° 28' 24" East, 31.62 feet, to the Place of Beginning.

CONTAINING 0.023 of an acre of land, to be the same, more or less.

ALSO EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #6

ALL that certain tract or parcel of land located southwesterly of Pointers Auburn Road in the Township of Mannington, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an concrete monument set for a corner, said concrete monument being North 28° 33' 34" East, 138.67 feet from an iron bar set for a corner; said iron bar being the northeasterly corner of land of Richard Jr, and Mary Anne Eber, (Block 2, Lot 18), said iron bar also being the end of course #101 (Tract 5) aforedescribed; (said beginning point having NJPCS NAD '83 (92) values N 302,372.35 feet and E 235,816.98 feet) and from said point and in the said bearing system running, thence

(1) over and through lands of The Chemours Company FC, LLC, North 52° 11' 56" West, 31.84 feet, to a concrete monument set for a corner, thence:

(2) over and through same, North 38° 03' 53" East, 32.53 feet, to a concrete monument set for a corner, thence

(3) over and through same, South 52° 01' 32" East, 31.74 feet, to a concrete monument set for a corner, thence

(4) over and through same, South 37° 53' 16" West, 32.43 feet, to the Place of Beginning.

CONTAINING 0.024 of an acre of land, to be the same, more or less.

**TRACT SIX**

**County of Salem**
**State of New Jersey**
**Township of Pilesgrove**
**Lands now or formerly**
**The Chemours Company FC, LLC**

**May 10, 2007**
**Revised October 23, 2014**
**Revised November 1, 2016**
**Revised November 30, 2016**
**Revised August 2, 2017**
**Revised December 1, 2017**
**Last Revised December 27, 2017**
**Block 45, Lot 8**
**Pointers - Auburn Road**
**Salem Creek**
**AKA Salem Canal**

ALL that certain tract or parcel of land located on Pointers-Auburn Road in the Township of Pilesgrove, County of Salem, State of New Jersey, bounded and described as follows:

BEGINNING at an iron bar set for a corner in the southeasterly line of Pointers-Auburn Road (49.50 feet wide); said point being in or near the high water mark of Salem Creek, also said point being the southwesterly corner of land of NJ Sod Realty LLC; (said beginning point having NJPCS NAD '83 (92) values N 302,749.12 feet and E 236,195.40 feet) and from said beginning point and in the said bearing system running, thence:

(1) along said high water mark, in a easterly direction, various courses thereof, approximately 670 feet (tie line = South 78° 20' 30" East, 614.32 feet, to an iron bar set for a corner; thence

(2) along line of said land of NJ Sod Realty LLC, North 80° 00' 19" East, 36.43 feet, to an iron bar found for a corner; thence

(3) still along same, South 58° 50' 17" East, 126.50 feet, to an iron bar set for a corner; thence

(4) still along same, North 34° 05' 43" East, 135.20 feet, to an iron bar found for a corner; thence

(5) still along same, South 59° 44' 17" East, 124.90 feet, to an iron bar found for a corner; thence

(6) still along same, South 15° 24' 17" East, 103.40 feet, to an iron bar found for a corner; thence

(7) still along same, South 86° 12' 17" East, 273.55 feet, to an iron bar found for a corner; thence

(8) still along same, South 74° 10' 17" East, 430.50 feet, to an iron bar found for a corner; thence

(9) still along same, South 09° 01' 43" West, 117.40 feet, to an iron bar found for a corner; thence

(10) still along same, South 59° 24' 17" East, 461.20 feet, to a point for a corner, said point being witnessed by an iron bar found 0.49 feet north and 0.39 feet west of said point; thence

(11) along line of other land of NJ Sod Realty LLC, South 27° 03' 43" West, 280 feet more or less, to the center of Salem Creek, passing over an iron bar set in line 120.00 feet from the beginning of this course; thence

(12) along the centerline of Salem Creek, in a westerly direction, various courses thereof, approximately 2,505 feet (tie line = North 65° 04' 07" West, 2,145.32 feet, to a point for a corner, in the southeasterly line of said Pointers-Auburn Road; thence

(13) along said southeasterly line, North 37° 24' 49" East, 85 feet more or less, to the Place of Beginning

CONTAINING 19.0 acres of land, to be the same, more or less.

BEING Lot 8 (19.0 acres) of Block 45, as shown on the Pilesgrove Township Tax Assessment Map.

EXCEPTING thereout and therefrom the following parcel of land.

EXCEPTION #7

ALL that certain tract or parcel of land located Easterly of Pointers - Auburn Road in the Township of Pilesgrove, County of Salem, State of New Jersey, bounded and described as follows:

COMMENCING at an iron bar set for a corner in the southeasterly line of Pointers - Auburn Road (49.5 feet wide); same being the place of beginning of Tract 6 hereinabove described said iron bar being the northwesterly corner of land of The Chemours Company FC, LLC (Block 45, Lot 8) and the southeasterly corner of land of NJ Sod Realty LLC (Block 45, Lot 7, Deed book 1035, Page 42), (said commencing point having NJPCS NAD '83 (92) values N 302,749.12 feet and E 236,195.40 feet) and from said commencing point and in the said bearing system running, thence:

(A) along the high water mark of Salem Creek and along the said line of land of NJ Sod Realty LLC (Block 45, Lot 7) in an easterly direction, the various courses thereof, approximately 630 feet (tie line = South 82° 25' 47" East, 496.74 feet) to the True Point of Beginning; (said True Point of Beginning having NJPCS NAD '83 (92) values N 302,683.68 feet and E 236,687.81 feet) and from said True Beginning point and in the said bearing system running, thence:

(1) still along same, in an easterly direction, the various courses thereof, approximately 30 feet (tie line = South 68° 33' 38" East, 21.31 feet) to a point for a corner; thence

(2) over and through lands of The Chemours Company FC, LLC, (Block 45, Lot 8), South 01° 13' 42" West, approximately 8 feet, to a point for a corner; thence

(3) over and through same, North 88° 46' 18" West, 20.00 feet, to a point for a corner; thence

(4) over and through same, North 01° 13' 42" East, approximately 15 feet, to the Place of Beginning.

CONTAINING 0.008 of an acre of land, to be the same, more or less.

THE ABOVE description prepared pursuant to a survey of land designated as:

**TRACT ONE:**

Being Lots 1 (3.6 acres) and 1.01 (2.9 acres) of Block 222, as shown on the Carney's Point Township Tax Assessment Map.

**TRACT TWO:**

Being Lot 2 (12.4 acres) of Block 227; Lots 1 (7.4 acres) and 1.01 (12.1 acres) of Block 228; Lots 1 (0.9 acres) and 1.01 (3.0 acres) of Block 264 as shown on the Carney's Point Township Tax Assessment Map.

Also being Lot 38 (36.6 acres) of Block 901 as shown on the Pennsville Township Tax Assessment Map.

Also being Lot 1 (78.4 acres) of Block 27 as shown on the Mannington Township Tax Assessment Map.

GROSS AREA = 150.8 Acs

EXCEPTION #8 = 6.8 Acs

NET AREA = 144.0 Acs

**TRACT THREE:**

Being Lot 6 (0.394 acres) of Block 262, as shown on the Carney's Point Township Tax Assessment Map.

**TRACT FOUR:**

Being Lot 12 (2.3 acres) of Block 246 and Lot 1.01 (12.7 acres) of Block 248, as shown on the Carney's Point Township Tax Assessment Map.

**TRACT FIVE:**

Being Lot 1 (224.6 acres) of Block 1 and Lot 20 (76.7 acres) of Block 2 as shown on the Mannington Township Tax Assessment Map and being Lots 2 (21.7 acres), 2.01 (5.5 acres), 4 (0.2 acres), 6 (69.3 acres) and 6.01 (16.3 acres) of Block 265; Lots 20 (144.9 acres) and 20.01 (17.0 acres) of block 267; Lots 8 (196.0 acres) and 8.01 (29.7 acres) of Block 268 as shown on the Carney's Point Township Tax Assessment Map.

GROSS AREA = 801.9 Acs

EXCEPTION #1 = 0.332 Acs

EXCEPTION #2 = 0.011 Acs

EXCEPTION #3 = 0.049 Acs

EXCEPTION #4 = 0.024 Acs

EXCEPTION #5 = 0.023 Acs

EXCEPTION #6 = 0.024 Acs

NET AREA = 801.4 Acs

**TRACT SIX:**

Being Lot 8 (19.0 acres) of Block 45, as shown on the Pilesgrove Township Tax Assessment Map.

GROSS AREA = 19.0 Acs

EXCEPTION #7 = 0.01 Acs

NET AREA = 18.99 Acs

SAID SURVEY prepared by Fralinger Engineering PA, 629 Shiloh Pike, Bridgeton, NJ 08302, dated May 10, 2007, last revised December 27, 2017 and marked as Commission No. 24214.01. A reduced set of the plan is attached at the end of this document.

William J. Olbrich Jr. 1/3/18

William J. Olbrich Jr.
Professional Land Surveyor
New Jersey License No. 24GS04324600
Date: May 10, 2007
Revised: October 23, 2014
Revised November 30, 2016
Revised April 11, 2017
Revised August 2, 2017
Revised December 1, 2017
Last Revised December 27, 2017
Our Comm. No.: 24214.01

WJO/bar

P:\24000-24499\24214.02\Deeds\24214 00 DD-01 17 Chemours May 10 Revised December 27.docx

PLAN & REPORT OF SURVEY
PREPARED FOR

# STATE OF NEW JERSEY - ONRR
# EASEMENT ACQUISITION
# LAND OF THE CHEMOURS COMPANY FC, LLC

## CARNEY'S POINT, MANNINGTON, PENNSVILLE & PILESGROVE TOWNSHIPS
## SALEM COUNTY, NEW JERSEY

LEGEND OF ACQUISITION




LOCATION MAP

GENERAL NOTES

TAX MAP REFERENCE

INDEX

CONSULTING ENGINEERS
PLANNERS
ENVIRONMENTAL SERVICES
& LAND SURVEYORS

Fralinger Engineering

SP-1


INDEX PLAN
MUNICIPAL CLERK CERTIFICATION
MUNICIPAL CLERK CERTIFICATION
MUNICIPAL CLERK CERTIFICATION
MUNICIPAL CLERK CERTIFICATION
LEGEND
Fralinger Engineering PA
CONSULTING ENGINEERS
PLANNERS
ENVIRONMENTAL SERVICES
& LAND SURVEYORS
CERTIFICATION
SP-2
INDEX PLAN


LEGEND
GRAPHIC SCALE
TRACT TWO
TRACT ONE
SPRINGER STREET
VICTORY STREET
GRANT AVE
SALEM
CREEK
NEW JERSEY TURNPIKE
NEW JERSEY INTERSTATE ROUTE 295
SORENSON ROAD
UN-RECORDED LEASE AGREEMENT DETAIL
EXCEPTION #R
NOT TO SCALE
PLAN & REPORT OF SURVEY
STATE OF NEW JERSEY - DNRG
EASEMENT ACQUISITION
LAND OF THE CHEMOURS COMPANY FC, LLC
SP-3
Fralinger Engineering PA
CONSULTING ENGINEERS
PLANNERS
ENVIRONMENTAL SERVICES
& LAND SURVEYORS
NO. DATE REVISION BY
WILLIAM J. OLBRICH, JR., P.L.S.


SALEM
CREEK
SALEM CREEK
SALEM
CREEK
GAME
CREEK
WOODLAND ROAD
SPORTSMAN ROAD
U.S. ROUTE 40
TRACT FIVE (PART)
GRAPHIC SCALE
SHEET SP-5
SHEET SP-6
LEGEND
PLAN & REPORT OF SURVEY
STATE OF NEW JERSEY - ONRR
EASEMENT ACQUISITION
SP-4
Fralinger Engineering
CONSULTING ENGINEERS
PLANNERS
ENVIRONMENTAL SERVICES
& LAND SURVEYORS
REVISION
DATE
BY


SHEET SP-4
TRACT FIVE (PART)
SALEM
CREEK
SHEET SP-6
LEGEND
GRAPHIC SCALE
PLAN & REPORT OF SURVEY
STATE OF NEW JERSEY - DNHR
EASEMENT ACQUISITION
LAND OF THE CHEMOURS COMPANY FC, LLC
SP-5
Fralinger Engineering PA
CONSULTING ENGINEERS
PLANNERS
ENVIRONMENTAL SERVICES
& LAND SURVEYORS
REVISION
WILLIAM F OLDRICH, JR., P.L.S.


SALEM
CREEK
TRACT FIVE (PART)
TRACT SIX
TRACT SIX
POINTERS - AUBURN ROAD
POINTERS - AUBURN ROAD
GRAPHIC SCALE
LEGEND
PLAN & REPORT OF SURVEY
STATE OF NEW JERSEY - GNRR
EASEMENT ACQUISITION
LAND OF THE CHEMOURS COMPANY FC, LLC
SP-6
Fralinger
Engineering PA
CONSULTING ENGINEERS
PLANNERS
ENVIRONMENTAL SERVICES
& LAND SURVEYORS
www.fralinger.com
DATE
REVISION
BY


TRACT THREE
TRACT FOUR
GAME
CREEK
NEW JERSEY TURNPIKE
U.S. ROUTE 40
SOUTH GAME CREEK ROAD
LEGEND
GRAPHIC SCALE
Fralinger Engineering
CONSULTING ENGINEERS
PLANNERS
ENVIRONMENTAL SERVICES
& LAND SURVEYORS
SP-7

# EXHIBIT H

# STATE OF NEW JERSEY
# DEPARTMENT OF ENVIRONMENTAL PROTECTION
# GREEN ACRES PROGRAM

# SCOPE OF SURVEY SERVICES AND STANDARD DETAIL REQUIREMENTS

## July 1, 2023

# Table of Contents


**1. PURPOSE ..... 5**

**2. REQUEST FOR SURVEY ..... 6**

**2A. METHOD OF ENGAGEMENT ..... 7**

2A-1 Qualifying for NJDEP Green Acres Survey Contracts ..... 7
2A-2 Site-Specific Engagement RFP ..... 7
2A-3 Site-Specific Engagements ..... 8
2A-4 Cost Estimating for site-specific engagements – All Inclusive Survey Cost ..... 8
2A-5 Notification of Site-Specific Engagement Award ..... 8
2A-6 Survey Contract Manager Discretion ..... 8
2A-7 Time for Deliverables ..... 8
2A-8 Deficiency Conversion/ Correction Cost ..... 8

**3. SURVEYING STANDARDS AND STANDARDS OF CARE ..... 9**

**3.1 Effective Date ..... 9**
**3A. General Requirements for Property Surveys ..... 9**
**3B. Other Requirements and Standards of Practice ..... 10**
**3C. The Normal Standard of Care ..... 10**
**3D. Boundary Resolution ..... 11**
**3D-1 Deed Conflicts ..... 11**
3D-1.1 Record Gore Areas ..... 11
3D-1.2 Record Overlap Areas ..... 12
**3E. Measurement Standards ..... 12**

**4. RECORDS RESEARCH ..... 13**

**5. FIELD WORK ..... 14**

**5.1 Field Procedures and Crew Responsibilities ..... 14**
**5.2 Notification of Parties and Surveyors' Right of Entry ..... 14**
5.2-1 Agency Notification ..... 14
5.2-2 Property Owner, Adjoiners, and Police Notification ..... 14
5.2-3 Other Notifications ..... 15
**5.3 Standards for the use of Global Positioning Systems (GPS) ..... 15**
5.3-1 Requirement for New GPS Work ..... 15
5.3-2 Control ..... 15
5.3-3 Datum ..... 15
**5A. MONUMENTS ..... 15**
**5A-1 Corner Marking and Line Marking ..... 16**
5A-1.1 Setting Corner Markers ..... 16
5A-1.2 Omitting Markers ..... 16
5A-1.3 Found Markers ..... 17
5A-1.4 Offset Markers ..... 17
5A-1.5 Public Access Corner Markers ..... 17
5A-1.6 Three Monument Minimum ..... 17
5A-1.7 Cap Detail ..... 17
5A-1.8 Acceptable Corner Markers ..... 17

5A-1.9 Flagging Corners ........ 18
5A-1.10 Setting Line Markers ........ 19
**5B. RIGHTS OF WAY AND ACCESS ........ 19**
**5C. LINES OF POSSESSION, AND IMPROVEMENTS ALONG THE BOUNDARIES ........ 20**
**5D. BUILDINGS ........ 20**
**5E. EASEMENTS AND SERVITUDES ........ 20**
**5F. CEMETERIES ........ 21**
**5G. WATER FEATURES ........ 21**

**6. REPORTS ........ 21**
**6A. PLAN OF SURVEY ........ 21**
**6A-1 Overview ........ 22**
6A-1.1 Boundary, Descriptions, Dimensions and Closures ........ 22
6A-1.2 Easements, Servitudes, Rights of Way, Access, and Record Documents ........ 22
6A-1.3 Determining Encumbered Area ........ 23
6A-1.4 - Surveys for Disposals and Diversions ........ 23
**6A-2 Survey Plan Presentation - General ........ 24**
6A-2.1 Plan Size ........ 25
6A-2.2 Title Block ........ 25
6A-2.3 Orientation ........ 25
6A-2.4 Location Map ........ 25
6A-2.5 Scale ........ 25
6A-2.6 Line Weight and Type ........ 25
6A-2.7 Point of Beginning ........ 25
6A-2.8 Clockwise Bearings ........ 26
6A-2.9 Line and Curve Tables ........ 26
6A-2.10 Coordinate Tables ........ 26
6A-2.11 Significant figures ........ 26
6A-2.12 Mathematical Closure ........ 26
6A-2.13 Mathematical Survey Expressions ........ 27
6A-2.14 Area ........ 27
6A-2.15 Legend of Acquisition ........ 27
6A-2.16 Plan Certification ........ 28
6A-2.17 Corner Marking and Line Marking ........ 28
6A-2.18 Encroachments ........ 28
6A-2.19 Property identification ........ 29
**6A-3 Survey Plan Presentation – Detailed Instructions ........ 29**
6A-3.1 Roads ........ 29
6A-3.2 Utilities and other facilities ........ 31
6A-3.3 Areas of Claim of Tidelands Ownership by State of New Jersey ........ 31
6A-3.4 Waterways and Watercourses ........ 31
6A-3.5 Aerial Photographs and Planimetric Mapping ........ 32
6A-3.6 Subdivision of Lands ........ 32
**6 B DEED DESCRIPTION ........ 33**
6B-1 Deed Description Format ........ 33
6B-2 Deed Description Type ........ 33
6B-3 Letterhead of Survey Firm ........ 33
6B-4 Description Heading ........ 33
6B-5 Description Introduction ........ 34

6B-6 Description Second Paragraph ........ 34
6B-7 Body of Description ........ 34
6B-8 Using Augmenting and Qualifying Clauses ........ 34
6B-9 Recite Areas Described ........ 35
6B-10 Closing Paragraph and Call for Survey ........ 35
6B-11 Original Signature, Embossed Seal and Date Signed ........ 35

**7. CERTIFICATIONS ........ 36**
**7.1 Plan Certification ........ 36**
**7.2 Surveyor's Certification and Summary Form ........ 36**

**8. DELIVERABLES ........ 37**
**8.1 Copies of Notifications ........ 37**
**8.2 Copies of Written Consent ........ 37**
**8.3 Parcel Closure ........ 37**
**8.4 Full-size Paper Copies of Survey Plan ........ 38**
**8.5 Metes and Bounds Description and Reduced Survey Plan ........ 38**
**8.6 Digital Files ........ 38**
**8.7 Surveyor's Certification and Summary Form ........ 39**
**8.8 Checklist of Work Completed, Detail Sheet and Tax map ........ 39**
**8.9 Corner Photographs and Corner Marker Description Sheets ........ 39**
**8.10 Preliminary Reviews and Modifications of Deliverables ........ 39**

**9. DEFINITIONS ........ 40**

**10. SAMPLE FORMS AND TEXT ........ 42**
**Sample Form 1 – AGENCY EMAIL NOTIFICATION ........ 43**
**Sample Form 2 – NOTIFICATION OF ENTRY LETTER ........ 44**
**Sample Form 3 – AERIAL PHOTO INFORMATION BLOCK ........ 45**
**Sample Form 4 - WETLANDS DELINEATION INFORMATION ........ 46**
**Sample Form 5A – LEGEND OF ACQUISITION - STATE ACQUISITION ........ 48**
**Sample Form 5B - LEGEND OF ACQUISITION - LOCAL UNIT OR NONPROFIT ........ 49**
**Sample Form 6A – CERTIFICATION FORM FOR STATE LAND ACQUISITION ........ 50**
**Sample Form 6B – CERTIFICATION FORM FOR LOCAL UNIT/NONPROFIT PROJECT ........ 52**
**Sample Form 7A – STATE LAND ACQUISITION CHECKLIST ........ 54**
**Sample Form 7B – LOCAL UNIT AND NONPROFIT LAND ACQUISITION CHECKLIST ........ 56**

**11. GREEN ACRES REVIEW OF SURVEY DELIVERABLES ........ 57**
**11.1 Purpose ........ 57**
**11.2 Principles Guiding the Survey Review ........ 57**
**11.2 Survey Reviews for Local Unit and Nonprofit Projects ........ 58**
**11.4 Survey Reviews for State Acquisition Projects ........ 58**
**11.4 Survey Review Process ........ 58**

# State of New Jersey
# Department of Environmental Protection
# Green Acres Program

# STANDARD DETAIL REQUIREMENTS FOR NJDEP GREEN ACRES SURVEYS
# (Effective July 1, 2023)

## 1. PURPOSE

The New Jersey Department of Environmental Protection's Green Acres Program is a state agency with the following mission statement: "To achieve, in partnership with others, a system of interconnected open spaces, whose protection will preserve and enhance New Jersey's natural environment and its historic, scenic, and recreational resources for public use and enjoyment." The Green Acres Program administers state funds, working with landowners, municipal and county governments, nonprofit agencies, and other conservation partners to protect land through direct purchase in fee or by obtaining conservation, public access, or historic preservation easements.

The specific content and format needs of the Green Acres Program are unique to its mission of acquiring interests in real property and are not fully met by the minimum land survey standards and requirements by NJSA 45:8--27 et seq. and NJAC 13:40--1.1 et seq., even when supplemented by the Minimum Standard Detail Requirements of ALTA/NSPS Land Title Surveys. New Jersey statutory and regulatory survey requirements, applicable sections of ALTA/NSPS detail requirements (effective February 23, 2021, and used by permission), and agency-specific requirements are incorporated herein to more fully address NJDEP/ Green Acres Program survey needs.

These Standard Detail Requirements for New Jersey Department of Environmental Protection (NJDEP) Green Acres Surveys have been developed primarily to assure a more consistent format and presentation of information as to the many matters which might be discoverable from survey and inspection, and which may or not be evidenced by the public records.

A survey plan or plat serves as a record of field and record conditions at the time of the survey and supplements a corresponding deed description of real property. The Green Acres Program utilizes these documents when encumbering land by restrictive covenant to assure that the property will be used for outdoor recreation or open space for public's use and benefit. For these documents to be acceptable to the Green Acres Program, the plan of real property must show the land to be free and clear of survey matters (except those matters disclosed by the survey and indicated on the plat or map), certain specific and pertinent information must be presented to identify the distinct and clear understanding between the State of New Jersey, the seller(s) of the property, the purchaser(s) of the property (all acquisition partners), the title insurance company (insurer),and the surveyor professionally responsible for the survey.

The State of New Jersey, the seller of the property, the title insurer, and any acquisition partners are entitled to rely on surveyors to conduct surveys and prepare associated plans or plats together with their corresponding but separate metes and bounds deed descriptions that are of a professional quality and are appropriately uniform, complete, and accurate. To that end, and in the interests of the general public; the surveying profession; title insurers; the State of New Jersey, Department of Environmental Protection, Green Acres Program (with reference to the joint efforts of ALTA and the National Society of Professional Surveyors, Inc. who jointly promulgated minimum standard of performance for ALTA/NSPS Land Title Surveys), does hereby set forth the details and criteria herein as the standard performance for NJDEP Green Acres Surveys.

A complete Green Acres Survey includes the research, fieldwork, and all deliverables as established by contract and as prepared in conformance with the specifications herein. This work includes but is not limited to records research as required under **Section 4** herein, on-site fieldwork required under **Section 5** herein, preparation of a plan or plat as required under **Section 6A** herein showing the results of the fieldwork and its relationship to record documents, a corresponding Deed Description as required under **Section 6B** herein,

digital copies of the survey and description as required under **Section 8** herein, and the plan certification and Surveyor's Certification and Summary Form outlined in **Section 7** herein.

Properties purchased with Green Acres Program funding subjects those parcels to restrictions and covenants to assure their status for conservation or outdoor recreation or open space. Thus, Green Acres is also an Ultimate User for surveys of properties for county governments, municipal governments, or not–for–profit organizations as well as for surveys made directly for this agency's State Land Acquisition Bureau. Green Acres' interests in the surveyed lands entitle it to require formats and additional information consistent with its needs and practices, which exceed minimum technical criteria established by the State Board of Professional Engineers and Surveyors' regulations established for surveys and descriptions produced in this state. Land surveys prepared for acquisitions for state parks, wildlife management areas, or cooperative efforts that will include state acquisition funds additionally must conform to the standards in this Green Acres Standard Scope of Survey Work for Land Surveys and Property Descriptions.

## 2. REQUEST FOR SURVEY

The survey may be ordered by the State of New Jersey, a municipal government, a county government, a nonprofit organization, or by the seller, depending upon the final intended disposition of the property by NJDEP and any real estate contracts made with the seller. In every case, the survey must be prepared in accordance with a written contract, followed by an authorization to proceed from the person or entity responsible for paying for the contract for professional land surveying services. Due to the Open Public Records Act (OPRA) and other laws regarding government records, copyright laws cannot apply to surveys prepared under these contracts.

The survey contract shall specify that a NJDEP Green Acres Survey is required. In every case the contract shall specify that the State of New Jersey, Department of Environmental Protection Green Acres Program is also one of the "Ultimate Users" (NJAC 13:40 5.1 (d)). The contract shall provide for financial remuneration as an "all-inclusive, not to exceed" price that covers any and all any costs associated with the preparation of the survey to avoid any cost overruns. In rare instances, certain properties, including but not limited to marinas, campgrounds, trailer parks and leased areas, may present issues outside those normally encountered on an NJDEP Green Acres Survey. The scope of work related to such properties is to be discussed among the surveyor, the person or entity responsible for paying the contract for professional land surveying services, the title insurer (if necessary), and the NJDEP Green Acres Program, and agreed upon in writing as to the costs to provide all deliverables related to the survey to eliminate or drastically minimize the possibility of any cost overruns prior to authorizing the survey.

The NJ Licensed Land Surveyor, pursuant to NJSA 45:8-44.1 et seq. has the authority "to go on, over and upon lands of others during reasonable hours." The NJ Licensed Land Surveyor who is working for the NJ Department of Environmental Protection in connection with State Land Acquisition surveys is authorized pursuant to NJSA 13:1D-9 to enter private lands. If eminent domain proceedings are considered, the NJ Licensed Land Surveyor acting on behalf of the prospective condemnor pursuant to NJSA 20:3-16 et seq. has the authority to make surveys in connection with the possible litigation.

The NJ Licensed Land Surveyor shall provide written notice via US postal system to the adjoiners, pursuant to the regulatory authority above. In the case of all State Land Acquisition surveys, in addition to the adjoiners, the surveyor will send written notice to the municipal Police Department (see **Sample Form 2**) and via email (see **Sample Form 1**) to the state division to whom the property will be assigned. If needed, in some instances where the property is fenced, blocked, or posted, the surveyor shall be responsible for securing permission to enter upon the property to be surveyed, to access the adjoining properties, or to access any offsite easements.

Freshwater Wetlands survey work is not usually required for NJDEP Green Acres Surveys. When required by contract with NJDEP, follow the specifications and guidelines provided by NJDEP.

Topographic survey work is not usually required for NJDEP Green Acres Surveys. If required by NJDEP, the recommended contour interval and elevation requirement for stable and unstable spot locations will be included in specifications and guidelines outside the scope of work of this document unless in combination with a Green Acres acquisition and development survey. Vertical relief will be shown with the source of information (e.g., ground survey or aerial map), contour interval, datum, and originating benchmark identified.

When required, topographic surveys, as a minimum, will be performed using conventional or GPS leveling methods that shall provide similar positional accuracy that would meet or exceed the former Federal Standard for Third Order, Class I accuracy for published NGVD 1988. The contour interval shown on any plans shall be ten (10) feet unless the site-specific engagement specifies an alternate interval. Unstable spot elevations on ground positions must be stated in feet to one decimal place (0.1'), and stable positions such as on monuments or concrete must be stated in feet to two decimal places (0.01'), unless the specifications and guidelines being furnished with the detail sheet for a site-specific engagement request specifies an alternative increment.

## 2A. METHOD OF ENGAGEMENT

### 2A-1 Qualifying for NJDEP Green Acres Survey Contracts

Survey contractors must first be generally pre–qualified with Treasury's Division of Property Management and Construction (DPMC) and then evaluated by Green Acres on a technical basis for the more specialized work associated with Green Acres' needs. Survey firms may find that DPMC pre–qualification allows them to secure awards from other agencies and organizations and will be a prerequisite for future Green Acres State Land Acquisition survey service two–year contracts. A surveyor can become familiar with the requirements of Green Acres survey work by attending workshops, asking questions, and practicing locally on open space acquisition projects. Be sure to ask your clients when surveying open land if there is a possibility that the land will become subject to Green Acres restrictions. If so, follow the Green Acres requirements for your client even before they submit it to the program.

Any firm wishing to perform work under this Scope of Survey Services must be pre-qualified by and in good standing with the New Jersey Department of the Treasury's Division of Property Management and Construction (DPMC) at the time of responding to Requests for Proposals and for the duration of any contract awarded. Details of DPMC qualification are available on-line through DPMC's website at https://www.state.nj.us/treasury/dpmc/pub_how_to_do_business_with_division.shtml

At the time when responses to Requests for Proposals are submitted, the prospective Survey Contract Vendor must submit proof of authorization to conduct business in the State of New Jersey. Information about Business Registration Certificates is available on-line through the Department of the Treasury Division of Revenue's website at http://www.state.nj.us/treasury/revenue/busregcert.shtml. The prospective Vendor must also submit proof of at least one individual in the direct employ of prospective Survey Contract Vendor holds a current and valid license as a Professional Land Surveyor. Subcontractors may not fulfill this requirement.

All surveying work performed for any Using Agency shall be under the direct supervision and responsible charge of an individual holding a current and valid license as a Professional Land Surveyor. That individual shall be readily available for consultation by the Using Agency and is responsible for assuring that deliverables submitted to the Using Agency are complete, in accordance with project specifications, and on time.

For State projects, a two-year contract is awarded through the Bureau of Treasury. Five vendors for each of Green Acres' three regions are chosen through Quality Based Selection, and when projects in the regions become available, the pre-qualified vendors are notified by Green Acres so that they can submit their bids. Notices of upcoming RFPs are posted on the home page of New Jersey's Department of Treasury, Division of Purchase and Property at http://www.state.nj.us/treasury/purchase/ Local government and non–profit acquisition managers secure surveying services individually, and Green Acres has no notice of these surveying opportunities until the work is submitted for review.

### 2A-2 Site-Specific Engagement RFP

The Survey Contract Manager shall contact prequalified vendor firms that have been assigned to the region for which survey work is required, informing them of the nature, special circumstances, completion time, and due date for submittal of an all-inclusive survey cost in response to each site-specific engagement RFP.

The Survey Contract Manager reserves the right to solicit additional RFPs from prequalified vendors assigned to adjacent regions or prequalified vendors who may have previously worked in the vicinity of the project.

### 2A-3 Site-Specific Engagements

Prequalified vendors shall submit firm fixed costs by the Response to RFP due date for the site-specific engagement to perform professional land surveying services by the survey due date specified by the Survey Contract Manager. The Response to RFP for site-specific engagements shall be submitted as an all-inclusive survey cost. Such costs shall be provided for work to be completed within three timeframes from the date of authorization: 60 days, 90 days, or 120 days, or such other period specified in the site-specific engagement RFP.

### 2A-4 Cost Estimating for site-specific engagements – All Inclusive Survey Cost

The New Jersey licensed Professional Land Surveyor shall be responsible for preparing accurate Responses to RFP for Site-Specific Engagements to cover all projected costs associated with the completion of work in accordance with the site-specific engagement award, to the satisfaction of NJDEP. Failure on the part of the New Jersey licensed Professional Land Surveyor to adequately assess project costs will not be accepted as justification for payment request for additional work.

The Contractor's all-inclusive survey cost shall include all costs to NJDEP and includes all licenses, permits, insurance, costs associated with obtaining consent, all research, notifications, postage and delivery costs, office and field work, supplying and setting all corner markers, line markers, and all deliverables specified in **Section 8 - Deliverables** or as modified by contract for a site-specific engagement RFP.

### 2A-5 Notification of Site-Specific Engagement Award

The Contractor with the best Response to RFP for a site-specific engagement, all factors considered, will be given the authorization to proceed by Notification of Engagement.

### 2A-6 Survey Contract Manager Discretion

The Survey Contract Manager shall have the flexibility to invite any one or more Contractors to submit Responses to RFP for a site-specific engagement across regional boundaries when the project area extends across such regional boundaries.

### 2A-7 Time for Deliverables

All deliverables and delivery times shall be specified by NJDEP in the site-specific RFP. Applicants unable to comply with the time frame may not be penalized for future responses to site-specific engagement RFPs, but may be assessed a penalty for lateness. NJDEP will be responsible for the approval of all deliverables for each element of the tasks in the scope of work.

### 2A-8 Deficiency Conversion/ Correction Cost

NJDEP and Survey Contract Manager shall have the option to mitigate deficiencies in any deliverable or any portion thereof as set forth in **Section 6 - Reports** and **Section 8 – Deliverables** in this document. NJDEP may offer the Contractor an opportunity to correct deficiencies or may choose to convert or correct the deficiencies in house with the charge of such correction being deducted from the final payment to the Contractor. The Contractor may accept reduction of payment as mitigation of deliverable deficiencies or elect to correct such deficiencies if this option is offered by NJDEP. If the correction of deficiencies results in a delay of delivery beyond the due date, NJDEP may elect to file a PB36 NJ State Using Agency Formal Complaint Report.

# 3. SURVEYING STANDARDS AND STANDARDS OF CARE

## 3.1 Effective Date

This document is effective July 1, 2023 and contains the Standard Detail Requirements for all NJDEP Green Acres Surveys, required for approval by the State of New Jersey, Department of Environmental Protection, Green Acres Program. Generally, survey activities that may be required by site-specific engagements with NJDEP/Green Acres and guided by these specifications are property surveys that do not require topographic services or wetlands location. When any other types of surveys are requested, specifications and guidelines will be furnished at the time that price quotes are solicited for a site-specific engagement.

## 3A. General Requirements for Property Surveys

The specifications herein primarily address property surveys, the most commonly requested work for NJDEP Green Acres. They also pertain to any boundary information required or depicted in the process of completing any other type of survey work requested.

i. The Detail Sheet supplied with the site-specific RFP will indicate the municipal tax block and lots to be surveyed. A copy of a tax map indicating the area and lots to be surveyed may also be supplied. From this information, the Contractor is required to obtain recorded deeds and other evidence to conduct the survey. The Contractor shall maintain the integrity of the municipal tax lots. Internal lot lines and individual areas per lot shall be stated on the plan, and each individual lot area shall be restated in the metes and bounds description. If the site-specific RFP dictates the acquisition of a portion of a tax lot, no attempt shall be made by the Contractor to assign new lot numbers to remaining lands, unless this provision is modified by NJDEP.

    a. For surveys of multiple abutting lots, it may not be necessary to survey the interior lines to obtain the area for each of those lots. The surveyor can calculate the areas from metes and bounds descriptions of the individual parcels. For LOCAL or NONPROFIT SURVEYS **ONLY**, when better data is not available, it may be acceptable to use tax map areas in conjunction with surveyed area for reporting purposes if better data is not available.

ii. The basis of bearings or north reference for all NJDEP Green Acres Surveys and the beginning point coordinate values (stated in U.S. Survey Feet to two decimal places) shall be New Jersey State Plane Coordinate System North American Datum 1983 Adjustment (NJSPCS NAD83). The grid factor shall be applied to the Northing and Easting values in U.S. Survey Feet of the parcel's description point of beginning, but not to horizontal survey distances in U.S. Survey Feet. The north arrow shown on the plan must indicate the Bearing Base or reference north. **NOTE:** While surveyed measurements are currently to be reported in U.S. Survey Feet, when the update from SPCS 83 to SPCS 2022 is finalized through the National Spatial Reference System (NSRS) Modernization and is adopted by the State of New Jersey, surveys for Green Acres will be required to report measurements in International Feet.

    a. State Plane Coordinates can be determined by traditional ground survey methods or with survey grade GPS. Handheld GPS is not an acceptable method as it does not provide the accuracy required by Green Acres.

    b. Conversion of coordinates from grid to ground coordinates is to be performed by determining a centroid point of the parcel being surveyed which will have the identical grid and ground coordinates. The combined scale factor is to be applied at the centroid. The point of beginning is to be labeled with the grid coordinates. The coordinates of the centroid point and the combined scale factor are to be stated on the plan.

    c. The distances shown on Green Acres surveys are to be ground measurements in U.S. Survey Feet. Distances must be ground for appraisal purposes, so that the surface area in acres to three decimal places is accurate. To eliminate confusion, plan notes should explain that the distances are ground and the coordinates are grid. Also provide a note regarding the conversion factor.

iii. All property lines of the surveyed parcel must form closed polygons: all sides must be defined by mathematical survey expressions with angular units being degrees, minutes, and whole seconds of arc. Horizontal distances, vertical elevations, radii of curves, lengths of arc, and New Jersey Plane

Coordinate values of Northing and Easting shall be stated in horizontal ground U.S. Survey Feet stated to two decimal places. See **Section 3E – Measurement Standards**.

iv. A separate plan of survey of property shall be prepared for each tax lot or group of contiguous tax lots in common ownership. Lots that are in common ownership in the general vicinity but are not contiguous may be grouped on a single plan only if detail and clarity of information is not compromised when the scale of the plan is reduced.

v. A metes and bounds deed description of the property surveyed shall be prepared for each group of contiguous tax lots in common ownership or single lot if not contiguous. The deed description prepared must follow the Green Acres specific format, including the provision that requires individual area per each included tax lot within the conducted property survey. The description shall be a separate document apart from the plan of survey and shall be prepared on company letterhead that includes the survey contract vendor's name and certificate of authorization number (if applicable), street and mailing addresses, telephone and fax numbers, company Email address, and company web page (if any), and shall be signed, sealed, and dated by the surveyor responsible for the preparation of the survey. A reduced signed copy (8-1/2" by 11") of the survey plan from which it was written shall be called for in the final paragraph and attached to each metes and bounds deed description. The specific sizing of the attached reduced survey is necessary for appropriate attachment to and filing with the recorded deed.

## 3B. Other Requirements and Standards of Practice

All survey work will be performed in accordance with New Jersey laws, court rulings and administrative codes pertaining to land surveying: NJAC 7:36 Appendix 2, NJSA 45:8 et seq., NJAC 13:40-1.1 et seq., the Recordation Law, NJSA 46:26A-1 et seq., and other laws pertaining to this professional activity. State Government is exempted from certain statutory laws and administrative rules, and this Scope of Work is written to minimize adverse impact of such exemption.

Where conflicts between the standards set forth herein and any jurisdictional requirements and standards of practice occur, generally this document (the **New Jersey Department of Environmental Protection Green Acres Program Scope of Survey Services)** incorporates all relevant State Statutes and Administrative Codes and shall apply.

The Contractor shall be required to obtain and maintain, during the term of prequalification for site-specific engagement award, all licenses, permits, certifications, authorizations, or any documents required by federal authorities, state authorities, county and municipal governments, and international authorities, whenever necessary, to complete its site-specific engagement award

## 3C. The Normal Standard of Care

Special care must be taken to insure accuracy, consistency, and clarity in all documents being prepared, since Green Acres participation and resultant restrictions insures that lands are retired from development pressure and the land survey plan and corresponding metes and bounds description will likely be the last ones prepared or recorded for that parcel. The Surveyor's Statute of Limitations does not apply to survey work prepared for governmental agencies.

i. <u>Responsibility for work</u> - The New Jersey licensed Professional Land Surveyor who is a member of the survey firm under contract shall be the primary point of contact for any site-specific engagement contract. The New Jersey licensed Professional Land Surveyor shall be responsible for obtaining all deeds, records, maps, measurements, and evidence to conduct a correct and accurate land survey and for providing all deliverables according to the site-specific engagement contract. The New Jersey licensed Professional Land Surveyor shall insure that the plan of survey and corresponding description of property shall be prepared and presented in the format as specified, attested to by the New Jersey licensed Professional Land Surveyor's embossed seal and original signature. The New Jersey licensed Professional Land Surveyor is responsible for checking all work and insuring that the deliverables are forwarded in the format specified in the Deliverables section of the site-specific engagement contract to NJDEP within the time period specified in the engagement award.

ii. <u>Supervision</u> - A New Jersey licensed Professional Land Surveyor is responsible for coordinating the research and supervising the field work and document preparation associated with the land survey.

Evidence of personal supervision is signified by the original signature and raised seal of the Land Surveyor on each land survey plan or metes and bounds deed description document submitted. It is for this reason that rubber stamps or digital signatures of the Land Surveyor are not acceptable and unlawful.

## 3D. Boundary Resolution

The boundary lines and corners of any property being surveyed as part of the NJDEP Green Acres survey shall be established and/or retraced in accordance with appropriate boundary law principles governed by the set of facts and evidence found in the course of performing the research and survey. Actual deed overlaps and gores are to be shown on plan with geometry and area provided. Gores will always be described in a separate metes and bounds Deed Description to be used in a Quit Claim Deed to NJDEP. Title for state acquisition lands can be obtained subject to an overlap while municipal, county, and nonprofit acquisitions may not encumber overlaps with open space funds.

The survey shall report the relationship of the boundaries of the surveyed property (i.e., contiguity, gaps, or overlaps) to its adjoiners, where ascertainable from Record Documents and/or from field evidence gathered during the process of conducting the survey of the property being surveyed. If the surveyed property is composed of multiple tax lots or parcels, the extent of any gaps or overlaps between those parcels shall be identified. Where gaps or overlaps are identified, the surveyor shall, prior to preparation of the final plat or map, disclose this to the insurer and NJDEP for determination of a course of action concerning junior/senior rights.

When, in the opinion of the surveyor, the results of the survey differ significantly from the record, or if a fundamental decision related to the boundary resolution is not clearly reflected on the plat or map, the surveyor shall explain this information with notes on the face of the plat or map.

### 3D-1 Deed Conflicts

The New Jersey licensed Professional Land Surveyor is responsible for obtaining all records, measurements, and evidence to prepare a correct and accurate land survey, and shall present information on the plan of survey to show how the record condition now exists or fits on the ground. As a result of this research, the surveyor may uncover areas of title uncertainty such as a gore area between deeds, deed overlaps, or other areas of ambiguity. To demonstrate that adjoining records have been examined, the plan of survey must indicate information for all adjoiners, including the name of the record owner, the municipal tax block and lot, and the deed book and page number for adjoining parcels.

The New Jersey licensed Professional Land Surveyor may be able to render a professional opinion as to how a deed problem was created. However, the surveyor is only responsible for showing on the plan of survey the record condition as it now exists. Conflicts with adjoining deeds that are not resolved in the process of boundary analysis by the surveyor must be shown as deed overlaps or deed gores on the plan of survey. Areas of confusion are to be located by bearings and distances and the area is to be clearly stated. The plat of a parcel being acquired must show the total area surveyed, subject to an area of confusion with an adjoining area for which the tax lot and block numbers are given. Any “Apparent Deed Gore”, Deed Overlap, “Clouded Title Area” or “Encroachment Area” shall be labeled on the plats of all adjoiners as an area of confusion being surveyed, and defined by bearings, distances, and area

Descriptions prepared by the New Jersey licensed Professional Land Surveyor may enable NJDEP to correct the records and clear title to land. The description of property may be written to include such areas, in which case the description shall provide a qualifying clause “subject to” such area, or the using agency may require that a separate metes and bounds description be prepared. Apparent gore areas found to exist as a result of the survey shall always be described by a separate metes and bounds description to provide the using agency the opportunity to obtain a quit claim deed.

#### 3D-1.1 Record Gore Areas

Green Acres generally does not fund areas of unknown title. Areas of apparent title gore between adjoining ownership may be resolved by obtaining a quit claim deed to the gore area from all adjoining parties.

A gore between adjoining deeds may be the result of a true vacancy dating back to a conveyance out

of the Board of Proprietors of Eastern or Western Divisions of New Jersey. Deed gores are to be defined by bearings, distances, and area, both on the survey plan and in a separate metes and bounds description, with references to tax lot and block numbers. A separate metes and bounds description of the gore area with appropriate copies shall be prepared in every case to provide NJDEP the opportunity to obtain a quit claim deed to the gore area from the Board of Proprietors or the sellers and the adjoiners as appropriate. The gore area shall be drawn on all survey plans of lots being surveyed. This description shall agree with the results of the survey plan to which it refers in every particular, and for that reason, the description must not include any information that does not appear either graphically or in a factual note on the survey plan. A reduced copy of the survey plan (8-1/2" by 11") must also be attached to each copy of the description.

#### 3D-1.2 Record Overlap Areas

Green Acres generally does not fund areas of clouded title. Areas of overlapping title can be handled in two ways:

1. Include the overlap area in the overall description of the property surveyed and understand that Green Acres will not fund it. The description will be "subject to" the described area of overlap in such instances.
2. Provide a description of the overall property, and also provide a separate metes and bounds description of the area of encroachments and overlap as exceptions from the area being funded by Green Acres. For State land acquisitions, after closing the sale to NJDEP of the area unaffected by the overlap, the property owner can use this described overlap area to quit claim the property to an adjoiner who is adversely using the land.

Areas of deed description overlaps are to be defined by mathematical survey expressions and area, both on the survey plan and following a qualifying clause in the metes and bounds description of the property, with references to tax lot and block numbers stated. The overlap area shall be drawn on all adjoining survey plans of lots being surveyed. The overall metes and bounds description of a property shall agree with the results of the survey plan to which it refers in every particular, and the overlap area shall be described by metes and bounds following a qualifying clause (i.e., *"subject to an overlap…"*). The area of overlap shall also be stated for each Tax Block and lot, so that the net area of each surveyed lot is known and stated both on the plan and in the corresponding metes and bounds description. The description must not include any information that does not appear either graphically or in a factual note on the survey plan. A reduced copy of the signed survey plan (8-1/2" by 11") must also be attached to each copy of the description.

## 3E. Measurement Standards

The following measurement standards address Relative Positional Precision for the monuments or witnesses marking the corners of the surveyed property.

i. "Relative Positional Precision" means the length of the semi-major axis, expressed in feet or meters, of the error ellipse representing the uncertainty due to random errors in measurements in the location of the monument, or witness, marking any corner of the surveyed property relative to the monument, or witness, marking any other corner of the surveyed property at the 95 percent confidence level (two standard deviations). Relative Positional Precision is estimated by the results of a correctly weighted least squares adjustment of the survey.

ii. Any boundary lines and corners established or retraced may have uncertainties in location resulting from (1) the availability, condition, history, and integrity of reference or controlling monuments, (2) ambiguities in the record descriptions or plats of the surveyed property or its adjoiners, (3) occupation or possession lines as they may differ from the written title lines, and (4) Relative Positional Precision. Of these four sources of uncertainty, only Relative Positional Precision is controllable, although due to the inherent errors in any measurement, it cannot be eliminated. The magnitude of the first three uncertainties can be projected based on evidence; Relative Positional Precision is estimated using statistical means (see **Section 3E-i.** above and **Section 3E-.v**. below).

iii. The first three of these sources of uncertainty must be weighed as part of the evidence in the determination of where, in the surveyor's opinion, the boundary lines and corners of the surveyed property should be located (see **Section 3D**. above). Relative Positional Precision is a measure of

how precisely the surveyor is able to monument and report those positions; it is not a substitute for the application of proper boundary law principles. A boundary corner or line may have a small Relative Positional Precision because the survey measurements were precise, yet still be in the wrong position (i.e., inaccurate) if it was established or retraced using faulty or improper application of boundary law principles.

iv. For any measurement technology or procedure used on a NJDEP Green Acres Survey, the surveyor shall (1) use appropriately trained personnel, (2) compensate for systematic errors, including those associated with instrument calibration required by state law, and (3) use appropriate error propagation and measurement design theory (selecting the proper instruments, geometric layouts, and field and computational procedures) to control random errors such that the maximum allowable Relative Positional Precision outlined in **Section 3E-v**. below is not exceeded.

v. The maximum allowable Relative Positional Precision for a NJDEP Green Acres Survey is the same as an ALTA/NSPS Land Title Survey, being 2 cm (0.07 feet) plus 50 parts per million (based on the direct distance between the two corners being tested). It is recognized that in certain circumstances, the size or configuration of the surveyed property, or the relief, vegetation or improvements on the surveyed property will result in survey measurements for which the maximum allowable Relative Positional Precision may be exceeded. If the maximum allowable Relative Positional Precision is exceeded, the surveyor shall note the reason as explained in **Section 6A-1.1-vi** below.

# 4. RECORDS RESEARCH

A New Jersey licensed Professional Land Surveyor is responsible for coordinating the research necessary to obtaining sufficient documentation and evidence to render a survey plan which is correct as well as accurate to the stated specifications and standards. For site-specific engagement contract purposes, the surveyor shall be prepared to conduct all the research required to complete the work by the due date. Land survey plans for adjoining State-owned property may be obtained from the administering division or from the original survey firm that prepared the work for NJDEP/Green Acres.

It is recognized that for the performance of a NJDEP Green Acres Survey, the New Jersey licensed Professional Land Surveyor is responsible for obtaining all records, measurements, and evidence to prepare a correct and accurate land survey, for providing paper and digital copies of the land survey plans that depict the results of the survey, and for preparing and providing the corresponding description of property, prepared on company letterhead for the deed of conveyance. To that end, the surveyor will obtain all appropriate data which can be relied upon in the preparation of the survey, including but not limited to tax records, deeds of the subject property as well as those of the adjoining parcels, public and private survey plans and filed maps. The request for a NJDEP Green Acres Survey shall set forth only the current record tax record block and lot of the property to be surveyed. In most cases, the surveyor will be provided with complete copies of the most recent title commitment, and, when available, copies of surveys of adjoining parcel surveys and deeds. However, it shall remain the responsibility of the surveyor to obtain the current record description of the property to be surveyed (or, in the case of an original survey, the parent parcel), the current record descriptions of adjoiners, any record easements benefiting the property, the record easements or servitudes and covenants burdening the property (all hereinafter referred to collectively as "Record Documents"), documents of record referred to in the Record Documents, documents necessary to ascertain, if possible, the junior/senior relationship pursuant to **Section 3D** above, and any other documents containing desired appropriate information affecting the property being surveyed, and to which the NJDEP Green Acres survey shall make reference, shall be provided to the surveyor for use in conducting the survey. Reference is made to **Section 3B** above.

# 5. FIELD WORK

The Survey shall be performed on the ground (except as otherwise negotiated).

## 5.1 Field Procedures and Crew Responsibilities

The New Jersey licensed Professional Land Surveyor shall be responsible for the work of all survey crews operating from the firm. The survey crew shall endeavor to cause as little inconvenience as possible to property owners when conducting the field survey.

Whenever possible, random traverse lines shall be run within the property being surveyed rather than upon the lands of an adjoiner. If traverse lines are run upon the lands of an adjoiner, no clearing of lines shall be conducted without the prior written consent of the party whose name appears as the property owner on the tax rolls of that municipality.

Painting and flagging evidence shall be kept to a minimum, and permanent paint shall not be used on lands of the adjoiner without prior written consent of that landowner. Littering or damaging any property may subject the offenders and licensee to possible civil action.

Large trees shall not be cut to clear line without the prior consent of NJDEP. Brushing-out of lines on adjoining land shall be kept to a minimum and is only permitted with the prior written consent of the owner. Brushing-out of lines on future state property shall be kept to a minimum. The surveyor is responsible for compliance with regulations, including procuring permits with regard to disturbance of wetland vegetation. Copies of the written consent documents, if any, must be forwarded to NJDEP with the final deliverables.

Locate improvements within any offsite easements or servitudes benefiting the surveyed property that are disclosed in the Record Documents provided to the surveyor and that are observed in the process of conducting the survey. Identify and locate any monumentation of said easements and servitudes.

Additionally, the field crew shall report any observations of evidence of prior or current earth moving work, dumping, clearing, or disturbances on the land, all of which is to be reported on the final plan.

## 5.2 Notification of Parties and Surveyors' Right of Entry

The New Jersey licensed Professional Land Surveyor shall prepare and send email and written notices as prescribed herein that their firm has been awarded a site-specific engagement contract to conduct a land survey of the property and the scheduled period of time that survey crews are scheduled to be present on the property.

### 5.2-1 Agency Notification

Prior to starting any field work, the New Jersey licensed Professional Land Surveyor must notify the Administering Agency by email that the survey firm has been engaged to perform property survey work on the site identified by the notice and the dates that field crews will be present. The notification is to be made using the sample division notification and sent by email to the appropriate division representative. The paper copy of the email letter is to be forwarded to NJDEP as a deliverable with all other notifications. See **Sample Form 1 – Agency Email Notification**.

### 5.2-2 Property Owner, Adjoiners, and Police Notification

The New Jersey licensed Professional Land Surveyor must send written notice to the property owner (or designated representative), and any adjacent property owners upon whose land it may be necessary to enter to complete the survey. The notice shall be reproduced as prescribed on company letterhead with a copy being sent to the police department of the municipality where the job is located and to NJDEP as a deliverable.

If it becomes necessary to enter the property without the permission of the owner, there are three statutory provisions allowing entry:

1) The Surveyor's Trespass Law, NJSA 45:8-44.1, to go on, over and upon lands of others during reasonable hours to make a land survey;

2) As an agent of the Commissioner of the Department of Environmental Protection, pursuant to NJSA 13:8A-16 land surveyors may enter on any lands for the purpose of making surveys or other inspections;

3) Pursuant to the provisions of Preliminary Entry of the Eminent Domain Statute, NJSA 20:3-16, agent surveyors of a prospective condemnor may enter lands during reasonable business hours to make a land survey.

Each statute requires that written notice must be sent via the United States Postal Service as Certified Mail, Return Receipt Requested. Such notice, if required, shall be sent prior to entry and the notice shall be reproduced on the letterhead of the survey firm, substantially in accordance with **Sample Form 2 – Notification of Entry Letter**.

### 5.2-3 Other Notifications

It shall be the responsibility of the New Jersey licensed Professional Land Surveyor to determine if other notifications shall be necessary. Copies of any notices shall be provided to NJDEP as confirmation with all other survey deliverables.

When digging will be necessary, the Underground Facility Protection Act, NJSA 2C:17-5, requires a phone call to 1-800-272-1000 three business days prior to digging to request that underground utilities be marked out on site.

## 5.3 Standards for the use of Global Positioning Systems (GPS)

When GPS technology is utilized, all work shall meet or exceed the Geospatial Positioning Accuracy Standards of the Federal Geographic Data Committee (FGDC). All work is to be tied into the National Spatial Reference System (NSRS). Network accuracy between any point in the survey and the NSRS must attain positional accuracy of 95%.

### 5.3-1 Requirement for New GPS Work

Because the precision attainable with GPS continues to improve the accuracy of measurements, new GPS work is to be performed for all Green Acres surveys, rather than relying on coordinates reported on prior adjacent surveys, regardless of who performed them.

### 5.3-2 Control

On the plan, indicate the National Geodetic Survey reference control utilized, the coordinates of the centroid point, and the combined scale factor.

### 5.3-3 Datum

Survey work is to be reported in the most current datum and adjustment, which at the time of this Scope of Survey Services is NAD 83 (2011).

**ALL FIELD WORK SHALL INCLUDE ITEMS IDENTIFIED IN SECTIONS 5A THROUGH 5G BELOW:**

## 5A. MONUMENTS

Survey plans and metes and bounds descriptions shall include:

i. The location and description of any monuments or lines that control the boundaries of the surveyed property.

ii. The location, size and type of any monuments found or set on the boundary of the surveyed property, including line markers.

iii. The location, size and type of any other monuments placed (or a reference monument or witness to the corner) at all major corners of the boundary of the property, unless already marked or referenced by existing monuments or witnesses.

## 5A-1 Corner Marking and Line Marking

Pursuant to rules of the New Jersey State Board of Professional Engineers and Land Surveyors, the New Jersey licensed Professional Land Surveyor is responsible for determining the Ultimate User of the survey, the survey plan, and the corresponding description. The Ultimate User shall be considered to be NJDEP and the State of New Jersey. In general, Green Acres' contracts establish that corner markers must be set at the limits of a project area (one or more tax lots) where the same adjoins lands of others. However, corner markers are not to be set on corners that are:

a. internal to the project area, common with other lands of the grantee taking title to the land (such as other lands owned by the purchasing agency) or
b. along a public road right–of–way, except where the external lines of the project area intersect the right–of–way line of the public road.

To more clearly define where corner markers must be set and where they may be omitted, the following sub-sections shall apply.

### 5A-1.1 Setting Corner Markers

Corner markers shall be set at the perimeter limits of a fee simple acquisition project area where the property being surveyed adjoins any lands owned by an individual or entity other than the purchaser or Using Agency, or not being acquired in fee as a part of the same project. Corner markers shall also be set at the perimeter limits of all public access easement corridors except where the public access easement corridor adjoins lands owned in fee by the purchaser or by NJDEP or is being acquired in fee as a part of the project. Corner markers shall also be set at the perimeter limits of all conservation easements. Corner markers shall be set at the intersection of a public road right- of-way line with a perimeter limit line of the project. These provisions shall apply to both fee acquisition and easement area acquisitions. Internal lines within a lot marking a public access easement corridor limit shall be marked under the same guidelines as a fee acquisition. Corners of exception areas, both fee and easement, shall also be marked. Corner markers for such residential exception areas that fall in a tilled field shall, in addition to having a surface marker set, have a detectable subsurface marker set not less than 1.5 feet below the surface. The requirement to mark corners may be clarified or modified by NJDEP in a site-specific RFP.

When Green Acres is not participating in funding the acquisition of an entire site, the limits of its participation, and therefore of its encumbrance on the land, must be marked on the ground. As an Ultimate User of all surveys in which it participates, Green Acres requires that the limits of its participation be marked in the field with permanent markers in accordance with this section and New Jersey State Board of Registration regulations.

### 5A-1.2 Omitting Markers

Corner markers shall be omitted where the corners are within the right-of-way or along the right-of-way line of a public road (except at the intersection of the right-of-way line with a perimeter limit line of the project, common with a private adjoiner). Corner markers may also be omitted where such corners are common with other lands owned by NJDEP, the corners are within the project area limits (i.e., internal tax lot corners), the corners are common with other lands being acquired as part of the overall project area being surveyed, or where the corners fall within a waterway, water impoundment, or vertical escarpment, unless, in the professional judgment of the surveyor, the corners should be set. Corner markers that are omitted must be identified on the plan as omitted by contractual agreement using the language required by the State Board of Professional Engineers and Land Surveyors. (See NJAC 13:40-5.1/d).

As an Ultimate User of all surveys in which it participates, Green Acres requires all corner markers to be set except as specified above. Green Acres will not grant waivers to corner marking requirements beyond what corner markers may be intentionally omitted by a contract for site-specific engagement.

### 5A-1.3 Found Markers

In instances where a corner marker would otherwise be set but during the course of conducting the survey, a corner marker is found in the field to be within a radius of 1.5 feet of the true corner as calculated by the surveyor, such corner shall be considered as marked. No new corner marker shall be set, except if this corner is the only alternative for use as the description point of beginning. The plan of survey shall clearly indicate the relationship of the found marker to the true calculated corner per the surveyor's calculations. Such relationship shall be shown graphically on the plan by north or south and east or west offset distances from the true corner and in a corner detail, if necessary for clarification. Provide the size, type, and description of the marker, including cap color and identity. If a marker is found on a corner for which a monument is specified to be set, the surveyor may set the monument as a line marker, set the monument on an alternate corner, or reduce the fee for the site-specific engagement if no new monument is set.

### 5A-1.4 Offset Markers

At the time of the survey, any marker that cannot be set because the location of the corner is inaccessible must be set on an offset. The marker must be set on the property line as near to the corner as is practical. The disk or cap shall be stamped "*OFFSET*" and the actual distance in U.S. Survey Feet to the corner shall be clearly indicated on the plan, stated to two decimal places.

### 5A-1.5 Public Access Corner Markers

Corner markers shall be set to physically identify the location of all public access trail corridors whether such corridors are being acquired in fee or by easement interest, unless this requirement is specifically waived or modified by NJDEP in a site-specific engagement RFP. All such corridors shall be marked on both sidelines at each angle point and where the corridor sidelines intersect a public road right-of-way or the subject property boundary.

### 5A-1.6 Three Monument Minimum

To maintain the coordinate system for potential future surveys or re-surveys, the Contractor shall set a minimum of three monuments for corner markers, visible between each other if at all possible, at each grouping of contiguous parcels that constitute a project area. The NJPCS Northing and Easting values must be stated for each of the three monuments set under this provision. It is highly preferred that one new set monument be selected as a description point of beginning for which the NJPCS Northing and Easting values must be stated. If the corner selected to be the Description Point of Beginning was found previously marked, then a monument must be set on an alternate corner to maintain the three-monument minimum requirement. If all original corner markers are found undisturbed, concrete monuments shall be set as line markers and added as accessories to those corners to fulfill the requirement for three new monuments. If original undisturbed corner markers are found within 1.5 feet of the record location, the corner is considered marked by a monument pursuant to the "Recordation Law". A detail of the relation of the found mark to the calculated corner must be provided. If the marker is greater than 1.5 feet from the calculated corner, an additional marker is to be set at the surveyed corner. Do not replace corner markers that are found or markers considered Monuments under the "Recordation Law".

### 5A-1.7 Cap Detail

To indicate the casting and stamping of each type of cap, disk, shiner, etc. actually set to mark corners, a detailed enlargement, not necessarily drawn to scale, shall be depicted on the survey plan. Each corner marker set in the field shall bear the name of the survey firm and shall be stamped with the year set and the corner number.

### 5A-1.8 Acceptable Corner Markers

All corner markers shall contain a standard 3-1/2 inch or 2-1/2 inch bronze or aluminum disk that bears the name of the survey firm and shall be stamped with the year set and the corner number. Currently available plastic markers do not take stamping well enough to be able to note the date set and the corner number, so presently only metal caps are permitted.

Corner markers shall generally be set flush with the ground except in rural, unimproved areas where the top of the marker may extend not more than 0.2 foot above the ground surface. Green Acres reserves the right to specify the cap design and marker type or to supply corner markers or monuments in a site-specific engagement RFP.

#### 5A-1.8-a Disks

Disks may be used for corner markers if the calculated survey corner falls on a large boulder or on poured concrete slabs, curbs, bridges, or walls. Each disk shall be a standard 3-1/2 inch or 2-1/2 inch bronze or aluminum disk set and cemented in a drill hole. The disk may be of such other materials or design approved by NJDEP for the site-specific engagement.

#### 5A-1.8-b Monuments

All monuments set shall be one of two types: pre-cast or poured in place and set flush, but not more than 0.2 foot above the ground surface. Monuments shall be constructed of reinforced concrete, detectable with a ferrous or magnetic locator, not less than 4 inches square on top, not less than 4 inches square on the bottom, not less than 30 inches in length, and displaying a standard 3-1/2 inch or 2-1/2 inch bronze or aluminum disk. Monuments may be prefabricated of other materials or design if pre-approved by NJDEP for the site-specific engagement.

#### 5A-1.8-c Subsurface Markers

Corner markers for a residential exception area to an easement acquisition that fall in a tilled field shall, in addition to having a surface marker set, have a ferrous or other metal detectable subsurface marker set not less than 1.5 feet below the surface. The requirement to set subsurface markers or mark these corners may be clarified or modified by NJDEP in a site-specific RFP or by mutual agreement of NJDEP and the New Jersey licensed Professional Land Surveyor at the time of the survey.

#### 5A-1.8-d Rebar

All other corner markers other than disks or monuments shall consist of minimum 1/2 inch diameter rebar pins, driven to a point of refusal but shall not less than 24 inches in length. Larger diameters or longer lengths may be necessary to deter vandalism or removal. All rebar pins when set shall contain a standard 3-1/2 inch or 2-1/2 inch bronze or aluminum disk. Plastic caps are not acceptable for marking corners. Corner markers shall generally be set flush with the ground except in rural, unimproved areas where the top of the marker may extend not more than 0.2 foot above the ground surface. NJDEP reserves the right to specify the cap design and marker type or to supply corner markers or monuments in a site-specific engagement RFP.

### 5A-1.9 Flagging Corners

For each corner marker that is found or set in the field, a witness lath shall be placed within the surveyed property not more than 2 feet from the marker. To aid NJDEP with identification and recovery of corner markers, the lath shall extend above the ground by 2 feet, labeled with the corner number, and three bands of pink surveyor's flagging shall be attached to the lath. This requirement for lath and flagging shall also apply to markers set on an offset to corner or pins set on line except that only one band of flagging is required. This does not apply to random traverse points set in the field, and it is recommended that an alternate flagging color be selected for each purpose. It is strongly recommended that the colors of each type of flagging used for each purpose be communicated to the administering division contact person.

#### 5A-1.9-a Corner Photographs

Every corner marker found or set is to be photographed, showing the marker and its witness lath with the corner number on the lath clearly visible. Photographs are to be submitted in pdf format in a digital file on the deliverable disk. Upon request by the Using Agency, the Contractor will also provide Corner Marker Description Sheets. See **Section 8.9** regarding Corner Marker Description Sheets for markers set under a site-specific contract.

#### 5A-1.10 Setting Line Markers

In addition to corner markers, line markers shall be set when the perimeter of a project area being surveyed and acquired in fee simple or as a public access corridor adjoins private lands not owned by NJDEP in fee or as part of a public access corridor easement. Line markers may be omitted when the adjoining land is being acquired by NJDEP as a part of the same project. Line markers must be set when the adjoining land is owned by an agency other than NJDEP. These provisions shall apply to both fee acquisitions and easement with public access area acquisitions. Additionally, public access easement corridors shall be marked under the same guidelines as a fee acquisition. Line markers shall be set at approximately 250 feet to 300 feet intervals to aid the administering divisions in identifying and locating long property lines in excess of 500 feet between corner markers. Only long lines for which corner markers must be set shall be further marked in this manner. The distances between line markers shall be noted on the plan of survey, stated as a horizontal distance in U.S Survey Feet to two decimal places. This requirement to set line markers may be modified or waived by NJDEP in a site-specific RFP.

#### 5A-1.10-a Omitting Line Markers

Line markers shall be omitted where the line is within or along the right-of-way line of a public road, or where the line falls within a waterway, water impoundment, or vertical escarpment. Individual line markers may be omitted when the line runs along a physical wall, a fence, or other physical feature, provided that the physical feature is identifiable in the field and the distance to the line can be clearly identified on the plan of survey. Line markers may also be omitted along lines that are common with other lands owned by NJDEP in fee simple or as a public access easement, or lands being acquired by NJDEP as part of the overall project area being surveyed. The New Jersey licensed Professional Land Surveyor may omit line markers on lines that are internal to the perimeter of the survey lines or when this requirement is modified by NJDEP in a site-specific RFP.

#### 5A-1.10-b Acceptable Line Markers

##### 5A-1.10-b.1 Rebar

When used for marking the line, rebar shall consist of minimum 1/2 inch diameter rebar pins, driven to the point of refusal, but shall not less than 24 inches in length. Larger diameters or longer lengths may be necessary to deter vandalism or removal. All rebar pins when set shall contain a standard 3-1/2 inch or 2-1/2 inch bronze or aluminum disk or a plastic cap, any of which are acceptable for line markers when marked with the surveyor's identification. However, plastic caps on rebar are not acceptable for marking corners and not acceptable for marking offsets to inaccessible corners.

##### 5A-1.10-b.2 Durable Fiberglass Post

When a pin and cap are not practical to mark the line, such as through a field or marsh, the perimeter lines may be marked by setting durable orange or white fiberglass posts, Carsonite or similar material, six (6) feet in length. If fiberglass posts are set, the flattest side of the post shall face away from the property being surveyed, to allow for the attachment of signage.

##### 5A-1.10-c Flagging Line Markers

For each line marker that is set (or found in the field within 1.5 feet of line), a witness lath shall be placed within the surveyed property not more than 2 feet from the marker. To aid NJDEP with identification and recovery of corner markers, the lath shall extend above the ground by 2 feet, be labeled as line marker, and one band of pink surveyor's flagging shall be attached to the lath. This does not apply to random traverse points set in the field, and it is recommended that an alternate flagging color be selected for that purpose.

## 5B. RIGHTS OF WAY AND ACCESS

Survey plans shall indicate the following:

i. The distance from the appropriate corner or corners of the surveyed property to the nearest right of way line, if the surveyed property does not abut a right of way.

ii. The name of any street, highway or other public or private way abutting the surveyed property, and the width and location of the traveled way relative to the nearest boundary line of the surveyed property.

iii. Visible evidence of physical access (such as, but not limited to, curb cuts and driveways) to any abutting streets, highways, or other public ways.

iv. The location and character of vehicular, pedestrian, or other forms of access by other than the apparent occupants of the surveyed property to or across the surveyed property, including, but not limited to driveways, alleys, private roads, sidewalks, and footpaths observed in the process of conducting the survey.

v. Without expressing a legal opinion as to ownership or nature, the location and extent of any potentially encroaching driveways, alleys, and other ways of access from adjoining properties onto the surveyed property observed in the process of conducting the survey.

vi. Where documentation of the width or location of any abutting street, road, or highway right of way was not disclosed in Record Documents provided to the surveyor or was not otherwise available from the controlling jurisdiction (see **Section 6A-1.2-iv.** below), the evidence and location of parcel corners recovered which might indicate the width or location of such right of way lines.

vii. Evidence of access to and from waters adjoining the surveyed property, such as paths, boat slips, launches, piers and docks observed in the process of conducting the survey.

## 5C. LINES OF POSSESSION, AND IMPROVEMENTS ALONG THE BOUNDARIES

Survey plans shall indicate the following:

i. The character and location of evidence of possession or occupation along the perimeter of the surveyed property, both by the occupants of the surveyed property and by adjoiners, observed in the process of conducting the survey.

ii. The character and location of all walls, buildings, fences, and other improvements within five feet of each side of the boundary lines, observed in the process of conducting the survey.

iii. Without expressing a legal opinion as to the ownership or nature of the potential encroachment, the evidence, location and extent of potentially encroaching structural appurtenances and projections observed in the process of conducting the survey, such as fire escapes, bay windows, windows and doors that open out, flue pipes, stoops, eaves, cornices, areaways, steps, trim, etc., by or onto adjoining property, or onto rights of way, easements or setback lines disclosed in Record Documents provided to the surveyor.

## 5D. BUILDINGS

Based on the normal standard of care, the location of all buildings on the surveyed property shown perpendicular to the nearest perimeter boundary line(s) and expressed to the appropriate degree of precision.

## 5E. EASEMENTS AND SERVITUDES

Survey plans shall indicate the following:

i. Evidence of any easements or servitudes burdening the surveyed property, disclosed in the Record Documents provided to the surveyor and observed in the process of conducting the survey.

ii. Evidence of easements or servitudes not disclosed in the Record Documents provided to the surveyor, but observed in the process of conducting the survey, such as those created by roads; rights of way; water courses; ditches; drains; telephone, fiber optic lines, or electric lines; water, sewer, oil or gas pipelines on or across the surveyed property and on adjoining properties if they appear to affect the surveyed property.

Surface indications of underground easements or servitudes on or across the surveyed property observed in the process of conducting the survey. Locate all utilities existing on or serving the surveyed property as determined by observed evidence together with any evidence from plans obtained from utility companies or provided by NJDEP, and any markings by utility companies and other appropriate sources (with reference as to the source of information).

iii. Evidence of use of the surveyed property by other than the apparent occupants observed in the process of conducting the survey.

iv. Within conservation areas, show exterior dimensions of all buildings at ground level and square footage of exterior footprints of all buildings at ground level.

## 5F. CEMETERIES

As accurately as the evidence permits, the survey plan shall indicate the location of cemeteries, gravesites, and burial grounds

i. disclosed in the Record Documents provided to the surveyor, or

ii. observed in the process of conducting the survey.

Cemeteries found on the surveyed property are to be shown on the plan and their limits shown to the best of the surveyor's ability. Generally, if a cemetery is intended to be and does physically reside entirely inside the acquisition site, then the area it encompasses will be part of the Green Acres encumbrance. The Cemetery Association will be responsible for maintenance of such sites.

However, if gravesites appear to be encroachments from adjoining property onto the surveyed site to be acquired, then the area must be identified as an exception from Green Acres funding, participation, and encumbrance. In such instances, the boundaries of the encroachment area must be monumented on the ground and defined by metes and bounds in a written description and on the plan.

## 5G. WATER FEATURES

The survey plan shall indicate:

i. The location of springs, together with the location of ponds, lakes, streams, and rivers bordering on or running through the surveyed property as observed during the process of conducting the survey. Wetlands locations are not generally part of Green Acres requirements, except as specified by contract.

ii. The location of any water boundary on the surveyed property. The attribute(s) of the water feature located (e.g., top of bank, edge of water, high water mark, etc.) should be congruent with the boundary as described in the record description or, in the case of an original survey, in the new description. (See **Section 6A-3.4**. below).

# 6. REPORTS

The report for a Green Acres Survey consists of the plan of survey, the metes and bounds description(s), and the Surveyor's Certification and Summary Form.

## 6A. PLAN OF SURVEY

The plan of survey is the survey report. A New Jersey licensed Professional Land Surveyor shall be responsible for preparing a plan of survey that serves to identify the results of the land survey and provide the basis for the preparation of a separate legal metes and bounds type description of property which shall not in any way be construed as modifying the apparent intention of the parties. Most special boundary or title situations found in the course of research or used as the basis of the survey may be explained in factual notes that are included on the plan of survey. Some special situations discovered in the course of conducting the

survey may necessitate preparation of a separate factual letter for clarification. The plan is to reflect evidence and locations gathered during the field work as outlined in **Section 5** above.

## 6A-1 Overview

The survey shall show the following information. Where dimensioning is appropriate, dimensions shall be in accordance with the appropriate standard of care.

### 6A-1.1 Boundary, Descriptions, Dimensions and Closures

i. The lines of the survey are to run with the lines indicated in the deeds of the chain of title for the subject property. Survey lines for lots created by a filed map extend to centerlines of paper streets. When no metes and bounds deed description for the subject property exists, the survey may be conducted from adjoining deed information and the plan must be annotated, "*SURVEYED AS IN POSSESSION FROM ADJOINING RECORD DEEDS*". The entire lot shall be surveyed and described by metes and bounds. Any lands to remain to the grantor become an exception to the description of the entire lot. The total area as surveyed is then also subject to other existing conditions, such as paramount public rights in road rights-of-way, public rights in rivers or claims of the State of New Jersey in tidelands as shown on public claims maps, or private access or utility easements found in the course of preparing the survey.

   a. If multiple Tax Lots are included within a single survey, the interior lines and individual areas of each lot are to be indicated on the survey plan and in the description. Each lot on a tax map represents a chain of title that may have its own unique title issues, covenants, restrictions, or easements that affect title, utility, and use of the land. Lot lines commonly define the division between municipal master plan zoning district areas that affects utility and value. All of these elements may affect the appraised value and utility of each lot.

ii. The location and description of any monuments, lines or other evidence that control the boundaries of the surveyed property or that were otherwise relied upon in establishing or retracing the boundaries of the surveyed property, and the relationship of that evidence to the surveyed boundary. In some cases, this will require notes on the plat or map.

iii. All distances and directions identified in the record description of the surveyed property (and in the new description, if one was prepared). Where a measured or calculated dimension differs from the record by an amount deemed significant by the surveyor, such dimension shall be shown in addition to, and differentiated from, the corresponding record dimension.

iv. The directional, distance and curve data necessary to compute a mathematical closure of the surveyed boundary. A note if the record description does not mathematically close. The basis of bearings shall be in accordance with **Section 3A-ii**.

v. The remainder of any recorded lot or existing parcel, when the surveyed property is composed of only a portion of such lot or parcel, shall be graphically depicted. Such remainder does not need to be included as part of the actual survey, except to the extent necessary to locate the lines and corners of the surveyed property, and it need not be fully dimensioned or drawn at the same scale as the surveyed property.

vi. A note on the face of the plat or map explaining the site conditions that resulted in a Relative Positional Precision that exceeds the maximum allowed under **Section 3E-v** of these standards.

vii. A note on the face of the plat or map identifying the title commitment/policy number, effective date, and name of the insurer for any title work provided to the surveyor.

### 6A-1.2 Easements, Servitudes, Rights of Way, Access, and Record Documents

i. The width and recording information of all plottable rights of way, easements, and servitudes (both public and private) burdening and benefiting the property surveyed, as evidenced by Record Documents that have been provided to or researched by the surveyor.

   A note regarding any right of way, easement or servitude evidenced by a Record Document either provided to or researched by the surveyor (a) the location of which cannot be determined from the record document, or (b) of which there was no observed evidence at the time of the survey, or (c) that is a blanket easement, or (d) that is not on, or does not touch, the surveyed property, or (e) that limits access to an otherwise abutting right of way, or (f) in cases where the surveyed property is composed

of multiple parcels, which of such parcels the various rights of way, easements, and servitudes cross.

ii. A note if no physical access to a public way was observed in the process of conducting the survey.

iii. The width of abutting rights of way and the source of such information (a) where available from the controlling jurisdiction or (b) where disclosed in Record Documents provided to the surveyor. Identify location and geometry of proposed changes in street right of way lines and ultimate right of way width, if information is available from the controlling jurisdiction. While road returns are among the best data regarding a road's width, Green Acres recognizes that sometimes tax maps may be the only available information and will accept information from that (documented) source.

iv. The identifying titles of all recorded plats, filed maps, right of way maps, or similar documents which the survey represents, wholly or in part, with their recording or filing data.

v. For non-platted adjoining land, names and recording data identifying adjoining owners according to current public records. For platted adjoining land, this same information is required due to the possibility of changes since the plat's recordation, although name and recording information of the subdivision plat may also be supplied.

**6A-1.3 Determining Encumbered Area**

i. Green Acres' policy is to avoid funding of areas of uses inconsistent with conservation, outdoor recreation purposes, park land, or open space preservation. Therefore, funding is not available for deed overlap areas, or other areas where the local unit will not be obtaining insurable or marketable title. Such areas must be identified separately as line items in the Area Summary in the Legend of Acquisition and subtracted from the total surveyed acreage to yield the net Green Acres encumbrance for a site. Additionally, areas that overlap adjoiners deeds and areas of unknown ownership such as gores are not eligible for Green Acres participation and encumbrance, although these areas can be included in the deed as quit claimed from seller to purchaser to minimize future claims to such areas.

ii. Where project parcels adjoin a road with substandard right–of–way width, a buffer area is to be excluded from the participation area to prevent a future diversion from parkland issue. Such buffer areas need not be labeled "for future road widening", as this may be construed as an offer of road dedication. However, they shall be labeled as exceptions to the Green Acres encumbrance area. The same is true for areas of encroachment where the client wishes to have the flexibility to settle boundary issues by selling these areas in fee or easement to the encroaching adjoiner.

iii. Power line rights-of-way and easements may be encumbered for outdoor recreation and conservation purposes, and are not deducted from the area encumbered by Green Acres. Such easements are considered in the overall appraisal of the premises and the seller is compensated for that area. Such easements and rights-of-way are therefore not part of the "area in right of way" in the Legend of Acquisition and Area Summary tables, as those lines refer to roads.

**Section 6A-1.4 - Surveys for Disposals and Diversions**

Properties that are encumbered by open space requirements through Green Acres must be kept free of any violations of that requirement. When a violation does occur, this is subject to action by the State House Commission.

There are two terms relating to changes in use of parklands:

- Diversions are the use of parkland, or allowance of another entity to use parkland, for any purpose contrary to Green Acres restrictions.
- Disposals are transfers or conveyances of any legal interest in parkland, either in fee simple or by easement to any other entity for any use contrary to Green Acres restrictions.

Surveying requirements are the same for both types of changes when the compensation to be made for such changes will be by providing replacement land rather than monetary compensation.

Minimum requirements call for the following as hard copies and digital files, prepared and submitted in accordance with Green Acres Program Rules and the Green Acres Scope of Survey Services and Standard Detail Requirements:

- A survey plan for the parcel(s) of land to be diverted or disposed of, including an inset drawing showing the location oof the diverted parcel in relation to the total parcel(s)/lot(s) of which it is a part. The body of the survey shall include a tie bearing and distance between a corner of the diverted or disposed land and at least two corners of the remainder of the total tract.
- A metes and bounds description for the parcel(s) to be diverted or disposed of
- A survey plan of the proposed replacement land(s)
- A metes and bounds description of the replacement land(s)

Beyond standard Green Acres requirements, surveys must also indicate any areas affected by wetlands, Pinelands Preservation Area, Agricultural Production Area, Special Agricultural Production Area, Highlands Planning Area, and Highlands Preservation Area.

Both diversions and disposals require significant review within NJDEP and by the State House Commission. The process (which can be lengthy) requires detailed explanation and justification by the applicant. The survey products may need to be revised if the applicant is asked for a reduction in the lands to be diverted or disposed of, or for changes in what is offered as compensatory lands. Not all land proposed as replacement for the diversion or disposal is acceptable.

### 6A-2 Survey Plan Presentation - General

The items in this section shall appear on every plan presented to Green Acres, whether for State land acquisition or Local Unit/Nonprofit land acquisition.

i. The plat or map shall be drawn on a sheet of not less than 8 ½ by 11 inches in size (see **Section 6A-2.1**) at a legible, standard engineering scale, with that scale clearly indicated in words or numbers and with a graphic scale. When recordation or filing of a plat or map is required by law, such plat or map shall be produced in recordable form. The boundary of the surveyed property is to be drawn in a manner that distinguishes it from other lines on the plat or map. A north arrow (with north to the top of the drawing when practicable – see **Section 6A-2.3**), a legend of symbols and abbreviations, and a vicinity or location map showing the property in reference to nearby highway(s) or major street intersection(s) (see **Section 6A-2.4**)

ii. Supplementary or detail diagrams when necessary.

iii. Show any permanent buildings, paved or concrete improvements, structures or foundation. In particular, residences are to be identified and labeled in coordination with NJDEP. If there are no visible buildings on the surveyed property, a note stating "No buildings existing on the surveyed property" shall appear on the face of the survey.

iv. The surveyor's project number (if any), and the name, registration or license number, signature, seal, street address, telephone number, and email address of the surveyor who performed the survey. The date(s) of any revisions made by said surveyor.

v. Sheet numbers where the plat or map is composed of more than one sheet.

vi. The title of the survey plan shall include the tax block(s) and lot(s), municipality, and county in which the property is located (see **Section 6A-2.2**)

vii. The plan shall include a list of and (to the extent possible) graphically depict all easements, conditions, restrictions, covenants, leases, etc. identified by the surveyor's research and/or all such exceptions in Schedule B-2 of a referenced Title Insurance Commitment/Policy relating to the surveyed lands. The list on the plan shall, to the extent possible, identify the recordation information (book, page, date), name of the party and/or property benefiting by any easement, the purpose of the easement, and whether the easement can be plotted or is not plottable. Leased areas shall be graphically shown on the plan and appear in the list on the plan together with identification of the recordation information and the parties involved. Conditions, restrictions, and covenants shall appear in the list with recordation information and the parties involved. This list identifying easements, conditions, restrictions, covenants, leases, etc. with recordation data and parties or properties affected and/or involved, shall also appear in the Description prepared by the surveyor.

### 6A-2.1 Plan Size

The full-size final paper copies of the survey plan shall be either 30 inches by 42 inches or 24 inches by 36 inches, as provided by the New Jersey Recordation Law (NJSA 46:26A-5d). Smaller sizes are not acceptable due to loss of legibility when reduced to 8-1/2” by 11” for attachment to and recordation of the Deed Descriptions. Prior to submittal to NJDEP, all paper copies of the survey plan shall be folded to a size of approximately 8-1/2 inches by 11 inches, with the Standard Title Block facing up. Unfolded paper copies of the survey plan are not acceptable. The reduced signed survey plan attached to each copy of the metes and bounds description shall be no smaller than 8 ½ inches by 11 inches from cut edge to cut edge and shall include the entire image of the original survey plan, including border lines. If it becomes necessary to produce a booklet type plan of the area surveyed, the first sheet or cover sheet of any such booklet must be an index to show alignment with the remaining sheets of the survey. Each sheet must contain the required elements of the survey such as title block, north arrow, signature and seal, Legend of Acquisition, etc.

### 6A-2.2 Title Block

The New Jersey licensed Professional Land Surveyor is responsible for providing a standard title block as required by rules of the State Board of Professional Engineers and Land Surveyors. In addition to the elements required by the State Board of Professional Engineers and Land Surveyors, all title blocks shall include the telephone number of the firm and an email address. Surveyed parcels shall be identified in the title block by tax lot, tax block, municipality, and county. It is possible that information included in the title block regarding the identity of parcels surveyed will be duplicated in the Legend of Acquisition, but this does not preclude the necessity for presenting it in both locations.

### 6A-2.3 Orientation

Survey information and the graphic depiction of the parcel on the plan shall be drawn so that north points generally upward or to the left when viewing the plan in a landscape view, or generally upward or to the right when viewing the plan in a portrait view.

### 6A-2.4 Location Map

A location map shall be provided in the upper right-hand corner of the plan. The perimeter of survey shall be drawn on the location map and an arrow shall indicate the site. A portion of a USGS Quadrangle Map (1 inch equals 2000 feet, 1:24,000 scale) is preferred, with at least one road or other identifying feature included for orientation. State the name of the quad and provide the scale and graphic north arrow. The orientation of this location or key map is to be the same as the orientation of the body of the survey map.

### 6A-2.5 Scale

Clarity of information will determine the actual scale of the plan. Standard engineering scales in feet in increments of 10 feet between 10 feet and 100 feet or increments of 100 feet between 100 feet and 500 feet are required, unless an alternate scale is requested in the site-specific RFP or by NJDEP. A graphic or bar scale of the overall plan shall be drawn on the plan. (This is imperative due to inclusion of reduced survey copies with the recorded deeds.) An enlargement detail may be drawn to an alternate scale from the overall plan, but a detail drawn to show encroachment or marker dimensions relative to the survey line is not required to be drawn to scale. Enlargement details are recommended in many instances to show relationships of calculated corners to evidence found.

### 6A-2.6 Line Weight and Type

The New Jersey licensed Professional Land Surveyor is responsible for presenting all of the findings on the final survey plan in a clear, concise manner. The perimeter survey lines shall be the predominant line weight of the main drawing. Solid lines are required for exterior boundaries and for limits of Green Acres’ interests.

### 6A-2.7 Point of Beginning

The point of beginning used in the metes and bounds description must be clearly labeled on the plan as “Description Point of Beginning” or “P.O.B.” or similar notation and must be tied into a corner of record or road intersection. The NJPCS NAD 1983 Northing and Easting **grid** coordinate values stated in U.S.

Survey Feet to two decimal places must be labeled on the plan and stated in the description. The surveyor shall set a monument at the point of beginning for each parcel, unless that point is already marked on the ground or if physical impossibility, such as falling in a water body, requires setting of an offset monument. In the latter situation, it is preferable to select a different corner as the point of beginning.

### 6A-2.8 Clockwise Bearings

Bearings shall be drawn on the map so that the corresponding metes and bounds description of the parcel will read in a clockwise fashion. Bearings may have to be indicated in both forward and reverse directions on the plan of survey, with a small arrow to show the direction that the bearing runs, to provide both quadrants when needed for the description.

### 6A-2.9 Line and Curve Tables

Line and Curve Tables are confusing and difficult for laypersons to use and understand and are therefore discouraged. Line and Curve Tables are not acceptable alternatives to labeling line and curve data directly on the drawn lines, unless specifically authorized by NJDEP.

### 6A-2.10 Coordinate Tables

To facilitate the recovery of State Land Corners using GPS technology, provide a **"Table of Ground Coordinates for Corners and Markers"** on the plan. Coordinate values shall be provided in this table for all actual property corners as well as for physical markers if those markers are offset from the true corners. In identifying property boundaries, the coordinate values presented for markers found or set are not to be construed as replacing the superior value of the actual property corner locations.

All markers found on the property corners shall be included. Although close enough by these specifications to satisfy the need for marking a corner, markers found within 1.5 feet of the property corner but not on the actual corner need not be included in this table. Offset markers set on line (as in situations involving water boundaries) shall be included in the table. Other line markers need not be included.

This table shall contain the following information:

- The number of each corner or corner offset marker (being the owner ID#; with the Point of Beginning being Corner No. 1 and subsequent corners numbered clockwise therefrom)
- The type of corner or marker (e.g., corner, offset marker [specify marker type], concrete monument, cross cut in stone, capped pin)
- The NJSPCS Northing and Easting values of the ***ground coordinate***
- The NJSPCS Northing and Easting values of the ***grid coordinate*** (only in those regions of NJ where, due to higher elevations, there are significant variations from Ground Coordinate values)

Labels of coordinate values for line markers that do not constitute mandatory offsets for property corners may be added to the body of the plan but are not required.

### 6A-2.11 Significant figures

Bearings shall be rounded to whole seconds of arc. Distances in U.S. Survey Feet for survey courses shall be rounded to two decimal places. NJSPCS Coordinate Values in U.S. Survey Feet shall be rounded to two decimal places. Areas of closed survey polygons shall be stated in acres and rounded to three decimal places. Square footage shall be rounded to the whole square foot but is only to be provided if the calculated area is less than 50 square feet or the survey is in an area of extremely high property values. If the latter, provide square feet and acres in the reported area.

### 6A-2.12 Mathematical Closure

All property surveys must form closed polygons with all sides defined by mathematical survey expressions being bearings and distances on all straight line segments and tie lines: radius, arc length, delta, chord bearing and chord distance on all curved lines. General calls along roads or waterways are unacceptable without a tie line and are only permitted for existing deed calls or if specifically required in a site-specific engagement specified by NJDEP. Tie lines are to be provided along waterways, and

riparian claim lines.

### 6A-2.13 Mathematical Survey Expressions

The New Jersey licensed Professional Land Surveyor is responsible for defining all courses of the parcel being surveyed by mathematical survey expressions. All straight-line courses will be defined by bearings and distances with angular units stated in degrees, minutes, and whole seconds of arc. Curves will be defined by radius, arc length, central angle, chord bearing and chord length, and the horizontal distances, radii of curves or lengths of arc must be stated in U.S. Survey Feet to two decimal places.

### 6A-2.14 Area

The areas calculated in association with the parcel land survey shall be stated in acres and rounded to three decimal places unless the parcel is bounded, all or in part, by a waterway or a Tidelands Claim of the State of New Jersey. In such cases, the area shall be given to one decimal place (0.1 acre). If the entire parcel is less than one (1) acre, the area shall be stated in square feet as well as acres. If the surveyed area is less than 50 square feet, then the area is to be stated in square feet only and rounded to the nearest square foot. If the survey is in an area of extremely high property values, provide both square feet and acreage. Consult NJDEP for guidance in any site-specific engagement.

Gross area shall be reported separately for each tax parcel or portion of tax parcel included in the survey. The Green Acres Program records open space parcels by the municipal tax block and lot number and records the area of each lot for these and other reasons. Although title may merge through the assemblage of lots, the final program records and payments are based on the Tax Lots that appear on the survey plan so the area of each lot is a required element for both the survey and the metes and bounds description.

### 6A-2.15 Legend of Acquisition

In addition to the surveyor's standard title block, all plans shall contain a Legend of Acquisition that provides the project number, funding source, Project Name, acquisition partner, seller name and ID#, municipality, county, list of each individual tax block and lot surveyed, type and percentage of interest being obtained in each individual lot, an Area Summary combining information about all surveyed and acquired lots, etc. See **Sample Forms 5A** and **5B – Legend of Acquisition Blocks** for State and Local Unit/Nonprofit land acquisitions.

Areas affected by road rights of way are reflected differently in the Legend of Acquisition for State acquisitions and for Local or Nonprofit acquisitions.

a) For a Local or Nonprofit acquisition of a tract that runs to the center of the road, the area within existing road rights of way is acquired but identified on the plan of survey as “not subject to Green Acres restrictions” and the area is deducted from the amount financed with Green Acres funds. The area identified under “Parcel Information” reflects the entire area of the parcel (100%). However, the area within the road right of way is reported in the “Area Summary” section and subtracted from the total parcel area (along with other exceptions such as Tidelands) to yield the net area of Green Acres encumbrance.

b) For a State acquisition, this situation likely will not exist. The State acquires everything as deeded to the center of the road right-of-way, subject to pre-existing paramount rights of the public to use the current road right–of–way.

When there is a future Master Plan or Ultimate right of way, avoid the terms “future right–of–way” and “ultimate right–of–way” because in doing so, the survey map and description may be construed as offering a dedication to the new width. The area between that line and the existing right of way is to be reported as follows:

a) For a Local or Nonprofit acquisition, 100% of the parcel is acquired and reported in the “Parcel Information” section. However, the area between the Master Plan or Ultimate right of way and the deed line (whether the existing right of way or centerline of the existing right of way) is identified on the plan of survey as “not subject to Green Acres restrictions.” The area that is affected by future rights of way is deducted from the amount financed with Green Acres funds. The area identified under “Parcel Information” reflects the entire area of the parcel, but the area

within the road right of way is reported in the "Certification" section and subtracted from the parcel area to yield the area of Green Acres encumbrance

b) For State acquisitions, it is not necessary to show planned future expansion of road rights of way when the acquisition is in fee, because the State takes title to the entirety of whatever the owner has offered. For acquisitions of easements, label the area of such future expansions as "limit of Green Acres encumbrance" and subtract it from the encumbered area reported in the "Area Summary" to avoid future diversion of encumbered lands to non-open space uses.

For State acquisitions of easement interests, or for Local and Nonprofit acquisitions that Green Acres will encumber by providing funding, all tidelands, navigable waters, and encumbered by encroachments must be reported within the "Area Summary," as these may affect the appraised values. First list the gross area of each separate parcel under "Parcel Information", then add a line in the "Area Summary" for each item to be subtracted from that gross area to yield the net area of Green Acres encumbrance.

### 6A-2.16 Plan Certification

See **Section 7 – Certifications.**

### 6A-2.17 Corner Marking and Line Marking

All corner marking shall be made in accordance with "Corner Marking and Line Marking" as set forth in **Section 5A-1** and shown on the survey plan. Detailed enlargements made to show a corner marker set or the relationships between any markers found and the actual calculated survey corner shall include all information shown on the full-scale plan. It is not necessary to indicate witness lath in the detail. Cap labels (surveyor, firm, license number) shall be identified on the plan for all such found corner markers, as well as referenced in the accompanying description prepared by the New Jersey licensed Professional Land Surveyor. Funding will not be approved for sites for which markers included in the contract are not yet set. Markers shall not be referenced as "to be set".

### 6A-2.18 Encroachments

Land acquired with Green Acres funding must be available for public recreation and conservation purposes and cannot have encroachments that would interfere with the use of the land for such purposes or encumber title to the land. For the purposes of this specification, an encroachment is any structure or improvement that extends, without permission, over a property line onto the land to be acquired with Green Acres funding.

Encroachments must be brought to the attention of NJDEP prior to finalizing the plan of survey and metes and bounds description of the property. Depending on the nature of the encroachment, and whether the survey is being prepared for a State acquisition or a local/nonprofit acquisition, the interest in the area to be acquired with Green Acres funds may be reduced to leave the area of encroachment with the seller.

### 6A-2.18a - Encroachments on Land to be Acquired through the State Acquisition Program:

Green Acres does not participate in the acquisition of an area of encroachment by an adjoining landowner. Such an area is not insurable by title companies and may be unmarketable. The encroacher may have developed unwritten rights over time that are contrary to the objective of acquiring lands for outdoor recreation and conservation (open space) purposes. If the statutory requirements for adverse possession or a prescriptive easement have been met, it is possible that the seller no longer owns the area of encroachment but, rather, there may be a claim of title by the encroacher. Areas that are surrounded by fences to the exclusion of the public or occupied by structures owned by others are not useable for the intended purposes of public outdoor recreation or open space. The encroachments must be removed, or the areas cut out and excluded from the area to be acquired, prior to the closing on the property.

### 6A-2.18b - Encroachments on Land to be Acquired by Local Governments or Nonprofits:

For surveys prepared for the proposed acquisition of land by a local government or nonprofit, all encroachments must be clearly drawn on the draft plan of survey, labeled and dimensioned to the property line. A detailed enlargement of the encroachment may be necessary to clearly show sheds, buildings, decks, or other structures or areas of adverse use such as stone parking areas or areas of mowed lawn.

However, whether the area of encroachment will remain within the area of Green Acres funding participation or if it will be excluded from this area will be determined by which of the following options is

authorized by the Green Acres Project Manager after initial review of the survey disclosing encroachments and prior to the final survey being approved by Green Acres:

**Option 1:** The local government unit or nonprofit will work with the landowner to eliminate the encroachment prior to closing.
**Option 2:** The local government unit or nonprofit may request removal of the area of encroachment from the Green Acres project site through the adjustment on the final survey of the property boundary of the land to be acquired.
**Option 3:** In exceptional circumstances, Green Acres may obtain a written commitment from the local government unit or nonprofit to eliminate an area of encroachment after closing and within a reasonable timeline (not to exceed 6 months from the date of closing.)

**Note:** After the release of Green Acres funding, any encroachment that is not resolved within the agreed-upon time will, in most cases, be considered a diversion of public parkland, which the local government unit or nonprofit must resolve through the diversion application process. (See Green Acres rules at N.J.A.C. 7:36-26.)

#### 6A-2.19 Property identification

**6A-2.19-a Street address** of the subject parcel being surveyed only if the municipality has assigned a common street number.

**6A-2.19-b Tax Block and Lot number** of the parcel being surveyed, and those of adjoiners; Note: If the survey findings indicate that the tax map is erroneous, so state. If a lot is not shown on the map, the lot shall be designated on the survey plan with the correct block number from the tax map and shall be identified as "*NO LOT NUMBER ASSIGNED*". Note discrepancies from tax map, such as errors in municipal tax map linework or mislocation of the parcel.

**6A-2.19-c The deed book and page number** of the reference deeds actually used must be indicated in the graphic portion of the plan to which they apply, rather than in a separate table. This information shall not be excluded or limited in appearance through the use of notes, except that the surveyor may limit his or her search of records to the obvious and reasonable (after consultation with NJDEP), and may produce a plan noting that the work is subject to the findings of an accurate and up-to-date title search by a competent title company. This note shall not appear if the title report has been supplied to the New Jersey licensed Professional Land Surveyor by NJDEP prior to delivery of the final plans.

**6A-2.19-d Provide the name of record owners** and the latest deed book and page reference for adjoining lands to indicate that those records had been examined in the survey process and that there are no areas of confusion in the record, except for those that may be shown on the plan, if any. Adjoining owner names and deed references are to be shown directly on the graphic portion of the plan to which they apply, rather than in a separate table.

### 6A-3 Survey Plan Presentation – Detailed Instructions

This section contains information that may not be applicable to all surveys.

#### 6A-3.1 Roads

The New Jersey licensed Professional Land Surveyor is responsible for preparing a survey and corresponding metes and bounds description, which cannot in any way be construed as modifying the apparent intention of the parties. Road rights-of-way and the principles of dedication of land for road purposes shall not be taken lightly by the surveyor. The lines of surveys prepared for the acquisition of land are to run with the lines of the deed description as written in the record, unless the site-specific engagement request directs some other course of action. If the fee title extends to the center of a public road, the survey lines should run to the center of the public road. If the public road involved is held in fee by the State and/or any of its political subdivisions, deed lines shall not run to the center of the road.

The survey must provide the bearings and distances of the road right-of-way sidelines, as well as the area within the public right-of-way. The area within the right-of-way is subject to the paramount rights of

the public and possible private rights, and therefore shall be stated as a separate item on both the plan and in the description. The area within public roads shall be stated both on the plan and in the description. If there has been no dedication to define the sidelines of the right-of-way, or the tax map (which is a document of last resort) does not define the width for the sidelines of the right-of-way, the area of the right-of-way is defined as the area of the paved or traveled portion of the roadbed. The survey must indicate recording information for maps, deed book number and page number, or other pertinent information regarding the dedication of public ways.

Proposed changes in street right-of-way lines shall also be noted on the plan, based on information from the controlling jurisdiction. For State land acquisitions, the future and ultimate right-of-way width merely defines the limit of assessed value, although the State will take title to the entire tract. Private roads crossing the parcel being surveyed must also be shown on the survey and mentioned in the description. The survey must indicate recording information for maps, deed book number and page number, or other pertinent information regarding the dedication of public ways or private easements.

Roads that are not open are to be so indicated. Paper streets that have not been formally vacated are subject to possible public and/or private rights, and the area contained by them must be indicated on the plan.

While a road width might vary, there is generally some defined width that can be determined directly in front of the acquisition parcel. The width between the road right–of–way sideline and centerline shall be shown on the survey and referenced in the description provided by the land surveyor.

**6A-3.1 a Deeds Running to Centerline of Public Road Rights–of–Way**

Because they are already subject to public use, the amount of area within public rights–of–way affects the appraised value of State acquisitions. If the fee title for a proposed acquisition extends to the center of a public road, the survey lines shall run to the center of the public road to properly extinguish all rights that the seller may have in the public right–of–way. Descriptions and surveys of properties that run to the centerline of public roads shall provide the bearings and distances of the right–of–way sidelines, as well as the area of the public right–of–way. They shall also note that the properties are subject to the paramount rights of the public and possible private rights; the area within road rights–of–way shall be stated as a separate item on both the plat and in the description. If there has been no dedication to define the sidelines of the right–of–way, the area of the right–of–way is defined as the area of the paved or traveled portion of the roadbed. This section does not apply to private roads crossing the parcel being surveyed, which also must also be shown.

The survey must indicate recording information for maps, deed book number and page number, or other pertinent information regarding the dedication of public ways or private easements. The surveyor is cautioned that a reference to a Green Acres Participation or Encumbrance buffer strip adjoining a public right–of–way labeled for “future road purposes” may be construed as an offer of dedication that is irrevocable on the part of the owner. It is suggested that the terms “participation limit line” or “buffer area” be used in order allow the using agency a greater flexibility for the future use of these areas without creating a road dedication.

**6A-3.1 b Private Rights-of-Way and Easements**

Private rights-of-way and easements for roads crossing the parcel being surveyed must also be shown with record or physical width provided. If record information exists regarding the creation and dimensions of private rights in the project area, that information is to be provided. Only if no record data as to location and width exists shall the physical location and width of the use by any individual or entity other than the record owner suffice. The survey must indicate recording information for maps, deed book and page number, or other pertinent information regarding the creation of the private easements. Calculation of the area of private easements is not required on the plan or in the description. The new metes and bound description may generally refer to the easement rights in a qualifying clause, i.e. SUBJECT TO, without actually describing the easement by metes and bounds.

**6A-3.1 c** Unimproved and Paper Streets

When a property to be acquired or funded by Green Acres fronts on an unimproved or paper street, the survey and description shall run to the center of such streets. A note shall be added to the plan and description that the area between the centerline of the paper street and the right–of–way line defining the perimeter of the site in question is subject to paramount public and/or private rights. State the area in acres to three decimal places.

**6A-3.2 Utilities and other facilities**

**6A-3.2-a Any utility easements**, visible or known of record, overhead wires or pole lines within the parcel being surveyed must be identified and shown on the plan of survey. If such easements are within the lines of a dedicated public road right-of-way, they may be omitted from any graphic depiction.

**6A-3.2-b Bridge and culvert easements** are considered to be part of the public right-of-way. They are to be dimensioned, their areas calculated, their corners marked where appropriate.

**6A-3.2-c Show all drains and sewers** that are visible on the surface of and within the limits of the parcel. Drains and sewers within a dedicated public road right-of-way need not be shown.

**6A-3.3 Areas of Claim of Tidelands Ownership by State of New Jersey**

The New Jersey licensed Professional Land Surveyor is responsible for obtaining the official state maps showing riparian claims of the State of New Jersey and reproducing these claim lines on the survey plan. The area of the New Jersey claim is to be stated in acres to one-tenth acre (0.1 acre). The sources to be used will be maps entitled "Lands Subject to Investigation for Areas Now or Formerly Below Mean High Water", which have been issued by the State and filed in the office of the county recorder or clerk. Contact the NJDEP Division of Land Use Regulation for further information.

The area affected by these riparian tidelands claims by the State are generally not funded for acquisition unless a Tidelands Grant has been issued, and shall be noted to the nearest tenth of an acre in the Legend of Acquisition on the survey, the Surveyor's Certification Form, and the description of lands to be acquired.

**6A-3.4 Waterways and Watercourses**

Waterways and water courses must be drawn and labeled on the plan, including the name and showing the direction of flow (for non-tidal bodies of water) and area contained within the bed of the water body. Note if water is tidal and/or navigable. The determination of navigability of a watercourse is on a case-by-case basis, but generally, Green Acres recognizes rivers (and some very large streams) as navigable.

When the boundary of a lot is a waterway, a note shall be placed on the face of the plat or map noting the date the boundary was measured, which attribute(s) of the water feature was/were located, and the caveat that the boundary is subject to change due to natural causes and that it may or may not represent the actual location of the limit of title. When the surveyor is aware of natural or artificial realignments or changes in such boundaries, the extent of those changes and facts shall be shown or explained.

Provide mathematical tie lines where the boundary follows a general call along a meandering water line. The tie line provided shall connect the beginning of the first course running along a watercourse to the terminus of the final such course. Tie lines may be eliminated from the plan when the waterline is surveyed and/or defined by mathematical survey expressions with angular units being stated in degrees, minutes and whole seconds of arc, and the horizontal distances, radii of curves or lengths of arc are stated in feet to two decimal places. If the survey follows a Mean High or Low Water Line, the surveyor must state on the plan the date and time of that the survey data had been collected. The terms "trash-line" and "debris line" are neither appropriate nor acceptable survey terms. The tie lines may be eliminated from the plan when the water line is physically surveyed and defined by bearings and straight line distances that are indicated on the plan. Do not provide a line table. It is also not advisable to calculate curves along waterways.

When a property is surveyed for the purpose of obtaining an easement, the area of the easement shall extend into the river or watercourse. The area in a navigable river is subject to the paramount rights of the public and also possible private rights. Area under water must be provided for appraisal purposes,

and is to be noted to the nearest tenth of an acre in the Legend of Acquisition on the Survey as well as on the Surveyor's Certification Form and in the description. Areas of navigable waters, generally rivers, are deducted from the net area of Green Acres' participation and encumbrance, whereas areas under a stream or pond are not deducted.

The official state maps showing riparian claims of the State of New Jersey shall be used to reproduce those claim lines on the plan of survey. These maps, entitled "Subject to Investigation for Areas Now or Formerly Below Mean High Water", have been filed in the office of the county recorder or clerk. . The area affected by these riparian tidelands claims by the State are generally not funded for acquisition unless a Tidelands Grant has been issued, and shall be noted to the nearest tenth of an acre in the Legend of Acquisition on the survey, the Surveyor's Certification Form, and the description of lands to be acquired.

### 6A-3.5 Aerial Photographs and Planimetric Mapping

Rectified orthophotography, photogrammetric mapping, airborne/mobile laser scanning and other similar products, tools or technologies may be used as the basis for the showing the location of certain features (excluding boundaries) where ground measurements are not otherwise necessary to locate those features to an appropriate and acceptable accuracy relative to a nearby boundary. The surveyor shall place a note on the face of the survey explaining the source, date, precision, and other relevant qualifications of any such data. An Aerial Information block shall be placed on the plan whenever aerial data has been used. See **Sample Form 3 – Aerial Photo Information Block**.

Aerial photographs or planimetric maps or manuscripts, when used to locate physical features upon the survey plan, will be georeferenced to NJPCS NAD 83, planimetrically depicted in conformance with National Map Accuracy Standards, and be current to within two (2) years of the date of the survey plan, unless the imagery is obtained from NJDEP (in which case NJDEP's most current imagery can be used). In all cases, features must be field verified to the date of the current field work.

### 6A-3.6 Subdivision of Lands

The State of New Jersey and, as an extension thereof, any state Using Agencies are exempted from municipal subdivision ordinances. Other entities, such as municipal, county, or non-profit groups operating under the Green Acres Program or county agricultural programs that may be using this Scope of Work for Professional Surveying Services, may not be exempted, and municipal subdivision laws would apply and supersede these provisions. The interest to be acquired in an entire lot is known as an Entire Acquisition in Fee or E/A Fee and the interest to be acquired in a portion of a tax lot is known as a Partial Acquisition in Fee or P/A Fee. This subsection applies to Partial Acquisitions in Fee.

A subdivision, known as partial acquisition, shall be effectuated by surveying and describing the entire property and tax lots of the seller, then excepting out, by a metes and bounds description of the exception, all lands that are to remain to the seller. Monuments shall be set on corners of new lines, and line markers shall be set on new lines that are 500 feet or longer. Monuments set for corners shall be called for in the exception description. Severance lines shall project to the limits of the deed and may extend into public road rights-of-way. For this reason, any site-specific engagement RFP that specifies an exact acreage to remain with the seller shall be presumed to be exclusive of any fee interest in an adjoining public right-of-way that is included in the exception area.

The bearings and distances of the dividing line between the Green Acres acquisition and the lands remaining to the seller must be shown on the plan. The plan shall not be labeled to suggest that any lots will be consolidated or lot lines will be removed or suggest proposed lot numbering, which shall remain a function of the municipal government in which the parcel is located. The integrity of the original lot shall be maintained by using terms such as "Part of Lot __", "Area to be Acquired", and "Area of Exception to Remain". This terminology shall be clearly labeled on the plan. The plan shall include the area tabulation on the graphic portion of the plan and in the Area Summary of the Legend of Acquisition, including the percentage of each portion of lot being acquired rounded to two decimal places. This requirement may be modified by NJDEP in a site-specific engagement RFP.

## 6 B DEED DESCRIPTION

### 6B-1 Deed Description Format

The metes and bounds description with reduced plan (8-1/2 inches by 11 inches) attached shall be inserted into the deed document by the seller's attorney without being retyped so that each description shall be written from the perspective of NJDEP as purchaser, in accordance with the following:

### 6B-2 Deed Description Type

The New Jersey licensed Professional Land Surveyor is responsible for preparing a separate metes and bounds type description of property pursuant to the survey of the property and with reference to the information contained on the plan of survey. This description is to agree with the results of the survey from which it written in every particular, and for this reason, the description shall not include any information that does not appear graphically or in a factual note on the survey plan, but shall include all details of the boundary and its markings that are shown on the plan. The metes and bounds description shall not be produced on the plan of survey but shall consist of a separate document. A copy of the survey plan reduced in size to 8-1/2 inches by 11 inches shall be stapled to the back of each copy of the description for recording. A separate metes and bounds description document shall be prepared by the New Jersey licensed Professional Land Surveyor for each fee acquisition area as defined by the survey. One description may include several contiguous lots in common ownership grouped together into one or more survey tracts, but the area of each tax lot shall be stated in addition to the total area contained at the end of the description.

A separate metes and bounds description document shall be prepared by the New Jersey licensed Professional Land Surveyor for recording in a deed of easement if, in addition to a fee area of acquisition, there is also an easement acquisition area as defined by the survey.

### 6B-3 Letterhead of Survey Firm

The New Jersey licensed Professional Land Surveyor shall prepare an original metes and bounds type description of property, separate and apart from the prepared final plan of survey. The first page shall be submitted on an original company letterhead 8 inches by 11 or 14 inches. The letterhead must contain the name of the survey firm, mailing address and street address (if different), and telephone, fax, and email address of the company. Subsequent sheets shall not be letterhead but may be plain paper or preprinted at the bottom with the name of the survey firm, mailing address and street address (if different), and telephone, fax, and email address of the company. Left edge lined legal paper shall not be used.

### 6B-4 Description Heading

Each new metes and bounds description shall contain an appropriate heading and reference information. Use the term "Deed Description" for all metes and bounds descriptions prepared under the scope of work. The Contractor shall use the qualifying supplemental terms "*Conservation Easement Area*", "*Public Access Easement Area*", "*Encroachment Area*", "*Gore Area*", "*Overlap Area*", or "*Exception Area*" as appropriate. .

All headings shall appear centered at the top of the page, but below any company logo, address, or name. The use of the term "Deed Description" without a qualifier shall be understood to represent the metes and bounds description of an entire property being acquired in fee simple. The heading and reference information shall be substantially in accordance with the following:

**DEED DESCRIPTION** (add qualifying statement such as
**CONSERVATION EASEMENT** or **PUBLIC ACCESS EASEMENT** or other term as appropriate)

**(project number – project name – Green Acres Survey Ref. #, if any)**

Lands N/F (Purported owner) Owner ID#___
(Date)

(Block___, Lot____)
(Municipality)

(Street address)
(County)

## 6B-5 Description Introduction

The first paragraph of the metes and bounds description shall be written as follows:

> All that certain tract or parcel of land located (at, on or along street address) in the (City, Borough, Town, or Township) of ________________, County of _________, New Jersey, bounded and described as follows:

## 6B-6 Description Second Paragraph

The second paragraph shall be used to describe the Point of Commencement, if any is used, that leads to the description beginning point. The description Point of Beginning shall be tied to a record corner or intersection and is generally a found undisturbed or set monument, including its New Jersey Plane Coordinates (NAD 1983) Grid Coordinate value in U.S. Survey Feet to two decimal places. The description shall state that the bearings that follow are NJSPCS NAD 83.

When commencing courses are used, they shall be lettered consecutively (to distinguish them from the numbered courses of the main description) and a line space shall be inserted between each commencing course.

## 6B-7 Body of Description

The description shall be written with courses running clockwise from the point of beginning. Each course shall be a new paragraph and shall be numbered, with a line space between each such course/paragraph. No information shall be provided in the description that does not appear graphically or appear in a factual note form on the plan.

The description shall not provide the New Jersey State Plane Coordinate System values of corners other than the Point of Beginning, as coordinates are not intended to control the boundary corners.

1. References to nearby markers and passing calls (including line markers) assist in the recovery of property lines and corners and in monitoring for stewardship of sites. Descriptions shall not run "to a point" when a physical marker exists. Whenever a called-for point is a marked corner, the description shall make reference to the type of marker and indicate whether found or set, without changing the intention of prior records. As an example, the call ***"to a point"*** should include language such as "*now evidenced by a concrete monument set*", "*to a point now evidenced by a one inch diameter pipe found*", "*to a point near a capped iron pin found*", "*passing over a capped iron pin set 50.00 feet from the origin of this line*", etc. Of course, original called-for markers shall still be called for in the description. An example is a call "*to a concrete monument set*" is now "*to a concrete monument found*." The description shall include reference to the Corner Number for corner markers that have been set. Cap labels (surveyor, firm, license number) shall be referenced for all such found corner markers.
2. Markers passed over by a property line shall also be referenced as being so many feet from the beginning or terminus of the relevant description course.
3. Funding will not be approved for sites for which markers included in the contract are not yet set. Markers shall not be referenced as "to be set".

## 6B-8 Using Augmenting and Qualifying Clauses

The surveyor is reminded that each description is to be prepared for use in a deed document from the perspective of NJDEP. An easement that benefits the parcel being surveyed but is located on an adjoining property shall be included in the description using the phrase "***together with***" such easement and describing its location and utility.

Another example of an augmenting clause to be included in the description if appropriate is if the State of New Jersey had issued a Tidelands Grant and rights associated with the grant are to pass with the parcel being surveyed. This situation would necessitate using the augmenting clause "***together with***" and continuing with the qualifying clause, such as "*and **subject to** the terms of Tidelands grant*", etc.

An easement located upon the parcel being surveyed that benefits an adjoiner shall be mentioned in a qualifying clause in the description using the phrase "***subject to***" such easement, describing its location and utility, and in certain instances, the area shall also be stated.

Qualifying clauses shall also include the area in acres when the parcel being acquired is subject to public rights in a road right-of-way, subject to public rights in a navigable waterway such as a river, subject to a Tidelands Claim of the State of New Jersey, or subject to an overlap of deed description with an adjoining parcel. Such areas shall further be described with metes and bounds following the qualifying clause.

Note that when plans and descriptions are for local units and nonprofit organizations utilizing this Scope of Survey Services in applying for Green Acres funding, any areas subject to public rights, overlaps, encroachments, cemeteries, etc. that will not be encumbered by Green Acres but are part of that local or nonprofit acquisition must be identified with a statement to that effect. Appropriate preamble language to the description of such lands is, "Excepting from Green Acres funding, participation, and encumbrance the following area" (followed by metes and bounds).

A minor deed gore area may be included in a conveyance by inserting in the deed an augmenting clause of quit claim attached to the surveyor's description at the request of NJDEP. A deed gore area that is of significance shall be described in a separate metes and bounds description prepared by the New Jersey licensed Professional Land Surveyor.

### 6B-9 Recite Areas Described

The metes and bounds description shall contain a paragraph that recites the total area contained within the metes and bounds description, then specifies the area of each included tax lot. This paragraph shall precede any exception description or any augmenting or qualifying clauses. Exception descriptions shall also contain a paragraph as to the total area of described exception, further specifying the area of each included portion of tax lot.

The total net area and individual net area of each included tax lot shall be restated following an exception description or qualifying clause of paramount public rights, deed overlaps, or Tidelands Claims of the State of New Jersey.

### 6B-10 Closing Paragraph and Call for Survey

To provide a uniform closing of all metes and bounds descriptions, the final paragraph shall contain the following language:

> The above description was written pursuant to a survey of property designated as Block _________, Lot ______, on the municipal tax map of (______*municipality name*________), County of (_________*county name*________), State of New Jersey. Said survey was prepared by (____*your firm's name and address*_______),(____ *date*_____), revised through (__*last revision date, if any*__) and is marked as file No. ________. A reduced copy of said plan is attached hereto and made a part hereof.

### 6B-11 Original Signature, Embossed Seal and Date Signed

Each separate metes and bounds description shall bear the date, original ink signature and embossed seal of the surveyor who prepared the survey plan. A rubber stamp facsimile, mechanically reproduced, or computer-generated signature is not acceptable.

# 7. CERTIFICATIONS

## 7.1 Plan Certification

Surveys shall be certified only to those parties having a tangible interest in the property. Attorneys for the parties involved in the transaction do not have a tangible interest and are not to be listed in certifications. Buyers, sellers, title insurers, and lending institutions do have tangible interests and may be included in the certification. Green Acres, as an entity providing funding for the acquisition and encumbering the property as a condition of that funding, is a party having interest and therefore must be included in the certification.

The plat or map of a NJDEP / Green Acres Survey for a state land acquisition shall bear only the following certification, unaltered, except as may be required pursuant to **Section 3B** above. The first portion of the certification is to the seller, purchaser, and purchaser's title insurance company.

> I hereby certify to *[name of seller]* and to purchaser, State of New Jersey *[as appropriate, state all acquisition partner names as specified by NJDEP]*, and on behalf of purchaser, to purchaser's title insurer *[provide specific name when available]* that this plan, survey, and a corresponding metes and bounds description have been prepared under my immediate supervision in accordance with a written contract with NJDEP; that this plan is a correct and accurate representation of conditions existing as of *[month and year of field work]*, subject to such notes as may appear hereon.
>
> I do further certify that the monuments as designated and shown hereon have been set.
>
> ______________________________________ ____________
>
> Signature and seal of NJ licensed Professional Land Surveyor Date

Plan certification for Local Unit/Nonprofit land acquisition projects shall bear a different certification from the one above, due to the different nature of Green Acres' participation and encumbrance:

> I hereby certify to State of New Jersey, to the seller *[name of seller]*, and to purchaser *[as appropriate, state all acquisition partner names as specified by NJDEP]* and on behalf of purchaser, to purchaser's title insurer *[provide specific name when available]* that this plan, survey, and a corresponding metes and bounds description have been prepared under my immediate supervision in accordance with a written contract with [*issuer of contract*] ; that this plan is a correct and accurate representation of conditions existing as of *[month and year of field work]*, subject to such notes as may appear hereon.
>
> I do further certify that the monuments as designated and shown hereon have been set.
>
> ______________________________________ ____________
>
> Signature and seal of NJ licensed Professional Land Surveyor Date

Certifications for State, Local Unit, and Nonprofit land acquisition surveys shall not be made to any persons or entities not having a tangible interest in the property. Legal counsel may be identified as representatives of the buyers or sellers. As an example: ***I hereby certify to the State of New Jersey, the seller A. B. Jones who is represented by C.D. Smith, Esq. … (etc.)*** Specific title agencies can be included in the certification if requested and clearly identified as having a tangible interest in the property.

## 7.2 Surveyor's Certification and Summary Form

See **Section 8.8, Sample Form 6A** (State Project) and **Sample Form 6B** (Local Unit/Nonprofit Project).

# 8. DELIVERABLES

All **final** deliverables must be received by NJDEP within the time specified in the Engagement Award and before the passing of the Due Date. The surveyor shall furnish copies of the plat or map of survey to NJDEP, and as otherwise negotiated with NJDEP. Hard copies shall be on durable and dimensionally stable material of a quality standard acceptable to NJDEP. Digital copies of the plat or map may be provided in addition to, or in lieu of, hard copies in accordance with the terms of the contract. When required by law or requested by NJDEP, the plat or map shall be produced in recordable form and recorded or filed in the appropriate office or with the appropriate agency.

All paper copies of full-size survey plans (not reduced plans) and all metes and bounds descriptions shall be signed and sealed by the New Jersey licensed Professional Land Surveyor who is responsible for the preparation of the field survey, the survey plan, and the metes and bounds descriptions. To ensure that the products are those of the licensee, the signature must be handwritten in ink on each original and paper copy of the plan of survey and on each metes and bounds description. Rubber stamp signatures or computer-generated signatures are unacceptable.

The New Jersey licensed Professional Land Surveyor is responsible for submitting all deliverable work products on or before the date specified in a site-specific engagement to NJDEP or to such other location or entity as may be specified in the site-specific RFP. As appropriate for the type of survey ordered, the deliverables shall include all of the following or such other items as may be directed in the site-specific RFP. For checklists of required deliverables, see **Sample Form 7A** for State land acquisitions and **Sample Form 7B** for Local Unit/Nonprofit land acquisitions, in **Section 10** of this document.

## 8.1 Copies of Notifications

Copies of all written notices that were originally prepared on company letterhead and sent to the administering division, property owners or designated representatives and occupants, if any, the municipal police department, adjacent property owners upon whose land it may have been necessary to enter to complete the survey: Relevant Sample Forms, required for State land acquisitions unless otherwise specified in the contract and not generally required for Local Unit/Nonprofit land acquisitions unless specified in the contract, are in **Section 10** of this document.

**8.1.1 DIVISION NOTIFICATION** - see <u>Sample Form 1</u> – Agency Email Notification
**8.1.2 PROPERTY OWNER NOTIFICATION** – see <u>Sample Form 2</u> – Notification of Entry Letter
**8.1.3 POLICE DEPARTMENT NOTIFICATION** – see <u>Sample Form 2</u> – Notification of Entry Letter
**8.1.4 ADJOINER NOTIFICATION** – see <u>Sample Form 2</u> – Notification of Entry Letter
**8.1.5 MISC. NOTIFICATION (UTILITY, ETC.)** – see <u>Sample Form 2</u> – Notification of Entry Letter

## 8.2 Copies of Written Consent

Copies of any written consent obtained from adjacent property owners or NJDEP to cut brush lines or large trees, if necessary.

**8.2.1 Adjoiner Consent to Cut Brush or Trees**
**8.2.2 Using Agency Consent to Cut Trees**

## 8.3 Parcel Closure

Provide a computer printout of the coordinate geometry COGO survey data files to demonstrate that the mathematical survey expressions used to define the parcel as used on the plan and in the description of the property form a closed polygon and to verify that the areas as stated are correct. The precision of the survey must be stated and the bearing and distance of the radial error of closure of the adjusted survey distance from the terminus of the final course to the point of beginning must be given. Parcel closure routine print-outs are required for the perimeter of each surveyed area defined by lines of the survey as a check that the bearings and distances as shown on the survey form a closed figure and the stated area is correct.

## 8.4 Full-size Paper Copies of Survey Plan

For each acquisition partner identified in the State land acquisition site-specific RFP, submit eight (8) signed, sealed, and dated paper copies of the survey plan depicting the results of the field and record investigation to NJDEP, prior to the due date for the site-specific engagement. (Generally, only two copies are required for Local Unit/Nonprofit land acquisitions, one for Green Acres and one for the Local Unit/Nonprofit. One additional copy is required for each additional acquisition or funding partner.) Prior to submittal, these plans shall be folded to approximately 8- 1 / 2 inches by 14 inches legal size with the title block or Legend of Acquisition facing up. Plans not bearing original signature or not folded prior to submission are unacceptable.

## 8.5 Metes and Bounds Description and Reduced Survey Plan

For each acquisition partner that is identified in the State land acquisition site-specific RFP, submit eight (8) original quality metes and bounds descriptions corresponding to and derived from the plan of survey. (Generally, only two copies are required for Local Unit/Nonprofit land acquisitions, one for Green Acres and one for the Local Unit/Nonprofit. One additional copy is required for each additional acquisition or funding partner.) Each description shall be signed and sealed as prescribed.

Prior to submittal, there shall be stapled to the back of each description a photographically reduced copy (8-1/2 inches by 11 inches) of the signed survey plan, reproduced onto paper stock. This reduced plan must be a true reduction of the original plan as submitted and shall not be altered from the full-sized plan to provide clarity of data. This reduced plan shall be signed by the New Jersey licensed Professional Land Surveyor prior to reduction but shall not be sealed, to minimize further distortion when recording. The reduced survey plan shall be attached by a single staple in the upper left-hand corner of the description packet, with the title block of the reduced plan being located near the bottom when viewed in a portrait orientation.

## 8.6 Digital Files

This section applies to both State and Local Unit/Nonprofit land acquisitions. Submit media storage devices, either standard 5.25-inch CD-R or Mini CD-R compact disks produced to be read by any CD-ROM. This media shall contain four (4) files that are not zipped or compressed in any way. Digital files (one full set) are required for both State and Local Unit/Nonprofit land acquisitions. Metadata should be incorporated into every digital file to document date, source, methodology, etc. Files altered are more easily detected when metadata exists.

Label the CDs with the name and File ID of the Property Owner, the Project Name and Number, Municipal Tax Block and Lot numbers, the Municipality and County, the Name of the Survey Firm, the Date of Survey, and Survey Reference Number.

**8.6- 1** - One file shall be the exact text of each metes and bounds description prepared for the site-specific engagement. The format shall be MS Word 2003 file in .doc format or other text file extension format that may be acceptable to NJDEP.

**8.6- 2** - One file shall be a digital file in AutoCAD .dwg format containing the full survey drawing. This drawing must be created at its real New Jersey State Plane Coordinates NAD 1983 position and the view shall be unrotated from the coordinate system so that the NJPCS NORTH points orthographically vertical in the screen. The file shall contain only a representation of the final drawing and shall not contain preliminary or working files or deed plots.

**8.6-3** - One file shall be a full-sized digital PDF copy of the plan once the plan has been signed and sealed by the surveyor. This drawing need not be created at its real New Jersey State Plane Coordinates NAD 1983.

**8.6- 4** - One file shall be a .dwg drawing containing the closed line polygon of the perimeter survey lines and certain other lines that are internal to the survey. Specifically, internal lines shall include: public road or other public right-of-way lines; bridge or culvert easements (which are de facto road right-of-way not funded by Green Acres);survey exception area lines; new survey tract lines created by this survey; funding participation limit lines (such as by Green Acres); internal navigable or tidal water edge or mean high water lines; survey tie lines; New Jersey Tidelands Claims Lines (actual State ownership); clouded title lines' overlapping deed lines from adjoiner deeds; internal lot lines; and limit

lines of new conservation or public access easements being created by this project of NJDEP. .

This file shall not be a complete drawing file of the survey and shall contain no text or symbols. This file shall be created at its real New Jersey Plane Coordinates NAD 1983 position and the view shall be unrotated from the coordinate system so that the NJPCS NORTH points orthographically vertical in the screen. The polygon shall be created from the coordinate geometry of its survey point of beginning through the final course of survey and terminus point. The file shall contain only a representation of the final drawing and shall not contain preliminary or working files.

To provide a uniform method of closure without degrading the quality of bearings used, enter the radial error of closure as a final closing arc between the survey point of beginning and the survey point of ending. Add this additional course by inversing from the point of ending to the point beginning as a final course.

## 8.7 Surveyor's Certification and Summary Form

Submit one copy of the Surveyor's Certification and Summary Form, which shall be completed, signed, and sealed by the New Jersey licensed Professional Land Surveyor who prepared or was in responsible charge for completion of the survey, survey plan, and property descriptions.

See **Sample Form 6**A – **Surveyor's Certification and Summary Form (State Project)**
See **Sample Form 6B** – **Surveyor's Certification and Summary Form (Local Unit/Nonprofit Project)**

## 8.8 Checklist of Work Completed, Detail Sheet and Tax map

Submit one (1) checklist, signed by the New Jersey licensed Professional Land Surveyor who prepared or was in responsible charge for completion of the survey, survey plan, and property description(s) to assure that the specified items have been completed and that all deliverables are submitted. Attach a copy of the Detail Sheet and copy of the tax map originally provided by NJDEP when the site-specific engagement RFP was solicited.

See **Sample Form 7A** – **Checklist of Work Completed (State Project)**
See **Sample Form 7B** – **Checklist of Work Completed (Local Unit/Nonprofit Project)**

## 8.9 Corner Photographs and Corner Marker Description Sheets

Photographs are to be provided for corner markers set as per **Section 5A-1.9a** of this Scope of Survey Services. Additionally, upon request by the Using Agency under a site-specific engagement, provide a Corner Marker Description Sheet for each corner marker that has been set under that site-specific engagement award. The sheet shall include the corner number, character of mark, project information, seller information, location of mark, and information fully identifying the firm that set the marker under the contract. The description sheet shall include a cap detail, a sketch showing proximity to field witness marks, and a photograph of the mark, identifying direction of view. These sheets are only required for those markers set as per **Section 5A-1.9-a** and further identified in the Coordinate Table (see **Section 6A-2.10**).

## 8.10 Preliminary Reviews and Modifications of Deliverables

For complex projects or survey vendors who have not previously prepared any work subject to the Green Acres Scope of Work, it is sometimes helpful to submit preliminary documents for review. Preliminary plans submitted through the Green Acres Project Manager for a project can help to identify encroachments, partial acquisition areas, and special issues that may need clarification. The program unfortunately does not have the resources to make a preliminary examination of each plan every time. Thus, if only a preliminary plan is submitted for review after a first review, closings may be delayed when documents (plans, descriptions, forms) are needed by a due date.

Occasionally, the title search ordered by Green Acres is not complete by the time that the survey is contracted and begun. The survey can be modified after the title search is received. Project deliverables that have not yet been approved by Green Acres can be revised easily. Project deliverables that have already been approved with closings based upon those deliverables will have to have corrective deeds filed if the title search reveals that substantive changes are necessary.

# 9. DEFINITIONS

The following definitions shall be part of any site-specific engagement awarded or order placed with prequalified vendors or in connection with prequalification.

**Corner Marker Description Sheet** – A form used to identify corner markers set for a site-specific engagement. Use of this form is only required if specified at the time of request for a site-specific engagement.

**Corner Number** - The number used to identify corner markers set in the field. The Corner Number consists of the four-digit file number or owner identification number, followed by a dash, followed by a sequential number of the corner. The description point of beginning is point number one, and each corner shall be numbered in sequence thereafter in a clockwise manner.

**Deed Overlap** – The situation that exists when the deed descriptions of adjoining parcels, when laid out on the ground, both describe and include the same lands; lands claimed by adjoining parties.

**Due Date** – Relative to a site-specific engagement, this is the date that all materials specified in the site-specific engagement contract are to be delivered in accordance with the requirements spelled out on the Detail Sheet.

**Detail Sheet** – The document transmitted with a site-specific engagement RFP announcement that provides specific project information and requirements for the land survey. The Detail Sheet may serve to clarify or modify standard requirements for a site-specific engagement.

**Entire Acquisition** - The acquisition of an entire parcel as indicated by a single municipally designated tax lot.

**File #** - a sequence number that identifies the seller of the property. Same as Offer # or Owner ID #.

**Geographic Information System/Land Information System (GIS/LIS)** – For the purpose of site-specific engagement awards, the system within NJDEP or other New Jersey state agencies consisting of computer hardware, software and resources that integrates a wide variety of data and explores interrelationships between different types of complex information compiled in geographic and associated tabular databases.

**Green Acres Program** – The division within the NJDEP that provides funding to non-profit groups, or municipal and county governments to acquire land for recreation or open space and serves as the real estate agent for the DEP, acquiring land for state parks, forests, natural areas, and wildlife management areas.

**Green Acres Participation Limit Lines** - Survey lines defined by metes and bounds within the surveyed deed lines that identify the limits of covenants and restrictions pursuant to Green Acres rules. Defined buffer lines for areas that are not encumbered by Green Acres restrictions.

**Green Acres Survey** - A property survey of land conducted for the purpose of open space acquisition in cooperation with the State of New Jersey, Department of Environmental Protection, Green Acres Program. A Green Acres Survey prepared for the Local Unit and Nonprofit Acquisition Program follows specific guidelines and specifications promulgated by the Green Acres Program pursuant to NJAC 7:36 Appendix 2. The full scope of work for Green Acres Surveys provides the desired format, research requirements, field methodology, presentation of findings on the plan of survey and the format of the corresponding metes and bounds description of property, and specifies the other deliverables. A Green Acres Survey is one that is performed in accordance with Green Acres Guidelines and approved for use by the Green Acres Program (as per this document). The ultimate determination of whether or not work is a “Green Acres survey” is dependent upon approval by Green Acres.

**Green Acres Encumbrance Area** - The net area for which funding has been expended for the acquisition or development of land, pursuant to Green Acres rules and regulations. The area subject to subject to restrictive covenants with the NJDEP Green Acres Program.

**Green Acres Partners**– The parties entering a tenancy in common for the common preservation of a parcel of land. The percentage of undivided interest for each Green Acres Partner, generally stated to two decimal places, may be used to derive the acreage of partner participation for each funding source that contributed toward the acquisition.

**Interest** – Relative to the Green Acres Land Survey Guidelines, the extent and nature of the acquisition of interests in a tax lot. The extent is either E/A –(entire acquisition) or P/A –(partial acquisition), and the nature of the acquisition is Fee –(fee simple absolute), CE –(conservation easement or restriction without public access), PE (permanent easement of conservation with public access), or AG –(conservation restriction specific to agricultural) e.g., E/A Fee; P/A Fee; E/A CE; P/A CE; etc.

**Local Unit** – a municipality, county, or agency of either such entity having governmental powers.

**Mathematical Survey Expressions** – Units of measurement to define lines of survey. Angular units shall be stated as bearings in degrees, minutes, and whole seconds of arc. Horizontal distances, radii of curves, or lengths of arc shall be stated in U.S. Survey Feet to two decimal places. All curves shall be defined by radius, arc length, delta, chord bearing, and chord distance.

**NJDEP** – New Jersey Department of Environmental Protection

**New Jersey State Plane Coordinate System (NJSPCS)** – North American Datum 1983. For surveys prepared pursuant to site-specific engagement awards, coordinate values (Northing or Y values and Easting or X values) for the description point of beginning shall be provided in U.S. Survey Feet, rounded to two decimal places after application of the grid factor. All bearings are provided in degrees, minutes, and rounded to whole seconds of arc. Distances are to be stated for horizontal ground distance with no grid factor applied in U.S. Survey Feet, stated to two decimal places.

**Notification of Engagement** - Written authorization for the designated applicants to commence the survey project.

**Offer #** - A sequence number that identifies the seller of the property. Same as Owner # or File #.

**Owner ID #** - A sequence number that identifies the seller of the property. Same as Offer # or File #.

**Partial Acquisition** - The acquisition of a part of a municipally designated lot where the remaining portion of the lot is of the same ownership as the portion to be acquired.

**Project Area** - One or more tax lots being surveyed simultaneously or as part of the same site-specific engagement.

**Site-Specific Engagement** – (a) The body of work performed after authorization to proceed has been granted by the State to a Contractor on a specific site, pursuant to the terms and conditions of the site-specific engagement award, including performance in accordance with Green Acres Guidelines); (b) a land survey contract for a particular project area.

**State Surveyor** – A New Jersey licensed Professional Land Surveyor employed by the New Jersey Department of Environmental Protection or other Using Agencies who is responsible for the technical aspects of the site-specific land survey contract and land survey document review for the Green Acres Program or other Using Agencies.

**State's Project Manager** - The individual assigned by the State to be responsible for coordinating the activities of the Contractors.

**Survey Contract Manager** – Responsible party within NJDEP who is responsible for the administration of site-specific engagement land survey contracts. The Green Acres Survey Contract Manager solicits the request for Response to RFP for site-specific engagements, receives all contract deliverables, and processes vouchers for final payment.

**Using Agency** – relative to Green Acres state land acquisition and Green Acres local assistance acquisition surveys, the “Using Agency” includes the Green Acres program, meaning that Green Acres becomes an Ultimate User of the deliverables.

# 10. SAMPLE FORMS AND TEXT

The following samples provide the basis of content and presentation for all state and local/nonprofit land acquisitions. Not all material is pertinent to every land acquisition project. Content is to be modified to conform to the specific conditions and contract parameters of each project.

Sample Form 1 – **AGENCY EMAIL NOTIFICATION**

Sample Form 2 – **NOTIFICATION OF ENTRY LETTER**

Sample Form 3 – **AERIAL PHOTO INFORMATION BLOCK**

Sample Form 4 - **WETLANDS DELINEATION INFORMATION**

Sample Form 5A – **LEGEND OF ACQUISITION – State Land Acquisition**

Sample Form 5B - **LEGEND OF ACQUISITION – Local Unit or Nonprofit Land Acquisition**

Sample Form 6A – **SURVEYOR'S CERTIFICATION AND SUMMARY FORM – State Land Acquisition**

Sample Form 6B – **SURVEYOR'S CERTIFICATION AND SUMMARY FORM – Local Unit or Nonprofit Land Acquisition**

Sample Form 7A – **STATE LAND ACQUISITION CHECKLIST**

Sample Form 7B – **LOCAL UNIT AND NONPROFIT LAND ACQUISITION CHECKLIST**

## Sample Form 1 – AGENCY EMAIL NOTIFICATION

**GREEN ACRES STATE LAND ACQUISITION**
**DIVISION NOTIFICATION EMAIL TRANSMITTAL**

DATE: ___________________

FROM:

Surveyor ________________________________________________________

Name of Survey Firm ____________________________________________________

Phone FAX______________________________VOICE________________________

Email___________________________________________________________________

EMAIL NOTIFICATION TO:

| | | | |
|---|---|---|---|
| ___ | Division of Parks and Forestry<br>Terry Schmidt<br>State Park Service | Email<br>Voice | Terry.Schmidt@dep.nj.gov<br>609-331-4575 |
| | OR | | |
| ____ | Division of Fish, Game and Wildlife<br>Lisa Carben<br>Bureau of Lands Management | Email<br>Voice | Lisa.Carben@dep.nj.gov<br>609-223-6054 |
| | OR | | |
| ____ | Office of Natural Lands Management<br>Cari Wild | Email<br>Voice | Cari.Wild@dep.nj.gov<br>609-984-1339 |

RE: Green Acres Survey Reference No.________________

Project Name & Number___________________________________________________________________

Seller's Name_____________________________________________________________________________

Municipality ________________________________________ County_______________________________

Tax Block Number(s)______________________________ Tax Lot Number(s)_________________________

Street Address of Property_________________________________________________________________

Our firm is under contract to provide Professional Land Surveying Services to GREEN ACRES STATE LAND ACQUISITION in connection with the above referenced land acquisition project.

Be advised that members of our field crew expect to initiate the survey work on the subject property starting on____________________and our due date to complete work is___________________________.

We would greatly appreciate receiving copies of any prior surveys or deed documents that may be in the possession of your staff that would assist in the completion of this project. Please call me here at the office to advise if you have any such documents.

**RETAIN THIS FORM TO SUBMIT AS CONTRACT DELIVERABLE FOLLOWING EMAIL TRANSMITTAL**

## Sample Form 2 – NOTIFICATION OF ENTRY LETTER

(*Company Letterhead*)

(*date*)

(*To Property Owner, Lessee/Occupant*)
(*Postal Address*)
(*Postal Address*)

RE: Project No.____________________ Project Name________________________

Lands N/F of ______________________________________________________

Municipality _________________________, County______________________

Block ______________ Lot _____________________________________

Street Address ______________________________________________

Survey Reference No.___________

Dear____________:

Our firm is under contract to provide Professional Land Surveying Services to _________________ as NJDEP in connection with the above referenced land acquisition project.

In order to perform the land survey, our staff must gather field evidence, make measurements, and obtain data relative to existing physical characteristics and conditions of the lands being surveyed and sometimes on those lands that adjoin the project. It may be necessary for our land survey crew to enter upon your property for this purpose.

Be advised that there are several laws that provide specific authority for land surveyors to enter property for the purpose of making surveys. This letter is being provided to you as written notice that members of this office may be on your property during the period between ( ____*time period*______) and (____ *time period*___________).

Your cooperation in this success of this engagement is important to us. We would greatly appreciate you loaning to us copies of any prior surveys or deed documents that you may have in your possession that would assist in the completion of this project. Please call me here at the office to advise if you have any such documents.

If you have any questions concerning this project, please call (_______*project coordinator identified in the site-specific engagement*______) who can be reached by calling (______*area code and phone number*_____). While the work is being performed, we will make every effort to cause as little inconvenience as possible.

Very truly yours,

_______________________________

CC Police Department
Using Agency
Using Agency Project Manager

## Sample Form 3 – AERIAL PHOTO INFORMATION BLOCK

When applicable, the following information shall be provided on the plan substantially in accordance with this format:

### AERIAL PHOTO INFORMATION BLOCK

Source of Mapping_______________________________________

Panel or Identification Number______________________________

Date of Photography_____________________________________

## Sample Form 4 - WETLANDS DELINEATION INFORMATION

Freshwater Wetlands survey work is not usually required for NJDEP Green Acres Surveys. If required by NJDEP, follow the specifications and guidelines provided by NJDEP. The guidelines included herein are meant to provide general guidance and shall be subject to more specific criteria in the contract for a site-specific engagement.

When work involving wetlands is specifically requested, it shall be one of two types identified at the time that price quotes are solicited for a site-specific engagement: ***SHOW WETLANDS*** or ***DELINEATE WETLANDS***.

**SHOW FRESHWATER WETLANDS**

Site-specific engagements requesting that that the wetlands be shown on the final plan of survey requires that the New Jersey licensed Professional Land Surveyor obtain copies of the appropriate New Jersey Freshwater Wetlands map for the area from the office of the county recorder or clerk. The upland limit line for those areas coded "01" on the Wetlands map must be reproduced, and an approximate estimate of wetlands area in acres on the plan must be derived to one decimal place (0.1 acre). The upland limit lines may be digitized or mechanically reproduced. The areas may be derived from the digitizing process or by planimeter, provided that the duplicated line is within 0.5 percent accuracy of the depiction of that upland limit line on the original source material. The mapped or digital source of upland limit line information must be provided (title of data or map, date, preparer, etc.).

**FRESHWATER WETLANDS DELINEATION SURVEY**

Site-specific engagements requesting that that the wetlands be surveyed, delineated, or field investigated requires that the New Jersey licensed Professional Land Surveyor engage an environmentalist, acceptable to NJDEP, who is proficient in New Jersey freshwater wetlands investigations. The environmentalist shall delineate the wetland areas in the field in accordance with adopted wetlands criteria in New Jersey. The New Jersey licensed Professional Land Surveyor shall field-locate each marked position, add the wetlands areas to the survey plan, provide areas in acres to two decimal places (0.01 acre), and label the wetlands area on the survey. Additionally, the wetlands buffer areas of 50 feet, 100 feet, or 150 feet as indicated by the environmentalist must be shown on the survey, with buffer areas calculated to two decimal places (0.01 acre).

The survey plan shall contain a Wetlands Delineation Information block that includes the environmental firm's name, street and mailing addresses, telephone and fax numbers, and company Email address. The Wetlands Delineation Information block shall be signed and signed by the individual environmentalist responsible for the delineation. The date of the delineation and for whom it was prepared must appear in the Wetlands Delineation block on the survey. The environmentalist shall provide an original signature in the Wetlands Delineation Information block on the original survey plan and on each paper copy or print made. Other specifications and guidelines, if any are needed, shall be furnished at the time a wetlands delineation is requested as part of a site-specific engagement.

The following Sample Wetlands Delineation Information block is for use in the event of an actual Wetlands delineation on the surveyed property made as part of a site-specific engagement for NJDEP. When applicable, the following information shall be provided substantially in accordance with this format:

## WETLANDS DELINEATION INFORMATION

ENVIRONMENTALIST: ________(*individual name*)__________________________

ORGANIZATION: ________(*organization name*)________________________

ADDRESS: ________(*address*)__________________________________

______________________________________________________

PHONE:____(*area code & number*)_______ FAX:____ (*area code & number*)___________

EMAIL: ______________________________________________________

DELINEATION PREPARED FOR:_______________________________________________

DATE OF DELINEATION:______________________________________________________

____________________________________________ _______________

Signature of Environmentalist Date Signed

## Sample Form 5A – LEGEND OF ACQUISITION - STATE ACQUISITION

The following information shall be **shown on the plan** substantially in accordance with this format: Do not include NJDEP's parenthetical instructions from this Sample Form regarding Project Information and Parcel Information on the plan. Text that is highlighted in this Sample Form is for guidance only and is not meant to appear on the plan.

### LEGEND OF ACQUISITION

**PROJECT INFORMATION**

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

(*if Tenancy-in-Common, include % interest as below*)

PROJECT NAME:________________________________________

GREEN ACRES SOURCE OF FUNDING/ PROJECT NUMBER: SA - -

GREEN ACRES PARTICIPATION ACRES THIS FUNDING SOURCE:______________

OWNER ID #_______________ SELLER'S NAME:__________________

MANAGING AGENCY/ENTITY:__________________________________

(*Add the following only if a Tenancy-in-Common with Acquisition Partners is identified on Detail Sheet - add lines for other partners*)

ACQUISITION PARTNER:_______________as to _____% interest, Tenants-in-Common

PROJECT NAME:________________________________________

GREEN ACRES SOURCE OF FUNDING/ PROJECT NUMBER:__________________

GREEN ACRES PARTICIPATION ACRES THIS FUNDING SOURCE:______________

**PARCEL INFORMATION** (*Repeat format to provide data separately for each individual tax parcel*)

MUNICIPALITY:_______________COUNTY:__________

TAX BLOCK:_____ LOT:____

INTEREST ACQUIRING: FEE___ EASEMENT___ TYPE OF EASEMENT____________

ENTIRE__or PART__ (OF LOT) PERCENT of LOT ACQUIRING:___ ACRES:_______

**AREA SUMMARY**

TOTAL GROSS AREA SURVEYED ________________________ACRES

SUBJECT TO:

AREA IN PUBLIC ROADS____________________________ACRES

AREA SUBJECT TO RIPARIAN CLAIM OF NEW JERSEY _________ACRES

TOTAL AREA UNDER NAVIGABLE FRESH WATERS____________ACRES

AREA SUBJECT TO TITLE OVERLAPS_____________________ACRES

AREA SUBJECT TO TITLE GORES_______________________ACRES

AREA SUBJECT TO PHYSICAL ENCROACHMENTS_____________ACRES

## Sample Form 5B - LEGEND OF ACQUISITION - LOCAL UNIT OR NONPROFIT

The following information shall be **shown on the plan** substantially in accordance with this format: Do not include NJDEP's parenthetical instructions from this Sample Form on the plan. Provide a separate entry under "Parcel Information" for each individual tax lot surveyed. Provide composite information for all tax lots in the "Area Summary." Subtract the total of areas under "Subject To" from "Gross Area Surveyed" (the sum of all tax lot areas listed in "Parcel Information" above) to report "Net Area of Green Acres Encumbrance." . Text that is highlighted in this Sample Form is for guidance only and is not meant to appear on the plan.

### LEGEND OF ACQUISITION

**PROJECT INFORMATION**

PROJECT NAME:______________________________________________

PROJECT NUMBER: - -

SELLER'S NAME:______________________________________________

MANAGING AGENCY/ENTITY:____________________________________

*(Add the following only if a Tenancy-in-Common with Acquisition Partners is identified on Detail Sheet – add lines for other partners)*

ACQUISITION PARTNER:_____________________as to ____% interest, Tenants-in-Common

PROJECT NAME:______________________________________________

**PARCEL INFORMATION** *(Repeat format to provide data separately for each individual tax parcel)*

MUNICIPALITY:____________________COUNTY:____________

TAX BLOCK:_____ LOT:____

INTEREST ACQUIRING: FEE___ EASEMENT___ TYPE OF EASEMENT______________

ENTIRE__or PART__ (OF LOT) PERCENT of LOT ACQUIRING:___ ACRES:_______

**AREA SUMMARY**

TOTAL GROSS AREA SURVEYED ______________________________ACRES

SUBJECT TO:

AREA IN PUBLIC ROADS___________________________________ACRES

AREA SUBJECT TO RIPARIAN CLAIM OF NEW JERSEY ____________ACRES

TOTAL AREA UNDER NAVIGABLE FRESH WATERS_______________ACRES

AREA SUBJECT TO TITLE OVERLAPS__________________________ACRES

AREA SUBJECT TO TITLE GORES_____________________________ACRES

AREA SUBJECT TO PHYSICAL ENCROACHMENTS_______________ACRES

NET AREA OF GREEN ACRES ENCUMBRANCE___________________ACRES

## Sample Form 6A – CERTIFICATION FORM FOR STATE LAND ACQUISITION

The sample form on the following page contains the template for the certification form used when the survey is prepared for the purpose of acquisition by the State of New Jersey. This form can be substituted by a document that contains the same information in substantially the same form. Please print on a single sheet of paper if possible; legal size (8-1/2" by 14") may be used if necessary. For Certification Forms that do not fit onto a single legal sized page, multiple letter size pages may be used.

If the acquisition project is a joint undertaking by multiple agencies or entities, then the following information is to be added at the end of the "Project Information" section:

ACQUISITION PARTNER:________________________________________________

PROJECT NAME:_______________________________________________________

GREEN ACRES SOURCE OF FUNDING/ PROJECT NUMBER:_______________________

GREEN ACRES PARTICIPATION ACRES THIS FUNDING SOURCE:__________________

If the acquisition project entails more than one tax lot, create a separate entry under "Acquisition Parcel Information" for each individual tax lot, using the following format. The necessary information for each separate tax lot is as follows:

MUNCIPALITY: _______________ COUNTY: ________ BLOCK: _____ LOT: _____

ENTIRE __ or PART __ (OF LOT) FEE ___ PERCENT of LOT: ___ ACRES:_______

EASEMENT __ TYPE OF EASEMENT:__________

Identify the deed used as reference for the property or properties in question in the "Acquisition Title Information" whether or not title commitment information is available.

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**GREEN ACRES PROGRAM**
**STATE LAND ACQUISITION PROGRAM**

# SURVEYOR'S CERTIFICATION AND SUMMARY FORM

## PROJECT INFORMATION

PROJECT NAME:____________________________________________________________

GREEN ACRES SOURCE OF FUNDING/ PROJECT NUMBER: SA-_______-__________

SELLER'S NAME:___________________________________________________________

MANAGING AGENCY/ENTITY:__________________________________________________

## ACQUISITION PARCEL INFORMATION

MUNCIPALITY: ________________ COUNTY: _________ BLOCK: _____ LOT: _____

ENTIRE __ or PART __ (OF LOT) FEE ___ PERCENT of LOT: ___ ACRES:_______

EASEMENT __ TYPE OF EASEMENT:__________

## ACQUISITION SURVEY INFORMATION

PREPARED FOR :___NJDEP GREEN ACRES PROGRAM_______________________________

SURVEY FIRM:_______________________________________ CONTRACT No._S-__________

SURVEYOR:_________________________________________ NJPLS No.________________

DATE ON SURVEY PLAN:_______ DATE SIGNED:______ DATE LAST REVISED:_______

## ACQUISITION TITLE INFORMATION

TITLE COMPANY____________________________________________________________________

COMMITMENT No.________________________ DATE OF COMMITMENT________________

DEED(S) USED FOR REFERENCE:______________________________________________________

## CERTIFICATION

I hereby certify that I have completed the above survey(s) in accordance with the Green Acres Survey Guidelines contained in a written contract as indicated. Based upon an actual field survey and my examination of evidence, the above parcels consist of a total surveyed area of _________acres subject to the following:

EASEMENTS______________________________________________________________

RESTRICTIONS___________________________________________________________

CONDITIONS_____________________________________________________________

PUBLIC ROAD______AC. CLAIMED NJ TIDELANDS ____AC. CLOUDED TITLE ____AC.

UNDERWATER_____AC. ENCROACHMENTS: YES___NO___ # OF DESCRIPTIONS:___

_________________________________ _________________________________

SURVEYOR'S SIGNATURE, DATE & SEAL REVIEW BY GREEN ACRES, NJDEP

**Sample Form 6B – CERTIFICATION FORM FOR LOCAL UNIT/NONPROFIT PROJECT**

The sample form on the following page contains the template for the certification form used when the survey is prepared for the purpose of acquisition by the State of New Jersey. This form can be substituted by a document that contains the same information in substantially the same form. Please print on a single sheet of paper if possible; legal size (8-1/2" by 14") may be used if necessary. For Certification Forms that do not fit onto a single legal sized page, multiple letter size pages may be used.

If the acquisition project is a joint undertaking by multiple agencies or entities that entails multiple project names and multiple project numbers, then the following information is to be repeated as needed in the "Project Information" section:

GREEN ACRES PROJECT No.:____________________________________________________

GREEN ACRES PROJECT NAME:__________________________________________________

If the acquisition project entails more than one tax lot, create a separate entry under "Acquisition Parcel Information" for each individual tax lot, using the following format. This section is to be completed to reflect the interests acquired by the local unit / nonprofit, not Green Acres. Often the acquisition by the local unit or nonprofit is for 100% of the property in fee (reported in this section) while the net area of Green Acres encumbrance may be somewhat less (reported in the "Certification" section). The necessary information reported in the "Acquisition Parcel Information" for each separate tax lot within the lines of the survey in which interests are being acquired by the local unit / nonprofit is as follows:

MUNCIPALITY: ________________ COUNTY: _________ BLOCK: _____ LOT: _____

ENTIRE __ or PART __ (OF LOT) FEE ___ PERCENT of LOT: ___ ACRES:_______

EASEMENT __ TYPE OF EASEMENT:__________

Identify the deed used as reference for the property or properties in question in the "Acquisition Title Information" whether or not title commitment information is available.

# NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION
## GREEN ACRES PROGRAM
### LOCAL GOVERNMENT AND NON-PROFIT ORGANIZATION FUNDING PROGRAM
### SURVEYOR'S CERTIFICATION AND SUMMARY FORM

**PROJECT INFORMATION**

GREEN ACRES PROJECT No.:______________________________

GREEN ACRES PROJECT NAME:______________________________

**ACQUISITION PARCEL INFORMATION**

PARCEL OR OWNER ID# ____________________

SELLER'S NAME: ______________________________

MUNICIPALITY:____________________ COUNTY:__________ BLOCK:____ LOT:_____

ENTIRE__ or PART__ (OF LOT) FEE___ PERCENT of LOT:___ ACRES:_______

EASEMENT___ TYPE OF EASEMENT______________

**SURVEY INFORMATION**

PREPARED FOR LOCAL UNIT/USING AGENCY:______________________________

SURVEY FIRM:______________________________

NAME OF SURVEYOR:______________________________ NJPLS No._____________

DATE ON SURVEY PLAN:___________ DATE SIGNED:___________ DATE LAST REVISED:__________

**TITLE INFORMATION**

TITLE COMPANY______________________________

(*IF NO COPY OF SEARCH WAS SUPPLIED BY USING AGENCY, STATE "*SUBJECT TO FINDINGS OF TITLE SEARCH*" ABOVE*)

COMMITMENT No.________________________ DATE OF COMMITMENT_______________

DEED(S) USED FOR REFERENCE:______________________________

**CERTIFICATION**

I hereby certify that I have completed the above survey in accordance with the "Green Acres Scope of Work for Professional Land Surveying Services" contained in a written contract with the above using agency. Based upon an actual field survey of the above property conducted under my supervision, my examination of field and record evidence and the above title report, (if any supplied by using agency), the parcel being acquired consists of a total surveyed area of _________________acres, subject to the following:
EASEMENTS______________________________
RESTRICTIONS______________________________
CONDITIONS:______________________________
ROAD:_______AC. CLAIMED AS NJ TIDELANDS:_______AC. OVERLAP:______AC.
UNDER WATER _______AC. GORE BETWEEN ADJOINING LANDS _________AC.
AREA OF CLOUDED TITLE:_____________ AC.
ENCROACHMENTS (YES)_____ (NO)____NUMBER OF SEPARATE DESCRIPTIONS PREPARED: _____

______________________________ ______________________________
SURVEYOR'S SIGNATURE, DATE & SEAL SURVEY REVIEWED BY GREEN ACRES

NET AREA OF GREEN ACRES ENCUMBRANCE: __________________ ACRES

## Sample Form 7A – STATE LAND ACQUISITION CHECKLIST

The sample form below contains the template for the checklist used when the survey is prepared for the purpose of acquisition by the State of New Jersey. This form can be substituted by a document that contains the same information in substantially the same form.

The primary distinctions between State Acquisition surveys and Local/Nonprofits surveys are that Sections 8.1, 8.2, and 8.9 of this Scope of Services do not apply to the latter unless required by contract with the Local Unit or nonprofit, and that the number of copies of deliverables differ.

### CHECKLIST OF WORK COMPLETED - STATE LAND ACQUISITION
**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**GREEN ACRES PROGRAM**

**8. SURVEY CONTRACT DELIVERABLES**

**8.1 Copies of Notifications – Letterhead Standard Notice**
- ☐ 8.1.1 Division Email Notification – Required -
- ☐ 8.1.2 Property Owner Notification – Required -
- ☐ 8.1.3 Police Department Notification – Required -
- ☐ 8.1.4 Adjoiner Notification – As Necessary -
- ☐ 8.1.5 Misc. Notification (Utility, etc.) – As Necessary

**8.2 Copies of Written Consent – Letterhead Request with Reply**
- ☐ 8.2.1 Adjoiner Consent to Cut Brush or Trees
- ☐ 8.2.2 Using Agency Consent to Cut Trees

- ☐ **8.3 Parcel Closure - Precision/Radial Error/Area**

- ☐ **8.4 Full size Paper Copies of Survey Plan**
- ☐ 8 Folded Copies for EACH ACQUISITION PARTNER for State acquisitions

- ☐ **8.5 Metes and Bound Description and Reduced Survey Plan**
- ☐ 8 copies for EACH ACQUISITION PARTNER with reduced plan stapled as last sheet

**8.6 Digital Files**
Cover Label on Digital Media Disk (standard 5.25-inch CD-R or Mini CD-R compact disk):
- ☐ Property Owner Name and Owner ID#
- ☐ Project Number & Name
- ☐ Municipal Tax Block and Lot numbers
- ☐ Municipality & County
- ☐ Survey Firm
- ☐ Date of Survey
- ☐ Survey Reference Number.

Contains:
- ☐ 8.6-1 Descriptions
- ☐ 8.6-2 AutoCAD .dwg
- ☐ 8.6-3 Full drawing .pdf format
- ☐ 8.6-4 Linework .dwg format
- ☐ 8.6-5 Photographs of corner markers found and set

- ☐ **8.7 Surveyor's Certification and Summary Form**
- ☐ One signed and sealed copy required, which reports separately each lot depicted on the plan

- ☐ **8.8 This Checklist of Work completed, Detail Sheet from site-specific engagement and tax map from site-specific engagement**

**8.9 Corner Marker Description Sheets (if requested)**

- ☐ Corner Number /Character of Mark
- ☐ Project Information/Seller Information
- ☐ Location of Mark
- ☐ Survey Firm
- ☐ Cap Detail
- ☐ Sketch with field witness marks
- ☐ Photograph of south side of mark, looking northward.

_______________________________________ ____________

Prepared by New Jersey Professional Land Surveyor Date

## Sample Form 7B – LOCAL UNIT AND NONPROFIT LAND ACQUISITION CHECKLIST

The sample form below contains the template for the checklist used when the survey is prepared for the purpose of acquisition by a local unit or nonprofit. This form can be substituted by a document that contains the same information in substantially the same form.

The primary distinctions between State Acquisition surveys and Local/Nonprofits surveys are that Sections 8.1, 8.2, and 8.9 of this Scope of Services do not apply to the latter unless required by contract with the Local Unit or nonprofit, and that the number of copies of deliverables differ.

### CHECKLIST OF WORK COMPLETED - LOCAL UNIT AND NONPROFIT LAND ACQUISITION
### NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION
**GREEN ACRES PROGRAM**

**8. SURVEY CONTRACT DELIVERABLES**

☐ **8.3 Parcel Closure - Precision/Radial Error/Area**

☐ **8.4 Full size Paper Copies of Survey Plan**
☐ 2 Folded Copies (unless otherwise notified)

☐ **8.5 Metes and Bound Description and Reduced Survey Plan**
☐ 2 copies for EACH ACQUISITION PARTNER with reduced plan stapled as last sheet

**8.6 Digital Files**
Cover Label on Digital Media Disk (standard 5.25-inch CD-R or Mini CD-R compact disk):
☐ Property Owner Name and Owner ID#
☐ Project Number & Name
☐ Municipal Tax Block and Lot numbers
☐ Municipality & County
☐ Survey Firm
☐ Date of Survey
☐ Survey Reference Number.
Contains:
☐ 8.6-1 Descriptions
☐ 8.6-2 AutoCAD .dwg
☐ 8.6-3 Full drawing .pdf format
☐ 8.6-4 Linework .dwg format
☐ 8.6-5 Photographs of corner markers found and set

☐ **8.7 Surveyor's Certification and Summary Form**
☐ One signed and sealed copy required, which reports separately each lot depicted on the plan

☐ **8.8 This Checklist of Work completed**

________________________________________ ____________
Prepared by New Jersey Professional Land Surveyor Date

# 11. GREEN ACRES REVIEW OF SURVEY DELIVERABLES

## 11.1 Purpose

The purpose of the Green Acres Survey review is to provide oversight in four specific areas:

A) **RULE REQUIREMENTS**: Review of land survey documents for required statements critical to the utility of the documents for acquisition and participation purposes regarding laws, rules, and/or contract specifications.
- To define and establish the nature and extent of Green Acres participation and tangible interest in real property being acquired for open space and recreational purposes
- By virtue of funding participation in the land and the potential for reimbursement of technical costs, additional emphasis is placed on Green Aces contractual requirements and format, as additional ultimate users of the Green Acres survey plan.

B) **TITLE:** Review for title issues identified as a result of conducting the land survey, such as
- Record deed overlaps
- Record gores
- Adverse use by adjoining owners
- Identification of conflicting or competing uses for ultimate or intended use of land
- The guidance of the technical documents to effectuate the acquisition

C) **POLICY AND STEWARDSHIP**: Review for Green Acres policy and stewardship issues, identified as a result of conducting the land survey, such as:
- The need to patrol, manage, and administer the land in perpetuity, including the establishment of limit lines or buffers
- Exclusion of funding from problem areas
- Designation of certain corner and line marking requirements
- Guidance in the production of technical documents to effectuation the acquisition

D) **COURTESY RECOMMENDATIONS**: Review of land survey documents for secondary land survey issues of a discretionary nature and not absolutely critical to utility of the documents regarding presentation of data, such as
- Clarity of data presentation in the selection of scale, line weights, or detail
- Minor errors not affecting the validity of title transfer or ability to determine Green Acres participation
- Minor omissions
- Misspellings or typographical errors
- Rounding errors associated with significant figures that do not lead to misappropriation of public funds
- Other presentation issues in the common practice of land surveying in New Jersey
- Common sense

## 11.2 Principles Guiding the Survey Review

1. The Green Acres Program is an ultimate user of the survey plan, no matter who awards the contract to the New Jersey licensed land surveyor preparing the survey documents for the acquisition.
2. Survey deliverables must be accepted by the Green Acres Program before being considered as Green Acres approved.
3. All deliverables must comply with rules and regulations issued by the New Jersey State Board of Professional Engineers and Land Surveyors. Therefore, the Green Acres Program considers each

initial survey drawing and description submitted for review as preliminary in nature if not in such compliance.

4. As a courtesy to the surveying licensee, any deficiencies related to rules and regulations of the State Board of Professional Engineers and Land Surveyors will be brought to the attention of the surveyor by Green Acres survey review staff for voluntary remedy.
5. Violations of the rules and regulations of the State Board of Professional Engineers and Land Surveyors not remedied voluntarily shall be brought to the attention of the surveyor's client prior to referral of the surveyor to the State Board.
6. As an option to facilitate the final review process, Green Acres may offer to review an actual advance or check print of survey documents with the goal of eliminating any potential issues prior to issuance and distribution of a full set of contract deliverables. Only one such courtesy advance review is offered for a project. This advance review is meant to assist inexperienced surveyors who have not previously submitted any work to Green Acres and are unfamiliar with Green Acres requirements, and to assist all surveyors involved in complex projects that include partial acquisitions, a mix of Green Acres, SADC, and/or diversions, or other out-of-the-ordinary circumstances. For such advance reviews, Green Acres must receive one set of survey plans, one set of descriptions, a DWG file in the appropriate datum, and a completed Surveyor's Certification and Summary Form.
7. To facilitate approval of survey deliverables, Green Acres may elect to prepare or modify the metes and bounds description submitted by the surveyor for the area of Green Acres funding, participation, or encumbrance, rather than directing the surveyor to rewrite the description. When a description submitted by a surveyor is modified by Green Acres, the letterhead and signature information is removed so that it becomes a document issued by Green Acres.
8. Reviews that reveal substantive deficiencies in meeting survey requirements, the existence of survey blunders, or violations of State Board rules allows Green Acres to make additional requests for refinements of the plan or description relative to any issue. These additional changes may address the presentation of data, plan clarity, minor errors or omissions, spelling or typographical errors, minor significant figure rounding errors, or issues in the common practice of land surveying in New Jersey.

## 11.2 Survey Reviews for Local Unit and Nonprofit Projects

1) Green Acres strives to approve documents as presented by local units or nonprofits, provided that the plans and descriptions are generally suitable for the intended acquisitions relative to Green Acres' policy and practices and do not contain violations of the rules of the State Board of Professional Engineers and Land Surveyors. Minor inconsequential deficiencies such as presentation of data, plan clarity, minor errors or omissions, spelling or typographical errors, minor significant figure rounding errors, or issue in the common practice of land surveying in New Jersey or common sense may be overlooked, provided that the area of Green Acres participation is clearly and correctly delineated and described.
2) Communications regarding the review of surveys and descriptions submitted by local units or nonprofits for Green Aces Local Assistance shall be primarily between the Green Aces Project Manager and the local units or nonprofits, unless the applicant requests direct communication with the State Review Surveyor.
3) Outside land survey vendors may directly contact Green Acres Survey Review Staff for advice on how to address specific concerns or for advice on survey questions related to the specific project.

## 11.4 Survey Reviews for State Acquisition Projects

1) Communications regarding the review of surveys and descriptions submitted for areas where the State will acquire a tangible interest as purchaser or as acquisition partner shall be primarily between the State Review Surveyor and the surveyor preparing the acquisition survey documents.
2) State acquisition survey plans shall be examined for all aspects of the contract, including presentation of data, plan clarity, minor errors or omissions, spelling or typographical errors, minor significant figure rounding errors, or issues in the common practice of land surveying in New Jersey.

## 11.4 Survey Review Process

1) The Green Acres Project manager is responsible for the flow of work between the Local Unit and the Green Acres Survey Review Section for all county, municipal, and nonprofit surveys.
2) The Green Acres Project manager is responsible for the flow of work between the Survey Contract Section and the Survey Review Section for all State land acquisition surveys.

# EXHIBIT I

Prepared by: ____________________________
Note for Preparer: < > indicates site-specific info to fill in
[ ] indicates optional language, depending on situation

**DEED OF CONSERVATION EASEMENT**

This Deed of Conservation Easement ("Easement"), made this <#> day of <month>, 20<year> is between the <name of settling party> ("Grantor"), having a principal place of business at <settling party address>, and the New Jersey Department of Environmental Protection ("Grantee"), having its principal place of business at 401 East State Street, Trenton, New Jersey 08625.

**WITNESSETH:**

Whereas, Grantor [and other parties] have entered a <type of settlement>, dated <date of settlement>, ("Settlement Agreement") with the New Jersey Department of Environmental Protection, the Commissioner of the New Jersey Department of Environmental Protection, [and the Administrator of the New Jersey Spill Compensation Fund (jointly, the "Department")] for the settlement of the Grantee's claims against Grantor for natural resource damages as alleged in the complaint in New Jersey Department of Environmental Protection, et al, v. <name of defendant/s> Docket No <docket #>.

Whereas, the purpose of the Settlement Agreement is to address injuries to <state injury – i.e. "groundwater arising from the discharge of hazardous substances"> at the <name of site>, encompassing approximately <#> acres, located on <name of road>, <municipality>, <county>; and

Whereas, as a condition of the Settlement Agreement, Grantor agreed to grant a conservation restriction on certain real property with a collective groundwater recharge value that will, upon their preservation, offset and compensate for the injuries to natural resources addressed in the Settlement Agreement. A copy of that <type of settlement> is attached as Appendix A; and

Whereas, Grantor is sole owner in fee simple of real property that consists of approximately <#> acres of land, designated as <block and lot> on the 202<year> tax map of the <municipality>, <county>, State of New Jersey, and more particularly described in a metes and bounds description and survey map of the property, prepared by <name of surveyor or firm>, dated <date> (the "Survey") attached hereto and made a part hereof as Appendix B (the "Property"); and

Whereas, the Property has resource qualities that provide natural resource services to the benefit of the general public by providing, among other such services, <list natural resource services, e.g. watershed protection, water quality protection, aquifer recharge potential, scenic vistas, a variety of wildlife habitat> ("Conservation Values"); and

Whereas, the qualities of the Property are further documented in an inventory of the Property in a "Present Condition Report" further described in Section 1.2, below. The Present Condition Report Summary and Signature Pages are attached to and made a part hereof as Appendix C; and

Whereas, Grantor intends, as owner of the Property, to convey to Grantee the right to preserve and protect the Conservation Values of the Property in perpetuity; and

Whereas, this Easement is entered into in accordance with the New Jersey Conservation and Historic Preservation Restriction Act, N.J.A.C. 13:8B-1 et seq., and shall be binding upon the Grantor its successors and assigns and upon the Grantee, its successors and assigns.

**NOW THEREFORE**, and in consideration for execution of the Settlement Agreement, the Grantor does hereby convey to the Grantee, a conservation easement above, below, upon, over and through the ground of the Property in perpetuity, pursuant to the laws of New Jersey, for the exclusive purpose of assuring that the Conservation Values will be conserved and maintained forever and that uses of the Property that are inconsistent with the Conservation Values are prohibited and will be prevented or corrected.

**1.** The recital clauses above are incorporated herein.

**2.** **Purpose.** The purpose of this Deed of Conservation Easement is to protect and maintain the Conservation Values of the Property forever, prevent any use of the Property that might or would impair or interfere with the Conservation Values, and, subject to the limitations set forth herein, allow only stewardship that is consistent with the terms of this Deed of Conservation Easement.

**2.1.** **Baseline Documentation:**

**2.1.1.** **Present Condition Report.** To enable Grantee to properly monitor and assure compliance with the terms of this Deed of Conservation Restriction, Grantor has provided to Grantee a Present Condition Report dated <date of report>containing such documentation as is, in the reasonable judgement of Grantee, necessary and sufficient to appropriately describe or depict the current conditions, uses, and features of the Property (collectively, the "Baseline Documentation"). The Baseline Documentation includes, without limitation, a survey map of the Property, photographs representative of the Property's current condition, and a summary description of the Property's size and location, various features of and natural resources associated with the Property, and uses currently being made of the Property. Grantor acknowledges that the Baseline Documentation accurately describes and depicts the Property as of the date of this Easement. The Present Condition Report shall be signed by both a representative of the Grantor and of the Grantee.

2.1.2. **Additional Baseline Documentation.** Grantee shall have the right, at its own cost, to update the Baseline Documentation to reflect changes in the Property, if any, resulting from natural occurrences or permitted activities that have taken place on the Property, and its agents, employees, and consultants shall have the right, upon reasonable notice, to enter the Property for this purpose. Grantor may, at its own cost and with the Grantee's consent, update the Baseline Documentation to reflect changes in the Property, if any, resulting from natural occurrences or permitted activities that have taken place on the Property.

2.1.4. **Maintenance and Legal Effect.** The Baseline Documentation shall be kept on file at the Grantee's and Grantor's offices and shall be accessible under reasonable notice during normal business hours. The parties agree that if a controversy arises about the condition, features, or uses of the Property as of the date of the Deed of Conservation Easement, the parties may, in addition to the Baseline Documentation, use other relevant or material documents, surveys, reports, and other evidence to assist in the resolution of the controversy.

3. **Prohibited Acts**. Any activity on or use of the Property inconsistent with the purpose of this Easement is prohibited. Without limiting the generality of the foregoing, the following activities and uses are expressly prohibited:

3.1. **Subdivision and Development**. Any new site disturbance, earth movement, construction or development or subdivision of the Property is expressly prohibited.

3.2.1. **Structures**. Construction on the Property of new "structures," as defined under the Municipal Land Use Law either temporary or permanent is specifically prohibited, including, but not limited to, the installation or construction of billboards and cellular phone towers, wind turbines, golf courses, solar fields, airstrips, and helicopter pads.

3.2.2. **Grading and Resource Extraction**. No topsoil, sand, gravel, loam, rock, or other minerals shall be deposited on, excavated, dredged, or removed from, the Property, except upon prior written notice to and written consent from the Grantee as may be necessary for activities permitted in Paragraph 4 below. No subsurface mining, drilling, directional drilling, or fracking for petroleum, natural gas or any other material extraction may occur on the Property.

3.2.3. **Roads, Driveways, and Impervious Cover**. No portion of the Property shall be covered with concrete, asphalt, oiled stone, or any other impervious paving material. No new roads or driveways may be constructed on the Property. [Existing roads and driveways may be maintained or replaced under Paragraph <paragraph #> herein, but must

be constructed with a porous material. No concrete, asphalt, oiled stone, or any other impervious paving material may be used to replace existing roads, driveways, or other impervious cover.]

**3.2.4. Trash**. No dumping or placing of trash or solid waste shall be permitted on the Property.

**3.2.5. Natural Resource Protection**. Except as expressly provided in Paragraph 4 below, no activity shall be permitted on the Property that would be detrimental to or otherwise impair the Conservation Values which include, but are not limited to, <drainage, flood control, water conservation, erosion control, or soil conservation>. Further, except as expressly provided in Paragraph 4 below, the destruction of plant life which would alter the existing pattern of vegetation, the use of fertilizers, herbicides or pesticides and/or the removal or clearing of live vegetation or trees, other than routine maintenance and mowing, shall be prohibited on the Property unless approved in advance by the Grantee, in writing, for maintenance and protection of the Conservation Values, habitat enhancement, invasive species removal or to prevent a safety hazard.

**3.2.6. Utilities and Rights of Way.** Any new installations of utilities, utility easements or grants of rights of way on the Property are expressly prohibited.

4. **Rights of Grantor:** The ownership rights of Grantor extend to Grantor's personal representatives, successors, and assigns, and include, but are not limited to, the right to sell or otherwise transfer the Property and the right to use and manage the Property in accordance with all applicable state, federal and local laws, provided such use is consistent with the purpose of this Deed of Conservation Easement. Subject to the prohibitions set forth in Paragraph 3, the following activities on and uses of the property are expressly permitted:

**[The following are sample permitted uses. This should be tailored to each individual property. Be sure to adjust numbering.]**

**4.1. Public Access/Trail Improvements.** To support public access to and use of the property, Grantor may, subject first to the Grantee's written consent: (1) maintain existing trails and install and maintain additional trails, provided that no trail shall be improved with macadam, gravel, paving stones or other impervious or semi-pervious material without the prior written approval of Grantee, which shall be in Grantee's sole discretion; (2) construct and maintain minor rustic boundary markers, trail markers, and other trail-related improvements reasonably necessary to their safe enjoyment or the control of runoff and trail-related damage, such as steps, bog bridges, erosion bars and railings, small unlighted information and interpretive signs, provided that they shall be constructed

of rustic natural colored materials that blend in with the natural surroundings and complement the natural and scenic features of the landscape; and (3) install barriers and low fences where necessary to prevent use or access by motor vehicles or to protect fragile natural resources. Grantor shall ensure that all permits, licenses or other authorizations required under all applicable laws, regulations or ordinances are obtained prior to any trail maintenance, improvement or construction activities.

4.2. **Maintenance of Forest.** Grantor shall have the right to expand or keep existing forest cover on the Property consistent with a Department-approved Forest Stewardship Plan or Woodland Management Plan.

4.3. **Maintenance of Open Fields.** Grantor shall have the right to maintain the existing field and meadow areas on the Property rather than allowing them to revert to successional woodland, consistent with a Department-approved [Meadow or Habitat] Management Plan.

4.4. **Control of Pest and Invasive Species.** Grantor may control non-native invasive species or vegetation and vegetation commonly considered to be pest species in accordance with an Invasive Species Control Plan approved by the Department.

4.5. **Removal of Hazardous Vegetation.** Grantor may, without prior consent of Grantee, trim or remove dead, fallen, diseased or infected trees, tree limbs, or plant material but only if they obstruct passage on paths, trails, roads or driveways; pose an imminent hazard to the safety of persons using the Property, or present a risk of infection to healthy non-invasive trees or plants. Despite the foregoing, dead or fallen trees or tree limbs or plant material may only be moved the minimum needed to clear paths and eliminate safety hazards, as dead and fallen trees, limbs and plant material provide habitat for flora and fauna.

4.6. **Existing Roads, Driveways and Impervious Cover.** Grantor shall retain the right to keep, utilize, and maintain existing roads and driveways. Replacement of the existing roads and driveways and any impervious cover may be performed provided Grantor does not expand the footprint of the existing road or driveway and uses only porous material and not pavement, concrete, asphalt, oiled stone, or any other impervious paving material. Existing roads, driveways and impervious cover are annotated on the Survey and documented in the Present Condition Report required under Paragraph 2.1.

4.7. **Existing Structures.** Grantor shall retain the right to keep, utilize, maintain operate, and as approved by Grantee in advance and in writing, which approval shall be in the Grantee's sole discretion replace with substantially similar items, all existing structures, which structures are annotated on the

Survey, without expanding the current footprint of each structure located on the Property, except as needed for compliance with building codes and other regulatory requirements.

4.8. **Retention of Utility Easements and Rights of Way.** Grantee acknowledges that this Easement is being taken subject to existing easements as noted on the Survey. Grantor shall retain the right to keep, utilize, maintain and replace in kind, but only in place all utility lines that currently transit on and through the Property and are otherwise annotated on the Survey pursuant to the terms set forth in the current easements and rights of ways. Easements shall not be relocated by Grantor unless approved by the Grantee in advance in writing whose approval shall be in the Grantee's sole discretion.

4.9. **Existing Security Enclosures and/or Fencing.** Grantor shall retain the right, at its discretion, to keep, utilize, maintain and replace in kind all existing security enclosures and/or fencing, which existing security enclosures and/or fencing are annotated on the Survey. Upon approval of a fencing plan by Grantee in writing, Grantor may be allowed to construct additional security fencing to exclude trespassers and fauna from sensitive natural areas to prevent their activities from harming the Conservation Values sought to be protected by this Easement.]

4.10. **Existing Agricultural Lease.** The lessee under the existing agricultural lease entered into prior to the date of acquisition of the Property and attached as Appendix D shall have the right to grow crops for food production within the fields currently under cultivation for the duration of the term of said lease. Upon expiration, any continuation of agricultural use of the property shall be at the sole discretion of the Grantee. Agricultural activities under said lease shall be consistent with the following: (1) they will not include sod, nurseries or other non-food crops, nor use of greenhouses or similar structures; and (2) application of fertilizers (including animal manure) and biocides will be in accordance with best management practices as recommended from time to time and in compliance with all environmental laws and governmental recommendations concerning the proper use and application of fertilizers and biocides to minimize pollution of aquifers, lakes, estuaries, watercourses and other water bodies. In determining consistency with best management practices, the parties shall apply such best management practices as are established at the time by first, the Rutgers Cooperative Extension Service for the county in which the property is located, second, the Natural Resource Conservation Service of the United States Department of Agriculture or, if same are no longer in effect, third, applicable recommendations, of the New Jersey Department of Agricultural, Standards for Soil Erosion and Sediment Control.. Nothing herein shall be construed to permit structures for agricultural use.

5. **Right of First Refusal**. Grantor and its successors and assigns agree to give Grantee or a Grantee-approved third-party designee the Right of First Refusal to acquire the Property, which right shall be of perpetual duration. The conditions of this Right shall be such that whenever Grantor receives a written offer from a person or persons to purchase all or any part of the Property, or to receive as a donation or for nominal consideration all or any part of the Property, and Grantor accepts the offer subject to this Right of First Refusal, the Grantor shall notify Grantee via certified mail of the offer. Grantee may elect to acquire the Property on not less favorable terms and conditions as those contained in the conditionally accepted offer. Grantee shall have 90 calendar days to elect to acquire the Property and will notify the Grantor by certified mail of such an election. If Grantee shall fail to notify Grantor within such 90-day period of its exercise of the Right of First Refusal, Grantor will be free to transfer the Property to a third party on the terms set forth in the offer. The Right of First Refusal shall apply to all offers for interests in the Property. The Right of First Refusal shall not apply to any proposed sale of the Property to any federal or state entity.

6. **Rights of Grantee**. To accomplish the conservation purposes of this Easement the following rights are conveyed to the Grantee:

6.1. **Enforcement**. Grantee has the right to preserve and protect the Conservation Values of the Property and enforce the terms and conditions of this Easement.

6.2. **Inspection**. Grantee and its agents shall be permitted access to, and have the right to enter upon, the Property for the purposes of inspection in order to enforce and assure compliance with the terms and conditions of this Easement.

7. **Responsibilities of Grantor and Grantee not affected**. Other than as specified herein, this Easement is not intended to impose any legal or other responsibility on the Grantee, or in any way to affect any existing obligations of the Grantor as owner of the Property. This shall apply to:

7.1. **Taxes**. Grantor shall continue to be solely responsible for payment of all taxes and assessments levied against the Property.

7.2. **Upkeep and Maintenance**. The Grantor, as owner of the Property, shall continue to be solely responsible for the upkeep and maintenance of the Property, to the extent it may be required by law. The Grantee shall have no obligation for the upkeep or maintenance of the Property. Nothing in this Easement shall require the Grantor to take any action to restore the condition of the Property after any Act of God or other event over which it had no control.

7.3. **Liability and Indemnification**. Grantor shall hold harmless, indemnify, and defend Grantee and its employees, agents, and contractors, and their successors and assigns from and against all liabilities, penalties, costs, losses, damages, expenses, or claims including, without limitation, attorneys fees, arising from or in any way connected with injury to or the death of any person or physical damage to any property resulting from any act, omission, condition, or other matter related to, or occurring on or about, the Property, regardless of cause, unless due solely to the negligence or wrongful willful acts or omissions of the indemnified parties. Grantor's agreement to hold harmless and indemnify Grantee shall not affect any statutory protections available to the Grantor under the Landowner's Liability Act, N.J.S.A 2A:42A-2, et seq.

8. **Remedies**. The Grantee shall have the right to prevent and correct violations of the terms of this Easement. Enforcement of the terms of this Easement shall be at the discretion of the Grantee and any failure on behalf by the Grantee to exercise its rights hereunder shall not be deemed or construed to be a waiver of the Grantee of those rights. This shall be true regardless of the number of violations of the terms of this Easement by the Grantor that occur or the length of time it remains unenforced. If the Grantee finds what it believes is a violation of the terms of this Easement, it may without limitation as to other available legal recourse, at its discretion take any of the following action:

8.1. **Notice of Violation; Corrective Action**. If Grantee determines that a violation of the terms of this Easement has occurred or is threatened, Grantee shall give written notice to Grantor of such violation and demand corrective action sufficient to cure the violation in accordance with a plan approved by the Grantee.

8.2. **Injunctive Relief**. If Grantor fails to cure the violation within 45 days after receipt of written notice from the Grantee, or under circumstances where the violation cannot reasonably be cured within a 45-day period, fails to begin curing such violation, or fails to continue diligently to cure such violation until finally cured, Grantee may bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of this Easement, to enjoin ex parte the violation by temporary or permanent injunction, and to require the restoration of the Property to the condition that existed prior to such injury. The Grantor acknowledges that any actual or threatened failure to comply or cure will cause irreparable harm to the Grantee and that money damages will not provide an adequate remedy.

8.3. **Damages**. Grantee shall be entitled to recover damages for violation of the terms of this Easement or injury to any Conservation Values protected by this Easement, including, without limitation, damages for the loss of Conservation Values. Without limiting Grantors' liability, Grantee, in its

sole discretion, may apply any damages recovered to the cost of undertaking any corrective action on the Property.

8.4. **Costs of Enforcement**. In any case where a court finds that a violation has occurred, all costs incurred by Grantee in enforcing the terms of this Easement against Grantor, including, without limitation, costs and expenses of suit, and attorneys' fees, and any costs of restoration necessitated by Grantor's violation of the Easement shall be borne by the Grantor.

9. **Development Rights**. Grantor hereby grants to Grantee all development rights or credits that are now or hereafter allocated to, implied, reserved or inherent in the Property, and the parties agree that such rights are terminated and extinguished, and may not be used on or transferred to any portion of the Property as it now or hereafter may be bounded or described, or to any other property adjacent or otherwise, nor used for the purpose of calculating permissible lot yield on the Property or any other property.

10. **Grantor's Warranties**.

10.1. **Covenant as to Grantor's Acts.** Grantor promises that, except for this Easement [and <describe any other pre-existing easements such as utility easements> as shown on the Survey], Grantor has done no act to encumber the Property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that Grantor has not allowed anyone else to obtain any legal rights that affect the Property (such as by making a mortgage or allowing a judgment to be entered against Grantor).

10.2. **Hazardous Substances**. Grantor warrants no actual knowledge of the presence of any hazardous substance, as that term is defined at N.J.S.A. 58:10-23.11b, on the Property. Grantor hereby promises to defend and indemnify Grantee against all litigation, claims, demands, penalties, and damages by non-parties, arising from or connected with any discharge of hazardous substances or other violation of federal, state, or local environmental laws.

11. **Amendment of Easement**. This easement may be amended only with the written consent of Grantee and Grantor. Any such amendment shall be consistent with the purposes of this Easement and with the laws of the State of New Jersey and any regulations promulgated pursuant to those laws. Amendments may require, where applicable, approval by the NJDEP Commissioner under the New Jersey Conservation and Historic Preservation Restriction Act, N.J.S.A. 13:8B-1 et seq.

12. **Interpretation**. This Easement shall be interpreted under the laws of the State of New Jersey, resolving any ambiguities and questions of the validity of specific provisions so as to give maximum effect to its conservation purposes.

**13.** **Perpetual Duration**. This Easement shall be a servitude running with the land in perpetuity. Every provision of this Easement that applies to the Grantor or Grantee shall also apply to their respective agents, executors, administrators, assigns, and all other successors as their interests may appear. The Grantor agrees that the terms, conditions, restrictions and purposes of this Easement shall be inserted in any subsequent deed, lease, sub-lease or other legal instrument by which the Grantor divests itself of any interest in the Property.

**14.** **Notices**. Any notices required by this Easement shall be in writing and shall be personally delivered or sent by first class mail, to Grantor and Grantee at the following addresses, unless a party has been notified of a change of address:

To Grantor:
<Grantor Contact Info>
<Grantor Contact Address>
<Grantor Contact City State Zip>

To Grantee:
New Jersey Dept. of Environmental Protection
c/o Chief, Office of Natural Resource Restoration
Mail Code 501-04; PO Box 420
501 East State Street
Trenton, NJ 08625

**15.** **Miscellaneous.**

**15.1.** The laws of the State of New Jersey shall govern the interpretation and performance of this Deed of Conservation Restriction.

**15.2** If any provision of this Easement or the application thereof to any person or circumstance is found to be invalid, the remainder of the provisions of this Easement, or the application of such provision to persons or circumstances other than those as to which it is found to be invalid, as the case may be, shall not be affected thereby.

**15.3.** This Easement sets forth the entire agreement of the parties and supersede all prior discussions, negotiations, understandings or agreements relating to the Easement, all of which are merged herein. No alteration or variation of this Easement shall be valid or binding unless contained in writing executed and recorded by the parties hereto.

**15.4.** Should there be more than one Grantor, the obligations imposed by this Easement upon each Grantor shall be joint and several.

**15.5.** The captions in this Easement have been inserted solely for convenience of

reference and are not a part of this Easement and shall have no effect upon construction or interpretation.

**15.6.** Execution of this Easement does not constitute a waiver of the rights or ownership interest of the State of New Jersey in public trust property.

**15.7.** This Easement shall be construed as if it were drafted by both parties. Both parties waive all statutory and common law presumptions which might otherwise serve to have the instrument construed in favor of, or against, either party as the drafter hereof.

**15.8.** Throughout this Easement, the singular shall include the plural, and the masculine shall include the feminine unless the text indicates otherwise.

**15.9.** This Easement may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Grantor has hereunder set his/her/their hand and seal on the day year first written above.

______________________________ ______________________________
Witness as to Signature of Grantor ,<Name> Grantor

By: ______________________________
Signature

______________________________
<Print Full Name Signed Above>

______________________________
<Title >

STATE OF NEW JERSEY )
) ss.
COUNTY OF <county> )

On ___________, ______________________ personally appeared before me who I am satisfied is the person named in and who executed this Instrument and they acknowledged that they signed, sealed and delivered the same as their act and deed, for the uses and purposes therein expressed, and that the full and actual consideration paid or to be paid for this easement as such consideration is defined in P.L. 1969, c49 is reflected in the <Type of Settlement>, dated <date of settlement>, referenced above.

______________________________

**Attachments:**

Appendix A – Settlement Agreement

Appendix B – Metes and Bounds Description and reduced survey of Property and Map of Land subject to Conservation Easement ("Property")

Appendix C – Present Condition Report

[Appendix D – Agricultural Lease]

**APPENDIX A –** SETTLEMENT AGREEMENT

**APPENDIX B** – METES AND BOUNDS DESCRIPTION OF THE PROPERTY AND MAP OF PROPERTY SUBJECT TO CONSERVATION EASEMENT

Metes and bounds description and map of the Easement Property based upon a survey prepared in accordance with New Jersey Green Acres, "Minimum Specifications for Land Surveys and Property Descriptions," which is available at: http://www.state.nj.us/dep/greenacres.

**APPENDIX C**

**Present Condition Report**
**Summary and Signature Pages**

The purpose of the following is to memorialize the original intent for the Conservation Easement, and to record the present conditions of the property to be conserved. The parties may update the baseline Present Condition Report should conditions change.

1. Type of Easement:

2. Current Landowner:
    Name:
    Address:
    Phone:

3. Location of Property:
    Municipality:
    County:
    Lot and Block:
    Acres:

4. Describe the property condition, including land use and management; ecological communities, historical, archaeological, geological, or other features; including the condition of any specific property areas or features that may change when the landowner exercises reserved rights:

5. Describe the property access:

6. List buildings or structures on the property, including houses, sheds, barns, etc. Describe purpose and show location on map.

7. Describe adjacent land uses:

8. Describe Purpose of Easement (Why the property was protected):

Data collected by:
Date baseline data collected:
Attachment checklist:
______ Survey & Legal Description
______ Tax Map
______ Road Map
______ Aerial map
______ Photograph Location Map (can be on aerial map)
______ Representative Photographs of Property, including access, existing trails, all structures/buildings, keyed to Location Map

**Signature Page**

I acknowledge that the within baseline documentation form dated [DATE] is an accurate representation, to the best of my knowledge, of portions of Block 20, Lot 1; Block 21, Lots 2 through 7; Block 22, Lot 1; and Block 23, Lot 1 on the tax map of the Borough of Sayreville, Middlesex County, State of New Jersey at the date that the baseline report data was collected.

I acknowledge that the within baseline documentation is a true, fair and accurate representation of existing conditions on the property which is referenced to and described in the conservation easement between Department of Environmental Protection and [_____].

___________________________________
BY:
Department of Environmental Protection
Date:

___________________________________
BY:
<Settling Party Representative>
Date:

**[APPENDIX D]**

Attach existing Agricultural Lease (if applicable)